JONATHAN E. NUECHTERLEIN
General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

FILED
CLERK, U.S. DISTRICT COURT
JUN 16 2015
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
JUN 15 2015
CENTRAL DISTRICT OF CALIFORNIA
_____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

BUNZAI MEDIA GROUP, INC.,
et al.,

Defendants.

Case No. CV15-04527-GW(PLAx)

FILED UNDER SEAL

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

MEMORANDUM IN SUPPORT OF TRO APPLICATION

JONATHAN E. NUECHTERLEIN
General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Case No. CV15-04527-GW(PLAx)

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | FILED UNDER SEAL |
| Plaintiff, | PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE |
| v. | |
| BUNZAI MEDIA GROUP, INC., *et al.,* | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

# TABLE OF CONTENTS

Page

I.  Introduction ........................................................................................ 1

II. Defendants' Business Practices are Permeated with Deception .................... 3

  A. Defendants Deceptive "Risk Free Trial" Offers ..................................... 4

    1.  Defendants' Advertisements Contain Material Misrepresentations .. 4

    2.  Defendants' Offers Fail to Disclose Material Terms ........................ 9

    3.  Defendants' Purported Disclosures are Inadequate ........................ 11

    4.  Defendants' Post-Sale Communications Do Not Disclose Material Terms ....................................................................................... 14

  B. Defendants Do Not Honor their Cancellation and Refund Policies ...... 15

  C. Defendants Deceive their Payment Network and Threaten Consumers who Seek Chargebacks ...................................................................... 17

III. The Defendants ................................................................................. 20

  A. Corporate Defendants ........................................................................ 20

    1.  BunZai Media Group, Inc. ("BunZai") ...................................... 20

    2.  Pinnacle Logistics, Inc. ("Pinnacle") ........................................ 21

    3.  Media Urge, Inc. ...................................................................... 22

    4.  CalEnergy, Inc. ......................................................................... 23

    5.  Adageo, LLC ............................................................................ 23

    6.  SBM Management, Inc. ............................................................. 24

    7.  The Shell Corporations ............................................................. 24

  B. Individual Defendants ........................................................................ 25

    1.  Alon Nottea .............................................................................. 25

    2.  Motti Nottea ............................................................................. 27

    3.  Doron Nottea ............................................................................ 27

    4.  Igor Latsanovski ....................................................................... 28

    5.  Oz Mizrahi ............................................................................... 28

    6.  Roi Reuveni .............................................................................. 29

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

7. Khristopher Bond, also known as Raymond Ibbot.......................... 30

IV. Legal Argument .............................................................. 30

A. The Court Possesses Authority to Grant the Requested Relief.............. 31

B. The FTC is Likely to Succeed on the Merits ................................ 33

1. Defendants are Violating Section 5 of the FTC Act........................ 33

i.   Defendants Fail to Disclose Clearly the Material Terms of Their Offer and Falsely Represent that their Trial Offer is "Risk Free" ..................................................... 35

ii.   Defendants Falsely Represent that their Business is Accredited by the Better Business Bureau with an "A-" Rating ................................................................. 36

iii.   Defendants Unfairly Charge Consumers without Authorization ............................................................. 37

2. Defendants are Violating the Restore Shoppers Online Confidence Act ............................................................ 37

3. Defendants are Violating the Electronic Fund Transfer Act and Regulation E............................................................. 38

C. Balancing of the Equities Serves the Public Interest ...................... 40

D. Defendants are Each Liable for the Law Violations ........................ 41

1. The Corporate Defendants Operate as a Common Enterprise......... 41

2. The Individuals are Liable for Injunctive and Monetary Relief...... 44

E. An *Ex Parte* TRO with Asset Freeze and Receiver is Essential to Prevent Further Harm to Consumers, Prohibit Defendants from Dissipating Assets or Destroying Documents, and to Preserve the Court's Ability to Award Effective Final Relief .................................... 45

1. The Proposed TRO Should be Entered *Ex Parte* ..................... 47

2. An Asset Freeze is Critical to Preserve Effective Consumer Relief 48

3. A Receiver is Appropriate in this Case ............................... 48

4. Expedited Discovery and Immediate Access to Defendants' Business Premises are Essential ........................................ 49

V. Conclusion ................................................................... 50

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AT&T Broadband v. Tech Comm'n., Inc.*,
   381 F.3d 1309 (11th Cir. 2004) ................................................48
*FTC v. 3rd Union Card Servs., Inc.*,
   No. 04-00712 (D. Nev. May 25, 2004) ....................................2
*FTC v. Affordable Media, LLC*,
   179 F.3d 1228 (9th Cir. 1999) ..............................................30
*FTC v. Am. Mortg. Consulting Grp.*,
   No. SACV12-01561 DOC (JPRx), 2012 WL 4718927 (C.D. Cal. Oct. 1, 2012)
   .............................................................................................30
*FTC v. Am. Nat'l Cellular, Inc.*,
   810 F.2d 1511 (9th Cir. 1987) ..............................................30
*FTC v. Amy Travel Serv., Inc.*,
   875 F.2d 564 (7th Cir. 1989) ........................................ 44, 45
*FTC v. Arlington Press, Inc.*,
   No. CV-98-9260-MMM(CWX), 1999 WL 33574020 (C.D. Cal. Jan. 11, 1999)
   .............................................................................................31
*FTC v. Brown & Williamson Tobacco Corp.*,
   778 F.2d 35 (D.C. Cir. 1985) ................................................35
*FTC v. BTV Indus.*,
   No. 02-00437 (D. Nev. Apr. 16, 2002) ..................................2
*FTC v. Consumer Advocates Grp. Experts, LLC*,
   No. CV12-04736 DDP (CWx), 2012 WL 2061702 (C.D. Cal. June 7, 2012)....30
*FTC v. Cyberspace.com LLC*,
   453 F.3d 1196 (9th Cir. 2006) ..............................................33
*FTC v. Cyberspace.com, LLC*,
   2002 U.S. Dist. LEXIS 25564, (W.D. Wash. July 10, 2002)............35
*FTC v. Direct Marketing Concepts, Inc.*,
   624 F.3d 1 (1st Cir. 2010) .....................................................35
*FTC v. Elec. Processing Servs., Inc.*,
   No. 02-00500 (D. Nev. Apr. 11, 2002) ..................................3
*FTC v. ERG Ventures, LLC*,
   No. 06-00578 (D. Nev. Oct. 31, 2006) ..................................2
*FTC v. Figgie Int'l, Inc.*,

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

Page | iv

994 F.2d 595 (9th Cir. 1993) ......................................................... 33, 34

*FTC v. Five-Star Auto Club, Inc.*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000). ...............................................36

*FTC v. Gill,*
265 F.3d 944 (9th Cir. 2001) ..........................................................33

*FTC v. Gill,*
71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999)....................................35

*FTC v. Global Mktg. Grp., Inc.*,
594 F. Supp. 2d 1281 (M.D. Fla. 2008) ...........................................37

*FTC v. Global Net Solutions, Inc.*,
No. 05-00002 (D. Nev. Jan. 3, 2005) ...............................................3

*FTC v. Grant Connect, LLC,*
No. 09-01349 (D. Nev. July 28, 2009) ..............................................2

*FTC v. H.N. Singer, Inc.*,
668 F.2d 1107 (9th Cir. 1982) .........................................................30

*FTC v. Health Formulas, LLC,*
Case No. 2:14-cv-01649-RFB-GWF, 2015 U.S. Dist. LEXIS 59387 (D. Nev.
May 6, 2015)............................................................................ 2, 31

*FTC v. Infusion Media, Inc.*,
No. 09-01112 (D. Nev. June 24, 2009) ..............................................2

*FTC v. Ivy Capital, Inc.*,
No. 11-00283 (D. Nev. Feb. 22, 2011)...............................................3

*FTC v. J.K. Publ'ns, Inc.*,
99 F. Supp. 2d 1176 (C.D. Cal. 2000)..................................... 37, 42, 43

*FTC v. Nat'l Audit Defense Network, Inc.*,
No. 02-00131 (D. Nev. Feb. 1, 2002).................................................3

*FTC V. Nat'l Vending Consultants, Inc.*,
No. 05-00160 (D. Nev. Feb. 8, 2005) ................................................3

*FTC v. National Foreclosure Relief, Inc.*,
No. SACV09-117-DOC(MLGx), 2009 WL 650401 (C.D. Cal. Mar. 6, 2009)..30

*FTC v. NCH, Inc.*,
1995-2 Trade Cas. (CCH) ¶71,113 (D. Nev. 1995) ...........................33

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) .........................................................43

*FTC v. Pantron I Corp.*,
33 F.3d 1088 (9th Cir. 1994) ...................................................... 33, 36

*FTC v. Pioneer Enters., Inc.*,
1992-2 Trade Cas. (CCH) ¶70,043 (D. Nev. 1992) ...........................33

*FTC v. Porter & Deitsch,*
605 F.2d 294 (7th Cir. 1979) ..........................................................35

