



## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

CV15 - 04527 - GW (PLAx)

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. |
| Plaintiff, | **APPENDIX TO PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| ***BUNZAI MEDIA GROUP, INC.,*** *et al.,* | |
| **Defendants.** | **FILED UNDER SEAL** |

### APPENDIX VOLUME I – Pages 1-415

APPENDIX VOLUME I

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 6 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

JUN 1 5 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**

9                                        CV15 - 04527 - GW (PLAx)

10   **FEDERAL TRADE COMMISSION,**      Case No.

11              Plaintiff,              **APPENDIX TO PLAINTIFF**
                                        **FEDERAL TRADE**
                v.                      **COMMISSION'S**
12                                      **MEMORANDUM IN SUPPORT**
     **BUNZAI MEDIA GROUP, INC.,** *et*  **OF ITS** *EX PARTE* **MOTION FOR**
13   *al.,*                             **TEMPORARY RESTRAINING**
                **Defendants.**         **ORDER**
14
                                        **FILED UNDER SEAL**
15

16                  **APPENDIX VOLUME I – Pages 1-415**

17

18

19

20

     APPENDIX VOLUME I

| APPENDIX VOLUME I – Pages 1-415 | | | |
|---|---|---|---|
| Exhibit | Attachment | Description | Bates Number |
| 1. |  | Declaration of FTC Investigator, Brent McPeek | 1-35 |
| 1. | A. | Deposition Transcripts of Alon Nottea | 36- 135 |
| 1. | B. | California Employment Development Department Records | 136- 157 |
| 1. | C. | Documents obtained from Dawn Goddard: BunZai Media Group – Partnership Agreement and an employment verification letter on behalf of Igor Latsanovski. | 158- 160 |
| 1. | D. | GoDaddy and Domain by Proxy business records | 161-230 |
| 1. | E. | J2 Global Communications, Inc., business records | 231-245 |
| 1. | F. | Priority Payment Systems, LLC,  and Cynergy Data, LLC, business records | 246-286 |
| 1. | G. | Undercover call transcripts | 287- 340 |
| 1. | H. | Undercover purchase records | 341-352 |
| 1. | I. | Web Captures | 353-415 |

Dated:

_/s/ Reid Tepfer_
REID A. TEPFER
LUIS H. GALLEGOS
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75077
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov

APPENDIX VOLUME I

### DECLARATION OF FTC INVESTIGATOR
### BRENT D. MCPEEK
### <u>PURSUANT TO 28 U.S.C. § 1746</u>

Pursuant to 28 U.S.C. § 1746, Brent D. McPeek declares that:

    1.    My name is Brent D. McPeek. I am over the age of 21 and competent to give this declaration. I am a Federal Trade Investigator with the Federal Trade Commission ("FTC"). I have a Bachelor of Science degree in agricultural economics with a minor in finance, as well as a Master of Science degree in applied economics. I have more than ten years' experience as an investigator and litigation consultant. My business address is Federal Trade Commission, Southwest Region, 1999 Bryan Street, Suite 2150, Dallas, Texas 75201.

    2.    My duties, as a Federal Trade Investigator, include investigating parties suspected of engaging in unfair or deceptive acts or practices in violation of the Federal Trade Commission Act and other laws and rules enforced by the Commission.

    3.    I assisted in the FTC's investigation of **Bunzai Media Group, Inc.** ("Bunzai Media Group") and related companies and individuals, including **Alon Nottea**, **Igor Latsanovski**, **Roi Reuveni**, and **Khristopher Bond**. I will refer to the subjects of the FTC's investigation collectively as the "Defendants." The Defendants include companies and individuals that solicit consumers to sell goods

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK         Page | 1

through internet advertising on several websites.  Collectively, I will refer to the business entities as the "Corporate Defendants."

4.     During the FTC's non-public investigation, I acquired personal knowledge of the facts stated here, and, if called, would testify to the same.  Any conclusions are based on my investigation, including my review of documents obtained by the FTC, consumer complaints about Defendants' business practices, and websites operated by Defendants.  Personally Identifying Information ("PII") has been redacted from all documents referenced in this declaration.

### Secretary of State Records

5.     During this investigation, I searched the California Secretary of State website for records related to the Corporate Defendants.  I ordered certified copies of records relating to the Corporate Defendants.  True and correct copies of these records are attached as Attachment ("Att.") M, at App. 555 – 611.

6.     According to its Articles of Incorporation, **Bunzai Media Group, Inc.** was incorporated in California on January 1, 2010.  *Id.*, at App. 555.  The Articles of Incorporation also identify Z. David Davidian, at 200 N. Maryland Avenue, Glendale, California 91106, as the incorporator and initial agent for service of process.  *Id.*  The annual Statement of Information filed April 26, 2010, identifies **Alon Nottea**, at 16161 Ventura Blvd. #378, Encino, CA 91436, as Director, Chief Executive Officer ("CEO"), Secretary, and Chief Financial Officer

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 2

("CFO"). *Id.*, at App. 556. The Statement of Information also identifies Z. David Davidian, CPA, as the agent for service of process and the person who completed and submitted the form. *Id.* On May 30, 2013, **Alon Nottea** executed a Certificate of Dissolution for **Bunzai Media Group, Inc.** *Id.*, at App. 558.

7.      According to its Articles of Incorporation, **Pinnacle Logistics, Inc.** was incorporated on June 6, 2012. *Id.*, at App. 559. The Articles of Incorporation also identify **Oz Mizrahi**, at 7900 Gloria Avenue, Van Nuys, CA 91406, as the incorporator and initial agent for service of process. *Id.* The annual Statement of Information filed September 10, 2012, identifies **O. S. Mizrahi**, at the same address, as Director, CEO, Secretary, CFO, and agent for service of process. *Id.*, at App. 560. The annual Statement of Information filed July 9, 2014, identifies Tal Karasso, at  16830 Ventura Blvd, Suite #360, Encino, CA 91436, as Director, CEO, Secretary, CFO, and agent for service of process. *Id.*, at App. 561. The 2014 Statement of Information also identifies 16830 Ventura Blvd, Suite #360, Encino, CA 91436 as the Principal Executive Office and Principal Business Office of the corporation. *Id.* On December 12, 2014, Tal Karasso executed a Certificate of Dissolution for Pinnacle Logistics, Inc. *Id.*, at App. 562.

8.      According to its Articles of Incorporation, **DSA Holdings, Inc.** was incorporated on January 10, 2006. *Id.*, at App. 563 – 564. The Articles of Incorporation also identify Jason M. Menin, at 16060 Ventura Blvd #180, Encino,

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 3

CA 91436, as the incorporator and initial agent for service of process. *Id.*, at App. 563. The annual Statement of Information filed June 24, 2006, identifies Jason M. Menin, at 8335 Winnetka Ave. #112, Winnetka, CA 91306, as Director, CEO, Secretary, CFO, and agent for service of process. *Id.*, at App. 565. On September 14, 2012, Jason Menin executed a Certificate of Dissolution for **DSA Holdings, Inc.** *Id.*, at App. 567.

      9.    According to its Articles of Incorporation, **Lifestyle Media Brands, Inc.** was incorporated on June 15, 2011. *Id.*, at App. 568. The Articles of Incorporation also identify David Davidian, at 200 N. Maryland Avenue, Suite 300, Glendale, California 91206, as the incorporator and initial agent for service of process. *Id.* The annual Statement of Information filed August 15, 2011, identifies Rachel Nottea, at 8335 Winnetka Ave. #118, Winnetka, CA 91306, as Director[1], CEO, Secretary, CFO, and agent for service of process. *Id.*, at App. 569. The Statement of Information also identifies David Davidian as the agent for service of process. *Id.* On December 16, 2014, Rachel Nottea executed a Certificate of Dissolution for **Lifestyle Media Brands, Inc.** *Id.*, at App. 571.

      10.    According to its Articles of Incorporation, **Agoa Holdings, Inc.** was incorporated on June 15, 2011. *Id.*, at App. 572. The Articles of Incorporation also identify David Davidian, at 200 N. Maryland Avenue, Suite 300, Glendale,

---

[1] The address for Rachel Nottea as *Director* of Lifestyle Media Brands, Inc. is listed as 7900 Gloria Ave, Van Nuys, CA 91406.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK           Page | 4

California 91206, as the incorporator and initial agent for service of process. *Id.*
The annual Statement of Information filed September 15, 2013, identifies **Roi**
**Reuveni**, at 18034 Ventura Blvd, Suite 234, Encino, CA 91316, as Director, CEO,
Secretary, and CFO of **Agoa Holdings, Inc.** *Id.*, at App. 573. The Statement of
Information also identifies 16830 Ventura Blvd, Suite #360, Encino, CA 91436 as
the mailing address of the corporation. *Id.* On December 12, 2014, **Roi Reuveni**
executed a Certificate of Dissolution for **Agoa Holdings, Inc.** *Id.*, at App. 576.

11. According to its Articles of Incorporation, **Zen Mobile Media, Inc.**
was incorporated on November 3, 2011. *Id.*, at App. 577. The Articles of
Incorporation also identify **Igor Latsanovski**, at 4335 Dickens Street, #167,
Sherman Oaks, CA 91403, as the incorporator and initial agent for service of
process. *Id.* The annual Statement of Information filed July 8, 2013, identifies
Sean Inniss, at 200 N. Maryland Avenue, Suite 300, Glendale, CA 91206, as
Director, CEO, Secretary, and CFO of **Zen Mobile Media, Inc.** *Id.*, at App. 578.
The 2013 Statement of Information also identifies 16830 Ventura Blvd, Suite
#360, Encino, CA 91436 as the mailing address of the corporation. *Id.* The annual
Statement of Information filed October 24, 2014, identifies "**Igor Lats**," at 4335
Van Nuys Blvd #167, Sherman Oaks, CA 91403, as Director, CEO, Secretary, and
CFO of **Zen Mobile Media, Inc.** *Id.*, at App. 580. On December 12, 2014, **Igor**

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 5

**Latsanovski**, as Director, executed a Certificate of Dissolution for **Zen Mobile Media, Inc.** *Id.*, at App. 581.

      12.    According to its Articles of Incorporation, **Safehaven Ventures, Inc.** was incorporated on November 10, 2011. *Id.*, at App. 582. The Articles of Incorporation also identify Tomer Amsalem, at 548 S. Spring Street, Unit 406, Los Angeles, CA 90031, as the incorporator and initial agent for service of process. *Id.* The annual Statement of Information filed February 29, 2012, identifies Tomer Amsalem, at 548 S. Spring Street, Unit 406, Los Angeles, CA 90031, as Director, CEO, Secretary, and CFO of **Safehaven Ventures, Inc.** *Id.*, at App. 583. The 2012 Statement of Information also identifies 200 N. Maryland Avenue, Suite 300, Glendale, CA 91206 as the mailing address of the corporation. *Id.* The annual Statement of Information filed July 8, 2013, lists Tomer Amsalem's address as 200 N. Maryland Avenue, Suite 300, Glendale, CA 91206, and 16830 Ventura Blvd, Suite #360, Encino, CA 91436 as the mailing address of the corporation. *Id.*, at App. 584. On December 27, 2013, Tomer Amsalem executed a Certificate of Dissolution for **Safehaven Ventures, Inc.** *Id.*, at App. 585.

      13.    According to its Articles of Incorporation, **Heritage Alliance Group, Inc.** was incorporated on March 29, 2012. *Id.*, at App. 586. The Articles of Incorporation also identify Tal Topel, at 21113 Osborne Street, Canoga Park, CA 91304, as the incorporator and initial agent for service of process. *Id.* The annual

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK          Page | 6

App. 000006
Ex. 1

Statement of Information filed March 6, 2013, identifies Tal Topel, at 21113

Osborne Street, Canoga Park, CA 91304, as Director, CEO, Secretary, and CFO of

Heritage Alliance Group, Inc. *Id.*, at App. 587.   The Statement of Information

also identifies 16830 Ventura Blvd, Suite #360, Encino, CA 91436 as the mailing

address of the corporation. *Id.* On December 19, 2014, Tal Topel executed a

Certificate of Dissolution for **Heritage Alliance Group, Inc.** *Id.*, at App. 589.

14.     According to its Articles of Incorporation, **AMD Financial Network,**

**Inc.** was incorporated on March 29, 2012. *Id.*, at App. 590.  The Articles of

Incorporation also identify Annsofie Algarp, at 9820 Ownsmouth Avenue, Unit 15,

Chatsworth, CA 91311, as the incorporator and initial agent for service of process.

*Id.*  The annual Statement of Information filed September 10, 2012, identifies A

Algarp, at 9820 Ownsmouth Avenue, Unit 15, Chatsworth, CA 91311, as Director,

CEO, Secretary, and CFO of **AMD Financial Network, Inc.** *Id.*, at App. 591.

15.     According to its Articles of Incorporation, **SBM Management, Inc.**

was incorporated on June 8, 2012. *Id.*, at App. 593.  The Articles of Incorporation

also identify Stephan Bauer, at 655 N. Central Avenue, Suite 1700, Glendale, CA

91203, as the incorporator and initial agent for service of process. *Id.*  The annual

Statement of Information filed May 13, 2013, identifies Stephan Bauer as Director,

CEO, Secretary, and CFO of **SBM Management, Inc.** *Id.*, at App. 594.   The

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                              Page | 7

1    Statement of Information also identifies 16830 Ventura Blvd, Suite #360, Encino,

2    CA 91436 as the mailing address of the corporation.  *Id.*

3
           16.     According to its Articles of Incorporation, **Media Urge, Inc.** was
4

5    incorporated on September 21, 2012.  *Id.*, at App. 596.  The Articles of

6    Incorporation also identify R. Ohana as the incorporator and California Corporate

7
     Agents, Inc. as the initial agent for service of process.  *Id.*  The annual Statement of
8

9    Information filed October 18, 2012, identifies R. Ohana, at 18757 Burbank Blvd.,

10   Suite 205, Tarzana, CA 91356, as Director, CEO, Secretary, and CFO.  *Id.*, at App.

11

12   597.  On December 19, 2014, Ram Ohana executed a Certificate of Dissolution for

13   Media Urge, Inc.  *Id.*, at App. 599.

14
           17.     According to its Articles of Organization, **Adageo, LLC** was formed
15

16   on September 25, 2012.  *Id.*, at App. 600.  The Articles of Organization also

17
     identify **Alon Nottea** as the organizer and California Corporate Agents, Inc. as the
18

19   initial agent for service of process.  *Id.*  The annual Statement of Information filed

20   May 9, 2013, identifies **Alon Nottea**, at 16161 Ventura Blvd, #378, Encino, CA

21

22   91436, as the Manager and CEO of the company.  *Id.*, at App. 601.   The Statement

23   of Information also identifies 16830 Ventura Blvd, Suite #360, Encino, CA 91436

24
     as the mailing address of the company.  *Id.*
25

26          18.     According to its Articles of Incorporation, **Calenergy, Inc.** was

27   incorporated on September 3, 2009.  *Id.*, at App. 603.  The Articles of Organization

28

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 8

also identify Aleksey Katmissky as the incorporator and **Igor Latsanovski**, at

1557 South Beverly Glen Boulevard, Suite 308, Los Angeles, CA 90024, as the

initial agent for service of process. *Id.* The annual Statement of Information filed

March 29, 2012, identifies **Igor Latsanovski**, at 5482 Amber Circle, Calabasas,

CA 91302, as Director, CEO, Secretary, and CFO. *Id.*, at App. 604. The

Statement of Information filed April 22, 2014 identifies a new address for **Igor**

**Latsanovski** and the company at 23679 Calabasas Rd., #531, Calabasas, CA

91302. *Id.*, at App. 605.

      19.    According to its Articles of Incorporation, **KAI Media, Inc.** was

incorporated on July 26, 2012. *Id.*, at App. 606. The Articles of Organization also

identify David Yosafian, at 14320 Ventura Blvd, #250, Sherman Oaks, CA 91423,

as the incorporator and initial agent for service of process. *Id.* The annual

Statement of Information filed May 9, 2013, identifies David Yosafian, at 14320

Ventura Blvd, Ste 250, Sherman Oaks, CA 91423, as Director, CEO, Secretary,

and CFO. *Id.*, at App. 607. The Statement of Information also identifies 16830

Ventura Blvd, Suite #360, Encino, CA 91436 as the mailing address of the

corporation. *Id.*

      20.    According to its Articles of Incorporation, **Insight Media, Inc.** was

incorporated on July 26, 2012. *Id.*, at App. 609. The Articles of Organization also

identify Gilad Miron, at 23371 Mulholland Dr., #355, Woodland Hills, CA 91364,

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK           Page | 9

as the incorporator and initial agent for service of process. *Id.* The annual

Statement of Information filed May 8, 2013, identifies Gilad Miron as Director,

CEO, Secretary, and CFO. *Id.*, at App. 610. The Statement of Information also

identifies 16830 Ventura Blvd, Suite #360, Encino, CA 91436 as the mailing

address of the corporation. *Id.*

### Defendants' Websites

21.    During this investigation, I viewed several websites and landing pages

operated by Defendants or their affiliates. I captured these websites using Adobe

Pro software and preserved them for offline viewing. True and correct printed

copies of these websites are attached as Att. I, at App. 353 – 524. The following

paragraphs discuss each of the websites as well as my related undercover purchase

of the AuraVie free trial from AuraVieFreeTrial.com.

### Bunzai Media Group, Inc. at http://204.232.201.236

22.    A true and correct copy of **Bunzai Media Group, Inc.'s** website at

http://204.232.201.236 is attached as *Id.*, at App. 353 – 391. The "Contact Us"

page of the website, *Id.*, at App. 358, lists the following contact information for

**Bunzai Media Group, Inc.**: 16161 Ventura Blvd. #378, Encino, CA 91436;

Direct: 818-200-1035; Fax: 818-647-0182. The "Careers" page of the website, *Id.*,

at App. 357, lists careers@bunzaimedia.com as a contact email address for

prospective employees. The "Portfolio" page of the website, *Id.*, at App. 375 –

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 10

377, identifies several *Brands* in the various categories, including **AuraVie SkinCare**, **Miracle Face Kit**, and **AuraVie Brand** Website.

**www.AuraVie.com**

23.    True and correct copies of several pages from www.auravie.com are attached as *Id.*, at App. 391 – 464.  The "Contact Us" page of the website, *Id.*, at App. 393, lists the following contact information for **AuraVie**: AuraVie.com, PO Box 10465, Van Nuys, CA 91410; Phone: 866-216-9336.

**www.AuraVieFreeTrial.com**

24.    A true and correct copy of **AuraVie SkinCare's** website at www.auraviefreetrial.com is attached as *Id.*, at App. 465 – 476.  The "Contact Us" page of the website, *Id.*, at App. 475, lists the following contact information for **AuraVie**: AuraVie.com, P.O. Box 10465, Van Nuys, CA 91410; Phone: 866-216-9336; support@auravie.com.  The "Terms & Conditions" page of the website, *Id.*, at App. 471, also includes the following additional address: Attention: Legal, 16161 Ventura Blvd, #378, Encino, CA 91436.

**www.MyMiracleKit.com**

25.    A true and correct copy of **Miracle Kit's** website at www.mymiraclekit.com is attached as *Id.*, at App. 477 – 490.  The "Terms & Conditions" page of the website, *Id.*, at App. 481 – 485, lists the following contact

App. 000011
Ex. 1

information for **Miracle Kit**: Phone: 866-495-0631; support@MyMiracleKit.com;

Attention: Legal, 19528 Ventura Blvd, #224, Tarzana, CA 91356.

**MiracleFaceKit.com**

26.    A true and correct copy of **AMD Financial Group**'s website at

miraclefacekit.com is attached as *Id.*, at App. 491 – 505.  The front page of the

website, *Id.*, at App. 491, lists **AMD Financial Group's** phone number as 866-

260-2113.  The "Privacy Policy" page of the website, *Id.*, at App. 501 – 504,

provides the following contact information: **Miracle Face Kit**, 18034 Ventura

Blvd #234, Encino, CA 91316.  The "Contact Us" page of the website, *Id.*, at App.

505, provides the following contact information for **Miracle Face Kit**: Phone:

866-853-1249; support@MiracleFaceKit.com; **AGOA Holdings, Inc**, 18034

Ventura Blvd #234, Encino, CA 91316.

**BuyDellure.com**

27.    A true and correct copy of **Dellure SkinCare's** website at

BuyDellure.com is attached as *Id.*, at App. 506 – 524.  The "Privacy Policy" page

of the website, *Id.*, at App. 519 – 521, provides the following contact information:

Dellure SkinCare, 18034 Ventura Blvd #234, Encino, CA 91316.  The "Contact

Us" page of the website, *Id.*, at App. 522, provides the following contact

information for **Dellure SkinCare**: Phone: 800-949-8255; support@Dellure.com;

**Kai Media, Inc**, 18034 Ventura Blvd #234, Encino, CA 91316.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                          Page | 12

### Former Employee

28.    During the course of this investigation, I participated in several

telephone conversations with former employees of some of the Corporate

Defendants, including **Bunzai Media Group, Inc.**  Dawn Goddard worked for

**Bunzai Media Group, Inc.**, however, she was paid through a separate company,

Cerenade Marketing International, Inc.

29.    In one of these conversations, Ms. Goddard recounted an incident

when **Khristopher Bond** told her that he was upset because he suspected **Alon

Nottea** and **Igor Latsanovski** were trying to cheat him out of his share of the

profits from the business.  She said that he became agitated and said that they

better not cheat him because "…I know where all the money is."  He then

explained to her that they would take the money from the businesses and run it

through multiple "shell companies" and eventually the money would end up in a

holding account in Lichtenstein.  She said that Khristopher told her that the

banking regulations are very lax in Lichtenstein and they were using these

practices to "hide money from the government to avoid paying taxes."

30.    Ms. Goddard also discussed the standard practice of the businesses to

use affiliate marketers to direct more customers to Defendants' various websites.

The affiliate marketers used banner and popup advertisements, sponsored search

terms, and special offers through completing surveys or other tasks that directed

consumers to the "free trial offer" websites.  Defendants provided affiliate marketers with advertisements describing their offers, however some affiliate marketers created their own advertisements.

31.     During the normal course of her duties, she came into possession of several documents.  She provided two of these documents to the FTC.  True and correct copies of these documents are attached as Att. C, at App. 158 – 160.

32.     The documents consist of a partnership agreement and an employment verification letter.  The partnership agreement is an unexecuted agreement between **Alon Nottea**, **Khristopher Bond**, and **Igor Latsanovski** to form **Bunzai Media Group, Inc.**  The agreement specifies the following (*see Id.*, at App. 158 – 159):

        a.     The name of the company shall be **Bunzai Media Group, Inc.** and also encompass "all worldwide subsidiaries and affiliates of the company and campaigns, domains, websites, intellectual properties and business including **AuraVie Skincare**."

        b.     The principal business office shall be located at 7900 Gloria Avenue, Van Nuys, CA 91406.

        c.     Each of the three partners shall own 1/3 of the company.

        d.     The agreement "shall commence from October 12th, 2010."

33.     The employment verification letter (*see Id.*, at App. 160), dated September 9, 2011, provides a verification of employment of **Igor Latsanovski** as

---

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 14

Chief Financial Officer of **Bunzai Media Group**. The letter also states that **Igor Latsanovski** has held that positon since February of 2011. The letter was signed by **Khristopher Bond**, as COO of **Bunzai Media Group**. The letterhead and signature block included the following contact information:

a.  **Khristopher Bond's** mobile phone number: 323-810-6755

b.  **Khristopher Bond's** email address:

khristopher@bunzaimedia.com

c.  Company address: 16161 Ventura Blvd. #378,  Encino, CA 91436

d.  Company phone number: 818-200-1035

e.  Company fax number: 818-647-0182

f.  Company website: www.bunzaimedai.com

## CIVIL INVESTIGATIVE DEMANDS

34.  During this investigation, the FTC sent Civil Investigative Demands (CIDs) to a number of third-party companies that provided services to the Defendants, including GoDaddy.com, LLC ("GoDaddy") and Domains by Proxy, LLC, ("Domains by Proxy") American Express Company ("American Express"), California Employment Development Department ("California EDD"), J2 Global Communications, Inc. ("J2 Global"), and Moneris Solutions, Inc. ("Moneris Solutions").

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 15

### GoDaddy.com, LLC and Domains by Proxy, LLC

35.     The CID responses from GoDaddy.com and Domains by Proxy contained account information, including communications and payment information, for domain purchases and registrations.  Because the entire contents of the GoDaddy and Domains by Proxy business records are voluminous and cannot be conveniently examined in Court, I attached true and correct copies of a limited number of these documents, as well as the Business Records Certifications executed by a representative of the respective companies., as Att. D, at App. at 161 – 230.  The GoDaddy records indicate that a single "Shopper ID" account, identified by Shopper ID 26219179, purchased and registered **BunzaiMedia.com**, **AuraVie.com, AuraVieFreeTrial.com, MyMiracleKit.com, MiracleFaceKit.com, Dellure.com,** and **BuyDellure.com**. *Id.*, at App. 188 – 193. Shopper ID 26219179 is identified as Jay Michaels, 655 N. Central Ave., Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; and Email: accounting@sbmmgmt.com.  *Id.*, at App. 188. Finally, each of these domain names was registered as anonymous or private using GoDaddy's Domains by Proxy private registration service.  *Id.*, at App. 194 – 204.

### BunzaiMedia.com

36.     The Domains by Proxy records related to the **BunzaiMedia.com** domain identify the Registrant Contact, Technical Contact, Administrative

Contact, and Billing contact as Acai Berries, Acai Berry Nutritionals, 8335 Winnetka Ave., #118, Winnetka, CA 91306; Phone: 818-785-6800; and Email: vigorect@gmail.com. *Id.*, at App. 181 – 183.

37.    The GoDaddy legal receipt records related to **BunzaiMedia.com** for payment for domain name registration, private registration services, and web hosting services provide several shipping/billing profiles that were used by **Bunzai Media** to pay for these services:

  a. **Alon Nottea**, Bunzai Media, 16161 Ventura Blvd., #378, Encino, CA 91436; Phone: 818-785-6800; Fax: 818-647-0182; Email: domains@bunzaimedia.com; Credit Card: **Alon Nottea**, Visa ending xx2520. *Id.*, at App. 223.

  b. Jay Michaels, 16161 Ventura Blvd., #378, Encino, CA 91436; Phone: 818-785-6800; Fax: 818-647-0182; Email: domains@bunzaimedia.com; Credit Card: **Alon Nottea**, Visa ending xx2520. *Id.*, at App. 221 – 222.

  c. Jay Michael, 7900 Gloria Ave., Van Nuys, CA 91406; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@bunzaimedia.com; Credit Card: Amex ending xx1116. *Id.*, at App. 215 – 216.

App. 000017
Ex. 1

d.   Jay Michael, 655 N. Central Ave., Suite 1700, Glendale, CA
91203; Phone: 818-200-1035; Fax: 818-647-0182; Email:
accounting@sbmmgmt.com; Credit Card: Amex ending
xx1116. *Id.*, at App. at 212.

**AuraVie.com**

38.   The Domains by Proxy records related to the **AuraVie.com** domain
identify the Registrant Contact, Technical Contact, Administrative Contact, and
Billing contact as Acai Berries, Acai Berry Nutritionals, 102 NE 2nd St., #381,
Boca Raton, FL 33432; Phone: 561-922-5979; and Email: vigorect@gmail.com.
*Id.*, at App. 165 – 167.

39.   The GoDaddy legal receipt records related to **AuraVie.com** for
payment for domain name registration, private registration services, and web
hosting services provide several shipping/billing profiles that were used by
**AuraVie.com** to pay for these services:

a.   Acai Berries, Acai Berry Nutritionals, 102 NE 2nd St., #381,
Boca Raton, FL 33432; Phone: 561-922-5979; Email:
vigorect@gmail.com; Credit Card: **Alon Nottea**, Visa ending
xx4448. *Id.*, at App. 226 – 227.

b.   Jay Michaels, 16161 Ventura Blvd., #378, Encino, CA 91436;
Phone: 818-785-6800; Fax: 818-647-0182; Email:

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 18

domains@bunzaimedia.com; Credit Card: **Alon Nottea**, Visa

ending xx2520.  *Id.*, at App. 218 – 219.

      c.     Jay Michael, 7900 Gloria Ave., Van Nuys, CA 91406; Phone:

818-200-1035; Fax: 818-647-0182; Email:

accounting@bunzaimedia.com; Credit Card: **Alon Nottea**,

Amex ending xx2043.  *Id.*, at App. 217.

      d.     Jay Michael, 655 N. Central Ave., Suite 1700, Glendale, CA

91203; Phone: 818-200-1035; Fax: 818-647-0182; Email:

accounting@sbmmgmt.com; Credit Card: Stephan Bauer,

Amex ending xx1057.  *Id.*, at App. 208 – 209.

      e.     Jay Michaels, 655 N. Central Ave., Suite 1700, Glendale, CA

91203; Phone: 818-200-1035; Fax: 818-647-0182; Email:

accounting@sbmmgmt.com; Credit Card: S Bauer, Amex

ending xx2055.  *Id.*, at App. 229 – 230.

**<u>AuraVieFreeTrial.com</u>**

    40.    The Domains by Proxy records related to the **AuraVieFreeTrial.com**

domain identify the Registrant Contact, Technical Contact, Administrative

Contact, and Billing contact as Jay Michaels, 16161 Ventura Blvd., #378, Encino,

CA 91436; Phone: 818-785-6800; and Email: domains@bunzaimedia.com.  *Id.*, at

App. 172 – 174.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK             Page | 19

41.     The GoDaddy legal receipt records related to **AuraVieFreeTrial.com**
for payment for domain name registration, private registration services, and web
hosting services lists the following shipping/billing profile that was used by
**AuraVieFreeTrial.com** to pay for these services:

        a.     Jay Michael, 655 N. Central Ave., Suite 1700, Glendale, CA
              91203; Phone: 818-200-1035; Fax: 818-647-0182; Email:
              accounting@bunzaimedia.com; Credit Card: Amex ending
              xx1116. *Id.*, at App. 213 – 214.

