1 BY MR. GAREEB:
2    Q.  Okay.  But you didn't object?
3    A.  No, we actually needed it.  I was happy.
4    Q.  And the content writing, when you say
5 content writing, what content are you referring to?  10:58
6    A.  Standard marketing copy descriptions about
7 products.  Descriptions in the cosmetic industry or
8 any other thing.  Writing about products, marketing
9 language and copy for websites.
10    Q.  For websites, okay.  So the Aura Vie    10:58
11 cosmetic line had a website?
12    A.  Yes.
13    Q.  Or are you saying the Bunzai website?
14       MR. UNGAR:  Objection as to the form of the
15 question.  It's vague and ambiguous and    10:59
16 unintelligible.
17 BY MR. GAREEB:
18    Q.  That's why I'm trying to correct it, but go
19 ahead.
20       MR. GAREEB:  Same objection.  Objection as to the  10:59
21 form of the question.  Vague and ambiguous and
22 unintelligible.  The objection is to the form of the
23 question.
24       MR. GAREEB:  I didn't even ask a question.  I
25 don't know what you are objecting to.    10:59

1    to the Aura Vie website?
2       MR. UNGAR:  Same objections as to the form of
3 the question.  It's vague and ambiguous.
4       THE WITNESS:  My input was generally more in
5 design than words.    11:00
6 BY MR. GAREEB:
7    Q.  And your input regarding design, was that
8 taken into account for the final Aura Vie website?
9    A.  I believe it was.
10    Q.  Were you happy with the end result of the    11:00
11 Aura Vie website?
12    A.  I was --
13       MR. UNGAR:  Objection as to the form of the
14 question.  It's vague and ambiguous.
15       THE WITNESS:  I'm never happy with the result of  11:01
16 stuff.  I always want it to be better, so it didn't
17 satisfy me, no.
18 BY MR. GAREEB:
19    Q.  Would it have ever satisfied you?
20       MR. UNGAR:  Objection as to the form of the    11:01
21 question.  It's vague and ambiguous.  It's not
22 readily understood either.
23       THE WITNESS:  I don't understand your question.
24 BY MR. GAREEB:
25    Q.  Did you ever complain that the website for    11:01

1       THE WITNESS:  Both.  Content for Bunzai Media
2 website and Aura Vie.
3 BY MR. GAREEB:
4    Q.  So Aura Vie did have a website?
5    A.  Yes.    10:59
6    Q.  And who developed that website?
7    A.  Bunzai Media developed it.
8    Q.  Did you have anything to do with the
9 writing of the content of the Bunzai website?
10    A.  Not that I can recall.    10:59
11    Q.  Did you have any say in the content on the
12 website for Bunzai Media Group?
13    A.  Yes.
14    Q.  What was that?
15    A.  I didn't have a say, but I had the    11:00
16 authority to say.  I didn't understand your
17 question.  I'm sorry.
18    Q.  Okay.  So you had the authority to say
19 something.  Did you ever give any input as to any of
20 the content pertaining to the Bunzai website?    11:00
21       MR. UNGAR:  Objection as to the form of the
22 question.  It's vague and ambiguous.
23       THE WITNESS:  Not that I can recall.
24 BY MR. GAREEB:
25    Q.  Did you offer any suggestions with respect    11:00

1 Aura Vie was not to your liking?
2    A.  No.
3    Q.  You also said that Mr. Bond worked on
4 designs.  Do you remember that?
5    A.  (Witness nods head.)    11:01
6    Q.  What kind of designs?
7    A.  Websites.
8    Q.  Okay.
9    A.  Catalog.
10    Q.  The actual product itself, the actual Aura  11:01
11 Vie product themselves, were they individually
12 packaged themselves?
13    A.  When we started, yes.
14    Q.  Okay.  How about after you started?
15       MR. UNGAR:  Objection as to the form of the    11:02
16 question.  It's vague and ambiguous.  It's readily
17 understood.
18       THE WITNESS:  When Bunzai Media started marking
19 Aura Vie, they were individually packed, and then in
20 order to save money they became combined in a tray.  11:02
21 The packaging changed.
22 BY MR. GAREEB:
23    Q.  Whose idea was that?
24       MR. UNGAR:  Objection as to the form of the
25 question.  It's vague and ambiguous, and it's not    11:02

11 (Pages 271 - 274)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000083
Ex. 1

1  readily understood in its form.
2      THE WITNESS:  I don't remember.
3  BY MR. GAREEB:
4      Q.  Did you have anything to do with the design
5  of the packaging of Aura Vie at any time during          11:03
6  Bunzai Media Group?
7      A.  Yes, I did.
8      Q.  Did Mr. Bond also have something to do with
9  the design of the packaging for the Aura Vie
10  cosmetic line?                                          11:03
11      A.  Yes, he did.
12      Q.  All right.  How did the design change from
13  the beginning to how it eventually turned out to be?
14      MR. UNGAR:  Objection as to the form of the
15  question.  It's vague and ambiguous.                    11:03
16      THE WITNESS:  The design didn't change much, but
17  in order to save weight of the package, we decided
18  to not have a dual packaging, remove the retail
19  packaging of the box and stick the actual product
20  into a tray in order to save 3 ounces of weight.        11:03
21  BY MR. GAREEB:
22      Q.  Did you also have a customer service
23  department for Bunzai Media Group pertaining to the
24  Aura Vie products?
25      A.  Yes.                                            11:04

Page 275

1      Q.  Who was that?
2      A.  I don't understand your question.
3      Q.  Who was part of the customer service
4  department of Bunzai Media Group?
5          (Cell phone buzzing.)                            11:04
6  BY MR. GAREEB:
7      Q.  Mr. Nottea, if you need to take that,
8  please do.
9      A.  It's okay.  I don't understand your
10  question.                                               11:04
11      MR. GAREEB:  Madam Court Reporter.
12          (The following record was read:)
13      "Q  Who was part of the customer service
14  department of Bunzai Media Group?"
15      THE WITNESS:  I don't recall specific names of      11:04
16  call center customer service reps.
17  BY MR. GAREEB:
18      Q.  What was the duties of a customer service
19  representative of Bunzai Media Group?
20      A.  To handle customer service inquiries.           11:05
21      Q.  Such as?  Give me an example.
22      MR. UNGAR:  Objection as to the form of the
23  question.  It's vague and ambiguous.  It's not
24  readily understood in its current form.
25      THE WITNESS:  I want to refer a friend, any         11:05

Page 276

1  inquiry that a customer might have about their
2  product.  I don't know how to use this.  Do I use
3  the serum before the moisturizer.
4  BY MR. GAREEB:
5      Q.  Are customer service representatives for        11:05
6  Bunzai Media Group trained for those types of
7  inquiries?
8      A.  I believe part of their training was.
9      Q.  Did you have anything to do with training
10  of customer service representatives?                    11:05
11      A.  I did not.
12      Q.  How about if a customer called in to
13  complain about the Aura Vie product, is that the --
14  did customer service deal with those, too?
15      A.  Sure.                                           11:06
16      Q.  Who would deal with those?
17      MR. UNGAR:  Objection as to the form of the
18  question.  It's vague and ambiguous, and it's not
19  readily understood.
20  BY MR. GAREEB:                                          11:06
21      Q.  Who would deal with those customer
22  complaints?
23      MR. UNGAR:  Objection as to the form of the
24  question.  It's vague and ambiguous.  It's not
25  readily understood, and there is a prior question      11:06

Page 277

1  pending.
2      THE WITNESS:  The customer service rep.
3  BY MR. GAREEB:
4      Q.  The question is, who, to your knowledge,
5  would field those types of inquiries?                   11:06
6      MR. UNGAR:  Same objections.
7      THE WITNESS:  Same answer.
8  BY MR. GAREEB:
9      Q.  Was it Kevin McNamara?
10      A.  No.                                             11:06
11      Q.  Was it Nastassia Yalley?
12      MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.
14      THE WITNESS:  I said it was customer service
15  reps.                                                   11:06
16  BY MR. GAREEB:
17      Q.  Okay.  Can you tell me who as you sit here
18  now who your customer service representatives were?
19      MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous.                    11:07
21      THE WITNESS:  I don't understand your question.
22  BY MR. GAREEB:
23      Q.  Did Bunzai employ customer service
24  representatives?
25      A.  Yes.                                            11:07

Page 278

12 (Pages 275 - 278)

APP. 000084
Ex. 1

1    Q.  Did those customer service representatives
2   field customer inquiries about the Aura Vie
3   products?
4    A.  Yes.
5    Q.  Did those customer service representatives    11:07
6   for Bunzai Media Group field any kind of complaints
7   that Aura Vie customers may have about the product?
8    A.  Yes.
9    Q.  Would the customer service representatives
10   for Bunzai Media Group respond to those complaints    11:07
11   regarding the Aura Vie products?
12    A.  Yes.
13    Q.  And as you sit here right now, can you tell
14   me the name of the person or persons who would be
15   doing these tasks on behalf of Bunzai Media Group?    11:08
16    A.  I don't recall specific names of agents
17   that worked a few years back.
18    Q.  Okay. So as you sit here right now, do you
19   happen to remember any name of any customer service
20   representatives on behalf of Bunzai Media Group?    11:08
21    A.  Not that I can recall.
22    Q.  Okay. I'm sorry. I may have asked this
23   question. Excuse me if I did.
24        Did you have any role pertaining to
25   training customer service representatives for Bunzai    11:08

Page 279

1   employ?
2        MR. UNGAR:  Objection as to the form of the
3   question. It's vague and ambiguous.
4        THE WITNESS:  I'm not aware of the policy
5   itself. It wasn't my department. Standard    11:10
6   procedure and picking up a phone call, answering a
7   customer service inquiry. If it's a matter that the
8   customer service agent was not able to handle or
9   resolve, there was some sort of escalation path.
10   BY MR. GAREEB:    11:10
11    Q.  What -- I'm sorry. Did you finish?
12    A.  Yes.
13    Q.  What was that escalation path?
14    A.  The call would be forwarded to a manager or
15   somebody who had more insight or more knowledge to    11:10
16   handle that call.
17    Q.  Who were the -- who was the manager or
18   managers for Bunzai Media Group?
19    A.  Roi Reuveni was the manager and Andre
20   Monsieur, I believe. I'm not really sure how to    11:11
21   spell that.
22    Q.  R-o-i?
23    A.  Yes.
24    Q.  R-e-u-b-e-n-i [sic]?
25    A.  I believe so.    11:11

Page 281

1   Media Group?
2    A.  No.
3    Q.  Who did?
4    A.  Khristopher Bond.
5    Q.  When the customer service representatives    11:08
6   replied to customers did you -- did Bunzai Media
7   Group have a protocol in place as to whether you or
8   Mr. Bond or someone else would -- you guys would
9   collaborate as to how to deal with specific customer
10   inquiries?    11:09
11        MR. UNGAR:  Objection as to the form of the
12   question. It's vague. It's not readily understood
13   in its current form.
14        THE WITNESS:  I really didn't understand your
15   question.    11:09
16   BY MR. GAREEB:
17    Q.  Not a problem. When a customer inquiry
18   comes in, does the customer service representative
19   have full authority to respond to any customer
20   complaint?    11:09
21    A.  No.
22    Q.  Give me the process as you understand it
23   when a customer calls in to inquire about the Aura
24   Vie products. What is the policy and the procedure
25   that the customer service representatives has to    11:09

Page 280

1    Q.  How do you know Mr. Reuveni?
2    A.  He's my cousin.
3    Q.  I'm sorry. Andre...
4    A.  Monsieur.
5    Q.  And how do you know Mr. Monsieur?    11:11
6    A.  He was hired.
7    Q.  So no previous relationship prior to Bunzai
8   Media Group?
9    A.  I don't believe so. No, I don't believe
10   so.    11:12
11    Q.  What was Kevin McNamara's job duties for
12   Bunzai Media Group?
13    A.  He was also one of the first guys we
14   brought in, so there wasn't really a job
15   description. It was kind of pick up the gauntlet    11:12
16   and help us out. It was in the beginning.
17    Q.  Okay. Going back real fast. When a
18   customer calls in to complain about the Aura Vie
19   products, are you made aware of that?
20    A.  On a regular basis, no.    11:12
21    Q.  Okay. But is there a time though when a
22   customer calls and complains, do you have any input
23   as to how to respond to a customer complaint?
24    A.  Do I have input, no.
25    Q.  Do you know how Bunzai responds to customer    11:13

Page 282

13 (Pages 279 - 282)

1    complaints?
2        A.  Responded to some instances, yes, to some,
3    no.  I need a little more --
4        Q.  Well, to your knowledge, how did Bunzai
5    respond to customer complaints about the Aura Vie        11:13
6    cosmetic line of products?
7        A.  Their response depends on the inquiry.
8        Q.  If there were complaints about the actual
9    product itself, how would Bunzai Media Group respond
10   to a customer?                                          11:14
11       A.  Probably have them send back the product
12   and issue a refund.
13       Q.  But how do you communicate -- to your
14   knowledge, how does Bunzai communicate with the
15   customers, by e-mail, by letter?                        11:14
16       A.  By e-mail, by phone.
17       Q.  Okay.  And any e-mails that go out to
18   respond to a customer complaint, do you review those
19   writings before they go out?
20       A.  No, I do not.                                   11:14
21       Q.  Okay.  What was Nastassia Yalley's job
22   duties at Bunzai Media Group?
23       MR. UNGAR:  Objection as to the form of the
24   question.  It's vague and ambiguous temporally.
25       THE WITNESS:  She was a bookkeeper and campaign     11:14

Page 283

1    manager.
2    BY MR. GAREEB:
3        Q.  What is a campaign manager?
4        A.  She dealt with internal details of setting
5    up an online campaign, tracking yes on and so forth.    11:15
6        Q.  We've been going for about an hour and ten
7    minutes.  I could use a bathroom break.  Do you mind
8    if we take a break?
9        A.  Sure.  Ten minutes.
10   (A brief recess was taken at       a m.)                11:15
11   BY MR. GAREEB:
12       Q.  Did you also have -- for Bunzai Media Group
13   did you also have a CPA?
14       A.  Yes.
15       Q.  Who was the CPA?                                11:32
16       A.  I'm trying to remember.  I think his name
17   was David.  David Hagen.
18       Q.  H-a-g-e-n?
19       A.  I believe so.
20       Q.  Also did Bunzai Media Group employ a           11:33
21   payroll service?
22       MR. UNGAR:  Objection as to the form of the
23   question.  Vague and ambiguous.  I don't know how
24   you mean by Bunzai Media Group.  But go ahead if you
25   understand.                                             11:33

Page 284

1        THE WITNESS:  I believe so.  I don't recall
2    which one, but I believe so.
3    BY MR. GAREEB:
4        Q.  Well, did you get a paycheck from Bunzai
5    Media Group?                                            11:33
6        A.  Yes.
7        Q.  How did you get the check?
8        A.  I believe it was direct deposit.
9        Q.  And did you actually receive a check even
10   though it was direct deposit?  Did you receive a        11:33
11   check as well?
12       MR. UNGAR:  Objection as to the form of the
13   question.  It's vague and ambiguous.
14       THE WITNESS:  I don't remember.
15   BY MR. GAREEB:                                          11:34
16       Q.  Who did direct deposits on behalf of
17   Bunzai?
18       MR. UNGAR:  Objection as to the form of the
19   question.  Vague and ambiguous as to who is
20   "Bunzai."                                               11:34
21       THE WITNESS:  Nastassia -- if I remember
22   correctly, Nastassia was handling that department.
23   BY MR. GAREEB:
24       Q.  As I understand it, Bunzai handled its own
25   payroll?                                                11:34

Page 285

1        A.  No.  When you work with a payroll service,
2    somebody needs to send them the hours and
3    information they need in order to generate payroll.
4    I believe Nastassia was the one to give that
5    information.                                            11:34
6        MR. UNGAR:  Counsel, can we agree that when you
7    use the term "Bunzai" you mean the defendant Bunzai
8    Media Group, Inc.?
9        MR. GAREEB:  Yes.
10       THE WITNESS:  Was there a question?                 11:34
11   BY MR. GAREEB:
12       Q.  Who was "them"?
13       MR. UNGAR:  Objection as to the form of the
14   question.  It's vague and ambiguous and not readily
15   understood in its form.                                 11:35
16       MR. GAREEB:  I know it's not.  That's why I'm
17   asking him the question.
18   BY MR. GAREEB:
19       Q.  You said Nastassia provided them with the
20   information.  Who is "them"?                            11:35
21       MR. UNGAR:  Objection as to the form of the
22   question.  It's vague and ambiguous and not readily
23   understood in its present form.
24       MR. GAREEB:  I withdraw the question.
25   BY MR. GAREEB:                                          11:35

Page 286

14 (Pages 283 - 286)

1    Q.  Who was the payroll service that you were
2  referring to?
3    A.  I don't recollect the name.
4    Q.  Was it ADP?
5    A.  I don't believe so.          11:35
6    Q.  Was it Wells Fargo?
7    A.  I don't think so.
8    Q.  But it was an outside payroll service?
9    MR. UNGAR:  Objection as to the form of the
10  question.  It's vague and ambiguous.        11:35
11    THE WITNESS:  Yes.
12  BY MR. GAREEB:
13    Q.  And your understanding is that Nastassia is
14  the one that was dealing with this outside payroll
15  service to get all the paycheck on behalf of Bunzai?  11:35
16    A.  Yes.
17    Q.  Who employed the payroll service, to your
18  knowledge?
19    A.  I don't recall.
20    Q.  Was it you?          11:36
21    MR. UNGAR:  Objection as to the form of the
22  question.  It's vague and ambiguous and not readily
23  understood in its present form.
24    THE WITNESS:  I don't believe so.
25  BY MR. GAREEB:          11:36
                                        Page 287

1  female?
2    A.  I don't recall.
3    Q.  Did Bunzai ever prepare marketing materials
4  for its Aura Vie products besides the website?
5    MR. UNGAR:  Objection as to the form of the    11:38
6  question.  It's vague and ambiguous.
7    THE WITNESS:  Yes.
8  BY MR. GAREEB:
9    Q.  Such as what?
10    A.  Flyers, catalogs.  That's it.        11:38
11    Q.  Who prepared these flyers that you just
12  referred to?
13    A.  The designer.
14    Q.  And who was the designer or designers at
15  Bunzai at that time?          11:38
16    A.  We had a few.  I just don't know what you
17  mean by "at that time" because the time is a long
18  time.  We had a few designers throughout our...
19    Q.  I'm referring to the marketing materials
20  that you were just testifying about relating to the   11:39
21  Aura Vie product line.  So I'm referring to the
22  marketing materials there.
23    So, to your knowledge, who prepared the
24  marketing materials for the Aura Vie product on
25  behalf of Bunzai?          11:39
                                        Page 289

1    Q.  Was the payroll service employed at the
2  inception of Bunzai?
3    A.  No.
4    Q.  When was the payroll service used during
5  the time you were at Bunzai?          11:36
6    A.  I don't recall.
7    Q.  Initially who was providing paychecks to
8  the employees of Bunzai?
9    A.  Internally.
10    Q.  Did Bunzai ever employ any independent    11:37
11  contractors?
12    MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.
14    THE WITNESS:  I believe they did.
15  BY MR. GAREEB:          11:37
16    Q.  Who?
17    MR. UNGAR:  Objection as to the form of the
18  question.  It's not readily understood in its
19  current form.
20    THE WITNESS:  I don't recall the name.      11:37
21  BY MR. GAREEB:
22    Q.  What did these independent contractors do
23  for Bunzai?
24    A.  I don't recall.
25    Q.  Were these independent contractors male or  11:37
                                        Page 288

1    MR. UNGAR:  Objection.  Vague and ambiguous.
2    THE WITNESS:  We had a few designers.
3  BY MR. GAREEB:
4    Q.  Were the marketing materials for Aura Vie
5  products prepared throughout the two years while    11:39
6  Bunzai was open?
7    A.  No.
8    Q.  So, to your knowledge, who initially
9  prepared the marketing materials for Aura Vie
10  products when Bunzai was first formed?        11:39
11    A.  Khristopher Bond.
12    Q.  Did anyone assist him, to your knowledge?
13    A.  Yes.
14    Q.  What was your role in preparing these
15  marketing materials?          11:40
16    A.  My role was simply to look at esthetics and
17  how engaging the ads were.
18    Q.  Okay.  And, to your knowledge, was your
19  suggestions implemented in the marketing materials?
20    A.  With respect to design, yes.      11:40
21    Q.  Okay.  Was there a final marketing material
22  that was then generated that was used to market the
23  Aura Vie products?
24    A.  Yes.
25    Q.  Did the design ever change during the two  11:40
                                        Page 290

15 (Pages 287 - 290)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000087
Ex. 1

1  years at Bunzai?
2     A.  Consistently.
3     Q.  I'm sorry?
4     A.  Consistently.
5     Q.  So it changed consistently; is that right?   11:40
6     A.  Yes.
7     Q.  Why would it change consistently?
8     MR. UNGAR:  I'm going to object as to the form
9  of the question.  It calls for a narrative.
10    THE WITNESS:  Design gets old.  Needs to be   11:41
11  revamped.
12  BY MR. GAREEB:
13    Q.  When you say a design gets old, do you mean
14  that the product line is no longer being used?
15    A.  I don't understand your question.   11:41
16    Q.  You're saying the design gets old.  What
17  I'm trying to find out is the product line that's
18  being marketed is that no longer being offered and
19  that's the reason why the changes in the design?
20    A.  I don't understand your question.   11:41
21    Q.  Okay.  Did you maintain a consistent line
22  of Aura Vie products during your time at Bunzai?
23    A.  Products themselves, yes.
24    Q.  And were the products the same during the
25  time at Bunzai -- during your time at Bunzai?   11:42

Page 291

1     A.  There were a few products.
2     Q.  Okay.  All right.  And the few products
3  that was consistently being marketed by Bunzai, did
4  the designs for the marketing ever change?
5     A.  Yes.   11:42
6     Q.  Why?
7     A.  In order to increase the engagement of
8  consumers with those particular designs.
9     Q.  And who would make those decisions
10  regarding changes in the designs for the Aura Vie   11:42
11  products that you just mentioned?
12    A.  Khristopher, myself, the designers.
13    Q.  Anyone else?
14    A.  No.
15    Q.  Was Cerenade charged with marketing Aura   11:42
16  Vie products?
17    MR. UNGAR:  Objection.  It's vague and ambiguous
18  as to the term "Cerenade."
19       Can we agree, Counsel, that if you are
20  going to use the word "Cerenade" that that refers to   11:43
21  the defendant in this case Cerenade Marketing
22  International Incorporated?  Can we make that
23  agreement?
24    MR. GAREEB:  Mr. Ungar, until the witness states
25  he does not understand, then I would appreciate it   11:43

Page 292

1  if you state your objection.  No speaking objection.
2  I'll be more than happy to make it as simple as
3  possible to the deponent, but let me do my job, and
4  you do your job.
5  BY MR. GAREEB:   11:43
6     Q.  Now, do you understand what I mean by
7  "Cerenade"?
8     A.  If you mean Cerenade Marketing
9  International, yes.
10    Q.  Was Cerenade -- you understand that   11:44
11  Cerenade International Marketing is also Cerenade in
12  this deposition?
13    A.  Yes.
14    Q.  Would that be an issue for you to refer to
15  it as Cerenade?   11:44
16    A.  Not at all.
17    Q.  Great.  Was Cerenade charged with marketing
18  any of the Aura Vie products?
19    A.  I don't understand your question.
20    Q.  Bunzai was marketing Aura Vie products;   11:44
21  right?
22    A.  Yes.
23    Q.  Was Cerenade doing the same?
24    MR. UNGAR:  Objection as to the form of the
25  question.  It's vague and ambiguous.  Not readily   11:44

Page 293

1  understood in its present form.
2  BY MR. GAREEB:
3     Q.  Go ahead.
4     A.  Can you repeat the question for me.
5       (The following record was read:)   11:45
6  "Q  Was Cerenade doing the same?"
7     THE WITNESS:  No.
8  BY MR. GAREEB:
9     Q.  Do you know what Cerenade was formed for?
10    MR. UNGAR:  Objection as to the form of the   11:45
11  question.  It's vague and ambiguous.  It's not
12  readily understood in its present form.
13    THE WITNESS:  It was --
14    MR. UNGAR:  Also calls for speculation.
15    THE WITNESS:  I believe Khristopher formed it as   11:45
16  his marketing entity.
17  BY MR. GAREEB:
18    Q.  For what purpose, to your knowledge?
19    A.  I don't know.
20    Q.  What was he marketing?   11:45
21    MR. UNGAR:  Objection as to the form of the
22  question.  It's vague and ambiguous.  It's not
23  readily understood in its present form, and it calls
24  for speculation.
25    MR. GAREEB:  I withdraw.   11:46

Page 294

16 (Pages 291 - 294)

BY MR. GAREEB:
1  BY MR. GAREEB:
2      Q.  What was Mr. Bond marketing on behalf of
3  Cerenade?
4      A.  Cerenade --
5      MR. UNGAR:  Objection as to the form of the   11:46
6  question.  It calls for speculation.
7      THE WITNESS:  I don't know.
8  BY MR. GAREEB:
9      Q.  In your marketing -- in Bunzai's marketing
10  materials pertaining to the Aura Vie products, did   11:46
11  Bunzai employ models?
12      MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.
14      THE WITNESS:  Not that I can recall.
15  BY MR. GAREEB:   11:47
16      Q.  When you reviewed the marketing materials
17  that Bunzai prepared, did it include models in those
18  marketing materials?
19      A.  No.
20      Q.  Do you know the address 16161 Ventura   11:47
21  Boulevard, Suite 378 in Encino?
22      MR. UNGAR:  Objection.  The question is vague
23  and ambiguous.
24      THE WITNESS:  I think I recall that address.
25  BY MR. GAREEB:   11:48

Page 295

1      A.  No, it was not.
2      Q.  Did you operate any other business in
3  Encino other than your parents' restaurant?
4      A.  Not that I recall.
5      Q.  What's Bunzai Media World?   11:50
6      A.  I have no idea.
7      Q.  Was there ever a time that you and Mr. Bond
8  were forming a partnership with Igor Latsovski?
9      A.  No.
10      Q.  Did Igor ever invest any money in Bunzai   11:50
11  Media Group?
12      MR. UNGAR:  Objection as to the form of the
13  question.  Vague and ambiguous to the term "Igor."
14  BY MR. GAREEB:
15      Q.  Do you understand who I mean by Igor?   11:51
16      A.  Yes.
17      Q.  Great.  Was there ever a time when Igor
18  ever invested money into Bunzai Media Group?
19      A.  Yes.
20      Q.  How much money did he invest?   11:51
21      A.  Around 500,000.
22      Q.  What did he get for his investment?
23      A.  He received -- it was a loan that he gave
24  to the company, so I believe if I remember correctly
25  that he received a third of revenues.  I believe he   11:51

Page 297

1      Q.  What is that address?
2      A.  If I'm not mistaken, it may be a mailing
3  address for Bunzai.  I think I recall that.  I'm not
4  really sure.
5      Q.  Is 7900 Gloria Avenue not a mailing   11:48
6  address?
7      MR. UNGAR:  Objection as to the form of the
8  question.  It's vague and ambiguous.
9      A.  I don't understand your question.
10      Q.  You earlier testified that Bunzai's   11:48
11  principal place of business was operating out of
12  7900 Gloria Avenue.  I'm trying to find out what is
13  this 16161 Ventura Boulevard, Suite 378 in Encino?
14      A.  I don't know.
15      Q.  Have you ever operated a business out of   11:49
16  16161 Ventura Boulevard, Suite 378, Encino?
17      A.  Not that I can recall.
18      Q.  Have you ever operated any business out of
19  Encino, California?
20      A.  Yes.   11:49
21      Q.  Which one?
22      A.  My parents had a restaurant in Encino.  I
23  helped them run it.
24      Q.  Was it at 16161 Ventura Boulevard, Suite
25  378 in Encino?   11:48

Page 296

1  received a third of the revenues.
2      Q.  And the third of revenues is that a third
3  until the loan is paid back, or he received a third
4  interest in the company?
5      MR. UNGAR:  Objection as to the form of the   11:52
6  question.  It's compound.  It's also vague and
7  ambiguous.
8      THE WITNESS:  I don't understand your question.
9  BY MR. GAREEB:
10      Q.  What did you mean by he received a third.   11:52
11  He received a third of what?
12      MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.  It's not
14  readily understood in its present form.
15      THE WITNESS:  What did I mean when I said "a   11:52
16  third"?  A third of the revenue.
17  BY MR. GAREEB:
18      Q.  Until his 500,000 is paid back?
19      MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous.  It's not   11:52
21  readily understood in its present form.
22      THE WITNESS:  I don't recall the specifics.
23  BY MR. GAREEB:
24      Q.  Is Igor still owed money from Bunzai Media
25  Group?   11:52

Page 298

17 (Pages 295 - 298)

Veritext National Deposition & Litigation Services
866 299-5127

APP. 000089
Ex. 1

1    A.  No, he is not.
2    Q.  Did Bunzai Media Group make enough money to
3  pay back Igor?
4    MR. UNGAR:  Objection as to the form of the
5  question.  It's vague and ambiguous.          11:53
6    THE WITNESS:  I -- can you repeat the question
7  for me.
8      (The following record was read:)
9    "Q  Did Bunzai Media Group make enough money to
10  pay back Igor?"                11:53
11    THE WITNESS:  I believe they did.
12  BY MR. GAREEB:
13    Q.  How much money do you estimate Bunzai made
14  in the two years it was operational?
15    MR. UNGAR:  Objection as to the form of the   11:53
16  question.  It's vague and ambiguous.
17    THE WITNESS:  I don't recall.
18  BY MR. GAREEB:
19    Q.  More than $500,000?
20    MR. UNGAR:  Objection as to the form of the   11:54
21  question.  It's vague and ambiguous.  It's not
22  readily understood in its present form.
23  BY MR. GAREEB:
24    Q.  How much money did you make out of Bunzai
25  Media Group in the two years it was operational?   11:54

Page 299

1    A.  I don't recall.
2    Q.  Approximately.
3    A.  $100,000.
4    Q.  And how much, to your knowledge, did
5  Mr. Bond make out of Bunzai Media Group during its   11:54
6  inception to the date of -- the day that it closed?
7    A.  I would have to look at some old documents.
8  I don't recall.
9    Q.  Do you know if he got paid more than you
10  did?                11:54
11    A.  No.
12    Q.  Did -- Bunzai obviously had monthly
13  expenses?
14    A.  Sure.
15    Q.  What was the rent?              11:55
16    A.  Somewhere around $8,000.
17    Q.  A month?
18    A.  Yes.
19    Q.  So we are talking about almost $100,000 a
20  year in rent?                11:55
21    MR. UNGAR:  Objection as to the form of the
22  question.  It's vague and ambiguous.  It's
23  argumentative.
24    THE WITNESS:  I believe so.
25  BY MR. GAREEB:                11:55

Page 300

1    Q.  You obviously had -- you said you had 35
2  employees at Bunzai?
3    A.  I believe the question was at the peak of
4  Bunzai.
5    Q.  Right.                11:55
6    A.  Yes.
7    Q.  And all those 35 people got paid; correct?
8    A.  I believe so.
9    Q.  What do you estimate the monthly payroll
10  was for Bunzai Media Group from 2010 to 2012?   11:56
11    MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.
13    THE WITNESS:  Please -- I don't understand your
14  question.
15  BY MR. GAREEB:                11:56
16    Q.  What was your overhead cost per month
17  between 2010 and 2012 at Bunzai?
18    MR. UNGAR:  Objection as to the form of the
19  question.  It's vague and ambiguous.
20    THE WITNESS:  It varied anywhere from $5,000 a   11:56
21  month to $150,000 a month.
22  BY MR. GAREEB:
23    Q.  Okay.  How long did Igor get a third of the
24  revenues of Bunzai Media Group?
25    A.  I don't recall.              11:56

