JONATHAN E. NUECHTERLEIN
General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN,
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343 (voice)
(310) 824-4380 (fax)
Attorneys for Plaintiff Federal Trade Commission

FILED CLERK, U.S. DISTRICT COURT JUN 16 2015 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY

LODGED CLERK, U.S. DISTRICT COURT JUN 15 2015 CENTRAL DISTRICT OF CALIFORNIA DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. CV15-04527 GW(PLAx) |
| Plaintiff, | LODGED UNDER SEAL |
| v. | CERTIFICATION AND DECLARATION OF PLAINTIFF'S COUNSEL REID TEPFER IN SUPPORT OF PLAINTIFF'S: (A) *EX PARTE* APPLICATION FOR ORDER WAIVING ADVANCE NOTICE REQUIREMENT; (B) *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER |
| BUNZAI MEDIA GROUP, INC., et al., | |
| Defendants. | |

JONATHAN E. NUECHTERLEIN
General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN,
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343 (voice)
(310) 824-4380 (fax)
Attorneys for Plaintiff Federal Trade Commission

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case No. CV15-04527-GW(PLAx)

LODGED UNDER SEAL

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

BUNZAI MEDIA GROUP, INC., et al.,

Defendants.

CERTIFICATION AND DECLARATION OF PLAINTIFF'S COUNSEL REID TEPFER IN SUPPORT OF PLAINTIFF'S: (A) *EX PARTE* APPLICATION FOR ORDER WAIVING ADVANCE NOTICE REQUIREMENT; (B) *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER

RULE 65 CERTIFICATION

|   |
|---|
| EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; AND (C) *EX PARTE* APPLICATION FOR AN ORDER TEMPORARILY SEALING THE DOCKET |

I, Reid Tepfer, declare as follows:

1. I am over 21 years old and am a citizen of the United States. I am an attorney for the Plaintiff, Federal Trade Commission ("FTC"), in the above-captioned case.

2. I am an active member in good standing with the State Bar of Texas. My business address is Federal Trade Commission, 1999 Bryan Street, Suite 2150, Dallas, Texas, 75201.

3. I submit this certification and declaration pursuant to Rule 65(b)(1)(B) of the Federal Rules of Civil Procedure, in support of the FTC's application for a waiver of the Court's advance notice requirement and requests that the FTC's proposed Temporary Restraining Order and Order Temporarily Sealing Case be issued *ex parte*, without notice to Defendants.

4. The FTC has not given Defendants notice of the action against them, and has not communicated with Defendants concerning the FTC's allegations or requests for *ex parte* relief. As set forth below, there is good cause to issue a

temporary restraining order and order temporarily sealing the case without notice to Defendants.

### Defendants' Deceptive Business Practices

5.  The FTC has filed a Motion for *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, and Other Equitable Relief ("TRO Motion") that is supported by hundreds of pages of exhibits, including declarations from consumers, Federal Trade investigators, and the Better Business Bureau. The submitted evidence shows that, since as early as 2010,[1] Defendants have been using deceptive business practices that violate Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, Section 907(a) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b). Further, the evidence shows that Defendants have caused millions of dollars in consumer injury.[2]

6.  Defendants market skincare products over the Internet using deceptive offers with hidden costs, negative option features, and return policies.[3]

---

[1] *See* App. 2, ¶6.

[2] App. 27.

[3] App. 667-68, ¶¶8-9; App. 718-19; App. 760, ¶2.

Specifically, Defendants falsely offer "risk free trials" or "gifts" of products to consumers nationwide using online banners, popup advertisements, and websites.[4] Defendants' offers trick consumers into purchasing Defendants' product and enrolling in a continuity plan that charges consumers for additional products each month.[5]

7.  Defendants require consumers who accept their risk free trials or gifts to provide credit or debit card billing information, purportedly to pay nominal shipping and handling fees to receive the advertised products.[6] However, 10 days after receiving consumers' billing information, Defendants charge consumers the full costs of the products, imposing charges of up to $97.88 onto consumers' credit or debit cards.[7] Defendants also enroll consumers into a negative option continuity plan, in which Defendants ship additional products each month and charge consumers' credit or debit cards the full costs of the products, usually

---

[4] See App. 27-28, ¶¶54-55; App. 30-31, ¶¶63-64; App. 650, ¶2; App. 666 ¶2.

[5] See App. 652, ¶6; App. 675, ¶2; App. 693, ¶¶4-5; App. 669, ¶4; App. 696, ¶4; App. 706-07, ¶¶6-7; App. 716, ¶8; App. 731-32, ¶¶3,7; App. 760-62, ¶3,5,7.

