**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
ANNAH S. KIM (State Bar No. 190609)
akim@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Attorneys for Defendants**
**Igor Latsanovski and Calenergy, Inc.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BUNZAI MEDIA GROUP INC., et al., <br><br> Defendants. | CASE NO. CV 15-04527 GW (PLAx) <br><br> ***EX PARTE APPLICATION* FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> *[Declarations of Annah S. Kim and Igor Latsanovski and [Proposed] Order Filed Concurrently]* <br><br> **Date:        TBD** <br> **Time:        TBD** <br> **Judge:      Hon. George Wu** |

# EX PARTE APPLICATION

Igor Latsanovski ("Latsanovski") and Calenergy, Inc. ("Calenergy") hereby apply *ex parte* for partial relief from the Temporary Restraining Order ("TRO") issued by this Court on June 16, 2015 (Doc. No. 14).  This Application is made on the grounds that the TRO imposes an unreasonable asset freeze on money acquired before and after the TRO was issued, the asset freeze imposes a substantial hardship on Latsanovski and Calenergy, and the FTC cannot establish grounds for the imposition of the asset freeze because there is no evidence that Latsanovski or Calenergy have dissipated assets.

This Application is made *ex parte* because Latsanovski and Calenergy will be irreparably prejudiced because (1) Latsansovski will not be able to pay for his family's living expenses such as Latsanovski's mortgage, health insurance, lease payments and other substantial financial obligations and (2) legitimate businesses unrelated to the subject skincare business may be forced to shut down and will be unable to repay its third party investors if relief is not granted before the August 6, 2015 hearing on the preliminary injunction.

Pursuant to Local Rule 7.19, notice of this *ex parte* application was provided to the FTC on July 15, 2015 via e-mail and the FTC opposes this application.  (Kim Decl., ¶ 8, Ex. J).

DATED: July 15, 2015          SCHEPER KIM & HARRIS LLP
                              MARC S. HARRIS
                              ANNAH S. KIM


                       By:  /s/  Annah S. Kim
                            ───────────────────────────
                            Annah S. Kim
                            Attorneys for Defendants Igor Latsanovski
                            and Calenergy, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ....................................................................................... 1

II. FACTS .. ................................................................................................... 3

    A.    CALENERGY WAS A CREDITOR ....................................................... 3

    B.    IGOR LATSANOVSKI WAS A SILENT INVESTOR ....................... 4

    C.    LATSANOVSKI'S ASSETS ARE NOT PROCEEDS FROM THE SKINCARE BUSINESS ................................................................ 4

    D.    LEGITIMATE BUSINESSES MAY BE FORCED TO CLOSE .......... 4

    E.    THE ALLEGED SKINCARE MARKETING BUSINESS CEASED IN 2014 ................................................................................ 6

III. LEGAL ARGUMENT ............................................................................. 7

    A.    THERE IS NO BASIS FOR THE RECEIVER ................................... 8

        1.    Legal Standards For Injunctive Relief In The FTC Act Context ................................................................................. 8

        2.    The Balance Of The Equities Does Not Favor An Injunction .............................................................................. 8

    B.    THERE IS NO BASIS FOR PERSONAL LIABILITY ..................... 10

    C.    THERE IS NO WARRANT FOR AN ASSET FREEZE ................... 11

    D.    THE ONE ALLEGATION OF DISSIPATION OF ASSETS ALLEGATION IS UNSUBSTANTIATED ......................................... 12

    E.    THE ASSET FREEZE IS OVERBROAD ......................................... 13

    F.    THE ASSET FREEZE IMPOSES AN ENORMOUS HARDSHIP ...................................................................................... 15

IV. CONCLUSION ...................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .........................................10

*F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ...............................14

*F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373 (D. Conn. 2009) ...............14

*F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012).........13, 14

*FTC v. Evans Products Co.*, 775 F. 2d 1084 (9th Cir. 1985)....................................12

*F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) ...................13, 14

*FTC v. John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009)....................................................................................................................12

*FTC v. Loewen*, C12-1207, 2012 WL 4045207 (W.D. Wash. Sept. 13, 2012)...........9

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)...................10, 11

*F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908(N.D. Ill. 2006) ...........................................14

*F.T.C. v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ............................................13, 14

*FTC v. Sterling Precious Metals, LLC*, 894 F. Supp.2d 1378 (S.D. Fla. 2012)..........8

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 ......................................................................14

*FTC v. Warner Comm'cs Inc.*, 742 F.2d 1156 (9th Cir. 1984)...................................8

