**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
ANNAH S. KIM (State Bar No. 190609)
akim@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
Telephone: (213) 613-4655
Facsimile: (213) 613-4656

Attorneys for Defendants
Igor Latsanovski and Calenergy, Inc.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP INC., et al.,<br><br>Defendants. | CASE NO. CV 15-04527 GW (PLAx)<br><br>**DECLARATION OF IGOR LATSANOVSKI IN SUPPORT OF *EX PARTE* REQUEST FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER**<br><br>*[Ex Parte Application for Partial Relief From Temporary Restraining Order; Declaration of Annah S. Kim and [Proposed] Order Filed Concurrently]*<br><br>Date: TBD<br>Time: TBD<br>Judge: Hon. George Wu |

DECLARATION OF IGOR LATSANOVSKI

## DECLARATION OF IGOR LATSANOVSKI

I, IGOR LATSANOVSKI, declare as follows:

1. I am a party in the above-entitled action. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. I am the sole shareholder and have been president and Chief Executive Officer of Defendant Calenergy, Inc. ("Calenergy") since approximately 2009. My duties as Calenergy's CEO include researching and selecting investment opportunities for Calenergy.

3. To the best of my ability, I answered all the questions and provided all information requested by the Receiver and the FTC in this matter in (a) my July 1, 2015 written responses to the FTC Questionnaire forms submitted on behalf of Calenergy and myself on July 1, 2015 and (b) during my July 2, 2015 deposition by the Receiver in this matter. Set forth below is information that I provided to the Receiver.

### INVESTMENT IN INTERNET SKINCARE COMPANY

4. Sometime in 2010, I was approached by Alon Nottea, to invest in an internet skincare project which later became Bunzai Media Group, Inc. ("Bunzai"). From my conversations with Mr. Nottea, I understood that he needed additional funds to hire additional employees and resources so he could develop his business selling skincare products over the internet more quickly. Because of my interest in internet businesses, I agreed to invest funds into Mr. Nottea's company.

5. Mr. Nottea introduced me to Khristopher Bond and Roi Reuveni, whom I understood would handle the day to day operations for the internet skincare business and who would handle all aspects of the business, including the marketing, advertising, product fulfillment and customer service. After due consideration, I

1 | decided that investing in Bunzai would be a good way to invest money for
2 | Calenergy.

6. As I explained during my July 2, 2015 deposition, my sole involvement in Bunzai, and all entities related to it ("Bunzai Group"), were the funds provided by Calenergy to Mr. Nottea and Calenergy was a silent investor in this business. As Calenergy's CEO, I had no involvement in the operation of the Bunzai Group and I had no authority to make any decisions regarding the operations of the Bunzai Group.

7. I did not perform any functions in advertising, payment processing, billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai Group's business operations. I was not notified by any person regarding any Bunzai Group's operational decisions. Moreover, I had no interactions with customers, did not receive any customer complaints, nor any reports of customer complaints. Calenergy did not directly receive any funds from the Bunzai Group's customers.

8. At no point did I believe that any customers were being deceived or defrauded. By all indications to me, Mr. Nottea was running a legitimate company operating in a legitimate industry.

### AMOUNTS INVESTED BY CALENERGY

9. At my request, my accountant, David Davidian, prepared a spreadsheet showing the transactions between Calenergy, Inc. and the other defendant entities named in this case from 2010 through 2015. A true and correct copy of this spreadsheet is attached as Ex. A. Because I do not have access to Calenergy's bank records from 2010 through 2012, I am unable to verify Mr. Davidian's accounting for those years, but based upon my review of the bank records available to me for 2013, 2014 and 2015, I was able to verify most of these transactions for those years.

10. Mr. Davidian's spreadsheet (Ex. A) was provided to the Receiver on July 2, 2015 and I was questioned on this spreadsheet during my July 2, 2015 deposition.

11. As set forth in Mr. Davidian's spreadsheet, Calenergy initially invested $175,000 for Alon Nottea's internet business, Bunzai Media Group, Inc. in 2010, and Calenergy continued to loan Mr. Nottea money through November 2014 for the internet skincare business. From 2010 through 2014, Calenergy invested approximately $1.6 million in Mr. Nottea's internet skincare businesses and Calenergy received approximately $1.9 million intermittently as a return on its investment or as repayment on its loans and interest.

12. In essence, what started a simple investment became a "line of credit" for the Bunzai Group wherein Calenergy would provide funds when requested by Mr. Nottea. As the Bunzai Group would repay Calenergy, the Bunzai Group would request additional funds for its operation against this line of credit. From 2010 through 2015, the Bunzai Group's outstanding year-end balance owed to Calenergy never exceeded $500,000.

