Michael J. Weiss (SBN 206473)
**ABRAMS GARFINKEL MARGOLIS BERGSON, LLP**
5900 Wilshire Blvd. Suite 2250
Los Angeles, CA 90036
310-300-2900
310-300-2901- Fax
Email: Mweiss@agmblaw.com

Kelly M. Crawford (TX SBN 05030700)
*Admitted Pro Hac Vice*
J. Mitchell Little (TX SBN 24043788)
*Admitted Pro Hac Vice*
**SCHEEF & STONE, L.L.P.**
500 N. Akard, Suite 2700
Dallas, Texas  75201
214-706-4200
214-706-4242 - Fax
Kelly.crawford@solidcounsel.com
Mitch.little@solidcounsel.com
Attorneys for Receiver
CHARLENE C. KOONCE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>             Plaintiff,<br><br>      v.<br><br>BUNZAI MEDIA GROUP, INC., a California corporation, also doing business as AuraVie and Miracle Face Kit, et al.,<br><br>             Defendants. | Case No. CV 15-4527-GW(PLAx)<br><br>**RECEIVER'S RESPONSE TO IGOR LATSANOVSKI AND CALENERGY, INC.'S APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER** |

        Charlene Koonce, the Court-appointed Temporary Receiver, responds to the *Ex*

*Parte* Application for Partial Relief from Temporary Restraining Order filed by

Defendants Igor Latsanovski ("Latsanovski") and CalEnergy, Inc. ("CalEnergy"), and in support, respectfully shows the Court as follows:

Latsanovski seeks relief from the asset freeze for his personal assets, requesting the Court to release the freeze on all personal bank accounts and use the equity in his home to satisfy any personal liability Latsanovski might owe with respect to the FTC's allegations.  He contends he had no personal involvement in any of the enjoined conduct, and was solely a disinterested investor in the Receivership Defendants Likewise, Latsanovski contends CalEnergy "did not directly receive any funds from the Bunzai Group's customers,"[1] that he and CalEnergy were only passive lenders or investors in the Bunzai Group of Companies, and requests that CalEnergy be released from the receivership aspects of the TRO.

Although the Receiver's investigation continues, far too many facts discovered thus far refute Defendants' contention to permit the requested relief.  Moreover, the bank records and QuickBook summaries available to the Receiver, (which still do not include information for several Receivership Defendants) however, demonstrate transfers to CalEnergy and Latsanovski from the Receivership Defendants engaged in selling skin cream, of at least $1.9MM.

---

[1] Latsanovski Dec., ¶ 7, Docket No. 90.

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

## **BACKGROUND**

1.      On June 16, 2015, the Court issued the *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Receivership Order").

2.      The Receivership Order freezes the assets of Defendants Latsanovski and CalEnergy, and directs the Receiver to assume control over CalEnergy's operations and assets. *Receivership Order*, ¶¶ V, XIV. CalEnergy, Inc. owns a 99% interest in Sunset Holdings Partners LLC ("Sunset Holdings"), and Defendant Latsanovski is a signatory on the Sunset Holdings Account.   Accordingly, Sunset Holdings' assets fall within the scope of the asset freeze (even if its assets were not otherwise within the scope of the Receivership Order based on receipt of funds from the on-line sale of skin care products).[2]

3.      Although many of the Receivership Defendants were dissolved in December 2014 or earlier,[3] as of the date of the Receivership Order, funds continued to

---

[2] Defendant Latsanovski claims an amendment to the Operating Agreement of Sunset Holdings transferred CalEnergy's ownership interest in Sunset Holdings to a third party. Based on the provisions of the Sunset Holding LLC agreement, CalEnergy's bylaws, and basic contract principles, the Receiver contends the amendment was invalid to transfer any of CalEnergy's interest in Sunset Holdings to the third-party and informed Latsanovski of her position. *Declaration of Charlene Koonce,* ("Koonce Dec.").

