Michael J. Weiss (SBN 206473)
**ABRAMS GARFINKEL MARGOLIS BERGSON, LLP**
5900 Wilshire Blvd. Suite 2250
Los Angeles, CA 90036
310-300-2900
310-300-2901- Fax
Mweiss@agmblaw.com

Charlene C. Koonce (TX Bar No 11672850)
***Admitted Pro Hac Vice***
**SCHEEF & STONE, L.L.P.**
500 N. Akard, Suite 2700
Dallas, Texas  75201
214-706-4200
214-706-4242 - Fax
Charlene.koonce@solidcounsel.com
RECEIVER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>BUNZAI MEDIA GROUP, INC., a California corporation, also doing business as AuraVie and Miracle Face Kit; et al.<br>        Defendants. | Case No. CV 15-4527-GW(PLAx)<br><br><br>**DECLARATION OF CHARLENE KOONCE** |

I, Charlene Koonce, declare under penalty of perjury under the laws of the United States of America, that the following statements are true and correct:

1.    I am over the age of 18 years, have never been convicted of a crime involving moral turpitude, and am otherwise competent to make this Declaration. I have personal knowledge of the facts stated herein.

2.    I am an attorney licensed to practice law in the state of Texas and am a partner with the law firm of Scheef & Stone, LLP. I am the court-appointed Receiver in the lawsuit referenced above. I have been licensed to practice law in Texas since 1991. I am admitted to practice before all state and federal courts in Texas, and am admitted to practice before the Fifth and Eleventh Circuit Courts of Appeal. My practice focuses on complex business litigation, and I have extensive experience in serving as or representing equity receivers in government enforcement cases.

3.    I have been appointed as a receiver or special master in government enforcement cases filed by the FTC and the SEC in seven cases, and served as a receiver in a state case involving allegations of fraud between and among the owners and operators of a strip mall. I have served as lead counsel to other receivers in more than a dozen similar government enforcement cases. My experience with receivership cases began in 1999 when I served as associate counsel for another receiver. Over the course of approximately 15 years, I have acquired the requisite skill, expertise, experience and training to investigate and formulate opinions about the operations of receivership entities and the nature of the businesses in which those entities engage.

4.      I was appointed as Receiver in the case styled above on June 17, 2015, and was ordered to investigate various aspects of the entities named as Receivership Defendants and report to the Court regarding my investigation.  To assist me in the investigation, I retained counsel and certified forensic accountants.  My accountant is Jeff Brandlin, and Mr. Brandlin can and will provide his own Declaration in support of the Report I intend to file on August 5, 2015, which will provide further support for my opinions set forth below.  Mr. Brandlin is a certified forensic accountant who qualifies as an expert in his field.

5.      As the Receiver for numerous Receivership Defendants, I am also the custodian of records for those Receivership Defendants, and also qualify as the custodian of records for the business records and investigative summaries created for receivership estate.

6.      Beginning on June 18, 2015, together with a team of attorneys, forensic accountants and IT specialists, I began investigating the operations of certain defendant entities and their affiliates as mandated by the TRO.  My investigation is not yet complete, and I continue requesting and obtaining information from various sources.  I will provide a comprehensive report regarding the matters the Court directed me to report about on or before August 5, 2015, but provide the information below in response to the Application for Partial Relief from the Temporary Restraining Order filed by Igor Latsanovski and CalEnergy, Inc.

7.     Based on my investigation outlined below, I believe Latsanovski and CalEnergy were likely partners rather than mere investors in the Bunzai Group of Companies. My opinion is premised on information obtained from Kristopher Bond who revealed that Igor Latsanovski was originally given a one-third interest in start-up of Bunzai Media Group, with Bond and Alon Nottea having the other 1/3 interests. This partnership interest in Bunzai Media Group, Inc. was to be held by Latsanovski and/or CalEnergy until they were repaid their initial investment. Bond stated he was "voted out" of the partnership in approximately March 2013. Bond had no motive to provide false information; he claims to have no assets (and none have been located to freeze) and has no interest in whatever personal liability.

