1   JONATHAN E. NUECHTERLEIN
    General Counsel

2   DAMA J. BROWN
    Regional Director
3

4   REID TEPFER
    rtepfer@ftc.gov
    Texas Bar No. 24079444
5   LUIS GALLEGOS
    lgallegos@ftc.gov
6   Oklahoma Bar No. 19098
    Federal Trade Commission
7   1999 Bryan Street, Suite 2150
    Dallas, Texas 75206
    (214) 979-9395 (Tepfer)
8   (214) 979-9383 (Gallegos)
    (214) 953-3079 (fax)
9
    RAYMOND McKOWN
10  rmckown@ftc.gov
    California Bar No. 150975
    10877 Wilshire Boulevard, Suite 700
11  Los Angeles, California 90024
    (310) 824-4325 (voice)
12  (310) 824-4380 (fax)

13  Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **Case No.  CV 15-4527-GW(PLAx)** |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO *EX PARTE* APPLICATION FOR PARTIAL RELIEF FROM TEMPORARY RESTRAINING ORDER OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC. AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| **BUNZAI MEDIA GROUP, INC.,** *et al.* | |
| **Defendants.** | |

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Defendant Igor Latsanovski was a principal member and the primary financier of a common enterprise scheme that caused American consumers an astonishing $69 million in financial injury.[1] He now comes before this Court two and a half weeks after the Court entered a continuance he requested, asking that the Court invalidate it without showing any change in circumstances. The FTC respectfully requests that this Court deny Defendants' Application. In the alternative, the FTC respectfully requests that the Court postpone ruling upon Defendants' Application until the August 6 preliminary injunction hearing to allow the Court to review the Receiver's report on the very issue presented by Defendants' Application.

## I.   The Court Should Enforce the Stipulated Continuance Order.

### a. The Snap Judgment Defendants Request Is Contrary to the Agreed Continuance.

After the FTC stipulated, at his attorney's request,[2] to a continuance to allow Defendant Latsanovski time to prepare his defense, he now requests that this Court invalidate the agreed continuance. Defendant Latsanovski, without showing any change in circumstances or new emergencies, asks this Court to make a snap judgment concerning the very issue to be addressed at the Court's

---

[1] *See* Doc. 91 at 11. This figure does not include any consumer harm caused in 2015.

[2] *See* Ex. 19, Att. C.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1   August 6 preliminary injunction hearing. This is no peripheral issue raised by

2   Defendant Latsanovski. Rather, it is the foremost issue before the Court at the

3   upcoming hearing.

4       The Receiver and the FTC have now detrimentally relied on counsel's

5   representation that the preliminary injunction and accompanying matters would be

6   adjourned until August 6. Accordingly, the FTC respectfully requests that the

7   Court deny Defendant Latsanovski's attempted gamesmanship.

8         **b.  Defendant Latsanovski Attempts to Deny this Court the Opportunity to Make this Decision Based on the Receiver's**

9         **Report Describing his Fraudulent Enterprise.**

10       Importantly, and perhaps not coincidentally, a full hearing would be

11   precluded by the piecemeal approach requested by Defendant Latsanovski.

12   Moreover, it would deprive this Court from making the decision based on the

13   Receiver's final report. This report, due August 5, will detail the source of

14   Latsanovski's funds, the flow of illicit funds through his corporations in an

15   apparent attempt to disguise his income, and his involvement in numerous illegal

16   practices. These facts are discussed in part below but should be fully presented to

17   the Court in less than three weeks.

18       Defendant Latsanovski has denied not only the Court of full information

19   concerning these businesses. Defendants have stonewalled the FTC and the

20

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1   Court's Receiver as well. The FTC's requests for additional information[3]

2   concerning these businesses were ignored, and the Receivers requests for access to

3   critical banking information remained unfulfilled until the past couple days.

4   **II.      Defendant Latsanovski Is Jointly and Severally Liable for the Full**
        **Amount of Consumer Harm under the Law.**

5

6   Defendant Latsanovski and his companies, CalEnergy, Inc., BunZai Media

   Group, Inc., and Zen Mobile Media, Inc. were principal participants in a common

7   enterprise scheme, described in both the FTC's Memorandum in Support of *Ex*

8   *Parte* Temporary Restraining Order and Other Equitable Relief and Order to

9   Show Cause Why a Preliminary Injunction Should Not Issue,[4] as well as the

10  Receiver's Response to Defendants' Application. Described further below,

11  however, are the facts and law supporting liability against Defendant Latsanovski

12  specifically and his companies.

