**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
ANNAH S. KIM (State Bar No. 190609)
akim@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Attorneys for Defendants**
**Igor Latsanovski and Calenergy, Inc.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP INC., et al.,<br><br>Defendants. | CASE NO. CV 15-04527 GW (PLAx)<br><br>**OPPOSITION OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC. TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Supplemental Declarations of Annah S. Kim and  Igor Latsanovski and [Proposed] Order Filed Concurrently]*<br><br>**Date:   August 6, 2015**<br>**Time:  8:30 am**<br>**Judge: Hon. George Wu** |

---

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ..................................................................................... 1

II. FACTS ................................................................................................... 3

    A.    CALENERGY IS AN INVESTMENT COMPANY ............................ 3

    B.    LATSANOVSKI WAS A SILENT INVESTOR ................................ 3

    C.    CALENERGY RECEIVED $317,756.05 FROM ITS INVESTMENT IN THE BUNZAI GROUP ......................................... 5

    D.    THE FROZEN ASSETS FAR  EXCEED WHAT CALENERGY RECEIVED FROM THE BUNZAI GROUP BUSINESS ..................... 6

    E.    THE LEGITIMATE BUSINESSES IMPACTED BY THE ASSET FREEZE WERE FUNDED BY THIRD PARTY INVESTORS, NOT CALENERGY ......................................................... 7

        1.    Sunset Holdings .................................................................... 7

        2.    ComicsFix ............................................................................. 9

        3.    Vastpay ................................................................................. 9

    F.    THESE LEGITIMATE BUSINESSES CANNOT OPERATE WITHOUT ACCESS TO THEIR FROZEN FUNDS ........................... 9

III. LEGAL ARGUMENT .......................................................................... 10

    A.    LEGAL STANDARDS FOR INJUNCTIVE RELIEF IN THE FTC ACT CONTEXT .................................................................... 10

    B.    THE FTC IS UNLIKELY TO SUCCEED ON THE MERITS AGAINST LATSANOVSKI OR CALENERGY ............................. 11

    C.    THE BALANCE OF THE EQUITIES DOES NOT FAVOR AN INJUNCTION ................................................................................ 13

    D.    THERE IS NO BASIS FOR PERSONAL LIABILITY ..................... 15

    E.    THERE IS NO WARRANT FOR AN ASSET FREEZE ................... 16

    F.    THE ASSET FREEZE IS OVERBROAD ......................................... 18

    G.    THE ASSET FREEZE IMPOSES AN ENORMOUS HARDSHIP ................................................................................... 20

IV. CONCLUSION .................................................................................... 21

i

## TABLE OF AUTHORITIES

**Page**

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ..............................17, 18

*F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ...........................19

*F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373 (D. Conn. 2009) ............19

*F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048(C.D. Cal. 2012)............18

*FTC v. Evans Products Co.*, 775 F. 2d 1084 (9th Cir. 1985)................................16

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982)...............................................14

*FTC v. IAB Marketing Associates LP*, 746 F.3d 1228 (11th Circ. 2014) .............18

*FTC v. John Beck Amazing Profits, LLC*, 2009 WL 7844076,
     at *15 (C.D. Cal. Nov. 17, 2009) .......................................................16

*F.T.C. v. Merch. Servs. Direct, LLC*, No. 13-CV-0279-TOR, 2013
     WL 4094394, at *2 (E.D. Wash. Aug. 13, 2013)........................................14

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010).....................15

*F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006) .....................................19

*F.T.C. v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ..............................................18

*FTC v. Sterling Precious Metals, LLC*, 894 F. Supp.2d 1378
     (S.D. Fla. 2012) ...................................................................10, 17

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ...........................................18

*FTC v. Warner Comm'cs Inc.*, 742 F.2d 1156 (9th Cir. 1984)........................10, 11

*Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010)......................................18

*Johnson v. Couturier*, 572 F.2d 1067 (9th Cir. 2009) .....................................16, 20

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .........................................................10

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .......................14

## I.   **INTRODUCTION**

The FTC contends that Igor Latsanovski ("Latsnovski") is liable for $69 million in consumer fraud because he loaned the internet skincare business operated by Alon Nottea approximately $1.9 million over a four-year period.  In addition, the FTC contends that all of Latsanovski's assets, regardless of the source, should be frozen, as should all assets belonging to other businesses in which he has invested.  Although the FTC's own evidence reflects that Latsanovski's role was that of an investor, who received approximately $317,000 from his investment in the business, it has grabbed everything Latsanovski has, and it refuses to let go because it senses a deep pocket from whom it hopes to address the alleged wrongdoing of others.

The FTC's Application for Temporary Restraining Order and OSC Re; Preliminary Injunction includes no evidence or allegation that Latsanovski played any role in the subject skincare business, other than to loan money to the business and to allow it to use his name to open a merchant account under his name.  Under oath, Latsanovski has explained in detail to the Temporary Receiver the full extent of his involvement with the skincare business, including the loans he made to the company, the amount he received in repayment and nature of his involvement with the various companies operated by Nottea.

The documents attached to the FTC's application, as well as those gathered by the Temporary Receiver, confirm Latsanovski's testimony that he was not involved in the operation of the business, had no interactions with customers, and received no funds from any customer.  Yet, the FTC is asking the Court to freeze *all* of Latsanovski's assets indefinitely, making it impossible for him to feed him family, pay his mortgage or maintain his health insurance.  Indeed, the FTC goes even further, and seeks to freeze those assets he may acquire *after* the date of the Temporary Restraining Order and into the future indefinitely.

