1   JONATHAN E. NUECHTERLEIN
    General Counsel
2
    DAMA J. BROWN
3   Regional Director

4   REID TEPFER
    rtepfer@ftc.gov
    Texas Bar No. 24079444
5   LUIS GALLEGOS
    lgallegos@ftc.gov
6   Oklahoma Bar No. 19098
    Federal Trade Commission
7   1999 Bryan Street, Suite 2150
    Dallas, Texas 75206
    (214) 979-9395 (Tepfer)
8   (214) 979-9383 (Gallegos)
    (214) 953-3079 (fax)
9
    RAYMOND McKOWN
10  rmckown@ftc.gov
    California Bar No. 150975
11  10877 Wilshire Boulevard, Suite 700
    Los Angeles, California 90024
    (310) 824-4325 (voice)
12  (310) 824-4380 (fax)

13  Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.*<br><br>**Defendants.** | **Case No.  CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S REPLY TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S OPPOSITION TO PRELIMINARY INJUNCTION AND PERMANENT RECEIVER AND MEMORANDUM OF POINTS AND  AUTHORITIES IN SUPPORT** |

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
TO PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

## I.   Introduction

This case concerns a deceptive scheme that has defrauded consumers of more than $69 million. Latsanovski was a principal member in the scheme and was actively involved in its operations. His company, CalEnergy, Inc., played a vital role funding the scheme and keeping it afloat. Nonetheless, as his only defense to the FTC's charges, Latsanovski argues that this Court should hold him harmless for his involvement because he claims to have been merely a "silent" investor. But the evidence tells a different story. The evidence, including emails in Latsanovski's own words, makes plain that he participated in the scam and that his claims to the contrary are patently false.

Latsanovski argues he never spoke with consumers to further their scheme. And indeed, in a $69 million Internet-based common-enterprise scam, not everyone answers the telephones. But, as explained further below, the law does not require that he have answered phones to be held accountable for the law violations that he and his companies helped perpetuate. While each member of the common enterprise may have had their own role, they are all equally liable under the law for the full amount of consumer redress.[1]

---

[1] *See FTC v. BurnLounge, Inc.*, 584 Fed. Appx. 315, 318 (9th Cir. 2014).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION       Page  **2**
TO PRELIMINARY INJUNCTION

## II.     The FTC Is Likely to Succeed on the Merits.

### A.     *The FTC Is Likely to Succeed on the Merits against Defendants Latsanovski.*

To obtain injunctive relief, the FTC must show a likelihood of success on the merits and that the balance of the equities favors the public interest.[2] The FTC has previously established liability under this standard for both Defendants Latsanovski and CalEnergy ("Opposition Defendants").[3] Additional evidence, including emails, government records, and the Defendants' own business documents, further proves his role in the common enterprise ("the AuraVie companies").

Opposition Defendants mischaracterize the evidentiary burden for personal liability. To obtain injunctive and monetary relief against an individual for injury to consumers resulting from a company's misconduct, the FTC must establish that the individual: (1) participated directly in the unlawful acts or practices or had authority to control them; and (2) had some knowledge of these acts or practices. The FTC may satisfy the knowledge requirement by showing either actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of

---

[2] *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, (9th Cir. 1984) (citing *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 713-714 (9th Cir. 1976)).

[3] *See* FTC's Memo in Support of *Ex Parte* TRO and Order to Show Cause  (Doc. 5) and Response to *Ex Parte* Application for Partial Relief from TRO (Doc. 93); *Ex Parte* TRO (Doc. 10).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION            Page  **3**
TO PRELIMINARY INJUNCTION

the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[4] The FTC need not show that the individual intended to defraud consumers.[5]

### 1.    *Latsanovski's Own Emails Contradict His Self-Serving Testimony and Describe His Role in the Common Enterprise.*

Latsanovski's participation in, control over, and knowledge of the deceptive scheme is documented in emails he exchanged with other participants in the common enterprise. In an August 2013 email, Latsanovski described his plan for the future of the AuraVie companies and his own role within it.[6] Writing to his partners, co-Defendants Alon and Doron Nottea, Latsanovski outlined his thoughts concerning the leadership and growth of "Pinicle,"[7] which he described as "our company."[8] He provided his business partners with his opinion on who should lead various departments of their company and, demonstrating keen

---

[4] *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997); *FTC v. Amy Travel Serv.*, 875 F.2d 564, 574 (7th Cir. 1989).

