Michael J. Weiss (SBN 206473)
**ABRAMS GARFINKEL MARGOLIS BERGSON, LLP**
5900 Wilshire Blvd. Suite 2250
Los Angeles, CA 90036
310-300-2900
310-300-2901- Fax
Mweiss@agmblaw.com
**Local counsel for Receiver**

Charlene C. Koonce (TX SBN 11672850)
*Admitted Pro Hac Vice*
**SCHEEF & STONE, L.L.P.**
500 N. Akard, Suite 2700
Dallas, Texas  75201
214-706-4200
214-706-4242 - Fax
Charlene.koonce@solidcounsel.com
**Court-appointed Receiver**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>BUNZAI MEDIA GROUP, INC., a California corporation, also doing business as AuraVie and Miracle Face Kit, et al.,<br><br>        Defendants. | Case No. 2:15-CV-4527-GW(PLAx)<br><br><br>**RECEIVER'S INITIAL REPORT** |

TABLE OF CONTENTS

I. SUMMARY ...................................................................................... 1

II. STEPS TAKEN TO IMPLEMENT THE TRO ................................... 5

 A. Summary of Initial Access and Entry at the Business Locations ................. 5

  1. 655 N. Central, Glendale, CA- SBM Management's Virtual Location 6

  2. 7900 Gloria, Reseda- Former Primary Operations Location for AuraVie Sales ........................................................................ 6

  3. "Canby" Locations- Where All Active Receivership Defendants are Controlled and Operated ............................................................ 8

   i. Suite 105- the Primary "Nerve Center" Location ..................... 8

   ii. Suite 109- the Pornography and Adult Products Location ....... 11

   iii. Suite 103- the Location for Affiliate Marketer, Focus Media Solutions ........................................................................ 12

 B. Service of the Order and Subsequent Communications ............................. 15

  1. Service on Banks and Credit Card Processors .............................. 16

  2. Service on Manufacturers and Warehouses .................................. 17

  3. Service on Non-Party Entities Operating from Suite 105 Canby ....... 18

   i. Chargeback Armor .................................................................. 18

   ii. Secured Merchants .................................................................. 20

  4. Service on Persons in Active Concert with the Defendants .............. 21

   i. David Davidian- the CPA for More than Thirty Entities ......... 21

   ii. Stephan Bauer- the Legal Owner of SBM Management Whose Signature was Frequently Forged ........................................... 22

  5. Service on the Individual Defendants and Summary of the Role Each Played ........................................................................ 24

   i. The "Nottea Defendants" ........................................................ 24

    a. Alon Nottea- the Defendant with Day-to-Day Control .. 25

    b. Doron Nottea- the "Bookkeeper" ................................. 27

    c. Motti Nottea- A "Paper" Participant Who Received Funds ........................................................................ 28

    d. Roi Reuveni- Supervisor of the AuraVie Call Center and IT Functions ........................................................... 29

   ii. Oz Mizrahi- the Legal Owner of Pinnacle Logistics, Which Operated the Call Center ........................................................ 30

   iii. Kristopher Bond- An Original Partner Frozen Out in Spring 2013  31

   iv. Igor Latsanovski- the Partner Who Provided Financing and Advice ........................................................................ 33

C.    Requests for Information to Defendants, and Other Efforts to Implement the Terms of the Order ........................................................................37

     1.    Defendants Failed to Provide Information or Provided False Information about the Entities, Email Accounts, and Assets ............38

     2.    Defendants Provided False or Incomplete Information about Continuing Sales and Shipments ........................................................40

D.    Investigation of Affiliate Marketing .............................................41

E.    Efforts to Limit Access to "Free Trial" Sales Websites................................43

F.    Evaluation of "New Entities" Discovered Through Defendants' Business and Financial Records ........................................................44

G.    Evaluation of Issues Related to Sunset Holdings.........................................46

     1.    The Transfer of CalEnergy's Interest in Sunset Was Not Effective...46

     2.    Evaluation and Release of Funds to Close the Sunset Holdings' Real Estate Deals .......................................................48

H.    Possession and Control was Asserted over Mailbox Locations....................51

I.    Filing and Registration of Order to Establish Jurisdiction............................52

III.    Value of All Liquidated and Unliquidated Assets, And Sum of Liabilities of The Receivership Defendants ........................................................52

IV.    Anticipated Future Actions........................................................55

A.    Preventing Diminution in Value- Taking Possession of Assets ...................56

B.    Pursuing Receivership Assets from Third Parties.......................................57

C.    Adjusting Liabilities- Subordinating Liabilities to Administrative Costs ....58

V.    Findings Regarding the Receivership Entities' Ability to Operate Legally and Profitably ........................................................60

A.    Background Regarding the Receivership Defendants' Manner of Operation- One Huge Collective Enterprise........................................................60

     1.    The Bunzai Group of Companies, While Under the Control of Alon, Doron, Bond, and Latsanovski, Sold Skin Care Products through Negative Option Enrollment Programs................................................61

     2.    The Relationship and Flow of Money between the Receivership Defendants and the Other Individuals ...............................................62

     3.    Defendants Hid Control and Concealed Income ...............................66

     4.    Focus Media Solutions- Marketed Non-Party Products Using Negative Option Enrollments ........................................................68

     5.    Defendants Forged Signatures and Committed Bank Fraud .............70

B.    Recommendations Regarding Continued Operation....................................71

     1.    The Dissolved Entities Cannot Continue Operating Legally ............72

     2.    Active Merchant Entities Cannot Continue Operating Legally.........73

     3.    "Facilitator" Entities Cannot Continue "Operating" Profitably ........73

     4.    Focus Media Could Operate Legally, but Not Profitably..................78

5.    CalEnergy and Sunset Holdings Cannot Operate Solely with Estate Assets ................................................................................. 79
  i.    CalEnergy Should be Dissolved ................................................ 79
  ii.   Sunset Holdings Cannot Operate Profitably ........................... 80
VI.  Other Matters Which Merit the Court's Attention ................................................. 81
  A.    Highly Suspicious Transactions ................................................................. 81
  B.    Expense and Complexity .............................................................................. 83

Charlene Koonce, the Court-appointed Temporary Receiver,[1] files this Initial Report as required by the *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Order") and respectfully shows the Court:

## I.   SUMMARY

The Receivership Defendants' operations are complex, incestuous and intentionally obscured. Defendants use or have used not less than twenty seven entities as one collective enterprise to sell the skin care products which underlie the FTC's Complaint.  These entities are used to disguise the dispersal of the funds received from those sales, and hide the individuals' control over those entities.[2]

As explained more fully below, Defendants began selling skin cream products in late 2010.  To accomplish those sales, they purchased the right to use the name "AuraVie" from an Estonian company and bought the skin cream products from overseas (at least initially).  Defendants bought "leads" (information about consumers who expressed interest in their products) and marketed the products through websites, "landing pages" and blogs, all of which offered "free trials" for the cost of shipping

---

[1] Pursuant to Stipulated Preliminary Injunctions already entered but subject to the Preliminary Injunction hearing regarding CalEnergy, for all named entities the Receiver's appointment is now permanent.

[2] A summary of how the entities operated and an explanation of the control and general flow of money are included below in section IV, and is **Exhibit 1** in the Appendix submitted concurrently with this Report.

only.[3]  The free trial, however, was automatically converted to "enrollment" in monthly purchase which was extremely difficult to cancel.

Unless the consumer cancelled and returned the product in a very short time period the customer was automatically charged for monthly deliveries of the products – a negative options enrollment.  When a consumer purchased a product on-line, their credit card was charged by a "merchant account" owned by a "retail merchant entity."   If the consumer returned the product or disputed the credit card charge, the credit card processor "charged- back" the merchant account.

If return rates (chargebacks) are too high in any one merchant account, the merchant will freeze or cancel the account.  Moreover, credit card processors frown on the same person or entity using several merchant accounts for the same products- a process known as "load balancing."

Because of their deceptive marketing of the skin care products, chargeback rates for the Receivership Defendants were high. Defendants accordingly created a myriad of "retail merchant corporations" each of which owned one of more "merchant accounts" with different credit card processors.  Defendants disguised their control of these entities by either incorporating the entities with the names and signatures of many different individuals, several of whom knew nothing about the entity, or, opened the merchant

---

[3]  As discussed below, Defendants created Defendant Media Urge, Inc. to provide online advertising and lead creation for their skin care products, and reduce the fees to third parties.  Media Urge, Inc. was dissolved and succeeded by Focus Media Solutions, Inc., a company controlled by Defendants Alon and Doron Nottea that engages in affiliate marketing. Focus Media Solutions, Inc. not only markets the skin care products of the Defendants, but also products sold by outside

accounts for the entities using forged signatures of individuals who had never heard of the entity or its merchant account.  Using so many diverse individuals to create the entities or own their accounts also created the illusion that the merchant accounts were not commonly controlled by Defendants.

Defendants also developed a technique or software to refute chargebacks – a process they called "Chargeback Armor," and later sold the process and provided the capital for the new entity, Chargeback Armor, Inc.  Defendants operated a call center for a brief period – to respond to customer complaints and return requests – but eventually began using "voice logix" – automated responses to such calls, to reduce costs.

Most documents and information suggests sales and marketing of Defendants' skin care products was largely finished by early spring of 2015, although Defendants continued charging for and shipping products based on the existing "enrollments" through the date of the Order. Defendants also continued their affiliate marketing of unrelated products, marketed through negative option enrollments. Through the process described above (the "Enjoined Conduct"), Defendants, including many entities that fall within the definition of "Receivership Defendants"[4] but which are not yet named in an

merchants.   SBM Management, also controlled by Doron & Alon Nottea and Igor Latsanovski, also purchased leads and performed affiliate marketing.
 [4] "Receivership Defendants" include the named entity defendants, "their successors and assigns, as well as any subsidiaries, fictitious business entities, or business names created or used by these entities or by the Individual Defendants that are related to, or receive funds from, the sale of skincare or other products online." Order.  ¶ "Definitions" 4.b.  A chart identifying all entities the Receiver believes fall within the Order's definition of "Receivership Defendant" including entities not specifically named as defendants is included in the Appendix as **Exhibit 3**.   The entities which have not yet been named as Defendants are in italics.

Amended Complaint, generated *at least* $69 million in gross sales of skin care products over the course of five years.  Sales continued as of the date of the Order.

The Receiver's investigation was hampered and compounded by lies, half-truths, omissions, and difficulties in obtaining information regarding at least 60 entities related to Defendants or involved in their skin care product sales.  Unravelling the Receivership Defendants' operations, bank accounts and enjoined conduct from the web of operations for the entities, created, controlled or utilized by Defendants presented a herculean task summarized below.[5]

Further, numerous additional entities created at or near the time many of the Receivership Defendants were dissolved appear to engage in IT services rather than skin care sales (the "New Entities") but own accounts obtained through bank fraud.

The Order requires the Receiver to report to the Court prior to the date set for a Preliminary Injunction hearing regarding the following matters:  1) steps taken by the Receiver to implement the Order; 2) value of all assets and sum of all liabilities for the Receivership Defendants; 3) future steps intended to a) prevent diminution in value of the Receivership Defendants' assets;   b) pursue receivership assets from third parties; c) adjust the liabilities of the Receivership Defendants if appropriate; 4) opinions regarding

---

[5] The financial analysis performed by the Receiver's forensic accountants is summarized in the Brandlin Report included in the Appendix as **Exhibit 2**.

the Receivership Defendants' ability to operate legally and profitably; and, 5) any other matters that should be brought to the Court's attention.[6]

## II.    STEPS TAKEN TO IMPLEMENT THE TRO

### A.    Summary of Initial Access and Entry at the Business Locations

Prior to issuance of the Order on June 16, 2015, the Receiver was provided with a list of defendants to ensure no conflicts existed in the potential appointment and to allow necessary preparation for the appointment. Surveillance indicated most addresses associated with the Receivership Defendants were post office box locations, but that Defendants were also operating from 6925 Canby, Suite 105, Reseda, CA rather than 107,[7] and that some activity still existed nearby at 7900 Gloria, Ave., Reseda, CA the address reflected on-line for most sites selling AuraVie products. Additionally, the operational address for SBM Management, Inc. was identified as 655 N. Central Ave., Suite 1700, Glendale, CA, a suite in an office building.

After meeting with the FTC's computer forensic preservation team and law enforcement, on June 18, 2015, the Receiver and a team of accountants, electronic discovery specialists (IT), attorneys, and Los Angeles or Glendale police officers initially accessed three locations.  One team entered Suite 105 Canby, one team visited 7900 Gloria, and one team accessed the 655 N. Central, Glendale address.

---

[6] *Order.* ¶ XXI.
[7] The Order identifies Suite 107 on Canby Ave as a potential address, but the Receiver discovered the Defendants and Receivership Defendants vacated Suite 107 sometime around the end of May, 2015.  The landlord confirmed a new, unrelated tenant now occupies Suite 107.  Multiple addresses, including 6914, 6925 and 6850 are included generally in an

### 1.   655 N. Central, Glendale, CA- SBM Management's Virtual Location

At the same time other team members were accessing the Canby and Gloria locations, two attorneys and a police officer went to the office location for SBM Management, Inc., as reflected in corporate filings at 655 N. Central Ave, Suite 1700, Glendale, CA 91203.   Entry at the location[8] revealed that it was a Regus office share location, and SBM only leased "virtual" space, i.e., phone and fax numbers, and mailing address.   Management at the location advised that no representative of SBM had ever been in the location following execution of the lease documents.   Management at the Regus suite also stated they had been instructed to gather mail sent to the address and forward it to 19528 Ventura Blvd Suite 224 Tarzana, CA 91356.[9]   Mr. Bauer denies under oath that he signed the document.

### 2.   7900 Gloria, Reseda- Former Primary Operations Location for AuraVie Sales

Two attorneys entered the premises at 7900 Gloria Ave., Reseda, California, which was identified as an initial access point of entry because the address currently appears on the websites for several Receivership Defendants. Access was made to obtain identifying information from the individuals working at the location and to observe the contents of the building.

---

office park on Canby Avenue, with different suite numbers for different offices located in the same office park.  All Canby addresses are referenced above as "Canby" with the relevant suite number.

[8] No one was able to access the actual suite during prior surveillance because the elevator to the 17th Floor required a key code to access.

Several employees for an entity called Pure Imagination Co. were working in the Gloria location. Those employees were provided with copies of the Order, and confirmed they took possession of the office in October 2014.  They also confirmed that some of the Receivership Defendants were the previous tenants.[10]  The Pure Imagination employees described their business as the creation of animation for movies, etc., and allowed the Receiver's attorneys to inspect the warehouse space behind the offices, including viewing the contents of boxes and storage shelves. The employees said they understood the warehouse and office space previously housed a call center that at one time had approximately 50 people fielding calls from consumers.[11]  The Pure Imagination employees described the previous contents of the warehouse as being skin care products, pornography, bags of salt, and children's toys and videos.  One employee described seeing large amounts of skin care products being thrown away in dumpsters near the time the office space was turned over to Pure Imagination.  The employees also confirmed their understanding that the previous tenants moved to the Canby addresses discussed below. The owner and employees of Pure Imagination provided sufficient information for the Receiver to conclude that neither it nor its individual employees were related to or engaged in any of the Receivership Defendants' operations.

---

[9]  This post office box address is also used for merchant accounts for DMA Media Holdings, Inc.

[10]  An additional entity, Nerd Machine LLC, subleased a small portion of the Gloria office space. The owner of Nerd Machine, LLC was very cooperative and he and his employees all provided identification, as well as sufficient information to conclude neither the company nor its individual employees were related to any of the Receivership Defendants' or their operations.

[11]  Other information confirms the call center was operated by various Receivership Defendants in connection with sale of AuraVie and similar products.

### 3.     "Canby" Locations- Where All Active Receivership Defendants are Controlled and Operated

"Secured Commerce, LLC" is the lessee of two suites at Canby, 105 and 109. Both leases are signed by Alan Argaman on behalf of Secured Commerce, and both are personally guaranteed by Argaman. Business cards in Suite 105 identified both Defendant Doron Nottea and Alan Argaman as Managing Directors for Secured Commerce.[12] A third location, Suite 103 is occupied by Focus Media Solutions and is also discussed below.

### i.     Suite 105- the Primary "Nerve Center" Location

At the time of the Receiver's initial entry, three individuals were present in Suite 105 Canby; Defendant Doron Nottea, Alan Argaman, and Phillip Camerino.  Camerino said he was only in the location "to charge his cell phone while he studied his Spanish."[13] Neither Doron nor Argaman would provide any information, including user names or passwords for their computers (other than their driver's licenses and cell numbers), and

---

[12] Counsel for Doron describes Secured Commerce as an entity owned by Alan Avi Argaman and Doron Nottea, and claims it is a "defunct tech business started in 2012 that provided shipping services (e.g., USPS) and passed volume discounts to its customers." As reflected in invoices obtained from Defendants' records, Secured Commerce invoiced Bunzai Media for assisting in marketing and selling AuraVie and thus falls within the definition of "Receivership Defendants."

[13] Financial records demonstrate Mr. Camerino was on Calengery's payroll, as well as payroll for an entity called Shalita Holdings, Inc. Other documents and data revealed that Camerino's name and log-in information were used extensively in connection with Quickbooks and other accounting functions managed from 105 Canby.  Prior employees and persons interviewed by the Receiver reported that Camerino was Doron Nottea's assistant. Despite calls and emails to Camerino and requests to Defendants that they ask Camerino to contact the Receiver, Camerino did not respond to communications from the Receiver after the date of initial access.

each stated they intended to retain counsel prior to providing any information.[14] Each was served with a copy of the TRO and the basis for its entry was explained.

