Michael J. Weiss (SBN 206473)
ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
5900 Wilshire Blvd. Suite 2250
Los Angeles, CA 90036
310-300-2900
310-300-2901- Fax
Mweiss@agmblaw.com
Local counsel for Receiver

Charlene C. Koonce (TX SBN 11672850)
*Admitted Pro Hac Vice*
SCHEEF & STONE, L.L.P.
500 N. Akard, Suite 2700
Dallas, Texas 75201
214-706-4200
214-706-4242 - Fax
Charlene.koonce@solidcounsel.com
Court-appointed Receiver

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

BUNZAI MEDIA GROUP, INC., a California corporation, also doing business as AuraVie and Miracle Face Kit, et al.,

Defendants.

Case No. 2-15-CV-4527-GW(PLAx)

APPENDIX TO INITIAL REPORT
VOLUME 1, PAGES 1-169

| EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1. | Summary regarding flow of money between all entities | 1 |
| 2. | Brandlin Report | 2-43 |
| 3. | List of all entities that fall within the definition of “Receivership Defendants,” including those not yet named in the Amended Complaint | 44-45 |
| 4. | RSA device photos | 46-49 |
| 5. | UMS envelope photos | 50-58 |
| 6. | Summaries of merchant accounts received from EVO and Globalpay | 59-63 |
| 7. | AuraVie and LeOR product photos | 64 |
| 8. | Photos of sticky note with AuraVie customer phone number and “523 messages” from Suite 103 | 65-66 |
| 9. | Yosafian signature stamp and checks | 67-68 |
| 10. | LeOR and AuraVie webpages and email requesting corrections of references to AuraVie in LeOR webpages | 69-89 |
| 11. | USM officers | 90 |
| 12. | Summary of frozen liquidated assets for Receivership Defendants | 91 |
| 13. | Intentionally left blank | |
| 14. | Latsanovski testimony regarding Chargeback Armor | 92 |
| 15. | Email from Chargeback Armor President regarding Alon, his “partner” | 93 |
| 16. | Declaration from Chargeback Armor President | 94-100 |
| 17. | Email from Chargeback Armor’s counsel confirming transfer of funds from Secured Merchants to Chargeback Armor | 101 |
| 18. | Secured Merchant invoice to SBM for chargeback and IVRx services | 102-117 |
| 19. | Stephan Bauer Declaration | 118-150 |
| 20. | Stephan Bauer Declaration | 151-169 |



tabbies
EXHIBIT
1

App.000001

# Federal Trade Commission
v.
# Bunzai Media Group, Inc., et al.

## Forensic Accounting Investigation
## &
## Expert Opinion

**Brandlin & Associates**
**Certified Public Accountants**
**Los Angeles, California**







BRANDLIN
AND ASSOCIATES

Ms. Charlene Koonce, Partner
Scheef & Stone, LLP
500 N. Akard Street, Suite 2700
Dallas, TX 75201

RE: FTC v. Bunzai Media Group, Inc., et al. – Case No. 2:15-CV-4527-GW(PLAx)

Dear Ms. Koonce:

Pursuant to your request, Brandlin & Associates ("B&A") has investigated certain transactions related to the above referenced litigation as well as the relationships and dealings between and among the named Receivership Defendants and Receivership Defendants Not Yet Named (collectively referred to herein as the Receivership Defendants, Defendants or RD's). This written report and the related exhibits summarize our opinions to date and form the basis from which these opinions were formed. Specifically, you asked us to:

1. Investigate the books and records of the entities charged in the FTC's complaint;
2. Evaluate banking transactions of the RD's and individuals charged in the FTC's complaint;
3. Prepare charts and exhibits, and other analyses of money received and paid to and from the RD's charged in the FTC's complaint;
4. Assess the RD's ability to operate legally and profitably; and
5. Estimate the liquidation value of the RD's known assets.

During our analysis, we reviewed numerous documents and reports obtained from various sources. Our work is ongoing and many documents and reports are still being reviewed. Our preliminary opinions follow in this report. As of the date of our report, discovery continues in this case. We therefore, anticipate updating our report once all the documents have been evaluated and upon inspection of any new information that we may receive after the date of this preliminary report.

