1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3         HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4  FEDERAL TRADE COMMISSION,          )
                                      )
5                        Plaintiff,   )
                                      )      CASE NO.
6          vs.                        )
                                      )      CV 15-4527-GW(PLAx)
7  BUNZAI MEDIA GROUP, INC., et al.,  )
                                      )
8                        Defendants.  )
9  _____)

10

11

12                   REPORTER'S TRANSCRIPT OF
              ORDER TO SHOW CAUSE WHY A PRELIMINARY
                   INJUNCTION SHOULD NOT ISSUE
13                 THURSDAY, AUGUST 6, 2015
                           9:41 A.M.
14                 LOS ANGELES, CALIFORNIA

15

16

17

18

19

20    _____

21
          DEBI READ, CSR 3949 CRR RMR RDR
22        FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET 432A
23        LOS ANGELES, CALIFORNIA 90012
                READIT3949@GMAIL.COM
24

25

1                    **A P P E A R A N C E S**

2

3   **ON BEHALF OF THE PLAINTIFF:**

        FEDERAL TRADE COMMISSION
4       BY:  REID A. TEPFER
             LUIS H. GALLEGOS
5            Attorneys at Law
        Southwest Region
6       1999 Bryan Street, Suite 2150
        Dallas, Texas 75201
7       214-979-9395/214-979-9383
        rtepfer@ftc.gov/lgallegos@ftc.gov

8

9   **ON BEHALF OF THE DEFENDANTS:**

10      SCHEPER KIM & HARRIS LLP
        BY:  MARC HARRIS
11           ANNAH S. KIM
             Attorney at Law
12      One Bunker Hill
        601 W. Fifth Street 12th Floor
13      Los Angeles, California 90071
        213-613-4655/213-61304662
14      mharris@scheperkim.com/akim@scheperkim.com

15

    **RECEIVER:**
16
        SCHEEF & STONE, L.L.P.
17      BY:  CHARLENE C. KOONCE
             Attorney at Law
18      500 N. Akard, Suite 2700
        Dallas, Texas 75201
19      214-706-4200
        charlene.koonce@solidcounsel.com

20

21

22

23

24

25

```
 1            LOS ANGELES, CALIFORNIA; THURSDAY, AUGUST 6, 2015

 2                           9:41 A.M.

 3                            -o0o-

 4            (Call to Order of the Court.)

 5       THE COURT:  All right.  Let me call the matter of -- let

 6   me call the matter of Federal Trade Commission versus Bunzai

 7   Media.

 8       Let me ask is there any other case that I haven't called

 9   other than FTC?  (No response.)  No?

10       Okay.  In that case I'm calling that case.  Let me have

11   appearances.

12            MR. TEPFER:  Good morning, your Honor.

13       Reid Tepfer for the Federal Trade Commission.

14            MS. KOONCE:  Good morning, your Honor.

15       Charlene Koonce, the Receiver.

16            THE COURT:  All right.  Why aren't you sitting --

17            MS. KOONCE:  Well, I'm never sure.  Nobody

18   necessarily wants me to sit with them because I'm not either

19   side.

20            THE COURT:  Well, let me put it this way:  You're

21   closer to that side than you are to the other side.

22            MR. GALLEGOS:  Luis Gallegos on behalf of Federal

23   Trade Commission.

24            MR. HARRIS:  Your Honor, Marc Harris and

25   Annah Kim on behalf of Igor Latsanovski and CalEnergy.
```

```
 1            THE COURT:  Anybody else making appearances?

 2        Let me ask if I understand the situation at this point in

 3   time.  Insofar as all of the defendants are concerned, the only

 4   ones that are making an appearance to oppose the Motion for

 5   Preliminary Injunction are -- I'll refer to him as Mr. L since

 6   I can't pronounce his name, and also CalEnergy.  Every other

 7   defendant either has stipulated or there's been a default

 8   taken; is that correct?

 9            MR. TEPFER:  Your Honor, we only anticipate those

10   two defendants.  There is another defendant in our proposed

11   preliminary injunction, defendant Khristopher Bond, but we

12   don't anticipate him appearing.  He hasn't been responsive so

13   far.

14            THE COURT:  Okay.  Has a default been taken as to

15   him?

16            MR. TEPFER:  We filed a default, yes, sir.

17            THE COURT:  All right.

18            MR. HARRIS:  Your Honor, there is one issue with

19   respect to the stipulations and orders that have been entered

20   with respect to the other defendants.  My understanding is that

21   when the parties were negotiating with the FTC over those

22   stipulations, the FTC requested that there be findings in the

23   proposed order relating to my clients, the two clients that are

24   here today, and those orders went through appointing the

25   permanent receiver, taking action with respect to CalEnergy in
```

particular, and we've asked counsel for the FTC to agree to

modify those orders.  He's agreed, but no paperwork has been

filed.

THE COURT:  Well, let me put it -- I presumed when I

signed off on those things that they were just doing that

insofar as they have any interests in CalEnergy, etc., etc.

But, obviously, they cannot bind the corporation or they can't

bind Mr. L because, obviously, they wouldn't have authority.

So that's how I viewed it and I presume the FTC views it in the

same way.

MR. TEPFER:  Yes, your Honor, that's how we viewed

it, but we aren't opposed to amending it for CalEnergy.

THE COURT:  All right.  That's fine.

