**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
ANNAH S. KIM (State Bar No. 190609)
akim@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Attorneys for Defendants**
**Igor Latsanovski and Calenergy, Inc.**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. CV 15-04527 GW (PLAx) |
| Plaintiff, | **DECLARATION OF CESAR M. PENICHE** |
| v. | |
| BUNZAI MEDIA GROUP INC., et al., | *[Filed concurrently with Response of Defendants' to FTC's Supplemental Position Concerning the Asset Freeze [Doc. No 175]; and Declaration of Annah S. Kim]* |
| Defendants. | |
| | **Date:         August 24, 2015** |
| | **Time:         8:30 a.m.** |
| | **Courtroom: 10** |

## DECLARATION OF CESAR M. PENICHE

I, Cesar M. Peniche, do hereby declare and state as follows:

1.      I am not a named party in the above-entitled action.  I make the following factual statements based on my personal knowledge, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify thereto.

2.      I am the Chief Executive Officer at and part owner of Sunset Holding Partners LLC ("Sunset Holding").  Sunset Holding is a legitimate real estate business that started in January 2015.  As described below, Sunset Holding can and will make a profit if given a chance to operate.  Given my personal interests in Sunset Holding, I hereby respond to the Joint Status Report concerning the asset freeze [Doc. No. 164] as Sunset Holding's survival and my personal interests are now in the Court's hands.

3.      Before I was the CEO of Sunset Holding, I was a real estate agent who helped others purchase and flip properties since on or about 2006.  Before that time, I worked for several mortgage companies starting in 2002, and became familiar with how to obtain financing for properties.

4.      I am not, and have never been, involved in any skin care product business, and never sold any cosmetics to any consumers.

5.      Sunset Holding is not a skin care product business, and does not sell any cosmetics to any consumers.  Sunset Holding has not engaged in any alleged FTC violations, and has never defrauded any consumers.

6.      From day one, I was Sunset Holding's CEO and handled the daily operations of Sunset Holding.  I have devoted a significant amount of time and energy since January 2015 working to build Sunset Holding up into a profitable business.  Since January 2015, I have worked full time for this business and have not received any payment.  I will give some examples of my work to date below.

7.      Since January 2015, I have scouted potential properties for flipping on a daily basis, including evaluating the comparable market values, zoning and building

1

1  restrictions.  This includes me going to the Department of Building and Safety to

2  determine buildability of many sites.

3        8.      From my experience in successfully flipping properties, the most difficult

4  and time consuming stage is the architectural process, involving city approval on plans,

5  entitlements, and code compliance.

6        9.      On or about March 11, 2015, I hired an architectural firm Cataldo &

7  Associates ("Cataldo") in Pasadena with a check from Sunset Holding for $10,000.

8  From that time, I have spent a significant amount of time meeting with the architects to

9  help design and provide input on the various projects, including how to make the

10 properties more profitable in considering the design that would best sell for that

11 particular area.  The architectural firm provided me with project renderings and

12 structural plans for each property.  Attached as Exhibit A are true and correct copies of

13 project renderings from Cataldo.  All but one of these plans have been submitted to the

14 various cities for approval.

15       10.     In addition, I have been responsible on a weekly basis to visit each property

16 to make sure it is not being vandalized or contain any squatters.  For example, in a

17 property in South Central Los Angeles, I negotiated the removal of squatters from the

18 premises.  I have also made sure the utilities are off for all vacant properties to preserve

19 the properties.

20       11.     In return for all my sweat equity and real estate expertise, I received a 40%

21 percent ownership interest in the company.  In addition, I was supposed to receive a

22 retroactive salary of $15,000 a month after the business operated for six months.  I have

23 not received any income from Sunset Holding to date.

24       12.     On June 10, 2015, I signed a document titled "Utilisation Request Form 1"

25 on behalf of Sunset Holding.  Attached as Exhibit B is a true and correct copy of this

26 document.

27       13.     On June 10, 2015, I signed an Amendment Agreement to Original Contract

28 Agreement between Guayas LTD and Sunset Holding on behalf of Sunset Holding for

2

$5,868,000 in loans for the purchase and construction of real estate owned by Sunset Holding. Attached as Exhibit C is a true and correct copy of that agreement. Under paragraph III.1. of the agreement: "If the company is unable to repay the loan, the members of the Borrowing Party are directly responsible for the loan."

