**SCHEPER KIM & HARRIS LLP**
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
ANNAH S. KIM (State Bar No. 190609)
akim@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone:  (213) 613-4655
Facsimile:   (213) 613-4656

**Attorneys for Defendants**
**Igor Latsanovski and Calenergy, Inc.**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>        v.<br><br>BUNZAI MEDIA GROUP INC., et al.,<br><br>    Defendants. | CASE NO. CV 15-04527 GW (PLAx)<br><br>**OPPOSITION OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC. TO RECEIVER'S MOTION FOR ORDER APPROVING AND AUTHORIZING PAYMENT FROM RECEIVERSHIP ASSETS OF RECEIVERSHIP FEES AND EXPENSES THROUGH JULY 31, 2015**<br><br>*[Declaration of Marc S. Harris In Support Of Opposition to Receiver's Motion for Order Approving Payment Filed Concurrently]*<br><br>**Date:       September 17, 2015**<br>**Time:       8:30 am**<br>**Judge:      Hon. George Wu** |

DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................. 1

II. FACTS ................................................................................................................. 3

    A.    RECEIVERSHIP DUTIES ................................................................... 3

    B.    RECEIVERSHIP ASSETS .................................................................... 5

    C.    RECEIVER'S FEE REQUESTS ........................................................... 6

III. LEGAL ARGUMENT ........................................................................................ 8

    A.    THE COURT MAY REDUCE THE RECEIVER'S REQUEST TO PRESERVE RECEIVERSHIP ASSETS ......................................... 8

    B.    THE TEMPORARY RECEIVER'S REQUEST IS NOT REASONABLE ....................................................................................... 9

        1.    Payment of Receiver's Fees Would Unfairly Burden the Receivership Estate ........................................................................ 10

        2.    The Temporary Receiver's Efforts Did Not Increase the Value of the Receivership Estate .................................................. 11

        3.    The Receiver Did Not Efficiently Perform the Work ............... 13

IV. CONCLUSION ................................................................................................ 17

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*F.T.C. v. Innovative Wealth Builders, Inc.*, No. 8:13-CV-123-T-33EAJ, 2013 WL 4500471 (M.D. Fla. Aug. 22, 2013) ..................................................... 8, 9

*F.T.C. v. Worldwide Info Servs., Inc.*, No. 6:14-CV-8-ORL-41DAB, 2015 WL 144389 (M.D. Fla. Jan. 12, 2015) ........................................................... 11, 16

*Gundlach v. Nat'l Ass'n for Advancement of Colored People, Inc.*, No. 303CV1003J32MCR, 2005 WL 2012738 (M.D. Fla. Aug. 16, 2005) ........... 16

*In re Alpha Telcom, Inc.*, NO. CV 01-1283-PA, 2006 WL 3085616 (D.Or. Oct. 27, 2006) ..................................................................................... 8, 9

*Drilling & Exploration Corp. v. Webster,* 69 F.2d 416 (9th Cir. 1934) ....................... 8

*In re San Vicente Med. Partners, Ltd.*, 962 F.2d 1402 (9th Cir. 1992) ....................... 8

*In re Imperial "400"Nat., Inc.*, 432 F. 2d 232 (3rd Cir. 1970) ................................... 9

*S.E.C. v. Byers*, No. 08 CIV. 7104 DC, 2014 WL 7336454 (S.D.N.Y. Dec. 23, 2014) ............................................................................................. 10

*SEC v. Byers*, 590 F. Supp. 2d 637 (S.D.N.Y. 2008) ................................................ 10

*SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220 (S.D.N.Y. 1973) ................ 10

*S.E.C. v. Goren*, 272 F. Supp. 2d 202 (E.D.N.Y. 2003) ..................................... 10, 11

*S.E.C. v. Northshore Asset Mgmt.*, No. 05 CIV. 2192 (WHP), 2009 WL 3122608 (S.D.N.Y. Sept. 29, 2009) ............................................................... 12

*S.E.C. v. Striker Petroleum, LLC*, No. 3:09-CV-2304-D, 2012 WL 685333 (N.D. Tex. Mar. 2, 2012) ........................................................................ 11

*Spalding Labs., Inc. v. Arizona Biological Control, Inc.*, No. CV 06-1157 ODW (SHX), 2008 WL 2227501 (C.D. Cal. May 29, 2008) ........................ 16

*United States v. Code Products Corp.*, 362 F. 2d 669 (3d Cir. 1966) ....................... 10

## I. INTRODUCTION

On June 16, 2015, the FTC requested *ex parte* that the Court appoint a Temporary Receiver to take control of the affairs of 15 corporate entities. The ostensible basis for this request was the FTC's claim that "in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of the victims." (FTC *Ex Parte* Application (Dkt #5) at 49). At the time of the FTC's request, 9 of the 15 corporate entities had been dissolved, none of the remaining entities had significant assets, and none of them were actively involved in the skincare business. The Court nevertheless appointed the Temporary Receiver, an attorney in Texas, to operate the California entities and preserve the limited assets.

