Michael J. Weiss (SBN 206473)
**ABRAMS GARFINKEL MARGOLIS BERGSON, LLP**
5900 Wilshire Blvd. Suite 2250
Los Angeles, CA 90036
310-300-2900
310-300-2901- Fax
Mweiss@agmblaw.com

Kelly M. Crawford (TX SBN 05030700)
*Admitted Pro Hac Vice*
**SCHEEF & STONE, L.L.P.**
500 N. Akard, Suite 2700
Dallas, Texas  75201
214-706-4200
214-706-4242 - Fax
Kelly.crawford@solidcounsel.com
Attorneys for Receiver
CHARLENE C. KOONCE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP, INC., a California corporation, also doing business as AuraVie and Miracle Face Kit, et al.,<br><br>Defendants. | Case No. 2:15-CV-4527-GW(PLAx)<br><br>RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT<br><br>Hearing Date:  September 17, 2015<br>Time: 10:30 am<br>Place:  Courtroom 10 |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  FACTS ....................................................................................................... 2

III. LEGAL ARGUMENT ............................................................................... 6

    A.   A Further Reduction of the Receiver's Payment Request to Preserve
         Receivership Assets is Not Justified ............................................. 6

    B.   The Receiver's Request is Reasonable ......................................... 8

         1.   Payment of the Receiver's Fees Does Not Unfairly Burden the
              Receivership Estate under the Lodestar Method ........................... 10

              a.   Objecting Defendants Do Not Care About Consumer
                   Redress ................................................................................ 10

              b.   Work to Recover Assets Does Not "Burden" the Estate ...... 11

              c.   Individual Defendants' Assets Are Also Available for
                   Consumer Redress ............................................................... 12

              d.   The Percentage Method of Compensation is Not Appropriate
                   ............................................................................................ 12

         2.   The Receiver's Efforts Funded the Estate and Have Already
              Provided Significant Value to Consumers ..................................... 14

         3.   The Receiver Efficiently Performed Her Mandate ......................... 18

IV.  CONCLUSION ......................................................................................... 24

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Donovan v. Robbins,* 588 F.Supp. 1268 (N.D. Ill. 1984) ................................14

4

*F.T.C. v. Innovative Wealth Builders, Inc.,* No. 8:13-CV-123-T-33EAJ, 2013 WL
    4500471 (M.D. Fla. Aug. 22, 2013)..........................................................6, 7

5

6

*FTC v. Worldwide Info Services, Inc.,* No. 14-CV-8-ORL-41DAB, 2015 WL 144389
    * 6 (M.D. Fla. Jan. 12, 2015) ....................................................................17

7

*In re Miniscribe Corporation,* 309 F.3d 1234 (10th Cir. 2002) .....................14

8

*SEC v. Fifth Ave. Coach Lines, Inc.,* 364 F. Supp. 1220 (S.D.N.Y. 1973) ..............9, 10

9

*SEC v. Goren,* 272 F.Supp.2d 202 (E.D.N.Y 2003).....................................9, 13

10

11

12

13

14

15

16

17

18

19

20

21

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

# I.  INTRODUCTION

Objecting Defendants Latsanovski and his company, Defendant CalEnergy, (collectively "Objecting Defendants") do not care about preserving funds for the estate or consumers, and their objection has nothing to do with consumer redress. Indeed, Latsanovski testified he did not care how the skin care products at issue were sold– why would he care now whether the consumers he helped defraud receive any compensation, or are protected from further fraud? Objecting Defendants further demonstrate their disregard for the consumers by ignoring the additional source for consumer redress:  Latsanovski and the other Individual Defendants' frozen assets – assets which are not part of the receivership estate.

Instead of the professed concern for consumers or the necessity and efficiency of the Receiver's team's work, Objecting Defendants' real motive is impeding the Receiver's efforts to continue performing her mandate, by ensuring she and her team receives only minimal payment for reasonable and necessary work. Thus far, the Receiver's diligent performance of the mandate revealed and will continue to reveal Latsanovski's active partnership with the other defendants in deceiving consumers and using hundreds of thousands of fraudulently obtained dollars to support his lavish lifestyle and fund his corporation, CalEnergy. Indeed, the Receiver's efforts uncovered an additional 12 entities used by Defendants in their deceptive skin care business, and shut those businesses down, thereby preventing further consumer harm.

Likewise, the Objecting Defendants' failure to cooperate with the Receiver[1] renders their complaints about the Receiver's fees disingenuous at best.  Indeed, the Receiver's fees would have been substantially reduced if Latsanovski (and other Defendants) had complied with the Receivership Order.[2] And of course Objecting Defendants would like the Court to ignore the fraudulent enterprise they used to make money, which used sham entities, whose officers and bank account signatories knew nothing about those entities or their assets.

In an effort to discourage continued diligence in performing her mandate, the Objecting Defendants argue the receivership estate cannot bear the burden of the Receiver's fees and expenses; the Receiver's efforts did not increase the value of the receivership estate; and the Receiver did not efficiently perform her work. Each of these arguments significantly misconstrues the nature of this case, all of the Defendants' deceptive conduct, and the obstacles overcome by the Receiver in performing her mandate.

