1  JONATHAN E. NUECHTERLEIN
   General Counsel

2  DAMA J. BROWN
3  Regional Director

4  REID TEPFER
   rtepfer@ftc.gov
   Texas Bar No. 24079444
5  LUIS GALLEGOS
   lgallegos@ftc.gov
6  Oklahoma Bar No. 19098
   Federal Trade Commission
7  1999 Bryan Street, Suite 2150
   Dallas, Texas 75206
   (214) 979-9395 (Tepfer)
8  (214) 979-9383 (Gallegos)
   (214) 953-3079 (fax)
9
   RAYMOND McKOWN
10 rmckown@ftc.gov
   California Bar No. 150975
11 10877 Wilshire Boulevard, Suite 700
   Los Angeles, California 90024
   (310) 824-4325 (voice)
12 (310) 824-4380 (fax)

13 Attorneys for Plaintiff Federal Trade Commission

14 **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16 **FEDERAL TRADE COMMISSION,**            Case No.  CV 15-4527-GW(PLAx)

17             Plaintiff,                   **RESPONSE TO CHARGEBACK
                                            ARMOR, INC.'S MOTION TO**
               v.                           **MODIFY THE PRELIMINARY
                                            INJUNCTION AND RELEASE**
18 **BUNZAI MEDIA GROUP, INC.,**            **FROZEN FUNDS**
   *et al.*
19             **Defendants.**

20

RESPONSE TO MOTION TO MODIFY

1      The FTC files this response in opposition to Relief Defendant Chargeback

2   Armor, Inc.'s Motion for an Order Modifying the Temporary Restraining Order

3   and Preliminary Injunctions and the Release of Frozen Funds.[1]

4       **I.      Introduction**

5      Chargeback Armor, Inc. has filed a motion requesting that its assets be

6   unfrozen on the basis that its business is allegedly "wholly separate and unrelated

7   to any of the Defendants."[2] Chargeback Armor's motion is long on rhetoric but

8   short on evidence. The facts here, though, speak for themselves. Chargeback

9   Armor, a relief defendant in this action, is a company controlled by Defendants

10  that received $250,000 from the common enterprise. $130,000 remains.

11  Chargeback Armor claims it never sold the AuraVie product itself. But

12  Chargeback Armor conveniently omits a fact it had proudly touted to potential

13  investors: the company handled 33,000 chargebacks for AuraVie products.[3]

14  Because Chargeback Armor is controlled by Defendants and its assets are from

15  the illegal common enterprise, those assets have been properly frozen by the Court

16  and must remain frozen.

17  _____

[1] Doc. No. 214.

18

[2] Doc. No. 214, at 3.

19

[3] *See* Ex. 22, Att. A ("33,000 chargebacks were processed in 2014 for our fi[r]st
20  client, AuraVie, an anti-aging skincare company"). All highlighting added by
FTC.

## II.     Argument

### A.     *Chargeback Armor is Controlled by the Defendants.*

Chargeback Armor is a company that uses software developed by Defendants in this matter[4] to challenge consumer "chargebacks."[5] Although Chargeback Armor's motion claims that the company has no affiliation with Defendants, a host of documents proves otherwise.[6] The documents establish that Chargeback Armor, Inc. is virtually indistinguishable from Defendant Secured Merchants LLC.[7] That company, Defendant Secured Merchants, played an

---

[4] *See* Doc. No. 120, at 7.

[5] A chargeback is a forced reversal of a charge by a payment processor at the request of a consumer. The success of Defendants' scam depends upon minimizing and refuting such chargebacks. In addition to cutting into the common enterprise's profits, chargebacks attract the scrutiny of financial institutions, which may suspend or terminate accounts with high chargeback rates. Defendants' chargeback rates averaged between 14 and 35%; the industry standard is 1%. *See* Doc. No. 161, at 8 n.7. In contesting these chargebacks, Defendants submitted false or forged documents to financial institutions. *See* Doc. No. 9, at 12-13. The FTC expects to explore in discovery whether Chargeback Armor also submitted forged documents in contesting consumer chargebacks.

[6] *See* Doc. No. 214, at 3-4 ("[Chargeback Armor] is a legitimate businesses completely unrelated to the alleged business conducted by the Defendants.")

