1

2

**FOURTH DECLARATION OF FTC INVESTIGATOR
BRENT D. MCPEEK
PURSUANT TO 28 U.S.C. § 1746**

3    Pursuant to 28 U.S.C. § 1746, Brent D. McPeek declares that:

4        1.       My name is Brent D. McPeek.  I am over the age of 21 and competent

5    to give this declaration.  I am a Federal Trade Investigator with the Federal Trade

6    Commission ("FTC").  I have a Bachelor of Science degree in agricultural

7    economics with a minor in finance, as well as a Master of Science degree in

8    applied economics.  I have more than ten years' experience as an investigator and

9    litigation consultant.  My business address is Federal Trade Commission,

10   Southwest Region, 1999 Bryan Street, Suite 2150, Dallas, Texas 75201.

11       2.       My duties, as a Federal Trade Investigator, include investigating

12   parties suspected of engaging in unfair or deceptive acts or practices in violation of

13   the Federal Trade Commission Act and other laws and rules enforced by the

14   Commission.

15       3.       I assisted in the FTC's investigation of Bunzai Media Group, Inc.

16   ("Bunzai Media Group") and related companies and individuals, including Alon

17   Nottea, Igor Latsanovski, Doron Nottea, Roi Reuveni, and Khristopher Bond.

18       4.       During the FTC's investigation, I acquired personal knowledge of the

19   facts stated here, and, if called, would testify to the same.  Personally Identifying

20

FOURTH DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK

EXHIBIT 22

Information ("PII") has been redacted from all documents referenced in this declaration.

## BUSINESS PREMISES

5.      As discussed in my Second Declaration, the FTC and forensic electronic technicians gained access to the various business premises of Defendants on June 18, 2015.  The forensic electronic technicians made forensically sound images of many of the computers found in the Defendants' business premises.  I have attached true and correct copies of some of the documents found on the business premises or retrieved from the forensic images of the computers to this declaration.

## DOCUMENTS FROM DEFENSE COUNSEL

6.      During the course of this litigation, defense counsel for Secured Merchants, LLC and Chargeback Armor, Inc., Sagar Parikh, provided certain documents to the FTC.  I have attached true and correct copies of some of these documents to this declaration.

## FTC COMMUNICATIONS WITH OPPOSING COUNSEL

7.      During the course of this litigation, FTC counsel has communicated via email with Sagar Parikh, counsel for Secured Merchants and Chargeback Armor.  These emails were provided to me, and I have attached them to this declaration.

FOURTH DECLARATION OF FTC INVESTIGATOR BRENT D. MCPEEK      Page | 2

EXHIBIT 22

1

## CHARGEBACK ARMOR

2    8.    I used the Bank of America monthly bank statements from February

3    through May 2015 for Chargeback Armor's business fundamentals checking

4    account (account # ending 0818) provided to the FTC by Mr. Parikh to determine

5    the total deposits into this account.  I calculated that the total deposits to the

6    account during this period was $276,241.36.  Based on the Working Capital

7    Infusion Agreement between Secured Merchants and Chargeback Armor, and the

8    two deposits to this account in March 2015 of $100,000 and $150,000, I

9    determined that Secured Merchants provided at least $250,000 of the total amount

10   deposited into the account.  Assuming that Secured Merchants did not provide any

11   additional funds to Chargeback Armor, the net deposit of funds is $26,241.36.

12

13   I declare, under penalty of perjury, that the foregoing statement is true and

14   correct.

15   Executed on October 8, 2015, at Dallas, Texas.

16

17   _____

**BRENT D. MCPEEK**

18

19

20



## OUR SERVICE:

ChargeBackArmor is a cloud-based enterprise chargeback[1] management platform. Our proprietary technology empowers merchants to make real-time data-driven decisions that help recover lost revenue and increase their bottom line as well as and ISOs[2] to offer our service as a white label solution to the merchants they process credit cards for.

## THE PROBLEM WE SOLVE:

Processing chargebacks is time-consuming for merchants and requires an internal costly staff.

Most merchants are not setup to proactively handle the issue of chargebacks and become very frustrated with the loss of revenues and time associated with handling this very time consuming and expensive issue. Instead of incurring a big cost for hiring internal staff to process chargebacks, we are a preferred vendor to handle all chargeback issues and provide reporting in real-time.

## THE MARKET:

Credit card chargebacks are a painful part of doing business. As the volume of non-cash payments, and specifically ACH[3] payments, continues to rise, the payments industry is challenged to reduce transaction returns as well as account take-over fraud.

Fueled by the increase in online payments, ACH volume grew to almost **22 billion transactions equating to $38.7 trillion** in value in 2013 and has continued to climb in 2014.

In 2014, **chargebacks amounted to $11 billion**[4] up from $8 billion in 2012.

## OUR TARGET MARKET:

√ Independent Sales Organizations (ISOs)[5]
√ High-rick online marketers

## BUSINESS MODEL:

We charge a flat $8 fee per processed chargeback for direct clients and $5 fee per chargeback for White Label clients who are ISOs and who will markup this cost to create an additional revenue for themselves.

---

[1] A chargeback, also known as a reversal, is when a buyer asks their credit card issuer to reverse a transaction after it has been completed. It is available only to users who make a payment funded by their credit card or debit card.
[2] An Independent Sales Organization (ISO) also known as Member Service Providers (MSP) is a third-party company that is contracted by a credit card member bank to procure new merchant relationships. ISOs also process online credit card processing transactions for small businesses in exchange for a fee or percentage of sales.
[3] Automated Clearing House (ACH) is an electronic network for financial transactions in the United States.
[4] 2014 Identity Fraud Report by Javelin Strategy & Research

**Att. A**

**COMPETITION:**

1. ChargeBack911
2. ChargeBackWin
3. ChargeBackExperts
4. MarginProfitsInc

**COMPETITIVE ADVANTAGES:**

1. Seamless API integration with any CRM, gateway and shipping providers
2. Real-time reporting on every facet of the chargeback process (by geography, by MID[6], by threshold, by time frame, by reason code, etc.)
3. Customized alerts & notifications
4. Full case history for legal and compliance purposes
5. Eliminating the need for an internal chargeback department
6. Enjoying higher winning ratios and putting money back into our clients' pocket

**INVESTMENT OPPORTUNITY:**

Currently seeking $500,000 for staffing and marketing purposes and a small portion will be used to continue developing the platform according to the needs of major ISOs who require a private label solution.

**INVESMENT DEAL TERMS:**

1. **Equity**: 20% or
2. **Debt & Equity**: 12 months term @ 12% annual interest rate + 5% equity upfront or
3. **Convertible Debt**: 12 months term @ 12% annual interested rate + 5% equity upfront + 1% additional equity per month for which the debt is not paid back

**MILESTONES:**

1. $1,000,000 invested by founders to develop the platform (over 18 months)
2. 33,000 chargebacks were processed in 2014 for our fist client, AuraVie, an anti-aging skincare company
3. 10 paying clients as of February 2015
4. $250,000 cash infusion from investor by end of February 2015
5. 100 paying clients at end of 2015
6. $3 million in revenue by end of 2015
7. $17 million in revenue by end of 2016

---

[6] A merchant identification number (MID) is a unique number assigned to a merchant account to identify it throughout the course of processing activities.

**Att. A**

**MANAGEMENT:**

We are technology-driven marketers who understand every intricate aspect of the online sales process. Our founders and our management are a unique and diverse group of industry professionals ranging in skills from risk management, IT, direct marketing, and customer contact center management.  Having used almost every major chargeback provider for our various clients and having a deep understanding of their shortcomings, we decided to build a state-of-the-art cloud-based chargeback platform to lower internal processing costs and win back losses to help increase out clients' bottom line.

Alon Nottea – President
Mike Costache – Chief Executive Officer
Avi Argaman – Chief Technology Officer
Roi Reuven – Customer Service Manager
Tyler Reitenbach – Sales Account Manager

**CONTACT:**  Mike Costache / mike@chargebackarmor.com / 310.753.9292

**DISCLAIMER:**

This is not an offer for securities and should not be construed as such, this is for informational purposes only. We reserve all rights to modify, change or unilaterally amend any of the above.

3

**Att. A**

**To:** Alon N[vigorect@gmail.com]; Mike Costache[mike@leoleo.biz]; Avico Global[Avicoglobal@gmail.com]; Doron@doron.us[Doron@doron.us]; Scott@Scottrish[Scott@chargebackarmor.com]
**From:** Tyler R
**Sent:** Tue 2/17/2015 7:43:46 PM
**Importance:** Normal
**Subject:** ChargeBack Armor Jan + Feb figures
**MAIL_RECEIVED:** Tue 2/17/2015 7:44:07 PM

As per Mike's request, below are the numbers of chargebacks we processed for each active client from Jan 1st, 2015 till today:

1. Auravie  (Jan 244 + Feb 190) x $6 = $2,604
2. PureVision Marketing  (Jan 38 + Feb 18) x $10 = $560

3. Creative Ventures (Jan 86 + Feb 17) x $10 = $1,030

4. Jersey Consolidated Feb 130 x $10 = $1,300 (free trial so we will not be billing for these chargebacks)

**Total to be billed to 3 clients for Jan and Feb (so far) is $4,194**

The following clients are onboarding @ $10/chargeback:

1. CHH Capital - approx 300/ month

2. 98 Interactive - approx 450/ month

3. Apex Ads Group - approx 1000/ month

Cheers,

## Tyler Reitenbach



## IT Shaman - Secured Merchants LLC
**Phone: (800) 976-7027     |     Email:  Tyler@SecuredMerchants.com**
**Skype:  Tyler.Reitenbach     |     Website:  www.SecuredMerchants.com**

*This e-mail message may contain confidential, proprietary or legally privileged information. It should not be used by anyone who is not the original intended recipient. If you have erroneously received this message, please delete it immediately and notify the sender. The recipient acknowledges that Secured Merchants LLC. is unable to exercise control or ensure or guarantee the integrity of/over the contents of the information contained in e-mail transmission and further acknowledges that any views expressed in this message shall not be implied or assumed unless the sender does so expressly with due authority of Secured Merchants LLC. Before opening any attachments please check them for viruses and defects.*

**Att. B**

## Chargeback Armor - billing

2 message(s)

Date: Wed Apr 29 2015 22:30:59 GMT-0600 (MDT)
From: Mike Costache
To: alan@creativeventuresmedia.com
CC: Roi R , Tyler R
ID: 14d08978d236ff19

Hi Alan,

The purpose of this email is to discuss your contract for chargeback re-presentment (see attached) with Secured Merchants, the technology company that developed the Chargeback Armor product.

A few months ago we established a new company, called Chargeback Armor, Inc. and we're transitioning all clients to be billed by this entity. Please see attached contract. The same has been sent for your digital signature via Adobe EchoSign.

You had received a 30 day free trial period (October 5 - November 5, 2014) during which time we processed all your chargebacks free of charge . We also waived the $2,500 implementation fee.

So far, Secured Merchants, LLC billed you $2,540 for 254 chargebacks processed between November 15 and December 31, 2014 (Invoice 11302) and an additional $860 for 86 chargebacks processed for you between January 1 and January 31, 2015 (invoice 11378).

On Friday, May 1st we will debit your account for the chargebacks we processed from February 1 until April 30, 2015. A detailed invoice will be emailed to you on May 1st and then we'll bill you every Monday, starting with May 11th.

With Secured Merchants we billed monthly, but with Chargeback Armor, Inc. we bill each Monday for chargebacks we processed for the past week. The only other term we changed is that we don't bill to your credit card, but via ACH so please fill out the last page of the contract I just sent you via Adobe EchoSign.

Feel free to call me if you have any questions.

Thank you,

Mike Costache
Chief Executive Officer
ChargeBack Armor, Inc.
Office: 800.976.7027
Mobile: 310.753.9292
Skype: mikecostache
Email: mike@chargebackarmor.com
LinkedIn: linkedin.com/in/mikecostache
5023 North Parkway Calabasas
Los Angeles, CA 91302

**Att. C**

Date: Tue Mar 24 2015 11:46:52 GMT-0600 (MDT)
From: Mike Costache
To: Roi R
CC: "Tyler R." , Robert Stayner , Alon Nottea , Avi Argaman , Lori Bembanaste
ID: 14c4ce4e76462377

Thanks, Roi.

Info@cba should come only to you and I.

Please sent up an inbox for Alon as well. Once he starts using business cards, he may get some calls on the 800 number as well.

Thanks,

Mike

**Att. D**

## Fwd: Principal Search Partners Executive Search & Recruitment Invoice # 1800

2 message(s)

Date: Thu Apr 16 2015 19:57:47 GMT-0600 (MDT)
From: Mike Costache
To: Doron Nottea
CC: Alon Nottea
ID: 14cc518a17a3ec20

Hi Doron,

Please issue and mail a $500 check to Daniel Peck for the graphics guy he introduced us for logo design. See invoice and address below.

Unfortunately, we decided that we can't use any of the 30 logos he made, but we need to pay this to respect the relationship with Daniel.

It was my mistake that I rushed to hire his graphics designer a few weeks ago and the guy just didn't produce logos like the ones he showed me that he had done for other clients.

Mike

**Att. E**

## Re: Follow up

6 message(s)

Date: Fri Apr 17 2015 10:56:02 GMT-0600 (MDT)
From: Principal Search Partners
To: Mike Costache , Roi | CBA , Alon | ChargebackArmor
CC:
ID: 14cc84efc76ddae1

Dear Mike, Roi and Alon,

I'm wondering if something has changed with your hiring strategy as it is becoming obvious to me that CBA is not ready to commit to hiring a full time VP of Sales at this point in time and is more interested in driving sales via independent contractors paid per deal than via a proven sales leader. This is fine but not what was discussed or agreed upon by us during our initial meeting. Between Wed and Thursday this week I had separate conversations with both Gina and Christian who corroborated my thoughts on this. Mike as you shared with me Gina was offered $100 per client with a 5% lifetime commission and Christian was offered a part time non paid position that may ramp to a VP role in the future. Gina has declined the offer and will not be accepting the offer you proposed. Christian is thinking about it but interfered it's unlikely he will move forward due to the compensation and current compensation he is receiving at Heartland. When I asked Christian about his interview with you he said it went well but that you said  "Maybe we don't need a VP of Sales at this point". Again this is 100% fine with us as we understand strategy and start uos changes but we should be told what direction you are going in with your hiring as it affects our company resources and time. At this point I'm not sure it makes sense to continue providing talent to you when it appears you are not ready to make any hiring decisions? Maybe the candidates are being told one thing by you and your goals remain to hire salaried employees but based on our conversation with them it does not seem that way. Please let me know if we are missing something here? Initially and within days of exciting our agreement we immediately provided qualified industry experienced talent from Verifi and Chargeback (2 big competitors of yours) that could not be interviewed due to budgetary constraints and then we provided talent that was within your budget but it appears that those candidates are being offered "part time positions paid on a commission or per deal basis" Again this is fine but you don't need an agency for this. Unfortunately we do not provide talent for commission based roles. We only provide talent for full time salaried roles. Please let us know how you would like to proceed as we can not continue to provide talent to you for commission based positions or short term engagements designed to test skills and abilities.


