**BEVERLY HILLS LAW CORP., PC**
Sagar Parikh, Esq. (SBN 282655)
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
Telephone:   (310) 887-1338
Facsimile:   (310) 982-2603
Email:       SP@BeverlyHillsLawCorp.com

Attorneys for Secured Merchants, LLC
and Chargeback Armor, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

               Plaintiff,

     vs.

BUNZAI MEDIA GROUP, INC., et al.,

          Defendants.

Case No. 2:15-cv-04527-GW (PLAx)

**CHARGEBACK ARMOR, INC.'S REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS**

**Hearing Date:  November 2, 2015
Time: 8:30 am
Location:  Courtroom 10 – Spring St.
Judge: Hon. George H. Wu**

    CHARGEBACK ARMOR, INC. ("CBA") hereby submits its Reply to the Oppositions filed by the FTC and the Receiver to its Motion.

- 1 -

The Court must not be persuaded by the FTC and the Receiver's baseless assertions that read like a conspiracy novel, as the evidence submitted by CBA points to the contrary.

As further discussed below, the Motion should be granted in its entirety and CBA's funds released in their entirety.

A. **The Receiver's Response**

First, to briefly address the Receiver's short response to the Motion, the argument that the CBA account is frozen because Doron Nottea is a co-signer must fail.  On September 17, the Court was not persuaded by that same argument with regards to Secured Merchants, LLC ("SM"), which also had Mr. Nottea as a co-signer, and the Court ordered 60% of SM's funds released, as 40% were deemed to have been derived from one of the Defendants, SBM Management, Inc.  The Court also allowed Mr. Argaman's computer to be released.

This was after the Receiver had already had an hour conference call with Michael Costache and CBA's counsel in or about June 2015 and subsequently agreed to released CBA's assets, a fax server at the office.  It follows that if the Receiver and/or FTC believed that CBA was involved in AuraVie sales, it would not have released this asset.

The Court should apply the exact same logic here that it applied with respect to SM, except all of CBA's funds should be released, as none of the funds belonging to CBA came from any of the Defendants, as further discussed below.

Next, CBA is not controlled by a Defendant, also discussed below.

Finally, unfortunately, Ms. Koonce has chosen to resort to personal attacks against Mr. Costache, the principal of CBA.  Mr. Costache was not even at the physical branch location during the conversation he had with the bank manager about unfreezing CBA's accounts.  Notably, Ms. Koonce was unable to obtain any sort of

- 2 -

declaration or statement from the bank manager or anybody at the bank stating that this event occurred.

B. **CBA is Not Dominated or Controlled By any Defendant**

The FTC, upon its request, was provided thousands of emails from CBA.  It has chosen to attach a handful of these to somehow prove that the Defendants own, control, and/or dominate CBA.  However, one only needs to look at the Declaration of Michael Costache, attached to the Motion, to disprove this.  As filed with the Secretary of State and attested to under penalty of perjury, Michael Costache is currently the only officer, shareholder, and director of CBA.

As explained in an email from CBA's counsel to the FTC, Alon Nottea, Alan Argaman, and Roi Reuven were listed as officers in CBA because as a start-up business, CBA's main goal was to obtain funding and raise capital.  These three individuals were advisors to Mr. Costache with regards to CBA and thus to make CBA appear more formidable with a real board and team behind it, these individuals were listed as officers on preliminary emails and business proposals before CBA even began operating.  However, at no time, did these individuals ever own any shares in CBA, actually become directors of CBA, or were added to the Board of CBA.  Mr. Roi Reuveni at one time was a consultant for CBA due to his technological expertise, pursuant to an agreement.   He was duly paid for services he provided, which were completely unrelated to AuraVie, as can be seen by the contract between the parties. Please see the Declaration of Michael Costache at ¶ 2-3.

Moreover, there is nothing illegal about taking advice from, having as employees, or having as consultants any of the Defendants.  To do so would be a draconian guilty by association blanket assertion that any business that was remotely associated with any of the Defendants would be illegal and could have its fund frozen and seized.  This is not the same or even close to the Defendants dominating or

- 3 -

1  controlling CBA.  As Mr. Costache attests under penalty of perjury, he was and is still
2  the sole and final decision maker with regards to CBA.

3        The FTC's interpretation of emails that were written between third-parties is
4  pure hearsay and speculation.  The best source of this information is Mr. Costache,
5  who again attests here under penalty of perjury that he is the sole officer, director, and
6  shareholder of CBA.  Costache Dec. at ¶ 1.

7        The "agreements" attached as purported evidence by the FTC are drafts of
8  documents that are not even executed or signed (such as Att. A.)  This document does
9  not constitute an agreement and is nothing more than a business plan/executive
10  summary.  It is not a legally binding document.

11        Remarkably, the FTC goes so far as to speculate that simply because Doron
12  Nottea was copied on emails involving CBA, he "exercised control over Chargeback
13  Armor."  No further explanation or reasoning is provided.  Such conjecture and
14  hearsay with no basis whatsoever cannot be relied upon as evidence.

15        Many other documents the FTC uses as evidence, such as Att. B, contain
16  financials that are not even related to CBA as they pre-date February 2015, when
17  CBA was formed.

