1   David C. Shonka
    Acting General Counsel
2
    DAMA J. BROWN
3   Regional Director

    REID TEPFER
4   rtepfer@ftc.gov
    Texas Bar No. 24079444
5   LUIS GALLEGOS
    lgallegos@ftc.gov
6   Oklahoma Bar No. 19098
    EMILY ROBINSON
7   erobinson@ftc.gov
    Texas Bar No. 24046737
    ZACHARY A. KELLER
8   zkeller@ftc.gov
    Texas Bar No. 24087838 (pro hac vice pending)
9   Federal Trade Commission
    1999 Bryan Street, Suite 2150
10  Dallas, Texas 75206
    (214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
11  (214) 979-9386 (Robinson); (214) 979-9382 (Keller)
    (214) 953-3079 (fax)
12  RAYMOND McKOWN
    rmckown@ftc.gov
13  California Bar No. 150975
    10877 Wilshire Boulevard, Suite 700
    Los Angeles, California 90024
14  (310) 824-4343(voice)
    (310) 824-4380 (fax)

15  Attorneys for Plaintiff Federal Trade Commission

16              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA

17  FEDERAL TRADE COMMISSION,          Case No. 2:15-CV-04527-GW (PLAx)

18              Plaintiff,             PLAINTIFF FEDERAL TRADE
                                       COMMISSION'S
19          v.                         MEMORANDUM OF POINTS
                                       AND AUTHORITIES IN
20  BUNZAI MEDIA GROUP, INC.,          SUPPORT OF ITS MOTION FOR
    et al.,                            SUMMARY JUDGMENT
                Defendants.

# TABLE OF CONTENTS

Page

I. INTRODUCTION…………………………………………………...……1

II. NATURE AND STAGE OF THE PROCEEDING…………………...……3

III. STATEMENT OF UNCONTROVERTED FACTS…………………………4

IV. DEFENDANTS DECEPTIVE BUSINESS PRACTICES…………...………5

V. DEFENDANTS' OPERATION OF A COMMON ENTERPRISE……………7

   A.  The Roles of the Corporate Defendants……………...………………7

   B. The Roles of the Individual Defendants. ................................................ 9

     1. Alon Nottea ("Alon")................................................................ 10

      i.   Alon Participated In and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise . 10

      ii.   Alon Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices ........................................... 10

     2. Doron Nottea ("Doron") ............................................................ 13

      i.   Doron Participated In and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise ....................................................................................... 13

      ii.    Doron Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices ........................................... 13

     3. Igor Latsanovski ........................................................................ 15

      i.   Igor Latsanovski Participated in and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise ....................................................................... 15

      ii.   Igor Latsanovski Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices .................... 16

     4. Alan Argaman................................................................................ 18

      i.   Alan Argaman Participated in and Controlled or Had Authority to Control One or More Companies Forming the Common Enterprise ....................................................................... 18

    ii.   Alan Argaman Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices .................... 19

  5. Roi Reuveni ...................................................................... 20

    i.   Roi Reuveni Participated in and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise ........................................................................... 20

    ii.   Roi Reuveni Knew, or Consciously Avoided Knowledge of, Defendants' Unlawful Acts or Practices .......................................... 21

A. Summary Judgment Standard. ................................................ 21

B. The FTC is Entitled to Summary Judgment as to Count I Because Defendants Failed to Disclose Material Terms of Their Offer ............. 22

C. The FTC is Entitled to Summary Judgment as to Count II Because Defendants Falsely Represented that their Trial Offer was "Risk Free" 25

D. The FTC is Entitled to Summary Judgment as to Count III Because Defendants Falsely Represented that their Better Business Bureau Rating………………………………………………………………..27

E. The FTC is Entitled to Summary Judgment as to Count IV Because Defendants Unfairly Charged Consumers without Authorization......... 27

F. The FTC is Entitled to Summary Judgment as to Count V Because Defendants Violated the Restore Shoppers Online Confidence Act ..... 31

G. The FTC is Entitled to Summary Judgment as to Count VI Because Defendants Violated the Electronic Fund Transfer Act and Regulation E ................................................................................................ 33

H. The FTC is Entitled to Summary Judgment as to Count VII Because (1) Relief Defendant Chargeback Armor, Inc. Received Funds From Defendants Traceable to Defendants' and (2) the Company is an Asset of the Individual Defendants ................................................. 35

I. Defendants are Each Liable for the Legal Violations ............................ 37

  1. The Corporate Defendants Operated as a Common Enterprise....... 37

  2. Injunctive and Monetary Relief for Individual Defendants ............ 41

    i.  The Standard For Injunctive Relief. ........................................... 41

    ii.  The Standard For Equitable Monetary Relief. .......................... 43

    iii.   The Individual Defendants Are Liable For Both Injunctive And Monetary Relief. .................................................................. 44

J.  Permanent Injunctive Relief and Monetary Damages Against Defendants Is Necessary.............................................................................................. 47

   1.  Permanent Injunctive Relief Against Defendants is Warranted...... 47

   2.  Equitable Monetary Relief against Defendants is Warranted. ........ 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ............................................39

*FTC v. Bay Area Bus. Council, Inc.,* No. 02-5762 (N.D. Ill. Apr. 16, 2004), *aff'd,* 423 F.3d 627 (7th Cir. 2005) .................................................................................49

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) ........27

*FTC v. Colgate-Palmolive*, 380 U.S. 374 (1965) ...................................................49

*FTC v. Commerce Planet*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012)............... 30, 52

*FTC v. Consumer Alliance*, No. 02-2429 (N.D. Ill. Sept.29, 2003)......................49

*FTC v. Credit Enhancement Servs.*, No. 02-2134 (E.D.N.Y. Mar. 31, 2004) .......49

*FTC v. Crescent Publ'g Grp.*, 129 F. Supp. 2d 311 (S.D. N.Y 2001) ..................30

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ...............................24

*FTC v. Dinamica Financiera*, No. 2:09-03554, 2010 WL 9488821 (C.D. Cal. Aug. 19, 2010) .......................................................................................................49

*FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ............. 27, 52

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) .........................................................52

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996).....................................48

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001)............................................................49

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001).............................................................23

*FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) ....................................27

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982).......................................48

*FTC v. Inc21.com*, 745 F. Supp. 2d 975 (N.D. Cal. 2010)...................... 28, 31, 52

*FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013) ..................................................................................................... 38, 48, 49

*FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000)..................... 29, 30, 38

*FTC v. John Beck Amazing Profits, LLC, et al.*, 888 F. Supp. 2d 1006 (C.D. Cal. 2012).....................................................................................................................49

*FTC v. MacGregor*, 360 Fed App'x 891 (9th Cir. 2009) ......................................30

*FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) ..............................48

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008).........38

*FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,113 (D. Nev. 1995) ................25
*FTC v. Neiswonger*, 494 F. Supp. 2d 1067 (E.D. Mo. 2007) ................................49
*FTC v. Neovi, Inc.*, No. 06-1952 JLS, 2010 WL 3789713 (S.D. Cal. Sept. 27, 2010) ................................................................................................................49
*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ............... 38, 39
*FTC v. Pantron I Corp.*, 33 F.3d 1088  (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995) ......................................................................................................30
*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) .................................. 23, 28
*FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043 (D. Nev. 1992) 25
*FTC v. Porter & Deitsch*, 605 F.2d 294 (7th Cir. 1979) ........................................27
*FTC v. QT, Inc.,* 448 F. Supp 2d 908 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008) ................................................................................................................30
*FTC v. Windward Mktg., Ltd.*, No. 96-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ........................................................................................... 29, 30
*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) .......25
*Sears, Roebuck and Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) ..................... 48, 49
*United States v. Odessa Union Warehouse Co-op*,
833 F.2d 172, 176 (9th Cir. 1987)……………………………………………….32

**Statutes**
12 C.F.R. § 205.10(b) ........................................................................... 2, 35, 36
15 U.S.C. § 1693e(a) ...................................................................................35
15 U.S.C. § 1693e(a) .............................................................................. 2, 35
15 U.S.C. § 45(a) ..........................................................................................2
15 U.S.C. § 57a ...........................................................................................34
15 U.S.C. § 8403 ................................................................................... 2, 33
15 U.S.C. § 8404 .........................................................................................34
15 U.S.C. §1693a(9) ....................................................................................36
16 C.F.R. § 310.2(u) ....................................................................................34

## I.     INTRODUCTION

Defendants marketed skincare products over the Internet using deceptive offers with hidden costs, negative option continuity plans, and undisclosed, onerous return policies. Defendants falsely offered "risk free trials" or "gifts" of products to consumers nationwide using popup advertisements and website offers. Defendants' offers were designed to trick consumers into purchasing Defendants' product and unwittingly enrolling into Defendants' negative option continuity plan, which automatically charged consumers for additional products each month.

