David C. Shonka
Acting General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff,<br><br>v. | Case No. 2:15-CV-04527-GW (PLAx)<br><br>**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN** |

| | |
|---|---|
| **BUNZAI MEDIA GROUP, INC.,** *et al*,<br><br>          Defendants. | **SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Federal Trade Commission ("FTC"), for its Statement of Uncontroverted Facts and Conclusions of Law in Support of its Motion for Summary Judgment and pursuant to Local Rule 56-1, states:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b; Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404; and Section 917(c), of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c) to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' law violations. *See* Dkt. 235.

### SUMMARY OF THE CASE

2.      Defendants collectively marketed skincare products over the Internet using deceptive offers with hidden costs, negative option features, and return policies. Specifically, Defendants offered "risk-free" trials of skincare products to consumers nationwide through pop-up advertisements and websites. Defendants required consumers who accepted the "risk-free" trials to provide their credit or

1    debit card billing information, purportedly to pay nominal shipping and handling

2    fees to receive the advertised products. However, 10 days after receiving

3    consumers' billing information, Defendants charged consumers the full costs of

4    the products included in the "risk-free" trials, imposing charges of up to $97.88

5    onto consumers' credit or debit cards. Defendants refused to provide refunds for

6    product returns unless consumers met onerous conditions that were not adequately

7    disclosed. Additionally, after charging consumers, Defendants enrolled consumers

8    in a negative option continuity plan, in which Defendants shipped additional

9    products each month and charged consumers' credit or debit cards the full costs of

10   the products, usually $97.88 per month. Defendants' scheme deceived consumers

11   nationwide out of millions of dollars.

12        3.     As explained more fully below, Defendants operated a common

13   enterprise through which they: (a) failed to disclose adequately material terms of

14   their sales offer, including the offer's costs and negative option features; (b)

15   falsely represented that consumers could obtain products on a "trial" or "risk-free"

16   trial basis for only a nominal shipping and handling fee; (c) failed to obtain

17   consumers' informed consent to the material terms, including the negative option

18   feature, of the transaction before charging the consumer; (d) falsely represented

19   their business was accredited by the Better Business Bureau with an "A-" rating;

20   (e) failed to provide consumers a simple method of cancelling their negative

1  option continuity plan, and (f) debited consumers' bank accounts on a recurring

2  basis without obtaining written authorization from consumers or providing a

3  written copy of the authorization to the consumer.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

4      4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.

5  §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b. Dkts. 299 ¶ 4;

6  300 ¶ 4; 301 ¶ 4. *See also* Exs. 910-2 ¶ 1; 911-2 ¶ 1; 914-2 ¶ 1; 915-2 ¶ 1; 916-2 ¶

7  1; 918-9 ¶ 1.

8      5.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and

9  (b)(2), and 15 U.S.C. § 53(b). Dkts. 299 ¶ 5; 300 ¶ 5; 301 ¶ 5. *See also* Exs. 910-2

10  ¶ 6; 911-2 ¶ 6; 912-4 ¶ 6; 913-4 ¶ 6; 914-3 ¶ 6; 915-3 ¶ 6; 916-10 ¶ 6; 917-12 ¶ 6;

11  918-10 ¶ 6.

12      6.    Assignment to the Western Division is proper because Defendants'

13  primary place of business was in Van Nuys, California. Ex. 904.

**PLAINTIFF**

14      7.    The FTC is an independent agency of the United States Government

15  created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC

16  Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or

17  affecting commerce. Additionally, the FTC enforces ROSCA, 15 U.S.C. §§ 8401-

18  05, which prohibits certain methods of negative option marketing on the Internet,

1  and EFTA, 15 U.S.C. § 1693 *et seq*., which regulates the rights, liabilities, and

2  responsibilities of participants in electronic fund transfer systems.

3        8.     The FTC is authorized to initiate federal district court proceedings,

4  by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and EFTA,

5  and to secure such equitable relief as may be appropriate in each case, including

6  rescission or reformation of contracts, restitution, the refund of monies paid, and

7  the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A),

8  56(a)(2)(B), 57b, 8404, and 1693o(c).

9  **DEFENDANTS**

10        9.     Defendant **BunZai Media Group, Inc.** ("BunZai"), also doing

11  business as AuraVie and Miracle Face Kit, was a California corporation with its

12  principal place of business at 7900 Gloria Avenue, Van Nuys, California 91406

13  ("the Van Nuys Office"). Exs. 904-1; 550, at 17:4-7; 600-9. BunZai. also used a

14  mailbox with the address of 16161 Ventura Boulevard, #378, Encino, California

15  91436 ("Encino Mailbox A"). Exs. 600-29; 904-2; and 909-6. At times material to

16  the Complaint, BunZai. advertised, marketed, distributed, or sold skincare

17  products, or provided customer service for such products, to consumers

18  throughout the United States. Exs. 909-1, -23, -24; 910-8 ¶ 56; 911-9 ¶ 56; 914-13

19  ¶ 56; 915-13 ¶ 56. BunZai transacted business in this district and throughout the

20  United States. Dkts. 244 ¶ 9; 245 ¶ 9; 250 ¶ 9; 251 ¶ 9; 253 ¶ 9; 254 ¶ 9.

1      a.      Defendant BunZai sold skincare products

2                using the name "AuraVie." Exs. 909-23; 910-9 ¶ 59; 911-9 ¶ 59; 914-

3                13 ¶ 59;  915-13 ¶ 59.

4      b.      Defendant BunZai sold skincare products

5                using the name "Miracle Face Kit." Exs. 909-23; 910-9¶ 61; 911-9 ¶

6                61.

7      c.      BunZai was owned by Defendants Alon

8                Nottea, Igor Latsanovski, and Khristopher Bond. Exs. 18-2; 302-2.

9      d.      BunZai handled customer service, chargeback refutation, complaint

10              handling, collections, and order fulfillment for Defendants' skincare

11              product business. Dkt. 120, at 38; Exs. 103; 104; 105; 111; 112; 114;

12              117; 124; 128; 240.

13      e.      Around June 6, 2013, BunZai was dissolved and its operations were

14              replaced by a convoluted corporate structure involving numerous

15              companies and shell companies, each with different owners or CEOs.

16              *See* Exs. 904-4; 946, at 13:16-19:25; 946, at 20:24-21:16. There was

17              a transitional period during which the shell corporations and BunZai

18              co-existed and operated simultaneously. *See* Dkt. 120, at 38-40.

19

20

1      f.      BunZai initially handled customer service, chargeback refutation,

2              complaint responses, collections, and fulfillment. *See* Dkt. 120, at 38;

3              Exs. 114; 124; 128; 240; *see also* UF #9(d), supra.

4      10.     Defendant **Pinnacle Logistics, Inc.,** ("Pinnacle") is or was a

5  California corporation with its principal place of business at the same location as

6  BunZai at the Van Nuys Office. Exs. 904-5; 550, at 17:21-24, 550, at 216:12-17.

7  Pinnacle had a secondary address of 6925 Canby Avenue, Suite 105, Reseda,

8  California 91335 ("the Reseda Office"). Dkts. 244 ¶ 10; 245 ¶ 10. At times

9  material to the Complaint, Pinnacle, advertised, marketed, distributed, or sold the

10 skincare products at issue in this case, or provided customer service for such

11 products, to consumers throughout the United States. Dkts. 244 ¶ 1-; 245 ¶ 10.

12 Pinnacle transacted business in this district and throughout the United States.

13 Dkts. 244 ¶ 10; 245 ¶ 10; 250 ¶ 10; 253 ¶ 10; 254 ¶ 10.

14     a.      Pinnacle took over the order fulfillment, customer service, and

15             chargeback functions and managed merchant accounts for

16             Defendants' skincare business after BunZai dissolved. *See* Exs. 194;

17             195; 222.

18     11.     Defendant **DSA Holdings, Inc.** is or was a California corporation

19 with its principal place of business at the same location as Pinnacle, at the Van

20 Nuys Office, and a secondary address of 8335 Winnetka Avenue, #112, Winnetka,

California 91306. Dkts. 244 ¶ 11; 245 ¶11; Exs. 904-9, -11; 550, at 19:19-20:7. At times material to the Complaint, DSA Holdings, Inc., processed credit card or debit card payments for AuraVie, Dellure, Miracle Face Kit, or other skincare products sold by Defendants through negative option. Exs. 910 ¶ 178; 911 ¶ 178; 550, at 19:19-21. DSA Holdings, Inc. transacted business in this district and throughout the United States. Dkts. #44 ¶ 11; 245 ¶ 11.

12.     Defendant **Lifestyle Media Brands, Inc.** is or was a California corporation with its principal place of business at the Van Nuys Office and a secondary address of 8335 Winnetka Avenue, #118, Winnetka, California 91306. Dkts. 244 ¶ 12; 245 ¶12; Ex. 904-14, -15. At times material to the Complaint, Lifestyle Media Brands, Inc. advertised, marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States. Ex. 550, at 71:11-14, 71:22-23. Lifestyle Media Brands, Inc. transacted business in this district and throughout the United States. Dkts. 244 ¶ 12; 245 ¶ 12.

13.     Defendant **Agoa Holdings, Inc.** is or was a California corporation with its principal place of business at the Van Nuys Office. Dkts. 244 ¶ 13; 245 ¶ 13; 250 ¶ 13; 251 ¶ 13; *see also* Ex. 904-18. At times material to the Complaint, Agoa Holdings, Inc. advertised, marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States. Exs. 550,

1   at 71:11-14; 909-154. Agoa Holdings, Inc. transacted business in this district and

2   throughout the United States.  Dkts. 244 ¶ 13; 245 ¶ 13; 250 ¶ 13; 251 ¶ 13.

3         14.    Defendant **Zen Mobile Media, Inc.** is or was a California

4   corporation with its principal place of business at the Van Nuys Office and a

5   secondary address of 4335 Dickens Street #167, Sherman Oaks, California 91403.

6   *See* Dkts. 244 ¶ 14; 245 ¶ 14; Ex. 904-23, -26. Zen Mobile Media, Inc. also used a

7   commercial mail receiving agent mailbox, 16830 Ventura Boulevard, #360,

8   Encino, California 91436 ("Encino Mailbox B"). Ex. 904-24. At times material to

9   the Complaint, Zen Mobile Media, Inc. processed consumers' payments for

10  skincare products sold by BunZaiExs. 914 ¶ 73; 915 ¶ 73; 556, at 21:1-4; 556, at

11  23:8-11. Zen Mobile Media, Inc. transacted business in this district and

12  throughout the United States. Dkts. 244 ¶ 14; 245 ¶ 14.

13        15.    Defendant **Safehaven Ventures, Inc.** is or was a California

14  corporation with its principal place of business at the Van Nuys Office and a

15  secondary address of 548 South Spring Street, #406, Los Angeles, California

16  90013. Ex. 904-28; *see also* Dkts. 244 ¶ 15; 245 ¶ 15. Safehaven Ventures, Inc.

17  also used Encino Mailbox B. Ex. 904-30. At times material to the Complaint,

18  Safehaven Ventures, Inc. advertised, marketed, distributed, or sold the skincare

19  products at issue in this case to consumers throughout the United States. Ex. 550,

20

1    at 71:11-14, 72:4-5. Safehaven Ventures, Inc. transacted business in this district

2    and throughout the United States. Dkts. 244 ¶ 15; 245 ¶ 15.

3        16.    Defendant **Heritage Alliance Group, Inc.** is or was a California

4    corporation with its principal place of business at the Van Nuys Office and a

5    secondary address of 21113 Osborne Street, Canoga Park, California 91304. Dkts.

6    244 ¶ 16; 245 ¶ 16; Ex. 904-32, -33. At times material to the Complaint, Heritage

7    Alliance Group, Inc. advertised, marketed, distributed, or sold the skincare

8    products at issue in this case to consumers throughout the United States.  Ex. 550,

9    at 71:11-14, 72:6-7. Heritage Alliance Group, Inc. transacted business in this

10   district and throughout the United States. Dkts. 244 ¶ 16; 245 ¶ 16.

11       17.    Defendant **AMD Financial Network, Inc.** is or was a California

12   corporation that listed its principal place of business as 9820 Owensmouth

13   Avenue, #15, Chatsworth, California 91311. Ex. 904-36, -37. AMD Financial

14   Network, Inc. was controlled and operated from the Reseda office.  Dkt. 120,

15   12:1-13:20, 77:5-16. At times material to the Complaint, AMD Financial

16   Network, Inc. advertised, marketed, distributed, or sold the skincare products at

17   issue in this case to consumers throughout the United States.  Exs. 550, at 71:11-

18   72:9; 909-140,-142,-143, -144.

19       18.    Defendant **SBM Management, Inc.** is or was a California

20   corporation with its principal place of business at 655 North Central Avenue,

1  Suite 1700, Glendale, California 91203, and its secondary address was the Encino

2  Mailbox B. Ex. 904-39, -40. At times material to the Complaint, SBM

3  Management, Inc., advertised, marketed, distributed, or sold the skincare products

4  at issue in this case to consumers throughout the United States. Ex. 550, at

5  200:18-25. SBM Management, Inc. transacted business in this district and

6  throughout the United States. Dkts. 244 ¶ 18; 245 ¶ 18.

7      19.    Defendant **Media Urge, Inc.** is or was a California corporation that

8  listed its principal place of business as 18757 Burbank Boulevard, Suite 205,

9  Tarzana, California. Ex. 904-43. At times material to the Complaint, Media Urge,

10  Inc. marketed for BunZai, Exs. 910 ¶  222; 912 ¶ 222; *see also* Ex. 556, at 115:5-

11  15;  secured third party advertising tracked sales and designed marketing

12  materials. Exs. 910 ¶¶  80-81; 911 ¶ ¶ 80-81; and performed marketing for the

13  Corporate Defendants. Exs. 910 ¶ 224; 550, at 33:19-34:12. Media Urge, Inc.

14  transacted business in this district. Dkts. 244 ¶ 19; 245 ¶ 19; 250 ¶ 19; 251 ¶ 19.

15      20.    Defendant **Adageo, LLC** is or was a California limited liability

16  company with Encino Mailbox A listed as its registered place of business. Ex.

17  904-46, -47. At times material to the Complaint, Adageo, LLC, existed to

18  advertise, market, distribute, or sell the skincare products at issue in this case to

19  consumers throughout the United States.  *See* Ex. 54-15, see also Ex. 550, at

20

1    156:21-157:15. Adageo, LLC transacted business in this district.  Dkts. 244 ¶ 20;

2    245 ¶ 20; 250 ¶ 20; 251 ¶ 20.

3           a.    Adageo, LLC purchased AuraVie products from a distributor and had

4                 them shipped to Pinnacle. Ex. 54 p. 11.

5           21.    Defendant **CalEnergy, Inc.** is or was a California corporation with

6    its principal place of business listed at 5482 Amber Circle, Calabasas, CA 90132.

7    Ex. 904-49. At times material to the Complaint, CalEnergy, Inc. financed BunZai

8    and managed Pinnacle and Media Urge, Inc. Ex. 571-2, -3. CalEnergy, Inc.

9    transacted business in this district. Dkts. 244 ¶ 21; 245 ¶ 21; 253 ¶ 21; 254 ¶ 21.

10   Defendant Igor Latsanovski is the   CEO of CalEnergy, Inc. Ex. 904-51

11          a.    Igor Latsanovski admitted that CalEnergy, Inc. made investments and

12                loans to Alon Nottea for Alon Nottea's Internet skincare business.

13                Dkts. 253 ¶¶ 2-3; 254 ¶¶ 2-3.

14          22.    Defendant **Kai Media, Inc.** is or was a California corporation. Ex.

15   904-52.  Kai Media was controlled and operated from the Reseda Office.  Dkt.

16   120, at 12:1-13:20, 77:5-16.  Kai Media, Inc. also operated out of the Van Nuys

17   Office. Ex. 551, at 64:23-68-7. It also used Encino Mailbox B. Ex. 904-53. At

18   times material to the Complaint, Kai Media, Inc. advertised, marketed, distributed,

19   or sold the skincare products at issue in this case to consumers throughout the

20   United States. Exs. 909-171; 550, at 71:11-14, 72:18-19. Kai Media, Inc.

1  transacted business in this district and throughout the United States. Dkts. 244 ¶

2  22; 245 ¶ 22.

3        23.    Defendant **Insight Media, Inc.** is or was a California corporation.

4  904-55. Insight Media, Inc., was controlled or operated from the Reseda Office.

5  Dkt. 120, at12:1-13:20, 77:5-16. Its secondary place of business was the Reseda

6  Office. Insight Media, Inc. also used Encino Mailbox B. Ex. 904-56. At times

7  material to the Complaint, Insight Media, Inc. advertised, marketed, distributed, or

8  sold the skincare products at issue in this case to consumers throughout the United

9  States. Ex. 550, at 41:25-42:5.  Insight Media, Inc. transacted business in this

10  district. Dkts. 244 ¶ 23; 245 ¶ 23.

11        24.    Defendant **Focus Media Solutions, Inc.** is or was a California

12  corporation. Dkts. 244 ¶ 24, 245 ¶ 24.   Focus Media Solutions, Inc., was

13  controlled and operated from at 6850 Canby, Suite #103, Reseda, California

14  91335, which was in the same complex as the Reseda Office.  Dkt. 120, at 12:15-

15  16:2. At times material to the Complaint, Focus Media Solutions, Inc. created

16  advertisements for skincare products sold by negative option. Ex. 910 ¶ 215.

