YOUR REPRESENTATIONS. You hereby represent and warrant that: You are age eighteen or older; You have read this Agreement and thoroughly understand the terms contained in this Agreement; Any Products You purchase from the Website will be used for Your personal, non-commercial use; You will not re-sell, re-distribute or export any Product that You order from the Website; myauravie.com has the right to rely upon all information provided to myauravie.com by You; myauravie.com may contact You by email, telephone or postal mail for any purpose, including but not limited to (i) follow-up calls, (ii) customer satisfaction surveys, and (iii) inquiries about any orders You placed, or considered placing, at or through the Website.

RESTRICTIONS
Without the express prior written authorization of myauravie.com, You may not: Duplicate the Website (except as expressly provided elsewhere in this Agreement or as permitted by law); Create derivative works based on the Website or any of the Materials; Remove any copyright or other proprietary notices from the Website or any of the Materials contained therein; Frame or utilize any framing techniques in connection with the Website or any of the Materials; Use any meta-tags or any other "hidden text" using the Website's name or link to any page of the Website; Circumvent any encryption or other security tools used anywhere on the Website (including the theft of user names and passwords or using another person's user name and password in order to gain access to a restricted area of the Website); Use any data mining, bots, or similar data gathering and extraction tools on the Website; Use any device, software or routine to bypass any operational element or to interfere, or attempt to interfere, with the proper working of the Website, server or activities conducted therein; or, Take any action that imposes an unreasonable or disproportionately large load on the Website or its network infrastructure.

TERMINATION
This Agreement shall remain in force as long as You access the Website, use any functions or features of the Website, or order anything from the Website. We reserve the right to terminate this Agreement without notice and/or refuse to sell to anyone who We believe, in Our sole discretion, (i) has violated any of the terms of this Agreement, (ii) is abusing the Products or the services we provide, or (iii) is unable to provide us with sufficient information to allow us to properly identify the customer's real name, address, or other contact information.

LIMITATION OF LIABILITY; NO WARRANTIES
In no event shall myauravie.com or its officers, directors, employees or subcontractors be liable for any indirect, special, incidental, exemplary, consequential or punitive damages, under any cause of action whatsoever including but not limited to contract, tort, strict liability, warranty or otherwise, for any claim, cause of action, fee, expense, cost or loss (collectively, "Claims") arising from or related to this Agreement, the Products, or Customer's use of the Website or any Product.

Except as otherwise specifically stated in this Agreement, the Website and all Products and services provided to You are provided "as is", without any warranty whatsoever.

You agree that myauravie.com's entire liability for all Claims shall be limited, in the aggregate, to the lesser of (i) USD $500.00, or (ii) the total amount of money You paid to myauravie.com in the one (1) month period immediately preceding the incident on which Your Claim is based. This limitation of liability shall apply for all Claims, regardless of whether myauravie.com was aware of or advised in advance of the possibility of damages or such Claims.

The warranties and representations specifically set forth in this agreement are the only warranties and representations with respect to this Agreement, and are in lieu of any and all other warranties, written or oral, express or implied, that may arise either by agreement between the parties or by operation of law, including warranties of merchantability and fitness for a particular purpose. None of these warranties and representations will extend to any third person. Some jurisdictions do not allow the exclusion of certain warranties, so some of the above exclusions may not apply to You.

INDEMNIFICATION
You agree to defend, indemnify, and hold harmless myauravie.com, its officers, directors, shareholders, employees, independent contractors, telecommunication providers, and agents, from and against any and all claims, actions, loss, liabilities, expenses, costs, or demands, including without limitation legal and accounting fees, for all damages directly, indirectly, and/or consequentially resulting or allegedly resulting from Your misuse or inability to use the Website, or Your breach of any of these terms and conditions of this Agreement. We shall promptly notify You by electronic mail of any such claim or suit, and cooperate fully (at Your expense) in the defense of such claim or suit. If we do not hear from You promptly, we reserve the right to defend such claim or suit and seek full recompense from You.

NOTICE
Any notice required to be given under this Agreement to You may be provided to You by postal mail or by email. If notice is sent by email, such notice shall be sent to the last known email address that You provided to Us, and shall be deemed delivered once sent. Notices by customers to myauravie.com must be sent in writing to the following address: myauravie.com, Attention: Legal, AuraVie.com,PO Box 10465,Van Nuys CA 91410,USA

FORCE MAJEURE
myauravie.com shall not be responsible for any failure to perform due to unforeseen circumstances or to causes beyond Our reasonable control, including but not limited to: acts of God, such as fire, flood, earthquakes, hurricanes, tropical storms or other natural disasters; war, riot, arson, embargoes, acts of civil or military authority, or terrorism; strikes, or shortages in transportation, facilities, fuel, energy, labor or materials; failure of the telecommunications or information services infrastructure; hacking, SPAM, or any failure of a computer, server or software, for so long as such event continues to delay the myauravie.com's performance.

MISCELLANEOUS
Governing Law. This Agreement and all matters arising out of, or otherwise relating to, this Agreement shall be governed exclusively by the laws of the State of California, excluding its conflict of law provisions.

RIGHTS TO INJUNCTIVE RELIEF. Both parties acknowledge that remedies at law may be inadequate to provide an aggrieved party with full compensation in the event of the other party's breach, and that an aggrieved party shall therefore be entitled to seek injunctive relief in the event of any such breach, in addition to seeking all other remedies available at law or in equity.

ASSIGNMENT. The rights and liabilities of the parties hereto will bind and inure to the benefit of their respective assignees, successors, executors, and administrators, as the case may be.

SEVERABILITY. If for any reason a court of competent jurisdiction or an arbitrator finds any provision of this Agreement, or any portion thereof, to be unenforceable, that provision will be enforced to the maximum extent permissible and the remainder of these Terms and Conditions will continue in full force and effect.

ATTORNEY'S FEES. In the event any Party shall commence any claims, actions, formal legal action, or arbitration to interpret and/or enforce the terms and conditions of this Agreement, or relating in any way to this Agreement, including without limitation asserted breaches of representations and warranties, the prevailing party in any such action or proceeding shall be entitled to recover, in addition to all other available relief, its reasonable attorney fees and costs incurred in connection therewith, including attorney fees incurred on appeal.

NO WAIVER . No waiver of or by myauravie.com shall be deemed a waiver of any subsequent default of the same provision of this Agreement. If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from this Agreement.

HEADINGS. All headings are solely for the convenience of reference and shall not affect the meaning, construction or effect of this Agreement.

COMPLETE AGREEMENT. This Agreement constitute the entire agreement between the parties with respect to Your access and use of the Website and Your ordering and use of the Products, and supersedes and replaces all prior understandings or agreements, written or oral, regarding such subject matters.

MODIFICATIONS. myauravie.com reserves the right to change any of the provisions posted herein and You agree to review these terms and conditions each time You visit the Website. Your continued use of the Website following the posting of any changes to these terms and conditions constitutes Your acceptance of such changes. myauravie.com does not and will not assume any obligation to provide You with notice of any change to this document. Unless accepted by myauravie.com in writing, these terms and conditions may not be amended by You.

Close this page

Terms and Conditions | Privacy Policy | Contact Us

© 2015 myauravie.com - All Rights Reserved



PRIVACY POLICY
**Last Modified: June 12, 2011**

**AuraVie SkinCare and all its related web sites (www.myauravie.com)**
The information collection, use, and dissemination practices of AuraVie SkinCare

This policy applies to AuraVie SkinCare's collection, use, storage and disclosure of information by AuraVie SkinCare on its (a) websites, including all its divisions, subsidiaries and related companies (collectively, the "Websites").

**1. Collection of Information.**

**1.1 Survey Information.**

AuraVie SkinCare collects information from individuals by various methods, including, but not limited to, when an individual voluntarily completes a AuraVie SkinCare survey, order form, or a registration page either online or offline, or by means of online or offline surveys, order forms, or registration pages operated by third parties (collectively, a "Survey"). (As used herein, "online" means using the Internet, including the Websites, and related technologies, and "offline" means by methods other than online, including in person, in the postal mail, using telephones and cell phones, and other similar means.) In the Surveys, AuraVie SkinCare may ask an individual to provide various information to AuraVie SkinCare , which may include his or her name, email address, street address, zip code, telephone numbers (including cell phone numbers and carriers), birth date, gender, salary range, education and marital status, occupation, social security number, employment information, personal and online interests, and such other information as may be requested from time to time (together, "Survey Information"). AuraVie SkinCare may also collect information concerning an individual from another source and uses that information in combination with information provided from this web site. Completing the Surveys is completely voluntary, and individuals are under no obligation to provide Survey Information to AuraVie SkinCare, but an individual may receive incentives from AuraVie SkinCare in exchange for providing Survey Information to AuraVie SkinCare.

**1.2 Third Party List Information.**
AuraVie SkinCare collects information from individuals when an individual provides information to a third party and AuraVie SkinCare subsequently purchases, licenses, or otherwise acquires the information from the third party (the "Seller"). Such purchased information may include, but is not limited to, an individual's name, email address, street address, zip code, telephone numbers (including cell phone numbers and carriers), birth date, gender, salary range, credit card information, education and marital status, occupation, industry of employment, personal and online interests, and such other information as the individual may have provided to the Seller (together, "Third Party List Information"). When acquiring Third Party List Information, AuraVie SkinCare seeks assurances from the Seller that the Seller has a right to transfer the Third Party List Information to AuraVie SkinCare and that the Seller has a right to provide offers from advertisers to the individuals whose personal information is included on the Seller's list.

**1.3 Other Information.**
Other occasions when AuraVie SkinCare obtains information from individuals include (1) when an individual is making a claim for a prize or seeking to redeem an incentive offered by AuraVie SkinCare (2) when an individual requests assistance through AuraVie SkinCare's customer service department, and (3) when an individual voluntarily subscribes to a AuraVie SkinCare service or newsletter (together, "Other Information").

**1.4 Cookies, Web Beacons, and Other Info Collected Using Technology.**
AuraVie SkinCare currently uses cookie and web beacon technology to associate certain Internet-related information about an individual with information about the individual in our database. Additionally, AuraVie SkinCare may use other new and evolving sources of information in the future (together, "Technology Information").

**(a) Cookies.**
A cookie is a small amount of data stored on the hard drive of the individual's computer that allows AuraVie SkinCare to identify the individual with his or her corresponding data that resides in AuraVie SkinCare's database. You may read more about cookies at http://cookiecentral.com. Individuals who use the Websites need to accept cookies in order to use all of the features and functionality of the Websites.

