**BEVERLY HILLS LAW CORP., PC**
Sagar Parikh, Esq. (SBN 282655)
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
Telephone:   (310) 887-1338
Facsimile:   (310) 982-2603
Email:       SP@BeverlyHillsLawCorp.com

Attorneys for Alan Argaman, Secured Merchants, LLC
and Chargeback Armor, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>            Plaintiff,<br><br>      vs.<br><br>BUNZAI MEDIA GROUP, INC., et al.,<br><br>            Defendants.<br>_____<br><br>SECURED MERCHANTS, LLC,<br>CHARGEBACK ARMOR, INC.<br>AND ALAN ARGAMAN,<br><br>            Cross-Claimants<br>                v.<br>ALON NOTTEA, an individual,<br><br>            Cross-Defendant | Case No. 2:15-cv-04527-GW (PLAx)<br><br>**ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK ARMOR, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES;**<br><br>**Hearing Date:  May 16, 2016<br>Time: 8:30 am<br>Location:  Courtroom 10 – Spring St.<br>Judge: Hon. George H. Wu** |

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 16, 2016 at 8:30 am in Courtroom 10 of the above-entitled Court, located at 312 N. Spring Street, Los Angeles, CA 90012, ALAN ARGAMAN ("Argaman"), SECURED MERCHANTS, LLC ("SM"), and CHARGEBACK ARMOR, INC. ("CBA") (collectively "Defendants) will and hereby do move the Court for summary judgment against Plaintiff FEDERAL TRADE COMMISSION.

The Defendants are entitled to judgment as a matter of law because there is no genuine issue of material fact that: (1) SM was not a part of the Common Enterprise alleged in the First Amended Complaint; (2) Argaman did not participate in or have the ability to control the alleged illegal conduct; (3) Relief Defendant CBA did not receive any ill-gotten gain from the conduct alleged in the First Amended Complaint.

This Motion is based upon: this Notice of Motion; the attached Memorandum of Points and Authorities; the Declarations of Alan Argaman and Mike Costache; the Compendium of Exhibits; the Statement of Uncontroverted Facts and Conclusions of Law; all the pleadings, papers, and records on file in this matter; any reply brief filed in connection with this Motion; and upon such argument that may be presented at the hearing on this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 15 and March 16, 2016.

DATED:  April 18, 2016                    BEVERLY HILLS LAW CORP., PC


                                          By:  /s/ Sagar Parikh
                                          Sagar Parikh, Esq.
                                          Attorneys for Alan Argaman, Secured
                                          Merchants, LLC and Chargeback Armor,
                                          Inc.

2

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 6

II. FACTUAL BACKGROUND ............................................ 7

III. LEGAL ARGUMENT .................................................... 8

A. SM Was Not a Part of Any Common Enterprise With the
AuraVie Defendants ........................................................... 9

1. Lack of Common Officers or Employees ...................... 9

2. No Evidence of Common Control. ............................... 11

3. The Evidence Regarding the Sharing of Office Space Does not
Support the Imposition of Common Enterprise Liability ............................. 13

4. There Is No Evidence of Comingling Funds. ............................ 14

5. Lack of Common Officers or Employees .......................... 14

6. SM Did Not Share Business Functions With The AuraVie
Defendants ................................................................ 15

B. There Is No Basis For Holding Argaman Liable ..................... 16

C. The Claim Against Relief Defendant Chargeback Armor Also Should
Be Dismissed.. ............................................................. 23

IV. CONCLUSION .............................................................. 24

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,* 477
U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................. 8

*Delaware Watch Co. v. FTC,* 332 F. 2d 745, 746 (2d Cir.
1964)........................................................................................................... 9

*FTC v. Am. Standard Credit Sys Inc.*, 874 F. Supp, 1080, 1089
(C.D. Cal. 1994) ...................................................................................... 22

*FTC v. Amy Travel. Serv., Inc.,* 875 ........................................................ 22
F.2d 564, 574 (7th Cir. 1989)

*FTC v. CHBA,* Case No. 1:10-cv-3551, Order at 9,
(E.D.N.Y May 23, 2012)............................................................................ 9

*FTC v. Freecom C'ommo'n, Inc.*, 401 F.3d 1192, 1205
(10th Cir. 2005) ...................................................................................... 21

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1210
(D. Nev. 2011) ........................................................................................ 14

*FTC v. Kuykendall,* 371 F. 3d 745, 758-59 (10th Cir. 2004)....................... 13

*FTC v. National Urological Grp. Inc.*, 645 F. Supp. 2d 1167,
1183 n. 7 (N.D. Ga. 2008) ...................................................................... 13

*FTC v. Neovi*, 598 F. Supp.2d 1104, 1116 (S.D. Cal. 2008) ...................... 14

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43
(9th Cir. 2010) ........................................................................................ 14

*FTC v. Publishing Clearing House, Inc.*, 104 F.3d
1168, 1171 (9th Cir. 1997) ...................................................................... 16

*FTC v. Stefanchik*, 559 F.3d 924, 931 ....................................................... 22
(9th Cir. 2009)

