# EXHIBIT "B"

# In the Matter of:

# FTC v. Bunzai Media Group, Inc., et al.

*January 28, 2016*
*Igor Latsanovski*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

### 25

1  A  Yes.
2  Q  And I guess -- I suppose I should ask: How
3  did you know that Alon and Khristopher were the owners
4  of BunZai Media Group?
5  A  I didn't know what is to know. I haven't
6  checked any paperwork.
7  Q  Sure.
8  A  Because I invest money in people.
9  Q  But I suppose what I'm asking is: Did -- did
10 they represent to you that they were owners of BunZai
11 Media Group?
12     MR. UNGAR: Objection --
13     THE WITNESS: Yes.
14     MR. UNGAR: -- as to the form of the
15 question. Vague and ambiguous.
16 BY MR. TEPFER:
17 Q  And this final agreement that we were
18 discussing in which you received one-third of the
19 profits, what period of time did that arrangement
20 cover?
21 A  Until the BunZai companies closed.
22 Q  And when did -- when was that agreement
23 started?
24 A  Because they changed the conditions between
25 us. So for me, the most important thing was to get my

### 26

1  investment back and to get some kind of profit. If
2  we're talking about a specific date, I don't even
3  know.
4  Q  So that agreement where you -- I guess, where
5  you and Alon and Khris agreed that you would receive
6  one-third of the profits, when did -- I guess, when
7  did y'all come to that agreement?
8      MR. UNGAR: Objection as to the form of the
9  question. It's vague and ambiguous.
10     THE WITNESS: The conditions between us
11 changed so often, and I'll say it again.
12     They changed so often that for me, from the
13 very beginning of the loan -- from when I gave them
14 the loan, regardless of -- for what they were calling,
15 regardless of any intermediate agreements, for me, it
16 was the idea to get some profit from this loan.
17 BY MR. TEPFER:
18 Q  Okay. And you said that the terms of the
19 various agreements that you had with Alon and
20 Khristopher changed frequently.
21     Was -- that one-third profit term, was that a
22 constant in the various agreements?
23     MR. UNGAR: Objection as to the form of the
24 question. It's vague and ambiguous, misstates his
25 prior testimony. It's argumentative.

### 27

1      THE WITNESS: I don't understand. I don't
2  understand what you would call the essence of the
3  question.
4  BY MR. TEPFER:
5  Q  Okay. Well, I suppose -- when did you make
6  the initial loan to BunZai Media Group?
7  A  In the year of 2010.
8  Q  Okay. And did you make loans subsequent to
9  that?
10 A  We had agreement that I would open a credit
11 line up to half a million dollars; and constantly I
12 would give them the loan, and they would repay. I
13 would give it, and they would repay it.
14 Q  And when you made that initial loan -- well,
15 I suppose -- when you first met Alon and Khristopher
16 to discuss BunZai Media Group and your potential loan,
17 did they make a sales pitch to you about the company?
18 A  I don't remember exactly. It was so many
19 years ago. So many things have happened during this
20 time, especially in the last six months.
21 Q  Sure. Do you recall discussing what the
22 business was when -- or sorry, when you made that
23 initial loan, do you recall discussing with them what
24 the business was that you would be loaning money to?
25 A  Yes.

### 28

1  Q  What did they explain to you that you would
2  be investing in?
3      MR. BENICE: You mean what entity he would be
4  loaning the money to?
5  BY MR. TEPFER:
6  Q  Or the -- sorry. To explain, did they -- did
7  Alon or Khristopher describe what -- what product it
8  was you would be investing in?
9  A  They showed the final product to me, and I
10 liked the way it looked.
11 Q  Did you review any of their advertisements at
12 that time?
13     MR. UNGAR: Objection as to the form of the
14 question. Vague and ambiguous, assumes facts not in
15 evidence.
16     THE WITNESS: Discussed numbers with them
17 because I'm an investor. For me, even I didn't try to
18 understand the word. The Internet, for me, was
19 something from the clouds.
20 BY MR. TEPFER:
21 Q  Sorry. The -- you were unfamiliar with the
22 Internet?
23 A  No. I was familiar with the Internet; but
24 selling something on the Internet, that was something
25 that, for me --

