# EXHIBIT "C"

# In the Matter of:

# FTC v. Bunzai Media Group, LLC, et al.

*February 18, 2016*
*Alon Nottea*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

## Page 1

```
            UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

FEDERAL TRADE COMMISSION   )
                           )
        Plaintiff          )
                           )
    v.                     ) No. CV 15-4527-GW(PLAx)
                           )
BUNZAI MEDIA GROUP, INC.,  )
et al.,                    )
                           )
        Defendants.        )
                           )


            Thursday, February 18, 2016

            10877 Wilshire Boulevard
            Suite 700
            Los Angeles, California



        The above-entitled matter came on for
deposition, pursuant to Notice, at 8:59 a.m.
```

## Page 2

```
            UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

FEDERAL TRADE COMMISSION   )
                           )
        Plaintiff          )
                           )
    v.                     ) No. CV 15-4527-GW(PLAx)
                           )
BUNZAI MEDIA GROUP, INC.,  )
et al.,                    )
                           )
        Defendants.        )
                           )


        DEPOSITION OF ALON NOTTEA, taken on
behalf of the Federal Trade Commission, at
10877 Wilshire Boulevard, Suite 700, Los Angeles,
California, commencing at 8:59 a.m., and concluding
at 5:04 p.m., on Thursday, February 18, 2016,
pursuant to Notice, before CHRISTINA KIM-CAMPOS,
CSR No. 12598, a Certified Shorthand Reporter, in
and for the State of California.

                    ***
```

## Page 3

APPEARANCES

| For the Federal Trade Commission: | U.S. FEDERAL TRADE COMMISSION<br>REID TEPFER, ESQ.<br>1999 Bryan Street<br>Suite 2150<br>Dallas, Texas 75201-6808<br>(214) 979-9383<br>rtepfer@ftc.gov |
|---|---|
| | U.S. FEDERAL TRADE COMMISSION<br>LUIS H. GALLEGOS, ESQ.<br>1999 Bryan Street<br>Suite 2150<br>Dallas, Texas 76201-6808<br>(214) 979-9383<br>lgallegos@ftc.gov |
| For the Defendants Alon Nottea and Roi Reuveni: | CROSSWIND<br>ROBERT M. UNGAR, ESQ.<br>2190 North Beverly Glen Blvd.<br>Los Angeles, California 90077<br>(818) 646-4750<br>rmu@crosswindlaw.com |
| For the Defendants Igor Latsanovski and CalEnergy, Inc. | LAW OFFICE OF JEFFREY S. BENICE<br>JEFFREY S. BENICE, ESQ.<br>(Via Telephone)<br>3080 Bristol Street<br>Suite 630<br>Costa Mesa, California 92626<br>JSB@JeffreyBenice.com |

## Page 4

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Alon Nottea | By Mr. Tepfer | 7 |
| Afternoon Session | | 149 |

| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| Nottea Deposition Exhibit No. 18 | 86 |
| Nottea Deposition Exhibit No. 21 | 97 |
| Nottea Deposition Exhibit No. 23 | 115 |
| Nottea Deposition Exhibit No. 26 | 127 |
| Nottea Deposition Exhibit No. 28 | 134 |
| Nottea Deposition Exhibit No. 29 | 135 |
| Nottea Deposition Exhibit No. 32 | 144 |
| Nottea Deposition Exhibit No. 33 | 147 |
| Nottea Deposition Exhibit No. 36 | 149 |
| Nottea Deposition Exhibit No. 38 | 151 |
| Nottea Deposition Exhibit No. 42 | 154 |
| Nottea Deposition Exhibit No. 46 | 156 |
| Nottea Deposition Exhibit No. 48 | 159 |
| Nottea Deposition Exhibit No. 58 | 164 |
| Nottea Deposition Exhibit No. 62 | 166 |
| Nottea Deposition Exhibit No. 65 | 173 |
| Nottea Deposition Exhibit No. 66 | 174 |

Case 2:15-cv-04527-GW-PLA   Document 355-3   Filed 04/18/16   Page 4 of 14   Page ID #:8761

FTC v. Bunzai Media Group, LLC, et al.                                Nottea                              2/18/2016

                                                45
1  question. It's vague and ambiguous.
2       THE WITNESS: No.
3  BY MR. TEPFER:
4       Q. So I guess when -- I want to talk a little
5  bit about that investment.
6            When you negotiated the terms of that
7  investment, did you give Igor Latsanovski a
8  description of BunZai Media Group, the company?
9       MR. UNGAR: Objection as to the form of the
10 question. It's vague and ambiguous.
11      THE WITNESS: Yes.
12 BY MR. TEPFER:
13      Q. Did you discuss with Igor Latsanovski the
14 product that his investment would be used for?
15      MR. UNGAR: Objection as to the form of the
16 question. Vague and ambiguous temporally.
17      THE WITNESS: I told him we were going to
18 retail skin care products, so the answer is yes.
19 BY MR. TEPFER:
20      Q. Did you discuss with him how those products
21 would be sold?
22      A. I did, but Igor's understanding and
23 knowledge of details of business models and online
24 weren't really there, so it was -- it was a little
25 bit more generic as far as online sales, skin care,

                                                46
1  generating interest with women and selling a good
2  product.
3       Q. Did you ever -- oh, sorry.
4       A. It could have been men as well. Doesn't
5  have to be women.
6       Q. Okay. Did you ever show him the websites
7  that BunZai created for the sale of AuraVie?
8       MR. UNGAR: Objection as to the form of the
9  question. It's vague and ambiguous.
10      THE WITNESS: He never had an interest, and
11 he wouldn't really know what that stood for, so --
12 BY MR. TEPFER:
13      Q. Do you know if -- did Igor Latsanovski ever
14 make recommendations about how to improve BunZai
15 Media Group's marketing strategies?
16      A. He wouldn't know how, so no.
17      Q. Did he ever provide assistance to BunZai
18 Media Group in obtaining new merchant accounts?
19      A. No.
20      Q. Did BunZai Media Group market AuraVie
21 SkinCare products outside of the United States?
22      MR. UNGAR: Objection as to the form of the
23 question. It's vague and ambiguous.
24      THE WITNESS: No. There was a small attempt
25 that was unsuccessful, and that didn't materialize

