Jeffrey S. Benice, Esq., State Bar No. 81583
LAW OFFICES OF JEFFREY S. BENICE
*A Professional Law Corporation*
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California  92626
Telephone No.: (714) 641-3600
Facsimile No.: (714) 641-3601
Website: www.JeffreyBenice.com
E-Mail: JSB@JeffreyBenice.com

Attorneys for Defendants,
Igor Latsanovski and Calenergy, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP INC.,<br>et al.,<br><br>Defendants. | **CASE NO. CV 15-04527 GW (PLAx)**<br><br>**DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JEFFREY S. BENICE; IGOR LATSANOVSKI; MARIYA ALEDSANDROVNA; ILIA KLYKOV IN SUPPORT THEREOF; AND [PROPOSED] ORDER**<br><br>**Date:         May 16, 2016**<br>**Time:          8:30 A.M.**<br>**Courtroom:   10**<br><br>**[Assigned for All Purposes to the Honorable George H. Wu]**<br><br>**[First Amended Complaint Filed: October 9, 2015]**<br><br>**[Concurrently filed with Request for Judicial Notice and Statement of Uncontroverted Facts and Conclusions of Law]** |

---

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

| | **TABLE OF CONTENTS** | |
|---|---|---|
| 1. | SUMMARY OF DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT | 3 |
| | A.   The FTC's Claims. | 3 |
| | B.   Defendants Latsanovski and Calenergy Have No Liability Under The FTC Act. | 4 |
| | C.   The FTC's Claims Against Defendants Latsanovski and Calenergy Should be Dismissed. | 7 |
| 2. | RULE 56 MOTION FOR SUMMARY JUDGMENT STANDARD | 8 |
| 3. | PROCEDURAL HISTORY | 10 |
| 4. | DEFENDANTS NEITHER PARTICIPATED IN NOR HAD KNOWLEDGE OR RECKLESSLY DISREGARDED DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT | 10 |
| | A.   Defendants Latsanovski's and Calenergy History. | 10 |
| | B.   Defendant Latsanovski's Loan Transactions with Defendant Bunzai. | 11 |
| 5. | DEFENDANTS ALTERNATIVELY ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE FTC'S CONTENTION DEFENDANTS ARE SUBJECT TO JOINT AND SEVERALLY LIABILITY | 14 |
| 6. | THE PRELIMINARY INJUNCTION AND ASSET FREEZE CONCERNING DEFENDANTS' ASSETS AND THE ASSETS OF THIRD PARTY SUNSET HOLDINGS, LLC AND OTHERS MUST BE DISSOLVED | 15 |
| | A.   The Asset Freeze is Overbroad. | 15 |
| | B.   Third Party Investors in Sunset. | 18 |
| | C.   Ilia Klykov. | 18 |
| | D.   January 12, 2015 Agreement Between Guayas, Ltd. And Calenergy, LLC. | 19 |
| | E.   Guayas' Transfer of Funds To Calenergy. | 21 |
| | F.   Lawrence Rubin's Sunset Investment. | 22 |
| | G.   Mariya Aleksandrovna' Sunset Investment. | 23 |

| | H. | The Preliminary Injunction and Asset Freeze Must Be Dissolved as to Third Party Investors. | 24 |
|---|---|---|---|
| 7. | | CONCLUSION | 24 |

## TABLE OF AUTHORITIES

## FEDERAL CASES

| | |
|---|---|
| _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 247-48 (1986) | 9 |
| _Cabasug v. Crane Co.,_ 2013 U.S. Dist. LEXIS 180918, at *19 n.2 (D. Haw. Dec. 27, 2013) | 9 |
| _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322 (1986) | 9 |
| _Commerce Planet, Inc., supra,_ 878 F. Supp. 2d at 1088-1090 | 16 |
| _Delaware Watch Co. v. FTC,_ 332 F.2d 745, 746 (2d Cir. 1694) | 4 |
| _Delaware Watch,_ 332 _F.2d_ 1143 | 4 |
| _F.T.C. v. Bronson Partners, LLC,_ 654 _F.3d_ 359, 369 (2d Cir. 2011) | 17 |
| _F.T.C. v. Bronson Partners, LLC,_ 674 F. Supp. 2d 373, 380 (D. Conn. 2009) | 17 |
| _FTC v. Burnlounge, Inc.,_ 584 Fed. Appx. 315 (9th Cir. 2014) | 8 |
| _FTC v. Burnlounge, Inc.,_ 584 Fed. Appx. 315, 317 (9th Cir. 2014) | 14 |
| _FTC v. Commerce Planet, Inc.,_ 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016) | 14 |
| _F.T.C. v. Commerce Planet, Inc.,_ 878 F. Supp. 2d 1048, 1085-86 (C.D. Cal. 2012) (citations omitted) | 16 |
| _FTC v. Network Services Depot, Inc.,_ 617 _F.3d_ 1127, 1138-39 (9th Cir. 2010); | 7, 8, 9, 13 |
| _FTC v. Pantron Comp.,_ 33 _F.3d_ 1088, 1102 (9th Cir. 1994) | 14 |
| _FTC v. Pantron Comp.,_ 33 _F.3d_ 1088, 1102 (9th Cir. 1994) _Id._ at w.4 | 15 |

| | |
|---|---|
| _FTC v. Publishing Clearing House, Inc_., 104 _F.3d_ 1168, 1170-71 (9th Cir. 1997) | 8 |
| _F.T.C. v. QT, Inc.,_ 448 F. Sup 2d 908, 974-75 (N.D. Ill. 2006) | 17 |
| _FTC v. Stefanchik_, 559 _F.3d_ 924, 930-931 (9th Cir. 2009) | 5 |
| _FTC v. Stefanchik_, 559 _F.3d_ 924, 931 (9th Cir. 2009) | 8, 13, 16 |
| _FTC v. Stefanchik_, 559 _F.3d_ 924, 931 (9th Cir. 2009) (citations omitted) | 14 |
| _FTC v. Verity Intl, Ltd.,_ 443 _F.3d_ 48, 68 (2d Cir. 2006) | 16 |
| _Hately v. SEC_, 8 _F.3d_ 653, 656 (9th Cir. 1993); | 8 |
| _Inc2 Corn Corp.,_ 745 F. Supp. 2d at 1011 ( | 16 |
| _Network Services Depot,_ 617 _F.3d_ at 1138-39 | 8 |
| _SEC v. First Pacific Bancorp_, 142 _F. 3d_ 1186, 1191-92 (9th Cir.   1998) | 8 |
| _Stefanchik_, 559 _F.3d_ at 927, 930-32 | 8 |
| _Stefanchik,_ supra at 931 | 16 |
| _Stefanchik,_ 559 F.3d at 931-32 | 16 |

## STATUTORY AUTHORITY

| | |
|---|---|
| Federal Rule of Civil Procedure 56 | 8 |
| Fed. R. Civ. Proc. 56(a) | 8, 9 |
| F.R.A.P. Rule 32.1(a) | 8 |

**TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Please take notice that on May 16, 2016 at 8:30 a.m. in the Courtroom No. 10 of United States District Judge George H. Wu presiding, Defendants Igor Latsanovski and Calenergy, Inc. (collectively, "*Defendants*")  will move pursuant to Federal Rules of Civil Procedure Rule 56 for summary judgment or alternatively partial summary judgment  on Plaintiff Federal Trade Commission's ("*FTC*") claims against them as asserted in the First Amended Complaint ("*FAC*"): no evidence exists *inter alia* that Defendants "*participated directly in deceptive acts or had the authority to control them.*" *See, FTC v. Stefanchik*, 559 *F. 3d* 924, 931 (9th Cir. 2010).  Further, no evidence exists that Defendants "*had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted.*" *FTC v. Network Servs. Depot Inc*., 617 *F.3d* 1127, 1138 (9th Cir. 2010).

