| | |
|---|---|
| **From:** | igor <igorlats@gmail.com> |
| **Sent:** | Tuesday, May 03, 2011 2:51 AM |
| **To:** | alon@bunzaimedia.com |
| **Cc:** | Rita Plotkina |
| **Subject:** | cyprus usa |
| **Attachments:** | United States of America EN-1.pdf |

hello
read please
igor

**EXHIBIT 470**



# ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ

## ΤΗΣ ΚΥΠΡΙΑΚΗΣ ΔΗΜΟΚΡΑΤΙΑΣ

| Αριθμός 1944 | Τετάρτη 4 Απριλίου 1984 | 417 |

**Αριθμός 856**

Η Σύμβαση μεταξύ των Ηνωμένων Πολιτειών της Αμερικής και της Δημοκρατίας της Κύπρου για την Αποφυγή της Διπλής Φορολογίας και την παρεμπόδιση της φοροδιαφυγής σε σχέση με τους φόρους πάνω στο εισόδημα που σύμφωνα με το ´Αρθρο 169(1) του Συντάγματος συνομολογήθηκε και υπογράφτηκε στις 19.3.1984 ύστερα από απόφαση του Υπουργικού Συμβουλίου με αριθμό 23.835 και ημερομηνία 10.11.1983, δημοσιεύεται στην Επίσημη Εφημερίδα της Δημοκρατίας σύμφωνα με τις διατάξεις του ´Αρθρου 169(3) του Συντάγματος, μαζί με μετάφραση της στην Ελληνική.

### CONVENTION BETWEEN THE GOVERNMENT OF THE REPUBLIC OF CYPRUS AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME

The Government of the Republic of Cyprus and the Government of the United States of America, desiring to conclude a convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, have agreed as follows:

418          ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

## Article 1

### TAXES COVERED

(1) The taxes which are the subject of this Convention are:

(a) In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code and the excise taxes imposed on insurance premiums paid to foreign insurers and with respect to private foundations, but excluding the accumulated earnings tax, the personal holding company tax and the social security taxes (the United States tax).  The excise tax imposed on insurance premiums paid to foreign insurers is covered, however, only to the extent that the foreign insurer does not reinsure such risks with a person not entitled to exemption from such tax under this or another convention.

(b) In the case of Cyprus, the Income Tax, the Capital Gains Tax and the Special Contribution (the Cypriot Tax).

(2) This Convention shall also apply to taxes substantially similar to those covered by paragraph (1) which are imposed in addition to, or in place of, existing taxes after the date of signature of this Convention.

(3) For the purpose of Article 7 (Non-Discrimination), this Convention shall also apply to taxes of every kind imposed at the national, state, or local level.  For the purpose of Article 28 (Exchange of Information), this Convention shall also apply to taxes of every kind imposed at the national level.

## Article 2

### GENERAL DEFINITIONS

(1) In this Convention, unless the context otherwise requires:

(a) The term "United States" means the United States of America and when used in geographical sense includes the states thereof and the District of

Columbia, the territorial waters of the United States, and any area outside the states and the District of Columbia which in accordance with international law and the laws of the United States is an area within which the rights of the United States with respect to the natural resources of the seabed and subsoil may be exercised;

(b) The term "Cyprus" means the Republic of Cyprus and when used in a geographical sense includes the territorial waters of Cyprus and any area outside Cyprus which in accordance with international law and the laws of Cyprus is an area within which the rights of Cyprus with respect to the natural resources of the seabed and subsoil may be exercised;

(c) The term "Contracting State" means the United States or Cyprus, as the context requires;

(d) The term "person" includes an individual, a partnership, a corporation, an estate, a trust, or any other body of persons;

(e) (i) The term "United States corporation" or "corporation of the United States" means a corporation which is created or organized under the laws of the United States or any state thereof or of the District of Columbia, or any unincorporated entity treated as a United States corporation for United States tax purposes; and

  (ii) The term "Cypriot corporation" or "corporation of Cyprus" means an entity (other than a United States corporation) treated as a body corporate for tax purposes under the laws of Cyprus, which is resident in Cyprus for the purposes of Cypriot tax;

(f) The term "competent authority" means:
  (i) In the case of the United States, the Secretary of the Treasury or his delegate; and
  (ii) In the case of Cyprus, the Minister of Finance or his authorized representative;

(g) The term "State" means any National State, whether or not a Contracting State;

420                 ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

(h) The term "international traffic" means any transport by ship or aircraft, except where such transport is solely between places in the other Contracting State;

(i) The reference to a rate of tax or tax burden which is "substantially less than" means less than 50 percent of.

(2) Any other term used in this Convention and not defined in this Convention shall, unless the context otherwise requires, have the meaning which it has under the laws of the Contracting State whose tax is being determined. Notwithstanding the preceding sentence, if the meaning of such a term under the laws of a Contracting State is different from the meaning of the term under the laws of the other Contracting State, or if the meaning of such a term is not readily determinable under the laws of a Contracting State, the competent authorities of the Contracting States may, in order to prevent double taxation or to further any other purpose of this Convention, establish a common meaning of the term for the purposes of this Convention.

<u>Article 3</u>

FISCAL RESIDENCE

(1) In this Convention:

(a) The term "resident of Cyprus" means:

(i) A Cypriot corporation; and

(ii) Any person (except a corporation) resident in Cyprus for the purposes of its tax, but in the case of income derived or paid by a partnership, estate, or trust this term applies only to the extent that the income derived by such person is subject to Cypriot tax as the income of a resident either in its hands or in the hands of its partners or beneficiaries.

(b) The term "resident of the United States" means:

(i) A United States corporation; and

(ii) A United States citizen and any person (except a corporation) resident in the United

470 - 5                                                    EXHIBIT 470

States for the purposes of its tax, but in the case of income derived or paid by a partnership, estate, or trust this term applies only to the extent that the income derived by such person is subject to United States tax as the income of a resident either in its hands or in the hands of its partners or beneficiaries.

(2) Where by reason of the provisions of paragraph (1) an individual is a resident of both Contracting States:

(a) He shall be deemed to be a resident of that Contracting State in which he maintains his permanent home. If he has a permanent home in both Contracting States or in neither of the Contracting States, he shall be deemed to be a resident of that Contracting State with which his personal and economic relations are closer (center of vital interests);

(b) If his center of vital interests is in neither of the Contracting States or cannot be determined, he shall be deemed to be a resident of that Contracting State in which he has a habitual abode;

(c) If he has a habitual abode in both Contracting States or in neither of the Contracting States, he shall be deemed to be a resident of the Contracting State of which he is a citizen; and

(d) If he is a citizen of both Contracting States or of neither Contracting State the competent authorities of the Contracting States shall settle the question by mutual agreement.

(3) An individual who is deemed to be a resident of a Contracting State and not a resident of the other Contracting State by reason of the provisions of paragraph (2) shall be deemed to be a resident only of the first-mentioned Contracting State for all purposes of this Convention, including Article 4 (General Rules of Taxation).

(4) Where by reason of the provisions of paragraph (1) a person other than an individual or a corporation is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

422      ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

## Article 4

### GENERAL RULES OF TAXATION

(1)  A resident of a Contracting State may be taxed by the other Contracting State on any income from sources within that other Contracting State and only on such income, subject to any limitations set forth in this Convention.  For this purpose, the rules set forth in Article 6 (Source of Income) shall be applied to determine the source of income.

(2)  The provisions of this Convention shall not be construed to restrict in any manner any exclusion, exemption, deduction, credit, or other allowance now or hereafter accorded:

    (a) By the laws of a Contracting State in the determination of the tax imposed by that Contracting State; or

    (b) By any other agreement between the Contracting States.

(3)  Notwithstanding any provisions of this Convention except paragraph (4) of this Article, a Constracting State may tax a citizen or resident of that Contracting State as if this Convention had not come into effect. For this purpose the term "citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of tax, but only for a period of 10 years following such loss.

(4)  The provisions of paragraph (3) shall not affect:

    (a) The benefits conferred by a Contracting State under Articles 5 (Relief from Double Taxation), 7 (Non-Discrimintation), 24 (Social Security Payments), and 27 (Mutual Agreement Procedure); and

    (b) The benefits conferred by a Contracting State under Articles 21 (Students and Trainees) and 22 (Governmental Functions) upon individuals who are neither citizens of, nor have immigrant status in, that Contracting State.

(5) Where, pursuant to any provision of this Convention, a Contracting State reduces the rate of tax on, or exempts, income of a resident of the other Contracting State and under the law in force in that other Contracting State the resident is subject to tax by that other Contracting State only on that part of such income which is remitted to or received in that other Contracting State, then the reduction or exemption shall apply only to so much of such income as is remitted to or received in that other Contracting State during the calendar year such income is paid or the next succeeding calendar year.

(6) Where, pursuant to any provision of this Convention other than paragraph 1 of Article 23 (Private Pensions and Annuities), a Contracting State reduces the rate of tax on, or exempts, income of a person who is a resident of the other Contracting State and under the law in force in that other Contracting State such income is subject to a rate of tax or tax burden which is substantially less than the tax which generally would be imposed by that Contracting State on such income if derived from sources within that Contracting State, then the reduction or exemption to be allowed under this Convention in the first-mentioned Contracting State shall not apply.

<u>Article 5</u>

RELIEF FROM DOUBLE TAXATION

Double taxation of income shall be avoided in the following manner:

(1) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the principles hereof), the United States shall allow to a citizen or resident of the United States as a credit against the United States tax the appropriate amount of the Cypriot tax. However, no such credit shall be allowed with respect to dividends paid by a Cypriot corporation to a resident of the United States, other than a United States corporation owning at least 10 percent of the voting power of such Cypriot corporation. In the case of such a United States corporation, the United States shall allow as a credit against the United

States tax on income the appropriate amount of the Cypriot
tax paid by the Cypriot corporation with respect to the
profits out of which the dividends are paid to the United
States corporation.  Where a credit is allowed pursuant to
this paragraph, such appropriate amount shall be based upon
the amount of the Cypriot tax paid, but the credit shall not
exceed the limitations provided by United States law for the
taxable year.  For the purpose of applying the United States
credit in relation to taxes paid to Cyprus, the rules set
forth in Article 6 (Source of Income) shall be applied to
determine the source of income.

(2) In accordance with the provisions and subject to the
limitations of the law of Cyprus (as it may be amended from
time to time without changing the principles hereof), Cyprus
shall allow to a citizen or resident of Cyprus as a credit
against the Cypriot tax the appropriate amount of the United
States tax and, in the case of a Cypriot corporation owning
at least 10 percent of the voting power of a United States
corporation from which it received dividends in any taxable
year, shall allow credit for the appropriate amount of the
United States tax paid by the United States corporation
paying such dividends with respect to the profits out of
which such dividends are paid.  Such appropriate amount shall
be based upon the amount of the United States tax paid but
shall not exceed that portion of the Cypriot tax, as computed
before the credit is given, which is applicable to such items
of income.  For the purpose of applying the Cypriot credit
in relation to taxes paid to the United States, the rules set
forth in Article 6 (Source of Income) shall be applied to
determine the source of income.


<u>Article 6</u>


SOURCE OF INCOME


For purposes of this Convention:

(1)  Dividends shall be treated as income from sources
within a Contracting State only if paid by a corporation of
that Contracting State.  Notwithstanding the preceding
sentence, if the dividends are described in paragraph 4(b)
of  Article 12 (Dividends), or are dividends paid by a
corporation (other than a resident of a Contracting State)
which derives 50 percent or more of its total gross income

from one or more permanent establishment which such corporation has in the United States, they shall be deemed to be from sources within the United States.

(2)  Interest shall be treated as income from sources within a Contracting State only if paid by such Contracting State, a political subdivision or a local authority thereof, or by a resident of that Contracting State.  Notwithstanding the preceding sentence, and except for interest described in paragraph 7(c) of Article 13 (Interest) which shall be deemed to be from sources within the United States:

(a) If the person paying the interest (whether or not such person is a resident of a Contracting State) has a permanent establishment in a Contracting State in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment; or

(b) If the person paying the interest is a resident of a Contracting State and has a permanent establishment in a State (other than a Contracting State) in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment such interest shall be deemed to be from sources within the State in which the permanent establishment is situated.

(3)  Royalties described in paragraph (2) of Article 14 (Royalties) for the use of, or the right to use, property or rights described in such paragraph shall be treated as income from sources within a Contracting State only to the extent that such royalties are for the use of, or the right to use, such property or rights within that Contracting State.

(4)  Income from real property (including royalties), described in Article 15 (Income from Real Property), shall be treated as income from sources within a Contracting State only if such property is situated in that Contracting State.

(5)  Income from the rental of tangible personal (movable) property shall be treated as income from sources within a Contracting State only if such property is used in that Contracting State.

(6)  Income received by an individual for his performance
of labor  or personal services, whether as an employee or
in an independent capacity, shall be treated as income from
sources within a Contracting State only to the extent that
such services are performed in that Contracting State.
Notwithstanding the preceding sentence, income from personal
services performed aboard ships or aircraft operated by a
resident of a Contracting State in international traffic
shall be treated as income from sources only within that
Contracting State if rendered by a member of the regular
complement of the ship or aircraft.  For the purposes of this
paragraph, income from labor  or personal services includes
pensions (as defined in paragraph (3) of Article 23 (Private
Pensions and Annuities)) paid in respect of such services.
Notwithstanding the preceding provisions of this paragraph:

> (a) Remuneration described in Article 22 (Governmental
> Functions) and payments described in Article 24
> (Social Security Payments) shall be treated as income
> from sources within a Contracting State only if paid
> by or from the public funds of that Contracting
> State or a political subdivision or local authority
> thereof; and

> (b) The portion of directors' fees taxable in a
> Contracting State under Article 20 (Directors' Fees)
> shall be treated as income from sources within such
> Contracting State.

(7)  Income from the purchase and sale of intangible or
tangible personal (including movable) property (other than
gains defined as royalties by paragraph (2)(b) of Article 14
(Royalties)) shall be treated as income from sources within
a Contracting State only if such property is either sold in
that Contracting State or is property described in paragraph
(1)(a) or (b) of Article 16 (Gains) and the real property is
located or deemed to be located in that Contracting State.

(8)  Notwithstanding paragraphs (1) through (7), industrial
or commercial profits which are attributable to a permanent
establishment which the recipient, a resident of a
Contracting State, has in the other Contracting State,
including income derived from real property and natural
resources and dividends, interest, royalties (as defined in
paragraph (2) of Article 14 (Royalties)), and gains, but

only if the property or rights giving rise to such income,
dividends, interest, royalties, or gains are effectively
connected with such permanent establishment, shall be
treated as income from sources within that other Contracting
State.

(9)  The source of any item of income to which paragraphs (1)
through (8) are not applicable shall be determined by each
of the Contracting States in accordance with its own law.
Notwithstanding the preceding sentence, if the source of
any item of income under the laws of one Contracting State
is different from the source of such item of income under
the laws of the other Contracting State or if the source
of such income is not readily determinable under the laws
of a Contracting State, the competent authorities of the
Contracting States may, in order to prevent double taxation
or further any other purpose of this Convention, establish
a common source of the item of income for the purposes of
this Convention.

## Article 7

### NON-DISCRIMINATION

(1)  A citizen of a Contracting State shall not be subjected
in the other Contracting State to more burdensome taxes than
a citizen of that other Contracting State who is in similar
circumstances.  For purposes of United States taxation,
United States citizens who are not resident in the United
States and Cypriot citizens who are not resident in the
United States are not in similar circumstances.

(2)  A permanent establishment which a resident of a
Contracting State has in the other Contracting State shall
not be subject in that other Contracting State to more
burdensome taxes than a resident of that other Contracting
State carrying on similar activities.  This paragraph shall
not be construed as obliging a Contracting State to grant
to individual residents of the other Contracting State any
personal allowances, reliefs, or deductions for taxation
purposes on account of civil status or family responsibilities
which it grants to its own individual residents.

(3)  Except where the provisions of paragraph 1 of Article
11 (Related Persons), paragraph 5 of Article 13 (Interest),.

or paragraph 4 of Article 14 (Royalties) apply, interest, royalties and other disbursements paid by a resident of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of the first-mentioned resident, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned Contracting State.  For purposes of this paragraph, the term "other disbursements" shall include charges for amounts expended by a resident of a Contracting State for purposes of a resident of the other Contracting State, including a reasonable allocation of executive and general administrative expenses (except to the extent representing the expenses of a type of activity which is not for the benefit of the resident of the other Contracting State, but constitute "stewardship" or "over-seeing" functions undertaken for the first mentioned resident's own benefit as an investor), research and development, and other expenses incurred by such resident for the benefit of a group of related persons including such resident.  Similarly, any debts of a resident of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of such first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned Contracting State.

(4)  A corporation of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar corporations of the first-mentioned Contracting State are or may be subjected.

## Article 8

### BUSINESS PROFITS

(1)  Industrial or commercial profits of a resident of a Contracting State shall be exempt from tax by the other Contracting State unless such resident is engaged in industrial or commercial activity in that other Contracting State through a permanent establishment situated therein.

EXHIBIT 470

If such resident is so engaged, tax may be imposed by that other Contracting State on the industrial or commercial profits of such resident but only on so much of such profits as are attributable to the permanent establishment.

(2)  Where a resident of a Contracting State is engaged in industrial or commercial activity in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to the permanent establishment the industrial or commercial profits which would be attributable to such permanent establishment if such permanent establishment were an independent entity engaged in the same or similar activities under the same or similar conditions.

(3)  In the determination of the industrial or commercial profits of a permanent establishment, there shall be allowed as deductions expenses which are reasonably connected with such profits, including executive and general administrative expenses, whether incurred in the Contracting State in which the permanent establishment is situated or elsewhere.

(4)  No profits shall be attributed to a permanent establishment of a resident of a Contracting State in the other Contracting State merely by reason of the purchase of goods or merchandise by that permanent establishment, or by the resident of which it is a permanent establishment, for the account of that resident.

(5)  The term "industrial or commercial activity" includes the conduct of manufacturing, mercantile, banking, insurance, agricultural, fishing or mining activities, the operation of ships or aircraft, the furnishing of services and the rental of tangible personal property.  Such term does not include the performance of personal services by an individual either as an employee or in an independent capacity.

(6)  (a) The term "industrial or commercial profits" means income derived from industrial or commercial activity. The term also includes income derived from real property and natural resources and dividends, interest, royalties (as defined in paragraph (2) of Article 14 (Royalties)), and gains but only if the property or rights giving rise to such income, dividends, interest, royalties, or gains is effectively connected with a

permanent establishment which the recipient, being
a resident of a Contracting State, has in the other
Contracting State, whether or not such income is
derived from industrial or commercial activity.

(b) To determine whether property or rights are
effectively connected with a permanent establishment,
the factors taken into account shall include whether
rights or property are used in or held for use in
carrying on industrial or commercial activity through
such permanent establishment and whether the activities
carried on through such permanent establishment were
a material factor in the realization of the income
derived from such property or rights.  For this
purpose, due regard shall be given to whether or not
such property or rights or such income were accounted
for through such permanent establishment.

(7)  Where industrial or commercial profits include items
of income which are dealt with separately in other Articles
of this Convention, the provisions of those Articles shall,
except as otherwise provided therein, supersede the
provisions of this Article.

## Article 9

PERMANENT ESTABLISHMENT

(1)  For purposes of this Convention, the term "permanent
establishment" means a fixed place of business through
which a resident of a Contracting State engages in industrial
or commercial activity.

(2)  The term "fixed place of business" includes but is
not limited to:

    (a)  A branch;

    (b)  An office;

    (c)  A factory;

    (d)  A workshop;

    (e)  A warehouse;

    (f)  A store or other sales outlet;

    (g)  A mine, quarry, or other place of extraction
        of natural resources; and

(h)  A building site or construction or installation project or an installation or drilling rig or ship used for the exploration or exploitation of natural resources which lasts for more than six months.

(3)  Notwithstanding paragraphs (1) and (2), a permanent establishment shall not include a fixed place of business used only for one or more of the following:

(a) The use of facilities for the purpose of storage, display, or delivery of goods or merchandise belonging to the resident;

(b) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of storage, display, or delivery;

(c) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of processing by another person;

(d) The maintenance of a fixed place of business for the purpose of purchasing goods or merchandise, or for collecting information, for the resident;

(e) The maintenance of a fixed place of business for the purpose of advertising, for the supply of information, for scientific research, or for similar activities which have a preparatory or auxiliary character, for the resident; or

(f) The maintenance of a building site or construction or installation project or an installation or drilling rig or ship used for the exploration or exploitation of natural resources which does not last for more than six months.

(4)  A person acting in a Contracting State on behalf of a resident of the other Contracting State, other than an agent of an independent status to whom paragraph (5) applies, shall be deemed to be a permanent establishment in the first-mentioned Contracting State if such person has, and habitually exercises in the first-mentioned Contracting State, an authority to conclude contracts in the name of

that resident, unless the activities of such person are
limited to those mentioned in paragraph (3) which, if
exercised through a fixed place of business, would not
make the fixed place of business a permanent establishment
under the provisions of that paragraph.

(5)  A resident of a Contracting State shall not be deemed
to have a permanent establishment in the other Contracting
State merely because such resident engages in industrial or
commercial activity in that other Contracting State through
a broker, general commission agent, or any other agent of an
independent status, where such broker or agent is acting in the
ordinary course of his business.

(6)  The fact that a resident of a Contracting State is a
related person (within the meaning of Article 11 (Related
Persons)) with respect to a resident of the other Contracting
State or with respect to a person who engages in industrial
or commercial activity in that other Contracting State
(whether through a permanent establishment or otherwise) shall
not be taken into account in determining whether that resident
of the first-mentioned Contracting State has a permanent
establishment in that other Contracting State.

(7)  The principles set forth in paragraphs (1) through (6)
shall be applied in determining for the purposes of this
Convention whether there is a permanent establishment in a
State other than a Contracting State or whether a person
other than a resident of a Contracting State has a permanent
establishment in a Contracting State.


## Article 10


### SHIPPING AND AIR TRANSPORT


(1)  Notwithstanding Articles 8 (Business Profits) and
16 (Gains), income which a resident of a Contracting State
derives from the operation in international traffic of ships
or aircraft, including gains derived from the sale, exchange,
or other disposition of such ships or aircraft, shall be
exempt from tax by the other Contracting State.

(2) For purposes of this Article, profits from the operation in international traffic of ships or aircraft include profits derived from the rental on a full or bareboat basis of ships or aircraft if operated in international traffic by the lessee or if such rental profits are incidental to other profits described in paragraph (1).

(3) Profits of a resident of a Contracting State from the use, maintenance or rental of containers (including trailers, barges, and related equipment for the transport of containers) used for the transport in international traffic of goods or merchandise shall be taxable only in that Contracting State.

## Article 11

### RELATED PERSONS

(1) Where a person subject to the taxing jurisdiction of a Contracting State and any other person are related and where such related persons make arrangements or impose conditions between themselves which are different from those which would be made between independent persons, any income, deductions, credits, or allowances which would, but for those arrangements or conditions, have been taken into account in computing the income (or loss) of, or the tax payable by, one of such persons, may be taken into account in computing the amount of the income subject to tax and the taxes payable by such person.

(2) For purposes of this Convention, a person is related to another person if either person owns or controls directly or indirectly the other, or if any third person or persons own or control directly or indirectly both. For this purpose, the term "control" includes any kind of control, whether or not legally enforceable, and however exercised or exercisable.

(3) Where an adjustment has been made by a Contracting State in accordance with paragraph (1), the other Contracting State shall, if it agrees that the adjustment by the first-mentioned Contracting State was in accordance with paragraph (1), make a corresponding adjustment to the income, loss or tax of the related person in that other Contracting State.

ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

### Article 12

### DIVIDENDS

(1)  Dividends derived from sources within Cyprus by a resident of the United States shall not be subject to any tax imposed by Cyprus in excess of the tax imposed with respect to the profits or earnings out of which such dividends are paid.  An individual resident of the United States shall be entitled to a refund of any Cypriot tax imposed with respect to the profits or earnings out of which a dividend is paid to the extent that said tax exceeds the individual's tax liability in Cyprus.

(2)  The rate of tax imposed by the United States on dividends, other than dividends of the type described in paragraph 4(b), derived from sources within the United States by a resident of Cyprus shall not exceed:

(a) 15 percent of the gross amount of the dividend; or

(b) When the recipient is a corporation, 5 percent of the gross amount of the dividend if:

(i) During the part of the paying corporation's taxable year which precedes the date of payment of the dividend and during the whole of its prior taxable year (if any), at least 10 percent of the outstanding shares of the voting stock of the paying corporation was owned by the recipient corporation; and

(ii) Not more than 25 percent of the gross income of the paying corporation for such prior taxable year (if any) consists of interest or dividends (other  than interest derived from the conduct of banking, insurance, or financing business and dividends or interest received from subsidiary corporations, 50 percent or more of the outstanding shares of the voting stock of which is owned by the paying corporation at the time such dividends or interest is received).

(3)  Paragraphs (1) and (2) shall not apply if the recipient of the dividends, being a resident of a Contracting State, has in the other Contracting State a permanent establishment and the shares with respect to which the dividends are paid

are effectively connected with such permanent establishment. In such a case, the provisions of Article 8 (Business Profits) shall apply.

(4)  Dividends paid by a corporation of a Contracting State to a person other than a resident of the other Contracting State shall be exempt from tax by the other Contracting State, unless

> (a) The recipient of the dividends has a permanent establishment in the other Contracting State and the shares with respect to which the dividends are paid are effectively connected with such permanent establishment; or

> (b) The corporation paying the dividends is a Cypriot corporation which derives 50 percent or more of its total gross income from one or more permanent establishments which such corporation has in the United States.

## Article 13

### INTEREST

(1)  Interest derived from sources within a Contracting State by a resident of the other Contracting State  may be taxed by both Contracting States.

(2)  The rate of tax imposed by a Contracting State on interest, other than interest described in paragraph 7(c) of this Article, derived from sources within that Contracting State by a resident of the other Contracting State shall not exceed 10 percent of the gross amount of such interest.

(3)  Notwithstanding paragraphs (1) and (2), interest beneficially derived by:

> (a) A Contracting State, or an instrumentality of that Contracting State not subject to tax by that Contracting State on its income;

> (b) A resident of a Contracting State  with respect to debt obligations (including any related debt obligations) guaranteed or insured by that Contracting State or an instrumentality thereof;

436          ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

(c) A bank or other financial institution; or

(d) A resident of a Contracting State with respect
to debt obligations arising in connection with the
sale of property or the performance of services;

shall be exempt from tax by the other Contracting State.

(4)  Paragraphs (2) and (3) shall not apply if the recipient
of the interest, being a resident of a Contracting State,
has a permanent establishment in the other Contracting State
and the indebtedness giving rise to the interest is
effectively connected with such permanent establishment.
In such a case, the provisions of Article 8 (Business
Profits) shall apply.

(5)  Where any interest paid by a person to any related
person (within the meaning of Article 11 (Related Persons))
exceeds an amount which would have been paid to an unrelated
person, the provisions of this Article shall apply only to
so much of the interest as would have been paid to an
unrelated person.  In such a case the excess payment may be
taxed by each Contracting State according to its own law,
including the provisions of this Convention where applicable.

(6)  The term "interest" as used in this Convention means
income from bonds, debentures, government securities, notes,
or other evidences of indebtedness, whether or not secured
and whether or not carrying a right to participate in
profits, and debt-claims of every kind, as well as all other
income which, under the taxation law of the Contracting
State in which the income has its source, is assimilated
to income from money lent.

(7)  Interest paid by a resident of a Contracting State
to a person other than a resident of the other Contracting
State shall be exempt from tax by the other Contracting
State, unless:

(a) Such interest is treated as income from sources
within the other Contracting State under paragraph (2)
of Article 6 (Source of Income);

(b) The recipient of the interest has a permanent
establishment in the other Contracting State and the
indebtedness giving rise to the interest is
effectively connected with such permanent establishment;
or

(c) The resident paying the interest is a Cypriot corporation which derives 50 percent or more of its total gross income from one or more permanent estbalishments which such corporation has in the United States.

## Article 14

### ROYALTIES

(1) Royalties derived from sources within a Contracting State by a resident of the other Contracting State shall be exempt from tax by the first-mentioned Constracting State.

(2) The term "royalties" as used in this Article means:

    (a) Payment of any kind made as consideration for the use of, or the right to use, copyrights of literary, artistic, or scientific works, motion pictures and works on film, videotape or other means of reproduction used for radio or television broadcasting, patents, designs, models, plans, secret processes or formulae, trademarks, or other like property or rights, or knowledge, experience, or skill (know-how); and

    (b) Gains derived from the sale, exchange, or other disposition of any such property or rights to the extent that the amounts realized on such sale, exchange, or other disposition for consideration are contingent on the productivity, use, or disposition of such property or right.

(3) Paragraph (1) shall not apply if the recipient of the royalties, being a resident of a Contracting State, has a permanent establishment in the other Contracting State and the property or rights giving rise to the royalties are effectively connected with such permanent establishment. In such a case, the provisions of Article 8 (Business Profits) shall apply.

(4) Where any royalty paid by a person to any related person (within the meaning of Article 11 (Related Persons)) exceeds an amount which would have been paid to an unrelated

438          ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ 1984

person, the provisions of this Article shall apply only to
so much of the royalty as would have been paid to an
unrelated person.  In such a case the excess payment may be
taxed by each Contracting State according to its own law,
including the provisions of this Convention where applicable.


## Article 15


### INCOME FROM REAL PROPERTY


(1)  Income from real property, including royalties and
other payments in respect of the exploitation of natural
resources and gains derived from the sale, exchange, or
other disposition of such property or of the right giving
rise to such royalties or other payments, may be taxed by
the Contracting State in which such real property or natural
resources are situated.  For purposes of this Convention,
interest on indebtedness secured by real property or secured
by a right giving rise to royalties or other payments in
respect of the exploitation of natural resources shall not
be regarded as income from real property.


(2)  Paragraph (1) shall apply to income derived from
the usufruct, direct use, letting, or use in any other form
of real property.


(3)  A resident of a Contracting State who is subject
to tax in the other Contracting State on income from real
property, including royalties and other payments in respect
of the exploitation of natural resources and gains derived
from the sale, exchange or other disposition of such
property or of the right giving rise to such royalties, may
elect for any taxable year to compute that tax on such
income on a net basis as if such resident were engaged in
trade or business in the other Contracting State.  Any
such election shall be binding for the taxable year of the
election and all subsequent taxable years unless the
competent authorities of the two Contracting States, pursuant
to a request by the taxpayer made to the competent authority
of the Contracting State in which the taxpayer is a resident,
agree  to terminate the election.

ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984          439

## Article 16

### GAINS

(1)  A resident of a Contracting State shall be exempt from tax by the other Contracting State on gains from the sale, exchange or other disposition of assets unless the gain is derived from the sale, exchange or other disposition:

(a) Where the United States is the other State, real property referred to in Article 15 (Income from Real Property) which is situated in the United States and a United States real property interest; and

(b) Where Cyprus is the other State, real property referred to in Article 15 (Income from Real Property) which is situated in Cyprus and an interest in real property situated in Cyprus.

(c) Property (other than property described in subparagraphs (a) and (b)) forming part of the business property of a permanent establishment which a resident of a Contracting State has in the other Contracting State or property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, including such gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such fixed base.

(2)  In the case of gains described in paragraph 1(a) and (b), the provisions of Article 15 (Income from Real Property) shall apply.  In the case of gains described in paragraph 1(c) the provisions of Article 8 (Business Profits), Article 15 (Income from Real Property) or Article 17 (Independent Personal Services) shall apply, as the case may be.

(3)  For purposes of this Convention, a United States real property interest shall be considered to be situated in the United States, and an interest in real property situated in Cyprus shall be considered to be situated in Cyprus.

ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ 1984

## Article 17

### INDEPENDENT PERSONAL SERVICES

(1) Income derive by an individual who is a resident of a Contracting State from the performance of personal services in an independent capacity may be taxed by that Contracting State. Except as provided in paragraph (2) such income shall be exempt from tax by the other Contracting State.

(2) Income derived by an individual who is a resident of a Contracting State from the performance of personal services in an independent capacity in the other Contracting State may be taxed by that other Contracting State, if:

  (a) The individual is present in that other Contracting State for a period or periods aggregating 183 days or more in the taxable year; or

  (b) The individual has a fixed base regularly available to him in that other Contracting State for the purpose of performing his services, but only so much of the income as is attributable to such fixed base.

## Article 18

### DEPENDENT PERSONAL SERVICES

(1) Wages, salaries, and similar remuneration derived by an individual who is a resident of a Contracting State from labor or personal services performed as an employee, including income from services performed by an officer of a corporation, may be taxed by that Contracting State. Except as provided by paragraph (2) such remuneration derived from sources within the other Contracting State may also be taxed by that other Contracting State.

(2) Remuneration described in paragraph (1) derived by an individual who is a resident of a Contracting State shall be exempt from tax by the other Contracting State if:

  (a) He is present in that other Contracting State for a period or periods aggregating less than 183 days in the taxable year;

          EXHIBIT 470

ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984          441

(b) The remuneration is paid by, or on behalf of,
an employer who is not a resident of that other
contracting State; and

(c) The remuneration is not borne as such by a
permanent establishment, a fixed base or a trade or
business which the employer has in that other
Contracting State.

(3)  Notwithstanding paragraph (2), remuneration derived by
an individual from the performance of labor  or personal
services as an employee aboard ships or aircraft operated by
a resident of a Contracting State in international traffic
shall be exempt from tax by the other Contracting State if such
individual is a member of the regular complement of the ship
or aircraft.

## Article 19

### ARTISTES AND ATHLETES

(1)  Notwithstanding the provisions of Articles 17
(Independent Personal Services) and 18 (Dependent Personal
Services), income derived by a resident of a Contracting
State as an entertainer, such as a theatre, motion picture,
radio or television artiste, or a musician, or as an athlete,
from his personal activities as such exercised in the other
Contracting State, may be taxed in that other Contracting
State, except where the amount of the gross receipts derived
by such entertainer or athlete, not including expenses
reimbursed to him or borne on his behalf, from such activities
does not exceed five hundred United States dollars or its
equivalent in Cypriot pounds per day, or five thousand United
States dollars or its equivalent in Cypriot pounds for the
taxable year concerned.

(2)  To the extent that income in respect of activities
exercised by an entertainer or an athlete in his capacity
as such accrues not to that entertainer or athlete but to
another person, that income may,notwithstanding the provisions
of Articles 8 (Business Profits), 17 (Independent Personal
Services), and 18 (Dependent Personal Services), be taxed in
the Contracting State in which the activities of the
entertainer or athlete are exercised.  For purposes of the
preceding sentence, income of an entertainer or athlete shall

be deemed not to accrue to another person if it is established
that neither the entertainer or athlete, nor persons related
thereto, participate directly or indirectly in the profits
of such other person in any manner, including the receipt of
deferred remuneration, bonuses, fees, dividends, partnership
distributions or other distributions.

## Article 20

### DIRECTORS' FEES

Fees derived by a resident of a Contracting State in
his capacity as a member of the board of directors of a
corporation of the other Contracting State (but not
including fixed or contigent payments derived in his
capacity as an officer or employee) may, to the extent
such fees are in excess of a reasonable fixed amount for
each day of attendance payable to all directors of the
corporation for attendance at the directors' meeting in
such other Contracting State, be taxable in such other
Contracting State.

## Article 21

### STUDENTS AND TRAINEES

(1)   (a) An individual who is a resident of a Contracting
State at the time he becomes temporarily present in
the other Contracting State and who is temporarily
present in that other Contracting State for the
primary purpose of:

(i) Studying at a university or other recognized
educational institution in that other Contracting
State; or

(ii) Securing training required to qualify him to
practive a profession or professional specialty;
or

(iii) Studying or doing research as a recipient of
a grant, allowance, or award from a governmental,
religious, charitable, scientific, literary, or
educational organization;

shall be exempt from tax by that other Contracting
State for a period not exceeding five taxable years

from the date of his arrival in that other Contracting
State, and for such additional period of time as is
necessary to complete, as a full-time student,
educational requirements as a candidate for a
postgraduate or professional degree from a recognized
educational institution, with respect to amounts
described in subparagraph (b).

(b) The amounts referred to in subparagraph (a) are:

(i) Gifts from abroad for the purpose of his
maintenance, education or training;

(ii) the grant, allowance or award; and

(iii) income from personal services performed
in that other Contracting State in an amount not
in excess of 2,000 United States dollars or its
equivalent in Cypriot pounds for any taxable year.

(2)   An individual who is a resident of a Contracting State
at the time he becomes temporarily present in the other
Contracting State and who is temporarily present in that
other Contracting State as an employee of, or under contract
with, a resident of the first-mentioned Contracting State,
for the primary purpose of:

(a) Acquiring technical, professional, or business
experience from a person other than a resident of the
first-mentioned Contracting State or other than a
person related to such resident; or

(b) Studying at a university or other recognized
educational institution in that other Contracting State;

shall be exempt from tax by that other Contracting State for
a period not exceeding one year with respect to his income
from personal services in an aggregate amount not in excess
of seven thousand five hundred United States dollars or its
equivalent in Cypriot pounds.

(3)   An individual who is a resident of a Contracting State
at the time he becomes temporarily present in the other
Contracting State and who is temporarily present in the other
Contracting State for a period not exceeding one year, as a
participant in a program  sponsored by the government of that
other Contracting State, for the primary purpose of training,
research, or study, shall be exempt from tax by that other

444　　　　ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ 1984

Contracting State with respect to his income from personal services in respect of such training, research, or study performed in that other Contracting State in an aggregate amount not in excess of ten thousand United States dollars or its equivalent in Cypriot pounds.

## Article 22

### GOVERNMENTAL FUNCTIONS

Wages, salaries, and similar remuneration, including pensions, annuities, or similar benefits, paid from public funds of a Contracting State to a citizen of that Contracting State for labor or personal services performed as an employee of that Contracting State in the discharge of governmental functions shall be exempt from tax by the other Contracting State.

## Article 23

### PRIVATE PENSIONS AND ANNUITIES

(1) Except as provided in Article 22 (Governmental Functions) pensions and other similar remuneration paid to an individual who is a resident of a Contracting State in consideration of past employment shall be taxable only in that Contracting State.

(2) Alimony and annuities paid to an individual who is a resident of a Contracting State shall be taxable only in that Contracting State.

(3) The term "pensions and other similar remuneration," as used in this Article, means periodic payments made:

(a) By reason of retirement or death in consideration for services rendered; or

(b) By way of compensation for injuries received in connection with past employment.

(4) The term "annuities", as used in this Article, means a stated sum paid periodically at stated times during life, or during a specified number of years, under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

　　　　　　　　**EXHIBIT 470**

(5)  The term "alimony", as used in this Article, means periodic payments made pursuant to a decree of divorce, separate maintenance agreement, or support or separation agreement which is taxable to the recipient under the internal laws of the Contracting State of which he is a resident.

### Article 24

#### SOCIAL SECURITY PAYMENTS

Social security payments and other public pensions paid by a Contracting State to an individual who is a resident of the other Contracting State or a citizen of the United States shall be taxable only in the first-mentioned Contracting State.  This Article shall not apply to payments described in Article 22 (Governmental Functions).

### Article 25

#### DIPLOMATIC AND CONSULAR OFFICERS

Nothing in this Convention shall affect the fiscal privileges of diplomatic and consular officials under the general rules of international law or under the provisions of special agreements.

### Article 26

#### LIMITATION ON BENEFITS

(1)  A person (other than an individual) which is a resident of a Contracting State shall not be entitled under this Convention to relief from taxation in the other Contracting State unless

a) more than 75 percent of the beneficial interest in such person (or in the case of a corporation, more than 75 percent of the number of shares of each class of the corporation's shares) is owned, directly or indirectly, by one or more individual residents of the first-mentioned Contracting State; and

**EXHIBIT 470**

446                    ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984

b) the gross income of such person is not used in
substantial part, directly or indirectly, to meet
liabilities (including liabilities for interest or
royalties) to persons who are residents of a State
other than a Contracting State and who are not
citizens of the United States.

For the purposes of subparagraph a), a corporation that has
substantial trading in its stock on a recognized exchange in
a Contracting State is presumed to be owned by individual
residents of that Contracting State.  A stock exchange shall
be treated as a "recognized exchange" by agreement of the
competent authorities of the Contracting States.

(2)  Paragraph 1 shall not apply if it is determined that
the establishment, acquisition and maintenance of such
person and the conduct of its operations did not have as a
principal purpose obtaining benefits under the Convention.

(3)  Where:
a) income derived by a trustee is to be treated
for the purposes of this Convention as income of
a resident of one of the Contracting States; and

b) the trustee derived the income in connection
with a scheme a principal purpose of which was to
obtain a benefit under this Convention,

then, notwithstanding any other provision of this Convention,
the Convention does not apply in relation to that income.

## Article 27

MUTUAL AGREEMENT PROCEDURE

(1)  Where a resident of a Contracting State considers that
the actions of one or both of the Contracting States result
or will result for him in taxation not in accordance with
this Convention, he may, notwithstanding the remedies
provided by the national laws of the Contracting States,
present his case to the competent authority of the
Contracting State of which he is a resident.  Should the
resident's claim be considered to have merit by the
competent authority of the Contracting State to which the

claim is made, it shall endeavor to come to an agreement
with the competent authority of the other Contracting State
with a view to the avoidance of taxation contrary to the
provisions of this Convention.

(2)  The competent authorities of the Contracting States
shall endeavor to resolve by mutual agreement any
difficulties or doubts arising as to the application of this
Convention.  In particular, the competent authorities of the
Contracting States may agree:

   (a) To the same attribution of income, deductions,
   credits or allowances of a resident of a
   Contracting State to its permanent establishment
   situated in the other Contracting State;

   (b) To the same allocation of income, deductions,
   credits, or allowances between persons, including a
   uniform position on the application of the requirements
   of paragraph (2) of Article 7 (Non-Discrimination);

   (c) To the same determination of the source of
   particular items of income;

   (d) To a uniform accounting for income and deductions;

   (e) To the same characterization of particular items
   of income; and

   (f) To a common meaning of a term.

The competent authorities may also consult together for the
elimination of double taxation in cases not provided for in
the Convention.

(3)  The competent authorities of the Contracting States
may communicate with each other directly for the purpose
of reaching an agreement in the sense of this Article.
When it seams advisable for the purpose of reaching
agreement, the competent authorities may meet together
for an oral exchange of opinions.

(4)  In the event that the competent authorities of the
Contracting States reach such an agreement, taxes shall be
imposed and refund or credit of taxes shall be allowed by
the Contracting States in accordance with such agreement.
Such a refund or credit of tax shall be allowed notwith-
standing any time limits in the domestic law of the
Contracting States.

448       ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ 1984

(5) In cases where this Convention specifies a dollar amount, the competent authorities may agree to a higher dollar amount.

(6) The competent authorities of the Contracting States may prescribe such rules and procedures as are necessary to carry out the purposes of this Convention.

## Article 28

### EXCHANGE OF INFORMATION

(1) The competent authorities of the Contracting States shall exchange such information as is pertinent to carrying out the provisions of this Convention and of the domestic laws of the Contracting States concerning taxes covered by this Convention.

    (a) The competent authority of each Contracting State shall be empowered by this Convention to secure within that State such information as is necessary to comply with this provision.

    (b) Any information so exchanged shall be treated as secret and shall not be disclosed to any persons other than those (including a court or administrative body) concerned with assessment, collection, enforcement, or prosecution in respect of or administration of the taxes which are the subject of this Convention.

(2) If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain the information to which the request relates in the same manner as if the tax of the first-mentioned Contracting State were the tax of that other Contracting State and were being imposed by that other Contracting State. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, or writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of such other Contracting State with respect to its own taxes.

         **EXHIBIT 470**

(3)  In no case shall the provisions of paragraphs (1) or (2) be construed so as to impose on a Contracting State the oblication:

> (a) To carry out administrative measures at variance with the laws or the administrative practice of that Contracting State or the other Contracting State;
>
> (b) To supply particulars which are not obtainable under the laws, or in the normal course of the administration, of that Contracting State or of the other Contracting State; or
>
> (c) To supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information, the disclosure of which would be contrary to public policy.

However, each Contracting State may, at its discretion, provide assistance which, under subparagraphs (a), (b) and (c), it is not obligated to provide.

(4)  The exchange of information shall be either on a routine basis or on request with reference to particular cases.  The competent authorities of the Contracting States may agree on the information which shall be furnished on a routine basis.

(5)  The competent authorities of the Contracting States shall notify each other of any amendments of the tax laws referred to in paragraph (1) of Article 1 (Taxes Covered) and of the adoption of any taxes referred to in paragraph (2) of Article 1 (Taxes Covered) by transmitting the texts of any amendments or new statutes.

(6)  The competent authorities of the Contracting States shall notify each other of the publication by their respective Contracting States of any material concerning the application of this Convention, whether in the form of regulations, rulings, or judicial decisions, by transmitting the texts of any such materials.

### Article 29

ASSISTANCE IN COLLECTION

(1)  Each of the Contracting State  shall endeavor to collect on behalf of the other Contracting State such taxes imposed by that other Contracting State as will ensure that any

exemption or reduced rate of tax granted under this Convention by that other Contracting State shall not be enjoyed by persons not entitled to such benefits.

(2) In no case shall this Article be construed so as to impose upon a Contracting State the obligation to carry out measures at variance with the laws, administrative practices, or public policy of either Contracting State with respect to the collection of its own taxes.

## Article 30

### ENTRY INTO FORCE

This Convention shall be ratified and instuments of ratification shall be exchanged at Washington as soon as possible. It shall enter into force upon the exchange of the instruments of ratification. The provisions shall for the first time have effect with respect to income of calendar years or taxable years beginning (or in the case of taxes payable at the source, payments made) on or after the first day of January of the year next following the year in which this Convention enters into force.

## Article 31

### TERMINATION

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention at any time after five years from the date on which this Convention enters into force provided that at least six months' prior notice of termination has been given through diplomatic channels. In such event, the Convention shall cease to have force and effect as respects income of calendar years or taxable years beginning (or, in the case of taxes paybale at the source, payments made) on or after the first day of January next following the expiration of the six-month period.

DONE AT Nicosia in duplicate in the English language this 19th Day of March, 1984.

FOR THE REPUBLIC OF CYPRUS:  FOR THE UNITED STATES OF
AMERICA:

CH. HADJIPANAYIOTOU              R. EWING

     EXHIBIT 470

**To:**         amit@fmspay.com[amit@fmspay.com]
**From:**       Alon | Bunzai Media
**Sent:**       Fri 3/26/2010 2:37:43 PM
**Importance:**     Normal
**Subject:**    DSA Holdings | Bank & Merchant Statements | Tax Returns | Corp docs | credit report | passport
**MAIL_RECEIVED:**     Fri 3/26/2010 2:37:43 PM

Motti CDL 150.jpg
Pasport Motti.jpg
eStmt_02_26_2010.pdf
eStmt_01_29_2010.pdf
eStmt_10_30_2009.pdf
eStmt_11_30_2009.pdf
eStmt_12_31_2009.pdf
eStmt_09_30_2009.pdf
DSA Corp Docs.pdf
DSA Merchant Statements.pdf
DSA-2008.pdf
DSA-2007.pdf
DSA-2006.pdf
Motti CreditReport.pdf

Dear Amit,
It was a pleasure speaking to you...

please take a look at the attached info for your (and banks) review.

My credit is not the best right now, so we will be filing under my dad...

1. We call every customer to verify the order.
2. We use Max Mind for Fraud Detection.
3. What will be the Monthly Volume Limit Per account (50K, 100K, 200K)?
4. Can we do multiple accounts? 3 Miracle Face and 1-3 accounts for Auravie?

The sites that i would like to show them are:

Continuity Offer
- http://www.themiracleface.com/
  http://www.themiracleface.com/order.php

Straight Sale Offer
- http://www.newmiraclekit.com/
  http://www.newmiraclekit.com/order.php

Continuity Offer
- http://www.myauravie.com/
  http://www.myauravie.com/order.php

Please look the terms on the order page to see if they approve!

keep me posted, thank you!!!

Best Regards,

Alon Nottea | CEO
Bunzai Media Group, Inc.
Skype: ▇▇▇▇ | Aim: ▇▇▇▇▇
Direct 818.785.6800 | Mobile ▇▇▇▇

Individually, we are one drop. Together, we are an ocean | Ryunosuke Satoro

474 - 1                                    **EXHIBIT 474**

**To:**       Alon | Critical Media[vigorect@gmail.com]
**From:**     Nastassia Yalley
**Sent:**     Mon 4/12/2010 8:24:44 PM
**Importance:** Normal
**Subject:**  Fwd: Lime Light Settlement Report for Bunzai Media Group Inc. - FaceKit-Intro
**MAIL_RECEIVED:** Mon 4/12/2010 8:24:45 PM

---------- Forwarded message ----------
From: <support@limelightcrm.com>
Date: Mon, Apr 12, 2010 at 5:20 PM
Subject: Lime Light Settlement Report for Bunzai Media Group Inc. - FaceKit-Intro
To: accounting@bunzaimedia.com

A total of $-537.80 has been settled for your account Bunzai Media Group Inc. - FaceKit-Intro.

Total No. of Charges: 0
Total Charges: 0.00

Total No. of Refunds: 8
Total Refunds: -537.80

Listed below are the totals broken down by payment types.

=== American Express ===
No. of Charges: 0
Total Charges: $0.00

No. of Refunds: 0
Total Refunds: $0.00

========= Visa =========
No. of Charges: 0
Total Charges: $0.00

No. of Refunds: 3
Total Refunds: $-169.95

===== Master Card ======
No. of Charges: 0
Total Charges: $0.00

No. of Refunds: 5
Total Refunds: $-367.85

======= Discover =======
No. of Charges: 0
Total Charges: $0.00

No. of Refunds: 0
Total Refunds: $0.00

You can retrieve additional information about the transactions by logging
into your Merchant Control Panel.

EXHIBIT 476

--
Nastassia Yalley
Director of Operations
818.785.6800

EXHIBIT 476

**To:**        doron5000@gmail.com[doron5000@gmail.com]
**From:**      Teny.Minas@wellsfargo.com
**Sent:**      Fri 12/10/2010 1:54:51 PM
**Importance:**        Normal
**Subject:**   FW: CUSTOMER/ BUNZAI MEDIA GROUP INC      "Confirmation of Signature"
**MAIL_RECEIVED:**   Fri 12/10/2010 1:55:18 PM

FYI

Teny Minas
Assistant Branch Manager
Coldwater Canyon
12900 Ventura Blvd. Studio City, CA 91604
Tel: 818-509-3480 Fax: 818-509-3495

_____

**From:** Goad, Melody A.
**Sent:** Friday, December 10, 2010 5:53 AM
**To:** Minas, Teny
**Subject:** RE: CUSTOMER/ BUNZAI MEDIA GROUP INC "Confirmation of Signature"

Tell them they should get everything in the mail in 7 to 10 business days.

_____

**From:**   Minas, Teny
**Sent:**  Thursday, December 09, 2010 4:40 PM
**To:**   Goad, Melody A.
**Subject:**   FW: CUSTOMER/ BUNZAI MEDIA GROUP INC      "Confirmation of Signature"

Hi Melody,

      Do you know when the customer will be contacted? They are asking me when they will get their PIN for wires.

Thanks,

Teny Minas
Assistant Branch Manager
Coldwater Canyon
12900 Ventura Blvd. Studio City, CA 91604
Tel: 818-509-3480 Fax: 818-509-3495

_____

**From:** Minas, Teny
**Sent:** Wednesday, December 08, 2010 11:16 AM
**To:** Goad, Melody A.
**Subject:** RE: CUSTOMER/ BUNZAI MEDIA GROUP INC "Confirmation of Signature"

I am confirming signatures and identification on the wire forms. I have identified the customer properly, confirmed account ownership and signed the wire forms myself.

Thanks,

Teny Minas
Assistant Branch Manager
Coldwater Canyon
12900 Ventura Blvd. Studio City, CA 91604
Tel: 818-509-3480 Fax: 818-509-3495

_____

**From:** Goad, Melody A.
**Sent:** Wednesday, December 08, 2010 5:59 AM
**To:** Minas, Teny
**Subject:** CUSTOMER/ BUNZAI MEDIA GROUP INC "Confirmation of Signature"
**Importance:** High

479 - 1                                        EXHIBIT 479

Wire Transfer - "Confirmation of Signature"

Dear Teny,

You have submitted wire documents for (BUNZAI MEDIA GROUP INC) account ████9528).

Per Wire Transfer risk control, when adding new callers or a new Standing Transfer Order Setup to a new or existing wire customer. **We must receive a return email from you confirming that <u>you have</u>:**

1. Signed the wire transfer forms
2. Positively identified the customer
3. Confirmed account ownership and authority to sign on the account

Please reply to this email with your confirmation within 24 hours to prevent processing delays and negative customer impact.

Thank you,
Melody

Melody A. Goad

Wells Fargo Wire Transfer Services
Operations Processor

Wells Fargo Technology and Operations  /  1300 SW 5th Ave, 8th Fl / Portland OR  97201
Mac P6101-081
Tel 503-886-3141 / Fax 866-922-6202 / Alt Fax 503-886-2451

goadm@wellsfargo.com

**Wells Fargo Restricted or Confidential** - This e-mail may contain confidential and/or privileged information. If you are not the addressee, you must not use, copy, disclose, or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message. Thank you for your cooperation.

**To:**         Doron Nottea[doron@doron.us]
**Cc:**         Alon Nottea[alon@bunzai media.com]; Alon Nottea[alon@bunzai-media.com]
**From:**       David Davidian, CPA
**Sent:**       Fri 3/30/2012 5:18:04 PM
**Importance:** Normal
**Subject:**    Heritage Alliance Group
**MAIL_RECEIVED:**  Fri 3/30/2012 5:21:09 PM
Articles of Incorporation.pdf
EIN.pdf
Statement of Information_Client.pdf

Dear Doron and Alon,

Attached please find the articles and other documents for the Heritage Alliance Group Inc.

Sincerely,
*Z. David Davidian, CPA*
**Davidian & Associates**
**Certified Public Accountants**
(888) 452-5577
(818) 242-7800
(888) 202-7757 Fax
www.LACPA.com

This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.

To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. tax advice contained in this communication, and its attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party for any matters addressed herein.

 *Please consider the environment before printing this e-mail*

EXHIBIT 481

**To:**         Alon | Bunzai Media[alon@bunzaimedia.com]
**Cc:**         Domain[Domain@xoxy.net]
**From:**       David Davidian, CPA
**Sent:**       Mon 11/14/2011 7:41:17 PM
**Importance:**         Normal
**Subject:**    Safehaven
**MAIL_RECEIVED:**    Mon 11/14/2011 7:41:23 PM
Statement of Information_Safehaven.pdf
Articles of Incorporation.pdf
EIN.pdf

Gentlemen,

Attached please find the articles of incorporation and the statement of information for Safehaven Ventures Inc.

Sincerely,
*Z. David Davidian, CPA*
Davidian & Associates
**Certified Public Accountants**
(888) 452-5577
(818) 242-7800
(888) 202-7757 Fax
www.LACPA.com

This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.

To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. tax advice contained in this communication, and its attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party for any matters addressed herein.

 *Please consider the environment before printing this e-mail*

EXHIBIT 482

**To:** Alon | Bunzai Media[alon@bunzaimedia.com]
**Cc:** Doron Nottea[doron@doron.us]; khristopher@bunzaimedia.com[khristopher@bunzaimedia.com]
**From:** David Davidian, CPA
**Sent:** Tue 6/21/2011 1:33:20 PM
**Importance:** Normal
**Subject:** Recommendation
**MAIL_RECEIVED:** Tue 6/21/2011 1:33:24 PM

Gentlemen,

It was a pleasure for me to meet you all yesterday.

For the tax planning and for the business structuring of your business, I would strongly recommend that you seek a professional help.

By consulting for an hour or two, you wont gain the education and experience that is necessary to plan and structure a successful business.

Perhaps you want to save a buck or two now, but with a correct planning you will save much more and will be successful in your operations for the years to come.

I am not trying to sell my services by this email, but after yesterday's meeting, as a professional I need to make this recommendation that you need to seek a "hands-on professional" in your business; either me or anyone else that you feel comfortable and safe.


Sincerely,

*Z. David Davidian, CPA*

### Davidian & Associates

**Certified Public Accountants**

(888) 452-5577

(818) 242-7800

(888) 202-7757 Fax

www.LACPA.com

This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.


To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. tax advice contained in this communication, and its attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party for any matters addressed herein.

 *Please consider the environment before printing this e-mail*

EXHIBIT 483

**To:**      David Davidian CPA[cpa@lacpa.com]; Alon @ Bunzai[alon@bunzaimedia.com]
**From:**   Doron
**Sent:**    Thur 6/16/2011 1:38:52 PM
**Importance:**   Normal
**Subject:**  Fwd: Tax ID's
**MAIL_RECEIVED:**  Thur 6/16/2011 1:39:39 PM

---------- Forwarded message ----------
From: **Doron** <doron@doron.us>
Date: Wed, Jun 15, 2011 at 7:42 PM
Subject: RE: Invoice
To: xposedinc@gmail.com

David,

Please use the following info.

Rachel Nottea  on AGOA Holdings Inc.

7900 Gloria Ave. Van Nuys, CA 91406

Roi Reuveni [redacted] DMA MEDIA HOLDINGS INC,

Reseda, CA [redacted]

Khristopher Bond [redacted] on LIFESTYLE BRANDS MEDIA INC.

North Hollywood, CA

No addresses yet use yours and for now I don't want to elect S or C corp we have 3 months.

Let me know you got this …

Doron

        **EXHIBIT 484**

**To:**       Paul Medina[paul@bunzaimedia.com]; Avico Global[avicoglobal@gmail.com]; Alon N[alon@bunzaimedia.com]
**From:**     AlertBot Help Desk
**Sent:**     Tue 9/4/2012 1:34:23 PM
**Importance:** Normal
**Subject:**  RE: Creating a monitor list to test API calls to our CRM Limelight [890152:329549]
**MAIL_RECEIVED:**   Tue 9/4/2012 1:39:48 PM

Hi Avi,

I reviewed the API documentation that Paul sent.  We can monitor the CRM's API directly.  We can use the "GET" method that your CRM's API supports.  Just send me one or more API URL with all the GET parameters in place and we can setup a monitor for it.

Best Regards,
George Pequeno
Network Engineer
AlertBot Pro Services
InfoGenius, Inc.
(Office Hours: 9AM to 6PM EST)

-----Original Message-----
From: "Paul Medina" <paul@bunzaimedia.com>
Received: 9/4/2012 12:43 PM
To: "Justin Noll" <helpdesk@alertbot.com>; "Avico Global" <avicoglobal@gmail.com>; "Alon N" <alon@bunzaimedia.com>
Subject: RE: Creating a monitor list to test API calls to our CRM Limelight

George and Avi,

Per our discussion today I am starting this email thread to create the proper monitor list to test our API calls from order page to thanks page.
We have noticed a significant amount of failures within the last month from our measured step " Submit CC Form Duration ". I have the Submit CC Form Duration set to alert if it takes longer than 60 secs.

Due to last weeks confirmation from Limelight (CRM) that they were down for an hour with no API calls reaching to their server this new monitor list will instantly notify me and confirm whether our down time is a server issue or a CRM issue.

Avi we use both of these documents to for our live domains http://help.limelightcrm.com/entries/317874-membership-api-documentation & http://help.limelightcrm.com/entries/317872-transaction-api-documentation

Lets provide George with Alertbot the proper info he needs so he can setup this monitor list for us. A monitor list a script they write to do a virtual test on our domains.

Regards & Thanks,

Paul B. Medina
Director of Business Development & Media Acquisitions
Bunzai Media Group
(Mobile) 818-983-7202
(Marketing) 855-717-5656
(Office Corporate) 818-200-1035 ext 7004
(Skype) PMedina0331
Email: Paul@BunzaiMedia.com
Website: http://www.BunzaiMedia.com

EXHIBIT 493

Further, this message is intended only for the designated recipient. It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

EXHIBIT 493

**To:**  Kevin Kotzin[kevin@earthboundentertainment.com]
**Cc:**  Alon Nottia[alon@bunzaimedia.com]
**From:** Avico Global
**Sent:** Fri 8/31/2012 3:22:01 PM
**Importance:**  Normal
**Subject:** Re: Status
**MAIL_RECEIVED:** Fri 8/31/2012 3:22:04 PM

Hi Kevin,

I believe Kris is still not well however I will talk to Alon and update you with the latest.

Avi

On Fri, Aug 31, 2012 at 12:09 PM, Kevin Kotzin <kevin@earthboundentertainment.com> wrote:

Hey Avi, Alon
Avi - left you a few messages you throughout week.  Please call me today.

Despite my many attempts, I have been unable to get a meeting with Khris to review my work on Angels, or get a deposit, so Angels has been on pause for an amount of time that is counterproductive.  I call multiple times every week to schedule a meeting, and its either canceled or postponed due to Khris' disposition.  I am sensitive to that, but I also know the result of my inactivity is that you see me as ineffective and possibly even incompetent.  I've been taking your advice at every turn to get a job done, but I just keep hitting roadblocks.

In the last 5 days I constructed two full Wordpress sites for other clients.

conejovalleymusic.com
therelationshipdoctor.net

If given what I need to do a project, I can be incredibly productive and produce very fast.   Ive been in touch with Khris on the phone.  He's going through a lot and unable to meet.  I'm just not sure what to do.  I am sensitive to his disposition, I just need to sit down with him and go over the work so that you will release the deposit and I can fly with this.   This is his vision, and it needs to be done under his direction.  I don't want to give you guys excuses.  I want to just do the work.  Let me know what i can do to actually provide you with some results.  The current way we are structured, my hands have been tied.

All I need is
1) to sit with someone to review what Ive done so far and to review the content
2) a deposit for the work i had been doing, but put on pause

Without those two things, I cannot do anything.  Let me know when I can swing by Bunzai.  I -**REALLY**- want to do work for you guys.

Kevin

**To:**      Alon | Bunzai Media[alon@bunzaimedia.com]
**From:**   Avico Global
**Sent:**    Thur 7/26/2012 2:58:13 AM
**Importance:**    Normal
**Subject:**   FINAL ANGEL SCOPE
**MAIL_RECEIVED:**   Thur 7/26/2012 2:58:26 AM
PastedGraphic-2.png
BeautyRegimen-SkinDetox.pdf
BeautyBuzz - AuraVie FACE YOGA.pdf

Alon - Check out below as final bullet point of what you will get on the Angel Project.
Last we spoke SMS is on hold and Kevin should be working on this only.

I will call you in the morning to confirm ... Avi

# Auravie Angels - Final Development Schedule & Budget

**Below are the first two of many additions and modifications to auravie.  We want to get the balling rolling on these aspects before we take on the other requests.**

**Auravie Angels Blog**
**Timeline 1.5 - 2 months**
**Setup Cost : $10,000**
**This is to create the groundwork for the Angels platform and create the platform for additional build-outs.**
**Additional Requests/Modifications may create fluctuation in scope/schedule/budget, or be held off for PHASE 2.**

1. Auravie.com Homepage will contain links to
- Beauty Buzz (static html page - see pdf below - face yoga)
- Beauty Regimen (static html page - see pdf below)
- 2 Angel Links
- See More (Shows main angel portal and angel links)

**2. Main Wordpress Portal will be at** angels.auravie.com
- Slideshow
- Links to each angel
- Text
- Additional Pages (About, Signup to be an Angel, Contact, FAQ, Shop)

**3. Each Wordpress Angel will have their own blog :** angels.auravie.com/sandra,angels.auravie.com/lunelle, ...etc
- Angel Banner (Using photo from photoshoot)
- Links to other angels
- Blog content (videos, images, etc)
- Facebook, Twitter, Contact Options

*(Angels will each be given a Basecamp email address to email their content, so that the content can be moderated as Basecamp tasks by Auravie staff.)*

STEPS:

- **Create subdomains & url structure**
- **Design & creation of a main portal (angels.auravie.com) showing each angel (Wordpress)**
- **Design & creation of an individual blog site (ie - angels.auravie.com/sandra) for each angel (Wordpress)**
- **Customized images will be added**
- **Create multiple user logins and setups for each individual blog**
- **Additional wordpress modules wil be installed for social media integration and seo**

          **EXHIBIT 497**

- **A protocol will be setup for content management via basecamp email addresses**
  - **In-house tutorial for amarie, victor, nastassia, and khris**
    - **Create signup form to become an auravie angel**
- **Edit links on auravie.com to include a link to the Auravie Angel site and additional content seen below.**
  - **Slice below static content and integrate into commercepak**
    - **Create the links shown in the above screenshot for auravie.com homepage**
      - **Include additional link to angels main portal in auravie.com top nav**

**To:**            Alon N[alon@bunzaimedia.com]
**Cc:**            Doron N[doron@bunzaimedia.com]; Nastassia Yalley[nastassia@bunzaimedia.com]
**From:**          Leor Arazy
**Sent:**          Thur 6/21/2012 8:39:18 PM
**Importance:**    Normal
**Subject:**       Company Set-Up
**MAIL_RECEIVED:** Thur 6/21/2012 9:10:23 PM

Hey,
I spoke with our payroll system and they are going to need all the new company information ASAP. We already have a short amount of time to make the switch.

By tomorrow I will need:

1. All the contact information: Are the numbers staying the same? Office and Fax?
2. Who will be the contact person?
3. Primary Bank Information
4. All employees under Pinnacle.
5. General Ledger: Account numbers, DET Code, debit or credit.
6. Signature for employee's paychecks.


Thanks,
Leor

**McPeek, Brent**

| | |
|---|---|
| **From:** | igor <igorlats@gmail.com> |
| **Sent:** | Wednesday, June 06, 2012 3:05 PM |
| **To:** | Alon N; Paul Medina |
| **Subject:** | exel |
| **Attachments:** | Cororate Report revision-1.xlsx |

**EXHIBIT 503**

**May-12 — RECVD**

| Company | Processor | Processing after refunds | % of total processing | Pinnacle Logistics Inv Inv/Management Cos | Mario | Merchant Fees | 1k Merch Fees | Misc (Payback4) | Total Expenses | Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $640,739.08 | $567,372.12 | $517,206.44 / $517,050.03 | $37,017.8 | $240,137.5 | $1,654,463.1 | $47,283.8 |
| **Banzai** | | | | | | | | | | |
| Projection | Total | $286,682.12 | 16.85% | $68,182.25 | $104,086.60 | $26,614.32 | $36,666.96 / $2,866.82 | $40,453.51 | $278,700.46 | $7,971.66 |
| Fact | | $286,682.13 | 17% | $68,182.25 | $104,086.60 | $26,614.42 | $36,666.96 / $2,866.82 | $40,453.51 | $278,700.46 | $7,971.66 |
| Difference | | $286,682.13 | 17% | | | | | | | |
| **Safehaven (fact)** | | | | | | | | | | |
| Projection | Total | $540,277.32 | 27.105.6% | $109,706.76 | $167,477.67 | $42,565.59 | $58,997.95 / $4,612.78 | $55,090.59 | $446,451.34 | $12,826.58 |
| Fact | | $540,277.32 | 27% | $109,706.76 | $167,477.67 | $42,565.59 | $58,997.95 / $4,612.78 | $55,090.59 | $446,451.34 | $12,826.58 |
| Difference | | $461,277.92 | 27% | | | | | | | |
| Difference contin | | | | | | | | | | |
| **Zen** | | | | | | | | | | |
| Projection | Total | $466,884.96 | 27.4310% | $111,040.30 | $169,511.43 | $43,083.00 | $59,715.10 / $4,668.85 | $55,881.80 | $453,902.47 | $13,382.49 |
| Fact | | $466,884.96 | 27% | $111,040.30 | $169,511.43 | $43,083.00 | $59,715.10 / $4,668.85 | $55,881.80 | $453,902.47 | $13,382.49 |
| Difference | | | | | | | | | | |
| Difference contin | | | | | | | | | | |
| **Agro** | | | | | | | | | | |
| Projection | Total | $486,598.9 | 28.61% | $115,809.8 | $176,794.5 | $44,913.5 | $62,280.0 / $4,869.4 | $58,711.6 | $473,398.8 | $13,540.1 |
| Fact | | $486,598.9 | 29% | $115,809.8 | $176,794.5 | $44,913.5 | $62,280.0 / $4,869.4 | $58,711.6 | $473,398.8 | $13,540.1 |
| Difference | | | | | | | | | | |
| Difference contin | | | | | | | | | | |
| **Totals** | | $1,701,783.9 | 100% | $404,739.1 | $617,372.2 | $157,206.4 | $217,660.0 / $17,017.8 | $240,137.5 | $1,654,463.1 | $47,283.8 |

**SPEND**

| | |
|---|---|
| Gateway Fee | 0 |
| SEO - Jabio | 0 |
| Marketing (OPA and CPC) | 0 |
| Salaries | 0 |
| Workers Comp | 0 |
| Account Fees | 0 |
| Paycheck Fee | 0 |
| Taxes | 0 |
| Kirry Salary | 0 |
| HSBC Burcial | 0 |
| Donor AMEX Payments | 0 |
| Donor AMEX 2- Marking Payments | 0 |
| Alex/Ashly Payments | 0 |
| Alex Salary | 0 |
| Office Expenses | 0 |
| Chargebacks | 0 |
| Product Expense | 0 |
| Grafisak | 0 |
| Jarzin Healthy Products (Filling) | 0 |
| Bank Expenses (Wire Fees) | 0 |
| Shipping Expense (UPS and USPS) | 0 |
| Trueship Labels | 0 |
| **Total Withdrawals** | 0 |

| RECVD — Jul-12 | Processor | Processing after refunds | % of total processing | Pinnacle Logistics Inc | Media buy/Management Company — Jun-12 | Mario | Merchant Fees | UN Merch Fees | Misc (Payback) | Total Expenses | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bunzai | Projection | $268,682.12 | 16.85% | $68,182.25 | $104,086.60 | $24,454.32 | $36,666.96 | $2,866.82 | $46,653.51 | $278,710.46 | |
| | Fact | $268,682.12 | | $68,182.25 | $128,171.2 | $52,506.6 | | | | | $27,971.66 |
| | Difference | | | $136,364.5 | | | | | | | |
| | Total | | 16.85% | | | | | | | | |
| Safehaven (Inc) | Projection | $461,277.92 | 27.1056% | $109,706.76 | $167,477.67 | $42,565.59 | $58,997.95 | $4,613.78 | $65,090.59 | $448,451.34 | $12,826.58 |
| | Fact | $461,277.92 | | $109,706.76 | $552,506.4 | $85,131.2 | | | | | |
| | Difference | | | $219,413.5 | | | | | | | |
| | Total | | 27.11% | | | | | | | | |
| Zen | Projection | $466,884.96 | 27.4350% | $111,040.30 | $169,513.41 | $43,083.00 | $59,715.10 | $4,648.85 | $65,881.90 | $453,902.47 | $12,982.49 |
| | Fact | $466,884.96 | | $111,040.30 | $339,026.9 | $86,166.0 | | | | | |
| | Difference | | | $222,080.6 | | | | | | | |
| | Total | | 27.44% | | | | | | | | |
| Agoa | Projection | $486,938.9 | 30.3 | $115,809.8 | $176,794.49 | $44,933.5 | $62,280.02 | $4,869.4 | $68,711.60 | $473,398.79 | $13,540.12 |
| | Fact | $486,938.9 | | $115,809.77 | $176,794.5 | $44,933.5 | $62,280.02 | | | | |
| | Difference | | | | | | | | | | |
| | Total | | 28.61% | | | | | | | | |
| | Difference count | | | $353,389.0 | $324,560.0 | $59,788.9 | | $317,621.2 | $946,797.6 | $327,080.2 | |
| SPEND | Projection | | | $404,795.08 | $617,872.19 | $517,036.44 | $317,660.02 | $37,017.84 | $260,137.50 | $1,654,463.07 | $47,320.84 |
| | Fact | | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| | Difference | | | $404,795.08 | $617,872.19 | $517,036.44 | $317,660.02 | $37,017.84 | $260,137.50 | $1,654,463.07 | $47,320.84 |
| Totals | | $1,701,783.9 | 100% | $404,795.08 | $617,872.19 | $517,036.44 | $317,660.02 | | $260,137.50 | $1,654,463.07 | $47,320.84 |

SPEND
- Shipping Expense
- SEO - Jakia
- Marketing (DFA and DPC)
- Salaries
- Worker's Comp
- Paycheck Fee
- Trans
- Chris Salary
- Dcovn AMEX Payments
- Dcovn AMEX 2- Marking Payments
- Office Expenses
- Chargebacks
- HSBC Burial
- Account Fees
- Jason Healthy Products (Filing)
- Bank Expenses (Wire fees)
- Transfip Labels
- Total Withdrawals

| Category | Total Projection | Processor Processing after refunds % of total processing | Pinnacle Logistics Inc | In buy/Management Cost | Mario | Merchant Fees | 1% Merch Fees | Misc (Payback) | Total Expenses | Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| **RECVD** Jul-12 | | | | | | | | | | |
| | | | -$513,026.47 | -$43,227.77 | -$519,635.96 | -$621,643.55 | $17,017.84 | $240,139.50 | -$14,616,166.31 | |
| **Bonzai** | | | | | | | | | | |
| Projection | Total | 16.85% | | | | | | | | |
| Fee1 | $386,602.12 | | -$53,068.28 | -$70,286.09 | -$87,503.91 | $104,721.73 | $2,866.82 | $40,653.84 | -$272,259.34 | $558,941.46 |
| Difference | $386,602.12 | | ($53,068.28) | $33,573 | -$87,503.91 | | | | | $0.00 |
| Difference week | $33,114.0 | | $33,114.0 | | -$361,076.6 | -$368,054.8 | 55,713.6 | 580,907.4 | $4,451.1 | $545,951.1 |
| **Sukhdeven Bact** | | | | | | | | | | |
| Projection | Total | 27.10500% | | | | | | | | |
| Fee1 | $461,277.92 | | -$65,888.04 | -$113,091.89 | -$140,795.74 | $168,499.59 | $4,612.78 | $65,091.14 | -$438,071.34 | $899,149.26 |
| Difference | $461,277.92 | | ($585,388.00) | ($115,091.89) | ($140,795.74) | ($168,495.59) | 54,612.78 | 565,091.14 | ($438,071.34) | $899,149.26 |
| Difference week | $54,117 | | $54,117 | 586,210 | -559,611 | -550,914 | 59,221.6 | $320,181.7 | $105,980 | $512,173.4 |
| **Zen** | | | | | | | | | | |
| Projection | Total | 27.450% | | | | | | | | |
| Fee1 | $466,884.96 | | -$86,435.97 | -$114,466.57 | -$142,507.17 | $170,547.78 | $4,668.85 | $65,882.35 | -$441,396.29 | $910,181.25 |
| Difference | $466,884.96 | | ($586,425.97) | ($114,466.57) | ($142,507.17) | ($170,547.78) | 54,668.85 | 565,882.35 | ($443,396.29) | $910,181.25 |
| Difference week | $24,614.3 | | $55,046.9 | -$99,424.2 | $93,337.7 | $5311,764.1 | $311,764.1 | | $510,561.2 | $913,263.7 |
| **Aqua** | | | | | | | | | | |
| Projection | Total | 28.61% | | | | | | | | |
| Fee1 | $486,958.9 | | -$90,138.2 | -$119,383.2 | -$148,628.2 | $177,873.3 | $4,869.4 | $68,712.2 | -$462,441.3 | $948,801.3 |
| Difference | $486,958.9 | | ($90,138.19) | ($119,383.21) | ($148,628.24) | ($177,873.26) | 54,869.39 | 568,712.17 | ($462,441.36) | $948,801.3 |
| Difference week | $57,411.3 | | $57,411.3 | -$303,619.7 | -$115,559.1 | 59,733.8 | $137,423.8 | $110,957.4 | | $949,380.25 |
| **RECVD** | | | | | | | | | | |
| Projection | | | | | | | | | Misc (Payback) | Total Expenses | Profit |
| Fee1 | $513,020.5 | | $47,227.8 | $47,223.7 | $514,434.4 | $62,142.4 | $17,017.6 | $240,139.5 | $14,616,166.3 | $9,962,920.4 |
| Difference | | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$14,616,166.31 | $9,962,920.4 |
| **SPEND** | | | | | | | | | | |
| Gateway Fee | | | | | | | | | | |
| SEO - Julius | | | | | | | | | | |
| Marketing (DPA and CPC) | | | | | | | | | | |
| Solvers | | | | | | | | | | |
| Worker Comp | | | | | | | | | | |
| Paylike Fee | | | | | | | | | | |
| Taxes | | | | | | | | | | |
| Kris Salary | | | | | | | | | | |
| Doron AMEX Payments | | | | | | | | | | |
| Doron AMEX & Marketing Payments | | | | | | | | | | |
| Alan AMEX Payments | | | | | | | | | | |
| Alan Salary | | | | | | | | | | |
| Shipping Expense (UPS and USPS) | | | | | | | | | | |
| HSBC Bonzai | | | | | | | | | | |
| Account Fees | | | | | | | | | | |
| HSBC Bonzai | | | | | | | | | | |
| Chargebacks | | | | | | | | | | |
| Office Expenses | | | | | | | | | | |
| Product Expense | | | | | | | | | | |
| Gratipak | | | | | | | | | | |
| Jacen Healthy Products (Filling) | | | | | | | | | | |
| Bank Expenses (Wire Here) | | | | | | | | | | |
| Teardrop Label | | | | | | | | | | |
| Total Withdrawals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Difference** | ($915,000.47) | | ($917,223.77) | | ($515,485.06) | ($503,798.9) | $34,035.7 | | -$536,294.9 | $5,317,952.21 |
| **Totals** | $1,701,783.9 | 100% | $995,718.6 | $500,144.4 | -$962,798.9 | | | | | |

| | Processor | Processing after refunds | % of total processing | Pinnacle Logistics Inc | Media buy/Management Company | Mario | Merchant Fees | 1% Merch Fees | Misc (Payback) | Total Expenses | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECVD** Aug 12 Company Total Projection | | | | | | | | | | | |
| **Bunzai** | | | | | | | | | | | |
| Projection | Total | $286,682.12 | 16.85% | $512,939.54 | $539,157.36 | $156,751.18 | $173,282.99 | $2,866.82 | $40,454.01 | ($547,744.23) | $884,426.35 |
| Fact | | $286,682.12 | 16.85% | | | | | | | | |
| Difference | | | | ($321,595.54) | ($139,157.36) | ($156,751.18) | ($173,282.99) | | | | |
| difference week | | | | $171,000.7 | $359,441.5 | $341,751 | $278,316.7 | $55,733.6 | $180,907.9 | ($350,007.9) | $1,193,567.5 |
| **Safehaven Fact** | | | | | | | | | | | |
| Projection | Total | $441,277.92 | 27.105% | $196,303.44 | $223,507.29 | $351,611.14 | $279,314.99 | $4,612.78 | $65,091.41 | $481,132.68 | $1,342,610.00 |
| Fact | | $441,277.92 | 27.11% | ($196,303.44) | ($223,507.29) | ($351,611.14) | ($279,314.99) | | | ($985,133.00) | $1,342,610.00 |
| Difference | | | | | | | | | | | |
| difference week | | | | $320,999.2 | $369,004 | $392,000 | $347,644 | $59,225.6 | $131,815.5 | $131,814.6 | $1,243,999 |
| **Zen** | | | | | | | | | | | |
| Projection | Total | $466,884.96 | 27.485% | $198,580.38 | $226,628.98 | $254,669.59 | $282,710.19 | $4,668.85 | $65,882.62 | $892,045.67 | $1,358,930.63 |
| Fact | | $466,884.96 | 27.48% | ($198,580.38) | ($226,628.98) | ($254,669.59) | ($282,710.19) | | | ($892,045.67) | $1,358,930.63 |
| Difference | | | | ($285,014.3 | ($341,095.6 | $5897,176.8 | $453,258.0 | $59,337.7 | $131,765.0 | $5,345,440.0 | $1,259,015.9 |
| difference week | | | | | | | | | | | |
| **Apps** | | | | | | | | | | | |
| Projection | Total | $486,936.9 | 50.3 | ($207,118.28) | ($326,363.3 | ($285,608.3) | $294,053.3 | $4,065.54 | $46,715.5 | $980,361.4 | $1,417,300.32 |
| Fact | | $486,936.9 | 28.61% | ($207,118.28) | ($326,363.30) | ($265,608.32) | ($294,053.35) | $54,869.39 | $68,712.46 | ($939,361.41) | $1,417,300.32 |
| Difference | | | | ($397,256.5 | $455,745.6 | $414,286.6 | $427,256.6 | $59,788.8 | $137,428.6 | $1,392,802.7 | $2,266,580.5 |
| **RECVD** Projection Fact | | | | ($71,000.9) | ($58,000.9 | ($590,664.4 | $100,000.855 | $0 | $241,543.0 | $53,215.0843 | $5,435,513.0 |
| Difference | Totals | $1,701,785.9 | 100% | ($772,845.64) | ($926,056.94) | ($1,045,047.52) | $517,017.84 | $14,2017 | $240,140.50 | ($5,255,483.99) | $4,953,267.90 |

**SPEND**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gateway Fee | | 0 | 0 | 0 | 0 | 0 | | | | | 0 |
| Marketing (DFA and DFC) | | | | | | | | | | | |
| SDI - Jatua | | | | | | | | | | | |
| Salaries | | | | | | | | | | | |
| Worker's Comp | | | | | | | | | | | |
| Payrofex Fee | | | | | | | | | | | |
| Taxes | | | | | | | | | | | |
| Chris Salary | | | | | | | | | | | |
| Oxxon AMEX Payments | | | | | | | | | | | |
| Oxxon AMEX 2 - Marking Payments | | | | | | | | | | | |
| Alon AMEX Payments | | | | | | | | | | | |
| Jason Healthy Products (filing) | | | | | | | | | | | |
| Office Expenses | | | | | | | | | | | |
| HSBC Bonzai Chargebacks | | | | | | | | | | | |
| HSBC Bonzai Account Fees | | | | | | | | | | | |
| Shipping Expense (UPS and USPS) | | | | | | | | | | | |
| Alon Salary | | | | | | | | | | | |
| Bank Expenses (Wire fees) | | | | | | | | | | | |
| TransNu Labels | | | | | | | | | | | |
| Product Expense | | | | | | | | | | | |
| Grafixik | | | | | | | | | | | |
| **Total Withdrawals** | | 0 | | | | | | | | | |

| Sep-12 | Company | Processor | Processing after refunds | % of total processing | Pinnacle Logistics Inc -$1,132,678.82 | Media buy/Management Company -$1,234,886.11 | Mario -$1,137,093.40 | Merchant Fees -$1,483,900.70 | EN Merch Fees $17,217.84 | Misc (Payback) $240,141.50 | Total Expenses -$4,686,799.68 | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECOVD | Company | | Total Projection | | Pinnacle Logistics Inc | Media buy/Management Company | Mario | Merchant Fees | EN Merch Fees | Misc (Payback) | Total Expenses | Profit |
| **Bunzal** | | | | | | | | | | | | |
| Projection | | Total | $286,682.12 | 16.85% | -$190,810.81 | $208,028.63 | -$225,246.44 | -$242,464.26 | $2,866.82 | $40,454.18 | -$83,229.13 | $1,100,951.25 |
| Fact | | | $286,683.12 | 16.85% | -$312,750.4 | -$347,184.0 | -$383,521.6 | -$416,057.3 | $5,733.6 | $80,908.2 | -$170,073.4 | $1,941,927.8 |
| Difference | | | | | | | | | | | | |
| Difference ratio | | | | 27.1056% | | | | | | | | |
| **SafeHaven Fact** | | | | | | | | | | | | |
| Projection | | Total | $461,377.92 | 27.1056% | -$307,018.84 | -$334,723.69 | -$562,426.55 | -$590,130.40 | $4,612.78 | $65,091.68 | -$1,324,594.02 | 90.00 |
| Fact | | | $461,277.92 | 27.11% | -$307,018.84 | $562,723.69 | -$562,426.55 | $4,612.78 | $65,091.68 | | -$1,324,594.02 | $1,785,871.94 |
| Difference | | | | | -$503,022.3 | -$506,610 | -$66,407.7 | $609.64.4 | $92,25.6 | $1,363,651.1 | -$2,205,706.7 | $1,124,482.5 |
| Difference ratio | | | | | | | | | | | | |
| **Agoa** | | | | | | | | | | | | |
| Projection | | | | | | | | | | | | $13,007,560.32 |
| Fact | | | | 27.490% | -$310,750.80 | $338,791.40 | -$566,832.00 | -$594,872.61 | $4,668.85 | $65,882.90 | -$1,340,695.06 | $1,807,600.02 |
| Difference | | | | | -$509,939.2 | $565,426.4 | $92,25.6 | $57,182.8 | $55,317.7 | $131,765.5 | -$2,232,740.7 | $3,166,510.6 |
| Difference ratio | | | | 27.44% | | | | | | | | |
| **Zen** | | | | | | | | | | | | |
| Projection | | Total | $466,884.96 | | -$310,750.80 | $338,791.40 | -$566,832.00 | -$594,872.61 | $4,668.85 | $65,882.90 | -$1,340,695.06 | $1,807,600.02 |
| Fact | | | $466,884.96 | | | | | | | | | |
| Difference | | | | | | | | | | | | |
| Difference ratio | | | | | | | | | | | | |
| **RECOVD** | | | | | | | | | | | | |
| Projection | | | $486,938.9 | 28.61% | -$316,095.4 | -$383,343.4 | -$541,633.4 | $4,869.4 | $68,712.7 | | -$1,398,281.5 | $1,886,220.4 |
| Fact | | Total | $486,938.9 | 28.61% | -$324,098.37 | -$353,343.39 | -$382,588.41 | -$411,833.43 | $4,830.39 | $568,712.74 | -$1,398,281.47 | $3,883,220.38 |
| Projection | | | $0.1 | | -$331,216.6 | -$589,706.7 | -$648,196.7 | -$706,686.8 | $9,738.8 | $137,425.2 | -$2,328,642.9 | $56,388,583.83 |
| Fact | | | $0.0 | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Difference | | | ($1,132,678.82) | | ($1,132,678.8) | ($1,234,886.11) | ($1,137,093.40) | ($1,483,900.70) | $17,217.84 | $240,141.50 | ($4,686,799.68) | $6,585,583.59 |
| Difference ratio | | | $0.0 | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| **SPEND** | | Totals | $1,701,783.9 | 100% | ($1,132,678.82) | ($2,260,043.0) | ($2,263,537.3) | ($2,409,772.2) | $24,035.7 | $403,382.0 | ($8,119,283.7) | $15,561,813.5 |

| SPEND | |
|---|---|
| Gateway Fee | 0 |
| SEO - Jatkin | |
| Marketing (CPA and CPC) | |
| Sockets | |
| Worker' Comp | |
| Payroll Fee | |
| Taxes | |
| Kris Salary | |
| Doron AMEX Payments | |
| Doron AMEX 2- Marking Payments | |
| Alan AMEX Payments | |
| Akin Salary | |
| Shipping Expense (UPS and USPS) | |
| HSBC Bunzai Account Fees | |
| HSBC Bunzai Chargebacks | |
| Office Expense | |
| Product Expense | |
| Grafpus | |
| Jacen Health's Products (Filing) | |
| Bank Expense (Wire Fees) | |
| Traveling Labor | |
| **Total Withdrawals** | 0 |

| RECVED Oct-12 | | Processor | Processing after refunds | % of total processing | Pinnacle Logistics Inc Company $1,561,507.99 | Media buy/Management Company $1,643,715.14 | Merchant Fees $1,081,192.87 | IX Merch Fees $57,267.84 | Misc (Payback) $240,142.50 | Total Expenses $4,522,135.37 | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Burial** | Projection | Processor | $286,082.12 | 16.85% | $250,682.08 | $27,899.89 | $294,127.71 | $2,866.82 | $40,454.35 | $6,090,714.03 | $1,385,396.15 |
| | Fact | | | | ($259,682.08) | ($27,899.89) | ($294,117.71) | | ($1,014.03) | $1,385,396.15 | $2,493,307.4 |
| | Difference | | $286,082.12 | 16.85% | ($450,402.9) | $484,708.5 | $315,704.2 | $55,733.6 | $180,508.5 | $3,135,749.3 | |
| **Safehaven Fact** | Projection | | $461,277.92 | 27.1956% | $417,434.25 | $445,538./0 | $472,341.95 | $500,940.80 | $4,612.78 | $60,091.95 | $2,391,112.8 |
| | Fact | | | | ($417,434.25) | ($447,343.95) | ($473,341.95) | | $4,612.78 | $60,091.95 | $1,707,053.36 | $2,291,132.28 |
| | Difference | | $461,277.92 | 27.11% | ($417,934.25) | ($501,538.10) | ($505,940.80) | $55,733.8 | $51,707,053.36 | | $2,415,006.7 |
| | Difference center | | | | ($72,486.1) | $780,60.6 | ($81,667.6) | $59,225.4 | $310,181.6 | ($52,014,464) | |
| **Agoa** | Projection | | | 27.650% | $432,913.21 | $410,950.81 | ($478,994.42) | $4,668.85 | $63,883.17 | ($1,789,144.44) | $2,356,229.40 |
| | Fact | | $466,884.96 | 27.44% | ($432,913.21) | ($450,950.81) | ($507,035.02) | $54,668.85 | $65,883.17 | ($1,789,144.44) | $2,356,229.40 |
| | Difference | | $466,884.96 | | ($733,664.0) | $793,765.2 | ($901,907.6) | $55,130.1 | $131,766.1 | ($53,130,000) | $4,563,820.4 |
| **Zen** | Projection | | | | ($441,078.5) | $470,323.48) | ($499,568.4) | $4,859.4 | $68,713.03 | ($1,866,201.5) | $2,353,140.4 |
| | Fact | $486,593.9 | 50.3 | ($441,078.5) | ($470,323.48) | ($528,813.52) | $54,859.89 | $68,713.03 | ($1,866,201.54) | $2,353,140.45 |
| | Difference | $486,593.9 | 28.61% | ($765,178.8) | $825,666.9 | ($940,547.0) | 59,738.8 | $137,425.8 | ($53,264,483.0) | $4,263,560.8 |
| | Difference center | | | | $825,666.9 | $880,156.9 | $940,547.0 | | | | $52,353,560.8 |
| **Total** | Total | | $1,701,783.9 | 100% | ($1,541,507.99) | ($1,643,715.14) | ($1,081,192.87) | $57,267.84 | $240,142.50 | ($4,522,135.37) | $18,223,899.28 |
| | Fact | | | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | | $0.0 |
| | Difference | | ($3,174,186.8 | | ($3,287,430.28) | ($3,287,430.63) | ($3,287,740.5 | 156,017.7 | $517,017.84 | ($51,580,915.1) | $53,612,482.7 |

| SPEND | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gateway Fee | | | | | | | | | | | |
| SEO - Julius | | | | | | | | | | | |
| Marketing (CPA and CPC) | | | | | | | | | | | |
| Salaries | | | | | | | | | | | |
| Worker's Comp | | | | | | | | | | | |
| Payroll Fee | | | | | | | | | | | |
| Taxes | | | | | | | | | | | |
| Kris Salary | | | | | | | | | | | |
| Doron AMEX Payments | | | | | | | | | | | |
| Doron AMEX 2- Marketing Payments | | | | | | | | | | | |
| Alon AMEX Payments | | | | | | | | | | | |
| Alon Salary | | | | | | | | | | | |
| Shipping Expense (UPS and USPS) | | | | | | | | | | | |
| HSBC Bancard Account Fees | | | | | | | | | | | |
| HSBC Bancard Chargebacks | | | | | | | | | | | |
| Office Expenses | | | | | | | | | | | |
| Product Expense | | | | | | | | | | | |
| Gratipak | | | | | | | | | | | |
| Jacem Healthy Products (Filling) | | | | | | | | | | | |
| Bank Expenses (Wire Fees) | | | | | | | | | | | |
| Tranship Label | | | | | | | | | | | |
| Total Withdrawals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |

EXHIBIT 503

| RECVED Company | Processor | Processing after refunds Company | % of total processing | Nov-12 Pinnacle Logistics Inc | Nov-12 Media buy/Management Company | Mario | Merchant Fees | 1K Merch Fees | Misc (Payback) | Total Expenses | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Burnal** | | | | | | Mario -$2,156,751.75 | Merchant Fees -$2,346,589.84 | 1K Merch Fees $37,017.84 | Misc (Payback) $360,143.50 | Total Expenses -$14,100,083.7 | Profit $16,081,314.2 |
| Total Projection | $286,682.12 | 16.85% | -$328,553.34 | -$345,771.16 | -$362,986.98 | -$380,206.79 | $2,866.82 | $40,454.52 | -$1,374,198.93 | $1,660,881.05 |
| Fact | $286,682.12 | 16.85% | -$328,553.34 | -$345,771.16 | -$382,986.98 | -$380,206.79 | $55,783.8 | $80,908.9 | -$1,374,198.93 | $1,660,881.05 |
| Difference | $585,235.4 | | -$622,971.1 | -$657,190.7 | | -$593,563.7 | $3,040,277.2 | | -$2,472,913.0 | |
| **Safehaven fact** | | | | | | | | | | | |
| Total Projection | $41,177.92 | 27.1056% | -$528,649.65 | -$556,353.50 | -$584,057.35 | -$611,761.20 | $4,632.78 | $66,092.22 | -$2,211,116.70 | $2,672,394.62 |
| Fact | $461,277.92 | 27.11% | ($528,649.65) | ($556,353.50) | ($584,057.35) | ($611,761.20) | $4,612.78 | $55,092.22 | ($2,211,116.70) | $2,672,394.62 |
| Difference | $946,483.9 | | ($986,483.9) | -$1,001,093.8 | | -$1,117,070.0 | $99,325.6 | $338,184.2 | -$3,578,071.1 | $4,501,527.2 |
| **Zen** | | | | | | | | | | | |
| Total Projection | $466,884.96 | 27.650% | -$535,075.62 | -$563,116.23 | -$591,156.83 | -$619,197.43 | $4,668.85 | $65,883.45 | -$2,237,093.82 | $2,830,878.78 |
| Fact | $466,884.96 | 27.44% | ($535,075.62) | ($563,116.23) | ($591,156.83) | ($619,197.43) | $4,668.85 | $65,883.45 | ($2,237,093.82) | $2,830,878.78 |
| Difference | $957,988.8 | | -$1,004,070.0 | | -$1,070,015.2 | -$1,126,213.5 | $93,337.7 | $111,766.6 | -$4,027,388.3 | $5,461,108.2 |
| **Agoa** | | | | | | | | | | | |
| Total Projection | $486,538.9 | $0.3 | -$508,058.5 | -$587,303.6 | -$616,548.6 | -$645,793.6 | $4,869.4 | $68,713.3 | -$2,334,121.4 | $2,431,060.5 |
| Total Fact | $486,538.9 | 28.61% | ($558,058.54) | ($587,303.57) | ($616,548.59) | ($645,793.61) | $4,869.39 | $68,713.32 | ($2,334,121.60) | $2,431,060.5 |
| Difference | | | -$999,137.0 | -$1,057,627.0 | -$1,116,117.1 | -$1,174,607.1 | $59,738.8 | $137,426.3 | -$4,200,263.1 | $5,174,201.0 |
| **RECVED** | | | | | | | | | | | |
| Projection | | | Pinnacle Logistics Inc $3,920,187.2 | Media buy/Management Company $2,072,364.5 | Mario $2,104,715.7 | Merchant Fees $2,236,959.0 | 1K Merch Fees $17,017.8 | Misc (Payback) $240,143.5 | Total Expenses -$8,157,483.6 | Profit $99,939,253.0 |
| Fact | | 100% | ($3,920,187.16) | ($2,082,544.45) | ($2,156,751.75) | ($2,236,959.04) | $17,017.84 | $360,143.50 | ($8,157,483.66) | $99,939,234.67 |
| Difference | $3,471,245.1 | | ($3,696,230.7) | | -$3,700,974.3 | -$4,100,083.7 | $354,031.7 | $360,286.0 | -$14,679,546.4 | $116,081,114.2 |

| SPEND | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gateway Fee | | | | | | | | | | | |
| SEO - Julius | | | | | | | | | | | |
| Marketing (CPA and CFC) | | | | | | | | | | | |
| Solidtrip | | | | | | | | | | | |
| Worker's Comp | | | | | | | | | | | |
| Paycheck Fee | | | | | | | | | | | |
| Taxes | | | | | | | | | | | |
| Kris Salary | | | | | | | | | | | |
| Doron AMEX Payments | | | | | | | | | | | |
| Doron AMEX X Marking Payments | | | | | | | | | | | |
| Alon AMEX Payments | | | | | | | | | | | |
| Alon Salary | | | | | | | | | | | |
| Shipping Expense (UPS and USPS) | | | | | | | | | | | |
| HSBC Bantal Account Fees | | | | | | | | | | | |
| HSBC Bantal Chargebacks | | | | | | | | | | | |
| Office Expenses | | | | | | | | | | | |
| Product Expense | | | | | | | | | | | |
| Gratiak | | | | | | | | | | | |
| Jacen Healthy Products (Filing) | | | | | | | | | | | |
| Bank Expenses (Wire fees) | | | | | | | | | | | |
| Tracking Label | | | | | | | | | | | |
| Total Withdrawals | | | | | | | | | | | |
| **Totals** | $1,701,783.9 | 100% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

EXHIBIT 503

| Dec-12 | | | | Pinnacle Logistics Inc $12,316,146.33 | Media buy/Management Company -$2,461,373.63 | Mario -$2,565,580.92 | 1% March Fees $17,017.84 | Misc (Payback) $402,283.0 | Total Expenses -$9,792,746.75 | Profit |
|--------|---|---|---|---|---|---|---|---|---|---|
| **RECVD** | Company | Processing after refunds | % of total processing | | | | | | | |
| | | | | | | | | | | |
| **Total Projection** | | | | | | | | | | |
| **Bunzai** | Processor | | | | | | | | | |
| Projection | | $286,687.12 | 16.85% | $3.97,424.61 | $41,442.43 | $441,863.24 | $449,078.06 | $2,866.82 | $40,654.69 | $1,499,688.83 |
| Fact | | $286,687.12 | 16.85% | ($397,424.61) | ($41,442.43) | ($441,863.24) | ($449,078.06) | $2,866.82 | $40,654.69 | ($1,499,688.83) |
| Difference | | | | | | | | | | |
| **Sellheavn fact** | | | | | | | | | | |
| Projection | | $641,277.92 | 37.1050% | $639,465.05 | ($667,168.90) | $572,576.61 | $5,715.6 | $580,907.2 | $3,654,378.05 | $3,597,247.0 |
| Fact | | $641,277.92 | 37.1050% | ($639,465.05) | ($667,168.90) | | | | | |
| Difference | | | | | | | | | | |
| **Zen** | | | | | | | | | | |
| Projection | | $466,884.96 | 27.4350% | $647,238.04 | ($673,276.64) | $711,359.85 | $4,668.85 | $65,883.72 | $63,686,643.20 | |
| Fact | | | 27.44% | ($647,238.04) | ($673,276.64) | ($711,359.85) | | | | |
| Difference | | | | | | | | | | |
| **Agoa** | | | | | | | | | | |
| Projection | | $486,918.9 | 28.61% | $675,038.6 | $394,283.7 | $762,773.7 | $4,869.4 | $569,713.6 | $3,802,041.7 | |
| Fact | | | 28.61% | ($675,038.6) | ($394,283.7) | ($762,773.7) | | | | |
| Difference | | | | | | | | | | |



EXHIBIT 503

**To:**       Doron Nottea[doron@doron.us]
**Cc:**       Alon | Bunzai Media[alon@bunzaimedia.com]
**From:**     David Davidian, CPA
**Sent:**     Fri 3/30/2012 5:15:58 PM
**Importance:**           Normal
**Subject:**  AMD Financial Network
**MAIL_RECEIVED:**   Fri 3/30/2012 5:16:21 PM
Articles of Incorporation.pdf
EIN.pdf
Statement of Information_Client.pdf

Dear Doron and Alon,

Attached please find the articles and other documents for the AMD Financial Network Inc.

Sincerely,
*Z. David Davidian, CPA*
Davidian & Associates
**Certified Public Accountants**
(888) 452-5577
(818) 242-7800
(888) 202-7757 Fax
www.LACPA.com

This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.

To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. tax advice contained in this communication, and its attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party for any matters addressed herein.

 *Please consider the environment before printing this e-mail*

**EXHIBIT 505**

| | |
|---|---|
| **From:** | Greg Serobyan <Greg.Serobyan@umsbanking.com> |
| **Sent:** | Wednesday, February 08, 2012 5:12 PM |
| **To:** | alon@bunzaimedia.com |
| **Cc:** | Jacki Cass; Joseph Schnelldorfer |
| **Subject:** | UMS Banking: RESERVE DOCUMENTS |
| **Attachments:** | Reserve Agreement Antiage.doc; Reserve Agreement good skin.doc; Reserve Agreement great skin.doc; Reserve Agreement Refresh.doc; Reserve Agreement replenish.doc; Reserve Agreement reveal.doc; Reserve Agreement Serum.doc; Reserve Agreement skin cream.doc; Reserve Agreement skin kit.doc; Reserve Agreement Skin renew.doc |

Hello Alon,

I am the underwriting administrator here at UMS Banking.  I work Directly with our senior underwriter Joe and under Jacki Cass.

Dylan Gaines requested I send these on to you for signature.

Your accounts are up and going but the final detail is the signature on the 5% rolling reserve documents!

Please return them to me asap if you can at your earliest convenience.  Let me know if you have any questions on these also.

Thanks!

Greg
--



        UMS Banking

        Greg Serobyan
Department of Underwriting
750 Fairmont Ave
Glendale, CA 91203
Phone: (800) 866-1881 ext. 159
Fax: 818-246-3631
Greg.Serobyan@umsbanking.com
www.umsbanking.com

<http://www.umsbanking.com>

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*
The information in this e-mail and in any attachments is CONFIDENTIAL and intended
for the sole use of the addressee(s) listed.
This e-mail may contain information that is confidential and exempt from disclosure
under applicable law.
You are hereby notified that any dissemination, distribution, duplication or
retaining of this transmission by someone other than the intended addressee or
addressee's designated agent is strictly prohibited.
If you have received this communication in error, please notify us by return (reply) e-mail immediately.
Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*

**511 - 2**                                                          **EXHIBIT 511**



Date:  January 20, 2012


To:   Zen Mobile Media Inc
       Antiage
       4335 Van Nuys Blvd #167
       Sherman Oaks, CA 91403
       ATTN  Igor Latsanowski


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:     $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds.</u>   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)


_____                    _____
Authorized Merchant Signature                                             Date


_____                    _____
Authorized UMS Banking Signature                                      Date



Date: February 7, 2012


To:     Good Skin
        19528 Ventura Blvd #224
        Tarzana, CA 91356
        ATTN Lori Bekhar


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:      $ to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.00%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds.</u>   From the start of this reserve and after a minimum of six  months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____          _____
Authorized Merchant Signature                                                    Date


_____          _____
Authorized UMS Banking Signature                                              Date



Date:  February 7, 2012


To:     Great Skin
        16161 Ventura Blvd #378
        Tarzana, CA 91356
        ATTN Motta Nottea


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:   $ to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.00%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds.</u>   From the start of this reserve and after a minimum of six  months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____                    _____
Authorized Merchant Signature                                      Date


_____                    _____
Authorized UMS Banking Signature                                   Date



Date: January 20, 2012

To:    Agoa Holdings Inc
       Refresh
       7900 Gloria Avenue
       Van Nuys CA 91406
       ATTN Roi Reuveni

From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:    $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:    $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:    $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____    _____
Authorized Merchant Signature             Date

_____    _____
Authorized UMS Banking Signature         Date



Date:  February 7, 2012


To:      Replenish
         19528 Ventura Blvd #224
         Tarzana, CA 91356
         ATTN Lori Bekhar


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:        $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:     $ to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.00%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds.</u>   From the start of this reserve and after a minimum of six  months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____          _____
Authorized Merchant Signature                                            Date


_____          _____
Authorized UMS Banking Signature                                      Date



Date:  January 20, 2012

To:    Zen Mobile Media Inc
       Reveal
       4335 Van Nuys Blvd #167
       Sherman Oaks, CA 91403
       ATTN  Igor Latsanowski

From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.

ESTIMATED TOTAL CASH RESERVE:       $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:       $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:      $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

<hr>

Authorized Merchant Signature                           Date

<hr>

Authorized UMS Banking Signature                        Date



Date:  January 20, 2012

To:   Safehaven Ventures Inc
      Serum
      548 S Spring Street #406
      Los Angeles, CA 90013
      ATTN Tomer Amsalem

From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:       $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:       $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:     $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____          _____
Authorized Merchant Signature                                    Date

_____          _____
Authorized UMS Banking Signature                              Date

**EXHIBIT 511**



Date:  January 20, 2012

To:    Zen Mobile Media Inc
       Skin Cream
       4335 Van Nuys Blvd #167
       Sherman Oaks, CA 91403
       ATTN  Igor Latsanowski


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:    $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

_____                _____
Authorized Merchant Signature                              Date


_____                _____
Authorized UMS Banking Signature                           Date



Date:  February 7, 2012


To:     Skin Kit
        16161 Ventura Blvd #378
        Tarzana, CA 91356
        ATTN Motta Nottea


From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.


ESTIMATED TOTAL CASH RESERVE:      $ to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:     $ to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.00%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six  months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)


_____                 _____
Authorized Merchant Signature                                                      Date


_____                 _____
Authorized UMS Banking Signature                                                  Date



Date: January 20, 2012

To:   Safehaven Ventures Inc
      Skin Renew
      548 S Spring Street #406
      Los Angeles, CA 90013
      ATTN Tomer Amsalem

From: <u>UMS Banking Credit Department</u>

RE: <u>Establishment of a Reserve Account</u>

UMS Banking's credit department has approved your request to open a merchant credit card processing account under the terms and conditions of the merchant agreement with Global Payments Inc.  We have added the condition that you provide collateral in the form of cash deposits, a letter of credit, or certificate of deposit that you have assigned to us.

ESTIMATED TOTAL CASH RESERVE:      $ - to be determined
(Includes the initial cash reserve provided)

INITIAL CASH RESERVE PROVIDED:      $ 0.00

MINIMUM NET RESERVE TO BE FUNDED AS A
PERCENTAGE OF CREDIT CARD DEPOSITS:     $ - to be determined

PERCENTAGE OF CREDIT CARD DEPOSITS:  5.0%
THAT GLOBAL PAYMENTS INC.
WILL WITHHOLD TO FUND RESERVE:

Acknowledgement::

We agree to the conditions listed above.  We agree to establish a reserve account and to have Global Payments, Inc. withhold a portion of our merchant credit card deposits.  <u>We understand that Global Payments Inc. or UMS banking will not pay interest on these funds</u>.   From the start of this reserve and after a minimum of six months, Global Payments will not release these funds until after a review of the account is made and it is determined at that time what reserve, if any, is needed.   All Funds will be released no less than six months after the closure of the merchant account  (that is those funds, which are in excess of the total projected amount of unpaid merchant obligations, chargebacks, merchant discount fees, credits/refunds, other fees, Etc.)

---

Authorized Merchant Signature                              Date

---

Authorized UMS Banking Signature                          Date

**From:**         Nastassia Yalley <nastassia@bunzaimedia.com>
**Sent:**          Tuesday, January 17, 2012 12:55 PM
**To:**            avico global; Roi | Bunzai; Alon Nottea
**Subject:**       Phone Numbers
**Attachments:**   PhonePower_Phone Numbers.xlsx


Hello,

Attached is our current phone numbers in our phonepower account. Let me know  if you need any more information.



-- -- -- -- -- -- -- -- --
Nastassia Yalley
Director of Marketing
O: 818.200.1035
F: 818.647.0182

**EXHIBIT 516**

| No. | Number | Forwards to | Pointed to | NOTES |
|---|---|---|---|---|
| 1 | 866-982-6218 | DMA MEDIA HOLDINGS | 8182001045 | |
| 2 | 888-276-7261 | LIFESTYLE BRANDS | 8182001045 | |
| 3 | 888-320-0196 | AGOA Holdings | 8182001045 | |
| 4 | 888-320-0198 | NOT IN USE | | |
| 5 | 888-291-7385 | BUNZAI MEDIA (HSBC ACCOUNT) | 8182001045 | |
| 6 | 888-324-9771 | COLLECTIONS NUMBER | 8182001045 | |
| 7 | 888-241-2619 | M3DTV.COM | 8182001045 | |
| 8 | 866-216-9336 | Using for MFK, OTT, AuraVie, and Souffle | 8182001045 | |
| 9 | 866-701-7706 | Digimouse.com | 8187857000 | |
| 10 | (888)609-8647 | ZEN MOBILE MEDIA | 8182001045 | OPENED ON 11/11/11 |
| 11 | (888)341-4183 | SAFEHAVEN VENTURES | 8182001045 | OPENED ON 11/11/11 |
| 12 | (888)586-2329 | NOT IN USE | 8182001035 | OPENED ON 11/11/11 |
| 13 | (888)499-8512 | NOT IN USE | 8182001035 | OPENED ON 11/11/11 |

516 - 2

EXHIBIT 516

**To:**   Roi | Bunzai[roi@bunzaimedia.com]
**Cc:**   Alon | Bunzai Media[alon@bunzaimedia.com]; Nastassia Yalley[Nastassia@bunzaimedia.com]; Paul
Medina[paul@bunzaimedia.com]
**From:**   Avico Global
**Sent:**   Tue 3/27/2012 7:53:03 PM
**Importance:**   Normal
**Subject:**   Re: 5 More 800 numbers
**MAIL_RECEIVED:**   Tue 3/27/2012 7:53:06 PM

Hi All

Below are five mixed toll free number .. they are already pointing to the server and working ..
Roi let me know if you need me ..

(866) 673-3254
(877) 245-8534
(855) 607-0471
(888) 528-3694
(855) 262-6584

If you need more numbers let me know

Avi

On Tue, Mar 27, 2012 at 4:37 PM, Roi | Bunzai <roi@bunzaimedia.com> wrote:

Alon,
Inform me when you get the numbers so I can enter them to the phone system if needed.

Best Regards,

# *Roi Reuveni*

IT Manager.
Bunzai Media Group, Inc.
Skype: ▮▮▮▮▮   E-Mail: Roi@Bunzaimedia.com
Direct 818.200.1045 | Mobile ▮▮▮▮▮▮



This e-mail message may contain confidential, proprietary or legally privileged information. It should not be used by anyone who is not the
original intended recipient. If you have erroneously received this message, please delete it immediately and notify the sender. The
recipient acknowledges that Bunzai Media Group is unable to exercise control or ensure or guarantee the integrity of/over the contants of
the information contained in e-mail transmission and further acknowledges that any views expressed in this message shall be implied or
assumed unless the sender does so expressly with due authority of Bunzai Media Group before opening any attachments please check
them for viruses and defects.

On Tue, Mar 27, 2012 at 2:41 PM, Alon | Bunzai Media <alon@bunzaimedia.com> wrote:

Avile - when you can i need these 5 numbers for more merchant accounts  - toda
PLEASE REPLY TO ALL SO THEY HAVE THE NUMBERS TOO - TODA

From: **Nastassia Yalley** <nastassia@bunzaimedia.com>
Date: Fri, Mar 23, 2012 at 9:50 AM

**EXHIBIT 529**

Subject: More 800 numbers
To: avico global <avicoglobal@gmail.com>, Alon Nottea <alon@bunzaimedia.com>

Hi Avi,
Is it possible for us to get 5 completely random 800 numbers?
Make sure they are completely off and different because we will
be using them for different corporations. Thank you ;]

--
-- -- -- -- -- -- -- -- --
**Nastassia Yalley**
Director of Marketing
O: 818.200.1035
F: 818.647.0182

**EXHIBIT 529**

**From:**            avico global <avicoglobal@gmail.com>
**Sent:**            Thursday, May 26, 2011 8:07 PM
**To:**              Alon | Bunzai Media
**Subject:**         screen shot for order page
**Attachments:**     SHIPPING ID 10.jpg; SHIPPING ID 9.jpg

alon read the chat of privious email and look at screen shots ... call me when u can ...

**EXHIBIT 531**



**EXHIBIT 531**



EXHIBIT 531

**To:**       Paul Medina[paul@mediaurge.com]; Doron .[doron@doron.us]; Alon | MediaUrge[alon@mediaurge.com]
**From:**   Nastassia Yalley
**Sent:**    Mon 11/5/2012 9:26:47 PM
**Importance:**      Normal
**Subject:**  September EOM
**MAIL_RECEIVED:**   Mon 11/5/2012 9:26:49 PM
misc expenses.xlsx
September 2012 Breakdown.xlsx

See attached.

--
-- -- -- -- -- -- -- -- --
**Nastassia Yalley**
Director of Marketing
O: 818.200.1035
C: ████████████
F: 818.647.0182

          **EXHIBIT 542**

**From:** Nastassia Yalley <nastassia@bunzaimedia.com>
**Sent:** Tuesday, October 23, 2012 8:34 PM
**To:** Doron .; Paul Medina
**Subject:** August EOM
**Attachments:** August 2012 Breakdown.xlsx

Let me know if you have any questions.


--
-- -- -- -- -- -- -- -- --
Nastassia Yalley
**Director of Marketing**
O: 818.200.1035
C:
F: 818.647.0182

1

**EXHIBIT 543**

**M3D ACCOUNT**

| | |
|---|---|
| **Beginning on 8/1/12** | **$ 1,716.41** |
| **Deposits** | |
| | $        - |
| **Withdrawals** | |
| Gateway Fee | $    (19.99) |
| Merchant Account Fees | $    (63.91) |
| **Ending Balance on 8/31/12** | **$ 1,632.51** |

**MFK ACCOUNT**

| | |
|---|---|
| **Beginning on 8/1/12** | **$ 7,932.47** |
| | |
| **Deposits** | |
| Transfer from Dead Sea | $ 10,000.00 |
| | |
| **Withdrawals** | |
| Gateway Fees | $ (20.59) |
| Bank Fee | $ (30.00) |
| N&A Consulting (CPA External) | $ (7,869.00) |
| Merchant Acct Fee NMC Single | $ (46.69) |
| **Ending Balance on 8/31/12** | **$ 9,966.19** |

**EXHIBIT 543**

**AURAVIE ACCOUNT**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | **$  6,336.40** | |
| | | |
| **Deposits** | | |
| Sales | **$  13,098.61** | |
| | | |
| **Withdrawals** | | |
| Gateway Fees | $   (47.08) | |
| Office Expenses | $   (1,468.11) | |
| Bank Fees | $   (3.00) | |
| Discount Fees NMC Auravie | $   (442.67) | |
| Chargeback NMC | $   (443.89) | |
| Merchant Acct Fee NMC Auravie | $   (251.52) | |
| Khris Salary (Trademark) | $   (325.00) | |
| **Ending Balance on 8/31/12** | **$  16,453.74** | |

| OFFICE EXPENSES | |
|---|---|
| Amazon.com | $   (31.52) |
| Craigslist | $   (25.00) |
| CVS | $   (21.13) |
| Elegant Themes | $   (89.00) |
| Food 4 Less | $   (123.44) |
| Fuel | $   (264.63) |
| GoDaddy.com | $   (77.00) |
| Home Depot | $   (226.29) |
| Jons Market | $   (60.26) |
| Norton Software | $   (89.98) |
| Refunds for Customers | $   (204.76) |
| Target | $   (240.15) |
| True Credit | $   (14.95) |
| **Grand Total** | **$ (1,468.11)** |

**BUNZAI ACCOUNT**

| Beginning on 8/1/12 | | $33,770.91 |
|---|---|---|
| **Deposits** | | |
| Transfers from AGOA | $ | 15,000.00 |
| Transfers from DeadSea | $ | 3,000.00 |
| Transfer from Lifestyle | $ | 10,000.00 |
| Transfers from DMA | $ | 17,000.00 |
| Transfers from Safe | $ | 45,000.00 |
| Transfers from Zen | $ | 40,000.00 |
| Convert2Media Revenue | $ | 5,996.00 |
| UMS Bunzai Chargeback Reversal | $ | 97.88 |
| Sales from UMS Bunzai | $ | 103,660.10 |
| **Total Deposits** | **$** | **239,753.98** |

| **Withdrawals** | | |
|---|---|---|
| Gateway Fee | $ | (50.95) |
| **Marketing (CPA and CPC)** | **$** | **(70,386.21)** |
| Salaries | $ | (22,931.88) |
| Khris Salary | $ | (20,754.00) |
| Alon Salary (Audioline, imperial,james alpert) | $ | (12,660.00) |
| Doron AMEX Payments | $ | (20,571.64) |
| Doron AMEX 2 Payments | $ | (5,383.24) |
| Alon AMEX | $ | (4,000.00) |
| UMS Chargebacks | $ | (11,934.31) |
| UMS Merchant Account Fees | $ | (10,659.28) |
| UMS Merchant Discount Fees | $ | (5,067.05) |
| **Office Expenses** | **$** | **(13,323.18)** |
| MW Transport | $ | (625.00) |
| K1 Packaging | $ | (4,000.00) |
| Grafipak | $ | (13,750.00) |
| Bank Expenses (Wire fees) | $ | (322.75) |
| **Total Withdrawals** | **$** | **(216,419.49)** |

| **Ending Balance on 8/31/12** | **$** | **57,105.40** |
|---|---|---|

| MARKETING EXPENSES | | |
|---|---|---|
| AOL Advertising, Inc | $ | (8,819.21) |
| Belal Ayoub | $ | (898.50) |
| Dedicated Media | $ | (500.00) |
| Frank Ciuffo | $ | (898.50) |
| LifeScript | $ | (23,715.00) |
| MediaCrowd | $ | (5,842.00) |
| N&A Consulting, Inc. | $ | (29,713.00) |
| **TOTAL MARKETING** | **$** | **(70,386.21)** |

| Name | Total | Description |
|---|---|---|
| Andrew Burg | $ (1,504.65) | Repairs and Maintenance |
| Apple Store | $ (48.69) | Dues and Subscriptions |
| BaseCamp | $ (199.00) | Dues and Subscriptions |
| Board of Equalization | $ (2,737.00) | Taxes and Licenses |
| Bug Terminator | $ (425.00) | Repairs and Maintenance |
| Christian Torres | $ (300.00) | Repairs and Maintenance |
| Craigslist | $ (25.00) | Office Supplies |
| Davidian & Associates | $ (415.00) | Legal and Professional Fees |
| Discount Mountain Software | $ (1,051.94) | Software |
| Domestic Uniform Rental | $ (318.28) | Office Supplies |
| Fiffi Meron | $ (350.00) | Money to open new bank accounts |
| Food 4 Less | $ (30.96) | Office Supplies |
| Intuit.com | $ (18.86) | Dues and Subscriptions |
| Matrix Marketing | $ (3,500.00) | Legal and Professional Fees |
| NextDimension | $ (125.00) | Legal and Professional Fees |
| Skype.com | $ (33.40) | Dues and Subscriptions |
| Susan Schwartz | $ (450.00) | Money to open new bank accounts |
| Travelers Insurance | $ (618.40) | Worker's comp |
| Xcaliber Solutions | $ (1,172.00) | Chargeback Management |
| **Grand Total** | **$ (13,323.18)** | |

**DEAD SEA ACCOUNT**

| **Beginning on 8/1/12** | $ | **15,870.05** |
|---|---|---|

**Deposits**

| Refunds Received | $ | 17.78 |
|---|---|---|
| Signapay Sales | $ | 50,067.89 |
| **TOTAL DEPOSITS** | **$** | **50,085.67** |

**Withdrawals**

| Transfer to MFK | $ | (10,000.00) |
|---|---|---|
| Transfer to Bunzai | $ | (3,000.00) |
| Merrick Account Fees | $ | (175.00) |
| Signapay Chargebacks | $ | (4,895.93) |
| Signapay Account Fees | $ | (2,919.56) |
| Signapay Discount Fees | $ | (691.96) |
| NMC Salt Soufflé Merchant Acct Fees | $ | (57.53) |
| NMC Salt Soufflé Merchant Discount Fees | $ | (30.79) |
| Office Expenses | $ | (1,010.73) |
| Bank Fees (Wire Fees) | $ | (91.86) |
| Internal Marketing (Adperio) | $ | (9,240.00) |
| Khris Salary | $ | (5,828.48) |
| Gateway Fees | $ | (60.33) |
| Salaries (Misha) | $ | (800.51) |
| **TOTAL WITHDRAWALS** | **$** | **(38,802.68)** |

| **Ending Balance on 8/31/12** | **$** | **27,153.04** |
|---|---|---|

| OFFICE EXPENSES | | |
|---|---|---|
| AT&T | $ | (158.75) |
| California Chicken Café | $ | (406.24) |
| Dishnetwork | $ | (135.53) |
| MetroFax | $ | (14.95) |
| Restaurant Depot | $ | (295.26) |
| Grand Total | $ | (1,010.73) |

**EXHIBIT 543**

**AGOA ACCOUNTS**

| | | |
|---|---|---:|
| **Beginning on 8/1/12** | $ | **52,713.75** |
| | | |
| **Deposits** | | |
| Sales from AGOA Signapay | $ | 140,082.34 |
| UMS Chargeback Reversal | $ | 1.93 |
| Sales from AGOA UMS | $ | 145,458.51 |
| **Total Deposits** | $ | **285,542.78** |
| | | |
| **Withdrawals** | | |
| Checks to Bunzai | $ | (15,000.00) |
| Checks to Pinnacle | $ | (100,000.00) |
| Transfer to Agoa Savings | $ | (141,000.00) |
| AGOA Signapay Merchant Acct Fees | $ | (4,093.36) |
| AGOA Signapay Merchant Discount Fees | $ | (2,072.16) |
| AGOA Signapay Chargebacks | $ | (4,083.12) |
| AGOA UMS Merchant Acct Fees | $ | (6,110.57) |
| AGOA UMS Merchant Discount Fees | $ | (1,067.10) |
| AGOA UMS Chargebacks | $ | (6,327.30) |
| Alon Salary (Kape) | $ | (1,730.00) |
| Clickbooth | $ | (8,789.00) |
| Jacem | $ | (11,032.25) |
| Payroll and Payroll Taxes (Roi and Leor) | $ | (13,429.44) |
| Office Expenses | $ | (260.06) |
| **TOTAL WITHDRAWALS** | $ | **(314,994.36)** |
| | | |
| **Ending Balance on 8/31/12** | $ | **23,262.17** |

| Office Expenses | | |
|---|---|---:|
| Farmer's Ranch Market | $ | (39.43) |
| Mercado Buenos Air | $ | (91.69) |
| MetroFax | $ | (14.95) |
| Plimus | $ | (84.00) |
| Quickbooks | $ | (29.99) |
| **Grand Total** | **$** | **(260.06)** |

| **AGOA SAVINGS ACCOUNT** | | |
|---|---|---:|
| **Beginning on 8/1/12** | $ | **2,822.41** |
| | | |
| **Deposits** | | |
| Transfer from Agoa Main | $ | 141,000.00 |
| | | |
| **Withdrawals** | | |
| External Marketing | $ | (119,797.00) |
| Internal Marketing (Lifescript) | $ | (19,350.00) |
| Bank Charges | $ | (14.76) |
| **Ending Balance on 8/31/12** | $ | **4,660.65** |

| External | |
|---|---:|
| Guru Media | $ (96,232.00) |
| W4 LLC | $ (16,685.00) |
| N&A | $  (6,880.00) |

**EXHIBIT 543**

## DMA ACCOUNTS

| **Beginning on 8/1/12** | $ | **27,367.84** |
|---|---|---|

**Deposits**

| Sales from Signapay | $ | 55,843.11 |
|---|---|---|
| Signapay Chargeback Reversal | $ | 195.76 |
| Sales from UMS | $ | 51,099.55 |
| **Total Deposits** | **$** | **107,138.42** |

**Withdrawals**

| DMA Signapay Account Fees | $ | (2,711.82) |
|---|---|---|
| DMA Signapay Discount Fees | $ | (1,966.21) |
| DMA Signapay Chargebacks | $ | (5,245.80) |
| UMS Account Fees | $ | (6,696.56) |
| UMS Discount Fees | $ | (3,474.22) |
| UMS Chargebacks | $ | (7,258.99) |
| Transfer to Bunzai | $ | (17,000.00) |
| Transfer to Pinnacle | $ | (32,500.00) |
| Office Expenses | $ | (14,867.94) |
| Payroll (Matan) | $ | (3,701.44) |
| Marketing (Morri CC Payback) | $ | (22,850.00) |
| Gateway Fee | $ | (112.75) |
| **TOTAL WITHDRAWALS** | **$** | **(118,385.73)** |

| **Ending Balance on 8/31/12** | **$** | **16,120.53** |
|---|---|---|

| **Office Expenses** | | |
|---|---|---|
| MetroFax | $ | (14.95) |
| Revguard | $ | (14,820.00) |
| Quickbooks | $ | (32.99) |
| **Grand Total** | **$** | **(14,867.94)** |

---

| **DMA SAVINGS ACCOUNT** | | |
|---|---|---|
| **Beginning on 8/1/12** | **$** | **1,381.42** |

**Deposits**

| Transfer from DMA Main | $ | - |
|---|---|---|

**Withdrawals**

| Bank Charges | $ | (14.89) |
|---|---|---|
| Transfer to DMA Main | $ | - |
| **Ending Balance on 8/31/12** | **$** | **1,366.53** |

**EXHIBIT 543**

**LIFESTYLE ACCOUNTS**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | **$** | **55,706.18** |

**Deposits**

| | | |
|---|---|---|
| Sales from Lifestyle Signapay | $ | 36,009.75 |
| **Total Deposits** | **$** | **36,009.75** |

**Withdrawals**

| | | |
|---|---|---|
| LMB Signapay Account Fees | $ | (1,938.96) |
| LMB Signapay Chargebacks | $ | (3,931.68) |
| LMB Signapay Discount Fees | $ | (595.65) |
| Gateway Fee | $ | (20.39) |
| Jacem | $ | (10,004.25) |
| Transfer to Bunzai | $ | (10,000.00) |
| Transfer to SBM | $ | (40,000.00) |
| Office Expenses | $ | (284.99) |
| **TOTAL WITHDRAWALS** | **$** | **(66,775.92)** |

| | | |
|---|---|---|
| **Ending Balance on 8/31/12** | **$** | **24,940.01** |

| **Office Expenses** | | |
|---|---|---|
| Quickbooks | $ | (32.99) |
| UPS Store (Mailbox) | $ | (252.00) |

| | | |
|---|---|---|
| **LMB SAVINGS ACCOUNT** | | |
| **Beginning on 8/1/12** | **$** | **2,292.42** |

**Deposits**

| | | |
|---|---|---|
| Transfer from LMB Main | $ | - |

**Withdrawals**

| | | |
|---|---|---|
| Metrofax | $ | (14.95) |
| Bank Fee | $ | (14.80) |
| **Ending Balance on 8/31/12** | **$** | **2,262.67** |

**EXHIBIT 543**

**ZEN MOBILE MEDIA ACCOUNTS**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | $ | 54,247.57 |

| **Deposits** | | |
|---|---|---|
| Chargeback Reversal | $ | 195.76 |
| Sales from Zen UMS | $ | 106,112.37 |
| Sales from Zen Signapay | $ | 139,547.11 |
| **Total Deposits** | **$** | **245,855.24** |

| **Withdrawals** | | | | **Office Expenses** | | |
|---|---|---|---|---|---|---|
| Zen Signapay Merchant Acct Fees | $ | (4,376.51) | | | | |
| Zen Signapay Merchant Discount Fees | $ | (868.52) | | MetroFax | $ | (14.95) |
| Zen Signapay Chargebacks | $ | (7,200.35) | | Time Warner Cable | $ | (1,089.84) |
| Zen UMS Merchant Acct Fees | $ | (7,932.76) | | | | |
| Zen UMS Merchant Discount Fees | $ | (1,938.16) | | | | |
| Zen UMS Chargebacks | $ | (9,533.85) | | | | |
| CalEnergy (Return) | $ | (15,000.00) | | | | |
| Jacem | $ | (36,700.00) | | | | |
| CPA expense | $ | (36,272.00) | | | | |
| Salaries (Sean) | $ | (3,000.00) | | | | |
| Office Expenses | $ | (1,104.79) | | | | |
| Transfer to Pinnacle | $ | (47,500.00) | | | | |
| Transfer to Bunzai | $ | (40,000.00) | | | | |
| Transfer to SBM | $ | (20,000.00) | | | | |
| Transfer to Zen Main | $ | (32,000.00) | | | | |
| **TOTAL WITHDRAWALS** | **$** | **(263,426.94)** | | | | |

| **Ending Balance on 8/31/12** | **$** | **36,675.87** |
|---|---|---|

| **ZEN SAVINGS ACCOUNT** | | |
|---|---|---|
| **Beginning on 8/1/12** | $ | 19,810.14 |

| **Deposits** | | |
|---|---|---|
| Transfer from Zen Main | $ | 32,000.00 |
| **Total Deposits** | **$** | **32,000.00** |

| **Withdrawals** | | | | **Office Expenses** | |
|---|---|---|---|---|---|
| Alon Salary | $ | (3,550.00) | | Quickbooks | -29.99 |
| CalEnergy (Return) | $ | (10,000.00) | | Metrofax | -14.95 |
| Office Expenses | $ | (44.94) | | | |
| Jacem | $ | (10,000.00) | | | |
| Marketing (Morri CC Payback) | $ | (23,180.00) | | | |
| Bank Fee | $ | (14.41) | | | |
| **TOTAL WITHDRAWALS** | **$** | **(46,789.35)** | | | |

| **Ending Balance on 8/31/12** | **$** | **5,020.79** |
|---|---|---|

**SAFEHAVEN VENTURES ACCOUNTS**

| | | |
|---|---|---:|
| **Beginning on 8/1/12** | **$** | **34,994.08** |
| | | |
| **Deposits** | | |
| Sales from UMS | | 121,051.04 |
| UMS Chargeback Reversal | | 83.20 |
| Sales from Safe Signapay | | 121,606.84 |
| Signapay Chargeback Reversal | | 181.08 |
| **Total Deposits** | **$** | **242,922.16** |
| | | |
| **Withdrawals** | | |
| Safe Signapay Acct Fees | $ | (4,334.06) |
| Safe Signapay Chargebacks | $ | (7,233.31) |
| Safe Signapay Discount Fees | $ | (1,348.92) |
| UMS Chargebacks | $ | (6,499.63) |
| UMS Account Fees | $ | (6,465.56) |
| UMS Discount Fees | $ | (1,268.90) |
| Bank Charges | $ | - |
| Jacem | $ | (35,000.00) |
| CPA Expense (Clickbooth) | $ | (48,366.00) |
| Office Expenses | $ | (510.28) |
| Transfer to Pinnacle | $ | (20,000.00) |
| Transfer to SBM | $ | (25,000.00) |
| Transfer to Bunzai | $ | (45,000.00) |
| Transfer to Safe Main | $ | (50,000.00) |
| **TOTAL WITHDRAWALS** | **$** | **(251,026.66)** |
| | | |
| **Ending Balance on 8/31/12** | **$** | **26,889.58** |

| **Office Expenses** | | |
|---|---|---:|
| MetroFax | $ | (29.90) |
| Quickbooks | $ | (29.99) |
| Time Warner | $ | (450.39) |
| **Grand Total** | **$** | **(510.28)** |

| | | |
|---|---|---:|
| **SAFE SAVINGS ACCOUNT** | | |
| **Beginning on 8/1/12** | **$** | **9,792.50** |
| | | |
| **Deposits** | | |
| Transfer from Safe Main | $ | 50,000.00 |
| | | |
| **Withdrawals** | | |
| Checks to Pinnacle | $ | (25,000.00) |
| Guru Media | $ | (31,832.00) |
| AT&T | $ | (30.00) |
| Bank Fee | $ | (20.22) |
| **Ending Balance on 8/31/12** | **$** | **2,910.28** |

**EXHIBIT 543**

**AMD ACCOUNTS**

| | | |
|---|---|---:|
| **Beginning on 8/1/12** | **$** | **53,659.92** |
| | | |
| **Deposits** | | |
| Sales | **$** | **117,808.54** |
| Interest from Bank | **$** | **0.19** |
| | | |
| **Withdrawals** | | |
| Transfer to AMD Savings | $ | (100.00) |
| Transfer to SBM | $ | (51,650.00) |
| Bank Fees | $ | (79.74) |
| CPA Expenses | $ | (45,805.00) |
| Quickbooks (Office Expense) | $ | (39.95) |
| Jacem | $ | (10,004.25) |
| UMS Chargeback | $ | (8,872.03) |
| UMS  Discount Fees | $ | (4,364.33) |
| UMS Account Fees | $ | (10,566.40) |
| **TOTAL Withdrawals** | **$** | **(131,481.70)** |
| | | |
| **Ending Balance on 8/31/12** | **$** | **39,986.95** |

| | | |
|---|---|---:|
| Clickbooth.com, LLC Accounts Pay | | (42,394.00) |
| Convert2Media, LLC Accounts Pay | | (2,491.00) |
| Media Crowd | Accounts Pay | (920.00) |

543 - 12                                    **EXHIBIT 543**

**HERITAGE ACCOUNTS**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | $ | **15,546.52** |
| | | |
| **Deposits** | | |
| Sales from UMS | $ | **128,810.09** |
| | | |
| **Withdrawals** | | |
| Transfer to Pinnacle | $ | (35,000.00) |
| Bank Fees | $ | (78.28) |
| Quickbooks | $ | (29.99) |
| CPA Expense (C2M) | $ | (9,823.00) |
| CPA Expense (CB) | $ | (17,672.00) |
| Jacem | $ | (21,700.00) |
| 1% owed (Tal) | $ | (5,213.86) |
| UMS Chargeback | $ | (9,961.85) |
| UMS Account Fees | $ | (9,628.36) |
| UMS Discount Fees | $ | (2,089.00) |
| Micamp Account Fees | $ | (1,148.66) |
| Micamp Discount Fees | $ | - |
| Micamp Chargeback | $ | (1,349.01) |
| **TOTAL Withdrawals** | **$** | **(113,694.01)** |
| | | |
| **Ending Balance on 8/31/12** | **$** | **30,662.60** |

**EXHIBIT 543**

| **Beginning on 8/1/12** | $ | 13,197.55 |
|---|---|---|

| **Deposits** | | |
|---|---|---|
| Agoa Holdings Inc. | $ | 100,000.00 |
| DMA Media Holdings Inc. | $ | 32,500.00 |
| Heritage Alliance Group, Inc. | $ | 35,000.00 |
| Safehaven Ventures Inc. | $ | 45,000.00 |
| Zen Mobile Media Inc. | $ | 47,500.00 |
| Refund | $ | 14.00 |
| **Deposits** | **$** | **260,014.00** |

| **Withdrawals** | | | | **OFFICE EXPENSES** | | |
|---|---|---|---|---|---|---|
| Salaries | $ | (91,169.26) | | AutoZone | $ | (265.85) |
| Employee Loans | $ | (900.00) | | Better Pack | $ | (313.00) |
| Bank Charges | $ | (17.00) | | Bug Terminator | $ | (75.00) |
| ChadPak | $ | (13,068.00) | | Crown Disposal Co. Inc. | $ | (410.42) |
| Transfer to Savings | $ | (800.00) | | Freeport Center Inc. | $ | (7,000.00) |
| Express One Shipping | $ | (7,500.00) | | Golden State Copier | $ | (1,652.50) |
| Time Warner Cable (Internet) | $ | (2,300.00) | | Google Apps | $ | (107.25) |
| Repairs and Maintenance | $ | (750.00) | | Home Tech Security | $ | (60.00) |
| Better Pack Supplies | $ | (1,015.25) | | HSA Packaging Systems | $ | (745.00) |
| Office Max Supplies | $ | (269.82) | | Intuit | $ | (29.99) |
| Crown Disposal Co. Inc. | $ | (421.99) | | LA DWP | $ | (2,265.21) |
| Express One | $ | (66,040.00) | | MYPLHR | $ | (1,146.84) |
| Fry's Electronics | $ | (597.22) | | Office Depot | $ | (262.26) |
| Fuel | $ | (772.28) | | Restaurant Depot | $ | (228.25) |
| Staples | $ | (269.79) | | SCMH Inc. | $ | (102.60) |
| Telephone | $ | (9,270.00) | | Smartsheet Com Inc | $ | (49.95) |
| Office Expenses | $ | (15,087.40) | | Southland Wholesale Supply | $ | (47.85) |
| **TOTAL Withdrawals** | **$** | **(210,248.01)** | | Staples | $ | (325.43) |
| | | | | **Grand Total** | **$** | **(15,087.40)** |

| **Ending Balance on 8/31/12** | **$** | **62,963.54** |
|---|---|---|

| Credit Cards Payments |
|---|
| Amex Payments |

| **Beginning on 8/1/12** | **$** | **12,645.12** |
|---|---|---|

| **Deposits** | | |
|---|---|---|
| Transfer from AMD | $ | 51,650.00 |
| Transfer from Lifestyle | $ | 40,000.00 |
| Transfer from Zen | $ | 20,000.00 |
| Transfer from Safe | $ | 10,000.00 |
| C2M Revenue | | 1,353.00 |
| **Total Deposits** | **$** | **123,003.00** |

| **Withdrawals** | | | | | |
|---|---|---|---|---|---|
| Gateway Fees | $ | (5,212.35) | | | |
| Bank Fees | $ | (19.60) | | | |
| Office Expenses (Accountant $48 | $ | (796.00) | | | |
| Salaries (Stephan) | $ | (2,500.00) | | | |
| Up Towers (SEO) | $ | (2,000.00) | | | |
| CPA Expense | $ | (15,082.47) | | Guru Media | -1,058.00 |
| 8 Circle Media | $ | (10,000.00) | | N&A Consultir | -4,816.00 |
| Internal Marketing | $ | (34,575.64) | | Pulse360 | -9,208.47 |
| **TOTAL WITHDRAWALS** | **$** | **(70,186.06)** | | | |

| **Ending Balance on 8/31/12** | **$** | **65,462.06** |
|---|---|---|

| **SBM BOFA ACCOUNT** | | |
|---|---|---|
| **Beginning on 8/1/12** | **$** | **7,706.22** |

| **Deposits** | | |
|---|---|---|
| **Transfer from Safehaven** | **$** | **15,000.00** |

| **Withdrawals** | | |
|---|---|---|
| Quickbooks | $ | (79.90) |
| Up Towers (SEO) | $ | (3,000.00) |
| **Ending Balance on 8/31/12** | **$** | **19,626.32** |

| | | |
|---|---|---|
| **Beginning on 8/1/12** | $ | 961.06 |
| | | |
| **Deposits** | | |
| | | 0.00 |
| **Total Deposits** | $ | - |
| | | |
| **Withdrawals** | | |
| MetroFax | $ | (17.90) |
| Transfer to savings | $ | (50.00) |
| Quickbooks | $ | (29.99) |
| **TOTAL WITHDRAWALS** | $ | **(97.89)** |
| | | |
| **Ending Balance on 8/31/12** | $ | 863.17 |

EXHIBIT 543

**DORON AMEX ACCOUNT**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | **$** | **(15,295.16)** owed |
| | | |
| Payments made from Bunzai | $ | 20,571.64 |
| Burst Media Refund | $ | 118.25 |
| **Total Payments** | **$** | **20,689.89** |
| | | |
| **Withdrawals** | | |
| Shipping | $ | (51.89) |
| Internal Marketing | $ | (651.07) |
| Office Expenses | $ | (4,782.76) |
| **TOTAL WITHDRAWALS** | **$** | **(5,485.72)** |
| | | |
| **Ending Balance on 8/31/12** | **$** | **(90.99)** Owed |

**INTERNAL MARKETING**

| | | |
|---|---|---|
| Clicktale | $ | (290.00) |
| Crossbrowsertesting | $ | (29.95) |
| Google Adwords | $ | (331.12) |

**OFFICE EXPENSES**

| | | |
|---|---|---|
| 1&1 Internet Inc. | $ | (38.97) |
| HostGator | $ | (622.50) |
| Icontact | $ | (74.00) |
| Maxmind, Inc. | $ | (150.00) |
| MetroFax | $ | (16.95) |
| Rackspace | $ | (234.37) |
| SmartSheet | $ | (79.95) |
| SST Computing Inc | $ | (2,550.00) |
| WidgetBox | $ | (3.99) |
| Software | $ | (1,012.03) |
| **Grand Total** | **$** | **(4,782.76)** |

**EXHIBIT 543**

**DORON AMEX ACCOUNT 2**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | $ | **(2,500.00)** |
| | | |
| **Payments made from Bunzai** | $ | **5,383.24** |
| **Payments made from Dead Sea** | $ | **5,000.00** |
| | | |
| **Withdrawals** | | |
| Shipping | $ | - |
| Internal Marketing | $ | (7,883.24) |
| **Ending Balance on 8/31/12** | **$** | **-** | CLEARED

| Internal Marketing | |
|---|---|
| Clickbooth CPC | $ (383.24) |
| WAM Media Group | $ (2,500.00) |
| Yabuka Media | $ (5,000.00) |
| **Grand Total** | **$ (7,883.24)** |

**ALON AMEX ACCOUNT**

| | | |
|---|---|---|
| **Beginning on 8/1/12** | **$ (2,782.68)** owed | |
| **Payments made from Bunzai** | **$ 4,000.00** | |

**Withdrawals**

| | | |
|---|---|---|
| Office Expenses | $ (1,333.80) | |
| Alon Salary | $ (1,099.23) | |

| | | |
|---|---|---|
| **Ending Balance on 8/31/12** | **$ (1,215.71)** owed | |

| Office Expenses | |
|---|---|
| Costco | $ 605.35 |
| Fuel | $ 106.51 |
| GoDaddy.com | $ 288.99 |
| MetroFax | $ 8.95 |
| Optizmo | $ 100.00 |
| Shutterstock.com | $ 224.00 |
| Grand Total | $ 1,333.80 |

| TOTALS | Gateway Fees | Merchant account fees | Merchant Discount Fees | Bank Fees | Chargebacks | CPA / Marketing Cost | Salaries | Product Expenses | Office Expenses | Shipping Cost | Misc and Payback |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MSD | $ (19.99) | $ (63.91) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MFK | $ (20.55) | $ (46.69) | $ - | $ (30.00) | $ - | $ (7,869.00) | $ - | $ - | $ - | $ - | $ - |
| AUBAVIE | $ (47.08) | $ (251.52) | $ (442.67) | $ (3.00) | $ (443.89) | $ - | $ (325.00) | $ - | $ (1,468.11) | $ - | $ - |
| BUNZAI | $ (50.95) | $ (10,659.28) | $ (5,067.05) | $ (322.75) | $ (11,934.31) | $ (70,386.21) | $ (56,345.88) | $ (18,375.00) | $ (13,323.18) | $ - | $ - |
| DEADSEA | $ (60.33) | $ (3,152.09) | $ (722.75) | $ (91.86) | $ (4,895.93) | $ (9,240.00) | $ (6,628.99) | $ - | $ (1,010.73) | $ - | $ - |
| AGOA | $ - | $ (10,203.93) | $ (3,139.26) | $ (14.76) | $ (10,410.42) | $ (147,936.00) | $ (15,159.44) | $ (11,032.25) | $ (260.06) | $ - | $ - |
| DMA | $ (112.75) | $ (9,408.38) | $ (5,440.43) | $ (14.89) | $ (12,504.79) | $ (22,850.00) | $ (3,701.44) | $ (10,004.25) | $ (14,867.94) | $ - | $ - |
| LIFESTYLE | $ (20.59) | $ (1,538.96) | $ (595.55) | $ (14.80) | $ (3,931.68) | $ - | $ - | $ - | $ (299.94) | $ - | $ - |
| ZEN | $ - | $ (12,309.27) | $ (2,806.68) | $ (14.41) | $ (16,734.20) | $ (59,452.00) | $ (6,550.00) | $ (46,700.00) | $ (1,149.73) | $ - | $ (25,000.00) Cal energy |
| SAFE | $ - | $ (10,799.62) | $ (2,617.82) | $ (20.22) | $ (13,732.94) | $ (80,198.00) | $ - | $ (35,000.00) | $ (540.28) | $ - | $ - |
| AMD | $ - | $ (10,566.40) | $ (4,364.33) | $ (79.74) | $ (8,872.03) | $ (45,885.00) | $ (6,550.00) | $ (10,004.25) | $ (39.95) | $ - | $ - |
| HERITAGE | $ - | $ (10,777.02) | $ (2,089.00) | $ (78.28) | $ (11,310.86) | $ (27,495.00) | $ (21,700.00) | $ - | $ (5,243.85) | $ - | $ - |
| PINNACLE | $ - | $ - | $ - | $ (17.00) | $ - | $ - | $ (92,069.26) | $ (13,068.00) | $ (30,753.75) | $ (73,540.00) | $ - |
| SBM | $ (5,212.35) | $ - | $ - | $ (19.60) | $ - | $ (64,658.11) | $ (2,500.00) | $ - | $ (875.90) | $ - | $ - |
| ALL STAR | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (47.89) | $ - | $ - |
| AMEX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (20,689.89) | $ - | $ - |
| AMEX 2 | $ - | $ - | $ - | $ - | $ - | $ (10,383.24) | $ - | $ - | $ - | $ - | $ - |
| ALON AMEX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (4,000.00) | $ - | $ - |
| **TOTAL** | $ (5,544.43) | $ (80,177.07) | $ (27,285.64) | $ (721.31) | $ (94,771.05) | $ (546,272.56) | $ (183,280.01) | $ (165,883.75) | $ (94,571.20) | $ (73,540.00) | $ (25,000.00) |

| BREAKDOWN | | Percentage of expense |
|---|---|---|
| Merchant Fees | $ (207,778.19) | 16.02% |
| CPA and Marketing | $ (546,272.56) | 42.12% |
| Overhead | $ (278,572.52) | 21.48% |
| Shipping | $ (73,540.00) | 5.67% |
| Product | $ (165,883.75) | 12.79% |
| Misc (Payback) | $ (25,000.00) | 1.93% |

| Income | $ 1,338,892.43 |
|---|---|
| TOTAL LEFTOVER | $ 41,345.41 |
| | $ 1,297,547.02 |

**To:**        Doron .[doron@doron.us]
**From:**      Leor Arazy
**Sent:**      Tue 9/25/2012 1:39:02 PM
**Importance:**        Normal
**Subject:**   Fwd: Payroll Report
**MAIL_RECEIVED:**     Tue 9/25/2012 1:39:05 PM
82484_DirDep.pdf
82484_PayReg.pdf
82484_PaySum.pdf
82484_WorkersComp.pdf
82484_PayRegYTD.pdf

This is our last payroll with Bunzai.

---------- Forwarded message ----------
From: **Leor Arazy** <leor@bunzaimedia.com>
Date: Wed, Jun 27, 2012 at 1:21 PM
Subject: Fwd: Payroll Report
To: Nastassia Yalley <nastassia@bunzaimedia.com>




---------- Forwarded message ----------
From: **MPAY Services** <no-reply@mpay.com>
Date: Wed, Jun 27, 2012 at 1:08 PM
Subject: Payroll Report
To: "leor@bunzaimedia.com" <leor@bunzaimedia.com>


Payroll reports are attached to this e-mail.

**To:**      Paul Medina[paul@bunzaimedia.com]; Doron[doron@doron.us]
**From:**   Nastassia Yalley
**Sent:**    Fri 8/17/2012 6:47:56 PM
**Importance:**     Normal
**Subject:**  Merchant accounts connected to bunzai
**MAIL_RECEIVED:**  Fri 8/17/2012 6:47:57 PM

Here are the merchant accounts that are currently depositing
into Bunzai Media bank accounts:



| | | |
|---|---|---|
| SIGNAPAY | 1236 | YOURFACEKIT.COM |
| NMC | 1811 | MIRACLEFACEKIT 8662169336 |
| NMC | 1746 | AURAVIE 888-291-7385 |
| NMC | 1936 | SALT SOUFFLE 8662169336 |
| UMS | 1128 | 877-705-3542 SKIN KIT |
| UMS | 1125 | 866-305-9569 GREAT SKIN |

--
-- -- -- -- -- -- -- -- --

**Nastassia Yalley**
Director of Marketing
O: 818.200.1035
C: 818.687.0366
F: 818.647.0182

      **EXHIBIT 546**

**To:**    Paul Medina[paul@bunzaimedia.com]
**Cc:**    Nastassia Yalley[nastassia@bunzaimedia.com]; Avico Global[avicoglobal@gmail.com]; Alon N[alon@bunzaimedia.com];
support[support@limelightcrm.com]
**From:**   Lime Light CRM Support
**Sent:**   Mon 8/13/2012 4:13:20 PM
**Importance:**     Normal
**Subject:**  Re: CA redirect sales
**MAIL_RECEIVED:**   Mon 8/13/2012 4:13:45 PM
Lime Light Payment Gateway Set Up Form.doc

Hi Paul,

We'll be happy to assist you with this, but first please fill out the attached application and send it back to us together with the
new MIDs' VAR Sheets.

Thank you,

---

.

On Mon, Aug 13, 2012 at 4:08 PM, Paul Medina <paul@bunzaimedia.com> wrote:

Limelight,
You can start creating a new gateway and standby until I advise which 2 descriptors will be going to this new gateway.

Regards,

Paul B. Medina
Director of Business Development & Media Acquisitions
Bunzai Media Group
(Mobile)▮▮▮▮▮▮▮
(Marketing) 855-717-5656
(Office Corporate) 818-200-1035 ext 7004
(Skype)▮▮▮▮▮▮
Email: Paul@BunzaiMedia.com
Website:http://www.BunzaiMedia.com

Further, this message is intended only for the designated recipient. It may contain confidential or proprietary information
and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated
recipient, you may not review, copy or distribute this message. If you have received this message in error, please
immediately notify the sender by reply e-mail and delete this message. Thank you.

On Mon, Aug 13, 2012 at 12:56 PM, Lime Light CRM Support <support@limelightcrm.com> wrote:

Hi Paul,

We haven't received any gateway applications to create new gateway accounts.

Please advise, thank you!

---

**547 - 1**               **EXHIBIT 547**

From: **Paul Medina** <paul@bunzaimedia.com>
Date: Mon, Aug 13, 2012 at 3:36 PM
Subject: CA redirect sales
To: Bernard Milton <bernard@truemarketingpartners.com>, Nastassia Yalley <nastassia@bunzaimedia.com>,
Avico Global <avicoglobal@gmail.com>, Alon N <alon@bunzaimedia.com>

Hello Bernard,
We are ready to start the process in redirecting CA customers to its own gateway. Here's the steps that need to
be done

1. Limelight create new gateway for these 2 merchant accounts. Campaign id 111 was created specifically for
this purpose.
2. Once Limelight creates new gateway and gives us the info Nastassia will then assign campaign id 111 to this
new gateway
3. I will let limelight know which 2 descriptors will be assigned to this new gateway
3. Avi once limelight makes the switch of the 2 descriptors to this gateway, when a customer selects CA in the
API switch the campaign ID to 111

Regards and Thanks,

Paul B. Medina
Director of Business Development & Media Acquisitions
Bunzai Media Group
(Mobile)
(Marketing) 855-717-5656
(Office Corporate) 818-200-1035 ext 7004
(Skype)
Email: Paul@BunzaiMedia.com
Website:http://www.BunzaiMedia.com

Further, this message is intended only for the designated recipient. It may contain confidential or proprietary
information and may be subject to the attorney-client privilege or other confidentiality protections. If you are
not a designated recipient, you may not review, copy or distribute this message. If you have received this
message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

**EXHIBIT 547**

| Is Refund | YES |
| Refund Date | (Multiple Items) |

| Row Labels | Sum of Refund Amount |
| --- | --- |
| Alon Shivhon | 4965.13 |
| Andre Collier | 3145.04 |
| Andree Mansour | 1114.81 |
| Andrew Stanley | 200.71 |
| Avear Carey | 3320.12 |
| Chadne Kidd | 2473.01 |
| Daisy Solano | 3194.98 |
| Derek Smith | 6268.03 |
| Gaby Galeano | 195.76 |
| Geiner Samayoa | 46399.73 |
| Gloria Thornton | 42.17 |
| Ingrid Aguilar | 3700.91 |
| Jacqueline Carroll | 5244.74 |
| Jamey Youngblood | 3206.31 |
| Jorge Rutiaga | 759.07 |
| Justin McKinnon | 294.65 |
| Moses Garcia | 2140.5 |
| Patrick Raflin | 3979.56 |
| Product Returns Assistant | 41384.85 |
| Sandra Rubio | 2392.77 |
| Shant Konyalian | 5790.46 |
| Victor Godoy | 2520.32 |
| Zach Steinberg | 3208.52 |
| Grand Total | 145942.15 |

| Is Refund | YES |
| Refund Date | (Multiple Items) |

| Row Labels | Count of Refund Amount |
| --- | --- |
| Alon Shivhon | 139 |
| Andre Collier | 88 |
| Andree Mansour | 28 |
| Andrew Stanley | 4 |
| Avear Carey | 101 |
| Chadne Kidd | 68 |
| Daisy Solano | 93 |
| Derek Smith | 151 |
| Gaby Galeano | 2 |
| Geiner Samayoa | 508 |
| Gloria Thornton | 2 |
| Ingrid Aguilar | 90 |
| Jacqueline Carroll | 153 |
| Jamey Youngblood | 77 |
| Jorge Rutiaga | 13 |
| Justin McKinnon | 7 |
| Moses Garcia | 63 |
| Patrick Raflin | 111 |
| Product Returns Assistant | 453 |
| Sandra Rubio | 60 |
| Shant Konyalian | 137 |
| Victor Godoy | 66 |
| Zach Steinberg | 124 |
| Grand Total | 2538 |



Refund Amount & Percentage - All Agents

Refund Amount & Percentage - All Agents

| Is Refund | YES | |
|-----------|-----|---|

| Sum of Refund Amount | Column Labels | |
|-----------------------|---------------|----------|
| Row Labels | 1/2/2012 | 1/3/2012 |
| Alon Shivhon | | 346.3 |
| Andre Collier | | 348.73 |
| Andree Mansour | | 379.28 |
| Andrew Stanley | 102.83 | 97.88 |
| Avear Carey | | 187.76 |
| Chadne Kidd | | 305.66 |
| Daisy Solano | 430.42 | 303.71 |
| Derek Smith | 558.39 | 734.72 |
| Gaby Galeano | | |
| Geiner Samayoa | 2377.52 | 4654.51 |
| Gloria Thornton | | |
| Ingrid Aguilar | | 134.07 |
| Jacqueline Carroll | 705.2 | 325.98 |
| Jamey Youngblood | 549.42 | 209.26 |
| Jorge Rutiaga | | 25 |
| Justin McKinnon | 255.5 | |
| Moses Garcia | | 118.63 |
| Patrick Raffin | 306.35 | 145.55 |
| Product Returns Assistant | 97.88 | 5084.92 |
| Sandra Rubio | | 250.76 |
| Shant Konyalian | | 953.13 |
| Victor Godoy | 588.68 | 185.83 |
| Zach Steinberg | 112.73 | 124.88 |
| Grand Total | 6084.92 | 14916.56 |

| Is Refund | YES | |
|-----------|-----|---|

| Count of Refund Amount | Column Labels | |
|-------------------------|---------------|----------|
| Row Labels | 1/2/2012 | 1/3/2012 |
| Alon Shivhon | | 10 |
| Andre Collier | | 9 |
| Andree Mansour | | 7 |
| Andrew Stanley | 3 | 1 |
| Avear Carey | | 7 |
| Chadne Kidd | | 9 |
| Daisy Solano | 10 | 8 |
| Derek Smith | 16 | 13 |
| Gaby Galeano | | |
| Geiner Samayoa | 27 | 51 |
| Gloria Thornton | | |
| Ingrid Aguilar | | 5 |
| Jacqueline Carroll | 20 | 11 |
| Jamey Youngblood | 13 | 6 |
| Jorge Rutiaga | | 1 |
| Justin McKinnon | 6 | |
| Moses Garcia | | 11 |
| Patrick Raffin | 9 | 5 |
| Product Returns Assistant | 1 | 56 |
| Sandra Rubio | | 5 |
| Shant Konyalian | | 22 |
| Victor Godoy | 14 | 5 |
| Zach Steinberg | 8 | 3 |
| Grand Total | 127 | 245 |

548 - 2                                    EXHIBIT 548

| Is Refund | YES | |
| Refund Date | (Multiple Items) | |

| Count of Refund Amount | Column Labels | | |
| Row Labels | 1.02 | 1.93 | Grand Total |
| Andre Collier | 13 | 24 | |
| Andre Sharon | 3 | 18 | |
| Andrew Mansour | 1 | 1 | |
| Andrew Stanley | 1 | 2 | |
| Aneel Carey | 7 | 21 | |
| Charlie Kidd | 1 | 12 | |
| Daisy Solano | 6 | 13 | |
| Dave Smith | 10 | 16 | |
| Gary Galanos | | | |
| Gloria Santana | | | |
| Gloria Thornton | | | |
| Ingrid Aguilar | 6 | 12 | |
| Jacqueline Cantrell | 14 | 27 | |
| Jamey Youngblood | 2 | 5 | |
| Jorge Naranja | 1 | 1 | |
| Justin McKinnon | | | |
| Moses Garcia | 14 | | |
| Patrick Ruffin | 5 | 13 | |
| Product Returns Assistant | | | |
| Sandra Rubio | 3 | | |
| Shawn Renardie | 2 | 17 | |
| Victor Godoy | 8 | 7 | |
| Zach Steinberg | 3 | 26 | |
| **Grand Total** | **100** | **231** | |

| | | 1.02 | 1.93 |
| Refund Amount | $ | | |
| Count | | 100 | 231 |



Count

## Refund Percentage



P. Returns Refunds 60%

All Agents Refunds 40%

| Name | Refund Amount | Refund Count | Percentage |
|---|---|---|---|
| Alon Shivhon | $4,965.13 | 139 | 8.54% |
| Andre Collier | $3,145.04 | 88 | 5.41% |
| Andrea Mansour | $1,114.81 | 28 | 1.92% |
| Andrew Stanley | $200.71 | 4 | 0.35% |
| Avear Carey | $3,320.12 | 101 | 5.71% |
| Chafine Kidd | $2,473.01 | 68 | 4.25% |
| Daisy Solano | $3,194.98 | 93 | 5.49% |
| Derek Smith | $6,268.03 | 151 | 10.78% |
| Gaby Galeano | $195.76 | 2 | 0.34% |
| Gloria Thornton | $42.17 | 2 | 0.07% |
| Ingrid Aguilar | $3,700.91 | 90 | 6.36% |
| Jacqueline Carroll | $5,244.74 | 153 | 9.02% |
| Jamey Youngblood | $3,206.31 | 77 | 5.51% |
| Jorge Rutiaga | $759.07 | 13 | 1.31% |
| Justin McKinnon | $294.65 | 7 | 0.51% |
| Moses Garcia | $2,140.50 | 63 | 3.68% |
| Patrick Raffin | $3,979.56 | 111 | 6.84% |
| Sandra Rubio | $2,392.77 | 60 | 4.11% |
| Shant Konyalian | $5,790.46 | 137 | 9.96% |
| Victor Godoy | $2,520.32 | 66 | 4.33% |
| Zach Steinberg | $3,208.52 | 124 | 5.52% |

| | Refund Amount | Refund Count | |
|---|---|---|---|
| All Agents Refunds | $58,157.57 | | |
| P. Returns Refunds | $87,784.58 | | |
| | $145,942.15 | | |

| | Amount |
|---|---|
| Refunded (MTD) | $145,942.15 |
| Proceed (MTD) | $998,049.52 |
| To be Processed | $738,000.00 |
| | $1,736,049.52 |

| | |
|---|---|
| Refund Ratio (MTD) | 14.62% |
| Predicted Refund Ratio | 8.41% |
| Refund Ratio Goal | $173,604.95 |
| | $27,662.80 |

| Name | Refund Amount | Refund Count |
|---|---|---|
| Geiner Samayoa | $46,399.73 | 508 |
| Product Returns Assistant | $41,384.85 | 453 |
| | $87,784.58 | 961 |

EXHIBIT 548

































Refunds Report - Alan
Refund Amount
Refund Count
Percentage
$6,000.00
$5,000.00
$4,000.00
$3,000.00
$2,000.00
$1,000.00
$0.00
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
8.54%
$4,965.13
139
Alon Shivhon

Refunds Report - Derek
Refund Amount
Refund Count
Percentage
$7,000.00
$6,000.00
$5,000.00
$4,000.00
$3,000.00
$2,000.00
$1,000.00
$0.00
12.00%
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
10.78%
$6,268.03
151
Derek Smith

Refunds Report - Dre
Refund Amount
Refund Count
Percentage
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
5.41%
$3,145.04
88
Andre Collier

Refunds Report - Gloria
Refund Amount
Refund Count
Percentage
$50.00
$40.00
$30.00
$20.00
$10.00
$0.00
0.08%
0.07%
0.06%
0.05%
0.04%
0.03%
0.02%
0.01%
0.00%
0.07%
$42.17
2
Gloria Thornton

Refunds Report - Avear
Refund Amount
Refund Count
Percentage
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
5.71%
$3,320.12
101
Avear Carey

Refunds Report - Ingrid
Refund Amount
Refund Count
Percentage
$4,000.00
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
7.00%
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
6.36%
$3,700.91
90
Ingrid Aguilar

Refunds Report - Chadne
Refund Amount
Refund Count
Percentage
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
4.25%
$2,473.01
68
Chadne Kidd

Refunds Report - Jacqueline
Refund Amount
Refund Count
Percentage
$6,000.00
$5,000.00
$4,000.00
$3,000.00
$2,000.00
$1,000.00
$0.00
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
9.02%
$5,244.74
153
Jacqueline Carroll

Refunds Report - Daisy
Refund Amount
Refund Count
Percentage
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
5.49%
$3,194.98
93
Daisy Solano

Refunds Report - Jamey
Refund Amount
Refund Count
Percentage
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
5.51%
$3,206.31
77
Jamey Youngblood

Refunds Report - Alan
Refund Amount
Refund Count
Percentage
1.31%
$800.00
$700.00
$600.00
$500.00
$400.00
$300.00
$200.00
$100.00
$0.00
$759.07
13
1.40%
1.20%
1.00%
0.80%
0.60%
0.40%
0.20%
0.00%
Jorge Rutiaga

Refunds Report - Alan
Refund Amount
Refund Count
Percentage
5.52%
$3,500.00
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
$3,208.52
124
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
Zach Steinberg

Refunds Report - Moses
Refund Amount
Refund Count
Percentage
3.68%
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
$2,140.50
63
4.00%
3.50%
3.00%
2.50%
2.00%
1.50%
1.00%
0.50%
0.00%
Moses Garcia

Refunds Report - Pat
Refund Amount
Refund Count
Percentage
6.84%
$5,000.00
$4,000.00
$3,000.00
$2,000.00
$1,000.00
$0.00
$3,979.56
111
8.00%
7.00%
6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
Patrick Raffin

Refunds Report - Shant
Refund Amount
Refund Count
Percentage
9.96%
$7,000.00
$6,000.00
$5,000.00
$4,000.00
$3,000.00
$2,000.00
$1,000.00
$0.00
$5,790.46
137
12.00%
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
Shant Konyalian

Refunds Report - Victor
Refund Amount
Refund Count
Percentage
4.33%
$3,000.00
$2,500.00
$2,000.00
$1,500.00
$1,000.00
$500.00
$0.00
$2,520.32
66
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%
Victor Godoy

1                    UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   FEDERAL TRADE COMMISSION   )
            Plaintiff          )
5      v.                      ) No. CV 15-4527-GW(PLAx)

6                              )

7   BUNZAI MEDIA GROUP, INC., )
     et al.,                   )
8           Defendants.        )

9                              )

10

11

12

13                      Thursday, February 18, 2016

14

15                      10877 Wilshire Boulevard
                        Suite 700
16                      Los Angeles, California

17

18

19

20          The above-entitled matter came on for

21   deposition, pursuant to Notice, at 8:59 a.m.

22

23

24

25

**EXHIBIT 550**

2

1                UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4  FEDERAL TRADE COMMISSION  )
                             )
5          Plaintiff         )
                             )
6      v.                    ) No. CV 15-4527-GW(PLAx)
                             )
7  BUNZAI MEDIA GROUP, INC., )
     et al.,                 )
8                            )
           Defendants.       )
9                            )

10

11

12

13

14

15              DEPOSITION OF ALON NOTTEA, taken on

16  behalf of the Federal Trade Commission, at

17  10877 Wilshire Boulevard, Suite 700, Los Angeles,

18  California, commencing at 8:59 a.m., and concluding

19  at 5:04 p.m., on Thursday, February 18, 2016,

20  pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21  CSR No. 12598, a Certified Shorthand Reporter, in

22  and for the State of California.

23

24                          ***

25

**550 - 2**                              **EXHIBIT 550**

7

```
 1               LOS ANGELES, CALIFORNIA

 2               THURSDAY, FEBRUARY 18, 2016

 3                    8:59 A.M.

 4

 5                    ALON NOTTEA,

 6          called as a witness by and on behalf of

 7          the Plaintiff, being first duly sworn,

 8          was examined and testified as follows:

 9

10                    EXAMINATION

11 BY MR. TEPFER:

12    Q.   Okay.  Good morning, Mr. Nottea.  My name is

13 Reid Tepfer, and this is Luis Gallegos.  We're both

14 attorneys with the Federal Trade Commission, and we

15 represent the FTC in FTC vs. BunZai Media Group,

16 Inc., in the Central District of California.

17          Would Counsel please identify himself for

18 the record.

19          MR. UNGAR:  Yes.  Robert Ungar, U-n-g-a-r,

20 appearing with Alon Nottea.  And I just wanted to

21 put on the record that Robert Esensten, who

22 represents Motti Nottea and Doron Nottea, will --

23 earlier indicated that he was going to appear today,

24 but he sent me an email last night indicating that

25 he was unable to participate today and asked that I
```

17

1    A.    I don't believe so.

2    Q.    I've got a few companies I just want to sort

3 of run through.

4          Could you tell me where BunZai Media Group,

5 Inc., was initially located at in 2010?

6    A.    7900 Gloria Avenue, Van Nuys, California

7 91406.

8    Q.    And did it ever move anywhere else, aside

9 from that location?

10   A.    BunZai also had a mailing address at

11 16161 Ventura Boulevard, Number 378, Encino, 91436,

12 and no, it did not have any other locations.

13   Q.    And those mailing locations, were those

14 buildings or -- sorry -- were those like a P.O. Box?

15         MR. UNGAR:  Objection as to the form of the

16 question.  It's vague and ambiguous, and it's

17 compound.

18         THE WITNESS:  16161 was a P.O. Box.  7900

19 was a warehouse.

20 BY MR. TEPFER:

21   Q.    Oh, okay.  Do you know where Pinnacle

22 Logistics, Inc., was located?

23   A.    At 7900 Gloria Avenue in Van Nuys,

24 California 91406.

25   Q.    Do you know what Pinnacle Logistics, Inc.'s,

**550 - 4**                              **EXHIBIT 550**

18

1 industry of business was?

2    A.   Yes, I do.

3    Q.   What was that?

4    A.   Call center and fulfillment services.

5    Q.   Aside from Oz Mizrahi, do you know anyone

6 else who has been employed by Pinnacle Logistics,

7 Inc.?

8         MR. UNGAR:  Objection as to the form of the

9 question.  Vague and ambiguous temporally.

10        THE WITNESS:  Yes.

11 BY MR. TEPFER:

12   Q.   Would you mind naming a few of them?

13   A.   Just one by one --

14   Q.   Just --

15   A.   -- start naming names?

16   Q.   Well, I suppose anyone that you know at

17 Pinnacle Logistics, Inc., if you could tell me

18 anyone you know who's in a management position at

19 Pinnacle Logistics, Inc., if you know.

20   A.   Roi Reuveni.

21        MR. UNGAR:  Objection as to the form of the

22 question.  It's vague and ambiguous, calls for

23 speculation, lacks foundation.

24 BY MR. TEPFER:

25   Q.   How do you know that Roi Reuveni was the

19

1 manager of Pinnacle Logistics, Inc.?

2    A.    He is my cousin.

3    Q.    What -- do you know what DSA Holdings, Inc.,

4 is?

5    A.    It's a company.

6    Q.    Do you know who owns or do you know who the

7 CEO of DSA Holdings, Inc., is?

8          MR. UNGAR:   Objection as to the form of the

9 question, vague and ambiguous --

10          THE WITNESS:   I don't recall.

11          MR. UNGAR:   -- temporally.

12 BY MR. TEPFER:

13    Q.    Has BunZai Media Group ever done any

14 business with DSA Holdings, Inc.?

15    A.    I believe they have.

16    Q.    Do you recall what sort of business that

17 was?

18    A.    No.

19    Q.    Do you know if DSA Holdings, Inc., ever

20 marketed AuraVie SkinCare products?

21    A.    I think they did.

22    Q.    Do you know where DSA Holdings, Inc., was

23 located when it was -- or at any point, have you

24 ever known where DSA Holdings, Inc., was located?

25    A.    I don't recall their particular address.

1    Q.   Do you know if they were located at

2 7900 Gloria?

3    A.   At some point, DSA particularly may have,

4 but it's -- it was an older company that was paused

5 for a while and then it got started again.  So DSA,

6 I think there was some history prior to 2010.  I

7 think it's an older company from 2006 or '7.

8    Q.   Mm-hmm.

9    A.   So I'm not really sure as to exactly the

10 relationship with BunZai, but there may have been

11 some.

12    Q.   What about Lifestyle Media Brands.  Do you,

13 have you ever heard of that company?

14    A.   I have.

15    Q.   And what business is Lifestyle Media Brands,

16 Inc., in?

17    A.   It's an online retailer for skin care

18 products.

19    Q.   And is that product AuraVie?

20    A.   Yes, it is.

21    Q.   Did it sell any other products, aside from

22 AuraVie?

23    A.   It may have sold Miracle Face Kit as well.

24    Q.   Did BunZai, I guess, receive proceeds from

25 the sale of AuraVie skin products from Lifestyle

21

1 Media Brands, Inc.?

2    A.    I don't believe so.

3    Q.    Do you know who the CEO of Lifestyle Media

4 Brands, Inc., is?

5          MR. UNGAR:  Objection as to the form of the

6 question.  Vague and ambiguous temporally.

7          THE WITNESS:  I don't recall.

8 BY MR. TEPFER:

9    Q.    And have you ever known anyone to, or

10 rather, have you ever known anyone who was the CEO

11 of Lifestyle Media Brands, Inc.?

12   A.    I should.

13   Q.    Why do you believe that you should?

14   A.    Because I was the CEO of BunZai, and if

15 people were doing business with BunZai, I'm pretty

16 much aware of which companies were.

17   Q.    Do you know if Lifestyle Media Brands, Inc.,

18 had a physical location -- or office space, rather?

19   A.    I don't.

20   Q.    Do you know if Lifestyle Media Brands, Inc.,

21 was ever located at 7900 Gloria?

22   A.    I don't recall.

23   Q.    Sure, sure.

24          Have you ever heard of Safehaven Ventures,

25 Inc.?

22

1     A.    I have.

2     Q.    How did you hear about Safehaven Ventures,

3 Inc.?

4     A.    It was a company that became a retail, an

5 online retail merchant for AuraVie.

6     Q.    Do you know who the CEO, or have you ever

7 known anyone to be the CEO of Safehaven Ventures,

8 Inc.?

9     A.    I do.

10    Q.    Who's that?

11    A.    I don't recall particularly --

12    Q.    Sure.

13    A.    -- as far as each one, so I can't -- for

14 this particular one, I don't recall.

15    Q.    Okay.  Do you -- do you recall, do you know

16 anyone who's ever been employed by Safehaven

17 Ventures, Inc.?

18    A.    Not that I can recall.  I'm sure there has.

19 If you want to be more specific, I can answer you.

20 I don't recall exactly who it was.

21    Q.    Sure.

22          I don't think -- did I -- did I ask -- well,

23 I'll just ask.

24          Was Safehaven Ventures, Inc., ever at

25 7900 Gloria, ever located there?

23

1    A.    I don't think so.

2    Q.    Do you know a company by the name of Agoa

3 Holdings, Inc.?

4    A.    I do.

5    Q.    What -- if you know, what is that company's

6 business?

7         MR. UNGAR:   Objection as to the form of the

8 question.   Vague and ambiguous temporally.

9         THE WITNESS:   Online merchant for skin care

10 product.

11 BY MR. TEPFER:

12   Q.    Have you ever known Agoa Holdings to be

13 engaged in any other business, aside from online

14 skin care products?

15        THE WITNESS:   There may have been some other

16 business dealings they were in, but I don't recall

17 particularly which ones.   There was some other stuff

18 going on with Agoa.   I don't remember exactly what.

19 BY MR. TEPFER:

20   Q.    Do you recall who the CEO of that company

21 is?

22   A.    I believe that's Roi.

23   Q.    And do you recall where -- or do you recall

24 any addresses for Agoa Holdings, Inc.?

25   A.    You must know that I -- there's a lot of

24

1 addresses in this thing, so if you want to ask me an

2 address, I can refer to it --

3    Q.   Sure.

4    A.   -- but I can't recollect addresses.

5    Q.   Yeah, it's tough to keep that straight, I'm

6 sure.  I think --

7         Did Agoa Holdings --

8         MR. UNGAR:  I'm going to interpose an

9 objection, Counsel.  We don't need in the record

10 your characterization, your remarks, your comments,

11 your thoughts.  The record doesn't care.  We don't

12 care.  Let's just move on with the deposition.  If

13 you have comments, keep them to yourself.

14         Proceed.

15         MR. TEPFER:  Okay.  What was the last

16 question?

17         (The previous question was read back

18         by the court reporter as follows:

19          "QUESTION:  And do you recall

20         where -- or do you recall any

21         addresses for Agoa Holdings, Inc.?")

22 BY MR. TEPFER:

23    Q.   So did Agoa Holdings, Inc., market AuraVie?

24    A.   Yes.

25    Q.   Okay.  What about Zen Mobile Media, Inc.?

32

1 Leverage Group?

2        MR. UNGAR:  Objection as to the form of the

3 question.  Vague and ambiguous temporally.

4        THE WITNESS:  I think it was my dad.

5 BY MR. TEPFER:

6    Q.   What about Shalita Holdings, Inc.; have you

7 ever heard of that company?

8    A.   I have.

9    Q.   And what is that company?

10   A.   An online retailer for AuraVie.

11   Q.   Do you know where that company -- or are you

12 aware of any physical addresses for Shalita

13 Holdings, Inc.?

14   A.   Off the top of my head, no.

15   Q.   Have you ever visited any physical address

16 for Shalita Holdings, Inc.?

17        MR. UNGAR:  Objection as to the form of the

18 question.  It's vague and ambiguous, and it borders

19 on the metaphysical.

20        THE WITNESS:  Not to my recollection.

21 BY MR. TEPFER:

22   Q.   Do you know if Shalita Holdings, Inc., was

23 ever located at 7900 Gloria?

24   A.   I don't believe it was.

25   Q.   Have you ever heard of All Star Beauty

33

1 Products, Inc.?

2     A.   I have.

3     Q.   And was that company also an online retailer

4 of AuraVie products?

5     A.   AuraVie and some other product as well.

6     Q.   What were those other products?

7     A.   I believe there was Pete Rose bat, a bat for

8 Pete Rose or some memorabilia or something like

9 that --

10    Q.   Okay.

11    A.   -- that it retailed.

12    Q.   Have you ever heard of Adageo, LLC?

13    A.   I have.

14    Q.   Sorry.

15         Was that the company we were discussing

16 earlier, that you did consulting through?

17    A.   Yes.

18    Q.   Okay.  Sorry.

19         Media Urge, Inc., you mentioned that

20 company.  Could you tell me what is that company's

21 business?

22    A.   It was kind of a marketing entity that tries

23 to develop new products or market strategies.

24    Q.   Do you know if that company ever marketed

25 AuraVie SkinCare products?

34

1    A.    It's hard to answer your question.  You have

2 to be more specific.

3    Q.    Well, did that company, to your knowledge,

4 ever create advertisements for AuraVie SkinCare

5 products?

6    A.    Yes.

7    Q.    Did that company ever, I guess, interact

8 with affiliate networks who sold AuraVie SkinCare

9 products?

10         MR. UNGAR:  Objection as to the form of the

11 question.  It's vague and ambiguous.

12         THE WITNESS:  Yes.

13 BY MR. TEPFER:

14    Q.    Do you know if Nastassia Yalley was an

15 employee of Media Urge, Inc., at any point?

16         MR. UNGAR:  Objection as to the form of the

17 question.  It's vague and ambiguous.

18         THE WITNESS:  I think she was.  I think she

19 was.  I'm not sure exactly where she was, is

20 employed, if she was employed -- if it was a

21 company, but she was -- she was there for a while.

22 BY MR. TEPFER:

23    Q.    Sure.

24         Was she ever an employee at BunZai Media

25 Group, Inc.?

41

1    A.    No.

2    Q.    Do you know what Focus Media Solutions,

3 Inc.'s, business is?

4    A.    They're an online media company, marketing

5 company.

6    Q.    How did you learn that Focus Media

7 Solutions, Inc., is a online marketing company?

8    A.    It was ran by Paul Medina, and I

9 communicated with Paul.

10    Q.    Do you know if Focus Media Solutions, Inc.,

11 marketed any products by -- or -- by negative

12 option?

13    A.    No.

14    Q.    And that's -- just for clarity, that's no,

15 you don't know, or no, they didn't?

16    A.    If you can be a little bit more specific

17 with your question, I can give you a direct answer.

18 So as far as them marketing, do they have products?

19 I don't understand your question as far as --

20    Q.    Okay.  I guess to rephrase it, do you know,

21 do you have any knowledge if Focus Media Solutions,

22 Inc., markets any of its or does any marketing of

23 products that are sold by negative option?

24    A.    No.

25    Q.    Have you ever heard of Insight Media, Inc.?

1    A.    I have.

2    Q.    What is that company's business?

3    A.    Online retailer for skin care.

4    Q.    And is that skin care product AuraVie?

5    A.    It is.

6    Q.    And did that company, I guess -- did that

7 company have any business with BunZai Media Group,

8 Inc.?

9    A.    We're talking about Insight?

10    Q.    Yes.

11    A.    I don't believe it did.

12    Q.    Just two more here.

13          Have you ever heard of Kai Media, Inc.?

14    A.    I have.

15    Q.    And what is that company?

16    A.    An online retailer for AuraVie.

17    Q.    Okay.  And do you know who the CEO of Kai

18 Media, Inc., is?

19    A.    I don't know.

20          MR. UNGAR:  Objection as to the form of the

21 question.  Vague and ambiguous temporally.

22          THE WITNESS:  I don't remember.

23 BY MR. TEPFER:

24    Q.    Do you know who came up with the product

25 name AuraVie?

71

1    A.   Yes, he did.

2         MR. TEPFER:  Actually, do you want to take a

3 quick break?

4         MR. GALLEGOS:  Sure.

5         MR. TEPFER:  We've been going for an hour

6 and 15.

7         THE WITNESS:  No problem.

8         (Recess)

9         MR. TEPFER:  Back on the record.

10 BY MR. TEPFER:

11   Q.   Just to talk about, to run through the list

12 of companies that marketed online, marketed AuraVie

13 online by risk free trial, was BunZai Media Group,

14 Inc., one of those companies?

15   A.   Yes.

16   Q.   Was Pinnacle Logistics, Inc., one of those

17 companies?

18   A.   No.

19   Q.   Was DSA Holdings, Inc., one of those

20 companies?

21   A.   I believe so.  Not sure.

22   Q.   What about Lifestyle Media --

23   A.   Yes.

24   Q.   -- Brands?

25        Agoa Holdings?

72

```
1    A.    Yes.

2    Q.    Zen Mobile Media?

3    A.    Yes.

4    Q.    Safehaven Ventures?

5    A.    Yes.

6    Q.    Heritage Alliance Group?

7    A.    Yes.

8    Q.    AMD Financial Network?

9    A.    Yes.

10   Q.    SBM Management?

11   A.    No.

12   Q.    Media Urge?

13   A.    No.

14   Q.    Adageo?

15   A.    No.

16   Q.    CalEnergy?

17   A.    No.

18   Q.    Kai Media?

19   A.    Yes.

20   Q.    Insight Media?

21   A.    Yes.

22   Q.    Focus Media --

23   A.    No.

24   Q.    -- Solutions?

25         Secured Commerce?
```

1    A.    Thank you.

2    Q.    Do you recall -- sorry.  Mine's a little

3 messed up.

4         Do you recall receiving this email from Gary

5 Bhasin?

6    A.    Yes.  I think I do.

7    Q.    Did you request that he send you a

8 management consulting proposal for AuraVie?

9    A.    I did.

10   Q.    At this time was Media Urge marketing the

11 AuraVie product?

12   A.    This is 2013.  Yeah, I think so.

13   Q.    In Mr. Bhasin's email -- and that's

14 B-h-a-s-i-n.  He states, "As per my initial

15 conversation with Doron and Paul Median" --

16   A.    Yeah.

17   Q.    -- "I understand that there is some serious

18 need of accurate projections, accounting

19 profitability model for your business."

20        What was your understanding of what business

21 Mr. Bhasin was referring to?

22   A.    Basically, after Nastassia left I had my

23 brother help me with some accounting.  He was busy

24 with his company.  He told me, "I don't have time

25 for this.  Find somebody who can do your stuff.

137

1 Let's start with him and with Paul."  I said, "Okay.

2 Who's a good guy?"  And, oh, I said, "Gary, let me

3 send Gary an email.  Maybe Gary can help out, bill

4 some reporting and take over some of the stuff that

5 Nastassia didn't do anymore."  And I told Gary,

6 "Gary, listen, I know you're a good guy.  You're a

7 good reporting guy.  You're good in accounting.  You

8 know your stuff.  Send me a proposal.  I want you to

9 manage my -- my -- my finances, my books, my

10 reports."

11      That's it.

12   Q.   What period of time did your brother Doron

13 assist you with this accounting work?

14      MR. UNGAR:  Objection as to the form of the

15 question.  It's vague and ambiguous.

16      THE WITNESS:  Doron assisted in --

17 particularly in the times when Nastassia left, I got

18 a little nervous.  I said, "Please make sure

19 everybody gets paid, everybody gets their bills

20 paid," you know, 'cause she was there with me from

21 the beginning, so when Nastassia left, it was like a

22 serious person leaving the company.  And because I'm

23 not very, very good at finances, I kind of told him,

24 "Brother, please do me a favor.  Just kind of take a

25 look for me, make sure Nastassia is doing okay.

1 Just, you know, a second pair of eyes on Nastassia's

2 accounting work.  When she's giving me a report,

3 make sure I'm not getting screwed."

4        That's it.

5 BY MR. TEPFER:

6    Q.   So before Nastassia left, Doron would

7 sometimes -- are you saying he would sometimes

8 review her accounting reports for --

9    A.   For me, on my behalf, because I'm not that

10 good with numbers.  So I said to my brother, "This

11 is -- does this look okay finance wise?"

12        I mean, I'm a marketing head, not a

13 financial head.

14    Q.   Mm-hmm.  When -- do you, if you recall, do

15 you -- when did Doron first assist you with

16 reviewing these accounting reports?

17        MR. UNGAR:  Objection as to the form of the

18 question.  It's vague and ambiguous.

19        THE WITNESS:  I don't know.  Somewhere

20 around 2012.

21 BY MR. TEPFER:

22    Q.   And did he assist you with the review of

23 these accounting reports until the filing of this

24 lawsuit in June 2015?

25    A.   No.

139

1        MR. UNGAR:  Objection as to the form of the

2 question.  It's vague and ambiguous.

3        THE WITNESS:  Let's correct again for a

4 second.

5 BY MR. TEPFER:

6   Q.   Sure.

7   A.   Reports as internal business processes were

8 done by Paul.  After Nastassia left, Paul did

9 reports, Paul did profit analysis.  Doron did more

10 payroll, more if a bill came in.  But actual reports

11 on profitability levels, refunds, the business

12 model, Doron has no clue.  Paul ran the reports that

13 I looked at the business model.  Doron ran the

14 reports of payroll, vendors, normal business

15 operation, not within the scope of the business

16 model.  Those reports are run by Paul.

17   Q.   And I guess the reports that were created by

18 Nastassia, what did those reports include?

19   A.   Just income, income.

20        MR. UNGAR:  Objection as to the form of the

21 question.  It's vague and ambiguous.

22        THE WITNESS:  Income and expense.

23 BY MR. TEPFER:

24   Q.   And so you were, I guess, seeking to employ

25 Gary Bhasin to perform some of the same tasks that

140

1 Nastassia had previously performed?

2    A.   As a subcontractor.  I just -- I knew he was

3 really good and I wanted somebody with a good pair

4 of eyes.

5    Q.   Did you ask Doron to meets with Gary Bhasin

6 to discuss his management consulting proposal?

7    A.   Doron and I knew Gary from way before this

8 business ever existed, so because I'm not so good at

9 finances I told Doron and Paul, "Please show the guy

10 what the combination between your existing reports

11 and your financial reports.  Give -- give -- give it

12 to the guy.  Show him."  Yes.

13       By the way, he never got hired in this.  It

14 never happened.

15    Q.   Sure.

16       Mr. Bhasin states --

17       MR. UNGAR:  Counsel, again, I'm going to

18 object.  We don't care about your comments, the

19 record doesn't care about your comments, the case

20 doesn't care about your comments.  You keep saying

21 "sure."  Nobody cares what you think about his

22 answer.

23       MR. TEPFER:  I --

24       MR. UNGAR:  So I would ask you to please

25 refrain from cluttering the record that way and

156

1   do that?  So you support these questions.  Can you

2   support customer inquiries for regular people who

3   don't know how to integrate and work with your

4   technology?  So get ready.  If you want to open up

5   200 sites a day, get ready for some phone calls."

6       Q.   Sure.

7            If we could go to Exhibit 46.

8            (Plaintiff's Exhibit 46 was

9            previously marked for identification

10           by the FTC and is attached hereto.)

11  BY MR. TEPFER:

12      Q.   I'm handing the witness what's been marked

13  Exhibit 46.

14           Do you recognize this invoice?

15      A.   No.

16      Q.   Did, to your knowledge, did Adageo, LLC,

17  ever receive 13,500 -- or rather, did Adageo ever

18  pay 13,500 to Secured Commerce for design, creation,

19  and optimization of AuraVie landing pages?

20      A.   No, I don't think so.  I don't believe so.

21      Q.   So it's -- did Adageo, LLC, ever provide

22  consulting to any of the AuraVie companies?

23           MR. UNGAR:  Objection as to the form of the

24  question.  It's vague and ambiguous.

25           THE WITNESS:  Yes.

157

1   BY MR. TEPFER:

2     Q.   What sort of consult --

3          Well, first, what companies did Adageo, LLC,

4   provide consulting services to?

5     A.   I -- I don't recall directly.

6     Q.   Sure.

7     A.   It may have been one of the company, but I

8   can't give you specifics.

9     Q.   What sort of consulting services?

10    A.   Management.

11    Q.   And when you say "management," is that,

12   like, how to manage a company?

13    A.   How to manage a company, how to manage a

14   campaign, how to, you know, be in business in online

15   arena.

16    Q.   And would -- was it you personally that was

17   providing these consulting services?

18    A.   If it was -- if it was a consulting services

19   to Adageo, maybe it was me personally.

20    Q.   Are there other employees at Adageo, LLC?

21    A.   No.

22    Q.   Did Secured Commerce ever provide Adageo any

23   services at all, to your knowledge?

24    A.   No.

25    Q.   And I don't believe I asked this:

1   Chargeback Armor, and it was managed through Mike

2   Costache.

3       Q.    So Chargeback Armor provided some of the

4   AuraVie companies chargeback rebuttal --

5       A.    Yes, they did.

6       Q.    -- services?

7             For what period of time did Chargeback Armor

8   provide the AuraVie companies chargeback rebuttal

9   services?

10      A.    From the period of time where another third

11  party didn't work and -- and slowly on they started.

12  I don't know exactly when.  For me it was the same.

13  For me it was whoever, just somebody respond.  I

14  don't know exactly the dates and when it

15  transitioned from a different third party to that

16  third party.

17      Q.    So do you mean you don't know when that

18  service or that -- I guess, when it came to be

19  called Chargeback Armor, Inc.?

20      A.    No.  I just don't know when we left Sabina,

21  and then there was somebody else in between.  We

22  attempted a few third party for people to respond

23  from.

24      Q.    Okay.  Do you know if -- just to help narrow

25  down the timeframe a little bit, do you happen to

                                    EXHIBIT 550

200

 1  accounting@sbmmgmt.com?

 2    A.   Yes.

 3    Q.   Who is that?

 4    A.   Philip.  Philip Camareno.

 5    Q.   And was Philip Camareno an employee at

 6  BunZai Media Group?

 7    A.   Yes.

 8    Q.   Do you know if he was an employee at SBM

 9  Management at any point?

10    A.   Not really sure.

11    Q.   Do you know?

12    A.   May have been.

13    Q.   Do you know if Mr. Camareno was employed by

14  any of the other AuraVie companies?

15    A.   No because if he was working with SBM, SBM

16  was managing the other company, so he could have --

17  not directly, no.

18    Q.   And to clarify, did SBM Management assist in

19  managing the various AuraVie companies?

20    A.   It did.

21    Q.   What sort of services did SBM Management

22  provide?

23    A.   Marketing services, management services,

24  accounting services, media placement services.  The

25  works.

216

1  so there was a tiny little building, about 900

2  square feet, that sent the remaining people their

3  shipments.  That was that office.

4        (Plaintiff's Exhibit 110 was

5        previously marked for identification

6        by the FTC and is attached hereto.)

7  BY MR. TEPFER:

8    Q.   I'm now handing the witness what's been

9  marked Exhibit 110.

10        Have you ever reviewed this document before?

11    A.   No.

12    Q.   In March of 2013, were BunZai and Pinnacle

13  both located at 7900 Gloria at that time?

14    A.   Yes, sir.  I don't know if it's March.  I'm

15  saying there was a couple months -- I don't know

16  exactly the dates, but there was a couple of months

17  between BunZai's death and Pinnacle's life, living.

18    Q.   So there was a period of time when BunZai

19  and Pinnacle, I guess, coexisted?

20    A.   A very short time, until some formalities

21  were done with -- with shutting up of the

22  corporation -- shutting down the corporation.

23    Q.   And after -- do you recall about when

24  Pinnacle was formed?

25        MR. UNGAR:  Objection as to the form of the

**550 - 28**                              **EXHIBIT 550**

267

1                    REPORTER'S CERTIFICATE

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify;

6          That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand, which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14         I further certify that I am neither

15   financially interested in the action, nor a relative

16   or employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated:

21

22

23

24                    CHRISTINA KIM-CAMPOS

25                    CERTIFICATE NO. 12598

1

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION   )
                                )
5              Plaintiff        )
                                )
6       v.                      ) No. CV 15-4527-GW(PLAx)
                                )
7    BUNZAI MEDIA GROUP, INC.,  )
     et al.,                    )
8                               )
               Defendants.      )
9    _____)

10

11

12

13                    Wednesday, January 20, 2016

14

15                    10877 Wilshire Boulevard
                      Suite 700
16                    Los Angeles, California

17

18

19

20         The above-entitled matter came on for

21    deposition, pursuant to Notice, at 10:04 a.m.

22

23

24

25

**EXHIBIT 551**

2

```
 1                    UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4    FEDERAL TRADE COMMISSION    )
                                  )
 5            Plaintiff           )
                                  )
 6       v.                       ) No. CV 15-4527-GW(PLAx)
                                  )
 7    BUNZAI MEDIA GROUP, INC.,   )
      et al.,                     )
 8                                )
              Defendants.         )
 9    _____ )

10

11

12

13

14

15            DEPOSITION OF DORON NOTTEA, taken on

16    behalf of the Federal Trade Commission, at

17    10877 Wilshire Boulevard, Suite 700, Los Angeles,

18    California, commencing at 10:04 a.m., and concluding

19    at 6:15 p.m., on Wednesday, January 20, 2016,

20    pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21    CSR No. 12598, a Certified Shorthand Reporter, in

22    and for the State of California.

23

24                         ***

25
```

**EXHIBIT 551**

6

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 20, 2016

 2                    10:04 A.M.

 3

 4                    DORON NOTTEA,

 5         called as a witness by and on behalf of

 6         the Plaintiff, being first duly sworn,

 7         was examined and testified as follows:

 8

 9         MR. ESENSTEN:  We're on the record now.

10    Mr. Nottea has appeared.  He does not feel well.

11    You can see he has some cold medicine in front of

12    him.  Had you not flown in from Dallas, I would have

13    canceled the deposition because of his medical

14    condition, but we're going to do our best, and if he

15    doesn't feel well enough or there's a -- he needs a

16    break or something, he's going to let you know.

17         MR. TEPFER:  Great.  Thanks.

18

19                    EXAMINATION

20    BY MR. TEPFER:

21      Q.   Hello, Mr. Nottea.  My name is Reid Tepfer.

22    I'm an attorney with the Federal Trade Commission,

23    and I'll be deposing you today.  As you know, we're

24    here in the matter of Federal Trade Commission vs.

25    BunZai Media Group, case number CV 15-4527-GW (PLA),
```

17

1    of the officers of the company told me.

2    BY MR. TEPFER:

3        Q.    And so did you do bookkeeping for Pinnacle

4    Logistics, Inc.?

5        A.    A little.

6        Q.    And did you ever have any training in

7    bookkeeping?

8        A.    No.

9        Q.    Did you ever do bookkeeping for DSA

10   Holdings, Inc.?

11       A.    DSA Holdings, Inc., yes.

12       Q.    Do you know what BunZai Media Group is?

13       A.    I know it's a corporation that my brother

14   has.

15       Q.    Do you know what the company sells?

16            MR. UNGAR:   Objection as to the form of the

17   question.

18            MR. ESENSTEN:   Objection.

19            MR. UNGAR:   It's vague and ambiguous.

20            MR. ESENSTEN:   And vague as to time.

21            Do you understand?  If you understand the

22   question, you can answer it.  If you don't, tell him

23   you do not understand the question.

24            THE WITNESS:   I understand they sell creams,

25   they sell skin care products.

**551 - 4**                              **EXHIBIT 551**

1    BY MR. TEPFER:

2         Q.    Do you know the method by which BunZai Media

3    Group sells those creams?

4         A.    I think they sell them -- sell them on

5    Internet.

6         Q.    Have you ever viewed one of the -- any of

7    the websites that BunZai Media Group uses to sell

8    them?

9         A.    No.

10              MR. UNGAR:   Objection as to the form of the

11   question, it's vague and ambiguous, it calls for

12   speculation, lacks foundation.

13              MR. ESENSTEN:   And vague as to time.

14   BY MR. TEPFER:

15        Q.    Are you familiar with BunZai Media Group's

16   corporate structure?

17        A.    A little bit.

18        Q.    Are you familiar with any companies that

19   make payments to BunZai Media Group, as the

20   bookkeeper?

21              MR. UNGAR:   Objection as to the form of the

22   question --

23              THE WITNESS:   No.

24              MR. UNGAR:   -- calls for speculation.

25   ///

1    DSA holdings, Inc.; is that correct?

2        A.   Yes.  Originally, yes.

3        Q.   And from what time period?

4        A.   From, I think, 2006, 2007, to probably 2009.

5        Q.   And do you know what DSA Holdings, what

6    their business was?

7        A.   They used to sell adult content.

8        Q.   Do you know if they had any other business?

9        A.   Besides selling adult, no.

10       Q.   Is that -- you don't know if they had any

11   other business?

12       A.   I don't have any other business.

13       Q.   Did you ever do bookkeeping for Lifestyle

14   Media Brands, Inc.?

15       A.   Yes.

16            MR. UNGAR:  Objection to the form of the

17   question, it's vague and ambiguous.

18            THE WITNESS:  Yes.

19   BY MR. TEPFER:

20       Q.   And from what time period?

21       A.   I mean, when I took over accounting was the

22   time I told you.  March, April 2013.

23       Q.   And so you took over accounting for all of

24   these companies at the same time?

25       A.   About the same --

1    Q.    So by bookkeeping, you paid the vendors?

2    A.    Exactly.

3    Q.    Okay.  Did you ever do any bookkeeping for

4    Agoa Holdings, Inc.?

5         MR. UNGAR:  Objection to the form of the

6    question, it's vague and ambiguous.

7         THE WITNESS:  Yes.

8    BY MR. TEPFER:

9    Q.    Do you know -- could you tell me the time

10   period?

11   A.    Again, probably March, April 2013.

12   Q.    And do you know what Agoa Holdings, Inc.'s,

13   business was?

14   A.    Skin care as well.

15   Q.    Do you know what brand of skin care Agoa

16   Holdings sold?

17   A.    I think it's a product called AuraVie.

18   Q.    And do you know who the owner of Agoa

19   Holdings, Inc., was?

20   A.    Yes.

21   Q.    And who was it?

22   A.    Roi Reuveni.

23        MR. ESENSTEN:  Do you need spellings of some

24   of these names?

25        MR. TEPFER:  Oh, can you spell them as we

                    EXHIBIT 551

50

1    go?

2            MR. ESENSTEN:  Sure.

3            MR. TEPFER:  And Agoa is A-g-o-a Holdings,

4    Inc.

5    BY MR. TEPFER:

6        Q.   Did you ever do --

7            MR. ESENSTEN:  Wait.  Do you want to spell

8    Roi's name?

9            MR. TEPFER:  I think it's R-o-i

10   R-e-u-v-e-n-i.

11           MR. ALON NOTTEA:  Correct.

12           MR. ESENSTEN:  And you used Igor's name.  Do

13   you know how to spell his last name?  It's --

14           MR. TEPFER:  It's like a spelling bee.  I

15   think it's L-a-t-s-a-n-o-v-s-k-i.

16   BY MR. TEPFER:

17       Q.   Mr. Nottea, did you ever do bookkeeping for

18   Zen Mobile Media, Inc.?

19       A.   Yes.

20       Q.   And from what time period?

21       A.   About the same.  April 2013 and on.

22       Q.   And do you know what that company's business

23   was?

24       A.   Skin care as well.

25       Q.   And do you know which brand of product it

**551 - 8**                                          **EXHIBIT 551**

1    sold?

2      A.   AuraVie.

3      Q.   Do you know how Zen Mobile Media sold

4    AuraVie?

5           MR. UNGAR:   Objection as to the form of the

6    question, vague and ambiguous.

7           THE WITNESS:  I know it was done -- from

8    what I know, it was done online.

9    BY MR. TEPFER:

10     Q.   And who hired you to do bookkeeping for Zen

11   Mobile Media, Inc.?

12     A.   Igor Latsanovski.

13     Q.   And so Igor was the owner of Zen Mobile

14   Media, Inc.?

15     A.   Yes.

16     Q.   And did you ever do bookkeeping for

17   Safehaven Ventures, Inc?

18          MR. UNGAR:   Objection as to the form of the

19   question, it's vague and ambiguous.

20          THE WITNESS:  Safehaven, yes.

21   BY MR. TEPFER:

22     Q.   What period of time did you do bookkeeping

23   for Safehaven Ventures, Inc.?

24     A.   Same time.   April 2013.

25     Q.   Do you know what Safehaven Ventures, Inc.'s,

            EXHIBIT 551

1    business was?

2        A.    Skin care.

3        Q.    And do you know which product it sold?

4        A.    AuraVie.

5            MR. GALLEGOS:  I had a hard time

6    understanding what year you're saying, if it's 2013

7    or 2015.

8            THE WITNESS:  2013.

9            MR. GALLEGOS:  '13.  Sorry.

10           THE WITNESS:  No problem.

11   BY MR. TEPFER:

12       Q.    And did you ever do bookkeeping for Heritage

13   Alliance Group, Inc.?

14       A.    Yes.

15       Q.    And who hired you to do bookkeeping for

16   Heritage Alliance Group?

17       A.    The guy's name is Tal Topel.  T-o-p-e-l.

18       Q.    And when did he hire you to do this?

19       A.    I don't exactly know the dates.  I mean, I

20   think that -- I think it might be also in the same

21   time that Nastassia -- I can't recall the exact

22   date.

23       Q.    And do you know what Heritage Alliance

24   Group's business was?

25       A.    Skin care as well.

1      Q.    And do you know which brand of skin care it

2   sold?

3      A.    AuraVie.

4      Q.    Sorry.

5            To go back to Safehaven Ventures, do you

6   know what Safehaven Ventures' business was?

7      A.    Skin care.  AuraVie as well.

8      Q.    And thank you.

9            I'm going to ask about SBM Management, Inc.

10  Did you ever do management for SBM Management?

11     A.    Yes.

12           MR. UNGAR:  Objection as to the form of the

13  question, vague and ambiguous.

14           THE WITNESS:  Yes.

15  BY MR. TEPFER:

16     Q.    Do you know who owned SBM Management, Inc.?

17     A.    Yes.

18     Q.    Who was that?

19     A.    Stephan Bauer.

20     Q.    And is he the one that hired you?

21     A.    Yes.

22     Q.    And what period of time did you do

23  bookkeeping for them?

24     A.    I guess from the same time.  April 2013 to

25  present.

1    office?

2        A.    Because a lot of the time he was traveling,

3    and he had bills to pay, so he -- he told me, for

4    instance, "I want to tell you to pay a bill, and

5    that's the certain date.  Take a check, send him a

6    check."

7            I just helped him with, you know, actually

8    filling out the check because he doesn't know

9    English, and mailing them.

10       Q.    And so you would pay bills, on occasion, for

11   CalEnergy Inc.?

12       A.    Yes.

13       Q.    But you did not do bookkeeping for them?

14       A.    No.

15           MR. ESENSTEN:  Again, we have a double

16   negative.

17           Did you do bookkeeping for them?

18           THE WITNESS:  No.

19           MR. ESENSTEN:  Okay.

20   BY MR. TEPFER:

21       Q.    Did you ever do bookkeeping for Kai Media,

22   Inc.?

23       A.    Yes.

24           MR. ESENSTEN:  Can you spell that for the

25   reporter, please.

1   you know, when they get bills like those, whatever,

2   make sure they get paid, and get paid on time.

3       Q.   And do you know what Kai Media Inc.'s

4   business was?

5       A.   I believe it had the same.  Skin care.

6   AuraVie is what I think.

7       Q.   And did you ever do bookkeeping for Insight

8   Media, Inc.?

9           MR. UNGAR:  Objection to the form of the

10   question, it's vague and ambiguous.

11           THE WITNESS:  Yes.

12   BY MR. TEPFER:

13       Q.   And did you begin doing bookkeeping in April

14   2013 for them as well?

15       A.   If they were open then, probably yes.  I

16   don't know exactly when they started, but I did

17   bookkeeping for them.

18       Q.   And were you doing bookkeeping for all of

19   these companies as of June 2015?

20       A.   June 2015, no.

21       Q.   Do you know what Secured Merchants, LLC, is?

22       A.   Yes.

23       Q.   Did you ever do any work for Secured

24   Merchants, LLC?

25       A.   I did some -- I did some bookkeeping for

59

1      them, yes.

2          Q.    When did you start doing bookkeeping for

3      Secured Merchants, LLC?

4              MR. UNGAR:   Objection as to the form of the

5      question, vague and ambiguous.

6              THE WITNESS:   Secured Merchants is owned by

7      Alan Argaman, which is sitting in the same building.

8      So since he asked me to help him, I helped him.   I

9      think it's 2013.   We were sharing an office so --

10     BY MR. TEPFER:

11         Q.    Did you ever do -- sorry.

12              What was Secured Merchants, LLC's, business?

13         A.    I don't exactly know what they did.   They

14     did some technical -- how can I explain it?   I think

15     they did some, they had some technical service that

16     they were bidding for.   I don't exactly know.   I

17     mean, I never made invoices there, so I don't know

18     exactly -- what exactly they actually did, but I

19     know it was something to do with technology.

20              MR. UNGAR:   Move to strike everything after

21     "I don't know."

22              THE WITNESS:   I don't know.

23     BY MR. TEPFER:

24         Q.    I'm sorry.

25         A.    I think it had something to do with

**551 - 14**                                        **EXHIBIT 551**

60

1    technology, but I don't know more.

2        Q.    Okay.  Did you ever do any bookkeeping for

3    Merchant Leverage Group, Inc.?

4            MR. UNGAR:  Objection as to the form of the

5    question, vague and ambiguous.

6            THE WITNESS:  No.

7    BY MR. TEPFER:

8        Q.    Do you know who owned Merchant Leverage

9    Group, Inc.?

10       A.    No.

11       Q.    Do you know what Merchant Leverage Group,

12   Inc.'s, business was?

13       A.    No.

14       Q.    And did you ever do bookkeeping for DMA

15   Media Holdings, Inc.?

16           MR. UNGAR:  Objection as to the form of the

17   question, vague and ambiguous.

18           THE WITNESS:  Yes.

19   BY MR. TEPFER:

20       Q.    When did you start doing bookkeeping for DMA

21   Media Holdings, Inc.?

22       A.    Same time.  April 2013.

23       Q.    And do you know what DMA Media Holdings,

24   Inc.'s, business was as well?

25       A.    They did the same skin care, same products.

**EXHIBIT 551**

1    AuraVie.

2        Q.    And did you ever do bookkeeping for Shalita

3    Holdings, Inc.?

4        A.    Yes.

5        Q.    What period of time did you do bookkeeping

6    for Shalita Holdings, Inc.?

7        A.    2000 -- I mean, I think 2014, 2015.

8        Q.    Do you know what Shalita Holdings, Inc.'s,

9    business was?

10        A.    Yes.

11        Q.    What was it?

12        A.    It was skin care as well.

13        Q.    And did you ever do bookkeeping for Allstar

14    Beauty Products, Inc.?

15             MR. UNGAR:   Objection as to the form of the

16    question, it's vague and ambiguous.

17             THE WITNESS:   Yes.

18    BY MR. TEPFER:

19        Q.    And when did you do bookkeeping for Allstar

20    Beauty Products?

21        A.    April 2013 until it stopped.

22        Q.    And do you know what Allstar Beauty

23    Products's business was?

24        A.    Beauty products.   Skin care.   One of them, I

25    think, was AuraVie.

64

1     Q.    What did you all speak about?

2     A.    This, how's he doing.  He asked me how am I

3   doing.  I asked him how is he doing.  That's it.

4     Q.    I think the last thing we were talking about

5   is Allstar Beauty Products.

6     A.    Yes.

7     Q.    You had mentioned that it sold AuraVie.  How

8   did you know it sold AuraVie?

9           (Mr. Alon Nottea enters the room.)

10          THE WITNESS:  I seen it.  I -- this -- I

11   seen it maybe on a bank statement.

12    Q.    Okay.  Can we get 43?

13          MR. GALLEGOS:  43, okay.

14          MR. ESENSTEN:  Are we going off the record?

15          MR. TEPFER:  Yeah, let's go off the record

16   real quick.

17          (Recess)

18          MR. ESENSTEN:  Let's go back on the record.

19          MR. TEPFER:  All right.  We're on the

20   record.  I just realized I'm going to run back over

21   some of the businesses we were discussing.

22   BY MR. TEPFER:

23    Q.    Do you know where BunZai Media Group, Inc.,

24   was located?

25    A.    7900 Gloria Avenue, Van Nuys.

**EXHIBIT 551**

1      Q.   And do you know the period that it was

2   located there?

3      A.   I think it was always there, from what I

4   remember.

5      Q.   Do you know beginning in when?

6      A.   2010 to 2013, I guess.

7      Q.   Until it closed?

8      A.   Yeah, probably.

9      Q.   Do you know when it closed?

10      A.   I believe sometime 2013.

11      Q.   And do you know where Pinnacle Logistics was

12   located?

13      A.   Same -- same place.

14      Q.   And do you know when Pinnacle Logistics,

15   Inc., began operating?

16      A.   No.  Maybe 2012, 2013.

17      Q.   Do you know where DSA Holdings, Inc., was

18   located?

19      A.   It was located in Winnetka, California, and

20   then it moved to same location, to -- to

21   7900 Gloria.

22      Q.   And so it was located at 7900 --

23      A.   Gloria.

24      Q.   -- Gloria while you were doing bookkeeping

25   for them?

66

 1      A.   I wasn't doing bookkeeping for them.  I told

 2   you that.

 3      Q.   I'm sorry.  I'm sorry.

 4      A.   I was helping Jason with bookkeeping.

 5      Q.   Okay.

 6           MR. UNGAR:  I'm going to object to the form

 7   of the question because it apparently misstates the

 8   prior testimony of the witness.  It's also

 9   argumentative.

10   BY MR. TEPFER:

11      Q.   And do you know where Lifestyle Media

12   Brands, Inc., was located while you did bookkeeping

13   for them?

14           MR. UNGAR:  Objection as to the form of the

15   question, it's vague and ambiguous.

16           THE WITNESS:  I don't remember the address

17   of Lifestyle, but I think it was -- I mean, I don't

18   know the exact address, but I know that they were

19   probably shipping from the Gloria address as well.

20   BY MR. TEPFER:

21      Q.   So it did business from the 7900 Gloria,

22   also?

23      A.   Yes.

24      Q.   Do you know where Agoa Holdings, Inc., was

25   located during the period in which you did

1    bookkeeping for them?

2        A.   I think same location as well.

3        Q.   And do you know where Zen Mobile Media,

4    Inc., was located while you -- during the period in

5    which you did bookkeeping for them?

6        A.   In the same location.

7        Q.   And that's 7900 Gloria?

8        A.   Gloria, yes.

9        Q.   And do you know where Safehaven Ventures was

10   located during the period you did bookkeeping for

11   them?

12       A.   They have an office in downtown, Safehaven,

13   and -- the one I know is in downtown, in L.A.

14       Q.   In downtown L.A.?

15       A.   Yeah.

16       Q.   And do you know if it had any other

17   location, aside from a downtown L.A. office?

18       A.   No.

19       Q.   Do you know where Heritage Alliance Group

20   was located during the period in which you did

21   bookkeeping for them?

22       A.   I think also the location, also Gloria.

23       Q.   And what about AMD Financial Network, Inc.?

24   Do you know where that was located?

25       A.   I know they have an office in Chatsworth,

68

1    and that's really the only address I know of them.

2        Q.    Okay.  What about Kai Media, Inc.?  Do you

3    know where Kai Media, Inc., was located during the

4    period in which you did bookkeeping?

5        A.    I -- same location.

6        Q.    And that's 7900 Gloria?

7        A.    Gloria, yes.

8        Q.    And what about Insight Media, Inc.?

9              MR. UNGAR:  Objection as to the form of the

10   question, it's vague and ambiguous.

11             THE WITNESS:  Insight had an office in

12   Woodland Hills or Calabasas.

13   BY MR. TEPFER:

14       Q.    And did it have any other locations, aside

15   from the Calabasas location?

16             MR. UNGAR:  Objection as to the form of the

17   question, it's vague and ambiguous.

18             THE WITNESS:  No.

19   BY MR. TEPFER:

20       Q.    And during the period that you did

21   accounting for USM Products, Inc., do you know where

22   that company was located?

23       A.    I never did accounting for USM Products.  I

24   think I might have done a little bit of bookkeeping

25   on this company.  The office was in Canoga Park.

69

1      Q.    And do you know where Merchant Leverage

2      Group, Inc., was located?

3      A.    No.

4      Q.    Do you know -- I believe you said you did

5      accounting for DMA Media Holdings, Inc.; is that

6      correct?

7            MR. UNGAR:   Objection as to the form of the

8      question, it's argumentative, it's harassing,

9      misstates prior testimony of the witness.   It's

10     inflammatory, especially after what was clarified

11     earlier.

12     BY MR. TEPFER:

13     Q.    Sorry.  Do you know where DMA Holdings, or

14     rather, you said that you had done bookkeeping

15     for DMA Media Holdings, Inc.; is that correct?

16     A.    Yes.

17     Q.    And --

18     A.    They were in same location, in the Gloria.

19     Q.    And so DMA Media Holdings, Inc., did

20     business --

21     A.    On Gloria.

22     Q.    -- did business at 7900 Gloria?

23     A.    Yes.

24     Q.    And during the period that you did

25     accounting -- I mean bookkeeping for Shalita

70

1      Holdings, Inc., where was that located?

2          A.    Shalita, Calabasas.

3          Q.    And did it have any other locations?

4          A.    No.

5          Q.    And during the period that you did

6      accounting -- I mean, that you did bookkeeping for

7      Allstar Beauty Products, Inc., do you know where

8      that company was located?

9          A.    In 7900 Gloria.

10         Q.    Let's see.  So I'd like you to take a look

11     at what's been marked Plaintiff's Exhibit 43.

12              MR. UNGAR:  What's the Bates number, please?

13              MR. TEPFER:  There is no Bates number.

14              (Plaintiff's Exhibit 43 was marked

15              for identification by the court

16              reporter and is attached hereto.)

17     BY MR. TEPFER:

18         Q.    Do you recognize this document?

19         A.    Wait a minute.  Yes, I've seen this before.

20         Q.    So you recall getting this email?

21         A.    Yes.

22         Q.    Could you read that first sentence in the

23     email?

24         A.    If you want.  Here (indicating)?

25         Q.    Yes, sir.

1          MR. TEPFER:  Yes.  It's -- Exhibit 41 has

2    three pages, and then Attachment A is one page.

3    BY MR. TEPFER:

4       Q.   Do you recall receiving this email from

5    David Davidian?

6          MR. ESENSTEN:  Which email are we talking

7    about?

8          MR. TEPFER:  The first email up at the top

9    that says "Please see attached."

10         MR. ESENSTEN:  Are you asking if he received

11   it?  It doesn't show him on the email chain.

12   BY MR. TEPFER:

13      Q.   If you can answer.

14      A.   I've never seen this at all.

15      Q.   Do you use the email address X-p-o-s-e-d --

16      A.   I do, yes.

17      Q.   Sorry.  Let me just --

18      A.   Yes, yes.  I see it.

19      Q.   xposedinc@gmail.com, is that your --

20      A.   Yes.

21      Q.   -- email address?

22      A.   Yes.

23         MR. ALON NOTTEA:  Wait for him.  Let him

24   finish before you respond.

25         THE WITNESS:  Okay.  Sorry.

```
 1

 2

 3        I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify:

 6            That the foregoing proceedings were taken

 7   before me at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14            I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17            IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: _____

21

22

23   _____

24        CHRISTINA KIM-CAMPOS, CSR

25        CERTIFICATE NO. 12598
```

```
1                   UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5    FEDERAL TRADE COMMISSION,      )Case No.
                                    )CV 15-4527-GW(PLAx)
6              Plaintiff,           )
                                    )
7         v.                        )
                                    )
8    BUNZAI MEDIA GROUP, INC.,      )
     et al.                         )
9                                   )
               Defendants.          )
10   _____)

11

12

13                   Thursday, January 28, 2016

14

15                   Federal Trade Commission

16                   10877 Wilshire Boulevard, Suite 700

17                   Los Angeles, California 90024

18

19

20        The above-entitled matter came on for

21   deposition, pursuant to notice, at 10:20 a.m.

22

23

24

25
```

5

```
 1                    P R O C E E D I N G S

 2                     -   -   -   -   -

 3      Whereupon--

 4                    NATALIYA KHARIKOVA,

 5      was duly sworn to act as English/Russian interpreter.

 6                    IGOR LATSANOVSKI

 7      a witness, called for examination, having been first

 8      duly sworn, was examined and testified as follows:

 9                         EXAMINATION

10      BY MR. TEPFER:

11         Q     Thank you.  Mr. --

12               THE INTERPRETER:  Excuse me, Counsel.

13               May I introduce myself for the record?

14               MR. TEPFER:  Sure.

15               THE INTERPRETER:   Thank you.

16               Nataliya Kharikova, certified Russian

17      interpreter -- certified interpreter for the Russian

18      language, ID Number 301296, credentials both verified,

19      and I've just been sworn in by the court reporter.

20               MR. TEPFER:  And let's see, could counsel

21      identify himself for the record?

22               MR. BENICE:  Yes.  Jeffrey Benice on behalf

23      of Mr. Latsanovski.

24      BY MR. TEPFER:

25         Q    All right.  Mr. Latsanovski, my name is Reid
```

22

1    owners of BunZai Media Group when Motti introduced you

2    to Alon?

3       A    As far as I understood, the owners were Alon

4    and Khristopher.

5       Q    And -- and just for clarity, that would be

6    Alon Nottea and Khristopher Bond?

7       A    Yes.

8       Q    And did Alon Nottea and Khristopher Bond

9    invite you to invest in the company at that point?

10           MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.

12           THE WITNESS:  Clarify.

13   BY MR. TEPFER:

14      Q    Did Alon Nottea or Khristopher Bond ask for

15   you to invest money into BunZai Media Group when you

16   were introduced to them?

17      A    Yes.

18      Q    And did you --

19      A    I gave them a loan so that they could show --

20   that is, they asked me to give them a loan, and I did

21   it.  That's it.

22      Q    Did they offer you an ownership interest in

23   BunZai Media Group in exchange for the loan?

24           MR. UNGAR:  Objection as to the form of the

25   question.  Vague and ambiguous.

1          THE WITNESS:  And can you clarify what you

2     mean?

3     BY MR. TEPFER:

4          Q    As to the word "ownership"?

5          A    No.  In general, the question as it is.

6          Q    I'm sorry.  What -- what part of the

7     question?  I'm having to clarify -- what part of the

8     question would you like me to clarify?

9          A    What did they offer to me in exchange for

10    what?

11         Q    Sure.  In exchange for the initial loan that

12    you were discussing, did Alon or Khristopher offer an

13    ownership or shareholder interest in BunZai Media

14    Group?

15         MR. UNGAR:  Objection as to the form of the

16    question.  Vague and ambiguous and compound.

17         THE WITNESS:  I don't understand how I'm

18    supposed to respond to that.

19         MR. BENICE:  Listen to the question

20    carefully.

21         Do you understand what he's asking you?

22         THE WITNESS:  Yeah.  (In English)

23         MR. BENICE:  Well, then answer the question.

24         THE WITNESS:  So they told me -- and the

25    conditions between us changed all the time -- and for

1    me, in exchange for my loan, first we talked of --

2    about interest, but they said that they couldn't give

3    me interest because they didn't know how the business

4    is going to be.

5              And second, they suggested that I get income

6    for my loan; that I get interest from the profits,

7    yes.  So not a fixed interest, but a percentage of the

8    profits.

9    BY MR. TEPFER:

10    Q    Okay.  And was that the final understanding

11   that you came to with the -- with Alon and

12   Khristopher?  That you would receive a percentage of

13   profits in exchange for your investment?

14             MR. UNGAR:  Objection as to the form of the

15   question.  It's vague and ambiguous.

16             THE WITNESS:  In exchange for my -- one

17   second.  One second.

18             So I gave them a loan, and for my loan they

19   would pay me interest, and the interest consisted of

20   one-third of the profits.  I didn't have any ownership

21   in the BunZai company.

22   BY MR. TEPFER:

23    Q    So what -- so you -- you received one -- I

24   guess the agreement you came to -- this -- was this

25   the final agreement between y'all?

1      A      Yes.

2      Q      And I guess -- I suppose I should ask:  How

3  did you know that Alon and Khristopher were the owners

4  of BunZai Media Group?

5      A      I didn't know what is to know.  I haven't

6  checked any paperwork.

7      Q      Sure.

8      A      Because I invest money in people.

9      Q      But I suppose what I'm asking is:  Did -- did

10  they represent to you that they were owners of BunZai

11  Media Group?

12              MR. UNGAR:  Objection --

13              THE WITNESS:  Yes.

14              MR. UNGAR:  -- as to the form of the

15  question.  Vague and ambiguous.

16  BY MR. TEPFER:

17      Q      And this final agreement that we were

18  discussing in which you received one-third of the

19  profits, what period of time did that arrangement

20  cover?

21      A      Until the BunZai companies closed.

22      Q      And when did -- when was that agreement

23  started?

24      A      Because they changed the conditions between

25  us.  So for me, the most important thing was to get my

26

 1    investment back and to get some kind of profit.  If

 2    we're talking about a specific date, I don't even

 3    know.

 4        Q    So that agreement where you -- I guess, where

 5    you and Alon and Khris agreed that you would receive

 6    one-third of the profits, when did -- I guess, when

 7    did y'all come to that agreement?

 8            MR. UNGAR:  Objection as to the form of the

 9    question.  It's vague and ambiguous.

10            THE WITNESS:  The conditions between us

11    changed so often, and I'll say it again.

12            They changed so often that for me, from the

13    very beginning of the loan -- from when I gave them

14    the loan, regardless of -- for what they were calling,

15    regardless of any intermediate agreements, for me, it

16    was the idea to get some profit from this loan.

17    BY MR. TEPFER:

18        Q    Okay.  And you said that the terms of the

19    various agreements that you had with Alon and

20    Khristopher changed frequently.

21            Was -- that one-third profit term, was that a

22    constant in the various agreements?

23            MR. UNGAR:  Objection as to the form of the

24    question.  It's vague and ambiguous, misstates his

25    prior testimony.  It's argumentative.

1          THE WITNESS:  I don't understand.  I don't

2     understand what you would call the essence of the

3     question.

4     BY MR. TEPFER:

5          Q     Okay.  Well, I suppose -- when did you make

6     the initial loan to BunZai Media Group?

7          A     In the year of 2010.

8          Q     Okay.  And did you make loans subsequent to

9     that?

10          A     We had agreement that I would open a credit

11     line up to half a million dollars; and constantly I

12     would give them the loan, and they would repay.  I

13     would give it, and they would repay it.

14          Q     And when you made that initial loan -- well,

15     I suppose -- when you first met Alon and Khristopher

16     to discuss BunZai Media Group and your potential loan,

17     did they make a sales pitch to you about the company?

18          A     I don't remember exactly.  It was so many

19     years ago.  So many things have happened during this

20     time, especially in the last six months.

21          Q     Sure.  Do you recall discussing what the

22     business was when -- or sorry, when you made that

23     initial loan, do you recall discussing with them what

24     the business was that you would be loaning money to?

25          A     Yes.

```
 1     Chargeback Armor, Inc., for example?

 2               THE INTERPRETER:  Excuse me, Counsel.

 3               Could you repeat it for the interpreter?

 4               MR. TEPFER:  Sure.

 5      Q     Did Alon Nottea ever ask you to invest in

 6     Chargeback Armor, Inc., and that's -- Chargeback is

 7     one word.

 8      A     Specifically that name I do not remember, but

 9     Alon had the -- those ideas about IT technology to

10     support -- well, IT technology, and it was in this

11     area; but that name I do not remember if it's word for

12     word.

13               MR. BENICE:  Can we take a two-minute

14     restroom break?

15               MR. TEPFER:  Sure.  We'll take a break real

16     quick.

17               (Recess.)

18               (Record read.)

19     BY MR. TEPFER:

20      Q     And you said those ideas about IT technology

21     in this area.

22               What area are you referring to?

23      A     In the area of chargeback.

24      Q     It sounded like you were not finished.

25      A     Yes.  He asked me to invest in the building
```

**552 - 9**                                          **EXHIBIT 552**

32

1    of this technology; but because I didn't understand --

2    because I don't understand this area at all, I

3    refused.

4         Q    So it was your understanding that Alon

5    Nottea -- and I was going to ask:  What's the --

6    what's the time period you're referring to here?

7         A    I don't remember when.  I don't remember

8    exactly.

9         Q    Do you know a year perhaps?

10        A    Maybe the year, but I don't remember exactly.

11        Q    Sure.  But it was after -- I guess after you

12   moved here in 2011?

13        A    Yes.

14        Q    And so it was your understanding that Alon

15   Nottea was, I guess, developing a program for -- in

16   the chargeback area?

17             MR. UNGAR:  Objection as to the form of the

18   question.  Vague and ambiguous, calls for speculation,

19   lacks foundation, misstates prior testimony.

20   BY MR. TEPFER:

21        Q    I should explain.  Every once in a while an

22   attorney may object, and I ask that you still answer

23   the question unless your attorney instructs you not

24   to.

25             MR. BENICE:  Do you understand the question?

1       Q     I guess your understanding -- what I'm

2    wondering is:  You said earlier, I believe, that a

3    chargeback is essentially getting your money returned,

4    and I'm wondering when did you come to that

5    understanding?  Was it after 2010?

6       A     Of course.  Most probably, yes, because how

7    can I -- sometimes you don't even remember what you

8    came to know yesterday.

9       Q     Do you know if you learned it from the

10   Internet?

11      A     I don't know.  I don't remember how I learned

12   this word.

13      Q     Okay.  And to go back a little bit to talk

14   about other business that you discussed with Alon,

15   aside from BunZai Media Group, did you ever provide

16   him loans for any other company?

17      A     Yes.

18      Q     What company?

19      A     Focus Media Group.

20      Q     Are there any other companies that you

21   provided Alon Nottea loans for?

22      A     I gave money to Alon as a loan; but what

23   legal entities he used to accept this money or to

24   accept this loan, I don't know, but I was giving the

25   loans directly to him under his personal guaranties.

1          Q      What are those personal guaranties you're

2     referring to?

3          A      Trust.

4          Q      Okay.  So it was your understanding that Alon

5     was -- was using the loans that you provided him to

6     sell skin products; correct?

7                 MR. UNGAR:  Objection as to the form of the

8     question.  Vague and ambiguous, misstates prior

9     testimony.

10    BY MR. TEPFER:

11         Q      You can go ahead.

12         A      I provided Alon a loan for his business.  How

13    he used it, I don't know.

14         Q      So you didn't know that BunZai Media Group

15    was selling skin care products?

16         A      I did.

17         Q      So did you -- do you know if you made loans

18    to Alon Nottea that weren't for the -- or for

19    companies that were selling skin care products?

20         A      That is, if he used the money that I provided

21    to him as a loan in some other areas?  Do I understand

22    correctly?

23         Q      Yes.

24         A      I don't think so, but he could have used it

25    for a number of different goals.

1    the federal rules rather than speaking objections.

2              MR. UNGAR:  Okay.  Then it's vague and

3    ambiguous.

4              MR. TEPFER:  Thank you.

5         Q    Are you familiar with SBM Management, Inc.?

6         A    Yes.

7              MR. UNGAR:  Objection as to the form of the

8    question.  Vague and ambiguous.

9    BY MR. TEPFER:

10        Q    What is SBM Management, Inc.?

11        A    It's a company.

12        Q    Do you know what the business of that company

13   is?

14        A    Well, I don't know.  It's one of the

15   companies that was in business.

16             MR. TEPFER:  Sorry.  Did you say it was one

17   of the companies that was a business?

18             THE INTERPRETER:  In business.

19             MR. TEPFER:  In business.

20        Q    In the BunZai group of companies business?

21   Is that what you meant?

22             MR. UNGAR:  Objection as to the form of the

23   question.  Vague and ambiguous.

24             THE WITNESS:  I don't know.  After the BunZai

25   company was closed, Alon asked me for a loan, and I

1    provided a loan for this company.

2    BY MR. TEPFER:

3        Q    You provided a loan to SBM Management, Inc.?

4        A    Yes.

5        Q    And what -- do you recall what time period

6    this was?

7        A    Well, a couple years ago.  A year -- in the

8    last two years.

9        Q    Okay.  And so you said that Alon asked you to

10   provide the loan to SBM Management, but do you know if

11   Alon was the one that, I guess, controlled SBM

12   Management, Inc.?

13            MR. UNGAR:  Objection as to the form of the

14   question.  Vague and ambiguous.

15            THE WITNESS:  I don't know.

16   BY MR. TEPFER:

17       Q    And I think you had also mentioned that you

18   provided a loan to Focus Media Solutions, Inc.

19            Do you recall when you did that?

20       A    It was approximately in June of this last

21   year.

22       Q    Who asked you to provide that loan to Focus

23   Media Solutions, Inc.?

24       A    Alon.

25       Q    Did he say what the loan was for?

60

1              THE WITNESS:  I never managed Zen Mobile

2    company.  That's why even theoretically I couldn't

3    hire anybody for work.

4    BY MR. TEPFER:

5        Q    So if we were to go back to the BunZai group

6    of companies, is it -- is it your understanding that

7    Alon Nottea owned multiple companies that sold the

8    AuraVie product?

9        A    My understanding is that I gave the money as

10   an investment, and how he managed it wasn't my

11   business.  I didn't try to understand.  My goal was to

12   have my loan repaid with interest as soon as possible.

13       Q    My question was:  Do you know if Alon Nottea

14   owned multiple companies that sold AuraVie?

15       A    No.  I don't know.  I don't know.  I don't

16   know how he functioned.

17       Q    And do you know if he asked other individuals

18   to open companies to, I guess, grow the business as

19   you said?

20            MR. UNGAR:  Objection as to the form of the

21   question.  Vague and ambiguous, calls for speculation,

22   lacks foundation.

23            THE WITNESS:  I can guess, but I do not know

24   exactly.

25   BY MR. TEPFER:

**552 - 15**                                          **EXHIBIT 552**

69

1      A    Yes.  But I never tried to understand what

2  they were doing.  My goal was to have my investment

3  repaid as soon as possible with interest -- my

4  interest -- my percentage.

5      Q    As a businessman were you concerned about

6  getting your investment back if they were giving away

7  the product for free?

8          MR. BENICE:  I'll object as irrelevant, no

9  foundation.

10         You can answer if you understand the

11  question.

12         MR. UNGAR:  Objection as to the form of the

13  question.  It's vague and ambiguous.  It assumes facts

14  not in evidence, and it's argumentative.

15         THE WITNESS:  So maybe you ask this question

16  differently somehow.

17         MR. BENICE:  Do you understand his question?

18         THE WITNESS:  Can you then repeat it?

19  There's so many things that are --

20         (Record read.)

21         THE WITNESS:  As an investor I'm interested

22  in people.  I invest in people.  I gave -- if I trust

23  them intuitively, then I give a loan to people.

24         But how they run their business, I don't

25  know.  Asking these technical details, I have no idea.

70

```
1      I invest in the people, and I hope to get the

2      investment back.

3      BY MR. TEPFER:

4          Q    Do you know what selling products -- what it

5      means to sell a product by negative option?

6          A    Explain this to me.

7          Q    Well, I'm asking if you know what that means.

8          A    I can guess, but --

9               MR. BENICE:  No.  Don't guess.  He's asking

10     you a simple question.  If you know, tell him you

11     know.  If you don't know, tell him you don't know.

12              THE WITNESS:  I don't know.

13     BY MR. TEPFER:

14         Q    Do you know what a continuity plan is?

15         A    Yes.

16         Q    What is your understanding of what a

17     continuity plan is?

18         A    If I go to a gym they charge -- they charge

19     me every month.

20         Q    Were you aware that that was one of the

21     methods by which AuraVie was sold?

22              MR. UNGAR:  Objection as to the form of the

23     question.  Vague and ambiguous.

24              THE WITNESS:  Exactly or guesses?

25              MR. BENICE:  Don't guess about anything.
```

**EXHIBIT 552**

```
1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6          That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14         I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: February 17th/2016

21

22         KIMBERLY CATHEY

           CSR No. 10701

23

24

25
```

1

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4     FEDERAL TRADE COMMISSION   )

5              Plaintiff         )

6       v.                       ) No. CV 15-4527-GW(PLAx)

7     BUNZAI MEDIA GROUP, INC., )

8     et al.,                    )

9              Defendants.       )

10

11

12

13

14                    Friday, February 19, 2016

15

16                    10877 Wilshire Boulevard

17                    Suite 700

18                    Los Angeles, California

19

20

21

22          The above-entitled matter came on for

23     deposition, pursuant to Notice, at 12:32 p.m.

24

25

                                          EXHIBIT 553

2

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION  )

5             Plaintiff        )

6       v.                     ) No. CV 15-4527-GW(PLAx)

7    BUNZAI MEDIA GROUP, INC., )

8    et al.,                   )

9             Defendants.      )

10

11

12

13

14

15          DEPOSITION OF ROI REUVENI, taken on behalf

16   of the Federal Trade Commission, at

17   10877 Wilshire Boulevard, Suite 700, Los Angeles,

18   California, commencing at 12:32 p.m., and concluding

19   at 6:14 p.m., on Friday, February 19, 2016, pursuant

20   to Notice, before CHRISTINA KIM-CAMPOS,

21   CSR No. 12598, a Certified Shorthand Reporter, in

22   and for the State of California.

23

24                           ***

25

6

```
1                    LOS ANGELES, CALIFORNIA

2                 FRIDAY, FEBRUARY 19, 2016

3                        12:32 P.M.

4

5                        ROI REUVENI,

6          called as a witness by and on behalf of

7          the Plaintiff, being first duly sworn,

8          was examined and testified as follows:

9

10                        EXAMINATION

11   BY MR. GALLEGOS:

12     Q.   Hello, Mr. Reuveni.  My name is Luis

13   Gallegos.  I'm the attorney for the Federal Trade

14   Commission.  I will be deposing you today.

15          We're here today in the matter of FTC vs.

16   BunZai Media Group, Inc., et al., Case Number

17   CV 15-4527, pending in the United States District

18   Court for the Central District of California.

19          With me is Mr. Reid Tepfer, who is also an

20   attorney for the Federal Trade Commission.

21          Can Counsel please identify themselves for

22   the record.  I'm sorry, Mr. --

23          MR. UNGAR:  Go ahead.

24          MR. GALLEGOS:  -- Ungar.  I identified --

25          MR. TEPFER:  This is Reid Tepfer with the
```

1     A.   Yes.

2     Q.   Let's discuss your prior employment, I

3   guess.

4          Can you please tell us, starting with your

5   last job and going backwards until around January

6   1st of 2010, what companies you've worked for?

7          MR. UNGAR:   Objection as to the form of the

8   question.   Calls for a narrative.

9   BY MR. GALLEGOS:

10    Q.   You can answer if you know.

11    A.   2010.   I don't remember.

12    Q.   What was the last job you held?

13    A.   I worked for Chargeback Armor.

14    Q.   Okay.   And what dates did you -- is that --

15   I'm sorry.   First of all, is that Chargeback Armor,

16   Inc.?

17    A.   Yes.

18    Q.   And what dates did you work for Chargeback

19   Armor, Inc.?

20    A.   I don't remember exactly, but around March

21   2015, I think.

22    Q.   March 2015, you said?

23    A.   Yes.

24    Q.   Was that the last date that you worked for

25   Chargeback Armor?

                    EXHIBIT 553

16

1      A.   No.   The last date that I worked for

2  Chargeback Armor was June 2015.

3      Q.   And when was the first --

4           Around when was it that you first started

5  working for Chargeback Armor?

6      A.   Around March.

7      Q.   Of 2015?

8      A.   Yes, of 2015.

9      Q.   And prior to working at Chargeback Armor,

10 where did you work?

11     A.   Secured Merchants.

12     Q.   And when did you stop working for Secured

13 Merchants?

14     A.   I don't exactly remember.

15     Q.   Okay.   Was it around the same time that you

16 started working at Chargeback Armor?

17          I'm sorry.   I'm sorry.   Yes?

18     A.   Pretty much.

19     Q.   Around March 2015?

20     A.   Around, yes.

21     Q.   Do you recall when it was that you first

22 started working at Secured Merchants?

23     A.   No.

24     Q.   Prior to working at Secured Merchants, where

25 did you work?

17

1      A.   I had my own service company and -- yeah, I

2   had my own service company.

3      Q.   And what was the name of that company?

4      A.   It was Trigen, LLC.

5      Q.   And can you tell us what dates you had that

6   company?

7      A.   I don't remember exactly.

8      Q.   And prior to working at -- or I guess, did

9   you consider it working at Trigen, LLC, even though

10  you owned it?

11         MR. UNGAR:  Objection as to the form of the

12  question.  It's vague and ambiguous, it's compound.

13         THE WITNESS:  Can you repeat the question?

14  BY MR. GALLEGOS:

15     Q.   Sure.

16         Prior to working at or starting your company

17  Trigen, LLC --

18     A.   Mm-hmm.

19     Q.   -- did you work anywhere else?

20     A.   Prior to that company?

21     Q.   Yes.

22     A.   I don't remember.  I'm sorry.  Prior to that

23  one -- I'm sorry.  I don't -- I just don't remember

24  prior to Trigen exactly.

25     Q.   Okay.  Did you ever work for a company named

1    Pinnacle Logistics?

2       A.   Yes.

3       Q.   And when did you work for Pinnacle

4    Logistics?

5       A.   From around July 2013.  Something like that.

6       Q.   And until -- when did you stop working at

7    Pinnacle Logistics?

8       A.   I would say around, up until around end of

9    August, September 2015.  No, I'm sorry.  '14.  '14.

10   2014.  I apologize.

11      Q.   And at the -- when you were working for

12   Pinnacle Logistics, Inc. --

13      A.   Mm-hmm.

14      Q.   -- were you also operating your company

15   Trigen, LLC?

16           MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous.

18           THE WITNESS:  I don't remember the exact

19   times, but it's possible.

20   BY MR. GALLEGOS:

21      Q.   And prior to working at Pinnacle Logistics,

22   Inc., did you work anywhere, at any other company?

23      A.   Yes.  For BunZai Media.

24      Q.   Is that BunZai Media Group, Inc.?

25      A.   Yes.

1      Q.    And what dates did you work at BunZai Media

2   Group?

3      A.    From around February 2012 up until the date

4   I gave you for Pinnacle.

5      Q.    And that would have been July 2013?

6      A.    Yes.

7      Q.    And prior to working for BunZai Media Group,

8   did you work at any other company?

9      A.    Yes.  I worked for a company named National

10  Satellite Systems.

11     Q.    And do you recall what dates you worked at

12  that company?

13     A.    That was a long -- I'm sorry, I don't.

14     Q.    Going back to -- well, actually, I'll go

15  back to those later on.

16           Starting with Chargeback Armor, Inc. --

17     A.    Mm-hmm.

18     Q.    -- did you have a supervisor at that

19  company?

20     A.    Yes, I do.

21     Q.    And who was your supervisor?

22     A.    Mike Costache.

23     Q.    What position did you hold at Chargeback

24  Armor, Inc.?

25     A.    I --

31

1          THE WITNESS:  I don't know.

2          MR. UNGAR:  -- as to use of the word

3   "involved."

4          THE WITNESS:  I don't know.

5   BY MR. GALLEGOS:

6     Q.    Was -- did Mr. Alan Argaman have a company

7   that used the services of Chargeback Armor?

8          MR. UNGAR:  Objection as to the form of the

9   question.  Vague and ambiguous, calls for

10  speculation, lacks foundation.

11         THE WITNESS:  No.

12  BY MR. GALLEGOS:

13    Q.    Do you know why Mr. Avi Argaman sent you

14  this email?

15    A.    No.

16         MR. UNGAR:  Objection as to the form of the

17  question.  It's vague and ambiguous, calls for

18  speculation, lacks foundation.

19         He's not a mind reader, Counsel.

20  BY MR. GALLEGOS:

21    Q.    Next to the website chargebackarmor.com it

22  has a chargebackstars.com.

23    A.    Mm-hmm.

24    Q.    Do you know that website?

25         MR. UNGAR:  Objection as to the form of the

54

1      Q.    How much did Trigen, LLC, receive for its

2   consulting work that it provided to Pinnacle

3   Logistics?

4      A.    I don't remember.

5      Q.    Do you recall if it was more than $5,000?

6      A.    I don't recall.

7      Q.    Do you recall how much Secured Merchants

8   received -- I'm sorry -- how much Trigen, LLC,

9   received for the work it performed for Secured

10  Merchants?

11     A.    No, I don't.  I don't recall.

12     Q.    Did Pinnacle Logistics pay you personally or

13  did it pay Trigen, LLC, for the services you

14  provided?

15     A.    Paid Trigen, LLC.

16     Q.    Did -- do you recall how much Trigen, LLC,

17  received from Pinnacle Logistics for its work?

18     A.    I don't recall.

19     Q.    Do you recall how much Secured Merchants

20  received or paid -- let me rephrase.

21          Do you recall how much Trigen, LLC, received

22  from Secured Merchants for the work it performed?

23     A.    No, I don't.  I don't recall.

24     Q.    Since 2010, have you owned any other company

25  besides Trigen, LLC?

**553 - 10**                    **EXHIBIT 553**

55

```
1      A.   Yes.

2      Q.   And what company or companies would that be?

3      A.   Netistics, LLC, and Agoa Holdings.

4      Q.   Any other?

5      A.   No.

6      Q.   When did you start Netistics, LLC?

7      A.   Around 2014.

8      Q.   And is it still currently active?

9      A.   Yes.

10     Q.   And what is the purpose of Netistics, LLC?

11     A.   Netistics, LLC, was --

12          MR. UNGAR:   Objection as to the form of the

13     question.   It's vague and ambiguous.

14          THE WITNESS:   It was a -- it was a

15     technology company.

16     BY MR. GALLEGOS:

17     Q.   Did Netistics have any employees from 2014,

18     when it started, until the present?

19     A.   No.

20     Q.   Aside from owning Netistics, LLC, did you

21     have a title with Netistics, LLC?

22     A.   No.

23     Q.   To your knowledge, who were the clients of

24     Netistics, LLC?

25     A.   Who were the clients of Netistics, LLC?
```

**553 - 11**                                    **EXHIBIT 553**

1    Inc.?

2        A.    No.

3        Q.    Any services to Alon Nottea?

4        A.    No.

5        Q.    Any services to Chargeback Armor, Inc.?

6        A.    No.

7        Q.    Any services to Motti Nottea?

8        A.    No.

9        Q.    Any services to Igor Latsanovski?

10       A.    No.

11       Q.    Any services to Oz Mizrahi?

12       A.    No.

13       Q.    Any services to Khristopher Bond?

14       A.    No.

15       Q.    Any services to Alan Argaman?

16       A.    No.

17       Q.    Any services to Paul Medina?

18       A.    No.

19       Q.    When did you start Agoa Holdings, Inc.?

20       A.    Around 2012.

21       Q.    Is it presently active?

22       A.    No.

23       Q.    When did it stop being active?

24             MR. UNGAR:   Objection as to the form of the

25    question.   It's vague and ambiguous.

**553 - 12**                                        **EXHIBIT 553**

1              THE WITNESS:  I don't remember exactly.

2      BY MR. GALLEGOS:

3      Q.   Was it 2013, to your recollection?

4      A.   No.

5      Q.   Was it 2014?

6      A.   I don't remember, but I think so.

7      Q.   Around 2014?

8      A.   Yeah.

9      Q.   What was the purpose of Agoa Holdings, Inc.?

10             MR. UNGAR:  Objection as to the form of the

11     question.  It's vague and ambiguous.

12             THE WITNESS:  It was a retail merchant

13     corporation.

14     BY MR. GALLEGOS:

15     Q.   What do you mean by "retail merchant

16     corporation"?

17     A.   It was a corporation that was selling skin

18     care products.

19     Q.   What skin care products was it selling?

20     A.   It was selling AuraVie.

21     Q.   Any other products?

22     A.   No, not that I re- -- no.

23     Q.   And it was selling AuraVie skin care

24     products from 2012, when it started, 'til around

25     2014 when it stopped?

61

1      A.   Yes.

2      Q.   Did Agoa Holdings, Inc., have any employees?

3      A.   No.

4      Q.   Did Agoa Holdings, Inc., have any managers?

5      A.   No.

6      Q.   Other than owner of Agoa Holdings, Inc., did

7   you have any title?

8      A.   I was the CEO of the company.

9      Q.   And as CEO of the company, what were your

10  duties and responsibilities?

11     A.   What are my duties and responsibilities?  I

12  was responsible to ensure, oversee -- oversee the

13  orders that came in.

14     Q.   And when you say "oversee the orders," what

15  does "oversee" encompass?

16          MR. UNGAR:  Objection as to the form of the

17  question.  It's vague and ambiguous.

18          THE WITNESS:  Oversee the orders that were

19  coming in.  I would look at the number of orders

20  that come in.

21  BY MR. GALLEGOS:

22     Q.   As CEO of Agoa Holdings, Inc., did you open

23  any merchant accounts for Agoa Holdings, Inc.?

24     A.   Yes, I did.

25     Q.   And do you recall which banks you opened

553 - 14                                    EXHIBIT 553

73

1      A.    No.

2            MR. UNGAR:   Objection as to the form of the

3    question.   It's vague and ambiguous.

4            THE WITNESS:   No.

5    BY MR. GALLEGOS:

6      Q.    To your knowledge, did Agoa Holdings, Inc.,

7    ever provide SBM Management with instructions on how

8    to respond to chargeback disputes made by consumers

9    of the AuraVie products sold by Agoa Holdings, Inc.?

10     A.    No.

11     Q.    Do you know of a company named DMA Media

12   Holdings, Inc.?

13     A.    Yes.

14     Q.    And how do you know about DMA Media

15   Holdings, Inc.?

16     A.    I was an officer at the company at some

17   point.

18     Q.    Do you recall when that was?

19     A.    No.

20     Q.    Do you recall if it was within 2014?

21     A.    I don't recall.

22     Q.    Do you recall if it was during 2013?

23     A.    I don't recall.

24     Q.    What officer position did you hold for DMA

25   Media Holdings, Inc.?

1        A.    I don't remember.

2        Q.    Was it CEO?

3        A.    I don't remember.

4        Q.    What was the purpose of DMA Media Holdings,

5   Inc.?

6             MR. UNGAR:  Objection as to the form of the

7   question.  It's vague and ambiguous.

8             THE WITNESS:  It was a retail merchant

9   corporation.

10  BY MR. GALLEGOS:

11       Q.    What do you mean by "retail merchant

12  corporation"?

13       A.    Same answer as Agoa.  It was a retail

14  merchant corporation processing orders for AuraVie.

15       Q.    Do you know when that company began?

16       A.    No, I don't remember.

17       Q.    Do you recall if it would have been before

18  2014?

19       A.    No, I don't remember.

20       Q.    Do you recall if it would have been before

21  2013?

22       A.    No, I don't recall.

23       Q.    2012?

24             MR. UNGAR:  Objection as to the form of the

25  question.  Vague and ambiguous.

                    EXHIBIT 553

1          Go ahead.

2     BY MR. GALLEGOS:

3        Q.   Do you ever recall having reviewed any

4     spreadsheet as shown on 146-3 through 146-7?

5        A.   No.

6             (Interruption in the proceedings)

7             MR. UNGAR:   There's knocking at the door.

8             MR. GALLEGOS:   Off the record.

9             (Mr. Tepfer leaves the room._

10    BY MR. GALLEGOS:

11       Q.   Mr. Reuveni, do you know what 146-1, what

12    the -- right underneath the 8572 number, what these

13    percentages indicate to you?

14       A.   I don't recall what it is.

15       Q.   Do you know what the "Fraud 33%" would

16    indicate?

17       A.   No.

18            MR. GALLEGOS:   Let's go on a 10 minute break

19    until 5:00 o'clock.

20            (Recess)

21            MR. GALLEGOS:   Back on the record.

22    BY MR. GALLEGOS:

23       Q.   While working at Pinnacle Logistics,

24    Mr. Reuveni, what titles did you have or hold?

25            MR. UNGAR:   Objection as to the form of the

1      question.  It's asked and answered three times.  No,

2      I take that back.  Four times.  It's badgering and

3      it's harassing.

4              THE WITNESS:  I was --

5              MR. UNGAR:  And it's 5:04 in the late

6      afternoon.

7              THE WITNESS:  I was the Call Center Manager

8      for Pinnacle and the Chargeback Department Manager.

9      BY MR. GALLEGOS:

10         Q.   Anything else?

11         A.   No.

12         Q.   And were you the Call Center Manager from

13     the period of July 2013 through September 2014?

14         A.   Yeah.

15         Q.   And were you the Chargeback Department

16     Manager for Pinnacle Logistics from July 2013

17     through September 2014?

18         A.   Yes.

19         Q.   And as the Call Center Department Manager,

20     did you have employees that you supervised?

21         A.   Yes.

22         Q.   And how many employees did you have?

23         A.   It varies.  So I would say around 20, 30, or

24     40.

25         Q.   And were Call Center employees provided any

1    training materials?

2         A.    Yes, they were.

3         Q.    Did Call Center employees have to go through

4    any training program?

5         A.    Yes, they were.

6         Q.    And how long was that training program?

7         A.    Around a week, five days.

8         Q.    And who conducted the training program for

9    Pinnacle Logistics?

10        A.    The Call Center Manager, Andree Mansour.

11        Q.    Anybody else?

12        A.    No.

13        Q.    As the Call Center Manager, did you review

14   any training materials provided during the training

15   program?

16        A.    Yeah.

17        Q.    Did you approve those -- were you required

18   to approve those materials before they were used?

19        A.    Yeah.  They were training manuals.  Yeah.

20        Q.    Who did Pinnacle Logistics -- rephrase.

21              Was Pinnacle Logistics Call Center employees

22   responding to consumer complaints?

23        A.    Yes.

24        Q.    Were they consumer complaints related to any

25   products sold by Pinnacle Logistics?

1      A.   No.

2      Q.   Were they products sold by other companies?

3      A.   Yes.

4      Q.   Do you recall which other companies those

5   were?

6      A.   SBM Management.

7      Q.   Any other companies?

8      A.   No.

9      Q.   Did Pinnacle Logistics Call Center employees

10   respond to consumer complaints for BunZai Media

11   Group?

12      A.   No.

13      Q.   Did Pinnacle Logistics Call Center employees

14   respond to consumer complaints relating to DSA

15   Holdings, Inc.?

16      A.   Yes.

17      Q.   Did Pinnacle Logistics Call Center employees

18   respond to consumer complaints related to Lifestyle

19   Media Brand, Inc.?

20      A.   Yes.

21      Q.   Did Pinnacle Logistics Call Center employees

22   respond to consumer complaints related to Agoa

23   Holdings, Inc.?

24      A.   Yes.

25      Q.   Did Pinnacle Logistics Call Center employees

169

1    respond to consumer complaints related to Zen Mobile

2    Media, Inc.?

3        A.   Yes.

4        Q.   Did Pinnacle Logistics employees respond to

5    consumer complaints related to Safehaven Ventures,

6    Inc.?

7        A.   Yes.

8        Q.   Did Pinnacle Logistics Call Center employees

9    respond to consumer complaints related to Heritage

10   Alliance Group, Inc.'s, products?

11       A.   Yes.

12       Q.   Did Pinnacle Logistics Call Center employees

13   respond to consumer complaints relating to AMD

14   Financial Network, Inc.'s, products?

15       A.   Yes.

16       Q.   Did Pinnacle Logistics Call Center employees

17   respond to consumer complaints relating to Media

18   Urge, Inc.?

19       A.   No.

20       Q.   Did Pinnacle Logistics employees respond to

21   consumer complaints relating to Adageo, LLC?

22       A.   No.

23       Q.   Did Pinnacle Logistics employees respond to

24   consumer complaints relating to CalEnergy, Inc.'s,

25   products?

170

1      A.   No.

2      Q.   Did Pinnacle Logistics Call Center employees

3  respond to consumer complaints related to Kai Media,

4  Inc., products?

5      A.   Yes.

6      Q.   Did Pinnacle Logistics employees -- sorry.

7           Did Pinnacle Logistics Call Center employees

8  respond to consumer complaints relating to Insight

9  Media, Inc.'s, products?

10     A.   Yes.

11     Q.   Did Pinnacle Logistics Call Center employees

12  respond to consumer complaints relating to Focus

13  Media Solutions, Inc.'s, products?

14     A.   No.

15     Q.   Did Pinnacle Logistics Call Center employees

16  respond to consumer complaints relating to Secured

17  Commerce, LLC, products?

18     A.   No.

19     Q.   Did Pinnacle Logistics employees respond to

20  consumer complaints relating to Secured Merchants,

21  LLC's, products?

22     A.   No.

23     Q.   Did Pinnacle Logistics Call Center employees

24  respond to consumer complaints relating to USM

25  Products, Inc.'s, products?

1      A.    No.

2      Q.    Did Pinnacle Logistics Call Center employees

3   respond to consumer complaints relating to Merchant

4   Leverage Group products?

5      A.    No.

6      Q.    Did Pinnacle Logistics employees, did

7   Pinnacle Logistics Call Center employees respond to

8   consumer complaints relating to DMA Media Holdings,

9   Inc.'s, products?

10     A.    Yes.

11     Q.    Did Pinnacle Logistics Call Center employees

12  respond to consumer complaints relating to Shalita

13  Holdings, Inc., products?

14     A.    Yes.

15     Q.    Did Pinnacle Logistics Call Center employees

16  respond to consumer complaints relating to All Star

17  Beauty Products, Inc., products?

18     A.    Yes.

19     Q.    As the Call Center Manager, did you report

20  to anybody?

21     A.    Yes.

22     Q.    Who did you report to?

23     A.    Stephan Bauer.

24     Q.    Was Stephan Bauer the CEO of Pinnacle

25  Logistics?

1      A.   No.

2      Q.   What position or title did Stephan Bauer

3   have at Pinnacle Logistics?

4           MR. UNGAR:  Objection as to the form of the

5   question.  It assumes facts not in evidence.

6           THE WITNESS:  He did not.

7   BY MR. GALLEGOS:

8      Q.   Why did you report to Stephan Bauer?

9      A.   Because Pinnacle Logistics would handle

10   Stephan Bauer customers' calls.

11      Q.   And were those Stephan Bauer's customers or

12   were those SBM Management?

13      A.   SBM Management.

14      Q.   Was Pinnacle Logistics, Inc., a client of

15   SBM Management, Inc.?

16      A.   I'm sorry.  Ask that again.

17      Q.   Was Pinnacle Logistics, Inc., a client of

18   SBM Management?

19      A.   No.

20      Q.   Was Pinnacle Logistics, Inc., owned by SBM

21   Management?

22      A.   No.

23           MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous.

25           THE WITNESS:  No.

**EXHIBIT 553**

1    BY MR. GALLEGOS:

2        Q.   Who owned Pinnacle Logistics, Inc.?

3             MR. UNGAR:   Objection as to the form of the

4    question.   It's vague and ambiguous temporally.

5             THE WITNESS:   Oz Mizrahi.

6    BY MR. GALLEGOS:

7        Q.   During the time that you worked at Pinnacle

8    Logistics, who owned Pinnacle Logistics, Inc.?

9             THE WITNESS:   Oz Mizrahi.

10   BY MR. GALLEGOS:

11       Q.   Did you report to Oz Mizrahi?

12       A.   No.

13       Q.   And why did you not report to Oz Mizrahi?

14            MR. UNGAR:   Objection as to the form of the

15   question.   It's argumentative.

16            THE WITNESS:   Because he wasn't involved in

17   day-to-day operations.

18   BY MR. GALLEGOS:

19       Q.   And who was involved in day-to-day

20   operations --

21            MR. UNGAR:   Objection --

22   BY MR. GALLEGOS:

23       Q.   -- at Pinnacle Logistics?

24            MR. UNGAR:   -- as to form of the question.

25   It's vague and ambiguous.

174

1              THE WITNESS:  Myself.

2     BY MR. GALLEGOS:

3        Q.    Anybody else?

4        A.    No.

5        Q.    As Pinnacle Logistics' Call Center Manager,

6     were you responsible for developing any standard

7     operating procedures for responding to consumer

8     complaints?

9        A.    Yes.

10       Q.    Anybody else?

11             MR. UNGAR:  Objection as to the form of the

12    question.  It's vague and ambiguous and

13    unintelligible.

14             THE WITNESS:  Anybody else?

15    BY MR. GALLEGOS:

16       Q.    Did anybody else assist you in developing

17    standard operation operating procedures relating to

18    responding to consumer complaints for Pinnacle

19    Logistics?

20             MR. UNGAR:  Objection as to the form of the

21    question.  It's vague and ambiguous.

22             THE WITNESS:  Yes.

23    BY MR. GALLEGOS:

24       Q.    And who would that person be?

25       A.    Employees.

1      Q.   Did Alon Nottea give advice running Pinnacle

2   Logistics day-to-day operations?

3      A.   No.

4      Q.   Did Doron Nottea provide advice running

5   Pinnacle Logistics' day-to-day operations?

6      A.   No.

7           MR. UNGAR:   Objection as to the form of the

8   question.  It's vague and ambiguous.

9           THE WITNESS:  No.

10  BY MR. GALLEGOS:

11     Q.   Did Igor Latsanovski provide advice in

12  running the day-to-day operations of Pinnacle

13  Logistics during the time you worked there?

14          MR. UNGAR:   Objection as to the form of the

15  question.  Vague and ambiguous as to the use of the

16  term "advice."

17          THE WITNESS:  No.

18  BY MR. GALLEGOS:

19     Q.   Did Alon Nottea assist in running the

20  day-to-day operations of Pinnacle Logistics?

21          MR. UNGAR:   Objection as to the form of the

22  question.  It's vague and ambiguous as to use of the

23  term "assist."

24          THE WITNESS:  No.

25  ///

176

 1    BY MR. GALLEGOS:

 2        Q.    Was Alon Nottea involved in any respect in

 3    the day-to-day operations of Pinnacle Logistics?

 4              MR. UNGAR:   Same objection as to the word

 5    "involved."

 6              THE WITNESS:  No.

 7    BY MR. GALLEGOS:

 8        Q.    Did Doron Nottea provide any assistance in

 9    the day-to-day operations of Pinnacle Logistics?

10              MR. UNGAR:   Same objection.

11              THE WITNESS:  No.

12    BY MR. GALLEGOS:

13        Q.    Did Doron Nottea provide any accounting

14    assistance to Pinnacle Logistics, Inc.?

15        A.    I don't know.

16        Q.    Did Doron Nottea pay any invoices on behalf

17    of Pinnacle Logistics, Inc., to your knowledge?

18        A.    No.

19        Q.    As the Call Center Manager for Pinnacle

20    Logistics, Inc., were you responsible for developing

21    Pinnacle's standard operating procedures used to

22    respond to A.G. or consumer complaints received

23    through an Attorney General's office?

24        A.    Yes.

25        Q.    As the Call Center Manager, were you

1   responsible for developing Pinnacle's standard

2   operating procedures used to respond to consumer

3   complaints received from the Better Business Bureau?

4       A.   Yes.

5       Q.   Did Alon Nottea provide any assistance in

6   developing those standard operating procedures?

7       A.   No.

8       Q.   Did Doron Nottea provide any assistance in

9   developing those standard operating procedures?

10      A.   No.

11      Q.   As the Call Center Manager for Pinnacle

12  Logistics, were you responsible for developing any

13  reports about consumer complaints?

14      A.   I don't remember.  I don't remember.

15      Q.   As the Call Center Manager at Pinnacle

16  Logistics, did you ever provide Alon Nottea with any

17  reports about consumer complaints relating to

18  Pinnacle Logistics' customers' --

19      A.   No.

20      Q.   -- products?

21           I'd like the record to reflect I'm handing

22  the witness Exhibit 153.

23           MR. UNGAR:   Thank you.

24  ///

25  ///

1

2

3      I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6          That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _March 11th 2016_

21

22

23  _____

24          CHRISTINA KIM-CAMPOS, CSR

25          CERTIFICATE NO. 12598

1

```
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
     FEDERAL TRADE COMMISSION,        )
 4                                    )
                         Plaintiff,   )
 5                                    )
             vs.                      )no. 2:15-CV-04527-
 6                                    )   GW (PLAx)
                                      )
 7   BUNZAI MEDIA GROUP, INC., A      )
     CALIFORNIA CORPORATION, ALSO     )
 8   DOING BUSINESS AS AURA VIE,      )
     MIRACLE FACE KIT, AND            )
 9   ATTITUDE COSMETICS;              )
                                      )
10   PINNACLE LOGISTICS, INC., A      )
     CALIFORNIA CORPORATION;          )
11                                    )
     DSA HOLDINGS, INC., A            )
12   CALIFORNIA CORPORATION;          )
                                      )
13   LIFESTYLE MEDIA BRANDS, INC.,    )
     A CALIFORNIA CORPORATION;        )
14                                    )
     AGOA HOLDINGS, INC., A           )
15   CALIFORNIA CORPORATION;          )
                                      )
16   ZEN MOBILE MEDIA, INC., A        )
     CALIFORNIA CORPORATION;          )
17                                    )
     SAFEHAVEN VENTURES, INC., A      )
18   CALIFORNIA CORPORATION;          )
                                      )
19   HERITAGE ALLIANCE GROUP, INC., )
     A CALIFORNIA CORPORATION, ALSO )
20   DOING BUSINESS AS AURA VIE       )
     DISTRIBUTION;                    )
21                                    )
     AMD FINANCIAL NETWORK, INC.,     )
22   A CALIFORNIA CORPORATION;        )
                                      )
23   SBM MANAGEMENT, INC.,            )
     A CALIFORNIA CORPORATION;        )
24   _____)
25   ***CAPTION ON NEXT PAGE **
```

```
1    ***CAPTION CONTINUED***
2    MEDIA URGE, INC., A CALIFORNIA )
     CORPORATION;                  )
3                                  )
     ADAGEO, LLC, A CALIFORNIA     )
4    LIMITED LIABILITY COMPANY     )
                                   )
5    CALENERGY, INC., A CALIFORNIA )
     CORPORATION;                  )
6                                  )
     KAI MEDIA, INC., A CALIFORNIA )
7    CORPORATION;                  )
                                   )
8    INSIGHT MEDIA, INC., A        )
     CALIFORNIA CORPORATION;       )
9                                  )
     FOCUS MEDIA SOLUTIONS, INC., A )
10   CALIFORNIA CORPORATION;       )
                                   )
11   SECURED COMMERCE, LLC, A      )
     CALIFORNIA LIMITED LIABILITY  )
12   COMPANY;                      )
                                   )
13   SECURED MERCHANTS, LLC, A     )
     CALIFORNIA LIMITED LIABILITY  )
14   COMPANY;                      )
                                   )
15   USM PRODUCTS, INC,  A         )
     CALIFORNIA CORPORATION;       )
16                                 )
     MERCHANT LEVERAGE GROUP,      )
17   INC., A CALIFORNIA CORPORATION;)
                                   )
18   DMA MEDIA HOLDINGS, INC., A   )
     CALIFORNIA CORPORATION;       )
19                                 )
     SHALITA HOLDINGS, INC., A     )
20   CALIFORNIA CORPORATION;       )
     ALL STAR BEAUTY PRODUCTS, INC.,)
21   A CALIFORNIA CORPORATION;     )
                                   )
22   ALON NOTTEA, INDIVIDUALLY AND )
     AS AN OFFICER OR MANAGER OF   )
23   BUNZAI MEDIA GROUP, INC. AND  )
     PINNACLE LOGISTICS, INC.;     )
24   _____)
25   ***CAPTION CONTINUED ON NEXT PAGE***
```

3

```
 1    ***CAPTION CONTINUED***
 2    DORON NOTTEA, INDIVIDUALLY AND )
      AS AN OFFICER OR MANAGER OF    )
 3    BUNZAI MEDIA GROUP, INC.  AND  )
      PINNACLE LOGISTICS, INC.;      )
 4                                   )
      IGOR LATSANOVSKI, INDIVIDUALLY )
 5    AND AS AN OFFICER OR MANAGER OF)
      BUNZAI MEDIA GROUP, INC,       )
 6    PINNACLE LOGISTICS, INC., AND  )
      ZEN MOBILE MEDIA, INC.;        )
 7                                   )
      OZ MIZRAHI, INDIVIDUALLY AND AS)
 8    AN OFFICER OR MANAGER OF BUNZAI)
      MEDIA GROUP, INC., AND PINNACLE)
 9    LOGISTICS, INC.;               )
                                     )
10    ROI REUVENI, INDIVIDUALLY AND  )
      AS AN OFFICER OR MANAGER OF    )
11    BUNZAI MEDIA GROUP, INC. AND   )
      PINNACLE LOGISTICS, INC.;      )
12                                   )
      AND                            )
13                                   )
      KHRISTOPHER BOND, ALSO KNOWN AS)
14    RAY IBBOT INDIVIDUALLY AND AS  )
      AN OFFICER OR MANAGER OF BUNZAI)
15    MEDIA GROUP, INC.;             )
                                     )
16    ALAN ARGAMAN, INDIVIDUALLY AND )
      AS AN OFFICER OR MANAGER OF    )
17    SECURED COMMERCE, LLC AND      )
      SECURED MERCHANTS, LLC         )
18                                   )
      PAUL MEDINA, INDIVIDUALLY AND  )
19    AS AN OFFICER OR MANAGER OF    )
      MEDIA URGE, INC., PINNACLE     )
20    LOGISTICS, INC., AND FOCUS     )
      MEDIA SOLUTIONS, INC., AND     )
21                                   )
              DEFENDANTS, AND        )
22                                   )
      CHARGEBACK ARMOR, INC.,        )
23    A CALIFORNIA CORPORATION;      )
                                     )
24            RELIEF DEFENDANT.      )
      _____)
25
```

4

```
 1                DEPOSITION OF ANDREW STANLEY

 2                SATURDAY, FEBRUARY 20, 2016

 3                 LOS ANGELES, CALIFORNIA

 4

 5

 6   Deposition of ANDREW STANLEY, taken on behalf of

 7   Plaintiff, at 8:24 A.M., Saturday, February 20, 2016,

 8   at 10877 Wilshire Boulevard, Suite 700, Los Angeles,

 9   California, before Jeanine Curcione, C.S.R. No. 10223,

10   RPR, pursuant to notice.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    LOS ANGELES, CALIFORNIA;

2           SATURDAY, FEBRUARY 20, 2016, 8:24 A.M.

3

4                         ANDREW STANLEY,

5               having been duly affirmed, was

6            examined and testified as follows:

7

8                         EXAMINATION

9   BY MR. GALLEGOS:

10       Q.  Good morning, Mr. Stanley.  My name is Lewis

11  Gallegos.  I'm the attorney with the Federal Trade

12  Commission and I will be deposing you today.  We're

13  here today in the matter of FTC versus BunZai Media

14  Group, Inc., et al., case number CV15-4527 pending in

15  the United States District Court for the Central

16  District of California.  With me is Mr. Reid Tepfer who

17  is also an attorney for the Federal Trade Commission.

18       MR. GALLEGOS:  Can counsel please identify

19  themselves for the record.

20       MR. TEPFER:  This is Reid Tepfer with the FTC.

21       MR. UNGAR:  Robert Ungar, U-n-g-a-r.

22  BY MR. GALLEGOS:

23       Q.  And Mr. Stanley, can you state and spell

24  your name for the record.

25       A.  Andrew Stanley, A-n-d-r-e-w, S-t-a-n-l-e-y.

11

1          A.  For the past five years I ended up working

2     for -- last year I worked for a solar company.  It was

3     outside sales and setting up appointments.  And prior

4     to that I worked for Pinnacle Logistics or BunZai Media

5     for three years as a customer service agent and worked

6     in the chargebacks department.

7          Q.  And prior to -- you said Pinnacle Logistics

8     and BunZai Media.  Are those the same company?

9          A.  Pretty much, yes.

10         Q.  Do you recall when you started working?

11         A.  I started working at BunZai Media in 2011.

12         Q.  And until when did your employment at BunZai

13    Media end?

14         A.  In January -- around January 2014.

15         Q.  And when did you start working at Pinnacle

16    Logistics?

17         A.  They set up Pinnacle Logistics I believe in

18    2012.

19         Q.  And when did you stop working at Pinnacle

20    Logistics?

21         A.  In January 2014.

22         Q.  And when you said you worked in the customer

23    service and chargeback department, for which company

24    were you working?

25         A.  So originally I was hired by BunZai Media

1          A.   Alon was the owner of BunZai Media.

2          Q.   Is that Alon Nottea?

3          A.   Yes.

4          Q.   And you said it was either Alon or Roi?

5          A.   Yes.

6          Q.   Is that Roi Reuveni?

7          A.   Yes.

8          Q.   And you said that Alon was the owner of

9     BunZai Media; is that correct?

10         A.   That's correct.

11         Q.   And how did you know that?

12         A.   I mean, he just told me he was the owner of

13    the business.

14         Q.   Did Alon have any other title -- or any

15    title?

16         MR. UNGAR:   I'm going to object.  I can't hear

17    because the witness has his hand in front of his mouth

18    and it's very soft and I simply can't hear, so if the

19    witness would please -- thank you, and speak up a

20    little bit so I can hear.

21         THE WITNESS:   I'll try.  Yeah, Alon told me he

22    was the -- yeah, the owner of BunZai.

23    BY MR. GALLEGOS:

24         Q.   Did Mr. Nottea -- to your knowledge did

25    Mr. Nottea tell you he had any title at BunZai Media?

          EXHIBIT 554

1   BY MR. GALLEGOS:

2       Q.  And just for clarification, Mr. Ungar makes

3   an objection, wait until he finishes so he can properly

4   make that on the record.

5       A.  Okay.

6       Q.  And what would those scripts be about?

7       MR. UNGAR:  Objection as to the form of the

8   question.  Vague and ambiguous.

9       THE WITNESS:  The scripts -- the scripts

10  detailed specifically what we needed to say to

11  customers when they called in.  There were different

12  responses on the scripts.  If a customer said one thing

13  specifically that they wanted to return an item or they

14  didn't like the products, there was a response written

15  out to say to the customer.

16  BY MR. GALLEGOS:

17      Q.  When you first started working at BunZai

18  Media Group, were you provided any kind of training?

19      A.  Yes, we were.

20      Q.  And who provided that training?

21      A.  Kristopher Bond.

22      Q.  And what did that training involve?

23      A.  He just talked to us about the product and

24  told us that it was a great product and that we just

25  need to be alert when talking to customers on the

23

1    phone.  I don't recall too, too much about what the

2    training was.  I just remember him talking about the

3    product and saying it was one of the best products on

4    the market.

5          Q.  Did Mr. Bond discuss anything about what to

6    expect from calls received by customers?

7          MR. UNGAR:  Objection as to the form of the

8    question.  It's vague and ambiguous.

9          THE WITNESS:  To be honest I don't really recall

10   specifically.  I just remember him talking a lot about

11   the product.

12   BY MR. GALLEGOS:

13         Q.  Did Mr. Bond talk during the training about

14   anything about refunds or any of that type of

15   information?

16         MR. UNGAR:  Objection.  Leading.  Lacks

17   foundation.  Calls for speculation.

18         THE WITNESS:  They did talk about refunds,

19   several times in training throughout working at BunZai

20   Media and Pinnacle Logistics.  That first meeting I

21   don't recall specifically what they said about refunds

22   in general.

23   BY MR. GALLEGOS:

24         Q.  As far as specifically BunZai, not

25   necessarily during training, but what was your

24

1    recollection of what they talked about with respect to

2    refunds?

3         A.  Basically what they would say is if a

4    customer called in and, you know, was demanding a

5    refund that our first response should be to take the

6    customer back to the landing page where they signed up

7    at and show the customers the terms and conditions they

8    agreed to when placing the order for the trial.  I

9    know -- and then at that point, you know, once we were

10   at the terms and conditions, try to send the customer

11   out a complimentary product.

12            And if they declined to that -- I mean, the

13   goal was to keep just reinstating the fact that they

14   weren't entitled to a refund and make the customer

15   understand that they weren't supposed to receive a

16   refund.  And basically the procedure was if they were

17   still demanding a refund to start off at a 15 percent

18   refund.  If they declined a 15 percent refund go to a

19   25 refund.

20            If they declined that you're supposed to put

21   the customer on hold and pretend you're talking to the

22   manager and then hop back on the phone and offer a

23   50 percent refund.  If they were still demanding and

24   screaming about receiving a refund, sometimes you could

25   talk to the manager about it or you could just place

1    the customer on hold again and pretend that you were

2    talking to a manager and then offer a 75 percent

3    refund.

4           And they said if a customer just kept

5    calling in and in again several times throughout the

6    day then to issue a full refund.

7           MR. UNGAR:  Move to strike the entirety of the

8    answer on the grounds it lacks competency, lacks

9    personal knowledge.  The witness has no recollection.

10   BY MR. GALLEGOS:

11          Q.  And was this the standard operating

12   procedure with respect to refunds at BunZai Media

13   Group?

14          A.  Yes, it was.

15          Q.  And to your recollection who told you of

16   this standard operating procedure?

17          MR. UNGAR:  Objection to the form of the

18   question.  Lacks foundation.  Vague and ambiguous.

19          THE WITNESS:  It was Andre.  Andre had asked

20   us -- Andre had told us when we first started

21   working -- first started working there how to handle

22   refunds.  And I am -- I recall that being the exact

23   procedure because I worked in the quality assurance

24   department for a while as well, so over and over

25   again -- and the chargebacks department, so we would

1    listen to calls.

2         So over and over again you would hear that exact

3    same procedure of customer service agents placing the

4    customer on hold, offering the initial 15 percent or

5    25 percent refund, the customer declining then placing

6    them on hold again and then offering the 50 percent

7    refund --

8         MR. UNGAR:  Move to strike as nonresponsive.

9         MR. GALLEGOS:  If you could please let the

10   witness finish his statement before --

11        MR. UNGAR:  I thought he was done.  He talks

12   very softly.  I thought he was finished.

13        I apologize if I stepped on the end of your

14   answer.

15        Move to strike as nonresponsive.

16   BY MR. GALLEGOS:

17        Q.  Was this the standard operating procedure of

18   refunds at Pinnacle Logistics to your knowledge?

19        A.  Yes, it was the same.

20        Q.  And to your recollection do you recall who

21   advised you of the standard operating procedure at

22   Pinnacle Logistics with respect to refunds?

23        A.  Roi was involved and Andre was involved in

24   the customer service and refunds handling procedures

25   and protocols.

1          Q.  While working in the customer service

2     department at BunZai Media, what were the, to your

3     recollection -- what were the typical complaints

4     customers were calling about?

5          MR. UNGAR:  Objection to the form of the

6     question.  Vague and ambiguous.  Lacks foundation.

7          THE WITNESS:  Customers mainly complained

8     about -- number one they didn't know why they were

9     charged.  They were calling in asking why they were

10    charged.  And they would just demand a refund when they

11    called in.  A lot of customers were upset.  They

12    claimed they didn't see the terms and conditions on the

13    website and the websites that -- one of the things they

14    had us say is that they had to check a box to agree to

15    the terms and conditions but on those websites there

16    was no box to click to agree to the terms and

17    conditions of the trial when entering in the

18    credit card information.

19         Q.  How do you know that?

20         A.  Because I looked at the websites when I was

21    working as a customer service agent and in the

22    chargebacks department as well.

23         Q.  While working at Pinnacle Logistics did you

24    also work in the customer service department?

25         A.  Sometimes.  Sometimes the -- at that time I

```
 1    remember they were processing a lot of orders, so

 2    obviously there were more customers calling in trying

 3    to find out why they were billed, so when they would

 4    get really busy I would hop on the phone as a customer

 5    service rep.

 6         MR. UNGAR:  Move to strike everything as

 7    nonresponsive after "Sometimes."

 8    BY MR. GALLEGOS:

 9         Q.  To your recollection do you recall if the

10    complaints that were received be -- strike that.  To

11    your knowledge what were the types of complaints that

12    Pinnacle Logistics was receiving from customers?

13         A.  At Pinnacle Logistics?

14         MR. UNGAR:  Objection as to the form of the

15    question.  It's vague and ambiguous.  Calls for

16    speculation.  Lacks foundation.

17         THE WITNESS:  At Pinnacle Logistics they were

18    the same complaints that we were receiving with BunZai,

19    that the customers didn't know why they were billed.

20    They said they didn't see the terms of the trial.  And

21    sometimes at both BunZai and Pinnacle Logistics,

22    sometimes customers would complain that the product

23    didn't work or it burned their face.

24    BY MR. GALLEGOS:

25         Q.  When -- do you recall what address BunZai
```

29

1    Media was located at?

2          A.  I can't remember the address off the top of

3    my head.  It was on Gloria -- I know the main streets.

4    It was on Woodley and Saticoy or off of Woodley and

5    Saticoy Street.

6          Q.  In what city?

7          A.  In Van Nuys.

8          Q.  And when you started working at Pinnacle

9    Logistics where was Pinnacle Logistics located?

10         A.  It was in the same building as BunZai Media.

11         Q.  As far as the employees that started working

12   at Pinnacle Logistics, were they the same as the

13   employees that worked at BunZai Media Group?

14         A.  Yes.  Some employees had quit while working

15   at BunZai but the transition from BunZai Media to

16   Pinnacle Logistics, when they told us it was officially

17   Pinnacle Logistics that we were working for it was the

18   same employees that were working there that were

19   working at BunZai.

20         Q.  Did any of the management structure change?

21         MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous.  Calls for

23   speculation.  Lacks foundation.

24         THE WITNESS:  It was -- the day-to-day

25   operations were a little bit more structured.  They

1    were providing us with more scripts and different

2    scripts to use.  Roi was coming down a lot and

3    listening to customer service reps on the phone.  He

4    would walk around with headphones and they were just

5    listening more for quality assurance purposes.  So it

6    was a bit more structured than BunZai Media was.

7         MR. UNGAR:  Move to strike as nonresponsive.

8    BY MR. GALLEGOS:

9         Q.  What about Alon Nottea's involvement?

10        MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.  Calls for

12   speculation.  Lacks foundation.

13        THE WITNESS:  Alon, which is still the owner of

14   the business, he would come in and talk to us sometimes

15   and tell us we were doing a great job.  And then he

16   would come and talk to me about chargebacks a couple of

17   times when I was at Pinnacle Logistics.

18   BY MR. GALLEGOS:

19        Q.  To your recollection was Doran Nottea ever

20   involved with BunZai Media Group?

21        MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous.  Lacks foundation.

23   Calls for speculation.

24        THE WITNESS:  I'm sorry.  Could you repeat the

25   question.

1    BY MR. GALLEGOS:

2         Q.  And why did you believe that?

3         A.  Because while we were working at Pinnacle

4    when I was working in the chargebacks department, Alon

5    would come in and talk to us and, you know, ask us how

6    many chargebacks we were winning or asking us what the

7    protocol was now because Roi was more involved in that

8    process, so Alon every once in a while if we were

9    having a problem or if -- if we were having a problem

10   or something that we wanted to talk to him directly

11   about, he was the person that we talked to if we were

12   ever having problems, so we would talk to him directly

13   if we needed something handled, if we needed to go

14   above Roi to talk to him about something.

15   BY MR. GALLEGOS:

16        Q.  Did you ever hear Doron Nottea discussing

17   merchant accounts while working at BunZai Media?

18        MR. UNGAR:  Objection.  Vague and ambiguous.

19   It's leading.  It's putting words into the witness's

20   mouth.

21        THE WITNESS:  Yes.  There was a time I heard he

22   was upset because his -- when we were responding to the

23   chargebacks his name and some of his family members'

24   names were on the paperwork that we were sending to the

25   banks, and he was upset that his name was on it and

1    question.  It's vague and ambiguous.  Calls for

2    speculation.  Lacks foundation.

3         THE WITNESS:  I'm sorry.  Did you say did I hear

4    about BBB complaints while working with BunZai?

5    BY MR. GALLEGOS:

6         Q.  Yes.

7         A.  Yeah, we heard about the Better Business

8    Bureau complaints.  If a customer was -- if a customer

9    was stating to us over the phone that they were going

10   to complain to the Better Business Bureau that we

11   needed to handle -- that we just needed to handle it

12   with better care while talking to the customer over the

13   phone, that we really need to try to resolve the issue

14   over the phone.

15   BY MR. GALLEGOS:

16        Q.  Was it ever explained to you why you needed

17   to resolve that issue?

18        MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous.

20        THE WITNESS:  Just so that they didn't file a

21   complaint with the Better Business Bureau so that it

22   didn't lower their rating.

23   BY MR. GALLEGOS:

24        Q.  While working at BunZai Media group did you

25   ever hear management discuss anything about online

1          by the Reporter.)

2     BY MR. GALLEGOS:

3          Q.  If you can look at 143-2 through 143-3.

4          A.  Okay.

5          Q.  Do you recognize this document, Mr. Stanley?

6          A.  Yes, this looks like one of the scripts that

7     were handed out during Pinnacle Logistics, at Pinnacle

8     Logistics.

9          MR. UNGAR:  Move to strike everything after

10    "Yes."

11    BY MR. GALLEGOS:

12         Q.  And do you recall who provided this script?

13         A.  No, I do not.

14         Q.  Was this script provided to all customer

15    service representatives at Pinnacle Logistics?

16         MR. UNGAR:  Vague and ambiguous.  Calls for

17    speculation.

18         THE WITNESS:  This was one of the scripts that

19    were handed out.  There were probably -- I have to say

20    more than ten scripts that were handed out between

21    BunZai Media and Pinnacle Logistics.

22    BY MR. GALLEGOS:

23         Q.  To your knowledge did Mr. Roi Reuveni ever

24    provide you this script?

25         MR. UNGAR:  Objection as to the form of the

**554 - 19**                                    **EXHIBIT 554**

```
1    question.  It's vague and ambiguous.

2         THE WITNESS:  I don't recall specifically this

3    script, but he did hand us scripts, yes.

4         MR. UNGAR:  Move to strike as nonresponsive.

5    BY MR. GALLEGOS:

6         Q.  And down towards the middle of the page

7    there's a question that starts with "Customer called

8    stating."  Do you see that?

9         A.  Yes, I do.

10        Q.  The last sentence in that section reads,

11   "Customer is not willing to call with bank and is not

12   willing to drop dispute."  Do you see that?

13        A.  Yes, I do.

14        Q.  Do you know what that means?

15        A.  Basically what this means is that if a

16   customer says to a customer service rep over the phone

17   that they filed a dispute with their bank and if

18   they're not willing to call back in with a -- with

19   their bank, like if they had Chase Bank they were

20   supposed to call their bank, say that they wanted to

21   call the company that they filed a dispute with, with

22   the bank rep on the line and they would call, you know,

23   AuraVie or they would call Pinnacle Logistics and they

24   basically had to say over the phone that they were

25   willing to drop the dispute in order to receive maybe a
```

39

```
 1    partial refund or 50 percent refund or full refund, but
 2    they had to admit over the phone with the bank rep that
 3    they were dropping the dispute.
 4           Q.  And if the customer was unwilling to do that
 5    what would happen?
 6           A.  If the customer wasn't willing to do that
 7    you're basically not supposed to issue the customer a
 8    refund until they called in with their bank.  And I
 9    would hear, you know -- I specifically listened to
10    calls with Andre where he would get upset with
11    customers and basically say things -- he would get
12    upset with customers when they weren't willing to drop
13    the dispute to call in with the bank.
14           MR. UNGAR:  Move to strike as nonresponsive.
15    BY MR. GALLEGOS:
16           Q.  Was that policy the same policy as to BunZai
17    Media?
18           MR. UNGAR:  Objection to the form of the
19    question.  Vague and ambiguous.
20           THE WITNESS:  Yes.  It was exactly the same.  If
21    the customer wasn't willing to call in with their bank
22    to say they wanted to drop the dispute over the phone
23    with the bank rep, the customer service rep wasn't
24    supposed to issue a refund.
25    ///
```

1          MR. UNGAR:  Move to strike as nonresponsive and

2     speculative and it lacks foundation.

3     BY MR. GALLEGOS:

4          Q.  While working in the customer service

5     department at BunZai Media, were you responsible for

6     handling any complaints received from the attorney

7     general's office?

8          A.  No.

9          Q.  While working in the customer service

10    department at BunZai Media group, were you ever

11    instructed to treat consumers threatening BBB

12    complaints differently?

13         A.  Yes.

14         Q.  And what were you told?

15         MR. UNGAR:  Objection as to the form of the

16    question.  It's vague and ambiguous.

17         THE WITNESS:  We were just told that it was more

18    serious if a customer was stating they were going to

19    file a complaint with the Better Business Bureau, that

20    we can't be short with them and we really needed to

21    take our time and see if they were willing to be issued

22    a partial refund and accept that refund.

23    BY MR. GALLEGOS:

24         Q.  And were these customers treated differently

25    from other customers?

```
1              MR. UNGAR:  Objection as to the form of the

2     question.  It's vague and ambiguous.

3              THE WITNESS:  Yes, they definitely were.

4     BY MR. GALLEGOS:

5         Q.  While working in the customer service

6     department of BunZai Media were you ever instructed to

7     treat customers threatening to file attorney general

8     complaints differently?

9         A.  Yes, we were.

10        Q.  And how were you instructed to do that?

11        A.  We were just told in the same way to take it

12    as serious as a Better Business Bureau complaint.  Or a

13    customer stating that they were going to file a

14    dispute, but -- yeah.

15        Q.  And to your recollection who told you that?

16        A.  Well, first it was Andre when I first

17    started there stating that, you know, if a customer

18    wants to file a dispute or if a customer says they want

19    to file a complaint with the BBB, Better Business

20    Bureau, that needs to be taken seriously, and you

21    really needed to try to resolve the issue over the

22    phone and see if the customer accepts a partial refund,

23    and if they're not accepting it -- and the reason I say

24    they were treated differently because when customers

25    called in, it was protocol after a while when customers
```

1    called in and demanded to speak with the supervisor,

2    you were supposed to say you were a team leader and

3    that you had complete control over issuing refunds for

4    any customer that called in.

5              And if a customer absolutely demanded to

6    speak to a supervisor you were supposed to say it's

7    going to be 24 hours to 48 hours to hear back from a

8    supervisor.  And for customers who stated that they

9    were filing a dispute or complaint with the Better

10   Business Bureau, you were allowed to place the customer

11   on hold and have that customer speak directly with a

12   supervisor or someone else, just to make the customer

13   feel calm and at ease, that they were speaking with a

14   supervisor so that they felt they were getting the

15   highest refund that they were entitled to or supposed

16   to get back.

17             MR. UNGAR:  Move to strike as nonresponsive and

18   it's a narrative.

19   BY MR. GALLEGOS:

20        Q.  And was this policy as far as with respect

21   to consumers that threatened AG or BBB complaints or

22   any complaints the same policy followed at Pinnacle

23   Logistics?

24        A.  It was.

25             MR. UNGAR:  Objection as to the form of the

1    question.  It's vague and ambiguous.

2         THE WITNESS:  Yes, it was.

3    BY MR. GALLEGOS:

4         Q.  While working in the customer service

5    department of BunZai Media Group, were you evaluated

6    based on number of refunds and amount of refunds you

7    gave?

8         MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.

10        THE WITNESS:  Yes.  They had data that Kris

11   showed me at one point in time at BunZai Media that

12   showed how long customer service agents were on the

13   phone and how many refunds they issued per day.  The

14   goal was to spend the least amount of time on the phone

15   with the customer and issue the least -- the least

16   amount of refunds that you could.

17   BY MR. GALLEGOS:

18        Q.  And how do you know about that goal?

19        A.  Because Andre told us that this was the

20   goal.  Kris told us that this was the goal for a

21   customer service rep.

22        Q.  And was this the same policy that was

23   followed at Pinnacle Logistics?

24        MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.

60

1    charged or why they were billed, the bank will

2    sometimes send out a retrieval request so they can find

3    out information about the customer, about why the

4    customer was billed and then send it to the customer

5    and tell the customer.

6         Q.  Is this before a customer has actually filed

7    a chargeback dispute?

8         A.  Yes.

9         Q.  And what was the typical procedure with

10   respect to responding to these retrieval requests?

11        MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13        THE WITNESS:  The procedure was the exact same

14   as responding to a chargeback.  Just simply gathering

15   information from Limelight where all the customer

16   orders were held, sending out the tracking information

17   or a screen shot of the tracking confirmation from the

18   United States Postal Service and a screen shot of the

19   landing page where the customer placed the order.

20        And there is a letter that they had at the end

21   of the packet that stated they followed all FTC rules

22   and regulations from a lawyer.

23   BY MR. GALLEGOS:

24        Q.  If you look at 131-3 of that exhibit.  The

25   column identified "Merchant Account."

**554 - 26**                                **EXHIBIT 554**

1        A.  Okay.

2        Q.  What does that column -- what information is

3    contained in that column?

4        A.  These were different merchant accounts that

5    were set up that we handled for BunZai and for Pinnacle

6    Logistics.

7        Q.  And in there it has "DSA Holdings."  Do you

8    recognize that name?

9        A.  Yes, I do.

10       Q.  Was that a company?

11       A.  Yes, that was a company.

12       Q.  And did that company sell AuraVie products,

13   to your knowledge?

14       A.  From what I was told is that it was BunZai

15   and Pinnacle selling the products but they had

16   different merchant accounts set up because if they

17   received over -- if they received more than 2 percent

18   of chargebacks for their overall transactions, the

19   merchant account would get shut down, so they had

20   different merchant accounts set up just in case some of

21   the accounts, merchant accounts got shut down or they

22   would process transactions through different merchant

23   accounts.  They never had over 2 percent chargebacks.

24       MR. UNGAR:  Move to strike as nonresponsive.

25   ///

1    just about the dispute, the way that maybe customer

2    service agents were handling it.  If it was like maybe

3    a customer service agent's fault, like if they didn't

4    go through all the terms and conditions, we would input

5    this in here.

6              If the customer agreed to settle the dispute

7    over the phone but still ended up filing a chargeback,

8    like if they had agreed to a refund but a chargeback

9    was still filed, we would input that reason.  It was

10   just basically just more information about maybe why

11   the dispute was filed.

12        Q.  Going back to 131-3 with respect to the

13   merchant accounts, who did you believe owned these

14   merchant accounts?

15        MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous.  It lacks

17   foundation.  It calls for speculation.

18        THE WITNESS:  Alon, Doron and Kris.

19   BY MR. GALLEGOS:

20        Q.  And why do you believe that?

21        A.  Because Kris was -- we were told that Kris

22   was one of the owners of the company.  We were told

23   that Alon was one of the owners of the company.  We

24   were told that Doron was one of the owners of the

25   company and we had saw Doron's names on one of these

66

1    merchant accounts, not specifically one of these

2    merchant accounts, but a merchant account we were

3    handling and responding to chargebacks for.

4              And I mean, Alon was the owner of the

5    company and then we also ended up -- I recall seeing

6    Roi on a merchant account that I was handling

7    chargebacks for earlier on.

8    BY MR. GALLEGOS:

9         Q.  And who told you Doron was one of the owners

10   of the -- what company?

11        MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous with regard to the

13   phrase "the company."

14        THE WITNESS:  Roi ended up telling me because he

15   said that him and Alon were cousins or just related.

16   BY MR. GALLEGOS:

17        Q.  And do you recall the name --

18        MR. UNGAR:  I'm sorry.  I have to stop you a

19   second.  I couldn't hear the end of the answer.  Could

20   you give the question and the answer, please.

21              (Record read.)

22   BY MR. GALLEGOS:

23        Q.  Do you recall the name of that company?

24        A.  BunZai.  That Doron was one of the owners of

25   BunZai.

**EXHIBIT 554**

1    departments now.

2          MR. UNGAR:  Move to strike as nonresponsive.

3          MR. GALLEGOS:  Let the record reflect that I'm

4    handing the witness Exhibit 134.

5              (Exhibit 134 was marked for identification

6              by the Reporter.)

7    BY MR. GALLEGOS:

8          Q.  If you could look at the first two pages of

9    that document, Mr. Stanley.

10             Do you recognize this document?

11         A.  Yes, I do.

12         Q.  And when I say this document I'm talking

13   about 134-1 through 134-2.

14         A.  Yes.

15         Q.  What is this document?

16         A.  In 2012 Roi had set up this template for

17   responding to chargebacks, so this template was used to

18   respond to chargebacks for each merchant account.

19         Q.  And how do you know Roi set up this

20   template?

21         A.  Because he said, "I set this up."

22         Q.  And how was this template used?

23         A.  This template was used -- like I said, there

24   were over 25 to 30 merchant accounts, so for each

25   chargeback you would have to input the merchant ID, the

```
 1    merchant name, the company, you know, company's phone

 2    and fax, the case number of the chargeback and send it

 3    off to the banks.

 4            Q.  Do you know which -- if BunZai Media Group

 5    used this template?

 6            A.  BunZai didn't use this template.

 7            Q.  This template was used by Pinnacle

 8    Logistics?

 9            MR. UNGAR:  Objection to the form of the

10    question.  Vague and ambiguous.  It's leading.  Puts

11    words into the witness's mouth.  Counsel might as well

12    be testifying.

13            THE WITNESS:  Yes.

14    BY MR. GALLEGOS:

15            Q.  Did BunZai Media Group have a similar

16    template to this?

17            A.  It was a similar template in terms of

18    inputting a different merchant ID.  Making sure that it

19    was the right merchant ID and case number.  The terms

20    and conditions of the trial were on the first page and

21    the cancellation policy.  It was just organized

22    differently.

23    BY MR. GALLEGOS:

24            Q.  And to your knowledge do you know who

25    developed the BunZai template?
```

1          A.   No.   I wasn't told who developed the BunZai

2     template.

3          Q.   And in that box right underneath your

4     chargeback department, in the second sentence of that

5     first paragraph it states, "As you can see on the

6     attached screen shot of the order page, the terms were

7     clearly shown on the pages required by the FTC, and the

8     customer had to check the box stating they accepted the

9     terms of the offer before they were able to continue

10    checking out."  Do you see that?

11         A.   Yes.

12         Q.   To your knowledge were customers required to

13    check a box stating they had accepted the terms of the

14    offer?

15         A.   On every single landing page for My Miracle

16    Face Kit, for AuraVie, we had access to every landing

17    page, because there were different pages.  They had

18    different landing pages for AuraVie.  They would have

19    Try AuraVie or Try My Miracle Face kits, there were a

20    lot of different websites they had set up for these

21    trials.

22              And when it came to the customer entering in

23    their credit card information, I never saw a check box

24    that the customer had to check to place the trial for

25    the order.  On some of the landing pages on the initial

1    page where the customer would enter in their shipping

2    information there would be a check box sometimes.  But

3    in terms of them having to enter in their credit card

4    number and click a box to agree to the terms in order

5    to check out I never saw one.

6         MR. UNGAR:  Move to strike as nonresponsive.

7    BY MR. GALLEGOS:

8         Q.  So where it talks about "as you can see on

9    the attached screen shot," what screen shot would the

10   chargeback department provide?

11        A.  It was one that was Photoshopped or just

12   one -- or just a screen shot of the AuraVie landing

13   page with a check box on it.  But on all of the

14   websites where the customer placed their order, I never

15   saw a check box.

16        Q.  And do you know -- when you say that it was

17   Photoshopped, do you know who Photoshopped that screen

18   shot?

19        A.  Who sent us the screen shot of the landing

20   page where the customer entered in their credit card

21   information was Roi.  I'm not sure who put that

22   together, but Roi had sent us these screen shots.

23        Q.  And was that the same process for both

24   Pinnacle and BunZai Media Group?

25        MR. UNGAR:  Objection as to the form of the

78

1          Q.   And what is this document?

2          A.   This was -- this was a protocol for customer

3    service agents on just handling the calls.  I mean,

4    this seems to be mainly in regards to customers filing

5    disputes and issuing refunds.  I guess resolving

6    customer complaints over the phone.

7          Q.   And do you know which company used this

8    document?

9          A.   I knew Pinnacle Logistics had one like this

10   and BunZai Media had one that was similar.

11         Q.   And on the back page on 103-2 it appears to

12   have some signatures on it.  Do you see that?

13         A.   Yes, I do.

14         Q.   To your knowledge were Pinnacle employees

15   required -- or employees in the Pinnacle customer

16   service department required to sign these types of

17   documents?

18         A.   Yes, they were.

19         Q.   And to your knowledge were BunZai employees

20   in the customer service department required to sign

21   these types of documents?

22         A.   At BunZai?  No, I don't remember customer

23   service agents signing and agreeing to the way they

24   were supposed to handle calls.

25         Q.   On 103-1, it -- in item number 3, on the

1    first item number 3, do you see that?  Where it states,

2    "As a last resort"?

3        A.  Yes.

4        Q.  It states, "Offer partial refunds but do not

5    start high.  Refund as little as you have to."  Do you

6    see that?

7        A.  Yes.

8        Q.  "Only refund in full if you absolutely have

9    to, resolving a dispute."  Do you see that?

10       A.  Yeah, I do.

11       Q.  Was this a policy of Pinnacle Logistics?

12       A.  Yes, it was.  It was a policy for BunZai as

13   well.

14       Q.  And this was a policy that all customer

15   service representatives were informed of to your

16   knowledge?

17       A.  Yes.

18       Q.  That was for both Pinnacle and BunZai

19   employees?

20       A.  Yes.  I mean, it was stated over and over

21   again to refund customers as little as possible.

22       Q.  Around the middle page where it has, "or

23   customers threatening dispute," it has, "If a customer

24   threatens a dispute, please do not say," quote, "That's

25   fine, ma'am," end quote.  "Remember to advise customers

1          handing the witness what's been marked as Exhibit 163.

2                    (Exhibit 163 was marked for identification

3               by the Reporter.)

4               MR. UNGAR:   Thank you.

5     BY MR. GALLEGOS:

6               Q.   Take a look at that.

7               A.   Okay.

8               Q.   Do you recognize this document, Mr. Stanley?

9               A.   Yes, I do.

10              Q.   And what is this document?

11              A.   These were all of the merchant accounts

12    under Pinnacle Logistics.

13              Q.   And how do you know that?

14              A.   Because we would receive chargebacks for

15    each and every one of these merchant accounts that I'm

16    looking at, and -- yeah, we would receive a response

17    chargeback for every single one of these merchant

18    accounts.

19              Q.   In the column that shows "CEO/Owner," do you

20    see that?

21              A.   Yes, I do.

22              Q.   Did you ever speak with any of the

23    individuals that are listed as CEO or owner for any of

24    these merchant accounts?

25              A.   Yes, I did.

1          Q.  And which CEO or owners did you speak with

2    about this?

3          A.  I mean, mainly Roi.  We met Igor a few

4    times.  He would come into the office a lot.  And he

5    would just talk to us for a few minutes, and we met

6    Sean a few times as well.  But all of the other -- I'm

7    not sure if they came into the office, but -- oh, and

8    then Motti.

9          Q.  And just for purposes of the record, when

10   you're talking about Igor, are you talking about Igor

11   Latsanovski?

12         A.  Yes.

13         Q.  And when you mentioned Sean are you talking

14   about Sean Brennecke?

15         A.  Yes.

16         Q.  Sean is spelled S-e-a-n.  Brennecke is

17   spelled B-r-e-n-n-e-c-k-e?

18         A.  Yes.

19         Q.  And when you mentioned Motti, are you

20   talking about Motti Nottea?

21         A.  Yes.

22         Q.  Motti is spelled M-o-t-t-i.

23         Do you know if whether or not any of the CEO

24   or owners that are identified for each merchant account

25   received a 1 percent compensation for any sales made

1    through their merchant accounts?

2         A.  I know that they were -- that they were

3    compensated, but I didn't know what percent -- what the

4    percentage was.

5         MR. UNGAR:  Move to strike as nonresponsive.

6    Lacks foundation.  Speculative.  Incompetent.

7    BY MR. GALLEGOS:

8         Q.  How do you know that they received some kind

9    of compensation?

10        A.  Because when I had first started there, like

11   I didn't understand why there were so many merchant

12   accounts until Kris explained it to me just very

13   briefly.  He was kind of a little open about these

14   things.

15        Q.  What did Kris tell you?

16        A.  Kris just told me they had different

17   merchant accounts set up in friends' names that they

18   knew and they would compensate them.  They would pay

19   them but he didn't tell me how much.  He only told me

20   this one time.

21        Q.  And when you say Kris --

22        A.  Kristopher Bond.

23        Q.  And you spell Kris, K-r-i-s-t-o-p-h-e-r?

24        A.  Yes.

25        Q.  To your knowledge who owned these merchant

1    accounts?

2         A.  Doron and Alon and I mean, we were under the

3    assumption that since Kris told us all the time that he

4    was a partner in the company and owned BunZai, we

5    assumed that he had owned these merchant accounts too.

6         Q.  Were these merchant accounts owned by Doron

7    and Alon or by their company?

8         MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  Calls for

10   speculation.  It's leading.  It's putting words into

11   the witness's mouth.  It's improper in a deposition.

12   It's also unethical.

13        THE WITNESS:  Did Doron and Alon own -- can you

14   rephrase it.

15        MR. UNGAR:  Move to strike as nonresponsive.

16   BY MR. GALLEGOS:

17        Q.  To your knowledge did BunZai Media Group own

18   these accounts?

19        A.  Yes.

20        Q.  And how do you know that?

21        A.  Because Alon -- when we first started

22   working on the chargebacks, we had saw Doron's name and

23   Doron's family's name on some of these merchant

24   accounts, and Roi basically told us when we started

25   working in the chargeback department that, you know,

87

1    they owned all these merchant accounts, that these were

2    the company's merchant accounts.

3              We worked for BunZai Media and Pinnacle

4    Logistics and we were responding to chargebacks filed

5    under these merchant accounts and every single order

6    were for things sold by BunZai and Pinnacle Logistics

7    which was AuraVie and My Miracle Face Kit.

8              MR. UNGAR:  Move to strike as nonresponsive.

9    BY MR. GALLEGOS:

10             Q.  How often did Igor Latsanovski come by the

11   BunZai office or Pinnacle office?

12             A.  In 2011 I didn't see him very much but in

13   2012 he came by a lot.

14             Q.  And when you say "came by a lot," what do

15   you mean?

16             A.  He was there at least -- for a while he was

17   coming every day and then there were sometimes where he

18   would come once a week or sometimes he would come once

19   a month, but I remember for a while, maybe for a month

20   or so he was coming every day, every other day we saw

21   him in the office a lot.

22             Q.  And what would he do when he was there, to

23   your knowledge?

24             MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.  Calls for

**554 - 40**                                        **EXHIBIT 554**

1    accounts.  That these were, you know, separate merchant

2    accounts.  But red specifically meant that the account

3    was closed down.

4            Q.  Do you know why the accounts were closed?

5            A.  No.

6            Q.  To your knowledge were the accounts ever

7    closed by a bank?

8            MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  Calls for

10   speculation.  Lacks foundation.  Incompetent.  Witness

11   just testified he doesn't know.

12           THE WITNESS:  Yes.

13   BY MR. GALLEGOS:

14           Q.  And how do you know?

15           A.  Kris ended up telling us at one point in

16   time that if the chargebacks were over 2 percent, that

17   the banks would close them out and that they did have

18   an account that was closed out.  He didn't tell me how

19   many or specifically on Attachment A, 163-2,

20   specifically why these accounts were closed, but we

21   knew that accounts were closed by the bank because

22   there were too many chargebacks on that merchant

23   account.

24           MR. UNGAR:  Move to strike as nonresponsive.

25   ///

                    EXHIBIT 554

1                      EXAMINATION

2    BY MR. UNGAR:

3         Q.  Sir, tell me everything you know about a

4    check box on the AuraVie website.

5         A.  Everything that I know about it?

6         Q.  Tell me everything you know about a check

7    box on the AuraVie website.

8         MR. GALLEGOS:  Objection.  Overbroad.  Asks for

9    a narrative.

10        THE WITNESS:  Everything that I know about the

11   check box on the AuraVie website is on some of the

12   landing pages there would be a check box where the

13   customer entered in their shipping and billing

14   information and their e-mail address, their telephone

15   number, but when they had to enter in their credit card

16   information on these landing pages for My Miracle Kit

17   and for the AuraVie trial pages, there weren't any

18   check boxes there.

19   BY MR. UNGAR:

20        Q.  Do you know anything else about check boxes

21   on the AuraVie website other than what you just

22   testified to?

23        A.  Other than responding to the chargebacks,

24   like I said there were screen shots that we received

25   that we submitted to the banks when we were responding

1    to the chargebacks and all these screen shots of these

2    landing pages were basically telling the banks that the

3    customer had to check a box when they entered in their

4    credit card information.

5          MR. GALLEGOS:  I'll object on the basis it's

6    vague and ambiguous --

7          MR. UNGAR:  Counsel, he was just testifying.

8    It's totally inappropriate.  It's improper.

9          MR. GALLEGOS:  It appeared that he had finished.

10         MR. UNGAR:  And I admonish you not to do it

11    again, please.  You've chastised me about it.  Please

12    follow proper decorum.

13    BY MR. UNGAR:

14         Q.  Would you like to hear the question again,

15    sir?

16         A.  Sure.

17         Q.  What else do you know about the check box on

18    the AuraVie website other than what you've already

19    testified to?

20         MR. GALLEGOS:  Before he answers I'm going to

21    object that it's ambiguous, vague, overbroad.

22         THE WITNESS:  Like I said, besides there being

23    no check box on the landing page for the trial websites

24    for AuraVie and My Miracle Kit, we were given screen

25    shots that we submitted to the banks that stated that

98

1    the customer had to check a box when they entered in

2    the credit card information, but on the actual landing

3    pages where the customer signed up at they didn't have

4    to check a box.

5    BY MR. UNGAR:

6         Q.  Isn't it true you had personally seen

7    AuraVie websites with check boxes?

8         MR. GALLEGOS:  Objection.  Misstates the

9    witness's testimony.

10        THE WITNESS:  I have seen AuraVie websites with

11   check boxes when a customer enters in their shipping

12   information, their billing address, but there are two

13   pages.  There was the first page that the customer saw

14   where they had to enter in their shipping information

15   and when they continued on to the next page, they had

16   to enter in their credit information.  On that page

17   there was no box that the customer had to click in

18   order to agree to the terms and conditions of the

19   trial.

20   BY MR. UNGAR:

21        Q.  What else do you know about the check box on

22   the AuraVie website other than what you've already

23   testified to?

24        A.  I believe I've stated mostly what I know

25   about the check box on the AuraVie websites.

1                    REPORTER'S CERTIFICATE

2

3          I, JEANINE CURCIONE, C.S.R. NO. 10223, RPR, in

4    and for the State of California, do hereby certify:

5          That prior to being examined, the witness named

6    in the foregoing deposition was by me duly sworn to

7    testify the truth, the whole truth and nothing but the

8    truth and that the witness reserved the right of

9    signature;

10         That said deposition was taken down by me in

11   shorthand at the time and place therein named, and

12   thereafter reduced to typewriting under my direction,

13   and the same is a true, correct and complete transcript

14   of said proceedings.

15         I further certify that I am not interested in

16   the event of the action.

17         Witness my hand this 4th day of March, 2016.

18

19                          _____

20                          Certified Shorthand
                            Reporter for the
21                          State of California

22

23

24

25

**EXHIBIT 554**

1

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION  )

5           Plaintiff          )

6      v.                      ) No. CV 15-4527-GW(PLAx)

7    BUNZAI MEDIA GROUP, INC., )

8    et al.,                   )

9           Defendants.        )

10

11

12

13

14                  Wednesday, February 24, 2016

15

16                  10877 Wilshire Boulevard

17                  Suite 700

18                  Los Angeles, California

19

20

21

22        The above-entitled matter came on for

23   deposition, pursuant to Notice, at 1:00 p.m.

24

25

2

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4     FEDERAL TRADE COMMISSION   )

5              Plaintiff         )

6        v.                      ) No. CV 15-4527-GW(PLAx)

7     BUNZAI MEDIA GROUP, INC., )

8     et al.,                    )

9              Defendants.       )

10

11

12

13

14

15

16              DEPOSITION OF ALAN ARGAMAN, taken on

17     behalf of the Federal Trade Commission, at

18     10877 Wilshire Boulevard, Suite 700, Los Angeles,

19     California, commencing at 1:00 p.m., and concluding

20     at 4:45 p.m., on Wednesday, February 24, 2016,

21     pursuant to Notice, before CHRISTINA KIM-CAMPOS,

22     CSR No. 12598, a Certified Shorthand Reporter, in

23     and for the State of California.

24

25                        ***

6

```
 1                    LOS ANGELES, CALIFORNIA

 2                    WEDNESDAY, FEBRUARY 24, 2016

 3                         1:00 P.M.

 4

 5                    ALAN ARGAMAN,

 6           called as a witness by and on behalf of

 7           the Plaintiff, being first duly sworn,

 8           was examined and testified as follows:

 9

10                       EXAMINATION

11   BY MS. ROBINSON:

12      Q.   Okay.  My name is Emily Robinson.  I'm an

13   attorney with the FTC.

14      A.   Okay.

15      Q.   I'll be doing your deposition today.

16      A.   Mm-hmm.

17      Q.   Here, also, is Reid Tepfer --

18      A.   All right.

19      Q.   -- who also is an attorney with the FTC.

20      A.   Okay.

21           MS. ROBINSON:  Should we wait for -- it just

22   occurred to me he hasn't called.

23           MR. TEPFER:  No, no.  It's 1:00 right now,

24   so we can go ahead.

25           MS. ROBINSON:  All right.  Well, okay.
```

**555 - 3**                                              **EXHIBIT 555**

1    Q.   -- actually 176-2, it says "Certified Copy

2  of Limited Liability Company Resolutions Opening and

3  Maintaining Deposit Accounts and Services" for Bank

4  of America; is that correct?

5    A.   Yes.

6    Q.   Okay.  And it's for the company Secured

7  Merchants, LLC; is that correct?

8    A.   Correct.

9    Q.   Okay.  And it lists here Doron Nottea and

10  Alan Argaman as members; is that correct?

11    A.   That's what it lists here, yes.

12    Q.   Yes.  Okay.

13       The -- and then is that your signature on

14  the next page, 176-3?

15    A.   Yes, it is.  Yes.

16    Q.   Okay.  How would you describe your role with

17  Secured Merchants, LLC?

18    A.   My role?

19    Q.   Yeah.

20    A.   I am -- the only role in Secured Merchants,

21  LLC, as far as my -- I'm not getting what you're

22  asking exactly, but if I gave you a correct answer,

23  then you're good with it.

24    Q.   This document lists you as a member;

25  correct?

       EXHIBIT 555

1          Are you also the owner of the company?

2     A.   This I -- I can't go into legal term what is

3     the difference between member and owner, but I

4     believe LLC works with members.

5     Q.   Okay.

6     A.   So if I'm a member, then --

7     Q.   Are you a controlling member?

8     A.   I'm the only member.

9     Q.   Okay.  This here lists Doron Nottea as a

10    member.  Is that incorrect?

11    A.   This is incorrect.  So just to --

12    Q.   Is there a newer version of this document?

13    A.   Okay.  Can I finish what I was going to say?

14    Q.   Absolutely.

15    A.   Thank you very much.

16         Secured Merchant, LLC, is and always has

17    been a single member LLC, and in a single member LLC

18    you're not allowed to have more than one member,

19    according to my knowledge.  So this is obviously a

20    mistake by someone or somehow, or it kind of --

21    Q.   But is that your name, is that your

22    signature on page 176-3?

23    A.   It looks like it, but I'm not sure, but it

24    does look like it.

25    Q.   Okay.  Do you remember filling this document

49

1    services myself, and this amount might be a payment

2    for services that I have provided for AuraVie.com

3    website.

4           MR. UNGAR:  Move to strike everything after

5    the word "No."

6    BY MS. ROBINSON:

7    Q.    Did you provide services for AuraVie.com?

8    A.    I myself provided a website called

9    AuraVie.com that was a straight sale website.

10   AuraVie.com sold skin care products on a website

11   that had shopping carts, that had no risk free

12   trials, that had multiple SKUs and products of skin

13   care that customers came in and bought, such as they

14   would buy on Amazon or eBay or Shopify or

15   BigCommerce or Volusion or any other shopping cart

16   platform.  So I provided a website for AuraVie.com.

17   Again, the word "provide," I don't know what it

18   means, but yes.

19   Q.    And is it your testimony that the AuraVie

20   website landing page that you designed did not have

21   a negative option?

22   A.    Absolutely not.

23   Q.    Okay.  And so --

24   A.    The AuraVie.com website that I worked on did

25   not have negative options, did not have risk free

**EXHIBIT 555**

51

```
1    detail for me.

2        A.    What is the exact question?

3        Q.    What does Lime Light do?

4        A.    You're asking me what Lime Light, another

5    software, does?

6        Q.    Campaign integration to Lime Light, so I'm

7    asking you --

8        A.    So you go to Lime Light, you -- you -- you

9    have a menu.  You use -- I haven't used it myself,

10   so I don't really know, but I mean, if you want a

11   demo, you would have to go to Lime Light CRM and ask

12   them for a demo.

13       Q.    So is it your testimony that you don't know

14   what Lime Light does?

15       A.    I just told you before that I do know.  As a

16   whole, Lime Light is a CRM where negative option

17   companies go to, to perform their business --

18       Q.    Okay.

19       A.    -- and continuity.

20       Q.    So is it your testimony that you designed a

21   landing page that did not have con- --

22       A.    Did --

23       Q.    -- did not have the continuity plan or

24   the negative option --

25       A.    Absolutely.  First of all, I don't know
```

64

1    BY MS. ROBINSON:

2        Q.    Go ahead and take a look at that, and just

3    let me know when you're done.

4        A.    Okay.

5        Q.    Okay.  This is an email to you from Alon --

6        A.    Yes.

7        Q.    -- is that correct?

8              And it's copied to Tal Karasso --

9        A.    Mm-hmm.

10       Q.    -- and looks like Roi Reuveni.  Do you know

11   who Tal Karasso is?

12       A.    Yes.

13       Q.    And why was -- strike that.

14             How do you know him?

15       A.    Seen him.

16       Q.    Have you spoken to him?

17       A.    Yes.

18       Q.    Do you know who he worked for?

19       A.    No.

20       Q.    Did he work for you?

21       A.    No.

22       Q.    Okay.  Let's see.  It says -- first line

23   says give me your -- excuse me -- "Good meeting

24   regarding call center yesterday".  Do you remember

25   having a meeting about a call center?

65

1      A.   No.

2      Q.   Do you remember ever having any talks or

3    meetings with Alon about a call center?

4           MR. UNGAR:   Objection as to the form of the

5    question.   It's vague and ambiguous.

6           THE WITNESS:   Don't recall.

7    BY MS. ROBINSON:

8      Q.   Did you ever provide any IT services to

9    Alon, relating to a call center?

10     A.   Possibly.

11     Q.   Do you remember whether you did?

12          MR. UNGAR:   Objection as to the form of the

13   question.   It's vague and ambiguous.

14          THE WITNESS:   Can you ask again what --

15   BY MS. ROBINSON:

16     Q.   You said -- you said "Possibly."   Do you

17   remember providing any IT services or any services

18   related to a call center --

19     A.   No.

20     Q.   -- to Alon?

21          MR. UNGAR:   Objection as to the form of the

22   question.   It's vague and ambiguous.

23   BY MS. ROBINSON:

24     Q.   The second and onto the third line says,

25   "Thank you for stepping up and getting directly

1    involved."

2          Do you know what Alon means by that?

3          MR. PARIKH:  Objection; calls for

4    speculation.

5    BY MS. ROBINSON:

6      Q.   And to clarify, my question is do you know

7    what he means by that?

8      A.   No.

9      Q.   Okay.  Did you ever at any point get

10   directly involved in an IT project for Alon?

11         MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13         THE WITNESS:  That's a vague question.  I'm

14   not getting it.

15   BY MS. ROBINSON:

16     Q.   Are you saying you don't understand the

17   question?

18     A.   The question, I don't understand it in the

19   current form that you're presenting it.  No.

20     Q.   Okay.

21     A.   So maybe you want to rephrase it.

22     Q.   Did you provide IT services to Alon?

23     A.   I told you that a few times today.

24     Q.   Yeah, I thought so.

25         So what services did you provide to him?

67

1          A.    I don't recall.

2          Q.    You don't recall what services you provided

3     to him?

4          A.    At this time, sitting here, I don't recall.

5     I can't -- if you ask me specifically, I might

6     recall --

7          Q.    Okay.

8          A.    -- but right now I don't.

9          Q.    But you don't recall any services relating

10    to a call center; is that your testimony?

11               MR. UNGAR:  Objection as to the form of the

12    question.  It's vague and ambiguous, and it's

13    argumentative.

14               THE WITNESS:  I don't understand your

15    question.

16    BY MS. ROBINSON:

17         Q.    What part don't you understand?

18         A.    It's too broad.

19         Q.    Do you remember providing any call center

20    services or IT services for a call center for Alon

21    or one of Alon's companies?

22         A.    It depends what you define as IT service.

23         Q.    Did you provide --

24               MR. UNGAR:  Objection.

25    ///

68

1    BY MS. ROBINSON:

2        Q.    -- any kind of services?

3              MR. UNGAR:  Objection.  Objection as to the

4    form of the question.  It's vague and ambiguous.

5              THE WITNESS:  I don't understand the

6    question.

7    BY MS. ROBINSON:

8        Q.    Okay.  Did you provide any services of any

9    nature for a call center for Alon or for one of

10   Alon's companies?

11             MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13             THE WITNESS:  I don't recall.

14   BY MS. ROBINSON:

15       Q.    Did you -- strike that.

16             Have you worked for a company that provided

17   IT services for Media Urge, Inc.?

18             MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous.

20             THE WITNESS:  I don't understand the

21   question.

22   BY MS. ROBINSON:

23       Q.    Which part is confusing to you?

24       A.    You're asking me about Media Urge, and I'm

25   not sure if -- I don't know if I provided services

555 - 12                                    EXHIBIT 555

69

1      to Media Urge, Inc., or whatever the company's name

2      is in specific, so I can't really answer this

3      question in the form you're asking me.  I already

4      told you that I provided IT services, but you're

5      asking me specifically to a company that I cannot

6      say yes because I don't know.

7         Q.   Have you ever worked for a company that

8      provided IT services for CalEnergy, Inc.?

9         A.   No.

10        Q.   Have you ever worked for a company that

11     provided IT services for Adageo, LLC?

12        A.   Not to my recollection, no.

13        Q.   Okay.  If we look back at -- I showed you

14     Exhibit 60 -- Exhibit 54-ish -- it was an invoice.

15     There we go.  If we look back at Exhibit 66 --

16        A.   Sure.

17        Q.   -- it's an invoice from Secured Commerce to

18     Adageo, LLC.  Does that refresh your recollection?

19        A.   We talked about this invoice quite a bit,

20     and I told you what I think about this invoice, is I

21     don't recall exactly this invoice, but this amount,

22     if it was paid and collected, it was probably for

23     money owed for an AuraVie.com straight sale website

24     project that I've done.

25        Q.   Okay.  And who did you do that project for?

70

1          MR. UNGAR:  Move to strike as not

2     responsive.

3     BY MS. ROBINSON:

4          Q.    Who did you do that project for?

5          A.    Can you -- can you ask me again?

6          Q.    Yeah.

7               The project that you described that this,

8     this invoice here --

9          A.    Yeah.

10         Q.    -- you described a project that was in this

11    invoice.

12         A.    Yeah.

13         Q.    Who did you provide that project for?

14         A.    From what I recall, SBM Management.

15         Q.    Okay.

16              MR. UNGAR:  Objection.  Objection as to the

17    form of the question.  It misstates the previous

18    testimony of the witness, it's vague and ambiguous,

19    it's badgering, and it's argumentative.

20    BY MS. ROBINSON:

21         Q.    Who did you speak to or with at SBM about

22    the project?

23         A.    SBM -- can you ask the question again --

24         Q.    Sure.

25         A.    -- 'cause I'm --

1      Q.    Who did you speak to at SBM Management about

2      the projects that you described?

3      A.    What do you mean "speak to"?  Speak to about

4      life or business or what?

5      Q.    About the project that you just described.

6      A.    About the AuraVie.com?

7      Q.    Yes.

8      A.    AuraVie.com project?  I don't remember

9      exactly who was -- it was most likely some of or all

10     of the -- because I don't know exactly who, I'm

11     going to say I don't remember who I spoke to, but

12     this project, AuraVie.com straight sale, was

13     requested to by the client.

14     Q.    And your testimony is the client was SBM

15     Management?

16     A.    Oh, yes.

17     Q.    Right.

18           Do you -- do you know why Adageo paid you

19     for a project you performed for SBM Management?

20     A.    I have no idea.

21           MR. UNGAR:  Objection as to the form of the

22     question.  It's vague and ambiguous, misstates the

23     prior testimony of the witness, it's argumentative,

24     and it's badgering.

25     ///

1    BY MS. ROBINSON:

2        Q.    You just testified that you provided the

3    AuraVie.com web page IT services for SBM Management;

4    is that correct?

5        A.    SBM Management wasn't my client.

6        Q.    Yes.

7              Did you ever provide any other IT services

8    or business services to SBM Management?

9        A.    Possibly.

10             MR. UNGAR:   Objection as to the form of the

11   question.   It's vague and ambiguous.

12   BY MS. ROBINSON:

13       Q.    Do you remember any other projects you

14   provided for SBM Management?

15       A.    No, I don't.   I already stated that I don't.

16   I told you that I don't recall the exact services I

17   gave, but -- but a website AuraVie.com was a service

18   that I did provide.

19       Q.    Have you ever worked for a company that

20   provided IT services to Focus Media Solutions?

21       A.    Yes.

22       Q.    What kind of services did you provide to

23   Focus Media Solutions?

24       A.    Hosting, consultation, insurance, leads,

25   related stuff.   Life insurance.   Yeah.

```
1        Q.   Did you ever provide any IT services for

2   Focus Media Solutions relating to skin care

3   products?

4        A.   No.

5        Q.   Did you ever work for a company that

6   provided IT services to Agoa Holdings, Inc.?

7        A.   No.

8        Q.   Did you ever work for a company that

9   provided IT services to Zen Mobile Media, Inc.?

10       A.   No.

11       Q.   Did you ever work for a company that

12   provided IT services to Safehaven Ventures, Inc.?

13       A.   I don't recall.

14       Q.   Did you ever work for a company that

15   provided IT services to Heritage Alliance Group,

16   Inc.?

17       A.   I don't recall.

18       Q.   Did you ever work for a company that

19   provided IT services to AMD Financial Network, Inc.?

20       A.   I don't recall.

21       Q.   Did you ever work for a company that

22   provided IT services to Kai Media, Inc.?

23       A.   I don't recall.

24       Q.   Did you ever work for a company that

25   provided IT services to Insight Media, Inc.?
```

74

1       A.   Don't recall.

2       Q.   Did you ever work for a company that

3    provided IT services to DMA Holdings, Inc.?

4       A.   I don't recall.

5       Q.   Did you ever work for a company that

6    provided services, IT services, to DSA Holdings,

7    Inc.?

8       A.   I don't recall.

9       Q.   Did you ever work for a company that

10   provided services to Lifestyle Media Brands, Inc.?

11      A.   Don't recall.

12      Q.   Did you ever work for a company that

13   provided services, IT services, to USM Products,

14   Inc.?

15      A.   Don't recall.

16      Q.   Did you ever work for a company that

17   provided IT services to Merchant Leverage Group,

18   Inc.?

19      A.   Don't recall.

20      Q.   Did you ever work for a company that

21   provided IT services to Shalita Holdings, Inc.?

22      A.   Don't recall.

23      Q.   Did you ever work for a company that

24   provided services to All Star Beauty Products, Inc.?

25      A.   Don't recall.

1       Q.    Did you or Secured Merchants ever contest

2    consumer chargebacks for AuraVie products?

3            MR. PARIKH:  I'm going to object as to the

4    word "contest."

5            THE WITNESS:  Yeah.

6    BY MS. ROBINSON:

7       Q.    Did Secured Merchants ever provide any IT

8    services related to consumer chargebacks for AuraVie

9    products?

10      A.    Can you repeat that question a little

11   slower?

12           MS. ROBINSON:  Would you mind --

13           THE WITNESS:  A little slower?

14           MS. ROBINSON:  -- reading it slower than I

15   said it.

16           (The previous question was read back

17            by the court reporter as follows:

18              "QUESTION:  Did Secured Merchants

19            ever provide any IT services related

20            to consumer chargebacks for AuraVie

21            products?")

22           THE WITNESS:  Yes.

23   BY MS. ROBINSON:

24      Q.    What were those services?

25      A.    Those services allowed the customer to

76

 1    review bank documents that came into their

 2    repository, storage, or system.  It allowed them to

 3    review the bank documents.  I assume some were

 4    chargeback, but I'm not -- not only chargebacks.

 5    Determine if there were any mistakes for customers,

 6    determine if there were any fraud, determine what

 7    the bank is asking for.  Basically, review the

 8    documents that they received from the bank and

 9    respond accordingly.  After reviewing, to -- in

10    order to ensure and to protect the customer's bank

11    interest and -- best interest, and to also -- and

12    also to fulfill their obligation with the banks that

13    send these documents, so I -- we provided a review

14    portal so they can transmit back via fax the

15    document to the bank.

16        Q.   Did -- when you say in that description,

17    when you say customer, you meant the customer, as in

18    the company that was selling the product and

19    receiving the chargeback, not the customer who

20    purchased?

21        A.   Well, I mean, it was kind of a lengthy

22    answer, so I'm not sure.

23        Q.   Okay.

24        A.   So let me make it a little shorter.

25             Basically, the client, which would be SBM

1    Management in this case, would be able to review

2    documents and respond only -- respond more correctly

3    and accurately, accurately; therefore, ensuring and

4    protecting the integrity of the response to -- back

5    to the banks, which makes it more accurate.

6        Q.    Did that program have a name?

7        A.    Yes.

8        Q.    The program that you --

9        A.    Yes.

10       Q.    What was it called?

11       A.    Secured Merchants.

12       Q.    It was called Secured Merchants program?

13       A.    Well, did the program have a name?  It was

14   the name of a service that I -- that I have in

15   Secured Merchants, and I described the service to

16   you, but --

17       Q.    Yes.

18             Did you provide that service to any other

19   companies, besides SBM Management, Inc.?

20       A.    Yes.  So this was an up and coming service,

21   and it was provided -- it was in its infancy.  So I

22   was developing it to make sure it's good, friendly

23   system, and I was able to have a few clients on it,

24   yeah.  I had -- to answer your question, yes, there

25   were more clients on the system and -- and more were

78

1    looking forward to sign up.

2        Q.   What is Chargeback Armor?

3        A.   It's similar to what I just described.

4        Q.   Okay.  Do you know who designed Chargeback

5    Armor?

6             MR. PARIKH:  Objection; vague.

7             THE WITNESS:  I don't understand the

8    question.

9    BY MS. ROBINSON:

10       Q.   Do you know who -- scratch that.

11            So you know what Chargeback Armor is;

12   correct?

13       A.   The way you're stating it --

14       Q.   Mm-hmm.

15       A.   -- I would have to say no.

16       Q.   Okay.

17       A.   Are you -- I mean, I'm not going to ask

18   questions for you, but the way you're stating it, I

19   have to say no.

20       Q.   Okay.  If we can look back at Exhibit 184.

21   Would you -- I've handed it to you.

22       A.   Okay.

23       Q.   It's going to say 184 at the bottom.  It was

24   an email from you to Alon.  It looks like this

25   (indicating).

79

1     A.    Okay.  Go ahead.

2     Q.    Should be in your stack there.

3     A.    Go ahead.

4     Q.    Down at the bottom of it, the last full

5  paragraph, I guess, it says excited about sales call

6  and boarding of the first customer for Chargeback

7  Armor.  And then it says, "as you mentioned" -- and

8  again, this email is written to you.  So "as you

9  mentioned, we need to have a meeting in order to

10  discuss a few points with respect to the launch of

11  these companies."

12          Do you know what this email is about?

13     A.    You want to point me where -- where you --

14  okay.  Okay.  I will read it.

15     Q.    Okay.  Yeah, please.  Take your time.

16     A.    Okay.  Go ahead.

17     Q.    Okay.  So do you know what this paragraph is

18  talking about when it says "the boarding of the

19  first customer for Chargeback Armor"?

20          MR. PARIKH:  Object.  Calls for speculation.

21          THE WITNESS:  Well, it says that -- how can

22  I know what it says if I didn't write it?  So I

23  guess I would say no, I don't know what he meant by

24  that.

25  ///

555 - 23                              EXHIBIT 555

118

1    'cause I know that they did business under these

2    names, but --

3        Q.    So you know -- you know that, and when you

4    say "they," who do you mean?

5        A.    SBM Management.

6        Q.    Okay.

7        A.    Yeah.

8        Q.    Do you know that SBM Management did business

9    selling a product called AuraVie?

10       A.    I believe so.

11       Q.    Okay.  Do you have any idea why SBM

12   Management had so many websites?

13            MR. PARIKH:  Objection; calls for

14   speculation.

15            MR. UNGAR:  Join.

16            THE WITNESS:  I don't have any idea why a

17   client had so many website.  I don't know if it's so

18   many.  That's what you're saying.

19   BY MS. ROBINSON:

20       Q.    Do you -- does it seem like a lot of

21   websites to you?

22       A.    Not necessarily.

23       Q.    During the time that you were providing

24   chargeback services to SBM, were you aware that they

25   were selling their skin care products by risk free

1    trial offer?

2           MR. PARIKH:  Objection; assumes facts not in

3    evidence.

4           THE WITNESS:  I can't answer your question

5    correctly.

6    BY MS. ROBINSON:

7       Q.   Okay.  Why not?

8       A.   I don't necessarily know what risk free

9    trial is.

10      Q.   Okay.  When you used the term before, what

11   did you mean?

12      A.   I -- I used it as an option that I don't

13   provide in my software the ability to do.  What

14   exactly it means in the scope of the business, I

15   don't know.

16      Q.   Okay.  Well, in the context that -- using

17   the definition that you meant when you said it, were

18   you aware that SBM Management was selling skin care

19   products by risk free trial?

20      A.    When I say that, I say that in scope of

21   technical terms.  In technical term, I don't know.

22   I mean, they were using Lime Light, so Lime Light

23   probably supports it.  I'm not sure if they went

24   that route or not.  I -- I didn't put my nose in

25   their business.

1      A.    That's not what I said.

2      Q.    Okay.

3      A.    In regards to this question, when you asked

4    me about a risk free trial.

5      Q.    Mm-hmm.

6      A.    I told you that I don't support it, and you

7    asked me what I think it is.  And I told you on

8    technical terms we don't -- we don't support

9    anything but straight sale.  I suppose that Lime

10   Light does offer other kinds of services, whether

11   they're trials or risk trials or non-risk trials

12   or -- they have abilities, the other CRM, to support

13   many, many different types of offers.  But that's --

14   I mean, I --

15     Q.    What is ClickConnector?

16           MR. PARIKH:  Objection; asked and answered.

17           THE WITNESS:  Yeah, I answered you already

18   what it is.  I'll answer again.  It's an API

19   connector.

20   BY MS. ROBINSON:

21     Q.    And it's your testimony earlier that

22   ClickConnector connected with Lime Light, connected

23   to Lime Light?

24     A.    Is that -- is that what you're saying that I

25   said?

128

1    my age I can't really see too well, but -- but --

2    but it does look a little bit -- I -- I think I need

3    to look for some glasses to -- to -- yeah.  So I can

4    see better, but it does -- it does look like a

5    ClickConnector type of a page.

6         Q.   And I'm going to hand you Exhibit 188 and

7    189 at the same time because I believe they are

8    similar to --

9         A.   Okay.  So what is your question here?

10        Q.   Okay.  I'm going to hand them both to you.

11        A.   Okay.

12             (Plaintiff's Exhibits 188 and 189

13             were previously marked for

14             identification by the FTC and are

15             attached hereto.)

16   BY MS. ROBINSON:

17        Q.   Are these both, 188 and 189, both also a

18   view --

19        A.   Yes.

20        Q.   -- in ClickConnector?

21        A.   Would you like me to explain to you?

22        Q.   Yes.

23        A.   Okay.  Good.

24             So this Exhibit 189 is, looks like a

25   sophisticated graphs and pie charts, and it looks

129

1    really neat.  Unfortunately, none of it ever worked

2    and it's just dummy graphs that we're now looking.

3    And I used it as a placement to make it look good,

4    but they never -- they never worked.

5           So if you click on them, they don't work,

6    the numbers don't move.  It's static information

7    that doesn't move or work.  It's for look purposes

8    only.  In fact, it was taken from a template on the

9    Internet that -- that it was copied from.

10   Q.   Okay.

11   A.   Yeah.

12   Q.   That's Exhibit 189.

13   A.   Sure.

14   Q.   What about 187 and 188?

15   A.   So 188 is Lime Light information displayed

16   in a I-frame, so it's information that is from Lime

17   Light.

18   Q.   Okay.  So did you provide this

19   ClickConnector overlay to SBM Management?

20   A.   I believe so, yes.

21   Q.   And when I say "you," I mean Secured

22   Merchants, so --

23   A.   Sometimes I don't know what you mean, so --

24   Q.   Okay.  In that context --

25   A.   -- this time I meant --

130

1      Q.    Yeah.

2            In that context I meant Secured Merchants.

3      A.    Okay.

4      Q.    So did you have access -- did Secured

5    Merchants have access to this information?

6      A.    This is my client's information, not my

7    information.

8      Q.    So did Secured Merchants have access to it?

9      A.    I don't know.  I never accessed it.

10     Q.    Did you provide any services related to --

11   strike that.

12           Did you provide any IT services related to

13   the Customer Service Department at the AuraVie

14   companies?

15           MR. PARIKH:  Objection; vague and ambiguous

16   as to "AuraVie companies."

17   BY MS. ROBINSON:

18     Q.    Did you --

19     A.    Yeah.  I mean, the whole question --

20     Q.    Did Secured Merchants provide any IT

21   services to the Customer Service Department for SBM

22   Management?

23     A.    I believe all the services we talked to

24   until now are somewhat related to Customer Service.

25   I mean, I don't know how they work or how they come

131

1    into Customer Service or what is Customer Service

2    and what isn't.  That's something you should ask

3    them.

4        Q.   Did you ever discuss SBM Management with

5    Doron Nottea?

6        A.   No.

7        Q.   Did you ever discuss any of the IT services

8    you were providing to SBM Management with Doron

9    Nottea?

10       A.   No.

11       Q.   Okay.  Did you ever -- did you ever discuss

12   any IT services that Secured Merchants was providing

13   to SBM Management with Doron Nottea?

14       A.   No.

15       Q.   Did you ever discuss AuraVie products with

16   Doron Nottea?

17       A.   No.

18       Q.   Do you know if Doron Nottea provided

19   accounting services to SBM Management?

20       A.   No.

21       Q.   Do you know if Doron Nottea provided

22   accounting services to any of the companies that

23   sold the AuraVie products?

24       A.   I'm not sure.

25            MS. ROBINSON:  If we could take a ten minute

**555 - 30**                                    **EXHIBIT 555**

1

2

3     I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6     That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14     I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17     IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____

21

22

23  _____

24     CHRISTINA KIM-CAMPOS, CSR

25     CERTIFICATE NO. 12598

1

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5     FEDERAL TRADE COMMISSION   )

6            Plaintiff           )

7        v.                      ) No. CV 15-4527-GW(PLAx)

8     BUNZAI MEDIA GROUP, INC., )

9     et al.,                    )

10            Defendants.        )

11

12

13

14                     Wednesday, February 17, 2016

15

16                     10877 Wilshire Boulevard

17                     Suite 700

18                     Los Angeles, California

19

20

21

22         The above-entitled matter came on for

23    deposition, pursuant to Notice, at 9:02 a.m.

24

25

**556 - 1**                                    **EXHIBIT 556**

2

1                  UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5    FEDERAL TRADE COMMISSION   )

6            Plaintiff          )

7       v.                      ) No. CV 15-4527-GW(PLAx)

8    BUNZAI MEDIA GROUP, INC., )

9    et al.,                    )

10           Defendants.        )

11

12

13

14

15           DEPOSITION OF NASTASSIA YALLEY, taken on

16   behalf of the Federal Trade Commission, at

17   10877 Wilshire Boulevard, Suite 700, Los Angeles,

18   California, commencing at 9:02 a.m., and concluding

19   at 3:07 p.m., on Wednesday, February 17, 2016,

20   pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21   CSR No. 12598, a Certified Shorthand Reporter, in

22   and for the State of California.

23

24                           ***

25

7

```
 1                    LOS ANGELES, CALIFORNIA

 2              WEDNESDAY, FEBRUARY 17, 2016

 3                       9:02 A.M.

 4

 5                    NASTASSIA YALLEY,

 6          called as a witness by and on behalf of

 7          the Plaintiff, being first duly sworn,

 8          was examined and testified as follows:

 9

10          MR. TEPFER:  And, Robert, just to check, are

11   you there?

12          MR. UNGAR:  Yeah.  Robert Ungar.

13

14                      EXAMINATION

15   BY MR. TEPFER:

16      Q.   Good morning, Ms. Yalley.  My name is Reid

17   Tepfer, and this is Luis Gallegos.  We're attorneys

18   with the Federal Trade Commission.  We represent the

19   FTC in FTC vs. BunZai Media Group, pending in the

20   Central District of California.

21      A.   Uh-huh.

22      Q.   First I should ask, do you understand that

23   you're under the same oath as if you were in the

24   courtroom?

25      A.   Yes.
```

13

1      Q.    What did it change its name to?

2      A.    Well, sorry.  I'm confused by that.  Like

3   they started a new company.  I don't think --

4      Q.    Okay.

5      A.    -- they changed the name.

6      Q.    What was the new company?

7            MR. UNGAR:  Move to strike.  Move to strike

8   as nonresponsive.

9   BY MR. TEPFER:

10     Q.    Okay.  What was the name of the new company

11   that they started?

12     A.    Media Urge.

13     Q.    And who started it?

14     A.    I don't know.  I think Alon.

15     Q.    So I just want to talk for a moment about

16   your -- people that may have been your coworkers.

17     A.    Do you want a cough drop?

18     Q.    Sure.  Thank you.

19     A.    Yeah.

20     Q.    Sorry I'm coughing.

21     A.    No, it's okay.

22     Q.    So who were your supervisors at BunZai Media

23   Group?

24     A.    Khristopher and Alon.

25     Q.    And is that Khristopher Bond?

**556 - 4**                                        **EXHIBIT 556**

14

1      A.    Yes.

2      Q.    And Alon Nottea?

3      A.    Yes.

4      Q.    I want to see if other people also worked

5    with you.

6            Did Paul Medina ever work with you at BunZai

7    Media Group?

8      A.    Yes, he did.

9      Q.    What was his position there?

10     A.    Khristopher brought him in as an intern, at

11   first, and then he kind of moved into a different

12   role.  He did internal media buying, merchant

13   accounting, and then other things.  I wouldn't know.

14     Q.    Sure, sure.

15           What about --

16           MR. UNGAR:  Counsel, let the record reflect

17   that Alon Nottea is present.

18           MR. TEPFER:  Okay.  Thank you.

19           MR. UNGAR:  Okay.

20   BY MR. TEPFER:

21     Q.    What about Alan Argaman?

22     A.    I don't know.

23           MR. TEPFER:  Oh, sorry.  We have someone

24   calling in here.  If you can hold real quick,

25   Robert.

15

1          MR. GALLEGOS:  Do you want to go off the

2    record?

3          MR. TEPFER:  Yeah.  If we could go off the

4    record real quick.

5          (Jeffrey Benice joins the proceedings.)

6          MR. TEPFER:  All right.  We can go back on

7    the record.

8          Would you mind reading what the last

9    question was.

10         (The previous question and answer

11          were read back by the court reporter

12          as follows:

13             "QUESTION:  What about Alan

14          Argaman?"

15             "ANSWER:  I don't know.)

16   BY MR. TEPFER:

17    Q.   What about Roi Reuveni; was he a coworker of

18   yours at BunZai Media Group?

19    A.   Yes.

20    Q.   Do you recall what Roi Reuveni's position

21   was at BunZai Media Group?

22    A.   He was in charge of Customer Service.

23    Q.   Anything else?

24    A.   I can't remember.

25    Q.   Do you recall when he was hired for that

**556 - 6**                              **EXHIBIT 556**

1    Customer Service position?

2        A.    No, I don't.

3        Q.    Was Roi Reuveni employed by BunZai Media

4    Group the entire time that you worked there?

5             MR. UNGAR:  Objection; vague and ambiguous,

6    calls for speculation, lacks foundation.

7    BY MR. TEPFER:

8        Q.    So you said no.  Does that mean that he --

9    was he hired after you?

10       A.    Yes.

11            MR. UNGAR:  Objection as to the form of the

12   question, vague and ambiguous.

13   BY MR. TEPFER:

14       Q.    And did he, was he still, to your knowledge,

15   employed at BunZai Media Group when you left the

16   company?

17       A.    Yes.

18       Q.    What about Doron Nottea; was he a coworker

19   of yours at BunZai Media Group?

20       A.    Not -- no, not technically.

21       Q.    When you say "not technically," what do you

22   mean?

23            MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous.

25            THE WITNESS:  Just don't answer?

1    BY MR. TEPFER:

2        Q.    Yeah, you can go ahead.

3        A.    He wasn't an employee.

4        Q.    But did he do any work for BunZai Media

5    Group?

6             MR. UNGAR:   Objection as to the form of the

7    question, vague and ambiguous, calls for

8    speculation, lacks foundation.

9             THE WITNESS:   Yes.

10   BY MR. TEPFER:

11       Q.    I'm sorry.   Could you repeat the answer?

12       A.    Yes.

13       Q.    What sort of work did he do for BunZai Media

14   Group?

15       A.    Accounting.

16            MR. UNGAR:   Objection as to the form of the

17   question, calls for speculation, lacks foundation.

18   BY MR. TEPFER:

19       Q.    Can you repeat the answer?

20       A.    Accounting.

21       Q.    And when you say "accounting," what do you

22   mean?

23       A.    Consulting, I guess.

24       Q.    And what period of time did Doron do this

25   accounting work, consulting for BunZai Media Group?

18

1      A.   I guess the whole -- at least the whole time

2    I was there.

3      Q.   And when you say "consulting," what do you

4    mean by that?  What sort of things did Doron consult

5    about?

6      A.   I'm not sure.  I can't say.  I wasn't

7    involved in every conversation.

8      Q.   Were --

9           MR. UNGAR:  Move to strike.  Move to strike

10   all prior testimony with regard to Doron and

11   accounting and consulting on the grounds that the

12   witness lacks personal knowledge, it's all

13   speculation, and it lacks foundation.

14   BY MR. TEPFER:

15     Q.   And so just speaking about any conversations

16   that you may have been a part of, what sort of tasks

17   do you know Doron to have performed for BunZai Media

18   Group?

19     A.   I don't -- I can't say.

20     Q.   You can't recall any tasks that Doron did?

21     A.   I just said accounting.

22          MR. UNGAR:  Objection.  Objection as to the

23   form of the question, asked and answered.  Witness

24   just testified she can't say, doesn't know.  And

25   it's argumentative.

**556 - 9**                                      **EXHIBIT 556**

1    BY MR. TEPFER:

2        Q.   Can you repeat your answer?

3        A.   I -- I can't say.

4        Q.   So talking about accounting, does that

5    include -- as far as accounting, does that include

6    calculations of Bunzai Media Group's profits, for

7    example?

8            MR. UNGAR:   Objection as to the form of the

9    question, calls for speculation --

10           THE WITNESS:   Maybe.

11           MR. UNGAR:   -- lacks foundation.

12   BY MR. TEPFER:

13       Q.   Sorry.   Just to clarify, if you could wait

14   'til after the attorney completes his objection to

15   answer.

16       A.   Oh, okay.

17           Maybe.

18       Q.   What about Motti Nottea; was he ever a

19   coworker of yours at --

20       A.   No.

21       Q.   Okay.   And Alon Nottea?

22       A.   He was my boss.

23       Q.   Okay.   I want to talk a little bit about

24   BunZai Media Group's business.   Do you recall what

25   BunZai Media Group's chief source of revenue was

1    during the time that you worked there?

2        A.   AuraVie SkinCare.

3        Q.   And do you recall how those products were

4    sold?

5        A.   Yes.  Online.

6        Q.   And do you recall that they were sold by

7    risk free trial?

8        A.   Yes.

9        Q.   I want to talk about a company called

10   Pinnacle Logistics, Inc.

11            Do you know that company?

12       A.   I've heard of it, yes.

13       Q.   Where did you hear about it?

14       A.   That was, like, the Customer Service

15   company.

16       Q.   And it was the Customer Service company for

17   what?

18       A.   For AuraVie.

19       Q.   Do you know where it was located?

20       A.   In the same building.

21       Q.   And do you know what DSA Holdings, Inc., is?

22       A.   A corporation.

23       Q.   Do you know what that corporation's business

24   is or was?

25       A.   No.

1 Q. What about Zen Mobile Media, Inc.; do you

2 know what that company is?

3 A. Yeah.  They're all corporations that were,

4 had merchant accounts.

5 Q. So those companies I'm describing, they had

6 merchant accounts?  What do you mean by that?

7 A. They were -- they had -- I don't know how

8 else to explain it.  They had -- I don't know.

9 They -- I don't -- I don't know how to explain it.

10 They had merchant accounts under them, so --

11 Q. So --

12 A. -- in order to process money.

13 Q. So were these companies, DSA Holdings and

14 Zen Mobile Media, were those companies owned by

15 BunZai Media Group, Inc.?

16 A. No, I don't think so.

17 Q. Do you know who owned Zen Mobile Media,

18 Inc.?

19 A. I forgot.

20 Q. Do you know if Alon Nottea had any

21 association with Zen Mobile Media, Inc.?

22 A. In what --

23 MR. UNGAR:  Objection as to the form of the

24 question.  It's vague and ambiguous.

25 ///

    **EXHIBIT 556**

1    BY MR. TEPFER:

2        Q.   Do you know if Alon Nottea ever worked for

3    Zen Mobile Media, Inc.?

4        A.   I don't know.

5            MR. UNGAR:   Objection as to the form of the

6    question, it calls for speculation and lacks

7    foundation, it's vague and ambiguous.

8    BY MR. TEPFER:

9        Q.   You can go ahead.

10       A.   No, I don't know.   I don't.

11       Q.   And when you said that they, they had

12   merchant accounts under their name, what were these

13   merchant accounts used for?

14       A.   For processing money --

15           MR. UNGAR:   Objection.

16           THE WITNESS:   -- for sales.

17           MR. UNGAR:   Objection as to the form of the

18   question.   It's vague and ambiguous, it lacks

19   foundation, and it calls for speculation.

20   BY MR. TEPFER:

21       Q.   You can go ahead.

22       A.   Processing money.

23       Q.   Processing money from the sale of products?

24       A.   Yes.

25       Q.   And sale of what products?

1       A.   AuraVie SkinCare.

2       Q.   Did you ever do any work for Zen Mobile

3    Media, Inc.?

4       A.   No.

5            MR. UNGAR:   Objection as to the form of the

6    question.   It's vague and ambiguous.

7    BY MR. TEPFER:

8       Q.   How do you know that Zen Mobile Media, Inc.,

9    had a merchant account that was used to process

10   AuraVie SkinCare product sales?

11      A.   I -- I just know.   I don't know.

12      Q.   Did you ever -- did someone tell you that?

13      A.   No.   We all applied for those merchant

14   accounts, so --

15      Q.   Who is -- when you say "we all," who are you

16   referring to?

17      A.   As a company.

18      Q.   So BunZai Media Group applied for those

19   merchant accounts?

20      A.   No, not BunZai Media Group.   No, not as

21   BunZai Media Group.   I guess I need to understand.

22   Do you -- like, you know, how this works, you apply

23   for a merchant account under a different

24   corporation, so --

25           MR. UNGAR:   Move -- move to strike as

24

1      nonresponsive.

2      BY MR. TEPFER:

3          Q.   I'd like to understand what you mean by

4      that.  So you're telling me that -- you're referring

5      to the sale of, I guess, continuity products?

6          A.   Any products you would need a merchant

7      account for selling online.

8          Q.   So to sell online, you have to have a

9      merchant account?

10         A.   Yes.

11         Q.   And I guess in the sale of AuraVie products,

12     you all had multiple merchant accounts?

13         A.   Yes.

14         Q.   And to sell these -- sorry.  To get

15     additional merchant accounts, you need additional

16     corporations; correct?

17         A.   Yes.

18         Q.   And so there were -- so who -- who told you

19     that multiple merchant accounts were needed for the

20     sale of these products?

21         A.   I guess --

22              MR. UNGAR:  Objection.  Objection as to the

23     form of the question, misstates the prior testimony

24     of the witness, it's leading, it's argumentative,

25     lacks foundation, and calls for speculation.

1    to hear.

2         MR. TEPFER:  No, I'm good, thank you.

3    BY MR. TEPFER:

4        Q.   Did you, while you were at BunZai Media

5    Group, did you help prepare any of the merchant

6    account applications for any of these other entities

7    that we just discussed?

8        A.   Yes.

9         MR. UNGAR:  Objection as to the form of the

10   question, vague and ambiguous.

11   BY MR. TEPFER:

12       Q.   Who directed you to fill out those

13   applications?

14       A.   My bosses.

15       Q.   And just to be more specific, could you name

16   which individuals?

17       A.   Alon and Khris.

18       Q.   Did Doron ever direct you to fill out any of

19   this?

20       A.   I don't remember.

21       Q.   Are you aware of any of the entities that

22   sold AuraVie products ever having any issues with

23   high chargebacks?

24        MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous, lacks

34

1     A.   Yes.

2     Q.   What sort of reports did you prepare?

3     A.   Accounting reports, profit and loss reports,

4   bank account statement reports, where money went.

5     Q.   Do you know why Doron Nottea -- or why --

6   sorry.

7     A.   They weren't for him specifically, no.

8     Q.   What --

9     A.   For the company.

10    Q.   Sure.

11      So those were prepared for BunZai -- you

12  said prepared for the company, and the company is?

13    A.   Meaning, like, Alon and Khris, so they would

14  know what happened to --

15      MR. UNGAR:  Move -- objection as to the form

16  of the question.  It's vague and ambiguous, it

17  misstates the prior testimony.  Move to strike the

18  response as nonresponsive.

19  BY MR. TEPFER:

20    Q.   And who asked you to prepare those reports?

21    A.   Again, my bosses.  Just a part of the job.

22  Also, Igor too.

23    Q.   Igor Latsanovski?

24    A.   Yes.

25    Q.   Do you -- did you ever send those reports to

35

1      Igor Latsanovski?

2          A.    Yes.

3          Q.    Do you know if he reviewed those reports?

4          A.    Yes, he did.

5          Q.    How do you know that?

6          A.    Because he would sit down next to me and we

7      would go through them, every line item.

8          Q.    Oh, really?

9          A.    (Witness shakes head up and down.)

10         Q.    Was he, I guess -- did he pay -- well, I

11     guess, just to talk about Igor Latsanovski a bit

12     more since you brought him up, did he work at BunZai

13     Media Group?

14         A.    He didn't work there, no.

15             MR. UNGAR:   Objection as to the form of the

16     question.   It's vague and ambiguous.

17             Counsel, you've got to define when you say

18     the word "he," "him," "his," who are you referring

19     to?   You've gone from Doron Nottea -- now you're --

20     I don't know where you are.

21             MR. TEPFER:   Counsel, please --

22             MR. UNGAR:   Who are you referring to?

23             MR. TEPFER:   Counsel, please limit your

24     objections to --

25             MR. UNGAR:   My objection is it's vague and

51

```
1    going to let it play a little bit past that.  I have

2    some more questions after that.

3        A.    Okay.

4              (The recording is played:

5                  "We have 2,000 and 1, 4, we have

6              50 people.  We have three people on

7              one line.  I want to know how many of

8              those because each one is going to

9              get a different free gift from me.

10             This is the thing.  I'm going to get

11             a guy.  He's going to sit.  He's

12             going to get a very, very -- I know

13             in advance he's going to have a very,

14             very, very, very low contact ratio.

15             He's going to talk to 700 people.

16             But I'm going to call back my

17             chargebacks.  I'm going to talk to

18             them.  I'm going to say we are a

19             third party company hired by BunZai

20             Media, or by the company who sold you

21             AuraVie, to figure out what they did

22             wrong.  What did they do wrong?  Why

23             did they charge them back?  Did you

24             call?  Did you try to call?  Was the

25             cancellation wrong?  Did they fuck
```

```
 1          you?  Did you feel misled?  Did you

 2          feel like you're an idiot?  Do you

 3          like that?  Yeah.  Yeah.  Very low

 4          contact ratio.  But out of the

 5          thousand people you'll talk to, out

 6          of the 10,000 phone calls you make,

 7          you'll know if you document it and

 8          it's documented and you have reports

 9          back from them.  And the FTC comes to

10          me, I'm telling them, listen, I'm

11          calling back my chargebacks and see

12          what I did wrong?  Do you know how

13          that looks?  Number 1, I'm really...

14          and Number 2, I'm being proactive...

15          I mean...we're going to call all of

16          our chargebacks, and say we are a

17          third party...Google, Google docs,

18          you have four... like you have a

19          spreadsheet...you know what might be

20          easier is just setting up a quick

21          poll and maybe emailing it to some of

22          these people... also good.  Also

23          good.  Because it's easier than

24          calling someone.  If someone...it's

25          digital...yeah, yeah, yeah.  She's
```

53

```
 1            talking about...emailing all those

 2            chargebacks.  Hey, you want to get a

 3            free moisturizer... yeah, or a five

 4            dollar gift card or something like

 5            that... I create the link...do you

 6            have to take the service...we pull

 7            the history for the last year and all

 8            their email addresses are right

 9            there, so it's, we can get ahold of

10            everyone right there...email and also

11            try a little bit of phone because I

12            want to have...I want to have a

13            hundred call people recording...but I

14            want to have a hundred call folder so

15            that later on in two years when I

16            have an FTC, here, here, here, I'm

17            proactive.  It's like -- it's like a

18            folder.  Here you go.  Here's

19            everything.  Your file recordings.

20            Look at everything.  Look at what

21            we're doing to be proactive for our

22            consumer.  Okay.  Number 1, it's

23            really going to give us some answers,

24            and Number 2, it's going to make us

25            look amazing.")
```

54

1    BY MR. TEPFER:

2       Q.    So is this Alon Nottea -- first of all, I

3    just want to check.  Did you hear the statement "I

4    want to have a hundred call folder, so that later on

5    in two years when I have an FTC, here, here, here,

6    I'm proactive.  Look at what we're doing to be

7    proactive for our consumer.  Okay.  Number 1, it's

8    really going to give us some answers, and Number 2,

9    it's going to make us look amazing"?  Did you hear

10   that statement?

11      A.    Yes.

12            MR. UNGAR:   Objection as to the form of the

13   question, vague and ambiguous, compound,

14   unintelligible.

15   BY MR. TEPFER:

16      Q.    Do you know who made that statement?

17      A.    Yes.

18      Q.    Who was it?

19      A.    Alon.

20      Q.    And did you recognize the individual who

21   stated that they were going to help build a form?

22      A.    I -- build a form?

23      Q.    Yeah.  And I can replay that, but did you

24   hear any other individuals speaking on that --

25      A.    Yes.

1    BY MR. TEPFER:

2        Q.   And sorry.  This is a tough one, so I'm

3    going to -- there's a little bit of typing noise

4    there, so I'm going to replay it again.  We're

5    starting at 1741 -- or rather -- sorry -- starting

6    at 1808.

7               (The recording is played:

8               "One more note...We must try 500

9               orders with the terms and conditions

10              on the invoice for customers.  It's

11              completely illegal to not have that

12              there, at least.")

13   BY MR. TEPFER:

14       Q.   So did you hear that statement, "We must try

15   500 with the terms and conditions on the invoice for

16   the customers.  It's completely illegal to not have

17   it there, at least"?

18       A.   Yes.

19       Q.   And who was that speaking, if you know?

20       A.   Alon.

21       Q.   And do you know what he's referring to?

22       A.   The terms and conditions.

23       Q.   And he -- were those terms and conditions,

24   while you worked at BunZai, were those placed on the

25   invoice sent to the cus- -- included in the risk

1    free trial sent to consumers?

2        A.   Do you mean after this?

3             MR. UNGAR:   Objection.   Objection as to the

4    form of the question.   It's vague and ambiguous.

5    BY MR. TEPFER:

6        Q.   Sure.   Let's talk about before -- before

7    this meeting.

8        A.   Honestly, I don't remember.

9        Q.   All right.   I'm starting the recording

10   again.   It's at 1822.

11            (The recording is played:

12                 "We're not getting a check box.

13            When the consumer gets the product at

14            home, the packing slip, it can be a

15            little bit grayed out.   It doesn't

16            have to be huge.   You can make the

17            'for Customer Service inquiries and

18            questions, call 1-800" big, and below

19            that, the terms.")

20   BY MR. TEPFER:

21       Q.   Did you hear the statement, "We're not

22   getting a check box.   When the consumer gets the

23   product at home, the packing slip, it can be a

24   little bit grayed out.   It doesn't have to be huge.

25   You can make the 'For Customer Service inquiries and

1    questions, call 1-800" big, and below that, the

2    terms"?

3             Did you hear that statement?

4    A.    Yes.

5    Q.    And do you know who is speaking?

6    A.    Alon.

7    Q.    All right.  Starting at 18 minutes and 34

8    seconds.

9             (The recording is played:

10            "The best way to see who's doing

11            that...order his product...yeah.

12            Yeah, yeah, yeah... order...yeah.

13            Don't use...even though it's going to

14            go through...yeah... use a credit

15            card...  I want to see our calls...is

16            that going to be easy to do, to print

17            out specific labels for the campaign?

18            No, no, no, no, no, no, no.  What I'm

19            saying is, what I'm saying is that

20            the problem is not with shipping

21            it... I can take 500 bucks

22            but...yeah...the question is how are

23            we gauging it... if we do a separate

24            complaint, later on, a month from

25            now, you're going to filter that

98

```
 1              complaint.  You'll see 500.  You'll

 2              see how many people called...more

 3              people called...less people

 4              call...Exactly.  That's why I say

 5              separate complaint in limelight.  No,

 6              but I'm talking about when it goes

 7              into commerce pack...yeah, yeah,

 8              yeah...ship out...have to be

 9              separate")

10   BY MR. TEPFER:

11     Q.   I'm just going to pause it real quick.

12          Was that you that referenced Commerce Pack

13   in there?

14     A.   Yes.

15     Q.   What is Commerce Pack?

16     A.   It was the back end of AuraVie.com.

17     Q.   And when you say "the back end," what do you

18   mean?

19     A.   To how they manage orders.

20     Q.   It's like an order, like a --

21     A.   Management system, yeah.

22     Q.   Okay.  I'm just going to start it back up at

23   19 minutes and 46 seconds.

24          (The recording is played:

25          "This calls for another 10 minute
```

99

1          meeting for that, just make it, in

2          the chargeback meeting let's talk

3          about this particular details, how to

4          do a test between 500 and 1,000

5          customers that get the terms.  It's a

6          complete different world when the

7          woman -- when you can prove to the

8          bank that the terms and conditions

9          are on the invoice...no, the only

10         thing...I know we crashed and burned

11         when we tested it before, but somehow

12         Rappoport is doing it and getting

13         through with it.")

14  BY MR. TEPFER:

15     Q.    So did you hear the statement, "This calls

16  for another 10 minute meeting for that.  Just make

17  it in the chargeback meeting.  Let's talk about this

18  particular details, how to do a test between 500 and

19  1,000 customers that get the terms"?

20         Did you hear that?

21     A.    Yes.

22     Q.    And was that Alon?

23     A.    Yes.

24     Q.    Did you hear this statement, "It's a

25  complete different world when the woman -- when you

**EXHIBIT 556**

100

1    can prove to the bank that the terms and conditions

2    are on the invoice"?

3        A.    Yes.

4        Q.    And was that also Alon?

5        A.    Yes.

6        Q.    And did you hear the statement, "I know we

7    crashed and burned when we tested it before, but

8    somehow, Rappoport is doing it and getting through

9    with it"?

10       A.    Yes.

11       Q.    And do you know who that was?

12       A.    Alon.

13       Q.    Who's Rappoport, if you know?

14       A.    Jeff Rappoport.

15       Q.    And is he -- does -- how do you know him?

16       A.    He's in this industry.

17       Q.    The continuity industry?

18       A.    He was then.

19       Q.    Do you know if BunZai Media Group ever ran

20   this test with 500 to 1,000 customers?

21       A.    No, I don't remember.

22       Q.    I'm starting again at 20 minutes and 8

23   seconds.

24            (The recording is played:

25            "Rappoport is also sending an email

```
1              when you're getting billed.  Okay.

2              He's sending this email.  I know we

3              can do it.  Yeah.  I'm just saying I

4              don't see how he was surviving doing

5              that."

6    BY MR. TEPFER:

7       Q.   Did you hear the statement that "Rappoport

8    is also sending an email when you're getting billed"

9    and the statement "I know we can do it.  I'm just

10   saying I don't see how he was surviving doing that"?

11             THE WITNESS:  Yes.

12   BY MR. TEPFER:

13      Q.   And was that Alon?

14      A.   Yes.

15      Q.   All right.  I'm starting at 2017.

16             (The recording is played:

17             "...if you send them the terms, it

18             can act like...we told you that we're

19             going to charge...we notified you...

20             you have ten days.  Exactly.  But

21             when me and Paul tried it a year ago,

22             it didn't work so good.  It hurted

23             us...If it's done creatively, if it's

24             done correctly and optimized...not

25             just try, it didn't work.  Let's see
```

EXHIBIT 556

1          what Jeff is doing because it's

2          working for him.  Order one product,

3          we'll get it, we'll see how it is.

4          Yeah, maybe we could put a link,

5          also.  Is that what we do now?  To

6          view the terms and conditions, visit

7          blah, blah, blah, dotcom?  On the

8          actual...on the invoice, can we do

9          that?  Maybe that's how...I mean,

10         I'll order it...find out, but maybe

11         that's something that can kind of

12         just... how many people are going to

13         be like...okay.  So what is it for?

14         To reduce chargebacks or to... stay

15         compliant?  Stay compliant and to

16         tell the woman on the phone... it's

17         another piece that we can actually

18         use to fight chargebacks.  It's going

19         to help Sabina, it's going to help us

20         be compliant, it's going to shut the

21         fucking customer up, but it might

22         hurt your numbers.")

23    BY MR. TEPFER:

24       Q.   Okay.  So did you hear the statement, "It's

25    another piece that we can actually use to fight

1    chargebacks.  It's going to help Sabina, it's going

2    to help us be compliant, it's going to shut the

3    effing customer up, but it might hurt your numbers"?

4        A.    Yes.

5        Q.    Sorry.  I wanted to make that P.G.

6              And who is that speaking?

7        A.    Alon.

8              MR. TEPFER:  Okay.  Why don't we take a

9    ten-minute break.

10             MR. GALLEGOS:  Yeah.

11             MR. TEPFER:  Is that okay with everyone?

12             We're off the record.

13             (Recess)

14             MR. TEPFER:  If we can go back on the

15   record.

16   BY MR. TEPFER:

17       Q.    Well, I think we can -- I think we can move

18   on from the recording.

19             And, Ms. Yalley, I don't mean to pry, but I

20   noticed that you were -- you've received some text

21   messages -- and it doesn't matter who they're from.

22   I just was curious if any of them are from any of

23   the defendants in this action.

24       A.    No.

25       Q.    Okay.  I just had to ask.

1    discussed were operated?

2         MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous, it misstates

4    the prior testimony of the witness, calls for

5    speculation, lacks foundation.

6         THE WITNESS:  No.

7    BY MR. TEPFER:

8    Q.   Who was -- so you mentioned -- just to be

9    clear, the employees that you mentioned at Pinnacle

10   Logistics were Leor, Andree, and one other person.

11   I forgot.

12   A.   Sandra.

13   Q.   And do you know if Roi Reuveni worked at

14   Pinnacle Logistics?

15   A.   I'm not sure --

16   Q.   Sure.

17   A.   -- if he was under that company.

18   Q.   Did you ever work for a company called Media

19   Urge, Inc.?

20   A.   Yes.

21   Q.   When did you work for Media Urge?

22   A.   I don't remember the exact dates.

23   Q.   Do you remember the years?

24   A.   2000 -- end of 2012, until when I left.

25   Q.   And when did you leave again?

1      A.    2013.

2      Q.    And how come you left?

3      A.    I found another job.

4      Q.    Who hired you at Media Urge?

5      A.    I don't know how to answer that.

6      Q.    How do you mean?

7      A.    It was just another one of their companies,

8   so there was no hiring process.

9      Q.    And you said "another one of their

10   companies."  Who are you referring to?

11      A.    I don't know who -- I don't know who owned

12   it, but it was one of their companies that --

13   BunZai's companies or something.

14      Q.    Okay.  So it was, it was in that same group

15   of companies?

16      A.    Yes.

17           MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, it's

19   argumentative.

20   BY MR. TEPFER:

21      Q.    Who was your supervisor at Media Urge?

22      A.    Alon.

23      Q.    Do you know anyone else who worked at Media

24   Urge?

25      A.    Yes.

1       Q.    Who's that?

2       A.    Paul and Victor Azal.

3       Q.    Did you all work on, I guess, the -- well, I

4    guess I'll just ask.

5             What did you do at Media Urge?

6       A.    I did accounting, the records that I

7    mentioned earlier, and worked with affiliates,

8    basically just making sure that their stats lined up

9    properly, they had the right number of sales, and

10   then, you know, getting their invoices, paying their

11   invoices, AR -- you know, AP, stuff like that.

12      Q.    Did Doron Nottea ever assist you in your

13   work while at Media Urge?

14      A.    In what regard?

15      Q.    In any regard.

16      A.    I think so.

17      Q.    How so?

18      A.    With accounting.

19      Q.    What sort of -- like how did he help you

20   with your accounting?

21      A.    Like where to pay people from.

22      Q.    Anything else?

23      A.    That was basically it.

24      Q.    Do you recall when -- did BunZai Media Group

25   ever cease operating while you were there?

115

1       A.   I don't know.

2            MR. UNGAR:   Objection as to the form of the

3    question.   It's vague and ambiguous.

4    BY MR. TEPFER:

5       Q.   Do you recall any of the vendors that you

6    would pay at Media Urge?

7       A.   Vendors?   Define "vendors."

8       Q.   Like -- well, I think you were talking about

9    sending invoices or something.

10      A.   Yes, to affiliate networks.

11      Q.   Oh, okay.   And do you know what those

12   affiliates were marketing?

13      A.   Were marketing?

14      Q.   Yes.

15      A.   Oh.   AuraVie.

16      Q.   Who informed you that you were going to be

17   switching over from BunZai to Media Urge?

18           MR. UNGAR:   Objection as to the form of the

19   question.   It's vague and ambiguous, and it assumes

20   facts not in evidence, and it's leading.

21           THE WITNESS:   I would say Alon.

22           (Plaintiff's Exhibit 68 was

23           previously marked for identification

24           by the FTC and is attached hereto.)

25   ///

1    BY MR. TEPFER:

2        Q.    Okay.  I'm handing the witness what's been

3    marked as Exhibit 68.

4            Do you remember sending this email?

5        A.    No.

6        Q.    It's probably not too memorable, but do you

7    know what Jacem Healthy Products is?

8        A.    Sorry.  I'm thinking.

9        Q.    That's okay.

10       A.    Manufacturer.

11       Q.    Okay.  Of --

12       A.    Of AuraVie SkinCare.

13       Q.    Okay.  And do you recall why you included

14    Doron on this email?

15       A.    'Cause he also helped with accounting.

16       Q.    Okay.

17            MR. UNGAR:  Move to strike as nonresponsive

18    and on the grounds of speculation.

19    BY MR. TEPFER:

20       Q.    Do you know who used the email address

21    accounting818@gmail.com?

22       A.    Yes.  Philip.

23       Q.    Who's Philip?

24       A.    He was Doron's assistant.

25       Q.    Oh, is that Philip Camerino?

1

2

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby

5   certify:

6            That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14           I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____3|2|16_____

21

22

23         _____

24         CHRISTINA KIM-CAMPOS, CSR

25         CERTIFICATE NO. 12598

| | |
|---|---|
| **To:** | Igorlats Igor[igorlats@gmail.com] |
| **Cc:** | Alon N[alon@mediaurge.com] |
| **From:** | David M |
| **Sent:** | Thur 12/26/2013 6:08:22 PM |
| **Importance:** | Normal |
| **Subject:** | Miki - Spain - Dellure |
| **MAIL_RECEIVED:** | Thur 12/26/2013 6:08:22 PM |

Hi Igor,

Regarding Miki in Spain.

Please discuss a few of these small points with me. It will help move everything forward more productively. 10 minute phone call with me.

## DELLURE

**Who will be paying for design & production? 50/50?**

**We will discuss changing the name with him but our recommendation: Maybe just translate the booklet to Spanish/Russian and start with existing Brand. This way we can use Dellure and save money.**

**We have already paid for translation.**

**- Quantities? You mentioned 10k Eyes and 1k for Everything. Please confirm & I will discuss with Miki.**

**What will cost of product be? Alons recommend - $4.50 per product. $4.50 FOB LA. Or China. Price does <u>not</u> include Shipping price to them.**

**Other marketing assets will they need from us? I can talk with Miki about this directly. We will send him website, pictures, brochure etc...everything we have.**

**What type of inventory projections?**

**Who will work on P&L investment sheet? I assume it will be Paul.**

**What are their plans for a website in Spain? Do they need assistance? I will discuss with Miki.**

**Merchant Account?**

**Customer service telephone numbers.**

**Does he have any existing infrastructure?**

**EXHIBIT 559**

**McPeek, Brent**

---

| | |
|---|---|
| **From:** | David M <david@mediaurge.com> |
| **Sent:** | Tuesday, March 18, 2014 1:10 AM |
| **To:** | Igorlats Igor |
| **Subject:** | Fwd: For Latsanovski |
| **Attachments:** | Calenergy Chart.pdf; Camerino Mngr Duties.docx; MediaUrge Management_Client_service_agreement.rtf; Pinacle MANAGEMENT SERVICES AGREEMENT.DOCX; Tab R - Guayas LTR Chart.pdf |

I will work on tomorrow.

---------- Forwarded message ----------
From: Sergei <sergei@barshev.com>
Date: Mon, Mar 17, 2014 at 9:30 PM
Subject: RE: For Latsanovski
To: David M <david@mediaurge.com>


I need job duties descriptions for (1) Philip Camerino,(2) Roi Reuveni and
(3) Motti Nottea as for the manager of Guayas Ltd (see attached chart). I attached a rough draft for Mr. Camerino.
Please amend as necessary and make it as detail as possible.  Please complete two attached agreements as appropriate.



*SERGEI SHEVCHENKO*, Attorney at Law

Certified Specialist, Immigration & Nationality Law

Board of Legal Specialization, State Bar of California



This e-mail message and its contents are copyrighted and are proprietary products of Sergei Shevchenko, Esq. Any unauthorized use, reproduction, or transfer of the message or its content, in any medium, is strictly prohibited. Barshev, P.C., A Law Corporation, 433 N. Camden Drive, 4th Floor, Beverly Hills, CA 90210, alternative mailing address is Barshev, P.C., P.O. Box 18292, Beverly Hills, CA 90209-4292, website: barshev.com;
Telephone: (310) 285-1552; Fax: (310) 862-1875. E-mail: sergei@barshev.com.



As part of our Green Initiative, we are moving away from paper correspondence.

Please consider the environment before printing.



*From:* David M [mailto:david@mediaurge.com <david@mediaurge.com>]
*Sent:* Sunday, March 16, 2014 1:31 PM
*To:* Igorlats Igor

1

**EXHIBIT 561**

*Cc:* Sergei Shevchenko
*Subject:* I. Latsanovski - CV

Hello Igor,

Please find the general completed draft attached.

Sergei,

If you have any specific needs on this item that you would like to share with me so that I can add them to this document & assist you, please advise in detail.

*Before sending out this document, please re-save and name appropriately.

Regards,

David Migdal

Mobile ████████

# Calenergy, Inc. Organizational Chart



EXHIBIT 561

Relationship Chart

Calenergy, Inc. (USA)

Mr. Igor Latsanovski, major shareholder of both entities

Guayas, Ltd (Estonia)

**CALENERGY INC**

**Job Duties of Philip Camerino, Manager**

Directs activities of MediUrge and Lifestyle. Coordinates activities of sales, graphic arts, media and research. Conducts meetings with agency personnel to outline and initiate new advertising policies or procedures. Provides marketing or technical advice. Records and analyzes production quality assurance, and directs investigation of customer complaints . Negotiates settlement of claims, for which company is responsible, within limits prescribed.  Surveys potential markets for increasing sales.

# MANAGEMENT SERVICES AGREEMENT

**THIS MANAGEMENT SERVICES AGREEMENT** (this "Agreement"), effective as of (DATE), is made by and between Pinacle Logistics, Inc., a California corporation (referred herein as the "Company"), and Calenergy Inc., referred as the "Managers").

WHEREAS, on the terms and subject to the conditions contained in this Agreement, the Company desires to obtain certain management and consulting services from the Managers and the Managers desire to perform such services for the Company.

NOW, THEREFORE, in consideration of the premises and the respective mutual agreements, covenants, representations and warranties contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Appointment of Managers. The Company appoints the Managers, and the Managers accept appointment on the terms and conditions provided in this Agreement as Managers to the Company, its direct and indirect subsidiaries and its direct and indirect parent companies including any other corporations or other entities hereafter formed or acquired by any member of the Company to engage in any business. It is understood that the Managers' rights and obligations hereunder shall be independent of the relationship between the Company and the respective boards of directors of the Company.

2.  Board of Directors Supervision. The activities of the Managers to be performed under this Agreement shall be subject to reasonable policies not inconsistent with the terms of this Agreement adopted by the Board of the Company and in effect from time to time. Where not required by applicable law or regulation, the Managers shall not require the prior approval of the Board to perform their duties under this Agreement.

3.  Services of the Managers. Subject to any limitations imposed by applicable law or regulation, the Managers shall render or cause to be rendered management, consulting and financial services to the Company, as requested by the Board and agreed to by the Managers, which services may include advice and assistance concerning any and all aspects of the operations, planning and financing of the Company, firing/hiring for the Company according to the Company's established procedures and budget, and conducting relations on behalf of the Company with accountants, attorneys, financial Managers and other professionals. The Managers shall provide and devote to the performance of this Agreement such employees, affiliates and agents of the Managers as the Managers shall deem appropriate to the furnishing of the services hereunder. In addition, the Managers shall, as requested by the Board and agreed to by the Managers, render advice and expertise in connection with any acquisitions or dispositions undertaken by the Company.

**EXHIBIT 561**

4.   <u>Reimbursement of Expenses; Independent Contractor</u>. All obligations or expenses incurred by the Managers in the performance of their duties under this Agreement shall be for the account of, on behalf of, and at the expense of the Company, and all such expenses shall be promptly reimbursed by the Company. The Managers shall not be obligated to make any advance to or for the account of the Company or to pay any sums, except out of funds held in accounts maintained by the Company, nor shall the Managers be obligated to incur any liability or obligation for the account of the Company. The Company shall reimburse the Managers by wire transfer of immediately available funds for any amount paid by the Managers, which shall be in addition to any other amount payable to the Managers under this Agreement. The Managers shall be independent contractors, and nothing in this Agreement shall be deemed or construed to (i) create a partnership or joint venture between the Company and the Managers, (ii) cause the Managers to be responsible in any way for the debts, liabilities or obligations of the Company or any other party, or (iii) cause the Managers or any of their employees, partners or members to be officers, employees or agents of the Company.

5.   <u>Other Activities of Managers; Investment Opportunities</u>. The Company acknowledges and agrees that neither the Managers nor any of the Managers' employees, officers, directors, affiliates or associates (collectively, the "<u>Managers Group</u>") shall be required to devote full time and business efforts to the duties of the Managers specified in this Agreement, but instead shall devote only so much of such time and efforts as the Managers reasonably deem necessary. The Company further acknowledges and agrees that members of the Managers Group are engaged in the business of investing in, acquiring and/or managing businesses for their own account, for the account of their affiliates and associates and for the account of other unaffiliated parties, and understands that the Managers plan to continue to be engaged in such business (and other business or investment activities) during the term of this Agreement. The Managers make no representations or warranties, express or implied, in respect of the services to be provided by the Managers Group. Except as the Managers may otherwise agree in writing after the date

2

hereof: (a) each member of the Managers Group shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly (i) engage in the same or similar business activities or lines of business as the Company or (ii) do business with any client or customer of the Company; (b) no member of the Managers Group shall be liable to any member of the Company for breach of any duty (contractual or otherwise) by reason of any such activities or of such member's participation therein; and (c) in the event that any member of the Managers Group acquires knowledge of a potential transaction or matter that may be a corporate opportunity for the Company, on the one hand, and such member of the Managers Group, on the other hand, or any other person or entity, no member of the Managers Group shall have any duty (contractual or otherwise) to communicate or present such corporate opportunity to the Company, and, notwithstanding any provision of this Agreement to the contrary, no member of the Managers Group shall be liable to any member of the Company for breach of any duty (contractual or otherwise) by reason of the fact that any member of the Managers Group directly or indirectly pursues or acquires such opportunity for itself, directs such opportunity to another person or entity, or does not present such opportunity to the Company. In no event will any member of the Managers Group be liable to any member of the Company for any indirect, special, incidental or consequential damages, including lost profits or savings, whether or not

such damages are foreseeable, or in respect of any liabilities relating to any third party claims (whether based in contract, tort or otherwise) other than for claims relating to the services which may be provided by the Managers hereunder (subject to <u>Section 8</u> hereof).

     6.   <u>Compensation of Managers</u>.

     (a)   In consideration of the management, consulting and financial services to be rendered, the Company will pay to the Managers an annual base management and consulting fee in cash in the aggregate amount of          Dollars ($5      ) (the "Management and <u>Consulting Fee</u>"), to be allocated among the Managers as set forth on **Schedule 1** attached hereto, payable in advance in equal quarterly installments on the 1ˢᵗ business day of each calendar quarter in each year. Notwithstanding the foregoing, the Consulting Fee for the remainder of        shall be       Dollars ($2      ) and shall be paid by the Company to the Managers (to be allocated among the Managers as set forth on **Schedule 1** attached hereto) on the date hereof. The next quarterly installment of the Management and Consulting Fee is due and payable by the Company on      (date). The payment by the Company of the Consulting Fee hereunder is subject to the applicable restrictions contained in the Company's and its subsidiaries' debt financing agreements. If any such restrictions prohibit the payment of any installment of the Management and Consulting Fee, such Management and Consulting Fee installment shall accrue and the Company shall make such installment payment as soon as it is permitted to do so under such restrictions, plus pay interest thereon from the due date of such installment before giving effect to such restriction to the date of payment at an interest rate of 10% per annum. If the Company acquires or enters into any additional business operations after the date of this Agreement (each, an "<u>Additional Business</u>"), the Board and the Managers will, prior to the acquisition or prior to entering into the business operations, in good faith, determine whether and to what extent the Management and Consulting Fee should be increased as a result thereof. Any increase will be evidenced by a written supplement to this Agreement signed by the Company and each of the Managers.

<div align="center">3</div>

---

     (b)   Additionally, at the time of any equity or debt financing for the Company or any of their respective subsidiaries that occurs after the date hereof, the Company shall pay to one or both of the Managers (as applicable) in cash a placement fee equal to four percent (2%) of the gross amount of any equity financing provided.

     (c)   Any payment pursuant to this <u>Section 6</u> shall be made in cash by wire transfer(s) of immediately available funds to or among one or more accounts as designated from time to time by the Managers to the Company in writing.

     7.   <u>Term</u>. This Agreement shall commence effective as of the date hereof and shall remain in effect until the date on which none of the Sponsors nor any of their respective affiliates hold directly or indirectly any equity securities of Holdings or its successors. In addition, the Managers may terminate this Agreement at any time upon written notice to the Company, such termination to be effective upon the Company's receipt of such written notice. No termination of this Agreement, whether pursuant to this <u>Section 7</u> or otherwise, shall affect the Company's obligations with respect to the fees, costs and expenses incurred by the Managers in rendering services hereunder and not reimbursed by the Company as of the effective date of such

termination. In addition, the provisions of <u>Sections 8</u>, <u>9</u>, <u>17</u> and <u>20</u> shall survive the termination of this Agreement and remain binding and in effect.

8.    <u>Liability</u>. No member of the Managers Group (including any person or entity acting for or on behalf of the Managers) shall be liable for any mistakes of fact, errors of judgment, or losses sustained by the Company for any acts or omissions of any kind (including acts or omissions of the Managers), except to the extent caused by intentional misconduct of the Managers as finally determined by a court of competent jurisdiction.

9.    <u>Indemnification of Managers</u>. The Company hereby agrees to jointly and severally indemnify and hold harmless the Managers and their present and future officers, directors, affiliates, employees and agents ("<u>Indemnified Parties</u>") from and against all losses, claims, liabilities, suits, costs, damages and expenses (including attorneys' fees) arising from their performance of services hereunder. The Company further agrees to reimburse the Indemnified Parties on a monthly basis for any cost of defending any action or investigation (including attorneys' fees and expenses), subject to an undertaking from such Indemnified Party to repay the Company if such party is determined not to be entitled to such indemnity.

10.    <u>Assignment</u>. Without the consent of the Managers, the Company shall not assign, transfer or convey any of its rights, duties or interest under this Agreement, nor shall it delegate any of the obligations or duties required to be kept or performed by it hereunder. The Managers shall not assign, transfer or convey any of their rights, duties or interest under this Agreement, nor shall they delegate any of their obligations or duties required to be kept or performed under this Agreement, except that the Managers may transfer their rights and delegate their obligations hereunder to (i) their respective affiliates or (ii) to each other.

4

---

11.    <u>Notices</u>. All notices, demands, or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (i) delivered personally to the recipient, (ii) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. Reseda, California time on a business day, and otherwise on the next business day, (iii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) received via electronic mail by the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if received via electronic mail before 5:00 p.m. Reseda, California time on a business day, and otherwise on the next business day after such receipt. Such notices, demands, and other communications shall be sent to the address for such recipient indicated in **Schedule 2**.

12.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other

jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

13.    No Waiver. The failure by any party to exercise any right, remedy or elections herein contained or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future exercise of such right, remedy or election, but the same shall continue and remain in full force and effect. All rights and remedies that any party may have at law, in equity or otherwise upon breach of any term or condition of this Agreement, shall be distinct, separate and cumulative rights and remedies and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy.

14.    Amendment. The provisions of this Agreement may be amended or modified only with the prior written consent of the Company and each of the Managers.

15.    Entire Agreement. This Agreement contains the entire agreement between the parties hereto with respect to the matters herein contained and any agreement hereafter made shall be ineffective to effect any change or modification, in whole or in party, unless such agreement is in writing and signed by the party against whom enforcement of the change or modification is sought.

16.    Applicable Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California1.

6

17.    MUTUAL WAIVER OF JURY TRIAL. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

18.    Successors. This Agreement and all the obligations and benefits hereunder shall inure to the successors and permitted assigns of the parties.

19.    Counterparts. This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

20.   <u>Confidentiality</u>. The Company may not disclose the terms of this Agreement except as may be required by applicable law or the rules of any exchange on which the Company's or its affiliates' securities are traded.

7

IN WITNESS WHEREOF, the parties hereto have caused this Management Services Agreement to be executed and delivered as of the date first above written.

**PINACLE LOGISTICS, INC.**

By: /s/ _____

Name: _____

Title:  Chairman, Chief Executive
          Officer and President

**CALENERGY INC.**

By: /s/ Igor Latsnovski _____

Name: Igor Latsanovski

Title:  President

# Guayas Ltd. Organizational Chart



**To:**     Igor[igorlats@gmail.com]
**From:**   David M
**Sent:**    Tue 3/18/2014 2:09:11 AM
**Importance:**      Normal
**Subject:**   Re: CV
**MAIL_RECEIVED:**    Tue 3/18/2014 2:09:11 AM

CV
- added Barcelona
- active links no problem. People can type.

Links - I think are on Guayas and cal-energy
I will have to talk to Victor.
Phone Numbers - Now I see he is talking about Guayas and Cal-Energy
Who has this information??

Roman should not have sent this direct to "Jim" - this was 'draft'.

Doron said today, letter should be done today but nothing yet. I hope tomorrow.
Bill calling me every day. I hope we have letter form bank tomorrow and I make LOI and give to Bill tomorrow.

UK - All is okay. Submitted info to EU Registration and printing UK Boxes.

E-cigarette - Moving forward & good.
Not enough people in office to complete work so I am hiring people from outside to complete work. Designer, website, etc...
I have no choice. Must move forward.

Spoke to Sergei. He just sent me email and I will work on tomorrow.
I will forward you email so you can see.


On Mon, Mar 17, 2014 at 10:11 PM, Igor <igorlats@gmail.com> wrote:

   Hi
   how are without ME
   did you fix in my CV some links ?
   thank you
   did you have letter from bank ( Doron )?
   if yes When you have meeting with Bill?
   what about UK ?
   E- sigaret ?

**EXHIBIT 564**

**To:**      Tyler R.[Tyler@chargebackarmor.com]
**Cc:**      David M[david@mediaurge.com]; Alon | MediaUrge[alon@mediaurge.com]; Paul Medina[paul@mediaurge.com]; Eugene S[eugene@vastpay.com]; Igor[igorlats@gmail.com]
**From:**    David N
**Sent:**    Fri 9/26/2014 3:33:11 PM
**Importance:**  Normal
**Subject:**  Re: chargebacks statistics September Leor Systems
**MAIL_RECEIVED:**  Fri 9/26/2014 3:33:14 PM

Tyler,

Let me know if you need any info or support from our end.

Thank you,

David Nichols
Vastpay, LLC
Office: +1 (800) 841-9885
Direct: +1 (818) 616-8654
Fax: +1 (818) 748-9168
skype: █████████
mail: david@vastpay.com



Confidentiality Notice: this message is intended only for the designated recipient. It may contain confidential or proprietary information and is subject to the attorney-client privilege and other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

On Fri, Sep 26, 2014 at 12:31 PM, Tyler R. <Tyler@chargebackarmor.com> wrote:

Yeah I know I just got off the phone with Kristina.  I put all live traffic (40 orders per day) into that MID.  We only need 40-50 or so to drop under 10% so we will be just fine.  I'll probably let it run for a few days like that and keep in touch with Kristina to keep an eye on it so we can get it down in the ball park of the other MIDs which is around 2-4%.

Cheers,

Tyler Reitenbach
Senior Account Executive
Chargeback Armor, LLC
Skype: █████████
Support: 800.976.7027

Email: Tyler@chargebackarmor.com

Privacy Notice: this message is intended only for the designated recipient. It contains confidential information and is subject to attorney-client privilege and other confidentiality protections. If you have received this message in error, please notify the sender and delete this message. Thank you.

**EXHIBIT 565**

On Fri, Sep 26, 2014 at 12:28 PM, David M <david@mediaurge.com> wrote:

It was Count Tyler.

This is the MID we need to pump sales into ASAP

| Leor Systems | 39400380rderleor | VISA | 22 | 185 | 1: |

On Fri, Sep 26, 2014 at 10:59 AM, Alon | MediaUrge <alon@mediaurge.com> wrote:

TEAM: VERY IMPORTANT

I spoke to Kristina from Pago Gateway regarding our chargeback thresholds and percentage [document attached here below]...
She says that the bank being audited and will be slowly closing all the merchants that are getting more than the 10% chargeback threshold

It looks like there are merchant accounts in there that show we are at 20% chargeback ratio, and even the ones we're using are way too high.... we need to get some transactions in there to lower the percentage.

Please review and let me know what's up... ASAP

Best Regards,

Alon Nottea
Rainmaker | MediaUrge
skype: ████████
email: alon@mediaurge.com

Confidentiality Notice: this message is intended only for the designated recipient. It may contain confidential or proprietary information and is subject to the attorney-client privilege and other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

---------- Forwarded message ----------
From: **Kristina Perez** <kristina@pagotechnology.com>
Date: Fri, Sep 26, 2014 at 10:39 AM
Subject: chargebacks statistics September Leor Systems
To: alon@mediaurge.com
Cc: Karina Brunenieks <karina@pagotechnology.com>

Hi Alon,

Please find below September first two weeks chargeback statistics. Karina will include you in to the weekly mailing list so you can have reporting available to you weekly.

| NAME | BANK MID | DESCRIPTOR | CARD TYPE | CB COUNT | SALE COUNT | CB COUNT RATIO | CB AMOUNT | SALE AMOUNT | CB AM RA |
|------|----------|------------|-----------|----------|------------|----------------|-----------|-------------|----------|
| Leor Systems | 3939428 | leorkit | MC | 7 | 200 | 3.5 | 629.51 | 16000.16 | |
| Leor Systems | 3939428 | leorkit | VISA | 18 | 1162 | 1.55 | 1414.85 | 10456.5 | |

EXHIBIT 565

| Leor Systems | 3940038 | orderleor | MC   | 18 | 291  | 6.19  | 1542.31 | 4367.2  |
| Leor Systems | 3940038 | orderleor | VISA | 22 | 185  | 11.89 | 1561.76 | 16007.6 |
| Leor Systems | 3940608 | leorsys   | MC   | 11 | 352  | 3.13  | 989.23  | 4094.92 |
| Leor Systems | 3940608 | leorsys   | VISA | 29 | 1103 | 2.63  | 2137.25 | 47810.1 |
|              |         |           | MC   |    | 36   |       |         |         |
|              |         |           | VISA |    | 69   |       |         |         |

Regards,

Kristina Perez

www.pagotechnology.com



Though nobody can go back and make a new beginning… Anyone can start over and make a new ending. **Chico Xavier** 1969

**IMPORTANT WARNING:**  This electronic transmission is intended for use of the person or entity to which it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information is strictly prohibited.  Please notify the sender immediately to arrange for the return or destruction of these misdirected documents.  This message may contain confidential material.

| | |
|---|---|
| **To:** | David M[david@mediaurge.com] |
| **From:** | Igor |
| **Sent:** | Mon 1/6/2014 4:13:44 PM |
| **Importance:** | Normal |
| **Subject:** | Re: Miki - Review what we want to send |
| **MAIL_RECEIVED:** | Mon 1/6/2014 4:13:46 PM |

give me our price pls


2014/1/6 David M <david@mediaurge.com>

Alon & Igor - Please review what we want to send to Miki.
Let me know of any changes (specifically in pricing) and I will send to Miki in SPANISH & ENGLISH.

Игорь - русский ниже

ENGLISH


Hello Miki,


Happy new year to you & your family.

We look forward to good business with you.


Here is an outline of our general plan.

Let us talk & review this information on the phone (or email), finalize the details & put plan into action.


**PRODUCT MARKETING**


Start # 1 – Combine our information with your information.

We need to share as much information as possible.

What is your existing infrastructure? What do you have ready right now that we can use right now?

What do we have to build & prepare?


Marketing Plans

How will we be marketing the product?

Website?

Other marketing mediums?

**EXHIBIT 569**

This will tell us what we have to prepare?

(WEBSITE LINK)

(ATTACH BROCHURE)


Sales Channel

Our plan is for off-line/retail sales. Can you share information about this retail channel with us so we can understand and prepare with you.

How will product sit on shelf? How will customer see product?

Do we have to create any Point Of Purchase materials?


Brand Name

We would like to use DELLURE as our brand name.

It has a good name, sounds European and we already have product ready.

(ATTACH IMAGES)


Europe Cosmetic Regulation - Labels

Please let us know the changes we need to make to labels so we can sell in European market.

(ATTACH LABELS)


Languages

Our discussion 2 weeks ago had:

RUSSIAN

ENGLISH

SPANISH

Let us discuss & confirm.

Brochure to translate is attached.


**CUSTOMER INTERACTION**

Customer Service Center in Spain or where is cheaper? Morocco?

Do you have a company in mind that we should work with?

Please let us know about them.

We can prepare a call-center script.

BANKING

Please let us know your plans for processing funds.

EXPENSES

Expenses from our side are related to Product Development & Marketing Assets.

For example: Inventory, Website, Marketing Collateral, Design, Web-Page

What other expenses should we expect?

PRICING

Our current cost for one box of product is $3.50.

What do you recommend our retail sales price to be?

We think it should be about 110 Euro or $150 US.

Current Pricing from China

Face Mask - $0.45

Nose Mask - $0.19

Eye Mask - $0.19

Exterior Box - $1.50

Brochure - $0.50

**Total - $3.14**

(DETAIL ALL PRICING)

<u>FINANCIAL PROJECTION</u>

We will create one together once we have all the other information from your side.

<u>STARTING INVENTORY TO SEND YOU</u>

1,000 Full Boxes

10,000 units of Eye Masks.

<u>GENERAL AGREEMENT</u>

1.  Create New Company for Joint Venture between Two Partners – Miki

2.  Each Partner will have 50%.

3.  Partner Miki, extra 10% for Management.

4.  Profits to be split 60 (Miki) and 40 (us)

5.  We share all expenses together

Agreement to be made in US in ENGLISH & SPANISH

## NOTE: ACTUAL COST when Ordering 30K Units

Face Mask - $0.45

Eye Mask - $0.35

Nose Mask - $0.11

Box, Sleeve, Flyer & Labor - $1.19

Misc. (Packing, Shipping) - $2.00

TOTAL - $4.10

*If we send him our existing inventory, factor in what we have paid already. Misc. number needs to be recouped.

*******************************************************************

Здравствуйте Мики,

С Новым годом вас и вашей семьи.
Мы с нетерпением ждем хорошего бизнеса с вами.

Вот план нашей генплана.
Давайте поговорим и рассмотреть эту информацию по телефону (или по электронной почте), согласовать все детали и поставить план в действие.

МАРКЕТИНГ ТОВАРОВ

Начните № 1 - комбинат нашу информацию с вашей информацией.
Мы должны делиться столько информации, сколько возможно.
Какова ваша существующая инфраструктура? Что у вас готов прямо сейчас, что мы можем использовать прямо сейчас?
Что мы должны построить и подготовить?

Маркетинговые планы
Как мы будем продавать продукт?
Сайт?
Другие маркетинговые среды?
Это скажет нам, что мы должны подготовить?
(Ссылка на сайт)
(ATTACH брошюра)

Канал продаж
Наш план состоит в off-line/retail продаж. Можете ли вы поделиться информацией об этом розничном канале с нами, чтобы мы могли понять и подготовить с вами.
Как продукт сидеть на полке? Как клиент увидит товар?
Есть ли у нас создать любой момент покупки материалов?

Бренд
Мы хотели бы использовать DELLURE как нашим брендом.
Он имеет хорошее имя, звучит Европы и у нас уже есть продукт готов.
(Вкладывать изображения)

Европа Косметическая Регулирование - Наклейки
Пожалуйста, дайте нам знать, изменения, которые мы должны сделать, чтобы этикетки поэтому мы можем продать на европейском рынке.
(Приклеивайте этикеток)

Языки
Наше обсуждение 2 недели назад было:
РУССКИЙ
ENGLISH
ИСПАНСКИЙ
Обсудим и подтвердить.
Брошюра перевести прилагается.

Взаимодействия с клиентами

Центр обслуживания клиентов в Испании или где дешевле? Марокко?

EXHIBIT 569

Есть ли у компании в виду, что мы должны работать?
Пожалуйста, сообщите нам о них.
Мы можем подготовить Call-Center сценарий.

БАНКОВСКАЯ

Пожалуйста, дайте нам знать ваши планы обработки фондов.

РАСХОДЫ

Расходы от нашей стороны связаны с развитию продуктов и сбытовых активов.
Например: Инвентарь, Сайт, маркетинговых материалов, дизайн, веб-страницы
Какие еще расходы мы должны ожидать?

Ценообразование

Наша текущая стоимость одной коробке продукта составляет $ 3.50.
Что вы рекомендуете наши цены розничные продажи должны быть?
Мы считаем, что она должна быть около 110 евро или $ 150 США.
Расценки из Китая
Маска для лица - $ 0.45
Нос Маска - $ 0.19
Eye Mask - $ 0.19
Внешний Box - $ 1.50
Брошюра - $ 0.50
Всего - $ 3.14
(ДЕТАЛИ Все цены)

Финансовые прогнозы

Мы создадим один вместе, как только у нас есть все другую информацию с вашей стороны.

ЗАПУСК инвентаре, чтобы отправить вас

1000 Полные ящики
10000 единиц глаз Маски.

ГЕНЕРАЛЬНОЕ СОГЛАШЕНИЕ

1. Создание новой компании для совместного предприятия между двумя партнерами - Мики
2. Каждый партнер будет иметь 50%.
3. Партнер Мики, дополнительные 10% по управлению.
4. Прибыль должны быть разделены 60 (Мики) и 40 (нас)
5. Мы разделяем все расходы вместе
Соглашение должны быть сделаны в США на английском и испанском

**Фактическая себестоимость при заказе 30К единиц**
**Маска для лица - $ 0.45**
**Eye Mask - $ 0.35**
**Нос Маска - $ 0.11**
**Коробка, рукава, объявления и труда - $ 1.19**
**Разное. (Упаковка, отправка) - $ 2.00**
**ИТОГО - $ 4.10**

**\* Если мы посылаем ему наш существующий инвентарь, фактор в том, что мы заплатили уже. Разное. номер должен окупиться.**