1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

9

10   **FEDERAL TRADE COMMISSION,**       Case No.  CV 15-4527-GW(PLAx)

11                  **Plaintiff,**        **[PROPOSED] ORDER**
                                          **GRANTING PLAINTIFF**
12                  **v.**                **FEDERAL TRADE**
                                          **COMMISSION SUMMARY**
13   **BUNZAI MEDIA GROUP, INC.,**        **JUDGMENT**
     *et al.*
14                  **Defendants.**

15          Plaintiff, Federal Trade Commission ("FTC" or "Commission"), filed its

16   First Amended Complaint for Permanent Injunction and Other Equitable Relief

17   ("Complaint") in this action on October 9, 2015, seeking a permanent injunction

18   and other equitable relief against 32 Defendants and one Relief Defendant. (Dkt.

19   235). Plaintiff's Complaint alleges that Defendants, acting as a common

20   enterprise, violated Section 5 of the Federal Trade Commission Act ("FTC Act"),

     15 U.S.C. § 45; Section 4 of the Restore Online Shoppers' Confidence Act

1    ("ROSCA"), 15 U.S.C. § 8404; and Section 917(c) of the Electronic Funds

2    Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c).

3        On April 18, 2016, Plaintiff filed its Notice of Motion and Motion for

4    Summary Judgment Against Defendants Alon Nottea, Doron Nottea, Igor

5    Latsanovski, Roi Reuveni, Alan Argaman, Secured Merchants, LLC, Calenergy,

6    Inc., and Relief Defendant Chargeback Armor, Inc. (Dkt. 353).[1] Plaintiff's motion

7    was supported by voluminous exhibits, including declarations, deposition

8    transcripts, and business records and communications of the Corporate

9    Defendants. (Dkts. 353-1 through 353-32). Simultaneously, Defendants Igor

10   Latsanovski and CalEnergy, LLC and Defendants Alan Argaman, Secured

11   Merchants, LLC, and Relief Defendant Chargeback Armor, Inc. also moved for

12   summary judgment and provided exhibits, including declarations, deposition

13   transcripts, and business records. (Dkts. 352, 356-61; and Dkts. 354-55 ).

14       The Court, having read the parties' submissions and considered the claims

15   and defenses raised, finds that Plaintiff FTC has shown that there is no genuine

16   dispute of material fact regarding the claims presented in its Complaint and that it

17   is entitled to summary judgment as a matter of law. Therefore, the Court awards

18   summary judgment in favor of Plaintiff FTC and against Defendants Alon Nottea,

19   Doron Nottea, Igor Latsanovski, Roi Reuveni, Alan Argaman, Secured Merchants

20   _____

[1] Due to a scrivener's error, Plaintiff's motion for summary judgment contained the incorrect title and, on April 19, 2016, Plaintiff filed a Notice of Errata. (Dkt. 364).

LLC, Calenergy, Inc., and Relief Defendant Chargeback Armor, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b.

2.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 15 U.S.C. § 53(b).

### PLAINTIFF

3.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. Additionally, the FTC enforces ROSCA, 15 U.S.C. §§ 8401-05, which prohibits certain methods of negative option marketing on the Internet, and EFTA, 15 U.S.C. § 1693 *et seq*., which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.

4.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and EFTA, and to secure such equitable relief as may be appropriate

1    in each case, including rescission or reformation of contracts,

2    restitution, the refund of monies paid, and the disgorgement of ill-

3    gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b,

4    8404, and 1693o(c).

5                                **MSJ DEFENDANTS**

6    5.    **Alon Nottea ("Alon")** resides in this district and, in connection with

7          the matters alleged in the Plaintiff's Complaint. (Dkt. 235). Alon

8          transacts or has transacted business in this district. (Dkt. 251 ¶ 32).

9    6.    **Doron Nottea ("Doron")** resides in this district and, in connection

10         with the matters alleged in the Plaintiff's Complaint. (Dkt. 235).

11         Doron transacts or has transacted business in this district. (Dkt. 244

12         ¶ 34).

13   7.    **Igor Latsanovski ("Latsanovski")** resides in this district and, in

14         connection with the matters alleged in the Plaintiff's Complaint.

15         (Dkt. 235). Latsanovski transacts or has transacted business in this

16         district. (Dkt. 253 ¶ 36).

17   8.    **Roi Reuveni ("Reuveni")** resides in this district and, in connection

18         with the matters alleged in the Plaintiff's Complaint. (Dkt. 235).

19         Reuveni transacts or has transacted business in this district. (Dkt. 250

20         ¶ 37).

9.    **Alan Argaman ("Argaman")** resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint. (Dkt. 235). Argaman transacts or has transacted business in this district. (Dkt. 299 ¶ 39).

10.   **CalEnergy, Inc.** is a California corporation and, in connection with the matters alleged in the Plaintiff's Complaint. (Dkt. 235). transacts or has transacted business in this district and, in connection with the matters alleged in the Plaintiff's Complaint. (Dkt. 235). CalEnergy transacts or has transacted business in this district. (Dkts. 244 ¶ 21; 245 ¶ 21; 253 ¶ 21; 254 ¶ 21; Ex. 904-49).

11.   **Secured Merchants, LLC** is a California limited liability company and, in connection with the matters alleged in the Plaintiff's Complaint. (Dkt. 235). Secured Merchants transacts or has transacted business in this district. (Dkts. 299 ¶ 26; 301 ¶ 26; 244 ¶ 26; 245 ¶ 26).

12.   **Relief Defendant Chargeback Armor, Inc.** is a California corporation and, in connection with the matters alleged in the Plaintiff's Complaint. (Dkt. 235). Chargeback Armor transacts or has transacted business in this district. (Dkts. 300 ¶ 41; 244 ¶ 41; 245 ¶ 41).

## COMMON ENTERPRISE

13.   "When determining whether a common enterprise exists, courts look to a variety of factors, including: common control; the sharing of office space and officers; whether business is transacted through 'a maze of interrelated companies'; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence which 'reveals that no real distinction existed between the Corporate Defendants.'" *FTC v. Wolf*, No. 98-8119-civ-Ferguson, 1996 U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 30, 1996) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431 (7th Cir.), *cert. den.*, 377 U.S. 992 (1964); *Zale Corp. and Corrigan-Republic, Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *SEC v. Elliott*, 953 F.2d 1560, 1565 n.1 (11th Cir. 1992); *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) P 70,570 at 72,095 (S.D. Fla. 1994)).

14.   The uncontroverted evidence shows that Defendants promoted the AuraVie websites and offers as a common enterprise with:

a. <u>Common control</u>: Alon, Doron, Latsanovski, Reuveni, and

Argaman each exerted control over the common enterprise:

    i. Alon was CEO of Bunzai Media Group, a consultant for

       Media Urge, and owner of Adageo. (Dkt. 251 ¶ 32). He also

       had control over Pinnacle Logistics and Focus Media

       Solutions. (Exs. 946 at 42:19-24; 914 ¶ 220; 915 ¶ 220).

    ii. Doron was a manager of Bunzai Media Group and Pinnacle

       Logistics. (Exs. 554 at 65:20-66:7 and 86:17-87:7; 35; 43;

       544.) He was an owner of Secured Commerce (Ex. 912

       ¶ 214; Dkt. 120 at 8) and managed the AuraVie call center.

       (Ex. 579). He also exerted control over Secured Merchants

       (Ex. 59) and performed services for all or virtually all of the

       Corporate Defendants (Exs. 551 at 17-18, 44, 49-52, 56, 58,

       60-61, 68; see also Ex. 365-13).

    iii. Latsanovaki was an owner of Bunzai Media Group and a

       CEO of Zen Mobile Media. (Dkt. 244 ¶ 36; 245 ¶ 36; Ex.

