### FEDERAL TRADE COMMISSION

### FINANCIAL STATEMENT OF INDIVIDUAL DEFENDANT

**Definitions and Instructions:**

1. Complete all items. Enter "None" or "N/A" ("Not Applicable") in the first field only of any item that does not apply to you. If you cannot fully answer a question, explain why.

2. "Dependents" include your spouse, live-in companion, dependent children, or any other person, whom you or your spouse (or your children's other parent) claimed or could have claimed as a dependent for tax purposes at any time during the past five years.

3. "Assets" and "Liabilities" include ALL assets and liabilities, located within the United States or any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

4. Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number(s) being continued.

5. Type or print legibly.

6. Initial each page in the space provided in the lower right corner.

7. Sign and date the completed financial statement on the last page.

**Penalty for False Information:**

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

(1) "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact; makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

(3) "in any ( . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration" (18 U.S.C. § 1623).

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

Attachment A

## BACKGROUND INFORMATION

### Item 1. Information About You

| | |
|---|---|
| Full Name **Doron Nottea** | Social Security No. ████-4434 |
| Current Address of Primary Residence **Tarzana, CA** ████ | Driver's License No. ████ · State Issued **CA** |
| | Phone Numbers Home: **818 262-9999** Fax: ( ) · Date of Birth: / / (mm/dd/yyyy) · Place of Birth **Israel** |
| ☐ Rent ☑ Own · From (Date): **04/18/2005** (mm/dd/yyyy) | E-Mail Address ████ **@gmail.com** |
| Internet Home Page **N/A** | |

**Previous Addresses for past five years** (if required, use additional pages at end of form)

| Address | |
|---|---|
| **N/A** | From: / / (mm/dd/yyyy) Until: / / (mm/dd/yyyy) ☐ Rent ☐ Own |
| Address | From: / / Until: / / ☐ Rent ☐ Own |
| Address | From: / / Until: / / ☐ Rent ☐ Own |

Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used:

### Item 2. Information About Your Spouse or Live-In Companion

| | |
|---|---|
| Spouse/Companion's Name **Lori Bekhor** | Social Security No. ████1588 · Date of Birth / / (mm/dd/yyyy) |
| Address (if different from yours) | Phone Number (818) 262-9771 · Place of Birth **Los Angeles, CA** |
| | ☐ Rent ☐ Own · From (Date): / / (mm/dd/yyyy) **04/18/2005** |

Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used:

| | |
|---|---|
| Employer's Name and Address **Not Employed** | Job Title |
| | Years in Present Job · Annual Gross Salary/Wages $ |

### Item 3. Information About Your Previous Spouse

| | |
|---|---|
| Name and Address | Social Security No. |
| | Date of Birth / / (mm/dd/yyyy) |

### Item 4. Contact Information (name and address of closest living relative other than your spouse)

| | |
|---|---|
| Name and Address **James W. Spertus, Spertus, Landes & Umhofer, LLP, 1990 S. Bundy Dr., Ste. 705, Los Angeles, CA 90025** | Phone Number ( ) **(310) 826-4700** |

Initials: _DN_

**EXHIBIT 941**

## Item 5. Information About Dependents (whether or not they reside with you)

| Name and Address | Social Security No. | Date of Birth |
|---|---|---|
| Leelle Nottea | | / / (mm/dd/yyyy) |
| | Relationship Daughter | |
| Name and Address | Social Security No. | Date of Birth |
| Oriel Nottea | | / / (mm/dd/yyyy) |
| | Relationship Son | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |

## Item 6.  Employment Information/Employment Income

Provide the following information for this year-to-date and for each of the previous five full years, for each business entity of which you were a director, officer, member, partner, employee (including self-employment), agent, owner, shareholder, contractor, participant or consultant at any time during that period. "Income" includes, but is not limited to, any salary, commissions, distributions, draws, consulting fees, loans, loan payments, dividends, royalties, and benefits for which you did not pay (e.g., health insurance premiums, automobile lease or loan payments) received by you or anyone else on your behalf.

| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
|---|---|---|---|---|
| NFT Holdings Inc. 6925 Canby Ave, #109 Reseda CA, 91335 | From (Month/Year) 01/2012 | To (Month/Year) Current | Year 20 15 2014 2013 2012 | Income $ 38,500 $ 52,200 $ $ 87,000 $ 97,500 $ |
| Ownership Interest? ☑ Yes ☐ No | | | | |
| Positions Held CEO, CFO, Secretary | From (Month/Year) / / / | To (Month/Year) / | | |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. Information currently unavailable | |
| Xposed Entertainment Inc. 7900 Gloria Ave Van Nuys CA 91406 | From (Month/Year) '2002 | To (Month/Year) '2012 | Year 20 | Income $ $ |
| Ownership Interest? ☑ Yes ☐ No | | | | |
| Positions Held CEO | From (Month/Year) / / / | To (Month/Year) / / / | | $ $ $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| Secured Commerce, LLC 6925 Canby Ave., #105 Reseda, CA 91335 | From (Month/Year) 06 '2012 | To (Month/Year) current | Year 20 15 2014 2013 2012 | Income $ N/A $ N/A $ 21,890 $ 0 $ |
| Ownership Interest? ☑ Yes ☐ No | | | | |
| Positions Held Member | From (Month/Year) / / / | To (Month/Year) / / / | | $ |

Initials: _____

**Item 7.  Pending Lawsuits Filed By or Against You or Your Spouse**

List all pending lawsuits that have been filed by or against you or your spouse in any court or before an administrative agency in the United States or in any foreign country or territory.  *Note:  At Item 12, list lawsuits that resulted in final judgments or settlements in your favor.  At Item 21, list lawsuits that resulted in final judgments or settlements against you.*

| Caption of Proceeding | Court or Agency and Location | Case No. | Nature of Proceeding | Relief Requested | Status or Disposition |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Item 8.  Safe Deposit Boxes**

List all safe deposit boxes located within the United States or in any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents.

| Name of Owner(s) | Name & Address of Depository Institution | Box No. | Contents |
|---|---|---|---|
| Doron Nottea | Bank of America, 16640 Ventura Bvd. Encino, CA 91436 | 4151 | cash and jewelry |
| | | | |
| | | | |

Initials: _DN_

## FINANCIAL INFORMATION

**REMINDER:** When an item asks for information regarding your "assets" and "liabilities" include ALL assets and liabilities, located within the United States or in any foreign country or territory, or institution, whether held individually or jointly, and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents. In addition, provide all documents requested in Item 24 with your completed Financial Statement.

