ROBERT M. UNGAR (State Bar No. 102007)
rmu@ungarlaw.com
14724 Ventura Blvd., PH
Sherman Oaks, CA 91403
Telephone: (310) 405-1884

BEN PETTIT (State Bar No. 135941)
ben@benpettit.com
20 E. Pueblo Street
Santa Barbara, CA 93105
Telephone (805) 896-5113

**Attorneys for Defendants:** Alon Nottea and Roi Reuveni

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>  Plaintiff,<br><br>  v.<br><br>BUNZAI MEDIA GROUP, INC., et al.,<br><br>  Defendants. | CASE NO. 2:15-CV-4527-GW (PLAx)<br><br>[*Assigned to the Honorable George H. Wu, Courtroom 10*]<br><br>**DECLARATION OF DEFENDANT ROI REUVENI IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: May 23, 2016<br>TIME: 8:30 A.M.<br>CTRM: 10 |

## DECLARATION OF ROI REUVENI

I, Roi Reuveni, declare:

1. I am over 18 years of age and a defendant in this lawsuit. If called upon to testify, I could and would testify competently as to those facts set forth herein, the same being based upon my personal knowledge.

2. In 2011, I was hired as an employee of Bunzai Media Group, Inc. ("BMG"), my cousin Alon Nottea's ("Alon") company. I was hired as an

1

information technology ("IT") manager to configure an internal phone system and manage the IT equipment and software. My boss was Kristopher Bond ("Bond"), who was Alon's business partner. BMG was managed by Bond and Alon. I was not involved in the marketing of BMG products and I had no management authority concerning the marketing of the BMG products, including the AuraVie products ("AuraVie"). Nor was I involved with or have management authority over the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of BMG products, including AuraVie. I did not have authority to manage BMG employees.

3. In mid 2012, I was employed by Pinnacle Logistics, Inc. (PLI") as a general manager, including managing PLI's call center, fulfillment services, and customer services. I did not own PLI. PLI had a call center with customer service representatives who would handle general inquiries, subscription management, product inquiries, refund requests, and return inquiries. PLI also provided product fulfillment and logistics services. PLI never sold, marketed or advertised products, including the AuraVie products. PLI never managed merchant accounts for sellers of AuraVie products.  PLI did not use the bank accounts or fictitious business names of other companies. Neither I nor PLI participated in nor had any management authority concerning the marketing of AuraVie or any other products, or manage the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of AuraVie or any other products.

4. Alon's brother, Doron Nottea ("Doron"), did not manage, operate or control BMG or PLI while I worked there. Doron did do bookkeeping for both BMG and PLI.

5. In 2011, I was asked by Alon to become an officer of a company called Agoa Holdings ("Agoa"), an online retail merchant of BMG products. I later learned that I was also listed as an officer of a company called DMA Media Holdings ("DMA"), also an online retail merchant of BMG products. I had no prior

1  experience in the online product sales business. I never believed that being an
2  officer of Agoa or DMA was illegal. Alon had never been in trouble with the law. I
3  did not manage or control these companies, their operations, or their bank accounts,
4  and I had no control to do so. To the best of my knowledge, I did not receive any
5  money from DMA and the only money I received from Agoa was for the modest
6  wages I earned working for BMG and PLI. I did not participate in or have
7  management authority concerning the marketing of AuraVie or any other products,
8  or manage the processing or charging of customer credit cards, debit cards or bank
9  accounts in connection with the sale of AuraVie or any other products.

10         6.     My duties at PLI did not include writing collection letters and I never
11  did so. That would have been something done by or for a PLI client.

12         7.     One of PLI's clients was SBM Management Company ("SBM") that
13  provided management services for online retail merchants selling AuraVie. SBM
14  provided an automated interactive voice response system ("IVR") for AuraVie
15  customers. In addition to PLI's customer service representatives, the IVR provided
16  customers a 24 hour 7 day a week ability to telephonically cancel a product trial or
17  subscription, obtain a return merchandise authorization number, answers to
18  frequently asked questions, and payment options if a customer did not want to
19  subscribe but did not want to return the product during the trial period. The
20  customer could obtain these automated functions over the phone and without the
21  need for intervention by a customer service representative. SBM and BMG also
22  used a software product called "limelight" to manage the customer ordering and
23  payment process. I was not involved in the management of the "limelight"
24  software.

25         8.     I formed a personal service company, Trigen, LLC, to loan out my
26  consulting services to third parties. Trigen was not a retail merchant. Neither Trigen
27  nor I were involved with nor had any management authority concerning the
28

1  marketing of AuraVie, or manage the processing or charging of AuraVie customer
2  credit cards, debit cards or bank accounts.
3      9.    My employment at PLI ended in mid 2014, and my consulting services
4  were loaned out by Trigen to Secured Merchants LLC ("SM") to work with SM in
5  the development of its IVR Logix System software. I was not an owner of SM.
6  Neither SM nor I participated in or had any management authority concerning the
7  marketing of AuraVie, or manage the processing or charging of AuraVie customer
8  credit or debit cards or bank accounts. SM was not an owner of PLI, and had no
9  authority to manage PLI employees. SM was a technology vendor to BMG and
10 SBM.
11     10.    My consultancy with SM ended in early 2015, and my consulting
12 services were then loaned out by Trigen to a start-up company, Chargeback Armor,
13 Inc. ("CBA") from March until June, 2015. Mike Costache, the owner of CBA,
14 engaged my services. CBA develops software and operates an automated merchant
15 chargeback management and rebuttal system. My engagement was limited to
16 business development services. During this brief three months in 2015, I assumed
17 the title of Chief Operating Officer but without any management authority. At no
18 time was CBA or I involved with or have management authority concerning the
19 marketing of the AuraVie products or any other products, nor manage the
20 processing or charging of customer credit cards, debit cards or bank accounts in
21 connection with the sale of AuraVie products or any other products. While engaged
22 at CBA, no services were performed in connection with the AuraVie products.
23 Doron Nottea did not manage CBA while I was there.
24     11.    As I previously testified, the chart in Exhibit 142 to Plaintiff's Motion
25 for Summary Judgment ("MSJ") was authored by Kristopher Bond ("Bond").
26     12.    As I previously testified, while I was working at BMG, to the best of
27 my knowledge Andrew Stanley ("Stanley") was not working in a chargeback
28 department.

13. With the exception of my job at PLI, I had no management authority over the business, operations, or finances of any Defendant in this lawsuit, including the marketing of the AuraVie products, or the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of AuraVie products. As stated above, my job at PLI and later at CBA did not involve the marketing of AuraVie products or the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of AuraVie products.

14. I did not know, and I wasn't in a position to know: (i) that it could be unlawful to advertise and market a "risk free trial" on the Internet; and (ii) that AuraVie marketing and advertising disclosures were inadequate or unlawful. As PLI's general manager, I knew that some customers who had not read Auravie's terms and conditions wanted a refund because they were not aware of the cancellation requirements. I was not aware these activities violated the law. In most cases, these customers were issued a refund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on May 2, 2016 at Los Angeles, California.

_____
ROI REUVENI