ROBERT M. UNGAR (State Bar No. 102007)
rmu@ungarlaw.com
14724 Ventura Blvd., PH
Sherman Oaks, CA 91403
Telephone: (310) 405-1884

BEN PETTIT (State Bar No. 135941)
ben@benpettit.com
20 E. Pueblo Street
Santa Barbara, CA 93105
Telephone (805) 896-5113

**Attorneys for Defendants:** Alon Nottea and Roi Reuveni

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP, INC., et al.,<br><br>Defendants. | CASE NO. 2:15-CV-4527-GW (PLAx)<br><br>[*Assigned to the Honorable George H. Wu, Courtroom 10*]<br><br>**DECLARATION OF DEFENDANT ALON NOTTEA IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**DATE:** May 23, 2016<br>**TIME:** 8:30 A.M.<br>**CTRM:** 10 |

## DECLARATION OF ALON NOTTEA

I, Alon Nottea, declare:

1. I am over 18 years of age and a defendant in this lawsuit. If called upon to testify, I could and would testify competently as to those facts set forth herein, the same being based upon my personal knowledge.

2. My friend, Kristopher Bond ("Bond") and I started Bunzai Media Group, Inc. ("BMG") which marketed products online, including AuraVie brand

1

products (collectively "AuraVie") concurrently using both continuity marketing and a traditional online retail sale at the suggested retail price (non-discounted). BMG offered the consumer a risk free trial period to try AuraVie products. If the consumer decided not to purchase the products during the trial period, the consumer would simply call a toll-free phone number (day or night / seven days a week), use an automated voice response system to easily opt out of purchasing the products, and return the unused portion of the products. If the consumer did not opt out during the trial period, then the consumer was charged a discounted purchase price for purchasing a monthly supply of the products on a recurring monthly basis. The consumer could easily opt out of receiving automatic monthly shipments by calling the 24/7 toll-free phone number.

There is nothing novel about this method of continuity marketing ("continuity marketing"). The highly successful Netflix business model has been built upon the same continuity marketing method, as are popular cosmetic products advertised on television and through the Internet every day.

3. When BMG started out in 2010, we consulted with trade and advertising professionals about marketing compliance requirements, and designed the AuraVie websites and continuity marketing program to satisfy those requirements; including, online order pages that displayed plain and clear terms explaining the continuity marketing program, the consumer's obligations, and the instructions for opting out by simply using an automated telephone system. In January 2011, Bond and I were notified by a continuity marketing compliance expert that the AuraVie website appeared to satisfy disclosure and advertising requirements, and were not deceptive or misleading. Our experience during the four years of AuraVie marketing was that 30% of customers continued in the month to month continuity program for extended lengths of time. Money returned to the customers as refunds and chargebacks was on average 25% of the total sales.

4. As an online marketing business with limited resources, BMG's merchant processor limited the daily amount of BMG's skin care orders that could be processed. The merchant processor advised in 2011 that BMG sell AuraVie through other retail merchant entities as a means of allowing more orders to be processed while reducing merchant processing costs. Following those suggestions, several retail merchant entities were formed with the help of friends and family. Those retail entities, as well as subsequently formed retail merchant business entities, were at all times managed and operated by Bond and I.

5. Bond and I had very limited resources when we started BMG. I was introduced to Igor Latsvanovski ("Igor") sometime in late 2010 as a person who may be willing to make a sorely needed modest investment in BMG. Many discussions were had about Igor becoming an owner and a shareholder of BMG, but in the end, Igor did not have experience in the online marketing business and decided instead to loan money to BMG. In consideration for the loan, Igor received a net profit participation and a modest fixed interest rate along with Bond and I personally guaranteeing repayment of the loan. Igor was not involved with the marketing of AuraVie or the operations of the business. Igor's concern was whether the finances of the business would allow repayment of his loan. In this regard, Bond and I tried to keep Igor informed of the finances of the business.

6. In 2011, I started investigating other distribution channels to increase sales volume, including foreign distribution through continuity marketing and licensing my AuraVie brands and intellectual property to third parties, both domestically and overseas. My investigation revealed that these potential distribution channels were either impractical or unprofitable and I abandoned any further efforts in this regard.

7. Bond left the business by early 2013. Along with some friends and business acquaintances, three new service companies were formed – Media Urge, Inc. ("MUI"), Pinnacle Logistics, Inc. ("PLI"), and SBM Management, Inc.

3

DECLARATION OF ALON NOTTEA IN OPPOSITION TO FTC'S MOTION FOR SUMMARY JUDGMENT

1  ("SBM") – as stand alone service business cmpanies. SBM was a fee for service
2  management company that would manage AuraVie retail merchants as well as other
3  online retail merchants ("B2C"); MUI hired and former BMG marketing employees
4  to provide B2C marketing services, including for AuraVie retailers; and, PLI
5  provided B2C logistics services, on a fee for service basis, including product order
6  fulfillment, shipping and logistics support, customer service, and call center
7  services, including to AuraVie retailers amongst others. The hope was these could
8  become profitable stand-alone service business organizations given that they did
9  not need to start from scratch. My cousin, Roi Reuveni, went to work for PLI.
10 Neither Roi Reuveni nor PLI were involved nor had any management authority
11 concerning AuraVie marketing, nor the charging or processing of AuraVie
12 customer credit cards, debit cards or bank accounts. PLI, MUI, and SBM did not
13 share officers, employees, or office space.

14       8.    Avi Argaman, Roi Reuveni, Igor Latsanovski, and Doron Nottea had
15 no authority to control AuraVie operations, sales, marketing, or finances, nor
16 knowledge of any alleged wrongdoing in connection with the marketing and sales
17 of AuraVie products.

