**BEVERLY HILLS LAW CORP., PC**
Sagar Parikh, Esq. (SBN 282655)
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
Telephone:   (310) 887-1338
Facsimile:   (310) 982-2603
Email:       SP@BeverlyHillsLawCorp.com

Attorneys for Alan Argaman, Secured Merchants, LLC
and Chargeback Armor, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>BUNZAI MEDIA GROUP, INC., et al.,<br><br>Defendants.<br>_____<br><br>SECURED MERCHANTS, LLC,<br>CHARGEBACK ARMOR, INC.<br>AND ALAN ARGAMAN,<br><br>Cross-Claimants<br>v.<br>ALON NOTTEA, an individual,<br><br>Cross-Defendant | **Case No. 2:15-cv-04527-GW (PLAx)**<br><br>**ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK ARMOR, INC.'S COMPENDIUM OF EXHIBITS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br>**Hearing Date:  May 23, 2016**<br>**Time: 8:30 am**<br>**Location:  Courtroom 10 – Spring St.**<br>**Judge: Hon. George H. Wu** |

ALAN ARGAMAN, SECURED MERCHANTS, LLC, and CHARGEBACK ARMOR, INC. (collectively "Defendants) submit their Compendium of Exhibits in Support of Defendants' Opposition to the FTC's Motion For Summary Judgment.

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBIT |
|---|---|
| 801 | Portions of Alan Argaman Deposition Transcript |
| 802 | FTC's Responses to Alan Argaman's Special Interrogatories |
| 803 | FTC's Responses to Secured Merchants, LLC's Special Interrogatories |
| 804 | FTC's Responses to Chargeback Armor, Inc.'s Special Interrogatories |
| 805 | Blank Page With Word Fluent - AuraVie-0000264 |
| 806 | AuraVie 2 Day Detox Skin Regiment - AuraVie-0001601 |
| 807 | AuraVie Payroll - AuraVie-0001847 |
| 808 | DELETED |
| 809 | Photo of LeElle Bottle - AuraVie-0002587 |
| 810 | Portion of Email Signature Line - AuraVie-0002591 |
| 811 | Articles of Incorporation For Chargeback Armor, Inc. - AuraVie-0002607 |
| 812 | Blank Page Produced By FTC in Discovery - AuraVie-0002608 |
| 813 | Hatch Flowchart - AuraVie-0002640 |
| 814 | Hatch Flowchart 2 - AuraVie-0002641 |
| 815 | Count of Date Document - AuraVie-0002756 |
| 816 | Articles of Incorporation for Pinnacle Logistics - AuraVie-0002784 |
| 817 | Portion of Proposed CBA Executive Summary - AuraVie-0002959 |
| 818 | Signature Page of CBA Contract - AuraVie-0002962 |
| 819 | AuraVie.com Notes - AuraVie-0002964 |
| 820 | Ruby Sky Development LLC Document - AuraVie-0003002 |

- 2 -

ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK ARMOR, INC.'S   COMPENDIUM OF EXHIBITS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 821 | Portion of Secured Merchants, LLC Document Produced By FTC in Discovery- AuraVie-0003008 |
| 822 | Chargeback Rebuttal - AuraVie-0003024 |
| 823 | Email From Natassia Yalley to Norman Bentley - AuraVie-0003025 |
| 824 | Email From Natassia Yalley to Paul Medina - AuraVie-0000476 |
| 825 | Document Info Cover Sheet Produced By FTC in Discovery - AuraVie-0003379 |
| 826 | Portion of Unknown Document Produced By FTC in Discovery - AuraVie-0003427 |
| 827 | Portion of Unknown Document Produced By FTC in Discovery - AuraVie-0003453 |
| 828 | AuraVie Ltd. Written Resolution - AuraVie-0003497 |
| 829 | Email From David Davidian to Global Media - AuraVie-0003540 |
| 830 | Pinnacle Logistics Payroll Register - AuraVie-0004100 |
| 831 | Email From Alan Argaman to Paul Medina Re Shipping Weight Change |
| 832 | Email From Alan Argaman to Alon Nottea Re Angel Project |
| 833 | All Invoices Sent From Secured Merchants to SBM Management, Inc. |
| 834 | Contract Between Secured Merchants and Big Ventures, Inc. |
| 835 | Contract Between Secured Merchants and Wealth Group, Inc. |
| 836 | Contract Between Secured Merchants and Wealth Vision Ventures, Inc. |
| 837 | Capital Infusion Agreement Between Chargeback Armor, Inc. |

- 3 -

ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK
ARMOR, INC.'S   COMPENDIUM OF EXHIBITS IN SUPPORT OF OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT

| | and Secured Merchants |
|---|---|
| 838 | Chargeback Armor Bank Statements |
| 839 | Email Between Victor Azal and Argaman - AuraVie-0003380 |

DATED:  May 23, 2016          **BEVERLY HILLS LAW CORP., PC**


By:   /s/ Sagar Parikh

Sagar Parikh, Esq.
*Attorneys for* Alan Argaman, Chargeback Armor, Inc. and Secured Merchants, LLC

- 4 -

# EXHIBIT 801

# In the Matter of:

# FTC v. Bunzai Media Group, Inc., et al.

*February 24, 2016*
*Alan Argaman*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

```
 1              UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   FEDERAL TRADE COMMISSION  )
 5          Plaintiff          )
 6      v.                     ) No. CV 15-4527-GW(PLAx)
 7   BUNZAI MEDIA GROUP, INC., )
 8   et al.,                   )
 9          Defendants.        )
10
11
12
13
14              Wednesday, February 24, 2016
15
16              10877 Wilshire Boulevard
17              Suite 700
18              Los Angeles, California
19
20
21
22          The above-entitled matter came on for
23   deposition, pursuant to Notice, at 1:00 p.m.
24
25
```

**2**

```
 1              UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   FEDERAL TRADE COMMISSION  )
 5          Plaintiff          )
 6      v.                     ) No. CV 15-4527-GW(PLAx)
 7   BUNZAI MEDIA GROUP, INC., )
 8   et al.,                   )
 9          Defendants.        )
10
11
12
13
14
15
16          DEPOSITION OF ALAN ARGAMAN, taken on
17   behalf of the Federal Trade Commission, at
18   10877 Wilshire Boulevard, Suite 700, Los Angeles,
19   California, commencing at 1:00 p.m., and concluding
20   at 4:45 p.m., on Wednesday, February 24, 2016,
21   pursuant to Notice, before CHRISTINA KIM-CAMPOS,
22   CSR No. 12598, a Certified Shorthand Reporter, in
23   and for the State of California.
24
25                      ***
```

**3**

```
 1   A P P E A R A N C E S
 2
 3   For the Federal       U.S. FEDERAL TRADE COMMISSION
 4   Trade Commission:     REID TEPFER, ESQ.
 5                         EMILY B. ROBINSON, ESQ.
 6                         1999 Bryan Street
 7                         Suite 2150
 8                         Dallas, Texas  75201-6808
 9                         (214) 979-9383
10                         rtepfer@ftc.gov
11                         erobinson@ftc.gov
12   For the Defendants    CROSSWIND
13   Alon Nottea and       ROBERT M. UNGAR, ESQ.
14   Roi Reuveni:          (Via Telephone)
15                         2190 North Beverly Glen Blvd.
16                         Los Angeles, California  90077
17                         (818) 646-4750
18                         rmu@crosswindlaw.com
19   For the Witness       BEVERLY HILLS LAW CORP., PC
20   Alan Argaman:         SAGAR PARIKH, ESQ.
21                         433 North Camden Drive
22                         6th Floor
23                         Beverly Hills, CA  90210
24                         (310) 887-1338
25                         SP@BeverlyHillsLawCorp.com
```

**4**

```
 1                    I N D E X
 2
 3   WITNESS               EXAMINATION           PAGE
 4   Alan Argaman        By Ms. Robinson            6
 5
 6   DEPOSITION EXHIBITS          INITIAL REFERENCE
 7   Argaman Deposition Exhibit No. 175          20
 8   Argaman Deposition Exhibit No. 182          22
 9   Argaman Deposition Exhibit No. 176          27
10   Argaman Deposition Exhibit No. 178          32
11   Argaman Deposition Exhibit No. 185          37
12   Argaman Deposition Exhibit No.  66          44
13   Argaman Deposition Exhibit No. 152          59
14   Argaman Deposition Exhibit No. 184          63
15   Argaman Deposition Exhibit No. 149          87
16   Argaman Deposition Exhibit No. 191         111
17   Argaman Deposition Exhibit No. 190         114
18   Argaman Deposition Exhibit No. 187         124
19   Argaman Deposition Exhibit No. 188         128
20   Argaman Deposition Exhibit No. 189         128
21
22
23              INFORMATION REQUESTED
24
25                   None.
```

FTC v. Bunzai Media Group, Inc., et al.                                          2/24/2016

---

49

1    services myself, and this amount might be a payment
2    for services that I have provided for AuraVie.com
3    website.
4         MR. UNGAR:  Move to strike everything after
5    the word "No."
6    BY MS. ROBINSON:
7         Q.  Did you provide services for AuraVie.com?
8         A.  I myself provided a website called
9    AuraVie.com that was a straight sale website.
10   AuraVie.com sold skin care products on a website
11   that had shopping carts, that had no risk free
12   trials, that had multiple SKUs and products of skin
13   care that customers came in and bought, such as they
14   would buy on Amazon or eBay or Shopify or
15   BigCommerce or Volusion or any other shopping cart
16   platform.  So I provided a website for AuraVie.com.
17   Again, the word "provide," I don't know what it
18   means, but yes.
19        Q.  And is it your testimony that the AuraVie
20   website landing page that you designed did not have
21   a negative option?
22        A.  Absolutely not.
23        Q.  Okay.  And so --
24        A.  The AuraVie.com website that I worked on did
25   not have negative options, did not have risk free

---

50

1    trial, did not have continuity ability of re-billing
2    customers.  My software or the platform or the
3    website AuraVie.com did not do risk free trial on
4    AuraVie.com.
5         Q.  Let's look at the second line in the
6    description.  It says, "Campaign Setup and
7    integration to Lime Light CRM and ClickConnector."
8    Can you tell me what that means?
9         A.  Lime Light CRM is a Lime Light CRM.  It's a
10   software that they use for -- for their business,
11   for their continuity business, I suppose.  I mean, I
12   don't know.  You can ask them, but yup.
13        Q.  What does CRM mean?
14        A.  Lime Light CRM, it's a customer relation
15   management system.
16        Q.  What's ClickConnector?
17        A.  ClickConnector, are we -- are we talking
18   about different document now or what?
19        Q.  It says, second line there --
20        A.  Oh --
21        Q.  -- says --
22        A.  -- so ClickConnector is an API connector.
23        Q.  What's API stand for?
24        A.  It's basically part of Lime Light.
25        Q.  Okay.  So describe that in a little more

---

51

1    detail for me.
2         A.  What is the exact question?
3         Q.  What does Lime Light do?
4         A.  You're asking me what Lime Light, another
5    software, does?
6         Q.  Campaign integration to Lime Light, so I'm
7    asking you --
8         A.  So you go to Lime Light, you -- you -- you
9    have a menu.  You use -- I haven't used it myself,
10   so I don't really know, but I mean, if you want a
11   demo, you would have to go to Lime Light CRM and ask
12   them for a demo.
13        Q.  So is it your testimony that you don't know
14   what Lime Light does?
15        A.  I just told you before that I do know.  As a
16   whole, Lime Light is a CRM where negative option
17   companies go to, to perform their business --
18        Q.  Okay.
19        A.  -- and continuity.
20        Q.  So is it your testimony that you designed a
21   landing page that did not have con-- --
22        A.  Did --
23        Q.  -- did not have the continuity plan or
24   the negative option --
25        A.  Absolutely.  First of all, I don't know

---

52

1    you're going into detail design or not, but I
2    operated for them, hosted a website called
3    AuraVie.com that was not a negative website, that
4    did not have risk free trial options, that was a
5    legitimate -- not to say that others are not, but it
6    was a straight sale, add to shopping cart, check
7    out, and buy it.  The -- the price was not free.  In
8    fact, it was maybe 100 or 200 or $300 per item.
9    Clients purchased it from their website.  And I
10   operated it for them.
11        Q.  But then you also provided campaign setup
12   integration to Lime Light, which is for continuity
13   plans; is that correct?
14        A.  No.  Lime Light -- again, Lime Light is
15   software that does not belong to me, and they know
16   very well how to use Lime Light by them-self.
17        Q.  Okay.  So what were you billing for in this
18   line, "Campaign Setup and integration to Lime Light
19   CRM and ClickConnector"?
20        A.  Yeah.  I mean, this could be just added
21   con-- I -- I -- I -- Secured Commerce did not work
22   with Lime Light.
23        Q.  Did you work with Lime Light?
24        A.  Yes.
25        Q.  Okay.  What did you do with Lime Light?

---

13 (Pages 49 to 52)

FTC v. Bunzai Media Group, Inc., et al.                                        2/24/2016

---

93

1    A.  I respond to so many emails.
2    Q.  Okay.
3    A.  I wish that I could tell you that I do
4    remember --
5    Q.  Do you remember --
6    A.  -- but I have no idea.
7    Q.  If you got a big long email and you had no
8    idea what they were talking about --
9    A.  This is the first I see this.  I don't
10   remember this email at all.
11   Q.  Okay.  So did you ever, in the context of
12   providing IT services for Chargeback Armor, Inc.,
13   did you speak with anybody other than Mr. -- and I'm
14   going to butcher his name -- Casit?
15   A.  Costache.
16   Q.  Costache.  I'm sorry.
17       Did you speak with anybody other than
18   Mr. Costache at Chargeback Armor, Inc.?
19       MR. PARIKH:  At what point in time?
20   BY MS. ROBINSON:
21   Q.  In the context of when you're providing the
22   IT services to -- so strike -- let me start over
23   with the question.
24       In the con- -- while you're providing IT
25   services to Chargeback Armor, Inc., did you speak

---

94

1    with anyone other than Mr. Costache?
2    A.  Mike was my point to guy.  Yeah.
3    Q.  Point to.
4       When did you start providing services to
5    Chargeback Armor, Inc.?
6    A.  I don't know the date.
7    Q.  Was it -- strike that.
8       Did Mr. Costache have any conversations with
9    you, prior to starting Chargeback Armor, Inc., about
10   using our website chargebackarmor.com?
11   A.  Possibly, yes.
12   Q.  Did you sell it to him?
13   A.  No.
14   Q.  Okay.  Did he -- did he use Chargeback --
15   did Chargeback Armor, Inc., use the website
16   chargebackarmor.com?
17       MR. PARIKH:  Objection; calls for
18   speculation.
19       THE WITNESS:  Not sure.
20   BY MS. ROBINSON:
21   Q.  You're not sure if it did or not; is that
22   your, what you're saying?
23   A.  I'm not sure.
24   Q.  Okay.  Did you have any conversation with
25   Mr. Costache about Chargeback Armor, Inc., using

---

95

1    chargebackarmor.com?
2    A.  Probably.
3    Q.  What were those conversations about?
4    A.  I don't recall.
5    Q.  Did anyone pay you any money for the
6    Chargeback Armor system -- services?
7       Did anyone pay you any money for Chargeback
8    Armor services?
9    A.  I just want to think out loud here.
10   Q.  Okay.
11   A.  I mean, if Chargeback Armor was serviced via
12   Chargeback Armor, Inc., then how can people pay me
13   money?  They pay Chargeback Armor, Inc.
14   Q.  So Secured Merchants invested 250,000 in
15   Chargeback Armor, Inc.; is that correct?
16   A.  Yes, that's correct.
17   Q.  Did you receive any kind of business plan
18   prior to your investment?
19   A.  Yes.
20   Q.  Okay.  Do you still have a copy of that
21   business plan?
22   A.  It was a verbal business plan.
23   Q.  Did you -- what did you -- what did Secured
24   Merchants receive for the 250,000?
25   A.  Secured Merchant invested 250,000 in

---

96

1    Chargeback Armor, Inc., as a startup company headed
2    by CEO Mike Costache --
3    Q.  Mm-hmm.
4    A.  -- who I talked to in great length, and he
5    convinced me that he can take the company to the
6    next level and bring clients and be -- and make it a
7    successful company.  It looked like a very good
8    business opportunity for Secured Merchant, and the
9    money was invested, and everything was going well
10   until the FTC came and ruined the plan, shall we
11   say.
12   Q.  Did Secured Merchants receive an ownership
13   in percentage for its investment, or did it receive
14   any kind of --
15   A.  Secured Merchant made a business deal that
16   was viable for them.  The main two points of the
17   deal was that at least half, if not more of that
18   same money that Secured Merchant gave, would come
19   back to Secured Merchant for its services that it
20   required.  So it was not like a lost investment
21   because half of that money would come back, at
22   least, and an unknown amount of ownership that was
23   supposed to be decided four months down the line,
24   after the inception of the company of Chargeback
25   Armor, Inc., was again interrupted by this lawsuit.

---

24 (Pages 93 to 96)

FTC v. Bunzai Media Group, Inc., et al.                                              2/24/2016

---

109

1   incorrect, but if you meant did we provide IVR
2   services, then yes.  But I don't know.  I don't want
3   to --
4        Q.  Okay.  Did you provide --
5        A.  -- tell you what --
6        Q.  -- IVR services?
7        A.  Yes.
8        Q.  Okay.  Did you provide IVR services to SBM
9   Management?
10       A.  Yes.
11       Q.  Did you provide IVR services to any other
12  company that Alon Nottea worked for?
13       A.  I don't know.
14       Q.  When you were providing IVR services to SBM
15  Management, did you discuss those services with
16  Alon?
17       A.  Probably.
18       Q.  And what are IVR services?  Could you please
19  describe those to me?
20       A.  IVR services, in a -- in an example would be
21  if you were to call AT&T and they would let you hear
22  an automated attendant, "Please press 1 for sales.
23  Please press 2 for customer service.  If you know
24  your order number, please press it now."  IVR and
25  telephony terms of the world, according to my best

---

110

1   judgment or understanding, means a better customer
2   interaction with the business, due to the fact that
3   it can work 24/7, it can provide better customer
4   satisfaction, it can provide customer with their
5   customer information, to know if their order is
6   active or cancelled.  It allows them to leave a
7   voicemail.  It allows them to perform -- perform
8   tasks, which, in the long-term or in the short term,
9   means better customer service and satisfaction.
10       Q.  And do you remember the timeframe that you
11  or Secured Merchants provided IVR services to SBM
12  Management?
13       A.  All that information was submitted to you
14  right at the beginning when you asked for it.  It
15  was submitted to the Receiver and -- and to
16  Mr. Reid.  I don't recall the dates, but you should
17  have that information.
18       Q.  Okay.  I'm going to object as
19  nonresponsive --
20       A.  Okay.
21       Q.  -- but I do believe I now understand that
22  you don't remember when you provided IVR services.
23       A.  No.
24       Q.  What's IVR Logix?
25       A.  It's a name.

---

111

1        Q.  Is it -- what is it the name of?
2        A.  Could be anything you want it to be.
3        Q.  Have you ever used the name IVR Logix?
4        A.  Probably.
5        Q.  Okay.  When?
6        A.  In conversations with myself, thinking of
7   the names.
8        Q.  Okay.
9        A.  What name can --
10       Q.  Did you use the name IVR Logix in context of
11  services to SBM Management?
12       A.  I'm not sure.
13           MS. ROBINSON:  I'll show you here.  This is
14  Exhibit 191.
15           (Plaintiff's Exhibit 191 was
16            previously marked for identification
17            by the FTC and is attached hereto.)
18  BY MS. ROBINSON:
19       Q.  And if you'll look, this is an Excel
20  spreadsheet --
21       A.  Sure.
22       Q.  -- that was just printed out.  If you'll
23  look at the last page --
24       A.  Okay.
25       Q.  -- and it's small font, so I'm going to warn

---

112

1   you about that, but on the right side of the page it
2   says "Related People" and it says, "Author, Avi.
3   Last modified by Avi."
4           Do you remember preparing this Excel
5   spreadsheet?
6        A.  I don't remember preparing it, but --
7        Q.  Does it look like something you might have
8   prepared?
9        A.  Could be.
10       Q.  Did you prepare Excel spreadsheets that
11  listed toll free numbers for SBM Management?
12       A.  I just told you I don't remember if I
13  prepared it, as you're --
14       Q.  Is this the type of report that you
15  provided?
16       A.  This is -- this is a report from the IVR in
17  regards to the amount of calls that came in per toll
18  free number.
19       Q.  All right.  Was this a report that you, as
20  part of your services related to IVR for SBM
21  Management, is this the type of report that you
22  would have prepared?
23       A.  Possibly.  This isn't something I do on
24  regular basis --
25       Q.  Okay.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

---

129

1    really neat.  Unfortunately, none of it ever worked
2    and it's just dummy graphs that we're now looking.
3    And I used it as a placement to make it look good,
4    but they never -- they never worked.
5        So if you click on them, they don't work,
6    the numbers don't move.  It's static information
7    that doesn't move or work.  It's for look purposes
8    only.  In fact, it was taken from a template on the
9    Internet that -- that it was copied from.
10       Q.  Okay.
11       A.  Yeah.
12       Q.  That's Exhibit 189.
13       A.  Sure.
14       Q.  What about 187 and 188?
15       A.  So 188 is Lime Light information displayed
16   in a I-frame, so it's information that is from Lime
17   Light.
18       Q.  Okay.  So did you provide this
19   ClickConnector overlay to SBM Management?
20       A.  I believe so, yes.
21       Q.  And when I say "you," I mean Secured
22   Merchants, so --
23       A.  Sometimes I don't know what you mean, so --
24       Q.  Okay.  In that context --
25       A.  -- this time I meant --

---

130

1        Q.  Yeah.
2            In that context I meant Secured Merchants.
3        A.  Okay.
4        Q.  So did you have access -- did Secured
5    Merchants have access to this information?
6        A.  This is my client's information, not my
7    information.
8        Q.  So did Secured Merchants have access to it?
9        A.  I don't know.  I never accessed it.
10       Q.  Did you provide any services related to --
11   strike that.
12           Did you provide any IT services related to
13   the Customer Service Department at the AuraVie
14   companies?
15           MR. PARIKH:  Objection; vague and ambiguous
16   as to "AuraVie companies."
17   BY MS. ROBINSON:
18       Q.  Did you --
19       A.  Yeah.  I mean, the whole question --
20       Q.  Did Secured Merchants provide any IT
21   services to the Customer Service Department for SBM
22   Management?
23       A.  I believe all the services we talked to
24   until now are somewhat related to Customer Service.
25   I mean, I don't know how they work or how they come

---

131

1    into Customer Service or what is Customer Service
2    and what isn't.  That's something you should ask
3    them.
4        Q.  Did you ever discuss SBM Management with
5    Doron Nottea?
6        A.  No.
7        Q.  Did you ever discuss any of the IT services
8    you were providing to SBM Management with Doron
9    Nottea?
10       A.  No.
11       Q.  Okay.  Did you ever -- did you ever discuss
12   any IT services that Secured Merchants was providing
13   to SBM Management with Doron Nottea?
14       A.  No.
15       Q.  Did you ever discuss AuraVie products with
16   Doron Nottea?
17       A.  No.
18       Q.  Do you know if Doron Nottea provided
19   accounting services to SBM Management?
20       A.  No.
21       Q.  Do you know if Doron Nottea provided
22   accounting services to any of the companies that
23   sold the AuraVie products?
24       A.  I'm not sure.
25           MS. ROBINSON:  If we could take a ten minute

---

132

1    break.  I'm hoping --
2            THE WITNESS:  Sure.
3            MS. ROBINSON:  -- I can wrap up soon.
4            MR. PARIKH:  Okay.
5            (Recess)
6            MS. ROBINSON:  Let's go back on the record.
7    BY MS. ROBINSON:
8        Q.  So was Secured Merchants' office located at
9    6925 Canby Avenue, Suite 105, in Reseda?
10           MR. PARIKH:  At what point in time are you
11   asking?
12           MS. ROBINSON:  2015.  Until June 2015.
13           THE WITNESS:  I'm not sure of dates, but I
14   did operate from there --
15   BY MS. ROBINSON:
16       Q.  Okay.
17       A.  -- from time to time.
18       Q.  Okay.  How many days a week were you in the
19   office?
20       A.  Not much.
21       Q.  You were there the day the Receiver showed
22   up with the FTC's lawsuit --
23       A.  Yes, I was.
24       Q.  -- is that correct?
25           So do you have an estimate of how many days

---

33 (Pages 129 to 132)

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

137

1    A. No, I didn't say that.
2    Q. -- is that what you said?
3    A. You may ask me anything you want, but I said
4    the dates, currently at this date, for what you're
5    asking, I can't recall exact dates. I mean, we're
6    talking about years. You want me to go specific on
7    a date, it's very difficult.
8    Q. Okay. Why don't you give me a year.
9    A. I told you I didn't come prepared. At least
10   give me some exhibit, give me some documentation I
11   can look at and refresh my mind to say this looks
12   correct or not. But if you're not doing that and if
13   you're just asking me dates from years ago, and I'm
14   telling you that I don't know, then that's my honest
15   answer 'cause anything else would be the wrong
16   answer.
17   Q. Okay. And what I am asking you, though, is
18   do you remember -- and you can give me a year,
19   whatever -- whatever specificity that you're
20   comfortable with -- do you remember when Secured
21   Commerce started its lease at 6925 Canby Avenue,
22   Suite 105, Reseda, California?
23   A. No.
24   Q. Do you remember not even to a year?
25   A. No.

138

1    Q. Okay. Do you know how many companies were
2    subleasing from Secured Commerce, LLC?
3    A. I don't recall.
4    Q. During the days that you worked in the
5    office, Doron Nottea's office was in that same
6    office as well; is that correct?
7    A. I didn't hear that question.
8    Q. Oh, I'm sorry.
9    A. Yeah.
10   Q. Did Doron Nottea also have an office in
11   Suite 105 at any point during the time you had a
12   lease there?
13   A. I believe so.
14      MR. PARIKH: Objection; calls for
15   speculation.
16   BY MS. ROBINSON:
17   Q. And if he did have a office there, he would
18   have subleased from Commerce; is that correct?
19   A. That's an assumption that you're making. I
20   believe he had a room that he was coming and going
21   from. I don't know --
22   Q. Did he sublease --
23   A. So that --
24   Q. -- from Secured Commerce?
25   A. I don't know.

