David C. Shonka
Acting General Counsel
DAMA J. BROWN
Regional Director
REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND** |

PLAINTIFF'S OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 1 | |

**BUNZAI MEDIA GROUP, INC.,**
*et al.*

                **Defendants.**

**CALENERGY, INC.'S MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. Introduction .................................................................4

II. Legal Argument...........................................................5

   A. Corporate Defendant CalEnergy, Inc.'s Integral Role in the Scheme
      Demands Injunctive Relief and Joint and Several Monetary Liability..........5

       1. CalEnergy's Ownership Role .................................7

       2. CalEnergy's Role as Financial Intermediary.................8

   B. Individual Defendant Latsanovski Meets the Legal Threshold for Injunctive
      Relief and Joint and Several Monetary Liability. .........................9

       1. Defendant Latsanovski was an Owner and Controlling Officer of
          Several Entities Central to the Scheme, Including Bunzai Media
          Group .................................................12

       2. A Mass of Evidence, Including Latsanovski's Own Emails,
          Establish His Central Participatory Role in the Common
          Enterprise. ...........................................15

       3. The Evidence Confirms Defendant Latsanovski's Knowledge of
          the Common Enterprise's Deception...........................18

III. The Preliminary Injunction and Asset Freeze Should Remain Unchanged.....20

   A. Defendant Latsanovski's Liability Extends to the Full Damages the
      Common Enterprise Caused.........................................20

   B. The FTC Need Not Trace Assets to the Illegal Conduct. ...........................21

   C. The Latsanovski, Aleksandrovna, and Klykov Declarations Fail to
      Challenge the Asset Freeze. .......................................22

   D. Evidence in the Case and Defendants' Past Indiscretions Demonstrate a
      High Risk that Defendants Will Dissipate Assets.......................26

IV. Conclusion...............................................................27

1

# TABLE OF AUTHORITIES

2

3

**Cases**

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ...............................................6

*FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)...................................7

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) ........................11

*FTC v. Certified Merch. Serv. LTD*, 4:02-cv-00044-PNB (E.D. Tex. 2002).........21

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .......................... 4, 21

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ..................5, 6

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) ...............21

*FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013)
............................................................................................................................ 6, 10

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000)........... 9, 21

*FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).........9

*FTC v. J.K. Publs., Inc.*, CV 99-00044 ABC (AJWx), 2009 U.S. Dist. LEXIS
36885, *15 (C.D. Cal. April 13, 2009)................................................................22

*FTC v. JK Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Ca. 2000) ......................5

*FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 WL 4348304, *10 (D.
Utah Sept. 16, 2011) ...........................................................................................10

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)...........6

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)...................6, 11

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). .... 9, 11

*FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991)..........................................11

*FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) ...........................................21

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ...10

*FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008) .........7

*FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13
(N.D. Ga. Sept. 30, 1997) ...................................................................................10

*FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997) ........9

*SEC v. Banner Fund Int'l*, 341 U.S. App. D.C. 175, 211 F.3d 602, 617 (D.C. Cir.
2000) ....................................................................................................................22

18

19

20

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

# I.       Introduction.

This case concerns a deceptive scheme that has defrauded consumers of more than $75 million. Defendant Latsanovski was an integral financer and manager of the scheme and was actively involved in its operations. His company, Defendant CalEnergy, Inc. ("CalEnergy," and, together with Defendant Latsanovski, "Defendants"), played a similarly vital role funding the scheme and overseeing operational and marketing aspects of the common enterprise. As his sole defense to the FTC's charges, Latsanovski argues that this Court should hold him harmless for his involvement because he claims that he himself was merely a "silent" investor while his company, CalEnergy, was merely an investment vehicle. In his version of the facts, neither he nor the company participated in the scheme, but the evidence tells a different story. The evidence, including Latsanovski's own words, make plain that he participated in the scam and that his claims to the contrary are patently false.

Latsanovski argues he never interacted with consumers or directly sold the product to consumers to further their scheme, which is true. But in a $75 million Internet-based common-enterprise scam, not everyone answers the telephones. And while each member of the common enterprise had their own role, they are all liable under the law for the full amount of consumer redress. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016). The evidence in this case

establishes that both Defendants were significant cogs in an intricate machine—a

machine in large part designed by Defendant Latsanovski alongside the other

Individual Defendants—that was used to confound consumers, regulators, and

payment processors and that Defendants should thus be held to account for the

harms their scheme brought to consumers.

