David C. Shonka
Acting General Counsel
DAMA J. BROWN
Regional Director
REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND** |

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

**BUNZAI MEDIA GROUP, INC.,**
*et al.*

2                    **Defendants.**

**CHARGEBACK ARMOR,
INC.'S MOTION FOR
SUMMARY JUDGMENT**

3

4

5                    **TABLE OF CONTENTS**

6    I.    Introduction ................................................................3

7    II.   Legal Argument. ........................................................5

8          A. Corporate Defendant SM's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability ................................5

           1. SM's Place in the Common Enterprise ........................................6

9          2.  SM's Role in the Common Enterprise was Central to the Scheme's Capital Structure and Finances. ...................................................13

10         B. Corporate Defendant CBA's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability ..........................16

11

           C. Individual Defendant Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability. ...........................20

12

13         1. Defendant Argaman's Management and Participation in the Common Enterprise was Critical to the Scheme's Success. .......................22

14         2.  The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception. .................................................25

15   III.   Conclusion ..................................................................26

16

17

18

19

20

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ...................................................................................17

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ............................................6

*FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)................................6

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) ................. 22, 27

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ...............................4

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ......................5

*FTC v. Holiday Enterp*, 2008 WL 953358, * 12 (N.D. Ga. Feb. 5, 2008).............17

*FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1009 (N.D. Cal. 2010*), aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) ......................................................................17

*FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013) ..................................................................................... 6, 16, 17, 21

*FTC v. JK Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Ca. 2000) ............... 5, 20

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)...........6

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)............ 6, 22, 27

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) ... 20, 22

*FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).......................................22

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000) ...................................................................................................17

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ...... 17, 21

*FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008) .........6

*FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ................................................................................21

*Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) .................21

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    Introduction

This case concerns a deceptive scheme that has defrauded consumers of more than $75 million. Defendant Argaman was a principal member in the scheme and was actively involved in its operations. His affiliated companies, Defendants Secured Merchants, LLC ("SM") and Chargeback Armor, Inc. ("CBA," and, together with Defendants Argaman and SM, "Defendants"), as well as his other company Defendant Secured Commerce, LLC, played a similarly critical role for the larger enterprise, allowing it to evade detection of credit card processors and stymie complaining consumers with abusive tactics.

In response to the FTC's charges, Defendant Argaman presents his varied roles in the scheme, along with those of the other Defendants, as a collection of half-measures, each in some way aiding the enterprise but never crossing the line to aiding illegality. Defendant Argaman admits to designing the enterprise's website, but only for a "straight-sale" version that involved legitimate sales. He admits to aiding in their chargeback abuses, but only as an arms-length contractor. He admits to allowing his co-conspirators to control his corporations' bank accounts, bookkeeping, and employee records, but only because these co-conspirators were longtime friends; incidentally, basic friendship also motivated his sharing office space with the scheme. Each of the many roles he played in the scheme he simply qualifies with a "yes, but" that Defendants apparently hope will

4

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

allow them to escape liability for their wrongs.

Unsurprisingly, the evidence tells a different, yet more plausible, story. Instead of half-measures, Defendant Argaman and the other two Defendants were not only participants in the AuraVie scheme but were also central players in critical areas for the enterprise's success. As such, although Defendants argue that this Court should hold them without fault in this massive swindle, this Court should instead deny their Motion for Summary Judgment and impose injunctive and monetary liability. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016).

This Opposition Brief will first address SM and CBA respectively to establish their roles in the scheme—SM as a member of the common enterprise and CBA as a relief defendant in the scheme—and consequent liability; it will then move to the role of Defendant Argaman, whose wrongs included not only those of SM and CBA but also his own further participation in the scheme.[1] These facts demonstrate that Defendants should be subject to full injunctive and monetary liability and that their Motion for Summary Judgment should be denied.

