DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Regional Director

REID TEPFER

rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)

RAYMOND McKOWN
rmckown@ftc.gov
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343 (voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**BUNZAI MEDIA GROUP, INC.,**<br>*et al.*<br>    **Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES TO DEFENDANTS ALAN ARGAMAN, SECURED MERCHANTS, AND CHARGEBACK ARMOR'S STATEMENT OF UNCONTROVERTED FACTS** |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 1. SM is a technology company that has only had one member, manager, and owner at all times it has existed. (Argaman Decl. at ¶ 1). | 1. Disputed.<br><br>    1. Plaintiff does not dispute that SM is a technology company.<br><br>    2. Plaintiff disputes:<br><br>That SM had one member: Along with Defendant Argaman, Defendant Roi Reuveni contracted on behalf of Secured Merchants LLC, listing his title as "Managing Member." Ex. 412-5. Moreover, Doron Nottea was listed as a member of Secured Merchants in bank documents. Ex. 176-2.<br><br>That SM had one manager: SM's Operating Agreement for the company lists Defendants Alon Nottea alongside Argaman as the Managers. Ex. 255-22. SM's Executive Summary lists Defendants Paul Medina and Alon Nottea |

| | alongside Defendant Argaman as managers. Ex. 256-2.<br><br>That SM had one owner: Ownership for limited liability companies is represented as membership interests. Therefore, Plaintiff reasserts: along with Defendant Argaman, Defendant Roi Reuveni contracted on behalf of Secured Merchants LLC, listing his title as "Managing Member." |
|---|---|
| 2. Argaman has been the sole member, manager, and owner of SM since SM was formed. (Argaman Decl. at ¶ 1). | 2. Disputed.<br><br>Plaintiff disputes:<br><br>That SM had one member: Along with Defendant Argaman, Defendant Roi Reuveni contracted on behalf of Secured Merchants LLC, listing his title as "Managing Member." Ex. 412-5. Moreover, Doron Nottea was listed as a member of Secured Merchants in bank documents. Ex. 176-2.<br><br>That SM had one manager: SM's Operating Agreement for the company lists Defendants Alon Nottea alongside Argaman as the Managers. Ex. 255-22. SM's Executive Summary lists Defendants Paul Medina and Alon Nottea alongside Defendant Argaman as managers. Ex. 256-2.<br><br>That SM had one owner: Ownership for limited liability companies is represented as membership interests. |

| | Therefore, Plaintiff reasserts: along with Defendant Argaman, Defendant Roi Reuveni contracted on behalf of Secured Merchants LLC, listing his title as "Managing Member." |
|---|---|
| 3. The only business that SM did with the AuraVie Defendants in this case is providing technological services to SBM Management, which services were memorialized in detailed invoices and were arms-length business transactions. (Argaman Decl. at ¶ 5-6, Argaman Depo., 109:8-25, Exhibit 833 ) | 3. Disputed.<br><br>1. Plaintiff does not dispute that SM provided services concerning the sale of AuraVie to SBM Management, Inc. and that those services were memorialized in invoices.<br><br>2. Plaintiff does dispute:<br><br>That SM's services for SBM were the "only business that SM did with the AuraVie Defendants":<br><br>The services SM provided SBM Management, Inc. served the entire common enterprise, not just SBM Management. (Dkt. #120, at 24.) For example, SM contested chargebacks for the sale of AuraVie products (Ex. 555, at 75:1-5; 348-3), which were sold by various Corporate Defendants and not SBM (Dkt. #120, at 24). SM also had an ownership interest in Chargeback Armor (Dkt. #231-1, at 50 and 53; *see also* exs. 256-1; 257-2; 280-1; 414), the company which Defendant Alon Nottea admitted was used to refute chargebacks for the common enterprise. Ex. 550, at 171:3-171:6. |

