1 Jeffrey S. Benice, Esq., State Bar No. 81583
  LAW OFFICES OF JEFFREY S. BENICE
2 *A Professional Law Corporation*
  3080 Bristol Street
3 Sixth Floor, Suite 630
  Costa Mesa, California 92626
4 Telephone No.: (714) 641-3600
  Facsimile No.: (714) 641-3601
5 Website: www.JeffreyBenice.com
  E-Mail: JSB@JeffreyBenice.com
6
  Attorneys for Defendants,
7 Igor Latsanovski and Calenergy, Inc.

8                    **UNITED STATES DISTRICT COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10 FEDERAL TRADE COMMISSION,          **CASE NO. CV 15-04527 GW (PLAx)**

11            Plaintiff,              **DEFENDANTS IGOR LATSANOVSKI AND
                                      CALENERGY, INC.'S MEMORANDUM OF**
12         v.                         **POINTS AND AUTHORITIES IN
                                      OPPOSITION TO PLAINTIFF FEDERAL**
13 BUNZAI MEDIA GROUP INC.,           **TRADE COMMISSION'S MOTION FOR
   et al.,                            SUMMARY JUDGMENT PURSUANT TO**
14                                    **FEDERAL RULES OF CIVIL PROCEDURE,
                                      RULE 56; DECLARATION OF IGOR**
15            Defendants.             **LATSANOVSKI IN SUPPORT THEREOF**

16 _____

17                                    **Date:        May 23, 2016**

18                                    **Time:        8:30 A.M.**

                                      **Courtroom:   10**
19                                    _____

20                                    **[Assigned for All Purposes to the Honorable
                                      George H. Wu]**
21
                                      **[First Amended Complaint Filed: October
22                                    9, 2015]**

23                                    **[Concurrently filed with Request for
                                      Judicial Notice; Response to Statement of**
24                                    **Uncontroverted Facts and Conclusions of
                                      Law and Statement of Genuine Issues]**
25

26

27

28
_____
       **DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL
              TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

| | TABLE OF CONTENTS | |
|---|---|---|
| 1. | SUMMARY OF DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO FEDERAL TRADE COMMISSION'S ("FTC") MOTION FOR SUMMARY JUDGMENT | 1 |
| | A.   The FTC's Claims. | 1 |
| | B.   Defendants Latsanovski and Calenergy Have No Liability Under The FTC Act. | 2 |
| | C.   The FTC's Claims Against Defendants Latsanovski and Calenergy are Meritless; The FTC's Summary Judgment Motion Must be Denied. | 5 |
| 2. | RULE 56 MOTION FOR SUMMARY JUDGMENT STANDARD | 7 |
| 3. | PROCEDURAL HISTORY | 8 |
| 4. | DEFENDANTS NEITHER PARTICIPATED IN NOR HAD KNOWLEDGE OR RECKLESSLY DISREGARDED DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT | 8 |
| | A.   Defendants Latsanovski's and Calenergy History. | 8 |
| | B.   Defendant Latsanovski's Loan Transactions with Defendant Bunzai. | 10 |
| 5. | AS A MATTER OF LAW; DEFENDANTS CAN BE LIABLE, IF AT ALL, ONLY FOR EQUITABLE DIGORGEMENT; THE FTC'S CONTENTION DEFENDANTS ARE SUBJECT TO JOINT AND SEVERAL LIABILITY IS MERITLESS | 12 |
| 6. | DEFENDANTS LATSANOVSKI AND CALENERGY'S SPECIFIC RESPONSES TO THE FTC'S UNCONTROVERTED FACT NO. 36 | 13 |
| 7. | CONCLUSION | 20 |

## TABLE OF AUTHORITIES

## FEDERAL CASES

| | |
|---|---|
| *Ambat v. City and County of San Francisco,* 757 *F.3d* 1071, 1031 (9th Cir. 2014.) | 7 |
| *Calderone v. United States,* 779 *F.2d* 254, 259 (6th Cir. 1986) | 7 |
| *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) | 7 |
| *Delaware Watch Co. v. FTC,* 332 *F.2d* 745, 746 (2d Cir. 1694) | 2 |
| *Delaware Watch,* 332 *F.2d* 1143 | 2 |
| *FTC v. Burnlounge, Inc*., 584 Fed. Appx. 315 (9th Cir. 2014) | 6 |
| *FTC v. Burnlounge, Inc.,* 584 Fed. Appx. 315, 317 (9th Cir. 2014) | 12 |
| *FTC v. Commerce Planet, Inc*., 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016) | 12 |
| *FTC v. Network Services Depot, Inc.,* 617 *F.3d* 1127, 1138-39 (9th Cir. 2010); | 6, 7, 12, 20 |
| *FTC v. Pantron Comp.,* 33 *F.3d* 1088, 1102 (9th Cir. 1994) | 13 |
| *FTC v. Publishing Clearing House, Inc*., 104 *F.3d* 1168, 1170-71 (9th Cir. 1997) | 6 |
| *FTC v. Stefanchik,* 559 *F.3d* 924, 931 (9th Cir. 2009) | 3, 6, 12, |
| *Hately v. SEC,* 8 *F.3d* 653, 656 (9th Cir. 1993); | 6 |
| *SEC v. First Pacific Bancorp,* 142 *F. 3d* 1186, 1191-92 (9th Cir.   1998) | 6 |
| *Stefanchik,* 559 *F.3d* at 927, 930-32 | 6 |

## STATUTORY AUTHORITY

| | |
|---|---|
| Federal Rule of Civil Procedure 56 | 7 |
| Fed. R. Civ. Proc. 56(a) | 7 |
| F.R.A.P. Rule 32.1(a) | 6 |

1.

