JEFFREY S. BENICE, ESQ., State Bar No. 81583
LAW OFFICES OF JEFFREY S. BENICE
*A Professional Law Corporation*
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
Telephone No.: (714) 641-3600
Facsimile No.: (714) 641-3601
Website: www.JeffreyBenice.com
E-Mail: JSB@JeffreyBenice.com

Attorneys for Defendants,
Igor Latsanovski and Calenergy, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP INC., et al.,<br><br>Defendants. | CASE NO. CV 15-04527 GW (PLAx)<br><br>**DECLARATION OF IGOR LATSANOVSKI IN SUPPORT OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 23, 2016<br>Time: 8:30 A.M.<br>Courtroom: 10<br><br>[Assigned for All Purposes to the Honorable George H. Wu, Courtroom 10]<br><br>[First Amended Complaint Filed: October 9, 2015] |

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

**OPPOSING DECLARATION OF IGOR LATSANOVSKI**

I, Igor Latsanovski, declare and state, as follows:

A. *Introduction.*

1. I am a defendant herein. I have personal knowledge of the facts set forth herein. I am the president and sole shareholder of Defendant Calenergy, Inc. ("*Calenergy*"). If called as a witness, I would and could testify thereto as follows. I make this declaration in support of my and Defendant Calenergy, Inc.'s Opposition to Plaintiff Federal Trade Commission's Motion for Summary Judgment.

B. *Summary Of CalEnergy Loans To Bunzai Media Group, Inc. and Affiliates.*

2. Attached hereto as Exhibit "A" and incorporated herein by reference is a true and correct copy of the Summary prepared by David Davidian on or about July, 2015.[1] The Summary reflects all loans made by CalEnergy to Defendant Bunzai Media Group, Inc. ("*Bunzai*") and Bunzai's successor SBM Management ("*SBM*") during the period 2010 through 2015. To my knowledge, Bunzai ceased operations in September 2013. Prior to Bunzai's cessation of business, CalEnergy's loans were to my knowledge, made solely to Bunzai. After Bunzai ceased business operations in 2013, the loans were made to Bunzai affiliate as noted above, SBM.

3. The total funds advanced as loans during the period 2010 to 2015 were up to $500,000. Bunzai and Bunzai's affiliated companies repaid me the total sum of $500,000 in principal; and $317,522.13 in interest during that time period as reflected on the Summary. The FTC's contention I loaned $1.9 million is incorrect. That is the approximate aggregate of all principal loan advances; repayments; and further re-advances of the original $500,000 loan made in various installments.

C. *Latsanovski's Use of Interpreter.*

4. In 2010 I met Mr. Gleb Gregory Lipskiy through my family. He immigrated from Ukraine to the United States in 1994 at six (6) years of age. He was born in 1988 in Ukraine. He

---

[1] Exh. "A" to Mr. Latsanovski's July 15, 2015 Declaration.

graduated from high school in America in 2008. He speaks fluent Russian and English.

5. I had just immigrated to the United States from Spain in 2010 and spoke little English; I had lived in Spain for approximately fifteen (15) years before coming to the United States. Because I could not read English, or speak English well, I asked Mr. Lipskiy to assist me, when I was involved in negotiations concerning investments in the United States that I was contemplating. He agreed to do so.

6. In or about 2010 and 2011 Mr. Lipskiy assisted in my negotiations with persons named Alon Nottea and Khristopher Bond in Los Angeles. He assisted me in reading documents and negotiating terms. Mr. Nottea and Mr. Bond did not speak Russian and I did not speak English well. I began to partially speak English in 2011-2012 but continued to use a translator for reading.

D. *June 10, 2015 Loan from Lawrence Rubin to Felix Katz and Sunset Holding Partners, LLC.*

7. On or about June, 2015, Lawrence Rubin was offered an investment opportunity in a California liability company called "*Sunset Holding Partners, LLC*" ("*Sunset*"). I am a sixty percent (60%) owner of an LLC interest in Sunset. At my direction Sunset was involved in investing in real estate investment opportunities in Southern California. Generally, Sunset would purchase the real estate assets; Sunset would then improve or develop the real estate assets; and thereafter sell the real estate assets. The sale proceeds would be first distributed to repay all debts, operating costs and expenses. Any net proceeds would thereafter be distributed to the LLC Members.

