# EXHIBIT "I"

## 217

1  question, and it's vague and ambiguous. The
2  information is equally accessible and available to
3  Plaintiff.
4        THE WITNESS: Not -- not exactly, no.
5  BY MR. TEPFER:
6     Q. Did --
7     A. Pinnacle, you said?
8     Q. Yes.
9     A. It's here (indicating). Before, you showed
10 me a document that the accountant gave. That's
11 dated here. In 6/6/2012. 2012.
12    Q. In Pinnacle Logistics, after BunZai was
13 dissolved, Pinnacle Logistics sold AuraVie products;
14 is that correct?
15    A. No.
16       MR. UNGAR: Objection as to the form of the
17 question. It's vague and ambiguous. It's asked and
18 answered now three times.
19 BY MR. TEPFER:
20    Q. So Pinnacle Logistics never sold AuraVie
21 products?
22    A. No.
23       MR. UNGAR: Objection as to the form of the
24 question. It's vague and ambiguous, asked and
25 answered four times.

## 218

1  BY MR. TEPFER:
2     Q. The reason I ask, on Document 110 -- oh,
3  perhaps I'm misunderstanding.
4        Pinnacle Logistics, I guess, handled
5  customer service for the sale of AuraVie products?
6     A. Yes, sir.
7     Q. Okay. That was my confusion.
8        And after BunZai was dissolved, the other
9  AuraVie companies continued to sell AuraVie
10 products; is that correct?
11       MR. UNGAR: Objection as to the form of the
12 question. It's vague and ambiguous, it assumes
13 facts not in evidence, misstates the prior testimony
14 of the witness.
15       THE WITNESS: Some of the companies that
16 we've said yes to a couple times today kept selling,
17 and some of them were gone.
18 BY MR. TEPFER:
19    Q. If we could -- it was Exhibit 65. If we
20 could jump back just a moment --
21    A. Found 66.
22    Q. Oh. I think it's --
23    A. Oh, it's the one I pulled out?
24    Q. Yes, yes.
25    A. Sorry. It's my fault.

## 219

1     Q. You reference some companies that had ceased
2  at that point in time to be selling AuraVie SkinCare
3  products. Are any of those entities described here?
4     A. Yeah, but I can't tell you which one
5  exactly.
6     Q. Do you know when -- at the time of the
7  filing of the FTC's lawsuit in June 2015, do you
8  know if Zen Mobile Media was still, I guess, selling
9  AuraVie products?
10    A. I don't believe they were. I don't believe
11 many of these companies were. I think all of them,
12 maybe besides one, that was just refilling happy
13 consumers orders from 18 months and 2 years ago
14 because we haven't acquired new consumers in over a
15 year.
16    Q. Did you discuss with Mr. Latsanovski his
17 company Zen Mobile Media, Inc.'s, decision to cease
18 selling AuraVie SkinCare products?
19    A. I made decision on behalf of Zen. It was
20 not Igor. It is not Igor's consent to make
21 decisions there.
22    Q. Did you make decisions on --
23    A. SBM Management made decision on behalf of
24 the retail merchants.
25    Q. And you mean the AuraVie companies we

## 220

1  discussed?
2     A. (Witness shakes head up and down.)
3     Q. Did -- I guess we can turn back.
4        At the time that the AuraVie companies --
5  after BunZai had dissolved and the AuraVie companies
6  were, had their customer service needs met by
7  Pinnacle, did you discuss this, I guess, the
8  Pinnacle standard operating procedure with anyone
9  there?
10       MR. UNGAR: Objection as to the form of the
11 question. It's vague and ambiguous.
12       THE WITNESS: We discussed many topics as
13 far as the expectation between SBM Management's
14 expectation. We had meeting with Stephan Bauer,
15 with Roi, with Pinnacle Logistics, as far as the
16 management of SBM to the retail merchants and what
17 SBM expected Pinnacle to do on behalf of the retail
18 merchants.
19 BY MR. TEPFER:
20    Q. Who was your point of contact at Pinnacle
21 Logistics for these discussions?
22    A. The majority of the time I spoke to Roi and
23 a few other people at Pinnacle, and Andree. They
24 were -- they were some of them, some of the people
25 in management.