# EXHIBIT "K"

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                2/18/2016

                                                                                 249

1   it.
2       (The previous question was read back
3   by the court reporter as follows:
4       "QUESTION: Did the AuraVie
5   companies enter into any sort of
6   licensing agreement with a U.S.
7   manufacturer for the sale of AuraVie
8   products?")
9       THE WITNESS: I believe there was some
10  agreement with the retail merchants. There was an
11  agreement between them. The retail merchants, with
12  the sale of AuraVie -- one more time. I just want
13  to make sure I answer correctly. One more time.
14      (The previous question was read back
15  by the court reporter as follows:
16      "QUESTION: Did the AuraVie
17  companies enter into any sort of
18  licensing agreement with a U.S.
19  manufacturer for the sale of AuraVie
20  products?")
21      THE WITNESS: No.
22  BY MR. TEPFER:
23      Q. A moment ago you stated they did enter into
24  some sort of agreement; is that correct?
25      A. Yes.

                                                                                 250

1       Q. What was the nature of the agreement that
2   the AuraVie companies entered --
3       A. I think it was a buyer/reseller agreement.
4   Like a buyer approval. You're approved to buy and
5   resell the product, but it wasn't licensing
6   agreement.
7       Q. Sure.
8       Did AuraVie ever contain an Israel secret
9   ingredient?
10      A. They're all secret ingredient. The whole
11  thing is. Secret ingredient, no.
12      Q. Did any of the products sold by the AuraVie
13  companies contain any sort of Israel secret
14  ingredient?
15      A. No. It's the combination of all the
16  ingredients that make it a secret. It's not any one
17  ingredient.
18      Q. Sure.
19      A. It's the formula. It just depends how you
20  look at it.
21      Q. On 119-4, on the second line of the first
22  bullet point, there's reference to brands, formulas,
23  and trade secrets. Do you know what brands,
24  formulas, or trade secrets that refers to?
25      MR. UNGAR: Same objection. Exhibit 119 is

                                                                                 251

1   a document protected by the attorney-client
2   privilege. It's violation of the FRE 502,
3   confidentiality agreement, and it's a violation of
4   the California Professional Rules of Conduct, the
5   use of this document, knowing that it's a -- it's
6   protected by attorney-client privilege.
7       MR. TEPFER: Are you instructing the witness
8   not to answer, Mr. Ungar?
9       MR. UNGAR: It's not my deposition, Counsel.
10  I've said it 12 times already, so --
11      THE WITNESS: Can you refer to the question
12  that you mentioned on which page?
13  BY MR. TEPFER:
14      Q. Sure.
15      MR. UNGAR: Are you telling the witness not
16  to answer the question?
17      MR. TEPFER: No. I'm just asking.
18      MR. UNGAR: Then you don't need to keep
19  asking me if I'm advising or informing the witness
20  not to answer the question. If I'm going to do so,
21  you'll know it.
22      MR. TEPFER: I'm very sorry, Mr. Ungar.
23      MR. UNGAR: Do you understand?
24      MR. TEPFER: Yes, sir.
25      MR. UNGAR: Thank you.

                                                                                 252

1       Why are you laughing?
2       MR. TEPFER: I'm not laughing.
3       MR. UNGAR: Why are you grinning?
4       MR. TEPFER: I'm just trying to diffuse this
5   situation.
6       MR. UNGAR: I don't --
7       MR. TEPFER: Would you mind --
8       MR. UNGAR: I don't know what you mean.
9       MR. TEPFER: Counsel, I'd like to move on.
10      Would you mind reading the question.
11      (The previous question was read back
12  by the court reporter as follows:
13      "QUESTION: On 119-4, on the
14  second line of the first bullet
15  point, there's reference to brands,
16  formulas, and trade secrets. Do you
17  know what brands, formulas, or trade
18  secrets that refers to?")
19      MR. UNGAR: Same objection.
20      THE WITNESS: No.
21  BY MR. TEPFER:
22      Q. Are you aware if any proceeds from the sale
23  of AuraVie products by the AuraVie companies were
24  ever transferred to a trust in Cyprus?
25      A. Never.