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   *FTC v. Publ'g Clearing House, Inc.*,
      104 F.3d 1168 (9th Cir. 1997) .................................................... 44, 45
2   *FTC v. Sharp*,
      782 F. Supp. 1445 (D. Nev. 1991) ...................................................45
3   *FTC v. Tyme Lock 2000, Inc.*,
      No. 02-01078 (D. Nev. Aug. 19, 2002).............................................3
4   *FTC v. Warner Commc'ns, Inc.*,
      742 F.2d 1156 (9th Cir. 1984) ........................................................31
5   *FTC v. Williams*,
      No. C11-828 MJP (W.D. Wash. 2011)..............................................46
6   *FTC v. Wolf*,
      1997-1 Trade Cas. (CCH) ¶ 71,713 (S.D. Fla. 1997)......................42
7   *FTC v. World Travel Vacation Brokers, Inc.*,
      861 F.2d 1020 (7th Cir. 1988) ........................................................33
8   *FTC v. World Wide Factors, Ltd.*,
      882 F.2d 344 (9th Cir. 1989) ........................................... 31, 32, 41
9   *In re Vuitton et Fils*,
      606 F.2d 1 (2d Cir. 1979) ...............................................................48
10  *Johnson v. Couturier*,
      572 F.3d 1067 (9th Cir. 2009) ........................................................49
11  *SEC v. First Fin. Group*,
      645 F.2d 429 (5th Cir. 1981) ..........................................................50
12  *SEC v. Manor Nursing Ctrs., Inc.*,
      458 F.2d 1082 (2d Cir. 1972) .........................................................49
13  *Simeon Mgmt. Corp. v. FTC*,
      579 F.2d 1137 (9th Cir. 1978) ........................................................35
14  *United States v. Odessa Union Warehouse Co-op*,
      833 F.2d 172, 176 (9th Cir. 1987).................................................32
15
16  15 U.S.C. § 1693e(a) ................................................................. 30, 37
    15 U.S.C. § 1693l..............................................................................37
    15 U.S.C. § 1693o(c)........................................................................38
17  15 U.S.C. § 45(a) .............................................................................30
    15 U.S.C. § 53(b) .............................................................................28
18  15 U.S.C. § 57a................................................................................36
    15 U.S.C. § 8403........................................................................ 30, 36
19  15 U.S.C. § 8404..............................................................................36
    15 U.S.C. §§ 1693o(b)-(c)...............................................................38
20  12 C.F.R. § 205.10(b) ................................................................ 30, 37

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

12 C.F.R. Part 205, Supp I, ¶ 10(b), comments (5) & (6) ....................................37
16 C.F.R. § 310.2(u) ..................................................................................36

## OTHER AUTHORITIES

Fed. R. Civ. P. 1 ........................................................................................49
Fed. R. Civ. P. 65(b) ..................................................................................46
Fed. R. Civ. P. 26(d) ..................................................................................49
Fed. R. Civ. P. 34(b) ..................................................................................49

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

## I.   Introduction

Defendants market skincare products over the Internet using deceptive offers with hidden costs, negative option features, and return policies. Specifically, Defendants falsely offer "risk free trials" or "gifts" of products to consumers nationwide, using online banners, popup advertisements, and websites. In truth, Defendants' offers are designed to trick consumers into purchasing Defendants' product and enrolling in a continuity plan that charges consumers for additional products each month.

Defendants require consumers who accept their "risk free trial" or "gift" to provide credit or debit card billing information, purportedly to pay nominal shipping and handling fees to receive the advertised products. However, 10 days after receiving consumers' billing information, Defendants charge consumers the full costs of the products—imposing charges of up to $97.88 onto consumers' credit or debit cards. Defendants also enroll consumers into a negative option continuity plan, in which Defendants ship additional products each month and charge consumers' credit or debit cards the full costs of the products, usually $97.88 per month. Finally, Defendants refuse to provide consumers with refunds for product returns unless the products are returned unused and unopened within 30 days of the order's placement. Defendants' practices violate Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 4 of the

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, Section

2   907(a) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and

3   Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), and have caused

4   millions of dollars of consumer injury.

5       In similar cases, where a business is permeated by deception and causing

6   significant consumer injury, the FTC typically requests, and district courts have

7   regularly entered, *ex parte* temporary restraining orders enjoining the law

8   violations and freezing Defendants' assets.[1] There is strong precedent in Ninth

9   Circuit district courts for granting such *ex parte* relief in FTC cases.[2] This relief is

10  _____

11  [1] *See, e.g., FTC v. Grant Connect, LLC*, No. 09-01349 (D. Nev. July 28, 2009)
    (Pro, J.) (granting *ex parte* TRO including asset freeze); *FTC v. Infusion Media,*

12  *Inc.*, No. 09-01112 (D. Nev. June 24, 2009) (Hunt, J.) (granting *ex parte* TRO
    including asset freeze); *FTC v. ERG Ventures, LLC*, No. 06-00578 (D. Nev. Oct.

13  31, 2006) (McKibben, J.) (granting *ex parte* TRO including asset freeze); *FTC v.
    3rd Union Card Servs., Inc.*, No. 04-00712 (D. Nev. May 25, 2004) (Jones, J.)

14  (granting *ex parte* TRO including asset freeze); *FTC v. BTV Indus.*, No. 02-00437
    (D. Nev. Apr. 16, 2002) (Hicks, J.) (granting *ex parte* TRO including asset
    freeze).

15

16  [2] *See, e.g., FTC v. Health Formulas, LLC*, Case No. 2:14-cv-01649-RFB-GWF,
    (D. Nev. Oct 9, 2014); *FTC v. Ivy Capital, Inc.*, No. 11-00283 (D. Nev. Feb. 22,

17  2011) (Mahan, J.) (granting *ex parte* TRO including asset freeze, immediate
    access, and receiver); *FTC V. Nat'l Vending Consultants, Inc.*, No. 05-00160 (D.

18  Nev. Feb. 8, 2005) (Jones, J.) (granting *ex parte* TRO including asset freeze,
    immediate access, and receiver); *FTC v. Global Net Solutions, Inc.*, No. 05-00002

19  (D. Nev. Jan. 3, 2005) (Pro, J.) (granting *ex parte* TRO including asset freeze and
    immediate access); *FTC v. Tyme Lock 2000, Inc.*, No. 02-01078 (D. Nev. Aug. 19,

20  2002) (Mahan, J.) (granting *ex parte* TRO including asset freeze, receiver, and
    immediate access); *FTC v. Elec. Processing Servs., Inc.*, No. 02-00500 (D. Nev.
    Apr. 11, 2002) (Hicks, J.) (granting *ex parte* TRO including asset freeze and

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  essential to prevent further harm to consumers, to prohibit Defendants from

2  dissipating assets or destroying documents, and to preserve the Court's ability to

3  award effective final relief for Defendants' law violations.

4  **II.     Defendants' Business Practices are Permeated with Deception[3]**

5         Defendants have advertised, marketed, distributed, and sold skincare products

6  online from multiple Internet websites, including auraviefreetrial.com, and

7  mymiraclekit.com, and miraclefacekit.com, since at least 2010.[4] Defendants

8  deceptively offer free trials of their products under a variety of brand names,

9  including "AuraVie," "Dellure," and "Miracle Face Kit" (collectively,

10 "AuraVie").[5] Defendants' offers fail to disclose clearly and materially

11 misrepresent the terms of their offers.

12

13

---

14 immediate access); *FTC v. Nat'l Audit Defense Network, Inc.*, No. 02-00131 (D.
   Nev. Feb. 1, 2002) (George, J.) (granting *ex parte* TRO including asset freeze,
15 immediate access, and receiver).

16 [3] The FTC's evidence is collected into an Appendix of Evidence ("App.") that, for
   ease of citation and reference, is consecutively paginated. The appendix includes
17 declarations from federal trade investigators, deceived consumers, an investigator
   with the Florida Attorney General, a United Postal Service Inspector, and the
18 Better Business Bureau.

19 [4] *See* App. 11-12; App. 173, 176, 179, 182.

20 [5] App. 11 ¶22; App. 783 ¶13.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1

### A. Defendants Deceptive "Risk Free Trial" Offers

2

#### 1. Defendants' Advertisements Contain Material Misrepresentations

3

4      Defendants contract with a network of third parties, known as "affiliate

5  marketers," to direct consumers to Defendants' websites.[6] Affiliate marketers use

6  a variety of Internet advertising techniques, including banner and pop-up

7  advertisements, sponsored search terms, and special offers to drive consumer

8  traffic to Defendants' websites.[7] Defendants provide affiliate marketers with

9  advertisements describing their offers for the affiliate marketers to use.[8] Some

10  affiliate marketers also create their own advertising.[9]

11      Defendants also purchase advertising space on third-party websites, such as

12  Amazon.com, Facebook.com, and HomeDepot.com, and offer consumers a "risk

13  free trial," "trial order," or "gift" of Defendants' products.[10] After consumers click

14  on these advertisements and are directed to Defendants' websites, Defendants lure

15  consumers into providing their credit or debit card information by representing

16  
_____

[6] App. 13-14 ¶30.