**MyMiracleKit.com**

42.     The Domains by Proxy records related to the **MyMiracleKit.com**
domain identify the Registrant Contact, Technical Contact, Administrative
Contact, and Billing contact as Acai Berries, Acai Berry Nutritionals, 102 NE 2nd
St., #381, Boca Raton, FL 33432; Phone: 561-922-5979; and Email:
vigorect@gmail.com. *Id.*, at App. 175 – 177.

43.     The GoDaddy legal receipt records related to **MyMiracleKit.com** for
payment for domain name registration, private registration services, and web
hosting services provide several shipping/billing profiles that were used by
**MyMiracleKit.com** to pay for these services:

        a.     Jay Michaels, 16161 Ventura Blvd., #378, Encino, CA 91436;
              Phone: 818-785-6800; Fax: 818-647-0182; Email:

domains@bunzaimedia.com; Credit Card: **Alon Nottea**, Visa ending xx2520. *Id.*, at App. 221 – 222.

b.    Jay Michael, 7900 Gloria Ave., Van Nuys, CA 91406; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@bunzaimedia.com; Credit Card: **Alon Nottea**, Amex ending xx2043. *Id.*, at App. 217.

c.    Jay Michaels, 655 N. Central Ave., Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@sbmmgmt.com; Credit Card: S Bauer, Amex ending xx2055. *Id.*, at App. 229 – 230.

**MiracleFaceKit.com**

44.    The Domains by Proxy records related to the **MiraleFaceKit.com** domain identify the Registrant Contact, Technical Contact, Administrative Contact, and Billing contact as Acai Berries, Acai Berry Nutritionals, 102 NE 2nd St., #381, Boca Raton, FL 33432; Phone: 561-922-5979; and Email: vigorect@gmail.com. *Id.*, at App. 168 – 171.

45.    The GoDaddy legal receipt records related to **MiracleFaceKit.com** for payment for domain name registration, private registration services, and web hosting services lists the following shipping/billing profiles that were used by **MiracleFaceKit.com** to pay for these services:

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK         Page | 21

a.      Acai Berries, Acai Berry Nutritionals, 102 NE 2nd St., #381, Boca Raton, FL 33432; Phone: 561-922-5979; Email: vigorect@gmail.com; Credit Card: **Alon Nottea**, Visa ending xx4448. *Id.*, at App. 228.

b.      **Alon Nottea**, 16161 Ventura Blvd., #378, Encino, CA 91436; Phone: 818-785-6800; Fax: 818-647-0182; Email: domains@bunzaimedia.com; Credit Card: **Alon Nottea**, Visa ending xx2520. *Id.*, at App. 225.

c.      Jay Michael, 7900 Gloria Ave., Van Nuys, CA 91406; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@bunzaimedia.com; Credit Card: **Alon Nottea**, Amex ending xx2043. *Id.*, at App. 217.

d.      Jay Michael, 655 N. Central Ave., Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@sbmmgmt.com; Credit Card: Stephan Bauer, Amex ending xx1057. *Id.*, at App. 210 – 211.

e.      Jay Michaels, 655 N. Central Ave., Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@sbmmgmt.com; Credit Card: S Bauer, Amex ending xx2055. *Id.*, at App. 229 – 230.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK          Page | 22

**BuyDellure.com**

46.    The Domains by Proxy records related to the **BuyDellure.com** domain identify the Registrant Contact, Technical Contact, Administrative Contact, and Billing contact as Jay Michael, 655 N. Central Ave. Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; and Email: accounting@sbmmgmt.com.  *Id.*, at App. 178 – 180.

47.    The GoDaddy legal receipt records related to **BuyDellure.com** for payment for domain name registration and private registration services lists the following shipping/billing profile that was used by BuyDellure.com to pay for these services:

      a.    Jay Michael, 655 N. Central Ave., Suite 1700, Glendale, CA 91203; Phone: 818-200-1035; Fax: 818-647-0182; Email: accounting@sbmmgmt.com; Credit Card: Amex ending xx2055.  *Id.*, at App. 205 – 207.

**J2 Global Communications, Inc.**

48.    The CID response from J2 Global, attached as Att. E, at App. 231 – 245, contains customer account information, including account profile and historical payment records.  These records indicate that the fax number used by several of the Defendants, 818-647-0182, is an electronic fax service provided by J2 Global.  *Id.*, at App. 238.  The account information associated with this fax

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK            Page | 23

number lists the following customer information: Name: Fax Center; Address:

7900 Gloria Ave., Van Nuys, CA 91406; Phone: 818-200-1035; Email addresses:

accounting@pinlogistics.com, accounting818@gmail.com, accounting

@bunzaimedia.com. *Id.*, at App. 233.

49.    The customer payment records related to the fax number 818-647-

0182 list several payment profiles that were used to pay for this service:

    a.    Name: Business Customer; Address: 7900 Gloria Ave.; Credit

          Card ending: xx1124; *Id.*, at App. 235.

    b.    Name: Business Customer; Address: 7900 Gloria Ave.; Credit

          Card ending: xx1040; *Id.*

    c.    Name: **Doron Nottea**; Address: 7900 Gloria Ave.; Credit Card

          ending: xx1018; *Id.*

    d.    Name: **Alon Nottea**; Address: 16161 Ventura Blvd., #378;

          Credit Card ending: xx2520; *Id.*, at App. 237.

    e.    Name: **Alon Nottea**; Address: 8335 Winnetka Ave., #118;

          Credit Card ending: xx2520; *Id.*

    f.    Name: **Alon Nottea**; Address: 8335 Winnetka Ave., #118;

          Credit Card ending: xx4448; *Id.*

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                Page | 24

## Moneris Solutions, Inc.

50.     The CID response from Cynergy Data, LLC, on behalf of Moneris Solutions, includes account application records, correspondence, monthly statements, and chargeback reports for the payment processor accounts for **Bunzai Media Group, Inc.** and **Zen Mobile Media, Inc.** at SignaPay.  True and correct copies of selected pages from these records are attached as Att. F, at App. 246 – 286.

51.     The account application and related documents for **Bunzai Media Group, Inc.** lists the following information related to its payment processor account (*Id.*, at App. 254 – 274):

a.     Legal Name, Address, and Contact Information:

> **Bunzai Media Group, Inc.**
>
> 16161 Ventura Blvd #378, Encino, CA 91436
>
> Phone: 818-785-6800
>
> Contact: Nastassia

b.     Account Name (d/b/a), Address, and Contact Information:

> **My AuraVie**
>
> 7900 Gloria Ave, Van Nuys, CA 91406
>
> Phone: 818-785-6800
>
> Fax: 818-647-0182

      c.      Email: accounting@bunzaimedia.com

      d.      Website Address: **MyAuraVie.com**

      e.      Owners/Officers:

            **Motti Nottea** (CEO/Owner)

            7900 Gloria Ave, Van Nuys, CA 91406

52.     The account application and related documents for **Zen Mobile Media, Inc.** lists the following information related to its payment processor account (*Id.*, at App. 275 – 286):

      a.      Legal Name, Address, and Contact Information:

            **Zen Mobile Media, Inc.**

            4335 Van Nuys Blvd #167, Sherman Oaks, CA 91403

            Phone: 866-982-6218

            Contact: **Igor Latsanovski**

      b.      Account Name (d/b/a), Address, and Contact Information:

            MySkin 877-743-7943

            4335 Van Nuys Blvd #167, Sherman Oaks, CA 91403

            Phone: 866-982-6218

            Fax: 818-994-8999

      c.      Owners/Officers:

            **Igor Latsanovski** (CEO/Owner)

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK           Page | 26

Calabasas, CA 91302

53.     Because the entire contents of the Moneris Solutions accounts statements and chargeback reports are voluminous and cannot be conveniently examined in Court, I summarized the total Sales and Chargebacks data for each account in the following table.

|  | Total Gross Sales | Total Chargebacks | Total Net Sales | Monthly Average Net Sales |
|---|---|---|---|---|
| **Bunzai Media Group, Inc** (Feb-11 thru Jan-13) | $1,937,385.03 | $119,111.85 | $1,818,273.18 | $75,761.38 |
| **Zen Mobile Media, Inc.** (Dec-11 thru Dec-14) | $2,059,900.93 | $151,023.88 | $1,908,877.05 | $51,591.27 |
| **Combined** | $3,997,285.96 | $270,135.73 | $3,727,150.23 | $79,301.07 |

## UNDERCOVER PURCHASES

### AuraVieFreeTrial.com

54.     On August 28, 2014, I logged onto the FTC's undercover computer at the FTC's Southwest Region Office.  I initiated the Mozilla Firefox browser and navigated to **auraviefreetrial.com**.  This is the same website I attached as Att. I, at App. 465 – 476.

55.     Using SnagIt, a screen video capture software program, I recorded the steps taken to order a trial package of the product referred to as "**AuraVie** 3-in-1 SkinCare Trial."  I filled out the online form with the heading "TELL US WHERE TO SEND YOUR TRIAL ORDER" using an undercover name, phone number and

mailing address, and then clicked the button labed "SEND ME MY TRIAL

ORDER." *Id.*, at App. 465.

56. A screen opened with a form for entering credit card information and

a graphic showing the trial with a price of $0.00 and priority shipping and handling

of $4.95 (after I input the promo code "AURA" the shipping and handling changed

to $2.95). I filled out the online form with the heading "SHIPPING PAYMENT"

using information tied to an undercover credit card account, and then clicked on

the button labeled "GET MY ORDER." *Id.*, at App. 476.

57. A screen then opened with the title "Thank You for Your Order!" and

listed a Shipping & Handling price of $1.02 and an eBooks Processing Fee of

$1.93, for a total of $2.95. A true and correct printed copy of this page is attached

as Att. H, at App. 341.

58. On August 28, 2014, I received a confirmation email related to my

"AuraVie SkinCare System Risk Free Trial – 30 day supply." *Id.*, at App. 342 –

348. On August 29, 2014, I received a shipping confirmation email notifying me

that my package was shipped and included the US Postal Service tracking number.

The email also provided the AuraVie Customer Care phone number of 888-291-

7385 and address at P.O. Box 10465, Van Nuys, CA 91410. *Id.*, at App. 349.

59. On September 26, 2014, I called a customer service number for

**AuraVie Skincare** for the purpose of attempting to cancel the account that was

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                          Page | 28

created when I made the initial undercover purchase on August 28, 2014.  I have attached a true and correct copy of the transcript of that telephone conversation at Att. G, at App. 287 – 304.  On September 26, 2014, I received an email from support@auravie.com referencing and including certain portions of the Terms & Conditions associated with the original purchase.  On the same day, I received a second email with confirmation of my account cancellation and a third email with confirmation of a partial refund of $45 to be applied to the credit card account that was used to make the initial purchase.  These three emails are attached as Att. H, at App. 350 – 352.

60.     On February 12, 2015, I called the customer service number for **AuraVie Skincare** again in order to attempt to obtain a refund of the balance that was not already refunded from the original purchase.  A true and correct copy of the transcript of that telephone conversation is attached as Att. G, at App. 305 – 321.

**MyMiracleKit.com**

61.     On January 20, 2015, another FTC Investigator took the steps to complete an undercover purchase of the free trial offered at **http://www.mymiraclekit.com**.  Att. K, at App. 534 – 552.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                         Page | 29

62.    On April 6, 2015, I called the customer service number for **AuraVie** Skincare included on the packing List that was provided with the free trial products associated with the purchase from **MyMiracleKit.com**.  The purpose of the call was to cancel future shipments of the products and attempt to obtain a refund of the charges.  A true and correct copy of the transcript of that telephone conversation is attached as Att. G, at App. 322 – 340.

### AMAZON.COM SHOPPER SURVEY

63.    On May 28, 2015, I logged onto the FTC's undercover computer at the FTC's Southwest Region Office.  I initiated the Mozilla Firefox browser and navigated to the "Wayback Machine" at http://archive.org.  I searched for the website located at the URL address http://consumers-research.com/survey/TV.c1.php?t202id=71048&t202kw=amazon in the Wayback Machine archives.  The results of that search and related pages are attached as Att. J, at App. 525 – 533.

64.    The search results indicate that the website at the designated URL address had been saved 31 times between February 14, 2013, and October 1, 2013. *Id.*, at App. 525.  I selected the version of the website that was archived on February 14, 2013.  A survey of four questions immediately began. *Id.*, at App. 527 – 530.  These questions and my responses were as follows:

a.    What is your Gender?

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 30

                                i.       Response: Female

       b.     How often do you visit Amazon.com?

                                  i.       Response: Once a week or more

       c.     How old are you?

                                  i.       Response: 55+

       d.     Do you plan to purchase anything from Amazon.com in the

future?

                                  i.       Response: Yes

65.     After completing the survey, I was presented with several special offers. *Id.*, at App. 532 – 533.  One of those special offers was the "Auravie ©  Anti-Aging System" and included the following language:

               Regular Price $98.97

               Yours: Risk FREE trial*

               Pay Shipping Only: $4.99

               Quantity Left: (1)

               Use Coupon "Amazon" for reduced shipping price

**ALON NOTTEA DEPOSITION TRANSCRIPT**

66.     During the course of this investigation, the FTC became aware of an employment lawsuit filed by a former employee against many of the Defendants in the FTC's present lawsuit.  The FTC contacted Alexander Gareeb, counsel for the

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK            Page | 31

former employees in the lawsuit, to request information and documents.  Mr.

Gareeb provided the transcripts of the deposition of **Alon Nottea**, taken on May 9,

May 12, and May 13, 2014.  True and correct copies of selected pages from these

transcripts are attached as Att. A, at App. 1 – 135.

### IGOR LATSANOVSKI IMMIGRATION DOCUMENTS

67.     During the course of its investigation, the FTC became aware of a

lawsuit filed by **Calenergy, Inc.** and **Igor Latsanovski**, among others, related to

the immigration and residency status of **Igor Latsanovski**.  The FTC contacted

Special Assistant United States Attorney ("SAUSA") Beth Gunter and requested

information and documents related to this lawsuit.  SAUSA Gunter provided a

copy of the Complaint filed by **Calenergy, Inc.** and **Igor Latsanovski** and copies

of the "Intent to Revoke" letters sent to **Calenergy, Inc.** by U.S. Citizenship and

Immigration Services.  True and correct copies of these documents are attached as

Att. N, at App. 612 – 631.

### CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT

68.     The CID response from the California EDD included account

information and quarterly employment tax records of **Bunzai Media Group, Inc.**

and **Pinnacle Logistics, Inc.**  Att. B, at App. 136 – 157.

69.     The account information for **Bunzai Media Group, Inc.** included the

following information (*see Id.*, at App. 136):

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 32

Bunzai Media Group, Inc.

16161 Ventura Blvd #378, Encino, CA 91436

Contacts: Christopher Bond, Alon Nottea

Phone: 818-785-6800

70.    The account information for **Pinnacle Logistics, Inc.** included the following information (*see Id.*, at App. 149):

Pinnacle Logistics, Inc.

6914 Canby Ave., Ste. 107, Reseda, CA 91335

Contacts: Leor Arazy

Phone: 818-200-1035

### USPIS DECLARATION

71.    During the course of this investigation, the FTC contacted the US Postal Inspection Service to request information and records related to certain Post Office box addresses, specifically PO Box 10465, Van Nuys, California 91410. U.S. Postal Inspector Sherri Lanham provided a declaration related to the persons and entities that registered PO Box 10465.  A true and correct copy of this declaration is attached as Att. L, at App. 553 – 554.

### AMERICAN EXPRESS

72.    The CID response from American Express included account statements, correspondence, and other records related to Defendants' American

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 33

Express credit card accounts and amounted to more than 2,500 pages. I have included true and correct copies of only selected pages of these records as Att. O, at App. 632 – 646.

73.    These records include the following cardholder information (*see Id.*, at App. 632 – 633):

American Express Card # ending 2055:

Name: S Bauer

Company: SBM Management, Inc.

74.    This card was used by S. Bauer to purchase the GoDaddy domain registration services used by Defendants for several of their websites. *Id.*, at App. 636 and Att. D, at App. 229 – 230.

75.    These records also include the following cardholder information (*see* Att. O, at 643):

American Express Card # ending 1116:

Name: Stephan Bauer

Address: 6925 Canby Ave, Ste. 105, Reseda, CA 91335

76.    This card was used by Stephan Bauer to purchase the GoDaddy domain registration services used by Defendants for several of their websites. Att. D, at App. 212 – 216.

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                Page | 34

1
2   I declare, under penalty of perjury, that the foregoing statement is true and
3   correct.
4
5   Executed on June 12, 2015, at Dallas, Texas.
6
7
8
9                                        BRENT D. MCPEEK
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK                    Page | 35

```
 1                SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT
 3
    DAWN GODDARD, an                   )
 4  individual; NANCY YALLEY,          )
    an individual,                     )
 5                                     )
         Plaintiffs,                   )
 6                                     ) No.  BC510493
         vs.                           )
 7                                     )
    KHRISTOPHER BOND, a.k.a.           )
 8  RAYMOND IBBOTT, an                 )
    individual; ALON NOTTEA, an        )
 9  individual; BUNZAI MEDIA           )
    GROUP, INC., a California          )
10  Corporation; PINNACLE             )
    LOGISTICS, INC., a                 )
11  California Corporation;            )
    CERENADE MARKETING                 )
12  INTERNATIONAL, INC., a             )
    California Corporation;            )
13  MEDIA URGE, INC., a                )
    California Corporation; and        )
14  DOES 1-100, Inclusive,             )
                                       )
15       Defendants.                   )
16  _____
17
18             DEPOSITION OF ALON NOTTEA, VOLUME I
19
20                  Woodland Hills, California
21                     Friday, May 9, 2014
22
23  Reported by:
    Angela S. Hartsock
24  CSR No. 12620
    Job No. 1850231
25  PAGES: 1 - 233
```

Page 1

ATTACHMENT A                                    APP.000036
                                                Ex. 1

```
 1      SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2      FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT
 3
 4  DAWN GODDARD, an          )
    individual; NANCY YALLEY, )
 5  an individual,            )
                              )
 6      Plaintiffs,           )No  BC510493
                              )
 7      vs                    )
                              )
 8  KHRISTOPHER BOND, a k a   )
    RAYMOND IBBOTT, an        )
 9  individual; ALON NOTTEA, an )
    individual; BUNZAI MEDIA  )
10  GROUP, INC , a California  )
    Corporation; PINNACLE      )
11  LOGISTICS, INC , a        )
    California Corporation;    )
12  CERENADE MARKETING        )
    INTERNATIONAL, INC , a    )
13  California Corporation;    )
    MEDIA URGE, INC , a       )
14  California Corporation; and )
    DOES 1-100, Inclusive,    )
15                            )
    Defendants                )
16  _____
17
18
19      Deposition of ALON NOTTEA, Volume I, taken on
20  behalf of Plaintiffs, at 21333 Oxnard Street, Woodland
21  Hills, California, commencing at 10:03 a m , and ending at
22  4:20 p m , on Friday, May 9, 2014, before Angela S
23  Hartsock, Certified Shorthand Reporter, No  12620
24
25
                                              Page 2
```

```
 1                  I N D E X
 2
 3  WITNESS      EXAMINATION      PAGE
 4
 5  ALON NOTTEA, VOLUME  DIRECT EXAMINATION    5
 1           BY MR  GAREEB:
 6
 7
 8        E X H I B I T S
 9
10  NUMBER      DESCRIPTION      PAGE
11  Exhibit 1   Plaintiff's Amended   14
            Notice of Taking
            Deposition of
12          Defendant Alon
            Nottea
13
14
15
        INSTRUCTED NOT TO ANSWER
16      Page  Line
17       11   6
         23  17
18       25   1
         26   2
19       30  16
         41   8
20       43  16
         47  24
21       48  10
         50   3
22       51   9
         52   7
23       65  21
         67  21
24       79  24
25
                                              Page 4
```

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3
 4      GAREEB LAW GROUP
 5      By: Alexander S. Gareeb, Esq.
 6      21333 Oxnard Street
 7      2nd Floor
 8      Los Angeles, California 90067
 9      (818) 456-0970
10      Agareeb@glglegal.com
11
12  For the Defendant:
13
14      UNGAR LAW
15      By: Robert M. Ungar, Esq.
16      14724 Ventura Boulevard
17      Sherman Oaks, California 91403
18      (310) 405-1884
19      RMU@ungarlaw.com
20
21
22          -o0o-
23
24
25
                                              Page 3
```

```
 1          Woodland Hills, California, Friday,
 2          May 9, 2014, 10:03 a.m.
 3
 4      THE COURT REPORTER:  Please raise your right
 5  hand to be sworn.
 6      You do swear or affirm that the evidence
 7  you will give in this matter will be the truth, the
 8  whole truth, and nothing but the truth?
 9      MR. NOTTEA:  I do.
10
11      THEREUPON,
12          ALON NOTTEA,
13  a witness, having been first duly sworn, upon his
14  oath, testified as follows:
15                              10:03
16          DIRECT EXAMINATION
17  BY MR. GAREEB:
18      Q.  Can you please state your name for the
19  record and your current address.
20      A.  My name is Alon Nottea, and the address is   10:04
21  ███████████████████████████████.
22      Q.  And can you spell your last name for the
23  record.
24      A.  N-a-t-t-e-a.
25      Q.  All right.  You've probably spoken with   10:04
                                              Page 5
```

2 (Pages 2 - 5)

Page 6

1 your counsel. I'm just going to go through the
2 proceeding here in this deposition just so there is
3 no misunderstanding at all. I'm going to explain to
4 you what we're doing here and the ground rules
5 regarding this procedure, and a deposition is a          10:04
6 procedure of taking down your testimony under oath
7 in connection with a lawsuit that was filed by Dawn
8 Goddard and Nancy Yalley against various defendants,
9 including yourself. Do you understand that?
10    A. I do.                                            10:04
11    Q. Great. Now, even though we are here in an
12 informal setting in my office, your testimony today
13 is given under penalty of perjury just like it would
14 be if you were in a court of law. So you do
15 understand that you are under oath to tell the          10:05
16 truth, the whole truth and nothing but the truth?
17    A. I do.
18    Q. And you do understand that you just took an
19 oath here; right?
20    A. I do.                                            10:05
21    Q. And that oath means that you are under
22 penalty of perjury at this point; correct?
23    A. I understand.
24    Q. Let me -- as a logistical thing -- I was
25 going to tell you later on, but I may as well do it     10:05

Page 8

1 gotta tell you, though, that if you do make any
2 corrections or changes to your deposition, that I or
3 any other person may comment on those changes at
4 trial, which could be embarrassing. You do
5 understand that?                                        10:06
6    A. I do.
7    Q. Beautiful. That's why it's very important
8 here that you give complete, accurate, truthful
9 testimony today.
10    A. Understood.                                      10:07
11    Q. Beautiful. All right. Now, it's very
12 important that you give full complete, truthful
13 answers to my questions. You understand that;
14 right?
15    A. I do.                                            10:07
16    Q. Now, you are also entitled to clear and
17 understandable questions. If you don't understand
18 my question, please say so, and I'll do my best to
19 try to rephrase it to the extent that I can.
20        Now, if I ask a question and you didn't ask     10:07
21 for clarification and you answered it, then we will
22 assume that is the answer to that question.
23 Understood?
24    A. I do.
25    Q. Great. This happened quite some time ago         10:07

Page 7

1 now.
2        The court reporter here can only take down
3 words. She can't take down nods or shakes of the
4 head.
5    A. Understood. This a natural reaction,             10:05
6 though.
7    Q. Of course. Of course. That's why we
8 always remind people. We're not faulting you. You
9 are doing great right now, but it's just very
10 important that you give some sort of verbal            10:05
11 response. No shrugs or --
12    A. Absolutely.
13    Q. Now, you do understand that you must answer
14 my questions truthfully and honestly unless counsel
15 here instructs you not to answer.                       10:06
16    A. I do.
17    Q. Great. And as we mentioned, the court here
18 is taking down everything that is being said in this
19 deposition. At the end of the deposition, well,
20 maybe a week or two later, you'll receive a booklet,   10:06
21 and you'll be given an opportunity to review that
22 booklet or that deposition transcript is what we
23 call it, and then you will be asked to sign it. If
24 there are any revisions, obviously, you would inform
25 your counsel and your counsel will inform us. But I    10:06

Page 9

1 relatively speaking. We're not here to -- this is
2 not an endurance contest here. We are all gentlemen
3 here and ladies, so if you don't know the exact
4 answer to my question, I'm entitled to your best
5 estimate. I don't want you to guess and guessing is    10:08
6 no good here. It's not allowed.
7    A. I understand.
8    Q. I just want to make it clear here that you
9 understand the difference between a guess and an
10 estimate, okay?                                        10:08
11        An estimate is we are here in my conference
12 room in front of a conference room table here. You
13 are here and you can see it, you can feel it, and
14 you could probably assess here by looking at it
15 what's the length of this table. Any answer you        10:08
16 give me if I asked you what's the length of this
17 table, that's an estimate; however, if I asked you
18 what's the length of my desk, you've never been to
19 my office, you've never seen my desk. So any answer
20 you give would be a --                                 10:08
21    A. A guess.
22    Q. There you go. And then the other thing,
23 too, again, we've talked about this whole natural
24 discussion between humans. We tend to talk over
25 each other as well. And even though in social          10:08

3 (Pages 6 - 9)

1  context it's completely acceptable, we don't want
2  the court reporter to work too hard today,
3  especially on a Friday. So let's not talk over one
4  another. Wait until I finish my answer [sic], and
5  I'll try to wait until you finish your answer.        10:09
6      A.  Understood.
7      Q.  And then it will go smoother. Now, do you
8  have any questions before we start?
9      A.  No.
10     Q.  Great. Is there any reason why you won't    10:09
11  be able to give truthful and accurate testimony
12  today?
13     A.  No.
14     Q.  Have you taken any drugs or alcohol in the
15  past 24 hours that would hinder your ability to give  10:09
16  truthful testimony today?
17     A.  No.
18     Q.  Great. Any reason why this deposition
19  cannot go forward today?
20     A.  No.                                           10:09
21     Q.  Great. One last thing, by the way. Again,
22  if you ever have to take a break, please just say
23  so. There is one caveat to that. If there is a
24  question pending, I'm going to ask that you answer
25  and then we can go on break.                          10:09
                                                    Page 10

1  for your deposition?
2      A.  Yes.
3      Q.  Which documents did you review?
4      A.  I looked at the original complaint.
5      Q.  Anything else?                                10:11
6      A.  No.
7      Q.  When you say the original complaint, what
8  do you mean the original complaint?
9      A.  The lawsuit.
10     Q.  Okay. How many complaints -- what's your    10:11
11  understanding of how many complaints there are in
12  this lawsuit?
13     A.  I don't know.
14     Q.  Did you review more than one complaint?
15     A.  I reviewed the document.                     10:11
16     Q.  Which document?
17     A.  The first document I saw from your office.
18     Q.  You are talking about the lawsuit that was
19  filed?
20     A.  Yes.                              10:11
21     Q.  All right. Anything else?
22     A.  No.
23     Q.  Why did you review the complaint?
24     MR. UNGAR: Objection as to the form of the
25  question. It's vague.                               10:12
                                                    Page 12

1      A.  We will do the best we can.
2      Q.  Beautiful. Thank you. Now, what documents
3  have you reviewed in preparation for your deposition
4  today?
5      A.  Be more specific.                             10:10
6      Q.  Did you talk to anyone in preparation for
7  your deposition today?
8      MR. UNGAR: Well, I'll object to the extent that
9  it's invading the attorney-client privilege.
10  BY MR. GAREEB:                                       10:10
11     Q.  Go ahead.
12     MR. UNGAR: I'm instructing you not to answer.
13     MR. GAREEB: Please re-read the question.
14     MR. UNGAR: Do not answer any questions
15  concerning -- with regard to any conversations     10:10
16  you've had with your attorney.
17  BY MR. GAREEB:
18     Q.  Have you had any discussions in preparation
19  for your deposition? It's just a yes or a no. I'm
20  not asking for any content.                          10:10
21     A.  Yes.
22     Q.  Did you have any discussions with anyone
23  other than your counsel?
24     A.  No.
25     Q.  Did you review any documents in preparation  10:10
                                                    Page 11

1  BY MR. GAREEB:
2      Q.  Go ahead.
3      A.  If you object, and you say go ahead,
4  what --
5      MR. UNGAR: You can answer.                       10:12
6  BY MR. GAREEB:
7      Q.  He is just doing his job. He has to
8  preserve the record, and if there is anything he
9  believes that's objectionable, his job is just to
10  object. You are to answer unless he instructs you   10:12
11  not to answer.
12        So why did you review the complaint?
13     A.  To prepare for the deposition.
14     Q.  And what about the complaint -- what in the
15  complaint would help you prepare for the deposition?  10:12
16     MR. UNGAR: Objection as to the form of the
17  question. It's vague.
18     THE WITNESS: Be more specific.
19  BY MR. GAREEB:
20     Q.  Why did you review the complaint?            10:12
21     A.  In order --
22     MR. UNGAR: Hold on. Objection. It's asked and
23  answered twice.
24  BY MR. GAREEB:
25     Q.  How would reviewing the complaint help you   10:12
                                                    Page 13

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000039
Ex. 1