Page 301

1    Q.  Do you know if a partnership agreement was
2  prepared on behalf of yourself, Mr. Bond and Igor to
3  form a partnership in Bunzai Media Group?
4    A.  I think Khristopher worked on a document a
5  while back.  One of his creative ideas that didn't   11:57
6  actually happen.
7    Q.  Did you review any partnership agreement
8  that Mr. Bond prepared?
9    A.  Not that I can recall.
10    Q.  Did you ever sign any partnership agreement   11:57
11  between yourself, Mr. Bond and Igor?
12    A.  Not that I can recall.
13    Q.  Was there -- okay.  Is there any record of
14  Igor loaning Bunzai $500,000?
15    MR. UNGAR:  Objection as to the form of the   11:57
16  question.  It's vague and ambiguous.  Calls for
17  speculation.
18    THE WITNESS:  I can't recall the specific
19  document, but I believe there should be something in
20  the records.                11:58
21  BY MR. GAREEB:
22    Q.  My question was not whether there should be
23  something.  I'm asking you was there anything in
24  writing which memorialized the $500,000 loan that
25  Igor purportedly loaned to Bunzai Media Group?   11:58

Page 302

18 (Pages 299 - 302)

1    MR. UNGAR:  Objection as to the form of the
2   question.  It's badgering the witness.
3    THE WITNESS:  I believe there was.
4   BY MR. GAREEB:
5    Q.  And what was the writing that you believe     11:58
6   existed to memorialize the $500,000 loan to Bunzai
7   that Igor supposedly gave?
8    A.  I don't recall.
9    Q.  Do you recall if it was a promissory note?
10    A.  I do not.                            11:58
11    Q.  Do you know how Igor secured his $500,000
12   loan to Bunzai Media Group?
13    MR. UNGAR:  Objection as to the form of the
14   question.  It's vague and ambiguous.  Assumes facts
15   not in evidence.                          11:59
16    THE WITNESS:  I don't believe he secured it.
17   BY MR. GAREEB:
18    Q.  How was his interest of a third of the
19   revenues memorialized in writing, if any?
20    MR. UNGAR:  Objection as to the form of the     11:59
21   question.  It's vague and ambiguous.  Particularly
22   with the use of the word "interest."
23    THE WITNESS:  I don't recall.
24   BY MR. GAREEB:
25    Q.  Do you recall if there was at least some     11:59

Page 303

1   writing to memorialize that Igor is entitled to a
2   third of the revenues?
3    A.  I believe there was.
4    Q.  Who prepared this writing?
5    A.  I think it was Khristopher.            12:00
6    Q.  Did you sign it?
7    A.  Yes.
8    Q.  Do you have -- did you have any revisions
9   to this writing before signing it?
10    A.  I can't recall.                        12:00
11    Q.  Did you have a lawyer involved pertaining
12   to this writing that reflects that Igor is entitled
13   to a third of the interest in revenues?
14    A.  No.
15    Q.  Do you know if Igor had a lawyer during     12:00
16   that time?
17    MR. UNGAR:  Objection as to the form of the
18   question.  It's vague and ambiguous.  Calls for
19   speculation.
20    MR. GAREEB:  I withdraw the question.       12:00
21   BY MR. GAREEB:
22    Q.  Do you know if Igor had a lawyer as it
23   pertains to this loan to Bunzai Media Group?
24    A.  There was no lawyer.
25    Q.  Who was the lawyer?                    12:01

Page 304

1    A.  There was no lawyer.
2    Q.  Okay.  Do you know if Mr. Bond retained a
3   lawyer as it pertains to this $500,000 loan to
4   Bunzai Media Group?
5    A.  No, he did not.                        12:01
6    Q.  Okay.  Do you still have a relationship
7   with Igor either personal or professional today?
8    A.  Yes.
9    Q.  Where does Igor live?
10    MR. UNGAR:  Objection as to the form of the     12:01
11   question.  It's vague and ambiguous.
12    THE WITNESS:  I've never been to his home.
13   BY MR. GAREEB:
14    Q.  What type of relationship do you have with
15   Igor presently?                           12:01
16    A.  We speak.  We talk on the phone from time
17   to time.
18    Q.  About business or about pleasure?
19    A.  Mostly business.
20    Q.  So what business do you have with Igor     12:02
21   presently?
22    A.  There is no current business with Igor.
23    Q.  So when you speak with him about business,
24   what do you guys speak about?
25    MR. UNGAR:  Objection as to the form of the     12:02

Page 305

1   question.  It's vague and ambiguous.
2    THE WITNESS:  Igor has big ideas and big dreams
3   that he wants to invest in, and he calls me to see
4   my opinion with respect to particulars in that
5   vision that he has.                        12:02
6   BY MR. GAREEB:
7    Q.  Now, are these investments that he wants
8   you to be involved in?
9    A.  No.
10    Q.  Why would he call you regarding his       12:02
11   investment ideas?
12    MR. UNGAR:  Objection as to the form of the
13   question.  It's vague and ambiguous, and it calls
14   for speculation.
15    THE WITNESS:  I'm a consultant.            12:03
16   BY MR. GAREEB:
17    Q.  What kind of consultant are you?
18    A.  Marketing consultant.
19    Q.  Through what company?
20    MR. UNGAR:  Objection as to the form of the     12:03
21   question.  It's vague and ambiguous.  It's not
22   readily understood in its present form.
23    THE WITNESS:  Adageo.
24   BY MR. GAREEB:
25    Q.  So Adageo is still operative today?       12:03

Page 306

19 (Pages 303 - 306)

Veritext National Deposition & Litigation Services
866 299-5127

1     A.  Yes, it is.
2     Q.  When Igor calls you, do you charge him for
3  your consulting services?
4     A.  No, I do not.
5     Q.  So then why would he call you for his      12:03
6  investment ideas?
7     MR. UNGAR:  Objection as to the form of the
8  question.  It's vague and ambiguous.  Calls for
9  speculation.  It's argumentative.  It's asked and
10  answered.                                 12:03
11     THE WITNESS:  He likes my insight.
12  BY MR. GAREEB:
13     Q.  Do you usually not charge for your insight
14  as a consultant?
15     MR. UNGAR:  Objection as to the form of the  12:04
16  question.  It's argumentative.
17     THE WITNESS:  I usually charge.
18  BY MR. GAREEB:
19     Q.  And why don't you charge Igor?
20     A.  He's an acquaintance and a person that I   12:04
21  worked with in the past.  A potential person that I
22  might go to in the future.  It's my discretion.  I
23  don't feel like charging him.
24     Q.  When did you work with him in the past?
25     A.  During the time of Bunzai Media Group.     12:04
                                          Page 307

1     MR. UNGAR:  Objection as to the form of the
2  question.  Calls for a narrative.
3     THE WITNESS:  Igor wasn't the one that called my
4  father.  He had an assistant named Gleb.  That's the
5  name Gleb.                                12:06
6  BY MR. GAREEB:
7     Q.  G-l-e-b?
8     A.  G-l-e-b.  And Gleb was the one that was
9  managing the advertising for that particular
10  business, and Gleb was the one that reached out to  12:06
11  the Israeli television channel.  They referred him
12  to my father as the person in the LA area, and Gleb
13  came and talked to my dad regarding making some
14  music for the commercial, and I guess Gleb mentioned
15  to Igor that my dad is a nice guy, and that he is   12:07
16  the guy that runs the show on the Israeli network,
17  so they had a meeting.  I believe Igor came over to
18  my parents' house.  They talked about this
19  particular ad and what type of direction they would
20  take for this ad.  They took a liking to each other.  12:07
21  He said, You should meet my son.  He is a good guy.
22     Q.  Then what happened?  Now you are getting to
23  my question.
24     MR. UNGAR:  Objection as to the form of the
25  question.  It's vague and ambiguous.  It's not     12:07
                                          Page 309

1  readily understood in its present form.
2     MR. GAREEB:  That's fine.  I'll withdraw that
3  question, and I'm going to move to strike your
4  answer.
5     Can you please re-read the question.  Not     12:07
6  the last one but the one he provided a
7  nonresponsive...
8     (The following record was read:)
9  "Q  How did it become, then, that Igor calls
10  your dad to possibly put ads in Israeli TV and then  12:06
11  somehow become a loaner of $500,000 to Bunzai Media
12  Group?"
13     THE WITNESS:  The same guy Gleb for about two
14  months he came around and spoke to Khristopher and
15  myself about him having the opportunity to invest in  12:08
16  the company, and we kind of went back and forth with
17  him about the possibility.  Eventually we saw that
18  he wasn't really a person who could make any
19  decisions, and we moved on.  And one day he was
20  like -- he wanted to introduce us to Igor.  Me       12:08
21  directly to Igor, and he brought Igor in for a
22  meeting.
23  BY MR. GAREEB:
24     Q.  My question is though, is that -- did Gleb
25  know that Bunzai needed capitalization?              12:09
                                          Page 310

1     Q.  Was it the first time you met him?
2     MR. UNGAR:  Objection as to the form of the
3  question.  It's vague and ambiguous with regard to
4  the word "him."
5     THE WITNESS:  Yes.                      12:04
6  BY MR. GAREEB:
7     Q.  How did you meet Igor?
8     A.  My father was managing the Israeli TV
9  channel, and Igor had some business that he wanted
10  to advertise to the Jewish community so one of      12:05
11  Igor's employees came to my father to try to run an
12  ad on Jewish television.
13     Q.  How long ago was that?
14     A.  Around three years ago.  Right -- middle of
15  2010 maybe.  Right around there.  I can't recall    12:05
16  specifically.
17     Q.  All right.  That's fine.  So when you met
18  Igor in the middle of 2010 or approximately around
19  that time, you were introduced to him by your
20  father?                                 12:06
21     A.  Uh-huh, yes.
22     Q.  How did it become, then, that Igor calls
23  your dad to possibly put ads in Israeli TV and then
24  somehow become a loaner of $500,000 to Bunzai Media
25  Group?                                  12:06
                                          Page 308

20 (Pages 307 - 310)

**Page 311**

```
 1        How is it that you even thought to go to
 2   Igor to ask for $500,000?
 3        MR. UNGAR:  Objection as to the form of the
 4   question.  It's compound.  Calls for speculation.
 5   It's vague and ambiguous.            12:09
 6        THE WITNESS:  Gleb needed some insight as to a
 7   good marketing way in approaching his clients on
 8   this commercial, on this Jewish Israeli commercial,
 9   and since my dad didn't have good direction to give
10   him, he called me.  And I said, I don't have time   12:10
11   for this.  Why don't you talk to Khristopher for a
12   couple minutes.  He might have good creative
13   insight.  So I believe in the conversation that Gleb
14   and Khristopher had with respect to the commercial
15   that they wanted to run -- what do you guys do?    12:10
16   Marketing.  Through that conversation was the
17   introduction that Bunzai was actually looking for
18   potentially a loan or some money, and that's how
19   Gleb kind of brought Igor into the picture.
20   BY MR. GAREEB:                       12:10
21        Q.  But you had indicated that this is all
22   derived through a conversation with Mr. Bond and
23   Igor?
24        A.  Mr. Bond and Gleb.
25        Q.  And Gleb, I'm sorry.  Okay.  That explains  12:10
```

**Page 312**

```
 1   Mr. Gleb.  How does it explain Igor?  How did you
 2   get to a point that Igor now invests 500,000?
 3        MR. UNGAR:  Objection as to the form of the
 4   question.  It's vague and ambiguous.  It's not
 5   readily understood in its present form.          12:11
 6        THE WITNESS:  In the beginning we thought that
 7   Gleb was actually an investor, a guy who could lend
 8   money.  He represented himself and spoke in a way
 9   that he was the guy, and then meeting with him a few
10   times, we quickly realized he couldn't make any    12:11
11   decisions and he had to get approval from somebody
12   else.  That somebody else ended up being Igor.
13   BY MR. GAREEB:
14        Q.  Did Gleb and Igor work together?
15        MR. UNGAR:  Objection as to the form of the    12:11
16   question.  Calls for speculation.
17        THE WITNESS:  Yes.
18   BY MR. GAREEB:
19        Q.  Where?
20        A.  I have no idea.                  12:11
21        Q.  How do you know they worked together then?
22        A.  Because Gleb was the one who was looking to
23   run a commercial of a business that Igor owned.  He
24   was kind of managing Igor's day-to-day operations
25   for that company that wanted to advertise.      12:11
```

**Page 313**

```
 1        Q.  Did you ever come to know what the
 2   relationship was between Gleb and Igor?
 3        A.  No.
 4        Q.  Do you know if Igor was Gleb's employer?
 5        A.  I have no idea.                  12:12
 6        Q.  Did Bunzai manufacture any products?
 7        A.  I don't understand your question.
 8        Q.  Did Bunzai market anything other than
 9   cosmetic products?
10        A.  Yes.                          12:12
11        Q.  I understand that because you had a
12   shipping and receiving department, you also
13   distributed cosmetic products; correct?
14        A.  We fulfilled orders through our online
15   customer base.                        12:13
16        Q.  By the way, what other products did Bunzai
17   market other than cosmetic products?
18        A.  There was a wellness product called ResV.
19   There was memorabilia of something -- oh, it also
20   marketed children's animated videos.            12:13
21        Q.  Okay.
22        A.  It marketed --
23        Q.  What was the name of that animation?
24        A.  Music In Three Dimensions.
25        Q.  Okay.                        12:14
```

**Page 314**

```
 1        A.  That's about it.
 2        Q.  What's bed bugs, by the way?
 3        A.  Good one.  Another product, which we -- it
 4   was -- I forgot the name.  One second.  It was a
 5   product that we were looking into marketing for the  12:14
 6   bed bug industry.
 7        Q.  All right.  So we know that you
 8   distributed -- you marketed and distributed certain
 9   products on behalf of Bunzai.  My question for you
10   is did Bunzai ever manufacture, for instance, Aura  12:14
11   Vie products?
12        A.  No.
13        Q.  And is it Jacem, one of the ones that
14   manufactured the products?
15        MR. UNGAR:  Objection as to the form of the    12:15
16   question.  It's vague and ambiguous.  Not readily
17   understood in its present form.
18        THE WITNESS:  I don't understand your question.
19   BY MR. GAREEB:
20        Q.  Who makes the actual Aura Vie products?    12:15
21        A.  Jacem.
22        Q.  Who bottles them or puts them in the
23   containers?
24        A.  Jacem.
25        Q.  And who puts them in the boxes?        12:15
```

21 (Pages 311 - 314)

1    A.  Jacem.
2    Q.  And who puts the labeling on the boxes?
3    A.  They are already on the boxes.
4    Q.  Okay.
5    A.  I don't understand.                    12:15
6    Q.  Who does the labeling on the actual boxes
7   where the products are in?
8    A.  Who is the printer?
9    Q.  Well --
10    MR. UNGAR:  If you don't understand his --    12:16
11    THE WITNESS:  I don't understand.
12   BY MR. GAREEB:
13    Q.  Okay.  That's very fair.  All I'm asking is
14   when you make a sale, do the products come to Bunzai
15   and then you guys ship it out to the customer that    12:16
16   purchased it?
17    A.  Yes.
18    Q.  And that's what I'm asking.  When you get
19   the product to Bunzai to ship out, is it already
20   packaged and labeled?                      12:16
21    A.  It is completely ready for delivery besides
22   a packing list and shipping label.
23    Q.  Correct.  That's what I'm asking you.  When
24   you get it other than the shipping label and the --
25    A.  Packing list.                         12:16
                                                Page 315

1    Q.  Yeah.  Once you get it, is it already a
2   complete product?
3    MR. UNGAR:  Objection as to the form of the
4   question.  It's vague and ambiguous.
5    THE WITNESS:  Yes.                        12:16
6   BY MR. GAREEB:
7    Q.  From Jacem?
8    A.  Yes.
9    Q.  Are the products manufactured -- I'm
10   talking about the actual lotions and the other    12:16
11   products -- manufactured in accordance to
12   specifications that you provide to Jacem?
13    MR. UNGAR:  Objection as to the form of the
14   question.  Vague and ambiguous as to the term
15   "products."                              12:17
16    THE WITNESS:  I don't understand your question.
17   BY MR. GAREEB:
18    Q.  Aura Vie is a cosmetic line; correct?
19    A.  Yes.
20    Q.  So the actual cosmetics themselves, the    12:17
21   actual product themselves, did you provide Jacem
22   with the formulations to make the cosmetic?
23    A.  No, we did not.
24    Q.  Did Bunzai provide Jacem with the language
25   you put on the labels of the cosmetic line    12:17
                                                Page 316

1   packaging?
2    A.  The packaging -- no.  The answer is no.
3    Q.  Do you know who was in charge of the
4   packaging for Aura Vie products?
5    A.  Graphy Pack.                          12:18
6    Q.  Did Bunzai work with graphic [sic] pack?
7    A.  Yes.
8    Q.  And did Bunzai provide -- graphic pack?
9    A.  Graphy Pack.
10    Q.  Did Bunzai provide Graphy Pack with the    12:18
11   specifications as to how to package the product?
12    A.  How to print the packaging material for the
13   product, yes.
14    Q.  Correct, okay.  And that company graph com
15   [sic] --                                  12:18
16    A.  Graphy Pack.
17    Q.  Graphy Pack, they prepare the packaging and
18   all that based on Bunzai's specifications of a
19   design; right?
20    A.  Correct.                             12:18
21    Q.  By the way, Aura Vie has a logo; right?
22    A.  Yes.
23    Q.  Okay.  Who prepared that logo?
24    MR. UNGAR:  Objection as to the form of the
25   question.  It's vague and ambiguous.        12:19
                                                Page 317

1    THE WITNESS:  I have no idea.
2   BY MR. GAREEB:
3    Q.  Was the logo of Aura Vie the same -- well,
4   strike that.
5      You had indicated that Aura Vie has a logo.    12:19
6   I just want to know was that logo made by Bunzai?
7    MR. UNGAR:  Objection as to the form of the
8   question.  It's vague and ambiguous.
9    THE WITNESS:  I really don't recall.  I don't
10   remember.                               12:19
11   BY MR. GAREEB:
12    Q.  When you first discovered the Aura Vie
13   product, did it have a logo?
14    MR. UNGAR:  Objection as to the form of the
15   question.  It's vague and ambiguous.        12:19
16    THE WITNESS:  I don't recall.
17   BY MR. GAREEB:
18    Q.  Do you know if the logo changed from the
19   first time you saw an Aura Vie product to the time
20   that Bunzai started marketing and distributing the    12:19
21   product?
22    A.  I don't specifically recall, but it may
23   have changed once or twice.  I don't remember.
24    Q.  If it did change, who would be in charge of
25   formulating a logo?                        12:20
                                                Page 318

22 (Pages 315 - 318)

Veritext National Deposition & Litigation Services
866 299-5127



**Page 319**

1    MR. UNGAR:  Objection as to the form of the
2    question.  It's vague and ambiguous.  Improper
3    hypothetical.
4        THE WITNESS:  Our design department.
5    BY MR. GAREEB:                          12:20
6        Q.  And who was part of your design product --
7    design department?
8        A.  Mr. Bond and myself.
9        Q.  Anyone else?
10       A.  A few people in design.  There were a few   12:20
11   designers.
12       Q.  Well, if it was you and Mr. Bond, let's
13   start there initially.  Did you and/or Mr. Bond ever
14   change the logo of Aura Vie?
15       A.  I don't recall doing that.              12:20
16       Q.  Okay.  Was there ever any discussion about
17   it?
18       MR. UNGAR:  Objection as to the form of the
19   question.  It's not readily understood in its
20   present form.                               12:21
21       THE WITNESS:  I don't understand what you are
22   talking about.
23   BY MR. GAREEB:
24       Q.  Was there ever any discussion among you,
25   Mr. Bond and/or any of the design team at Bunzai    12:21

**Page 320**

1    pertaining to the logo of Aura Vie?
2        A.  I don't recall.
3        Q.  Do you know what address is at ████████
4    A████████ Tarzana California?
5        A.  No.                                12:22
6        Q.  Do you know if Igor works out of ████████
7    ████████ in Tarzana?
8        A.  I'm unaware.
9        Q.  Do you know if Igor lives in Tarzana?
10       A.  I believe Igor lives in Calabasas.    12:22
11       Q.  Do you know if Igor prior to October, 2010
12   lived in Tarzana?
13       A.  If I recall, his assistant Gleb lived in
14   Tarzana.  I don't know if he is an assistant.
15       Q.  When you first met Gleb, do you know who he  12:22
16   worked for?
17       A.  No.
18       Q.  By the way, who is Leticia Garcia?
19       A.  She was a lady that -- I believe she did
20   some work with Khristopher.  She was -- it was a    12:23
21   lady that worked with Khristopher.  He had her in
22   the office.  I don't know.  A lady that worked with
23   Khristopher.
24       Q.  Okay.  What do you mean "had her in the
25   office"?                                    12:24

**Page 321**

1        A.  I remember seeing her in Khristopher's
2    office a few times.
3        Q.  Which office?
4        A.  In the office that he had in the building
5    before he left.                           12:24
6        Q.  Okay.  So did you have an office in that
7    building in that --
8        A.  I had an office there, too.  Sorry.
9        Q.  And Leticia Garcia what was she hired for?
10       MR. UNGAR:  Objection as to the form of the    12:24
11   question.  Vague and ambiguous.  Assumes facts not
12   in evidence.
13       THE WITNESS:  I have no idea.
14   BY MR. GAREEB:
15       Q.  When you saw her at the office, what was    12:24
16   she doing?
17       A.  She was working with Khristopher, Dawn and
18   Nancy on projects that were not relevant to me.
19       Q.  What do you mean not relevant to you?
20       A.  They were part of Cerenade.          12:25
21       Q.  When was this?
22       A.  Can't give you dates.
23       Q.  Okay.  Was she working at 7900 Gloria
24   Avenue?
25       A.  Sometimes.                          12:25

**Page 322**

1        Q.  Did she do any work on behalf of Aura Vie?
2        A.  Not that I'm aware of.
3        Q.  Did you ever talk to Leticia Garcia?
4        A.  A few times.
5        Q.  What did you talk to her about?        12:25
6        A.  I believe at some point after Khristopher
7    and her had some falling out and she tried to -- I
8    think she was trying to threaten him to sue him for
9    something.  I don't recall.
10       MR. GAREEB:  Move to strike as nonresponsive.   12:26
11   BY MR. GAREEB:
12       Q.  What did you talk to Leticia about?
13       A.  I don't recall.
14       Q.  How many times did you talk to her?
15       MR. UNGAR:  Objection as to the form of the    12:26
16   question.  It's vague and ambiguous.  It's not
17   readily understood in its present form.
18       MR. GAREEB:  Withdrawn.
19   BY MR. GAREEB:
20       Q.  What did you talk to Leticia Garcia about?   12:26
21       A.  I don't recall.
22       Q.  How many times have you spoken with her?
23       A.  Maybe twice.
24       Q.  Approximately when?
25       A.  During the same time that she was --     12:27

23 (Pages 319 - 322)

1    A.  I may vaguely remember one e-mail being
2  sent to me with some mock-up that I wanted to show
3  at a meeting, so maybe some designer worked on a
4  sample for me to show, but I can't give you -- I
5  remember some e-mail from design about some bed      12:37
6  bug -- so maybe -- our designers may have worked on
7  some design for bed bugs.
8    Q.  Okay.  All right.  But you don't remember
9  who the designer or designers are?
10    A.  I remember.              12:37
11    Q.  Great.  Who were the designers that worked
12  on the bed bugs project?
13    A.  Victor.
14    Q.  Do you happen to know his last name?
15    A.  A-z-a-l, Azal.              12:38
16    Q.  Was he -- did you have a head designer?
17    MR. UNGAR:  Objection as to the form of the
18  question.  It's vague and ambiguous.
19    THE WITNESS:  No.
20    MR. GAREEB:  I'll withdraw.          12:38
21  BY MR. GAREEB:
22    Q.  Did you have a head designer at Bunzai
23  Media Group?
24    A.  No.
25    Q.  What was Victor's job title?          12:38

Page 331

1    A.  Designer.  I don't remember specifically
2  job titles, so I don't want to say the wrong thing,
3  but he was a designer.
4    Q.  Did Victor also work at least in part on
5  the Aura Vie project as well?          12:38
6    A.  Sure.
7    Q.  The Vigorect project.  I believe you said
8  that Bunzai was also -- I'm sorry, is it Vigoret or
9  Vigorect?
10    A.  It's V-i-g-o-r-e-c-t.          12:38
11    MR. GAREEB:  I wrote -- Madam Court Reporter, I
12  previously spelled it wrong for you.
13  BY MR. GAREEB:
14    Q.  So it's V-i-g-o-r-c-t?
15    A.  Correct.              12:39
16    Q.  What is Vigorect?
17    A.  It was a male enhancement product.
18    Q.  You know what, you did testify to that.  On
19  Friday; you're right.
20    How did the Vigorect product come to      12:39
21  Bunzai?
22    MR. UNGAR:  Objection as to the form of the
23  question.  It's vague and ambiguous.  Assumes facts
24  not in evidence.  Misstates the prior testimony of
25  the witness.              12:39

Page 332

1    THE WITNESS:  Vigorect was never a part of
2  Bunzai.
3  BY MR. GAREEB:
4    Q.  What was Vigorect a part of?
5    A.  I Everyday Products.          12:39
6    Q.  I Everyday Products.  So this is before
7  Bunzai.  Okay.  Were you pursuing -- or at least
8  attempted to pursue the Vigorect project while at
9  Bunzai?
10    MR. UNGAR:  Objection as to the form of the    12:40
11  question.  It's vague and ambiguous.  It's not
12  readily understood in the form presented.
13    THE WITNESS:  I don't understand that one.
14  BY MR. GAREEB:
15    Q.  Okay.              12:40
16    A.  You can just rephrase.
17    Q.  No problem.  I'm actually thinking.  Did
18  you attempt to try to market or distribute any
19  Vigorect products while at Bunzai?
20    MR. UNGAR:  Objection as to the form of the    12:40
21  question.  It's vague and ambiguous.  It's not
22  readily understood in its present form.
23    THE WITNESS:  No.
24  BY MR. GAREEB:
25    Q.  Okay.  Who is Oren, O-r-e-n?        12:40

Page 333

1    A.  I'm Israeli.  I know a lot of Orens.
2    MR. UNGAR:  Is this a good time to take our
3  lunch break?  I do need a lavatory break, but it is
4  12:41 now.  I was thinking maybe we could to our
5  half hour lunch break at this time.        12:41
6    MR. GAREEB:  You know what, I always defer to
7  the deponent and the court reporter.
8    In other words, to answer your question --
9    MR. UNGAR:  You're the deponent.  Is it okay
10  with you to take a lunch?          12:41
11    THE WITNESS:  Absolutely.  It's okay with you.
12    MR. GAREEB:  Sure, It's okay.
13    (At 12:42 p.m. the deposition
14    was adjourned for lunch.)
15  ///
16  ///
17  ///
18
19
20
21
22
23
24
25

Page 334

26 (Pages 331 - 334)

1    (At 1:37 p.m. the deposition
2    of [!WITNESS] was reconvened.)
3
4  BY MR. GAREEB:
5    Q. Back the record. Mr. Nottea, you know that  13:37
6  you are still under penalty of perjury?
7    A. I do.
8    Q. Is there anything which would hinder your
9  ability to give truthful and accurate testimony for
10  the afternoon session of this deposition?    13:38
11    A. No, there is not.
12    Q. Is there any reason we should not go
13  forward?
14    A. No.
15    Q. Great. Let's proceed. I asked you about  13:38
16  Oren. You said you know a lot of Orens. What is
17  the diamond line?
18    MR. UNGAR: Objection as to the form of the
19  question. It's vague and ambiguous. That's all.
20    THE WITNESS: I'm not really sure what you mean.  13:38
21  BY MR. GAREEB:
22    Q. What is Caesar's Palace gold line?
23    MR. UNGAR: Objection as to the form of the
24  question. It's vague and ambiguous.
25    THE WITNESS: I don't know.    13:38

Page 335

1  BY MR. GAREEB:
2    Q. You've never heard of the Caesar's Palace
3  gold line at all?
4    MR. UNGAR: Objection as to the form of the
5  question. It's argumentative.    13:39
6    THE WITNESS: No.
7  BY MR. GAREEB:
8    Q. Did elastic have a gold line?
9    A. No.
10    Q. Did it have a diamond line?    13:39
11    A. No.
12    Q. How about Aura Vie, did it have a gold
13  line?
14    A. No.
15    Q. How about a diamond line?    13:39
16    A. No.
17    Q. Did any of the products in which you
18  marketed ever have a diamond line?
19    MR. UNGAR: Objection as to the form of the
20  question. It's vague and ambiguous.    13:39
21    THE WITNESS: No.
22  BY MR. GAREEB:
23    Q. Did any of the products that you marketed
24  or your company marketed have a gold line?
25    MR. UNGAR: Objection as to the form of the  13:39

Page 336

1  question. It's vague and ambiguous.
2    THE WITNESS: Not that I'm aware of.
3  BY MR. GAREEB:
4    Q. Did you ever work with a person by the name
5  of Oren?    13:40
6    A. Yes.
7    Q. When?
8    A. During -- right around the inception of
9  Bunzai.
10    Q. What is Oren's last name?    13:40
11    A. Oren's last name is Ohian. I can't spell
12  that for you. I'm sorry.
13    Q. I can't either.
14    MR. UNGAR: I can try. O-h-i-a-n. Sort of like
15  Ohio with an "n" at the end.    13:40
16  BY MR. GAREEB:
17    Q. In what context did you work with
18  Mr. Ohian?
19    A. Oren Ohian has a cosmetic company himself
20  or had back in the time when I dealt with him.    13:41
21    Q. Okay. And when you dealt with him, how
22  were you dealing with him?
23    MR. UNGAR: Objection as to the form of the
24  question. It's vague and ambiguous.
25    THE WITNESS: Originally -- I'm thinking. I    13:41

Page 337

1  went to Oren to request some contacts in the skin
2  care arena for manufacturing, packaging. He was
3  much more proficient in the cosmetic industry than I
4  was. I went to him for some education and for some
5  contacts.    13:42
6  BY MR. GAREEB:
7    Q. Was he employed by Bunzai? -- strike that.
8  I withdraw the question. Was Oren Ohian employed by
9  Bunzai Media Group?
10    A. No.    13:42
11    Q. How do you know Mr. Ohian?
12    A. I know him for many years. He's a friend.
13    Q. Did you know Mr. Ohian when he owned the
14  cosmetic company?
15    A. Yes.    13:42
16    Q. Did you approach Mr. Ohian prior to
17  approaching Jacem?
18    A. Yes.
19    Q. And is it fair to say you were looking for
20  a cosmetic line to market on behalf of Bunzai when    13:42
21  you approached Mr. Ohian?
22    A. Yes.
23    Q. Were you considering Mr. Ohian's company
24  and his cosmetic line to market?
25    A. Yes.    13:43