[6] See App. 27, ¶¶55-56; App. 30-31, ¶64; App. 692, ¶2; App. 705, ¶2.

[7] See App. 265; App. 468; App. 652, ¶6; App. 667-69, ¶¶¶7,8,14; App. 675, ¶3; App. 692, ¶3; App. 728, ¶¶4,5; App. 735-36; App. 742-45, ¶7-9, ¶11; App. 754-56.

$97.88 per month.[8] Moreover, consumers often have significant difficulty receiving a refund and cancelling the continuity plan. Finally, Defendants refuse to provide consumers with refunds for product returns unless the products are returned unused and unopened within 30 days of placing the order.[9] These practices are unlawful and violate Section 5 of the FTC Act, ROSCA, and EFTA.

**Reasons Why an *Ex Parte* Temporary Restraining Order is Necessary**

8. This Court may issue a temporary restraining order without notice to Defendants "only if specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The FTC's evidence makes such a showing.

9. The evidence establishes that Defendants are violating, and unless enjoined by this Court, are likely to continue to violate:

    a. Section 5(a) of the FTC Act by: failing to adequately disclose material terms of their offer, including the offer's cost and negative option features; falsely representing that Defendants' business is accredited by the Better Business Bureau with an "A-" rating; and

---

[8] *See* App. 652, ¶6; App. 675, ¶2; App. 693, ¶¶4-5; App. 669, ¶4; App. 696, ¶4; App. 706-07, ¶¶6-7; App. 716, ¶8; App. 731-32, ¶¶3,7; App. 760-62, ¶3,5,7.
[9] *See* App. 266; App. 404; App. 429; App. 436; App. 454; App. 469; App. 482; App. 496-97; App. 515-16.

unfairly charging consumers' credit or financial accounts without authorization;

b. ROSCA by: failing to clearly and conspicuously disclose all material terms of the negative option feature of their sales offer before obtaining consumers' credit card or financial information; failing to obtain consumers' informed consent to a negative option feature before charging consumers' credit cards or financial accounts; and failing to provide a simple mechanism for consumers to stop recurring charges to credit cards or financial accounts;

c. EFTA by: debiting consumers' financial accounts without consent of the consumers.

10. Irreparable harm may be presumed in a statutory enforcement action brought by a law enforcement agency. *See United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172, 176 (9th Cir. 1987); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984).

11. In addition, evidence shows that Defendants are likely to dissipate assets or destroy business documents, either of which would cause immediate and irreparable injury, loss, or damage to the FTC's ability to prosecute this matter and to the Court's ability to award effective, final relief at trial or other disposition:

    a. Defendants operate their deceptive enterprise through a maze of interrelated shell companies[10] that are owned or managed by a handful of individuals.[11] These companies and individuals conceal their identities and affiliation with one another from consumers[12] and from their own financial institutions.[13] Instead, the companies and individuals conduct business under unregistered, assumed names.[14]

    b. Defendants have used their multitude of corporate structures and shell companies to establish and maintain access to the banking and financial services needed to continue their scheme.[15] In particular, Defendants' business practices depend upon having the ability to impose charges onto consumers' credit and debit cards. Unlike a legitimate business that establishes an account with a merchant bank or payment processor, Defendants have established numerous accounts with merchant banks and payment processors—all using

---

[10] App. 2-10, ¶¶6-20; App. 780, ¶5.

[11] *See* App. 2-10, ¶¶6-20; App. 779-82, ¶4, ¶¶6-10; App. 555-611.

[12] App. 784, ¶¶17-18.

[13] App. 784, ¶¶17-18.

[14] App. 18; App. 174-75; App. 180-81; App. 218-21.

[15] App. 784, ¶¶17-18.

unique billing descriptors.[16] In this way, Defendants can continue their business practices without interruption even if a merchant account is terminated due to consumer complaint, refund, or chargeback activities.

c. To avoid losing merchant accounts in response to consumer complaint, refund, or chargeback activities, Defendants threaten to seek criminal prosecution of consumers who request refunds from their credit card issuers (called "chargebacks") for unauthorized charges.[17]

d. When consumers seek chargebacks, Defendants deceive merchant banks and payment processors by presenting falsified documents that make it appear that Defendants' websites require consumers to click a box indicating they have read and agreed to the terms and conditions of their offer when completing their purchase.[18]

e. Defendants have connections to foreign jurisdictions[19] and, according to one former employee, have already been transferring funds

---

[16] App. 784, ¶¶17-18.

[17] App. 469.

[18] App. 783-84, ¶¶15-16.

[19] App. 617, ¶17.

overseas to hide assets and avoid tax liabilities.[20] In addition, one defendant, Igor Latsanovski, is currently in the process of having his lawful status in the U.S.A. revoked.