*F.T.C. v. Zamani*, No. SACV 09-0977-DOC, 2011 WL 2222065, at *13 (C.D. Cal. June 6, 2011) ...........................................................................................................13

*Johnson v. Couturier*, 572 F.2d 1067 (9th Cir. 2009) ........................................12, 16

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..............................................................8

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     <u>INTRODUCTION</u>**

3        With only cursory fact investigation, relying on hearsay and indulging in a

4   host of unsupported assumptions, plaintiff Federal Trade Commission (the "FTC")

5   applied *ex parte* and obtained a temporary restraining order, a complete asset freeze

6   and other relief against several individual and corporate defendants, including

7   Latsanovski and Calenergy.  There was absolutely no need for this *ex parte*

8   approach.  Many of the corporate defendants in the case dissolved long ago.  There

9   is no evidence that any of the defendants were engaged in efforts to hide or dissipate

10  assets.  Thus, there was no exigency here, and the FTC should have subjected its

11  thin case to the adversarial process rather than rushing into Court to obtain relief

12  without notice to any of the defendants.

13       With particular regard to Latsnovski and Calenergy, the FTC's stealth

14  approach is particularly troubling.  Indeed, the very evidence that the FTC gathered

15  in the course of its investigation reveal that Latsanovski had no involvement in the

16  operations of the subject skincare business, and that Calenergy is a legitimate

17  business engaged in legitimate activities wholly separate from the skincare business.

18  The financial records obtained by the FTC show that Latsanovski's and Calenergy's

19  assets have nothing to do with the skincare business, and that neither has made any

20  effort to hide or dissipate assets.  Thus, there was also absolutely no need for the

21  imposition of a receivership on Calenergy, and no warrant for an asset freeze with

22  respect to Latsanovski.

23       Defendants could have made all these points to the Court last month had the

24  FTC given appropriate notice.  Instead, based on a handful of consumer complaints

25  and a false claim that consumer injury was ongoing, the FTC chose to approach the

26  Court in stealth, making exaggerated claims bereft of any significant evidentiary

27  support.

28       Latsanovski and Calenergy intend to address these deficiencies in greater

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

1  detail in anticipation of the preliminary injunction hearing, presently set for August

2  6, 2015.  However, immediate partial relief is necessary for Latsanovski and

3  Calenergy.  The pending TRO and receivership have made it impossible for

4  Latsanovski to feed his family and pay his bills and may force legitimate businesses,

5  which did not have any relationship with the skincare business alleged in the

6  Complaint, to shut down and lose over $800,000 in investments.

7        Latsanovski and Calenergy request a partial modification of the TRO issued

8  by this Court on June 16, 2015 (Doc. No. 14).  As set forth below and in the

9  supporting declaration of Mr. Latsanovski, under the TRO, Mr. Latsanovski has no

10  means to support his family, continue operating his businesses and to meet his

11  substantial monthly personal and business obligations.  The existing freeze, and the

12  imposition of a receiver over Calenergy are not supported by the evidence and are

13  not warranted under the law because Latsanovski's sole involvement in the internet

14  skincare business that is the subject of this lawsuit was a line of credit that

15  Calenergy made to Alon Nottea, the owner and operator of the skincare business.

16  The loans, which were made through Calenergy, were fully paid off in 2015.  The

17  total net amount received by Calenergy was $317,746.05.

18        Through its TRO, the FTC has frozen or encumbered assets worth 16 times

19  the amount that Latsanovski and Calenergy received from the skincare business.

20  Moreover, the TRO's asset freeze includes an extraordinary and draconian provision

21  that prevents Latsanovski from spending assets he acquires *after* the imposition of

22  the TRO, and having nothing to do with the subject skincare business.  In other

23  words, even if Latsanovski were to resort to panhandling to raise money to feed his

24  family, the TRO would prevent him from spending whatever pennies he could

25  gather.

26        Because the FTC failed to provide any substantiated evidence of the

27  dissipation of funds by Latsanovski in its *ex parte* papers and he has established

28

2

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

1    substantial hardship due to the imposition of the freeze, the requested asset freeze

2    must be lifted as to Latsnovski.  Likewise, because the FTC has not, and cannot,

3    establish that Calenergy is engaged in any illegal or improper practices, there is no

4    justification for the continued involvement of the Temporary Receiver in

5    Calenergy's business affairs.  Accordingly, Latsanovski and Calenergy respectfully

6    request that this Court lift the asset freeze as to them and relieve the Receiver of any

7    duty over Calenergy.[1]

8    **II.**    **FACTS**

9         **A.**    **CALENERGY WAS A CREDITOR**

10         Latsanovski's sole role in the alleged internet skincare business was to loan or

11   invest money, through Calenergy, to Alon Nottea between 2010 and 2014.