13. According to Mr. Davidian's spreadsheet, Calenergy received $317,746.05 net return during the course of five years from Mr. Nottea and the Bunzai Group. In June 2015, Calenergy agreed to provide Alon Nottea a $500,000 line of credit for a different marketing business, Focus Media Solutions, and provided Mr. Nottea $325,000 check in June 2015.

14. According to the zillow.com, my home is worth approximately $3.1 million. Based upon the valuation and my outstanding mortgage loan, I have approximately $1.2 million in equity, which is more than sufficient to cover the $317,765.05 that Calenergy received from its four year investment or loans in the internet skincare marketing business.

## THE FORMATION OF ZEN MEDIA MOBILE, INC.

15. At my July 2, 2015 deposition, I was asked about Zen Media Mobile, Inc. As I explained at my deposition, at some point, Mr. Nottea asked me to form a company and open a merchant account. He explained that the skincare business was growing so rapidly that the company needed more merchant accounts to process the transactions.

16. Mr. Nottea explained to me that each merchant account had a monthly transaction limit and since the business was growing rapidly, he needed more accounts to service all of his customers. Mr. Nottea also advised me that his father and other acquaintances were also opening these accounts for the business, but that he would take care of everything that needed to be done to operate the merchant accounts.

17. At Mr. Nottea's request, on or about November 3, 2011, I caused Zen Mobile Media, Inc. ("Zen Mobile") to be incorporated and authorized Mr. Nottea to fill out the necessary paperwork for Zen Mobile to acquire a merchant account. I understood that Mr. Nottea or one of his employees would handle the merchant account business.

18. Once Zen Mobile was formed, I was not required to do very much in terms of Zen Mobile's business. I simply pre-signed many checks (black pre-signed Zen Mobile checks were recovered by the FTC) which were to be used by Mr. Nottea and his employees to operate the merchant account. I did not perform any functions in advertising, payment processing, billing, product fulfillment, or anything else. I had no interactions with customers.

19. At no point did I believe that any customers were being deceived or defrauded. By all indications to me, Mr. Nottea was running a legitimate company operating in a legitimate industry.

20. I understand that the Bunzai Group's business, run by Mr. Nottea and the other defendants, ceased taking new orders sometime in 2014, but continued to

fulfill existing subscription orders. And in or about approximately December 2014, Zen Media was dissolved at Mr. Nottea's instruction.

### THIS ASSET FREEZE IS AN SIGNIFICANT HARDSHIP

21. The asset freeze in this case has been a significant hardship on me because I am unable to pay my current legal obligations and the asset freeze prevents me from conducting business. The FTC has also frozen the following assets:

| Account Name | Amount Frozen |
| --- | --- |
| Wells Fargo, Personal Account | Approximately $55,000 |
| Wells Fargo, Mikhail Latsanovski (son) Account | Approximately $1,200 |
| Wells Fargo, Anna Latsanovski (daughter) Account | Approximately $243 |
| Wells Fargo, Calenergy, Inc. Account | Approximately $60,000 |
| Wells Fargo, Sunset Holdings | Approximately $200,000[1] |
| Wells Fargo, Rilend, Inc. | $71,000 |
| Bank of America Accounts (Personal, Calenergy, Vastpay LLC, Nexipay LLC, ComicsFix LLC) | Approximately $60,000 |

22. Currently (and for the last 5 years), I have been investing my money in various business ventures, but still have not generated any income from these investments to date. I currently do not receive a regular paycheck or any meaningful regular income, but I have received a salary from Calenergy, which I cannot receive while Calenergy's accounts are frozen. I am the sole provider for my wife, Tatiana, and my children, Anna (age 18) and Mihail (age 22).

23. Due to my inability to access my funds and assets since the freeze, I am unable to pay for food for my family. I also cannot pay my mortgage, medical insurance, or any other living expenses for my family because I am not able to spend or access any funds to pay my bills or cover any of my living expenses. My

---

[1] On June 30, 2015, the receiver and the FTC authorized the disbursement of funds from the Sunset's accounts to fund two real estate transactions that were in escrow at the time the freeze was imposed (Doc. No. 33.)

monthly expenses include my mortgage, utilities, my children's tuition, medical insurance payments, credit card payments and other significant legal obligations, including payments on a credit line. In addition, I will not be able to pay for my legal fees if my assets remain frozen.