[3] Bunzai Media Group, Inc. was dissolved in 2013; Defendants Agoa Holdings, Heritage Alliance Group, Inc., Lifestyle Media Brands, Media Urge, Inc., Pinnacle Logistics Inc., and Safehaven Ventures, Inc. were dissolved in December 2014.  Other entities, such as SBM Management, Inc., Insight Media Inc, remain active.  In addition, entities which fall within the definition of "Receivership Defendant" based on their role in selling the skin care products by the methods alleged in the Complaint but which are not named, such as All-Star Beauty Products, Inc., and Shalita Holdings, Inc., also remain active.

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

be transferred to most of the entities, directly or indirectly, from the merchant accounts affiliated with the sale or marketing of skin care products. Indeed, most of the dissolved entities had extremely active bank or merchant accounts. And some merchant accounts were still receiving income from the sale of AuraVie until the Receiver had them closed.[4]

4.    Bunzai Media Group was the original entity engaged in the sale of skin care products. Thus far, no Defendant contests those sales were made by means of the deceptive free trial sales practices alleged by the FTC, and the Receiver has not discovered evidence controverting those allegations. Bunzai used multiple other entities to operate a call center, own merchant accounts for use in processing the sales, or otherwise sell or market the products.[5] One of the additional entities which sold (or sells)[6] the products at issue was Zen Mobile Media, Inc.

5.    The bank records, merchant sales agreements, other related documents and admissions by the Nottea Defendants suggest Latsanovski was more than a passive investor who received a poor return on an investment.[7] First, the summary of

_____

*Koonce Dec.* ¶ 11. All companies engaged in the sale of the skin cream products at issue which are further identified in the Koonce Declaration are referenced above as the "Bunzai Group of Companies."

[4] *Koonce Dec.* ¶ 12-13.

[5] *Koonce Dec.* ¶ 10-15; Exh. 1.

[6] Consumers contacted the Receiver after the date the TRO was issued requesting assistance in stopping the June 2015 charges to their credit cards for Auravie and shipments of unwanted products they have been unable to cancel. Although the Defendants identified one merchant account as the source of the charges to these consumers, many entities including Zen Mobile Media were receiving income from credit card processing up until the date the Receiver closed those accounts so as to disable further charges. *Koonce Dec.* ¶¶ 12-13; 17.

[7] The Receivership Defendants' operations are convoluted, complex, and appear to have been structured so as to separate the individuals who were actually in control of the operations and the money, from the publicly disclosed control over the entities and their bank accounts. For instance, Alon Nottea does not appear as an officer or director for any

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

Latsanovski's "investments"[8] demonstrates continual transfers of funds between CalEnergy on the one hand, and Bunzai and other Receivership Defendants such as SBM Management, Inc. on the other hand. The summary of CalEnergy's transfers to Receivership Defendants, however, demonstrates that until September 27, 2013,[9] Latsanovski was a net *borrower* from the Bunzai Group. Eventually, beginning in October 2013, Latsanovski's "investments" exceeded the amount he had previously received from the Bunzai Group, and he became a "lender".[10] Beginning on September 27, 2013, the funds paid to Latsanovski as either interest, profit, or a partnership distribution, exceeded his contributions.[11] Virtually all payments made to CalEnergy were in large round increments of thousands of dollars, rather than the irregular increments that would suggest repayment of principal and interest.

6. Additional evidence suggests Latsanovski was a partner in the sales of the skin care products at issue. First, Kristopher Bond reported that he, Alon, and Latsanovski were partners in the Bunzai Media Group of Companies. Specifically,

---

entity other than Bunzai Media Group and Adageo, LLC (his personal "consulting" LLC), yet by all accounts was in control, individually or jointly with others, of the entities selling skin cream products, including the entities that owned merchant accounts. Moreover, although neither Alon nor Doron Nottea are listed as signatories on *any* of the entities many, many bank accounts, they undisputably controlled the flow of money from those entities. *Koonce Dec.*¶ 18.

[8] Latsanovski testified he made loans to Alon for running the Bunzai Group of businesses. *Latsanovski Dec.,* Docket No. 90. All of those loans are wholly undocumented. *Koonce Dec.*¶ 19.

[9] The date is important. It is the same date as a letter discussed below which recognizes dissolution of a partnership between Latsanovski, Bond and Alon Nottea.

[10] The posture as a net borrower makes no sense in the context of either lender or partner, and suggest some other possible explanation for the flow of money prior to September 27, 2013, or gaps in the financial information available to the Receiver would provide a more accurate or comprehensive picture.