8.     My opinion is also based on additional information received from Alon Nottea. Pursuant to my investigation, I also requested (and continue to request) information and documents from the individual defendants. In response to one of my requests, counsel for Alon provided me with a copy of the letter attached as **Exhibit 1.** The letter outlines the terms of distribution for the assets of several entities involved in the Bunzai Group of Companies, and one of the attorneys to whom the letter was sent, Art Baram, was counsel for Calenergy. The letter strongly suggests the operation of the Bunzai Companies was a partnership between Alon Nottea, Bond, Latsanovski, and CalEnergy.

9. My opinion is also based on the accounting information summarized below. Neither Latsanovski nor CalEnergy received payments in amounts that appear to be principal and interest amounts. Instead the funds transferred to Latsanovski and CalEnergy were generally large, round figures in the tens of thousands.

10. As proposed in the wind-up plan for the dissolved partnership and as further discussed below, SBM Management, Inc. and the other retail merchant corporations did not stop selling the "AuraVie" brand products. Information I obtained from merchant accounts for the retail merchant entities discussed below, including merchant account summaries created by the Defendants, narrative information received from the Defendants in response to my questions, marketing and promotional information obtained from computers and email accounts, demonstrate that sales of Auravie and related products sold in the same manner, such as "LeOR" and "Dellure" continued through the end of 2014 for most entities, but also continued into June 2015 for some.

11. I have reviewed the facts included in the Declarations supporting the FTC's Complaint, asked Defendants to provide information regarding whether each Receivership Defendant (including entities which fall within that definition but which were not named as Defendants) is an active corporation authorized to conduct business in the state of California. Additionally, for many entities, I have requested the same information from various services which search the corporate filings with the

California Secretary of State.  Based on the information obtained from these sources, I

summarize the status of the following entities (named Defendants are bolded):[1]

| Entity Name | Status | Owners/ O & D | Open Bank Accounts | Operations |
|---|---|---|---|---|
| **Adageo, LLC** | Active | Alon Nottea | Yes | Personal consulting LLC for Alon Nottea |
| **Agoa Holdings, Inc.** | Dissolved | Roi Reuveni | Yes | Retail merchant for skin care products |
| All –Star Beauty Products, Inc. | Active | Sean Brennecke | Yes | Retail merchant for skin care products |
| **AMD Financial Network, Inc.** | Active | A Algarp | Yes | Retail merchant for skin care products |
| Apogee Network, LLC | Active | Stephan Bauer | Yes | Personal consulting LLC for Alon Nottea |
| **BunZai Media Group, Inc.** | Dissolved | Alon Nottea | Yes | Parent entity for sale of skin care products |
| **CalEnergy, Inc.** | Active | Igor Latsanovski (100%) | Yes | Lender or partner to Bunzai and owner of Sunset Holdings |

[1] The investigation regarding additional entities used by or affiliated with the Defendants is continuing.

| DMA Media Holdings | Dissolved | Roi Rueveni; Rachel Nottea (owner of merchant accounts) | No | Retail merchant for skin care products |
|---|---|---|---|---|
| **DSA Holdings, Inc.** | Dissolved | Jason M Menin | None to date | Guarantor of retail merchant accounts for skin care products |
| Focus Media Solutions, Inc. | Active | David Yosafain | Yes | Affiliate marketer for skin care products and other products |
| **Heritage Alliance Group, Inc.** | Dissolved | Tal Topel | None to date | Retail merchant for skin care products |
| **Insight Media, Inc**. | Active | Tal Topel | Closed merchant accounts with significant balances | Retail merchant for skin care products |
| **Kai Media, Inc.** | Active | Gilad Miron | Yes | Retail merchant for skin care products |
| **Lifestyle Media Brands, Inc.** | Active | David Yosafian Rachel Nottea (owner of merchant accounts) | yes | Retail merchant for skin care products |
| **Media Urge, Inc.** | Dissolved | R Ohana | Yes | Marketing for skin care |