13  **a.  Defendant Latsanovski's Claim that He was a "Silent" Investor**
        **Strains Credibility and Contradicts the Facts.**

14

15  Defendant Latsanovski transparently attempts to minimize his involvement

16  and that of his company to extricate himself from the common enterprise. But his

17  contentions are unsupported by fact or law. The facts make clear: Latsanovski was

18  a principal and knowing perpetrator of the AuraVie scam.

19  _____

    [3] *See* Ex. 19, Att. C.

20
    [4] *See* Doc. 5.

    **RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**
    Page | 4

Defendant Latsanovski contends he was a "silent" investor—that is, according to Defendant Latsanovski, his involvement was limited to providing capital.[5] Such a claim is directly contradicted by an executed partnership agreement found during the Court-ordered immediate access of the common enterprises' business premises: this partnership agreement lists Defendant Latsanovski as the majority shareholder of BunZai Media Group, Inc.[6] It is also directly contradicted by the representations he made to the Department of Homeland Security.[7] Further, he lists BunZai Media Group, Inc. as his employer to the state of California—in documents he signed under penalty of perjury.[8] Further still, Defendant Latsanovski incorporated Zen Mobile Media, Inc.[9]— supposedly at the direction of Defendant Alon Nottea, without much

---

[5] *See* Doc. 90 at 9; *see also* Ex. 21 (Defendant Latsanovski's $195,000 payment to BunZai Media Group, Inc.).

[6] *See* Ex. 19, Att. A (listing Defendant Latsanovski as a partner with a 55% share of BunZai Media Group). A second executed partnership agreement lists Latsanovski as equal partners with Defendants Khristopher Bond and Alon Nottea.

[7] *See* Ex. 20, Att. B (listing "BunZai Media Group, Inc. as his "Business or Organization").

[8] *See* Ex. 20, Att. C (California Employment Development Department Withholding Allowance Certificate).

[9] *See* Ex. 20, Att. A (showing Latsanovski's signature on Zen Mobile Media, Inc.'s Articles of Incorporation).

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1  understanding of what the company was or why he was doing it.[10] These objective

2  documents, which pre-date the filing, are more reliable and have more credibility

3  than Defendant Latsanovski's self-serving declaration.

4      Despite claiming little involvement with the company, Defendant

5  Latsanovski incorporated Zen Mobile Media, Inc.,[11] and bank records show Zen

6  Mobile Media paid his personal credit card bills.[12]

7      Moreover, Defendant Latsanovski admits to opening Zen Mobile Media's

8  merchant account. Zen Mobile Media's account was opened to evade the

9  merchant processor's chargeback limitations, a fact that Defendant Latsanovski

10  claims to have not understood. He contends that he believed Alon Nottea needed

11  him to do so because of the companies' large profits. Defendant Latsanovski's

12  misunderstanding of how merchant processing systems work is particularly

13

14

15

16

17

18  [10] *See* Doc. 90-1 at 5, ¶16.

19  [11] *See* Ex. 20, Att. A.

20  [12] *See* Doc. 91 at 7.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1 puzzling considering that Latsanovski himself owns a payment processing

2 company and is requesting, in this Application, for its assets to be unfrozen.[13]

3 **b. Willful Blindness in the Face of Countless Indicia of Fraud Cannot Preclude Liability.**

4 Even if Defendant Latsanovski were to have been willfully blind of the

5 blatant fraud in the companies he was involved in, such purposeful ignorance

6 would not shield him from liability. The FTC may satisfy the knowledge

7 requirement by showing either actual knowledge of the misrepresentations,

8 reckless indifference to the truth or falsity of the misrepresentations, or an

9 awareness of a high probability of fraud coupled with an intentional avoidance of

10 the truth.[14] Moreover, the FTC need not show that Latsanovski intended to

11 defraud consumers for this Court to hold him liable for doing so.[15]

12 Latsanovski somehow claims to have not seen *any* of the countless warning

13 signs of the fraud permeating the businesses he participated in. He likewise claims

14

15 [13] *See* Doc. 90 at 10-11 (explaining that Vastpay, LLC, one of Latsanovski's companies, is a "merchant service provider"); *see also* Ex. 19, Att. B. Other courts have considered defendants' business acumen when determining whether their

16 lack of knowledge is reasonable. *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1235 (9th Cir. 1999) (stating that "experienced business persons like the

17 [defendants] should have conducted greater due diligence efforts…").