The testimony and documents also establish that Latsanovski's companies, including Calenergy, Inc. ("Calenergy"), Sunset Holdings Partners LLC ("Sunset

Holdings"), ComicsFix LLC ("ComicsFix") and Vastpay LLC ("Vastpay"), are wholly independent of Alon Nottea and the internet skincare business that is the subject of this litigation.  For example, Sunset Holdings is a real estate investment company which has funded its real estate purchases almost entirely from foreign investments, hard money loans and a line of credit.  ComicsFix is an internet-based comics book company that never received any funds from the skincare business.  Nevertheless, the FTC and Temporary Receiver have asserted dominion over the assets of these companies, and refuse to allow access to their business accounts and assets to operate.  If the asset freeze is not lifted as to these companies, they will be destroyed.

Balanced against the hardship to Latsanovski and his affiliated companies, the FTC can offer no legitimate basis for an asset freeze or the appointment of a Permanent Receiver over these companies.  It has produced no evidence to establish any effort by Latsanovski, Calenergy or Latsanovski's other companies to hide or dissipate assets.  Although the Temporary Receiver contends that certain financial information has been difficult to access, and some transactions are admittedly complicated, no assets have been hidden or dissipated, and there is no evidence of any intention to do so.

Further, there can be no argument that the appointment of a Receiver is necessary to avoid further consumer harm or to take control of a rogue business.  These are legitimate businesses that are not alleged to be engaged in any sort of consumer fraud or misconduct.  Without evidence that ill-gotten assets are being hidden or dissipated, an asset freeze and the appointment of a Permanent Receiver is neither necessary nor appropriate.

Accordingly, Latsanovski and Calenergy request that this Court lift the asset

1  freeze and relieve the Temporary Receiver of any control over Calenergy.[1]  They

2  also ask that the funds and assets of Sunset Holdings, ComicsFix and Vastpay be

3  released from the TRO and that these legitimate businesses be allowed to resume

4  their operations.

5  **II.    FACTS**

6      **A.    CALENERGY IS AN INVESTMENT COMPANY**

7          Calenergy is engaged in the business of identifying investment opportunities

8  for overseas investors.  Declaration of Annah S. Kim ("Kim Decl."), Ex. K (7/2/15

9  Depo.) at 53:17-19, 54:13-16, 93:1-6,133:23-134:12.  As Calenergy's CEO,

10  Latsanovski is approached by businesses seeking investors for their business, locates

11  the investors, and facilitates the transfer of funds form the investors to the

12  businesses.  Declaration of Igor Latsanovski (Doc. No. 90-1)("Latsanovski Decl."),[2]

13  ¶ 25.  He does not play any role in these potential or existing businesses other than

14  to provide funds from third party investors through Calenergy's accounts.  *Id.;*

15  Supplemental Declaration of Igor Latsanovski in Support of Opposition to

16  Preliminary Injunction ("Suppl. Latsanovski Decl."), ¶ 6.

17      **B.    LATSANOVSKI WAS A SILENT INVESTOR**

18          One business that Latsanovski invested in through Calenergy was Alon

19  Nottea's skincare business.  Latsanovski believed that Alon Nottea operated various

20  companies involved in the skincare business as the "Bunzai Group."[3]  Latsanovski's

21  sole role in the skincare business was to facilitate loans and investments, through

22  _____

23  [1]  Latsanovski and Calenergy take no position as to the propriety of maintaining the
24  Temporary Receiver in place with respect to the other Receivership Defendants.

25  [2]  A courtesy copy of this declaration is attached to the Supplemental Declaration of
    Igor Latsanovski as Exhibit L.

26  [3]  For ease of reference, "Bunzai Group" shall refer to the other defendants in this
27  matter which the FTC contends were involved in the internet skincare business.

28

1   Calenergy, to Alon Nottea between 2010 and 2014.  Latsanovski Decl., ¶¶ 6-7, 9-12;

2   Kim Decl., Ex. K (7/2/15 Depo.) at 27:20-24.  As Latsanovski testified under oath at

3   his July 2, 2015 deposition, he did not play any role in the operation of the internet

4   skincare business.  Kim Decl., ¶ Ex. K (7/2/15 Depo.) at 27:11-14; 36:2-3; 31:25-

5   32:3.  Latsanovski never spoke to any customers, had no involvement in the

6   marketing or advertising of the skincare products, and never received any reports

7   regarding customer complaints.  Further, neither Calenergy nor Latsanovski ever

8   receive any money from consumers.  Latsanovski Decl., ¶¶ 4-7, 11.  The FTC has

9   come forward with no evidence to the contrary.[4]

10          Latsanovski's only other connection to the Bunzai Group is his agreement to

11   allow Nottea to use his name (and credit) to set up a merchant account in the name

12   of Zen Mobile Media, Inc. ("Zen Mobile").  Latsanovski testified that he

13   incorporated Zen Mobile at Alon Nottea's request.  Kim Decl., Ex. K (7/2/15 Depo.)

14   at 50:15-51:7.  Nottea explained that the Bunzai Group business was growing and

15   that Nottea needed additional merchant accounts to process additional transactions

16   and that Nottea wanted Latsanovski to open a merchant account because

17   Latsanovski had good credit.  Kim Decl., Ex. K (7/2/15 Depo.) at 28:14-24; 29:8-19.

18   Latsanovski's only involvement was to sign documents and open a merchant

19   account upon Nottea's request.  *Id.* at 28:14-29:19; 29:23-30:5, 28:9-11, 39:22-

20   40:14.  Latsanovski did not perform any work for Zen Mobile, did not review any

21   _____

22   [4] On July 24, 2015, the Temporary Receiver sent documents purporting to establish
     Latsanovski's role in the Bunzai Group business.  At most, these documents

23   establish that Latsanovski understood that Alon Nottea was running the skincare
     business without any input from Latsanovski (Kim Decl., Ex. Q (8/14/13 email:

24   "You have to be on top of all" and "I'm talking personal opinion, I do not know
     much as you know it…But in any case, you and your vision of the director – the

25   main thing") and that Oleg Trushlya, had his own business, SkinCare OU, which
     may have had a relationship with the Bunzai Group. Latsanovski or Latsanovski's

26   entities (including Guayas) never received any funds from SkinCare OU or
     Trushlya.  Suppl. Latsanovski Decl., ¶ 5.