[5] *Publ'g Clearing House*, 104 F.3d at 1171.

[6] *See* Ex. 21, Att. A (describing the future of common enterprise, specifically the roles of Pinnacle and VastPay).

[7] Defendant Pinnacle Logistics, Inc. was the successor to Defendant BunZai Media Group, Inc., one of the principal AuraVie companies. *See* Doc. No. 9-4, at App. 779-80.

[8] Ex. 21, Att. A (Document highlighted by Plaintiff).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page   **4**
TO PRELIMINARY INJUNCTION

knowledge of their activities, he evaluated the relative strengths and weaknesses of various employees.

Other emails establish that Latsanovski was actively involved in opening,[9] managing,[10] and monitoring[11] merchant accounts for the AuraVie companies.[12] Further, the emails detail Defendants' collective efforts to evade oversight from financial institutions and to keep the deceptive enterprise operating. The emails show that Latsanovski was aware of the high chargeback percentages[13] of their

---

[9] *See* Ex. 21, Att. I (Latsanovski emailed co-Defendant Alon Nottea concerning a Cypriot merchant account company, with application attached).

[10] Paul Medina, an officer of Defendant Media Urge, forwarded Defendants Alon Nottea and Latsanovski communications with payment processors concerning new skincare accounts. Medina referenced his "approach . . . to help internet merchants lower their charge backs and balance them out with techniques I have learned in this industry. Showing them how to stay under the radar and possibly managing and handling their charge backs internally." *See* Ex. 21, Att. E.

[11] Latsanovski was regularly included on emails that provided detailed reports and spreadsheets concerning chargebacks and reserve levels for various merchant accounts. In one example, Latsanovski was forwarded an email containing this data concerning the AuraVie companies' merchant accounts with EVO. *See* Att. O.

[12] For example, Latsanovski received an email from a Latvian payment processor that requested he correct bank information to complete the application for a payment processing account for a company called Skincare OÜ. *See* Att. G. Att. H is a copy of the merchant account agreement attached to the email.

[13] A chargeback is when a consumer reverses a credit card transactions. High chargeback percentages are often an indicator of fraud or customer dissatisfaction. Accordingly, most payment processors require that merchants maintain a low chargeback percentage.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION                    Page  **5**
TO PRELIMINARY INJUNCTION

common enterprise.[14] As an instrumental member of the common enterprise, he was involved in discussions with payment processors,[15] including frequent discussions about securing more payment processor accounts for their enterprise.[16]

The emails show that he participated in and controlled companies in addition to Pinnacle Logistics, including ones that he had no ownership interest in. For example, one email shows that Latsanovski ordered Defendant SBM Management, Inc., a company purportedly owned and operated by Stephan Bauer, to issue a payment to an Israeli bank account.[17] Other emails suggest his role as a decision making business partner, rather than an uninformed investor that only

---

[14] Latsanovski received emails detailing for him the chargeback monitoring programs of both Visa and MasterCard. *See* Ex. 21, Att. K. Further, he received emails from Alon Nottea concerning a possible chargeback monitoring service. *See* Ex. 21, Att. X.

[15] Defendant Alon Nottea asked a payment processor representative when he would like for him and Latsanovski to come meet him. *See* Ex. 21, Att. F.

[16] In an email to UMS banking, Alon Nottea asked the representative to let her know when "you, Igor and I can jump on a short call." *See* Ex. 21, Att. D. The email, forwarded to other members of the common enterprise, included a spreadsheet with the presumptive topic of conversation: a list of merchant accounts with UMS banking, including a column for "total actual risk." *See* Ex. 21, Att. T (spreadsheet formatting was modified to fit screen).

[17] *See* Ex. 21, Att. U.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION        Page  **6**
TO PRELIMINARY INJUNCTION

provided loans.[18]

Notably, in his August 2013 email, Latsanovski demonstrated his knowledge and recognized the riskiness of their deceptive enterprise, and he advocated for limiting the number of participants to prevent court testimony against them. Latsanovski cautioned Defendants Doron and Alon Nottea that they should "work with fewer people" because "after all people is a problem, dividing the information can give us testimony in court."[19] He signed the email, not as a silent investor, but as "Your sincere partner Igor."