Contemporaneously with serving a copy of the TRO on Doron and Argaman, the forensic accountants, attorneys and IT staff began reviewing the individual offices and their contents.[15] Numerous "books" each holding dozens of credit cards were found in Doron's office, as well as deposit stamps for more than 18 entities. Additionally, books of deposit slips or checks for at least 35 entities were also located in the office. RSA devices used to make electronic funds transfers for at least 8 bank accounts at WF were on Doron Nottea's desk.[16]

Blank signed checks on multiple accounts were also found in Mr. Nottea's office for:

* CalEnergy (signed by Latsanovski);[17]
* A personal account for Mr. Latsanovski (signed by Latsanovski);
* SBM Management (signed by Stephen Bauer);
* Insight Media;
* Jacem Healthy Products, Inc.;
* AMD Financial Network; Optimized Media Services, Inc.;
* USM Products (signed by David Yosafain); and,
* Focus Media Solutions (signed with a stamp for Yosafain).

---

[14] Counsel currently representing Doron Nottea is the fourth since the he was served with the Order. Argaman subsequently retained his own lawyer, but continued in his refusal to provide password and user name access to those computers. An Affidavit of Noncompliance and Motion for Show Cause Hearing was prepared but could not be filed while the case was under seal. Hours before the seal was lifted, on June 23, 2015, Argaman's counsel provided the relevant passwords.

[15] Video cameras were in use for Suite 105 and whoever monitored those cameras offsite was also aware of the Receiver's entry until the cameras were disabled.

[16] See photos included in Appendix as **Exhibit 4**.

[17] Most signatures were not legible. Comparing the signatures to other documents, however, which included the typed name of the individual signing, revealed the identity of the purported signatory for some checks.

All told, the number of bank cards, checks, account access devices, deposit stamps, and deposit slips in Doron's office was extraordinary.[18]

Approximately a dozen large envelopes from UMS Banking Payment Processing Services, addressed to a variety of entities and locations were also found in Doron's office, with each containing approved applications for processing services.[19]   These approved applications were on behalf of merchants selling skin care products, such as "EllaSkin," "Serum," etc.[20]

A warehouse area in the back of Suite 105 held old computer/copiers, personal items such as a bicycle, servers and books and records.[21]   Male enhancement supplements were located in the kitchen. Suite 105 included four discreet offices, each with computer equipment, and one large Mac in a hallway area.[22]

---

[18] Online bank records revealed at least **360** bank accounts credit or debit cards and QuickBook accounts owned or controlled by entities operating from Suite 105, or used by the Individual Defendants or Receivership Defendants.

[19] Appendix **Exhibit 5**.

[20] *See*, Appendix **Exhibit 6** for a summary of the merchant accounts referenced in the UMS and GlobalPay summaries provided by those entities.

[21] A general summary of the inventory items stored in the warehouse portion of Suite 105 is discussed in the Brandlin Report.

[22] Defendants eventually provided the user names/passwords for computers in two offices and the computer in the hallway office area.  On June 23, Alan Argaman eventually provided the user names and passwords for the computers in the other two offices. Until after a Motion to Compel was filed, however, the Nottea Defendants refused to provide email account credentials, even for the dissolved entities, based on a purported effort to preserve attorney-client communications. Defendant Latsanovski provided email log-in and password information for his personal and "CalEnergy" accounts on or about June 26, 2015.  The Receiver offered to institute a preservation protocol for the Individual Defendants' email accounts if the Nottea defendants would agree to pay for the costs of the protocol.  Likewise, she offered to institute the same protocol for the dissolved entities while seeking a determination that 1) dissolved entities have no privilege; and 2) even if any receivership defendant had an attorney client privilege, it was held by the Receiver. Numerous motions, including Motions to Show Cause, were filed regarding the Receiver's efforts to access email accounts.  The emails to which the Receiver has access (some passwords were changed after Defendants provided the email account name and prior passwords) continue to be downloaded, sorted for privilege in the personal use accounts, and reviewed.

RECEIVER'S INITIAL REPORT

### ii.        Suite 109- the Pornography and Adult Products Location

Shortly after entering Suite 105, the FTC's investigator discovered two other suites in the Canby location that were occupied by or affiliated with the Receivership Defendants' operations. Entry was immediately made in Suite 103 and 109.

Four individuals were working in Suite 109.  Some skin care products, including AuraVie, LeOR and Dellure products were stored in the warehouse portion of Suite 109, which was the majority of the space in the suite.  Most of the inventory in the Suite, however, consisted of pornographic videos, adult entertainment items or sexual enhancement products. Two of the individuals working in the location refused to provide their ID, and left shortly after the Receiver served them with copies of the TRO. Two other individuals in the location, however, provided their names and cell numbers and were subsequently contacted.  Jorge Magana stated his job was operating the fork lift, and said Doron Nottea paid him with checks drawn from various entity accounts, including DSA Holdings, Inc.[23] Mr. Magana and one other individual in the Suite confirmed Doron Nottea was their boss.

Based on information obtained following initial entry, the Receiver believes the following entities, whose activities were unrelated to the skin care products or similar on-line sales and marketing, operated from Suite 109:

- Xcite Entertainment, Inc.

---

[23] DSA Holdings held a merchant account used to sell skin care products. Information received from the Receivership Defendants' accountant demonstrates the forklift driver was on payroll for AMD Financial Network, an entity that was a retail merchant for skin care products.

- NFT Holdings, Inc. d/b/a Xposed Media, Adult 1 Stop, Critical X, Extra Entertainment, and Global Media Products
- Vertex Holdings Group, Inc.
- Doron Nottea Sole Proprietorship for, LD Holdings, DVD Connection, Global Media Products, Magnum Distribution, and Access Distribution.

These entities also receive accounting support from individuals in Suite 105, particularly Phillip Camerino.

Within less than a week of the initial access, the Receiver communicated with Doron Nottea's then counsel about extricating the lease obligation for Suite 109 and the non-skin care product inventory located in Suite 109 from the receivership estate. Doron's fourth attorney continues negotiating with the FTC regarding whether these entities' assets should remain frozen and other issues pertaining to those entities and the details of any agreement to extricate the entities from the asset freeze.[24]

### iii.    Suite 103- the Location for Affiliate Marketer, Focus Media Solutions

Suite 103 of 6850 Canby is located in a different area of the Canby business complex. When the Receiver entered Suite 103, five individuals were present.  Photos and designs of LeOR products were on the screen of the computer of the individual who identified himself as a graphic designer at that location.[25] "Sticky notes" on several

---

[24] Since these entities do not fall within the Order's definition of Receivership Defendants the Receiver makes no recommendation below regarding their continued operation.

[25] The designs for the "LeOr" skin care products are almost identical to the AuraVie products.  *See,* Appendix **Exhibit 7.**

computer screens or desks had phone numbers, which when called turned out to be the customer service numbers for AuraVie.[26]

Each of the individuals in Suite 109 was facially cooperative and provided interviews to the Receiver or her counsel and each was provided with a copy of the Order.   Information discovered after those individuals left, however, demonstrated that much of the relevant information provided by the individuals working in Suite 109, was false.[27]

All of the individuals working in Suite 109 reported working for "Focus Media Solutions."[28] Paul Medina described himself as the prior Executive President of Media Urge,[29] but held himself out as an employee of Focus, and signed the lease for Suite 109. Medina stated Doron and Alon Nottea hired him to work at Media Urge, which eventually became Focus Media Solutions, and which he understood was owned by David Yosafian.  Mr. Medina said he had never seen David Yosafian, but was told by the Notteas that Yosafian was the President of Focus Media, but "only on paper."[30]  Medina

---

[26] *See*, Appendix **Exhibit 8.**   The phone on the desk where one of those sticky notes was found showed more than 500 messages.  The same number on the sticky was the customer service number provided to a consumer who received a shipment of AuraVie on June 2, 2015.

[27] Cameras were also on-line in Suite 103 and it is highly likely the individuals working in Suite 103 observed the Receiver's prior entry in Suite 105 and thus had notice of the impeding access at Suite 103, which occurred at least 15-30 minutes after entry in Suite 105.

[28] The accountants who provided the payroll services for all of the entities provided information in demonstrating that none were on payroll for Focus Media Solutions.

[29] Medina also reported that Media Urge had ceased operating, but other employees stated Focus Media used Media Urge email accounts, which was confirmed by reviewing the data on the computers. The Receiver also discovered that Medina held himself out as the CEO of SBM Mgmt. Inc. in SMB's contractual relationship with Lions Bay Media, an entity for which SBM provided lead generation services related to on-line sales of skin cream products sold by Lions Bay.  Medina, however, later denied through his counsel ever having served as an officer or director for SBM.

[30] Yosafian is the owner and registered agent for Kai Media Solutions as well as Focus Media Solutions and was the only individual on payroll for Focus Media Solutions.  He did not respond to the Receiver's emails, phone calls or letters enclosing the Order that were sent to his house.

reported that he was instructed to use Yosafian's name on accounting paperwork that was then forwarded to Doron who performed all accounting services for Focus.[31]

Medina denied Focus provided any advertising for AuraVie or any products sold by Alon or Doron Nottea, but did admit to running "some trials" for eight different skin care products. Medina claimed Media Urge was the marketing entity for AuraVie and solicited leads for the Defendants' skin care products, but asserted the Defendants had stopped selling AuraVie, Dellure, and LeOR at least two years previously.

Emails on the computers in Suite 103 demonstrate the employees at that location were designing webpages for skin care products such as LeOR and Dellure up until the fall of 2014.[32]  Further, documents located in Suite 109 demonstrate the LeOR webpages were created by duplicating the AuraVie pages and the product was offered pursuant to the same Enjoined Conduct alleged in the Complaint. The Focus Media team in Suite 103 were also buying, placing and designing on-line advertisements for a variety of products, which included skin care products sold by non-parties, by means of the Enjoined Conduct.  The attorney who represents Paul Medina and previously represented Focus Media[33] has been informed the Receiver contends Focus Media falls within the definition

---

[31] A signature stamp bearing Yosafian's purported signature was found in Doron Nottea's office, and was identified as his signature by examining a check with the stamped signature on an account in Yosafian's name.  Appendix **Exhibit 9**,

[32] The LeOr pages look nearly identical to the AuraVie pages, and indeed one email suggests the LeOr pages were photo-shopped from AuraVie that the Defendants failed to remove all references to AuraVie. Appendix **Exhibit 10**.

[33] Paul Medina eventually admitted he had retained counsel for Focus Media "only as a favor to Alon" but in reality had no authority to act on behalf of the corporation.  Medina had nonetheless signed contracts on behalf of Focus Media and presumably signed the engagement agreement for Focus Media's counsel.  Upon hearing Medina's admissions, Focus Media's counsel terminated the representation.

of "Receivership Defendants." Focus Media's assets have been transferred to the receivership estate's bank account.

On June 18, 2015, after Medina and Doron Nottea had been personally served with the Order, but before the Receiver's counsel could convince Wells Fargo to freeze Focus Media's bank account (it is not a named Defendant), funds in one of Focus Media's accounts were transferred to USM Products, Inc.[34] When the transfer was discovered, the Receiver immediately requested whichever Individual Defendant had initiated the transfer to reverse it and return the funds. A Motion to Show Cause was drafted, but the funds were returned – by Alon Nottea – before the Receiver filed the motion.[35]

Locks were changed on all locations and notice regarding the pending lawsuit, the receivership and the Court's control over the premises was posted on all doors for each location.  Rent has been or will be paid for July and August for Suites 105 and 103.

## B.    Service of the Order and Subsequent Communications

The Order is enforceable upon receipt by any person or entity who receives a copy. Accordingly, to obtain possession and control over the Receivership Defendants' assets, obtain information about the nature of the Receivership Defendants' business operations, determine whether operations could continue legally and profitably, and to understand the scope of the operations, the Receiver served the Order on banks, affiliate marketing

---

[34] The officers of USM Products, Inc. are David Yosafian, Jay Michaels and Jenik Shanazari. Appendix **Exhibit 11**. Alon's attorney confirmed "Jay Michaels" is an assumed name sometimes used by Alon.

[35] Alon claimed he had not received notice of the Order at the time the transfer was made, which was after Doron Nottea had left the Canby location.  Nonetheless, Alon admitted USM was not entitled to receive funds from Focus Media.

website companies, Google (who maintained most email accounts), Go-Daddy (who hosted the websites), lawyers who had previously represented the entities, individuals whose names appeared in Defendants' records, and others.

Late on June 18, 2015, copies of the Order were emailed to all Individual Defendants (although most had already been personally served) and each was requested to provide the information required by the Order, including access to Receivership Defendant documents stored in emails and on-line credentials to access bank accounts. Information was also requested and reviewed about multiple additional entities operated or controlled by the Individual Defendants, or their affiliates.  Subsequent requests for the same and similar information were made through each Defendant's attorney.

### 1.  Service on Banks and Credit Card Processors

Information obtained by the FTC prior to issuance of the Order suggested Defendants were banking at Wells Fargo (WF) and Bank of America (BA).  Surveillance also identified many local or regional banks with branches near the Defendants' residences or Canby location.  Approximately one hour before the Receiver and her team entered the Defendants' business premises, a letter explaining the asset freeze provision of the Order was faxed to WF, BA, all large national banks and the local regional banks operating near the Defendants. Within the first thirty minutes during the initial access, dozens of accounts for entities not named as Receivership Defendants but whose banking functions were controlled from 105 Canby, as well as EIN and SSN data were located

and sent to two of the Receiver's attorneys who were communicating with the banks. Some credit card processor information was also identified, and similar letters were sent to the credit card processors. In all, approximately 60 banks or financial institutions were served with a copy of the Order and an explanatory letter.

Responses from these institutions confirm the Receivership Defendants generally banked at BA and WF, but also had multiple merchant accounts held at processors such as Signapay, UMS and Global Payments. The banks provided rolling responses regarding frozen accounts and signature cards and other records.

A bank account for the receivership estate was opened at Amegy Bank in Dallas and as required by the Order, the Receiver requested that the Receivership Defendants' banks transfer the proceeds of the entities' accounts to the Amegy account.[36]

### 2.   Service on Manufacturers and Warehouses

Invoices demonstrating purchases or storage of skin care products were also located in the Offices. Copies of the TRO together with requests for information regarding those invoices were sent to several entities.  The owner of Jacem Healthy Products responded to the request and informed the Receiver he had manufactured AuraVie and LeOR for the defendants, but had not received any purchase requests since

---

[36] A summary of the funds transferred to the receivership estate's bank account is included in the Appendix as **Exhibit 12**.  Accounts for three entities not yet named as Defendants, Apogee Network, LLC, Forward Momentum, LLC and Trigen, LLC are also frozen but have not yet been transferred to the receivership estate's bank account. EVO Payments International, a processor for All-Star Beauty Products, Inc., which Defendants confirmed was a retail merchant selling skin care products, holds approximately $212,000 in a reserve account.  EVO claims a perfected security interest in those funds based on its possession, and the Receiver is negotiating with EVO to have the bulk of the funds transferred, with an

January 9, 2015.  Checks paying Jacem were issued from bank accounts owned by eight different entities:  DMA Media Holdings, Heritage Alliance Group, Insight Media, Kai Media, Lifestyle Media Brands, Shalita Holdings, USM Products, and Zen Mobile Media.[37]

Likewise, Build Rehabilitation Industries responded with a list of inventory which included beauty supply boxes, sea salt, botanical supplements and various DVD and "movies masters" it was storing for Defendants.[38]

### 3.    Service on Non-Party Entities Operating from Suite 105 Canby

### i.    Chargeback Armor

Business cards, transfers from the Receivership Defendants, and other documents suggested an entity called Chargeback Armor, Inc. was also operating from Suite 105 Canby. A copy of the Order was emailed to the President of Chargeback Armor, Inc. whose contact information was found on-line. *Extensive* and time consuming communications with Chargeback Armor's President and counsel, as well as review of relevant documents followed. Chargeback Armor, Inc. purports to sublease some of the office space in Suite 105 Canby and contracts with Secured Merchants, another company operating from the same location, for data hosting services.

---

agreement to allow EVO to hold a small percentage subject to the continuing obligation to keep the reserves frozen and not offset any chargebacks.
[37] Jacem provided copies of the checks to the Receiver.  Quickbooks records for the Receivership Defendants showed payments to Jacem only from Agoa Holdings and AMD Financial.
[38] The amount of accrued but unpaid rent has been requested, several times, but not provided.

In addition to the legal existence of the corporation chartered in March 2015, "Chargeback Armor" was also the name used by Defendants for their software or electronic process in fighting consumer chargeback activities for the skin care sales.[39] Chargeback Armor's president stated the software and technical process used to refute a request for a chargeback was developed by Defendant Roi Reuveni, who, upon incorporation of Chargeback Armor as a separate entity, contracted with Chargeback Armor, Inc., to "consult" with the entity and essentially license his process for use by the new entity. Emails from Costache to potential clients refer to Nottea as a "partner",[40] and Igor Latsanovski testified he declined *Alon's* invitation to invest in Chargeback Armor.[41]

The entity Chargeback Armor, Inc. was incorporated in March 2015 by Mike Costache. Its' bank account was frozen because Defendant Doron Nottea was a signatory on the account and identified in the bank's profile as an account owner.[42] Mr. Costache demanded that the freeze placed on Chargeback Armor Inc.'s bank account be lifted immediately. When told that the freeze could not be lifted on the account because Doran was a signatory, Costache began a campaign of harassment to achieve his goal and directed BA to remove Doron Nottea from the account, a blatant violation of the Order.