Brandlin & Associates
July 31, 2015

12100 Wilshire Blvd., Suite 1120 | Los Angeles, California 90025 | Phone 310.789.1777 | Fax 310.201.4743

**FTC v. Bunzai Media Group, Inc., et al.**
**Forensic Investigation & Expert Report**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY .......... 4
INTRODUCTION .......... 5
DEFENDANTS' BUSINESS OPERATIONS .......... 6
RECEIVERSHIP DEFENDANTS .......... 6
NATURE OF BUSINESS .......... 7
INFORMATION MADE AVAILABLE .......... 9
DAVIDIAN & ASSOCIATES, CPAS .......... 9
INFORMATION REVIEWED .......... 10
CREDIT CARD PROCESSORS .......... 12
BENEFICIARIES (SBM MANAGEMENT, INC. / CALENERGY, INC. / SUNSET HOLDINGS, LLC) ... 13
ABILITY TO OPERATE LEGALLY & PROFITABLY .......... 14
WHAT WE ARE MISSING .......... 15
LIQUIDATION OF DEFENDANTS' OFFICE – PROPERTY & EQUIPMENT .......... 15
APPENDICES – REPORT EXHIBITS .......... 16

## EXECUTIVE SUMMARY

1. The named Receivership Defendants operated a *negative options marketing* business to consumers. The products being sold were identified as AuraVie, LeOR and Dellure.
2. Our first priority was to assist counsel in freezing the Receivership Defendants' bank accounts at Bank of America (BofA) and Wells Fargo Bank (WFB) totaling approximately $3.5million.
3. We subsequently accessed and secured the RD's books and records and electronic information made available to us.
4. Our investigation revealed that there were substantially more entities and related financial information than originally thought.
5. The named Receivership Defendants total 29. We identified 70 Merchant Accounts, 48 bank accounts, 18 sets of QuickBooks and 82 credit cards. See Exhibit 3.
6. In general, the Defendants were not forthcoming in response to the Receiver's requests for information. Multiple requests for information were made. Partial explanations were provided or none at all.
7. The Defendant entities that prepared their tax returns reported cumulative gross receipts of ~ $75 million for the tax years 2010 through 2014. During the same time period, the Defendants reported minimal profits (i.e., no corporate taxes or minimal taxes were paid). See Exhibit 5.
8. The Defendants' books and records that we were able to access were principally comprised of QuickBooks. We believe that these records are the most complete record of the financial transactions and results of operations for the Defendant entities.
9. Our analysis and comparison of the Defendants' tax returns and QuickBooks identified unreconciled differences between the two. A simple comparison of the two sets of data (i.e., QuickBooks and tax returns) identified large and small variances, and in some cases no variances. In short, there was no consistency in the comparison of tax returns and QuickBooks. See Exhibit 8.
10. Analysis of the Receivership Defendants' QuickBooks indicated the RD's did not report accounts receivables, inventories and only minimal

salary expense. We did not identify salaries paid to the individual defendants in QuickBooks. See Exhibit 6.

11. We identified ~ $653,000 in checks made payable to BofA, WFB, Chase Bank and Citibank (potentially payments for bank issued credit cards). These payments could have been a mechanism for the individual Defendants to support their lifestyles, withdraw cash from the businesses, and pay personal credit cards, move money offshore, etc., since we did not identify salaries paid to the individual defendants. See Exhibit 13.
12. Analysis of the entities' chargeback rates indicates the rates for RD's ranged between *14%* and *35%* for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of *1%*.

**INTRODUCTION**

On June 16, 2015, Charlene Koonce was appointed as Temporary Receiver ("Receiver") for the Receivership Defendants.

On June 16, 2015, Brandlin & Associates was engaged by the court appointed Receiver's counsel, Scheef & Stone, LLP.

On June 18, 2015, we met with Ms. Koonce, representatives of the Federal Trade Commission (FTC), Receiver's counsel, IT consultants and members of law enforcement and entered and established control of the RD's offices at Canby.

Our preliminary objective was to locate and control the assets of the RD's. Once the initial identification was accomplished we began to piece together (with little or no help from the RD's) a "picture" of the operations, corporate and LLC entities, persons in control of those entities, the related financial information, interrelationships of the RD's, etc.

In order for us to perform our forensic procedures, we first needed to develop an understanding of the operations of the RD's and how the named RD's in the case were related to one another. We also needed to gain an understanding of the general business structure of the entities, how the

entities earned revenue, and what expenses the entities incurred to carry-out their business operations, etc.

We continued performing the investigation onsite at the Defendants' office and supporting the Receiver's needs through the date of this report (albeit the last two weeks of investigation were performed from B&A's office). We have incurred approximately 700 hours (through the date of this report) performing this investigation and providing ancillary support to the Receiver.