Now, to summarize what I think is the situation at this

point in time for purposes of the preliminary injunction, it

appears to the Court that no one is really arguing at this

stage that the FTC has failed to supply sufficient evidence

that certain defendants were violating Section 5 of the FTC

Act, 15 U.S.C. Section 45 subpart(a), Section 5 of the Restore

Online Shoppers' Confidence Act, 15 U.S.C. Section 84 -- well,

the FTC says 8404, but probably should be 8403, and the

Electronic Fund Transfer Act, 15 U.S.C. Section 16930

subpart(c).

However, their issues are, one, whether Mr. L is anything

more than a passive investor of certain of the defendants'

1    operations, and the -- two, the nature and extent of

2    CalEnergy's involvement.  And I think even if those issues are

3    decided against those defendants, there is a issue as to the

4    extent of the asset freeze in regards to those two defendants.

5         Let me ask are those the issues really that we have to

6    resolve at this point in time?

7              MR. TEPFER:  Yes, your Honor, I believe that

8    summarizes it.

9              MR. HARRIS:  I would agree, your Honor.

10             THE COURT:  Okay.  Let me ask.  It seems to me that

11   certainly as to Mr. L, he's clearly more than a passive

12   investor.  The FTC has provided the Court with evidentiary

13   materials, and from what he says, for example, in e-mails and

14   things of that sort, he's pretty much more than an investor and

15   he refers to himself often as being more than an investor.  And

16   so I don't understand how at this point in time he's going to

17   be able to argue that the FTC has not shown what it needs to

18   show as to him insofar as his involvement.

19             MR. HARRIS:  Can I be heard on that, your Honor?

20             THE COURT:  Sure.

21             MR. HARRIS:  Your Honor, there's certainly a lot of

22   paper that's been submitted to the Court, and the FTC is

23   relying heavily on the Receiver's efforts in trying to build a

24   case against Mr. Latsanovski.  I think the Receiver and her law

25   firm have spent close to maybe over a million dollars in little

```
 1    over a month primarily trying to build a case against
 2    Mr. Latsanovski.
 3              THE COURT:  Hopefully they haven't spent that much
 4    money.
 5              MR. HARRIS:  I believe they have, your Honor.
 6              THE COURT:  That would be kind of high.
 7              MR. HARRIS:  I certainly agree with that and I think
 8    that's where we stand, but Ms. Koonce can speak to that.
 9              MS. KOONCE:  It's not quite that much, your Honor.
10              MR. HARRIS:  So -- but it's certainly in that
11    neighborhood.  And that's where the efforts have been focussed,
12    your Honor, because that's where the money is.
13         And what they've come up with is long on invective and
14    accusations --
15              THE COURT:  Well, no, they come out -- for example,
16    how do you respond to Document No. 119-1, the e-mail of
17    August 14th, 2013?  I mean, you have --
18              MR. HARRIS:  Yes.
19              THE COURT:  -- Mr. L saying certain things,
20    referring to himself as "your sincere partner."  You know, he
21    is making statements as to how the operations should go
22    forward.  I mean, an investor doesn't do that.
23              MR. HARRIS:  Well, I would disagree, your Honor, and
24    I think this is -- you've grabbed the -- or pointed to the key
25    document.  This is the lynchpin of the argument with respect to
```

```
 1   Mr. --

 2          THE COURT:  Well, let's put it this way, it's one of

 3   a number of lynchpins.

 4          MR. HARRIS:  Well, I'll address the others

 5   generally.  I'm not going to go through them all, but this is a

 6   key document for the FTC and for the Receiver, and I would

 7   submit this document -- by the way, written in August of 2013,

 8   which is well into if not at the very tail end of this business

 9   venture -- is written by someone who's loaned a lot of money to

10   this organization -- to this set of companies run by Mr. Alon

11   Nottea, and he's entitled to ask and he does ask, "What's

12   happening with my money?"

13          And you can see from the broken English and terminology

14   that he uses, he's saying, I know this is your company, I know

15   you're running this company, but I'm entitled -- I'd like to

16   state my opinion for what it's worth, and that's what he does

17   in this e-mail.

18          And we can say -- you could say that takes him out of the

19   passive investor role, but really all he's doing is offering

20   his two cents couched throughout this e-mail as, You're running

21   the company; let me just tell you what I think.  I think you

22   have too many people, your expenses are too high, and so on,

23   and he's entitled to do that.

24          And if the -- if in this -- if we have a trial in this

25   case over whether this e-mail reflects direct personal
```

1    involvement in the fraud at issue, then let's have that case.

2    But it's certainly --

3            THE COURT:  Let me just stop you.  What is this

4    language?  At one point he says, "We talked about having fewer

5    employees."  But he says, "After all, people is a problem.

6    Dividing the information can give us testimony in court, or

7    just come up with these statements to show us," etc., etc.,

8    etc.

9            MR. HARRIS:  Yeah.

10           THE COURT:  I mean --

11           MR. HARRIS:  Well, this is -- those couple of words,

12   the FTC has run off on this theory that somehow he's trying to

13   keep people quiet from exposing the fraud in court.  That's

14   just a fanciful interpretation of a document that was created

15   using --

16           THE COURT:  I don't necessarily agree with that

17   interpretation by the FTC, but it certainly indicates to me,

18   you know, that he is not a passive investor.  A passive

19   investor doesn't say something of that sort.

20           MR. HARRIS:  Let me -- let me explain, your Honor.

21   You asked what he means by that.  He's been told by the people

22   he's given money to for this business that the expenses are

23   very high.  They've got these personnel costs that are so high,

24   he's saying in this letter, You've got too many people.  You

25   need to pare it down.  You need to cut the costs.  Too many

 1   people, more problems, and he's giving his two cents.