14.   I am shocked and scared that the FTC and Receiver are attempting to shut down my business and destroy my interests in it. If this happens, I fear that I will be financially ruined for alleged conduct that I had nothing to do with at all.

15.   I believe that if the Court allows this legitimate real estate business to operate free of the Receiver and freeze order, Sunset Holding could and would execute its plans to rehab and sell its properties for a substantial profit. Based on conservative estimates, Sunset Holding can and will be profitable.

16.   On the other hand, should the Court order the fire sale of all homes that the government requested, Sunset Holding and I personally will lose substantial money.

17.   The properties are currently in different stages of development.

West San Antonio, Long Beach

18.   The property on 430 West San Antonio, Long Beach, California was purchased for approximately $691,000 on or about April 8, 2015. The house was already in a distressed condition, and was purchased "AS IS." Attached as Exhibit D are true and correct copies of photographs of this house in April 2015.

19.   While in escrow, I contracted with an architect and contractors to rehab this house. Sunset Holding gave a check for $6,000, which was a 30% initial payment to the architectural firm Cataldo. When Cataldo submitted the plans to the City, Sunset Holding gave it another check for $6,000, which was the agreed upon next payment. Attached as Exhibit E is a true and correct copy of the plans submitted to the City of Long Beach. Sunset Holding currently owes Cataldo $6,000 already outstanding, and an additional $2,150 upon completion of the construction regarding this property.

20.   On or about May 19, 2015, a demolition permit from the city was issued for this property. On or about April 14, 2015, Sunset Holding then paid the contractor

3

1   $40,000 to begin work on this property.  As a result, beginning in May 2015, the house

2   was gutted to prepare it for the remodel.  During the gutting process, the contractor

3   discovered that there were several major cracks throughout the foundation and termite

4   damage rendering the structure uninhabitable if not repaired.  Attached as Exhibit F are

5   true and correct copies of photographs showing the current condition of the house as of

6   approximately July 2015, and also showing the foundation and termite damage

7   discovered during demolition.  On or about May 12, 2015, Sunset Holding paid the

8   contractor an additional $50,000 to fix the unaccounted for termite damage and to

9   continue working on the project.  However, the work on this property has stopped as a

10  result of this case.  The lot is currently worth approximately $300,000 for land value

11  alone.

12          21.     On or about July 1, 2015, City of Long Beach approved the full

13  construction permit.  Obviously, if this house would be sold now, it would be sold only

14  for land value rather than the partially renovated house which is not habitable.

15          22.     If the Court allows Sunset Holding to operate, the renovation can be

16  completed within approximately three months for approximately $200,000.  This amount

17  would dramatically increase the value of the house to approximately $1,400,000.

18          Stratford Road, Los Angeles, California

19          23.     The property on 5624 Stratford Road, Los Angeles, California, on the other

20  hand, is almost completed, needing only approximately another $25,000 and only

21  approximately one month to complete.  In particular, this property still requires fencing

22  the perimeter, landscaping, exterior finishes including stucco, window trim, and paint.

23  Attached as Exhibit G is a true and correct copy of a photographs of the property taken

24  within the last month.  The work on this property has stopped as a result of this case.

25          24.     In addition, attached as Exhibit H is a true and correct copy of photographs

26  showing the property development on Stratford Road during construction.

27          25.     Sunset Holding has entered into contracts with various vendors to work on

28  its properties.  For example, Sunset Holding is contractually obligated to pay Cataldo

4

approximately $150,000 for services rendered for Sunset Holding's properties. Failure to pay on these contracts would ruin my ability to use these construction related businesses on any future projects.

26.    Again, Sunset Holding is a legal business that was on track to be extremely profitable. I have nothing to do with the alleged FTC violations related to the sale of skin care product allegations. If Sunset Holding is permitted to operate, I will continue to operate it legally. Based on my experience in the real estate and mortgage industries, if the FTC took a lien on the properties for the original amount of the loans on them, I do not believe that Sunset Holding would be able to obtain additional traditional financing to continue to operate. Sunset Holding can be profitable if given the opportunity to execute its plan of remodeling and selling its properties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _20th_ day of August, 2015, at _____, California.