Within days of her appointment, the Temporary Receiver ("Receiver") took possession and control of the office premises and mailboxes of the then-remaining entities, and confirmed that: (1) nine of the entities had been dissolved (Receiver Affidavit (Dkt #36), ¶ 3); (2) the Court-ordered asset freeze had locked down the bank accounts of the entities (Receiver Report (Dkt #120) ("Report") at 16-17; (3) none of the entities possessed significant assets, other than limited cash in the bank (Report, Ex. 12 (Dkt #121-5 at 9); and (4) none of the entities were actively involved in the skincare business (Receiver Response (Dkt #91), ¶ 3). The Receiver also quickly came to the conclusion that none of the entities under her control could or should be operated going forward. (Report at 71-81). The Receiver also knew, within days of her appointment, that the assets of the receivership estate amounted to less than $700,000 in cash (Report at 17 and Report, Ex. 12).

Despite the fact that the corporate assets that the FTC feared might be subject to "diversion or waste" were identified and secured in the earliest days of the Receiver's appointment, the Receiver and her armada of lawyers, accountants and

investigators from Texas billed more than 2,300 hours, and incurred fees and expenses totaling $735,714.75 in the ensuing six weeks.[1]

Even with the discounts that the Receiver has applied, her motion seeks an award equal to more than 90% of the assets of the receivership estate. For this princely sum, the Court (and the estate) have received only a recommendation to dissolve the few remaining business entity defendants and a compilation of various financial statements provided by the defendants. The Receiver acknowledges that she has no ability to generate additional income for the receivership estate. Indeed, she suggests that she will need an additional $125,000 to $175,000 to complete her duties and wind down the corporate defendants. By the time the Receiver is finished there will be no assets left.

In the pending motion, the Receiver goes to great lengths to try to justify her team's exorbitant bill, pointing to the roadblocks her team faced along the way based on the alleged refusal of certain individuals to cooperate with their efforts.[2] However, the Receiver cannot argue that this allegedly "massive undertaking" provided any value to the estate – it did not result in any additional funds coming into the estate through the operation of the subject businesses, and it did not lead to the identification of any assets (other than those that were readily apparent). On the contrary, the Receiver's efforts served only to deplete the limited assets that were

---

[1] The Receiver has agreed to write-off certain of the fees and expenses, and is now seeking $588,658.02, with a stated intention to seek additional funds in the future.

[2] The Receiver broadly interprets "refusal to cooperate." Shortly after defendants Latsanovski and Calenergy informed the Receiver they would oppose this motion, her counsel emailed Mr. Latsanovski's counsel late on a Friday night threatening that "resisting the Receiver" would "make it worse" for Mr. Latsanovski. The Receiver's counsel advised that Mr. Latsanovski "needs to take the 5th and hunker down" rather than continue to challenge the Receiver. (Declaration of Marc Harris ("Harris Decl."), ¶ 6, Ex. D).

available when she took over.

Remarkably, when the Receiver advised the FTC that it intended to seek fees and costs in excess of $735,000,[3] an amount that far exceeds the total cash in the receivership estate, the FTC voiced no objection. This is the same FTC that has repeatedly objected to Mr. Latsanovski being permitted to use *any* of his frozen, untainted assets to pay his bills or feed his family, all in the name of preserving assets for consumer redress. The FTC's silence exposes the hollowness of its oft-repeated claims that preserving assets for aggrieved consumers is paramount.

Although the court has yet to decide any of the substantive issues in this litigation, the Receiver seeks an order effectively declaring a winner in this case – herself. The Court should not allow the "diversion and waste" of the estate proposed by the Receiver and her team. The request is unreasonable because the work performed and hours billed by the Receiver and her team were excessive, and because the estate did not benefit from these efforts. Accordingly, the Receiver's request for fees and costs should be denied.