## II.    FACTS

The factual background submitted by Objection Defendants includes numerous incorrect statements and assumptions.

---

[1] *See* Receiver's Declaration in Support of Reply to Defendants' Opposition to Receiver Motion to Pay (the "Receiver's Declaration"), filed contemporaneously with this Reply, at paragraph 6.

[2] The Court's June 16, 2015 *Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why A Preliminary Injunction Should Not Issue* is referred to herein as the "Receivership Order."

First, by citing to only five of the 17 numbered paragraphs in the Receivership Order that impose duties upon the Receiver, Objecting Defendants suggest the Receiver's duties were quite limited. The omission of *12* provisions of the Receivership Order listing various duties and responsibilities assigned to the Receiver, however, demonstrates Objecting Defendants' effort to persuade this Court that the Receiver's job was not nearly as expansive as reflected in the entire Receivership Order and as explained in her Motion for Payment.

Consistent with this theme, Objecting Defendants argue that 9 of the 15 entities named in the FTC Complaint were dissolved.  As set forth in the Receiver's Report,[3] dissolution did not mean the entities were not still conducting business or holding monies that were Receivership Assets.   Indeed, the Receiver continues receiving communications regarding activities of Defendant Media Urge, Inc. which was purportedly dissolved in 2014. Contrary to Objecting Defendants' argument, simply because an entity was dissolved did not mean work regarding that entity was not required.

In addition, while arguing the Receiver did not add any value to the receivership estate and acted inefficiently, the Objecting Defendants admit that within a few hours of entering the Defendants' offices on June 18, 2015 the Receiver

---

[3] The Receiver's Report was filed on August 3, 2015 [Docket No. 120-124], and is referred to herein as the "Receiver's Report." *See also,* Docket No. 92, pp. 6-7, Receiver's Declaration in Response to Objecting Defendants' motion for relief from TRO, which identifies virtually all dissolved entities as having active bank or merchant accounts.

1   identified an additional 10 entities that were eventually determined to be

2   "Receivership Defendants." Additional entities were later discovered, several of

3   which engaged in bank fraud (at Defendants' direction), and many of which required

4   extensive investigation to sort Defendant's fictional information from the truth, or find

5   information Defendants refused to provide about those entities' operation. In the face

6   of such fraud and a lack of cooperation, the Receiver's actions were not only efficient,

7   but also added substantial value to the receivership estate. Indeed, the Receiver was

8   able to investigate, locate, and freeze accounts holding monies in the name of the new

9   entities that were not known to the FTC, nor included in the Complaint.

10          Next, the Objecting Defendants argue the Receiver has control of less than

11   $650,000.   The Receiver currently has possession of $938,126.80,[4] which is on

12   deposit in the receivership bank account, based on the following:

13          $499,105.10          recovered from named Receivership Defendants;

14          $232,506.20[5]       recovered from entities not yet named as Receivership
                                  Defendants, but which Defendants admit acted as "retail
15                                merchants for skin care products"; and,

16

---

17          [4] *See, Declaration of Charlene Koonce, submitted concurrently with this Reply,* ("Receiver's
     Declaration), ¶ 4.   Some of the funds previously recovered above were spent on expenses the
18   Receivership Order authorized the receiver to pay, such as July rent for the Canby locations, and
     rental for a storage unit to store the contents of the Canby location and stop any further rent. The
19   amount on deposit includes cash recovered from the Canby location. As reflected in the Response to
     Doron Nottea's Objection, Docket No. 184, the Receiver has no objection to segregating those funds
20   or agreeing not to use them until the Court determines who owns the funds.
            [5] An additional $8,613.33 remains due for one DMA Media Holdings, Inc. account, which
21   Priority Payments claims is "in the mail."

1

2

      $223,640.63       recovered from additional entities which fall within the definition of "Receivership Defendants," such as Focus Media, the successor in interest to Media Urge.

3

4

5

6

7

8

9

10

      The facts regarding the sources of the Receiver's recovery also demonstrate Defendants' efforts to mislead the court in arguing they are the deep pockets and the Receiver is "going after" the Objecting Defendants because she needs their monies to pay fees and expenses.  Of the $938,126.80 in the estate's bank account, less than 7% or $66,407 was recovered from Defendant CalEnergy. None of the monies in the receivership estate belong to Defendant Latsanovski.  Indeed, the estate has sufficient funds to fully pay all fees and expenses sought by the Receiver while leaving a much larger balance than the $66,407 recovered from CalEnergy.

11

12

13

14

15

16

17

      Objecting Defendants' efforts to paint themselves as victims is also evidenced by a footnote in the Objection, in which they posture Latsanovski as an innocent lender to others involved in the deceptive practices at issue. The Court has already rejected this argument, based on evidence previously submitted.  Latsanovski was an active partner[6] in the business of deceiving consumers, and Latsanovski used the numerous entities he owns and controls to receive monies from the skincare sales to finance his luxurious lifestyle.

18

19

      The true motive for the objection to the fee application is also demonstrated by Objecting Defendants' focus on the total amount of fees and expenses incurred by the

20

21

_____

[6] *See,* Docket Nos. 91, 92, and 93 for evidence regarding Latsanovski's role.