[7] *See* Ex. 21, Att. C ("The purpose of this email is to discuss your contract for chargeback re-presentment (see attached) with Secured Merchants, the technology company that developed the Chargeback Armor product. A few months ago we established a new company, called Chargeback Armor, Inc. and we're transitioning all clients to be billed by this entity."); *see also id.*, Att. S (describing Chargeback Armor as part of Secured Merchants LLC); *id.*, Att. T (same).

integral role in the common enterprise by "provid[ing] the voice-logix and 'chargeback' services which were integral to the Receivership Defendants' efforts to hold onto the money swindled from consumers."[8]

Further made clear is that Defendants Alon Nottea, Doron Nottea, Roi Reuveni, and Alan Argaman were integrally involved with or controlled Chargeback Armor. Alon Nottea is identified in Chargeback Armor's executive summary as president of the company,[9] and a March 2015 services agreement states he is a board member.[10] In his asset deposition, Defendant Igor Latsanovski also testified Alon Nottea controlled the company: he described Chargeback Armor as a technology company Alon Nottea started and recounted that Alon had solicited an investment from him to finance the company.[11] Moreover, in an email, Chargeback Armor CEO Mike Costache[12] makes clear Defendants Alon Nottea and Alan Argaman were owners of Chargeback Armor—the only question was

---

[8] Doc. No. 192, at 3.

[9] *See* Ex. 22, Att. A.

[10] *Id.*, Att. Q ("The Board currently consists of three additional people: Mike Costache, Alon Nottea and Avi Argaman."); *see also id.*, Att. X ("Alon Nottea, Board Member / Director of Strategic Symbiotic Alliances").

[11] *See* Doc. No. 121-5, at 10.

[12] Costache was also an employee of Defendant Secured Merchants LLC. *See* Ex. 22, Att. W. He further held himself out to be an employee of Defendant SBM Management, Inc. *See id.*, Att. AA.

1    which shell corporation would offer the most tax advantageous means of

2    disguising their ownership.[13] Chargeback Armor CEO Mike Costache also refers

3    to Defendant Alon Nottea in an email as his "business partner" in Chargeback

4    Armor.[14] And despite Chargeback Armor's claim that Alon Nottea has no

5    relationship with the company, he has a company email address and was

6    frequently included in company emails discussing business decisions.[15] These

7    emails show Mike Costache, the purported sole owner and CEO of the company,

8    running business and compensation decisions by Alon Nottea for his approval.[16]

9

10

---

11   [13] *See id.*, Att. V ("The only thin[g] I need you guys to decide upon is if you two
     will be shareholders (at least for now) th[r]ough Secured Merchants. You can later
12   decide through which entities you will individually own your shares in CBA
     [Chargeback Armor] if through SM [Secured Merchants] is not the most tax
13   advantageous.").

14   [14] *See* Doc. No. 121-5, at 11.

15   [15] *See, e.g.,* Ex. 22, Att. B (a February 2015 to Alon Nottea email discussing
     chargebacks processed for active clients including AuraVie); *id.*, Att. K (Alon
16   Nottea and Roi Reuveni received an email from Mike Costache discussing a
     potential employee); *id.*, Att. L ("Just saved us $3000.");

17

18   [16] *See id.*, Att. G ( "I will consult with you after I finish with him and then we'll
     make a decision as to what role he will play going forward . . . ."); *id.*, Att. H
19   ("Once I short list the best candidates for each position, I will discuss with you
     and Roi and we'll make a collective decision."); *id.*, Att. P (Mike Costache
20   appears to be requesting approval or direction regarding compensating an
     employee);

These emails establish Alon Nottea's control of Chargeback Armor and his active role within the company.[17]

Defendant Doron Nottea likewise exercised control over Chargeback Armor. And just like his brother, Alon, Doron Nottea was included on numerous emails regarding business decisions related to Chargeback Armor.[18]