We hope we can continue working with you and supporting your hiring needs and would like to but before we continue we will need clarity on your hiring goals and timelines. Thank you.

Shabbat Shalom.
Daniel

**Att. F**

## Robert Stayner

1 message(s)

Date: Sat Mar 14 2015 19:36:47 GMT-0600 (MDT)
From: Mike Costache
To: Alon | ChargebackArmor , Avico Global
CC: Roi | CBA
ID: 14c1b13880230939

Hi Alon and Avi,

I spoke with Robert yesterday and asked him to come to the Reseda office on Monday at 11 am so I can have a chat with him about where he sees himself going forward.

I asked him to put together a job description (see below), to tell me the title he thinks he deserves and the type of compensation he wants in order to excel at what he is planning to do going forward.

I only met him for 30 minutes about a month ago so I know little about his background from www.linkedin.com/pub/robert-stayner/8/6b8/505

I am very unclear about what he is do now vs what he is supposed to do for the $2500 monthly fee he gets. I know that he opened up the relationship to CardFlex. So I thought a friendly interviewing session would give me more insights as to where I think he can fit in now that we're flying.

I know that you guys know him well and what his skill set is. I don't so I have to allocate time to know for myself and to hear it directly from him. I will consult with you after I finish with him and then we'll make a decision as to what role he will play going forward beside managing the CardFlex relationship. For two weeks I've been asking him to reach out to other ISOs and he came back with nothing so far. So I don't see him in sales and he claims that he wishes to be the Director of Operations for CBA as that is his expertise from managing Sabina's business.

Mike Costache
Chief Executive Officer
Chargeback Armor, Inc.
T: 800.976.7027
C: 310.753.9292
E: mike@chargebackarmor.com
5023 North Calabasas Parkway
Los Angeles, CA 91302

**From:** Robert Stayner <robert@chargebackarmor.com>
**Date:** Fri, 13 Mar 2015 23:15:49 -0700
**To:** M <mike@chargebackarmor.com>
**Subject:** Resume, Job description

Hi Mike ,

I have attached a very corporate job description. But I also want to include current daily job duties since I am sure that is partially what you are interested in.

**Att. G**

- Maintain daily production operations of CBA
- Report CBA errors to Tyler for resolution by our programming team  in India
- Resolve client issues and questions as well as perform Demos requested by referral(currently only cardflex) would not mind doing it for all clients
- Reviewing the review section   verifying that all necessary information has been outputted to the template and add additional comments to have a higher win ratio. physically reviewing each chargeback processed and look for trends in their processing and suggest fixes and solutions to reduce CB risk.
- Modifying the retailer section of CBA to update the fax to numbers before sending chargebacks for the first time.
- staying up to date on Visa/MC/Discover/AMEX chargeback rules and what is needed to be successful at winning cases, and if needed recommend changes to CBA to accomplish these requirements
- Researching individual orders that may not be correctly formatted in the Clients CRM  and asking Tyler for resolution

See you Monday,
Robert Stayner
--

**Att. G**

## FW: Chargeback Armor Executive Search Agreement

10 message(s)

Date: Sat Mar 14 2015 19:45:56 GMT-0600 (MDT)
From: Mike Costache
To: Alon | ChargebackArmor , Avico Global
CC: Roi | CBA
ID: 14c1b1be9c3aa2df

Hi Alon and Avi,

The best deal Daniel Peck was able to offer us was:

1.     4 months instead of 3 months guarantee for a free replacement in case we fire or the candidate quits.
2.     Net 15 and Net 45 to pay in two installments the 18% fee for each annual salary. Originally he wanted Net 30 (the Net 60 he offered Paul once was an exception)

Just sharing with you since he is your contact and he sent me the contract to sign. Unless you have anything to add, I plan to move forward with him as he already has candidates ready for me to interview.

The positions I discussed with him are:

1.     VP of Sales
2.     Sales Reps
3.     Marketing Consultant/Implementer for 1 month (paid per hour) for website and marketing materials

Once I short list the best candidates for each position, I will discuss with you and Roi and we'll make a collective decision.

Mike Costache
Chief Executive Officer
Chargeback Armor, Inc.
T: 800.976.7027
C: 310.753.9292
E: mike@chargebackarmor.com
5023 North Calabasas Parkway
Los Angeles, CA 91302

**Att. H**

## Happy Birthday

4 message(s)

Date: Sat Mar 21 2015 11:09:14 GMT-0600 (MDT)
From: Mike Costache
To: Robert Stayner
CC: Tyler Reitenbach , Roi Reuveni , Alon Nottea , Avi Argaman , Lori Bembanaste , Doron Nottea
ID: 14c3d4f6020901ba


Hi Robert,

On behalf of our small (yet growing) team, I would like to wish you a Happy Birthday. Hope you are spending some quality time with family and friends and just taking it easy.

When we meet on Wednesday in Orange County, I will bring you a gift from all of us as a small token of appreciation. I don't make a big deal about birthdays, but they are important reminders that we all need to stop sometimes at least a short while to take a breather and enjoy life.

We are all just little pions so enjoy this 4-minute video, which is a great visual reminder of our vortex'ing at 70,000 km/hour in an unknown direction, which can only be defined by us during the short time we are alive on this planet: http://youtu.be/ZVV3xZBAdYY

Happy Birthday, again.

Mike Costache
Chief Executive Officer
ChargeBack Armor, Inc.
Office: 800.976.7027
Mobile: 310.753.9292
Skype: mikecostache
Email: mike@chargebackarmor.com
LinkedIn: linkedin.com/in/mikecostache
5023 North Parkway Calabasas
Los Angeles, CA 91302

**Att. I**

*Calabasas Executive Suites*
5023 North Parkway Calabasas, LLC

5023 N. Parkway Calabasas, LLC
Calabasas, CA 91302
Tel. (818) 876-9696
Fax (818) 876-8501
www.calabasasexecutive-suites.com

## MAIL SERVICE AGREEMENT

**DATE: February 27, 2015**

Lessee: **Chargeback Armor, Inc**

| | |
|---|---|
| Name of Building: | Calabasas Executive Suites |
| Address: | 5023 North Parkway Calabasas |
| City and State: | Calabasas, California 91302 |

This Mail Service Agreement is entered into as of the date above between **Chargeback Armor, Inc** ("Lessee") and 5023 North Parkway Calabasas, LLC, a California limited liability company ("Lessor") commencing on **March 1, 2015** , and ending **March 31, 2016** (the "Initial Term"). Thereafter, this Agreement shall continue on a month to month basis as per section 6 below. Lessee agrees to pay Lessor the amount of **$100.00** per month for the following services (payment must be in the form of a check, cashier's check, credit card, or money order):

1. RECEPTIONIST AND MAIL SERVICE. Your incoming mail will be held at the front desk or in an assigned mailbox located at the suite. Access to the building or your mailbox will only be allowed Monday through Friday from 8:30 am to 5:00 pm. You will not be given a key to the mailroom or the building. In the event that you require your mail to be forwarded to you, you will be charged for the postage or courier bill with an additional 30% surcharge, which will be added to your monthly service charge. This surcharge also applies to outgoing mail or packages that you want Lessor to send out for you. Lessor's staff will not read your mail to you over the phone. Should you have a visitor come to the suite and ask to see you, our receptionist will tell your visitors that you are "not presently in the office" (unless you are at the suite, in which case you will be notified).

2. OUTGOING CALLS. There will be no outgoing line for you to make calls unless you receive an authorization code from your Suite Manager or you rent an office or a desk so that you can have one of Lessor's phone instruments and a line installed.

3. ADDITIONAL SERVICES. You will have access to all common areas, other than gym, during normal business hours, including but not limited to the kitchen (free), photocopier, scanner,

**Att. J**

● Page 2                                                February 27, 2015

postage machine, and fax service, all which shall be billed to you on an "as used" basis at Lessor's current prevailing rates.

4.  DIRECTORY LISTING. Upon request and approval, you may have your name or company name listed on lobby directory at a one time cost of $100.00 as well as an ongoing monthly fee of $35.00.

5.  LATE PAYMENT. If you do not pay your service charge by the 5th business day of the month, you agree that Lessor may refuse to provide mail services, conference room or any additional service to you until the service charge is paid, in which case your service charge still accrues, and you waive any rights to damages against us by reason of the termination of service. In addition, if the service charge is not paid by the 5th day of the month, a 10% late charge will apply. Additionally, Lessor may terminate this agreement upon five (5) days written notice to you if the service charge is not received by the 10th of month. In the event of such termination, you waive your right to any refund of your security deposit, additional fees collected and agree that you continue to be liable for all service charges and late fees due through the Initial Term or as extended per section 6. A service charge of Fifty Dollars ($50.00) for each of Lessee's dishonored checks returned by the institution on which said checks are drawn. If at any time during the term of this Service Agreement Lessee has tendered payment by check and Lessee's bank returns more than one such payment for any reason including insufficient funds, Lessor may, at its option, require all future payments be made by cashier's check.

6.  Term: The Initial Term of this Agreement is twelve (12) months as indicated herein and shall not be terminated sooner. At the end of the Initial Term, if neither party has rendered Termination Notice as required in section 7, this Agreement shall automatically extend on a month to month basis, unless either party notifies the other in writing to the contrary at lease (1) One full calendar month prior to the expiration date of this Agreement.

7.  NOTICE TO TERMINATE. One full calendar month prior to the end of the Initial Term, either party may send written notice terminating this Agreement ("Termination Notice"), unless terminated sooner by Lessor as specified in section 5. If this Agreement is renewed on a month to month basis, either party may terminate this agreement by providing one full calendar month written notice terminating this Agreement, unless terminated sooner by Lessor as specified in section 5. IF WRITTEN TERMINATION NOTICE IS RECEIVED BY EITHER PARTY ON THE 1ST OF THE MONTH OR ANY DATE LATER THAN THE 1ST OF THE MONTH, ANY SUCH NOTICE SHALL NOT BE EFFECTIVE UNTIL TWO (2) FULL CALENDAR MONTHS STARTING FROM THE END OF THE MONTH IN WHICH THE NOTICE WAS RECEIVED. For example, if written notice of termination is received by either party on May 1st or later, any such notice shall be effective June 30th. If written notice of termination is received by either party by April 30th, any such notice shall be effective May 31st.

Notice to Lessor must be mailed via certified U.S. mail or by hand delivery, only when given directly to the Suite Manager, when accompanied by a written acknowledgement from the Suite Manager to:

> **5023 North Parkway Calabasas, LLC**
> **5023 N. Parkway Calabasas**
> **Calabasas, CA  91302**
> **Attn:  Assal Kamal, Suite Manager**

8.  MAIL HANDLING. Lessee is permitted to receive mail for three (3) companies OR individuals per "Service Agreement". Any additional company OR individual name(s) added to "Service Agreement" will be charged an additional $25.00 each per month. Any substitutions to names as listed on "Exhibit B" shall require one (1) full calendar month written notice to Lessor.

Mail Service Agreement

**Att. J**

● Page 3                                                                     February 27, 2015

9.  MAIL HANDLING AFTER TERMINATION. Upon termination of this agreement, LESSOR shall stamp all of your mail "Return to Sender". LESSOR shall not hold or store mail, nor place a forwarding address on it, unless you pay LESSOR charge for this service. Our current charge for this service is $150.00 per month, NOT INCLUDING POSTAGE. Lessee is prohibited from filing a change of address form with the U.S. Post Office due to the executive suite nature of this Agreement, as per the Application for Delivery of Mail Through Agent form, which is incorporated herein.

10. LIABILITY. Lessor liability for any and all alleged breaches under this agreement shall be limited to the obligation to refund the prorated current monthly service charge if we should cease to provide service at any time. Prorated amounts shall be calculated on a 30-day month basis. Lessor is not liable for any loss of business or damages of any sort occurring from, or in connection with, or incidental to the furnishing of, or failure to furnish, telephone or reception service, or for authorizing or permitting the disconnection of your telephone service if you have not paid your telephone bill.

11. ACCESSIBILITY.  In compliance with California State Legislation SB 1186, as of the date of this Lease, the Premises have not been inspected by a Certified Access Specialist ("CASp").  The office building was built in 1981 with an addition and renovation made in 1990.  While no major construction has occurred since that time, Lessor has made physical changes within the building to allow for better accessibility.  Any specific reasonable accommodation request should be made to Lessor .