18        Next, Mr. Igor Latsanovski was nothing more than a potential investor in CBA.
19  He was never involved in its operations and did not ever invest in it.  Thus, his
20  statement that Alon Nottea started CBA is not based upon personal knowledge and not
21  supported by the evidence, namely Mr. Costache's declaration and filings with the
22  Secretary of State.  Indeed, Alon Nottea has never received any monies from CBA as
23  he never had any formal involvement with CBA.  See Costache Dec. at ¶ 2.

24        All of the corporate governing documents of CBA have been turned over to
25  FTC, along with the litany of emails.  Among these documents, there are no
26  shareholders agreements, stock ledgers, meeting minutes, board resolutions, stock

27
28

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS

1  certificates, or any other formal corporate documents that state any of the Defendants
2  are directors or shareholders of CBA.

3    In summary, the FTC has provided zero legally binding documents that show
4  that the shareholders of CBA are anybody other than Michael Costache or that there
5  are currently (or ever were) any other officers or directors other than Mr. Costache.

6  **C. <u>Processing Chargebacks on Behalf of Merchants is Not Inherently Illegal</u>**

7    Another argument repeated throughout the Opposition is the fact that CBA
8  processed chargebacks on behalf of merchants, including for the sale of AuraVie.
9  Even assuming arguendo that this was true, **there is nothing illegal about this**.  CBA
10  would simply be a vendor providing a service that is completely legal, i.e. doing
11  chargebacks on behalf of merchants.  As the Motion states, there are numerous
12  companies that are worth hundreds of millions of dollars and in some cases billions of
13  dollars that do the exact same thing that CBA does.

14    Simply because CBA allegedly did this for the AuraVie sales does not make it
15  liable in this matter and does not subject its funds to a freeze.  If this guilty by
16  association argument were applied across the board, other vendors, such as those that
17  provided janitorial services to the suite where the AuraVie sales were made from, the
18  banks where the AuraVie sales were deposited, the telephone companies that provided
19  telephonic services for the operators and owners of the AuraVie skincare business,
20  and other vendors who provided services to AuraVie and received payment for these
21  services could be deemed to be part of the TRO here and have their assets frozen;
22  obviously, this has not occurred and cannot occur as it is illogical.

23    Notwithstanding all of that, the FTC and Receiver have not even shown that
24  CBA actually processed chargebacks for AuraVie sales.  The Receiver's Initial Report
25  (Document 120, p. 7, lines 13-15) states that AuraVie sales were "largely finished" by
26  early Spring 2015 and also states in the same document that CBA was not

27
28

incorporated until March 2015.  Indeed, CBA did not ever actually process chargebacks for AuraVie skincare sales.   See Costache Dec. at ¶ 4.

### D. Chargeback Armor Did Not Receive Any Funds From the Common Enterprise

In its Opposition, the FTC conveniently ignores the substantial evidence contained in the Motion and the Declaration of Alan Argaman clearly showing that the $250,000 SM gave to CBA came from three contracts SM had with entities that are wholly separate from any of the Defendants and unrelated to any of the Defendants.

The FTC did not do any tracing of funds here to prove that the $250,000 from SM into CBA came from illicit funds; it simply chose to make a connection that is not there.  The only determination made by the FTC's forensic investigator is that SM put a total of $250,000 into CBA.  However, this is plainly admitted and acknowledged by CBA.  The FTC plainly failed to address the three contracts that SM entered into that generated the $250,000 that went into CBA.   These funds were wholly unrelated to AuraVie or any of the Defendants.

As the bank statements of SM show (attached as EXHIBIT B to the Declaration of Alan Argaman), when the $250,000 was given to CBA by SM, in March 2015, SM would not have been able to capitally infuse the $250,000 from anything other than these three contracts with Wealth Vision, Inc., Wealth Group, Inc., and Big Ventures, Inc.  Indeed, these contracts were signed in January and February 2015.  Then SM took this total income of $250,000, and subsequently capitally infused that into CBA in March 2015.  The three contracts are attached to the Declaration of Alan Argaman as part of the Motion.

The FTC's Opposition does not contain any evidence showing that the actual monies that CBA were received from the sales of AuraVie.  The FTC has not, and cannot, show that CBA directly received any monies from AuraVie.

- 6 -

1    Thus, releasing the frozen funds to CBA would not lead to CBA being unjustly

2  enriched or benefitting in any way from the common enterprise here that allegedly

3  defrauded consumers.  The $250,000 CBA received, of which $133,075.19 is

4  remaining, are not tainted funds and were not ever commingled with any monies from

5  AuraVie.

6                                             **IV.**

7                                      **CONCLUSION**

8    For the aforementioned reasons, CBA's Bank of America account number 3250

9  3040 0818 should be unfrozen and all funds therein (including $133,075.19) should be

10  released as CBA is not controlled by Defendants Alon Nottea, Doron Nottea, Roi

11  Reuveni, and Alan Argaman, CBA did not receive monies from the common

12  enterprise, and CBA's business of fighting chargebacks on behalf of merchants is a

13  legal, legitimate business and thus CBA was entitled to act as a vendor.

14    Despite the FTC's extraordinary and bold (but ultimately unsupported) claims

15  that CBA assisted in "bilking consumers for millions of dollars", CBA had no direct

16  involvement in the sale of AuraVie or the use of negative options, or any other direct

17  involvement alleged in the Complaint and the FTC's Opposition fails to make any

18  such connection.