Defendants solicited consumers' credit card information by requiring consumers who accepted their purported "risk free trial" or "gift" to provide credit or debit card billing information, supposedly to pay nominal shipping and handling fees to receive the advertised products. However, 10 days after receiving consumers' billing information, Defendants charged consumers the full costs of the products—imposing charges of up to $97.88 onto consumers' credit or debit cards.

Defendants also enrolled consumers into a negative option continuity plan, in which Defendants shipped additional products each month and charged consumers' credit or debit cards the full costs of the products, usually $97.88 per month. And when deceived consumers attempted to send unordered and unwanted

purchases back for a refund, Defendants generally refused to provide them with refunds.

Defendants' practices violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, and Section 907(a) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and caused over $75 million in consumer injury.

Plaintiff Federal Trade Commission ("FTC") moves for summary judgment under FED. R. CIV. P. 56(a), against Individual Defendants Alon Nottea; Doron Nottea; Igor Latsanovski; Roi Reuveni; and Alan Argaman; Corporate Defendants Secured Merchants LLC and CalEnergy, Inc.; and Relief Defendant Chargeback Armor, Inc.

The evidence provides an overwhelming account of Defendants' violations of the FTC Act, ROSCA, and EFTA. Accordingly, entry of a final order against these Defendants, as well as against the Defendants who have defaulted, is appropriate.[1] That final order should include provisions permanently enjoining

---

[1] The Corporate Defendants that have defaulted are: Bunzai Media Group, Inc., d/b/a AuraVie and Miracle Face Kit; Pinnacle Logistics, Inc.; DSA Holdings, Inc.; Lifestyle Media Brands, Inc.; Agoa Holdings, Inc.; Zen Mobile Media, Inc.; Safehaven Ventures, Inc.; Heritage Alliance Group, Inc., also doing business as AuraVie Distribution; AMD Financial Network, Inc.; SBM Management, Inc.; Media Urge, Inc.; Adageo, LLC; KAI Media, Inc.; Insight Media, Inc.; Focus Media Solutions, Inc.; Secured Commerce, LLC; USM Products, Inc.; Merchant

Defendants' deceptive practices, converting the Receiver into a liquidating receiver, and awarding monetary relief of $75,624,030 to redress consumer injury and disgorge ill-gotten funds. (Ex. 944).

## II.    NATURE AND STAGE OF THE PROCEEDING

On June 18, 2015, the FTC filed its Complaint and sought an *ex parte* temporary restraining order against Defendants. (Dkts. 3, 5). The Court entered a TRO against all defendants, enjoining their deceptive practices, freezing their assets, and appointing a Receiver over the Corporate Defendants and related shell companies. (Dkt. 14). The Court also granted the FTC and Receiver immediate access to Defendants' business premises to copy or image business records. *Id.* Subsequently, by stipulation or following contested hearings, Preliminary Injunctions with asset freezes and receivership provisions were entered against all of the defendants named in the original Complaint. (Dkts. 95, 101, 104, 108, 147).

In October 2015, the FTC amended its Complaint (Dkt. 235), adding eight corporate defendants,[2] two individual defendants,[3] and a relief defendant.[4] Of the

Leverage Group, Inc.; DMA Media Holding, Inc.; Shalita Holdings, Inc.; All Star Beauty Products, Inc. Individual Defendant Khristopher Bond has defaulted as well.

[2] The additional Corporate Defendants were: Focus Media Solutions, Inc.; Secured Commerce LLC; Secured Merchants LLC; UMS Products; Merchant Leverage Group, Inc.; DMA Media Holdings, Inc.; Shalita Holdings, Inc.; and All Star Beauty Products, Inc.

[3] The additional Individual Defendants were Paul Medina and Alan Argaman.

33 named defendants, 20 Corporate Defendants and one Individual Defendant failed to defend; most have already been defaulted by the Clerk of the Court. (Dkts. 157; 158; 159; 229; and 230). The Court stayed the case as to Defendants Oz Mizrahi, Motti Nottea, and Paul Medina to permit the Commission time to consider approving proposed settlements as to those Defendants. (Dkt. #339).

## III.   STATEMENT OF UNCONTROVERTED FACTS

In support of its motion for summary judgment, the FTC has filed a separate Statement of Uncontroverted Facts and Conclusions of Law ("UF"), with citations to pleadings, depositions, declarations, and other relevant evidence.  This evidence includes Defendants' own business records and correspondence; sworn testimony from Defendants, Defendants' former employees, and Defendants' customers; business records from the third-party service providers, such as webhosting companies and financial institutions, and the Better Business Bureau; and other evidence.[5] Cumulatively, this evidence proves that Defendants operated a common enterprise to deceptively sell skincare products online to consumers throughout the United States. *See*, *e.g.,* Defendants' Business Practices (UF #45-67) and Common Enterprise (UF #42-43).

---

[4] The Relief Defendant was Chargeback Armor, Inc.

[5] *See* Index of Exhibits.

## IV.    DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

Through numerous websites, Defendants prominently touted "risk-free trial," "trial order," or "FREE trial" offers of skincare products. (UF #45, UF #47-49). Defendants' websites claimed the offers were merely for a trial, promised "100% Satisfaction Guaranteed," and even claimed that to be accredited by the Better Business Bureau ("BBB") with an A- rating. (UF #49-50). The websites requested consumers' credit card or debit card information, purportedly to pay a small shipping and handling fee to receive the trial offer. (UF #48, UF #50).

In truth, Defendants' trial offers were a ruse. The offers came with hidden costs and inadequately disclosed negative option continuity plan features and return policies. (UF #51-62). Defendants buried details about the costs of the products, automatic enrollment into continuity plans, and onerous return policies, by placing such details in hyperlinks that consumers could only find by scrolling to the bottom of webpages and clicking on an obscure "T&C." (UF #56, UF #59). And even when disclosures were provided, they were often incomplete and failed to clearly inform consumers of the material terms, conditions, and limitations of their sales offers.[6] (UF #56-58). After consumers accepted the "trial offers,"

---

[6] Years ago, BunZai's attorney noted the inadequacy of this disclosure, concluding that "[a]lmost certainly the FTC would say it [] is not 'conspicuous.'" UF # 61(a)(vi).

Defendants sent confirming emails that reinforced the false impression that the product was free.[7] (UF #60-61).

Consumers learned about the costs of the "risk free trial" offers only when they saw charges—typically $97.88 each—on their credit or debit card statement. (UF #53). Likewise, consumers learned about Defendants' onerous return polices only when they realized they were being charged for products that they believed were free or received subsequent shipments of unordered product and tried to return the items. (UF #52-54). Consumers alleged, and Defendants' former employees and business records confirm, that Defendants generally refused to provide consumers with full refunds.[8] (UF #55, UF #62-67). In fact, even when consumers contacted their credit card companies and requested chargebacks for unauthorized charges, Defendants aggressively continued their deception. (UF #65). Defendants told consumers that chargebacks were illegal and would be reported to local or federal law enforcement authorities for civil or criminal enforcement proceedings. (UF #65(c)). Defendants also submitted doctored and

---

[7] BunZai's attorney also stated that Defendants were required to send a "a post-transaction confirmation email . . . that includes all the material negative option terms and cancellation/refund procedure." UF #61(a). However, Alon Nottea found that doing so in the past had cut down on his sales. UF #32(u)(vi). He further questioned how his competitor could include such notices. UF #32(u)(iv).