17  Focus Media Solutions, Inc. transacted business in this district and throughout the

18  United States. Dkts. 244 ¶ 24; 245 ¶ 24.

19        25.    Defendant **Secured Commerce, LLC** is or was a California

20  company doing business at the Reseda Office. Ex. 54-2. Secured Commerce

1   created the websites used for deceptively marketing and selling skincare products,

2   *See* Ex. 54-2, including the landing pages that contained the bogus "risk free trial"

3   offers. *See* Ex. 54-2; 909-113, -114, -115, -116, -117, -118, -119, -120, -121, -122,

4   -123, -124, -125. At times material to the Complaint, as part of the common

5   enterprise, Secured Commerce LLC participated in efforts to advertise, market,

6   distribute, or sell the skincare products at issue in this case to consumers

7   throughout the United States. *See* Ex. 54-2. Secured Commerce, LLC transacted

8   business in this district. Dkts. 244 ¶ 25; 245 ¶ 25.

9       26.     Defendant **Secured Merchants, LLC** is or was a California limited

10   liability company with its principal place of business at the Reseda Office. Dkts.

11   299 ¶ 26; 301 ¶ 26.   Secured Merchants, LLC, provided other members of the

12   common enterprise the service of contesting chargebacks.  See Ex. 917-45 ¶ 56.

13   Secured Merchants, LLC transacted business in this district. Dkts. 244 ¶ 26; 245 ¶

14   26.

15       a.     Relief Defendant Chargeback Armor, Inc., stated that Secured

16              Merchants, LLC, billed SBM Management, Inc., for processing

17              chargebacks request. Exs. 917 ¶¶ 156, 162.

18       b.     Secured Merchants, LLC, oversaw a variety of other responsibilities

19              for the common enterprise.

20

1           i.        Secured Merchants managed the "voice logix" system,

2                  Defendants' automated customer service line. Ex. 257-2.

3           ii.      Defendant Argaman, and Secured Merchants LLC,

4                  provided $250,000 to Chargeback Armor, Inc. and was the

5                  entity that owned chargebackarmor.com. Exs. 916 ¶ 235;

6                  917 ¶ 235; 280-1.

7      c.     Secured Merchant, LLC's executive summary stated that the

8           company's founders owned a skincare product business:

9                  Over the past two years, the founders of
10                Secure Merchants saw first-hand every type of
failure trap that could have killed their skin
11                care product company, which today has
monthly sales of $2.5 million or 25,000 orders.

12                Thus the problems that our three initial
services solve for any DRM [Direct Response
13                Marketing] company are the core infrastructure
needed to deal with (1) the inevitable credit
14                card chargebacks, (2) keeping customers
happy or allowing them an easy opt-out, and
15                (3) providing the most sophisticated customer
record management system.
16                Ex. 256.

17      d.     A Secured Merchants, LLC, employee sent an email

18           titled "ChargeBack Armor Jan + Feb figures" to Alon,

19           Alan Argaman, Doron Nottea, and Roi Reuveni. Ex.

20

1          151. This email included chargeback statistics for

2          AuraVie. *Id*.

3    e.    A document titled "Secured Merchants" described the

4          "ChargeBack Armor" services as helping "win back lost

5          revenue by reversing chargebacks in your favor" and

6          "handl[ing] the entire chargeback dispute process on

7          your behalf." Ex. 257.

8    27.    Defendant **USM Products, Inc.** is or was a California corporation.

9  USM Products, Inc. made bulk purchases of products and containers for the

10  common enterprise. Exs. 910 ¶ 194; 912 ¶ 194. USM Products, Inc. transacted

11  business in this district. Dkts. 244 ¶ 27; 245 ¶ 27.

12    28.    Defendant **Merchant Leverage Group, Inc.** is or was a California

13  corporation. Merchant Leverage Group, Inc. transacted business in this district.

14  Dkts. 244 ¶ 28; 245 ¶ 28.

15    29.    Defendant **DMA Media Holdings, Inc.** is or was a California

16  corporation located at the Van Nuys Office.  Ex. 551, at 64:23-69:23. At times

17  material to the Complaint, DMA Media Holdings, Inc. advertised, marketed,

18  distributed, or sold the skincare products at issue in this case to consumers

19  throughout the United States. Ex. 550, at 19:19-21. DMA Media Holdings, Inc.

20

1 | transacted business in this district and throughout the United States. Dkts. 244 ¶

2 | 29; 245 ¶ 29.

3 |      30.    Defendant **Shalita Holdings, Inc.** is or was a California corporation.

4 | At times material to the Complaint,  Shalita Holdings, Inc. advertised, marketed,

5 | distributed, or sold the skincare products at issue in this case to consumers

6 | throughout the United States. Ex. 550, at 32:6-10. Shalita Holdings, Inc.

7 | transacted business in this district. Dkts. 244 ¶ 30; 245 ¶ 30.

8 |      31.    Defendant **All Star Beauty Products, Inc.** is or was a California

9 | corporation with its place of business located at the Van Nuys Office. Ex. 551, at

10 | 64:23-70:9. At times material to the Complaint, All Star Beauty Products, Inc.

11 | advertised, marketed, distributed, or sold the skincare products at issue in this case

12 | to consumers throughout the United States. Ex. 550, at 71:11- 73:13. All Star

13 | Beauty Products, Inc. transacted business in this district.  Dkts. 244 ¶ 31; 245 ¶

14 | 31.

15 |      32.    Defendant **Alon Nottea** is or was a Chief Executive Officer ("CEO")

16 | of BunZai, a consultant for Media Urge, Inc., and an owner of Adageo, LLC. Dkt.

17 | 251 ¶ 32. At times material to the Complaint, acting alone or in concert with

18 | others, he formulated, directed, controlled, had the authority to control, or

19 | participated in the acts or practices set forth in the Complaint. *See infra* UF

20 | #32(a), (b), (g), (h), and (i). Defendant Alon Nottea resides in this district and, in

1    connection with the matters alleged herein, transacted business in this district.

2    Dkt. 251 ¶ 32.

3        a.    Alon Nottea was involved in the day-to-day operations of BunZaiEx.

4              910 ¶ 18.

5        b.    Alon Nottea controlled or had authority to control the business

6              operations of BunZaiEx. 910 ¶ 21.

7        c.    Alon Nottea used the alias "Jay Michaels." Ex. 910 ¶ 202.  GoDaddy

8              records show that the Shopper ID 26219179 is identified as Jay

9              Michaels. Ex. 598-5. GoDaddy records show that Shopper ID

10             26219179 purchased and registered BunzaiMedia.com, AuraVie.com,

11             AuraVieFreeTrial.com, MyMiracleKit.com, MiracleFaceKit.com,

12             Dellure.com, and BuyDellure.com. Ex. 598-6,-7,-8,-9,-10.

13       d.    Alon Nottea solicited investments for Relief Defendant Chargeback

14             Armor, Inc. Ex. 910 ¶ 234.

15       e.    Alon Nottea sent and received emails using the email accounts

16             vigorect@gmail.com and alon@chargebackarmor.com. Exs. 910 ¶¶

17             254-55; 917 ¶ 55.

18       f.    Alan Argaman stated that Alon Nottea also sent and received emails

19             using the email account alon@securedmerchants.com. Exs. 916 ¶

20             256; 918 ¶ 256.

g.   Former employees testified that Alon Nottea owned or managed PinnacleExs. 554, at 11:7-9, 13:8-13, 29:17-19; 946, at 42:12-24.

      i.   Defendant Paul Medina testified that he thought of Pinnacle was "a department of Alon's process" in selling AuraVie products. Ex. 946, at 42:19-42:24.

h.   Defendants Igor Latsanovski and CalEnergy, Inc. admitted that Alon Nottea had authority to control Focus Media Solutions, Inc. Exs. 914 ¶ 220; 915 ¶ 220.

i.   Chargeback Armor, Inc. admitted that Alon Nottea provided advice and referred potential partners and clients to the company. Ex. 917 ¶ 231.

j.   Alon Nottea solicited investments for Corporate Defendants including BunZai, Focus Media Solutions, and Chargeback Armor from individuals including Defendant Igor Latsanovski. Ex. 552, at 22:14-27, 36:13-19; See Ex. 552, at 31:5-32:3.

k.   Alon made decisions concerning the AuraVie common enterprise business model and organization.

      i.   He made suggestions concerning whether to open or close shell corporations that functioned as "retail merchant corporations." *See e.g.,* Exs. 267.

ii.  He discussed the enterprise's business structure with accounting and legal professionals and was apprised of the opening of new companies in the common enterprise and the relationship between them. Exs. 278; 483.

iii.  CPA David Davidian sent Alon incorporation and ancillary related documents for Defendant Corporations that Defendant Alon claims no ownership interest in. *See, e.g.*, Exs. 299; 374; 481; 482; 505.

l.  Alon Nottea hired and supervised employees at Corporate Defendants such as BunZai, Pinnacle, and Media Urge.

i.  Employees he hired and managed included Andrew Stanley, Nastassia Yalley, and Defendant Paul Medina. Exs. 554, at 30:9-17; 556, at 13:22-24, 30:4-17; 946, at 10:6-10:15.

ii.  Alon Nottea supervised Paul Medina in his positions at Bunzai, Media Urge, and Focus Media Solutions. Ex. 946, at 9:19-10:15.

     iii.    Both Paul Medina and Nastassia Yalley testified Alon Nottea had reassigned and supervised them at Media Urge. Ex. 556, at 113:21-22, 112:18-114:11, 115:16-115:21; 946, at 10:6-8.

m.    Alon Nottea procured new merchant accounts, oversaw merchant account load balancing, and recruited "merchant account guarantors" or "CEOs."

     i.    Alon Nottea recruited friends, family, and acquaintances to serve as stand-in "owners" and "officers" for Defendants' shell corporations and to open new merchant accounts in their names for processing consumer charges. Exs. 262; 268; 318; 474.

     ii.    When creating one merchant account, Alon noted "My credit is not the best right now, so we will be filing under my dad…" Ex. 474.

     iii.    Alon oversaw the performance of these entities and balanced their chargeback rates to ensure none raised a cautionary flag to payment processors. *See*, *e.g.,* Exs. 294; 319; Ex. 946, at 39:18-41:25; Ex. 946, at 60:16-61:5; Ex. 946, at 74:3-74:7.

        iv.     Paul Medina testified that Alon Nottea supervised Matan Reuveni, an employee who engaged in load balancing for the sale of AuraVie products. Ex. 946, at 60:16-61:5.

        v.     Paul Medina also testified that Alon Nottea told him not to permit particular merchant account's chargeback percentages to exceed a certain point. Ex. 946, at 74:3-74:24.

n.    Alon Nottea reviewed and assisted in drafting protocols, model responses, and other correspondence concerning interactions with regulators. *See* Ex. 320.

        i.     He oversaw supervisors or employees who created the protocols, model responses, or other correspondence. *See* Ex. 555, at 78:13-22.

o.    Alon Nottea oversaw, supervised, or assisted in supervising accounting and bookkeeping for the common enterprise.

        i.     Alon was frequently updated by employees concerning the common enterprise's profits, losses, and consumer chargebacks. For example, two employees, Paul Medina and Nastassia Yalley, would periodically send him

1    spreadsheets about the financial status of the Corporate

2    Defendants. *See, e.g.,* Exs. 167; 304; 305; 307.

3        ii.    Alon Nottea received reports from his employees and

4    third party financial institutions concerning the reserve

5    amounts held in the Corporate Defendants various

6    accounts and was actively involved in their negotiations.

7    Exs. 324, 339, 349,  430, 511, 351 (Alon Nottea email to

8    Defendant Latsanovski and Paul Medina regarding

9    reserve amounts required by AuraVie's payment

10   processor)).

11       iii.    Alon Nottea was apprised of even relatively small

12   financial concerns, and he would receive updates on the

13   same type of minutiae handled by employees such as

14   Nastassia Yalley. *See, e.g.,* Exs. 303; 316.

15   p.    Alon Nottea oversaw advertising and marketing for the common

16   enterprise.

17       i.    Alon personally oversaw the development of creative

18   content and advertising for AuraVie and other products

19   marketed by the Defendant Corporations. Exs. 169, 185,

20   497.

1          ii.          Alon oversaw various marketing campaigns. Ex. 497.

2      q.      Alon Nottea supervised the customer service departments of the

3          common enterprise.

4          i.          Alon supervised, or assisted in supervising, the customer

5              service and call center departments at BunZai. *See* Ex.

6              143, 149, 184, and 455.

7          ii.          Alon reviewed or assisted in the in drafting protocols or

8              model responses for responding to consumer calls,

9              complaints, and collections. *See, e.g.*, Exs. 137; 143;

10             312.

11     r.      Alon Nottea oversaw the registration and purchase of Internet

12         domains for the common enterprise.

13         i.          Alon Nottea identified which website names to purchase

14             and either purchased them himself or instructed another

15             person to do so. *See, e.g.,* Ex. 120.

16         ii.          Alon is listed as registrant, technical contact,

17             administrative contact, and billing contact for the

18             enterprise's websites—websites (auravie.com,

19             auraviefreetrial.com, auravietrialkit.com, and

20

1  mymiraclekit.com)  paid for by a business credit card in

2  his name. *See* Dkt. 6-3, at 3, 5-6, 8.

    iii.    Alon also used an admitted alias, Jay Michaels, to

4  register at least 65 domain names related to sale of the

5  AuraVie, LeOR, and Dellure skin care products. *See*

6  Dkt. 120, at 31, 43-44.

7  s.  The supervisors or employees of the chargebacks department at

8  BunZai reported to Alon concerning the department and its statistics.

9  *See, e.g.,* Exs. 122-2; 131; 132; 146.

    i.    Alon Nottea received chargeback monitoring reports

11  from Roi Reuveni, Andrew Stanley, and other

12  employees of the Corporate Defendants. Exs. 86; 131;

13  and 122-2.

    ii.    Meeting notes from a meeting led by Alon Nottea

15  instructed Roi: "CHARGEBACK (same day you do load

16  balancing)." Ex. 86.

    iii.    Paul Medina testified that Alon Nottea showed him

18  charts or graphs pertaining to the companies'

19  chargebacks that he was working on. Ex. 946, at 78:1-

20  78:21.

1       iv.    Alon was actively involved in the load balancing his

2                        employees would use to maintain the enterprise's

3                        merchant accounts. Exs. 94; 122.

4       v.    Alon also discussed specific chargebacks or "winnings"

5                        with employees in the chargeback department at BunZai

6                        and Pinnacle. Ex. 60-2.

7     t.    Alon was aware that consumers were misled by his companies'

8       deceptive advertising.

9       i.    Alon Nottea researched the methods, strategies and

10                        technologies the enterprise used for combatting

11                        consumer chargebacks. For example, he reviewed a

12                        management and consulting plan with Gary Bhasin that

13                        included chargeback analysis for the common enterprise.

14                        *See* Ex. 385. Further, he met with a third party company

15                        to discuss the possibility of utilizing a chargeback

16                        "intercept" program for AuraVie. *See* Ex. 62.

17       ii.    On several occasions, he was notified concerning the

18                        high-risk status or high chargeback rate of the common

19                        enterprise by financial institutions. Ex. 309.

20

1        iii.    Alon acknowledged that he maintained merchant
2                accounts that were "in jeopardy." Ex. 428.

3        iv.     Alon Nottea was apprised by the Better Business Bureau
4                of the ways his advertising failed to adequately or
5                accurately disclose its material terms to consumers. Ex.
6                592.

7        v.       He received notice concerning penalties assessed
8                against his companies' merchant accounts for
9                chargebacks, as well as notices concerning possible
10               suspension of his merchant accounts due to chargebacks.
11               Ex. 102.

12       vi.     He was notified by business acquaintances concerning
13               FTC enforcement actions for similar deceptive conduct.
14               Ex. 592.

15       vii.    He received correspondence concerning AuraVie
16               complaints on "ripoffreport.com." Ex. 93.

17   u.   Nastassia Yalley testified that the following statements from a
18        meeting between her, Defendants Alon Nottea, Paul Medina, and Roi
19        Reveuni, were made by Alon Nottea:

20

i. "I'm going to get a guy. He's going to sit. He's going to get a very, very—I know in advance he's going to have a very, very, very, very low contact ratio. He's going to talk to 700 people. But I'm going to call back my chargebacks. I'm going to talk to them. I'm going to say we are a third party company hired by BunZai Media, or by the company who sold you AuraVie, to figure out what they did wrong. What did they do wrong? Why did they charge them back? Did you call? Did you try to call? Was the cancellation wrong? Did they fuck you? Did you feel misled? Did you feel like you're an idiot? Do you like that? Yeah. Yeah. Very low contact ratio. But out of the thousand people you'll talk to, out of the 10,000 phone calls you make, you'll know if you document it and it's documented and you have reports back from them. And the FTC comes to me, I'm telling them, listen, I'm calling back my chargebacks and see what I did wrong? Do you know how that looks? Number 1, I'm really... and Number 2, I'm being proactive... we're going to call all of our chargebacks, and say we are a third party." Ex. 556, at 51:16-54:19.

ii. "We're not getting a check box. When the consumer gets the product at home, the packing slip, it can be a little bit grayed out. It doesn't have to be huge. You can make the 'for Customer Service inquiries and questions, call 1-800' big, and below that, the terms." Ex. 556, at 96:11-97:6.

iii. "This calls for another 10 minute meeting for that, just make it, in the chargeback meeting let's talk about this particular details, how to do a test between 500 and 1,000 customers that get the terms. It's a complete different world when the woman—when you can prove to the bank that the terms and conditions are on the invoice...no, the only thing...I know we crashed and burned when we tested it before, but somehow Rappoport is doing it and getting through with it." Ex. 556, at 98-101:13.

iv.    "Rappoport is also sending an email when you're getting billed. Okay. He's sending this email. I know we can do it. Yeah. I'm just saying I don't see how he was surviving doing that." Ex. 556, at 102:24-103:7.

v.    "One more note...We must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least." Ex. 556, at 95:7-95:22.

vi.    "...if you send them the terms, it can act like...we told you that we're going to charge...we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn'tdidn't work so good. It hurted us...If it's done creatively, if it's done correctly and optimized...not just try, it didn't work. Let's see what Jeff is doing because it's working for him." Ex. 556, at 101:15-103:4.

vii.    "So what is it for? To reduce chargebacks or to... stay compliant? Stay compliant and to tell the woman on the phone... it's another piece that we can actually use to fight chargebacks. It's going to help Sabina, it's going to help us be compliant, it's going to shut the fucking customer up, but it might hurt your numbers." Ex. 556, at 101:15-103:4.