**(b) Web Beacons.**
A web beacon is programming code that can be used to display an image on a web page but can also be used to transfer an individual's unique user identification (often in the form of a cookie) to a database and associate the individual with previously acquired information about an individual in a database. This allows AuraVie SkinCare to track certain web sites an individual visits online. Web beacons are used to determine products or services an individual may be interested in, and to track online behavioral habits for marketing purposes. For example, AuraVie SkinCare might place, with the consent of a third party website, a web beacon on the third party's website where fishing products are sold. When Bill, an individual listed in AuraVie SkinCare's database, visits the fishing website, AuraVie SkinCare receives notice by means of the web beacon that Bill visited the fishing site, and AuraVie SkinCare would then update Bill's profile with the information that Bill is interested in fishing. AuraVie SkinCare may thereafter present offers of fishing related products and services to Bill. In addition to using web beacons on web pages, AuraVie SkinCare also uses web beacons in email messages sent to individuals listed in AuraVie SkinCare's database.

**(c) New Technology.**
The use of technology on the Internet, including cookies and web beacons, is rapidly evolving, as is AuraVie SkinCare's use of new and evolving technology. As a result, AuraVie SkinCare strongly encourages individuals to revisit this policy for any updates regarding its use of technology.

**1.5 Outside Information.**
AuraVie SkinCare may receive information about individuals from third parties or from other sources of information outside of AuraVie SkinCare including information located in public databases ("Outside Information").

**1.6 Individual Information.**
As used herein, Individual Information means Survey Information, Third Party List Information, Other Information, Technology Information, and Outside Information, and any other information AuraVie SkinCare gathers or receives about individuals.

**1.7 No Information Collected from Children.**
AuraVie SkinCare will never knowingly collect any personal information about children under the age of 13. If AuraVie SkinCare obtains actual knowledge that it has collected personal information about a child under the age of 13, that information will be immediately deleted from our database. Because it does not collect such information, AuraVie SkinCare has no such information to use or to disclose to third parties. AuraVie SkinCare has designed this policy in order to comply with the Children's Online Privacy Protection Act ("COPPA").

**1.8 Credit Card Information.**
AuraVie SkinCare may in certain cases collect credit card numbers and related information, such as the expiration date of the card ("Credit Card Information") when an individual places an order from AuraVie SkinCare. When the Credit Card Information is submitted to AuraVie SkinCare, such information is encrypted and is protected with SSL encryption software. AuraVie SkinCare will use the Credit Card Information for purposes of processing and completing the purchase transaction, and the Credit Card Information will be disclosed to third parties only as necessary to complete the purchase transaction.

**2. Use of Individual Information.**

**2.1 Discretion to Use Information.**
THE COMPANY MAY USE INDIVIDUAL INFORMATION FOR ANY LEGALLY PERMISSIBLE PURPOSE IN COMPANY'S SOLE DISCRETION. The following paragraphs in Section 2 describe how AuraVie SkinCare currently uses Individual Information, but AuraVie SkinCare may change or broaden its use at any time. As noted below, AuraVie SkinCare may update this policy from time to time. AuraVie SkinCare may use Individual Information to provide promotional offers to individuals by means of email advertising, telephone marketing, direct mail marketing, online banner advertising, and package stuffers, among other possible uses. If you do not wish us to use personal information about you to promote or sell our products and services or to sell, transfer or otherwise provide personal information about you to third parties, please inform us by contacting customer service at 866-216-9336 and we will certainly honor your request.

**2.2 Email.**
AuraVie SkinCare uses Individual Information to provide promotional offers by email to individuals. AuraVie SkinCare may maintain separate email lists for different purposes. If email recipients wish to end their email subscription from a particular list, they need to follow the instructions at the end of each email message to unsubscribe from the particular list.

**2.2(a) Content of Email Messages.**
In certain commercial email messages sent by AuraVie SkinCare, an advertiser's name will appear in the "From:" line but hitting the "Reply" button will cause a reply email to be sent to AuraVie SkinCare. The "Subject:" line of AuraVie SkinCare email messages will usually contain a line provided from the advertiser to AuraVie SkinCare.

**2.2(b) Solicited Email.**
AuraVie SkinCare only sends email to individuals who have agreed on the Websites to receive email from AuraVie SkinCare or to individuals who have agreed on third party websites to receive email from third parties such as AuraVie SkinCare. AuraVie SkinCare does not send unsolicited email messages. As a result, statutes requiring certain formatting for unsolicited email are not applicable to AuraVie SkinCare's email messages.

**2.3 Targeted Advertising.**
AuraVie SkinCare uses Individual Information to target advertising to an individual. When an individual is using the Internet, AuraVie SkinCare uses Technology Information (see also Section 2.5 below) to associate an individual with that person's Individual Information, and AuraVie SkinCare attempts to show advertising for products and services in which the person has expressed an interest in the Surveys, indicated an interest by means of Technology Information, and otherwise. AuraVie SkinCare may, at its discretion, target advertising by using email, direct mail, telephones, cell phones, and other means of communication to provide promotional offers.

**2.4 Direct Mail and Telemarketing.**
AuraVie SkinCare uses Individual Information to advertise, directly or indirectly, to individuals using direct mail marketing or telemarketing using telephones and cell phones.

**2.5 Use of Technology Information.**
AuraVie SkinCare uses Technology Information (1) to match a person's Survey Information and Third Party List Information to other categories of Individual Information to make and improve profiles of individuals, (2) to track a person's online browsing habits on the Internet, (3) to determine which areas of AuraVie SkinCare's web sites are most frequently visited. This information helps AuraVie SkinCare to better understand the online habits of individuals so that AuraVie SkinCare can target advertising and promotions to them.

**2.6 Profiles of Individuals.**
AuraVie SkinCare uses Individual Information to make a profile of an individual. A profile can be created by combining Survey Information and Third Party List Information with other sources of Individual Information such as information obtained from public databases.

**2.7 Storage of Individual Information.**

AuraVie SkinCare stores the Individual Information in a database on AuraVie SkinCare computers. Our computers have security measures (such as a firewall) in place to protect against the loss, misuse, and alteration of the information under AuraVie SkinCare's control. Not withstanding such measures, AuraVie SkinCare cannot guarantee that its security measures will prevent AuraVie SkinCare computers from being illegally accessed, and the Individual Information on them stolen or altered.

**3. Dissemination of Individual Information.**

**3.1 Sale or Transfer to Third Parties.**
AURAVIE SKINCARE WILL NOT SELL OR TRANSFER INDIVIDUAL INFORMATION TO THIRD PARTIES FOR ANY PURPOSE WHATSOEVER UNLESS AS STIPULATED HEREIN.

**3.2 Legal Process.**
AuraVie SkinCare may disclose Individual Information to respond to subpoenas, court orders, and other legal processes.

**3.3 Summary Data.**
AuraVie SkinCare may sell or transfer non-individualized information, such as summary or aggregated anonymous information about all persons or sub-groups of persons.

**3.4 Access.**
Individuals have access to their Individual Information collected to provide an opportunity for an individual to correct, amend, or delete such information. Access can be obtained by contacting customer service at the number on the order page. AuraVie SkinCare may also grant advertising clients and email services providers access to an individual's email address to verify the origin of the Individual Information collected.

**4. Privacy Practices of Third Parties.**

**4.1 Advertiser cookies and web beacons.**
Advertising agencies, advertising networks, and other companies (together, "Advertisers") who place advertisements on the Websites and on the Internet generally may use their own cookies, web beacons, and other technology to collect information about individuals. AuraVie SkinCare does not control Advertisers' use of such technology and AuraVie SkinCare has no responsibility for the use of such technology to gather information about individuals.

**4.2 Links.**
The Websites and email messages sometimes contain hypertext links to the web sites of third parties. AuraVie SkinCare is not responsible for the privacy practices or the content of such other web sites. Linked web sites may contain links to web sites maintained by third parties. Such links are provided for your convenience and reference only. AuraVie SkinCare does not operate or control in any respect any information, software, products or services available on such third party web sites. The inclusion of a link to a web site does not imply any endorsement of the services or the site, its contents, or its sponsoring organization.

**4.3 Affiliated Companies.**
AuraVie SkinCare may disclose, transfer, and sell Individual Information to entities affiliated with AuraVie SkinCare in AuraVie SkinCare's discretion.

**5. Unsubscribe Procedures.**
If you wish to discontinue receiving email messages from AuraVie SkinCare please email us at support@auravie.com or write to:

AuraVie.com
PO Box 10465
Van Nuys CA 91410
USA

We reserve the right to add Individual Information to multiple lists maintained by AuraVie SkinCare.
For more information about protecting your privacy, you may wish to visit: www.ftc.gov

PLEASE NOTE: OUR PRIVACY POLICY CHANGES FROM TIME TO TIME AND CHANGES ARE EFFECTIVE UPON POSTING. PLEASE CHECK BACK FREQUENTLY FOR UPDATES AS IT IS YOUR SOLE RESPONSIBILITY TO BE AWARE OF CHANGES. AURAVIE SKINCARE DOES NOT PROVIDE NOTICES OF CHANGES IN ANY MANNER OTHER THAN BY POSTING THE CHANGES AT THIS WEB SITE. IF YOU DO NOT AGREE WITH THE TERMS OF THIS PRIVACY POLICY PLEASE DO NOT PROVIDE ANY INFORMATION TO AURAVIE SKINCARE OR USE ANY OF THE SERVICES OR PRODUCTS OFFERED OR PROVIDED ON ANY OF THE WEB SITES REFERRED TO IN THIS PRIVACY POLICY.

Close this page

Terms and Conditions | Privacy Policy | Contact Us

© 2015 myauravie.com - All Rights Reserved

Attn: Joanne

Detach and return bottom portion with your payment. 140850 4 01 00000000401 D STMTII D 6 38) PMEI See reverse side for important information

HSBC

| | |
|---|---|
| Account Number: | [redacted] |
| New Balance | $26.97 |
| Minimum Payment Due | $15.00 |
| Payment Due Date | 03/26/2011 |

Include account number on check to HSBC Card Services. Do not send cash. Please send your payment 7 to 10 days prior to the payment due date to ensure timely delivery.

140 AMOUNT ENCLOSED

MOTTI M NOTTEA
7900 GLORIA AVE
VAN NUYS CA 91406-1804

HSBC CARD SERVICES
PO BOX 17332
BALTIMORE MD 21297-1332

549409698963025600001500000026974

BMG 0258

March 21st, 2011

We would like to request a mailing address change for account number: [redacted]

The new address should be:

7900 Gloria Ave
Van Nuys, CA 91406

Please let me know if you need any more information.