*FTC. v. Swish Mag.*, No. C 09-03814 RS, 2010
WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) .................................................21

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1277...................................21
(M.D. Fla. 2012)

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201,
167 L. Ed. 2d 1045 (2007) .........................................................................17

*Scott v. Harris,* 550 U.S. 372, 378, 380-81, 127 S. Ct. 1769, 167 L. Ed.
2d 686 (2007) .................................................................................................8

**STATUTES**

Fed. R. Civ. P. 56(a). .....................................................................................8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Argaman owns SM, which is a technology company. (Argaman Decl. at ¶ 2, Argaman Depo., 141:15-25, 142:1-3). SM provided technical services on a fee for service basis to a number of companies including some of the other defendants in this case. SM invested some of the proceeds from its work for other clients in relief defendant CBA. Based on these arms-length and legal business relationships, the FTC seeks to hold Argaman and SM jointly and severally liable for the allegedly $70 million deceptive advertising and unauthorized billing scheme that the AuraVie Defendants (defined for the purposes of this Motion as all Defendants other than SM, Argaman, CBA, and Secured Commerce, LLC) perpetrated and to hold CBA liable as a relief defendant. The FTC does this while conceding that SM only made approximately $340,000 in total for its services provided to the AuraVie entities (specifically SBM management). (Exh. 833). The FTC seeks to do this by asserting that SM was a part of a "common enterprise" with the AuraVie defendants. Neither the law nor the facts support this conclusion. Despite having the benefit of pre-complaint discovery, the ability to conduct a "raid" on the premises of the defendants in this case, the full weight of the government behind it, and almost a year of discovery, the FTC cannot produce sufficient admissible evidence to create a genuine issue of material fact regarding SM's involvement in the common enterprise. Because the claims against Argaman and CBA both are derivative from the claim against SM, those claims also fail as a matter of law. As a result, the Court should grant the Defendants' motion for summary judgment.

//

//

//

## II.

## FACTUAL BACKGROUND

Argaman is the sole member/manager and owner of SM.   (Argaman Decl. at ¶ 1).  The FTC has tried to argue  otherwise, but has failed to provide any admissible evidence of this and Argaman's testimony and the documentation shows otherwise. Thus, SM is not controlled by, owned, or operated by any of the other defendants, and was not used by these other defendants in furtherance of the alleged "AuraVie" consumer fraud. (Argaman Decl. at ¶ 1, 3).

Argaman, by and through his company SM, simply acted as an arms' length technology vendor  developing and installing a portal system through which chargebacks made by consumers could be viewed and processed.  Argaman developed technology; he had no interaction with customers.    (Argaman Decl. at ¶ 5-6, Argaman Depo., 109:8-25).  As further discussed below, Argaman, by and through SM, also provided technology for Interactive Voice Response systems and helped design a straight sale website.  (Argaman Decl. at ¶ 5, 6, 9).

The FTC's efforts to inflate and distort Argaman's role to include the shipping of AuraVie products and designing of the AuraVie risk free trial website lack supporting admissible evidence.

Relief Defendant CBA was formed on February 18, 2015 (Exh. 811), one full year after the AuraVie Defendants' skin care sales business had been shuttered.  The First Amended Complaint does not allege that CBA engaged in any wrongdoing. Rather, the only allegation against CBA is that SM made a capital investment of $250,000 of its own funds into CBA in exchange for equity.  The First Amended Complaint alleges that this money is ill-gotten gain from the alleged deception; however, ample  documentation, including bank records, invoices, and contracts show that the funds that SM invested in CBA were not from any work that SM did for the

7

other Defendants but rather for work not connected to the AuraVie Defendants.   (Exh. 834, 835, 836, 837, 838, Argaman Decl. at ¶ 19, Costache Decl. at ¶ 4-5).

The Defendants anticipate that the FTC will attempt to rely on its answers to contention interrogatories that it served on the last day of discovery to attempt to support the FTC's own motion for summary judgment and to oppose the Defendants' motion.  Defendants submit that the Court should not consider these answers as they are not verified as required by Rule 33. (Exh. 802-804).  Moreover, the answers themselves are patently inaccurate and not reliable, which perhaps explains why no one at the FTC would verify them.  As explained below, throughout the answers documents are cited to support bold assertions when in fact the document bear little or no relationship to the facts for which they are offered.  Given the stakes for Mr. Argaman, SM, and CBA, the FTC's cavalier attitude towards their discovery obligations is beneath what citizens should expect from their government.

### III.

### <u>LEGAL ARGUMENT</u>

Summary judgment is appropriate where the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 378, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). For a dispute of fact to be genuine, the evidence must be such that a reasonable trier of fact could return a verdict for the non-moving party. *See Scott*, 550 U.S. at 380-81. A mere scintilla of evidence in favor of the non-moving party is insufficient to withstand summary judgment. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

//

//

**A. SM Was Not a Part of Any Common Enterprise With the AuraVie Defendants.**

SM conducted a limited amount of arms-length business with the AuraVie entities. (Argaman Decl. at ¶ 5-6). Those business relationships do not provide an adequate factual basis for imposing joint and several liability for the conduct of the AuraVie entities on SM's part of a common enterprise.