7 (Pages 25 to 28)

```
                                          41
 1   referring to a specific instance where -- that you're
 2   aware of that you signed papers that said you were an
 3   employee?
 4       A   No. It's just I remember there's always so
 5   much paperwork and all this paperwork in the company,
 6   and maybe there was some documents that they gave me
 7   to sign mistakenly or not mistakenly.
 8          I gave them a loan, and I always wanted to --
 9   for them to give me the interest and to get the
10   principal back.
11          They constantly tried in various ways to not
12   return the money to me, and they offered various ways
13   of how they're going to be repaid and always postponed
14   the repayment.
15          I was ready to agree for them to call this
16   money anything they wanted just so that I could get it
17   back.
18       Q   Do you -- you said that you were a nominal
19   owner of Zen Mobile Media, Inc.
20          Did you -- and you signed, I suppose,
21   paperwork for Zen Mobile Media, Inc.?
22       A   What paperwork do you mean?
23       Q   For example, did you ever sign applications
24   for merchant accounts for Zen Mobile Media, Inc.?
25       A   I don't remember. If there are any
```

```
                                          42
 1   applications with my signature, then I did. If there
 2   aren't any, then I didn't. I just don't remember.
 3       Q   Do you recall who would ask you to sign
 4   documents concerning Zen Mobile Media, Inc.?
 5       A   Yes.
 6       Q   Who was that?
 7       A   Alon.
 8       Q   Did anyone else ever request that you sign
 9   documents concerning Zen Mobile Media, Inc.?
10          MR. UNGAR: Objection as to the form of the
11   question. Vague and ambiguous, calls for speculation.
12          THE WITNESS: No.
13   BY MR. TEPFER:
14       Q   And was -- you stated that you were only the
15   nominal owner of Zen Mobile Media, Inc.
16          Who was -- in your understanding was the real
17   owner of Zen Mobile Media, Inc.?
18       A   I don't know.
19       Q   Why did you allow Zen Mobile Media, Inc. to
20   be opened in your name?
21          MR. UNGAR: Objection as to the form of the
22   question. Vague and ambiguous and argumentative.
23   BY MR. TEPFER:
24       Q   You can go ahead.
25          MR. BENICE: If you understand the question.
```

```
                                          43
 1          THE WITNESS: Can you please repeat it?
 2          (Record read.)
 3          THE WITNESS: Alon asked me about it.
 4   BY MR. TEPFER:
 5       Q   So Alon Nottea asked you to open that
 6   company?
 7       A   Yes.
 8       Q   Did he state why he wanted you to open Zen
 9   Mobile Media, Inc.?
10       A   Well, I trusted him. I trusted him with
11   money, so. He said the company's growing, expanding,
12   so we need another company, and I okayed it.
13       Q   I'm going to maybe shift gears a little bit
14   to talk about other -- other companies that you own.
15          (Discussion off the record.)
16          MR. TEPFER: Yeah. Maybe now would be a good
17   time for a lunch break -- if we could go off the
18   record -- if that's good for everyone.
19          THE WITNESS: Okay.
20          MR. GALLEGOS: We're off the record.
21          (Noon recess.)
22          MR. TEPFER: We're back on the record.
23       Q   So before the break we were talking a little
24   bit about some of the other companies that you -- I
25   wanted to see if we could talk about VastPay.
```

```
                                          44
 1          Could you tell me what -- what VastPay's
 2   business is?
 3       A   Okay. VastPay is a company that I opened
 4   together with Eugene in order to buy -- to buy
 5   wholesale small companies and to make it a big
 6   company.
 7       Q   And that's Eugene Shampansky?
 8       A   Yes, Shampansky.
 9       Q   Do you know how to spell that for the court
10   reporter?
11          MR. TEPFER: I'll be able to get that to you.
12       Q   So you said that it's a company that you
13   started with Eugene to buy other companies?
14       A   Small ones. It was Eugene's idea to buy
15   small ones and make a big one.
16       Q   So it's an investment firm? Is that --
17       A   In the area of merchant business.
18       Q   So by "merchant business" do you mean
19   merchant processing?
20       A   That's -- that's just the name of the
21   company. The idea was to buy companies with existing
22   clients because they don't cost as much; and then when
23   the companies are bigger, when it has a lot of
24   clients, the idea is it's going to cost more.
25       Q   And what does VastPay do for its clients?
```