                                                47
1  either.
2  BY MR. TEPFER:
3       Q. Where did BunZai Media Group attempt to
4  market those products?
5       MR. UNGAR: Objection as to the form of the
6  question. It's vague and ambiguous.
7       THE WITNESS: I'm -- it was a long, long
8  time ago. I'm not really sure. A lot of people
9  were talking about different types of processing or
10 different types of pricing. I wanted to learn the
11 business a little more to get some more metrics in
12 the business. I don't remember exactly which --
13 where it was or through which contact, but I tried a
14 couple of thousand dollars and the monies didn't
15 make sense, and I just dropped it. It was like
16 three, four years ago, and it just -- nothing
17 materialized from it.
18 BY MR. TEPFER:
19      Q. Okay. Have you ever heard of a company
20 called SkinCare OU?
21      A. I have a recollection of that name.
22      Q. Do you know what that company's business
23 was?
24      MR. UNGAR: Objection as to the form of the
25 question. It's vague and ambiguous.

                                                48
1       THE WITNESS: I don't remember.
2  BY MR. TEPFER:
3       Q. Do you know if BunZai Media Group has ever
4  done any business with a company called SkinCare OU?
5       A. I think you're talking about the same little
6  test that was done. I think there was 3- to $5,000
7  of a test of some processing. Didn't make sense.
8  Merchant fees didn't work out. The lady that
9  introduced, the fees were too high --
10      Q. Mm-hmm.
11      A. -- and it just -- it just went away. There
12 was some lady named Kristina who set up a merchant
13 account. There was a few monies that went through
14 this account. The fees were too high. It didn't
15 make sense for this business model. I don't even
16 remember getting the fund. I think -- I think it
17 was a loss before it started. There was no -- the
18 fees were more than the money that was supposed to
19 come in, so it just -- nothing happened with it.
20      Q. Do you know who Oleg Trushlya is?
21      MR. UNGAR: Do you want to spell that for
22 the record --
23      MR. TEPFER: Sure. We spelled it yesterday.
24      MR. UNGAR: -- because I don't -- I can't
25 even understand what the name is.

53

1  BY MR. TEPFER:
2  Q. Do you know if Roi Reuveni ever worked at
3  Chargeback Armor, Inc.?
4  A. He may have consulted. I don't know if he
5  worked there. I don't know.
6  Q. Do you know if Alan Argaman ever worked at
7  Chargeback Armor, Inc.?
8  A. No idea.
9  Q. Do you know if Secured Merchants ever
10 contested any chargebacks on behalf -- or any
11 consumer chargebacks on behalf of BunZai Media
12 Group, Inc.?
13     MR. UNGAR: Objection as to the form of the
14 question. Vague and ambiguous.
15     THE WITNESS: No, they didn't.
16 BY MR. TEPFER:
17 Q. Do you know if Pinnacle Logistics ever
18 contested any chargebacks on behalf of BunZai Media
19 Group, Inc.?
20     MR. UNGAR: Objection as to the form of the
21 question. Vague and ambiguous.
22     THE WITNESS: If Pinnacle Logistics
23 contested on behalf of BunZai?
24 BY MR. TEPFER:
25 Q. Mm-hmm.

54

1  A. No, they didn't.
2  Q. Do you know if Pinnacle Logistics, Inc.,
3  ever contested any chargebacks, consumer
4  chargebacks, from the purchase of AuraVie products?
5     MR. UNGAR: Objection as to the form of the
6  question. Vague and ambiguous.
7     THE WITNESS: I believe they did.
8  BY MR. TEPFER:
9  Q. Why do you believe that?
10 A. There was a Chargeback Department there.
11 Q. So -- sorry. I just wanted to clarify. You
12 said Pinnacle Logistics was the Chargeback
13 Department there, and do you mean the Chargeback
14 Department at BunZai Media Group?
15     MR. UNGAR: Objection as to the form of the
16 question.
17     THE WITNESS: No. I --
18     MR. UNGAR: It's vague and ambiguous and it
19 misstates the prior testimony of the witness.
20     THE WITNESS: Do you have a -- do you have a
21 question? I'm not really sure what the question is.
22     MR. TEPFER: Sure.
23 Could you read back the question.
24     MR. UNGAR: Which one?
25     MR. TEPFER: The last one.

55

1     (The previous question was read back
2  by the court reporter as follows:
3     "QUESTION: You said Pinnacle
4  Logistics was the Chargeback
5  Department there, and do you mean the
6  Chargeback Department at BunZai Media
7  Group?")
8     THE WITNESS: Yes. I think there's some
9  clarification.
10 BY MR. TEPFER:
11 Q. Was Pinnacle Logistics, Inc., considered
12 the -- 0do you consider Pinnacle Logistics, Inc., to
13 be the Chargeback Department of BunZai Media Group,
14 Inc.?
15 A. No.
16 Q. Did Pin- -- to your knowledge, did Pinnacle
17 Logistics, Inc., sell AuraVie products?
18 A. No.
19 Q. Do you know why Pinnacle Logistics, Inc.,
20 would process chargebacks concerning AuraVie
21 products if they didn't sell those products?
22 A. It's a service, just like a customer service
23 call center or fulfillment. It's a service.
24 Q. Did BunZai Media Group enter into a contract
25 with Pinnacle Logistics, Inc., for these services?

56

1     MR. UNGAR: Objection as to the form of the
2  question. It's vague and ambiguous, and it's asked
3  and answered.
4     THE WITNESS: No.
5  BY MR. TEPFER:
6  Q. Do you know if they entered into a contract
7  with any other company that sold AuraVie products
8  for the -- processing these charges?
9     MR. UNGAR: Objection as to the form of the
10 question. Vague and ambiguous.
11     THE WITNESS: I believe so.
12 BY MR. TEPFER:
13 Q. Can you recall the names of any companies
14 specifically that Pinnacle Logistics provided these
15 services to?
16     MR. UNGAR: Objection as to the form of the
17 question. Vague and ambiguous.
18     THE WITNESS: Some of the companies you
19 mentioned in the beginning of the deposition, one of
20 them being Kai Media or Agoa Holdings of such.
21 BY MR. TEPFER:
22 Q. And I'll just -- I guess I'll, for clarity,
23 run down the list real quick.
24     Was DSA Holdings, Inc., one of those
25 companies, to your knowledge?