Alternatively, Defendant will seek partial summary judgment on the FTC's contention Defendants are jointly and severally liable with the other defendants for all purported consumer injury.  Rather, Defendants liability if any is solely for disgorgement of any sums *directly* received from Defendant Bunzai Media, Inc. during the period 2010 to 2015.  *See, SEC v. JT Wallenbrock & Assocs*., 440 *F.3d* 1109, 1114 (9th Cir. 2006); *FTC v. Burnlounge, Inc*., 584 Fed. Appx. 315 (9th Cir. 2014).

Finally, because summary judgment or alternatively partial summary judgment should be granted, Defendants request that the existing preliminary injunction and asset freeze order issued on September 9, 2015 be dissolved.  No basis in law or fact exists for the order to continue in effect against Defendants Latsanovski and Calenergy.

Defendants' motion is based upon this notice of motion and motion; the supporting declarations of Jeffrey S. Benice, Igor Latsanovski, Mariya Aleksandrovna, Ilia Klykov; the concurrently filed Statement of Uncontroverted Facts and Conclusions of Law; the Request for Judicial Notice; and all files and records filed herein.

///

///

1    This motion is made following the conference of counsel pursuant to Local Rule 7-3 which

2    took place via e-mail on April 6, 2016 and April 12, 2016.

3

4

5    DATED: April 15, 2016                         Respectfully submitted,

6

7                                                  _____

8                                                  LAW OFFICES OF JEFFREY S. BENICE
                                                   Jeffrey S. Benice
9                                                  Attorney for Defendants,
                                                   Igor Latsanovski and Calenergy, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1.

## SUMMARY OF DEFENDANTS LATASANOSKI AND CALENERGY'S
## MOTION FOR SUMMARY JUDGMENT OR
## ALTERNATIVELY PARTIAL SUMMARY JUDGMENT

*A.      The FTC's Claims.*

The FTC's first amended complaint ("*FAC*") contains seven counts for (1) failure to disclose adequate material terms of offer; (2) false "*risk-free*" trial claim; (3) false Better Business Bureau Accreditations and rating claims; (4) unfairly charging consumers without authorization; (5) violation of ROSCA – Auto-Renewal Continuity Plan; (6) unauthorized debiting from consumer's accounts; and (7) a separate count against relief Defendant Chargeback Armor, Inc.

The FTC's primary factual contention is that defendants conceived and operated a skincare business called "*Aura Vie*"; and improperly sold the products through misleading web-based advertising.  Defendants Latsanovski and Calenergy's Motion for Summary Judgment or Alternatively Partial Summary Judgment does not address the propriety of the web-based sales program.  ***Rather, it is focused on one key issue; whether they should be individually liable; and if liable on any theory, subject to equitable disgorgement rather than joint and severally liability.***

The FTC's allegations against Defendants Latsanovksi and Calenergy directly implicated them in the alleged scheme:

> "21.  *Defendant Calenergy, Inc. is or was a California corporation*
> *with its principal place of business at 63420 Cordova Drive,*
> *Calabasas, CA 91302.  At times material to this Complaint,*
> *CalEnergy, Inc. had advertised marketed, distributed, or sold the*
> *skincare products at issue in this case to consumers throughout the*
> *United States. CalEnergy, Inc. transacts or has transacted*
> *business in this district and throughout the United States.*"
>
> [FAC ¶21]
>
> "36.  *Defendant Igor Latsanovski is or was an owner of Bunzai*

3

*Media Group, Inc. and CEO of Zen Mobile Media Group, Inc. At times material to this Complaint, he has formulated, directed, controlled, had the Authority to control, or participated in the acts or practices set forth in this Complaint. By and through the corporate defendants, he has harmed consumers nationwide with his unfair and deceptive practices. Defendant Igor Latsanovski resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States."* [FAC, ¶36.]

As explained the FTC's allegations are meritless. Neither Defendant Latsanovski nor Calenergy held any ownership interest in Defendant Bunzai; nor had any involvement in defendant Bunzai's operations.

The FTC further alleges that Defendants Latsanovksi and CalEnergy engaged in a common enterprise. [FAC, ¶42.] The FTC uses the common enterprise doctrine to expand its reach beyond those who themselves deceptively market a product where the *"same individuals were transacting an integrated business through a maze of interrelated companies."* <u>Delaware Watch Co. v. FTC</u>, 332 F.2d 745, 746 (2d Cir. 1694). Courts rely on several factors to assess the existence of a common enterprise: whether companies (1) maintain officers and employees in common; (2) operate under common control; (3) share offices; (4) commingle funds; and (5) share advertising and marketing. No one factor is determinative, rather, the entirety of the factual circumstances dictates whether a common enterprise exists and whether a company should be found to be a part of it. <u>Delaware Watch</u>, 332 *F.2d* 1143. As explained, neither any individual factor nor the overall circumstances support finding Defendants Latsanovski and Calenergy to be a part of any common enterprise with the Bunzai defendants. The evidence is undisputed that Defendants Latsanovski and CalEnergy were solely third party lenders to Defendant Bunzai (and affiliate companies) during the period 2010 to 2015. No common enterprise existed between them. [See discussion *infra* at 11-13.]

///

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1    **B.**        ___Defendants Latsanovksi and Calenergy Have No Liability Under The FTC Act.___

2            Defendant Latsanovski and his company Calenergy have been named as defendants by

3    Plaintiff FTC because they allegedly "*participated in the scheme*"; and Latsanovski was "*an*

4    *employee of Bunzai, he was a party and majority shareholder.*" [*See, FTC's July 31, 2015 Reply*

5    *to Defendants' Opposition to Preliminary Injunction* at 8: lns. 15-16; 9: lns. 1-2.] In fact, the

6    FTC's assertions concerning Defendants' participation in the alleged Aura Vie marketing

7    "*scheme*" are materially misstated or grossly exaggerated for the sole purpose of imposing joint

8    and several liability on Defendants. *See, FTC v. Stefanchik*, 559 *F.3d* 924, 930-931 (9th Cir.

9    2009); *only these defendants have significant assets to seize*. The remaining defendants are

10   essentially judgment proof.