       18-2). He managed or helped manage Media Urge and

       Pinnacle Logistics (*See* Exs. 561-3; 588-1, 588-9), and was

       able to direct that payments be made from SBM

       Management. (Ex. 64).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

    iv.  Reuveni was an officer and manager of Pinnacle Logistics. (Exs. 553 at 18-19; 911-16 ¶¶ 106-08). He was an officer and director of Agoa Holdings. (Ex. 911-37 ¶ 245; Dkt. 250 ¶ 37). He was also president of DMA Media Holdings (Ex. 911-37 ¶ 244), COO of Chargeback Armor (Ex. 917-66 ¶ 237), was a managing member and employee of Secured Merchants (Exs. 412-5; 553 at 16:19-20).

    v.  Argaman owned Secured Commerce (Dkt. 299 ¶ 39), Secured Merchants (Dkt. 299 ¶ 39), and was the Chief Technology Officer of Chargeback Armor. (Ex. 281).

b.  <u>Shared office space and officers</u>: In addition to the overlapping officers noted above, the common enterprise shared office space:

    i.  Bunzai Media Group, Pinnacle Logistics, DSA Holdings, Agoa Holdings, Zen Mobile Media, SafeHaven Ventures, Heritage Alliance Group, and AMD Financial Network all shared physical office space in Van Nuys, California. (Dkts. 244 ¶¶ 9, 11, 13-17; 245 ¶¶ 9-11, 13-17; 250 ¶¶ 9-10, 13; 251 ¶¶ 9-10, 13).

    ii.  Bunzai Media Group and Agoa Holdings shared a mailbox. (Dkts. 244 ¶ 9; 245 ¶ 9; Exs. 904-2; 904-47).

iii.  Zen Mobile Media, SafeHaven Ventures, SBM Management, Adageo, Kai Media, and Insight Media shared a mailbox. (Exs. 904-24; 904-30; 904-40; 904-47; 904-53; 904-56).

c.  <u>A maze of interrelated companies</u>: Defendants recruited friends and family to serve as owners of shell companies, which were used to operate the common enterprise.  (See Exs. 262; 268; 318; 474). CalEnergy claimed to be the "parent" corporation of two of the AuraVie companies: Pinnacle Logistics and Media Urge. (Ex. 908).

d.  <u>Commingling of funds</u>: Doron possessed credit cards, signature stamps, checks, and deposit slips for dozens of entities. (Dkt. 120 at 13, 70-71, 74; Ex. 536. *See also* Exs. 49; 437). CalEnergy, through Latsanovski, provided signed, blank checks to finance operations (Dkt. 120 at 13, 39-40), and paid Reuveni, who reportedly worked for other companies. (Ex. 911-37 ¶ 246). Secured Merchants gave $250,000 to Chargeback Armor. (Exs. 916 ¶ 235; 917 ¶ 235; Dkt, 231-1 at 53). Revenues from AuraVie flowed to SBM Management and CalEnergy, then to Focus Media. (Dkt. 121-1 at 3).

15.    In the Ninth Circuit, cases hold that entities constitute "a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

a.  Vertical commonality exists where an investor and promoter are involved in a common venture without requiring other investors' involvement. *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir.1978) (noting that a farmer, a feedlot operator, and a bank may be involved in a "common enterprise" if the farmer and the bank both depended upon the success of the feedlot for the success of their investments).

b.  Conversely, horizontal commonality is shown by the "pooling of interests, usually combined with a pro-rata sharing of profits." *Brodt v. Bache & Co.*, 595 F.2d at 460. "[T]he critical factor in the common enterprise test 'is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts.'" *Id.* at 461.

16.   A common enterprise may be proven by evidence that companies pooled resources, staff, and funds; that companies were owned and managed by the same group of individuals; and that companies all participated to some extent in a common venture to sell the same products. *Network Servs. Depot, Inc.*, 617 F.3d at 1143.

17.   As described above, supra at ¶ 36, the uncontroverted evidence shows that Defendants pooled resources, staff, and funds; that Corporate Defendants were owned and managed by the same group of individuals—the Individual Defendants; and that the Corporate Defendants all participated to some extent in a common venture to sell the same products.

## COMMERCE

18.   At all times material to this Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44. Defendants' Internet skincare product business was marketed, and sold products, to consumers nationwide. (Exs. 910 ¶ 55; 911 ¶ 55).

## AuraVie's "Risk-Free Trial" or "Trial Order" Offers Violated The FTC Act, ROSCA, And EFTA

19.     The uncontroverted evidence shows that multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, promoted "risk-free trial" or "trial order" offers of skincare products to consumers nationwide since at least 2010. (Exs. 909; 597-13; 597-16; 597-19; 597-22. *See also* Dkt. 120 at 5). The websites offered trials of products with a variety of brand names, including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively "AuraVie products."). (Exs. 909-23; 909-24; 909-144; 909-155). Some websites also promoted AuraVie products as a "gift" or "giveaway," purportedly for completing an online survey. (Ex. 903-8).

20.     Consumers interested in accepting the "risk-free trial" or "trial order" offers were required to provide credit card or debit card information, purportedly to pay nominal shipping and handling fees. (*See, e.g*., Ex. 909-125). Consumers who accepted the AuraVie "risk-free trial" or "trial order" offers were automatically enrolled into an "auto-ship" or negative option plan, in which additional products were shipped and billed to consumers' credit cards or debit cards each month. (Exs. 2

¶ 6; 5 ¶ 4; 7 ¶ 6; 14 ¶ 3-4; 909-117, 909-118; 909-125; 909-130; 909-131; 909-145; 909-146. *See also* Exs. 3 ¶ 8; 4 ¶ 6; 9 ¶ 5; and 13 ¶ 7). In addition, unless consumers returned their trial product within 10 days of signing up for the "risk-free trial" or "trial order," their credit cards or debit cards would be billed the full costs of the product, typically $97.88. (Ex. 909-125).

### *Analysis of the FTC Act Violations*

21. Plaintiff alleges that the AuraVie websites and sales offers were deceptive and unfair under Section 5 of the FTC Act. 15 U.S.C. § 45.

   a. An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes a representation, omission, or practice that is both likely to mislead consumers acting reasonably under the circumstances and material. *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

      i. "To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d at 1223 (citing *Cyberspace.com*, 453 F.3d 1196, 1200 (9th Cir. 2006)).

ii.  A representation, omission, or practice is material if it is important to consumers and likely to affect their purchasing decisions. *FTC v. Cyberspace.com LLC*, 453 F.3d at 1201 (internal citations omitted). The failure to clearly and conspicuously disclose material terms of an offer is deceptive and violates Section 5. A false representation that a product is free or risk free is also material. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012).

b.  An act or practice is unfair under Section 5 if it causes substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

22.  The uncontroverted evidence, gleaned from a facial review of the AuraView websites (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128 ), establishes that AuraVie's "risk-free trial" or "trial order" offers were materially misleading to consumers in several ways:

a.  The overall net impression of the offers was that AuraVie products were available to consumers without risk, further

obligation, or cost—other than the disclosed nominal shipping and handling fees. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* 589-3).

b.  The offers stated that customer satisfaction was "100% guaranteed." (Ex. 909-128). In fact, customers were regularly dissatisfied with the trial offers because they resulted in undisclosed and unauthorized charges. (Exs.4 ¶ 3; 5 ¶ 3; 6 ¶ 5; 7 ¶ 3; 9 ¶ 4; 10 ¶ 3; 11 ¶ 3; 12 ¶ 5; 13 ¶ 6; 14 ¶ 5; 15 ¶ 4).

c.  The offers stated that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating. (Ex. 909-116). In fact, at least since March 2014, AuraVie did not have BBB accreditation and its rating was an F. (Exs. 907 ¶ 5; 592).

d.  The offers failed to clearly and conspicuously disclose that acceptance of the offers would result in consumers being charged as much as $97.88 for the skincare products after a 10 days or other limited time period. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* Ex. 589-4).

e.  The offers failed to clearly and conspicuously disclose that, to avoid charges, consumers would have to return the product, at

their own cost and within a short time period. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* Ex. 589-5).

 f. The offers failed to clearly and conspicuously disclose that consumers would incur restocking or other charges if they returned the product. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* Ex. 589-5).

 g. The offers failed to clearly and conspicuously disclose that acceptance of the offers would result in consumers being automatically enrolled into a negative option continuity program, receiving additional AuraVie skincare products each month, and incurring additional charges of up to $97.88 on their credit cards or debit cards each month. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* Ex. 589-5).

 h. The offers failed to clearly and conspicuously disclose how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (Exs. 903-8; 909-113; 909-115; 909-116; 909-125; 909-128. *See also* Ex. 589-5).