### ASSETS

**Item 9. Cash, Bank, and Money Market Accounts**
List cash on hand (as opposed to cash in bank accounts or other financial accounts) and all bank accounts, money market accounts, or other financial accounts, including but not limited to checking accounts, savings accounts, and certificates of deposit. The term "cash on hand" includes but is not limited to cash in the form of currency, uncashed checks, and money orders.

a. Amount of Cash on Hand $ 800        Form of Cash on Hand   currency

| b.  Name on Account | Name & Address of Financial Institution | Account No. | Current Balance |
|---|---|---|---|
| See Attachment A | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

**Item 10.  Publicly Traded Securities**
List all publicly traded securities, including but not limited to, stocks, stock options, corporate bonds, mutual funds, U.S. government securities (including but not limited to treasury bills and treasury notes), and state and municipal bonds. Also list any U.S. savings bonds.

| Owner of Security | Issuer | Type of Security | No. of Units Owned |
|---|---|---|---|
| Broker House, Address | Broker Account No. | | |
| | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | Broker Account No. | | |
| | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | Broker Account No. | | |
| | Current Fair Market Value $ | Loan(s) Against Security $ | |

Initials: _____

## Item 11. Non-Public Business and Financial Interests

List all non-public business and financial interests, including but not limited to any interest in a non-public corporation, subchapter-S corporation, limited liability corporation ("LLC"), general or limited partnership, joint venture, sole proprietorship, international business corporation or personal investment corporation, and oil or mineral lease.

| Entity's Name & Address | Type of Business or Financial Interest (e.g., LLC, partnership) | Owner (e.g., self, spouse) | Ownership % | If Officer, Director, Member or Partner: Exact Title |
|---|---|---|---|---|
| NFT Holdings Inc. 6925 Canby Ave. #109 Reseda CA, 91335 | S-Corp | Self | 100 | Owner |
| Vertex Holdings Inc. 6925 Canby Ave. #109 Reseda CA, 91335 | S-Corp | Self | 100 | Owner |
| Secured Commerce, LLC 6925 Canby Ave., #105 Reseda, CA 91335 | LLC | Self | 50 | Member |

## Item 12. Amounts Owed to You, Your Spouse, or Your Dependents

| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
|---|---|---|---|
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |
| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |

## Item 13. Life Insurance Policies

List all life insurance policies (including endowment policies) with any cash surrender value.

| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value |
|---|---|---|---|
| WRL Trans America | Leelle Nottea & Oriel Nottea | ▮▮▮▮ | $ 1,000,000 |
| | Insured Doron Nottea | Loans Against Policy $ 0 | Surrender Value $ 80,000 |
| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
| | Insured | Loans Against Policy $ | Surrender Value $ |

## Item 14. Deferred Income Arrangements

List all deferred income arrangements, including but not limited to, deferred annuities, pensions plans, profit-sharing plans, 401(k) plans, IRAs, Keoghs, other retirement accounts, and college savings plans (e.g., 529 Plans).

| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. | |
|---|---|---|---|---|
| | Date Established / / (mm/dd/yyyy) | Type of Plan | Surrender Value before Taxes and Penalties $ | |
| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. | |
| | Date Established / / | Type of Plan | Surrender Value before Taxes and Penalties $ | |

Initials: ▮▮▮

## Item 15.  Pending Insurance Payments or Inheritances
List any pending insurance payments or inheritances owed to you.

| Type | Amount Expected | Date Expected (mm/dd/yyyy) |
|---|---|---|
| None | $ | / / |
| | $ | / / |
| | $ | / / |

## Item 16.  Vehicles
List all cars, trucks, motorcycles, boats, airplanes, and other vehicles.

| Vehicle Type Sedan | Year 2014 | Registered Owner's Name Dolon Nottea | Purchase Price Lease $ | Original Loan Amount $ N/A | Current Balance $ N/A |
|---|---|---|---|---|---|
| Make Maserati | | Registration State & No. | Account/Loan No. N/A | Current Value $ Lease | Monthly Payment $ 1100 |
| Model Ghibli | | Address of Vehicle's Location | Lender's Name and Address Ally Bank, P.O. Box 78234, Phoenix, AZ 85062-8234 | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

## Item 17.  Other Personal Property
List all other personal property not listed in Items 9-16 by category, whether held for personal use, investment or any other reason, including but not limited to coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| | | | $ | $ |
| | | | $ | $ |
| | | | $ | $ |

Initials: ⟋⟍

## Item 18.  Real Property
List all real property interests (including any land contract)

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |  |
|---|---|---|---|
| Tarzana CA | Residential House | Doron Nottea |  |

| Acquisition Date (mm/dd/yyyy) 04 /28 /2005 | Purchase Price $ 1.599.000 | Current Value $ 1.550.000 | Basis of Valuation Realtor.com/Zillow.com |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ 1,000,000 |
|---|---|---|
| HSBC Bank USA, N.A. P.O. Box 7151 Pasadena, CA 91109 |  | Monthly Payment $ 4,300.00 |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
|  | Current Balance $ | Monthly Rent Received $ |

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages |
|---|---|---|
|  |  |  |

| Acquisition Date (mm/dd/yyyy) /   / | Purchase Price $ | Current Value $ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ |
|---|---|---|
|  |  | Monthly Payment $ |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
|  | Current Balance $ | Monthly Rent Received $ |

## LIABILITIES

## Item 19.  Credit Cards
List each credit card account held by you, your spouse, or your dependents, and any other credit cards that you, your spouse, or your dependents use, whether issued by a United States or foreign financial institution.

| Name of Credit Card (e.g., Visa, MasterCard, Department Store) | Account No. | Name(s) on Account | Current Balance |
|---|---|---|---|
| Bank Of America | 1287 | Doron Nottea | $ 30,000 |
| Chase | 5943 | Doron Nottea | $ 24,000 |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |

## Item 20.  Taxes Payable
List all taxes, such as income taxes or real estate taxes, owed by you, your spouse, or your dependents.

| Type of Tax | Amount Owed | Year Incurred |
|---|---|---|
|  | $ |  |
|  | $ |  |
|  | $ |  |

Initials: _AV_

**EXHIBIT 941**

## Item 21.  Other Amounts Owed by You, Your Spouse, or Your Dependents

List all other amounts, not listed elsewhere in this financial statement, owed by you, your spouse, or your dependents.

| Lender/Creditor's Name, Address, and Telephone No. | | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) | | | |
| --- | --- | --- | --- | --- | --- |
| | | Lender/Creditor's Relationship to You | | | |
| Date Liability Was Incurred  /  /  (mm/dd/yyyy) | Original Amount Owed $ | | Current Amount Owed $ | | Payment Schedule |
| Lender/Creditor's Name, Address, and Telephone No. | | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) | | | |
| | | Lender/Creditor's Relationship to You | | | |
| Date Liability Was Incurred  /  /  (mm/dd/yyyy) | Original Amount Owed $ | | Current Amount Owed $ | | Payment Schedule |

## OTHER FINANCIAL INFORMATION

## Item 22.  Trusts and Escrows

List all funds and other assets that are being held in trust or escrow by any person or entity for you, your spouse, or your dependents.  Include any legal retainers being held on your behalf by legal counsel.  Also list all funds or other assets that are being held in trust or escrow by you, your spouse, or your dependents, for any person or entity.