18       9.    AuraVie sales revenue was received by BMG and later by SBM.

19       10.   As the AuraVie business was winding down, I was advised of changes
20 that were occurring in marketing compliance requirements and the unwillingness of
21 AuraVie affiliate marketers to meet or exceed those requirements. By 2014, I
22 advised our merchant processor that new AuraVie product orders would not be
23 accepted but previously enrolled continuity program customers would continue to
24 receive their monthly AuraVie products. With the exception of continuity program
25 customer service and product fulfillment, the AuraVie business was closed by the
26 end of 2014. Some legacy AuraVie websites could still be found on the Internet at
27 the end of 2014 and into 2015.
28

11. My brother, Doron Nottea ("Doron"), was not my business partner and was not involved in marketing AuraVie products, or in charging or processing of AuraVie customer credit cards, debit cards or bank accounts. Doron allowed Bond and I to use a portion of his existing business warehouse space to begin operating BMG. A few years later, after BMG's bookkeeper resigned, I asked Doron to handle and oversee our bookkeeping. Other than an LLC called Secured Commerce LLC ("Secured"), Doron was not an owner, manager, or officer of any entity defendant in this lawsuit. Secured was a vendor that provided discounted postage for the shipment of AuraVie products.  The purchases of the discounted postage from Secured was no different than any other vendor, such as office supplies, telecommunication services, or freight forwarding. Doron had no management authority over the designing of AuraVie websites, or AuraVie marketing, or charging or processing of AuraVie customer credit cards, AuraVie customer debit cards, or AuraVie customer bank accounts, refunds or chargebacks, or customer service. Doron was never entitled to share in any profits from the AuraVie business venture.

To do his bookkeeping, Doron was given, used and had access to financial information, including income and expense information, commission and other payout information, financial arrangements with other persons and entities, employee and payroll information, tax information, insurance information, banking information, merchant account information, corporate structure information, and related matters. The types of information provided to Doron, and the functions he performed, were no different from that of the previous bookkeeper who resigned from BMG. Doron did not have decision-making power over any of these areas; as the bookkeeper he needed all relevant financial information in order to properly do his job.  He did not have input on, nor was he involved in communication about, management decisions, marketing decisions, website design, processing of customer payments or refunds, or any such functions.  He was at times copied on

emails by me and others that related to financial information; as the evidence produced by the FTC shows, he never responded to this type of email as it was not his function or job to do so.

12. BMG used the services of Secured Merchants, LLC ("SM"), as a technology vendor. Neither Alan Argaman, the sole owner of SM, nor SM were involved with nor had management control over AuraVie marketing or charging or processing of AuraVie customer credit cards, debit cards or bank accounts. Neither Argaman nor SM were owners, managers, employees, or officers of BMG, SBM, or any retail merchant company that sold AuraVie. SM offered a software they called "chargeback armor" for managing merchant account chargebacks that was used with a customer relations management software called "limelight". Argaman and SM never managed accounts AuraVie had with limelight. SM and Argaman never designed any websites or landing pages for AuraVie. AuraVie websites were designed by company website designers. SM was paid on a fee for services basis. I have never been an owner, officer, manager or employee of SM or Chargeback Armor, Inc. ("CBA"), which is the marketing company for the "chargeback armor" software product. I did not control the business or make policy for CBA. From time to time I consulted with Mike Costache, CBA's CEO, concerning marketing the "chargeback armor" software product.

13. I was notified in or about 2011 that the Los Angeles area Better Business Bureau ("BBB") had issued AuraVie an accredited "A-" rating.

14. The AuraVie website order pages always prominently displayed that the customer would be charged shipping and handling for product delivery located before entry of a customer's billing information.

15. PLI, SM, CBA, Doron, Argaman, Igor, Focus Media Solutions, Inc. ("FMS"), and Reuveni were not involved in marketing or advertising AuraVie products, or in charging or processing of AuraVie customer credit cards, debit cards or bank accounts.

16. Adageo, LLC ("Adageo") is my personal service company that loaned out my consulting services. Adageo did not own or control any other entity-defendant in this lawsuit. No other individual defendant in this lawsuit owns, controls, or had management authority over Adageo. Adageo did not advertise, market, distribute or sell the AuraVie products. Adageo, LLC did not purchase AuraVie products from a distributor and have them shipped to Pinnacle.

17. I learned that some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie products if they did not cancel during the trial period. It was never my intention to deceive any customer. It was my intention to sell a quality product for a fair price using continuity marketing.

18. AuraVie websites disclosed all costs, charges, return policies, and continuity program terms and conditions. Any customer could read the continuity program terms and conditions before entry of his or her billing information. AuraVie websites did not misrepresent the terms of trial offers.

19. AuraVie websites also offered products on a straight sale. Prices, charges and terms were disclosed before the order page for straight sales.

20. It was not a practice to ship product after cancellation. It was not a practice to charge customers without shipping an ordered product. An email was sent to the customer confirming that their order was being processed.

21. False documents were not provided to payment processing companies.

22. Consumers never paid defendants PLI, MUI, SBM, FMS, Adageo, and CalEnergy for AuraVie products. These entity defendants did not have a merchant account.

23. Unfortunately, the business was not very profitable due to the high cost of marketing and advertising (approximately 50% of each sale), merchant processing fees, returns and chargebacks, overhead, and debt service. During the

four years, my modest compensation and profit distributions combined never exceeded $135,000 in any one calendar year.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on May 2, 2016 at Los Angeles, California.

_____
ALON NOTTEA