139

1    Q. Secured Commerce, LLC, is your company;
2    right?
3    A. Secured Commerce, LLC, is not fully my
4    company.
5    Q. Okay. Who else has ownership of that
6    company?
7    A. It's -- Doron has ownership of that.
8    Q. Okay.
9    A. Yeah. And that --
10   Q. So what percentage ownership do you and
11   Doron have?
12   A. At this time?
13   Q. Yes.
14      Has it changed since Secured Commerce, LLC,
15   was --
16   A. Oh, I -- I don't know the proper term, but I
17   left as a member of Secured Commerce, LLC, because
18   the company was failing, and there was -- my
19   business vision was not implemented. That company
20   did not benefit me in any way, so I detached myself
21   from that company --
22   Q. Okay.
23   A. -- as a member.
24   Q. So when did you do that?
25   A. Again, you're asking me when, and I don't

140

1    know the dates.
2    Q. Okay. Was it before you left the country?
3    A. I'm not sure.
4    Q. So at the time, June 18th, 2015, when the
5    Receiver came over --
6    A. Mm-hmm.
7    Q. -- and took access of the premises, at that
8    time were you still a member of Secured Commerce,
9    LLC?
10   A. You would have to ask my accountant, but I
11   wasn't actively a member as far as my communication
12   with Doron. I de-- you know, I left the company.
13   Q. Do you know -- strike that.
14      Who is your accountant?
15   A. David Davidian.
16   Q. How long has David Davidian been your
17   accountant?
18   A. Long time. I don't remember the dates
19   again.
20   Q. Okay. Who recommended David Davidian to
21   you?
22   A. Nobody.
23   Q. How did you know David Davidian?
24   A. I don't remember.
25   Q. Do you know how much SBM Management paid

35 (Pages 137 to 140)

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

---

141

1    Secured Merchants for its chargeback services?
2        A. I don't recall.
3        Q. Do you recall if it was over $300,000?
4        A. How much?
5        Q. $300,000?  Do you recall if it was over
6    $300,000?
7        A. I don't recall.
8        Q. Did you read the Receiver's report that was
9    filed in this case?
10       A. Some of it.  Only what's related to me.
11       Q. Okay.  Do you have -- is there anything in
12   the Receiver's report that you dispute or disagree
13   with?
14       A. I didn't read it.  I read only my portion.
15       Q. Okay.  The portion that you read that
16   related to you, was there any parts that you
17   disputed or disagreed with?
18       A. So I don't remember everything I read, but
19   from my recollection she wrote that Secured Merchant
20   and Alan Argaman, maybe she said Alan or not, I'm
21   not sure, but it seemed like a viable technology
22   company that gave service to many clients.
23       Q. Did you agree or disagree with that?
24       A. With that assumption --
25       Q. Yes.

---

142

1        A. -- that I just stated?
2        Q. Yes.
3        A. I think that's what I do for a living.
4        Q. Okay.
5        A. I do that every day.
6        Q. Did you read anything that you disagreed
7    with in the Receiver's report?
8        A. I don't -- I don't re -- remember word for
9    word.  If you want to give me the segment about
10   myself, we can look into it.
11       Q. During the time that you provided chargeback
12   services for SBM Management, did you ever run an
13   Internet search for AuraVie?
14       A. What?
15       Q. During the time that you provided chargeback
16   services for SBM Management, did you ever run an
17   Internet search for AuraVie?
18       A. Like a -- I don't understand the question.
19   Internet search for AuraVie?  What --
20       Q. Yeah.
21       A. -- does that mean?
22       Q. Have you ever used an Internet search
23   engine?
24       A. Yes.
25       Q. Okay.  Have you ever used an Internet search

---

143

1    engine to search for AuraVie?
2        A. Why would I do that?
3        Q. Did you ever do it?
4        A. No.  Don't recall doing that.
5        Q. Okay.  Did you ever ask anyone related to
6    SBM Management for information about their sales
7    practices?
8        MR. PARIKH:  Objection; vague and ambiguous
9    as to "sales practices."
10       THE WITNESS:  No.
11   BY MS. ROBINSON:
12       Q. Did you ever ask anyone at SBM
13   Management for information on their AuraVie
14   marketing materials?
15       A. No.
16       Q. When you were at the Suite 105 office for
17   Secured Merchants, was Doron Nottea ever there as
18   well at the same time as you?
19       A. I usually have my door closed, so I'm not
20   sure when he was there or not.
21       Q. Was he there sometimes?
22       A. I -- I would assume he was.
23       Q. Did you ever talk about what he was working
24   on?
25       A. Not specifically.

---

144

1        Q. When you were at the Suite 105 office, how
2    often was Alon there?
3        A. He wasn't there.
4        Q. Ever?
5        A. I don't like to use the word "ever," but
6    maybe he came to visit his brother or -- or -- it
7    was not his office, that's for sure.
8        Q. Did he ever come for meetings?
9        MR. PARIKH:  Objection; calls for
10   speculation.
11       MR. UNGAR:  Join.
12       THE WITNESS:  I myself didn't see that.
13   BY MS. ROBINSON:
14       Q. Okay.  Did he ever come to have a -- to the
15   office to have a meeting with you?
16       A. I was hardly there.  I don't recall
17   meetings.
18       Q. Okay.  So when you did talk with Alon about
19   services you provided to SBM Management, was it
20   usually over the phone or email?
21       A. I'm not sure.
22       MS. ROBINSON:  I'll pass the witness.  That
23   means --
24       MR. PARIKH:  I don't have any questions.
25       MS. ROBINSON:  Mr. Parikh, do you have any

---

36 (Pages 141 to 144)

# EXHIBIT  802

DAVID SHONKA
Acting General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4325 (voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.*<br><br>**Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**RESPONSES TO DEFENDANT ALAN ARGAMAN'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "FRCP"), and subject to the general and specific objections set forth below, Plaintiff Federal Trade Commission responds to the First Set of Special Interrogatories propounded by Defendant Alan Argaman.

## General Objections and Definitions

1.      **Lack of Waiver; Right to Modify**. The following responses are made without waiving any objections raised by Plaintiff in this proceeding or any objections Plaintiff may have with respect to the subsequent use of these answers. Plaintiff specifically reserves: (a) the right to object on any and all proper grounds, at any time, to other discovery procedures involving or relating to the subject matter of interrogatories answered herein; and (b) the right, at any time to revise, correct or clarify the following responses.

2**.      Right to Supplement/Modify**. Plaintiff reserves the right to supplement and will supplement these responses as required under FRCP 26(e) if additional responsive information becomes available.

3.      **Attorney Client, Deliberative Process and Attorney Work Product Privileges**. Plaintiff generally objects to Defendant Argaman's First Set of Special Interrogatories to Plaintiff to the extent these interrogatories directly or indirectly seek information subject to the attorney-client, deliberative process or

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**
Page | 2

work product privileges.

**4.     Scope of Discovery**. Plaintiff objects to Defendant Argaman's First Set of Special Interrogatories to Plaintiff to the extent that the instructions and definitions contained therein attempt to impose obligations upon the Plaintiff greater than those required by the Federal Rules of Civil Procedure.

**5.     Creating Documents, Legal Research, or Compilations**. Plaintiff objects to Defendant Argaman's First Set of Special Interrogatories to Plaintiff insofar as these interrogatories would directly or indirectly require Plaintiff to create new documents as opposed to producing already existing documents, as any such request is beyond the scope of FRCP 34.

Plaintiff objects to Defendant's Interrogatories to the extent that they require Plaintiff to undertake legal research for Defendant or require analysis and organization of factual evidence that they can do equally well. Such requests are beyond the scope of FRCP 33 and 34. Additionally, under FRCP 33(d), if the response to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing business records, the responding party may refer to the records. Plaintiff reserves the right to respond under FRCP 33(d).

**6.     Non-Waiver by Production**. Without waiving any stated objections, Plaintiff intends to make available all responsive, relevant, and non-privileged

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

documents within Plaintiff's custody, control, or possession, subject to the Court's Protective Order. The FTC further notes that it has previously provided, pursuant to the parties' agreement, a forensic image of Defendants' computers copied by the FTC, as well as other documents in the FTC's possession.

**7.      Blockbuster Interrogatories**. Plaintiff objects to Defendant's use of "Blockbuster Interrogatories." A "Blockbuster Interrogatory" is an interrogatory that requests a party to "state all facts" of the case. Such interrogatories are objectionable under the federal rules of discovery. *See, e.g.*, *Hilt v. SFC Inc.,* 170 F.R.D. 182 , 186 (D. Kan. 1997) (stating a party cannot use Blockbuster Interrogatory to ask for "each and every fact," that requires a "narrative or otherwise detailed account of her entire case in chief"); *Grynberg v. Total S.A.,* No. 03-cv-01280-WYD-BNB, 2006 WL 1186836 at *6, 2006 U.S. Dist. LEXIS 28854 (D. Colo. 2006) (characterizing overly expansive interrogatories as "blockbuster" and finding them improper); *United States v. The Louisiana Clinic,* No. Civ. A. 99-1767, 2003 WL 21283944 at *6, 2003 U.S. Dist. LEXIS 9401 (E.D. La. 2003) (rejecting a request to compel a response to an interrogatory seeking an explanation of why and how each produced document related to each claim, stating, "[R]elators should not have to try their case in the context of a response to interrogatories"); and *Jones v. Goldstein*, 41 F.R.D. 271, 272 (D.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

Md. 1966) (holding that interrogatories requesting a party "[s]et forth the facts upon which [an entire defense is based]" and to provide a "statement of the facts as to how you contend that the occurrences took place …" are overbroad as they seek the party to provide their entire case in an interrogatory answer).

**8.      Impermissible Contention Requests for Production Based on Use in Court.** Plaintiff objects to the Defendant's Discovery Requests that concern whether the document supports a contention or that is based on how the document may be used in court ("Contention Request for Production"). Such requests are beyond the scope of FRCP 34: FRCP 34 does not authorize such discovery requests because to detail how a document will be used in court violates the attorney work product privilege. *Myers v. Goldco, Inc.*, Case No. 4:08cv8-RH/WCS, 2008 U.S. Dist. LEXIS 37089, *14 (May 6, 2008) (disallowing FRCP 34 request for "all documents which you intend to introduce at the trial of this case or which may be used to refresh the recollections of witnesses" because documents "that a party 'intends to use at trial' are protected by the work product privilege"). FRCP 34 instead requires document requests to "describe with reasonable particularity each item or category of items to be inspected," which Contention Requests for Production fail to do. *See Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 202 (N.D. W. Va. 2000) (a document request

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

is not reasonably particular if it merely requests documents "related to a claim or defense" in the litigation); *see also Reagan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649-50 & n. 6 (10th Cir. 2008) (a request for "all documents that relate …" is overly broad and fails to identify documents as required by FRCP 34). Plaintiff further objects to Defendant Discovery Requests that seek "all documents relating to" a specific topic, item or matter: such requests are beyond the scope of FRCP 34, violate the attorney work product privilege, violate the deliberative process privilege and are impermissible "fishing expeditions." *Lopez v. Chertoff*, Case No. CV 07-1566-LEW, 2009 U.S. Dist. LEXIS 50419, ** 5-8 (E.D. Cal. June 2, 2009) (stating "one of the purposes of FRCP 34 is to prevent fishing expeditions, and thus Plaintiff has some responsibility to narrow his request" and denying request for documents "relating to" claims as facially overbroad). A request for "all documents" that support a contention is a not just an impermissible fishing expedition, but is an attempt to "drain the pond and collect the fish from the bottom." *Amcast Indus.v.Detrex Corp.*, 138 F.R.D. 115, 121 (N.D. Ind. 1991) (citation omitted).

**9.      These Discovery Requests are Untimely.** Plaintiff objects on the basis that these discovery requests are untimely. The deadline for these responses extends beyond the discovery cutoff.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**
Page | 6

**Specific Objections and Answers**

**INTERROGATORY NO. 1:** IDENTIFY each PERSON who has knowledge of any the allegations made against Argaman in the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as vague and overbroad. Without waiving any objection, the FTC responds substantively as follows.

Witnesses with knowledge of Argaman's participation in the common enterprise as described in the FTC's FAC include:

- Alon Nottea
- Doron Nottea
- Khristopher Bond
- Igor Latsanovski
- Paul Medina
- Roi Reuveni
- Nastassia Yalley
- Defendants' former employees
- Charlene Koonce (receiver) and her attorneys
- FTC investigator Brent McPeek
- Stephan Bauer
- Richard Gordon
- David Davidian
- Representatives, employees, and principals of Defendant Corporations
- Mike Costache
- Richard Gordon
- Jeff Brandlin and his associates

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

- Record custodians of banks, merchant processors, or other financial institutions employed by Defendants
- Forensic custodians

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 2:** State all facts upon which YOU base YOUR contention that Argaman engaged in wrongdoing, if YOU so contend.

**RESPONSE:** The FTC specifically objects to this request as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

Defendant Argaman provided the common enterprise with a variety of essential services without which the common enterprise could not have continued to deceive consumers. Defendant Argaman provided many of these services through Secured Merchants LLC, a company he owns and jointly operated with other Individual Defendants, in furtherance of the common enterprise. Defendant Argaman claims that he was the "only member" of Secured Merchants and that he operated his company at arm's length from Defendants. This claim, however, is directly contradicted by the evidence in this case:

  – A Secured Merchants LLC's operating agreement draft names Defendant Argaman and Defendant Alon Nottea as the company's

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

Page | 8

two managers.[1]

A Secured Merchants "Executive Summary," created in June 2013 states that the company's management consisted of Defendants Alon Nottea, Avi Argaman, and Paul Medina.[2]

– Secured Merchants shared many employees with the other Corporate Defendants involved in the common enterprise, including:
  o Robert Stayner—an employee of Pinnacle Logistics, SBM Management, and Chargeback Armor and Secured Merchants.
  o Tyler Reitenback— an employee of Pinnacle, Chargeback Armor, and Secured Merchants.
  o Defendant Roi Reuveni was an employee of CalEnergy, Pinnacle Logistics, Chargeback Armor, Agoa Holdings, DMA Media Holdings, and Secured Merchants.
  o Mike Costache— CEO of Chargeback Armor, Inc., was also an employee of Secured Merchants LLC.
  o Defendant Doron Nottea handled accounting and payroll for Secured Merchants, as well as the rest of the common enterprise.

– Secured Merchants LLC operated out of the same office suite as the other Corporate Defendants.

– Nonprivileged attorney invoices discuss meetings concerning Secured Merchants with "Igor."

– Defendants possessed a "Standard Service Agreement" form listing Defendant Roi Reuveni as Secured Merchant's "Managing Member."[3]

– Secured Merchants LLC was identified as one of the "Bunzai Companies" on a list that Defendant Doron Nottea sent to CPA

---

[1] Bates No. AuraVie-0003002.
[2] Bates No. AuraVie-0003024.
[3] Bates No. AuraVie-0003008.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

David Davidian.[4]

– Doron Nottea created the email address securedmerchantsllc@gmail.com.

Moreover, Secured Merchant's executive summary shows its founders were in the business of selling skincare products:

> Over the past two years, the founders of Secure Merchants saw first-hand every type of failure trap that could have killed their skin care product company, which today has monthly sales of $2.5 million or 25,000 orders.
> Thus the problems that our three initial services solve for any DRM [Direct Response Marketing] company are the core infrastructure needed to deal with (1) the inevitable credit card chargebacks, (2) keeping customers happy or allowing them an easy opt-out, and (3) providing the most sophisticated customer record management system.[5]

Defendant Argaman, through Secured Merchants LLC, provided the following services:

– Defendant Argaman assisted Alon Nottea in operating a call center for AuraVie customer complaints.[6]

– Defendant Argaman provided technical expertise to create an automated response system to allow large numbers of consumers to cancel their AuraVie continuity plans.[7]

---

[4] Bates No. AuraVie-0003453.
[5] Bates No. AuraVie-0003024 - AuraVie-0003025.
[6] *See*, *e.g.,* AuraVie-0002640 - AuraVie-0002641.
[7] *See also* Doc. No. 121-6, at 9-21; Doc No. 121-7, at 1-3.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

–   Secured Merchants boasted that its contribution to the common enterprise "offer[s] a vehicle to resolve consumer disputes before they become chargebacks."

–   Defendant Argaman integrated the AuraVie free trial campaigns into Lime Light, a third party customer relationship management (CRM) software Defendants used for selling their products by negative option continuity plans.[8]

–   Email and screenshots show Defendant Argaman designing, creating, or managing a website offering risk free trial offers of skincare products.[9]

–   Defendant Argaman further admitted to creating AuraVie landing pages.[10]

–   Defendant Argaman ordered Attitudeline/INFINI skincare products, a product that Defendants marketed or sold, or assisted others in marketing or selling, by negative option continuity plans (or assisted others in marketing or selling in the same manner).[11]

---

[8] *See id.*

[9] Bates No. AuraVie-0003379.

[10] *See* Ex. 46 (Invoice from Secured Commerce, Defendant Argaman's company, to Adageo LLC, Defendant Alon Nottea's company, for "Design, Creation, & Optimization of Auravie landing page Campaign Setup and integration to Lime Light CRM and Click Connector"). While Defendant Argaman claims the website he only created was "AuraVie.com," a straight-sale website, this claim is not supported by the evidence. In particular, email and screenshots show Defendant Argaman assisting with the order page of a website that offered risk-free trials of skincare products.

[11] Bates No. AuraVie-0000264.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

–  Defendant Argaman participated in planning and managing "AuraVie Day," a promotional day organized to promote the AuraVie products.[12]

–  Defendant Argaman established toll-free telephone numbers for various shell corporations and set up call forwarding for those numbers.[13] These phone numbers helped disguise Defendants' purpose in using shell corporations to deceive banks, consumers, and law enforcement.

–  Defendant Argaman played a role in the decision making and marketing of new products relating to the common enterprise that went beyond providing assistance with technology issues and shipping. For example:
   o  Defendant Argaman introduced Defendant Doron Nottea to a skincare product called LeElle.[14] Defendant Argaman was later consulted concerning the company's packaging design.[15]
   o  Defendant Argaman also provided input concerning who would own the new product Defendants were marketing.[16]

–  Defendant Argaman played a key role in refuting consumer chargebacks for the Corporate Defendants, both through his company, Secured Merchants LLC, and as a principal at Chargeback Armor, Inc.
   o  Defendant Argaman admitted his company contested consumer chargebacks for the Corporate Defendants that sold AuraVie and that Secured Merchants had previously provided a chargeback refutation service termed "chargeback armor."[17]

---

[12] Bates No. AuraVie-0001601.

[13] *See, e.g.,* Bates No. AuraVie-0002784.

[14] Bates No. AuraVie-0003540.

[15] Bates No. AuraVie-0002587.

[16] Bates No. AuraVie-0002591.

[17] Deposition of Alan Argaman, at 86-88.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

Page | 12

o Defendant Argaman possessed a "Standard Service Agreement" form for clients' use of Chargebackarmor.com.[18] Further, emails suggest that Secured Merchants processed chargebacks for AuraVie under the name Chargeback Armor.[19] According to Chargeback Armor, Inc.'s Executive Summary, "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company."[20]

Through Secured Merchants LLC, Defendant Argaman received at least $300,000 from the common enterprise.[21]

Defendant Argaman also assisted in shipping the AuraVie product through his company, Secured Commerce LLC,[22] which he co-owned and operated with Defendant Doron Nottea, and used to lease the main office suite where Defendants operated.

Defendant Argaman also operated Relief Defendant Chargeback Armor, Inc. jointly with other Individual Defendants, a company Defendants Alon Nottea admitted was used to refute consumer chargebacks. This company specialized in

---

[18] The Service Agreement states: "The Software is made available to you and the Service is owned, operated, and provided to you by SM through the CHARGEBACKARMOR.COM Site."

[19] *See*, *e.g.,* Bates No. AuraVie-00004100.

[20] *See* Bates No. AuraVie-0002959.

[21] Doc. No. 120, at 25.

[22] Bates No. AuraVie-0002607 - AuraVie-0002608.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL
INTERROGATORIES TO PLAINTIFF FEDERAL TRADE
COMMISSION – SET TWO**

providing chargeback refutation services to high-risk clients,[23] of which

Defendants were but one of many.[24] A document titled "Secured Merchants –

Company Describes" described the "ChargeBack Armor" services as helping "win

back lost revenue by reversing chargebacks in your favor" and "handl[ing] the

entire chargeback dispute process on your behalf."

　　　　While other Defendants played a key role in Chargeback Armor's

operations,[25] evidence shows Defendant Argaman's foundational role at

Chargeback Armor:

- Defendant Argaman, through his company Secured Merchants LLC, provided $200,000 in startup capital to Chargeback Armor, Inc.

- Chargeback Armor's Executive Summary states that Defendant Argaman was the company's "Chief Technology Officer."[26]

---

[23] In fact, Chargeback Armor's Executive Summary states that their "target market" was "High-rick [sic] online marketers." Bates No. AuraVie-0002959 - AuraVie-0002961.

[24] In an email that UMS Banking employee Dylan Gaines forwarded to Defendant Argaman, Gaines stated that UMS Banking "actually REQUIRE all merchants that are in the riskier category to sign up with this program [i.e., Chargeback Armor]." In another email, purported CEO Mike Costache emailed Defendant Argaman and other Defendants informing him that he would be demonstrating the Chargeback Armor program for "Richard Gordon, 'the Godfather of High-Risk Processing.'" Bates No. Auravie -R5352(LIT)-09-02-2016.

[25] For example, Defendant Doron Nottea was a signatory and was identified as the account owner on Chargeback Armor's bank account. *See* Doc. No. 120, at 23.

[26] Bates No. AuraVie-0002959 - AuraVie-0002961.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL
INTERROGATORIES TO PLAINTIFF FEDERAL TRADE
COMMISSION – SET TWO**

Page | 14

– Nova 8 Media billed Defendant Argaman of Secured Merchants for "design services" for "Chargeback Armor."[27]

– A Chargeback Armor, Inc. services agreement dated March 2, 2015 describes the company's board of directors as consisting of Mike Costache, Alon Nottea, and Avi Argaman.[28]

– Defendant Argaman incorporated Chargeback Armor, Inc. in concert with other Individual Defendants.[29]

– Defendant Argaman received statistics detailing chargeback numbers for various Chargeback Armor clients, including AuraVie.[30]

– Mike Costache drafted a shareholders' agreement for Chargeback Armor that included Defendant Argaman and Defendant Alon Nottea.

– Defendant Argaman participated in discussions concerning high-level corporate decisions for Chargeback Armor ranging from employee hiring and compensation to the purported CEO's workload and opening the company's corporate bank account.

– Purported CEO Mike Costache reported to Defendant Argaman concerning new Chargeback Armor customers.

– Mike Costache, a Secured Merchants employee and purported Chargeback Armor CEO, sent an email to a Secured Merchants client that included referring to Secured Merchants as "the technology company that developed the Chargeback Armor product" and then noting that Secured Merchants is "transitioning all clients to be billed" by Chargeback Armor.[31]

---

[27] *See, e.g.,* Bates No. AuraVie-0003427.
[28] Bates No. AuraVie-0002962 - AuraVie-0002964.
[29] Bates No. AuraVie-0003497.
[30] Bates No. AuraVie-0002756.
[31] Doc. No. 231-1, at 8.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

Defendant Argaman was included on numerous emails discussing the company business that far exceed the limited scope of his claimed involvement. Numerous factors should have alerted Defendant Argaman to the high probability of fraud:

- Defendant Argaman was aware, or should have been aware, that Defendants marketed their products by negative option continuity plans.
  - His computer contained screenshots of his employees or subordinates visiting Defendants' websites, which offered "risk-free trials."
  - Defendant Argaman assisted Defendants with managing their various trial campaigns on Lime Light software—software he acknowledged was often used for selling products by continuity.
  - Secured Merchants Executive Summary lists, under "Target Markets," numerous products that sell their products by negative option continuity plans.

- Defendant Argaman was aware, or should have been aware, that Defendants took significant measures to disguise their common enterprise. For example, Defendant Argaman was sent emails discussing the numerous shell companies and merchant accounts Defendants used to sell AuraVie products by negative option continuity plans.[32] In fact, he assisted in managing these accounts through the Lime Light CRM software.[33]

- Defendant Argaman was aware, or should have been aware, that Defendants engaged in "load balancing"—the means by which Defendants deceived payment processors concerning their actual

---

[32] *See*, *e.g.,* Bates No. AuraVie-0000476 - AuraVie-0000478.
[33] Deposition of Alan Argaman, at 118-119; 123; 128-131.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

chargeback ratio—between their various merchant accounts. Load balancing was discussed in emails he received,[34] and the ability to engage in load balancing was a feature of Lime Light, a software he assisted Defendants in using.[35]

– Defendant Argaman was aware that Defendants required a platform for responding to the large number of chargebacks they received. He created such a platform for Defendants and assisted them in responding to such chargebacks without regard for whether the volume of chargebacks indicated fraud.

– Defendant Argaman was aware, or should have been aware, that consumers had a valid basis for requesting the chargebacks that he assisted Defendants in contesting.
   o Mike Costache, the purported CEO of Chargeback Armor, stated that they would investigate the validity of consumer chargebacks before attempting to contest them: "CA provides a service in which on behalf of a merchant CA will investigate the basis for the chargeback and whether there is a basis to contest the chargeback. If CA determines there is a basis to contest the chargeback, CA will contest the chargeback on behalf of the merchant with the credit card processor."[36]
   o Costache further stated that Chargeback Armor's policy was to "reply[] only to chargebacks that can be won with proper evidence from the client's Customer relationship Management (CRM), gateway provider(s) and shipping provider(s)."[37]

Defendant Argaman's conduct and knowledge satisfies the standard for individual liability.