This Opposition Brief will first address CalEnergy itself and then will move

to Latsanovski's larger role in the scheme. These discussions will demonstrate that

Defendants should be subject to full injunctive and monetary liability the law

provides and that their Motion for Summary Judgment should be denied

accordingly. This Brief will then address Defendants' re-raising of the issue of the

asset freeze to which Defendant Latsanovski is subject and will similarly

demonstrate that Defendants' arguments are without merit and that the asset

freeze should remain unchanged.

## II.  Legal Argument.

### A.  *Corporate Defendant CalEnergy, Inc.'s Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability*

CalEnergy's central role in the scheme demands its designation as part of

the common enterprise responsible for the AuraVie scam. Where, as here,

Corporate Defendants act as a common enterprise, each may be held jointly and

severally liable for the unlawful acts and practices of the other. *FTC v. Grant*

*Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) ; *FTC v. JK*

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1 | *Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Ca. 2000) . "To determine

2 | whether a common enterprise exists, the Court considers factors such as:

3 | 'common control; the sharing of office space and officers; transacting business

4 | through a maze of interrelated companies; the commingling of corporate funds

5 | and failure to maintain separation of companies; unified advertising; and evidence

6 | that reveals that no real distinction exists between the corporate defendants.'"

7 | *Grant Connect*, 827 F. Supp. 2d, at 1216 (quoting *FTC v. Nat'l Urological Grp.,*

8 | *Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)); *see also FTC v. Ivy Capital,*

9 | *Inc.,* No. 11-283, 2013 WL 1224613 at *13 (D. Nev. Mar. 26, 2013) (common

10 | enterprise existed where there was common control, shared office space,

11 | interrelated activity, and commingled funds).

12 | When determining whether a common enterprise exists, "the pattern and

13 | frame-work of the whole enterprise must be taken into consideration." *Del. Watch*

14 | *Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable

15 | because it was part of a "maze of interrelated companies"). The Ninth Circuit has

16 | also held that "entities constitute a common enterprise when they exhibit either

17 | vertical or horizontal commonality – qualities that may be demonstrated by a

18 | showing of strongly interdependent economic interests or the pooling of assets

19 | and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir.

20 | 2010)

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

Contrary to Defendants' arguments, CalEnergy was an integral member of the common enterprise that acted as both (1) an owner and controller of other entities involved in the scheme and (2) a financial intermediary for the enterprise that funded areas ranging from marketing to order fulfillment. Other courts have recognized that "[i]t is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an 'unholy' alliance." *FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)(citing *FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)) .

## 1. CalEnergy's Ownership Role

The company's own documentary evidence reveals that CalEnergy was in fact a primary owner of at least two entities central to the common enterprise. An organizational chart titled "Calenergy Chart" provided to Defendant Latsanovski regarding his management position at CalEnergy lists Defendant Latsanovski as the "President" of Calenergy and further provides that he supervised operations of Defendants Pinnacle Logistics, Inc. and Media Urge, Inc., which were subsidiaries of CalEnergy. Ex. 561-3. Both of these entities were central to the scheme's operations: Pinnacle Logistics was the entity responsible for order fulfillment, UF

1  #10(a);[1] Ex. 67, while Media Urge, Inc. managed the scheme's deceptive

2  advertising campaigns. UF #19.

3        This same email contained a Management Services Agreement between

4  CalEnergy and Pinnacle Logistics, Inc., in which CalEnergy agreed to provide

5  "management and consulting services" to Pinnacle Logistics. UF #36(e); *see*

6  Exhibit 561. These documents confirm the information CalEnergy provided on its

7  own website: as a screen shot of the company's website confirms, CalEnergy

8  listed Media Urge and Pinnacle Logistics as two of its management companies.

9  CalEnergy's website further noted that Pinnacle Logistics was serving AuraVie as

10  a client by "providing storage and warehousing services." Ex. 908-4.

### 3.  CalEnergy's Role as Financial Intermediary

11

12        Despite Defendants' claims that CalEnergy was "solely [a] lender[] to

13  Bunzai," Dkt. 360, at 18, CalEnergy was an integrated and integral financial

14  intermediary. The funds it characterizes as "lending" were in fact only initially a

15  true capital investment by Defendant Latsanovski, quickly becoming money

16  transfers consisting of the ill-gotten gains derived from the AuraVie scheme. *See*

17  Dkt. 121-1, at 3. In fact, CalEnergy served as one of the two primary entities that

18  collected revenues from Auravie's web of merchant accounts that Defendants

19

20

---

[1] For the purposes of this Opposition Brief, citation references to "UF #[x]" refer to the Plaintiff's Statement of Uncontroverted Facts & Conclusions of Law In Support of Its Motion for Summary Judgment, Dkt. 353-2.