## II.   Legal Argument.
### A.   *Corporate Defendant SM's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability*

---

[1] This Opposition will not address Defendants' concerns voiced in their Motion for Summary Judgment relating to Bates Number citations provided in Plaintiff's discovery responses. These complaints were the first notice Plaintiff has received regarding this issue and are not proper for the summary judgment process.

5

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    SM's central role in the scheme demands its designation as part of the

2    common enterprise responsible for the AuraVie scam. Where, as here, Corporate

3    Defendants act as a common enterprise, each may be held jointly and severally

4    liable for the unlawful acts and practices of the other. *FTC v. Grant Connect, LLC*,

5    827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) ; *FTC v. JK Publications, Inc.*, 99 F.

6    Supp. 2d 1176, 1202 (C.D. Ca. 2000) . "To determine whether a common

7    enterprise exists, the Court considers factors such as: [1] common control; [2] the

8    sharing of office space and officers; [3] transacting business through a maze of

9    interrelated companies; [4] the commingling of corporate funds and failure to

10   maintain separation of companies; [5] unified advertising; and [6] evidence that

11   reveals that no real distinction exists between the corporate defendants." *Grant*

12   *Connect*, 827 F. Supp. 2d, at 1216 (quoting *FTC v. Nat'l Urological Grp., Inc.*,

13   645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)); *see also FTC v. Ivy Capital, Inc.*,

14   No. 11-283, 2013 WL 1224613 at *13 (D. Nev. Mar. 26, 2013) (common

15   enterprise existed where there was common control, shared office space,

16   interrelated activity, and commingled funds).

17        When determining whether a common enterprise exists, "the pattern and

18   frame-work of the whole enterprise must be taken into consideration." *Del. Watch*

19   *Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable

20   because it was part of a "maze of interrelated companies"). The Ninth Circuit has

6

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

also held that "entities constitute a common enterprise when they exhibit either vertical or horizontal commonality – qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010). Other courts have recognized that "[i]t is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an 'unholy' alliance." *FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)(citing *FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)).

### 1. *SM's Place in the Common Enterprise*

To challenge SM's liability for the wrongs perpetrated by AuraVie, Defendants forgo substantive discussion of SM's actual role in the scheme, opting instead to recast SM's role as not meeting the legal standards associated with common enterprise liability. *See generally* Dkt. 354, at 9-16. Their attempt fails to reflect the full facts of this case, which reveal that SM was not only an integral cog in the AuraVie machine but also that SM meets each of the six standards associated with common enterprise liability:

(1) Interrelated Companies and (2) Common Control

Regarding (1) transacting business through a maze of interrelated companies, as well as (2) common control, Defendants claim "there is no

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

evidentiary support" for SM sharing employees with other Corporate Defendants. Dkt. 354, at 11. They argue that SM was operated solely by Defendant Argaman,[2] but both documentary and testamentary evidence contradict this claim and reveal SM to be operated by various Individual Defendants and employees shared with other Corporate Defendant.

The involvement of other AuraVie individual defendants begins with Defendant Doron Nottea ("Doron"). Despite Defendants' self-serving claim that Doron "never undertook any actions in furthering SM's business,"[3] Nottea in fact controlled SM's bank account and held himself out as an owner of SM, listing his status as "Member" in bank account documents. Ex. 176-2.[4] He also testified that he provided bookkeeping services for SM.[5] These services included at least (1) authorizing payments for SM's payroll through David Davidian's accounting firm,[6] with Davidian's firm referring to SM's account as "your [i.e. Doron's] account" *see* Exs. 289; 366; and (2) providing access to SM's employee records to

---

[2] *See* Dkt. 354, at 7 ("SM is not controlled by, owned, or operated by any of the other defendants").

[3] Dkt. 354, at 10.

[4] He also created the email address securedmerchantsllc@gmail.com. UF # 43(b)(5)

[5] UF #34(h)(xvi); *see* Ex. 551, at 58:23-59:9. For the purposes of this Opposition, citation references to "UF #[x]" refer to the Plaintiff's Statement of Uncontroverted Facts & Conclusions of Law In Support of Its Motion for Summary Judgment, Dkt. 353-2.