| | |
|---|---|
| | |
| 4. This service provided by SM to the AuraVie Defendants consisted of developing and installing a portal system through which chargebacks made by consumers could be viewed and processed and providing the technology for the Interactive Voice Response (IVR) system. (Argaman Decl. at ¶ 5, 6, 13, 16). | 4. Disputed.<br><br>Plaintiff disputes that the services Secured Merchants provided to the other AuraVie Defendants were limited to these two services.<br><br>Services that Secured Merchants provided to other members of the common enterprise included: (1) chargeback resolution through their "ChargeBack Armor" service (Ex. 555, at 75:1-5; 256; 257; Dkt. #121-7, at 2); (2) automated customer service systems through their "voice logix" system (Dkt. #121-7, at 2) and other assistance with Defendants' call center (Ex. 47); and (3) assisting Defendants in managing consumer relations for their negative option continuity plans through LimeLight, a third party customer relationship management. (*See, e.g.,* Dkt. #121-6, at 12; ex. 946, at 20:3-20:16.)<br><br>Plaintiff further disputes that Secured Merchants "Chargeback Armor" service consisted of merely "installing a portal system." Secured Merchants company description states that, as part of their "ChargeBack Armor" service, Secured Merchants "handle[s] the entire chargeback dispute process on your behalf." Ex. 257. Moreover, Secured Merchants provided "real-time" information concerning the "results" of their chargeback |

| | |
|---|---|
| | refutation. *Id.* |
| | |
| 5. SM did not process (accept or deny) chargebacks nor did it dictate the content of the IVR system. (Argaman Decl. at ¶ 5, 6, 17). | 5. Disputed.<br><br>1. Plaintiff does not dispute that SM did not dictate the content of the IVR system.<br><br>2. Plaintiff disputes:<br><br>That SM did not process chargebacks: The meaning of this contention is unclear. Plaintiff does not dispute that payment processors and banks are ultimately responsible for accepting or denying consumer chargeback demands.<br><br>However, SM "processed" Auravie's chargebacks, including through its ChargeBack Armor service, if by "processed" Defendants mean that SM provided the services that accounted for and sought to mitigate chargeback demands resulting from the scheme's deceptive practices. Secured Merchants described ChargeBack Armor as "Credit card chargeback processing, management & dispute services." Ex. 256. Indeed, Secured Merchants company description states that, as part of their "ChargeBack Armor" service, Secured Merchants "handle[s] the entire chargeback dispute process on your behalf." Ex. 257. |
| | |

| | |
|---|---|
| 6. The only AuraVie website that Argaman created or designed was the straight-sale AuraVie website that did not use negative options, continuity, or risk free trials. (Argaman Depo., 49:8-18) | 6. Disputed.<br><br>1. Plaintiff disputes the entirety of this contention:<br><br>Defendant Argaman was an owner and the manager of Defendant Secured Commerce LLC (Dkt. #299 ¶ 39), which designed the landing page used for deceptively marketing and selling AuraVie's skincare products according to an invoice. Ex. 46. Moreover, emails show Defendant Argaman working on and discussing with Defendant Alon Nottea a Miracle Face Kit website. Ex. 531. |
| 7. SM never employed any of the other Defendants in this case at any time, nor was ever owned, operated or controlled by any other Defendants in this case. (Argaman Decl. at ¶ 1, 3). | 7. Disputed.<br><br>1. Plaintiff disputes the entirety of this contention:<br><br>Ownership: Defendant Roi Reuveni contracted on behalf of Secured Merchants LLC, listing his title as "Managing Member." Ex. 412-5. Moreover, Doron Nottea was listed as a member of Secured Merchants in bank documents. Ex. 176-2.<br><br>Control: SM employed, and was operated, owned or controlled by, many Defendants. Secured Merchants' "Executive Summary," created in June 2013, states that the company's management consisted of Defendants Alon Nottea, "Avi" Argaman, and Paul Medina. Ex. 256-2. Secured Merchants LLC's |

| | |
|---|---|
| | operating agreement draft names Defendant Argaman and Defendant Alon Nottea as the company's two managers. Ex. 255-5. Moreover, Defendant Roi Reuveni testified that he was employed by Secured Merchants LLC. Ex. 553, at 16:9-16:11.<br><br>Employees and Operations: Although SM was purportedly owned solely by Alan Argaman, Paul Medina requested approval from Doron and Defendant Alan Argaman to switch one of the Limelight accounts over to SM. Ex. 59. Moreover, Nottea coordinated the common enterprise's certified public accountant's paying of SM employees, telling Nottea that such payments would "come off from your [i.e., SM's] account," relating to payment of a SM employee. Ex. 289. |
| 8. Doron Nottea was put as an authorized signer on the SM bank account for convenience purposes, but never actually wrote any checks on behalf of SM. (Argaman Decl. at ¶ 4). | 8. Disputed.<br><br>1.  Plaintiff does not dispute that Doron Nottea never wrote any actual checks on behalf of SM but qualifies this response by noting Nottea's role in having the common enterprise's certified public accountant provide a "pay stub" for payroll that will "come off from your [i.e., SM's] account," relating to payment of a SM employee. |