## SUMMARY OF DEFENDANTS LATSANOVSKI AND CALENERGY'S

## OPPOSITION TO FEDERAL TRADE COMMISSION'S ("*FTC*")

## MOTION FOR SUMMARY JUDGMENT

*A.*   *The FTC's Claims.*

The FTC's first amended complaint ("*FAC*") contains seven counts for (1) failure to disclose adequate material terms of offer; (2) false "*risk-free*" trial claim; (3) false Better Business Bureau Accreditations and rating claims; (4) unfairly charging consumers without authorization; (5) violation of ROSCA – Auto-Renewal Continuity Plan; (6) unauthorized debiting from consumer's accounts; and (7) a separate count against relief Defendant Chargeback Armor, Inc.

The FTC's primary factual contention is that defendants conceived and operated a skincare business called "*Aura Vie*"; and improperly sold the products through misleading web-based advertising.    [Defendant Alon Nottea, Bunzai's president and owner, discusses the entirely proper and statutorily compliant operations of Bunzai in his opposition. Defendants join in that position.]The FTC's allegations against Defendants Latsanovksi and Calenergy directly implicated them in the alleged scheme:

> "21. *Defendant Calenergy, Inc. is or was a California corporation*
> *with its principal place of business at 63420 Cordova Drive,*
> *Calabasas, CA 91302.  At times material to this Complaint,*
> *CalEnergy, Inc. had advertised marketed, distributed, or sold the*
> *skincare products at issue in this case to consumers throughout the*
> *United States. CalEnergy, Inc. transacts or has transacted*
> *business in this district and throughout the United States.*"
> [FAC ¶21]
> "36. *Defendant Igor Latsanovski is or was an owner of Bunzai*
> *Media Group, Inc. and CEO of Zen Mobile Media Group, Inc. At*
> *times material to this Complaint, he has formulated, directed,*
> *controlled, had the Authority to control, or participated in the acts*

1

1  *or practices set forth in this Complaint.  By and through the*

2  *corporate defendants, he has harmed consumers nationwide with*

3  *his unfair and deceptive practices.  Defendant Igor Latsanovski*

4  *resides in this district and, in connection with the matters alleged*

5  *herein, transacts or has transacted business in this district and*

6  *throughout the United States."* [FAC, ¶36.]

7  As explained the FTC's allegations are meritless.  Neither Defendant Latsanovski nor

8  Calenergy held any ownership interest in Defendant Bunzai; nor had any involvement in defendant

9  Bunzai's operations. Moreover, they did not participate directly or indirectly in any wrongful

10  conduct. [And as Defendant Nottea explains there was no wrongful conduct.]

11  The FTC further alleges that Defendants Latsanovksi and CalEnergy engaged in a common

12  enterprise.  [FAC, ¶42.] The FTC uses the common enterprise doctrine to expand its reach beyond

13  those who themselves deceptively market a product where the "*same individuals were transacting*

14  *an integrated business through a maze of interrelated companies.*"  *Delaware Watch Co. v. FTC*,

15  332 F.2d 745, 746 (2d Cir. 1694).  Courts rely on several factors to assess the existence of a

16  common enterprise: whether companies (1) maintain officers and employees in common; (2)

17  operate under common control; (3) share offices; (4) commingle funds; and (5) share advertising

18  and marketing.  No one factor is determinative, rather, the entirety of the factual circumstances

19  dictates whether a common enterprise exists and whether a company should be found to be a part

20  of it.  *Delaware Watch*, 332 *F.2d* 1143.

21  As explained, neither any individual factor nor the overall circumstances support finding

22  Defendants Latsanovski and Calenergy to be a part of any common enterprise with the Bunzai

23  defendants.  The evidence is undisputed that Defendants Latsanovski and CalEnergy were solely

24  third party lenders to Defendant Bunzai (and affiliate companies) during the period 2010 to 2015.

25  No common enterprise existed between them. [See discussion *infra* at 11-13.]

26  **B.   *Defendants Latsanovksi and Calenergy Have No Liability Under The FTC Act*.**

27  Defendant Latsanovski and his company Calenergy have been named as defendants by

28  Plaintiff FTC because they allegedly "*participated in the scheme*"; and Latsanovski was "*an*

1    *employee of Bunzai, he was a party and majority shareholder.*" [*See, FTC's July 31, 2015 Reply*

2    *to Defendants' Opposition to Preliminary Injunction* at 8: lns. 15-16; 9: lns. 1-2.] In fact, the

3    FTC's assertions concerning Defendants' participation in the alleged Aura Vie marketing

4    "*scheme*" are materially misstated or grossly exaggerated for the sole purpose of imposing joint

5    and several liability on Defendants.  *See, FTC v. Stefanchik*, 559 *F.3d* 924, 930-931 (9th Cir.

6    2009); *only these defendants have significant assets to seize*. The remaining defendants are

7    essentially judgment proof.

8         For example, the FTC contends *inter alia* that Defendants transferred at least $1.9 million

9    from defendant Bunzai to Defendants. [*See, Receiver's July 16, 2015 Response to Defendants'*

10   *Application for Partial Relief from Temporary Restraining Order* at 2: lns. 21-22.] In fact,

11   Defendant Calenergy loaned defendant Bunzai the principal sum of $500,000 as a form of

12   revolving credit line during the period 2010 to 2015.  Defendant Bunzai repaid $500,000 in

13   principal and $317,748.05 (herein "*$317,000*") in interest to Calenergy. [Decl. of Latsanovski,

14   ¶¶2-5; Exh. "A" thereto; *July 1, 2015 Loan Summary*.]  The 1.9 million number is the aggregate of

15   all principal loan advances; repayments; and further re-advances of the original $500,000 in loans

16   made in various installments. [Decl. of Latsanovski, ¶4.]The FTC (and the Receiver) has

17   continued to grossly overstate Defendants' loans to defendant Bunzai to improperly attempt to

18   expand Defendants' role and relationship with Defendant Bunzai.  [*See, Defs.' Response to*

19   *Plaintiffs Statement of Uncontroverted Facts and Conclusions of Law and Statement of Genuine*

20   *Issues Nos. 2-5* and evidence referenced therein, hereinafter "*Defs' Stat.*"]

21        More importantly, Defendants' business relationship with defendant Bunzai has been

22   mischaracterized and distorted by the FTC to ensnare Defendants in this litigation; and subject

23   unrelated third party "*untainted*" assets owned by unrelated third party Sunset Holdings, LLC

24   ("*Sunset*") and others to be subject to an asset freeze through this Court's September 9, 2015

25   preliminary injunction. In fact, the undisputed facts are that:

26        • Defendants Latsanovski and Calenergy were solely investors who loaned $500,000

27             in principal to defendant Bunzai.  [Decl. of Latsanovksi, ¶2-4; Exh. "A" thereto;

28             *July, 2015 Loan Summary*.][Decl. of Benice, ¶4; Exh. "C" thereto, *February 18,*

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL
TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

*2016 Deposition of Alon Nottea* at R.T. 84: lns. 15-25 (Bates 85); 85: 1-25 (Bates 86); 86: lns. 1-24 (Bates 86).]

- Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000. [Decl. of Latsanovksi, ¶¶2-4; Exh. "A" thereto; *July 1, 2015 Loan Summary*.][Decl. of Latsanovsky, ¶¶15-16.] [Decl. of Benice, ¶2: Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski*, R.T. 35: lns. 2-25 (Bates 21); 36: lns. 1-24 (Bates 22); 37 lns. 1-24 (Bates 23); 38: lns. 1-24 (Bates 24); 114: lns. 1-24 (Bate 41); 116: lns. 1-11 (Bates 42)][Decl. of Benice, ¶4: Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* R.T. 85: lns. 3-5 (Bates 86)("*Did Bunzai...pay back Igor...? A. I believe it did.*"]

- Defendants had no involvement in the day to day operations of defendant Bunzai.[Decl. of Benice, ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski* at R.T. 30: lns. 6-23 at Bates 20.][Decl. of Benice, ¶4; Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* at R.T. 109: lns. 22-24 (Bates 89); 110: lns. 1-25; 111: lns. 1-25: 112: lns. 1-12; 161: lns. 10-19 (Bates 92).][Decl. of Latsanovsky, ¶10; 12-18.]

- Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct. [Decl. of Benice, ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski* at R.T. 269: lns 4-18 (Bates No. 069) ("*Alon can do it... He is running it. [Bunzai]*"[Decl. of Latsanovski, ¶17.]

- Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business. Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

1   operational decisions.  Neither Calenergy nor Defendant Latsanovski received any

2   money from consumers directly. [Decl. of Latsanovksi, ¶¶10; 17-18.]

3   • As noted above, the amount of Defendant Latsanovski's assets impacted by the

4   TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In

5   total, over $3.1 million of Latsanovski's assets have been impacted by the asset

6   freeze.  Latsanovski's $3.1 million home is subject to the freeze and his personal

7   bank accounts (which contained approximately $50,000) have been frozen. [Decl.

8   of Latsanovksi, ¶23.]

9   • Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners

10   LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors

11   who would be willing to provide funds to these businesses. None of these

12   businesses received funds from Defendant Bunzai.  As a result of the asset freeze,

13   these legitimate businesses have had their bank accounts frozen even though  (a)

14   these businesses are completely unrelated to the alleged internet skincare business,

15   (b) were funded by unrelated sources of income; and/or (c) were not run by

16   Defendants Calenergy or Latsanovski. [Decl. of Latsanovksi, ¶27.]

17   • Most importantly, unrelated third party, Sunset Holding Partner, LLC ("*Sunset*") is

18   a real estate investment company that was formed in January 2015, well after the

19   business entities involved in the skincare business were dissolved.  But its Well

20   Fargo account ($212,000) and real estate assets valued in excess of $5 million were

21   frozen in September 2015, even though all of the funds frozen came from a outside

22   real estate investors.    [Decl. of Latsanovksi, ¶27.][*See, Defs.' Stat.* Nos. 1-158 and

23   evidence referenced therein.]

24   **C.**   ***The FTC's Claims Against Defendants Latsanovski and Calenergy Are Meritless; The***

25   ***FTC's Summary Judgment Motion Must be Denied.***

26   The Ninth Circuit has established a two-pronged test for determining when an individual

27   may be held personally liable for corporate violation of the FTC Act.  *The test requires the FTC to*

28   *prove that the individual: (1) participated directly in, or had the authority to control, the unlawful*

5

1   *acts or practices at issue; **and** (2) had actual knowledge of the misrepresentations involved, was*

2   *recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high*

3   *probability of fraud and intentionally avoided learning the truth.* See, <u>FTC v. Network Services</u>

4   <u>Depot, Inc.</u>, 617 *F.3d* 1127, 1138-39 (9th Cir. 2010); <u>FTC v. Stefanchik</u>, 559 *F.3d* 924, 931 (9th Cir.

5   2009).  Satisfaction of the two-pronged test establishes the degree of collaboration between co-

6   defendants necessary to justify joint and several liability in analogous factual contexts, such as

7   actions brought by the Securities and Exchange Commission ("*SEC*") to obtain disgorgement in

8   securities fraud cases. See, <u>SEC v. First Pacific Bancorp</u>, 142 *F. 3d* 1186, 1191-92 (9th Cir.  1998);

9   <u>Hately v. SEC</u>, 8 *F.3d* 653, 656 (9th Cir. 1993);   <u>Network Services Depot</u>, 617 *F.3d* at 1138-39;

10   <u>Stefanchik</u>, 559 *F.3d* at 927, 930-32; <u>FTC v. Publishing Clearing House, Inc</u>., 104 *F.3d* 1168,

11   1170-71 (9th Cir. 1997).

12        The facts are undisputed that Defendants Latsanovski and Calenergy did not engage in

13   conduct satisfying the two-pronged test.  Thus, the FTC's motion for summary judgment must

14   accordingly be denied; ***as a matter of law they have no liability arising from the FTC's claims***

15   ***asserted in the FAC.***  And at minimum triable facts exist concerning the issues. Moreover,

16   Defendants are accordingly entitled to summary judgment on their concurrently filed motion for

17   summary judgment or partial summary judgment on all claims asserted against them; and the

18   preliminary injunction and asset freeze should be dissolved as well. [*See, Defs.' Stat. Nos.* 1-158

19   and evidence referenced therein.]