8. Mr. Rubin agreed to advance the sum of $1,000,000 to Sunset on or about June 10, 2015. I approved the transaction. The funds were used for the purchase and renovation of property located at 430 W. Antonio Drive, Long Beach, California 90807 ("*the Property*"). Attached hereto as Exhibit "B" and incorporated herein by reference is a true copy of the "*Promissory Note Secured by Deed of Trust*" dated June 10, 2015 ("*the Note*") and accompanying Deed of Trust. Pursuant to the Note's terms, the full principal of $1,000,000 and all unpaid interest is due for payment on June 10, 2016. The payment due on that date, pursuant to paragraph 2.2 of the Note

entitled "*Balloon Payment*" is $1,007,500.00.

### E. *Effect of Federal Trade Commission Preliminary Injunction On Note's Repayment.*

9. I understand that the Property's current fair market value is approximately $700,000. Because Sunset's development plan for the Property has been stopped as a result of the Federal Trade Commission injunction, the loan is grossly undersecured and will likely be defaulted on in four (4) months when it is due. I accordingly request that the Federal Trade Commission injunction be modified to enable the Property to be sold or to permit redevelopment of the Property to enable Mr. Rubin to receive full repayment of the $1,007,500 in loan funds.

### F. *Latsanovski Had No Control Over Defendant Bunzai.*

10. I did not play any role in the operation of the internet skincare business Defendant Bunzai. I never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by Defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions. Neither Calenergy nor I received any money from consumers directly.

### G. *Latsanovski's Relationship with Third Party Investors.*

11. My role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was primarily to locate third party investors who would be willing to provide investment funds to these businesses. None of these businesses received funds from Defendant Bunzai. As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though (a) these businesses are completely unrelated to the alleged internet skincare business; (b) were funded by other sources of income; and/or (c) were not run by Defendants Calenergy.

///

///

///

3

DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT

**H.   *Defendants Latsanovski's and Calenergy's History.***

12.   I am a 52 year old immigrant. I was born in Kazakhstan (USSR) in 1964 and lived with his family there until approximately 1990. I graduated from college in approximately 1983. In 1992, I moved to Canada. In 1996, when I was 33 years old, I moved with my wife to Spain. I lived in Barcelona, Spain from 1996 to 2010. While in Spain, I became involved in various real estate development projects. In 2010, I moved from Spain to the United States. [my wife and family (2 children), moved to the United States in 2011.] When I first arrived in the United States in 2010 he could speak a little English, but could not read nor write English.

13.   I represented a group of foreign investors in 2010 as their agent in the United States. My business plan involved placing the foreign investors investment funds in to suitable investments in the United States. I also made investments on my own behalf. In 2009, I created Defendant Calenergy and became its CEO. I used Defendant Calenergy to fund investments with investor funds.

14.   Sometime in 2010, I was approached by Defendant Alon Nottea, to invest in an internet skincare project with Defendant Bunzai Media Group, Inc. ("*Bunzai*"). Defendant Nottea was Defendant Bunzai's president and CEO. From conversations with Defendant Nottea, I understood that Defendant Bunzai needed funds to hire additional employees and resources. I preliminarily agreed to invest funds in Bunzai:

15.   Defendant Nottea also introduced me to Defendant Khristopher Bond, who I was advised by Defendant Alon Nottea handled the day to day operations for the internet skincare business and also handled all aspects of the business, including marketing, advertising, product fulfillment and customer service.

16.   My sole involvement in Defendant Bunzai, and all entities related to it ("*Bunzai Group*"), was to provide loans through my company Defendant Calenergy. As Defendant Calenergy's CEO, I had no involvement in the operation of the Bunzai Group and had no authority to make any decisions regarding the operations of the Bunzai Group.

17.   I did not perform any functions in advertising, payment processing, billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai Group's operational

decisions. Moreover, I had no interactions with customers, did not received any customer complaints, nor any reports of customer complaints.

18. At no point did I believe that any customers were being deceived or defrauded. By all indications, Defendant Nottea was running a legitimate company operating in a legitimate industry.

**I.   *Defendant Latsanovski's Loan Transactions with Defendant Bunzai.***

19. In 2010 when I was introduced to defendants Nottea and Bunzai, an initial proposal was made to me, in which I would invest *"$350k in exchange for 55% ownership of Bunzai Media Group, Ownership Shares ... will be as follows: 55% Igor, 22.5% Alon[Nottea], 22.5 Khristopher [Bond]"*. The proposal was memorialized in a document entitled *"Bunzai Media Group - Partnership Agreement,"* dated October 12, 2010. A true copy of the October 12, 2010 Agreement is attached hereto as "Exhibit C".