63 (Pages 249 to 252)

Case 2:15-cv-04527-GW-PLA   Document 397-12   Filed 05/02/16   Page 3 of 3   Page ID #:10480

FTC v. Bunzai Media Group, LLC, et al.                                              Notea                                                   2/18/2016

253

1  Q. And are you aware -- did you ever consider
2  the possibility of transferring funds from the sale
3  of AuraVie products to a trust in Cyprus?
4       MR. UNGAR: Objection as to the form of the
5  question. It's vague and ambiguous.
6       THE WITNESS: No.
7  BY MR. TEPFER:
8  Q. Did you ever consider transferring funds
9  from the sale of AuraVie products to any bank in
10 Cyprus?
11      MR. UNGAR: Objection as to the form of the
12 question. It's vague and ambiguous.
13      THE WITNESS: Like I said in the beginning,
14 I don't know, I don't recollect exactly. There was
15 an attempt to understand banking in Cyprus. I
16 contacted a bank. I saw the numbers, the rates.
17 The importation was crap. Moved on. Never
18 happened.
19 BY MR. TEPFER:
20 Q. So you explored the possibility of BunZai
21 marketing AuraVie in Cyprus?
22 A. I explored the possibility of seeing how
23 business gets done in Cyprus.
24 Q. And do you recall what type of business you
25 had considered conducting in Cyprus?

254

1       MR. UNGAR: Objection as to the form of the
2  question. It's vague and ambiguous.
3       THE WITNESS: Online marketing.
4  BY MR. TEPFER:
5  Q. And do you recall what product you
6  anticipated marketing online in Cyprus?
7  A. There was no product. It wasn't a product
8  development. It wasn't about a product. It was
9  about different concept.
10 Q. Do you know if SBM Management contracted for
11 media buys for the AuraVie companies?
12      MR. UNGAR: Objection as to the form of the
13 question. It's vague and ambiguous.
14      THE WITNESS: I don't really understand what
15 you're saying.
16 BY MR. TEPFER:
17 Q. Did -- I guess, did SBM Management make
18 payments to third parties for online advertising for
19 the AuraVie companies?
20      MR. UNGAR: Objection as to the form of the
21 question. It's vague and ambiguous.
22      THE WITNESS: Yes.
23 BY MR. TEPFER:
24 Q. Do you recall the third party entities that
25 SBM Management made payments to for the AuraVie

255

1  companies's online marketing?
2  A. One by one?
3  Q. Sorry. And it -- there are -- I guess
4  you're saying many?
5  A. It managed the RMCs.
6  Q. Okay.
7  A. Of course.
8  Q. Did you ever discuss with the CEOs of the
9  AuraVie companies their potential exposure to claims
10 for false advertising?
11      MR. UNGAR: Objection as to the form of the
12 question. It's vague and ambiguous.
13      THE WITNESS: I explained to them the risks,
14 as I knew them, as I understand them.
15 BY MR. TEPFER:
16 Q. And so you explained to the various CEOs of
17 the AuraVie companies the potential risks associated
18 with this marketing?
19      MR. UNGAR: Objection as to the form of the
20 question. It's vague and ambiguous, and it
21 misstates the testimony of the witness, and it's
22 argumentative.
23      THE WITNESS: You have to repeat the
24 question for me, please.
25      (The previous question was read back

256

1  by the court reporter as follows:
2       "QUESTION: And so you explained
3  to the various CEOs of the AuraVie
4  companies the potential risks
5  associated with this marketing?")
6       THE WITNESS: Based on my understanding of
7  what the risks were, sure.
8  BY MR. TEPFER:
9  Q. And what was your understanding of the risks
10 associated with this marketing?
11 A. That they might, you know, there might be an
12 issue with a merchant account and they might get
13 themselves -- if -- if an issue occurred with a
14 merchant account that was out of its parameters,
15 that they might get themselves a problem
16 establishing another merchant account.
17 Q. Did you discuss the possibility of an FTC
18 enforcement action with any of the CEOs of the
19 AuraVie companies?
20 A. Not that I can recall.
21 Q. What about the possibility of an Attorney
22 General enforcement action?
23 A. Not that I can recall.
24 Q. And so just to clarify, the risks that you
25 spoke with them about were regarding actions taken

64 (Pages 253 to 256)