17  [7] *Id.*

18  [8] *Id.*

19  [9] *Id.*

20  [10] *See* App. 650 ¶2; App. 741 ¶2; App. 754 ¶2.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1 | that consumers need to pay only a nominal shipping and handling charge,

2 | typically $4.99 or less, to receive a "risk free trial," "trial order," or "gift."[11]

3 |       Defendants' websites prominently claim that their offer is merely a "trial":



(screen capture from http://auraviefreetrial.com, last visited August 28, 2014)[12]

Additionally, many consumers also report receiving popup surveys that offer the products as a "gift" or "giveaway" that is seemingly associated with the website

---

[11] *See* App. 27 ¶55, App. 31 ¶65; App. 650 ¶2; App. 675 ¶2; App. 741 ¶2; App. 760 ¶2.

[12] App. 27 ¶¶54-55; App. 465.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1 | they have visited:



Visitor Survey:

# Amazon

You've been selected to take part in an anonymous survey for visitors in the **San Francisco, California** area. Tell us what you think of **Amazon** in this 30 second questionnaire, and to say "thank you", we'll offer you a few exclusive giveaways. Available Today Only: **Thursday, May 28, 2015**

**Question 1 of 4: What is your Gender?**

○ Female
○ Male

Copyright 2011-2012 All rights reserved. We are not affiliated nor partnered, with Amazon. Amazon has not authored, participated in, or in any way reviewed this advertisement or authorized it. The trial products offered on the last page pay this website for orders placed. See important terms and conditions regarding this ad here.

(http://consumers- research.com/survey/TV.c1.php?t202id= 71048&t202kw=amazon; URL is no longer available, but an archive of the can be seen at https://archive.org/web).[13]

After completing the survey, consumers are offered a selection of products they can select as their "prize," including an AuraVie "risk FREE trial," which is allegedly available for only the $4.99 cost of shipping:

---

[13] App. 30-31 ¶¶ 63-65.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1

**We have the following special offers for your participation.** You may
choose only (1) prize from the list below for participating in our survey!
Available today only: **Thursday, May 28, 2015**

2

3

**Fujifilm- Camera
FINEPIX AX500**
Regular Price $129.98
Your price today: $1
Quantity Left: (2)

*Select Reward*

Coupon *Amazon*
applied for reduced shipping price

4

5

**iPod Shuffle-**
Regular Price $89.98
Your Price today: $1
Quantity Left: (2)

*Select Reward*

Coupon *Amazon*
applied for reduced shipping price

6

7

**Auravie ® Anti-Aging System**
Regular Price $98.97
Yours:Risk FREE trial*
Pay Shipping Only: $4.99
Quantity Left: (1)

*Select Reward*

Use Coupon *Amazon*
for reduced shipping price

8

9

**Green Coffee Bean ® Diet
Burn Fat Without Diet or Exercise!**
Regular Price $69.98
Yours: Risk FREE trial*
Pay Shipping Only: $1.95
Quantity Left:(2)

*Select Reward*

Use Coupon *Amazon*
for reduced shipping price

10

11

**Electronic Cigarettes Kit-
Tastes Like a Real Cigarette!**
Regular Price $98.97
Yours:Risk FREE trial*
Pay Shipping Only: $4.95
Quantity Left: (1)

*Select Reward*

Use Coupon *Amazon*
for reduced shipping price

page 1 |

12

13

(http://consumers- research.com/survey/TV.c1.php?t202id=
71048&t202kw=amazon; captured by https://archive.org/web).[14]

14

And although many consumers will incur charges for the trial offer, Defendants

15

promote it as a "risk free trial" and, on most sites, claim that customer satisfaction

16

is "100% guaranteed":

17

18

19

20

---

[14] App. 30-31 ¶¶63-65.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**



(screen capture from http://mymiraclekit.com, last visited April 13, 2015)[15]

Defendants also use deceptive pop-up advertisements that discourage consumers from leaving Defendants' websites without accepting their offer. When consumers attempt to leave the websites, a text box appears that offers to ship the trial offer at an even lower shipping price.[16] These pop-up advertisements contain false representations that AuraVie is accredited by the Better Business Bureau ("BBB") with an "A-" rating:

[15] App. 11 ¶25; App. 479.

[16] App. 467.1.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   (screen capture from http://auraviefreetrial.com, last visited April 13, 2015)[17]

2   In fact, AuraVie is not accredited by the BBB and has an F rating with the BBB.[18]

3   ### 2.  Defendants' Offers Fail to Disclose Material Terms

4     Defendants' marketing practices employ hidden costs, negative option

5   continuity plan features and, return policies, and are materially deceptive. In their

6   advertisements and sales offers, Defendants fail to disclose clearly that they will

7   charge consumers' credit or debit accounts for the trial product, typically as much

8   as $97.88, after a 10-day period.[19] Defendants also fail to disclose clearly that

9   consumers who accept the trial offer will be enrolled into a continuity program.

10  Under the continuity program, Defendants send consumers monthly shipments of

11  Defendants' skincare product and charge consumers' credit or debit cards the full

12  cost of each product shipped.[20]

13    Consumers are typically unaware that they have been billed for

14  Defendants' products and enrolled in this continuity program until they discover

15  _____

16  [17] App. 467.1; App. 11 ¶24.

17  [18] App. 789-90 ¶5.

18  [19] App. 651 ¶¶3, 5-6; App. 692-93 ¶¶3-5; App. 697 ¶5; App. 705-06 ¶¶2, 6; App.
    714-15 ¶¶3-5; App. 727-28 ¶¶2-5; App. 735 ¶5; App. 742-43 ¶7; App. 755 ¶¶4-6.

19

20  [20] App. 652 ¶6; App. 668-69 ¶¶8, 14; App. 693 ¶4; App. 706 ¶6; App. 742-43 ¶7;
    *See also* App. 676 ¶6; App. 728 ¶5; App. 742-43 ¶7.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    the charges—usually $97.88—on their credit or debit card statements.[21] Often, by

2    that time, Defendants contend that it is too late for consumers to return the

3    products and obtain a refund.[22]

4          Finally, although they promote their offer as "risk free" with "100%

5    satisfaction guaranteed," Defendants fail to disclose, or disclose clearly, material

6    terms of their return policy.[23] Defendants fail to disclose clearly that opened

7    product must be returned and received by Defendants within 10 days of placing

8    the order to avoid a $97.88 fee.[24] Defendants also fail to disclose clearly that after

9    10 days, only unopened products may be returned for a refund—and that no

10   refunds will be provided for any product returned after 30 days.[25]

11

---

12   [21] App. 675 ¶3; App. 692 ¶3; App. 697 ¶5; App. 705 ¶3; App. 728 ¶4; App. 731
     ¶3; App. 734 ¶3; App. 738 ¶5; App. 742 ¶6; App. 755 ¶5; App. 761 ¶4; *See also*
13   App. 715 ¶4.

14   [22] App. 652 ¶6; App. 676 ¶6; App. 693 ¶4; App. 706 ¶6; App 735 ¶5.

15   [23] App. 650-52 ¶¶2-6; App. 653 ¶10; App. 677 ¶8; App. 716 ¶8; App. 737 ¶2;
     App. 744 ¶9; App. 756 ¶8; *See also* App. 669 ¶14; App. 675 ¶2; App. 692 ¶2;
16   App. 707 ¶7; App. 714 ¶3; App. 728 ¶7; App. 731 ¶2; App. 732 ¶7; App. 735 ¶7;
     App. 739 ¶7; App. 760 ¶3; App. 762 ¶7.

17   [24] App. 650-52 ¶¶2-6; App. 652-53 ¶¶7, 10; App. 693 ¶5; App. 715 ¶4; App. 728
18   ¶7; App. 737 ¶¶2-3; App. 744 ¶9; App. 755 ¶4, App. 756 ¶8; *See also* App. 675
     ¶2; App. 754 ¶3.
19
     [25] App. 652-53 ¶¶7-10; App. 693 ¶5; App. 728 ¶7; App. 744 ¶9; App. 754 ¶3;
20   App. 755 ¶4; App. 756 ¶8; App. 760 ¶3; *See also* App. 650-52 ¶¶2-6; App. 715
     ¶4; App. 737 ¶¶2-3; App. 762 ¶7.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    Because consumers often do not receive their "risk free trial" or "gift" until

2    after 10 days have elapsed (or nearly elapsed), many consumers cannot return the

3    product in time to avoid the $97.88 fee.[26] Defendants also fail to disclose clearly

4    to consumers that they often assess a "restocking" fee of up to $15 for returning

5    products.[27] Accordingly, consumers who accept Defendants' offers are likely to

6    incur unexpected charges.

### 3. Defendants' Purported Disclosures are Inadequate

Defendants' websites do not contain a disclosure concerning the cost of the

product, continuity program, or return policies until the "final step" of

Defendants' ordering page.[28] Many consumers report never seeing such a

disclosure, even when they looked for a disclosure.[29] As the screen capture below

illustrates, the disclosure is in significantly smaller print and is obscured by a

_____

[26] App. 755 ¶¶4,6; *See also* App. 731¶3.

[27]App. 676-77 ¶7; *See also* App. 335 *l.* 8; App. 652 ¶6.

[28] App. 341.