```
 1   prepare for the deposition?
 2       MR. UNGAR:  Same objection.
 3       THE WITNESS:  Refresh my memory.
 4   BY MR. UNGAR:
 5       Q.  And refresh your memory about what?      10:13
 6       A.  This case.
 7       Q.  So about the facts stated in the complaint?
 8       A.  Correct.
 9       MR. UNGAR:  Objection as to the form of the
10   question.
11          You have to give me an opportunity to
12   object if there is an objection.
13       MR. GAREEB:  I'm going to mark as Exhibit 1 --
14   I'm handing you what's been marked as Exhibit 1.
15   (Deposition Exhibit 1, Plaintiff's Amended Notice of  10:13
16   Taking Deposition of Defendant Alon Nottea, was
17   marked for identification and is attached hereto.)
18       MR. UNGAR:  Counsel, do you have a separate copy
19   for myself?
20       MR. GAREEB:  No.  I'll get a copy for you.      10:13
21       MR. UNGAR:  I would like copies of exhibits if
22   you are going to be offering exhibits.
23   BY MR. GAREEB:
24       Q.  Does that document look familiar to you?
25       MR. GAREEB:  The question was, does that document  10:14
```
Page 14

```
 1   look familiar to you.
 2       THE WITNESS:  Yes, it does.
 3          (Assistant walks in.)
 4       MR. GAREEB:  Great.  Can you make copies of
 5   this?                                             10:14
 6   BY MR. GAREEB:
 7       Q.  When did you receive that document?  I'm
 8   sorry.  When did you receive that document for the
 9   first time?
10       A.  I don't recall.                           10:15
11       Q.  But you are here obviously because of that
12   deposition notice; correct?
13       MR. UNGAR:  Objection to the form of the
14   question.  Calls for speculation.  It's vague.  It's
15   argumentative.                                    10:15
16       THE WITNESS:  Yes.
17   BY MR. GAREEB:
18       Q.  Mr. Nottea, I'm just going to go real fast
19   briefly --
20       MR. UNGAR:  Counsel, before you start, I want to  10:15
21   make sure we have a clear record.  Mr. Nottea is
22   here today not just with regard to the notice of
23   taking his deposition, but also, as you were
24   notified by electronic mail, he is here as the PMK
25   for Bunzai Media Group, Inc., and also Media Urge,  10:15
```
Page 15

```
 1   Inc.
 2       MR. GAREEB:  Thank you.  Are you done?  Are you
 3   done, yes or no?  I don't want to cut you off.
 4       MR. UNGAR:  Well, I appreciate that you don't
 5   want to cut me off.                               10:16
 6       MR. GAREEB:  Yeah.  Are you done?
 7       MR. UNGAR:  I believe I'm done --
 8       MR. GAREEB:  Great.
 9       MR. UNGAR:  -- yes, yes, sir.
10   BY MR. GAREEB:                                    10:16
11       Q.  What's your date of birth?
12       A.  ████████████████.
13       Q.  Place of birth?
14       A.  Israel.
15       Q.  What part?                                10:16
16       A.  Tel Aviv.
17       Q.  Marital status?  Are you married?
18       A.  I am.
19       Q.  Kids?
20       A.  Two.                                      10:16
21       Q.  How long have you been married?
22       A.  Nine years.
23       Q.  And how old are your kids?
24       A.  Five and seven.
25       Q.  God bless.                                10:16
```
Page 16

```
 1       A.  Thank you.
 2       Q.  Were you -- I doubt this because you seem
 3   young -- but were you married before?
 4       A.  No.
 5       Q.  Your first wife?                          10:17
 6       A.  Yes.
 7       Q.  Hopefully your only wife.
 8       A.  Thank you.
 9       Q.  Educational background.  Let's start with
10   high school.  Where did you go to high school?    10:17
11       A.  Taft High School.
12       Q.  Oh.  When did you move to the U.S. from
13   Israel?
14       A.  1984.
15       Q.  You were nine?                            10:17
16       A.  Correct.  Almost.
17       Q.  So you went to Taft High School.  What year
18   did you graduate?
19       A.  '93.
20       Q.  Great sports program.  Did you grow up in  10:17
21   the Valley?
22       A.  I did.
23       Q.  And then you got your high school diploma
24   obviously?
25       A.  I did.                                    10:17
```
Page 17

5 (Pages 14 - 17)

ATTACHMENT A

APP. 000040
Ex. 1

```
 1   question. It's vague.
 2       You can answer if you understand it.
 3       THE WITNESS: I did many things.
 4   BY MR. GAREEB:
 5       Q.  By the way, could I offer you some water,   10:44
 6   coffee, tea?  Or behind you if you open the fridge,
 7   there is also soda.
 8       A.  Thank you.  I'm fine for now.
 9       Q.  Let's try to streamline this.  When you say
10   you did many things, did you ever work at, like, a   10:44
11   job from eight to five?
12       A.  No.
13       Q.  So when you say that you are an
14   entrepreneur, you mean you always -- this is my
15   words, not yours -- but is it fair to say you look   10:44
16   for opportunities on things that interest you, not
17   necessarily an office job or eight to five job;
18   correct?
19       A.  Yes.
20       MR. UNGAR:  Objection as to the form of the   10:45
21   question.
22   BY MR. GAREEB:
23       Q.  I'm sorry?
24       A.  It's fair to say that.
25       Q.  Have you ever been convicted of a felony?   10:45
                                              Page 38
```

```
 1       A.  No.
 2       Q.  Have you ever been arrested?
 3       A.  No.
 4       MR. GAREEB:  Okay.  Now, give me a moment.
 5   Sorry.  We're going to have a two-minute break.  Is   10:45
 6   that okay?
 7   (A brief recess was taken at 10:46 a.m.)
 8   BY MR. GAREEB:
 9       Q.  What is Bunzai Media Group, to your
10   knowledge?                                    10:47
11       MR. UNGAR:  Objection as to the form of the
12   question.  It's vague.
13       Counsel, are you referring to the defendant
14   in the lawsuit?
15   BY MR. GAREEB:                                10:47
16       Q.  Go ahead.
17       MR. UNGAR:  Do you understand who he is
18   referring to?
19       THE WITNESS:  I don't know if you are asking me
20   or him.                                       10:48
21       MR. UNGAR:  I was -- but he won't answer.
22       THE WITNESS:  Can you rephrase the question?
23   BY MR. GAREEB:
24       Q.  Sure.  What is Bunzai Media Group, Inc.?
25       A.  What is it?  It's a company.           10:48
                                              Page 39
```

```
 1       Q.  What kind of company is it?
 2       A.  Marketing company.
 3       Q.  Who formed it?
 4       A.  I did.
 5       Q.  When?                                  10:48
 6       A.  Sometime around January, 2010.
 7       Q.  Is it still operational?
 8       A.  It is not.
 9       Q.  Why not?
10       A.  It's closed.                           10:48
11       Q.  Why?
12       MR. UNGAR:  Objection as to the form of the
13   question.  It's vague.
14   BY MR. GAREEB:
15       Q.  Why?                                   10:48
16       MR. UNGAR:  Same objection.
17       THE WITNESS:  My partner and I had differences
18   and decided to go in different directions.
19   BY MR. GAREEB:
20       Q.  Who is your partner?                   10:49
21       A.  Khristopher Bond.
22       Q.  You said that you had partners.
23       A.  I didn't say that.
24       Q.  You said your partner and I had different
25   opinions.                                     10:49
                                              Page 40
```

```
 1       MR. UNGAR:  Objection as to the foam of your
 2   question.
 3   BY MR. GAREEB:
 4       Q.  Was he or was he not your partner?
 5       A.  He was.                                10:49
 6       Q.  Did you have a partnership agreement?
 7       A.  No.
 8       Q.  So what made you guys partners?
 9       MR. UNGAR:  Objection as to the form of the
10   question, and it calls for a legal conclusion, and   10:50
11   the witness has not been qualified as a legal
12   expert, and it also seeks an opinion.
13       I instruct you not to answer that question.
14       MR. GAREEB:  That's an improper instruction.
15   You can only instruct him if it's private   10:50
16   information or attorney-client.
17       Are you going to stick with that
18   instruction, yes or no?
19       MR. UNGAR:  (No response.)
20       MR. GAREEB:  I'm giving you an opportunity to   10:50
21   reconsider.  Mr. Unger, we can sit here and stare at
22   each other all day.  If you don't want to answer
23   that question, fine.  I'm not -- can you -- are you
24   going to stick with your instruction?
25       MR. UNGER:  (No response.)                 10:50
                                              Page 41
```

11 (Pages 38 - 41)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

**Page 42**

1 MR. GAREEB: That's all you have to do. So if
2 you're going to sit here and stare at me for
3 minutes, that's fine. It's going to be a waste of
4 time. I'm waiting. Okay. We will take his silence
5 as he's not going to reconsider.                   10:51
6 BY MR. GAREEB:
7 Q. Are you going to follow his instruction?
8 A. I am.
9 Q. When did it dissolve?
10 A. When did what dissolve?                        10:51
11 Q. When did Bunzai Media Group dissolve?
12 MR. UNGAR: Objection as to the form of the
13 question. It's vague.
14 BY MR. GAREEB:
15 Q. Go ahead.                                      10:51
16 A. I don't remember the exact dates.
17 Q. I'm not asking for exact dates. It's an
18 estimate.
19 A. Sometime around the end of 2012.
20 Q. What was the difference of opinions?          10:51
21 A. Khristopher wanted to pursue some marketing
22 ideas that I wasn't interested in.
23 Q. What were those marketing ideas that you
24 were not interested in?
25 A. Random unassociated to our business          10:52

**Page 43**

1 marketing ideas that were not in line with my
2 vision.
3 Q. Give me an example.
4 A. Shutting off Ventura Boulevard to do
5 transformation day and get communities involved in  10:52
6 services that weren't anything to do with our
7 business.
8 Q. Hasn't transformation day actually
9 happened? Isn't it true that transformation day
10 actually happened?                                 10:52
11 A. I don't recall.
12 Q. You don't recall if it happened?
13 A. I don't know.
14 Q. So you weren't there?
15 A. I wasn't.                                      10:52
16 Q. And to your understanding, you don't know
17 if it ever happened, the transformation day? Is
18 that what you are saying?
19 MR. UNGAR: Objection as to the form of the
20 question. It's vague. It's argumentative. It's     10:52
21 not related to the subject of this lawsuit. It's
22 not reasonably calculated to lead to the discovery
23 of admissible evidence.
24 Instruct the witness not to answer.
25 BY MR. GAREEB:                                    10:53

**Page 44**

1 Q. Right. Are you going to follow that
2 instruction?
3 A. I am.
4 Q. Okay. I just want you to know there will
5 be a motion to compel. I think there is enough here  10:53
6 to make it worth my while, so that's fine. So you
7 can continue doing what you want to do. All right.
8 So what else what? What other problems did
9 you have with Mr. Bond other than the fact you had
10 differences of opinions regarding the marketing or  10:53
11 the direction of the company?
12 MR. UNGAR: Objection. Vague. Objection as to
13 the form of the question. The question is not
14 related to the subject of this lawsuit. It's not
15 reasonably calculated to lead to the discovery of   10:53
16 admissible evidence.
17 You can answer that question if you
18 understand it.
19 BY MR. GAREEB:
20 Q. Go ahead.                                      10:53
21 A. Khristopher had ideas that weren't in line
22 with our business model.
23 MR. GAREEB: Move to strike as nonresponsive.
24 Madam Court Reporter, can you please
25 re-read the question.                              10:54

**Page 45**

1 You've already objected so you don't have
2 to object again to her reading. Go ahead.
3 (The following record was read:)
4 "Q So what else what? What other problems did
5 you have with Mr. Bond other than the fact you had  10:53
6 differences of opinions regarding the marketing or
7 the direction of the company?"
8 MR. UNGAR: Same objection.
9 THE WITNESS: Differences as to the focus of the
10 company. Khristopher wanted to work on             10:54
11 transformation days, and that wasn't in line with
12 our business.
13 BY MR. GAREEB:
14 Q. What is your business?
15 A. Online marketing company.                      10:54
16 Q. What would you market?
17 A. Products that would have a good conversion
18 on the Internet.
19 Q. When you say good conversion, what does
20 good conversion mean?                              10:55
21 A. Products that would --
22 Q. Oh, turn?
23 A. Yes. Basically products that -- when I say
24 conversion, I mean users to purchasers, which means
25 a certain amount of users would come to a website   10:55

12 (Pages 42 - 45)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000042
Ex. 1

1   and a certain amount would buy.  Conversion is
2   visits to actual purchasers.
3       Q.  So as I understand it, something that would
4   be interesting to a mass?
5       A.  Correct.                          10:55
6       Q.  Got it.  Is there any particular products
7   that Bunzai Media Group marketed online?
8       A.  Yes.
9       Q.  What is it?
10      A.  One product called ResVall, R-e-s-v-a-l-l.  10:55
11      Q.  What is ResVall?
12      A.  It's a wellness product.  Like a vitamin.
13      Q.  That someone ingests?
14      A.  Correct.
15      Q.  Anything else that Bunzai Media Group   10:56
16  marketed online?
17      A.  Yes.  Skin care products.
18      Q.  What else?
19      MR. UNGAR:  Objection as to the form of the
20  question.  It's vague.                    10:56
21      You can answer if you understand.
22      THE WITNESS:  Other products.
23  BY MR. GAREEB:
24      Q.  Okay.  How did you meet Mr. Bond?
25      A.  He was my employee in a former entity.   10:57

Page 46

1   Q.  Which entity?
2       A.  It was called I Everyday Products.
3       Q.  I Everyday Products, was that a company?
4       A.  I believe so.
5       Q.  Who formed I Everyday Products?        10:57
6       A.  A person by the name off Andreas Zapata.
7       Q.  A-n-d-r-e-s [sic]?
8       A.  I believe so.
9       Q.  You will have to help me with the last
10  name.                                   10:57
11      A.  Z-a-p-a -- Z-a-p-a-t-a.
12      Q.  A-t-a or a-t-o?
13      A.  A-t-a.
14      Q.  How do you know Mr. Zapata?
15      A.  He -- a few years before that he was the  10:58
16  regional UPS rep for the city I was renting a
17  building in.
18      Q.  Interesting.  But did you have an ownership
19  interest in I Everyday Products?
20      A.  Yes.                              10:58
21      Q.  What kind of interest did you have in I
22  Everyday Products?
23      A.  One-third.
24      Q.  Did Mr. Zapata have the two-thirds?
25      MR. UNGAR:  Objection.  It's not related to the  10:58

Page 47

1   subject of this lawsuit, and it's not reasonably
2   calculated to lead to the discovery of admissible
3   evidence.
4       So the objection is that it's not discovery
5   relevant, and I instruct the witness not to answer  10:59
6   the question.
7   BY MR. GAREEB:
8       Q.  Are you going to follow that instruction?
9       A.  I am.
10      Q.  Okay.  Did you invest in I Everyday    10:59
11  Products?
12      MR. UNGAR:  Same objection.  Instruct the
13  witness not to answer the question.
14  BY MR. GAREEB:
15      Q.  Are you going to follow that instruction?  10:59
16      A.  I am.
17      Q.  What was your position at I Everyday
18  Products?
19      A.  I just don't remember.
20      MR. GAREEB:  You are not going to object to that  10:59
21  one?
22      MR. UNGER:  (No response.)
23  BY MR. GAREEB:
24      Q.  Go ahead.
25      A.  My position in I Everyday Products?  I  10:59

Page 48

1   don't remember my position.
2       Q.  Great.  What did you do?
3       MR. UNGAR:  Objection as to the form of the
4   question.  It's vague.
5   BY MR. GAREEB:                          10:59
6       Q.  Withdrawn.
7       What were your job duties at I Everyday
8   Products?
9       A.  Come up with good marketing ideas.
10      Q.  You sit down at your desk and come up with  11:00
11  the ideas?
12      MR. UNGAR:  Objection as to the form of the
13  question.  It's vague.  It's argumentative both in
14  substance and in tone.
15      You can answer if you understand.       11:00
16      THE WITNESS:  Figure out good go-to-market
17  strategies.
18  BY MR. GAREEB:
19      Q.  Say that again.
20      A.  Find out good go-to-market strategies.  11:00
21      Q.  Were you getting paid for doing that?
22      A.  I was not.
23      Q.  Were you working for free?
24      A.  I was working for future potential.
25      Q.  Did you ever earn a paycheck from I  11:00

Page 49

13 (Pages 46 - 49)

1  Everyday Products?
2      A.  No.
3      Q.  How did you become a one-third owner?
4      MR. UNGAR:  Objection as to the form of the
5  question.  It's vague.  It's not related to the          11:01
6  subject of this lawsuit.  It's not reasonably
7  calculated to lead to the discovery of admissible
8  evidence.
9          Instruct the witness not to answer on all
10  of those grounds.                                        11:01
11  BY MR. GAREEB:
12      Q.  Are you going to follow his instruction?
13      A.  I am.
14      Q.  Okay.  Is I Everyday Products still
15  operational?                                             11:01
16      A.  It is not.
17      Q.  What did I Everyday Products do?
18      MR. UNGAR:  Objection as to the form of the
19  question.  It's vague.
20          You can answer to the extent you understand      11:01
21  it.
22      THE WITNESS:  I Everyday Products started off by
23  developing nutritional supplements for bodybuilding.
24  You know, fiber, workout kind of stuff for gyms, and
25  then it developed a product called Vigorect, which       11:02
                                                  Page 50

1      Q.  When did the company close?
2      A.  It was about a year and a half.  The
3  company was existing for about a year and a half.
4      Q.  Did it stop operating due to any conflicts
5  between you and Mr. Zapata?                               11:04
6      A.  No.
7      Q.  Was there any conflicts between anyone at I
8  Everyday Products that you have knowledge of that --
9      MR. UNGAR:  Objection.  Sorry.  Finish.
10  BY MR. GAREEB:                                           11:04
11      Q.  That caused the closure of I Everyday
12  Products?
13      MR. UNGAR:  Objection as to the form of the
14  question.  It's vague.  It's not related to the
15  subject of this lawsuit.  It's not reasonably            11:04
16  calculated to lead to the discovery of admissible
17  evidence.  I instruct the witness not to answer the
18  question.
19  BY MR. GAREEB:
20      Q.  Are you going to follow the instruction?         11:04
21      A.  Are you going to keep asking me that every
22  time he says that?
23      Q.  Yes, I have to.
24      A.  Okay, then, yes.
25      Q.  Because I'm giving you an opportunity             11:04
                                                  Page 52

1  is a male enhancement product.
2  BY MR. GAREEB:
3      Q.  Natural supplement?
4      MR. UNGAR:  Objection as to the form of the
5  question.  It's vague.                                   11:02
6          If you understand, you can answer.
7      THE WITNESS:  My belief was that it was natural.
8  BY MR. GAREEB:
9      Q.  Was it really?
10      MR. UNGAR:  Objection as to the form of the          11:02
11  question.  It's vague.  It's not related to the
12  subject of this lawsuit.  It's not reasonably
13  calculated to lead to the discovery of admissible
14  evidence.  It's not discovery relevant; therefore, I
15  instruct the witness not to answer the question.        11:02
16  BY MR. GAREEB:
17      Q.  Are you going to follow the instruction?
18      A.  Of course.
19      Q.  Okay.  When did I Everyday Products start?
20      A.  Approximately two years before Bunzai, so       11:03
21  that would be 2008.
22      Q.  And when did you leave I Everyday Products?
23      A.  I don't know what you mean.
24      Q.  Did you leave I Everyday Products?
25      A.  The company lost money and closed.               11:03
                                                  Page 51

1  because you do understand that he -- if this is all
2  relevant -- he is objecting to some but not to
3  others so --
4      A.  I don't see the relevance.
5      Q.  -- I can't wait until the judge sees this         11:05
6  motion.  All right.  You will see the relevance when
7  you see the sanctions award.  All right.  So --
8      A.  The sanction award?
9      Q.  Was there anyone else that was an owner
10  besides you and Mr. Zapata?                              11:05
11      A.  Yes.
12      Q.  Who?
13      A.  I have to remember his name.  Rodney
14  Sanders.
15      Q.  Did you know Rodney Sanders before joining       11:05
16  I Everyday Products?
17      A.  No.
18      Q.  So you said Mr. Bond was your employee at I
19  Everyday Products.  What was Mr. Bond's job duties?
20      A.  Content writing.  Marketing strategies.          11:05
21  Those were his duties.
22      Q.  What kind of content would he be writing
23  for I Everyday Products?
24      A.  Ad placements, supply fliers, marketing
25  material.                                                11:06
                                                  Page 53

14 (Pages 50 - 53)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

1    Q.   And these would be ad placements and fliers
2  and so forth for the supplements and Vigorect?
3    MR. UNGAR:  Objection as to the form of the
4  question.  It's vague.
5    THE WITNESS:  Yes.                         11:06
6  BY MR. GAREEB:
7    Q.   And marketing strategies, likewise, to
8  figure out effective marketing strategies for
9  selling these supplements and Vigorect?
10    A.   Correct.                             11:06
11    Q.   And how long was Mr. Bond there?
12    A.   A year and a half.
13    Q.   So he was there from start to finish?
14    A.   Yes.  He was there -- Andreas brought him
15  in --                                      11:07
16    Q.   Uh-huh.
17    A.   -- and it was a couple weeks after it
18  opened, and he was there until the end.
19    Q.   Great.  Were you his direct supervisor?
20    A.   No.                                  11:07
21    Q.   But did you work with him during the year
22  and a half that I Everyday Products was open?
23    A.   Yes.
24    Q.   In what capacity?
25    A.   The same capacity.  Sharing ideas, coming   11:07

Page 54

1  up with marketing strategies.
2    Q.   Would you also write content as well?
3    A.   No.
4    Q.   Were you supervising Mr. Bond for the
5  marketing strategies?                       11:07
6    MR. UNGAR:  Objection as to the form of the
7  question.  It's vague.
8    If you understand, you can answer.
9    THE WITNESS:  I already said no.
10  BY MR. GAREEB:                              11:07
11    Q.   Okay.  And describe Mr. Bond when you first
12  met him in terms of his demeanor.
13    MR. UNGAR:  Objection as to the form of the
14  question.  It's vague, but you can answer if you
15  understand what he means.                   11:08
16    THE WITNESS:  Very nice individual.  This is
17  specific to -- I just went to clarify.  This is
18  specific to I Everyday Products when I met --
19  BY MR. GAREEB:
20    Q.   Just when you met him.  The first time --   11:08
21  well, let's go back.
22    Was the first time you met Mr. Bond at I
23  Everyday Products?
24    A.   That's correct.
25    Q.   Great.  What was your perception of        11:08

Page 55

1  Mr. Bond in terms of his demeanor when you met him?
2    MR. UNGAR:  Objection as to the form of the
3  question.  It's vague.
4    If you understand what he means, you can
5  answer.                                     11:08
6    THE WITNESS:  My perception of Mr. Bond?
7  BY MR. GAREEB:
8    Q.   When you first met him.
9    A.   He seemed like an amazing guy.
10    Q.   What made him amazing?               11:08
11    A.   His demeanor, his language, his approach,
12  his candor, his hug.  That's what made him amazing.
13    Q.   In your opinion?
14    A.   In my opinion.
15    Q.   And when you say his demeanor was amazing,   11:09
16  what do you mean his demeanor was amazing?
17    A.   What do I mean?  He just seemed like a
18  generally nice, good, caring person.
19    Q.   You say that his language was amazing.
20  What did you mean by that?                  11:09
21    A.   His tone, his approach, his courtesy, his
22  likeness.
23    Q.   When you say his approach was amazing, what
24  does that mean?
25    A.   I don't know.                        11:09

Page 56

1    Q.   I'm just repeating what you said.  You said
2  his approach was amazing.  I just want to know what
3  you mean by that.
4    MR. UNGAR:  Objection to the form of the
5  question.  It's vague and argumentative both in   11:10
6  substance and in tone.
7    MR. GAREEB:  My tone was actually quiet.
8  Mr. Unger's, however, is more than loud.  So why
9  don't we keep it cool here.  I have not raised my
10  voice.  Stay civil, Mr. Unger.             11:10
11    Go ahead.
12    MR. UNGER:  Same objection.
13    MR. GAREEB:  Madam Court Reporter, please
14  re-read the question.
15    (The following record was read:)         11:10
16  "Q   When you say his approach was amazing, what
17  does that mean?"
18    MR. UNGAR:  Same objection.
19    THE WITNESS:  I don't know.  It was part of the
20  context of what I answered earlier.  I don't know   11:10
21  exactly what I meant.  Cool guy.
22  BY MR. GAREEB:
23    Q.   Okay.  And you said his candor was amazing.
24  In what way?
25    A.   He simply seemed like a genuinely good,    11:11

Page 57

15 (Pages 54 - 57)

APP. 000045
Ex. 1

Page 66

```
 1      Instruct the witness not to answer.
 2   BY MR. GAREEB:
 3      Q.  Are you going to follow the instruction?
 4      A.  Yes, I am.
 5      Q.  Your counsel is objecting that it's        11:20
 6   irrelevant. It's an improper objection in
 7   deposition because the law in California for
 8   discovery is very broad. That's the reason why
 9   "irrelevant" is not a proper objection because he is
10   not wearing a black robe. It may be relevant. He   11:21
11   may not know why it's relevant, and that's the
12   reason why the rules of discovery are the way that
13   they are.
14      A.  I don't see the relevance.
15      Q.  I know you don't. And that's the reason    11:21
16   why there will be a motion here because this is
17   completely improper, but that's fine. You are doing
18   it at your peril. That's fine. All right.
19          So you said your numbers are off in terms
20   of months after you started Bunzai Media Group. So  11:21
21   what you are saying is even though --
22      A.  I Everyday Products.
23      Q.  I Everyday Products was not operational.
24   There were still things to tie up; right?
25      A.  Right. I don't know what you mean by that,  11:21
```

Page 67

```
 1   tie up.
 2      Q.  Well, you were still paying employees;
 3   right?
 4      MR. UNGAR:  Objection as to the form of the
 5   question. It's vague. It's also argumentative.     11:22
 6   BY MR. GAREEB:
 7      Q.  You were paying --
 8      A.  I wasn't paying anyone.
 9      Q.  I thought you said you kept Mr. Bond on
10   salary.                                            11:22
11      A.  I Everyday Products kept him on salary.
12      Q.  So it's I Everyday Products. And did I
13   Everyday Products keep anyone else on salary after
14   it closed?
15      A.  After it closed?                            11:22
16      Q.  After it stopped operations.
17      A.  Andreas and Khristopher for a few more
18   months.
19      Q.  And what were you doing?
20      A.  Looking for something new to do.            11:22
21      Q.  You knew that I Everyday Products was going
22   to end?
23      MR. UNGAR:  Objection as to the form of the
24   question. It's vague. It's not related to the
25   subject of this lawsuit. It's not reasonably       11:22
```

Page 68

```
 1   calculated to lead to the discovery of admissible
 2   evidence.
 3          I instruct the witness not to answer the
 4   question.
 5   BY MR. GAREEB:                                     11:23
 6      Q.  Are you going to follow that instruction?
 7      A.  I am.
 8      Q.  Think about the question. So there came a
 9   time where you decided to start Bunzai Media Group?
10      A.  Correct.                             11:23
11      Q.  And you said you formed that in January,
12   2010; is that right?
13      A.  Somewhere around there, yes.
14      Q.  That was formed as a corporation; right?
15      A.  Yes.                                  11:23
16      Q.  Who was the president of that corporation?
17      A.  I was.
18      Q.  Who formed that corporation?
19      A.  I believe I did.
20      Q.  You were the president?              11:24
21      A.  I was the CEO.
22      Q.  Do you know if you were the president?
23      A.  I don't remember.
24      Q.  Was there a CFO?
25      A.  No.                                   11:24
```

Page 69