Page 338

27 (Pages 335 - 338)

```
 1    Q.  Did you end up marketing any of Mr. Ohian's
 2  cosmetic lines?
 3    A.  Yes.
 4    Q.  Under what name?
 5    A.  Miracle Face Kit.                    13:43
 6    Q.  And what is Miracle Face Kit?
 7    A.  Miracle Face Kit was from the Dead Sea in
 8  Israel.  It was a mud mask and I believe a mineral
 9  serum.
10    Q.  Some people might say the Dead Sea in    13:43
11  Jordan.
12    A.  Correct.
13    MR. UNGAR:  Are you going to ask the deponent a
14  question?
15        Vague and ambiguous.              13:44
16    MR. GAREEB:  Mr. Ungar, I'm just trying to
17  inject a little levity here.  I'm Jordanian.
18    MR. UNGAR:  Just do your job, Counsel.
19    MR. GAREEB:  That's what I'm doing.  When you're
20  objecting to colloquy -- all right.       13:44
21  BY MR. GAREEB:
22    Q.  So Miracle Face Kit, is that Mr. Ohian's
23  company Miracle Face Kit?
24    A.  I'm not sure if these products were
25  independently called something else under his brand.  13:44
                                          Page 339
```

```
 1    Q.  Was he also marketing the same cosmetic
 2  line that you were marketing on behalf of Bunzai?
 3    MR. UNGAR:  Objection as to the form of the
 4  question.  It's vague and ambiguous.  Assumes facts
 5  not in evidence.                         13:44
 6    THE WITNESS:  I am not aware that he was, no.
 7  BY MR. GAREEB:
 8    Q.  Now, you had indicated earlier that you did
 9  not know 16161 Ventura Boulevard, Suite 378 in
10  Encino was; is that correct?             13:45
11    MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.  It's
13  argumentative, and it misstates prior testimony of
14  the witness.
15    THE WITNESS:  I don't understand your question.  13:45
16  BY MR. GAREEB:
17    Q.  Did Bunzai Media Group ever do business at
18  16161 Ventura Boulevard, Suite 378, Encino,
19  California 91346?
20    A.  That is a mailbox location.  I believe    13:45
21  there was some address associated with that address.
22  I don't particularly recall.
23    Q.  Did you ever have an office at 16161
24  Ventura Boulevard, Suite 378 in Encino?
25    A.  No.                               13:45
                                          Page 340
```

```
 1    Q.  Going back to Miracle Face Kit, was that a
 2  name that Bunzai gave to the product line that you
 3  were marketing on behalf of Mr. Ohian?
 4    A.  I don't recall.  I believe it was the name
 5  before.  Before -- I believe it was its original   13:46
 6  name for this particular product.
 7    Q.  And Bunzai marketed this product under the
 8  name Miracle Face Kit?
 9    A.  Yes.
10    Q.  And isn't it a fact that Miracle Face Kit   13:46
11  is a fictitious business name of Bunzai Media Group,
12  Inc.; correct?
13    A.  I believe so.
14    Q.  And isn't it a fact that Aura Vie is also a
15  fictitious business name of Bunzai Media Group,    13:46
16  Inc.; correct?
17    A.  I believe so.
18    Q.  Would it surprise you to learn that the
19  registered owner of these fictitious business names
20  is Bunzai Media Group, Inc. at 16161 Ventura    13:47
21  Boulevard, Suite 376, Encino, California 91436?
22    MR. UNGAR:  Objection as to the form of the
23  question.  It's vague and ambiguous.  It's also
24  argumentative.
25    THE WITNESS:  No.                    13:47
                                          Page 341
```

```
 1  BY MR. GAREEB:
 2    Q.  What is ResV Products?
 3    A.  The entity that ResVall was going to be
 4  marketed under.
 5    Q.  Isn't it a fact that ResV Products is also   13:47
 6  a fictitious business name of Bunzai Media Group,
 7  Inc.?
 8    A.  I believe so.
 9    Q.  What is Colon Cleanse, c-o-l-o-n,
10  c-l-e-a-n-s-e?                           13:48
11    MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.
13    THE WITNESS:  It's another product that we --
14  Khristopher and I worked on that we spent some time
15  researching the industry and another product that we   13:48
16  thought about doing but didn't really come to
17  fruition.
18  BY MR. GAREEB:
19    Q.  And isn't it a fact that Colon Cleanse is
20  fictitious business name of Bunzai Media Group,    13:48
21  Inc.?
22    A.  I believe it is.
23    Q.  By the way, ResV Products, was that a
24  product that Bunzai manufactured?
25    A.  ResV Products was the name of the d/b/a.   13:48
                                          Page 342
```

28 (Pages 339 - 342)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000098
Ex. 1

| | |
|---|---|
| 1  The product was called ResVall, but it wasn't | 1  product? |
| 2  marketed. | 2    A.  I have no idea. |
| 3    Q.  It was not marketed? | 3    Q.  How did you find out about this Organic |
| 4    A.  No. | 4  Target Treatment? |
| 5    Q.  Okay.  Where did you acquire that product?   13:49 | 5    A.  In my discussions with Oren regarding       13:51 |
| 6    MR. UNGAR:  Objection as to the form of the | 6  ingredients for Aura Vie.  He brought it to my |
| 7  question.  It's vague and ambiguous. | 7  attention that he was working on this product line |
| 8    THE WITNESS:  I acquired it through a company in | 8  called Organic Target Treatment, and he recommended |
| 9  Orange County named GMP Laboratories. | 9  that I look into it because it's an interesting |
| 10  BY MR. GAREEB:                              13:49 | 10  product.                                     13:52 |
| 11    Q.  I'm sorry? | 11    Q.  Did Oren's company manufacture that |
| 12    A.  GMP Laboratories. | 12  particular product? |
| 13    Q.  Do you know who owns GMP Laboratories? | 13    A.  I'm unaware if he was the manufacturer. |
| 14    A.  I have no idea. | 14    Q.  But you found out about it from Oren? |
| 15    Q.  Did your cousin Roi Reuveni have any       13:49 | 15    A.  Yes.                                    13:52 |
| 16  interest in the company that makes ResV Products? | 16    Q.  Attitude Cosmetics, what is that? |
| 17    MR. UNGAR:  Objection as to the form of the | 17    A.  I'm not sure if it's Attitude Cosmetics, |
| 18  question.  It calls for speculation. | 18  but Attitude is Oren's company. |
| 19    THE WITNESS:  No. | 19    Q.  Okay.  And isn't it a fact that Attitude |
| 20  BY MR. GAREEB:                              13:50 | 20  Cosmetics is a fictitious business name of Bunzai    13:52 |
| 21    Q.  Do you know the owner of the company that | 21  Media Group, Inc.? |
| 22  manufactured ResV Products? | 22    A.  Not to my knowledge. |
| 23    A.  No. | 23    Q.  Dead Sea Products, what is that? |
| 24    Q.  How about Colon Cleanse, do you know the | 24    MR. UNGAR:  Objection as to the form of the |
| 25  owner of the company that -- let me ask you this --  13:50 | 25  question.  It's vague and ambiguous.          13:52 |
| Page 343 | Page 345 |
| 1  I withdraw the question. | 1    THE WITNESS:  I don't know. |
| 2      How did you find the product called Colon | 2  BY MR. GAREEB: |
| 3  Cleanse? | 3    Q.  Isn't it a fact that Dead Sea Products is a |
| 4    A.  Through Suhail at GMP Labs. | 4  fictitious business name of Bunzai Media Group, |
| 5    Q.  Did GMP Labs manufacture Colon Cleanse?    13:50 | 5  Inc.?                                          13:53 |
| 6    A.  I believe they may have made us some | 6    A.  Maybe. |
| 7  samples, but it didn't really go into production. | 7    Q.  What kind of products is Dead Sea Products? |
| 8    Q.  All right.  How about Organic Treatment? | 8    MR. UNGAR:  Objection as to the form of the |
| 9  What kind of a product line is that? | 9  question.  It's vague and ambiguous. |
| 10    A.  Organic Target Treatment was a product line  13:50 | 10    THE WITNESS:  I believe Dead Sea Products was   13:53 |
| 11  that belonged to Oren. | 11  the d/b/a that was set up for the sales of Miracle |
| 12    Q.  Isn't it a fact that Organic Treatment is a | 12  Face Kit, which was a Dead Sea product.  So the |
| 13  fictitious business name of Bunzai Media Group, | 13  sales -- online sales that happened to Miracle Face |
| 14  Inc.? | 14  Kit -- I think that was why the d/b/a of Dead Sea |
| 15    A.  Potentially.                            13:51 | 15  Products.                                     13:53 |
| 16    Q.  I'm sorry? | 16  BY MR. GAREEB: |
| 17    A.  Potentially.  I don't recall. | 17    Q.  And M3D Kits.  Isn't it a fact that M3D |
| 18    Q.  What is Organic Treatment? | 18  Kits is also a fictitious business name of Bunzai |
| 19    A.  It's called Organic Target Treatment, OTT. | 19  Media Group, Inc.? |
| 20  It's these pens that have some cosmetic inside and  13:51 | 20    A.  Probably.                               13:53 |
| 21  you put push it out, and it's like a targeted | 21    Q.  What is M3D Kits? |
| 22  treatment for dark circles or for scars.  It's a | 22    A.  The educational videos I told you about |
| 23  cosmetic product.  It's just a different kind of | 23  earlier.  One more product that we marketed. |
| 24  packaging. | 24    Q.  And that's the one you did at I Everyday |
| 25    Q.  And who manufactures that particular       13:51 | 25  Products?                                     13:54 |
| Page 344 | Page 346 |

29 (Pages 343 - 346)

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    A.  No, no.
 2    Q.  Prior to I Everyday Products?
 3    A.  No, Bunzai Media.
 4    Q.  Okay.  And this is the educational or
 5  learning --                            13:54
 6    A.  Correct.
 7    Q.  -- products?
 8    A.  Correct.
 9    Q.  And who developed the products for M3D
10  Kits?                                  13:54
11    A.  M3D, Inc.
12    Q.  Did M3D, Inc. have a relationship with
13  Bunzai Media Group?
14    A.  Yes.
15    Q.  What was that relationship?        13:54
16    A.  Bunzai was going to market M3D's
17  educational children's videos online.
18    Q.  Did Bunzai actually end up marketing that
19  particular product?
20    A.  Yes.                              13:55
21    Q.  Who is in charge of that?
22    MR. UNGAR:  Objection as to the form of the
23  question.  It's vague and ambiguous.  It is not
24  readily understood in its present form.
25    THE WITNESS:  Khristopher.            13:55
                                          Page 347
```

```
 1    MR. UNGAR:  Objection as to the form of the
 2  question.  It's vague and ambiguous.
 3    THE WITNESS:  That's the name that he called
 4  himself.  I don't know if that's his name.
 5  BY MR. GAREEB:                         13:56
 6    Q.  Did you ever ask him if that was his name?
 7    A.  I did.
 8    Q.  And what did he say?
 9    A.  He said the name I got when we left the
10  Amazon Rain Forest and went to Canada is a name that  13:57
11  you wouldn't be able to pronounce.
12    Q.  Was he suggesting he's from the rain
13  forest?
14    A.  Khristopher suggested that he was from
15  Guyana.                                13:57
16    Q.  Guyana.  Do you know when he moved from
17  Guyana?
18    A.  I do not.
19    Q.  Did you ever hear the name Ray Ibbott?
20    A.  I have.                           13:57
21    Q.  Who is that?
22    A.  I don't know.
23    Q.  You heard the name, but you don't know who
24  it is?
25    MR. UNGAR:  Objection as to the form of the  13:57
                                          Page 349
```

```
 1  BY MR. GAREEB:
 2    Q.  When you were dealing with Mr. Ohian, did
 3  any of these product lines that we discussed, was
 4  any of them -- did any of them have a diamond line?
 5    MR. UNGAR:  Objection as to the form of the  13:55
 6  question.  It's compound.
 7    THE WITNESS:  No.
 8  BY MR. GAREEB:
 9    Q.  Did Khris Bond have a brother, to your
10  knowledge?                             13:56
11    A.  Yes.
12    Q.  Did you ever speak to him?
13    A.  Yes.
14    Q.  Was he ever involved in Bunzai Media Group?
15    A.  No.                              13:56
16    Q.  Did you ever do business with Mr. Bond's
17  brother?
18    A.  No.
19    Q.  What's Mr. Bond's brother's name?
20    A.  Michael.                         13:56
21    Q.  Is it Michael Ibbott?  What's his last
22  name?
23    A.  Don't know.
24    Q.  Do you know if Khristopher Bond's real name
25  is in fact Khristopher Bond?           13:56
                                          Page 348
```

```
 1  question.  It's argumentative.
 2  BY MR. GAREEB:
 3    Q.  I wasn't trying to be argumentative.
 4    A.  I've heard that name in reference to
 5  Khristopher.                           13:57
 6    Q.  When?
 7    A.  When they were moving to the house -- the
 8  ranch.  There was a box that Dawn came to pick up
 9  for Khristopher, and the box on the outside -- it
10  was something from his sister, and the box said Ray  13:58
11  Ibbott on the box.
12    Q.  And who was his sister?
13    A.  What?
14    Q.  Who is sister?
15    A.  Sorry.                           13:58
16    Q.  Who is his sister?
17    MR. UNGAR:  Objection as to the form of the
18  question.  It's vague and ambiguous.
19    THE WITNESS:  I don't understand the question.
20  BY MR. GAREEB:                         13:58
21    Q.  You said that he received a box from his
22  sister.  How do you know it was from his sister?
23    A.  I remember Khristopher mentioning it.
24    Q.  Do you know his sister's name?
25    A.  Debra.  I'm guessing.  No.        13:58
                                          Page 350
```

30 (Pages 347 - 350)

```
 1     A.  No.
 2     Q.  So you don't know what the reference is to
 3  Caesar's Palace gold line?
 4     A.  No.
 5     Q.  You hesitated.  Is it because you don't      14:03
 6  remember?
 7     A.  I don't remember about some -- I just don't
 8  remember specifics.  I remember about some product
 9  that he was going to talk to somebody at Caesar's
10  about, which I don't want to -- I vaguely           14:04
11  remember --
12     Q.  When you say he, are you referring to --
13     A.  Khristopher, yes.
14     Q.  And was this during the same time period in
15  which you met Mr. Bond's brother and sister?        14:04
16     A.  Yes.
17     Q.  When you went to Las Vegas during this
18  time, did you do any work while you were in Las
19  Vegas?
20     A.  No.                                          14:04
21     Q.  So this trip was purely pleasure for you?
22     A.  There was something else going on.  One
23  second.  For me it was also -- I had a meeting there
24  with -- I had another business meeting.  I had
25  another reason to go to Vegas.                      14:05
                                              Page 355
```

```
 1     Q.  Was Mr. Bond involved in that meeting?
 2     A.  No.
 3     Q.  Did it have anything to do with Bunzai
 4  Media Group?
 5     A.  No.                                          14:05
 6     Q.  Did it have anything to do with Pinnacle?
 7     A.  No, I don't believe there was a Pinnacle
 8  then.
 9     Q.  Did it have anything to do with Media Urge?
10     A.  No.                                          14:05
11     Q.  Did you ever work on a project called
12  eBooks?
13     A.  No.
14     Q.  Do you know what eBooks is?
15     A.  Yes.                                         14:05
16     Q.  What is it?
17     A.  Electronic books.
18     Q.  All right.  Did Bunzai Media Group market
19  or develop any kind of eBooks?
20     A.  I don't believe that Bunzai Media Group      14:06
21  did.
22     Q.  Who do you believe did?
23     MR. UNGAR:  I'm going to object.  The question
24  in its form is vague and ambiguous.  It's not
25  readily understandable in its present form.         14:06
                                              Page 356
```

```
 1     THE WITNESS:  Can you ask the question again.
 2     (The following record was read:)
 3     "Q  All right.  Did Bunzai Media Group market
 4  or develop any kind of eBooks?
 5     "Q  Who do you believe did?"                     14:06
 6     MR. UNGAR:  Same objection.
 7     THE WITNESS:  Khristopher Bond worked with some
 8  eBooks.
 9  BY MR. GAREEB:
10     Q.  While he was at Bunzai Media Group?          14:07
11     A.  I believe it was -- I don't recall.
12     Q.  As you sit here today, do you know if
13  Bunzai Media Group marketed eBooks during the time
14  of 2010 and 2012?
15     A.  Marketed eBooks, yes.                        14:07
16     Q.  Under what product line did you market --
17  did Bunzai Media Group market eBooks?
18     A.  I don't think we marketed eBooks.  I think
19  that the consumers that received -- I think
20  consumers who engaged or bought the product -- the  14:07
21  Aura Vie product received some eBooks as an addition
22  to their purchase.
23     Q.  Kind of as an incentive or gift?
24     MR. UNGAR:  Objection as to the form of the
25  question.  It's vague and ambiguous, and it's       14:08
                                              Page 357
```