12. Defendants' efforts to conceal their identities, their well-documented deceptive conduct, and their suspicious banking activities demonstrate a strong probability that Defendants are likely, if given advance notice of this action, to obstruct or frustrate the law enforcement proceedings against them by dissipating assets or destroying business records and documents.

13. In the FTC's law enforcement experience, Defendants who receive advance notice of the filing of an action by the FTC often attempt to immediately dissipate assets or destroy documents, as illustrated by the following examples, provided on information and belief:

    a. In *FTC v. Transcontinental Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the FTC moved for temporary restraining order, but provided prior notice to the defendants rather than proceeding *ex parte*. The Court granted the FTC's motion for a temporary restraining order freezing the defendants' assets and appointing a receiver, but when the receiver and FTC arrived at the defendants' premises, they found hundreds of empty file folders with labels indicating that they had

---

[20] App. 13, ¶29.

contained records of recent transactions. The defendants told the receiver that five computers, including that of the corporate defendant's CFO, had been "stolen" the night before, and thus could not be examined.

b. In *FTC v. Connelly*, No. 06-cv-00701 (C.D. Cal. 2006), the Court issued an *ex parte* TRO with an asset freeze against one defendant, but issued a noticed Order to Show Cause to the other two individual defendants, ordering them to show cause the following week as to why their assets should not be frozen. With notice that the FTC sought to freeze their assets, the three defendants withdrew at least $800,000 over the next two days, some of which was clearly subject to the asset freeze. One of the defendants whose assets were not immediately frozen withdrew approximately $450,000 from various accounts. By that defendant's own admission, he then transferred the money to friends, family, and his attorneys, "invested" $100,000 in a restaurant, and paid off a $49,000 car loan for the defendant whose assets were frozen. The third defendant transferred $350,000 to her attorney. Upon finding out that the defendants were rapidly withdrawing large sums of money, the Court reversed its earlier

decision and froze the assets of the remaining two individuals. Only a portion of the money was recovered.

c. In *FTC v. Physicians Healthcare Dev., Inc.*, No. 02-02936 (C.D. Cal. 2002), defendants were given short notice of a temporary restraining order hearing. By the time of the hearing, defendants had removed all business records and computer equipment from the business premises. None of the records and computers were ever recovered.

d. In *FTC v. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), the Court denied the FTC's request that an asset freeze be issued without notice to defendants, and instead scheduled a noticed hearing on the relief sought. Within hours of receiving notice, an individual defendant withdrew approximately $200,000 from one of his bank accounts.

e. In *FTC v. Renaissance Fine Arts, Ltd.*, No. 1:94CV0157 (N.D. Ohio 1994), the FTC filed a case without seeking an *ex parte* temporary restraining order with asset freeze. Shortly after the action began, the defendant liquidated his business and fled the country. The FTC then sought a temporary restraining order with an asset freeze, but it was too late. Although the FTC ultimately obtained a substantial monetary judgment, it could not be collected.

f. In *FTC v. Academic Guidance Servs.*, No. 92-3001 (AET) (D.N.J. 1992), defendants discovered that the FTC intended to file a case against them (and seek *ex parte* temporary restraining order) the following week. The FTC later learned that after this discovery, the defendants promptly leased a document shredder and spent the weekend destroying evidence.

g. In *FTC v. World Class Network, Inc.*, CV-97-162 AHS (C.D. Cal. 1997), after the court had issued an *ex parte* restraining order, two of the defendants withdrew $202,000 from the bank, spent it, and hid in assets after being served with the restraining order and asset freeze. The spouse of another defendant withdrew over $100,000 and left the state to open and deposit funds into an out-of-state account.

h. In *FTC v. Your Yellow Book*, CIV-14-786-D (W.D. Ok. 2014), the FTC received an *ex parte* temporary restraining order and asset freeze. Because defendants operated the business out of their home, the FTC requested, and was granted, a provision requiring a turnover of business documents, rather than immediate access to the business premises. After the bank mistakenly failed to freeze some of the defendants' accounts, one defendant withdrew nearly $30,000. Additionally, Defendants attempted to delete nearly 3,000 business

records from the business's computer before turning it over to the FTC. The court later held defendants in contempt for these actions, finding that some of the money had been withdrawn with notice of the TRO and that the defendants had attempted to destroy evidence in violation of the TRO. Unfortunately, the FTC was unable to recover over $7,000 because defendants had lost that money at a casino.