12   Declaration of Igor Latsanovski ("Latsanovski Decl."), ¶¶ 6-7, 9-12.  Initially, in

13   2010, Calenergy provided $175,000 to Nottea as an investment in his internet

14   business, Bunzai Media Group, Inc. ("Bunzai Group").  Over the next several years,

15   Calenergy's investment became a line of credit where Calenergy would provide

16   funds when requested by Nottea.  Latsanovski Decl., ¶¶ 11-12.  Between 2010 and

17   2014, Calenergy approximately provided another $1.4 million in loans to Mr.

18   Nottea's internet skincare business, for a total of $1.6 million.  Latsanovski Decl., ¶

19   11, Ex. A (Davidian Spreadsheet).

20         From 2011 through 2015, the Bunzai Group intermittently made payments on

21   its loans from Calenergy.  Latsanovski Decl., ¶¶ 9-11, Ex. A (Davidian

22   Spreadsheet).  For example, from 2013 through 2015, Calenergy received various

23   payments ranging from $1,313.16 to $150,000.  Between 2010 and 2014, the Bunzai

24   Group's outstanding year-end balance did not exceed $500,000.  In total, Calenergy

25   _____

26   [1] To the extent, the FTC wishes to present additional evidence, it may do so at the
     August 6, 2015 hearing.

27

28                                              3

1  received approximately $1.9 million and made a $317,756.05 return during the

2  course of this four year investment.  Latsanovski Decl., ¶¶ 9-13, Ex. A (Davidian

3  Spreadsheet).  In June 2015, after the skincare business had ceased operating,

4  Calenergy agreed to make another loan to Nottea, in the amount of $325,000, in

5  connection with a business called Focus Media.  *Id.*, ¶ 13.

6  **B.   IGOR LATSANOVSKI WAS A SILENT INVESTOR**

7  As he testified under oath at his July 2, 2015 deposition, Latsanovski,

8  Calenergy's CEO, did not play any role in the operation of the internet skincare

9  business.  Latsanovski never spoke to any customers, was not involved in the day to

10  day operations of the internet skincare business and had no involvement in the

11  marketing or advertising of the skincare products, and never received any reports

12  regarding customer complaints.  Neither Calenergy nor Latsanovski received any

13  money from consumers directly.  Latsanovski Decl., ¶¶ 4-7, 11.  Importantly,

14  Calenergy did not receive any money from any defendant in this case until *after*

15  Calenergy provided loans to Mr. Nottea.  Latsanovski Decl., ¶¶10-13, Ex. A

16  (Davidian Spreadsheet).

17  **C.   LATSANOVSKI'S ASSETS ARE NOT PROCEEDS FROM THE**

18  **SKINCARE BUSINESS**

19  As noted above, the amount of Latsanovski's assets impacted by the TRO and

20  asset freeze far exceeds the amount he made from his investment in Mr. Nottea and

21  his companies.  In total, over $5.1 million of Latsanovski's assets have been

22  impacted by the asset freeze.  Latsanovski's $3.1 million home is subject to the

23  freeze and his personal bank accounts (which include approximately $60,000) have

24  been frozen.  Latsanovski Decl., ¶¶ 14, 21.

25  **D.   LEGITIMATE BUSINESSES MAY BE FORCED TO CLOSE**

26  As set forth in his declaration, Latsanovski's role in Sunset Holdings Partners

27  LLC, ComicsFix LLC, and Vastpay LLC was to locate third party investors who

28  4

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

would be willing to provide funds to these businesses and to facilitate the transfer of these third party funds to these businesses and Latsanovski did not play any role in their operations.  Latsanovski Decl., ¶ 25.  None of these businesses received funds from the subject skincare business.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though (a) these businesses are completely unrelated to the alleged internet skincare business, (b) are funded by other sources of income; and/or (c) were not run by Calenergy or Latsanovski:

- Sunset Holdings Partner LLC is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well Fargo account ($1.8 million) was frozen even though the vast majority of the funds frozen came from an outside real estate investor and a hard money lender in June 2015.  Latsanovski Decl., ¶ 24-25, Ex. B ($1.1 million transfer from outside investor on June 11, 2015 and $985,000 transfer from hard money lender on June 12, 2015).[2]

- Rilend, Inc. is a potential business venture for Mr. Latsanovski.  But its accounts (approximately $71,000) were frozen even though Rilend Inc. was not incorporated until April 2015, its bank accounts were not open until April 16, 2015, and its accounts were funded by Mr. Latsanovski personally – months after the internet skincare business dissolved in 2014.  Latsanovski Decl., ¶¶ 20, 21, 25 and Ex. C (Rilend statement).