### LEGITIMATE BUSINESSES MAY CLOSE DUE TO THE ASSET FREEZE

24. The asset freeze is also preventing other businesses, which are unrelated to the internet skincare business alleged in the Complaint, from conducting business to my detriment and the detriment of their vendors. Currently, business accounts for Vastpay LLC ("Vastpay"), Sunset Holding Partners LLC ("Sunset"), Rilend, Inc. ("Rilend") and ComicsFix LLC ("ComicsFix") are frozen even though they have no connection to the internet skincare business alleged in the Complaint because they are funded by overseas investors, run by CEOs and have additional shareholders. For example, most of the $1.8 million initially frozen by the asset freeze in Sunset's bank accounts were from funds from outside investors. Attached as Exhibit B is a true and correct copy of Sunset's Wells Fargo statement as of June 26, 2015 showing a $985,000 deposit by a hard money lender on June 12, 2015 and a $1.1 million wire from an outside real estate investor on June 11, 2015.

25. My investment strategy involves potential businesses contacting me to find investors for their businesses. My role is to locate these investors and facilitate the transfer of funds from these third party overseas investors to the potential businesses. I do not play any role in these potential or existing businesses other than to provide funds from third party investors to these businesses. These existing businesses (Sunset, ComicsFix and Vastpay) have additional shareholders and partners and they do not have any connection to the internet skincare business alleged in the Complaint. For example, Sunset is a real estate investment company, ComicsFix provides software and content related to comics, and Vastpay is a merchant service provider. And Rilend is a potential new business venture, which I funded personally. These entities did not provide or receive any business from the

internet skincare business. In fact, Sunset was not formed until January 16, 2015 and Rilend was not formed until April 16, 2015, both well after the internet skincare marketing business ceased. Attached as Exhibit C is a true and correct copy of a print-out from the California Department of State for Sunset Holding Partners, LLC and Rilend, Inc. and Rilend's account statement reflecting the initial deposit in April 16, 2015.

26. ComicsFix, Vastpay and Sunset received third party investments from Europe through Calenergy's bank accounts or directly from the investors. I do not play any role in the daily operations of these businesses and I do not control, manage or solely own these entities. These entities are run by Chief Executive Officers and have other shareholders and partners who rely on Calenergy or me for financial support for these businesses. Without this support or access to the business accounts, the outstanding salaries owed to the CEOs of Vastpay and ComicsFix and their contractors, who have their own families to support, cannot be paid and other outstanding bills, such as contractors who have performed work for these entities, also cannot be paid.

a. Due to the freeze, ComicsFix has been unable to pay its CEO and other contractors who rely on ComicsFix for income to support their own families. In addition, the CEO for ComicsFix has informed me that ComicsFix has been developing software for its business, but no longer can afford to pay its software developer and other outstanding business expenses, including salaries owed to contractors. Without paying these invoices, ComicsFix will not be able to develop the required software. In addition, potential investors, which ComicsFix needs to survive, will not invest in ComicsFix this month, and ComicsFix will have to shut down its business. If ComicsFix is forced to shut down, ComicsFix's shareholders will lose approximately $200,000 and potential future business opportunities, and its contractors and CEO will lose income to support their families.

b. Due to the freeze, Vastpay has been unable to pay outstanding salaries owed to its CEO and contractors, who rely on Vastpay for income to support their families. In addition, Vastpay has been unable to pay for its information technology required to run its merchant service provider business, including bills from its servers, as well as its current lease. If Vastpay's bills (and the outstanding salaries for the CEO and the contractors who rely on Vastpay for income) are not paid, Vastpay will be forced to shut down. If Vastpay is forced to shut down, the shareholders of Vastpay LLC could lose approximately $600,000 and its contractors and CEO will lose income.

c. Due to the freeze, Sunset has been unable to pay contractors who rely on Sunset for income to support their own families. Sunset not only cannot pay outstanding invoices and business expenses, but cannot honor current contracts for construction work and architect design on its properties. In addition, Sunset has a line of credit which it cannot make payments on. As a result of its inability to pay down this line of credit, Sunset lose the line of credit, which is a guaranty for properties purchased by Sunset. If this guaranty is lost, Sunset (including its shareholders) will also lose ownership and their investment in these properties and will not be able to repay its third party overseas investors. If Sunset has been unable to pay outstanding invoices for these contractors, these contractors not only stop work on current projects, but refuse to work on any future Sunset projects. If Sunset is forced to shut down, the shareholders of Sunset will face significant losses, potential future business opportunities, and its contractors will remain unpaid.

d. Although Rilend is not currently active, Rilend has also lost opportunities to invest in a mortgage company due to the asset freeze.

27. Accordingly, I am requesting that this Court lift the asset freeze so (a) I may pay my personal living expenses with existing funds and (b) that these legitimate businesses can operate not only to generate potential income that I can use to support my family but also to protect the investments that my partners and CEOs, who have no connection to the internet skincare business, have made in these businesses, and to protect these legitimate businesses from closing down, losing additional business opportunities, and defaulting on outstanding obligations to contractors which rely on these businesses for income.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2015, at Calabasas, California.

_____
IGOR LATSANOVSKI