[11] *Koonce Dec.*¶ 21.

Bond reported that because Latsanovski's investment in a start-up company was risky, Latsanovski was made a 1/3 partner until his "investment" was repaid.[12]

7.     Likewise, a September 27, 2013 letter obtained from Alon supports Latsanovski's role as a partner rather than an investor.  The letter outlines a proposal for winding down a partnership that had purportedly already been dissolved.  One of the lawyers who received the letter, Art Baram, was counsel for CalEnergy, and Alon admits Latsanovski/CalEnergy was one of the partners at issue.[13]

8.     Notably, although Bunzai Media Group was dissolved in 2013, presumably after the "partnership" was dissolved, CalEnergy continued providing money to Receivership Defendants through November 26, 2014. And, although many Receivership Defendants were dissolved in December 2014, CalEnergy continued receiving funds from the Receivership Defendants through April 2015.

9.     And, the funds provided to CalEnergy and with which it was repaid, were derived from the sale of those products.[14] And most, of the funds were *transferred indirectly* to CalEnergy from the entities which sold the skin cream products through the free trial methods but were nonetheless proceeds of the skin care sales.  Thus, the

---

[12] *Koonce Dec.* ¶ 7.
[13] *Koonce Dec.*, ¶ 8.
[14] *Koonce Dec*. ¶¶ 22-23; 31-32. The accounting summary provided by Latsanovski regarding CalEnergy's transfers fails to identify the specific entity to or from which most transfers were made, although it does specify in several instances that funds were sent to SBM, or received from Zen, and in November 2014, payments to CalEnergy were made by AMD, Heritage, Zen, Insight and DMA.  Each of those entities was engaged in selling the skin cream through the free trial processes.  Moreover, although the Receiver's forensic accountants continue evaluating the more than 250 bank and merchant accounts at issue including credit card or debit accounts, it appears that none of the individual defendants

entire $1.9MM transferred from the Receivership Defendants directly to CalEnergy appear to have been derived from the sale of skin care products, although eventually, the *net* transfer to CalEnergy was only $317,746.00.  This net figure also does not include amounts paid for the benefit of Latsanovski by the Receivership Defendants, such as payments of his personal American Express bills from a Zen Mobile Media account.

10.    Except for Focus Media Solutions, an entity created in 2014 which marketed unrelated products in addition to skin care products, the only source of income discovered thus far for the Receivership Defendants was the sale of skin care products.[15]

11.    Latsanovski's conduct also suggests willful ostrich behavior with respect to the operations of the Receivership Defendants.  He left pre-signed, blank checks for CalEnergy and an endorsement stamp for deposit in CalEnergy's Bank of America account with Doron Nottea at the office location used by the Receivership Defendants.[16]

12.    Additional business records obtained from the Receivership Defendants' offices or Google Drives support the conclusion that Latsanovski was either involved in the Bunzai Group of Companies' operations, or willfully participated in creating that

---

involved received funds from the skin care products *directly*.  All proceeds from that conduct were shuffled through *numerous* entities or accounts before being transferred or used for the benefit of the individual defendants.

[15] *Koonce Dec. ¶ 15.*
[16] *Koonce Dec. ¶¶ 24-25.*

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

illusion.   In 2011, Latsanovski signed W-4 forms filed with the IRS, identifying himself as an employee of Bunzai Media Group, Inc.   Likewise an I-9 form for Latsanovski lists Bunzi as his employer in 2011.   Latsanovski is listed on a company contact sheet for Bunzai, with a reference to his department as "corporate" and a company email of igor@bunzaimedia.com.[17]  On September 9, 2011, Latsanovski obtained a letter signed by Bunzai's COO Kristopher Bond, stating that Latsanovski was the Chief Financial Officer of Bunzai who received a salary of $15,000 month from Bunzai.[18]

13.   Latsanovski was also listed in corporate filings as the incorporator of Zen Mobile Media, Inc., a merchant entity which sold the skin care products.   Although he denied any knowledge of what business Zen was engaged in, Latsanovski signed blank checks for the entity and left them with Doron Nottea.[19]   In a summary created by Defendants regarding the entities selling the skin care products, Latsanovski is also listed as the owner of certain merchant accounts at Signapay and UMS Banking, for Zen.[20]   And, Latsanovski's personal American Express bills are paid from Zen's still-active Wells Fargo bank account.[21]