| | | | | products |
|---|---|---|---|---|
| **Pinnacle Logistics** | Dissolved | R Ohana | Yes | "Fulfilment" and call center operations for skin care products |
| **Safehaven Ventures, Inc.** | Dissolved | O.S. Mizrahi Tal Karasso | Yes | Retail merchant for skin care products |
| **SBM Management, Inc.** | Dissolved | Tomer Amsalem | Yes | Management of retail merchant corporations, and pass-through entity |
| Secured Commerce, Inc. | Active | Doron Nottea and Alan Argaman | Yes | Lessee of office space for Receivership Defendants |
| Secured Merchants, Inc. | Active | Alan Argaman | Yes | Provided IT services related to management of merchant accounts, etc.; also operates from same location as Receivership Defendants |
| Shalita Holdings, Inc. | Active | Erin Link | Yes | Retail merchant for skin care products |

DECLARATION OF CHARLENE KOONCE

| Sunset Holdings, LLC | Active | CalEnergy and Latsanovski | Yes | Invests in real estate |
|---|---|---|---|---|
| **Zen Mobile Media, Inc.** | Active | Igor Latsansovski | Yes | Retail merchant for skin care products |
| Trigen, LLC | Active | Stephan Bauer | Yes | Personal consulting LLC for Roi Rueveni |

12.     My forensic accountants have reviewed the available bank records and/or Quickbooks information for these entities, including review of on-line bank account information when that access was available. Much of the information available, however, is incomplete. Nonetheless, review of the available information demonstrates that as of June 18, 2015, many of these entities, including some dissolved entities, had open, active bank accounts and/or merchant accounts in which sales or chargebacks were processed.  For instance, Agoa Holdings, Inc., which was purportedly dissolved in 2014 received more than $134,000 in income in 2015, with the most recent transaction in its bank account prior to the Receiver freezing its accounts on June 17, 2015, was on June 16, 2015.  As noted above, Agoa was a retail merchant for Auravie products.

13.     Likewise, Zen Mobile Media, an entity purportedly dissolved in 2014 had debit cards for Wells Fargo accounts, active merchant accounts from which it received $81,929 from January 1, 2015 through the present. The last merchant deposit in Zen's

merchant account was June 11, 2015 and the last transaction date in its WF account was on June 16 2015.

14.    In connection with my mandate to evaluate the operations of these companies, and in an effort to figure out what each was doing, why and how, I asked my accountants to create a summary demonstrating the income each received. Additional information about the flow of funds between and among the entities will be provide in my report filed prior to the Preliminary Injunction hearing.

15.    Defendants or their accountant provided tax returns for each entity to me, or I obtained those tax returns from the records available on Defendants' computers. Because we do not have access to all bank records for each, my accountants summarized the income based on tax returns for each entity, and that summary reflects the total gross income for these entities as reflected in **Exhibit 2.**  Because almost all money received from the retail merchant entities was transferred to SBM Management, Inc., SBM's income should not be included in a calculation of the gross sales of these products to avoid a potential "double counting."  Additionally, because Focus Media Solutions, Inc. was engaged in marketing products which included but were not limited to skin care products and I do not know what percentage of its income related to skin care products sold through deceptive free trial offers, its income should likewise not be included in evaluating the gross sales of these entities.  Even eliminating SBM and Focus Media Solutions' income, however, the gross amount which any Defendant is

potentially liable is at least $69M if all entities are evaluated as a collective enterprise. Income to Zen Mobile Media alone is $8,485,055.  These figures also do not include income from January 1, 2015 through the present, and because several entities have not yet filed their 2014 tax returns, income for some entities for 2014 is likewise not included.   Except for Focus Media Solutions, the only source of income I have discovered to date for any Receivership Defendants relates to the sale of skin care products. My investigation suggests all sales of AuraVie and LeOr were made pursuant to the enjoined free trial and negative option methods outlined in the Complaint.  One other product previously sold by Defendants, "Dellure" face masks, may not have been sold pursuant to the free trials and negative option enrollments, but Defendants did not begin selling that product until early 2014 or later, and I do not yet know what percentage of the sales income received by the Receivership Defendants is attributable to Dellure sales.  I have also not discovered any evidence suggesting that income from Dellure sales continued past December 2014.