18 [14] *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989); *FTC v. Network*

19 *Servs. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010).

20 [15] *See Publ'g Clearing House*, 104 F.3d at 1171.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1    to be unaware of the business practices at the various shell corporations he

2    established. Despite providing the common enterprise $1.9 million dollars, he

3    contends he does not really know how they made money.[16] He signed blank

4    checks for these supposedly independent businesses.[17] Despite this laundry list of

5    warning signs, Latsanovski somehow overlooked them all. Such assertions are

6    absurd, hardly the credible behavior of a millionaire investor, and this Court need

7    not believe them.

8              **c.  Defendant Latsanovski's Contention of Meager Profits is
                   Counterfactual and Irrelevant.**

9

10           Although Defendant Latsanovski caused over $69 million in consumer

     injury—and readily admits to infusing the common enterprise with capital to keep

11   it afloat to do so—Defendant Latsanovski complains to this Court about his profit

12   margin.

13
             Defendant Latsanovski claims to have only received $317,746 from his

14   scam. This estimate appears to understate his profits greatly when faced with the

15   _____

[16] This claim is made despite Latsanovski having signed a partnership agreement
16   describing that products would be sold using a "free trial" marketing technique
     and listing Latsanovski as primary shareholder of BunZai Media Group. *See*
17   Ex.19, Att. A.

18   [17] *See* Ex. 20, Att. D (blank Zen Mobile Media check, pre-signed by Igor
     Latsanovski, found during the immediate access of the common enterprise's
19   business premises); *id.* (pre-signed blank checks from CalEnergy, Inc. and Igor
     Latsanovski's personal bank account, also found at the common enterprise's
20   business premises).

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1    full facts. In addition to the profits Defendant Latsanovski admits CalEnergy

2    received from the common enterprise, Defendant Latsanovski is also a partner in

3    BunZai Media Group, Inc., which bilked consumers of over $17 million, and an

4    owner of Zen Mobile Media Group, Inc., which took in $8.4 million more from

5    consumers.

6        But even more importantly, Defendant Latsanovski's liability is measured

7    by the consumer harm caused by the entire common enterprise[18]—not his

8    individual profits.[19] And likewise, CalEnergy is liable for the entire consumer

9    harm.[20] As Defendant Latsanovski concedes, "[e]quity may require a defendant to

10   restore his victims to the status quo where the loss suffered is greater than the

11   defendant's unjust enrichment."[21] It would be inequitable to allow Defendant

12   Latsanovski to shield his substantial assets from use for consumer redress.

13   [18] *See FTC v. BurnLounge, Inc.*, 584 Fed. Appx. 315,318 (9th Cir. 2014)
     (affirming this Court's decision to hold the individual and corporate defendants
14   jointly and severally liable).

15   [19] As Defendants concede, "'courts have often awarded restitution in the full
     amount of funds lost [where] equity may require a defendant to restore." Doc. 90
16   at 13 (quoting *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal.
     2010)).

17
     [20] Participants in a common enterprise are held jointly and severally liable for the
18   law violations. *See*, *e.g., FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202
     (C.D. Cal. 2000*); FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080
19   (S.D. Fla. 1997).

20   [21] *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1  Defendant Latsanovski requests that he be allowed to walk away from over $69

2  million in consumer harm while returning, at most, $317,746 of the profits he

3  admits to receiving from the scheme.

4       Despite this, Defendant Latsanovski contends that he did not receive funds

5  directly from consumers, and that the proper measurement is not the consumer

6  loss but his ill-gotten gains, citing *FTC v. Verity Int'l, Ltd.*[22] Defendants'

7  argument ignores his ownership interest in both BunZai Media Group, Inc. and

8  Zen Mobile Media Group, Inc.—both of which *did* receive funds directly from

9  consumers—and further ignores his participation in the common enterprise.