27

28

1  Zen Mobile mail and was unaware of any additional merchant accounts under his

2  name. *Id.* at 51:13-25, 153:13-154:7, 156:22-156:4; 158:16-22. When Latsanovski

3  realized that Zen Mobile had bank accounts in his name that he did not control,

4  Latsanovski asked Alon Nottea to cancel these accounts. *Id.* at 250:25-251:23.

5  Nottea told Latsanovski that his name would be taken off the papers. *Id.* at 252:1-

6  12.

7       The FTC does not contend that Latsanovski played any other or greater role

8  with respect to the Bunzai Group. Its own evidence confirms that Latsanovski was

9  the "money person" and was not involved in the running any of the companies. *See*

10  Second McPeek Decl. (Doc. No. 93-1), ¶ 10g. The Temporary Receiver's own

11  analysis and Bunzai Group documents confirm that Latsanovski and Calenergy were

12  investors only, and the Bunzai Group companies were run by Alon Nottea and

13  Khristopher Bond. *See* Receiver Decl. (Doc. No. 92), ¶ 7 (Latsanovski's and

14  Calenergy's partnership interest was to be held "until they were repaid their initial

15  investment"); and Bunzai Media Group-Partnership Agreement (Doc. No. 93-1) at 9

16  ("Igor will invest" and "Alon & Khris will have total autonomy on how budget is

17  spent").

18     C.   **CALENERGY RECEIVED $317,756.05 FROM ITS**

19         **INVESTMENT IN THE BUNZAI GROUP**

20       The Receiver and the FTC have alleged that Calenergy received $1.9 million

21  from the Bunzai Group over several years. This is accurate, but ignores that $1.6

22  million flowed *from* Calenergy to the Bunzai Group during the same time period.

23  The net amount that was received by Calenergy was approximately $317,000.

24       Latzanovski has testified, and the financial records support, that the

25  relationship between Calenergy and the Bunzai Group functioned as a line of credit,

26  with Mr. Nottea periodically borrowing against the line and repaying it back.

27  Between 2010 and 2014, Calenergy provided approximately $1.6 million in loans to

28  the Bunzai Group. Latsanovski Decl., ¶ 11, Ex. A.

The Bunzai Group intermittently made payments on its loans from 2011 through 2015.  Latsanovski Decl., ¶¶ 9-11, Ex. A.  Thus, the outstanding loan balance would decrease and increase as payments or additional loans were made. Between 2010 and 2014, the Bunzai Group's outstanding balance never exceeded $500,000.  *See* Kim Decl., Ex. K (7/2/15 Depo.) at 180:1-3; Latsanovski Decl., Ex. A.  In total, Calenergy received approximately $1,929,629 on its $1,611,833 million loan, resulting in a total return of $317,746 on its investment, which is approximately a four or five percent.  Latsanovski Decl., ¶¶ 9-13, Ex. A; Kim Decl., Ex. K (7/2/15 Depo.) at 181:3-8, 193:19-23 and 196:7-14.[5]

## D.   THE FROZEN ASSETS FAR EXCEED WHAT CALENERGY RECEIVED FROM THE BUNZAI GROUP BUSINESS

The amount of Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his investment in Mr. Nottea and his companies. In total, over $3 million of Latsanovski's assets have been impacted by the asset freeze, which is almost 10 times Calenergy's return on its investment with the Bunzai Group.  Latsanovski Decl., ¶¶ 14, 21.  Additionally, assets of other businesses, totaling $2.1 million, have been frozen.  As set forth below, none of

---

[5]  Whether the internet skincare business shut down in 2014, it is undisputed that Mr. Latsanovski believed that the internet skincare business ceased in 2014.  *See* and Latsanovski Decl., ¶ 20 (Bunzai business ceased taking new orders in 2014 and Zen Media was dissolved at Alon Nottea's instruction in 2014).  The FTC's own records also confirm his understanding because they show that the businesses involved in the internet skincare marketing business were dissolved by the end of 2014.  *See* Declaration of Brent McPeek, ¶¶ 6-13 and 16 [Doc. No. 6] at APP 2-8 (noting that defendants Bunzai Media Group, Inc. was dissolved in May 2013, Pinnacle Logistics, Inc. was dissolved in December 2014, Media Urge, Inc. was dissolved in December 2014, and other business entities were dissolved in 2014); Receiver's Response (Doc. No. 91), ¶ 3 and n.3; and FTC Memo (Doc. No. 5) at 21-22 (Media Urge, Inc. and Pinnacle Logistics took over Bunzai's skincare marketing business).

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

Latsanovski's funds or assets are proceeds from the Bunzai Group's business.

### E. THE LEGITIMATE BUSINESSES IMPACTED BY THE ASSET FREEZE WERE FUNDED BY THIRD PARTY INVESTORS, NOT CALENERGY

The FTC and/or the Temporary Receiver have exercised dominion over several companies wholly unrelated to the internet skincare business on the ostensible ground that either Latsanovski or Calenergy has an ownership interest in the companies. They have either frozen bank accounts or asserted control over assets owned by Sunset Holdings Partners LLC, ComicsFix LLC and Vastpay LLC.

Latsanovski has an ownership in each of these companies, and each has received funds from Calenergy's bank account. Again, Latsanovski's role in each of the businesses was to locate overseas investors to provide funds to these businesses and to facilitate the transfer of these overseas funds to these businesses; Latsanovski does not play any role in their operations other than to obtain these funds and manage the flow of funds from the overseas investors. Latsanovski Decl., ¶ 25; Suppl. Latsanovski Decl., ¶ 6. Further, none of these companies was involved in any way in the skincare business; none of the funding for any of the companies came from the skincare business; and each company is operated by an independent CEO, having nothing to do with the skincare business.