Further, contrary to his claim that he knew nothing of the Defendants' deceptive marketing practices, Latsanovski received emails with links to the deceptively advertised free trial offers of AuraVie and other skincare products.[20]

Individually and collectively, these emails directly contradict Latsanovski's *post hoc* testimony that he was merely a silent investor[21] whose role was limited to

---

[18] Igor regularly received emails regarding the monthly salary reports for Pinnacle Logistics, Inc. *See, e.g.*, Ex. 21, Att. L. Co-Defendant Doron Nottea referred to Latsanovski as "Alons partner." Ex. 21, Att. N.

[19] *See* Ex. 21, Att. A.

[20] *See* Ex. 21, Att. F.; Ex. 21, Att. Q.

[21] The Receiver likewise concluded "[b]ased on the findings of her investigation to date . . . Latsanovski was a partner not a mere investor." *See* Doc. 91, at 10.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **7**
TO PRELIMINARY INJUNCTION

providing funds through CalEnergy to Alon Nottea.[22] These emails further disprove his contention that he never performed any substantive role in the operation of the AuraVie companies.[23] Far from being unaware of the law violations his companies were committing, Latsanovski was an active participant and schemed ways to limit future court testimony against him and his business partners.

### 2.   *Latsanovski was an Employee of BunZai Media Group.*

Before this lawsuit was filed, Latsanovski repeatedly asserted to state and federal agencies that BunZai Media Group was his employer. He listed BunZai Media Group, Inc. as his employer in documents filed with the state of California under penalty of perjury.[24]  BunZai Media Group was also listed under "Business or Organization Name" in his employment verification form for the Department of Homeland Security, a form that was signed by BunZai Media Group's Human Resources Director, Leor Arazy.[25]

Indeed, the irrefutable evidence shows that not only did Latsanovski participate in the scheme as an employee of BunZai, he was a partner and majority

---

[22] *See* Doc. 106-5, at 9 ¶6.

[23] *See* Doc. 106-5, at 6 ¶¶15-18.

[24] *See* Doc 93-2, Att. C, at 11.

[25] *See* Doc 93-2, Att. B, at 6.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION       Page  **8**
TO PRELIMINARY INJUNCTION

1    shareholder. Latsanovski is identified as a partner in an executed partnership

2    agreement found during the Court-authorized immediate access of the AuraVie

3    companies' business premises.[26] Latsanovski's status as a partner in the AuraVie

4    companies was corroborated by co-Defendant Khristopher Bond, who stated that

5    he, Defendant Alon Nottea, and Latsanovski were partners in the AuraVie

6    companies.[27]

7           **3.**     *Business Records Show Latsanovski's Knowledge of the*
                   *Common Enterprise's Deception.*

8

9         Despite providing the AuraVie companies $1.9 million in undocumented

     loans,[28] Latsanovski claims he does not understand the companies' business

10   model.[29] He says he found nothing unusual in his business partners' request that

11   he sign blank checks for the companies or their creation of dozens of merchant

12   accounts and shell corporations.[30] Further, he asserts he incorporated one of the

13

     ─────────────────

14   [26] *See* Doc. 93-2, Att. A (listing Defendant Latsanovski as a partner with a 55%
     share of BunZai Media Group). A second executed partnership agreement lists

15   Latsanovski as equal partners with Defendants Khristopher Bond and Alon
     Nottea. *Id.*

16
     [27] Doc 92, at 4 ¶ 7.

17
     [28] *See* Doc. 92-1, at 13.

18
     [29] *See* Doc. 106-5, at 3-4.