---

[39] Igor Latsanovski testified that Chargeback Armor "was Alon's company." Appendix **Exhibit 14**. Likewise, Stephan Bauer described Chargeback Armor as a software program Doron and Alon Nottea had built to manage the chargeback ratios, which they decided to sell together with its related services, to third parties.

[40] Appendix **Exhibit 15**.

[41] *See*, Appendix **Exhibit 14**.

[42] Since the freeze is in place because the account is accessible to Doron, the account is subject to the FTC's control rather than the Receiver's.

Chargeback Armor, Inc. also argued that none of its activities fell within the scope of the Enjoined Conduct, and argued its assets were derived solely from its unrelated business activities. The Receiver reviewed Chargeback Armor Inc.'s client contracts, and reached the same conclusion with respect to the nature of Chargeback Armor's business operations.[43] The source of its assets, however, demonstrated the freeze on Chargeback Armor's assets was proper.

As start-up capital, Chargeback Armor received a capital contribution or loan from Secured Merchants.[44]  Secured Merchants in turn contracts with Chargeback Armor and according to Costache, provides hosting and web-based support, and also contracts directly with an entity in India, SJS IT Server Solutions Private Ltd., whose employees input data from documents into Chargeback Armor's software, which in turn is then used to respond to consumer requests for chargebacks. Roi Reuveni is Chargeback Armor's COO.

### ii.        Secured Merchants

Secured Merchants also appears to have facilitated the operations of the Receivership Defendants. It operates from the office area closest to the entry door at Canby, although it has no sublease or similar agreement with Secured Commerce, the

---

[43] Based on information received from the Nottea Defendants and a Declaration provided by Chargeback Armor's President regarding ownership and the lack of use of certain items in operating the Receivership Defendants, the Receiver nonetheless released possession of a fax server and a few personal items to Chargeback Armor's President. Appendix **Exhibit 16**.

[44] Appendix **Exhibit 17**.  Secured Merchants is facially owned by Alan Argaman, but Doron Nottea is a signatory on its bank accounts.

lessee.[45] Secured Merchants received more than $300K from SBM Management, Inc., which in turn received millions from entities owned, controlled or operated by the Defendants and which sell or market products via "free trial" offers on line.[46] Until approximately January 2015, Secured Merchants provided the Bunzai Group of Companies, through SMB Management, Chargeback resolution services and "IVR" (call routing for customer complaints).[47]  Thus, based on its receipt of income from the skin care sales, as well as its facilitation of the Enjoined Conduct, Secured Merchants falls within the Order's definition of a "Receivership Defendant."

### 4.    Service on Persons in Active Concert with the Defendants

### i.    David Davidian- the CPA for More than Thirty Entities

The Receiver's attorneys also visited the office of David Davidian, the CPA who prepared the tax returns for most Receivership Defendants and multiple other entities operated by the Defendants. Davidian is also the registered agent for several of the Receivership Defendants and his address, 200 N. Maryland Ave., Ste. 300, Glendale, CA, is referenced below as "the CPA Office."  Davidian's staff informed the Receiver's team that he was on vacation.

A Subpoena Duces Tecum for a deposition scheduled after Davidian returned from vacation was served and to avoid the deposition, Davidian began producing tax returns

---

[45] Argaman is an owner of both Secured Merchants and Secured Commerce, and signed and personally guaranteed the 105 Canby lease, but on behalf of Secured Commerce, not Secured Merchants.
[46] *See,* Brandlin Report, Appendix **Exhibit 2**.
[47] See Secured Merchants' invoices to SBM, Appendix **Exhibit 18**.

and related records for the Defendant entities and their affiliates. Davidian also provided invaluable information regarding the email accounts used by the Individual Defendants when they communicated with him on behalf of each of the entities, and information related to which entities were dissolved.

In all, Davidian provides or provided tax services for at least 29 entities owned or controlled by Defendants, although most of those entities have been structured so as to create an illusion of independence from the Individual Defendants.  Davidian reports 2014 tax returns have not been filed for Focus Media Solutions, AMD Financial Network, Kai Media, Secured Merchants, Shalita Holdings, Insight Media Solutions and CalEnergy, with extensions filed for each.  Davidian also provides payroll services for those entities with employees and indicated that payroll reporting and tax obligations are or will also be due.[48]

### ii. Stephan Bauer- the Legal Owner of SBM Management Whose Signature was Frequently Forged

Stephan Bauer is the registered agent for SBM Management, Inc., and is listed on various filings with the California Secretary of State and tax filings as the only officer, owner, or director of SBM Management. Bauer was also identified as a signatory for dozens of bank accounts owned by various Receivership Defendants.  In a telephone interview, Bauer provided extensive information about the skin care businesses, the

---

[48] The forensic accountants retained by the Receiver do not provide tax preparation services and because Davidian is already familiar with these entities and their tax obligations, if the Receiver's obligations continue with respect to the entities, she will likely engage Davidian to prepare the returns for these entities.

Receivership Defendants and the Individual Defendants.  Most importantly, however, as discussed below in Section V.A.5., Bauer claimed his signature used to open many bank accounts for SBM was forged.  Bauer provided an exemplar to the Receiver of a signature he had provided to bank in February 2015.[49]

Bauer first began working with Alon and Doron in approximately late 2009 or early 2010 when he helped Alon locate a lab and manufacturing facility for skincare products.[50]  Bauer claimed he was paid $2,200/month as commission for this service.[51] Alon and Doron told Bauer the skincare business was not profitable and stopped paying him, but Bauer believed Alon then began using a new manufacturer at that point.[52]

Doron advised Bauer that despite the cessation of sales by SBM, he needed to keep the corporate entity active to deal with corporate issues which were incomprehensible to Bauer. Although Bauer recalls accompanying Doron or Alon to WF to sign wire transfers out of SBM Management's accounts connected to chargeback issues, those activities are the extent of Bauer's claimed involvement with SBM's affairs following approximately the fall of 2013.[53]

---

[49] *See,* Bauer Declaration, Appendix **Exhibits 19 and 20**.

[50] He also claims to have assisted in locating William Rothbard as legal counsel regarding the "proper" and legal way to run "free trial" and the return policy language for the on-line sales.

[51] Accounting records showing payments to Bauer support his contention.

[52] Invoices and interviews with the owner of Jacem Healthy Products confirm Jacem began manufacturing AuraVie and LeOr products in approximately December 2013. *See,* Appendix **Exhibit 21**.

[53] SBM was sued in September 2014 for failing to pay for lead generation related to AuraVie, provided to SBM between July and September of 2014. A Notice of Stay was filed in the lawsuit, *Lifescript, Inc. v. SBM, Management, Inc.,* Cause No. EC062856, pending in the Superior Court of California, Los Angeles County.  Bauer communicated with SBM's lawyer regarding that matter, but the lawyer informed the Receiver that Alon Nottea was his primary contact regarding strategy matters.

As further discussed below, SBM is extremely active and since January 2014, has received not less than $2.3 million from the Receivership Defendants and affiliated companies. It has also received more than $700,000 from outside sources, such as Lions Bay Media, MoBooka, etc.  Of those receipts, only $23,000[54] was transferred to Stephan Bauer, with the balance going to other Receivership Entities and affiliated companies, or untraceable checks payable to banks.[55]  In sum, SBM is a clearinghouse used by the Individual Defendants to disburse income received by the Receivership Defendants and related entities, to themselves and other related entities, but Bauer's legal ownership is used as a shield.

### 5.     Service on the Individual Defendants and Summary of the Role Each Played

#### i.     The "Nottea Defendants"

Doron Nottea was the only Individual Defendant present during initial access and he was immediately served with a copy of the Order. Despite Doron's refusal to provide the requested information, email addresses for each Individual Defendant were located by approximately midnight on June 18th and copies of the Order were emailed to all Individual Defendants with requests for cooperation and information.  Additionally, on June 19th deposition notices, with copies of the Order enclosed were sent by FedEx or email to all Individual Defendants except Oz Mizrahi, who is discussed separately below.

---

[54] As reflected in Quickbooks records maintained by Defendants.
[55] Exhibit 13 to Brandlin Report, and Appendix **Exhibit 13**.

Extensive requests for information, including business email accounts and passwords, bank account information, etc., were also emailed to all Individual Defendants. In an effort to reduce the costs of the investigation, the depositions were cancelled once Doron, Alon, Motti and Roi (collectively the "Nottea Defendants"), obtained counsel who promised to provide the requested information. Likewise, the deposition of Igor Latsanovski was rescheduled after his counsel began providing information to the Receiver.

### a.    Alon Nottea- the Defendant with Day-to-Day Control

Alon's control over the Receivership Defendants and the many additional entities operated from the Canby Offices was established by:

- testimony of Mr. Latsanovski;[56]
- information provided by the Focus Media employees;
- Mr. Bauer;
- other individuals who were interviewed;[57]
- Alon's control over and access to Focus Media's funds despite his not being a signatory on Focus Media's bank accounts; and,
- Alon's admissions in responses to written questions from the Receiver.

Although the legal ownership and organization of virtually every Receivership Defendant and affiliated entity was structured so that no Individual Defendant had any "legal control" or "ownership" of most Receivership Defendants or their bank accounts,

---

[56] Mr. Latsanovski testified at his deposition that all companies in the "Bunzai Group" were controlled by Alon. Alon Nottea was also identified in certain corporate filings and other records as the CEO of Bunzai Media.   Appendix **Exhibit 22**.

[57] The Receiver's team spoke to Nancy Yalley, a former employee, David Davidian, the CPA for all entities, and counsel for Erin Link.  Phillip Camerino and David Yosifain (the purported CEO of Focus Media and Kai Media) refused to answer their respective phones, or respond to emails or letters sent by the Receiver. Likewise, Sean Brennecke, the purported

the Individual Defendants' *actual* control was undeniable.   For instance, although bank accounts and merchant accounts owned by numerous entities which were not named as defendants were frozen based on the Receiver's identification of those entities as "Receivership Defendants," *none of the owners listed on those entities' bank accounts contacted the Receiver to request that the accounts be unfrozen.* Accounts for all those entities, however, were monitored from Canby with QuickBooks accounts for most managed in the large Mac computer at 105 Canby, and many shared the same password.

Further, information received from Alon regarding consent obtained from the individuals whose names were on some of the merchant accounts sharply contrasted with information received from Doron about the same issue.  Alon asserted he had consent to sign certain third-parties' names on the merchant account documents, including the account in his mother's name "Rachel Nottea".[58]  Doron on the other hand admitted, "Alon Nottea used her [Rachel's] name to guarantee a merchant account, but that was done without Rachel Nottea's knowledge or consent."[59]  The Receiver has been unable to contact most of the other individuals whose names are on the merchant accounts, except Eran Link who confirms his name was forged on any new merchant accounts opened for Shalita, as well as bank account opening documents for Shalita.

---

CEO of All-Star Beauty Products, Inc., Annsofie Algarp, the purported CEO of AMD Financial Network and other entities, similarly failed to respond to the Receiver's inquiries.

[58] *See* Appendix **Exhibit 23, pp. 4-5** for Alon's explanation regarding third-party signatures on merchant accounts.

[59] Summaries found in Defendants' computers identify Rachel Nottea as the owner of a merchant account used to sell skin cream owned by DMA Media Holdings. Appendix **Exhibit 24**.  *See,* Appendix **Exhibit 25, p. 3** for Doron's explanation about the use of Rachel's name.

Alon also used a fictitious name, Jay Michaels, to register at least 65 domain names related to sale of the AuraVie, LeOR and Dellure skin care products. The same fictitious name was used on a corporate registration document filed with the California Secretary of State, on which Jay Michaels was identified as an officer of USM Products, Inc., a corporation to which Alon transferred the Focus Media Solutions funds that he later returned.

### b.    Doron Nottea- the "Bookkeeper"

Doron Nottea provided accounting support for the various Receivership Defendants and numerous other entities.   For instance, Mr. Latsanovski testified that Doron provided bookkeeping assistance to CalEnergy and Mr. Latsanovski personally – without receiving any compensation. The first assertion, that Doron was the bookkeeper, was easily verified. The second assertion, that the services were provided without compensation - was not credible despite a marked lack of income flowing from any entity to Doron *directly.*

Doron is not on the payroll for any of the Receivership Defendants, does not report having a "personal consulting LLC" used as a buffer for his income, and except for Secured Commerce, LLC, is only listed as an officer for the adult products/porn businesses. When asked how he was compensated for his role in operating the Bunzai Group of Companies, he admitted he was paid "indirectly," i.e. off the books so the income was not reported: "[s]ome money was paid to my credit cards on my behalf, some

was paid for my for rent, utilities and other bills…"  Doron managed a vast array of accounts and credit cards, although apparently not always without error. At least in one check, the "wrong signature" stamp was used on an SBM check in his control.[60]

The Receiver discovered that after he was served with the Order, Doron tried to access a safe deposit box, telling the bank officer that he had lost his key.  The Receiver, however, had seized the key to the safe deposit box and asked Doron to identify the box location before he left the Canby location.  Doron consented to the Receiver's attorney inventorying the safe deposit box, which held $456,000 in cash.  Doron claims the cash is the proceeds of the sale of furniture for cash from a prior residence, and funds his wife received in connection with an inheritance.

### c.   Motti Nottea- A "Paper" Participant Who Received Funds

Motti Nottea is Alon and Doron Nottea's father and is married to Rachel.  No evidence connects Motti to any control or operational supervision of any of the Receivership Defendants, but he nonetheless indicated he was an employee of CalEnergy and DMA Media Holdings.[61] In connection with those two entities, both of which received income directly from the sale of skin care products on-line, Motti reports having

---

[60] Appendix **Exhibit 26**.

[61] Defendants describe DMA Media Holdings as a retail merchant for skincare products, which was dissolved in December 2014.  Motti is also the sole owner of "Symbiotic Capital Group" a company he claims "never did anything," but which he also reports having paid him $10,000 in 2014.  Doron Nottea admitted he paid his father the $10,000 out of one of his porn business accounts, to help with personal bills. Appendix **Exhibit 25**.

received a total of $76,500. Using Defendants' Quickbooks records, the Receiver's accountants traced only $16,800 to Motti through these entities.[62]

### d. Roi Reuveni- Supervisor of the AuraVie Call Center and IT Functions

Reuveni is a cousin of Alon and Doron Nottea and managed the call center for AuraVie products,[63] which was owned and operated by Pinnacle Logistics. Reuveni was also President for DMA Media Holdings and an officer or director for Agoa Holdings, Inc., both of which were identified by defendants as retail merchant corporations for skin care products. Reuveni, like Alon has a "personal consulting entity", Trigen, LLC, through which he receives and disburses his income.[64]

As noted above, beginning in approximately March 2015, Reuveni also contracted with Chargeback Armor to provide his technical expertise regarding a process and software used to respond to consumer chargeback demands created either by Reuveni or Alon or Doron. Reuveni is Chargeback's COO. Trigen and Reuveni receive income from Chargeback Armor.

---

[62] The discrepancy between the amount Motti reported and Defendants' Quickbooks records highlights the inconsistency of the information available to the accountants.

[63] Oz Mizrahi held the title of CEO for Pinnacle, and was purportedly the signatory on its bank accounts, but reports having been present at the call center location only about two days/month.   The Receiver found Mr. Mizrahi to be credible, based on his willingness to provide information and the information that he provided.

[64] See, Appendix **Exhibit 25**. The original corporate filings for Trigen reflect Stephen Bauer as the Manager. Appendix **Exhibit 28**. More recent filings list only Reuveni.  Bauer disclaims any connection to, management of, or involvement with Trigen. Bauer is likewise listed as the signatory on Trigen's BA accounts, but again, reports that his signature on those bank documents was forged. See, Bauer Declaration, Appendix **Exhibit 20 ¶ 2**.

As reflected in check stubs found in defendants' offices, Reuveni individually was also paid by CalEnergy.[65]  He did not disclose those payments or any affiliation with CalEnergy, however, on his sworn financial statement. In total, between January 1, 2014 and June 30, 2015 Reuveni received $100,000 from CalEnergy (filtered first through Agoa Holdings - $75,000, and DMA Holdings - $25,000).[66] Reuveni also reported income of $96,396 from Trigen, and $150,913 from Agoa.[67] The funds from Agoa were direct receipts for skin care product sales; the income from Trigen was indirect income from the same and from Chargeback Armor.[68]

### ii.       Oz Mizrahi- the Legal Owner of Pinnacle Logistics, Which Operated the Call Center

The Receiver's counsel interviewed Mr. Mizrahi over the telephone.  Mr. Mizrahi reported meeting Alon Nottea in approximately 2010, through social channels while his primary occupation and source of income was (and still is) construction contracting. Mr. Mizrahi was experiencing financial difficulties because the economy was poor, and Alon asked Mizrahi to work part-time for Pinnacle Logistics.  Mizrahi was paid $1,200 every two weeks but for only about ten months.