**DEFENDANTS' BUSINESS OPERATIONS**

The Defendants' operated as an online advertiser and seller of skincare products branded as AuraVie, LeOR and Dellure. These products were offered to customers as a "free trial" requiring only a $5.95 payment for shipping resulting in enrollment at $97.88 commencing within 10 days of receipt, absent cancellation.

The RD's operated the same enjoined conduct alleged in the complaint. In short, the Defendants operated using *negative option marketing*. Negative option marketing is defined as an offer or agreement to sell or provide any good or service, a provision under which the consumers silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

**RECEIVERSHIP DEFENDANTS**

Named Receivership Defendants and Receivership Defendants Not Yet Named are collectively referred to herein as the Receivership Defendants or RD's. RD's listed below, include only the corporate and limited liability company entities that fall within the definition of "Receivership Defendants."

The Named Receivership Defendants and Receivership Defendants Not Yet Named are colored coded in the exhibits attached to this report for ease of reference (e.g., Exhibit 1 – *Flow of Funds*).

| NAMED RECEIVERSHIP DEFENDANTS | RECEIVERSHIP DEFENDANTS NOT YET NAMED |
|---|---|
| 1 Adageo, LLC | 16 All-Star Beauty Products, Inc. |
| 2 Agoa Holdings, Inc. | 17 Apogee Network, LLC |
| 3 AMD Financial Network, Inc. | 18 Daria Media, Inc. |
| 4 Bunzai Media Group, Inc. | 19 DMA Media Holdings, Inc. |
| 5 CalEnergy, Inc. | 20 Focus Media Solutions, Inc. |
| 6 DSA Holdings, Inc. | 21 Forward Momentum, LLC |
| 7 Heritage Alliance Group, Inc. | 22 Merchant Leverage Group, Inc. |
| 8 Insight Media, Inc. | 23 Secured Commerce, LLC |
| 9 Kai Media, Inc. | 24 Secured Merchant, LLC |
| 10 Lifestyle Media Brands, Inc. | 25 Shalita Holdings, Inc. |
| 11 Media Urge, Inc. | 26 Sunset Holdings, LLC |
| 12 Pinnacle Logistics, Inc. | 27 Trigen, LLC |
| 13 Safehaven Ventures, Inc. | 28 USM Products, Inc. |
| 14 SBM Management, Inc. | |
| 15 Zen Mobile Media, Inc. | |

RD's listed below include only the individuals listed as RD's on the Temporary Restraining Order (TRO) dated June 16, 2015.

| RECEIVERSHIP DEFENDANTS - INDIVIDUALLY AND AS AN OFFICER OR MANAGER |
|---|
| 1 Alon Nottea (son) |
| 2 Doron Nottea (son) |
| 3 Motti Nottea (father or uncle) |
| 4 Igor Latsanovski |
| 5 Roi Reuveni |
| 6 Oz Mizrahi |
| 7 Kristopher Bond (aka Ray Ibbot) |

Note that, by and large, the individual RDs produced only limited individual information. At no time did the individual RDs produce complete banking records, tax returns and / or credit card statements.

### NATURE OF BUSINESS

In its simplest form, the RDs sold beauty products over the internet to consumers. The consumers paid for the products offered, with their credit cards. The initial purchase resulted in the enrollment in the RD's program

that resulted in subsequent continuation and ongoing participation in the RDs' campaign to sell beauty products.

The charges on the consumers' credit card were collected by a credit card processor (e.g., UMS Banking, Global Payments, Signapay, Merchant Services, EVO, etc.). These processors deposited the sale proceeds in the Merchant Entities' bank accounts (i.e., Agoa Holdings, Inc., All Star Beauty Products, Inc., AMD Financial Network, Inc., DMA Media Holdings, Inc., DSA Holdings Inc., Heritage Alliance Group, Inc., etc.). The Merchant Entities then paid various expenses and distributed much of their funds to other RD's.

The Receivership Defendants' operations are complex, interrelated, incestuous and intentionally obscured. There are a multitude of merchant accounts, bank accounts and companies, credit cards, significant cash receipts and cash disbursements between and among commonly controlled companies, cash receipts and disbursements to affiliated companies which do not provide services to the Defendant entities, and multiple aliases used by the Defendants. We believe the organizational setup was intentionally designed to obscure the financial position, operational results and the transfer of funds from one Defendant entity to another. In short, the Defendant entities sold a limited number of stock keeping units (SKUs) however, it had an unexplainable organizational structure and reported losses, marginal profits and an excess of cash disbursements over cash receipts.