 2       Now at the end of the day, your Honor, that may be an

 3   argument and we're going to have a battle in this case as to

 4   whether the language that he used in this e-mail or these other

 5   documents that have flowed to him demonstrate some knowledge --

 6            THE COURT:  Let me just ask why is he claiming to be

 7   an employee of Bunzai?

 8            MR. HARRIS:  There is -- he's not claiming to be an

 9   employee of Bunzai.

10            THE COURT:  Well, he did say in documents that he

11   submitted to the federal government that he is an employee.

12   Isn't that in one of his immigration papers or something of

13   that sort somewhere there's a reference to him being an

14   employee?  I mean, one doesn't do that as a passive investor

15   either.

16            MR. HARRIS:  Your Honor, I understand the Court's --

17   the Court's points on this and I just want to say there is --

18   Mr. -- we've been very open with the government.

19   Mr. Latsanovski testified; we've given a lot of documents about

20   what his involvement in the company was.

21       Now, if they want to say -- if the FTC in this trial in

22   this case wants to argue that he was close enough and was

23   interacting enough with the Notteas such that he should be held

24   responsible for -- for their actions in this case, okay, that's

25   what the case is going to be about.  And we're not going to

```
 1    resolve that with the Court today about whether he was -- he
 2    clearly was not running the company.
 3        He clearly invested money in the company, and if his
 4    inquiries about the company or his allowing his name to be used
 5    for one of these merchant accounts, which he did -- it's not a
 6    good fact for us, but he did -- if all of those things put
 7    together result in some level of liability for him, okay,
 8    that's what we're having this case for.
 9            THE COURT:  All right.  But that's the reason why
10    we're having a preliminary injunction for also is a question as
11    to whether the FTC met its -- meets its burden for obtaining a
12    preliminary injunction of some sort.  And so certainly I think
13    as to Mr. L they've done that.
14        Let me ask the FTC, do you want to respond to anything
15    that's been argued so far?
16            MR. TEPFER:  Yes, your Honor.  I'd be happy to go
17    through any of the evidence.  I believe that --
18            THE COURT:  I looked at the evidence.  Why do you
19    want to go through it if I've looked at it?
20            MR. TEPFER:  I feel that -- I feel that it's
21    overwhelming in this case, and if you're satisfied that
22    Mr. Latsanovski is more than a passive investor --
23            THE COURT:  I am -- I am satisfied.  I haven't heard
24    anything from defense counsel that would indicate to me that
25    the evidence is not sufficient at this point in time for a
```

```
 1    determination to be made for purposes of preliminary injunction
 2    insofar as his role and that his role was more than a passive
 3    investor.  Yes, I agree with that.
 4        Okay.  So that being said, you want to say anything else?
 5            MR. TEPFER:  I'd be happy to address the role of
 6    CalEnergy --
 7            THE COURT:  Well, that's what I want you to address
 8    because that is a little more complicated to my mind.  So let
 9    me have you address that.  I'll allow defense counsel to
10    respond.
11            MR. TEPFER:  Yes.  So CalEnergy is essentially
12    Latsanovski's alter ego --
13            THE COURT:  I understand that.  But when you say
14    alter ego, do you mean alter ego in the -- well, let me put it
15    this way.  What law are you relying on for the elements of
16    alter ego status?
17            MR. TEPFER:  Well, perhaps not -- not technically
18    alter ego.  It's essentially CalEnergy is Igor Latsanovski and
19    as such it's every bit as involved as he is.  It's essentially
20    just a way to shield liability, to put another name on
21    documents for actions that defendant Latsanovski's taking.
22            THE COURT:  Well, let me just ask.  Is the FTC
23    taking the position that it's not a separate -- it's not, like,
24    properly incorporated or something to that extent?
25            MR. TEPFER:  No, your Honor, not that it wasn't
```

1   properly incorporated, but as with all the various shell

2   companies throughout, these companies don't observe corporate

3   formalities.  It's -- it's essentially just as involved as he

4   is and has an essential role in the common enterprise and is

5   liable for its role in the common enterprise for infusing the

6   various Bunzai companies --

7            THE COURT:  Let me just ask.  Did it write letters

8   of this sort, like, for example, you know, something came from

9   CalEnergy that had language that -- you know, similar to what

10  is contained in Document No. 119-1 at page 477?  Is there

11  something you have from CalEnergy that states something of

12  that --

13           MR. TEPFER:  We do have -- if I could reference --

14  this was in Docket 5 of the memo of points and authorities on

15  the temporary restraining order.  It shows the relationship of

16  CalEnergy.  It holds itself out to be the parent company of

17  Pinnacle which is the successor-in-interest to Bunzai Media

18  Group, and it also took actions in infusing the Bunzai

19  companies and keeping them afloat.  It was a part of the common

20  enterprise an an essential component of it, in fact.