_____
CESAR M. PENICHE

5

# EXHIBIT A









FRONT VIEW



RARE VIEW



RENDERING FRONT VIEW

RENDERING WEST SIDE

RENDERING EAST . SIDE

RENDERINGS

A-7









# EXHIBIT B

**Utilisation Request Form 1**

Moscow, 10 June 2015

**Sunset Holding Partners LLC,** a legal entity registered at the address: 23679 Calabasas rd Suit 1054 Los Angeles 91302 USA, represented by MIKE PENICHE, director, duly empowered,

(the "**Borrower**"),

ON FIRST PART,

**Zolotareva Maria Aleksandrovna,** Russian citizen, passport 75 0672831 delivered on February 05, 2015, by FMS 77001, registered at: 119002, Moscow, Nikolopeskovskij M. per, house 4, apt. # 6,

(the "**Lender**"),

ON SECOND PART.

Hereinafter jointly referred as the "**Parties**" or individually as a "**Party**"

**HAVE AGREED TO THE FOLLOWING:**

1.  In accordance with the Master Loan Agreement dated June 4, 2015 made between the Borrower and the Lender (the "**Agreement**") the Borrower places the present Utilisation Request.

2.  Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

3.  The Lender offers and the Borrower engages to return the Loan on the following terms and conditions:

| | |
|---|---|
| Amount and currency: | 1,100,000 US Dollars |
| Utilisation Date: | June 15, 2015 |
| Purpose: | Acquisition and renovation of real estate. Address: 3783 Redwood Ave Los Angeles CA |
| Interest rate: | 20 % per year |
| Terms and conditions: | As per the Master Loan Agreement |
| Loan Repayment Date: | January 15, 2016 |

4.  The Borrower is compliant with each condition specified in Clause 3 (*Utilisation of the Loan Facility*) of the Agreement on the date of this Utilisation Request.

5.  This Utilisation Request is irrevocable.

6.  The Loan shall be transferred by the Lender to the following Borrower's account:

    ACC: 2869829222
    ABA rout Nr. 122000247
    Bank: Wells Fargo Bank
    NA San Francisco, California
    SWIFT: WFBIUS6SXXX

7.  This Utilisation request may be amended only with written consent of both Parties.

8.  This Utilisation request is executed in 2 (two) original copies in English and in Russian. In case of any discrepancies between English and Russian texts, the Russian text shall prevail.

**Signatures of the Parties:**

The Borrower

Sunset Holding Partners LLC

Signed by: MIKE PENICHE
Title: Director

The Lender

Zolotareva Maria Aleksandrovna

Signed by:

Запрос на использование № 1

Москва, 10 июня 2015 года

**Компания Sunset Holding Partners LLC (Санет Холдинг Партнерс ЛЛС)**, юридическое лицо по законодательству США, зарегистрированное по адресу: 23679 Calabasas rd Suit 1054 Los Angeles 91302 USA (США, 91302, Лос Анджелес Сьют 1054 Калабасас-роуд, 23679), в лице Директора Мика Пениша, надлежащим образом уполномоченного,

(далее - "Заёмщик"),

С ОДНОЙ СТОРОНЫ,

Золотарёва Мария Александровна, гражданка Российской Федерации, паспорт 75 0672831 выдан ФМС 77001 05.02.2015 г., зарегистрированная по адресу: 119002, г. Москва, Малый Николопесковский переулок, д. 4, кв. 6,

(далее - "Займодавец"),

С ДРУГОЙ СТОРОНЫ,

Далее совместно именуемые "Стороны", а по отдельности - "Сторона"

ДОГОВОРИЛИСЬ О СЛЕДУЮЩЕМ

1.  В соответствии с положениями Договора займа от 4 июня 2015 года, заключенного между Заёмщиком и Займодавцем (далее - "Договор"), Заёмщик осуществляет подачу настоящего Запроса на использование.

2.  Термины, которым дано определение в тексте Договора, употребляются в настоящем Запросе на использование в тех же значениях, если только в Запросе им не придано иное значение.