## II. FACTS

### A. RECEIVERSHIP DUTIES

Pursuant to the TRO issued by this Court on June 16, 2015, the Receiver was appointed as an equity receiver for the corporate defendants named in the Complaint ("Receivership Defendants"). Her duties were to control, preserve and maintain the Receivership Defendants' assets that were generated by their involvement in the skincare business. (*See* TRO (Dkt #14), Section IX, A ("Assume full control of the

---

[3] According to the Motion, the FTC indicated in an email that it took no position on the Receiver's request. (Temp. Rec. Motion (Dkt #161) ("Motion") at 6). Presumably, this statement of no position was in response to the Receiver's "meet and confer" proposal on August 10, 2015, requesting all parties to advise whether they opposed the Receiver's anticipated application for fees and costs in the amount of $735,714.

1  Receivership Defendants by removing … any Defendants, from the control of,
2  management of, or participation in the affairs of the Receivership Defendant), C
3  ("Take exclusive custody, control, and possession of all assets … in the possession,
4  custody, or control of, the Receivership Defendants"), E ("Conserve, hold and
5  manage all assets of the Receivership Defendants … to preserve the value of those
6  assets … [by] preventing the unauthorized transfer, withdrawal or misapplication of
7  assets"), L and M ("preserve" or "recover assets" in legal actions).)
8       The Receivership Defendants were defined as the 15 named business entities
9  in the Complaint[4] as well as "subsidiaries, fictitious business entities, or business
10 names used by the entities or Individual defendants that are related to, or receive
11 funds from, the sale of skincare or other products online."  (TRO (Dkt #14),
12 Definition 4(b)).  Of the 15 named business entities, nine of them were dissolved by
13 the end of 2014.  (*See* 6/12/15 McPeek Decl. (Dkt #6), ¶¶ 5-20 and Att. M).  The
14 Receiver identified an additional 10 business entities[5] which she contends are
15 Receivership Defendants within minutes of raiding defendants' offices on June 18.
16 (*See* Report at 16-17 ("Within the first thirty minutes during the initial access [June
17 18], dozens of accounts for entities not named as Receivership Defendants … were
18 located").)  Of these additional 10 entities, two of them were dissolved (*see* Report,

---

[4] Bunzai Media Group, Inc., d/b/a AuraVie and Miracle Face Kit; Pinnacle Logistics, Inc.; DSA Holdings, Inc.; Lifestyle Media Brands, Inc.; Agoa Holdings, Inc.; Zen Mobile Media, Inc.; Safehaven Ventures, Inc.; Heritage Alliance Group, Inc., also doing business as AuraVie Distribution; AMD Financial Network, Inc.; SBM Management, Inc.; Media Urge, Inc.; Adageo, LLC; Calenergy, Inc.; KAI Media, Inc.; Insight Media, Inc.

[5] *See* Temp. Rec. Motion for Asset Freeze (Dkt #165) (identifying All Star Beauty Products, Inc., DMA Media Holdings, Inc., Focus Media Solutions, inc., Forward Momentum, LLC, Merchant Leverage Group, Inc., Secured Commerce LLC, Secured Merchants, LLC, Shalita Holdings LLC, Trigen LLC and USM Products, Inc. as additional Receivership Defendants).

Ex. 76 (Dkt #124-11).)

## B. RECEIVERSHIP ASSETS

According to the Receiver, the receivership estate consists of $650,464.60 in unencumbered cash. (Motion, Ex. A, Summary of Unencumbered Cash Receipts (Dkt # 165-1) ("Motion, Ex. A").)[6] But only $405,075.58 of this cash belongs to the 15 named entities in the Complaint. (*See id.*). The remaining $241,538.02 belongs to the 10 additional entities that the Receiver hopes to add as Receivership Defendants. (*See* Receiver's Motion for Order to Freeze Additional Assets (Dkt #165) and Motion, Ex. A).[7]

Of the $405,075 ostensibly belonging to the Receivership Defendants, approximately half was transferred into the receivership estate at the direction of the Receiver from the account of an entity that is not named in the Complaint.[8] Of the

---

[6] The Receiver also suggests that the estate includes $7 million in real estate. (Motion at 20). However, this real estate is not owned by a Receivership Defendant, but by Sunset Holding Partners, LLC ("Sunset"). As the Court is aware, Sunset is a real estate investment company that was formed in 2015 and funded well after the skincare business ended. The FTC has taken the position that the assets owned by Sunset should remain frozen because they are assets owned or controlled by Mr. Latsanovski, who is subject to the asset freeze. Although the Receiver has, at times, suggested that she has some right to control Sunset, she has acknowledged that this is an open question. (*See* Harris Decl., ¶ 7 and Ex. E).