1   Receiver, while ignoring the Receiver's 20% voluntary reduction by $147,000 of

2   those fees and expenses.  Similarly, in arguing the Receiver's future fees and expenses

3   will render the receivership estate insolvent, the Objecting Defendants "assume" the

4   Receiver will not be successful in increasing the estate. The assumption lacks support,

5   and should be given no weight, however, particularly given that the Objecting

6   Defendants already know the Receiver holds a fraudulent transfer claim exists against

7   *at least* one entity controlled by Latsanovski. Objecting Defendants simply hope that

8   claim does not come to fruition.[7]  Likewise, as stated in the Receiver's Report, claims

9   may exist against banks. And, the Receiver continues to investigate sources of

10  recovery for funds potentially owed to the Receivership Defendants – sources which

11  were of course, not disclosed by any Defendant despite a request for that information.

12              **III.   LEGAL ARGUMENT**

13  **A.     A Further Reduction of the Receiver's Payment Request to Preserve
            Receivership Assets is Not Justified**

14

15          This Court unquestionably has authority to fix the compensation of the Receiver,

16  and in doing so should consider the circumstances surrounding the Receiver's efforts

17  to insure the fees are reasonable.

18          The Objecting Defendants cite  *F.T.C. v. Innovative Wealth Builders, Inc.,* No.

19  8:13-CV-123-T-33EAJ, 2013 WL 4500471 (M.D. Fla. Aug. 22, 2013) as support for

20          [7] To the extent CalEnergy transferred  monies to Sunset Holdings without receiving the
    exchange of reasonably equivalent value and was insolvent,, such transfer may be set aside as a
    fraudulent transfer.  The Receiver is investigating the possibility of pursuing such an action.

21

1   reducing a receiver's fees out of concern the fees will eat up the estate and as a

2   reference to the FTC's obligation to scrutinize the Receiver's fees.

3       In *FTC v. Innovative Wealth*, the Florida District Court judge cut a receiver's

4   fees because 1) the Receiver requested payment based on a higher hourly rate than he

5   told the court he agreed to earlier in the case; 2) he billed the estate for performing

6   administrative services such as unpacking boxes that should have been done by a

7   paralegal or other assistant; and 3) he billed for unnecessary legal work (specifically,

8   preparing an amended complaint against a target that will likely never be filed because

9   it was prepared after the deadline for amending pleadings). *Id.* at \*2-3.

10      None of the issues in *FTC v. Innovative Wealth* are present in this case. The

11   Receiver is charging even less than the already discounted hourly rate she agreed to

12   upon accepting the case; the Receiver had administrative tasks done by paralegals or

13   administrative staff (as shown on the invoices provided); and the Receiver did not

14   incur expenses for any legal work that was time barred.

15      Next, the Objecting Defendants harshly criticize the FTC for not objecting to

16   the Receiver's fee request, claiming the FTC "completely abdicated its responsibility

17   to scrutinize the Receiver's fee requests." Once again, the Objecting Defendants'

18   argument misconstrues the facts.  When the Receiver initially conferred with the FTC

19   regarding the fee request, as she did with the Objecting Defendants, the FTC

20

21

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

expressed concern over the significant amount of the fees and expenses.[8] To accommodate the FTC's concerns, the Receiver voluntarily reduced all fees by 20% – reducing the total request by $147,000. Contrary to the Objecting Defendants' contention, the FTC did its job. It carefully scrutinized the Receiver's fee request, conferred with the Receiver regarding its review, and as a result of the conference, the fees requested by the Receiver were *substantially* reduced.

## B.      The Receiver's Request is Reasonable

The factors considered by a court in ruling upon a receiver's fee request are set forth in the Receiver's Motion for Payment. Those factors include evaluation of the "lodestar" amount (the total fee request divided by the number of hours worked). Significantly, the Objecting Defendants do not argue the lodestar rate is unreasonable, or too high.[9] Instead, they argue the estate cannot bear the total fees, the Receiver's efforts did not increase the value of the estate, and the Receiver was not efficient.

Under the circumstances of this case, which involved uncovering a massive scheme involving more than 27 entities engaged in the deceptive practices at issue, (entities sifted and sorted from more than a total of *sixty* entities operated and controlled by the defendants – most of which were operated and controlled from the

---

[8] The FTC had no complaint regarding the reasonableness or the necessity of the fees and expenses, but was concerned about the total amount of the request.

[9] Indeed, the Receiver welcomes the opportunity to compare the reduced hourly rates she and her attorneys are charging the estate with the hourly rates charged to the Objecting Defendants by their own attorneys.

1    same location as the Receivership Defendants)[10] the lodestar rate the Receiver is

2    requesting this Court to approve - $234.53 per hour[11] – is extremely reasonable.

3         Once again, the cases relied upon by the Objecting Defendants for their

4    argument, have no application here. The Objecting Defendants cite *SEC v. Goren*, 272

5    F. Supp.2d 202, 206 (E.D. N.Y. 2003) for the proposition that courts must exercise

6    discretion to avoid the appearance of a windfall. What windfall exists in the

7    Receiver's request for payment in this case?  Instead of a "windfall", the Receiver

8    discounted all of the fees (which were *already* discounted by 15% before work

9    commenced) by 20%.  There is no "windfall" at issue here and Objecting Defendants'

10   suggestion otherwise only highlights their real motive in objecting to the payment

11   request.