---

[17] In an email to Chargeback Armor CEO Mike Costache, Alon Nottea indicated that he had a vote in Chargeback Armor's decisions and that Mike Costache's compensation was at least in part determined by him: "That being said, I hold you, personally responsible and accountable for making the right decisions on behalf of our company... These (right or wrong) decisions are in turn, directly attributable to your own incentive plan... If the right focus, dedication, passion, and fire in the eyes is there, you have my blessing and my vote...." *See id.*, Att. M.; *see also id.*, Att. D (Mike Costache requests that Defendant Roi Reuveni create a Chargeback Armor email address for Defendant Alon Nottea and also references Nottea receiving business cards and possibly receiving calls forwarded from the company's 800 number); *id.*, Att. F (Alon received an email regarding Chargeback Armor's hiring decision); *id.*, Att. I (referring to the Chargeback Armor "team," which appears to include Alon Nottea, Doron Nottea, Roi Reuveni, and Alan Argaman); *id.*, Att. R (Alon Nottea assisted employees with Chargeback Armor's sale pitch).

[18] *See* Ex. 22, Att. E (An email in which Mike Costache explains a business expense to Defendant Doron Nottea); *id.*, Att. P.

RESPONSE TO MOTION TO MODIFY
Page | 6

1    Further, although Chargeback Armor claims Doron Nottea was merely a

2    temporary bookkeeper,[19] he is listed as Secretary of the company on its Bank of

3    America account.[20]

4          Defendant Roi Reuveni was Chief Operating Officer of Chargeback

5    Armor.[21] The company executive summary also identifies him as the customer

6    service manager.[22] Further, he was actively involved in managing the company

7    and making business decisions.[23]

8          Defendant Alan Argaman, owner of Defendant Secured Merchants, was

9    also a principal of Chargeback Armor.[24] He too was kept apprised of Chargeback

---

[19] *See* Doc. No. 214, at 31 ("I made Doron Nottea a co-signer for convenience reasons as I travel a lot for business overseas and wanted Doron to be able to write checks to vendors, employees, and other expenses that CBA had to pay while I was out of town.").

[20] *Id.*, Att. U; *see also* Doc. No. 120, at 23 (noting that Doron Nottea is an account *owner* for Chargeback Armor). The bank originally froze Chargeback Armor's account based on Doron Nottea's authority over the account.

[21] *See id.*, Att. X.

[22] *See* Ex. 21, Att. A.

[23] *See* Ex. 21, Att. F (Roi received an email regarding Chargeback Armor's hiring decision); *id.*, Att. H (same); *id.* Att. K (same); *id.*, Att. I (referring to the Chargeback Armor "team," which appears to include Roi Reuveni); *id.*, Att. J (Chargeback Armor's mail service agreement signed by Roi Reuveni on behalf of the company);

[24] *See* Ex. 22, Att. A (listing Alan Argaman as "Chief Technology Officer").

1  Armor's operations,[25] weighed in on business decisions,[26] and was a member of

2  Chargeback Armor's corporate board.[27] Moreover, these Defendants operated

3  Chargeback Armor from the same office suite used by nearly every defendant in

4  this case.[28]

5        Despite this mountain of evidence, Chargeback Armor contends that "CBA

6  is not dominated or controlled in any way, shape, or form by any Defendant" and

7  that "Mr. Costache is the only officer, director, and shareholder of CBA."[29] But

8  these bald assertions are plainly contradicted by the facts.

9             **B.**    ***Chargeback Armor Received Its Funds from the Common***
                 ***Enterprise.***

10

11

12

13

14 ────────────────────

15  [25] *See id.*, Att. B; *id.*, Att. D; *id.*, Att. G; *id.*, Att. H; *id.*, Att. I; *id.*, Att. L; *id.*, Att. M; *id.*, Att. P; & *id.*, Att. R.

16  [26] *See id.*, Att. M (Alon Nottea states "[l]et's sit down and discuss and get final
17  approval from the chief papa global" in apparent reference to Alan Argaman's
    email address, avicoglobal@gmail.com).

18  [27] *See id.*, Att. Q.

19  [28] Doc. No. 120, at 22.

20  [29] Doc. No. 214, at 11.