12. . HIRING LESSOR EMPLOYEES. Lessor spends a great deal of time to hire and train employees for the operation of the suite.  Each client derives the benefit of our experience in operating the suite and of such hiring and training procedures.  You are not to offer or accept for hire any of our employees at any time during this service agreement and for a period of one hundred eighty (180) days thereafter the termination of this agreement. In the event you breach this provision and offer or accept for hire any of Lessor employees, at any time during this service agreement, or within one hundred eighty (180) days after this service is terminated by either party, you will pay Lessor the sum of Twenty Thousand dollars ($20,000.00) for the employee so hired to compensate us for the loss in hiring and training said employee

13. SECURITY DEPOSIT. You will maintain, at all times, a security deposit with us in an amount equal to one times the monthly service charge plus a service retainer of $50.00 for a total security deposit of 100.00. We will bill you for any such additional security deposit as required

14. Please sign this agreement and return it to the Suite Manager, together with payment, made payable to *5023 North Parkway Calabasas, LLC*:

    $100.00 _____     First month's service charge (March)

    $100.00 _____     Security deposit

    $100.00 _____     Set up fee


    $300.00 _____     **Total amount due**

Mail Service Agreement

**Att. J**

● Page 4                                          February 27, 2015

15.    EXHIBITS A – C ARE ATTACHED HERETO AND MADE A PART HEREOF

| LESSEE | LESSOR |
|---|---|
| Chargeback Armor, Inc | 5023 North Parkway Calabasas, LLC<br>A California limited liability company |

X:_____          X:_____
**Signature**                        By:  TVP ASSET, INC., a California Corporation,
                                     As Managing Agent for Lessor

X:____ _Boi deureni_ _____
**Print Name**

Title:_____

____2/27/15____                      ____2/27/2015____
Date                                 Date

Mail Service Agreement

**Att. J**

● Page 5                                                        February 27, 2015

## EXHIBIT A

### *Calabasas Executive Suites*
### *5023 North Parkway Calabasas, LLC*

Lessee Name: **Chargeback Armor, Inc**

### EMERGENCY CONTACT INFORMATION

In case of emergency, please contact:

_Boi Reuveni_          _818-667-0555_     _818 262 9999_
Name                         Phone Number          Alternate Number

Relationship: _____

My residence phone and/or business phone (cell phone):

_____

My e-mail address:

_Boi G chargebackarmor.com_____

* Lessee Signature: _____          date _____

## EXHIBIT B

Mail Service Agreement

**Att. J**

● Page 6

February 27, 2015

## *Calabasas Executive Suites*
## *5023 North Parkway Calabasas, LLC*

### BILLING ADDRESS INSTRUCTIONS

Lessee Name: **Chargeback Armor, Inc**

Please use the following as my billing address for all rent payments and notices:

The suite address _____

Email Address: Accounting G Chargebackarmor.com

Other (as listed below):

_____

_____

### MAIL HANDLING INSTRUCTIONS
Please list up to three (3) name(s) of company or individual for which mail will be accepted:

1. IVH rogix

2. Secured merchants

3. Alon Argoman (Avi), Doron Notted, michael costache

*NOTE: Additional name(s) of company /individual are $25.00 each per month.*

Please accept the following types of items:

√ Special Delivery       √ Registered Mail

√ Certified Mail        √ Federal Express

√ Postage Due          (or similar)
                      √ Messenger Delivery

√ United Parcel Service

### ***PLEASE NOTE THAT WE DO NOT ACCEPT ANY C.O.D. ' S***

Special instructions not covered above: _____

_____

* Lessee Signature: _____          date _____

Mail Service Agreement

**Att. J**

EXHIBIT C

*Calabasas Executive Suites*
*5023 North Parkway Calabasas, LLC*

# LOBBY DIRECTORY LISTING

**To request a Lobby Directory Strip listing, please complete
below.  Allow 2-3 weeks for delivery and installation.  Lobby
Directory Strips Listings are $100.00 each.**

| |
|---|
| **Not to exceed 40 characters.** |

**I understand that there is a $35.00 per month fee for the lobby
listing to remain on the Directory.**

**Signature:**

**Date:**

**Att. J**

## Robert Podlesni - follow up from today

1 message(s)

Date: Tue Mar 17 2015 18:40:03 GMT-0600 (MDT)
From: Mike Costache
To: Alon | ChargebackArmor , Roi | CBA
CC: Avico Global
ID: 14c2a52ac4e0a30d

Hi Alon and Roi,

As you can see below Robert is high balling us at $1500/day. The most I was thinking for one month is $4,000 which would mean $500/day when he is here. I'm sure that we'll have access to him when he is not here physically as he will be processing/thinking about stuff for us, making intros, preparing documents, etc.

I'm glad he understood that the first 90 days are a trial to see what we can do together. I like the way he was smart to mention that he doesn't expect to get 5% personally on revenues we derive from his intros when he becomes an equity/option earner.

Even if he agrees to $500/day, I don't see us starting to pay him till April 1st when I predict that we'll have an office for him to come to. So we don't need to rush the decision, but then again it's only a month contract we'd agree to.

I'd like to get him to do something for us that leads to revenue like I did with Lori from VastPay who is arranging 10 demos and we pay her $100/demo before she starts a $4250/month sales job.

What are your thoughts on his follow up email from below?

Mike Costache
Chief Executive Officer
Chargeback Armor, Inc.
T: 800.976.7027
C: 310.753.9292
E: mike@chargebackarmor.com
5023 North Calabasas Parkway
Los Angeles, CA 91302

**From:** Robert Podlesni <rp@systemamarketing.com>
**Date:** Tue, 17 Mar 2015 16:55:40 -0700
**To:** M <mike@chargebackarmor.com>
**Subject:** Secured Merchants First Proposal

Mike,

I love where you guys are at and your plan for the next few years.  The people you have are both passionate and driven, which is why I feel comfortable moving forwards with your group.

As requested, below is my outline.

Title - Wizzard
Daily Rate - $1,500/day Paid weekly

**Att. K**

Day Commitment - 2 per week
(Since I will be traveling to your office, usually these end up being early start, late end days)
No minimum length of contract however I am anticipating until our final agreement is reached in 90 days.

**My Expectations:**
- An equity agreement and final "consulting" agreement is reached within 90 days
- I am open to forfeiting my commission per chargeback in order to increase the revenue of the company as an equity holder
- This would include interest in the IVR product

**My Responsibilities:**
- Comply with CEO (your) direction on 30 day, 6 month, and 1 year objectives
- Measure these goals, a lot
- Maximize revenue from existing clients
- Assist in increasing revenue by $500k over the next 6 months (Sooner based on our talks)
- Develop ISO and Acquiring bank relationships
- Start discussions with my existing corporate relationships
- Grow IVR and Chargeback Armor sales.
- Grow Chargeback Armor services suite

In addition, some of my mentors/friends are fairly well off and with great connections. If we need to gather investors, this could be tapped into.

Once we arrive at an interim deal I would like a list of your expectations to ensure I deliver on the appropriate metrics.

Looking forward to hearing your thoughts.

RP

--


**Robert Podlesni**
p. 800.805.5920
m. 805.813.4469
www.systemamarketing.com



# Fwd: TRANSACT 15 Registration Confirmation & Receipt

2 message(s)

Date: Fri Mar 20 2015 11:56:24 GMT-0600 (MDT)
From: Mike Costache
To: Alon Nottea , Avi Argaman , Roi Reuveni
CC:
ID: 14c3854342d73ae1


Hi,

FirstData is the sponsor of the scholarship I applied for (we have a second free pass for Roi under IVR Logix). Just saved us $3000.

Mike

**Att. L**

## Re: Job Description for Roi for CBA

3 message(s)

Date: Fri Mar 13 2015 00:55:56 GMT-0600 (MDT)
From: Alon | ChargebackArmor
To: Mike Costaman
CC: Avi Argaman
ID: 14c11eb032dfe4a0

Mike, I respect your position and couldn't agree more with respect to the article and the importance of having a symbiotic relationship between upper-level management.... Undeniably, a major key to success.

I learned a long time ago, that at the end of the day, the only real thing we can measure is results... And I am a true believer that the only way to reach real results, is through teamwork... A combined effort for a common goal...

I'm onboard with the direction, vision as well as the 'impressive' job description ... Those are big words to live in standby.... That being said, I hold you, personally responsible and accountable for making the right decisions on behalf of our company... These (right or wrong) decisions are in turn, directly attributable to your own incentive plan... If the right focus, dedication, passion, and fire in the eyes is there, you have my blessing and my vote....

Let's sit down and discuss and get final approval from the chief papa global and push forward like we have never pushed before, and may it succeed,     amen!


On Thursday, March 12, 2015, Mike Costache <mike@chargebackarmor.com> wrote:

Hi Alon,

As we had talked earlier on the phone, below is the job description of a COO which is where I see Roi excelling at.

If you have the time to read an amazing article from the Harvard Business Review about CEO-COO relationship, please spend 5 minutes to read:

https://hbr.org/2006/05/second-in-command-the-misunderstood-role-of-the-chief-operating-officer

My summary of the CEO-COO relationship is this:

"The single element most critical to the success of a CEO-COO pairing is the level of trust and communication between the two individuals."

Mike

Begin forwarded message:

**From:** Roi R <roi@securedmerchants.com>
**Date:** March 12, 2015 at 21:26:36 PDT
**To:** Mike Costache <mike@chargebackarmor.com>
**Subject: COO Job Discerption**

Mike,

See below the job description you requested about my role at CBA

**Att. M**

**COO Job Description**

1.   Advise senior management on financial planning, budgeting, cash flow, and policy matters.
2.   Upgrade and implement an appropriate system of policies, internal controls, accounting standards, and procedures.
3.   Contribute to the development of Chargeback Armor's strategic goals and objectives as well as the overall management of the organization.
4.   Coordinate the annual operations plan and budget
5.   Oversee, direct, and organize the work of the finance and operations teams.
6.   Promote a culture of high performance and continuous improvement that values learning and a commitment to quality.
7.   Ensure staff members receive timely and appropriate training and development.
8.   Establish and monitor staff performance and development goals, set objectives, establish priorities, conduct annual performance appraisals, and administer salary adjustments.
9.   Upgrade and implement an appropriate system of policies, internal controls, accounting standards, and procedures.
10.   Lead the performance management process that measures and evaluates progress against goals for the organization
11.   Maintain continuous lines of communication, keeping the CEO informed of all critical issues.

**Roi Reuveni,**



**Phone: (747) 600-2424  |  Email:  Roi@SecuredMerchants.com**
**Direct:  (818) 338-6888  |  Website:  www.SecuredMerchants.com**

*This e-mail message may contain confidential, proprietary or legally privileged information. It should not be used by anyone who is not the original intended recipient.  If you have erroneously received this message, please delete it immediately and notify the sender.  The recipient acknowledges that Secured Merchants LLC. is unable to exercise control or ensure or guarantee the integrity of/over the contents of the information contained in e-mail transmission and further acknowledges that any views expressed in this message shall not be implied or assumed unless the sender does so expressly with due authority of Secured Merchants LLC. Before opening any attachments please check them for viruses and defects.*

--

Respectfully,

Alon Nottea
Strategic Alliances
Chargeback Armor, LLC

**Att. M**

Skype: alonbaba  Direct: 800.976.7027Email: <u>alon@chargebackarmor.com</u>



Privacy Notice: this message is intended only for the designated recipient. It contains confidential information and is subject to attorney-client privilege and other confidentiality protections. If you have received this message in error, please notify the sender and delete this message. Thank you.

Att. M

**Tepfer, Reid A.**

| | |
|---|---|
| **From:** | sp1085@gmail.com on behalf of Sagar Parikh <sp@beverlyhillslawcorp.com> |
| **Sent:** | Tuesday, July 07, 2015 12:25 PM |
| **To:** | Tepfer, Reid A.; Gallegos, Luis; Charlene Koonce |
| **Subject:** | Secured Merchants Documents |
| **Attachments:** | 52 Invoices SM TO SBM.pdf; SM TO SBM Invoices All Dates.pdf; SM TO SBM Sales All Dates.xls |

All:

Please see attached 52 detailed invoices issued by Secured Merchants to SBM Management for various IT services. As previously mentioned, SM was a vendor of SBM.

Since its inception on Aug 15, 2013, Secured Merchants' total Income amounts to $790,141.80 while income from SMB Management amounts to $320,665.89. The income from SBM Management represents 40.58% of Secured Merchants' total all-time revenue . The rest came from other clients unrelated to this civil lawsuit or any companies owned/controlled by Alon or Doron Nottea.

Now you have all the proof you have been looking for to exonerate both my clients from any wrong doings:

1. Secured Merchants' CEO's decision to provide working capital to Chargeback Armor was a legal business transaction between the parties, not involving any of the Defendants in this matter.
2. Chargeback Armor provides a credible service to merchants by having the most advanced chargeback re-presentment, monitoring, reporting and analytics platform in the payment industry. This can be evidenced by the 16 major referral partners who have agreed to bring all their clients onto this platform and the 10 clients who signed up in the company's first three months of operations. Please don't waste our time anymore asking for more evidence that this is a very credible company and service run by a very ethical and credible businessman.

As Charlene has already apologized on the phone to my client, Mr. Costache, for previously sending an email claiming that his company used illicit funds from Secured Merchants, we expect a full apology from the FTC as well.

You have illegally put a halt on my two clients ability to run and expand their companies for the past three weeks. Now, you have been provided all the documentation you requested and you can see with your own eyes that no money from any possible "defrauded American costumers" has been used by my two clients.

To continue to claim otherwise, would be a ludicrous position and tantamount to going after the janitor who cleans SBM or any other Defendants' offices or the landlord that SBM or any other Defendants rent from, as they too would be receiving funds from the Defendants in this case.

As aforementioned numerous times, the ONLY reason why Doron Nottea was a signer on both my clients' bank accounts is due to convenience so he can issue checks when my clients were out of

**Att. N**

town traveling.   You cannot continue to hold these accounts hostage simply by virtue of this connection.  Guilt by association is not a valid reason.

Both my clients regret adding Doron Nottea as a co-signer, but they had no knowledge of any wrongdoing on his behalf or any of the fraud claims from your civil lawsuit, as evidenced by the documentation.

We expect to see the bank accounts unfrozen by 3 pm PST today, Tuesday, July 8th.

Thank you,

Sagar Parikh, Esq.

## BEVERLY HILLS LAW CORP., PC

**433 N. CAMDEN DRIVE, 6TH FLOOR**
**BEVERLY HILLS, CA 90210**
**Tel |**   (310) 887-1338
**Fax|**   (310) 982-2603
**Email |**  SP@BeverlyHillsLawCorp.com
**Web |**   www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.

Att. N

**Tepfer, Reid A.**

| | |
|---|---|
| **From:** | Tepfer, Reid A. |
| **Sent:** | Tuesday, July 07, 2015 1:27 PM |
| **To:** | 'Sagar Parikh' |
| **Cc:** | Gallegos, Luis; 'Charlene Koonce' |
| **Subject:** | RE: Re Chargeback Armor's New Account Being Frozen |
| **Attachments:** | Chargeback Armor BOA letter.pdf; TRO.pdf |

Sagar,

Please find attached a letter and attachment you may provide to Bank of America requesting that Chargeback Armor's new account, account no. ▓▓▓▓▓▓, be unfrozen. I also have a call in with the bank to speak with them concerning the account and will let you know when I hear back. This letter only requests that Chargeback's new account, account no. ▓▓▓▓▓▓, be unfrozen and does not pertain to your request that Chargeback Armor's primary account be unfrozen. I hope that this letter will remedy the miscommunication.