19

20  DATED:  October 19, 2015                 **BEVERLY HILLS LAW CORP., PC**

21

22                                          By:   /s/ Sagar Parikh
23                                             Sagar Parikh, Esq.
                                             *Attorneys for,*
24                                             Chargeback Armor, Inc. and Secured
                                             Merchants, LLC
25

26

27

28

- 7 -

## <u>DECLARATION OF MICHAEL COSTACHE</u>

I, Michael Costache declare:

I have personal knowledge of the following facts and, if called upon to testify, I could and would so competently and truthfully testify to these facts:

1. I am the founder, and sole director, officer, and shareholder of Chargeback Armor, Inc. ("CBA"), a California corporation.

2. I have always been the only shareholder, director, and officer of CBA. Other various individuals, including Doron Nottea, Alon Nottea, Roi Reuveni, and Alan Argaman were listed as officers before CBA officially began operating because I was preparing business plans/executive summaries in order to obtain funding and thus had to list a full board and list of officers to attract investors. Thus, while I had discussions with the aforementioned parties about being officers and directors, ultimately, I remained the only officer. Doron Nottea, Alon Nottea, and Alan Argaman received no monies from CBA and did not have and currently do not have any decision making authority. I sought their advice occasionally, but ultimately I was the sole and final decision-maker.

3. Roi Reuveni has a background in technological services and was thus hired as a temporary consultant for CBA and paid for his work as a consultant. The

- 8 -

advice and services he provided were completely unrelated to AuraVie or any other conduct alleged in the Complaint.  A true and correct copy of the consulting agreement between Mr. Reuveni and CBA is attached hereto as EXHIBIT A.   Roi Reuveni, other than being a consultant, was also never a decision-maker with regards to CBA.

4.  CBA has never received monies from the sale of AuraVie.  CBA has never done chargebacks on behalf of CBA, as it was not incorporated until February 18, 2015.

5.  Any chargebacks done on behalf of AuraVie were done not by CBA, but by SM.

6.  CBA has received $250,000 in funding, by and through three clients of SM and thus did not receive any monies from the common enterprise.   This is evidenced by the contracts attached to the Declaration of Alan Argaman attached to the Motion.   Attached hereto as EXHIBIT B is a true and correct copy of CBA's bank statement from March 2015 after the money from SM was deposited.

7.  At the time the new CBA account was frozen, I only dealt with the manager of Bank of America via telephone once.  Thus, at no time was I even at the branch,

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS

let alone threatened with the police being called because of my behavior at the branch.  Such allegations made by the Receiver are patently false.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: October 19, 2015          By:     *Michael Costache*

                                    Michael Costache

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT A</u>**

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS

# CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (hereinafter referred to as the "Agreement") is made and entered into as of March 1, 2015 by and among Chargeback Armor, Inc., (hereinafter referred to as the "CBA") with offices at 5023 North Parkway Calabasas, Calabasas, CA 91302 and Trigen, LLC, a California limited liability company (hereinafter referred to as the "Consultant") whose Managing Member is Roi Reuveni, residing at 5525 Canoga Ave, Apt 105. Woodland Hills, CA 91367.

## WITNESSETH:

**WHEREAS,** Consultant has specific knowledge about chargebacks; and

**WHEREAS,** CBA desires to retain Consultant to provide consulting services related to and in support of efforts in which Consultant has expertise; and

**WHEREAS,** Consultant is in the business of providing such consulting services and has agreed to provide the services in

**NOW, THEREFORE,** in consideration of this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Consultant shall furnish CBA with his best advice, information, judgment and knowledge with respect to the services related to and in support of efforts in which Consultant has expertise, which is to be provided in accordance with this Agreement.

2. The term of this Agreement shall begin on March 1, 2015 and shall, subject to the provisions for termination set forth herein, continue on a month-to-moth basis and terminate upon a 5-day written notice by either party (email sufficing).

3. Compensation: $3,000 payable on the 15th and $3,000 payable on the last day of each month. The $3,000 is for consulting work provided to CBA for the two weeks prior to payment. First payment shall be due on March 15, 2015.

4. CBA shall be responsible for all of Consultant's pre-approved of pocket expenses, during travel to industry tradeshow, and other reasonable entertainment with potential clients or referral partners.

5. Except as required in the performance of his obligations under this Agreement or with CBA's prior written authorization, Consultant (including for purposes hereof, his employees, agents, representatives, consultants and contractors) shall not directly or indirectly use, disclose, disseminate or otherwise reveal any confidential information, including but not limited to information regarding CBA's personnel, and shall maintain confidential information in confidence perpetually.

6. Upon termination or expiration of this Agreement for any reason whatsoever, Consultant shall return to CBA all documents, records, notebooks, computer files, and similar repositories or materials containing confidential information of CBA's business model.