[8] For example, Defendants' scripts advised customer service agents to avoid refunds: "*Important* Avoid Returns as much as possible . . . Customers should initially be advised that the best we can do is cancel their membership and prevent any future charges or shipments." UF #63(a)(i).

falsified documents to banks, protesting chargebacks and asserting that consumers had knowingly agreed to the charges and the continuity plan. (UF #65).

## V.     DEFENDANTS' OPERATION OF A COMMON ENTERPRISE
### A. The Roles of the Corporate Defendants.

The evidence proves that Defendants participated in or controlled the common enterprise with knowledge of its deceptive and unfair practices. (UF #9-41). Defendants created a complex web of companies to deceive consumers, banks, and law enforcement and to operate the scheme. (UF #42-43). The Court's Receiver identified as many as 27 corporate entities that Defendants used to carry out their scheme. (Ex. 121-3 at 4-5). Defendants collectively operated these corporations from the same physical location, with the same employees, and commingled funds generated from the sale of the same products. (UF #42).

**BunZai Media Group, Inc.** ("BunZai") was owned by Alon Nottea, Igor Latsanovski, and Khristopher Bond. (UF #9). Defendants initially operated their online skincare product business exclusively through BunZai. (UF #9). However, apparently to avoid detection and to protect their assets, Defendants dissolved BunZai around 2012 and replaced it with a convoluted corporate structure with numerous shell companies, each with different "owners" or "CEOs." (UF #9(e)). Defendants recruited friends, family, and acquaintances to permit their names to be used for shell corporations and merchant accounts. (UF #42(h)). These shell companies funneled the money primarily to two entities: **SBM Management, Inc.**

and **CalEnergy, Inc.** (UF #42(d)). In turn, these companies passed funds on to the Individual Defendants or their personal shell companies. *Id*. There were many participants, but one common enterprise scheme.

After dissolving BunZai, Alon Nottea, Igor Latsanovski, and Khristopher Bond formed **Pinnacle Logistics, Inc.**, to take over order fulfillment and customer service functions for the enterprise. (UF #10). **Media Urge, Inc.,** and its successor, **Focus Media Solutions, Inc.,** both owned by Alon Nottea, served as the marketing arm. (UF #19, 24). These companies, controlled and managed by the Individual Defendants (UF #43(a)), assisted in the created and placed online advertisements and websites for skincare and other products sold by "risk free trial" offers. They also coordinated with affiliate networks to deceptively market the company's "risk-free trials." (Dkt. #120, at 46.)

**CalEnergy, Inc**., owned by Igor Latsanovski, held itself out as the parent company of the enterprise and managed both Pinnacle and Media Urge. It provided the common enterprise the funds needed to keep afloat. (UF #21, UF #36(e), UF #36(g)). **Secured Commerce LLC**, owned by Alan Argaman and Doron Nottea (UF #39(b)), created the webpages containing bogus "risk free trial" offers. (UF #39(d)(viii)). It also leased the suite where the Individual Defendants operated the common enterprise. (Dkt. #120, at 12). Among other things, **Secured Merchants LLC,** provided chargeback services to companies (UF #26(a), UF

#26(b), UF #39(f)) that included the Corporate Defendants (UF #27(d)), a service it termed "Chargeback Armor." (UF #27(e)). This service was critical to retaining Defendants' payment processor accounts and maintaining the ability to accept credit card payments from consumers—upon which the entire deceptive enterprise hinged. Relief Defendant **Chargeback Armor, Inc.** likewise refuted consumer chargebacks for unauthorized charges for Defendants' skincare products. (UF #41(d)(ii)). Chargeback Armor, Inc. was owned and operated by Defendants Alon Nottea, Doron Nottea, Roi Reuveni, and Alan Argaman, in addition to purported CEO Mike Costache. (UF #42(c)).  Other companies served as shells to operate merchant accounts, mailboxes, or performed other limited support functions for the common enterprise. (UF #11-17, UF #20, UF #22-23, UF #27-31; *see generally* Dkt. #120).

## B.  The Roles of the Individual Defendants.

The Individual Defendants in this action—Defendants (1) Alon Nottea, (2) Doron Nottea, (3) Igor Latsanovski, (4) Alan Argaman, and (5) Roi Reuveni—jointly operated this intricately constructed web of companies, along with the other named defendants, to perpetrate the common enterprise's abusive scheme. (UF #32-40). Individuals are liable for injury to consumers resulting from a company's deceptive acts or practices when they either:  participated directly in

or had authority to control the acts or practices and had some knowledge of the acts or practices.[9]

### 1.    Alon Nottea ("Alon")

#### *i. Alon Participated In and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise*

Defendant Alon Nottea oversaw or was involved in nearly every aspect of the day-to-day operation of the AuraVie common enterprise. (UF #32). His duties included soliciting investors (UF #32(j)); determining the business model and company organization (UF #32(k)); managing employees (UF #32(*l*)); procuring new merchant accounts and "merchant account guarantors" or "CEOs" (UF #32(m)); managing complaint responses and threatened litigation (including Better Business Bureau and Attorney General) (UF #32(n)); reviewing accounting and bookkeeping (UF #32(o)).; overseeing and implementing advertising and marketing (UF #32(p)); addressing customer service issues (UF #32(q)); registering websites (UF #32(r)); and monitoring chargeback demands. (UF #32(s)).

#### *ii. Alon Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices*

---

[9]  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

Because Alon oversaw virtually all aspects of the enterprise, he was fully knowledgeable of the companies' deceptive acts and practices. He knew consumers were misled by the deceptive "risk-free trial" offers. In fact, Alon was recorded strategizing how to continue the scheme, while maintaining a façade of compliance. In a recorded meeting with Roi Reuveni, Paul Medina, and others, Alon stated:

> [I]f you send them the terms, it can act like... we told you that we're going to charge... we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurted us... If it's done creatively, if it's done correctly and optimized... not just try, it didn't work.

(UF #32(u)(vi)).

Alon was well aware that reliance on hidden disclosures was unlawful. He suggested that, "We must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least." (UF #32(u)(v)). Nonetheless, because he believed that clear disclosure of the terms and conditions of their "risk-free trial" offers would cause revenues to plummet, Alon failed to correct the business practices. Instead, he prepared for an inevitable FTC law enforcement action. He planned to defend the FTC lawsuit by creating a façade of compliance. His plan, dubious as it was, included placing and recording calls to dissatisfied customers, pretending to be a third party company and asking

why the customers sought chargebacks. He believed that evidence of such calls would placate the FTC:

> "And the FTC comes to me, I'm telling them, listen, I'm calling back my chargebacks and see what I did wrong? Do you know how that looks?... we[']re going to call all of our chargebacks, and say we are a third party." [10]

Alon likely believed an FTC enforcement action was inevitable because BunZai Media Group's attorney had informed him that the AuraVie enterprise was violating FTC law.[11] The attorney noted a myriad of problems with Defendants' "risk-free trial" offers and websites, including that purported disclosures were "buried in the T&C's." (UF 61(a)) In an email—sent over two years before the FTC's enforcement action—BunZai's attorney suggested numerous changes to improve compliance with the law. *Id*. Most, if not all, of these suggestions were ignored.

---

[10] Alon elaborated on his plan again later in the recorded conversation, stating that he would retain a file of recorded calls to present to the FTC: "[B]ut I want to have a hundred call folder so that later on in two years when I have an FTC, here, here, here, I'm proactive. It's like—it's like a folder. Here you go. Here's everything. Your file recordings. Look at everything. Look at what we're doing to be proactive for our consumer." UF #32(u)(i).

[11] *See* UF #61(a) BunZai attorney William Rothbard provided a point-by-point breakdown of the many ways the AuraVie marketing campaign violated FTC law).

## 2.      Doron Nottea ("Doron")

### i. Doron Participated In and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise

Doron Nottea, Alon's brother, was a principal member of the common enterprise. Specifically, for various Corporate Defendants, acting alone or in concert, Doron (1) held himself out as an owner (UF #34(d)); (2) managed employees of Corporate Defendants ( UF #34(e)); (3) controlled and managed Corporate Defendants' banking and merchant accounts (UF #34(f)); (4) performed bookkeeping and accounting duties (UF #34(g)); and (5) determined whether to continue or cease operations of various Corporate Defendants. (UF #34(h)). Thus, Doron unquestionably exercised control and participated in the common enterprise to a degree that directly implicates him in the scheme.