33.    Defendant **Motti Nottea** resides in this district and he held a merchant account in his name for BunZai. Dkt. 245 ¶ 33

34.    Defendant **Doron Nottea** is or has been a manager at BunZaiand PinnacleDefendant Doron Nottea resides in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States. Dkt. 244 ¶ 34.

1     a.     Doron Nottea possessed a book of credit cards and signed blank

2            checks for Zen Mobile Media, Inc. Dkt. 120, at 32, 40.

3     b.     Alon Nottea, Roi Reuveni, and Motti Nottea, Igor Latsanovski,

4            CalEnergy Inc., and Chargeback Armor, Inc. stated that Doron

5            Nottea sent and received emails using the email account

6            dornon@doron.us. Exs. 910 ¶ 257; 911¶ 257; 913 ¶ 257; 914 ¶ 257;

7            915¶ 257; 917 ¶ 257.

8                  i.     Doron Nottea sent and received emails from the email

9                         address globalmediausa@gmail.com. Exs. 942; 943; 52.

10                 ii.    Doron Nottea sent and received email from the email

11                        address xposedinc@gmail.com. Ex. 551, at 109:15-

12                        109:22.

13    c.     Chargeback Armor, Inc. admitted that Doron Nottea sent and

14           received messages using the Skype account name Accounting818.

15           Ex. 917 ¶ 258.

16    d.     Doron Nottea owned Corporate Defendants that participated in the

17           common enterprise.

18                 i.     Andrew Stanley, a former employee of both BunZai and

19                        Pinnacle, testified that Doron Nottea held himself out as

20

1          the owner of both BunZai and Pinnacle Ex. 554, at

2          65:20-66:7; 86:17-87-7; *see also* Exs. 35; 43; 544.

3     ii.    An individual emails Doron Nottea "want[ing] to sell

4          cosmetics on [Nottea's] distribution channel." Ex. 35.

5     iii.   Stephan Bauer appeared to inform Nottea that he can use

6          SBM Management, Inc. for Nottea's marketing "hard

7          core online trial and offers biz." Ex. 43.

8     iv.    Alon Nottea emails Doron Nottea profit spreadsheet of

9          BunZai and states they need to go through it together.

10         Ex. 518.

11    v.     Doron Nottea provided and received payroll reports for

12         Bunzai. Ex. 544.

13    vi.    Doron Nottea was apprised of incorporation documents

14         relating to both BunZai and Pinnacle. *See* Exs. 299; 343.

15    vii.   Doron Nottea was apprised of  incorporation documents

16         for other Corporate Defendants as well. Exs. 41; 374;

17         505.

18    viii.  In initial structuring decisions relating to the common

19         enterprise, Doron Nottea was directly involved with

20

1    Alon Nottea and Kristopher Bond in determining the

2    enterprise's needs. Ex. 483.

3    ix.    David Davidian emailed Alon Nottea, Doron Nottea,

4    and Kristopher Bond regarding further consultations in

5    structuring the enterprise. Ex. 483.

6    x.    Doron Nottea co-owned Secured Commerce LLC with

7    Alan Argaman. *See* Dkt. #120, at 8.

8    e.    Doron Nottea managed employees of the common enterprise.

9    i.    Leor Arazy, human resources manager for Pinnacle and

10    BunZai, included Doron Nottea on an email sending out

11    a salary report by department for Pinnacle. Ex. 38.

12    ii.    Leor Arazy sent Doron Nottea the company's paycheck

13    advance policy and requests that he let her know if he

14    wants any changes. Ex. 84

15    iii.    Doron Nottea received payroll information for

16    Corporate Defendants. Exs. 345; 346; 353.

17    iv.    Doron Nottea sent "new employee" information for shell

18    corporations to CPA David Davidian. Ex. 433.

19    v.    Defendant Paul Medina testified in his deposition that he

20    reported to Doron's employees or assistants for anything

1          financially related for the various Corporate Defendants.

2          Ex. 946, at 28:6-28:13; Ex. 946, at 27:8-27:21.

3          vi.     Paul Medina emailed Doron Nottea a list of current

4                  merchant accounts selling AuraVie. *See* Ex. 384

5          vii.    Former employees Nastassia Yalley and Philip

6                  Camerino were Doron's "assistants." Ex. 946, at 27:8-

7                  27:21.

8          viii.   Defendant Medina also provided Defendant Doron

9                  Nottea with commission calculations to payment the

10                 straw "owners" of the various Corporate Defendants,

11                 who were paid. Exs. 946, at 44:10-20; 166.

12         ix.     Nastassia emailed Defendants Doron Nottea and Paul

13                 Medina a list of merchant accounts associated with

14                 BunZai. Ex. 546.

15    f.   Defendant Alon Nottea also kept Doron apprised of day-to-day

16         higher level issues concerning the enterprise. This included:

17         i.      Meetings and discussions relating to negotiating

18                 Canadian shipping rates sent to Doron's email,

19                 xposedinc@gmail.com. Ex. 174.

20

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

1            ii.      Discussions relating to resolving IRS audits and

2                     workers' compensation audits . Exs. 350; 376.

3            iii.     Operationally, Alon Nottea placed Doron Nottea in

4                     charge of many aspects of managing the Indian call

5                     centers associated with the scheme, telling his Indian

6                     counterpart that "Doron will manage the corporation and

7                     DBA Setup as well as accounting, disbursement of funds

8                     back to India." Ex. 579.

9            iv.     Doron forwarded contractual agreements such as the

10                    confidentiality agreements required to start negotiations

11                    for third party services. Ex. 271.

12           v.      Doron even managed basic documentation such as

13                    insurance documents relating to minor advertising

14                    engagements with third parties. Ex. 308.

15           vi.     Doron received emailed about renewing P.O. Box

16                    relating to Dellure. Ex. 333.

17     g.    Despite attempting to keep Alon Nottea and his own name off

18          financial management records, evidence makes clear Doron Nottea

19          managed or controlled numerous accounts associated with the

20          common enterprise, including either making payments or providing

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

permission to make payments on behalf of several of the entities. Exs. 466; 485; *see also, e.g.*, Exs 292, 294, 296. 479 (setting up wire transfers), 488.

    i.    Doron adamantly instructed that "All invoices only to accounting@pinlogistics.com never to me !" Ex. 466.

    ii.    Doron instructed an individual "please DON'T write Alon's Name on it" regarding a check from shell company Agoa Holdings. Ex. 485.

    iii.    Doron was responsible for arranging wire transfers relating to the common enterprise. Ex. 497.

    iv.    Numerous "books" each holding dozens of credit cards were found in Doron's possession, located in his office, as well as deposit stamps for more than 18 entities. Dkt. #120, at 13, 70-71, 74.

    v.    Books of deposit slips or checks for at least 35 entities were also located in Doron's office. Dkt.#120, at 13.

    vi.    He also kept RSA devices used to make electronic funds transfers for at least eight bank accounts. Dkt.#120, at 13.

1        vii.    Doron Nottea maintained personal information including

2                copies of other Individual Defendants' driver licenses

3                and signature block for using new bank accounts, as

4                well as access to and used blank pre-signed checks for

5                numerous Corporate Defendants. Ex. 536; *see also*, *e.g,*

6                Exs. 49; 437.

7        viii.   Doron Nottea possessed blank, pre-signed checks for

8                CalEnergy, Inc. in his office. Dkt. 120, at 13; *see also*

9                Ex. 49.

10       ix.    Former employee Andrew Stanley, whose work for

11              several years consisted of responding to chargebacks for

12              the common enterprise, stated that Doron Nottea

13              controlled and oversaw many merchant accounts

14              associated with BunZai, including reviewing complex

15              issues such as reserve rates relating to such merchant

16              accounts. Exs. 173; 349; 430; *see* Ex. 554, at 86:17-

17              87:7.

18       x.    Doron opened, managed, and controlled the merchant

19              accounts and other financial accounts used by the

20              common enterprise, and was even apprised of

1    negotiations with potential payment processors by his

2    brother, Alon. Exs. 64; 78; 88; 167; 383; 467.

3        xi.        Doron requested that Yalley send him a list of "all our

4    merchant accounts"; Yalley replied with a spreadsheet

5    of all the merchant accounts used by the AuraVie

6    companies. Ex. 78.

7        xii.       Yalley provided Doron, Alon, and Paul with accounting

8    spreadsheets for the AuraVie businesses. Ex. 167.

9        xiii.      Defendant Latsanovski requested that Nottea make a

10   payment to an Israeli bank account from SBM

11   Management's bank account. Ex. 64.

12       xiv.       Yalley sent Doron login information concerning

13   accessing payments made to AuraVie.com. Ex. 88.

14   h.    Doron handled accounting or bookkeeping for the common

15   enterprise.

16       i.         Doron oversaw the finances of the common enterprise,

17   calculating the companies' profits and losses and

18   managing the enterprise's various entities and merchant

19   accounts. *See* Exs. 21; 46; 47; 51; 52; 58; 59; 335; 337;

20

1                      338; 339; 340; 391; 392; 393; 399; 405; 406; 407; 408;

2                      409; 946, at 36:8-36:11.

3         ii.      Defendant Latsanovski openly discussed Doron's

4                      "department" in the company he runs with Alon Nottea.

5                      Ex. 21.

6        iii.     Yalley referenced Doron instructing her which toll-free

7                      numbers to leave open. Ex. 47.

8        iv.     Alon forwarded Doron an email concerning skincare

9                      merchant accounts with EVO and UMS. Ex. 52.

10       v.      An invoice from Secured Commerce to Adageo for the

11                   AuraVie landing page shows Doron was involved in the

12                   common enterprise's landing page's creation. Ex. 46.

13      vi.     Doron sent Alon what appears to be an affiliate's

14                   "advertorial" concerning AuraVie. Ex. 51.

15     vii.    (intentionally left blank)

16    viii.   Paul Medina requested approval from Doron and

17                   Defendant Alan Argaman to switch one of the Limelight

18                   accounts over to Secured Merchants LLC, a company

19                   purportedly owned solely by Alan Argaman. Limelight

20

1        is the CRM software used for managing the continuity

2        sales aspect of the enterprise. Ex. 59.

3        ix.        Medina testified he believed Doron Nottea was in

4        charge of accounting for the AuraVie companies. Ex.

5        946, at 36:8-36:11.

6        x.         Davidian emailed Doron Nottea the IRS Form W2 for

7        several AuraVie companies. Ex. 338.

8        xi.        Alon Nottea testified that he asked Doron Nottea to

9        assist him with accounting for the common enterprise

10       and to supervise Nastassia's accounting work for the

11       Corporate Defendants. Ex. 550, at 136:20-138-20,

12       139:24-140:12.

13       xii.       Defendant Medina also provided Doron Nottea with

14       information concerning the 1% "commission" payouts—

15       the payments made to the figureheads of the various

16       shell companies for permitting their names to be used to

17       open the accounts—among other financial information

18       for the enterprise. *See also* Exs. 32; 45; 166; Ex. 946, at

19       44:10-45:15.

20

1   xiii.  Paul Medina provided Doron Nottea with commission

2       calculations. Ex. 166.

3   xiv.  Paul Medina sent Alon and Doron Nottea a spreadsheet

4       called "US Rebill Die Down.xlsx," which appears to

5       concern the revised expenses for the AuraVie common

6       enterprise as they wound down operations in the United

7       States. Ex. 45.

8   xv.  Former employee Nastassia Yalley provided monthly

9       "breakdowns" of accounting and expenses for the

10      Corporate Defendants to Doron. *See, e.g.,* Ex. 82; 167;

11      542; 543; 556, at 33:23-34:1.

12   xvi.  Doron admitted to active involvement in the

13      bookkeeping of nearly all Corporate Defendants. This

14      list includes: Pinnacle, Ex. 551, at 17:3-17:5; DSA

15      Holdings, Inc., Ex. 551, at 17:9-17:11; DMA Media

16      Holdings, Inc., Ex. 551, at 60:14-60:18; SBM

17      Management, Inc., Ex. 551, at 53:9-53:14; Kai Media,

18      Inc., Ex. 551, at 56:21-56:23; Lifestyle Media Brands,

19      Inc., Ex. 551, at 44:13-44:15; Agoa Holdings, Inc., Ex.

20      551, at 49:3-49:7; Zen Mobile Media, Inc., Ex. 551, at

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

1       50:17-50:19; Heritage Alliance Group, Inc., Ex. 551, at

2       52:12-52:14; Safehaven Ventures, Inc., Ex. 551, at

3       51:16-51:20; Insight Media, Inc., Ex. 551, at 58:7-58:11;

4       Secured Merchants, LLC, Ex. 551, at 58:23-59:9;

5       Shalita Holdings, Inc., Ex. 551, at 61:2-61:4; Allstar

6       Beauty Products, Inc., Ex. 551, at 61:13-61:17; USM

7       Products, Inc., Ex. 551, at 68:20-68:25;

8   xvii.  Chargeback Armor, Inc. admitted that Doron Nottea

9       performed bookkeeping work for Focus Media

10      Solutions, Inc. Ex. 917 ¶ 221.

11   xviii.  Doron Nottea was one of the individuals authorized to

12      receive mail for Chargeback Armor, Inc. Ex. 365-13.

13 i. Doron Nottea managed the Common Enterprise employees and

14  controlled its business.

15   i.  Doron Nottea met with an individual to discuss his

16      management plan for the AuraVie business, which

17      included ways to reduce his companies' chargeback

18      levels. Exs. 29; 385.

19   ii.  Emails show that Doron corresponded with a certified

20      public accountant about incorporating various Corporate

1   Defendants and overseeing the initial financials of these

2   corporations. *See* Exs. 553, 299, 302, 343, 364.

3       iii.   Doron Nottea and the CPA David Davidian discussed

4   corporate filings, including DSA Holdings, Inc. Ex. 41.

5       iv.   Doron was provided invoices for "new corporations"

6   including SBM Management, Inc. and CalEnergy, Inc.

7   Ex. 397.

8       v.   Doron also coordinated the stand-in owners of various

9   shell corporations involved in the enterprise, providing

10   personal information of each individual so that their

11   identities could be used in the incorporation process. Ex.

12   484.

13       vi.   Alon Nottea forwarded Doron, as well as Paul Medina

14   and Igor Latsanovski, an email in which Alon informed

15   UMS Bank they intended to wind up their sale of

16   AuraVie products in part due to FTC and credit card

17   regulations. Ex. 60.

18       vii.   Alon Nottea forwarded Doron an email concerning skin

19   care merchant accounts approved by a payment

20   processing entity. Ex. 329.

1           viii.      David Midgal emailed Doron asking "what you want me

2                    to do" concerning "a new PO Box (address) for

3                    Dellure"—one of the common enterprise's products. Ex.

4                    331-1.

5       j.      Doron Nottea sent a text message from his phone (XXX) XXX-9999

6           to his email address, xposed@gmail.com, in which he states:

7                 Our volume is down to about 350 (100 from lifescript
                + 250 from un-compliant survey traffic per day...)
8                 And even that is a miracle since we can no longer use
                advertorials for now ... As the lady (pam bondi) in
9                 the Florida Atty. Gen. is reviewing every single
                continuity skincare and diet advertisers in the
10               industry... We are waiting for some more industry
                news to be released in order to make an executive
11               decision on whether or not to run blogs again...
                Nevertheless, dawn's and Nancy's attorney is
12               pushing hard ... threatening to file against all
                corporations and people involved, this creates a very
13               big exposure and risk to our entire entities...
                Especially now that Nastassia is gone, they will have
14               access to much more personal, private and sensitive
                information. This is very concerning, and very
15               risky... If you are not willing to let your attorney
                speak to their attorney, I will half to engage in a non-
16               formal potential settlement meeting in order to avoid
                the exposure... This also creates additional exposure
17               for pinnacle logistics as Dawn and Nancy are
                probably still in touch with some current and former
18               employees... Thereby moving the exposure to
                pinnacle employees as well ... We don't want the
19               word out that every single employee Can go after us
                because we are in the business of settling false
20               demands ... Additionally, Joyce Gaines from UMS

> contacted me With respect to the level of reserves they are holding, they have had a few merchants funds frozen by the FTC previously... And she is concerned due to the high-risk nature of our business model, she would like to hold additional reserves which means more of a lack of income to the company...
>
> Ex. 330. *See also* Ex. 941 (Doron Nottea provides sworn statement concerning his phone number (XXX) XXX-9999); Ex. 551, at 109:15-109:22 (Doron Nottea confirms his email address, xposedinc@gmail.com).

35.     Defendant **Oz Mizrahi** is or was the CEO of Pinnacle and resides in this district.  Dkt. 245 ¶ 35.

36.     Defendant **Igor Latsanovski** resides in this district and, in connection with the matters alleged herein, transacted business in this district. Dkt. 253 ¶ 36.

a.     Doron Nottea and Motti Nottea stated that Igor Latsanovski was an owner of BunZai, and CEO of Zen Mobile Media Group, Inc. Dkts. 244 ¶ 36; 245 ¶ 36.

b.     Partnership agreements show Igor Latsanovski was an owner of BunZaiEx. 18-2.