Signed: ____________
Motti Nottea



To:
Signapay
105 Decker Court
Irving, TX 75062

I, Motti Nottea, the CEO of Bunzai Media Group, Inc., am making a formal request to close our merchant account under Signapay.

The account is: [redacted]

The account is under Bunzai Media Group, Inc. It is being closed because the corporation will no longer be using it. Please make sure that the reserves under the account are released to the company bank account under Wells Fargo, account number: 528. Let me know if you need any more information.

Sincerely,

Motti Nottea
CEO/Owner

16161 Ventura Blvd #378 Encino, CA 91436
P: 818.200.1035 F: 818.647.0182
www.Bunzaimedia.com

# MERCHANT APPLICATION

SignaPay

Merchant # 389900000 2069373

☐ New Location ☐ Additional Location

105 Decker Court • Suite 650 • Irving, TX 75062

Tel: 800-944-1399 • Fax: 214-260-9320 • www.signapay.net

ISO #:

## Business Information

Note: Failure to provide accurate information may result in a withholding of merchant funding per IRS regulations. (See Terms and Conditions for further information)

Legal Name (as it appears on your income tax return): ZEN MOBILE MEDIA, INC

Name of Account (Doing Business As): MYSKIN 877-743-7743

Legal Address: 4335 VAN NUYS BLVD #167

Physical Street Address (No P.O. Box): 4335 VAN NUYS BLVD #167

City: SHERMAN OAKS State: CA Zip: 91403

City: SHERMAN OAKS State: CA Zip: 91403

Phone #: ( 866 ) 982-6218 Contact: IGOR LATSANOVSKI

DBA Phone #: ( 866 ) 982-6218 Fax #: ( 818 ) 994-8999

Must Choose One Mailing Address: ☐ DBA Address ☑ Legal Address

E-Mail Address:

Website Address: www.

Federal Tax # (as it appears on your income tax return): [redacted]

# of Locations: 1 Years in Business: 1

Years Owned Business: 1

Place of Legal Formation: CA

Country of Primary Business Operations: USA

Bank Reference: WELLSFARGO Contact: TENY MINAS Phone #: ( 818 ) 509-3480

## Owners or Officers • Individual Ownership Must be Equal to or Greater than 50%

Name: 1. IGOR LATSANOVSKI Title: CEO/OWNER Date of Birth: [redacted] Applicant's SS #: [redacted] % Equity Ownership: 100

Residence Address: [redacted] City: CALABASAS State: CA Zip: [redacted] # Years: 2

US Government Issued ID#: [redacted] Type of ID: DL Expiration Date: [redacted] Country of Citizenship (if not US): CANADA Home Phone: (818) 200-1035

Name: 2. Title: Date of Birth: Applicant's SS #: % Equity Ownership:

Residence Address: City: State: Zip: # Years:

US Government Issued ID#: Type of ID: Expiration Date: Country of Citizenship (if not US): Home Phone: ( )

## Business Profile

Type of Ownership: ☐ Sole Proprietor ☐ Assoc/Estates/Trusts ☐ Joint Venture ☐ Government ☑ Corporation (Privately Traded) ☐ Corporation (Publicly Traded) ☐ Medical or Legal Corp ☐ Partnership ☐ Tax Exempt Org ☐ Single Member LLC ☐ Multi Member LLC ☐ Civic Assoc ☐ Limited Partnership ☐ Political Org ☐ Other:

Type of Goods or Services Sold: BEAUTY AND SKINCARE PRODUCTS SIC Code:

Do you currently accept Discover ®/Visa/Mastercard? ☐ Yes ☑ No (If yes, you should submit 3 current months' statements.)

Name of Current Processor:

Has Merchant or any associated principal disclosed below filed bankruptcy or been subject to involuntary bankruptcy? ☐ Yes ☑ No Date:

## Sales Profile

Merchant Type: ☑ Retail ☐ Restaurant ☐ Lodging ☐ Service ☐ Internet ☐ Home Based ☐ Other

Discover/Visa/MasterCard Sales Profile (Be Accurate):

| | |
|---|---|
| Card Swipe | % |
| Manual Key Entry with Imprint, Card Present | % |
| Mail Order/Telephone | 100 % |
| Internet | % |
| Total = | 100% |

## Business Trade Suppliers • List Two

| Name: | Address: | Contact: | Phone #: |
|---|---|---|---|
| CRITICAL MEDIA | WOODLAND HILLS, CA | RON SWARTZ | ( 818 ) 517-5000 |
| GAMBIT NETWORK | SHERMAN OAKS, CA | NASTASSIA YALLEY | ( 818 ) 687-0366 |

## Merchant Site Survey Report • To Be Completed by Sales Representative

Merchant Location: ☐ Retail Location with Store Front ☐ Office Building ☐ Internet ☐ Residence ☐ Other

Area Zoned: ☑ Commercial ☐ Industrial ☐ Residential Square Footage: ☐ 0-250 ☐ 251-500 ☐ 501-2,000 ☐ 2,001+

Does the amount of inventory and merchandise on shelves and floor appear consistent with this type of business? ☐ Yes ☐ No

If No, explain:

The Merchant: ☑ Owns ☐ Leases the Business Premises Landlord Name & Phone #:

Further Comments by Inspector (Must Complete)

I hereby verify that this application has been fully completed by merchant applicant and that I have physically inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.

Verified and Inspected by: Office #: Representative #: Representative Signature: Date:

ZMM 0328

## Discover / Visa / Mastercard Standard Retail / High Risk Retail Rates

Merchant Chooses to accept the following: ☐ Tiered ☐ Interchange + Pricing

DISC/VS/MC (Other Cards) Discount Rate: ____ %
VS/MC Discount Rate for Debit Cards ____ %
AMEX Discount Rate: ____ %

## Fees

| Fee | Amount | Unit |
|---|---|---|
| DISC/VS/MC Transaction Fee: | | Per Item |
| Non-Bankcard Transaction Fee: | | Per Item |
| Statement Fee: | | Monthly |
| VIMAS Online Service: | | Monthly |
| Monthly Minimum: | | Monthly |
| Annual Fee: | | Per Year |
| Debit Transaction Fee Plus Network Fees: | | Per Item |
| EBT Transaction Fee: | | Per Item |
| EBT Statement Fee: | | Monthly |
| Batch Fee: | | Per Batch |
| Manual Imprinter: QTY:____ | | One Time |
| Chargeback Fee: | | Per Item |
| ACH Reject Fee: | $25.00 | Per Item |
| Retrieval Fee: | $5.00 | Per Item |
| Voice Authorization Fee: | $0.95 | Per Call |
| Gateway Access Fee: | | Monthly |
| AVS Surcharge | | Per Item |
| Early Termination Fee: | $495.00 | One Time |
| Others (please specify): | | |

## Mail / Phone / Internet / Touchtone Rates

Merchant Chooses to accept the following: ☒ Tiered ☐ Interchange + Pricing

DISC/VS/MC (Other Cards) Discount Rate: 2.19 %
VS/MC Debit Card Discount Rate: 2.19 %
AMEX Rate: $7.95 Monthly

## Fees

| Fee | Amount | Unit |
|---|---|---|
| DISC/VS/MC Transaction Fee: | .25 | Per Item |
| Non-Bankcard Transaction Fee: | .25 | Per Item |
| Statement Fee: | 9.95 | Monthly |
| VIMAS Online Service: | | Monthly |
| Monthly Minimum: | $25 | Monthly |
| Annual Fee: | $99 | Per Year |
| MOTO/Internet Surcharge: | | Per Item |
| AVS Surcharge: | | Per Item |
| Batch Fee: | 0.10¢ | Per Batch |
| Manual Imprinter: QTY:____ | | One Time |
| Chargeback Fee: | 20 | Per Item |
| ACH Reject Fee: | $25.00 | Per Item |
| Retrieval Fee: | $5.00 | Per Item |
| Voice Authorization Fee: | $0.95 | Per Call |
| Gateway Access Fee: | | Monthly |
| Early Termination Fee: | $495.00 | One Time |
| Others (please specify): | | |

1) I/We understand and agree to the following: that my/our discount rate as stated above will be charged on all electronically authorized payment card transactions that are in batches closed daily (qualified rate); 2) and that all payment card transactions that do not meet the requirements stated in number 1 above may be charged up to 4.61% higher than my/our discount rate. Discover/Visa/Mastercard business transactions may be charged up to 4.61% above qualified rate.
3) Pass-through Association fees include Visa Acquirer Processing Fee, Visa Misuse of Auth Fee, Visa International Service Assessment Fee (ISA), Visa Zero Floor Limit Fee, Visa International Acquirer Fee, MC Acquirer Program Support Fee, MC Cross Border Fee, and the MC Network Access and Brand Usage (NABU) Fee. Please visit our website for further details.
Do you use a third party to process or transmit Cardholder data? ☐ Yes ☐ No. Give name/address:(examples include, but not limited to hosting companies,shopping carts, Loyalty Programs, Electronic Data Capture). Please identify any Software used for storing transmitting or processing Card Transactions or Authorization requests ____

## Merchant Benefits Club

☐ Yes, I want to participate in the optional Merchant Benefits Club which includes equipment support and replacement for an additional $14.99 per terminal/peripheral per month. Initials: X

## American Express

By signing below, I represent that I have read and am authorized to sign and submit this application for the above entity which agrees to be bound by the American Express® Card Acceptance Agreement ("Agreement"), and that all information provided herein is true, complete and accurate. I authorize Cynergy Data, LLC and American Express Travel Related Services Company, Inc. ("American Express") and American Express's agents and Affiliates to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies, and disclose such information to their agents, subcontractors, Affiliates, and other parties for any purpose permitted by law. I authorize and direct Cynergy Data, LLC and American Express and American Express's agents and Affiliates to inform me directly, or through the entity above, of reports about me that they have requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I also authorize American Express to use the reports from consumer reporting agencies for marketing and administrative purposes. I understand that upon American Express's approval of the application, the entity will be sent the Agreement.
CHECK ONE: ☐ Retail - $0.10 Trans Fee + 0.30% CNP Downgrade ☐ Services, Wholesale & All Other - $0.15 Trans Fee

Signature: X Date:

## Debit/Credit Authorization • Include a voided check or bank letter verifying bank account information.

Merchant authorizes Processor or Bank to present Automated Clearing House credits, Automated Clearing House debits, wire transfers, or depository transfer checks to and from the following account and to and from any other account for which Processor or Bank are authorized to perform such functions under the Merchant Processing Agreement, for the purposes set forth in the Merchant Processing Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees and amounts due for supplies and materials. This Automated Clearing House authorization cannot be revoked until all Merchant obligations under this Agreement are satisfied, and Merchant gives Cynergy Data written notice of revocation.