Courts allow the FTC to use the common enterprise doctrine to expand the agency's reach beyond those who themselves deceptively market a product where the "same individuals were transacting an integrated business through a maze of interrelated companies." *Delaware Watch Co. v. FTC, 332 F. 2d 745, 746* (2d Cir. 1964). Applying *Delaware Watch*, courts rely on several factors to assess the existence of a common enterprise: whether companies (1) maintain officers and employees in common; (2) operate under common control; (3) share offices; (4) commingle funds; and (5) share advertising and marketing. See *FTC v. CHBA, Case No. 1:10-cv-3551, Order at 9*, (E.D.N.Y May 23, 2012). No one factor is determinative, rather, the entirety of the factual circumstances dictates whether a common enterprise exists and whether a company should be found to be a part of it. *Delaware Watch*, 332 F.2d 1143.

Here, neither any individual factor nor the overall circumstances support finding SM to be a part of the common enterprise involving the AuraVie Defendants.

**1. Lack of Common Officers or Employees.**

Most of the work done by SM is done by technical personnel in India. (Argaman Decl. at ¶ 2). Argaman, the sole managing member and owner of SM at all times since SM was formed, was not an employee or officer of any of the AuraVie Defendants. (Argaman Decl. at ¶ 1, 3, 4).

1   Doron Nottea is the only link between SM and the AuraVie Defendants, and

2   that link is inadequate to impose joint and several liability upon SM as Mr. Nottea

3   never undertook any actions in furthering SM's business.  Mr. Nottea was not an

4   officer or employee of SM.  (Argaman Decl. at ¶ 4, Argaman Depo., 131:4-24).

5   Doron Nottea has for many years operated an "adult" products business

6   independent of the AuraVie Defendants.  Doron Nottea has done some bookkeeping,

7   including bill payment, for AuraVie Defendants.  There is no evidence that he is an

8   officer or employee of the AuraVie Defendants or had the ability to control those

9   entities.

10   Moreover, Argaman and Doron Nottea have known each other for years.

11   Several years ago Argaman proposed to Doron Nottea that the two of them share

12   office space for their two separate business ventures and possibly explore doing

13   business together.  To this end, Secured Commerce, another Defendant, was formed.

14   However, Secured Commerce did very limited business and was eventually shuttered.

15   (Argaman Decl. at ¶ 8-9, Argaman Depo., 139:1-21).

16   Due to this friendship and Doron Nottea's experience with bookkeeping,

17   Argaman made Doron Nottea an authorized signatory on the bank account for SM.  ,

18   Doron Nottea was simply on the SM bank account for convenience purposes, as

19   Argaman travels internationally often and wanted the convenience of having his friend

20   and business associate write checks on behalf of SM under the direction of Argaman.

21   (Argaman Decl. at ¶ 4).  However, Doron Nottea, actually never wrote any checks on

22   behalf of SM, and was never intended to be, nor was in practice, a part of the actual

23   operations of SM.  (Argaman Decl. at ¶ 4).

24   In the Interrogatory Responses, the FTC references a document Bates Stamped

25   by the FTC as AuraVie-0003002 and represents that this document shows Alon

26   Nottea and Argaman are both managers of SM.  However, when one glances at this

27   referenced document, it appears to be a table of contents for a document that is for

28

"Ruby Sky Development, LLC. (Exh. 820).  This document does not support this baseless allegation.

Next, the FTC says in its Responses that there is an executive summary for SM that names various management team members (AuraVie-0003024).  However, AuraVie-0003024 is a document entitled "Chargeback Rebuttal" and thus completely nonsensical in this context. (Exh. 822).

Finally, the FTC boldly alleges that SM shared many employees with the other Corporate Defendants.  Notably, there is no evidentiary support provided for this assertion in the Responses. (Exh. 803, p. 9).  The FTC's unsupported assertions do not defeat SM's properly supported motion.

## 2.  No Evidence of Common Control.

There is no evidence that there was common control between SM and the AuraVie Defendants.  Argaman ran a technology company that provided technological services to a variety of companies including the AuraVie Defendants.  There is no evidence that Argaman controlled the AuraVie Defendants or that Alon Nottea, Motti Nottea, Doron Nottea, Igor Latsanovski, Oz Mizrahi, or Roi Reuveni controlled Secured Merchants.  (Argaman Decl. at ¶ 1, 3). There is also no evidence that Argaman knew, intended that, or actually provided any services through SM to further the AuraVie Defendants' allegedly deceptive and unfair business practices. (Argaman Decl. at ¶ 5, 6, 10, 11, 12, 13, 14, 15, 16, 17).

Indeed, both the Court and the Receiver previously recognized that Secured Merchants is an independent business that generated the majority of its income from customers other than the AuraVie Defendants. (Doc. 120, p. 77:21-22). These facts are fundamentally inconsistent with common control or a common enterprise.