### Page 57

1  A   During the -- if we take the last five years,
2  I know that at some point -- some period of time
3  during those five years they were located there.
4  Q   And what -- what's the address that -- or
5  location that you're referring to?
6  A   In the Valley, but I don't remember the
7  address. I remember physically where it is, but I
8  don't have it in my memory.
9  Q   Sure. Do you know if it was Van Nuys?
10 A   Most probably, yes.
11 Q   Does 7900 Gloria Avenue sound correct to you?
12 A   Yes, it does.
13 Q   Do you know if AuraVie was one of the
14 products that the call center provided customer
15 service support for?
16     MR. UNGAR: Objection as to the form of the
17 question. Vague and ambiguous.
18     THE WITNESS: Probably.
19 BY MR. TEPFER:
20 Q   And why do you believe that it is likely that
21 Pinnacle Logistics provided customer service support
22 for AuraVie products?
23 A   For many indications.
24 Q   Can you provide some of those indications?
25 A   Well, they were located in the same building,

### Page 58

1  yes. Call center expenses; that is, the call center
2  services were paid to them. Just in general, you
3  know. I can't tell you specific dot by dot things,
4  but in general.
5  Q   And you said the same building -- the same
6  building -- Pinnacle Logistics was in the same
7  building as what?
8  A   Where Alon was.
9  Q   And you said that call center services were
10 paid to -- I think you said call center services were
11 paid to them.
12     Could you explain that?
13 A   That's not what I said.
14 Q   Oh, sorry.
15 A   You didn't interpret it correctly.
16     I said that Alon paid the call center for its
17 services.
18 Q   Okay. Do you know other companies that were
19 located in that building?
20 A   I know that for a while in this business --
21 in this building another business was located, but I'm
22 not sure.
23 Q   Do you know what that business sold?
24     THE INTERPRETER: Could you repeat this for
25 the interpreter, please?

### Page 59

1      MR. TEPFER: Sorry.
2  Q   Do you know what that other business sold?
3      THE INTERPRETER: Are you saying sold,
4  Counsel?
5      MR. TEPFER: Sold. Uh-huh. Sorry.
6      THE WITNESS: To who? Interpreted as
7  specifically who was it sold to, this business.
8  BY MR. TEPFER:
9  Q   Oh. I'm just curious if you know what this
10 other -- the business purpose of -- this other
11 business located at that 7900 Gloria, if you knew what
12 that business purpose was.
13 A   I can only assume.
14     MR. BENICE: Don't assume. If you don't
15 know, tell him you don't know.
16     THE WITNESS: I don't know.
17 BY MR. TEPFER:
18 Q   Did you ever hire anyone to do any work for
19 Zen Mobile Media, Inc.?
20 A   No.
21 Q   Doron Nottea testified that you had hired him
22 to do bookkeeping services for Zen Mobile, Inc.
23     Do you know why he would say that?
24     MR. UNGAR: Objection as to the form of the
25 question. Vague and ambiguous.

### Page 60

1      THE WITNESS: I never managed Zen Mobile
2  company. That's why even theoretically I couldn't
3  hire anybody for work.
4  BY MR. TEPFER:
5  Q   So if we were to go back to the BunZai group
6  of companies, is it -- is it your understanding that
7  Alon Nottea owned multiple companies that sold the
8  AuraVie product?
9  A   My understanding is that I gave the money as
10 an investment, and how he managed it wasn't my
11 business. I didn't try to understand. My goal was to
12 have my loan repaid with interest as soon as possible.
13 Q   My question was: Do you know if Alon Nottea
14 owned multiple companies that sold AuraVie?
15 A   No. I don't know. I don't know. I don't
16 know how he functioned.
17 Q   And do you know if he asked other individuals
18 to open companies to, I guess, grow the business as
19 you said?
20     MR. UNGAR: Objection as to the form of the
21 question. Vague and ambiguous, calls for speculation,
22 lacks foundation.
23     THE WITNESS: I can guess, but I do not know
24 exactly.
25 BY MR. TEPFER:

15 (Pages 57 to 60)

                                                                  65

1   Exhibit 16.
2       MR. BENICE: 60?
3       MR. TEPFER: 16.
4   Q   Have you ever seen this Web site?
5   A   What is have I seen?
6   Q   Like, have you ever -- sorry. Maybe we're --
7   A   It's just too abstract. I need to see.
8   Q   Have you -- have you ever -- before the
9   filing of this lawsuit, have you ever seen this
10  advertisement before?
11  A   I don't remember exactly. Maybe briefly when
12  I was running around when I popped into the office and
13  saw it; but if you want to ask if anybody specifically
14  showed me this Web site and told me what's on it, then
15  no.
16  Q   And you said you might have seen it when you
17  popped into the office.
18      Are you referring to BunZai Media Group?
19  A   Yes, maybe.
20  Q   How often would you stop by the offices
21  there?
22  A   What do you mean by "often"?
23  Q   Would you go by once a month?
24  A   And for what purpose?
25  Q   Just for any purpose.

                                                                  66

1       Would you go once a month?
2   A   Sometimes once a month. Sometimes once every
3   six months.
4   Q   Would you ever go by once a week?
5   A   I don't remember.
6   Q   I guess on -- what -- for what purpose would
7   you -- would you go to the BunZai Media Group offices?
8   A   For the most part it was to discuss new
9   projects with Alon.
10  Q   Did y'all ever have meetings about BunZai
11  Media Group?
12  A   We had meetings to discuss financial results
13  of Alon's business.
14  Q   Who would typically attend these meetings?
15      MR. UNGAR: Objection. Vague and ambiguous.
16      THE WITNESS: It varied from time to time,
17  but most frequently me and Alon.
18  BY MR. TEPFER:
19  Q   Would -- did Doron ever attend any of these
20  meetings?
21  A   I don't remember. Maybe some. I don't
22  remember exactly; but in my memory, I don't remember
23  any.
24  Q   What about Roi Reuveni?
25  A   Same.

                                                                  67

1   Q   Do you know who was in charge of creating
2   advertisements for -- or overseeing rather -- the
3   advertising department at BunZai Media Group?
4   A   My understanding or exactly?
5   Q   Your understanding.
6   A   As far as I understand, Khristopher was
7   responsible for the advertising.
8   Q   Did you know if the AuraVie products were
9   sold by or were offered as a free trial?
10      MR. UNGAR: Objection as to the form of the
11  question. Vague and ambiguous.
12      THE WITNESS: Yes.
13  BY MR. TEPFER:
14  Q   How did you know that?
15  A   Alon, with Khristopher, told me.
16  Q   So they explained that they would offer a
17  free trial, and then what was your understanding of
18  the terms of the free trial?
19  A   They said we have an amazing product, and I
20  know it myself because I brought it to Europe and
21  everybody liked it. So every time when I would travel
22  to Europe I would get calls, "Please bring it. Please
23  bring it."
24      MR. BENICE: Just listen to his question.
25      THE WITNESS: Okay.

                                                                  68

1       MR. BENICE: Do you want the question read
2   back?
3       THE WITNESS: Please read it back.
4       (Record read.)
5       MR. BENICE: If you know.
6       THE WITNESS: They said that this product --
7   they're going to let people try it. That's all I
8   knew. For five years I saw good results. People
9   liked it for the most part. My wife -- my wife likes
10  it as well.
11  BY MR. TEPFER:
12  Q   Did you understand that if the product was
13  not returned within a particular time period that the
14  customer would then be charged a certain amount for
15  the skin cream?
16      MR. UNGAR: Objection as to the form of the
17  question. It's vague and ambiguous and assumes facts
18  not in evidence.
19      THE WITNESS: Okay. I know that Alon used
20  various ways to sell the product; but specific
21  details, techniques, I never really tried to
22  understand it deeply. They changed drawings or did
23  some other things.
24  BY MR. TEPFER:
25  Q   They changed drawings?