Page 77

1  A. I just don't know. I think it was BunZai.
2  I think he was working with BunZai.
3  Q. Do you know if he was ever an employee of a
4  company that you owned?
5      MR. UNGAR: Objection as to the form of the
6  question. It's vague and ambiguous.
7      THE WITNESS: No. There was some -- I just
8  don't know if he, if Andrew moved over to working
9  with Pinnacle or not. I'm not really sure where --
10 where he was paid from.
11 BY MR. TEPFER:
12 Q. Mm-hmm. Did you review the company's, I
13 guess -- BunZai Media Group, Inc.'s, customer
14 service policies?
15     MR. UNGAR: Objection as to the form of the
16 question. It's vague and ambiguous, it assumes
17 facts not in evidence.
18     THE WITNESS: Khristopher Bond was
19 responsible for hiring, managing, writing scripts,
20 dealing with the call center environment, working
21 with -- with the actual customer service reps.
22 Khristopher was -- you know, he used to come in, in
23 the morning, give these people a hug, sit with them,
24 you know, work with them on -- on how to improve
25 their business process and how to improve their

Page 78

1  script. It wasn't something that was -- English is
2  not my first language. I can speak, obviously, but
3  it's -- Khristopher was much more of the guy who,
4  you know, sat in the Customer Service Department
5  and -- and performed and -- and, you know, filled
6  his duties. I'm not so much into calls and customer
7  service and scripting and stuff like that.
8  BY MR. TEPFER:
9  Q. To your knowledge, did BunZai Media Group
10 have a, sort of a standard operating procedure for
11 customer service?
12 A. Probably. I'm a big believer in SOPs.
13 Q. Do you know -- and do you recall ever
14 reviewing the, I guess, the SOP for customer service
15 at BunZai Media Group?
16 A. Most likely if it got through Khristopher's
17 eyes. I'm not a big guy in reading. I -- you know,
18 I don't read a lot of stuff too -- too deeply. If
19 it looks good, it's there with manager, it got
20 approved from the department, it came to my desk,
21 looked good to me -- I don't -- I'm not a guy who
22 will read a hundred pages and look for the word.
23 Q. Right.
24 A. It's not my --
25 Q. Do you recall if BunZai Media Group ever had

Page 79

1  a standard operating procedure for, I guess, Better
2  Business Bureau complaints?
3  A. Probably.
4  Q. Do you recall reviewing that?
5  A. No.
6  Q. Do you think that it is likely that you
7  reviewed that, if it exists?
8      MR. UNGAR: Objection as to the form of the
9  question. Vague and ambiguous.
10     THE WITNESS: No. I think it's likely
11 that's something Khristopher would review, and if he
12 would approve it, I would approve it.
13 BY MR. TEPFER:
14 Q. When BunZai Media Group first opened, did
15 the company have department managers?
16 A. No.
17 Q. Did the company ever have department
18 managers?
19 A. There was some managers. I don't know
20 about, you know, department -- yeah, there was some
21 departments and some managers, yes.
22 Q. Who were the managers over the, I guess,
23 generally speaking, over the entirety of BunZai's
24 existence? Could you name some of those managers?
25 A. I would say Andree Mansour was manager of

Page 80

1  call center, Sandra Rubio was manager of
2  Resolutions. That's about it.
3  Q. There were only two managers that you're
4  aware of at BunZai Media Group, Inc.?
5  A. Paul was kind of a manager. Paul Medina was
6  kind of a manager. It was a different department.
7  There wasn't really managers. It was just kind of
8  get the work done kind of stuff, you know.
9  Q. When you said Sandra was manager of
10 Resolutions --
11 A. I guess I saw an email recently. That's why
12 it came to my mind.
13 Q. What is the, I guess, the Resolutions
14 Department?
15 A. If there was any sort of complaint by a
16 customer, then I wanted to make sure that everything
17 would be handled professionally and there's no
18 damages to anybody and nobody feels like they got
19 the short end of the stick, so I had a person in
20 charge of making sure there was resolution to any
21 complaint.
22 Q. Did Sandra report to you?
23 A. No.
24 Q. Who did she report to?
25 A. To Khris. Khristopher Bond.

Page 81

1   Q. Did you have a BunZai Media Group, Inc.,
2   email address?
3   A. Yes.
4   Q. Do you recall what it is?
5   A. It was Alon at BunZai Media.
6   Q. Do you recall if Doron, your brother, ever
7   had a BunZai Media address?
8   A. I don't think so.
9   Q. Do you know if Roi did?
10  A. He may have. He may have.
11  Q. Do you happen to recall what it is?
12  A. If it was, it's probably
13  roi@bunzaimediagroup. Maybe Roi R. But I don't
14  remember exactly. I don't remember. I don't
15  remember that email address.
16  Q. Okay.
17  A. I'm saying if he did, it would be Roi@.
18  Q. What about -- did you use any other email
19  addresses to conduct business on behalf of BunZai
20  Media Group, Inc.?
21  A. I had an email that I used called
22  vigorette@gmail.
23  Q. Uh-huh.
24  A. And -- and sometimes I would send to him
25  some emails from that email address as well.