11           For example, the FTC contends *inter alia* that Defendants transferred at least $1.9 million

12   from defendant Bunzai to Defendants. [*See, Receiver's July 16, 2015 Response to Defendants'*

13   *Application for Partial Relief from Temporary Restraining Order* at 2: lns. 21-22.] In fact,

14   Defendant Calenergy loaned defendant Bunzai the principal sum of $500,000 as a form of

15   revolving credit line during the period 2010 to 2015.  Defendant Bunzai repaid $500,000 in

16   principal and $317,748.05 (herein "*$317,000*") in interest to Calenergy. [Decl. of Latsanovski,

17   ¶¶2-5; Exh. "A" thereto; *July 1, 2015 Loan Summary.*]  The 1.9 million number is the aggregate of

18   all principal loan advances; repayments; and further re-advances of the original $500,000 in loans

19   made in various installments. [Decl. of Latsanovski, ¶4.]The FTC (and the Receiver) has

20   continued to grossly overstate Defendants' loans to defendant Bunzai to improperly attempt to

21   expand Defendants' role and relationship with Defendant Bunzai.

22           More importantly, Defendants' business relationship with defendant Bunzai has been

23   mischaracterized and distorted by the FTC to ensnare Defendants in this litigation; and subject

24   unrelated third party "*untainted*" assets owned by unrelated third party Sunset Holdings, LLC

25   ("*Sunset*") and others to be subject to an asset freeze through this Court's September 9, 2015

26   preliminary injunction. In fact, the undisputed facts are that:

27   •    Defendants Latsanovski and Calenergy were solely investors who loaned $500,000

28        in principal to defendant Bunzai.  [Decl. of Latsanovksi, ¶2-4; Exh. "A" thereto;

                                              5

1    *July, 2015 Loan Summary.*][Decl. of Benice, ¶4; Exh. "C" thereto, *February 18,*

2    *2016 Deposition of Alon Nottea* at R.T. 84: lns. 15-25 (Bates 85); 85: 1-25 (Bates

3    86); 86: lns. 1-24 (Bates 86).]

4    • Defendants actually received $317,000 in investment return on the $500,000

5    investment and were repaid the $500,000. [Decl. of Latsanovksi, ¶¶2-4; Exh. "A"

6    thereto; *July 1, 2015 Loan Summary.*][Decl. of Latsanovsky, ¶¶15-16.] [Decl. of

7    Benice, ¶2: Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski*, R.T. 35:

8    lns. 2-25 (Bates 21); 36: lns. 1-24 (Bates 22); 37 lns. 1-24 (Bates 23); 38: lns. 1-24

9    (Bates 24); 114: lns. 1-24 (Bate 41); 116: lns. 1-11 (Bates 42)][Decl. of Benice, ¶4:

10   Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* R.T. 85: lns. 3-5

11   (Bates 86)("*Did Bunzai...pay back Igor...? A. I believe it did.*"]

12   • Defendants had no involvement in the day to day operations of defendant

13   Bunzai.[Decl. of Benice, ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of*

14   *Latsanovski* at R.T. 30: lns. 6-23 at Bates 20.][Decl. of Benice, ¶4; Exh. "C"

15   thereto, *February 18, 2016 Deposition of Alon Nottea* at R.T. 109: lns. 22-24

16   (Bates 89); 110: lns. 1-25; 111: lns. 1-25: 112: lns. 1-12; 161: lns. 10-19 (Bates

17   92).][Decl. of Latsanovsky, ¶10; 12-18.]

18   • Defendants had no knowledge of or involvement in Defendant Bunzai's alleged

19   wrongful activity and did not recklessly disregard such conduct. [Decl. of Benice,

20   ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski* at R.T. 269: lns

21   4-18 (Bates No. 069) ("*Alon can do it... He is running it. [Bunzai]*"[Decl. of

22   Latsanovski, ¶17.]

23   • Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of

24   the internet skincare business.  Latsanovski never spoke to any customers; was not

25   involved in the day to day operations of the internet skincare business; had no

26   involvement in the marketing or advertising of the skincare products; never

27   received or reviewed any reports regarding customer complaints; and had no

28   knowledge of the web based advertising used by defendant Bunzai. Defendants

1  Alon and Bond actually operated and controlled Defendant Bunzai and made all
2  operational decisions.  Neither Calenergy nor Defendant Latsanovski received any
3  money from consumers directly. [Decl. of Latsanovksi, ¶¶10; 17-18.]

4  • As noted above, the amount of Defendant Latsanovski's assets impacted by the
5  TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In
6  total, over $3.1 million of Latsanovski's assets have been impacted by the asset
7  freeze.  Latsanovski's $3.1 million home is subject to the freeze and his personal
8  bank accounts (which contained approximately $50,000) have been frozen. [Decl.
9  of Latsanovksi, ¶23.]

10  • Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners
11  LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors
12  who would be willing to provide funds to these businesses. None of these
13  businesses received funds from Defendant Bunzai.  As a result of the asset freeze,
14  these legitimate businesses have had their bank accounts frozen even though  (a)
15  these businesses are completely unrelated to the alleged internet skincare business,
16  (b) were funded by unrelated sources of income; and/or (c) were not run by
17  Defendants Calenergy or Latsanovski. [Decl. of Latsanovksi, ¶27.]

18  • Most importantly, unrelated third party, Sunset Holding Partner, LLC ("*Sunset*") is
19  a real estate investment company that was formed in January 2015, well after the
20  business entities involved in the skincare business were dissolved.  But its Well
21  Fargo account ($212,000) and real estate assets valued in excess of $5 million  were
22  frozen in September 2015, even though all of the funds frozen came from a outside
23  real estate investors.   [Decl. of Latsanovksi, ¶27.]

24  **C.**  ***The FTC's Claims Against Defendants Latsanovsky and Calenergy Should be***
25  ***Dismissed.***

26  The Ninth Circuit has established a two-pronged test for determining when an individual
27  may be held personally liable for corporate violation of the FTC Act. *The test requires the FTC to*
28  *prove that the individual: (1) participated directly in, or had the authority to control, the unlawful*

7

1  *acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, was*

2  *recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high*

3  *probability of fraud and intentionally avoided learning the truth. See,* FTC v. Network Services

4  Depot, Inc., 617 *F.3d* 1127, 1138-39 (9th Cir. 2010); FTC v. Stefanchik, 559 *F.3d* 924, 931 (9th Cir.

5  2009).  Satisfaction of the two-pronged test establishes the degree of collaboration between co-

6  defendants necessary to justify joint and several liability in analogous factual contexts, such as

7  actions brought by the Securities and Exchange Commission ("SEC") to obtain disgorgement in

8  securities fraud cases. *See,* SEC v. First Pacific Bancorp, 142 *F. 3d* 1186, 1191-92 (9th Cir.  1998);

9  Hately v. SEC, 8 *F.3d* 653, 656 (9th Cir. 1993);   Network Services Depot, 617 *F.3d* at 1138-39;

10  Stefanchik, 559 *F.3d* at 927, 930-32; FTC v. Publishing Clearing House, Inc., 104 *F.3d* 1168,

11  1170-71 (9th Cir. 1997).