23. The uncontroverted evidence also establishes that AuraVie's "risk-free trial" or "trial order" offers were unfair:

1        a.  Consumers nationwide have testified, by declaration, that they

2           were subject to injury in the form of unauthorized charges for

3           product that was advertised as part of a "risk-free trial" or "trial

4           order," as well as for additional unordered and unwanted products

5           that were sent each month. (Exs. 4 ¶3; 5 ¶ 3; 6 ¶ 5; 7 ¶ 3; 9 ¶ 4; 10

6           ¶ 3; 11 ¶ 3; 12 ¶ 5; 13 ¶ 6; 14 ¶ 5; 15 ¶ 4).

7        b.  Consumers could not reasonably avoid such injury because the

8           costs and negative option continuity features of the AuraVie offers

9           were not disclosed to consumers. (Exs. 909-115; 909-125).

10      c.  Business practices that rely upon a lack of disclosure and

11          unauthorized billing provide no countervailing benefits to

12          consumers or competition.

13      d.  Courts have regularly found unauthorized billing practices to be

14          unfair. *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D.

15          Cal. 2010); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D.

16          Cal. 2000); *FTC v. Windward Mktg., Ltd.*, No. 1:96-cv-615F,

17          1997 U.S. Dist. LEXIS 17,114, at *10, 13 (N.D. Ga. Sept. 30,

18          1997).

19    24.    Defendants contend that the terms and conditions relating to the

20          "risk-free trial" or "trial order" offers of AuraVie products were

disclosed to consumers. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com*, 453 F.3d at 1200; *see also FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010); *Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999).

25.    Even assuming *arguendo* that each of the AuraVie websites included such disclosures, the disclosures were  unquestionably deficient:

> We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.  (Ex. 909-125).

a.  A facial review of the websites shows that the disclosures were not placed in proximity to the "risk-free trial" or "trial order" offer and were not of sufficient size or clarity to be readily seen by consumers. Thus, the disclosures were not sufficiently clear and

prominent so that the overall net impression of the offer was truthful. (Exs. 909-115; 909-125).

b. The disclosures failed to state whether the 10-day trial offer began on the date that the product was ordered, or days later, when the product was delivered. (Ex. 909-125).

c. The disclosures failed to state that consumers would incur restocking or other charges for returning the product. (Ex. 909-125).

d. The disclosures failed to state that refunds would not be provided after 10 days if the product was opened or 30 days if the product was unopened. (Ex. 909-125).

e. The disclosures failed to state that charges for additional products would automatically be imposed onto consumers' credit cards or debits cards. (Ex. 909-125).

26. Consumers who accepted AuraVie "risk-free trial" or "trial orders" were directed to an order confirmation page and often received an email confirming their order. The confirmation page stated that the product was being shipped at $0.00 and was also materially misleading (Exs. 902-1 thru 3; 8 ¶ 4; 8-5; 8-6; 14 ¶ 3; 15 ¶ 3; 15-5. *See also* 12 ¶¶ 2, 7; 14 ¶¶ 3, 8):

a. The overall net impression of the email was that AuraVie products were being sent to consumers "risk free" and without further cost or obligation, other than the disclosed nominal shipping and handling fee. (*Id.*).

b. The emails failed to clearly and conspicuously disclose that the consumer would be charged as much as $97.88 for the skincare products after a 10 days or other limited time period. (*Id.*).

c. The emails failed to clearly and conspicuously disclose that, to avoid charges, consumers would have to return the product, at their own cost and within a short time period. (*Id.*).

d. The emails failed to clearly and conspicuously disclose that consumers would incur restocking or other charges if they returned the product. (*Id.*).

e. The emails failed to clearly and conspicuously disclose that the consumer was automatically enrolled into a negative option plan, would receive additional AuraVie skincare products each month, and would incur additional charges of up to $97.88 on their credit cards or debit cards each month. (*Id.*).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

    f. The email failed to clearly and conspicuously disclose how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (*Id.*).

 27. There is no genuine dispute that AuraVie products were promoted, marketed, and sold using the above practices. Nor is there a genuine dispute that such practices violated Section 5 of the FTC Act:

    a. The failure to disclose, or disclose adequately, material terms and conditions of a sales offer, including: that consumers' credit card or debit card information would be billed the costs of products upon the expiration of a limited trial period; the dates on which the trial period began and ended; that consumers would be enrolled into a negative option plan with additional charges to their credit cards or debit cards; the costs of the negative option plan, and the frequency and duration of the recurring charges; the means to cancel the negative option plan to avoid additional charges; and the requirements of refund policies were deceptive omissions that were likely to mislead consumers acting reasonably. These practices violated Section 5 of the FTC Act, 15 U.S.C. § 45(a).

b. The representation that consumers could try AuraVie products "risk-free" was deceptive and likely to mislead consumers acting reasonably. This practice violated Section 5, 15 U.S.C. § 45(a).

c.  The representation that AuraVie was accredited by and had a rating of "A-" with the BBB was false and likely to mislead consumers acting reasonably. This practice also violated Section 5, 15 U.S.C. § 45(a).

d. The practice of causing charges to be submitted for payment to consumers' credit cards and debit cards without their express informed consent was unfair and violated Section 5, 15 U.S.C. § 45(n).

### Analysis of the ROSCA Violations

28.  Likewise, there is no genuine dispute that the above-described practices violated Section 4 of ROSCA, 15 U.S.C. § 8403:

a.  A negative option feature is "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).

1    b.  AuraVie treated consumers' silence or failure to take affirmative

2        action as acceptance of the offer to send and charge consumers for

3        additional AuraVie products. (*See* 909-125). Therefore, the

4        AuraVie offers included a negative option feature.

5    c.  ROSCA generally prohibits charging consumers for goods or

6        services sold on the Internet through a negative option feature,

7        unless the seller: (i) clearly and conspicuously discloses all

8        material terms of the transaction before obtaining the consumer's

9        billing information; (ii) obtains the consumer's express informed

10       consent before making the charge; and (iii) provides a simple

11       mechanism to stop recurring charges. *See* 15 U.S.C. § 8403.

12   d.  As discussed above, the AuraVie websites and offers failed to

13       clearly and conspicuously disclose all material terms of the

14       transaction before obtaining consumers' billing information;

15       failed to obtain consumers' express informed consent before

16       making charges; and failed to provide a simple mechanism to stop

17       recurring charges. These practices violated ROSCA, 15 U.S.C.

18       § 8403.

19

20

*Analysis of the EFTA Violations*

29.     Finally, there is no genuine dispute that the above-described practices violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a).

30.     A "preauthorized electronic fund transfer" is any electronic fund transfer that is authorized in advance and scheduled to recur at substantially regular intervals. 12 C.F.R. § 205.10(b).

31.     AuraVie's negative option plan, which billed consumers at regularly monthly intervals, use electronic funds transfers that were purportedly pre-authorized.

32.     Under EFTA, a preauthorized electronic fund transfer may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693a(10); *see also* Section 205.10(b) of Regulation E ("preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer.")

33.     The uncontroverted evidence shows that consumers who accepted AuraVie's "risk-free trial" or "trial order" offers did not authorize, in writing, electronic fund transfers to be made from their accounts.