| Trustee or Escrow Agent's Name & Address | Date Established (mm/dd/yyyy) | Grantor | Beneficiaries | Present Market Value of Assets* |
| --- | --- | --- | --- | --- |
| | /  / | | | $ |
| | /  / | | | $ |
| | /  / | | | $ |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

## Item 23.  Transfers of Assets

List each person or entity to whom you have transferred, in the aggregate, more than $5,000 in funds or other assets during the previous five years by loan, gift, sale, or other transfer (exclude ordinary and necessary living and business expenses paid to unrelated third parties).  For each such person or entity, state the total amount transferred during that period.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value* | Transfer Date (mm/dd/yyyy) | Type of Transfer (e.g., Loan, Gift) |
| --- | --- | --- | --- | --- |
| | | $ | /  / | |
| | | $ | /  / | |
| | | $ | /  / | |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

Initials: _JW_

**Item 24.  Document Requests**
Provide copies of the following documents with your completed Financial Statement.

|  |  |
|---|---|
|  | Federal tax returns filed during the last three years by or on behalf of you, your spouse, or your dependents. |
|  | All applications for bank loans or other extensions of credit (other than credit cards) that you, your spouse, or your dependents have submitted within the last two years, including by obtaining copies from lenders if necessary. |
| Item 9 | For each bank account listed in Item 9, all account statements for the past 3 years. |
| Item 11 | For each business entity listed in Item 11, provide (including by causing to be generated from accounting records) the most recent balance sheet, tax return, annual income statement, the most recent year-to-date income statement, and all general ledger files from account records. |
| Item 17 | All appraisals that have been prepared for any property listed in Item 17, including appraisals done for insurance purposes.  You may exclude any category of property where the total appraised value of all property in that category is less than $2,000. |
| Item 18 | All appraisals that have been prepared for real property listed in Item 18. |
| Item 21 | Documentation for all debts listed in Item 21. |
| Item 22 | All executed documents for any trust or escrow listed in Item 22.  Also provide any appraisals, including insurance appraisals that have been done for any assets held by any such trust or in any such escrow. |

## SUMMARY FINANCIAL SCHEDULES

**Item 25.  Combined Balance Sheet for You, Your Spouse, and Your Dependents**

| Assets |  | Liabilities |  |
|---|---|---|---|
| Cash on Hand (Item 9) | $ 800 | Loans Against Publicly Traded Securities (Item 10) | $ |
| Funds Held in Financial Institutions (Item 9) | $ 494,708.93 | Vehicles - Liens (Item 16) | $ |
| U.S. Government Securities (Item 10) | $ | Real Property – Encumbrances (Item 18) | $ 1,000,000 |
| Publicly Traded Securities (Item 10) | $ | Credit Cards (Item 19) | $ 54,000 |
| Non-Public Business and Financial Interests (Item 11) | $ | Taxes Payable (Item 20) | $ |
| Amounts Owed to You (Item 12) | $ | Amounts Owed by You (Item 21) | $ |
| Life Insurance Policies (Item 13) | $ 80,000 | Other Liabilities (Itemize) |  |
| Deferred Income Arrangements (Item 14) | $ |  | $ |
| Vehicles (Item 16) | $ |  | $ |
| Other Personal Property (Item 17) | $ |  | $ |
| Real Property (Item 18) | $ 1,550,000.00 |  | $ |
| Other Assets (Itemize) |  |  | $ |
|  | $ |  | $ |
|  | $ |  | $ |
|  | $ |  | $ |
| **Total Assets** | $ 2,125,508.93 | **Total Liabilities** | $ 1,054,000.00 |

**Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents**
Provide the current monthly income and expenses for you, your spouse, and your dependents.  Do not include credit card payments separately; rather, include credit card expenditures in the appropriate categories.

| Income (State source of each item) |  | Expenses |  |
|---|---|---|---|
| Salary - After Taxes  Paycheck NFT Holdings, Inc.<br>Source: | $ 5,533.90 | Mortgage or Rental Payments for Residence(s) | $ 2,518.31 |
| Fees, Commissions, and Royalties<br>Source: | $ | Property Taxes for Residence(s) | $ 1,804.72 |
| Interest<br>Source: | $ | Rental Property Expenses, Including Mortgage Payments, Taxes, and Insurance | $ |
| Dividends and Capital Gains<br>Source: | $ | Car or Other Vehicle Lease or Loan Payments | $ 1,823.00 |
| Gross Rental Income<br>Source: | $ | Food Expenses | $ 1,000.00 |
| Profits from Sole Proprietorships<br>Source: | $ | Clothing Expenses | $ 1,000.00 |
| Distributions from Partnerships, S-Corporations, and LLCs  approx.<br>Source: | $ 3,500 | Utilities | $ 800.00 |

Initials: JW

## Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents (cont.)

| | | | |
|---|---|---|---|
| Distributions from Trusts and Estates | $ | Medical Expenses, Including Insurance | $ |
| Source: | | | |
| Distributions from Deferred Income Arrangements | $ | Other Insurance Premiums | $ 750 |
| Source: | | | |
| Social Security Payments | $ | Other Transportation Expenses | $ 200 |
| Alimony/Child Support Received | $ | Other Expenses (Itemize) | |
| Gambling Income | $ | | $ |
| Other Income (Itemize) | | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| Total Income | $ 9,033.90 | Total Expenses | $ 9,896.03 |

## ATTACHMENTS

### Item 27.  Documents Attached to this Financial Statement
List all documents that are being submitted with this financial statement.  For any item 24 documents that are not attached, explain why.

| Item No. Document Relates To | Description of Document |
|---|---|
| 24 | 2011 tax returns |
| 24 | 2012 tax returns |
| 24 | 2013 tax returns |
| 9 | 2012-2015 Account Statements for Bank of America account no. ▉▉▉9000 |
| 9 | 2013-2014 Account Statements for Wells Fargo account no. ▉▉▉1544 |
| 9 | 2012-2015 Account Statements for HSBC account no. ▉▉▉4099 |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court.  I have used my best efforts to obtain the information requested in this statement.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge.  I have provided all requested documents in my custody, possession, or control.  I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines).  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

**July 6, 2015**

(Date)