---

[34] *See*, *e.g.*, Bates No. AuraVie-0001847.
[35] Deposition of Alan Argaman, at 64-79.
[36] Doc. No. 121-6, at 3.
[37] *Id.*

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 3:** DESCRIBE the investigation done by YOU before YOU added Argaman added as a Defendant in the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as violating the law enforcement privilege and the deliberative process privilege. The FTC further objects to this interrogatory as vague and overbroad.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 4:** State all facts that support YOUR contention that Argaman "designed, created, and helped manage the websites or landing pages used for deceptively marketing and selling skincare products" as alleged in Paragraph 39 of the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as a blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which are incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 5:** State all facts that support YOUR contention that Argaman "harmed consumers nationwide with his unfair and deceptive business practices", as alleged in Paragraph 39 of the FAC.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which are incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 6:** State all facts that support YOUR contention that Argaman "has formulated, directed, controlled, had the authority to control, or participated in the acts or practices set forth in this Complaint", as alleged in Paragraph 39 of the FAC.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

See Objections and Responses to Interrogatory No. 2, which are incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 7:** State all facts that support YOUR contention that Argaman participated in the common enterprise, if YOU so contend.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatories No. 2, which are incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

Respectfully submitted,

Dated: April 4, 2016

/s/ REID TEPFER_____
REID TEPFER
LUIS H. GALLEGOS
Attorneys for the Plaintiff
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

Page | 20

1
2

(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL
INTERROGATORIES TO PLAINTIFF FEDERAL TRADE
COMMISSION – SET TWO**
Page | 21

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 4, 2016, a true and correct copy of the foregoing document was electronically emailed to the attorneys listed below.

Robert Esensten
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
(310) 273-3090
RESENSTEN@ESENSTENLAW.COM
*Counsel for Doron Nottea and Motti Nottea*

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*
*Roi Rueveni*

Jeffrey S. Benice
Law Offices of Jeffrey S. Benice
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
E-Mail: JSB@JeffreyBenice.com
*Counsel for Igor Latsanovski and*

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET TWO**

*CalEnergy, Inc.*

Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Dr., 6th Floor
Beverly Hills, CA 90210
*Counsel for Chargeback Armor, Inc.,*
*Secured Merchants LLC, and Alan Argaman*

<u>/S/ REID TEPFER</u>
REID TEPFER

**ANSWERS TO DEFENDANT DORON NOTTEA'S SPECIAL
INTERROGATORIES TO PLAINTIFF FEDERAL TRADE
COMMISSION – SET TWO**

Page | 23

# EXHIBIT 803

DAVID SHONKA
Acting General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4325 (voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.*<br><br>**Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "FRCP"), and subject to the general and specific objections set forth below, Plaintiff Federal Trade Commission responds to the Second Set of Special Interrogatories propounded by Secured Merchants LLC ("SM").

**General Objections and Definitions**

**1.     Lack of Waiver; Right to Modify**. The following responses are made without waiving any objections raised by Plaintiff in this proceeding or any objections Plaintiff may have with respect to the subsequent use of these answers. Plaintiff specifically reserves: (a) the right to object on any and all proper grounds, at any time, to other discovery procedures involving or relating to the subject matter of interrogatories answered herein; and (b) the right, at any time to revise, correct or clarify the following responses.

**2**.     **Right to Supplement/Modify**. Plaintiff reserves the right to supplement and will supplement these responses as required under FRCP 26(e) if additional responsive information becomes available.

**3.     Attorney Client, Deliberative Process and Attorney Work Product Privileges**. Plaintiff generally objects to Defendant SM's First Set of Special Interrogatories to Plaintiff to the extent these interrogatories directly or indirectly seek information subject to the attorney-client, deliberative process or

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**
Page | 2

work product privileges.

**4.      Scope of Discovery**. Plaintiff objects to Defendant SM's First Set of Special Interrogatories to Plaintiff to the extent that the instructions and definitions contained therein attempt to impose obligations upon the Plaintiff greater than those required by the Federal Rules of Civil Procedure.

**5.      Creating Documents, Legal Research, or Compilations**. Plaintiff objects to Defendant SM's First Set of Special Interrogatories to Plaintiff insofar as these interrogatories would directly or indirectly require Plaintiff to create new documents as opposed to producing already existing documents, as any such request is beyond the scope of FRCP 34.

Plaintiff objects to Defendant's Interrogatories to the extent that they require Plaintiff to undertake legal research for Defendant or require analysis and organization of factual evidence that they can do equally well. Such requests are beyond the scope of FRCP 33 and 34. Additionally, under FRCP 33(d), if the response to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing business records, the responding party may refer to the records. Plaintiff reserves the right to respond under FRCP 33(d).

**6.      Non-Waiver by Production**. Without waiving any stated objections, Plaintiff intends to make available all responsive, relevant, and non-privileged

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

documents within Plaintiff's custody, control, or possession, subject to the Court's Protective Order. The FTC further notes that it has previously provided, pursuant to the parties' agreement, a forensic image of Defendants' computers copied by the FTC, as well as other documents in the FTC's possession.

**7.      Blockbuster Interrogatories**. Plaintiff objects to Defendant's use of "Blockbuster Interrogatories." A "Blockbuster Interrogatory" is an interrogatory that requests a party to "state all facts" of the case. Such interrogatories are objectionable under the federal rules of discovery. *See, e.g.*, *Hilt v. SFC Inc.,* 170 F.R.D. 182 , 186 (D. Kan. 1997) (stating a party cannot use Blockbuster Interrogatory to ask for "each and every fact," that requires a "narrative or otherwise detailed account of her entire case in chief"); *Grynberg v. Total S.A.,* No. 03-cv-01280-WYD-BNB, 2006 WL 1186836 at *6, 2006 U.S. Dist. LEXIS 28854 (D. Colo. 2006) (characterizing overly expansive interrogatories as "blockbuster" and finding them improper); *United States v. The Louisiana Clinic,* No. Civ. A. 99-1767, 2003 WL 21283944 at *6, 2003 U.S. Dist. LEXIS 9401 (E.D. La. 2003) (rejecting a request to compel a response to an interrogatory seeking an explanation of why and how each produced document related to each claim, stating, "[R]elators should not have to try their case in the context of a response to interrogatories"); and *Jones v. Goldstein*, 41 F.R.D. 271, 272 (D.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**
Page | 4

Md. 1966) (holding that interrogatories requesting a party "[s]et forth the facts upon which [an entire defense is based]" and to provide a "statement of the facts as to how you contend that the occurrences took place …" are overbroad as they seek the party to provide their entire case in an interrogatory answer).

**8.** **Impermissible Contention Requests for Production Based on Use in Court.** Plaintiff objects to the Defendant's Discovery Requests that concern whether the document supports a contention or that is based on how the document may be used in court ("Contention Request for Production"). Such requests are beyond the scope of FRCP 34: FRCP 34 does not authorize such discovery requests because to detail how a document will be used in court violates the attorney work product privilege. *Myers v. Goldco, Inc.*, Case No. 4:08cv8-RH/WCS, 2008 U.S. Dist. LEXIS 37089, *14 (May 6, 2008) (disallowing FRCP 34 request for "all documents which you intend to introduce at the trial of this case or which may be used to refresh the recollections of witnesses" because documents "that a party 'intends to use at trial' are protected by the work product privilege"). FRCP 34 instead requires document requests to "describe with reasonable particularity each item or category of items to be inspected," which Contention Requests for Production fail to do. *See Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 202 (N.D. W. Va. 2000) (a document request

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

is not reasonably particular if it merely requests documents "related to a claim or defense" in the litigation); *see also Reagan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649-50 & n. 6 (10th Cir. 2008) (a request for "all documents that relate …" is overly broad and fails to identify documents as required by FRCP 34). Plaintiff further objects to Defendant Discovery Requests that seek "all documents relating to" a specific topic, item or matter: such requests are beyond the scope of FRCP 34, violate the attorney work product privilege, violate the deliberative process privilege and are impermissible "fishing expeditions." *Lopez v. Chertoff*, Case No. CV 07-1566-LEW, 2009 U.S. Dist. LEXIS 50419, ** 5-8 (E.D. Cal. June 2, 2009) (stating "one of the purposes of FRCP 34 is to prevent fishing expeditions, and thus Plaintiff has some responsibility to narrow his request" and denying request for documents "relating to" claims as facially overbroad). A request for "all documents" that support a contention is a not just an impermissible fishing expedition, but is an attempt to "drain the pond and collect the fish from the bottom." *Amcast Indus.v.Detrex Corp.*, 138 F.R.D. 115, 121 (N.D. Ind. 1991) (citation omitted).

**9.     These Discovery Requests are Untimely.** Plaintiff objects on the basis that these discovery requests are untimely. The deadline for these responses

extends beyond the discovery cutoff. The deadline for these responses extends beyond the discovery cutoff.

### Specific Objections and Answers

**INTERROGATORY NO. 1:** IDENTIFY each PERSON who has knowledge of any the allegations made against SM in the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as vague and overbroad. Without waiving any objection, the FTC responds substantively as follows.

Witnesses with knowledge of Defendant SM's participation in the common enterprise as described in the FTC's FAC include:

- Alon Nottea
- Doron Nottea
- Khristopher Bond
- Igor Latsanovski
- Paul Medina
- Roi Reuveni
- Nastassia Yalley
- Defendants' former employees
- Charlene Koonce (receiver) and her attorneys
- FTC investigator Brent McPeek
- Stephan Bauer
- Richard Gordon
- David Davidian
- Representatives, employees, and principals of Defendant Corporations

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

- Mike Costache
- Richard Gordon
- Jeff Brandlin and his associates
- Record custodians of banks, merchant processors, or other financial institutions employed by Defendants
- Forensic custodians

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 2:** State all facts upon which YOU base YOUR contention that SM engaged in wrongdoing, if YOU so contend.

**RESPONSE:** The FTC specifically objects to this request as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

1. SM's Connection to the other Defendants

Defendant SM provided the common enterprise with a variety of essential services without which the common enterprise could not have continued to deceive consumers. The owner of SM, Defendant Argaman, *claims* that the company operated at arm's length from Defendants as a mere independent contractor. But this claim is directly contradicted by the evidence in this case:

- Defendant SM's operating agreement draft names both Defendant Argaman and Defendant Alon Nottea as the company's two

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

managers. [1]

– A Secured Merchants "Executive Summary," created in June 2013 states that the company's management consisted of Defendants Alon Nottea, Avi Argaman, and Paul Medina. [2]

– Secured Merchants shared many employees with the other Corporate Defendants involved in the common enterprise, including:
   o Robert Stayner—an employee of Pinnacle Logistics, SBM Management, and Chargeback Armor and Secured Merchants.
   o Tyler Reitenback— an employee of Pinnacle, Chargeback Armor, and Secured Merchants.
   o Defendant Roi Reuveni was an employee of CalEnergy, Pinnacle Logistics, Chargeback Armor, Agoa Holdings, DMA Media Holdings, and Secured Merchants.
   o Mike Costache— CEO of Chargeback Armor, Inc., was also an employee of Secured Merchants LLC.
   o Defendant Doron Nottea handled accounting and payroll for Secured Merchants, as well as the rest of the common enterprise.

– Secured Merchants LLC operated out of the same office suite as the other Corporate Defendants.

– Nonprivileged attorney invoices discuss meetings concerning Secured Merchants with "Igor."

– Defendants possessed a "Standard Service Agreement" form listing Defendant Roi Reuveni as Secured Merchant's "Managing Member."[3]

– Secured Merchants LLC was identified as one of the "Bunzai Companies" on a list that Defendant Doron Nottea sent to CPA

---

[1] Bates No. AuraVie-0003002.
[2] Bates No. AuraVie-0003024.
[3] Bates No. AuraVie-0003008.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

David Davidian. [4]

– Doron Nottea created the email address securedmerchantsllc@gmail.com.

–

2. SM's Role in the Scheme

Services provided through Defendant SM for the common enterprise included the following:

– Assisting Alon Nottea in operating a call center for AuraVie customer complaints. [5]

– Defendant SM provided technical expertise to create an automated response system to allow large numbers of consumers to cancel their AuraVie continuity plan. [6]

– Defendant SM boasted that its contribution to the common enterprise "offer[s] a vehicle to resolve consumer disputes before they become chargebacks."

– SM integrated the AuraVie free trial campaigns into LimeLight, a third party customer relationship management (CRM) software Defendants used for selling their products by negative option continuity plans. [7]

– Email and screenshots show Defendant Argaman, acting on behalf of Defendant SM designing, creating, or managing a website offering risk-free trial offers of skincare products. [8]

---

[4] Bates No. AuraVie-0003453.
[5] *See, e.g.,* AuraVie-0002640 - AuraVie-0002641.
[6] *See also* Doc. No. 121-6, at 9-21; Doc No. 121-7, at 1-3.
[7] *See id.*
[8] Bates No. AuraVie-0003379.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Page | 10

– Defendant Argaman further admitted to creating AuraVie landing pages in his capacity at Defendant SM.[9]

– Defendant SM ordered Attitudeline/INFINI skincare products, a product that Defendants marketed or sold, or assisted others in marketing or selling, by negative option continuity plans (or assisted others in marketing or selling in the same manner).[10]

– Defendant SM participated in planning and managing "AuraVie Day," a promotional day organized to promote AuraVie products.[11]

– Defendant SM established toll-free telephone numbers for various shell corporations and set up call forwarding for those numbers.[12] These phone numbers help disguise Defendants' shell corporations purpose of deceiving banks, consumers, and law enforcement.

– Defendant SM played a key role in refuting consumer chargebacks for the Corporate Defendants, both through his company, Secured Merchants LLC, and as a principal at Chargeback Armor, Inc.
   o Defendant Argaman admitted that Defendant SM contested consumer chargebacks for the Corporate Defendants that sold AuraVie and that Defendant SM had previously provided a chargeback refutation service termed "chargeback armor."[13]

---

[9] *See* Ex. 46 (Invoice from Secured Commerce, Defendant Argaman's company, to Adageo LLC, Defendant Alon Nottea's company, for "Design, Creation, & Optimization of Auravie landing page Campaign Setup and integration to Lime Light CRM and Click Connector").While Defendant Argaman claims the website he only created was "AuraVie.com," a straight-sale website, this claim is not supported by the evidence. In particular, email and screenshots show Defendant Argaman assisting with the order page of a website that offered risk-free trials of skincare products.

[10] Bates No. AuraVie-0000264.

[11] Bates No. AuraVie-0001601.

[12] *See, e.g.,* Bates No. AuraVie-0002784.

[13] Deposition of Alan Argaman, at 86-88.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

o Defendant SM possessed a "Standard Service Agreement" form for clients' use of Chargebackarmor.com. [14] Further, emails suggest that Defendant SM processed chargebacks for AuraVie under the name Chargeback Armor. [15] According to Chargeback Armor, Inc.'s Executive Summary, "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." [16]

Defendant SM generated at least $300,000 from the common enterprise.[17]

3. SM's Relationship to Defendants Alan Argaman and Chargeback Armor, Inc.

Another aspect of SM's participation in the common enterprise involves its relationship to Defendant Chargeback Armor, Inc. Defendant Chargeback Armor was jointly operated by Defendant Argaman and other Individual Defendants. Defendant Chargeback Armor specialized in providing chargeback refutation services to high-risk clients,[18] of which Defendants were but one of many.[19]

[14] The Service Agreement states: "The Software is made available to you and the Service is owned, operated, and provided to you by SM through the CHARGEBACKARMOR.COM Site."
[15] See, e.g., Bates No. AuraVie-00004100.
[16] See Bates No. AuraVie-0002959.
[17] Doc. No. 120, at 25.
[18] In fact, Chargeback Armor's Executive Summary states that their "target market" was "High-rick [sic] online marketers."

[19] In an email that UMS Banking employee Dylan Gaines forwarded to Defendant Argaman, Gaines stated that UMS Banking "actually REQUIRE all merchants that are in the riskier category to sign up with this program [i.e., Chargeback Armor]." In another email, purported CEO Mike Costache emailed Defendant Argaman and other Defendants informing him that he would be demonstrating the

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Indeed, Defendant Alon Nottea, the Individual Defendant with "Day-to-Day Control" of the scheme,[20] attested that CBA refuted consumer chargebacks for the scheme. Insofar as the common enterprise's abuse of the chargeback process is a critically important component to the wrongful practices they engaged in, Defendant Chargeback Armor's role in the scheme is nothing short of integral to the scheme's operation.

A document titled "Secured Merchants – Company Describes" described the "ChargeBack Armor" services as helping "win back lost revenue by reversing chargebacks in your favor" and "handl[ing] the entire chargeback dispute process on your behalf."

Defendant SM had a foundational role in developing the business of and eventually formally incorporating Defendant Chargeback Armor. Defendant SM provided $200,000 in startup capital to Chargeback Armor, Inc, and Nova 8 Media billed Defendant Argaman of Defendant SM for "design services" for "Chargeback Armor." Mike Costache, a Defendant SM employee and purported Chargeback Armor CEO, sent an email to a SM client that included referring to SM as "the technology company that developed the Chargeback Armor product"

---

Chargeback Armor program for "Richard Gordon, 'the Godfather of High-Risk Processing.'"

[20] Doc. No. 120, at 29.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES**
**TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

and then noting that Defendant SM is "transitioning all clients to be billed" by Chargeback Armor.[21] And the financial structure of the scheme provided that Defendant SM was the entity that funneled funds deriving from wronged consumers to Chargeback Armor for its services.[22] Insofar as Defendant Chargeback Armor furthered the work of Defendant SM's role in abusive chargeback policies and practices, Defendant SM is thus further implicated in the scheme by Defendant Chargeback Armor's participation.

4. The Principals of Defendant CBA Knew, Or Should Have Known, That CBA Was Assisting in Fraudulent Business Practices.

Defendant Argaman was included on numerous emails discussing the company business that far exceed the limited scope of he claims to be his level of involvement. Numerous factors should have alerted Defendant CBA's operators such as Defendant Argaman to the high probability of fraud:

- Defendant Argaman was aware, or should have been aware, that Defendants marketed their products by negative option continuity plans.
    - His computer contained screenshots of his employees or subordinates visiting Defendants' websites, which offered "risk-free trials."
    - Defendant Argaman assisted Defendants with managing their various trial campaigns on Lime Light software—software he

---

[21] Doc. No. 231-1, at 8.
[22] Doc. No. 121-1, at 3.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

acknowledged was often used for selling products by continuity.
- o Secured Merchants Executive Summary lists, under "Target Markets," numerous products that sell their products by negative option continuity plans.

– Defendant Argaman was aware, or should have been aware, that Defendants took significant measures to disguise their common enterprise. For example, Defendant Argaman was sent emails discussing the numerous shell companies and merchant accounts Defendants used to sell AuraVie products by negative option continuity plans. In fact, he assisted in managing these accounts through the Lime Light CRM software.

– Defendant Argaman was aware, or should have been aware, that Defendants engaged in "load balancing"—the means by which Defendants deceived payment processors concerning their actual chargeback ratio—between their various merchant accounts. Load balancing was discussed in emails he received, and the ability to engage in load balancing was a feature of Lime Light, software he assisted Defendants in using.

– Defendant Argaman was aware that Defendants required a platform for responding to the large number of chargebacks they received. He created such a platform for Defendants and assisted them in responding to such chargebacks without regard for whether the volume of chargebacks indicated fraud.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 3:** DESCRIBE the investigation done by YOU before YOU added SM added [sic] as a Defendant in the FAC.

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

**RESPONSE:** The FTC specifically objects to this Interrogatory as violating the law enforcement privilege and the deliberative process privilege. The FTC further objects to this Interrogatory as vague and overbroad.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 4:** State all facts that support YOUR contention that SM "designed, created, and helped manage the websites or landing pages used for deceptively marketing and selling skincare products" as alleged in Paragraph 39 of the FAC.

**RESPONSE:** The FTC specifically objects to this Interrogatory as a blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which is incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 5:** State all facts that support YOUR contention that SM "provided other members of the common enterprise the service of

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

contesting the large number of credit card chargebacks requested by consumers", as alleged in Paragraph 26 of the FAC.

**RESPONSE:** The FTC objects to this Interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which is incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 6:** State all facts that support YOUR contention that SM "enabled many of the corporations and shell companies to maintain their payment processing accounts and to continue to defraud consumers", as alleged in Paragraph 26 of the FAC.

**RESPONSE:** The FTC objects to this Interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which is incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 7:** State all facts that support YOUR contention that SM "managed the automated answering service for handling AuraVie customer calls", as alleged in Paragraph 26 of the FAC.

**RESPONSE:** The FTC objects to this Interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatories No. 2, which is incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 8:** State all facts that support YOUR contention that SM "has participated in efforts to advertise, market, distribute, or sell the skincare products at issue in this case to consumers throughout the United States", as alleged in Paragraph 26 of the FAC.

**RESPONSE:** The FTC objects to this Interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatories No. 2, which is incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

Respectfully submitted,

Dated: April 4, 2016                              /s/ REID TEPFER_____
                                                 REID TEPFER
                                                 LUIS H. GALLEGOS
                                                 Attorneys for the Plaintiff
                                                 Federal Trade Commission
                                                 1999 Bryan Street, Suite 2150
                                                 Dallas, Texas 75201
                                                 (214) 979-9395 (Tepfer)
                                                 (214) 979-9383 (Gallegos)
                                                 (214) 953-3079 (facsimile)
                                                 rtepfer@ftc.gov
                                                 lgallegos@ftc.gov

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S**
**SPECIAL INTERROGATORIES**
**TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 4, 2016, a true and correct copy of the foregoing document was electronically emailed to the attorneys listed below.

Robert Esensten
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
(310) 273-3090
RESENSTEN@ESENSTENLAW.COM
*Counsel for Doron Nottea and Motti Nottea*


Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and
Roi Rueveni*

Jeffrey S. Benice
Law Offices of Jeffrey S. Benice
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
E-Mail: JSB@JeffreyBenice.com
*Counsel for Igor Latsanovski and*

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

*CalEnergy, Inc.*

Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Dr., 6th Floor
Beverly Hills, CA 90210
*Counsel for Chargeback Armor, Inc.,*
*Secured Merchants LLC, and Alan Argaman*

/S/ REID TEPFER
REID TEPFER

**RESPONSES TO DEFENDANT SECURED MERCHANTS LLC'S**
**SPECIAL INTERROGATORIES**
**TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**
Page | 21

EXHIBIT 804

DAVID SHONKA
Acting General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4325 (voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **BUNZAI MEDIA GROUP, INC.,** *et al.* <br><br> **Defendants.** | **Case No. CV 15-4527-GW(PLAx)** <br><br> **RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "FRCP"), and subject to the general and specific objections set forth below, Plaintiff Federal Trade Commission responds to the First Set of Special Interrogatories propounded by CBA.

**General Objections and Definitions**

1. **Lack of Waiver; Right to Modify**. The following responses are made without waiving any objections raised by Plaintiff in this proceeding or any objections Plaintiff may have with respect to the subsequent use of these answers. Plaintiff specifically reserves: (a) the right to object on any and all proper grounds, at any time, to other discovery procedures involving or relating to the subject matter of interrogatories answered herein; and (b) the right, at any time to revise, correct or clarify the following responses.

2. **Right to Supplement/Modify**. Plaintiff reserves the right to supplement and will supplement these responses as required under FRCP 26(e) if additional responsive information becomes available.

3. **Attorney Client, Deliberative Process and Attorney Work Product Privileges**. Plaintiff generally objects to Defendant CBA's First Set of Special Interrogatories to Plaintiff to the extent these Interrogatories directly or indirectly seek information subject to the attorney-client, deliberative process or

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

work product privileges.

**4.     Scope of Discovery**. Plaintiff objects to Defendant CBA's First Set of Special Interrogatories to Plaintiff to the extent that the instructions and definitions contained therein attempt to impose obligations upon the Plaintiff greater than those required by the Federal Rules of Civil Procedure.

**5.     Creating Documents, Legal Research, or Compilations**. Plaintiff objects to Defendant CBA's First Set of Special Interrogatories to Plaintiff insofar as these Interrogatories would directly or indirectly require Plaintiff to create new documents as opposed to producing already existing documents, as any such request is beyond the scope of FRCP 34.

Plaintiff objects to Defendant's Interrogatories to the extent that they require Plaintiff to undertake legal research for Defendant or require analysis and organization of factual evidence that they can do equally well. Such requests are beyond the scope of FRCP 33 and 34. Additionally, under FRCP 33(d), if the response to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing business records, the responding party may refer to the records. Plaintiff reserves the right to respond under FRCP 33(d).

**6.     Non-Waiver by Production**. Without waiving any stated objections, Plaintiff intends to make available all responsive, relevant, and non-privileged

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

documents within Plaintiff's custody, control, or possession, subject to the Court's Protective Order. The FTC further notes that it has previously provided, pursuant to the parties' agreement, a forensic image of Defendants' computers copied by the FTC, as well as other documents in the FTC's possession.

7.     **Blockbuster Interrogatories**. Plaintiff objects to Defendant's use of "Blockbuster Interrogatories." A "Blockbuster Interrogatory" is an interrogatory that requests a party to "state all facts" of the case. Such interrogatories are objectionable under the federal rules of discovery. *See, e.g.*, *Hilt v. SFC Inc.,* 170 F.R.D. 182 , 186 (D. Kan. 1997) (stating a party cannot use Blockbuster Interrogatory to ask for "each and every fact," that requires a "narrative or otherwise detailed account of her entire case in chief"); *Grynberg v. Total S.A.,* No. 03-cv-01280-WYD-BNB, 2006 WL 1186836 at *6, 2006 U.S. Dist. LEXIS 28854 (D. Colo. 2006) (characterizing overly expansive interrogatories as "blockbuster" and finding them improper); *United States v. The Louisiana Clinic,* No. Civ. A. 99-1767, 2003 WL 21283944 at *6, 2003 U.S. Dist. LEXIS 9401 (E.D. La. 2003) (rejecting a request to compel a response to an interrogatory seeking an explanation of why and how each produced document related to each claim, stating, "[R]elators should not have to try their case in the context of a response to interrogatories"); and *Jones v. Goldstein*, 41 F.R.D. 271, 272 (D.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Md. 1966) (holding that interrogatories requesting a party "[s]et forth the facts upon which [an entire defense is based]" and to provide a "statement of the facts as to how you contend that the occurrences took place …" are overbroad as they seek the party to provide their entire case in an interrogatory answer).