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT
8

used to deceive payment processors. Upon receiving those funds, CalEnergy passed the revenues on to Defendant Latsanovski and Focus Media Solutions, Inc. to pay for advertising. *See id*.

These financial transfers were critical to the scheme's daily function. By Defendant Latsanovski's own testimony, CalEnergy's financing was essential to allowing the AuraVie companies to maintain business. *See* Dkt. #106-2, at 30. Indeed, the linchpin of the common enterprise was CalEnergy's provision of adequate funds to carry out their business. Accordingly, CalEnergy should be held jointly and severally liable for the full amount of injury inflicted on consumers nationwide.[2]

### B.   Individual Defendant Latsanovski Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability.

Like his company CalEnergy, Defendant Latsanovski's role in the scheme merits full injunctive and monetary liability. Individuals are subject to injunctive relief for a company's deceptive acts or practices when they either: (1) "participated directly in the acts or practices;" or (2) "had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). "Participation" can include an individual working at and drawing a salary from the

---

[2] *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Wolf*, 1997-1 Trade Cas. (CCH) ¶ 71,713, at 79,080 (S.D. Fla. 1997).

company, even if the individual is not involved in day-to-day operations. *See, e.g.,* *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000). Moreover, where an officer participates in "acts crucial to the success" of an enterprise, the officer has directly participated for the purposes of individual liability. *Id.* In *J.K. Publications*, for instance, the court held liable a corporate officer who had obtained merchant accounts and purchased a database of consumers for the corporate defendant. *Id.*

Individuals are also liable for injunctive relief if they had "authority to control" the corporation, which can be inferred from "'active involvement in business affairs and the making of corporate policy.'" *J.K. Publications*, 99 F. Supp. at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).An individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *Id.* at 1204. Indeed, a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority."[3]

---

[3] *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 WL 1224613, *14 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ("An individual's status as a

To obtain equitable monetary relief against an individual, the FTC must show, in addition to one of the two factors above, that the individual had some knowledge of the company's deceptive acts or practices. *J.K. Publications,* 99 F. Supp. at 1204.Individuals possess the requisite knowledge if they: (1) had actual knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.[4] The "degree of participation in business affairs is probative of knowledge."[5] The FTC is not required to prove an individual intended to deceive to establish knowledge.[6]

Here, Defendant Latsanovski meets the threshold of both ownership and participation, and the weight of the evidence demonstrates that he meets the knowledge required for joint and several monetary liability. As a result, this Court

corporate officer gives rise to the presumption of ability to control a small, closely-held corporation."); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.").

[4] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

[5] *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[6] *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

should hold him fully liable for the enterprise's wrongs, and Defendants' Motion for Summary Judgment should be denied.

>    **1.    *Defendant Latsanovski was an Owner and Controlling Officer of Several Entities Central to the Scheme, Including Bunzai Media Group***

Alongside CalEnergy, Defendant Latsanovski owned and controlled several entities involved in the scheme, starting with BunZai Media Group, Inc. Latsanovski attempts to contest this relationship with BunZai by telling a tale of several eschewed, close-but-not-quite-consummated opportunities for him to become an owner in Bunzai Media Group that never fully developed. *See* Dkt. 360, at 16-18. His story is contradicted not only by documents he executed but also by the testimony of his co-conspirators. Regarding his own testimony, Defendant Latsanovski repeatedly asserted to state and federal agencies before this lawsuit was filed that BunZai Media Group was his employer. He previously swore under oath that the company was his employer, UF #36(g), and that he held an officer's position in the company. Dkt. 106, at 6.

Documentary evidence including business correspondence and emails confirm Defendant Latsanovski's ownership role in the common enterprise and in BunZai Media specifically. UF #36(q). First, evidence contradicts the claim made by Latsanovski, that he never became an actual partner of the enterprise under the March 2011 Partnership Agreement. *See* Dkt. 360, at 16-18. BunZai Media

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1   Group, Inc.'s certified public accountant, David Davidian, circulated corporate

2   structure charts on at least two occasions long after the March 2011 Partnership

3   Agreement was executed—one in December 2011, Ex. 522, and the other in

4   March 2012, Ex. 302—where the "Shareholder(s)" for BunZai Media Group, Inc.

5   are listed as "Alon, Igor, Chris." Moreover, in a payroll spreadsheet for September

6   2011, Defendant Latsanovski is listed as an "Executive" alongside Defendants

7   Alon Nottea and Kristopher Bond. Ex. 451. And during this period, Defendant

8   Latsanovski provided his business partners with his opinion on who should lead

9   various departments of their company and, demonstrating keen knowledge of their

10   activities, he evaluated the relative strengths and weaknesses of various

11   employees. UF #36(q).