[6] Davidian's firm handled accounting for most of AuraVie's entities. *See* UF. #32(k)(iii); #34(d)(ix), (i)(ii), (i)(iii); #43(b)(iv).

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Davidian's firm. UF #43(b)(iv). Doron either served these roles because he had a greater role in building and managing SM's business or perhaps, as Defendant Argaman would have it, as a mere token of "friendship." *See* Dkt. 354, at 10. But regardless of his motives, Doron unquestionably had access to and control of SM's entire financial and corporate structure and thus was critical in its operations. This characterization also gels with Doron's own apparent understanding of SM's relationship to the other AuraVie companies: Nottea provided Davidian a list of "Bunzai Companies" that included SM. UF #43(b)(iv).

The AuraVie co-conspirators' involvement only began with Doron; others' influence was pervasive. Defendant Roi Reuveni testified that he worked for SM, UF #37(i)—a claim that is supported by Reuveni's holding himself out as an owner of SM by signing a contract on SM's behalf in his capacity as "Managing Member." UF #37(i)(i); Ex. 412-5. In addition, the Operating Agreement for the company lists Defendants Alon Nottea alongside Argaman as the Managers. UF #43(b)(ii); Ex. 255-22. Indeed, according to nonprivileged attorney invoices, even Defendant Igor Latsanovski is referenced in meetings concerning SM. UF #43(b)(iii). In addition, Robert Stayner and Tyler Reitenbach were both employees of SM while employees of other Corporate Defendants—Stayner an employee of SBM Management, Inc. and Reitenbach an employee of Pinnacle Logistics, Inc. and later CBA. Exs. 289; 366; 370; 391; 563. Thus SM, far from

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1  being an arms-length contractor working for AuraVie, was instead an entity where

2  many of the principal individual AuraVie defendants and employees of Corporate

3  Defendants actively managed its operations.

4  (3) Commingling of Funds

5       Defendants place the brunt of their rebutting SM's common enterprise

6  liability on the status of its (3) commingling of funds, but their argument does not

7  fully reflect the facts of this case. Defendants do not deny some financial

8  relationships with its co-conspirators: Defendants concede, Dkt. 354, at 15, that

9  SM received funds from SBM Management, Inc., a company that, as the Receiver

10  noted in her report, "in turn received millions from entities owned, controlled or

11  operated by Defendants and which sell or market products via 'free trial' offers on

12  line." Dkt. 120, at 25. In addition, Defendants concede that SM provided $250,000

13  to establish Defendant CBA—an entity that, as discussed further in Section II.C.,

14  *infra.*, played a role similar to SM's own in the scheme's deceptive use of

15  merchant accounts and chargeback management. UF #26(b)(i).

16       Regarding SBM Management, Defendants contend that their sending an

17  invoice to SBM legitimized the mere shifting of money between (to borrow

18  Doron's phrase) the "BunZai compan[ies]" as arms-length. Dkt. 354, at 15.

19  Regarding CBA, they then assert that providing start-up capital to another entity

20  critical to the scheme lies outside the bounds of the common enterprise simply

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

because SM had other clients. Dkt. 354, at 23. Such logic fails to reflect, however, that these financial relationships were undeniably tied to the common enterprise and that these money transfers comprised a basic financing mechanic sustaining the scheme. Because of the complex corporate network that AuraVie built, their scheme's architecture necessitated transfers between entities to sustain the operations of each as they performed their distinct roles. *See* Dkt. 121-1, at 3. Such shuttling funds between entities builds the very type of relationships that common enterprise liability was created to address.