|  | 2.  Plaintiff disputes:<br><br>That Doron Nottea was only placed on the SM bank account for convenience purposes: Doron Nottea was not listed on the SM bank account for convenience. He was listed on the company's bank account because he, along with Alan Argaman, (1) controlled SM (Ex. 59); (2) provided bookkeeping services to SM (Ex. 551, at 58:23-59:9); and (3) provided instructions and authorization to the common enterprise's certified public accountant relating to paying employees. Exs. 287; 289. Moreover, Doron Nottea was listed as a member of Secured Merchants in bank documents. Ex. 176-2. |
|---|---|
| 9. Argaman never engaged in any advertising or marketing, directly, or indirectly, for the sale of AuraVie skincare products. (Argaman Decl. at ¶ 5-7). | 9. Disputed.<br><br>1.  Plaintiff disputes the entirety of this contention:<br><br>Defendant Argaman was an owner of Defendant Secured Commerce, LLC, (Dkt. #299 ¶ 39), which designed the landing page used for deceptively marketing and selling AuraVie's skincare products according to an invoice. Ex. 46. Moreover, emails show Defendant Argaman working on and discussing with Defendant Alon Nottea a Miracle Face Kit website. Ex. 531. Moreover, emails show Defendant Argaman being consulted, along with Defendants Alon and |

| | |
|---|---|
| | Doron Nottea, concerning advertising for a skincare product. Ex. 360; *see also* ex. 361.<br><br>Acting either on behalf of one of his corporate entities or in his individual capacity, Defendant Argaman designed and managed the AuraVie Angels advertising campaign. Exs. 185; 187; 494; 497. |
| 10. Argaman never had any control, ownership, or operational role in any of the AuraVie Defendants. (Argaman Decl. at ¶ 5-7, 10-17). | 10. Disputed.<br><br>    1. Plaintiff disputes the entirety of this contention:<br><br>Ownership: Defendant Argaman was an owner of Defendants Secured Commerce, LLC (Dkt. #299 ¶ 39), Secured Merchants (Dkts. 244 ¶ 39; 245 ¶ 39), and Chargeback Armor, Inc. Ex. 281-3. Secured Commerce designed the landing page used for deceptively marketing and selling AuraVie's skincare products according to an invoice. Ex. 46. SM provided a variety of services described in genuine dispute response #4. Chargeback Armor was a service used by Defendants to respond to consumer chargebacks. Ex. 550, at 171:3-171:6.<br><br>Control: Argaman was an operator, board member, and the Chief Technology Officer of Relief Defendant CBA. Exs. 231-1 at 36, 281. He operated Secured Commerce, |

| | LLC (Dkt. #299 ¶ 39), serving a role that included designing and creating the AuraVie landing page. Ex. 46. He also operated SM alongside Defendant Doron Nottea and the other individual Defendants discussed in Facts No. 1 and 2, *supra*. |
|---|---|
| | <u>Other Operational Roles</u>: Argaman provided a variety of services to Defendants. *See*, *e.g.,* Ex. 149. He provided technical expertise to the other Corporate Defendants, including establishing a relationship with or otherwise managing a third party and in-house call centers for AuraVie consumer complaints (Exs. 149; 386; 432; 441; 516), software for continuity sales ((*See*, *e.g.,* Dkt. #121-6, at 12; ex. 946, at 20:3-20:16), and websites. Exs. 46; 440; 441; 531; *see also* Ex. 555, at 49:5-49:18. He also participated in product selection and packaging for the Corporate Defendants (Exs. 360, 362; *see also* 361), and assisted in establishing dozens of phone numbers for Defendants' shell corporations. Ex. 432. Finally, he managed or was involved in managing shipping logistics relating to Pinnacle Logistics, Inc., although it is unclear whether he was acting as an employee of Pinnacle or in his individual capacity. Exs. 367; 370. |
| | |
| 11. Argaman did not have knowledge of, nor was he recklessly indifferent | 11. Disputed. |