20        Alternatively, Defendants liability if any must be limited to equitable disgorgement, not

21   joint and several liability.  Assuming *arguendo* that the Court determines that defendants

22   Latsanovski and Calenergy's alleged status as *partners* with Bunzai creates an inference that they

23   likely had actual knowledge or were recklessly indifferent to the truth of purported

24   misrepresentations made to consumers, they are *subject only to disgorgement, not joint and several*

25   *liability*. See, <u>FTC v. Burnlounge, Inc</u>., 584 Fed. Appx. 315 (9th Cir. 2014) [*See*, F.R.A.P. Rule

26   32.1(a); *citation permitted of unpublished opinions*.] Defendants received $317,000 in

27   profit/interest return on the $500,000 investment made into Bunzai. [Decl. of Latsanovski, ¶¶2-4.]

28   *Thus, the amount they should be ordered to disgorge if any should not exceed $317,000.* [*See,*

1   *Defs.' Stat.* Nos. 2-5 and evidence referenced therein; specifically subpart "*B.  During the period*

2   *2010 to 2015 Defendants Latsanovski and Calenergy made loans totaling $500,000 to Defendant*

3   *Bunzai and its affiliates.*"]

**2.**

## **RULE 56 MOTION FOR SUMMARY JUDGMENT STANDARD**

6   Federal Rule of Civil Procedure 56 ("*Rule 56*") mandates that a summary judgment motion

7   be granted "*if the movant shows that there is no genuine dispute as to any material fact and the*

8   *movant is entitled to judgment as a matter of law.*" Fed. R. Civ. Proc. 56(a).  Because summary

9   judgment is a "*drastic device*" preventing a party from presenting its case at trial the moving party

10  bears a "*heavy burden*" of demonstrating the absence of any triable issue of material fact.  *See,*

11  *Ambat v. City and County of San Francisco*, 757 *F.3d* 1017, 1031 (9th Cir. 2014).  "*Where the*

12  *moving party has the burden – the plaintiff on a claim for relief ... his showing must be sufficient*

13  *for the court to hold that no reasonable trier of fact could find other than for the moving party.*"

14  *Calderone v. United States*, 779 *F.2d* 254, 259 (6th Cir. 1986) (citation omitted.)

15  Summary judgment for a defendant (and denial of a plaintiff's motion) is appropriate when

16  the plaintiff fails to make a showing sufficient to establish "*the existence of an element essential to*

17  *that party's case, and on which that party will bear the burden of proof at trial.*"  *See, Celotex*

18  *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

19  As explained below, there is no evidence that Defendants "*(1) participated directly in or*

20  *had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge*

21  *of the misrepresentations involved, [were] recklessly indifferent to the truth or falsity of the*

22  *misrepresentation or [were] aware of a high probability of fraud and intentionally avoided*

23  *learning the truth.*"  *See, FTC v. Network Services Depot, Inc.,* 617 *F.3d* 1127, 113.8-1139 (9[th]

24  Cir. 2010). [*See, Def's Sep. Stat*. Nos. 1-158 and evidence referenced therein.]Thus, the FTC's

25  summary judgment motion must be denied.

26  ///

27

28  ///

7

**3.**

## PROCEDURAL HISTORY

The FTC filed this Action on June 16, 2015 concurrently with an ex parte application to temporarily seal the entire file and docket; and an ex parte application for a restraining order.  This Court granted the TRO and thereafter lifted the stay.  A hearing on the FTC's preliminary injunction and asset freeze was set for August 6, 2015.  On September 9, 2015 the Court entered its order granting a preliminary injunction and asset freeze as to Defendants Latsanovski and Calenergy. (As well as all other defendants).

**4.**

## DEFENDANTS NEITHER PARTICIPATED IN NOR HAD
## KNOWLEDGE OR RECKLESSLY DISREGARDED
## DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT

The FTC's evidence in support of summary judgment against Defendants Latsanovski and Calenergy is found primarily in Statement of Uncontroverted Facts and Conclusions of Law No. 36 and subparts a. through q.  Defendant Latsanovski separately addresses each subpart of Uncontroverted Fact No. 36 in his concurrently filed opposing declaration; specifically paragraphs 28-30. [*As well as all other supporting evidence identified on Defendants' Response to Statement of Uncontroverted Issues and Statement of Genuine Issues*.] The FTC's purported "*evidence*" is either misstated or grossly exaggerated. [*See, Section 6, infra*.]

A.   <u>**Defendants Latsanovski's and Calenergy's History.**</u>

Defendant Latsanovksi is a 52 year old immigrant.  He was born in Kazakhstan (USSR) in 1964 and lived with his family there until approximately 1990. He graduated from college in approximately 1983.  In 1992 Defendant Latsanovksi moved to Canada. In 1996, when he was 33 years old, he moved with his wife to Spain.  Defendant Latsanovksi lived in Barcelona, Spain from 1996 to 2010. While in Spain he became involved in various real estate development projects.  In 2010, he moved from Spain. [his wife and family (2 children), moved to the United States in 2011.]  When he first arrived in the United States in 2010 he could speak a little English, but could

8

1  not read nor write English. [Decl. of Latsanovski, ¶14.] He used an interpreter to read English.

2  [Decl. of Latsanovski, ¶¶4-6.]

3      Defendant Latsanovski represented a group of foreign investors in 2010 as their agent in

4  the United States. His business plan involved placing the foreign investors' investment funds in to

5  suitable investments in the United States. He also made investments on his own behalf. In 2009

6  Defendant Latsanovski created Defendant Calenergy and became its CEO.  Defendant Latsanovski

7  used Defendant Calenergy to fund investments with investor funds. [Decl. of Latsanovski, ¶14.]