A condition to the October 12, 2010 Agreement's validity was that:

> *"upon signing this agreement, Igor shall invest $75k to run a continuity test for 30 days. During this test, Bunzai will purchase at least 1,000 orders . . . within the first 15 days, and a conversion from free trial to transitional stage . . . of at least 75% of those orders. If this goal is met and both parties agree to continue with the partnership, then Igor will immediately invest the remaining $275k to complete the financial agreements of this deal."* [Exh. "C" hereto; *October 12, 2010 Agreement* at 1.]

20. I advanced the $75,000 on October 12, 2010. However, the condition to the validity of the October 12, 2010 Agreement did not occur. The continuity test was not satisfactorily completed and the *"parties [did not] agree to continue with the partnership . . ."*

21. Defendants Nottea and Bond, defendant Bunzai's officers, then proposed a *"Bunzai Media Group Loan Agreement"* dated December 16, 2010. A true copy of the Agreement is attached hereto as Exhibit "D" and incorporated herein by referenced. The December 16, 2010 Loan Agreement offered two alternatives to me concerning a loan of $175,000 I was to make to

5

defendant Bunzai; *"This Agreement . . . with respect . . . to the loan of $175k to existing company."* First, defendant Bunzai agreed to repay the $175,000 in three (3) payments on April 5, May 5, and June 5, 2010 respectfully of $50,000, $50,000 and $100,000. *"Alternatively, "Igor's 175k will become an investment that will represent a percentage of ownership in the company that will be determined the first week of January, 2011."*

22. No subsequent agreement was negotiated in January, 2011. Rather, in March, 2011 Defendants Nottea and Bond offered me a new partnership proposal. This new agreement dated March 23, 211, required me to immediately *"invest $500,000 into the company for administration, manufacturing and marketing expenses. . . Investments shall be returned as follows:*

*Igor $300k*

*Alon and Khristopher (to go to French Partners) $200k*

*Igor $200k*

*Alon and Khristopher $300k"*

[A true copy of the March 23, 2011 Agreement is attached hereto as Exhibit "E" and incorporated herein by reference.]

23. Pursuant to the March 23, 2011 Partnership Agreement's terms, I and defendants Nottea, and Bond would each own *"1/3 of 100% of the company."* Further:

*"5. It is understood by all parties that this will be Alon Nottea and*

*Khristopher Bond's primary business and they shall devote to the*

*conduct of the business so much of their respective time as may*

*be reasonably necessary for the efficient operation of the business."*

24. I decided not to invest $500,000 in one lump sum into Defendant Bunzai in March, 2011. I was uncomfortable with the terms of repayment of the investment and decided that I would remain a lender as set forth in December 16, 2010 Loan Agreement. Defendants Nottea and Bond agreed that my status would be as a lender only.

**J.  The FTC Asset Freeze.**

25. The FTC has frozen the equity of my personal residence located at 3420 Cordova Drive, Calabasas, CA 91302. The house is valued at $3.1 million. There is approximately $1.3

6

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

million of equity in the house.

26. Further, third party investor funds of Lawrence Rubin and Mariya Aleksandrovna totaling respectively $1,000,000 and $1,100,000 were also invested into Sunset and are also improperly subject to the asset freeze. And, $5.8 million of funds invested into Sunset by Ilia Klykov were also improperly frozen.

27. ComicsFix, Vastpay and Sunset were all funded by outside investors, not proceeds from the internet skincare business. For example, the accounts of Sunset have been frozen even though Sunset was formed in January 2015; Sunset is a real estate investment company, and the vast majority of the funds frozen in June 2015 came from outside real estate investors, including Mariya Aleksandrovna, and Ilia Klykov.

**K.** *<u>The FTC's Contention about Latsanovski's Ownership of Bunzai is Baseless</u>*.

28. I was never "*a principal member and investor in the AuraVie common enterprise...*" [FTC Motion at 15: lns. 4-5.] Rather, as explained above, I was solely an investor. I was never a "*partner*" in Bunzai and was never an employee. The FTC's reference to "Dkt. 106 at 6" and UF #36(g) supposedly confirming that I was an "*employee*" and "*officer*" are misleading:[2]

- UF 36(g): This is a 2012 Form W-2 that Bunzai issued to me for $110.00. This is the sole and only W-2 I ever received from Bunzai. This W-2 was issued apparently to document $110 paid to me sometime in 2012. I have no records of the payment and no knowledge as to why Bunzai gave me a W-2 rather than a 1099.