[29] App. 677 ¶8; App. 714 ¶3.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    variety of graphics and texts:



(screen capture from http://auraviefreetrial.com, last visited April 13, 2015; not to scale)[30]

In contrast, Defendants represent—in bold, red font at the top center of the page—that their trial shipment costs "$0.00."

Even if the disclosure was prominently displayed, it fails to mention many

_____

[30] App. 11 ¶24; App. 476.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

material terms and conditions of Defendants' offer. Defendants' disclosure states:

> We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.[31]

Defendants' disclosure paragraph fails to disclose: (a) that the 10-day trial period begins on the day that the product is ordered; (b) that, to avoid charges, the consumer must also return the product to Defendants before the end of the trial period; (c) that to return a product, the consumer must first obtain a Return Merchandise Authorization ("RMA") code from Defendants; (d) that consumers may not return the product for a refund after 10 days if it has been opened; (e) that consumers may not return the product for a refund after 30 days, even if it has not been opened; and (f) that a restocking fee, usually $15, may be charged when a product is returned.

Most of the material terms and conditions of Defendants' offer are hidden in a separate, multi-page terms and conditions webpage accessible only by

---

[31] App. 11 ¶24; App. 476.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   hyperlink.[32] On many of Defendants' affiliate sites, this hyperlink can be found by

2   scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C":

3

4

5

6

7

8

9

10

11

12   (screen capture from auravietrialkit.com, last visited April 13, 2015)[33]

13       **4. Defendants' Post-Sale Communications Do Not Disclose**

14          **Material Terms**

15       Defendants send consumers who accept their offer a confirmation email that

16   reinforces the false impression that consumers will receive a free shipment of

17

18   _____

19   [32] App. 11 ¶¶ 24-25; App. 12¶¶ 26-27; App. 467-71, 476; *See also* App. 479-85,
     495-500, 514-18, 523.

20   [33] App. 467.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    Defendants' skincare product.[34] Defendants' emails show no charges for the "risk

2    free trial" other than the nominal shipping and handling fees.[35]

3          Defendants' emails do not disclose that consumers will be charged the full

4    cost of the product, usually $97.88, after 10 days unless the consumer cancels the

5    order and returns the product during that time.[36]   The emails do not disclose that

6    the consumer has been enrolled into a continuity program that will result in future

7    shipments of product and a monthly charge of $97.88 on their credit or debit

8    cards.[37] Nor do these emails state when the charge will be imposed or how

9    consumers can avoid the charge.[38] Finally, the emails do not disclose that

10   unopened products may be returned for a refund only within 30 days of ordering.[39]

11          **B.   Defendants Do Not Honor their Cancellation and Refund Policies**

12

13

---

14   [34] App. 715 ¶4; App. 718-19; App. 754-55 ¶3; App. 760 ¶3; App. 764; See also
     App. 737 ¶2; App. 739 ¶7; App. 754 ¶3; App. 756 ¶8.

15

16   [35] App. 715 ¶4; App. 718-19; App. 737 ¶2; App. 739 ¶7; App. 754 ¶3; App. 756
     ¶8; App. 760 ¶3; App. 764.

17   [36] *Id.*

18   [37] *Id.*

19   [38] *Id.*

20   [39] *Id.*

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

After consumers learn that Defendants have charged their accounts and signed them up for a continuity plan, they often have significant difficulty receiving a refund and cancelling the continuity plan. Many consumers have difficulty contacting Defendants, despite calling Defendants' toll-free number repeatedly.[40] Even when consumers speak with one of Defendants' representatives and cancels the continuity plan, consumers often receive further shipments and unauthorized charges.[41] Other consumers report receiving multiple charges from Defendants without receiving products.[42] As a result, consumers continue to incur unwanted and unauthorized charges.

When consumers call Defendants to complain about unauthorized charges, Defendants often tell consumers that, while the continuity plan will be cancelled, their money will not be refunded.[43] In some instances, Defendants offer consumers only a partial refund.[44] Other times, Defendants condition a partial

---

[40] *See* App. 667 ¶5; App. 668 ¶9; App. 676 ¶¶4-6; App. 697 ¶6; App. 715 ¶5; App. 735 ¶5; App. 755 ¶5.

[41] App. 716 ¶6.

[42] App. 731-32 ¶¶3-4.

[43] *See* App. 652 ¶6; App. 693 ¶4; App. 743 ¶7; *See also* App. 715 ¶5.

[44] *See* App. 669 ¶13; App. 676-77 ¶7; App. 706 ¶6; App. 728 ¶5; App. 735 ¶5; App. 755-56 ¶6; App. 761 ¶5.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  refund upon the consumers' promise or signed statement that they will not

2  complain to any government authority or to the Better Business Bureau.[45]

3       Further, Defendants often do not honor return policies, even when

4  consumers satisfy them. For example, Defendants often tell consumers that they

5  cannot obtain a refund on any product returned even when the product remains

6  unopened and the 30-day period has not yet elapsed, contrary to Defendants'

7  terms and conditions.[46] Some consumers report being refused a refund by

8  Defendants despite sending the product back within the permissible time period,

9  with Defendants' customer service representative stating they never received the

10  return shipment.[47] In other instances, consumers receive refunds from Defendants

11  only after they have complained to their credit card companies, state regulatory

12  authorities, or the Better Business Bureaus. Even in those instances, however,

13  Defendants have not always issued full refunds.[48]

14  **C. Defendants Deceive their Payment Network and Threaten**
    **Consumers who Seek Chargebacks**

15

16  _____

17  [45] *See* App. 693 ¶4; App. 698 ¶8.

    [46] *See* App. 735 ¶5; App. 312 *l.* 19.

18  [47] *See* App. 706 ¶6; *See also* App. 743 ¶7.

19  [48] App. 669 ¶¶12-13; App. 678 ¶11; App. 694 ¶8; App. 707-8 ¶9, App. 713; App.

20  745 ¶11; App. 752-53; App. 758-59.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    In numerous instances, Defendants submit inaccurate or false information to

2    financial institutions and otherwise obstruct consumers' efforts to seek

3    chargebacks or refunds for unauthorized credit card charges.[49]

4    Merchants that accept credit card payments contract with financial

5    institutions called "acquiring banks" and use the services of payment processing

6    companies. Acquiring banks have various rules that a merchant must follow to

7    qualify for and retain access to a merchant account. Acquiring banks want to

8    avoid losses associated with consumer reversals of credit card transactions

9    (termed "chargebacks").[50] Therefore, acquiring banks often require that merchants

10   clearly and prominently disclose to consumers the terms and conditions of a sale

11   before the consumer authorizes payment. Acquiring banks may suspend or

12   terminate merchant accounts that have a high rate of chargebacks.

13   Many of Defendants' charges for their trial offer and continuity program

14   result in chargeback requests by consumers.[51] In an effort to maintain access to

15   credit card processing, Defendants have established as many as two dozen

16   merchant accounts, held by shell corporations, that use a variety of billing

17

18   [49] *See* App. 783-84 ¶¶15-16.

19   [50] *See* App. 279.

20   [51] *See* App. 27 ¶53; See also App. 783-84 ¶¶15-16, 18.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    descriptors.[52] Many of these shell companies use the same payment processing

2    companies and acquiring banks.[53]

3            To prevent consumers from receiving chargebacks for unauthorized

4    charges, Defendants submit falsified documents to oppose consumers' chargeback

5    requests.[54] These falsified documents are altered or doctored to make it appear that

6    Defendants' websites require consumers to click a box on the ordering screen

7    indicating they have read and agreed to the terms and conditions of their offer to

8    complete a purchase[55] and show a disclosure that is larger and more prominent

9    than appears on their actual websites.[56] Defendants also attempt to discourage

10   chargebacks by threatening, in their terms and conditions, to refer consumers who

11   request chargebacks to authorities for potential criminal prosecution:

12           CHARGEBACKS AND REVERSALS. We handle all
             chargebacks and reversals as potential cases of fraudulent use
13           of our product offer and/or theft of product. In cases where we
             have provided a product and we have verified that a client has
14           received a product and/or refused or returned product(s),
             whether or not they have used the product in any way, possible
15           actions taken by the company may include filing a complaint
             with the Internet Crimes Bureau and/or local authorities, or
16
     _____

17   [52] *See* App. 784 ¶¶17-18; App. 786-88.

18   [53] *See* App. 786-88.

19   [54] *See* App. 783-84 ¶¶15-16.

     [55] *See* App. 783-84 ¶¶15-16.
20
     [56] *See* App. 266, App. 470, App. 498, App. 517, App. 775.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

reporting the incident to the appropriate authorities in your
state to investigate theft of product and possible mail fraud
which is a Federal Crime. All cases of chargeback requests
will be vigorously fought by the Company. BE AWARE that if
you choose to claim your online transaction was fraudulent
that all activity and IP address information is captured. This
digital proof of whom and where the order was placed will be
submitted to the proper authorities. This information may be
used in a civil and criminal case against a customer if there is
fraudulent use or theft of product(s).[57]

## III. The Defendants

### A.   Corporate Defendants

#### 1.   BunZai Media Group, Inc. ("BunZai")

BunZai Media Group, Inc. ('BunZai"), also doing business as AuraVie,
Miracle FaceKit, and Attitude Skincare, was a California corporation incorporated
in January 2010 with its principal place of business at 7900 Gloria Avenue, Van
Nuys, California 91406 ("the Van Nuys Office").[58] BunZai, along with Defendant
Pinnacle Logistics, Inc., is at the center of Defendants' scam. The company
marketed skincare products using a variety of names through the shell
corporations.[59] BunZai formally dissolved in June 2013.[60] BunZai was owned by

---

[57] *See* App. 266, App. 470, App. 498, App. 517, App. 775.