```
 1      Q.  Was there a secretary?
 2      A.  No.
 3      Q.  Was there a treasurer?
 4      A.  No.
 5      Q.  Were there board members?            11:24
 6      A.  No.
 7      Q.  No board?
 8      A.  No.
 9      Q.  Okay. Did you capitalize Bunzai Media
10   Group personally?                          11:24
11      A.  Not entirely.
12      Q.  What does that mean not entirely?
13      A.  I put a little bit of money into it, ran
14   out of money, had to find outside money.
15      Q.  All I'm talking about now is when you     11:24
16   formed it. Just that time when you formed it. We
17   will get into later on who capitalized it initially.
18      MR. UNGAR:  I'm going to object to all the
19   previous questions regarding formation in that the
20   questions are unclear, vague. I'm not sure the     11:25
21   witness understood, but you can answer again if you
22   understand.
23      THE WITNESS:  Can you be more specific so I can
24   answer you correctly?
25   BY MR. GAREEB:                                     11:25
```

18 (Pages 66 - 69)

APP. 000046
Ex. 1

1    Q. Sure. When Bunzai Media Group was first
2  opened, first started around January, 2010, who
3  capitalized Bunzai Media Group?
4    A. Capitalization happened with a few -- I was
5  the first one who capitalized it, and then I ran out   11:25
6  of money, and then we went on and on and on.
7    Q. How long did the money that you initially
8  capitalized Bunzai Media Group -- how long did it
9  last?
10    A. Six months.                    11:26
11    Q. The six months -- in the first six months
12  did anyone else put any money into Bunzai Media
13  Group?
14    A. No.
15    Q. You said you formed this with Mr. Bond,     11:26
16  right, Bunzai Media Group? You said that
17  Khristopher Bond was your partner in Bunzai Media
18  Group.
19    A. Eventually.
20    Q. Okay. But when it first opened, did      11:26
21  Mr. Bond have a role in Bunzai Media Group?
22    A. Yes.
23    Q. What was that role?
24    A. COO.
25    Q. So he was an officer?              11:26

Page 70

1    A. Yes.
2    Q. Was he also -- you said there was no board
3  members. And what was his job duties as a COO?
4    A. Managing day-to-day operations, helping
5  with marketing, hiring.                11:27
6    Q. Did Mr. Bond put up any -- in the first --
7  well, did Mr. Bond ever put up any money for Bunzai
8  Media Group?
9    A. No.
10    Q. Ever? I'm only talking about Bunzai right   11:27
11  now.
12    A. No.
13    Q. Who else invested in Bunzai Media Group
14  besides yourself?
15    MR. UNGAR: Objection as to the form of the    11:27
16  question. It's vague.
17    THE WITNESS: A guy by the name of Pierre Tobul.
18  BY MR. GAREEB:
19    Q. T-a-b-o? T-a-b-e?
20    A. It's a French name. T-o-b-u-l.        11:28
21    Q. Oh, Tobul. And he was an investor?
22    A. Yes.
23    Q. Did he have any role in Bunzai Media Group
24  other than investor?
25    A. No. I don't know if it's called an      11:28

Page 71

1  investor. He gave a loan to the company.
2    Q. Was that loan ever paid back?
3    A. Yes, it was.
4    Q. What was the loan for?
5    A. Hiring, growing.                 11:29
6    Q. Oh, for, like, salaries and overhead and
7  stuff like that?
8    A. (Witness nods head.)
9    Q. Let me ask you, did Bunzai ever have any
10  products, or was it purely an online marketing firm?   11:29
11    MR. UNGAR: Objection as to the form of the
12  question. It's vague. It's unintelligible.
13    You can answer if you can understand it.
14    THE WITNESS: Be more specific. I have
15  products.                       11:29
16  BY MR. GAREEB:
17    Q. Well, let me ask just ask you this. Bunzai
18  Media Group is a marketing company. What did it
19  market?
20    A. We went through that.             11:29
21    Q. We did go through that. Thank you.
22    These products, how was it that -- do the
23  manufacturer of these products come to Bunzai and
24  say we want to hire you to market our products? Is
25  that how it works?                  11:30

Page 72

1    A. Both ways. Sometimes people come to us,
2  and sometimes we reach out to manufacturers and say
3  we are interested in that product.
4    Q. Got it. Okay. Yeah, you've answered my
5  question. I just want to know, you guys never     11:30
6  developed or manufactured any products to sell,
7  Bunzai; right?
8    MR. UNGAR: Objection as to the form of the
9  question. It's vague.
10    You can answer if you understand it.      11:30
11  BY MR. GAREEB:
12    Q. You know what, I'm going to withdraw the
13  question.
14    Did Bunzai Media Group ever manufacture any
15  products to market?                 11:30
16    A. Yes.
17    Q. Oh, okay. What products did Bunzai
18  manufacture?
19    A. Let's go back for a second. Bunzai Media
20  Group, we are not manufacturers.           11:31
21    Q. That's why I asked if Bunzai Media Group
22  ever manufactured any products.
23    A. You need to be more specific because Bunzai
24  Media doesn't cook or doesn't fill, you know.
25    Q. That's what manufacture means. So you've    11:31

Page 73

19 (Pages 70 - 73)

1 answered my question.
2       So you rely on other companies' products to
3 market?
4       A. Yes.
5       Q. Okay. And just to be clear, either they     11:31
6 will come to you or you will say, hey, I like that
7 product. I want to market it?
8       MR. UNGAR: Objection as to the form of the
9 question. It's vague.
10      THE WITNESS: Yes.                               11:31
11 BY MR. GAREEB:
12      Q. How many employees did Bunzai Media Group
13 start with?
14      A. None.
15      Q. So it started with you and Mr. Bond?         11:31
16      A. Yes.
17      Q. And did you eventually hire employees?
18      A. Yes.
19      Q. How soon after it started?
20      A. About a month.              11:32
21      Q. At its peak how many employees did Bunzai
22 Media Group have?
23      A. At its peak?
24      Q. Do you understand the question?
25      A. Yes. I'm just trying to give you a good     11:32

Page 74

1 answer.
2       Q. Just give an estimate.
3       MR. UNGAR: Objection. As to the form of the
4 last question. There was a question pending.
5       THE WITNESS: About 35.                         11:32
6 BY MR. GAREEB:
7       Q. When was that? Was that during the first
8 year, first six months?
9       A. Probably 18 months into the business.
10      Q. What kind of employees did you have?        11:33
11      MR. UNGAR: Objection as to the form of the
12 question. It's vague.
13 BY MR. GAREEB:
14      Q. Generally.
15      A. I don't understand.                         11:33
16      Q. Did you have a receptionist, salespeople,
17 programmers? What kind of employees did you have?
18      MR. UNGAR: Objection as to the form of the
19 question. It's vague.
20      You can answer if you understand.              11:33
21      THE WITNESS: Be more specific, please.
22 BY MR. GAREEB:
23      Q. Did you have a receptionist?
24      MR. UNGAR: Objection as to the form of the
25 question? It's vague as to the use of the word     11:33

Page 75

1 "you."
2       If you understand what "you" means, you can
3 go ahead and answer.
4       THE WITNESS: Who does "you" mean?
5 BY MR. GAREEB:                                        11:33
6       Q. We're talking about Bunzai Media Group.
7 Kind of like how you always say "we."
8       A. There were times that we had a
9 receptionist, and times that we didn't.
10      Q. Did you have any salespeople?              11:34
11      MR. UNGAR: Same objection as to the use of the
12 word "we," "you," "I," "me."
13      Counsel, if you're talking about Bunzai
14 Media Group --
15      MR. GAREEB: I already made that clear.        11:34
16      MR. UNGAR: -- for purposes of all of your
17 questions until you notify us otherwise, it's fine.
18 But you didn't put that on the record.
19      MR. GAREEB: I did put it on the record. It was
20 the last objection you made, and if you are going to 11:34
21 be an obstructionist here and just keep objecting
22 over and over again we're -- this deposition is
23 never going to finish. So I'll leave it up to you
24 as to what you want to do, but these are really
25 minor kind of benign questions. You want to object 11:34

Page 76

1 and cause these problems, that's fine. If you want
2 to slow it down, that's fine. I already said that
3 we are talking about Bunzai Media Group. In fact,
4 he even asked me, Are you talking about Bunzai Media
5 Group, and I said, Yes. I will do my best to      11:34
6 refrain from using the word "you," "me," "we,"
7 "them."
8       THE WITNESS: Thank you.
9 BY MR. GAREEB:
10      Q. And I would appreciate it if you would      11:35
11 refrain from saying "we" unless you mean more than
12 one person.
13      MR. UNGAR: Thank you.
14 BY MR. GAREEB:
15      Q. That being the case -- no thank you needed. 11:35
16 That being the case, what types of employees did
17 Bunzai employ?
18      MR. UNGAR: Same objection. It's vague as to
19 the form of the question.
20      THE WITNESS: Be more specific.               11:35
21 BY MR. GAREEB:
22      Q. You said there was a receptionist at one
23 point.
24      A. Okay.
25      Q. Were there salespeople?               11:35

Page 77

20 (Pages 74 - 77)

| | |
|---|---|
| 1   A. No. | 1      MR. UNGAR: Objection as to the form of the |
| 2   Q. Were there programmers? | 2   question. Argumentative and misstates the testimony |
| 3   A. No. | 3   of the witness. |
| 4   Q. So what kinds of employee did you have? | 4      I instruct you not to answer that question. |
| 5   What did they do?                    11:35 | 5      MR. GAREEB: You are instructing him not to      11:48 |
| 6      MR. UNGAR: Same objections. The form of the | 6   answer on what basis? |
| 7   question is vague, and it's also two questions. | 7      MR. UNGER: (No response.) |
| 8   It's compound. | 8      MR. GAREEB: I'm sorry? You are instructing him |
| 9      THE WITNESS: Customer service. | 9   not to answer on what basis? |
| 10  BY MR. GAREEB:                     11:35 | 10     MR. UNGAR: Counsel, you already said if I speak  11:48 |
| 11  Q. How many customer service reps did you have | 11  you are going to cut me off, so I'm not going to |
| 12  at the peak? If you don't know, you don't know. | 12  speak. |
| 13  A. 25. | 13     MR. GAREEB: I just need to know the basis of |
| 14  Q. Who else? You had customer service | 14  your objection. I did not hear you. I was turning |
| 15  representatives. Who else?              11:36 | 15  the page. Counsel, what is the basis of your      11:48 |
| 16  A. Marketing department. | 16  objection? |
| 17  Q. Marketing representatives you mean? | 17     MR. UNGER: (No response.) |
| 18  A. Yes. | 18     MR. GAREEB: Let the record reflect that |
| 19  Q. And at the peak how many did you have? | 19  Mr. Unger is not even looking -- he's not talking. |
| 20  A. Three.                         11:36 | 20  He's ignoring me.                      11:48 |
| 21  Q. Any other employees other than customer | 21     So, Madam Court Reporter, what was the |
| 22  service representatives or marketing reps? | 22  objection? |
| 23  A. Shipping. | 23     (The following record was read:) |
| 24  Q. About how many? | 24  "MR. UNGER: Objection as to the form of the |
| 25  A. Three.                         11:36 | 25  question. Argumentative and misstates the testimony 11:48 |
| Page 78 | Page 80 |

| | |
|---|---|
| 1   Q. Who else? | 1   of the witness. |
| 2      MR. UNGAR: I need a break. About five minutes, | 2      I instruct you not to answer that |
| 3   please. | 3   question." |
| 4      MR. GAREEB: No problem. | 4   BY MR. GAREEB: |
| 5   (A brief recess was taken at     a.m.)      11:36 | 5   Q. And you are going to follow that          11:49 |
| 6   BY MR. GAREEB: | 6   instruction? |
| 7   Q. Besides customer service representatives, | 7   A. I am. |
| 8   marking representatives and shipping reps, what | 8      (Mr. Gareeb leaves the room.) |
| 9   other types of employees did Bunzai employ? | 9   THE WITNESS: Is he getting a bat? |
| 10     MR. UNGAR: Same objections. The form of the   11:47 | 10  THE COURT REPORTER: I don't know.          11:49 |
| 11  question is vague. | 11     MR. UNGAR: Off the record. |
| 12     THE WITNESS: Those were the main departments. | 12     (A brief recess was taken.) |
| 13  Marketing, customer service. Shipping and returns | 13  BY MR. GAREEB: |
| 14  were together. Warehouse. | 14  Q. When -- how long was Bunzai Media Group |
| 15  BY MR. GAREEB:                     11:47 | 15  operational?                          11:50 |
| 16  Q. Same thing, yeah. | 16  A. We kind of covered it, but I don't mind |
| 17  A. That's about it. | 17  telling you again. We said it started up -- |
| 18  Q. And who were the shareholders for Bunzai? | 18  Q. Around January, 2010. |
| 19  A. Khristopher and I. | 19  A. And you asked me earlier when it ended. |
| 20  Q. Were you guys equal?               11:47 | 20  Q. Right.                           11:50 |
| 21  A. Yes. | 21  A. Which was towards the end of 2012, so two |
| 22  Q. 50-50? | 22  years. Approximately two years. |
| 23  A. Yes. | 23  Q. Okay. The questions now are between 2010 |
| 24  Q. And, I'm sorry, Bunzai Media Group was open | 24  and 2012 approximately when you were working with |
| 25  for about a year, year and a half you said?      11:48 | 25  Mr. Bond at Bunzai Media Group, did you ever hear or 11:51 |
| Page 79 | Page 81 |

21 (Pages 78 - 81)

APP. 000049
Ex. 1

Page 82

```
1    see Mr. Bond yelling at any employees?
2       A.  Yes.
3       Q.  On more than one occasion?
4       A.  I believe so.
5       Q.  Did you feel that his yelling was improper   11:51
6    at that particular point?
7       MR. UNGAR:  Objection as to the form.  It's
8    vague.
9       THE WITNESS:  I don't remember.  Just one sec.
10   The question before this...                        11:52
11   BY MR. GAREEB:
12      Q.  Did you ever hear him yell?
13      A.  At...
14      Q.  At any employee.  I thought you said "yes."
15      A.  I heard him yell.  He was in meetings        11:52
16   but -- let's go back to the question so I can
17   give --
18      Q.  Tell you what, let's start over.  Withdraw
19   that question.
20          From the time that you were at Bunzai Media  11:52
21   Group from approximately 2010 to 2012, did you ever
22   witness or hear of Mr. Bond yelling at any
23   employees?
24      A.  Yes.
25      Q.  Did you feel that that was improper?         11:52
```

Page 83

```
1       MR. UNGAR:  Objection as to the form of the
2    question.  It's vague.
3       THE WITNESS:  I don't recall.
4    BY MR. GAREEB:
5       Q.  Do you think that him yelling at the         11:52
6    employee was just -- unjustified?
7       MR. UNGAR:  Objection as to the form of the
8    question.  It's vague.  Assumes facts not in
9    evidence.
10      THE WITNESS:  I don't recall.                    11:53
11   BY MR. GAREEB:
12      Q.  Did you ever see or hear of Mr. Bond doing
13   anything improper with an employee?
14      MR. UNGAR:  Objection as to the form of the
15   question.  It's vague.                              11:53
16      THE WITNESS:  Employee of who?
17   BY MR. GAREEB:
18      Q.  Bunzai Media Group.
19      A.  No.
20      Q.  Did you ever see him act inappropriately     11:53
21   with an employee of any company?
22      MR. UNGAR:  Same objections.
23      THE WITNESS:  Yes.
24   BY MR. GAREEB:
25      Q.  Which company?                               11:53
```

Page 84

```
1       A.  There is a problem with the word "employee"
2    there.  So I don't know.  No, I don't.
3       Q.  I thought you just said "yes."
4       MR. UNGAR:  Objection as to the form of the
5    question.  It's argumentative.                     11:53
6       THE WITNESS:  Ask me again.
7    BY MR. GAREEB:
8       Q.  When you saw or heard of him acting
9    inappropriately with an employee of another company
10   or of any company, did you think it was improper?  11:54
11   Wait a minute.  I withdraw the question.  I
12   apologize.  That was a very unintelligible question.
13   I should go out and be shot.
14      MR. GAREEB:  Madam Court Reporter, can you
15   please re-read two questions earlier.               11:54
16      (The following record was read:)
17   "Q  Did you ever see him act inappropriately
18   with an employee of any company?
19   "Q  Which company?"
20      THE WITNESS:  Cerenade Marketing International.  11:55
21   BY MR. GAREEB:
22      Q.  And who was the employee or employees that
23   you found him acting inappropriately?
24      A.  Can you be more specific as to
25   inappropriately.                                    11:55
```

Page 85

```
1       Q.  I'm just following-up on your answers.
2       MR. UNGAR:  Objection as to the form of the
3    question.
4    BY MR. GAREEB:
5       Q.  All I'm doing is following-up on your        11:55
6    answers.  I'm sorry.  Go ahead.
7       MR. UNGAR:  Objection as to the form of the
8    question.  It's vague.  It's improper.  It's
9    argumentative.
10          Do you understand the question?  Whichever   11:55
11   one you think you are answering, go ahead and answer
12   it.
13      THE WITNESS:  Ask me the question again.
14      MR. GAREEB:  Madam Court Reporter.
15      (The following record was read:)               11:55
16   "Q  And who was the employee or employees that
17   you found him acting inappropriately?"
18   BY MR. GAREEB:
19      Q.  Who are the employees that you are
20   referring to that Mr. Bond acted inappropriately to 11:56
21   at Cerenade?
22      A.  I'm not really sure what inappropriately
23   means.
24      Q.  Okay.  Then what did you mean by you saw
25   Mr. Bond act inappropriately to an employee or     11:56
```

22 (Pages 82 - 85)

Veritext National Deposition & Litigation Services
866 299-5127

APP. 000050
Ex. 1

| | |
|---|---|
| 1    Q.  Okay.  And this was during the time of | 1   BY MR. GAREEB: |
| 2   Bunzai Media Group? | 2    Q.  It's the same question, but go ahead. |
| 3     MR. UNGAR:  Objection as to the form of the | 3    A.  The only times I saw him drinking was |
| 4   question.  It's vague and ambiguous.  Assumes facts | 4   during his time with Cerenade. |
| 5   not in evidence.       12:31 | 5    Q.  And when was that?      12:33 |
| 6   BY MR. GAREEB: | 6    A.  After the summer of 2012 when we decided to |
| 7    Q.  You had indicated that Dawn Goddard poured | 7   split ways. |
| 8   a couple drinks.  Was this during the time of Bunzai | 8    Q.  But the time that you saw him drinking, was |
| 9   Media Group? | 9   Bunzai still operational? |
| 10     MR. UNGAR:  Same objections.     12:31 | 10    A.  It was in its last days.      12:34 |
| 11     THE WITNESS:  So around summertime of 2012 we | 11    Q.  So it was operational? |
| 12   were basically transitioning out of each other.  He | 12     MR. UNGAR:  Objection as to the form of the |
| 13   was already focused on his new direction.  So it was | 13   question.  It's argumentative and it's vague. |
| 14   during his time of Cerenade. | 14   BY MR. GAREEB: |
| 15   BY MR. GAREEB:       12:32 | 15    Q.  Right.       12:34 |
| 16    Q.  So I'm going to go back.  You had testified | 16    A.  Give me the question again. |
| 17   that there were two times that you've seen him | 17    Q.  So it was operational during the summer of |
| 18   drinking while working.  You addressed the first | 18   2012? |
| 19   one.  I'm asking for the second time. | 19     MR. UNGAR:  Same objection. |
| 20     The second time you saw him drinking, did   12:32 | 20     THE WITNESS:  It was during -- it was during our   12:34 |
| 21   you approach him? | 21   winding up process. |
| 22    A.  No. | 22   BY MR. GAREEB: |
| 23    Q.  So the second time you just didn't do | 23    Q.  Okay.  And it was during a time that |
| 24   anything? | 24   Mr. Bond was 50 percent owner of Bunzai Media Group; |
| 25    A.  It wasn't part of my -- our partnership.   12:32 | 25   right?       12:34 |
|                  Page 110 |                  Page 112 |
| 1    Q.  So you only saw him drinking one time | 1    A.  Yes. |
| 2   during Bunzai Media Group? | 2    Q.  During 2010 and 2012 when you and Mr. Bond |
| 3     MR. UNGAR:  Objection as to the form of the | 3   were working together at Bunzai Media Group, did you |
| 4   question.  Please, you have to wait. | 4   ever see Mr. Bond smoking marijuana at work? |
| 5     THE WITNESS:  Okay.      12:32 | 5     MR. UNGAR:  Objection.  Misstates prior    12:35 |
| 6     MR. UNGAR:  Objection as to the form of the | 6   testimony of the witness.  Assumes facts not in |
| 7   question.  It's vague.  Go ahead. | 7   evidence.  The witness just testified that they |
| 8     THE WITNESS:  I never saw him drinking during | 8   weren't working together in the latter half of 2012 |
| 9   our time in Bunzai Media. | 9   at Bunzai. |
| 10   BY MR. GAREEB:       12:33 | 10     THE WITNESS:  Yes.      12:35 |
| 11    Q.  I asked you about two minutes ago between | 11   BY MR. GAREEB: |
| 12   2010 and 2012 while you were working with Mr. Bond | 12    Q.  Did you tell him anything? |
| 13   at Bunzai Media Group you had indicated that you saw | 13    A.  I did. |
| 14   him drinking twice.  Are you changing that story | 14    Q.  What did you tell him? |
| 15   now?       12:33 | 15    A.  It's unacceptable.      12:35 |
| 16     MR. UNGAR:  Objection as to the form of the | 16    Q.  What did he say? |
| 17   question.  It's argumentative.  It's harassing.  It | 17    A.  He said he will go outside. |
| 18   misstates prior testimony of the witness, and it | 18    Q.  And you were okay with that? |
| 19   assumes facts not in evidence. | 19    A.  No. |
| 20     You can answer.      12:33 | 20    Q.  So what did you tell him?      12:35 |
| 21   BY MR. GAREEB: | 21    A.  "It's unacceptable.  I won't have it. |
| 22    Q.  Are you changing that story? | 22   Please refrain from doing this again in our office." |
| 23     MR. UNGAR:  Same objections.  Hold on.  The | 23    Q.  And what did he say? |
| 24   objection is that the last question, the question | 24    A.  "I'll do the best I can." |
| 25   pending, is argumentative.      12:33 | 25    Q.  Were you satisfied with that answer?    12:36 |
|                  Page 111 |                  Page 113 |

29 (Pages 110 - 113)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000051
Ex. 1

```
 1   Fadi Rasheed, an associate at the firm, and he's
 2   also assisting me on this case.
 3      MR. UNGAR:  He's what?
 4      MR. GAREEB:  Assisting me on this case while
 5   Marwa Rafie is on maturity leave.              12:41
 6      MR. UNGAR:  What is your name, sir?
 7      MR. RASHEED:  Fadi Rasheed.
 8      MR. UNGAR:  How do you spell it?
 9      MR. RASHEED:  F-a-d-i, R-a-s-h-e-e-d.
10      MR. UNGER:  Thank you very much.          12:41
11      THE WITNESS:  Next question.
12      MR. GAREEB:  Madam Court Reporter.
13         (The following record was read:)
14   "Q  Did anyone complain about him drinking
15   between 2010 and 2012 with Bunzai Media Group?"  12:38
16   BY MR. GAREEB:
17      Q.  So when he was coughing up blond, you never
18   asked him, Why are you coughing up blood?
19      A.  No.
20      Q.  When he fainted, you never asked him, Why  12:42
21   are you fainting?
22      A.  No.
23      Q.  Were you ever concerned about someone
24   coughing up blood and exposing other employees to
25   those blood products?                          12:42
                                          Page 118
```

```
 1      A.  No.
 2      Q.  Did you ever think to yourself that this is
 3   a dangerous condition, a dangerous situation to have
 4   someone coughing up blood and exposing other people
 5   to those blood products?                       12:42
 6      A.  The coughing up blood happened once in
 7   front of me.  It was a little bit of blood.  It
 8   wasn't changing my thoughts about Khristopher.  So I
 9   thought it was unhealthy for him to be in a work
10   environment.                                   12:42
11      Q.  So did you ask him to leave?
12      A.  Leave what?  Leave where?
13      Q.  Did you have any concern that your
14   employees would be exposed to blood?
15      A.  Yes.                                    12:43
16      Q.  And did you do anything about it?
17      A.  Like I said, this was happening at the time
18   of the exit.  I had already done something about it.
19      Q.  What did you do about it?
20      A.  Separate our partnership.               12:43
21      Q.  So why did you separate your partnership?
22      A.  We talked about this.
23      Q.  We talked about Bunzai Media Group.
24      A.  What's the question?
25      Q.  Why did you -- why did you dissolve your  12:43
                                          Page 119
```

```
 1   partnership?
 2      A.  Khristopher had marketing ideas that were
 3   not in line with mine.
 4      Q.  Okay.  So how did you guys go about
 5   dissolving Bunzai Media Group?                 12:44
 6      A.  We decided to end our partnership.  That's
 7   how.
 8      Q.  Was there an argument that precipitated it?
 9      A.  I don't recall.
10      Q.  Was there a formal dissolution between you  12:44
11   and Mr. Bond regarding Bunzai Media Group?
12      MR. UNGAR:  Objection as to the form of the
13   question.  It's vague.  Calls for an opinion and a
14   legal conclusion.
15         You can answer if you understand.       12:44
16      THE WITNESS:  A formal dissolution?  Can you
17   explain.
18   BY MR. GAREEB:
19      Q.  Well, you said you separated; right?
20   Correct?                                       12:45
21      A.  I said okay.
22      Q.  So what did you do to separate?  What did
23   you do with Bunzai Media Group?
24      A.  Had a meeting.  We talked about our
25   differences.                                   12:45
                                          Page 120
```

```
 1      Q.  Who was in the meeting?
 2      A.  Khristopher and I.
 3      Q.  When was this?
 4      A.  Around summertime of 2012.
 5      Q.  Okay.  And where did this meeting take   12:45
 6   place?
 7      A.  I think at Khristopher's home.
 8      Q.  Where was his home?  What city?
 9      A.  ███████████.
10      Q.  Why his home?                           12:45
11      A.  Khristopher didn't have a driver's license
12   so I sometimes picked him up.
13      Q.  And other times do you know who would pick
14   him up?
15      A.  Friends, friends of his, family members of  12:46
16   his.
17      Q.  Do you know if any employees picked him up?
18      A.  Sometimes.
19      Q.  Was that part of their job duties, to your
20   knowledge?                                     12:46
21      A.  Can you be more specific.  I don't
22   understand your question.
23      Q.  You mentioned that employees picked up
24   Mr. Bond from home; correct?  Was that their job
25   duties?                                        12:46
                                          Page 121
```

31 (Pages 118 - 121)

1    A.  Which employees are you referring to?
2    Q.  I don't know.  Which employees are you
3  referring to?
4    A.  His employees maybe.  From our employees,
5  no, it wasn't their job description.          12:46
6    Q.  When you say "our" you mean Bunzai Media
7  Group?
8    A.  Bunzai Media Group.
9    Q.  By the way, during this time period between
10  2010 and 2012 while you were partnering with      12:46
11  Mr. Bond or while you were working with Mr. Bond at
12  Bunzai Media Group, were there any employees that
13  would go and pick him up from home?
14    MR. UNGAR:  Objection.  Misstates prior
15  testimony of the witness.  Assumes facts not in    12:47
16  evidence.  The witness never testified to that.
17    MR. GAREEB:  That's why I'm asking him.
18  BY MR. GAREEB:
19    Q.  Go ahead.
20    A.  I don't recall.          12:47
21    Q.  Which employees were you referring to that
22  would go and pick him up?
23    A.  The plaintiffs.
24    Q.  The plaintiffs?  How do you know?
25    A.  I saw them bringing him to work.       12:47
Page 122

1    Q.  So you saw Dawn Goddard drive him to Bunzai
2  Media Group, yes or no?
3    A.  I saw Dawn Goddard driving him to Cerenade.
4    Q.  Where is Cerenade?
5    A.  During the time of that separation.  I      12:47
6  don't know the address of Cerenade.
7    Q.  So how could you see it?
8    A.  Dawn wasn't hired for Bunzai.
9    Q.  You said that you saw Dawn drive Mr. Bond
10  to work.  Where did you see her drive him to?  What   12:48
11  location?
12    A.  A few locations.  I saw him -- she drove
13  him around all the time.
14    Q.  And you actually saw this?
15    A.  Yes.  She brought him to my house once.     12:48
16  She brought him to work.
17    Q.  She brought him to work where?
18    A.  Wherever he had to go.
19    Q.  But you said you saw it.  Obviously, you
20  must have been at the work.          12:48
21    A.  Yeah.
22    Q.  Which work?
23    A.  Van Nuys.
24    Q.  And what's the name of the company that you
25  are referring to as "work"?          12:48
Page 123

1    A.  Bunzai Media Group.
2    Q.  Okay.  What's the address of Bunzai Media
3  Group?
4    A.  I don't remember.
5    Q.  Do you recall the address 7900 Gloria     12:49
6  Avenue in Van Nuys, California?
7    A.  I do.
8    Q.  What address is that?
9    A.  Can you be more specific.
10    Q.  What address is that?          12:49
11    A.  It's an address in Van Nuys.
12    Q.  For what?
13    A.  Rephrase your question.
14    Q.  What company is at 7900 Gloria Avenue, Van
15  Nuys, California 91406?          12:50
16    A.  During which time?
17    Q.  At any time.
18    MR. UNGAR:  I'm going to object as to the form
19  of the question.  It calls for speculation.  It's
20  not related to the subject of this lawsuit.  It's    12:50
21  not reasonably calculated to lead to the discovery
22  of admissible evidence for any time periods prior to
23  2010.
24    THE WITNESS:  What's the question?
25    MR. GAREEB:  Same question.  He didn't instruct  12:51
Page 124

1  you not to answer.
2    Madam Court Reporter, please re-read the
3  question.
4    (The following record was read:)
5  "Q   What company is at 7900 Gloria Avenue, Van    12:50
6  Nuys California 91406?"
7    MR. UNGAR:  You can answer with regard to time
8  periods from 2010 forward.  I'm instructing you not
9  to answer with regard to time periods prior to 2010.
10    THE WITNESS:  Bunzai Media Group.        12:51
11  BY MR. GAREEB:
12    Q.  Are you going to follow his instruction not
13  to answer to the company's prior to 2010 that were
14  at the location of 7900 Gloria Avenue, Van Nuys,
15  California?          12:52
16    A.  Yes.
17    Q.  Do you know what company or companies that
18  was at 7900 Gloria Avenue, Van Nuys prior to 2010?
19    A.  I'm not sure.  No, I don't.
20    Q.  So Bunzai Media Group started at 7900      12:52
21  Gloria Avenue, Van Nuys, California as of
22  approximately 2010?
23    A.  Yes.
24    Q.  Were you ever in this location prior to
25  that time?          12:52
Page 125

32 (Pages 122 - 125)

Veritext National Deposition & Litigation Services
866 299-5127

1    MR. UNGAR:  Objection as to the form.  It's
2  vague as to the use of the word "you."
3        You can answer if you understand.
4    THE WITNESS:  I don't.  I don't understand.
5    MR. GAREEB:  Madam Court Reporter, can you      12:52
6  please re-read the question.
7        (The following record was read:)
8  "Q   So Bunzai Media Group started at 7900
9  Gloria Avenue, Van Nuys, California as of
10  approximately 2010?"                    12:52
11    THE WITNESS:  Yes.
12  BY MR. GAREEB:
13    Q.  Which companies?
14    A.  Which companies?
15    Q.  I'm sorry.  I'm sorry.          12:53
16    MR. UNGAR:  Counsel, when are we going to take
17  our lunch break?  It's about five minutes to 1:00
18  now.  I don't know when everyone wants to take a
19  lunch break.
20        Counsel, when do you want to take our lunch   12:53
21  break?  Counsel, when do you want to take a lunch
22  break?
23    MR. GAREEB:  15 minutes.
24    MR. UNGER:  Okay.
25  BY MR. GAREEB:                      12:54

Page 126

1    Q.  So what was at 7900 Gloria Avenue prior to
2  2010?
3    A.  I'm not sure.
4    Q.  I thought you just said "yes."
5        Were you -- prior to 2010, were you ever at   12:54
6  the location of 7900 Gloria Avenue, Van Nuys,
7  California?
8    MR. UNGAR:  Objection as to the form of the
9  question.  It's vague as to -- and it's also not
10  discovery relevant as to whether or not he was ever   12:55
11  at 7900 Gloria Avenue.
12        You can answer the question if you
13  understand it.
14    THE WITNESS:  Yes.
15  BY MR. GAREEB:                      12:55
16    Q.  Why were you at 7900 Gloria Avenue prior to
17  2010?
18    A.  My brother had a business at that location.
19    Q.  What business was that?
20    A.  Distribution business.          12:55
21    Q.  Who is your brother?
22    A.  Doron.
23    Q.  Nottea?
24    THE COURT REPORTER:  What is it?
25    THE WITNESS:  D-o-r-o-n.            12:55

Page 127

1  BY MR. GAREEB:
2    Q.  What kind of distribution center?
3    A.  Adult distribution center.  Adult movies.
4    Q.  To your knowledge, who owns 7900 Gloria
5  Avenue, Van Nuys, California?              12:56
6    A.  I have no idea.
7    Q.  So it's not your family or you?
8    A.  No.
9    Q.  Do you know how long your brother Doron was
10  at 7900 Gloria Avenue?                  12:56
11    A.  I don't recall exactly how long or roughly
12  how long.
13    Q.  What was the name of the company?
14    A.  I don't recall.
15    Q.  Okay.  Do you have an interest in that      12:56
16  company or did you ever -- withdraw the question.
17        Did you ever have an interest in your
18  brother's company, your adult movie distribution
19  company?
20    A.  I did not.                      12:56
21    Q.  Okay.  Is your brother still operating that
22  company or anyone operating that company at 7900
23  Gloria Avenue today?
24    A.  No, but there is some storage.
25    Q.  So he occupies 7900 Gloria Avenue insofar   12:56

Page 128

1  as storage?
2    A.  He doesn't occupy.
3    Q.  But he has storage there?
4    MR. UNGAR:  Objection as to the form of the
5  question.  It's vague as to the use of the word      12:57
6  "he."  If you understand, you can answer.
7    THE WITNESS:  He pays for a little storage
8  there.
9  BY MR. GAREEB:
10    Q.  Do you run any businesses currently out of   12:57
11  7900 Gloria Avenue?
12    A.  No, I do not.
13    Q.  When did you leave 7900 Gloria Avenue?
14    A.  Towards the end of 2012, beginning of 2013.
15  January or February, 2013.  Around then.          12:57
16    Q.  Okay.  Where did you move to?
17    A.  I moved to a location in Reseda.
18    Q.  In what location is that?
19    A.  An office.
20    Q.  What's the address?                  12:58
21    A.  I don't know the exact -- 63 -- 6327 Canby.
22    Q.  What business were you running out of 6327
23  Canby?
24    MR. UNGAR:  Objection.  Assumes facts not in
25  evidence.  Objection as to the form of the question.   12:58

Page 129

33 (Pages 126 - 129)

**Page 130**