```
 1  compound.
 2     THE WITNESS:  I don't believe it was a gift.  I
 3  think it was to educate them more or give them more
 4  value.
 5  BY MR. GAREEB:                                      14:08
 6     Q.  These eBooks, were they given to the
 7  consumer for free?
 8     A.  I think it was part of their transaction.
 9     Q.  Okay.  All right.  Did you have anything to
10  do with that particular project regarding the       14:08
11  eBooks?
12     A.  No.
13     Q.  Did you have any objection to providing
14  eBooks as part of a package when a consumer
15  purchased the cosmetic products?                    14:08
16     A.  No.
17     Q.  Do you know a Meagan Good, M-e-a-g-a-n?
18  Last name is Good, G-o-o-d.
19     A.  I know who she is.
20     Q.  Who is she?                                  14:09
21     A.  She's an actress, singer, TV personality.
22     Q.  Did you ever meet her?
23     A.  I did.
24     Q.  For what purpose?
25     A.  She was introduced to us.  Oren brought      14:09
                                              Page 358
```

32 (Pages 355 - 358)

1  Meagan Good to our knowledge. He wanted to do a
2  product on her behalf, and they spoke to us -- to
3  Bunzai with regards to -- I don't remember who they
4  spoke to, but they spoke to Khristopher and I with
5  regards to marketing her product.            14:10
6      Q.  What was her product that you guys marketed
7  on her behalf?
8      A.  We didn't.
9      Q.  What were you guys considering to market on
10 her behalf?                                  14:10
11     MR. UNGAR:  Objection as to the form of the
12 question.  It's vague and ambiguous particularly to
13 the reference "you guys."
14 BY MR. GAREEB:
15     Q.  Do you understand the question?       14:10
16     A.  Can you repeat it.
17     Q.  I'll withdraw it.  I'll ask it again.
18        What types of products was Bunzai Media
19 Group looking to market on behalf of Meagan Good?
20     MR. UNGAR:  Objection as to the form of the   14:10
21 question.  Assumes facts not in evidence.
22     THE WITNESS:  I don't think we were -- the
23 products were part of the conversation.  I think
24 Oren had the products already.  When Oren introduced
25 her, it was more of a campaign commission, less of a   14:10
                                            Page 359

1  product commission.
2  BY MR. GAREEB:
3      Q.  Please describe that.  I don't know what
4  you mean.
5      MR. UNGAR:  Objection as to the form of the   14:11
6  question.  It's vague and ambiguous.
7      THE WITNESS:  I don't understand your question.
8  BY MR. GAREEB:
9      Q.  Please elaborate as to what you meant just
10 now by you were marketing not the product but the   14:11
11 person.
12     MR. UNGAR:  Objection as to the form of the
13 question.  It's vague and ambiguous.  It's not
14 readily understandable in the form presented.
15     MR. GAREEB:  That's the reason I asked the   14:11
16 question.
17     THE WITNESS:  Oren said he has a good contact.
18 He knew Meagan's manager or some guy that was
19 working with Meagan or someone responsible for
20 Meagan.  He had a product line figured out for her,   14:11
21 and he brought her -- he asked me if I had an
22 interest in meeting her and potentially doing the
23 marketing for a celebrity based line.
24 BY MR. GAREEB:
25     Q.  So as I understand it, you were trying to   14:11
                                            Page 360

1  use the celebrity of Meagan Good to promote a
2  particular product line?
3      A.  He was.
4      Q.  Who is he?
5      A.  Oren.  Or Meagan herself.            14:12
6      Q.  Oren was trying to do that through Bunzai?
7      MR. UNGAR:  Objection as to the form of the
8  question.  It's vague and ambiguous.  Calls for
9  speculation.
10     THE WITNESS:  I don't recall Bunzai having any   14:12
11 interaction with that particular deal.  I quickly
12 told Oren that I did not have an interest, and I
13 passed it -- I passed Oren on to work directly with
14 Khristopher with Meagan Good's manager to Cerenade
15 because I didn't want anything to do with it.   14:12
16 BY MR. GAREEB:
17     Q.  To your knowledge, was Victor the one that
18 was spearheading this particular project on behalf
19 of Bunzai with Mr. Bond?
20     A.  No.                                  14:13
21     MR. UNGAR:  Objection as to the form of the
22 question.  It's vague and ambiguous.  Assumes facts
23 not in evidence.
24 BY MR. GAREEB:
25     Q.  I'm sorry?                           14:13
                                            Page 361

1      A.  Do you mean Victor the designer we spoke
2  about earlier?
3      Q.  Yes.
4      A.  No.
5      Q.  Are there any other Victors that you know   14:13
6  of that work at Bunzai?
7      A.  No.
8      Q.  Do you know if a catalog of these Meagan
9  Good products was ever prepared?
10     A.  Yes.                                 14:13
11     Q.  Who prepared those?
12     A.  An outside designer Khristopher was working
13 with.
14     Q.  Okay.  In the end, did Bunzai ever market
15 those particular products on behalf of Meagan Good?   14:13
16     A.  No.
17     Q.  Why not?
18     A.  I think Meagan and her manager quickly
19 realized that they were dealing with Khristopher and
20 that deal fell through quickly.              14:13
21     Q.  Enough said.  What is the Aura Vie angels?
22     A.  I'm not exactly sure what it was.  It was a
23 concept that Khristopher Bond came up with.  Give me
24 some more questions.  I don't even know how to
25 answer that.                                 14:14
                                            Page 362

33 (Pages 359 - 362)

1    Q.  Well, what is it?  In general what is the
2  Aura Vie angels project, or is it a project?
3    MR. UNGAR:  Objection as to the form of the
4  question.  It's compound.
5  BY MR. GAREEB:                             14:14
6    Q.  You know, I'll withdraw.  Let's start with
7  laying some foundation.
8      First and foremost, what is Aura Vie
9  angels?
10   A.  A project that Khristopher managed with     14:14
11  respect to a testimonial program.
12   Q.  Who were the angels of the Aura Vie angels?
13   MR. UNGAR:  Objection as to the form of the
14  question.  It's vague and ambiguous.  It assumes
15  facts not in evidence.                     14:15
16   THE WITNESS:  I don't know.
17  BY MR. GAREEB:
18   Q.  Who is Iris, I-r-i-s?
19   MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous.        14:15
21   THE WITNESS:  I don't understand the question.
22  BY MR. GAREEB:
23   Q.  Do you know an Iris that worked for Bunzai
24  Media Group?
25   A.  I believe I know the Iris you're referring  14:15
                                            Page 363

1  context of Aura Vie angels?
2    A.  Part of Khristopher's creative imaginary
3  marketing system.  I still don't understand.
4    Q.  So do you know what it references when it
5  says Aura Vie angels?                      14:17
6    A.  I believe it was a testimonial program that
7  Khristopher was working on developing.
8    Q.  What is a testimonial program in your mind?
9    MR. UNGAR:  Objection as to the form of the
10  question.  It's vague and ambiguous.        14:17
11   THE WITNESS:  He wanted to go through a
12  30-day -- I don't remember how many days -- but a
13  time period where a few women were using the
14  product.  Speaking to them about their results and
15  talking to them about their results and taking notes  14:17
16  of their results in order to create testimonials.
17  BY MR. GAREEB:
18   Q.  What does it refer to when it says, "Aura
19  Vie angels lifestyle shoots"?  Do you know what that
20  means?                                    14:18
21   A.  I have no idea.
22   Q.  Do you know if there was any kind of photo
23  shoots pertaining to Aura Vie angels?
24   A.  I recall some photo shoot.
25   Q.  And what were they -- what were the photos   14:18
                                            Page 365

1  to.  I'm not sure if she worked to Bunzai.
2    Q.  The Iris that you believe I'm referring to,
3  who is that?  What's her last name?
4    A.  I don't remember.
5    Q.  Could it be Castro?                   14:16
6    MR. UNGAR:  Objection as to the form of the
7  question.  It's vague and ambiguous.  Calls for
8  speculation.  It's argumentative.
9    THE WITNESS:  I don't recall her last name.
10  BY MR. GAREEB:                             14:16
11   Q.  And Iris that you do recall, who does she
12  work for?
13   MR. UNGAR:  Objection as to the form of the
14  question.  Calls for speculation.
15   THE WITNESS:  I really don't remember.      14:16
16  BY MR. GAREEB:
17   Q.  When we refer to Aura Vie angels, are
18  angels models?
19   A.  No.
20   Q.  Who are angels?                       14:16
21   MR. UNGAR:  Objection as to the form of the
22  question.  It's vague and ambiguous.
23   MR. GAREEB:  I'll withdraw.
24  BY MR. GAREEB:
25   Q.  So what is it referring to angels in the    14:16
                                            Page 364

1  being taken of in these photo shoots that you
2  remember?
3    A.  I have no idea.
4    Q.  So when you say that you remember photo
5  shoots, what were you remembering in reference to?   14:18
6    MR. UNGAR:  Objection as to the form of the
7  question.  It's vague and ambiguous.  It's not
8  readily understandable in the present form.
9    THE WITNESS:  I remember some preparation or
10  Khristopher asking someone -- it was a photo         14:18
11  shoot -- I don't know.  I really don't remember.  I
12  wasn't there.  I wasn't part of that meeting.  I'm
13  speculating.  I'm guessing.
14  BY MR. GAREEB:
15   Q.  What do you remember about photo shoots     14:19
16  then?
17   A.  I remember there was some -- they rented
18  some place and they had some food catering, and
19  according to what I was told there was -- that
20  Khristopher showed them a cooking lesson and he     14:19
21  cooked for the girls there, and they took some
22  photos.  That's what I remember.
23   Q.  What girls are you referring to?
24   A.  I believe who Khristopher was referring to
25  as the Aura Vie angels.                     14:19
                                            Page 366

                                    34 (Pages 363 - 366)

1    Q.  Okay.  And where did this photo shoot take
2 place?
3    A.  I have no idea.
4    Q.  You said they rented some sort of facility.
5 Do you remember where?                        14:19
6    A.  Somewhere in LA.
7    Q.  Who paid for this photo shoot and all the
8 food and all that stuff?
9    A.  I believe it was Cerenade.
10    Q.  Cerenade or Bunzai?              14:20
11    A.  I don't recall.
12    Q.  When was this photo foot going to take
13 place?
14    A.  I don't remember.
15    Q.  Do you remember if it was in 2010?       14:20
16    A.  No.
17    Q.  Do you remember if it was 2011?
18    A.  Probably towards the end maybe.  Probably.
19 I don't know.
20    Q.  Towards the end of what?            14:20
21    A.  I don't know.  I don't know.
22    Q.  So you can't narrow it down even to a year?
23    A.  2011 or 2012.
24    Q.  Okay.  So you can narrow it down to two
25 years?                                  14:20

Page 367

1    A.  Really I wasn't --
2    Q.  I understand.  It's perfectly fine.
3       What is All Star Virtual Sports Academy?
4    A.  All Star Virtual Sports Academy.
5    MR. UNGAR:  I'm going to object as to the form   14:21
6 of the question.  It's vague and ambiguous.
7    THE WITNESS:  I'm just trying to recollect.  I
8 think it was another Khristopher idea to market some
9 memorabilia.  Some baseball memorabilia maybe.
10 BY MR. GAREEB:                          14:21
11    Q.  And he wanted to market it through Bunzai
12 Media Group?
13    A.  No.
14    Q.  Who did he want to market it through?
15    A.  It was his own thing.  I don't know if     14:22
16 Cerenade was there or not, but it was his own kind
17 of project.
18    Q.  You had nothing to do with it?
19    A.  No.
20    Q.  How do you know about it?           14:22
21    A.  The person who introduced Khristopher to
22 that -- to those people.  I know the guy who
23 introduced Khristopher to those people.  I think it
24 was a baseball player Pete Rose or his wife or his
25 ex-wife.                                14:22

Page 368

1    Q.  Okay.  But it has nothing to do with Bunzai
2 Media Group?
3    A.  No.
4    Q.  And Bunzai Media Group has never marketed
5 sports memorabilia?                       14:22
6    A.  No.
7    Q.  And certainly nothing regarding All Star
8 Virtual Sports Academy?
9    MR. UNGAR:  Objection as to the form of the
10 question.  It's vague and ambiguous, and it's     14:22
11 argumentative.
12    THE WITNESS:  Not that I recall.
13 BY MR. GAREEB:
14    Q.  Okay.  Did Bunzai Media Group ever market
15 stretch mark creams?                     14:23
16    A.  No.
17    Q.  How about breast increaser?
18    A.  No.
19    Q.  Did you ever hear of any stretch mark
20 creams?                                14:23
21    A.  Yes.
22    Q.  In what context?
23    A.  It was one of the products that we thought
24 about potentially marketing.
25    Q.  Who?                            14:23

Page 369

1    A.  Bunzai Media Group.
2    Q.  What happened?  I withdraw.
3       When you considered -- when Bunzai
4 considered marketing stretch mark creams, what was
5 the final decision as to whether to market these    14:23
6 stretch mark creams?
7    A.  It was negative.  It didn't actually occur.
8    Q.  Why did it not occur?
9    A.  When I reached out to third-party
10 advertisers about their interest in this particular   14:24
11 business model, I didn't get a lot of engagement.  I
12 didn't see it.  I let it go.
13    Q.  So you thought that if Bunzai marketed it,
14 it probably wasn't a big seller.  Was that your
15 analysis?                              14:24
16    A.  I didn't think I could get it to the right
17 level.
18    Q.  Okay.  And the breast increaser, did you
19 ever hear of that?
20    A.  Sure.                           14:24
21    Q.  What is that?
22    A.  It came out of a manufacturer in Israel who
23 did a big study.  He sent me a big 200 page -- 150
24 to 200 page study about their clinical trials that
25 they did with women with small breasts that use this  14:24

Page 370

35 (Pages 367 - 370)

1 programs that you were researching for Bunzai to
2 market?
3    A.  Yes.
4    Q.  And what weight loss program was this?
5    A.  I don't know if any particular -- if it had  14:29
6 a particular name that I can refer to.
7    Q.  So you were looking for a weight loss
8 product, not necessarily a product in mind?
9    A.  Yes.
10    MR. UNGAR:  Objection as to the form of the   14:30
11 question.  It's compound.  It's vague and ambiguous.
12 BY MR. GAREEB:
13    Q.  The question is, is that fair?
14    A.  Yes.
15    Q.  Were you able to locate a weight loss   14:30
16 program that Bunzai was able to market?
17    MR. UNGAR:  Objection as to the form of the
18 question.  It's vague and ambiguous.
19    THE WITNESS:  No.
20 BY MR. GAREEB:                                 14:30
21    Q.  Who was helping you out in researching a
22 weight loss program for Bunzai to market?
23    A.  Nobody that I can remember.
24    Q.  Isn't it a fact that Nancy Yalley assisted
25 you in this weight loss program that Bunzai was to  14:31
                                          Page 375

1 received anything that Nancy Yalley prepared as it
2 pertains to a weight loss program?"
3    THE WITNESS:  No.
4 BY MR. GAREEB:
5    Q.  You ever hear of an SMS wellness program?   14:32
6    A.  No.
7    Q.  Have you ever heard of SMS?
8    MR. UNGAR:  Objection as to the form of the
9 question.  It's vague and ambiguous particularly
10 with regarding to the letters "SMS."        14:33
11    THE WITNESS:  Sure.
12 BY MR. GAREEB:
13    Q.  What is SMS?
14    A.  Text messages.
15    Q.  You ever hear of SMS in relation to Bunzai   14:33
16 Media Group?
17    A.  No.
18    Q.  Ever consider marketing any products, any
19 wellness program -- strike that.
20    Did Bunzai ever consider marketing any      14:33
21 wellness programs?
22    A.  Yes.
23    Q.  What are those?
24    A.  One of them was ResV Products as I
25 mentioned, which was a wellness product.  And at  14:33
                                          Page 377

1 market?
2    MR. UNGAR:  Objection as to the form of the
3 question.  It's vague and ambiguous.  Assumes facts
4 not in evidence.  It's argumentative.
5    THE WITNESS:  No.                            14:31
6 BY MR. GAREEB:
7    Q.  Did you ever receive from Nancy Yalley
8 anything that outlined parameters and timeline and
9 component sheets pertaining to a weight loss program
10 that Bunzai could market?                      14:31
11    MR. UNGAR:  Objection as to the form of the
12 question.  It's vague and ambiguous.  It's compound.
13 It's argumentative.
14    THE WITNESS:  No.
15 BY MR. GAREEB:                                 14:31
16    Q.  So your testimony here is you've never
17 received anything that Nancy Yalley prepared as it
18 pertains to a weight loss program?
19    A.  That's not what I said.  That's not the
20 same question you had.                         14:32
21    MR. GAREEB:  I know.  I -- okay.
22    Madam Court Reporter, can you re-read that
23 question.
24    (The following record was read:)
25    "Q  So your testimony here is you've never   14:31
                                          Page 376

1 some point I was talking to a company who had a
2 technology back-end that would let women track the
3 amount of calories, what they ate.  Basically keep
4 in line with their diet habits.  So I researched
5 that at one point to see what it would cost to gain   14:34
6 access so the consumer that would engage in ResVall
7 or wellness products could track their weight loss
8 through some sort of online portal.
9    Q.  Okay.  And what was the name of that
10 wellness program that Bunzai was considering to      14:34
11 market?
12    A.  I don't remember.  I don't remember.
13    Q.  Well, do you recall if it was SMS wellness
14 program?
15    A.  No.                                      14:35
16    Q.  As you sit here today, have you ever heard
17 of SMS wellness program?
18    A.  No.
19    Q.  Okay.  You ever hear of 8Circle Media?
20    A.  Yes.                                     14:35
21    Q.  What is that?
22    A.  It's the company Khristopher hired to work
23 on a personal app for himself called
24 Khristopher-isms.
25    Q.  Okay.  And when was this?               14:35
                                          Page 378

37 (Pages 375 - 378)

Veritext National Deposition & Litigation Services
866 299-5127

1   MR. UNGAR: Objection as to the form of the
2   question. It's vague and ambiguous. It's not
3   readily understandable as presented, and it calls
4   for speculation.
5       THE WITNESS: Can you repeat the question for       14:35
6   me.
7       (The following record was read:)
8   "Q And when was this?"
9   MR. UNGAR: Same objection.
10      THE WITNESS: Sometime in 2012.       14:36
11  BY MR. GAREEB:
12      Q. Beginning part of 2012?
13      A. I don't know.
14      Q. Did Bunzai Media Group pay for the services
15  of 8Circle Media?       14:36
16      A. No.
17      Q. What is Khristopher-isms anyway?
18      A. Khristopher Bond sends text messages to
19  people in the morning. What he calls inspirational
20  text messages. He wanted to work on an app that       14:36
21  would send people random messages to remind them
22  when to smile, when to be happy. That's what it
23  was.
24      Q. Did he send these to Bunzai employees?
25      MR. UNGAR: Objection as to the form of the       14:37
                                                        Page 379

1   MR. UNGAR: Objection as to the form of the
2   question. It's vague and ambiguous.
3       MR. GAREEB  Withdraw.
4   BY MR. GAREEB:
5       Q. Did Bunzai retain the services of 8Circle       14:38
6   Media?
7       A. Not that I recall. I don't believe so.
8       Q. All right. You had indicated that Bunzai
9   developed a website for Aura Vie. Remember that
10  testimony?       14:38
11      A. Yes.
12      Q. Is that website AuraVie.com?
13      A. Yes.
14      Q. You ever hear the term "life cell,"
15  L-i-f-e, c-e-l-l?       14:39
16      A. I have.
17      Q. What is it?
18      A. I don't know. I don't know.
19      Q. All right. Do you recall if Bunzai Media
20  Group provided written content for single product       14:39
21  blogs?
22      MR. UNGAR: Objection as to the form of the
23  question. It's vague and ambiguous. It's not
24  readily understandable in the form presented.
25      THE WITNESS: I don't understand the question.       14:40
                                                        Page 381

1   question. It's vague and ambiguous. It's not
2   readily understandable as presented.
3       THE WITNESS: I don't know who he sent them to.
4   BY MR. GAREEB:
5       Q. Did you receive them?       14:37
6       A. Yes.
7       Q. How often did you receive these text
8   messages from Khristopher that he called
9   Khristopher-isms?
10      A. Well, first of all, he was sending text       14:37
11  messages way before he had a name for them.
12      Q. Okay.
13      A. So since I met him.
14      Q. All right. To your knowledge, did he send
15  them to employees of Bunzai?       14:37
16      MR. UNGAR: Objection as to the form of the
17  question. It's vague and ambiguous.
18      THE WITNESS: To my knowledge, he sent them to
19  anyone he met and took their number.
20  BY MR. GAREEB:       14:37
21      Q. Okay. What is 8Circle Media, to your
22  knowledge?
23      A. I think they were a mobile app development
24  company.
25      Q. Did Bunzai also use 8Circle Media?       14:38
                                                        Page 380

1   BY MR. GAREEB:
2       Q. Do you know if Bunzai utilized blogs
3   between 2010 and 2012?
4       MR. UNGAR: Objection as to the form of the
5   question. It's vague and ambiguous.       14:40
6       THE WITNESS: No.
7   BY MR. GAREEB:
8       Q. Do you know what a blog is?
9       A. I do.
10      Q. And do you know if Bunzai ever used a blog       14:40
11  in 2010 or 2012?
12      MR. UNGAR: Objection as to the form of the
13  question. It's vague and ambiguous, and it calls
14  for speculation.
15      THE WITNESS: Not that I can recall.       14:40
16  BY MR. GAREEB:
17      Q. Did you ever have a blog on behalf of
18  Bunzai Media Group?
19      A. No.
20      Q. Did you ever have a blog, period?       14:40
21      A. No.
22      Q. Do you know a person by the name Inez,
23  I-n-e-z?
24      A. No.
25      Q. Did you ever hear of something called       14:41
                                                        Page 382

38 (Pages 379 - 382)

1 Boar's Head project?
2   A.  Boar?
3   Q.  B-o-a-r's Head project.
4   A.  Never.
5   Q.  Who is Maxi?      14:41
6     MR. UNGAR:  Objection as to the form of the
7 question.  It's vague and ambiguous.
8     THE WITNESS:  I don't understand your question.
9 BY MR. GAREEB:
10   Q.  Do you know a Maxi, M-a-x-i?    14:41
11   A.  Yes.
12   Q.  Who is that?
13   A.  I believe that is Khristopher's ex-wife.
14   Q.  Was she ever involved in any projects at
15 Bunzai Media Group?      14:41
16     MR. UNGAR:  Objection as to the form of the
17 question.  It's vague and ambiguous, and it calls
18 for speculation.
19     THE WITNESS:  She was -- she wrote something for
20 Aura Vie. Her testimonial about the use of the Aura  14:42
21 Vie product.
22 BY MR. GAREEB:
23   Q.  Would she be considered to be one of the
24 Aura Vie angels?
25     MR. UNGAR:  Objection as to the form of the  14:42

Page 383

1   Q.  Did Bunzai ever promote a private label for
2 Caesar's Palace pertaining to a beauty product?
3     MR. UNGAR:  Objection as to the form of the
4 question.  Vague and ambiguous.
5     THE WITNESS:  I'm aware that Khristopher had    14:44
6 talks with Caesar's Palace about stuff.  I don't
7 know what it was.
8 BY MR. GAREEB:
9   Q.  So you were not involved in any of those
10 discussions?      14:44
11   A.  No.
12   Q.  Did these private labels on behalf of
13 Caesar's, did that ever amount to any revenue
14 generation for Bunzai?
15     MR. UNGAR:  Objection as to the form of the    14:44
16 question.  It's vague and ambiguous.  Assumes facts
17 not in evidence.  Calls for speculation.  It's
18 argumentative.
19     THE WITNESS:  Nothing came to be of it.  As    14:44
20 usual Khristopher -- nothing came to be of Caesar's
21 Palace.
22 BY MR. GAREEB:
23   Q.  Okay.  Never marketed anything pertaining
24 to Caesar's Palace?  I'm sorry.  Bunzai never
25 marketed anything on behalf of Caesar's Palace?  14:45

Page 385

1 question.  Vague and ambiguous.  Calls for
2 speculation.
3     THE WITNESS:  I don't know.
4 BY MR. GAREEB:
5   Q.  How many times have you met Maxi?    14:42
6   A.  Ten.
7   Q.  How long have you known Maxi?
8   A.  2011.
9   Q.  Did you ever work with Maxi?
10   A.  No.      14:42
11   Q.  What's Maxi's last name?
12   A.  Bond.
13   Q.  Was Maxi ever an employee of Bunzai Media
14 Group?
15   A.  No.      14:43
16   Q.  Was she ever an independent contractor of
17 Bunzai Media Group?
18     MR. UNGAR:  Objection as to the form of the
19 question.  It's vague and ambiguous.
20     THE WITNESS:  Not that I'm aware of.    14:43
21 BY MR. GAREEB:
22   Q.  Was she -- was she employed by Media Urge?
23   A.  No.
24   Q.  Was she employed by Pinnacle?
25   A.  No.      14:43

Page 384

1   A.  No.
2   Q.  Bunzai never marketed anything that had the
3 name Caesar's on it?
4   A.  No.
5   Q.  Did Bunzai ever have any dealings with    14:45
6 Kaiser?
7   A.  I don't understand your question.
8   Q.  Did Bunzai ever have any dealings with Blue
9 Cross?
10   A.  Not that I'm aware of.    14:45
11   Q.  How about Kaiser?
12     MR. UNGAR:  Objection as to the form of the
13 question.  It's vague and ambiguous.  It's not
14 understandable in its present form.
15     THE WITNESS:  The insurance company Kaiser?  I  14:45
16 don't understand your question.
17 BY MR. GAREEB:
18   Q.  Did Bunzai Media Group have any kind of
19 relationship with Kaiser?
20   A.  Kaiser medical?    14:46
21   Q.  Yes.
22   A.  No.
23   Q.  Did Bunzai Media Group ever advertise in
24 Ventura Boulevard Magazine?
25   A.  I don't think we advertised.  I think  14:46

Page 386

39 (Pages 383 - 386)

Veritext National Deposition & Litigation Services
866 299-5127

APP. 000107
Ex. 1

1  they -- I think -- it wasn't an advertisement.  I
2  think it was an article.  I don't remember buying
3  advertising there, but I know we had an ad there.
4      Q.  Would it be called, what you are referring
5  to, a promo story?                          14:46
6      A.  There was something there.  I don't
7  remember money.  I don't remember the Ventura
8  Magazine ad.  There was some small ad in the Ventura
9  Magazine.  I don't remember how it came to be.
10     Q.  Okay.  Well, we are referring to the      14:47
11 Ventura Boulevard Magazine.
12     A.  Yes.
13     Q.  That's what you're referring to?
14     A.  Yes.
15     Q.  Do you know a person by the name of Nas,  14:47
16 N-a-s?
17     A.  No.
18     Q.  Did Bunzai Media Group ever market a
19 product called Gold Mask?
20     A.  No.                                   14:47
21     Q.  Have you ever heard of the Gold Mask?
22     A.  Yes.
23     MR. UNGAR:  Objection as to the form of the
24 question.  It's vague and ambiguous.  Go ahead.
25 BY MR. GAREEB:                                14:47

Page 387

1      Q.  What is the Gold Mask?
2      A.  It is -- it's hard to explain.  It's kind
3  of a biofiber really thin mask that you put on your
4  face.
5      Q.  Okay.  And Bunzai never marketed the Gold  14:47
6  Mask product?
7      A.  No.
8      Q.  Why?
9      MR. UNGAR:  Objection as to the form of the
10 question.  It's vague and ambiguous.  Calls for     14:48
11 speculation.  It's argumentative.
12     THE WITNESS:  I don't know.  I don't know.
13 BY MR. GAREEB:
14     Q.  Is there -- why was the decision made not
15 to market the Gold Mask product?                   14:48
16     MR. UNGAR:  Objection as to the form of the
17 question.  It's vague and ambiguous.  It assumes
18 facts not in evidence.
19     THE WITNESS:  The discussion on that product was
20 during my separation with Khristopher.  We thought  14:48
21 about it.  It was talked about.  We already had a
22 bad taste in our mouth.  We didn't work on it.
23 Didn't want to spend the time on it.
24 BY MR. GAREEB:
25     Q.  You said we.  Who is we had a bad taste in  14:49

Page 388

1  their mouth?
2      A.  I had a bad taste in my mouth for
3  Khristopher.
4      Q.  Oh.  And that was because he was doing
5  projects that you didn't agree with?               14:49
6      A.  Yeah.
7      Q.  Is there any other reason?
8      MR. UNGAR:  Objection as to the form of the
9  question.  It's vague and ambiguous.  It's not
10 presently understandable.  It's not readily          14:49
11 understandable in the form presented.
12     THE WITNESS:  I don't understand your question.
13 BY MR. GAREEB:
14     Q.  Why was the decision to not market Gold
15 Mask product?                                      14:49
16     MR. UNGAR:  Objection as to the form of the
17 question.  It's vague and ambiguous.  Assumes facts
18 not in evidence.  It's argumentative.  Calls for
19 speculation.
20     MR. GAREEB:  And I withdraw.                  14:49
21 BY MR. GAREEB:
22     Q.  Now, while you were at Bunzai Media Group,
23 isn't it a fact that Iris assisted you in managing
24 deadlines and projects?
25     A.  No.                                     14:50

Page 389

1      Q.  Who was your assistant at Bunzai Media
2  Group?
3      A.  I didn't have an assistant.
4      Q.  Who assisted you in doing your job duties
5  at Bunzai Media Group?                            14:50
6      MR. UNGAR:  Objection as to the form of the
7  question.  It's vague and ambiguous.
8      THE WITNESS:  I don't remember having any
9  assistants.
10 BY MR. GAREEB:                                    14:50
11     Q.  Did you have deadlines while you were at
12 Bunzai Media Group?
13     MR. UNGAR:  Objection as to the form of the
14 question.  It's vague and ambiguous.
15     THE WITNESS:  Not that I can recall.          14:50
16 BY MR. GAREEB:
17     Q.  Did you have projects while you were at
18 Bunzai Media Group?
19     A.  Of course.
20     Q.  Did anyone assist you in managing those   14:50
21 projects?
22     A.  No.
23     Q.  So when you were at Bunzai Media Group you
24 did everything on your own?
25     A.  No.                                     14:51

Page 390

40 (Pages 387 - 390)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000108
Ex. 1

| | |
|---|---|
| 1    Q.  Who assisted you then? | 1    transformation. What is that? |
| 2    MR. UNGAR: Objection as to the form of the | 2    A.  It was part of Khristopher's thoughts that |
| 3    question. It's vague and ambiguous. | 3    he wanted to make employees happy. So he said once |
| 4    THE WITNESS: Employees. | 4    a year we're going to have this day where our women |
| 5    BY MR. GAREEB:                    14:51 | 5    employees will get their hair done and nails done,    14:54 |
| 6    Q.  Such as... | 6    and our male employees will get to go to a massage |
| 7    A.  Iris wasn't one of them. | 7    and to get some -- it was like some event that he |
| 8    Q.  Okay. Who was one of them? | 8    wanted to do for the employees. |
| 9    A.  Nastassia. | 9    Q.  Okay. And was the day of transformation |
| 10   Q.  Who else?                    14:51 | 10   advertised in the Ventura Boulevard Magazine?    14:54 |
| 11   A.  Kevin. | 11   MR. UNGAR: Objection as to the form of the |
| 12   Q.  Who else? | 12   question. It's vague and ambiguous. Calls for |
| 13   A.  Victor. | 13   speculation. |
| 14   Q.  Who else? | 14   THE WITNESS: I have no idea. |
| 15   A.  Khristopher.                  14:51 | 15   BY MR. GAREEB:                    14:54 |
| 16   Q.  Who else? | 16   Q.  Okay. Isn't it a fact the day of |
| 17   A.  That's about it. | 17   transformation happened on Ventura Boulevard? |
| 18   Q.  Do you know what H being is? | 18   MR. UNGAR: Objection as to the form of the |
| 19   A.  No. | 19   question. Calls for speculation. |
| 20   Q.  You ever hear of H being?      14:52 | 20   THE WITNESS: I wasn't there. I don't know.    14:55 |
| 21   A.  I have. | 21   BY MR. GAREEB: |
| 22   Q.  In what context? | 22   Q.  What was your understanding of the event |
| 23   A.  H being is a concept -- woven up concept of | 23   day of transformation? |
| 24   my ex-partner Khristopher, which H stands for | 24   A.  I didn't have an understanding. I didn't |
| 25   human, and I actually took a liking to that name. I  14:52 | 25   understand what his original understanding was.    14:55 |
| Page 391 | Page 393 |
| 1    liked H being. It sounded organic. It sounded | 1    Q.  Why didn't you go to the day of |
| 2    real, but it doesn't mean anything. It's a name | 2    transformation? |
| 3    that Khristopher came up. | 3    A.  Day of transformation, I believe, occurred |
| 4    Q.  He came up with it for what purpose? | 4    twice. It was one year -- it was probably 2010, and |
| 5    A.  I have no idea.                14:52 | 5    then the next year 2011 or '11 and '12. I didn't    14:56 |
| 6    MR. GAREEB: Objection as to the form of the | 6    feel the need to go. I don't remember. I was busy. |
| 7    question. It's vague and ambiguous. Calls for | 7    Q.  All right. Who is Justin at Bunzai Media? |
| 8    speculation. | 8    A.  He was working for Bunzai. He was managing |
| 9    THE WITNESS: I don't know. | 9    some department or -- he was an employee of Bunzai. |
| 10   BY MR. GAREEB:                    14:52 | 10   Q.  What was his job? What was his title?    14:57 |
| 11   Q.  What context was it thought up -- was the | 11   MR. UNGAR: Objection as to the form of the |
| 12   name H being thought up? | 12   question. It's vague and ambiguous. |
| 13   MR. UNGAR: Objection as to the form of the | 13   THE WITNESS: I don't remember. |
| 14   question. It's vague and ambiguous. It calls for | 14   BY MR. GAREEB: |
| 15   speculation.                     14:53 | 15   Q.  Well, I know he was an employee, but what    14:57 |
| 16   THE WITNESS: I really honestly don't know. To | 16   did he do for -- |
| 17   give you something -- sorry. I know. Maybe his | 17   MR. UNGAR: It's vague and ambiguous. |
| 18   first original name for Khristopher-ism was H being, | 18   MR. GAREEB: Can I finish my question, please? |
| 19   but it doesn't have any... | 19   BY MR. GAREEB: |
| 20   BY MR. GAREEB:                    14:53 | 20   Q.  What did Justin do for Bunzai Media Group?  14:57 |
| 21   Q.  And from 2010 to 2012 there was nothing | 21   A.  I don't recall. |
| 22   that Bunzai either marketed or developed as it | 22   Q.  What's his last name? |
| 23   pertained to H beings; is that correct? | 23   MR. UNGAR: Objection as to the form of the |
| 24   A.  Yes. | 24   question. It's vague and ambiguous. |
| 25   Q.  Now, I want to talk to you about the day of  14:53 | 25   THE WITNESS: I don't recall.                14:57 |
| Page 392 | Page 394 |

41 (Pages 391 - 394)

1　BY MR. GAREEB:
2　　Q.　When did he start working for Bunzai Media
3　Group?
4　　MR. UNGAR:　Objection as to the form of the
5　question.　It's vague and ambiguous.　　　　14:58
6　　THE WITNESS:　I don't know.
7　BY MR. GAREEB:
8　　Q.　When did he leave Bunzai Media Group?
9　　MR. UNGAR:　Same objection.　It's vague and
10　ambiguous as to the use of the phrase "he."　　14:58
11　BY MR. GAREEB:
12　　Q.　You do understand that this question we are
13　talking about Justin; correct?
14　　A.　Justin?
15　　Q.　Yeah.　　　　　　　　　　14:58
16　　A.　Yes.
17　　Q.　So you understand when I say "he" and "him"
18　in the context of Justin; correct?
19　　A.　Yes.
20　　Q.　So you don't know when he started, you　　14:58
21　don't know when he left, and you don't know what his
22　job title is.　Do you know what his job duties are?
23　　A.　I wasn't directly supervising him.　I
24　didn't hire him.　No, I'm not sure what he was
25　doing.　　　　　　　　　　　14:58
Page 395

1　　A.　I don't recall, but I believe he was being
2　managed by the customer service department.　So
3　maybe it had to do with that department.
4　　Q.　Let me ask you this, would Justin be a
5　manager or supervisor?　　　　　14:59
6　　A.　I don't know.
7　　Q.　What is Inside Paris?
8　　A.　I'm sorry.　I don't understand your
9　question.
10　　Q.　Do you know of a script called Inside　　15:00
11　Paris?
12　　A.　No.
13　　Q.　Did you ever have the e-mail address
14　Alon@mediaurge.com?
15　　A.　I did.　　　　　　　　　15:00
16　　Q.　Do you recall ever receiving a script
17　called Inside Paris?
18　　A.　A script?　Sounds kinky.　No, I don't.
19　　Q.　Do you know a person by the name of Dror,
20　D-r-o-r?　　　　　　　　　　15:02
21　　A.　I do.
22　　Q.　Who is that?
23　　A.　A friend of mine.
24　　Q.　Did you ever do business with Mr. Dror?
25　　A.　I did not.　I have not.　　　　15:02
Page 397

1　　Q.　How do you know him then?
2　　A.　I remember the name Justin.　It was one of
3　the people I said hi to.
4　　Q.　Was he younger or older?
5　　MR. UNGAR:　Objection as to the form of the　　14:58
6　question.　It's vague and ambiguous.
7　　THE WITNESS:　Younger.
8　BY MR. GAREEB:
9　　Q.　In his twenties?
10　　A.　May have been early 30s.　I'm not really　　14:59
11　sure.
12　　Q.　Do you know if Justin was part of the
13　design team?
14　　A.　He was not.
15　　Q.　Do you know if Justin was part of the　　14:59
16　shipping and receiving?
17　　A.　He was not.
18　　Q.　So as I understand it, the only thing
19　remaining for Bunzai is the call center.　So was he
20　part of the call center?　　　　14:59
21　　MR. UNGAR:　Objection as to the form of the
22　question vague and ambiguous.
23　　THE WITNESS:　He was not.
24　BY MR. GAREEB:
25　　Q.　Was he a customer service representative?　14:59
Page 396

1　　Q.　Do you recall a meeting on December 12,
2　2012, between Mr. Bond, yourself, Dawn Goddard, Iris
3　Castro, Leor Arazy, Nancy Yalley and Nastassia
4　Yalley?
5　　A.　Was Dror one of those people you mentioned　15:02
6　right now or no?
7　　Q.　Yes.
8　　A.　Do I recall it or was I part it?　Can you
9　repeat it.
10　　(The following record was read:)　　　15:03
11　"Q　Do you recall a meeting on December 12,
12　2012, between Mr. Bond, yourself, Dawn Goddard, Iris
13　Castro, Leor Arazy, Nancy Yalley and Nastassia
14　Yalley?"
15　　THE WITNESS:　No, I don't.　　　15:03
16　BY MR. GAREEB:
17　　Q.　Were you present at a meeting in which Dror
18　was present with Mr. Dawn Goddard, Iris Castro, Leor
19　Arazy, Nancy Yalley and/or Nastassia Yalley?
20　　A.　Could have been.　　　　15:03
21　　Q.　What would be the purpose of Dror having a
22　meeting with these individuals?