14. In addition, as described in the following examples, also provided upon information and belief, temporary restraining orders with asset freezes, including *ex parte* temporary restraining orders, are effective in preventing dissipation or concealment of assets and aiding in their recovery:

   a. In *FTC v. Goldman Schwartz Inc.*, No. 4:13-cv-00106 (S.D. Tex. 2013), the FTC sought and received an *ex parte* TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account at BBVA and purchased a cashier's check payable to his non-defendant wife. Shortly thereafter, the owner liquidated approximately $160,000 in securities held in a personal TD Ameritrade account. The next day, the owner's wife withdrew

another $18,500 from a non-defendant corporation's account that was covered by the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all the money. TD Ameritrade received a faxed copy of the TRO and froze the owner's account before he could withdraw the proceeds from the sale of the securities, and the cashier's check and cash were voluntarily relinquished in response to a threatened contempt action.

b. In *FTC v. Prime Legal Plans*, No. 12061872 (S.D. Fla. 2012), the FTC sought and received a temporary restraining order and asset freeze against the defendants. Despite this, defendants, after learning of the FTC's action but before the asset freeze had been fully implemented, immediately directed the transfer of approximately $1.7 million from corporate bank accounts and into accounts held by a relative, a spouse, and a girlfriend. Because the court had issued an asset freeze, the bank was able to recover close to $1.5 million of that money, although $197,000 had been spent and was not recoverable.

c. In *FTC v. Productive Mktg.*, No. 00-065020-NM-BQR (C.D. Cal. 2000), the defendants' attempt to withdraw money from their bank was stymied by the temporary restraining order.

    d. In *FTC v. Inetintl Com, Inc.*, CV-98-2140-CAS-CW (C.D. Cal. 1998), a defendant who had been served with the temporary restraining order nevertheless tried to withdraw money from his bank account, but was unsuccessful because the temporary restraining order had been served on the bank.

    e. In *FTC v. Equifin Int'l*, CV-97-4526 DT (C.D. Cal. 1997), due to an *ex parte* temporary restraining order and freeze, a receive was able to recover money that an individual defendant withdrew after the order was served on the corporate defendants.

15. The FTC's request for temporary relief is intended to maintain *status quo* over assets and business documents relating to Defendants' law violations until a fair and impartial hearing may be held before the Court.

**Reasons Why an *Ex Parte* Order to Temporarily Seal Case is Necessary**

16. A seal is also warranted in light of the efforts of various newspapers to regularly monitor court filings. For example, provided on information and belief, in June 1999, the FTC's Western Region, Los Angeles Office, filed an *ex parte* motion for a TRO in *FTC v. Wazzu Corp.*, No. SACV-99-762-AHS (Anx) (C.D. Cal. 1999). When the FTC attorneys arrived at the defendants' business premises three days later to serve the TRO, the defendants said that they had already learned that the FTC had filed a case against them. The defendants'

attorney stated that they subscribe to a monitoring service that checks all court filings on a daily basis to see whether any of the service's subscribers have been sued and that the monitoring service had seen information showing that the defendants had been sued by the FTC. This was confirmed by an FTC attorney who spoke to the employee of the monitoring service who had discovered the FTC's lawsuit.

## Conclusion

17. For all the above reasons, as contemplated by Federal Rule of Civil Procedure 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the dissipation of assets, and from the concealment, transfer, or destruction of Defendants' records, if Defendants receive advance notice of the FTC's Complaint and TRO Motion. In addition, it is in the interests of justice that this Court grant the FTC's *Ex Parte* Motion for an Order Temporarily Sealing the Entire File and Docket.

18. The FTC has not made a previous application for similar relief in this matter.

Respectfully submitted,
JONATHAN E. NUECHTERLEIN
General Counsel

DAMA J. BROWN
Regional Director

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: 6/15/15 | /s/ Reid Tepfer |
| 3 | | REID TEPFER, |
| | | Texas Bar No. 24079444 |
| 4 | | LUIS GALLEGOS |
| 5 | | Oklahoma Bar No. 19098 |
| | | Federal Trade Commission |
| 6 | | 1999 Bryan Street, Suite 2150 |
| 7 | | Dallas, Texas 75206 |
| | | (214) 979-9395 (Tepfer) |
| 8 | | (214) 979-9383 (Gallegos) |
| 9 | | (214) 953-3079 (fax) |
| 10 | | rtepfer@ftc.gov; lgallegos@ftc.gov |
| 11 | | |
| | | RAYMOND MCKOWN, |
| 12 | | California Bar No. 150975 |
| 13 | | 10877 Wilshire Boulevard, Suite 700 |
| | | Los Angeles, California 90024 |
| 14 | | (310) 824-4343(voice) |
| 15 | | (310) 824-4380 (fax) |
| | | rmcknown@ftc.gov |