- ComicsFix LLC, an online comics content provider, and Vastpay LLC, a

---

[2]  On June 30, 2015, the receiver and the FTC authorized the disbursement of funds from the Sunset's accounts to fund two real estate transactions that were in escrow at the time the freeze was imposed (Doc. No. 33.)

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

merchant service provider, are run by CEOs (not Latsanovski), never received any funds from the internet skincare business, and have no connection to the internet skincare business.  But their accounts (approximately $60,000) were also frozen.  Latsanovski Decl., ¶¶ 21, 25-26 (a) and (b).

These legitimate businesses cannot operate without access to the frozen funds and may be forced to shut down if access to these funds is not immediately granted.  Latsanovski Decl., ¶¶ 26(a)-(d), 27.  As a result of this freeze, these businesses have been unable to pay outstanding salaries to their CEOs and contractors, who rely on these businesses for income to support their families.  In addition to being unable to pay these salaries, ComicsFix, Vastpay and Sunset are losing business opportunities that could generate potential income for their contractors, CEOs, shareholders and third party investors.  Latsanovski Decl., ¶ 26(a)-(c); *see also* Latsanovski Decl., ¶ 26(d) (Rilend has lost the opportunity to invest in a mortgage company).  If these businesses are forced to shut down due to their inability to pay their expenses, not only will these bills remain unpaid, the shareholders in these companies also stand to lose over $800,000 funds already invested in these businesses and these businesses will not be able to repay its third party investors.  Latsanovski Decl., ¶ 26(a)-(d) (Vastpay's shareholders may lose $600,000 and ComicsFix shareholders may lose $200,000 in money already invested; Sunset Holdings may lose ownership of real estate properties and investments made in these properties).

## E.   THE ALLEGED SKINCARE MARKETING BUSINESS CEASED IN 2014

It is undisputed that Latsanovski understood that the internet skincare business stopped accepting new orders in 2014 and that the business entities allegedly involved in the internet skincare businesses were dissolved in 2014.  *See* and Latasanovski Decl., ¶ 20 (Bunzai business ceased taking new orders in 2014 and

6

1  Zen Media was dissolved at Alon Nottea's instruction in 2014).  The FTC's own

2  records also confirm his understanding because they show that the the businesses

3  involved in the internet skincare marketing business were dissolved by the end of

4  2014.  *See* Declaration of Brent McPeek, ¶¶ 6-13 and 16 [Doc. No. 6] at APP 2-8

5  (noting that defendants Bunzai Media Group, Inc. was dissolved in May 2013,

6  Pinnacle Logistics, Inc. was dissolved in December 2014, Media Urge, Inc. was

7  dissolved in December 2014, and other business entities were dissolved in 2014);

8  and FTC Memo (Doc. No. 5) at 21-22 (Media Urge, Inc. and Pinnacle Logistics

9  took over Bunzai's skincare marketing business).  So the FTC imposed on this Court

10  to obtain a temporary restraining order against companies that had ceased accepting

11  new orders many months earlier.

## III.  <u>LEGAL ARGUMENT</u>

13      As set forth below, the FTC cannot establish any basis for the imposition of a

14  receiver or an unlimited asset freeze because Calenergy was a silent investor and

15  Latsanovski had no involvement in the operations of the internet skincare business.

16  Further, even if Latsanovski were liable (which he is not), his liability should be

17  limited to the return Calenergy received on its investment/loan in the internet

18  skincare business ($317,756.05) because Calenergy did not have any role in the

19  internet skincare business and did not directly receive any consumer proceeds.

20  Because Latsanovski has more than adequate assets to cover this liability and the

21  FTC cannot establish any likelihood of dissipation of his assets, an asset freeze and

22  receiver are not warranted.