---

[17] *Koonce Dec. ¶ 27d.*
[18] *Koonce Dec. ¶ 27.*
[19] *Koonce Dec. ¶ 28.*
[20] The applications would have required Latsanovski's signature, but the Receiver does not have copies of those merchant account applications.
[21] *Koonce Dec. ¶ 28.*

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

14.    Between January 1, 2015 and mid-June 2015, Zen Mobile Media received not less than $962,000 from credit card processors, such as Signapay and Global Payments.[22] In turn, other Receivership Defendants received large amounts from credit card processors or other merchant accounts, transferred those funds to yet other Receivership Defendants, with the funds then transferred to entities such as CalEnergy or another Receivership Defendant before being transferred to "personal consulting" LLC entities owned or controlled by other individual defendants.[23]

15.    Money transferred to CalEnergy from the Receivership Defendant entities was also transferred to Sunset Holdings.[24] Although Sunset's business operations involve real estate purchases, about half of the funds used for those purchases were co-mingled funds from the skin care proceeds received by CalEnergy.[25] Moreover, in violation of a stipulation entered into between Latsanovski and the Receiver intended solely to close a real estate deal so as to prevent forfeiture of escrowed funds, Latsanovski directed funds intended to close on a real estate deal to be disbursed contrary to the stipulation and used $193,000 intended to close one sale, to pay for architect and contractor fees on a different sale. The payment of architect and contractor fees was not authorized by the stipulation. As a result, a shortfall for closing

---

[22] *Koonce Dec. ¶16.*
[23] *Koonce Dec. ¶ 18.*
[24] *Koonce Dec. ¶ 33.*
[25] *Id.*

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

on the second property (whose closing funds were thus shorted by the amount misdirected) was created and estate funds were disbursed to third parties.[26]

To date, the Receiver has not been provided with any information regarding other properties purchased by Sunset Holdings, or other pending transactions which would potentially deplete CalEnergy's assets if they are unfrozen.[27]

## ARGUMENT

The Receiver takes no position regarding whether Latsanovski may ultimately be personally liable for the collective operation of the many, many entities engaged in the sale of skin cream products as described in the Complaint. Based on the findings of her investigation to date the Receiver's opinion is that Latsanovski was a partner not a mere investor.

Further, although incomplete financial data is available, CalEnergy admits transferring $1,611,883.00 to the Bunzai Group of Companies in furtherance of those entities' operations, and claims receipt of a total of at least $1,929,529.00. Zen Mobile Media, an entity which Latsanovski was an officer of and signed checks for, and which the Nottea Defendants admit was a retail merchant corporation selling the skin care products at issue, received not less than $8,485,055.00 (gross) from the sales. Based on the Receivership Defendants' QuickBooks records, CalEnergy in turn received at

---

[26] *Koonce Dec.* ¶34.  The Receiver has given Latsanovski and CalEnergy time to cure the unauthorized dispersal of funds, and if the issue is not corrected without any detriment to the receivership estate, she will file a Motion for Show Cause Hearing.

[27] *Koonce Dec.* ¶ 33.

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

least $213,000 directly from Zen Mobile Media. Moreover, Latsanovski's personal American Express account was paid directly from Zen's bank account, although the exact amount of those payments is as yet unknown.

The only known source of the funds CalEnergy received from any Receivership Defendants was skin care product marketing and sales.[28] Indeed a total of approximately $69 million (gross) was received by the Receivership Defendants in connection with their sale of the skin care products from January 1, 2010 to December 31, 2014. No question exists that the Bunzai Group of Companies were engaged in the enjoined conduct through at least December 2014, and that some of those entities continued selling or marketing the products at issue and receiving income from those sales through the date of the TRO.

Likewise, no question exists that the funds transferred to Sunset Holdings by CalEnergy and used in various real estate transactions, were derived from the sale of the skin care products at issue.

The equity in Latsanovski's home would come nowhere near enough to satisfy the amounts received just by Zen Mobile Media, let alone the receipts of the Bunzai Group of Companies, if CalEnergy and/or Latsanovski are found liable for those sales.