16.    I have reviewed a summary of the income for the dissolved entities for 2015 which was created by my accountants and is premised on the information available in the bank records.   For the period January 1, 2015 through June 15, 2015, those bank records reflect income just to Zen Mobile Media of not less than $962,000.

17.    Sales continued through June 2015 for some entities. In connection with my appointment as Receiver, I posted notice regarding this lawsuit on certain websites

or landing pages associated with the skin care sales. In connection with that information, or as a result of information provided to consumers by the FTC, I have been contacted by consumers whose credit cards were charged in June 2015 for Auravie products shipped in June 2015; products they did not order, do not want, but for which they have been unable to cancel "subscriptions".   By comparing the charge referenced on one consumer's credit card with the merchant account information available to me, I concluded that one charge was from a UMS merchant account in the name of Safehaven Ventures, Inc., an entity purportedly dissolved in 2013.  I have not been able to determine which entity and merchant account is responsible for a charge to another consumer on June 16, 2015 in the amount of $97.88 for "Auravie." Additionally, pursuant to my investigation I have also discovered that the merchant account for Shalita Holdings, Inc., a retail merchant selling skin cream, was open and actively receiving income from those sales- as of June 18, 2015.

18.    Notably, none of the individual defendants are owners, officers, directors, employees of Safehaven Ventures, Inc. or Shalita Holidngs, and none is a signatory on those entities' bank accounts.  Nonetheless, Alon Nottea has admitted his control over all merchant entities, and at this point in my investigation, I believe he made most day-to-day operational decisions for the Bunzai Group of Companies.  Moreover, proceeds of sales flowed to the individual Defendants only indirectly. For instance, as further described below, CalEnergy received sales proceeds from the Receivership

Defendants, and transferred some of those funds to Latsanovski individually or paid his credit card bills. Similarly, sales proceeds from various Receivership Defendants were transferred to Alon Nottea by indirect transfers to his "personal consulting LLC," Adageo, LLC and Apogee Network, LLC.   My investigation regarding the flow of money continues.

19.    I attended the July 2, 2015 deposition of Igor Latsanovski, during which Mr. Latsanovski testified that he loaned money to the Bunzai Group of Companies, but had no active role in their operation and no knowledge of their day-to-day operations. Mr. Latsanovski also testified that all of his loans were undocumented.  He provided a summary of the transfers between CalEnergy, Inc., a corporation he owns and controls, and the Bunzai Group of Companies.  In turn, I asked my accountants to analyze that summary as well as additional accounting information related to CalEnergy's transactions with the Bunzai Group of Companies.

20.    My accountants do not have access to the Bunzai Media Group bank accounts for 2010 -2012, and were not able to review the transactions summarized in the top three lines of the chart.  Accordingly, I do not know if the amounts received by CalEnergy include salary payments to Mr. Latsanovski, which other records reflect were paid to CalEnergy rather than directly to Mr. Latsanovski.  For instance, a photograph of check stubs which include a reference to Latsanovski's salary of $7,500

but paid to CalEnergy, is attached as **Exhibit 3.**   The photo was taken in the Receivership Defendants' office and I observed the check stubs that are photographed.

21.   A true and correct copy of the summary submitted by Mr. Latsanovski regarding the CalEnergy transactions with the Bunzai Group of Companies is attached as **Exhibit 4.**   The summary attached as **Exhibit 4** includes a running "balance" for the net owed to or received from CalEnergy which was added by my accountants, and demonstrates that until September 27 2013, CalEnergy borrowed more from the Bunzai Group of Companies than it loaned or contributed.   This posture – a net borrower -regardless of whether CalEnergy was a lender or a partner, makes no sense and suggests the missing information would provide a more comprehensive picture.