10       More importantly, Defendants fail to note that the Ninth Circuit has

11  expressly rejected *Verity's* holding.[23] In addition, *Verity* would not apply here

12  regardless. *Verity* addressed "the appropriate amount of restitution where multiple

13  nonparty middlemen retained a significant portion of the total revenues."[24] In *IAB*

14  *Marketing*, the entities claiming to be only middlemen were named defendants,

15  subject to joint and several liability, and, accordingly, the Court found that *Verity*

16

---

17  [22] *See* Doc. 90 at 19 (citing *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir.
18  2006)).

19  [23] *FTC v. Publrs. Bus. Servs.*, 540 Fed. Appx. 555, 556-57 (9th Cir.) (citing
*Stefanchik*, 559 F.3d at 931-32 (9th Cir. 2009)).

20  [24] *See IAB Marketing Associates, LP*, 746 F.3d 1228, 1234 (11th Cir. 2014).

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1   did not apply.[25] Such is the case here. The supposed "middlemen" Defendant

2   Latsanovski points to were his fellow participants in the common enterprise.

3   Therefore, Defendants are jointly and severally liable for the consumer injury.

4   **III.   Injunctive Relief Is Appropriate for Defendants' Ongoing Scheme.**

5   Although Defendants characterize their Application as being a request for

6   partial relief from the TRO, they ask this Court to deny a preliminary injunction.[26]

7   Preliminary injunctive relief is necessary and appropriate against Defendant

8   Latsanovski and his businesses for the reasons described in the FTC's

9   Memorandum in Support of *Ex Parte* Temporary Restraining Order and Other

10   Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should

11   Not Issue.[27]

12   Defendants contend this is not the case because the common enterprise is no

13   longer operating.[28] But as the Receiver's response notes, this statement is entirely

14   false.[29] Defendants continue to make millions at the expense of consumers.

15   _____

16   [25] *See also FTC v. HES Merchant Serv's Co.*, 6:12-cv-1618-Orl-22KRS (M.D. Fla. Feb. 2, 2015).

17   [26] *See* Doc. 90 at 13-15.

18   [27] *See* Doc. 5.

19   [28] *See* Doc. 90 at 9.

20   [29] *See* Doc. 91 at 11.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1    Further, even if Defendants had actually ceased their conduct, this would not

2    preclude a preliminary injunction if there is a "possibility of recurrence."[30]

3    **IV.   The Assets are Properly Frozen by This Court to Preserve Consumer Relief.**

4

5            **a.  The Consumer Harm at Issue Dwarfs the Frozen Assets.**

6            Defendants' illegal common enterprise has caused nearly $70 million

7    dollars in harm to American consumers.[31] And it is possible that even that number

8    does not fully capture the harm caused by Defendant Latsanovski and his

9    collection of fraudulent companies.[32] As it stands, consumers may be able to

10   [30] "It is settled that an action for an injunction does not become moot merely
     because the conduct complained of was terminated, if there is a possibility of
11   recurrence, since otherwise the Defendants would be free to return to (their) old
     ways." *Allee v. Medrano*, 416 U.S. 802, 810 (1974); *accord TC v. H.N. Singer,*
12   *Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982) (affirming injunction and asset freeze
     issued after defendants ceased operations); *FTC v. American Standard Credit Sys.*,
13   874 F. Supp. 1080, 1087 (C.D. Cal. 1994) (granting injunction where termination
     by VISA had stopped defendants' deceptive credit card marketing); *see also FTC*
14   *v. Affordable Media*, 179 F.3d 1237 (9th Cir. 1999) (even voluntary cessation of
     practices does not moot a preliminary injunction where an asset freeze and
15   repatriation are sought to redress consumers); *Fedders v. FTC*, 529 F.2d 1398,
     1403 (2d Cir. 1976) ("[T]he fact that [defendant] may have discontinued the
16   offending practice before the Commission issued the complaint in this case,
     however, does not bar a cease-and-desist order, where the public interest
17   otherwise requires it.").

18   [31]  *See* Doc. 91 at 11.

19   [32] This number does not include any consumer harm from 2015, as Defendants
     have not yet filed tax returns. But, as the Receiver's response notes, the enterprise
20   remains active, and the injury to consumers in 2015 is likely to again be in the
     millions. *See* Doc. 91 at 11.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

receive only a fraction of the restitution owed to them by Defendant Latsanovski and his associates. Defendants seek to lessen this possibility further still.