#### 1. *Sunset Holdings*

Sunset Holdings was initially formed in January 2015 to invest in real estate, primarily properties that can be purchased, renovated and re-sold at a profit. Suppl. Latsanovski Decl., ¶ 13; Kim Decl., Ex. K (7/2/15 Depo.) at 210:11-24). Since its inception, Mike Peniche has been Sunset Holdings' CEO and has been responsible for its daily operations. *Id.*, ¶ 9. In May 2015, Latsanovski signed an agreement memorializing that Peniche would be entitled to 40% of the profits of Sunset Holdings based on his management of the company and its properties. Under this

1  May 2015 agreement, Latsanovski became a 60% owner, and Peniche a 40%

2  owner.[6]  *Id.*, ¶ 9, Ex. N.

3         Sunset Holdings did not receive any funds from the Bunzai Group.  In total,

4  Sunset Holdings has received approximately $8 million since its inception.

5  Receiver Decl. (Doc. No. 92), ¶ 33.  Sunset Holdings received approximately $7.7

6  million of its funds from (a) its loan from Guayas Limited ("Guayas")[7] through

7  Calenergy ($4.601 million),[8] (b) outside investors and loans ($2.085 million), and

8  (c) line of credit ($1 million), which is approximately 95% of the money it has

9  received to date.  Approximately $7.753 million has been spent on purchasing real

10  estate properties and paying operating costs.[9]  *See* Supp. Latsanovski Decl., Ex. P

11  (Sunset Holdings' Financial Transactions); Kim Decl., Ex. K (7/2/15 Depo.) at

12  211:10-19, 214:7-24, 232:9-13.  This accounts for the remaining balance of

_____

14  [6]  The Receiver and the FTC claim that the May 2015 agreement was insufficient to
transfer ownership to Latsanovski and Peniche.  Receiver Decl. (Doc. No. 92), ¶¶
34-35.  However, the Sunset Holdings Operating Agreement makes clear that
Latsanovski, as the Managing Member, has the "sole power and authority" to "admit
new Members (or transferees of any interests of existing Members)" and to do so by
means of "such instruments, in form a substance satisfactory to the Managing
Member, as the Managing Member may deem necessary or desirable to effectuate
such admission."  Supp. Latsanovski Decl., ¶ 7; Ex. M.  Contrary to the Receiver's
assertion, Calenergy does not have any ownership interest in Sunset Holdings.

[7]  Latsanovski is a shareholder of Guayas.  Supp. Latsanovski Decl., ¶ 2.

[8]  The Guayas loan consists of two loans that Calenergy originally obtained loans
from two European companies, Guayas Limited and Bavaria LP, in the amount of
$5,868,000.  Supp. Latsanovski Decl., ¶ 10; *see* Kim Decl., Ex. K (7/2/15 Depo.) at
217:11-13.  Supp. Latsanovski Decl., ¶¶ 10-11.  Bavaria Ltd assigned its Calenergy
loans to Guayas Ltd.  *See* Supp. Latsanovski Decl., Ex. O.  On or about May 20,
2015, Sunset Holdings agreed to repay Calenergy's $5,868,000 loan from Guayas.
Supp. Latsanovski Decl., ¶ 10, Ex. O.

[9]  Sunset Holdings received $1.1 million from an outside investor, a $985,000 hard
money loan, and $1 million in a line of credit

1    $212,541.  Supp. Latsanovski Decl., Ex. P.

2            **2.    *ComicsFix***

3        ComicsFix LLC is an online comics content provider.  Like the other

4    businesses, it is run by an independent CEO and has never directly received any

5    funds from the Bunzai Group business, and has no connection to the internet

6    skincare business.  Latsanovski Decl., ¶¶ 21, 25-26 (a) and (b); Suppl. Latsanovski,

7    ¶ 17.

8            **3.    *Vastpay***

9        Vastpay is a merchant service provider, operated by an independent CEO.

10   The company is independent of the Bunzai Group and has not received any income

11   from any defendants in this action.  Vastpay received approximately $620,000 from

12   foreign lenders and has not received any funds from the Bunzai Group.  Suppl.

13   Latsanovski Decl., ¶¶ 15-16.

14       **F.    <u>THESE LEGITIMATE BUSINESSES CANNOT OPERATE</u>**

15            **<u>WITHOUT ACCESS TO THEIR FROZEN FUNDS</u>**

16       As a result of the freeze order issued by this Court, ComicsFix, Sunset

17   Holdings and Vastpay have been unable to pay salaries to their CEOs and amounts

18   owed to contractors to keep their businesses operating.  Latsanovski Decl., ¶ 26(a)-

19   (d); Suppl. Latsanovski Decl., ¶¶ 12, 16, and 18.  In addition to being unable to pay

20   these salaries and expenses, ComicsFix and Sunset Holdings are losing new

21   business opportunities.  Latsanovski Decl., ¶ 26(a)-(c).  Specifically,

22       • Vastpay has had equipment repossessed and is on the verge of closing

23            down its business.  Suppl. Latsanovski Decl., ¶ 17.

24       • ComicsFix is unable to pay for software it needs to continue to operate its

25            business.  Suppl. Latsanovski Decl., ¶ 19.

26       • Sunset Holdings is unable to pay  architects and contractors to develop its

27            real estate properties for sale and has lost potential business opportunities.

28            *See* Suppl. Latsanovski Decl., ¶ 13.