19
     [30] *See* Doc. 93-2, Att. F; *see also* Doc. 106-5, Ex. L, at 10 ¶¶ 17-19. Latsanovski

20   also left pre-signed checks for his personal checking account.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION     Page  **9**
TO PRELIMINARY INJUNCTION

1  AuraVie companies, Defendant Zen Mobile Media, and opened its merchant

2  account only as a "favor" to Defendant Alon Nottea, with little understanding of

3  what the company was or why he was doing it.[31]   According to him, he believed

4  that Alon Nottea needed the merchant accounts and shell companies because of

5  the companies' large profits, rather than to evade the merchant processor's

6  chargeback limits.[32] These contentions, and Latsanovski's alleged

7  misunderstanding of how merchant processing systems work, is particularly

8  dubious considering that he himself owns a payment processing company.[33]

9  Further, although Latsanovski contends he had nothing to do with Defendant Zen

10  Mobile Media, and incorporated it and created its merchant account only as a

11  favor, he fails to address why this company paid thousands on his American

12  Express credit card bills.[34]

13      In fact, the evidence shows that Latsanovski was well advised of the risky

14  [31] *See* Doc. 106-5, 6 ¶¶16-18; *see also* 106-2, at 6.

15  [32] *See* Doc. 106-5, 6 ¶16.

16  [33] *See* Doc. 90 at 10-11 (explaining that Vastpay, LLC, one of Latsanovski's
    companies, is a "merchant service provider"); *see also* Doc. 93-2, Att. B.
17  Latsanovski has displayed a sophisticated understanding of payment processors in
    his emails. *See* Ex. 21, Att. P. *See also* Doc. 106-2, at 25 (Latsanovski claims to
18  understand how reserve accounts or chargebacks work).

19  [34] *See* Ex. 92-1, at 16 ¶24. Importantly, Latsanovski failed to note these payments
    in his brief or include them in his profit calculations. *See* Doc. 106 at 9; 106-5, at
20  5 ¶13.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **10**
TO PRELIMINARY INJUNCTION

conduct his businesses engaged in. In April 2013, Latsanovski's partner, co-Defendant Alon Nottea, shared with Latsanovski notice from one of their payment processors that the companies could be subject to suit by the FTC:

> In the event of an FTC closure they will freeze our reserves on your accounts immediately. We have had this happen in the past with Mortgage modification accounts on our books. So our exposure over the ensuing 18 months could be as high as $ 18 million dollars or as low as $ 6 million.[35]

This email, from a UMS banking representative to Alon Nottea, rejected a request that the bank reduce the company's reserve account requirements on the basis the company was considered too high risk:

> I have to protect UMS based on the nature and risk of the business in front of us, the current nature of the industry and the regulatory scrutiny and the current chargeback/return ratios. One of your accounts is already on the Excessive Chargeback Program.

> No matter how much I may like you, personally, I can not allow that to influence good business judgement.[36]

Despite these warning signs, Latsanovski claims to have had been unaware of any illegal activity by his companies. Such assertions are absurd, hardly the credible behavior of a millionaire investor, and this Court need not believe them. This evidence demonstrates actual knowledge of the misrepresentations, reckless

---

[35] *See* Ex. 21, Att. C.

[36] *See* Ex. 21, Att. C.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **11**
TO PRELIMINARY INJUNCTION

1   indifference to the truth or falsity of the misrepresentations, or an awareness of a

2   high probability of fraud coupled with an intentional avoidance of the truth.

3   **B.      The FTC is Likely to Succeed on the Merits against CalEnergy.**

4        As an integral member of the common enterprise, CalEnergy is jointly and

5   severally liable for the law violations.[37] By Defendant Latsanovski's own

6   testimony, CalEnergy's financing was essential to allowing the AuraVie

7   companies to maintain business.[38] Indeed, the linchpin of the common enterprise

8   was CalEnergy's provision of adequate funds to carry out their business.

9   Accordingly, CalEnergy should be held liable for the full amount of injury

10  inflicted on consumers nationwide. CalEnergy is an alter ego of Latsanovski and

11  engages in business activities for the benefit of Latsanovski without observing

12  corporate formalities. CalEnergy is as much a part of the common enterprise as

13  Latsanovski himself is.

14       Opposition Defendants contend that CalEnergy is an investment company

15  and should not be liable for infusing capital, which they characterize as "loans"

16

17

18  _____

19  [37] *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v.*
    *Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997).