Mizrahi admitted to knowing he was nominally designated as an officer of Pinnacle Logistics, Inc. but claimed "I didn't do nothing out there" and that "Alon was

---

[65] Appendix **Exhibit 29**.
[66] Reuveni also failed to provide access credentials to one of his personal bank accounts, despite multiple requests.
[67] Defendants' Quickbook records show only $4,000 paid to Reuveni through these entities during the period 1/14-6/15.  Agoa Holdings was a retail merchant for the skin care products, and Reuveni was an officer of both.
[68] *See* Appendix **Exhibit 1**, and Exhibit 1 to the Brandlin Report.

running the show." He also reported Roi Reuveni was managing the call center and Paul Medina also managed various aspects of the call center. Mizrahi had no prior experience in customer service or running a call center and received no training. He said he was at the office no more than two times per month as he was out bidding and doing construction jobs.[69]

Mizrahi admitted to knowledge of call scripts for responding to customer complaints about the skin care products,[70] but was not familiar with what the scripts said and had not personally used the scripts. He did not answer the phone at the call center and never spoke with any consumers. He also reported never having signed any tax documents for Pinnacle, although he did sign blank checks for Pinnacle. Mizrahi stated he remains friends with Alon, and after speaking with Alon about the basis for the FTC's allegations, was informed by Alon that the case arose from disgruntled former employees.

### iii.      Kristopher Bond- An Original Partner Frozen Out in Spring 2013

In an interview, Bond confirmed he started the Bunzai Media Group with Alon Nottea, to sell skin care products. Bond claims he solicited an investment from Latsanovski, whom he had met as an investor in a male enhancement company with which Bond was associated. Bond reported that Latsanovski originally invested $250,000

---

[69] Pinnacle's tax returns show the following income for Mizrahi: 2012 - $18,000; 2013 - $1,385; and, 2014, $0.

[70] One example of such a call script and the voice logix flow chart for routing customer calls is included in the Appendix as **Exhibit 30**.

in Bunzai, and because the investment was risky, Alon agreed to make Latsanovski a one third partner until he was repaid.  Bond reports that Latsanovski wanted to work for Bunzai, but Bond objected. As the company grew, Bond reported Latsanovski would loan money to purchase products and in return, receive a percentage of the sale of the skin care products.[71] Alon hired Doron to handle all bookkeeping.

According to Bond, sales took off immediately and within two weeks of starting operations, they were receiving 100 orders per day.  Despite the high sales, Bond reported the companies were not profitable because of a high chargeback rate, coupled with the costs of the customer leads purchased. Bond reported and other Defendants confirmed that some of Bunzai's merchant processor accounts were frozen by the merchants because of the high chargeback rates.[72]

Bond reported his last day working with Bunzai Media and the Nottea Defendants was in December 2012, because of health issues. In March 2013, Bond claimed Alon informed him he was "voted out" of the business.  Bond stated that Alon informed Bond that Alon did not want to continue the business without Bond, and Bond believed the business then "died" shortly thereafter.

During the same approximate time period, Bond, Alon Nottea, Bunzai Media Group, Pinnacle Logistics, and iPoint Vision were sued for sexual harassment in

---

[71] The various partnership agreements between Bond, Alon and Latsanovski reflect varying percentages of ownership for each of the three partners.  *See,* Docket No. 93-1.
[72] The Receiver's accountants determined Defendants' chargeback rates ranged between 14%-35/%  The industry standard for acceptable rates is 1%

connection with another company Bond owned.   The lawsuit involved allegations regarding Bond's improper conduct, and was settled with all defendants agreeing to pay a total of $90,000.[73]   After Bond was no longer part of the partnership and as further discussed below, sales continued with Latsanovski's on-going financial contributions.

### iv.   Igor Latsanovski- the Partner Who Provided Financing and Advice

On July 2, 2015, the Receiver deposed Mr. Latsanovski.  Contrary to Latsanovski's deposition testimony that he was solely an investor with no knowledge of the chargeback issues or manner of sales, documents discovered after the deposition demonstrate Latsanovski received frequent reports about the chargeback rates related to skin care product sales by email, and provided his opinion to Alon about how the entities should operate.[74] Further, Latsanovski personally directed at least one transfer out of SBM Management's bank accounts.[75]

Mr. Latsanovski is the sole owner of CalEnergy, Inc., and at his deposition did not deny receiving funds from Receivership Defendants engaged in the sale or marketing of skin care products through CalEnergy. Instead, he denied express knowledge of any wrongdoing and denied any participation in the Receivership Defendants' operation.

---

[73]The settlement payments have not been paid since entry of the Order, and counsel for the plaintiffs' reports approximately $15,000 remains due.

[74] *See*, Appendix **Exhibit 31** (regarding Chargeback summaries emailed to Latsanovski) and **Exhibit 32** regarding additional information emailed to Latsanovski and his request for how he could help with operations; and **Exhibit 33** regarding Latsanovski's opinion about how the business should operate.

[75] Appendix **Exhibit 34**.

Later discovery of additional documents proved Latsanovski's testimony about his involvement and knowledge was false.

Latsanovski testified that each of the Bunzai Group of Companies[76] was controlled by Alon Nottea, with accounting support provided by Doron Nottea.  At the time of the deposition, the Receiver did not have possession or knowledge of a group of partnership agreements between Alon Nottea, Kristopher Bond and Latsanovski which governed the start-up and operation of Bunzai Media Group and eventually, its affiliated entities.  The partnership agreements belie Latsanovski's characterization of his interest as solely an investor, as do subsequent communications discussed below.

Pursuant to requests for the business records of the Receivership Defendants, Alon Nottea provided a September 27, 2013 letter from his counsel to two outside lawyers which proposed the dissolution of a partnership (the Letter).[77] The Letter outlines a proposal to wind up the business of the already dissolved Bunzai Media Group partnership, and includes the following provisions:

1)   The "fulfillment operation" Pinnacle Logistics, Inc. will pay the Partnership the fair value of its current assets and assume its own liabilities;
2)   The "media operation," Media Urge, Inc., would be dissolved since it had no assets;
3)   The "retail merchant corporations under management by SBM Management, Inc…. will stop marketing and selling the "AuraVie" brand product line, but

---

[76] During the deposition, the "Bunzai Group of Companies" was defined to include all companies Alon used for "running his business".  Latsanovski admitted he specifically recognized Agoa Holdings, All-Star Beauty Products, Lifestyle Media Brands, Pinnacle Logistics, SBM Mgmt, and Zen as having been involved in the sale of the skin care products. Appendix **Exhibit 22**.

[77] A true and correct copy of the letter is included in the Appendix as **Exhibit 35**.  The Receiver did not have possession of the Letter at the time of Latsanovski's deposition.

will continue to process automatic monthly reorders… the RMCs have no assets other than merchant accounts reserves and will be dissolved;[78]

4)  After all assets were collected and liquidated, the Partnership would fund a three year contingent liability reserve, and distribute any remaining amounts to the partners;

5)  Merchant Account Reserves of $1M would be retained, with the balance of such funds distributed equally to the partners, and allowing for an advance to Bond.

At his deposition, Mr. Latsanovski distinguished between his role "on paper," i.e., the legal fiction he assisted in creating, from what he contended was the reality of his involvement. For instance, certain documents identify Latsanovski as an employee and officer for Bunzai,[79] although he denied any day-to-day involvement with either entity or any of the other Receivership Defendants.

Further, Latsanovski admitted knowing the entities were selling skin care and "cosmetics" online, and knew the source of the funds he received indirectly through CalEnergy were derived from the operation of entities created and controlled by Alon Nottea.[80] Latsanovski also left blank, signed checks on CalEnergy's account with Doron Nottea at the Canby office.[81]

Bank records reflect transfers of funds received from the sale or marketing of skin care products to Latsanovski through CalEnergy. CalEnergy also received transfers directly from Zen Mobile Media, a corporation dissolved in 2014, which Latsanovski

---

[78] The Retail Merchant entities did not stop selling AuraVie, however.  As discussed below, those entities continued selling AuraVie, as well as LeOR and Dellure products. Indeed, after September 27, 2013, payments to Latsanovski from the Receivership Defendants increased.

[79] *See,* Koonce Declaration, Docket No. 92, Exhibits 8-14.

[80] Excerpts from Latsanovski deposition transcript, Appendix **Exhibit 22**.

[81] *See,* Appendix **Exhibit 36**.

testified was "Alon's company." Latsanovski was fully aware of his role "on paper" for Zen, however. He was identified in in corporate filings as the CEO, CFO, Director and Secretary of Zen Mobile Media, Inc. and he signed blank checks on Zen's account which were left in Doron Nottea's possession.  Many of these checks were written for large, round amounts, such as $10,000, $5,000, etc., and paid to banks such as WF or BA.  He testified he had no knowledge of who presented those checks for payment or what happened to the cash received in exchange for those checks.[82] Further, Zen paid Latsanovski's American Express bills – a total of $164,757, including payments long after Zen was dissolved.

In a December 23, 2013 merchant bank application provided to MidPayments, Daniale Perry was identified as the CEO of Zen, and the address listed for Ms. Perry was Mr. Latsinovski's home address. The account application lists the product to be sold as "face creams".[83]  In a telephone conversation with the Receiver's counsel, Ms. Perry reported having no knowledge of Zen or its operations, and not having given anyone permission to use her name or social security number on the application and did not sign it.  She also denies having signed the application.  Latsinovski similarly testified that he had no knowledge of Ms. Perry and denied that she lived at his residence. The application thus presents another likely example of bank fraud.  *Id.*

---

[82] Appendix **Exhibit 36**.
[83] Appendix **Exhibit 37**, which includes Latsanovski's testimony about the forgery.

Latsanovski was a net *borrower* from the Receivership Defendants until approximately October 2013.[84] Nonetheless, available (but incomplete) bank records demonstrate total transfers by CalEnergy, which Latsanovski termed loans, to the Receivership Defendants, of not less than $950,000.[85]   The constant inflow of money from CalEnergy was repaid first by Bunzai and later by SBM Management, as well as the numerous retail merchant companies. After CalEnergy received a full return on the funds transferred to the Receivership Defendants (a net gain of $317,746 according to Latsanovski) on June 16, 2015, he wrote a check for nearly the same amount, $325,000 to Focus Media Solutions.[86]

## C.    Requests for Information to Defendants, and Other Efforts to Implement the Terms of the Order

In addition to reviewing the information available in the Defendants' offices and computers, the Receiver began requesting information, on a rolling basis, from all Individual Defendants.[87] These requests included for instance, those items required by the TRO, such as a *complete* as a list of all entities through which the Individual Defendants

---

[84] Notably, the date when the Receivership Defendants became indebted to Latsanovski correlates approximately with the date on which the "partnership" was dissolved as discussed above. The "net borrower" status might be explained if Bunzai through CalEnergy was initially paying Skincare OU – an Estonia company controlled by the same gentlemen who is CEO of Igor's 100% owned company Guayas, for the AuraVie products. *See*, Appendix **Exhibit 38** for the Bunzai/Skincare OU contract.  Bank records necessary to confirm this possibility have not yet been produced.

[85] Gaps exist between the financial information available in CalEnergy's bank accounts, its QuickBooks account, and the records for the Receivership Defendants which transferred the funds to CalEnergy and Latsanovski.  Latsonovski admits CalEnergy received at least $1.3 (gross).

[86] Appendix **Exhibit 39**. Upon demand, Alon Nottea returned those funds to Focus Media's and Kai Media's accounts, and the proceeds of both accounts were then transferred to the receivership estate's bank account.

[87] The process was time consuming, particularly with respect to Doron & Motti who have engaged four different lawyers since entry of the Order. Each of those lawyers asked for extensions to provide the information required by the Order and requested by the Receiver, and each of the last three has asked the Receiver to resend multiple prior unanswered requests.

conducted business and all entities affiliated with the Receivership Defendants; identification of the owners and officers for all such entities and identification of all bank accounts associated with each; a statement regarding whether each entity was involved in the Enjoined Conduct; a list of all affiliates and employees; identification of all email accounts and credentials necessary to access those accounts; identification of the person who deleted information and documents from the email account the Receiver now knows to be Doron Nottea's email account; identification of all bank accounts and credit cards, and credentials necessary to obtain on-line access to those accounts; and, confirmation that the Defendants had served the Order on all employees, affiliates, and agents. Each Individual Defendant responded to these requests with varying speeds and degrees of cooperation.

### 1. Defendants Failed to Provide Information or Provided False Information about the Entities, Email Accounts, and Assets

The Receiver has been forced to file numerous motions intended to obtain the Nottea Defendants' compliance with the Order. Although all Nottea Defendants' counsel professed an intention to cooperate, the information provided by those Defendants in response to the Receiver's requests was frequently incomplete, evasive, and in some instances blatantly false.

First, despite obvious occupation and use of some of the offices at 105 Canby by Doron and Alon – family photographs were on display there - Defendants initially

---

One attorney filed a Motion to Vacate the Court's Order to appear and show cause contending – inaccurately – that all

claimed they did not occupy those offices and had no access to the computer passwords and user names.[88]   Further, although the Defendants were asked to provide a comprehensive list of every entity with which they were affiliated and explain the nature of the business conducted by each, many entities were omitted which required numerous rounds of "follow-up" questions at the same time the Receiver's independent (and expensive) investigation was underway. And, Defendants simply lied about some entities. For example, Defendants described Daria Media, Inc. as "Established as Management Company for E-Cigarette and Nicotine product lines. Never had a merchant account. No relation to skin care."[89]   Daria, however, was an affiliate marketer for skin care products, like Stemlogica discussed below. Above All Offers reported paying Daria Media $1,021,823[90] during the period between November 18, 2012 and August 16, 2014. Above All Offers did not identify <u>any</u> nicotine products marketed by Daria—<u>only</u> skin care products.[91]

Similarly, a week after the Receiver passed the hearing on the Show Cause Motion regarding identification of email accounts, and after Defendants had been asked

---

requested information had been provided. *See,* Docket No. 60.

[88] Appendix **Exhibit 40**.

[89] *See* Appendix **Exhibit 27**, **p. 10** (a document provided by Alon pursuant to a "dropbox" production rather than by email.

[90] Defendants' Quickbooks records did not show *any* payment from Above All Offers to Daria.

[91] Likewise, Defendants were asked to confirm whether Dellure was ever sold pursuant to free-trials. Defendants initially claimed Dellure was intended to be sold "in a new direction [not risk free trial]." Defendants later admitted Dellure was sold as either a straight buy or pursuant to a trial. Documents received from Clickbooth.com (another affiliate marketer for "click per action" sales and marketing) confirmed Dellure, like AuraVie, were sold on a free trial basis. Appendix **Exhibit 41**.

repeatedly to identify all email accounts used to conduct any business operations, the Receiver's IT consultant located four new email accounts.

Given the discovery of the bank fraud regarding Bauer and others' signatures, the deletion of emails in the email account controlled by Doron and used to email information to Alon during the pendency of the case, evasive and contumacious designation of entity email accounts as personal and failure to identify the primary email accounts used by the entities, false or evasive information provided in response to emailed requests, the Receiver chose to discontinue efforts to interview or depose the Nottea Defendants, and instead sought information regarding their operation of the Receivership Defendants through third parties, their lawyers, and indirect sources.

> ### 2.     Defendants Provided False or Incomplete Information about Continuing Sales and Shipments

The Order prohibits Defendants from certain Enjoined Conduct.[92] Shortly after the Nottea Defendants engaged counsel, the Receiver asked for confirmation that all skin care product sales within the Enjoined Conduct had stopped. Defendants' counsel initially represented the skin care product sales had purportedly stopped many months before.[93] Nonetheless, the Receiver was contacted by a consumer (who found the Receiver's contact information based on the notice posted in connection with the websites discussed above) regarding shipment of AuraVie received in June 2015, and a

---

[92] Order, ¶¶ I- III.

credit card "enrollment charge" placed on their card on June 4, 2015 (the "first consumer").[94]  Likewise, another consumer reported a $97.99 charge to her credit card on June 15, 2015 and receipt of AuraVie products on or about the same date ("the second consumer"). She reported having attempted for many months to cancel the "subscription" without success.[95]

Again, information was requested from Defendants about which merchant was processing these charges and from whom the products were shipped. Defendants identified "Insight Media, Inc." as the only entity whose merchant account at UMS continued processing "refill" orders, using the descriptor "FACECREAM 8662075676." The descriptor for the Second Consumer does not match the information provided by Defendants and although the descriptor matches the charges for the First Consumer, the merchant account identified also matches Defendants' summary for an account owned by Safehaven Ventures not Insight Media.  Because all merchant accounts (at least those discovered to date) have been closed, the Receiver believes the charges have stopped.

### D.    Investigation of Affiliate Marketing

---

[93] At the time of that initial communication, all Notteas, Roi Reuveni and Adageo were all represented by the same lawyer.  When asked to identify the merchant from which June sales were reported by consumers, counsel clarified that fulfilment of continuity orders was continuing.

[94] The merchant information on that consumers' credit card traced back to a merchant account owned by Safehaven Ventures, Inc. at UMS Bank.  Compare, Appendix **Exhibit 13** for Safehaven merchant account and Appendix **Exhibit 42**, although the descriptor also matched information provided by Defendants for a merchant account owned by Insight Media**.**

[95] The second consumer's charges were processed using a merchant descriptor of "AuraVie SKU- AUR-9788-30M," which has not yet been linked to a specific merchant entity selling AuraVie.

The Receiver also discovered Focus Media Solutions was engaged in marketing skin care and other products on line through negative options.[96]  Indeed, the Receiver discovered through bank records and documents received from affiliate marketing companies, that Focus Media was utilizing various "blogs" or landing pages which looked very similar to the AuraVie pages, to promote skin care products sold by non-party merchants.