Exhibits 1 and 2 to this report depicts the flow of funds (*flow of funds*) received from consumer credit or debit cards and how the Defendant entities funneled the monies to other Defendant entities. The creation of this chart is based on varying sources of information that is discussed later in this report.

Based on information derived from the Defendant entities (tax returns, QuickBooks, bank statements, check facsimiles, etc.) and the lack of information provided by the Defendants themselves, it appears the Defendants operated in a manner to eliminate / hide profits, circumvent taxation (both personal and corporate) and prey on consumers.

Our forensic investigation was principally conducted at the RD's Canby location. Our initial inspection of the Defendants' offices revealed multiple

banking records (check books (~ 150 different bank accounts were identified just from collection of the check books, credit and debit cards (~ 100 different bank cards were identified and located in Doron Nottea's desk), multiple computers (principally computers), a computer server, surveillance monitors of the Defendants' other operating locations as well as a residential home (believed to be one of the Defendants') and varying hardcopy documents. In addition, the Receiver secured Doron Nottea's personal attaché case containing cash totaling ~ $3,600 ($3,500 in one hundred dollar bills), a safe deposit box key to a safe deposit box that contained ~ $456,000 in cash, and other miscellaneous items. Please refer to Exhibit 1 which contains pictures depicting the above.

### INFORMATION MADE AVAILABLE

The information that was available to review to piece together the scope and duration of the RDs' operations included primarily QuickBooks data, bank account information, tax returns, credit card activity, etc.

As user names and passwords were secured from the RD's, we accessed the QuickBooks online for each of the RD's that made their QuickBooks data available to us. The QuickBooks data included cash receipts and disbursements reports, financial statements, including the asset and liability accounts, etc., for each of these entities.

A few of the RD entities made available all of the requested data. Most of the entities did not produce either QuickBooks (or similar data), bank account information or tax returns. A few of the RDs did not produce any of this information.

### DAVIDIAN & ASSOCIATES, CPAS

Davidian & Associates, CPAs (*aka* David Davidian) was the paid tax preparer for many of the specific Defendant entities. Mr. Davidian provided copies of tax returns for the Defendant entities for the period 2010 through 2014. A summary of the tax returns is included in Exhibit 5. From those records the RDs for which we have information generated gross revenues of over $75 million, combined, for the five (5) years 2010 through 2014. During that time the taxable income aggregated $26,000 for all the RDs for which tax return data was made available.

Because of the magnitude of the RD transactions and transfers, it is impossible to determine if the business could be viable standalone enterprises, if operated legally.

**INFORMATION REVIEWED**

QuickBooks Online

We learned that many of the RD's maintained their books and records using QuickBooks online (QB's, QB's online or QuickBooks).

As we obtained the user name and password for the QB online accounts, we accessed and evaluated QuickBooks for each Defendant entity. From the QB files, we were able to export cash receipts and cash disbursements records to Excel. Once in Excel we were able to analyze and summarize cash receipts and disbursements transactions by date, payee, amount, etc.

The exports of this data covered the period from January 1, 2014 through, circa, June 30, 2015. We exported balance sheets as of December 31, 2014 and circa June 30, 2015, respectively. We also exported income statements for the twelve months ended December 31, 2014 and six months ended circa June 30, 2015, respectively. See Exhibits 6, 7 and 8.

Balance Sheets

The typical items or accounts reported in the Defendant entities' balance sheets were cash, accounts receivable and credit card liability.

The Defendant entities did not report inventories on their respective balance sheets as of the aforementioned time periods which we would have expected. Inventories would have included purchases and yet to be sold beauty products.

Please refer to Exhibit 6 which contains a summary of QuickBooks balance sheets.

Statements of Operations

The individual Defendant entities' typically reported little or no profit from operations despite, in some cases, millions of dollars of revenue. The Defendant entities' also reported little or no payroll expense. Most often the statement of operations included hundreds of thousands of dollars or even

millions of dollars in marketing and / or credit card expense which offset revenues.

During the 18 months ended June 30, 2015, collectively, the Defendant entities' reported revenues and expenses of $18.7 million and $18.7 million, respectively.

In short, the books and records (i.e., QuickBooks) of the Defendant entities' reported profits, collectively of $6,000.

Please refer to Exhibit 7 which contains a summary of QuickBooks statements of operations.