21           THE COURT:  All right.  All right.  What else?

22           MR. TEPFER:  I would also make the point that

23  defendant Latsanovski claims that this is merely an investment

24  company and shouldn't be liable for infusing the common

25  enterprise with capital.  But in fact, even assuming that were

```
 1    the case that it was merely an investment company, it shouldn't
 2    be held harmless for its actions because these loans were
 3    extended with reckless disregard or with knowledge of --
 4              THE COURT:  Let me ask you.  Is CalEnergy's sources
 5    of revenue solely based upon the companies that are involved
 6    here in the improper marketing and sales?  In other words,
 7    doesn't CalEnergy have other forms of revenue from sources that
 8    are not tainted by these particular actions?
 9              MR. TEPFER:  Uhm, your Honor, I believe that it did
10    receive funds from -- from outside -- outside of the common
11    enterprise, but I believe that it is still liable for the --
12    for its participation in the common enterprise.  Perhaps the
13    Receiver can speak more to the other sources of funds.
14              THE COURT:  Yes.
15              MS. KOONCE:  Yes, your Honor.  I don't remember the
16    exact number off the top of my head, but I know a substantial
17    amount of the funds that flowed into CalEnergy came from Guayas
18    Ltd., which is an Estonian company that also owned a hundred
19    percent -- it's a hundred percent owned by
20    Mr. Latsanovski.  I believe that there was $900,000 in
21    cashier's checks.
22              THE COURT:  But the question I had was that, you
23    know, if one were to trace where those funds came from, are
24    they funds that are generated by the defendants in this case,
25    in other words, the business operations in this case as to
```

1    these products?

2              MS. KOONCE:  Only, I think, 1.3 million is the total

3    that we have traced from the defendants that the skin care

4    proceeds directly into CalEnergy.

5              THE COURT:  Okay.

6              MR. HARRIS:  It's actually 1.6 million, your Honor,

7    and we gave that information to the government.

8              THE COURT:  Okay.

9              MR. HARRIS:  And what happened was -- and it's been

10   confirmed -- but we provided that information.  We provided the

11   entirety of the financial relationship between CalEnergy and

12   these subject companies.

13        And as we've -- as we've -- the Court may be aware of this

14   'cause it's been in a couple of our pleadings, there was $1.6

15   million loaned to the skin care businesses -- we'll call them

16   the Bunzai companies -- over a period of several years.  That

17   money was paid back, loaned, paid back, sort of like a line of

18   credit, and at the end of the day when it all washed out -- I'm

19   sorry.  I may have misspoken.  1.9 million went in the

20   direction of -- of -- from the skin care companies to

21   CalEnergy, and 1.6 had been loaned.  So there's a net profit;

22   that's where we come up with this $317,000 which was the

23   profit.  So that's the financial relationship between CalEnergy

24   and the skin care companies.

25             THE COURT:  Okay.

1          MS. KOONCE:  I just want to speak to --

2    Mr. Latsanovski was very compliant in what he gave us.  But I

3    will say the bank records for Bunzai have been -- they're

4    nonexistent.  It's been closed for three years, and so they

5    gave us a summary.  They gave us access to the accounts that

6    were open and -- except one account which Bank of America

7    wouldn't give anybody access to.  So they were compliant.

8        But I want to be clear here that the information that we

9    have has been limited as well, for instance, that the Sunset

10   Holdings that you're addressing now, we don't -- we don't have

11   the information.  We've been given a summary.  I don't have

12   closing statements.  I don't know where that money came from.

13         THE COURT:  All right.  I mean, I can hear other

14   arguments, but it seems to me that I think I'm showing where

15   I'm heading at this point in time in terms of the preliminary

16   injunction.  I think a preliminary injunction certainly as to

17   the operations aspect of it, I'm going to issue the preliminary

18   injunction insofar as, you know, what should be, you know --

19   anybody who's going to be continuing marketing, etc., etc.,

20   what they're supposed to disclose and things of that sort.

21         MR. HARRIS:  Your Honor, I should have said at the

22   outset, we have no problem with an injunction as to conduct.

23         THE COURT:  Well, okay.  So -- and as I spoke --

24   said in the beginning, the real question is the extent of any

25   asset freeze and things of that sort.  It seems to me that to

```
1   the extent -- and this is something, you know, if we want to,
2   you know, litigate further, I'll give you more time to litigate
3   it.  But it seems to me that hopefully the parties can get
4   together and agree upon -- I mean, there's going to have to be
5   some asset freeze, and as to certain of the defendants they've
6   already agreed to, for all intents and purposes.
7        But insofar as if CalEnergy has lawful or at least, put it
8   this way, sources of income and revenue that is being generated
9   that is outside of the alleged improper conduct, I don't see
10  why I'd be freezing those -- those asset-type things.
11       And even though I understand that -- with the following
12  proviso as well:  Obviously, I don't want CalEnergy or Mr. L to
13  go into accounts and take away all the assets in the accounts
14  and things of that sort too, because, obviously, you know, if
15  they are found to be liable, I want them -- there to be some
16  basis for -- for recovery.
17       But conversely, however, for example, if there're like
18  monthly expenses the corporation has, for example, if it has
19  any employees or something like that, if it has a payroll,
20  taxes, and things of that sort, those things, obviously, should
21  be paid, etc., etc., and if there is, you know, things of that
22  sort.
23       And, obviously, to the extent that I think Mr. L is
24  entitled to some living expenses, you know, and so I don't
25  think he should be deprived of those while this case is ongoing
```

```
 1   because this case may be -- you know, take a long time to
 2   resolve.  Although, frankly, if everybody's smart, everybody
 3   should get together and try to resolve it quickly because
 4   sometimes, as it turns out, all the money is spent in terms of
 5   like -- not to blame the Receiver for having spent a million
 6   dollars or up to a million dollars or almost a million dollars
 7   at this point in time -- these things get so phenomenally
 8   expensive that it's kind of like a bankruptcy action.  Somebody
 9   goes into bankruptcy and what happens is all the bankruptcy
10   attorneys get all the fees and pretty much nothing is left for
11   the creditors and anything else -- not that the government
12   attorneys are like that.
13        But just seems to me hopefully the parties can resolve the
14   issue and, you know, might just very well be this is an
15   accounting issue at some point in time.
16             MR. HARRIS:  I hope we can, your Honor.
17        If I can call the Court's attention to one -- one issue
18   here and it's where the assets really are.  There's some bank
19   accounts that have been frozen, but the assets that we're most
20   concerned about relate to a business that CalEnergy has
21   invested in called Sunset Holdings.  Sunset Holdings is a real
22   estate company.  They fix and flip properties and they own
23   approximately ten pieces of real estate purchased with funds
24   that came -- and we've laid it out in our papers where every
25   penny came from.
```

1          THE COURT:  Let me stop.  Have those been -- has

2    that been a successful operation?