3.  Займодавец предлагает, а Заёмщик обязуется осуществить возврат Займа на следующих условиях:

| | |
|---|---|
| Сумма и валюта: | 1 100 000 (один миллион сто тысяч) долларов США |
| Дата использования: | 15 июня 2015 года |
| Цель: | Покупка и реставрация объекта недвижимости по адресу: 3783 Redwood Ave Los Angeles CA |
| Процентная ставка: | 20 % годовых |
| Условия и положения: | В соответствии с условиями Договора займа |
| Дата погашения займа: | 15 января 2016 года |

4.  По состоянию на дату подачи настоящего Запроса на использование Заёмщиком выполнены все условия, предусмотренные Статьей 3 (Использование Общей суммы займа) Договора.

5.  Настоящий Запрос на использование носит безотзывный характер.

6.  Сумма Займа будет перечислена Займодавцем на следующий счёт Заёмщика:

    Счет в долларах США: 2869829222
    ABA rout Nr. 122000247
    Банк: Wells Fargo Bank
    NA San Francisco, California
    SWIFT: WFBIUS6SXXX

7.  Изменения в текст настоящего Запроса на использование могут быть внесены только по письменному согласию обеих Сторон.

8.  Настоящий Запрос на использование исполнен в 2 (двух) подлинных экземплярах на английском и русском языках. В случае выявления любых несоответствий между текстами на английском и русском языках версия на английском языке имеет преимущественную силу.

Подписи Сторон:

| **Заёмщик** | **Займодавец** |
|---|---|
| **Sunset Holding Partners LLC (Санет Холдинг Партнерс ЛЛС)** | Золотарёва Мария Александровна |
| Подпись: | Подпись: _____ /Золотарёва Мария/ |
| Должность: Мик Пениш, директор | |

# EXHIBIT C

# AMENDMENT AGREEMENT TO ORIGINAL CONTRACT AGREEMENT

## GUAYAS LTD & SUNSET HOLDING PARTNERS, LLC

*Amendment Agreement (hereinafter referred to as Agreement) made by and between;*

*GUAYAS LTD. located at Estonia (hereinafter referred to as Assignor or GUYAS), represented by Mr Oleg Trushlya and*

*SUNSET HOLDING PARTNERS LLC, located at California (hereinafter referred to as Asignee or SUN), represented by Mr. Cesar M. Peniche.*

The Parties hereto hereby agree as the follows;

## I. DEFINITIONS
For the purposes of this Agreement the following terms shall have the meaning hereunder assigned to them by the Parties;

Lending Party -
GUAYAS LTD, who loaned to SUNSET HOLDING PARTNERS LLC on June 10th, 2015 (06/10/2015).

Borrowing Party -
SUNSET HOLDING PARTNERS LLC, who was the receiving party of the loan from GUAYA LTD.

## II. PROPERTY DETAIL
Below are the detailed loan amounts by properties:

| | | |
|---|---|---|
| 1. | 5624 Stratford Rd, Los Angeles | $600,000 |
| 2. | 1737 W 35th St, Los Angeles | $300,000 |
| 3. | 1032 W 22nd St, Los Angeles (USC) | $450,000 |
| 4. | 21809-21811 Figueroa (CARSON) | $1,100,000 |
| 5. | 314 W 113th St. Inglewood (Townhomes) | $300,000 |
| 6. | 657 W Acacia Ave, El Segundo | $800,000 |
| 7. | 2445 Louella Ave, Venice | $1,218,000 |
| 8. | 3777 Rosewood Ave, Los Angeles | $1,100,000 |
| | Total Sum | $5,868,000 |

## III. TERMS & CONDITIONS
1. The Borrowing Party is responsible for the entirety the loan. If the company is unable to repay the loan, the members of the Borrowing Party are directly

responsible for the loan.

2. The Lending Party is not liable for any conduct of the Borrowing Party, nor responsible for any fines, fees or costs associated with doing business.

3. These loans will be granted in order to purchase real estate objects and costs associated with completion of projects including but not limited to costs associated with: architecture, city fees, construction, resale, etc.

4. The Borrowing Party must return the capital amount and interest of the respective Agreement.

5. Loans shall bear annual interest of 11%. Interest shall be fully paid in proportion of selling properties as they are sold. The Borrowing Party shall return principal with interest within a maximum of five (5) days of closing of sale.