[7] The Receiver is also holding $3,851 in cash of "undetermined ownership."

[8] Just days before the asset freeze was imposed, Calenergy loaned $325,000 to a company called Focus Media Solutions. (Report at 37 (June 16, 2015 loan to Focus Media). Focus Media is not involved in the skincare business, and was not named in the Complaint. After the freeze order, the Receiver directed Alon Nottea to return these funds to the bank accounts of Focus Media and Receivership Defendant, Kai Media. (*See* Report at 37, n. 86 ("Upon demand, Alon Nottea returned" the funds to Focus Media's and Kai Media's accounts); Motion, Ex. A ($166,825.21 in Focus Media account #6565 and $201,627.79 in Kai Media account #9190).)

remaining $205,000, nearly a third ($66,407) belongs to Calenergy.[9] Thus, the actual amount of cash properly subject to the control of the Receiver is substantially less than $650,000.

The Receiver also hopes to obtain an additional $284,529.95 in cash being held by third-parties, SignaPay and EVO. (*See* Motion, Ex. A). Notwithstanding the fact that the Receiver has been aware of these reserve accounts since June, she has not been able to secure the release of the funds. (*See* Report at 16-17). The Receiver has not provided any update regarding her efforts to obtain these funds or the likelihood of success in doing so.

### C. RECEIVER'S FEE REQUESTS

On August 10, 2015, the Receiver informed counsel for all parties that she intended to file a motion seeking approximately $735,714.75 in fees and costs for approximately six weeks of work. (*See* Harris Decl., ¶ 3 and Ex. B (8/10/15 Request).)[10] In her Motion, the Receiver agrees to write-off and/or discount certain of the fees, resulting in a total demand of $588,658.02 in fees and costs. The following chart summarizes the fee and cost requests and hours billed by the Receiver and her team as set forth in the Motion and the 8/10/15 Request:

| Category | 8/10/15 Request (Harris Decl., Ex. A) | Motion (Dkt #161) | Hours |
|---|---|---|---|
| | | | |

---

[9] Calenergy has repeatedly set forth in detail the tenuous connection between itself and the skincare business. At most, Calenergy provided loans to the skincare business over a span of five years and received a net profit of approximately $317,000. (*See* Latsanovski Decl. (Dkt #90-1) and Supplemental Latsanovski Decl. (Dkt #106-4).)

[10] The Receiver had previously advised counsel that she would be seeking $758,033.44 in fees and costs based on approximately 2,372 hours billed. *See* Harris Decl., ¶ 2 and Ex. A.

| Category | 8/10/15 Request (Harris Decl., Ex. A) | Motion (Dkt #161) | Hours |
|---|---|---|---|
| Receiver's Fees | $108,323.70 | $86,658.96 | 373.53 |
| Receiver's Attorneys' Fees (12 attorneys, 3 assistants, 2 paralegals, and one law clerk) | $289,250.00 | $223,772.40 | 1024.6 |
| Receiver Attorneys' Costs (includes travel, lodging and meals for traveling attorneys) | $31,571.87 | $31,082.89 | |
| Local Counsel Fees | $3,064.55 | $2,451.64 | 10.8 |
| Local Counsel Costs | $1,771.25 | $1,771.25 | |
| Receiver's Accountant Fees | $252,962.50 | $202,369.80 | 790.83 |
| Receiver's Accountant Costs | $2,050.09 | $2,050.29 | |
| IT Fees | $41,100 | $32,880 | 137 |
| IT Costs | $5,620.79 | $5,620.79 | |
| Total Fees | $694,700.75 | $548,132.80 | |
| Total Costs | $41,014 | $40,525.22 | |
| **Total** | **$735,714.75** | **$588,658.02** | **2,336.76** |

The amount proposed by the Receiver in her 8/10/15 Request exceeds the

7

total assets currently in the receivership estate by $85,250. Even after the reductions proposed by the Receiver in her Motion, the amount sought represents more than 90% of the assets of the receivership estate. The Receiver has advised the Court that she expects to incur $125,000 to $175,000 in additional fees and costs to wind down the affairs of the Receivership Defendants. (Motion at 31). Assuming that the Receiver is not successful in increasing the amount of the estate, the fees and costs sought by the Receiver (in the Motion and in the future) will deplete the entirety of the estate, leaving nothing for the aggrieved consumers who were intended to be protected by the appointment of the Receiver.