12        Likewise, Objecting Defendants' reference to *SEC v. Fifth Ave. Coach Lines,*

13   *Inc.,* 364 F. Supp. 1220, 1223 (S.D.N.Y. 1973) is misplaced.  Objecting Defendants

14   rely upon the case as support for the proposition that fees should only be approved for

15   work that ultimately results in a benefit to the receivership estate.  In that 1973 case,

16   the trustee's counsel sought fees of $489,924. The SEC took no position.  One person,

17   a shareholder of the company in receivership, objected on the basis the legal services

18   were "unnecessary and wasteful."  The district court, however, found it "eminently

19

20        [10] *See,* Receiver's Report, Docket No. 120, p. 83 and Docket No. 124, pp. 8-16.
          [11] The lodestar rate for the receiver and her attorneys is $220.00, and when the accountant's

21   time is incorporated, the lodestar is $234.53.

fair and reasonable to award the fees requested" by the receiver. *Id.* at 1222. The court did not approve a fee request from a third party, not retained by the receiver, because "his position is very different from that of the court appointed counsel to the court appointed trustee", and "it would not be reasonable to compensate Mr. Traubner [the third party] out of the assets of the company."  364 F. Supp. at 1223.

In the instant case, the Court is not considering a fee request from a third party not retained by the Receiver, and thus *Fifth Ave. Coach Lines, Inc.* has no application for the proposition relied upon by Objecting Defendants.

### 1.     Payment of the Receiver's Fees Does Not Unfairly Burden the Receivership Estate under the Lodestar Method

The receivership estate held nothing when the Receiver was appointed.  As discussed *infra*, through the diligence of Receiver and her team, more than $938,000 is currently in the Receiver's possession. And, most importantly, the Receiver uncovered the massive web of entities involved in Defendants' deceptive skin cream marketing scheme, in addition to those entities named by the FTC, and shut down *all* of those entities, for the benefit of all future consumer victims.

### a.     Objecting Defendants Do Not Care About Consumer Redress

The Objecting Defendants' argument that the Receiver should not be paid because there will be nothing left for putative victims is *extremely* disingenuous, ignores the realities of a receivership, and is not supported by the law. First, Latsanovski testified that he did not know how the Receivership Defendants sold their

products (which was a lie)[12] and as long as no one was killed in the process, essentially did not care.[13]

### b.    Work to Recover Assets Does Not "Burden" the Estate

The first 30 – 60 days of a receivership are by far the most expensive.  Indeed, the Receiver's Report regarding the extensive work performed by the Receiver and her team in just the first 3 days of the receivership, detail the scope of the work required just to perform a sliver of the Receiver's broad mandate.  And unquestionably, the Receiver and her team worked without respite – throughout the weekends and late at night. This early work in accumulating evidence and securing assets before they disappeared was critical.[14] The Receiver and her team's efforts are the only reason the receivership estate has any assets. To suggest the assets were easily obtained, particularly the approximately $450,000 recovered from entities not named as "Receivership Defendants" but which fall within that definition, is complete fiction.  The argument also ignores Defendants' lies and efforts to impede asset recoveries.[15] The hours necessary to perform the mandate, after the date of the

---

[12] Evidence discovered after Latsanovski's deposition proved that he in fact did know the products were sold using negative option marketing, because Latsanovski received reports about the chargeback rates. Koonce Dec. ¶ 7, Ex. G.

[13] Koonce Declaration, Exhibit F.

[14] For instance, one attorney began downloading information from Doron Nottea's computer shortly after the FTC finished imaging that hard-drive at approximately 9:00 p.m. on June 18, 2015 and continued into the small hours of June 19th. Because of that access, the Receiver obtained invaluable records that Doron later deleted.

[15] As an example, as noted in the Receiver's Report, Defendants reported that assets for all entities were on deposit only at Wells Fargo and Bank of America. The Receiver, however, discovered more than $389,000 in merchant reserve accounts not disclosed by Defendants. This

Preliminary Injunction hearing, have dropped exponentially. Moreover, the Receiver's voluntary 20% reduction to the already discounted fees leaves even more funds in the receivership estate.

### c.  Individual Defendants' Assets Are Also Available for Consumer Redress

In addition, contrary to Objecting Defendants' argument otherwise, the Court should not ignore the Individual Defendants' frozen assets available for consumer redress – assets which are not part of the receivership estate and thus provide no basis for Latsanovski's "deep pocket" argument. Indeed, the Receiver's prompt action prevented Doron Nottea from removing $450,000 in cash from his safety deposit box at Bank of America.[16] Those funds are available for potential consumer redress, but would have disappeared but for the Receiver's actions.  Ignoring these assets ignores the entire purpose of the asset freeze on the Individual Defendants' assets.

### d.  The Percentage Method of Compensation is Not Appropriate

Objecting Defendants also request payment for fees incurred by the estate based on a percentage of the amount recovered, instead of the lodestar formula mandated by

information was likewise not provided to the Receiver by the FTC prior to their file date, and the FTC's Complaint remained sealed for approximately a week after filing.