1    In addition to its proprietary technology, Chargeback Armor received

2  $250,000 from Secured Merchants LLC.[30] Secured Merchants LLC, in turn,

3  received at least $320,665 as part of its role in the Defendants' illegal common

4  enterprise.[31] Although the capital-infusion agreement states that Secured

5  Merchants LLC will be granted an ownership interest in the company,[32]

6  Chargeback Armor's counsel represents that this money was essentially gifted to

7  Chargeback Armor with no consideration in return.[33] Further, to date, Chargeback

8  Armor has received, at most, $33,677 from sources outside the common

9  enterprise.[34]

---

[30] *See* Ex. 22, Att. Y (capital infusion agreement between Secured Merchants LLC and Chargeback Armor, Inc. for $250,000); *id.*, Att. Y (showing $120,000 check from Secured Merchants to Chargeback Armor); *id.*, Att. CC (showing $100,000 wire transfer from Secured Merchants to Chargeback Armor and $30,000 check, presumably also to Chargeback Armor); *id.*, Att. DD (showing the $100,000 wire and a $150,000 deposit); *see also* Doc. No. 214, at 6.

[31] Counsel for Secured Merchants LLC and Chargeback Armor admit that the company received at least that amount from Defendant SBM Management, Inc. *See* Ex. 22, Att. N; *see also* Doc. No. 120 ("Secured Merchants received more than $300K from SBM Management, Inc., which in turn received millions from entities owned, controlled or operated by the Defendants and which sell or market products via "free trial" offers on line.").

[32] *Id.*, Att. Y.

[33] *See id.*, Att. EE.

[34] *See* Ex. 22, Att. FF. But the FTC calculates the amount of money Chargeback Armor received from sources outside the common enterprise to be even less— around $26,000. *See* Ex. 22.

1

### C.  *Chargeback Armor Assisted Defendants in Deceiving Consumers.*

2

Evidence shows that Chargeback Armor assisted Defendants in their

3

skincare business and did so even before their formal date of incorporation. Most

4

tellingly, in a document created for potential investors, Chargeback Armor claims

5

to have processed 33,000 chargebacks for its first client, AuraVie, in 2014.[35]

6

Mike Costache does not explicitly contest in his declaration that he assisted

7

Defendants or received profits from the common enterprise.[36] Instead, he merely

8

claims he did not "engage in . . . the Prohibited Business Activities."[37]

9

### D.  *The FTC and the Court's Receiver Have Acted in Good Faith in Maintaining the Court's Asset Freeze.*

10

11

In its motion, Chargeback Armor makes many accusations against the FTC,

claiming that the FTC and Receiver acted in bad faith by allegedly freezing a new

12

account Chargeback Armor opened at the suggestion of the FTC. Chargeback

13

Armor's own evidence establishes the falsity of these accusations.

14

---

15

[35] Ex. 22, Att. A.

16

[36] Doc. No. 214, at 29. Notably, Mike Costache omitted AuraVie as a "client" in his purportedly exhaustive list of entities with which Chargeback Armor has

17

consulting contracts or referral agreements that he provided the Court. *See* Doc. No. 214, at 29-31; *see also* Doc. No. 214, at 7 ("Mr. Costache then went so far as

18

to list out for the Receiver and the FTC, under penalty of perjury, each and every single customer CBA has ever had and ever referral agreement ever entered into

19

between CBA and any other party.").

20

[37] *See* Doc. No. 214, at 29.

1

2

3

4

5

6

7

8

9

10

       Counsel for the FTC advised Chargeback Armor's counsel that, it would not agree to the release of frozen assets because they are assets of the Defendants. Nonetheless, based on Chargeback Armor's assurances that none of the named defendants were controlling its activities, Chargeback Armor could continue to operate its business using a new account that none of the named Defendants controlled or had access to. However, on July 7, Chargeback Armor's counsel informed the FTC that the new account had been mistakenly frozen by Bank of America. To remedy this issue, FTC counsel called the bank and additionally provided Chargeback Armor's counsel a letter to Bank of America requesting that the account be unfrozen the next day.[38]

11

12

13

14

15

16

       Moreover, Chargeback Armor is illogical in its contention that the continued freeze of these funds "is nothing more than an obvious effort by the Receiver to find more cash to pay her own fees."[39] Chargeback Armor is not part of the receivership,[40] and the Receiver never requested that the Court include the company in the receivership.[41] The FTC, not the Receiver, requests the freeze be maintained based on the following legal bases.