Thank you,
Reid

**From:** sp1085@gmail.com [mailto:sp1085@gmail.com] **On Behalf Of** Sagar Parikh
**Sent:** Tuesday, July 07, 2015 10:57 AM
**To:** Charlene Koonce
**Cc:** Tepfer, Reid A.; Gallegos, Luis; Leslie Sanderson; Brandi McKay
**Subject:** Re: Re Chargeback Armor's New Account Being Frozen

Please see attached for the account information.  Confirm when it is unfrozen.

Thanks

Sagar Parikh, Esq.

BEVERLY HILLS LAW CORP., PC
433 N. CAMDEN DRIVE, 6TH FLOOR
BEVERLY HILLS, CA 90210
Tel |     (310) 887-1338
Fax|    (310) 982-2603
Email | SP@BeverlyHillsLawCorp.com
Web |    www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.

On Tue, Jul 7, 2015 at 6:20 AM, Charlene Koonce <charlene.koonce@solidcounsel.com> wrote:

**Att. O**

Sagar, I think this is a communication error with the bank and we will reach out as well to get that account unfrozen if you provide the account info.

Sent from my iPhone

On Jul 7, 2015, at 7:34 AM, "Tepfer, Reid A." <rtepfer@ftc.gov<mailto:rtepfer@ftc.gov>> wrote:

Sagar,

If the account is in Chargeback Armor's name and has only Mr. Costache's name and no Defendants, our position is that it shouldn't be frozen. Please let me know the account information, and I will get in touch with the bank.

Thanks,
Reid

From: sp1085@gmail.com<mailto:sp1085@gmail.com> [mailto:sp1085@gmail.com] On Behalf Of Sagar Parikh
Sent: Monday, July 06, 2015 10:54 PM
To: Charlene Koonce; Tepfer, Reid A.; Gallegos, Luis
Subject: Re Chargeback Armor's New Account Being Frozen

All:

Last week, Mr. Costache opened a new account under Chargeback Armor's name with only him as the signatory.

However, now this account has been frozen as well.

Please advise.  Charlene had made the representation to us orally and in writing that the Chargeback Armor account was originally frozen because Doron Nottea was a signatory on the account.

Clearly, this was not the case, as this new account does not have Doron on it, but is frozen.

We take this to mean that Chargeback Armor itself is being investigated, not just Doron, correct?

Sagar Parikh, Esq.

Beverly Hills Law Corp., PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
Tel |    (310) 887-1338
Fax|    (310) 982-2603
Email | SP@BeverlyHillsLawCorp.com<mailto:SP@BeverlyHillsLawCorp.com>
Web |    www.BeverlyHillsLawCorp.com<http://www.beverlyhillslawcorp.com/>

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and

**Att. O**

destroy the related message immediately.

**Att. O**

## Compensation for Lori and Tyler

1 message(s)

Date: Tue Mar 31 2015 01:08:52 GMT-0600 (MDT)
From: Mike Costache
To: Alon | ChargebackArmor
CC: Roi R , doron@doron.us, Avico Global
ID: 14c6ea952589b8fc

Hi Alon,

I left the check book here in the office so that Doron can write checks tomorrow for Roi, Robert and I'm forgetting the third check he needed.

As a reminder and as per my email to you and Avi, I paid Tyler $1000 on March 23rd for 33 future demos ($30/demo). He was very happy to receive this money as he was about to loose his apartment. I have not discussed any other compensation with Tyler or with you and Avi so please let me know what you believe is the best way to move forward given how much work he does for CBA versus other things he does for Avi which are not related to CBA.

I'm taking two checks with me to SF for Lori:
1.      $1000 for the first 10 demos (she did 9 so far and we have 1 contracts signed with HRMA Services and a second about to be signed with AVP Solutions)
2.      $2,125 which is the first half of next month's consulting fee (as defined below)
In the next 15 days, we'll know what else she will close and then we can make adjustments as to how we proceed with her.

I'm attaching the full contract I signed with Lori on March 16th, but the main compensation is defined below and was also approved by you:

(1) $100 per demo for the first 10 Qualified Demos arranged by Consultant. This first $1,000 compensation shall be payable thenext day after the 10th demo.

(2) $250 upon all relevant information for integration purposes is collected from each Referral Client. Consultant agrees to assist CBA in this process as much as possible.

(3) $4,250 monthly consulting fee to be payable in two parts, on the 1st or the 15th of the month, commencing after the first 10 Qualified Demos are accomplished. Expectations for this monthly fee include: (1) a minimum of one Qualified Demo per week with an ISO or an Agent of an ISO and (2) a minimum of five Qualified Demos withReferral Clients. For each of these demos Consultant shall be paid $100 on top of the monthly consulting fee.

(4) Five percent (5%) of the Net Revenues received by CBA from Merchants introduced to CBA by Consultant, payable to Consultant for the duration of the agreement between CBA and the Merchant. This commission shall be payable by CBA to Consultant within fifteen (15) days of receipt of payment from each Merchant.

Mike Costache
Chief Executive Officer
Chargeback Armor, Inc.

**Att. P**

Office: 800.976.7027
Mobile: 310.753.9292
Email: mike@chargebackarmor.com
Skype: mikecostache
LinkedIn.com/in/mikecostache
5023 North Calabasas Parkway
Los Angeles, CA 91302

**Att. P**

## CHARGEBACK ARMOR, INC.

### SERVICES AGREEMENT

This Services Agreement (the "Agreement") is entered into as of March 2, 2015 by and between Chargeback Armor, Inc., a corporation incorporated in the State of California on February 18, 2015 with Corporate Number 3756956 and 1,000 authorized shares (the "Company") and Jason Caramanis, an individual ("JC").

The parties agree as follows:

3. **Services**. JC agrees to act as a member of the Company's Board of Directors, including attending and participating in board conference calls and meetings as set forth, to collaborate and provide advice to the Company and to raise money for the Company as outlined below and as is mutually agreed by the parties (collectively, the "Services").

4. **Compensation for Capital Raising.**

(a)  Upon execution of this Agreement, JC will help the company raise two hundred and fifty thousand dollars ($250,000).

(b)  Upon receipt of the $250,000 investment, the Company will immediately grant JC or any legal entity controlled by him an equity interest in the Company equal to fifteen percent (15%). Additionally, JC will join the Board of Directors for a period of one year. The Board currently consists of three additional people: Mike Costache, Alon Nottea and Avi Argaman. Board seats are extended for additional periods of one year at a time for each board member upon the board's approval.

(c)  JC agrees to raise an additional $250,000 when the Company shows gross income of at least $500,000. Upon receipt of the additional $250,000 JC will receive an additional five percent (5%) equity for a total of twenty percent ownership of 20%. The Company will provide proper accounting to evidence the $500,000 in gross revenue and JC agrees to raise the additional $250,000 investment within thirty (30) business days.

(d)  If the Company does not produce at least $500,000 in gross revenues within 12 months from the time of the original investment, the Company will be required to pay JC $100,000 within 12 months from then and JC will remain as a15% equity owner in the Company.

(e)  In the event that the Company fails to make the payment to JC in the amount of $100,000 within 12 months, the Company agrees that JC's equity ownership interest in the Company shall increase by one percent ( "1%") for each month that the $100,000 is not paid to JC in full until JC has a total of 20% ownership.

(f)  In the event that JC doesn't raise the additional investment of $250,000, JC will give back to the Company one percent (1%) of his equity for each month that he doesn't raise this second investment up until he has 10% ownership in the Company.

5. **Term and Termination**.  The term of this Agreement shall be for a period of one (1) year from the date hereof, and may be renewed by mutual agreement of the parties; provided, however, that this Agreement may be terminated by either party for any reason upon thirty (30) days prior written notice without further obligation or liability.

6. **Independent Contractor**.  JC's relationship with the Company will be that of an independent contractor and not that of an employee.  JC will not be eligible for any employee benefits, nor will the Company make deductions from payments made to JC for employment or income taxes, all of which will be JC's responsibility.  JC agrees to indemnify and hold the Company harmless from any liability for, or assessment of, any such taxes imposed on the Company by relevant taxing authorities.  JC will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

7. **Nondisclosure of Confidential Information**.

(a)  Agreement Not to Disclose.  JC agrees not to use any Confidential Information (as defined below) disclosed to JC by the Company for JC's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services.  JC shall not disclose or permit disclosure of any Confidential Information of the Company to third parties

Att. Q

other than other members of the Company's Board. JC agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. JC further agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information which may come to JC's attention.

(b) Definition of Confidential Information. "Confidential Information" means any information, technical data or know-how (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-how which: (i) is in the possession of JC at the time of disclosure, as shown by JC's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of JC.

(c) Exceptions. Notwithstanding the above, JC shall not have liability to the Company or any of its subsidiaries with regard to any Confidential Information of the Company which JC can prove:

(i) is disclosed with the prior written approval of the Company; or

(ii) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that JC shall provide prompt notice of such court order or requirement to the Company to enable the Company or its appropriate subsidiary to seek a protective order or otherwise prevent or restrict such disclosure.

8. **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant JC any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

9. **Notices.**

To Company:   5023 North Parkway Calabasas, CA 91302

Tel: 310.753.9292

Email: mike@chargebackarmor.com

To JC:   ████████████, Woodland Hills, CA ████

Tel: ██████████

Email: dutchtrust@yahoo.com

10. **Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any exhibits hereto, constitutes the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, 48 hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below, or as subsequently modified by written notice. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

Att. Q

The parties have executed this Agreement as of the date first written above.

ChargeBack Armor, Inc.                          Jason Caramanis


_____              _____
Signature:                                      Signature:

Mike Costache  / CEO_____           Jason Caramanis_____
Print Name / Title                              Print Name

**Att. Q**

## Re: Lori (2 of 10 demos this week). More coming soon.

3 message(s)

Date: Fri Mar 20 2015 12:00:33 GMT-0600 (MDT)
From: Mike Costache
To: Alon | ChargebackArmor
CC: Roi Reuveni , Avi Argaman
ID: 14c3858004310f55

She has done that and she has it under control.

On Mar 20, 2015, at 10:23, Alon | ChargebackArmor <alon@chargebackarmor.com> wrote:

please have her demo you as a client and make sure you're happy with her approach - maybe we can give a few good pointers to enhance her pitch...


Respectfully,

Alon Nottea
Strategic Alliances
Chargeback Armor, LLC
Skype: alonbaba  Direct: 800.976.7027 Email: alon@chargebackarmor.com



Privacy Notice: this message is intended only for the designated recipient. It contains confidential information and is subject to attorney-client privilege and other confidentiality protections. If you have received this message in error, please notify the sender and delete this message. Thank you.

On Fri, Mar 20, 2015 at 8:50 AM, Mike Costache <mike@chargebackarmor.com> wrote:

Hi guys,

Just sending you guys a quick follow up note so you know that this is Lori's second intro to a potential referral partner.

I've asked her to allow Tyler to demo to merchants but she wants to move faster so she is demo'ing herself potential referral partners (ISOs and Agents) and then she makes the intro to me immediately. She is a sales person with a strong personality and although I have asked her to have at least me on every initial call, she is comfortable doing a quick demo by herself after seeing 5 demos by Tyler.

So she has 8 more demos to do and inform me before we own her $100/demo for the first 10. I think I got a great thing going with her so thanks, Alon, for introducing me to her.

Mike

**Att. R**

Begin forwarded message:

**From:** Lori Bembanaste <lori@chargebackarmor.com>
**Date:** March 20, 2015 at 08:11:55 PDT
**To:** Michael Reilly <mike.reilly@highriskma.com>
**Cc:** Lori Bembanaste <lori@chargebackarmor.com>, David Haselkorn <david@choiceinc.biz>
**Subject: Chargeback Armor Agreement**

Hi Mike,

Thank you very much for your time yesterday and allowing me to give you an overview and demo on what Chargeback Armor is all about. I am very pleased you found our product to be a beneficial addition to your merchants' portfolios of services as a tool to help recover lost revenue.
As discussed, please find attached our Referral Agreement, some text to help you introduce me to your merchants, and some text to help you introduce me to some of your partners in case the situation presents itself :)
Please do not hesitate to reach out to me if I can be of any service.
Thank you David for taking the time to make the introduction.
Have a wonderful day gentlemen!

--


Kind Regards,
Lori Z. Bembanaste
Advisory Board Member

Chargeback Armor, Inc.
C: 954.993.6399
E: lori@chargebackarmor.com
Skype: lorizb

**Att. R**

# SECURE MERCHANTS

1. **Marketing**
2. **Processing orders** (new, rebills, declines, reorders and personalized subscription cycles)
3. **Shipping** (daily shippable items report & shippable performance report)
4. **IVR** (reports in Roi's Excel)
5. **Call Center/CSR**
6. **RMA** (identified by the label with QR code printed on the original order box)
7. **Quality Assurance** (customize QA scripting forms for sales people, CSR reps, etc)
8. **ChargeBacks**
9. **Collections** (set up to mail collections notice after X declines after Y days in between declines)

We provide B2B management software for online marketers. Our services include CRM software, Gateway Processing (Onshore/Offshore), Chargeback Management, Call Center Management, Fraud Management (consumer/affiliate), Fulfillment Management (domestic/global), Advertising Optimization (online, print, radio, TV).

We equip online marketers with turn-key back-end office services to build a stable business through varied marketing channels. Flexible, compatible, intuitive—our software and business model allow you to take the reins and maximize the potential of your business.


**ChargeBack Armor:**

- We specialize in end-to-end processing of chargeback disputes.

- We are a leading innovator of solutions for fraud and risk management.

- We help you win back lost revenue by reversing chargebacks in your favor.

- We reduce the direct negative impact on your profit that chargebacks bring to your business.

- Our custom solutions provide you compliance, chargeback response and recovery, and we handle the entire chargeback dispute process on your behalf.

- Our proprietary technology follows all the rules, processes and requirements of all major merchant processors.

- We protect your merchant account by lowering risk, optimizing profit and reducing your internal cost of managing chargebacks.

Att. S

- Consider us your "Chargeback Department" not your outsourced chargeback service provider.

- We providing real-time dashboard-based accuracy in results.

- **END-TO-END SOLUTION:** You only need one solution to run your entire fraud/risk operation.
- **SIMPLICITY AND EASE OF USE:** Fraud prevention does not have to be complex or complicated.
- **VALUE AND ACCURACY:** Single-source solution with fixed costs...avoid the expense / upkeep of using multiple, disparate tools.