7. All original works of authorship resulting from Consultant's performance of his duties hereunder are deemed to be "works made for hire" under the copyright laws of the United States, and will be and will remain the sole and exclusive property of CBA. Consultant, at CBA's request and sole expense, will assign to CBA in perpetuity all proprietary rights that he may have in such works of authorship. Such assignment shall be done by documents as prepared by CBA. Should CBA elect to register claims of copyright to any such works of authorship, Consultant will, at the expense of CBA, do such things, sign such documents and provide such reasonable cooperation as is necessary for CBA to register such claims, and obtain, protect, defend and enforce such proprietary rights. Consultant shall have no right to use any trademarks or proprietary marks of CBA without the express, prior written consent of CBA regarding each use, except as otherwise set forth herein.

8. In the event of a breach hereunder and a failure to cure such breach within 15 days of written notice of such breach, this Agreement may be terminated by the non-breaching party upon written notice.

9. The provisions of this Agreement are severable, and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions, and any partially enforceable provision to the extent enforceable in any jurisdiction, shall nevertheless be binding and enforceable.

10. The rights and obligations of CBA under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of CBA. The rights, obligations and duties of Consultant hereunder may not be assigned or delegated without CBA's prior written consent.

11. Consultant acknowledges and agrees that his engagement hereunder is exclusive and that he may not provide similar services to competitors of CBA. Consultant shall represent herself as a legal agent, representative of CBA, but not as a partner or employee of the CBA. Consultant shall not have the right or authority to contract in the name of CBA nor shall he assume or create any obligations, debts, accounts or liabilities for CBA.

12. The Consultant represents and warrants to CBA that he is under no contractual or other restrictions or obligations which are inconsistent with the execution of this Agreement, or which will interfere with the performance of his duties or provision of services hereunder. Consultant represents and warrants that the execution and performance of this Agreement will not violate any policies or procedures of any other person or entity for which he performs services concurrently with those performed herein.

13. In performing the services, Consultant shall comply, to the best of his knowledge, with all business conduct, regulatory and health and safety guidelines established by CBA for any governmental authority with respect to CBA's business.

14. Pursuant to this Agreement, Consultant shall have no right to receive any Client employee benefits including, but not limited to, health and accident insurance, life insurance, sick leave and/or vacation.

15. The Consultant acknowledges and agrees that he shall be solely responsible to pay any and all incomes taxes on any moneys earned from CBA while performing services contemplated under this Agreement. The Consultant further acknowledges that CBA will not at any time withhold any taxes from CBA's payments to the Consultant under this Agreement for the purposes of income tax or any other applicable taxes.

16. Any notices or other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and delivered when delivered in person, two (2) days after being mailed postage prepaid by certified or registered mail with return receipt requested, or when delivered by overnight delivery service or by facsimile to the recipient at the following address or facsimile number, or to such other address or facsimile number as to which the other party subsequently shall have been notified in writing by such recipient:

> If to CBA:
> Chargeback Armor, Inc.
> 5023 North Parkway Calabasas
> Calabasas, CA 91302
>
> If to the Consultant:
> Roi Reuveni
> 5525 Canoga Ave, Apt 105
> Woodland Hills, CA 91367

17. Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions as to prior or future violations thereof or of any other provision of this Agreement, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted the parties herein are cumulative and the waiver by a party of any single remedy shall not constitute a waiver of such party's right to assert all other legal remedies available to him or it under the circumstances.

18. This Agreement will be governed by and interpreted in accordance with the substantive laws of the State of California without reference to conflicts of law.

19. In the event of any disputes, controversies, or claims between the CBA and the Consultant relating to or arising out of any of the terms of this Agreement, CBA and the Consultant agree that they shall engage in the following three-stage dispute resolution procedure and will not institute or file any legal action or proceeding. The costs of all mediation and arbitration proceedings between the CBA and the Consultant, if required pursuant to this three-stage resolution dispute procedure, shall be divided equally between the CBA and the Consultant, regardless of the results of such proceedings, or any allocation of fault or damages.

**Provision 1 – Direct Negotiation**

Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall first be resolved through good faith direct negotiation by CBA and Consultant for 30 days to find conciliatory resolution to the dispute, controversy or claim. If direct negotiations fail to reach a conciliatory resolution, then the CBA and Consultant agree to enter into nonbinding mediation as described in Provision 2.

**Provision 2 – Nonbinding Mediation**

CBA and Consultant agree that any dispute, controversy or claim arising out of or relating to this Agreement shall be submitted to nonbinding mediation unless CBA and Consultant mutually agree otherwise. The selected mediation service will be agreed upon by CBA and Consultant and the selected mediation service's rules and procedures will be followed. CBA and Consultant agree to negotiate in good faith during the mediation process to reach a settlement to the dispute, controversy or claim. If CBA and Consultant fail to reach a settlement during nonbinding mediation, then CBA and Consultant agree to enter into binding arbitration as described in Provision 3.

**Provision 3 – Binding Arbitration**

CBA and Consultant agree that any dispute, controversy or claim arising out of or relating to this Agreement that cannot be resolved or settled in accordance with Provisions 1 and 2 of this article shall be submitted to binding arbitration conducted in accordance with the Construction Industry Rules of the American Arbitration Association to the extent the dispute may relate to construction/remediation. Any other dispute, controversy or claim will be submitted to binding arbitration conducted in accordance with the American Arbitration Association rules (the "Rules"). Arbitration shall be held in "*City, State*", before a panel of at least one (1) arbitrator. Judgment upon the award rendered by the panel of arbitrators may be entered in any court having jurisdiction thereof or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be.

20. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

21. The terms of this Agreement are confidential and no press release or other written or oral disclosure of any nature regarding the terms of this Agreement shall be made by either party

without the other party's prior written approval; however, approval for such disclosure shall be deemed given to the extent such disclosure is required to comply with governmental rules or a valid court order.

22. With respect to its subject matter, this Agreement constitutes the entire understanding of the parties superseding all prior agreements, understandings, negotiations and discussions between them whether written or oral, and there are no other understandings, representations, warranties or commitments with respect thereto.

23. No modification to this Agreement, nor any waiver of any rights, will be effective unless assented to in writing by the party to be charged.

24. The person(s) executing this agreement hereby represent and warrant that each respectively has the authority to execute this agreement on behalf of the party for which he is executing.

**IN WITNESS WHEREOF,** the parties have executed this Agreement effective as of the date first written above.

_____

Roi Reuveni, Consultant

_____

Mike Costache, CEO, Chargeback Armor, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT B</u>**

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

✉ bankofamerica.com

✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CHARGEBACK ARMOR, INC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

## Your Business Fundamentals Checking

for March 1, 2015 to March 31, 2015          Account number: 3250 3040 0818

**CHARGEBACK ARMOR, INC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2015 | $200.00 | # of deposits/credits: 4 |
| Deposits and other credits | 251,020.20 | # of withdrawals/debits: 18 |
| Withdrawals and other debits | -6,023.63 | # of items–previous cycle[1]: 0 |
| Checks | -24,000.00 | # of days in cycle: 31 |
| Service fees | -74.00 | Average ledger balance: $103,754.01 |
| **Ending balance on March 31, 2015** | **$221,122.57** | [1]Includes checks paid,deposited items&other debits |

## Retirement could last longer than you might think

For 5 strategies to help you avoid outliving your savings, visit **merrilledge.com/5-strategies**



**MERRILL EDGE**
Bank of America Corporation

Merrill Edge® is available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), and consists of the Merrill Edge Advisory Center™ (investment guidance) and self-directed online investing. MLPF&S is a registered broker-dealer, member SIPC and a wholly owned subsidiary of Bank of America Corporation. Merrill Lynch, Merrill Edge, the Merrill Edge logo, and Merrill Edge Advisory Center are trademarks of Bank of America Corporation.

ARJB3CX9

Investment products: | **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value** |

 **Bank of America**

<span style="color:red">**Your checking account**</span>

**CHARGEBACK ARMOR, INC**   |   **Account # 3250 3040 0818**   |   **March 1, 2015 to March 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 03/17/15 | WFB DIRECTPAY   DES:DEPOSIT   ID:DPXXXXXXXX INDN:CHARGEBACK ARMOR INC   CO ID:BIZEDP   CCD PMT INFO:SECURED MERCHANTS LLC ACCOUNTS | 100,000.00 |
| 03/19/15 | BKOFAMERICA ATM 03/19 #000001192 DEPOSIT BALBOA-PARTHENIA   NORTHRIDGE   CA | 150,000.00 |
| 03/20/15 | CHECK ORDER FEE REFUND | 74.00 |
| 03/31/15 | CHECKCARD 0328 JETBLUE    27976169183 BELLEVUE    WA 7473309508924690015 | 946.20 |
| **Total deposits and other credits** | | **$251,020.20** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 03/18/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3892  INDN:CHARGEBACK ARMOR        CO ID:1133133497 WEB | -300.00 |
| 03/23/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3754  INDN:CHARGEBACK ARMOR        CO ID:1133133497 WEB | -2,647.37 |

<span style="color:red">Card account # XXXX XXXX XXXX 2957</span>

| Date | Description | Amount |
|---|---|---|
| 03/25/15 | CHECKCARD  0324 JOS A BANK #830 LOS ANGELES  CA 24492155084698830010010 CKCD 5611 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -65.07 |
| 03/26/15 | CHECKCARD  0325 FEDEXOFFICE   00025015 WOODLAND HILLCA 24164075084069100350014 CKCD 7338 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.49 |
| 03/27/15 | CHECKCARD  0325 IN-N-OUT BURGER #265 SIGNAL HILL  CA 24445005085100413542901 CKCD 5814 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.51 |
| 03/27/15 | CHECKCARD  0326 SQ *TEL AVIV GRILL Los Angeles  CA 24692165085000521906950 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -30.36 |
| 03/30/15 | CHECKCARD  0327 EXPEDIA*1101460429163 EXPEDIA.COM  NV 24692165086000765260931 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -161.73 |
| 03/30/15 | CHECKCARD  0326 UNITED      01676167448 800-932-2732 TX 24692165086000931895024 CKCD 3000 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -426.20 |
| 03/30/15 | CHECKCARD  0328 JETBLUE     27976169183 BELLEVUE     WA 24733095088246900172436 CKCD 3174 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -946.20 |
| 03/30/15 | CHECKCARD  0329 EXPEDIA*1101601279821 EXPEDIA.COM  NV 24692165088000737461573 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -373.54 |
| 03/31/15 | CHECKCARD  0330 EXPEDIA*1101651740547 EXPEDIA.COM  NV 24692165089000178879803 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.00 |

*continued on the next page*

# Get easy access to business know-how

 Visit our free online community at **bankofamerica.com/sbc**.