### ii. Doron Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices

Moreover, Doron's participation and control far exceeds the limited bookkeeping activities he claims. His financial management (UF #34(d)-(j); #43(b)(v),  his role supervising the employees (*See*, *e.g.,* UF #34(e)), and his oversight of payment to straw account holders directly implicates him in the scheme and demonstrates the knowledge he had of the enterprise's day-to-day operations. Moreover, he was included on numerous emails discussing the

enterprise's business practices,[12] even to the degree of reviewing packaging for skincare products. (UF #39(e)(i)).

Doron evinced intimate knowledge of the scam in a text message he sent to his own email address. (UF #34(j) . In it, he complained that "our volume is down" due to regulatory scrutiny.[13] He further discussed litigation the Defendants were embroiled in with former employees, noting that former employees were "threatening to file against all corporations and people involved," which posed a "a very big exposure and risk to our entire entities." (UF #34(j)).

Moreover, in the same correspondence, Doron acknowledged the "high-risk nature of our business model" and the possibility that their assets may be frozen by the FTC. (UF #34(j)). This text message leaves no doubt that Doron fully understood the illegal and deceptive nature of the enterprise he was running.

---

[12] For example, Alon includes Nottea on an email he forwards from UMS Bank, in which he discusses his plan for winding down the sales of AuraVie in part because of FTC regulations. UF #34(i)(viii); UF #34(i)(viii).

[13] UF #34(j) ("Our volume is down to about 350 (100 from lifescript + 250 from un-compliant survey traffic per day ... ) And even that is a miracle since we can no longer use advertorials for now ... As the lady (pam bondi) in the Florida Atty. Gen. is reviewing every single continuity skincare and diet advertisers in the industry ... We are waiting for some more industry news to be released in order to make an executive decision on whether or not to run blogs again ...")

### 3. Igor Latsanovski

#### i. Igor Latsanovski Participated in and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise

Igor Latsanovski was a principal member and investor in the AuraVie common enterprise. He was a partner in BunZai Media Group, Inc. (UF #36(a), (b), and (c) the principle entity in the common enterprise. (Dkt. #120, at 38). Although Latsanovski claimed that he was merely a "silent investor" in BunZai Media Group, (Dkt. #106, at 6) he previously swore under oath that the company was his employer (UF #36(g))[14] and that he held an officer's position in the company. (Dkt. #106, at 6). In a letter to the United States Citizenship and Immigration Services describing his job responsibilities at CalEnergy, Latsanovski represented that he was actively involved in "reviewing the activities and providing guidance to managed companies." (UF #36(h)).  Business correspondence and emails confirm Defendant Latsanovski was personally involved in managing the companies on a day-to-day level. (UF #36(q)). For example, in an August 2013 email, Latsanovski described his plan for the future of the AuraVie companies and his own role within it. (UF #36(q)). Writing to his partners, co-Defendants Alon and Doron Nottea, Latsanovski outlined his thoughts concerning the leadership and growth of Pinnacle, which he described as

---

[14] *See also* UF #36(g) (BunZai Media Group, Inc. Form W-2 listing Defendant Latsanovski as an employee.).

"our company." (UF #36(q)). He provided his business partners with his opinion on who should lead various departments of their company and, demonstrating keen knowledge of their activities, he evaluated the relative strengths and weaknesses of various employees. (UF #36(q)).

Other emails show Latsanovski participated in and controlled companies in addition to Pinnacle Logistics, including ones in which he had no apparent ownership. (UF #36(i) and (n)). And emails confirm Latsanovski was a decision-making business partner, rather than an uninformed investor that only provided loans. (*See*, *e.g.,* UF #36(q)). In addition to managing the companies, Latsanovski also propped up the common enterprise by financing the Corporate Defendants despite his knowledge of Defendants' illegal business practices. (Dkt. 120, at 35-36). Latsanovski himself has acknowledged his funding of the enterprise was essential to the companies' continued operations. (Dkt. #106-2, at 30-31.)

Defendant Latsanovski owned, managed, and directly participated in the business practices at issue in the scheme.

### ii. Igor Latsanovski Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices

Latsanovski knew or consciously avoided knowledge of his companies' illegal business practices. In emails, Latsanovski demonstrated a keen understanding of the company's business model, its issues with chargebacks, its

related entities, and its employees. (UF #36(j) and (l)). He was consistently provided updates from the other Individual Defendants concerning the common enterprise and in fact specifically inquired into company chargeback rates in his email correspondence. (UF #36(l) and (m)). He was often at the Corporate Defendants' business premises (UF #36(i)(ix)), where he discussed chargebacks with Defendant Alon Nottea. (UF #36(l)(iii). Moreover, he reviewed the company's books with employees and demonstrated a comprehensive knowledge of the financial workings and performance of the enterprise. (Ex. 36(i)). Moreover, he edited and emailed a spreadsheet containing sales, revenue, and chargeback information and would periodically discuss and review sales data with employees. (Ex. 36(i)(i)).

Further, Latsanovski's claim that he was unaware of Defendants' attempts to deceive banks, consumers, and law enforcement is not credible. Latsanovski has expertise in the payment-processing industry, and owned at least one merchant service provider. (*See* Dkt. #90-1). In his emails, he also discussed and was apprised of the companies' issues with compliance. UF #36(m).  The evidence thus shows Latsanovski acted with full knowledge of the deception.

### 4.     Alan Argaman

> #### *i. Alan Argaman Participated in and Controlled or Had Authority to Control One or More Companies Forming the Common Enterprise*

Defendant Argaman provided the common enterprise with a variety of essential services without which the common enterprise could not have continued operations. (UF #39(d)). Aside from his individual involvement in other aspects of the common enterprise,[15] Argaman provided many services through Secured Merchants LLC, a company he owns and jointly operated with other Individual Defendants. (UF #39).

Secured Merchants's executive summary shows its founders were in the business of selling skincare products:

> Over the past two years, the founders of Secure Merchants saw first-hand every type of failure trap that could have killed their skin care product company, which today has monthly sales of $2.5 million or 25,000 orders.
> Thus the problems that our three initial services solve for any DRM [Direct Response Marketing] company are the core infrastructure needed to deal with (1) the inevitable credit card chargebacks, (2) keeping customers happy or allowing them an easy opt-out, and (3) providing the most sophisticated customer record management system. (UF #26(c)).

---

[15] *See, e.g.,* UF # 39(d)(xii) (Argaman forwarding shipping rates for AuraVie product to Doron Nottea); UF # 39(d)(ix) (providing potential purchase opportunity for common enterprise to Doron Nottea); UF #39(k) (working with Doron Nottea regarding payments made to the Indian call center providing customer services for the common enterprise).

Thus either Defendant Argaman himself was involved in the skincare business or the other founders—founders Argaman denies the existence of[16]—are the members touting such a history with managing a chargeback-ridden skincare business. In fact, through Secured Merchants LLC, Defendant Argaman received at least $300,000 from the common enterprise. (Dkt. #120, at 25).

### ii. Alan Argaman Had Knowledge or Consciously Avoided Knowledge of AuraVie's Unlawful Acts or Practices

Defendant Argaman was included on numerous emails discussing the companies' business that far exceed the limited scope of his claimed involvement, including emails discussing or including the enterprise's unusually high chargeback rates.[17] And despite his claims to the contrary, numerous factors should have alerted Defendant Argaman to the high probability of fraud.

Defendant Argaman knew, or consciously avoided knowing, that Defendants marketed their products using deceptive risk free trial offers. (UF #39(h)). Moreover, he knew, or should have known, that Defendants took significant measures to disguise their common enterprise. (UF #39(i) and (j)). Argaman knew Defendants required a platform for responding to the large number of chargebacks they received—in fact, he created such a platform for Defendants

---

[16] UF #43(b)(vi).

[17] *See* UF #39(h), (i), (j), and (l).

and assisted them in responding to such chargebacks without regard for whether the high number of chargebacks indicated fraud. (UF #39(f) and (g)). Lastly, Defendant Argaman knew, or should have known, that consumers had a valid basis for requesting the chargebacks he contested: Chargeback Armor claimed to investigate all chargebacks they contested. (UF #41(h)).