1     c.     Defendant Medina, an employee of BunZai, also believed

2          Latsanovski owned BunZai. Ex. 946, at 29:10-29:12.

3     d.     A former employee of BunZai, testified that Igor Latsanovski

4          received and reviewed monthly accounting reports for BunZaiEx.

5          556, at 34:2-4; 34:20-35:7.

6     e.     The website for Igor's personal company, Defendant CalEnergy,

7          reflected that CalEnergy was the parent company of both Defendants

8          Media Urge and Pinnacle. Dkt. 908.

9               i.     CalEnergy's internal organizational chart—which

10                  Latsanovski reviewed—confirms that Latsanovski

11                  supervised and managed Media Urge and Pinnacle. *See*

12                  Exs.561-3; 588-1, -9.

13              ii.     Igor is listed as the "President" of Calenergy, Inc., who

14                  supervised (1) Defendant Reuveni, who himself

15                  managed Pinnacle, and (2) Philip Camerino, who

16                  himself managed "MediUrge," a misspelling of

17                  Defendant Media Urge. Ex. 561; 561-3; 588-9.

18       f.  Latsanovski previously swore under oath that BunZai was his

19         employer. *See* Ex. 949.

20

1      g.  A BunZai Form W-2 listed Defendant Latsanovski as an

2           employee. Ex.402-8.

3      h.  In a letter to the United States Citizenship and Immigration

4           Services describing his job responsibilities at CalEnergy,

5           Latsanovski represented that he was involved in "reviewing the

6           activities and providing guidance to managed companies." Ex.

7           571-2.

8           i.   In this letter he stated that he would meet with the

9                company's presidents and employees, including

10               "manager Roi Reuveni to review activities of the

11               managed call center Pinnacle (including AuraVie,

12               Dellure and Attitude . . .)" *See* Ex. 571-2, -3.

13     i.  Latsanovski was personally involved in managing the enterprise

14          on a day-to-day level.

15          i.   Latsanovski sent a revised profit and loss spreadsheet

16               containing sales and chargeback information for the

17               common enterprise. Ex. 503.

18          ii.  Latsanovski participated in discussions concerning

19               international merchant accounts. See Ex. 319.

20

1       iii.      Latsanovski participated in meetings or conference calls

2                with payment processors. *See* Ex. 329.

3       iv.      Latsanovski  was asked to proofread advertising to be

4                used by Defendants overseas and assisted in

5                coordinating the marketing campaign. Exs. 564; *see* Ex.

6                559.

7       v.      Latsanovski was apprised of low-level contractual

8                disputes relating to the advertising. *See* Exs. 48.

9       vi.       Latsanovski assisted Defendants in transferring funds

10                overseas for safekeeping, including possibly to a Cyprus

11                trust. *See* Exs. 55; 450; 470.

12       vii.      He provided Defendants with blank, pre-signed checks

13                to allow Defendants to operate the company. Dkt. 120,

14                at 9, 35, 36.

15       viii.      Among those Corporate Defendants, CalEnergy

16                transferred funds to Latsanovski and a company he

17                owns. Dkt. 120, at 69.

18       ix.      Defendant Medina testified that Latsanovski was present

19                at the common enterprise's place of business multiple

20

1           days each month from 2010 until 2014. Ex. 946, at

2           28:17-29:3.

3       j.  Latsanovski participated in or controlled companies in addition to

4          Pinnacle, including ones that he had no ownership interest in.

5          i.    Latsanovski ordered Doron to issue a payment to an

6          Israeli bank account using funds from SBM

7          Management, Inc., a company purportedly owned and

8          operated by Stephan Bauer. Ex. 64.

9       k.  An email shows Igor making business decisions concerning

10         operational aspects of companies within the common enterprise.

11         These discussions include employee staffing decisions and how to

12         manage the business's needs for areas such as "plants and Call-

13         centers" while leaving higher level "intellectual labor" to Alon

14         Nottea and himself. Ex. 21.

15       l.  Latsanovski discussed and reviewed sales with employees.

16         i.    Former employee Yalley stated that Latsanovski would

17         sit down next to her and review profit and loss

18         statements for the enterprise. Exh. 556, at 34:2-4; 34:20-

19         35:7.

20

1            ii.      Defendant Medina testified that he would have

2                     discussions concerning sales and affiliates with him. Ex.

3                     946, at 30:4-30:13.

4            iii.      Paul Medina testified that he overhead Igor Latsanovski

5                     discussing chargebacks with Defendant Paul Medina.

6                     Ex. 946, at 31:16-32:3

7      m. Latsanovski was included on emails with links to the companies'

8        advertisements and emails discussing issues with chargebacks and

9        compliance.

10           i.      Latsanovski received an email concerning excess

11                    chargeback programs and the enterprise's excessive

12                   chargeback rates. Ex.562.

13           ii.      Latsanovski received emails discussing high-risk

14                   merchant accounts. Exs. 235; 444; 445.

15          iii.      Latsanovski received an email discussing load balancing

16                   to maintain merchant accounts for the enterprise. Ex.

17                   565.

18          iv.      Latsanovski received emails containing links to

19                   Defendants' deceptive risk-free trial websites. Ex. 28.

20

n.   Latsanovski requested information concerning the common

enterprise's chargeback rates and merchant reserve. Ex. 549.

o.   Latsanovski incorporated Zen Mobile Media, Inc., one of the shell

companies used by Defendants to process consumer payments for

Defendants' risk-free trials. Ex. 904-23.

p.   Latsanovski provided loans to Corporate Defendants in the common

enterprise for the AuraVie business. Ex. 552, at 22:14-21, 23:11-

24:21, 27:5-13, 36:13-37:13, 52:5-53:8, 60:5-12, 69:21-70:2.

q.   Latsanovski sent an "opinion" email regarding the future of Pinnacle

and the common enterprise. Ex. 21. In this email, Latsanovski states:

    i.   "And I feel (although it is not objectively) that we want
to keep Pinicle . I'll tell you my reasons and point out
the pros and cons. We want to grow and already we
have Product company in the U.S. business-marketing,
security-merchant, merchant-VastPay, and more will be
opening: the Product company in England, Brazil, itc,
merchant- Europe and so on. That is, we must focus all
our resources on that." Ex. 21.

    ii.   "Money, knowledge and people, I'm talking about the
Directors, the people who can not just perform, but also
to make decisions and in addition whom we trust and
know their capabilities. . . .Who we have: You, Paul,
Roy, Andre and David and me a little, that's all! Doron
has his department. You have to be on top of all, we
understand!, . . . David is a good helper, but he has no
power to make decisions and you always have to solve
them for him, he's very good assistant, but assistant.
Maybe with time and next to someone, he will be able to
learn how to lead. I would recommend Roy as head of

the Product company ,near him would have put David, and maybe next to Roy and under your leadership David will grow. Roy is Sergeant and will be able to perform your tasks well in the distance. Andre good helper, too, but we still have a lot of different directions. And I would not want to so we are constantly thinking about how to download the work of our factory -Pinicle ." Ex. 21

iii.   . I want us to think, and concentrated our efforts on the opening of new businesses and the further management (without the presence of fixed assets) and thus used outsorsing. Do not tie their hands obligations to the large number of low-skilled workers. Let's work with fewer people, but with highly qualified people. Yes we lose in quality, but we'll take with a lot of things: 1-responsibility to the large number of people, and that's a lot. after all people is a problem, dividing the information can give us testimony in court, or just come up with these statements and show to  us, and so on. 2 - we remove ourselves from the constant expenditure and translate these costs by the number of products sold. Let those who can not make Intelligent business, own and operate plants and Call-centers, and we will deal with intellectual labor. And we will not get nervous and worry about how to make money for the factory when we transition point occurs in the business. And we are in a quiet mode to create new products. And then as it is now in emergency mode are buying goods, and all for what, to support our factory -Call-center ! 3 - we have to  use ours, unfortunately, are not big human resources for development, rather than plant control. 4 - remove some legal risk to other companies that will serve us.

iv.   I just want to give you a look at our entire company, with my eyes, maybe it will give you something.

v.   Latsanovski signs the email "Your sincere partner Igor." Ex 21.

37.   Defendant **Roi Reuveni** is or has been an employee of BunZai Media

1    Group, Inc. and an officer and manager of PinnacleEx. 553, at 18:21-19:6; 911-16

2    ¶¶ 106-08. He was a manager of the customer service, call center, and

3    chargebacks departments at Defendant PinnacleEx. 911-16 ¶¶ 107-08, 911-31¶

4    207. Further, he was an officer or director of Agoa Holdings, Inc. Ex. 911-37 ¶

5    245; Dkt. 250 ¶ 37. Defendant Roi Reuveni resides in this district. Dkt. 250 ¶ 37.

6        a.   Roi Reuveni was a president for DMA Media Holdings, Inc. Ex. 911-

7             37 ¶ 244.

8                 i.   DMA Media Holdings was another "retail merchant

9                      corporation" or shell entity that processed payments for

10                     AuraVie sales. Ex. 553 at 73:11-74:14.

11       b.   Chargeback Armor, Inc. stated that Roi Reuveni was the COO of

12            Chargeback Armor, Inc. Ex. 917-66 ¶ 237.

13                i.   Reuveni's email signature indicated that he was COO of

14                     Chargeback Armor, Inc. Ex. 290.

15       c.   Roi Reuveni admitted that since at least January 2010, he controlled

16            or had the authority to control PinnacleExs. 911-16 ¶ 110; *see also*

17            910-15 ¶ 110; 912-27 ¶ 110.

18       d.   Roi Reuveni admitted that he received compensation from CalEnergy

19            Inc. Ex. 911-37 ¶ 246; *see also* Exs. 914-53 ¶ 246; 915-53 ¶ 246.

20

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

e.   Roi Reuveni sent and received emails using the email accounts roi@chargebackarmor.com and roi@securedmerchants.com. Exs. 911-39 ¶¶ 259-60; *see also* Exs. 917-71 ¶¶ 259-60; 918-62 ¶ 260.

f.   Roi Reuveni executed the lease agreement for Chargeback Armor, Inc. Ex. 917-71 ¶ 262.

g.   Reuveni supervised BunZai and Pinnacle chargeback department employees. *See e.g.* Exs. 129; 131; 132.

   i.   Reuveni managed Pinnacle, which oversaw fulfillment, customer service, and chargeback rebuttals for the enterprise. Ex. 554, at 32:2-32:14; Ex. 550, at 18:16-19:2; Ex. 553, at 31:1-15, 165:23-166:24, 167:20-177:18.

   ii.   Reuveni assisted in reviewing or drafting AuraVie's template collection letter. Exs. 312.

   iii.   Roi reviewed customer service protocols, scripts, and call recordings. Exs. 109-7; 143; 195; 573.

   iv.   A call disposition instructional flowchart was authored by Reuveni according to the document's metadata. Ex. 142.

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

1          v.      Paul Medina testified that Roi Reuveni edited scripts

2              used by call center employees for responding to

3              consumer complaints about AuraVie. Ex. 946, at 47:2-

4              48:2.

5         vi.     Reuveni reviewed the companies' deceptive free trial

6              websites. Exs. 202 (Reuveni's email address in upper

7              left hand corner of screenshot); 203 (Reuveni's email

8              address in upper left hand corner of screenshot); 594.

9        vii.    Reuveni was apprised of the companies' sales and

10            chargebacks, both domestic and international. Ex. 151.

11      viii.    Reuveni assisted in managing LimeLight, the customer

12            management software used by the common enterprise.

13            Ex. 248.

14        ix.     Reuveni tracked customer service call dispositions for

15            the common enterprise. Exs. 140; 325.

16        x.      A third party call center emailed Reuveni consumer call

17            summaries. Ex. 325.

18        xi.    Reuveni discussed the enterprise's chargeback ratios and

19            ways to lower it with UMS bank and other payment

20            processing entities. Ex. 285.

1     h.     Reuveni's participated in the common enterprise since at least early

2     2011. Ex. 263.

3     i.     Reuveni worked for Secured Merchants. Ex. 553, at 16:9-16-20.

4     i.     He signed contracts on behalf of Secured Merchants

5     LLC, listing his title as "Managing Member." Ex. 412-5.

6     j.     Reuveni incorporated Agoa Holdings and was its owner and CEO.

7     Agoa was another retail merchant corporation or shell company that

8     process consumer payments for AuraVie risk free trials.  Reuveni

9     admitted that he would oversee orders of AuraVie for the company.

10     Ex. 553, at 54:24-55:3; and Ex. 553, at 59:19-61:24.

11     k.     Reuveni was included on and sent emails concerning Chargeback

12     Armor, Inc.'s business. Ex. 365.

13     l.     Reuveni admitted he worked for Chargeback Armor. Ex. 553 15:12-

14     16:8.

15     m.     Reuveni reviewed the common enterprise's deceptive free trial

16     websites. Exs. 202 (Reuveni's email address in upper left hand corner

17     of screenshot); 203 (Reuveni's email address in upper left hand

18     corner of screenshot); 594.

19

20

1      n.    Reuveni was present at the meeting in which his cousin, Alon,

2               discussed the illegality of their scheme and his plans for how to

3               prepare for the inevitable FTC enforcement action. *See* Ex. 86.

4      o.    Defendant Reuveni corresponded concerning posts on

5               "ripoffreport.com" with Defendants Alon Nottea, Paul Medina, and

6               Khristopher Bond. Ex. 93.

7      p.    Roi Reuveni owned Trigen LLC. Ex. 553, at 16:24-17:4.

8      q.    Alon emailed Reuveni concerning new MasterCard regulations

9               concerning chargebacks. Ex. 141.

10    r.    Reveuni received chargeback reports from third party companies.

11             Revguard, a third party company that assists companies in

12             responding to chargebacks, emailed chargeback information to

13             Reuveni. Exh. 144. XCaliber Solutions also updated Reuveni

14             concerning chargeback statistics for the common enterprise's sales.

15             Ex. 146.

16    s.    Roi Reuveni received call logs along with an invoice from a third

17             party call center. These call logs documented customer complaints

18             concerning the common enterprise's business practices. Ex. 325.

19    38.    Defendant **Khristopher Bond**, is or has been an owner of BunZai.

20  Dkts. 244 ¶ 38,  245, ¶ 38.  Defendant Bond was integrally involved in the day-to-

1   day operations of BunZai. Dkts. 244 ¶ 38,  245, ¶ 38 Bond resides in this district.

2   Dkts. 244 ¶ 38,  245, ¶ 38. Khristopher Bond has defaulted in this action. Dkt.

3   #229.

4        39.     Defendant **Alan Argaman** was an owner of Defendant Secured

5   Commerce LLC, Dkts. 299 ¶ 39, which designed, created, and helped manage the

6   websites or landing pages used for deceptively marketing and selling skincare

7   products. Ex. 46.  He is also an owner of Secured Merchants, LLC, Dkts. 299 ¶

8   39; 244 ¶ 39; 245 ¶ 39; *see also* Ex. 917 ¶ 208. Defendant Alan Argaman resides

9   in this district. Dkt. 299 ¶ 39.

10       a.    Doron Nottea and Motti Nottea stated that Alan Argaman managed

11             Secured Commerce, LLC. Dkts. 244 ¶ 39; 245 ¶ 39.

12       b.    Doron Nottea also stated that he and Alan Argaman were the owners

13             of Secured Commerce, LLC. Ex. 912 ¶ 214.

14       c.    Alan Argaman sent and received emails using the email account

15             avicoglobal@gmail.com. Ex. 916 ¶ 261.

16       d.    Alan Argaman provided a variety of critical services to the common

17             enterprise, many through his company, Secured Merchants LLC.

18             i.    Argaman provided integration services for their

19                   customer service management software, Limelight (*See*

20                   Dkt. 121-6, at 9-21; Dkt. 121-7, at 1-3), which

1                    Defendant Argaman testified is a software typically used

2                    for continuity sales.  Ex. 555, 51:3-19.  *See also* Ex. 946,

3                    at 19:23-20:17.

4        ii.      Argaman assisted Alon Nottea in operating a call center

5                    for AuraVie customer complaints. Exs. 47; 149; 432;

6                    440; 441; 516.

7        iii.     Argaman provided technical expertise to create an

8                    automated response system to allow large numbers of

9                    consumers to cancel their AuraVie continuity plans. *See*

10                   Dkt. 121-6, at 9-21; Dkt. 121-7, at 1-3.

11      iv.     Secured Merchants boasted that its contribution to the

12                   common enterprise "offer[s] a vehicle to resolve

13                   consumer disputes before they become chargebacks."

14                   Ex. 257-2.

15      v.      Defendant Argaman integrated the AuraVie free trial

16                   campaigns into Lime Light, a third party customer

17                   relationship management (CRM) software Defendants

18                   used for selling their products by negative option

19                   continuity plans. *See* Exs. 187; 306; 476; 493; 528; 547.

20

1           vi.    Email and screenshots show Defendant Argaman

2                      designing, creating, or managing a website offering risk

3                      free trial offers of skincare products. Ex. 531.

4          vii.    Defendant Argaman admitted to creating AuraVie.com.

5                      *See* Ex. 555, 49:5-18.

6        viii.    Defendant Alon Nottea's company was invoiced by

7                      Secured Commerce LLC, a company owned by

8                      Defendant Argaman for "Design, Creation, &

9                      Optimization of Auravie landing page Campaign Setup

10                   and integration to Lime Light CRM and Click

11                   Connector." *See* Ex. 46.

12         ix.    Defendant Argaman sold Attitudeline/INFINI skincare

13                   products, a product that Defendants marketed or sold, or

14                   assisted others in marketing or selling, by negative

15                   option continuity plans (or assisted others in marketing

16                   or selling in the same manner). Ex. 368.