**DDA:** [redacted] **ABA Routing:** [redacted]

**INVESTIGATIVE CONSUMER REPORT:** An investigative or consumer report may be made in connection with application. MERCHANT authorizes BANK or any of its agents to investigate the references provided or any other statements or data obtained from MERCHANT, from any of the undersigned individual credit or financial responsibility. You have a right, upon written request, to a complete and accurate disclosure of the nature and scope of the investigation requested.

**AVERAGE TICKET SIZE:** 85.00 **AVERAGE MONTHLY VOLUME:** 85,000.00

Each person certifies that the average ticket size and sales volume indicated is accurate and agrees that any transaction or monthly volume that exceeds either of the above amounts could result in delayed and/or withheld settlement of funds. Also, see paragraphs 4c and 13b of the MERCHANT Processing Agreement regarding suspension and termination of MERCHANT.

***IMPORTANT NOTICE:** All information contained in this application was completed, supplied and/or reviewed by the undersigned Merchant. Processor shall not be responsible for any change in printed terms unless specifically agreed to in writing by an officer of Processor and/or Harris, N.A., Chicago, IL. By signing below you are agreeing to the provisions stated within this merchant application, on the reverse side (the Merchant Agreement) and acknowledge receipt of the merchant operating guide. Those provisions must be read before signing. By signing below, you agree to the terms on the front and back of this MERCHANT Processing Agreement and the merchant operating guide.*

## Individual Guaranty • No Titles

As a primary inducement to Processor and Bank to enter into this Agreement, the undersigned Guarantor(s), by signing this Agreement, jointly and severally, unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to Processor and Bank under this Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and Processor or Bank, as such agreements now exist or are amended from time to time, with or without notice. Guarantor(s) understands further that Processor or Bank may proceed directly against Guarantor(s) without first exhausting their remedies against any other person or entity responsible to it or any security held by Processor and Bank or Merchant. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Processor and Bank. Guarantor(s) understand that the inducement to Processor and Bank to enter into this agreement is consideration for the guaranty, and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guaranty.

**AGREED AND ACCEPTED**

X ____ 11/9/11
#1 From Application - Signature Date

X

## For All Businesses • Business Resolution

The indicated officer(s) identified in numbers 1 and/or 2 below have the authorization to execute the MERCHANT Processing Agreement on behalf of the here within named business. **MERCHANT UNDERSTANDS THAT THIS AGREEMENT SHALL NOT TAKE EFFECT UNTIL MERCHANT HAS BEEN APPROVED BY BANK AND A MERCHANT NUMBER IS ISSUED.**

ZEN MOBILE MEDIA, INC
Print Legal Name of Merchant Business

X ____ 11/9/11
#1 From Application - Signature Date

X
#2 From Application - Signature Date

X
Accepted by Processor Date

X

ZMM 0329

**Merchant Processing Agreement**

This Merchant Processing Agreement ("Agreement") is entered into on the Effective Date defined in Section 13.A. below, between the business indicated on the Merchant Application ("Merchant" or "you"), Cynergy Data, LLC ("CD" or "Processor"), and Harris, N.A. ("Bank"):

Recitals

Merchant desires to accept Debit Cards and/or Other Cards, as indicated on the Merchant Application, validly issued by members of Discover®, Visa U.S.A., Inc. ("Visa") and MasterCard International, Incorporated ("MasterCard"). "Debit Card" means all Discover Visa or MasterCard cards issued by a non-U.S. bank, a Discover, Visa or MasterCard card that accesses a consumer's asset account within 14 days after purchase, including but not limited to Discover, Visa or MasterCard issued stored value, prepaid, payroll, EBT, gift, and consumer check cards, and debit cards validly issued by the debit card networks indicated in Section 4.O below ("Debit Networks"), such as on-line (PIN-based) cards. "Other Cards" means all cards issued by a non-U.S. bank and all Discover, Visa or MasterCard cards other than Debit Cards, including but not limited to business and consumer credit cards and business debit cards. The category of card acceptance you have indicated on the Merchant Application will collectively be referred to as "Cards". Bank and Processor desire to provide Card processing services to Merchant. Therefore, Merchant, Processor and Bank agree as follows:

Terms and Conditions

1. Honoring Cards.

A. Without Discrimination. You will honor, without discrimination, any Debit Card and/or Other Card, as indicated by you on the Merchant Application, properly tendered by a Cardholder. "Cardholder" means a person presenting a Card and purporting to be the person in whose name the Card is issued. If you elect to accept only one of the card acceptance categories but later submit a transaction from a card in a different category, you agree that Processor and Bank may process the transaction and assess the appropriate fee, and that all terms of this Agreement will apply to that transaction. You will not establish a minimum or maximum transaction amount as a condition for honoring a Card. Cardholders will be entitled to the same services and return privileges you extend to cash customers, and you will not impose any special conditions (unless permitted by the Card Associations) in connection with the acceptance of a Card. "Card Association" means Visa, MasterCard, Discover, American Express, Japanese Credit Bureau, and/or a Debit Network, as applicable.

B. Cardholder Identification. You will identify the Cardholder and check the expiration date and signature on each Card. You will not honor any Card if: (i) the Card has expired; (ii) the signature on the sales draft does not correspond with the signature on the Card; (iii) the account number embossed on the Card does not match the account number on the Card's magnetic strip (as printed in electronic form) or the account number is listed on a current Electronic Warning Bulletin file. You may not require a Cardholder to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license number as a condition for honoring a Card unless permitted under the Laws and Rules (defined in Section 14, below). You may not require a Cardholder to complete a postcard or similar device that includes the Cardholder's account number, Card expiration date, signature, or any other Card account data in plain view when mailed.

[illegible]

2. Authorization.

[illegible]

3. Presentment of Sales Drafts.

[illegible]

4. Deposit of Sales Drafts and Funds Due Merchant.

[illegible]

a refund to the customer (which may be made in cash, by an adjustment draft or with a check or cashier's check, as permitted by the Rules) whenever you determine that a Debit Card transaction should be canceled or reversed.

ii. Adjustments. Except as the Debit Networks may permit, you will not make any cash refunds or payments for returns or adjustments on Debit Card transactions but will instead complete an adjustment form provided or approved by Processor. The Debit Card Sales Draft for which no refund or return will be accepted by you must be clearly and conspicuously marked (including on the Cardholder's copy) as "final sale" or "no return" and must comply with the Rules.

iv. Error Resolution. You will refer Debit Card Cardholders with questions or problems to the institution that issued the Debit Card. You will cooperate with Processor and with each applicable Debit Network and its other members to resolve any alleged errors relating to transactions. You will permit and will pay all expenses of periodic examination and audit of functions related to each Debit Network, at such frequency as the applicable Debit Network deems appropriate. Audits will meet Debit Network standards, and the results will be made available to the Debit Network.

5. Other Types of Transactions.

A. Mail/Telephone Order. Processor and Bank caution against mail orders or telephone orders or any transaction in which the Cardholder and Card are not present ("mail/telephone orders") due to the high incidence of customer disputes. You will perform AVS and obtain the expiration date of the Card for a mail/telephone order and submit the expiration date when obtaining authorization of the Card transaction. For mail/telephone order transactions, you will type or print legibly on the signature line the following as applicable: telephone order or "TO" or mail order or "MO". You must promptly notify Processor and Bank if your retail/mail order/telephone order mix changes from the percentages represented to Processor and Bank in the Merchant Application. Processor and Bank may cease accepting mail/telephone order transactions, or limit its acceptance of such transactions, or increase their fees, or terminate this Agreement, or impose a Reserve Account (defined in Section 7.A), if this mix changes. You may not deposit a mail/telephone order Sales Draft before the product is shipped.

B. Recurring Transactions. For recurring transactions, you must obtain a written request from the Cardholder for the goods and services to be charged to the Cardholder's account, the frequency of the recurring charge, and the duration of time during which such charges may be made. You will not complete any recurring transaction after receiving: (i) a cancellation notice from the Cardholder (ii) notice from Processor or Bank, or (iii) a response that the Card is not to be honored. You must print legibly on the Sales Draft the words "Recurring Transaction".

C. Multiple Sales Drafts. You will include a description and total amount of goods and services purchased in a single transaction on a single Sales Draft or transaction record, unless (i) partial payment is entered on the Sales Draft or transaction record and the balance of the transaction amount is paid in cash or by check at the time of transaction, or (ii) a Sales Draft represents an advance deposit in a Card transaction completed in accordance with this Agreement and the Rules.

D. Partial Completion.

i. Prior Consent. You will not accept for payment by Card any amount representing a deposit or partial payment for goods or services to be delivered in the future without the prior written consent of Processor or Bank. Such consent will be subject to Bank's final approval. The acceptance of a Card for payment or partial payment of goods or services to be delivered in the future without prior consent will be deemed a breach of this Agreement and cause for immediate termination, in addition to any other remedies available under the Laws or Rules.

ii. Acceptance. If you have obtained prior written consent, then you will complete such Card transactions in accordance with the terms set forth in this Agreement, the Rules, and the Laws. Cardholders must execute one Sales Draft when making a deposit with a Card and a second Sales Draft when paying the balance. You will note upon the Sales Draft the words "deposit" or "balance" as appropriate. You will not deposit the Sales Draft labeled "balance" until the goods have been delivered to Cardholder or you have fully performed the services.

E. Future Delivery. You will not present any Sales Draft or other memorandum to Bank for processing (whether by electronic means or otherwise) which relates to the sale of goods or services for future delivery without Processor or Bank's prior written authorization. Such consent will be subject to Bank's final approval. If Processor or Bank have given such consent, you represent and warrant to Processor and Bank that you will not rely on any proceeds or credit resulting from such transactions to purchase or furnish goods or services. You will maintain sufficient working capital to provide for the delivery of goods or services at the agreed upon future date, independent of any credit or proceeds resulting from sales drafts or other memoranda taken in connection with future delivery transactions.