In its Interrogatory Responses, the FTC states that Doron Nottea referenced SM as one of the "Bunzai Companies", in document AuraVie-0003453.  Yet, this document is nothing more than a single page of an unknown document and contains no reference to Doron Nottea, Argaman, or SM.  (Exh. 827).  This is the type of

1    "investigation", "discovery" and "fact-uncovering" that the FTC has been able to
2    achieve in the nearly one year that this matter has been litigated.   SM was not one of
3    the "Bunzai Companies." (Argaman Decl. at ¶ 3, 7, 10-17).

4         Also in its Interrogatory Responses, FTC references alleged invoices that
5    discuss SM meeting with "Igor" (presumably referring to Defendant Igor
6    Lastanovsky).  Again, no such invoices are referenced or attached to the Responses.
7    (Exh. 803 p. 9).

8         SM's only connection with the AuraVie merchants was in providing IT services
9    to those merchants primarily for viewing and handling chargebacks and for
10   developing their IVR system.  Secured Merchants' role was to provide the technology
11   for handling chargebacks and an IVR system; Secured Merchants was not involved in
12   actually handling chargebacks or dictating the content of the IVR.  (Argaman Decl. at
13   ¶ 5-6).

14        Simply put, it provided the technology, and the AuraVie Defendants used it
15   however they wished; SM did not instruct them on how to use the technology, did not
16   instruct them on how the technology could be used for illegal practices, nor did
17   SM/Argaman have any actual or constructive knowledge of its technology being used
18   for any wrongdoing as they were not privy to the meetings and communications
19   between the AuraVie Defendants.  SM sent invoices that were paid for the services
20   rendered, no different than a landlord renting a premises to the AuraVie Defendants,
21   or USPS being used for shipping of the AuraVie products and being paid for this.
22   (Argaman Decl. at ¶ 5-6, 12-16).

23        Secured Commerce, a company that was started by Argaman and Doron Nottea,
24   sent one invoice for website development to the AuraVie Defendants.  As has been
25   explained repeatedly, and testified to under oath, that website was a "straight sale"
26   website where consumers simply could purchase the AuraVie products outright in one
27   transaction, not a negative option/continuity/risk-free trial website, and the services
28   were invoiced for a total of $13,500, which hardly provides a basis for holding

12

1    Secured Commerce responsible for all of AuraVie's negative option sales.  (Argaman
2    Decl. at ¶ 9, Argaman Depo., 49:8-25).

3         Yet, in its Interrogatory Responses, the FTC continues to blindly assert that SM
4    and Argaman did other web design work for the AuraVie Defendants without
5    providing any support for this assertion.

6         This type of third-party vendor relationship is not common control and not the
7    basis for imposing common enterprise liability.  See *FTC v. Kuykendall*, 371 F. 3d
8    745, 758-59 (10th Cir. 2004) (finding no common enterprise based on commonly
9    owned company providing and being paid for services such as equipment leasing,
10   billing, and collecting); *FTC v. National Urological Grp. Inc.*, 645 F. Supp. 2d 1167,
11   1183 n. 7 (N.D. Ga. 2008) (finding common enterprise where companies were not
12   "compensated for services" performed on the "on the other companies behalf.").

13        Here, unlike the situation in *Kuykendall*, SM is not commonly owned with the
14   AuraVie Defendants as Argaman is the sole owner, so the imposition of common
15   enterprise liability is even more unwarranted.

16        **3.   The Evidence Regarding the Sharing of Office Space Does not
17             Support the Imposition of Common Enterprise Liability.**

18        SMs/Argaman shared office space with Doron Nottea and his adult business in
19   Suite 105 of the Canby building.  Doron Nottea also used Suite 109 in that building
20   for his adult business.  Because he also performed some bookkeeping for the AuraVie
21   entities, Doron Nottea kept books and records for those entities in Suite 105.  There is
22   no evidence that Suite 105 was in any way the operational "nerve center" for the
23   AuraVie entities or Alon Nottea who ran those entities operated out of Suite 105.

24        The evidence shows that the AuraVie entities operated out of the 7900 Gloria,
25   Van Nuys CA address and briefly from a space at the Canby building in Suite 103.
26   Neither Secured Merchants nor Argaman had anything to do with those spaces.  The
27   AuraVie entities leased, paid for, and occupied those spaces without the involvement
28   of Argaman or SM.  (Argaman Decl. at ¶ 10-11).

When the AuraVie entities vacated that space some remaining inventory was moved into the space used by Doron Nottea's adult business pending disposition.

These incidental contacts fail to establish that SM was a part of a common enterprise.

### 4. There Is No Evidence of Comingling Funds.

Typically, one of the strongest indicators that defendants operate as a common enterprise is the comingling of funds. There is no evidence of that here. The AuraVie entities paid Secured Commerce and Secured Merchants for services rendered, but that does not constitute the requisite comingling of funds. See *Kuykendahl* supra 371 F. 3d at 758-59. Courts analyzing whether funds have been comingled so as to constitute a common enterprise focus on whether the companies pooled funds, shared expenses, and had unhindered movement of funds between them. See *FTC v. Neovi*, 598 F. Supp.2d 1104, 1116 (S.D. Cal. 2008); *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010) (finding a common enterprise where companies pooled revenues and assets for their collective use); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1210 (D. Nev. 2011) (same, where companies transferred funds among themselves through various undocumented loans and accounts receivable). The FTC has not provided any evidence of that type of conduct here, and the absence of this type of evidence is fatal to the allegation that SM participated in any common enterprise.