                                              17 (Pages 65 to 68)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

### 73

```
 1     A   I don't remember a single check personally
 2   with my name from the BunZai company.
 3          (Exhibit 18 marked.)
 4          MR. TEPFER: I'm now handing the witness
 5   what's been marked as Exhibit 18.
 6     Q   This collection of documents, are you
 7   familiar with these documents?
 8     A   Yes.
 9     Q   Is that your initials and signature -- well,
10   like, I suppose -- I'm sorry. Go ahead.
11          On that first page with 18-2, is that your
12   initials down at the bottom?
13     A   Yes.
14     Q   And on 18-3, is that your signature?
15     A   Yes.
16     Q   And, I guess, on 18-4 on that check, is that
17   your signature?
18     A   Yes.
19     Q   And 18-5, is that also your signature?
20     A   Yes.
21     Q   And the last one just on 18-6, that's your
22   signature as well; correct?
23     A   Yes.
24     Q   Oh, did I forget one?
25          On 18-7, is that your signature?
```

### 74

```
 1     A   Yes.
 2     Q   On the first -- I guess on 18-2 -- and these
 3   are my own highlights here -- that first highlight, do
 4   you -- the ownership shares, during -- was that ever
 5   the ownership shares of BunZai Media Group or the
 6   ownership distribution?
 7          MR. UNGAR: Objection as to the form of the
 8   question. Vague and ambiguous.
 9          THE WITNESS: Look at the next document,
10   18-5. Everything is explained there, that it was a
11   loan.
12   BY MR. TEPFER:
13     Q   Sure. But to -- my question is a little
14   different, though.
15          As far as these -- was there ever a period of
16   time where the ownership distribution was -- of BunZai
17   Media Group was 55 percent to you, 22.5 percent to
18   Alon, and 22.5 percent to Khristopher Bond?
19     A   We signed a great deal of documents. This is
20   one of the ways or means for commerce between us. We
21   only have three documents here, but we signed at least
22   five or six.
23          You now are simply trying to ask me about
24   intermediate negotiations, but I'm talking about our
25   final agreement that -- and the agreement is that I
```

### 75

```
 1   give them a loan and that they pay it back and pay me
 2   interest of -- of one-third of the profits.
 3     Q   So was there ever a period of time where the
 4   ownership distribution was what is stated here?
 5     A   No.
 6     Q   And so in October of 2010, the -- on the date
 7   of this signature, is it your testimony that that
 8   ownership distribution of BunZai Media Group was
 9   different than what's stated up here?
10     A   Because during the same period of time there
11   were other documents signed.
12     Q   And so your testimony is that there are other
13   documents signed at the same time that conflict with
14   the ownership distribution in this document?
15          MR. UNGAR: Objection as to the form of the
16   question. It's vague and ambiguous, misstates prior
17   testimony of the witness.
18          THE WITNESS: We signed and developed at the
19   same time and at different times various documents.
20   This is just a part of them.
21          The most important thing is that from day
22   one -- it was agreed that from day one it is a loan,
23   and I will have one-third of the income regardless of
24   what kind of documents we have signed in between.
25   BY MR. TEPFER:
```