Page 82

1   Basically, my BunZai Media email was inside my
2   vigorette, so I can choose where I'm sending from.
3   So sometimes I didn't pay attention and an email
4   came out of vigorette instead of dropping the
5   drop-down and choosing BunZai Media.
6   Q. Okay. Did you ever conduct any other -- or
7   rather, did you ever use any other email addresses
8   to conduct BunZai business, that you recall?
9   A. After BunZai I had Alon@MediaUrge. I used
10  that email address.
11  Q. In the Resolutions Department did Sandra, to
12  your knowledge, ever, I guess, draft reports about
13  her department concerning, I guess, complaints?
14  A. I'm not sure.
15  Q. Do you recall if you researched any reports
16  drafted by Sandra regarding complaints?
17  A. Not to my recollection. An actual report
18  about complaints, not to my recollection, but
19  there -- there may have been. It was business and I
20  wanted reports on everything. I'm a big reporting
21  guy. Reports. Somebody has to make a report. They
22  have to work.
23  Q. Would you typically review any reports
24  drafted by, I guess, the managers at BunZai Media
25  Group, Inc.?

Page 83

1   A. I -- I -- we already answered that, and
2   that's the question you answered and I said yes to
3   that and yes.
4   Q. Oh.
5   A. Yes, I reviewed reports, but for me it was
6   more making sure there's an SOP.
7   Q. Uh-huh.
8   A. For me it was more making sure there's an
9   SOP and that somebody does a report and then sends
10  it to somebody below me. It wasn't so much bring it
11  back to me. Let's create a process that we're in
12  charge of, that I know the department is responsible
13  for that particular task, and then kind of maintain
14  it within their own chain of command. I just wanted
15  to make sure that there is a report and an SOP. And
16  if there is a complaint, make sure it gets solved.
17  If there's a happy customer, make sure we ask for a
18  referral. I just like the stuff, you know, to work
19  and not, you know, fall between the cracks.
20  Q. Okay. Do you -- would you ever communicate
21  with Igor Latsanovski concerning BunZai Media Group,
22  through email?
23  A. I'm sure there's a few emails, yeah.
24  Q. Do you know what his email address is?
25  A. Yeah.

Page 84

1       MR. UNGAR: Objection as to the form of the
2   question. Vague and ambiguous temporally.
3       THE WITNESS: You mean Igor Latsanovski's
4   email address?
5   BY MR. TEPFER:
6   Q. Do you know what Igor -- the email address
7   that you would send to him to communicate concerning
8   BunZai Media Group?
9   A. I don't know the exact specifics of his
10  email, but I think it's Igor's gmail or something.
11  Igor --
12  Q. Does igorlats@gmail.com sound correct to
13  you?
14  A. Yeah.
15  Q. Did you ever receive emails from Igor
16  concerning his company's investment in BunZai Media
17  Group?
18  A. Not often.
19  Q. But do you know if you -- you said "not" --
20  A. Not to my recollection.
21  Q. When did you initially receive -- or when
22  did BunZai Media Group initially receive its
23  investment from CalEnergy, Inc.?
24  A. I don't know the -- the -- you know, if I
25  have to recall, it would have been somewhere in

## Page 85

1  maybe end of 2010 or more towards the middle or end
2  of 2010. Somewhere around there.
3      Q. Did BunZai Media Group, Inc., ever pay back
4  Igor Latsanovski's company?
5      A. I believe it did.
6      Q. Did BunZai Media Group, Inc., receive any
7  subsequent investments from Igor Latsanovski's
8  company?
9          MR. UNGAR: Objection as to the form of the
10 question. It's vague and ambiguous.
11         THE WITNESS: I don't know. He kind of, you
12 know, gave me a line, and we tried to always pay
13 back this loan.
14 BY MR. TEPFER:
15     Q. Was there ever any disputes between you and
16 Mr. Latsanovski concerning the repayments of any
17 loans?
18     A. I wouldn't call it disputes, but there was
19 conversations.
20     Q. What -- I guess, were those conversations
21 regarding the timeliness of BunZai Media Group's
22 repayment to CalEnergy?
23     A. Sure.
24     Q. Did BunZai Media Group ever have any
25 difficulties in repaying CalEnergy its loans?

## Page 86

1      A. Of course.
2      Q. Would you say that that was a frequent
3  occurrence?
4      A. Well, Igor is -- you know, he likes to know
5  where his money is. So, you know, it's -- it's --
6  I'm not saying it's frequent, but, you know, when
7  you're commit to paying someone something back for
8  their money and it's not there, then you have to
9  have conversations about why not.
10     Q. Okay.
11     A. And Igor is not the guy who says he will
12 talk to you next month. He wants to know why.
13     Q. And did Igor frequently -- was there -- for
14 these loans, was there a standard, I guess, duration
15 for which these loans were to last from CalEnergy,
16 Inc.?
17         MR. UNGAR: Objection as to the form of the
18 question. It's vague and ambiguous.
19         THE WITNESS: We always discuss some timing,
20 but it was clear that it was based on performance of
21 the business.
22         (Plaintiff's Exhibit 18 was
23         previously marked for identification
24         by the FTC and is attached hereto.)
25 ///

## Page 87

1  BY MR. TEPFER:
2      Q. I'm now handing the witness what's been
3  marked as Exhibit 18.
4          And this is for Mr. Esensten.
5          Mr. Nottea, do you recall signing the
6  Partnership Agreements located in this document?
7      A. There's a few here. I'm not sure if it's
8  the same one or not. There's a couple different
9  ones.
10     Q. Sure.
11         Let's talk about first the signature on
12 18-3. Do you recall signing that document?
13     A. Is it okay just to turn up -- it's a little
14 cold -- just turning it up a little bit?
15     Q. Yeah, yeah. Sorry.
16     A. Do I recall signing what's on 18-2 here
17 (indicating)?
18     Q. 3.
19     A. 18-3?
20     Q. Uh-huh.
21     A. Yes, I do.
22     Q. And do you recall initialing 18-2?
23     A. I do.
24     Q. At the top of that highlighted portion,
25 which I highlighted --

## Page 88

1      A. Okay.
2      Q. -- it states, "Igor will invest 350K in
3  exchange for 55% ownership of BunZai Media Group."
4          Did, at any point, Igor Latsanovski have an
5  ownership interest in BunZai Media Group?
6      A. No.
7      Q. Do you recall why the terms of this
8  agreement did not come into fruition?
9      A. This agreement was just something to have on
10 paper. There was a test that we were doing at the
11 beginning because I obviously would not let anybody
12 have 55 percent of the company. It was a test to
13 prove myself, to say show me what you can do, show
14 me you can bring in some orders, show me that you
15 can -- you are what you say, and then we'll
16 re-negotiate once we more forward. So it was just
17 kind of a document to have in place so Igor could
18 feel secure about lending me some money.
19     Q. Did you draft this Partnership Agreement?
20     A. I did not.
21     Q. Do you know who did?
22     A. It looks like Khristopher Bond. He was
23 usually the guy who would sit with -- because of
24 Igor's language, Khristopher would have a lot more
25 patience, he would have a lot more time. I'm kind