12       The facts are undisputed that Defendants Latsanovski and Calenergy did not engage in

13  conduct satisfying the two-pronged test.  Thus, as a matter of law they have no liability arising

14  from the FTC's claims asserted in the FAC.  They are accordingly entitled to summary judgment

15  on all claims asserted against them; and the preliminary injunction and asset freeze should be

16  dissolved as well. [*See,* discussion infra at 15-24.]

17       Alternatively, Defendants an entitled to partial summary judgment on the FTC's claims

18  against them for joint and several liability. Assuming *arguendo* that the Court determines that

19  defendants Latsanovski and Calenergy's alleged status as *partners* with Bunzai creates an

20  inference that they likely had actual knowledge or were recklessly indifferent to the truth of

21  purported misrepresentations made to consumers, they should be *subject only to disgorgement, not*

22  *joint and several liability. See,* FTC v. Burnlounge, Inc., 584 Fed. Appx. 315 (9th Cir. 2014) [*See,*

23  F.R.A.P. Rule 32.1(a); *citation permitted of unpublished opinions.*] Defendants received $317,000

24  in profit/interest return on the $500,000 investment made into Bunzai. [Decl. of Latsanovski, ¶¶2-

25  4.] *Thus, the amount they should be ordered to disgorge if any should not exceed $317,000.*

26  ///

27  ///

28  ///

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

**2.**

## RULE 56 MOTION FOR SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 ("*Rule 56*") mandates that a summary judgment motion be granted "*if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.*" Fed. R. Civ. Proc. 56(a).

Even if a party has asserted several claims in the complaint, the defendant  may choose to move for summary judgment on a single claim or even part of a single claim.  *See*, Fed. R. Civ. Proc. 56(a)("*A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought.*"); <u>*Cabasug v. Crane Co.,*</u> 2013 U.S. Dist. LEXIS 180918, at *19 n.2 (D. Haw. Dec. 27, 2013)("*Plaintiff's Motion is proper under Rule 56(a) which allows a party to move for summary judgment on a 'claim or defense.' This language was included  in the 2010 amendments to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense.*")

Under this standard, "*the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; the requirement is that there be no genuine issue of material fact.*" <u>*Anderson v. Liberty Lobby, Inc.,*</u> 477 U.S. 242, 247-48 (1986).  A material fact is one that "*might affect the outcome of the suit under the governing law,*" and a genuine dispute exists only if "*a reasonable jury could return a verdict for the nonmoving party.*"

Summary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish "*the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.*" *See*, <u>*Celotex Corp. v. Catrett*</u>, 477 U.S. 317, 322 (1986).

As explained below, there is no evidence that Defendants "*(1) participated directly in or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, [were] recklessly indifferent to the truth or falsity of the misrepresentation or [were] aware of a high probability of fraud and intentionally avoided*

9

1 | *learning the truth." See, <u>FTC v. Network Services Depot, Inc.,</u>* 617 *F.3d* 1127, 113.8-1139 (9[th]
2 | Cir. 2010).

3.

<b><u>PROCEDURAL HISTORY</u></b>

The FTC filed this Action on June 16, 2015 concurrently with an ex parte application to temporarily seal the entire file and docket; and an ex parte application for a restraining order.  This Court granted the TRO and thereafter lifted the stay.  A hearing on the FTC's preliminary injunction and asset freeze was set for August 6, 2015.  On September 9, 2015 the Court entered its order granting a preliminary injunction and asset freeze as to Defendants Latsanovski and Calenergy. (As well as all other defendants).

4.

<b><u>DEFENDANTS NEITHER PARTICIPATED IN NOR HAD</u></b>

<b><u>KNOWLEDGE OR RECKLESSLY DISREGARDED</u></b>

<b><u>DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT</u></b>

A.     <b><u>*Defendants Latsanovski's and Calenergy's History.*</u></b>

Defendant Latsanovksi is a 52 year old immigrant.  He was born in Kazakhstan (USSR) in 1964 and lived with his family there until approximately 1990. He graduated from college in approximately 1983.  In 1992 Defendant Latsanovksi moved to Canada. In 1996, when he was 33 years old, he moved with his wife to Spain.  Defendant Latsanovksi lived in Barcelona, Spain from 1996 to 2010. While in Spain he became involved in various real estate development projects.  In 2010, he moved from Spain. [his wife and family (2 children), moved to the United States in 2011.]  When he first arrived in the United States in 2010 he could speak a little English, but could not read nor write English. [Decl. of Latsanovski, ¶14.] He used an interpreter to read English. [Decl. of Latsanovski, ¶¶4-6.]

Defendant Latsanovski represented a group of foreign investors in 2010 as their agent in the United States. His business plan involved placing the foreign investors' investment funds in to suitable investments in the United States. He also made investments on his own behalf. In 2009 Defendant Latsanovski created Defendant Calenergy and became its CEO.  Defendant Latsanovski

10

<b>DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT</b>

1   used Defendant Calenergy to fund investments with investor funds. [Decl. of Latsanovski, ¶14.]

2       Sometime in 2010, Latsanovski was approached by Defendant Alon Nottea, to invest in an

3   internet skincare project with Defendant Bunzai Media Group, Inc. ("*Bunzai*").  Mr. Nottea was

4   Defendant Bunzai's president and CEO. From conversations with Defendant Nottea, Defendant

5   Latsanovski understood that Defendant Bunzai needed funds to hire additional employees and

6   resources. Defendant Latsanovksi preliminarily agreed to invest funds in Defendant Nottea's

7   company.

8       Defendant Nottea also introduced Defendant Latsanovski to Defendants Khristopher Bond

9   who handled the day to day operations for the internet skincare business and also handled all

10  aspects of the business, including marketing, advertising, product fulfillment and customer service.

11      Defendant Latsanovski's sole involvement in Defendant Bunzai, and all entities related to it

12  ("*Bunzai Group*"), was to provide loans through his company Defendant Calenergy. As Defendant

13  Calenergy's CEO, Defendant Latsanovski had no involvement in the operation of the Bunzai

14  Group and had no authority to make any decisions regarding the operations of the Bunzai Group.

15  [Decl. of Latsanovski, ¶¶14-15.]

16      Defendant Latsanovksi did not perform any functions in advertising, payment processing,

17  billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai

18  Group's operational decisions.  Moreover, he had no interactions with customers, did not received

19  any customer complaints, nor any reports of customer complaints.  [Decl. of Latsanovski, ¶16.]

20      At no point did Defendant Latsanovski believe that any customers were being deceived or

21  defrauded. By all indications, Defendant Nottea was running a legitimate company operating in a

22  legitimate industry. [Decl. of Latsanovski, ¶17.]