Further, because the consumers had not authorized the electronic fund transfers, consumers were not provided copies of any such authorization. (*See, e.g.*, Exs. 4 ¶ 3; 5 ¶ 3; 6 ¶ 5; 7 ¶ 3; 9 ¶ 4; 10 ¶ 3; 11 ¶ 3; 12 ¶ 5; 13 ¶ 6; 14 ¶ 5; 15 ¶ 4). Accordingly, the practices violated EFTA. 15 U.S.C. § 1693e(a).

**DEFENDANTS ARE LIABLE FOR FTC ACT, ROSCA, AND EFTA VIOLATIONS**

***The Individual Defendants***

34.     Having determined that the uncontested facts prove that the AuraVie "risk-free trial" and "trial order" offers violated the FTC Act, ROSCA, and EFTA, the Court next examines whether Defendants are liable for the violations.

35.     An individual may be held liable for injunctive relief arising from deceptive or unfair acts or practices when they *either* participated directly in the acts or practices *or* had authority to control them. *FTC v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1170 (9th Cir. 1997).

  a.   Participation may include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publ'ns, Inc*., 99 F. Supp. 2d at 1206. Where an officer participates in "acts crucial to

1    the success" of an enterprise, the officer has directly participated

2    for the purposes of individual liability. *Id.*

3    b.  Authority to control may be inferred from "'active involvement in

4        business affairs and the making of corporate policy.'" *J.K.*

5        *Publ'ns*, 99 F. Supp. at 1203-04 (quoting *FTC v. Am. Standard*

6        *Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). An

7        individual's "status as a corporate officer and authority to sign

8        documents on behalf of the corporate defendant can be sufficient

9        to demonstrate the requisite control." *J.K. Publ'ns.,* 99 F. Supp. at

10       1204.

11           i.  A "corporate officer is presumed to be in control of a small,

12               closely held corporation, and assuming the duties of a

13               corporate officer is probative of an individual's participation

14               or authority." *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283,

15               2013 U.S. Dist. LEXIS 42369 at *42 (D. Nev. Mar. 26,

16               2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-

17               225DAK, 2011 U.S. Dist. LEXIS 104982 at *26 (D. Utah

18               Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*,

19               506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007); *FTC v.*

20

*Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17,114 at \*38-39 (N.D. Ga. Sept. 30, 1997).

ii. "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973).

36. To obtain equitable monetary relief against an individual, the FTC must show, in addition to one of the two factors above, that the individual had some knowledge of the company's deceptive acts or practices. *J.K. Publ'ns*, 99 F. Supp. 2d at 1204.

   a. Individuals possess the requisite knowledge if they: (i) had actual knowledge of the misrepresentations; (ii) were recklessly indifferent to the truth or falsity of the misrepresentations; or (iii) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

b. The "degree of participation in business affairs is probative of knowledge." *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

37. The FTC is not required to prove that an individual actually intended to deceive to establish knowledge. *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

38. The Court finds that Individual Defendants Alon Nottea, Doron Nottea, Igor Latsanovski, Roi Reuveni, and Alan Argaman each participated in, controlled, or had the authority to control the unlawful acts and practices at issue in this case and that each is therefore liable for injunctive relief. The Court further finds that these defendants each acted with the requisite knowledge to be held liable for equitable monetary relief and therefore a monetary judgment against them is proper.

a. **Alon Nottea** owned, operated, or controlled companies that collectively marketed and sold "AuraVie" and other skincare products though negative option continuity plans, to consumers across the United States. Acting in concert with the other named Defendants, Alon controlled, had the authority to control, or participated in the activities of BunZai Media Group, Inc.,

Pinnacle Logistics, Inc., Media Urge, Inc., Adageo, LLC, and other "AuraVie" companies, including the activities alleged in Plaintiff's Complaint.

    i.   Alon was the registrant, technical contact, administrative contact, and billing contact for the websites (auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com) used to promote the AuraVie "risk-free trial" and "trial order" offers. (Exs. 598-6; 598-7; 598-8; 598-9; 598-10). He paid for those websites with a business credit card in his name. (*See* Dkt. 6-3 at 3, 5-6, 8). Using an admitted alias, Alon also registered at least 65 domain names related to sale of the AuraVie, LeOR, and Dellure skin care products. (*See* Dkt. 120, at 31, 43-44).The evidence that Alon participated in or controlled the deceptive and unfair website offers is irrefutable.

    ii.   Evidence that Alon acted with actual knowledge of the deceptiveness of the scheme is equally irrefutable. In an audio-recorded business meeting with co-defendants Roi Reuveni and Paul Medina, Alon acknowledge that it was "completely illegal" not to disclose the terms of conditions

1    of the AuraVie sales offer on invoices. Instead of taking

2    corrective action, however, he conspired for ways to show

3    compliance without clearly disclosing the offers' terms and

4    conditions –which he believed would decrease sales. The

5    options he considered included feigning concern by

6    recording interviews with dissatisfied customers to present

7    in a potential FTC suit, indiscreetly disclosing terms "a

8    little bit grayed out" on packing slips, or trying a test run

9    with terms disclosed to gauge impact. (*See* Ex. 556 pp. 51-

10   54, 96-103).

b. **Doron Nottea** owned, operated, or controlled companies that
collectively marketed and sold "AuraVie" and other skincare
products through negative option plans to consumers across the
United States. Acting in concert with the other named Defendants,
Doron controlled, had the authority to control, or participated in
the activities of BunZai Media Group, Inc., Pinnacle Logistics,
Inc., Secured Commerce, LLC, and the other "AuraVie"
companies, including the activities alleged in Plaintiff's
Complaint.  (Ex. 554, at 65:20-66:7; 86:17-87-7; *see also* Exs. 35;
43; 544).

i.  Doron admitted to providing the book-keeping and financial-related services to companies that promoted the AuraVie "risk-free trial" and "trial order" offers, including Pinnacle Logistics, Inc. (Ex. 551 at 17:3-17:5); DSA Holdings, Inc. (Ex. 551 at 17:9-17:11); DMA Media Holdings, Inc. (Ex. 551 at 60:14-60:18); SBM Management, Inc. (Ex. 551 at 53:9-53:14); Kai Media, Inc. (Ex. 551 at 56:21-56:23); Lifestyle Media Brands, Inc. (Ex. 551 at 44:13-44:15); Agoa Holdings, Inc. (Ex. 551, at 49:3-49:7); Zen Mobile Media, Inc. (Ex. 551 at 50:17-50:19); Heritage Alliance Group, Inc. (Ex. 551 at 52:12-52:14); Safehaven Ventures, Inc. (Ex. 551 at 51:16-51:20); Insight Media, Inc. (Ex. 551 at 58:7-58:11); Secured Merchants, LLC (Ex. 551 at 58:23-59:9); Shalita Holdings, Inc. (Ex. 551 at 61:2-61:4); Allstar Beauty Products, Inc. (Ex. 551 at 61:13-61:17); and USM Products, Inc. (Ex. 551 at 68:20-68:25). He held himself out as an owner of Bunzai Media Group and Pinnacle. (Exs. 554 at 65:20-66:7, 87:17-87:7; *see also* Exs. 35, 43, 544). Email communications show that Doron was involved in management decisions

concerning corporate structure (Ex. 299; 343; 41; 374; 505;

483), operations (Exs. 330; 271; 308; 333; 47, 60), sales

(Exs. 21; 46-47; 51-52; 58-59; 335; 337), marketing (Exs.

46, 51), and human resources (Exs. 38; 84; 579). While

Doron's name may not have been listed as an owner or

shareholder, his participation and control over the

enterprises is irrefutable.

ii. The evidence also establishes that Doron knew about

deceptive and unfair practices of the business enterprise.

Indeed, in an email about "our business," Doron

acknowledged receiving warnings about possible FTC asset

freezes and the "high risk nature of our business model."