Signature

| Name On Account | Name & Address of Financial Institution | Account No. | Current Balace |
|---|---|---|---|
| Doron Nottea Personal Checking | Bank Of America, Tarzana | | $ 42,000.00 |
| Doron Nottea Personal Checking | Wells Fargo | | $ 21,000.00 |
| Doron Nottea Personal Checking | Wells Fargo | | $ 2,600.00 |
| Doron Nottea Personal Checking | Wells Fargo | | $ 25,000.00 |
| Doron Nottea Personal Checking | Wells Fargo | | $ 8,500.00 |
| Doron Nottea Personal Checking | Wells Fargo | | $ 2,200.00 |
| Doron Nottea Sole Prop  (dba LD Holdings) | Wells Fargo | | $ 20,000.00 |
| Doron Nottea Sole Prop  (dba Access Distribution) | Wells Fargo | | $ 64,500.00 |
| Doron Nottea Joint with Rachel Nottea | HSBC Bank, Encino CA | | $ 28,000.00 |
| Doron Nottea Joint with Rachel Nottea | HSBC Bank, Encino CA | | $ 178,000.00 |
| Doron Nottea Personal Checking | Chase Bank | | $ 4,200.00 |
| Doron Nottea Personal Checking | Chase Bank | | $ 1,700.00 |
| Doron Nottea Sole Prop LD HOLDINGS | Bank Of America | | $ 14,095.00 |
| Doron Nottea Sole Prop dba DVD Connection | Bank Of America | | $ 3,469.00 |
| Doron Nottea Sole Prop Global Media Products | Bank Of America | | $ 6,119.00 |
| Doron Nottea Sole Prop Magnum Distribution | Bank Of America | | $ 3,464.00 |
| Doron Nottea Personal Checking | CITIBANK, Encino, CA | | $ 4,755.39 |
| Doron Nottea Personal Checking | CITIBANK | | $ 773.98 |
| Doron Nottea Personal Checking | Chase Bank | | $ 4,200.06 |
| Doron Nottea Personal Checking | Chase Bank | | $ 1,709.44 |
| **CORP BANKS** | | | |
| NFT Holdings Inc. dba XPOSED MEDIA | Bank Of America | | $ 10,675.44 |
| NFT Holdings Inc. dba ADULT 1 STOP | Bank Of America | | $ 4,793.93 |
| NFT Holdings Inc. dba CRITICAL X | Bank Of America | | $ 8,519.36 |
| NFT Holdings Inc. dba Extra Entertainment | Bank Of America | | $ 2,870.96 |
| NFT Holdings Inc. dba Global Media Products | Bank Of America | | $ 3,294.32 |
| NFT HOLDINGS, INC. | Wells Fargo | | $ 7,675.83 |
| Vertex Holdings Group Inc. | Bank Of America | | $ 3,474.25 |
| Vertex Holdings Group Inc. | Bank Of America | | $ 11,584.02 |
| Secured Commerce LLC. | Bank Of America | | $ 1,543.00 |
| Secured Commerce LLC. | Bank Of America | | $ 65.12 |
| Secured Commerce LLC. | Bank Of America | | $ 130.23 |
| Secured Commerce LLC. | Wells Fargo | | $ 3,796.60 |
| | | $ | 494,708.93 |

ATTACHMENT A

EXHIBIT 941

**To:**       Doron[globalmediausa@gmail.com]
**From:**     Paul@Adlifestylenetwork.com
**Sent:**     Mon 1/20/2014 10:52:08 PM
**Importance:**          Normal
**Subject:**   ADLN 2013 Expenses
**MAIL_RECEIVED:**    Mon 1/20/2014 10:52:55 PM
ADLN Business Expenses 2013.xlsx

Doron,

Please see 2013 ADLN business expenses

Regards,

--
Paul B. Medina
CEO
AD Lifestyle Network, Inc.
(Office) 818.835.5858
(Cell) 818.983.7202
(Fax) 818.474.7373
(Skype) PMedina0331
Email: Paul@ADLifestyleNetwork.com
Website: www.ADLifestyleNetwork.com


Further, this message is intended only for the designated recipient.
It may contain confidential or proprietary information and may be
subject to the attorney-client privilege or other confidentiality
protections. If you are not a designated recipient, you may not
review, copy or distribute this message. If you have received this
message in error, please immediately notify the sender by reply e-mail
and delete this message. Thank you.

**942 - 1**                                    **EXHIBIT 942**

**To:**  Global Media[globalmediausa@gmail.com]
**From:**  Leor Arazy
**Sent:**  Tue 12/31/2013 2:20:37 PM
**Importance:**  Normal
**Subject:**  December 30 Override Payroll
**MAIL RECEIVED:**  Tue 12/31/2013 2:20:42 PM
█████  2013123001_Payroll Summary Report - SV(MPI_0301)_Payroll.pdf

Hey Doron,

This is the payroll we did for that one check we processed so we can have all the employees earnings for 2013 instead of going into 2014.

Best Wishes,
Leor



**Human Resources Department - Pinnacle Logistics Inc.**
**Direct: 866 216-9336 | E-Mail: HR@pinlogistics.com**

This e-mail message may contain confidential, proprietary or legally privileged information. It should not be used by anyone who is not the original intended recipient. If you have erroneously received this message, please delete it immediately and notify the sender. The recipient acknowledges that Pinnacle Logistics Inc. is unable to exercise control or ensure or guarantee the integrity of/over the contents of the information contained in e-mail transmission and further acknowledges that any views expressed in this message shall be implied or assumed unless the sender does so expressly with due authority of Pinnacle Logistics Inc. before opening any attachments please check them for viruses and defects.

1

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4    FEDERAL TRADE COMMISSION   )

 5             Plaintiff         )

 6       v.                      ) No. CV 15-4527-GW(PLAx)

 7    BUNZAI MEDIA GROUP, INC., )

 8    et al.,                    )

 9             Defendants.       )

10

11

12

13

14                    Tuesday, February 23, 2016

15

16                    10877 Wilshire Boulevard

17                    Suite 700

18                    Los Angeles, California

19

20

21

22

23         The above-entitled matter came on for

24    deposition, pursuant to Notice, at 9:02 a.m.

25
```

946 - 1                                    EXHIBIT 946

2

1                        UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4     FEDERAL TRADE COMMISSION   )

5              Plaintiff         )

6       v.                       ) No. CV 15-4527-GW(PLAx)

7     BUNZAI MEDIA GROUP, INC., )

8     et al.,                    )

9              Defendants.       )

10

11

12

13

14

15                DEPOSITION OF PAUL MEDINA, taken on

16    behalf of the Federal Trade Commission, at

17    10877 Wilshire Boulevard, Suite 700, Los Angeles,

18    California, commencing at 9:02 a.m., and concluding

19    at 11:40 a.m., on Tuesday, February 23, 2016,

20    pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21    CSR No. 12598, a Certified Shorthand Reporter, in

22    and for the State of California.

23

24                             ***

25

**946 - 2**                                              **EXHIBIT 946**

6

```
 1                    LOS ANGELES, CALIFORNIA

 2               TUESDAY, FEBRUARY 23, 2016

 3                         9:02 A.M.