**8.      Impermissible Contention Requests for Production Based on Use in Court.** Plaintiff objects to Defendant's Discovery Requests that concern whether the document supports a contention or that is based on how the document may be used in court ("Contention Request for Production"). Such requests are beyond the scope of FRCP 34: FRCP 34 does not authorize such discovery requests because to detail how a document will be used in court violates the attorney work product privilege. *Myers v. Goldco, Inc.*, Case No. 4:08cv8-RH/WCS, 2008 U.S. Dist. LEXIS 37089, *14 (May 6, 2008) (disallowing FRCP 34 request for "all documents which you intend to introduce at the trial of this case or which may be used to refresh the recollections of witnesses" because documents "that a party 'intends to use at trial' are protected by the work product privilege"). FRCP 34 instead requires document requests to "describe with reasonable particularity each item or category of items to be inspected," which Contention Requests for Production fail to do. *See Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 202 (N.D. W. Va. 2000) (a document request

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

is not reasonably particular if it merely requests documents "related to a claim or defense" in the litigation); *see also Reagan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649-50 & n. 6 (10th Cir. 2008) (a request for "all documents that relate …" is overly broad and fails to identify documents as required by FRCP 34). Plaintiff further objects to Defendant Discovery Requests that seek "all documents relating to" a specific topic, item or matter: such requests are beyond the scope of FRCP 34, violate the attorney work product privilege, violate the deliberative process privilege and are impermissible "fishing expeditions." *Lopez v. Chertoff*, Case No. CV 07-1566-LEW, 2009 U.S. Dist. LEXIS 50419, ** 5-8 (E.D. Cal. June 2, 2009) (stating "one of the purposes of FRCP 34 is to prevent fishing expeditions, and thus Plaintiff has some responsibility to narrow his request" and denying request for documents "relating to" claims as facially overbroad). A request for "all documents" that support a contention is a not just an impermissible fishing expedition, but is an attempt to "drain the pond and collect the fish from the bottom." *Amcast Indus.v.Detrex Corp.*, 138 F.R.D. 115, 121 (N.D. Ind. 1991) (citation omitted).

      **9.**      **These Discovery Requests are Untimely.** Plaintiff objects on the basis that these discovery requests are untimely. The deadline for these responses extends beyond the discovery cutoff.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

**Specific Objections and Answers**

**INTERROGATORY NO. 1:** IDENTIFY each PERSON who has knowledge of any the allegations made against CBA in the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as vague and overbroad. Without waiving any objection, the FTC responds substantively as follows.

Witnesses with knowledge of Defendant CBA's participation in the common enterprise as described in the FTC's FAC include:

- Alon Nottea
- Doron Nottea
- Khristopher Bond
- Igor Latsanovski
- Paul Medina
- Roi Reuveni
- Nastassia Yalley
- Defendants' former employees
- Charlene Koonce (receiver) and her attorneys
- FTC investigator Brent McPeek
- Stephan Bauer
- Richard Gordon
- David Davidian
- Representatives, employees, and principals of Defendant Corporations
- Mike Costache
- Richard Gordon
- Jeff Brandlin and his associates

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

- Record custodians of banks, merchant processors, or other financial institutions employed by Defendants
- Forensic custodians

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 2:** State all facts upon which YOU base YOUR contention that CBA engaged in wrongdoing, if YOU so contend.

**RESPONSE:** The FTC specifically objects to this request as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

1. Defendant CBA's Role in the Scheme

Relief Defendant CBA provided the common enterprise with a variety of essential services without which the common enterprise could not have continued to deceive consumers. Defendant Argaman, the owner of CBA, *claims* that he operated his company at arm's length from Defendants, but this claim does not reflect the evidence in this case:

Defendant CBA was jointly operated by Defendant Argaman and other Individual Defendants. CBA specialized in providing chargeback refutation

services to high-risk clients,[1] of which Defendants were but one of many.[2] Indeed, Defendant Alon Nottea, the Individual Defendant with "Day-to-Day Control" of the scheme,[3] attested that CBA was used by the common enterprise to refute consumer chargebacks. Insofar as the common enterprise's abuse of the chargeback process is a critically important component to the wrongful practices they engaged in, CBA's role in the scheme is nothing short of integral to the scheme's operation.

2. Defendant CBA's Various Connections to the Other Defendants.

A mountain of evidence shows Individual Defendants' foundational role at Defendant CBA:

- Defendant Argaman, through his company Secured Merchants LLC, provided $200,000 in startup capital to Defendant CBA.

---

[1] In fact, Chargeback Armor's Executive Summary states that their "target market" was "High-rick [sic] online marketers."

[2] In an email that UMS Banking employee Dylan Gaines forwarded to Defendant Argaman, Gaines stated that UMS Banking "actually REQUIRE all merchants that are in the riskier category to sign up with this program [i.e., Chargeback Armor]." In another email, purported CEO Mike Costache emailed Defendant Argaman and other Defendants informing him that he would be demonstrating the Chargeback Armor program for "Richard Gordon, 'the Godfather of High-Risk Processing.'"

[3] Doc. No. 120, at 29.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

– Defendant Argaman incorporated Chargeback Armor, Inc. in concert with other Individual Defendants.[4]

– Mike Costache, a Secured Merchants employee and purported Chargeback Armor CEO, sent an email to a Secured Merchants client that included referring to Secured Merchants as "the technology company that developed the Chargeback Armor product" and then noting that Secured Merchants is "transitioning all clients to be billed" by Chargeback Armor.[5]

– CBA's Executive Summary states that Defendant Argaman was the company's "Chief Technology Officer,"[6] and Defendant Reuveni serves as the Chief Operating Officer.[7]

– A CBA services agreement from March 2, 2015 describes the company's board of directors as consisting of "Mike Costache, Alon Nottea, and Avi Argaman."

– Alon Nottea was referred to as a "partner" in Defendant CBA by purported CEO Mike Costache and solicited investments for CBA from at least one potential investor.[8]

– Upon CBA's incorporation, Defendant Reuveni, who developed the software used by CBA, was a "consultant" for the company and "essentially license[d]" the software to it.[9]

– Defendant Doron Nottea was a signatory to CBA's bank account and was identified as the account's owner by the bank records.[10]

---

[4] Bates No. AuraVie-0003497.
[5] Doc. No. 231-1, at 8.
[6] Bates No. AuraVie-0002959 - AuraVie-0002961.
[7] Doc. No. 120, at 23.
[8] Doc. No. 120, at 23.
[9] Doc. No. 120, at 23.
[10] Doc. No. 120, at 23.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**
Page | 10

&ndash;   Defendant Argaman received company proprietary statistics detailing chargeback numbers for various Chargeback Armor clients, including AuraVie.

&ndash;   Defendant Argaman participated in discussions concerning high-level corporate decisions ranging from employee hiring and compensation to the purported CEO's workload and opening the company's corporate bank account.

&ndash;   Purported CEO Mike Costache reported to Defendant Argaman concerning new Chargeback Armor customers.

3. Defendant CBA's Past Life as Secured Merchants LLC.

Further, before Defendant CBA was formally incorporated, it enjoyed an earlier life as a distinct division within Defendant Secured Merchants LLC, a company owned and operated by the same Individual Defendant as Defendant CBA. An internal Secured Merchants document titled "Secured Merchants – Company Describes" describes Secured Merchants LLC's chargeback protection program as "ChargeBack Armor" services that "win back lost revenue by reversing chargebacks in your favor" and "handle the entire chargeback dispute process on your behalf."

Defendant Argaman admitted his company contested consumer chargebacks for the Corporate Defendants that sold AuraVie[11] and

---
11

that Secured Merchants had previously provided a chargeback

refutation service termed "chargeback armor." Documentary

evidence confirms this: for example, a blank "Standard Service

Agreement" for clients' use of Chargebackarmor.com.[12] Further,

emails suggest that Secured Merchants processed chargebacks for

AuraVie under the name Chargeback Armor. According to

Chargeback Armor, Inc.'s Executive Summary, "33,000 chargebacks

were processed in 2014 for our fist [sic] client, AuraVie, an anti-

aging skincare company." Indeed, the structural similarities between

Secured Merchants LLC and Chargeback Armor, Inc. are striking:

- A Secured Merchants LLC's operating agreement draft names both Defendant Argaman and Defendant Alon Nottea as the company's two managers.[13]

- Secured Merchants shared many employees with the other Corporate Defendants involved in the common enterprise, including:
  o Robert Stayner—an employee of Pinnacle Logistics, SBM Management, and Chargeback Armor and Secured Merchants.
  o Tyler Reitenback— an employee of Pinnacle, Chargeback Armor, and Secured Merchants.

---

[12] The Service Agreement states: "The Software is made available to you and the Service is owned, operated, and provided to you by SM through the CHARGEBACKARMOR.COM Site."

[13] Bates No. AuraVie-0003002.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

o Defendant Roi Reuveni was an employee of CalEnergy, Pinnacle Logistics, Chargeback Armor, Agoa Holdings, DMA Media Holdings, and Secured Merchants.

o Mike Costache— CEO of Chargeback Armor, Inc., was also an employee of Secured Merchants LLC.

o Defendant Doron Nottea handled accounting and payroll for Secured Merchants, as well as the rest of the common enterprise.

− Secured Merchants LLC operated out of the same office suite as the other Corporate Defendants.

− Nonprivileged attorney invoices discuss meetings concerning Secured Merchants with "Igor."

− Defendants possessed a "Standard Service Agreement" form listing Defendant Roi Reuveni as Secured Merchant's "Managing Member."

− Secured Merchants LLC was identified as one of the "Bunzai Companies" on a list that Defendant Doron Nottea sent to CPA David Davidian. [14]

In sum: both enterprises played a key role in refuting consumer chargebacks for the Corporate Defendants, both had Defendant Argaman as the primary operator of the services, and both enterprises marketed their product as "Chargeback Armor."

The services Argaman provided through Secured Merchants LLC relating to chargebacks and that were ultimately formally moved to Defendant CBA include the following:

---

[14] Bates No. AuraVie-0003453.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

– Defendant Argaman provided technical expertise to create an automated response system to allow large numbers of consumers to cancel their AuraVie continuity plan.[15]

– Secured Merchants boasted that its contribution to the common enterprise "offer[s] a vehicle to resolve consumer disputes before they become chargebacks."

– Defendant Argaman integrated the AuraVie free trial campaigns into Lime Light, a third party customer relationship management (CRM) software Defendants used for selling their products by negative option continuity plans.[16]

Through his company, Secured Merchants LLC, Defendant Argaman received at least $320,665.89 from the common enterprise.

4. The Principals of Defendant CBA Knew, Or Should Have Known, That CBA Was Assisting in Fraudulent Business Practices.

Defendant Argaman was included on numerous emails discussing the company business that far exceed the limited scope of his claimed involvement, and another member of the company's board of directors, Defendant Alon Nottea, was, as described by the Receiver in her Report, "the Defendant with Day-to-Day

---

[15] *See also* Doc. No. 121-6, at 9-21; Doc No. 121-7, at 1-3 (Secured Merchants sent SBM Management numerous invoices for services described as: "ChargeBack resolution automated services"; "CallCenter"; "Lime Light Integration CC Services"; "IVR PBX solution per record.").

[16] *See id.*

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Page | 14

Control."[17] Numerous factors should have alerted Defendant CBA's operators such as Defendant Argaman to the high probability of fraud:

– Defendant Argaman was aware, or should have been aware, that Defendants marketed their products by negative option continuity plans.
  o His computer contained screenshots of his employees or subordinates visiting Defendants' websites, which offered "risk-free trials."
  o Defendant Argaman assisted Defendants with managing their various trial campaigns on Lime Light software—software he acknowledged was often used for selling products by continuity.
  o Secured Merchants Executive Summary lists, under "Target Markets," numerous products that sell their products by negative option continuity plans.

– Defendant Argaman was aware, or should have been aware, that Defendants took significant measures to disguise their common enterprise. For example, Defendant Argaman was sent emails discussing the numerous shell companies and merchant accounts Defendants used to sell AuraVie products by negative option continuity plans. In fact, he assisted in managing these accounts through the Lime Light CRM software.

– Defendant Argaman was aware, or should have been aware, that Defendants engaged in "load balancing"—the means by which Defendants deceived payment processors concerning their actual chargeback ratio—between their various merchant accounts. Load balancing was discussed in emails he received, and the ability to engage in load balancing was a feature of Lime Light, software he assisted Defendants in using.

---

[17] See Doc. No. 120 at 25.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

– Defendant Argaman was aware that Defendants required a platform for responding to the large number of chargebacks they received. He created such a platform for Defendants and assisted them in responding to such chargebacks without regard for whether the volume of chargebacks indicated fraud.

– Defendant Argaman was aware, or should have been aware, that consumers had a valid basis for requesting the chargebacks that he assisted Defendants in contesting.

  o Mike Costache, the purported CEO of Chargeback Armor, stated that they would investigate the validity of consumer chargebacks before attempting to contest them: "CA provides a service in which on behalf of a merchant CA will investigate the basis for the chargeback and whether there is a basis to contest the chargeback. If CA determines there is a basis to contest the chargeback, CA will contest the chargeback on behalf of the merchant with the credit card processor."[18]

  o Costache further stated that Chargeback Armor's policy was to reply[] only to chargebacks that can be won with proper evidence from the client's Customer relationship Management (CRM), gateway provider(s) and shipping provider(s)."[19]

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 3:** DESCRIBE the investigation done by YOU before YOU added CBA added [sic] as a Defendant in the FAC.

---

[18] Doc. No. 121-6, at 3.

[19] *Id.*

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**
Page | 16

**RESPONSE:** The FTC specifically objects to this interrogatory as violating the law enforcement privilege and the deliberative process privilege. The FTC further objects to this interrogatory as vague and overbroad.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 4:** State all facts that support YOUR contention that CBA "has been controlled or managed by Defendants Alon Nottea, Doron Nottea, and Roi Reuveni", as alleged in Paragraph 41 of the FAC.

**RESPONSE:** The FTC specifically objects to this interrogatory as a blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, which is incorporated by reference herein for all purposes. Defendant Reuveni serves as the Chief Operating Officer.[20] Moreover, upon CBA's incorporation, Defendant Reuveni, who developed the software used by CBA, was a "consultant" for the company and "essentially license[d]" the software to it.[21]

---

[20] Doc. No. 120, at 23.
[21] Doc. No. 120, at 23.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Regarding Alon Nottea, a CBA services agreement from March 2, 2015 describes the company's board of directors as consisting of "Mike Costache, Alon Nottea, and Avi Argaman," and Defendant Argaman incorporated Chargeback Armor, Inc. in concert with other Individual Defendants. Alon Nottea was referred to as a "partner" in Defendant CBA by purported CEO Mike Costache and solicited investments into Defendant CBA by at least one potential investor.[22]

Defendant Doron Nottea was a signatory to CBA's bank account and was identified as the account's owner by the bank records.[23]

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 5:** State all facts that support YOUR contention that CBA "received funds and other property that can be traced directly to Defendants' unlawful acts or practices alleged below", as alleged in Paragraph 41 of the FAC.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

---

[22] Doc. No. 120, at 23.
[23] Doc. No. 120, at 23.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

See Objections and Responses to Interrogatory No. 2, which is incorporated by reference herein for all purposes. As an integral component in the common enterprise and by providing services to the scheme's operating subsidiaries, Defendant CBA's revenues were tied to the abusive practices the scheme perpetrated. The funds Defendant SBA accrued from its participation in the scheme were derived as follows: Defendant SBM Management, Inc. was an intermediary between other Defendants and their intricate web of merchant entities, which Defendants used to obfuscate the scheme's chargeback statistics to deceive banks processing the chargebacks. Those merchant entities would transfer their income to Defendant SBM Management, which would in turn send the money along to, among other entities, Defendant Secured Merchants LLC. [24] Defendant Secured Merchants LLC would then transmit some of the money sent from SBM Management, Inc. to Defendant CBA.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 6:** State all facts that support YOUR contention that CBA "has received, directly or indirectly, funds and other assets from Defendants that are traceable to funds obtained from Defendants' customers

---

[24] Doc. No. 121-1, at 3.

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

Page | 19

through the unlawful acts or practices described herein", as alleged in Paragraph 97 of the FAC.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatory No. 2, 4, and 5, which are incorporated by reference herein for all purposes.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

**INTERROGATORY NO. 7:** State all facts that support YOUR contention that CBA will be "unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of Defendants' unlawful acts or practices", as alleged in Paragraph 97 of the FAC.

**RESPONSE:** The FTC objects to this interrogatory as vague, overbroad, and an impermissible blockbuster interrogatory. Without waiving any objection, the FTC responds substantively as follows.

See Objections and Responses to Interrogatories No. 2, 4, 5, and 6, which are incorporated by reference herein for all purposes. As a principal member of the common enterprise, Defendant CBA jointly received all the revenue

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

associated with this scheme and is liable for all damages associated with this action. The exact amount that it individually generated from the scheme is difficult to determine precisely because the company's managers intentionally obscured payments and used indirect methods of revenue flow to disguise its participation—for example, by having the owners and managers of CBA transfer revenues to other entities such as Secured Merchants LLC or other Corporate Defendants.

The FTC reserves the right to supplement this response as permitted by the Federal Rules.

Respectfully submitted,

Dated: April 4, 2016                    /s/ REID TEPFER_____
                                        REID TEPFER
                                        LUIS H. GALLEGOS
                                        Attorneys for the Plaintiff
                                        Federal Trade Commission
                                        1999 Bryan Street, Suite 2150
                                        Dallas, Texas 75201
                                        (214) 979-9395 (Tepfer)
                                        (214) 979-9383 (Gallegos)
                                        (214) 953-3079 (facsimile)
                                        rtepfer@ftc.gov
                                        lgallegos@ftc.gov

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 4, 2016, a true and correct copy of the foregoing document was electronically emailed to the attorneys listed below.

Robert Esensten
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
(310) 273-3090
RESENSTEN@ESENSTENLAW.COM
*Counsel for Doron Nottea and Motti Nottea*


Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*
*Roi Rueveni*

Jeffrey S. Benice
Law Offices of Jeffrey S. Benice
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
E-Mail: JSB@JeffreyBenice.com
*Counsel for Igor Latsanovski and*

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S
SPECIAL INTERROGATORIES
TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

*CalEnergy, Inc.*

Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Dr., 6th Floor
Beverly Hills, CA 90210
*Counsel for Chargeback Armor, Inc.,*
*Secured Merchants LLC, and Alan Argaman*

<u>/S/ REID TEPFER</u>
REID TEPFER

**RESPONSES TO DEFENDANT CHARGEBACK ARMOR, INC.'S**
**SPECIAL INTERROGATORIES**
**TO PLAINTIFF FEDERAL TRADE COMMISSION – SET ONE**

# EXHIBIT 805

AuraVie-0000264

# EXHIBIT 806

down toxins and help the skin rebound from sun damage and other assaults.



**STEP 4** in our **AuraVie 2-DAY SKIN DETOX REGIMEN** **therapeutic sweating** which promotes profuse perspiration to eliminate unhealthy toxins from your . Skin whether you enjoy a sauna, working out, dancing, fast walking, you need to pump up your heartbeat until you break a sweat. (Then 10 minutes more…please.)

After completing your **AuraVie 2-DAY SKIN DETOX REGIMEN** skin is now ready to receive the maximum benefits of using **AuraVie SkinCare Treatments.**

**When NOT To Detox:**

- ∞ During pregnancy
- ∞ If you suffer from major heart disease
- ∞ If you are over seventy or under twelve
- ∞ When you are on prescribed medication (check with your doctor)
- ∞ If you are under extreme pressure emotionally or physically (training for sports competition, or if you are recovering from the loss of a loved one

AuraVie-0001601

# EXHIBIT 807

| Name | Position | Amount | Commission | Total Gross Amount | Pay Rate | Hours | Notes |
|---|---|---|---|---|---|---|---|
| Khrisopher Bond | Executive | N/A | $        - | $        - | N/A | N/A | |
| Alon Nottea | Executive | N/A | $        - | $        - | N/A | N/A | |
| Igor Lats | Executive | N/A | $        - | $        - | N/A | N/A | |
| Nastassia Yalley | Director | $24K W2 $32,400 109 | $        - | $    2,169.23 | N/A | N/A | |
| Paul Medina | Director | $24K W2 $32,400 109 | $        - | $    2,169.23 | N/A | N/A | |
| Leor Arazy | Marketing | $18K W2 $18K 1099 | $        - | $    1,384.62 | $36k/year | N/A | |
| Victor Azal | Graphic Design | $        1,384.62 | $        - | $    1,384.62 | $36k/year 1099 | N/A | |
| Nicole Oconnell | Customer Service | $        812.65 | $        - | $        812.65 | $11.54/hour | 70 hours 25 minutes | |
| Andree Mansour | Customer Service | $38.4K W2 | $    10.00 | $    1,377.52 | $38.4k/year | 74 hours and 5  minutes | |
| Sandra Rubio | Customer Service | $36K W2 | $    10.00 | $    1,394.62 | $36k/year | 80 hours | took 9/15-9/16 off PAID |
| Jorge Rutiaga | Customer Service | $        897.81 | $        - | $        897.81 | $11.54/hour | 77 hours 48 minutes | |
| Rudy Avila | Customer Service | $        705.92 | $        - | $        705.92 | $11.54/hour | 74 hours 10 minutes | Paid back $150 this pay period, $150 on 10/7/11 |
| Andrew Stanley | Customer Service | $        808.03 | $        - | $        808.03 | $11.54/hour | 70 hours 1 minute | |
| Shant Konyalian | Customer Service | $    1,000.32 | $    84.00 | $    1,084.32 | $30k/year | 69 hours 22 minutes | |
| Derek Smith | Customer Service | $        901.27 | $        - | $        901.27 | $11.54/hour | 78 hours  minutes | |
| Justin McKinnon | Customer Service | $33K W2 | $        - | $    1,269.23 | $33k/year | 80 hours | |
| Victor Godoy | Customer Service | $30K W2 | $    25.20 | $    1,070.65 | $30k/year | 72 hours 30 minutes | |
| Moses Garcia | Customer Service | $        800.30 | $    20.00 | $        820.30 | $11.54/hour | 69 hours 21 minutes | |
| Laura Getten | Customer Service | $        161.64 | $        - | $        161.64 | $12/hour | 13 hours 28 minutes | |
| Chadne Kidd | Customer Service | $        789.34 | $        - | $        789.34 | $11.54/hour | 68 hours 24 minutes | |
| Avear Carey | Customer Service | $        828.00 | $        - | $        828.00 | $11.54/hour | 71 hours 45 minutes | |
| Gloria Thorton | Customer Service | $        892.20 | $        - | $        892.20 | $12/hour | 74 hours 21 minutes | |
| Patrick Raffin | Customer Service | $        927.01 | $    50.00 | $        977.01 | $11.54/hour | 80 hours 13 minutes | |
| Randy Pimentel | Customer Service | $        930.12 | $        - | $        930.12 | $11.54/hour | 80 hours 24 minutes | |
| Geiner Samayoa | Customer Service | $        928.05 | $        - | $        928.05 | $11.54/hour | 80 hours 17 minutes | Moved to full time this pay period |
| Laneisha Walker | Customer Service | $        855.34 | $        - | $        855.34 | $11.54/hour | 74 hours 7 minutes | |
| Alon Shivhon | Customer Service | $        933.93 | $    10.00 | $        943.93 | $11.54/hour | 80 hours 37 minutes | Moved to full time this pay period |
| Andrew Alvarado | Shipping | $        728.92 | $        - | $        728.92 | $11.54/hour | 71 hours 50 minutes | Minus $100 he owes plus $100 for the next two pay periods |
| Mynor Blanco | Shipping | $        944.32 | $        - | $        944.32 | $11.54/hour | 81 hours and 13 minutes | Last paycheck so include 9/21/11 and two hours for 9/22/11 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TOTAL Paychecks** | | | $    27,228.89 | | | | |
| **Worker's Comp** | | | $    140.47 | | | | |
| **Paychex Fee** | | | $    135.10 | | | | |
| **Manual Checks** | | | $    568.25 | The taxes from these checks will come out on 10/7/11 | | | |
| **Employer Taxes** | | | $    2,325.53 | $    29,694.89 | The amount on the paychex sheet. | | |
| **TOTAL COST OF PAYROLL** | | | $    30,398.24 | | | | |

# EXHIBIT 809



AuraVie-0002587

# EXHIBIT 810

818-876-9696 TEL

818-876-8501 FAX

CA DRE # 01905030

akamal@tvpasset.com

--

AuraVie-0002591

# EXHIBIT 811

3756956

| **ARTS-GS** | **Articles of Incorporation of a General Stock Corporation** |
|---|---|

To form a **general stock corporation** in California, you can fill out this form or prepare your own document, and submit for filing along with:

– A **$100 filing fee**.

– A separate, non-refundable **$15 service fee** also must be included, if you **drop off** the completed form or document.

*Important!* Corporations in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

Note: *Before submitting the completed form,* you should consult with a private attorney for advice about your specific business needs.

**FILED**
Secretary of State
State of California

**FEB 1 8 2015**

*ICC*                This Space For Office Use Only

For questions about this form, go to *www.sos.ca.gov/business/be/filing-tips.htm.*

**Corporate Name** (List the proposed corporate name. Go to www.sos.ca.gov/business/be/name-availability.htm for general corporate name requirements and restrictions.)

① The name of the corporation is CHARGEBACK ARMOR, INC

**Corporate Purpose**

② The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your corporation is sued. You may list any adult who lives in California. You may not list your own corporation as the agent. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

③ a. MICHAEL COSTACHE
     *Agent's Name*

   b. 200 N MARYLAND AVENUE, SUITE 300          GLENDALE          CA 91206
     *Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box*   *City (no abbreviations)*   *State   Zip*

**Corporate Addresses**

④ a. 200 N MARYLAND AVENUE, SUITE 300          GLENDALE          CA   91206
     *Initial Street Address of Corporation - Do not list a P.O. Box*   *City (no abbreviations)*   *State   Zip*

   b. _____
     *Initial Mailing Address of Corporation, if different from 4a*   *City (no abbreviations)*   *State   Zip*

**Shares** (List the number of shares the corporation is authorized to issue. Note: Before shares of stock are sold or issued, the corporation must comply with the Corporate Securities Law of 1968 administered by the California Department of Business Oversight. For more information, go to www.dbo.ca.gov or call the California Department of Business Oversight at (866) 275-2677.)