12         This documentary evidence is further supported by testimony of other

13   Defendants and employees of the common enterprise. A former employee of

14   BunZai testified that Defendant Latsanovski received and reviewed monthly

15   accounting reports for BunZai, while Doron Nottea and Motti Nottea stated that

16   Latsanovski was an owner of BunZai. UF #36(a); 36(d). Defendant Latsanovski's

17   status as a partner in the AuraVie companies was further corroborated by

18   Defendant Khristopher Bond, who stated that Alon Nottea and Latsanovski, were

19   his partners in the AuraVie companies. Dkt. 92, at 4 ¶ 7.

20         Moreover, Defendant Latsanovski's ownership and controlling interests do

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

not end with CalEnergy, Inc. and BunZai Media Group, Inc. In an August 2013 email, Latsanovski described his plan for the future of the AuraVie companies and his own role within it. Writing to Defendants Alon and Doron Nottea, Latsanovski described the leadership and growth of Pinnacle Logistics, Inc., which he described as "our company," as well as the roles he thought employees such as Roi Reuveni and David Midgal should serve. UF #36(q). He then went on to tell the Notteas that they should "concentrate[] our efforts on the opening of new businesses and the[ir] further management." *Id.*

Defendant Latsanovski took his own advice to heart, using his role at CalEnergy to control Pinnacle Logistics, Inc. along with Media Urge, Inc.—two entities central to the common enterprise's day-to-day business operations. Defendant Latsanovski also incorporated and owned one of the shell merchant account entities the scheme used to deceive payment processors: Zen Mobile Media, Inc. UF #36(o). Although Latsanovski contends he had nothing to do with Defendant Zen Mobile Media and that he incorporated it (and created its merchant account) only as a favor, he fails to address why this company paid thousands on his American Express credit card bills,[7] much less how he had nothing to do with Zen Mobile Media when the AuraVie merchant accounts were such a constant

---

[7] *See* Ex. 92-1, at 16 ¶24. Importantly, Latsanovski failed to note these payments in his brief or include them in his profit calculations. *See* Dkt. 106 at 9; 106-5, at 5 ¶13.

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1   source of communication between himself and Defendant Nottea.

2          All told, Defendant Latsanovski's ownership and controlling interests in

3   BunZai (the central entity), CalEnergy (management and financial

4   intermediation), Pinnacle Logistics (order fulfillment), Media Urge (advertising),

5   and Zen Mobile Media (holding a merchant account) ran the gamut of the

6   operations needed to execute the AuraVie scheme. They reveal that the supposed

7   "silent investor" was in fact been a key player in the enterprise.

8          ### 2.   *A Mass of Evidence, Including Latsanovski's Own Emails, Establish His Central Participatory Role in the Common Enterprise.*

9

10         Aside from his ownership in the common enterprise, Latsanovski's

11   participation in, control over, and knowledge of the deceptive scheme was more

12   pervasive even than his extensive ownership interests. This fact is demonstrated

13   by emails he exchanged with other participants in the common enterprise and

14   other evidence ranging from others' testimony to financial spreadsheets that he

15   personally edited. His participation primarily related to three critical areas for the

16   scheme: (1) structuring the enterprise; (2) overseeing the financial performance,

17   advertising, and business operations of the enterprise; and (3) providing expertise

18   relating to managing high-risk credit card processing accounts.

19         Regarding structuring the business, an email from August 2014—more than

20   three years after the alleged abandonment of the executed 2011 BunZai

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

Partnership Agreement—shows Defendant Latsanovski making business decisions concerning structural and operational aspects of companies within the common enterprise. Ex. 21. These discussions included employee staffing decisions and how to manage the business's needs in areas such as "plants and Call-centers" while leaving higher level "intellectual labor" to Alon Nottea and himself. *Id*. He signed the email, "Your sincere partner Igor." *Id*. Similarly for CalEnergy, Defendant Latsanovski owned and managed CalEnergy, where Defendant Latsanovski described himself to the US Citizenship and Immigration Services as "reviewing the activities and providing guidance to managed companies" such as Media Urge, Inc. and Pinnacle Logistics, Inc. UF #36(h).