Beyond those two instances, the financial relationship between SM and the other AuraVie defendants further inform the degree of SM's financial integration within the scheme. As discussed above, Doron Nottea openly admitted to bookkeeping for SM—the same services he provided for the vast majority of other entities involved in the scheme. UF #34(h)(xvi). Perhaps more telling, however, is an unprivileged attorney email sent to Defendants Alon Nottea and Igor Latsanovski, containing a Collateral Assignment Agreement for SM, under which terms "Assignor" and "Assignee" are both "members of Secure Merchants, LLC" and contemplate intertwined secured collateral assignments of membership interests in the parties' co-owned properties. Ex. 557-2. That Defendants Nottea and Latsanovski were preparing such an agreement demonstrates that the financial relationship between SM and its co-conspirators extended beyond a mere arms-

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

length contractual relationship. Just as SM featured the same employees and officers as the other AuraVie corporate defendants in this case, those AuraVie principals had vision of SM that integrated it within the scheme as a "BunZai company."

(4) Marketing the Scheme

Regarding (4) marketing the scheme, SM did not itself advertise for AuraVie but instead, like all other AuraVie Defendants not responsible for that discreet area of the enterprise, relied upon Media Urge, Inc. and Focus Media Solutions, Inc. to provide consumers the deceptive advertising that led to the entities' revenue streams. *See* UF #19, 24. Defendant Argaman used the LLC he co-owned with Defendant Doron Nottea to design the deceptive AuraVie landing page that was so critical to executing the AuraVie scam. UF # 39. Defendant Argaman was also the chief architect of the AuraVie Angels marketing campaigns. UF #39(d)(x).

(5) Distinction Between Entities and (6) Maintaining a Shared Office

Regarding (5) the distinction between entities, the above-discussed sharing of officers and employees, certified professional accountant, and funds is complemented by two additional facts. First, SM (6) shared an office with their co-conspirators, with the involvement of Defendant Doron Nottea  and other AuraVie defendants eased by the fact that SM was, by Nottea's own testimony,

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

"sitting in the same building . . . We were sharing an office." Ex. 553, at 59:2-59:9. Second, the active involvement of several of the individual AuraVie defendants in SM's management and operations is uniquely complemented in SM's case by the manner in which SM facilitated the creation of CBA. Before CBA was a going concern, SM labeled its chargeback refutation service as "chargeback armor." UF #39(f)(i). In its "Standard Service Agreement," SM provided for clients' use of its services through chargebackarmor.com. UF#39(f)(ii)-(iii). But most compellingly, Mike Costache, a SM employee and purported CBA CEO, sent an email to a SM client that included referring to SM as "the technology company that developed the CBA product" and noted that SM is "transitioning all clients to be billed" by CBA. Dkt. 231-1, at 8. In a common enterprise where all companies shared officers and employees, with the name of each entity standing as little more than a way to distinguish between the scheme's different types of operations, this transition from SM to CBA is a stark example of a distinction without a difference. Such facts, combined with the active management and involvement of Defendants Alon Nottea, Roi Reuveni, and Doron Nottea reveal SM as merely one thread in a vast web of companies that were each essential to perpetrating the AuraVie scheme.

### 2.  SM's Role in the Common Enterprise was Central to the Scheme's Capital Structure and Finances

Despite Defendants' claims that SM's relationship to the scheme was a

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

"routine arms' length business relationship[]," Dkt. 354, at 15, this picture fails to reflect the facts. Defendants contend that SM merely billed SBM Management, Inc. for services "completely unrelated to the alleged sale of skincare using deceptive marketing and advertising." Dkt. 354, at 15. In fact, the invoices Defendants point to are for services that were critical to perpetuating the scheme, including (1) chargeback resolution through their "ChargeBack Armor" service; UF #39(f); (2) automated customer service systems through their "voice logix" system; UF #26(b)(i); and (3) managing consumer relations for their negative option continuity plans through LimeLight, a third party customer relationship management (CRM) software. UF #39(d)(v). SM's services were critical to the AuraVie scheme because chargebacks are likely to be a major concern for any business was premised upon using consumer credit card information for unauthorized charges. Consumer anger unsurprisingly followed AuraVie throughout its life: Defendants' chargeback rates rose as high as 35 percent[7] and was a constant source of discussion among the chief principals of the scam. *See, e.g.,* Exs. 141; 144; 285; 293; *see also* UF #65. In fact, Defendant Argaman and the other *de facto* principals of SM were regularly apprised of the chargeback rates. *See*, *e.g.*, UF #39(g)(vii), (l). Yet although such high chargeback rates

---

[7] *See* Dkt. 121-1, at 8 ("Analysis of the entities' chargeback rates indicates the rates for RD's ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%.").