| | |
|---|---|
| to, the alleged misrepresentations that the AuraVie Defendants made to consumers. (Argaman Decl. at ¶ 10-16). | 1.  Plaintiff disputes the entirety of this contention:<br><br>Defendant Argaman had knowledge of, or was recklessly indifferent to, the Auravie Defendants' misrepresentations to consumers. He was an owner of Defendant Secured Commerce LLC (Dkt. 299 ¶ 39), which designed the primary landing page template for AuraVie's deceptive business practices. Ex. 46. He provided integration services for the common enterprise's customer service management software, Limelight (*See* Dkt. #121-6, at 9-21; Dkt. #121-7, at 1-3; Ex.  555, at 51:3-19; *see also* Ex. 946, at 19:23-20:17), which was used for continuity sales.<br><br>The scope of the roles he played in the scheme was comprehensive: Argaman at least (1) participated in AuraVie's "AuraVie Angels" campaign (Exs. 185; 187; 494; 497); (2) was involved with shipping logistics of the products (Exs. 174; 367; 370); (3) pitched similar products to other Defendants as potential business opportunities (Ex. 361; *see also* Ex. 362); managed chargebacks and refunds (Exs. 256; 257-2; Ex. 555, at 75:1-5; 348-3; Dkt. #121-7, at 1-3); and (4) designed the "free trial" landing page for the scheme. Exs. 46; 531. Such a broad swath of responsibilities undermines any attempt by Defendant Argaman to feign ignorance of the business he was engaged in. |

| | |
|---|---|
| | Furthermore, he helped the common enterprise process large numbers of continuity plan cancellations and "resolve consumer disputes before they [became] chargebacks." Ex. 257-2. *See also* ex. 256; Ex. 555, at 75:1-5; 348-3. |
| 12. Argaman never designed, selected, or created any of the products AuraVie sold to consumers. (Argaman Decl. at ¶ 15). | 12. Disputed.<br><br>   1. Plaintiff does not dispute that Argaman did not design or create any AuraVie products.<br><br>   2. Plaintiff does dispute:<br><br>That Argaman did not aid in selecting products:<br><br>*Attitudeline/INFINI*: Defendant Argaman sold Attitudeline/INFINI skincare products, a product that Defendants marketed or sold, or assisted others in marketing or selling, by negative option continuity plans (or assisted others in marketing or selling in the same manner). Ex. 368.<br><br>*LeElle*: Defendant Argaman sent Doron Nottea a presentation concerning a product called LeElle. Ex. 361. Defendant Argaman was later consulted concerning the company's packaging design. Ex. 361. Defendant Argaman also provided input concerning who would own the |

| | |
|---|---|
| | new product Defendants were marketing. Ex. 362. |
| | |
| 13. Argaman never dealt directly or indirectly with any AuraVie consumers. (Argaman Decl. at ¶ 13, 14, 16). | 13. Disputed.<br><br>  1. Plaintiff disputes the entirety of this contention:<br><br>Defendant Argaman helped create an automated response system to allow large numbers of consumers to cancel their AuraVie continuity plans. He also helped establish a relationship with or manage a call center in India. Exs. 149; 386; Ex. 121-7, at 1. *See also* 441.<br><br>Furthermore, he was an owner of Defendant Secured Commerce LLC (Dkt. 299 ¶ 39), which designed the primary landing page template for AuraVie's deceptive business practices. Ex. 46.<br><br>Finally, he was responsible for planning and executing the AuraVie Angels campaign. *See* Exs. 185; 494; 497. |
| | |
| 14. Argaman didn't play a role in the creation of the scripts used by the AuraVie call centers. (Argaman Decl. at ¶ 13). | 14. Undisputed. |
| | |
| 15. Argaman was never paid by SM or any of the AuraVie Defendants. (Argaman Decl. at ¶ 22). | 15. Disputed.<br><br>  *1.* Plaintiff does not dispute that Argaman was never |

| | |
|---|---|
| | paid by SM or by any of the AuraVie Defendants but qualifies this response by noting that where, as here, one is the owner of an entity, any revenues generated by the entity and not paid out as either employee salary or as a capital withdrawal remain on the company's books as retained earnings. These retained earnings function to increase the enterprise value. The enterprise value is a gain to the owners of the enterprise. So, even if not actually paid as an employee or as a capital withdrawal, Defendant Argaman nevertheless accrued economic value from the scheme's deceptive business practices. Ex. 46. SM admits to receiving more than $300,000 from Defendant SBM Management for chargeback services relating to the sale of skincare products. Ex. 918-57, ¶236. |
| 16. SM never employed any of the Defendants in this case. | 16. Disputed.<br><br>   1. Plaintiff disputes the entirety of this contention:<br><br>SM employed several of the Individual Defendants as well as |

employees of other Corporate Defendants:

*Roi Reuveni*: testified he worked for both Chargeback Armor and Secured Merchants. Ex. 553-5, at 16:1-16:23. Moreover, he held himself out as a managing member of Secured Merchants. Ex. 412-5.

*Alon Nottea and Paul Medina*: Secured Merchants' "Executive Summary," created in June 2013, states that the company's management consisted of Defendants Alon Nottea, "Avi" Argaman, and Paul Medina. Ex. 256-2. Secured Merchants LLC's operating agreement draft names Defendant Argaman and Defendant Alon Nottea as the company's two managers. Ex. 255-22.

*Doron Nottea*: Paul Medina requested approval from Doron and Defendant Alan Argaman to switch one of the Limelight accounts over to SM. Ex. 59. Nottea provided bookkeeping services (Ex. 557-11, at 58:21-25), controlled SM's bank account, created the email address securedmerchantsllc@gmail.com (Ex. 357; *see also* Ex. 942), and provided authorization for the common enterprise's accountant to make payroll disbursements. Ex. 289-1.

*Robert Stayner and Tyler Reitenbach*: Regarding the Corporate Defendants, both Stayner (Ex. 287-2) and

|  | Reitenbach (Ex. 287-2) were employees of SM while employees of other Corporate Defendants. Stayner was also an employee of SBM Management (Ex. 391-2), while Reitenbach was an employee of CBA and Pinnacle Logistics, Inc. Exs. 563, 370. |
|---|---|
| 17. SM or Argaman or CBA never approved or denied chargebacks for the AuraVie Defendants. (Argaman Decl. at ¶ 6, 17, Costache Decl. at ¶ 4). | 17. Disputed.<br><br>1. Plaintiff disputes the entirety of this contention:<br><br>Plaintiff reasserts its response to Fact #5: The meaning of this contention is unclear. Plaintiff does not dispute that payment processors and banks are ultimately responsible for accepting or denying chargeback demands. However, SM disputed consumer chargeback requests, including through its ChargeBack Armor service. Ex. 281-1.<br><br>SM's role in founding and developing CBA is also relevant here. Defendant Argaman and SM provided $250,000 to CBA (Ex. 916-57, ¶235; Ex. 917-65, at ¶235), owned and operated CBA's website (Ex. 280), and oversaw CBA's chargeback statistics. Dkt. #231-1, at 7. In turn, a document titled "Secured Merchants" described the "ChargeBack Armor" services as helping "win back lost revenue by reversing chargebacks in your favor" and "handl[ing] the entire chargeback dispute process on your behalf." Ex. |

| | |
|---|---|
| | 257-1. Mike Costache, then a SM employee and soon-to-be purported CBA CEO, sent an email to a SM client that included referring to SM as "the technology company that developed the CBA product" and then noted that SM is "transitioning all clients to be billed" by CBA. Dkt. #231-1, at 8.<br><br>Relief Defendant CBA refuted consumer chargebacks for the unauthorized AuraVie charges. Ex. 946-9, at 24:9-24:23. CBA boasted to potential investors that "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." Ex. 281-2. Defendant Alon Nottea corroborated that Chargeback Armor, Inc. processed chargebacks for the common enterprise. Ex. 550-26, at 172:3-6. |
| 18. CBA was not formed until February 2015, by Mike Costache. (Costache Decl. at ¶ 4, Exh. 811). | 18. Disputed.<br><br>   1.  Plaintiff disputes the entirety of this contention:<br><br>Although not formally incorporated until March 2015, the company operated informally before incorporation. For example, CBA boasted in its Executive Summary to potential investors that "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." Ex. 281-2. Moreover, an email from |