8      Sometime in 2010, Latsanovski was approached by Defendant Alon Nottea, to invest in an

9  internet skincare project with Defendant Bunzai Media Group, Inc. ("*Bunzai*").  Mr. Nottea was

10  Defendant Bunzai's president and CEO. From conversations with Defendant Nottea, Defendant

11  Latsanovski understood that Defendant Bunzai needed funds to hire additional employees and

12  resources. Defendant Latsanovksi preliminarily agreed to invest funds in Defendant Nottea's

13  company.

14      Defendant Nottea also introduced Defendant Latsanovski to Defendants Khristopher Bond

15  who handled the day to day operations for the internet skincare business and also handled all

16  aspects of the business, including marketing, advertising, product fulfillment and customer service.

17      Defendant Latsanovski's sole involvement in Defendant Bunzai, and all entities related to it

18  ("*Bunzai Group*"), was to provide loans through his company Defendant Calenergy. As Defendant

19  Calenergy's CEO, Defendant Latsanovski had no involvement in the operation of the Bunzai

20  Group and had no authority to make any decisions regarding the operations of the Bunzai Group.

21   [Decl. of Latsanovski, ¶¶14-15.]

22      Defendant Latsanovksi did not perform any functions in advertising, payment processing,

23  billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai

24  Group's operational decisions.  Moreover, he had no interactions with customers, did not received

25  any customer complaints, nor any reports of customer complaints.  [Decl. of Latsanovski, ¶16.]

26      At no point did Defendant Latsanovski believe that any customers were being deceived or

27  defrauded. By all indications, Defendant Nottea was running a legitimate company operating in a

28  legitimate industry. [Decl. of Latsanovski, ¶17.][*See, Defs.' Stat*. Nos. 1-5 and evidence referenced

DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL
TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

1  therein.]

2  **B.**    ___Defendant Latsanovski's Loan Transactions with Defendant Bunzai.___

3       In 2010 when Defendant Latsanovski was introduced to defendants Nottea and Bunzai an

4  initial proposal was made to Defendant Latsanovski, in which he would invest *"$350k in exchange*

5  *for 55% ownership of Bunzai Media Group, Ownership Shares ... will be as follows:  55% Igor,*

6  *22.5% Alon[Nottea], 22.5 Khristopher [Bond]"*.   The proposal was memorialized in a document

7  entitled "*Bunzai Media Group - Partnership Agreement*," dated October 12, 2010. [Decl. of

8  Latsanovski, ¶18; Exh. "C" thereto; *Bunzai Media Group Partnership Agreement dated October*

9  *12, 2010.*]

10       A condition to the October 12, 2010 Agreement's validity was that:

11            "*upon signing this agreement, Igor shall invest $75k to run a*

12            *continuity test for 30 days.  During this test, Bunzai will purchase*

13            *at least 1,000 orders . . . within the first 15 days, and a conversion*

14            *from free trial to transitional stage . . . of at least 75% of those*

15            *orders.  If this goal is met and both parties agree to continue with*

16            *the partnership, then Igor will immediately invest the remaining*

17            *$275k to complete the financial agreements of this deal.*" [Decl. of

18            Latsanovski, ¶18; Exh. "C" thereto; *October 12, 2010 Agreement*

19            *at 1.*]

20       Defendant Latsanovski advanced the $75,000 on October 12, 2010. However, the condition

21  to the validity of the October 12, 2010 Agreement did not occur. The continuity test was not

22  satisfactorily completed and the "*parties [did not] agree to continue with the partnership . . .*"

23  [Decl. of Latsanovski, ¶19.]

24       Defendants Nottea and Bond, defendant Bunzai's officers, then proposed a "*Bunzai Media*

25  *Group Loan Agreement*" dated December 16, 2010. [Decl. of Latsanovski, ¶20; Exh. "D" thereto;

26  "*Bunzai Media Group Loan Agreement dated December 16, 2010.*"]  The December 16, 2010

27  Loan Agreement offered two alternatives to Defendant Latsanovski concerning a loan of $175,000

28  he was to make to defendant Bunzai; "*This Agreement . . . with respect . . . to the loan of $175k to*

1  *existing company.*"  First, defendant Bunzai agreed to repay the $175,000 in three (3) payments on

2  April 5, May 5, and June 5, 2010 respectfully of $50,000, $50,000 and $100,000.  "*Alternatively,*

3  *"Igor's 175k will become an investment that will represent a percentage of ownership in the*

4  *company that will be determined the first week of January, 2011.*"  [Decl. of Latsanovski, ¶20; Exh.

5  "D" thereto; *Bunzai Media Group Loan Agreement* dated December 16, 2010.]

6       No subsequent agreement was negotiated between the parties in January, 2011.  Rather, in

7  March, 2011 Defendants Nottea and Bond offered Defendant Latsanovski a new partnership

8  proposal.  This new agreement required Defendant Latsanovski to immediately "*invest $500,000*

9  *into the company for administration, manufacturing and marketing expenses. . . Investments shall*

10  *be returned as follows:*

11       *Igor $300k*

12       *Alon and Khristopher (to go to French Partners) $200k*

13       *Igor $200k*

14       *Alon and Khristopher $300k*"

15       Pursuant to the March 23, 2011 Partnership Agreement's terms defendants Latsanovski,

16  Nottea, and Bond would each own "*1/3 of 100% of the company.*"  Further:

17       "*5. It is understood by all parties that this will be Alon Nottea and*

18       *Khristopher Bond's primary business and they shall devote to the*

19       *conduct of the business so much of their respective time as may*

20       *be reasonably necessary for the efficient operation of the business.*"

21       [Decl. of Latsanovski, ¶21; Exh. "D" thereto; "*Bunzai Media Group –*

22       *Partnership Agreement* dated March 23, 2011.]

23       Defendant Latsanovsky decided not to invest $500,000 in one lump sum into Defendant

24  Bunzai in March, 2011. [Decl. of Latsanovski, ¶22.]  He was uncomfortable with the terms of

25  repayment of the investment and decided that he would remain a lender as set forth in December

26  16, 2010 Loan Agreement. [Decl. of Latsanovski, ¶22.]  Defendants Nottea and Bond agreed that

27  Defendant Latsanovski's status would be as a lender only. [Decl. of Latsanovski, ¶22.][*See, Defs.'*

28  *Stat.* Nos 1-5 and evidence referenced therein.]

DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL
TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

1   Because Defendants Latsanovski and Calenergy functioned solely as lenders to defendant

2   Bunzai, as a matter of law they may not be held personally liable for Defendant Bunzai's corporate

3   violation of the FTC Act.  Accordingly, as a matter of law no evidence exists that they *(1)*

4   *participated directly in, or had the authority to control, the unlawful acts or practices at issue;* **and**

5   *(2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth*

6   *or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally*

7   *avoided learning the truth. See, FTC v. Network Services Depot, Inc.,* 617 *F.3d* 1127, 1138-39 (9th

8   Cir. 2010); *FTC v. Stefanchik*, 559 *F.3d* 924, 931 (9th Cir. 2009); or at minimum triable facts exist

9   concerning the issues.  The FTC's summary judgment motion must accordingly be denied.

10   **5.**

11   ## AS A MATTER OF LAW, DEFENDANTS CAN BE LIABLE, IF AT ALL,

12   ## ONLY FOR EQUITABLE DISGORGEMENT; THE FTC'S

13   ## CONTENTION DEFENDANTS ARE SUBJECT TO JOINT

14   ## AND SEVERAL LIABILITY IS MERITLESS

15   Because no evidence exists that Defendants acted in concert with defendant Bunzai to

16   violate the FTC Act, Defendants are liable if at all to only disgorgement of the sums they directly

17   received from defendant Bunzai during the period 2010-2015.  That sum is $317,000 [Decl. of

18   Latsanovski, ¶¶1-4.]  See, *FTC v. Commerce Planet, Inc*., 2016 U.S. App. LEXIS 3992, 2016-1

19   Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016). [*See, Defs.' Stat*. Nos. 1-5 and

20   evidence referenced therein.]

21   Utterly no evidence exists the Defendants "*participated directly in*" or controlled the

22   alleged unlawful acts and had actual knowledge of the misrepresentations or were recklessly

23   indifferent to them. The evidence is undisputed that Defendants loaned Defendant Bunzai

24   $500,000 during the period 2010 to 2015; that the full principal amount of $500,000 was repaid by

25   Defendant Bunzai; and $317,000 in interest on the investment return on the $500,000 loan was

26   repaid. [Decl. of Latsanovski, ¶¶1-4; 10; 15-18.]

27   Accordingly, to the extent Defendants are liable at all it is solely for disgorgement of the

28   $317,000 they received for Defendant Bunzai – nothing more.  *See, e.g., FTC v. Burnlounge, Inc*.,

12

1  584 Fed. Appx. 315, 317 (9th Cir. 2014) (Affirming district court's order that a defendant who

2  raised capital necessary to create the defendant corporation; owned stock in the corporation ; and

3  held a position in the organization; "*likely ... had actual knowledge or was at least recklessly*

4  *indifferent to the truth of the misrepresentations made to consumers*" disgorge "*all monies and*

5  *other items of enrichment which he obtained from Burnlounge's operations.*")  This Court has

6  "*broad authority to fashion appropriate remedies for violations of the Act. [and] it includes the*

7  *'authority to grant any ancillary relief necessary to accomplish complete justice.'*" *FTC v. Pantron*

8  *Comp.*, 33 *F.3d* 1088, 1102 (9th Cir. 1994).  Such ancillary relief may include restitution or

9  disgorgement. *Id.* at w.4.

10      Because of Defendants sole involvement in Defendant Bunzai's operations was as a lender

11  of only $500,000, they should be subject solely to disgorgement of the $317,000 they received as a

12  return on their $500,000 investment. Assuming Defendants have any liability at all.

13                                                  **6.**

14  **DEFENDANTS LATSANOVSKI AND CALENERGY'S SPECIFIC RESPONSES**

15  **TO THE FTC'S UNCONTROVERTED FACT NO. 36**

16      As explained, the FTC's key purported evidence supporting its summary judgment motion

17  as to Defendants Latsanovski and Calenergy is set forth in Uncontroverted Fact No. 36. To assist

18  the Court in reviewing the voluminous evidence submitted in support of and in opposition to the

19  FTC's motion, Defendants herein will set forth Defendant Latsanovski's specific responses to No.

20  36 and its subparts as set forth in his declaration:

21      "*(a)     The FTC's reference to Doron and Motti Nottea's statement that I was an*

22      *'owner' of Bunzai is erroneous [36a].  They specifically denied that I had any*

23      *ownership interest in 'Response's to FTC's Request for Admission-Set One.'  A*

24      *true copy of their responses is attached hereto as Exh. 'H' and incorporated*

25      *herein  by reference. I never owned any part of Bunzai.  I was the 'CEO' of Zen*

26      *Mobile Media.  Alon Nottea asked me to incorporate Zen Mobile.  Mr. Nottea*

27      *thereafter managed the business' day to day operations. Zen Mobile handled*

28      *merchant account business. [Attached hereto as Exhibit 'I' is a true copy of Mr.*

13

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

Nottea's February 18, 2016 Deposition R.T. 219: lns. 14-21; Nottea specifically testified that 'A. I made decision on behalf of Zen. It was not Igor.  It is not Igor's consent to make decisions there.']

(b)      I fully explained that no partnership was ever created with Bunzai above. I have no knowledge concerning the source of Defendant Medina's belief that I was an 'owner' of Bunzai.  I was never a Bunzai owner.  Defendant Medina testified in his February 23, 2016 deposition that he was hired to work at Bunzai by Khristopher Bond; that he was supervised by Khristopher Bond and Alon Nottea; and that he 'assum[ed][Bunzai] is owned by Alon and Khristopher because ...they hired me.' A true copy of Medina's February 23, 2016 Deposition R.T. 10 and 12 is attached hereto as Exhibit 'J' and incorporated herein by reference.  The specific testimony is at R.T. 10: lns. 9-15; and R.T. 12: lns. 10-13.] Because Calenergy loaned Bunzai substantial funds I was interested in Bunzai's financial status to ensure Calenergy would be repaid; because Bunzai was typically late or delinquent in repaying the loan.