- UF 36 (h): This is a resume I prepared as part of my immigration application in 2014. It accurately reflects that I was fully employed by Calenergy in 2014 and that my "*work schedule does not have fixed hours and includes travel within the United States and abroad for negotiations and assessment of potential projects...*"

---

[2] The noted sub-paragraphs specifically reference the FTC's Statement of Uncontroverted Facts and Conclusions of Law paragraphs.

7

- UF36(q): This is my August 14, 2013 e-mail to Alon Nottea expressing my *"opinion"* and concerns. Before I sent the e-mail I had discussions with Alon Nottea, Bunzai's controlling principal, expressing my concern that the loan to Bunzai would not be repaid. As I stated in my January 28, 2016 deposition, *"[t]the personal thing inside me was that I don't want to lose my money."* [Attached as Exhibit "F" and incorporated herein by reference is a true copy of page 91 of Latsanovski's deposition. The quote is at 91: lns. 5-7.] As of July-August 2013 Calenergy was owed approximately $100,000 and Mr. Nottea was requesting I authorize Calenergy to loan further funds; in September 2013 Calenergy loaned $400,000 to SBM. Mr. Nottea had also informed me that he was considering closing down all operations because the business was not making enough money. My primary opinion that I expressed was that *"I want us to think and concentrated (sic) our efforts on the opening of new businesses...and thus use outsourcing...[A]nd we are in a quite mode to create new products..."* Also, in my e-mail I closed with the reference *"Sincerely your sincere partner Igor."* I understand the word *"partner"* as referencing a close personal friend. I had no other understanding of the term at the time. My e-mail was originally written in Russian and translated by an automated translator. The Russian word I used that was translated into *"partner"* is the word *"tovarish."* The word actually means referring to a person who thinks and feels like you. [Attached hereto as Exhibit "G" is a true copy of a page from Yandex Translator showing multiple translated meanings; *"partner"* is included.

L. <u>Latsanovski's Specific Response to Uncontroverted Fact No. 36.</u>

29. I have reviewed the FTC's Uncontroverted Fact No. 36 and its subparts and specifically respond as follows:

(a) The FTC's reference to Doron and Motti Nottea's statement that I was an *"owner"* of Bunzai is erroneous [36a]. They specifically denied that I had any ownership interest in *"Response's to FTC's Request for Admission-Set One."* A

8

true copy of their responses is attached hereto as Exh. "H" and incorporated herein by reference. I never owned any part of Bunzai. I was the *"CEO"* of Zen Mobile Media. Alon Nottea asked me to incorporate Zen Mobile. Mr. Nottea thereafter managed the business' day to day operations. Zen Mobile handled merchant account business. [Attached hereto as Exhibit "I" is a true copy of Mr. Nottea's February 18, 2016 Deposition R.T. 219: lns. 14-21; Nottea specifically testified that *"A. I made decision on behalf of Zen. It was not Igor. It is not Igor's consent to make decisions there."*]

(b) I fully explained that no partnership was ever created with Bunzai above.

(c) I have no knowledge concerning the source of Defendant Medina's belief that I was an *"owner"* of Bunzai. I was never a Bunzai owner. Defendant Medina testified in his February 23, 2016 deposition that he was hired to work at Bunzai by Khristopher Bond; that he was supervised by Khristopher Bond and Alon Nottea; and that he *"assum[ed][Bunzai] is owned by Alon and Khristopher because ...they hired me."* A true copy of Medina's February 23, 2016 Deposition R.T. 10 and 12 is attached hereto as Exhibit "J" and incorporated herein by reference. The specific testimony is at R.T. 10: lns. 9-15; and R.T. 12: lns. 10-13.] Because Calenergy loaned Bunzai substantial funds I was interested in Bunzai's financial status to ensure Calenergy would be repaid; because Bunzai was typically late or delinquent in repaying the loan.