[58] *See* App. 158.

[59] App. 780 ¶5.

[60] App. 558.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

Defendants Alon Nottea, Igor Latsanovski, and Khristopher Bond.[61] Defendant

Motti Nottea was a Chief Executive Officer ("CEO").[62]

### 2. Pinnacle Logistics, Inc. ("Pinnacle")

Pinnacle Logistics, Inc. ("Pinnacle"), another California corporation, was

incorporated in June 2012[63] and took over BunZai's marketing and sale of the

various skincare products in 2013.[64] Pinnacle's principle place of business was at

the same location as BunZai, at the Van Nuys Office.[65] However, it recently

moved to 6914 Canby, Ste. 107, Reseda, California 91335 ("the Reseda

Office").[66] With the formation of Pinnacle, virtually nothing changed in BunZai's

operation except for its name.[67] The principals are the same (save one,

Khristopher Bond, who left the enterprise),[68] and the location, employees, sales

---

[61] App. 158.

[62] App. 254, App. 258.

[63] App. 3 ¶7; App. 559.

[64] App. 69; App. 779-80 ¶4.

[65] App. 779 ¶2.

[66] App. 33 ¶70; App. 149.

[67] App. 779-80 ¶4.

[68] App. 42.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   tactics, and product remain unchanged.[69] Defendants Alon Nottea, Doron Nottea,

2   and Oz Mizrahi own or operate Pinnacle.[70]

3   ### 3.   Media Urge, Inc.

4          Media Urge, Inc., was a California corporation with its principal place of

5   business at the same office campus as the  Reseda Office.[71] The corporation was

6   formed in September 2012 and formally dissolved in July 2014.[72] This company

7   secured third-party advertising, tracked sales, and designed marketing materials.[73]

8   Media Urge, Inc., and Pinnacle are owned by the same parent company,

9   Defendant CalEnergy, Inc.[74] While Pinnacle took over BunZai's product

10  fulfilment, Media Urge appears to have taken over its affiliate marketing and

11  advertising work.[75]

12

13  _____

14  [69] App. 779-80 ¶4.

15  [70] App. 3 ¶7; App. 560; App. 779-80 ¶4.

16  [71] App. 55.

17  [72] App. 8 ¶16; App. 596, 599.

18  [73] App. 55, 60-61.

19  [74] App. 809.

20  [75] App. 61, App. 63, App. 69.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

### 4.  CalEnergy, Inc.

CalEnergy, Inc., a California corporation established in September 2009,[76] has held itself out as the parent company of Pinnacle and Media Urge, Inc.[77] The CEO and registered agent for CalEnergy, Inc., is Defendant Igor Latsanovski,[78] an owner of BunZai[79] and the CEO of Defendant Zen Mobile Media, Inc.[80] Igor Latsanovski has also held himself out to be the founder, president, and multinational manager of the company.[81]

### 5.  Adageo, LLC

Adageo, LLC, a California limited liability corporation incorporated in September 2012,[82] is a consulting company Alon Nottea is an owner.[83] Its registered address is 16161 Ventura Boulevard, #378, Encino, California 91436.[84]

---

[76] App. 603.

[77] App. 809.

[78] App. 8-9 ¶19; App. 604.

[79] App. 158.

[80] App. 26 ¶52; App. 275; App. 786-88.

[81] App. 617.

[82] App. 8; App. 600.

[83] App. 60.

[84] App. 8 ¶ 17; App. 601.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   Oz Mizrahi and Media Urge, Inc., hired Adageo, LLC, to consult Media Urge

2   regarding affiliate marketing.[85]

3                      **6.   SBM Management, Inc.**

4          SBM Management, Inc., was a California corporation was a California

5   corporation with its principal place of business at 655 North Central Avenue,

6   Suite 1700, Glendale, California 91203. A corporate credit card registered to SBM

7   Management, Inc., was used to pay for numerous AuraVie "risk free trial"

8   websites,[86] and the an SBM Management, Inc., email address was listed as the

9   point of contact.[87]

10                     **7.   The Shell Corporations**

11         Defendants use numerous shell corporations to further their scheme. These

12  shell corporations include: Agoa Holdings, Inc.; Zen Mobile Media, Inc.;

13  SafeHaven Ventures, Inc.; Heritage Alliance Group, Inc.; AMD Financial

14  Network, Inc.; Kai Media, Inc.; and Insight Media, Inc. ("shell corporations").[88]

15  All of the shell corporations are California corporations. And although the shell

16  corporations have various mailing addresses, they are in fact all operated from the

-------------------------------------

17  [85] App. 61, 63.

18  [86] App. 34 ¶¶73-76.

19  [87] App. 229.

20  [88] App. 782 ¶10; App. 786-88.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   same location by employees of BunZai and Pinnacle.[89] Each shell corporation is

2   associated with at least one merchant account that the Individual Defendants use

3   to process payments for AuraVie and related products.[90] By processing payments

4   through a variety of accounts and a variety of names, the Individual Defendants

5   attempt to disguise their chargeback rates from the credit card network.[91]

6   **B.   Individual Defendants**

7   Each of the Individual Defendants own, operate, or manage one or more of

8   the Corporate Defendants, and each shares in the profits from the enterprise's

9   illegal operation. Further, each of the Individual Defendants: (1) participated

10  directly in the wrongful acts or had authority to control them; and (2) had some

11  knowledge, either actual or constructive, of the wrongful acts.

12  **1.  Alon Nottea**

13  Alon Nottea, along with Defendants Igor Latsanovski and Khristopher

14  Bond, was an owner of BunZai.[92] He was a principal or manager of Pinnacle[93] and

15

_____

16  [89] App. 780 ¶5.

17  [90] App. 784 ¶17; App. 786-88.

18  [91] App. 784-85 ¶¶ 18-19.

19  [92] App. 158.

20  [93] App. 780 ¶6.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    also worked as a consultant for Media Urge,[94] assisting them in taking over some

2    of BunZai's business. Alon is listed as mailing and billing contact for the

3    enterprise's websites,[95] and a business credit card in his name was used to pay for

4    many of the websites.[96] Alon Nottea was at one time listed as the billing and

5    shipping contact for many of the enterprise's websites.[97] Alon Nottea was

6    described by a former employee as the head of the common enterprise,[98] and he

7    was integrally involved in the day-to-day operations of the scam.[99] Because he

8    oversaw operations in both the chargeback and customer-service departments at

9    BunZai and Pinnacle,[100] he had actual knowledge that consumers were being

10    injured by unauthorized charges to their credit and debit card accounts.

11

12

13

---

14    [94] App. 60.

15    [95] App. 223, 225-26, 228.

16    [96] App. 217-18, 220-21, 223, 225-26, 228.

17    [97] App. 217-228.

18    [98] App. 780 ¶6; App. 781 ¶9.

19    [99] App. 780-81 ¶¶6-7, 9; App. 783 ¶15; App. 784-85 ¶18.

20    [100] App. 780 ¶6.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

### 2. Motti Nottea

Motti Nottea, Alon's father, held himself out as a CEO of BunZai.[101] He also is or was the CEO or owner of DSA Holdings, Inc.,[102] one of the shell corporations used to process payments for Defendants' continuity plans.[103] His position as CEO of BunZai and DSA Holdings, Inc., demonstrates an ability to control the companies. His management of at least one of the enterprises' merchant account suggests that he had actual knowledge of the unauthorized charges at issue.

### 3. Doron Nottea

Doron Nottea, Alon's brother, was a manager at BunZai and Pinnacle.[104] He handled Pinnacle and the shell companies' finances.[105] His position as manager and role in handling the Corporate Defendants' finances evinces his knowledge of the deceptiveness of the enterprise and of the resulting consumer injury.

---

[101] App. 254, 258, 260, 274.

[102] App. 787.

[103] App. 785¶19.

[104] App. 781 ¶9.

[105] App. 782 ¶10.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1

### 4. Igor Latsanovski

2      Igor Latsanovski was an owner of BunZai[106] and Zen Mobile Media, Inc.,[107]

3   as well as a president,[108] multinational manager,[109] and the registered agent for

4   CalEnergy, Inc.[110] His name is also listed on the Zen Mobile Media, Inc.,

5   merchant account,[111] suggesting knowledge of the company's business practices

6   and high chargeback requests. As an owner, Latsanovski had authority to control

7   his companies' practices. His participation in obtaining merchant accounts for the

8   enterprise shows that he was aware of the unauthorized billing scheme or,

9   alternatively, was recklessly indifferent to the illegal business practices.