```
 1      THE WITNESS:  I don't understand your question.
 2  BY MR. GAREEB:
 3      Q.  What were you doing at 6327 Canby Avenue?
 4      A.  I was a consultant for Media Urge.
 5      Q.  What is Media Urge?              12:59
 6      A.  Media Urge is a company.
 7      Q.  What did the company do?
 8      A.  Marketing.
 9      Q.  Marketing what?
10      A.  Whatever they felt like marketing.      12:59
11      Q.  Such as?
12      A.  Products.
13      Q.  What kind of products?
14      A.  Cosmetic products, other types of products.
15      Q.  What type of other products?      12:59
16      A.  Fitness, wellness.
17      Q.  Fitness, wellness what?  Supplements,
18  programs?
19      A.  Diet program.
20      Q.  What else?                      12:59
21      A.  That's it.
22      Q.  Who formed Media Urge?
23      MR. UNGAR:  Objection as to the form of the
24  question to the extent it calls for speculation.
25      THE WITNESS:  I have to look at my records.  I'm  13:00
```

**Page 131**

```
 1  not really sure.
 2  BY MR. GAREEB:
 3      Q.  Did you have an interest in Media Urge?
 4      A.  No.
 5      Q.  Did your brother Doron have an interest in  13:00
 6  Media Urge?
 7      A.  No.
 8      Q.  How about Roi?
 9      A.  No.
10      Q.  Who is Igor Latsanobski?  I-g-o-r,        13:00
11  L-a-t-s-a-n-o-b-s-k-i.  Who is that gentleman?
12      A.  A person who gave us a loan.
13      Q.  Gave you a loan for what?
14      A.  In Bunzai Media Group when I ran out of
15  money, Igor gave us a loan.                  13:00
16      Q.  How much?
17      A.  500,000.
18      Q.  Did he loan it, or did he invest in it?
19      MR. UNGAR:  Objection as to the form of the
20  question.  It seeks an opinion.  Also a legal    13:01
21  conclusion, but to the extent you understand the
22  difference, you can answer.
23      THE WITNESS:  I don't really understand the
24  question.
25  BY MR. GAREEB:                              13:01
```

**Page 132**

```
 1      Q.  Did you form a partnership between you,
 2  Mr. Bond and Igor?
 3      A.  No.
 4      Q.  Was Igor a third owner of Bunzai Media
 5  Group?                                       13:01
 6      A.  I don't recall.  I don't believe so.
 7      Q.  Huh?
 8      A.  No.
 9      Q.  Did you ever pay Igor back?
10      MR. UNGAR:  Objection as to the form of the  13:01
11  question.  It's vague as to the use of the word
12  "you," Y-o-u.
13      THE WITNESS:  Do you want to be more specific?
14  BY MR. GAREEB:
15      Q.  No.  I'm specific enough.  You can answer  13:02
16  the question, and then I can be --
17      A.  No.
18      Q.  Who did Igor loan money to?
19      A.  Bunzai.
20      Q.  Did Bunzai pay him back?              13:02
21      A.  I believe they did.
22      Q.  How soon after he loaned the money?
23      A.  I don't recall.
24      Q.  Did you have any French partners relating
25  to Bunzai Media Group?                       13:02
```

**Page 133**

```
 1      MR. UNGAR:  Objection as to the form of the
 2  question.  It's vague.  It's unintelligible.
 3      THE WITNESS:  No.
 4  BY MR. GAREEB:
 5      Q.  How do you know Igor?                13:02
 6      A.  I was introduced to him by a guy named Gleb
 7  who introduced Igor for some advertising for a
 8  clinic.  Some clinic that Igor was involved in, and
 9  they wanted to do some advertising for TV, and they
10  came to me for consulting.                   13:03
11      Q.  So when Bunzai Media Group took the loan
12  from Igor, was there a promissory note?
13      A.  I don't recall.
14      Q.  What did -- was there any kind of security
15  that you offered to Igor in exchange to secure his  13:03
16  $500,000 loan?
17      MR. UNGAR:  Objection as to the form of the
18  question.  It's vague.
19      THE WITNESS:  Give me one second.  I need to use
20  the restroom.                                13:03
21      MR. GAREEB:  I guess we are going off the
22  record.
23      (The witness leaves the room.)
24      MR. GAREEB:  Why don't we take this opportunity
25  now on the record to meet and confer?        13:04
```

34 (Pages 130 - 133)

1    THE COURT REPORTER: Not right now, but I can
2    add the timestamps.
3    BY MR. GAREEB:
4        Q.    All right. What is your trouble with the
5    word "provided"? Do you not understand that word?    14:01
6        A.    I just want clarification on it.
7        Q.    I understand you want -- do you not
8    understand that word? I need to know why you need
9    clarification. I need to know how I should reframe
10    my question.                              14:02
11        A.    The answer is yes.
12        Q.    Okay. Isn't it a fact that you actually
13    had an interest in the Green Goddess Collective?
14        MR. UNGAR: I'm going to ask to go off the
15    record, Counsel, so that I can confer with my client    14:02
16    because I think what's being suggested here is a
17    criminal violation, so I need to consult with my
18    client briefly about this.
19        Do you have a problem going off the record
20    for that purpose?                          14:02
21        MR. GAREEB: I do. And I have a question
22    pending also. And if you would like me to --
23        Madam Court Reporter, can you please
24    re-read the question and give counsel an opportunity
25    to object if he is so inclined to do so.    14:02

Page 142

1        MR. UNGAR: I'm going to take a break now with
2    my client. I'm going to consult with him regarding
3    your question. So...
4        MR. GAREEB: Even though a question is pending?
5        MR. UNGAR: Even though there is a question    14:04
6    pending.
7        MR. GAREEB: And all I'm asking is if he has
8    interest in the Green Goddess Collective.
9        MR. UNGAR: Did you previously ask him --
10    doesn't that involve marijuana?    14:04
11        MR. GAREEB: It involves legal medical
12    marijuana, I'm assuming.
13        MR. UNGAR: Ah, well, see that's what I don't
14    know. That's what I need to find out. That's why I
15    need to take a break. I have to find out what it    14:04
16    involves so I can counsel my client accordingly.
17        MR. GAREEB: Now I think you are dangerously
18    close to coaching, but you know what though, I'll
19    play it. Go ahead. We will go off the record.
20    (A brief recess was taken at 2:05 p.m.)    14:05
21    BY MR. GAREEB:
22        Q.    Back on the record. Let the record reflect
23    both counsel and client are here after consulting
24    despite the fact there is a question pending.
25        That being said, can I have an answer to    14:09

Page 144

1        (The following record was read:)
2        "Q    Isn't it a fact that you actually had an
3    interest in the Green Goddess Collective?"
4        MR. UNGAR: Do you want to speak to your
5    attorney?                              14:03
6        THE WITNESS: I would like to speak with my
7    attorney.
8        MR. GAREEB: For what purposes?
9        MR. UNGAR: I just stated the purpose, Counsel.
10        MR. GAREEB: There is no suggestion of any    14:03
11    criminal activities. I'm asking if he had an
12    interest in the Green Goddess Collective. What
13    would be the criminal aspect there?
14        MR. UNGAR: Your prior questions.
15        MR. GAREEB: What prior questions? They have    14:03
16    already been answered.
17        MR. UNGAR: Are you denying my client the right
18    to confer with counsel off the record briefly
19    concerning the possibility of a -- of my client
20    being involved in some kind of criminal activity?    14:03
21        MR. GAREEB: Well, yes, because there is a
22    question pending. If he --
23        MR. UNGAR: Okay.
24        MR. GAREEB: Hold on. Once he answers the
25    question, he can take a break.    14:03

Page 143

1    the pending question.
2        A.    Can you please repeat the question.
3        (The following record was read:)
4        "Q    Isn't it a fact that you actually had an
5    interest in the Green Goddess Collective?"    14:02
6        THE WITNESS: No.
7    BY MR. GAREEB:
8        Q.    Did you have any ownership interest in the
9    Green Goddess Collective?
10        A.    None whatsoever.                14:10
11        Q.    Do you have knowledge that the Green
12    Goddess Collective was actually raided?
13        A.    No.
14        Q.    Okay. Do you know where the Green Goddess
15    Collective is located?                    14:10
16        A.    If I remember, somewhere in Venice.
17        Q.    Now, in the summer of 2012, you had
18    indicated that there was some issues between you and
19    Mr. Bond; correct?
20        A.    Correct.                      14:11
21        Q.    What were those issues other than you guys
22    have different philosophies or objectives for the
23    company?
24        A.    That was the main reason.
25        Q.    I know. What were the other reasons?    14:11

Page 145

37 (Pages 142 - 145)

1   well, during that first conversation, did he -- was
2   it already agreed that he would go open up another
3   company?
4       A.   It wasn't that first conversation.  We had
5   a few discussions back and forth.  It wasn't just          14:18
6   one conversation.  We had multiple conversations
7   about it.
8       Q.   Okay.  But in the end he said to you, I'm
9   going to go open up another company?
10      A.   Yes.                                               14:18
11      Q.   Which company?
12      A.   Cerenade Marketing International.
13      Q.   And do you know when he formed that
14   company?
15      A.   I don't have a recollection of when.              14:18
16      Q.   Was it during -- to your knowledge, was it
17   during the time that he was with Bunzai?
18       MR. UNGAR:  Objection as to the form of the
19   question.  It's vague.
20       THE WITNESS:  Can you repeat the question.            14:18
21       MR. GAREEB:  Sure.  Madam Court Reporter.
22       (The following record was read:)
23       "Q   To your knowledge, was it during the time
24   that he was with Bunzai?"
25       THE WITNESS:  It was during the Bunzai              14:18

Page 150

1   separation.
2   BY MR. GAREEB:
3       Q.   Okay.  During the separation, when did you
4   guys separate, the end of 2012?
5       MR. UNGAR:  Objection as to the form of the          14:19
6   question.  Misstates prior testimony of the witness.
7   Counsel is testifying.
8   BY MR. GAREEB:
9       Q.   When did Bunzai dissolve?
10      A.   I believe it was at the end of the year.         14:19
11  End of 2012.
12      Q.   Okay.  Prior to the end of 2012, did you
13  know Dawn Goddard?
14      A.   Yes.
15      Q.   How do you know her?                             14:19
16      A.   I was introduced to her by Khristopher.
17      Q.   When?
18      A.   Same day he hired her.
19      Q.   And do you know when he hired her?
20      A.   No.  The date, no.                               14:19
21      Q.   Was it during the time of Bunzai Media
22  Group?
23      MR. UNGAR:  Objection as to the form of the
24  question.  It's vague.
25      THE WITNESS:  It was during the time of our          14:20

Page 151

1   separation.
2   BY MR. GAREEB:
3       Q.   The end of 2012?
4       A.   It was before.
5       Q.   Like the summer of 2012?                         14:20
6       A.   Around there.  Around there.
7       Q.   Did Dawn Goddard do any work for you?
8       A.   No.
9       Q.   Were you ever involved in a project in
10  which she was involved in?                                14:20
11      A.   No.
12      Q.   What's Aura Vie?
13      MR. UNGAR:  Objection as to the form of the
14  question.  It's vague, and it's unintelligible.
15      THE WITNESS:  A name.                                 14:20
16  BY MR. GAREEB:
17      Q.   A name of what?
18      A.   A product.
19      Q.   Which product?
20      A.   Cosmetic.                                        14:20
21      Q.   And is Aura Vie a company?
22      A.   Aura Vie is a product.
23      Q.   I understand that.  My question is, is it
24  also a company?
25      A.   I don't believe so.                              14:20

Page 152

1       Q.   Who manufactures Aura Vie?
2       A.   It's a combination.
3       Q.   Of...
4       A.   Manufacturers.
5       Q.   And do you know who those manufacturers          14:21
6   are?
7       A.   Yes.
8       Q.   What's the name of the manufacturers?
9       A.   Jason Healthy Products and Max Daniel
10  Limited in China.                                         14:21
11      Q.   And are these chemical properties that you
12  or someone associated with you manufactured?
13      A.   I don't understand the question.
14      Q.   Aura Vie products, did you have any role in
15  formulating any of those products?                        14:22
16      A.   No.
17      Q.   Did any of your companies have any role in
18  the manufacturing of those products?
19      MR. UNGAR:  Objection as to the form of the
20  question.  It's vague as to the term any of your          14:22
21  companies.
22       You can answer if you understand.
23      THE WITNESS:  Rephrase your question, please.
24  BY MR. GAREEB:
25      Q.   Did you have any ownership interest in any       14:22

Page 153

39 (Pages 150 - 153)

1 of the manufacturers that formulated Aura Vie
2 products?
3   A.  No.
4   Q.  Did anyone in your family have any interest
5 in any manufacturers that formulated the Aura Vie      14:22
6 product?
7   A.  No.
8   Q.  So what was your role regarding Aura Vie
9 products?
10   A.  Marketing.                           14:22
11   Q.  Under what company?
12   A.  Bunzai.
13   Q.  Did Dawn Goddard ever do anything for Aura
14 Vie?
15   A.  Not that I'm aware of.               14:23
16   Q.  Have you ever sent her any e-mails giving
17 her directions as to any tasks?
18   A.  Not that I can recall.
19   Q.  But it's possible?
20   MR. UNGAR:  Objection as to the form of the   14:23
21 question.  It's vague.  Anything is possible.
22   THE WITNESS:  Dawn worked for Khristopher.
23 Khristopher is doing work -- Cerenade is doing work
24 for Bunzai for content writing, design potentials.
25 Under a request that Khristopher received,       14:23

Page 154

1 potentially Dawn received a copy of an e-mail that I
2 sent.  Directly requesting something of Dawn, no.
3 BY MR. GAREEB:
4   Q.  No, you don't remember or no?
5   A.  No, I don't recall.                   14:23
6   Q.  So it could have happened; you just don't
7 remember?
8   A.  I don't have any recollection of such
9 request.
10   Q.  How about Nancy Yalley?               14:23
11   MR. UNGAR:  Objection as to the form of the
12 question.  It's vague and unintelligible.
13 BY MR. GAREEB:
14   Q.  How about with respect to Nancy Yalley as
15 it pertains to Aura Vie --                  14:24
16   MR. UNGAR:  Same --
17   MR. GAREEB:  I'm not done.  I know that you
18 probably thought I was, and I apologize for
19 snapping, so let me -- I'm trying my best here.  I'm
20 a little under the weather.                 14:24
21   THE WITNESS:  Me too.
22 BY MR. GAREEB:
23   Q.  Let's start over.  With respect to Nancy
24 Yalley, did Ms. Yalley do any work on behalf of Aura
25 Vie products -- or for Aura Vie products?    14:24

Page 155

1   A.  Not that I'm aware of.
2   Q.  Did she do any work for Bunzai Media Group?
3   A.  Not that I'm aware of.
4   Q.  When did you meet Nancy Yalley that you can
5 remember?                                  14:24
6   A.  Around the same time.  She is Nastassia's
7 sister.  I don't remember exactly when.
8   Q.  Okay.  Was it during the time of Bunzai
9 Media Group or before?
10   A.  It was during the time of Bunzai Media    14:25
11 Group.
12   Q.  Before August of -- before summer of 2012?
13   A.  Right around then.
14   Q.  When did -- who is Nastassia Yalley?
15   A.  Nastassia Yalley was the first employee of   14:25
16 Bunzai.
17   Q.  Okay.  And were you introduced to Nancy in
18 2010 when Bunzai was first formed?
19   A.  No.
20   Q.  Okay.  So it was around summer of 2012?   14:25
21   A.  Around then, yes.  I might be off by a
22 couple months.
23   Q.  That's fair.  What was Nastassia's job at
24 Bunzai Media Group?
25   A.  She was the bookkeeper.  She was campaign   14:25

Page 156

1 management, bookkeeping and communication, e-mails.
2   Q.  And did Nastassia ever complain to you
3 about Mr. Bond?
4   A.  Be more specific.
5   Q.  Did she ever complain to you about -- did   14:26
6 she --
7   A.  Yes.
8   Q.  Did she have any complaints about --
9   A.  Yes.
10   Q.  What were the complaints?            14:26
11   A.  She brought it to my attention that he is
12 also working with concepts that were not relevant to
13 our strategy.
14   Q.  Anything else?
15   A.  Dealing with expenses that he had, and he   14:26
16 came to her for some assistance.  There was some
17 complaints.  I vaguely remember exactly what they
18 were about.  She randomly came to me about
19 complaints about Mr. Bond.
20   Q.  Did Nastassia ever complain about the      14:27
21 smoking of the cigarettes and marijuana of Mr. Bond?
22   MR. UNGAR:  Objection as to the form of the
23 question.  It's compound.  It's multiple questions.
24   THE WITNESS:  Yes.
25 BY MR. GAREEB:                             14:27

Page 157

40 (Pages 154 - 157)

ATTACHMENT A                                APP. 000058
                                            Ex. 1

```
 1    Q.  What did you do pursuant to those
 2  complaints?
 3    A.  I spoke to Khristopher, tried to get him to
 4  stop doing it.  He yelled a few times.
 5    Q.  At you or Nastassia?              14:27
 6    A.  No, I yelled at Khristopher.
 7    Q.  Oh.
 8    A.  But that's what I did.  I spoke to
 9  Khristopher.
10    Q.  And did he stop after that?          14:27
11    A.  No.
12    Q.  And what did you do when he didn't stop?
13    A.  I asked him to leave.
14    Q.  Okay.  When did Nastassia complain about
15  the smoke?                          14:28
16    A.  When?  I have no idea.  I don't recall.
17    Q.  Do you recall pregnant women being employed
18  at Bunzai Media Group?  Do you recall pregnant women
19  being employed by Bunzai Media Group between 2010
20  and 2012?                          14:28
21    A.  No.
22    Q.  Do you recall at least one pregnant
23  employee complaining to you about Mr. Bond's smoke?
24    A.  No.
25    Q.  How about any complaints about his drinking  14:28
                                      Page 158
```

```
 1    MR. GAREEB:  Withdrawn.
 2  BY MR. GAREEB:
 3    Q.  Now, you said that -- okay.  So do you know
 4  when Mr. Bond started the Cerenade operations?
 5  You've already testified as to when you believe it    14:30
 6  started -- formed.  I'm asking when it started
 7  operations.  Do you know?
 8    MR. UNGAR:  I'll object as to the form of the
 9  question.  It's two questions in one, and it assumes
10  facts not in evidence.                  14:30
11    THE WITNESS:  Cerenade, to my recollection, it
12  started right when he started it or as soon as we
13  decided to part ways.  He -- I don't know if
14  Cerenade was set up or not so -- but right away he
15  started working in this direction.         14:31
16  BY MR. GAREEB:
17    Q.  Did you work with him at Cerenade?
18    A.  No.
19    Q.  Did you assist in forming Cerenade?
20    A.  No.                          14:31
21    Q.  Do you have any interest in Cerenade?
22    A.  No.
23    Q.  How about Doron?
24    A.  No.
25    Q.  How about Roi?                14:31
                                      Page 160
```

```
 1  on the job?
 2    A.  No.
 3    Q.  Any complaints about him grabbing females
 4  breasts?
 5    A.  No.                          14:29
 6    Q.  Any complaints about him grabbing females'
 7  butts?
 8    A.  No.
 9    Q.  Any complaints about him grabbing males'
10  butts?                              14:29
11    A.  No.
12    Q.  Any complaints about him throwing up blood?
13    A.  No.
14    Q.  Did you hear of Mr. Bond grabbing females?
15    MR. UNGAR:  Objection to the form of the      14:29
16  question.  It's vague and ambiguous.
17    MR. GAREEB:  You were doing so good.
18    MR. UNGAR:  You can answer if you understand the
19  question.
20    THE WITNESS:  No.                14:29
21  BY MR. GAREEB:
22    Q.  Except for Nastassia Yalley complaining?
23    A.  Except for --
24    MR. UNGAR:  Objection as to the form of the
25  question.  It's vague.                  14:30
                                      Page 159
```

```
 1    A.  No.
 2    Q.  To your knowledge, who had interest in
 3  Cerenade?
 4    A.  To my knowledge, it's Khristopher only.
 5    Q.  Do you know if he had any employees?      14:31
 6    A.  Yes.
 7    Q.  Do you know how many?
 8    A.  No.
 9    Q.  Do you know Leor?
10    THE COURT REPORTER:  I'm sorry.  I didn't      14:31
11  understand what you said.
12    MR. GAREEB:  Do you know Leor?  L-e-o-r.
13    THE WITNESS:  Which Leor?  I know a Leor.
14  BY MR. GAREEB:
15    Q.  Who is that?                    14:32
16    A.  Leor was HR for Bunzai.
17    Q.  Okay.  When Bunzai shut down, did Leor stop
18  working at Bunzai?  I'm sorry, that was a stupid
19  question.  I withdraw.
20    After Bunzai dissolved, what happened to    14:32
21  Leor, to your knowledge?
22    A.  I believe she was one of the people that
23  was rehired by Pinnacle.
24    Q.  We will get to Pinnacle in a second.  I
25  want to go back to Bunzai Media Group and Aura Vie.  14:32
                                      Page 161
```

41 (Pages 158 - 161)

APP. 000059
Ex. 1

**Page 162**

1     Was Aura Vie a d/b/a of Bunzai Media Group?
2     A.  I'm not sure.
3     Q.  Who is Phillip Cormoreno [phonetic]?
4     A.  He is a reception/assistant.
5     Q.  Was he ever the CEO?                          14:33
6     MR. UNGAR:  Objection.  The question is vague,
7  and it's improper in form, and it's unintelligible
8  as stated.
9     THE WITNESS:  I don't understand your question.
10    BY MR. GAREEB:                                    14:33
11    Q.  Was Phillip Cormoreno the CEO of Bunzai
12 Media Group, Inc.?
13    A.  No.
14    Q.  What's Miracle Face Kit?
15    A.  A product.                                    14:33
16    Q.  Is that also a d/b/a of Bunzai Media Group,
17 Inc.?
18    A.  Potentially.  I don't have a recollection
19 of the d/b/a's.
20    Q.  But you do realize there were d/b/a's?        14:34
21    A.  I believe so.
22    Q.  Okay.  Where did you end up working after
23 Bunzai dissolved?
24    A.  I had a consulting position with Media Urge
25 in order to kind of help them get on their feet.    14:34

**Page 163**

1     Q.  And what was your position at Media Urge?
2     A.  Consultant.
3     Q.  Did you ever use a title rainmaker?
4     A.  I did.
5     Q.  And what is that title rainmaker?             14:34
6     A.  When I --
7     MR. UNGAR:  Objection as to the form of the
8  question.  It's vague as stated.
9         If you understand it, you can answer it.
10    MR. GAREEB:  It is vague.  That's why I'm asking  14:35
11 him.
12    THE WITNESS:  It's a person who brings business
13 to an organization.
14    BY MR. GAREEB:
15    Q.  And was that an official position,           14:35
16 rainmaker?
17    A.  No, I didn't have an official position,
18 hence the title.
19    Q.  Oh, you were a consultant?
20    A.  (Witness nods head.)                          14:35
21    Q.  Were you a consultant through a company?
22    A.  Yes.
23    Q.  Which company?
24    A.  Adageo.
25    Q.  And what is Adageo?                           14:35

**Page 164**

1     A.  Adageo is a company.
2     Q.  When was that company formed?
3     A.  I don't have a specific recollection of
4  when it formed exactly.
5     Q.  And who are members or shareholders of        14:35
6  Adageo?
7     A.  Myself and Pierre Tobul.
8     Q.  Was Adageo formed right after Bunzai Media
9  Group?
10    A.  I don't remember exactly when it was          14:36
11 formed.
12    Q.  Was it formed before Bunzai Media Group?
13    A.  No.
14    Q.  What did Media Urge do?
15    A.  Secure third-party advertising, engage in     14:36
16 tracking of conversion and campaigns and help to
17 design marketing material.
18    Q.  And then Adageo, what is the purpose of
19 that company?
20    A.  To do business.                               14:37
21    Q.  What kind of business?
22    A.  Consulting.
23    Q.  So it's a consulting company?
24    A.  It has a few interests.  It has a few
25 directions.                                          14:37

**Page 165**

1     Q.  You mean broader than just being a
2  consulting company?
3     A.  Yes.
4     Q.  What else is it?
5     A.  It's a marketing company.                     14:37
6     Q.  What else?
7     A.  What else?
8     Q.  Let with withdraw it.  You are consulting
9  on marketing; right?
10    A.  And various other things.                     14:37
11    Q.  And what else are you consulting -- by the
12 way, would that be online marketing or not
13 necessarily?
14    MR. UNGAR:  Objection to the form of the
15 question.  Multiple questions there.                 14:38
16        You can answer.
17    MR. GAREEB:  No, there is only one question, so
18 I will withdraw just so I can make the record clear.
19    BY MR. GAREEB:
20    Q.  So Adageo -- by the way, is that A-d-e-g-o,   14:38
21 A-d-e-g?
22    A.  A-d-a-g-e-o.
23    Q.  And it's a corporation?
24    A.  It's an LLC.
25    Q.  And you were a 50 percent member of that      14:38

42 (Pages 162 - 165)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000060
Ex. 1

**Page 166**

```
 1   LLC?
 2       A.  Yes.
 3       Q.  And Pierre Tobul was also a 50 percent
 4   member?
 5       A.  Yes.                              14:38
 6       Q.  Who was the managing member?
 7       A.  I don't recall.
 8       Q.  And Mr. Tobul was just a member?
 9       A.  I don't recall.
10       Q.  Well, was there a co-manager of Adageo,  14:38
11   LLC?
12       MR. UNGAR:  Objection as to the form of the
13   question.  It's vague.
14           You can answer if you understand.
15       THE WITNESS:  I believe I was the only manager.  14:39
16   BY MR. GAREEB:
17       Q.  All right.  Other than consulting on
18   marketing, is there another purpose of Adageo?
19       A.  You asked me that question.
20       Q.  And I withdrew it to ask another question.  14:39
21   Now I'm asking the question, and I'm not withdrawing
22   this time.  I'm waiting for an answer.
23       A.  Adageo is a consulting entity --
24       Q.  Right.
25       A.  -- for technology, for marketing, for  14:39
```

**Page 167**