23　　A.　Dror -- based on my knowledge of what Dror
24　told me, he had a deal with Khristopher to develop a
25　product called NicoFix.　It was a gum for people who　15:03
Page 398

42 (Pages 395 - 398)

1  smoke. Dror was a poker player. He wanted the gum
2  while he was playing poker so he wouldn't have to
3  smoke. That's what I know. He had a meeting with
4  Khristopher to help market that.
5     Q.  Why was Pinnacle involved in these        15:04
6  meetings?
7     MR. UNGAR: Objection as to the form of the
8  question. It's vague and ambiguous. Calls for
9  speculation. Assumes facts not in evidence.
10    THE WITNESS: I have no idea.                   15:04
11 BY MR. GAREEB:
12    Q.  Why would Nastassia be part of this
13 meeting?
14    A.  I have no idea.
15    Q.  Why would Nancy Yalley be part of this     15:04
16 meeting?
17    MR. UNGAR: Objection as to the form of the
18 question. It's vague and ambiguous.
19    THE WITNESS: Nancy and Dawn were personal
20 assistants to Khristopher. They were there at every  15:04
21 meeting he had.
22 BY MR. GAREEB:
23    Q.  Why was Leor there?
24    MR. UNGAR: Objection as to the form of the
25 question. It's vague and ambiguous. Assumes facts  15:05

Page 399

1     question. It's vague and ambiguous. Calls for
2  speculation. Assumes facts not in evidence.
3     THE WITNESS: I have no idea.
4  BY MR. GAREEB:
5     Q.  I didn't understand your answer. I asked    15:06
6  you what was your answer. You said, "More of
7  Khristopher's dreams." My question is, what became
8  of this project where Dror was -- sorry. Go ahead.
9     MR. UNGAR: Objection as to the form of the
10 question. It's vague and ambiguous. It's          15:06
11 badgering. It's harassing. Calls for speculation.
12 Assumes facts not in evidence.
13    MR. GAREEB: Let me say one thing before you
14 answer. I have not once raised my voice. I have
15 not acted inappropriately. Not once have I ever     15:06
16 badgered. No. 2, badgering is a TV thing. It's not
17 a proper objection. And No. 3, in no way am I
18 meaning to harass you, burden you or even badger you
19 as your client [sic] says. I'm just trying to get
20 the information. What is badgering is, and I have    15:07
21 to say this on the record, is virtually every
22 question had an objection, and what that does is it
23 increases the cost of this transcript, which means
24 that I will be moving to get reimbursed for at least
25 a portion, if not all, of this transcript because of  15:07

Page 401

1  not in evidence.
2     THE WITNESS: I don't know.
3  BY MR. GAREEB:
4     Q.  Why would you be there?
5     MR. UNGAR: Objection as to the form of the      15:05
6  question. It's vague and ambiguous. Assumes facts
7  not in evidence.
8     THE WITNESS: I don't remember being there.
9  BY MR. GAREEB:
10    Q.  What ever became of this meeting, to your    15:05
11 knowledge?
12    MR. UNGAR: Objection as to the form of the
13 question. It assumes facts not in evidence. Calls
14 for speculation.
15    THE WITNESS: The same that became of most other  15:05
16 things.
17    MR. GAREEB: Can you please re-read.
18       (The following record was read:)
19 "A  The same that became of most other things."
20    MR. UNGAR: Same objection.                      15:05
21 BY MR. GAREEB:
22    Q.  Which is what?
23    A.  More of Khristopher's dreams.
24    Q.  Was it a project that Dror abandoned?
25    MR. UNGAR: Objection as to the form of the      15:06

Page 400

1     the improper objections. I'm only proceeding along
2  this deposition just to get the information. I'll
3  deal with the law and motion later.
4        That being said, Madam Court Reporter, can
5  you please re-read the question.                    15:07
6        (The following record was read:)
7  "Q  Was it a project that Dror abandoned?"
8     MR. UNGAR: Same objection.
9     THE WITNESS: I'm unaware.
10 BY MR. GAREEB:                                      15:08
11    Q.  So then why is it that you stated when I
12 asked you whatever happened to this project you said
13 Khristopher Bond's ideas, and I'm just trying to
14 find out why was this project abandoned?
15    MR. UNGAR: Objection as to the form of the      15:08
16 question. It's vague and ambiguous. Calls for
17 speculation. Assumes facts not in evidence. It is
18 harassing and as formed it is badgering.
19    THE WITNESS: I think we need Dror for that
20 particular answer. I don't know.                    15:08
21 BY MR. GAREEB:
22    Q.  Okay. Have you ever heard of the company
23 the Starco Group?
24    A.  I've heard that name.
25    Q.  You ever hear of Ross from the Starco       15:09

Page 402

43 (Pages 399 - 402)

**Page 403**

1  Group?
2  A.  Yes.
3  Q.  How do you know Ross from the Starco Group?
4  A.  Ross from the Starco Group is the friend
5  that I mentioned earlier in Vernon.        15:09
6  Q.  And you are talking about the bed bugs
7  project; correct?
8  A.  I know Ross for different reasons.  But
9  particularly for the bed bugs aerosol can.  Yes,
10  same guy.        15:09
11  Q.  How do you know Ross other than the bed
12  bugs project?
13  A.  He is a husband of a friend's sister.
14  Q.  Okay.  I think I understand you.  What was
15  Ross's role in the bed bugs project?        15:10
16  A.  He had no role.
17  Q.  Well, did you discuss with Ross anything
18  regarding the bed bugs project?
19  A.  The possibility of making it an aerosol.
20  Q.  Did Ross from the Starco Group want to do        15:10
21  this business with you regarding the bed bugs?
22  MR. UNGAR:  Objection as to the form of the
23  question.  It's vague and ambiguous.
24  THE WITNESS:  I don't think he would mind an
25  order but there was no real -- can you do it?  Yes,        15:11

**Page 404**

1  I can.  It's cheap.
2  BY MR. GAREEB:
3  Q.  Did it end up happening?
4  A.  No.
5  Q.  Okay.  Why not?        15:11
6  MR. UNGAR:  Objection as to the form of the
7  question.  It's vague and ambiguous.  It's not
8  understandable in the form presented.
9  THE WITNESS:  Just a product that we looked
10  into.  It didn't make sense.        15:11
11  BY MR. GAREEB:
12  Q.  You ever hear of Cosmetics DNA?
13  A.  Yes.
14  Q.  What is Cosmetics DNA?
15  A.  I believe it's a line -- a manufacturer out  15:11
16  of Israel.  He is the one that manufacturers that
17  line.  There is a manufacturer out of Israel that
18  manufactured that line.
19  Q.  Cosmetics DNA?
20  A.  Yeah.        15:12
21  Q.  What was the purpose of pursuing Cosmetics
22  DNA?
23  A.  I don't remember ever pursuing it.
24  Q.  Okay.  Were you interested in Cosmetic DNA?
25  MR. UNGAR:  Objection as to the form of the        15:12

**Page 405**

1  question.  It's vague and ambiguous.
2  THE WITNESS:  Cosmetics DNA had a particular --
3  in their marketing material that I read, they had
4  something interesting where a consumer would tell a
5  company their type of blood or their type of -- I        15:12
6  guess blood, and based on that blood type the
7  manufacturer would create shampoos and conditioners
8  and products that would fit to that particular
9  customer.  It was intriguing.
10  BY MR. GAREEB:        15:13
11  Q.  It sounds interesting, but you were looking
12  into it for what purpose?
13  A.  More stuff to market.
14  Q.  Okay.  All right.  Did Bunzai Media Group
15  ever market that Cosmetics DNA?        15:13
16  A.  They did not.
17  Q.  Okay.  Why not?
18  A.  It was again -- it wasn't an easy product
19  to bring to market.  It was regulations and going
20  through FDA.        15:13
21  Q.  By the way, in the cosmetics industry --
22  well, never mind.  That's more for edification.  I
23  don't want your lawyer to engage in all these
24  objections.
25  You ever hear of the product Aura Vie        15:13

**Page 406**

1  Regen, R-e-g-e-n?
2  A.  No.
3  Q.  You never heard of it?
4  A.  No.
5  Q.  Did Aura Vie provide an eye cream product?  15:14
6  A.  Yes.
7  Q.  What was the name of that eye cream
8  product?
9  A.  Now I understand what you mean.  It's
10  called Regen.  Aura Vie Regen.  I apologize.        15:14
11  Q.  No, it's my fault.  It's R-e-g-e-n?
12  A.  Yes.
13  Q.  What is Aura Vie Regen?
14  A.  It's an eye cream.
15  Q.  Okay.        15:14
16  A.  It's a cosmetic eye cream.
17  Q.  Is that a product that Bunzai Media Group
18  marketed?
19  MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous with regard to        15:15
21  the term "this" [sic].
22  BY MR. GAREEB:
23  Q.  We are referring to Aura Vie Regen.  When I
24  say "this" in the context, you understand it's Aura
25  Vie Regen; right?        15:15

44 (Pages 403 - 406)

ATTACHMENT A                    APP. 000112
                                Ex. 1

| | | |
|---|---|---|
| 1 | A. Yes. | |
| 2 | Q. Great. | |
| 3 | A. And yes. The answer to the question is | |
| 4 | yes. | |
| 5 | Q. Okay. So that is a product that Bunzai | 15:15 |
| 6 | Media Group marketed. | |
| 7 | A. Can we take a break? | |
| 8 | MR. GAREEB: We have been going over an hour, so | |
| 9 | you want to take a 10, 15-minute break? | |
| 10 | MR. UNGAR: Counsel, do you have a time estimate | 15:15 |
| 11 | as to how much longer you'll be with Mr. Nottea? | |
| 12 | Because as I told you in my letter, we have the PMK | |
| 13 | for Pinnacle on call right now. I just want to give | |
| 14 | him a sense as to when they should be expecting | |
| 15 | your -- | 15:16 |
| 16 | MR. GAREEB: Well, it's 3:15 right now. We are | |
| 17 | probably going to take a 10, 15-minute break right | |
| 18 | now, so that makes it 3:30. I have about an hour -- | |
| 19 | well, the problem is it depends. | |
| 20 | Are you going to keep objecting after every | 15:16 |
| 21 | question? If you are, then I can almost assure you | |
| 22 | we will not be done today. | |
| 23 | Although, I will say this, Mr. Nottea, we | |
| 24 | are going a lot faster than we did Friday, and I do | |
| 25 | appreciate that. | 15:16 |

Page 407

| | | |
|---|---|---|
| 1 | THE WITNESS: Ten minutes. | |
| 2 | MR. GAREEB: Yeah. | |
| 3 | (A brief recess was taken at 3:16 p.m.) | |
| 4 | BY MR. GAREEB: | |
| 5 | Q. Back on the record. We were talking about | 15:35 |
| 6 | Aura Vie Regen. Is this a -- is Aura Vie Regen, is | |
| 7 | that a product that Bunzai Media Group marketed? | |
| 8 | A. Yes. | |
| 9 | Q. Who was responsible for the text of the eye | |
| 10 | cream packaging? | 15:36 |
| 11 | A. The person usually responsible for any of | |
| 12 | that stuff is Khristopher. | |
| 13 | Q. Okay. Do you know if Dawn Goddard was | |
| 14 | responsible for the text of the eye cream packaging | |
| 15 | pertaining to Aura Vie Regen? | 15:36 |
| 16 | A. I have no idea. | |
| 17 | Q. Do you know -- so when you say you have no | |
| 18 | idea, is it possible? | |
| 19 | MR. UNGAR: It's vague and ambiguous. It calls | |
| 20 | for speculation. It assumes facts not in evidence. | 15:36 |
| 21 | It's argumentative. | |
| 22 | BY MR. GAREEB: | |
| 23 | Q. Now let me ask my question. So when you | |
| 24 | say you don't know, is it possible that Dawn Goddard | |
| 25 | edited the text for the eye cream packaging | 15:37 |

Page 408

| | | |
|---|---|---|
| 1 | pertaining to Aura Vie Regen? | |
| 2 | MR. UNGAR: Objection as to the form of the | |
| 3 | question. Vague and ambiguous. Calls for | |
| 4 | speculation. Assumes facts not in evidence, and | |
| 5 | it's augmentative. | 15:37 |
| 6 | THE WITNESS: Based on what I know, Khristopher | |
| 7 | wrote that. | |
| 8 | MR. GAREEB: Move to strike as nonresponsive. | |
| 9 | Can you re-read my question. | |
| 10 | (The following record was read:) | 15:37 |
| 11 | "Q. So when you say you don't know, is it | |
| 12 | possible that Dawn Goddard edited the text for the | |
| 13 | eye cream packaging pertaining to Aura Vie Regen?" | |
| 14 | MR. UNGAR: Same objection. | |
| 15 | THE WITNESS: I highly doubt that. | 15:38 |
| 16 | BY MR. GAREEB: | |
| 17 | Q. Do you recall ever sending her an e-mail | |
| 18 | asking her to review the text of the eye cream | |
| 19 | packaging pertaining to Aura Vie Regen Regen? | |
| 20 | MR. UNGAR: Objection as to the form of the | 15:38 |
| 21 | question. It's vague and ambiguous. Specifically | |
| 22 | with reference to the word "her." | |
| 23 | THE WITNESS: I don't remember that. | |
| 24 | BY MR. GAREEB: | |
| 25 | Q. Did you ever use the e-mail address | 15:38 |

Page 409

| | | |
|---|---|---|
| 1 | alon@mediaurge.com? | |
| 2 | A. We visited that, yes. | |
| 3 | Q. Did you ever do a small compliance audit on | |
| 4 | your current blogs? | |
| 5 | MR. UNGAR: Objection as to the form of the | 15:39 |
| 6 | question. It's vague and ambiguous. Assumes facts | |
| 7 | not in evidence. It calls for speculation. | |
| 8 | THE WITNESS: I don't understand your question. | |
| 9 | BY MR. GAREEB: | |
| 10 | Q. Okay. Did you ever have landing pages? | 15:39 |
| 11 | A. Yes. | |
| 12 | Q. What are landing pages? | |
| 13 | A. Websites. | |
| 14 | Q. Did you ever have a blog? | |
| 15 | A. No. | 15:39 |
| 16 | MR. UNGAR: Objection as to the form of the | |
| 17 | question. Vague and ambiguous. | |
| 18 | BY MR. GAREEB: | |
| 19 | Q. Who had landing -- some companies of yours | |
| 20 | had landing pages? | 15:40 |
| 21 | MR. UNGAR: Objection as to the form of the | |
| 22 | question. It's compound. It's also vague and | |
| 23 | ambiguous. | |
| 24 | THE WITNESS: Aura Vie had a landing page. | |
| 25 | BY MR. GAREEB: | 15:40 |

Page 410

45 (Pages 407 - 410)

| | |
|---|---|
| 1  Q.  Did Aura Vie also have a blog? | 1     Madam Court Reporter, can you please |
| 2  A.  No. | 2  re-read the last question. |
| 3  Q.  What is consumerlifestyletrends.com? | 3     (The following record was read:) |
| 4  A.  I don't recall. | 4     "Q  Did you ever send her complaints the FDA |
| 5  Q.  What is getmyAuraVie.com?        15:40 | 5  had to L'Oréal regarding the medical claims to    15:43 |
| 6  A.  I don't recall. | 6  review?" |
| 7  Q.  What is AuraVietrialkit.com? | 7     MR. UNGAR:  Objection as to the form of the |
| 8  A.  Sounds like a domain name. | 8  question.  It's vague and ambiguous. |
| 9  Q.  Do you know what it is? | 9     THE WITNESS:  Not that I recall. |
| 10    MR. UNGAR:  Objection as to the form of the    15:40 | 10  BY MR. GAREEB:                  15:44 |
| 11  question.  It's vague and ambiguous specifically | 11    Q.  Did you ever ask her to look through the |
| 12  with reference to the use of the word "this" [sic]. | 12  blogs and notice language that is used to entice |
| 13    THE WITNESS:  I need you to read the question | 13  customers to order the product? |
| 14  for me. | 14    MR. UNGAR:  Objection as to the form of the |
| 15     (The following record was read:)     15:41 | 15  question.  It's vague and ambiguous.         15:44 |
| 16  "Q  Do you know what it is?" | 16    THE WITNESS:  I don't have a recollection of |
| 17    MR. GAREEB:  I'll withdraw. | 17  that. |
| 18  BY MR. GAREEB: | 18  BY MR. GAREEB: |
| 19    Q.  Do you know what www.AuraVietrialkit.com | 19    Q.  Did you ever tell her, let's work on other |
| 20  is?                         15:41 | 20  optimizations and ways that we can do this?     15:44 |
| 21  A.  Sounds like a landing page. | 21    MR. UNGAR:  Objection as to the form of the |
| 22  Q.  Is that a landing page that Bunzai Media | 22  question.  It's vague and ambiguous.  Specifically |
| 23  Group developed? | 23  with regard to the use of the word "her." |
| 24  A.  I don't know. | 24    THE WITNESS:  No. |
| 25  Q.  How about www.feelAuraVie.com?  Are you    15:41 | 25  BY MR. GAREEB:                  15:44 |
| Page 411 | Page 413 |

| | |
|---|---|
| 1  familiar with that particular address? | 1    Q.  Ever have any discussions with Mr. Bond |
| 2  A.  No. | 2  about a review of the current blog and landing pages |
| 3  Q.  Do you know if Bunzai Media Group developed | 3  to ensure there is no language regarding medical |
| 4  that particular address? | 4  claims of a product? |
| 5  A.  I'm not sure.            15:42 | 5  A.  Yes.                    15:45 |
| 6  Q.  Ever hear of www.tryAuraVie.com? | 6  Q.  Did you guys ever discuss it? |
| 7  A.  No. | 7  A.  Medical claims? |
| 8  Q.  Did you ever hear of www.getmyAuraVie.com? | 8  Q.  The -- to review all the blog and landing |
| 9  A.  No. | 9  pages pertaining to medical claims that the product |
| 10  Q.  Do you ever ask Dawn Goddard to do a small   15:42 | 10  made or marketed?                15:45 |
| 11  compliance audit on your current blogs landing | 11    MR. UNGAR:  Objection as to the form of the |
| 12  pages? | 12  question.  It's vague and ambiguous. |
| 13  A.  Not that I can recall. | 13    THE WITNESS:  I don't understand the question. |
| 14  Q.  Did you ever send her complaints the FDA | 14  BY MR. GAREEB: |
| 15  had to L'Oréal regarding the medical claims to    15:43 | 15    Q.  Well, you said that you had a discussion    15:46 |
| 16  review? | 16  with Mr. Bond about current blogs and landing pages |
| 17    MR. UNGAR:  Objection as to the form of the | 17  and what language was used; correct? |
| 18  question.  It's vague and ambiguous. | 18    MR. UNGAR:  Objection as to the form.  The |
| 19    THE WITNESS:  Regarding L'Oréal you said; right? | 19  question in its current form is vague and ambiguous. |
| 20  BY MR. GAREEB:                  15:43 | 20  It also misstates the testimony.         15:46 |
| 21  Q.  Yes. | 21    THE WITNESS:  That's not what I said. |
| 22  A.  I think Dawn tried to bring that to my | 22  BY MR. GAREEB: |
| 23  attention.  If I remember correctly, Dawn sent me | 23    Q.  What did you say? |
| 24  something about L'Oréal. | 24    MR. UNGAR:  Objection as to the form of the |
| 25    MR. GAREEB:  Move to strike nonresponsive.    15:43 | 25  question.  It's argumentative.  It's vague and    15:46 |
| Page 412 | Page 414 |

46 (Pages 411 - 414)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000114
Ex. 1

1    ambiguous.
2        THE WITNESS:  Do you have a question for me?
3    BY MR. GAREEB:
4        Q.  Yeah.
5        A.  What is it?                     15:46
6        Q.  I just asked it.
7        A.  What did you say?
8        MR. GAREEB:  Madam Court Reporter.
9        (The following record was read:)
10   "Q  Well, you said that you had a discussion     15:46
11   with Mr. Bond about current blogs and landing pages
12   and what language was used; correct?"
13       THE WITNESS:  No.
14   BY MR. GAREEB:
15       Q.  Did you ever have a discussion with     15:47
16   Mr. Bond about doing a compliance audit on your
17   current blogs and landing pages?
18       A.  Yes.
19       Q.  What did you guys discuss?
20       A.  I discussed that I want to make sure that  15:47
21   everything -- all landing pages and websites are
22   within compliance, and I referred him to take a look
23   and give me his opinion.  See if there is any
24   issues.
25       Q.  Which landing pages are you referring to?  15:47
                                             Page 415

1        A.  I don't recall.
2        Q.  What websites were you referring to?
3        A.  I don't recall.
4        Q.  Was it the Aura Vie website?
5        A.  Aura Vie website, yes.            15:47
6        Q.  Bunzai Media Group website?
7        A.  Not really, no.
8        Q.  What do you mean not really?
9        A.  Not the Bunzai Media Group website.
10       Q.  Okay.  But Aura Vie?              15:48
11       A.  Yes.
12       Q.  Anything else?
13       MR. UNGAR:  Objection as to the form of the
14   question.  It's vague and ambiguous.
15       BY MR. GAREEB:                        15:48
16       Q.  Any other websites?
17       A.  No.
18       Q.  What do you recall about complaints to the
19   FDA regarding the L'Oréal medical claims on their
20   websites?                               15:48
21       A.  I don't recall.
22       Q.  Did you ever send a flyer to Dawn Goddard
23   asking her to discuss it -- discuss the flyer with
24   Khris and come up with the best marketable way to
25   present to your six-month customers in order to     15:49
                                             Page 416

1    bring them back and have them sign up for an
2    additional six months.  Do you remember that?
3        MR. UNGAR:  Objection to the form of the
4    question.  It's vague and ambiguous.
5        THE WITNESS:  No.                     15:49
6    BY MR. GAREEB:
7        Q.  Do you know who Ingrid Aguilar is?
8        A.  No.
9        Q.  How about Andrew Alvarado?
10       A.  Andrew.  I believe Andrew was a guy from  15:49
11   shipping, but I'm not sure.
12       Q.  For which company?
13       A.  I -- I -- I don't remember.
14       Q.  You said Leor Arazy, she was an employee of
15   Bunzai Media Group; right?              15:50
16       A.  Yes.
17       Q.  How about Victor Azal, also employee of
18   Bunzai Media Group?
19       A.  Yes.
20       Q.  How about Mynor, M-y-n-o-r, Blanco?     15:50
21       A.  Mynor was in the warehouse.
22       Q.  Of Bunzai Media Group; right?
23       A.  Yes.
24       Q.  Cassandra Brugh, B-r-u-g-h?
25       A.  I'm not aware of that person.       15:50
                                             Page 417

1        Q.  Avear, A-v-e-a-r, Kerry, K-e-r-r-y.  Do you
2    know who that person is?
3        A.  She -- yes, I think I met her a couple
4    times.
5        Q.  And she was also an employee of Bunzai  15:51
6    Media Group; right?
7        A.  I'm not sure if she was an employee of
8    Bunzai.
9        Q.  Where did you meet her?
10       A.  She was an agent.  Customer service rep.  15:51
11   I'm not sure she was under Bunzai.
12       Q.  As opposed to who?
13       A.  Pinnacle.
14       Q.  Okay.  Jacquelyn, Karroll, K-a-r-r-o-l-l.
15   Who is that individual, to your knowledge?     15:51
16       A.  I believe she was part of the customer
17   service group.
18       Q.  Of Bunzai Media Group?
19       A.  I think so.
20       Q.  Gabriel Castillo, C-a-s-t-i-l-l-o.  Do you  15:51
21   know that individual?
22       A.  I don't recall that individual.
23       Q.  Iris Castro.  That was an employee of
24   Bunzai Media Group; right?
25       MR. UNGAR:  Objection as to the form of the   15:52
                                             Page 418

                                   47 (Pages 415 - 418)

1  question. It's vague and ambiguous. Misstates
2  previous testimony of the witness.
3     THE WITNESS: I don't remember Iris.
4  BY MR. GAREEB:
5     Q. Beatriz, B-e-a-t-r-i-z, last word, Chaidez,   15:52
6  C-h-a-i-d-e-z. Do you know that individual?
7     A. I don't remember her.
8     Q. Andre Collier, C-o-l-l-i-e-r. Who is that
9  individual?
10    A. I have no idea.   15:52
11    Q. Jaquita, J-a-q-u-i-t-a, Fizer, F-i-z-e-r.
12 Do you know who that individual is?
13    A. Not to my knowledge.
14    Q. Joel Garcia. Do you know who that
15 individual is?   15:52
16    A. Yes.
17    Q. Who is that?
18    A. Call center agent.
19    Q. Employed by whom?
20    A. I believe he was back in the Bunzai days.   15:53
21    Q. Moses Garcia. Do you know that individual?
22    A. I believe so.
23    Q. Who is Mr. Moses Garcia?
24    A. I think he was part of the fulfillment
25 department.   15:53
                               Page 419

1     Q. Matan Gil [sic]. We have mentioned that
2  name before. M-a-t-a-n, last name Gil, G-i-l. Do
3  you know that individual?
4     A. By the way, it's Gal. And, yeah, I know
5  him.   15:55
6     Q. I'm sorry. Gal. Isn't it a fact that
7  Matan Gal worked for Bunzai Media Group?
8     A. Yes.
9     Q. Victor Godoy, G-o-d-o-y. Do you know that
10 individual?   15:55
11    A. I think I recall Victor.
12    Q. And Victor was also employed by Bunzai
13 Media Group?
14    A. I believe so.
15    Q. Lucy Gyulyan, G-y-u-l-y-a-n. Do you know   15:55
16 that individual?
17    A. I don't believe so.
18    Q. Okay. Diane Hernandez. Do you know that
19 individual?
20    A. There was a Diana.   15:56
21    Q. And that Diana was employed by Bunzai Media
22 Group?
23    A. I don't recall if she was part of the
24 Bunzai team or simply started -- I don't recall.
25    Q. Michael Hidalgo?   15:56
                               Page 421

1     Q. Of Bunzai Media Group?
2     A. I believe so.
3     Q. Gabriela Galeano, G-a-l-e-a-n-o. Do you
4  know that individual?
5     A. Yes.   15:53
6     Q. Who is Gabriela Galeano?
7     A. She was also customer service department.
8     Q. For Bunzai Media Group?
9     A. I believe so.
10    Q. Do you know an individual by the name of   15:53
11 Patrick Gatbonton, G-a-t-b-o-n-t-o-n?
12    A. There were two Pats. I don't know the last
13 names. So it's confusing. There were two Patricks.
14 So I have to say no.
15    Q. Both these Patricks that you're referring   15:54
16 to, were they employees of Bunzai Media Group?
17    A. Yes.
18    Q. Laura Getten, G-e-t-t-e-n. Do you know
19 that individual?
20    A. Yes.   15:54
21    Q. Who is that individual?
22    A. She was also working -- I don't remember
23 where she was working.
24    Q. Was she employed by Bunzai Media Group?
25    A. I don't believe so.   15:55
                               Page 420

1     A. No.
2     Q. John Ibarra, I-b-a-r-r-a. Do you know that
3  individual?
4     A. No.
5     Q. Sean Inniss, I-n-n-i-s-s?   15:56
6     A. Yes.
7     Q. Who is that?
8     A. He was in charge of some quality control in
9  the warehouse, in the shipping department.
10    Q. Shipping department of Bunzai Media Group?   15:56
11    A. Yes.
12    Q. Okay. Shermaine, S-h-e-r-m-a-i-n-e,
13 Jackson. Do you know that person?
14    A. No.
15    Q. Next person is Chadne, C-h-a-d-n-e, last   15:57
16 name Kidd, K-i-d-d. Do you know that individual?
17    A. Yes.
18    Q. Who was that?
19    A. She was also an agent, I believe.
20    Q. For Bunzai Media Group?   15:57
21    A. I believe so.
22    Q. Okay. Aaron Krolczyk. A-a-r-o-n.
23    A. Yeah.
24    Q. Last name is K-r-o-l-c-z-y-k. Do you know
25 that individual?   15:57
                               Page 422

                               48 (Pages 419 - 422)

ATTACHMENT A
APP. 000116
Ex. 1

| | |
|---|---|
| 1  A. Yes. | 1  Q. Evette Nakaya, N-a-k-a-y-a. |
| 2  Q. Who is Aaron? | 2  A. Don't know her either. |
| 3  A. He was also in customer service. | 3  Q. Luam, L-u-a-m, Ozmon. Do you know that |
| 4  Q. For Bunzai Media Group; correct? | 4  individual? |
| 5  A. Yes.                    15:57 | 5  A. Luam. I heard that name. May have been    16:00 |
| 6  Q. Matthew Livingston. Do you know that | 6  call center. That's what I remember. |
| 7  individual? | 7  Q. Call center for Bunzai Media Group? |
| 8  A. No. | 8  A. I can't recall. |
| 9  Q. It's either Jorge or George. It's | 9  Q. Patrick Raffin, R-a-f-f-i-n. Do you know |
| 10  J-o-r-g-e, Magana, M-a-g-a-n-a. Do you know that  15:58 | 10  that individual?                    16:00 |
| 11  individual? | 11  A. Yes. |
| 12  A. I do. | 12  Q. Who was that? |
| 13  Q. Who is that person? | 13  A. All center agent. |
| 14  A. He manages the warehouse. | 14  Q. For Bunzai Media Group? |
| 15  Q. For Bunzai Media Group; correct?    15:58 | 15  A. Yes.                    16:00 |
| 16  A. Correct? | 16  Q. Tyler Reitenbach, R-e-i-t-e-n-b-a-c-h. Do |
| 17  Q. You mentioned this name before Andree | 17  you know that individual? |
| 18  Monsieur. He was also employed by Bunzai Media | 18  A. Yes. |
| 19  Group; correct? | 19  Q. Who is that? |
| 20  A. Yes.                    15:58 | 20  A. He was another agent.              16:00 |
| 21  Q. Gregg, G-r-e-g-g, Mazzy, M-a-z-z-y. Do you | 21  Q. On behalf of Bunzai Media Group? |
| 22  know that individual? | 22  A. I don't recall. |
| 23  A. Yes. | 23  Q. Feliberto, F-e-l-i-b-e-r-t-o, Ribas, |
| 24  Q. Who is that individual? | 24  R-i-b-a-s. Do you know that individual? |
| 25  A. He is a guy who does -- he validated    15:58 | 25  A. Yes.                    16:01 |
| Page 423 | Page 425 |

| | |
|---|---|
| 1  addresses from home. He is a guy that does address | 1  Q. Who is that individual? |
| 2  validation. | 2  A. I just recall the name. I don't remember |
| 3  Q. On behalf of Bunzai Media Group; correct? | 3  from where, so I guess I have to take that one back. |
| 4  A. Yes. | 4  I don't remember. |
| 5  Q. Paul Medina. Do you know that individual?  15:59 | 5  Q. Sandra Rubio. Do you know that individual?  16:01 |
| 6  A. Yes. | 6  A. Yes. |
| 7  Q. Who is that? | 7  Q. Who was that? |
| 8  A. He was in the marketing department. | 8  A. Another customer service agent for Bunzai |
| 9  Q. Of Bunzai Media Group? | 9  Media. |
| 10  A. Yes.                    15:59 | 10  Q. Got it. Chris Roth. Do you know that    16:01 |
| 11  Q. Sorry. It's getting very -- I'm trying to | 11  individual? |
| 12  rush this. David Magdal, M-a-g-d-a-l. Do you know | 12  A. I'm trying to pinpoint that face. No, I |
| 13  that individual? | 13  don't. |
| 14  A. Yes. | 14  Q. Erik, with a K, Rutiaga, R-u-t-i-a-g-a? |
| 15  Q. Who is Mr. Magdal?                15:59 | 15  A. I don't recall that name.          16:02 |
| 16  A. He was a business acquaintance. | 16  Q. How about Jorge or George, with a J, |
| 17  Q. Did he provide any services to Bunzai Media | 17  Rutiaga, R-u-t-i-a-g-a? |
| 18  Group? | 18  A. Same last name? |
| 19  A. No. | 19  Q. Yep. There is an Erik with a K, and a |
| 20  Q. How do you know Mr. Magdal?          15:59 | 20  Jorge with a J.                    16:02 |
| 21  A. I don't recall how I know him. I don't | 21  A. Those names sound familiar, but I can't |
| 22  recall. | 22  pinpoint exactly where. |
| 23  Q. Monica Miranda. Do you know that | 23  Q. Okay. How about this individual. Geiner, |
| 24  individual? | 24  G-e-i-n-e-r, Samayoa, S-a-m-a-y-o-a. Do you know |
| 25  A. No.                    16:00 | 25  that individual?                    16:02 |
| Page 424 | Page 426 |

49 (Pages 423 - 426)

1    A.  Yes.
2    Q.  And how do you know Mr. Samayoa?
3    A.  He was from the warehouse.  I'm just not
4  sure how long I've known him.
5    Q.  Well, I'm not asking how long.          16:03
6    A.  I'm thinking to myself, sorry.
7    Q.  And he was at the warehouse of Bunzai Media
8  Group?
9    A.  That's what I'm saying.  I don't really
10  know if it was post-Bunzai.  I'm not really sure.   16:03
11    Q.  Okay.  Leticia Sanchez.  Do you know that
12  individual?
13    A.  No.
14    Q.  Derek Smith.  Do you know that individual?
15    A.  No.                                      16:03
16    Q.  Patricia Smith.  Do you know that
17  individual?
18    A.  No.
19    Q.  Do you know a person by the name of Liyalu,
20  L-i-y-a-l-u, Sprauge, S-p-r-a-u-g-e?           16:03
21    A.  No.
22    Q.  Andrew Stanley.  Do you know that
23  individual is?
24    A.  Yes.
25    Q.  Who was that?                            16:04

Page 427

1    A.  He was also in the customer service
2  department and worked for Bunzai.
3    Q.  Daisy Sallano.  Do you know that
4  individual?
5    A.  I recall the name.  I don't remember what   16:04
6  she did.  It was a name that was in the document
7  somewhere.
8    Q.  Okay.  And was she employed by Bunzai Media
9  Group?
10    A.  I can't say.                             16:04
11    Q.  Ashley Taira, T-a-i-r-a.  Do you know that
12  individual?
13    A.  I don't.
14    Q.  Julio Telon, T-e-l-o-n.  Do you know that
15  individual?                                    16:04
16    A.  Yes.
17    Q.  Who is that?
18    A.  It's a guy whose been with me in the
19  warehouse.  He was in the warehouse.
20    Q.  Of Bunzai?                               16:04
21    A.  He was with me for a lot of years before
22  so, yeah, probably.
23    Q.  I think it's Tiesha, T-i-e-s-h-a, Thomas.
24  Do you know that individual?
25    A.  No.                                      16:05

Page 428

1    Q.  Tiffany Williams?
2    A.  No.
3    Q.  Regina Woods.  Do you know that individual?
4    A.  No.
5    Q.  Cruising along.  It's great.  Mr. Nottea,   16:05
6  I'm going to ask you a couple questions about your
7  relationship with the plaintiffs.
8        When did you first meet Dawn Goddard?
9    A.  The day Khristopher hired her.
10    Q.  And where did you meet her?              16:06
11    A.  At 7900 Gloria Avenue in Van Nuys.
12    Q.  And when you were introduced to Ms.
13  Goddard, how were you introduced to her?
14    A.  Khristopher came out of his office with her
15  and just basically introduced her to every single   16:07
16  person.  This is going to be my personal assistant.
17  She's going to be helping me out.  She's going to be
18  coming with me in the morning.  And he introduced
19  her to every single person.
20    Q.  And what was explained to you what her job   16:07
21  duties were?
22    A.  She -- it wasn't really explained to me
23  what her duties were besides personal assistant and
24  taking care of some things for Khris.
25    Q.  Taking care of things for Khris like what?   16:07

Page 429

1    MR. UNGAR:  Objection as to the form of the
2  question.  Vague and ambiguous.  Calls for
3  speculation.  Assumes facts not in evidence.
4    THE WITNESS:  I don't know.
5  BY MR. GAREEB:                                  16:08
6    Q.  Is it do his laundry?
7    MR. UNGAR:  Objection as to the form of the
8  question.  It's vague and ambiguous.
9    THE WITNESS:  Maybe.  I don't know.  It would be
10  best for Khristopher to answer that.            16:08
11  BY MR. GAREEB:
12    Q.  I tend to agree with you.  My question to
13  you, though, is did she ever work on any projects
14  with Dawn Goddard?
15    MR. UNGAR:  Objection as to the form of the   16:08
16  question.  It's vague and ambiguous.
17    THE WITNESS:  No.
18  BY MR. GAREEB:
19    Q.  Would it surprise you to learn that there
20  were e-mails that were sent to her by you to ask her   16:08
21  to do stuff for you?
22    A.  It would surprise me, yes.
23    Q.  Would it also surprise you to learn that it
24  was Dawn Goddard who responded to the customer
25  complaints pertaining to the Aura Vie products?   16:09

Page 430

50 (Pages 427 - 430)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000118
Ex. 1

1    MR. UNGAR: Objection as to the form of the
2    question. It's vague and ambiguous. Calls for
3    speculation and assumes facts not in evidence and
4    it's argumentative.
5        THE WITNESS: It would surprise me.        16:09
6    BY MR. GAREEB:
7        Q. Would it surprise you to learn that Dawn
8    Goddard wrote multiple letters responsive to
9    customers' complaining about Aura Vie products?
10       MR. UNGAR: Objection as to the form of the    16:09
11   question. Assumes facts not in evidence. Calls for
12   speculation. It's an improper hypothetical and
13   argumentative.
14       THE WITNESS: Absolutely it would surprise me.
15       MR. GAREEB: Let's show you then. I'm going to   16:10
16   hand you what we will mark as Exhibit 2.
17   (Deposition Exhibit 2, compilation of complaint
18   response letters, was marked for identification and
19   is attached hereto.)
20       MR. UNGAR: Do you have a copy for counsel?    16:10
21       MR. GAREEB: You can share it.
22       MR. UNGAR: Do you have a copy for counsel?
23       MR. GAREEB: You can share it.
24       Will you please read it. When you are
25   done, look up at me, and I'll have some questions    16:11
                                                    Page 431

1    for you.
2        THE WITNESS: I don't understand this document.
3    BY MR. GAREEB:
4        Q. I'm not asking you questions yet. On the
5    bottom there it says "Aura Vie." Do you see that?   16:12
6        A. Yes.
7        Q. That's the logo for Aura Vie; correct?
8        MR. UNGAR: Objection as to the form of the
9    question. It's vague and ambiguous.
10       THE WITNESS: It looks similar to it, yes.    16:12
11   BY MR. GAREEB:
12       Q. And this appears to be a complaint
13   regarding Aura Vie skin care product; correct?
14       MR. UNGAR: Objection as to the form of the
15   question. It's vague and ambiguous. Calls for    16:13
16   speculation. Assumes facts not in evidence.
17       THE WITNESS: It appears to be.
18   BY MR. GAREEB:
19       Q. And it also appears to be a response by an
20   Aura Vie customer complaining about an Aura Vie    16:13
21   product; correct?
22       MR. UNGAR: Objection as to the form of the
23   question. It's vague and ambiguous. Assumes facts
24   not in evidence. Misstates the document.
25       THE WITNESS: I didn't understand your question.   16:13
                                                    Page 432

1        MR. GAREEB: Madam Court Reporter.
2        (The following record was read:)
3        "Q   And it also appears to be a response by an
4    Aura Vie customer complaining about an Aura Vie
5    product; correct?"                          16:13
6        MR. UNGAR: Same objections.
7        THE WITNESS: It doesn't seem to be a response.
8    BY MR. GAREEB:
9        Q. I'm going to turn your attention to -- see
10   where it says "complaint ID"?                16:13
11       A. I do.
12       Q. And it says, "Hal Beverage." Do you see
13   that?
14       A. Yes.
15       Q. And it says, "836 Pennsylvania Street." Do   16:14
16   you see that?
17       A. I do.
18       Q. "Valley, California." Do you see that?
19       A. I do.
20       Q. And right below it says, "Response." Do   16:14
21   you see that?
22       MR. UNGAR: Objection as to the form of the
23   question. It's vague and ambiguous. It's not
24   understandable in the form presented.
25       THE WITNESS: I see the word response.        16:14
                                                    Page 433

1    BY MR. GAREEB:
2        Q. Okay. And on the very bottom it references
3    the name of Dawn Goddard; correct?
4        A. That's correct.
5        Q. Signifying that that's the author of this   16:14
6    document; correct?
7        MR. UNGAR: Objection as to the form of the
8    question. It's vague and ambiguous. Assumes facts
9    not in evidence. Calls for speculation.
10   Argumentative.                              16:14
11       THE WITNESS: This document doesn't seem
12   legitimate to me.
13   BY MR. GAREEB:
14       Q. What is it that's not legitimate?
15       MR. UNGAR: Objection as to the form of the    16:14
16   question. It's argumentative.
17       THE WITNESS: It doesn't seem like an Aura Vie
18   response.
19   BY MR. GAREEB:
20       Q. I know. I'm asking you what's the basis of   16:15
21   your opinion there?
22       A. There is no website where the product was
23   ordered. There is -- it doesn't seem like an
24   internal document.
25       Q. Well, it does show in the second to last   16:15
                                                    Page 434

51 (Pages 431 - 434)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

APP. 000119
Ex. 1

**Page 435**