23      The imposition of the asset freeze is also unwarranted because it unjustifiably

24  imposes a substantial hardship not only on Latsanovski, but also on the legitimate

25  businesses, their shareholders and third-party investors, which have no relationship

26  to the internet skincare business.  If the asset freeze is not lifted, Latsanovski will

27  not be able to pay for his family's food and home or other living expenses.  In

28

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

1  addition, legitimate businesses will be unable to pay their mounting operating

2  expenses and may have to shut-down if relief is not granted immediately, which

3  would result in vendors, employees and others who rely on these businesses for

4  income to remain unpaid and the loss of the significant investments already made in

5  these businesses.

6       A.    **THERE IS NO BASIS FOR THE RECEIVER**

7           1.   *Legal Standards For Injunctive Relief In The FTC Act Context*

8       "It frequently is observed that a preliminary injunction is an extraordinary and

9  drastic remedy, one that should not be granted unless the movant, by a clear

10 showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968,

11 972, (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and

12 Procedure § 2948, pp. 129–130 (2d ed. 1995)).  Although the FTC need not satisfy

13 the traditional equity standard that courts typically impose on private litigants to

14 justify imposition of a preliminary injunction, it must nonetheless demonstrate

15 (1) the likelihood that it will ultimately succeed on the merits, and (2) that a balance

16 of the equities weighs in favor of granting the relief requested.  *FTC v. Warner*

17 *Comm'cs Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984).  When the FTC seeks "the

18 granting of extraordinary injunctive relief," it bears a "heavy burden."  *FTC v.*

19 *Sterling Precious Metals, LLC*, 894 F. Supp.2d 1378, 1383 (S.D. Fla. 2012).

20          2.   *The Balance Of The Equities Does Not Favor An Injunction*

21      Even if the FTC could establish that it is likely to succeed on the merits—and

22 it cannot— the requested injunctive relief of a receiver and asset freeze is not

23 warranted because the FTC fails to meet its burden of showing that the balance of

24 equities tips in favor of an injunction.  The equities in this case weigh heavily

25 against any injunctive relief, for at least three reasons.

26      First, Calenergy and Latsanovski did not engage in any misconduct, let alone

27 a pattern of misconduct.  Neither Latsanovski nor Calenergy ever sold any skincare

28

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY
RESTRAINING ORDER

products, engaged in deceptive marketing or any of the other conduct alleged in the Complaint.  Latsanovski Decl., ¶¶ 4-8.  Indeed, all that the Complaint alleges about Latsanovski is that he is an owner of Bunzai Media Group, Inc. and was the CEO of Zen Mobile Media Group, Inc.  Complaint [Doc. No. 3], ¶ 28.  The FTC argues that Latsanovski's signature on Zen Media's behalf suggests "knowledge of the company's business practices and high chargeback requests."  FTC Brief [Doc. No. 5] at 22.  In fact, Calenergy was only an investor in Bunzai Media, not an owner, and Latsanosvski had no involvement in Zen Media other than incorporating that entity at Mr. Nottea's request.  Latsanovski Decl., ¶¶ 4-5, 15-18.[3]  Further, even the FTC's own evidence supports the fact that Latsanovski was only an investor.  *See* Stanley Decl., ¶ 8 [Doc. No. 9-4] at App. 781.

With respect to Calenergy, all the Complaint and the FTC alleges is that it operated as part of a common enterprise with the other corporate defendants (Complaint [Doc. No. 3], ¶ 31) and that it "held itself out as the parent company of Pinnacle and Media Urge, Inc." (FTC Brief [Doc. No. 5] at 23), but again, the FTC provides no evidence that Calenergy participated or had any role in the alleged internet skincare business.

Second, and perhaps most significantly, there is no risk of Defendants causing any continued harm to consumers because the business that is described in the Complaint no longer exists.  This fact alone provides a sufficient basis for denying the FTC's proposed injunction.  See *FTC v. Loewen*, C12-1207, 2012 WL 4045207 (W.D. Wash. Sept. 13, 2012) (holding that "without evidence of ongoing activity

---

[3] Latsanovski was deposed by the Temporary Receiver on July 2, 2015, and provided detailed information regarding his interactions with Mr. Nottea and the circumstances surrounding his limited involvement with Bunzai Media and Mr. Nottea's other businesses.

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

1   affecting consumers, the balance of equities tips in favor of Defendants").  Under

2   these circumstances, the "public interest" vaguely alluded to in the FTC's brief does

3   not outweigh the substantial harm to Latsanovski and businesses were a permanent

4   injunction to issue.