---

[28] *Koonce Dec.* ¶ 15. At least one entity, Focus Media Solutions, Inc., which is the successor entity to Media Urge, Inc. and which was incorporated in March 2014, also engaged in marketing or lead generation for non-skin care products, as well as marketing of skin care products sold by non-parties, pursuant to free trial programs. Some of the funds CalEnergy received in 2014 and possibly 2015 are likely indirect transfers attributable to income earned by Focus Media but the Receiver has been unable to determine how much of Focus Media's funds were derived from sales or marketing products outside the scope of the enjoined conduct.

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

Further, while Latsanovski may have equity in his home, the home is presumptively protected by California's homestead exemption, and may also be subject to the interest of his spouse. The availability of Latsanovski's interest in that equity is thus uncertain, as well as insufficient to satisfy potential liability.

And finally, in his Declaration, Mr. Latsanovski contends in a nutshell, that he provided no services to Bunzai Group, but was only a lender. He was not a lender to Zen Mobile Media, however, yet that entity paid his credit card bills. Moreover, to the extent transfers were made by CalEnergy to Bunzai Media Group and SBM Management, Inc., but repaid by other entities, or from funds received from other entities, those entities likely have a fraudulent transfer claim against CalEnergy, which could easily exceed the equity in Mr. Latsanovski's home, as well as the current assets of Sunset Holdings and CalEnergy.

Based on the information listed above and in the Receiver's Declaration, far too many facts suggest Latsanovski and CalEnergy were more than passive investors, and release of CalEnergy (and Sunset Holdings) at this juncture would be premature.[29]

Accordingly, the Receiver requests that the Court deny Defendants' Application for Partial Relief from Temporary Restraining Order, and requests such other and further relief to which she may show herself entitled.

---

[29] If the Court is inclined to grant the relief requested by Latsanovski and CalEnergy, the Receiver requests that the Court preserve the Receivership Estate's entitlement to seek compensation for at least some of the *extensive* work performed to date by the Receiver and her team.

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*/s/Charlene Koonce*
Charlene C. Koonce
***Receiver***
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
Telephone: 214-706-4200
Telecopier: 214-706-4242
*Admitted Pro Hac Vice* (TX SBN 11672850)

**SCHEEF & STONE, L.L.P.**
Kelly M. Crawford (Texas SBN 05030700)
*Pro Hac Vice*
J. Mitchell Little (Texas SBN 24043788)
*Pro Hac Vice*
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
Telephone: 214-706-4200
Telecopier: 214-706-4242

***Counsel for Receiver***

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 16 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com
*Local counsel for Receiver*

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi, as an officer or manager of BunZai Media Group, Inc. and Pinnacle Logistics, Inc.*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea, Roi Rueveni and Adageo, LLC*

David P. Beitchman
Beitchman & Zekian
16130 Ventura Blvd., Suite 570
Encino, CA 91436
dbeitchman@bzlegal.com
*Counsel for Doron Nottea and Motti Nottea*

Marc S. Harris
Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
mharris@scheperkim.com
*Counsel for Igor Latsanovski and CalEnergy, Inc.*

Reid Tepfer
Luis Gallegos
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, TX 75201
rtepfer@ftc.gov
lgallegos@ftc.gov
*Counsel for the FTC*

RECEIVER'S RESPONSE TO DEFENDANT IGOR LATSANOVSKI'S APPLICATION FOR
PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER

1  Raymond E McKown
2  Federal Trade Commission
   10877 Wilshire Boulevard Suite 700
3  Los Angeles, CA 90024
   rmckown@ftc.gov
4
5          A copy of the foregoing document was emailed to:
6  Steve Gebelin
7  Raines Feldman LLP
   9720 Wilshire Boulevard Fifth Floor
8  Beverly Hills, CA 90212
9  sgebelin@raineslaw.com
   *Co-Counsel for Oz Mizrahi, as an officer or manager of BunZai Media Group, Inc.*
10 *and Pinnacle Logistics, Inc.*
11
                                    */s/  Charlene C. Koonce*
12                                   CHARLENE C. KOONCE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27