22.   According to the summary provided by Latsanovski, beginning on September 27, 2013, however, the same date of a letter outlining the winding up plan for a dissolved partnership regarding the operation of the Bunzai Group of Companies, CalEnergy began transferring more money than it was receiving, and its "investment" was greater than its return until approximately April 10, 2014, when it began receiving profits, dividends, interest or some other form of income.   Beginning in April 2014, CalEnergy's receipts from the Bunzai Group of Companies exceeded its contributions. Up until at approximately January 2014, the only known source of the income for the companies that were paying CalEnergy is skin care product sales.   In total, the bank

records reflect a total of $1,929,629.05 paid to CalEnergy from the Bunzai Group of Companies, with those funds used to operate the companies at issue.

23.   Further, CalEnergy received transfers *directly* from Zen Mobile Media, Heritage Alliance Group, DMA Media Holdings, and Insight Media, Inc., all of which were retail merchants of the skin care products.  Most transfers however were made to and received from SBM Management, Inc., an entity into which all merchant account proceeds were funneled before later dispersal to CalEnergy and other entities owned or controlled by other Defendants.

24.   On June 18, 2015 when I entered the offices of the Receivership Defendants, I observed many, many pre-signed blank checks on numerous accounts for various entities located in Doron Nottea's office.  By comparing the signatures on the entity checks with signatures on checks for Mr. Latsanovski's personal checking account which were also in the Office, I determined the signatures on the checks for Zen and CalEnergy were Mr. Latsanovski's.  True and correct copies of photos of some of the pre-signed blank checks I observed are attached as **Exhibit 5.**

25.   Additionally, I observed at least 20 endorsement stamps in Doron Nottea's office for various bank accounts in the name of different entities.  Stamps for the CalEnergy account at Bank of America and two different Wells Fargo accounts for Zen Mobile Media were included.  Photos of those endorsement stamps are attached as **Exhibit 6.**

26.     I have also requested and received bank statements for Zen Mobile Media, and my accountants have reviewed Zen's bank account information on-line, as that information became available.  A true and correct copy of the May 20, 2015 statement for Zen's Wells Fargo account is attached as **Exhibit 7.**  As reflected in that statement, Latsanovski's personal American Express account was paid directly from Zen's Wells Fargo account, although we have not yet summarized all such payments.

27.     I have also reviewed documents and information available to me and my team from the Defendants' computers and which were printed from the Defendants' computers.   Those documents, which are business records for the Receivership Defendants for which I am the custodian of records, which were printed by Mr. Little, one of my attorneys and which were also utilized in exhibits to Mr. Latsanovski's deposition, include the following, true and correct copies of  which are also also attached as Exhibits;

        a.     A 2011, W-4 form in which Latsanovski is identified as an employee of Bunzai Media Group, Inc. and his related employee documents; (**Exhibit 8**);

        b.     An I-9 form for Latsanovski  in which he lists Bunzi as his employer in 2011; (**Exhibit 9);**

DECLARATION OF CHARLENE KOONCE

c.    A company contact sheet for Bunzai on which Latsanovski is listed with a reference to his department as "corporate" and a company email of igor@bunzaimedia.com; (**Exhibit 10**);

d.    A September 9, 2011 letter, signed by Bunzai's purported COO Kristopher Bond, stating that he was the Chief Financial Officer of Bunzai, who received a salary of $15,000 month from Bunzai. (**Exhibit 11**);

28.    Similarly, I obtained copies of the Articles of Incorporation for Zen Mobile Media, true and correct copies of which are attached as **Exhibit 12.** Latsanovski's signature appears on the articles of incorporation.   While in the Receivership Defendants' offices, I also observed many, many checks pre-signed by Latsanovski on Zen's bank accounts.  A true and correct copy of one of those checks is attached as **Exhibit 13.**  I also received the summary of "contact person" information for each of the entities attached as **Exhibit 14,** from the CPA for the entities, David Davidian.   The summary reflects Latsanovski is the contact person for Zen Mobile Media.

29.    Shortly after my appointment, Mr. Latsanovski informed me of his ownership in an entity called Sunset Holdings Partners, LLC, and provided certain documents to me related to Sunset's operation and two pending real estate transactions. Because Latsanovski was also a signatory on Sunset Holdings' bank accounts, its assets were frozen.