Zen Mobile Media alone—a company incorporated by Latsanovski,[33] and one that pays his personal credit card bill[34]—has netted $8.4 million. BunZai Media Group, a company in which Defendant Latsanovski is a partner,[35] brought in even more: over $17 million between 2010 and 2014.

### b. There Is a Significant Likelihood that These Assets Would Be Dissipated If Unfrozen Based on Defendant Latsanovski's Attempts to Disguise Assets and the Common Enterprise's Numerous Overseas Transfers.

Hiding assets, or disguising their origin, is a form of dissipation. Defendant Latsanovski and the other individual Defendants have gone to great lengths to hide their ill-gotten gains in various countries and various shell corporations. The Receiver has already had significant difficulty tracking down the scattered assets moved through dozens of merchant accounts, shell corporations, and bank accounts.[36] If Defendants assets were unfrozen, they would only redouble their efforts to frustrate recovery for consumers.

---

[33] *See* Ex. 20, Att. A

[34] *See* Doc. 91 at 7.

[35] *See* Ex. 19, Att. A.

[36] *See generally* Doc. 91-1.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1    Further, Defendants contest that assets were sent abroad and argue that the

2  supporting statements are untrustworthy hearsay. But this point is moot: as the

3  Receiver notes in her response, bank records establish that overseas dissipation is

4  precisely what occurred.[37] The common enterprise has moved hundreds of

5  thousands of dollars abroad to unknown locations. These assets may be

6  unrecoverable.

7    Importantly, Defendants appear to misunderstand the asset-freeze standard

8  and overstate the FTC's burden. The FTC need not show Defendants have

9  dissipated assets as Defendants appear to suggest.[38] Rather, the FTC need only

10  establish a likelihood of dissipation.[39] Even if this were the standard, though, the

11  evidence described above would satisfy it.

12
13    **c. Every Company that Defendant Latsanovski Claims Had Its Assets Improperly Frozen Either Received Significant Assets from the Common Enterprise or was Personally Funded by Defendant Latsanovski.**

14    As noted extensively in the Receiver's report, Defendant Latsanovski's

15  companies, including CalEnergy, are an inextricable link in Defendants common

16

17  _____

    [37] *See* Doc. 91.

18
    [38] *See* Doc. 90 at 7 (arguing that the asset freeze is inappropriate because "the FTC
19  failed to provide any substantiated evidence of the dissipation of funds by
    Latsanovski").

20
    [39] *Johnson v. Couturier*, 572 F.2d 1067, 1085 (9th Cir. 2009).

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1   enterprise. Defendant Latsanovski admits that CalEnergy funded the illegal

2   enterprise to keep it operating and profited from it. Accordingly, the Court has

3   properly frozen its assets, and the company is properly within the receivership.

4           Defendant Latsanovski's contends that Sunset Holdings is an unrelated

5   enterprise. Yet its governing documents show Defendant CalEnergy to be a 99

6   percent owner and Latsanovski to be a 1 percent owner.[40] The company is little

7   more than an alter ego of the Defendants. The only document offered to contradict

8   this is a handwritten "verbal agreement" of questionable authenticity, which

9   discusses an intended future agreement.[41] Further, as discussed by the Receiver,

10  the enterprise has received millions of dollars from Defendant CalEnergy, Inc.[42]

11          Defendant Latsanovski also contends that corporate assets in Rilend, Inc.'s

12  accounts should be unfrozen. Rilend was established wholly with Defendant

13  Latsanovksi's personal funds[43] and has no actual business.[44] Such assets are

14  properly frozen, just as are the rest of Defendant Latsanovski's personal assets.

15  _____

[40] Ex. 21 at 2 (Sunset Holdings operating agreement).

16
[41] *See* Ex. 31 ("I…am responsible to create official agreement reflecting this
17  verbal agreement.").

18  [42] *See* Doc. 91-1 at 20, ¶33.

19  [43] *See* Doc. 90 at 10.

20  [44] *See* Doc. 90 at 10 (describing Rilend as a "potential business venture").