## III.  <u>LEGAL ARGUMENT</u>

As set forth below, the FTC cannot establish any basis for the imposition of a receiver or an unlimited asset freeze because Calenergy and Latsanovski had no involvement in the operations of the Bunzai Group business or knowledge of any alleged fraudulent activity.  Further, even if Latsanovski were liable (which he is not), his liability should be limited to the return Calenergy received on its investment in the Bunzai Group ($317,756.05) because Calenergy did not have any role in the internet skincare business and did not directly receive any consumer proceeds.  Because Latsanovski has more than adequate assets to cover this liability and the FTC cannot establish any likelihood of dissipation of his assets, an asset freeze and receiver are not warranted.

The imposition of the asset freeze is also unwarranted because it unjustifiably imposes a substantial hardship not only on Latsanovski, but also on legitimate businesses thathave no relationship to the Bunzai Group business.  If the asset freeze is not lifted, Latsanovski will not be able to pay for his family's food and home or other living expenses.  In addition, these legitimate businesses will be unable to pay their mounting operating expenses and may have to shut-down.

### A.  <u>LEGAL STANDARDS FOR INJUNCTIVE RELIEF IN THE FTC ACT CONTEXT</u>

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)).  Although the FTC need not satisfy the traditional equity standard that courts typically impose on private litigants to justify imposition of a preliminary injunction, it must nonetheless demonstrate (1) the likelihood that it will ultimately succeed on the merits, and (2) that a balance of the equities weighs in favor of granting the relief requested. *FTC v. Warner*

10

1  *Comm'cs Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984).  When the FTC seeks "the

2  granting of extraordinary injunctive relief," it bears a "heavy burden."  *FTC v.*

3  *Sterling Precious Metals, LLC*, 894 F. Supp.2d 1378, 1383 (S.D. Fla. 2012).

4      **B.    THE FTC IS UNLIKELY TO SUCCEED ON THE MERITS**

5          **AGAINST LATSANOVSKI OR CALENERGY**

6          The FTC has failed to establish any violation of the FTC Act by either

7  Calenergy or Latsanovski.  First, Calenergy and Latsanovski did not engage in any

8  misconduct, let alone a pattern of misconduct.  Neither Latsanovski nor Calenergy

9  ever sold any skincare products, engaged in deceptive marketing or any of the other

10 conduct alleged in the Complaint.  Latsanovski Decl., ¶¶ 4-8.  Indeed, the Complaint

11 merely alleges Latsanovski is that he is an owner of Bunzai Media Group, Inc. and

12 was listed as the CEO of Zen Mobile Media.  Complaint [Doc. No. 3], ¶ 28.  In fact,

13 Latsanovski was only an investor in Bunzai Media, not an owner, and Latsanosvski

14 had no involvement in Zen Media other than incorporating that entity at Mr.

15 Nottea's request.  Latsanovski Decl., ¶¶ 4-5, 15-18; Kim Decl., Ex. K (7/2/15

16 Depo.) at 28:9-11; 28:14-29:19, 50:15-51:7; 51:13-25.

17         Without identifying any evidence, the FTC argues that Latsanovski's

18 signature on Zen Mobile's behalf alone suggests "knowledge of the company's

19 business practices and high chargeback requests."  FTC Brief [Doc. No. 5] at 22.

20 But the undisputed evidence is that Latsanovski had no involvement or knowledge

21 regarding Zen Mobile's operation because his role was limited to incorporating Zen

22 Mobile at Alon Nottea's request and signing documents at Nottea's request.  He did

23 not review any Zen Mobile documents or even control Zen Media's bank account.

24 *See* Section IIB *supra.*

25         With respect to Calenergy, the Complaint merely alleges that Calenergy

26 operated as part of a common enterprise with the other corporate defendants

27 (Complaint [Doc. No. 3], ¶ 31) and that it "held itself out as the parent company of

28 Pinnacle and Media Urge, Inc." (FTC Brief [Doc. No. 5] at 23).  But the FTC

11

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

1  provides no evidence that Calenergy managed, controlled or even participated in the

2  operations of Pinnacle and Media Urge, Inc.  That is because the evidence

3  Calenergy did not have any role in Bunzai Group business other than providing

4  Alon Nottea investments and loans from its bank accounts.  *See* Section IIB, *supra.*

5      It is undisputed that Alon Nottea controlled and ran the Bunzai Group.  *See*

6  Receiver Decl. (Doc. No. 92), ¶ 18; Kim Decl. (7/2/15 Depo.) at 46:12-18, 46:19-

7  25; 47:1-4; 47:17-19.  The FTC contends that Bunzai Media Group agreements

8  establish that Latsanovski was a partner in this business (FTC Opp. (Doc. No. 93) at

9  5[10]), butits own evidence demonstrates that Latsanovski's role was limited to

10  investments, and that others were in charge of operating the business.  For example,

11  the October 12, 2010 Bunzai Media Group Agreement  (Ex. 19 (Doc. No. 93-1) at ¶

12  4), states that Latsanovski was to invest money and "It is understood by all parties

13  that this will be Alon Nottea & Khristopher Bond's primary business and they shall

14  devote to the conduct of the business so much of their respective time as may be

15  reasonably necessary for the efficient operation of the business." (*Id.,* ¶ 5).  This

16  also is confirmed by the statements of former Bunzai Group employees interviewed

17  by the FTC.  Dawn Goddard identified Latsanovski as "the money person" and does

18  not provide any evidence that Latsanovski played any role in the Bunzai Group

19  business.  Second McPeek Decl. (Doc. No. 93-1), ¶ 10g.  Andrew Stanley stated that

20  he understood that Latsanovski was an investor in the business.  *See* Stanley Decl., ¶

21

22  [10] The Temporary Receiver relies upon information provided by defendant

23  Khristopher Bond, another defendant, that Latsanovski was more than a silent
investor.  Receiver Response (Doc. No. 92), ¶ 7.  This reliance is misplaced

24  because Mr. Bond did not provide any evidence or even contend that Latsanovski
ever participated in the Bunzai Group business.  Setting aside that Mr. Bond falsely

25  represented that Latsanovski was an employee of the Bunzai Group and to the extent
that information is reliable, even that information supports Mr. Latsanovski's

26  position that he was only an investor.  Mr. Bond told the Receiver that Latsanovski

27  was only to have an interest in the business until his investment was repaid.  *Id.*

28

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

8 [Doc. No. 9-4] at App. 781.  Accordingly, the FTC's own evidence does not provide any evidence that Latsanovski had any role in business operations for the Bunzai Group.