20  [38] *See* Doc. 106-2, at 30.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **12**
TO PRELIMINARY INJUNCTION

that they "brokered."[39] This argument misses the point, however. Even assuming

*arguendo* these payments were loans, they were extended with knowledge or

reckless disregard for the deceptiveness of the scheme. CalEnergy should not be

held harmless for its decision to fund illegal activities. Nor should consumers,

who were deceived by Defendants' unlawful scheme, be expected to foot the bill

to repay loans issued by a feckless investor.[40]

**III.    The Equities Favor a Preliminary Injunction with an Asset Freeze and Permanent Receivership.**

> **A.    *Equity Favors Freezing Latsanovski's Assets in Full, as He Will Be Jointly and Severally Liable for the Full Amount of Consumer Injury.***

Equity requires that Latsanovski and his alter ego, CalEnergy, be held

jointly and severally liable for the full amount of consumer injury. Oppositions

---

[39] Opposition Defendants claim CalEnergy is an "investment company" that acts as a "broker" for overseas investors. Doc. 106-4 ¶¶ 5, 9; Doc. 90-1 ¶ 25. But companies that broker investments must generally register with the Securities and Exchange Commission and be members of Financial Industry Regulatory Authority. CalEnergy has registered with neither. In fact, CalEnergy was merely a shell corporation intended to shield Latsanovski from liability.

[40] Regardless of the amount of money transferred from CalEnergy to the AuraVie companies, the entirety of the $1.9 million CalEnergy received in return from the other AuraVie companies was derived from the sale of free trials of skincare products. *See* Doc. 91, at 5 (citing Doc. 92 ¶¶ 22-23; 31-32). CalEnergy should be disgorged, at a minimum, of the $1.9 million in returned investment.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **13**
TO PRELIMINARY INJUNCTION

1  Defendants, in arguing to the contrary, rely chiefly on *FTC v. Verity Int'l, Ltd.*[41]

2  But this caselaw has been expressly rejected by the Ninth Circuit.[42] Further, even

3  if *Verity* had not been rejected, its holding would not apply here. *Verity* addressed

4  "the appropriate amount of restitution where multiple nonparty middlemen

5  retained a significant portion of the total revenues."[43] In *IAB Marketing*, the

6  entities claiming to be only middlemen were named defendants, subject to joint

7  and several liability. Accordingly, the Court found that *Verity* did not apply.[44] As

8  in IAB marketing, the supposed "middlemen" Defendant Latsanovski points to

9  were his fellow participants in the common enterprise. *Verity,* therefore, is

10  inapplicable.

11      Although Defendant Latsanovski caused over $69 million in consumer

12  injury—and readily admits to infusing the AuraVie companies with capital to

---

13  [41] *See* Doc. 106, at 22 (citing *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006)).

14

15  [42] *See FTC v. Publrs. Bus. Servs.*, 540 Fed. Appx. 555, 556-57 (9th Cir.) (citing *Stefanchik*, 559 F.3d at 931-32 (9th Cir. 2009)) (rejecting the Second Circuit's approach in *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006)); *see also FTC v. Bronson Partners, LLC* 654 F.3d 359, 375 (2d. Cir. 2011) (holding that

16  revenue—not profit—is the proper measure for unjust gain under Section 13(b) of

17  the FTC Act); *FTC v. Direct Mkg. Concepts, Inc.*, 624 F.3d 1, 14-16 (1st Cir. 2010) (same); *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (same).

18  [43] *See IAB Marketing Associates, LP*, 746 F.3d 1228, 1234 (11th Cir. 2014).

19  [44] *See also FTC v. HES Merchant Serv's Co.*, 6:12-cv-1618-Orl-22KRS (M.D.

20  Fla. Feb. 2, 2015).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION      Page  **14**
TO PRELIMINARY INJUNCTION

keep it afloat to do so—he claims that his liability exposure should be limited to his profits.[45] But existing authority establishes Defendant Latsanovski's liability is measured by the consumer harm caused by the entire common enterprise,[46] not his individual profits.[47] As Defendant Latsanovski concedes, "[e]quity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment."[48] Defendant Latsanovski requests that he be allowed to walk away from over $69 million in consumer injury that he caused while returning, at most, $317,746 of the profits he admits to receiving from the scheme. Such a result would be inequitable.

### B.   The FTC Need Not Trace Assets to the Illegal Conduct.

The Court enjoys broad equitable authority and may freeze Defendants'

---

[45] Latsanovski claims to have only received $317,746 from his scam. Doc. 106 at 8. This estimate greatly understates his profits. In addition to the profits Defendant Latsanovski admits CalEnergy received, Defendant Latsanovski is also a partner in BunZai Media Group, Inc., which bilked consumers of over $17 million, and an owner of Zen Mobile Media Group, Inc., which took in $8.4 million from consumers.