The Receiver had an associate attempt to purchase products from the websites through which Focus Media received income based on its marketing.  The associate viewed sites for products such as "Stemlogica" a skin care product manufactured or sold by "Du Mondi, Ltd.," for which Focus Media contracted with Above All Offers to provide affiliate marketing. Those websites offered virtually identical terms and conditions to the AuraVie products, i.e., enrollment in a continuity program absent cancellation if a product was not returned within a certain time period following a "free trial" offer.[97]

One order for "Stemlogica" face cream products was placed, with the terms promising a risk free trial, requiring only a $5.95 payment for shipping, with "enrollment" at $149.99 commencing within ten days absent "cancellation."[98]   The

---

[96] Screen shots tracking sales "campaigns" for products Focus Media marketed, which were taken from one of the computers in Suite 105 are included in Appendix **Exhibit 43**.

[97] *See*, Appendix **Exhibit 43** and **Exhibit 44**.

[98] Screen shots evidencing the purchase information are included in the Appendix as **Exhibit 45**.  Bunzai Media, SBM Management, and Daria Media, Inc. all marketed <u>**skin care**</u> products through Above All Offers. Appendix **Exhibit 46**. Similarly these and possibly additional entities also performed affiliate marketing for similar online "click per action" entities like Mobooka, Phresh Clicks, and Clickbooth. *See,* Appendix **Exhibit 1**.

product was received, the associate who made the purchase called and cancelled the order (after a lengthy effort by the sales person to convince the associate to remain in the program), and the product was immediately returned.  Subsequently, however, on July 22, 2015, $149.99 was charged on the same card with a reference to the merchant, "Dermacella."[99] According to the credit card company on which the charge was applied, the merchant account which placed the charge was in Great Britain. Based on the proximity between the "free trial offer", the amount of the charge, and the free trial of Stemlogica premised on the negative continuity option, two conclusions seem most likely: the Dermacella product was the negative option enrollment for Stemlogica; or, the merchant who received the credit card information for the free trial in Stemlogica sold or otherwise converted the credit card data to facilitate a fraudulent charge. In either case, Focus Media was marketing a negative continuity program for a product involved in fraudulent conduct.

### E.   Efforts to Limit Access to "Free Trial" Sales Websites

By obtaining information from Go-Daddy, the Receiver was able to temporarily disable most "free trial" offers available on "AuraVie.com", "myAuraVie.com", and "miraclefacekit.com" by "repointing" those pages to a notice regarding the Order and the receivership proceedings.[100] More than 65 additional websites or "landing pages" which offered sales by means of the enjoined conduct were also located, all registered with Go-

---

[99] The charge was disputed, and the cred card was cancelled.  Information on Dermacella's website suggests the company operates from Prague. Appendix **Exhibit 47**. Focus Media's CEO denied knowledge of such a product or company.

Daddy, and all hosted on the same IP address which route to Defendants and their control.[101] Notably, all such pages were registered to "Jay Michaels'" and Alon admitted he used that fictitious name to register the websites.

Eventually, Defendants provided the credentials to disable or repoint those websites, but not until after the Receiver expended significant time and resources in obtaining the same information from Go Daddy or other hosts.[102]

### F. Evaluation of "New Entities" Discovered Through Defendants' Business and Financial Records

As noted in the introduction, Defendants contend four new entities (discovered through analysis of the banking records[103] but not otherwise identified by Defendants until the Receiver asked specifically about those entities) provide services as "Online Help Desk and IT Solution Providers." These entities are Eccentric Innovations, Inc., Dynamic Media, Inc., Intensive Media, Inc., and Optimized Media Services, Inc. Impulse Media Group appears to operate as a manager or supervisor of these entities- it receives funds from each and transfers funds to entities defendants have identified as vendors, including a call center in India operated by Telestar Solutions Private Limited[104]

---

[100] A copy of the notice posted on those pages is included in the Appendix as **Exhibit 48**.

[101] A list of those landing pages on which "free trial" offers are made, is included in Appendix **Exhibit 49**.

[102] An attempt was made on June 30, 2015 to purchase "Dellure" and "TrueVisage" using landing pages for those products. Although all credit card information was entered for each, an "error" message was received and the website provided a message that said the charge was not processed.

[103] A screen shot of the bank accounts tracked for these New Entities from one of the computers in Suite 105 is included in the Appendix as **Exhibit 50**.

[104] Defendant SBM Management also sent funds to Telestar Solutions Private Limited which Defendants identified as payment for call center and customer support services.

and Multi Tech Interactive Private Limited.  Stephan Bauer's or Eran Link's signatures on the documents used to open bank accounts for each are forged.[105]

The Receiver has not received any responses to inquiries made to the officers/owners for Dynamic (Tomer Amsalem), Intensive (Annsofie Algarp), or Eccentric (Dror Michaelo). Eran Link is the only officer identified in the corporate formation documents for Optimized Media Solutions, but has sworn under oath that his signature was forged and that he has no knowledge of the entity or its operations. Each of these individuals' names also appears in connection with ownership of a Receivership Defendant or its bank accounts,[106] and Alon Nottea reported each individual had "little or no knowledge of the day-to day operations of the skin care sales businesses." Further, Amsalem reportedly lives in Israel, yet his debit card issued on a Dynamic Media account was used for purchases of items like pizza, in southern California.  Similarly, Defendants identified Amsalem as the only officer for Dynamic and identified no employees for that entity.  The accounts for these entities are frozen, and *no owners contacted the Receiver to inquire about the basis for the freeze.* Each of the New Entities has only a post office box address, but each is controlled from Canby 105.

The Defendants' description of the nature of the New Entities' operations and the absence of any skin care proceeds flowing directly to any suggest the New Entities do not

---

[105] *See,* Appendix **Exhibits 51** and **52**.
[106] Algarp is an officer for AMD Financial Network, a retail merchant of the skin care products; Dror Michaelo is the owner of merchant accounts used by Impulse Media Group, (Defendants claim Impulse is engaged only in IT-help desk operations); and Amsalem is the only officer identified for Safehaven Ventures, a retail merchant for the skin care products.

fall within the Order's definition of a Receivership Defendant- at least not facially. Based on the fraud connected to their bank accounts, however, the accounting of their income managed from the Canby locations, and the demonstrated lack of interest by the legal owners, the New Entities are almost certainly controlled by the Nottea Defendants, and may also be engaged in some form of fraud. The Receiver lacks resources and information to reach a definitive conclusion, however, and because it is not clear that these entities qualify as "Receivership Defendants", no recommendation regarding their continued operation is included below.

## G.    Evaluation of Issues Related to Sunset Holdings

As part of her investigation the Receiver learned that Defendant CalEnergy, Inc. owns a 99% interest in Sunset Holdings Partners LLC ("Sunset Holdings"), and that Defendant Latsanovski is a signatory on the Sunset Holdings Account.  Sunset Holdings also received at least $4,601,000 from CalEnergy (which in turn received at least $1.3 million from the Enjoined Conduct.)  As such, the Receiver informed Defendant Latsanovski and his attorneys that Sunset Holdings, as an asset of Defendant CalEnergy, Inc. is subject to the Order.

### 1.    The Transfer of CalEnergy's Interest in Sunset Was Not Effective

Defendant Latsanovski claims a "Verbal Agreement" amended the Operating Agreement of Sunset Holdings and transferred CalEnergy's ownership interest in Sunset Holdings to a third party.  Sunset Holdings Partners LLC's Operating Agreement, dated

January 16, 2015 provides that Latsanovski is a 1% owner and CalEnergy is a 99% owner.[107] The handwritten "Verbal Agreement,"[108] however, is not a legal or binding document and does not divest CalEnergy of its interest.

First, the "Verbal Agreement" does not meet the definition of a contract, because it lacks consideration.  Cal.Civ.Code § 1550 (West) ("A sufficient cause or consideration" is an essential element of a contract.).  The Verbal Agreement recites no consideration to be paid to CalEnergy – from either Latsanovski or Peniche, and, it includes the parties' manifested intent to enter into a formal definitive agreement.  The last sentence of the Verbal Agreement, however, states that a formal agreement will be forthcoming, thus showing an intent that the agreement is not meant to be definitive.  Similarly, the Verbal Agreement lacks traditional conveyance language, as well as basic representations and warranties that typically would be included in a sale document.

Second, the management structure described in the Verbal Agreement would require an amendment to the Sunset Holding Partners LLC Operating Agreement.  And, it is not clear whether the Verbal Agreement was executed by CalEnergy, as there is no capacity listed for Latsanovski's signature on the Verbal Agreement.  Based on the provisions of the Sunset Holding LLC agreement, CalEnergy's bylaws, and basic contract principles, the amendment was invalid to transfer any of CalEnergy's interest in Sunset Holdings to the third-party. The Receiver will provide more formal briefing and

---

[107] Appendix **Exhibit 53**.
[108] Appendix **Exhibit 54**.

argument to the extent the Court requires additional information or briefing regarding this issue.

### 2. Evaluation and Release of Funds to Close the Sunset Holdings' Real Estate Deals

Prior to entry of the Order, Sunset Holdings entered into two contracts for the purchase of real estate that were scheduled to close escrow on June 30, 2015: (1) the purchase of a property located at 3777 Rosewood Avenue, Los Angeles, CA 90066 (the "Rosewood Property"); and (2) the purchase of a property located at 3783 Redwood Avenue, Los Angeles, CA 90066 (the "Redwood Property").

In addition, the Receiver learned that prior to entry of the Order, Sunset Holdings deposited $300,000 in Parkfield Escrow toward the purchase of the Rosewood Property for $1,007,000; and deposited $100,000 in LA Citiwide Escrow Marina toward the purchase of the Redwood Property for $1 million. Pursuant to the terms of the real estate contracts, if Sunset Holdings did not proceed with the closings scheduled on June 30, 2015, $400,000 in escrow would be forfeited to the sellers of the Redwood Property and the Rosewood Property.

To avoid forfeiture of the monies in escrow,[109] Latsanovski asked the Receiver to lift the freeze on the Sunset Holdings account at WF to allow the transfer of the funds required to close on the purchase of the two properties:  $707,000 required to be sent to Parkfield Escrow to close on the purchase of the Rosewood Property; and $900,000

required to be sent to LA Citiwide Escrow Marina to be used to close on the purchase of the Redwood Property.

After consultation with the attorneys for Latsanovski and the Federal Trade Commission, the Receiver agreed to lift the freeze on the Sunset Holdings account to allow the specific disbursement of funds to the two title companies. Accordingly, Defendants Latsanovski and CalEnergy, the Receiver, the Federal Trade Commission, and Sunset Holdings entered into a Stipulation that was filed with the Court on June 30, 2015 as Docket No. 33.[110]

Soon after the Stipulation was filed with the Court Defendants Latsanovski and CalEnergy requested the Receiver to agree to the release of additional monies for the purchase of the Rosewood Property. Specifically, Defendants indicated an additional $196,222.76 was needed to pay for "additional disbursements" primarily consisting of $51,237 to be paid to an architectural firm and $135,000 to be paid to a construction firm. The Receiver determined these additional disbursements were not part of Sunset Holdings' contract with the seller of the Rosewood Property and therefore were not necessary in order to avoid a forfeiture of the escrow money. As a result, the Receiver denied the Defendants' request to lift the freeze on the Sunset Holdings account to allow the disbursement of additional monies.

---

[109] The Order requires the Receiver to "perform all acts necessary or advisable to preserve the value of those assets..." ¶ XIV E.
[110] A true and correct copy of the Stipulation is included in the Appendix as **Exhibit 55**.

In violation of the express terms of the Stipulation agreed to by the parties and the Receiver's directions, Defendant Latsanovski then instructed WF to disburse $900,000 to Parkfield Escrow, Inc. for the purchase of the Rosewood Property instead of $707,000 as agreed to by the parties.[111]   As a result of this incorrect wire transfer, Parkfield Escrow, Inc. received $193,000 more than was authorized by the Receiver; and LA Citiwide Escrow Marina received $193,000 less than was authorized by the Receiver.

Attorneys for Latsanovski claim his incorrect wire transfer request was the result of Latsanovski getting the two properties mixed up and making a simple mistake. Even if Latsanovski's instructions to WF were a mistake, however, Latsanovski knew that Parkfield Escrow received more monies than the Receiver authorized. Rather than correct the mistake and have the additional monies transferred to LA Citiwide Escrow Marina, Latsanovksi instructed Parkfield Escrow to close on the purchase of the Rosewood Property and disburse the monies to the architect and contractor. Latsanovski's actions were an intentional violation of the Stipulation between the parties, and violated the Order.

As a result of the conversion of the monies by Latsanovski in closing on the Rosewood Property, there was a $193,000 shortfall in funds necessary to close on the purchase of the Redwood Property at LA Citiwide Escrow Marina.

---

[111] A true and correct copy of the wire transfer request executed by Defendant Latsanovski is included in the Appendix as **Exhibit 56**.

Latsanovski requested the Receiver to release additional funds from the Sunset Holdings account to make up the shortfall.  The Receiver refused this request and made demand upon Latsanovski to immediately make up the shortfall of funds created by his impermissible diversion of funds.  In addition, the Receiver informed Latsanovski the Receiver would file a show cause motion against Latsanovski if the shortfall was not cured, but delayed filing the show cause motion to give Latsanovski an opportunity to cure the shortfall.  On July 17, 2014, Latsanovski secured funds from third parties to make up the shortfall and Sunset Holdings closed on the purchase of the Redwood Property[112].

Sunset Holdings now owns the Rosewood Property and the Redwood Property and the monies placed in escrow for the purchase of the properties prior to the receivership were not forfeited.  In addition, the Receiver filed notices of *lis pendens* on each of the two properties to provide notice the properties are subject to the Order.

### H.    Possession and Control was Asserted over Mailbox Locations

Ten different mail box locations are referenced in corporate documents for the various Receivership Defendants. A copy of the Order was hand delivered to each location and instructions were provided to each vendor to forward the mail to the Receiver. Mail for many other entities is also delivered to several of the same mail box

---

[112] The Receiver prohibited Latsanovski from allowing the Redwood Property to be encumbered with a lien in exchange for the third party funds making up the shortfall.

addresses used by the Receivership Defendants and the Receiver is holding (but has not opened) that mail and will turn it over to Defendants.

## I.     Filing and Registration of Order to Establish Jurisdiction

Receivers are vested with "complete jurisdiction and control" over all property, real or personal, located in different judicial districts, if within ten days of appointment the receiver files copies of the complaint and order of appointment in each judicial district in which such property is located. 28 U.S.C. § 754. The statute, together with provisions of 28 U.S.C. § 1692, allow the Receiver and this Court to obtain in rem jurisdiction over all property located outside of the Southern District of California, and permits nationwide service of process over persons holding such property. Accordingly, to comply with the Statute, and because the scope of the Receivership Defendants' operation suggest assets could be located with merchants operating anywhere in the country, the Receiver filed a copy of the Complaint and the Order in all 93 judicial districts in the United States.

## III.    Value of All Liquidated and Unliquidated Assets, And Sum of Liabilities of The Receivership Defendants

A summary of the estimated assets and liabilities for each Receivership Defendant is included in the Appendix as **Exhibit 57**. Sunset Holdings' bank accounts, certain reserve accounts on deposit for Netistics, LLC, an entity owned and controlled by Reuveni,[113] which Defendants reported were unrelated to skin care sales (approximately,

---

[113] *See,* Appendix **Exhibit 58**.

$12,000) and funds on deposit for Forward Momentum, LLC (approximately $17,000) remain frozen where deposited. As required by the Order, the funds on deposit for all other Receivership Defendants, including those not named as such but which Defendants admit fall within the definition of a "Receivership Defendant," have been or will be transferred to the receivership estate's bank account.   The total liquid assets transferred or which will be transferred is approximately $1,209,380.30,[114] which includes cash on deposit for Sunset Holdings and other entities not yet named as Receivership Defendants. The summary includes Sunset Holdings' real estate, which Latsanovski reports was purchased for approximately $7,060,000 but against which $7,968,000 in unsecured loans exists.[115]

    As with Vastpay, Comicfix, Chargeback Armor and others, the accounts for other entities are frozen because an Individual Defendant is a signatory on the account or the account owner. Thus, those accounts fall within the Order's direction that financial institutions freeze assets "belonging to, for the use or benefit of, under the control of or subject to access by any Defendant…"[116] but are not estate assets.

    Defendants' records reflect liabilities for these entities of $704.[117]   Additional liabilities exist, off the books, although many of the entities having been dissolved in December 2014. For instance, in June 2014, Alon Nottea, Bunzai Media Group, Inc.,

---

[114] This amount does not include the $456,000 in Doron's safe deposit box.
[115] *See* Appendix **Exhibit 59**.
[116] Order ¶ V.
[117] *See* Exhibit 6 to the Brandlin Report.

Pinnacle Logistics, Inc., Media Urge, Inc. and i Point Vision, LLC[118] entered into a settlement agreement with two former employees, and agreed to pay the former employees a total of $90,000.   A total of approximately $15,000 remains due on that obligation, although it is owed jointly and severally by the entities and Alon Nottea.

And SBM Management was sued by LifeScript, Inc. for failing to pay for "lead generation" related to AuraVie products, with the last known services from LifeScript having been provided in approximately July 2014.   LifeScript alleges damages of $372,755.

Focus Media Solutions had employees working at the time of the Receiver's initial access.   Some of those employees, such as Paul Medina and Rotem Fhima (the graphic designer) were undeniably aware that their services were provided in furtherance of consumer fraud.   The Receiver believes wages may be due to these employees, but when interviewed none could "recall" which entity issued their paycheck and they were not listed on the payroll reports for Focus Media provided by its CPA.   At most, however, payroll should be due for June 16-18[th], since all were paid on June 15th.