Cash Receipts & Cash Disbursements (based on QuickBooks data)
In all we analyzed 48 bank accounts over 18 months. We analyzed many of the RD's bank account records where user name and passwords were provided. We inspected the RD's QuickBooks data and verified the RD's banking transactions were recorded in QuickBooks. The QuickBooks data for the period January 1, 2014 through June 30, 2015 indentified the named Receivership Defendants had cash receipts and disbursements of $14,315,000 and $14,519,519, respectively of a net cash outflow of $204,520 indicating these entities cannot operate without 3rd party financial assistance.

The Receivership Defendants Not Yet Determined (who provided us access to their records) reported similar results. Before Focus Media Solutions, Inc., the Net Cash Inflow is $339,432. After eliminating Focus Media's Net Cash Inflow of $586,168, the net cash outflow becomes $246,736.

Overall with only two (2) isolated exceptions the entities spent more than they took in which is consistent with the QuickBooks and tax returns data for the entities which made this data available to us. See Exhibit 10 for additional details.

Tax Returns
We obtained copies of tax returns for some of the Defendants' entities from David Davidian, CPA. We obtained copies of tax returns for other Defendants' entities and / or individuals directly from the Defendants or from their counsel.

In some cases the data per the QuickBooks files reconciled to the tax return files. In other cases there were small differences. In some other cases the differences were significant. For example, the QuickBooks files for SBM Management, Inc. (SBM) reported profits for the year ended December 31, 2014 of $308,000. For the same period the tax return reported a loss of $3,000, a difference of ~ $311,000.

Between January 1, 2010 and December 31, 2014, the Defendant entities' in aggregate reported gross receipts of $75,470,000. During the same time period, the Defendant entities' reported operating expenses of $75,443,000. The aggregate net income for this time period was $26,000.

Refer to Exhibit 5 for a comparative summary of operating results per the tax returns.

### CREDIT CARD PROCESSORS

The Defendants had multiple accounts with credit card processors including UMS Banking (UMS), Global Payments, Inc. (Global Payments), Signapay, Merchant Services and EVO.

The purpose of the credit card processors was to allow customers to make payments via credit or debit cards.

During our investigation we identified at least seventy (70) Merchant Accounts that were related to skincare or beauty products that used credit card processors to collect and distribute customers' payments (refer to Exhibit 3).

#### Purpose of Merchant Accounts

There are four (4) parties involved in a typical credit card transaction. Below is a summary of the parties involved [**specific parties identified in brackets**].

1. Customer – a customer that uses his or her credit or debit card to pay for a purchase
2. Issuing Bank – a bank or financial institution that has issued a credit or debit card to the customer

3. Acquiring Bank – a bank or financial institution used for processing services [**UMS, Global Payments, Signapay, EVO, etc.**]
4. Merchant – merchant or business receiving the payment [**Defendants**]

Processing of and receipt of customer payments were typically deposited in the Defendants' bank accounts held at BofA and WFB.

In addition to processing and remitting customer payments to the Defendants, the credit card processors maintained "reserves" in the event there were customer chargebacks.

**BENEFICIARIES (SBM MANAGEMENT, INC. / CALENERGY, INC. / SUNSET HOLDINGS, LLC)**

The initial primary beneficiaries of the Defendants' negative option marketing operations were SBM Management, Inc. (SBM) and CalEnergy.

Once the Merchant Entities (see page 8, paragraph 2) collected the funds from the credit card processors who received fund from the negative option marketing operations, those funds were transmitted to SBM Management or CalEnergy. Also these collected funds were used to pay chargebacks (i.e., refunds), credit cards like American Express (AMEX), affiliated networks (the entities that connect the consumers with the RDs, fulfillment and call centers) and other expenses. In addition, payments were made to affiliated related party entities like Adageo, Agoa, AMD, etc. (see Exhibit 11).

With the exception of payments to Adageo, SBM and CalEnergy, these transfers resulted in practically a net neutral cash flow.

Adageo was a "personal consulting LLC" entity controlled by Alon Nottea and is a pass-through entity receiving consulting fees from the enjoined conduct.

Funds that were transferred to SBM and CalEnergy were used in various ways.

SBM funds were used to pay AMEX charges, all other operating expenses and transfers to CalEnergy and Media Urge (~ $147,000, $46,000 of which was transferred to Adageo). See Exhibit 10 for additional details.