3          MR. HARRIS:  Well, successful in the sense that

4    properties' been purchased, they're in the process of being

5    rehabbed.  It's only been in existence since 2015, so nothing's

6    been sold, it hasn't generated income, but that's the problem.

7    They need to be able to fix, rehab, and sell these properties.

8          MS. KOONCE:  I just want to -- so with respect to

9    those properties, again we have asked multiple times for the

10   closing statements to find out how much was paid actually, what

11   is owed, what are the potential mechanic's liens or

12   construction liens, what is the salary owed to the gentleman

13   who's purportedly the CEO.  We have no idea because none of

14   it's been provided.

15        But I will say the information that's been provided by

16   Ms. Kim in an e-mail does demonstrate that the properties are

17   valued at I think around 7 million with loans of about 7.9.

18        If you look at the Sunset Holdings bank statements, the

19   amounts that are transferred out of the escrow companies do not

20   match the amounts that are supposedly paid for those

21   properties.

22          THE COURT:  Let me put it this way.  I understand

23   the FTC's position and -- but conversely, however, if there's

24   property that has been purchased and if there are liens on

25   those properties, you know --

1          MS. KOONCE:  But they're unsecured, your Honor.

2    There's no lien in place that we know of.

3          THE COURT:  Oh, they're not secured on the property?

4          MS. KOONCE:  No.  That's another one of the issues

5    that we've seen that there's no -- there's no -- there's no

6    lien.

7          THE COURT:  Who holds the liens?

8          MS. KOONCE:  Well, in one instance there is a woman

9    in Russia who contacted the escrow company after the closing

10   and she was supposed to have a lien.  In most of the other

11   instances I believe it's supposed to be Guayas Ltd., which is

12   Mr. Latsanovski's Estonian company, that loaned some of that

13   money through CalEnergy to start with, but there are no liens

14   in place.

15         MR. HARRIS:  I can explain that, your Honor.

16         THE COURT:  All right.

17         MR. HARRIS:  These -- the properties were in the

18   process of being -- there was an agreement that the properties

19   would be liened, the TRO came down and that couldn't happen.

20       And the reason they weren't liened previously is, as

21   Ms. Koonce correctly points out, Guayas Limited, which is a

22   company that is owned by Mr. Latsanovski, was the original

23   source of capital for the purchase of these properties.  At

24   some point Mr. Latsanovski had a dispute -- I wouldn't even

25   call it a dispute -- but a discussion with his partner in this

1  project -- in this Sunset Holdings.  It's the person -- his

2  name is Mike Panish -- he's the person who finds the

3  properties, he manages the rehab.  He's the sweat equity guy,

4  as Mr. Latsanovski is the guy who put up the money.

5      And Mr. Latsanovski and Mr. Panish were having a --

6  working out their arrangement, and it became clear to

7  Mr. Latsanovski at that point that Guayas, his company, should

8  have liens on these properties because now he's got Mr. Panish

9  who may claim an interest and may say he's not responsible for

10  the mortgage and so forth.

11      So the parties agreed liens would be put on the properties

12  by Guayas, the company that loaned the money.  That was in

13  process at the time the TRO came down and the liens couldn't be

14  recorded.

15          MS. KOONCE:  My understanding is -- and this has

16  been submitted to the Court -- there's some verbal agreement on

17  paper that was going to transfer interest to Mr. Panish.  That

18  happened on May 5th purportedly.  It's a very unusual document.

19  Again, these properties were purchased I think between

20  March 2015 and June -- it might have even been January.  So

21  there was quite a period of time in there when if there was

22  going to be a lien, a lien could have been put in place before

23  June 18th.  So again, this is reported, but these are just very

24  unusual transactions all in all.

25          THE COURT:  Let me just stop.  I don't -- the fact

1    that -- well, this is the way I kind of look at it.  It seems

2    to me that if there is a business flipping properties, that

3    7business probably should go forward if it is a potential

4    money-making proposition because the alternative is is that

5    somebody's not going to make the payments on the properties, or

6    in a sense that -- I presume there are mortgages on the

7    properties themselves, so the bank holds certain mortgages,

8    don't they?

9              MR. HARRIS:  No.

10             THE COURT:  Oh, so they're out free and clear?

11             MR. HARRIS:  Well, they're owned subject to these

12   loans from Guayas.  There's -- a line of credit was used for

13   one, but -- so that's --

14             THE COURT:  Let me put it this way.  If that's the

15   case, I can see actually even having just the -- the -- you

16   know, those operations still continuing -- not necessarily --

17   but, obviously, insofar as any future money's being put on --

18   into the properties, there has to be liens on the property for

19   those additional funds that are spent to rehab and that would

20   be recovered upon the sale.  That would be normal course.  I

21   don't have any problem with that.  I presume the FTC wouldn't

22   have a problem with that.

23             MR. TEPFER:  Your Honor, we have no issue with

24   the -- with that company continuing to operate.