6. INTEREST BEGAN INCURRING DATE OF ORIGINAL SIGNED CONTRACT AGREEMENT BETWEEN GUAYAS LTD. AND SUNSET HOLDING PARTNERS ON MAY 20th, 2015. INTEREST PAID ON PROPERTIES STARTS ACCRUING MAY 20th, 2015.

## IV. ASSIGNMENT FEE

1. The Borrowing Party shall pay the Lending Party in the amount of US $5,868,000 (five million eight hundred and sixty eight thousand US Dollars).

2. The lending amount for the sum of US $5,868,000 shall be paid to the account mentioned by the Lending Party within a maximum of one year following the signing of this Agreement by both parties. Failing to pay the loan amount within one year, the Borrowing Party shall pay to the Lending Party a penal fine in the amount of 5% from the unreturned sum.

## V. SPECIAL CONDITIONS

1. The Borrowing Party confirms that the details and value for the properties enclosed are accurate and true, have been delivered to the Lending Party in their completeness and that the loan has been made available to the Lending Party.

2. The Borrowing Party hereby undertakes not to transfer or assign to third parties the claim assigned, neither shall it encumber the claim with other limited real rights nor perform any other civil transactions without written consent.

3. Reference 3.6 for interest has already accrued and interest owed on properties as they are sold.

## VI. RESOLUTION OF DISPUTES

1. Disputes arising between the Parties shall be resolved by means of negotiations. If an agreement is not reached between the Parties the dispute is resolved in court.

## VII. OTHER PROVISIONS

1. Any changes to the Agreement, including additions and amendments, shall be recorded in writing and take effect after signing by the Parties, except as agreed otherwise by the Parties.

2. Any notices delivered to the other Party shall be in writing and shall take effect as of their receipt.

## VIII. VALIDITY

1. The Agreement shall take effect as of the moment of signing by the Parties.

2. By signing the Agreement the Parties certify that they have observed every rule, procedure and requirement for co-ordination that they must observe to be able to undertake the obligations specified in the Agreement.

3. In case a provision of the Agreement proves fully or partially invalid or cannot be executed, other provision of the Agreement remain valid.

4. The Agreement has been concluded in English, in two identical copies on three pages, of which the Lending Party receives one copy and the Borrowing Party the other.

## XI. SIGNATURES

Lending Party

GUAYAS LTD.
Ahtri 10a Tallinn 10151.
Estonia

Borrowing Party

Sunset Holding Partners, LLC
705 W 9th St Suite 1807
Los Angeles, CA 90015

Mr. Oleg Trushlya

Mr. Cesar M. Peniche

# EXHIBIT D










**San Antonio Project**

**April 2015**

**Page 1 of 1**

EXHIBIT E





## WALL TYPE LEGEND:

EXISTING WALL TO REMAIN THE SAME

EXISTING WALL TO BE DEMO.

EXISTING WINDOW TO BE DEMO.

EXISTING DOOR TO BE DEMO.

**DEMOLITION 1ST FLOOR PLAN**
SCALE 1/4" = 1'-0"

A-1

DEMOLITION FLOOR PLAN

SUNSET HOLDING PARTNER LLC
705 W. 8TH ST. SUITE 2904
LONG BEACH, CA 90295

450 W SAN ANTONIO DR
LONG BEACH, CA 90807

MIKE G. PENOCHE
Ph: (909) 790-9988
Email: h8sac@aol.com

### GENERAL DEMOLITION NOTES

**1.01 SECTION INCLUDES**

A. Furnishing all labor, materials and equipment necessary for demolition, dismantling, cutting and alterations as indicated, specified, and required for completion of the Contract, for demolition, removal, and/or rehabilitation of the project as applicable. Following is a partial list:

1. Protecting existing work to remain.
2. Cleaning soiled materials that are to remain.
3. Disconnecting and capping utilities.
4. Removing debris and equipment.
5. Removal of items, as indicated on Drawings.
6. Salvageable items to be retained by the Owner.

**1.02 PROJECT CONDITIONS**

A. Drawings may not indicate in detail all demolition work to be carried out. Contractor shall carefully examine existing work to ascertain the full extent of demolition required for completed work to conform to Drawings and Specifications.

B. Existing work to remain that is damaged during and by demolition operations, shall be repaired or replaced to satisfaction of the Architect/ Inspector at no cost to Owner.