### III. LEGAL ARGUMENT

#### A. THE COURT MAY REDUCE THE RECEIVER'S REQUEST TO PRESERVE RECEIVERSHIP ASSETS

A court appointing a receiver "has full power to fix the compensation of such receiver and the compensation of the receiver's attorney or attorneys." *In re Alpha Telcom, Inc.*, No. CV 01-1283-PA, 2006 WL 3085616, at *2 (D. Or. Oct. 27, 2006) (citing *Drilling & Exploration Corp. v. Webster,* 69 F.2d 416, 418 (9th Cir. 1934)). "[C]onsiderable discretion" is afforded to the court in that regard, which may fashion a "fee award that is appropriate under the circumstances." *Id.* at *2. Ultimately, a receiver's fees must be considered reasonable. *See In re San Vicente Med. Partners, Ltd.,* 962 F.2d 1402, 1409 (9th Cir. 1992).

Because the purpose of an equity receivership is "to conserve the resources available for payment to the victims of fraud in the instance that the FTC prevails," where a receiver has expended significant sums that would otherwise be available to remediate alleged consumer fraud, the Court "must exercise its discretion to prevent the dissipation of assets that should be available for victim restitution should the FTC prevail on its claims against Defendants." *F.T.C. v. Innovative Wealth Builders, Inc.*, No. 8:13-CV-123-T-33EAJ, 2013 WL 4500471, at *2 (M.D. Fla. Aug. 22, 2013) (reducing receiver's requested fees by 50% "to prevent the

dissipation of assets available for victim restitution"). In reducing the requested fees, the court in *Innovative Wealth* expressed its concern that the "fees [will] eat up the estate" and noted that the FTC should scrutinize the Receiver's fee requests and "play a role in safeguarding the funds for the victims of the alleged fraudulent scheme." *Id.*, at *2 (directing the FTC to "find a less expensive way of protecting the assets").

Here, the FTC has completely abdicated its responsibility to scrutinize the Receiver's fee requests, as it "takes no position regarding the relief sought" (Motion at 6), notwithstanding the fact that the Receiver's requested and anticipated fees will consume the *entire* estate. It is appalling that, at the same time the FTC has challenged Mr. Latsanovski's ability to use his *own* money – money not tainted in any way by the alleged wrongful conduct – to pay his bills and feed his family, it has raised no objection to the Receiver taking all of the available assets of the Receivership Defendants to pay herself, her law firm and the rest of her army. Despite its claimed vigilance with respect to the need to provide for consumer redress, the FTC has not lifted a finger to safeguard these funds. Accordingly, this Court should exercise its discretion to avoid the appearance of a windfall by the Receiver by carefully scrutinizing the Receiver's fee request to ensure that the request is reasonable in light of the size of the receivership estate and the work performed.

### B. THE TEMPORARY RECEIVER'S REQUEST IS NOT REASONABLE

In determining whether requested fees and costs are reasonable, the court may consider the following factors: (a) the economic hardship on the professionals providing services to the estate; (b) the economy of administration; (c) the burden that the estate may bear; (d) the amount of time required; and (e) the overall value of the services provided to the estate. *Alpha Telcom*, 2006 WL 3085616 at *2–3; *In re Imperial "400" Nat., Inc.,* 432 F. 2d 232, 238 (3rd Cir. 1970). The result obtained

by the receiver is a "critical factor" to be considered. *See United States v. Code Products Corp.,* 362 F. 2d 669, 673 (3d Cir. 1966) (primary considerations in fixing receiver's compensation are the fair value of his time, labor and skill measured by conservative business standards; the degree of activity, integrity and dispatch with which work is conducted; and the result obtained, the last being a "critical factor"). As such, it is appropriate to reduce a receiver's fees to reflect the public interest involved in preserving funds held in the receivership estate. *See SEC v. Byers,* 590 F. Supp. 2d 637, 646-47 (S.D.N.Y. 2008).

Where victims may stand to recover only "a fraction of their losses," the court must take that fact into account in compensating the receiver. *S.E.C. v. Byers*, No. 08 CIV. 7104 DC, 2014 WL 7336454, at *6 (S.D.N.Y. Dec. 23, 2014). Further, if the receiver's fee request would substantially deplete the funds available to consumers, a fee reduction is appropriate to avoid the appearance that the receiver obtained a windfall at the expense of the public. *S.E.C. v. Goren*, 272 F. Supp. 2d 202, 206 (E.D.N.Y. 2003) ("courts must exercise discretion to avoid even the appearance of a windfall").