[16] The Receiver confiscated the key to the safety deposit box from Doron Nottea, and informed Bank of America of the Court's freeze order, which extended to safety deposit boxes in the name of or accessible to Doron Nottea.  Nonetheless, Doron Nottea tried to access his safety deposit box, but could not do so because the key was in the hands of the Receiver and Bank of America was alerted to the freeze order.

1    governing authorities. Specifically, Objecting Defendants ask that the Court award the

2    Receiver only 25% of the assets recovered as payment of her fees and expenses.

3          This percentage approach to a receiver's compensation is not supported even by

4    the cases relied upon by the Objecting Defendants. Indeed, the *Goren* case cited by the

5    Objecting Defendants expressly *rejects* the use of a percentage approach to

6    compensation. The district court in *Goren* compared the receivership to a trusteeship

7    in a bankruptcy[17] and found the receiver "did not engage in complex and speculative

8    litigation, as in a typical common-fund case,[18] but merely executed the Court's orders

9    to conserve and liquidate Goren's assets." *SEC v. Goren,* 272 F.Supp.2d 202, 207

10   (E.D.N.Y 2003). And, continuing its reliance upon bankruptcy as a guide for

11   receiverships, the *Goren* court cited a Tenth Circuit opinion awarding a bankruptcy

12   trustee his fee: "'[w]hile it cannot be denied that results obtained is a factor to be

13   considered in assessing the reasonableness of trustee compensation…we believe this

14   is better considered as merely one of the criteria for determining the multiplier, if any,

15

16          [17] Indeed, the local rules of this Court use bankruptcy as analogy to the actions of a Receiver.
     Local rule 66-8 mandates "a receiver shall administer the estate as nearly as possible in accordance
17   with the practice in the administration of estates in bankruptcy." A trustee in bankruptcy, like a
     receiver, holds a priority administrative claim against the bankruptcy estate. It is certainly
18   commonplace in bankruptcy cases for administrative expenses to consume a significant amount of
     the bankruptcy estate.
           [18] The percentage of recovery method may be used in a common-fund case. 272 F. Supp. at
19   206. Notably, in SEC cases, *all assets,* those of the individuals and those of the entities, are held in
     the estate, yet the lodestar method is the generally accepted method for evaluating compensation. In
20   FTC cases, the assets are divided with only entity assets held by the estate, but individual assets
     frozen and subject to the FTC and the Court's control only, but nonetheless available for consumer
21   redress.

to be applied to the lodestar amount, rather than the *sine que non* of the reasonableness calculation." *Id.*, *citing, In re Miniscribe Corporation,* 309 F.3d 1234, 1243 (10th Cir. 2002).

Here, the Receiver engaged in an extremely complicated investigation to perform the mandate, and has likewise filed detailed and extensive briefs and reports. This Court should reject the unsupported percentage of compensation approach proposed by Objecting Defendants and follow the well-established lodestar method for determining the Receiver's compensation.

### 2. The Receiver's Efforts Funded the Estate and Have Already Provided Significant Value to Consumers

The Receiver is responsible for the $938,000 currently held by the receivership estate and is responsible for preserving another $450,000 in Doron Nottea's safe deposit box for future consumer redress. Nonetheless, Objecting Defendants first criticize the Receiver for not operating any of the Receivership Defendants' businesses to create income for the receivership estate.[19] As detailed in the Initial Report, the Receiver determined the Receivership Defendants' businesses could not be operated legally and profitably and wisely chose NOT to continue operations that

---

[19] Indeed, even if a receiver does not increase the value of the estate, or if a TRO is dissolved so the receiver's efforts ultimately provide no benefit to consumers, the receiver is entitled to reasonable compensation. *Donovan v. Robbins,* 588 F.Supp. 1268, 1271-1272 (N.D. Ill. 1984)(Awarding receiver's fees and expenses incurred despite denial of preliminary injunction and receiver's failure to increase value of property administered, where TRO appointing receiver was entered in good faith, receiver's services were necessary and diligently provided).

would have only drained the receivership estate.[20] The Receiver's efficient efforts preserved funds in the estate.

Next, Objecting Defendants argue the receivership assets were easy pickings that required very little effort from the Receiver.  Nothing could be further from the truth.  As detailed in the Receiver's Report, the Defendants, including the Objecting Defendants, set up a myriad of corporations, almost half of which were not named in the FTC Complaint, to receive and move money from the skin care business for the Defendants' benefit. These entities were set up with straw persons as officers or owners of bank accounts, solely to disguise their connection to the Defendants.

Defendant Latsanovski himself admitted that his role "on paper," i.e., the legal fiction he assisted in creating, was different from what he contended was the reality of his involvement.[21]  For instance, certain documents identify Latsanovski as an employee and officer for Bunzai,[22] although Latsanovski denied both roles. Latsanovski also denied any control over Zen Mobile Media, but some of his personal expenses were paid from Zen Mobile Media's Wells Fargo account.[23] Latsanovski's

---

[20] Indeed, with the possible exception of the "personal consulting LLC" entities owned by Alon Nottea and Roi Reuveni, *none* of the Defendants, including the Objecting Defendants responded to the Receiver's request for specific information regarding whether any of the entities they controlled could continue operating legally and profitably.  Indeed, despite *multiple* requests, Objecting Defendants have never provided any information regarding CalEnergy's liabilities, operating expenses, employees, or other financial obligations.  *See,* Receiver's Report, Docket No. 120, p. 79, n. 184; Receiver's Declaration, ¶5(d), Exhibit C.