17

18

19

20

---

[38] *See* Doc. No. 214, at 53; Ex. 22, Att. O.

[39] *See* Doc. No. 214, at 3.

[40] *See* Doc. No. 212.

[41] *See* Doc. No. 165.

1

### III.    Legal Argument

2
### A.    As a Relief Defendant, Chargeback Armor Will Be Subject to Disgorgement.

3

4     The FTC has sought leave to name Chargeback Armor, Inc. as a relief

5  defendant in this action. Courts may order equitable relief against a relief

6  defendant that has (1) received ill-gotten funds and (2) does not have a legitimate

7  claim to those funds.[42] These equitable powers include the power preliminarily to

8  freeze the assets of relief defendants.[43] To obtain a preliminary injunction freezing

9  the assets of a relief defendant, the FTC "must demonstrate only that [it is] likely

10  ultimately to succeed in disgorging the frozen funds."[44] As such, a plaintiff need

11  not show that a primary defendant managed the property at issue to the complete

12

13  _____

14  [42] *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 281 (D. Conn. 2013) *aff'd sub nom. FTC v. Strano*, 528 F. App'x 47 (2d Cir. 2013) (summary order); *see also SEC v.Colello*, 139 F.3d 674,676 (9th Cir. 1998) ("[A]mple authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong.").

15

16

17  [43] *FTC v. Strano*, 528 F. App'x 47, 49 (2d Cir. 2013) (*citing Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Cavanagh*, 155 F.3d 129, 136–37 (2d Cir.1998)).

18

19  [44] *Strano*, 528 F. App'x at 50 (quoting *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010).

20

1   exclusion of the relief defendant, only that the primary defendant treated the

2   property as its own.[45]

3            Importantly, there is no requirement that frozen assets be traceable to the

4   fraudulent activity underlying the lawsuit.[46] The defendant should not benefit from

5   the fact that other assets were commingled with illegal profits.[47]  This holds true

6   even for relief defendants. The amount of assets to be frozen should be determined

7   by showing a reasonable approximation of the amount, with interest, that a relief

8   defendant was unjustly enriched.[48]

9            Here, Chargeback Armor acknowledges that it received $250,000 and

10  proprietary software from Secured Merchants LLC for no apparent consideration.

11  The Court should maintain the freeze even on the limited funds Chargeback

12  Armor attributes to sources outside the common enterprise, as the amount of

13  Chargeback Armor's unjust enrichment ($250,000) greatly exceeds the remaining

---

14  [45] *Id.* at 51.

15  [46] *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011); *SEC v. ETS
16  Payphones, Inc.*, 408 F. 3d 727, 735-36 (11th Cir. 2005); *Kemp v. Peterson*, 940
    F.2d 110 (4th Cir. 1991); *SEC v. Current Fin. Servs.*, 62 F. Supp. 2d. 66 (D.D.C.
17  1999); *see SEC v. Glauberman*, No. 90 Civ. 5205, 1992 WL 175270, at *2
    (S.D.N.Y. Jul. 16, 1992) (rejecting the argument that disgorgement is not
18  appropriate because "the challenged transfers cannot be traced dollar for dollar to
    profits from insider trading").

19  [47] *Glauberman*, 1992 WL 175270, at *2.

20  [48] *Lauer*, 445 F. Supp. 2d at 1370; *IAB Mktg. Assocs.*, 2013 WL 5278216 at *7.

1   assets ($130,000).[49] To hold otherwise would permit Chargeback Amor to benefit

2   from commingling these assets with its illicit funds.