*Optimizing Chargeback Management to Increase Profitability*

*Features Include:*

• Automated Dispute Resolution
• Chageback Prevention Tools
• High Recovery Rates
• Dispute Trend Analysis
• Global Chargeback Support

**IVR Logix:**

- We offer a vehicle to resolve consumer disputes before they become chargebacks

- An automated response service to assist you with resolving customer needs 24/7

- Expedited customer identification for customer reps to quickly locate and resolve accounts

- Leads to a lower staffing cost in the customer service center

- Customized reporting from customer service rep to manager to QA

- Reguard's 3 conditions: in-trial (0-14 days), post trial (15-180 days), already canceled (anytime)

Att. S

- Our system will identity the tier level of the customer and offers an optimal resolution based on the parameters assigned by the Customer Service Manager

- Reduces call volume to a manageable level that your reps will need to actually respond to

- Will let you know how efficient the IVR system is responding to your customers' needs

- Accurate amount of money we're saving you and the revenue generated without the cost of an agent

<u>Reporting:</u>

- How much you are saving in save sale options
- How many customers are offered a discounted rate to keep the product
- Subscription Tracking, meaning what part of your program your customers are exiting in
- Helps you gauge where your customers need the most attention by categorizing to determine the customer service level required to resolve the particular need. This feature helps reduce chargebacks in the future by identifying which customers require the most attention and by assigning them to the most qualified reps
- How many customers are returning products through the IVR vs CSR
- Identify your peak CSR hours to optimize the staffing costs

**Click Connector:**

- One localized platform that segregates all aspects of a business yet gives every department head access to the modules required to operated on a daily basis
- Customizable
- Internal messenger and outbound emailing to end customers
- Workflow: assigning tasks, reminders, duties to co-workers with ticket tags for proper closer and future retrieval

3                                                                    **Att. S**

# *SECURE MERCHANTS*

**OUR SERVICES:**  We are an enterprise cloud-based infrastructure provider to the Direct Response Marketing (DRM) industry. Our three initial services include:

**ChargeBack Armor:** Credit card chargeback processing, management & dispute services

**IVR Logix:**  Interactive Voice Response (IVR) system that plugs into the client's CRM platform to optimize the Lifetime Value (LTV) of their customers by lowering the opt-out rates and saving DRMers the cost of running their customer service center

**Click-Connector:**  Customer Relationship Management (CRM) on steroids allowing customization to an unprecedented level not currently addressed by anyone in the marketplace

**PROBLEMS WE SOLVE:**  There are many great products and many great online marketers who are able to quickly ramp up sales based on the right media buying, but without the proper infrastructure to sustain their growth, the probability of failure is high.

Over the past two years, the founders of Secure Merchants saw first-hand every type of failure trap that could have killed their skin care product company, which today has monthly sales of $2.5 million or 25,000 orders.

Thus the problems that our three initial services solve for any DRM company are the core infrastructure needed to deal with (1) the inevitable credit card chargebacks, (2) keeping customers happy or allowing them an easy opt-out, and (3) providing the most sophisticated customer record management system.

**TARGET MARKETS:**

√  **Consumer Products:** Bella Brite, Kollagen Intensiv, IvoryWhite, ProCleanse, OrthWhite, youthEFX, XengthX1, PureCollagen, IdroTherapy, TestoForce, Mango Pure Cleanse, Prime Cleanse, Anana Stem Cellactiv, Lyten Skin, BioGeniste, BellaClear, The Ultimate Facial, Mobanu, SlimSplash, Givale Skin Peel, THINAction, 20MinuteBeauty, eyepothesis, BurnRX, Minoxigen, The Grant Approval Network, MaxCleanse, trimsport, Essence of Argan, PureClease360, RivitaSlim, HydraWhite, DermaJuvenate, Real, ColoCleansePro, PureMangoSlim, Lean DetoXCleanse, Financial Approval Network, InstanTrim, AfricanMango, NutraScience, PureBerryMax

√  **Resellers:** SuiteApp (NetSuite sister company), LimeLightCRM, OrangeCRM, TriangeCRM, UltraCard, ResponseCRM and OrderMotion

√  **CRM & ERP Implementers:** Sererra, DKM, Celigo

**BUSINESS MODEL:**

We intent to offer our CRM platform free of charge for the first six months as a loss leader in order to attract many DRMers to switch from their current CRM platform while starting to use our IVR and ChargeBack services.

We offer a tiered pricing model allowing our customers to start small and buy more services from us as their business scales based on the merit of their product offer, ability to increase their media buy and most importantly, their ability to increase credit card processing capacity.

*THIS IS NOT AN OFFER FOR SECURITIES AND SHOULD NOT BE CONSTRUED AS SUCH, THIS IS FOR INFORMATIONAL PURPOSES ONLY. WE RESERVE ALL RIGHTS TO MODIFY, CHANGE OR UNILATERRALY AMEND ANY OF THE ABOVE.*

Att. T

# *SECURE MERCHANTS*

**PRICING MODEL:**

**ChargeBack Armor:**

**IVR Logix:**

**Click-Connector:**

**OMPETITION:**  The most well-known players for each of the three services we provide are:

- Revguard
- Limelight CRM, Orange CRM, TriangeCRM, UltraCard, ResponseCRM and OrderMotion
- ChargeBack.com, ChargeBack911, ChargeBackWin

**INVESTMENT OPPORTUNITY:**

We have secured a $1 million investment from an angel investor who had previously invested in the founders' previous startups. See Use of Proceeds for details.

**MANAGEMENT:**

- Alon Nottea
- Avi Argaman
- Paul Medina

**CONTACT:**

*THIS IS NOT AN OFFER FOR SECURITIES AND SHOULD NOT BE CONSTRUED AS SUCH, THIS IS FOR INFORMATIONAL PURPOSES ONLY. WE RESERVE ALL RIGHTS TO MODIFY, CHANGE OR UNILATERRALY AMEND ANY OF THE ABOVE.*

Att. T

Date: 3/4/2015 Time: 7:55:58 PM (US Central Time) Scanned From IP:10,166,183,137

**Bank of America**

BANK OF AMERICA, N.A. (THE "BANK")

**Certified Copy of Corporate Resolutions - Opening and Maintaining Deposit Accounts and Services**

Account Number: ▮▮0818

Name of Corporation    **CHARGEBACK ARMOR, INC**

I, the undersigned, hereby certify to   BANK OF AMERICA, N.A.                                                            .

that I am the Secretary/Assistant Secretary and the designated keeper of the records and minutes of

CHARGEBACK ARMOR, INC                                                      , duly organized and existing under the laws of the

State of ___California___ (the "Corporation"; that the following is a true copy of resolutions duly adopted by the Board of

Directors of said Corporation at a meeting duly held on the _25_ day of _February, 2015_, at which a quorum was present and acted

throughout or adopted by the unanimous written consent of the Board of Directors; and that such resolutions are in full force and effect and have not been amended or rescinded.

**1. Resolved,** that   BANK OF AMERICA, N.A.                                                  (the "Bank") is hereby designated as a depository of the Corporation and that deposit accounts and/or time deposits (CDs) be opened and maintained in the name of this Corporation with Bank in accordance with the terms of the Bank's Deposit Agreement and Disclosures and the applicable rules and regulations for such accounts; that any one of the following officers or employees of the Corporation:

| Name | Michael Costache | Title | CEO |
| Name | Doron Nottea | Title | Secretary |
| Name | | Title | |
| Name | | Title | |

is hereby authorized, on behalf of this Corporation and in its name, to execute and to sign any application, deposit agreement, signature card and any other documentation required by Bank to open said accounts; to sign checks, drafts, notes, bills of exchange, acceptances, time deposits (CDs) or other orders for payment of money; to endorse checks, drafts, notes, bills, time deposits (CDs) or other instruments owned or held by this Corporation for deposit with Bank or for collection or discount by Bank; to accept drafts, acceptances, and other instruments payable at Bank; to place orders with Bank for the purchase and sale of foreign currencies on behalf of this Corporation; to execute and deliver an electronic fund transfers agreement and to make transfers or withdrawals by electronic transfer on behalf of the Corporation; to obtain an access device (including but not limited to a card, code, or other means of access to the Corporation's accounts) that may be used for the purpose of initiating electronic fund transfers [Corporation agrees and acknowledges that neither the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) nor Regulation E (12 C.F.R. Part 205) are applicable to any such access device]; to establish and maintain a night deposit relationship; to execute and deliver a wire transfer agreement and to request, or to appoint or delegate from time to time such persons who may request, wires of funds; to enter into any agreements with the Bank for the provision by Bank of various Treasury Management services to this Corporation as such officer or employee may determine, in his or her sole discretion, and to sign any and all documents and take all actions required by Bank relative to such Treasury Management services or the performance of the Corporation's obligations thereunder, and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in accordance with the terms of any such agreement shall have been received by Bank and that such termination shall not affect any action taken by the Bank prior to such termination, to rent or lease a safe deposit box from Bank, to execute the rental agreement or lease, to enter the safe deposit box and to terminate the rental agreement or lease; to take whatever other actions or enter in to whatever other agreements relating to the accounts or investment of funds in such accounts with Bank and to execute, amend, supplement and deliver to Bank such agreements on behalf of the Corporation upon such terms and conditions as such officer or employee may deem appropriate and to appoint and delegate, from time to time, such person(s) who may be authorized to enter into such agreements and take any other actions pursuant to such agreements in connection with such accounts that the officer or employee deems necessary; and to waive presentment, demand, protest, and notice of protest or dishonor of any check, note, bill, draft, or other instrument made, drawn or endorsed by this Corporation; and

**2. Further Resolved,** that the Bank be and is hereby authorized to honor, receive, certify, pay or exchange for money orders or other instruments all instruments signed in accordance with the foregoing resolutions even though such payment may create an overdraft or even though such instruments may be drawn or endorsed to the order of any officer or employee signing the same or tendered by such officer or employee or a third party for exchange or cashing, or in payment of the individual obligation of such officer or employee, or for deposit to such officer's or employee's personal account and Bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolutions or the application or disposition of such instrument or the proceeds thereof, and, further, that the Bank is authorized to honor any instructions regarding withdrawals, orders for payment or transfer of funds whether oral, by telephone or electronic means if such withdrawal, orders or transfer are initiated by an above authorized officer or employee; and

**3. Further Resolved,** that the Bank be and is hereby requested, authorized and directed to honor and to treat as authorized, checks, drafts or other orders for the payment of money drawn or purportedly drawn in this Corporation's name, including those payable to the individual order of any person whose name appears thereon as signer thereof, when bearing or purporting to bear the facsimile signature of an officer or employee authorized in the foregoing resolutions and Bank shall be entitled to honor, to treat as authorized, and to charge this Corporation for such checks, drafts, or other orders regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such signature resembles the facsimile specimen duly certified to or filed with the Bank by the Secretary or Assistant Secretary or other officer of this Corporation or if such facsimile signature resembles any facsimile signature previously affixed to any check, draft or other order drawn in the Corporation's name, which check, draft, or other order was accepted and paid without timely objection by the Corporation, thereby ratifying the use of such facsimile signature; and the Corporation hereby indemnifies and holds the Bank harmless against any and all loss, cost, damage or expense suffered or incurred by the Bank arising out of or in any way related to the misuse or unlawful or unauthorized use by a person of such facsimile signature; and

NCA
00-14-9012M  11-2013

Date: 3/4/2015 Time: 7:55:58 PM (US Central Time) Scanned From IP:10.166.183.137

Account Number: ████0818

**4. Further Resolved,** that endorsements for deposit may be evidenced by the name of the Corporation being written or stamped on the check or other instrument deposited, without designation of the party making the endorsement, and Bank is authorized to supply any endorsement on any instrument tendered for deposit or collection; and

**5. Further Resolved,** that the Secretary or Assistant Secretary of this Corporation shall certify to Bank names and signatures of persons authorized to act on behalf of this Corporation under the foregoing resolutions and shall from time to time hereafter, as changes in the identity of said officers and employees are made, immediately report, furnish and certify such changes to Bank and shall submit to Bank a new account signature card reflecting such change(s) in order to make such changes effective and Bank shall be fully protected in relying on such certifications and shall be indemnified and saved harmless from any claims, demands, expenses, losses, or damages resulting from, or growing out of, honoring the signature of any officer or employee so certified, or refusing to honor any signature not so certified; and

**6. Further Resolved,** the foregoing resolutions shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as Bank is concerned until three (3) business days after Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by said Bank prior thereto; and

**7. Further Resolved,** that all transactions by any officer or employee of this Corporation on its behalf and in its name with Bank prior to the delivery to Bank of a certified copy of the foregoing resolutions are, in all respects, hereby ratified, confirmed, approved and adopted; and

**8. Further Resolved,** that the Secretary or Assistant Secretary be and hereby is, authorized and directed to certify these resolutions to said Bank and that the provisions hereof are in conformity with the Charter or Articles of Incorporation and Bylaws of this Corporation and that the Secretary or Assistant Secretary be, and hereby is, authorized and directed to certify, from time to time hereafter, the names of the holders of the above authorized titles and their signatures on any signature card or other documentation required by said Bank.

In Witness Whereof, I have hereunto subscribed my name and affixed the seal of this Corporation, this   25   day of   February, 2015.



Secretary/Assistant Secretary

(Corporate Seal)

| Bank Information | |
| --- | --- |
| Date | 02/25/2015 |
| Banking Center Name | TARZANA |
| Associate's Name | Hadar Sverdlov |
| Associate's Phone Number | 818-712-6015 |

NCA
00-14-9012M 11-2013

Date: 3/4/2015 Time: 7:55:58 PM (US Central Time) Scanned From IP:10.166.183.137

**Bank of America** 🏴

BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card with Substitute Form W-9**

**Account Number:** [redacted]                                          **Bank Number:** 318

**Account Type:**  ☒ DDA   ☐ SAV   ☐ CD

**Account Title:**

CHARGEBACK ARMOR, INC.

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☒ C Corporation   ☐ S Corporation

☐ Partnership   (Enter the type of partnership: General, LP, LLP or LLLP)

☐ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor) ____

☐ Other (Defined in W-9 instructions) ____

Social Security Number _____   (or)   Employer Identification Number [redacted]

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, **I/we acknowledge** the receipt of these documents. **By signing below, I/we acknowledge and agree** that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which **I/we want** interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

**Substitute Form W-9.** Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions) and (4) the FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS instructions for Form W-9).