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015**

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 03/31/15 | CHECKCARD  0329 AMERICAN AI 00176169447 BELLEVUE    WA 24717055089870893079796<br>CKCD 3001 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -633.20 |
| 03/31/15 | CHECKCARD  0330 LA SOSTA GASTRONOMIA MANHATTAN BEACA<br>2401339508900283861537 CKCD 5499 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -151.00 |
| 03/31/15 | CHECKCARD  0330 EXPEDIA*1101686211769 EXPEDIA.COM  NV 24692165089000179214125<br>CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -242.96 |
| **Subtotal for card account # XXXX XXXX XXXX 2957** | | **-$3,076.26** |
| **Total withdrawals and other debits** | | **-$6,023.63** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| 03/19/15 | 5010 | -3,000.00 | | 03/24/15 | 5012 | -20,000.00 |
| 03/24/15 | 5011 | -1,000.00 | | | | |
| | | | | **Total checks** | | **-$24,000.00** |
| | | | | **Total # of checks** | | **3** |

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 02/27/15:

At least one of the following occurred

○ $250+ in net new purchases on a linked Business debit card

○ $250+ in net new purchases on a linked Business credit card

○ $3,000+ minimum daily balance in primary checking account

○ $5,000+ average monthly balance in primary checking account

○ $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 03/19/15 | CHECK ORDER00318 DES:FEE          ID:<br>PMT INFO: PRODUCT(S): 55.36      S&H: 12.53    CA TAX: 6.11 | -74.00 |
| **Total service fees** | | **-$74.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 03/01 | 200.00 | 03/20 | 246,900.00 | 03/26 | 223,168.07 |
| 03/17 | 100,200.00 | 03/23 | 244,252.63 | 03/27 | 223,118.20 |
| 03/18 | 99,900.00 | 03/24 | 223,252.63 | 03/30 | 221,210.53 |
| 03/19 | 246,826.00 | 03/25 | 223,187.56 | 03/31 | 221,122.57 |

## <u>DECLARATION OF ALAN ARGAMAN</u>

I, Alan Argaman, declare:

I am the sole member and managing member of Secured Merchants, LLC. I have personal knowledge of the following facts and, if called upon to testify, I could and would so competently and truthfully testify to these facts:

1.  I am the founder, only current member, and only current manager of Secured Merchants, LLC ("SM").

2.  Attached as EXHIBIT C hereto are true and correct copies of the March 2015 bank statements from the two SM bank accounts.  The $250,000 total that was given to CBA as a capital infusion by SM was done from these two accounts and this $250,000 in turn was obtained from Wealth Vision, Inc., Wealth Group, Inc., and Big Ventures, Inc., pursuant to contracts executed on February 5, 2015, February 27, 2015, and January 15, 2015, respectively.   True and correct copies of these three contracts are attached to my Declaration that is attached to the original Motion.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

- 13 -

1  DATED: October 19, 2015        By:  *Alan Argaman*

2                                        Alan Argaman

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**

CHARGEBACK ARMOR, INC.'S  REPLY TO FEDERAL TRADE COMMISSION AND RECEIVER'S
OPPOSITION TO MOTION FOR ORDER MODIFYING THE TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIONS AND THE RELEASE OF FROZEN FUNDS



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

✉️ bankofamerica.com

📧 Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

SECURED MERCHANTS LLC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

# Your Business Fundamentals Checking

for March 1, 2015 to March 31, 2015                    Account number: 3250 1501 0922

SECURED MERCHANTS LLC

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2015 | $10,841.83 | # of deposits/credits: 2 |
| Deposits and other credits | 120,670.89 | # of withdrawals/debits: 30 |
| Withdrawals and other debits | -4,978.31 | # of items–previous cycle[1]: 4 |
| Checks | -124,872.00 | # of days in cycle: 31 |
| Service fees | -25.00 | Average ledger balance: $27,211.21 |
| **Ending balance on March 31, 2015** | **$1,637.41** | [1]Includes checks paid,deposited items&other debits |



# Retirement could last longer than you might think

For 5 strategies to help you avoid outliving your savings,
visit **merrilledge.com/5-strategies**



Merrill Edge® is available
through Merrill Lynch, Pierce,
Fenner & Smith Incorporated
(MLPF&S), and consists of the
Merrill Edge Advisory Center™
(investment guidance) and
self-directed online investing.
MLPF&S is a registered broker-
dealer, member SIPC and a
wholly owned subsidiary of Bank
of America Corporation. Merrill
Lynch, Merrill Edge, the Merrill
Edge logo, and Merrill Edge
Advisory Center are trademarks
of Bank of America Corporation.
ARJB3CX9