### 5. Roi Reuveni

#### i. Roi Reuveni Participated in and Controlled or Had Authority to Control One or More of the Companies Forming the Common Enterprise

Defendant Reuveni, cousin of Doron and Alon, supervised the customer service and chargeback departments of the AuraVie common enterprise. (UF #37(g)). Reuveni participated in the common enterprise since at least early 2011. (UF #37(h)). Reuveni permitted Defendants to use his information to open the shell corporations DMA Media Holdings, Inc. (UF #37(a)) and Agoa Holdings, Inc. (UF #37(k)). Both companies were used to process consumers' credit cards for the AuraVie products. (UF #37(a) and (j)).

Reuveni also worked for Secured Merchants. (UF #37(i)). Moreover, Reuveni was also Chief Operating Officer and a "consultant" to Chargeback Armor, Inc., (Dkt. #120, at 33) the company Defendants used to fight customers' legitimate chargeback demands, and assisted in managing its operations. (UF #37(b); *see also* UF #37(f); (l); and (m)).

### ii. Roi Reuveni Knew, or Consciously Avoided Knowledge of, Defendants' Unlawful Acts or Practices

Defendant Reuveni knew of the deceptive acts and practices of the common enterprise. In fact, he was integral to carrying out these acts and could not have fulfilled his duties within the common enterprise without such knowledge. (*See* 37(n); (o); and (p)). Countless emails show Reuveni discussing and being included on emails concerning consumer complaints (*See* UF #37(g)(ix); UF #37(t)), chargebacks (*See* UF #37(r) and (s)), and how best to handle them. (*See*, *e.g*, UF #37(q); *see also* UF 37(p)). He continued to participate in and promote the deceptive operation despite knowing the consumer injury it was causing.

## VI.  LEGAL ARGUMENT

### A.  Summary Judgment Standard.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its burden under Rule 56(c), the burden shifts to the non-moving party to produce facts to show there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1    Summary judgment is proper when a rational trier of fact would not be able

2    to find for the nonmoving party on the claims at issue. *Id*.; *Harvill v. Westward*

3    *Commc'ns, LLC*, 443 F.3d 428, 433 (5th Cir. 2005). Only disputes over facts that

4    might affect the outcome of the case would properly preclude summary judgment.

5    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, any opposition

6    to this motion must set forth admissible evidence that is significantly probative,

7    and not merely colorable, of any fact that is claimed to be disputed. *Id*. at 249.

8    As the Supreme Court has held:  "The mere existence of a scintilla of

9    evidence . . . will be insufficient; there must be evidence on which the [fact finder]

10   could reasonably find for [the opposing party]." *Id*. at 252; *Hawking v. Ford*

11   *Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000). Because Defendants cannot

12   come forward with any probative controverting evidence showing that there is a

13   genuine issue for trial, the Court should grant summary judgment.

14   **B.   The FTC is Entitled to Summary Judgment as to Count I Because Defendants Failed to Disclose Material Terms of Their Offer**

15

16   Section 5(a) of the FTC Act empowers the FTC to prevent "deceptive acts

17   or practices in or affecting commerce." 15 U.S.C. § 45(a) (2006). An act or

18   practice is deceptive if "first, there is a representation, omission, or practice that,

19   second, is likely to mislead consumers acting reasonably under the circumstances,

20   and third, the representation, omission, or practice is material." *FTC v. Gill*,

265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)). A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[18] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).

The evidence shows that AuraVie's scheme centered around deceptive omissions. Specifically, after representing that they were offering a "risk-free trial" offer, Defendants failed to disclose the material terms of that offer. Defendants failed to disclose that they would use consumers' credit or debit card information to charge for the full costs of the products after a limited time. (UF #45, #47-49, #59-62). Defendants failed to disclose the dates that the trial period began and ended. (UF #56-58, UF #61(a)). Defendants failed to disclose that consumers who accepted a "risk-free trial" offer would be automatically enrolled in a negative option continuity plan with additional charges. (UF #56-58). Defendants failed to disclose the costs of the continuity plan and the frequency

---

[18] The FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id.* at 605–06.

and duration of the recurring charges. (UF #51-61). Defendants also failed to disclose the means consumers could use to cancel the continuity plan. (UF #55-58). Finally, Defendants failed to disclose the limitations of their refund policies. (UF #62-67).

These failures to disclose were likely to mislead reasonable consumers. Indeed, Defendants knew from consumer complaint and chargeback activity that consumers were being misled and believed the website offers were advertising free products. (*See*, *e.g.,* UF #32(s) and (u); UF #34(j); UF #39(f) and (g); UF #65). Notably, the FTC is not required to show an intent to deceive, since consumers can be equally harmed by both deliberate and negligent conduct. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev. 1992) (George, C.J.). However, in this case, the evidence shows that Defendants did indeed intend to deceive consumers. (*See* UF #61(a), UF #32). They buried disclosures that were material to Defendants' sales offer in obscure hyperlinks, to trick consumers into paying for Defendants' products. (*See* UF #49; UF #56, UF #59). Defendants' failure to clearly and conspicuously disclose the material terms of their offer was a deceptive omission that violated Section 5 of the FTC Act.

### C. The FTC is Entitled to Summary Judgment as to Count II Because Defendants Falsely Represented that their Trial Offer was "Risk Free"

There is no genuine dispute that Defendants falsely represented to consumers that its products were "Free" or "Risk Free." (UF #47-50). These representations were deceptive under Section 5 of the FTC Act because they were both likely to mislead consumers acting reasonably and material to consumers' purchasing decisions. *See FTC v. Gill*, 265 F.3d 950; *FTC v. Pantron I Corp*., 33 F.3d 1095.

"To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d at 1223 (citing *Cyberspace.Com*, 453 F.3d at 1200). Here, Defendants' websites prominently touted that products were offered "Free" in large, colorful font, often in multiple places. This created a "net impression" that Defendants' product was free (except for the disclosed nominal shipping fee). That impression was likely to mislead reasonable consumers because it was false: Defendants actually intended to charge up to $97.88 for the products. (UF #51-53). There is no question that a false representation that a product is "free" or "risk free" is material and violates Section 5. *See FTC v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012) ("This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on

whether or not to purchase a product. The notion that consumers will get a free kit makes it more likely that they will unwittingly provide their credit card information, thinking they are only paying for shipping and handling, when in fact, they are obligating themselves to pay a subscription fee for the continuity program.")

To be clear, the fact that some of Defendants' websites contained hidden disclosures of some, but often not all, of the charges a consumer would incur by accepting the "risk free" offer did not cure Defendants' deception. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."). [19] As Defendants

---

[19] *See also FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010) ("[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an accurate impression") (*quoting Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine print disclosure at the bottom of the ad); *FTC v. Porter & Deitsch*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers made in contract for credit repair services were insufficient to counteract advertising claims about the service).

knew, consumers did not see the disclosures that they buried in inconspicuous hyperlinks. (UF #56-61). Thus, summary judgment on Count II is warranted.

### D. The FTC is Entitled to Summary Judgment as to Count III Because Defendants Falsely Represented that their Better Business Bureau Rating

Defendants falsely represented that they were accredited by the Better Business Bureau ("BBB") with an "A-" rating. (UF #49-50). These representations were likely to mislead reasonable consumers because they were false; AuraVie had its accreditation revoked over a year before the filing of this suit and had an "F" rating with the BBB. (UF #50). Express product claims are presumed to be material and reliance upon such claims is presumptively reasonable. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000). Accordingly, Defendants' misrepresentation was materially deceptive and violated Section 5 of the FTC. Therefore, summary judgment on Count III is warranted.

### E. The FTC is Entitled to Summary Judgment as to Count IV Because Defendants Unfairly Charged Consumers without Authorization

An act or practice is unfair, and violates Section 5(a) of the FTC Act, if it causes, or is likely to cause, substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or

1   competition. 15 U.S.C. § 45(n). Defendants' unauthorized charges to consumer

2   credit cards and bank accounts were unfair.