17         x.    Defendant Argaman participated in planning and

18                   managing the AuraVie Angels promotional campaign.

19                   Exs. 185; 494; 497.

20

1            xi.     Defendant Argaman established toll-free telephone

2                     numbers for various shell corporations and set up call

3                     forwarding for those numbers. *See*, *e.g.,* Ex. 529.

4           xii.    Defendant Argaman used Secured Commerce to lease

5                     the main office suite where Defendants operated. Dkt.

6                     120, at 12.

7   e.    Defendant Argaman played a role in the decision making and

8       marketing of new products relating to the common enterprise that

9       went beyond providing assistance with technology issues and

10      shipping. For example:

11          i.      Defendant Argaman sent Doron Nottea a presentation

12                   concerning a product called LeElle. Defendant Argaman

13                   was later consulted concerning the company's

14                   packaging design. Exs. 360; 361.

15         ii.     Defendant Argaman also provided input concerning who

16                   would own the new product Defendants were marketing.

17                   Ex. 362.

18   f.    Defendant Argaman played a key role in refuting consumer

19       chargebacks for the Corporate Defendants, through his company,

20       Secured Merchants LLC.

i.     Defendant Argaman admitted that his company contested consumer chargebacks for the Corporate Defendants that sold AuraVie and that Secured Merchants had previously provided a chargeback refutation service termed "chargeback armor." Ex. 555, at 75:1-5, 86:10-25, 88:15-24.

ii.     Defendant Argaman possessed a "Standard Service Agreement" form for clients' use of Chargebackarmor.com. Further, emails suggest that Secured Merchants processed chargebacks for AuraVie under the name Chargeback Armor. Exs. 280; 348; 412; 413.

iii.     The Chargeback Armor Service Agreement states: "The Software is made available to you and the Service is owned, operated, and provided to you by SM through the CHARGEBACKARMOR.COM Site." Ex. 280.

iv.     According to Chargeback Armor, Inc.'s Executive Summary, "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." *See* Ex. 281-2.

1          v.     A document titled "Secured Merchants – Company

2                  Describes" described the "ChargeBack Armor" services

3                  as helping "win back lost revenue by reversing

4                  chargebacks in your favor" and "handl[ing] the entire

5                  chargeback dispute process on your behalf." Ex. 257.

6    g.    Defendant Argaman operated Relief Defendant Chargeback Armor,

7    Inc., a company Defendant Alon Nottea admitted was used to refute

8    consumer chargebacks, jointly with other Individual Defendants.

9          i.     Defendant Argaman, through his company Secured

10                Merchants LLC, provided $250,000 in startup capital to

11                Chargeback Armor, Inc. Exs. 916 ¶ 235; 917 ¶ 235; Dkt.

12                #231-1, at 53.

13          ii.    Chargeback Armor's Executive Summary states that

14                Defendant Argaman was the company's "Chief

15                Technology Officer." Ex. 281.

16          iii.    Nova 8 Media billed Defendant Argaman of Secured

17                Merchants for "design services" for "Chargeback

18                Armor." *See*, *e.g.,* Ex. 414.

19          iv.    A Chargeback Armor, Inc. services agreement dated

20                March 2, 2015 describes the company's board of

1        directors as consisting of Mike Costache, Alon Nottea,

2        and Avi Argaman. Dkt. # 231-1, at 36.

3        v.      A Chargeback Armor, Inc. lease agreement dated

4                February 27, 2015 lists Mike Costache, Doron Nottea,

5                and Defendant Argaman as individuals to whom mail

6                may be sent to Chargeback Armor, Inc. Ex. 365-13.

7        vi.     Defendant Argaman incorporated Chargeback Armor,

8                Inc. in concert with other Individual Defendants. Ex.

9                404.

10       vii.    Defendant Argaman received statistics detailing

11               chargeback numbers for various Chargeback Armor

12               clients, including AuraVie. Ex. 151.

13       viii.   (Intentionally left blank.)

14       ix.     Defendant Argaman participated in discussions

15               concerning high-level corporate decisions for

16               Chargeback Armor ranging from updates regarding the

17               launch of the company to opening the company's

18               corporate bank account. Exs. 184; 369.

19       x.      Alon Nottea reported to Defendant Argaman concerning

20               new Chargeback Armor customers. Ex. 184.

1            xi.      Mike Costache, a Secured Merchants employee and

2                    purported Chargeback Armor CEO, sent an email to a

3                    Secured Merchants client that included referring to

4                    Secured Merchants as "the technology company that

5                    developed the Chargeback Armor product" and then

6                    noting that Secured Merchants is "transitioning all

7                    clients to be billed" by Chargeback Armor. Dkt. # 231-

8                    1, at 8.

9       h.    Argaman had notice that Defendants marketed their products through

10         negative option plans.

11           i.      (Intentionally left blank.)

12           ii.     Defendant Argaman assisted Defendants with managing

13                   their various trial campaigns on Lime Light software—

14                   software he acknowledged was often used for selling

15                   products by continuity plan. *See* Exs. 59; 92.

16           iii.    Secured Merchants Executive Summary listed, under

17                   "Target Markets," numerous companies that sell or sold

18                   their products by negative option continuity plans or

19                   trial offer. *See* Ex. 256.

20

i.      Defendant Argaman was aware, or should have been aware, that Defendants took significant measures to disguise their common enterprise.

        i.      Defendant Argaman was sent emails discussing the "load balanc[ing] between multiple merchant accounts and corporations." Ex. 337.

        ii.     Paul Medina informed Defendants Doron Nottea, Alon Nottea, and Alan Argaman about high risk accounts. Ex. 337.

        iii.    Defendant Argaman assisted in establishing dozens of phone numbers for Defendants' shell corporations.

j.      Defendant Argaman was aware, or should have been aware, that Defendants engaged in "load balancing"—the means by which Defendants deceived payment processors concerning their actual chargeback ratio—between their various merchant accounts.

        i.      Load balancing was discussed in emails Argaman received. *See, e.g.,* Ex. 449.

k.      Defendant Argaman appears to have assisted in coordinating the assistance of and payment to a third party call center in India, which handled some customer service calls for Defendants. Ex. 386.

1    l.    Defendant Argaman was included on an email detailing the high

2          chargeback rates for merchant accounts associated with the common

3          enterprise. Ex. 337.

4    40.   Defendant **Paul Medina** is or was the Executive President or Vice

5    President of Defendant Media Urge, Inc. Ex. 946, 9:9-22.  He was also and

6    employee of BunZai, and the CEO of Focus Media Solutions, Inc. See Ex. 946, at

7    7:18-8:9.

8    41.   Relief Defendant **Chargeback Armor, Inc.** is a California

9    corporation , Dkt. 300 ¶ 41, with its principal place of business at the Reseda

10   Office. Dkt. 120, at 18. At times material to the Complaint, Chargeback Armor,

11   Inc. received funds from Secured Merchants, LLC, which received funds from

12   SBM Management, Inc. Ex. 917 ¶¶ 235-236. At times material to the Complaint,

13   Chargeback Armor Inc. transacted business in this district. Dkts. 244 ¶ 41; 245 ¶

14   41.

15        a.    Secured Merchants, LLC transferred $250,000 in funds to

16              Chargeback Armor, Inc. Exs. 916 ¶ 235; 917 ¶ 235; Dkt. # 231-1, at

17              53.

18        b.    Secured Merchants, LLC received more than $300,000 in funds for

19              providing chargeback services relating to the sale of Defendants'

20              skincare products. Ex. 918 ¶ 236.

c.   Alan Argaman and Chargeback Armor, Inc. stated that Roi Reuveni was the COO of Chargeback Armor, Inc. Ex. 917 ¶ 237.

d.   Relief Defendant Chargeback Armor, Inc. refuted consumer chargebacks for the unauthorized AuraVie charges.

    i.   Chargeback Armor boasted to potential investors that 33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." Dkt. 231-1, at 4.

    ii.   Defendant Alon Nottea stated that Chargeback Armor, Inc. processed chargebacks for the common enterprise. Ex. 550, 172:3-5; *see also* Ex. 946, at 24:9-23.

e.   Although not formally incorporated until March 2015, the company operated informally before incorporation. *See* Ex. 280.

f.   Chargeback Armor appears to have provided nearly identical chargeback services as Secured Merchants. Dkt. 231-1, at 8; Exs. 280; 412; 413.

g.   This company specialized in providing chargeback refutation services to the "Direct Response Marketing" industry, of which Defendants were but one of many. Ex. 256.

h.   Chargeback Armor's Executive Summary states that their "target market" was "High-rick [sic] online marketers." Ex. 281.

i.   Chargeback Armor claims to investigate all chargebacks they contest.

    i.   Mike Costache, the purported CEO of Chargeback Armor, stated that they would investigate the validity of consumer chargebacks before attempting to contest them. Dkt. # 121-6, at 3.

    ii.   Costache stated that Chargeback Armor's policy was to "reply[] only to chargebacks that can be won with proper evidence from the client's Customer relationship Management (CRM), gateway provider(s) and shipping provider(s)." *Id.*

j.   Chargeback Armor authorized Secured Merchants to receive its mail. Ex. 365.

**COMMON ENTERPRISE**

42.   Defendants BunZai; Pinnacle; DSA Holdings, Inc.; Lifestyle Media Brands, Inc.; Agoa Holdings, Inc.; Zen Mobile Media, Inc.; Safehaven Ventures, Inc.; Heritage Alliance Group, Inc.; AMD Financial Network, Inc.; SBM Management, Inc.; Media Urge, Inc.; Adageo, Inc.; CalEnergy, Inc.; Kai Media, Inc.; Insight Media, Inc.; Focus Media Solutions, Inc.; Secured Commerce, LLC;

1   Secured Merchants, LLC; USM Products, Inc.; Merchant Leverage Group, Inc.;

2   DMA Media Holdings, Inc.; Shalita Holdings, Inc.; All Star Beauty Products, Inc.

3   (collectively, "Corporate Defendants") have operated as a common enterprise

4   while engaging in the deceptive and unlawful acts and practices alleged herein.

5   *See, e.g.* Dkts. 121-1 p. 3, 10-11; 121-3 pp. 4-5; Ex. 384.

6        a.     To determine the existence of a common enterprise, a court may

7             consider a variety of factors including: common control; the sharing

8             of office space and officers; whether business is transacted through a

9             maze of interrelated companies; the commingling of corporate funds

10            and failure to maintain separation of companies; unified advertising;

11            pooled resources and staff; and evidence which reveals that no real

12            distinction existed between the Corporate Defendants. *FTC v. J.K.*

13            *Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v.*

14            *Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997).

15       b.     The shared use of different merchant accounts and fictitious business

16            names to conduct business and process credit and debit card

17            transactions may provide a sufficient basis for finding a common

18            enterprise.  *See Cf. J.K. Publications, Inc.*, 99 F. Supp. 2d at 1202.

19       c.     It has been held by the Ninth Circuit that "entities constitute a

20            common enterprise when they exhibit either vertical or horizontal

1   commonality – qualities that may be demonstrated by a showing of

2   strongly interdependent economic interests or the pooling of assets

3   and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127,

4   1143 (9th Cir. 2010).

5   d.   Defendants' shell companies funneled the money from AuraVie sales

6        to two primary entities, SBM Management, Inc. and CalEnergy, Inc.,

7        which in turn passed the funds on to Focus Media Solutions, Inc, the

8        Individual Defendants, or their personal shell companies. *See* Dkt.

9        #121-1, at 3.

10  e.   Because these Corporate Defendants operated as a common

11       enterprise, each of them is jointly and severally liable for the acts and

12       practices alleged. *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176,

13       1202 (C.D. Cal. 2000); *FTC v. Wolf*, 1997-1 Trade Cas. (CCH)

14       ¶ 71,713, at 79,080 (S.D. Fla. 1997) .

15  f.   The Defendants shared offices space and pooled resources:

16            i.    BunZai, Pinnacle, DSA Holdings, Inc., Agoa Holdings,

17                  Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc.,

18                  Heritage Alliance Group, Inc., and AMD Financial

19                  Network, Inc. used the Van Nuys Office. Dkts. 244 ¶¶ 9-

20

1    11, 13-17; 245 ¶¶ 9-11, 13-17; 250 ¶¶ 9-10, 13 ; 251 ¶¶

2    9-10, 13;

3    ii.    BunZaiand Adageo, LLC used Encino Mailbox A. Dkts.

4           244 ¶ 9; 245 ¶ 9; Exs. 904-2, -47.

5    iii.   Pinnacle used the Reseda office. Exs. 244 ¶ 10; 245 ¶

6           10.

7    iv.    Zen Mobile Media, Inc., SafeHaven Ventures, Inc.,

8           SBM Management, Inc., Adageo, LLC, Kai Media, Inc.,

9           and Insight Media, Inc. used Encino Mailbox B. Ex.

10          904-24, -30, 40, -47, -53, -56.

11   v.     Secured Merchants LLC operated out of the same office

12          suite as the other Corporate Defendants. Dkt. 120, at 24.

13   g.   Counsel for BunZai, designed the common enterprise structure. *See*

14        Exs. 119; 278; *see also* Ex. 123 (waiver of privilege).

15   h.   Defendants recruited friends, family, and acquaintances to permit

16        their names to be used to open shell corporations and their respective

17        merchant accounts fraudulently.   In exchange, Defendants paid these

18        figureheads 1% of the revenue processed through the companies' in

19        their names. *See* Ex. 32; 166; 170; 172.

20

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

43.  Defendants Alon Nottea, Motti Nottea, Doron Nottea, Oz Mizrahi, Igor Latsanovski, Roi Reuveni, Khristopher Bond, also known as Ray Ibbot, Alan Argaman, and Paul Medina (collectively, "Individual Defendants") formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

a.  Media Urge, Inc. and Focus Media Solutions, Inc. were controlled by the Individual Defendants. See Ex. 941 at 8:18-9:10; Ex. 941 at 9:19-9:25; Id. at 10:3-10:5; see also Dkt. #120, at 6 n.3, 17.

b.  Secured Merchants was owned and operated by the Individual Defendants:

   i.  Secured Merchants "Executive Summary," created in June 2013 states that the company's management consisted of Defendants Alon Nottea, "Avi" Argaman, and Paul Medina. Ex. 256-2.

   ii.  A Secured Merchants LLC's operating agreement draft names Defendant Argaman and Defendant Alon Nottea as the company's two managers. Ex. 255-22.

1                iii.      Nonprivileged attorney invoices reference meetings

2                            concerning Secured Merchants with Alon Nottea and

3                            "Igor." Ex. 388-3; 388-4.

4                iv.      Secured Merchants LLC was identified as one of the

5                            "Bunzai Companies" on a list that Defendant Doron

6                            Nottea sent to CPA David Davidian. Ex. 394.

7                v.       Doron Nottea created the email address

8                            securedmerchantsllc@gmail.com. Ex. 357.

9                vi.      Defendant Argaman denied the existence of any other

10                          founder for Secured Merchants. Ex. 555, at 28:16-28:23;

11                          Ex. 555, at 29:7-29:8.

12      c.      Chargeback Armor, Inc. was owned and operated by Defendants:

13                i.       Chargeback Armor's Executive Summary lists

14                          Defendant Alon Nottea as President, Defendant Alan

15                          Argaman as Chief Technology Officer, and Defendant

16                          Roi Reuveni as Customer Service Manager. *See* Ex.

17                          281-3.

18                ii.      Defendant Paul Medina also testified that he believed

19                          Alon Nottea owned the company. Ex. 946, at 25:2-25:6.

20

1     iii. Alon Nottea reported to Defendant Argaman concerning

2       new Chargeback Armor customers. Ex. 184.

3     iv. Defendant Alon Nottea solicited investors for

4       Chargeback Armor, Ex. 910 ¶ 234; 917 ¶ 234, and the

5       purported Chargeback Armor CEO referred to him as

6       his "business partner." Dkt. 120, at 23.

7     v. Purported CEO Mike Costache consulted with the

8       Individual Defendants concerning hiring and contracting

9       decisions. Dkt. #231-1, at 23, 26.

10    vi. Mike Costache, a Secured Merchants employee and

11      purported Chargeback Armor CEO, sent an email to a

12      Secured Merchants client that included referring to

13      Secured Merchants as "the technology company that

14      developed the Chargeback Armor product" and then

15      noting that Secured Merchants is "transitioning all

16      clients to be billed" by Chargeback Armor. Dkt. #231-1,

17      at 8.

18    vii. Nova 8 Media billed Defendant Argaman of Secured

19      Merchants for "design services" for "Chargeback

20      Armor." Ex. 414.

1         viii.    A Chargeback Armor, Inc. services agreement dated

2                 March 2, 2015 describes the company's board of

3                 directors as consisting of Mike Costache, Alon Nottea,

4                 and Avi Argaman. Dkt. #231-1, at 36.

5         ix.    A Chargeback Armor, Inc. lease agreement dated

6                 February 27, 2015 lists Mike Costache, Doron Nottea,

7                 and Defendant Argaman as individuals to whom mail

8                 may be sent to Chargeback Armor, Inc. Ex. 365-13.

9         x.    Defendant Doron Nottea was a signatory on Chargeback

10                 Armor's bank account and is listed as secretary of the

11                 company on its bank of America account. *See* Dkt.

12                 #214, at 31; Dkt. #231-1, at 46.

13         xi.    Mike Costache requested that Defendant Roi Reuveni

14                 set up an inbox anticipating email and telephone

15                 communications in light of Alon Nottea's new business

16                 cards with a toll free number. Dkt. 231-1, at 9.