F. Electronic Commerce. You may process electronic commerce ("EC") transactions only if you have so indicated on the Application, and only if you have obtained CD's consent. If you submit EC transactions without such consent, Processor may immediately terminate this Agreement. If you have indicated on the Application that you will be submitting EC transactions, you acknowledge that you have received a copy of the Visa Cardholder Information Security Program ("CISP") manual and/or DISC (Discover Information Security Compliance). If you present EC transactions, such transactions must comply with the CISP and/or DISC requirements and all other applicable Rules and Laws. You understand that transactions processed via EC are high risk and subject to a higher incidence of chargebacks. You are liable for all chargebacks and losses related to EC transactions, whether or not: i) EC transactions have been encrypted; and ii) you have obtained consent to engage in such transactions. Encryption is not a guarantee of payment and will not waive any provision of this Agreement or otherwise validate a fraudulent transaction. You must offer Cardholders a secure transaction method, such as Secure Sockets Layer (SSL) or 3-D Secure. All communication costs related to EC transactions are your responsibility. You understand that Processor will not manage the EC telecommunications link and that it is your responsibility to manage that link. All EC transactions will be settled by Bank into a depository institution of the United States in U.S. currency.

i. Requirements. For goods to be shipped on EC transactions, you may obtain authorization up to 7 calendar days prior to the shipment date. You need not to obtain a second authorization if the Sales Draft amount is within 15% of the authorized amount, provided that the additional amount represents shipping costs. Further, your web site must contain all of the following information: a) complete description of the goods or services offered, b) returned merchandise and refund policy, c) customer service contact, including electronic mail address and/or telephone number, d) transaction currency (such as U.S. or Canadian dollars), e) export or legal restrictions, if known, f) delivery policy, consumer data privacy policy, g) your security method for transmission of payment data, and h) Discover, MasterCard and Visa logos in full color according to their individual Brand guidelines. If you store cardholder account numbers, expiration dates, and other personal cardholder data in a database, you must follow Discover, Visa and MasterCard guidelines on securing such data. You shall immediately notify Processor of any suspected or confirmed loss or theft of any transaction information. In addition, you must provide reasonable access to Discover, Visa, MasterCard, a Debit Network or independent third party to verify your ability to prevent future security breaches in a manner consistent with the requirements of any Rule.

ii. Cardholder Information Security. You agree that you are, and will remain, fully compliant with the Payment Card Industry Data Security Standard required by Discover and the Card Associations, including but not limited to undertaking the required annual or quarterly self-assessments and Web infrastructure scans, as appropriate. If you accept EC transactions, you must: install and maintain a working network firewall to protect data accessible via the Internet; keep security patches up-to-date; encrypt stored data and data sent over open networks; use and update anti-virus software; restrict access to data by business "need-to-know"; assign a unique ID to each person with computer access to data; not use vendor-supplied defaults for system passwords and other security parameters; track access to data by unique ID; regularly test security systems and processes; maintain a policy that addresses information security for employees and contractors; and restrict physical access to cardholder information. When outsourcing administration of information assets, networks, or data you must retain legal control of proprietary information and use limited "need-to-know" access to such assets, networks or data. Further, you must reference the protection of cardholder information and compliance with the Visa CISP Rules in contracts with other service providers. You agree to indemnify and reimburse Processor and Bank immediately for any loss, liability, assessment or fine incurred due to your breach of this Section.

G. American Express and Diners Club Transactions. Upon your request, Processor and Bank will provide authorization and/or data capture service, for Diners Club and American Express transactions. By signing this Merchant Agreement, Merchant agrees to abide by the terms and conditions of Diners Club and American Express. I understand that the Diners Club Agreement will be sent to the business entity indicated on this application. By accepting the Diners Club card for goods and/or services Merchant agrees to be bound by the terms and conditions of the Agreement. Processor and Bank are not responsible for funding such transactions. Initial setup fees may apply.

H. Cash Advances. You will not deposit any transaction for purpose of obtaining or providing a cash advance. You agree that any such deposit shall be grounds for immediate termination.

I. Prohibited Transactions. You will not accept or deposit any fraudulent transaction and you may not, under any circumstances, present for deposit directly or indirectly, a transaction which originated with any other merchant or any other source. You will not, under any circumstance, engage in any transaction prohibited by the Rules or deposit telemarketing transactions unless you obtain Bank or Processor's prior written consent. Such consent will be subject to Bank's final approval. If you process any such transactions, you may be immediately terminated and Bank may hold funds and/or require you to establish a Reserve Account. Further, you may be subject to Discover or the Card Association reporting requirements. You will not accept cash, checks or other negotiable items from any Cardholder and forward a credit through Discover or any Card Association or Debit Network (i.e., as a purported payment or deposit to an account maintained by the Cardholder); forward any transaction or initiate any reversal of a transaction that did not originate between you and the Cardholder; complete any transaction that you knew or should have known to be fraudulent or not authorized by the Cardholder; accept any Debit Card in payment for any legal services or for expenses related to the defense of any crime (other than a traffic violation), or any domestic relations matter where services or expenses are furnished a person whose name is not embossed on the Debit Card or any bankruptcy, insolvency, or other proceeding affecting the creditors of any Cardholder; present for processing a transaction that does not represent a sale of goods or service directly between Cardholder and you. You will fully cooperate with Processor, Discover and with each Card Association in the event that Processor, Discover or any Card Association determines that there is a substantial risk of fraud arising from your access to Discover and the Card Association. You will take whatever actions Processor, Discover or Card Associations reasonably deem necessary in order to protect Discover, such Card Association, its members, and its Cardholders. Neither Discover, the Card Associations, Processor, nor any of their respective personnel will have any liability to you for any action taken in good faith.

J. Debit Card Transactions.

i. For each PIN-based Debit Card sale, the Cardholder must enter his Personal Identification Number ("PIN") through a PIN pad located at the point of sale.

ii. Each PIN pad will be situated to permit Cardholders to input their PINs without revealing them to other persons, including your personnel. iii. You will instruct personnel that they may not ask any Cardholder to disclose the PIN and that in the event that any of your personnel nonetheless becomes aware of any Cardholder's PIN, such personnel will not use such PIN or create or maintain any record of such PIN, and will not disclose such PIN to any other person.

iv. The PIN message must be encrypted from the PIN pad to the point of sale device connected to a Debit Network used to initiate transactions ("Terminal") and from the Terminal to the Debit Network and back so that the PIN message will not be in the clear at any point in the transaction. v. You will comply with any other requirements relating to PIN security as required by Bank or by any Debit Network. vi. A transaction receipt in conformity with Regulation E and the Rules will be made available to the Cardholder. vii. You may not establish a minimum or maximum transaction amount as a condition for use of a Debit Card. viii. You may not charge any Cardholder for the use of any Debit Card unless the Rules so permit. ix. You may not collect tax as a separate cash transaction.

K. Debit Card Terminals. Debit Card terminals, including hardware and software, must be certified for use by Bank and by all of the Debit Networks. Terminals must include encrypted PIN pads which allow entry of up to sixteen character PINs, printers and a keyboard lock function. You are responsible for compliance with all Rules regarding the use of Terminals, regardless of whether such Terminals are obtained through CD or through a third party.

6. Designated Account.

A. Establishment and Authority. Merchant will establish and maintain an account at an ACH receiving depository institution approved by Bank ("Designated Account"). Merchant will maintain sufficient funds in the Designated Account to satisfy all obligations, including fees, contemplated by this Agreement. Merchant irrevocably authorizes Bank to debit the Designated Account for chargebacks, fees and any other penalties or amounts owed under this Agreement. This authority will remain in effect for at least 2 years after termination of this Agreement whether or not you have notified Processor and Bank of a change to the Designated Account. Merchant must obtain prior written consent from Bank or Processor to change the Designated Account. If Merchant does not get that consent, Processor and Bank may immediately terminate the Agreement and may take other action necessary as determined by them within their sole discretion.

B. Deposit. Bank will initiate a deposit in an amount represented on Sales Drafts to the Designated Account subject to Section 4 of this Agreement upon receipt of funds from Discover, Visa, MasterCard, or a Debit Network. Typically, the deposit will be initiated 3 business days following Processor's receipt of the Sales Draft, except for mail order/telephone order and electronic commerce transactions, which will be initiated 5 business days following receipt of the Sales Draft. "Business Day" means Monday through Friday, excluding holidays observed by the Federal Reserve Bank of New York. Merchant authorizes Bank and Processor to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant conditional credit for any entry. Bank, in its sole discretion, may grant you provisional credit for transaction amounts in the process of collection, subject to receipt of final payment by Bank and subject to all chargebacks.

C. Asserted Errors. You must promptly examine all statements relating to the Designated Account, and immediately notify Processor and Bank in

Merchant Initials: X L.I. CD Initials: X [signature] ZMM 0330

ATTACHMENT F

APP. 000277

Exh. 600

asserting of any error. Your written notice must include: (i) Merchant name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error; and (iv) an explanation of why you believe an error exists and the cause of it, if known. That written notice must be received by Processor and Bank within 30 calendar days after you received the periodic statement containing the asserted error. You may not make any loss or expense relating to any asserted error for 60 calendar days immediately following Processor's receipt of your written notice. During that 60 day period, Processor and Bank will be entitled to investigate the asserted error.

D. Indemnity. You will indemnify and hold Processor and Bank harmless for any action they take against the Designated Account, the Reserve Account, or any other account pursuant to this Agreement.

E. ACH Authorization. You authorize Processor and Bank to initiate debit/credit entries to the Designated Account, the Reserve Account, or any other account maintained by you at any institution, all in accordance with this Agreement. This authorization will remain in effect beyond termination of this Agreement. In the event you change the Designated Account, this authorization will apply to the new account.

7. Security Interests, Reserve Account, Recoupment and Set-Off.

A. Security Interests.

i. Security Agreement. This Agreement is a security agreement under the Uniform Commercial Code. You grant to Processor and Bank a security interest in and lien upon: (i) all funds at any time in the Designated Account, regardless of the source of such funds; (ii) all funds at any time in the Reserve Account, regardless of the source of such funds; (iii) present and future Sales Draft; and (iv) any and all amounts which may be due to you under this Agreement including, without limitation, all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). You agree to provide other collateral or security to Processor and Bank to secure your obligations under this Agreement upon Processor or Bank's request. These security interests and liens will secure all of your obligations under this Agreement and any other agreements now existing or later entered into between you and Processor and Bank. This security interest may be exercised by Processor and Bank without notice or demand of any kind by making an immediate withdrawal or freezing the secured assets.

ii. Perfection. Upon request of Processor or Bank, you will execute one or more financing statements or other documents to evidence this security interest. You represent and warrant that no other person or entity has a security interest in the Secured Assets. Further, with respect to such security interests and liens, Processor and Bank will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. You will obtain from Processor and Bank written consent prior to granting a security interest of any kind in the Secured Assets to a third party. You agree that this is a contract of recoupment and Processor and Bank are not required to file a motion for relief from a bankruptcy action automatic stay for Processor or Bank to realize on any of its collateral (including any Reserve Account). Nevertheless you agree not to contest or object to any motion for relief from the automatic stay filed by Processor or Bank. You authorize Processor or Bank and appoint Processor or Bank your attorney in fact to sign your name to any financing statement used for the perfection of any security interest or lien granted hereunder.