### 5. SM Did Not Share Advertising and Marketing With the AuraVie Defendants.

There is no evidence SM engaged in any shared advertising or marketing with the AuraVie entities.

As evidence of this, in its Interrogatory Responses, the FTC quotes from an unknown document, explaining that SM was in the business of selling skincare products, according to its founders. The documents referenced, AuraVie-0003024 - AuraVie-0003025, have nothing to do with this assertion. (Exh. 822, 823).

14

At its core, this is a case about deceptive marketing and advertising and not a shred of evidence has been produced by the FTC showing that SM had anything to do with the advertising or marketing in question.

This alone makes it clear that there is simply no basis for the imposition of any liability upon SM or Argaman.

### 6. **SM Did Not Share Business Functions With The AuraVie Defendants.**

In the First Amended Complaint, the FTC makes conclusory allegations that all of the corporate defendants shared business functions and that this supports finding a common enterprise. This vague and overbroad allegation does not rescue the failed effort to pin common enterprise liability on SM. Secured Merchants had limited business relations with the AuraVie entities, for which they sent invoices and were paid. (Argaman Decl. at ¶ 5-6). This does not create a common enterprise.

Similarly, the fact that Secured Merchants shared office space with Doron Nottea and that Mr. Nottea provided some bookkeeping services for both the AuraVie Defendants and Secured Merchants (again, the "bookkeeping services" were limited to being an authorized signer on a bank account and having the ability to write checks, but not even actually writing checks) (Argaman Decl. at ¶ 4) does not transform routine arms' length business relationships into a common enterprise.

SM invoiced the AuraVie Defendants, particularly SBM Management, for approximately $340,000 for technical services. (Exh. 833). These invoices detail these services and it is abundantly evidence upon looking at these invoices that the invoices are completely unrelated to the alleged sale of skincare using deceptive marketing and advertising.

There is no evidence that SM shared in any profits generated by the AuraVie entities. SM was a vendor paid for technological services. Nevertheless, the FTC seeks to hold SM and (and though this entity Argaman) jointly and severally liable for

15

the full amount of alleged consumer injury, an amount the FTC has stated to be in excess of $75 million.

The FTC brings this case under Section 13(b) of the FTC Act, 15 USC §53(b), which allows this Court to award a permanent injunction and other equitable relief. Imposing joint and several liability upon SM under these facts (or lack thereof) is anything but equitable.  SM's motion for summary judgment should be granted.

**B.  There Is No Basis For Holding Argaman Liable.**

The FTC seeks to hold Argaman liable based on his role at SM.  As explained above, the FTC lacks sufficient evidence to hold SM liable as part of an alleged common enterprise.  With the lack of evidence against SM, there is no basis for finding Argaman liable.

There is also no basis for finding Argaman liable for any alleged actions he took apart from his work through SM.   The Ninth Circuit has established a two-prong test for determining when an individual may be personally liable for corporate violations of the FTC Act; the FTC must prove that the individual: 1) participated directly in or had authority to control the unlawful acts or practices; and 2) had actual knowledge of the misrepresentation involved, was recklessly indifferent to the truth or falsity of the representation, or was aware of a high probability of fraud and intentionally avoided learning the truth.  *FTC v. Network Serv. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010); *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

There is no evidence that Argaman participated in or had the authority to control the alleged illegal conduct or that he possessed the requisite knowledge.

The Ninth Circuit has explained that "the common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known'" *Network Serv. Depot, Inc.*, 617 F.3d at

1141 n. 12 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007).)

Where the material facts are substantially undisputed, knowledge can be a question of law properly decided by summary judgment. See *Network Serv. Depot, Inc.*, 617 F.3d at 1139.

There is no evidence showing that Argaman actually knew of or was recklessly indifferent to purported misrepresentations or unfairness concerning the negative option, continuity, risk-free trials, and/or any of the other forms of deceptive advertising and marketing alleged.  (Argaman Decl. at ¶ 7, 12-16).

In the FTC's Interrogatory Responses, Argaman is alleged to have provided various services, such as assisting a call center with Alon Nottea (AuraVie-0002640 - AuraVie-0002641).  These two documents relate to something called "Hatch" and contain graphics that have no reference to SM, Alon Nottea, a call center, or Argaman. (Exh. 813-814).

The FTC further boldly claims that there are screenshots that show Argaman designing, creating, or managing a website offering risk free trial offers of skincare products.  Predictably, the "evidence" cited here is yet another document that has nothing to do with the allegation, let alone support the allegation.  See AuraVie-0003379, Exh. 825.  Bizarrely, this document appears to be some sort of cover sheet from the FTC, not even a document related to AuraVie.