### 76

```
 1     Q   And to go down to the second part that I
 2   highlighted on 18-2, where it says "Upon signing this
 3   agreement, Igor shall invest $75K to run a continuity
 4   test for 30 days," do you know what that statement is
 5   referring to?
 6     A   I'll say it again. This is a document that
 7   never came into force because it's an intermediate
 8   document that was signed in between while we were
 9   negotiating on the terms.
10          The most important term was that from day one
11   from when I gave my first check, it's a loan and it's
12   payable back with interest on my investment as a
13   percentage, and that all the papers that we have
14   signed between ourselves were not and are not valid.
15          MR. TEPFER: I guess I'll object as
16   nonresponsive.
17     Q   I guess what -- I'm just curious.
18          Is it your understanding that the -- this
19   continuity test never occurred?
20          MR. UNGAR: Objection as to the form of the
21   question. Vague and ambiguous.
22          MR. BENICE: Do you understand his question?
23   Restate the question, please.
24          THE WITNESS: Confusing all the time.
25          (Record read.)
```

```
                                      77
 1        MR. UNGAR: Same objection.
 2        THE WITNESS: What exactly did not occur?
 3   BY MR. TEPFER:
 4     Q  So, I guess, first I had better clarify.
 5        It says "Igor shall invest $75K to run a
 6   continuity test."
 7        Do you know what a continuity test is?
 8     A  I'll explain one more time. We signed a lot
 9   of papers as a method of how to negotiate with each
10   other. It's a pile of papers.
11        What do you want to ask me? Like this paper
12   was valid for five minutes, and for the other one it
13   didn't. I just don't understand what I need to say.
14        MR. BENICE: Listen to the question. Just
15   answer the question.
16        THE WITNESS: Okay. (In English)
17        MR. BENICE: No editorial.
18        THE WITNESS: Okay. (In English)
19   BY MR. TEPFER:
20     Q  I just -- the aspect I'm curious about is
21   whether you -- whether you know what a continuity test
22   is.
23     A  Can you translate this for me?
24        THE INTERPRETER: Would you like the
25   interpreter to translate the paragraph?
```

```
                                      78
 1        MR. TEPFER: Sure. Sure.
 2        Would you mind translating?
 3        THE WITNESS: It doesn't say here that the
 4   use was going to happen for 30 days, that the test was
 5   going to run for 30 days, and within 30 days they will
 6   have to show that they're selling the product.
 7        MR. BENICE: His question is: Do you know
 8   whether there was a continuity test? That's his only
 9   question. Yes or no or you don't know.
10        THE WITNESS: I don't remember.
11   BY MR. TEPFER:
12     Q  And do you know what a continuity test is?
13     A  The way I understand it here is that they had
14   30 days to -- to show me that they actually have
15   sufficient volume of sales.
16     Q  And, I guess, towards the end of that
17   highlighted section it says -- it refers to a
18   conversion from free trial to transitional stage.
19        Do you understand what that is referring to?
20     A  No. I didn't even read this document when we
21   signed it, because I was giving money. I was
22   investing money in people.
23     Q  I guess if you could turn to 18-6. Those
24   highlights are mine.
25        Do you recall reviewing this document at any
```

```
                                      79
 1   point?
 2     A  Yes.
 3     Q  So you read this or had this translated when
 4   you signed it?
 5     A  I don't remember, but I understand what it
 6   talks about.
 7     Q  And it says on the next page on 18-7 that it
 8   was signed in March of 2011.
 9        Do you know if you signed any other
10   partnership agreements for BunZai Media Group after
11   this date?
12     A  I don't remember, but most probably yes.
13   There was a bunch of papers all the time.
14     Q  Down at the bottom, the last highlight there
15   says "Igor - 1/3 of 100% of the company."
16        Was that your -- or this distribution
17   referenced here, was that your understanding of the
18   partnership shares or ownership in March of 2011?
19     A  No. We agreed that I'm going to get
20   one-third of the profits, and I don't have any
21   ownership share in the company.
22        And Khristopher categorically objected to
23   those terms.
24     Q  Do you know if Alon or Khristopher also
25   received, I guess, a percentage of net profits?
```

```
                                      80
 1     A  As far as I can guess, yes.
 2     Q  18-7, the last -- or rather that -- after
 3   Number 6, the section I highlighted there, it states
 4   "Igor shall receive a minimum salary of $5K per month
 5   (starting April 1st, 2011)."
 6        Did you ever receive a monthly salary of
 7   $5,000 from BunZai Media Group?
 8     A  This was a way -- because what they did was
 9   they assigned 15,000 a month salary to each of them.
10        And I said, "Guys, there's a person who's
11   providing the loan. With those kind of expenses,
12   I will never be able to get any kind of profit." And
13   I said, "Give me at least some type of guaranteed
14   minimum."
15        And they -- "minimum interest on my money."
16        And they put down 5,000, but it's a technical
17   error that it's a salary. I think in subsequent
18   documents this error was corrected.
19     Q  And this collection of documents that is
20   Exhibit 18 was found in a folder in Doron Nottea's
21   office.
22        Do you know why he would be in possession of
23   these contracts?
24     A  Because he helped his brother to store all
25   the paperwork because he was organized and Alon was
```