## Page 93

1    he would understand, yes.
2        Q. Do you recall what you said to him?
3        A. We're just going to generate a few orders
4    every day to show him some consistency, and once we
5    do that for -- I don't know, I don't remember if it
6    was 10 or 20, how many days that was -- that once I
7    proved that fact to him, that we would -- he would
8    then move forward.
9        Q. And it says here, the next line, "During
10   this test, BunZai will purchase at least 1,000
11   orders (CPA of $45 to $50 each) within the first 15
12   days, and a conversion from Free Trial to
13   Transitional stage (day 16 to day 30) of at least
14   75% of these orders."
15       I was wondering if you could -- do you know
16   what "CPA" stands for?
17       A. Yes, I do.
18       Q. What does it stand for?
19       A. Cost per -- cost per action, actually.
20       Q. And what is cost per action?
21       A. What is cost per action? Exactly what it
22   means, it's -- it's a cost for an action. In
23   marketing terms it's an action, and in our language
24   it would be an acquisition, an acquisition of a
25   customer.

## Page 94

1        Q. And are those payments made to external
2    affiliates?
3        A. Yes, they are.
4        Q. Did you explain that to Mr. Latsanovski?
5        A. I don't recall.
6        Q. Do you recall if you explained to
7    Mr. Latsanovski what a conversion from free trial to
8    transitional stage is?
9        A. I believe I did.
10       Q. I want to jump to 18-6. At the bottom, is
11   that your signature there?
12       A. It looks like it is, yes.
13       Q. And on 18-7, is that your signature there?
14       A. Yes. Looks like it.
15       Q. Do you recall signing this agreement?
16       A. Just one second. Let me read.
17       Q. Sure.
18       A. Okay. Go ahead.
19       Q. Do you recall this agreement?
20       A. Vaguely, but I do.
21       Q. Do you know if this was the final
22   memorialization of the agreement between you,
23   Igor -- I guess between you and Igor?
24       A. This is in 2011, so the answer would be
25   absolutely not.

## Page 95

1        Q. Do you know if any future agreements were
2    ever memorialized?
3            MR. UNGAR: Objection as to the form of the
4    question. Vague and ambiguous.
5            THE WITNESS: It's verbal memorialization.
6    BY MR. TEPFER:
7        Q. Well, first let's talk -- yeah, let's talk
8    about verbal first.
9            Was there subsequent, I guess, verbal
10   agreements to this document?
11           MR. UNGAR: Objection --
12           THE WITNESS: Many.
13           MR. UNGAR: -- as to the form of the
14   question. Vague and ambiguous.
15   BY MR. TEPFER:
16       Q. Do you -- I'm sorry. Go ahead.
17       A. Many.
18       Q. And do you know if there were subsequent
19   written, I guess, contractual agreements concerning
20   your --
21       A. I -- in my mind, written stuff with Igor, it
22   changed so much that I'm not sure. Based on my
23   looking at some of your documents or some of the
24   evidence, I remember there's one -- maybe one more.
25   I remember I saw something else in evidence. So I'm

## Page 96

1    not really sure if it's this or not. Maybe it was
2    under one page and just kind of copied different.
3        So in my understanding, to what I saw, there
4    was one more document, but as far as what our
5    understanding was together, it's not based on any of
6    this (indicating).
7        Q. This part that I highlighted there at the
8    bottom of 18-6, it says Igor "1/3 of 100% of the
9    company".
10       To your knowledge, was there ever a point
11   where Igor owned one-third of BunZai Media Group?
12       A. No, he did not.
13       Q. Was it was there ever a discussion, I guess,
14   about Igor owning 1/3 of BunZai Media Group?
15       A. He -- he -- no, he didn't have an interest
16   in owning.
17       Q. Do you know why this was included in this
18   Partnership Agreement?
19       A. Some --
20           MR. UNGAR: Objection as to the form of the
21   question. It's vague and ambiguous, and it's
22   argumentative.
23           THE WITNESS: We wanted to have something on
24   paper so he can have some security, so he can have
25   something to -- to hold, something to -- to take

**97**

1  home.
2  BY MR. TEPFER:
3  Q. Did you draft this Partnership Agreement?
4  A. No.
5  Q. Do you know who did?
6  A. Khristopher did.
7  Q. Did you consider Mr. Latsanovski to be a
8  partner of yours in BunZai Media Group, Inc.?
9  A. No.
10      (Plaintiff's Exhibit 21 was
11      previously marked for identification
12      by the FTC and is attached hereto.)
13  BY MR. TEPFER:
14  Q. I'm now handing the witness what's been
15  marked Exhibit 21.
16      And this is for Mr. Esensten.
17      Do you recall receiving this email from Igor
18  Latsanovski?
19  A. No.
20  Q. Have you ever read this before?
21  A. Only after the FTC lawsuit.
22  Q. Uh-huh. Wait. Could you repeat that?
23  A. Only after the, what's provided in evidence.
24  I've never seen it before that.
25  Q. Do you recall having a conversation with

**98**

1  Mr. Latsanovski in, around this period of time?
2  A. Yes.
3      MR. UNGAR: Objection as to the form of the
4  question. Vague and ambiguous.
5  BY MR. TEPFER:
6  Q. Do you recall what that conversation was
7  concerning?
8  A. In reference to the time period of this
9  document? We're talking about the same kind of --
10  Q. Yes, sir.
11  A. No.
12  Q. Do you have any idea why Mr. Latsanovski
13  included Doron on this email?
14      MR. UNGAR: Objection as to the form of the
15  question. It's vague and ambiguous, calls for
16  speculation, lacks foundation.
17      THE WITNESS: I believe I was visiting
18  Israel at the time of this document, and there was
19  some issues going on, and Igor had some concerns
20  about the business, and I mentioned to him that I
21  want to get out of this business. And he kind of
22  sent me his opinion on how he feels and -- and --
23  and kind of don't leave, don't stay in Israel, come
24  back to America, let's try something new.
25  ///