23  **B.    *Defendant Latsanovski's Loan Transactions with Defendant Bunzai.***

24      In 2010 when Defendant Latsanovski was introduced to defendants Nottea and Bunzai an

25  initial proposal was made to Defendant Latsanovski, in which he would invest *"$350k in exchange*

26  *for 55% ownership of Bunzai Media Group, Ownership Shares ... will be as follows:  55% Igor,*

27  *22.5% Alon[Nottea], 22.5 Khristopher [Bond]"*.  The proposal was memorialized in a document

28  entitled "*Bunzai Media Group  - Partnership Agreement*," dated October 12, 2010. [Decl. of

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

Latsanovski, ¶18; Exh. "C" thereto; *Bunzai Media Group Partnership Agreement dated October 12, 2010.*]

A condition to the October 12, 2010 Agreement's validity was that:

> "*upon signing this agreement, Igor shall invest $75k to run a continuity test for 30 days. During this test, Bunzai will purchase at least 1,000 orders . . . within the first 15 days, and a conversion from free trial to transitional stage . . . of at least 75% of those orders. If this goal is met and both parties agree to continue with the partnership, then Igor will immediately invest the remaining $275k to complete the financial agreements of this deal.*" [Decl. of Latsanovski, ¶18; Exh. "C" thereto; *October 12, 2010 Agreement* at 1.]

Defendant Latsanovski advanced the $75,000 on October 12, 2010. However, the condition to the validity of the October 12, 2010 Agreement did not occur. The continuity test was not satisfactorily completed and the "*parties [did not] agree to continue with the partnership . . .*" [Decl. of Latsanovski, ¶19.]

Defendants Nottea and Bond, defendant Bunzai's officers, then proposed a "*Bunzai Media Group Loan Agreement*" dated December 16, 2010. [Decl. of Latsanovski, ¶20; Exh. "D" thereto; "*Bunzai Media Group Loan Agreement dated December 16, 2010.*"] The December 16, 2010 Loan Agreement offered two alternatives to Defendant Latsanovski concerning a loan of $175,000 he was to make to defendant Bunzai; "*This Agreement . . . with respect . . . to the loan of $175k to existing company.*" First, defendant Bunzai agreed to repay the $175,000 in three (3) payments on April 5, May 5, and June 5, 2010 respectfully of $50,000, $50,000 and $100,000. "*Alternatively, "Igor's 175k will become an investment that will represent a percentage of ownership in the company that will be determined the first week of January, 2011.*" [Decl. of Latsanovski, ¶20; Exh. "D" thereto; *Bunzai Media Group Loan Agreement* dated December 16, 2010.]

No subsequent agreement was negotiated between the parties in January, 2011. Rather, in March, 2011 Defendants Nottea and Bond offered Defendant Latsanovski a new partnership

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1   proposal.  This new agreement required Defendant Latsanovski to immediately "*invest $500,000*

2   *into the company for administration, manufacturing and marketing expenses. . . Investments shall*

3   *be returned as follows:*

4          *Igor $300k*

5          *Alon and Khristopher (to go to French Partners) $200k*

6          *Igor $200k*

7          *Alon and Khristopher $300k*"

8          Pursuant to the March 23, 2011 Partnership Agreement's terms defendants Latsanovski,

9   Nottea, and Bond would each own "*1/3 of 100% of the company.*"  Further:

10          "*5. It is understood by all parties that this will be Alon Nottea and*

11          *Khristopher Bond's primary business and they shall devote to the*

12          *conduct of the business so much of their respective time as may*

13          *be reasonably necessary for the efficient operation of the business.*"

14          [Decl. of Latsanovski, ¶21; Exh. "D" thereto; "*Bunzai Media Group –*

15          *Partnership Agreement* dated March 23, 2011.]

16          Defendant Latsanovsky decided not to invest $500,000 in one lump sum into Defendant

17   Bunzai in March, 2011. [Decl. of Latsanovski, ¶22.]  He was uncomfortable with the terms of

18   repayment of the investment and decided that he would remain a lender as set forth in December

19   16, 2010 Loan Agreement. [Decl. of Latsanovski, ¶22.]  Defendants Nottea and Bond agreed that

20   Defendant Latsanovski's status would be as a lender only. [Decl. of Latsanovski, ¶22;

21          Because Defendants Latsanovski and Calenergy functioned solely as lenders to defendant

22   Bunzai, as a matter of law they may not be held personally liable for Defendant Bunzai's corporate

23   violation of the FTC Act.  Accordingly, as a matter of law no evidence exists that they *(1)*

24   *participated directly in, or had the authority to control, the unlawful acts or practices at issue; and*

25   *(2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth*

26   *or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally*

27   *avoided learning the truth. See, FTC v. Network Services Depot, Inc.*, 617 *F.3d* 1127, 1138-39 (9th

28   Cir. 2010); *FTC v. Stefanchik*, 559 *F.3d* 924, 931 (9th Cir. 2009).

13

**5.**

## DEFENDANTS ALTERNATIVELY ARE ENTITLED

## TO PARTIAL SUMMARY JUDGMENT ON THE FTC'S

## CONTENTION DEFENDANTS ARE SUBJECT TO JOINT

## AND SEVERALLY LIABILITY

Defendants alternatively seek partial summary judgment on the FTC's contention they are jointly and severally liable with their co-defendants; because no evidence exists that Defendants acted in concert with defendant Bunzai to violate the FTC Act, Defendants are liable if at all to only disgorgement of the sums they directly received from defendant Bunzai during the period 2010-2015.  That sum is $317,000 [Decl. of Latsanovski, ¶¶1-4.]  See, *FTC v. Commerce Planet, Inc.*, 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016).

Utterly no evidence exists the Defendants "*participated directly in*" or controlled the alleged unlawful acts and had actual knowledge of the misrepresentations or were recklessly indifferent to them. The evidence is undisputed that Defendants loaned Defendant Bunzai $500,000 during the period 2010 to 2015; that the full principal amount of $500,000 was repaid by Defendant Bunzai; and $317,000 in interest on the investment return on the $500,000 loan was repaid. [Decl. of Latsanovski, ¶¶1-4; 10; 15-18.]

Accordingly, to the extent Defendants are liable at all it is solely for disgorgement of the $317,000 they received for Defendant Bunzai – nothing more.  Defendants accordingly seek partial summary judgment on this issue. *See, e.g., FTC v. Burnlounge, Inc.,* 584 Fed. Appx. 315, 317 (9th Cir. 2014) (Affirming district court's order that a defendant who raised capital necessary to create the defendant corporation; owned stock in the corporation ; and held a position in the organization; "*likely ... had actual knowledge or was at least recklessly indifferent to the truth of the misrepresentations made to consumers*" disgorge "*all monies and other items of enrichment which he obtained from Burnlounge's operations.*")  This Court has "*broad authority to fashion appropriate remedies for violations of the Act. [and] it includes the 'authority to grant any ancillary relief necessary to accomplish complete justice.'*" *FTC v. Pantron Comp.*, 33 *F.3d* 1088,

14

1  1102 (9th Cir. 1994).  Such ancillary relief may include restitution or disgorgement.  *Id*. at w.4.

2  Because of Defendants sole involvement in Defendant Bunzai's operations was as a lender

3  of only $500,000, they should be subject solely to disgorgement of the $317,000 they received as a

4  return on their $500,000 investment.

5  6.