(Ex. 330).

c. **Igor Latsanovski** owned, operated, or controlled companies that

collectively marketed and sold "AuraVie" and other skincare

products through negative option plans to consumers across the

United States. Acting in concert with the other named Defendants,

Latsanovski controlled, had the authority to control, or

participated in the activities of BunZai Media Group, Inc.,

Pinnacle Logistics, Inc., Zen Mobile Media Group, Inc., and the

1    other "AuraVie" companies, including the activities alleged in

2    Plaintiff's Complaint. (Dkts. 244 ¶ 36; 245 ¶ 36).

3        i.  Latsanovski disavows his participation in or control over

4            the AuraVie companies. However, he previously attested

5            that he was employed by Bunzai Media Group (Ex. 949;

6            *see also* Ex. 402-8), and he represented to the U.S.

7            Citizenship and Immigration Services that he guided

8            "managed companies," including Pinnacle Logistics and

9            reviewed "activities of the managed call center Pinnacle

10           (including AuraVie, Dellure and Attitude . . .)" (Ex. 571-2;

11           571-3). The companies' emails confirm Latsanovski's

12           involvement in decisions concerning corporate structure

13           (Ex. 904-23), operations (Exs. 571-2; 571-3; 319; 529),

14           sales (Exs. 503; 556 at 34:2-4, 34:20-35:7), marketing (Ex.

15           564; *see* Exs. 559; 48), and human resources (Exs. 561-3;

16           588-9) and that Latsanovski referred to himself as a

17           "partner" in the businesses. (Ex. 21).  Latsanovski's

18           participation and control over the enterprises is irrefutable.

19       ii.  Latsanovski's knowledge of the deceptive and unfair

20           practices is also irrefutable. He received links to AuraVie's

1  deceptive "risk-free trial" and "trial order" offers. (Ex. 28).

2  He was aware that the AuraVie companies experienced

3  high rates of consumer chargebacks—a strong indicator of

4  consumer fraud—and that the AuraVie companies

5  responded by managing chargeback rates through "load

6  balancing." (Exs. 235; 444; 445; 656).

7  39.  **Roi Reuveni** owned, operated, or controlled companies that

8  collectively marketed and sold "AuraVie" and other skincare

9  products through negative option continuity plans to consumers

10  across the United States. Acting in concert with the other named

11  Reuveni owned, operated, controlled, had the authority to control or

12  participated in the activities of BunZai Media Group, Inc., Pinnacle

13  Logistics, Inc., Agoa Holdings, Inc., DMA Media Holdings, Inc.,

14  Secured Merchants, LLC, Chargeback Armor, Inc., and other

15  "AuraVie" companies:

16  a.  Reuveni admitted that he participated in the scheme by overseeing

17  AuraVie orders. (Ex. 553 at 54:24-55:3 and 59:19-61:24; Ex. 911-

18  37 ¶ 245; Dkt. 250 ¶ 37). He was also an employee of BunZai

19  Media and an officer and manager of Pinnacle (Exs. 553 at 18:21-

20  19:6; 911-16 ¶¶ 106-08; *see also* 910-15 ¶ 110; 912-27 ¶ 110); an

incorporator, officer or director of Agoa Holdings, Inc. (Ex. 911-37 ¶ 245; Dkt. 250 ¶ 37); managing member of Secured Merchants, with authority to sign contracts (Ex. 553, at 16:9-16-20, Ex. 412-5); president of DMA Media Holdings, Inc. (Ex. 911-37 ¶ 244); and COO of Chargeback Armor, Inc., with authority to sign contracts (Ex. 917-66 ¶ 237.Ex. 290; 917-71 ¶ 262). He received compensation from CalEnergy Inc. (Ex. 911-37 ¶ 246; *see also* Exs. 914-53 ¶ 246; 915-53 ¶ 246). Evidence of Reuveni's participation and control over the enterprise is well-documented and overwhelming.

  b. Reuveni acted with knowledge of the law violations. He was present at the meeting in which his cousin, Alon, discussed the illegality of their scheme and plans for how to prepare for the inevitable FTC enforcement action. (*See* Ex. 86). Reveuni also received chargeback reports (Exs. 144, 146) and call logs documenting customer complaints regarding undisclosed terms and conditions and unauthorized charges. (Ex. 325). He also reviewed the deceptive AuraVie websites. (Exs. 202; 203; 594).

40. **Alan Argaman ("Argaman")** owned, operated, or controlled companies that collectively marketed and sold "AuraVie" and other

skincare products through negative option continuity plans to consumers across the United States. Acting in concert with the other named Defendants, Alan Argaman controlled, had the authority to control, or participated in the activities of Secured Commerce, LLC, Secured Merchants, LLC, and the other "AuraVie" companies, including the activities alleged in Plaintiff's Complaint:

a.  Argaman owned Secured Commerce LLC, which designed, created, and helped manage the websites and landing pages used to promote the AuraVie "risk-free trial" and "trial order" offers. (Dkt. 299 ¶ 39; Ex. 46). On this basis alone, injunctive relief against Argaman is warranted. However, he was also an owner of Secured Merchants, LLC (Dkts. 299 ¶ 39; 244 ¶ 39; 245 ¶ 39; *see also* Ex. 917 ¶ 208), and provided technological solutions to help the AuraVie companies manage their negative option plans, including telephone, customer service, and chargeback refutation services. (*See* Dkts. 121-6 at 9-21; 121-7 at 1-3; Exs. 47; 149; 432; 555 at 51:3-19; *see also* Exs. 946 at 19:23-20:17; 440; 441; 516). Argaman helped plan and manage an "AuraVie Angels" promotional campaign. (Exs. 185; 494; 497). He also used

1    Secured Commerce to lease the main office suite where

2    Defendants collectively operated the scheme. (Dkt. 120 at 12).

3    b. Because he designed, created, and helped manage the websites

4    and landing pages used to promote the AuraVie "risk-free trial"

5    and "trial order" offers, Argaman unquestionably knew of the

6    deceptiveness of the AuraVie enterprise. However, the fact that he

7    played a key role in refuting consumer chargebacks for the

8    Corporate Defendants, individually and through Secured

9    Merchants LLC (Ex. 555, at 75:1-5, 86:10-25, 88:15-24), makes

10    clear that Argaman either knew that the companies were engaged

11    in deception or he was recklessly indifferent. Argaman was aware

12    that the companies operated through dozens of shell entities and

13    that they engaged in "load balancing" merchant accounts. (*See,*

14    *e.g.,* Ex. 449). Despite these clear indications of fraud, Argaman

15    continued to participate in the scheme.

16    ***The Corporate Defendants and Relief Defendant***

17    41.    **CalEnergy, Inc**. financed BunZai Media Group, Inc., and managed

18    Pinnacle Logistics, Inc., and Media Urge, Inc. (Ex. 571-2, -3; *see*

19    *also* Exs. 561-3; 588-1; 588-9). Latsanovski was the CEO of

20    CalEnergy (Ex. 904-51) and used the company to provide financing

1    for the AuraVie enterprise. CalEnergy claimed to be the parent

2    company of both Pinnacle Logistics, Inc., and Media Urge, Inc.—

3    both of which promoted the AuraVie "risk-free trial" and "trial

4    order" offers. (Dkt. 908) .