 4

 5                       PAUL MEDINA,

 6          called as a witness by and on behalf of

 7          the Plaintiff, being first duly sworn,

 8          was examined and testified as follows:

 9

10                       EXAMINATION

11   BY MR. TEPFER:

12     Q.   All right.  Mr. Medina, my name is Reid

13   Tepfer, and with me is Emily Robinson.  We're both

14   attorneys with the Federal Trade Commission, and we

15   represent the FTC in FTC vs. BunZai Group, in the

16   Central District of California.

17          First of all, I'll ask do you understand

18   you're under the same oath today as if you were in

19   the courtroom?

20     A.   Yes.

21     Q.   And I'll assume that you understand the

22   questions that I ask you, unless you tell me that

23   you don't understand them.  Is that okay?

24     A.   Yes.

25     Q.   Sometimes an attorney may object.
```

**EXHIBIT 946**

1       Q.    And anyone else?

2       A.    No.

3       Q.    And is Alon Nottea the one that hired you

4   for Focus Media Solutions?

5       A.    Yes.

6       Q.    And when did you begin your position at

7   Media Urge?

8       A.    2013.  I don't recall the -- the dates.

9       Q.    Okay.  And who hired you at Media Urge?

10      A.    Alon Nottea.

11      Q.    And did you have a title while you were

12  there?

13      A.    I was Director of Business Development, and

14  then I was moved to Vice President.

15      Q.    Was that a promotion?

16      A.    It was a promotion, yes.

17      Q.    Do you recall when you got that promotion?

18      A.    I don't recall.

19      Q.    Were you working anywhere else, like at

20  another company, simultaneous with Media Urge?

21      A.    I was working -- I started working for a

22  company called BunZai Media in 2010, I believe.

23      Q.    Uh-huh.

24      A.    And then -- and then Alon Nottea told me to

25  go work for Media Urge.

**EXHIBIT 946**

10

1       Q.    And who hired you at BunZai Media?

2       A.    Khristopher Bond.

3       Q.    And at Focus Media Solutions did you have a

4    supervisor of any kind?

5       A.    Alon Nottea.

6       Q.    And did you have a supervisor while you were

7    at Media Urge?

8       A.    Alon Nottea and Khristopher Bond.

9       Q.    And I think you said that Alon hired you at

10   BunZai.  Was he your supervisor there -- or rather,

11   you said Khristopher hired you?

12      A.    Khristopher hired me at BunZai Media.  Yes.

13      Q.    And who were your supervisors at BunZai

14   Media?

15      A.    Khristopher and Alon.

16      Q.    And what sort of work did you do for Bunzai

17   Media while you were there?

18      A.    I started as a Customer Service Rep, taking

19   phone calls for Customer Service Reps.  I

20   transitioned from Customer Service to learning about

21   a software called Lime Light.  It's a -- it's a

22   customer relation management software.  So I was

23   doing -- actually, I did some shipping -- actually,

24   I started as doing shipping at BunZai Media, and

25   then I moved from shipping to Customer Service, and

946 - 5                          EXHIBIT 946

19

1    A.   I remember that was a company mentioned from

2    Igor.

3    Q.   And that's Igor Latsanovski?

4    A.   Yes.

5    Q.   What did Mr. Latsanovski tell you about

6    CalEnergy, Inc.?

7    A.   Nothing.

8    Q.   Did he state that he was the owner of the

9    company?

10   A.   No.

11   Q.   Have you ever heard of the company Kai

12   Media, Inc.?

13   A.   Yes.

14   Q.   And where have you heard of that name?

15   A.   From Alon Nottea.

16   Q.   Was that another one of the companies that,

17   to your knowledge, sold AuraVie products by risk

18   free trial?

19   A.   Yes.

20   Q.   Have you ever -- have you ever heard of the

21   company Secured Commerce, LLC?

22   A.   No.

23   Q.   What about the company Secured Merchants,

24   LLC?

25   A.   Yes.

1      Q.    Where have you heard of that company?

2      A.    From Alon as well.

3      Q.    Do you recall what Alon Nottea mentioned to

4    you about Secured Merchants?

5      A.    They managed technical development, software

6    development.  There was a period of time when Lime

7    Light needed to connect to the websites, so they

8    were outsourced to Secured Merchants.

9      Q.    And when you say "the websites," what

10   websites are you referring to?

11     A.    The websites that sold the products.

12     Q.    Do you recall the URL of any of those

13   websites?

14     A.    Yes.

15     Q.    Could you state the ones that you recall?

16     A.    Miracle Face Kit, myauravie.com.

17   Tryauravie.com.  Auraviefreetrial.com.

18     Q.    Have you ever heard of a company called USM

19   Products, Inc.?

20     A.    No.

21     Q.    Have you ever heard of a company called

22   Merchant Leverage Group, Inc.?

23     A.    No.

24     Q.    What about DMA Media Holdings, Inc.?

25     A.    Yes.

**946 - 7**                                              **EXHIBIT 946**

1       Q.    Where have you heard of that company?

2       A.    Same company.  To upload into Lime Light.

3       Q.    And so another company that sold AuraVie?

4       A.    Yes.

5       Q.    And have you ever heard of Shalita Holdings,

6   Inc.?

7       A.    Yes.

8       Q.    And where have you heard of that company?

9       A.    Same company.  To upload into Lime Light.

10      Q.    And have you ever heard of the company All

11  Star Beauty Products, Inc.?

12      A.    Yes.

13      Q.    And where have you heard of that company?

14      A.    Similar case.

15      Q.    Another one that sold AuraVie?

16      A.    Yes.

17      Q.    And just for, to make things simpler, if I

18  could refer to the companies that sold AuraVie by

19  risk free trial, just refer to them as the AuraVie

20  companies, does that sound okay?

21      A.    That sounds okay.

22      Q.    So all of the AuraVie companies that we've

23  just discussed --

24      A.    Correct.

25      Q.    -- were -- you stated that you uploaded

**946 - 8**                                    **EXHIBIT 946**

24

 1    sales for affiliate networks.  So when a sale would

 2    come in from, let's say, an affiliate network, it --

 3    it would notify me, letting me know where the sale

 4    came from.

 5        Q.    Okay.  And is this Hitpath software, do you

 6    happen to know who developed that software?

 7        A.    Hitpath Company -- it's a company called

 8    Hitpath.

 9        Q.    Okay.  And are you familiar with a company

10    called Chargeback Armor, Inc.?

11        A.    I've heard of that company, yes.

12        Q.    Where have you heard of Chargeback Armor,

13    Inc.?

14        A.    From Alon.

15        Q.    Do you recall anything that Alon said to you

16    regarding the company?

17        A.    They were going to manage some chargeback.

18    They were going to manage chargebacks for his

19    products.

20        Q.    And so Chargeback Armor, Inc. -- so

21    Chargeback Armor, Inc., was going to be hired to

22    manage chargebacks for AuraVie?

23        A.    Correct.

24        Q.    Do you recall what time period Alon said

25    this to you?

EXHIBIT 946

1    of the Media Urge employees or myself, I would ask

2    Philip.

3        Q.    Did Doron Nottea have some kind of role at

4    Media Urge?

5        A.    No.  I would -- I would -- I would mainly

6    work with Philip, so I'm assuming Philip would talk

7    to Doron.

8        Q.    And so it was your understanding that Philip

9    was an assistant to Doron?

10       A.    Yes.

11       Q.    Do you know if Nastassia Yalley was also an

12   assistant to Doron at any point?

13       A.    Yes.

14       Q.    How do you know that Nastassia was an

15   assistant to Doron?

16       A.    I would -- I would overhear Doron asking her

17   for some accounting task.

18       Q.    Do you recall what those accounting tasks

19   were related to?

20       A.    A lot of information about banking.  I never

21   got into details.  I -- I never asked about --

22       Q.    Do you --

23       A.    -- that.

24       Q.    Sorry.

25            Do you know if those accounting tasks

1    related to any of the AuraVie companies?

2         A.    Yes.