⑤ This corporation is authorized to issue only one class of shares of stock.

   The total number of shares which this corporation is authorized to issue is _____1000_____.

This form must be signed by each incorporator. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of incorporation.

▶ *Michael Costache*          MICHAEL COSTACHE
   *Incorporator - Sign here*          *Print your name here*

| Make check/money order payable to: **Secretary of State** | **By Mail** | **Drop-Off** |
|---|---|---|
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State<br>Business Entities, P.O. Box 944260<br>Sacramento, CA 94244-2600 | Secretary of State<br>1500 11th Street, 3rd Floor<br>Sacramento, CA 95814 |

Corporations Code §§ 200-202 et seq., Revenue and Taxation Code § 23153
ARTS-GS (REV 03/2014)

2014 California Secretary of State
www.sos.ca.gov/business/be

AuraVie-0002607

EXHIBIT 812

AuraVie-0002608

# EXHIBIT 813

## WHY HATCH?



Hatch is positioned to take advantage of rapidly growing online and social media spend.

AuraVie-0002641

# EXHIBIT 814



AuraVie-0002640

# EXHIBIT 815

| Values | | |
|---|---|---|
| | Count of Date I | Count of Date Replied |
| **Total** | **7764** | **3658** |

| Count of Date Replied | |
|---|---|
| Row Labels | Total |
| 5/11/2015 | 51 |
| 5/12/2015 | 87 |
| 5/13/2015 | 59 |
| 5/14/2015 | 74 |
| 5/15/2015 | 55 |
| **Grand Total** | **326** |

EXHIBIT 816

3477467

**ARTICLES OF INCORPORATION**

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

JUN 06 2012

OF

**PINNACLE LOGISTICS, INC.**

The undersigned, desiring to form a corporation under the laws of the State of California, declares:

I

The name of the corporation is:

**PINNACLE LOGISTICS, INC.**

II

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in this State of the corporation's initial agent for service of process is Oz Mizrahi, 7900 Gloria Avenue, Van Nuys, CA 91406.

IV

This corporation is authorized to issue only one class of shares, which shall be designated "common" shares. The total number of such shares authorized to be issued is 1,000,000 shares.

V

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California Law.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation this 6th day of June, 2012.

_____
OZ MIZRAHI, INCORPORATOR

AuraVie-0002784

# EXHIBIT 817

6. $3 million in revenue by end of 2015

7. $17 million in revenue by end of 2016

## MANAGEMENT:

We are technology-driven marketers who understand every intricate aspect of the online sales process. Our founders and our management are a unique and diverse group of industry professionals ranging in skills from risk management, IT, direct marketing, and customer contact center management. Having used almost every major chargeback provider for our various clients and having a deep understanding of their shortcomings, we decided to build a state-of-the-art cloud-based chargeback platform to lower internal processing costs and win back losses to help increase out clients' bottom line.

Alon Nottea – President
Mike Costache – Chief Executive Officer
Avi Argaman – Chief Technology Officer
Roi Reuven – Customer Service Manager
Tyler Reitenbach – Sales Account Manager

**CONTACT:** Mike Costache / mike@chargebackarmor.com / 310.753.9292

## DISCLAIMER:

This is not an offer for securities and should not be construed as such, this is for informational purposes only. We reserve all rights to modify, change or unilaterally amend any of the above.

3

AuraVie-0002959

# EXHIBIT 818

The parties have executed this Agreement as of the date first written above.

ChargeBack Armor, Inc.                          Jason Caramanis

_____          _____
Signature:                                      Signature:

Mike Costache  / CEO_____            Jason Caramanis_____
Print Name / Title                              Print Name

AuraVie-0002962

# EXHIBIT 819

**Auravie.com Notes**

1. Main Screen- shows all 6 Auravie products.
2. Re-Price all products.
3. Customers will only be able to see the 6 Auravie products.
4. For all other products, customers will not be able to see them unless they have a membership number.
     A. If they click on the link, it will have a ghost effect.
     B. Type in your information for a membership code.
     C. You can get a membership by being in a Risk Free Trial, coupon codes, and forums or call in for a membership.
5. Retail price- 100%
6. Sale price- 20% less than the retail price.
7. Continuity price- 40% less than the sale price.
     A. They get the product that they want. If product is a 60-day supply, they get the product every 60 days.
     B. The 5th shipment will always be FREE; customer only pays for shipping and handling for $5.95.
     C. Option 2, addition discount for every shipment.
          i. 20% off the first shipment
          ii. 25% off the second shipment.
          iii. 30% off the third shipment.
          iv. 35% off the fourth shipment.
          v. Fifth shipment is Free, plus shipping and handling.
     D. Cannot use a coupon code in continuity offer.
     E. If customer calls in about the continuity offer, the agents will be able to give an additional 10% discount.
     F. The agent can give a 5% discount and keep the other 5% for commission.
8. Chance to design your own skin care program(skinid, murad...etc)
     A. Ask customers to fill out a survey to get an understanding of their skin problems.
     B. We will always recommend at least 3 products. Based on their answers, we will recommend the other products to be a part of their regiment.
     C. " We feel that there are other products that can maximize your results. Please contact our beauty experts to help your skin care treatment an they can give you a further discount."
          i. Agents will have the option to up sell.
          ii. Throw in a FREE product.
9. Rating for every product.
10. Reviews- some good and bad.
11. Option for customer to upload their testimonial- before and after picture.
     A. If we use their picture we will give them a free month supply of whatever they would like.
12. Able to sign up to receive motivational SMS texts.

AuraVie-0002964

# EXHIBIT 820

8.   Loan To The Company.................................................................................................. 4

9.   Contribution and Assignment of Computer Software................................................. 4

10.  Allocations.................................................................................................................... 4

11.  Company Expenses....................................................................................................... 5

12.  Distributions of Cash Available for Distribution........................................................ 6

13.  Powers, Rights and Obligations of Managers............................................................. 6
     13.1   General Authority and Powers of Managers................................................. 6
     13.2   Time Devoted to Company; Other Ventures; Competition........................... 7
     13.3   Liability of Managers to Members and Company......................................... 7
     13.4   Indemnification............................................................................................. 7
     13.5   Fiduciary Responsibility............................................................................... 7
     13.6   Conflicts of Interest...................................................................................... 8
     13.7   Restrictions on Authority of Managers........................................................ 8

14.  Status of Members....................................................................................................... 9
     14.1   Limitation of Liability................................................................................... 9
     14.2   Death or Incapacity of a Member................................................................. 9
     14.3   Recourse of Members.................................................................................... 9
     14.4   No Right to Property...................................................................................... 9

15.  Books and Records, Accounting, Reports and Statements and Tax Matters.............. 9
     15.1   Books and Records........................................................................................ 9
     15.2   Annual Accounting Period............................................................................ 9
     15.3   Right to Examine Records........................................................................... 10
     15.4   Tax Matters Partner..................................................................................... 10
     15.5   Tax Returns................................................................................................. 10
     15.6   Tax Elections.............................................................................................. 10

16.  Transfers of Company Interests; Withdrawal and Admission of Members............... 10
     16.1   General Prohibition..................................................................................... 10
     16.2   Withdrawal of Member............................................................................... 10
     16.3   Permitted Transfers Without Refusal Rights.............................................. 11
     16.4   Other Transfers Subject to Refusal Rights................................................. 11
     16.5   Purchase or Redemption Price.................................................................... 12
     16.6   Conditions Precedent to Any Transfer or Encumbrance............................ 12
     16.7   Effect of Transfer........................................................................................ 12
     16.8   Substitute Members..................................................................................... 13
     16.9   Assignment as Security Permitted............................................................... 13

17.  Resignation and Admission of Manager.................................................................... 13
     17.1   Resignation of Manager.............................................................................. 13
     17.2   Death or Incompetency of Manager............................................................ 13

ii

Ruby Sky Development, LLC

AuraVie-0003002

# EXHIBIT 821

10. Allocations. The Company shall allocate Net Income and Net Loss to the Members in proportion to each Member's Percentage Interest; provided that, until such time as the amounts in Sections 8 and 9 above have been paid in full, Net Income and Net Loss shall be specially allocated 66 2/3% to _____ and 33 1/3% to _____.

11. Company Expenses. The Company shall pay, and the Managers shall be reimbursed for, all costs and expenses of the Company, which may include, but are not limited to:

(a) All organizational expenses incurred in the formation of the Company;

(b) All costs of personnel employed by the Company;

(c) All costs reasonably related to the conduct of the Company's day-to-day business affairs, including, but without limitation, the cost of supplies, utilities, taxes, licenses, fees and services contracted from third parties;

(d) All costs of borrowed money, taxes and assessments on Company property, and other taxes applicable to the Company;

(e) Legal, audit, accounting, brokerage and other fees;

(f) Fees, costs, expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an interest in the Company or in connection with the business of the Company;

(g) Fees and expenses paid to contractors, investment bankers, brokers and services, leasing agents, consultants, managers, brokers, insurance brokers and other agents, including affiliates of the Managers;

(h) Expenses in connection with Company financing and refinancing, and operation, sale, distribution, publication and use of Company Property;

(i) The cost of insurance obtained in connection with the business of the Company;

(j) Expenses of revising, amending, converting, modifying or terminating the Company;

(k) Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members;

(l) Expenses in connection with preparing and mailing reports required to be furnished to Members for investment, tax reporting or other purposes that the Managers deem appropriate; and

Secure Merchants, LLC

-v-

AuraVie-0003008

# EXHIBIT 822

Chargeback Rebuttal:

(Date)

(Mid-Name)                                                          Merchant #:

(Mid address and phone)                                      Case #:

Dear Chargeback Department,

Thank you very much for your correspondence on this matter.  At Auravie, we take pride in providing 100% customer satisfaction along with the highest quality skincare products available on the market today.  As a BBB accredited business, our customers can be sure they are being provided with the upmost in quality and customer service, as we strive to resolve all requests in an efficient and timely manner.  Our products contain only the highest quality, clinically proven ingredients and are manufactured in the U.S.A. to ensure excellence and consistency.

As such, we are so confident in the efficacy of our products, we offer them on a 10 day risk-free trial basis (See attachments 1, 2 & 3 Order Screen, Offer Terms and Conditions & FTC Compliance Letter), allowing our customers the opportunity to try our spa quality products for the shipping and handling cost of just ($Price). Per the "Terms and Conditions" listed in the center of the credit card order screen and affirmed by the customer using a check box below the order submission button, we ship out a full one month supply of products, a retail price of $219.99, via United States Postal Service Priority Mail with Delivery Confirmation (See attachment 4 USPS Delivery Confirmation/s) to the address provided by the customer at the time the order was placed (See attachment 5 & 6 CRM Screenshot & Gateway Authorization Receipt with CVV2 & AVS results). Our customers then have 10 full days, or 20 applications of the twice daily use products, once they are confirmed delivered by the USPS, to discover the benefits. If for any reason the products are not satisfactory, the customer can cancel via a 7 days a week, 24 hour toll-free automated phone system, an e-mail, or a letter, anytime within their 10 day trial period and receive a Return Merchandise Authorization number to return the unused portion of the products within 30 days of the order date to finalize cancellation and avoid any and all future billings or charges.  If the products are satisfactory, the customer need do nothing, and at the end of their 10 day trial period they agree that their card will be charged $97.88, the discounted membership rate for our spa quality product, and become enrolled in our 6 month VIP membership program, where they will receive a fresh supply at the same discounted rate every 30 days, so that they may continue the use of our product and achieve the maximum results. The 6th and final shipment is mailed out free as a thank you for the clients continued support; the customer only pays the shipping and handling fee of $14.95. Our friendly customer service agents are available to handle all non-standard requests Monday thru Friday 7:00am PST to 4:00pm PST and reply to all e-mail, letter and voicemail correspondence a total of 3 times on 3 consecutive days before determining a customer to be unreachable to assure all customer needs are met to the best of our ability. We make every effort to ensure proper resolutions to all cases within our terms, conditions, and policies by offering several different options to all customers calling in, up to and including, partial refunds, full refunds, replacement products and free gifts depending on the circumstances.

The specific customer in question (Text Box). It is with our sincerest apologies that our mutual customer in question felt it necessary to remedy the situation through a chargeback, however we believe the documentation provided shows that we have made every effort to provide the customer with top quality products and customer service.

Regards,
Executive Resolution Department

- Attachment 1 Order Screen Snapshot
- Attachment 2 Full Offer Terms & Conditions
- Attachment 3 FTC Compliance Letter
- Attachment 4 USPS Delivery Confirmation/s
- Attachment 5 CRM Snapshots of all Order Pages
- Attachment 6 Gateway Receipts With AVS and CVV2 Results

AuraVie-0003024

EXHIBIT 823

**To:**      Norman Bentley[nb@mmd-holdings.com]
**Cc:**      Alon | Critical Media[vigorect@gmail.com]
**From:**    Nastassia Yalley
**Sent:**    Wed 5/12/2010 4:47:48 PM
**Subject:** Re: Panama paperwork
**MAIL_RECEIVED:**    Wed 5/12/2010 4:47:48 PM

Okay here come the questions. Please bear with me :]

1. Do I fill the signature cards under Emilio McIntosh and Fernando Castillo?
2. There is also a receipt for request for Checkbook, do you need to fill that out?
If so can we put Motti or Alon's name on that?

3. Also what do they mean by Identity number (on all the sheets)?
4. Who should we put for President, Secretary, and Treasurer?
5. Profile for Directors - is this Alon?
6. Name of Owners - is this Alon?
7. Do the references have to be in Panama?


On Wed, May 12, 2010 at 12:53 PM, Norman Bentley <nb@mmd-holdings.com> wrote:

What specific info do you need?

Thanks,
Norman Bentley

Cell: 818 458-9200



***********************************************
Disclaimer:
This email message, its contents and any attachments hereto, are for the
sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please
contact the sender by reply email and destroy all copies of the original
message.

Notwithstanding the Uniform Electronic Transactions Act or the applicability
of any other law of similar substance or effect, absent an express statement
to the contrary hereinabove, this email communication, its contents and any
attachments hereto, are not intended to represent an offer or acceptance to
enter into a contract and are not otherwise intended to bind the sender, any
of its clients, or any other person or entity.
***********************************************
Please consider the environment before printing this email.
***********************************************

On May 12, 2010, at 3:22 PM, Nastassia Yalley <nastassianwm@gmail.com> wrote:


Hi Norman

Do you know where I can find more information on this Queensway Capital corp?

AuraVie-0003025

# EXHIBIT 824

**To:**       Paul Medina[paul@bunzaimedia.com]; Doron[doron@doron.us]
**From:**     Nastassia Yalley
**Sent:**     Fri 8/17/2012 6:47:56 PM
**Importance:**       Normal
**Subject:**  Merchant accounts connected to bunzai
**MAIL_RECEIVED:**    Fri 8/17/2012 6:47:57 PM

Here are the merchant accounts that are currently depositing
into Bunzai Media bank accounts:

| SIGNAPA Y | 3899000001761236 | YOURFACEKIT.COM |
|-----------|------------------|-----------------|
| NMC | 510159011201811 | MIRACLEFACEKIT8662169336 |
| NMC | 510159011201746 | AURAVIE 888-291-7385 |
| NMC | 510159011201936 | SALT SOUFFLE 8662169336 |
| UMS | 8788140021128 | 877-705-3542 SKIN KIT |
| UMS | 8788140021125 | 866-305-9569 GREAT SKIN |

--
-- -- -- -- -- -- -- -- --
**Nastassia Yalley**
Director of Marketing
O: 818.200.1035
C: 818.687.0366
F: 818.647.0182

AuraVie-0000476

# EXHIBIT 825

# DOCUMENT INFO

Name:        AV-0000010.PSD

Location:    Y:\Auravie_1423137\EDD\Law_IMP\Aura
             Vie-1423137_R5856 30-03-2016
             v3\NATIVES\00000\00000\

Size:        3,852KB (3,944,097 bytes)

Modified:    Monday, July 13, 2015 12:56 PM

Comments:    FILE PRODUCED NATIVELY

# DOCUMENT INFO

AuraVie-0003379

EXHIBIT 826

Case 2:15-cv-04527-GW-PLA   Document 392-3   Filed 05/02/16   Page 125 of 230   Page ID #:9970

States for the purposes of its tax, but in the
case of income derived or paid by a partnership,
estate, or trust this term applies only to the
extent that the income derived by such person is
subject to United States tax as the income of a
resident either in its hands or in the hands of
its partners or beneficiaries.

(2) Where by reason of the provisions of paragraph (1)
an individual is a resident of both Contracting States:

(a) He shall be deemed to be a resident of that
Contracting State in which he maintains his permanent
home.  If he has a permanent home in both Contracting
States or in neither of the Contracting States, he
shall be deemed to be a resident of that Contracting
State with which his personal and economic relations
are closer (center of vital interests);

(b) If his center of vital interests is in neither
of the Contracting States or cannot be determined,
he shall be deemed to be a resident of that
Contracting State in which he has a habitual abode;

(c) If he has a habitual abode in both Contracting
States or in neither of the Contracting States,
he shall be deemed to be a resident of the Contracting
State of which he is a citizen; and

(d) If he is a citizen of both Contracting States
or of neither Contracting State the competent
authorities of the Contracting States shall settle
the question by mutual agreement.

(3) An individual who is deemed to be a resident of a
Contracting State and not a resident of the other Contracting
State by reason of the provisions of paragraph (2) shall be
deemed to be a resident only of the first-mentioned Contracting
State for all purposes of this Convention, including Article
4 (General Rules of Taxation).

(4) Where by reason of the provisions of paragraph (1) a
person other than an individual or a corporation is a resident
of both Contracting States, the competent authorities of the
Contracting States shall by mutual agreement endeavor to
settle the question and to determine the mode of application
of the Convention to such person.

AuraVie-0003427

# EXHIBIT 827

ΕΠΙΣΗΜΗ ΕΦΗΜΕΡΙΔΑ ΤΗΣ 4ης ΑΠΡΙΛΙΟΥ  1984                    447

claim is made, it shall endeavor to come to an agreement
with the competent authority of the other Contracting State
with a view to the avoidance of taxation contrary to the
provisions of this Convention.

(2)  The competent authorities of the Contracting States
shall endeavor to resolve by mutual agreement any
difficulties or doubts arising as to the application of this
Convention.  In particular, the competent authorities of the
Contracting States may agree:

>     (a) To the same attribution of income, deductions,
>     credits or allowances of a resident of a
>     Contracting State to its permanent establishment
>     situated in the other Contracting State;
>
>     (b) To the same allocation of income, deductions,
>     credits, or allowances between persons, including a
>     uniform position on the application of the requirements
>     of paragraph (2) of Article 7 (Non-Discrimination);
>
>     (c) To the same determination of the source of
>     particular items of income;
>
>     (d) To a uniform accounting for income and deductions;
>
>     (e) To the same characterization of particular items
>     of income; and
>
>     (f) To a common meaning of a term.

The competent authorities may also consult together for the
elimination of double taxation in cases not provided for in
the Convention.

(3)  The competent authorities of the Contracting States
may communicate with each other directly for the purpose
of reaching an agreement in the sense of this Article.
When it seams advisable for the purpose of reaching
agreement, the competent authorities may meet together
for an oral exchange of opinions.

(4)  In the event that the competent authorities of the
Contracting States reach such an agreement, taxes shall be
imposed and refund or credit of taxes shall be allowed by
the Contracting States in accordance with such agreement.
Such a refund or credit of tax shall be allowed notwith-
standing any time limits in the domestic law of the
Contracting States.

AuraVie-0003453

# EXHIBIT 828

**AURAVIE LTD**

---

**WRITTEN RESOLUTION OF THE SUBSCRIBER TO THE MEMORANDUM OF ASSOCIATION OF AURAVIE LTD MADE ON THE 19TH DAY OF MAY 2011.**

---

We, the undersigned, being the Subscriber to the Memorandum of Association of Auravie Ltd, a Limited Liability Company incorporated and registered in the Republic of Cyprus on the 19th day of May 2011 under number HE 287300 and having its registered office at *52, 1 Aprilliou street, P.C.7600, Athienou, Larnaca, Cyprus*, (hereinafter referred to as "the Company"), do hereby, in pursuance of Article 102 of the Company's Articles of Association, **resolve** as follows:-

**Director Appointment**

1.    To appoint the following to be the Director of the Company:

VASILIKI ARGYROU
12 Ellados Street, Flat 204
CY-2003 Strovolos, Nicosia
Cyprus

(Sgn.)....................
**Mrs. Vasiliki Argyrou**
**Subscriber**

1

AuraVie-0003497

EXHIBIT 829

| From: | David Davidian, CPA <cpa@lacpa.com> |
|-------|--------------------------------------|
| **Sent:** | Tuesday, March 25, 2014 11:26 PM |
| **To:** | Global Media <globalmediausa@gmail.com> |
| **Subject:** | AMD Financial Network Inc |
| **Attach:** | Balance sheet_P&L_02.28.2014_AMD.pdf |

Attached please find the balance sheet and P&L as of 2/28/2014 and for the two months ended 2/28/2014.

Sincerely,
*Z. David Davidian, CPA*
Davidian & Associates
**Certified Public Accountants**
(888) 452-5577
(818) 242-7800
(888) 202-7757 Fax
www.LACPA.com

This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.

To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. tax advice contained in this communication, and its attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party for any matters addressed herein.

 *Please consider the environment before printing this e-mail*

AuraVie-0003540

# EXHIBIT 830

# Payroll Register with YTD - SV

**PINNACLE LOGISTICS INC**
Company (83919)

Check Date: 03/07/2014
Pay Period: 02/19/2014 to 03/04/2014
Process: 2014030701

## 1246 — Mazzy, Gregg — Emp Id 57 — Rate 12.0000 — Freq B

| Earning | Hours | Amount | YTD Hrs | YTD Amt |
|---|---|---|---|---|
| OVERTIME | 5.87 | 105.61 | 24.93 | 448.77 |
| REG | 79.27 | 951.20 | 402.37 | 4828.44 |
| **Totals** | **85.13** | **1056.81** | **427.30** | **5277.21** |

| Tax | Status | Amount | Taxable | YTD Txble | YTD Amt |
|---|---|---|---|---|---|
| CA | S-4 | 3.53 | 1056.81 | 5277.21 | 17.36 |
| CASDI-E | | 10.57 | 1056.81 | 5277.21 | 52.77 |
| FITW | S-4 | 36.93 | 1056.81 | 5277.21 | 185.16 |
| MED | | 15.32 | 1056.81 | 5277.21 | 76.52 |
| SS | | 65.53 | 1056.81 | 5277.21 | 327.19 |
| **Totals** | **Employee** | **131.88** | | | **659.00** |

| Voucher | Type | Amount | YTD Amt |
|---|---|---|---|
| Date | 03/07/14 | | |
| Net | | | 924.93 |
| Dir Dep | | | 924.93 |
| Check | | | 0.00 |

| Deduction | Amount | YTD Amt |
|---|---|---|
| **Totals** | **0.00** | **0.00** |

## 1247 — Raffin, Patrick — Emp Id 26 — Salary 1923.08 — Freq B

| Earning | Hours | Amount | YTD Hrs | YTD Amt |
|---|---|---|---|---|
| SAL | 80.00 | 1923.08 | 400.00 | 9615.40 |
| **Totals** | **80.00** | **1923.08** | **400.00** | **9615.40** |

| Tax | Status | Amount | Taxable | YTD Txble | YTD Amt |
|---|---|---|---|---|---|
| CA | S-2 | 71.29 | 1923.08 | 9615.40 | 365.42 |
| CASDI-E | | 19.23 | 1923.08 | 9615.40 | 96.15 |
| FITW | S-2 | 223.80 | 1923.08 | 9615.40 | 1194.96 |
| MED | | 27.88 | 1923.08 | 9615.40 | 139.42 |
| SS | | 119.23 | 1923.08 | 9615.40 | 596.15 |
| **Totals** | **Employee** | **461.43** | | | **2392.10** |

| Voucher | Type | Amount | YTD Amt |
|---|---|---|---|
| Date | 03/07/14 | | 650.00 |
| Net | | | |
| Dir Dep | | | 1461.65 |
| Check | | | 1461.65 |
| | | | 0.00 |

| Deduction | Amount | YTD Amt |
|---|---|---|
| ADV | | |
| **Totals** | **0.00** | **650.00** |

## 1249 — Rubio, Sandra — Emp Id 28 — Salary 1846.00 — Freq B

| Earning | Hours | Amount | YTD Hrs | YTD Amt |
|---|---|---|---|---|
| SAL | 80.00 | 1846.00 | 400.00 | 9230.00 |
| **Totals** | **80.00** | **1846.00** | **400.00** | **9230.00** |

| Tax | Status | Amount | Taxable | YTD Txble | YTD Amt |
|---|---|---|---|---|---|
| CA | M-2 | 22.20 | 1846.00 | 9230.00 | 111.00 |
| CASDI-E | | 18.46 | 1846.00 | 9230.00 | 92.30 |
| FITW | M-2 | 147.67 | 1846.00 | 9230.00 | 738.35 |
| MED | | 26.77 | 1846.00 | 9230.00 | 133.84 |
| SS | | 114.45 | 1846.00 | 9230.00 | 572.26 |
| **Totals** | **Employee** | **339.55** | | | **1647.75** |

| Voucher | Type | Amount | YTD Amt |
|---|---|---|---|
| Date | 03/07/14 | | |
| Net | | | 1516.45 |
| Dir Dep | | | 1516.45 |
| Check | | | 0.00 |

| Deduction | Amount | YTD Amt |
|---|---|---|
| **Totals** | **0.00** | **0.00** |

## Totals for Department: (101) Customer Service

| Employee | Earning | Hours | Amount | YTD Hrs | YTD Amt |
|---|---|---|---|---|---|
| Total 7 | BON | | | | 200.00 |
| Female 4 | COMM | | | | 35.00 |
| Male 3 | HOL | | | 48.00 | 692.16 |
| Chks/Vchrs | OT | | | 18.00 | 389.34 |
| Total 7 | OVERTIME | 6.90 | 127.96 | 44.05 | 862.29 |
| Female 4 | PTO | 20.75 | 299.22 | 96.00 | 1384.33 |
| Male 3 | REG | 270.93 | 3715.04 | 1398.51 | 19192.76 |
| | SAL | 240.00 | 5961.08 | 1200.00 | 29805.40 |
| | **Totals** | **538.58** | **10103.30** | **2804.56** | **52561.28** |

| Tax | Taxable | Amount | YTD Txble | YTD Amount |
|---|---|---|---|---|
| CA | 10103.30 | 227.63 | 52561.28 | 1214.29 |
| CASDI-E | 10103.30 | 101.03 | 52561.28 | 525.60 |
| FITW | 10103.30 | 928.98 | 52561.28 | 4985.85 |
| MED | 10103.30 | 146.49 | 52561.28 | 762.14 |
| SS | 10103.30 | 626.40 | 52561.28 | 3258.79 |
| **Totals** | **Employee** | **2030.53** | | **10746.67** |

| Deduction | Amount | YTD Amt | Checks/Vchrs | | |
|---|---|---|---|---|---|
| ADV | 200.00 | 1050.00 | | | |
| Garn | 46.15 | 230.75 | Net | | 7954.54 |
| Reimb | -127.92 | -171.92 | Dir Dep | | 7131.23 |
| | | | Check | | 823.31 |
| **Totals** | **118.23** | **1108.83** | | | |

**Department: (103) Product Returns**

---

# EXHIBIT 831

**To:** Paul Medina[paul@mediaurge.com]
**Cc:** Alon Nela[alon@mediaurge.com]; RJ[RJ@opinlogistics.com]; Tyler[tyler@opinlogistics.com]; Bill[bill@opinlogistics.com]
**From:** Avico Global
**Sent:** Thur 10/24/2013 5:14:07 PM
**Importance:** Normal
**Subject:** Re: Shipping weight changed to 13 Ounces for Auravie only
**MAIL_RECEIVED:** Thur 10/24/2013 5:39:58 PM

OK
Thanks for info .. I will make sure it works and get back to you ...