Defendant Latsanovski's management of operational concerns is confirmed by testimony of various Defendants and former employees involved in the common enterprise. Defendant Alon Nottea included Defendant Latsanovski in an email from Nottea's BunZai email account where he asked a third party if the person "had a chance to think about our corporate structure discussion . . . When would be a good time for Igor and I to see you and make some final decisions?" Ex. 425. He was consistently apprised of the enterprise's financial performance and business relationships, and he typically engaged employees in full reviews of this data to identify ways to improve efficiency. For example, former employee Yalley testified that Latsanovski sat next to her and review profit and loss

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

16

statements for the enterprise. Likewise, Defendant Medina testified that he had discussions concerning sales and affiliates with him. UF #36(l). Defendant Latsanovski even reviewed and edited profit and loss spreadsheets containing sales and chargeback information for the common enterprise. UF #36(i)(i).

Regarding the scheme's advertising campaigns, Defendant Latsanovski reviewed and proofread advertising used outside the United States and helped coordinate the scheme's deceptive marketing campaigns as it expanded internationally. UF #36(i)(iv). He was even apprised of low-level contractual disputes relating to advertising: for example, when a model accused the company of using her image in its advertising without compensation or permission. Ex. 276.

Finally, Defendant Latsanovski's experience with payment processors and merchant accounts was critical to the success of the common enterprise. Aside from himself incorporating one of the shell merchant entities, Zen Mobile Media, Inc., UF#36(a), 36(o), he was consulted regarding the enterprise's excess chargebacks, high-risk merchant accounting, and load balancing. UF #36(m). He used this information to gain a sense for the business's future needs and sought to provide his expertise to the enterprise's employees that were actively managing the deceptive use of the merchant accounts. For example, in an email to one employee, he asked a series of questions such as "How many re-bills" and "how many charge backs (for each affiliate and what period charge[)]"; he finishes this

email asking "about our industry or what you think we need know" and, more tellingly: "what kind of help do you need from me[?]" Such interactions go far beyond the role Defendant Latsanovski characterizes as "solely [a] lender[] to defendant Bunzai." Ex. 549.

Thus Defendant Latsanovski's role in the common enterprise went far beyond the "silent investor" charade that he maintains, instead extending into many aspects of the common enterprise from high-level structuring to day-to-day proofreading of advertising copy. Indeed, as he wrote in the above-discussed August 2014 email to Defendant Alon Nottea: "Directors, the people who can not just perform, but also to make decisions and in addition whom we trust and know their capabilities. . . .Who we have: You, Paul, Roy, Andre and David and me a little, that's all!" UF #36(q).

### 3. *The Evidence Confirms Defendant Latsanovski's Knowledge of the Common Enterprise's Deception.*

With such pervasive ownership and management responsibilities in the scheme, Defendant Latsanovski can hardly deny knowledge of the fraud he was helping to perpetrate. Latsanovski knew or consciously avoided knowledge of his companies' illegal business practices. In emails, Latsanovski demonstrated a keen understanding of the company's business model, its issues with chargebacks, its related entities, and its employees. UF #36(j) and (l). The documentary and

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT
18

testamentary evidence speak for themselves: He was consistently provided updates from the other Individual Defendants concerning the common enterprise and in fact specifically inquired into company chargeback rates in his email correspondence. UF #36(l) and (m). He was often at the Corporate Defendants' business premises, UF #36(i)(ix), where he discussed chargebacks with Defendant Alon Nottea. UF #36(l)(iii). He reviewed the company's books with employees and demonstrated a comprehensive knowledge of the financial workings and performance of the enterprise. UF #36(i). He edited and emailed a spreadsheet containing sales, revenue, and chargeback information and periodically discussed and reviewed sales data with employees. UF #36(i)(i). Indeed, there were few operational areas of the scheme where he was not only constantly apprised but also directly participated.

Further, Latsanovski's claim that he was unaware of Defendants' attempts to deceive consumers, banks, and law enforcement is not credible. Latsanovski has expertise in the payment-processing industry, and owned at least one merchant service provider. *See* Dkt. 90-1. In his emails, he discussed and was apprised of the companies' issues with compliance. UF #36(m). The evidence thus shows Latsanovski acted with full knowledge of the deception.

In fact, the evidence shows that Latsanovski was well advised of the risky conduct his businesses engaged in. In April 2013, Latsanovski's partner, co-

Defendant Alon Nottea, shared with Latsanovski notice from one of their payment processors that the companies could be subject to suit by the FTC:

> In the event of an FTC closure they will freeze our reserves on your accounts immediately. We have had this happen in the past with Mortgage modification accounts on our books. So our exposure over the ensuing 18 months could be as high as $ 18 million dollars or as low as $ 6 million. Ex. 23.