14

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

should raise a warning to anyone with experience in the chargeback industry, SM continued to, as it provided in its Executive Summary, "handle the entire chargeback dispute process on your [i.e. AuraVie's] behalf," UF #39(f)(v) and to have AuraVie "[c]onsider us your 'Chargeback Department,' not your outsourced chargeback service provider." Ex. 257-2.

SM's responsibility for AuraVie's chargeback process was also problematic for SM because of the abusive behaviors and policies AuraVie practiced when dealing with refund and chargeback claims. These policies and practices in fact constituted some of the most egregious consumer harms at issue in this case.

In their Motion for Summary Judgment, Defendants note "[m]ost of the work done by SM is done by technical personnel in India." Dkt. 354, at 9. And indeed, Defendant Argaman in his capacity at SM was intimately involved with coordinating Indian call centers for the various merchant accounts Defendants maintained. UF #39(k). But while Defendants may have passed by the call center work as merely "technical," Defendants' "technical" work constituted some of the most deceptive practices at issue in this case.

**B.    *Corporate Defendant CBA's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability***

CBA's role in the scheme and the AuraVie defendants' participation in CBA's planning and execution demand its designation as part of the common enterprise responsible for the AuraVie scam and render it an appropriate relief

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

defendant. "The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *FTC v. Ivy Capital, Inc., et al.*  2013 WL 1224613, *18 (D. Nev. Mar. 26, 2013) quoting *SEC v.Colello*, 139 F.3d 674, 676 (9th Cir. 1998). )**.** Here, disgorgement of the revenues CBA generated in its furtherance of the scheme is the minimal equitable relief that should be levied by this Court.

Under the FTC Act, disgorgement from a relief defendant is warranted where: (1) the relief defendant has received ill-gotten gains; and (2) does not have a legitimate claim to those gains.[8] Once demonstrated, the appropriate remedy is an equitable monetary judgment equivalent to the amount of ill-gotten gains that the relief defendant received. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp.

---

[8] *See FTC v. Ivy Capital,Inc., et al.,* 2013 WL 1224613, * 18 (relief defendant who was responsible for keeping the books and for various operations or administrative tasks is liable for disgorgement) ); *FTC v.Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (relief defendant liable for the full amount off ill-gotten gains she received when she provided no service to the corporate defendants); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (summary judgment against a relief defendant who failed to show he had a legitimate claim to the ill-gotten gains he received) ); *FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1009 (N.D. Cal. 2010*), aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten gains as he was "president" of a corporation "in name only" and provided no services to the corporation) ); *FTC v. Holiday Enterp*, 2008 WL 953358, * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant liable as "[s]he never performed any work for the [defendant] companies (except for occasional signing of checks) and would not have a legitimate claim to properties because of any work performed for the Holiday companies") ; *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000) .

16

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

2d at 1273). Moreover, government agencies, in an effort to maximize the recovery of funds taken through fraud, may pursue individuals or companies even if they are no longer in possession of the ill-gotten assets.[9]

The case against CBA as a relief defendant is simple and direct: The evidence shows that the Relief Defendant received substantial revenues traceable directly or indirectly to the unlawful conduct of AuraVie. UF #41. CBA was a key component to the continuation of the AuraVie scheme and received transfers in exchange for aiding the enterprise's ability to manage and abusively contest chargeback demands from consumers. UF #41(d). Because these payments were generated by deceiving consumers, CBA does not have a legitimate claim to them and should be forced to disgorge those funds.