| | |
|---|---|
| | Costache to a client stated that SM was transitioning to billing under Chargeback Armor. Dkt. #231-1, at 8. |
| 19. Costache has at all times been the sole incorporator, shareholder, director, and board member of CBA. (Costache Decl. at ¶ 1). | 19. Disputed.<br><br>   1. Plaintiff does not dispute that Costache incorporated CBA.<br><br>   2. Plaintiff does dispute:<br><br>That Costache was the sole shareholder of CBA: Defendant Alon Nottea solicited investors for Chargeback Armor (ex. 910-33, ¶234; Ex. 917-65, ¶234), and the purported Chargeback Armor CEO referred to him as his "business partner." Dkt. 120, at 19. Roi Reuveni was COO of the company. Ex. 917, at ¶237. SM was offered equity ownership interest in CB armor in exchange for its $250,000 investment. Dkt. #231-1, at 53; *see also* Dkt. #231-1, at 50. Alon Nottea's email signature was from Chargeback Armor. Dkt. #231-1, at 27. Moreover, purported CEO Mike Costache also consulted with the Individual Defendants concerning hiring and contracting decisions. Dkt. #231-1, at 11-13, 23, and 26. Additionally, in a March 23, 2015 email, Costache represented that Alon Nottea was a board member of the company and Roi Reuveni was COO. Dkt. #231-1, at 52. |

| | |
|---|---|
| | <u>That Costache was the sole director of CBA</u>: A Chargeback Armor, Inc. services agreement dated March 2, 2015 describes the company's board of directors as consisting of Mike Costache, Alon Nottea, and Avi Argaman. Chargeback Armor's Executive Summary lists Defendant Alon Nottea as President, Defendant Alan Argaman as Chief Technology Officer, and Defendant Roi Reuveni as Customer Service Manager. Doron Nottea was a signatory on Chargeback Armor's bank account and is listed as secretary of the company on its Bank of America account.<br><br><u>That Costache was the sole board member of CBA</u>: Insofar as "sole director" and "sole board member" are equivalent, Plaintiff reasserts: A Chargeback Armor, Inc. services agreement dated March 2, 2015 describes the company's board of directors as consisting of Mike Costache, Alon Nottea, and Avi Argaman. Dkt. #231-1, at 36. Chargeback Armor's Executive Summary lists Defendant Alon Nottea as President, Defendant Alan Argaman as Chief Technology Officer, and Defendant Roi Reuveni as Customer Service Manager. Ex. 281-3. Doron Nottea was a signatory on Chargeback Armor's bank account and is listed as secretary of the company on its Bank of America account. Dkt. #231-1, at 46, 48. In a March 24, 2015 email, Costache |

|  | represented that Defendant Alon Nottea was a board member. Dkt. #231-1, at 53. |
|---|---|
|  |  |
| 20. Argaman was never employed by or had any ownership interest in CBA. (Argaman Decl. at ¶ 21, Costache Decl. at ¶ 7). | 20. Disputed.<br><br>1. Plaintiff disputes the entirety of this contention:<br><br>Chargeback Armor's Executive Summary lists Argaman as Chief Technology Officer. Ex. 281-3. He was also listed as a member of the company's board of directors. Dkt. #231-1, at 36. Indeed, Argaman and his Secured Merchants company owned and operated CBA. Dkt. 231-1, at 53. *See* Ex. 280. He incorporated it in concert with other Individual Defendants. Ex. 404. SM provided CBA $250,000 in startup capital. Ex. 916-57, ¶235; Ex. 917-65, at ¶235. He participated in discussions concerning high-level corporate decisions for Chargeback Armor ranging from updates regarding the launch of the company to opening the company's corporate bank account. Exs. 184, 369. He received reports concerning new Chargeback Armor customers. Ex. 184. Finally, he was billed by Nova 8 Media for design services for CBA. Ex. 414. |
|  |  |
| 21. The $250,000 that SM invested in CBA was an arms-length business transaction and these funds came from entities other than the AuraVie Defendants. (Argaman Decl. at ¶ 18, | 21. Disputed.<br><br>1. Plaintiff disputes the entirety of this contention: |