(e)      Calenergy's website accurately referenced at the time that 'we are working under a strategic hierarchy which allows us to hire management companies that specialized in managing our clients.' That accurately describes Calenergy's business. The  companies identified on the website were either contracted management companies or clients.  There is no reference to Calenergy having an ownership in any of the identified companies; it was not a 'parent' company.

        i. and ii.        Calenergy's 'organization chart' referenced by the FTC was a document that was never fully implemented [Exh. 561]. Calenergy never successfully commenced the operation identified on the charts. Calenergy did employ Camerino as an accountant; Reuveni referred Calenergy information concerning potential start-up company investment opportunities; and Nottea worked for Calenergy developing prospective contracts with international companies. They worked between three and six

14

months for Calenergy in late 2013. Their general job title was 'manager.'

(f)     I never swore under oath that Bunzai was my employer. Exh. 949 referenced by the FTC is a Form I-9 Employment Eligibility Verification. Bunzai's HR employee Lear Arazy executed the document apparently believing I was an "employee" of Bunzai in November, 2011.  I was never employed by Bunzai **and therefore did not sign the form**.  The FTC's statement that I swore under oath is accordingly false.

(g)     This is a 2012 Form W-2 that Bunzai issued to me for $110.00.  This is the sole and only W-2 I ever received from Bunzai.  This W-2 was issued apparently to document $110 paid to me sometime in 2012. I have no records of the payment and no knowledge as to why Bunzai gave me a W-2 rather than a 1099.

(h)     All information provided to the immigration service accurately described Calenergy and my ownership of Calenergy. This is a resume I prepared as part of my immigration application in 2014. It accurately reflects that I was fully employed by Calenergy in 2014 and that my 'work schedule does not have fixed hours and includes travel within the United States and abroad for negotiations and assessment of potential projects...'

(i)     I never was personally involved in managing Bunzai on a day to day level.

    i.     Paul Medina provided me with quarterly (sometime monthly) financial reports concerning Bunzai's operations; I requested reports because I authorized Calenergy to loan money to Bunzai with no security. Exh. 507 is a form of detailed financial report that I was provided by Medina; I sent Exh. 507 back to Medina as confirming my acceptance of the format.

    ii.     In 2011, I introduced Alon Nottea to Oleg Trushla. Mr. Trushla was attempting to sell cosmetics in Europe.  I understand that he was unsuccessful.  I received copies of some correspondence between them, I assume because I introduced them. At no time did I participate directly in

1    their communications. Exh. 319 referenced by the FTC is such a

2    communication.

3        iii.     Exhibit 329 referenced by the FTC contains no evidence of my

4    participation in any meeting or conference call.

5        iv.     Exhibits 564 and 559 reference communications to me from David

6    Migdal in 2014.  Migdal was an associate of Alon Nottea.  I referred

7    Nottea/Migdal to 'Miki' in Barcelona; I do not recall Miki's last name. I

8    met Miki when I lived in Barcelona. Miki sold a product through his

9    Spanish magazines called 'Gold Mask.' Mr. Nottea expressed an interest in

10   speaking to Miki.  I wasn't involved in the conversations.  Exhibits 564 and

11   559 are updates sent to me by Midgal concerning the Barcelona business.

12   He apparently thought because I referred Miki that he should update me on

13   the status of a few conversations.  Also, at no time did I ever proofread

14   Bunzai advertising; or have any involvement in the Bunzai website creation

15   or operation. And Exhibits 564 and 559 make no reference to advertising.

16       v.      I was not apprised of 'low level contractual disputes' concerning

17   advertising.  Exhibit 48 referenced by the FTC is an e-mail to Jose at

18   an 'investment group'. I was copied on the e-mail.  I have no

19   recollection of reading it.  I don't' know 'Jose' and never had any

20   discussion with him.  Exhibit 48 appears to concern direct sales by

21   Bunzai.  It has nothing to do with a contractual dispute.

22       vi.     I did not assist Defendants in transferring funds overseas to

23   Cypress. This in an FTC fabrication.  Exhibit 55 references my

24   referral of Alon Nottea to a banker. Mr. Nottea specifically testified

25   at his February 23, 2016 deposition that he never transferred any

26   funds to a Cypress trust or bank. [Attached hereto as Exh. 'K' is a

27   true copy of pages 252 and 253 of the February 23, 2016 Deposition

28   of Alon Nottea. His testimony denying transferring funds to

16

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

Cypress is at R.T. 252 lns. 22-25; 253: lns. 1-20.] The FTC's assertion is false.

vii.     From time to time I would leave pre-signed checks with Doron Nottea to pay my personal bills when I was travelling on business; and to pay Calenergy bills.

viii.    I own Calenergy. Calenergy loaned funds at my direction to Bunzai and Bunzai affiliates as described above.

ix.      The FTC intentionally miscites Medina's testimony.  He never said I was present 'at the common enterprises place of business **multiple days each month**.'  His true deposition testimony was:

'Q.  How do you know Igor Latsanovski?

A.   I would see him around the office a **few days** out of each month.' [Attached hereto as Exhibit 'L' is a true copy of Medina's February 23, 2016 R.T. 28: lns. 17-18.][Exh. 946]

(j)      At no time have I owned or controlled Pinnacle.  Attached hereto as Exhibit 'M' is a true copy of  the (1) Articles of Incorporation of Pinnacle Logistics, Inc. filed June 6, 2012 by Oz Mizrah; and (2) Statement of Information for Pinnacle filed September 10,  2012 with the California Secretary of State's office. Mizrah is identified as the CEO, Secretary and CFO of Pinnacle.  Also, the FTC's Exhibit 553 is a portion of the deposition of Roi Reuveni.  At R.T. 173: lns. 19-25; 174: lns. 1-4; Reuveni testified that he was the sole person involved in Pinnacle's day to day operations at R.T. 174: lns. 1-4. He specifically testified that I had no involvement in the day to day operations of Pinnacle at 175: 11-17.

i.       Exhibit 64 confirms my request that $38,892 be wired to Leumi Le Bank in Israel from SBM to provide necessary cash for a small start-up business I was developing in Spain. A company in Israel provided required equipment. The $38,892 was a loan repayment by SBM to Calenergy that I elected to use for the

new startup company.