(e) Calenergy's website accurately referenced at the time that *"we are working under a strategic hierarchy which allows us to hire management companies that specialized in managing our clients."* That accurately describes Calenergy's business. The companies identified on the website were either contracted management companies or clients. There is no reference to Calenergy having an ownership in any of the identified companies; it was not a *"parent"* company.

      i. and ii. Calenergy's *"organization chart"* referenced by the FTC was a document that was never fully implemented [Exh. 561]. Calenergy

9

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

never successfully commenced the operation identified on the charts. Calenergy did employ Camerino as an accountant; Reuveni referred Calenergy information concerning potential start-up company investment opportunities; and Nottea worked for Calenergy developing prospective contracts with international companies. They worked between three and six months for Calenergy in late 2013. Their general job title was *"manager."*

(f) I never swore under oath that Bunzai was my employer. Exh. 949 referenced by the FTC is a Form 1-9 Employment Eligibility Verification. Bunzai's HR employee Lear Arazy executed the document apparently believing I was an *"employee"* of Bunzai in November, 2011. I was never employed by Bunzai **and therefore did not sign the form**. The FTC's statement that I swore under oath is accordingly false.

(g) See discussion above at ¶28, UF36(g).

(h) All information provided to the immigration service accurately described Calenergy and my ownership of Calenergy.

(i) I never was personally involved in managing Bunzai on a day to day level.

  i. Paul Medina provided me with quarterly (sometime monthly) financial reports concerning Bunzai's operations; I requested reports because I authorized Calenergy to loan money to Bunzai with no security. Exh. 507 is a form of detailed financial report that I was provided by Medina; I sent Exh. 507 back to Medina as confirming my acceptance of the format.

  ii. In 2011, I introduced Alon Nottea to Oleg Trushla. Mr. Trushla was attempting to sell cosmetics in Europe. I understand that he was unsuccessful. I received copies of some correspondence between them, I assume because I introduced them. At no time did I participate directly in their communications. Exh. 319 referenced by the FTC is such a communication.

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

iii. Exhibit 329 referenced by the FTC contains no evidence of my participation in any meeting or conference call.

iv. Exhibits 564 and 559 reference communications to me from David Migdal in 2014. Migdal was an associate of Alon Nottea. I referred Nottea/Migdal to "*Miki*" in Barcelona; I do not recall Miki's last name. I met Miki when I lived in Barcelona. Miki sold a product through his Spanish magazines called "*Gold Mask*." Mr. Nottea expressed an interest in speaking to Miki. I wasn't involved in the conversations. Exhibits 564 and 559 are updates sent to me by Midgal concerning the Barcelona business. He apparently thought because I referred Miki that he should update me on the status of a few conversations. Also, at no time did I ever proofread Bunzai advertising; or have any involvement in the Bunzai website creation or operation. And Exhibits 564 and 559 make no reference to advertising.

v. I was not apprised of "*low level contractual disputes*" concerning advertising. Exhibit 48 referenced by the FTC is an e-mail to Jose at an "*investment group*". I was copied on the e-mail. I have no recollection of reading it. I don't' know "Jose" and never had any discussion with him. Exhibit 48 appears to concern direct sales by Bunzai. It has nothing to do with a contractual dispute.

vi. I did not assist Defendants in transferring funds overseas to Cypress. *This in an FTC fabrication.* Exhibit 55 references my referral of Alon Nottea to a banker. Mr. Nottea specifically testified at his February 23, 2016 deposition that he never transferred any funds to a Cypress trust or bank. [Attached hereto as Exh. "K" is a true copy of pages 252 and 253 of the February 23, 2016 Deposition of Alon Nottea. His testimony denying transferring funds to Cypress is at R.T. 252 lns. 22-25; 253: lns. 1-20.] The FTC's assertion is false.

11

   vii. From time to time I would leave pre-signed checks with Doron Nottea to pay my personal bills when I was travelling on business; and to pay Calenergy bills.

   viii. I own Calenergy. Calenergy loaned funds at my direction to Bunzai and Bunzai affiliates as described above.

   ix. The FTC intentionally miscites Medina's testimony. He never said I was present "*at the common enterprises place of business **multiple days each month***." His true deposition testimony was:

> "*Q. How do you know Igor Latsanovski?*
>
> *A. I would see him around the office a **few days** out of each month.*" [Attached hereto as Exhibit "L" is a true copy of Medina's February 23, 2016 R.T. 28: lns. 17-18.][Exh. 946]