10

### 5. Oz Mizrahi

11

12      Oz Mizrahi is the CEO and owner of Pinnacle[112] and was one of the

    "heads" of the company.[113] He actively participated in Defendants' illegal scheme.

13

──────────────

14   [106] App. 158-59; App. 781 ¶8.

15   [107] App. 786-88.

16   [108] App. 617.

17   [109] App. 617.

18   [110] App. 8-9 ¶18, App. 604-605.

19   [111] App. 5 ¶11; App. 26 ¶52.

20   [112] App. 560.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

In addition to managing the business itself,[114] he registered a post office box in the name of Pinnacle and AuraVie in which he held himself out as "administrator" of Pinnacle.[115] His position as an owner of two of the companies demonstrates an ability to control the companies' business practices, including the practices giving rise to the complaint.

### 6. Roi Reuveni

Roi Reuveni, a cousin of the Nottea brothers, Alon and Doron, and was a manager of the customer service and chargebacks departments at BunZai and Pinnacle.[116] As manager of the chargebacks department, he drafted the deceptive template used to respond to financial institutions with false information when consumers requested chargebacks.[117] He is also the CEO or owner of Agoa Holdings, Inc., one of the shell corporations used to process payments for Defendants' continuity plans.[118] Reuveni's knowledge of the deceptiveness of the

---

[113] App. 780 ¶4.

[114] *See* App. 780 ¶4.

[115] App. 553.

[116] App. 781 ¶9.

[117] App. 781 ¶9.

[118] App. 786-87.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   enterprise can be inferred from his positions as manager and CEO of companies in

2   the enterprise and role in supervising the customer service and chargeback

3   departments.

### 7.  Khristopher Bond, also known as Raymond Ibbot

5        Khristopher Bond, also known as Raymond Ibbot, was an owner of BunZai

6   along with Igor Latsanovski and Alon Nottea.[119] A former employee stated that

7   Bond trained him as an AuraVie customer service representative and prepared him

8   to respond to customer complaints.[120] He eventually left the common enterprise,

9   leading to the dissolution of BunZai.[121] His position as manager and role in

10  supervising the customer service department shows his participation in and actual

11  knowledge of the deceptive enterprise.

### IV.   Legal Argument

13       To put an immediate stop to Defendants' ongoing deceptive practices and to

14  preserve the possibility of effective final relief, the FTC requests the issuance of

15  an *ex parte* TRO with provisions for asset and document preservation, the

16  appointment of a receiver, immediate access to Defendants' business premises and

---

18  [119] *See* App. 158-59; *see also* App. 780-81 ¶7.

19  [120] App. 782 ¶11.

20  [121] App. 52.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    records, and an order to show cause why a preliminary injunction should not

2    issue. As shown below, the Court possesses authority to enter the relief sought, the

3    evidence demonstrates that the FTC is likely to succeed on the merits, and the

4    equities weigh in favor of the requested relief.

5    **A.     The Court Possesses Authority to Grant the Requested Relief.**

6        Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the FTC authority to

7    seek, and the district court authority to grant, both a permanent injunction against

8    violations of any provisions of law enforced by the FTC and "any ancillary relief

9    necessary to accomplish complete justice."[122] This ancillary relief can include,

10   among other remedies, an *ex parte* temporary restraining order, a preliminary

11   injunction, an asset freeze, and the appointment of a receiver. [123] On numerous

12   occasions, courts of this district have acted under the authority of Section 13(b) to

13   grant preliminary relief similar to that sought here.[124]

14

---

15   [122] *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111–13 (9th Cir. 1982).

16   [123] *E.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir.
     1999) (*ex parte* TRO and preliminary injunction including asset freeze); *FTC v.*
17   *Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987) (TRO and
     preliminary injunction including asset freeze and appointment of a receiver).
18
     [124] *FTC v. Am. Mortg. Consulting Grp.*, No. SACV12-01561 DOC (JPRx), 2012
19   WL 4718927 (C.D. Cal. Oct. 1, 2012); *FTC v. Consumer Advocates Grp. Experts,*
     *LLC*, No. CV12-04736 DDP (CWx), 2012 WL 2061702 (C.D. Cal. June 7, 2012);
20   *FTC v. National Foreclosure Relief, Inc.*, No. SACV09-117-DOC(MLGx), 2009
     WL 650401 (C.D. Cal. Mar. 6, 2009); *FTC v. Myricks,* No. CV05-7013 CAS

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    In determining whether to grant preliminary relief under Section 13(b), a

2    court must consider two factors: (1) the FTC's likelihood of ultimate success and

3    (2) whether the public equities outweigh any private equities.[125] "District courts

4    apply a more lenient standard to the FTC when it is seeking an injunction than

5    they do to private litigants."[126] Unlike private litigants, the FTC does not need to

6    prove irreparable injury,[127] which is presumed in a statutory enforcement action.[128]

7    Because irreparable injury is presumed, the burden of establishing success on the

8    merits is decreased, and a court "'need only to find some chance of probable

9    success on the merits'" in order to award preliminary relief.[129] In addition, when

10

---

11   FMOX, 2005 WL 3670908 (C.D. Cal. Sept. 27, 2005); *FTC v. Arlington Press,
     Inc.*, No. CV-98-9260-MMM(CWX), 1999 WL 33574020 (C.D. Cal. Jan. 11,
12   1999);

13   [125] *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, (9th Cir. 1984) (citing *FTC v.
     Simeon Mgmt. Corp.*, 532 F.2d 708, 713-714 (9th Cir. 1976).
14

     [126] *FTC v. Health Formulas, LLC*, Case No. 2:14-cv-01649-RFB-GWF, 2015 WL
15   2130504, at *5 (D. Nev. May 6, 2015) (citing *FTC v. Affordable Media*, 179 F.3d
     1228, 1233 (9th Cir. 1999)).
16
     [127] *Warner Commc'ns*, 742 F.2d at 1159.
17
     [128] *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *see also
18   See United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir.
     1987).
19
     [129] *Id.* (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172,
20   176 (9th Cir. 1987)).


**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

weighing the equities, the public interest receives greater weight than private interests.[130]

**B.      The FTC is Likely to Succeed on the Merits**

The evidence in the record amply demonstrates that the FTC is likely to succeed on the merits of its claims that Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b). Further, the record illustrates that the equities weigh heavily in favor of the requested relief.

**1.  Defendants are Violating Section 5 of the FTC Act**

Section 5(a) of the FTC Act empowers the FTC to prevent "deceptive acts or practices in or affecting commerce."[131] An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[132] A misrepresentation may be

---

[130] *Id.* (citing *Warner Comm'cns*, 742 F.2d at 1165).

[131] 15 U.S.C. § 45(a) (2006).

[132] *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)). Under Section 5, the FTC is not required to prove that a defendant intended to deceive consumers, nor is a

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  either express or implied.[133] A representation, omission, or practice is material if it

2  "'involves information that is important to consumers and, hence, likely to affect

3  their choice of, or conduct regarding, a product.'"[134]

4          An act or practice is unfair, and also violates Section 5(a) of the FTC Act, if

5  it causes, or is likely to cause, substantial injury to consumers that is not

6  reasonably avoidable and is not outweighed by countervailing benefits to

7  consumers or competition.

8          Here, Defendants engage in deceptive and unfair practices in violation of

9  Sections 5(a) by: (i) failing to disclose clearly material terms of their offer; (ii)

10  making false "risk free trial" claims; (iii) making false representations regarding

11

---

12  defendant's good faith a defense to liability. *FTC v. World Travel Vacation
   Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, 1995-2
13  Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) (O'Connor, J.); *FTC v.
   Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev.
14  1992) (George, C.J.).

15  [133] *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("[N]othing in
   statute or case law . . . protects from liability those who merely imply their
16  deceptive claims . . . .").

17  [134] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting
   *Cliffdale Assocs.*, 103 F.T.C. at 165). The FTC need not prove actual reliance by
18  each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof
   would defeat the intent of the FTC Act and would frustrate prosecutions of large
19  consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once
   the FTC has proved that the defendant made material misrepresentations, that they
20  were widely disseminated, and that consumers purchased the defendant's product.
   *Id.* at 605–06.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    their Better Business Bureau rating and accreditation status; and (iv) unfairly

2    charging consumers without authorization.

3                **i.   Defendants Fail to Disclose Clearly the Material Terms of Their Offer and Falsely Represent that their Trial Offer is "Risk Free"**

5        As alleged in Counts I and II of the Complaint, Defendants use trickery to

6    obtain consumers' credit card information. The Defendants represent that the

7    products they sell are available on a "risk free" basis—consumers need only pay

8    shipping—but Defendants then bury material, contradictory terms concerning

9    their offer. In particular, the Defendants fail to disclose clearly that their "risk

10   free" trial offer of product converts into a $97.88 charge after just 10 days.

11   Further, Defendants fail to disclose when the trial begins and ends; that consumers

12   are automatically enrolled into a negative option continuity plan with monthly

13   charges; or how consumers can cancel their membership in this program.

14       An advertisement that fails to disclose material information is deceptive.[135]

15   Importantly, numerous courts have held that an inconspicuous disclosure does not

16   remedy the deceptiveness of a material omission.[136]

---

[135] *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978).