```
 1   manufacturing, and for any other thing I feel like
 2   consulting on.
 3       Q.  Okay.  Got it.  But for Media Urge, did you
 4   provide consulting services for marketing,
 5   technology and manufacturing or --           14:39
 6       A.  No, just on some of those.
 7       Q.  Marketing?
 8       A.  Yes.
 9       Q.  Online marketing?
10       A.  Marketing in general.           14:40
11       Q.  Okay.
12       A.  Packaging, anything.
13       Q.  Media Urge, did it have its own products
14   that you were consulting on?
15       A.  No.                           14:40
16       Q.  So would you describe Media Urge, Inc. as
17   the same kind of business concept as Bunzai Media
18   Group?
19       A.  No.
20       Q.  How is it different?           14:40
21       MR. UNGAR:  Objection as to the form of the
22   question.  Calls for a narrative, but if you can do
23   it concisely, go ahead.
24       THE WITNESS:  If it doesn't have product, it
25   doesn't have shipping, it doesn't have receiving,  14:40
```

**Page 168**

```
 1   doesn't have a call center.
 2   BY MR. GAREEB:
 3       Q.  So what is Media Urge, Inc.?
 4       A.  We talked about this.  I don't mind
 5   repeating it.                          14:40
 6       Q.  So you said it secures third-party
 7   advertising.
 8       A.  (Witness nods head.)
 9       Q.  Which third-party advertising did it secure
10   while you were a consultant for Media Urge, Inc.?  14:41
11       A.  Many.
12       Q.  Such as...
13       A.  Negotiations with different publishers,
14   online publishers.
15       Q.  I'm sorry.  Who were the shareholders of  14:41
16   Media Urge, Inc.?
17       A.  Who are --
18       Q.  Who owned Media Urge, Inc.?
19       A.  Tal Carasso.
20       THE COURT REPORTER:  I'm sorry.           14:41
21       THE WITNESS:  Tal, T-a-l.  Carasso.  I'm not
22   sure of the spelling.
23   BY MR. GAREEB:
24       Q.  Who is Tal Topel?
25       A.  Tal Topel is a different person.       14:42
```

**Page 169**

```
 1       Q.  But do you know Tal Topel?
 2       A.  I do.
 3       Q.  How do you know him?
 4       A.  How do I know him?  He is a friend of mine.
 5       Q.  Okay.  Did you ever hear of Heritage  14:42
 6   Alliance Group, Inc.?
 7       A.  Yes.
 8       Q.  Does Tal Topel own that, to your knowledge?
 9       A.  I believe he does.
10       Q.  Who else owns Media Urge, Inc. besides  14:42
11   Mr. Carasso?
12       A.  To my knowledge nobody.
13       Q.  Well, who hired Adageo to act as
14   consultants for Media Urge?
15       A.  Who hired Adageo?                  14:42
16       Q.  Who hired you?
17       A.  I believe it was Oz Mizrahi.
18       THE COURT REPORTER:  I'm going to need the
19   spelling.
20       THE WITNESS:  O-z, M-i-z-r-a-h-i, I believe.  14:43
21   BY MR. GAREEB:
22       Q.  What role does Oz Mizrahi have with Media
23   Urge, Inc.?
24       A.  I'm not really sure.
25       Q.  Well, do you know if he was an executive of  14:43
```

43 (Pages 166 - 169)

```
 1  Media Urge, Inc.?
 2     A.  No, he was the person that had an interest
 3  in -- the question was, did he have an interest?
 4  What was the question again?
 5     MR. GAREEB:  Madam Court Reporter.        14:43
 6        (The following record was read:)
 7     "Q  Well, do you know if he was an executive of
 8  Media Urge, Inc.?"
 9     THE WITNESS:  No.
10  BY MR. GAREEB:                               14:44
11     Q.  Was he an officer?
12     A.  I believe so.
13     Q.  President?
14     A.  I'm not sure.
15     Q.  Do you know if he was CEO?            14:44
16     A.  He established it, so I don't really know.
17  I don't know what he labeled himself.
18     Q.  So Oz Mizrahi formed Media Urge with Tal
19  Carasso?
20     A.  Later.                               14:44
21     Q.  But they both own it, to your knowledge?
22     A.  No.
23     Q.  To your knowledge, is Tal Carasso the only
24  owner, 100 percent owner?
25     MR. UNGAR:  Objection as to the form of the  14:44
                                          Page 170
```

```
 1  question.  It's vague, and it's asking the witness
 2  for an opinion, but, please, if you understand the
 3  question, answer it, if you can answer it.
 4     THE WITNESS:  Can you repeat the question.
 5        (The following record was read:)      14:45
 6     "Q  To your knowledge, is Tal Carasso the only
 7  owner, 100 percent owner?"
 8  BY MR. GAREEB:  I'll ask it again.
 9        Is Tal Carasso, to your knowledge, the sole
10  owner of Media Urge, Inc.?                   14:45
11     MR. UNGAR:  Same objection.
12     THE WITNESS:  Yes.
13  BY MR. GAREEB:
14     Q.  Is Media Urge still operative today?
15     A.  Yes.                                 14:45
16     Q.  Do you do any work for Media Urge, Inc.?
17     A.  Yes.
18     Q.  Do you have any interest in Media Urge?
19     A.  I do not.
20     Q.  And do you do the same thing with Media  14:45
21  Urge now that you did back after Bunzai Media Group
22  dissolved?
23     A.  Same thing, yes.
24     Q.  Is Tal Carasso still 100 percent owner, to
25  your knowledge?                             14:45
                                          Page 171
```

```
 1     A.  Yes.
 2     Q.  Is Oz Mizrahi still involved in Media Urge,
 3  Inc.?
 4     A.  No.  He quickly lost interest.  Excuse me.
 5     Q.  No problem.                          14:46
 6     MR. UNGAR:  Do you need a break?
 7     THE WITNESS:  No.
 8     MR. GAREEB:  Do you need a break?
 9     THE WITNESS:  No, I'm good.
10     MR. GAREEB:  Are you okay?               14:46
11     MR. UNGAR:  Peachy, P-e-a-c-h-y.
12  BY MR. GAREEB:
13     Q.  Did Khris Bond have any interest in Media
14  Urge, Inc., to your knowledge?
15     A.  No.                                  14:46
16     Q.  Did Media Urge, Inc. do any business with
17  Cerenade, to your knowledge?
18     A.  Did Media Urge do business with Cerenade?
19  I don't know.
20     Q.  Did Cerenade do business with Adageo, to  14:46
21  your knowledge?
22     A.  No.
23     Q.  Did you personally do any work for
24  Cerenade?
25     A.  No.                                  14:46
                                          Page 172
```

```
 1     Q.  To your knowledge, did Dawn Goddard do any
 2  work for Media Urge, Inc.?
 3     A.  No.
 4     Q.  How about Nancy Yalley?
 5     A.  Not that I can recall or know about, no.  14:47
 6     Q.  Who is Victor Azal?
 7     A.  A designer.
 8     Q.  Designer for whom?
 9     A.  Designer for whom?  He was a designer for
10  Bunzai, and he moved over to Media Urge.     14:47
11     Q.  Did you help him get that job?
12     A.  Sure.
13     Q.  And was it, to your knowledge, Oz Mizrahi
14  that hired Mr. Azal?
15     A.  I believe so.                        14:48
16     Q.  What is T9 Designs?
17     A.  T9 Designs.
18     MR. UNGAR:  How do you spell it?  T9 or
19  T-E-E-N-I-N-E, or some combination of those two?
20     MR. GAREEB:  Capital T, the number nine, space,  14:48
21  designs.
22     MR. UNGAR:  Thank you.
23     THE WITNESS:  I think it's a company owned by a
24  person we hired for Media Bind.
25  BY MR. GAREEB:                              14:48
                                          Page 173
```

44 (Pages 170 - 173)

ATTACHMENT A                                  APP. 000062
                                              Ex. 1

| | |
|---|---|
| 1   Q. And that person would be who? | 1   Q. What is it? |
| 2   A. Matan Gal. | 2   A. Media buyer. |
| 3   Q. And who is Matan Gal? | 3   Q. Media buyer? |
| 4   A. I don't understand your question. | 4   A. Yes. |
| 5   Q. Who is Matan Gal?          14:48 | 5   Q. What exactly is a media buyer?          14:50 |
| 6   A. A human. | 6   A. Someone who purchases advertising. |
| 7   Q. What kind of human? | 7   Q. So T9 Designs would purchase advertising? |
| 8   A. What does that mean? | 8   A. I have no idea about T9. |
| 9   MR. UNGAR: I'm going to object to these | 9   Q. Matan Gal purchased advertising on behalf |
| 10   question. Them seem to be almost metaphysical in a  14:48 | 10   of Media Urge, Inc.?          14:51 |
| 11   sense. They are vague, they are ambiguous. They | 11   A. Yes. |
| 12   are unintelligible. | 12   Q. You need to explain to me then how does |
| 13   MR. GAREEB: The answers are not much better. | 13   Media Urge, Inc. work? I know you said that they |
| 14   So what -- | 14   secure third-party advertising and engage in |
| 15   MR. UNGAR: That's a ridiculous thing to say.   14:49 | 15   tracking campaigns and design marketing. So does   14:51 |
| 16   MR. GAREEB: Your objections are actually | 16   Media Urge purchase advertising? |
| 17   ridiculous. | 17   A. Media Urge -- one sec. |
| 18   BY MR. GAREEB: | 18   (Cell phone buzzing.) |
| 19   Q. What is T9 Design? | 19   BY MR. GAREEB: |
| 20   MR. UNGAR: That's a ridiculous thing to say.   14:49 | 20   Q. Sure. No problem.          14:52 |
| 21   Behave yourself. | 21   A. It's more of -- yes. It's hard to explain. |
| 22   BY MR. GAREEB: | 22   Q. What was the question? |
| 23   Q. Do you know what it does? | 23   A. Does Media Urge purchase advertising. |
| 24   A. No. | 24   Q. And, what, it just resells it? |
| 25   Q. How do you know Matan Gal?          14:49 | 25   MR. UNGAR: Objection as to the form of the   14:52 |
| Page 174 | Page 176 |

| | |
|---|---|
| 1   A. I know his father. | 1   question. It's vague and unintelligible. |
| 2   Q. How long have you known his father? | 2   MR. GAREEB: I'll withdraw the question. |
| 3   A. Ten years. | 3   BY MR. GAREEB: |
| 4   Q. How long have you known Matan Gal? | 4   Q. What's the Gambit Network, Inc.? |
| 5   A. Five years.          14:49 | 5   A. I believe it's Nastassia's company.          14:52 |
| 6   Q. And when did you first meet? Under what | 6   Q. Who formed that company, to your knowledge? |
| 7   circumstances did you first meet Matan Gal? | 7   A. No idea. |
| 8   A. He was working for his father for some | 8   Q. Did you have anything to do with forming |
| 9   entity and I went to go visit with his dad, and he | 9   that company? |
| 10   introduced me to his son.          14:49 | 10   A. No.          14:53 |
| 11   Q. And he was hired by Media Urge for what | 11   Q. Did you advise her to form that company? |
| 12   purpose? | 12   A. No. |
| 13   MR. UNGAR: It assumes facts not in evidence, | 13   Q. Did the Gambit Network, Inc. work also for |
| 14   but answer if you can. | 14   Media Urge? |
| 15   THE WITNESS: He was hired -- I think his entity   14:50 | 15   A. I believe so.          14:53 |
| 16   was hired, or I don't remember exactly how, but for | 16   Q. What did the Gambit Network, Inc. do? |
| 17   the procurement and -- for media bind. | 17   MR. UNGAR: Objection as to the form of the |
| 18   THE COURT REPORTER: Media bind? | 18   question. Calls for speculation. If you know. |
| 19   THE WITNESS: Media bind. Media buyer. | 19   THE WITNESS: I don't know. |
| 20   BY MR. GAREEB:          14:50 | 20   BY MR. GAREEB:          14:53 |
| 21   Q. Media buyer? So do you know what his role | 21   Q. What did Nastassia Yalley do for Media |
| 22   was at Media Urge, Inc.? | 22   Urge, Inc.? |
| 23   MR. UNGAR: Just calls for a yes or no. | 23   MR. UNGAR: Objection as to the form of the |
| 24   THE WITNESS: Yes. | 24   question. Assumes facts not in evidence. |
| 25   BY MR. GAREEB:          14:50 | 25   THE WITNESS: It's bookkeeping and campaign   14:53 |
| Page 175 | Page 177 |

45 (Pages 174 - 177)

**Page 178**

```
 1    management.
 2    BY MR. GAREEB:
 3        Q.  Who was she paid by, to your knowledge?  To
 4    your knowledge.
 5        A.  When?                              14:53
 6        Q.  When she was at Media Urge.
 7        A.  Probably by Media Urge.
 8        Q.  Did you pay her?
 9        MR. UNGAR:  Objection as to the form of the
10    question.  It's vague with regard to the use of the   14:54
11    word "you."  Don't know who "you" is in this
12    context, but answer if you understand the question.
13        THE WITNESS:  Please ask the question again.
14    Please rephrase your question instead of just
15    reading it again.                           14:54
16    BY MR. GAREEB:
17        Q.  Did you ever pay Nastassia Yalley when she
18    was at Media Urge, Inc.?
19        MR. UNGAR:  "You" means you personally.
20        THE WITNESS:  No, not that I can recall.  14:54
21    BY MR. GAREEB:
22        Q.  Did any of your companies, i.e., Adageo,
23    LLC, pay Nastassia Yalley during her time at Media
24    Urge?
25        MR. UNGAR:  Objection as to the form of the   14:54
```

**Page 179**

```
 1    question.  It's compound.
 2        THE WITNESS:  No.
 3    BY MR. GAREEB:
 4        Q.  Other than Adageo, did any of your other
 5    companies pay Nastassia Yalley while she was at   14:55
 6    Media Urge, Inc.?
 7        MR. UNGAR:  Objection as to the form of the
 8    question.  It's vague with regard to the phrase "all
 9    of your companies."  Assumes facts not in evidence.
10    Misstates prior testimony of the witness with regard  14:55
11    to, quote, "all of your companies," close quote.
12        If you understand his question, you can
13    answer it.
14        THE WITNESS:  (Inaudible response.)
15        THE COURT REPORTER:  I didn't hear you.   14:55
16        MR. UNGAR:  Please rephrase the question.
17    BY MR. GAREEB:
18        Q.  During the time you were at Media Urge, how
19    many companies did you have?
20        MR. UNGAR:  Objection.  The question is vague.  14:55
21        THE WITNESS:  One.
22    BY MR. GAREEB:
23        Q.  Which one?
24        A.  Adageo.
25        Q.  And while you were at Media Urge, how many  14:55
```

**Page 180**

```
 1    companies did you have an interest in?
 2        MR. UNGAR:  Objection.  The question is improper
 3    in form, and it's vague with regard to "interest."
 4        If you know what that means...
 5    BY MR. GAREEB:                              14:56
 6        Q.  Go ahead.
 7        A.  Please rephrase your question.
 8        Q.  My question is going to stick.  What do you
 9    have a problem with the question?  You have been
10    answering interest when we were talking about   14:56
11    Bunzai, so it's the same meaning as when you
12    answered those questions that were not objected to.
13    It's the same meaning.
14        So with that proviso, did you have any
15    other interest in any other company other than   14:56
16    Adageo during the time you were at Media Urge?
17        MR. UNGAR:  Same objection.  The objection is to
18    the form of the question.  It's vague with regard to
19    the term "interest."  I'm putting that in quotes.
20        If you understand what he means by       14:56
21    "interest," answer the question.
22        THE WITNESS:  No.
23    BY MR. GAREEB:
24        Q.  No, you don't understand or no you had --
25        A.  No, I had no other interest.         14:56
```

**Page 181**

```
 1        Q.  So during the time you were at Media Urge,
 2    the only company that you were involved in or had
 3    any kind of ownership interest in was Adageo, LLC?
 4        MR. UNGAR:  Objection as to the form of the
 5    question.  It's vague and misstates the witness's   14:57
 6    prior testimony and assumes facts not in evidence.
 7        You can answer.
 8        THE WITNESS:  As far as I can remember.
 9    BY MR. GAREEB:
10        Q.  As far as you can remember what?     14:57
11        A.  The -- can you repeat his question for me.
12        (The following record was read:)
13    "Q  So during the time you were at Media Urge,
14    the only company that you were involved in or had
15    any kind of ownership interest in was Adageo, LLC?"  14:57
16        THE WITNESS:  Correct.
17    BY MR. GAREEB:
18        Q.  Who is Motti Nottea?
19        A.  My father.
20        Q.  Isn't it a fact that Motti Nottea had an   14:58
21    interest in Bunzai Media Group?
22        A.  Not that I recall.
23        Q.  So it's possible, but you just don't
24    recall?
25        A.  It may have been something in the beginning  14:58
```

46 (Pages 178 - 181)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000064
Ex. 1

1   when we started, but I don't -- I don't recall.
2       Q.   So was there ever a time where -- you said
3   in the beginning, so did you buy him out, or was he
4   bought out?
5       A.   I don't remember him being somebody to buy   14:58
6   out.
7       Q.   Oh, okay.  I understand your answer now.
8           Let's talk about Pinnacle.  Real fast,
9   during the time you were at Media Urge, Inc., did
10  you have any dealings with Mr. Bond?               14:59
11      MR. UNGAR:  Objection as to the form of the
12  question.  It's vague.  It misstates the prior
13  testimony with regard specifically to the statement
14  that Mr. Nottea was at, A-T, Media Urge, Inc.
15      THE WITNESS:  Please rephrase your question.   14:59
16  BY MR. GAREEB:
17      Q.   When you were at Media Urge, Inc. as a
18  consultant, did you do any work for Cerenade?
19      A.   No.
20      Q.   Did you do any work with Mr. Bond?        14:59
21      A.   Not that I can recall.
22      Q.   Did you have any professional dealings with
23  Mr. Bond during the time that you were at Media
24  Urge, Inc.?
25      MR. UNGAR:  Objection as to the form of the    14:59

Page 182

1   question.  It's vague.
2          If you know what it means, you can answer.
3      THE WITNESS:  I don't know what you mean.  Not
4   that I can recall.
5   BY MR. GAREEB:                                    14:59
6      Q.   Did you work with Mr. Bond or any of his
7   companies during the time you were at Media Urge,
8   Inc.?
9      MR. UNGAR:  Objection as to the form of the
10  question.  It calls for speculation concerning any  15:00
11  of Mr. Bond's companies.  It's also compound.
12      THE WITNESS:  You want to rephrase that.
13      MR. UNGAR:  You can answer the multiple parts if
14  you want.
15      THE WITNESS:  I need to hear the question again.  15:00
16          (The following record was read:)
17      "Q   Did you work with Mr. Bond or any of his
18  companies during the time you were at Media Urge,
19  Inc.?"
20      THE WITNESS:  No, not that I can recall.       15:00
21  BY MR. GAREEB:
22      Q.   And, to your knowledge, do you know if
23  Media Urge, Inc. did any work for Mr. Bond or any of
24  his companies, to your knowledge?
25      MR. UNGAR:  Same objection as to the form of the  15:01

Page 183

1   question.  It's two questions.
2          But if you understand it, you can answer.
3   Hold on one second.  Also, it has the same problem
4   as before.  It's vague with regard to Mr. Bond's
5   "other companies."                                15:01
6      MR. GAREEB:  Did you get that?
7      THE COURT REPORTER:  Yeah.
8      THE WITNESS:  I'm going to need to hear the
9   question again.
10          (The following record was read:)         15:01
11      "Q   And, to your knowledge, do you know if
12  Media Urge, Inc. did any work for Mr. Bond or any of
13  his companies, to your knowledge?"
14      MR. UNGAR:  Same objections.
15      THE WITNESS:  Not that I can recall.          15:02
16  BY MR. GAREEB:
17      Q.   Do you know if Media Urge, Inc. did any
18  work for Cerenade?
19      MR. UNGAR:  I'm sorry, Counsel.  Can you speak
20  up just a little bit.  I couldn't hear that.      15:02
21  BY MR. GAREEB:
22      Q.   Do you know if Media Urge, Inc. did any
23  work for Cerenade?
24      A.   Media Urge as an entity or somebody from
25  Media Urge?                                       15:02

Page 184

1      Q.   Let's start with the entity right now.
2      A.   No.
3      Q.   Do you know if Cerenade did any work for
4   Media Urge?
5      A.   Potentially.                              15:02
6      Q.   But you don't have first-hand knowledge?
7      A.   I know that Cerenade was asked to maybe do
8   something for Media Urge.  I don't know what it is.
9      Q.   Do you know who asked?
10     A.   No.                                       15:03
11     Q.   Going back to your two answers ago, you had
12  indicated that someone within Media Urge did work
13  for Cerenade.  Is that accurate?
14     A.   No.  I requested Nastassia to assist in the
15  separation.  Khristopher doesn't have a lot of   15:03
16  knowledge of accessing his accounts, banks.  I
17  requested Nastassia to help.  This is not Media
18  Urge; this was Bunzai.  This was during the time of
19  Bunzai.
20     Q.   No problem.  That's fine.                 15:03
21     A.   I apologize about that.
22     Q.   I appreciate your candor.
23     MR. UNGAR:  Did you complete your answer?  Are
24  you finished with your answer?
25     THE WITNESS:  Yes.                             15:03

Page 185

47 (Pages 182 - 185)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000065
Ex. 1

1  BY MR. GAREEB:
2    Q.  My fault.  Sorry.  That's not going to
3  happen again.
4       So Pinnacle Logistics -- you know what,
5  let's talk about SBM Management, Inc.  what is SBM   15:04
6  Management?
7    A.  It's a management company.
8    Q.  What do they manage?
9    A.  They manage companies.
10   Q.  Which companies?                    15:04
11   A.  I'm not really sure.
12   Q.  Do they manage Pinnacle?
13   A.  I don't believe so.
14   Q.  Do they manage Bunzai?
15   A.  Don't believe so.              15:04
16   Q.  Do they manage Media Urge?
17   A.  Don't believe so.
18   Q.  Do they manage Cerenade?
19   A.  I don't think so.
20   Q.  You know they manage companies, but you   15:04
21  don't know which companies.  Is that what you're
22  saying?
23   A.  I don't know all the details about their
24  organization.
25   Q.  Who is Steven Bauer?              15:04
                                          Page 186

1    A.  I think he is the owner of SBM.
2    Q.  How do you know him?
3    A.  Specifically I don't remember how.
4    Q.  What's his involvement as it pertains to
5  companies that you are associated with?   15:05
6    A.  His involvement?
7    Q.  Yeah.
8    A.  Can you rephrase your question.
9    Q.  May I ask why?  What is it that you are
10  confused about?                    15:05
11   MR. UNGAR:  I'll object as to the form of the
12  that question.  It's argumentative.
13       Did you understand his question?
14   THE WITNESS:  If you would like to repeat it, I
15  can answer.                    15:05
16   MR. GAREEB:  Well, no need to repeat it.  I'm
17  not trying to be difficult here.  I'm really trying
18  to streamline this.  I really am.
19   MR. UNGAR:  Did you understand his question?
20   MR. GAREEB:  I don't have a question yet.   15:05
21   MR. UNGAR:  There was a question pending.
22       Are you withdrawing it?
23   MR. GAREEB:  I did.  I said I withdraw.
24   MR. UNGAR:  Thank you.
25  BY MR. GAREEB:                    15:05
                                          Page 187

1    Q.  Do you have a personal relationship with
2  Steven Bauer?
3    A.  Personal relationship?
4    Q.  Yes.
5    A.  Do I know him?              15:06
6    Q.  Do you have a personal relationship with
7  him?
8    A.  No.
9    Q.  Do you have a professional relationship
10  with him?                    15:06
11   A.  Yes.
12   Q.  What is the -- what is -- what is the
13  content -- what is the professional relationship?
14   A.  I am confused.  Personal, business?  Ask me
15  the question again.              15:06
16   Q.  Sure.  What kind of professional
17  relationship do have you with Mr. Bauer?
18   A.  Bauer has been in the -- I know Bauer for a
19  few years.  He was part of an animation company that
20  I used to work with a long time ago, and we stayed   15:06
21  in touch over the years about a few different topics
22  he was working on, I was working on.  That's the
23  nature of our relationship.
24   Q.  And do you know why SBM was formed?
25   A.  Do I know why it was formed?        15:07
                                          Page 188

1    Q.  Uh-huh.
2    A.  Not particularly, no.
3    Q.  Did you ever tell Dawn -- hold on.  Did you
4  ever tell Dawn that SBM was formed because you told
5  her, "God forbid our products will come under fire.   15:07
6  All the little companies will point to SBM and say
7  they were just running their offer through SBM"?
8  Did you ever say that to her?
9    A.  No.
10   Q.  Did SBM manage Agoa Holdings, Inc.?   15:07
11   A.  May have.
12   Q.  Who owns Agoa Holdings, Inc.?
13   MR. UNGER:  I'm going to object at this point.
14  These last questions, certainly the last ten, do not
15  appear to be related to the subject of this lawsuit.   15:08
16   MR. GAREEB:  They most certainly are.
17   MR. UNGAR:  They don't.
18   MR. GAREEB:  They most certainly are.
19   MR. UNGAR:  Are you going to allow me to finish
20  my objection or not?              15:08
21   MR. GAREEB:  Go ahead.
22   MR. UNGAR:  I'll begin again.  The last ten
23  questions approximately do not appear to be related
24  to the subject of this lawsuit.  The questions do
25  not appear to be attempting to elicit information   15:08
                                          Page 189

48 (Pages 186 - 189)

1 reasonably calculated to the discovery of admissible
2 evidence in this case.
3      If there is an offer of proof as to why
4 this discovery is relevant, fine. But at this
5 junction I'm going to instruct the witness not to      15:09
6 answer further questions.
7      MR. GAREEB: Based on relevance?
8      MR. UNGAR: Discovery relevance.
9      MR. GAREEB: What is discovery relevance?
10     MR. UNGAR: Counsel, if you want to have a meet    15:09
11 and confer, we can have it.
12     MR. GAREEB: Great. Let's do it now.
13     MR. UNGAR: We've already been through that.
14 Either you move on and ask another question or not,
15 and we can conclude for the day, and we'll be back    15:09
16 on Monday.
17 BY MR. GAREEB:
18     Q. Are you going to follow his instruction not
19 to answer?
20     MR. UNGAR: Unless there is an offer of proof.    15:09
21     THE WITNESS: Yes. I would also like to request
22 a couple minutes break if I can.
23     MR. GAREEB: Absolutely.
24 (A brief recess was taken at 3:09 p.m.)
25 BY MR. GAREEB:                                         15:23

Page 190

1     Q. Back on the record. To your knowledge, did
2 SBM Management manage the company Bunzai Media
3 Group, Inc.?
4     A. No.
5     Q. Did it -- who is Roi, R-o-i?                    15:23
6     A. Who is Roi?
7     Q. Yeah.
8     MR. UNGAR: I'm going to object to the form of
9 the question. It's vague.
10     Do you understand what he means?                  15:24
11     THE WITNESS: No. I don't understand your
12 question.
13 BY MR. GAREEB:
14     Q. You don't understand the question, "Who is
15 Roi, R-o-i," even though we have talked about him?    15:24
16     MR. UNGAR: Objection. It's argumentative.
17 BY MR. GAREEB:
18     Q. Do you know a gentleman by the name of Roi,
19 R-o-i, Reuveni, R-e-u-v-e-n-i?
20     A. Yes.                                           15:24
21     Q. Who is he?
22     A. He is an employee that used to be with
23 Bunzai. He was let go, and I believe he was rehired
24 by Pinnacle.
25     Q. And so what does Roi Reuveni do for            15:25

Page 191

1 Pinnacle?
2     A. I think he is a general manager.
3     Q. What did he do for Bunzai?
4     A. He managed fulfillment in the shipping
5 department.                                            15:25
6     Q. And is that what he did also at Pinnacle,
7 shipping department?
8     A. Customer service, shipping, logistics.
9     Q. And do you know if Roy Reuveni worked with
10 Dawn Goddard?                                         15:25
11     A. Can you be more specific.
12     Q. Yes. Do you know if Roy Reuveni worked
13 with Dawn Goddard?
14     A. No.
15     Q. Do you know if Roi Reuveni worked with        15:25
16 Nancy Yalley?
17     A. I don't believe so.
18     Q. So what is Pinnacle Logistics?
19     MR. GAREEB: Off the record.
20     (A discussion was held off the record.)          15:26
21 BY MR. GAREEB:
22     Q. What is Pinnacle Logistics, Inc.?
23     A. Fulfillment call center.
24     Q. So it's a call center to fulfill what?
25     A. Fill orders.                                   15:30

Page 192

1     Q. Orders of...
2     MR. UNGAR: I'm going to object to the form of
3 the question. It's vague and unintelligible as
4 stated.
5      If you understand it, you can answer.           15:30
6     THE WITNESS: Please be more specific.
7 BY MR. GAREEB:
8     Q. Is Pinnacle Logistics, Inc. just a call
9 center?
10     A. No.                                           15:30
11     Q. Does it have any other purpose?
12     A. Shipping and receiving.
13     Q. Anything else?
14     A. No, not that I'm aware of.
15     Q. Who formed Pinnacle Logistics, Inc.?          15:31
16     A. I don't recall.
17     Q. Who were the officers of Pinnacle
18 Logistics, Inc.?
19     A. I don't recall.
20     Q. When was it formed?                           15:31
21     A. I don't recall. Should have been somewhere
22 after the Bunzai days.
23     Q. Was Pinnacle Logistics formed during the
24 Media Urge days?
25     MR. UNGAR: Objection as to the form of the       15:31

Page 193

49 (Pages 190 - 193)

Veritext National Deposition & Litigation Services
866 299-5127

1  question. It's vague with regard to the phrase
2  "Media Urge days." But you can answer it.
3     THE WITNESS: I'm not sure exactly when it was
4  formed. I think it was towards the end of 2012 or
5  beginning of 2013. Somewhere around then.          15:32
6  BY MR. GAREEB:
7     Q.  The same time that you went and worked for
8  Media Urge, then?
9     A.  Yes.
10    Q.  Okay. Do you recall any ownership interest  15:32
11 in Pinnacle Logistics, Inc.?
12    A.  No.
13    Q.  Did you have anything to do with forming
14 Pinnacle Logistics, Inc.?
15    A.  Forming, no.                                 15:32
16    Q.  Did you invest any money in Pinnacle
17 Logistics, Inc.?
18    A.  No.
19    Q.  What is your role in Pinnacle Logistics,
20 Inc.?                                               15:32
21    A.  I don't have a role.
22    Q.  Never did any work under Pinnacle
23 Logistics, Inc.; is that right?
24    MR. UNGAR: Objection as to the form of the
25 question. It's argumentative and harassing.         15:32

Page 194

1     THE WITNESS: Have I done any work for Pinnacle
2  Logistics, Inc.?
3  BY MR. GAREEB:
4     Q.  Yes.
5     A.  Not that I can recall.                       15:32
6     Q.  Leor worked for you for Bunzai?
7     MR. UNGAR: Objection as to the form of the
8  question. It's vague with regard to the use of the
9  word "you," Y-O-U.
10    THE WITNESS: I believe Leor worked for Bunzai.   15:33
11 I believe she was one that we rehired.
12 BY MR. GAREEB:
13    Q.  And who rehired her, to your knowledge?
14    A.  I don't remember.
15    Q.  Was Oz Mizrahi an owner of Pinnacle          15:33
16 Logistics, Inc.?
17    A.  I believe so.
18    Q.  Anyone else, to your knowledge?
19    A.  My knowledge is more recent. I don't
20 remember what happened in the setting up of it.     15:33
21    Q.  Is Oz Mizrahi still involved with Pinnacle
22 Logistics, Inc., to your knowledge?
23    A.  Not that I'm aware of.
24    Q.  Do you do any work for Pinnacle Logistics,
25 Inc. at all?                                        15:34

Page 195

1     MR. UNGAR: Objection. It's asked and answered.
2  This is the third time, Counsel. I will allow him
3  to answer it, but the next time you ask I'm going to
4  instruct him not to answer.
5     THE WITNESS: I'm not going to answer. I've      15:34
6  already answered that question.
7     MR. UNGAR: But you have to answer it again,
8  please.
9     THE WITNESS: No.
10 BY MR. GAREEB:                                      15:34
11    Q.  Do you know anything about the corporate
12 structure of Pinnacle Logistics, Inc.?
13    A.  No.
14    Q.  Do you know anything about the financials
15 of Pinnacle Logistics, Inc.?                        15:34
16    A.  No.
17    Q.  Do you know if Nastassia worked for
18 Pinnacle Logistics, Inc.? Nastassia Yalley.
19    A.  I don't believe so.
20    Q.  Did Dawn Goddard work for Pinnacle           15:34
21 Logistics, Inc.?
22    A.  No.
23    Q.  Did Nancy Yalley work for Pinnacle
24 Logistics, Inc.?
25    A.  I don't think so.                            15:34

Page 196

1     Q.  Do you know if Nastassia provided any kind
2  of services to Pinnacle Logistics, Inc.?
3     A.  Not that I'm aware of.
4     Q.  Do you know if Dawn Goddard provided any
5  services to Pinnacle Logistics, Inc.?               15:35
6     A.  I don't see what those would be, no.
7     Q.  Do you know if Nancy Yalley provided any
8  services to Pinnacle Logistics, Inc.?
9     A.  I don't think so.
10    Q.  How do you know what Pinnacle Logistics,     15:35
11 Inc. is?
12    MR. UNGAR: Objection as to the form of the
13 question. It's vague.
14       You can answer it if you understand it.
15    THE WITNESS: How do I know what it is?           15:35
16 BY MR. GAREEB:
17    Q.  Yeah.
18    A.  By visiting, seeing.
19    Q.  Why would you visit Pinnacle Logistics,
20 Inc.?                                               15:36
21    A.  Because they were given the job duties of
22 fulfilling the orders from were left in the
23 subscription model of Khristopher's and I's exit
24 from Bunzai.
25    Q.  Okay. Are you saying that whatever was       15:36

Page 197

50 (Pages 194 - 197)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A                                      APP. 000068
                                                        Ex. 1

1 left in Bunzai, meaning wasn't tied up, it was
2 transferred to Pinnacle and -- sorry go. What did
3 you mean by that?
4    MR. UNGAR: I'll object as to the form of the
5 question. It's vague.                    15:36
6    THE WITNESS: Rephrase your question.
7 BY MR. GAREEB:
8    Q. What did you mean by Pinnacle took over for
9 Bunzai?
10    A. Bunzai still had some orders in their      15:36
11 system that needed to be fulfilled and shipped to
12 consumers.
13    Q. Right.
14    A. And because of lack of management and the
15 company was being separated and Khristopher and I    15:36
16 were in separation, Pinnacle was given the duties
17 from Bunzai to ship the remaining orders.
18    Q. And who gave those duties?
19    A. I don't remember.
20    Q. Was it you that gave Pinnacle those duties?   15:37
21    A. I don't believe so.
22    Q. If it's not you, who else would have the
23 authority to hire Pinnacle to finish up what Bunzai
24 started?
25    MR. UNGAR: Objection as to the form of the    15:37
Page 198

1 question. It's argumentative.
2    THE WITNESS: Who else would have the authority?
3 Khristopher for one, Nastassia.
4 BY MR. GAREEB:
5    Q. Do you know if Mr. Bond gave Pinnacle    15:37
6 Logistics those duties?
7    A. I just don't recall. I don't recall
8 exactly how those duties were given.
9    Q. Well, did you hear if Pinnacle Logistics,
10 Inc. prior to them receiving those duties?    15:38
11    A. No.
12    Q. How did you find out about Pinnacle
13 Logistics, Inc.?
14    A. It was brought to my attention. I don't
15 recall.                             15:38
16    Q. Oz Mizrahi is also the owner of Media Urge;
17 right?
18    A. I don't believe so. I think earlier when
19 you said that I was confused. I don't think so.
20    Q. Was Oz Mizrahi an owner of Adageo, LLC?    15:38
21    A. No. That's me.
22    Q. So earlier you testified that Media Urge
23 was Tal Carasso and Oz Mizrahi. Is that not
24 accurate?
25    MR. UNGAR: Objection as to the form of the    15:39
Page 199

1 question. It's vague.
2    But you can answer if you understand.
3    THE WITNESS: I just don't remember. I think I
4 made a mistake in that answer.
5 BY MR. GAREEB:                        15:39
6    Q. Okay. Well, is it a mistake that you knew
7 who Oz Mizrahi was?
8    A. No, I know who Oz Mizrahi is.
9    Q. How long have you known Oz Mizrahi?
10    A. A few years.                    15:39
11    Q. A few years. Like how many years
12 approximately? This is one of those estimate
13 questions.
14    A. About two years.
15    Q. So 2012?                      15:39
16    A. Right around there.
17    Q. How did you meet Mr. Mizrahi?
18    A. I don't remember. Introduced by a friend.
19    Q. Do you, Mr. Nottea, do any work with Oz
20 Mizrahi?                          15:40
21    A. No.
22    Q. Do you have any interest in any companies
23 with Oz Mizrahi?
24    A. No.
25    Q. Do you have any interest in any companies   15:40
Page 200

1 in which Oz Mizrahi is an owner?
2    A. Not that I'm aware of.
3    Q. Are you still in touch with Mr. Mizrahi?
4    A. From time to time.
5    Q. Personal or professional?            15:40
6    A. Personal.
7    Q. You don't -- do you have any professional
8 relationship with Mr. Mizrahi today?
9    MR. UNGAR: Objection as to the form of the
10 question. It's vague.                    15:40
11    THE WITNESS: I don't believe so.
12 BY MR. GAREEB:
13    Q. To your knowledge, did Pinnacle Logistics
14 finish what Bunzai started in terms of fulfillment
15 and shipping?                       15:41
16    MR. UNGAR: Objection as to the form of the
17 question. It misstates the previous testimony of
18 the witness and assumes facts not in evidence.
19    MR. GAREEB: I withdraw the question.
20 BY MR. GAREEB:                       15:41
21    Q. Pinnacle Logistics was given the duties to
22 fulfill the orders of Bunzai; correct?
23    A. Yes.
24    Q. Have those been filled, to your knowledge,
25 as of today?                        15:41
Page 201

51 (Pages 198 - 201)

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      A.  I believe so.
 2      Q.  So do you have any dealings with Pinnacle
 3  Logistics, Inc. today?
 4      A.  No.
 5      Q.  To your knowledge, does Media Urge have any   15:41
 6  dealings with Pinnacle Logistics, Inc. today?
 7      A.  Not that I'm aware of.
 8      Q.  Do you know who the shareholders are of
 9  Pinnacle Logistics, Inc.?
10      A.  No.                                   15:42
11      Q.  Do you know who works at Pinnacle
12  Logistics, Inc.?
13          MR. UNGAR:  Objection as to the form of the
14  question.  It's vague temporally.
15          THE WITNESS:  I know some of the people.   15:42
16  BY MR. GAREEB:
17      Q.  Who?
18      A.  That work at Pinnacle?
19      Q.  Yeah.
20      A.  Some of the guys from the warehouse were   15:42
21  rehired from Bunzai.  A couple guys from -- two,
22  three guys from the call center.  That's about it.
23      Q.  Was there ever a time that you called Dawn
24  Goddard at 10:00 o'clock at night to tell her to go
25  to the ranch?                               15:44
                                              Page 202
```

```
 1  called me to come to the ranch, not me call her.
 2      Q.  Is she a nurse?
 3      A.  I don't believe so.
 4      Q.  Does she have any medical training, to your
 5  knowledge?                                 15:45
 6      A.  I don't know.
 7      Q.  Why wouldn't you call 911?
 8          MR. UNGAR:  Objection as to the form of the
 9  question.  It's argumentative.  It assumes facts not
10  in evidence.  It misstates the prior testimony of   15:45
11  the witness.
12          You can answer if you understand.
13          THE WITNESS:  It was common for Khristopher to
14  not feel well.  We couldn't call 911 every time
15  Khristopher had a little thing.  911 was not part of   15:45
16  our procedure when Khristopher felt bad.  Sometimes
17  he felt really, really bad.  Crazy migraines.  He
18  was in a lot of pain to the point that Dawn felt
19  that she should call me.  I'm Khristopher's -- was
20  Khristopher's friend.  We were very close during the   15:46
21  time we were partners, and she felt it was important
22  for me to know and come check up on a friend.
23  BY MR. GAREEB:
24      Q.  And did you go to the ranch -- did you ever
25  go to the ranch on your own just to visit with   15:46
                                              Page 204
```

```
 1      A.  Not that I recall.
 2      Q.  Do you recall ever going to the ranch
 3  yourself in the evening due to Khristopher's health
 4  continue?
 5          MR. UNGAR:  Objection to the form of the   15:44
 6  question.  Vague with regard to the use of the term
 7  "the ranch," but if you understand what he's talking
 8  about...
 9          THE WITNESS:  Are we talking about the home
10  assignment?                                15:44
11  BY MR. GAREEB:
12      Q.  Yeah.  Is that what's commonly referred to
13  as "the ranch"?
14      A.  Probably.  There were horses there.  Yes.
15      Q.  And was there ever a time that you went   15:44
16  there around 10:00 o'clock at night and you called
17  Dawn to come to the ranch?
18      A.  Maybe.
19      Q.  Why would you call Dawn?
20      A.  She was, like, Khristopher's nurse.   15:45
21      Q.  I'm sorry?
22      A.  She was, like, Khristopher's nurse.
23      Q.  Dawn Goddard?
24      A.  She was taking care of him.  She had
25  concerns about him.  I think she may have even   15:45
                                              Page 203
```

```
 1  Khristopher?
 2      A.  A couple times.
 3      Q.  Did you go to the ranch to visit him
 4  because he called saying he's not feeling well?
 5      A.  I don't remember.                    15:46
 6      Q.  Did you ever take him to the hospital?
 7      A.  Yes.
 8      Q.  How many times?
 9      A.  I want to clarify something.
10      Q.  Sure.                               15:46
11      A.  I never took him to the hospital because he
12  was feeling bad.  I took him to the hospital because
13  of appointments that he had.
14      Q.  He had appointments at the hospital?
15      A.  UCLA.  I took him to UCLA about 15 times.   15:47
16      Q.  The medical center?
17      A.  Correct.
18      Q.  Because he didn't have a license?
19      A.  Correct.
20      Q.  Let me ask you, what was his condition?   15:47
21  What was his ailment?
22          MR. UNGAR:  Objection as to the form of the
23  question.  It's vague, but you can answer to the
24  extent of your knowledge, your personal knowledge.
25          THE WITNESS:  Can you just rephrase the question   15:47
                                              Page 205
```