```
 1   paragraph there is a reference to the transaction
 2   ID; correct?  Do you see that?
 3      A.  I do.
 4      MR. UNGAR:  Objection as to the form of the
 5   question.  Assumes facts not in evidence.      16:15
 6   BY MR. GAREEB:
 7      Q.  Let me ask you, did you have any responses
 8   to complaints to customers who complained about Aura
 9   Vie products?
10      MR. UNGAR:  Objection as to the form of the    16:15
11   question.  It's vague and ambiguous.  It's an
12   improper hypothetical.  Assumes facts not in
13   evidence.  Calls for speculation.
14      THE WITNESS:  I don't understand your question.
15      MR. GAREEB:  Madam Court Reporter.            16:15
16         (The following record was read:)
17      "Q  Let me ask you, did you have any responses
18   to complaints to customers who complained about Aura
19   Vie products?"
20      MR. UNGAR:  Same objections.                  16:16
21      THE WITNESS:  Not here at this time.
22   BY MR. GAREEB:
23      Q.  So is there a format that Aura Vie used to
24   respond to customer complaints?
25      A.  There was a format of how Aura Vie         16:16
```

**Page 436**

```
 1   represented itself, period.  Not necessarily for
 2   complaints.  This document doesn't look like it.
 3      Q.  It doesn't look like what?
 4      A.  Like an Aura Vie document.
 5      Q.  Well, that's what I'm asking you.  I'm     16:16
 6   asking you do you have a standard letter or standard
 7   format of a letter in which you respond to Aura Vie
 8   customer complaints?
 9      MR. UNGAR:  Objection as to the form of the
10   question.  It's compound.  It's vague and ambiguous.  16:16
11   Calls for speculation.
12      THE WITNESS:  There is not one standard format,
13   no.
14   BY MR. GAREEB:
15      Q.  Okay.  Turning your attention now to       16:17
16   Exhibit 3.
17         Actually, I'm going to -- all these
18   discussions we're having right now about customer
19   complaints related to Aura Vie products, I'm going
20   to mark all these subsequent documents collectively  16:18
21   as Exhibit 2.
22         Counsel, any objection?
23      MR. UNGAR:  I don't know.  I haven't seen the
24   documents so I reserve the objection.
25      MR. GAREEB:  Counsel, I just handed you the rest  16:19
```

**Page 437**

```
 1   of the documents.
 2      MR. UNGAR:  Thank you.
 3      MR. GAREEB:  Any objection?
 4      MR. UNGAR:  I haven't looked at the documents
 5   yet.  I will, and when I do, I'll let you know.      16:19
 6      MR. GAREEB:  Okay.  Want to take a break or
 7   should I proceed?
 8      MR. UNGAR:  You should proceed if you more
 9   questions.
10   BY MR. GAREEB:                                     16:19
11      Q.  Are you done reviewing the letter I just
12   handed you?
13      A.  The first one.  Yes, sir, I am.
14      Q.  You testified earlier that Aura Vie skin
15   care's mailing address is 16161 Ventura Boulevard,   16:19
16   Suite 376 in Encino; correct?
17      A.  I believe so.
18      Q.  And that's referenced on the top of this
19   document that's Bates labeled plaintiff Goddard
20   000325?                                             16:19
21      A.  Yes.
22      Q.  And just below it, it has a complaint ID
23   number.  Do you see that?
24      A.  I do.
25      Q.  It appears the customer is a Tamlie Kepler  16:20
```

**Page 438**

```
 1   from Ohio.  Do you see that?
 2      A.  I do.
 3      Q.  And right below it, it says, "response."
 4      A.  I do.
 5      Q.  And right below that is a response to a    16:20
 6   complaint that Ms. Kepler had regarding the Aura Vie
 7   product; correct?
 8      MR. UNGAR:  Objection as to the form of the
 9   question.  It's vague and ambiguous.  Calls for
10   speculation.  Assumes facts not in evidence.        16:20
11      THE WITNESS:  I'm not sure.
12   BY MR. GAREEB:
13      Q.  I'm asking you about the letter.  Doesn't
14   the letter -- the content of the letter refer to a
15   response to a complaint of Ms. Kepler's?            16:20
16      MR. UNGAR:  Objection as to the form of the
17   question.  It's vague and ambiguous.  Assumes facts
18   not in evidence.  Calls for speculation.
19      THE WITNESS:  My answer is no.
20   BY MR. GAREEB:                                     16:21
21      Q.  What is this a response to then?
22      MR. UNGAR:  Objection as to the form of the
23   question.  It's vague and ambiguous, and it's
24   argumentative.
25      THE WITNESS:  The first thing I saw was        16:21
```

52 (Pages 435 - 438)

**Page 451**

1  MR. UNGAR: Objection as to the form of the
2  question. Assumes facts not in evidence. Calls for
3  speculation.
4  THE WITNESS: Yes.
5  BY MR. GAREEB:                         16:42
6  Q. Below that it references a response?
7  A. It does.
8  Q. And below that it appears to be a response
9  to a complaint submitted by -- a response to
10 complaint ID No. 1217176?                16:43
11 MR. UNGAR: Objection as to the form of the
12 question. It's vague and ambiguous. Calls for
13 speculation. Assumes facts not in evidence.
14 THE WITNESS: It appears to be, yes.
15 BY MR. GAREEB:                         16:43
16 Q. Turning your attention to PLTF Goddard
17 000337.
18 A. I'm there.
19 Q. On the upper left-hand corner it references
20 Aura Vie Skin Care 16161 Ventura Boulevard, Suit   16:43
21 378, Encino?
22 A. Yes.
23 Q. Below that it references complaint ID No.
24 212944?
25 A. Yes.                                16:43

**Page 452**

1  Q. And that appears to be a complaint that was
2  submitted by a Sharyn, S-h-a-r-y-n, Ward of Salmon,
3  Idaho.
4  MR. UNGAR: Objection as to the form of the
5  question. Calls for speculation. Assumes facts not  16:43
6  in evidence. Vague and ambiguous.
7  THE WITNESS: Yes.
8  BY MR. GAREEB:
9  Q. And below that it references a response?
10 A. Yes.                                16:44
11 Q. Below that it appears to be a response to
12 complaint ID No. 212944?
13 MR. UNGAR: Objection as to the form of the
14 question. It's vague and ambiguous. Calls for
15 speculation. Assumes facts not in evidence.         16:44
16 THE WITNESS: It appears to be, yes.
17 BY MR. GAREEB:
18 Q. Finally turning your attention to PLTF
19 Goddard 000344.
20 A. Yes.                                16:44
21 Q. It references in the upper left-hand corner
22 Aura Vie Skin Care 16161 Ventura Boulevard, Suit
23 378, Encino?
24 A. Yes, it does.
25 Q. And then below that it references complaint  16:44

**Page 453**

1  ID No. 1210961?
2  A. Yes.
3  Q. That appears to be a complaint submitted by
4  Linda Vaitsas, V-a-i-t-s-a-s, of Greensboro, North
5  Carolina?                              16:44
6  MR. UNGAR: Objection as to the form of the
7  question. Vague and ambiguous. Assumes facts not
8  in evidence. Calls for speculation.
9  THE WITNESS: It appears to be.
10 BY MR. GAREEB:                         16:45
11 Q. And below that it references a response?
12 A. It appears to say that, yes.
13 Q. And below that appears to be a response to
14 complaint ID No. 1210961; correct?
15 MR. UNGAR: Objection as to the form of the   16:45
16 question. Vague and ambiguous. Calls for
17 speculation. Assumes facts not in evidence.
18 THE WITNESS: Again, in a different font than
19 before, but yes, it does appear to be.
20 MR. GAREEB: I'm going to hand you what I'll   16:45
21 mark as Exhibit 3.
22 (Deposition Exhibit 3, e-mail thread dated April 26,
23 2013 from Ms. Foster to Mr. Bond, was marked for
24 identification and is attached hereto.)
25 THE WITNESS: Okay.                     16:47

**Page 454**

1  BY MR. GAREEB:
2  Q. Who is Business Consumer Alliance?
3  A. I don't understand your question.
4  Q. What is Business Consumer Alliance?
5  A. I don't know.                       16:47
6  Q. Have you ever heard of Business Consumer
7  Alliance?
8  A. No.
9  Q. Do you know a LaTrisha Foster?
10 A. No.                                 16:48
11 Q. Plaintiff Goddard 000086, which we attached
12 as Exhibit 3, it appears to be an e-mail that was
13 sent to Bunzai regarding a complaint that Business
14 Consumer Alliance received; right?
15 MR. UNGAR: Objection as to the form of the   16:48
16 question. It's vague and ambiguous. Calls for
17 speculation. Assumes facts not in evidence.
18 THE WITNESS: It appears like an e-mail to me.
19 MR. GAREEB: Right. Madam Court Reporter can
20 you re-read the question.                16:48
21 (The following record was read:)
22 "Q Plaintiff Goddard 000086, which we attached
23 as Exhibit 3, it appears to be an e-mail that was
24 sent to Bunzai regarding a complaint that Business
25 Consumer Alliance received; right?"      16:48

56 (Pages 451 - 454)

| | |
|---|---|
| 1  MR. UNGAR: Same objections. | 1  Can you give us an estimate as to how much |
| 2  THE WITNESS: Yes. | 2  longer you want to go just this afternoon. |
| 3  BY MR. GAREEB: | 3  MR. GAREEB: We already established it among |
| 4  Q. And this was sent to | 4  everyone in this room, I thought, to 5:00 o'clock. |
| 5  Khristopher@Bunzaimedia.com. Do you know who that   16:49 | 5  THE WITNESS: He wasn't here when you said 5:00.   16:51 |
| 6  is? | 6  MR. GAREEB: Okay. And then just for purposes of |
| 7  MR. UNGAR: Objection as to the form of the | 7  housekeeping, did you want Mr. Nottea back tomorrow |
| 8  question. Assumes facts not in evidence. Calls for | 8  morning? |
| 9  speculation. | 9  MR. GAREEB: I don't know yet. Let's finish |
| 10  THE WITNESS: Khristopher Bond.          16:49 | 10  this up and we'll talk about it later.        16:51 |
| 11  BY MR. GAREEB: | 11  THE WITNESS: I'm ready for you. |
| 12  Q. And also it's to info@Bunzaimediag.com. Do | 12  BY MR. GAREEB: |
| 13  you know what that e-mail address is? | 13  Q. Great. What is that? What is this |
| 14  A. Not particularly. | 14  document? |
| 15  Q. And then there is another individual here   16:49 | 15  A. Seems like a copy of an e-mail.         16:52 |
| 16  in which this was sent to Justin@Bunzaimedia.com. | 16  Q. Isn't it a fact that it's an e-mail from |
| 17  Is that the same Justin we discussed earlier in this | 17  you to and ▓▓▓▓▓▓▓▓? |
| 18  deposition? | 18  A. It appears to be. |
| 19  MR. UNGAR: Objection as to the form of the | 19  Q. And this was in relation to the discussion |
| 20  question. Vague and ambiguous. Calls for      16:49 | 20  we talked about Cosmetics DNA?          16:52 |
| 21  speculation. Assumes facts not in evidence. | 21  A. Correct. |
| 22  THE WITNESS: It appears to be. | 22  Q. Why would you send this to Ms. Goddard? |
| 23  BY MR. GAREEB: | 23  A. She is Khristopher's personal assistant. |
| 24  Q. And then also there is a | 24  Q. I'm sorry? |
| 25  ▓▓▓▓▓▓▓▓. Do you know who that is?   16:49 | 25  A. She's Khristopher Bond's personal          16:52 |
| Page 455 | Page 457 |
| 1  A. It looks like Dawn Goddard's e-mail. | 1  assistant. |
| 2  Q. Have you ever sent an e-mail to this e-mail | 2  MR. GAREEB: Great. I want to turn your |
| 3  address, you personally? | 3  attention now to PLFT Goddard 000121, and I'm going |
| 4  A. Not that I can recall. | 4  to hand that to the court reporter right now to |
| 5  Q. Now, this appears to be -- well it says,   16:49 | 5  mark.           16:52 |
| 6  "Dear Bunzai, attached is a complaint that we | 6  I have to make a copy, but let's work on |
| 7  received from the above consumer." Did you read | 7  this one. It's -- we will mark that as Exhibit 5. |
| 8  that? | 8  I'll make copies. |
| 9  A. I can read that, yes. | 9  (Deposition Exhibit 5, e-mail dated October 3, 2012 |
| 10  Q. Do you know why Dawn Goddard would be   16:50 | 10  from Mr. Nottea to Ms. Goddard, was marked for   16:54 |
| 11  receiving this directly from LaTrisha Foster? | 11  identification and is attached hereto.) |
| 12  MR. UNGAR: Objection as to the form of the | 12  MR. GAREEB: Can you make a copy of these as |
| 13  question. It's vague and ambiguous. Assumes facts | 13  well. We'll have a copy of everything. |
| 14  not in evidence. Calls for speculation. | 14  (A brief recess was taken.) |
| 15  THE WITNESS: I have no idea.          16:50 | 15  BY MR. GAREEB:           16:57 |
| 16  MR. GAREEB: Let's mark PLTF Goddard 0127 as | 16  Q. Mr. Nottea, I've handed you what's been |
| 17  Exhibit 4. | 17  marked as Exhibit 5. Look up after you are done. |
| 18  (Deposition Exhibit 4, e-mail dated September 27, | 18  A. I'm ready. |
| 19  2012 from Mr. Nottea to Mr. Bond, was marked for | 19  Q. That, in fact, is an e-mail from you; |
| 20  identification and is attached hereto.)      16:50 | 20  correct?           16:57 |
| 21  MR. UNGAR: Counsel, before you move on to your | 21  A. Appears to be. |
| 22  next line of questioning, it's now 4:50. I don't | 22  Q. To Dawn Goddard? |
| 23  know how much longer the court reporter wants to go, | 23  A. It appears to be. |
| 24  but I'm starting to lose focus here since we have | 24  Q. And to Khristopher Bond; correct? |
| 25  been here since 10:00 a.m.          16:51 | 25  A. Yes.           16:57 |
| Page 456 | Page 458 |

57 (Pages 455 - 458)

| | |
|---|---|
| 1    Q.   There you are asking both Dawn and | 1       MR. GAREEB: Madam Court Reporter. |
| 2  Khristopher to review the text on the eye cream | 2          (The following record was read:) |
| 3  packaging Aura Vie Regen; correct? | 3       "Q   And this is a project that you were |
| 4       MR. UNGAR: Objection as to the form of the | 4  considering doing on behalf of Bunzai Media Group; |
| 5  question. It's vague and ambiguous. It assumes    16:57 | 5  right?"                                    17:01 |
| 6  facts not in evidence. | 6       THE WITNESS: Potentially. |
| 7       THE WITNESS: It appears to be, yes. | 7  BY MR. GAREEB: |
| 8       MR. GAREEB: Turning your attention to | 8       Q.   Also carbon copied is |
| 9  Exhibit 122 through 126. | 9  Khristopher@Bunzaimedia.com. That's Khristopher |
| 10 (Deposition Exhibit 6, e-mail dated September 27,   16:57 | 10 Bond; correct?                              17:02 |
| 11 2012 from Mr. Nottea to Starco Group, was marked for | 11      MR. UNGAR: Objection as to the form of the |
| 12 identification and is attached hereto.) | 12 question. Vague and ambiguous. |
| 13      THE WITNESS: Are we supposed to have those? | 13      THE WITNESS: Yes. |
| 14      MR. GAREEB: Let the record reflect I'm giving | 14 BY MR. GAREEB: |
| 15 back the exhibits to -- the copies to Mr. Ungar.   16:58 | 15      Q.   It was also sent to Dawn Goddard; correct?   17:02 |
| 16      THE WITNESS: I'm ready. | 16      A.   Yes. |
| 17      MR. GAREEB: Let the record reflect that we | 17      Q.   Why would you send it to Dawn Goddard? |
| 18 produced these documents several months ago. | 18      A.   She may have been assisting Khristopher on |
| 19      THE WITNESS: I'm ready. | 19 this project, proofreading stuff for him, reading |
| 20 BY MR. GAREEB:                              16:59 | 20 things on his behalf. It was common.          17:02 |
| 21      Q.   What is that? | 21      Q.   I'll hand you now what I'm going to |
| 22      A.   It looks like an e-mail. | 22 collectively mark as Exhibit 7. |
| 23      MR. UNGAR: Wait, wait. Objection as to the | 23      MR. UNGAR: Before you launch off into the next |
| 24 form of the question. It's vague and ambiguous. | 24 round of questioning, it's now 5:03. How much |
| 25      THE WITNESS: It seems to be a copy of an    17:00 | 25 longer do you expect, or should we come back in the   17:03 |
| Page 459 | Page 461 |
| 1  e-mail. | 1  morning? I know I'm starting to lose focus. |
| 2  BY MR. GAREEB: | 2       MR. GAREEB: It's not about you losing focus. |
| 3       Q.   Isn't it a fact it's an e-mail from you? | 3  It's about the deponent and/or the court reporter. |
| 4       A.   It seems to be. | 4  So are you okay to continue? Oh, you have child |
| 5       Q.   It's an e-mail to who we discussed before    17:00 | 5  care. All right.                            17:03 |
| 6  ▮▮▮▮▮▮▮▮; right? | 6       MR. UNGAR: Do you want us back here in the |
| 7       A.   Yes. | 7  morning? |
| 8       Q.   We were talking about the Starco Group in | 8       MR. GAREEB: I have hearings tomorrow. |
| 9  relation to a project that you were researching | 9       MR. UNGAR: Then we have a scheduling issue. |
| 10 regarding bed bugs; right?                    17:00 | 10      MR. GAREEB: Can you go five more minutes?    17:03 |
| 11      A.   Yes. | 11      THE COURT REPORTER: Yes. |
| 12      Q.   And this is a project that you were | 12      MR. GAREEB: I'm going to hand you what I'm |
| 13 considering doing on behalf of Bunzai Media Group; | 13 going to mark as Exhibit 7, which the court reporter |
| 14 right? | 14 will hand to you and your counsel. |
| 15      A.   Correct.                            17:00 | 15 (Deposition Exhibit 7, e-mail dated September 20,    17:03 |
| 16      Q.   And -- | 16 2012 from Mr. Nottea to Ms. Goddard, was marked for |
| 17      A.   Well, not really sure if it was going to | 17 identification and is attached hereto.) |
| 18 be. | 18 BY MR. GAREEB: |
| 19      Q.   You testified earlier that this was a | 19      Q.   Just look at me when you are ready. |
| 20 project that you were doing for Bunzai Media Group.   17:00 | 20      I've just handed you -- or the court        17:06 |
| 21 Are you changing that story now? | 21 reporter handed you Exhibit 7. That's an e-mail, |
| 22      MR. UNGAR: Objection as to the form of the | 22 correct, from you to Dawn Goddard? |
| 23 question. It's argumentative. | 23      MR. UNGAR: Objection as to the form of the |
| 24      THE WITNESS: Just one second. Can you repeat | 24 question. Vague and ambiguous. There are many |
| 25 the question.                               17:01 | 25 e-mails.                                    17:06 |
| Page 460 | Page 462 |

Veritext National Deposition & Litigation Services
866 299-5127

1      THE WITNESS: It appears to be, yes.
2   BY MR. GAREEB:
3      Q.  And if you look on the top the subject line
4   says, "When you come in, please see me regarding
5   this e-mail.  Thanks"; correct?              17:06
6      A.  That's what it appears to say, yes.
7      Q.  This is you directing Dawn to do a small
8   compliance audit on current blogs and landing pages;
9   correct?
10     MR. UNGAR: Objection as to the form of the    17:06
11  question.  Vague and ambiguous.  Misstates the
12  document.
13     THE WITNESS: It appears to be.
14     MR. GAREEB: Exhibit 8 PLTF Goddard 00039
15  through 42.                                    17:07
16  (Deposition Exhibit 8, fictitious business name
17  statement, was marked for identification and is
18  attached hereto.)
19  BY MR. GAREEB:
20     Q.  Mr. Nottea, make sure that the original   17:07
21  ones with the stamp are given back to her.  We will
22  do it later.
23     A.  Okay.  I'm ready for you.
24     Q.  Great.  Now, this is a fictitious business
25  name statement; correct?                       17:09

Page 463

1      A.  Appears to be.
2      Q.  And it appears to be a fictitious business
3   name statement filed on behalf of Bunzai Media
4   Group, Inc.?
5      A.  It looks like it.                        17:09
6      Q.  And it has a mailing address of 16161
7   Ventura Boulevard, Suite 378, Encino, California?
8      A.  Yes.
9      Q.  And this is the fictitious business name
10  statement in which you applied for d/b/a's -- for   17:09
11  d/b/a, right, doing business as?
12     MR. UNGAR: Objection as to the form of the
13  question.  Calls for speculation.  It's vague and
14  ambiguous.  Assumes facts not in evidence.
15  BY MR. GAREEB:                                 17:09
16     Q.  Correct?
17     A.  Appears to be.
18     Q.  All right.  So in this instance it would be
19  Bunzai Media Group, Inc. d/b/a Miracle Face Kit;
20  correct?                                       17:10
21     MR. UNGAR: Objection as to the form of the
22  question.  Vague and ambiguous.  Assumes facts not
23  in evidence.  Calls for speculation.
24     THE WITNESS: It appears to be, yes.
25  BY MR. GAREEB:                                 17:10

Page 464

1      Q.  And this fictitious business name also
2   shows that Aura Vie is a d/b/a of Bunzai Media
3   Group, Inc.; correct?
4      A.  No.
5      Q.  I'm sorry?                              17:10
6      A.  That's not what it shows to me.
7      Q.  So your answer to -- Miracle Face Kit is a
8   d/b/a of Bunzai but not Aura Vie?
9      MR. UNGAR: Objection as to the form of the
10  question.  It's vague and ambiguous.  It's      17:10
11  argumentative.
12  BY MR. GAREEB:
13     Q.  Is that your testimony?
14     A.  I'm not an expert in these documents.  It
15  looks like there was an address filled out.     17:10
16     Q.  Read right under where it says "fictitious
17  name."  Do you see that?
18     A.  Yes.
19     Q.  Right under it.  It says, "The following
20  persons are doing business as."                17:11
21     A.  Yes.
22     Q.  And it has there Miracle Face Kit.  Do you
23  see that?
24     A.  Uh-huh.
25     Q.  Which indicates that Bunzai Media Group,   17:11

Page 465

1   Inc. is doing business as Miracle Face Kit?
2      MR. UNGAR: Objection as to the form of the
3   question.  It's vague and ambiguous.  Assumes facts
4   not in evidence.  Calls for speculation.
5      MR. GAREEB: You keep saying "assumes facts not  17:11
6   in evidence."  What is -- never mind.  I'm not going
7   to comment.
8      Go ahead.
9      THE WITNESS: It appears to be.
10  BY MR. GAREEB:                                 17:11
11     Q.  Right.  And also it says No. 2 there, Aura
12  Vie.  It appears to be doing business -- Bunzai
13  Media Group, Inc. is doing business as Aura Vie;
14  correct?
15     MR. UNGAR: Objection as to the form of the    17:11
16  question.  It's vague and ambiguous.  Assumes facts
17  not in evidence.  Calls for speculation.
18     THE WITNESS: Appears to be.
19  BY MR. GAREEB:
20     Q.  Turning your attention to PLTF Goddard     17:11
21  00041.
22     A.  Yes.
23     Q.  Also it says there, "Registrar recorder
24  county clerk fictitious business name statement
25  additional name sheet."  Do you see that?       17:11

Page 466

59 (Pages 463 - 466)

Veritext National Deposition & Litigation Services
866 299-5127

1   A. I do.
2   Q. And this also refers to 3, 4, 5, 6, 7, 8.
3   These names are also fictitious business names for
4   Bunzai Media Group, Inc.; correct?
5       MR. UNGAR: Objection as to the form of the       17:12
6   question. Vague and ambiguous. Assumes facts not
7   in evidence. Calls for speculation.
8       THE WITNESS: Appears to be, yes.
9       MR. GAREEB: Okay. The court reporter has child
10  care duties, which is more important than any of us   17:12
11  in this room, so we have to finish up. At this
12  point it's almost 5:15, so you guys left abruptly on
13  Friday so we had to do the deposition per Code. And
14  your counsel will explain to you what that is.
15      At this point, Mr. Ungar, do you want to do   17:12
16  it per code, or do you want to offer a stipulation?
17      MR. UNGAR: It's your deposition. You offer the
18  stipulation.
19      MR. GAREEB: Okay. So you want to do it per
20  stipulation?                                   17:13
21      MR. UNGAR: I said it's your deposition. You
22  offer the stipulation if you want to offer one.
23      MR. GAREEB: Okay. I offer the proposed
24  stipulation:
25      I'll propose that the court reporter is   17:13

Page 467

1   proceeding.
2       So stipulated?
3       MR. UNGAR: I'll stipulate but with the proviso
4   that instead of 15 days that it be 21 days in order
5   to review and to notify opposing counsel as to       17:14
6   whether or not there have been any changes or
7   modifications, as well as within that 21 days to
8   sign the original deposition transcript under
9   penalty of perjury.
10      MR. GAREEB: With that proviso, so stipulated.   17:15
11
12      (TIME NOTED: 5:15 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 469

1   relief of her duties under the Code with respect to
2   the retention of the original transcript. The
3   original transcript be forwarded directly to defense
4   counsel. Defense counsel can provide it to
5   Mr. Nottea for review and execution under penalty of   17:13
6   perjury and notify all counsel of any changes or
7   corrections to the transcript within 15 days of
8   mailing by the court reporter?
9       THE WITNESS: Are you okay with that?
10      MR. UNGAR: I'm sorry. Did you have -- is that   17:14
11  the end of your stipulation?
12      MR. GAREEB: No, I --
13      MR. UNGAR: Please proceed.
14      MR. GAREEB: If counsel are not notified of any
15  changes or modifications or corrections to the       17:14
16  transcript within the stipulated time period, being
17  15 days, that an unsigned copy of the original may
18  be utilized for any subsequent hearings or
19  arbitration or proceedings for any admissible
20  purpose.                                       17:14
21      Plaintiffs' counsel will retain custody of
22  the original and provide it to all other counsel
23  upon reasonable request. If the original is lost,
24  destroyed or otherwise unavailable, a certified copy
25  may be utilized at any subsequent hearing or   17:14

Page 468

1   I, ALON NOTTEA, do hereby declare under penalty of
2   perjury that I have read the foregoing transcript;
3   that I have made any corrections as appear noted, in
4   ink, initialed by me, or attached hereto; that my
5   testimony as contained herein, as corrected, is true
6           and correct.
7
8       EXECUTED this    day of,      2014,
9   at
10      (City)            (State)
11
12
13
14
15      ALON NOTTEA, Volume II
16
17
18
19
20
21
22
23
24
25

Page 470

60 (Pages 467 - 470)

ATTACHMENT A                                      APP. 000125
                                                      Ex. 1

```
 1              REPORTER'S CERTIFICATE
 2
 3   STATE OF CALIFORNIA  )
                          ) ss.
 4   COUNTY OF LOS ANGELES)
 5
 6      I, Angela S. Hartsock, CSR No. 12620, do hereby
 7   certify:
 8          That the foregoing proceedings were taken
 9   before me at the time and place herein set forth;
10   that any witnesses in the forgoing proceedings,
11   prior to testifying, were placed under oath; that a
12   verbatim record of the proceedings was made by me
13   using machine shorthand which was thereafter
14   transcribed by me or under my direction; further,
15   that the foregoing is an accurate transcription
16   thereof.
17          I further certify that I am neither
18   financially interested in the action nor a relative
19   or employee of any attorney of any of the parties.
20          IN WITNESS WHEREOF, I have subscribed my
21   name.
22   Date: 05/27/2014
23
24          ----------------------------
25          Angela S. Hartsock
            CSR, No.12620.
```

Page 471

61 (Page 471)

ATTACHMENT A

APP. 000126
Ex. 1

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2      FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

3

4   DAWN GODDARD, an individual;

    NANCY YALLEY, an individual,

5

            Plaintiffs,        No. BC510493

6    vs.

7   KHRISTOPHER BOND a.k.a. RAYMOND

    IBBOTT, an individual; ALON NOTTEA,

8   an individual; BUNZAI MEDIA GROUP

    INC., a California Corporation;

9   PINNACLE LOGISTICS, INC., a California

    Corporation; CERENADE MARKETING

10  INTERNATIONAL, INC., a California

    Corporation; MEDIA URGE, INC., a

11  California Corporation; and Does

    1-100, Inclusive,

12

            Defendants.

13  _____

14

15         DEPOSITION OF ALON NOTTEA

16        Woodland Hills, California

17        Tuesday, May 13, 2014

18           Volume III

19

20

21

22  Reported by:

    IRMA C. HOGAN

23  CSR No. 4877

24  Job No. 1863045

25  PAGES 500 - 651

                                Page 500

ATTACHMENT A                      APP. 000127
                                    Ex. 1

```
 1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2    FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
 3
 4  DAWN GODDARD, an individual;
    NANCY YALLEY, an individual,
 5
          Plaintiffs,     No. BC510493
 6   vs.
 7  KHRISTOPHER BOND a.k.a. RAYMOND
    IBBOTT, an individual; ALON NOTTEA,
 8  an individual; BUNZAI MEDIA GROUP
    INC., a California Corporation;
 9  PINNACLE LOGISTICS, INC , a California
    Corporation; CERENADE MARKETING
10  INTERNATIONAL, INC., a California
    Corporation; MEDIA URGE, INC., a
11  California Corporation; and Does
    1-100, Inclusive,
12
          Defendants.
13
14  _____
15
16      Continued Deposition of ALON NOTTEA,
17  Volume III, taken on behalf of Plaintiffs, at
18  21333 Oxnard Street, 2nd Floor, Woodland Hills,
19  California, beginning at 1:18 P.M. and ending at
20  5:08 P.M. on Tuesday, May 13, 2014, before IRMA C.
21  HOGAN, Certified Shorthand Reporter No. 4877.
22
23
24
25
                                              Page 501
```

```
 1                    INDEX
 2
 3  WITNESS                    EXAMINATION
 4  ALON NOTTEA
    Volume III
 5
 6     By Mr. Gareeb           506
 7
 8
 9
10  Exhibit 9  E-MAIL titled "You're invited     507
11    to the Pacquiao project"
12
13  Exhibit 10  E-mail: "Invitation: Darius &     524
14    tanya..."
15
16  Exhibit 11  E-mail: "You're invited to the    531
17    Angela Dean project"
18
19  Exhibit 12  E-mail: "You're invited to the    532
20    MediaUrge/Design Roo..."
21
22  Exhibit 13  E-mail: "You're invited to the    536
23    Pete & Kiana project"
24
25
                                              Page 503
```

| | EXHIBITS | PAGE |
|---|---|---|
| Exhibit 9 | E-MAIL titled "You're invited to the Pacquiao project" | 507 |
| Exhibit 10 | E-mail: "Invitation: Darius & tanya..." | 524 |
| Exhibit 11 | E-mail: "You're invited to the Angela Dean project" | 531 |
| Exhibit 12 | E-mail: "You're invited to the MediaUrge/Design Roo..." | 532 |
| Exhibit 13 | E-mail: "You're invited to the Pete & Kiana project" | 536 |

```
 1  APPEARANCES:
 2
 3  For Plaintiff:
 4     GAREEB LAW GROUP
 5     BY:  ALEXANDER S. GAREEB, ESQ.
 6     21333 Oxnard Street
 7     2nd Floor
 8     Woodland Hills, California 91367
 9     (818) 456-0970
10     agareeb@glglegal.com
11
12  For Defendant ALON NOTTEA:
13     UNGAR LAW
14     BY:  ROBERT M. UNGAR, ESQ.
15     14724 Ventura Boulevard
16     Penthouse
17     Sherman Oaks, California 91403
18     (310) 405-1884
19     rmu@ungarlaw.com
20
21
22
23
24
25
                                              Page 502
```

```
 1                INDEX (CONTINUED)
 2                    ALON NOTTEA
 3
 4            EXHIBITS              PAGE
 5  Exhibit 14  E-mail: "You're ivited to the    537
 6    HBeing/Red carpet D..."
 7
 8  Exhibit 15  E-mail: "You're invited to the    538
 9    H.Being/Adagio 24K..."
10
11  Exhibit 16  E-mail: "Invitation Meeting with   540
12    Motti @ Fri Oct 12 11am-12p..."
13
14  Exhibit 17  E-mail: "Invitation: Tal & liron   543
15    @ Wed Oct 10 1pm-2p..."
16
17  Exhibit 18  E-mail: Khristopherisms, reply    546
18    response options
19
20  Exhibit 19  E-mail: "You're invited to the    548
21    Cerenade/Success..."
22
23  Exhibit 20  E-mail: "You're invited to the    554
24    H.Being/BCircle/SMS Pr..."
25
                                              Page 504
```

INDEX (CONTINUED)
ALON NOTTEA

| | EXHIBITS | PAGE |
|---|---|---|
| Exhibit 14 | E-mail: "You're ivited to the HBeing/Red carpet D..." | 537 |
| Exhibit 15 | E-mail: "You're invited to the H.Being/Adagio 24K..." | 538 |
| Exhibit 16 | E-mail: "Invitation Meeting with Motti @ Fri Oct 12 11am-12p..." | 540 |
| Exhibit 17 | E-mail: "Invitation: Tal & liron @ Wed Oct 10 1pm-2p..." | 543 |
| Exhibit 18 | E-mail: Khristopherisms, reply response options | 546 |
| Exhibit 19 | E-mail: "You're invited to the Cerenade/Success..." | 548 |
| Exhibit 20 | E-mail: "You're invited to the H.Being/BCircle/SMS Pr..." | 554 |

2 (Pages 501 - 504)