5       In arguing that the equities support a preliminary injunction, the FTC once

6   again relies on flimsy assumptions instead of evidence-backed facts.  Most

7   egregiously, the FTC contends that the equities support issuance of an injunction

8   because "there is a strong likelihood that future violations will occur" because of the

9   *other* Defendants' prior conduct, not the conduct of Latsanovski and Calenergy.

10  FTC Brief [Doc. No. 5] at 40-41.  Despite being the lynchpin of the FTC's argument

11  for an injunction, this statement is flat-out untrue.  The FTC *knows* that Latsanovski

12  and Calenergy will not "continue to defraud the public" because it is undisputed that

13  Mr. Latsanovski understood that the operations of the internet skincare business

14  were shut down months ago.  Accordingly, the FTC's argument is mistaken, if not

15  deliberately misleading.

16      In sum, the FTC has failed to meet its burden of showing that Latsanovski or

17  Calenergy will either continue to engage in the allegedly deceptive and unfair

18  conduct—because they can't—or "conceal, dissipate, or otherwise divert their

19  assets, thereby defeating the possibility of the Court granting effective final relief."

20  *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Although the FTC

21  has a general interest in preventing consumer harm, under these particular

22  circumstances, the balance of the equities does not tip in favor the issuance of a

23  preliminary injunction.

24      **B.     THERE IS NO BASIS FOR PERSONAL LIABILITY**

25      To establish individual liability for equitable restitution under the FTC Act,

26  the FTC must establish that:  (1) the individual must have participated directly in the

27  deceptive acts or had the authority to control them and (2) the individual "had

28

10

*knowledge* that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1138 (9th Cir. 2010) (emphasis in original). The FTC may establish knowledge by showing that an individual "had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 1138 (citation omitted)

Reckless indifference can be found if the defendant ignored or failed to investigate "numerous warning signs" of dishonest or fraudulent conduct. *Id.* at 1141 (finding knowledge established where individual defendants received customer complaints and distributed unfounded projections in marketing materials). Warning signs of dishonest or fraudulent conduct included: (1) the receipt of multiple customer complaints; (2) knowledge that unsupported financial projections were being used in marketing materials and contracts; and (3) the receipt of reports indicating delays, which rendered projections impossible to achieve. *Id.*

Even assuming that the FTC could establish the first prong, that Latsanovski actively participated in or controlled the subject businesses (which it cannot), the FTC cannot establish that Latsanovski knew, avoided knowing or was recklessly indifferent to any alleged dishonest or fraudulent conduct by any corporate defendant because it is undisputed that: (a) Latsanovski's sole involvement in the internet skincare business was Calenergy's line of credit to Mr. Nottea; (b) Calenergy was a silent investor; and (c) Mr. Latsanovski had no involvement or knowledge regarding the skincare business operations and did not receive any customer complaints. Accordingly, unlike the individual defendants in *Network Services*, Latsanovski could not have been on notice of any dishonest or fraudulent conduct or customer injury resulting from this conduct and cannot be held liable for

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

1  any of the corporate defendants' acts.

2  ## C.  THERE IS NO WARRANT FOR AN ASSET FREEZE

3  To begin with, if there is no basis for a preliminary injunction, there clearly is

4  no basis for an asset freeze.  As shown above, the evidence that the FTC has

5  marshaled in support of its injunction application is woefully lacking.

6  Beyond this, a likelihood of dissipation of assets is essential for an asset

7  freeze.  *Johnson v. Couturier*, 572 F.2d 1067, 1085 (9th Cir. 2009).  Mere evidence

8  of deceptive marketing, uncoupled with evidence of dissipation, is insufficient.  *FTC*

9  *v. John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17,

10 2009).  *See also FTC v. Evans Products Co.*, 775 F. 2d 1084, 1089 (9th Cir. 1985)

11 (no irreparable harm because FTC failed to prove that the defendant "is likely to

12 secret away assets before relief can be effectuated").

13 Here, as shown in the declaration of Igor Latsanovski, he has not dissipated

14 any assets and has fully cooperated with the FTC and Receiver in providing his

15 financial information and sitting for a deposition on July 2, 2015.  Further, even if

16 Latsanovski was liable for any violation of the FTCA, his liability should be limited

17 to Calenergy's return on its investment, $317,746.05, not the total amount of

18 consumer loss in this case, which is fully covered by his assets – his home alone has

19 over $1 million in equity.  Latsanovski Decl., ¶ 14.  As such, no asset freeze is

20 required.