30.    We have not been able to fully assess the scope and magnitude of Latsanovski and CalEnergy's involvement because: a) I have not received the QuickBooks data or the equivalent for Latsanovski's personal activities, or complete QuickBooks data for CalEnergy, Sunset Holdings or for other entities which may be related but which have not yet been discovered; and b) Latsanovski has not provided online access to all of his bank accounts so that we can reconcile information available in the Receivership Defendants QuickBooks files and the data available in the combined Wells Fargo and Bank of America accounts for CalEnergy; and c) we have not been provided with the credit card data for Latsanovski's personal activities, CalEnergy or Sunset Holdings. Obtaining this information would likely lead to requests for additional information necessary to clarify what is revealed through this financial data.

31.    I nonetheless asked my accountants to summarize the flow of money into and out of CalEnergy and Sunset Holding's bank accounts using the bank records available to us.[2]  The information available in the Bank of America and Wells Fargo accounts for CalEnergy does not match the data in QuickBooks for the Receivership Defendants. Those records demonstrate:

a.    CalEnergy's Wells Fargo account shows that between December 2, 2013

_____

[2] Until approximately 5:00 pm on July 14, 2015 we did not have online access to CalEnergy's Bank of America account.

and June 29, 2015 it received $9.5MM, with $950K, or at least 10%, originating from Receivership Defendant entities. These amounts transferred to CalEnergy were made in thousand dollar, rounded amounts – not the dollars and cents amounts which would generally reflect payments of principal and interest. Based on the Wells Fargo information, the payments received by CalEnergy from Receivership Defendants include the following:

- SBM Management - $90,000
- Insight Media - $60,000
- Agoa Holdigs - $75,000
- Zen Mobile Media - $25,000
- Lifestyle Media Brands - $30,000
- Focus Media Solutions - $200,000
- Kai Media - $50,000
- Insight Media - $25,000
- Heritage Alliance Group, Inc. - $35,000
- DMA Media Holdings - $25,000
- AMD Financial Network, Inc. - $35,000

b.      The limited information for CalEnergy's Bank of America's account, which is incomplete and includes information only for the period July 14, 2014 through July 14, 2015, demonstrates :

- A  beginning balance of $37,259;
- Deposits of $11,250, of which $10,000 came from Zen Media;
- Disbursements of $46,271;
- $16,563 not identified in the B of A account;
- $15,000 transferred to Latsanovski personally; and
- $8,551 paid to Anthem Blue Cross.

c.      The same Wells Fargo records for CalEnergy for the period between December 2, 2013 and June 29, 2015 (the only time period for which the records are available to me and my accountants), indicate that CalEnergy paid out $9.5MM:  At least $1.9MM was paid to Latsanovski; and approximately $450K paid to AMEX in the name of Latsanovski. CalEnergy's Wells Fargo records demonstrate that between Dec 2, 2013 and June 29 2015, it paid out $9.5MM.

- At least $1.9MM was paid to Latsanovski
- Approximately $450K was paid to AMEX in the name of Latsanovski

d.      The incomplete and stale nature of the information in CalEnergy's QuickBooks file, which are only available for the period January 1, 2014 thru July 18, 2014, highlights the gaps in the information available to me this far. For instance, the QuickBooks data does not include the information obtained from CalEnergy's Bank of America account, and, most of the transactions reflected in the QuickBooks records during this timeframe are unlabeled or blank. The QuickBooks information nonetheless shows:

- Deposits of $1,020,964 are recorded during this limited period, but none have labels that would identify the source of these receipts;
- Disbursements of $164,472 are recorded, but $5,342 is unlabeled as to who received those funds;
- Of the $164,472 in disbursements recorded during this limited period, $143,000 was paid to AMEX and $12,753 was paid to "MBCC" an entity we cannot identify.