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1  Personal assets should not be carved out from the Court's proper asset freeze

2  solely because Defendant Latsanovski has stashed them in a shell corporation. The

3  Defendants use the corporations of the common enterprise as piggy banks,

4  commingling assets and raiding them as necessary, and thus the corporate assets

5  are indistinguishable from their personal ones.[45]

6        Defendant Latsanovski has provided little, if any, financial information

7  concerning the other corporations at issue (Vastpay and ComicsFix) and has

8  declined to provide the FTC with financial information concerning them despite

9  request.[46] Based on counsel's representations, however, these companies'

10  accounts were apparently also chiefly funded with Defendant Latsanovski's

11  personal assets.[47] Further, Vastpay is a subsidiary of CalEnergy, according to

12  CalEnergy's own website.[48]

13      **V.**    **The FTC Is Not Opposed to Reasonable Living Expenses from After-Acquired Assets, Provided the Funds Are Derived from a**

14          **Lawful Job.**

15      The FTC does not oppose Defendant Latsanovski being allowed reasonable

16  living expenses derived from after-acquired assets from a lawful job. However,

17  _____

18  [45] *See generally* Doc. 91.

   [46] *See* Ex. 19, Att. C.

19  [47] *See* Ex. 19, Att. C.

20  [48] Doc. 6, Ex. 18.

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1   Defendant Latsanovski's claimed expenses are unreasonable. For example, in

2   Defendant Latsanovski's financial disclosure statements, he states that he requires

3   $500 per month for new clothes, as well as lease payments for three vehicles, two

4   of which are Mercedes-Benz luxury vehicles. Defendant Latsanovski should not

5   be allowed to continue to live his extravagant lifestyle at his victims' expense.

6   **VI.    Conclusion**

7       The FTC respectfully requests that this Court deny Defendants 'Application,

8   or, in the alternative, postpone ruling upon Defendants' Application until the

9   August 6 preliminary injunction hearing.

10

11                                 Respectfully submitted,

12

13   Dated: 7/16/15                  /s/ REID TEPFER_____
                                 REID A. TEPFER

14                                    LUIS H. GALLEGOS
                                 Attorneys for the Plaintiff

15                                    Federal Trade Commission
                                 1999 Bryan Street, Suite 2150

16                                    Dallas, Texas 75201
                                 (214) 979-9395 (Tepfer)

17                                    (214) 979-9383 (Gallegos)
                                 (214) 953-3079 (facsimile)

18                                    rtepfer@ftc.gov
                                 lgallegos@ftc.gov

19

20

             **RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

4

The undersigned certifies that on July 16 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

5

6

7

8

Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com
*Local counsel for Receiver*

9

10

11

12

13

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi, as an officer or manager of BunZai Media Group, Inc. and Pinnacle Logistics, Inc.*

14

15

16

17

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea, Roi Rueveni and Adageo, LLC*

18

19

20

David P. Beitchman
Beitchman & Zekian
16130 Ventura Blvd., Suite 570
Encino, CA 91436
dbeitchman@bzlegal.com
*Counsel for Doron Nottea and Motti Nottea*

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**

1  Marc S. Harris
   Scheper Kim & Harris, LLP
2  601 W. Fifth Street, 12th Floor
   Los Angeles, CA 90071
3  mharris@scheperkim.com
   *Counsel for Igor Latsanovski and*
4  *CalEnergy, Inc*

5  Annah Kim
   Scheper Kim & Harris, LLP
6  601 W. Fifth Street, 12th Floor
   Los Angeles, CA 90071
7  akim@scheperkim.com
   *Counsel for Igor Latsanovski and*
8  *CalEnergy, Inc*

9  Charlene Cantrell Koonce
   Receiver
10
   Charlene Koonce
11 Scheef & Stone
   500 N. Akard, Suite 2700
12 Dallas, Texas 75201
   charlene.koonce@solidcounsel.com
13 *Receiver*

14 Kelly M. Crawford
   Scheef and Stone
15 500 N. Akard, Suite 2700
   Dallas, Texas 75201
16 kelly.crawford@solidcounsel.com
   *Counsel to Receiver*

17

18                                         /S/ REID TEPFER
                                            REID TEPFER
19

20

**RESPONSE TO *EX PARTE* APPLICATION TO MODIFY TRO**