The FTC also emphasizes that Latsanovski's name was used by Nottea in connection with the Zen Mobile to set up merchant accounts in his name.  At his deposition, Latsanovski described in detail the circumstances of his involvement with Zen Media — which are virtually identical to a pattern of activity described by the FTC in its papers.  *See* Section IIA *supra.*  For example, according to the FTC, "Alon Nottea, Doron Nottea, and Paul would ask individuals to put their names on these [merchant accounts]" while "Alon, Doron or Paul would control the accounts."  Second McPeek Decl. (Doc. No. 93-1), ¶ 12.  The FTC further alleges that "there were many people with their names on merchant accounts and corporate records that had nothing to do with the actual business."  *Id.*  The FTC thus acknowledges that the Notteas used third parties to open accounts that were later used by the skincare business, yet only Latsanovski is being dragged into this case and having his assets frozen based on his acquiescence to Alon Nottea's request.

## C.   THE BALANCE OF THE EQUITIES DOES NOT FAVOR AN INJUNCTION

Further, the requested injunctive relief of a receiver and asset freeze is not warranted because the FTC fails to meet its burden of showing that the balance of equities tips in favor of an injunction because the FTC has insufficient evidence to establish that Calenergy or Latsanovski will engage in consumer fraud in the future and because legitimate business will be destroyed.

First, in arguing that the equities support a preliminary injunction, the FTC relies on flimsy assumptions instead of evidence-backed facts.   The FTC contends that "there is a strong likelihood that future violations occur," but it bases this claim on conduct of others, not on the conduct of Latsanovski and Calenergy.  FTC Brief [Doc. No. 5] at 40-41.   The FTC knows that Latsanovski and Calenergy will

13

1  not "continue to defraud the public" because neither party was involved in any prior

2  fraud on consumers.  Moreover, the business upon which this entire action is based

3  ceased operations months ago.  There is absolutely no basis for the bald conclusion

4  that either Latsanovski or Calenergy participated or will participate in any consumer

5  fraud in the future.

6       Second, it is against the public interest to impose a receiver over, or freeze

7  assets of, Sunset Holdings, Vastpay, ComicsFix or Calenergy.  In determining

8  whether the freezing of assets or the appointment of a receiver is appropriate, the

9  court "must carefully balance the potential benefit to injured consumers against the

10  potential disruption of the defendant's business." *F.T.C. v. Merch. Servs. Direct,*

11  *LLC*, No. 13-CV-0279-TOR, 2013 WL 4094394, at *2 (E.D. Wash. Aug. 13, 2013).

12  In doing so, the court must consider whether the asset freeze "might thwart the goal

13  of compensating investors if the freeze were to cause such disruption of the

14  defendants' business that they would be financially destroyed." *FTC v. H.N. Singer,*

15  *668 F.2d 1107, 1113 (9th Cir. 1982)* (quoting *SEC v. Manor Nursing Ctrs.*, *Inc.*, 458

16  F.2d 1082, 1106 (2d Cir. 1972)).  If the FTC fails to establish that past violations are

17  likely to recur, the only consideration is whether the asset freeze or receiver "is

18  necessary to preserve effective relief for injured consumers." *Merchant Services,*

19  *2013 WL 4094394*, at * 3.  Where the FTC "has not established a high likelihood of

20  success on the merits, the risk of putting Defendants out of business is

21  unacceptable." *Id.*, *at *4* (denying FTC's motion for an asset freeze and

22  receivership where there is no evidence of future violations, no evidence that

23  defendants would "cut bait" and run, and where asset freeze and receivership would

24  put the business at risk).

25       Since neither Latsanovski nor Calenergy engaged in any alleged fraud or

26  violations of the FTC Act, and there is absolutely no evidence that they will do in

27  the future, the only need for an asset freeze and receiver is to  to preserve effective

28  relief for consumers.  But imposing the receiver and the asset freeze will force these

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

1   businesses to shut down and lose the opportunity to generate additional funds that

2   would be available to consumers if they are held liable in this action.  *See* Suppl.

3   Latsanovski Decl., ¶¶ 12-19.

4        As set forth above, Sunset Holdings, Vastpay and ComicsFix were funded

5   with third party funds, not with Bunzai Group proceeds, and it is undisputed that

6   they were not involved in the Bunzai Group business.  Without access to their

7   frozen assets and funds, these businesses will be unable to pay their expenses,

8   continue business operations and may be forced to close down.  Suppl. Latsanovski

9   Decl., ¶¶ 12-19.  Because these are legitimate businesses with ongoing operations

10  with no connection to the Bunzai Group business, it is unacceptable to allow the

11  asset freeze or the imposition of a receiver to put these businesses at risk.

12      **D.**    **THERE IS NO BASIS FOR PERSONAL LIABILITY**

13       To establish individual liability for equitable restitution under the FTC Act,

14  the FTC must establish that:  (1) the individual must have participated directly in the

15  deceptive acts or had the authority to control them and (2) the individual "had

16  *knowledge* that the corporation or one of its agents engaged in dishonest or

17  fraudulent conduct, that the misrepresentations were the type upon which a

18  reasonable and prudent person would rely, and that consumer injury resulted."  *FTC*

19  *v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1138 (9th Cir. 2010) (emphasis in

20  original).  The FTC may establish knowledge by showing that an individual "had

21  actual knowledge of material misrepresentations, [was] recklessly indifferent to the

22  truth or falsity of a misrepresentation, or had an awareness of a high probability of

23  fraud along with an intentional avoidance of the truth."  *Id.* at 1138 (citation

24  omitted).