[46] *See FTC v. BurnLounge, Inc.*, 584 Fed. Appx. 315, 318 (9th Cir. 2014) (holding individual and corporate defendants jointly and severally liable).

[47] As Defendants concede, "'courts have often awarded restitution in the full amount of funds lost [where] equity may require a defendant to restore." Doc. 90 at 13 (quoting *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010)).

[48] *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **15**
TO PRELIMINARY INJUNCTION

assets regardless of whether the assets can be traced to the alleged fraudulent

activity.[49] In *FTC v. J.K. Publs., Inc.*, the court noted that "[t]he applicability of

joint and several liability is entirely inconsistent with the proposition that

traceability is required."[50] The Court further concluded that a traceability

requirement would lead to "absurd results": "'Under [that] approach, for example,

a defendant who was careful to spend all the proceeds of his fraudulent scheme,

while husbanding his other assets, would be immune from an order of

disgorgement.'"[51] In this case, evidence suggests that Latsanovski may have

helped dissipate assets of the AuraVie companies overseas.[52] It would be

inequitable for Latsanovski to be able to retain assets he claims are not directly

traceable to the AuraVie companies while dissipating his ill-gotten gains out of

the reach of this Court.

###    C.    *The Evidence Shows the Opposition Defendants Are Likely to*

---

[49] *FTC v. Certified Merch. Serv. LTD*, 4:02-cv-00044-PNB (E.D. Tex. 2002) ("The Court is of the opinion that in exercising its discretion over the issuance and the scope of the preliminary injunction, it should ensure that adequate funds are available for redress to the merchants harmed by Defendants' alleged fraudulent acts. Therefore, all assets of Defendants should remain frozen, regardless of whether the assets can be traced to the alleged fraudulent activity.")

[50] *FTC v. J.K. Publs., Inc.*, CV 99-00044 ABC (AJWx), 2009 U.S. Dist. LEXIS 36885, *15 (C.D. Cal. April 13, 2009).

[51] J.*K. Publs., Inc.*, 2009 U.S. Dist. LEXIS 36885, *15 (*quoting S.E.C. v. Banner Fund Int'l*, 341 U.S. App. D.C. 175, 211 F.3d 602, 617 (D.C. Cir. 2000)).

[52] *See* Ex. 21, Att. U; Att. G; Att. M; Att. R; & Att. I.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION    Page **16**
TO PRELIMINARY INJUNCTION

1     *Dissipate Assets and Have Already Done So.*

2          Opposition Defendants are likely to dissipate unfrozen assets. As discussed

3     below, Defendants have already moved much of the proceeds from their scam

4     overseas. Further, Latsanovski appears to have been fundamental in dissipating

5     the AuraVie companies' assets abroad. Numerous emails show Latsanovski

6     applying for, assisting others in applying for, or managing foreign bank accounts

7     and payment processing accounts in countries such as Israel,[53] Latvia,[54] Estonia,[55]

8     Cyprus.[56]

9          **D.    Other Defendants' Other Companies are Not Truly Independent or Unrelated, and Their Assets Should Be Frozen Accordingly.**

10         The Court has properly frozen Sunset Holding, LLC's assets.  Sunset's

11    governing documents show Defendant CalEnergy is a 99 percent owner and

---

14    [53] *See* Ex. 21, Att. U (Latsanovski requested that money from SBM Management be transferred to an Israeli bank account).

15    
16    [54] *See* Att. G & Att. H (Latsanovski was requested to correct banking information on an Latvian payment processing account for a company called Skincare OÜ, which is apparently owned by one of his Sunset Holding, LLC investors).; Ex 21, Att. M (Latsanovski prepared to open an account with a Latvian bank).

17    

18    [55] Latsanovski was advised of the movement of Skincare OU's funds overseas to an Estonian bank. *See* Ex. 21, Att. R.