Phillip Camerino was also an employee of CalEnergy, Inc., as well as other entities.   Camerino failed and refused to respond to the Receivers' efforts to contact him, and thus no information is available about any amounts which might be due him in

---

[118] It is not clear at this point why iPoint Vision, LLC was included as a party to the settlement agreement. Defendants report iPoint Vision was a consulting LLC for Tal Karasso, a fashion photographer/marketing consultant who provided services to the Receivership Entities and received more than $67,500 from SBM Management.

wages. Jorge Magana was the forklift driver for the businesses operated in Suite 109, and his wages are thus likely due from a non-receivership entity.

Several entities have not filed their 2014 tax returns, with the deadline to file extended to September or October 2015.  The entities that have not filed are:

- Apogee Network, LLC (personal consulting/pass through entity for Alon Nottea)
- Adageo, LLC (personal consulting/pass through entity for Alon Nottea)
- Secured Commerce, LLC (entity that leased Receivership Defendant business locations and designed AuraVie landing page);[119]
- Trigen, LLC (personal consulting/pass through entity for Roi Reuveni);
- Calenergy, Inc. (named Receivership Defendant);
- USM Products, Inc. (purchased AuraVie and packing materials)
- Focus Media Solutions, Inc. (the successor entity to Media Urge, which created marketing materials for AuraVie and related skin care products, in addition to advertising other products on-line for "click per action" income)

The amount of taxes due for these entities is unknown.  The cost to prepare the tax returns is estimated at approximately $2,500. Additionally, the CPA who handled payroll as well as tax preparation for the entities reports a past due amount to his firm of approximately $1,000.  Although Defendants deny any entity other than CalEnergy and Focus Media had payroll expenses, Davidian reports processing payroll for Focus Media, and Financial, Kai Media, Shalita Holdings and Insight Media (all except Focus Media are retail merchants for skin care).

## IV.    Anticipated Future Actions

---

[119] Entities listed above which are not named as Receivership Defendants, nonetheless fall within the Order's definition of Receivership Defendants based on their relation to the Individual Defendants and receipt of assets from the sale of skin care products.   Other entities also have extended deadlines to file tax returns, but at this point, the Receiver does not believe those entities qualify as "Receivership Defendants."

The TRO directs the Receiver to report the steps she intends to take in the future to a) prevent any diminution in value of the Receivership Defendants' assets; b) pursue receivership assets from third parties; and c) adjust the liabilities of the Receivership Defendants, if appropriate.

## A.    Preventing Diminution in Value- Taking Possession of Assets

With the exception of the realty owned by CalEnergy through Sunset Holdings, virtually all of the Receivership Defendants' assets are liquid. Taking possession of those assets, particularly the merchant reserve accounts is the first step to preserve those assets.[120]   Negotiations continue to recover the proceeds of the reserve accounts on deposit with EVO, a processor which holds more than $200,000 in reserve accounts for skin care products sold by All-Star Beauty Products, Inc., and one small account for Trigen, LLC.

With the exception of the realty owned by Sunset Holdings, virtually all other known assets are cash and thus at this time no other future actions are anticipated to prevent diminution in value. The location and appraised value of Sunset Holdings' realty has not been provided.[121]   In all likelihood that realty would be sold quickly to avoid insurance costs or other liabilities needed to maintain the properties.[122]

---

[120] In the Receiver's experience, processors are often reluctant to observe an asset freeze, because they continue to claim a perfected security interest in the reserve accounts and are generally responsible for the consumer charge-backs even if the reserve account is depleted.

[121] Latsanovski's counsel described Sunset Holdings' real estate holdings by property "name", the amount of the loan for each purchase and the purchase price for each property.  Appendix **Exhibit 59**.

[122] Defendants identified properties by "name", loan amount, and purchase price. The loan from Guayas to CalEnergy, the proceeds of which were transferred to Sunset Holdings with the loan obligation eventually assigned to Sunset

## B.    Pursuing Receivership Assets from Third Parties

At least one document[123] suggests Receivership Defendants transferred funds to an Estonia corporation owed by Latsanovski, Guayas International, Inc., an entity which in turn funded some of the real estate purchases made by Sunset Holdings, Inc.   The Receiver will continue investigating those transfers and evaluating the merits and advisability of a fraudulent transfer lawsuit against Guayas.[124] Further, in the event Sunset Holdings is found to not be a Receivership Defendant, based on receipts from CalEnergy, CalEnergy likely holds a fraudulent transfer claim against Sunset Holdings and that claim will be evaluated as well.

Information suggests WF and BA likely violated banking regulations and possibly various duties owed to one or more of the entities[125] in allowing bank accounts to be opened for those entities without having followed all appropriate steps to verify the signatories on the account opening documents.   The Receiver will continue investigating the viability and advisability of a lawsuit regarding these issues. [126]

---

exceeds the purchase price for every single property, except the two closed since the Order was issued. The loans, however, are unsecured.

[123] Appendix **Exhibit 60**.

[124] Latsanovski owns 100% of Guayas, but its CEO is Oleg Trushla, who resides in Russia.  Appendix **Exhibit 61**.

[125] The same bank officer at WF participated in opening accounts based on forged signatures and the Receiver continues investigating whether one or more employees at Bank of America participated in that activity. Most forgeries discovered to date relate to four entities which are purportedly engaged in on-line "tech support" services, rather than skin card product sales.  A breach of duty by the banks that allowed those accounts to be opened may thus create a claim for those entities, but those entities may not be Receivership Defendants.

[126] If pursuing a lawsuit appears likely to result in a net return for the estate, the Receiver will attempt to engage counsel on a contingency basis.

## C.    Adjusting Liabilities- Subordinating Liabilities to Administrative Costs

As noted above, due to the complexity of the case and difficulties in obtaining accurate and complete information, more than 2,000 hours have been billed to date by the Receiver, her attorneys, accountants, and IT professionals. The Receiver believes estate cash will likely be completely consumed by the investigation that has occurred to date and abbreviated winding up activities necessary to dissolve the Receivership Defendants. Accordingly, adjustment or discharge of the following liabilities will need to occur before the entities can be dissolved:

- Operating costs incurred by any of the Receivership Defendants prior to the Receiver's appointment, including but not limited to costs for storage of products, bank fees, any shipping costs, the settlement payments owed to prior employees, wages etc.[127] should be subordinated to payments for fees and expenses in performing the mandate, if authorized by this Court;

- The claim against SBM Management by Lifescript asserted in the pending lawsuit, to the extent any such claim ever ripens into a judgment, should be subordinated to payments for fees and expenses in performing the mandate, if authorized by this Court;

- Unsecured obligations owed by Sunset Holdings or CalEnergy to contractors, "hard money lenders," other entities owned or controlled by Latsanovski, employees, or officers of those entities should be subordinated to payments for fees and expenses in performing the mandate, if authorized by this Court, and further subordinated to any judgment entered against Sunset Holdings or CalEnergy in favor of the FTC;

---

[127] *See,* Appendix **Exhibit 62** for CPA Davidian's summary of the entities' payroll obligations. "Retail merchant" corporation AMD Financial Holdings purportedly employs four persons, including the fork lift driver for Suite 109 and Annsofie Algarp, the CEO for AMD. Payroll records for Focus Media Solutions reflect only one employee, one who was not present when the Receiver entered the premises and one who refuses to communicate with the Receiver, David Yosifian. (Doran Nottea reported that Yosafian lived in Israel – **Exhibit 25**). Yosafian is also purportedly an employee for Kai Media, another entity Defendants identify as a retail merchant entity. Gilad Miron, who is purportedly an employee for Insight Media, was likewise reported by Doron as a resident of Israel, although Alon provided a local address for Miron which is a post office box.

- The Individual Defendants should be compelled to pay for income taxes and all other obligations owed by the active merchant entities and the "personal consulting" LLC entities, (defined below) and all "facilitator" entities, so those entities can be dissolved without further expense to the estate.

Secured Commerce, LLC is the lessee on Suites 105 and 109.  The lease on Suite 109 should be assigned to one of Doron Nottea's business entities which operate the pornography and adult products sales, so that no liability for that lease continues for Secured Commerce. The Receiver has not paid any rent for Suite 109.

Likewise, Secured Commerce is the lessee for Suite 105[128] and that lease expires in October 2015. Rent for the space was paid for July. Based on the Receiver's opinion summarized below that none of the other entities which were previously controlled from Suites 105 can operate legally or profitably, the Stipulated Permanent Injunctions which include the entities operating from that location, and the absence of any answer or response by the Receivership Defendants, in late July, the Receiver conferred with defendants about her intention to vacate Suite 105, but received no response.[129] The Receiver requests express authority to terminate the lease since Secured Commerce is not a named Receivership Defendant.  If the Court authorizes terminating the lease the Receiver will negotiate with the landlord to terminate the lease.   If the landlord is not amenable to a favorable termination agreement which eliminates all future liability for

---

[128] All Receivership Defendants except CalEnergy, Sunset Holdings, Inc. and Focus Media Solutions are believed to have operated from 105 Canby, to the extent the entity had any operations at all.

Secured Commerce, the Receiver recommends defaulting and allowing collection efforts to commence against the guarantor, Argaman.

Likewise, Focus Media Solutions is the lessee for Suite 103. The term of the lease expires on September 30, 2015, with monthly rentals accruing at the rate of $980. Paul Medina is the individual guarantor on that lease. Rent was paid for July, but as with the space for 105, the Receiver has communicated her intention to vacate the space, to Defendants.[130] If express authorization is provided to vacate that space and terminate the lease, the lease will be terminated as soon as possible.

## V.   Findings Regarding the Receivership Entities' Ability to Operate Legally and Profitably

The Receiver's findings and recommendations require an explanation of the Receivership Defendants' operations, which as noted above and in prior filings appeared intentionally obscured and complex.

### A.   Background Regarding the Receivership Defendants' Manner of Operation- One Huge Collective Enterprise

Bunzai's bank accounts are closed and have been closed since at least 2013. To date, the Receiver has not received copies of those records,[131] but is nonetheless able to

---

[129] Vacating the space requires selling furniture, inventory and anything with value in the space, abandoning personal items such as family photos and the like to the Individual Defendants, and temporarily storing the computers and documents.

[130] Neither Alon nor Doron have responded to the Receiver's inquiry about personal items in the leased space that they want to recover.

[131] Efforts to obtain on-line access, which speeds up the analysis considerably, were painful and circuitous, with in-house legal for the banks providing different and conflicting instructions from the branch managers who were purportedly able to provide the access. Efforts to obtain on-line access for accounts to which defendants could not provide such access continued until late July, at which point paper copies were requested. Because none of the entities other than CalEnergy are

report regarding the Receivership Defendants' manner of operation based on the more recent transactions involving SBM Management, CalEnergy and all of the entities which existed solely to own merchant accounts.

1.   **The Bunzai Group of Companies, While Under the Control of Alon, Doron, Bond, and Latsanovski, Sold Skin Care Products through Negative Option Enrollment Programs**

The "Bunzai Group" of companies sold AuraVie and LeOR through the deceptive free trial negative option enrollment programs alleged in the Complaint. Documents related to the creation of the websites, edits for the terms and conditions, call scripts to respond to angry consumers, "voice logix" flow charts demonstrating how calls were routed for those same consumers, emails about responding to customer complaints, were found in the Receivership Defendants' documents.

Bunzai contracted to purchase the products, use the name "AuraVie" and provide a call center for "Skincare OU."[132] Documents demonstrate that when Defendants decided to stop or at least reduce sales of AuraVie, they began selling "LeOR" using the exact same advertisements. The phone number listed on the various websites for AuraVie and LeOR was the number identified on a desk in Suite 103, and the phone on that desk registered more than 500 unanswered calls.

---

resisting the Preliminary Injunction, and because of the scope of the case has already necessitated expensive and expansive efforts, paper records for Bunzai and other entities will not be evaluated unless absolutely necessary based on a future issue.

    [132] A partially executed copy of the contract between Bunzai and Skincare OU is included in the Appendix at **Exhibit 38**. Skincare OU is an Estonian company whose authorized signatory on the contract was "Oleg Trushlaya," the same individual Latsanovski reports is the CEO of Guayas, the entity which engaged in highly suspicious transactions with Sunset Holdings and CalEnergy discussed in Section V. Although additional explanation was requested from Latsanovski

Defendants also sold "Dellure" face masks using the same negative continuity programs. While the AuraVie and later LeOR sales were made primarily between early 2011 and 2015, Dellure was sold generally from 2013 to the present.[133] And, although Defendants appear to generally have stopped new continuity enrollments for AuraVie and LeOR in late 2014 or the spring of 2015, they continued charging and shipping for at least AuraVie products as of the date of the TRO. Further, although Defendants claimed skin care sales had stopped, four entities Defendants described as "former retail merchants" for the skin care were processing payroll as of June 2015.[134]

### 2. The Relationship and Flow of Money between the Receivership Defendants and the Other Individuals

As noted in the partnership dissolution Letter from September 27, 2013[135], the retail merchant entities described below sold products pursuant to the Enjoined Conduct from approximately October 2010 through June 2015, when sales stopped because the Receiver closed the merchant accounts. Pinnacle Logistics, Inc. was initially operated as the fulfilment operation, and for a period, also operated a call center responding to consumer complaints and inquiries. Secured Commerce contracted on behalf of Pinnacle for at least small maintenance services, suggesting Secured Commerce may have had

---

regarding this aspect of the operations, and although it was directly contrary to his deposition testimony, no explanation was provided as of the date this report was filed.

[133] Although never disclosed by Defendants, they evidently also sold or attempted to sell face cream products called "Ageless Youth." *See* Appendix **Exhibit 63.** The websites (skingrandiose.com and skincareabsolute.com) look very similar to the Auravie sites and offer free trial purchases. Defendants applied for a merchant account with Complete Merchant Services for All-Star Beauty Inc. for these sales. Appendix **Exhibit 64.**

[134] Compare Appendix **Exhibits 23, 27** and **62.**

[135] *Supra,* **Exhibit 35.**

control or authority over Pinnacle.[136] Additionally, Secured Commerce designed AuraVie landing pages, at least for some period.[137] Media Urge was the marketing arm which also created and placed the websites and landing pages, and SBM Management "managed" the Retail Merchant entities.   And, although the Dissolution Letter suggested these entities would stop selling AuraVie skin care products and those entities would be dissolved, instead, between September 2013 and at least December 2014, AuraVie continued to be actively marketed and sold and Defendants added LeOR to their product line.[138]

SBM also paid for lead generation from outside companies. Until at least July 2014, SBM Management solicited AuraVie leads from LifeScript.  SBM was charged for the leads even if the consumers who later bought the products cancelled their purchase and obtained a chargeback refund. SBM also contracted with affiliate marketing sites like Mobooka and paid for lead generation received through Mobooka.  And SBM and then later Focus Media worked the other side of the ledger as well, by marketing on the affiliate marketing sites like Mobooka and "Above All Offers," first AuraVie and Dellure, and then later other products, like Stemlogica, sold by non-parties.

---

[136] *See,* Appendix **Exhibit 65**.
[137] *See,* Appendix **Exhibit 66**.
[138] Multiple documents, including bank records, invoices from Sercurent Merchants to SBM, and emails all demonstrate confirmed marketing and sales through January or February of 2015. Bank records evidencing substantial income through June 2015 suggest fulfilment sales continued longer. Defendants admit and consumers confirm continuing sales as of the date of the Order. LeOR's packaging is almost identical to AuraVie's, the websites for the two products use the same models and photographs, the terms and conditions for the sales appear identical and were designed by employees using "Media Urge" email accounts.  Indeed, the LeOR websites were duplicated from the AuraVie websites as reflected in the email included in the Appendix as **Exhibit 10**, which references uncorrected references to AuraVie in LeOR websites.

Despite the high cost of generating sales, from 2010 through the end of 2014, the Receivership Defendants' tax returns demonstrate at least $69 million in gross sales.[139] In December 2014 approximately eight entities were dissolved.   Most of those entities, however, continued to have open and active bank accounts and some also had open and active merchant accounts.[140]

A graphic summary of the manner in which money flowed with respect to the sale of the face cream products is included in the Appendix as **Exhibit 1**.[141]   Many different entities owned the merchant accounts from which the products were sold.   Those merchant entities -  Agoa Holdings, All Star Beauty Products, AMD Financial, DMA Holdings, DSA Holdings, Heritage Alliance Group, Inc., Insight Media, Inc., Kai Media, Inc., Lifestyle Media Brands, Safehaven Ventures, Inc., Shalita Holdings, Inc., and Zen Mobile Media - received funds directly from processors such as UMS.[142]   The descriptors on the merchant accounts generally referenced skin care products, such as "Refresh 877-745-3614" and "Skinren 877-611-4188" although not all accounts have been matched to specific products. Media Urge and SBM paid for affiliate marketing of Auaravie and

---

[139] A summary of the gross sales based on tax return information available is included in the Appendix as **Exhibit 67**, and gross sales are also discussed in the Brandlin Report..  As noted in the Koonce Declaration [Docket No. 92], SBM's "income" should not be included so as to avoid "double counting" retail merchant income transferred to SBM Management. Likewise, although 50% of Focus Media Solutions' income was probably derived from Enjoined Conduct, its income is not included in the $69MM figure.