CalEnergy received funds from RDs ($650,000) coupled with the funds received from Traska Komerebanka and Danske Bank ($7,066,500) were used to fund transfers to Igor Latsanovski ($1,856,000) and Sunset Holdings ($4,591,000), pay AMEX charges ($449,551), etc. See Exhibit 11 for additional information.

Sunset Holdings, LLC (Sunset) had total cash receipts between January 2014 and June 2015 of $8,037,640. $4,601,000 came from CalEnergy, $900,000 was received from Igor Latsanovski, and the balance was received from what appeared to be unrelated third parties. During the same period, Sunset Holdings spent $6,219,925. $300,000 was transferred back to CalEnergy and $5,191,622 appears to have been disbursed to various financial institutions in what appeared to be real estate related transactions. The vast majority of the income was received from CalEnergy and Igor Latsanovski who were direct beneficiaries of the enjoined conduct of the RD's. See Exhibit 12 for additional details.

**ABILITY TO OPERATE LEGALLY & PROFITABLY**

We considered whether any of these entities could operate legally and profitability.

The data available (tax returns, QuickBooks and bank records) all seems to indicate that the individual and combined operations are breakeven at best which when operating implementing the proscribed enjoined conduct.

The tax returns over the 5 years indicate revenues of ~ $75 million and expenses of the same.

The QuickBooks data for the 18 months ended June 2015 reflect income of $18,732,000 and expenses of $18,726,000, resulting in a marginal profit of $6,000.

Cash receipts and disbursements per QuickBooks for the 18 months ended June 2015 indicate that the RD's took in $20,767,203 and spent $20,427,770 indicating more cash was received than was spent by $339,000. However, this includes the results from Focus Media Solutions. Focus Media Solutions is $586,168 more in receipts than disbursements. Focus Media Solutions estimates that *50%* of their income or $2.2 million was derived from enjoined

conduct. Eliminating *50%* of their income would eliminate the $586,168 surplus.

Given these factors that the data available indicates a breakeven at best and given that a substantial portion of the results of these operations include enjoined conduct, its elimination would most definitively result in operations that would not be profitable.

### WHAT WE ARE MISSING

Exhibit 3 presents by RD the data that was accessible partially or completely. As can be seen in the above exhibit a substantial amount of data is missing. The missing data coupled with an inability to reconcile between QuickBooks and tax returns and QuickBooks and bank account activity made our investigation unnecessarily complex, time consuming and incomplete.

In addition, the RD's did not provide information requested of them regarding the credit card processors. The only credit card processor information that we identified is based on the information obtained from the RD's offices. There may be other credit card processors that we are not aware. This information would be especially useful as it could identify additional inflows of cash receipts from consumers and potentially other entities that participated in negative option marketing.

### LIQUIDATION OF DEFENDANTS' OFFICE – PROPERTY & EQUIPMENT

The Defendants' office contains varying pieces of property (office furniture) and equipment (computer equipment, copier, fax machine, etc.). The Defendants' assets also include a delivery van that was identified and parked behind Canby – Suite 109.

We inspected the contents of the Defendants' office and have categorized the items into the following broad categories.

1. Computer equipment (desktop computers, monitors, printers, server rack, etc.)
2. Video monitors / televisions / overhead projectors
3. Office furniture (desks, chairs, credenza, couches, refrigerator, etc.)
4. Other (bikes, video cassettes, storage records, etc.)

The Defendants' office includes a backroom with a rollup door similar to a public storage rental unit. Approximately half of the items listed above are located in the office warehouse. Please refer to Exhibit 14 which contains pictures depicting the above.

A formal liquidation assessment of the Defendants' office contents is not warranted since the primary nature of the items is electronics and from their appearance is aged (at least 2 years old). Electronic items are typically subject to accelerating obsolescence (depreciation) due new product developments (technological advancements and / or improvements).

Liquidating the Defendants' office contents in whole may provide a higher value to the estate rather than selling items piecemeal.

We estimate the liquidation value of the Defendants' office contents to be no more than $20,000 (less liquidation costs).

Counsel estimated the fair value of the delivery van (VIN 1F~~xxx~~27497) parked behind Canby, Suite 109, between $2,000 and $6,900.

**APPENDICES – REPORT EXHIBITS**

Please refer to the Appendices to this report containing multiple exhibits summarizing and depicting the varying information that has been discussed throughout this Expert report.

Also included in the Appendices are pictures of the Defendant's office, related books and records, multiple banking records; including credit and debit cards with varying aliases, etc. which portray the Defendants' state of affairs, obscured nature of the books and records, lack of formalized or institutionalized operations, etc.