25        As far as the assets that they do have, we feel that, you

1  know, Sunset Holdings, as the Receiver's concluded, is

2  essentially CalEnergy and Igor, and CalEnergy is Igor's a

3  hundred percent company.

4       So I feel that the defendants are attempting to read into

5  the law a tracing requirement that isn't there.  The source of

6  the assets isn't important to prove --

7            THE COURT:  Well, let me put it this way.

8            MR. TEPFER:  Yes, your Honor.

9            THE COURT:  For example, I'm not allowing those

10 assets to be sold or anything of that sort, you know.  I may

11 distribute it to people.  But I'm saying that if in fact the

12 properties -- there's a current operation on the properties to

13 rehab or re- -- you know, remodel, whatever, flip them for a

14 profit, those should be allowed to go forward.  And insofar as

15 any profit is made off them, that is -- that is generated not

16 from -- from, you know, bad conduct but just generated, I think

17 that CalEnergy or whoever it is should get those profits.

18            MR. TEPFER:  Yes, your Honor.

19            THE COURT:  Because we can argue about the prior

20 source of the funds, in other words, if he had -- out of the 7

21 million that was used to purchase the property, you know, like,

22 you know, 5 million, 6 million, or 1 million was derived from

23 the improper conduct that's involved in this case, well, those

24 moneys, obviously, should not go to CalEnergy or to Mr. L.

25       But insofar as the other stuff, if -- if it is, you know,

1    fine and dandy funds, they should go back to him, if at one

2    point these projects are completed and they're sold.

3              MR. TEPFER:  Yes, your Honor.  We wouldn't be

4    opposed to that.  The preliminary -- proposed preliminary

5    injunction provides for defendant Latsanovski to retain

6    after-acquired assets and that seems like that would be a good

7    way to perhaps pay for his living expenses going forward.

8              THE COURT:  Well, let me just ask.  Do you think the

9    parties can get together and reach -- 'cause you know how

10   I'm -- what I'm thinking at this point in time in terms of what

11   I'm going to do.  You can spend a lot of time and a lot of

12   money trying to get the fine points, or you guys can -- can get

13   together and reach a stipulation.

14             MR. HARRIS:  Here's the challenge, your Honor, and I

15   think we're certainly going to give it the college try.

16             THE COURT:  Okay.

17             MR. HARRIS:  We're so far apart in terms of how we

18   view sort of what Mr. Latsanovski's exposure is and what the

19   scope of what the FTC and the Receiver should be allowed to do

20   with respect to these legitimate companies.  And I'll take one

21   more minute on this, sort of backtracking a little bit.

22         The reason I started with this -- with this e-mail that

23   got us -- got the Court over the hurdle of -- of --

24             THE COURT:  You keep on saying like this was the

25   only document I looked at.  I looked at other documents.

1          MR. HARRIS:  But the reason I started with that

2     piece of it, even though I knew where the Court was going, is

3     'cause look where we've ended up.  We've got a situation where

4     the person who claims he was a past investor but the Court

5     finds no, I think more than that, I can see where the Court's

6     coming from on that issue, because of dipping his toe too far

7     into this company and injecting himself further than he should

8     have, so he can't get himself out of it right now on a motion

9     to dismiss or anything else.

10         We've now got completely separate legitimate companies

11    that are now being scrutinized by the Receiver, by the FTC; the

12    Receiver saying, Well, I don't know, that loan seems fishy to

13    me -- has nothing to do with the skin care business.  We've

14    gotten so far from sort of the core of this thing of what

15    should give the government rights as to Mr. Latsanovski, and

16    now we're -- we're now scrutinizing, liening up, or trying to

17    take money from a wholly legitimate business that is not

18    traceable to this skin care business.  And that's why we don't

19    see it the same way as the government.

20         THE COURT:  Oh --

21         MR. HARRIS:  That's what makes it challenging to --

22         THE COURT:  -- yes, you did.  Could it possibly be

23    that the parties could get together and resolve as many, for

24    example, of the companies that, you know, both sides can agree

25    upon, but then as to the companies where the parties cannot

1    agree upon, gear those up for like a mini hearing as just as to

2    those, and I'll make a ruling as to those separate?

3         You know, because the problem now is it will take a long

4    time, you know, to do everything, but it might be of all the

5    companies, it might be two or three that are at issue.  And

6    I'll allow both sides to give me the evidence as to those and

7    I'll make a determination as to whether or not I find that

8    they -- those companies -- you know, there's enough evidence to

9    make a determination that those companies are so divorced from

10   the improper conduct that is the source of this case that I

11   would say Hey, sorry, FTC, on that company at least up to

12   this -- as to this portion; I'm just giving it back to Mr.

13   Latsanovski.  He can do with it what he will.  I'm, in other

14   words, taking that out of the -- of the litigation, etc., etc.

15   Although if ultimately a judgment is found against him, you

16   know, whatever assets he has, including the val -- you know,

17   the proper assets that he might have gotten could be subject to

18   whatever penalty the FTC ultimately gets against him.  Then

19   they could seek to attach it at that point in time if they have

20   a judgment, etc.

21             MR. HARRIS:  We're happy to engage on that issue,

22   your Honor.

23             THE COURT:  Why don't you guys do that, see how far

24   you can get.  And, you know, just let me know how long -- much

25   period of time you need to do that sort of thing.

1          MS. KOONCE:  Can I have a point of clarity--

2          THE COURT:  Sure.

3          MS. KOONCE:  -- along the same line?  So what you

4    said before is that you would want Sunset Holdings which holds

5    the properties to continue operating, if that's possible.  My

6    question is, again, I don't know what the insurance costs --

7    you have to insure that property.