C. Notify the Architect immediately for further instructions, should materials, systems or conditions differ from those indicated on Drawings.

**1.03 COORDINATION**

A. Prior to commencement of work in this Section, contact the owner to confirm that all items identified as owner property have been removed or clearly marked.

**PART 2 - PRODUCTS**

**2.01 HANDLING OF MATERIALS**

A. All existing items to be reused or retained by the owner shall be removed by the use of proper tools to insure against damage.

B. Salvage items to be retained by the owner and not incorporated into work shall be delivered to the owner cleaned, arranged and labeled, unless otherwise instructed.

C. Items to be reused shall be stored on site and protected from damage, soiling and theft.

**PART 3 - EXECUTION**

**3.01 GENERAL**

A. Protection:

1. Do not begin demolition until temporary partitions, barricades, warning signs and other forms of protection are installed.

2. Provide all safeguards, including warning signs and lights, barricades, and the like, for protection of the occupants and public during demolition.

B. Noise, Dust and Water Control: Refer to Supplementary Conditions.

C. Safety: If at any time safety of existing construction appears to be endangered, Contractor shall take construction, cease operations and immediately notify the Architect. Do not resume demolition until the Architect's instructions are received.

**3.02 DEMOLITION**

A. Do not throw materials from heights. Use ramps or chutes.

B. Remove existing construction only to extent necessary for proper completion of new construction and operation with mating work. Cut back finished surfaces to straight, plane as nearly as feasible.

C. Where openings are cut oversized or in improper location, replace the excess removed material as instructed by the architect at no additional cost to the owner.

**3.03 REMOVAL OF EXISTING PLUMBING AND ELECTRICAL EQUIPMENT AND SERVICES**

A. Contractor shall remove from building and site all existing plumbing and electrical equipment fixtures and services that are indicated for removal or are necessary for completion of work shall disconnect, and, when necessary, cap services to that portion of work prior to commencement of, or during work at this Section.

**3.04 REMOVAL OF OTHER MATERIALS**

A. Masonry: Cut back to joint lines and remove old mortar without damaging units to remain. Allow space for repairs to building where applicable.

B. Woodwork: Cut or remove to a joint or panel line. Undamaged, removed material, may be reused.

C. Roofing: remove as required, including roof insulation, flashing, and related items connected thereto. At penetrations through existing roofing, trim, cut edges back to sound roofing with openings of minimum size necessary to receive new work.

D. Sheet metal: Remove back to joint, lap, or connection. Secure loose and unfastened ends or edges and make watertight.

E. Glass: Remove broken or damaged glass and clean rebates and stops of setting materials.

F. Modular materials such as ceiling, resilient and ceramic tile. Remove to a joint when practicable. After removing flooring materials, clean substrates of old cement and adhesive.

G. Gypsum board: Remove to a joint line or a support.

H. Plaster: Saw cut plaster on straight lines but leave a minimum of 2" of firmly attached metal lath where lying to new lath/plaster.

I. Work not mentioned to be removed that interferes with new construction shall be cut to clean-cut lines to provide for proper interface with new construction, or patching and repair, as required.

**3.05 CLEANING**

A. Existing facilities, equipment at work that is not indicated to be removed, but interferes with new construction, shall be cut neatly and removed as required to facilitate installation of new work, and then replaced and finished as specified for new work.

**3.05 CLEANING**

A. Clean all existing materials to remain, using skilled or experience workmen under supervision, using appropriate tools and materials.

B. Protect adjacent materials and equipment during cleaning functions.

**3.06 PATCHING**

A. Patching materials which are to remain when damaged by this work. Finish material and appearance of patch or repair shall make workmanship contiguous materials and finishes in all respects, as approved by the Architect.

**3.07 CLEANUP/ DISPOSAL**

A. Parking trucks or building shall be coordinated with the City of Torrance.

B. Debris shall be conveyed by trucks designed to transport such debris.

C. Debris shall be dampened by fog water spray when it is transported from its location to truck. Amount of water shall be controlled to insure against water ponding site area of debris pick-up.

D. Debris pick-up area shall be kept broom-clean and shall be flushed with clean water, when necessary, to Remove soil.

E. Debris, waste, and removed materials, other than items to be salvaged, are Contractor's property and legal disposal off site. Continuously clean-up and remove these items and do not allow to accumulate in building(s) or on site.