The Receiver contends that her request is reasonable because "the lodestar rate for all services is well below the prevailing market rates and all time and expenses were necessary." (Motion at 20). However, even the authority cited by the Receiver acknowledges that disbursements from the receivership estate should only be authorized for work that ultimately results in a benefit to the receivership estate. *See SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1223 (S.D.N.Y. 1973) (denying request for fees and expenses by outside counsel where his "efforts resulted in no particular benefit to the company").

        1.    *Payment of Receiver's Fees Would Unfairly Burden the Receivership Estate*

Viewed under the standard set forth above, it is clear that the Receiver's request is not reasonable. Even with the purported reduction in fees proposed in the

1  Motion, the Receiver's request is more than 90% of the total cash available in the
2  receivership estate. Granting the request would leave $61,826 in the estate, an
3  amount that would quickly disappear if the Receiver is paid for the work that she
4  contends remains to be done. Even if the Receiver could recover the additional
5  $300,000 she seeks to add to the pot (a dubious proposition), her current take would
6  represent 62% of the estate, leaving less than $400,000 for putative victims before
7  the Receiver's next request for payment.
8       This factor alone is sufficient to justify substantially reducing the Receiver's
9  request. *See Goren*, 272 F. Supp. 2d at 213 (reducing fees after citing with approval
10 General Accounting Office study criticizing a receivership where fees equaled 54%
11 of the common fund); *F.T.C. v. Worldwide Info Servs., Inc.*, No. 6:14-CV-8-ORL-
12 41DAB, 2015 WL 144389, at *6 (M.D. Fla. Jan. 12, 2015) ("common sense"
13 indicates the amount of fees requested is excessive where the total requests exceeds
14 the entirety of the receivership estate). *Compare S.E.C. v. Striker Petroleum, LLC*,
15 No. 3:09-CV-2304-D, 2012 WL 685333, at *4 (N.D. Tex. Mar. 2, 2012)
16 (receivership's fee request was reasonable when the total requested fees and
17 expenses were less than 15% of the receivership estate and where the "receivership
18 estate can afford to pay the requested fees").
19      To avoid addressing the depletion of the receivership assets to pay her fees,
20 the Receiver suggests that the Court should consider that Mr. Latsanovski's and
21 Doron Nottea's personal assets "will also be available for consumer redress."
22 (Motion at 20). But this has no bearing on whether the fees charged are reasonable
23 – it is the Receiver's job to preserve the assets of the receivership for potential
24 consumer redress, not to take those assets for herself and point to assets outside the
25 estate as potential sources of recovery for aggrieved consumers.
26           **2.    *The Temporary Receiver's Efforts Did Not Increase the Value***
27                  ***of the Receivership Estate***
28      Further, the Receiver's request is not reasonable because her efforts did not

result in any additional funds being made available for consumer redress.  *See S.E.C. v. Northshore Asset Mgmt.*, No. 05 CIV. 2192 (WHP), 2009 WL 3122608, at *2 (S.D.N.Y. Sept. 29, 2009) (noting that investors "would have been better off if the Receiver had simply distributed the $15.4 million on deposit and promptly wound down the affairs of the receivership estate" rather than incur over $11 million in fees and costs); *id.*, at *4 (noting requested fees were excessive where receiver had not provided any services in collecting approximately 72% of the assets during the time period covered by the fee request).

Preliminarily, it is important to note that it is undisputed that the Receiver's efforts did not and could not result in any additional income for the receivership estate, as the Receiver has not operated any of the businesses of the Receivership Defendants.  In terms of gathering and preserving existing assets, the Receiver can hardly take credit for that.  *At best*, the Receiver spent approximately $588,000 to locate and preserve approximately $952,000 in assets.[11]  However, a review of the list of assets provided by the Receiver reveals that virtually all of the assets included in the current estate (or the projected estate) were obvious and locked down as a result of the Court's asset freeze, or disclosed by defendants in the ensuing days.

By the time the Receiver and her army from Texas arrived on the battlefield to bayonet the wounded, the fighting was nearly over.  The FTC and Receiver already knew that the named defendants banked at Wells Fargo and Bank of America, and had taken steps to freeze all the named defendants' accounts.  (*See* Report at 16-17).[12]  These bank accounts, frozen since June 18, contained

---

[11] This figure assumes that the Receiver will bring in the promised $300,000 from third parties.