[21] *See,* Receiver Declaration, ¶¶ 6 and 7.

[22] *See, Koonce Declaration*, Docket No. 92, Exhibits 8-14.

[23] Receiver's Report, Docket No. 120, p. 36.

bald and wholly unsupported suggestion to this Court that the assets of the estate "were obvious" is entirely baseless, and like Latsanovski himself, lacks credibility.

Countless hours were required by the Receiver, her attorneys and accounts to connect the dots and *determine which entities were involved in the Enjoined Conduct,* and which were only used for other fraudulent purposes by Defendants.  Only after tracking down witnesses, identifying forgeries, following the flow of funds by close examination of the bank records, and obtaining records and information from outside sources such as the affiliate marketers paying Defendants and their entities, could the Receiver determine which of the additional entities' assets were derived from the skin care business and used by the Defendants for that purpose.

Similarly, more than 70 merchant accounts were set up to receive money from consumers who purchased skin care products based on deceptive advertising, and many of those merchant accounts were in the names of entities not named in the FTC's Complaint; none were initially disclosed by Defendants. Indeed, none of these merchant accounts were identified by the FTC in its Complaint, and only a fraction were identified in documents supporting the Complaint.[24] Further, research, investigation, and repeated demands to Defendants followed by close analysis of that information was necessary to determine whether accounts for entities were controlled

---

[24] Indeed, the Receiver tracked down and interviewed two persons listed in corporate or bank documents as in control of certain entities and the entities' merchant accounts, and discovered Defendants unlawfully used those persons' identities and forged their signatures.

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

by Defendants, and fell within the scope of the TRO. Objecting Defendants wholly ignore the sham illusion they created, which made the Receiver's job very difficult. Because of this work, the merchant accounts were closed and the fraudulent billing of consumer credit cards ceased.

In addition, as a direct result of the Receiver and her team's diligence, an additional $360,000 withdrawn from an account in the name of one of the entities that was not named, but which falls within the scope of the Receivership Order, was recovered.[25] And, more than $200,000 was located in bank accounts (not just merchant accounts) for entities not named as Receivership Defendants. None of the named Individual Defendants are signatories on the accounts of those entities, although the Receiver was able to determine that Defendants were nonetheless in control of those entities and their bank accounts – despite the misleading information to the contrary initially provided by Defendants. Those funds, as well as funds that will remain after payment of all reasonable and necessary administrative expenses, will be available for consumer redress.

Finally, the significant value to consumers from the Receiver's discovery of, and ending the activities of the web of sham entities used in the fraudulent sales of skin cream, should not be ignored. *See, FTC v. Worldwide Info Services, Inc*., No. 14-

---

[25] Alon Nottea transferred the funds out of Focus Media's bank account to USM Products' account. Alon is not an officer for Focus Media, nor a signatory on its bank account, and had not disclosed *any* records for USM, although the Receiver discovered Alon's alias name was an officer for USM Products.

1   CV-8-ORL-41DAB, 2015 WL 144389 * 6 (M.D. Fla. Jan. 12, 2015)(Finding that "the

2   Receiver's actions resulted in avoidance of significant future harm to consumers.")

### 3.    The Receiver Efficiently Performed Her Mandate

4          Objecting Defendants complain about the volume of hours worked by the

5   Receiver and her team as unnecessary because "the undertaking was quite simple."

6   Objecting Defendants' "simplicity" argument is premised on a contention that the

7   Receiver was aware at the outset that 9 of the 15 corporate defendants were dissolved,

8   and that the FTC provided the Receiver with bank account, merchant account, and

9   credit card processing for the corporate defendants. The argument ignores the

10  additional active entities used by Defendants but not named in the Complaint and the

11  various types of fraud committed by Defendants and their creation of a deceptive web

12  of entities to shield them from legal ownership and control over those entities.

13         The Receiver's Report, however, details the complexity of Defendants'

14  fraudulent operations, and the extensive work required to perform the mandate of the

15  Receivership Order. As explained in the Receiver's Report, Defendants purposely

16  dissolved old corporate entities (and ignored the dissolved status of many in

17  continuing to operate those entities) and set up new entities in conducting their

18  fraudulent enterprise and to hide their own receipt of the income from that enterprise.

19  Thus, the dissolution of many of the named Receivership Defendants did not make the

20  Receiver's job easier, but instead made it more difficult. Indeed, Defendants continued

21

1   operating dissolved entities (most of which continued to have active bank accounts) as

2   well as the new entities. And for virtually all of those entities, Defendants were

3   conspicuously absent from the incorporation documents and the bank account

4   ownership records.  And of course, Defendants lied about the nature of several of

5   those entities' operations, or just omitted discussion of certain entities despite direct

6   requests for information about them.