3   **B.    Because Chargeback Armor's Assets Are in Fact Defendants' Assets, They Are Properly Frozen.**

4   Further, even aside from Chargeback Armor's unjust enrichment, its funds

5   are properly frozen. The Court possesses broad authority to fashion an equitable

6   remedy and award "any ancillary relief necessary to accomplish complete

7   justice."[50] Here, as demonstrated above, Defendants Alon Nottea, Doron Nottea,

8

9

10

11

12

13 _____

14   [49] Indeed, "tracing an asset to the illegal activities of the defendant is not a prerequisite to distributing that asset as part of an order of consumer redress under § 13(b)." *FTC v. Home Assure, LLC*, No. 8:09-cv-547-T-23TBM, 2009 WL

15   1043956, at *3, n. 14 (M.D. Fla. Apr. 16, 2009) (quoting *FTC v. Windward Mktg, Ltd.*, No. 1:96-cv-615 FMH, slip op. at 5-6 (N.D.Ga.1997)). Otherwise, a

16   defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from a collection. *SEC v.*

17   *Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006); *FTC v. IAB Mktg. Assocs.*, LP, No. 12-61830-Civ, 2013 WL 5278216, at *7 (S.D. Fla. Sept. 18, 2013); *FTC*

18   *v. J.K. Publ'ns, Inc.*, No. CV 99-00044, 2009 WL 997421, at *5 (C.D. Cal. Apr. 13, 2009) (such a rule would lead to the "absurd result" of immunizing defendants

19   who transferred all assets from a scheme).

20   [50] *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111–13 (9th Cir. 1982).

Roi Reuveni, and Alan Argaman clearly control Chargeback Armor and own its assets. Those assets, then, are properly frozen, just like Defendants' other assets.[51]

## IV.    Conclusion

The Court has properly frozen Chargeback Armor, Inc.'s assets. The company is one of Defendants' dozen entities, and it received $250,000 from the common enterprise. Further, the company assisted Defendants in bilking consumers for millions of dollars. Accordingly, the FTC respectfully requests that the Court deny Chargeback Armor, Inc.'s motion.

Dated: 10/8/15                          */s/ Reid Tepfer*_____
                                         REID A. TEPFER
                                         LUIS H. GALLEGOS
                                         Attorneys for the Plaintiff
                                         Federal Trade Commission
                                         1999 Bryan Street, Suite 2150
                                         Dallas, Texas 75201
                                         (214) 979-9395 (Tepfer)
                                         (214) 979-9383 (Gallegos)
                                         (214) 953-3079 (facsimile)
                                         rtepfer@ftc.gov
                                         lgallegos@ftc.gov

---

[51] *See* Doc. Nos. 105 & 108, at 15 (defining the assets frozen by the stipulated preliminary injunction as "any asset that is: 1. owned, controlled by, or held for the benefit of, any Defendant, directly or indirectly; 2. in the actual or constructive possession of any Defendant . . . or 4. owned, controlled by, held for the benefit of, or in the actual or constructive possession, of any entity directly or indirectly owned, managed, or controlled by any Defendant").

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on October 8, 2015, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com
*Local counsel for Receiver*

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

1

Robert M. Ungar

2   Crosswind Law
14724 Ventura Blvd Penthouse

3   Sherman Oaks, CA 91403
rmu@crosswindlaw.com

4   *Counsel for Alon Nottea and*
*Roi Rueveni*

5

Robert Esensten

6   Esensten Law
12100 Wilshire Blvd., Suite 1660

7   Los Angeles, CA 90025
resensten@esenstenlaw.com

8   *Counsel for Doron Nottea and*
*Motti Nottea*

9

Marc S. Harris

10  Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor

11  Los Angeles, CA 90071
mharris@scheperkim.com

12  *Counsel for Igor Latsanovski and*
*CalEnergy, Inc.f*

13

Annah Kim

14  Scheper Kim & Harris, LLP
601 W. Fifth Street, 12th Floor

15  Los Angeles, CA 90071
akim@scheperkim.com

16  *Counsel for Igor Latsanovski and*
*CalEnergy, Inc.*

17

18

19

20

RESPONSE TO MOTION TO MODIFY

1   Charlene Cantrell Koonce
    Receiver
2   Scheef & Stone
    500 N. Akard, Suite 2700
3   Dallas, Texas 75201
    charlene.koonce@solidcounsel.com
4   *Receiver*

5   Kelly M. Crawford
    Scheef and Stone
6   500 N. Akard, Suite 2700
    Dallas, Texas 75201
7   kelly.crawford@solidcounsel.com
    *Counsel to Receiver*

8

9                                          /S/ REID TEPFER
                                            REID TEPFER
10

11

12

13

14

15

16

17

18

19

20