> The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

☐ Nonresident Alien Status (if applicable) If the beneficial owner of this account is a foreign person, check here, and complete and sign the applicable Form(s) W-8.

| Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|
| 1 MICHAEL COSTACHE | CEO | *[signature]* | 02-25-05 |
| 2 DORON NOTTEA | SECRETARY | *[signature]* | 2/25/15 |
| 3 | | | |
| 4 | | | |
| 5 | | | |

NCA
00-14-9297MW 08-2014

© 2012 Bank of America, N.A. All Rights Reserved
Page 1 of 2

Date: 3/4/2015 Time: 7:55:58 PM (US Central Time) Scanned From IP:10.166.183.137

**Account Number:** ▮▮▮▮▮▮▮▮▮▮

☐ **Signature Card Addendum on File**

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

| Authorized Signer | Title |
|---|---|
|  | CEO |

**Review Information**

**Customer 1:**

Name   MICHAEL COSTACHE

| ID Type: US Driver License W/Photo | ID# ▮▮▮▮ | ID Issuer: CALI DL | Iss. Date ▮▮▮ | Exp. Date ▮▮▮ |
|---|---|---|---|---|
| ID Type: BOA ATM/Cked No Photo | ID# ▮▮▮ | ID Issuer: BOFA DEBIT CARD | Iss. Date: N/A | Exp. Date: ▮▮▮ |

**Customer 2:**

Name   DORON NOTTEA

| ID Type: US Driver License W/Photo | ID# ▮▮▮▮ | ID Issuer: California | Iss. Date ▮▮▮ | Exp. Date ▮▮▮ |
|---|---|---|---|---|
| ID Type: Other | ID# ▮▮▮▮ | ID Issuer: SOCIAL | Iss. Date: N/A | Exp. Date: N/A |

**Customer 3:**

Name _____

| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |
|---|---|---|---|---|
| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |

**Customer 4:**

Name _____

| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |
|---|---|---|---|---|
| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |

**Customer 5:**

Name _____

| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |
|---|---|---|---|---|
| ID Type: _____ | ID#: _____ | ID Issuer: _____ | Iss. Date: _____ | Exp. Date: _____ |

**Bank Information**

| Date | 02/25/2015 |
|---|---|
| Banking Center Name | TARZANA |
| Associate's Name | Hadar Sverdlov |
| Associate's Phone Number | 818-712-6015 |

NCA
00-14-9297MW 08-2014

Page 2 of 2

## Re: Shareholder Agreement for us and for Jason

2 message(s)

Date: Sun Mar 01 2015 21:22:34 GMT-0700 (MST)
From: Alon | ChargebackArmor
To: Mike Costache
CC: Avico Global
ID: 14bd881b4631fa61

avile, lets jump on a call to discuss....


Respectfully,

    Alon Nottea
    Strategic Alliances
    Chargeback Armor, LLC
Skype: alonbaba  Direct: 800.976.7027Email: alon@chargebackarmor.com



Privacy Notice: this message is intended only for the designated recipient. It contains confidential information and is subject to attorney-client privilege and other confidentiality protections. If you have received this message in error, please notify the sender and delete this message. Thank you.

On Sat, Feb 28, 2015 at 8:11 AM, Mike Costache <mike@chargebackarmor.com> wrote:

    Hi Alon and Avi,

    Here are the main issues that need to be covered in a Shareholder Agreement: http://www.lawdepot.com/contracts/shareholder-agreement/

    I have the answer to most of those fields that need to be filled out before a shareholder agreement is generated. The only think **I need you guys to decide upon is if you two will be shareholders (at least for now) though Secured Merchants.** You can later decide through which entities you will individually own your shares in CBA if through SM is not the most tax advantageous.

    Attached is a also an extensive 29 page Shareholder Agreement. I'm not sure how many pages the LawDepot agreement is as I haven't yet created a profile on their system, but I'm pretty sure that it will be less than 29 pages.

    Mike

**Att. V**

## Re: IVR Logix

16 message(s)

Date: Wed Mar 18 2015 19:39:51 GMT-0600 (MDT)
From: Mike Costache
To: Tamie Melkonian , Timothy Kim
CC: Jordan Salkin , Robert Podlesni , alon@securedmerchants.com, roi@securedmerchants.com
ID: 14c2fafc63b48351

Thank you for the friendly introduction, Robert.

Hi Tim and Tamie,

Glad to make your acquaintance via email for now.

Thank you for offering a few meeting options. April 2 at 1pm works for us to meet at your office. We will demo our IVR Logix product and our Chargeback Armor product.

We're recently span off these two technology products as well as a CRM and an commerce StoreFront product out of Secured Merchants, our holding company.

My colleagues, Alon Nottea and Roi Reuveni (both cc'ed here) will join me as well.

Thank you,

Mike Costache
Secured Merchants, LLC
T: 800.976.7027
C: 310.753.9292
E: mike@chargebackarmor.com
5023 North Calabasas Parkway
Los Angeles, CA 91302

**Att. W**

## Re: Chargeback Armor

3 message(s)

Date: Tue Mar 24 2015 22:48:30 GMT-0600 (MDT)
From: Mike Costache
To: Douglas Sash , "Susan Le (Johnson)" , Tanya Earles , John Cornell , Martha Larios
CC: Alon | ChargebackArmor , Roi R , Robert Stayner , Robert Podlesni
ID: 14c4f42a84264dae

Hi Doug and team,

Look forward to meeting you tomorrow to get acquainted and to better understand your chargeback situation.  I like the way you described Experian's benefits and the extra cash we can bring to Experian's bottom line.

My team will include:

Alon Nottea, Board Member / Director of Strategic Symbiotic Alliances
Roi Reuveni, Chief Operating Officer
Robert Stayner, Senior Account Executive

I saw a mention below that we'll be meeting in a conference room for 8 so we'll have to squeeze unless you have a larger conference room. Per my count, we'll be 11 people as per this email.

Mike Costache
Chief Executive Officer
Chargeback Armor, Inc.
Office: 800.976.7027
Mobile: 310.753.9292
Email: mike@chargebackarmor.com
Skype: mikecostache
LinkedIn.com/in/mikecostache
5023 North Calabasas Parkway
Los Angeles, CA 91302

**Att. X**

# WORKING CAPITAL INFUSION AGREEMENT

This Agreement is entered into as of March 1, 2015 by and between Chargeback Armor, Inc., a corporation incorporated in the State of California on February 18, 2015 with Corporate Number 3756956 and 1,000 authorized shares (the "Company") and between Secured Merchants, LLC, a California limited liability company located at 23679 Calabasas Road # 531 Calabasas, CA 91302 ("SM").

The parties agree as follows:

1.      **Working Capital Cash Infusion**. SM agrees to provide Chargeback Armor $250,000 in working capital in order to go to market and provide chargeback re-presentment services to clients. The capital must be delivered in one tranche or in multiple tranches but no later than April 1, 2015.

2.      **Compensation for Capital Infusion.** SM will offered equity ownership in the Company. The exact percentage will be determined after four (4) months when the Company has gone to market and better understood the sale cycle and the completion and how much additional capital will be required from outside investors.

3.      **Term and Termination**.  The term of this Agreement shall be for a period of one (1) year from the date hereof, and may be renewed by mutual agreement of the parties; provided, however, that this Agreement may be terminated by either party for any reason upon thirty (30) days prior written notice without further obligation or liability.

4.      **Independent Contractor**.  SM's relationship with the Company will be that of an independent contractor and not that of an employee.  SM will not be eligible for any employee benefits, nor will the Company make deductions from payments made to SM for employment or income taxes, all of which will be SM's responsibility.  SM agrees to indemnify and hold the Company harmless from any liability for, or assessment of, any such taxes imposed on the Company by relevant taxing authorities.  SM will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

5.      **Nondisclosure of Confidential Information**.

(a)      Agreement Not to Disclose.  SM agrees not to use any Confidential Information (as defined below) disclosed to SM by the Company for SM's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services.  SM shall not disclose or permit disclosure of any Confidential Information of the Company to third parties other than other members of the Company's Board. SM agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information.  SM further agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information, which may come to SM's attention.

(b)      Definition of Confidential Information.  "Confidential Information" means any information, technical data or know-how (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary.  Confidential Information does not include information, technical data or know-

how which: (i) is in the possession of SM at the time of disclosure, as shown by SM's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of SM.

(c)     Exceptions.  Notwithstanding the above, SM shall not have liability to the Company or any of its subsidiaries with regard to any Confidential Information of the Company which SM can prove:

(i)          is disclosed with the prior written approval of the Company; or

(ii)         is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that SM shall provide prompt notice of such court order or requirement to the Company to enable the Company or its appropriate subsidiary to seek a protective order or otherwise prevent or restrict such disclosure.

6.     **No Rights Granted**.  Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant SM any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

7.     **Miscellaneous**.  Any term of this Agreement may be amended or waived only with the written consent of the parties.  This Agreement, including any exhibits hereto, constitutes the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof.  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, 48 hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below, or as subsequently modified by written notice.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

The parties have executed this Agreement as of the date first written above.

ChargeBack Armor, Inc.                          Secured Merchants, LLC

_____                          _____
Signature:                                       Signature:

Mike Costache  / CEO_____                Alan Argaman / Owner_____
Print Name / Title                               Print Name / Title



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

📧 bankofamerica.com

✉️ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

SECURED MERCHANTS LLC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

# Your Business Fundamentals Checking

for March 1, 2015 to March 31, 2015

Account number: ▉▉ 0922

**SECURED MERCHANTS LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2015 | $10,841.83 | # of deposits/credits: 2 |
| Deposits and other credits | 120,670.89 | # of withdrawals/debits: 30 |
| Withdrawals and other debits | -4,978.31 | # of items-previous cycle[1]: 4 |
| Checks | -124,872.00 | # of days in cycle: 31 |
| Service fees | -25.00 | Average ledger balance: $27,211.21 |
| **Ending balance on March 31, 2015** | **$1,637.41** | [1]Includes checks paid,deposited items&other debits |



Retirement could last longer than you might think

For 5 strategies to help you avoid outliving your savings, visit **merrilledge.com/5-strategies**

MERRILL EDGE
Bank of America
Corporation

Merrill Edge® is available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), and consists of the Merrill Edge Advisory Center™ (investment guidance) and self-directed online investing. MLPF&S is a registered broker-dealer, member SIPC and a wholly owned subsidiary of Bank of America Corporation. Merrill Lynch, Merrill Edge, the Merrill Edge logo, and Merrill Edge Advisory Center are trademarks of Bank of America Corporation.
ARJB3CX9

Investment products: | **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value** |

Att. Z

SECURED MERCHANTS LLC   |   Account # � 0922   |   March 1, 2015 to March 31, 2015

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**Updating your contact information** - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time.  These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals.  Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

  – Tell us your name and account number.
  – Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
  – Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly.  You are in the best position to discover errors and unauthorized transactions on your account.  If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.  You may also review your activity online or visit a banking center for information.

© 2015 Bank of America Corporation



**Bank of America, N.A. Member FDIC and**     **Equal Housing Lender**

 **Bank of America**

**Your checking account**

**SECURED MERCHANTS LLC**   |   Account # ███████████   |   **March 1, 2015 to March 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|-------:|
| 03/13/15 | Counter Credit | 120,000.00 |
| 03/27/15 | GATEWAYFEES   DES:CREDIT   ID:SECURED MERCHAN INDN:SECURED MERCHANTS, LLC  CO ID:███████  CCD | 670.89 |
| **Total deposits and other credits** | | **$120,670.89** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|-------:|
| 03/02/15 | IRS        DES:USATAXPYMT ID:2███████████ INDN:SECURED MERCHANTS LLC   CO ID:███████  CCD | -671.28 |
| 03/02/15 | EMPLOYMENT DEVEL DES:EDD EFTPMT ID███████ INDN:SECURED MERCHANTS LLC   CO ID:███████  CCD | -122.45 |
| 03/12/15 | TRANSFER SECURED MERCHANTS LL:Robert Stayner Confirmation# ██████████ | -1,250.00 |
| 03/12/15 | INTUIT PAYROLL S DES:QUICKBOOKS ID:XXXXXXXXX INDN:SECURED MERCHANTS LLC   CO ID:1███████  CCD | -1,556.82 |
| 03/16/15 | IRS        DES:USATAXPYMT ID███████████ INDN:SECURED MERCHANTS LLC   CO ID:███████  CCD | -671.28 |
| 03/16/15 | EMPLOYMENT DEVEL DES:EDD EFTPMT ID:███████ INDN:SECURED MERCHANTS LLC   CO ID:███████  CCD | -122.45 |

**Card account # XXXX XXXX XXXX 1287**

| Date | Description | Amount |
|------|-------------|-------:|
| 03/03/15 | CHECKCARD ███2 RECEPTIONHQ 866-883-3499 AZ ██████████████ CKCD 7394 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -19.95 |
| 03/03/15 | CHECKCARD  0███ J2 *METROFAX 888-929-4141 CA ████████████ RECURRING CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -39.75 |
| 03/04/15 | CHECKCARD  0███3 GOOGLE *SVCSAPPS_SECUR CC@GOOGLE.COMCA █████████████████CKCD 7311 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -87.65 |
| 03/06/15 | CHECKCARD  0███ J2 *METROFAX 888-929-4141 CA 2████████████ CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -2.84 |
| 03/11/15 | CHECKCARD  0███ SQ *TEL AVIV GRILL  CA 2██████████████ CKCD 5812 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -48.78 |
| 03/12/15 | CHECKCARD  0███ RECEPTIONHQ 866-883-3499 AZ 2████████████ CKCD 7394 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |

*continued on the next page*



# Get easy access to business know-how

Visit our free online community at **bankofamerica.com/sbc**.