Investment products:   | Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |

 **Bank of America**

**Your checking account**

**SECURED MERCHANTS LLC   |   Account # 3250 1501 0922   |   March 1, 2015 to March 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 03/13/15 | Counter Credit | 120,000.00 |
| 03/27/15 | GATEWAYFEES   DES:CREDIT   ID:SECURED MERCHAN INDN:SECURED MERCHANTS, LLC  CO ID:3383693141 CCD | 670.89 |
| **Total deposits and other credits** | | **$120,670.89** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 03/02/15 | IRS          DES:USATAXPYMT ID:270546172775971  INDN:SECURED MERCHANTS LLC   CO ID:3387702000 CCD | -671.28 |
| 03/02/15 | EMPLOYMENT DEVEL DES:EDD EFTPMT ID:1319934720  INDN:SECURED MERCHANTS LLC   CO ID:2282533055 CCD | -122.45 |
| 03/12/15 | TRANSFER SECURED MERCHANTS LL:Robert Stayner Confirmation# 0319736727 | -1,250.00 |
| 03/12/15 | INTUIT PAYROLL S DES:QUICKBOOKS ID:XXXXXXXXX  INDN:SECURED MERCHANTS LLC   CO ID:1722616679 CCD | -1,556.82 |
| 03/16/15 | IRS          DES:USATAXPYMT ID:270547500277165  INDN:SECURED MERCHANTS LLC   CO ID:3387702000 CCD | -671.28 |
| 03/16/15 | EMPLOYMENT DEVEL DES:EDD EFTPMT ID:19941120  INDN:SECURED MERCHANTS LLC   CO ID:2282533055 CCD | -122.45 |

**Card account # XXXX XXXX XXXX 1287**

| Date | Description | Amount |
|---|---|---|
| 03/03/15 | CHECKCARD  0302 RECEPTIONHQ 866-883-3499 AZ 24492155061894961965927 CKCD 7394 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -19.95 |
| 03/03/15 | CHECKCARD  0302 J2 *METROFAX 888-929-4141 CA 24692165061000042339051 RECURRING CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -39.75 |
| 03/04/15 | CHECKCARD  0303 GOOGLE *SVCSAPPS_SECUR CC@GOOGLE.COMCA 24692165062000665237466 CKCD 7311 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -87.65 |
| 03/06/15 | CHECKCARD  0305 J2 *METROFAX 888-929-4141 CA 24692165064000529815448 CKCD 5968 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -2.84 |
| 03/11/15 | CHECKCARD  0310 SQ *TEL AVIV GRILL Los Angeles  CA 24692165069000923497798 CKCD 5812 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -48.78 |
| 03/12/15 | CHECKCARD  0311 RECEPTIONHQ 866-883-3499 AZ 24492155070894189980087 CKCD 7394 XXXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |

*continued on the next page*

# Get easy access to business know-how

 Visit our free online community at **bankofamerica.com/sbc**.

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

SECURED MERCHANTS LLC  |  Account # 3250 1501 0922  |  March 1, 2015 to March 31, 2015

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 03/12/15 | CHECKCARD  0311 SMARTSHEET 425-283-1870 WA 24492155070894193355912 CKCD 5734 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -7.10 |
| 03/13/15 | CHECKCARD  0312 IN *DAVIDIAN & ASSOCIAT 818-2427800  CA 24692165071000867869834 CKCD 8931 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/16/15 | CHECKCARD  0314 J2 *METROFAX 888-929-4141 CA 24692165073000731083800 RECURRING CKCD 5968 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -74.39 |
| 03/16/15 | CHECKCARD  0314 J2 *METROFAX 888-929-4141 CA 24692165073000731083784 RECURRING CKCD 5968 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -7.95 |
| 03/18/15 | CHECKCARD  0316 HOME TECH SECURITY VAN NUYS    CA 24071055076987196263292 CKCD 8999 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -35.00 |
| 03/18/15 | CHECKCARD  0317 RECEPTIONHQ 866-883-3499 AZ 24492155076894333834630 CKCD 7394 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/23/15 | CHECKCARD  0320 WWW.LOGMEIN.COM 888-326-2642 MA 24692165079000669819245 CKCD 4816 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -23.99 |
| 03/23/15 | CHECKCARD  0322 SMARTSHEET 425-283-1870 WA 24492155081894449728083 RECURRING CKCD 5734 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -50.00 |
| 03/23/15 | CHECKCARD  0322 INTUIT *QB ONLINE 800-286-6800 CA 24692165081000601264118 RECURRING CKCD 5734 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -30.99 |
| 03/25/15 | CHECKCARD  0324 J2 *METROFAX 888-929-4141 CA 24692165083000448866537 CKCD 5968 XXXXXXXXXXX1287 XXXX XXXX XXXX 1287 | -5.64 |
| **Subtotal for card account # XXXX XXXX XXXX 1287** | | **-$584.03** |
| **Total withdrawals and other debits** | | **-$4,978.31** |

## Checks

| Date | Check # | Amount |
|------|---------|--------|
| 03/03/15 | 18556 | -2,500.00 |
| 03/06/15 | 18557 | -680.00 |
| 03/11/15 | 18558 | -200.00 |

| Date | Check # | Amount |
|------|---------|--------|
| 03/23/15 | 18559 | -1,092.00 |
| 03/13/15 | 18560 | -400.00 |
| 03/19/15 | 18561 | -120,000.00 |
| **Total checks** | | **-$124,872.00** |
| **Total # of checks** | | **6** |

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 02/27/15:

At least one of the following occurred



- ☑ $250+ in net new purchases on a linked Business debit card
- ◯ $250+ in net new purchases on a linked Business credit card
- ☑ $3,000+ minimum daily balance in primary checking account
- ☑ $5,000+ average monthly balance in primary checking account
- ◯ $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