3          Courts have regularly found unauthorized billing practices to be unfair.

4   *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010) (unauthorized

5   charges to telephone bills were unfair); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176,

6   1203 (C.D. Cal. 2000) (unauthorized credit card charges); *FTC v. Windward*

7   *Mktg., Ltd.*, No. 96-615F, 1997 WL 33642380, at *10, 13 (N.D. Ga. Sept. 30,

8   1997) (unauthorized bank debits).

9          Three uncontroverted facts irrefutably prove that Defendants charged

10  consumer credit cards and bank accounts without authorization. First, Defendants'

11  records and those of its processors show that it processed thousands of charges to

12  consumer credit card accounts. Second, Defendants' victims have testified that

13  they did not authorize those charges, or even see a disclosure regarding such

14  charges. Thousands of these consumers complained directly to Defendants, to

15  banks, the Better Business Bureau, or to law enforcement. Third, Defendants'

16  chargeback rates rose as high as 35 percent.[20] These rates were consistent across

17  Defendants' many merchant accounts. These appallingly high rates accord no

18

---

19  [20] *See* Dkt. #121-1, at 8 ("Analysis of the entities' chargeback rates indicates the
    rates for RD's ranged between 14% and 35% for the various Defendant entities.

20  The chargeback ratio appears significantly higher than the industry acceptable
    chargeback rates of 1%.").

explanation other than unauthorized charges.[21]

Consumers nationwide were injured by Defendants' practices. Taking consumers' money without authorization is presumed to cause substantial injury. *See J.K. Publ'ns*, 99 F. Supp. 2d at 1201 (finding substantial injury where "consumers were injured by a practice for which they did not bargain"). The injury is substantial even if the amount taken is relatively small. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995) ("[C]onsumer injury is substantial when it is the aggregate of many small individual injuries."). Indeed, it is a well-established principle in the federal courts that large numbers of consumer complaints and high chargeback, return, and refund rates are convincing evidence that a consumer did not agree to be charged. *See FTC v. MacGregor*, 360 Fed App'x 891, 894 (9th Cir. 2009) (holding that high refund and return rates, along with high volume of complaints, are probative of misrepresentations and other abuses).[22]

---

[21] Defendants' high chargeback rates existed despite their use of dozens of shell companies, merchant accounts, and billing descriptors. These practices served no other purpose than to conceal the immense common enterprise and its beneficiaries from its victims, payment processors, banks, and law enforcement. *See J.K. Publ'ns*, 99 F. Supp. 2d at 1202-3 (finding that defendants' use of five different merchant accounts and four fictitious business names in one year was evidence of unauthorized billing).

[22] *See also FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) (high volume of consumer complaints and excessive chargeback rates

In addition, consumers had no means of reasonably avoiding charges that had not been effectively disclosed to them. (UF #51-62). Consumers cannot reasonably avoid an unauthorized charge that they only discover after it occurs. *Inc21.com*, 745 F. Supp. 2d at 1004 ("[T]he burden should not be placed on defrauded customers to avoid charges that were never authorized to begin with.").

Finally, consumers do not benefit from being debited or charged for products or services "they never agreed to purchase, didn't know were being provided to them, and never wanted in the first place." *Inc21.com*, 745 F. Supp. 2d at 1004-05; *see also Neovi*, 604 F.3d at 1157 (consumers are "injured by a practice for which they did not bargain"); *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

Because Defendants' unauthorized charges caused, or were likely to cause, substantial injury to consumers that was not reasonably avoidable and was not outweighed by countervailing benefits to consumers or competition, Plaintiff is

---

reaching 8 percent consistent with fraud); *Grant Connect*, 827 F. Supp. 2d at 1221 ("[H]igh number of cancellations, refunds and chargebacks suggest that in fact consumers were deceived about what they were ordering."); *J.K. Publ'ns*, 99 F. Supp. 2d at 1203 (finding unauthorized charging where, among other things, more than 50 percent of consumers contacting defendants claimed they had not ordered defendants' products and there were 7.3 percent chargebacks); *FTC v. QT, Inc.*, 448 F. Supp 2d 908, 936 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008) (refund rate of 25 percent indicates deception); *FTC v. Crescent Publ'g Grp.*, 129 F. Supp. 2d 311, 315, 322 (S.D. N.Y 2001) (lack of consumer authorization evidenced by "strikingly high chargeback level that averaged approximately 10.51 percent."); *Windward Mktg.*, 1997 WL 33642380, at *6, 12 (concluding from 40 percent return rate that defendant knew debits were unauthorized).

entitled to summary judgment on Count IV of its Complaint.

**F.  The FTC is Entitled to Summary Judgment as to Count V Because Defendants Violated the Restore Shoppers Online Confidence Act**

Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless (1) the seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403 (2006).[23] Defendants' continuity plans are a negative option feature, as defined by the TSR. 16 C.F.R. § 310.2(u) (2006). [24] Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

---

[23] It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. *Id.*

[24] The TSR defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

Defendants violated ROSCA in three ways. First, Defendants failed to disclose clearly all material terms of their negative option continuity plan. (UF #51-62). The terms, when provided at all, were buried in fine print hyperlinks on pages dominated by "risk free" and "trial" offers. (UF #56, UF #59). The unusually (and unconscionably) onerous return and chargeback policies were buried in an obscure, small "T&C" hyperlink filled with fine print and impenetrable jargon. (*Id.*).

Second, Defendants routinely charged consumers for continuity plans without obtaining their express informed consent. Defendants solicited consumers' credit card information purportedly for the purposes of paying a nominal shipping and handling fee. (UF #48, #50). Defendants then used that billing information to charge consumers—without consumers' authorization or knowledge—up to $97.88. (UF #51-62).

Third, Defendants failed to provide a simple mechanism for cancelling the continuity plan. Chargeback demands and return requests were met by a level of resistance from Defendants and their employees that was designed to obstruct any refunds and to threaten and intimidate consumers who challenged Defendants' unlawful practices. (UF #9-41). Their intimidation tactics included telling consumers that chargeback requests were almost never successful to informing consumers that chargeback requests would be treated by Defendants as fraudulent

and were subject to potential civil and criminal investigation and even prosecution. (*Id.*) Plaintiff is entitled to summary judgment on Count V of the Complaint.

### G. The FTC is Entitled to Summary Judgment as to Count VI Because Defendants Violated the Electronic Fund Transfer Act and Regulation E

The Electronic Fund Transfer Act, and its implementing statute Regulation E, regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account. EFTA and Regulation E require that, before a merchant can make such recurring debits, it must obtain a written authorization signed or similarly authenticated by the consumer.[25]

EFTA and Regulation E work hand-in-hand.  Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Section 903(9) of EFTA, 15 U.S.C. §1693a(9), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."  Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that "[p]reauthorized

---

[25] 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."  Section 205.10 of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. §205.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization."  *Id*. ¶10(b), cmt 5.  The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable …"  *Id*. ¶ 10(b), cmt 6.

As demonstrated above, Defendants' business practices failed to comply with EFTA for several reasons. First, Defendants' terms and conditions regarding recurring monthly fees were not clear and readily understandable. In fact, this information was concealed in documents available only by hyperlink or in hard-to-read disclosures. Further, Defendants' websites were covered with claims that their offer was "risk free" and other directly contradictory statements.

Second, Defendants' websites or terms and conditions pages could not serve as the consumer's "copy" of the authorization, as required by 15 U.S.C. § 1693e(a), because it was not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional transfers. In short, consumers who purchased Defendants' products using their debit cards

were not authorizing recurring debits from their bank accounts and never received a copy of any purported authorization for such debits.

Accordingly, summary judgment on Count VI is warranted.

### H. The FTC is Entitled to Summary Judgment as to Count VII Because (1) Relief Defendant Chargeback Armor, Inc. Received Funds From Defendants Traceable to Defendants' and (2) the Company is an Asset of the Individual Defendants

The undisputed facts demonstrate that the Relief Defendant has no legal or equitable title to the funds it received gratuitously from the Individual Defendants and other Corporate Defendants engaged in the scheme. "The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."[26] Here, disgorgement of the revenues Chargeback Armor generated in its furtherance of the scheme is the minimal equitable relief that should be levied by this Court. And this Court should grant just such relief.