17    d.   Defendants' CPA sent Doron Nottea a spreadsheet of the "BunZai

18       companies." Included on this list were nearly every Corporate

19       Defendant. Ex. 302.

20

**COMMERCE**

44.     At all times material to the Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44. Exs. 910 ¶ 55; 911 ¶ 55.

**DEFENDANTS' BUSINESS PRACTICES**

45.     Defendants advertised, marketed, distributed, and sold skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, since at least 2010. Exs. 909; 597-13,-16,-19, -22; *see also* Dkt. 120, at 1. Defendants offered free trials of their products under a variety of brand names including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively, "AuraVie"). Exs. 909-23, -24, -25, -144, -155; 335 (Dellure); 232-33 (Miracle Face Kit).

46.     Defendants' website failed to disclose adequately and materially misrepresented the terms of their trial offers. Ex. 909-113, -115, -116, -126, -128, -140.

### *Defendants' Risk-Free Trial Offers*

47.     [Intentionally left blank.]

48.     Consumers testified by sworn declaration that Defendants advertised on third-party websites such as Facebook.com, Amazon.com, HomeDepot.com, and offered a "risk-free" trial or "trial order" of Defendants'

skincare products. Exs. 2 ¶ 2; 13 ¶ 2; 14 ¶ 2;  After consumers clicked on these advertisements, they were directed to Defendants' websites and lured into providing their credit or debit card information by representations that if consumers paid a nominal shipping and handling charge, typically $4.99 or less, they would receive a "risk-free" trial, "trial order," or "gift" of products. Exs. 2 ¶ 2; 4 ¶ 2; 13 ¶ 2; 14 ¶ 2; 15 ¶ 2; 909-113,-125; 909-113, -115, -128; *see also* 903-8.

49.      Defendants' websites prominently claimed that their offer was merely a "trial":



(screen capture from http://auraviefreetrial.com, captured Mar. 25, 2014).

1  Ex. 909-113; *see* also Ex. 600-17.   Defendants promoted their offer as a "risk-

2  free" trial and, on most sites, claimed that customer satisfaction was "100%

3  guaranteed":



8  (screen capture from http://mymiraclekit.com, capturedMay 12, 2014). Ex. 909-

9  128.

10          a.      Earlier versions of one of Defendants' websites offered their

11                  products as a prize, purportedly for consumers who completed

12                  surveys:



(screen capture from http://archive.org, captured May 28, 2015). Ex. 903-8.

50.     When a user attempted to leave Defendants' websites, a text box appeared that offered to ship the trial offer at a lower shipping price. These pop-up advertisements contained false representations that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating:



(screen capture from http://auraviefreetrial.com, captured March 25, 2014).
Ex. 909-116. In fact, AuraVie was not accredited by the BBB and it had an F

rating. Ex. 907 ¶ 5.

        a.     the BBB actually contacted Defendants concerning their deceptive

              practices. Ex. 592.

**Defendants' Hidden Costs, Continuity Plan Features, and Return Policy**

     51.    Defendants' marketing practices employed tactics including hidden

costs, signing up consumers for negative option continuity plans without their

consent, and undisclosed and onerous return policies. *See, e.g.,* Exs. 2 ¶¶ 3-6; 5 ¶¶

2-5; 6 ¶¶ 3-6; 7 ¶¶ 2-6; 8 ¶¶ 3-5; 9 ¶¶ 2-5; 11 ¶ 5; 13 ¶ 7; 14 ¶¶ 4-6; 909-117, -

118, -130, -131, -145, -146. In their advertisements and sales offers, Defendants failed to disclose adequately that they would charge consumers' credit or debit accounts for the trial product, typically as much as $97.88, after a 10-day period. *Id*.

52.     Defendants also failed to disclose adequately that consumers who accepted the trial offer would be enrolled into a continuity program. Exs. 2 ¶ 6; 3 ¶ 14; 5 ¶ 4; 7 ¶ 6; *see also* 4 ¶ 6; 9 ¶ 5; 13 ¶ 7; 909-113, -115, -116, -126, -140, -155. Under the continuity program, Defendants sent consumers additional shipments of Defendants' skincare product each month and charged consumers' credit or debit cards the full cost of each product shipped until consumers affirmatively canceled their membership in the continuity program. Exs. 2 ¶ 6; 14; 5 ¶ 4; 7 ¶ 6; 909-117,-118, -130, -131, -145, -146; *see also*  3 ¶¶ 8; 4 ¶ 6; 9 ¶ 5; 13 ¶ 7.

53.     Consumers testified that they were typically unaware that they had enrolled in Defendants' continuity program until they discovered charges—usually $97.88 a month—on their credit or debit card statements. Exs. 4 ¶ 3; 5 ¶ 3; 6 ¶ 5; 7 ¶ 3; 9 ¶ 4; 10 ¶ 3; 11 ¶ 3; 12 ¶ 5; 13 ¶ 6; 14 ¶ 5; 15 ¶ 4; *see also* 8 ¶ 4. Consumers further testified that, by time they became aware of the charges, Defendants told them it was too late for them to return the product for a refund. Exs. 2 ¶ 6; 4 ¶ 6; 5 ¶ 4; 7 ¶ 6.

54.      Further, although Defendants promoted their offers as "risk-free" with "100% satisfaction guaranteed," Defendants failed to disclose, or disclose adequately, material terms of their return policy. Ex. 909-113, -115, -116, -126, -140, -155; *see also* 2 ¶¶ 2-6, 10; 3 ¶ 14; 4 ¶ 8; 5 ¶ 2; 7 ¶ 7; 8 ¶ 8; 9 ¶ 7; 10 ¶¶ 2, 7; 11 ¶ 7; 12 ¶ 2; 13 ¶ 9; 14 ¶ 8; 15 ¶ 3, 7. Defendants failed to disclose adequately that consumers must cancel their order within 10 or 14 days and return unopened product within a certain period of time, usually 10, 14, or 30 days, to avoid being charged a $97.88 fee. Exs., 909-117, -118, -125, -131, -146; 2 ¶ 6; 5 ¶ 5; 9 ¶ 7; 13 ¶ 9; 14 ¶¶ 3-4, 8. Defendants also failed to disclose adequately that after 10 days, only unopened products could be returned for a refund and that no refunds would be provided for any product returned after 30 days. Ex., 909-118, -131, -146; *see also* 2 ¶¶ 7-10; 5 ¶ 5; 9 ¶ 7; 12 ¶¶ 2-3; 13 ¶ 9; 14 ¶¶ 3-4, 8; 15 ¶ 3.

55.      Consumers have testified that, because they did not receive their "risk-free" trial until after 10 days have elapsed (or nearly elapsed), they could not return the product in time to avoid the $97.88 fee. Ex. 14 ¶ 4, 6; *see also* 10 ¶¶  3-4. Consumers also testified that Defendants failed to disclose adequately that they often assessed a "restocking" fee of up to $15 for returning products. Ex. 4 ¶ 7; *see also* Exs. 2 ¶ 6; 901-49: 8; 909-118, -131, -146. Accordingly, consumers who accepted Defendants' trial offers were likely to incur unexpected charges.

56.      Defendants' websites did not contain a disclosure concerning the

1   initial charges for the product, continuity program, or return policies until the

2   "final step" of their ordering page. Ex. 909-125. Consumers have testified that

3   they never saw such a disclosure, even when they specifically looked for one. Exs.

4   4 ¶ 8; 8 ¶ 3.

5          a.      As the screen capture below illustrates, the disclosure was in

6                  significantly smaller print and was obscured by a variety of graphics

7                  and text:

(screen capture from http://auraviefreetrial.com, captured March 24, 204; not to scale) Ex. 909-125.  In contrast, Defendants represented—in bold, red font at the top-center of the page—that their trial shipment cost "$0.00." *Id*.

      b.    For some websites, no disclosure was provided even in the final step. Ex. 902-1.

1      57.    Even if the disclosure were prominently displayed, it failed to

2  mention many material terms and conditions of Defendants' offer. Defendants'

3  disclosure stated:

> We take great pride in the quality of our products & are
> confident that you will achieve phenomenal results. By
> submitting your order, you agree to both the terms of
> this offer (click link below) & to pay $4.95 S&H for
> your 10 day trial. If you find this product is not for you,
> cancel within the 10 day trial period to avoid being
> billed. After your 10 day trial expires, you will be billed
> $97.88 for your trial product & enrolled in our monthly
> autoship program for the same discounted price. Cancel
> anytime by calling 866.216.9336. Returned shipments
> are at customer's expense. This trial is limited to 1 offer
> per household.

Ex. 909-125.

1        58.    Defendants' disclosure paragraph, as set forth above, failed to

2    disclose: (a) that the 10-day trial period by which consumers must cancel began

3    on the day that the product was ordered; (b) that, to avoid charges, the consumer

4    must also return the product to Defendants by a certain time; (c) that consumers

5    could not return the product for a refund after 10 days if it has been opened; (d)

6    that consumers could not return the product for a refund after 30 days, even if it

7    was not opened; and (e) that a restocking fee, usually $15, may be charged when a

8    product was returned. *Id.*

9

10

11

12

13

14

15

16

17

18

19

20

59.     Most of the material terms and conditions of Defendants' offer was found in a separate, multi-page terms and conditions webpage that was accessible by hyperlink. Ex. 909-116,-117,-118,-119,-120,-130,-131,-132,-133,-134,-145,-146,-147,-148,-149,-164,-165, -166,-167,-172. On many of Defendants' websites, this hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" Ex. 909-115,-128,-144,-163, *See also* 909-144, -163, -172:



(screen capture from auravietrialkit.com, captured on March 25, 2014). Ex. 909-115.

60.     Defendants sent consumers who signed up for a trial offer a confirmation email that reinforced the impression that they would receive a free

1   shipment of Defendants' skincare product. Exs. 8 ¶ 4; 8-5,-6; 14 ¶ 3; 15 ¶ 3; 15-5;

2   *see also* 12 ¶¶ 2, 7; 14 ¶¶ 3, 8; 902-2. These emails showed no charges for the

3   "risk-free" trial other than the nominal shipping and handling fees. *Id.*

4        61.    Further, Defendants' confirmation emails did not disclose that

5   consumers would be charged the full cost of the product, usually $97.88, after 10

6   days unless the consumer canceled the order and returned the product during that

7   time. *Id.* Defendants' confirmation emails did not disclose that the consumer was

8   enrolled into a continuity program that would result in future shipments of product

9   and a monthly charge of $97.88 on their credit or debit cards. *Id.* These emails

10   also failed to state when the charge would be imposed or how consumers could

11   avoid the charge. *Id.* Nor did the emails disclose that unopened products could be

12   returned for a refund only within 30 days of ordering. *Id.*

13        a.    Defendants were aware that their confirmation emails were

14               inadequate. BunZai's attorney informed Alon Nottea that the

15               company was required by law to issue a "post-transaction

16               confirmation email to be sent (within the lesser of 10 days or half the

17               trial period time) that included all the material negative option terms

18               and cancellations/refund procedure." Ex.589-5. The attorney also

19               provided advise on how to become compliant with FTC law. Ex. 589.

20               In his letter, BunZai's attorney further stated:

1      i.  "A 15% restocking fee on non-trial returns is buried in

2         the T&Cs. That's a highly material term that should be

3         disclosed much more prominently, ideally on the order

4         page." Ex. 589-5

5      ii.  "It isn't clear whether the 10-day trial begins from order

6         or delivery date. The consumer needs to have use of the

7         product for the full stated trial period or, alternatively, if

8         the trial period begins from the order date, there must be

9         very clear disclosure of that so the consumer knows,

10        before she orders, that the trial period includes shipping

11        time and she will have less than the stated trial period to

12        try the product." Ex. 589-5

13      iii.  "To satisfy the 'express informed consent' requirement,

14         the Green Millionaire consent mandates a 'check box,

15         signature, or other substantially similar method, that

16         consumers must affirmatively select or sign to accept the

17         negative option feature.' All key negative option

18         disclosures (costs, trial period length, need to cancel to

19         avoid charge), together with a statement that the

20

1          consumer is agreeing to pay the costs, must be

2          'immediately adjacent' to the check box." Ex. 589-4.

3     iv.   "I would recommend that you not say 'Risk-Free Trial'

4          since there is risk the consumer won't cancel and will be

5          charged the purchase price, and the FTC certainly

6          wouldn't view it as "risk-free." Ex. 589-3.

7     v.    "The FTC and a recent federal court decision in an FTC

8          case in California also require that negative option terms

9          appear 'above the fold,' requiring no scrolling. Right

10         now your negative option terms are well below and quite

11         far to the left of the credit card fields and the submit

12         button, and are below the fold (at least on my screen),

13         invisible without scrolling. As such, they are out of

14         compliance with the placement requirements of both

15         Rockefeller and the FTC." Ex. 589-4

16    vi.   "Almost certainly the FTC would say [your disclosure]

17         therefore is not 'conspicuous.'" Ex. 589-4.

18

19

20

b.    In an audio-recorded meeting that included Alon Nottea, Roi Reuveni, and Paul Medina, Alon Nottea stated:

…If you send these terms, it can act like . . . we told you that we're going to charge . . . we notified you . . . you have 10 days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurted (sic) us . . . If it's done creatively, if it's done correctly and optimized . . . not just try, it didn't work. Ex. 556, at 101:12- 103:7.

**Defendants' Cancellation and Refund Practices**

62.    Consumers testified that, after they learned that Defendants charged their credit card or debit card accounts and signed them up for a continuity plan, they often had significant difficulty receiving a refund and cancelling the continuity plan. *See* Exs. 3 ¶¶ 5, 9; 4 ¶¶ 4-6; 6 ¶ 6; 8 ¶ 5; 11 ¶ 5; 14 ¶ 5-7.

63.    Many consumers reported difficulty contacting Defendants' customer service representatives, despite calling Defendants' toll-free number numerous times. *Id.* Even when consumers spoke with a representative, some consumers continued to receive shipments and unauthorized charges after cancelling the continuity plan. Ex. 8 ¶ 6. Still others reported receiving multiple charges from Defendants without receiving products. Ex. 10 ¶¶ 3-4. As a result, consumers continued to incur unwanted and unauthorized charges. *Id.*

64.    Consumers testified that, when they called Defendants to complain about unauthorized charges, Defendants told them that the continuity plan would be cancelled, but their money would not be refunded. *See* Exs. 2 ¶ 6; 5 ¶ 4; 8 ¶ 5;

13 ¶ 7. Other consumers testified they were offered only a partial refund. *See* Exs. 3 ¶ 13; 4 ¶ 7; 7 ¶ 6; 9 ¶ 5; 11 ¶ 5; 14 ¶ 6; 15 ¶ 5; 901-10:17 to 901-11:2, 901-49:6-17. Consumers testified that, at other times, Defendants conditioned a partial refund upon the consumer's promise or signed statement that they would not complain to their credit card company,  to the Better Business Bureau, or to any authority. *See* Exs. 5 ¶ 4; 6 ¶ 8.

    a.    A former employee of BunZai and Pinnacle, who worked in the customer service and chargeback departments, testified that the companies' practice was to deny refunds unless consumers persisted in complaining about the charges. Ex. 554 at 11:4-6, 11:10-21, 24:3-25:6, 25:23-26:7, 26:17-19, 45:13-16 ("The goals was to spend the least amount of time on the phone with the customer and issue the least—the least amount of refunds that you could."), 79:4-13.

        i.    Defendants' customer service scripts confirm that customer service representatives were advised to avoid refunds as much as possible. *See* Ex. 240-3 ("*Important* Avoid Returns as much as possible . . . Customers should initially be advised that the best we can do is cancel their membership and prevent any future charges or shipments").

1

  b.  Consumer's allegations and former employee testimony are

2

     corroborated by employee training materials, which included scripted

3

     rebuttals for responding to consumer complaints and refund requests.

4

     Ex. 554 22:9-22:15, 37:18-37:21, Ex. 240. According to the scripts,

5

     Defendant's employees were to "Avoid Returns as much as possible.

6

     Never offer a return unless the customer requests it or is extremely

7

     irate. Customers should initially be advised the best we can do is

8

     cancel their membership and prevent any future charges or

9

     shipments." Ex. 240-3. Consumers who threatened to file complaints

10

     with their financial institutions or the Better Business Bureau were to

11

     be offered a partial refund. Ex.554, at 34:5-13, 34:18-21, 38:15-

12

     39:13, 39:16-24, 42:9-22, Ex.240-7. Consumers who threatened to

13

     file complaints with the FTC or Attorneys General were to be offered

14

     a full refund. Ex. 240-9; Ex.554, at 43:5-44:16.

15

  c.  Defendant Pinnacle Logistic, Inc. also provided employees with

16

     scripted rebuttals for responding to complaints and refund requests.

17

     Exs. 103-1, -2; 554, at 21:20-22:15, 26:17-19, 37:5-8, 37:14-21,

18

     38:6-39:24, 80:15-81:3,  81:11-19, 82:4-18.

19

20

1        d.     Defendants' scripts often instructed employees to inform consumers

2               that AuraVie was "FTC compliant" and followed the FTC's rules and

3               regulations.  Ex. 553, at 79:22-80:14.

4        65.    Defendants' continuity program resulted in many complaints and

5 chargeback requests by consumers. *See* Exs 907; 554 at 26:2-7, 27:7-18, 28:2-5,

6 28:17-23, 90:20-23.  A former employee testified that Defendants provided false

7 documents to payment processing companies and exaggerated the measures they

8 took to communicate the terms of their offer to consumers. Ex. 554, at 97:22-98:4,

9 see Ex. 554, at 71:3-72:5, 72:8-72:22, 96:10-96:18, 96:23-97:4, 98:16-98:19; *see*

10 27:13-27:18.

11        a.     Defendants established dozens of merchants accounts, held by

12               numerous shell corporations, and used a variety of billing descriptors.