B. Reserve Account.

i. Establishment. You will establish and maintain a non-interest bearing deposit account ("Reserve Account") at Bank initially or at any time in the future as requested by Processor and Bank, with sums sufficient to satisfy your current and future obligations as determined by Processor and Bank. [illegible]

the obligations relate to Sales Drafts initiated or created before or after the filing of the bankruptcy petition.

D. Remedies Cumulative. The rights and remedies conferred upon Processor and Bank in this Agreement, at law or in equity, are not intended to be exclusive of each other. Rather, each and every right of Processor and Bank under this Agreement, at law or in equity, will be cumulative and concurrent and in addition to every other right.

8. Fees and Other Amounts Owed Bank.

A. Fees and Taxes. You will pay Processor and Bank fees for services, forms and equipment in accordance with the rates set forth on the Application. Such fees will be calculated and debited from the Designated Account once each business day or month for the previous business day's or month's activity, or will be netted out from the funds due you attributable to Sales Drafts presented to Processor and Bank. Processor and Bank reserve the right to adjust the fees set forth on the Application and in this Section, in accordance with Section 16.I, below, provided that Bank shall approve, in advance, any fee to or obligation of Merchant arising from or related to performance of this Agreement. You are also obligated to pay all taxes, and other charges imposed by any governmental authority on the services provided under this Agreement. Bank may not assign or otherwise transfer an obligation to pay or reimburse Merchant arising from, or related to, performance of this Agreement to Processor.

B. Other Amounts Owed. You will immediately pay Processor and Bank any amount incurred by Processor and Bank attributable to this Agreement including but not limited to chargebacks, fines imposed by Visa or MasterCard, non-sufficient fund fees, and ACH debits that overdraw the Designated Account, Reserve Account or are otherwise dishonored. You authorize Bank to debit via ACH the Designated Account, Merchant Account, or any other account you have at Bank or at any other financial institution for any amount you owe Processor or Bank under this Agreement or under any other contract, note, guaranty, instrument or dealing of any kind now existing or later entered into between you and Processor or Bank, whether your obligation is direct, indirect, primary, secondary, fixed, contingent, joint or several. In the event Processor or Bank demand sums due or such ACH does not fully reimburse Processor and Bank for the amount owed, you will immediately pay Processor and Bank such amount.

C. Merchant Maintenance Supply/Replacement Program ("MMP"). You are responsible for purchasing all supplies required to properly process Card transactions (sales slips, printer rolls, etc.). If you elect to participate in the MMP, you understand that supply quantities provided by CD will be based on your monthly transaction count. Enrollment in MMP also entitles merchant to free refurbished replacement equipment after at least one statement cycle onto CD. Equipment is under warranty for the life of merchant's enrollment in MMP. Terminal/Peripheral replacement will only apply to those terminals/ peripherals that have submitted or settled batch/transactions. A monthly fee is required for each terminal/peripheral you have. If your terminal/peripheral type is unavailable, CD will substitute the terminal/peripheral at its discretion. CD may choose to cancel the merchant's MMP at any time without notice. This program does not cover (i) terminals/peripherals that have been subject to water damage; and (ii) Products that have been damaged due to alteration or modification (iii) Non-Payment Card Industry Data Security Standards ("PCI DSS") compliant terminals/ peripherals. In these instances, the merchant will be charged the full purchase price of the refurbished replacement equipment. This program is non-transferable without written consent.

9. Application, Indemnification, Limitation of Liability.

A. Application. You represent and warrant to Processor and Bank that all information in the Application is correct and complete. You must notify Processor in writing of any changes to the information in the Application, including but not limited to: any additional location or new business, the identity of principals and/or owners, the form of business organization (i.e., sole proprietorship partnership, etc.), type of goods and services provided and how sales are completed (i.e. by telephone, mail, or in person at your place of business). The notice must be received by Processor within 10 business days of the change. You will provide updated information to Processor within a reasonable time upon request. You are liable to Processor for all losses and expenses incurred by Processor arising out of your failure to report changes to it. Bank and Processor may immediately terminate this Agreement upon notification by you of a change to the information in the Application.

B. Indemnification. You will hold harmless and indemnify the Card Associations, Processor and Bank, their employees and agents (i) against all claims by third parties arising out of this Agreement, and (ii) for all attorneys' fees and other costs and expenses paid or incurred by Processor or Bank in the enforcement of the Agreement, including but not limited to those resulting from any breach by you of this Agreement and those related to any bankruptcy proceeding.

C. Limitation of Liability. Any liability of Processor or Bank under this Agreement, whether to you or any other party, whatever the basis of the liability, shall not exceed in the aggregate the difference between (i) the amount of fees paid by you to Processor and Bank during the month in which the transaction out of which the liability arose occurred, and (ii) assessments, chargebacks, and offsets against such fees which arose during such month. In the event more than one month is involved, the aggregate amount of Processor's and Bank's liability shall not exceed the lowest amount determined in accord with the foregoing calculation for any one month involved. Neither Processor Bank nor their agents, officers, directors, or employees shall be liable for indirect, special, or consequential damages.

D. Performance. Processor and Bank will perform all services in accordance with this Agreement. Processor and Bank make no warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty. Processor and Bank disclaim all implied warranties, including those of merchantability and fitness for a particular purpose. No party will be liable to the others for any failure or delay in its performance of this Agreement if such failure or delay arises out of causes beyond the control and without the, fault or negligence of such party. Neither Processor nor Bank shall be liable for the acts or omissions of any third party. For purposes of this Agreement, Processor is the exclusive agent of Bank and Bank is at all times entirely responsible for, and in control of Processor's performance.

10. Representations and Warranties. You represent and warrant to Processor and Bank at the time of execution and during the term of this Agreement the following:

A. Information. You are a corporation, limited liability company, partnership or sole proprietorship validly existing and organized in the United States. All information contained on the Application or any other document submitted to Processor or Bank is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant. You are not engaged or affiliated with any businesses, products or methods of selling other than those set forth on the Application, unless you obtain the prior written consent of Processor and Bank.

B. Entity Power. Merchant and the person signing this Agreement have the authority to execute and perform this Agreement. This Agreement will not violate any law, or conflict with any other agreement to which you are subject.

C. No Litigation or Termination. There is no action, suit or proceeding pending or to your knowledge threatened which if decided adversely would impair your ability to carry on your business substantially as now conducted or which would adversely affect your financial condition or operations. You have never entered into an agreement with a third party to perform credit or debit card processing which has been terminated by that third party.

D. Transactions. All transactions are bona fide. No transaction involves the use of a Card for any purpose other than the purchase of goods or services from you nor does it involve a Cardholder obtaining cash from you unless allowed by the Rules and agreed in writing with Processor and Bank. E. Rule compliance. You will comply with the Laws and Rules.

11. Audit and Financial Information.

A. Audit. You authorize Processor or Bank to audit your records, systems, processes or procedures to confirm compliance with this Agreement, as amended from time to time. You will obtain, and will submit a copy of, an audit of your business when requested by Processor or Bank.

B. Financial Information.

i. Authorizations. You authorize Processor or Bank to make any business or personal credit inquiries they consider necessary to review the acceptance and continuation of this Agreement. You also authorize any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to Processor and Bank.

ii. Documents. You will provide Processor or Bank personal and business financial statements and other financial information as requested from time to time. If requested, you will furnish within 120 calendar days after the end of each fiscal year to Processor and Bank a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year.

12. Third Parties.

A. Services. You may be using special services or software provided by a third party to assist you in processing transactions, including authorizations and settlements, or accounting functions. You are responsible for ensuring compliance with the requirements of any third party in using their products. This includes making sure you have and comply with any software updates. Processor and Bank have no responsibility for any transaction until that point in time Processor or Bank receive data about the transaction.

B. Use of Terminals Provided by Others. You will notify Processor and Bank immediately if you decide to use electronic authorization or data capture terminals or software provided by any entity other than Processor and Bank or its authorized designee ("Third Party Terminals") to process transactions. If you elect to use Third Party Terminals you agree (i) the third party providing the terminals will be your agent in the delivery of Card transactions to Processor and Bank; and (ii) to assume full responsibility and liability for any failure of that third party to comply with the Rules or this Agreement. Neither Processor nor Bank will be responsible for any losses or additional fees incurred by you as a result of any error by a third party agent or a malfunction in a Third Party Terminal.

C. Debit Network Requirements. In order to inform Cardholders that Debit Cards may be accepted at your locations, you will prominently display the trademark of each Debit Network at each location and will display signage of each Debit Network at the entrance, near all Terminals and on the window of such location. All uses by you of any Debit Network trademark will comply with the Rules. You acknowledge and agree that in displaying any such trademark, you will be subject to approval by the applicable Debit Network. You will under no circumstances be deemed to be a licensee or sublicensee of any trademark of any Debit Network, nor will you otherwise be deemed to have or to acquire any right, title or interest in such trademarks.

13. Term and Termination

A. Term. The Agreement will become effective on the date Bank executes this Agreement ("Effective Date"), provided, however that if you submit a transaction prior to the Effective Date, you will be bound by all terms of this Agreement. The Agreement will remain in effect for a period of 3 years ("Initial Term") and will renew for successive 1 year terms ("Renewal Term") unless terminated as set forth below.

B. Termination. The Agreement may be terminated by Bank or Merchant to be effective at the end of the Initial Term or any Renewal Term by giving written notice of an intention not to renew at least 90 calendar days before the end of the current term. Further, this Agreement may be terminated at any time

with or without notice and with or without cause by Processor and Bank. Processing under a particular Debit Network may be suspended or terminated (without terminating this entire Agreement) if: (i) the Debit Network determines to suspend or terminate processing; or (ii) automatically upon termination or expiration of Processor's or your access to such Debit Network whether caused by termination or expiration of Processor's agreement with such Debit Network or otherwise. In addition, in the event that Processor's participation in such Debit Network is suspended for any reason, processing through such Debit Network by you will be suspended for the period of time of such suspension and Bank or Processor will immediately notify you of that event. Neither Processor, Bank, nor any Debit Network will have any liability to you as a result of any such suspension or termination.