Presumably, the FTC is referring to document AuraVie-0003380 (Exh. 839). However, this is nothing more than the AuraVie webmaster reaching out to SM for technical services involving internet protocols.  A plain reading of the email shows that Argaman/SM are not discussing anything whatsoever related to the designing, creating, or managing of the website.  Argaman simply pointed Victor Azal to the authority on the internet protocol governing authority, ARIN.  (Argaman Decl. at ¶ 23).

As Argaman stated in his deposition, he only ever worked on an AuraVie site that was a straight sale site, i.e. had no continuity, risk free trial offers, negative options, etc.  See Argaman Depo., 49:8-18).  The FTC chose not to ask Argaman about Exh. 839 at his deposition, and cannot now speculate about what this document means to defeat summary judgment.

Next, the FTC claims Argaman ordered a product that the Defendants sold using negative option and continuity plans, referencing AuraVie-0000264.  This document is literally a blank page with the words "Fluent" in the top left.  It is unclear how this document supports the FTC's assertions.  (Exh. 805).

The FTC continues its fairy tale by creating an "AuraVie Day, which is supposedly a promotional day to promote AuraVie products.  The document cited here, AuraVie-0001601, refers to a two day detox plan.  (Exh. 806).  The FTC has completely misinterpreted this document as a plain reading of the document itself shows that it has nothing to do with an actual promotional day but refers to a diet plan of some sort.  Most notably, this document does not reference SM or Argaman in any way, shape, form, and indeed, these parties never engaged in or had any knowledge of an AuraVie Day.  Once again, the FTC failed to ask Mr. Argaman about this document at his deposition, but now speculates as to what it might mean.  This is inadequate to defeat summary judgment.

In its Interrogatory Response, the FTC states that Argaman also supposedly set up toll-free numbers so Defendants could defraud and deceive banks and law enforcement according to the Interrogatory Responses. The sole document referred to in support of this very serious allegation is AuraVie-0002784.  (Exh. 816).  This document is an Articles of Incorporation for Pinnacle Logistics, a company Argaman or SM had no relationship with and this document does not even have anything to do with toll free numbers.   Once again, the FTC failed to question Argaman about this document or this subject matter during his deposition.

1    Next, the FTC maintains in its Responses that Argaman supposedly introduced
2    Doron Nottea to a product called LeElle and then furthermore consulted on the design
3    and ownership of this product, a product that the Defendants purportedly sold. (Exh.
4    802, p. 12).

5    The sole support provided for this is a picture of the product.  It is hard to
6    envision how, even after giving the FTC the entire benefit of the doubt, this picture of
7    a bottle of stretch mark reduction cream shows that Argaman introduced Doron Nottea
8    to this product, that Argaman helped design the packaging for this product, and that
9    Defendants sold this product.  (Exh. 809).  Once again, the FTC failed to question
10   Argaman on this subject during his deposition.

11   Next, in the Responses, the FTC quotes from a supposed Standard Service
12   Agreement that Argaman "possessed", yet does not reference the document or provide
13   a copy of it.  (Exh. 802, p. 13).   This is not admissible evidence sufficient to defeat
14   summary judgment.

15   The FTC then continues its pattern of making serious allegations without
16   providing any relevant support whatsoever, this time claiming that Argaman, through
17   Secured Commerce, assisted in shipping AuraVie products.  (Exh. 802, p. 13). The
18   documents referenced in support of this, AuraVie-0002607 - AuraVie-0002608, are a
19   Statement of Information for CBA, and a blank page, respectively.  (Exh. 811-812).
20   These have nothing to do with shipping AuraVie products and nothing of the sort
21   occurred as discussed above.  Once again, no questions were asked regarding this
22   document at Argaman's deposition.

23   The FTC also alleges that Argaman was  privy to the alleged wrongdoing of the
24   other Defendants, as he allegedly received "emails discussing the numerous shell
25   companies and merchant accounts Defendants used to sell AuraVie products by
26   negative option continuity plans", or AuraVie-0000476 - AuraVie-0000478. (Exh.
27   802, p 16) (Exh.  824). This document has nothing to do with any shell companies or

28

merchant accounts and Argaman is not even copied on all of the emails. No questions were asked regarding this document at Argaman's deposition.

In the Responses, Exh 802, p. 16, Exh. 807, the FTC cites AuraVie-0001847 as evidence that Argaman knew about "load balancing;" however, this document is apparently a payroll sheet that does not even reference Argaman or SM. Indeed, this document actually supports Argaman's defenses as he was not a part of the individuals listed as on the payroll team and did not have anything to do with any load balancing. No deposition questions were asked regarding this document.

Putting aside the FTC's nonsensical Interrogatory Responses, the evidence and testimony clearly show that Argaman, by and through SM, was a vendor, and did not interact with consumers of the AuraVie products, did not design the content on the AuraVie website, did not create the copy used by the AuraVie Defendants to market and sell their product, did not create the scripts used by the AuraVie Defendants' customer call center, did not himself process or approve/deny any consume chargebacks made against AuraVie, and did not decide which products to ship or sell. (Argaman Decl. at ¶ 2, 3, 5, 6, 12-16).