**Page 101**

1  get upset that if he made some mistakes in running the
2  business, he -- there are other ways and it's not the
3  end of the world.
4       And all the example is they are just
5  associations that are examples that come together,
6  because if you're too abstract, the person is not
7  going to be able to understand you. They're not going
8  to understand what you're trying to tell them
9  emotionally.
10       THE WITNESS: Can we go to the restroom? (In
11  English)
12       MR. TEPFER: Sure. Take a five-minute break.
13       (Recess.)
14       MR. TEPFER: We can go back on the record.
15   Q  I guess if we could go to -- well, maybe not
16  yet.
17       Do you know what UMS Banking is?
18   A  Yes.
19   Q  What is it?
20   A  It's a business that's involved in merchant
21  business.
22   Q  Have you ever done any business with UMS
23  Banking?
24   A  Me personally, no.
25   Q  How did you become familiar with UMS Banking?

**Page 102**

1   A  From Alon.
2   Q  What did Alon tell you about UMS Banking?
3   A  Big, good company.
4   Q  And did he tell you that this was a company
5  that was used for processing charges to consumers for
6  the sale of AuraVie products?
7   A  He said that he was working together with
8  them. What specific products, I don't know.
9       (Exhibit 23 marked.)
10       MR. TEPFER: I'm just handing the witness
11  what's been marked as Exhibit 23.
12   Q  So this e-mail is from Alon Nottea in 2013.
13       Do you remember receiving this?
14   A  No. Well, but if it has my -- you know, if
15  I'm on here, it means I received it.
16   Q  And is it -- is it your opinion that you
17  likely reviewed this e-mail and don't remember?
18   A  Doubt it. Because when Alon would send me
19  e-mails, it would, for the most part, be when I call
20  him and I ask him about the repayment of my investment
21  and the interest; and he would send me an e-mail back,
22  so maybe that would be one of them, I don't know, as
23  an excuse why he's not paying it back mostly -- most
24  probably, but I don't know.
25   Q  In the forwarded e-mail from Joyce Gaines at

**Page 103**

1  Number 3 it says "In the event of an FTC closure they
2  will freeze our reserves on your accounts
3  immediately."
4       Did Alon Nottea ever discuss with you before
5  June of 2015 the possibility of a -- or risk of an FTC
6  enforcement action?
7   A  No.
8   Q  Did he ever discuss with you Federal Trade
9  Commission laws and regulations?
10   A  The initial stage. He gave me a letter from
11  an FTC attorney saying he was working correctly and
12  everything is well. He showed me that letter.
13       MR. BENICE: Listen carefully to his
14  question. Read the question back.
15       (Record read.)
16       THE WITNESS: No.
17  BY MR. TEPFER:
18   Q  In the second to the last paragraph, I think,
19  it states "I have to protect UMS based on the nature
20  and risk of the business in front of us."
21       Did you ever hear anyone characterize the
22  BunZai group of companies as a high risk business?
23       MR. BENICE: You mean before the FTC action
24  was filed?
25       MR. TEPFER: Right. Before June 2015.

**Page 104**

1       THE WITNESS: And what is "high risk"?
2  BY MR. TEPFER:
3   Q  Well, just have you ever --
4   A  What do you mean by "high risk"?
5   Q  Well, have you ever heard anyone use the
6  phrase "high risk" in reference to these companies
7  prior to the FTC's enforcement action?
8   A  I don't remember exactly.
9   Q  It refers to the current chargeback return
10  ratios.
11       Were you ever apprised of the
12  chargeback/return ratios of Alon's businesses?
13   A  No. I fortunately have not read this e-mail.
14   Q  Sure. But outside of the context of this
15  e-mail, had you ever just been -- generally speaking,
16  been apprised at any point of the chargeback/return
17  ratios of the companies that you invested in with Alon
18  that sold AuraVie?
19   A  Can you clarify the question specifically?
20  Have I heard this phrase, or what does it mean?
21   Q  Like you stated before that you would discuss
22  numbers more with Alon rather than other topics, and I
23  was wondering if one of those topics that you did
24  discuss with Alon would be chargeback/return ratios
25  for the companies that you invested in or that sold

Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 10 of 10   Page ID #:8757
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                                    1/28/2016