**99**

1  BY MR. TEPFER:
2  Q. You said there were some issues going on.
3  What issues are you referring to?
4  A. It was the beginning of Dawn Goddard and
5  Nancy Yalley's unlawful lawsuit that I ended up
6  being sued as an alter ego of someone that never
7  worked for me and I never hired.
8  Q. And who's that person that you're referring
9  to that you never hired?
10  A. Dawn Goddard and Nancy Yalley.
11  Q. And they never worked for you?
12  A. Never.
13  Q. And you said that Mr. Latsanovski, I guess,
14  expressed some concerns. What were those concerns
15  that he expressed?
16  A. Same concerns. Dawn Goddard came to the
17  office and threatened me and Igor for -- for -- for
18  suing us for something that had no relevance to us.
19  And it started to go downhill from there. And, you
20  know, I told them, "Listen, I'm out of this" --
21  excuse my language -- "shit," and wanted to end the
22  company. I went to Israel for a trip. I told Igor
23  "I'm thinking about staying here with my wife and my
24  children." He got a little nervous and sent me this
25  email -- which I never saw in Israel. I only saw it

**100**

1  later.
2  Q. Mm-hmm.
3  A. I only saw it years later. I never -- when
4  I went to Israel, I never even got a chance to read
5  this email.
6  Q. And you said at that point you were
7  considering ending your company. What company are
8  you referring to?
9  A. BunZai Media Group.
10  Q. Was the -- sorry.
11      What period of time did BunZai Media Group,
12  I guess, cease to exist?
13  A. Right around -- right around a little bit,
14  right around this time, what I believe is, like,
15  towards June, July, August of 2013, or right around
16  this time.
17  Q. What was the reason for the decision to, I
18  guess, close BunZai Media Group, Inc.?
19  A. Number one, profitability wasn't there.
20  Number two, there was -- too messy and too many -- I
21  just wasn't happy with the way it was managed, I
22  wasn't happy with my relationship with Khristopher.
23  It was kind of going south, and it was starting
24  to -- you know, have other interest in myself, and
25  it was time to -- time to finish.

                                                                                      109

1    Q. Did BunZai Media Group, Inc., have any sort
2    of business relationship with any company located in
3    Israel?
4    A. I believe there was one affiliate marketer,
5    there was one marketing company in Israel that did
6    some affiliate work. Other than that, no.
7    Q. That same line refers to David, and I was
8    wondering if you knew who David is.
9        MR. UNGAR: Objection as to the form of the
10   question. Vague and ambiguous, misstates the
11   document.
12   BY MR. TEPFER:
13   Q. Do you see where it says "David" there?
14   Did --
15   A. "David is good helper"?
16   Q. Uh-huh.
17       Did you ever have an employee at this time
18   named David?
19   A. I think we had a consultant. I'm not sure
20   if it was an employee. It was a guy named David.
21   There's a couple Davids.
22   Q. Mm-hmm. Later on Mr. Latsanovski states "I
23   would recommend Roy as head of the product company".
24       Was it -- is it your understanding that
25   Mr. Latsanovski is referring to BunZai Media Group?

                                                                                      110

1    A. I have no idea.
2    Q. At this time did you own any other company,
3    aside from BunZai Media Group?
4    A. I don't know if -- if Adageo was there. So
5    Adageo, yes.
6    Q. Did Adageo market any products at that time?
7    A. No.
8    Q. Did Roi ever become the head of BunZai Media
9    Group?
10   A. No.
11   Q. Did Mr. Latsanovski, aside from his
12   statements in this email, did he ever make any
13   other, I guess, hiring recommendations to you for --
14   at BunZai Media Group?
15   A. Never.
16   Q. Later on Mr. Latsanovski states, "And I
17   would not want to so we are so constantly thinking
18   about how to download the work of our factory -
19   Pinicle."
20       Did Pinnacle Logistics manufacture the
21   AuraVie product?
22   A. No, they did not.
23   Q. Are you aware of anything that Pinnacle
24   manufactured?
25   A. No.

                                                                                      111

1    Q. Later in the document Mr. Latsanovski
2    states, "after all people is a problem, dividing the
3    information can give us testimony in court, or just
4    come up with these statements and show to us, and so
5    on."
6        Do you have any understanding of what
7    Mr. Latsanovski is referring to in that statement?
8        MR. UNGAR: Objection as to the form of the
9    question. It's vague and ambiguous. The sentence
10   is gibberish. It calls for speculation. It lacks
11   foundation. It seeks an expert opinion in language
12   and dialect.
13       MR. TEPFER: Please, no speaking objections,
14   Counsel.
15       MR. UNGAR: I'm sorry?
16       MR. TEPFER: I said please, no speaking
17   objections, Counsel.
18       MR. UNGAR: That was not a speaking
19   objection, Counsel.
20   BY MR. TEPFER:
21   Q. If you could answer.
22   A. I believe, to my knowledge, what Igor is
23   speaking about is the fact we were both offended
24   that two ladies sued us, that we have no idea why.
25   Q. In your conversation with Mr. Latsanovski

                                                                                      112

1    when you were in Israel, did he express these same
2    concerns on the phone?
3        MR. UNGAR: Objection as to the form of the
4    question. It's vague and ambiguous.
5        THE WITNESS: I don't recall.
6    BY MR. TEPFER:
7    Q. At any time did Mr. Latsanovski express
8    concerns to you about testimony in court from
9    employees?
10       MR. UNGAR: Objection as to the form of the
11   question.
12       THE WITNESS: No.
13       MR. UNGAR: It's vague and ambiguous.
14   BY MR. TEPFER:
15   Q. I'm sorry. You can --
16   A. No.
17   Q. Did BunZai Media Group have a call center?
18   A. Yes.
19   Q. Later on Mr. Latsanovski states, "And we are
20   in quiet mode to create new products".
21       Do you recall what new products you and Igor
22   were considering at this point in time?
23   A. No.
24   Q. Do you have any understanding of what
25   Mr. Latsanovski meant by "quiet mode"?