6  **THE PRELIMINARY INJUNCTION AND ASSET FREEZE CONCERNING**

7  **DEFENDANTS' ASSETS AND THE ASSETS OF THIRD PARTY**

8  **SUNSET HOLDINGS, LLC AND OTHERS MUST BE DISSOLVED**

9  Because Defendants as a matter of law are liable for no more than disgorgement of the

10  $317,000 they actually received from Defendant Bunzai, the existing preliminary injunction and

11  asset freeze concerning Defendants' assets valued in excess of $317,000 and the assets of non-

12  defendant third parties must be dissolved.

13  **A.**   ***The Asset Freeze is Overbroad.***

14  The preliminary injunction issued by this Court on September 9, 2015 froze all defendants'

15  assets as well as the assets of non-defendant third parties Sunset Holdings, LLC, Rilend, Inc.,

16  Vastpay and ComicFix, LLC.

17  First the FTC depleted the following sums in cash out of the bank accounts of defendants

18  and the identified third parties:

19  - Vastpay - $40,000

20  - Sunset Holdings Partners, LLC - $212,000

21  - Igor Latsanovski - $50,000

22  - Calenergy, Inc. - $60,000

23  Second, the FTC has frozen the equity of Defendant Latsanovski's personal residence

24  located at 3420 Cordova Drive, Calabasas, CA 91302.  The house is valued at $3.1 million.  There

25  is approximately $1.3 million of equity in the house. [Decl. of Latsanovski, ¶23.]

26  Third, and most importantly, the asset freeze of Sunset Holdings Partners, LLC ("*Sunset*")

27  has effectively frozen $5,868,000 in third party investor funds independently invested in Sunset.

28  [Decl. of Klykov, ¶¶1-7.]  Ilia Klykov describes that investment of $5,868,000 in detail in his

15

1  supporting declaration.

2      Further, third party investor funds of Lawrence Rubin and Mariya Aleksandrovna totaling

3  respectively $1,000,000 and $1,100,000 were also invested into Sunset and are also improperly

4  subject to the asset freeze. [Decl. of Latsanovski, ¶24.]

5      The district court has "*broad authority to fashion appropriate remedies for violations of the*

6  *FTC Act.*" <u>F.T.C. v. Stefanchik</u>, 559 *F.3d* 924, 931 (9th Cir. 2009) (citations omitted); <u>F.T.C. v.</u>

7  <u>Commerce Planet, Inc.</u>, 878 F. Supp. 2d 1048, 1085-86 (C.D. Cal. 2012) (citations omitted).

8  Although this Court has the authority to award restitution to redress consumer injury, it also may

9  order a defendant to disgorge illegally obtained funds "*to deprive wrongdoers of ill-gotten gains.*"

10  *Id.* As such, the Court should only authorize an award of consumer loss when equity requires a

11  defendant to restore a consumer to the status quo. <u>Stefanchik</u>, *supra* at 931 (noting that "*Equity*

12  *may require a defendant to restore his victims to the status quo where the loss suffered is greater*

13  *than the defendant's unjust enrichment*").

14      Courts typically measure restitution by total consumer loss where defendants ***directly***

15  received consumer proceeds or were directly involved in the alleged misconduct — neither of

16  which is present here. *See* <u>Stefanchik</u>, 559 F.3d at 931-32 (upholding award of consumer loss

17  where defendants "*were driving force behind marketing scheme*" and had "*authority to control*" it);

18  <u>Inc2 Corn Corp.</u>, 745 F. Supp. 2d at 1011 (upholding use of consumer loss as measurement of

19  restitution where defendants directly received proceeds from consumers); <u>Commerce Planet, Inc.</u>,

20  *supra*, 878 F. Supp. 2d at 1088-1090 (awarding consumer loss where individual defendant

21  supervised business operations and reviewed alleged misleading statements).

22      Courts have recognized that loss should be measured by a defendants' ill- gotten gain, not

23  total consumer loss, where, as here, the defendant did not participate in marketing or selling the

24  products to consumers or directly receive consumer proceeds. *See,* <u>FTC v. Verity Intl, Ltd.</u>, 443

25  *F.3d* 48, 68 (2d Cir. 2006) (finding FTC's remedy was limited to Defendants' profit where

26  defendant did not directly market products to consumers or receive funds from consumers). In

27  <u>Verity</u>, the court rejected the FTC's attempt to recover all consumer losses from the defendant as

28  overbroad because it was improper to rely on "*shorthand from cases in which only one who sold*

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1   *directly to the consumers was sued.*" *Id.* Because a middleman received funds from the consumers

2   directly, the Second Circuit directed the district court to consider how much of this money was

3   received by defendant and that this fraction constituted defendant's unjust enrichment or ill-gotten

4   gains. *See also* F.T.C. v. Bronson Partners, LLC, 654 *F.3d* 359, 369 (2d Cir. 2011) ("*funds*

5   *returned to consumers or never received by a defendant are not unjust gains").*[1]

6        Because any monies received by Defendants Calenergy or Latsanovski were or re-payment

7   of a line of credit made to Defendant Bunzai, and neither Calenergy nor Latsanovski played any

8   role in the skincare business operations, it would be inequitable to permit the FTC to seize all of

9   Defendants Latsanovski's or Calenergy's assets to secure losses allegedly caused by the conduct of

10  others.

11       Moreover, it is also inequitable to permit the FTC to freeze assets that are not related to

12  Defendant Bunzai's skincare business. ComicsFix, Vastpay and Sunset were all funded by outside

13  investors, not proceeds from the internet skincare business. For example, the accounts of Sunset

14  have been frozen even though Sunset was formed in January 2015; Sunset is a real estate

15  investment company, and the vast majority of the funds frozen in June 2015 came from outside

16  real estate investors. [Decl. of Latsanovski, ¶25.][Decl. of Aleksandrovna, ¶¶1-7.][Decl. of

17  Klykov, ¶¶1-7.]

18       At most, the preliminary injunction and asset freeze should be limited to the amount of

19  Defendants Latsanovski's and Calenergy's alleged unjust enrichment — the $317,756.05 return on

20  the loan/investment by Calenergy in Defendants Bunzai.  The asset freeze and preliminary

21  injunction should otherwise be dissolved and/or modified.

22  ────────────────────

23  [1]  Other courts are in accord with this reasoning. *See* F.T.C. v. QT, Inc., 448 F. Sup 2d 908, 974-75 (N.D. Ill. 2006)
    (citing *Verity* and noting that "*defendant's gain will be equal to the consumer's loss because the consumer buys goods*

24  *or services directly from the defendant*" but "*it is incorrect to generalize this shorthand and apply it to cases where*
    *others take* "consumer's money before it reaches a defendant's hands"; F.T.C. v. Bronson Partners, LLC, 674 F. Supp.

25  2d 373, 380 (D. Conn. 2009) (noting "*if the funds flow directly to the defendant, the defendant is in receipt of the*
    *whole amount and thus liable in restitution for the whole amount, i.e., its gain; but if the funds flow through an*

26  *intermediary who passes only a portion of the funds on to the defendant, the defendant has not unjustly received the*
    *whole amount.*"); *aff'd*, 654 *F.3d* 359 (2d Cir. 2011).