5    42.   **Secured Merchants, LLC** processed chargebacks for the AuraVie

6          companies (*see* Ex. 917-45 ¶ 56), often using the name Chargeback

7          Armor. (Exs. 280; 348; 412; 413; 555 at 75:1-5, 86:10-25, 88:15-24).

8          Secured Merchants was owned by Alan Argaman (Dkts. 299 ¶ 39;

9          244 ¶ 39; 245 ¶ 39; *see also* Ex. 917 ¶ 208) and Roi Reuveni claimed

10         to be its managing member (Ex. 412-5). Both individuals participated

11         in or controlled the unlawful activities described in Plaintiff's

12         Complaint individually and through this entity. Although the

13         company denies that it or its principals were ever involved in selling

14         AuraVie or other skincare products, its own executive summary

15         states that the company's founders owned a skincare product business

16         and created infrastructure to "to deal with [ ] inevitable credit card

17         chargebacks." (Ex. 256). Secured Merchants also managed

18         Defendants' automated customer service line. (Ex. 257-2).

19   43.   **Chargeback Armor, Inc**. gratuitously received $250,000 from

20         Secured Merchants, as start-up funds or seed money. (Exs. 916 ¶ 235;

917 ¶ 235; Dkt. # 231-1 at 53). Secured Merchants had been paid $300,000 from SBM Management, for handling the AuraVie chargebacks. (Ex. 918 ¶ 236). SBM Management derived its revenues directly from the sale-by-negative-option of AuraVie products. (Ex. 917 ¶¶ 235-236). Disgorgement of funds is proper where, as here, Chargeback Armor, can claim no legal entitlement to retaining the money. *See, e.g., FTC v. Ivy Capital, Inc.*, 2013 WL 1224613, at * 18 (relief defendant who was responsible for keeping the books and for various operations or administrative tasks is liable for disgorgement); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (relief defendant liable for the full amount off ill-gotten gains received without providing any service to the corporate defendants); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (summary judgment against a relief defendant who failed to show a legitimate claim to the ill-gotten gains received); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1009 (N.D. Cal. 2010), aff'd 475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten gains as he was "president" of a corporation "in name only" and provided no services to the corporation); *FTC v. Holiday Enter*, 2008 WL 953358, at * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant

1   who never performed work for defendant companies would not have

2   a legitimate claim); *FTC v. Think Achievement Corp.*, 144 F. Supp.

3   2d 1013, 1020-22 (N.D. Ind. 2000). Moreover, it is well-established

4   that government agencies, in an effort to maximize the recovery of

5   funds taken through fraud, may pursue individuals or companies even

6   if they are no longer in possession of the ill-gotten assets. *See, e.g.,*

7   *CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga.

8   May 7, 2012).

9   44.   Although named only as a Relief Defendant, Chargeback Armor was

10   also heavily entwined in the deceptive AuraVie operation.

11   a.   Argaman incorporated Chargeback Armor in concert with other

12   Individual Defendants. (Ex. 404). He was the company's Chief

13   Technology Officer. (Ex. 281). Reuveni, an active participant in

14   the AuraVie scheme, was the Chief of Operations of Chargeback

15   Armor, Inc. (*See* Ex. 917 ¶ 237).

16   b.   A Chargeback Armor services agreement, dated March 2, 2015,

17   listed the company's board of directors as including Alon and

18   Argaman. (Dkt. # 231-1 at 36). Its lease agreement authorized

19   Doron and Argaman to receive mail sent to Chargeback Armor.

20   (Ex. 365-13).

c. The company provided critical chargebacks refutation services the AuraVie enterprise to continue its deceptive operations. (Dkt. 231-1, at 5; Ex. 550 at 172:3-5; *see also* Exs. 946 at 24:9-23; 280; 412; 413; Dkt. 231-1 at 8). According to a Secured Merchants employee and purported Chargeback Armor CEO, Secured Merchants was "the technology company that developed the Chargeback Armor product" and subsequently "transition[ed] all clients to be billed" by Chargeback Armor. (Dkt. # 231-1 at 8).

### THE PROPER INJUNCTIVE EQUITABLE MONETARY RELIEF

45. Having found that the Individual Defendants and Corporate Defendants are liable for the FTC Act, ROSCA, and EFTA violations alleged and that the Relief Defendant has no legitimate claim to funds at issue, the Court next examines the proper forms of relief to be awarded.

46. Section 13(b) of the FTC Act authorizes courts to issue a permanent injunction whenever a defendant violates the laws enforced by the Commission and is likely to continue to violate them. *FTC v. H.N. Singer, Inc*., 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp*., 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. Medlab, Inc*., 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009). To determine

whether a defendant is likely to engage in similar violations in the future, courts look to two general factors:  (a) the deliberateness and seriousness of the present violation, and (b) the defendant's past record with respect to deceptive and unfair marketing practices. *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*, 2013 WL 1224613, at *16.  The court may also weigh the "adaptability or transferability of the unfair practice to other products." *Id*.  This Court finds that a permanent injunction against all defendants is proper and serves the public interest.

47.  Further, "[a] court may frame an injunction based on violation of the FTC Act broadly enough to prevent the defendant from engaging in similar illegal conduct in the future." *FTC v. Neovi, Inc*., No. 06-1952 JLS, 2010 WL 3789713, at *2 (S.D. Cal. Sept. 27, 2010) (citing *FTC v. Colgate-Palmolive*, 380 U.S. 374, 395 (1965)). Numerous courts have imposed bans enjoining future participation in a particular line of business. *See, e.g., FTC v. Gill*, 265 F.3d 944, 957-58 (9th Cir. 2001) (ban on engaging in the credit repair business); *Ivy Capital*, 2013 WL 1224613, at *16 (ban on business coaching); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1013 (C.D. Cal. 2012) (ban on telemarketing and producing or disseminating

infomercials); *Grant Connect*, 827 F. Supp. 2d at 1233 (ban on

marketing and selling grant products and business opportunities);

*FTC v. Dinamica Financiera*, No. 2:09-03554, 2010 WL 9488821, at

*12 (C.D. Cal. Aug. 19, 2010) (ban on loan modification and

foreclosure relief services); *FTC v. Neiswonger*, 494 F. Supp. 2d

1067, 1084 (E.D. Mo. 2007) (ban on marketing  business

opportunities); *FTC v. Bay Area Bus. Council, Inc.,* No. 02-5762

(N.D. Ill. Apr. 16, 2004) (ban on telemarketing and on sale of credit-

related products), aff'd, 423 F.3d 627 (7th Cir. 2005); *FTC v. Credit

Enhancement Servs.*, No. 02-2134 (E.D.N.Y. Mar. 31, 2004) (ban on

marketing or selling credit-related goods or services); *FTC v.

Consumer Alliance*, No. 02-2429 (N.D. Ill. Sept.29, 2003) (ban on

telemarketing and sales of credit card protection and credit-related

products). Such a ban, prohibiting Defendants from engaging in

future negative options sales, is appropriate here.

48. Where consumers suffer economic injury resulting from defendants'

violations of the FTC Act, equity requires monetary relief in the full

amount of consumers' losses (or ill-gotten gains). *FTC v. Stefanchik*,

559 F.3d 924, 931 (9th Cir. 2009) (affirming summary judgment

holding defendants liable for the full amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

49. To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate. *See Commerce Planet*, 878 F. Supp. 2d at 1089 (citing *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)). "Fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendants' burden to show inaccuracy." *Id.*

50. Where defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

51. Here, the Court's Receiver determined that the amount of Defendants' ill-gotten gains or consumer injury is $75,624,030. The Court therefore finds that the Individual Defendants and Corporate Defendants shall be jointly and severally liable for that amount.

52. As for the Relief Defendant, the appropriate remedy is an equitable monetary judgment equivalent to the amount of ill-gotten gains that

the relief defendant received. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1273. Thus, Relief Defendant Chargeback Armor is liable to disgorge the $250,000 it gratuitously received from Defendants.

**NOW THEREFORE, the Court HEREBY ORDERS:**

**PERMANENT INJUNCTION AND MONETARY JUDGMENT**

**DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A.     "**Acquirer**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization  that operates or licenses a credit card system (*e.g.* Visa, MasterCard, American Express, and Discover) to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

B.     "**Charge**" or "**Charging**" means causing billing information to be submitted for payment, including against a consumer's credit card, debit card, bank account, phone bill, or other account, or otherwise attempting to collect money or other consideration.

C.     "**Clear and conspicuous**" means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     On a product label, the disclosure must be presented on the principal display panel.

6.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

7.      The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

8.      The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

9.      When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

D.      "**Credit Card Laundering**" means:

1.      Presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and any Defendant;

2.      Employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a

transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or

3.      Obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

E.      "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

F.      "**Continuity Plan**" means any plan, arrangement, or system in which a consumer is periodically charged for products or services *without* prior notification by the seller before each charge.