3         Q.    Do you know the time period in which you

4    heard overheard this?

5         A.    2011, 2012, 2013.

6         Q.    And you had stated that you would speak to

7    Philip, I guess, about some of these accounting

8    issues as they arose?

9         A.    Correct.

10        Q.    What made you think that you should speak to

11   Philip?  Did --

12        A.    Alon Nottea told me to talk to Philip for

13   anything regarding any financials, accounting.

14        Q.    Okay.  We discussed Igor Latsanovski

15   earlier.

16        A.    Yes.

17        Q.    How do you know Igor Latsanovski?

18        A.    I would see him around the office a few days

19   out of each month.

20        Q.    And that's the 7900 Gloria?

21        A.    Yes.

22        Q.    Do you recall -- I'll strike that.

23              Do you -- was that for the entire duration

24   that you worked at 7900 Gloria?

25        A.    Yes.

1      Q.    And -- sorry, would you mind reminding me

2      that time period, the beginning, end point?

3      A.    I started in 2010, until 2014.

4      Q.    And when you went to work for Media Urge,

5      did you change locations?

6      A.    No.

7      Q.    So Media Urge was also located at

8      7900 Gloria?

9      A.    Yes.

10     Q.    Do you know if Igor Latsanovski was an owner

11     in BunZai Media Group, Inc.?

12     A.    I believe so, yes.

13     Q.    You said that Mr. Latsanovski would be there

14     a few days out of the month; is that correct?

15     A.    Correct.  Mm-hmm.

16     Q.    Do you know what he would do when he was at

17     7900 Gloria?

18     A.    He would go into a room with Alon and

19     Khristopher all the time, and they would close the

20     door.

21     Q.    And do you know if they would have meetings?

22     A.    Yes.

23     Q.    Do you happen to know what those meetings

24     were about?

25     A.    No.

1     Q.    Did you ever discuss the sale of AuraVie

2     with Mr. Latsanovski?

3     A.    No.

4     Q.    Did you ever have any business discussions

5     with Mr. Latsanovski?

6     A.    Because he knew that I ran Hitpath and Lime

7     Light and I -- I knew a lot about reporting, Excel,

8     he would come up to me and he would say, "How are

9     things going?  How are the sales going?", because I

10    managed Hitpath and all the sales would be coming in

11    from affiliate networks.  So he wanted to know that

12    they were -- that -- just wanted to interact with

13    me, seeing how things were -- were doing.

14    Q.    And just to make sure I understand your job

15    responsibilities a little better --

16    A.    Mm-hmm.

17    Q.    -- did you ever -- I know that -- BunZai

18    Media Group had a Chargeback Department; correct?

19    A.    Yes.

20    Q.    Did you have any part in the chargeback

21    department?

22    A.    No.

23    Q.    Do you know who that was?

24    A.    Khristopher.

25    Q.    Do you know if Roi Reuveni had any position

**EXHIBIT 946**

1      Q.    Okay.  Okay.  That makes sense.

2            And did you ever discuss with Doron Nottea

3    directly concerning the AuraVie companies?

4      A.    Yes.  Because Lime Light has a processing

5    report, he asked me one time to send him all the

6    processing for each company that Alon told me to

7    upload.

8      Q.    And was it your understanding that Doron

9    Nottea was in charge of the accounting for the

10   AuraVie companies?

11     A.    Yes.

12     Q.    If we could jump in to talking a little bit

13   about some documents --

14     A.    Okay.

15     Q.    -- I'm now handing the witness what's been

16   marked Exhibit 26.

17            (Plaintiff's Exhibit 26 was marked

18            previously for identification by the

19            FTC and is attached hereto.)

20   BY MR. TEPFER:

21     Q.    Have you ever seen this document before?

22     A.    No.

23     Q.    In -- if you could turn to -- if you could

24   turn to -- at the bottom it has a Bates number --

25     A.    Okay.

1    what this is -- what this is regarding.

2        Q.   Do you recall if you read it at the time

3    that you received it?

4        A.   Yes.

5        Q.   Do you have any idea why in the "To" column

6    it says "Igor"?

7             Do you have any idea why Alon may have sent

8    this email to Igor?

9        A.   No.

10       Q.   Did you ever have any discussions with Alon

11   Nottea concerning the possibility of a FTC closure

12   of their UMS accounts?

13       A.   No.

14       Q.   Did Alon Nottea ever express to you any

15   concerns regarding the possibility of a FTC

16   enforcement action?

17       A.   No.

18       Q.   Did Mr. Nottea ever discuss with you FTC

19   rules or regulations?

20       A.   No because I handle Lime Light merchant

21   accounts.

22       Q.   Yes, sir.

23       A.   There was -- he always wanted to know --

24   Alon Nottea always wanted to know the processing for

25   each merchant account, for the reason of making sure

1    that each merchant account in Lime Light does not

2    surpass by a lot.  So he always liked to keep me in

3    the loop regarding processing because of -- because

4    I managed the -- the software.

5         Q.   And so Alon Nottea tried -- wanted to make

6    sure that one merchant account wasn't processed a

7    lot more than the other?

8         A.   That's right.

9         Q.   And do you know why that is?

10        A.   It has to do with the Visa/MasterCard

11   regulations, I believe.

12        Q.   Is that the chargeback regulations you're

13   referring to?

14        A.   Yes.

15        Q.   Did Mr. Nottea ever express concern about

16   the Visa/MasterCard chargeback regulations?

17        A.   Yes.  He always told me to make sure in Lime

18   Light the processing does not -- one does not spike

19   up too much.

20        Q.   Did he direct you to his process through

21   different entities, based on the chargeback

22   percentages for the company?

23        A.   Yes.

24        Q.   Was that standard practice?

25        A.   I never seeked legal advice for standard

1    practice.  I was just doing as I was told.

2       Q.   Yes, sir.

3            And that was as you were told from Mr. Alon

4    Nottea?

5       A.   Right.

6       Q.   And do you recall the time period in which

7    that was, I guess, the direction from Alon Nottea?

8       A.   I took over Lime Light in 2011.  So from the

9    beginning.

10      Q.   And to your knowledge, did Alon Nottea

11   direct other employees to do that same practice?

12      A.   No.  He only told me.

13      Q.   Were you the only person, I suppose, in

14   charge of Lime Light and --

15      A.   Yes.

16      Q.   -- that practice?

17      A.   That's right.  There was -- when -- when Roi

18   was in charge of doing the whole call center, he --

19   he had direct access to Lime Light as well, and

20   also, another colleague by the name of Andree

21   Mansour.

22      Q.   Do you know if Roi Reuveni would also --

23   sorry.

24           Is that practice called load balancing?

25      A.   Yes.

1    Q.    Do you know if Roi Reuveni ever engaged in

2    load balancing for the AuraVie companies?

3    A.    No.

4    Q.    And is that no, you don't know, or no, he

5    did not?

6    A.    No, he did not.

7    Q.    We may have also discussed this, but I --

8    just for clarity, at Pinnacle Logistics, do you know

9    what Roi Reuveni's title was?

10   A.    I don't know his exact title, but I knew he

11   ran the Pinnacle department.

12   Q.    And when you say "the Pinnacle department,"

13   do you mean Pinnacle Logistics, the company?

14   A.    Pinnacle Logistics.

15   Q.    Did you think of Pinnacle as a department of

16   a bigger company?

17   A.    As a -- I saw it as a department of Alon's

18   process.

19   Q.    And so was it -- and when you say his

20   process, do you mean his sale of AuraVie products?

21   A.    That's right.

22   Q.    Did -- and was it your understanding that

23   Pinnacle was one of Alon Nottea's companies?

24   A.    Yes.

25   Q.    And what made you think that Pinnacle was

44

1      A.   That was early.  That was in the earlier

2    years.  2012.

3      Q.   Did Alon Nottea ever explain to you why so