AA

On Thu, Oct 24, 2013 at 2:12 PM, Paul Medina <paul@mediaurge.com> wrote:

Avi,
I have made the changes to all product ids to 13 ounces, please verify on your end this is done and shipping labels are at the new lower costs.

Also let me know what is an avg cost for these 13 ounces so we can have an idea for cost projections on shipping.

Thanks,

--
Paul B. Medina
Executive Vice President

Mobile:818-983-7202 | Office:855-717-5656
Direct: 818-200-1035 ext 7004 | Fax:818-647-0182
Skype:PMedina0331 | Email: Paul@MediaUrge.com
Website: http://www.MediaUrge.com/



Further, this message is intended only for the designated recipient. It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

Attachment J

# EXHIBIT 832

**To:**      Alon | Bunzai Media[alon@bunzaimedia.com]
**From:**    Avi | Global
**Sent:**     Thur 7/26/2012 2:58:13 AM
**Importance:**    Normal
**Subject:**    FINAL ANGEL SCOPE
**MAIL_RECEIVED:**   Thur 7/26/2012 2:58:26 AM

PastedGraphic-2.png
BeautyRegimen-SkinDetox.pdf
BeautyBuzz - AuraVie FACE YOGA.pdf

Alon - Check out below as final bullet point of what you will get on the Angel Project.
Last we spoke SMS is on hold and Kevin should be working on this only.

I will call you in the morning to confirm ... Avi

# Auravie Angels - Final Development Schedule & Budget

**Below are the first two of many additions and modifications to auravie.  We want to get the balling rolling on these aspects before we take on the other requests.**

**Auravie Angels Blog**
**Timeline 1.5 - 2 months**
**Setup Cost : $10,000**
**This is to create the groundwork for the Angels platform and create the platform for additional build-outs.**
**Additional Requests/Modifications may create fluctuation in scope/schedule/budget, or be held off for PHASE 2.**

1. Auravie.com Homepage will contain links to
- Beauty Buzz (static html page - see pdf below - face yoga)
- Beauty Regimen (static html page - see pdf below)
- 2 Angel Links
- See More (Shows main angel portal and angel links)

2. Main Wordpress Portal will be at angels.auravie.com
- Slideshow
- Links to each angel
- Text
- Additional Pages (About, Signup to be an Angel, Contact, FAQ, Shop)

3. Each Wordpress Angel will have their own blog : angels.auravie.com/sandra,angels.auravie.com/lunelle, ...etc
- Angel Banner (Using photo from photoshoot)
- Links to other angels
- Blog content (videos, images, etc)
- Facebook, Twitter, Contact Options

*(Angels will each be given a Basecamp email address to email their content, so that the content can be moderated as Basecamp tasks by Auravie staff.)*

STEPS:

- Create subdomains & url structure
- Design & creation of a main portal (angels.auravie.com) showing each angel (Wordpress)
- Design & creation of an individual blog site (ie - angels.auravie.com/sandra) for each angel (Wordpress)
- Customized images will be added
- Create multiple user logins and setups for each individual blog
- Additional wordpress modules wil be installed for social media integration and seo

Attachment K

# EXHIBIT 833

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA 91203

SHIP DATE  08/01/2013

INVOICE #  10032
DATE  08/01/2013
DUE DATE  08/01/2013

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | |
|---|---|
| TOTAL | $2,500.00 |
| PAYMENT | $2,500.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA 91203

INVOICE #  10075
DATE  09/02/2013
DUE DATE  09/02/2013

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | |
|---|---|
| TOTAL | $2,500.00 |
| PAYMENT | $2,500.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA 91203

INVOICE # 10110
DATE 10/04/2013
DUE DATE 10/04/2013

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---:|---|---:|---:|
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | | |
|---:|---:|
| TOTAL | $2,500.00 |
| PAYMENT | $2,500.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10111 |
| TERMS | Due on receip |
| DATE | 10/31/2013 |
| DUE DATE | 11/01/2013 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 6868 | IVR<br>• IVR PBX solution per record charge of 0.70 (October Charges) | 0.70 | 4,807.60 |
| 1214 | CBA<br>• ChargeBack resolution automated services ($4 per record) (October Charges) | 4.00 | 4,856.00 |

| | |
|---|---|
| TOTAL | $9,663.60 |
| PAYMENT | $9,663.60 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10121 |
| TERMS | Net 10 |
| DATE | 11/04/2013 |
| DUE DATE | 11/14/2013 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | |
|---|---|
| TOTAL | $2,500.00 |
| PAYMENT | $2,500.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10133 |
| TERMS | Due on receip |
| DATE | 11/20/2013 |
| DUE DATE | 11/20/2013 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 8307 | IVR<br>• IVR PBX solution per record charge of 0.70 (IVR Totals 11/1/2013-11/15/2013 Charges) | 0.70 | 5,814.90 |
| 696 | CBA<br>• ChargeBack resolution automated services ($4 per record) (CBA Totals 11/1/2013-11/15/2013 October Charges) | 4.00 | 2,784.00 |

| | |
|---|---|
| TOTAL | $8,598.90 |
| PAYMENT | $8,598.90 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10205 |
| TERMS | Due on receip |
| DATE | 12/02/2013 |
| DUE DATE | 12/02/2013 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 8676 | IVR<br>• /IVR PBX solution per record charge of 0.70 (IVR Totals 11/15/2013-11/30/2013 Charges) | 0.70 | 6,073.20 |
| 611 | CBA<br>• ChargeBack resolution automated services ($4 per record) (CBA Totals 11/1/2013-11/30/2013 October Charges) | 4.00 | 2,444.00 |

| | |
|---|---|
| TOTAL | $8,517.20 |
| PAYMENT | $8,517.20 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10244 |
| --- | --- | --- |
| | TERMS | Net 10 |
| | DATE | 12/05/2013 |
| | DUE DATE | 12/15/2013 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
| --- | --- | --- | --- |
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | TOTAL | $2,500.00 |
| --- | --- | --- |
| | PAYMENT | $2,500.00 |
| | BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

| BILL TO | | INVOICE # | 10267 |
|---|---|---|---|
| SBM Management Inc. | | TERMS | Due on receip |
| 655 N. Central Ave. Suite 1700 | | DATE | 12/16/2013 |
| Glendale, CA  91203 | | DUE DATE | 01/01/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 5938 | IVR<br>• /IVR PBX solution per record charge of 0.70 (IVR Totals 12/1/2013-12/15/2013 Charges) | 0.70 | 4,156.60 |
| 613 | CBA<br>• ChargeBack resolution automated services ($4 per record) (CBA Totals 12/1/13-12/15/13) | 4.00 | 2,452.00 |

| | |
|---|---|
| TOTAL | $6,608.60 |
| PAYMENT | $6,608.60 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10291 |
| TERMS | Net 10 |
| DATE | 12/27/2013 |
| DUE DATE | 01/06/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 11695 | IVR<br>• IVR PBX solution per record charge of 0.70 12-15-13 to 12-31-13 | 0.70 | 8,186.50 |
| 653 | CBA<br>• ChargeBack resolution automated services ($4 per record)<br>12-15-13 to 12-31-13 | 4.00 | 2,612.00 |

| | |
|---|---|
| TOTAL | $10,798.50 |
| PAYMENT | $10,798.50 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10350 |
| TERMS | Net 10 |
| DATE | 01/02/2014 |
| DUE DATE | 01/12/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime light custom CC custom configuration | 2,500.00 | 2,500.00 |

| | |
|---|---|
| TOTAL | $2,500.00 |
| PAYMENT | $2,500.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10387 |
| TERMS | Net 10 |
| DATE | 01/16/2014 |
| DUE DATE | 01/26/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 583 | CBA<br>• ChargeBack resolution automated services ($4 per record) 1-1-14/1-15-14 | 4.00 | 2,332.00 |
| 9658 | IVR<br>• IVR PBX solution per record charge of 0.70 1-1-14/1-15-14 | 0.70 | 6,760.60 |

| | |
|---|---|
| TOTAL | $9,092.60 |
| PAYMENT | $9,092.60 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10400 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 02/01/2014 |
| | DUE DATE | 02/11/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | |
|---|---|
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10405 |
| TERMS | Net 10 |
| DATE | 02/03/2014 |
| DUE DATE | 02/13/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 838 | CBA<br>• ChargeBack resolution automated services ($4 per record) 1-15-14/1-31-14 | 4.00 | 3,352.00 |
| 14377 | IVR<br>• IVR PBX solution per record charge of 0.70 1-15-14/1-31-14 | 0.70 | 10,063.90 |

| | |
|---|---|
| TOTAL | $13,415.90 |
| PAYMENT | $13,415.90 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10410 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 02/05/2014 |
| | DUE DATE | 02/15/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Hosting<br>• Hosting custom configuration Services | 9,354.60 | 9,354.60 |

| | |
|---|---|
| TOTAL | $9,354.60 |
| PAYMENT | $9,354.60 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas 91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA 91203

| | | INVOICE # | 10418 |
|---|---|---|---|
| | | TERMS | Net 10 |
| | | DATE | 02/07/2014 |
| | | DUE DATE | 02/17/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Phone<br>• IVR Custom TF configuration | 9,820.00 | 9,820.00 |

| | |
|---|---|
| TOTAL | $9,820.00 |
| PAYMENT | $9,820.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10451 |
| TERMS | Net 10 |
| DATE | 02/17/2014 |
| DUE DATE | 02/27/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 479 | CBA<br>• ChargeBack resolution automated services ($4 per record) 2-01-14/2-15-14 | 4.00 | 1,916.00 |
| 9042 | IVR<br>• IVR PBX solution per record charge of 0.70 2-01-14/2-15-14 | 0.70 | 6,329.40 |

| | |
|---|---|
| TOTAL | $8,245.40 |
| PAYMENT | $8,245.40 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

INVOICE # 10505
TERMS Net 10
DATE 03/03/2014
DUE DATE 03/13/2014

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 787 | CBA | 4.00 | 3,148.00 |
|  | • ChargeBack resolution automated services ($4 per record) 2-15-14/2-28-14 |  |  |
| 9893 | IVR | 0.70 | 6,925.10 |
|  | • IVR PBX solution per record charge of 0.70 2-15-14/2-28-14 |  |  |

| | |
|---|---|
| TOTAL | $10,073.10 |
| PAYMENT | $10,073.10 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | | INVOICE # | 10506 |
|---|---|---|---|
| | | TERMS | Net 10 |
| | | DATE | 03/03/2014 |
| | | DUE DATE | 03/13/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime light custom CC custom configuration | 1,875.00 | 1,875.00 |

| | |
|---|---|
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10507 |
| TERMS | Net 10 |
| DATE | 03/06/2014 |
| DUE DATE | 03/16/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Hosting<br>• Hosting custom configuration Services | 7,061.24 | 7,061.24 |

| | |
|---|---|
| TOTAL | $7,061.24 |
| PAYMENT | $7,061.24 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10510 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 03/14/2014 |
| | DUE DATE | 03/24/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Phone<br>• IVR Custom TF configuration | 9,820.00 | 9,820.00 |

| | |
|---|---|
| TOTAL | $9,820.00 |
| PAYMENT | $9,820.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10517 |
| --- | --- | --- |
| | TERMS | Net 10 |
| | DATE | 03/17/2014 |
| | DUE DATE | 03/27/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
| --- | --- | --- | --- |
| 602 | CBA<br>• ChargeBack resolution automated services ($4 per record) 3-01-14/3-15-14 | 4.00 | 2,408.00 |
| 11805 | IVR<br>• IVR PBX solution per record charge of 0.70 3-01-14/3-15-14 | 0.70 | 8,263.50 |

| | |
| --- | --- |
| TOTAL | $10,671.50 |
| PAYMENT | $10,671.50 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10565 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 04/01/2014 |
| | DUE DATE | 04/11/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | |
|---|---|
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10551 |
| TERMS | Net 10 |
| DATE | 04/01/2014 |
| DUE DATE | 04/11/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 402 | CBA<br>• ChargeBack resolution automated services ($4 per record) 3-15-14/3-31-14 | 4.00 | 1,608.00 |
| 5735 | IVR<br>• IVR PBX solution per record charge of 0.70 3-15-14/3-31-14 | 0.70 | 4,014.50 |

| | |
|---|---|
| TOTAL | $5,622.50 |
| PAYMENT | $5,622.50 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10570 |
| TERMS | Net 10 |
| DATE | 04/02/2014 |
| DUE DATE | 04/12/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Hosting<br>• Hosting Configuration Services | 9,355.00 | 9,355.00 |

| | |
|---|---|
| TOTAL | $9,355.00 |
| PAYMENT | $9,355.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | | | |
|---|---|---|---|
| INVOICE # | 10577 |
| TERMS | Net 10 |
| DATE | 04/07/2014 |
| DUE DATE | 04/17/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Phone<br>• IVR Phone TF Configuration | 9,820.00 | 9,820.00 |

| | |
|---|---|
| TOTAL | $9,820.00 |
| PAYMENT | $9,820.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10596 |
| TERMS | Net 10 |
| DATE | 04/14/2014 |
| DUE DATE | 04/24/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 965 | CBA<br>• ChargeBack resolution automated services ($4 per record) (4-1-14 to 4-15-14) | 4.00 | 3,860.00 |
| 1639 | IVR<br>• IVR PBX solution per record charge of 0.70 (4-1-14 to 4-15-14) | 0.70 | 1,147.30 |

| | |
|---|---|
| TOTAL | $5,007.30 |
| PAYMENT | $5,007.30 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10640 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 04/21/2014 |
| | DUE DATE | 04/30/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 2998 | CBA<br>• ChargeBack resolution automated services ($4 per record) CBA 4/15-4/30 | 4.00 | 11,992.00 |
| 2794 | IVR<br>• IVR PBX solution per record charge of 0.70  4/15-4/30 | 0.70 | 1,955.80 |

| | |
|---|---|
| TOTAL | $13,947.80 |
| PAYMENT | $13,947.80 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10777 |
| TERMS | Net 10 |
| DATE | 05/02/2014 |
| DUE DATE | 05/12/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | |
|---|---|
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10827 |
| TERMS | Due on receip |
| DATE | 05/15/2014 |
| DUE DATE | 05/15/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---:|---|---:|---:|
| 1286 | CBA<br>• ChargeBack resolution automated services ($4 per record) (5-01-14 to 5-15-14) | 4.00 | 5,144.00 |
| 2434 | IVR<br>• IVR PBX solution per record charge of 0.70  (5-01-14 to 5-15-14) | 0.70 | 1,703.80 |

| | |
|---|---:|
| TOTAL | $6,847.80 |
| PAYMENT | $6,847.80 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 10832 |
| TERMS | Net 10 |
| DATE | 05/15/2014 |
| DUE DATE | 05/25/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CallCenter | 18,910.00 | 18,910.00 |

| | |
|---|---|
| TOTAL | $18,910.00 |
| PAYMENT | $18,910.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10845 |
|---|---|---|
| | TERMS | Due on receip |
| | DATE | 06/02/2014 |
| | DUE DATE | 06/02/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---:|---|---:|---:|
| 1197 | CBA<br>• ChargeBack resolution automated services ($4 per record) (5-15-14 to 5-31-14) | 4.00 | 4,788.00 |
| 3307 | IVR<br>• IVR PBX solution per record charge of 0.70  (5-15-14 to 5-31-14) | 0.70 | 2,314.90 |

| | |
|---:|---:|
| TOTAL | $7,102.90 |
| PAYMENT | $7,102.90 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10850 |
| --- | --- | --- |
| | TERMS | Net 10 |
| | DATE | 06/02/2014 |
| | DUE DATE | 06/12/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
| --- | --- | --- | --- |
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | |
| --- | --- |
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas 91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA 91203

| | |
|---|---|
| INVOICE # | 10942 |
| TERMS | Due on receip |
| DATE | 06/16/2014 |
| DUE DATE | 06/16/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | Web<br>• Lime light custom configuration and integration services | 20,800.00 | 20,800.00 |

| | |
|---|---|
| TOTAL | $20,800.00 |
| PAYMENT | $20,800.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| INVOICE # | 10952 |
| TERMS | Due on receip |
| DATE | 07/01/2014 |
| DUE DATE | 07/01/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | |
|---|---|
| TOTAL | $1,875.00 |
| PAYMENT | $1,875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 10962 |
|---|---|---|
| | TERMS | Due on receip |
| | DATE | 07/02/2014 |
| | DUE DATE | 07/02/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1641 | CBA<br>• ChargeBack resolution automated services ($4 per record) (6-15-14 to 6-31-14) | 4.00 | 6,564.00 |
| 2647 | IVR<br>• IVR PBX solution per record charge of 0.70  (6-15-14 to 6-31-14) | 0.70 | 1,852.90 |

| | | |
|---|---|---|
| | TOTAL | $8,416.90 |
| | PAYMENT | $8,416.90 |
| | BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 11054 |
|---|---|---|
| | TERMS | Due on receip |
| | DATE | 07/16/2014 |
| | DUE DATE | 07/16/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---:|---|---:|---:|
| 2604 | CBA<br>• ChargeBack resolution automated services ($4 per record) (7-01-14 to 7-15-14) | 4.00 | 10,416.00 |
| 3572 | IVR<br>• IVR PBX solution per record charge of 0.70  (7-01-14 to 7-15-14) | 0.70 | 2,500.40 |

| | |
|---|---:|
| TOTAL | $12,916.40 |
| PAYMENT | $12,916.40 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11093 |
| TERMS | Due on receip |
| DATE | 08/01/2014 |
| DUE DATE | 08/01/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1471 | CBA<br>• ChargeBack resolution automated services ($4 per record) (7-15-14 to 7-31-14) | 4.00 | 5,884.00 |
| 2198 | IVR<br>• IVR PBX solution per record charge of 0.70  ( 7-15-14 to 7-31-14) | 0.70 | 1,538.60 |

| | |
|---|---|
| TOTAL | $7,422.60 |
| PAYMENT | $7,422.60 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11103 |
| TERMS | Due on receip |
| DATE | 08/18/2014 |
| DUE DATE | 08/18/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---:|---|---:|---:|
| 483 | CBA<br>• ChargeBack resolution automated services ($4 per record) (8-01-14 to 8-15-14) | 4.00 | 1,932.00 |
| 3686 | IVR<br>• IVR PBX solution per record charge of 0.70  ( 8-01-14 to 8-15-14) | 0.70 | 2,580.20 |
| 1 | CC<br>• Lime Light Integration CC Services | 470.65 | 470.65 |

| | |
|---|---:|
| TOTAL | $4,982.85 |
| PAYMENT | $4,982.85 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11198 |
| TERMS | Due on receip |
| DATE | 09/03/2014 |
| DUE DATE | 09/03/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 452 | CBA<br>• ChargeBack resolution automated services ($4 per record) (8-15-14 to 9-01-14) | 4.00 | 1,808.00 |
| 1822 | IVR<br>• IVR PBX solution per record charge of 0.70   (8-15-14 to 9-01-14) | 0.70 | 1,275.40 |

| | |
|---|---|
| TOTAL | $3,083.40 |
| PAYMENT | $3,083.40 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11123 |
| TERMS | Net 10 |
| DATE | 09/01/2014 |
| DUE DATE | 09/11/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 875.00 | 875.00 |

| | |
|---|---|
| TOTAL | $875.00 |
| PAYMENT | $875.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 11234 |
|---|---|---|
| | TERMS | Due on receip |
| | DATE | 09/16/2014 |
| | DUE DATE | 09/16/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 579 | CBA<br>• ChargeBack resolution automated services ($4 per record) (9-01-14 to 9-15-14) | 4.00 | 2,316.00 |
| 652 | IVR<br>• IVR PBX solution per record charge of 0.70   (9-01-14 to 9-15-14) | 0.70 | 456.40 |

| | |
|---|---|
| TOTAL | $2,772.40 |
| PAYMENT | $2,772.40 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11235 |
| TERMS | Due on receip |
| DATE | 10/02/2014 |
| DUE DATE | 10/02/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 513 | CBA<br>• ChargeBack resolution automated services ($4 per record) (9-15-14 to 9-31-14) | 4.00 | 2,052.00 |
| 658 | IVR<br>• IVR PBX solution per record charge of 0.70   (9-15-14 to 9-31-14) | 0.70 | 460.60 |

| | |
|---|---|
| TOTAL | $2,512.60 |
| PAYMENT | $2,512.60 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | INVOICE # | 11236 |
|---|---|---|
| | TERMS | Net 10 |
| | DATE | 10/03/2014 |
| | DUE DATE | 10/13/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 2,635.00 | 2,635.00 |

| | |
|---|---|
| TOTAL | $2,635.00 |
| PAYMENT | $2,635.00 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | | INVOICE # | 11260 |
|---|---|---|---|
| | | TERMS | Net 10 |
| | | DATE | 11/05/2014 |
| | | DUE DATE | 11/15/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 1 | CC<br>• Lime Light Integration CC Services | 1,875.00 | 1,875.00 |

| | | |
|---|---|---|
| TOTAL | | $1,875.00 |
| PAYMENT | | $1,875.00 |
| BALANCE DUE | | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11275 |
| TERMS | Due on receip |
| DATE | 11/17/2014 |
| DUE DATE | 11/17/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 419 | CBA<br>• ChargeBack resolution automated services ($4 per record) (11-01-14 to 11-15-14) | 4.00 | 1,676.00 |
| 2871 | IVR<br>• IVR PBX solution per record charge of 0.70  (11-01-14 to 11-15-14) | 0.70 | 2,009.70 |

| | |
|---|---|
| TOTAL | $3,685.70 |
| PAYMENT | $3,685.70 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11245 |
| TERMS | Due on receip |
| DATE | 10/21/2014 |
| DUE DATE | 11/21/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 395 | CBA<br>• ChargeBack resolution automated services ($4 per record) (10-01-14 to 10-15-14) | 4.00 | 1,580.00 |
| 890 | IVR<br>• IVR PBX solution per record charge of 0.70  (10-01-14 to 10-15-14) | 0.70 | 623.00 |

| | |
|---|---|
| TOTAL | $2,203.00 |
| PAYMENT | $2,203.00 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11276 |
| TERMS | Due on receip |
| DATE | 12/01/2014 |
| DUE DATE | 12/01/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 125 | CBA<br>• ChargeBack resolution automated services ($4 per record) (11-15-14 to 11-30-14) | 4.00 | 500.00 |
| 2212 | IVR<br>• IVR PBX solution per record charge of 0.70  (11-15-14 to 11-30-14) | 0.70 | 1,548.40 |

| | |
|---|---|
| TOTAL | $2,048.40 |
| PAYMENT | $2,048.40 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | | |
|---|---|---|
| INVOICE # | 11256 |
| TERMS | Due on receip |
| DATE | 11/04/2014 |
| DUE DATE | 12/04/2014 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 394 | CBA<br>• ChargeBack resolution automated services ($4 per record) (10-15-14 to 10-31-14) | 4.00 | 1,576.00 |
| 1903 | IVR<br>• IVR PBX solution per record charge of 0.70  (10-15-14 to 10-31-14) | 0.70 | 1,332.10 |

| | |
|---|---|
| TOTAL | $2,908.10 |
| PAYMENT | $2,908.10 |
| BALANCE DUE | $0.00 |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

**BILL TO**
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11301 |
| TERMS | Due on receip |
| DATE | 01/01/2015 |
| DUE DATE | 01/01/2015 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 88 | CBA<br>• ChargeBack resolution automated services ($4 per record) (12-15-14 to 12-31-14) | 4.00 | 352.00 |
| 1159 | IVR<br>• IVR PBX solution per record charge of 0.70  (12-15-14 to 12-31-14) | 0.70 | 811.30 |

| | |
|---|---|
| TOTAL | $1,163.30 |
| PAYMENT | $1,163.30 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| | |
|---|---|
| INVOICE # | 11277 |
| TERMS | Due on receip |
| DATE | 12/22/2014 |
| DUE DATE | 01/22/2015 |

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 211 | CBA<br>• ChargeBack resolution automated services ($4 per record) (12-01-14 to 12-15-14) | 4.00 | 844.00 |
| 1091 | IVR<br>• IVR PBX solution per record charge of 0.70  (12-01-14 to 12-15-14) | 0.70 | 763.70 |

| | |
|---|---|
| TOTAL | $1,607.70 |
| PAYMENT | $1,607.70 |
| BALANCE DUE | **$0.00** |

Secured Merchants, LLC.
5023 North Parkway
Calabasas  91302 US



(800) 976-7027
accounting@securedmerchants.com
www.securedmerchants.com

# Invoice

BILL TO
SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

INVOICE #  11377
TERMS  Net 10
DATE  02/03/2015
DUE DATE  02/13/2015

| QUANTITY | ACTIVITY | RATE | AMOUNT |
|---|---|---|---|
| 120 | CBA<br>• ChargeBack resolution automated services ($7 per record) 1/1/15-1/31/15 | 7.00 | 840.00 |
| 143 | CBA<br>• ChargeBack resolution automated services ($7 per record) 1/1/15-1/31/15 | 7.00 | 1,001.00 |
| 3303 | IVR<br>• IVR PBX solution per record charge of 0.70 1/1/15-1/31/15 | 0.70 | 2,312.10 |

|  |  |
|---|---|
| TOTAL | $4,153.10 |
| PAYMENT | $4,153.10 |
| BALANCE DUE | $0.00 |

EXHIBIT 834

# PROFESSIONAL SERVICE AGREEMENT

This is a Professional Services Agreement (this "Agreement") dated as of January 15, 2015 between Secured Merchants, LLC, a California Limited Liability located at 5023 North Parkway Calabasas, Calabasas, CA 91302 ("Provider") and Big Ventures, Inc., a Nevada corporation located at 5348 Vegas Drive, #906, Las Vegas, NV 89108 ("Client"), whereby Provider shall provide IT professional services to Client in accordance with the terms and conditions set forth below.