This email, from a UMS banking representative to Alon Nottea, rejected a request that the bank reduce the company's reserve account requirements on the basis the company was considered too high risk:

> I have to protect UMS based on the nature and risk of the business in front of us, the current nature of the industry and the regulatory scrutiny and the current chargeback/return ratios. One of your accounts is already on the Excessive Chargeback Program. *Id.*

> No matter how much I may like you, personally, I can not allow that to influence good business judgement. *Id.*

Despite these warning signs, Latsanovski claims to have had been unaware of any illegal activity by his companies. Such assertions are absurd, hardly the credible behavior of a millionaire investor, and this Court need not believe them. This evidence demonstrates actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.

**III.   The Preliminary Injunction and Asset Freeze Should Remain**

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

20

**Unchanged.**

    **A.**    ***Defendant Latsanovski's Liability Extends to the Full Damages the Common Enterprise Caused.***

Equity requires that Latsanovski and his alter ego, CalEnergy, be held jointly and severally liable for the full amount of consumer injury. Although Defendant Latsanovski caused over $75 million in consumer injury and readily admits to infusing the AuraVie companies with capital to keep it afloat to do so, he claims that his liability exposure should be limited to his profits.[8] Defendant Latsanovski requests that he be allowed to walk away from over $75 million in consumer injury that he caused while returning, at most, $317,746 of the profits he admits to receiving from the scheme. Such a result would be inequitable. But existing authority establishes Defendant Latsanovski's liability is measured by the ill-gotten gains or consumer harm caused by the entire common enterprise,[9] not

---

[8] Latsanovski claims to have only received $317,746 from his scam. Dkt. 360 at 24. This estimate greatly understates his profits. In addition to the profits Defendant Latsanovski admits CalEnergy received, Defendant Latsanovski is also a partner in BunZai Media Group, Inc., which bilked consumers of over $17 million, and an owner of Zen Mobile Media Group, Inc., which took in $8.4 million from consumers.

[9] *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ("Defendants held jointly and severally liable for payment of restitution are liable for the unjust gains the defendants collectively received, even if that amount exceeds (as it usually will) what any one defendant pocketed from the unlawful scheme.").

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1  his individual profits.[10] "Equity may require a defendant to restore his victims to

2  the status quo where the loss suffered is greater than the defendant's unjust

3  enrichment." *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).

4  **B.    The FTC Need Not Trace Assets to the Illegal Conduct.**

5       The Court enjoys broad equitable authority and may freeze Defendants'

6  assets regardless of whether the assets can be traced to the alleged fraudulent

7  activity.[11] In *FTC v. J.K. Publs., Inc.*, the court noted that "[t]he applicability of

8  joint and several liability is entirely inconsistent with the proposition that

9  traceability is required." *FTC v. J.K. Publs., Inc.*, CV 99-00044 ABC (AJWx),

10  2009 U.S. Dist. LEXIS 36885, *15 (C.D. Cal. April 13, 2009). The Court further

11  concluded that a traceability requirement would lead to "absurd results": "'Under

12  [that] approach, for example, a defendant who was careful to spend all the

13  proceeds of his fraudulent scheme, while husbanding his other assets, would be

14

15  _____

16  [10] As Defendants conceded previously, "'courts have often awarded restitution in the full amount of funds lost [where] equity may require a defendant to restore."

17  Dkt. 90, at 13 (quoting *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010)).

18  [11] *FTC v. Certified Merch. Serv. LTD*, 4:02-cv-00044-PNB (E.D. Tex. 2002) ("The Court is of the opinion that in exercising its discretion over the issuance and

19  the scope of the preliminary injunction, it should ensure that adequate funds are available for redress to the merchants harmed by Defendants' alleged fraudulent

20  acts. Therefore, all assets of Defendants should remain frozen, regardless of whether the assets can be traced to the alleged fraudulent activity.")

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

immune from an order of disgorgement.'"[12] It would be inequitable for

Latsanovski to be able to retain assets he claims are not directly traceable to the

AuraVie companies while dissipating his ill-gotten gains out of the reach of this

Court.

### C.   The Latsanovski, Aleksandrovna, and Klykov Declarations Fail to Challenge the Asset Freeze.

In their Motion for Summary Judgment, Defendants are attempting—for the

third time[13]— to reopen the asset freeze by ushering in the two new witnesses and

some additional facts relating to the assets seized. These attempts are unavailing.

Defendants filed two declarations supporting their Motion for Summary Judgment

that attempt to cast assets subject to the asset freeze as improperly restricted. This

last-minute attempt to provide previously undisclosed evidence relating to the

origin of Defendant Latsanovski's Sunset Holding Partners, LLC fail for three

reasons: (1) that in any event, two of these declarations should be disregarded by

the Court because Defendants did not disclose the witnesses during the discovery

period, and Defendant Latsanovski's own introduction of evidence relating to a

third party's interest should be similarly disregarded; (2) even assuming the

veracity of these new declarations, the assets in question still fall under the

---

[12] J.*K. Publs., Inc.*, 2009 U.S. Dist. LEXIS 36885, *15 (*quoting SEC v. Banner Fund Int'l*, 341 U.S. App. D.C. 175, 211 F.3d 602, 617 (D.C. Cir. 2000)).