CBA's culpability for its role in the scheme is reinforced by the critical roles that several AuraVie defendants played in building and developing the company so it could aid the common enterprise. Defendants' contention that neither Defendant Argaman nor any "other Defendant had any formal role with CBA as a shareholder or director," Dkt. 354, at 24, fails to reflect that CBA was in fact an enterprise that both Defendant Argaman and other individual AuraVie

---

[9] *See, e.g., CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.").

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

defendants controlled and oversaw in furtherance of the scheme. Defendants acknowledge[10] that Defendant Argaman made a $250,000 angel investment in CBA. What Defendants fail to adequately explain[11] is that Defendants Alon Nottea and Argaman are both listed along with Mike Costache as the board of directors for CBA. Dkt. 231-1, at 36. Moreover, a CBA Executive Summary lists Defendant Argaman as the company's "Chief Technology Officer," and the same document also lists Alon Nottea as President, Roi Reuveni as Customer Service Manager, and Tyler Reitenbach, an employee of SM and Pinnacle Logistics, as Sales Account Manager. Dkt. 231-1, at 6. In email discussions, Reuveni was in fact designated to be CBA's Chief Operating Officer, although it is unclear whether he ultimately served in that role. See Dkt. 231-1, at 26-27. In fact, Defendant Paul Medina testified that he believed Defendant Alon Nottea owned CBA,[12] and a CBA office lease listed Doron Nottea and Argaman alongside Mike Costache as individuals to whom mail may be sent at CBA. UF #39(g)(v).

These officer and director roles reflect CBA's intimate relationship with the

[10] Dkt. 354, at 23.

[11] In his declaration accompanying Defendants' Motion for Summary Judgment, Mike Costache, the purported sole shareholder, director and officer of CBA, presents the various officer and director duties of the individual AuraVie defendants as a sham "in order to obtain funding and thus had to list a full board and list of officers to attract investors." Dkt. 354-1, at ¶2. Thus he at once concedes that other Auravie defendants were held out as officers and directors of the enterprise while at the same time admitting that they were held out as such as a way to fraudulently represent CBA to potential investors.

[12] UF #43(c)(ii).

18

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

larger AuraVie enterprise. Despite Defendants' claim that CBA could not have done any work for the scheme because it was incorporated after the AuraVie business "had been shuttered," Dkt. 354, at 7, CBA's own Executive Summary boasted of the "33,000 chargebacks [that] were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." UF #39(g)(iv); Ex. 281-2. And in fact, Defendant Argaman, along with Defendants Alon Nottea and Roi Reuveni, received statistics detailing chargeback numbers for various CBA clients, including AuraVie. UF #39(g)(vii); Ex. 151. Given such a deep level of involvement by the Individual Defendants and CBA's clear role in serving the chargeback management role in the scheme, equity demands that CBA be forced at a minimum to disgorge the ill-gotten gains it reaped from AuraVie's abusive market practices; therefore, Defendants' Motion should be denied.

### C.    Individual Defendant Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability.

Like SM and CBA, Defendant Argaman's direct participation in the scheme demands full injunctive and monetary liability. Individuals are subject to injunctive relief for a company's deceptive acts or practices when they either: (1) "participated directly in the acts or practices;" or (2) "had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). "Participation" can include an individual working at and drawing a salary from the

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

company, even if the individual is not involved in day-to-day operations. *See, e.g.*, *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000). Moreover, where an officer participates in "acts crucial to the success" of an enterprise, the officer has directly participated for the purposes of individual liability. *Id.* In *J.K. Publications*, the court held liable a corporate officer who had obtained merchant accounts and purchased a database of consumers for the corporate defendant. *Id.*

Individuals are also liable for injunctive relief if they had "authority to control" the corporation, which can be inferred from "'active involvement in business affairs and the making of corporate policy.'" *Id.* at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). An individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *Id.* at 1204. Indeed, a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority."[13]