| | |
|---|---|
| 19, 20, Costache Decl. at ¶ 5, Exh. 834-838). | <u>That the $250,000 Investment in CBA was Arms-Length</u>: Defendant Secured Merchants LLC provided $250,000 to CBA (Ex. 916-57, ¶235; Ex. 917-65, at ¶235; Dkt. #231-1, at 53), which was itself operated by several of SM's managers, officers and employees. SM received more than $300,000 in funds for providing chargeback services relating to the sale of Defendants' skincare products. Ex. 918-57, ¶236.<br><br><u>That the funds came from entities other than the AuraVie Defendants</u>: Defendants failed to establish that the funds transferred from Chargeback Armor's sole bank account were not funds received from the common enterprise. The only evidence provided to support this merely establishes that SM had clients in addition to the Defendants. *See* Dkt. 354, at 23  (citing Exs. 834-838). |
| 22. CBA never received any ill-gotten gain from the AuraVie Defendants. (Costache Decl. at ¶ 4, Exh. 838). | 22. Disputed<br><br>1. Plaintiff disputes the entirety of this contention:<br><br>CBA received ill-gotten gains as part of the common enterprise. Specifically, CBA was paid to process chargebacks and perform other services for the AuraVie Defendants. CBA also received $250,000 from Secured Merchants, LLC (Ex. 917-65, |

| | ¶235; Dkt. #231-1, at 53), which received more than $300,000 in funds for providing chargeback and other services relating to the sale of Defendants' skincare products. Exs. 918-57, ¶236; 918-57, ¶236; 550-26, at 172:3-172:6.<br><br>Moreover, CBA served the common enterprise by refuting consumer chargebacks relating to the unauthorized AuraVie charges. CBA boasted to potential investors that "33,000 chargebacks were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." Dkt. #231-1, at 5. Defendant Alon Nottea corroborated that Chargeback Armor, Inc. processed chargebacks for the common enterprise. Ex.  550-26 p. 172:3-172:6. |
| | |

## CONCLUSIONS OF LAW

| 1. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices. 15 U.S.C. 45(a)(1). | 1. Undisputed. |
| --- | --- |
| | |
| 2. An act or practice is "unfair" if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. §45(n). | 2. Undisputed. |
| | |

| | |
|---|---|
| 3. An act or practice is "deceptive" if: (1) there is a representation; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation is material. See *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). | 3. Undisputed. |
| 4. A corporation is liable for monetary relief under section 13(b) of the FTC Act for violations of section 5 if the FTC shows that the corporation engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. See *FTC v. Pantron I Corp*., 33 F.3d 1088, 1102 (9th Cir. 1994). | 4. Undisputed. |
| 5. To establish liability of an individual for a corporate violation of FTC Act §5, the FTC may establish knowledge by demonstrating that the individual defendant had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth. *See FTC* v. *Network Serv. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010) (discussing individual liability for restitution); *FTC* v. *Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (same). | 5. Undisputed. |
| *6.* To establish common enterprise | 6. Disputed. |

| | |
|---|---|
| liability, it must be shown that individuals transact business through a "maze of interrelated companies." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2013) (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964). | Defendants are substituting a necessary showing for a factor courts consider in determining whether there is a common enterprise: "Factors in determining common enterprise include: (1) common control; (2) sharing office space and offices; (3) whether business is transacted through a 'maze of interrelated companies'; and (4) commingling of funds." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012). |
| | |
| *7.* The FTC has not shown any material issue of fact in this case. | 7. Disputed.      *See* Plaintiff's Motion for Summary Judgment, Dkts. 353;  353-1. |
| | |

Dated: 5/2/16

/s/ REID TEPFER
REID A. TEPFER
LUIS H. GALLEGOS
EMILY ROBINSON
ZACHARY A. KELLER
Attorneys for the Plaintiff
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov
zkeller@ftc.gov
erobinson@ftc.gov

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 2, 2016, a true and correct copy of the foregoing document was electronically emailed to the attorneys listed below.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*
*Roi Reuveni*

Jeffrey S. Benice
Law Offices of Jeffrey S. Benice
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
E-Mail: JSB@JeffreyBenice.com
*Counsel for Igor Latsanovski and*
*CalEnergy, Inc.*

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
*Counsel for Doron Nottea and*
 *Motti Nottea*

Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Dr., 6th Floor
Beverly Hills, CA 90210
*Counsel for Chargeback Armor, Inc.,*
*Secured Merchants LLC, and Alan Argaman*

/S/ REID TEPFER
REID TEPFER