(k)     I discussed Exhibit 21, my August 14, 2013 e-mail above at p. 8; UF36(a).

(l)     i.      I never discussed and reviewed sales with employees.   As I stated, I would regularly request to see a Bunzai profit and loss statement to ensure the loan would be repaid.

Ii and iii.      I would from time to time ask Medina how the business is doing – because I was nervous about Bunzai repaying the loan.

(m)     I never discussed Bunzai's advertising with anyone.  I have no recollection of receiving Exhibits 562 and 565.

ii.      The FTC's contention I received e-mails discussing high-risk merchant accounts is false.  Exhibit 444 referenced by the FTC is an offer I received to invest in a company called 'National Merchant Center.'   I didn't invest. Exhibit 445 has no relationship to Bunzai's operations. Exhibit 235 has no relationship to me, Calenergy or Bunzai.

It is a 'draf'" agency agreement that I considered with a third party named Rick Lee. It was never formalized.

iii.      Exhibit 565 is essentially the same e-mail as Exhibit 562.  I have no recollection of receiving these e-mails or ever reading them.

iv.      Exhibit 28 is a communication between Alon Nottea and Alex Pitt concerning Pitt's interest in seeking investors for his business called 'Pay Pro.' Alon Nottea so testified at his February 18, 2016 deposition.  A true copy of pages 134 and 135 are attached hereto as Exhibit 'N'. Mr. Nottea specifically testified that he never showed me the websites included in Exhibit 28; or any other similar websites.  [See, R.T. 135: lns. 10-15.]

(n)     Exhibit 549 represents information given to me to consider in analyzing a United Kingdom investment.

(o)     Alon Nottea requested I incorporate Zen Mobile Media, Inc.  I filed the necessary documents to incorporate.  I didn't own any stock or other interest in

18

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

1    *Zen.  And I have never managed or controlled Zen. [See p. 8-9; 36(a).]*

2    *(p)    I fully discuss the loans made to Bunzai (and Bunzai affiliates) above.*

3    *(q)    This is my August 14, 2013 e-mail to Alon Nottea expressing my 'opinion'*

4    *and concerns.  Before I sent the e-mail I had discussions with Alon Nottea,*

5    *Bunzai's controlling principal, expressing my concern that the loan to Bunzai*

6    *would not be repaid.  As I stated in my January 28, 2016 deposition, '[t]he*

7    *personal thing inside me was that I don't want to lose my money.' [Attached as*

8    *Exhibit 'F' and incorporated herein by reference is a true copy of page 91 of*

9    *Latsanovski's deposition.  The quote is at 91: lns. 5-7.] As of July-August 2013*

10    *Calenergy was owed approximately $100,000 and Mr. Nottea was requesting I*

11    *authorize Calenergy to loan further funds; in September 2013 Calenergy loaned*

12    *$400,000 to SBM.  Mr. Nottea had also informed me that he was considering*

13    *closing down all operations because the business was not making enough money.*

14    *My primary opinion that I expressed was that "I want us to think and concentrated*

15    *(sic) our efforts on the opening of new businesses...and thus use*

16    *outsourcing...[A]nd we are in a quite mode to create new products...'  Also, in my*

17    *e-mail I closed with the reference 'Sincerely your sincere partner Igor.'  I*

18    *understand the word 'partner' as referencing a close personal friend.  I had no*

19    *other understanding of the term at the time.  My e-mail was originally written in*

20    *Russian and translated by an automated translator.  The Russian word I used that*

21    *was translated into 'partner' is the word 'tovarish.'  The word actually means*

22    *referring to a person who thinks and feels like you. [Attached hereto as Exhibit 'G'*

23    *is a true copy of a page from Yandex Translator showing multiple translated*

24    *meanings; 'partner' is included."*

25

26  ///

27  ///

28  ///

---

**19**

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

**7.**

**CONCLUSION**

For the reasons stated, the FTC's motion for summary judgment against Defendants Igor Latsanovski and Calenergy, Inc.'s must be denied; [*See, Defs.' Stat*. Nos. 1-158 and evidence referenced therein.] At minimum triable fact issues exist concerning  (1) Defendants' participation in or authority to control Bunzai's alleged unlawful practices; and (2) whether Defendants "*had actual knowledge of the misrepresentations involved...*" *FTC v. Network Services Depot, Inc*., 617 *F.3d* 1127, 1138-1139 (9th Cir. 2010).

DATED: May 1, 2016                         Respectfully submitted,


                                              _____
                                              LAW OFFICES OF JEFFREY S. BENICE
                                              Jeffrey S. Benice
                                              Attorney for Defendants,
                                              Igor Latsanovski and Calenergy, Inc.

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 2, 2016, a true and correct copy of the foregoing document described as DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S MEMORANDUM OF POINT IN AUTHORITIES IN OPPOSITION TO PLAITIFF FEDERAL TRADE COMMISSIONS MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56;   DECLARATION OF IGOR LATSANOVSKI IN SUPPORT THEREOF] was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

*Local Counsel For Receiver*
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA  90036
nameri@agmblaw.com

*Counsel For Alon Nottea and*
*Roi Rueveni*
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA  91403
rmu@crosswindlaw.com

*Federal Trade Commission*
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

*Counsel For Doron Nottea and Motti*
*Nottea*
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA  90025
Telephone:  (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

*Counsel For Chargeback Armor, Inc.*
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA  90210
SP@BeverlyHillsLawCorp.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 2nd day of May, in Costa Mesa, California  92626.

_____
Javaise Escoto, Declarant

21

**DEFENDANTS LATSANOVSKI AND CALENERGY'S OPPOSITION TO PLAINTIFF'S FEDERAL**
**TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**