(j) At no time have I owned or controlled Pinnacle.  Attached hereto as Exhibit "M" is a true copy of the (1) Articles of Incorporation of Pinnacle Logistics, Inc. filed June 6, 2012 by Oz Mizrah; and (2) Statement of Information for Pinnacle filed September 10, 2012 with the California Secretary of State's office. Mizrah is identified as the CEO, Secretary and CFO of Pinnacle.  Also, the FTC's Exhibit 553 is a portion of the deposition of Roi Reuveni.  At R.T. 173: lns. 19-25; 174: lns. 1-4; Reuveni testified that he was the sole person involved in Pinnacle's day to day operations at R.T. 174: lns. 1-4. He specifically testified that I had no involvement in the day to day operations of Pinnacle at 175: 11-17.

   i. Exhibit 64 confirms my request that $38,892 be wired to Leumi Le Bank in Israel from SBM to provide necessary cash for a small start-up business I was developing in Spain. A company in Israel provided required equipment. The $38,892 was a loan repayment by SBM to Calenergy that I elected to use for the new startup company.

(k) I discussed Exhibit 21, my August 14, 2013 e-mail above at p. 8; UF36(a).

(l)    i.    I never discussed and reviewed sales with employees. As I stated, I would regularly request to see a Bunzai profit and loss statement to ensure the loan would be repaid.

    ii and iii.    I would from time to time ask Medina how the business is doing – because I was nervous about Bunzai repaying the loan.

(m)    I never discussed Bunzai's advertising with anyone. I have no recollection of receiving Exhibits 562 and 565.

    ii.    The FTC's contention I received e-mails discussing high-risk merchant accounts is false. Exhibit 444 referenced by the FTC is an offer I received to invest in a company called "*National Merchant Center*." I didn't invest. Exhibit 445 has no relationship to Bunzai's operations. Exhibit 235 has no relationship to me, Calenergy or Bunzai. It is a "*draft*" agency agreement that I considered with a third party named Rick Lee. It was never formalized.

    iii.    Exhibit 565 is essentially the same e-mail as Exhibit 562. I have no recollection of receiving these e-mails or ever reading them.

    iv.    Exhibit 28 is a communication between Alon Nottea and Alex Pitt concerning Pitt's interest in seeking investors for his business called "*Pay Pro*." Alon Nottea so testified at his February 18, 2016 deposition. A true copy of pages 134 and 135 are attached hereto as Exhibit "N". Mr. Nottea specifically testified that he never showed me the websites included in Exhibit 28; or any other similar websites. [See, R.T. 135: lns. 10-15.]

(n)    Exhibit 549 represents information given to me to consider in analyzing a United Kingdom investment.

(o)    Alon Nottea requested I incorporate Zen Mobile Media, Inc. I filed the necessary documents to incorporate. I didn't own any stock or other interest in Zen. And I have never managed or controlled Zen. [See p. 8-9; 36(a).]

(p)    I fully discuss the loans made to Bunzai (and Bunzai affiliates) above.

13

(q)     I fully discuss my "*opinion*" e-mail above.

**J.   <u>Latsanovski Had Minimal Expertise in the Payment Processing Industry.</u>**

30.    In 2013 I invested in a business wholly unrelated to Bunzai called "*Vastpay*." I was the majority shareholder of Vastpay.  Vastpay's business plan was to aggregate small businesses into one main business and ultimately sell the combined businesses at profit.  Vastpay's CEO was Eugene Shanpansky.  The business ceased operations in 2015.  My financial investment in Vastpay did not result in me developing detailed expertise in the payment processing business. I do have some general information concerning payment processing that any investor would acquire. Mr. Shanpansky was the person with specific merchant processing expertise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of April, 2016, at Costa Mesa, CA.

_____
IGOR LATSANOVSKI

# CERTIFICATE OF SERVICE

The undersigned certifies that on May 2, 2016, a true and correct copy of the foregoing document described as DECLARATION OF IGOR LATSANOVSKI IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT were served electronically via e-mail. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

**Local Counsel For Receiver**
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com

**Counsel For Chargeback Armor, Inc.**
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com

**Federal Trade Commission**
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

**Counsel For Doron and Motti Nottea**
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
Telephone: (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

**Counsel For Alon Nottea and Roi Rueveni**
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed the 2nd day of May, 2016, in Costa Mesa, California 92626.

_____
Javaise Escoto, Declarant

15
**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**