[136] *FTC v. Cyberspace.com LLC*, No. C00-1806L, 2002 U.S. Dist. LEXIS 25564, *8-9 (W.D. Wash. July 10, 2002) (holding that a fine print disclosure was inadequate to escape liability), *aff'd* 453 F.3d 1196, 1200 (9th Cir. 2006) (collection case where deception was found because fine print disclosures were inadequate); *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

ii. **Defendants Falsely Represent that their Business is Accredited by the Better Business Bureau with an "A-" Rating**

Count III addresses Defendants' practice of falsely representing accreditation by the Better Business Bureau ("BBB") with an "A-" rating.[137] These representations are false.[138] AuraVie had its accreditation revoked over a year ago and has an "F" rating with the BBB.[139] Express product claims are presumed to be material,[140] and reliance upon such claims is presumptively reasonable.[141] Accordingly, Defendants representations about their company's

---

2010) ("[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an accurate impression") (*quoting Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine print disclosure at the bottom of the ad); *FTC v. Porter & Deitsch*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers made in contract for credit repair services were insufficient to counteract advertising claims about the service).

[137] App. 467.1.

[138] App. 789-90 ¶5.

[139] App. 789-90 ¶5.

[140] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994).

[141] *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   BBB rating and accreditation status are materially deceptive in violation of

2   Section 5 of the FTC.

### iii. Defendants Unfairly Charge Consumers without Authorization

3
4       As alleged in Count IV, Defendants routinely charge consumers' credit or

5   debit cards without consumers' express informed consent. Such conduct is

6   consistently held to be unfair under the FTC Act.[142]

7

### 2. Defendants are Violating the Restore Shoppers Online Confidence Act

8
9       Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging

10  consumers for goods or services sold on the Internet through a negative option

11  feature, unless the seller clearly and conspicuously discloses all material terms of

12  the transaction before obtaining the consumer's billing information, obtains the

13  consumer's express informed consent before making the charge, and provides a

14  simple mechanism to stop recurring charges.[143]  Defendants' continuity plans are a

15

16

17

18  [142] *See, e.g., FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal.
    2000); *FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla.
19  2008).

20  [143] *See* 15 U.S.C. § 8403 (2006).


**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   negative option feature, as defined by the TSR.[144] Under Section 5 of ROSCA, 15

2   U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under

3   Section 18 of the FTC Act, 15 U.S.C. § 57a.

4        As described in Count V of the Complaint, Defendants violate ROSCA in

5   three ways. First, Defendants fail to disclose clearly, if at all, material terms of

6   their continuity plan. Second, Defendants routinely charge consumers for

7   continuity plans without obtaining their express informed consent. Third,

8   Defendants fail to provide a simple mechanism for cancelling the continuity plan.

9        **3.  Defendants are Violating the Electronic Fund Transfer**
           **Act and Regulation E**

10       The Electronic Fund Transfer Act and its implementing Regulation E

11  regulate the circumstances under which a merchant may make regularly recurring

12  debits from a consumer's bank account. EFTA and Regulation E require that,

13  before a merchant can make such recurring debits, it must obtain a written

14

15  [144] It is unlawful "for any person to charge or attempt to charge any consumer for
    any goods or services sold in a transaction effected on the Internet through a

16  negative option feature (as defined in the Federal Trade Commission's
    Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)"

17  without clearly and conspicuously disclosing material terms, obtaining a
    consumer's informed consent, and providing a simple mechanism to stop

18  recurring charges. 15 U.S.C. § 8403 (2006). The TSR defines a negative option
    feature as "an offer or agreement to sell or provide any goods or services, a

19  provision under which the consumer's silence or failure to take an affirmative
    action to reject goods or services or to cancel the agreement is interpreted by the

20  seller as acceptance of the offer." 16 C.F.R. § 310.2(u) (2006).


**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    authorization signed or similarly authenticated by the consumer.[145] For an

2    authorization to be valid, the terms of the preauthorized transfer must be "clear

3    and readily understandable" and the authorization "should evidence the

4    consumer's identity and assent to the authorization."[146] Moreover, a copy of the

5    authorization must be provided to the consumer.[147] These protections ensure that

6    consumers' consent to recurring debits will be knowing and informed. A

7    consumer's rights under EFTA cannot be waived.[148]

8           Defendants' business practices fail to comply with EFTA for several

9    reasons. First, Defendants' terms and conditions regarding recurring monthly fees

10   are not clear and readily understandable. In fact, this information is concealed in

11   documents available only by hyperlink or in hard-to-read disclosures. Further,

12   Defendants' websites are covered with claims that their offer is "risk free" and

13   other directly contradictory statements.

14          Second, Defendants' websites or terms and conditions pages cannot serve

15   as the consumer's "copy" of the authorization, as required by 15 U.S.C. §

16   _____

[145] 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

17

[146] Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R.
18   Part 205, Supp I, ¶ 10(b), comments (5) & (6).

19   [147] 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).

20   [148] 15 U.S.C. § 1693*l* (2006).

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1   1693e(a), because it is not signed or similarly authenticated by the consumer and

2   does not evidence the consumer's identity and assent to additional transfers. In

3   short, consumers who purchased Defendants' products using their debit cards

4   were not authorizing recurring debits from their bank accounts and never received

5   a copy of any purported authorization for such debits. In light of this evidence, the

6   Commission has clearly demonstrated a likelihood of success on Count VI of the

7   Complaint.

8   ## C.  Balancing of the Equities Serves the Public Interest

9       The FTC has demonstrated a likelihood of success on the merits of every

10   count contained in the Complaint, and injunctive relief is further warranted

11   because the public equities outweigh the private equities. The public equities are

12   served by enjoining deceptive or unfair acts or practices that violate the law,

13   maintaining status quo over assets and business documents relating  to

14   Defendants' law violations until a fair and impartial hearing may be held, and

15   preserving the Court's ability to award full and effective final relief at trial or

16   other disposition of this matter.[149]

17       Defendants have operated their deceptive scheme since at least 2010, and

18   have received millions of dollars in ill-gotten gains from hundreds of

19   

20   _____

[149] *See World Wide Factors*, 882 F.2d at 347.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  consumers.[150] Consumers nationwide lost money as a result of Defendants'

2  misrepresentations.[151] Despite receiving numerous complaints from the BBB, state

3  attorneys general, and consumers themselves, Defendants continue to promote

4  their program, products, and services in the same deceptive manner.

5       Absent injunctive relief, there is a strong likelihood that future violations

6  will occur. Here, the public's interest in immediately halting this unlawful scheme

7  and preventing the victimization of additional consumers far outweighs any

8  limited interest Defendants may have in continuing to operate their businesses.[152]

9  **D.    Defendants are Each Liable for the Law Violations**

10           **1.  The Corporate Defendants Operate as a Common Enterprise**

11

12  Defendants run their scam through a tangled web of companies that operate

13  as a common enterprise. Participants in a common enterprise are held jointly and

14

15  _____

[150] App. 2 ¶6, 27 ¶53.

16

17  [151] *See* App. 791-806; App. 650 ¶1; App. 666 ¶1; App. 675 ¶1; App. 692 ¶1; App. 696 ¶1; App. 705 ¶1; App. 714 ¶1; App. 731 ¶1; App. 734 ¶1; App. 737 ¶1; App. 741 ¶1; App. 754 ¶1; App. 760 ¶1.

18

19  [152] *See World Wide Factors*, 882 F.2d at 347 (affirming the district court's finding that "'there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets

20  from dissipation or concealment'").

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    severally liable for the law violations.[153] To determine the existence of a common

2    enterprise, a court may consider a variety of factors including: common control;

3    the sharing of office space and officers; whether business is transacted through a

4    maze of interrelated companies; the commingling of corporate funds and failure to

5    maintain separation of companies; unified advertising; pooled resources and staff;

6    and evidence which reveals that no real distinction existed between the Corporate

7    Defendants[154] It has been held by the Ninth Circuit that "entities constitute a

8    common enterprise when they exhibit either vertical or horizontal commonality –

9    qualities that may be demonstrated by a showing of strongly interdependent

10    economic interests or the pooling of assets and revenues." [155]

11        The Corporate Defendants have operated as a common enterprise under the

12    leadership of Alon Nottea and the other Individual Defendants.[156] All 14

13    Corporate Defendants are owned and operated by Alon Nottea or one of his

14

15

---

16    [153] *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997);

17    [154] *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997).

18    [155] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010)

19    [156] *See* App. 2-10 (explaining connections between the 14 Corporate Defendants);

20    App. 779 ¶¶4, 6.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  family members or associates and all participate in the scam of luring consumers

2  to provide billing information with false offers of "risk free trials."[157]

3      As detailed above, many of the Corporate Defendants have no business

4  premises, employees, or business function except to process charges for

5  Defendants' "risk free trial."[158] Many, if not all, of the Corporate Defendants

6  operated out of a single address.[159] Several other factors show the intertwined

7  nature of these companies: BunZai and Pinnacle share phone numbers, mailing

8  addresses, and dozens of employees.[160]  Further, the finances for almost all of the

9  corporate Defendants are derived from the sale of the same products. The finances

10  of these Corporate Defendants are handled by the same managers and

11  employees.[161] Because the Corporate Defendants operate as a common enterprise,

12  they are all jointly and severally liable for the violations alleged in the Complaint.