52 (Pages 202 - 205)

1  complained about Dawn wearing too tight of pants
2  while she was at work?
3    A. I don't recall.
4    MR. UNGAR: Let's take a break. I need about a
5  five-minute break.                    16:02
6    THE COURT REPORTER: Off the record?
7    MR. GAREEB: I didn't consent but --
8    MR. UNGAR: Are you refusing to go off the
9  record?
10   MR. GAREEB: I'm not done.            16:02
11   MR. UNGAR: We are coming back.
12   MR. GAREEB: We took a break about 20 minutes
13 ago.
14   MR. UNGAR: Are you refusing, yes or no?
15   MR. GAREEB: Go ahead. I'm going to hold you to  16:02
16 five minutes, though.
17 (A brief recess was taken at 4:02 p.m.)
18   MR. GAREEB: What was the last question?
19   (The following record was read:)
20   "Q  Isn't it a fact that you actually    16:01
21 complained about Dawn wearing too tight of pants
22 while she was at work?
23 "A  I don't recall."
24 BY MR. GAREEB:
25   Q. Did you have an opinion that Dawn was    16:04
                                        Page 218

1  and mind her business?
2    A. Not that I can recall.
3    Q. Do you know -- did anyone complain to you
4  or did you ever hear of Mr. Bond pushing Dawn
5  Goddard away when she tried to take an alcoholic    16:05
6  beverage from Mr. Bond while at work?
7    A. No.
8    Q. Do you know if Mr. Bond used to comment
9  inappropriately about Dawn Goddard's body?
10   A. No.                            16:06
11   Q. Did Mr. Bond ever comment on anyone's body
12 parts while you were associated with him?
13   A. No.
14   Q. Did Bunzai Media Group have an HR
15 department?                          16:06
16   A. I believe so.
17   Q. And was it a fact that Leor was the
18 director of human resources for Bunzai Media Group?
19   A. It's hard for me to recall exactly. I
20 remember her more getting hired with HR. I don't    16:07
21 remember if she was HR in Bunzai. I don't remember
22 that. I remember she may have been HR.
23   Q. Well, you testified earlier that Leor was
24 HR. My question was, isn't it a fact she was
25 director of human resources for Bunzai Media Group?  16:07
                                        Page 220

1  wearing pants that were too tight at work?
2    A. I have no recollection of that.
3    Q. Okay. Do you recall her wearing pants that
4  may have been too tight while she was at work?
5    A. No.                          16:04
6    Q. Did you ever hear of any complaints that
7  Khristopher Bond was making mention of Dawn Goddard
8  wearing too tight of pants at work?
9    A. No.
10   Q. Did you ever tell Dawn Goddard when she    16:04
11 came and complained to you about Khristopher Bond
12 that she needed to quote, butt out, and mind her
13 business?
14   A. I didn't understand your question.
15   MR. GAREEB: Madam Court Reporter.    16:05
16   (The following record was read:)
17   "Q  Did you ever tell Dawn Goddard when she
18 came and complained to you about Khristopher Bond
19 that she needed to quote, butt out, and mind her
20 business?"                          16:04
21   THE WITNESS: Can you say that one more time.
22 BY MR. GAREEB:
23   Q. Did you ever tell Dawn Goddard that when
24 she complained about Khris Bond that -- strike that.
25   Did you ever tell Dawn Goddard to butt out  16:05
                                        Page 219

1    A. I don't know the exact nature of the title.
2    Q. Okay. When you heard an employee tell you
3  that Khris Bond is calling Dawn Goddard a cow, did
4  you ever have a discussion with Leor about that?
5    A. I didn't say that I heard Khristopher call  16:08
6  anybody a cow.
7    Q. When you heard from someone, Nastassia,
8  that Khristopher Bond called Dawn Goddard a cow, did
9  you go and talk to Leor about that?
10   A. No, I did not.                    16:08
11   Q. When people -- when employees were
12 complaining to you about Khris Bond's smoking, did
13 you get Leor involved in that?
14   A. No, I did not.
15   Q. When you received all the complaints that  16:08
16 you testified about today that employees came to you
17 about, did you ever get Leor the director of human
18 resources involved in those issues?
19   MR. UNGAR: Objection as to the form of the
20 question. It's vague.                   16:08
21   THE WITNESS: No.
22 BY MR. GAREEB:
23   Q. Isn't it a fact that Dawn Goddard came and
24 complained to you, and I believe Nastassia, that
25 Mr. Bond was touching her inappropriately?    16:09
                                        Page 221

56 (Pages 218 - 221)

ATTACHMENT A

APP. 000071
Ex. 1

**Page 230**

1  told you repeatedly I would be willing to do so
2  informally off the record. And all I asked was
3  politely was to please e-mail to me your citations
4  so I have an opportunity to review it over the
5  weekend. We'll be back on Monday unless you have    16:18
6  another question for the witness right now, but you
7  don't seem to have another question.
8      MR. GAREEB: Oh, I have questions.
9      MR. UNGAR: Then you want to ask them right now?
10     MR. GAREEB: I can't ask them when I have an    16:18
11 obstructionist lawyer who is hindering my ability to
12 give testimony here, and if you want the citations,
13 I'm going to give them to you right now. You are
14 not going to make me do extra work when I want to
15 sit here and talk to you and have a meet and confer    16:18
16 here in good faith. You don't want to do that.
17 That's fine. So take a pen and here are --
18     MR. UNGAR: The only person who is obstructing
19 this deposition is you. And if you want to
20 informally meet and confer, I'm willing to do that    16:18
21 as I said.
22     MR. GAREEB: Then let's do it now.
23     MR. UNGAR: We're going to leave now unless you
24 have another question on the record for the witness.
25 That's it. What do you want to do?    16:18

**Page 231**

1      MR. GAREEB: Do you want the citations?
2      MR. UNGAR: Do you have another question?
3      MR. GAREEB: Do you want the citations?
4      MR. UNGAR: This is ridiculous. Let the record
5  reflect that this is ridiculous what this lawyer is    16:19
6  doing. We will be back on Monday unless we hear
7  otherwise.
8      MR. GAREEB: So counsel has left. We have not
9  had the opportunity to do a stipulation. I tried to
10 meet and confer. He would not do so. He was    16:19
11 standing by the door the whole time, him and his
12 client, clearly with a motivation to leave, and
13 counsel's condescending bad faith tactics hindered
14 this deposition from being efficient, from being
15 complete thus far and being thorough thus far, and    16:19
16 accordingly we are exploring the ability to file a
17 motion. And counsel has refused to meet and confer.
18 He wants to meet and confer, quote, "informally" but
19 won't tell me what that means when we had the
20 ability to meet and confer right now regarding the    16:20
21 very issues that occurred at this deposition.
22     So that being the case, I will e-mail
23 counsel the law, and at this point I guess we have
24 to do this deposition per code. Thank you.
25     (TIME NOTED: 4:20 p.m.)

**Page 232**

1      I, ALON NOTTEA, do hereby declare under
2  penalty of perjury that I have read the foregoing
3  transcript; that I have made any corrections as
4  appear noted, in ink, initialed by me, or attached
5  hereto; that my testimony as contained herein, as
6  corrected, is true and correct.
7
8      EXECUTED this     day of,     2014,
9  at
10     (City)          (State)
11
12
13
14     _____
15     ALON NOTTEA, Volume I
16
17
18
19
20
21
22
23
24
25

**Page 233**

1      REPORTER'S CERTIFICATE
2
3  STATE OF CALIFORNIA  )
                         ) ss.
4  COUNTY OF LOS ANGELES )
5
6      I, Angela S. Hartsock, CSR No. 12620, do hereby
7  certify:
8      That the foregoing proceedings were taken
9  before me at the time and place herein set forth;
10 that any witnesses in the forgoing proceedings,
11 prior to testifying, were placed under oath; that a
12 verbatim record of the proceedings was made by me
13 using machine shorthand which was thereafter
14 transcribed by me or under my direction; further,
15 that the foregoing is an accurate transcription
16 thereof.
17     I further certify that I am neither
18 financially interested in the action nor a relative
19 or employee of any attorney of any of the parties.
20     IN WITNESS WHEREOF, I have subscribed my
21 name.
22 Date: 05/22/2014
23
24
25     _____
       Angela S. Hartsock
       CSR, No.12620.

59 (Pages 230 - 233)

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2          FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT
3

DAWN GODDARD, an                    )
4    individual; NANCY YALLEY,       )
an individual,                      )
5                                    )
      Plaintiffs,                    )
6                                    ) No.  BC510493
      vs.                            )
7                                    )
KHRISTOPHER BOND, a.k.a.            )
8    RAYMOND IBBOTT, an              )
individual; ALON NOTTEA, an         )
9    individual; BUNZAI MEDIA        )
GROUP, INC., a California            )
10   Corporation; PINNACLE          )
LOGISTICS, INC., a                   )
11   California Corporation;        )
CERENADE MARKETING                   )
12   INTERNATIONAL, INC., a         )
California Corporation;              )
13   MEDIA URGE, INC., a            )
California Corporation; and          )
14   DOES 1-100, Inclusive,         )
                                     )
15        Defendants.                )
                                     )
16   --------------------------------------------------------
17
18
19          DEPOSITION OF ALON NOTTEA, VOLUME II
20               Woodland Hills, California
21                 Monday, May 12, 2014
22
23   Reported by:
Angela S. Hartsock
24   CSR No.  12620
Job No.  1861882
25   PAGES:  234 - 417

                                              Page 234

ATTACHMENT A                          APP. 000073
                                      Ex. 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2        FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT
 3
 4  DAWN GODDARD, an           )
    individual; NANCY YALLEY,  )
 5  an individual,             )
                               )
 6   Plaintiffs,            )No  BC510493
                               )
 7   vs                        )
                               )
 8  KHRISTOPHER BOND, a k a    )
    RAYMOND IBBOTT, an         )
 9  individual; ALON NOTTEA, an )
    individual; BUNZAI MEDIA   )
10  GROUP, INC , a California  )
    Corporation; PINNACLE      )
11  LOGISTICS, INC , a         )
    California Corporation;    )
12  CERENADE MARKETING         )
    INTERNATIONAL, INC , a     )
13  California Corporation;    )
    MEDIA URGE, INC , a        )
14  California Corporation; and )
    DOES 1-100, Inclusive,     )
15                             )
    Defendants                 )
16  _____
17
18
19       Deposition of ALON NOTTEA, Volume II, taken on
20  behalf of Plaintiffs, at 21333 Oxnard Street, Woodland
21  Hills, California, commencing at 10:15 a m , and ending at
22  5:15 p m , on Monday, May 12, 2014, before Angela S
23  Hartsock, Certified Shorthand Reporter, No  12620
24
25
                                            Page 235
```

```
 1            I N D E X
 2
 3  WITNESS:     EXAMINATION:    PAGE:
 4
 5  ALON NOTTEA, VOLUME   DIRECT EXAMINATION    239
    II     BY MR  GAREEB:
 6
 7
 8         E X H I B I T S
 9
10  NUMBER:      DESCRIPTION:    PAGE:
11  Exhibit 2     compilation of        431
              complaint response
              letters
12
13  Exhibit 3     e-mail thread dated   453
              April 26, 2013 from
14            Ms  Foster to
              Mr  Bond
15  Exhibit 4     e-mail dated          456
              September 27, 2012
16            from Mr Nottea to
              Mr  Bond
17
18  Exhibit 5     e-mail dated          458
              October 3, 2012
              from Mr Nottea to
19            Ms  Goddard
20  Exhibit 6     e-mail dated          459
              September 27, 2012
21            from Mr  Nottea to
              Starco Group
22
23  Exhibit 7     e-mail dated          462
              September 20, 2012
24            from Mr Nottea to
              Ms  Goddard
25
                                            Page 237
```

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3
 4      GAREEB LAW GROUP
 5      By: Alexander S. Gareeb, Esq.
 6      21333 Oxnard Street
 7      2nd Floor
 8      Los Angeles, California 90067
 9      (818) 456-0970
10      Agareeb@glglegal.com
11
12  For the Defendant:
13
14      UNGAR LAW
15      By: Robert M. Ungar, Esq.
16      14724 Ventura Boulevard
17      Sherman Oaks, California 91403
18      (310) 405-1884
19      RMU@ungarlaw.com
20
21
22           -oOo-
23
24
25
                                            Page 236
```

```
 1   Exhibit 8       fictitious business     463
              name statement
 2
 3
 4
 5
 6
                    -oOo-
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page 238
```

2 (Pages 235 - 238)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000074
Ex. 1

| | |
|---|---|
| 1   Woodland Hills, California, Monday, | 1    A.  No. |
| 2        May 12, 2014, 10:15 a.m. | 2    Q.  What were your job duties at Pinnacle |
| 3 | 3  Logistics, Inc.? |
| 4    THE COURT REPORTER:  Please raise your right | 4    A.  I have no job duties. |
| 5  hand to be sworn. | 5    Q.  What was your relationship with Pinnacle    10:15 |
| 6        You do swear or affirm that the evidence | 6  Logistics, Inc.? |
| 7  you will give in this matter will be the truth, the | 7    A.  I have no relationship. |
| 8  whole truth, and nothing but the truth? | 8    Q.  So what you are saying is that you did |
| 9        MR. NOTTEA:  I do. | 9  nothing related to Pinnacle Logistics, Inc.? |
| 10 | 10    A.  I'm sorry.  I don't understand your    10:15 |
| 11        THEREUPON, | 11  question. |
| 12            ALON NOTTEA, | 12    Q.  You have done no services on behalf of |
| 13  a witness, having been first duly sworn, upon his | 13  Pinnacle Logistics, Inc.? |
| 14  oath, testified as follows: | 14    A.  No. |
| 15                     10:13 | 15    Q.  Did you ever manage anyone at Pinnacle    10:15 |
| 16        DIRECT EXAMINATION | 16  Logistics, Inc.? |
| 17  BY MR. GAREEB: | 17    A.  No. |
| 18    Q.  Good morning.  During the last deposition | 18    Q.  And do you know Oz Mizrahi? |
| 19  that took place on Friday I gave you a set of | 19    A.  I do. |
| 20  admonitions.  Do you recall those admonitions    10:13 | 20    Q.  How well do you know Oz Mizrahi?  How well    10:16 |
| 21  regarding the rules of this deposition? | 21  do you know Oz Mizrahi? |
| 22    A.  Yes. | 22    A.  I don't understand your question. |
| 23    Q.  Have you taken any drugs or alcohol within | 23    Q.  How well do you know Oz Mizrahi? |
| 24  the past 24 hours that would hinder your ability to | 24    A.  I don't understand question. |
| 25  give truthful and accurate testimony today?    10:13 | 25    Q.  How do you know Oz Mizrahi?    10:16 |
| Page 239 | Page 241 |

| | |
|---|---|
| 1    A.  No, I have not. | 1    A.  I don't remember. |
| 2    Q.  Is there a reason why this deposition | 2    Q.  You don't remember how you know him? |
| 3  should not go forward today? | 3    A.  I don't remember how I was introduced. |
| 4    A.  No. | 4    Q.  I didn't ask you how you were introduced. |
| 5    Q.  You do understand you are still under oath    10:14 | 5  I asked how do you know him?    10:16 |
| 6  under penalty of perjury? | 6    A.  He is an acquaintance. |
| 7    A.  I do. | 7    Q.  In what fashion? |
| 8    Q.  And that oath that you took is for you to | 8    A.  Business. |
| 9  tell the truth and the whole truth; correct? | 9    Q.  Such as... |
| 10    A.  Correct.    10:14 | 10    A.  I don't understand your question.    10:16 |
| 11    Q.  You do understand that? | 11        MR. GAREEB:  Madam Court Reporter, can you |
| 12    A.  I do. | 12  re-read the last two questions. |
| 13    Q.  Great.  When we left off, we were talking | 13        MR. UNGAR:  I'm going to interpose an objection. |
| 14  about Pinnacle Logistics, Inc.  You indicated that | 14  I think the witness said the last -- |
| 15  was a call center.    10:14 | 15        MR. GAREEB:  No, no.  No speaking objections,    10:17 |
| 16    A.  I believe, and shipping center. | 16  please.  Set forth your objection only.  Thank you. |
| 17    Q.  I'll get there, but it's a call center? | 17        What are your objections? |
| 18    A.  Yes. | 18        MR. UNGAR:  I stated it, thank you. |
| 19    Q.  It also has a shipping and receiving center | 19        MR. GAREEB:  What was his objection? |
| 20  as well?    10:14 | 20        Read the last two questions.    10:17 |
| 21    A.  I believe so. | 21        MR. UNGAR:  Same objection. |
| 22    Q.  Now, what did you have to do with forming | 22        (The following record was read:) |
| 23  Pinnacle Logistics, Inc.? | 23    "Q  I asked how do you know him? |
| 24    A.  I don't recall. | 24    "Q  In what fashion?" |
| 25    Q.  You don't understand what you did?    10:14 | 25        THE WITNESS:  I don't understand the question.    10:18 |
| Page 240 | Page 242 |