```
 1   Q.  When you had this meeting with Tal and      2:27:48PM
 2  Liron -- and you said you had many -- was it business
 3  related or personal?
 4   A.  Personal.
 5   Q.  Did you ever have any business meetings with  2:27:54PM
 6  Tal and Liron?
 7   A.  Not that I can recall.
 8   Q.  And at any of these meetings that you had
 9  with Tal and Liron, was Khristopher Bond ever present?
10   A.  I don't recall.                              2:28:10PM
11   Q.  How about Iris Castro, was she present?
12   A.  I have no idea.
13   Q.  How about Nancy Yalley, was she present?
14   A.  I don't recall the meeting that you're
15  speaking about so how can I recall who was present.  2:28:22PM
16   Q.  The only meeting I'm speaking of is the one
17  which you said you had several meetings with Tal and
18  Liron.
19       MR. UNGAR:  Objection as to the form of the
20  question.  It's argumentative.                     2:28:31PM
21  BY MR. GAREEB:
22   Q.  I'm just asking you, in the meetings that you
23  had with Tal and Liron, was Iris Castro ever involved
24  in any of those meetings?
25   A.  I have no idea.                              2:28:47PM
                                                Page 545
```

```
 1   Q.  So based on that, do you recall receiving   2:30:16PM
 2  this e-mail on or about October 7, 2012?
 3   A.  No, I do not.
 4   Q.  Okay.  Who is Tal Karasso?  Tal Karasso -- I
 5  withdraw the question.                            2:30:50PM
 6       Tal Karasso was the president of Media Urge;
 7  right?
 8   A.  I don't know.
 9   Q.  He was not?  Okay.  Let me ask you who is Tal
10  Karasso?                                          2:31:30PM
11   A.  I don't understand your question.
12   Q.  Do you know a Tal T-a-l, Karasso,
13  K-a-r-a-s-s-o?
14   A.  Yes, I do.
15   Q.  Who is Tal Karasso?                          2:31:45PM
16   A.  He's a person I know.
17   Q.  On Friday you testified that Tal Karasso was
18  a principal at Media Urge, Inc.; is that correct?
19       MR. UNGAR:  Objection as to the form of the
20  question.  It's argumentative, misstates prior    2:32:01PM
21  testimony.
22       THE WITNESS:  I'm not sure if he's a
23  principal of Media Urge.
24  BY MR. GAREEB:
25   Q.  I'm sorry?                                   2:32:09PM
                                                Page 547
```

```
 1   Q.  How about Nancy Yalley, was she involved in  2:28:49PM
 2  any of those meetings?
 3   A.  I have no idea.
 4   Q.  How about Dawn Goddard, was she involved in
 5  any of those meetings?                            2:28:54PM
 6   A.  I have no idea.
 7   Q.  How about Nastassia Yalley, was she involved
 8  in any of those meetings?
 9   A.  I don't know.
10       MR. GAREEB:  Exhibit 18.                      2:29:11PM
11       (Exhibit 18 was marked for identification.)
12       THE WITNESS:  I'm ready.
13  BY MR. GAREEB:
14   Q.  Yesterday we discussed Khristopherisms.
15  Remember that?                                    2:29:44PM
16   A.  I do.
17   Q.  And this e-mail references Khristopherisms?
18   A.  Seems that way.
19   Q.  And in fact you -- do you know what this
20  e-mail is?                                        2:29:57PM
21   A.  I've never seen this in my life.
22   Q.  If you look at the e-mail distribution list,
23  it references Alon Nottea, alon@bunzaimedia.com.  See
24  that?
25   A.  I see it.                                    2:30:14PM
                                                Page 546
```

```
 1   A.  I'm not sure if -- the word you mentioned was  2:32:09PM
 2  "principal"?
 3   Q.  Yes.
 4   A.  I'm not sure if that's the case.
 5   Q.  What relation did Mr. Karasso have with Media  2:32:16PM
 6  Urge, Inc.?
 7       MR. UNGAR:  Objection as to the form of the
 8  question.  It's vague and ambiguous.
 9       THE WITNESS:  I don't know the nature as to
10  the relationship.                                 2:32:26PM
11  BY MR. GAREEB:
12   Q.  Do you know Liron Schwartz?
13   A.  I do.
14       MR. GAREEB:  Exhibit 19.
15       (Exhibit 19 was marked for identification.)   2:32:43PM
16       THE WITNESS:  I'm ready.
17  BY MR. GAREEB:
18   Q.  Great.  This is an invitation to a project
19  called Cerenade/Success/WPS, Testimonial Program
20  Content.  Do you see that?                         2:33:07PM
21   A.  I do.
22   Q.  And it references final drafts, skin care
23  line.
24   A.  Okay.
25   Q.  Do you know what that is reference to?        2:33:16PM
                                                Page 548
```

13 (Pages 545 - 548)

| | |
|---|---|
| 1  A.  I have no idea.                    2:33:18PM | 1      MR. UNGAR:  Objection as to the form of the  2:35:19PM |
| 2  Q.  Did AuraVie have a skin care line? | 2  question.  It's vague and ambiguous, not readily |
| 3      MR. UNGAR:  Objection as to the form of the | 3  understandable. |
| 4  question.  It's vague and ambiguous. | 4      THE WITNESS:  I have no idea about anything |
| 5      THE WITNESS:  I don't understand your   2:33:28PM | 5  on this document.                    2:35:27PM |
| 6  question. | 6  BY MR. GAREEB: |
| 7  BY MR. GAREEB: | 7  Q.  Yesterday you testified about a testimonial |
| 8  Q.  AuraVie was a cosmetic line; correct? | 8  program.  Do you remember that? |
| 9  A.  That is correct. | 9  A.  No.  You need to be more specific. |
| 10  Q.  Did it include skin care products?    2:33:36PM | 10  Q.  Has Bunzai Media ever been involved in a    2:35:40PM |
| 11  A.  Every cosmetic line includes skin care | 11  testimonial program? |
| 12  products. | 12      MR. UNGAR:  Objection as to the form of the |
| 13  Q.  Below it it says, "Khristopher says: Hi | 13  question.  It's vague and ambiguous, it's not readily |
| 14  Everyone, Liron and Tal, please review the documents | 14  understandable as presented. |
| 15  in this room, thanks."  See that?    2:33:52PM | 15      THE WITNESS:  I don't understand your    2:35:50PM |
| 16  A.  I see it. | 16  question. |
| 17  Q.  Does that refresh your recollection as to who | 17      MR. GAREEB:  Madam Court Reporter? |
| 18  Liron is? | 18      Tell you what, I'll withdraw that question. |
| 19      MR. UNGAR:  Objection as to the form of the | 19  Q.  Has Bunzai Media ever done a testimonial |
| 20  question.  It's vague and ambiguous.  It's not readily  2:34:02PM | 20  program as it pertains to AuraVie?    2:36:08PM |
| 21  understandable as asked. | 21  A.  No. |
| 22      THE WITNESS:  I still don't know who Liron | 22  Q.  Do you know what a testimonial program is? |
| 23  is. | 23  A.  No.  Software?  I don't know what it means. |
| 24  BY MR. GAREEB: | 24  Q.  Did you ever do business with Liron Schwartz? |
| 25  Q.  Let's go down then.          2:34:14PM | 25  A.  I have.                    2:36:58PM |
| Page 549 | Page 551 |
| 1      It says "Questions?  Contact Khristopher Bond  2:34:15PM | 1  Q.  What kind of business?          2:36:58PM |
| 2  at khristopher@bunzaimedia.com."  See that? | 2  A.  I believe he was an editor that I knew from a |
| 3  A.  It appears to be the default on every | 3  long time ago. |
| 4  document. | 4  Q.  What kind of editor? |
| 5  Q.  And below it, it says other people on this   2:34:22PM | 5  A.  Video editor.                  2:37:19PM |
| 6  project are Alon N.  That's you; right? | 6  Q.  Did he also edit, to your knowledge, |
| 7  A.  It seems to be. | 7  testimonial programs? |
| 8  Q.  Dawn Goddard? | 8      MR. UNGAR:  Objection as to the form of the |
| 9  A.  That's what it says. | 9  question.  It's vague and ambiguous, calls for |
| 10  Q.  Liron Schwartz?              2:34:30PM | 10  speculation.                    2:37:31PM |
| 11  A.  That's what it says. | 11      THE WITNESS:  I don't believe so. |
| 12  Q.  Nastassia Yalley? | 12  BY MR. GAREEB: |
| 13  A.  That appears to be the name. | 13  Q.  How about Tal Karasso, how do you know him? |
| 14  Q.  And Tal Karasso.  See that? | 14  A.  He's an acquaintance. |
| 15  A.  Amen.                    2:34:41PM | 15  Q.  Ever do business with Mr. Karasso?    2:37:47PM |
| 16  Q.  Is that a yes? | 16  A.  No. |
| 17  A.  Yes. | 17  Q.  Is Tal Karasso involved in any way to Media |
| 18  Q.  Liron Schwartz -- how do you know him? | 18  Urge, Inc.? |
| 19  A.  I know him for many years. | 19  A.  I believe he is. |
| 20  Q.  Was he involved in the AuraVie Project?    2:34:49PM | 20  Q.  How?                    2:38:08PM |
| 21      MR. UNGAR:  Objection as to the form of the | 21  A.  I'm not really sure. |
| 22  question.  It's vague and ambiguous. | 22  Q.  When you were a consultant to Media Urge, who |
| 23      THE WITNESS:  No. | 23  hired you? |
| 24  BY MR. GAREEB: | 24  A.  Originally Oz. |
| 25  Q.  Do you know what the Testimonial Program is?  2:35:12PM | 25  Q.  You're talking about Oz Mizrahi; right?    2:38:24PM |
| Page 550 | Page 552 |

14 (Pages 549 - 552)

```
 1    A.  Can you repeat the question for me?        2:38:39PM
 2    Q.  Sure.  You're referring to Oz Mizrahi; right?
 3    A.  The previous question.  If you can, repeat
 4  the previous question for me.
 5    Q.  I could, but you still have to answer that   2:38:52PM
 6  last question.
 7        Go ahead.
 8        (Record read.)
 9        THE WITNESS:  No, that is incorrect.
10  BY MR. GAREEB:                                      2:39:25PM
11    Q.  Okay.  Which Oz are you referring to then?
12        MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous, it's compound,
14  it's not readily understandable.
15        THE WITNESS:  Oz was a mistake.  It wasn't   2:39:40PM
16  Oz.  I said Oz by mistake.
17  BY MR. GAREEB:
18    Q.  But you do know an Oz Mizrahi; right?
19    A.  I do.
20    Q.  So who hired you?                            2:39:49PM
21        MR. UNGAR:  Objection --
22  BY MR. GAREEB:
23    Q.  Who hired you at Media Urge?
24    A.  I don't recall.
25    Q.  So it's not Oz Mizrahi?                      2:39:59PM
                                                   Page 553
```

```
 1  BY MR. GAREEB:                                      2:41:47PM
 2    Q.  Let me ask the question again.  What is the
 3  project called H.Being/8Circle/SMS Project,
 4  Khristopherisms?
 5    A.  I have no idea.                               2:41:59PM
 6    Q.  It says there if there's any questions
 7  contact Alon N. at alon@bunzaimedia.com?
 8    A.  That's what it says.
 9    Q.  And the other people who appear to be on this
10  project are Khristopher Bond, Liron Schwartz, Tal   2:42:11PM
11  Karasso, and ████████████████.  That's Dawn
12  Goddard; right?
13    A.  It appears to be.
14    Q.  What ever -- what ended up happening to this
15  particular project?                                2:42:36PM
16        MR. UNGAR:  Objection as to the form of the
17  question.  It's vague and ambiguous, assumes facts not
18  in evidence, calls for speculation.
19        THE WITNESS:  I have no clue.
20  BY MR. GAREEB:                                      2:42:45PM
21    Q.  Did you ever -- were you ever involved in
22  this project with Liron Schwartz?
23        MR. UNGAR:  Objection as to the form of the
24  question.  It's vague and ambiguous.
25        THE WITNESS:  No, I was not.                 2:42:52PM
                                                   Page 555
```

```
 1    A.  No, it was not.                              2:40:02PM
 2    Q.  Okay.  I'm going to turn your attention now
 3  to Exhibit 20.
 4        (Exhibit 20 was marked for identification.)
 5        THE WITNESS:  I'm ready.                      2:40:48PM
 6  BY MR. GAREEB:
 7    Q.  This is an e-mail which appears that you sent
 8  for an invitation to a project.  See that?
 9        MR. UNGAR:  Objection as to the form of the
10  question.  It's vague and ambiguous, calls for   2:40:57PM
11  speculation, assumes facts not in evidence.
12        THE WITNESS:  It appears to be that way.
13  BY MR. GAREEB:
14    Q.  It says, "Alon N. invited you to a project
15  called H.Being/8Circle/SMS project, Khristopherisms." 2:41:11PM
16  See that?
17    A.  That's what it says.
18    Q.  What is that?
19        MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous.                2:41:21PM
21        THE WITNESS:  Khristoherisms is an app or is
22  a name that Khristopher came up with in -- he was
23  interested in developing an app so we can send
24  inspirational text messages to people.
25  ///                                                 2:41:44PM
                                                   Page 554
```

```
 1  BY MR. GAREEB:                                      2:42:54PM
 2    Q.  Were you involved in this project with Tal
 3  Karasso?
 4    A.  I wasn't involved --
 5        MR. UNGAR:  Objection as to the form of the   2:42:59PM
 6  question.  It's vague and ambiguous with regard to the
 7  word "this."
 8        THE WITNESS:  I was not involved in this or
 9  any Cerenade project.
10  BY MR. GAREEB:                                      2:43:10PM
11    Q.  Why do you claim this is a Cerenade project?
12    A.  It's Khristopher's.  Isn't that in the name?
13    Q.  Where on this document does it mention
14  Cerenade anywhere?
15    A.  I don't see it mentioning Cerenade in this   2:43:30PM
16  document.
17    Q.  But in fact it does mention Bunzai Media;
18  correct?
19    A.  That's what it appears to say.  It's part of
20  an e-mail address.                                  2:43:41PM
21    Q.  Were you ever involved in the AuraVie
22  Transformation in or about September 17, 2012?
23    A.  I had no part of the transfor-- the
24  Transformation Day I think you said.
25  ///                                                 2:44:20PM
                                                   Page 556
```

15 (Pages 553 - 556)

Veritext National Deposition & Litigation Services
866 299-5127
ATTACHMENT A

APP. 000131
Ex. 1

```
 1   Q.  I'll bet.                    2:50:03PM
 2       All that is off the record.
 3       I'm going to mark Exhibit 24.
 4       (Exhibit 24 was marked for identification.)
 5       THE WITNESS:  Ready.          2:50:54PM
 6 BY MR. GAREEB:
 7   Q.  Do you know a Zack and Nancy pertaining to
 8 Vegas and Angel Shoots?
 9   A.  I have no clue.
10   Q.  Do you know a Zack Grant?     2:51:01PM
11   A.  I have no idea who that is.
12   Q.  This appears to be a meeting that was
13 organized by nastassia@bunzaimedia.com; right?
14   A.  It appears to be.
15   Q.  And this meeting was to take place on or   2:51:26PM
16 about July 12, 2012; correct?
17       MR. UNGAR:  Objection as to the form of the
18 question.  It's vague and ambiguous, calls for
19 speculation, assumes facts not in evidence.
20       THE WITNESS:  That's what the document says.  2:51:38PM
21 BY MR. GAREEB:
22   Q.  According to Exhibit 24 it also says meetings
23 to take place, 7900 Gloria Avenue, Van Nuys,
24 California; correct?
25   A.  That's what it says.         2:51:47PM
                                   Page 561
```

```
 1       MR. UNGAR:  Objection as to the form of the   2:54:25PM
 2 question.  It's compound, assumes facts not in
 3 evidence, calls for speculation, vague and ambiguous.
 4       THE WITNESS:  It appears to be Khristopher,
 5 yes.                             2:54:34PM
 6 BY MR. GAREEB:
 7   Q.  And this was sent to
 8 nastassia@bunzaimedia com?
 9       MR. UNGAR:  Objection as to the form of the
10 question.  It vague and ambiguous, calls for   2:54:38PM
11 speculation, assumes facts not in evidence.
12       THE WITNESS:  That's what it seems to appear
13 like, yes.
14 BY MR. GAREEB:
15   Q.  And also in this distribution list on   2:54:50PM
16 Exhibit 25 appears to be Nancy Yalley; right?
17   A.  Yes, it does.
18   Q.  Including yourself, alon@bunzaimedia.com?
19   A.  That's what it says.
20   Q.  And there's a Patty Swan.  Do you know who   2:55:05PM
21 that is?
22   A.  I don't recall.
23   Q.  There's a Dror-joseph Michaelangelo.  Do you
24 know who that is?
25   A.  Yes, I do.                   2:55:21PM
                                   Page 563
```

```
 1   Q   And that's Bunzai's offices?   2:51:48PM
 2   A   Yes, it is
 3   Q   As of July 12, 2012, that was Bunzai's
 4 office; right?
 5   A   It was also Cerenade's office   2:52:05PM
 6   Q   On July 12, 2012?
 7   A   I believe so
 8   Q   Does this document reference anywhere
 9 Cerenade?
10       MR UNGAR:  Objection as to the form of the   2:52:18PM
11 question  It's argumentative
12       THE WITNESS:  No, it does not
13 BY MR. GAREEB:
14   Q   I'm going to hand you Exhibit 25
15       (Exhibit 25 was marked for identification )   2:53:25PM
16       THE WITNESS:  Ready when you are
17 BY MR. GAREEB:
18   Q   This references the Pete Rose Treatment  Do
19 you recall you and I discussed that yesterday?
20       MR UNGAR:  Objection as to the form of the   2:54:06PM
21 question as compound
22       THE WITNESS:  I recall
23 BY MR. GAREEB:
24   Q   Now, this e-mail was sent from
25 ███████████  That's Khristopher Bond?   2:54:19PM
                                   Page 562
```

```
 1   Q.  Who is Dror?                 2:55:21PM
 2   A.  Dror is an acquaintance of mine.
 3   Q.  Did you ever do business with him?
 4   A.  No, I did not.
 5   Q.  Was he involved in the Pete Rose Treatment?   2:55:28PM
 6   A.  Not that I'm aware of.
 7   Q.  Is the Pete Rose Treatment -- is that an
 8 AuraVie product?
 9   A.  I have no idea what the Pete Rose Treatment
10 is.                              2:55:45PM
11   Q.  Do you remember receiving this e-mail
12 regarding the Pete Rose Treatment?
13   A.  I do not remember receiving this e-mail.
14   Q.  And in the middle of the page there, that is   2:56:02PM
15 the Bunzai Media Group logo?
16   A.  It appears to be.
17   Q.  It references Khristopher Bond, C-O-O.  See
18 that?
19   A.  That's what it says.
20   Q.  What is a C-O-O?              2:56:16PM
21   A.  Usually, I believe, it's a title.
22   Q.  Chief Operating Officer?
23   A.  I believe so.
24       MR. GAREEB:  Mark Exhibit 26.
25       (Exhibit 26 was marked for identification.)   2:57:05PM
                                   Page 564
```

17 (Pages 561 - 564)

```
 1       THE WITNESS:  I guess I'm ready when you are.  2:57:55PM
 2  BY MR. GAREEB:
 3    Q.  Did you ever hear of Kiana Kim?
 4    A.  I have no idea who that is.
 5    Q.  How about kianabeauty.com, you ever hear of  2:58:13PM
 6  that?
 7    A.  Never.
 8    Q.  This references AuraVie Skin Care.  See that?
 9    A.  I see that on the document, yes.
10    Q.  Who is -- I'm sorry -- do you know who      2:58:24PM
11  "xgoosesports" is?
12    A.  I have no clue.
13    Q.  This e-mail is referencing the AuraVie skin
14  care product line; right?
15    A.  I don't know if that's what it is.  I haven't  2:58:47PM
16  read the document.
17    Q.  That's why I asked you to review it and then
18  when you're done look up at me.
19    A.  Okay.
20    Q.  This is an e-mail as it pertains to          2:59:54PM
21  AuraVieVie's skin care product line; correct?
22    A.  I believe this e-mail pertains to some
23  project regarding Kiana and Kiana Beauty.
24    Q.  And this is an e-mail that was written by
25  Khrisopher Bond; correct?                        3:00:12PM
                                           Page 565
```

```
 1       MR. UNGAR:  Objection as to the form of the  3:00:14PM
 2  question.  It's vague and ambiguous, calls for
 3  speculation.
 4       THE WITNESS:  It -- I don't know who it was
 5  written by.  The last page shows Khrisopher, but -- I  3:00:26PM
 6  don't know.
 7  BY MR. GAREEB:
 8    Q.  It shows Khrisopher Bond, CEO; right?
 9    A.  But the last page is in an entirely different
10  font, like a different printout, not like from the  3:00:39PM
11  same document, so I can't attest to that.
12    Q.  Go ahead and take it.
13        Okay.  Twenty-seven.
14        (Exhibit 27 was marked for identification.)
15        THE WITNESS:  Ready when you are.       3:01:50PM
16  BY MR. GAREEB:
17    Q.  Have you ever seen Exhibit 27?
18    A.  Never in my life.
19    Q.  It references AuraVie Angel Shoot; correct?
20    A.  That's what it says.                    3:01:58PM
21    Q.  And it's talking about some sort of -- on the
22  bottom it references Nastassia Yalley.  See that?
23    A.  I do.
24    Q.  She was a Bunzai employee; right?
25    A.  She was.                                3:02:10PM
                                           Page 566
```

```
 1    Q.  And also Nancy Yalley is referenced there;  3:02:10PM
 2  correct?
 3    A.  That's correct.
 4    Q.  And the place in which this AuraVie Angel
 5  Shoot was to take place, according to Exhibit 27, is  3:02:19PM
 6  16101 Ventura Boulevard, Encino; correct?
 7    A.  There's two addresses on the document, but
 8  that address is one of them.
 9    Q.  Correct.  What is that address?
10    A.  I have no idea.                         3:02:33PM
11    Q.  Could that be the Bunzai Media address?
12        MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous, it calls for
14  speculation.
15        THE WITNESS:  I believe this has nothing to  3:02:45PM
16  do with that address.
17  BY MR. GAREEB:
18    Q.  The other address is 16161.  This is 16101.
19        MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous, not readily  3:02:55PM
21  understandable as presented.
22        THE WITNESS:  This is not the Bunzai address.
23  BY MR. GAREEB:
24    Q.  Okay.  But it does reference on the bottom
25  there a Bunzai Media employee; correct?         3:03:15PM
                                           Page 567
```

```
 1        MR. UNGAR:  Objection.  Asked and answered at  3:03:18PM
 2  least eight times, same question.  It's now harassing
 3  the witness.
 4        THE WITNESS:  It also shows Nancy Yalley as
 5  an employee of Cerenade.                        3:03:33PM
 6  BY MR. GAREEB:
 7    Q.  Where does it say that?
 8    A.  Where does it say Bunzai or Nastassia?
 9    Q.  Let me ask you this:  As of August 5, 2012,
10  was Nastassia Yalley a Bunzai employee?         3:03:44PM
11    A.  I don't recall.
12    Q.  Previously you testified regarding an
13  October 2012 invitation where you acknowledged that
14  Nastassia Yalley was Bunzai employee.  I'm asking you
15  three months earlier, July -- I'm sorry -- August 5,  3:04:05PM
16  2012.
17        MR. UNGAR:  Objection as to the form of the
18  question --
19        MR. GAREEB:  I haven't asked the question
20  yet.                                           3:04:15PM
21    Q.  Was Nastassia Yalley a Bunzai employee as of
22  August 2012?
23        MR. UNGAR:  Objection as to the form of the
24  question.  It's vague and ambiguous, it's not readily
25  understandable, and it's argumentative.         3:04:27PM
                                           Page 568
```

18 (Pages 565 - 568)

Veritext National Deposition & Litigation Services
866 299-5127

ATTACHMENT A

```
 1      THE WITNESS: I believe so.              3:04:33PM
 2 BY MR. GAREEB:
 3   Q.  Okay.  Mr. Alon, when -- I'm sorry.
 4      Mr. Nottea, did you ever come to know or did
 5 anyone ever inform you that at some point in time Dawn  3:07:05PM
 6 Goddard requested her personnel papers?
 7      MR. UNGAR:  Objection as to the form of the
 8 question.  It's vague and ambiguous, not readily
 9 understandable as presented.
10      THE WITNESS: I don't know why I would have  3:07:23PM
11 knowledge of that request.
12 BY MR. GAREEB:
13   Q.  Is the answer no?
14   A.  That's the answer, "no."
15   Q.  Who is Angela Mafioli?                   3:07:31PM
16   A.  Angela Mafioli?  I don't know who she was.  I
17 mean I heard the name, but I don't know who she is.
18   Q.  Do you know if she was a Bunzai employee?
19   A.  She was never a Bunzai employee.
20   Q.  If you don't remember who she is, how do you  3:08:03PM
21 know she was never a Bunzai employee?
22      MR. UNGAR:  Objection as to the form of the
23 question.  It's argumentative.
24      THE WITNESS: I don't understand your
25 question.                                      3:08:19PM
                                              Page 569
```

```
 1 BY MR. GAREEB:                                 3:08:19PM
 2   Q.  Fine.  Let's go to -- let's do it the hard
 3 way.
 4      I need to make copies of these.
 5      (Recess taken.)                           3:08:37PM
 6 BY MR. GAREEB:
 7   Q.  Isn't it a fact that the plaintiffs, Dawn
 8 Goddard and Nancy Yalley, initially, when they were
 9 first hired, were getting paychecks from Pinnacle?  Is
10 that true?                                      3:09:19PM
11      MR. UNGAR:  Objection as to the form of the
12 question.  It's compound.
13      THE WITNESS: I don't believe that's true,
14 but I wouldn't -- I don't really know.
15 BY MR. GAREEB:                                 3:09:30PM
16   Q.  To your knowledge was Pinnacle Logistics even
17 around during the time that Dawn and Nancy were first
18 hired?
19      MR. UNGAR:  Objection as to the form of the
20 question.  It's vague and ambiguous, not readily  3:09:44PM
21 understandable in the form presented.
22      THE WITNESS: I'm not sure.
23 BY MR. GAREEB:
24   Q.  Isn't it a fact that you actually informed
25 the plaintiffs that Mr. Bond was regularly visiting a  3:10:12PM
                                              Page 570
```

```
 1 physician and was under constant care?  Correct?  3:10:17PM
 2      MR. UNGAR:  Objection as to the form of the
 3 question.  Vague and ambiguous with respect to the use
 4 of the word "plaintiff."
 5      THE WITNESS: I don't remember that, no.    3:10:30PM
 6 BY MR. GAREEB:
 7   Q.  Isn't it a fact that you informed the
 8 plaintiffs that Mr. Bond was suffering from multiple
 9 forms of cancer?
10   A.  I don't recall saying that.              3:10:49PM
11   Q.  It's that you may have said it but you don't
12 recall?  Or that you did not say it?
13   A.  I may have said that.
14   Q.  Isn't it a fact that you informed the
15 plaintiffs that Mr. Bond was reputed to give endless  3:11:05PM
16 samples of blood for testing and had to endure
17 agonizing cancer treatments?
18      MR. UNGAR:  Objection as to the form of the
19 question.  Vague and ambiguous, not readily
20 understandable.                               3:11:18PM
21      THE WITNESS: I never said that.
22 BY MR. GAREEB:
23   Q.  Did you ever tell them that he had to endure
24 agonizing cancer treatments?
25   A.  I don't recall saying anything like that.  3:11:28PM
                                              Page 571
```