21 ## D.  THE ONE ALLEGATION OF DISSIPATION OF ASSETS
22 ALLEGATION IS UNSUBSTANTIATED

23 The FTC justified its draconian asset freeze by asserting that Defendants had

24 planned or attempted in the past to hide assets.  The only "evidence" offered by the

25 FTC to support this claim is the FTC investigator's characterization of a

26 conversation with a former disgruntled Bunzai employee, Dawn Goddard, in which

27 Goddard purportedly described a conversation with Kristopher Bond during which

28

12

Bond told Goddard that defendants transferred money to Lichtenstein.[4]  The FTC made no attempt to substantiate this double-hearsay allegation.  For example, the FTC offered no evidence that any monies were transferred from any defendants' bank accounts to Lichtenstein.  *See generally* Appendix [Doc. Nos. 6-9].  This reliance on "hearsay affidavits, not subject to cross-examination, in granting injunctive relief" presents substantial dangers.  *Sterling Precious Metals,* 894 F. Supp.2d at 1383.  This is especially true in this case where the FTC's relies on hearsay (and double hearsay and triple hearsay) to establish this broad allegation.

## E.    THE ASSET FREEZE IS OVERBROAD

The district court has "broad authority to fashion appropriate remedies for violations of the FTC."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (citations omitted); *F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1085-86 (C.D. Cal. 2012) (citations omitted).  Although this court has the authority to award restitution to redress consumer injury, it also may order a defendant to disgorge illegally obtained funds "to deprive wrongdoers of ill-gotten gains."  *Commerce Planet*, 878 F. Supp. 2d at 1087.  As such, the court should only authorize an award of consumer loss when equity requires a defendant to restore a consumer to the status quo.  *Stefanchik*, 559 F.3d at 931 (9th Cir. 2009) (noting that "Equity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment"); *F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) (noting "courts have often awarded restitution in the full amount of funds lost" where "equity may require a defendant to restore" the status quo.); *F.T.C. v. Zamani*, No. SACV 09-0977-DOC, 2011 WL 2222065, at

---

[4] Notably, although the FTC was able to obtain a declaration from former employee, Andrew Stanley, it failed to obtain any declaration from Ms. Goddard.  *See* McPeek Decl., ¶ 28 [Doc. No. 6] at APP 13.

13

*13 (C.D. Cal. June 6, 2011) (noting that "it is error to simply conclude that the "total amount paid by consumers" constitutes the defendant's unjust enrichment without accounting for refunds and actual services rendered.")(citation omitted).

Courts typically measure restitution by total consumer loss where defendants directly received consumer proceeds or were directly involved in the alleged misconduct – neither of which is present here. *See Stefanchik*, 559 F.3d at 931-32 (upholding award of consumer loss where defendants "were driving force behind marketing scheme" and had "authority to control" it); *Inc21.com Corp.*, 745 F. Supp. 2d at 1011  (upholding use of consumer loss as measurement of restitution where defendants directly received proceeds from consumers); *Commerce Planet, Inc.*, 878 F. Supp. 2d at 1088-1090 (awarding consumer loss where individual defendant supervised business operations and reviewed alleged misleading statements).

Courts have recognized that loss should be measured by a defendants' ill-gotten gain, not total consumer loss, where, as here, the defendant did not participate in marketing or selling the products to consumers or directly receive consumer proceeds.  *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir 2006) (finding FTC's remedy was limited to Defendants' profit where defendant did not directly market products to consumer or receive funds from consumers).  In *Verity*, the court rejected the FTC's attempt to recover all consumer losses from the defendant as overbroad because it was a fallacy to rely on "shorthand from cases in which only one who sold directly to the consumers was sued." *Id.*  Because a middleman received funds from the consumers directly, the Second Circuit directed the district court to consider how much of this money was received by defendant and that this fraction constituted defendant's unjust enrichment or ill-gotten gains.  *See also F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011) ("funds returned

DEFENDANTS' *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

1   to consumers or never received by a defendant are not unjust gains").[5]

2       Because any monies received by Calenergy or Latsanovski were re-payments

3   a line of credit made by Calenergy to Alon Nottea, and neither Calenergy nor

4   Latsanovski played any role in the skincare business, it would be inequitable to

5   permit the FTC to seize all of Latsanovski's or Calenergy's assets to secure losses

6   allegedly caused by conduct of others.