32.    In comparison, the Quickbooks records for the Defendants and Receivership Defendants unrelated to CalEnergy (which is only a subset of the entire population of the Receivership Defendants and related entities), demonstrate much larger amounts transferred to CalEnergy than CalEnergy's own bank accounts reveal:

a.    Between January 1, 2014 and year to date (YTD) 2015, the Receivership Defendant entities paid CalEnergy $1.3MM. Those payments to CalEnergy include the following:

- SBM Management - $609,230
- Insight Media - $85,000
- Agoa Holdigs - $75,000
- Zen Mobile Media - $213,022
- Lifestyle Media Brands - $30,000
- Focus Media Solutions - $200,000
- Kai Media - $50,000
- Insight Media - $85,000
- Heritage Alliance Group, Inc. - $35,000
- AMD Financial Network, Inc. - $35,000

CalEnergy's two known bank accounts at Wells Fargo and Bank of America should reconcile with the Receivership Defendants' QuickBooks accounts at least with respect to transactions between CalEnergy and the Receivership Defendants. I believe substantial gaps exist in the accounting information available to me regarding CalEnergy's transactions with the Receivership Defendants. Similarly, this information is not consistent with Latsanovski's own summary which reflects transfers from Receivership Defendants to CalEnergy in the amount of $1.9MM.

33.    I also asked the accountants to summarize the financial activity in Sunset's bank accounts. A summary created on or about July 1, 2015 which relied solely on our access to Sunset's Wells Fargo account is attached as **Exhibit 15**. Sunset's bank records, (again my access is limited to the Sunset Holdings Wells Fargo online bank activity) reflect its receipt of more than $4.6M from CalEnergy out of a total of slightly more than $8M it has received since inception (January 21, 2015- June 29, 2015). An additional $900k was received from Latsanovski's personal line of credit.  The bank records also reflect numerous transfers to various escrow companies totaling approximately $5.2 MM. Although requested, the records evidencing what properties were purchased by Sunset with those funds have not been provided. Approximately $300K was paid to CalEnergy by Sunset Holdings which again presents an anomaly if CalEnergy's funds are intended to support Sunset Holdings' real estate investments.

34.    In connection with Mr. Latsanovski and CalEnergy's request to release certain funds from CalEnergy's bank account to close on a real estate transaction, I have also reviewed numerous documents, including those described below. The operating agreement for Sunset Holdings, which was provided to me by Defendant Latsanovski or someone on his behalf, provides that ownership of that entity is 99% CalEnergy, 1% Latsanovski.  A true and correct copy of the Sunset Holdings operating agreement is attached as **Exhibit 16**.  A writing which purports to be the summary of a

verbal agreement to amend Sunset's Operating Agreement and transfer all of CalEnergy's interest in Sunset Holdings to Latsanovski and a third party, Michael Peniche, (the "Verbal Agreement"), and which was also provided to Latsanovski, is attached as **<u>Exhibit 17</u>**.

35.    I have informed Latsanovski and CalEnergy's counsel that I will contest the legality and validity of the Verbal Agreement because: (a) the Verbal Agreement does not meet the definition of a contract since it fails to include any consideration for the transfer; and, (b) the parties manifested an intention to enter into a formal definitive agreement. Additional provisions of CalEnergy's bylaws and Sunset Holdings' Operating Agreement support my position.

36.    In violation of a stipulation entered into between Latsanovski and myself, which was intended solely to close two real estate transactions so as to prevent potential forfeiture of escrowed funds, Latsanovski directed funds to be disbursed contrary to the stipulation and used $193,000 intended to close one sale, to instead pay for architect and contractor fees on a different sale.  Payment of the architect fees and related costs were not authorized by the stipulation.  As a result, a shortfall for closing on the second property (whose closing funds were thus shorted by the amount misdirected) was created and estate funds were disbursed to third parties. I have informed Mr. Latsanovski that his conduct was contumacious and have given him until the end of business on July 16, 2015 to provide the funds he disbursed so that the

1   second transaction can close, and have also instructed him that no lien can be created

2   on the second property based on his conduct.

3

4        Executed this 16th day of July 2015.

5                                    */s/ Charlene Koonce*
6                                    CHARLENE C. KOONCE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF CHARLENE KOONCE