25       Reckless indifference can be found if the defendant ignored or failed to

26  investigate "numerous warning signs" of dishonest or fraudulent conduct.  *Id.* at

27  1141 (finding knowledge established where individual defendants received customer

28  complaints and distributed unfounded projections in marketing materials).  Warning

1    signs of dishonest or fraudulent conduct included:  (1) the receipt of multiple

2    customer complaints; (2) knowledge that unsupported financial projections were

3    being used in marketing materials and contracts; and (3) the receipt of reports

4    indicating delays, which rendered projections impossible to achieve.  *Id.*

5          Here, the FTC cannot establish that Latsanovski actively participated in or

6    controlled the subject businesses, that Latsanovski knew, avoided knowing or was

7    recklessly indifferent to any alleged dishonest or fraudulent conduct by any

8    corporate defendant.  It is undisputed that: (a) Latsanovski's sole involvement in the

9    internet skincare business was Calenergy's line of credit to Mr. Nottea; (b)

10   Calenergy was an investor, not an owner or operator; and (c) Latsanovski had no

11   involvement or knowledge regarding the skincare business operations and did not

12   receive any customer complaints.  Accordingly, unlike the individual defendants in

13   *Network Services*, there was nothing in this case that could have put Latsanovski on

14   notice of any dishonest or fraudulent conduct or customer injury resulting from this

15   conduct and cannot be held liable for any of the corporate defendants' acts.

16         **E.    THERE IS NO WARRANT FOR AN ASSET FREEZE**

17         The asset freeze should also be lifted because there is no evidence of a likely

18   dissipation of assets.  *Johnson v. Couturier*, 572 F.2d 1067, 1085 (9th Cir. 2009).

19   Mere evidence of deceptive marketing, uncoupled with evidence of dissipation, is

20   insufficient.  *FTC v. John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *15

21   (C.D. Cal. Nov. 17, 2009).  *See also FTC v. Evans Products Co*., 775 F. 2d 1084,

22   1089 (9th Cir. 1985) (no irreparable harm because FTC failed to prove that the

23   defendant "is likely to secret away assets before relief can be effectuated").

24         Here, Latsanovski has not dissipated any assets and has fully cooperated with

25   the FTC and Receiver in providing his financial information and sitting for a

26   deposition.  Nor is there any claim that unfreezing the assets of Sunset Holdings,

27   Vastpay or ComicFix would deplete the assets of Calenergy.  Further, Latsanovski's

28   liability is limited to Calenergy's return on its investment, $317,746.05, not the total

16

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

1    amount of consumer loss in this case.  This potential liability is fully covered by his

2    assets – his home alone has over $1 million in equity.  Latsanovski Decl., ¶ 14.  As

3    such, no asset freeze is required.

4           The FTC justified its draconian asset freeze by asserting that Defendants (not

5    specifically Latsanovski or Calenergy) had planned or attempted in the past to hide

6    assets.  The only "evidence" offered by the FTC to support this claim is the FTC

7    investigator's characterization of conversations with a former Bunzai employee,

8    Dawn Goddard, in which Goddard purportedly described (1) a conversation she had

9    with Kristopher Bond during which Bond told Goddard that Alon Nottea and

10   Latsanovski would transfer money to Lichtenstein (McPeek Decl. (Doc. No. 6), ¶

11   29) and (2) expressed her belief that "if the Notteas actually think they will be wiped

12   out, they will just buy tickets and fly back to Israel." (Second McPeek Decl., (Doc.

13   No. 93-1), ¶ 12).

14          First, this comment regarding flying to Israel appears to relate to the Notteas,

15   not to Latsanovski or Calenergy.[11]  Second, the FTC made no attempt to substantiate

16   this double-hearsay allegation or provide any evidence how it relates to Latsanovski.

17   For example, the FTC offered no evidence that any monies were transferred from

18   any defendants' bank accounts to Lichtenstein.  *See generally* Appendix [Doc. Nos.

19   6-9].  This reliance on "hearsay affidavits, not subject to cross-examination, in

20   granting injunctive relief" presents substantial dangers.  *Sterling Precious Metals,*

21   *894 F. Supp.2d at 1383*.

22          In sum, the FTC has failed to meet its burden of showing that Latsanovski or

23   Calenergy will continue to engage in the allegedly deceptive and unfair conduct or

24   "conceal, dissipate, or otherwise divert their assets, thereby defeating the possibility

25   of the Court granting effective final relief."  *FTC v. Affordable Media*, 179 F.3d

26   _____

27   [11]  Latsanovski is not from Israel.

28

1228, 1236 (9th Cir. 1999).  The balance of the equities does not tip in favor of the

issuance of a preliminary injunction especially when it will force legitimate

businesses to shut down.

### F.    THE ASSET FREEZE IS OVERBROAD

The district court has "broad authority to fashion appropriate remedies for

violations of the FTC."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)

(citations omitted); *F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1085-86

(C.D. Cal. 2012) (citations omitted).  This court has the authority to award

restitution to redress consumer injury, and also may order a defendant to disgorge

illegally obtained funds "to deprive wrongdoers of ill-gotten gains."  *Commerce*

*Planet*, 878 F. Supp. 2d at 1087.  The court, however, should only authorize an

award of consumer loss when equity requires a defendant to restore a consumer to

the status quo.  .

Courts typically measure restitution by total consumer loss where defendants

directly received consumer proceeds or were directly involved in the alleged

misconduct – neither of which is present here. *See Stefanchik*, 559 F.3d at 931-32

(upholding award of consumer loss where defendants "were driving force behind

marketing scheme" and had "authority to control" it); *Inc21.com Corp.*, 745 F.