19    
20    [56] *See* Att. I (Latsanovski sent Alon Nottea a merchant account application for a payment processor located in Cyprus).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **17**
TO PRELIMINARY INJUNCTION

1    Latsanovski to be a one percent owner.[57] Like CalEnergy, the company is little

2    more than an alter ego of the Defendants. The only document offered to contradict

3    this is a handwritten "verbal agreement" of questionable authenticity, which

4    discusses an intended future agreement.[58] Further, Defendants contend that the

5    majority of assets controlled by Sunset are those of innocent third parties.[59] But in

6    support of this argument, Defendants present a contract where Sunset received

7    assets from Guayas Ltd—a company wholly owned by Latsanovski[60]—and Oleg

8    Trushlya.[61] Hardly an unrelated investor, Trushlya, through his company Skincare

9    OÜ, appears to have been a provider of the products in this case.[62] In fact,

10   _____

[57] *See* Doc. 106-7 at 3 (Sunset Holdings operating agreement).

11   [58] *See* Doc. 106-8, at 3 ("I…am responsible to create official agreement reflecting

12   this verbal agreement.").

13   [59] *See* Doc. 106-4.

14   [60] *See* 106-2, at 23. A 2013 loan application also identifies Latsanovski as owner
     of Guayas. It further shows Latsanovski reporting $587,694.83 in monthly income

15   from this company—a fact he failed to disclose to both the IRS and which is
     contrary to his declaration. *See* Ex. 21, Att. W; *see also* 106-5 (Latsanovski states

16   "Currently (and for the last 5 years), I have been investing my money in various
     business ventures, but still have not generated any income from these investments

17   to date. I currently do not receive a regular paycheck or any meaningful regular
     income, but I have received a salary from Calenergy, which I cannot receive while

18   Calenergy's accounts are frozen.").

19   [61] *See* Doc. 106-8, at 2.

20   [62] *See* Ex. 21, Att. V (The "Exclusive U.S.A Fulfillment & Call Center
     Agreement" concerning the sale of Skincare OÜ's "skincare products, The

     PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page   **18**
     TO PRELIMINARY INJUNCTION

1    Latsanovski assisted Trushlya in acquiring an account for Skincare OÜ with a

2    Latvian payment processor.[63] Additionally, as the Receiver has noted, since its

3    inception, Sunset Holdings haas had more than $8 million flow through the

4    company, over half of which is traceable to CalEnergy.[64]

5           Further, Defendant Latsanovski claims that Vastpay, LLC, a merchant

6    processing company he owns, is entirely independent.[65] However, Latsanovski's

7    email to co-Defendants Alon and Doron Nottea establishes that it too is involved

8    is involved in the common enterprise.[66]  Latsanovski's email describes Vastpay as

9    part of the future of the AuraVie common enterprise and as a company he

10

11   _____

12   Miracle Face & Body Treatment, and AuraVie Skincare in the United States." The
     agreement is signed by Oleg Trushlya, on behalf of Skincare OÜ, and Defendant
     Alon Nottea, on behalf of BunZai Media Group.).

13

14   [63] *See* Ex. 21, Att. I.

15   [64] *See* Doc. 92, at 22 ¶ 33.

16   [65] *See* Doc. 106-5 (stating "I do not play any role in the daily operations of these
     businesses and I do not control, manage or solely own [ComicsFix, Vastpay and
     Sunset].").

17

18   [66] *See* Ex. 21, Att. A ("And I feel (although it is not objectively) that we want to
     keep Pinicle . I'll tell you my reasons and point out the pros and cons. We want to
     grow and already we have Product company in the U.S. business-marketing,

19   security-merchant, merchant-VastPay, and more will be opening…"). Another
     email shows co-Defendant Alon Nottea inquiring whether Vastpay's bank account

20   had been opening and requesting related documents. *See* Ex. 21, Att. J.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **19**
TO PRELIMINARY INJUNCTION

controls.[67]

Likewise, Guayas, as discussed above, is yet another alter ego of Latsanovski and is wholly owned by him. Further, the CEO of this company is Oleg Trushyla, whose company, Skincare OÜ, was one of the product suppliers at issue in this case.[68] It is misleading of Opposition Defendants to characterize Guayas, or any of Latsanovski's other shell corporations, as independent third parties that are being collaterally harmed by the Court's asset freeze.