[140] A summary which includes the dissolved entities' bank activity following their dissolution is Exhibit 10 to the Brandlin Report.

[141] Exhibits 1 and 2 to the Brandlin Report provide additional detail.

[142] *See*, Appendix **Exhibit 13** for Defendants' November 2013 summary of the merchant account owned by the various merchant entities in existence at that time.

Dellure on sites such as Clickbooth.com, which charged Defendants $45.00 for any consumer purchase, even if the purchase was later cancelled.[143]

The many merchant entities were necessary to spread out the chargebacks, and avoid having any processor cancel the merchant accounts.[144] Bond reported one processor, Merrick Bank, having frozen entity merchant accounts early in the timeline (despite a request for the information, the Defendants failed to identify the time period in which the freeze occurred) for sales related to AuraVie, which almost certainly prompted the more "diverse" (yet fraudulent) ownership of merchant accounts.

These merchant entities then transferred their income to either SBM Management or CalEnergy.  In turn, CalEnergy transferred funds to Latsanovski, Sunset Holdings, and elsewhere;[145]  SBM transferred some funds to intermediate vendors, such as Telstar Solutions Private, Ltd, I Point Vision, Media Urge, Secured Merchants and Forward Momentum.[146]  In turn Media Urge transferred funds to Adageo (Alon's personal LLC entity), Forward Momentum transferred to Trigen (Roi Reuveni's personal LLC entity),

---

[143] *See,* Appendix **Exhibit 41** for Clickbooth invoices to SBM.

[144] The Receiver conferred with Geoff Gray, the Manager of Risk for one merchant processor and a member of the "Merchant Aquirrers' Committee" which creates standards and provides education to the "payment" side of the banking industry.  Gray described defendants' conduct in spreading out the merchant accounts to manage the chargeback rates as "load balancing." While not per se illegal, the credit card companies and credit card processing companies will not permit such conduct and will freeze merchant accounts when they discover load balancing.

[145] *See* Brandlin Exhibit 1 (flow of money), Brandlin Exhibit 10 (all cash receipts by entity) and Brandlin Exhibit 11 (all deposits to CalEnergy's WF account).

[146] Forward Momentum, LLC is purportedly owned by David Migdal, who was also an employee or consultant for Media Urge.  Defendants admit Migdal was involved in the day to day operation of the Bunzai Group of Companies and got paid through Forward Momentum. Its known assets are accordingly frozen.  Forward Momentum also funded operations for "New Entities" discussed below.

Chargeback Armor (an entity from which Reuveni also receives income directly) and SJS IT Seven Solutions (which Defendants claim is an unrelated vendor).

Doron does not own a "personal consulting" LLC entity and admits the compensation for his role in the operation of these entities is using some of the credit cards in his office to pay personal expenses.[147] Additionally, the Receiver cannot confirm whether Doron[148] or other individuals also received the proceeds of more than $500,000 in checks written to banks.[149] Other Individual Defendants may be receiving compensation through credit card charges, but Defendants did not provide the credit card records for these accounts and only admitted to "occasional" permission to pay personal expenses on the company credit cards. Motti Nottea received income as an employee of CalEnergy and DMA Media Holdings.

### 3.     Defendants Hid Control and Concealed Income

Several of the merchant entities, for instance Zen Mobile Media and Heritage Alliance, also paid credit card bills for the individuals.  Notably, none of the Notteas are identified as credit or debit card owners on any of the accounts owned by the entities.

---

[147]  Between January 1, 2014 and June 2015, payments to American Express by all Receivership Defendants exceeded $3 million, based on Defendants' Quickbook records.

[148]  Doron was the registered owner of a safe deposit box in which $456,000 *in cash* was found.  Although Doron claims the cash was received from buyers of the contents of his home ($300,000) and inheritance checks received by his wife, the documents he has provided to substantiate this claim support only the sale of the contents of the home for $300,000- not his receipt of *cash* for that transaction, and his wife's receipt of inheritance funds – not the deposit of those funds in cash in the safe deposit box.

[149]  Alon Nottea claimed approximately $548,000 in cashier's checks payable to banks were used generally to pay for shipping and similar business expenses, but cannot the Receiver cannot confirm that fact because no access to the credit card accounts or records have been provided, and the checks payable to banks are untraceable.. No explanation was provided for a $104,500 check written on CalEnergy's WF account signed by Latsanovski (who testified he had no idea what the funds were used for or who presented the check).

Instead, most credit cards are in the name of the entity and Stephan Bauer, or the purported owner of the bank accounts for the specific entity, such as Sean Brennecke, Tal Karasso, Tal Topel, Dror Michaelo, Annsofie Algarp and others.   Doron Nottea had dozens of such credit cards in his office drawers at the Canby location.

Further, although the Individual Defendants were generally not identified as officers, directors, or in most instances, employees of any of the companies engaged in the Enjoined Conduct, they were undoubtedly in control.   Indeed with respect to the purported officers and owners of the many, many companies involved in the Enjoined Conducts, Defendants reported those individuals "had no knowledge of the day-to-day operations."[150] Moreover, at least some individuals who were identified as signatories on the entities' bank accounts, for instance Erin Link, Stephan Bauer, and Rachel Nottea were not in control of those accounts and were unaware of the existence of many accounts.   Thus, even when accounts for entities that were not named as Receivership Defendants but which fell within the definition of "Receivership Defendants" were frozen, the owners of those entities and their accounts did not contact the Receiver about the reason for the freeze or request to have the freeze lifted.[151]   Nonetheless the credit and debit cards issued to the Receivership Defendants, including the un-named Receivership Defendants, were active and were used for personal expenses.

---

[150] *See,* Appendix **Exhibit 25.**
[151] A copy of the Order and a letter requesting that several account owners contact the Receiver to discuss the case were sent by federal express to those account holders, Annsofie Algarp, for instance. Algarp signed for the fed ex, but then returned it unopened and never contacted the Receiver.  The same letter enclosing the Order was sent to Sean Brennecke,

The logical conclusion about the control over the entities and their funds when compared to their legal ownership and the flow of money described below is a conscious (and fairly effective) attempt to conceal who was operating and profiting from operating the Receivership Defendants. The Receiver's investigation has not encompassed the tax reporting or consequences of the efforts to use entities "owned" (on paper) by non-parties for payment of personal expenses. Nonetheless, tax fraud is also a likely result of the conduct described below since the Individual Defendants paid personal expenses through credit or debit cards issued to entities with which they were not legally affiliated.

### 4.   Focus Media Solutions- Marketed Non-Party Products Using Negative Option Enrollments

In approximately September 2014 Focus Media Solutions, Inc. was incorporated and began advertising various types of products on the internet. Focus Media generated leads for car and life insurance, and marketed risk free trials of skin care products sold by non-party entities, which relied on negative continuity enrollments. The lead generation and sales activity was conducted through affiliate networks, such as Mobooka, Above All Offers and Clickbooth, which connect merchants with "affiliate marketers" much like Craigslist connects buyers with sellers and which SBM had used to market AuraVie and

---

who emailed the Receiver stating he would retain counsel and then provide information as requested. After his early July email, however, neither Mr. Brennecke nor any attorney on his behalf communicated with the Receiver.

Dellure.[152]  All of Focus Media's income was derived from these affiliate networks, including skincare negative option offers contained in a Blog.[153]

Paul Medina reported Focus Media was not yet profitable and could not operate without loans from CalEnergy, and without continuing the negative enrollment advertisements.[154]  It was likely also the only Receivership Defendant with any legitimate employees, and thus had additional overhead expenses.  On June 16, 2015, CalEnergy wrote a $325,000 check to Focus Media Solutions.[155]  Latinsovksi did not include this check in the summary he provided at his July 2, 2015 deposition, nor did he include it in the same summary when he filed his motion seeking partial relief from the Order.[156]  Medina and Alon Nottea each claimed the other had control over Focus Media's operations, but Medina eventually reported the CalEnergy loan was conditioned on Latsanovski's insistence that Focus Media stop marketing any products through negative

---

[152] Contracts and other relevant documents were requested from Mobooka, Above All Offers, Phresh Clicks and multiple other affiliate marketers.  Several did not respond to the Receiver's requests for information, and the Receiver chose not to spend estate funds to obtain their compliance.  The records received from Clickbooth, however, demonstrated that Defendants e-signed contracts for SBM Management and other entities in Stephen Bauer's name, but from Alon Nottea or other individuals' email accounts, again suggesting Defendants were engaged in concealing the true ownership and control of the funds and accounts at issue.  A copy of the electronic tracking of one such docusign trail is included in the Appendix as **Exhibit 68**.

[153]  The blog's content was pulled down shortly after it was identified for the Receiver, and a copy is not available. The blog was found at http://thedailylivingtips.com/beautyv7cellumis/.

[154] Defendants' Quickbook records, however, reflect Focus Media's receipt of $2,166,937 with out-going payments of $1,580,769.  Notably, however, Focus Media's employees were not reflected in its payroll accounts as identified by Davidian..

[155] A copy is included in the Appendix at **Exhibit 33**, and was located by the Receiver in Suite 105 during initial access.

[156] On July 6, 2015, the Receiver discovered that the check had cleared Focus Media's account on July 18, 2015 and because WF did not immediately freeze Focus Media's account since it was not a named Receivership Defendant, the funds were then transferred to USM Products, an entity not previously identified by Defendants as an affiliate.  Following requests for immediate return of the funds, counsel for Alon Nottea reported the transfer had occurred before Alon had received notice of the Order, Alon voluntarily returned the funds to the Receiver by virtue of transfers to Focus Media Solutions and Kai Mobile Media.

option continuity plans and reduce its overhead.[157]   Thus, Latsanovski was well-aware of the negative option marketing conducted by Focus Media.

### 5.   Defendants Forged Signatures and Committed Bank Fraud

Bauer provided a Declaration verifying that he had never heard of several of the entities on whose bank accounts he was listed as a signatory.[158]   Additionally, bank records for Heritage Alliance Group, Inc. reflect a debit card issued to Stephen Bauer and also demonstrate charges as late as May 2015 on that card.   Bauer's name was on dozens of credit cards issued to the various entities, with all of those cards in Doron Nottea's office.   Bauer was specifically asked whether in May 2015 he purchased tires charged on the debit account for Heritage Alliance Group's WF account, and stated he had no knowledge of the card, the account, or the purchase.

Bauer, on behalf of SBM Management, Inc., also purportedly signed a contract with Mobooka, Inc.   Even to an untrained eye, the signature on the Mobooka contract bears little resemblance to other Bauer signatures, and Mr. Bauer denies ever having seen the Mobooka contract or executing it.[159]   Bauer also stated that his signature on six e-file

---

[157] Appendix **Exhibit 69**.
[158] Bauer shows as a signatory on accounts for at least the following entities: Eccentric Innovations, Impulse Media Group, Optimized Media Solutions, Intensive Media, Dynamic Media and Focus Media Solutions **aka** Kai Media and a pay pal account for SBM Management. Mr. Bauer's Declaration regarding the forgeries of his signature is included in the Appendix as **Exhibits 19** and **20**.   Another individual, Erin Link, contacted the Receiver after discovering that an entity account on which he was a signatory was frozen. (The account was frozen because Link was the signatory on many merchant accounts used to sell the skin cream products).   Link also provided two Declarations (one was a supplement) verifying the forgery of his name on all merchant accounts *opened* in his name for Shalita Holdings, as well as the signature cards for bank accounts owned by Optimized Media Services, Inc.   Copies of both Link Declarations are included in the Appendix as **Exhibits 51** and **52**.   Link also reported that based on a prior business relationship, Doron Nottea had access to Link's personal identifying information, including his social security number, which was used on the forged documents.
[159] *See,* Appendix **Exhibit 20**.

authorizations related to SBM's tax returns are not his, and that he had never seen the e-file authorizations.[160]

Likewise Eran Link denied executing opening documents for Optimized Media accounts opened at BA, executing corporate formation documents for that entity or signing any new merchant account applications for Shalita Holdings.[161]

### B.      Recommendations Regarding Continued Operation

The Order requires the Receiver to report about the ability of the Receivership Defendants[162] to operate legally and profitably, but continued operation is conditioned on the "good faith determination that the business can be lawfully operated at a profit using the assets of the receivership estate."[163]   With regard to this reporting requirement, the Receiver specifically asked the Nottea Defendants to identify any entity (including entities not yet named as Receivership Defendants but which fell in this the definition) they contended could continue operating legally and profitably and requested financial justification for that contention. Except for Trigen, Adageo, and Focus Media no recommendation or justification information was provided.

---

[160] Bauer admitted he requested that Alon and Dorn get SBM's tax returns filed, and probably would have signed the returns or the e-file authorizations if he had been asked.

[161] *See,* Appendix **Exhibits 51** and **52**.

[162] A summary identifying all "Receivership Defendants" including those not yet named in the lawsuit is included in the Appendix at **Exhibit 2**.

[163] Order ¶ XXI 5.

Further, as noted below, the receivership estate has possession or control over approximately $1,209,280.30 in liquid assets.[164] The Receiver believes that most or all liquid assets will be necessary to pay, upon the Court's approval, for the investigation that has already occurred or work required to dissolve and wind-down entities that cannot operate legally and profitably.[165]   Thus, the existence of sufficient funds necessary to wind-up and finalize all matters incident to performing the mandate is questionable. Unless additional funds are located or Sunset Holdings real estate is liquidated, no additional funds are probably insufficient to operate *any* entity.

### 1.    The Dissolved Entities Cannot Continue Operating Legally

None of the dissolved Receivership Defendants[166] can legally continue operating.[167]   Accordingly, the following Receivership Defendants cannot continue operating in any manner and the Receiver will discontinue their operations, if any and close their bank accounts (entities in bold have not yet been named as Defendants):

Agoa Holdings, Inc.
Bunzai Media Group, Inc.
**DMA Media Holdings, Inc.**
DSA Holdings, Inc.

---

[164] This amount includes $212,541.08 on deposit for Sunset, which the Receiver has not transferred to the estate bank account.  The amount does not include the $456,000 in Doron's safe deposit box. Assuming control continues over Sunset Holdings, the estate holds a total of $7MM in realty (with unsecured loans against that property exceeding its value). Although Defendants claim those properties are subject to loans received from CalEnergy, Guayas, and a "hard money" loan for $1MM, none of the loans are secured.  With the exception of the hard money loans, funds in those properties accordingly tie back to Latsanovski who owns 100% of Guayas.

[165] Each active entity will need to file state and federal tax returns, with additional time and expense related to the dissolution process, including adjustment of any debts owed by any particular entity.

[166] SBM was previously reported as dissolved, but that designation was an error.  SBM is still active.

[167] Corporations may continue to exist for the purpose of winding up the corporation's affairs. *See* CAL. CORP. CODE § 2010(a) (West).  Several provisions in the California Corporations Code however, include language expressly prohibiting active business operation of a dissolved corporation.  *See* CAL. CORP. CODE § 1905(b) (West);  CAL. CORP. CODE § 2010(a) (West); and CAL. CORP. CODE § 2001(b) (West).

Heritage Alliance Group, Inc.
Lifestyle Media Brands, Inc.
Media Urge, Inc.
Pinnacle Logistics, Inc.
Safehaven Ventures, Inc.

### 2.    Active Merchant Entities Cannot Continue Operating Legally

All retail merchants which have not been dissolved and continue to receive income from the sale or marketing of products dependent on negative option continuity plans cannot continue operating legally. Accordingly, the following entities cannot continue operating legally, and should be dissolved:[168]

**All-Star Beauty Products, Inc.**
AMD Financial Network, Inc.
**Daria Media Holdings, Inc.**
Insight Media Group, Inc.
Kai Media Group, Inc.
**Shalita Holdings, Inc.**
Zen Mobile Media, Inc.

### 3.    "Facilitator" Entities Cannot Continue "Operating" Profitably

Likewise, entities that have no apparent source of income other than payments related to the sales made by the merchant entities cannot operate profitably without continued receipt of that enjoined income. Thus, **Secured Commerce, Inc.,** the lessee entity for Focus Media Solutions and Suite 105 where all other Receivership Defendants

---

[168] To the extent the Receiver requests authorization to take action with respect to an entity that is not yet named as a Defendant and as set forth below, she will submit a motion or a proposed order, depending on the Court's preference.

were controlled, (which Defendants reported was no longer operating), and which created AuraVie web and landing pages, cannot continue operating profitably.[169]

Likewise, SBM Management, Inc. although contracted to perform affiliate marketing for unrelated products, also purchased leads for Auravie but served primarily as a "manager" for the retail merchant entities. Virtually all of those entities transferred their income to SBM Management (some also transferred funds directly to CalEnergy). Since SBM's income was derived from Enjoined Conduct it cannot continue operating legally or profitably.

The "personal consulting LLC entities" controlled by Alon, Adageo, LLC, and **Apogee, LLC**, have no "operations." They do not sell any products, and generate income only as pass-through entities for "consulting" fees related to the Enjoined Conduct, and otherwise if any of Alon's business activities fall outside of the Enjoined Conduct.[170] Thus if Alon's conduct is legal, these entities could continue operating legally and profitably if no supervision by the Receiver was required, or if no funds from the estate were necessary. Alon, however, undoubtedly used Adageo and Apogee inequitably to distance himself from the income generated by the Enjoined Conduct. Accordingly, the Receiver recommends dissolution of Apogee and Adageo. The

---

[169] Secured Commerce presents another excellent example of Defendants providing inaccurate information. When asked what business Secured Commerce engaged in, Doron's then attorney responded: "Secured Commerce ("SC") — members are Avi Argaman and Doron Nottea; no business transacted since 2014. This is a defunct tech business started in 2012 that provided **shipping services** (e.g., USPS) and passed volume discounts to its customers. SC is not in the "negative option" marketing or skincare business." An invoice from Secured Commerce to Adageo, LLC reflects Secured Commerce charged for "Design, Creation & Optimization of AuraVie Landing Page…" *See,* Appendix, **Exhibit 64**.