8          THE COURT:  Yes.

9          MS. KOONCE:  I don't know where the funds would come

10   from to make the improvements.  The loans that were applied

11   exceeded, purportedly, the value of what was bought.  More

12   money was loaned than the purchase price.  I don't know where

13   that money is.  And there's $212,000 in one account for Sunset,

14   and so I'm -- I need the Court's clarification in terms of what

15   my role would be in supervising --

16         THE COURT:  Well, no.  But if the -- if it's going

17   to go forward, it has to go forward on its own terms.  In other

18   words, I don't expect the FTC to supply money for insurance and

19   stuff like that.

20        So in other words, if costs are to be incurred like, for

21   example, supposedly there's supposedly people who have an

22   interest in -- on those properties but they don't have liens at

23   this point in time, so for all intents and purposes those

24   properties are clear of any mortgages.  You can get loans on

25   those properties to do the insurance, to do the expenses of

1   the -- of the -- of the rehab, etc.  I presume that that's how

2   it's going to go forward.  In other words, it's going to --

3   those projects are going to be going forward on that basis, and

4   whatever moneys are necessary, obviously there has to be review

5   of some sort by the Receiver/FTC to make sure that it's not --

6   it's not used -- to be used as some sort of device to siphon

7   off whatever money is worth on the property by bogus liens

8   being placed just to siphon money off.

9        But if, for example, a lien is placed on the property to

10  pay for insurance for the property, to pay for construction

11  costs and things of that sort, it seems to me that's where the

12  money would come from.  In other words, I don't expect the FTC

13  to be fronting the project.

14             MS. KOONCE:  So you would continue the asset freeze

15  with what's proven and just want Mr. Latsanovski or his partner

16  who's operating that to take liens to operate those --

17             THE COURT:  Yes.

18             MS. KOONCE:  -- and pay for them?

19             THE COURT:  Yes.  In other words, it wouldn't be --

20  they wouldn't be -- I wouldn't be allowing them to put in their

21  own liens for whatever moneys supposedly were invested, because

22  again, there is -- I've issued an order on that.  But insofar

23  as they want to go forward and -- with the project of

24  rehabilitating the properties, which is clearly not any

25  prohibited conduct in this particular case, they can do that.

1    Or I would also allow them, if they want to, to say, Hey,

2  at this point in time we're no longer interested, let's just

3  sell the property.  I would allow them to sell the property,

4  put the money in escrow to be resolved in this case, and if I

5  find, for example, that third parties other than Mr. L or even

6  of his associates placed money or gave him money to invest in

7  the property, you know, as part of the sale, I could say, Okay,

8  that portion I'll allow the return of that particular loaned

9  money, you know, etc.

10    But again, you know what I'm talking about here is I'm

11  talking about ongoing so that even though the property is

12  subject to, you know, some control by this litigation, that

13  there's sufficient freedom to make sure that we don't have a

14  situation where everything's lost because, you know -- you

15  know, property is either at some point in time, you know,

16  abandoned or something happens, somebody gets injured on the

17  properties or something of that sort.

18    MR. HARRIS:  I understand, your Honor.  I also

19  understand your directive that we should have a discussion to

20  try and resolve whether there are companies, businesses that

21  are divorced from this skin care business.

22    THE COURT:  Yes.  But also, the other thing about

23  that is if defendant wants to take that position, they're going

24  to have to offer whatever documents they have because the FTC's

25  going to have to be satisfied, at least to reach an agreement

```
 1   that those companies are so divorced that they shouldn't be
 2   part of this situation.
 3        But as I said, if the parties get together and turns out
 4   to maybe two or three companies they cannot reach an agreement,
 5   then you guys give me the evidence and I'll make a ruling at
 6   that point in time on the limited number of companies.
 7              MR. HARRIS:  Thank you, your Honor.
 8              THE COURT:  With all that said, how long do you
 9   think it'll take for you guys to discuss this, reach an
10   agreement, and if not, give me materials for me to do some sort
11   of hearing?
12              MR. HARRIS:  Well, if counsel are in town -- all --
13   Receiver's -- the Receiver and counsel are all from Texas.
14              THE COURT:  I'm leaving town today.
15              MR. HARRIS:  Understand that.  But we may be able to
16   take some time, if possible, depending on their travel
17   schedules.  But if not, we'd be available over the next several
18   days into next week to have those discussions.
19              MR. TEPFER:  We'd certainly be happy to have those
20   discussions.  First thing, we have a flight leaving relatively
21   soon.
22              THE COURT:  My plane leaves at 12:45.
23              MR. TEPFER:  Not quite that soon.
24              MR. HARRIS:  We better let you go, your Honor.
25   We'll work on it.
```

```
 1              THE COURT:  No, no, I can make it in plenty of time.
 2              MR. TEPFER:  Would two weeks perhaps?
 3              THE COURT:  Two weeks would be fine with me.  Is
 4    that going to be all right?
 5              MR. HARRIS:  Yes, your Honor.
 6              THE COURT:  I'll tell you what.  This is what I
 7    want, however, so let me ask.  In two weeks I'm going to hear
 8    the matter?  Or two weeks you're going to be able to give me
 9    something in writing?  Or what's going to happen in two weeks?
10              MR. HARRIS:  I would propose a status report to the
11    Court with the results of our efforts and then we would hear
12    from the Court as to whether the Court wants to set it for a
13    further hearing.
14              THE COURT:  I'll tell you what I'll do.  Give me a
15    status report on the 14th, that's a Friday, just letting me
16    know where you guys are.  And if it looks like you guys are
17    going to want a hearing, then tell me the status report when
18    you can get me materials for me to look at prior to the
19    hearing.  And then -- you can even propose a hearing date and
20    I'll let you know whether or not the hearing date is fine with
21    me.
22         But whatever materials you get to me, the more complicated
23    the materials are, the more time I'm going to need to look at
24    them.  And so if it's something that's really, you know --
25    well, first of all, if you agree on everything, great.  If you
```

 1   agree on something and it's not too complicated, then I can do

 2   a hearing in a couple of days.  But if it's something that's,

 3   you know, the mound of materials like a foot high, it's going

 4   to take me a while to look at that stuff -- not to criticize

 5   anybody.