WALL TYPE LEGEND:

EXISTING WALL TO REMAIN THE SAME

EXISTING WALL TO BE DEMO.

EXISTING WINDOW TO BE DEMO.

EXISTING DOOR TO BE DEMO.

DEMOLITION SECOND FLOOR PLAN
SCALE 1/4" = 1'-0"

DEMOLITION FLOOR PLAN

A-1.1

EXISTING 1ST FLOOR PLAN
SCALE 1/4" = 1'-0"

EXISTING 2ND FLOOR PLAN
SCALE 1/4" = 1'-0"

A-2

WALL TYPE LEGEND

FLOOR PLAN LEGEND

NOTES

PROPOSED 1ST FLOOR PLAN
SCALE 1/4" = 1'-0"

PROPOSED 2ND FLOOR PLAN
SCALE 1/4" = 1'-0"

GARAGE

GARAGE

FAMILY ROOM

UTILITIES

ENTRY

FOYER

LIVING ROOM

DINING ROOM

KITCHEN

BEDROOM

BEDROOM

BEDROOM

BEDROOM

WALK-IN CLOSET

WALK-IN CLOSET

BATHROOM

BATHRM

HALL

HALL

OPEN BELOW

PROPOSED
FLOOR PLANS

A-3

SECTION A-A
SCALE 1/4" = 1'-0"

SECTION B-B
SCALE 1/4" = 1'-0"



EAST ELEVATION
SCALE 1/4" = 1'-0"

NORTH ELEVATION
SCALE 1/4" = 1'-0"

PROPOSED ELEVATIONS

A-5.1

SUNSET HOLDING PARTNERS LLC.
705 W. 9TH ST. SUITE 2904
LOS ANGELES CA. 90035

MIKE G. PENICHE
Ph: (323) 794-0081
Email: Milkewilson@yahoo.com

450 W SAN ANTONIO DR.
LONG BEACH CA. 90807

**STRUCTURAL**

**S-1**

ABBREVIATIONS

GENERAL NOTES

REINFORCING STEEL

STRUCTURAL LUMBER

GLU-LAM BEAMS AND PURLINS

SPECIAL INSPECTIONS

DESIGN DATA

| Detail | Title | Scale |
|---|---|---|
| 16 | FOOTING EXCAVATION | |
| 17 | PIPE & TRENCH LOCATION | |
| 18 | REINFORCING BARS BENDS & LAPS | |
| 19 | REINFORCING BARS BENDS & LAPS | |
| 20 | TYPICAL OPENING FRAMING | |
| 21 | NAILING SCHEDULE | |
| 23 | STUD WALL OPEN'G HEADER SCHED. | |
| 25 | HOLDOWN ANCHOR (HD) SCHEDULE | |

SUNSET HOLDING PARTNERS LLC.

705 W. 9TH ST. SUITE 2004
LOS ANGELES CA 90015

439 W SAN ANTONIO DR
LONG BEACH CA 90807



ROOF FRAMING PLAN
SCALE 1/4" = 1'-0"

S-3

S-4

**1** CONTINUOUS FOOTING

**2** NON-BEARING WALL

**3** PAD FOOTING

**4** UNDERPINNED PAD FOOTING

**6** BASE PLATE / PIPE COLUMN

**7** BASE PLATE / PIPE COLUMN

**8** BASE PLATE / PIPE COLUMN

**9** BASE PLATE / PIPE COLUMN

**11** POST / WOOD BEAM

**12** IN-WALL POST

**13** BEAM AT HEADER

**14** BEAM TO JOIST

**16** FLOOR FRAMING

**17** FLOOR FRAMING

**18** FLOOR FRAMING

**19** FLOOR BEAM / FLOOR BEAM

**21** ROOF FRAMING

**22** ROOF FRAMING

EXHIBIT F



**San Antonio Project**

**July 2015**

**Page 1 of 2**











San Antonio Project

July 2015

Page 2 of 2

EXHIBIT G













**Stratford**
**Project**
**Complete**

**Page 1 of 2**












**Stratford Project Complete**

**Page 2 of 2**

# EXHIBIT H











**Stratford Project**

**Construction**

**Page 1 of 1**