[12] *See* Section II, B and footnote 8 *supra*.

approximately $205,000 at the time of the asset freeze.[13] Within thirty minutes of initial raid, the Receiver identified additional bank accounts (which she now seeks to include in the receivership estate) that contained approximately $80,000.[14] The remainder of the $650,000 relates to a $325,000 loan that Calenergy made to Focus Media, just days before the raid, which Mr. Latsanovski disclosed to the Receiver during his July 2, 2015 deposition.  (*See* 7/2/2015 Latsanovski Depo., Ex. K (Dkt #106-2) at 169-171).[15]

Thus, there is no evidence that the assets that are presently part of the receivership estate were located due to any substantial efforts by the Receiver.[16] The Receiver spends a significant portion of her Motion offering excuses for the exorbitant fees she incurred, including listing several instances in which defendants or third parties were slow to provide information, documents or passwords related to their bank accounts or emails.  Whether or not these allegations and excuses are true, the fact remains that the Receiver's efforts yielded very little benefit to the estate.

### 3. *The Receiver Did Not Efficiently Perform the Work*

In addition, the Receiver's request is unreasonable because the Receiver did not exercise economy or efficiency in securing or locating the receivership assets.

---

[13] Approximately $3500 in cash was also secured on the day of the raid.  *See also* Motion, Ex. A (listing Wells Fargo and Bank of America accounts).

[14] *See* Section II, B and footnote 8, *supra*.

[15] *See* Section II, B and footnote 8, *supra*.

[16] Nor did the Receiver have to expend significant time or resources to locate the additional funds she hopes to bring into the estate.  The vast majority of these funds ($284,529) is held and controlled by third parties that were known to the Receiver from the outset.  See 6/3/15 Stanley Decl., Attachment A (Dkt #9-4), ¶ 19 and APP 786-788) (identifying SignaPay as a merchant account processor); Motion, Ex. A at 2 re "Total transfer requested" (requesting transfer from SignaPay) and Report at 17, n. 36 (negotiating release of approximately $212,000 from EVO).

For example, over the course of six weeks (42 days), the Receiver and her team billed a total of 2,336.76 hours. (*See* Motion at 23).[17] Assuming the Receiver and her team worked weekends, they were billing approximately 55 hours a day, which would mean that at least 5-7 people were working on this matter every day of the week. There is no justification for the use of this manpower to locate or secure the assets at issue in this case.

Contrary to the Receiver's assertion that this was a "massive undertaking," this undertaking was quite simple because, from the very onset of this engagement, the Receiver was aware that 9 out of the 15 corporate defendants were dissolved before the TRO issued on June 16, 2015. (*See* 6/12/15 McPeek Decl. (Doc. No. 6), ¶¶ 5-20 and Att. M). In addition, she was aware that the alleged improper conduct was finished before the TRO was issued, so there was very little work required to operate or wind down these businesses.

As for the location of assets, the bulk of the work was accomplished by the time the Receiver and her team from Texas arrived on the scene. Prior to the Receiver's appointment, the FTC provided the Receiver with bank account, merchant account, and credit card processing information for the 15 named corporate defendants. (Report at 16; *see also* 6/3/15 Stanley Decl., Attachment A (Dkt #9-4), ¶ 19 and APP 786-788). Because the Receiver and her team were able to identify additional entities during the June 18, 2015 raid, she was able to take immediate steps to freeze these accounts. (*See* Report at 16-17 and Receiver Invoice, Ex. B (Dkt #161-2) at 6/19/15 Entry ("emails and calls … requesting additional accounts/banks to freeze").) Running in circles for six weeks may have been exhausting for the Receiver and her team, but it was not an efficient way for

---

[17] The 2,336.76 billed hours consist of 1,408.93 hours billed by the Receiver and counsel, 790.83 billed hours by accountants and 137 hours billed by IT consultants.

14
DEFENDANTS' OPPOSITION TO RECEIVER MOTION FOR PAYMENT

them to fulfill their mandate.

To the extent the Receiver struggled to "understand the operations of each of the entities," she had a much more efficient path available to her – under the terms of the TRO, she had the extraordinary power to depose (on 48 hours' notice) any party or non-party with relevant information.  She chose to depose only one witness, Mr. Latsanovski.  Rather than question percipient witnesses under oath, the Receiver's law firm mobilized a team of 12 attorneys, 3 legal assistants, 2 paralegals and a legal clerk to bill more than 1,000 hours over the course of six weeks.