7        In addition, Latsanovski should hardly be heard to complain about purported

8   efficiencies when he participated in creating the illusion regarding who controlled and

9   owned the Receivership Defendants.[26] This illusion, particularly with respect to

10   companies that were not named defendants but utilized by Defendants in the Enjoined

11   Conduct drove the cost for the Receiver and her team to perform her mandate – not

12   inefficiencies.

13        Similarly, Objecting Defendants' contention that the deceptive skin care

14   product sales had ceased before the receivership is also not supported by any facts,

15   and is contrary to the Receiver's findings as previously reported.[27]

16        Moreover, Latsanovski's actions were the direct and sole cause of significant

17   fees. As detailed in the Receiver's Report, Latsanovski's counsel requested the

---

[26] *See,* Koonce Dec. ¶

[27] The Receiver was contacted by consumers whose credit cards were charged without their permission, and who received AuraVie shipments in June 2015. Likewise, the Receiver ordered skincare products deceptively marketed by one of the entities not named as a Receivership Defendant, which also resulted in an unauthorized charge for a negative option enrollment. *See* Receiver's Report, Docket No. 120 at pp. 40-41.

Receiver's assistance in releasing funds from Sunset Holdings' frozen account – an account on which Latsanovski is the signatory, and which received more than $4MM from CalEnergy – to close on two real estate transactions and avoid the forfeiture of approximately $400,000 in escrow funds. The Receiver's attorneys evaluated the transaction, and entered into a Stipulation with Latsanovski and the FTC that allowed the release of very specific amounts from the frozen bank account. After the Stipulation was approved, Latsanovski wired funds to the escrow companies in amounts contrary to the Stipulation, which resulted in an excess amount held by one escrow company, and another escrow company having a shortfall and unable to close. Rather than correct this problem, Latsanovski had the escrow company holding excess funds pay third parties for work on the property.[28] Only on the date the Receiver had stated she would file a show cause motion if the shortfall was not remedied did Latsanovski obtain funds from a third party[29] to make up the shortfall at the other escrow company. Latsanovski's contempt caused the estate to incur extensive fees and expenses regarding each of these issues.

The Objecting Defendants also argue the Receiver's investigation would have been more efficient if she had simply deposed every witness instead of obtaining

---

[28] To date, Latsanovski has never provided any documents, identifying who exactly received those additional funds.

[29] This third-party, Mike Peniche, now claims a lien on the property at issue, despite express prohibitions against such a lien. *See,* Docket No. 187.

information through rolling requests to the Nottea Defendants.[30] Latsanovski's own failure to testify truthfully disposes of this argument. Latsanovski testified he was just an investor with no knowledge regarding the specific manner in which the entities were operated, and no control over the entities' assets.[31] These statements, however, were not true.[32] After the deposition the Receiver obtained documents that contradicted Latsanovski's testimony regarding his role in the skin care business. Indeed, once these additional documents were discovered, Latsanovski's counsel was specifically asked why Latsanovski failed to disclose the information contained in the documents during the deposition, but ignored the request.[33]

Latsanovski's failure to be forthcoming and truthful is the *exact* reason the Receiver chose not to depose the other defendants. Before deposing Latsanovski, the Receiver had already discovered some of the Nottea Defendants' bank fraud, and within a week of Latsanovski's deposition, was forced to file a motion to compel and two motions for show cause orders due to the Nottea Defendants' refusal to provide accurate, complete information as required by the Receivership Order. Under those circumstances, choosing not to incur deposition expenses for witnesses the Receiver already knew would lie, was the far more prudent and efficient choice.

---

[30] The argument is contrary to Objecting Defendants contention at the Preliminary Injunction hearing that deposing Defendant Latsanovski evidenced the Receiver's intent to "target" Latsanovski and CalEnergy. Now Objecting Defendants contend the absence of depositions for the Nottea Defendants demonstrates inefficiency?

[31] Koonce Dec. Exhibit D.

[32] *Id.*

[33] *See,* Receiver'*s* Declaration, Exhibit C.

1    Surprisingly, after first complaining that the Receiver's decision to forgo
2    depositions was not efficient, Objecting Defendants next argue the Receiver should
3    have minimized travel expenses from Dallas to Los Angeles. To date, the Receiver
4    has made only three trips from Dallas to Los Angeles – 1) to enforce the Receivership
5    Order on the first day of the receivership and the days that followed; 2) to attend the
6    deposition of Mr. Latsanovski; and 3) to attend the preliminary injunction hearing on
7    August 6, 2015. In other instances, when appropriate, the Receiver or her counsel
8    appeared before the Court by telephone.

9    The Receiver also ensured that travel expenses were kept to a minimum.
10   During the initial seizure of the assets, the Receiver and her team stayed at a Howard
11   Johnson's motel in Reseda since it was close to the location of the Defendants'
12   operations and inexpensive.  Any complaints the Objecting Defendants have regarding
13   travel time billed by the Receiver or her attorneys are further addressed by the
14   Receiver reducing the total fees by 20% or $147,000.[34]  Indeed, at a lodestar rate of
15   $234.00, that voluntary reduction is the equivalent of *628* hours of work.