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9  |  AD-11-14-0062.B

**Att. Z**

SECURED MERCHANTS LLC   |   Account #⬛⬛⬛⬛   |   March 1, 2015 to March 31, 2015

## Withdrawals and other debits - continued

| Date | Description | Amount |
|---|---|---|
| 03/12/15 | CHECKCARD ⬛ 1 SMARTSHEET 425-283-1870 WA ⬛⬛⬛⬛ CKCD 5734 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -7.10 |
| 03/13/15 | CHECKCARD ⬛ IN *DAVIDIAN & ASSOCIAT 818-2427800 CA 2 ⬛⬛⬛⬛ CKCD 8931 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/16/15 | CHECKCARD 0⬛ J2 *METROFAX 888-929-4141 CA 2 ⬛⬛⬛⬛ RECURRING CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -74.39 |
| 03/16/15 | CHECKCARD 0⬛ J2 *METROFAX 888-929-4141 CA 2 ⬛⬛⬛⬛ RECURRING CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -7.95 |
| 03/18/15 | CHECKCARD 0⬛ HOME TECH SECURITY VAN NUYS    CA 2 ⬛⬛⬛⬛ CKCD 8999 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -35.00 |
| 03/18/15 | CHECKCARD 0⬛ RECEPTIONHQ 866-883-3499 AZ 2 ⬛⬛⬛⬛ 0 CKCD 7394 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/23/15 | CHECKCARD ⬛ WWW.LOGMEIN.COM 888-326-2642 MA ⬛⬛⬛⬛ 9245 CKCD 4816 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -23.99 |
| 03/23/15 | CHECKCARD ⬛ SMARTSHEET 425-283-1870 WA 2 ⬛⬛⬛⬛ RECURRING CKCD 5734 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/23/15 | CHECKCARD ⬛ INTUIT *QB ONLINE 800-286-6800 CA ⬛⬛⬛⬛ RECURRING CKCD 5734 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -30.99 |
| 03/25/15 | CHECKCARD ⬛ *METROFAX 888-929-4141 CA ⬛⬛⬛⬛ CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -5.64 |
| **Subtotal for card account # XXXX XXXX XXXX 1287** | | **-$584.03** |
| **Total withdrawals and other debits** | | **-$4,978.31** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|---|---|---|---|---|---|---|
| 03/03/15 | 18556 | -2,500.00 | | 03/23/15 | 18559 | -1,092.00 |
| 03/06/15 | 18557 | -680.00 | | 03/13/15 | 18560 | -400.00 |
| 03/11/15 | 18558 | -200.00 | | 03/19/15 | 18561 | -120,000.00 |
| | | | | **Total checks** | | **-$124,872.00** |
| | | | | **Total # of checks** | | **6** |

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 02/27/15:

At least one of the following occurred



✔ $250+ in net new purchases on a linked Business debit card

○ $250+ in net new purchases on a linked Business credit card

✔ $3,000+ minimum daily balance in primary checking account

✔ $5,000+ average monthly balance in primary checking account

○ $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

*continued on the next page*

**Att. Z**



**Your checking account**

**SECURED MERCHANTS LLC**   |   **Account #** ▓▓▓▓▓▓   |   **March 1, 2015 to March 31, 2015**

## Service fees - continued

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 03/06/15 | ONLINE BUSINESS SUITE ACCT MGMT SERVICES | -15.00 |
| 03/13/15 | ONLINE BUSINESS SUITE NEXT DAY PAYMENT | -10.00 |
| **Total service fees** | | **-$25.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 03/01 | 10,841.83 | 03/11 | 6,454.13 | 03/19 | 2,169.14 |
| 03/02 | 10,048.10 | 03/12 | 3,590.21 | 03/23 | 972.16 |
| 03/03 | 7,488.40 | 03/13 | 123,130.21 | 03/25 | 966.52 |
| 03/04 | 7,400.75 | 03/16 | 122,254.14 | 03/27 | 1,637.41 |
| 03/06 | 6,702.91 | 03/18 | 122,169.14 | | |

✓ To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.

**Att. Z**

SECURED MERCHANTS LLC   |   Account #  ███████████   |   March 1, 2015 to March 31, 2015

This page intentionally left blank

**Att. Z**

**Bank of America**

---

SECURED MERCHANTS LLC   |   Account #          |   March 1, 2015 to March 31, 2015

## Check images

**Account number: 3250 1501 0922**

Check number: 18556   |   Amount:  $2,500.00



Check number: 18557   |   Amount:  $680.00





Check number: 18561   |   Amount:  $120,000.00



This page intentionally left blank

# Chargeback Rebuttal Program

| Sales and Service Agreement | Client ID: SBM Management Inc. |
|---|---|
| CHARGEBACKWIN.NET<br>4795 SOUTH SANDHILL ROAD<br>LAS VEGAS, NEVADA 89121<br>www.chargebackwin.net | **Product Information**:<br><br>PROGRAM BEING CONTRACTED FOR:<br>**Chargeback Rebuttal Service**<br>TOTAL COST: **10% of value of the dispute/inquiry. Due and Payable upon first win. "Win" as defined in body of contract.** |
| CUSTOMER SERVICE: **866-649-5559   MONDAY – FRIDAY 9AM - 6PM PST**<br>**702-446-2102 fax**<br>EMAIL INQUIRIES: **INFO@CHARGEBACKWIN.NET** | **Client Signature or Initials** |

| Client Information | Client Information: |
|---|---|
| CLIENT NAME: SBM Management Inc.<br>Mike Costache | BUSINESS ADDRESS:   SBM Management Inc.<br>655 N. Central Ave. Suite 1700<br>Glendale, CA 91203 |
| PREFERRED NUMBER:   **Tel. 310-753-9292** | |
| PREFERRED FAX: | EMAIL ADDRESS:<br>Stephan Bauer<br>accounting@sbmmgmt.com |

## CHARGEBACK REBUTTAL PROGRAM

Scope and Duties: Client retains and hires ChargeBackWin.net to provide dispute/inquiry rebuttal services. Specifically, ChargeBackWin.net will create and submit a rebuttal package for individual disputes/inquiries submitted by Client. Rebuttal packages may include depending on individual requirements for the specific dispute/inquiry: Rebuttal letter and supporting documents. ChargeBackWin.net will effectively follow up with the respective merchant services customer service department on the status of dispute/inquiry rebuttals submitted by ChargeBackWin.net. ChargeBackWin.net will provide a "master spreadsheet" to Client. The "master spreadsheet" will provide an accounting for all the disputes/inquiries Client has sent to ChargeBackWin.net for rebuttal services. The "master spreadsheet" will include tracking information and notations pertinent to the individual dispute/inquiry and will be updated and submitted to Client every Friday afternoon. ChargeBackWin.net is paid by Client the agreed upon percentage when the **initial** win decision has been rendered in the case of the specific dispute/inquiry. A "win" is defined by the disputed amount being reversed back to the Clients account or reserve account by the credit card processing company or issuing bank. For example, Client has agreed to pay ChargeBackWin.net 10% per win. If the value of Clients' individual dispute/inquiry as represented on their dispute/inquiry paperwork were $1000.00, ChargeBackWin.net would be paid 10% or $100.00.

**Client Covenants**: At all times while in contract with ChargeBackWin.net, Client agrees to:

a. Immediately provide ChargeBackWin.net with complete copies of the individual dispute/inquiry for which Client would have ChargeBackWin.net provide rebuttal services.

b. Provide all supporting documentation that ChargeBackWin.net request from Client, within three business days of said request.

c. When applicable, provide ChargeBackWin.net with a user login to Client CRM in order for ChargeBackWin.net to collect the supporting documentation needed as quickly as possible.

d. Client should be aware that dispute/inquiry cases that are more than 15 days past their original due date will likely be lost as they are outside most acceptable time frames for consideration and reversal. ChargeBackWin.net will not accept these types of disputes/inquiries.

e. Client should be aware that providing requested supporting documentation in a tardy manner, to where the dispute/inquiry is now 15 days past the original due date will likely cause the dispute/inquiry to be lost because the rebuttal will be outside of most acceptable time frames for consideration and reversal. ChargeBackWin.net will not accept these types of disputes/inquiries.

Client Signature or Initials

**Entire Agreement**: This Agreement contains the full and complete understanding and agreement between the parties with respect to the within subject matter, and supersedes all other agreements between the parties whether written or oral relating thereto and may not be modified or amended except by a written instrument executed by both of the parties hereto.

| **Chargeback Rebuttal Services** | Internal Use Only | Billing Information |
|---|---|---|
| Client to pay 10% on win, per dispute/inquiry.<br>Client will be invoiced in $100.00 increments.<br>Payment due within 3 days of receipt.<br>We accept visa, mastercard, american express, paypal and debit card. | CRS<br>325248 | Invoice Will Be Sent To:<br>Stephan Bauer<br>accounting@sbmmgmt.com |

I understand and agree to the terms of the services I have ordered/purchased above. I acknowledge that all sales are FINAL and agree NOT to dispute these charges. I further agree that all legal disputes involving this contract, and/or goods and/or services provided hereunder shall be resolved by arbitration under the rules of the American Arbitration Association and that any such arbitration shall be convened in Clark County, Nevada or as otherwise agreed to between the parties. I hereby agree to waive my right to bring a court action of any kind or nature regarding this purchase/order and any issues arising out of it.

Printed Name: _____   Signature: _____   Date: ____ _____

A signed and faxed copy OR an electronically signed version of this document is hereby agreed to be accepted as a binding original.

Att. AA



**Your checking account**

CHARGEBACK ARMOR, INC  |  Account _____  |  **March 1, 2015 to March 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 03/17/15 | WFB DIRECTPAY   DES:DEPOSIT   ID:DPXXXXXXXX INDN:CHARGEBACK ARMOR INC   CO ID:BIZEDP    CCD PMT INFO:SECURED MERCHANTS LLC ACCOUNTS | 100,000.00 |
| 03/19/15 | BKOFAMERICA ATM 03/19 #000001192 DEPOSIT BALBOA-PARTHENIA   NORTHRIDGE   CA | 150,000.00 |
| 03/20/15 | CHECK ORDER FEE REFUND | 74.00 |
| 03/31/15 | CHECKCARD  0328 JETBLUE _____   BELLEVUE    WA 7 | 946.20 |
| **Total deposits and other credits** | | **$251,020.20** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 03/18/15 | AMERICAN EXPRESS DES:ACH Pmt _____ INDN:CHARGEBACK ARMOR    CO ID:1_____ WEB | -300.00 |
| 03/23/15 | AMERICAN EXPRESS DES:ACH Pmt _____ INDN:CHARGEBACK ARMOR    CO ID_____ WEB | -2,647.37 |

**Card account # XXXX XXXX XXXX 2957**

| Date | Description | Amount |
|------|-------------|--------|
| 03/25/15 | CHECKCARD ____ JOS A BANK #830 LOS ANGELES  CA 2_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -65.07 |
| 03/26/15 | CHECKCARD ____ FEDEXOFFICE   00025015 WOODLAND HILLCA 2_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.49 |
| 03/27/15 | CHECKCARD ____ IN-N-OUT BURGER #265 SIGNAL HILL  CA_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.51 |
| 03/27/15 | CHECKCARD ____ SQ *TEL AVIV GRILL Los Angeles  CA_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -30.36 |
| 03/30/15 | CHECKCARD ____ EXPEDIA*_____ EXPEDIA.COM  NV_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -161.73 |
| 03/30/15 | CHECKCARD ____ UNITED _____ 800-932-2732 TX_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -426.20 |
| 03/30/15 | CHECKCARD ____ JETBLUE _____ BELLEVUE    WA_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -946.20 |
| 03/30/15 | CHECKCARD  0329 EXPEDIA*_____ EXPEDIA.COM  NV_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -373.54 |
| 03/31/15 | CHECKCARD  0330 EXPEDIA_____ EXPEDIA.COM  NV_____ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.00 |

*continued on the next page*



# Get easy access to business know-how

Visit our free online community at **bankofamerica.com/sbc**.

### The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

**Att. BB**

# Gold Business Services Package

Account number: ███████241   ■ March 1, 2015 - March 31, 2015   ■ Page 1 of 4



SECURED MERCHANTS LLC
5023 PARKWAY CALABASAS
CALABASAS CA 91302-1421

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

The plans you establish today will shape your business far into the future. The heart of the planning process is your business plan. Take the time now to build a strong foundation. Find out more at wellsfargoworks.com/start/business-planning

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☑ |
| Online Statements | ☑ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☑ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 3/1 | $2,597.86 |
| Deposits/Credits | 130,000.00 |
| Withdrawals/Debits | - 130,024.00 |
| **Ending balance on 3/31** | **$2,573.86** |
| Average ledger balance this period | $18,074.31 |

Account number: **1062015241**

**SECURED MERCHANTS LLC**

*California account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

Account number: ███ 241  ■  March 1, 2015 - March 31, 2015  ■  Page 2 of 4



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|---------------------|----------------------|
| 3/9 | | Direct Pay Monthly Base | | 10.00 | 2,587.86 |
| 3/13 | | Deposit Made In A Branch/Store | 130,000.00 | | 132,587.86 |
| 3/16 | | WF Direct Pay-Payment- Tran ID Dp059880130 | | 100,000.00 | 32,587.86 |
| 3/19 | 5022 | Check | | 30,000.00 | 2,587.86 |
| 3/31 | | Monthly Service Fee | | 14.00 | 2,573.86 |
| **Ending balance on 3/31** | | | | | **2,573.86** |
| **Totals** | | | **$130,000.00** | **$130,024.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of checks written   *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount |
|--------|------|--------|
| 5022 | 3/19 | 30,000.00 |

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 03/01/2015 - 03/31/2015 | | Standard monthly service fee $14.00 | You paid $14.00 |
|---|---|---|---|
| **How to avoid the monthly service fee**  *(complete 1 AND 2)* | | Minimum required | This fee period |
| 1) Have any **ONE** of the following account requirements | | | |
| · Average ledger balance | | $7,500.00 | $18,074.00  ☑ |
| · Qualifying transaction from a linked Wells Fargo Business Payroll Services account | | 1 | 0  ☐ |
| · Qualifying transaction from a linked Wells Fargo Merchant Services account | | 1 | 0  ☐ |
| · Total automatic transfers to an eligible Wells Fargo business savings account | | $150.00 | $0.00  ☐ |
| · Linked Direct Pay Service through Wells Fargo Business Online | | 1 | 1  ☑ |
| · Combined balances in linked accounts, which may include | | $10,000.00 | ☑ |
|   - Average ledger balances in business checking, savings, and time accounts | | | |
|   - Most recent statement balance of business credit card, Wells Fargo Secured Credit Card, BusinessLine® line of credit, Secured BusinessLine® line of credit, Wells Fargo Express Equity® line of credit, and Wells Fargo BusinessLoan® term loan | | | |
|   - Combined average daily balances from the previous month for Business PrimeLoan℠, Wells Fargo Express Equity® loan, Wells Fargo Express Refi® loan, Wells Fargo Purchase Advantage℠ loan, Wells Fargo Small Business Advantage® line of credit, Equipment Express® loan, and Equipment Express® Single Even t loan | | | |
| 2) Complete the package requirements | | | |
| · Have qualifying linked accounts or services in separate categories* | | 3 | ☐ |

*Includes Wells Fargo business accounts and services such as debit card, savings accounts, active Online Banking, credit card, loans and lines of credit.