*continued on the next page*



**Your checking account**

**SECURED MERCHANTS LLC   |   Account # 3250 1501 0922   |   March 1, 2015 to March 31, 2015**

## Service fees - continued

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 03/06/15 | ONLINE BUSINESS SUITE ACCT MGMT SERVICES | -15.00 |
| 03/13/15 | ONLINE BUSINESS SUITE NEXT DAY PAYMENT | -10.00 |
| **Total service fees** | | **-$25.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 03/01 | 10,841.83 | 03/11 | 6,454.13 | 03/19 | 2,169.14 |
| 03/02 | 10,048.10 | 03/12 | 3,590.21 | 03/23 | 972.16 |
| 03/03 | 7,488.40 | 03/13 | 123,130.21 | 03/25 | 966.52 |
| 03/04 | 7,400.75 | 03/16 | 122,254.14 | 03/27 | 1,637.41 |
| 03/06 | 6,702.91 | 03/18 | 122,169.14 | | |

☑ To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.



**SECURED MERCHANTS LLC   |   Account # 3250 1501 0922   |   March 1, 2015 to March 31, 2015**

## Check images

**Account number: 3250 1501 0922**

Check number: 18556   |   Amount:  $2,500.00



Check number: 18557   |   Amount:  $680.00



Check number: 18558   |   Amount:  $200.00



Check number: 18559   |   Amount:  $1,092.00



Check number: 18560   |   Amount:  $400.00



Check number: 18561   |   Amount:  $120,000.00



# Gold Business Services Package

Account number: **1062015241**  ■  March 1, 2015 - March 31, 2015  ■  Page 1 of 4



SECURED MERCHANTS LLC
5023 PARKWAY CALABASAS
CALABASAS CA 91302-1421

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS**  (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR  97228-6995

## Your Business and Wells Fargo

The plans you establish today will shape your business far into the future. The heart of the planning process is your business plan. Take the time now to build a strong foundation. Find out more at wellsfargoworks.com/start/business-planning

## Account options

*A check mark in the box indicates you have these convenient services with your account(s).  Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☑ |
| Online Statements | ☑ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☑ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 3/1 | $2,597.86 |
| Deposits/Credits | 130,000.00 |
| Withdrawals/Debits | - 130,024.00 |
| **Ending balance on 3/31** | **$2,573.86** |
| Average ledger balance this period | $18,074.31 |

Account number:  **1062015241**

**SECURED MERCHANTS LLC**

*California account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  121042882

For Wire Transfers use
Routing Number (RTN):  121000248

**Overdraft Protection**
This account is not currently covered by Overdraft Protection.  If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

Account number:  **1062015241**   ■  March 1, 2015 - March 31, 2015   ■  Page 2 of 4



---

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 3/9 | | Direct Pay Monthly Base | | 10.00 | 2,587.86 |
| 3/13 | | Deposit Made In A Branch/Store | 130,000.00 | | 132,587.86 |
| 3/16 | | WF Direct Pay-Payment- Tran ID Dp059880130 | | 100,000.00 | 32,587.86 |
| 3/19 | 5022 | Check | | 30,000.00 | 2,587.86 |
| 3/31 | | Monthly Service Fee | | 14.00 | 2,573.86 |
| **Ending balance on 3/31** | | | | | **2,573.86** |
| **Totals** | | | **$130,000.00** | **$130,024.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of checks written   *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount |
|---|---|---|
| 5022 | 3/19 | 30,000.00 |

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 03/01/2015 - 03/31/2015 | Standard monthly service fee $14.00 | You paid $14.00 |
|---|---|---|
| **How to avoid the monthly service fee**  *(complete 1 AND 2)* | Minimum required | This fee period |
| 1) Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $7,500.00 | $18,074.00 ☑ |
| · Qualifying transaction from a linked Wells Fargo Business Payroll Services account | 1 | 0 ☐ |
| · Qualifying transaction from a linked Wells Fargo Business Merchant Services account | 1 | 0 ☐ |
| · Total automatic transfers to an eligible Wells Fargo business savings account | $150.00 | $0.00 ☐ |
| · Linked Direct Pay Service through Wells Fargo Business Online | 1 | 1 ☑ |
| · Combined balances in linked accounts, which may include | $10,000.00 | ☑ |
| - Average ledger balances in business checking, savings, and time accounts | | |
| - Most recent statement balance of business credit card, Wells Fargo Secured Credit Card, BusinessLine® line of credit, Secured BusinessLine® line of credit, Wells Fargo Express Equity® line of credit, and Wells Fargo BusinessLoan® term loan | | |
| - Combined average daily balances from the previous month for Business PrimeLoanSM, Wells Fargo Express Equity® loan, Wells Fargo Express Refi® loan, Wells Fargo Purchase AdvantageSM loan, Wells Fargo Small Business Advantage® line of credit, Equipment Express® loan, and Equipment Express® Single Even  t loan | | |
| 2) Complete the package requirements | | |
| · Have qualifying linked accounts or services in separate categories* | 3 | ☐ |

*Includes Wells Fargo business accounts and services such as debit card, savings accounts, active Online Banking, credit card, loans and lines of credit.
C2/C2