Under the FTC Act, disgorgement from a relief defendant is warranted where:  (1) the relief defendant has received ill-gotten gains; and (2) does not have

---

[26] *FTC v. Ivy Capital, Inc., et al.*  2013 WL 1224613, *18 (D. Nev. Mar. 26, 2013) quoting *SEC v.Colello*, 139 F.3d 674, 676 (9th Cir. 1998).

1   a legitimate claim to those gains.[27]   Once demonstrated, the appropriate remedy is

2   an equitable monetary judgment equivalent to the amount of ill-gotten gains that

3   the relief defendant received.[28]   Moreover, it is well-established that government

4   agencies, in an effort to maximize the recovery of funds taken through fraud, may

5   pursue individuals or companies even if they are no longer in possession of the ill-

6   gotten assets.[29]

7        The evidence shows that the Relief Defendant received substantial transfers

8   of funds traceable directly or indirectly to the unlawful conduct of AuraVie.

9   (UF #41). Chargeback Armor, Inc. was a key component to the continuation of the

10   [27] *See FTC v. Ivy Capital,Inc., et al.,* 2013 WL 1224613, * 18 (relief defendant
    who was responsible for keeping the books and for various operations or

11   administrative tasks is liable for disgorgement); *FTC v.Transnet Wireless Corp*.,
    506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (relief defendant liable for the full

12   amount off ill-gotten gains she received when she provided no service to the
    corporate defendants); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998)

13   (summary judgment against a relief defendant who failed to show he had a
    legitimate claim to the ill-gotten gains he received); *FTC v. Inc21.com Corp*., 745

14   F.Supp.2d 975, 1009 (N.D. Cal. 2010*), aff'd* 475 Fed. Appx. 106 (9th Cir. 2012)
    (relief defendant liable for ill-gotten gains as he was "president" of a corporation

15   "in name only" and provided no services to the corporation); *FTC v. Holiday
    Enterp*, 2008 WL 953358, * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant liable as

16   "[s]he never performed any work for the [defendant] companies (except for
    occasional signing of checks) and would not have a legitimate claim to properties

17   because of any work performed for the Holiday companies"); *FTC v. Think
    Achievement Corp*., 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000).

18   [28] *See FTC v. Transnet Wireless Corp*., 506 F. Supp. 2d at 1273.

19   [29] *See*, *e.g.,* *CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga.
    May 7, 2012) ("An individual may be a proper relief defendant even if she does

20   not possess the actual ill-gotten gains if she previously received benefits that were
    derived from another person's unlawful conduct.").

scheme and received transfers in exchange for aiding the enterprise's ability to manage and abusively contest chargeback demands from consumers. (UF #41(d)). Because these payments were generated by deceiving consumers, Chargeback Armor does not have a legitimate claim to them and should be forced to disgorge those funds. Therefore, summary judgment on Count VII should be granted.

## I.   Defendants are Each Liable for the Legal Violations
### 1. The Corporate Defendants Operated as a Common Enterprise

Where, as here, Corporate Defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202. "To determine whether a common enterprise exists, the Court considers factors such as: common control; the sharing of office space and officers; transacting business through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *Id.* (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)); *see also FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 at *13 (D. Nev. Mar. 26, 2013) (common enterprise existed where there was common control, shared office space, interrelated activity, and commingled funds).  When determining whether a common

enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable because it was part of a "maze of interrelated companies"). The Ninth Circuit has also held that "entities constitute a common enterprise when they exhibit either vertical or horizontal commonality – qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." [30]

In this case, all indicia of common enterprise that federal courts have recognized as demonstrating collective action—(1) common control; (2) the sharing of office space and officers; (3) whether business is transacted through a maze of interrelated companies; (4) the commingling of corporate funds and failure to maintain separation of companies; (5) unified advertising; (6) pooled resources and staff; and (7) evidence which reveals that no real distinction existed between the Corporate Defendants—are met.[31] Each of the Individual Defendants controlled multiple entities, and each served in various roles at other of the enterprise's entities as well.

---

[30] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010)

[31] *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997).

*(1) Common control:* The Corporate Defendants and shell companies operated as a single economic unit under common control using shared resources to effect their mutual goals of charging consumers without their authorization and evading detection. (UF #42).

*(2) Common offices:* As detailed above, many of the Corporate Defendants have no business premises, employees, or business function except to process charges for Defendants' "risk free trial."[32] Many, if not all, of the Corporate Defendants operated out of a single office, which was leased by Secured Commerce LLC (co-owned by Doron Nottea and Alan Argaman) but housed the operations of substantially all of the entities involved in the scheme. Several other factors show the intertwined nature of these companies: BunZai and Pinnacle share phone numbers, mailing addresses, and dozens of employees.

*(3) Network of interrelated companies:* Third, all Corporate Defendants are owned and operated by Defendants, their family members, or associates, and all participated in the scam of luring consumers to provide billing information with false offers of "risk free trials." The shell entities all served the common purpose of generating revenues through the Defendants' fraudulent scheme while evading detection by payment processors, while Defendants such as SBM Management,

---

[32] *Cf. J.K. Publications, Inc.*, 99 F. Supp. 2d at 1202 (finding a common enterprise where "the corporate defendants utilized at least five different merchant accounts and four fictitious business names to process over $40 million in credit and debit card transactions").

Inc. and CalEnergy, Inc. served as intermediary entities transferring funds from the merchant accounts to a web of entities whose purposes ranged from the scheme's operations to simply existing to funnel funds to Individual Defendants such as Alon Nottea (Apogee Network LLC and Adageo, LLC) and Roi Reuveni (Trigen, L.L.C.).

(4) *Commingling of corporate funds*: Fourth, the finances for almost all of the Corporate Defendants were derived from the sale of the same products. (UF #42.) The finances of these Corporate Defendants were handled by the same managers and employees. (UF #42(d)).

(5) *Unified advertising*: As discussed above, the AuraVie scheme had a unified advertising company in Media Urge, Inc. The common enterprise used the same Internet advertising for the same product, regardless of what shell company processed the charge. (UF #43(a)); (UF #19).

(6) *Pooled resources and staff*: As discussed above, the same principal actors, most of whom are Individual Defendants in this action, owned and operated the numerous corporate entities associated with this scheme. (UF #43). Despite the extensive operations and many nominally different operating entities associated with the scheme, a relatively small group of individuals were responsible for day-to-day operations. (UF #43). No single employee relating to the financing or decision making of the various entities worked for only one entity

or in only one field: all operated across companies and in various different responsible positions throughout the corporate web. (UF #32, #32(d), #32(f), #32(g), #32(K)(iii), #34, #34(a), #34(d), #34(h), #34(h)(xvi), #36(a), #37, #37(a), #37(b), #37(d), #39, #40.)

*(7) No distinctions between entities*: Although each Corporate Defendant served its own purpose in the scheme, many served similar purposes or easily could have served a different one because the companies shared owners, managers, and financial expertise. Insofar as the small group of Individual Defendants owned and operated such a vast web of companies to execute the scheme, the companies' names and corporate architecture were for all intents and purposes nominal: each entity could have served a different purpose in the scheme without any needed change in ownership structure, hiring of employees, or recruiting of experts. Even in the most highly expertised areas of the common enterprise—the chargeback area of the scheme's operations—Defendants Reuveni and Argaman served together with both Doron and Alon Nottea for both Secured Merchants, LLC and Relief Defendant Chargeback Armor, Inc. in a manner that left those entities hardly distinct from the other operating enterprises in the scheme. (UF #41); (UF #43(b)); (UF #43(c)).

### 2. Injunctive and Monetary Relief for Individual Defendants
#### *i.  The Standard For Injunctive Relief.*

Individuals are subject to injunctive relief for a company's deceptive acts or practices when they either:  (1) "participated directly in the acts or practices;" or (2) "had authority to control them."[33]  "Participation" can include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations.[34]  Moreover, where an officer participates in "acts crucial to the success" of an enterprise, the officer has directly participated for the purposes of individual liability.[35]  In *J.K. Publications*, for instance, the court held liable a corporate officer who had obtained merchant accounts and purchased a database of consumers for the corporate defendant.[36]

Individuals are also liable for injunctive relief if they had "authority to control" the corporation, which can be inferred from "'active involvement in business affairs and the making of corporate policy.'"[37]  An individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control."[38]  Indeed, a "corporate officer is presumed to be in control of a small, closely held

---

[33] *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

[34] *See, e.g., FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).