13               Ex. 554, at   61:15-23, 32:22-25, 69:23-70:3, 83:25-83:18, 85:8-22,

14               85:25-87:7, 90:6-23. According to the sworn testimony of former

15               employee Andrew Stanley-the use of numerous merchant accounts,

16               shell corporations, and billing descriptors was intended to limit the

17               number of consumer chargebacks to any one particular account and

18               to help ensure that the enterprise could maintain access to credit card

19               processing. Ex. 554:12-555:28.

20

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

b.      Andrew Stanley also testified that Defendants submitted falsified documents to oppose consumer chargeback requests.  Ex. 554, at 71:3-72:22, 96:10-18, 96:20-97:4, 98:16-19; *see also* 97:22-98:4, 60:13-22.  These falsified documents were altered or doctored to make it appear that Defendants' websites required consumers to click a box on the ordering screen indicating that they had read the terms and conditions of the sales offer in order to complete a purchase. Ex. 909-13 to -28. No such box existed on AuraVie's websites. *See* Ex. 554 at 71:12-72:5. Disclosures were made larger and more prominent in materials provided to dispute chargeback requests than appeared on the actual websites.  See Exs. 600-21; 909-119,-147,-166; 15-16.

c.      Defendants' terms and conditions contained the following statement: CHARGEBACKS AND REVERSALS. We handle all chargebacks and reversals as potential cases of fraudulent use or our product offer and/or theft of product. In cases where we have provided a product and we have verified that a client has received a product and/or refused or returned product(s), whether or not they have used the product in any way, possible actions taken by the company may include filing a complaint with the Internet Crimes Bureau and/or local authorities in your state to investigate theft of product and

1   possible mail fraud which is a Federal Crime. All cases of

2   chargeback requests will be vigorously fought by the Company. BE

3   AWARE that if you choose to claim your online transaction was

4   fraudulent that all activity and IP address information is captured.

5   This digital proof of whom and where the order was placed with be

6   submitted to the proper authorities. This information may be used in

7   a civil and criminal case against a customer if there is fraudulent use

8   or theft of product(s).

9   d.   Ex. 909-118, -131, -132,-146,-147,-165 See  Exs. 600-21, Ex. 15-16.

10      Defendants made similar representations to consumers who called

11      their customer service number to request a refund. Ex. 240-5.

12      Defendants instructed call center representatives to tell consumers

13      that their chargeback attempts fail "90% of the time, meaning if they

14      did temporarily credit your account, they will take those funds out

15      again." Ex. 104-4.

16   e.   In an effort to maintain access to credit card processing, Defendants

17      established as many as dozens of merchant accounts, held by

18      numerous shell corporations, and used a variety of billing descriptors

19      to obscure that Defendants were in fact a single enterprise. See Ex.

20

907 ¶¶17-18; Ex. 554, at 61:12-23, 69:23-70:3, 82:25-83:18, 85:15-22, 85:25-87:7, 90:15-23, see 32:22-25.

f.      Many of these shell companies use the same payment processing companies and acquiring banks. *See* Ex. 78-2.

66.     Consumers testified that Defendants often did not honor return policies, even when consumers satisfied them. *See* Ex. 11 ¶ 5; 901-26:19. For example, Defendants told consumers that they could obtain a refund on any product returned even when the product remained unopened and the 30-day period had not yet elapsed, contrary to Defendants' terms and conditions. *Id*. Some consumers reported being refused a refund by Defendants despite sending the product back within the permissible time period, with Defendants' customer service representative stating that Defendants could not confirm receipt of return shipment or that the shipment was not returned properly. Exs. 7 ¶ 6; 13 ¶ 7.

67.     Consumers testified that, in other instances, they received refunds from Defendants only after they complained to their credit card companies, regulatory authorities, or the Better Business Bureau. Exs. 3 ¶¶ 12-13; 4 ¶ 11; 7 ¶ 9; 7-13. Even in those instances, however, Defendants did not always issue full refunds. *Id*.

## VIOLATIONS OF THE FTC ACT

68.      Section 5(a) of the FTC Act prohibits "unfair or deceptive acts orpractices in or affecting commerce." 15 U.S.C. § 45(a) (2006).

69.         Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n). Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

a.   An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164-65 (1984)).

b.   A misrepresentation may be either express or implied. *FTC v. Figgie Int'l*, *Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("[N]othing in statute or case law . . . protects from liability those who merely imply their deceptive claims . . . .").

c.   Although the representation, omission, or practice must be likely to mislead a reasonable consumer, the FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id.* at 605–06.

d.   A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).  Express claims are presumed to be material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). Reliance upon such claims is presumptively reasonable. *FTC v. Five-Star Auto Club, Inc*., 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

e.   An advertisement that fails to disclose material information is deceptive. *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir.

1978). Inconspicuous disclosures do not remedy the deceptiveness of a material omission. *FTC v. Cyberspace.com LLC*, No. C00-1806L, 2002 WL 32060289, 2-4 (W.D. Wash. July 10, 2002) (holding that a fine print disclosure was inadequate to escape liability), *aff'd* 453 F.3d 1196, 1200 (9th Cir. 2006) (collection case where deception was found because fine print disclosures were inadequate); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010) ("[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an accurate impression") (*quoting Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine print disclosure at the bottom of the ad); *Porter & Deitsch  v. FTC*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers made in contract for

1  credit repair services were insufficient to counteract advertising

2  claims about the service).

3      f.    Under Section 5, the FTC is not required to prove that a defendant

4      intended to deceive consumers, nor is a defendant's good faith a

5      defense to liability. *FTC v. World Travel Vacation Brokers, Inc.*,

6      861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. Pioneer Enters., Inc.*,

7      1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev. 1992)

8      (George, C.J.).

9      g.    Charging consumers' credit or debit cards without consumers'

10      express informed consent has consistently held to be unfair under the

11      FTC Act. *See*, *e.g.*, *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176,

12      1201 (C.D. Cal. 2000); *FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp.

13      2d 1281, 1288-89 (M.D. Fla. 2008).

14  **Count I.**

15  **Failure to Disclose Adequately Material Terms of Offer**

16      70.    In numerous instances, in connection with the advertising,

17  marketing, promotion, offering for sale, or sale of skincare products, including but

18  not limited to AuraVie products, Defendants represented, directly or indirectly,

19  expressly or by implication, that consumers who provided their credit or debit

20  card billing information would be charged only a nominal shipping and handling

1   fee to receive a trial shipment of Defendants' skincare products and, that their

2   satisfaction was guaranteed. *See* UF 48 and 49, *supra*.

3       71.        In numerous instances in which Defendants made the

4   representation set forth in Paragraph 70, Defendants failed to disclose, or disclose

5   adequately to consumers, material terms and conditions of their offer, including:

6       (a)    That Defendants would use consumers' credit or debit card

7               information to charge consumers the full costs of the trial products,

8               usually $97.88, upon the expiration of a limited trial period;

9       (b)    The dates on which the trial period began and ended;

10      (c)    That Defendants would automatically enroll consumers in a negative

11              option continuity plan with additional charges;

12      (d)    The cost of the continuity plan, and the frequency and duration of the

13              recurring charges;

14      (e)    The means consumers must use to cancel the negative option

15              program to avoid additional charges; and

16      (f)    Requirements of their refund policies. *See* UF 51 and 52, *supra; see*

17              *also* Ex. 909-125.

18      72.        Plaintiff alleged that Defendants' failure to disclose, or to disclose

19

20

1    adequately, the material information described in Paragraph 71, in light of the

2    representation described in Paragraph 70, constituted a deceptive act or practice in

3    violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II.**

**False "Risk-Free" Trial Claim**

6    73.    Through the means described in Paragraph 45-67, Defendants

7    represented, directly or indirectly, that consumers could try AuraVie "risk-free."

8    74.    The representation set forth in Paragraph 73 was false. Consumers

9    could not try Defendants' products "risk-free," because Defendants charged

10   consumers the full cost if the "risk-free" product was opened and not returned

11   within 10 days of placing the order, often assessed a restocking fee of up to $15,

12   and consumers had to bear the additional expense of returning the product to the

13   Defendants. In addition, Defendants failed, in numerous instances, to refund

14   consumers' charges assessed for the trial order, despite consumers having returned

15   the product according to the offer's terms and conditions. *See* UF 66, *supra*.

16   75.    Plaintiff alleged that Defendants' representations set forth in

17   Paragraph 73 constituted deceptive acts or practices in or affecting commerce in

18   violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

19

20

## Count III.

### False Better Business Bureau Accreditation and Rating Claims

76.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of skincare products, Defendants represented, directly or indirectly, expressly or by implication, that Defendants were accredited by and had a rating of "A-" with the Better Business Bureau. *See* UF 50, *supra*.

77.      In truth and in fact, Defendants were not accredited by and did nothave a rating of "A-" with the Better Business Bureau. Defendants' rating with the Better Business Bureau was an "F." *Id.*

78.     Plaintiff alleged Defendants' representation in Paragraph 76 was false or misleading and constituted a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV.

### Unfairly Charging Consumers Without Authorization

79.     In numerous instances, Defendants caused charges to be submitted for payment to the credit and debit cards of consumers without the express informed consent of consumers. *See* UF 53 and 62-65, *supra*. Charging consumers' credit or debit cards without consumers' express informed consent has consistently held to be unfair under the FTC Act. *See*, *e.g.*, *FTC v. J.K. Publ'ns,*

1  *Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000); *FTC v. Global Mktg. Grp., Inc.*,

2  594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008).

3      80.    Defendants' actions caused or were likely to cause substantial injury

4  to consumers that consumers cannot reasonably avoid themselves and that was not

5  outweighed by countervailing benefits to consumers or competition.

6      81.    Plaintiff alleged Defendants' practices as described in Paragraph 79

7  constituted unfair acts or practices in violation of Section 5 of the FTC Act, 15

8  U.S.C. §§ 45(a) and 45(n).

9  **VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

10      82.    In 2010, Congress passed the Restore Online Shoppers' Confidence

11  Act, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010.

12  Congress passed ROSCA because "[c]onsumer confidence is essential to the

13  growth of online commerce. To continue its development as a marketplace, the

14  Internet must provide consumers with clear, accurate information and give sellers

15  an opportunity to fairly compete with one another for consumers' business."

16  Section 2 of ROSCA, 15 U.S.C. § 8401.

17      83.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits

18  charging consumers for goods or services sold in transactions effected on the

19  Internet through a negative option feature, as that term is defined in the

20  Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(u), unless

the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403.

84.     The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).  It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. 15 U.S.C. § 8403 (2006).

85.     As described above, Defendants advertised and sold Defendants' skincare products to consumers through a negative option feature as defined by the TSR. *See* UF 51-53, *supra*.

86.      Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of

1    ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15

2    U.S.C. § 57a.

3                                    **Count V.**

4              **Violation of ROSCA – Auto-Renewal Continuity Plan**

5         87.    In numerous instances, in connection with the selling of skincare

6    products on the Internet through a negative option feature, Defendants failed to:

7         (a)    clearly and conspicuously disclose all material terms of

8                the negative option feature of the skincare products

9                transaction before obtaining the consumer's billing

10               information;

11        (b)    obtain the consumer's express informed consent to the

12               negative option feature before charging the consumer's

13               credit card, debit card, bank account, or other financial

14               account for the transaction; and/or

15        (c)    provide simple mechanisms for a consumer to stop

16               recurring charges for skincare products to the

17               consumer's credit card, debit card, bank account, or

18               other financial account.

19        88.    Plaintiff alleged Defendants' practices in Paragraph 87 were a

20

1  violation of Section 4 of ROSCA, 15 U.S.C. § 8403, and a violation of a rule

2  promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. §

3  8404(a).

4  **Violations of the Electronic Fund Transfer Act and Regulation E**

5  89.    Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a

6  "preauthorized" electronic fund transfer from a consumer's account may be

7  "authorized by the consumer only in writing, and a copy of such authorization

8  shall be provided to the consumer when made."

9  90.    Section 903(10) of EFTA, 15 U.S.C. § 1693a(10), provides that

10  the term "preauthorized electronic fund transfer" means "an electronic fund

11  transfer authorized in advance to recur at substantially regular intervals."

12  91.    Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides

13  that "[p]reauthorized electronic fund transfers from a consumer's account may be

14  authorized only by a writing signed or similarly authenticated by the consumer.

15  The person that obtains the authorization shall provide a copy to the consumer."

16  92.     Section 205.10 of the Federal Reserve Board's Official Staff

17  Commentary to Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he

18  authorization process should evidence the consumer's identity and assent to the

19  authorization." ¶ 10(b), cmt 5.

20

a.  For an authorization to be valid, the terms of the preauthorized

transfer must be "clear and readily understandable" and the

authorization "should evidence the consumer's identity and assent to

the authorization." Federal Reserve Board's Official Staff

Commentary to Regulation E, 12 C.F.R. Part 205, Supp I, ¶ 10(b),

comments (5) & (6). These protections ensure that consumers'

consent to recurring debits will be knowing and informed.

b.  A consumer's rights under EFTA cannot be waived. 15 U.S.C. §

1693*l* (2006).

## Count VI.

## Unauthorized Debiting from Consumers' Accounts

93.    In numerous instances, Defendants debited consumers' bank

accounts on a recurring basis without obtaining a written authorization signed or

similarly authenticated from consumers for preauthorized electronic fund transfers

from their accounts, thereby violating Section 907(a) of EFTA, 15 U.S.C.

§ 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

94.    Further, in numerous instances, Defendants debited consumers'

bank accounts on a recurring basis without providing a copy of a written

authorization signed or similarly authenticated by the consumer for preauthorized

electronic fund transfers from the consumer's account, thereby violating Section

1    907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12

2    C.F.R. § 205.10(b).

3         95.      Under Section 917 of EFTA, 15 U.S.C. § 1693o©, a violation of

4    EFTA and Regulation E constitutes a violation of the FTC Act.

5         96.      Plaintiff alleges Defendants engaged in violations of EFTA and

6    Regulation E as described in alleged in Paragraphs 93 and 94.

7                              **Count VII.**

8                           **Relief Defendant**

9         97.      Relief Defendant, Chargeback Armor, Inc. received, directly or

10   indirectly, funds and other assets from Defendants that were traceable to funds

11   obtained from Defendants' customers through the unlawful acts or practices

12   described herein.

13        98.      Relief Defendant was not a bona fide purchaser with legal and

14   equitable title to Defendants' customers' funds or other assets, and Relief

15   Defendant will be unjustly enriched if it is not required to disgorge the funds or

16   the value of the benefit it received as a result of Defendants' unlawful acts or

17   practices.

18        99.      By reason of the foregoing, Relief Defendant holds funds and assets

19   in constructive trust for the benefit of Defendants' customers.

20

**CONSUMER INJURY**

100.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and EFTA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S AUTHORITY TO GRANT RELIEF**

101.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

a.   To obtain injunctive and monetary relief against individuals for injury to consumers resulting from a company's conduct, the FTC must establish that the individuals both: (1) participated directly in the unlawful acts or practices or had authority to control them; and (2) had some knowledge of these acts or practices. *FTC v. Publ'g*

1    *Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997); *FTC v.*

2    *Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

3    b.    Authority to control the company can be demonstrated by "active

4          involvement in business affairs and the making of corporate policy,

5          including assuming the duties of a corporate officer." *Amy Travel*,

6          875 F.2d at 573.

7    c.    The FTC may satisfy the knowledge requirement by showing either

8          actual knowledge of the misrepresentations, reckless indifference to

9          the truth or falsity of the misrepresentations, or an awareness of a

10         high probability of fraud coupled with an intentional avoidance of the

11         truth. *Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875

12         F.2d at 574. The degree of participation in business affairs is

13         probative of knowledge. *Publ'g Clearing House*, 104 F.3d at 1170;

14         *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991) (Pro, J.).

15   d.    To establish individual liability, the FTC need not show that the

16         individual intended to defraud consumers. *Publ'g Clearing House*,

17         104 F.3d at 1171.

18   102.  Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 5 of ROSCA, 15

19   U.S.C. § 8404, and Section 917(c) of EFTA, 15 U.S.C. § 16930(c), authorize this

20   Court to grant such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the FTC Act, ROSCA, and EFTA, including the rescission or reformation of contracts and the refund of money.

## PRAYER FOR RELIEF

Pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, Section 5 of ROSCA, 15 US.C. § 8404, Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers, this Court has authority to:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and EFTA by Defendants;

B.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, and EFTA, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

C.    Enter an order requiring Relief Defendant to disgorge all funds and assets, or the value of the benefit it received from the funds and assets, which are traceable to Defendants' unlawful acts or practices; and

D.    Award Plaintiff the cost of bringing this action, as well as such other additional relief the Court determines to be just and proper.

**Jurisdiction and Venue**

103.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

104.   Personal jurisdiction over all Defendants exists pursuant to the FTC Act's provision for nationwide service of process, 15 U.S.C. § 53(b).

105.   Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

**The Standard for Summary Judgment**

106.   Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

107.   The moving party "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

108.   Once the moving party satisfies its burden under Rule 56(c), the burden shifts to the non-moving party to produce facts to show there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1   109. Summary judgment is proper when a rational trier of fact would not

2 be able to find for the nonmoving party on the claims at issue. *Id.*; *see also*

3 *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Only

4 disputes over facts that might affect the outcome of the case would properly

5 preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

6 (1986).  Thus, any opposition to this motion must set forth admissible evidence

7 that is significantly probative, and not merely colorable, of any fact that is claimed

8 to be disputed.  *Id.* at 249.

9   110. As the Supreme Court has held:  "The mere existence of a scintilla of

10 evidence . . . will be insufficient; there must be evidence on which the [fact finder]

11 could reasonably find for [the opposing party]." *Id.* at 252; *Hawking v. Ford*

12 *Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000).