C. Action upon Termination.

i. Terminated Merchant File. You acknowledge that Bank is required to report your business name and the name of Merchant's principals to Discover, Visa and MasterCard when Merchant is terminated due to the reasons listed in the Rules.

ii. Designated Account. All your obligations regarding accepted Sales Drafts will survive termination. You must maintain in the Designated Account and the Reserve Account enough funds to cover all chargebacks, deposit charges, refunds and fees incurred by you for a reasonable time, but in any event not less than the time specified in this agreement. You authorize Bank to charge those accounts, or any other account maintained under this Agreement, for all such amounts. If the amount in the Designated Account or Reserve Account is not adequate, you will pay Processor and Bank the amount you owe it upon demand, together with all costs and expenses incurred to collect that amount, including reasonable attorneys' fees.

iii. Equipment. Within 14 business days of the date of termination, you must return all equipment owned by Processor and immediately pay Processor and Bank any amounts you owe them for equipment costs.

iv. Early Termination. If you terminate this Agreement before the end of the Initial Term, you will immediately pay Bank, as deconversion costs, an early termination fee equal to $495. You agree that the early termination fee is not a penalty, but rather is reasonable in light of the financial harm caused by your early termination. Other remedies Bank or Processor may have under this Agreement still apply.

14. Compliance With Laws And Rules. You agree to comply with all rules and operating regulations issued from time to time by a Debit Network, Diners' Club, Discover, MasterCard, and Visa and any policies and procedures provided by Processor or Bank, including those set forth in the Merchant Operating Manual ("Rules"). The Rules are incorporated into this Agreement by reference as if they were fully set forth in this Agreement. You further agree to comply with all applicable state, federal and local laws, rules and regulations ("Laws"), as amended from time to time. You will assist Processor and Bank in complying with all Laws and Rules now or hereafter applicable to any Card transaction or this Agreement. You will execute and deliver to Processor and Bank all instruments it may from time to time reasonably deem necessary.

15. Use of Trademarks and Confidentiality.

A. Use of Trademarks. Your use of Discover, Visa and MasterCard trademarks must fully comply with the Rules. Your use of Discover, Visa, MasterCard or other cards' promotional materials will not indicate directly or indirectly that Discover, Visa or MasterCard endorse any goods or services other than their own and you may not refer to Discover, Visa or MasterCard in stating eligibility for your products or services. If you have requested signage for the purpose of indicating acceptance of Debit Cards, you must display such signage for a minimum of 3 months. All point of sale displays or websites must include either appropriate Discover or Visa-owned marks to indicate acceptance of Debit and Other Cards or Visa approved signage to indicate acceptance of the limited acceptance category you have selected.

B. Confidentiality.

i. Cardholder Information. You will not disclose to any third party Cardholders' account information or other personal information except to an agent of yours assisting in completing a Card transaction, a Card Association, or as required by law. You must keep all systems and media containing account, Cardholder, or transaction information (physical or electronic, including but not limited to account numbers, card imprints, and TIDs) in a secure manner, to prevent access by or disclosure to anyone other than your authorized personnel. You must destroy all material containing Cardholders' account numbers, Card Imprints, Sales Drafts, Credit Vouchers (except for Sales Drafts maintained in accordance with this Agreement, Laws, and the Rules). Further, you must take all steps reasonably necessary to ensure Cardholder information is not disclosed or otherwise misused. You may not retain or store magnetic stripe, Discover CID or CVV2 data after authorization.

4. Provisions. You will not use for your own purposes, will not disclose to any third party, and will retain in strictest confidence all information and data belonging to or relating to the business of Processor and Bank (including without limitation the terms of this Agreement), and will safeguard such information and data by using the same degree of care that you use to protect your own confidential information. If you have requested BIN information, you must only use this BIN information for product identification purposes at the point of sale, and not disclose this proprietary and confidential Visa BIN information to any third party without prior written permission from Visa.

5. Disclosure. You authorize Processor and Bank to disclose your name and address to any third party who requests such information or otherwise has a reason to know such information.

C. Return to Bank. All promotional materials, advertising displays, emblems, Sales Drafts, credit memoranda and other items supplied to you and not purchased by you or consumed in use will remain the property of Processor and Bank and will be immediately returned to Processor upon termination of this Agreement. You will be fully liable for all loss, cost, and expense suffered or incurred by Processor and Bank arising out of the failure to return or destroy such materials following termination.

16. General Provisions.

A. Entire Agreement. This Agreement as amended from time to time, including the Rules, the Merchant Operating Manual, and the completed Merchant Application, all of which are incorporated into this Agreement, constitute the entire agreement between the parties, and all prior or other agreements or representations, written or oral, are superseded. This Agreement may be signed in one or more counterparts, all of which, taken together, will constitute one agreement.

B. Governing Law. This Agreement will be governed by the laws of the State of New York. Proper venue for any dispute arising from this agreement shall be in any state or federal court of competent jurisdiction in New York County, New York. Merchant and Guarantor(s) agree to submit to the personal jurisdiction of courts located in New York County, New York.

C. Exclusivity. During the Initial and any Renewal Term of this Agreement, you will not enter into an agreement with any other entity that provides Card processing services similar to those provided by Processor and Bank as contemplated by this Agreement without Processor and Bank's written consent.

D. Construction. The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any alteration or strikeover in the text of this pre-printed Agreement will have no binding effect, and will not be deemed to amend this Agreement. This Agreement may be executed by facsimile, and facsimile copies of signatures to this Agreement shall be deemed to be originals and may be relied on to the same extent as the originals.

E. Assignability. This Agreement may not be assigned by Merchant directly or by operation of law, without the prior written consent of Processor. If Merchant nevertheless assigns this Agreement without the consent of Processor, the Agreement shall be binding upon the assignee. Bank will be informed of any such assignment.

F. Notices. Any written notice under this Agreement will be deemed received upon the earlier of: (i) actual receipt or (ii) five calendar days after being deposited in the United States mail, and addressed to the last address shown on the records of the sender.

G. Bankruptcy. If your business fails, including bankruptcy, insolvency, or other suspension of business operations, you must not sell, transfer, or disclose any materials that contain Cardholder account numbers, personal information, or other Visa transaction information to third parties. You must either return this information to Processor or provide acceptable proof of destruction of this information. You will immediately notify Processor and Bank of any bankruptcy, receivership, insolvency or similar action or proceeding initiated by or against Merchant or any of its principals. You will include Processor and Bank on the list and matrix of creditors as filed with the Bankruptcy Court, whether or not a claim may exist at the time of filing. Failure to comply with either of these requirements will be cause for immediate termination or any other action available to Processor and Bank under applicable Rules or Laws.

H. Attorneys' Fees. Merchant will be liable for and will indemnify and reimburse Processor and Bank for all attorneys' fees and other costs and expenses paid or incurred by Processor and Bank or their agents in the enforcement of this Agreement, or in collecting any amounts due from Merchant or resulting from any breach by Merchant of this Agreement.

I. Amendments. Bank and Processor may amend this Agreement at any time upon notice to you. With regard to increases in existing fees, or imposition of new fees, except for any fee increases imposed by Discover, Visa, MasterCard, or a Debit Network, you may cancel the Agreement if you object to the fee changes in writing within 30 days. If you do not object, and continue to process for 30 days after receiving notice of the fee change, you will be deemed to assent to the new fees.

J. Severability and Waiver. If any provision of this Agreement is illegal, the invalidity of that provision will not affect any of the remaining provisions and this Agreement will be construed as if the illegal provision is not contained in the Agreement. Neither the failure nor delay by Processor or Bank to exercise, or partial exercise of, any right under this Agreement will operate as a waiver or estoppel of such right, nor shall it amend this Agreement. All waivers must be signed by the waiving party.

K. Independent Contractors. Processor, Bank and Merchant will be deemed independent contractors and will not be considered agent, joint venture or partner of the other.

L. Employee Actions. You are responsible for your employees' actions while in your employment.

M. Survival. Sections 4.A, 4.B, 6, 7, 8, 9, 13.C, 15, 16.B, and 16.H will survive termination of this Agreement.

N. Bank Contact. You may contact Bank at the following address and telephone number:

Harris, N.A.
150 N. Martingale, Suite 900
Schaumburg, Illinois 60173

Merchant Initials: X L.I. CD Initials: X [signature] 0331

ATTACHMENT E APP. 000278

## DISCLOSURE PAGE

### Member Bank (Acquirer) Information

Acquirer Name: Harris, N.A.

Acquirer Address: 150 N. Martingale Road, Suite 900, Schaumburg, IL 60173

Acquirer Phone: 847-240-6600

### Important Member Bank (Acquirer) Responsibilities

1. A Discover / Visa / MasterCard Member is the only entity approved to extend acceptance of Discover / Visa / MasterCard products directly to a Merchant.
2. A Discover / Visa / MasterCard Member must be a principal (signer) to the Merchant Agreement.
3. The Discover / Visa / MasterCard Member is responsible for educating Merchant on pertinent Discover / Visa / MasterCard Operating Regulations with which Merchant must comply.
4. The Discover / Visa / MasterCard Member is responsible for and must provide settlement funds to the Merchant.
5. The Discover / Visa / MasterCard Member is responsible for all funds held in reserve that are derived from settlement.

### Merchant Information

Merchant Name: ZEN MOBILE MEDIA, INC

Merchant Address: 4335 VAN NUYS BLVD #167, SHERMAN OAKS, CA 91403

Merchant Phone: 866.982.8714

### Important Merchant Responsibilities

1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with Discover / Visa / MasterCard Operating Regulations.

The responsibilities listed above do not supercede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Discover / Visa / MasterCard Member (Acquirer) is the ultimate authority should the Merchant have any problems.

Merchant Signature — 11/9/2011 Date

IGOR LATSANOVSKI, CEO/OWNER
Merchant's Printed Name and Title

ZMM 0332



To Whom It May Concern: 11/08/2011

This letter is to state that Zen Mobile Media, Inc. has a merchant account with Wells Fargo Bank. Account information is as follows:

Routing number: [redacted]

Account number: [redacted]

Do not hesitate to contact me if you have any further questions.