As explained above, the technology services that SM provided to the AuraVie Defendants was developing and installing a portal through which chargebacks could be viewed and processed and an IVR system. There is no evidence that SM or Argaman responded to chargebacks on behalf of the AuraVie entities or was responsible for how customer service calls were disposed of. (Argaman Decl. at ¶ 5, 6, 13, 16).

Argaman provided technology services, not customer service, and there is no credible, probative, admissible evidence to the contrary. (Argaman Decl. at ¶ 12-16). The case law is clear this Argaman's limited involvement is insufficient for imposing individual liability. Notably, Argaman was not even paid any monies from SM or the AuraVie Defendants at any time, let alone from the sale of AuraVie products. (Argaman Decl. at ¶ 22).

1    Compare *FTC v. Freecom C'ommo'n, Inc.*, 401 F.3d 1192, 1205 (10th Cir.

2  2005) (finding individual defendant liable where evidence of frequent meeting

3  attendance, final control over all senior hiring and marketing campaigns, and status as

4  controlling shareholder of a closely held corporation supported inference of authority

5  to control corporate defendant) with *FTC. v. Swish Mag.*, No. C 09-03814 RS, 2010

6  WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (rejecting FTC's argument that individual

7  defendant's "status as CEO, standing alone, plausibly demonstrates his control over

8  the company and warrants the inference of involvement in the deception" in granting

9  CEO's motion to dismiss) and *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1277

10  (M.D. Fla. 2012) (although individual defendant had authority over day-to-day affairs

11  of corporate defendant, it was not until another employee was terminated and she

12  obtained authority over the sales division one could infer she had the authority to

13  control the sales people and their use of a deceptive sales script.)

14    The FTC argues that Argaman was involved in other aspects of the common

15  enterprise including shipping and affiliate marketing and cites documents as support.

16  However, these documents do not support the assertion for which the FTC offers

17  them.

18    Exhibit 831, cited by the FTC numerous times in this case, relates to the fact

19  that the product size of the AuraVie product changed in 2013.  Mr. Medina asked Mr.

20  Argaman to make sure that this change was reflected properly on the straight sale

21  website that Mr. Argaman helped set up (AuraVie.com) and to confirm the new lower

22  shipping rate for the smaller package.  This email and the conduct surrounding it

23  demonstrate nothing about Mr. Argaman directly participating in the alleged deceptive

24  conduct.  It simply confirms what Argaman readily admitted: that he did helped create

25  the AuraVie straight sale website that was not alleged by the FTC to have been a part

26  of any wrongdoing as it did not used any negative option sell method or anything of

27  the sort.

28

1      Exhibit 832, also cited by the FTC numerous times, relates to the "straight sale"

2 offer website for the AuraVie products and to the work that Mr. Argaman discussed in

3 his deposition regarding developing a website for that offer.  It does not relate in any

4 way to affiliate marketing or the negative option offer/continuity that is the predicate

5 for the FTC allegations.  (Argaman Decl. at ¶ 9).

6      Neither of these exhibits, nor any of the evidence in the case, supports the

7 assertion that Argaman participated directly in or had the ability to control the alleged

8 illegal conduct, and his limited technology consulting work is an insufficient basis

9 upon which to impose individual liability.

10      This failure renders this case different from those in which individual liability is

11 imposed and requires his dismissal.  See e.g. *FTC v. Stefanchik*, 559 F.3d 924, 931

12 (9th Cir. 2009) (individual defendant, who was owner, sole shareholder, director and

13 manager of company, held liable where he controlled the marketing activity and

14 representations about the product, was informed after his counsel reviewed the scripts

15 that he would need to be able to substantiate his claims (and could not), and was

16 informed by others that the sales representatives were misleading consumers); *FTC v.*

17 *Publ. Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1996) (finding that

18 defendant controlled the deceptive acts in question, where "substantial facts before the

19 Circuit . . . detailed the defendant's relationship not only to the corporation but also to

20 its telemarketing scheme.") (emphasis added); *FTC v. Amy Travel. Serv., Inc.*, 875

21 F.2d 564, 574 (7th Cir. 1989) (finding "clear" evidence of defendants' authority and

22 involvement where they "were the principal shareholders and officers of the closely

23 held corporations," "created the businesses, opened new ones, wrote telemarketing

24 scripts, and hired personnel" and "controlled the financial affairs of the companies and

25 reviewed the sales reports and other information"); *FTC v. Am. Standard Credit Sys*

26 *Inc.*, 874 F. Supp., 1080, 1089 (C.D. Cal. 1994) (finding FTC entitled to injunctive

27 relief against CEO and company president who participated in the day-to-day

28 operations of the company, formulated, reviewed, approved implemented, and

disseminated their company's marketing policies and procedures, and "monitored the marketing activities'.' of its third-party marketers).

C. **The Claim Against Relief Defendant Chargeback Armor Also Should Be Dismissed**.

The First Amended Complaint alleges that CBA received ill-gotten funds from the alleged wrongdoing to which it is not entitled. The only funds that the FTC has identified are the $250,000 that SM invested in CBA. (Doc. 231, p. 2: 8-10).