### Page 109

```
 1   projections we discussed yesterday."
 2        Do you recall having any conversation with
 3   Eugene Shampansky regarding any of the attached
 4   documents, which are 25-2 through 25-8?
 5     A   Yes.  It was a long time ago, so I don't
 6   remember; but most probably it was just one of those,
 7   you know, business projects.
 8     Q   Do you -- was this regarding BunZai Media
 9   Group, this business project?
10     A   No.  This was in relation to merchant
11   business.
12     Q   Is this a merchant business that you had
13   considered, I guess, entering into with Alon Nottea
14   and Khristopher Bond?
15     A   No.  I was never going to, but no.
16     Q   Do you know why you forwarded this e-mail to
17   Alon Nottea and Khristopher Bond?
18     A   Who forwarded it?  I did.
19     Q   Yes.  But do you know why, or do you --
20        MR. TEPFER:  Can you repeat the question?  I
21   can't even remember what it was.
22        (Record read.)
23        THE WITNESS:  Maybe simply because I wanted
24   to find out maybe -- it was a long time ago.  It was
25   in 2012.
```

### Page 110

```
 1   BY MR. TEPFER:
 2     Q   So you don't recall specifically why you
 3   would have forwarded that to Alon Nottea or
 4   Khristopher?
 5     A   Absolutely not.  Maybe it was a mistake.
 6   Maybe not.  Maybe I wanted to know his opinion on the
 7   subject.
 8     Q   Do you know what AD Lifestyle Network is?
 9     A   What is it?  You mean the name of the company
10   or the product?
11     Q   Have you ever heard of that company?
12     A   I'm not sure, but I think I do.
13        (Exhibit 27 marked.)
14   BY MR. TEPFER:
15     Q   I'm now handing you what's been marked as
16   Exhibit 27.
17        In this e-mail that was sent to you and Alon,
18   Paul Medina requested that you read below the
19   forwarded document.
20        Did you read that forwarded message?
21     A   No.  I'll say it again that for the most
22   part, the e-mails I get, I don't read them.
23        What is this e-mail about?
24     Q   Well, it refers to -- and this is from Andy
25   Meadows at SignaPay -- well, first I should ask:  Do
```

### Page 111

```
 1   you know what SignaPay is?
 2     A   I can give you my guess.  I think most
 3   probably it's a company which is a processor for a
 4   loan.
 5        And I see the subject of this e-mail it says
 6   "New accounts."  So most probably it's just another
 7   excuse from Alon where he's saying, "The company is
 8   growing.  They're new accounts, and that's why I'm not
 9   paying the money back."
10        So I don't know the contents of this e-mail,
11   but I think that's what it is.
12     Q   And so your understanding of -- well, your
13   understanding of why you received this e-mail was more
14   of an excuse from Alon about why he's failed to repay
15   your loans?
16     A   Most often all the e-mails were about that.
17     Q   Do you know why Paul Medina would have sent
18   you this e-mail, though?
19     A   I don't know.  Maybe Alon asked him.
20     Q   Do you know what BunZai Media Group's profit
21   margin was?
22     A   It's a very abstract question, because I did
23   not control expenses; and for me, I was -- I was
24   looking for any way for them to repay me my loan and
25   the interest as soon as possible.
```

### Page 112

```
 1        I knew that any of my attempts to actually
 2   seriously check all those things was not going to
 3   be -- that's why I just accepted everything they were
 4   saying.  Just accepted it as it was.
 5     Q   So you're saying that it wasn't worth trying
 6   to discuss those issues with Alon because you didn't
 7   think that he would be truthful with you about your
 8   information?  Is that what you're stating?
 9     A   No.  No.  I just knew that most probably he
10   didn't even know this information, so.
11     Q   And when you mentioned earlier that you would
12   sort of discuss numbers with Alon Nottea, was profit a
13   part of that discussion?
14     A   Yes.  But in the end I was just trying to get
15   a way for him to repay me at least some money, because
16   for the profits I understood that he didn't even know
17   about it all himself.
18     Q   And did you come to understand any reasons
19   why Alon's companies had a thin -- or, I guess, didn't
20   have much profit?
21     A   I could only guess.  Most probably because
22   his expenses were high.
23     Q   Do you know what his expenses were?
24     A   Well, the ones I know is advertising, call
25   center.  All those business expenses were high, but,
```