28 (Pages 109 to 112)

                                                                 121
1   industry and articles that I've read, then yes.
2       Q. Later on in the email, in the paragraph
3   after Number 4 Ms. Gaines states, "I have to protect
4   UMS based on the nature and the risk of the business
5   in front of us, the current nature of the industry
6   and the regulatory scrutiny and the current
7   chargeback/return ratios. One of your accounts is
8   already on the Excessive Chargeback Program."
9           Do you know which Excessive Chargeback
10  Program Mrs. Gaines is referring to?
11      A. Not exactly.
12      Q. Are you aware of any of your -- or rather,
13  of BunZai Media Group's accounts being on an
14  Excessive Chargeback Program?
15      A. To begin with, I don't know if it was a
16  BunZai Media Group account, but as far as what we're
17  talking about, when a merchant account is no longer
18  being used, then there are no longer transactions to
19  that merchant account. The only thing left for that
20  merchant account to occur is either a refund or some
21  customer who complained on it, which means if a
22  merchant account is not in use, there is no
23  transactions that are coming in on it. So there was
24  an account that we stopped use, and it became
25  Excessive Chargeback Program because there were no

                                                                 122
1   new transactions.
2       Q. Do you recall what account that is, that
3   you're referring to?
4       A. No idea.
5       Q. Do you believe it was a BunZai Media Group
6   account?
7       A. No.
8       Q. Do you believe it was one of the other
9   AuraVie companies?
10      A. Potentially.
11      Q. Was it a Media Urge company?
12      A. No.
13      Q. Or rather, was it Media Urge?
14      A. No.
15      Q. Do you recall any other emails from merchant
16  processors expressing their concern regarding any of
17  the AuraVie companies chargeback return ratios?
18      A. Not off the top of my head. I dealt with
19  many merchant processing. Could be.
20      Q. Subsequent to receiving this email, did you,
21  I guess, investigate or take investigative -- sorry.
22  Let me start over.
23          After receiving this email, did you
24  investigate the chargeback return ratio for any of
25  the AuraVie companies?

                                                                 123
1       A. Of course.
2       Q. Do you recall what steps you took to look
3   into this?
4       A. I took many steps.
5       Q. Could you describe some of those?
6       A. A deeper understanding of what's happening,
7   an understanding of -- you know, learning about
8   consumer disputes, understanding what the reason
9   codes are, what can we do to satisfy these
10  consumers? Why are consumers complaining? Why are
11  they not calling back the company to get a refund?
12  Somebody is calling the bank before they call me.
13  They're concerned. Call me. I'm happy to find
14  resolution.
15      Q. As a result of this email, did you consider
16  making changes to the --
17      A. All the time. Excuse me. Let you finish.
18      Q. Sure. And I was just going to say the
19  AuraVie risk free trial advertisements.
20          MR. UNGAR: Objection as to the form of the
21  question. It's vague and ambiguous.
22          THE WITNESS: All days are moving, changing,
23  and optimizing, learning. So yes, of course.
24  BY MR. TEPFER:
25      Q. I guess to investigate these chargeback

                                                                 124
1   return ratios, would you ever review the customer
2   complaints that were sent to the AuraVie companies?
3       A. Can you be more specific?
4       Q. Did you ever personally read any of the
5   complaints that were sent to --
6       A. I did.
7       Q. -- the AuraVie companies?
8       A. I did.
9       Q. Were there any, I suppose, common complaints
10  that you felt were reoccurring in these complaints?
11      A. Not necessarily.
12      Q. Did you ever read complaints where consumers
13  expressed complaints that they were unaware of the
14  $97.88 charge that was applied to their account, I
15  guess, after 10 days?
16          MR. UNGAR: Objection as to the form of the
17  question. It's vague and ambiguous, it assumes
18  facts not in evidence.
19          THE WITNESS: No, not exactly. No
20  particular document like that, that I recall.
21  BY MR. TEPFER:
22      Q. Do you recall how often you would review
23  consumer complaints?
24      A. Very rarely.
25      Q. To go back to your statement about the four

### Page 129

1  number --
2  A. Okay. Yes, sir.
3  Q. Did you draft either of those two sections
4  that are attributed to you?
5      MR. UNGAR: Objection as to the form of the
6  question. It's vague and ambiguous.
7      THE WITNESS: No.
8  BY MR. TEPFER:
9  Q. Do you know if anyone, aside from
10 Khristopher Bond, assisted in drafting this
11 document?
12 A. Khristopher asked some, asked me some
13 questions some industry terms --
14 Q. Uh-huh.
15 A. -- and I gave him some stuff, and we're
16 sitting in a very close office environment, and I
17 remember the times, it took a couple of months, he
18 took a couple of months while getting paid to work
19 on this document. So some of the stuff that he has
20 here I may have told him, but he sat and wrote this
21 whole thing on his own.
22 Q. And you said while Mr. Bond was getting
23 paid. Were you paying Mr. Bond at that time?
24 A. The -- you know, it wasn't me. No, I wasn't
25 paying him.