27

28

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1  **B.      _Third Party Investors in Sunset._**

2          As explained, Sunset's capital came from third party investors with utterly no relationship

3  to Defendant Bunzai or the FTC's claims. The investors are identified below.

4  **C.      _Ilia Klykov._**

5          Mr. Klykov is a Russian real estate attorney.  He describes in detail the structure of the

6  $5,868,000 in investor funds invested into Sunset in his supporting declaration. [Decl. of Klykov,

7  ¶¶1-7]. Mr. Klykov has known defendant Latsanovski for approximately 15 years. Over the years,

8  he has from time to time invested funds with defendant Latsanovski's assistance for real estate

9  investment and development.

10         In or about November 6, 20 he entered into an agreement with Defendant Latsanovski

11 entitled "_Fiduciary Management Agreement_" ("_the Fiduciary Agreement_") [Decl. of Klykov, ¶4;

12 Exh. "A" thereto; "_Fiduciary Management Agreement._"] The Fiduciary Agreement is presently in

13 full force and effect.  Pursuant to the Fiduciary Agreement's term, Defendant Latsanovski agreed

14 to become Mr. Klykov' s fiduciary agent concerning the operation of an Estonian legal entity "_OU_

15 _Guayas_." The Fiduciary Agreement further provides:

16         "_Whereas_

17              • _The client [Klykov] intends to acquire 100 per cent share_

18                _Capital of Estonian legal entity OU Guayas Legal entity_

19                _code 11084313 (hereinafter Estonian company)._

20              • _Due to personal reasons the client is not disposed to_

21                _become the official Member (owner)of Estonian company,_

22                _however he is disposed to be the effective beneficial owner_

23                _of Estonian company and make decisions related to the_

24                _control of the company:_

25                           . . .

26              • _The client is entrusting the fiduciary [Defendant_

27                _Latsanovski] to acquire Shares in an Estonian Company:_

28                           . . .

---
**18**

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1.   *The client is engaging the fiduciary to become the*
*mandate shareholder in the company incorporated*
*under the name of **OU Guayas** within three business*
*days after signing this agreement and the fiduciary will*
*have one hundred per cent (100%) membership*
*(ownership) in his company.*

2.   *The client is also engaging the fiduciary to be*
*its legal representative.*

3.   ***The parties specifically agree that the membership***
***(ownership) in the company is the sole and exclusive***
***property of the client [Klykov]and any benefits derived***
***thereon is to the sole benefits of the client [Klykov] . . .***"

[Decl. of Klykov, ¶4;Exh. "A" thereto; *November 6,*
*2009 Fiduciary Management Agreemen*t.]

[Emphasis added.]

**D.    <u>January 12, 2015 Agreement Between Guayas, Ltd. And Calenergy, LLC.</u>**

Thereafter, on or about January 12, 2015, Mr. Klykov authorized Guayas to enter into an Agreement with Defendant Calenergy "*with the objective to invest the funds of Guayas into real estate objects within the territory of the United States of America...*" [Decl. of Klykov, ¶5; Exh. "B" thereto; *January 17, 2015 Agreement*.]

The Agreement provides in relevant part:

"**1.      Obligations of Calenergy**

*For the purposes of this Agreement Calenergy shall bear*
*obligations towards Guayas to perform the following:*

*1.1      Establish a Company, whose field of business is to find,*
*purchase, develop, sell, renovate and reconstruct the real estate*
*objects suitable for investment;*

*1.2      Ensure that the Company being established is under the*

19

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

*supervision of Igor Latsanovski with participation of not less than 51 percent;*

*1.3     Where a real estate object suitable for investment is found, transfer to the Company monetary funds received from Guayas in an amount sufficient to purchase, renovate and reconstruct the object;*

**1.4     Transfer to Guayas all claims of Calenergy to the Company connected with the performance of this Agreement;**

*1.5     Secure the purchased real estate by mortgaging it in favor of Guayas;*

*1.6     Abovementioned activities shall be performed within 1 (one) year.*

**2.       Terms of provision and investment of funds**

**2.1     Guayas hereby agrees to provide funds to Calenergy, and Calenergy agrees to accept those funds and use them to meet the Agreement's objectives described in art.1 on the terms and conditions as set forth or referred to in this Agreement.**

*2.2     The maximum amount of funds Guayas plans to invest into real estate is $US 10,000,000.00 (ten million $US).*

*2.3     The funds shall be provided in several tranches where Calenergy needs those funds and those funds are available to Guayas.*

*2.4     The funds shall be provided with the objective to invest into real estate objects within the territory of the United States of America.     [Emphasis added.]*

*2.5     The funds shall be allocated into real estate at annual interest of 11%.*

*2.6     The funds shall he allocated under the condition that those*

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

*funds are payable to Guayas in whole or in parts by the 20th of January 2018 at the latest.*

*2.7    Every time a real estate object is sold, the Company shall return to Guayas a part of its principal debt in amount of funds spent by the Company on the purchase, renovation and reconstruction of the real estate object and annual interest of the respective debt at 11%.*

*2.8    The outstanding principal amount of the fund provided under this Agreement, interest thereon and any charge or other payment connected thereto shall be paid in $US or in EUR on the due date to such account(s) as Guayas shall have specified. .."*

[Decl. of Klykov, ¶5; Exh. "B" thereto, *January 12, 2015 Agreement*.] [Emphasis added.]

## E.    *Guayas' Transfer of Funds To Calenergy.*

During the period, January 2015 to April 2015, Mr. Klykov instructed the transfer of $3,480,000 from Guayas to Calenergy pursuant to the terms of the Agreements described above. [Decl. of Klykov, ¶6; Exh. "C" thereto; *Wells Fargo Bank Statement.*]

Additionally, Mr. Klykov caused the sum of $2,388,000 to be wired from a second company called "*Bavaria Inter LP*". *Bavaria is an investor in Guayas*. Mr. Klykov raised Bavaria's funds in order to invest them into real estate. He instructed to make those wires in April, 2015 directly to Calenergy. The total funds invested by Guayas were accordingly $5,868,000. And, none of the loaned funds came from any source other than the investment funds identified herein. None of the funds came from or were the property of Mr. Latsanovski. [Decl. of Klykov, ¶7.]

From January, 2015, to May 2015, the $5,868,000 was wired at different times at Mr. Klykov's direction from Calenergy's and/or Defendant Latsanovski's Wells Fargo accounts to the accounts of Sunset. [Decl. of Klykov, ¶6, Exh. "D" thereto; *Wells Fargo Bank Statement reflecting transfers.*] Defendant Latsanovski was Mr. Klykov's agent fiduciary pursuant to the Fiduciary

1  Agreement at all times concerning the investment of the $5,868,000. At no time did Defendant

2  Latsanovski have any right to or interest in the $5,868,000. The $5,868,000 was invested in the

3  following properties:

| | | | |
|---|---|---|---|
| 1. | 5624 Stratford Rd., Los Angeles | $ | 600,000 |
| 2. | 1737 W. 35th St., Los Angeles | $ | 300,000 |
| 3. | 1032 W. 22nd St., Los Angeles (USC) | $ | 450,000 |
| 4. | 21809-21811 Figueroa (CARSON) | | $1,100,000 |
| 5. | 314 W. 113th St., Inglewood (Townhomes) | $ | 300,000 |
| 6. | 657 W. Acacia Ave., El Segundo | $ | 800,000 |
| 7. | 2445 Louella Ave., Venice | | $1,218,000 |
| 8. | 3777 Rosewood Ave., Los Angeles | | $1,100,000 |
| | Total Sum | | $5,868,000 |

13  [Decl. of Klykov, ¶8, Exh. "E" thereto "*Amendment Agreement to Original Contract Agreement*,"

14  between Guayas, Ltd and Sunset Holding Partners, LLC dated June 10, 2015.]