G.      Hereinafter, "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

1.      Hereinafter, "**Corporate Defendants**" means Calenergy, Inc. and Secured Merchants, LLC and their successors and assigns

2.      Hereinafter, "**Individual Defendants**" means Alon Nottea, Doron Nottea, Igor Latsanovski, Roi Reuveni, and Alan Argaman individually, collectively, or in any combination.

H.      "**Electronic Fund Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is

initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone.  Such term does not include:

1.     Any check guarantee or authorization service that does not directly result in a debit or credit to a consumer's account;

2.     Any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and that is not designed primarily to transfer funds on behalf of a consumer;

3.     Any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission;

4.     Any automatic transfer from a savings account to a demand deposit account pursuant to an agreement between a consumer and a financial institution for the purpose of covering an overdraft or maintaining an agreed upon minimum balance in the consumer's demand deposit account; or

5.     Any transfer of funds which is initiated by a telephone conversation

between a consumer and an officer or employee of a financial institution which is

not pursuant to a prearranged plan and under which periodic or recurring

transfers are not contemplated.

I.      "**Material**" means likely to affect a person's choice of, or conduct

regarding, goods or services.

J.      "**Merchant**" means a person who is authorized under a written contract with

an Acquirer to honor or accept credit cards, or to transmit or process for payment

credit card payments, for the purchase of goods or services.

K.      "**Merchant Account**" means an account with an Acquirer that authorizes

and allows a Merchant to honor or accept credit cards, or to transmit or process for

payment credit card payments, for the purchase of goods or services or a

charitable contribution.

L.      "**Negative Option Feature**" means, in an offer or agreement to sell or

provide any good or service, a provision under which the consumer's silence or

failure to take an affirmative action to reject a good or service or to cancel the

agreement is interpreted by the seller or provider as acceptance or continuing

acceptance of the offer or agreement.

M.      "**Preauthorized Electronic Fund Transfer**" as defined by the Electronic

Fund Transfer Act, 15 U.S.C. § 1693a(10), means an electronic fund transfer

authorized in advance to recur at substantially regular intervals.

N.     "**Receiver**" means Charlene Koonce, the person appointed by the Court in this matter pursuant to the Temporary Restraining Order and the Preliminary Injunction.

## ORDER

## I.     BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Defendants are permanently restrained and enjoined from advertising, marketing, promoting, or offering for sale any good or service with a Negative Option Feature, whether directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising.

## II.     PROHIBITED BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service, are permanently restrained and enjoined from:

A.     Before a customer consents to pay for such good or service, failing to disclose, or assisting others in failing to disclose, in a clear and conspicuous manner all material terms and conditions of any offer, including:

    1.     The amount, timing, and manner of all fees, charges, or other amounts that a consumer will be charged or billed, including but not

limited to the date of the charge and whether it will be a credit card charge or checking account debit;

2.     The dates that any limited time sales offer begins and ends;

3.     The identity of the seller, including the seller's name, physical address, and customer service telephone number;

4.     The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer; and

5.     Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer.

B.     Before a customer consents to pay for such good or service, failing to disclose, or assisting others in failing to disclose, in a clear and conspicuous manner all material terms and conditions of any refund or cancellation policies, including:

1.     The specific steps and means by which such requests must be submitted;

2.     The customer service telephone number that a customer must call to cancel or return goods or services;

3.     The email address, web address, or street address to which such requests must be directed;

4.      Any mechanism that customers must use to return any goods or services, including any requirement for specific tracking methods or delivery confirmation for a package;

5.      If there is any policy of not making refunds or cancellations, including any requirement that a product will not be accepted for return or refund unless it is unopened and in re-sellable condition, a statement regarding this policy; and

6.      The date by which a customer is required to request a refund;

C.      Misrepresenting, or assisting others in misrepresenting, expressly or by implication, any fact material, including:

1.      That a good or service is free, a bonus, a gift, a trial, without cost;

2.      That a good or service is available for a minimal processing, service, or administrative fee or without further obligation;

3.      That a purchase is "risk free" or offered with a satisfaction guarantee or money-back guarantee;

4.      That the seller is accredited or rated favorably by the Better Business Bureau;

5.      A seller's affiliation with, or endorsement or sponsorship by, any person or entity;

6.      The amount that a consumer's credit or debit card will be charged and the timing of the charge(s);

7.      That a transaction has been authorized by a consumer;

8.      The dates that any limited time sales offer begins and ends;

9.      The requirements or terms of the seller's refund or cancellation policies;

10.     The identity of the seller, including the seller's name, physical address, and customer service telephone number;

11.     The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;

12.     Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer; and

13.     Any material aspect of the performance, efficacy, nature, or central characteristics of a good or service.

D.      Providing false information to any bank or other billing entity, directly or indirectly, to contest a consumer's request for a refund, cancellation, chargeback, or reversal of payment;

E.      Failing to obtain a consumer's express informed consent by causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services without the consumer's express verifiable

authorization, which shall include: (a) the customer's signature, including an electronic or digital form of signature that is recognized as a valid signature under federal law; or (b) express oral authorization that is audio-recorded and made available to the customer and the customer's bank or other billing entity and that evidences clearly both the customer's authorization of payment and the customer's receipt of the following information: (i) The number of debits, charges, or payments (if more than one); (ii) the date(s) the debit(s), charge(s), or payment(s) will be submitted for payment; (iii) the amounts of the debit(s), charge(s), or payment(s); (iv) the customer's name; (v) the customer's billing information identified with sufficient specificity such that the customer understands what account will be used to collect payment; (vi) identification of the seller's name, physical address, and telephone number; (vii) the date of the customer's oral authorization.;

F.      Failing to obtaining written authorization signed or similarly authenticated from consumers for Preauthorized Electronic Fund Transfers from the consumer's account; or

G.      Failing to provide a copy of a written authorization signed or similarly authenticated by a consumer for Preauthorized Electronic Fund Transfers from the consumer's account.

### III.    PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service, are permanently restrained and enjoined from Credit Card Laundering.

### IV.    MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.    Judgment in the amount of **SEVENTY FIVE MILLION SIX HUNDRED AND TWENTY FOUR THOUSAND AND THIRTY Dollars ($75,624,030)** is entered in favor of the Commission against Individual Defendants and Corporate Defendants, jointly and severally, as equitable monetary relief.

B.    Defendants are ordered to pay to the Commission the amount of **SEVENTY FIVE MILLION SIX HUNDRED AND TWENTY FOUR THOUSAND AND THIRTY Dollars ($75,624,030),** within 7 days of entry of this Order.

C.    Judgment in the amount of **TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00)** is entered in favor of the Commission against Relief Defendant Chargeback Armor, Inc.

1    D.      Relief Defendant is ordered to pay to the Commission the amount of **TWO**

2    **HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00)** within 7

3    days of entry of this Order.

## V.    ADDITIONAL MONETARY PROVISIONS

4

5          **IT IS FURTHER ORDERED** that:

6    A.      Within 7 days of entry of this Order, Defendants must submit their

7    Taxpayer Identification Numbers (Social Security Numbers or Employer

8    Identification Numbers) to the Commission, for use in collecting and reporting on

9    any delinquent amount arising out of this Order, in accordance with 31 U.S.C.

10   §7701.

11   B.      All money paid to the Commission pursuant to this Order may be deposited

12   into a fund administered by the Commission or its designee to be used for

13   equitable relief, including consumer redress and any attendant expenses for the

14   administration of any redress fund. If a representative of the Commission decides

15   that direct redress to consumers is wholly or partially impracticable or money

16   remains after redress is completed, the Commission may apply any remaining

17   money for such other equitable relief (including consumer information remedies)

18   as it determines to be reasonably related to Defendants' practices alleged in the

19   Complaint. Any money not used for such equitable relief is to be deposited to the

20   U.S. Treasury as disgorgement. Defendants have no right to challenge

any actions the Commission or its representatives may take pursuant to this Subsection.