4    many different companies were processing, I guess,

5    charges for the AuraVie risk free trial sales?

6      A.   I -- I never asked him.  I never --

7      Q.   Did you ever hear Mr. Nottea discuss it with

8    anyone else?

9      A.   No.

10     Q.   Are you aware if any -- to talk about the

11   AuraVie companies generally, the individuals that

12   are listed as CEO, owner on those companies, are you

13   aware if they received a 1 percent commission for

14   sales process through their merchant accounts?

15     A.   Yes.  I pulled a processing report from Lime

16   Light, and Doron Nottea told me to place a formula

17   saying at the end of the processing add 1 percent to

18   there, but I didn't ask him why.

19     Q.   Did --

20     A.   So I sent him that report.

21     Q.   And did Doron Nottea ever refer to this

22   1 percent amount as a commission?

23     A.   No, he didn't refer.  He just told me to

24   just do the report.

25     Q.   And do you recall the time period that Doron

45

1    Nottea told you to do this report?

2        A.    2012.

3        Q.    And would you periodically provide these

4    reports to Doron Nottea?

5        A.    Yes.

6        Q.    And do you recall the duration in which you

7    provided these reports to Doron Nottea?

8        A.    Every three months.

9        Q.    And that began in 2012; correct?

10       A.    Correct.

11       Q.    Do you recall when it ended?

12       A.    2014.

13       Q.    And would you provide these reports directly

14   to Doron Nottea?

15       A.    Yes.

16       Q.    Do you recall if AuraVie, if Alon Nottea

17   ever had intentions of phasing out the sale of

18   AuraVie products?

19       A.    Yes.  I remember being in a meeting with him

20   saying that he wanted to stop the process.

21       Q.    Do you know who else was in that meeting?

22       A.    No, I don't recall.

23       Q.    Do you know if Roi Reuveni was in that

24   meeting?

25       A.    I don't remember.

46

1      Q.    What about Doron Nottea?

2      A.    It was -- it was just a verbal.  It was a

3   verbal.  It wasn't a formal --

4      Q.    Yes.

5      A.    -- meeting.

6      Q.    Did Mr. Nottea -- did Alon Nottea explain

7   why he was going to phase out AuraVie products?

8      A.    No.

9      Q.    Did Alon Nottea ever express concern about

10   the number of online complaints for AuraVie

11   products?

12      A.    Not to me.

13      Q.    Did Alon Nottea ever discuss with you the

14   amount of complaints that the call center received

15   at any point?

16      A.    Not with me, no.

17      Q.    Did you ever overhear him having that

18   discussion with anyone else?

19      A.    Yes.

20      Q.    Who did you hear Alon Nottea discuss the

21   complaints the call center received?

22      A.    Khristopher.

23      Q.    What -- do you recall what he said about

24   those complaints?

25      A.    They have to respond back.  They just have

47

1      to respond back to those complaints.

2           Q.    Do you know if Alon Nottea had any role in

3      drafting the scripts that the call center used in

4      responding to these complaints?

5           A.    No.   I do know Khristopher did.

6           Q.    Do you know if Roi Reuveni ever had any role

7      in drafting the scripts that the call centers used?

8           A.    Yes.

9           Q.    How do you know that?

10          A.    Just discussing with him.   I would run into

11     him.   "Hi, how's the call center doing?   How you

12     doing?   How's the chargebacks doing?"

13                And then he would tell me, "Oh, I'm working

14     on this protocol, the -- the new report that" --

15     because Khristopher wrote the original one.

16          Q.    Mm-hmm.

17          A.    That's the one that I was using when I was a

18     Customer Service Rep.   So I was reading off a script

19     that Khristopher wrote.

20          Q.    Mm-hmm.

21          A.    But then I -- I do know that he handed it

22     over to Roi.

23          Q.    Oh, to Roi?

24          A.    Yes.

25          Q.    Okay.   And do you recall when he handed that

1    over to Roi?

2         A.   I'm going to say 2012.  '12, '13.

3         Q.   And do you know -- sorry.  Go ahead.

4         A.   Sorry.  It's just my dates are hard to

5    remember.

6         Q.   Do you recall the time period in which Roi

7    Reuveni began managing the Chargeback Department of

8    Pinnacle?

9         A.   I remember there was a Chargeback Department

10   that Khristopher ran downstairs with a guy by the

11   name of Andrew.  The period when he handed that off

12   to Roi, I can't recall.

13        Q.   And that Andrew, is that Andrew Stanley?

14        A.   Yes.

15        Q.   Is it correct that you were CEO of AD

16   Lifestyle Network?

17        A.   Yes.

18        Q.   What is that company?

19        A.   It's my personal company that I use for any

20   extra work on the side.

21        Q.   Okay.  It's separate from the AuraVie

22   companies?

23        A.   Yes.

24        Q.   Are you aware if BunZai Media Group ever did

25   any processing in the United Kingdom?

EXHIBIT 946

1      Q.    Do you know if that was Doron Nottea?

2            MR. UNGAR:   Objection as to the form of the

3      question.   Calls for speculation, lacks foundation.

4            THE WITNESS:   I don't recall.

5      BY MR. TEPFER:

6      Q.    A little bit further down it says "Matan

7      Reuveni" and then it says --

8      A.    Mm-hmm.

9      Q.    -- "Load Balancing".

10     A.    Mm-hmm.

11     Q.    Do you know anyone named Matan Reuveni?

12     A.    Yes.

13     Q.    And to spell that, it's M-a-t-a-n.

14           Who is Matan Reuveni?

15     A.    Roi Reuveni's brother.

16     Q.    And do you know if Matan Reuveni did any

17     load balancing for the AuraVie companies at any

18     point?

19     A.    Yes.

20     Q.    What time period did he do that?

21     A.    2012, 2013.

22     Q.    Do you know what company Matan Reuveni

23     worked for?

24     A.    No.

25     Q.    Do you know if Matan Reuveni had any

EXHIBIT 946

1    supervisor?

2        A.    Alon and Roi.

3        Q.    And did he engage in load balancing for the

4    sale of AuraVie products?

5        A.    Yes.

6        Q.    On the next page, at the top it says "SBM

7    Flexible".  Do you know what that refers to?

8        A.    SBM Flexible.  SBM Flexible.  No.  Alon must

9    have told me to put in this.

10       Q.    And a little bit further down, I guess one,

11   two, on the fourth row, it says "Sandra Rubio

12   E-mails and BBB/ATTY".

13       A.    Okay.

14       Q.    Do you know what that refers to?

15       A.    No.  I do know she worked in some Resolution

16   Department they created.

17       Q.    Oh, so Sandra Rubio was an employee of the

18   AuraVie companies?

19       A.    Yes.

20       Q.    And a little bit further down it says "CB

21   Armour" and then "$4".

22       A.    Mm-hmm.

23       Q.    Do you know what that refers to?

24       A.    It was a third party company that charges a

25   fixed rate to answer chargebacks.

EXHIBIT 946

1     Q.   Are you aware if any of the AuraVie

2     companies -- sorry for the -- I'll rephrase.

3          Did Alon Nottea ever discuss with you

4     concerns about chargeback percentages for any of the

5     AuraVie companies?

6     A.   Yes.  He told me not to take a processing of

7     a merchant account in a software too high.

8     Q.   And do you recall how high that chargeback

9     ratio was permitted to go, according to Alon's

10    instructions?

11    A.   Well --

12         MR. UNGAR:  Objection as to the form of the

13    question, and it's vague and ambiguous.

14         THE WITNESS:  Well, no because the software

15    didn't tell me how many chargebacks were coming in

16    the Chargeback Department.  He would just tell me to

17    keep them even.

18    BY MR. TEPFER:

19    Q.   And so it was your understanding that the

20    chargeback ratio was supposed to be consistent

21    across the --

22    A.   That is --

23    Q.   -- AuraVie companies?

24    A.   That is correct, yes.

25    Q.   Did you ever hear Alon Nottea discuss

78