**NOW, THEREFORE**, the parties agree as follows:

## 1.    Scope of Services

Provider shall develop technology platforms to Client. In particular, Provider develops platforms in the Customer Relationship Management (CRM), Initial Voice Response (IVR) and Credit Card Chargeback space. Provider shall be available to consult with the officers of Client and its administrative staff concerning matters pertaining to the Services to be rendered by the Provider.

## 2.    Compensation

Assuming satisfactory performance, Client will pay Provider $120,000 for such services.

## 3.    Term, Termination, and Cancellation

This Agreement shall remain in effect from the date of signature through December 15, 2015. Either party may terminate this Agreement by providing no less than thirty (30) days written notice. At the time of such notice of termination, Provider shall complete all work in progress as if such notice of termination had not been given. The services should continue during the thirty (30) day notice period unless Provider and Client agree to end the contract or any specific tasks sooner.

## 4.    Status

Provider agrees that he/she shall at all times during this assignment be considered an independent contractor of Client. Provider shall be free from Client's direction and control. Provider shall be exclusively responsible for the payment of any and all employment and other tax obligations arising out of payments from Client. Provider shall not present himself/herself as an agent, representative or employee of Client to anyone.

In addition, Provider acknowledges that he/she is entitled to no benefits available to Client employees, including but not limited to worker's compensation or unemployment compensation. Provider also acknowledges that he/she is not employed by Client in any other capacity and that he/she shall not hold any other position with Client during the term of this Agreement.

Provider represents and warrants that he/she possesses the requisite experience and expertise to perform this obligation hereunder in accordance with the highest professional standards. In the event that Provider becomes sick, disabled, incapacitated or is otherwise unable to perform his/her assigned duties, Client may, in its sole discretion, terminate this Agreement, suspend this Agreement, or take any other steps it deems appropriate.

## 6.   Confidential Information

During the term of this Agreement and for a period of one year thereafter, Provider shall keep Client information strictly confidential by using the same care and discretion that would be common in the industry.

## 7.   Intellectual Property

All materials developed by Provider for Client will belong exclusively to Client, and will be deemed to have been developed and created by Provider for Client as "work for hire". Provider will execute any and all documents necessary to assign and transfer to Client all intellectual property and other rights in materials and information created for Client pursuant to this Agreement.

## 8.   Conflict of Interest and Commitment

During the term of this Agreement Provider agrees that he/she shall avoid any conflict of interest, including but not limited to any situations in which financial or other personal considerations directly or significantly affect, or have the appearance of directly or significantly affecting her professional duties in carrying out her responsibilities under this Agreement.

## 9.   Indemnification

Provider agrees to comply with all applicable federal, state and local laws in connection with the performance of Provider's obligations under this Agreement. Provider agrees to release Client from any claims, other than breach of contract, arising under this contract. Each party agrees to defend, indemnify and hold harmless the other against any claim, costs, liability, expense, or loss sustained by reason arising from negligent performance of this Agreement.

## 10.   Entire Agreement

This Agreement and the documents incorporated by reference in this Agreement set forth the entire understanding between the parties hereto regarding the subject matter hereof and may not be amended except by an instrument in writing signed by both parties.

## 11.   No Waiver

Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under the Agreement shall operate or be construed as a waiver thereof, not shall any single or partial exercise of any right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence.  No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.


Secured Merchants, LLC                          Big Ventures, Inc.


_____                          _____  3/1/15
Alan Aggaman                                     Brian McMullen

# EXHIBIT 835

# PROFESSIONAL SERVICE AGREEMENT

This is a Professional Services Agreement (this "Agreement") dated as of February 27, 2015 between Secured Merchants, LLC, a California Limited Liability located at 5023 North Parkway Calabasas, Calabasas, CA 91302 ("Provider") and Wealth Group, Inc. a Nevada corporation located at 5348 Vegas Drive, Las Vegas, NV 89106 ("Client"), whereby Provider shall provide IT professional services to Client in accordance with the terms and conditions set forth below.

**NOW, THEREFORE**, the parties agree as follows:

1. **Scope of Services**

Provider shall develop technology platforms to Client.  In particular, Provider develops platforms in the Customer Relationship Management (CRM), Interactive Voice Response (IVR) and Credit Card Chargeback space. Provider shall be available to consult with the officers of Client and its administrative staff concerning matters pertaining to the Services to be rendered by the Provider.

2. **Compensation**

Assuming satisfactory performance, Client will pay Provider $10,000 for such services.

3. **Term, Termination, and Cancellation**

This Agreement shall remain in effect from the date of signature through December 15, 2015.  Either party may terminate this Agreement by providing no less than thirty (30) days written notice.  At the time of such notice of termination, Provider shall complete all work in progress as if such notice of termination had not been given.  The services should continue during the thirty (30) day notice period unless Provider and Client agree to end the contract or any specific tasks sooner.

4. **Status**

Provider agrees that he/she shall at all times during this assignment be considered an independent contractor of Client.  Provider shall be free from Client's direction and control.  Provider shall be exclusively responsible for the payment of any and all employment and other tax obligations arising out of payments from Client. Provider shall not present himself/herself as an agent, representative or employee of Client to anyone.

In addition, Provider acknowledges that he/she is entitled to no benefits available to Client employees, including but not limited to worker's compensation or unemployment compensation.  Provider also acknowledges that he/she is not employed by Client in any other capacity and that he/she shall not hold any other position with Client during the term of this Agreement.

Provider represents and warrants that he/she possesses the requisite experience and expertise to perform this obligation hereunder in accordance with the highest professional standards.  In the event that Provider becomes sick, disabled, incapacitated or is otherwise unable to perform his/her assigned duties, Client may, in its sole discretion, terminate this Agreement, suspend this Agreement, or take any other steps it deems appropriate.

## 6.   Confidential Information

During the term of this Agreement and for a period of one year thereafter, Provider shall keep Client information strictly confidential by using the same care and discretion that would be common in the industry.

## 7.   Intellectual Property

All materials developed by Provider for Client will belong exclusively to Client, and will be deemed to have been developed and created by Provider for Client as "work for hire". Provider will execute any and all documents necessary to assign and transfer to Client all intellectual property and other rights in materials and information created for Client pursuant to this Agreement.

## 8.   Conflict of Interest and Commitment

During the term of this Agreement Provider agrees that he/she shall avoid any conflict of interest, including but not limited to any situations in which financial or other personal considerations directly or significantly affect, or have the appearance of directly or significantly affecting her professional duties in carrying out her responsibilities under this Agreement.

## 9.   Indemnification

Provider agrees to comply with all applicable federal, state and local laws in connection with the performance of Provider's obligations under this Agreement.  Provider agrees to release Client from any claims, other than breach of contract, arising under this contract.  Each party agrees to defend, indemnify and hold harmless the other against any claim, costs, liability, expense, or loss sustained by reason arising from negligent performance of this Agreement.

## 10.   Entire Agreement

This Agreement and the documents incorporated by reference in this Agreement set forth the entire understanding between the parties hereto regarding the subject matter hereof and may not be amended except by an instrument in writing signed by both parties.

## 11.   No Waiver

Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under the Agreement shall operate or be construed as a waiver thereof, not shall any single or partial exercise of any right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence.  No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

Secured Merchants, LLC                    Wealth Group, Inc.

_____                   _____   3/1/15
Alan Argaman                              Brian McMullen

# EXHIBIT 836

# PROFESSIONAL SERVICE AGREEMENT

This is a Professional Services Agreement (this "Agreement") dated as of February 5, 2015 between Secured Merchants, LLC, a California Limited Liability located at 5023 North Parkway Calabasas, Calabasas, CA 91302 ("Provider") and Wealth Vision, Inc., a Nevada corporation located at 8883 W. Flamingo Road, Suite 102, Las Vegas, NV 89147 ("Client"), whereby Provider shall provide IT professional services to Client in accordance with the terms and conditions set forth below.

**NOW, THEREFORE**, the parties agree as follows:

### 1.     Scope of Services

Provider shall develop technology platforms to Client.  In particular, Provider develops platforms in the  Customer Relationship Management (CRM), Initial Voice Response (IVR) and Credit Card Chargeback space. Provider shall be available to consult with the officers of Client and its administrative staff concerning matters pertaining to the Services to be rendered by the Provider.

### 2.     Compensation

Assuming satisfactory performance, Client will pay Provider $120,000 for such services.

### 3.     Term, Termination, and Cancellation

This Agreement shall remain in effect from the date of signature through December 15, 2015.  Either party may terminate this Agreement by providing no less than thirty (30) days written notice.  At the time of such notice of termination, Provider shall complete all work in progress as if such notice of termination had not been given.  The services should continue during the thirty (30) day notice period unless Provider and Client agree to end the contract or any specific tasks sooner.

### 4.     Status

Provider agrees that he/she shall at all times during this assignment be considered an independent contractor of Client.  Provider shall be free from Client's direction and control.  Provider shall be exclusively responsible for the payment of any and all employment and other tax obligations arising out of payments from Client. Provider shall not present himself/herself as an agent, representative or employee of Client to anyone.

In addition, Provider acknowledges that he/she is entitled to no benefits available to Client employees, including but not limited to worker's compensation or unemployment compensation.  Provider also acknowledges that he/she is not employed by Client in any other capacity and that he/she shall not hold any other position with Client during the term of this Agreement.

1

Provider represents and warrants that he/she possesses the requisite experience and expertise to perform this obligation hereunder in accordance with the highest professional standards. In the event that Provider becomes sick, disabled, incapacitated or is otherwise unable to perform his/her assigned duties, Client may, in its sole discretion, terminate this Agreement, suspend this Agreement, or take any other steps it deems appropriate.

## 6.    Confidential Information

During the term of this Agreement and for a period of one year thereafter, Provider shall keep Client information strictly confidential by using the same care and discretion that would be common in the industry.

## 7.    Intellectual Property

All materials developed by Provider for Client will belong exclusively to Client, and will be deemed to have been developed and created by Provider for Client as "work for hire". Provider will execute any and all documents necessary to assign and transfer to Client all intellectual property and other rights in materials and information created for Client pursuant to this Agreement.

## 8.    Conflict of Interest and Commitment

During the term of this Agreement Provider agrees that he/she shall avoid any conflict of interest, including but not limited to any situations in which financial or other personal considerations directly or significantly affect, or have the appearance of directly or significantly affecting her professional duties in carrying out her responsibilities under this Agreement.

## 9.    Indemnification

Provider agrees to comply with all applicable federal, state and local laws in connection with the performance of Provider's obligations under this Agreement. Provider agrees to release Client from any claims, other than breach of contract, arising under this contract. Each party agrees to defend, indemnify and hold harmless the other against any claim, costs, liability, expense, or loss sustained by reason arising from negligent performance of this Agreement.

## 10.    Entire Agreement

This Agreement and the documents incorporated by reference in this Agreement set forth the entire understanding between the parties hereto regarding the subject matter hereof and may not be amended except by an instrument in writing signed by both parties.

## 11.    No Waiver

2

BTA

Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under the Agreement shall operate or be construed as a waiver thereof, not shall any single or partial exercise of any right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence. No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

Secured Merchants, LLC                           Wealth Vision, Inc.


_____                          _____   3/1/15
Alan Argaman                                     Brian McMullen

# EXHIBIT 837

## WORKING CAPITAL INFUSION AGREEMENT

This Agreement is entered into as of March 1, 2015 by and between Chargeback Armor, Inc., a corporation incorporated in the State of California on February 18, 2015 with Corporate Number 3756956 and 1,000 authorized shares (the "Company") and between Secured Merchants, LLC, a California limited liability company located at 23679 Calabasas Road # 531 Calabasas, CA 91302 ("SM").

The parties agree as follows:

1.      **Working Capital Cash Infusion**. SM agrees to provide Chargeback Armor $250,000 in working capital in order to go to market and provide chargeback re-presentment services to clients. The capital must be delivered in one tranche or in multiple tranches but no later than April 1, 2015.

2.      **Compensation for Capital Infusion.** SM will offered equity ownership in the Company. The exact percentage will be determined after four (4) months when the Company has gone to market and better understood the sale cycle and the completion and how much additional capital will be required from outside investors.

3.      **Term and Termination**. The term of this Agreement shall be for a period of one (1) year from the date hereof, and may be renewed by mutual agreement of the parties; provided, however, that this Agreement may be terminated by either party for any reason upon thirty (30) days prior written notice without further obligation or liability.

4.      **Independent Contractor**. SM's relationship with the Company will be that of an independent contractor and not that of an employee. SM will not be eligible for any employee benefits, nor will the Company make deductions from payments made to SM for employment or income taxes, all of which will be SM's responsibility. SM agrees to indemnify and hold the Company harmless from any liability for, or assessment of, any such taxes imposed on the Company by relevant taxing authorities. SM will have no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

5.      **Nondisclosure of Confidential Information**.

(a)     Agreement Not to Disclose.  SM agrees not to use any Confidential Information (as defined below) disclosed to SM by the Company for SM's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. SM shall not disclose or permit disclosure of any Confidential Information of the Company to third parties other than other members of the Company's Board. SM agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. SM further agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information, which may come to SM's attention.

(b)     Definition of Confidential Information.  "Confidential Information" means any information, technical data or know-how (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information does not include information, technical data or know-

how which: (i) is in the possession of SM at the time of disclosure, as shown by SM's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of SM.

(c)     Exceptions. Notwithstanding the above, SM shall not have liability to the Company or any of its subsidiaries with regard to any Confidential Information of the Company which SM can prove:

(i)     is disclosed with the prior written approval of the Company; or

(ii)     is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that SM shall provide prompt notice of such court order or requirement to the Company to enable the Company or its appropriate subsidiary to seek a protective order or otherwise prevent or restrict such disclosure.

6.     **No Rights Granted**. Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant SM any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

7.     **Miscellaneous**. Any term of this Agreement may be amended or waived only with the written consent of the parties. This Agreement, including any exhibits hereto, constitutes the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, 48 hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below, or as subsequently modified by written notice. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

The parties have executed this Agreement as of the date first written above.

ChargeBack Armor, Inc.

Secured Merchants, LLC

Signature:

Signature:

Mike Costache  / CEO

Alan Argaman / Owner

Print Name / Title

Print Name / Title

2

# EXHIBIT 838

*Bus Platinum Privileges*



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

 1.888.BUSINESS (1.888.287.4637)

bankofamerica.com

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CHARGEBACK ARMOR, INC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

Please see the Account Changes section of your statement for details regarding important changes to your account.

# Your Business Fundamentals Checking
# Bus Platinum Privileges

for May 1, 2015 to May 31, 2015                           Account number: 3250 3040 0818

**CHARGEBACK ARMOR, INC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on May 1, 2015 | $164,331.96 | # of deposits/credits: 13 |
| Deposits and other credits | 25,021.16 | # of withdrawals/debits: 40 |
| Withdrawals and other debits | -8,687.07 | # of items-previous cycle[1]: 10 |
| Checks | -30,550.73 | # of days in cycle: 31 |
| Service fees | -10.00 | Average ledger balance: $149,826.21 |
| **Ending balance on May 31, 2015** | **$150,105.32** | [1]Includes checks paid,deposited items&other debits |



# Get easy access to business know-how

Visit our free online community at
**bankofamerica.com/sbc**.

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   May 1, 2015 to May 31, 2015

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**Updating your contact information** - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time.  These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals.  Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

–   Tell us your name and account number.
–   Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
–   Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly.  You are in the best position to discover errors and unauthorized transactions on your account.  If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.  You may also review your activity online or visit a banking center for information.

© 2015 Bank of America Corporation

 Bank of America, N.A. Member FDIC and     Equal Housing Lender



**Your checking account**

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   May 1, 2015 to May 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 05/07/15 | ACH Solutions    DES:8008661881 ID:91457764  INDN:Chargeback Armor, Inc.  CO ID:95-4425010 CCD | 8,699.00 |
| 05/07/15 | BANK OF AMERICA  DES:DEPOSIT    ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXB CCD | 2,460.00 |
| 05/07/15 | Staples, Inc    05/07 #000816684 REFUND Staples, Inc      VAN NUYS      CA | 75.18 |
| 05/08/15 | CHECKCARD  0507 CASCO MEDIA CORP 9787619198   MA 7443106512820082200 | 300.00 |
| 05/11/15 | CHECKCARD  0508 EXPEDIA*1104549590012 EXPEDIA.COM  NV 7469216512800070435 | 34.00 |
| 05/12/15 | BANK OF AMERICA  DES:DEPOSIT    ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXB CCD | 210.00 |
| 05/14/15 | CHECKCARD  0513 CASCO MEDIA CORP 9787619198   MA 7443106513420082250 | 450.00 |
| 05/15/15 | ACH Solutions    DES:8008661881 ID:91462306  INDN:Chargeback Armor, Inc.  CO ID:95-4425010 CCD | 4,670.00 |
| 05/15/15 | Temporary Credit Adjustment on 05/13/15 | 159.98 |
| 05/19/15 | BANK OF AMERICA  DES:DEPOSIT    ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXB CCD | 700.00 |
| 05/21/15 | ACH Solutions    DES:8008661881 ID:91466659  INDN:Chargeback Armor, Inc.  CO ID:95-4425010 CCD | 4,078.00 |
| 05/26/15 | BANK OF AMERICA  DES:DEPOSIT    ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXB CCD | 240.00 |
| 05/29/15 | ACH Solutions    DES:8008661881 ID:91471093  INDN:Chargeback Armor, Inc.  CO ID:95-4425010 CCD | 2,945.00 |
| **Total deposits and other credits** | | **$25,021.16** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 05/01/15 | AMERICAN EXPRESS DES:ACH Pmt    ID:W8430  INDN:CHARGEBACK ARMOR        CO ID:1133133497 WEB | -54.23 |

*continued on the next page*



# Make an impression.
(Without making a dent in your account.)

## 500 business cards $9.99

Visit vistaprint.com and enter **BOFA500** at checkout.

Expires 10.1.15. S & H charges and restrictions apply. See website for details.  |  Vistaprint is a part of Cimpress and its privacy, information security & information sharing practices may be different from those of Bank of America®. Bank assumes no responsibility for customer service, fulfillment or billing. By responding to this offer, you disclose to Vistaprint you are a Bank of America customer.  ARQRND75

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   May 1, 2015 to May 31, 2015

# Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 05/04/15 | BANK OF AMERICA DES:FEE       ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXXB CCD | -27.50 |
| 05/12/15 | ACH Solutions Fe DES:8008661881 ID:91460476  INDN:Chargeback Armor, Inc.  CO ID:95-4425010 CCD | -5.00 |
| 05/14/15 | TRANSFER CHARGEBACK ARMOR, IN:Robert Stayner Confirmation# 2860159508 | -1,250.00 |
| 05/27/15 | TRANSFER CHARGEBACK ARMOR, IN:Robert Stayner Confirmation# 0176075754 | -1,250.00 |

Card account # XXXX XXXX XXXX 2957

| Date | Description | Amount |
|------|-------------|--------|
| 05/04/15 | CHECKCARD  0501 5023 N PARKWAY CALABASA 818-8769638  CA 24755425122121228250448 CKCD 6513 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -100.00 |
| 05/06/15 | CHECKCARD  0505 EXPEDIA*1104549590012 EXPEDIA.COM  NV 24692165125000252126895 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -34.00 |
| 05/07/15 | CHECKCARD  0506 CASCO MEDIA CORP 978-761-9198 MA 24431065127200822900060 CKCD 7829 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -1,500.00 |
| 05/12/15 | CHECKCARD  0510 AMERICAN AI 00175961796 BELLEVUE      WA 24717055131871313710364 CKCD 3001 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -602.20 |
| 05/13/15 | CHECKCARD  0512 CASCO MEDIA CORP 978-761-9198 MA 24431065133200822400139 CKCD 7829 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -1,500.00 |
| 05/14/15 | CHECKCARD  0512 SPIRIT AIRL 48701124103 MIRAMAR      FL 24717055133871335280477 CKCD 3260 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -159.98 |
| 05/14/15 | CHECKCARD  0512 MARMALADE CAFE #11 SHERMAN OAKS CA 24692165133000127745150 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -43.00 |
| 05/14/15 | CHECKCARD  0513 BIG ITZIK GRILL ENCINO        CA 24013395133001370356104 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -94.00 |
| 05/15/15 | CHECKCARD  0513 SPIRIT AIRL 48701124496 MIRAMAR      FL 24717055134871345444286 CKCD 3260 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -178.98 |
| 05/15/15 | CHECKCARD  0514 J2 *METROFAX 888-929-4141 CA 24692165134000639332173 CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.95 |
| 05/15/15 | CHECKCARD  0514 J2 *METROFAX 888-929-4141 CA 24692165134000639332223 CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.95 |
| 05/15/15 | CHECKCARD  0514 J2 *METROFAX 888-929-4141 CA 24692165134000639332272 CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.95 |
| 05/15/15 | CHECKCARD  0514 J2 *METROFAX 888-929-4141 CA 24692165134000639332298 CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.95 |
| 05/15/15 | CHECKCARD  0514 J2 *METROFAX 888-929-4141 CA 24692165134000639332264 CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.95 |
| 05/18/15 | CHECKCARD  0515 SPIRIT AIRL 48701125540 MIRAMAR      FL 24717055136871364888593 CKCD 3260 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -60.00 |
| 05/20/15 | CHECKCARD  0517 AMERICAN AI 00102842495 LOS ANGELES  CA 24717055139871393419219 CKCD 3001 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -25.00 |
| 05/20/15 | CHECKCARD  0518 ACE CAB ORLANDO     FL 24869485139262785750657 CKCD 4121 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -55.98 |
| 05/20/15 | CHECKCARD  0519 INTUIT *QB ONLINE 800-286-6800 CA 24692165139000070952724 RECURRING CKCD 5734 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -21.99 |
| 05/22/15 | CHECKCARD  0521 SQ *MG TRANSPORTATION Orlando      FL 24692165141000871773911 CKCD 4121 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -51.75 |
| 05/22/15 | CHECKCARD  0522 LAX PARKING CURB EXPRE 310-410-9906 CA 24692165142000188373693 CKCD 8999 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -78.98 |
| 05/26/15 | CHECKCARD  0521 AMERICAN AI 00106131654 ORLANDO      FL 24717055142871423497529 CKCD 3001 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -75.00 |

*continued on the next page*

 **Bank of America** 

<span style="color:red">**Your checking account**</span>

**CHARGEBACK ARMOR, INC  |  Account # 3250 3040 0818  |  May 1, 2015 to May 31, 2015**

## Withdrawals and other debits - continued

| Date | Description | | Amount |
|------|-------------|---|-------|
| 05/26/15 | CHECKCARD  0521 CARIBE ROYALE RESORT SU ORLANDO CKCD 7011 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | FL 24210735142200710200918 | -620.05 |
| 05/26/15 | CHECKCARD  0521 CARIBE ROYALE RESORT SU ORLANDO CKCD 7011 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | FL 24210735142200710200900 | -584.86 |
| 05/26/15 | CHECKCARD  0521 CARIBE ROYALE RESORT SU ORLANDO CKCD 7011 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | FL 24210735142200710203029 | -10.00 |
| 05/26/15 | CHECKCARD  0523 J2 *METROFAX 888-929-4141 CA 24692165143000919139891 RECURRING CKCD 5968 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | | -31.80 |
| 05/29/15 | CHECKCARD  0528 IR EVENTS GROUP 650-6222200 CA 24436545149006958815364 CKCD 7399 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | | -75.00 |
| **Subtotal for card account # XXXX XXXX XXXX 2957** | | | **-$5,942.32** |
| <span style="color:red">Card account # XXXX XXXX XXXX 9607</span> | | | |
| 05/05/15 | Staples, Inc   05/05 #000057610 PURCHASE Staples, Inc     VAN NUYS     CA | | -106.82 |
| 05/06/15 | JETRO HOLDINGS  05/06 #000498025 PURCHASE JETRO HOLDINGS LL  VAN NUYS      CA | | -51.20 |
| **Subtotal for card account # XXXX XXXX XXXX 9607** | | | **-$158.02** |
| **Total withdrawals and other debits** | | | **-$8,687.07** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| 05/01/15 | 5026 | -2,125.00 | | 05/06/15 | 5031 | -1,200.00 |
| 05/01/15 | 5027 | -225.73 | | 05/15/15 | 5032 | -3,000.00 |
| 05/01/15 | 5030* | -14,000.00 | | 05/15/15 | 5033 | -10,000.00 |
| | | | | **Total checks** | | **-$30,550.73** |
| | | | | **Total # of checks** | | **6** |

*  There is a gap in sequential check numbers

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 04/30/15:

At least one of the following occurred

- ✓ $250+ in net new purchases on a linked Business debit card
- ◯ $250+ in net new purchases on a linked Business credit card
- ✓ $3,000+ minimum daily balance in primary checking account
- ✓ $5,000+ average monthly balance in primary checking account
- ✓ $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

*continued on the next page*

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   May 1, 2015 to May 31, 2015**

## Service fees - continued

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 05/15/15 | ONLINE BUSINESS SUITE NEXT DAY PAYMENT | -10.00 |
| **Total service fees** | | **-$10.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 05/01 | 147,927.00 | 05/12 | 156,078.46 | 05/20 | 145,619.76 |
| 05/04 | 147,799.50 | 05/13 | 154,578.46 | 05/21 | 149,697.76 |
| 05/05 | 147,692.68 | 05/14 | 153,481.48 | 05/22 | 149,567.03 |
| 05/06 | 146,407.48 | 05/15 | 145,082.73 | 05/26 | 148,485.32 |
| 05/07 | 156,141.66 | 05/18 | 145,022.73 | 05/27 | 147,235.32 |
| 05/08 | 156,441.66 | 05/19 | 145,722.73 | 05/29 | 150,105.32 |
| 05/11 | 156,475.66 | | | | |

 To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.