[13] Defendant Latsanovski previously raised this same issue unsuccessfully in an *Ex Parte* Application (Dkt. #91) and in his opposition to the preliminary injunction. Dkt. #106.

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

definition of "owned" "Assets" under the Preliminary Injunction and are thus still subject to the freeze; and (3) again assuming the veracity of these new declarations, the assets in question qualify for many definitions of "controlled" "Assets" that are subject to the asset freeze.

First, even if these declarations did not fail by their own terms to undermine the asset freeze, the declarations themselves are objectionable and improper because Defendants failed to disclose them in a timely manner. The discovery period's witness disclosures ended March 4, 2016, and Defendants failed to disclose Mariya Aleksandrovna, Lawrence Rubin, or Ilia Klykov had disclosed their alleged relationships with Defendants before the filing of Defendants' Motion for Summary Judgment.

Second, even assuming the veracity of the allegations made by the declarants, the assets in question would still fall under the purview of the Court's asset freeze and should remain frozen under at least two provisions of the freeze. Under the Preliminary Injunction, "Asset" is defined to mean "any *legal or equitable* right, title, interest or claim to any item of economic value." Dkt. 200, at 5 (emphasis added). This definition applies to the assets described in all three declarations, and for this reason Defendants' claims regarding Ilia Klykov, Maria Aleksandrovna, and Lawrence Rubin fail.

Mr. Klykov's assertions relating to all of his business dealings involving

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

24

Defendant Latsanovski openly admit to Defendant Latsanovski maintaining legal ownership of all assets involved, with Mr. Klykov retaining equitable ownership. *See* Dkt. 357, at 3. Regarding Guayas, Ltd. itself, the management agreement between the parties specifies that Defendant Latsanovski become the "mandate shareholder" holding "one hundred percent (100%) membership in his company," thus leaving Defendant Latsanovski in both legal ownership and actual control of the entity itself. Regarding the Guayas-CalEnergy Agreement, by its own terms Sunset Holdings, LLC was "established under the supervision of Igor Latsanovski." Dkt. 357, at ¶5. Moreover, the Guayas-CalEnergy Agreement contemplates legal ownership by Defendants CalEnergy and Latsanovski and for CalEnergy to "use" the funds provided. *Id.*

Declarant Mariya Aleksandrovna's claims are similarly unavailing. Under the terms stated in her declaration and in the accompanying documentation, she merely provided an unsecured credit facility for Defendant Latsanovski. *See* Dkt. 358, at ¶4-5. When Defendant Latsanovski received the funds under the agreement, he then gained both beneficial and legal ownership of the funds she provided him. She still retains the debt obligation owed to her by Defendant Latsanovski—a contract that by its terms is freely assignable by Ms. Alexandrovna and may be sold off at her discretion. But while that contract and debt obligation are not subject to the asset freeze, the funds Defendant

Latsanovski now owns and controls unquestionably are subject to it. The claims Defendant Latsanovski makes on behalf of Lawrence Rubin are similarly unavailing for similar reasons: that Mr. Rubin retains his debt obligation, but the ownership of the funds he provided were transferred to Defendant Latsanovski for him to ultimately dispose of as he saw appropriate—whether acting under the terms of the two parties' agreement or choosing to deploy the funds in some other manner. The most any of these three parties have demonstrated is that they may have a contractual claim against Defendant Latsanovski—a fact that even if true does not affect the asset freeze or whether Defendant Latsanovski owned or controlled the funds provided to him.

Finally, the asset freeze covers all Assets that were "controlled by, or held for the benefit of, any Defendant, directly or indirectly," as well as "in the actual or constructive possession of" or "indirectly owned, managed, or controlled by" any Defendant. Dkt. 200, at 14. Here, as discussed above, both declarants Klykov and Alexandrovna assert facts where Defendant Latsanovski and CalEnergy, Inc. were in unquestioned control of the assets being provided them. As such, the assets in question remain under the clear purview of the asset freeze and should remain subject to it.

### D. Evidence in the Case and Defendants' Past Indiscretions Demonstrate a High Risk that Defendants Will Dissipate Assets.