---

[13] *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 WL 1224613, *14 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ("An individual's status as a corporate officer gives rise to the presumption of ability to control a small, closely-held corporation."); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and

20

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

To obtain equitable monetary relief against an individual, the FTC must show, in addition to one of the two factors above, that the individual had some knowledge of the company's deceptive acts or practices. *J.K. Publications,* 99 F. Supp. at 1204. Individuals possess the requisite knowledge if they: (1) had actual knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.[14] The "degree of participation in business affairs is probative of knowledge."[15] The FTC, however, is not required to prove that an individual actually intended to deceive to establish knowledge.[16] Here, Defendant Argaman meets the threshold of both control and participation, and the weight of the evidence demonstrates that he meets the knowledge required for joint and several monetary liability.

### 1.   *Defendant Argaman's Management and Participation in the Common Enterprise was Critical to the Scheme's Success.*

---

primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. Windward Mktg.,* No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.").

[14] *FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House,* 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.,* 875 F.2d 564, 574 (7th Cir. 1989).

[15] *Amy Travel Serv.,* 875 F.2d at 574; *FTC v. Sharp,* 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[16] *Network Servs. Depot,* 617 F.3d at 1139; *Publ'g Clearing House,* 104 F.3d at 1171.

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant Argaman was a key player in the AuraVie scheme, his influence running the gamut of the enterprise's operational areas. Alongside his key ownership and managerial roles at SM and CBA, Defendant Argaman also (1) owned and controlled Secured Commerce, LLC, which designed the misleading "free trial" webpage so critical to the scheme's success; and (2) provided discrete services, apparently in his individual capacity, that further entrenched him in the inner workings of the scheme. His pervasive impact on the success of the scheme not only establishes his key participatory role in the AuraVie deception but also, alongside the access he had to the scheme's abusive practices, demand that this Court hold him fully liable for the damage that his actions have caused consumers.

Although SM and CBA were Defendant Argaman's primary executive and ownership roles in the scheme, his ownership and direct operational role in Secured Commerce, LLC is similarly significant. Defendants' Motion dismissively describes a Secured Commerce, LLC that "did very limited business and was eventually shuttered," Doc. #354, at 10, but that fiction fails to reflect the integral role Secured Commerce, LLC played in executing the scheme. Defendant Argaman openly admitted to designing AuraVie.com in his capacity at Secured Commerce. Dkt. 354, at 12. Under his version of the facts, Defendant Argaman describes a website design that eschewed the abusive practices of which AuraVie stands accused, selling products with terms fully disclosed as a "straight sale." *Id*.

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1      Given that AuraVie derived all its profits from unauthorized charges to

2  consumers based on its negative option continuity plan, it is not surprising that the

3  documentary evidence belies Defendant Argaman's story. His email

4  correspondence instead casts his role in a different, truer light: in an email sent to

5  Defendant Alon Nottea with the subject heading "screen shot for order page,"

6  Defendant Argaman attaches screenshots of website order pages and requests that

7  Nottea "look at the screen shots …[and] call me when you can":



Ex. 531.

      These screenshots directly contradict Defendant Argaman's self-serving

testimony. These screenshots, with a URL of http://localhost/mystore/order.php,

provide a landing site for Miracle Face Kit's "Serum Risk Free Trial," with all of

the "Satisfaction Guaranteed" and "Sub-Total $0.0000" traits of the very "risk

free" deception that Defendant Argaman denies having created. *Id.* And his direct

participation in creating such a website should not be surprising, considering the

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

LimeLight software he operated was custom-made to facilitate negative option continuity plans. UF #39(d)(v).