13

14  _____

15  [157] App. 2-10; App. 782 ¶10.

16  [158] App. 780, ¶5; *Cf. J.K. Publications, Inc.*, 99 F. Supp. 2d at 1202 (finding a common enterprise where "the corporate defendants utilized at least five different merchant accounts and four fictitious business names to process over $40 million

17  in credit and debit card transactions").

18  [159] App. 779-80 ¶4 App. 782 ¶10.

19  [160] App. 2-3; App. 782 ¶10.

20  [161] App. 782 ¶10.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

## 2. The Individuals are Liable for Injunctive and Monetary Relief

To obtain injunctive and monetary relief against individuals for injury to consumers resulting from a company's conduct, the FTC must establish that the individuals both: (1) participated directly in the unlawful acts or practices or had authority to control them; and (2) had some knowledge of these acts or practices.[162] Authority to control the company can be demonstrated by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."[163] The FTC may satisfy the knowledge requirement by showing either actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[164] The degree of participation in business affairs is probative of knowledge.[165] To establish individual liability, the FTC need not show that the individual intended to defraud consumers.[166]

---

[162] *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

[163] *Amy Travel*, 875 F.2d at 573.

[164] *Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 574.

[165] *Publ'g Clearing House*, 104 F.3d at 1170; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991) (Pro, J.).

[166] *Publ'g Clearing House*, 104 F.3d at 1171.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

**E. An *Ex Parte* TRO with Asset Freeze and Receiver is Essential to Prevent Further Harm to Consumers, Prohibit Defendants from Dissipating Assets or Destroying Documents, and to Preserve the Court's Ability to Award Effective Final Relief**

As part of the permanent relief in this case, the FTC seeks restitution for the consumer victims of AuraVie. To preserve this possibility, the FTC seeks a TRO with an immediate freeze of Defendants' assets, the appointment of a temporary receiver, access to Defendants' business premises and records, and expedited discovery. Absent such relief, there is a substantial risk that Defendants will continue to operate their deceptive scheme, dissipate their ill-gotten assets, and destroy documents to preclude satisfaction of any final order requiring monetary relief.

Such actions by Defendants are a common occurrence in FTC cases. Defendants involved in similar scams have secreted assets, destroyed documents, and otherwise stymied courts' abilities to provide relief to consumers after learning of a federal action. The Certification and Declaration of Plaintiff's Counsel Reid Tepfer in Support of Plaintiff's: (A) *Ex Parte* Motion for Temporary Restraining Order; (B) *Ex Parte* Seal Order Application; and (C) *Ex Parte* Application for Waiver of Notice Requirement, filed contemporaneously with this motion, details the FTC's experience in many of these cases.

Further, the facts here show Defendants are particularly likely to attempt to thwart potential victim relief. Defendants have made substantial efforts to conceal

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1  their identities and locations and operate their scam using countless fictitious

2  business names and billing descriptors that do not reflect the real name of the

3  company. They have numerous drop box locations, business addresses, and

4  telephone numbers. Such a deceptive scheme demonstrates such an indifference to

5  the law that both the individuals and the corporations may reasonably be expected

6  to frustrate the FTC's law enforcement efforts by destroying evidence and

7  concealing or dissipating assets. Defendants' business practices amount to trickery

8  and deceit: Defendants trick consumers into providing billing information, bilk

9  them of sometimes hundreds of dollars each, and then submit false or forged

10  documents to financial institutions to prevent refunds. They have continued these

11  practices unabated by hundreds of consumer chargeback transactions and

12  complaints.

13       Notably, a former employee informed the FTC that Defendants have

14  planned and attempted in the past to hide assets in other companies or countries.[167]

15  These measures were taken to hide assets from the government to avoid taxes.[168]

16  Defendants may also have been avoiding possible government enforcement

17  actions. Accordingly, Defendants will likely move money out of the FTC's reach

18  quickly if given the opportunity.

19  [167] *See* App. 13 ¶29; *See FTC v. Williams*, No. C11-828 MJP (W.D. Wash. 2011).

20  [168] App. 13 ¶29.

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    Moreover, many, if not all, of the Defendants have connections abroad. In

2    fact, one of the key Defendants in this case, Igor Latsanovski, is currently in the

3    process of having his lawful status in the U.S. revoked.[169] These facts demonstrate

4    the substantial difficulties that would arise without the benefit of the preliminary

5    relief requested below.

6    **1. The Proposed TRO Should be Entered *Ex Parte***

7    Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte*

8    orders upon a clear showing that "immediate and irreparable injury, loss, or

9    damage will result" if notice is given to Defendants. Proper situations for *ex parte*

10   relief include situations where notice would "render fruitless further prosecution

11   of the action."[170] Consumer fraud cases such as this fall within the category of

12   situations where *ex parte* relief is not only appropriate but necessary to preserve

13   the possibility of full and effective final relief.

14   Providing notice of this action would likely impair the FTC's ability to

15   secure relief for consumers because it is highly likely that Defendants will

16   dissipate assets and destroy documents—a result that would cause immediate,

17

18

---

19   [169] *See* App. 32 ¶67; App. 612-631.

20   [170] *In re Vuitton et Fils*, 606 F.2d 1, 5 (2d Cir. 1979).

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

irreparable harm. It is therefore appropriate, in light of the facts above, for this Court to grant the requested relief *ex parte*.[171]

### 2. An Asset Freeze is Critical to Preserve Effective Consumer Relief

Defendants have generated millions in income from their deceptive activities at the expense of consumers. Without a freeze of Defendants' assets, these funds will likely disappear during the course of this action. An asset freeze should be imposed where there exists a likelihood of success on the merits and there is a likelihood of dissipation of assets in the absence of an injunction.[172]

Defendants who engage in deceit may be considered likely to waste assets prior to resolution of the action.[173] And as discussed extensively above, Defendants have taken steps and made attempts to secrete assets before, possibly in anticipation of law-enforcement actions, and will likely attempt to frustrate restitution if given the opportunity.

### 3. A Receiver is Appropriate in this Case

---

[171] *See AT&T Broadband v. Tech Comm'n., Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004) (holding that *ex parte* relief is appropriate where either the defendant or persons involved in similar activities have concealed evidence or disregarded court orders in the past).

[172] *Johnson v. Couturier*, 572 F.3d 1067, 1085 n.11 (9th Cir. 2009).

[173] *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    It is also necessary to appoint a receiver for the Corporate Defendants. In

2  cases in which a corporate defendant, through its management, has defrauded

3  members of the public, "it is likely that in the absence of the appointment of a

4  receiver to maintain the status quo, the corporate assets will be subject to

5  diversion and waste" to the detriment of the victims.[174] A receiver can monitor the

6  use of Defendants' assets, marshal and preserve records, identify assets, determine

7  the size and extent of the fraud, and identify additional consumers who were

8  injured. As the facts above demonstrate, diversion and waste of funds is likely

9  without the benefit of a receiver.

### 4. Expedited Discovery and Immediate Access to Defendants' Business Premises are Essential

12    To locate assets wrongfully obtained from defrauded consumers, the FTC

13  respectfully requests that this court permit expedited discovery, including

14  immediate access to Defendants' business premises and records, and order

15  financial reporting by Defendants.

16    District courts are authorized to depart from normal discovery procedures

17  and fashion discovery by order to meet discovery needs in particular cases.[175]

18  Moreover, the prompt and full disclosure of the scope and financial status of

---

[174] *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981).

[175] FED. R. CIV. P. 1, 26(d), 34(b).

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1    Defendants' business operations is necessary to locate and preserve the

2    Defendants' assets and business records. For these reasons, the proposed Order

3    requires that Defendants produce certain financial records and information on

4    short notice, and requires financial institutions served with the order to disclose

5    whether they are holding any of Defendants' assets.

6    **V. Conclusion**

7        The FTC respectfully requests that the court grant its motion for an *ex parte*

8    TRO with an asset freeze, appointment of a temporary receiver, and other

9    equitable relief.

10

                             Respectfully submitted,

11

12   Dated: 6/15/15                          _____*/s/ Reid Tepfer*_____
                                             REID TEPFER,
13                                           Texas Bar No. 24079444
                                             LUIS GALLEGOS
14                                           Oklahoma Bar No. 19098
                                             Federal Trade Commission
15                                           1999 Bryan Street, Suite 2150
                                             Dallas, Texas 75206
16                                           (214) 979-9395 (Tepfer)
                                             (214) 979-9383 (Gallegos)
17                                           (214) 953-3079 (fax)
                                             rtepfer@ftc.gov; lgallegos@ftc.gov
18
                                             RAYMOND MCKOWN,
19                                           California Bar No. 150975
                                             10877 Wilshire Boulevard, Suite 700
20                                           Los Angeles, California 90024
                                             (310) 824-4343(voice)

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**

1                               (310) 824-4380 (fax)

                                rmcknown@ftc.gov

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**MEMORANDUM IN SUPPORT OF TRO APPLICATION**