3 (Pages 239 - 242)

1  BY MR. GAREEB:
2      Q. How do you know Oz Mizrahi?
3      A. I don't remember.
4      Q. How long have you known Mr. Mizrahi?
5      A. Approximately two, two and a half years.    10:19
6      Q. Did you meet him in a personal context?
7      A. No.
8      Q. So you met him in a business context?
9      A. I don't recall.
10     Q. Well, if it's not personal and you don't    10:19
11  recall it's business, then how is it you know
12  Mr. Mizrahi.
13     MR. UNGAR: Objection as to the form of the
14  question. It's argumentative.
15     THE WITNESS: I believe I met him through a    10:19
16  friend. I don't recall.
17  BY MR. GAREEB:
18     Q. Which friend?
19     A. I don't recall.
20     Q. So you believe you met him through a    10:19
21  friend, but you don't recall the friend; is that
22  right?
23     A. That's right.
24     Q. Okay. What types of business did you do
25  with Mr. Mizrahi?    10:19

Page 243

1      A. I don't understand your question.
2      Q. What type of business did you do with
3  Mr. Mizrahi?
4      A. I don't understand your question.
5      MR. GAREEB: Do you have a timestamp?    10:20
6      THE COURT REPORTER: I will timestamp it.
7  BY MR. GAREEB:
8      Q. What is it that you don't understand about
9  the question?
10     MR. UNGAR: Objection as to the form of the    10:20
11  question. It's argumentative.
12     THE WITNESS: What type of business have I done
13  with Mr. Mizrahi? I don't understand your question.
14  BY MR. GAREEB:
15     Q. Have you done any business with    10:21
16  Mr. Mizrahi?
17     A. No.
18     Q. Have you ever had any dealings with
19  Mr. Mizrahi at all?
20     A. Yes.    10:21
21     Q. In what context?
22     A. I believe we had some conversations when
23  he -- he had some questions regarding some previous
24  Bunzai employees.
25     Q. Where? When? When was this?    10:22

Page 244

1      MR. UNGAR: Objection as to the form of the
2  question. It's vague and ambiguous.
3      THE WITNESS: Around the time when Pinnacle was
4  being set up.
5  BY MR. GAREEB:    10:22
6      Q. Who set up Pinnacle?
7      A. I'm not aware.
8      Q. You're not aware, or you don't know?
9      A. I don't know.
10     Q. What did you talk to him about during the    10:22
11  time that Pinnacle was being set up?
12     A. Some logistical questions that he had with
13  regard to freight forwarders, I believe.
14     THE COURT REPORTER: What is it?
15     THE WITNESS: Freight forwarders.    10:22
16  BY MR. GAREEB:
17     Q. Why would he be talking to you about
18  freight forwarders?
19     MR. UNGAR: Objection as to the form of the
20  question. Calls for speculation.    10:23
21     THE WITNESS: He set up a fulfillment entity, I
22  believe, so he was having some questions with
23  regards to how Bunzai used to handle inventory and
24  so on and so forth.
25  BY MR. GAREEB:    10:23

Page 245

1      Q. What's a fulfillment center as you call it?
2      A. Shipping and receiving.
3      Q. But you said he was setting up a
4  fulfillment company. What was the fulfillment
5  company?    10:23
6      A. I believe it was Pinnacle.
7      Q. Okay. And why would he come to you and ask
8  you about Bunzai?
9      MR. UNGAR: Objection as to the form of the
10  question. Calls for speculation.    10:23
11     THE WITNESS: I was CEO of Bunzai. I had some
12  knowledge as to the operations of Bunzai that I
13  could pass forward.
14  BY MR. GAREEB:
15     Q. And is Bunzai and Pinnacle similar    10:24
16  companies?
17     A. No.
18     Q. Why would the operation of Bunzai be
19  relevant to the operations of Pinnacle Logistics
20  then?    10:24
21     MR. UNGAR: Objection as to the form of the
22  question. Calls for speculation.
23     THE WITNESS: I don't understand your question.
24  BY MR. GAREEB:
25     Q. Why would he come to you and ask you about    10:24

Page 246

4 (Pages 243 - 246)

1  the operation of Bunzai as it pertains to Pinnacle
2  when Pinnacle and Bunzai don't have the same
3  operations?
4    MR. UNGAR:  Objection as to the form of the
5  question.  Calls for speculation, and it's    10:24
6  argumentative.
7    THE WITNESS:  I don't understand your question.
8    MR. GAREEB:  Madam Court Reporter, can you
9  please re-read.
10    (The following record was read:)    10:24
11  "Q  Why would he come to you and ask you about
12  the operation of Bunzai as it pertains to Pinnacle
13  when Pinnacle and Bunzai don't have the same
14  operations?"
15    MR. UNGAR:  Same objections.    10:24
16    THE WITNESS:  There was some random questions
17  with inventory, cataloging.
18  BY MR. GAREEB:
19    Q.  So now you've mentioned that he's spoken to
20  you about freight forwarders and inventory catago --  10:25
21  catalog --
22    A.  Cataloging.
23    Q.  Cataloging. I'm sorry.  Anything else that
24  he talked with you about?
25    A.  Not that I can recall.    10:25

Page 247

1    Q.  What else does Pinnacle do?
2    A.  I believe they have a call center.
3    Q.  I'm sorry.  Besides call center, besides
4  shipping and receiving, besides inventory
5  cataloging, what else did they do?    10:26
6    A.  That's all I'm aware of.
7    Q.  Okay.  Do you know why Mr. Mizrahi came to
8  you and wanted to talk to you about inventory
9  cataloging?
10    A.  I had some previous knowledge.    10:27
11    Q.  How does he know that?
12    A.  I believe he knew I was CEO of Bunzai.
13    Q.  How did he know, to your knowledge, that
14  Bunzai did inventory cataloging?
15    MR. UNGAR:  Objection as to the form of the    10:27
16  question.  Calls for speculation.
17    THE WITNESS:  I'm not aware that he knew what
18  Bunzai did.
19  BY MR. GAREEB:
20    Q.  Well, then why did he come to you and ask    10:27
21  you about inventory cataloging?
22    MR. UNGAR:  Objection as to the form of the
23  question.  Calls for speculation.
24    THE WITNESS:  I don't know.
25  BY MR. GAREEB:    10:27

Page 249

1    Q.  Did you deal with freight forwarders when
2  you were at Bunzai?
3    A.  Seldomly.
4    Q.  Huh?
5    A.  Randomly.    10:25
6    Q.  I don't know what that means, randomly?
7    A.  Sometimes.
8    Q.  Did you deal with inventory cataloging when
9  you were at Bunzai?
10    A.  I dealt with many things at Bunzai.    10:26
11    Q.  I didn't ask you that. I asked you if you
12  dealt with inventory cataloging when --
13    A.  Sometimes.
14    Q.  Hold on. Let me finish my question.
15    Were you involved with inventory cataloging  10:26
16  when you were at Bunzai?
17    A.  Sometimes.
18    Q.  Did Pinnacle do inventory cataloging?
19    A.  I believe so.
20    Q.  Did they do freight forwarding?    10:26
21    A.  I don't know.
22    Q.  So you don't know whether they did freight
23  forwarding, but you do know that they do inventory
24  cataloging; correct?
25    A.  Yes.    10:26

Page 248

1    Q.  Did Mr. Mizrahi have anything to do with
2  Bunzai?
3    A.  No.
4    Q.  You testified earlier that Oz Mizrahi had
5  something to do with Media Urge, Inc.; correct?    10:28
6    A.  If I did, it was a mistake.
7    Q.  Okay.  So as far as you know, Oz Mizrahi is
8  only involved in Pinnacle Logistics, Inc.?
9    A.  Based on my knowledge.
10    Q.  Did you do any other business with Oz    10:28
11  Mizrahi other than this -- him asking you questions
12  about Bunzai as he was setting up Pinnacle
13  Logistics?
14    A.  No.
15    Q.  Did you ever invest in anything in which    10:28
16  Oz Mizrahi was involved in?
17    A.  No.
18    MR. UNGAR:  Slow down, please. Objection as to
19  the form of the question.  It's vague and ambiguous.
20  BY MR. GAREEB:    10:29
21    Q.  You can answer now.
22    A.  Not that I can recall now.
23    Q.  Were you involved in any business venture
24  in which Mr. Mizrahi was involved?
25    MR. UNGAR:  Same objection. It's vague and    10:29

Page 250

5 (Pages 247 - 250)

1  ambiguous.
2      THE WITNESS:  I don't understand your question.
3      MR. GAREEB:  Madam Court Reporter.
4          (The following record was read:)
5      "Q  Were you involved in any business venture    10:29
6  in which Mr. Mizrahi was involved?"
7      MR. UNGAR:  Objection as to the form of the
8  question.  It's vague and ambiguous.
9      THE WITNESS:  No.
10  BY MR. GAREEB:                                  10:29
11      Q.  As you sit here right now, is it your
12  testimony that you had nothing to do with Pinnacle
13  Logistics, Inc.?
14      A.  I don't understand your question.
15      Q.  As you sit here right now, you had       10:30
16  nothing -- as you sit here today, is it your
17  testimony that you had no job duties at Pinnacle
18  Logistics, Inc.?
19      A.  That's correct.
20      Q.  As you sit here today, is it your testimony  10:30
21  that you did not supervise anyone at Pinnacle
22  Logistics, Inc.?
23      A.  That's correct.
24      Q.  As you sit here right now, is it your
25  testimony that you had no management duties     10:30

Page 251

1  whatsoever at Pinnacle Logistics, Inc.?
2      A.  No.
3      Q.  And as you sit here right now, is it your
4  testimony that you played no role whatsoever in
5  forming Pinnacle Logistics, Inc.?              10:30
6      MR. UNGAR:  Objection as to the form of the
7  question.  It's vague and ambiguous.
8      THE WITNESS:  I don't understand your question.
9      MR. GAREEB:  Madam Court Reporter.
10          (The following record was read:)       10:31
11      "Q  And as you sit here right now, is it your
12  testimony that you played no role whatsoever in
13  forming Pinnacle Logistics, Inc.?"
14      MR. UNGAR:  Same objection.
15      THE WITNESS:  That's not what I said.       10:31
16  BY MR. GAREEB:
17      Q.  Okay.  So did you play a role in forming
18  Pinnacle Logistics, Inc.?
19      A.  I randomly answered some questions
20  regarding old practices of Bunzai.  That's it.  10:31
21      MR. GAREEB:  Move to strike as nonresponsive.
22      Madam Court Reporter, can you please
23  re-read the question.
24          (The following record was read:)
25      "Q  And as you sit here right now, is it your  10:30

Page 252

1  testimony that you played no role whatsoever in
2  forming Pinnacle Logistics, Inc.?"
3      THE WITNESS:  I don't understand the question.
4  BY MR. GAREEB:
5      Q.  Did you play any role whatsoever in forming  10:32
6  the company Pinnacle Logistics, Inc.?
7      A.  Informing?
8      Q.  Forming.
9      A.  Like in forming, two words?
10      Q.  Yes.                                     10:32
11      A.  No.
12      Q.  Did you ever get any stock in Pinnacle
13  Logistics, Inc.?
14      A.  No.
15      Q.  Did you ever give any stock in Pinnacle   10:32
16  Logistics, Inc.?
17      MR. UNGAR:  Objection as to the form of the
18  question.  It's vague and ambiguous.
19      THE WITNESS:  No.
20  BY MR. GAREEB:                                   10:32
21      Q.  Where does Mr. Mizrahi live?
22      A.  I don't know.
23      Q.  When you had -- when he was discussing with
24  you about freight forwarders, where did this
25  conversation take place?                        10:33

Page 253

1      A.  On the phone.
2      Q.  Where were you?
3      A.  I don't recall.
4      Q.  Did he happen to say where he was?
5      A.  I don't recall.                          10:33
6      Q.  Did you ever receive a paycheck from
7  Pinnacle Logistics, Inc.?
8      A.  No.
9      Q.  Did you ever work with Pinnacle Logistics,
10  Inc. in any of your endeavors?                  10:33
11      A.  Yes.
12      Q.  In what fashion?
13      MR. UNGAR:  Objection as to the form of the
14  question.  It's vague and ambiguous.
15      THE WITNESS:  I don't understand the question.  10:34
16  I'm really sorry.
17  BY MR. GAREEB:
18      Q.  It's okay.  You indicated that you did work
19  with Pinnacle in some fashion.  I want to know what
20  that is.                                        10:34
21      A.  During the winding down of Bunzai Media
22  Group, there was some questions from Pinnacle with
23  respect to Bunzai.
24      Q.  Okay.  We're going to go through this now
25  in detail.  When was the decision made as to when  10:34

Page 254

6 (Pages 251 - 254)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000078
Ex. 1

```
 1  Bunzai was to start winding down?
 2     A.  Around summer of 2012.
 3     Q.  Okay.  Can you be a little more specific in
 4  terms of was it the beginning of the summer, the
 5  middle of the summer or the latter part of the     10:35
 6  summer?
 7     A.  I believe it was around June.
 8     Q.  2012?
 9     A.  Yes.
10     Q.  Now, in June, 2012, was Dawn Goddard -- oh,  10:35
11  did you know Dawn Goddard by that time?
12     A.  I don't recall.
13     Q.  Did you know Nancy Yalley at that time?
14     A.  I don't recall.
15     Q.  As you sit here now, when was the first     10:36
16  time you can recall meeting Dawn Goddard?
17     A.  The day Khristopher hired her.
18     Q.  As you sit here right now, can you estimate
19  for me when was the first time you met Dawn Goddard?
20     A.  I believe it was end of July or beginning   10:36
21  of August or sometime around there.  July, August,
22  2012.
23     Q.  You met Dawn and Nancy?
24     A.  I believe your question was Dawn.  I was
25  answering with regards to Dawn.                     10:36
                                            Page 255
```

```
 1     Q.  When was the first time as you can recall
 2  the first time you met Nancy?
 3     A.  I think a little before Dawn.
 4     Q.  A little before Dawn?
 5     A.  I think so.                                  10:36
 6     Q.  How did you meet Nancy?
 7     MR. UNGAR:  Objection as to the form of the
 8  question.  Vague and ambiguous.
 9     Counsel, can you please define who you mean
10  by Nancy for the record.                            10:37
11  BY MR. GAREEB:
12     Q.  How did you first meet Nancy Yalley?
13     A.  I believe the same way.  When Khristopher
14  hired her.
15     MR. UNGAR:  Counsel, I'm sorry.  Can we agree   10:37
16  that if you are going to use the term "Nancy,"
17  anybody wants to use the term "Nancy," that it's
18  referring to the plaintiff Nancy Yalley?
19     MR. GAREEB:  I've referred to Nancy Yalley, so I
20  don't know what you're referring to.  When that    10:37
21  issue comes up -- if it starts becoming cluttered,
22  then we will define it, but as of right now, let me
23  just proceed with my deposition.  That would be very
24  nice.  Thank you.
25  BY MR. GAREEB:                                      10:37
                                            Page 256
```

```
 1     Q.  Okay.  So where did you meet Ms. Yalley?
 2     A.  Nancy Yalley?
 3     Q.  Yes.
 4     A.  I believe it was in the Van Nuys location.
 5     Q.  Which Van Nuys location?                     10:38
 6     A.  7900 Gloria Avenue.
 7     Q.  And why would Nancy Yalley be at 7900
 8  Gloria Avenue during the first time you met her?
 9     A.  Mr. Bond had an office at the location
10  before they left.  For a short period of time, Dawn  10:38
11  and Nancy were working with Khristopher in that
12  office before they moved on.
13     Q.  What was your job title?
14     A.  I don't understand your question.
15     Q.  During that time, what was your job title?   10:39
16     A.  I don't understand your question.
17     Q.  During that time that you met Ms. Yalley in
18  approximately July or August of 2012, what was your
19  job title?
20     A.  I believe I was still CEO of Bunzai.         10:39
21     Q.  And Mr. Bond was also 50 percent owner of
22  Bunzai at that time?
23     A.  Yes.
24     Q.  And Bunzai during that time was located at
25  7900 Gloria Avenue; correct?                        10:39
                                            Page 257
```

```
 1     A.  I don't recall the actual address.
 2     Q.  Well, does 7900 Gloria Avenue sound
 3  familiar?
 4     A.  Yes.
 5     Q.  Was that Bunzai's address?                   10:40
 6     A.  I don't believe.
 7     Q.  What was Bunzai's address then?
 8     A.  I don't remember.
 9     Q.  Well, you testified earlier that Bunzai
10  Media Group was at 7900 Gloria Avenue.  Was that    10:40
11  testimony not correct?
12     MR. UNGAR:  I'm going to object as to the form
13  of the question.  It's argumentative.
14     THE WITNESS:  That's correct.
15  BY MR. GAREEB:                                      10:40
16     Q.  It's correct that you were incorrect, or
17  it's correct that Bunzai Media Group's office was
18  located at 7900 Gloria Avenue?
19     MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous.  It's          10:40
21  argumentative, and it's compound.
22     THE WITNESS:  Bunzai Media had some dealings at
23  7900.
24  BY MR. GAREEB:
25     Q.  Isn't it a fact that the principle place of  10:41
                                            Page 258
```

7 (Pages 255 - 258)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000079
Ex. 1

1  business was, in fact, at 7900 Gloria Avenue?
2      MR. UNGAR:  Objection as to the form of the
3  question.  It's vague and ambiguous temporally.
4      THE WITNESS:  I believe it was.
5  BY MR. GAREEB:                              10:41
6      Q.  Now, Bunzai Media Group was -- one of its
7  products that it was marketing was Aura Vie;
8  correct?
9      A.  Yes.
10     Q.  What is Aura Vie?                    10:41
11     MR. UNGAR:  Objection as to the form of the
12 question.  It's vague and ambiguous.
13     THE WITNESS:  It's a cosmetic line of skin care
14 products.
15 BY MR. GAREEB:                              10:42
16     Q.  Who formed -- who -- well, is Aura Vie your
17 line of products?
18     A.  I don't understand your question.
19     Q.  Did you Alon Nottea formulate Aura Vie?
20     A.  No.                                  10:42
21     Q.  Who was the manufacturer of Aura Vie, to
22 your knowledge?
23     A.  There are a few.  Jacem Healthy Products is
24 the manufacturer.
25     Q.  Who is Jacem Products?                10:43

Page 259

1  that manufacturer?
2      A.  I was looking for manufacturers.
3      Q.  And how did you find that particular
4  manufacturer?
5      MR. UNGAR:  Objection as to the form of the    10:43
6  question.  It's vague and ambiguous.
7      THE WITNESS:  I was referred to him.
8  BY MR. GAREEB:
9      Q.  Is Aura Vie a product line that you found
10 and then sought a referral?                  10:44
11     A.  Can you ask the question again.
12     MR. GAREEB:  Absolutely.  Madam Court Reporter.
13         (The following record was read:)
14     "Q  Is Aura Vie a product line that you found
15 and then sought a referral?"                 10:44
16     THE WITNESS:  No.
17 BY MR. GAREEB:
18     Q.  Then just someone knew that you were in the
19 industry and knew you were looking and referred you
20 to this particular product line?             10:44
21     MR. UNGAR:  Objection as to the form of the
22 question.  Calls for speculation.  It's vague and
23 ambiguous.  It's also argumentative.
24     THE WITNESS:  No.
25 BY MR. GAREEB:                              10:45

Page 261

1      A.  A manufacturer.
2      Q.  Where?
3      A.  In Chatsworth.
4      Q.  And do you happen to have any interest in
5  that company?                               10:43
6      A.  No.
7      Q.  How did you find that company?
8      A.  Referred.
9      Q.  By...
10     MR. UNGAR:  Objection as to the form of the    10:43
11 question.  It's vague and ambiguous and
12 unintelligible.
13 BY MR. GAREEB:
14     Q.  Referred by whom?
15     MR. UNGAR:  Same objection.  Vague and ambiguous  10:43
16 and unintelligible.
17     THE WITNESS:  I don't recall.
18 BY MR. GAREEB:
19     Q.  What was the purpose of the referral?
20     MR. UNGAR:  Objection as to the form of the    10:43
21 question.  It's vague and ambiguous and
22 unintelligible.
23     THE WITNESS:  A manufacturing referral.
24 BY MR. GAREEB:
25     Q.  What was the purpose of the referral to    10:43

Page 260

1      Q.  So as you sit here right now, how did you
2  first become aware of Aura Vie?
3      A.  My partner Khristopher Bond came up with
4  the name.  He researched some interesting
5  ingredients, and we were interested in developing    10:45
6  this line of products.
7      Q.  So then I'm going to ask, to your
8  knowledge, who formulated the cosmetic line of skin
9  care products called Aura Vie?
10     MR. UNGAR:  Objection as to the form of the    10:45
11 question.  It's vague and ambiguous.
12     THE WITNESS:  I believe Jacem Healthy Products
13 formulated it.
14 BY MR. GAREEB:
15     Q.  And when you first found out about this    10:45
16 product line, it didn't have a name?
17     A.  I'm sorry.  I don't understand your
18 question.
19     Q.  When you researched manufacturers, did they
20 offer an Aura Vie cosmetic line of skin care    10:46
21 products?
22     A.  I believe so.
23     Q.  Okay.  Because you just indicated that
24 Mr. Bond came up with the name of Aura Vie.  That's
25 why I'm a little confused here.               10:46

Page 262

8 (Pages 259 - 262)

Veritext National Deposition & Litigation Services
866 299-5127



1    MR. UNGAR: Objection as to the form of the
2  question. It's argumentative. It's vague and
3  ambiguous.
4    THE WITNESS: I don't really recall where the
5  name came from. I believe Khristopher worked on it,  10:46
6  maybe it came from Jacem directly. I wasn't
7  involved with the name.
8  BY MR. GAREEB:
9    Q.  What was the purpose of pursuing a cosmetic
10  line of skin care products?  10:46
11    A.  Making money.
12    Q.  I know. But who is going to make money?
13    MR. UNGAR: Objection as to the form of the
14  question. It's vague and ambiguous.
15    THE WITNESS: I don't understand your question.  10:47
16  BY MR. GAREEB:
17    Q.  Okay. Was Bunzai Media Group looking for a
18  cosmetic line of skin care products to market? Is
19  that why you guys were pursuing Aura Vie?
20    A.  Yes.  10:47
21    Q.  Who was in charge of marketing Aura Vie
22  specifically within Bunzai Media Group?
23    A.  The marketing department.
24    Q.  Of...
25    A.  Bunzai Media.  10:47

Page 263

1    Q.  Okay. And who did that include?
2    MR. UNGAR: Objection as to the form of the
3  question. It's vague and ambiguous.
4    THE WITNESS: Myself. Back then -- myself and
5  Khris -- Khristopher Bond.  10:48
6  BY MR. GAREEB:
7    Q.  Anyone else?
8    A.  There was a Kevin McNamara who helped us.
9    Q.  Anyone else?
10    A.  No.  10:48
11    Q.  Nastassia Yalley was not there?
12    MR. UNGAR: Objection as to the form of the
13  question. It's vague and ambiguous. Calls for
14  speculation.
15    THE WITNESS: Nastassia Yalley was there.  10:48
16  BY MR. GAREEB:
17    Q.  Okay. Was she involved in the marketing of
18  Aura Vie?
19    A.  From time to time.
20    Q.  Who else? You mentioned yourself,  10:48
21  Mr. Bond, Kevin Mc --
22    A.  McNamara.
23    Q.  -- McNamara and Nastassia Yalley; right?
24  Anyone else?
25    A.  Can you establish a time because I don't  10:49

Page 264

1  know exactly when we're talking about.
2    Q.  Well, you had stated that Bunzai Media
3  Group was operative from 2010 to the end of 2012.
4  So it's during that time period.
5    A.  Okay.  10:49
6    Q.  So other than Ms. Nastassia Yalley,
7  yourself, Mr. Bond and Kevin McNamara, anyone else
8  that was responsible for marketing the Aura Vie
9  cosmetic line on behalf of Bunzai Media Group?
10    A.  Not that I can recall.  10:49
11    Q.  What was your job with respect to marketing
12  the Aura Vie cosmetic line of skin care products on
13  behalf of Bunzai Media Group?
14    A.  Looking for media outlets.
15    Q.  How did you do that?  10:50
16    A.  Trade shows, networking.
17    Q.  Anything else?
18    A.  Going to work every day.
19    Q.  Great. And other than going to work every
20  day looking for media outlets, anything else that  10:50
21  you went to work every day to do?
22    A.  Be more specific. I don't understand your
23  question.
24    Q.  Sure. Sure. What other job duties did you
25  do at Bunzai Media Group other than looking for  10:50

Page 265

1  media outlets?
2    A.  Analyze reports.
3    Q.  What kind of reports?
4    A.  Many kinds.
5    Q.  Such as...  10:51
6    A.  Conversion, monitoring of EPC's, accounting
7  reports. That's about it.
8    Q.  Great. You said that you analyzed
9  conversion reports; is that correct?
10    A.  Yes.  10:51
11    Q.  Who prepared the conversion reports for you
12  to analyze?
13    A.  Technology.
14    Q.  Who in technology prepared these conversion
15  reports?  10:51
16    A.  Software. It's not a person.
17    Q.  Okay. So conversion reports, as I
18  understand it, is prepared or formed by some sort of
19  software?
20    A.  Yes.  10:52
21    Q.  What software is that?
22    A.  Link Trust.
23    Q.  Lynn --
24    A.  Link Trust.
25    Q.  Is that Bunzai's proprietary software?  10:52

Page 266

9 (Pages 263 - 266)

Veritext National Deposition & Litigation Services
866 299-5127

APP. 000081
Ex. 1

1   A.  No, it is not.
2   Q.  And this is software out for the consumer
3   to go out and purchase?
4   A.  I believe so.
5   Q.  And where do you get -- where did you get      10:52
6   Link Trust?  Where did you purchase it?
7   A.  Linktrust.com.
8   Q.  You just downloaded it?  Is that what it
9   is?
10   A.  I believe so.                              10:52
11   Q.  Who appeared the accounting reports that
12   you analyzed?
13   A.  Nastassia.
14   Q.  And the accounting reports, what were they
15   used for?                                        10:53
16   A.  What was the accounting reports used for?
17   Q.  Yeah.
18   A.  Getting a general overview of where the
19   company stands financially.
20   Q.  So the accounting reports, we are talking   10:53
21   about income statements here?
22   A.  Just day-to-day expenses.
23   Q.  Balance sheets?
24   A.  It was more internal expense reports, less
25   accounting from an accounting perspective.       10:53
                                        Page 267

1   Q.  You are confusing me because you described
2   the accounting reports to see how the company is
3   doing financially.  Then I asked you if they are
4   balance sheets, and you said they are more expense
5   reimbursements.  So I'm trying to find out what are   10:53
6   these accounting reports.
7   MR. UNGAR:  Objection as to the form of the
8   question.  It's vague and ambiguous.
9   THE WITNESS:  Standard reports.  Sales reports,
10   expense reports, income reports that were derived      10:54
11   internally, not through a CPA or financial
12   statements that arrived from an accounting firm.
13   Internal documents.
14   BY MR. GAREEB:
15   Q.  What was Mr. Bond -- well, let me ask you    10:54
16   this, other than conversion reports and accounting
17   reports monitoring the EPC's, what else did you do
18   for Bunzai Media Group?
19   A.  Listen, I was CEO.  I did many things.  I
20   don't recall exactly every one of my duties.      10:54
21   Q.  Mr. Bond, what he supposed to do as
22   being a 50 percent owner of Bunzai Media Group?
23   MR. UNGAR:  Objection as to the form of the
24   question.  It's vague and ambiguous.
25   THE WITNESS:  Can you re-ask the question for   10:55
                                        Page 268

1   me.
2   MR. GAREEB:  I withdraw.
3   BY MR. GAREEB:
4   Q.  What did Mr. Bond do on behalf of Bunzai
5   Media Group?                                     10:55
6   A.  Mr. Bond developed customer service,
7   scripting, write content, work on design.  That's
8   about it.
9   Q.  When you say develop customer service, what
10   did you mean by that?                            10:56
11   A.  I said developed customer service
12   scripting.
13   Q.  Okay.  What is that?
14   A.  It's work with customer service.
15   Khristopher took calls by himself of customers that   10:56
16   were coming in and developed the best way, the
17   courteous way to talk to customers.  Developed a
18   script that was the best way to speak to these
19   customers.
20   Q.  He developed a script for whom?              10:56
21   A.  For Bunzai.
22   Q.  Okay.  But the script, who was to be using
23   these scripts?
24   A.  The call center.
25   Q.  Did you see the script at any time?         10:56
                                        Page 269

1   MR. UNGAR:  Objection as to the form of the
2   question.  It's vague and ambiguous.
3   THE WITNESS:  The script that Khristopher was
4   working on for customer service sometimes came
5   through to me for review as well and for my thought   10:57
6   and input, yes.
7   BY MR. GAREEB:
8   Q.  And did you provide any input?
9   MR. UNGAR:  Objection as to the form of the
10   question.  It's vague and ambiguous.             10:57
11   THE WITNESS:  Not that I can recall.
12   BY MR. GAREEB:
13   Q.  In the end did you okay a script be used
14   for the call center for Bunzai Media Group?
15   A.  I didn't need to okay.  His English was    10:57
16   better than mine was.  Obviously my partner was
17   better at this than I was.  There was no needing of
18   my approval.
19   Q.  So you gave him that project for him to
20   ensure that he develops a customer service script?   10:57
21   MR. UNGAR:  Objection as to the form of the
22   question.  It's vague and ambiguous, and it's
23   argumentative.
24   THE WITNESS:  I didn't give him the project.  He
25   took it upon himself.                            10:58
                                        Page 270

10 (Pages 267 - 270)

Veritext National Deposition & Litigation Services
866 299-5127