```
 1   Q.  You don't recall, meaning you don't know if  3:11:32PM
 2 you said it; you could have, but you don't know?  Or
 3 that you don't recall saying it at all?
 4   A.  I don't recall saying those particular words
 5 to the plaintiffs.                             3:11:42PM
 6   Q.  Well, let me rephrase the question.
 7      Do you recall saying something to the effect
 8 that Mr. Bond was giving blood samples a lot?
 9      MR. UNGAR:  Objection as to the form of the
10 question.  It's vague and ambiguous.           3:11:55PM
11      THE WITNESS: I didn't need to.
12 BY MR. GAREEB:
13   Q.  I didn't ask if you needed to.  I asked you
14 if you've ever said something to that effect.
15   A.  I don't remember saying anything to that    3:12:05PM
16 effect.
17   Q.  Meaning it's possible you would have, but you
18 just don't remember, or you don't remember ever saying
19 that?
20   A.  It's possible.                            3:12:13PM
21   Q.  And is it also possible that you told the
22 plaintiffs that -- not in these words but something to
23 the effect that he's suffering through agonizing
24 cancer treatments?
25      MR. UNGAR:  Objection as to the form of the  3:12:24PM
                                              Page 572
```

19 (Pages 569 - 572)

APP. 000134
Ex. 1

1 deposition of the PMKs provided that we did not 5:07:29PM
2 experience the same types of delay tactics, improper
3 objections, delaying objections. We had approximately
4 seven or eight breaks today in the four hours we've
5 been here. All but one have been requested by defense 5:07:48PM
6 counsel.
7 Also, the record would reflect that yesterday
8 I stated that I will continue the deposition until
9 completed. I have now completed the deposition of
10 Mr. Nottea individually, subject to the reservation of 5:08:07PM
11 proceeding to court.
12 That being said, the record is clear and that
13 is our position.
14 MR. UNGAR: Thank you, Madam Court Reporter.
15 Have a nice evening. 5:08:22PM
16 And, Counsel, if you want to meet and confer,
17 you know how to do that.
18 (TIME NOTED: 5:08 P.M.)
19
20
21
22
23
24
25

Page 649

1
2
3
4 I, the undersigned, a Certified Shorthand
5 Reporter of the State of California, do hereby
6 certify:
7 That the foregoing proceedings were taken
8 before me at the time and place herein set forth; that
9 any witnesses in the foregoing proceedings, prior to
10 testifying, were placed under oath; that a verbatim
11 record of the proceedings was made by me using machine
12 shorthand which was thereafter transcribed under my
13 direction; further, that the foregoing is an accurate
14 transcription thereof.
15 I further certify that I am neither financially
16 interested in the action nor a relative or employee of
17 any attorney of any of the parties.
18 IN WITNESS WHEREOF, I have this date subscribed
19 my name.
20
21 Dated: May 20, 2014
22
23 _____
 IRMA C. HOGAN
24 CSR No. 4877
25

Page 651

1
2
3
4 I, ALON NOTTEA, do hereby declare under penalty
5 of perjury that I have read the foregoing transcript;
6 that I have made any corrections as appear noted, in
7 ink, initialed by me, or attached hereto; that my
8 testimony as contained herein, as corrected, is true
9 and correct.
10 EXECUTED this _____ day of _____, 2014,
11 at _____, _____.
 (City)          (State)
12
13
14 _____
15 ALON NOTTEA
16
17
18
19
20
21
22
23
24
25

Page 650

39 (Pages 649 - 651)



Serving the People
Of California

Page 1 of 1

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

Employment Tax
Add:
Parent Profile (2)
Employment Parent Profile                      0057-1963904
BUNZAI MEDIA GROUP, INC.
16161 VENTURA BLVD # 378 ENCINO CA 91436-2522
Names
Legal:BUNZAI MEDIA GROUP, INC.
Addresses
Location:16161 VENTURA BLVD # 378 ENCINO CA 91436-2522
Contacts
Business Location:CHRISTOPHER BOND;ALON NOTTEA Business Phone +1 (818) 785-6800

## Attributes for Employment 001-0341-6

Identities
FEIN              2514
SOS Corp Id:C3239863
TPI          :0057-1963904
Account ID :001-0341-6
Account Attributes
AccountType                                              :EMP
Dates & Status
Account Commence Date (1st Payroll Date)                 :01-Oct-2010
Cease (Last Subject Date)                                :31-Mar-2013
Status                                                   :Closed
Inactivation Reason                                      :OUT-OF-BUSINESS
Reinstate Date
Employer Type and Reporting Codes
Employer Type                                            :COMMERCIAL (01)
UI Reporting Code                                        :Tax Rated
DI Reporting Code                                        :Subject
PIT Reporting Code                                       :Subject
ETT Reporting Code                                       :Subject
Filing Information
Filing Frequency                                         :Quarterly - Employer
Potentially Subject                                      :No
Mail Returns                                             :No
Reason for not mailing returns                           :Electronic Filer
Mandatory EFT Payer?                                     :No
Mandatory Elec Filer?                                    :No
Allow Supplemental Tax Returns                           :No
Allow Supplemental Wage Reports                          :No
Registered for ACH Credit                                :No
Registration
Number of California employees                           :1
Employs family members (Employerâ€™a Parent, Minor Child Under 18, or Spouse)?
Miscellaneous
Have you ever owned or been a principal owner in a business registered with EDD? :No
Registration Source                                      :TeleReg
Reason for Application                                    :New Business
Registered Agents
Payroll Reporting Agent
Counseling Service Agent
UI Election Code
UI Exemption Code
NAICS
NAICS Level Primary Commence Cease Title
541613AccountTrue08-Sep-2011Marketing Consulting Services US

1/16/2015

ATTACHMENT B

APP 000136
Ex. 1

SUNZAI MEDIA GROUP, INC., 001-0341-6
16161 VENTURA BLVD # 378 ENCINO CA 91436-2522
RETURNS BY PERIOD

| PERIOD | STATUS |
|--------|--------|
| 30-Sep-13 | Not Required |
| 30-Sep-13 | Not Required |
| 30-Jun-13 | Not Required |
| 30-Jun-13 | Processed |
| 31-Mar-13 | Processed |
| 31-Mar-13 | Not Required |
| 31-Dec-12 | Processed |
| 31-Dec-12 | Processed |
| 30-Sep-12 | Processed |
| 30-Sep-12 | Processed |
| 00-Sep-12 | Processed |
| 30-Jun-12 | Processed |
| 30-Jun-12 | Processed |
| 31-Mar-12 | Processed |
| 31-Mar-12 | Processed |
| 31-Dec-11 | Processed |
| 31-Dec-11 | Processed |
| 30-Sep-11 | Processed |
| 30-Sep-11 | Processed |
| 30-Jun-11 | Processed |
| 31-Mar-11 | Processed |
| 31-Mar-11 | Processed |
| 31-Dec-10 | Processed |
| 31-Dec-10 | Processed |

| DLQ | RECEIVED | RETURN |
|-----|----------|--------|
| 31-Oct-13 | | Wage Report |
| 31-Oct-13 | | Tax Return |
| 31-Jul-13 | | Tax Return |
| 31-Jul-13 | 15-Aug-13 | Wage Report |
| 30-Apr-13 | 1-Aug-13 | Tax Return |
| 30-Apr-13 | | Wage Report |
| 31-Jan-13 | 12-Feb-13 | Tax Return |
| 31-Jan-13 | 13-Feb-13 | Wage Report |
| 31-Oct-12 | 24-Oct-12 | Wage Report |
| 31-Oct-12 | 13-Nov-12 | Wage Report |
| 31-Oct-12 | 19-Nov-12 | Tax Return |
| 31-Jul-12 | 14-Aug-12 | Tax Return |
| 31-Jul-12 | 1-Aug-12 | Wage Report |
| 30-Apr-12 | 17-Apr-12 | Tax Return |
| 30-Apr-12 | 17-Apr-12 | Wage Report |
| 31-Jan-12 | 17-Jan-12 | Tax Return |
| 31-Jan-12 | 17-Jan-12 | Wage Report |
| 31-Oct-11 | 14-Oct-11 | Tax Return |
| 31-Oct-11 | 14-Oct-11 | Wage Report |
| 1-Aug-11 | 15-Jul-11 | Tax Return |
| 1-Aug-11 | 19-Jul-11 | Wage Report |
| 2-May-11 | 20-Apr-11 | Wage Report |
| 2-May-11 | 26-Apr-11 | Tax Return |
| 21-Jan-11 | 20-Feb-11 | Tax Return |
| 31-Jan-11 | 31-Jan-11 | Wage Report |

EDD

Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

by

Employment Tax Branch

ATTACHMENT B

APP. 000137
Ex. 1

```
EDD     STATE OF CALIFORNIA
DE6                              EDD    04204
        PAGE   1 OF   1

QTR ENDED    12 31 10      DUE  01 01 11     DELINQUENT 01 31 11          10   4
```

00060198

00103416

BUNZAI MEDIA GROUP, INC.
16161 VENTURA BLVD SUITE 378

ENCINO CA 91436

1          1        1

VOLUNTARY PLAN DI                        No Payroll   Final Return

626160427          KHRISTOPHER          BOND

20000.00                    20000.00              100.00

# EDD
Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

20000.00              20000.00         100.00

20000.00              20000.00         100.00

I declare that the information herein is correct to the best of my knowledge and belief.          CAWA0101 06/15/04

SIGNATURE _____   TITLE CPA

DATE  1/31/11        PHONE 818-242-7800

0222112599020028

EDD      STATE OF CALIFORNIA
DESC                                    EDD      10053
         PAGE    1 OF    1

009C0111

QTR ENDED    03 31 11      DUE   04 01 11      DELINQUENT  05 02 11                    11   1

00103416

BUNZAI MEDIA GROUP, INC.
16161 VENTURA BLVD SUITE 378

ENCINO CA 91436

0        0        0

VOLUNTARY PLAN DI                                  X  No Payroll    Final Return

# EDD
Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

0.00               0.00               0.00

I declare that the information herein is true and correct to the best of my knowledge and belief.        CAWA0603  12/27/10

SIGNATURE                                    TITLE CPA

DATE   4/24/11                               PHONE 818-242-7800

0429112268010033

ATTACHMENT B                                      APP_000139
                                                  Ex. 1

```
PROGRAM: WGSBM012                    STATE OF CALIFORNIA                RUN DATE: 09/23/2013
REPORT : WGSBM012-01            EMPLOYMENT DEVELOPMENT DEPARTMENT        RUN TIME:   16:59:38
                                     WAGE RECORD SYSTEM                  PAGE NUMBER:     527

                           QUARTERLY ARCHIVE REPORT BY ACCOUNT
```

ACCT NO 001-0341

| EE NAME SSA | BR | 11-1 | | | 11-2 | | | 11-3 | | | 11-4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P PIT WAGES | SUBJ WAGES PIT WHLD | A | P PIT WAGES | SUBJ WAGES PIT WHLD | A | P PIT WAGES | SUBJ WAGES PIT WHLD | A | P PIT WAGES | SUBJ WAGES PIT WHLD | A |
| AGUILAR | INGRID 000 | | | | | | | | | | S 1683.70 1683.70 | | F |
| AGUIRRE | DANIEL 000 | | | | S 65.00 65.00 | | F | S 70.50 70.50 | | F | | | |
| ALVARADO | ANDREW 000 | | | | S 807.11 807.11 | | F 3.42 | S 5844.09 5844.09 | | F 34.69 | S 6441.35 6441.35 | | F 62.04 |
| ARACY | LEOR 000 | | | | S 692.31 692.31 | | F 0.73 | S 4846.17 4846.17 | | F 5.11 | S 4846.17 4846.17 | | F 5.11 |
| AVILA | RUDY 000 | | | | S 803.88 803.88 | | F 3.34 | S 5809.81 5809.81 | | F 32.64 | S 2522.41 2522.41 | | F 5.94 |
| BATES | TINEKA 000 | | | | S 218.00 218.00 | | F | S 1211.80 1211.80 | | F | | | |
| BLAZEK | MYNOK 000 | | | | S 830.50 830.50 | | F | S 6097.84 6097.84 | | F 0.15 | S 3326.41 3326.41 | | F 4.26 |
| BOND | KHRISTOPHE 000 | | | | | | | | | | S 30000.00 30000.00 | | F 323.99 |
| CAREY | AVEAR 000 | | | | | | | S 5810.96 5810.96 | | F 41.33 | S 6053.27 6053.27 | | F 46.06 |
| CARROLL | JACQUELINE 000 | | | | | | | | | | S 3763.06 3763.06 | | F 35.35 |
| COLLIER | ANDRE | | | | | | | | | | S 2327.27 | | F |

## EDD
Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by 

ATTACHMENT B

APP. 000140
Ex. 1

```
PROGRAM: WGSBMD12                        STATE OF CALIFORNIA                    RUN DATE: 09/23/2013
REPORT : WGSBMD12-01              EMPLOYMENT DEVELOPMENT DEPARTMENT             RUN TIME:   16:59:38
                                       WAGE RECORD SYSTEM                      PAGE NUMBER:    528

                             QUARTERLY ARCHIVE REPORT BY ACCOUNT
```

ACCT NO 001-0341

| EE NAME<br>SSA | BR | 11-1<br>P PIT WAGES | SUBJ WAGES | A PIT WHLD | 11-2<br>P PIT WAGES | SUBJ WAGES | A PIT WHLD | 11-3<br>P PIT WAGES | SUBJ WAGES | A PIT WHLD | 11-4<br>P PIT WAGES | SUBJ WAGES | A PIT WHLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COLWELL | 000<br>KELLY | | | | | | | S | 706.40 | F | | 2327.27 | 8.80 |
| GARCIA | 000<br>MOSES | | | | S | 896.58 | 7.36 | | 706.40<br>5984.24 | F<br>40.03 | S | 5937.84 | 38.00 |
| GETTER | 000<br>LAURA | | | | | 896.58 | | | 5984.24 | | S | 5937.84<br>2346.48 | F<br>0.11 |
| GODOY | 000<br>VICTOR | | | | S | 836.65 | F | S | 6717.53 | F | | 2346.48<br>7873.19 | F |
| GUERRERO | 000<br>ROLAND | | | | | 836.65<br>1615.38 | 4.81<br>F | | 6717.53<br>4063.45 | 72.30<br>F | | 7873.19 | 123.13 |
| KIDD | 000<br>CHADNE | | | | S | 1615.38<br>459.20 | 54.37<br>F | S | 4063.45<br>5617.92 | 118.77<br>F | S | 5171.92 | F |
| LATSABIDZE | 000<br>IGOR | | | | | 459.20 | | | 5617.92 | 27.56 | | 5171.92<br>1090.00 | 13.57<br>F |
| MANSOUR | 000<br>ANDREE | | | | S | 1476.92 | F | S | 10296.04 | F | S | 1090.00<br>10298.58 | F |
| MCKENDRIE | 000<br>JUSTIN | | | | | 1476.92<br>1153.85 | 39.92<br>F | | 10296.04<br>8307.75 | 276.64<br>F | | 10298.58<br>8884.61 | 276.81<br>F |
| MEDINA | 000<br>PAUL | | | | S | 1153.85<br>923.08 | 18.87<br>F | S | 8307.75<br>6461.56 | 151.30<br>F | | 8884.61<br>6461.56 | 183.47<br>F |
| MEDRANO | 000<br>JUAN | | | | | 923.08 | | S | 6461.56<br>342.33 | F | | 6461.56 | |
| MORENO | 000<br>CRISTINA | | | | | | | | 342.33 | | S | 3008.85 | 44.81 |
| NOTTEA | 000<br>ALON | | | | | | | | | | S | 3008.85<br>18461.52 | F |
| NOTTEA | 000<br>MOTTI | | | | | | | | | | S | 18461.52<br>60000.00 | 352.28<br>F |
| OCONNELL | 000<br>NICOLE | | | | S | 896.32 | F | S | 6031.28 | F | | 60000.00<br>451.21 | 1199.35<br>F |
| OSHRROA | 000<br>ASHLEY | | | | S | 896.32<br>964.15 | 7.40<br>F | | 6031.28<br>276.96 | 276.96<br>F | | 451.21 | |
| PIMENTEL | 000<br>RANDY | | | | | 964.15 | | S | 276.96<br>4603.34 | F | S | 466.45 | F |
| QUINTANILLA | 000<br>MARIA | | | | S | 1193.85 | F | | 4603.34<br>2909.62 | 33.37<br>F | | 466.45 | |
| RAFFIN | 000<br>PATRICK | | | | | 1193.85 | 21.24 | S | 2909.62<br>4711.34 | 39.12<br>F | S | 6378.56 | F |
| REUVEN | 000<br>ROI | | | | | | | | 4711.34 | 34.49 | | 6378.56<br>11076.90 | 57.39<br>F |
| RODRIGUEZ | 000<br>STEPHANIE | | | | S | 351.70 | F | S | 4911.39 | F | | 11076.90 | 142.35 |

ATTACHMENT B                                    APP 000141
                                                                    Ex. 1

```
PROGRAM: WGSBM012                    STATE OF CALIFORNIA               RUN DATE: 05/23/2013
REPORT : WGSBM012-01          EMPLOYMENT DEVELOPMENT DEPARTMENT        RUN TIME:   16:55:38
                                    WAGE RECORD SYSTEM                 PAGE NUMBER:     529

                          QUARTERLY ARCHIVE REPORT BY ACCOUNT

ACCT NO 001-0341
```

| SSA | EE NAME BR | P PIT WAGES | 11-1 SUBJ WAGES | A PIT WHLD | P PIT WAGES | 11-2 SUBJ WAGES | A PIT WHLD | P PIT WAGES | 11-3 SUBJ WAGES | A PIT WHLD | P PIT WAGES | 11-4 SUBJ WAGES | A PIT WHLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 000 | | | | | 351.70 | | | 4911.39 | 31.86 | | | |
| RUBIO | SANDRA 000 | | | | S | 1183.85 | F | | 8862.71 | F | S | 5706.56 | F |
| RUTIAGA | JORGE 000 | | | | | 1183.85 | 20.58 | | 8862.71 | 187.08 | | 9706.56 | 237.75 |
| SAMAYOA | GEZNER 000 | | | | S | 922.20 | F | S | 6019.54 | F | S | 6143.56 | F |
| | | | | | | 922.20 | 8.64 | | 6019.54 | 41.49 | | 6143.56 | 47.48 |
| SANDOVAL | EVELYN 000 | | | | | | | S | 4122.45 | F | S | 6302.46 | F |
| | | | | | | | | | 4122.45 | 18.71 | | 6302.46 | 60.02 |
| SHICHEN | ALON 000 | | | | | | | S | 534.20 | F | | | |
| | | | | | | | | | 534.20 | | | | |
| SMITH | DEREK 000 | | | | | | | S | 1615.73 | F | S | 6631.97 | F |
| | | | | | S | 991.47 | F | | 1615.73 | 9.92 | | 6631.97 | 68.54 |
| SOLANO | DAISY 000 | | | | | 991.47 | 1.10 | S | 5855.29 | F | S | 6349.50 | F |
| | | | | | | | | | 5855.29 | | | 6349.50 | 2.77 |
| STANLEY | ANDREW 000 | | | | | | | | | | | 1620.45 | 7.50 |
| | | | | | S | 916.31 | F | S | 5754.41 | F | S | 6130.28 | F |
| STEINBERG | ZACHARY 000 | | | | | 916.31 | | | 5754.41 | | | 6130.28 | |
| | | | | | | | | | | | | 1808.41 | 8.55 |
| THORNTON | GLORIA 000 | | | | | | | S | 4412.60 | F | S | 5706.96 | F |
| | | | | | | | | | 4412.60 | | | 5706.96 | 0.78 |
| WALTER | LANEISHA 000 | | | | | | | S | 2402.52 | F | | 57.70 | |
| | | | | | | | | | 2402.52 | 2.02 | | 57.70 | |
| YALLEY | NASTASSIA 000 | | | | S | 923.08 | F | S | 6461.56 | F | S | 6461.56 | F |
| | | | | | | 923.08 | 4.53 | | 6461.56 | 31.71 | | 6461.56 | 31.71 |
| YOUNGBLOOD | JAMEY 000 | | | | | | | | | | | 1412.56 | F |
| | | | | | | | | | | | | 1412.56 | 9.55 |
| SUBJ WAGE TOTALS | | | | | | 19,121.39 | | | 147,673.33 | | | 267,203.28 | |
| PIT WAGE TOTALS | | | | | | 19,121.39 | | | 147,673.33 | | | 267,203.28 | |
| PIT WHLD TOTALS | | | | | | | 196.33 | | | 1,229.79 | | | 3,197.29 |
| TOTAL EMPLOYEES | | | | | | | 22 | | | 32 | | | 36 |

EDD
Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

ATTACHMENT B

APP_000142
Ex. 1

PROGRAM : WGS&M012
REPORT : WGS8M012-01

STATE OF CALIFORNIA
EMPLOYMENT DEVELOPMENT DEPARTMENT
WAGE RECORD SYSTEM

RUN DATE: 08/20/2014
RUN TIME:  00:17:15
PAGE NUMBER:   514

QUARTERLY ARCHIVE REPORT BY ACCOUNT

ACCT NO 001-0341

| | 12-1 | | 12-2 | | 12-3 | | 12-4 | |
|---|---|---|---|---|---|---|---|---|
| EE NAME | P SUBJ WAGES A | | P SUBJ WAGES A | | P SUBJ WAGES A | | P SUBJ WAGES A | |
| SSA BR | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | |

ACCT NO 001-0341

| EE NAME | P SUBJ WAGES A | | P SUBJ WAGES A | | P SUBJ WAGES A | | P SUBJ WAGES A | |
|---|---|---|---|---|---|---|---|---|
| SSA BR | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | | PIT WAGES PIT WHLD | |
| AGUILAR INGRID 000 | S 5342.31 F 5342.31 | | 7532.15 T 7532.15 20.76 | | | | | |
| ALVARADO ANDREW 000 | S 5922.77 F 5922.77 64.26 | | 9131.11 T 9131.11 235.67 | | | | | |
| ARAZY LEOR 000 | S 4354.97 F 4354.97 6.58 | | | | | | | |
| BECKER BEAU 000 | | | S 5736.58 T 5736.58 92.61 | | | | | |
| BLANCO MYNOR 000 | S 5890.80 F 5890.80 7.79 | | 8299.61 T 8299.61 142.20 | | | | | |
| CAREY AVEAR 000 | S 5574.86 F 5574.86 58.03 | | S 8147.79 T 8147.79 135.35 | | | | | |
| CARROLL JACQUELINE 000 | | | S 8363.98 T 8363.98 153.15 | | | | | |
| CARROLL JAQUELINE 000 | S 6163.86 F 6163.86 77.46 | | | | | | | |
| CASTILLO GABRIEL 000 | S 2011.23 F 2011.23 27.96 | | 8608.53 T 8608.53 156.84 | | | | | |
| CASTRO IRIS 000 | | | 5208.84 T 5208.84 2.67 | | | | | |
| CHAVEZ BEATRIZ 000 | S 1070.70 F 1070.70 15.47 | | 8229.94 T 8229.94 172.97 | | | | | |
| CHALLEN ROGER 000 | | | S 5302.59 T 5302.59 67.17 | | | | | |
| COLLIER ANDRE 000 | S 5368.59 F 5368.59 44.23 | | 7256.97 T 7256.97 90.09 | | | | | |
| DELEON KATHERINE 000 | | | 1241.58 T 1241.58 | | | | | |
| FLORES EDITH 000 | | | 3273.30 T 3273.30 15.24 | | | | | |
| GARCIA JOEL 000 | | | 5687.83 T 5687.83 2.91 | | | | | |
| GARCIA MOSES 000 | S 5661.96 F 5661.96 52.45 | | 7335.85 T 7335.85 94.12 | | | | | |
| GATHONTON PATRICK 000 | S 948.04 F 948.04 | | 6848.48 T 6848.48 9.25 | | | | | |

EDD
Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

ATTACHMENT B

APP_000143
Ex. 1

```
PROGRAM: WGSBM012                          STATE OF CALIFORNIA                    RUN DATE: 09/20/2014
REPORT : WGSBM012-01                 EMPLOYMENT DEVELOPMENT DEPARTMENT            RUN TIME:   00:17:15
                                          WAGE RECORD SYSTEM                      PAGE NUMBER:     515

                               QUARTERLY ARCHIVE REPORT BY ACCOUNT

ACCT NO 801-0341            12-1                12-2                12-3                12-4
                    |----------------|  |----------------|  |----------------|  |----------------|
   EE NAME       P   SUBJ WAGES    A   P   SUBJ WAGES    A   P  SUBJ WAGES   A    P   SUBJ WAGES    A
   SSN    BR    PIT WAGES   PIT WHLD  PIT WAGES   PIT WHLD  PIT WAGES PIT WHLD   PIT WAGES   PIT WHLD

GETTEN    LAURA     S    2705.98   F   S    6522.40   T
          000       2705.98   20.89       6522.40   64.26
GOODY     VICTOR    S    7381.94   F   S    9836.93   T
          000       7381.94  138.62       9836.93   241.39
HERNANDEZ DIANA     S    1216.20   F   S    8274.40   T
          000       1216.20   13.02       8274.40   141.30
HOUSTON   LARENCE                      S     256.08   T
          000                               256.08
JONES     NICHOLAS  S    2016.36   F   S    5305.34   T
          000       2016.36   19.72       5305.34   62.58
KIDD      CHADNE    S    4867.04   F   S    6926.24   T
          000       4867.04   29.12       6926.24   83.53
KNIGHT    LAJUANDA  S    1039.20   F   S     796.80   T
          000       1039.20   14.09        796.80    11.25
KONWITA   SHANI     S     592.40   F
          000        592.40    2.43
LATCANNOSY IGOR     S     110.00   F
          000        110.00
MAGANA    JORGE     S    7087.60   F   S   10716.08   T
          000       7087.60   42.50       10716.08   94.22
MAL       AHMAD                        S    1951.47   T
          000                               1951.47   39.86
MANSOUR   ANDREE    S   10343.94   F   S   12758.84   T
          000      10343.94  355.70       12758.84  482.98
MAZ       GREGG                        S    2565.00   T
          000                               2565.00
MCKINNON  JUSTIN    S    8134.53   F   S    6600.00   T
          000       8134.53  182.07       6600.00   151.13
MORENO    CRISTINA  S    2792.81   F   S    3604.52   T
          000       2792.81  163.98       3604.52    55.41
HY        SIDGHAN   S      65.00   F
          000         65.00
NOLASCO   CARLO                        S    5905.39   T
          000                               5905.39    8.99
NOTTLA    ALON      S   16153.84   F   S   20215.56   T
          000      16153.84  384.34       20215.56   545.02
NOTTLA    MOTTI     S   50000.00   F
          000      50000.00  719.75
OSMAN     LUAM      S     945.24   F   S    7204.20   T
          000        945.24    5.64       7204.20    87.77
RAFFIN    PATRICK   S    6572.92   F   S    9398.40   T
          000       6572.92   99.93       9398.40   210.59
```

ATTACHMENT B

APP 000144
Ex. 1

```
PROGRAM: WGSBM012                    STATE OF CALIFORNIA                RUN DATE: 09/20/2014
REPORT : WGSBM012-01           EMPLOYMENT DEVELOPMENT DEPARTMENT        RUN TIME:   00:17:15
                                     WAGE RECORD SYSTEM                 PAGE NUMBER:     516

                            QUARTERLY ARCHIVE REPORT BY ACCOUNT

ACCT NO 001-0341         12-1                12-2                12-3                12-4
                  |---------------|  |---------------|  |---------------|  |---------------|
      EE NAME     P   SUBJ WAGES  A  P   SUBJ WAGES  A  P   SUBJ WAGES  A  P   SUBJ WAGES  A
   SSA      BR    PIT WAGES  PIT WHLD PIT WAGES  PIT WHLD PIT WAGES PIT WHLD PIT WAGES PIT WHLD

BETTENBACH    WILLIAM                    S   5759.92   T
              000                            5759.92      95.07
RIVAS         FELIBERTO  S   1652.22   F     S   6645.68   T
              000           1652.22      10.31    6645.68      62.94
ROTT          CHRISTOPHE                 S    300.00   T
              000                             300.00
RUBIO         SANDRA     S   8665.56   F     S  11864.73   T
              000           8665.56     217.82   11864.73     384.25
RUTTAGA       ERIK       S   3043.53   F     S   6819.14   T
              000           3043.53      14.53    6819.14      41.11
RUTTAGA       JORGE      S   5782.37   F     S   8305.02   T
              000           5782.37      57.75    8305.02     142.16
SAGANYO       GEINER     S   6207.17   F     S   8706.43   T
              000           6707.17      85.57    8706.43     195.28
SHAW          AMORY                      S   4239.22   T
              000                             4239.22      75.11
SHIVREN       ALON       S   4384.41   F
              000           4384.41      38.69
SMITH         DEREK      S   5477.34   F     S   7845.17   T
              000           5477.34       6.27    7845.17      24.20
SMITH         PATRICIA                   S    855.00   T
              000                             855.00
SOLANO        DAISY      S   6221.15   F     S   8371.32   T
              000           6221.15      79.20    8371.32     149.37
STANLEY       ANDREW     S   5893.05   F     S   7844.46   T
              000           5893.05              7844.46      12.16
STEINBERG     ZACHARY    S   3677.74   F
              000           3677.74      23.54
TAINA         ASHLEY     S   1041.90   F     S   7863.35   T
              000           1041.90      14.21    7863.35     155.35
THORTHIAN     GLORIA     S   3218.24   F
              000           3218.24       0.31
WILLIAMS      TIFFANY    S   1046.04   F     S   6703.37   T
              000           1046.04              6703.37
YOUNGBLOOD    JAMEY      S   3395.66   F
              000           3395.66      26.71

           SUBJ WAGE TOTALS     235,041.47          317,175.59
           PIT WAGE TOTALS      235,041.47          317,175.59
           PIT WHLD TOTALS        3,121.14            5,008.28
           TOTAL EMPLOYEES             42                  47
```

EDD

Serving the People
Of California

This is to certify that this is a
full, true and correct copy of the
data entered onto the Employment
Development Department tax system.

Employment Tax Branch

by

ATTACHMENT B

APP. 000145
Ex. 1

NTF  Employment
EDD  Development
     Department
State of California

**QUARTERLY CONTRIBUTION
RETURN AND REPORT OF WAGES
(CONTINUATION)**

REMINDER: File your DE 9 and DE 9C together.
You must FILE this report even if you had no payroll. If you
had no payroll, complete items C and O.

00090112

Page number  1  of  1

| QUARTER ENDED | DUE | DELINQUENT IF NOT POSTMARKED OR RECEIVED BY | YR | QTR |
|---|---|---|---|---|
| 09 30 12 | 10 01 12 | 11 02 12 | 12 | 3 |

**RECORD COPY ONLY
DO NOT SEND TO THE AGENCY**

CA 3/12 82484 10/31/12 09:46

Serving the People
Of California

is to certify that this is a
full, true and correct copy of the
data entered onto the Employer
Development Department tax system.

EMPLOYER ACCOUNT NO.
001 0341 6

DO NOT ALTER THIS AREA

T☐  S☐ W☐  A☐

EFFECTIVE DATE

BUNZAI MEDIA GROUP INC
16161 Ventura Blvd. #378

Encino, CA 91436

Employment Tax Branch

by

A. EMPLOYEES full-time and part-time who worked
during or received pay subject to UI for the payroll
period which includes the 12th of the month.

| 1st Mo. | 2nd Mo. | 3rd Mo. |
|---|---|---|
| 0 | 0 | 0 |

B. ☐ Check this box if you are reporting ONLY Voluntary Plan Disability Insurance
wages on this page. Report Personal Income Tax (PIT) Wages and PIT Withheld,
if appropriate. (See instructions for item B.)

C. ☐ NO PAYROLL
X

| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
|---|---|---|---|
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |
| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | | H. PIT WITHHELD |

| I. TOTAL SUBJECT WAGES THIS PAGE | J. TOTAL PIT WAGES THIS PAGE | K. TOTAL PIT WITHHELD THIS PAGE |
|---|---|---|
| 0 00 | 0 00 | 0 00 |

| L. GRAND TOTAL SUBJECT WAGES | M. GRAND TOTAL PIT WAGES | N. GRAND TOTAL PIT WITHHELD |
|---|---|---|
| 0 00 | 0 00 | 0 00 |

2  CADESC1   NTF 2578966   Copyright 2012 Greatland/Nelco – Forms Software Only

O. I declare that the information herein is true and correct to the best of my knowledge and belief.

Signature
Required

Title  Agent

Date  10/31/12   Phone

MAIL TO: State of California / Employment Development Department / P.O. Box 989071 / West Sacramento CA 95798-0071
DE 9C Rev. 1 (1-13) (INTERNET)

1119122120050040

NTF
DE 9C                    EDD 11260

PAGE   1 OF 1                                                              009C0111

QTR ENDED 12 31 12    DUE 01 01 13    DELINQUENT 01 01 13                        12 4

                                                                        001 0341 6

CA 4/12 82484 01/28/13 12:41

      BUNZAI MEDIA GROUP INC
      16161 Ventura Blvd. #378

      Encino, CA 91436
                                                        0          0          0

      VOLUNTARY PLAN DI                          No Payroll
                                                    X

                EDD            This is to certify that this is a
                               full, true and correct copy of the
          Serving the People   data entered onto the Employment
          Of California        Development Department tax system.

                               Employment Tax Branch

                               by

                         0  00                   0  00                   0  00

                         0  00                   0  00                   0  00

I declare that the information herein is true and correct.

          Signature                            Title  Agent
          Date  01/28/13              Phone  (888)  632-2940
          2 CASCALT   NTF 2577005   Copyright 2012 Drestland/Nelco - Forms Software Only
                 0213132478050025

                              ATTACHMENT B                        APP 000147
                                                                      Ex. 1

**EDD** Employment Development Department
State of California

**QUARTERLY CONTRIBUTION RETURN AND REPORT OF WAGES (CONTINUATION)**

REMINDER: File your DE 9 and DE 9C together. You must FILE this report even if you had no payroll. If you had no payroll, complete items C and O.

Page number 1 of 1

009C0111

QUARTER ENDED 03/31/2013   DUE 04/01/2013   DELINQUENT IF NOT POSTMARKED 04/30/2013

I hereby certify that this is a full, true and correct copy of the data entered onto the Employment Development Department tax system.

EMPLOYER ACCOUNT NO. 001-0341-6

BUNZAI MEDIA GROUP INC
16161 VENTURA BLVD SUITE 378
ENCINO, CA 91436

Check this box if you are reporting ONLY Voluntary Plan Disability Insurance wages on this page. Report Personal Income Tax (PIT) Wages and PIT Withheld, if appropriate. (See instructions for Item B.)

NO PAYROLL

| D. SOCIAL SECURITY NUMBER | E. EMPLOYEE NAME (FIRST NAME) | (M.I.) (LAST NAME) | | |
| --- | --- | --- | --- | --- |
| F. TOTAL SUBJECT WAGES | G. PIT WAGES | H. PIT WITHHELD | | |

| I. TOTAL SUBJECT WAGES THIS PAGE | J. TOTAL PIT WAGES THIS PAGE | K. TOTAL PIT WITHHELD THIS PAGE |
| --- | --- | --- |
| 0.00 | 0.00 | 0.00 |

| L. GRAND TOTAL SUBJECT WAGES | M. GRAND TOTAL PIT WAGES | N. GRAND TOTAL PIT WITHHELD |
| --- | --- | --- |

O. I declare that the information herein is true and correct to the best of my knowledge and belief.

Signature ▶ _____   Title: CPA (Owner, Accountant, Preparer, etc.)   Phone (818) 242-7800   Date 08/05/13

MAIL TO: State of California / Employment Development Department / P.O. Box 989071 / West Sacramento CA 95798-9071

DE 9C Rev 1 (1-12) (INTERNET)   Page 1 of 2   Fast, Easy, and Convenient! Visit EDD's Web site at www.edd.ca.gov

0815132060050034

ATTACHMENT B

APP. 000148
Ex. 1