7       It is also inequitable to permit the FTC to freeze assets that are not related to

8   the subject skincare business.  ComicsFix, Vastpay and Sunset were all funded by

9   outside investors, not proceeds from the internet skincare business.  For example,

10  the accounts of Sunset Holding Partners LLC ("Sunset") have been frozen even

11  though Sunset was formed in January 2015, Sunset is a real estate investment

12  company, and the vast majority of the funds frozen in June 2015 (approximately

13  $1.8 million) came from an outside real estate investor and a hard money lender in

14  June 2015.  Latsanovski Decl., ¶¶ 24-26, Ex. B and C.

15      At most, the asset freeze should be limited to the amount of Latsanovski's

16  alleged unjust enrichment – the $317,756.05 return on the loan/investment by

17  Calenergy in the skincare business calculated by Mr. Davidian -- all of which was to

18  be reinvested in Focus Media as part of $500,000 Calenergy line of credit in June

19

20  _____

21  [5] Other courts are in accord with this reasoning.  *See F.T.C. v. QT, Inc.*, 448 F. Supp.
    2d 908, 974-75 (N.D. Ill. 2006) (citing *Verity* and noting that "defendant's gain will

22  be equal to the consumer's loss because the consumer buys goods or services
    directly from the defendant" but "it is incorrect to generalize this shorthand and

23  apply it" to cases where others take "consumer's money before it reaches a
    defendant's hands); *F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 380 (D.

24  Conn. 2009) (noting "if the funds flow directly to the defendant, the defendant is in
    receipt of the whole amount and thus liable in restitution for the whole amount, i.e.,

25  its gain, but if the funds flow through an intermediary who passes only a portion of
    the funds on to the defendant, the defendant has not unjustly received the whole

26  amount."); *aff'd,* 654 F.3d 359 (2d Cir. 2011).

27

28
                                         15

2015.  Latsanovski Decl., ¶ 12.  This amount can be easily secured by a lien on Latsanovski's home, which has equity far in excess of this amount.  (Latsanovski Decl., ¶ 14).  As such, there is no need for an asset freeze.

### F.    THE ASSET FREEZE IMPOSES AN ENORMOUS HARDSHIP

Not only is there no basis for an asset freeze, but the existing freeze has created an enormous hardship for Latsanovski and his legitimate businesses, as shown in his declaration.  The sweeping freeze has made it difficult, if not impossible, for him to provide for himself and his family and to continue running his legitimate businesses.

In *Johnson v. Couturier*, 572 F. 2d at 1085-86, the Ninth Circuit recognized that the balance of hardships of an asset freeze might be mitigated where the injunction is limited to permit a defendant "to cover normal living expenses and legal fees" and allows the defendant "to petition the court at any time for consent to an asset transfer or disposal."  Here, however, the asset freeze imposed by the Court *ex parte* includes no such limitations.  Indeed, the FTC included in its proposed order a draconian provision that even assets acquired *after* the date of the order are subject to the freeze.

This provision suggests that, not only can Latsanovski not use his legitimately earned funds to feed his family, but he cannot earn or borrow additional funds to do so.   How does the FTC propose Latsanovski and his wife and children eat or keep a roof over their heads?  Even if Latsanovski were permitted to spend funds acquired after the freeze was imposed, how does the FTC propose Latsanovski obtain these funds?  The TRO has effectively stopped legitimate businesses, which are completely unrelated to the subject skincare business, from operating or generating any potential income, prevented these companies from paying their CEOs and contractors, and put them on the verge of closing down because they cannot pay their mounting expenses out of the frozen accounts.  *See* Latsanovski Decl., ¶¶ 24-

16

1    26(a)-(d).  There is no authority for this draconian sanction – particularly for

2    someone who is not alleged to have done anything wrong.

3    **IV.    <u>CONCLUSION</u>**

4            Because the FTC did not establish an adequate basis or immediate need for

5    imposing an asset freeze and receivership in its *ex parte* papers and there is no

6    evidence of any dissipation of funds, and Defendants Igor Latsanovski and

7    Calenergy, Inc. respectfully request that this Court lift the asset freeze as to

8    Latsanovski's and Calenergy's assets and relieve the Receiver of any duty over

9    Calenergy.

10   DATED: July 15, 2015                SCHEPER KIM & HARRIS LLP
                                         MARC S. HARRIS
11                                       ANNAH S. KIM

12

13

14                                       By:   /s/  Annah S. Kim
                                               Annah S. Kim
15                                             Attorneys for Defendants Igor Latsanovski
16                                             and Calenergy, Inc.

17

18

19

20

21

22

23

24

25

26

27

28
                                    17