Supp. 2d 975,  1011 (N.D. Cal. 2010)  (upholding use of consumer loss as

measurement of restitution where defendants directly received proceeds from

consumers); *Commerce Planet, Inc.*, 878 F. Supp. 2d at 1088-1090 (awarding

consumer loss where individual defendant supervised business operations and

reviewed alleged misleading statements); *FTC v. IAB Marketing Associates LP*, 746

F.3d 1228, 1234 (11th Circ. 2014) (liability for total consumer loss where

defendants received reports regarding misrepresentations to customers made by

others).

Courts have recognized that loss should be measured by a defendants' alleged

18

1    ill-gotten gain, not total consumer loss, where, as here, the defendant did not

2    participate in marketing or selling the products to consumers or directly receive

3    consumer proceeds.  *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006)

4    (finding FTC's remedy was limited to Defendants' profit where defendant did not

5    directly market products to consumer or receive funds from consumers).  In *Verity*,

6    the court rejected the FTC's attempt to recover all consumer losses from the

7    defendant as overbroad because it was error to rely on "shorthand from cases in

8    which only one who sold directly to the consumers was sued." *Id.*  Because a

9    middleman received funds from the consumers directly, the Second Circuit directed

10   the district court to consider how much of this money was received by defendant

11   and that this fraction constituted defendant's unjust enrichment or ill-gotten gains.

12   *See also F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011) ("funds

13   returned to consumers or never received by a defendant are not unjust gains").[12]

14         Because any monies received by Calenergy or Latsanovski were re-payments

15   on a line of credit made by Calenergy to Alon Nottea, and neither Calenergy nor

16   Latsanovski played any role in the skincare business, it would be inequitable to

17   permit the FTC to seize all of Latsanovski's or Calenergy's assets to secure losses

18   allegedly caused by the conduct of others.  At most, the asset freeze should be

19   limited to the amount of Latsanovski's alleged unjust enrichment – the $317,756.05

20   _____

21   [12] Other courts are in accord with this reasoning.  *See F.T.C. v. OT, Inc.*, 448 F.
     Supp. 2d 908, 974-75 (N.D. Ill. 2006) (citing *Verity* and noting that "defendant's
22   gain will be equal to the consumer's loss because the consumer buys goods or
     services directly from the defendant" but "it is incorrect to generalize this shorthand
23   and apply it" to cases where others take "consumer's money before it reaches a
     defendant's hands); *F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 380 (D.
24   Conn. 2009) (noting "if the funds flow directly to the defendant, the defendant is in
     receipt of the whole amount and thus liable in restitution for the whole amount, i.e.,
25   its gain, but if the funds flow through an intermediary who passes only a portion of
     the funds on to the defendant, the defendant has not unjustly received the whole
26   amount."); *aff'd*, 654 F.3d 359 (2d Cir. 2011).

27

28
                                            19
     _____
     DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

1   return on the loan/investment by Calenergy in the skincare business.  This amount

2   can be easily secured by a lien on Latsanovski's home, which has equity far in

3   excess of this amount.  Latsanovski Decl., ¶ 14.  As such, there is no need for an

4   asset freeze.

### G.   THE ASSET FREEZE IMPOSES AN ENORMOUS HARDSHIP

6        Not only is there no basis for an asset freeze, but the existing freeze has also

7   created an enormous hardship for Latsanovski and his legitimate businesses.  The

8   sweeping freeze has made it difficult, if not impossible, for him to provide for

9   himself and his family and to continue running his legitimate businesses.

10        In *Johnson v. Couturier*, 572 F. 2d at 1085-86, the Ninth Circuit recognized

11   that the balance of hardships of an asset freeze might be mitigated where the

12   injunction is limited to permit a defendant "to cover normal living expenses and

13   legal fees" and allows the defendant "to petition the court at any time for consent to

14   an asset transfer or disposal."  Here, however, the asset freeze imposed by the Court

15   *ex parte* includes no such limitations.  Indeed, the FTC included in its proposed

16   order a draconian provision that even assets acquired *after* the date of the order are

17   subject to the freeze.

18        This provision suggests that Latsanovski cannot use his legitimately earned

19   funds to feed his family, or even borrow additional funds to do so.   The TRO has

20   effectively put a freeze on all his assets, stopped legitimate businesses, which are

21   completely unrelated to the subject skincare business, from operating or generating

22   any potential income which could be used to satisfy a judgment or support Mr.

23   Latsanovski's family, and put these businesses at the risk of closing down with

24   significant losses.  *See* Latsanovski Decl., ¶¶ 24-26(a)-(d).  There is no authority for

25   this draconian sanction – particularly for someone who is not alleged to have done

26   anything wrong.

27

28

## IV.   <u>CONCLUSION</u>

The draconian sanctions obtained by the FTC on an *ex parte* basis should be set aside to allow defendants Latsanovski and Calenergy their day in court to contest the charges against them.  It is unjust and inequitable for the FTC to crush these parties, and their affiliated businesses, before the merits of the case have been heard. Because the FTC did not establish an adequate basis or immediate need for imposing an asset freeze and receivership in its *ex parte* papers and there is no evidence of any dissipation of funds, defendants Igor Latsanovski and Calenergy, Inc. respectfully request that the Temporary Restraining Order be dissolved, the asset freeze be lifted, the Temporary Receiver be discharged as to Calenergy, and the request for Preliminary Injunction be denied.

DATED: July 24, 2015                   SCHEPER KIM & HARRIS LLP
                                       MARC S. HARRIS
                                       ANNAH S. KIM


                                  By:  /s/  Annah S. Kim
                                       Annah S. Kim
                                       Attorneys for Defendants Igor Latsanovski
                                       and Calenergy, Inc.

DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28