### E.  A Preliminary Injunction is Appropriate for the Defendants' Ongoing Scheme.

A preliminary injunction is appropriate to stop the Defendants' illegal business practices. Defendants contend this is not the case because the common enterprise is no longer operating. But as the Receiver has noted, this contention is entirely false.[69] Defendants continued to make millions at the expense of consumers until this Court's TRO. Further, even if Defendants had actually ceased

---

[67] *See* Ex. 21, Att. A. *See also* Doc. 6, Ex. 18 (CalEnergy's own website indicating that Vastpay is a subsidiary of CalEnergy.).

[68] *See* Ex. 21, Att. V.

[69] *See* Doc. 91 at 11.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page   **20**
TO PRELIMINARY INJUNCTION

their conduct, this would not preclude a preliminary injunction if there is a

"possibility of recurrence." [70]

**IV.     Latsanovski Has Attempted to Deceive this Court and Should Have No Credibility.**

Latsanovski has provided self-serving testimony by deposition and

declaration that is provably counterfactual. He has misrepresented facts to the

Court and government under penalty of perjury in court documents, employment

documents, tax filings, and Court-ordered financial disclosure statements. And, as

emails from Latsanovski himself make clear, Latsanovski knew these statements

were untrue when he made them. As part of Defendants' common enterprise,

Latsanovski deceived both consumers and financial institutions; he now employs

his well-honed skills of deception to present the Court with falsehoods as well.

---

[70] "It is settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the Defendants would be free to return to (their) old ways." *Allee v. Medrano*, 416 U.S. 802, 810 (1974); *accord TC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982) (affirming injunction and asset freeze issued after defendants ceased operations); *FTC v. American Standard Credit Sys.*, 874 F. Supp. 1080, 1087 (C.D. Cal. 1994) (granting injunction where termination by VISA had stopped defendants' deceptive credit card marketing); *see also FTC v. Affordable Media*, 179 F.3d 1237 (9th Cir. 1999) (even voluntary cessation of practices does not moot a preliminary injunction where an asset freeze and repatriation are sought to redress consumers); *Fedders v. FTC*, 529 F.2d 1398, 1403 (2d Cir. 1976) ("[T]he fact that [defendant] may have discontinued the offending practice before the Commission issued the complaint in this case, however, does not bar a cease-and-desist order, where the public interest otherwise requires it.").

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION          Page  **21**
TO PRELIMINARY INJUNCTION

1   Accordingly, Latsanovski's self-serving statements, which represent his only

2   attempted defense, should carry no weight.

3   **V.      Conclusion**

4          For the forgoing reasons, the FTC respectfully requests that the Court enter

5   the Proposed Preliminary Injunction Order, including an asset freeze and

6   appointment of permanent receiver.

7                       Respectfully submitted,

8

9   Dated: 7/31/15            /s/ REID TEPFER_____
                           REID A. TEPFER

10                             LUIS H. GALLEGOS
                           Attorneys for the Plaintiff

11                             Federal Trade Commission
                           1999 Bryan Street, Suite 2150

12                             Dallas, Texas 75201
                           (214) 979-9395 (Tepfer)

13                             (214) 979-9383 (Gallegos)
                           (214) 953-3079 (facsimile)

14                             rtepfer@ftc.gov
                           lgallegos@ftc.gov

15

16

17

18

19

20

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 31, 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com
*Local counsel for Receiver*

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi, as an officer or manager of BunZai Media Group, Inc. and Pinnacle Logistics, Inc.*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea, Roi Rueveni and Adageo, LLC*

David P. Beitchman
Beitchman & Zekian
16130 Ventura Blvd., Suite 570
Encino, CA 91436
dbeitchman@bzlegal.com
*Counsel for Doron Nottea and Motti Nottea*

Marc S. Harris
Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
mharris@scheperkim.com
*Counsel for Igor Latsanovski and CalEnergy, Inc*

Annah Kim
Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
akim@scheperkim.com
*Counsel for Igor Latsanovski and CalEnergy, Inc*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
TO PRELIMINARY INJUNCTION                    Page **23**

1  Kelly M. Crawford                    Dallas, Texas 75201
   Scheef and Stone                     kelly.crawford@solidcounsel.com
2  500 N. Akard, Suite 2700             *Counsel to Receiver*

3
                                              /S/ REID TEPFER
4                                             REID TEPFER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20