Receiver also requests permission to take possession of all of Apogee's assets,[171] but have no further responsibility for Apogee, its taxes, tax returns or operations, and recommends that the Court order Alon to dissolve Apogee.

**Trigen, LLC**[172] appears to receive income from Chargeback Armor, and the services provided to Chargeback Armor appear both legal but not yet profitable, (since Chargeback Armor's operation is still dependent on its capital contribution from Secured Merchant's rather than income). Based on Reuveni's role in operating the Receivership Defendants (he managed the call center) and his use of Trigen to receive compensation for those activities, the Receiver requests permission to take possession of Trigen's assets,[173] but have no further responsibility for Trigen, its taxes, tax returns or operations, and recommends the Court order Reuveni to dissolve it.

Like Trigen, Adageo and Apogee, **Forward Momentum LLC** is a pass-through entity used as a receptacle for David Migdal's income[174] for his role in the Enjoined Conduct (Defendants admitted and documents confirm his day-to-day involvement). Neither Migdal nor Forward Momentum has been named as a Defendant, but Forward

---

[170] Given the bank fraud in which the New Entities are engaged and Alon's supervision of these entities, the legality of any operation is dubious.

[171] Apogee's accounts are frozen.

[172] Defendant Reuveni provided no information about Trigen, *Inc.*, an entity which has a bank account at BA on which his is a signatory. Reuveni also controls Netstics, LLC and is the only signatory on its BA bank account, although Bauer is also designated as an officer. *See,* Appendix **Exhibit 70**. Reuveni claims Netstics provides online tech support. It pays Multi-Tech Interactive in India for services which appear to be related to the New Entities. The Receiver lacks sufficient information to make a recommendation regarding whether Netstics LLC falls within the scope of the Order and thus makes no recommendation regarding its continued operation.

[173] The Receiver has frozen Trigen's known accounts, but not taken possession of them.

[174] Migdal is the only known officer.

Momentum falls within the definition of a Receivership Defendant.[175] Forward Momentum or perhaps just David Migdal also provides support[176] to the New Entities whose bank accounts were opened over forgeries. Defendants provided no recommendation regarding whether Forward Momentum could continue operating legally and profitably and the Receiver has no access to its bank records. Nonetheless, the Receivership Defendants' records evidence not less than $73,830 transferred to Forward Momentum from SBM in connection with Migdal's role in the Enjoined Conduct. Accordingly, the Receiver requests permission to take possession of Forward Momentum's assets but have no further responsibility for Forward Momentum, its taxes, tax returns or operations and recommends the Court order dissolution of Forward Momentum.

Defendants describe **USM Products, Inc.** as an "importer/exporter of parts, packaging and product assembly and manufacturing." USM was one of the entities used to pay Jacem Heathly Products for AuraVie products and was also the recipient of the Focus Media Funds transferred in violation of the freeze. Alon is one of the officers and owners, although the corporate formation documents use his fictitious name, Jay Michaels.  The Receiver has no access to any of USM's bank accounts or its QuickBook accounts but has traced at least $170,000 to USM from other Receivership Defendants. Defendants did not deny USM's participation in the Enjoined Conduct, but provided no

---

[175] Forward Momentum's known accounts are frozen.
[176] Forward Momentum received money from Dynamic Media.

information regarding whether USM could continue to operate legally and profitably. Accordingly, the Receiver requests permission to take possession of all of USM's assets[177] but have no further responsibility for USM, its taxes, tax returns or operations and recommends the Court order dissolution of USM.

The Receivership Defendants used **Merchant Leverage Group, Inc. to** provide "merchant processing services."  Although its only officer listed in corporate filings was Stephan Bauer, Alon admits control and does not deny its participation in the Enjoined Conduct.[178]  It received at least $14,500 from SBM. The Receiver lacks sufficient information to determine whether the entity could operate profitably and cannot determine whether it has or is operating legally.  Based on Alon's control and his known propensity to bank fraud, as well as the limited estate assets necessary to operate any entity, the Receiver requests permission to take possession of all of Merchant Leverage Group's assets[179] but have no further responsibility for Merchant Leverage Group, its taxes, tax returns or operations and recommends the Court order dissolution of Merchant Leverage Group.

In addition, **Secured Merchants, Inc.** appears to provide legitimate services to Chargeback Armor, and may likewise be engaged in other business activities which are

---

[177] The Receiver has already taken possession of USM's known bank accounts, based on its clear inclusion within the definition of a "Receivership Defendant."

[178] Merchant Leverage Group's website is registered to Igor Latsanovski, but Stephan Bauer is its only known current officer. Appendix **Exhibit 71**; see also **Exhibit 25**. Defendants admitted "Eugene, had his own merchant business aside from Vastpay, and provided merchant services for Leor's sales, although it was not vastpay business" *See Appendix* **Exhibit 74**.  The Receiver believes Merchant Leverage Group, Inc., was the processor for the skin care products and was operated or managed by Eugene Shampansky, the current manager of Vastpay.

RECEIVER'S INITIAL REPORT

not enjoined.  Nonetheless, about 40% of Secured Merchant's income since its inception was received from SBM Management, and it provided chargeback and voice logix services to the Bunzai Group in furtherance of the Enjoined Conduct.[180] It is thus a "Receivership Defendant." Neither Defendants nor counsel for Secured Merchants provided any opinion regarding whether Secured Merchants could continue operating profitably and legally.  Without that information and based in the lack of funds in the estate for continued operations, the Receiver requests permission to take possession of all of Secured Merchants' assets but have no further responsibility for Secured Merchants, its taxes, tax returns or operations and requests that Defendants (or Avi Argaman) be directed to dissolve Secured Merchants.[181]

### 4.    Focus Media Could Operate Legally, but Not Profitably

Some of Focus Media Solutions' operations were legal, but it cannot operate solely on the funds remaining in the receivership estate and does not generate enough net income to continue operating without loans.[182] Although its income from marketing products not sold by negative option enrollments might render a profit, insufficient assets exist for monitoring or supervising its activities to ensure all are legal. Accordingly, the Receiver requests permission to take possession of Focus Media's assets[183] but have no

---

[179] The Receiver has already taken control over Merchant Leverage Group's known bank accounts, based on its inclusion within the definition of a "Receivership Defendant."

[180] *See,* Appendix **Exhibit 18**.

[181] Based on the undeniable role played by Secured Merchants in the Enjoined Conduct, the Receiver has already taken possession of Secured Merchants' accounts.

[182] *See,* Appendix **Exhibit 69**.

[183] The Receiver has already taken possession of Focus Media's assets.

further responsibility for Focus Media, its taxes, tax returns or operations and recommends the Court order dissolution of Focus Media.

### 5.   CalEnergy and Sunset Holdings Cannot Operate Solely with Estate Assets

#### i.   CalEnergy Should be Dissolved

CalEnergy received at least $1.3MM from the Receivership Defendants whose operations are enjoined, out of a total of approximately $9.5MM transferred to its bank account since inception. The balance of the funds CalEnergy received were the proceeds of cashier's checks, or were transferred from Danske Bank or Trasta Komercbanka, purportedly as loans from Guayas or Bavaria, Inter LP, then transferred to Sunset Holdings.[184] Defendants describe CalEnergy's operations as searching for investment opportunities and it likewise serves as a pass-through entity for loans from Guayas to these other entities, such as Vastpay. The Bunzai Companies could not have operated without the funds received from CalEnergy.

To the extent CalEnergy's operations include legitimate real estate investments through Sunset Holdings, it could presumably continue operating legally, but could not do so based solely on the assets held by the receivership estate (unless Sunset Holdings' real estate assets are liquidated). Moreover, CalEnergy appears to have been used, at

---

[184] Latsanovski testified Bavaria Inter LP loaned money to CalEnergy, and Guayas bought the loans such that CalEnergy then owed the borrowed funds to Guayas. Appendix **Exhibit 72**. Sunset then took assignment of all of CalEnergy's debt to Guayas. Appendix **Exhibit 73**. *See also,* discussion below in Section V. No specific obligation owed by CalEnergy has been disclosed but the Receiver believes Vastpay and Comicfix, two other Latsanovski entities may rely on CalEnergy for capital. CalEnergy likely owes income taxes.

least in part, as a shield to distance Latsanovski from the Enjoined Conduct and his receipt of proceeds from that conduct.  To suggest CalEnergy continue operating would only further its inequitable function. Accordingly, the Receiver recommends dissolution of CalEnergy, but requests that the Court direct Latsanovski to pay its income taxes.

### ii.        Sunset Holdings Cannot Operate Profitably

Sunset Holdings falls within the definition of a Receivership Defendant because it is wholly owned by Latsanovski (1%) and CalEnergy (99%), and received funds (indirectly) from the sale of the skin care products.  Its real estate investments appear to be legal, and may eventually be profitable. Sunset Holdings, however, has not specifically identified the real estate it owns, the purchase price or current value of those holdings,  the amount of improvements invested in any such property, or any outstanding obligations other than the loans used to purchase the realty.[185] The information disclosed to date, however, suggests Sunset Holdings is insolvent and cannot operate without continuing to borrow funds.  Indeed, Sunset claims ownership in ten properties, which it claims to have purchased for a total of $7,060,000, but for which it borrowed $7,968,000 (to cover costs of improvements) from Guayas through CalEnergy. To the extent Sunset Holdings depends on loans or income from CalEnergy/Guayas, hard money lenders or others, it cannot operate profitably from the assets in receivership, unless some of its real

---

[185] Closing statements and appraisals have been requested but not received to date.

estate holdings are liquidated to fund those operations.[186] Moreover, as noted below, Sunset's transactions with Guayas, Bavaria Inter LP and CalEnergy are suspicious on their face because of any apparent justification for the significant movement of funds.[187] Accordingly, the Receiver recommends that if Sunset is named as a Receivership Defendant, the Receiver be authorized to liquidate Sunset's assets but have no further responsibility for Sunset Holdings, its taxes, tax returns or operations, and recommends the Court order dissolution of Sunset Holdings.

In the alternative, if Sunset is released from the asset freeze and found not to be a Receivership Defendant, the Receiver requests that its assets be surcharged for a portion of the fees and costs incurred by the receivership estate with respect to Sunset Holdings' real estate transactions.[188]

## VI.   Other Matters Which Merit the Court's Attention

### A.   Suspicious Transactions

Latsanovski owns CalEnergy and Guayas, and CalEnergy owns 99% of Sunset Holdings. Guayas is an Estonian company which purportedly raises money for investment in real estate and other enterprises, such as Vastpay.[189] All three have

---

[186] The sources of all funds received by Sunset Holdings since inception are listed in Exhibit 12 to the Brandlin Report. None of the loans Sunset Holdings received are secured, and thus if its assets are liquidated, the loans should be subordinated to administrative costs and any judgment the FTC takes against Latsanovski.

[187] Notably, all of the loans against Sunset Holdings' real estate holdings are unsecured.

[188] See, **Section II G.2.** Sunset has at least $200,000 on deposit in one account. If the Court is inclined to release Sunset's assets from the asset freeze (its accounts are frozen in part, because Latsanovski is a signatory on the accounts) the Receiver requests permission to submit a declaration detailing fees and costs incurred by the Estate with respect to Sunset.

[189] Latsanovski's "opinion" email to Alon references "Vastpay" as a joint enterprise.  *See* Appendix **Exhibit 33**. Because Alon Nottea's responses to requests about whether Vastpay provided services were not clear, the Receiver requested additional information, Appendix **Exhibit 74**.  The Receiver's accountants do not have access to Vastpay's Bank of America

participated in transactions involving the transfer of funds for no apparent economic benefit which renders the transactions suspect.[190]

Defendant Latsanovski produced an assignment agreement pursuant to which Sunset Holdings presumably assumed CalEnergy's obligation to pay more than $5.6MM to Guayas.[191] The assignment begs numerous questions, such as why Sunset would assume a debt without some discount, why Guayas would not require security for the debt or the assignment, and why the loans were first made through CalEnergy instead of directly to Sunset.

These questions were posed to Defendants who provided substantive answers. Defendant Latsanovski contends that lien agreements existed but were not finalized as of the date of the Order, and explained the loans were made to CalEnergy rather than Sunset Holdings because Latsanovski "wanted to control the flow of funds from the Guayas loan to Sunset which he accomplished by having the loan proceeds deposited in CalEnergy's accounts."[192] These explanations are certainly plausible, but not convincing. To the extent CalEnergy and Sunset Holdings are indebted to Guayas the issue is highly relevant and is thus included here. The original source of the funds transferred to CalEnergy by Guayas,

---

account, the only account with significant funds in it.  No other financial records, however, suggest any of the Receivership Defendants transferred funds to Vastpay, and Defendant Latsanovski denies Vastpay had any involvement in the Enjoined Conduct.

[190] Moreover, at least one bank specifically referenced by the "Organized Crime and Corruption Reporting Project" as traditionally engaged in money laundering, Trasta Komercbanka, is involved in these transactions and has transferred significant amounts to CalEnergy. *See* the article included in the Appendix as **Exhibit 75** regarding the "Russian laundromat."

[191] *See*, Appendix **Exhibit 73.** Guayas is purportedly operated from Russia. *See,* Appendix **Exhibit 72**.

[192] Even if the transfer of interest of Sunset's ownership was valid, the transfer did not occur until May 5, 2015, and until that date CalEnergy owned 99% of Sunset and was in turn owned wholly by Latsanovski.

Bavaria Inter LP, and/or Trasta Komercbanka and whether any conduct is illegal or improper rather than just unusual and unsecured is beyond the scope of the appointment.

## B.    Expense and Complexity

The Receiver will file her first pay petition before the deadline required by the Order, but the Court should be aware that no less than 2,000 hours have been billed by the Receiver, her counsel, accountants, and IT support.   Rather than fifteen entities named in the Complaint, the Receiver, her counsel and accountants have had to sift through information related to **sixty** entities affiliated with or operated by the Individual Defendants with more than 25 of those qualifying as "Receivership Defendants."[193] Because the information provided by Defendants was often untimely, incomplete, or untrustworthy, the Receiver was required to reach out to non-parties, vendors and others to find information about many of those entities, or have her accountants track through the financial records to determine whether any connection existed with the Receivership Defendants.

The large number of entities, bank and credit card accounts, difficulties in obtaining the Defendants' compliance and cooperation, the efforts intended to distance the Individual Defendants from legal ownership and control including forged signatures and outright bank fraud, and limited or no access for so many of the accounts at issue, dwarf the intensity and work required on the first sixty days of any prior receivership on

---

[193] A summary of those sixty entities and their respective connection with the Defendants is included in the Appendix as **Exhibit 76**.

which the Receiver or her counsel have worked.   Further, the case has presented numerous fire-drill emergencies such as money transferred out of an account for a Receivership Defendant not yet named, deletion of email data, an emergency motion by Latsanovski and CalEnergy for relief from the Order, and Doron Nottea's Motion to Vacate the Court's Show Cause Order.   Moreover, Defendants' multiple changes in counsel have required duplication of efforts in requesting the same information from the same Defendants.

In the week before this Report was filed, the individual Defendants have largely stopped responding to the Receiver's requests, for instance regarding information about the merchant processor involved in the entities' operations.[194]   Moreover, although Doron Nottea agreed to the Stipulated Order demanded by Google for the Receiver to obtain access to the deleted information in his personal email account, he changed the password on the account before the order was entered and the Receiver's IT expert cannot access the account at all.   Alon will not agree to the terms of the Stipulated Order required by Google.

Efforts have been made and will continue to limit the scope of the work involved and the Receiver expects the rate at which work has been necessary to drop off dramatically following the Preliminary Injunction hearing. Because of the highly unusual posture of having discovered such deep and wide issues in addition to what is outlined in

---

[194] *See* Appendix **Exhibit 74**, to which no response was received.

the Complaint, and the extensive work performed to date, the Receiver includes notice of the fees and complexity in this Report.[195]

The information contained in this report was obtained and is reported pursuant to the mandate in the Order.

Respectfully Submitted,

*/s/Charlene Koonce*
Charlene C. Koonce
**Receiver**
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
Telephone: 214-706-4200
Telecopier: 214-706-4242

**SCHEEF & STONE, L.L.P.**

---

[195] Closing statements and appraisals have been requested but not received to date.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on August 3rd 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court.  The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard
5th Floor
Beverly Hills, CA 90212
*Counsel for Oz Mizrahi*

David P. Beitchman, Esq.
Beitchman|Zekian, PC
16130 Ventura Boulevard, Suite 570
Encino, CA 91436
*Counsel for Doron Nottea and Motti Nottea*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
*Counsel for Alon Nottea, Roi Reuveni, and Adageo, LLC*

Marc S. Harris
Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
*Counsel for Igor Latsanovski and CalEnergy, Inc.*

Benjamin A Pettit
Ben Pettit
20 East Pueblo Street
Santa Barbara, CA 93105
*Attorney for Alon Nottea*

Raymond E McKown
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024

Reid Tepfer
Luis Gallegos
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, TX  75201

*/s/  Charlene C. Koonce*
CHARLENE C. KOONCE