 6            MR. HARRIS:  We'll be respectful of the Court's time

 7   and we understand.

 8            THE COURT:  All right.  And also if you guys can

 9   settle the matter, you know, hey, more power to you.  I mean,

10   the problem is just -- 'cause I handled a couple of other ones

11   of these things, and I handled one that went on for

12   two-and-a-half years, and by the end there wasn't any money.  I

13   mean, there was some money left over, but not enough to pay

14   anybody anything.  But I mean, so, you know, it's better that

15   if you guys, you know, try to resolve it and so at least

16   somebody can walk away with some moneys that otherwise that

17   aren't spent just in the litigation process.

18       Have a very nice day, everybody.  Have a very pleasant

19   plane trip for those of you that are flying.

20            MR. HARRIS:  Your Honor, so I assume the terms of

21   the TRO will stay --

22            THE COURT:  Yes.

23            MR. HARRIS:  -- in effect --

24            THE COURT:  Yes.

25            MR. HARRIS:  -- pending our resolution and further

1    hearing?

2            THE COURT:  Yes.

3            MS. KOONCE:  Your Honor, I think I mentioned this,

4    but I'm planning on filing a motion to designate.  I listed

5    quite a few entities that we found that were part of the skin

6    care cream process.

7            THE COURT:  Yes.

8            MS. KOONCE:  They -- I treated them as receivership

9    defendants; they fell within that definition.  They are not

10   named defendants.  One of them, for instance, is the lessee.

11           THE COURT:  Okay.

12           MS. KOONCE:  I can't terminate the lease, I can't

13   stop that cost until I have authority to do that.  So I'm going

14   to file a motion for designation that I have authority while

15   the FTC takes its steps it needs to add them.  Is that

16   something that the Court would entertain on an ex parte

17   expedited basis or should I --

18           THE COURT:  I wouldn't do it an ex parte basis, but

19   I would do it on an expedited basis.  Obviously, I would want

20   responses --

21           MS. KOONCE:  And I've conferred already.  I just

22   haven't gotten any responses yet.

23           THE COURT:  Okay.  But I -- but I want to give the

24   entities or persons that you want to include an opportunity to

25   at least appear in court.  So it can't be done like two, three

 1   days or a week.  It has to be more time than that.

 2            MS. KOONCE:  Right.  So my thought process there was

 3   with the exception of I think two of those, Alon Nottea

 4   controls all of them, and it's my understanding he doesn't even

 5   contest that.  Two of them are controlled by individuals who

 6   are not defendants, and I would propose that we use a summary

 7   proceeding that issues very purposefully in receivership cases

 8   where you provide notice and an opportunity to be heard and

 9   personally serve it.

10            THE COURT:  Oh, yeah.  If the additional entities

11   are, like, controlled by current defendants or something like

12   that sort, in other words, they are solely owned by

13   those defendants -- not solely owned?

14            MS. KOONCE:  That's part of the issue here.  They're

15   almost never owned by the individual defendants, but the

16   individual defendants control the bank accounts, control the

17   flow of money, and receive the proceeds.  They're just not

18   listed as the officers and directors.  But they're all

19   controlled from the Canby location.  They are all -- they are

20   skin care merchants, of that nature.

21            THE COURT:  But are they individuals or are they

22   entities?

23            MS. KOONCE:  They're entities.

24            THE COURT:  Oh, if they're entities, you can -- it's

25   different than individuals.  But entities -- but, obviously,

```
 1   you still have to give them a certain period of time for them
 2   to be able to respond.
 3              MS. KOONCE:  Right.
 4              THE COURT:  Okay.  All right.  Everybody have a nice
 5   day.
 6              MR. HARRIS:  Thank you, your Honor.
 7              MR. TEPFER:  Your Honor, I also wanted to ask if we
 8   would be able -- we were concerned about serving the banks with
 9   an order to keep the asset freeze in place just because of the
10   expiration of the TRO.
11              THE COURT:  Yes.
12              MR. TEPFER:  If we would be able to get an order to
13   that effect?
14              THE COURT:  Yes.  Tell my clerk the language that
15   you want and he'll issue a minute order.  But, obviously, do it
16   now before defense counsel leaves so everybody can agree that
17   the language is all right, okay?
18              MR. HARRIS:  Thank you, your Honor.
19              MR. TEPFER:  Thank you, your Honor.
20              THE COURT:  Thank you.  Everybody have a nice day.
21        (Proceedings concluded at 10:22 a.m.)
22
23
24
25
```

1       CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5   I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6   FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7   OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8   TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10  HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11  FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12  CONFERENCE OF THE UNITED STATES.

13

14          DATED THIS 8TH DAY OF AUGUST, 2015._____

15

16

17          /S/ DEBRA READ
            _____  _____
18          DEBRA READ, CSR NO. 3949 CRR RMR
            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25