In evaluating the efficiency of the Receiver's efforts, the Court must also consider that much of the Receiver's juggernaut was dispatched to California from Texas to partake in this billing frenzy.  Whatever the justification for having a Texas lawyer act as the receiver in a case where all parties and assets are located in California, it was incumbent upon the Receiver to minimize the extraordinary expense of this unusual appointment.  At a minimum, the Receiver should have refrained from billing for the additional costs necessitated by her inconvenient geography.  Yet, a substantial portion of the fees and costs sought by the Motion relate to time-consuming and expensive travel by the Receiver and her colleagues. (*See*, *e.g.*, Ex. B, Receiver's Bill (Dkt #161-2) at 6/20/2015 ("travel to airport and return to Dallas"); 7/1/2015 and 7/2/2015 entries (time entries include "travel to LA" and "return to Dallas), Ex. C, Scheef & Stone Bill (Dkt #161-3) at 6/3/2015 entry ("Travel from Dallas to Los Angeles"); 6/15/2015 entry ("Review airfare, hotel reservations, car reservations previously made and modify for seven (7) people"); 6/16/2015 KMC, LMS, ML, WLH entries ("travel to LA"); 6/17/2015 DBD, JSS (travel from Dallas to Los Angeles); 6/19/2015 KMC, LMS, ML entries ("travel from Los Angeles to Dallas") and 6/20/2015 DBD and WLH entries (same); 7/1/2015 and 7/2/2015 entries (noting travel time to Los Angeles and to Dallas); and Ex. D, Scheef & Stone Costs (Dkt #161-4) (seeking reimbursement for airfare, air shuttles, taxis, car rentals, car expenses and parking in connection to travel).)  The

15
DEFENDANTS' OPPOSITION TO RECEIVER MOTION FOR PAYMENT

travel-related expenses amount to $14,394.82. The *fees* billed by Receiver and her team are impossible to calculate based on the invoices provided by the Receiver, but they are certainly substantial.[18]

There is no justification for the receivership estate to pay the costs and fees associated with this travel because the FTC was aware that the Receivership Defendants were located in Los Angeles County, but elected to recommend a receiver from Texas even though there are numerous qualified receivers in California. Further, the Receiver compounded this inefficiency by retaining her own Texas law firm, rather than a local firm as her counsel. Because these costs could have easily been avoided, it is inequitable to charge the receivership estate for them. *See F.T.C. v. Worldwide Info Servs., Inc.*, No. 6:14-CV-8-ORL-41DAB, 2015 WL 144389, at *7-*9 (M.D. Fla. Jan. 12, 2015) (reducing fees and travel costs where it was "unnecessary" for at least three of the Receiver's professionals to travel at the commencement of the receivership even where receiver voluntarily reduced billable hours to account for "excessive travel time").

Further, the requested CPA fees and expenses are excessive. It appears from the Receiver's Report and the Motion that the CPA's work consisted of reviewing QuickBooks records for the defendant entities, as well as other financial statements and tax returns provided by defendants. (*See* CPA Report, Executive Summary (Dkt

---

[18] The precise amount of fees attributable to travel are impossible to discern because the lawyers from the Receiver's firm engaged in the discouraged practice of "block billing," and included their travel time in their billable hours. *See Spalding Labs., Inc. v. Arizona Biological Control, Inc.*, No. CV 06-1157 ODW (SHX), 2008 WL 2227501, at *4 (C.D. Cal. May 29, 2008) (apply 15% fee reduction to account for block billing which makes "it difficult, if not impossible to determine how much time was spent on particular activities"); *Gundlach v. Nat'l Ass'n for Advancement of Colored People, Inc.*, No. 303CV1003J32MCR, 2005 WL 2012738, at *4 (M.D. Fla. Aug. 16, 2005) (applying 30% fee reduction where all fees based on block billing).

#121-1) at 7). The CPAs were not required to perform any tax work. (*See* Report at 22, n. 48). Accordingly, the CPA Report was simply a compilation of documents and QuickBooks records provided by Defendants and cannot justify the 791 hours billed, or the $202,369.80 in fees claimed.

## IV. CONCLUSION

For the foregoing reasons, Defendants Latsanovski and Calenergy respectfully request that this Court reject the Receiver's request for $588,658.02, and award an amount that (a) is commensurate with the benefits (if any) that the Receiver's efforts have bestowed upon the estate; (b) disallows the fees and costs that were not absolutely necessary to accomplish the objectives of the receivership; and (c) allows at least 75% of the assets that were in the estate when the Receiver took over to remain available for consumer redress if the FTC prevails in this action.

DATED: August 27, 2015

SCHEPER KIM & HARRIS LLP
MARC S. HARRIS
ANNAH S. KIM

By: /s/ Marc S. Harris
Marc S. Harris
Attorneys for Defendants Igor Latsanovski
and Calenergy, Inc.