16   Objecting Defendants also complain the Receiver is using her own law firm in
17   Texas rather than hiring local counsel. Despite Objecting Defendants' contention,
18   however, the Receiver did hire local counsel and uses such local counsel for
19
20
21

---

[34]  Moreover, all meal charges were written off of the invoice for the Receiver and her team.

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

appropriate tasks.[35] The Receiver retained her own law firm in Texas to handle most of the work, however, because using her firm is more efficient and less expensive to the receivership estate. The efficiencies are especially apparent in this case, because the attorneys, paralegals, and associates are readily available to confer with, review documents and information, and strategize regarding the very complex and multi-faceted investigation necessitated by the scope of Defendants' fraud. Those concerted efforts were necessary on a daily, if not hourly basis. In addition, the Receiver's law firm has performed extensive receivership work for the Securities and Exchange Commission, U.S. Commodity Futures Trading Commission, and the Federal Trade Commission, and yet agrees to charge extremely reduced rates for the firm's services. Thus, in using her own law firm, the Receiver draws upon a wealth of experience that makes her use of the law firm efficient.  Finally, each of the attorneys and paralegals at the Receiver's law firm discounted their hourly rates *by at least* 15% for work on this case.  This discount was made prior to the Receiver discounting all fees by an additional twenty percent when she filed her Motion for Payment.

Finally, the Objecting Defendants' complaints about the Receiver's CPA's fees are groundless.  They argue the accountants were not required to perform any tax work, but instead simply reviewed and compiled QuickBooks records. Again, the assertion ignores reality and the sham enterprise created and operated by all

---

[35] Local counsel interviewed Defendant Khristopher Bond to save the expense of the Receiver's Texas counsel travelling to California to conduct such interview.

Defendants, including Objecting Defendants. As set forth in detail in the Receiver's Report, the Receiver's accountants engaged in extensive forensic accounting to trace monies from the skincare business from the consumer's initial purchase through the Defendants as end users of such funds. This forensic accounting involved tracing monies in many cases, through at least three or four different entities before the money was ultimately traced to the Defendants. Moreover, the QuickBooks records for the various entities did not match the bank records, most of which were incomplete and reflected deceptive ownership, and the accountants thus reviewed tax returns to obtain as complete a picture as possible.  All told, the accountants analyzed at least 70 merchant accounts, 48 bank accounts, 18 sets of QuickBooks, and 82 credit cards, although accounts for many, many other entities were maintained and controlled from the same location and required sorting and tracing to determining which of those additional entities were engaged in the Enjoined Conduct. The complexity of the accountants' review is further reflected in the graphic depictions of the flow of money included in the Receiver's Report.[36]

## IV.   CONCLUSION

Objecting Defendants do not provide any legitimate basis for any further reduction in the fees and expenses the Receiver seeks permission to pay, nor do they present their objections out of any concern about preserving the estate for consumer

---

[36] *See,* Brandlin Report in support of Receiver's Report, Docket No. 121-1, pp. 4-19.

redress. The percentage reduction method they propose in considering the fees is not appropriate in this case. Instead, the lodestar method commonly followed by the courts in considering the fee applications of receivers should be followed by the Court. Considering the Receiver's voluntary discount of 20% of the fees across the board for herself and her team, and evaluating each of the lodestar factors, the Receiver's fee request is reasonable and should be approved by the Court. The Objecting Defendants having participated in creating the complexity which drove the amount of fees at issue, and have no basis to complain about the reasonableness, efficiency, or necessity of the Receiver's fee request

DATED:  September 3, 2015

Respectfully submitted

*/s/ Kelly M. Crawford*
Kelly M. Crawford
**Scheef & Stone, LLP**
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
Telephone: 214-706-4200
Telecopier: 214-706-4242
*Admitted Pro Hac Vice* (TX SBN 05030700)
***Attorneys for the Receiver***

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT

1

## <u>CERTIFICATE OF SERVICE</u>

2

The undersigned certifies that on September 3, 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court.  The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

3

4

5

Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkel Margolis Bergson
5900 Wilshire Blvd Suite 2250
Los Angeles, CA 90036
*Local counsel for Receiver*

6

7

8

David P. Beitchman
Andre Boniadi
Beitchman|Zekian, PC
16130 Ventura Boulevard, Suite 570
Encino, CA 91436
*Counsel for Doron Nottea and Motti Nottea*

9

Erik S Syverson
Scott M. Lesowitz
Steven T. Gebelin
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
*Counsel for Oz Mizrahi, as an officer or manager of BunZai Media Group, Inc. and Pinnacle Logistics, Inc.*

10

11

12

13

Marc S. Harris
Annah S Kim
Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
*Counsel for Igor Latsanovski and CalEnergy, Inc.*

14

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
*Counsel for Alon Nottea, Roi Rueveni and Adageo, LLC*

15

16

Reid Tepfer
Luis Gallegos
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, TX  75201
*Counsel for the FTC*

17

18

Raymond E McKown
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
*Counsel for the FTC*

19

Benjamin A Pettit
20 East Pueblo Street
Santa Barbara, CA 93105
*Counsel for Alon Nottea*

20

*/s/  Charlene C. Koonce*
CHARLENE C. KOONCE

21

RECEIVER'S REPLY TO DEFENDANTS' OPPOSITION TO RECEIVER'S MOTION FOR PAYMENT