C2/C2

Account number: ▮▮▮▮▮**241**  ■  March 1, 2015 - March 31, 2015  ■  Page 3 of 4



## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|---|---|---|---|---|---|
| Transactions | 4 | 200 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

 IMPORTANT ACCOUNT INFORMATION

Effective May 1st, 2015, the total amount of automatic transfers each statement cycle from this account to a Wells Fargo Business Market Rate Savings account required to waive this account's monthly service fee is changing from $150 to $25. You can find additional details about how to qualify for a waiver of the monthly service fee in the "Monthly service fee summary" section of your statement.

If you have questions about this change, or would like a complimentary financial review to ensure that you have the right accounts to meet your financial goals, please contact your local banker or call the phone number listed at the top of your statement.

Account number: ▮▮▮▮▮▮▮   ■ March 1, 2015 - March 31, 2015   ■ Page 4 of 4



---

### General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

---

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.

2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

3. Use the chart to the right to list any deposits, transfers into your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance
shown on your statement . . . . . . . . . . . . . . . . . . . . . $ _____

**ADD**

**B.** Any deposits listed in your        $ _____
register or transfers into        $ _____
your account which are not        $ _____
shown on your statement.        + $ _____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ _____

**SUBTRACT**

**C.** The total outstanding checks and
withdrawals from the chart above . . . . . . . . . . . . - $ _____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same
as the current balance shown in
your check register . . . . . . . . . . . . . . . . . . . . . . . $ . _____

| Number | Items Outstanding | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **Total amount  $** |  |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

💻 bankofamerica.com

✉️ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CHARGEBACK ARMOR, INC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

# Your Business Fundamentals Checking

for March 1, 2015 to March 31, 2015                          Account number: 3250 3040 0818

**CHARGEBACK ARMOR, INC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2015 | $200.00 | # of deposits/credits: 4 |
| Deposits and other credits | 251,020.20 | # of withdrawals/debits: 18 |
| Withdrawals and other debits | -6,023.63 | # of items-previous cycle¹: 0 |
| Checks | -24,000.00 | # of days in cycle: 31 |
| Service fees | -74.00 | Average ledger balance: $103,754.01 |
| **Ending balance on March 31, 2015** | **$221,122.57** | ¹Includes checks paid,deposited items&other debits |



Retirement could last longer than you might think

For 5 strategies to help you avoid outliving your savings, visit **merrilledge.com/5-strategies**

MERRILL EDGE
Bank of America Corporation

Merrill Edge® is available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), and consists of the Merrill Edge Advisory Center™ (investment guidance) and self-directed online investing. MLPF&S is a registered broker-dealer, member SIPC and a wholly owned subsidiary of Bank of America Corporation. Merrill Lynch, Merrill Edge, the Merrill Edge logo, and Merrill Edge Advisory Center are trademarks of Bank of America Corporation. ARJB3CX9

Investment products: | **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value** |

CHARGEBACK ARMOR, INC   |   Account #_____   |   March 1, 2015 to March 31, 2015

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**Updating your contact information** - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time.  These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals.  Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly.  You are in the best position to discover errors and unauthorized transactions on your account.  If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.  You may also review your activity online or visit a banking center for information.

© 2015 Bank of America Corporation

**Bank of America, N.A. Member FDIC and**  **Equal Housing Lender**



**Your checking account**

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 03/17/15 | WFB DIRECTPAY   DES:DEPOSIT   ID:DPXXXXXXXX INDN:CHARGEBACK ARMOR INC   CO ID:BIZEDP   CCD PMT INFO:SECURED MERCHANTS LLC ACCOUNTS | 100,000.00 |
| 03/19/15 | BKOFAMERICA ATM 03/19 #000001192 DEPOSIT BALBOA-PARTHENIA   NORTHRIDGE   CA | 150,000.00 |
| 03/20/15 | CHECK ORDER FEE REFUND | 74.00 |
| 03/31/15 | CHECKCARD ▮ JETBLUE ▮ BELLEVUE   WA ▮ | 946.20 |

**Total deposits and other credits** **$251,020.20**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 03/18/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3892 INDN:CHARGEBACK ARMOR   CO ID▮ WEB | -300.00 |
| 03/23/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3754 INDN:CHARGEBACK ARMOR   CO ID▮ WEB | -2,647.37 |

Card account # XXXX XXXX XXXX 2957

| Date | Description | Amount |
|------|-------------|--------|
| 03/25/15 | CHECKCARD ▮ JOS A BANK #830 LOS ANGELES  CA ▮ CKCD 1 XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -65.07 |
| 03/26/15 | CHECKCARD ▮ FEDEXOFFICE ▮ WOODLAND HILL.CA ▮ CKCD ▮ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.49 |
| 03/27/15 | CHECKCARD ▮ IN-N-OUT BURGER #265 SIGNAL HILL  CA 2▮ CKCD ▮ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.51 |
| 03/27/15 | CHECKCARD ▮ SQ *TEL AVIV GRILL Los Angeles  CA ▮ CKCD XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -30.36 |
| 03/30/15 | CHECKCARD ▮ EXPEDIA* ▮ EXPEDIA.COM NV ▮ CKCD ▮ XXXX XXXX XXXX 2957 | -161.73 |
| 03/30/15 | CHECKCARD ▮ UNITED ▮ 800-932-2732 TX▮ CKCD ▮ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -426.20 |
| 03/30/15 | CHECKCARD ▮ JETBLUE ▮ BELLEVUE   WA ▮ CKCD ▮ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -946.20 |
| 03/30/15 | CHECKCARD ▮ EXPEDIA* ▮ EXPEDIA.COM N▮ CKCD 4722 XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -373.54 |
| 03/31/15 | CHECKCARD ▮ EXPEDIA ▮ EXPEDIA.COM NV ▮ CKCD ▮ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.00 |

continued on the next page

# Get easy access to business know-how

 Visit our free online community at **bankofamerica.com/sbc**.

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

CHARGEBACK ARMOR, INC   |   Account #  ███████████   |   March 1, 2015 to March 31, 2015

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 03/31/15 | CHECKCARD ███ AMERICAN AI███████ BELLEVUE  WA ████████████ | -633.20 |
| | CKCD ████ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | |
| 03/31/15 | CHECKCARD ████ LA SOSTA GASTRONOMIA MANHATTAN BEACA | -151.00 |
| | ███████████████ CKCD ████ XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | |
| 03/31/15 | CHECKCARD████ EXPEDIA*1██████ EXPEDIA.COM  NV ████████████ | -242.96 |
| | CKCD ███ XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | |
| **Subtotal for card account # XXXX XXXX XXXX 2957** | | **-$3,076.26** |
| **Total withdrawals and other debits** | | **-$6,023.63** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| 03/19/15 | 5010 | -3,000.00 | | 03/24/15 | 5012 | -20,000.00 |
| 03/24/15 | 5011 | -1,000.00 | | | | |
| | | | | **Total checks** | | **-$24,000.00** |
| | | | | **Total # of checks** | | **3** |

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 02/27/15:

At least one of the following occurred

○  $250+ in net new purchases on a linked Business debit card

○  $250+ in net new purchases on a linked Business credit card

○  $3,000+ minimum daily balance in primary checking account

○  $5,000+ average monthly balance in primary checking account

○  $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

| Date | Transaction description | | Amount |
|------|-------------------------|---|--------|
| 03/19/15 | CHECK ORDER00318 DES:FEE       ID: | | -74.00 |
| | PMT INFO: PRODUCT(S): 55.36      S&H: 12.53     CA TAX: 6.11 | | |
| **Total service fees** | | | **-$74.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 03/01 | 200.00 | 03/20 | 246,900.00 | 03/26 | 223,168.07 |
| 03/17 | 100,200.00 | 03/23 | 244,252.63 | 03/27 | 223,118.20 |
| 03/18 | 99,900.00 | 03/24 | 223,252.63 | 03/30 | 221,210.53 |
| 03/19 | 246,826.00 | 03/25 | 223,187.56 | 03/31 | 221,122.57 |



**Your checking account**

**CHARGEBACK ARMOR, INC   |   Account #** ▮▮▮▮▮▮▮▮▮   **|   March 1, 2015 to March 31, 2015**

To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.

This page intentionally left blank

**Tepfer, Reid A.**

| | |
|---|---|
| **From:** | sp1085@gmail.com on behalf of Sagar Parikh <sp@beverlyhillslawcorp.com> |
| **Sent:** | Wednesday, July 01, 2015 12:53 PM |
| **To:** | Tepfer, Reid A. |
| **Cc:** | Gallegos, Luis |
| **Subject:** | Re: Re Unfreezing Chargeback Armor's Accounts |

With regards to the $250,000 that Secured Merchants provided as working capital, please understand that technology startups are a different kind of a game. Founders can't always estimate how much capital they need so instead of spending months haggling over what percentage ownership or what type of loan terms to offer, people use trust in humanity and they move forward to see how the marketplace embraces (or not) a specific technology. We have provided to you the only contractual agreements between Secured Merchants and Chargeback Armor. I really don't think this is the place or the time to ponder on the valuation of Chargeback Armor. That is a business decision that my clients gave themselves four months to come up with as stated in the agreement we provided you.

This $250,000 did not come from any source related to anyone named in your lawsuit. Secured Merchants has numerous clients and what a legal entity does with its profits is only up to the owner of that business.

Thank you for your understanding. Please let me know if you have further questions. We provided all these answers 7-8 days ago to Charlene. It is imperative that you unfreeze my client's bank account so he can remove Doron as a co-signer and move on with his life.

Please advise when that will happen.


Sagar Parikh, Esq.

# BEVERLY HILLS LAW CORP., PC

433 N. CAMDEN DRIVE, 6TH FLOOR
BEVERLY HILLS, CA 90210
Tel |     (310) 887-1338
Fax |    (310) 982-2603
Email |  SP@BeverlyHillsLawCorp.com
Web |    www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.


On Wed, Jul 1, 2015 at 10:43 AM, Sagar Parikh <sp@beverlyhillslawcorp.com> wrote:
Yes, that is correct: Chargeback Armor has no contractual relationships with anyone else named in the lawsuit other than Trigen for 3 months as Roi Reuveni's specific expertise in chargeback management was useful for Mr. Costache as he was trying to figure out how to best position this brand and technology. He has no idea of any of these legal issues that Trigen or any of the other defendants were involved in.

Doron being a co-signer on Chargeback Armor's account was explained to Charlene and again: Mr. Costache travels a lot and since certain bills needed to be paid via check, he allowed Doron to be a co-signer for convenience purposes. He never paid or intended to pay for a few seconds of Doron's time to write such checks. Mr. Costache had a found an outsourcing bookkeeping company that he was planning to transition to for $500/month. He can show proof of communication with that company so you can see his intentions of having that accounting task done by a professional. As you may or may not know, with startups in the first 90-120 days there are a lot of decisions in regards to services, staffing, marketing, management, sales, ect.

My client has provided all his email communication with Roi and Doron and Alon and Alan to Charlene. I can provide to you as well, if you would like.

Att. EE

The only thing anyone can hold my client liable for is for choosing the wrong person to allow to sign pre-approved checks and for deciding to rent office space for the first 90 days of his startup in an office with others whom he had no knowledge of their possible wrongdoings which you are now investigating.

We can go on and on and explain forever all your concerns but in the meantime you are holding this business hostile and keeping families from getting paid. So please agree to a phone conversation with Mr. Costache and I and he will answer any and all of your questions just like he did with Charlene.

He is willing to sign a declaration you need just like he did with Charlene when she was nice enough to allow him to get his belongings and his company's fax server on Friday. But now he can't bill his clients for services rendered in the past two weeks.

So what time are you available today for a phone conversation? Feel free to record it or transcribe and my client will sign off on it. But please don't waste any more time as people's lives are at stack here. Find one illegal or even unethical thing that my client did and then you will have reason to hold his company hostage.

Sagar Parikh, Esq.

## BEVERLY HILLS LAW CORP., PC

**433 N. CAMDEN DRIVE, 6TH FLOOR**
**BEVERLY HILLS, CA 90210**
Tel |   (310) 887-1338
Fax |   (310) 982-2603
Email |   SP@BeverlyHillsLawCorp.com
Web |    www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE:: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.

On Wed, Jul 1, 2015 at 9:30 AM, Tepfer, Reid A. <rtepfer@ftc.gov> wrote:

Yes; thank you. I only meant that we do not wish to have questions answered by Mr. Costache over the phone at this time.

But just to clarify: is it your position that Chargeback Armor had no relation with any of the named Defendants in the BunZai Media Group matter aside from Trigen? Does this mean that Doron Nottea was not to be compensated for his accounting/bookkeeping services? Please also have your client explain the status of the $250k "loan" or "capital infusion." At this point, it remains unclear to us how that contractual relationship was intended to work.

Second, is it your position that Secured Merchants had no relation with any of the named Defendants in the BunZai Media Group matter? If Secured Merchants did have business relationships with any defendant, please give us documents sufficient to show the nature of that relationship and the payments made between the entities or individuals. From our conversation this morning, you had stated that Secured Merchants had previously had business relationships with some defendants in the FTC's action against BunZai Media Group.

2

**Att. EE**

**Tepfer, Reid A.**

| | |
|---|---|
| **From:** | sp1085@gmail.com on behalf of Sagar Parikh <sp@beverlyhillslawcorp.com> |
| **Sent:** | Wednesday, July 08, 2015 1:23 PM |
| **To:** | Tepfer, Reid A. |
| **Cc:** | Kelly Crawford; Gallegos, Luis; Charlene Koonce |
| **Subject:** | Re: Secured Merchants Documents |

Charlene,

Since you and Reid are unwilling to unfreeze the Chargeback account, can you please unfreeze $33,677 from the account?

That money is not tied to any of the Defendants.

Thank you


Sagar Parikh, Esq.

# BEVERLY HILLS LAW CORP., PC

**433 N. CAMDEN DRIVE, 6TH FLOOR**
**BEVERLY HILLS, CA 90210**
**Tel |** (310) 887-1338
**Fax |** (310) 982-2603
**Email |** SP@BeverlyHillsLawCorp.com
**Web |** www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.


On Wed, Jul 8, 2015 at 6:16 AM, Tepfer, Reid A. <rtepfer@ftc.gov> wrote:

Sagar,



The FTC will not agree to release these funds. The evidence you've provided establishes that the funds were derived from the illegal conduct described in the complaint and are controlled by the Defendants in the FTC's action.



Thank you,

Reid

**Att. FF**