[35] *Id.*

[36] *Id.*

[37] *J.K. Publications*, 99 F. Supp. at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).

[38] *Id.* at 1204.

corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority."[39]

### ii.  The Standard For Equitable Monetary Relief.

To obtain equitable monetary relief against an individual, the FTC must show, in addition to one of the two factors above, that the individual had some knowledge of the company's deceptive acts or practices.[40] Individuals possess the requisite knowledge if they: (1) had actual knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.[41]  The "degree of participation in business

---

[39] *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 WL 1224613, *14 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ("An individual's status as a corporate officer gives rise to the presumption of ability to control a small, closely-held corporation."); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.").

[40] *J.K. Publications,* 99 F. Supp. at 1204.

[41] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

affairs is probative of knowledge."[42]  The FTC, however, is not required to prove that an individual actually intended to deceive to establish knowledge.[43]

### iii.  The Individual Defendants Are Liable For Both Injunctive And Monetary Relief.

There is no genuine dispute that each individual defendant participated in furthering the goal of, and/or had authority to control, the AuraVie companies.  It is also undisputed that each individual had the requisite degree of knowledge of AuraVie's unlawful acts and practices to hold him jointly and severally liable for equitable monetary restitution to AuraVie's many consumer victims.  Because there are no genuine issues of material fact in dispute, the FTC requests the Court order summary judgment against each of the Individual Defendants.

Each of the Individual Defendants owned or operated one or more of the companies involved in the common enterprise. **Alon Nottea** owned several of the entities, including but not limited to being a partner in Bunzai Media Group, sole owner of his "consulting" LLCs, Adageo LLC and Apogee Network LLC.[44]  **Igor Latsanovski** was a partner in Bunzai Media Group, Inc. and was the sole owner of CalEnergy, Inc.—an entity critical to the scheme's money transfers across its

---

[42] *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[43] *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

[44] *See* Section IV(B)(1).

web of operating and pass-through entities.[45] **Alan Argaman** owned at least Secured Merchants LLC and Secured Commerce, LLC and was closely involved in the day-to-day operations of Chargeback Armor, Inc., all of which were critical to the scheme's deceptive chargeback practices.[46] **Roi Reuveni** owned his consulting LLC, Trigen, L.L.C., while also serving as an officer and owner, along with Defendants Alon and Doron Nottea Chargeback Armor, Inc.[47] **Doron Nottea** owned (with Alan Argaman) Secured Commerce LLC and (with Alon Nottea and Roi Reuveni) Chargeback Armor, Inc., while serving as the bookkeeper for the vast majority of the enterprise's web of companies.[48] Moreover, all these defendants signed legal documents on behalf of AuraVie companies, including merchant account applications, tax returns, and bank signature cards.  Thus, the undisputed facts show that the individual defendants each had authority to control one or more of the AuraVie companies.

As described above, the undisputed facts also show that each individual defendant actively participated in AuraVie's unlawful acts and practices, and had ample knowledge of them.  Indeed, each Individual Defendant's documented and admitted participation in AuraVie's business affairs proves his knowledge of AuraVie's unlawful conduct. **Defendants Alon** and **Doron Nottea** were

---

[45] *See* Section IV(B)(3).
[46] *See* Section IV(B)(4).
[47] *See* Section IV(B)(5).
[48] *See* Section IV(B)(2).

responsible for the day-to-day operations of the majority of the common enterprise's entities, with Alon running the business and Doron managing the finances of the web of subsidiaries required to execute the scheme.[49] As such, both undeniably had knowledge of the practices that they themselves were carrying out.

Despite holding himself out as a mere investor, **Defendant Latsanovski** was kept apprised by Alon Nottea of all the core business dealings relating to the scheme and was regularly consulted by Alon Nottea regarding business decisions required to further the company's plans.[50] As such, he unquestionably at least should have known of the enterprise's abusive practices, particularly considering his background in owning payment processors outside of the common enterprise.

**Defendants Argaman** and **Reuveni** similarly at the very least should have been aware and likely were aware of the enterprise's scheme and that it was abusing consumers. Defendants Argaman and Reuveni were intimately involved in providing and operating software designed to minimize chargeback demands by consumers.[51] Setting aside that such programs would inherently attract the type of clientele that would maintain high chargeback rates (an indicia of fraud), Defendant Argaman co-owned the entity that leased the AuraVie office space and shared that office with the other Individual Defendants. His connection with the

---

[49] *See* Sections IV(B)(1), IV(B)(2).
[50] *See* Section IV(B)(3)(ii).
[51] *See* Sections IV(B)(4), IV(B)(5).

other Individual Defendants, along with his access to chargeback data that strongly suggests the fraudulent nature of the enterprise that he was involved with and operationally supporting, demands that he should have been aware of the deception being perpetrated.  Defendant Reuveni was similarly implicated by his participation in the chargeback management of the common enterprise, by his relationship with the other Individual Defendants, and by his other operational roles in the common enterprise.  Therefore, all Individual Defendants meet the standard for equitable monetary liability.

### J. Permanent Injunctive Relief and Monetary Damages Against Defendants Is Necessary.

#### 1. Permanent Injunctive Relief Against Defendants is Warranted.

Section 13(b) of the FTC Act authorizes courts to issue a permanent injunction whenever a defendant violates the laws enforced by the Commission and is likely to continue to violate them.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009).  To determine whether a defendant is likely to engage in similar violations in the future, courts look to two general factors:  (1) the deliberateness and seriousness of the present violation, and (2) the defendant's past record with respect to deceptive and unfair marketing practices.  *Sears, Roebuck and Co. v. FTC*, 676

F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*, 2013 WL 1224613, at *16.  The court may also weigh the "adaptability or transferability of the unfair practice to other products."  *Id*.

Here, the Individual Defendants attempted to steal millions of dollars from thousands of consumers, successfully depriving consumers of over $75 million after returns and refunds.[52]  In response to many hundreds of consumer complaints, high return and chargeback rates, terminated merchant accounts, and law enforcement inquiries, the Individual Defendants took additional steps to evade detection. Incorrigible and adaptive, they created new campaigns and shell companies, fraudulently acquired merchant accounts, lied to consumers and law enforcement.  Without entry of a permanent injunction, Defendants will likely begin their fraud anew, likely learning from past mistakes and making detection more difficult.

### 2.      Equitable Monetary Relief against Defendants is Warranted.

Where, as here, consumers suffer economic injury resulting from defendants' violations of the FTC Act, equity requires monetary relief in the full amount of consumers' losses.  *Stefanchik*, 559 F.3d at 931 (affirming summary judgment holding defendants liable for the full amount of loss incurred by

---

[52] *See* Section II.B.

consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.  To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate.  *See Commerce Planet,* 878 F. Supp. 2d at 1089 (citing *FTC v. Direct Marketing Concepts, Inc.,* 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)).  "Fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendants' burden to show inaccuracy." *Id.*

Here, according to Defendants' own business records and payment processing records, Defendants' charges, minus returns, chargebacks, and refunds, totaled $75,624,030 million. (Ex. 944). But this figure may not include all consumer harm.  It does not, for example, account for the NSF fees or other costs incurred by AuraVie's victims because of the unauthorized, and unexpected, charges.[53]

Because Defendants are jointly and severally liable for that amount, the FTC requests that the Court convert the Receiver into a liquidating receiver and order it wind down AuraVie, liquidate its assets, and pay net assets to the FTC for partial satisfaction for the redress owed to AuraVie's victims.

---

[53] *See* Section II.A.2, II.B.

## VII.  CONCLUSION

For these reasons, the FTC respectfully requests that the Court grant summary judgment against Defendants on all counts alleged in the Amended Complaint and enter a Final Order for Final Judgment and Order for Injunctive and Other Relief.

Respectfully submitted,


Dated: 4/18/16

_____/s/ Reid Tepfer_____
REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (*pro hac vice* pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 979-9386 (Robinson)
(214) 979-9382 (Keller)
(214) 953-3079 (fax)

RAYMOND MCKOWN,
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)
rmcknown@ftc.gov