13      **Counts I-III: Section 5 of the FTC Act – Deception**

14   111. Section 5(a) of the FTC Act empowers the FTC to prevent "deceptive

15 acts or practices in or affecting commerce." 15 U.S.C. § 45(a) (2006).

16   112. An act or practice is deceptive if "first, there is a representation,

17 omission, or practice that, second, is likely to mislead consumers acting

18 reasonably under the circumstances, and third, the representation, omission, or

19 practice is material." *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001); *FTC v.*

20

1  *Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the

2  standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)).

3       113.  A representation, omission, or practice is material if it "'involves

4  information that is important to consumers and, hence, likely to affect their choice

5  of, or conduct regarding, a product.'" *FTC v. Cyberspace.com LLC*, 453 F.3d

6  1196, 1201 (9th Cir. 2006 (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).

7       114.  The FTC need not prove actual reliance by each individual consumer.

8  *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the

9  FTC Act and would frustrate prosecutions of large consumer redress actions. *Id.*

10  Instead, a presumption of actual reliance arises once the FTC has proved that the

11  defendant made material misrepresentations, that they were widely disseminated,

12  and that consumers purchased the defendant's product.  *Id.* at 605–06.

13       115.  The FTC is not required to show an intent to deceive, since

14  consumers can be equally harmed by both deliberate and negligent conduct. *FTC*

15  *v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC*

16  *v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995)

17  (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043,

18  at 69,156 (D. Nev. 1992) (George, C.J.).

19

20

116.   The failure to clearly and conspicuously disclose the material terms of an offer is a deceptive omission that violated Section 5 of the FTC Act. *FTC v. Pioneer Enters., Inc*., 1992-2 Trade Cas. (CCH) ¶ 70,043 (D. Nev. 1992).

117.   Representations are deceptive under Section 5 of the FTC Act where they are both likely to mislead consumers acting reasonably and material to consumers' purchasing decisions. *See FTC v. Gill*, 265 F.3d 950; *FTC v. Pantron I Corp*., 33 F.3d 1095.

118.   "To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc*., 821 F. Supp. 2d at 1223 (citing *Cyberspace.com*, 453 F.3d at 1200).

119.   There is no question that a false representation that a product is free or risk free is material and a violation of Section 5.  *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012) ("This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product. The notion that consumers will get a free kit makes it more likely that they will unwittingly provide their credit card information, thinking they are only paying for shipping and handling, when in fact, they are obligating themselves to pay a subscription fee for the continuity program.")

1    120.    To be effective, a disclosure must be sufficiently clear and prominent

2    so that the "overall net impression" of the sales offer is truthful. *See*

3    *Cyberspace.Com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by

4    virtue of the net impression it creates even though the solicitation also contains

5    truthful disclosures."). *See also FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d

6    1, 12 (1st Cir. 2010) ("[d]isclaimers or qualifications in any particular ad are not

7    adequate to avoid liability unless they are sufficiently prominent and unambiguous

8    to change the apparent meaning of the claims and leave an accurate impression")

9    (*quoting Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989));

10   *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985)

11   (holding that an advertisement's description of cigarette tar content was deceptive

12   despite a fine print disclosure at the bottom of the ad); *FTC v. Porter & Deitsch*,

13   605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures

14   "buried in small print" were inadequate to qualify weight loss claims in

15   advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers

16   made in contract for credit repair services were insufficient to counteract

17   advertising claims about the service).

18   121.    Express product claims are presumed to be material and reliance

19   upon such claims is presumptively reasonable. *FTC v. Pantron I Corp.*, 33 F.3d

20

1088, 1095-96 (9th Cir. 1994); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

## Count IV: Section 5 of the FTC Act - Unfairness

122.   An act or practice is unfair, and violates Section 5(a) of the FTC Act, if it causes, or is likely to cause, substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

123.   Courts have regularly found unauthorized billing to be unfair.  *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010) (unauthorized charges to telephone bills were unfair); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000) (unauthorized credit card charges); *FTC v. Windward Mktg., Ltd.*, No. 96-615F, 1997 WL 33642380, at *10, 13 (N.D. Ga. Sept. 30, 1997) (unauthorized bank debits).

124.   Taking consumers' money without authorization is presumed to cause substantial injury.  *See J.K. Publ'ns*, 99 F. Supp. 2d at 1201 (finding substantial injury where "consumers were injured by a practice for which they did not bargain").

125.   The injury is substantial even if the amount taken is relatively small. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), *cert. denied*, 514

U.S. 1083 (1995) ("[C]onsumer injury is substantial when it is the aggregate of many small individual injuries.").

126.   It is well-established principle in the federal courts that large numbers of consumer complaints and high chargeback, return, and refund rates are convincing evidence that a consumer did not agree to be charged. *See FTC v. MacGregor*, 360 Fed App'x 891, 894 (9th Cir. 2009) (holding that high refund and return rates, along with high volume of complaints, are probative of misrepresentations and other abuses). *See also FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) (high volume of consumer complaints and excessive chargeback rates reaching 8 percent consistent with fraud); *FTC v. Grant Connect, LLC*,  827 F. Supp. 2d 1199, 1221 (D. Nev. 2011) ("[H]igh number of cancellations, refunds and chargebacks suggest that in fact consumers were deceived about what they were ordering."); *J.K. Publ'ns*, 99 F. Supp. 2d at 1203 (finding unauthorized charging where, among other things, more than 50 percent of consumers contacting defendants claimed they had not ordered defendants' products and there were 7.3 percent chargebacks); *FTC v. QT, Inc.,* 448 F. Supp 2d 908, 936 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008) (refund rate of 25 percent indicates deception); *FTC v. Crescent Publ'g Grp*., 129 F. Supp. 2d 311, 315, 322 (S.D. N.Y 2001) (lack of consumer authorization evidenced by "strikingly high chargeback level that averaged approximately 10.51

1   percent."); *Windward Mktg.,* 1997 WL 33642380, at *6, 12 (concluding from 40

2   percent return rate that defendant knew debits were unauthorized).

3       127.   Consumers cannot reasonably avoid an unauthorized charge that they

4   discover after it occurs.  *Inc21.com*, 745 F. Supp. 2d at 1004 ("[T]he burden

5   should not be placed on defrauded customers to avoid charges that were never

6   authorized to begin with.").

7       128.   Finally, consumers do not benefit from being debited or charged for

8   products or services "they never agreed to purchase, didn't know were being

9   provided to them, and never wanted in the first place."  *Inc21.com*, 745 F. Supp.

10  2d at 1004-05; *see also Neovi,* 604 F.3d at 1157 (consumers are "injured by a

11  practice for which they did not bargain"); *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

12                **Count V: Restore Online Shoppers' Confidence Act ("ROSCA")**

13      129.   Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging

14  consumers for goods or services sold on the Internet through a negative option

15  feature, unless the seller clearly and conspicuously discloses all material terms of

16  the transaction *before* obtaining the consumer's billing information, obtains the

17  consumer's express informed consent *before* making the charge, and provides a

18  simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403 (2006).

19      130.   Specifically, it is unlawful "for any person to charge or attempt to

20  charge any consumer for any goods or services sold in a transaction effected on

the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. 15 U.S.C. § 8403 (2006).

131.   The Telemarketing Sales Rule defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u) (2006).

132.   Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

**Count VI: The Electric Funds Transfer Act ("EFTA") and Regulation E**

133.   The Electronic Fund Transfer Act, and its implementing Regulation E, regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account. EFTA and Regulation E require that, before a merchant can make such recurring debits, it must obtain a written authorization signed or similarly authenticated by the consumer. 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

134.    Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

135.    Section 903(9) of EFTA, 15 U.S.C. §1693a(9, provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

136.    Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer." Section 205.10 of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. §205.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." *Id*. ¶10(b), cmt 5.  The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable …" *Id*. ¶ 10(b), cmt 6.

### Count IV: Relief Defendant

137.    "The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held

1    by the original wrongdoer or by one who has received the proceeds after the

2    wrong." *FTC v. Ivy Capital, Inc.,* 2013 WL 1224613, at *18 (D. Nev. Mar. 26,

3    2013) quoting *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998).

4         138.   Under the FTC Act, disgorgement from a relief defendant is

5    warranted where:  (1) the relief defendant has received ill-gotten gains; and (2)

6    does not have a legitimate claim to those gains. *See FTC v. Ivy Capital, Inc., et al.,*

7    2013 WL 1224613, at * 18 (relief defendant who was responsible for keeping the

8    books and for various operations or administrative tasks is liable for

9    disgorgement); *FTC v. Transnet Wireless Corp*., 506 F. Supp. 2d 1247, 1273

10   (S.D. Fla. 2007) (relief defendant liable for the full amount off ill-gotten gains she

11   received when she provided no service to the corporate defendants); *SEC v.*

12   *Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (summary judgment against a relief

13   defendant who failed to show he had a legitimate claim to the ill-gotten gains he

14   received); *FTC v. Inc21.com Corp*., 745 F. Supp. 2d 975, 1009 (N.D. Cal. 2010*),

15   aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten

16   gains as he was "president" of a corporation "in name only" and provided no

17   services to the corporation); *FTC v*. *Holiday Enterp*, 2008 WL 953358, at * 12

18   (N.D. Ga. Feb. 5, 2008) (relief defendant liable as "[s]he never performed any

19   work for the [defendant] companies (except for occasional signing of checks) and

20   would not have a legitimate claim to properties because of any work performed

for the Holiday companies"); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000).

139.   Once demonstrated, the appropriate remedy is an equitable monetary judgment equivalent to the amount of ill-gotten gains that the relief defendant received. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1273.

140.   Moreover, it is well-established that government agencies, in an effort to maximize the recovery of funds taken through fraud, may pursue individuals or companies even if they are no longer in possession of the ill-gotten assets. *See, e.g., CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.").

141.   Finally, courts have found that an individual's status as an employee does not create a legitimate claim to salary or other employee benefits if her employment was "in name only." *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d at 999.

**Liability: Common Enterprise**

142.   Where corporate defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

143.   Corporations "'constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interest or the pooling of assets and revenues.'" *Grant Connect*, 827 F. Supp. 2d at 1266 (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010)).

144.   In determining whether a common enterprise exists, "the Court considers factors such as: common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *Id.* (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)); *see also FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 at *13 (D. Nev. Mar. 26, 2013) (common enterprise existed where there was common control, shared office space, interrelated activity, and commingled funds). In addition, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v.*

1   *FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable because

2   it was part of a "maze of interrelated companies").

3       145.   The Ninth Circuit has also held that "entities constitute a common

4   enterprise when they exhibit either vertical or horizontal commonality – qualities

5   that may be demonstrated by a showing of strongly interdependent economic

6   interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot,*

7   *Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

8       146.   It is not necessary that the FTC prove any particular number of entity

9   connections and any specific connection. Instead, it must be proved that the

10   defendants maintained an "unholy" alliance. *See FTC v. Ameridebt, Inc.*, 343 F.

11   Supp. 2d 451, 462 (D. Md. 2004).

12                          **Individual Liability**
                            **Liability for Injunctive Relief**

13       147.   Individuals are liable for injury to consumers resulting from a

14   company's deceptive acts or practices when they either:  (1) "participated directly

15   in the acts or practices;" or (2) "had authority to control them." *FTC v. Publ'g*

16   *Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

17       148.   "Participation" can include an individual working at and drawing a

18   salary from the company, even if the individual is not involved in day-to-day

19   operations. *See, e.g., FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206

20   (C.D. Cal. 2000). Moreover, where an officer participates in "acts crucial to the

1    success" of an enterprise, the officer has directly participated for the purposes of

2    individual liability. *Id*. In *J.K. Publications*, for instance, the court held liable a

3    corporate officer who had obtained merchant accounts and purchased a database

4    of consumers for the corporate defendant. *See, e.g., FTC v. J.K. Publications, Inc.*,

5    99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).

6         149.   Individuals are also liable for injunctive relief if they had "authority

7    to control" the corporation, which can be inferred from "'active involvement in

8    business affairs and the making of corporate policy.'" *J.K. Publications*, 99 F.

9    Supp. at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080,

10   1089 (C.D. Cal. 1994)). An individual's "status as a corporate officer and

11   authority to sign documents on behalf of the corporate defendant can be sufficient

12   to demonstrate the requisite control." *Id.* at 1204. Indeed, a "corporate officer is

13   presumed to be in control of a small, closely held corporation, and assuming the

14   duties of a corporate officer is probative of an individual's participation or

15   authority." *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 WL 1224613, *14

16   (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-

17   225DAK, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011)); *see also FTC v.*

18   *Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ("An

19   individual's status as a corporate officer gives rise to the presumption of ability to

20   control a small, closely-held corporation."); *Standard Educators, Inc. v. FTC*, 475

1  F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief

2  executive and primary shareholder of a closely held corporation whose stock-in-

3  trade is overreaching and deception."); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-

4  CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's

5  status as a corporate officer gives rise to a presumption of ability to control a

6  small, closely-held corporation.").

7  **Liability for Equitable Monetary Relief**

8      150.   To obtain equitable monetary relief against an individual, the FTC

9  must show, in addition to one of the two factors above, that the individual had

10  some knowledge of the company's deceptive acts or practices. *J.K. Publications,*

11  99 F. Supp. at 1204.

12      151.   Individuals possess the requisite knowledge if they:  (1) had actual

13  knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or

14  falsity of the misrepresentations; or (3) had an awareness of a high probability of

15  deceptive conduct together with an intentional avoidance of the truth. *FTC v.*

16  *Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g*

17  *Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564,

18  574 (7th Cir. 1989).

19      152.   The "degree of participation in business affairs is probative of

20  knowledge." *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445,

1  1450 (D. Nev. 1991). The FTC, however, is not required to prove that an

2  individual actually intended to deceive to establish knowledge. *Network Servs.*

3  *Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

**Permanent Injunctive Relief is Warranted**

5    153.   Section 13(b) of the FTC Act authorizes courts to issue a permanent

6  injunction whenever a defendant violates the laws enforced by the Commission

7  and is likely to continue to violate them. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107,

8  1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir.

9  1996); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009).

10    154.   To determine whether a defendant is likely to engage in similar

11  violations in the future, courts look to two general factors:  (1) the deliberateness

12  and seriousness of the present violation, and (2) the defendant's past record with

13  respect to deceptive and unfair marketing practices. *Sears, Roebuck and Co. v.*

14  *FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*, 2013 WL 1224613, at *16.

15  The court may also weigh the "adaptability or transferability of the unfair practice

16  to other products." *Id*.

**The Court May Impose Occupational Bans**

18    155.   Further, "[a] court may frame an injunction based on violation of the

19  FTC Act broadly enough to prevent the defendant from engaging in similar illegal

20  conduct in the future." *FTC v. Neovi, Inc.*, No. 06-1952 JLS, 2010 WL 3789713,

1  at *2 (S.D. Cal. Sept. 27, 2010) (citing *FTC v. Colgate-Palmolive*, 380 U.S. 374,

2  395 (1965)).

3       156.   In fact, numerous courts have imposed bans enjoining future

4  participation in a particular line of business. *See, e.g.*, *FTC v. Gill*, 265 F.3d 944,

5  957-58 (9th Cir. 2001) (ban on engaging in the credit repair business);  *Ivy*

6  *Capital*, 2013 WL 1224613, at *16 (ban on business coaching); *FTC v. John Beck*

7  *Amazing Profits*, LLC, 888 F. Supp. 2d 1006, 1013 (C.D. Cal. 2012) (ban on

8  telemarketing and producing or disseminating infomercials); *Grant Connect*, 827

9  F. Supp. 2d at 1233 (ban on marketing and selling grant products and business

10  opportunities); *FTC v. Dinamica Financiera*, No. 2:09-03554, 2010 WL 9488821,

11  at *12 (C.D. Cal. Aug. 19, 2010) (ban on loan modification and foreclosure relief

12  services); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1084 (E.D. Mo. 2007) (ban

13  on marketing  business opportunities); *FTC v. Bay Area Bus. Council, Inc.,* No.

14  02-5762 (N.D. Ill. Apr. 16, 2004) (ban on telemarketing and on sale of credit-

15  related products), *aff'd*, 423 F.3d 627 (7th Cir. 2005); *FTC v. Credit Enhancement*

16  *Servs.*, No. 02-2134 (E.D.N.Y. Mar. 31, 2004) (ban on marketing or selling credit-

17  related goods or services); *FTC v. Consumer Alliance*, No. 02-2429 (N.D. Ill.

18  Sept.29, 2003) (ban on telemarketing and sales of credit card protection and

19  credit-related products).

20

**Measure of Monetary Relief**

157.   Where consumers suffer economic injury resulting from defendants' violations of the FTC Act, equity requires monetary relief in the full amount of consumers' losses.  *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (affirming summary judgment holding defendants liable for the full amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

158.   To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate.  *See Commerce Planet,* 878 F. Supp. 2d at 1089 (citing *FTC v. Direct Marketing Concepts, Inc.,* 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)). "Fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendants' burden to show inaccuracy." *Id.*

Respectfully submitted,

David C. Shonka
Acting General Counsel
DAMA J. BROWN
Regional Director

Dated: April 18, 2016          __/s/ Reid Tepfer_____
REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
Lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer);
(214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson);
(214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 19, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
Counsel for Oz Mizrahi

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
Counsel for Alon Nottea and
Roi Rueveni

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
Counsel for Doron Nottea and
Motti Nottea

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
Receiver

Kelly M. Crawford

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW

1
2
3

Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
Counsel to Receiver

4
5
6
7

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
Attorney for Secured Merchants LLC
and Chargeback Armor, Inc.

8
9
10
11

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, CA 92626
Telephone: (714) 641-3600 Ext. 214

12

13

/S/ REID TEPFER
REID TEPFER

14
15
16
17
18
19
20