Thank you,

Teny Minas
Assistant Branch Manager
(818) 509-3480



105 Decker Court
Suite 650
Irving, TX 75062
Tel: 800-944-1399
Fax: 214-260-9320

# MAIL, TELEPHONE ORDER, & INTERNET MERCHANT ADDENDUM

**UNDERWRITING & MARKETING REVIEW:** (Please answer the following questions as accurately as possible)

How are your products/services promoted? (check all that apply) [X] Direct Mail [ ] Radio/Television [ ] Print Advertising [X] Telemarketing [ ] Internet (what is your URL) www.

NOTE: Print advertising materials must be submitted to appsprocessing@signapay.com)

Preferred 23 character (or less) DBA identifier (appears on customers' billing statement)
MYSKIN 877-743-7943

List name(s) and address(es) of vendor from which the product or service is purchased:
N/A

List name(s) and address(es) of third party or fulfillment organizations, or parties aside from your staff who will assist or participate with the sales, marketing, processing of orders, or shipping of merchandise:
N/A

List geographical area(s) where your product will be marketed and sold: USA
List carrier services that will deliver product: USPS
What is your return or refund policy: 30 DAYS TO RETURN
How does the customer order your product/service? [X] mail [X] telephone [ ] Internet
When you receive an authorization, how long before merchandise is shipped: 24 HOURS
Do you perform recurring monthly billing? [X] Yes [ ] No — If Yes, [X] Monthly [ ] Quarterly [ ] Bi-annual [ ] Annual
Is your database collecting entire credit card numbers? [ ] Yes [X] No — If Yes, are you PCI compliant? [ ] Yes [ ] No

**IMPORTANT NOTICE TO INTERNET MERCHANTS:**

Visa and MasterCard have set a minimum standard requirement for accepting credit cards on the Internet. In order to avoid a significant delay in the settlement of your funds, please ensure that your website has the following seven (7) items completed prior to the commencement of your credit card processing:

1. Refund / Cancellation Policy
2. Privacy Policy
3. Terms & Conditions listed
4. Products & the Corresponding Pricing listed
5. 128-bit SSL page(s) where personal and credit card information is obtained (usually provided by shopping cart or gateway)
6. Telephone Customer Service contact number
7. Shipping & Handling method and shipping delivery time after the sale

**URGENT:** You must contact your sales representative immediately upon completing the above 7 internet processing requirements.

This amendment is made by and between Harris N.A., Chicago, IL ("Bank"), and the undersigned "MERCHANT" and subject to the approval of BANK.
WHEREAS: Bank is engaged in the general banking business including the purchase of Credit Card Transactions from merchants and provide certain services related to the processing of Credit Card Transactions to MERCHANT; and
WHEREAS: MERCHANT desires to honor at this business location(s) Card Numbers presented in connection with the Mail Order/ Telephone Order sale of product/services to customers; and
WHEREAS: BANK and MERCHANT has entered into Harris N.A., Chicago, IL. (Bank) VISA/MasterCard Processing Agreement ("Agreement").
NOW THEREFORE, in consideration of the representations, covenants, and promises made herein, the parties hereto agree to amend Agreement as follows:

1. MERCHANT agrees to use and retain proof of a traceable delivery system as means of shipment of product to customer.
2. MERCHANT agrees that transactions will not be processed until products are shipped to Cardholder.
3. MERCHANT agrees to a charge of $0.05 per AVS transaction(s) when applicable.
4. Agreement may be immediately terminated by BANK if MERCHANT fails to comply with any of the terms of this agreement.

AGREED & ACCEPTED BY: [signature] DATE: 11/9/2011

OWNER/OFFICER — Authorized Harris N.A. Agent

IGOR LATSANOVSKI
Print Name — Print Name

SignaPay is a registered ISO/MSP of Harris N.A., Chicago, IL

CALIFORNIA
DRIVER LICENSE
DL
CLASS C
EXP
END NONE
LN LATSANOVSKI
FN IGOR
DOB
RSTR NONE
SEX M
HAIR BLK
EYES GRN
HGT 6'-00"
WGT 145 lb
10/04/2011

ZMM 0335

Print

# Application Detail

MID: 3899000002069373

Address

Sales Rep : Affiliate Referral
ISO # : 12650
Legal Name : ZEN MOBILE MEDIA INC
Address 1 : 4335 VAN NUYS BLVD
Address 2 : SUITE 167
City : SHERMAN OAKS
State/Zip : CA 91403
Phone : --

DBA Name : ZEN MOBILE MEDIA
Address 1 : 4335 VAN NUYS BLVD
Address 2 : SUITE 167
City : SHERMAN OAKS
State/Zip : CA 91403
DBA Phone : 888-609-8647
Web Address :
E-mail :

Mailing Address
Mailing Name : ZEN MOBILE MEDIA INC
Address1 : 4335 VAN NUYS BLVD
Address2 : SUITE 167
City : SHERMAN OAKS
State/Zip : CA 91403

Owners

1st Owner/Officer information

First Name : IGOR
Last Name : LATSANOVSKI
Title : Pres dent
Date Of Birth:
Applicant SS # :
Phone : 818-200-1035

Address 1:
Address2 :
City :
State/Zip :
% Ownership : 100
Drivers Lic : State:

2nd Owner/Officer information

First Name :
Last Name :
Title :
Date Of Birth: --
Applicant SS # : --
Phone : --

Address1 :
Address2 :
City :
State/Zip :
% Ownership :
Drivers Lic : State :

Trade References

Trade References 1

Trade Name : CRITICAL MEDIA
Address, City, St/Zip : WOODLAND HILL

1/16/2015

On Line Application - Merchant Details

Contact : RON SWARTZ
Phone : 818- 517- 5000

Trade References 2

Trade Name : GAMBIT
Address, City, St/Zip : SHERMAN OAKS
Contact : NASTASSIA YALLEY
Phone : 818- 687- 0366

Business Profile

| | | | |
|---|---|---|---|
| Type Ownership: | LLC | Card Swipe: | 60%   100% Addendum ☐ |
| Goods/Services: | SKIN CARE AND SPA | Manual Keyed: | 0% |
| Accept V/M: | ☐ | Mail/Phone: | 40% |
| Current Procesor: | | Internet: | 0% |
| Tax ID: | ▇▇▇▇ | Rate Type : | Moto/eComm/Manualk |
| # of locations: | 2 | | |
| Years in biz: | 1 months | Bank Reference | |
| Bankruptcy Filed: | ○ Yes  ● No | | |
| Bankruptcy date: | -- | Bank Name: | WELLS FARGO |
| Type Business: | Retail | Account Name: | ZEN MOBILE MEDIA |
| Other Business: | | Account #: | ▇▇▇▇ |
| Location Type: | Retail Location with Store Front | Re Type Account: | |
| Area Zoned: | 501-2,000 | Routing #: | ▇▇▇▇ |
| | | Phone: | 818-509-3480 |

Does the amount of inventory and merchandise on shelves and floor appear consistent with this type of business?:

If NO, explain:

SIC Code: BEAUTY SHOPS, BARBER SHOP 7230

Rates and Fees

| | | | |
|---|---|---|---|
| DS/VS/MC Credit Card Discount Rate: | 2.19%  Bundled: ☐ | Batch Fee: | 0.1 Per Batch |
| DS/VS/MC Check Card Discount Rate: | 2.19% | Voice Authorization Fee: | 0.95 Per Call |
| DS/VS/MC Transaction Fee: | 0.25 Per Item | MOTO Surcharge: | 0 Per Item |
| Non-Bankcard Transaction Fee: | 0.25 Per Item | Chargeback/ACH Reject fee: | 25 Per Item |
| Statement Fee: | 9.95 Monthly | Retrieval Fee: | $5 Per Item |
| Vimas Online Service: | 0 Monthly | AVS Surcharge: | 0 Per Item |
| Monthly Minimum: | 25 Monthly | Early termination Fee: | 295 Per Item |
| Annual Fee: | 99 Per Year | Manual imprinter Qty: | 0 $ea. |
| Mid-Qual Surcharge: | 1.85% | Mid-Qual per item: | 0 Per Item |
| Non-Qual Surcharge: | 1.85% | Non-Qual per item: | 0 Per Item |
| Average Ticket: | 800 | Monthly Volume: | 20000 |
| Imprinter Plate Qty: | 0 | | |
| Check Card Per Item: | 0.1 | | |

ATTACHMENT F

APP_000284
ZMM 0337

https://vimas.cynergydata.com/InternalVimas/onlineappdetails.asp?intmid=452578

2/4

1/16/2015 On Line Application - Merchant Details

Services/TID

| | |
|---|---|
| Discover : | Not Selected - Mid #: Status Date 11/21/2011 |
| Amex : | Not Selected - Mid #: Status Date 11/21/2011 |
| Diners : | Not Selected - Mid #: Status Date 11/21/2011 |
| Debit : | Not Selected - Surcharge Amt $: Status Date 11/21/2011 |
| EBT : | Not Selected - FCS #: Status Date 11/21/2011 |
| Check Conversion : | Not Selected - Status Date 11/21/2011 |
| Gift Card : | Not Selected - Status Date 11/21/2011 |

Equipment

| Payment Option |
|---|
| |

| Source |
|---|
| Iso |

| Terminal Program |
|---|
| HCS-Host Capture Front-End |

| Features | |
|---|---|
| ☐ AMEX REV PIP<br>☐ AMEX SPLIT DIAL | Industry Type:<br>Moto |

| Ship to |
|---|
| Merchant |

| Delivered Method |
|---|
| Ground |

| Special Instructions |
|---|
| |

ATTACHMENT F

APP. 000285

ZMM 0338

https://vimas.cynergydata.com/InternalVimas/onlineappdetails.asp?intmid=452578 3/4

600-40 Exh. 600

1/16/2015 On Line Application - Merchant Details

| Equipment | | |
|---|---|---|
| Model | Price | Payment |
| AUTHORIZE.NET GATEWAY | 0 | Reprogramming |
| START UP KIT W/OUT IMPRINTER | 0 | Cash |
| MAGTEK Mini Card Reader USB Black | 66 | Reprogramming |

Agreement

Signature:

Validation Questions

| Question | Answer | Data in Credit Report |
|---|---|---|
| 1 - Enter the 6 first digits of any of your Credit/Store Cards | | |
| 2 - Have you had any federal or state tax lien for the past 5 years? | No | |
| 3 - Do you have a Mortgage Loan? | No | |
| 4 - Enter the total initial amount of your loan | | |

ATTACHMENT F

APP. 000286
ZMM 0339

https://vimas.cynergydata.com/InternalVimas/onlineappdetails.asp?intmid=452578 4/4

600-41 Exh. 600