The FTC maintains that SM invested money in CBA and that these funds constitute ill-gotten gain to which CBA has no legitimate claim making CBA a relief defendant. This allegation also is fatally flawed and contradicted by the evidence.

First, because SM was not a part of any alleged common enterprise, there is no basis for keeping it in the case. Without SM in the case, there is no basis for continuing to assert that CBA received any alleged ill-gotten gain.

Second, Secured Merchants and CBA have supplied bank records, invoices, copies of contracts, and sworn testimony demonstrating that the $250,000 that SMinvested in CBA came from work SM performed for clients other than the AuraVie Defendants. (Exh. 834-838). Thus, there is no evidence that CBA received any ill-gotten gain from the conduct alleged in the First Amended Complaint.

This was a simple business transaction that the FTC cannot arbitrarily claim was illegal: SM provides technological services and three of its clients were the Wealth Group, Inc., Wealth Vision, Inc., and Big Ventures, Inc., three companies not part of this lawsuit, unrelated to the Defendants, and unrelated to the sale of AuraVie. (Exh. 834-836, Argaman Decl. at ¶ 18).

SM then took this $250,000 and chose to make a capital investment into CBA in exchange for future equity in CBA, once the valuation of CBA was more established. This was attested to in Argaman's deposition and the contract for this transaction was provided, as well as the bank statements showing the transfer. (Argaman Decl. at ¶ 18, 19, 20, Argaman Depo., 95: 14-25, 96:1-25).

23

1    Third, while the FTC would like to claim differently, Argaman had no role with

2  CBA and this cannot be used to hold CBA liable either (even assuming the FTC can

3  overcome the insurmountable task of somehow showing Argaman is liable for

4  anything).  (Argaman Decl. at ¶ 21, Costache Decl. at ¶ 1-2, 7).  No other Defendant

5  had any formal role with CBA as a shareholder or director either.  (Costache Decl. at ¶

6  2, 7).

7    In its Interrogatory Responses (Exh. 802) the FTC argues that Argaman was

8  supposedly on the Board of CBA, according to AuraVie-0002962 - AuraVie-0002964.

9  However, these documents do not even relate to Argaman.  (Exh. 818-819).

10    Argaman also allegedly incorporated CBA according to the FTC (Exh. 802, p.

11  15), yet AuraVie-0003497 that the FTC references does not show this.  (Exh.  828)

12  Indeed, Costache has always been the sole officer, director, and shareholder of CBA

13  and is the one that incorporated the company, as Secretary of State filings show

14  (Costache Decl. at ¶ 1).

15    Multiple times in these same Responses, Alon Nottea is alleged to have stated

16  that "CBA was used by the common enterprise to refute consumer chargebacks."

17  (Exh. 802, p. 13).  There is not one shred of evidenced cited to support this; no

18  documents, no deposition testimony.

19    For all these reasons, the claim against CBA should be dismissed.

20                                                **IV.**

21                                        <u>**CONCLUSION**</u>

22    For the aforementioned reasons, Argaman, CBA, and SM should be granted

23  summary judgment against the FTC on all of the claims the FTC alleges against these

24  Defendants as there is simply no evidence (after a year of litigation and two months

25  before trial) that these Defendants can be held liable for any wrongdoing, even if this

26  matter proceeded to a trial.  These defendants must be dismissed from the case, be

27  awarded their costs, and any monies of theirs that are frozen by the FTC and the

28  FTC's Receiver must be unfrozen and released to them.

1   DATED:  April 18, 2016

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BEVERLY HILLS LAW CORP., PC**


By:   /s/ Sagar Parikh
      Sagar Parikh, Esq.
      *Attorneys for* Alan Argaman, Chargeback
      Armor, Inc. and Secured Merchants,
      LLC

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

        The undersigned certifies that on April 18, 2016, a true and correct copy of
the foregoing document was electronically emailed to the attorneys listed below.

4

5
Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor

6
Beverly Hills, CA 90212
esyverson@raineslaw.com

7
*Counsel for Oz Mizrahi*

8
Robert M. Ungar
Crosswind Law

9
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403

10
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*

11
*Roi Rueveni*

12
Randi R. Geffner
Esensten Law

13
12100 Wilshire Blvd.
Suite 1660

14
Los Angeles, CA 90025
(310) 273-3090

15
RGEFFNER@ESENSTEINLAW.COM
*Counsel for Doron Nottea and Motti Nottea*

16

Jeffrey S. Benice

17
Law Offices of Jeffrey S. Benice
3080 Bristol Street

18
Sixth Floor, Suite 630
Costa Mesa, California 92626

19
E-Mail: JSB@JeffreyBenice.com
*Counsel for Igor Latsanovski and*

20
*CalEnergy, Inc.*

Benjamin A Pettit
20 East Pueblo Street
Santa Barbara, CA 93105
*Counsel for Alon Nottea*

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
*Counsel for FTC*

Sagar Parikh, Esq.

**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO
DEFENDANT IGOR LATSANOVSKI'S
REQUESTS FOR PRODUCTION**
Page | 2