### Page 130

1  Q. Do you recall if Mr. Bond consulted with
2  Nastassia Yalley concerning the drafting of this
3  document?
4  A. I believe he did.
5  Q. Do you recall if Mr. Bond consulted with
6  your brother Doron concerning the drafting of this
7  document?
8  A. I don't think so.
9  Q. Do you -- do you recall if he consulted with
10 Paul Medina concerning the drafting of this
11 document?
12 A. I don't think so.
13 Q. Did BunZai Media Group check its affiliates
14 or affiliate marketers for advertisements that you
15 believe were misleading?
16     MR. UNGAR: Objection as to the form of the
17 question. It's vague and ambiguous.
18     THE WITNESS: Can you repeat that for me,
19 please. I forgot the question.
20     (The previous question was read back
21 by the court reporter as follows:
22     "QUESTION: Did BunZai Media
23 Group check its affiliates or
24 affiliate marketers for
25 advertisements that you believe were

### Page 131

1  misleading?")
2      THE WITNESS: Yes.
3  BY MR. TEPFER:
4  Q. What sort of steps, or rather, did BunZai
5  Media Group have a standard operating procedure for
6  this sort of affiliate policing?
7  A. It's something that was -- again, it was an
8  on moving target, always consistently changing. By
9  default there were some parameters that we would
10 give to an affiliate network about the do's and
11 don't's. Don't incentivize traffic. Don't give
12 away free stuff. Don't tell people if they fill
13 some form out. So there was always some
14 instructions in the insertion orders, in the
15 agreement between the advertiser and the publisher
16 or the network about restrictions, about what not to
17 do. So yes.
18 Q. Who, if you know, at BunZai Media Group was
19 tasked with overseeing this affiliate policing?
20 A. Well, myself, Nastassia, Paul.
21 Q. Did, in your opinion, BunZai Media Group
22 have an issue with un-compliant affiliates?
23     MR. UNGAR: Objection as to the form of the
24 question. Calls for an opinion.
25     THE WITNESS: There were affiliates that we

### Page 132

1  stopped, that we terminated. Yes.
2  BY MR. TEPFER:
3  Q. On what grounds did you terminate your
4  relationship with these affiliates? What sort of --
5  sorry.
6      To rephrase, can you describe the
7  advertisements of these affiliates that you found to
8  be -- you found would require you to terminate your
9  relationship with them?
10 A. I don't recall the particulars right now, as
11 far as, you know, what they have, to give you an
12 example. Can I recall what particular things we
13 terminated?
14 Q. Well, perhaps a better question:
15     How would you learn about un-compliant
16 affiliates?
17     MR. UNGAR: Objection as to the form of the
18 question. It's vague and ambiguous regarding the
19 word "noncompliant" or "un-compliant."
20     THE WITNESS: Again, I'm not speaking as to
21 the word un-compliant because I don't know what
22 noncompliant, un-compliant means. I'm speaking of
23 problems, per se.
24 BY MR. TEPFER:
25 Q. Right. Sure.

161

1   A. Investors? No.
2   Q. In the second sentence you state that you
3   called Jose on Friday regarding setting up a
4   merchant processing relationship.
5       Do you remember that phone call?
6   A. No recollection of it. It's five years ago.
7   I don't know who Jose is. I may have called some
8   guy. You know, I did a lot of business in few
9   years. No.
10  Q. Did Mr. Latsanovski ever, to your knowledge,
11  provide you any introductions to individuals at
12  merchant processing companies?
13  A. I asked -- I asked him if he can introduce
14  me to a few people. I remember during the course of
15  a few years together he may have introduced me to a
16  few people in the business.
17  Q. And did Mr. Latsanovski have a lot of
18  connections in the merchant processing industry?
19  A. No.
20      MR. UNGAR: Objection to the form of the
21  question. It's vague and ambiguous, it calls for
22  speculation, lacks foundation.
23  BY MR. TEPFER:
24  Q. In -- later on you state "In every
25  department of our business, from Product

162

1   Development, Manufacturing, Design & Optimization,
2   Media Planning & Buying, Merchant Processing,
3   Understanding Online Compliance, Affiliate
4   Management & Fraud Prevention, to 'True, In-house'
5   Customer Service, Call Center Management & Product
6   Fulfillment."
7       Are those an accurate description of BunZai
8   Media Group's various departments?
9   A. It's -- no.
10  Q. Are there --
11  A. It's not department.
12  Q. Are there any of the, I guess, the
13  departments described there that were departments at
14  BunZai Media Group?
15  A. No, no. There was a Design Department.
16  Q. Later on you state that "We understand
17  consumer/publisher fraud and are extremely proactive
18  with chargeback resolution."
19      What did you mean by the phrase "extremely
20  proactive with chargeback resolution"?
21  A. Just what it means.
22  Q. As in that -- how do you -- how do you mean
23  "proactive"?
24  A. How do I mean "proactive"?
25  Q. Well --

163

1   A. By -- by finding possible, the quickest way
2   to minimize damages and finding resolution with the
3   customer.
4   Q. And what is --
5       So chargeback resolution, does that phrase
6   include contesting chargebacks successfully?
7       MR. UNGAR: Objection as to the form of the
8   question. It's vague and ambiguous.
9       THE WITNESS: No.
10  BY MR. TEPFER:
11  Q. Are you familiar with BunZai Media Group's
12  chargeback resolution processes?
13  A. Not in detail.
14  Q. Who at the company would be tasked with
15  chargeback resolution or managing that department?
16  A. In the beginning Khristopher took a couple
17  of months to call a bunch of companies to get a
18  deeper understanding of what needs to happen in
19  order to comply and supply and respond back to
20  chargebacks. And he called a few banks and called a
21  few merchant processors and did some research and
22  created a protocol. So the Regional Department was
23  actually maintained and created by Khristopher, and
24  then I think he handed it down to a few of the
25  employees.

164

1   Q. Did BunZai Media Group have a merchant
2   account with National -- National Merchant at any
3   point?
4   A. National Merchant?
5   Q. Yes.
6   A. National Merchant? National Merchant, no,
7   I'm not familiar with that name.
8   Q. Okay. Do you know anyone by the name of
9   Roman Balanko?
10  A. Yes.
11  Q. Who is he?
12  A. He's a merchant processor.
13      (Plaintiff's Exhibit 58 was
14      previously marked for identification
15      by the FTC and is attached hereto.)
16  BY MR. TEPFER:
17  Q. I'm now handing the witness what's been
18  marked Exhibit 58.
19      Do you recall receiving this email from
20  Mr. Latsanovski?
21  A. No.
22  Q. To your recollection, did you ever have any
23  conversations with Mr. Latsanovski regarding Visa
24  and MasterCard Excessive Chargeback Program?
25  A. No. This is an email that he forwarded me.

41 (Pages 161 to 164)