15         The evidence is accordingly undisputed that none of the funds transferred to Sunset and

16  thereafter invested as described herein came from Defendant Bunzai's operations or were funds

17  derived from Defendants Latsanovski or Calenergy.  The source of all funds, are from innocent

18  third party investors; and the funds are the property of those investors. No basis exists for those

19  funds to be subject to the preliminary injunction or asset freeze.

20  *F.*     ***Lawrence Rubin's Sunset Investment.***

21         Mr. Rubin is a resident of the City of New York, State of New York. Mr. Rubin agreed to

22  advance the sum of $1,000,000 to Sunset on or about June 10, 2015.  The fund's use was for the

23  purchase and renovation of property located at 430 W. Antonio Drive, Long Beach, California

24  90807 ("*the Property*"). [Decl. of Latsanovski, ¶¶9-10; Exh. "B" thereto, "*Promissory Note*

25  *Secured by Deed of Trust*" dated June 10, 2015 ("*the Note*") and accompanying Deed of Trust.]

26  Pursuant to the Note's terms, the full principal of $1,000,000 and all unpaid interest is due for

27  payment on June 10, 2016.  The payment due on that date, pursuant to paragraph 2.2 of the Note

28  entitled "*Balloon Payment*" is $1,007,500.00.  Mr. Rubin had no relationship of any kind with

1 | Defendant Bunzai or any other defendant. [Decl. of Latsanovski, ¶¶9-10.]

2 | **G.** **_Mariya Aleksandrovna' Sunset Investment._**

3 |     Ms. Aleksandrovna is a resident of the City of Moscow, Russian Federation.  She privately

4 | invests personal funds from time to time into short term loans secured by real estate.

5 |     On or about June, 2015, Defendant Latsanovski advised her of an investment opportunity

6 | in a California limited liability company called "*Sunset Holding Partners, LLC*" ("*Sunset*").

7 | Defendant Latsanovski further advised her that Sunset's business was to locate real estate

8 | investment opportunities in Southern California.  Sunset would purchase the real estate assets;

9 | Sunset would then improve or develop the real estate assets; and thereafter sell the real estate

10 | assets.  The sale proceeds would be first distributed to repay all debts, operating costs and

11 | expenses.  Any net proceeds would thereafter be distributed to the LLC Members.

12 |     Based upon Defendant Latsanovski's description of Sunset's real estate investment

13 | operation, Ms. Aleksandrovna agreed to enter into a "*Master Loan Agreement*" ("*the Agreement*")

14 | with Sunset.  [Decl. of Aleksandrovna, ¶¶2-4; Exh. "A" thereto, *Agreement dated June 4, 2015.*]

15 | Pursuant to paragraph 2.1 of the Agreement, she agreed to establish "*a revolving loan facility in*

16 | *an aggregate amount which shall not exceed $10,000,000...*" Sunset was responsible for the

17 | repayment of all loan proceeds.

18 |     Thereafter, on June 10, 2015, she executed a "*Utilization Request Form 1*" to confirm a

19 | loan advance under the Agreement of $1,100,000 for the acquisition and renovation of residential

20 | property located at 3783 Redwood Avenue, Los Angeles, California.  [Decl. of Aleksandrovna,

21 | ¶5; Exh. "B" thereto, "*Utilization Request Form 1*".]  Pursuant to the terms of the Agreement and

22 | Utilization Request Form 1, the $1,100,000 was the sole loan advance that she made to Sunset.

23 |     Most importantly, she had absolutely no knowledge concerning Igor Latsanovski; Alon

24 | Nottea; any related companies, identified or related to them; or Defendant Bunzai's or Aura Vie's,

25 | business dealings or violations of law as asserted by the Federal Trade Commission.  None of the

26 | loaned funds came from any source other than her personal investment funds.  [Decl. of

27 | Aleksandrovna, ¶7; Exh. "C" thereto, *Sunset's Wells Fargo Bank Account Statement for Account*

28 | *No. 2869829227, for the period June 1, 2015 to June 30, 2015.*]  At Bates No.__ is confirmation

**DEFENDANTS LATSANOVSKI AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT**

1  of her $1,100,000 loan of funds under the Agreement being wired into Sunset's Wells Fargo Bank

2  Account on June 11, 2015].

3  **H.**     ***The Preliminary Injunction and Asset Freeze Must Be Dissolved as to Third Party***

4           ***Investors and the Entities in Which They Invested.***

5           Utterly no evidence exists that any identified third party investor or entity was part of a

6  "*common enterprise*" with any defendant; had any involvement or business dealings with

7  defendants Bunzai; Nottea or Bond; or received any funds from defendant Bunzai's operation.

8  The preliminary injunction and asset freeze must accordingly be dissolved as to them.

9                                      **7.**

10                                **CONCLUSION**

11          For the reasons stated, Defendants Igor Latsanovski and Calenergy, Inc.'s motion for

12  summary judgment should be granted or alternatively partial summary judgment granted as

13  requested. Further, the preliminary injunction and asset freeze should be dissolved and/or

14  modified to limit its effect to $317,000 of Defendants' funds.

15

16  DATED: April 15, 2016                    Respectfully submitted,

17

18                                           _____

19                                           LAW OFFICES OF JEFFREY S. BENICE
                                             Jeffrey S. Benice
20                                           Attorney for Defendants,
                                             Igor Latsanovski and Calenergy, Inc.

21

22

23

24

25

26

27

28

                                          24

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 18, 2016, a true and correct copy of the foregoing document described as DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S NOTICE OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56; AND DECLARATIONS OF JEFFREY S. BENICE; IGOR LATSANOVSKI; MARIYA ALEDSANDROVNA; ILIA KLYKOV; IN SUPPORT THEREOF; [PROPOSED] ORDER [CONCURRENTLY FILED WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW] was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court.   The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

*Local Counsel For Receiver*
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA  90036
nameri@agmblaw.com

*Counsel For Alon Nottea and*
*Roi Rueveni*
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA  91403
rmu@crosswindlaw.com

*Federal Trade Commission*
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

*Counsel For Doron Nottea and Motti*
*Nottea*
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA  90025
Telephone:  (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

*Counsel For Chargeback Armor, Inc.*
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA  90210
SP@BeverlyHillsLawCorp.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 18 day of April, in Costa Mesa, California  92626.

Javaise Escolo, Declarant

25