C.      Any asset freeze is modified to permit the payments/transfers identified in the Monetary Judgment Section.

## VI.    RECEIVERSHIP

**IT IS FURTHER ORDERED** that **Charlene Koonce**, of **Scheef & Stone, LLP**, is appointed as Permanent Equity Receiver ("Receiver") for the Corporate Defendants and any of their affiliates, subsidiaries, divisions, or sales or customer service operations, wherever located, with the full power of an equity receiver. The Receiver shall complete liquidation of all assets of the Corporate Defendants and without further order of the Court. The Receiver shall use the proceeds of the sales of these assets to pay any legitimate liens and necessary expenses relating to the sales. Upon liquidation of these assets, the Receiver shall submit her final report and application for fees and expenses relating to the receivership over the Corporate Defendants and, and upon approval of the same by the Court, shall pay any remaining funds, less claims approved by the Court, to the Commission. Upon the Court's approval of the Receiver's final report as to the Corporate Defendants, and the payment of any remaining funds to the Commission under this Section, the Receivership over the Corporate Defendants shall be terminated. Upon termination of the Receivership, the Receiver shall return or provide copies to the

1    Defendants of all of Defendants' documents seized by the Receiver, with the

2    exception of Customer Information

### VII.    CUSTOMER INFORMATION

4    **IT IS FURTHER ORDERED** that Defendants, their officers, agents,

5    employees, and attorneys, and all other persons in active concert or participation

6    with any of them, who receive actual notice of this Order, whether acting directly

7    or indirectly, are permanently restrained and enjoined from directly or indirectly:

8    A.     Failing to provide sufficient consumer information to enable the

9    Commission to efficiently administer consumer redress. If a representative of the

10   Commission requests in writing any information related to redress, Defendants

11   must provide it, in the form prescribed by the Commission, within 14 days.

12   B.      Disclosing, using, or benefitting from consumer information, including the

13   name, address, telephone number, email address, Social Security number, other

14   identifying information, or any data that enables access to a consumer's account

15   (including a credit card, bank account, or other financial account), that any

16   Defendant obtained prior to entry of this Order in connection with the sale of any

17   product through a negative option continuity plan; and

18   C.     Failing to destroy such consumer information in all forms in their

19   possession, custody, or control within 30 days after receipt of written direction to

20   do so from a representative of the Commission.

[PROPOSED] ORDER GRANTING PLAINTIFF FEDERAL TRADE COMMISSION
SUMMARY JUDGMENT                                              PAGE 59

Provided, however, that consumer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## VIII.   COOPERATION

**IT IS FURTHER ORDERED** that Defendants and Relief Defendant must fully cooperate with representatives of the Commission and the Receiver in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Defendants must provide truthful and complete information, evidence, and testimony. Defendants must appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission or Receiver representative may reasonably request upon 5 days written notice, or other reasonable notice, at such places and times as a Commission or Receiver representative may designate, without the service of a subpoena.

## IX.   ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants and Relief Defendant obtain acknowledgments of receipt of this Order:

A.     Each Defendant and Relief Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, each Defendant and Relief Defendant, for any business that he, individually or collectively with any other Defendant, is the majority owner or controls directly or indirectly, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which each Defendant delivered a copy of this Order, such Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## X.    COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to the Commission:

A.      One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

        1.      Each Defendant must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with such Defendant;

(b) identify all of such Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

(c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant which Defendants must describe if he knows or should know due to his own involvement; (d) describe in detail whether and how each Defendant is in compliance with each Section of this Order; and

(e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.    Additionally, each Defendant must:  (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and

(c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.    For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1        1.     Each Defendant must report any change in:  (a) any designated point

2    of contact; or (b) the structure of any entity that such Defendant has any

3    ownership interest in or controls directly or indirectly that may affect compliance

4    obligations arising under this Order, including:  creation, merger, sale, or

5    dissolution of the entity or any subsidiary, parent, or affiliate that engages in any

6    acts or practices subject to this Order.

7        2.     Additionally, each Defendant must report any change in:

8    (a) name, including aliases or fictitious name, or residence address; or (b) title or

9    role in any business activity, including any business for which such Defendant

10    performs services whether as an employee or otherwise and any entity in which

11    such Defendant has any ownership interest, and identify the name, physical

12    address, and any Internet address of the business or entity.

13    C.     Each Defendant must submit to the Commission notice of the filing of any

14    bankruptcy petition, insolvency proceeding, or similar proceeding by or against

15    such Defendant within 14 days of its filing.

16    D.     Any submission to the Commission required by this Order to be sworn

17    under penalty of perjury must be true and accurate and comply with 28 U.S.C. §

18    1746, such as by concluding:  "I declare under penalty of perjury under the laws

19    of the United States of America that the foregoing is true and correct.  Executed

20    on: _____" and supplying the date, signatory's full name, title (if applicable), and

1  signature.

2  E.      Unless otherwise directed by a Commission representative in writing, all

3  submissions to the Commission pursuant to this Order must be emailed to

4  DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:

5  Associate Director for Enforcement, Bureau of Consumer Protection, Federal

6  Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The

7  subject line must begin:  *FTC v. BunZai Media Group, Inc*., et al. FTC File No.

8  X150047.

9                          **XI.    RECORDKEEPING**

10         **IT IS FURTHER ORDERED** that each Defendant must create certain

11  records for 20 years after entry of the Order, and retain each such record for 5

12  years.  Specifically, each Defendant for any business that such Defendant,

13  individually or collectively with any other Defendants, is a majority owner or

14  controls directly or indirectly, must create and retain the following records:

15  A.      Accounting records showing the revenues from all goods or services sold;

16  B.      Personnel records showing, for each person providing services, whether as

17  an employee or otherwise, that person's:  name; addresses; telephone numbers;

18  job title or position; dates of service; and (if applicable) the reason for

19  termination;

20  C.      Records of all consumer complaints and refund requests, whether received

1  directly or indirectly, such as through a third party, and any response;

2  D.      All records necessary to demonstrate full compliance with each provision of

3  this Order, including all submissions to the Commission; and

4  E.      A copy of each unique advertisement or other marketing material, including

5  Internet and social media advertising or webpages.

6                    **XII.   COMPLIANCE MONITORING**

7          **IT IS FURTHER ORDERED** that, for the purpose of monitoring each

8  Defendant's compliance with this Order, including any failure to transfer any

9  assets as required by this Order:

10  A.      Within 14 days of receipt of a written request from a representative of the

11  Commission, each Defendant must:  submit additional compliance reports or other

12  requested information, which must be sworn under penalty of perjury; appear for

13  depositions; and produce documents for inspection and copying.  The

14  Commission is also authorized to obtain discovery, without further leave of court,

15  using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30

16  (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

17  B.      For matters concerning this Order, the Commission is authorized to

18  communicate directly with Defendants. Defendants must permit representatives of

19  the Commission to interview any employee or other person affiliated with any

20  such Defendant who has agreed to such an interview.  The person interviewed

1    may have counsel present.

2    C.      The Commission may use all other lawful means, including posing, through

3    its representatives as consumers, suppliers, or other individuals or entities, to any

4    Defendant or any individual or entity affiliated with any such Defendant, without

5    the necessity of identification or prior notice.  Nothing in this Order limits the

6    Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of

7    the FTC Act, 15 U.S.C. §§ 49, 57b-1.

8                    **XIII.    CONSUMER REPORTING AGENCIES**

9            Upon written request from a representative of the Commission, any

10    consumer reporting agency must furnish consumer reports concerning any

11    Defendant, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C.

12    §1681b(a)(1).

13                    **XIV.    RETENTION OF JURISDICTION**

14            **IT IS FURTHER ORDERED** that this Court retains jurisdiction of this

15    matter for purposes of construction, modification, and enforcement of this Order.

16

17            **SO ORDERED this ___ day of _____, 2016.**

18

19                                    _____
                                      **UNITED STATES DISTRICT JUDGE**

20