```
 1          (Plaintiff's Exhibit 76 was

 2          previously marked for identification

 3          by the FTC and is attached hereto.)

 4   BY MR. TEPFER:

 5     Q.    Do you recognize this document?

 6     A.    No.

 7     Q.    Have you ever seen a document substantially

 8   similar to this one?

 9     A.    Oh, Alon showed me once.  He showed me -- I

10   came over to his office, and he showed me a similar

11   graph, saying "Oh, look what we're working on."

12   That's it.

13     Q.    Do you recall what time period that was?

14     A.    2013.

15     Q.    And was that also a graph concerning

16   chargebacks?

17     A.    That is correct, yes.

18     Q.    And do you recall if it was a graph

19   concerning chargebacks from the sale of AuraVie

20   products?

21     A.    Yes.

22     Q.    Do you know who created that graphic that

23   you viewed?

24     A.    No.

25     Q.    Was it keeping track of chargebacks by call
```

1

2

3          I, the undersigned, a Certified Shorthand

4      Reporter of the State of California, do hereby

5      certify:

6              That the foregoing proceedings were taken

7      before me at the time and place herein set forth; that

8      any witnesses in the foregoing proceedings, prior to

9      testifying, were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof.

14             I further certify that I am neither

15     financially interested in the action nor a relative or

16     employee of any attorney of any of the parties.

17             IN WITNESS WHEREOF, I have this date

18     subscribed my name.

19

20     Dated: _____

21

22

23     _____

24          CHRISTINA KIM-CAMPOS, CSR

25          CERTIFICATE NO. 12598

**946 - 28**                                    **EXHIBIT 946**

OMB No. 1615-0047; Expires 08/31/12

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**Form I-9, Employment Eligibility Verification**

Read instructions carefully before completing this form. The instructions must be available during completion of this form.

**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because the documents have a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification** *(To be completed and signed by employee at the time employment begins.)*

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| LATSANOVSKI | IGOR | | |

| Address *(Street Name and Number)* | Apt. # | Date of Birth *(month/day/year)* |
|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| CALABASAS, | CA | | 4983 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☐ A citizen of the United States
☐ A noncitizen national of the United States (see instructions)
☐ A lawful permanent resident (Alien #) _____
☐ An alien authorized to work (Alien # or Admission #) _____
until (expiration date, if applicable - *month/day/year*) _____

| Employee's Signature | Date *(month/day/year)* |
|---|---|
| | 11/3/2011 |

**Preparer and/or Translator Certification** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address *(Street Name and Number, City, State, Zip Code)* | Date *(month/day/year)* |
|---|---|

**Section 2. Employer Review and Verification** *(To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number, and expiration date, if any, of the document(s).)*

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: Visa | | Driver License | | |
| Issuing authority: USA | | California-DMV | | |
| Document #: | | | | |
| Expiration Date *(if any)*: ~P451 | | | | |
| Document #: | | | | |
| Expiration Date *(if any)*: | | | | |

**CERTIFICATION:** I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on *(month/day/year)* 11/6/11 and that to the best of my knowledge the employee is authorized to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| | Perr Araz | HR Director |
| Business or Organization Name and Address *(Street Name and Number, City, State, Zip Code)* | | Date *(month/day/year)* |
| Bonzai Media Group Inc. 7900 Glenoaks ... Van Nuys 91406 | | 11/16/11 |

**Section 3. Updating and Reverification** *(To be completed and signed by employer.)*

| A. New Name *(if applicable)* | B. Date of Rehire *(month/day/year)* *(if applicable)* |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment authorization.

| Document Title: | Document #: | Expiration Date *(if any)*: |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date *(month/day/year)* |
|---|---|

Form I-9 (Rev. 08/07/09) Y Page 4

Attachment B

**EXHIBIT 949**



Attachment B

EXHIBIT 949



Attachment B

EXHIBIT 949