## Account Changes

At Bank of America, we're committed to keeping you up-to-date on any changes that may impact your banking accounts.

**We want to keep you informed about important changes coming to your checking account starting July 6, 2015.**
Today when you use your debit card to pay for a purchase, the merchant asks us to authorize a transaction amount. We typically place a hold on your account for the transaction amount authorized, which reduces the available balance in your account. For some travel related transactions, holds are not placed because the merchant's request is an estimate. However, starting July 6, 2015, when you use your debit card to pay for a purchase, we will place a hold on your account for the full amount requested by the merchant, even if the amount requested is an estimate, and reduce your available balance by the amount requested.

If the request authorization appears to be an estimate, the transaction detail for your account in Online Banking may show, "Amount may change – waiting for final amount from merchant." If the final transaction amount ends up being different than the amount we authorized, your account balance will be adjusted when we receive the final transaction amount.

We're pleased to serve your financial needs. If you have any questions regarding this change, please call the number listed on this statement or visit bankofamerica.com/locator to find a banking center nearest you.

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   May 1, 2015 – May 31, 2015

This page intentionally left blank

*Bus Platinum Privileges*



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

🖥 bankofamerica.com

✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CHARGEBACK ARMOR, INC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

# Your Business Fundamentals Checking
# Bus Platinum Privileges

for April 1, 2015 to April 30, 2015

Account number: 3250 3040 0818

**CHARGEBACK ARMOR, INC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on April 1, 2015 | $221,122.57 | # of deposits/credits: 0 |
| Deposits and other credits | 0.00 | # of withdrawals/debits: 32 |
| Withdrawals and other debits | -8,755.61 | # of items-previous cycle¹: 5 |
| Checks | -48,025.00 | # of days in cycle: 30 |
| Service fees | -10.00 | Average ledger balance: $178,026.07 |
| **Ending balance on April 30, 2015** | **$164,331.96** | ¹Includes checks paid,deposited items&other debits |

# Learn to tap the power of social media

Marketing through social media can work in ways traditional marketing can't. Check out our **Social Media Infographic** at the Bank of America Small Business Community to learn more about Facebook, Twitter, Pinterest, Instagram and LinkedIn.

Visit **bankofamerica.com/sbc**.

    

Bank of America and the Bank of America logo are registered trademarks of the Bank of America Corporation. All other trademarks are the property of their respective owners.
Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.   ARCLYQGK  I  SSM-12-14-0219.B

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   April 1, 2015 to April 30, 2015

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

– Tell us your name and account number.
– Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
– Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled. You may also review your activity online or visit a banking center for information.

© 2015 Bank of America Corporation



Bank of America, N.A. Member FDIC and   Equal Housing Lender



**Your checking account**

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   April 1, 2015 to April 30, 2015

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 04/01/15 | TRANSFER CHARGEBACK ARMOR, IN:Robert Stayner Confirmation# 1692110724 | -1,250.00 |
| 04/02/15 | BANK OF AMERICA  DES:FEE      ID:372392414887  INDN:CHARGEBACK ARMOR INC    CO ID:XXXXXXXXXB CCD | -116.00 |
| 04/13/15 | TRANSFER CHARGEBACK ARMOR, IN:Robert Stayner Confirmation# 1692888323 | -1,250.00 |
| 04/13/15 | TRANSFER CHARGEBACK ARMOR, IN:Trigen LLC Confirmation# 0292889694 | -3,000.00 |
| 04/28/15 | TRANSFER CHARGEBACK ARMOR, IN:Robert Stayner Confirmation# 1625800782 | -1,250.00 |

**Card account # XXXX XXXX XXXX 2957**

| Date | Description | Amount |
|------|-------------|--------|
| 04/01/15 | CHECKCARD  0330 ELECTRONIC TRANSACTIONS 202-8282635  DC 2430137509011800010019 CKCD 8699 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -950.00 |
| 04/01/15 | CHECKCARD  0330 THE PRINTING HOUSE 818-3800380  CA 24257815090900011500082 CKCD 7338 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -172.22 |
| 04/01/15 | CHECKCARD  0331 STARBUCKS #05649 SAN FR San FranciscoCA 24692165090000849776005 CKCD 5814 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.60 |
| 04/02/15 | CHECKCARD  0401 SIDECAR 415-745-5553 CA 24492155092637000700968 RECURRING CKCD 4111 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -25.00 |
| 04/02/15 | CHECKCARD  0401 LYFT TUE AT 0923AM 855-280-0278 CA 24492155091637006463430 RECURRING CKCD 4789 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -33.18 |
| 04/02/15 | CHECKCARD  0401 5023 N PARKWAY CALABASA 818-8769638  CA 24755425092120927548942 CKCD 6513 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -100.00 |
| 04/03/15 | CHECKCARD  0403 LAX PARKING CURB EXPRE 310-410-9906 CA 24692165093000059964520 CKCD 8999 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -39.49 |
| 04/03/15 | CHECKCARD  0402 LYFT WED AT 1152AM 855-280-0278 CA 24492155092637002626476 RECURRING CKCD 4789 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -17.83 |
| 04/06/15 | CHECKCARD  0402 CHEESECAKE FACTORY #141 GLENDALE    CA 24610435093072010237417 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -160.00 |
| 04/08/15 | CHECKCARD  0406 JERRY'S WOODLAND HILLS WOODLAND HILLCA 24761975097118275010102 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -38.00 |
| 04/20/15 | CHECKCARD  0419 INTUIT *QB ONLINE 800-286-6800 CA 24692165109000846682304 RECURRING CKCD 5734 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -21.99 |
| 04/23/15 | CHECKCARD  0422 ACE PARKING LOT #1151 SAN DIEGO    CA 24493985113200745400578 CKCD 7523 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -26.00 |
| 04/24/15 | CHECKCARD  0422 RESPONSE EXPO 617-219-8300 MA 24431055113206784926032 CKCD 7399 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -100.00 |

*continued on the next page*



You've helped make America what it is

**Celebrate National Small Business Week.** During the entire month of May, we'll be honoring America's 23 million small businesses. Check out the following at **bankofamerica.com/sbc**:

- **Our Small Business Owner Report** — read about small business issues and perspectives

- **Bank of America Small Business Community** — share insights with other business owners

AR6G7Q4M  I  SSM-12-14-0249.B

CHARGEBACK ARMOR, INC  |  Account # 3250 3040 0818  |  April 1, 2015 to April 30, 2015

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 04/27/15 | CHECKCARD  0426 TAVERIVA TONY MALIBU      CA 24431065117207588601024 CKCD 5812 XXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -84.00 |
| 04/28/15 | CHECKCARD  0427 76 10093052 LOS ANGELES  CA 24015175117002626407083 CKCD 5542 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -65.52 |
| 04/29/15 | CHECKCARD  0428 SQ *TEL AVIV GRILL Los Angeles  CA 24692165118000049843579 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -48.78 |
| **Subtotal for card account # XXXX XXXX XXXX 2957** | | **-$1,889.61** |
| **Total withdrawals and other debits** | | **-$8,755.61** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| 04/09/15 | 5013 | -1,000.00 | | 04/21/15 | 5018 | -500.00 |
| 04/09/15 | 5014 | -2,125.00 | | 04/01/15 | 5020* | -1,250.00 |
| 04/01/15 | 5015 | -3,000.00 | | 04/01/15 | 5021 | -12,000.00 |
| 04/01/15 | 5016 | -12,000.00 | | 04/21/15 | 5025* | -10,000.00 |
| 04/01/15 | 5017 | -3,150.00 | | 04/28/15 | 5029* | -3,000.00 |
| | | | | **Total checks** | | **-$48,025.00** |
| | | | | **Total # of checks** | | **10** |

*  There is a gap in sequential check numbers

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 03/31/15:

At least one of the following occurred

- ☑ $250+ in net new purchases on a linked Business debit card
- ○ $250+ in net new purchases on a linked Business credit card
- ○ $3,000+ minimum daily balance in primary checking account
- ☑ $5,000+ average monthly balance in primary checking account
- ☑ $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 04/02/15 | ONLINE BUSINESS SUITE NEXT DAY PAYMENT | -10.00 |
| **Total service fees** | | **-$10.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 04/01 | 187,342.75 | 04/02 | 187,058.57 | 04/03 | 187,001.25 |

continued on the next page



**Your checking account**

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   April 1, 2015 to April 30, 2015**

## Daily ledger balances - continued

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|-----------|------|-------------|
| 04/06 | 186,841.25 | 04/20 | 179,406.26 | 04/27 | 168,696.26 |
| 04/08 | 186,803.25 | 04/21 | 168,906.26 | 04/28 | 164,380.74 |
| 04/09 | 183,678.25 | 04/23 | 168,880.26 | 04/29 | 164,331.96 |
| 04/13 | 179,428.25 | 04/24 | 168,780.26 | | |

 To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.

**CHARGEBACK ARMOR, INC**   |   **Account # 3250 3040 0818**   |   **April 1, 2015 — April 30, 2015**

This page intentionally left blank

BUSINESS  PLATINUM  PRIVILEGES™

# Congratulations! You have qualified for our business rewards and recognition program.

As one of our high-balance customers, you have automatically qualified for the **Business Platinum PrivilegesTM** program1 because you maintain a combined balance of $50,000 or more in business deposit accounts with Bank of America and you have a small business checking account. This complimentary program, which comes at no cost to you, includes the following extra benefits:

- **A higher level of service with the Priority Service Team** — dedicated small business telephone banking representatives empowered to answer your questions quickly and efficiently

- **No minimum balance requirement on business savings** with the Platinum Business Interest MaximizerTM account2 — and you'll pay no monthly maintenance fee

- **Reduced rates** when you open a new business line of credit3

- **Access to Merrill Edge® investment and retirement services,** designed to meet the unique needs of small businesses — plus, get up to $600 when you open and fund a Merrill Edge Business Investor Account4

## Learn more about the Business Platinum Privileges program today.

Visit **bankofamerica.com/businessplatinum** or stop by **your local banking center.**

Call **888.BUSINESS** (888.287.4637) to speak with our dedicated Priority Service Team.

**Note:**  When calling our dedicated customer service specialists, please have your Access ID/PIN or your Bank of America account number on hand to verify your account.





Investment products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
| --- | --- | --- |

*(Please see reverse for important disclosures.)*

**Addendum to:**

**Business Schedule of Fees (Effective September 10, 2012)**

This Addendum supplements the Business Schedule of Fees. Please retain this document for your records. For purposes of this Addendum, "you" and "your" means the corporation, unincorporated association, limited liability company, limited liability partnership, partnership, sole proprietorship, or other entity holding a business account (other than a Commercial account) with Bank of America in any capacity other than an individual capacity.

**Business Platinum Privileges™**

You automatically qualify for the Business Platinum Privileges program when you maintain a combined balance of $50,000 or more in eligible business deposit accounts with Bank of America, and you have an open Business Fundamentals® checking, Business Interest checking or Business Advantage checking account with Bank of America. The combined balance requirement is calculated based on the average daily balance for the month in your Bank of America business deposit account(s), and applies only when the owner of the business checking account and the owner of the other eligible deposit account(s) share the same Taxpayer Identification Number (TIN). Public service trust accounts, such as IOLTA accounts, are not counted toward the combined balance. Your enrollment in Business Platinum Privileges becomes effective in the month following the month in which you qualify. Some Business Platinum Privileges benefits are automatic; other benefits may require you to open a new account or take other action. Read carefully the terms of any Business Platinum Privileges offer to understand the action required.

The benefits of the Business Platinum Privileges program will be described to you separately. We may change or terminate Business Platinum Privileges program rules or benefits at any time, without prior notice. Your enrollment in Business Platinum Privileges will discontinue if you do not qualify during a calendar quarter, and you do not restore your qualification during the following calendar quarter. You will be considered not qualified during a calendar quarter if neither your average daily balance for the quarter nor your quarter-end balance satisfy the combined balance requirement, or you do not have an open, eligible business checking account with Bank of America as of the end of the quarter.

For Merrill Lynch Wealth Management clients, your eligible combined balances will be reviewed annually to ensure you continue to qualify for benefits. Your enrollment in Business Platinum Privileges will discontinue if you do not qualify at the annual review, and you do not restore your qualification within a 90-day period. You will be considered not to qualify at the annual review if your average daily balance for the prior 12 months did not satisfy the combined balance requirement, or you do not have an open eligible business checking account with Bank of America at the end of such year. The annual review will be conducted as of June 30 of each year. In the event that your enrollment is discontinued, your Business Platinum Privileges benefits may be discontinued immediately without further notice. If you have defaulted on a business credit account with Bank of America or its affiliates, we may exclude you from eligibility for Business Platinum Privileges. If you are enrolled in Business Platinum Privileges and you default under a business credit account with Bank of America or its affiliates, we may immediately discontinue your enrollment in Business Platinum Privileges. You will be considered for re-enrollment after 12 months. Review for defaults will be conducted monthly.

1  Please see the above Business Platinum Privileges Addendum to your Business Schedule of Fees.

2  New Business Platinum Privileges™ customers at point of sale will be eligible to open up a Platinum Business Interest Maximizer™ savings account immediately, but will be enrolled officially in the program the following month. Other benefits will activate upon enrollment. The Platinum Business Interest Maximizer™ account is only available on request to customers enrolled in the Business Platinum Privileges program, or whose opening balance qualifies them for the Business Platinum Privileges program. Limit of one Platinum Business Interest Maximizer™ account may be opened per customer. Your enrollment in Business Platinum Privileges will not automatically convert any existing or new money market savings account to a Platinum Business Interest Maximizer™ without your request. See the enclosed Business Platinum Privileges Addendum for a description of the requirements for enrollment in Business Platinum Privileges. If your enrollment in the Business Platinum Privileges program is discontinued, your Platinum Business Interest Maximizer™ account will automatically convert to a Business Interest Maximizer™ account and the interest rate and fees for that subsequent account will apply.

3  Credit is subject to approval; normal credit standards apply. Credit is issued by Bank of America, N.A.

4  To qualify for this cash offer, you must open a Merrill Edge® Business Investor Account ("BIA") and fund the account within 45 days with funds originating from outside Merrill Lynch and Bank of America. The balance must be held in the account for a minimum of 90 consecutive days following the funding date. For purposes of this offer, qualifying balance shall mean total incoming assets or transfers (including cash, securities and/or margin debit balance transfers) from external accounts, minus assets withdrawn or transferred out of the account within the 90 day holding period. The cash reward will be paid out as follows: $20,000-$49,999, receive $100; for $50,000-$99,999, receive $150 for $100,000-$199,999, receive $250; for $200,000 or more, receive $600. The reward will be paid within two weeks after meeting the qualifying criteria. Depending on your particular circumstances, the value of this reward you receive may constitute taxable income. In addition, Merrill Lynch may issue an Internal Revenue Service Form 1099 (or other appropriate form) to you that reflects the value of such reward. Please consult your tax advisor. Merrill Edge reserves the right to change or cancel this offer at any time. Merrill Edge does not provide legal or tax advice.

The offering of cash rewards, free trades, waiver of fees (including account fees), and/or any other thing of value may not be used as an inducement to sell any kind of insurance, including life insurance or annuities.

Some Merrill Edge® benefits may be available to customers with less than $50,000 in investable assets. Please speak with a Financial Solutions Advisor for more information about Merrill Edge®.

Merrill Edge is available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), and consists of the Merrill Edge Advisory Center (investment guidance) and self-directed online investing.

MLPF&S is a registered broker-dealer, member SIPC and a wholly owned subsidiary of Bank of America Corporation.

Banking products are provided by Bank of America, N.A., and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation.

Business Platinum Privileges is a trademark and Business Fundamentals, Bank of America and the Bank of America logo are registered trademarks of Bank of America Corporation. Merrill Edge® and Platinum Business Interest Maximizer™ are trademarks of Bank of America Corporation

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.   AR6BYTNL | SSM-02-15-0548.D



P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

1.888.BUSINESS (1.888.287.4637)

bankofamerica.com

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CHARGEBACK ARMOR, INC
5023 PARKWAY CALABASAS
CALABASAS, CA  91302-1421

# Your Business Fundamentals Checking

for March 1, 2015 to March 31, 2015           Account number: 3250 3040 0818

**CHARGEBACK ARMOR, INC**

## Account summary

| | |
|---|---|
| Beginning balance on March 1, 2015 | $200.00 |
| Deposits and other credits | 251,020.20 |
| Withdrawals and other debits | -6,023.63 |
| Checks | -24,000.00 |
| Service fees | -74.00 |
| **Ending balance on March 31, 2015** | **$221,122.57** |

# of deposits/credits: 4

# of withdrawals/debits: 18

# of items-previous cycle[1]: 0

# of days in cycle: 31

Average ledger balance: $103,754.01

[1]Includes checks paid,deposited items&other debits



Retirement could last longer than you might think

For 5 strategies to help you avoid outliving your savings, visit **merrilledge.com/5-strategies**

MERRILL EDGE
Bank of America Corporation

Merrill Edge® is available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), and consists of the Merrill Edge Advisory Center™ (investment guidance) and self-directed online investing. MLPF&S is a registered broker-dealer, member SIPC and a wholly owned subsidiary of Bank of America Corporation. Merrill Lynch, Merrill Edge, the Merrill Edge logo, and Merrill Edge Advisory Center are trademarks of Bank of America Corporation.

ARJB3CX9

Investment products: | **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value**

**CHARGEBACK ARMOR, INC**   |   **Account # 3250 3040 0818**   |   **March 1, 2015 to March 31, 2015**

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**Updating your contact information** - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time.  These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals.  Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

  – Tell us your name and account number.
  – Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
  – Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly.  You are in the best position to discover errors and unauthorized transactions on your account.  If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.  You may also review your activity online or visit a banking center for information.

© 2015 Bank of America Corporation

 Bank of America, N.A. Member FDIC and   Equal Housing Lender

 **Bank of America**

<span style="color:red">**Your checking account**</span>

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015**

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 03/17/15 | WFB DIRECTPAY   DES:DEPOSIT   ID:DPXXXXXXXXX INDN:CHARGEBACK ARMOR INC   CO ID:BIZEDP    CCD PMT INFO:SECURED MERCHANTS LLC ACCOUNTS | 100,000.00 |
| 03/19/15 | BKOFAMERICA ATM 03/19 #000001192 DEPOSIT BALBOA-PARTHENIA   NORTHRIDGE   CA | 150,000.00 |
| 03/20/15 | CHECK ORDER FEE REFUND | 74.00 |
| 03/31/15 | CHECKCARD 0328 JETBLUE    27976169183 BELLEVUE    WA 7473309508924690015 | 946.20 |
| **Total deposits and other credits** | | **$251,020.20** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 03/18/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3892 INDN:CHARGEBACK ARMOR      CO ID:1133133497 WEB | -300.00 |
| 03/23/15 | AMERICAN EXPRESS DES:ACH Pmt   ID:W3754 INDN:CHARGEBACK ARMOR      CO ID:1133133497 WEB | -2,647.37 |

<span style="color:red">Card account # XXXX XXXX XXXX 2957</span>

| Date | Description | Amount |
|------|-------------|--------|
| 03/25/15 | CHECKCARD  0324 JOS A BANK #830 LOS ANGELES  CA 24492155084698830010010 CKCD 5611 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -65.07 |
| 03/26/15 | CHECKCARD  0325 FEDEXOFFICE   00025015 WOODLAND HILLCA 24164075084069100350014 CKCD 7338 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.49 |
| 03/27/15 | CHECKCARD  0325 IN-N-OUT BURGER #265 SIGNAL HILL  CA 24445005085100413542901 CKCD 5814 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -19.51 |
| 03/27/15 | CHECKCARD  0326 SQ *TEL AVIV GRILL Los Angeles  CA 24692165085000521906950 CKCD 5812 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -30.36 |
| 03/30/15 | CHECKCARD  0327 EXPEDIA*1101460429163 EXPEDIA.COM  NV 24692165086000765260931 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -161.73 |
| 03/30/15 | CHECKCARD  0326 UNITED     01676167448 800-932-2732 TX 24692165086000931895024 CKCD 3000 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -426.20 |
| 03/30/15 | CHECKCARD  0328 JETBLUE    27976169183 BELLEVUE    WA 24733095088246900172436 CKCD 3174 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -946.20 |
| 03/30/15 | CHECKCARD  0329 EXPEDIA*1101601279821 EXPEDIA.COM  NV 24692165088000737461573 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -373.54 |
| 03/31/15 | CHECKCARD  0330 EXPEDIA*1101651740547 EXPEDIA.COM  NV 24692165089000178879803 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -7.00 |

*continued on the next page*



# Get easy access to business know-how

Visit our free online community at **bankofamerica.com/sbc**.

## The Bank of America Small Business Community

- Get the latest insights on how fellow business owners run and grow their businesses
- Search our extensive library for business topics that interest you
- Connect with other business owners

Bank of America, N.A. Member FDIC. ©2015 Bank of America Corporation.
AR4L4LV9 | AD-11-14-0062.B

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 03/31/15 | CHECKCARD  0329 AMERICAN AI 00176169447 BELLEVUE     WA 24717055089870893079796 CKCD 3001 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -633.20 |
| 03/31/15 | CHECKCARD  0330 LA SOSTA GASTRONOMIA MANHATTAN BEACA 2401339508900283861374 CKCD 5499 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -151.00 |
| 03/31/15 | CHECKCARD  0330 EXPEDIA*1101686211769 EXPEDIA.COM  NV 24692165089000179214125 CKCD 4722 XXXXXXXXXXXX2957 XXXX XXXX XXXX 2957 | -242.96 |
| **Subtotal for card account # XXXX XXXX XXXX 2957** | | **-$3,076.26** |
| **Total withdrawals and other debits** | | **-$6,023.63** |

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| 03/19/15 | 5010 | -3,000.00 | | 03/24/15 | 5012 | -20,000.00 |
| 03/24/15 | 5011 | -1,000.00 | | | | |
| | | | | **Total checks** | | **-$24,000.00** |
| | | | | **Total # of checks** | | **3** |

## Service fees

Based upon the activity below, the monthly fee on your Business Fundamentals checking account was waived for the statement period ending 02/27/15:

At least one of the following occurred

○  $250+ in net new purchases on a linked Business debit card

○  $250+ in net new purchases on a linked Business credit card

○  $3,000+ minimum daily balance in primary checking account

○  $5,000+ average monthly balance in primary checking account

○  $15,000+ combined average monthly balance in linked business accounts

A check mark indicates that you have qualified for a monthly fee waiver on the account based on your usage of these products or services.  For information on how to open a new product or to link an existing service to your account please call 1-888-BUSINESS or visit bankofamerica.com/smallbusiness.

| Date | Transaction description | Amount |
|------|-------------------------|--------|
| 03/19/15 | CHECK ORDER00318 DES:FEE        ID: PMT INFO: PRODUCT(S): 55.36        S&H: 12.53     CA TAX: 6.11 | -74.00 |
| **Total service fees** | | **-$74.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 03/01 | 200.00 | 03/20 | 246,900.00 | 03/26 | 223,168.07 |
| 03/17 | 100,200.00 | 03/23 | 244,252.63 | 03/27 | 223,118.20 |
| 03/18 | 99,900.00 | 03/24 | 223,252.63 | 03/30 | 221,210.53 |
| 03/19 | 246,826.00 | 03/25 | 223,187.56 | 03/31 | 221,122.57 |

 **Your checking account**

**CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015**

☑ To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.

CHARGEBACK ARMOR, INC   |   Account # 3250 3040 0818   |   March 1, 2015 to March 31, 2015

This page intentionally left blank

# EXHIBIT 839

| From: | Avico Global <avicoglobal@gmail.com> |
|---|---|
| Sent: | Friday, June 1, 2012 10:29 PM |
| To: | Victor Azal <victor@bunzaimedia.com> |
| Cc: | Paul Medina <paul@bunzaimedia.com>; Alon N <alon@bunzaimedia.com> |
| Subject: | Re: Important: IP's for Rackspace Plesk Server |

Hi Victor,

You have approximately 30 dedicated IPs and the majority of them don't need to be dedicated.
All the ones that are not live or do not have SSL cert associated to them should be on a shared IP not dedicasted.
By optimizing the IPs we should have many free IPs for future use.

The problem is that an IP justification form needs to be filled out as IP dont just get issued without a valid reason.
If all the current IPs will be justified then there is no problem getting more. These is being enforced by ARIN who controls all the IPs.

Call me so we can maximize the IP allocation and get you set up

Avi

On Fri, Jun 1, 2012 at 3:02 PM, Victor Azal <victor@bunzaimedia.com> wrote:

Avi,

I am on a deadline for creating a store to be exclusive for Ventura Blvd Magazine which we will be featured in their next issue.
In order to create this store I need a IP addresses on the plesk server.

This is important to finish ASAP.

Please add at least 5 new IP's to the Plesk server.

--
**Best Regards**

Victor Azal
**Director of Design**
**www.BunzaiMedia.com**
Skype: AzalVictor | Mobile: 1.818.284.8129