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

Both the Defendants' actions in the AuraVie scheme and their actions after the Preliminary Injunction suggest that Defendants are likely to dissipate unfrozen assets. Regarding AuraVie, by the time of the initial asset freeze, Defendants had already moved much of the proceeds from their scam overseas, and Defendant Latsanovski appeared to have been fundamental in dissipating the AuraVie companies' assets abroad. Numerous emails show Latsanovski applying for, assisting others in applying for, or managing foreign bank accounts and payment processing accounts in countries such as Israel, UF #34(g)(xiii), and Cyprus, UF #36(i).

Moreover, Defendant Latsanovski has already blatantly violated one stipulated asset release in an attempt to funnel more funds from those being held for redressing his role in the AuraVie scam. As the Receiver explained in her Report, "[i]n violation of the express terms of the Stipulation agreed to . . . Defendant Latsanovski then instructed [Wells Fargo] to disburse $900,000 . . . instead of $707,000 as agreed to by the parties." Dkt. 120, at 54. Even after he was made aware of his "mistake," Defendant Latsanovski, "[r]ather than correct the mistake . . . instructed Parkfield Escrow to close on the purchase." *Id*. Such an episode demonstrates the risks associated with releasing any assets subject to the asset freeze: if Defendant Latsanovski has already resorted to such tactics to alienate restricted assets, the risk that he will immediately dissipate any unfrozen

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1    assets is very high. Therefore, the asset freeze should remain in place.

2    **IV.**    **Conclusion**

3        For the forgoing reasons, the FTC respectfully requests that the Court deny

4    Defendants' Motion for Summary Judgment as it relates to both monetary liability

5    and any change to the terms of the standing preliminary injunction and asset

6    freeze.

7            Respectfully submitted,

8

9    Dated: 5/2/16          /s/ ZACHARY A. KELLER_____

10                      ZACHARY A. KELLER
                       REID A. TEPFER

11                      LUIS H. GALLEGOS
                       Attorneys for the Plaintiff

12                      Federal Trade Commission
                       1999 Bryan Street, Suite 2150

13                      Dallas, Texas 75201
                       (214) 979-9395 (Tepfer)

14                      (214) 979-9383 (Gallegos)
                       (214) 953-3079 (facsimile)

15                      rtepfer@ftc.gov
                       lgallegos@ftc.gov

16

17

18

19

20

## CERTIFICATE OF SERVICE

1

2        The undersigned certifies that on May 2, 2015, a true and correct copy of
the foregoing document was electronically filed with the clerk of the U.S. District
3   Court, Central District of California, using the electronic case filing system of the
court. The attorneys listed below were served by pursuant to the ECF notice
4   generated by the Court, or by email.

5   Erik S Syverson                     Costa Mesa, CA 92626
Raines Feldman LLP                  Telephone: (714) 641-3600 Ext. 214
6   9720 Wilshire Boulevard Fifth Floor  *Counsel for Igor Latsanovski and*
Beverly Hills, CA 90212             *CalEnergy, Inc*
7   esyverson@raineslaw.com
*Counsel for Oz Mizrahi*
8                                       Sagar Parikh
Beverly Hills Law Corp. PC
Robert M. Ungar                     433 N. Camden Drive, 6th Floor
9   Crosswind Law                       Beverly Hills, CA 90210
14724 Ventura Blvd Penthouse        SP@BeverlyHillsLawCorp.com
10  Sherman Oaks, CA 91403              *Attorney for Paul Medina, Secured*
rmu@crosswindlaw.com                *Merchants, LLC,*
11  *Counsel for Alon Nottea and*      *and Chargeback Armor, Inc.*
*Roi Rueveni*
12                                      Charlene Cantrell Koonce
Robert Esensten                     Receiver
13  Esensten Law                        Scheef & Stone
12100 Wilshire Blvd., Suite 1660    500 N. Akard, Suite 2700
14  Los Angeles, CA 90025               Dallas, Texas 75201
resensten@esenstenlaw.com           charlene.koonce@solidcounsel.com
15  *Counsel for Doron Nottea and Motti* *Receiver*
*Nottea*
16                                      Kelly M. Crawford
Jeffrey Benice                      Scheef and Stone
17  Law Offices of Jeffrey S. Benice    500 N. Akard, Suite 2700
A Professional Law Corporation      Dallas, Texas 75201
18  3080 Bristol Street                 kelly.crawford@solidcounsel.com
Sixth Floor, Suite 630              *Counsel to Receiver*

19

20                                      /S/ REID TEPFER

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT

1          REID TEPFER

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

OPPOSITION TO DEFENDANTS IGOR LATSANOVSKI AND
CALENERGY, INC.'S  MOTION FOR SUMMARY JUDGMENT
2