The scope of Defendant Argaman's involvement went beyond his managerial and ownership roles in discrete entities and extended to direct involvement with the products themselves. Defendant Argaman (1) coordinated with other AuraVie defendants to sell Attitudeline/INFINI skincare products, a product that Defendants marketed or sold, or assisted others in marketing or selling, by negative option continuity; UF #39(d)(ix); (2) planned and managed the AuraVie Angels promotional campaign; UF #39(d)(x); (3) established toll-free telephone numbers for various shell corporations and set up call forwarding for those numbers to aid the deception AuraVie used against credit card processors; UF #39(d)(xi); and (4) coordinated shipping logistics for Pinnacle Logistics, Inc.—the AuraVie company responsible for order fulfillment. Exs. 174; 370. Argaman also sent Doron a presentation concerning another product called LeElle and advised him on LeElle's packaging design. UF #39(e). He was also consulted regarding who would own the product as his AuraVie co-conspirators considered bringing it to market. UF #39(e). Given such pervasive ties to the enterprise both within the context of his formal corporate relationships and his individual dealings, Defendant Argaman should thus be held fully liable for the resulting damages.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### 2.    *The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception.*

Defendant Argaman's knowledge of the wrongs AuraVie committed is manifest in both his degree of participation in the scheme and in the higher-level discussions he was privy to through his email correspondence. Regarding his participation, Defendant Argaman's varied roles encompassed both designing websites and managing chargebacks and refunds—perhaps the two most abusive areas of the AuraVie scheme. His further marketing and ownership discussions relating to LeElle and his coordinating the AuraVie Angels campaign only reinforce the working knowledge he had of not only the AuraVie business itself but how that business went about its deception.

Regarding the enterprise-level discussions, Defendant Argaman was regularly apprised of the enterprise's unusually high chargeback rates, its load-balancing practices, and its many shell merchant accounts.[17] And despite his claims to the contrary, numerous factors should have alerted Defendant Argaman to the high probability of fraud, most prominently the extremely high chargeback rates he was responsible for managing and the AuraVie chargeback statistics that he was regularly provided. Finally, Defendant Argaman knew, or should have known, that consumers had a valid basis for their many chargeback demands: CBA claimed to investigate all chargebacks they contested. UF #41(h). Given

---

[17] *See* UF #26(d); 39(h), (i), (j), and (l).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

such a level of access to information alongside his broad responsibilities,

Defendant Argaman meets either *Amy Travel*'s "degree of participation" standard

or, at a bare minimum, the *Network Servs. Depo.* "high probability of deceptive

conduct together with an intentional avoidance of the truth" standard that establish

liability for his role in the AuraVie scheme.

**III.    Conclusion**

For the forgoing reasons, the FTC respectfully requests that the Court deny

Defendants' Motion for Summary Judgment.

Respectfully submitted,

Dated: 5/2/16

/s/ REID TEPFER
REID A. TEPFER
LUIS H. GALLEGOS
Attorneys for the Plaintiff
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1

## CERTIFICATE OF SERVICE

2

The undersigned certifies that on May 2, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

3

4

5   Erik S Syverson
Raines Feldman LLP
6   9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
7   esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

8

Robert M. Ungar
9   Crosswind Law
14724 Ventura Blvd Penthouse
10   Sherman Oaks, CA 91403
rmu@crosswindlaw.com
11   *Counsel for Alon Nottea and*
*Roi Rueveni*

12

Robert Esensten
13   Esensten Law
12100 Wilshire Blvd., Suite 1660
14   Los Angeles, CA 90025
resensten@esenstenlaw.com
15   *Counsel for Doron Nottea and Motti*
*Nottea*

16

Jeffrey Benice
17   Law Offices of Jeffrey S. Benice
A Professional Law Corporation
18   3080 Bristol Street
Sixth Floor, Suite 630
19   Costa Mesa, CA 92626

20

Telephone: (714) 641-3600 Ext. 214
*Counsel for Igor Latsanovski and*
*CalEnergy, Inc*

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
*Attorney for Paul Medina, Secured*
*Merchants, LLC,*
*and Chargeback Armor, Inc.*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

Kelly M. Crawford
Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
*Counsel to Receiver*

/S/ REID TEPFER

27

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

REID TEPFER

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**