# REQUEST FOR JUDICIAL NOTICE NO. 5

1   Jeffrey S. Benice, Esq., State Bar No. 81583
    LAW OFFICES OF JEFFREY S. BENICE
2   *A Professional Law Corporation*
    3080 Bristol Street
3   Sixth Floor, Suite 630
    Costa Mesa, California 92626
4   Telephone No.: (714) 641-3600
    Facsimile No.: (714) 641-3601
5   Website: www.JeffreyBenice.com
    E-Mail: JSB@JeffreyBenice.com
6

7   Attorneys for Defendants,
    Igor Latsanovski and Calenergy, Inc.
8

9

10              **UNITED STATES DISTRICT COURT**

11       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13   FEDERAL TRADE COMMISSION,          CASE NO. CV 15-04527 GW (PLAx)

14              Plaintiff,              **DECLARATION OF JEFFREY S.
                                        BENICE IN SUPPORT OF DEFENDANTS
15          v.                          IGOR LATSANOVSKI AND
                                        CALENERGY, INC.'S MOTION FOR
16   BUNZAI MEDIA GROUP INC., et al.,   SUMMARY JUDGMENT PURSUANT TO
                                        FEDERAL RULES OF CIVIL
17              Defendants.             PROCEDURE RULE 56 OR,
                                        ALTERNATIVELY PARTIAL
18                                      SUMMARY JUDGMENT**

19
                                        **Date:        May 16, 2016**
20                                      **Time:        8:30 A.M.**
21                                      **Courtroom:   10**

22

23                                      **[Assigned for All Purposes to the Honorable
                                        George H. Wu, Courtroom 10]**
24
                                        **[First Amended Complaint Filed: October
25                                      9, 2015]**

26

27

28

────────────────────────────────────────────
            DECLARATION OF JEFFREY S. BENICE IN SUPPORT

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 3 of 107   Page ID
#:10645
Case 2:15-cv-04527-GW-PLA   Document 355   Filed 04/18/16   Page 2 of 3   Page ID #:8673

I, Jeffrey S. Benice, declare and state:

1.      I, Jeffrey S. Benice am counsel of record for Defendants Igor Latsanovski and Calenergy, Inc.  I have personal knowledge of the facts set forth.  If called as a witness, I could and would competently testify to the following:

**A.**      *July 2, 2015 Deposition Transcript of Igor Latsanovski.*

2.      Attached hereto as Exhibit "A" and incorporated herein by reference are true copies of the following identified pages of the July 2, 2015 Deposition Transcript of Igor Latsanovski:

R.T. 1-10; 16-19; 21; 24; 26; 28; 29; 30; 35-40; 43; 49; 53; 72; 73; 75; 79; 80; 81; 84; 85; 91; 92; 93; 97; 114; 116; 117; 125; 127; 128; 134; 142; 146; 156; 159; 160; 166; 174; 177; 180; 181; 188; 195; 196; 197; 212; 222; 230; 235; 248; 249; 251; 269; 270; 271.

**B.**      *January 28, 2016 Deposition of Igor Latsanovski.*

3.      Attached hereto as Exhibit "B" and incorporated herein by reference are true copies of the following identified pages of the January 28, 2016 Deposition Transcript of Igor Latsanovski:

R.T. 27-28; 41; 60; 66-68; 76; 80; 104; 105; 111.

**C.**      *February 18, 2016 Deposition of Alon Nottea.*

4.      Attached hereto as Exhibit "C" and incorporated herein by reference are true copies of the following identified pages of the February 18, 2016 Deposition Transcript of Alon Nottea:

R.T.  1-2; 43-47; 54-55; 77-80; 81-84; 87-88; 93-95; 99-100; 110; 122-124; 129-131; 163.

**D.**      *January 20, 2016 Deposition of Doron Nottea.*

5.      Attached hereto as Exhibit "D" and incorporated herein by reference are true copies of the following identified pages of the January 20, 2016 Deposition Transcript of Doron Nottea:

R.T.1-4; 29-31; 51; 55-56.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of April, 2016, at Costa Mesa, California.

Jeffrey S. Benice

1

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 18 2016, a true and correct copy of the foregoing document described as declaration of **DECLARATION OF JEFFREY S. BENICE IN SUPPORT OF DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULE 56 OR, ALTERNATIVELY PARTIAL SUMMARY JUDGMENT** was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

_**Local Counsel For Receiver**_
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com

_**Counsel For Alon Nottea and Roi Rueveni**_
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com

_**Federal Trade Commission**_
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

_**Counsel For Doron Nottea and Motti Nottea**_
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
Telephone: (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

_**Counsel For Chargeback Armor, Inc.**_
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 18th day of April, 2016, in Costa Mesa, California 92626.

_____
Javaise Escoto, Declarant

3
DECLARATION OF JEFFREY S. BENICE IN SUPPORT

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 5 of 107   Page ID
#:10647
Case 2:15-cv-04527-GW-PLA   Document 355-1   Filed 04/18/16   Page 1 of 73   Page ID
#:8675

# EXHIBIT

## "A"

Federal Trade Commission vs. Bunzai Media Group, Inc.                    Igor Latsanovski

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,          )
                                   )
               Plaintiff,          )
                                   )
          vs.                      )   CASE NO. CV 15-4527-
                                   )          GW(PLAx)
BUNZAI MEDIA GROUP, INC., a        )
California corporation, also       )
doing business as Aura Vie and)
Miracle Face Kit; et al.,          )
                                   )
               Defendants.         )
          _____)

VIDEOTAPED

DEPOSITION OF IGOR LATSANOVSKI

Thursday, July 2, 2015

Los Angeles, California

REPORTED BY:  GAIL T. BERARDINO, C.S.R. NO. 4045

Kusar Court Reporters & Legal Services, Inc.

001

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

1                      UNITED STATES DISTRICT COURT

2                      CENTRAL DISTRICT OF CALIFORNIA

3

4    FEDERAL TRADE COMMISSION,      )
                                    )
5               Plaintiff,          )
                                    )
6          vs.                      )   CASE NO. CV 15-4527-
                                    )            GW(PLAx)
7    BUNZAI MEDIA GROUP, INC., a    )
     California corporation, also   )
8    doing business as Aura Vie and )
     Miracle Face Kit; et al.,      )
9                                   )
                Defendants.         )
10   _____)

11

12

13             Videotaped deposition of IGOR LATSANOVSKI,

14        taken on behalf of the Receiver, at 5900 Wilshire

15        Boulevard, Suite 2250, Los Angeles, California

16        90036, commencing at the hour of 8:50 a.m.,

17        Thursday, July 2, 2015, before Gail T. Berardino,

18        CSR No. 4045, pursuant to Notice of Taking

19        Deposition.

20

21

22

23

24

25

Kusar Court Reporters & Legal Services, Inc.                        2

002

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

```
 1    APPEARANCES:

 2    For Receiver Charlene C. Koonce:

 3              SCHEEF & STONE, LLP
              BY:  J. MITCHELL LITTLE
 4                 Attorney at Law
              2600 Network Boulevard
 5            Suite 400
              Frisco, Texas 75034
 6            214-706-4200
              Mitch.little@solidcounsel.com
 7
      For Federal Trade Commission:
 8
              FEDERAL TRADE COMMISSION
 9            BY:  REID TEPFER
                 Attorney at Law
10            (Appearing by telephone)
              1999 Bryan Street
11            Suite 2150
              Dallas, Texas 75201
12            214-979-9395

13
      For Witness Igor Latsanovski:
14
              SCHEPER KIM & HARRIS, LLP
15            BY:  MARC S. HARRIS
                 Attorney at Law
16            601 West 5th Street
              12th Floor
17            Los Angeles, California 90071
              213-613-4690
18            Mharris@scheperkim.com
                 and
19            GUROVICH, BERK & ASSOCIATES
              BY:  ELON BERK
20                 Attorney at Law
              15250 Ventura Boulevard
21            Suite PH-1220
              Sherman Oaks, California 91403
22            818-205-1555
              gba_law@yahoo.com

23
      Also Present:
24
              Charlene C. Koonce
25            Chuck Perry, Videographer
```

Kusar Court Reporters & Legal Services, Inc.                    3

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

```
 1                              I N D E X

 2    DEPONENT                 EXAMINATION              PAGE

 3    IGOR LATSANOVSKI         MR. LITTLE                14

 4

 5                   EXHIBITS FOR IDENTIFICATION

 6    Receiver's 1    Articles of Incorporation of Zen
                      Mobile Media, Inc.; 2 pages
 7                                                       11

      Receiver's 2    IRS e-file Signature Authorization
 8                    for Form 1120 for Zen Mobile Media,
                      Inc., for 2011; 8 pages
 9                                                       11

      Receiver's 3    Gmail from accounting818@gmail.com
10                    to Risk@gomidsource.com dated
                      12/27/13; 3 pages
11                                                       11

      Receiver's 4    IRS Form W-3 Transmittal of Wage
12                    and Tax Statements 2011 for Zen
                      Mobile Media, Inc.; 2 pages
13                                                       11

      Receiver's 5    W-2 Wage and Tax Statement 2012
14                    for Zen Mobile Media, Inc.; 2 pages 11

15    Receiver's 6    W-2 Wage and Tax Statement 2013
                      for Zen Mobile Media, Inc.; 2 pages 11
16
      Receiver's 7    W-2 Wage and Tax Statement 2014
17                    for Zen Mobile Media, Inc.; 2 pages 11

18    Receiver's 8    Voided check from Zen Mobile Media
                      Inc., check 7074, account No.
19                    122000247, Wells Fargo; 1 page      11

20    Receiver's 9    Merchant Application for Reveal
                      dated 12/23/13; 5 pages             11
21
      Receiver's 10   Merchant Application for Skincare
22                    dated 12/23/13; 5 pages             11

23    Receiver's 11   Blank checks, No. 7127 on account
                      of Zen Mobile Media, No. 6278 on
24                    account of Igor Latsanovski and
                      Tatiana Stamburg, No. 1136 on
25                    account of CalEnergy, Inc.; 1 page  11
```

Kusar Court Reporters & Legal Services, Inc.                    4

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

```
 1                            I N D E X

 2    (Continued)

 3                    EXHIBITS FOR IDENTIFICATION

 4    Receiver's 12   Documents from Bunzai Media Group,
                      Inc.'s employee file for Igor
 5                    Latsanovski; 5 pages              11

 6    Receiver's 13   Information from LinkedIn for
                      Igor Latsanovski; 2 pages         11
 7
      Receiver's 14   Form I-9, Employment Eligibility
 8                    Verification for Igor Latsanovski,
                      photocopy of visa and California
 9                    driver's license; 3 pages         11

10    Receiver's 15   Check Nos. 6003, 6004 and 6005
                      and register page for Zen Mobile
11                    Media, Inc., account at Wells
                      Fargo; 1 page                     11
12
      Receiver's 16   Blank check 7127 on account of
13                    Zen Mobile Media, Inc., at Wells
                      Fargo; 1 page                     11
14
      Receiver's 17   Employee Information List for
15                    Bunzai Media Group, Inc.; 3 pages 11

16    Receiver's 18   Davidian & Associates' List of
                      all companies; 1 page             11
17
      Receiver's 19   Check 7088 to Wells Fargo on
18                    account of Zen Mobile Media,
                      Inc., dated 2/19/14; 1 page       11
19
      Receiver's 20   Check 7107 to Bank of America
20                    on account of Zen Mobile Media,
                      Inc., dated 9/6/14; 1 page        11
21
      Receiver's 21   Check 7112 to Chase on account
22                    of Zen Mobile Media, Inc.,
                      dated 10/14/14; 1 page            11
23
      Receiver's 22   Check 7117 to Chase on account
24                    of Zen Mobile Media, Inc.,
                      dated 4/1/15; 1 page              11
25
```

Kusar Court Reporters & Legal Services, Inc.                    5

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

<table>
<tr><td>1</td><td colspan="2" align="center">I N D E X</td><td></td></tr>
<tr><td>2</td><td colspan="2">(Continued)</td><td></td></tr>
<tr><td>3</td><td colspan="2" align="center">EXHIBITS FOR IDENTIFICATION</td><td></td></tr>
<tr><td>4</td><td>Receiver's 23</td><td>Check 7103 to Wells Fargo on<br>account of Zen Mobile Media,</td><td></td></tr>
<tr><td>5</td><td></td><td>Inc., dated 8/8/14; 1 page</td><td>11</td></tr>
<tr><td>6</td><td>Receiver's 24</td><td>Merchant account information;</td><td></td></tr>
<tr><td>7</td><td></td><td>3 page</td><td>11</td></tr>
<tr><td>8</td><td>Receiver's 25</td><td>2014-2015 Amount Received From,<br>2014-2015 Amount Paid To,<br>Amount Paid to Cal Energy</td><td></td></tr>
<tr><td>9</td><td></td><td>2014-2015; 3 pages</td><td>11</td></tr>
<tr><td>10</td><td>Receiver's 26</td><td>Amount Paid 2014-2015; 1 page</td><td>11</td></tr>
<tr><td>11</td><td>Receiver's 27</td><td>Blank checks 2028, 2029 and 2030<br>on account of CalEnergy, Inc.,</td><td></td></tr>
<tr><td>12</td><td></td><td>and check stubs for checks 2022,<br>2023 and 2034; 1 page</td><td></td></tr>
<tr><td>13</td><td></td><td></td><td>11</td></tr>
<tr><td>14</td><td>Receiver's 28</td><td>Blank checks, No. 1136 on account<br>of CalEnergy, Inc., No. 6278 on<br>account of Igor Latsanovski and</td><td></td></tr>
<tr><td>15</td><td></td><td>Tatiana Stamburg; 1 page</td><td>11</td></tr>
<tr><td>16</td><td>Receiver's 29</td><td>Reserves Release; 1 page</td><td>11</td></tr>
<tr><td>17</td><td>Receiver's 30</td><td>2011 Form 1120 U.S. Corporation<br>Income Tax Return for Zen Mobile</td><td></td></tr>
<tr><td>18</td><td></td><td>Media, Inc.; 15 pages</td><td>11</td></tr>
<tr><td>19</td><td>Receiver's 31</td><td>2012 Form 1120 U.S. Corporation<br>Income Tax Return for Zen Mobile</td><td></td></tr>
<tr><td>20</td><td></td><td>Media, Inc.; 17 pages</td><td>11</td></tr>
<tr><td>21</td><td>Receiver's 32</td><td>2013 Form 1120 U.S. Corporation<br>Income Tax Return for Zen Mobile</td><td></td></tr>
<tr><td>22</td><td></td><td>Media, Inc.; 22 pages</td><td>11</td></tr>
<tr><td>23</td><td>Receiver's 33</td><td>2014 IRS e-file Signature<br>Authorization for Form 1120 for</td><td></td></tr>
<tr><td>24</td><td></td><td>Zen Mobile Media, Inc.; 32 pages</td><td>11</td></tr>
<tr><td>25</td><td></td><td></td><td></td></tr>
</table>

Kusar Court Reporters & Legal Services, Inc.

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 1 | I N D E X | |
| 2 | (Continued) | |
| 3 | EXHIBITS FOR IDENTIFICATION | |
| 4 | Receiver's 34 | Various "pay to the order of" stamps; 1 page | |
| 5 | | | 11 |
| 6 | Receiver's 35 | Letter dated 9/9/11 from Khristopher Bond; 1 page | |
| | | | 11 |
| 7 | Receiver's 36 | Various check stubs from Bunzai Media Group, Inc., to CalEnergy, Inc.; 1 pages | |
| 8 | | | 11 |
| 9 | Receiver's 37 | Igor's Investment; 1 page | 11 |
| 10 | Receiver's 38 | Cashier's check dated 3/23/11 Payable to Bunzai Media Group, Inc.; 1 page | |
| 11 | | | 11 |
| 12 | Receiver's 39 | Various "pay to the order of" stamps; 1 page | |
| 13 | | | 11 |
| 14 | Receiver's 40 | Check No. 1107 to Wells Fargo Bank on account of CalEnergy dated 11/18/14; 1 page | |
| 15 | | | 11 |
| 16 | Receiver's 41 | Check No. 1135 to Focus Media Solutions on account of CalEnergy dated 6/17/15; 1 page | |
| 17 | | | 11 |
| 18 | Receiver's 42 | Check No. 2500 to Bank of America on account of Focus Media Solutions, Inc., dated 11/26/14; 1 page | |
| 19 | | | 11 |
| 20 | Receiver's 43 | Check No. 2504 to Chase Bank on account of Focus Media Solutions, Inc., dated 12/30/14; 1 page | |
| 21 | | | |
| 22 | | | 11 |
| 23 | Receiver's 44 | Check No. 2509 to Focus Media Solutions on account of Focus Media Solutions, Inc., dated 1/15/15; 1 page | |
| 24 | | | 11 |
| 25 | | | |

007

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

```
 1                        I N D E X

 2     (Continued)

 3                  EXHIBITS FOR IDENTIFICATION

 4     Receiver's 45   Check No. 2520 to Chase Bank
                       on account of Focus Media
 5                     Solutions, Inc., dated
                       2/26/15; 1 page                      11
 6
       Receiver's 46   Check No. 2523 to Chase Bank
 7                     on account of Focus Media
                       Solutions, Inc., dated 3/13/15;
 8                     1 page                               11

 9     Receiver's 47   Check No. 2522 to Wells Fargo
                       on account of Focus Media
10                     Solutions, Inc., dated 3/13/15;
                       1 page                               11
11
       Receiver's 48   Focus CPA Analysis by Campaign;
12                     5 pages                              11

13     Receiver's 49   Wells Fargo Bank Activity for
                       CalEnergy, Inc., from 12/2/13
14                     through 6/29/15; 21 pages            11

15     Receiver's 50   Wells Fargo Bank Activity for
                       Sunset Holdings from 1/21/15
16                     through 6/29/15; 11 pages            11

17     Receiver's 51   Email from Sagi Gal to
                       Accounting818@gmail.com dated
18                     8/5/13; 1 page                       11

19     Receiver's 52   Above All Offer; 1 page             11

20     Receiver's 53   Bills and Expenses; 5 pages         11

21     Receiver's 54   CalEnergy, Inc., Quarterly
                       Payroll 7/15/13; 7 pages            11
22
       Receiver's 55   Weekly Report Accounting
23                     Worksheet; 1 page                   11

24     Receiver's 56   M3D Account Beginning on
                       4/1/13; 21 pages                    11
25
```

Case 2:15-cv-04527-GW-PLA  Document 397-21  Filed 05/02/16  Page 14 of 107  Page ID
#:10656
Case 2:15-cv-04527-GW-PLA  Document 355-1  Filed 04/18/16  Page 10 of 73  Page ID
#:8684

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski          4

I N D E X

(Continued)

EXHIBITS FOR IDENTIFICATION

Receiver's 57   SBM Management, Inc., Transaction
                Detail by Account dated February,
                2013; 5 pages                          11

Receiver's 58   Direct Pay; 3 pages                    11

Receiver's 59   Complaint for Permanent
                Injunction and Other Equitable
                Relief; 39 pages                       11

Receiver's 60   Company Details for Bavaria Inter
                LP; 5 pages                            11

Receiver's 61   Application for Registration of
                a Limited Partnership for Bavaria
                Inter LP; 3 pages                      11

Receiver's 62   One-page handwritten document;
                1 page                                 140

INFORMATION REQUESTED

        PAGE          LINE

         97            7

         97            16

Kusar Court Reporters & Legal Services, Inc.                    9

Federal Trade Commission vs. Bunzai Media Group, Inc.                    Igor Latsanovski

```
 1                              I N D E X

 2      (Continued)

 3

 4                     WITNESS INSTRUCTED NOT TO ANSWER

 5                          PAGE        LINE

 6                          166          10

 7                          203           3

 8                          241          20

 9                          242           7

10                          243          19

11                          243          25

12                          244           3

13

14

15

16

17

18

19

20

21

22

23

24

25
```

010

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 08:55:35 | 1 | what age? |
| | 2 | A    I live there before I go to military, Army. |
| 08:55:49 | 3 | I was in Army two years.  It's obligation there. |
| | 4 | Q    Yes.  And what -- in what branch of the |
| 08:55:56 | 5 | Soviet military did you do your service? |
| | 6 | A    What means "branch"? |
| 08:55:59 | 7 | Q    Army? |
| | 8 | A    Yeah. |
| 08:56:00 | 9 | Q    Okay. |
| | 10 | A    Regular Army. |
| 08:56:02 | 11 | Q    What did you do in the Army? |
| | 12 | A    Like, soldier. |
| 08:56:06 | 13 | Q    You were infantry? |
| | 14 | A    "In-" -- |
| 08:56:08 | 15 | Q    Yes. |
| | 16 | A    Like, normal soldier. |
| 08:56:10 | 17 | Q    Carried a rifle? |
| | 18 | A    Yeah. |
| 08:56:13 | 19 | Q    Okay.  Were you deployed anywhere? |
| | 20 | A    No, just regular -- the regular Army. |
| 08:56:18 | 21 | Q    What period of time? |
| | 22 | A    Two years. |
| 08:56:23 | 23 | Q    And was that in the 1980's? |
| | 24 | A    1994-1996.  Before, I finish college. |
| 08:56:34 | 25 | Q    What college? |

Kusar Court Reporters & Legal Services, Inc.                                16

011

Federal Trade Commission vs. Bunzai Media Group, Inc.                     Igor Latsanovski

| 08:56:39 | 1 | A    Construction, four years, before I go.  It |
| | 2 | means I finish high school, and college is the same |
| 08:56:44 | 3 | place. |
| | 4 | MR. HARRIS:  Did you mean '94 or '84? |
| 08:56:51 | 5 | THE WITNESS:  No, sorry, '84.  Sorry.  It's, yeah, |
| | 6 | '84. |
| 08:56:52 | 7 | BY MR. LITTLE: |
| | 8 | Q    You finished college in 1984? |
| 08:56:59 | 9 | A    No; no; no.  19- -- 1984, and I leave for |
| | 10 | military 1986.  Sorry. |
| 08:57:05 | 11 | Q    Were you deployed in Afghanistan? |
| | 12 | A    No. |
| 08:57:09 | 13 | Q    "No," okay.  So after you got out of the |
| | 14 | Army, what did you do professionally? |
| 08:57:15 | 15 | A    Professionally, I go to study at university. |
| | 16 | Q    Okay.  And what did you study there? |
| 08:57:22 | 17 | A    In Moscow. |
| | 18 | Q    And what did you study? |
| 08:57:31 | 19 | A    The same, construction. |
| | 20 | Q    And when did you get out of college? |
| 08:57:39 | 21 | A    I didn't -- I finished, like, four years ago, |
| | 22 | already, external, because 19- -- yeah, 1992 I leave to |
| 08:57:51 | 23 | Canada. |
| | 24 | Q    What did you -- why did you leave to Canada |
| 08:57:55 | 25 | in 1992? |

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 18 of 107   Page ID
#:10660
Case 2:15-cv-04527-GW-PLA   Document 355-1   Filed 04/18/16   Page 14 of 73   Page ID
#:8688

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 08:58:03 | 1 | A    I was young.  I feel some -- have more |
| | 2 | opportunity, not like I didn't have in Soviet Union |
| 08:58:12 | 3 | (sic).  I thought I have more possibility, like |
| | 4 | American dream. |
| 08:58:21 | 5 | Q    As a Soviet citizen, how did you obtain a |
| | 6 | visa to come to Canada? |
| 08:58:27 | 7 | A    I applied to Canadian citi- -- Canadian |
| | 8 | embassy.  They interview me, and that's it.  I was |
| 08:58:33 | 9 | young. |
| | 10 | Q    How old were you? |
| 08:58:45 | 11 | A    1992, it's twenty- -- calculated, it's |
| | 12 | like -- before 30, yeah?  It's twenty- -- |
| 08:58:51 | 13 | Q    Yeah, so my calculation is you were 28 years |
| | 14 | old. |
| 08:58:52 | 15 | A    Yeah. |
| | 16 | Q    Okay.  Are you a citizen of any other country |
| 08:58:58 | 17 | besides what used to be the Soviet Union? |
| | 18 | A    Yeah, Russia. |
| 08:59:02 | 19 | Q    Russia.  You are a Russian citizen? |
| | 20 | A    Yes. |
| 08:59:04 | 21 | Q    Okay. |
| | 22 | A    Automatically, yeah? |
| 08:59:07 | 23 | Q    Yes. |
| | 24 | A    I -- when I live in Canada, yeah? |
| 08:59:13 | 25 | Q    Yes. |

Kusar Court Reporters & Legal Services, Inc.

013

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 08:59:15 | 1 | A    I'm embassy as Soviet citizen.  I live in |
| | 2 | Canada like Russia citizen, to ship to. |
| 08:59:22 | 3 | Q    And what did you do for work in Canada? |
| | 4 | A    Okay.  First I'm working in factory for |
| 08:59:30 | 5 | produce furniture. |
| | 6 | Q    Yes?  And after that? |
| 08:59:42 | 7 | A    After that I leave to live with my family to |
| | 8 | Barcelona. |
| 08:59:49 | 9 | Q    What year was that? |
| | 10 | A    '9 -- okay.  It's around 19- -- 1996. |
| 09:00:06 | 11 | Q    Okay.  So between 1992 and 1996, did you have |
| | 12 | any other jobs besides working as a -- working in the |
| 09:00:11 | 13 | factory to make furniture? |
| | 14 | A    No, I make some -- I try to make some |
| 09:00:15 | 15 | different businesses. |
| | 16 | Q    Okay.  And what are those? |
| 09:00:22 | 17 | A    Most of them, it's real estate. |
| | 18 | Q    And what were those businesses called? |
| 09:00:28 | 19 | A    "Difference" entity. |
| | 20 | Q    Can you tell me what they were? |
| 09:00:35 | 21 | A    A lot of "difference" names.  Some of them |
| | 22 | in -- After Deck in Spain. |
| 09:00:42 | 23 | Q    After Deck Promotions? |
| | 24 | A    Yeah.  Some of them, really I don't remember |
| 09:00:51 | 25 | exactly, what else name (sic). |

014

Case 2:15-cv-04527-GW-PLA  Document 397-21  Filed 05/02/16  Page 20 of 107  Page ID
#:10662
Case 2:15-cv-04527-GW-PLA  Document 355-1  Filed 04/18/16  Page 16 of 73  Page ID
#:8690

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:02:01 | 1 | I think -- |
| | 2 | MR. LITTLE:  Okay. |
| 09:02:02 | 3 | MR. HARRIS:  -- we do need -- at some point need |
| | 4 | to get to what the -- the discovery -- |
| 09:02:04 | 5 | MR. LITTLE:  We're going to. |
| | 6 | MR. HARRIS:  -- that you're entitled to. |
| 09:02:06 | 7 | MR. LITTLE:  We're going to.  I'm going to move |
| | 8 | on. |
| 09:02:08 | 9 | Q    So were your parents wealthy? |
| | 10 | A    No. |
| 09:02:12 | 11 | Q    Okay.  That's all I wanted to know. |
| | 12 | A    They -- they left. |
| 09:02:15 | 13 | Q    Okay.  So the family that you're talking |
| | 14 | about in Barcelona, who does that include? |
| 09:02:20 | 15 | A    My wife and my children. |
| | 16 | Q    And what are their names? |
| 09:02:28 | 17 | A    My wife Tatiana, my children, Mihail, my |
| | 18 | daughter Anna. |
| 09:02:33 | 19 | Q    And how long did you live in Barcelona? |
| | 20 | A    15 years, around that. |
| 09:02:41 | 21 | Q    And so what did you do in Barcelona for work? |
| | 22 | A    Real estate.  Not just in Barcelona.  It's |
| 09:02:49 | 23 | all Europe. |
| | 24 | Q    All over Europe? |
| 09:02:51 | 25 | A    (Nods head up and down.) |

Kusar Court Reporters & Legal Services, Inc.                              21

015

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 09:05:04 | 1 | Q    Okay.  Are you sure? |
| 09:05:12 | 2 | A    I have salary from CalEnergy. |
| 09:05:12 | 3 | Q    Okay.  And I -- this is probably a good time |
| | 4 | for me to explain one of the other rules of the |
| 09:05:15 | 5 | deposition. |
| | 6 |      When you give your deposition, |
| 09:05:20 | 7 | Mr. Latsanovski, it's under oath, and it's subject to |
| | 8 | the same penalties of perjury as if you were in court. |
| 09:05:24 | 9 |      Do you understand that? |
| | 10 | A    Yeah. |
| 09:05:27 | 11 | Q    Okay.  So if you lie -- |
| | 12 | A    No; no; no; no. |
| 09:05:30 | 13 | Q    -- some bad things could happen, right? |
| | 14 | A    Maybe I don't understand you -- your |
| 09:05:34 | 15 | questions, because you're asking maybe -- |
| | 16 | Q    Okay. |
| 09:05:35 | 17 | A    -- technically. |
| | 18 | Q    Right, okay.  So let me -- let me try to do a |
| 09:05:39 | 19 | more specific job -- |
| | 20 | A    Yes. |
| 09:05:42 | 21 | Q    -- of asking the questions. |
| | 22 |      Have you received any type of employment |
| 09:05:50 | 23 | benefits, salary, bonus, from any other company besides |
| | 24 | CalEnergy in the United States? |
| 09:05:54 | 25 | A    Okay, you're talking about bonus, like |

Kusar Court Reporters & Legal Services, Inc.                                    24

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:06:52 | 1 | BY MR. LITTLE: |
| | 2 | Q    R-i-l-e-n-d? |
| 09:06:56 | 3 | A    Yes. |
| | 4 | Q    Incorporated. |
| 09:07:02 | 5 | What other companies? |
| | 6 | A    Temporarily, ComicsFix. |
| 09:07:12 | 7 | Q    ComicsFix? |
| | 8 | A    Yes. |
| 09:07:18 | 9 | Q    Okay.  What other companies? |
| | 10 | A    Temporarily, Sunset. |
| 09:07:24 | 11 | Q    Sunset Holdings Partners? |
| | 12 | A    Yeah. |
| 09:07:29 | 13 | Q    What else? |
| | 14 | A    CalEnergy -- VastPay. |
| 09:07:36 | 15 | Q    VastPay? |
| | 16 | A    Yeah, NexiPay. |
| 09:07:41 | 17 | Q    "Next Pay"? |
| | 18 | A    NexiPay. |
| 09:07:45 | 19 | Q    NexiPay?  Any other companies? |
| | 20 | A    I don't remember another one. |
| 09:07:49 | 21 | Q    Okay.  Are you sure? |
| | 22 | MR. HARRIS:  You don't have to keep asking him |
| 09:07:55 | 23 | that, Counsel.  He gave you his answer.  Ask another |
| | 24 | question. |
| 09:07:55 | 25 | MR. LITTLE:  Okay. |

Kusar Court Reporters & Legal Services, Inc.                          26

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 09:09:13 | 1 | Aura Vie that you were associated with? |
| | 2 | A    Yes. |
| 09:09:15 | 3 | Q    What are those? |
| | 4 | A    Zen Mobile. |
| 09:09:25 | 5 | Q    Zen Mobile Media? |
| | 6 | A    Yes. |
| 09:09:28 | 7 | Q    And how were you associated with Zen Mobile |
| | 8 | Media? |
| 09:09:36 | 9 | A    Alon, who managed this business, asked me for |
| | 10 | open merchant account for use my name (sic).  I give |
| 09:09:46 | 11 | him "permitted." |
| | 12 | Q    Okay, I want to come back and touch on that |
| 09:09:52 | 13 | and make sure that I understand, okay? |
| | 14 | Alon Nottea asked you to open an account for |
| 09:09:58 | 15 | Zen Mobile Media? |
| | 16 | A    Yes. |
| 09:10:00 | 17 | Q    Okay.  And put your name or associate your |
| | 18 | name to it? |
| 09:10:02 | 19 | A    Yes. |
| | 20 | Q    Okay.  Why did you do that? |
| 09:10:12 | 21 | A    Because he "explained" me business grow up. |
| | 22 | And for grow up this business, like, I give this money |
| 09:10:22 | 23 | to this business "need" help, need additional merchant |
| | 24 | account, because each of merchant has limit, and I have |
| 09:10:30 | 25 | a good credit score. |

Kusar Court Reporters & Legal Services, Inc.                          28

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:10:35 | 1 | He opened for his dad for everything.  For |
| | 2 | me, I didn't have, like, if he opened for his family. |
| 09:10:43 | 3 | I say, "Okay, if you need, do it."  I trust him.  If I |
| | 4 | trust you money (sic), I trust you open for grow up |
| 09:10:52 | 5 | your business. |
| | 6 | Q    Okay.  I'm going to -- I'm going to go back |
| 09:10:59 | 7 | and -- and sort through that just a little bit, okay? |
| | 8 | Alon Nottea asked you to open an account for |
| 09:11:06 | 9 | Zen Mobile Media, correct? |
| | 10 | A    Yes. |
| 09:11:08 | 11 | Q    And the reason that he asked you to open that |
| | 12 | account was because he needed more merchant accounts to |
| 09:11:13 | 13 | grow the business? |
| | 14 | A    He say, "For business purpose, need merchant |
| 09:11:18 | 15 | account." |
| | 16 | Q    Okay.  And did you help him create those |
| 09:11:23 | 17 | merchant accounts, too? |
| | 18 | A    No, I -- I just only sign paper when he ask |
| 09:11:29 | 19 | me.  That's it. |
| | 20 | Q    Did you do anything else for Zen Mobile Media |
| 09:11:43 | 21 | besides help -- hold on a second.  Let me finish my |
| | 22 | question. |
| 09:11:46 | 23 | Did you do anything else for Zen Mobile Media |
| | 24 | besides open an account for Zen Mobile Media?  Anything |
| 09:11:52 | 25 | at all? |

Kusar Court Reporters & Legal Services, Inc.                          29

Federal Trade Commission vs. Bunzai Media Group, Inc.    Igor Latsanovski

| | | |
|---|---|---|
| 09:11:54 | 1 | A    Not. |
| | 2 | Q    Did you ever assist Zen Mobile Media in |
| 09:12:04 | 3 | filing federal income tax returns? |
| | 4 | A    Not.  I give "permit" do it from my -- to |
| 09:12:17 | 5 | him. |
| | 6 | Q    Tell the court if you were ever the chief |
| 09:12:24 | 7 | financial officer of Bunzai. |
| | 8 | A    On the paper or physically? |
| 09:12:29 | 9 | Q    Either.  Were you ever the chief financial |
| | 10 | officer of Bunzai? |
| 09:12:37 | 11 | A    If on the paper I was it, legally, I -- I |
| | 12 | don't know. |
| 09:12:39 | 13 | Q    You don't know? |
| | 14 | A    (Shakes head from side to side.) |
| 09:12:48 | 15 | Q    Tell the court if you were ever an employee |
| | 16 | of Bunzai. |
| 09:12:51 | 17 | A    No. |
| | 18 | Q    Tell the court if you ever received a salary |
| 09:12:56 | 19 | from Bunzai. |
| | 20 | A    Not. |
| 09:13:08 | 21 | Q    Tell the court if you ever received a |
| | 22 | $15,000-a-month salary from Bunzai. |
| 09:13:13 | 23 | A    Not. |
| | 24 | Q    Tell the court if you incorporated or created |
| 09:13:22 | 25 | Zen Mobile Media. |

020

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:17:41 | 1 | MR. LITTLE:  Sure. |
| | 2 | Q    Mr. Latsanovski, how much money did you put |
| 09:17:50 | 3 | into Mr. Bond and Mr. Nottea's companies? |
| | 4 | A    First time, $175,000. |
| 09:17:59 | 5 | Q    Was it a loan? |
| | 6 | A    Long story. |
| 09:18:02 | 7 | Q    I've got all day. |
| | 8 | A    Okay. |
| 09:18:07 | 9 | MR. HARRIS:  That's a yes-or-no question. |
| | 10 | THE WITNESS:  This is -- was investment. |
| 09:18:09 | 11 | BY MR. LITTLE: |
| | 12 | Q    It was an investment? |
| 09:18:11 | 13 | A    Yeah. |
| | 14 | Q    Okay.  Did you have any documents, any paper |
| 09:18:17 | 15 | that substantiated the investment? |
| | 16 | A    During our relationship, we signed a lot of |
| 09:18:26 | 17 | "difference" documents, papers.  They changed, between |
| | 18 | us, a lot of times terms.  Maybe some of them, we |
| 09:18:31 | 19 | signed it. |
| | 20 | Q    Okay.  Do you have in your possession any |
| 09:18:37 | 21 | writings that you can turn over to the receiver to show |
| | 22 | the terms of your investment with Mr. Nottea and |
| 09:18:43 | 23 | Mr. Bond? |
| | 24 | A    I don't have these terms for myself. |
| 09:18:52 | 25 | Q    You don't -- you don't know what the terms |

Kusar Court Reporters & Legal Services, Inc.                    35

021

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 27 of 107   Page ID
#:10969
Case 2:15-cv-04527-GW-PLA   Document 355-1   Filed 04/18/16   Page 23 of 73   Page ID
#:8697

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:18:52 | 1 | were? |
| | 2 | A    They "change" a lot of times. |
| 09:18:58 | 3 | Q    How did they change? |
| | 4 | A    When we met, we signed agreement.  I give |
| 09:19:12 | 5 | them money.  From profit, they will give me 55 percent. |
| | 6 | Q    Okay. |
| 09:19:14 | 7 | A    After that -- |
| | 8 | Q    Can I -- can I pause there? |
| 09:19:17 | 9 | A    Pardon? |
| | 10 | Q    Can I -- can I stop there for a second and |
| 09:19:19 | 11 | ask you a question? |
| | 12 | A    Yes. |
| 09:19:23 | 13 | Q    So if the businesses selling Aura Vie that |
| | 14 | Mr. Nottea and Mr. Bond invested -- or that you |
| 09:19:31 | 15 | invested with them on made money, you would get 55 |
| | 16 | percent of the profit?  Did I understand that? |
| 09:19:39 | 17 | A    Not -- not completely. |
| | 18 | Q    Okay, explain. |
| 09:19:46 | 19 | A    This is period of time for me -- |
| | 20 | THE REPORTER:  I'm sorry, start that again? |
| 09:19:46 | 21 | "This" -- |
| | 22 | THE WITNESS:  During this period of time, they |
| 09:19:55 | 23 | renegotiated and they changed their position a lot of |
| | 24 | time.  How -- I don't know how they "looking" myself. |
| 09:20:07 | 25 | In the end I feel myself like person who give them |

Kusar Court Reporters & Legal Services, Inc.                          36

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 28 of 107   Page ID
#:10970
Case 2:15-cv-04527-GW-PLA   Document 369-70   Filed 04/18/16   Page 24 of 73   Page ID
#:8698

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 09:20:11 | 1 | loan, and they hope they will return me. |
| | 2 | BY MR. LITTLE: |
| 09:20:12 | 3 | Q    Okay. |
| | 4 | A    Because terms, every times a lot of time |
| 09:20:16 | 5 | changes (sic). |
| | 6 | Q    Okay.  Let me -- let me make sure I |
| 09:20:21 | 7 | understand. |
| | 8 | So did you put money in with Mr. Nottea and |
| 09:20:28 | 9 | Mr. Bond with the expectation that you were going to |
| | 10 | get 55 percent of the profits? |
| 09:20:35 | 11 | A    This is one part of our negotiation side |
| | 12 | which doesn't work, because after they renegotiate -- |
| 09:20:46 | 13 | they change they -- our agreement, and we sign a lot of |
| | 14 | times "difference" -- |
| 09:20:48 | 15 | Q    Yeah. |
| | 16 | A    -- because I didn't have choice. |
| 09:20:54 | 17 | Q    So in America, we call that "retrading the |
| | 18 | deal." |
| 09:20:56 | 19 | A    Yes. |
| | 20 | Q    He was retrading the deal with you? |
| 09:21:01 | 21 | A    Yeah.  And I'm -- personally be happy return |
| | 22 | my money (sic). |
| 09:21:05 | 23 | Q    Okay.  So it was not a good investment, is |
| | 24 | that what you're saying? |
| 09:21:10 | 25 | A    If I'm here, not. |

023

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 29 of 107   Page ID
#:10671
Case 2:15-cv-04527-GW-PLA   Document 359-1   Filed 04/18/16   Page 25 of 73   Page ID
#:8699

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:21:12 | 1 | Q    I think I understand what you're saying. |
| | 2 | Tell the court why -- well, let me back up. |
| 09:21:21 | 3 | Is CalEnergy your company? |
| | 4 | A    Yes. |
| 09:21:24 | 5 | Q    Okay.  And you created it? |
| | 6 | A    Yes. |
| 09:21:27 | 7 | Q    Okay.  And when you created it, did you own |
| | 8 | all the stock in it? |
| 09:21:30 | 9 | A    Yes. |
| | 10 | Q    Okay.  Tell the court why CalEnergy received |
| 09:21:36 | 11 | hundreds of thousands of dollars from companies that |
| | 12 | sold Aura Vie. |
| 09:21:45 | 13 | A    These return my investment.  This my |
| | 14 | financial which I give to Bunzai Group.  I sound just |
| 09:21:56 | 15 | like Bunzai Group, all of it.  I give money.  They |
| | 16 | return me piece by piece, piece by piece, enough to |
| 09:22:06 | 17 | say, "Igor, we need additional investment, because we |
| | 18 | grow up and we have to hire people." |
| 09:22:13 | 19 | I give them again, and after they again me |
| | 20 | return piece by piece, piece by piece (sic). |
| 09:22:21 | 21 | Q    Did you receive -- did CalEnergy receive |
| | 22 | money from any company that sold Aura Vie besides |
| 09:22:26 | 23 | Bunzai? |
| | 24 | A    Really?  I don't know. |
| 09:22:29 | 25 | Q    Okay. |

024

Federal Trade Commission vs. Bunzai Media Group, Inc.                 Igor Latsanovski

| 09:22:32 | 1 | A    For me -- what means, I don't know.  For me, |
| | 2 | it's -- all these accounts which Alon manage it, for me |
| 09:22:41 | 3 | it was like Bunzai.  When they wire money for me, I |
| | 4 | "be" happy.  Doesn't matter from where. |
| 09:22:46 | 5 | Q    I see.  So it didn't matter to you where the |
| | 6 | money was coming from as long as it was coming back? |
| 09:22:49 | 7 | A    Yeah. |
| | 8 | Q    Okay.  Have you ever dissolved a business |
| 09:22:56 | 9 | entity that sold Aura Vie? |
| | 10 | A    Dissolved? |
| 09:23:00 | 11 | Q    Yes. |
| | 12 | A    What it -- what it means? |
| 09:23:03 | 13 | Q    Yeah. |
| | 14 | A    My English isn't perfect. |
| 09:23:06 | 15 | Q    Sure.  It means closed down. |
| | 16 |       Have you ever closed down a company that sold |
| 09:23:09 | 17 | Aura Vie? |
| | 18 | A    Yes.  Alon said he closed Zen Media, yeah? |
| 09:23:18 | 19 | Q    "Yes"?  Did he ask you to sign anything to |
| | 20 | dissolve that company? |
| 09:23:29 | 21 | A    I give per- -- I don't remember exactly. |
| | 22 | Q    Have you ever pre-signed checks for Zen |
| 09:23:37 | 23 | Mobile Media and left them with the Nottea family? |
| | 24 | A    Yes. |
| 09:23:39 | 25 | Q    For what purpose? |

Kusar Court Reporters & Legal Services, Inc.                                    39

025

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 31 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 359-73   Filed 04/18/16   Page 27 of 73   Page ID
#:8701
#:10073

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 09:23:48 | 1 | A    If they have my money, I sign checks which I |
| | 2 | don't -- which company with, I don't use it.  It's not |
| 09:23:56 | 3 | my business.  They ask me.  I come and sign checks, and |
| | 4 | that's it. |
| 09:24:00 | 5 | Q    Tell the court why you had -- why you left |
| | 6 | pre-signed personal checks with the Nottea family. |
| 09:24:12 | 7 | A    Because Doron, he good book- -- like good |
| | 8 | support guy, and he help me "for" pay something my |
| 09:24:21 | 9 | personal, like tickets, like -- like man- -- help from |
| | 10 | manage personal purpose (sic). |
| 09:24:26 | 11 | Q    Let me make sure I understand that. |
| | 12 | Doron Nottea helped you manage your personal |
| 09:24:30 | 13 | finances; is that correct? |
| | 14 | A    Yeah, a little bit.  Some parts of it. |
| 09:24:35 | 15 | Q    What did you pay him to do that? |
| | 16 | A    Nothing. |
| 09:24:41 | 17 | Q    Did you pay him to manage Zen Mobile Media? |
| | 18 | A    No. |
| 09:24:46 | 19 | Q    Do you have any explanation for the court as |
| | 20 | to why Doron Nottea would help manage your personal |
| 09:24:52 | 21 | finances for free? |
| | 22 | A    For personal purpose.  He good guy.  For help |
| 09:24:55 | 23 | me. |
| | 24 | Q    He's a good guy? |
| 09:25:00 | 25 | A    Yeah, because I'm -- didn't have nobody in |

Kusar Court Reporters & Legal Services, Inc.                           40

026

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 32 of 107   Page ID
#:10674
Case 2:15-cv-04527-GW-PLA   Document 336-14   Filed 04/18/16   Page 28 of 73   Page ID
#:8702

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:27:18 | 1 | Camerino was working in suite No. 105 when the -- when |
| | 2 | the receiver made her initial entry? |
| 09:27:24 | 3 | A    When?  You're talking about what period of |
| | 4 | time? |
| 09:27:26 | 5 | MR. LITTLE:  What date was that? |
| | 6 | MS. KOONCE:  It was June 18th. |
| 09:27:28 | 7 | MR. LITTLE:  18th? |
| | 8 | MR. HARRIS:  This month he's talking about. |
| 09:27:30 | 9 | BY MR. LITTLE: |
| | 10 | Q    June, yes. |
| 09:27:32 | 11 | A    No. |
| | 12 | Q    June 18, do you know why Philip Camerino -- |
| 09:27:35 | 13 | A    No. |
| | 14 | Q    -- would be working in there?  "No"? |
| 09:27:40 | 15 | A    No. |
| | 16 | Q    Okay.  I want to go back to this meeting that |
| 09:27:47 | 17 | you had with Alon Nottea and Khristopher Bond, okay? |
| | 18 | Did they make an initial request of you for money? |
| 09:27:56 | 19 | A    Yes.  I give them $175,000. |
| | 20 | Q    Okay.  How much money, total, did you give to |
| 09:28:03 | 21 | their business that sold Aura Vie? |
| | 22 | A    Okay, because I give them, they start to |
| 09:28:14 | 23 | return, I give them again, maximum amount of money |
| | 24 | which my money working there -- |
| 09:28:17 | 25 | Q    Uh-huh. |

Kusar Court Reporters & Legal Services, Inc.                              43

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 33 of 107   Page ID
#10975
Case 2:15-cv-04527-GW-PLA   Document 389-15   Filed 04/18/16   Page 29 of 73   Page ID
#:8703

Federal Trade Commission vs. Bunzai Media Group, Inc.         Igor Latsanovski

```
09:34:10   1   Look behind tab 1 in the book in front of you, okay?

           2        A    This one (indicating)?

09:34:15   3        Q    No, tab 1.  There are tabs.  Look behind that

           4   at tab 1.

09:34:18   5             Right now I am showing you what has been

           6   marked as Receiver's Exhibit 1 to your deposition.

09:34:23   7        A    Uh-huh.

           8        Q    Okay?  And I'm going to ask you, have you

09:34:29   9   ever seen Receiver's Exhibit 1 before?

          10        A    What questions?

09:34:38  11        Q    Have you ever seen this document before,

          12   Receiver's Exhibit 1?

09:34:42  13        A    If I sign it, yes.

          14        Q    Okay.  Is that your signature on Receiver's

09:34:45  15   Exhibit 1?

          16        A    Yes.

09:34:49  17        Q    Okay.  Did you incorporate Zen Mobile Media,

          18   Incorporated?

09:34:53  19        A    If I sign it.

          20        Q    Okay.  I want you to look at paragraph Roman

09:35:01  21   numeral IV.  It's in the middle of the page.

          22             Do you see it?

09:35:03  23        A    Yes.

          24        Q    It reads, "This corporation is authorized

09:35:06  25        to issue only one class of shares which shall
```

Kusar Court Reporters & Legal Services, Inc.                                    49

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 09:38:50 | 1 | Said, "Well, some person." |
| | 2 | He said, "You know, I recommend this guy. |
| 09:38:54 | 3 | He's smart guy."  That's it. |
| | 4 | Q    Okay. |
| 09:38:57 | 5 | A    Said, "Okay."  And don't care. |
| | 6 | Q    Has David Davidian always done the accounting |
| 09:39:02 | 7 | work for CalEnergy? |
| | 8 | A    No, just only for the last two years. |
| 09:39:06 | 9 | Q    Okay.  Who was doing it before David |
| | 10 | Davidian? |
| 09:39:10 | 11 | A    It was a company.  I apply an application.  I |
| | 12 | don't remember exactly name. |
| 09:39:15 | 13 | Q    That's fine.  Why did you set up CalEnergy? |
| | 14 | A    Why? |
| 09:39:17 | 15 | Q    Why did you create it? |
| | 16 | A    For my business. |
| 09:39:27 | 17 | Q    What is CalEnergy's business? |
| | 18 | A    Investment.  Investment, management its |
| 09:39:38 | 19 | investment (sic). |
| | 20 | Q    Any other business besides managing |
| 09:39:41 | 21 | investments? |
| | 22 | A    Right now?  (Shakes head from side to side.) |
| 09:39:47 | 23 | Q    Has it ever had any business besides managing |
| | 24 | investments? |
| 09:39:56 | 25 | A    I'm starting business for produce gas and |

Kusar Court Reporters & Legal Services, Inc.                              53

029

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 35 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 399-77   Filed 04/18/16   Page 31 of 73   Page ID
#:8705

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | | |
|---|---|---|---|
| 09:59:32 | 1 | A | Uh-huh. |
| | 2 | Q | Yes, you do? |
| 09:59:35 | 3 | A | See. |
| | 4 | Q | Okay. Do you know what a DBA is? |
| 09:59:40 | 5 | A | Yeah, it's like additional name under |

6  company.

09:59:44  7       Q    Right. So I understand this to mean Zen

8  Mobile Media, Inc., was doing business as Reveal

09:59:53  9  866-670-2751, okay?

10            So did you understand that Zen Mobile Media

10:00:02 11  was setting up merchant accounts?

12       A    If this --

10:00:04 13       MR. HARRIS:  Objection, vague.

14  BY MR. LITTLE:

10:00:08 15       Q    Okay. Earlier your testimony was,

16  Mr. Latsanovski, that you created Zen Mobile Media

10:00:13 17  because Alon told you he needed to set up merchant

18  accounts.

10:00:15 19       A    Yes.

20       Q    Okay. So you knew it was setting up merchant

10:00:17 21  accounts --

22       A    Yes.

10:00:19 23       Q    -- correct?

24       A    Yes.

10:00:22 25       Q    Did you know it set up this merchant account?

Kusar Court Reporters & Legal Services, Inc.                      72

Case 2:15-cv-04527-GW-PLA   Document 389-7   Filed 04/18/16   Page 32 of 73   Page ID
#:8706

Federal Trade Commission vs. Bunzai Media Group, Inc.                Igor Latsanovski

| | | | |
|---|---|---|---|
| 10:00:23 | 1 | A | Exactly this one? |
| | 2 | Q | Yes. |
| 10:00:24 | 3 | A | No. |
| | 4 | Q | Okay.  What did you know about any of the |
| 10:00:30 | 5 | | merchant accounts that were set up by Zen? |
| | 6 | A | Nothing. |
| 10:00:34 | 7 | Q | Did you ever ask Alon to explain to you what |
| | 8 | | merchant accounts were set up by Zen? |
| 10:00:38 | 9 | A | Not. |
| | 10 | Q | Why not? |
| 10:00:45 | 11 | A | He run business (sic).  I trust him because |
| | 12 | | I'm invest to people (sic). |
| 10:00:48 | 13 | Q | Okay.  You trusted him? |
| | 14 | A | Yes. |
| 10:00:52 | 15 | Q | Okay.  Just explain to me, if you would, how |
| | 16 | | you came to trust Alon Nottea. |
| 10:00:57 | 17 | A | Okay. |
| | 18 | | MR. HARRIS:  Objection, vague. |
| 10:00:59 | 19 | | BY MR. LITTLE: |
| | 20 | Q | You can answer, if you understand me. |
| 10:01:03 | 21 | A | Yeah, I understand. |
| | 22 | Q | Okay. |
| 10:01:09 | 23 | A | My method of make investment, for trust |
| | 24 | | people (sic). |
| 10:01:11 | 25 | Q | Okay. |

Kusar Court Reporters & Legal Services, Inc.                                    73

031

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 37 of 107   Page ID
#:10079
Case 2:15-cv-04527-GW-PLA   Document 360-79   Filed 04/18/16   Page 33 of 73   Page ID
#:8707

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:02:30 | 1 | A    In my mind, I decided, "Okay, I can lose this |
| | 2 | money, or maybe I can find good team who can help me, |
| 10:02:41 | 3 | yeah, for make some profit here in United States." |
| | 4 | Q    Okay.  Looking back at Receiver's Exhibit 9 |
| 10:02:51 | 5 | here, did you understand that Zen Mobile Media was |
| | 6 | selling Aura Vie? |
| 10:02:54 | 7 | A    Where does it show it? |
| | 8 | Q    Well, lists -- further down the page on the |
| 10:03:02 | 9 | left side there is a -- a line item for a |
| | 10 | "Product/Service Sold."  Do you see that?  And it says, |
| 10:03:07 | 11 | "Facial Creams." |
| | 12 | MR. HARRIS:  Yeah (indicating). |
| 10:03:09 | 13 | THE WITNESS:  Okay. |
| | 14 | BY MR. LITTLE: |
| 10:03:10 | 15 | Q    Do you see that? |
| | 16 | A    Yes. |
| 10:03:13 | 17 | Q    Did you understand that the facial creams |
| | 18 | that Zen Mobile Media was selling included Aura Vie? |
| 10:03:18 | 19 | A    Maybe. |
| | 20 | Q    Maybe? |
| 10:03:20 | 21 | A    I don't know, because I -- I don't use this |
| | 22 | company personally. |
| 10:03:28 | 23 | Q    Okay.  Looking at the right side of the page, |
| | 24 | there is a box for "Bank" -- "Bank Information." |
| 10:03:33 | 25 | Do you see that? |

Kusar Court Reporters & Legal Services, Inc.                        75

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 38 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 350-30   Filed 04/18/16   Page 34 of 73   Page ID
#:8708

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:06:55 | 1 | A    It means you sell product online.  If you |
| | 2 | sell product online -- |
| 10:06:58 | 3 | (Telephone ringing.) |
| | 4 | THE WITNESS:  Apologize.  I turn off. |
| 10:07:00 | 5 | BY MR. LITTLE: |
| | 6 | Q    It's okay.  Don't worry. |
| 10:07:02 | 7 | MR. HARRIS:  Can you silence it? |
| | 8 | THE WITNESS:  Yeah, sorry. |
| 10:07:03 | 9 | BY MR. LITTLE: |
| | 10 | Q    That's okay. |
| 10:07:06 | 11 | A    Okay. |
| | 12 | If you sell online product -- |
| 10:07:10 | 13 | Q    Uh-huh. |
| | 14 | A    -- and sell product with, like, free trial -- |
| 10:07:15 | 15 | Q    Yes. |
| | 16 | A    -- it means it's negative option. |
| 10:07:21 | 17 | Q    Free trial, and then a consumer has an |
| | 18 | opportunity -- they have to cancel within a certain |
| 10:07:27 | 19 | period of time, right? |
| | 20 | A    It's already details. |
| 10:07:30 | 21 | Q    I'm sorry? |
| | 22 | A    I don't know these details already what you |
| 10:07:32 | 23 | explain to me -- |
| | 24 | Q    Okay. |
| 10:07:34 | 25 | A    -- because I have my personal experience -- |

Kusar Court Reporters & Legal Services, Inc.                          79

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 39 of 107   Page ID
#:10961
Case 2:15-cv-04527-GW-PLA   Document 389-31   Filed 04/18/16   Page 35 of 73   Page ID
#:8709

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:07:34 | 1 | Q    Okay. |
| | 2 | A    -- yeah?  Because a lot of times online I try |
| 10:07:40 | 3 | to buy something, and the same, free trial, everything, |
| | 4 | it's okay. |
| 10:07:44 | 5 | Sometimes I don't like it.  Like, last time |
| | 6 | somebody charged me for a sport, it's like for -- so I |
| 10:07:53 | 7 | say, "I don't like it."  I online tried return money, |
| | 8 | yeah. |
| 10:07:54 | 9 | Q    Okay. |
| | 10 | A    So it means -- this, it means negative |
| 10:07:57 | 11 | options, yeah? |
| | 12 | Q    So my understanding is, and I'm sure the FTC |
| 10:08:04 | 13 | could clarify this for you at some point -- |
| | 14 | A    Yeah. |
| 10:08:06 | 15 | Q    -- and much more eloquently than I could, but |
| | 16 | my understanding is you sign up for a free trial, you |
| 10:08:11 | 17 | give them your credit card information, and the |
| | 18 | consumer has to do -- take some affirmative action to |
| 10:08:18 | 19 | cancel the free trial before their credit card gets |
| | 20 | charged. |
| 10:08:20 | 21 | Do you understand that? |
| | 22 | A    Too long and "complicate" for me right now. |
| 10:08:26 | 23 | Q    Okay.  Did you understand that the companies |
| | 24 | that Alon was running were engaged in negative option |
| 10:08:33 | 25 | marketing? |

Kusar Court Reporters & Legal Services, Inc.                              80

034

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 40 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document #:9082   Filed 04/18/16   Page 36 of 73   Page ID
#:13700

Igor Latsanovski                    Federal Trade Commission vs. Bunzai Media Group, Inc.                    1090802

| | | |
|---|---|---|
| 10:08:41 | 1 | A    I understand Alon did everything for sell |
| | 2 | product, good quality, because Khristopher create |
| 10:08:45 | 3 | good-quality product. |
| | 4 | Q    Okay. |
| 10:08:51 | 5 | A    I give present to my friends, this product. |
| | 6 | All of them like it, and all the time when I travel, |
| 10:08:58 | 7 | they say, "Igor, please bring more.  It's good, really |
| | 8 | quality product." |
| 10:09:01 | 9 | Q    Uh-huh.  My question was different, |
| | 10 | Mr. Latsanovski, and I want to -- I want to make sure |
| 10:09:05 | 11 | you understand my question. |
| | 12 | A    Okay. |
| 10:09:08 | 13 | Q    Did you understand that the businesses that |
| | 14 | Alon Nottea was running, including Bunzai and Zen |
| 10:09:17 | 15 | Mobile Media, were offering products over the Internet |
| | 16 | via free trial -- |
| 10:09:21 | 17 | A    I know -- I know -- |
| | 18 | Q    Hold on a second.  Let me finish. |
| 10:09:23 | 19 | A    Okay. |
| | 20 | Q    Okay?  Did you understand that Alon's |
| 10:09:27 | 21 | companies were offering products over the Internet |
| | 22 | through something called negative option marketing? |
| 10:09:35 | 23 | MR. HARRIS:  Your definition or his of that term? |
| | 24 | MR. LITTLE:  Let me ask a more specific question. |
| 10:09:41 | 25 | MR. BERK:  I think we need to restate that |

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 41 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 369-3   Filed 04/18/16   Page 37 of 73   Page ID
#:8711

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 10:11:29 | 1 | Q    There were pre-signed checks -- does your |
| | 2 | signature appear on each of these checks on Receiver's |
| 10:11:33 | 3 | Exhibit 11, sir? |
| | 4 | A    Yes. |
| 10:11:37 | 5 | Q    Okay.  Why did you pre-sign checks for |
| | 6 | CalEnergy and leave them with Doron Nottea? |
| 10:11:42 | 7 | MR. BERK:  Objection, asked and answered. |
| | 8 | BY MR. LITTLE: |
| 10:11:44 | 9 | Q    You can answer. |
| | 10 | THE WITNESS:  I have to answer? |
| 10:11:46 | 11 | MR. BERK:  Yes. |
| | 12 | THE WITNESS:  Because he help me for, if I not |
| 10:11:56 | 13 | here, I authorize him for help me pay some (sic) -- for |
| | 14 | personal or business purpose. |
| 10:11:59 | 15 | BY MR. LITTLE: |
| | 16 | Q    And just to make sure I understand, you |
| 10:12:04 | 17 | allowed Doron Nottea to do that -- |
| | 18 | A    What is "allowed"? |
| 10:12:08 | 19 | Q    You permitted Alon -- Doron Nottea to do |
| | 20 | that? |
| 10:12:10 | 21 | A    Yes. |
| | 22 | Q    He was not an employee of CalEnergy, right? |
| 10:12:15 | 23 | A    Not. |
| | 24 | Q    Was Doron Nottea a signer on the bank account |
| 10:12:18 | 25 | of CalEnergy? |

Kusar Court Reporters & Legal Services, Inc.                              84

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | | |
|---|---|---|---|
| 10:12:20 | 1 | A | Not. |
| | 2 | Q | Did you pay him anything -- |
| 10:12:22 | 3 | A | No. |
| | 4 | Q | -- to help you? |
| 10:12:25 | 5 | A | Nothing. |
| | 6 | Q | And as I understand your testimony, your |

answer is the same with regard to your personal checks

that appear -- or your personal check that appears on

this page, "yes"?

| | | | |
|---|---|---|---|
| | 10 | A | Yes, the same, like -- |
| 10:12:40 | 11 | Q | Okay.  Do you leave pre-signed checks with |

anyone else besides Doron Nottea when you travel?

| | | | |
|---|---|---|---|
| 10:12:45 | 13 | A | Yes. |
| | 14 | Q | Who? |
| 10:12:49 | 15 | A | My wife. |
| | 16 | Q | Have you left any pre-signed checks with |

David Davidian?

| | | | |
|---|---|---|---|
| | 18 | A | Not. |
| 10:13:05 | 19 | Q | Do you leave your wife pre-signed checks for |

any other account than your personal account?

| | | | |
|---|---|---|---|
| 10:13:10 | 21 | A | I don't remember.  I trust her. |
| | 22 | Q | I understand. |
| 10:13:17 | 23 | A | For this reason, I live with her already 25 |

years.

| | | | |
|---|---|---|---|
| 10:13:20 | 25 | Q | And just to make sure I understand your |

Kusar Court Reporters & Legal Services, Inc.                              85

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 10:17:50 | 1 | Q    Either.  Do you know if Leor Arazy worked for |
| | 2 | Bunzai? |
| 10:17:52 | 3 | A    I don't remember. |
| | 4 | Q    Okay.  Turn to Receiver Exhibit 13.  This is |
| 10:18:01 | 5 | just a printout of your LinkedIn page. |
| | 6 | A    Uh-huh. |
| 10:18:02 | 7 | Q    Do you see that? |
| | 8 | A    Yes. |
| 10:18:05 | 9 | Q    Okay.  And one of the companies -- I asked |
| | 10 | you earlier in your deposition for all the companies |
| 10:18:13 | 11 | that you've owned or worked for, and one that you did |
| | 12 | not mention was a company called Guayas Limited. |
| 10:18:17 | 13 | A    Yes. |
| | 14 | Q    What is that company? |
| 10:18:20 | 15 | A    This is European company. |
| | 16 | Q    Okay.  Where in Europe? |
| 10:18:25 | 17 | A    Estonia. |
| | 18 | Q    In Tallinn? |
| 10:18:29 | 19 | A    Yes. |
| | 20 | Q    What does it do? |
| 10:18:33 | 21 | A    They do business. |
| | 22 | Q    You say, "They do business."  You're listed |
| 10:18:41 | 23 | as the CEO of that company.  What does it do? |
| | 24 | A    Okay, I'm shareholder this company (sic). |
| 10:18:44 | 25 | Q    You're a shareholder? |

Kusar Court Reporters & Legal Services, Inc.                              91

037

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | | |
|---|---|---|---|
| 10:18:45 | 1 | A | (Nods head up and down.) |
| | 2 | Q | Are you the CEO? |
| 10:18:48 | 3 | A | I'm shareholder. |
| | 4 | Q | Well -- |
| 10:18:51 | 5 | A | I was COO some short period of time. |
| | 6 | Q | Do you -- is this your LinkedIn page? |
| 10:18:56 | 7 | A | If you print it, yes. |
| | 8 | Q | Yeah, so did you fill in all the information |
| 10:18:59 | 9 | | here? |
| | 10 | A | No. |
| 10:19:02 | 11 | Q | Who filled in the information? |
| | 12 | A | I sometimes ask somebody "for" help me, for |
| 10:19:06 | 13 | | create information about me. |
| | 14 | Q | Okay. |
| 10:19:09 | 15 | A | Personally, I didn't. |
| | 16 | Q | Have you ever been the CEO of Guayas Limited? |
| 10:19:16 | 17 | A | CO (sic)?  Never. |
| | 18 | Q | "Never."  What does it do? |
| 10:19:20 | 19 | A | What? |
| | 20 | Q | What does the company do? |
| 10:19:22 | 21 | A | Do? |
| | 22 | Q | (Nods head up and down.) |
| 10:19:25 | 23 | A | They make business. |
| | 24 | Q | What kind of business? |
| 10:19:30 | 25 | A | Investment in real estate. |

Kusar Court Reporters & Legal Services, Inc.                    92

038

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:19:33 | 1 | Q    And where does the money come from? |
| | 2 | A    You talking about which company? |
| 10:19:39 | 3 | Q    Guayas Limited, where does the money come |
| | 4 | from? |
| 10:19:43 | 5 | A    They working themselves money (sic).  They |
| | 6 | have cash flow. |
| 10:19:47 | 7 | Q    Okay.  Who is "they" that you're talking |
| | 8 | about.  Who else is -- who else participates in that |
| 10:19:50 | 9 | company? |
| | 10 | A    Okay.  Oleg is the CO (sic) of company for |
| 10:19:55 | 11 | run this business. |
| | 12 | Q    Oleg?  And what is his last name? |
| 10:19:57 | 13 | A    Trushla. |
| | 14 | Q    Trushla? |
| 10:20:00 | 15 | A    Yeah, Trushla. |
| | 16 | Q    How would you spell it? |
| 10:20:06 | 17 | A    T-R-U-S-H-L-A, Trushla. |
| | 18 | Q    He lives in Estonia? |
| 10:20:09 | 19 | A    No. |
| | 20 | Q    Where does he live? |
| 10:20:14 | 21 | A    He "live" in Russia. |
| | 22 | Q    And who else works for Guayas Limited besides |
| 10:20:21 | 23 | Oleg Trushla? |
| | 24 | A    Irina. |
| 10:20:23 | 25 | Q    Irina? |

Kusar Court Reporters & Legal Services, Inc.                                    93

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:23:37 | 1 | A    I give you. |
| | 2 | Q    What I'll do is I'll leave a -- ask the court |
| 10:23:41 | 3 | reporter to leave a blank in your deposition so you can |
| | 4 | tell me what his phone number is later. |
| 10:23:44 | 5 | A    I give you. |
| | 6 | Q    Okay? |
| 10:23:45 | 7 | (Information requested:_____ |
| | 8 | _____.) |
| 10:23:45 | 9 | BY MR. LITTLE: |
| | 10 | Q    And is -- the same question for Irina |
| 10:23:51 | 11 | Stamburg, you can do that as well? |
| | 12 | A    Yes. |
| 10:23:53 | 13 | Q    You can provide me the phone number? |
| | 14 | A    No problem. |
| 10:23:55 | 15 | Q    Okay. |
| | 16 | (Information requested:_____ |
| 10:23:55 | 17 | _____.) |
| | 18 | BY MR. LITTLE: |
| 10:23:59 | 19 | Q    All right.  What does VastPay do? |
| | 20 | A    VastPay? |
| 10:24:02 | 21 | Q    Yes. |
| | 22 | A    This is a merchant processing company. |
| 10:24:07 | 23 | Q    Merchant processing company? |
| | 24 | A    Uh-huh. |
| 10:24:12 | 25 | Q    Has it ever done any business with any of the |

Kusar Court Reporters & Legal Services, Inc.                              97

040

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:52:58 | 1 | Q    Okay.  Debt -- |
| | 2 | A    But -- no, but I can use another "words" |
| 10:53:03 | 3 | which I understand it. |
| | 4 | Q    Sure, all right.  Did you buy shares of |
| 10:53:12 | 5 | anything, any companies that Alon was owning? |
| | 6 | A    No. |
| 10:53:15 | 7 | Q    Okay.  Did you loan money to those entities |
| | 8 | that Alon owns? |
| 10:53:19 | 9 | A    Yes. |
| | 10 | Q    Okay.  Do you have any written loan |
| 10:53:27 | 11 | agreements of any kind with any of Alon's companies? |
| | 12 | A    Bunzai and some other, maybe, companies. |
| 10:53:31 | 13 | Q    You think you have written agreements with |
| | 14 | Bunzai? |
| 10:53:33 | 15 | A    Yeah.  I don't remember exactly. |
| | 16 | Q    Okay. |
| 10:53:38 | 17 | A    We -- like, we sign a lot of agreements |
| | 18 | and -- |
| 10:53:41 | 19 | Q    You said you signed a lot of agreements with |
| | 20 | Alon? |
| 10:53:43 | 21 | A    No, some of papers.  Yeah, I don't |
| | 22 | remember -- |
| 10:53:45 | 23 | Q    Where are they? |
| | 24 | A    I don't know. |
| 10:53:50 | 25 | Q    Okay. |

Kusar Court Reporters & Legal Services, Inc.                    114

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 48 of 107   Page ID
#:10690
Case 2:15-cv-04527-GW-PLA   Document 389-1   Filed 04/18/16   Page 44 of 73   Page ID
#:8718

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:54:47 | 1 | A    Around -- because all the time say, "Give |
| | 2 | money," then return money, then I give them money. |
| 10:54:53 | 3 | Maximum, I don't remember exactly, and CPA can say |
| | 4 | exactly, maximum I think so one period of time was like |
| 10:54:59 | 5 | half a million. |
| | 6 | Q    Half a million dollars? |
| 10:55:02 | 7 | A    Right.  I said, maybe.  I'm not sure.  'Cause |
| | 8 | all this money, like -- like, again, back -- |
| 10:55:08 | 9 | Q    And you did it purely off of a verbal |
| | 10 | agreement? |
| 10:55:09 | 11 | A    Yes. |
| | 12 | Q    What was the verbal agreement? |
| 10:55:13 | 13 | MR. HARRIS:  Objection, asked and answered. |
| | 14 | You can -- you can answer. |
| 10:55:17 | 15 | THE WITNESS:  Huh? |
| | 16 | MR. HARRIS:  You can answer.  He asked you this |
| 10:55:21 | 17 | earlier, and you gave this answer, but you can answer |
| | 18 | his question again. |
| 10:55:23 | 19 | THE WITNESS:  Okay. |
| | 20 | Terms changed a lot of times. |
| 10:55:25 | 21 | BY MR. LITTLE: |
| | 22 | Q    I know you said that, so -- |
| 10:55:29 | 23 | A    Okay.  For me -- |
| | 24 | Q    Yes. |
| 10:55:31 | 25 | A    -- I'm calculating how much I give them, how |

Kusar Court Reporters & Legal Services, Inc.                              116

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 49 of 107   Page ID
#:10691
Case 2:15-cv-04527-GW-PLA   Document 353-1   Filed 04/18/16   Page 45 of 73   Page ID
#:8719

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 10:55:35 | 1 | they return.  In my mind, I have profit from this |
| | 2 | company, like interest.  Maybe we change it, like, |
| 10:55:44 | 3 | shares, dividends.  We sound this money like difference |
| | 4 | pronunciation (sic).  For physically, in my mind, I |
| 10:55:51 | 5 | give them money.  I have some part of interest, my |
| | 6 | money (sic). |
| 10:55:54 | 7 | Q    How much interest did you charge them on the |
| | 8 | loan? |
| 10:56:01 | 9 | A    Generally, I have profit for during these |
| | 10 | five years, yeah, from them around 300 -- I don't |
| 10:56:11 | 11 | remember exactly.  Like, around 300 -- like 3, 320, |
| | 12 | like this one, profit. |
| 10:56:15 | 13 | It means how much I give them.  They return |
| | 14 | me an additional money, which, like, for me for -- for |
| 10:56:23 | 15 | "difference" names, like, percent.  Doesn't matter for |
| | 16 | me, yeah?  Like, money which I receive. |
| 10:56:28 | 17 | Q    I want to unpack that and go back to what you |
| | 18 | talked about. |
| 10:56:31 | 19 | You said you think you received 300 to |
| | 20 | $320,000 in profit? |
| 10:56:35 | 21 | A    Yes. |
| | 22 | Q    Okay.  Who paid you the profit? |
| 10:56:40 | 23 | A    Alon from this -- his entities. |
| | 24 | Q    From his entities? |
| 10:56:42 | 25 | A    Yes. |

Kusar Court Reporters & Legal Services, Inc.                                117

043

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 50 of 107   Page ID
#:10692
Case 2:15-cv-04527-GW-PLA   Document 385-2   Filed 04/18/16   Page 46 of 73   Page ID
#:8720

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 11:04:33 | 1 | BY MR. LITTLE: |
| | 2 | Q    You can answer. |
| 11:04:36 | 3 | A    Okay.  Alon. |
| | 4 | Q    Alon.  Anyone else? |
| 11:04:39 | 5 | MR. HARRIS:  Same objections. |
| | 6 | BY MR. LITTLE: |
| 11:04:41 | 7 | Q    You can answer. |
| | 8 | A    Alon. |
| 11:04:46 | 9 | Q    Okay.  Is there anyone else that you're aware |
| | 10 | of as you sit here today that control the companies |
| 11:04:51 | 11 | that you circled on Receiver's Exhibit 18? |
| | 12 | A    How I know, Alon (sic). |
| 11:04:54 | 13 | Q    Okay.  That's fine. |
| | 14 | All right.  I want you to take this -- sorry, |
| 11:05:00 | 15 | just one second. |
| | 16 | Okay.  As you sit here today, are you aware |
| 11:05:07 | 17 | of what Doron Nottea's role is with any of the |
| | 18 | companies that you circled on Receiver's Exhibit 18? |
| 11:05:10 | 19 | A    No. |
| | 20 | MR. BERK:  Objection, calls for speculation. |
| 11:05:13 | 21 | MR. LITTLE:  Can we have one person making |
| | 22 | objections?  Is that okay? |
| 11:05:15 | 23 | MR. BERK:  We can do that. |
| | 24 | MR. LITTLE:  Thanks. |
| 11:05:18 | 25 | Q    All right.  So what I'd like you to do is |

Kusar Court Reporters & Legal Services, Inc.                        125

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 11:06:23 | 1 | that the Federal Trade Commission was investigating the |
| | 2 | Bunzai group of companies? |
| 11:06:28 | 3 | A     Again? |
| | 4 | Q     At any point in time did Alon Nottea tell you |
| 11:06:34 | 5 | that the FTC, the Federal Trade Commission, was |
| | 6 | investigating the Bunzai group of companies? |
| 11:06:43 | 7 | A     Yeah, when I -- this is to receive -- this is |
| | 8 | information.  They close bank and everything, he call |
| 11:06:48 | 9 | me. |
| | 10 | Q     Okay.  So I want to make sure I understand |
| 11:06:52 | 11 | the timing, okay? |
| | 12 | A     Yeah. |
| 11:06:55 | 13 | Q     At any point in time before June of this |
| | 14 | year -- |
| 11:06:56 | 15 | A     Okay. |
| | 16 | Q     -- did you know that the Federal Trade |
| 11:06:59 | 17 | Commission was investigating -- |
| | 18 | A     Not. |
| 11:07:01 | 19 | Q     -- Alon's company? |
| | 20 | A     Not. |
| 11:07:05 | 21 | Q     "No," okay.  Do you know why Zen Mobile Media |
| | 22 | was dissolved, was legally dissolved? |
| 11:07:11 | 23 | A     (Shakes head from side to side.) |
| | 24 | Q     "No"? |
| 11:07:12 | 25 | MR. HARRIS:  You have to answer. |

Kusar Court Reporters & Legal Services, Inc.                              127

045

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 11:07:12 | 1 | BY MR. LITTLE: |
| | 2 | Q    You have to answer audibly. |
| 11:07:16 | 3 | A    I don't know, no. |
| | 4 | Q    Okay.  Do you know why Lifestyle Media Brands |
| 11:07:19 | 5 | was legally dissolved? |
| | 6 | A    Not. |
| 11:07:23 | 7 | Q    Do you know why Pinnacle Logistics was |
| | 8 | legally dissolved? |
| 11:07:25 | 9 | A    Not. |
| | 10 | Q    Do you know why Agoa Holdings was legally |
| 11:07:28 | 11 | dissolved? |
| | 12 | A    Not. |
| 11:07:32 | 13 | Q    Do you know why Bunzai Media Group was |
| | 14 | legally dissolved? |
| 11:07:35 | 15 | A    Not. |
| | 16 | Q    Okay. |
| 11:07:36 | 17 | A    May I ask water? |
| | 18 | Q    Water?  Yeah, sure. |
| 11:07:43 | 19 | A    Yeah, because I -- |
| | 20 | Q    You're paying him.  We'll let him get it. |
| 11:07:48 | 21 | MR. BERK:  Anybody else? |
| | 22 | MS. KOONCE:  I'll take some. |
| 11:07:50 | 23 | MR. LITTLE:  No, thank you. |
| | 24 | THE WITNESS:  Thank you. |
| 11:07:51 | 25 | /// |

Kusar Court Reporters & Legal Services, Inc.                            128

046

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 11:12:52 | 1 | company. |
| | 2 | Q    Okay.  What was the European company from -- |
| 11:12:58 | 3 | that it took the loan from? |
| | 4 | A    CalEnergy take loans from European company |
| 11:13:03 | 5 | for interest, yeah? |
| | 6 | Q    And -- and what was the company in Europe |
| 11:13:08 | 7 | that it borrowed the money from? |
| | 8 | A    They own the -- this company, they own this |
| 11:13:12 | 9 | money. |
| | 10 | Q    Yes.  What was the name of the European |
| 11:13:16 | 11 | company? |
| | 12 | A    Okay, Guayas. |
| 11:13:22 | 13 | Q    Guayas.  And you are the 100 percent |
| | 14 | shareholder of Guayas, correct? |
| 11:13:26 | 15 | A    Yes. |
| | 16 | Q    Where did Guayas get the money that it loaned |
| 11:13:34 | 17 | to CalEnergy that CalEnergy loaned to Zen -- Bunzai? |
| | 18 | A    Okay, Guayas "have" profit. |
| 11:13:39 | 19 | Q    From what? |
| | 20 | A    From their business purpose.  They make |
| 11:13:47 | 21 | profit, declare this profit, pay taxes and everything, |
| | 22 | and make assets like money, and this money, they give |
| 11:13:52 | 23 | loan to CalEnergy. |
| | 24 | Q    Sure.  So what business purposes generated |
| 11:13:59 | 25 | the money for Guayas? |

Kusar Court Reporters & Legal Services, Inc.                              134

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 54 of 107   Page ID
#16996
Case 2:15-cv-04527-GW-PLA   Document 356-6   Filed 04/18/16   Page 50 of 73   Page ID
#:8724

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | | |
|---|---|---|---|
| 11:22:26 | 1 | | CEO\owner of those companies. |
| | 2 | | Is that true? |
| 11:22:27 | 3 | A | Not. |
| | 4 | Q | Not true, okay. |
| 11:22:36 | 5 | | Have you ever heard of a company called |
| | 6 | | Chargeback Armor? |
| 11:22:40 | 7 | A | Yes. |
| | 8 | Q | Okay.  What does that company do? |
| 11:22:51 | 9 | A | Alon start in technology directions.  He |
| | 10 | | invite me if I could be investor.  I say, "No." |
| 11:22:59 | 11 | Q | Do you know anything else about it? |
| | 12 | A | Not. |
| 11:23:03 | 13 | Q | Okay.  Do you know -- have you ever heard of |
| | 14 | | a company called IVR Logics? |
| 11:23:08 | 15 | A | Yes. |
| | 16 | Q | What do you know about IVR Logics? |
| 11:23:17 | 17 | A | I'm not sure, but I'm -- I'm "hear" this |
| | 18 | | name. |
| 11:23:21 | 19 | Q | Okay.  Alon invited you to invest in |
| | 20 | | Chargeback Armor, but you did not want to, correct? |
| 11:23:25 | 21 | A | (Nods head up and down.) |
| | 22 | Q | Did he ask you for a certain amount of money? |
| 11:23:29 | 23 | A | Yeah, but I don't remember the details. |
| | 24 | Q | Okay. |
| 11:23:31 | 25 | A | We start negotiate and negotiate, but in the |

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

| | | |
|---|---|---|
| 11:27:45 | 1 | ending with Zen Mobile Media. |
| | 2 | Do you see that? |
| 11:27:48 | 3 | A    Uh-huh. |
| | 4 | Q    When you made your investment -- I'm sorry. |
| 11:27:52 | 5 | Let me back up. |
| | 6 | Did you understand that the Bunzai group of |
| 11:28:01 | 7 | companies was funneling money to SBM Management? |
| | 8 | A    Don't know how the structure working. |
| 11:28:05 | 9 | Q    You don't know that? |
| | 10 | A    (Shakes head from side to side.) |
| 11:28:11 | 11 | Q    Okay.  I want you to turn with me to |
| | 12 | Receiver's Exhibit 26. |
| 11:28:14 | 13 | A    Uh-huh. |
| | 14 | Q    Okay?  Receiver's Exhibit 26 is -- hold on a |
| 11:28:37 | 15 | sec. |
| | 16 | Receiver's Exhibit 26, Mr. Latsanovski, is a |
| 11:28:43 | 17 | summary that the forensic accountant employed by the |
| | 18 | receiver made of all the money that was paid to |
| 11:28:50 | 19 | CalEnergy by these companies. |
| | 20 | A    Uh-huh. |
| 11:28:52 | 21 | Q    Do you see that? |
| | 22 | A    Yes. |
| 11:28:58 | 23 | Q    All right.  I want to go one by one, okay? |
| | 24 | At the time CalEnergy received $75,000 from |
| 11:29:05 | 25 | Agoa Holdings, did you know that it was making money by |

Kusar Court Reporters & Legal Services, Inc.                          146

049

Federal Trade Commission vs. Bunzai Media Group, Inc.         Igor Latsanovski

| 11:38:20 | 1 | BY MR. LITTLE: |
| | 2 | Q    Have you ever known who owned Zen Mobile |
| 11:38:23 | 3 | Media? |
| | 4 | A    Physically, no. |
| 11:38:39 | 5 | Q    Yes.  Do you know what is located at 4335 Van |
| | 6 | Nuys Boulevard, No. 167, in Sherman Oaks? |
| 11:38:48 | 7 | A    This page, right? |
| | 8 | Q    Any page, yeah.  I mean, it's the address |
| 11:38:53 | 9 | that appears throughout Receiver's Exhibit 30.  Do you |
| | 10 | know what's at that location? |
| 11:38:55 | 11 | A    Not. |
| | 12 | Q    Okay.  Have you ever picked up mail for Zen |
| 11:38:59 | 13 | Mobile Media? |
| | 14 | A    From this address, not. |
| 11:39:04 | 15 | Q    Did you -- all right.  So here's what I want |
| | 16 | to understand.  Our belief is that this is a mailbox, |
| 11:39:13 | 17 | just like the mailbox you pick up your stuff for |
| | 18 | CalEnergy -- |
| 11:39:15 | 19 | A    Yeah; yeah. |
| | 20 | Q    -- in Calabasas. |
| 11:39:16 | 21 | A    Yeah. |
| | 22 | Q    Did you ever provide your ID to anyone at |
| 11:39:22 | 23 | this mailbox to pick up the mail? |
| | 24 | A    From Zen Mobile? |
| 11:39:24 | 25 | Q    Yes. |

Kusar Court Reporters & Legal Services, Inc.                          156

**050**

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 57 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 389-99   Filed 04/18/16   Page 53 of 73   Page ID
#:8727

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| 11:41:38 | 1 | A (Shakes head from side to side.) |
| | 2 | MR. HARRIS: You have to answer audibly. |
| 11:41:39 | 3 | BY MR. LITTLE: |
| | 4 | Q You have to answer. |
| 11:41:42 | 5 | A Oh, okay. Not. |
| | 6 | Q Okay. |
| 11:41:43 | 7 | A I don't remember exactly. |
| | 8 | Q All right. Take a look at Receiver's Exhibit |
| 11:41:47 | 9 | 31, if you would. |
| | 10 | Did you provide any information to David |
| 11:41:57 | 11 | Davidian to prepare the 2012 tax return for Zen Mobile |
| | 12 | Media? |
| 11:42:01 | 13 | A If Alon asked me, I did. |
| | 14 | Q Okay. |
| 11:42:06 | 15 | A But exactly, I don't remember. |
| | 16 | Q All right. I want you to turn in this book |
| 11:42:20 | 17 | to Receiver's Exhibit 35, if you would. |
| | 18 | Mr. Latsanovski, earlier in your deposition |
| 11:42:26 | 19 | you testified under oath that you were neither an |
| | 20 | employee nor an officer of Bunzai Media Group. |
| 11:42:30 | 21 | A Uh-huh. |
| | 22 | Q This letter reads, "To whom it may concern, |
| 11:42:35 | 23 | "Mr. Igor Latsanovski holds the position |
| | 24 | of Chief Financial Officer of Bunzai Media |
| 11:42:39 | 25 | Group and currently earns a salary of $15,000 |

Kusar Court Reporters & Legal Services, Inc.                    159

051

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 11:42:44 | 1 | per month as compensation for his services. |
| | 2 | Mr. Latsanovski has held this key position |
| 11:42:48 | 3 | at Bunzai Media Group since February, 2011." |
| | 4 | You see that? |
| 11:42:50 | 5 | A   Yes. |
| | 6 | Q   Is that true? |
| 11:42:52 | 7 | A   Not. |
| | 8 | Q   It's not true? |
| 11:42:54 | 9 | A   (Shakes head from side to side.) |
| | 10 | Q   Okay.  Do you understand that this document |
| 11:42:59 | 11 | was used by you to obtain financing to purchase a car |
| | 12 | or lease a car? |
| 11:43:05 | 13 | A   Yeah, I didn't know it. |
| | 14 | Q   No, you didn't know that? |
| 11:43:07 | 15 | A   (Shakes head from side to side.) |
| | 16 | Q   Okay.  Have you ever seen this document |
| 11:43:10 | 17 | before? |
| | 18 | A   I don't remember. |
| 11:43:15 | 19 | Q   You don't remember?  Okay.  Take a look at |
| | 20 | Receiver's Exhibit 36, please. |
| 11:43:19 | 21 | A   36? |
| | 22 | Q   36. |
| 11:43:21 | 23 | A   Okay. |
| | 24 | Q   Do you see that there's a pay stub here for |
| 11:43:29 | 25 | "Igor's salary" from April 1 to April 16? |

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

| | | |
|---|---|---|
| 11:48:25 | 1 | MR. LITTLE:  Potential receivership asset. |
| | 2 | Q    What's his name? |
| 11:48:28 | 3 | MR. HARRIS:  Well, how is it a potential |
| | 4 | receivership asset? |
| 11:48:29 | 5 | MR. BERK:  The lease? |
| | 6 | MR. HARRIS:  How is this a potential, a 2011 car? |
| 11:48:31 | 7 | MR. LITTLE:  If there's a leasehold in a car |
| | 8 | that's still maintained by him, I need to know what it |
| 11:48:34 | 9 | is. |
| | 10 | Q    So who is it leased by? |
| 11:48:36 | 11 | MR. HARRIS:  No, you don't.  I'm going to instruct |
| | 12 | him not to answer. |
| 11:48:39 | 13 | MR. LITTLE:  You're going to instruct him not to |
| | 14 | answer whose -- whose lease he signed for? |
| 11:48:41 | 15 | MR. HARRIS:  Unless you tell me what receivership |
| | 16 | asset you're talking about, how it relates to what your |
| 11:48:45 | 17 | job is here, I'm not going to let him answer. |
| | 18 | MR. LITTLE:  Yeah. |
| 11:48:48 | 19 | Q    So, Mr. Latsanovski, did you obtain a lease |
| | 20 | with a letter from Mr. Bond saying that you were CFO, |
| 11:48:53 | 21 | "yes" or "no"? |
| | 22 | A    I don't understand question. |
| 11:48:56 | 23 | Q    Okay.  Did you provide this letter to someone |
| | 24 | so you could obtain a lease on a car for someone, |
| 11:49:02 | 25 | anyone? |

Kusar Court Reporters & Legal Services, Inc.                    166

053

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 12:04:29 | 1 | Q    Yes. |
| | 2 | A    -- we make some, in my mind, in my mind, some |
| 12:04:35 | 3 | deal. |
| | 4 | Q    Okay. |
| 12:04:41 | 5 | A    But after, this deal quickly change, and |
| | 6 | after -- |
| 12:04:43 | 7 | Q    Alon changed it? |
| | 8 | A    No.  Most time -- most time, initially was |
| 12:04:50 | 9 | Khristopher. |
| | 10 | Q    Khristopher would change the deal? |
| 12:04:57 | 11 | A    Yeah.  He is amazing, really creative guy. |
| | 12 | In my life -- |
| 12:04:59 | 13 | Q    Uh-huh. |
| | 14 | A    -- like him, first time I met. |
| 12:05:04 | 15 | Q    That's not his real name, is it? |
| | 16 | A    Okay, yeah, but -- |
| 12:05:07 | 17 | Q    What's his real name? |
| | 18 | A    I don't know. |
| 12:05:09 | 19 | MR. HARRIS:  You have to let him finish his |
| | 20 | "questions." |
| 12:05:12 | 21 | MR. LITTLE:  I'm going to; I'm going to. |
| | 22 | MR. HARRIS:  Well, not -- not once in a while. |
| 12:05:16 | 23 | Every time you have to let him finish his "questions" |
| | 24 | -- his answers. |
| 12:05:16 | 25 | MR. LITTLE:  Okay. |

Kusar Court Reporters & Legal Services, Inc.                              174

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 12:07:34 | 1 | 100,000, 25,000, 175,000 -- |
| | 2 | A    Some checks, if CalEnergy -- some checks, if |
| 12:07:42 | 3 | these checks to CalEnergy, it's, like, to return my |
| | 4 | investment. |
| 12:07:46 | 5 | Q    Okay.  Let's turn the page, if you would.  I |
| | 6 | recovered this document from the office of Focus Media |
| 12:07:50 | 7 | Solutions. |
| | 8 | A    Uh-huh. |
| 12:07:57 | 9 | Q    Okay?  This is -- somebody maintained a |
| | 10 | record of your investment -- |
| 12:08:00 | 11 | A    Yeah. |
| | 12 | Q    -- okay, it looks like to me.  It looks |
| 12:08:03 | 13 | like -- |
| | 14 | A    It's true. |
| 12:08:06 | 15 | Q    Okay.  Hold on a second.  It looks like you |
| | 16 | invested 486,692 in Bunzai.  Is that right? |
| 12:08:13 | 17 | A    I don't remember, beside of accounting (sic). |
| | 18 | Q    Okay.  And your testimony was that the checks |
| 12:08:20 | 19 | on Exhibit 36 were checks returning your investment, |
| | 20 | right? |
| 12:08:22 | 21 | A    Yeah. |
| | 22 | Q    Okay.  Tell the court why there are no checks |
| 12:08:34 | 23 | in the amount of $2,500 or $7,500 on this repayment |
| | 24 | ledger. |
| 12:08:40 | 25 | A    I don't know.  I don't know who did it.  For |

Kusar Court Reporters & Legal Services, Inc.                              177

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 62 of 107   Page ID
#:10704
Case 2:15-cv-04527-GW-PLA   Document 385-104   Filed 04/18/16   Page 58 of 73   Page ID
#:8732

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 12:10:55 | 1 | Q    Did you ever put more than half a million |
| | 2 | dollars in Bunzai? |
| 12:11:02 | 3 | A    For one shot?  No. |
| | 4 | Q    No, not for one shot, total.  Did you ever |
| 12:11:10 | 5 | put more than half a million dollars total into Bunzai? |
| | 6 | A    I -- more than half -- I think so.  Okay, |
| 12:11:14 | 7 | maybe. |
| | 8 | Q    "Maybe"? |
| 12:11:17 | 9 | A    Maybe. |
| | 10 | Q    Okay. |
| 12:11:20 | 11 | A    I explain why.  Because I receive some money, |
| | 12 | because I -- I never cross-balance between how much I |
| 12:11:28 | 13 | give them and how much they return me. |
| | 14 | Q    You never checked? |
| 12:11:32 | 15 | A    Yes.  For this reason, maybe some period of |
| | 16 | time, yeah, I give -- they ask, "We need pay salary. |
| 12:11:40 | 17 | Igor, we need additional $200,000." |
| | 18 | I say, "Listen, guys, you don't" -- "didn't |
| 12:11:45 | 19 | return previously (sic) investments." |
| | 20 | Say, "Igor, people, we have to pay salary. |
| 12:11:49 | 21 | We have 50 people." |
| | 22 | "What do I have to do?" |
| 12:11:53 | 23 | They say, "We have to close otherwise." |
| | 24 | I say, "Okay." |
| 12:11:57 | 25 | And which balance, what you ask me right now, |

Kusar Court Reporters & Legal Services, Inc.                    180

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 63 of 107   Page ID
Case 2:15-cv-04527-GW-PLA   Document 369-05   Filed 04/18/16   Page 59 of 73   Page ID
#:10705
#:8733

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

```
12:12:01   1   I -- too hard me say sure (sic).

           2        Q    I understand.  All right.

12:12:07   3             So at the end of the day, though, Bunzai paid

           4   back 3 -- as I understand your testimony --

12:12:12   5        A    Yes.

           6        Q    -- Bunzai paid back 300 to $320,000 more than

12:12:16   7   you put in, right?

           8        A    Exactly.

12:12:20   9        Q    Okay.  Hold on a sec.

          10             Would you turn back to Receiver's Exhibit 26.

12:12:25  11        A    Uh-huh.

          12        Q    Bunzai is not on the list here in Receiver's

12:12:36  13   Exhibit 26.

          14        A    Uh-huh.

12:12:40  15        Q    These companies paid your company, CalEnergy,

          16   almost 1.3 million dollars in the last 18 months.

12:12:45  17        A    Okay.

          18        Q    Why?

12:12:49  19        A    Because during this period of time they

          20   receive more than this period of time money (sic).

12:12:54  21        Q    They received more than 1.3 million from you?

          22        A    Yeah.

12:12:56  23        Q    Okay.

          24        A    Because they show right now how much they

12:13:00  25   pay, but they didn't show how much they received.
```

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 13:16:22 | 1 | MR. HARRIS:  Okay, not interested. |
| | 2 | THE WITNESS:  39? |
| 13:16:23 | 3 | BY MR. LITTLE: |
| | 4 | Q    39, please. |
| 13:16:30 | 5 | A    Okay. |
| | 6 | Q    Okay.  Can you tell the court why a deposit |
| 13:16:39 | 7 | stamp for CalEnergy was present in Mr. Doron Nottea's |
| | 8 | office. |
| 13:16:43 | 9 | A    What?  Why what? |
| | 10 | Q    Can you tell me why a deposit stamp for |
| 13:16:49 | 11 | CalEnergy was present in Doron Nottea's office? |
| | 12 | A    Because he -- yeah; yeah. |
| 13:16:51 | 13 | MR. HARRIS:  Right here. |
| | 14 | THE WITNESS:  Because he helped me.  I authorized |
| 13:16:58 | 15 | him for help me some -- because when I travel, if some |
| | 16 | needed, he can help me. |
| 13:16:59 | 17 | BY MR. LITTLE: |
| | 18 | Q    Did he use it? |
| 13:17:01 | 19 | A    Who, him? |
| | 20 | Q    Yes. |
| 13:17:03 | 21 | A    I think so sometimes, yeah. |
| | 22 | Q    Okay.  What checks did he deposit for you, do |
| 13:17:06 | 23 | you know? |
| | 24 | A    I don't remember. |
| 13:17:08 | 25 | Q    Did he -- |

Kusar Court Reporters & Legal Services, Inc.                         188

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 65 of 107   Page ID
#:10707
Case 2:15-cv-04527-GW-PLA   Document 389-7   Filed 04/18/16   Page 61 of 73   Page ID
#:8735

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 13:23:07 | 1 | invest -- because this is -- it's, like, the same |
| | 2 | money.  I give them, they return me.  It's around, |
| 13:23:15 | 3 | maximum, how my money, they use -- not maximum, around, |
| | 4 | I don't exactly, like a half million dollars. |
| 13:23:18 | 5 | BY MR. LITTLE: |
| | 6 |        Q     Like what? |
| 13:23:21 | 7 |        A     Half-million dollars, $500,000.  This money |
| | 8 | come in.  I give them check for $200,000.  They return |
| 13:23:29 | 9 | me 20, 50.  Again give -- this is cash flow 1.6 million |
| | 10 | dollars. |
| 13:23:31 | 11 |        Q     Yeah. |
| | 12 |        A     But physically, my money working there, |
| 13:23:34 | 13 | around $500,000. |
| | 14 |        Q     That makes no sense, Mr. Latsanovski, and let |
| 13:23:41 | 15 | me explain why.  The total amount of withdrawals from |
| | 16 | CalEnergy's accounts was 1,611,000 of your money. |
| 13:23:48 | 17 |        A     No, this is the same money coming in and out. |
| | 18 |        MR. BERK:  Can I -- can I -- |
| 13:23:51 | 19 |        MR. LITTLE:  No, you can't. |
| | 20 |        Q     So I have a question here.  Mr. Latsanovski, |
| 13:23:56 | 21 | it appears as though CalEnergy is simply circulating |
| | 22 | money through the accounts of the Bunzai group |
| 13:24:00 | 23 | companies. |
| | 24 |        Is that true? |
| 13:24:05 | 25 |        MR. BERK:  Objection, calls for, I think, a legal |

Kusar Court Reporters & Legal Services, Inc.                    195

059

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 66 of 107   Page ID
#:10708
Case 2:15-cv-04527-GW-PLA   Document 385-108   Filed 04/18/16   Page 62 of 73   Page ID
#:8736

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

| | | |
|---|---|---|
| 13:24:06 | 1 | conclusion.  I don't even know. |
| | 2 | BY MR. LITTLE: |
| 13:24:08 | 3 |     Q    You can answer the question. |
| | 4 |     A    Okay.  Ask me slowly, please. |
| 13:24:16 | 5 |     Q    Okay.  It appears to me, Mr. Latsanovski -- |
| | 6 |     A    Uh-huh. |
| 13:24:18 | 7 |     Q    -- that you -- that CalEnergy is simply |
| | 8 | circulating money through the Bunzai group of companies |
| 13:24:23 | 9 | and making nothing. |
| | 10 |     Is that true? |
| 13:24:27 | 11 |     A    Yes. |
| | 12 |     Q    So -- |
| 13:24:31 | 13 |     A    For this reason.  For this reason.  Okay, it |
| | 14 | is what it is, fact. |
| 13:24:36 | 15 |     Q    Explain to the court why, if you could make |
| | 16 | 20 percent as a hard money lender, you would circulate |
| 13:24:42 | 17 | money through the Bunzai group of companies for five |
| | 18 | years and make |
| 13:24:45 | 19 |     MR. BERK:  Objection; assumes facts -- |
| | 20 | BY MR. LITTLE: |
| 13:24:45 | 21 |     Q    -- nothing. |
| | 22 |     MR. BERK:  -- not in evidence, calls for |
| 13:24:47 | 23 | speculation. |
| | 24 |     THE WITNESS:  I live with dream.  Alon is all time |
| 13:24:59 | 25 | promise me, "Igor, we learn.  We have some mistakes." |

Federal Trade Commission vs. Bunzai Media Group, Inc.        Igor Latsanovski

| | | |
|---|---|---|
| 13:25:05 | 1 | He open call center, hire lot of people, have expenses. |
| | 2 | Okay, it is what it is. |
| 13:25:12 | 3 | And every times, his phrase was, "Igor, I |
| | 4 | don't steal no (sic) one penny from you.  Did you see? |
| 13:25:18 | 5 | I try do maximum what I do." |
| | 6 | BY MR. LITTLE: |
| 13:25:19 | 7 | Q    Uh-huh. |
| | 8 | A    "Sure I don't give you lot of profit, but you |
| 13:25:26 | 9 | return your money.  You have some profit.  And give me |
| | 10 | one additional chance.  Yeah, I will show you." |
| 13:25:32 | 11 | In America here, don't have a lot of people |
| | 12 | to whom I have to invest who real (sic).  Because I'm |
| 13:25:38 | 13 | person, I cannot working myself.  I under- -- I |
| | 14 | understand I have to -- you know some -- |
| 13:25:44 | 15 | I don't know some, like -- this is -- you |
| | 16 | know some problem with guys, but you know already this |
| 13:25:50 | 17 | is already -- you already his problems (sic), but I |
| | 18 | believe in his energy, and in my mind, I decided to |
| 13:26:00 | 19 | give him second chance.  Maybe I'm stupid. |
| | 20 | Q    Hey, I don't think you're stupid at all, but |
| 13:26:05 | 21 | what I'm trying to understand is, when you finally got |
| | 22 | over $300,000 to the good and you had made a return on |
| 13:26:14 | 23 | your money, you dropped another $325,000 into it. |
| | 24 | Help me understand on what level that would |
| 13:26:19 | 25 | make sense as an investor. |

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 13:42:06 | 1 | A    Okay.  The -- all money which I receive, I |
| | 2 | receive from a loan agreement from Guayas. |
| 13:42:28 | 3 | Q    Okay.  Hold on a sec.  Just a moment. |
| | 4 | Okay.  The transfers of over four million |
| 13:42:49 | 5 | dollars came from Guayas which you own a hundred |
| | 6 | percent of, correct? |
| 13:42:55 | 7 | A    Yeah, but I am not COO.  I ask COO for give |
| | 8 | me a loan. |
| 13:42:59 | 9 | Q    I understand.  So you asked the COO if he |
| | 10 | would give you a loan? |
| 13:43:01 | 11 | A    Yes. |
| | 12 | Q    The COO being Oleg? |
| 13:43:03 | 13 | A    Yes. |
| | 14 | Q    Okay.  Does Oleg have a lot of money? |
| 13:43:06 | 15 | A    He personally? |
| | 16 | Q    Yes. |
| 13:43:08 | 17 | A    He manage this company.  This is his cash |
| | 18 | flow, his -- "he" responsible for it.  I cannot -- I |
| 13:43:12 | 19 | shareholder. |
| | 20 | Q    Yes. |
| 13:43:17 | 21 | A    I can ask him, but I cannot say, "You have to |
| | 22 | do it," because if I will say, I "have" responsible. |
| 13:43:24 | 23 | Q    Sure.  So as the hundred percent shareholder, |
| | 24 | you can show us the balance sheet of Guayas Limited, |
| 13:43:28 | 25 | right? |

Kusar Court Reporters & Legal Services, Inc.                              212

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 13:52:54 | 1 | purpose, better have one account where I receive "this" |
| | 2 | all loan, and after already if some businesses ask me, |
| 13:53:00 | 3 | I give them money faster.  And it's here, I can make by |
| | 4 | phone wire. |
| 13:53:04 | 5 | Q    Okay.  So -- |
| | 6 | A    It's for management purpose. |
| 13:53:08 | 7 | Q    Yes.  Looking back on the first page of |
| | 8 | Exhibit 49, it appears to me that you've received about |
| 13:53:18 | 9 | seven million dollars -- a little over seven million |
| | 10 | dollars in loans from Danske Bank and from -- from |
| 13:53:23 | 11 | Bavaria -- |
| | 12 | A    Guayas. |
| 13:53:28 | 13 | Q    -- Bavaria -- Guayas and Bavaria Inter LP, |
| | 14 | okay? |
| 13:53:30 | 15 | A    Uh-huh. |
| | 16 | Q    Out of that money, a little over 4.5 million |
| 13:53:35 | 17 | dollars was transferred to Sunset. |
| | 18 | A    Uh-huh. |
| 13:53:37 | 19 | Q    What did you do with the rest of the money? |
| | 20 | What was it intended for? |
| 13:53:42 | 21 | A    I invest to some businesses, like -- for |
| | 22 | example, like, and I use myself.  The balance, you can |
| 13:53:50 | 23 | see everything.  This is -- this is not cash/cash, |
| | 24 | yeah?  You can see from balance everything. |
| 13:53:55 | 25 | Ask David.  He can show you to where money |

Kusar Court Reporters & Legal Services, Inc.                              222

**063**

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 70 of 107   Page ID
#:10712
Case 2:15-cv-04527-GW-PLA   Document 385-11   Filed 04/18/16   Page 66 of 73   Page ID
#:8740

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 14:12:38 | 1 | A    Sure.  In this case, not.  But before we meet |
| | 2 | together.  She -- |
| 14:12:42 | 3 | Q    You had met her before? |
| | 4 | A    Yes. |
| 14:12:44 | 5 | Q    Where does she live? |
| | 6 | A    She live in Moscow. |
| 14:12:48 | 7 | Q    Okay.  Do you know where she made this money? |
| | 8 | A    Sure.  "She" working for some huge, big |
| 14:12:54 | 9 | private company, yeah. |
| | 10 | Q    Okay. |
| 14:12:57 | 11 | A    She -- her bonus, like, a couple of million |
| | 12 | dollars per year, just only bonus. |
| 14:13:03 | 13 | Q    Okay.  What kind of company are we talking |
| | 14 | about here? |
| 14:13:06 | 15 | A    I don't remember.  Some high -- huge company. |
| | 16 | Q    And this man Lawrence Rubin who sent you |
| 14:13:13 | 17 | $985,000, who is that? |
| | 18 | A    No, this hard money. |
| 14:13:15 | 19 | Q    It's hard money? |
| | 20 | A    Yeah.  This is -- this is Mike.  You have to |
| 14:13:19 | 21 | ask COO.  He -- |
| | 22 | Q    Mike found this person? |
| 14:13:20 | 23 | A    Yeah. |
| | 24 | Q    Okay.  Tell me, what is the contact |
| 14:13:23 | 25 | information for Mike? |

Kusar Court Reporters & Legal Services, Inc.                              230

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 14:18:17 | 1 | A    Except of Bunzai Group?  No.  Really, no. |
| | 2 | Q    And the reason I ask this, it appears to me |
| 14:18:23 | 3 | from the bank records that -- and the transfers from |
| | 4 | CalEnergy to you personally, that you are mostly living |
| 14:18:31 | 5 | off of money that's coming from overseas. |
| | 6 | Is that true? |
| 14:18:33 | 7 | A    Yeah. |
| | 8 | Q    That is true? |
| 14:18:38 | 9 | A    Yeah.  I sell house.  I -- in Barcelona, we |
| | 10 | have house. |
| 14:18:40 | 11 | Q    Yes. |
| | 12 | A    House, it's condominium. |
| 14:18:42 | 13 | Q    Yeah. |
| | 14 | A    We sell it.  It's around two million dollars. |
| 14:18:50 | 15 | And I go, I call to Oleg.  I say, "Listen, you have" -- |
| | 16 | "what you do.  You give hard money loan.  Take my |
| 14:18:55 | 17 | money, pay me some interest."  Say, "Okay." |
| | 18 | And I eat this, my money, really.  Between |
| 14:19:02 | 19 | us, it's, like, really I eat my money.  And all these |
| | 20 | years I look for -- you can see I open a lot of these |
| 14:19:12 | 21 | directions, yeah, and try find something, and this is |
| | 22 | not -- because if I will have enough income here, maybe |
| 14:19:19 | 23 | I never give to Alon additional opportunity. |
| | 24 | Q    Sure. |
| 14:19:23 | 25 | A    It's, like, maybe, maybe, maybe this one, |

065

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 14:35:38 | 1 | Do you know why or did Alon ever tell you why |
| | 2 | his companies needed your money? |
| 14:35:49 | 3 | A    Because he "need" additional cash flow.  This |
| | 4 | is main reason.  He have to pay salary, didn't have |
| 14:35:53 | 5 | money and -- |
| | 6 | Q    You don't think he had money? |
| 14:35:56 | 7 | A    Well, I believe him. |
| | 8 | Q    You believed him when he said he didn't have |
| 14:35:59 | 9 | money? |
| | 10 | A    Yes. |
| 14:36:17 | 11 | Q    Okay.  I want you to turn to Receiver's |
| | 12 | Exhibit 59.  This is a copy of the Complaint. |
| 14:36:32 | 13 | Do you understand that you were sued by the |
| | 14 | Federal Trade Commission? |
| 14:36:35 | 15 | A    Yes. |
| | 16 | Q    Okay.  I want you to take a look at paragraph |
| 14:36:52 | 17 | 28 on Page 14.  Are you there? |
| | 18 | A    Uh-huh. |
| 14:36:58 | 19 | Q    This reads, "Defendant Igor Latsanovski is or |
| | 20 | was an owner of Bunzai Media Group, Incorporated." |
| 14:37:05 | 21 | Is that true? |
| | 22 | A    We -- when I met with them, we signed |
| 14:37:16 | 23 | agreement, like, I partner (sic), but after, we change |
| | 24 | a lot of times. |
| 14:37:22 | 25 | Physically, I "am" never been partner of this |

Kusar Court Reporters & Legal Services, Inc.                                    248

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 14:37:28 | 1 | company, but we sign a lot of papers, like, I'm for -- |
| | 2 | like, "Igor, for protect your money, we give you all |
| 14:37:34 | 3 | the paper like shareholder."  Say "Okay." |
| | 4 | But one term starts.  Second term say, in my |
| 14:37:42 | 5 | mind, I give them money like loan, and they return me. |
| | 6 | What they think about it is another story. |
| 14:37:46 | 7 | Q    Where are the papers that will show whether |
| | 8 | you are a partner in Bunzai? |
| 14:37:52 | 9 | A    We -- we signed some papers, create new ones. |
| | 10 | It's, like, during this life was a lot of changes. |
| 14:38:06 | 11 | Q    The sentence continues on "and CEO of Zen |
| | 12 | Mobile Media Group, Incorporated." |
| 14:38:10 | 13 | Were you the CEO of Zen Mobile Media Group, |
| | 14 | Incorporated? |
| 14:38:15 | 15 | A    Alon asked me.  I signed all papers. |
| | 16 | MR. LITTLE:  I'm going to object as being |
| 14:38:21 | 17 | nonresponsive. |
| | 18 | Q    I want to make sure that I get a complete |
| 14:38:27 | 19 | answer to this question.  Were you or were you not the |
| | 20 | chief executive officer of Zen Mobile Media Group, |
| 14:38:32 | 21 | Incorporated? |
| | 22 | A    Physically, not. |
| 14:38:37 | 23 | Q    On paper, were you the CEO of Zen Mobile |
| | 24 | Media Group, Incorporated? |
| 14:38:43 | 25 | A    Yeah.  If he asked me, I signed papers. |

Kusar Court Reporters & Legal Services, Inc.                                249

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 74 of 107   Page ID
#:10716
Case 2:15-cv-04527-GW-PLA   Document 355-1   Filed 04/18/16   Page 70 of 73   Page ID
#:8744

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 14:39:54 | 1 | Zen Mobile Media Group, could you have walked into |
| | 2 | Alon's office and said, "Take me off all the papers"? |
| 14:40:00 | 3 | A   I "said" him. |
| | 4 | Q   You told him that? |
| 14:40:01 | 5 | A   Yes. |
| | 6 | Q   When did you do that? |
| 14:40:10 | 7 | A   I don't remember.  Not one time, a lot of |
| | 8 | times.  "Can you" -- because sometimes when I go to |
| 14:40:20 | 9 | bank, because on bank, yeah, I have -- Wells Fargo Bank |
| | 10 | has -- when you have your accounts, yeah, you can |
| 14:40:28 | 11 | "sees" all your accounts, and my -- when I opened my |
| | 12 | log-in, yeah, I didn't see just this is Zen.  Why I |
| 14:40:33 | 13 | don't know. |
| | 14 | And sometimes when they make some |
| 14:40:37 | 15 | transactions, some wire, they ask me from which |
| | 16 | account, and they send me from Zen.  And then this is |
| 14:40:45 | 17 | when they remind me exist some account for my name |
| | 18 | which I don't control, do nothing. |
| 14:40:51 | 19 | And then period of time say, "Listen, Alon, |
| | 20 | remember you ask me about open for my name Zen (sic)? |
| 14:40:56 | 21 | Please can you cancel this." |
| | 22 | "Okay, yeah.  I will; I will."  It's, like, |
| 14:40:59 | 23 | repeat sometimes. |
| | 24 | Q   Alon told you that? |
| 14:41:01 | 25 | A   What means "told"? |

Kusar Court Reporters & Legal Services, Inc.                      251

068

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 75 of 107   Page ID
#:10717
Case 2:15-cv-04527-GW-PLA   Document 355-1   Filed 04/18/16   Page 71 of 73   Page ID
#:8745

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 15:12:03 | 1 | Q    Right.  Is there anything you can tell me |
| | 2 | about any of the Bunzai group of companies? |
| 15:12:07 | 3 | A    Sorry. |
| | 4 | Q    It's fine.  Is there anything that you can |
| 15:12:11 | 5 | tell me about the Bunzai group of companies that would |
| | 6 | assist the receiver in either seizing assets or |
| 15:12:21 | 7 | preparing her report? |
| | 8 | A    Okay, again, because I'm a little bit -- |
| 15:12:28 | 9 | Q    Yeah, let me ask it -- let me ask it in |
| | 10 | pieces. |
| 15:12:31 | 11 | Is there anything else that you can tell me |
| | 12 | about the Bunzai group of companies -- |
| 15:12:33 | 13 | A    Okay. |
| | 14 | Q    -- that would help us understand how they |
| 15:12:37 | 15 | operate? |
| | 16 | A    Alon can do it.  He can explain everything. |
| 15:12:41 | 17 | Q    Okay. |
| | 18 | A    He is running it. |
| 15:12:45 | 19 | Q    Okay.  Is there anything else that you can |
| | 20 | tell me about the Bunzai group of companies that might |
| 15:12:52 | 21 | help us understand more about how Alon runs the |
| | 22 | companies? |
| 15:12:58 | 23 | A    I think so best -- better that he can |
| | 24 | explain?  Nobody can. |
| 15:13:00 | 25 | Q    Okay. |

Kusar Court Reporters & Legal Services, Inc.                            269

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 15:13:04 | 1 | A    Because without his "permit"..... |
| | 2 | Q    Do you know whether these companies can |
| 15:13:08 | 3 | continue to operate without your loans? |
| | 4 | A    They -- they close it one "years" ago. |
| 15:13:14 | 5 | Q    What do you mean? |
| | 6 | A    They Alon said, "Igor, that's it.  It's |
| 15:13:19 | 7 | finished as a business." |
| | 8 | Say, "Wow." |
| 15:13:21 | 9 | "It's done." |
| | 10 | I say, "Well, okay." |
| 15:13:26 | 11 | And say, "Okay, Igor, done." |
| | 12 | For this reason he request me for this loan |
| 15:13:32 | 13 | for open new entity for cover his -- he "said" me, |
| | 14 | "Igor, this is new directions which can make profit." |
| 15:13:38 | 15 | I said, "Okay." |
| | 16 | Q    Did Alon ever tell you that he was closing |
| 15:13:42 | 17 | down that Bunzai group of companies? |
| | 18 | A    Yes. |
| 15:13:43 | 19 | Q    He did? |
| | 20 | A    Yes. |
| 15:13:45 | 21 | Q    When did he tell you that? |
| | 22 | A    One year ago, around. |
| 15:13:48 | 23 | Q    A year ago? |
| | 24 | A    Yeah, around. |
| 15:13:51 | 25 | Q    Did he tell you that he was closing those |

Federal Trade Commission vs. Bunzai Media Group, Inc.          Igor Latsanovski

| | | |
|---|---|---|
| 15:13:54 | 1 | companies down because those companies were being |
| | 2 | investigated by the Federal Trade Commission? |
| 15:14:00 | 3 | A   No; no.  He said, "Because overhead expenses |
| | 4 | eats all profit, economically not reasonable continue |
| 15:14:06 | 5 | this business." |
| | 6 | I said, "Okay.  It is what it is." |
| 15:14:18 | 7 | Q   I want to go back and talk about David |
| | 8 | Davidian for a couple more minutes, okay? |
| 15:14:21 | 9 | A   Okay. |
| | 10 | Q   Okay?  Did Alon -- I understood your |
| 15:14:36 | 11 | testimony that Alon referred you to David -- |
| | 12 | A   Yes. |
| 15:14:37 | 13 | Q   -- is that right? |
| | 14 | A   Yes. |
| 15:14:44 | 15 | Q   When you talked to David, did he explain to |
| | 16 | you that he was doing the accounting work for this |
| 15:14:49 | 17 | Bunzai group of companies? |
| | 18 | A   No.  He professionally (sic).  If "he" |
| 15:14:54 | 19 | talking about this direction, it's only about this |
| | 20 | direction. |
| 15:15:06 | 21 | Q   Okay.  Here's where I'm getting hung up, |
| | 22 | okay, and maybe you can help me understand this.  You |
| 15:15:14 | 23 | have a relationship with David on -- he does your |
| | 24 | personal accounting, and he does CalEnergy's |
| 15:15:18 | 25 | accounting, "yes"? |

Kusar Court Reporters & Legal Services, Inc.                              271

# EXHIBIT "B"

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 79 of 107   Page ID
#:10721
Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 2 of 10   Page ID
#:8749

# In the Matter of:

# FTC v. Bunzai Media Group, Inc., et al.

*January 28, 2016*
*Igor Latsanovski*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                        1/28/2016

25

1     A  Yes.
2     Q  And I guess — I suppose I should ask:  How
3  did you know that Alon and Khristopher were the owners
4  of BunZai Media Group?
5     A  I didn't know what is to know.  I haven't
6  checked any paperwork.
7     Q  Sure.
8     A  Because I invest money in people.
9     Q  But I suppose what I'm asking is:  Did — did
10  they represent to you that they were owners of BunZai
11  Media Group?
12        MR. UNGAR:  Objection —
13        THE WITNESS:  Yes.
14        MR. UNGAR:  — as to the form of the
15  question.  Vague and ambiguous.
16  BY MR. TEPFER:
17     Q  And this final agreement that we were
18  discussing in which you received one-third of the
19  profits, what period of time did that arrangement
20  cover?
21     A  Until the BunZai companies closed.
22     Q  And when did — when was that agreement
23  started?
24     A  Because they changed the conditions between
25  us.  So for me, the most important thing was to get my

26

1  investment back and to get some kind of profit.  If
2  we're talking about a specific date, I don't even
3  know.
4     Q  So that agreement where you — I guess, where
5  you and Alon and Khris agreed that you would receive
6  one-third of the profits, when did — I guess, when
7  did y'all come to that agreement?
8        MR. UNGAR:  Objection as to the form of the
9  question.  It's vague and ambiguous.
10        THE WITNESS:  The conditions between us
11  changed so often, and I'll say it again.
12        They changed so often that for me, from the
13  very beginning of the loan — from when I gave them
14  the loan, regardless of — for what they were calling,
15  regardless of any intermediate agreements, for me, it
16  was the idea to get some profit from this loan.
17  BY MR. TEPFER:
18     Q  Okay.  And you said that the terms of the
19  various agreements that you had with Alon and
20  Khristopher changed frequently.
21        Was — that one-third profit term, was that a
22  constant in the various agreements?
23        MR. UNGAR:  Objection as to the form of the
24  question.  It's vague and ambiguous, misstates his
25  prior testimony.  It's argumentative.

27

1        THE WITNESS:  I don't understand.  I don't
2  understand what you would call the essence of the
3  question.
4  BY MR. TEPFER:
5     Q  Okay.  Well, I suppose — when did you make
6  the initial loan to BunZai Media Group?
7     A  In the year of 2010.
8     Q  Okay.  And did you make loans subsequent to
9  that?
10     A  We had agreement that I would open a credit
11  line up to half a million dollars; and constantly I
12  would give them the loan, and they would repay.  I
13  would give it, and they would repay it.
14     Q  And when you made that initial loan — well,
15  I suppose — when you first met Alon and Khristopher
16  to discuss BunZai Media Group and your potential loan,
17  did they make a sales pitch to you about the company?
18     A  I don't remember exactly.  It was so many
19  years ago.  So many things have happened during this
20  time, especially in the last six months.
21     Q  Sure.  Do you recall discussing what the
22  business was when — or sorry, when you made that
23  initial loan, do you recall discussing with them what
24  the business was that you would be loaning money to?
25     A  Yes.

28

1     Q  What did they explain to you that you would
2  be investing in?
3        MR. BENICE:  You mean what entity he would be
4  loaning the money to?
5  BY MR. TEPFER:
6     Q  Or the — sorry.  To explain, did they — did
7  Alon or Khristopher describe what — what product it
8  was you would be investing in?
9     A  They showed the final product to me, and I
10  liked the way it looked.
11     Q  Did you review any of their advertisements at
12  that time?
13        MR. UNGAR:  Objection as to the form of the
14  question.  Vague and ambiguous, assumes facts not in
15  evidence.
16        THE WITNESS:  Discussed numbers with them
17  because I'm an investor.  For me, even I didn't try to
18  understand the word.  The Internet, for me, was
19  something from the clouds.
20  BY MR. TEPFER:
21     Q  Sorry.  The — you were unfamiliar with the
22  Internet?
23     A  No.  I was familiar with the Internet; but
24  selling something on the Internet, that was something
25  that, for me —

7 (Pages 25 to 28)

073

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 81 of 107   Page ID #:10723
Case 2:15-cv-04527-GW-PLA   Document 355-23   Filed 04/18/16   Page 4 of 10   Page ID #:8751
Laisanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

41

1  referring to a specific instance where -- that you're
2  aware of that you signed papers that said you were an
3  employee?
4     A.  No.  It's just I remember there's always so
5  much paperwork and all this paperwork in the company,
6  and maybe there was some documents that they gave me
7  to sign mistakenly or not mistakenly.
8        I gave them a loan, and I always wanted to --
9  for them to give me the interest and to get the
10 principal back.
11       They constantly tried in various ways to not
12 return the money to me, and they offered various ways
13 of how they're going to be repaid and always postponed
14 the repayment.
15       I was ready to agree for them to call this
16 money anything they wanted just so that I could get it
17 back.
18    Q.  Do you -- you said that you were a nominal
19 owner of Zen Mobile Media, Inc.
20       Did you -- and you signed, I suppose,
21 paperwork for Zen Mobile Media, Inc.?
22    A.  What paperwork do you mean?
23    Q.  For example, did you ever sign applications
24 for merchant accounts for Zen Mobile Media, Inc.?
25    A.  I don't remember.  If there are any

42

1  applications with my signature, then I did.  If there
2  aren't any, then I didn't.  I just don't remember.
3     Q.  Do you recall who would ask you to sign
4  documents concerning Zen Mobile Media, Inc.?
5     A.  Yes.
6     Q.  Who was that?
7     A.  Alon.
8     Q.  Did anyone else ever request that you sign
9  documents concerning Zen Mobile Media, Inc.?
10       MR. UNGAR:  Objection as to the form of the
11 question.  Vague and ambiguous, calls for speculation.
12       THE WITNESS:  No.
13 BY MR. TEPFER:
14    Q.  And was -- you stated that you were only the
15 nominal owner of Zen Mobile Media, Inc.
16       Who was -- in your understanding was the real
17 owner of Zen Mobile Media, Inc.?
18    A.  I don't know.
19    Q.  Why did you allow Zen Mobile Media, Inc. to
20 be opened in your name?
21       MR. UNGAR:  Objection as to the form of the
22 question.  Vague and ambiguous and argumentative.
23 BY MR. TEPFER:
24    Q.  You can go ahead.
25       MR. BENICE:  If you understand the question.

43

1     THE WITNESS:  Can you please repeat it?
2     (Record read.)
3     THE WITNESS:  Alon asked me about it.
4  BY MR. TEPFER:
5     Q.  So Alon Nottea asked you to open that
6  company?
7     A.  Yes.
8     Q.  Did he state why he wanted you to open Zen
9  Mobile Media, Inc.?
10    A.  Well, I trusted him.  I trusted him with
11 money, so.  He said the company's growing, expanding,
12 so we need another company, and I okayed it.
13    Q.  I'm going to maybe shift gears a little bit
14 to talk about other -- other companies that you own.
15       (Discussion off the record.)
16       MR. TEPFER:  Yeah.  Maybe now would be a good
17 time for a lunch break -- if we could go off the
18 record -- if that's good for everyone.
19       THE WITNESS:  Okay.
20       MR. GALLEGOS:  We're off the record.
21       (Noon recess.)
22       MR. TEPFER:  We're back on the record.
23    Q.  So before the break we were talking a little
24 bit about some of the other companies that you -- I
25 wanted to see if we could talk about VastPay.

44

1        Could you tell me what -- what VastPay's
2  business is?
3     A.  Okay.  VastPay is a company that I opened
4  together with Eugene in order to buy -- to buy
5  wholesale small companies and to make it a big
6  company.
7     Q.  And that's Eugene Shampansky?
8     A.  Yes, Shampansky.
9     Q.  Do you know how to spell that for the court
10 reporter?
11       MR. TEPFER:  I'll be able to get that to you.
12    Q.  So you said that it's a company that you
13 started with Eugene to buy other companies?
14    A.  Small ones.  It was Eugene's idea to buy
15 small ones and make a big one.
16    Q.  So it's an investment firm?  Is that --
17    A.  In the area of merchant business.
18    Q.  So by "merchant business" do you mean
19 merchant processing?
20    A.  That's -- that's just the name of the
21 company.  The idea was to buy companies with existing
22 clients because they don't cost as much; and then when
23 the companies are bigger, when it has a lot of
24 clients, the idea is it's going to cost more.
25    Q.  And what does VastPay do for its clients?

11 (Pages 41 to 44)

074

FTC v. Bunzai Media Group, Inc., et al.                     Latsanovski                     1/28/2016

---

**57**

1    A    During the -- if we take the last five years,
2  I know that at some point -- some period of time
3  during those five years they were located there.
4    Q    And what -- what's the address that -- or
5  location that you're referring to?
6    A    In the Valley, but I don't remember the
7  address. I remember physically where it is, but I
8  don't have it in my memory.
9    Q    Sure. Do you know if it was Van Nuys?
10    A    Most probably, yes.
11    Q    Does 7900 Gloria Avenue sound correct to you?
12    A    Yes, it does.
13    Q    Do you know if AuraVie was one of the
14  products that the call center provided customer
15  service support for?
16    MR. UNGAR: Objection as to the form of the
17  question. Vague and ambiguous.
18    THE WITNESS: Probably.
19  BY MR. TEPFER:
20    Q    And why do you believe that it is likely that
21  Pinnacle Logistics provided customer service support
22  for AuraVie products?
23    A    For many indications.
24    Q    Can you provide some of those indications?
25    A    Well, they were located in the same building,

---

**58**

1  yes. Call center expenses; that is, the call center
2  services were paid to them. Just in general, you
3  know, I can't tell you specific dot by dot things,
4  but in general.
5    Q    And you said the same building -- the same
6  building -- Pinnacle Logistics was in the same
7  building as what?
8    A    Where Alon was.
9    Q    And you said that call center services were
10  paid to -- I think you said call center services were
11  paid to them.
12    Could you explain that?
13    A    That's not what I said.
14    Q    Oh, sorry.
15    A    You didn't interpret it correctly.
16    I said that Alon paid the call center for its
17  services.
18    Q    Okay. Do you know other companies that were
19  located in that building?
20    A    I know that for a while in this business --
21  in this building another business was located, but I'm
22  not sure.
23    Q    Do you know what that business sold?
24    THE INTERPRETER: Could you repeat this for
25  the interpreter, please?

---

**59**

1    MR. TEPFER: Sorry.
2    Q    Do you know what other business sold?
3    THE INTERPRETER: Are you saying sold,
4  Counsel?
5    MR. TEPFER: Sold. Uh-huh. Sorry.
6    THE WITNESS: To who? Interpreted as
7  specifically who was it sold to, this business.
8  BY MR. TEPFER:
9    Q    Oh. I'm just curious if you know what this
10  other -- the business purpose of -- this other
11  business located at that 7900 Gloria, if you knew what
12  that business purpose was.
13    A    I can only assume.
14    MR. BENICE: Don't assume. If you don't
15  know, tell him you don't know.
16    THE WITNESS: I don't know.
17  BY MR. TEPFER:
18    Q    Did you ever hire anyone to do any work for
19  Zen Mobile Media, Inc.?
20    A    No.
21    Q    Doron Nottea testified that you had hired him
22  to do bookkeeping services for Zen Mobile, Inc.
23    Do you know why he would say that?
24    MR. UNGAR: Objection as to the form of the
25  question. Vague and ambiguous.

---

**60**

1    THE WITNESS: I never managed Zen Mobile
2  company. That's why even theoretically I couldn't
3  hire anybody for work.
4  BY MR. TEPFER:
5    Q    So if we were to go back to the BunZai group
6  of companies, is it -- is it your understanding that
7  Alon Nottea owned multiple companies that sold the
8  AuraVie product?
9    A    My understanding is that I gave the money as
10  an investment, and how he managed it wasn't my
11  business. I didn't try to understand. My goal was to
12  have my loan repaid with interest as soon as possible.
13    Q    My question was: Do you know if Alon Nottea
14  owned multiple companies that sold AuraVie?
15    A    No. I don't know. I don't know. I don't
16  know how he functioned.
17    Q    And do you know if he asked other individuals
18  to open companies to, I guess, grow the business as
19  you said?
20    MR. UNGAR: Objection as to the form of the
21  question. Vague and ambiguous, calls for speculation,
22  lacks foundation.
23    THE WITNESS: I can guess, but I do not know
24  exactly.
25  BY MR. TEPFER:

---

15 (Pages 57 to 60)

075

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 83 of 107   Page ID #:10725
Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 6 of 10   Page ID
Latsanovski
#:9075

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

---

65

1    Exhibit 16.
2        MR. BENICE: 60?
3        MR. TEPFER: 16.
4    Q   Have you ever seen this Web site?
5    A   What is have I seen?
6    Q   Like, have you ever — sorry. Maybe we're —
7    A   It's just too abstract. I need to see.
8    Q   Have you — have you ever — before the
9    filing of this lawsuit, have you ever seen this
10   advertisement before?
11       A   I don't remember exactly. Maybe briefly when
12   I was running around when I popped into the office and
13   saw it; but if you want to ask if anybody specifically
14   showed me this Web site and told me what's on it, then
15   no.
16       Q   And you said you might have seen it when you
17   popped into the office.
18       Are you referring to BunZai Media Group?
19   A   Yes, maybe.
20   Q   How often would you stop by the offices
21   there?
22   A   What do you mean by "often"?
23   Q   Would you go by once a month?
24   A   And for what purpose?
25   Q   Just for any purpose.

---

66

1        Would you go once a month?
2    A   Sometimes once a month. Sometimes once every
3    six months.
4    Q   Would you ever go by once a week?
5    A   I don't remember.
6    Q   I guess on — what — for what purpose would
7    you — would you go to the BunZai Media Group offices?
8    A   For the most part it was to discuss new
9    projects with Alon.
10   Q   Did y'all ever have meetings about BunZai
11   Media Group?
12   A   We had meetings to discuss financial results
13   of Alon's business.
14   Q   Who would typically attend these meetings?
15       MR. UNGAR: Objection. Vague and ambiguous.
16       THE WITNESS: It varied from time to time,
17   but most frequently me and Alon.
18   BY MR. TEPFER:
19   Q   Would — did Doron ever attend any of these
20   meetings?
21   A   I don't remember. Maybe some. I don't
22   remember exactly; but in my memory, I don't remember
23   any.
24   Q   What about Roi Reuveni?
25   A   Same.

---

67

1    Q   Do you know who was in charge of creating
2    advertisements for -- or overseeing rather — the
3    advertising department at BunZai Media Group?
4    A   My understanding or exactly?
5    Q   Your understanding.
6    A   As far as I understand, Khristopher was
7    responsible for the advertising.
8    Q   Did you know if the AuraVie products were
9    sold by or were offered as a free trial?
10       MR. UNGAR: Objection as to the form of the
11   question. Vague and ambiguous.
12       THE WITNESS: Yes.
13   BY MR. TEPFER:
14   Q   How did you know that?
15   A   Alon, with Khristopher, told me.
16   Q   So they explained that they would offer a
17   free trial, and what was your understanding of
18   the terms of the free trial?
19   A   They said we have an amazing product, and I
20   know it myself because I brought it to Europe and
21   everybody liked it. So every time when I would travel
22   to Europe I would get calls, "Please bring it. Please
23   bring it."
24       MR. BENICE: Just listen to his question.
25       THE WITNESS: Okay.

---

68

1        MR. BENICE: Do you want the question read
2    back?
3        THE WITNESS: Please read it back.
4        (Record read.)
5        MR. BENICE: If you know.
6        THE WITNESS: They said that this product —
7    they're going to let people try it. That's all I
8    knew. For five years I saw good results. People
9    liked it for the most part. My wife — my wife likes
10   it as well.
11   BY MR. TEPFER:
12   Q   Did you understand that if the product was
13   not returned within a particular time period that the
14   customer would then be charged a certain amount for
15   the skin cream?
16       MR. UNGAR: Objection as to the form of the
17   question. It's vague and ambiguous and assumes facts
18   not in evidence.
19       THE WITNESS: Okay. I know that Alon used
20   various ways to sell the product; but specific
21   details, techniques, I never really tried to
22   understand it deeply. They changed drawings or did
23   some other things.
24   BY MR. TEPFER:
25   Q   They changed drawings?

---

17 (Pages 65 to 68)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 2:15-cv-04527-GW-PLA  Document 397-21  Filed 05/02/16  Page 84 of 107  Page ID #:10726
Case 2:15-cv-04527-GW-PLA  Document 355-2  Filed 04/18/16  Page 7 of 10  Page ID
Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

---

73

```
 1        A   I don't remember a single check personally
 2   with my name from the BunZai company.
 3        (Exhibit 18 marked.)
 4        MR. TEPFER: I'm now handing the witness
 5   what's been marked as Exhibit 18.
 6        Q   This collection of documents, are you
 7   familiar with these documents?
 8        A   Yes.
 9        Q   Is that your initials and signature -- well,
10   like, I suppose -- I'm sorry.  Go ahead.
11        On that first page with 18-2, is that your
12   initials down at the bottom?
13        A   Yes.
14        Q   And on 18-3, is that your signature?
15        A   Yes.
16        Q   And, I guess, on 18-4 on that check, is that
17   your signature?
18        A   Yes.
19        Q   And 18-5, is that also your signature?
20        A   Yes.
21        Q   And the last one just on 18-6, that's your
22   signature as well; correct?
23        A   Yes.
24        Q   Oh, did I forget one?
25        On 18-7, is that your signature?
```

74

```
 1        A   Yes.
 2        Q   On the first -- I guess on 18-2 -- and these
 3   are my own highlights here -- that first highlight, do
 4   you -- the ownership shares, during -- was that ever
 5   the ownership shares of BunZai Media Group or the
 6   ownership distribution?
 7        MR. UNGAR: Objection as to the form of the
 8   question.  Vague and ambiguous.
 9        THE WITNESS: Look at the next document,
10   18-5.  Everything is explained there, that it was a
11   loan.
12   BY MR. TEPFER:
13        Q   Sure.  But to -- my question is a little
14   different, though.
15        As far as these -- was there ever a period of
16   time where the ownership distribution was -- of BunZai
17   Media Group was 55 percent to you, 22.5 percent to
18   Alon, and 22.5 percent to Khristopher Bond?
19        A   We signed a great deal of documents.  This is
20   one of the ways or means for commerce between us.  We
21   only have three documents here, but we signed at least
22   five or six.
23        You now are simply trying to ask me about
24   intermediate negotiations, but I'm talking about our
25   final agreement that -- and the agreement is that I
```

75

```
 1   give them a loan and that they pay it back and pay me
 2   interest of -- of one-third of the profits.
 3        Q   So was there ever a period of time where the
 4   ownership distribution was what is stated here?
 5        A   No.
 6        Q   And so in October of 2010, the -- on the date
 7   of this signature, is it your testimony that that
 8   ownership distribution of BunZai Media Group was
 9   different than what's stated up here?
10        A   Because during the same period of time there
11   were other documents signed.
12        Q   And so your testimony is that there are other
13   documents signed at the same time that conflict with
14   the ownership distribution in this document?
15        MR. UNGAR: Objection as to the form of the
16   question.  It's vague and ambiguous, misstates prior
17   testimony of the witness.
18        THE WITNESS: We signed and developed at the
19   same time and at different times various documents.
20   This is just a part of them.
21        The most important thing is that from day
22   one -- it was agreed that from day one it is a loan,
23   and I will have one-third of the income regardless of
24   what kind of documents we have signed in between.
25   BY MR. TEPFER:
```

76

```
 1        Q   And to go down to the second part that I
 2   highlighted on 18-2, where it says "Upon signing this
 3   agreement, Igor shall invest $75K to run a continuity
 4   test for 30 days," do you know what that statement is
 5   referring to?
 6        A   I'll say it again.  This is a document that
 7   never came into force because it's an intermediate
 8   document that was signed in between while we were
 9   negotiating on the terms.
10        The most important term was that from day one
11   from when I gave my first check, it's a loan and it's
12   payable back with interest on my investment as a
13   percentage, and that all the papers that we have
14   signed between ourselves were not and are not valid.
15        MR. TEPFER: I guess I'll object as
16   nonresponsive.
17        Q   I guess what -- I'm just curious.
18        Is it your understanding that the -- this
19   continuity test never occurred?
20        MR. UNGAR: Objection as to the form of the
21   question.  Vague and ambiguous.
22        MR. BENICE: Do you understand his question?
23   Restate the question, please.
24        THE WITNESS: Confusing all the time.
25        (Record read.)
```

19 (Pages 73 to 76)

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 85 of 107   Page ID
#:10727
Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 8 of 10   Page ID
#:8755

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                                    1/28/2016

<table>
<tr><td>

**77**

1     MR. UNGAR:  Same objection.
2        THE WITNESS:  What exactly did not occur?
3  BY MR. TEPFER:
4     Q   So, I guess, first I had better clarify.
5     It says "Igor shall invest $75K to run a
6  continuity test."
7        Do you know what a continuity test is?
8     A   I'll explain one more time.  We signed a lot
9  of papers as a method of how to negotiate with each
10  other.  It's a pile of papers.
11        What do you want to ask me?  Like this paper
12  was valid for five minutes, and for the other one it
13  didn't.  I just don't understand what I need to say.
14        MR. BENICE:  Listen to the question.  Just
15  answer the question.
16        THE WITNESS:  Okay.  (In English)
17        MR. BENICE:  No editorial.
18        THE WITNESS:  Okay.  (In English)
19  BY MR. TEPFER:
20     Q   I just — the aspect I'm curious about is
21  whether you — whether you know what a continuity test
22  is.
23     A   Can you translate this for me?
24        THE INTERPRETER:  Would you like the
25  interpreter to translate the paragraph?

</td><td>

**79**

1  point?
2     A   Yes.
3     Q   So you read this or had this translated when
4  you signed it?
5     A   I don't remember, but I understand what it
6  talks about.
7     Q   And it says on the next page on 18-7 that it
8  was signed in March of 2011.
9        Do you know if you signed any other
10  partnership agreements for BunZai Media Group after
11  this date?
12     A   I don't remember, but most probably yes.
13  There was a bunch of papers all the time.
14     Q   Down at the bottom, the last highlight there
15  says "Igor - 1/3 of 100% of the company."
16        Was that your — or this distribution
17  referenced here, was that your understanding of the
18  partnership shares or ownership in March of 2011?
19     A   No.  We agreed that I'm going to get
20  one-third of the profits, and I don't have any
21  ownership share in the company.
22        And Khristopher categorically objected to
23  those terms.
24     Q   Do you know if Alon or Khristopher also
25  received, I guess, a percentage of net profits?

</td></tr>
<tr><td>

**78**

1        MR. TEPFER:  Sure.  Sure.
2        Would you mind translating?
3        THE WITNESS:  It doesn't say here that the
4  use was going to happen for 30 days, that the test was
5  going to run for 30 days, and within 30 days they will
6  have to show that they're selling the product.
7        MR. BENICE:  His question is:  Do you know
8  whether there was a continuity test?  That's his only
9  question.  Yes or no or you don't know.
10        THE WITNESS:  I don't remember.
11  BY MR. TEPFER:
12     Q   And do you know what a continuity test is?
13     A   The way I understand it here is that they had
14  30 days to -- to show me that they actually have
15  sufficient volume of sales.
16     Q   And, I guess, towards the end of that
17  highlighted section it says — it refers to a
18  conversion from free trial to transitional stage.
19        Do you understand what that is referring to?
20     A   No.  I didn't even read this document when we
21  signed it, because I was giving money.  I was
22  investing money in people.
23     Q   I guess if you could turn to 18-6.  Those
24  highlights are mine.
25        Do you recall reviewing this document at any

</td><td>

**80**

1     A   As far as I can guess, yes.
2     Q   18-7, the last — or rather that — after
3  Number 6, the section I highlighted there, it states
4  "Igor shall receive a minimum salary of $5K per month
5  (starting April 1st, 2011)."
6        Did you ever receive a monthly salary of
7  $5,000 from BunZai Media Group?
8     A   This was a way — because what they did was
9  they assigned 15,000 a month salary to each of them.
10        And I said, "Guys, there's a person who's
11  providing the loan.  With those kind of expenses,
12  I will never be able to get any kind of profit."  And
13  I said, "Give me at least some type of guaranteed
14  minimum."
15        And they -- "minimum interest on my money."
16        And they put down 5,000, but it's a technical
17  error that it's a salary.  I think in subsequent
18  documents this error was corrected.
19     Q   And this collection of documents that is
20  Exhibit 18 was found in a folder in Doron Nottea's
21  office.
22        Do you know why he would be in possession of
23  these contracts?
24     A   Because he helped his brother to store all
25  the paperwork because he was organized and Alon was

</td></tr>
</table>

20 (Pages 77 to 80)

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 86 of 107   Page ID #:10728
Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 9 of 10   Page ID #:8756
Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                          1/28/2016

---

101

1  get upset that if he made some mistakes in running the
2  business, he -- there are other ways and it's not the
3  end of the world.
4       And all the example is they are just
5  associations that are examples that come together,
6  because if you're too abstract, the person is not
7  going to be able to understand you. They're not going
8  to understand what you're trying to tell them
9  emotionally.
10      THE WITNESS: Can we go to the restroom? (In
11 English)
12      MR. TEPFER: Sure. Take a five-minute break.
13      (Recess.)
14      MR. TEPFER: We can go back on the record.
15  Q  I guess if we could go to -- well, maybe not
16 yet.
17      Do you know what UMS Banking is?
18  A  Yes.
19  Q  What is it?
20  A  It's a business that's involved in merchant
21 business.
22  Q  Have you ever done any business with UMS
23 Banking?
24  A  Me personally, no.
25  Q  How did you become familiar with UMS Banking?

---

102

1  A  From Alon.
2  Q  What did Alon tell you about UMS Banking?
3  A  Big, good company.
4  Q  And did he tell you that this was a company
5  that was used for processing charges to consumers for
6  the sale of AuraVie products?
7  A  He said that he was working together with
8  them. What specific products, I don't know.
9      (Exhibit 23 marked.)
10      MR. TEPFER: I'm just handing the witness
11 what's been marked as Exhibit 23.
12  Q  So this e-mail is from Alon Nottea in 2013.
13      Do you remember receiving this?
14  A  No. Well, but if it has my -- you know, if
15 I'm on here, it means I received it.
16  Q  And is it -- is it your opinion that you
17 likely reviewed this e-mail and don't remember?
18  A  Doubt it. Because when Alon would send me
19 e-mails, it would, for the most part, be when I call
20 him and I ask him about the repayment of my investment
21 and the interest; and he would send me an e-mail back,
22 so maybe that would be one of them, I don't know, as
23 an excuse why he's not paying it back mostly -- most
24 probably, but I don't know.
25  Q  In the forwarded e-mail from Joyce Gaines at

---

103

1  Number 3 it says "In the event of an FTC closure they
2  will freeze our reserves on your accounts
3  immediately."
4       Did Alon Nottea ever discuss with you before
5  June of 2015 the possibility of a -- or risk of an FTC
6  enforcement action?
7  A  No.
8  Q  Did he ever discuss with you Federal Trade
9  Commission laws and regulations?
10  A  The initial stage. He gave me a letter from
11 an FTC attorney saying he was working correctly and
12 everything is well. He showed me that letter.
13      MR. BENICE: Listen carefully to his
14 question. Read the question back.
15      (Record read.)
16      THE WITNESS: No.
17 BY MR. TEPFER:
18  Q  In the second to the last paragraph, I think,
19 it states "I have to protect UMS based on the nature
20 and risk of the business in front of us."
21      Did you ever hear anyone characterize the
22 BunZai group of companies as a high risk business?
23      MR. BENICE: You mean before the FTC action
24 was filed?
25      MR. TEPFER: Right. Before June 2015.

---

104

1       THE WITNESS: And what is "high risk"?
2  BY MR. TEPFER:
3  Q  Well, just have you ever --
4  A  What do you mean by "high risk"?
5  Q  Well, have you ever heard anyone use the
6  phrase "high risk" in reference to these companies
7  prior to the FTC's enforcement action?
8  A  I don't remember exactly.
9  Q  It refers to the current chargeback return
10 ratios.
11      Were you ever apprised of the
12 chargeback/return ratios of Alon's businesses?
13  A  No. I fortunately have not read this e-mail.
14  Q  Sure. But outside of the context of this
15 e-mail, had you ever just been -- generally speaking,
16 been apprised at any point of the chargeback/return
17 ratios of the companies that you invested in with Alon
18 that sold AuraVie?
19  A  Can you clarify the question specifically?
20 Have I heard this phrase, or what does it mean?
21  Q  Like you stated before that you would discuss
22 numbers more with Alon rather than other topics, and I
23 was wondering if one of those topics that you did
24 discuss with Alon would be chargeback/return ratios
25 for the companies that you invested in or that sold

---

26 (Pages 101 to 104)

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 87 of 107   Page ID
#:10729
Case 2:15-cv-04527-GW-PLA   Document 355-2   Filed 04/18/16   Page 10 of 10   Page ID
#:8757

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                        1/28/2016

---

109

1    projections we discussed yesterday."
2         Do you recall having any conversation with
3    Eugene Shampansky regarding any of the attached
4    documents, which are 25-2 through 25-8?
5         A.  Yes.  It was a long time ago, so I don't
6    remember; but most probably it was just one of those,
7    you know, business projects.
8         Q.  Do you -- was this regarding BunZai Media
9    Group, this business project?
10        A.  No.  This was in relation to merchant
11   business.
12        Q.  Is this a merchant business that you had
13   considered, I guess, entering into with Alon Nottea
14   and Khristopher Bond?
15        A.  No.  I was never going to, but no.
16        Q.  Do you know why you forwarded this e-mail to
17   Alon Nottea and Khristopher Bond?
18        A.  Who forwarded it?  I did.
19        Q.  Yes.  But do you know why, or do you --
20        MR. TEPFER:  Can you repeat the question?  I
21   can't even remember what it was.
22        (Record read.)
23        THE WITNESS:  Maybe simply because I wanted
24   to find out maybe -- it was a long time ago.  It was
25   in 2012.

---

110

1    BY MR. TEPFER:
2         Q.  So you don't recall specifically why you
3    would have forwarded that to Alon Nottea or
4    Khristopher?
5         A.  Absolutely not.  Maybe it was a mistake.
6    Maybe not.  Maybe I wanted to know his opinion on the
7    subject.
8         Q.  Do you know what AD Lifestyle Network is?
9         A.  What is it?  You mean the name of the company
10   or the product?
11        Q.  Have you ever heard of that company?
12        A.  I'm not sure, but I think I do.
13        (Exhibit 27 marked.)
14   BY MR. TEPFER:
15        Q.  I'm now handing you what's been marked as
16   Exhibit 27.
17        In this e-mail that was sent to you and Alon,
18   Paul Medina requested that you read below the
19   forwarded document.
20        Did you read that forwarded message?
21        A.  No.  I'll say it again that for the most
22   part, the e-mails I get, I don't read them.
23        What is this e-mail about?
24        Q.  Well, it refers to -- and this is from Andy
25   Meadows at SignaPay -- well, first I should ask:  Do

---

111

1    you know what SignaPay is?
2         A.  I can give you my guess.  I think most
3    probably it's a company which is a processor for a
4    loan.
5         And I see the subject of this e-mail it says
6    "New accounts."  So most probably it's just another
7    excuse from Alon where he's saying, "The company is
8    growing.  They're new accounts, and that's why I'm not
9    paying the money back."
10        So I don't know the contents of this e-mail,
11   but I think that's what it is.
12        Q.  And so your understanding of -- well, your
13   understanding of why you received this e-mail was more
14   of an excuse from Alon about why he's failed to repay
15   your loans?
16        A.  Most often all the e-mails were about that.
17        Q.  Do you know why Paul Medina would have sent
18   you this e-mail, though?
19        A.  I don't know.  Maybe Alon asked him.
20        Q.  Do you know what BunZai Media Group's profit
21   margin was?
22        A.  It's a very abstract question, because I did
23   not control expenses; and for me, I was -- I was
24   looking for any way for them to repay me my loan and
25   the interest as soon as possible.

---

112

1         I knew that any of my attempts to actually
2    seriously check all those things was not going to
3    be -- that's why I just accepted everything they were
4    saying.  Just accepted it as it was.
5         Q.  So you're saying that it wasn't worth trying
6    to discuss those issues with Alon because you didn't
7    think that he would be truthful with you about your
8    information?  Is that what you're stating?
9         A.  No.  No.  I just knew that most probably he
10   didn't even know this information, so.
11        Q.  And when you mentioned earlier that you would
12   sort of discuss numbers with Alon Nottea, was profit a
13   part of that discussion?
14        A.  Yes.  But in the end I was just trying to get
15   a way for him to repay me at least some money, because
16   for the profits I understood that he didn't even know
17   about it all himself.
18        Q.  And did you understand any reasons
19   why Alon's companies had a thin -- or, I guess, didn't
20   have much profit?
21        A.  I could only guess.  Most probably because
22   his expenses were high.
23        Q.  Do you know what his expenses were?
24        A.  Well, the ones I know is advertising, call
25   center.  All those business expenses were high, but,

---

28 (Pages 109 to 112)

080

# EXHIBIT

## "C"

# In the Matter of:

# FTC v. Bunzai Media Group, LLC, et al.

*February 18, 2016*
*Alon Nottea*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, LLC, et al.

2/18/2016

---

**1**

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4    FEDERAL TRADE COMMISSION  )
             Plaintiff          )
 5                              )
          v.                    )  No. CV 15-4527-GW(PLAx)
 6                              )
 7    BUNZAI MEDIA GROUP, INC., )
      et al.,                   )
 8          Defendants.         )
 9                              )
10
11
12
13                  Thursday, February 18, 2016
14
15               10877 Wilshire Boulevard
                      Suite 700
16               Los Angeles, California
17
18
19
20         The above-entitled matter came on for
21    deposition, pursuant to Notice, at 8:59 a.m.
22
23
24
25
```

---

**2**

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4    FEDERAL TRADE COMMISSION  )
 5          Plaintiff           )
                                )
 6          v.                  )  No. CV 15-4527-GW(PLAx)
                                )
 7    BUNZAI MEDIA GROUP, INC., )
      et al.,                   )
 8          Defendants.         )
 9                              )
10
11
12
13
14
15         DEPOSITION OF ALON NOTTEA, taken on
16    behalf of the Federal Trade Commission, at
17    10877 Wilshire Boulevard, Suite 700, Los Angeles,
18    California, commencing at 8:59 a.m., and concluding
19    at 5:04 p.m., on Thursday, February 18, 2016,
20    pursuant to Notice, before CHRISTINA KIM-CAMPOS,
21    CSR No. 12598, a Certified Shorthand Reporter, in
22    and for the State of California.
23
24                       ***
25
```

---

**3**

```
 1
 2    A P P E A R A N C E S
 3    For the Federal      U.S. FEDERAL TRADE COMMISSION
      Trade Commission:    REID TEPFER, ESQ.
 4                         1999 Bryan Street
                           Suite 2150
 5                         Dallas, Texas  75201-6808
                           (214) 979-9383
 6                         rtepfer@ftc.gov
 7                         U.S. FEDERAL TRADE COMMISSION
                           LUIS H. GALLEGOS, ESQ.
 8                         1999 Bryan Street
                           Suite 2150
 9                         Dallas, Texas 76201-6808
                           (214) 979-9383
10                         lgallegos@ftc.gov
11
12    For the Defendants   CROSSWIND
      Alon Nottea and      ROBERT M. UNGAR, ESQ.
13    Roi Reuveni:         2130 North Beverly Glen Blvd.
                           Los Angeles, California  90077
14                         (818) 646-4750
                           rmu@crosswindlaw.com
15
16    For the Defendants   LAW OFFICE OF JEFFREY S. BENICE
      Igor Latsanovski     JEFFREY S. BENICE, ESQ.
17    and CalEnergy, Inc.  (Via Telephone)
                           3080 Bristol Street
18                         Suite 630
                           Costa Mesa, California  92626
19                         JSB@JeffreyBenice.com
20
21
22
23
24
25
```

---

**4**

```
 1                  I N D E X
 2
 3    WITNESS              EXAMINATION          PAGE
 4    Alon Nottea         By Mr. Tepfer          7
 5    Afternoon Session                         149
 6
 7    DEPOSITION EXHIBITS            INITIAL REFERENCE
 8    Nottea Deposition Exhibit No.  18          86
 9    Nottea Deposition Exhibit No.  21          97
10    Nottea Deposition Exhibit No.  23         115
11    Nottea Deposition Exhibit No.  26         127
12    Nottea Deposition Exhibit No.  28         134
13    Nottea Deposition Exhibit No.  29         135
14    Nottea Deposition Exhibit No.  32         144
15    Nottea Deposition Exhibit No.  33         147
16    Nottea Deposition Exhibit No.  36         149
17    Nottea Deposition Exhibit No.  38         151
18    Nottea Deposition Exhibit No.  42         154
19    Nottea Deposition Exhibit No.  46         156
20    Nottea Deposition Exhibit No.  48         159
21    Nottea Deposition Exhibit No.  58         164
22    Nottea Deposition Exhibit No.  62         166
23    Nottea Deposition Exhibit No.  65         173
24    Nottea Deposition Exhibit No.  66         174
25
```

1 (Pages 1 to 4)

Nottea

FTC v. Bunzai Media Group, LLC, et al.

2/18/2016

45

```
1    question. It's vague and ambiguous.
2          THE WITNESS: No.
3    BY MR. TEPFER:
4        Q.  So I guess when -- I want to talk a little
5    bit about that investment.
6          When you negotiated the terms of that
7    investment, did you give Igor Latsanovski a
8    description of BunZai Media Group, the company?
9          MR. UNGAR: Objection as to the form of the
10   question. It's vague and ambiguous.
11         THE WITNESS: Yes.
12   BY MR. TEPFER:
13       Q.  Did you discuss with Igor Latsanovski the
14   product that his investment would be used for?
15         MR. UNGAR: Objection as to the form of the
16   question. Vague and ambiguous temporally.
17         THE WITNESS: I told him we were going to
18   retail skin care products, so the answer is yes.
19   BY MR. TEPFER:
20       Q.  Did you discuss with him how those products
21   would be sold?
22       A.  I did, but Igor's understanding and
23   knowledge of details of business models and online
24   weren't really there, so it was -- it was a little
25   bit more generic as far as online sales, skin care,
```

47

```
1    either.
2    BY MR. TEPFER:
3        Q.  Where did BunZai Media Group attempt to
4    market those products?
5          MR. UNGAR: Objection as to the form of the
6    question. It's vague and ambiguous.
7          THE WITNESS: I'm -- it was a long, long
8    time ago. I'm not really sure. A lot of people
9    were talking about different types of processing or
10   different types of pricing. I wanted to learn the
11   business a little more to get some more metrics in
12   the business. I don't remember exactly which --
13   where it was or through which contact, but I tried a
14   couple of thousand dollars and the monies didn't
15   make sense, and I just dropped it. It was like
16   three, four years ago, and it just -- nothing
17   materialized from it.
18   BY MR. TEPFER:
19       Q.  Okay. Have you ever heard of a company
20   called SkinCare OU?
21       A.  I have a recollection of that name.
22       Q.  Do you know what that company's business
23   was?
24         MR. UNGAR: Objection as to the form of the
25   question. It's vague and ambiguous.
```

46

```
1    generating interest with women and selling a good
2    product.
3        Q.  Did you ever -- oh, sorry.
4        A.  It could have been men as well. Doesn't
5    have to be women.
6        Q.  Okay. Did you ever show him the websites
7    that BunZai created for the sale of AuraVie?
8          MR. UNGAR: Objection as to the form of the
9    question. It's vague and ambiguous.
10         THE WITNESS: He never had an interest, and
11   he wouldn't really know what that stood for, so --
12   BY MR. TEPFER:
13       Q.  Do you know if -- did Igor Latsanovski ever
14   make recommendations about how to improve BunZai
15   Media Group's marketing strategies?
16       A.  He wouldn't know how, so no.
17       Q.  Did he ever provide assistance to BunZai
18   Media Group in obtaining new merchant accounts?
19       A.  No.
20       Q.  Did BunZai Media Group market AuraVie
21   SkinCare products outside of the United States?
22         MR. UNGAR: Objection as to the form of the
23   question. It's vague and ambiguous.
24         THE WITNESS: No. There was a small attempt
25   that was unsuccessful, and that didn't materialize
```

48

```
1          THE WITNESS: I don't remember.
2    BY MR. TEPFER:
3        Q.  Do you know if BunZai Media Group has ever
4    done any business with a company called SkinCare OU?
5        A.  I think you're talking about the same little
6    test that was done. I think there was 3- to $5,000
7    of a test of some processing. Didn't make sense.
8    Merchant fees didn't work out. The lady that
9    introduced, the fees were too high --
10       Q.  Mm-hmm.
11       A.  -- and it just -- it just went away. There
12   was some lady named Kristina who set up a merchant
13   account. There was a few monies that went through
14   this account. The fees were too high. It didn't
15   make sense for this business model. I don't even
16   remember getting the fund. I think -- I think it
17   was a loss before it started. There was no -- the
18   fees were more than the money that was supposed to
19   come in, so it just -- nothing happened with it.
20       Q.  Do you know who Oleg Trushlya is?
21         MR. UNGAR: Do you want to spell that for
22   the record --
23         MR. TEPFER: Sure. We spelled it yesterday.
24         MR. UNGAR: -- because I don't -- I can't
25   even understand what the name is.
```

12 (Pages 45 to 48)

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                        2/18/2016

---

53

```
1   BY MR. TEPFER:
2       Q.  Do you know if Roi Reuveni ever worked at
3   Chargeback Armor, Inc.?
4       A.  He may have consulted. I don't know if he
5   worked there. I don't know.
6       Q.  Do you know if Alan Argaman ever worked at
7   Chargeback Armor, Inc.?
8       A.  No idea.
9       Q.  Do you know if Secured Merchants ever
10  contested any chargebacks on behalf -- or any
11  consumer chargebacks on behalf of BunZai Media
12  Group, Inc.?
13      MR. UNGAR:  Objection as to the form of the
14  question. Vague and ambiguous.
15      THE WITNESS:  No, they didn't.
16  BY MR. TEPFER:
17      Q.  Do you know if Pinnacle Logistics ever
18  contested any chargebacks on behalf of BunZai Media
19  Group, Inc.?
20      MR. UNGAR:  Objection as to the form of the
21  question. Vague and ambiguous.
22      THE WITNESS:  If Pinnacle Logistics
23  contested on behalf of BunZai?
24  BY MR. TEPFER:
25      Q.  Mm-hmm.
```

---

54

```
1       A.  No, they didn't.
2       Q.  Do you know if Pinnacle Logistics, Inc.,
3   ever contested any chargebacks, consumer
4   chargebacks, from the purchase of AuraVie products?
5       MR. UNGAR:  Objection as to the form of the
6   question. Vague and ambiguous.
7       THE WITNESS:  I believe they did.
8   BY MR. TEPFER:
9       Q.  Why do you believe that?
10      A.  There was a Chargeback Department there.
11      Q.  So -- sorry. I just wanted to clarify. You
12  said Pinnacle Logistics was the Chargeback
13  Department there, and do you mean the Chargeback
14  Department at BunZai Media Group?
15      MR. UNGAR:  Objection as to the form of the
16  question.
17      THE WITNESS:  No. I --
18      MR. UNGAR:  It's vague and ambiguous and it
19  misstates the prior testimony of the witness.
20      THE WITNESS:  Do you have a -- do you have a
21  question? I'm not really sure what the question is.
22      MR. TEPFER:  Sure.
23      Could you read back the question.
24      MR. UNGAR:  Which one?
25      MR. TEPFER:  The last one.
```

---

55

```
1       (The previous question was read back
2   by the court reporter as follows:
3       "QUESTION:  You said Pinnacle
4   Logistics was the Chargeback
5   Department there, and do you mean the
6   Chargeback Department at BunZai Media
7   Group?")
8       THE WITNESS:  Yes. I think there's some
9   clarification.
10  BY MR. TEPFER:
11      Q.  Was Pinnacle Logistics, Inc., considered
12  the -- 0do you consider Pinnacle Logistics, Inc., to
13  be the Chargeback Department of BunZai Media Group,
14  Inc.?
15      A.  No.
16      Q.  Did Pin- -- to your knowledge, did Pinnacle
17  Logistics, Inc., sell AuraVie products?
18      A.  No.
19      Q.  Do you know why Pinnacle Logistics, Inc.,
20  would process chargebacks concerning AuraVie
21  products if they didn't sell those products?
22      A.  It's a service, just like a customer service
23  call center or fulfillment. It's a service.
24      Q.  Did BunZai Media Group enter into a contract
25  with Pinnacle Logistics, Inc., for these services?
```

---

56

```
1       MR. UNGAR:  Objection as to the form of the
2   question. It's vague and ambiguous, and it's asked
3   and answered.
4       THE WITNESS:  No.
5   BY MR. TEPFER:
6       Q.  Do you know if they entered into a contract
7   with any other company that sold AuraVie products
8   for the -- processing these charges?
9       MR. UNGAR:  Objection as to the form of the
10  question. Vague and ambiguous.
11      THE WITNESS:  I believe so.
12  BY MR. TEPFER:
13      Q.  Can you recall the names of any companies
14  specifically that Pinnacle Logistics provided these
15  services to?
16      MR. UNGAR:  Objection as to the form of the
17  question. Vague and ambiguous.
18      THE WITNESS:  Some of the companies you
19  mentioned in the beginning of the deposition, one of
20  them being Kai Media or Agoa Holdings of such.
21  BY MR. TEPFER:
22      Q.  And I'll just -- I guess I'll, for clarity,
23  run down the list real quick.
24      Was DSA Holdings, Inc., one of those
25  companies, to your knowledge?
```

14 (Pages 53 to 56)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

084

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

---

77

1   A.  I just don't know.  I think it was BunZai.
2   I think he was working with BunZai.
3      Q.  Do you know if he was ever an employee of a
4   company that you owned?
5      MR. UNGAR:  Objection as to the form of the
6   question.  It's vague and ambiguous.
7      THE WITNESS:  No.  There was some -- I just
8   don't know if he, if Andrew moved over to working
9   with Pinnacle or not.  I'm not really sure where --
10   where he was paid from.
11  BY MR. TEPFER:
12     Q.  Mm-hmm.  Did you review the company's, I
13   guess -- BunZai Media Group, Inc.'s, customer
14   service policies?
15     MR. UNGAR:  Objection as to the form of the
16   question.  It's vague and ambiguous, it assumes
17   facts not in evidence.
18     THE WITNESS:  Khristopher Bond was
19   responsible for hiring, managing, writing scripts,
20   dealing with the call center environment, working
21   with -- with the actual customer service reps.
22   Khristopher was -- you know, he used to come in, in
23   the morning, give these people a hug, sit with them,
24   you know, work with them on -- on how to improve
25   their business process and how to improve their

---

78

1   script.  It wasn't something that was -- English is
2   not my first language.  I can speak, obviously, but
3   it's -- Khristopher was much more of the guy who,
4   you know, sat in the Customer Service Department
5   and -- and performed and -- and, you know, filled
6   his duties.  I'm not so much into calls and customer
7   service and scripting and stuff like that.
8   BY MR. TEPFER:
9      Q.  To your knowledge, did BunZai Media Group
10   have a, sort of a standard operating procedure for
11   customer service?
12     A.  Probably.  I'm a big believer in SOPs.
13     Q.  Do you know -- and do you recall ever
14   reviewing the, I guess, the SOP for customer service
15   at BunZai Media Group?
16     A.  Most likely if it got through Khristopher's
17   eyes.  I'm not a big guy in reading.  I -- you know,
18   I don't read a lot of stuff too -- too deeply.  If
19   it looks good, it's there with manager, it got
20   approved from the department, it came to my desk,
21   looked good to me -- I don't -- I'm not a guy who
22   will read a hundred pages and look for the word.
23     Q.  Right.
24     A.  It's not my --
25     Q.  Do you recall if BunZai Media Group ever had

---

79

1   a standard operating procedure for, I guess, Better
2   Business Bureau complaints?
3      A.  Probably.
4      Q.  Do you recall reviewing that?
5      A.  No.
6      Q.  Do you think that it is likely that you
7   reviewed that, if it exists?
8      MR. UNGAR:  Objection as to the form of the
9   question.  Vague and ambiguous.
10     THE WITNESS:  No.  I think it's likely
11   that's something Khristopher would review, and if he
12   would approve it, I would approve it.
13  BY MR. TEPFER:
14     Q.  When BunZai Media Group first opened, did
15   the company have department managers?
16     A.  No.
17     Q.  Did the company ever have department
18   managers?
19     A.  There was some managers.  I don't know
20   about, you know, department -- yeah, there was some
21   departments and some managers, yes.
22     Q.  Who were the managers over the, I guess,
23   generally speaking, over the entirety of BunZai's
24   existence?  Could you name some of those managers?
25     A.  I would say Andree Mansour was manager of

---

80

1   call center, Sandra Rubio was manager of
2   Resolutions.  That's about it.
3      Q.  There were only two managers that you're
4   aware of at BunZai Media Group, Inc.?
5      A.  Paul was kind of a manager.  Paul Medina was
6   kind of a manager.  It was a different department.
7   There wasn't really managers.  It was just kind of
8   get the work done kind of stuff, you know.
9      Q.  When you said Sandra was manager of
10   Resolutions --
11     A.  I guess I saw an email recently.  That's why
12   it came to my mind.
13     Q.  What is the, I guess, the Resolutions
14   Department?
15     A.  If there was any sort of complaint by a
16   customer, then I wanted to make sure that everything
17   would be handled professionally and there's no
18   damages to anybody and nobody feels like they got
19   the short end of the stick, so I had a person in
20   charge of making sure there was resolution to any
21   complaint.
22     Q.  Did Sandra report to you?
23     A.  No.
24     Q.  Who did she report to?
25     A.  To Khris.  Khristopher Bond.

---

20 (Pages 77 to 80)

FTC v. Bunzai Media Group, LLC, et al.                                          2/18/2016

---

81

1    Q.  Did you have a BunZai Media Group, Inc.,
2  email address?
3    A.  Yes.
4    Q.  Do you recall what it is?
5    A.  It was Alon at BunZai Media.
6    Q.  Do you recall if Doron, your brother, ever
7  had a BunZai Media address?
8    A.  I don't think so.
9    Q.  Do you know if Roi did?
10   A.  He may have.  He may have.
11   Q.  Do you happen to recall what it is?
12   A.  If it was, it's probably
13 roi@bunzaimediagroup.  Maybe Roi R.  But I don't
14 remember exactly.  I don't remember.  I don't
15 remember that email address.
16   Q.  Okay.
17   A.  I'm saying if he did, it would be Roi@.
18   Q.  What about -- did you use any other email
19 addresses to conduct business on behalf of BunZai
20 Media Group, Inc.?
21   A.  I had an email that I used called
22 vigorette@gmail.
23   Q.  Uh-huh.
24   A.  And -- and sometimes I would send to him
25 some emails from that email address as well.

---

82

1  Basically, my BunZai Media email was inside my
2  vigorette, so I can choose where I'm sending from.
3  So sometimes I didn't pay attention and an email
4  came out of vigorette instead of dropping the
5  drop-down and choosing BunZai Media.
6    Q.  Okay.  Did you ever conduct any other -- or
7  rather, did you ever use any other email addresses
8  to conduct BunZai business, that you recall?
9    A.  After BunZai I had Alon@MediaUrge.  I used
10 that email address.
11   Q.  In the Resolutions Department did Sandra, to
12 your knowledge, ever, I guess, draft reports about
13 her department concerning, I guess, complaints?
14   A.  I'm not sure.
15   Q.  Do you recall if you researched any reports
16 drafted by Sandra regarding complaints?
17   A.  Not to my recollection.  An actual report
18 about complaints, not to my recollection, but
19 there -- there may have been.  It was business and I
20 wanted reports on everything.  I'm a big reporting
21 guy.  Reports.  Somebody has to make a report.  They
22 have to work.
23   Q.  Would you typically review any reports
24 drafted by, I guess, the managers at BunZai Media
25 Group, Inc.?

---

83

1    A.  I -- I -- we already answered that, and
2  that's the question you answered and I said yes to
3  that and yes.
4    Q.  Oh.
5    A.  Yes, I reviewed reports, but for me it was
6  more making sure there's an SOP.
7    Q.  Uh-huh.
8    A.  For me it was more making sure there's an
9  SOP and that somebody does a report and then sends
10 it to somebody below me.  It wasn't so much bring it
11 back to me.  Let's create a process that we're in
12 charge of, that I know the department is responsible
13 for that particular task, and then kind of maintain
14 it within their own chain of command.  I just wanted
15 to make sure that there is a report and an SOP.  And
16 if there is a complaint, make sure it gets solved.
17 If there's a happy customer, make sure we ask for a
18 referral.  I just like the stuff, you know, to work
19 and not, you know, fall between the cracks.
20   Q.  Okay.  Do you -- would you ever communicate
21 with Igor Latsanovski concerning BunZai Media Group,
22 through email?
23   A.  I'm sure there's a few emails, yeah.
24   Q.  Do you know what his email address is?
25   A.  Yeah.

---

84

1    MR. UNGAR:  Objection as to the form of the
2  question.  Vague and ambiguous temporally.
3    THE WITNESS:  You mean Igor Latsanovski's
4  email address?
5  BY MR. TEPFER:
6    Q.  Do you know what Igor -- the email address
7  that you would send to him to communicate concerning
8  BunZai Media Group?
9    A.  I don't know the exact specifics of his
10 email, but I think it's Igor's gmail or something.
11 Igor --
12   Q.  Does igorlats@gmail.com sound correct to
13 you?
14   A.  Yeah.
15   Q.  Did you ever receive emails from Igor
16 concerning his company's investment in BunZai Media
17 Group?
18   A.  Not often.
19   Q.  But do you know if you -- you said "not" --
20   A.  Not to my recollection.
21   Q.  When did you initially receive -- or when
22 did BunZai Media Group initially receive its
23 investment from CalEnergy, Inc.?
24   A.  I don't know the -- the -- you know, if I
25 have to recall, it would have been somewhere in

---

21 (Pages 81 to 84)

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

---

85

1  maybe end of 2010 or more towards the middle or end
2  of 2010. Somewhere around there.
3      Q.  Did BunZai Media Group, Inc., ever pay back
4  Igor Latsanovski's company?
5      A.  I believe it did.
6      Q.  Did BunZai Media Group, Inc., receive any
7  subsequent investments from Igor Latsanovski's
8  company?
9          MR. UNGAR:  Objection as to the form of the
10  question. It's vague and ambiguous.
11         THE WITNESS: I don't know. He kind of, you
12  know, gave me a line, and we tried to always pay
13  back this loan.
14  BY MR. TEPFER:
15     Q.  Was there ever any disputes between you and
16  Mr. Latsanovski concerning the repayments of any
17  loans?
18     A.  I wouldn't call it disputes, but there was
19  conversations.
20     Q.  What -- I guess, were those conversations
21  regarding the timeliness of BunZai Media Group's
22  repayment to CalEnergy?
23     A.  Sure.
24     Q.  Did BunZai Media Group ever have any
25  difficulties in repaying CalEnergy its loans?

---

86

1      A.  Of course.
2      Q.  Would you say that that was a frequent
3  occurrence?
4      A.  Well, Igor is -- you know, he likes to know
5  where his money is. So, you know, it's -- it's --
6  I'm not saying it's frequent, but, you know, when
7  you're commit to paying someone something back for
8  their money and it's not there, then you have to
9  have conversations about why not.
10     Q.  Okay.
11     A.  And Igor is not the guy who says he will
12  talk to you next month. He wants to know why.
13     Q.  And did Igor frequently -- was there -- for
14  these loans, was there a standard, I guess, duration
15  for which these loans were to last from CalEnergy,
16  Inc.?
17         MR. UNGAR:  Objection as to the form of the
18  question. It's vague and ambiguous.
19         THE WITNESS: We always discuss some timing,
20  but it was clear that it was based on performance of
21  the business.
22         (Plaintiff's Exhibit 18 was
23         previously marked for identification
24         by the FTC and is attached hereto.)
25  ///

---

87

1  BY MR. TEPFER:
2      Q.  I'm now handing the witness what's been
3  marked as Exhibit 18.
4          And this is for Mr. Esensten.
5          Mr. Nottea, do you recall signing the
6  Partnership Agreements located in this document?
7      A.  There's a few here. I'm not sure if it's
8  the same one or not. There's a couple different
9  ones.
10     Q.  Sure.
11         Let's talk about first the signature on
12  18-3. Do you recall signing that document?
13     A.  Is it okay just to turn up -- it's a little
14  cold -- just turning it up a little bit?
15     Q.  Yeah, yeah. Sorry.
16     A.  Do I recall signing what's on 18-2 here
17  (indicating)?
18     Q.  3.
19     A.  18-3?
20     Q.  Uh-huh.
21     A.  Yes, I do.
22     Q.  And do you recall initialing 18-2?
23     A.  I do.
24     Q.  At the top of that highlighted portion,
25  which I highlighted --

---

88

1      A.  Okay.
2      Q.  -- it states, "Igor will invest 350K in
3  exchange for 55% ownership of BunZai Media Group."
4          Did, at any point, Igor Latsanovski have an
5  ownership interest in BunZai Media Group?
6      A.  No.
7      Q.  Do you recall why the terms of this
8  agreement did not come into fruition?
9      A.  This agreement was just something to have on
10  paper. There was a test that we were doing at the
11  beginning because I obviously would not let anybody
12  have 55 percent of the company. It was a test to
13  prove myself, to say show me what you can do, show
14  me you can bring in some orders, show me that you
15  can -- you are what you say, and then we'll
16  re-negotiate once we more forward. So it was just
17  kind of a document to have in place so Igor could
18  feel secure about lending me some money.
19     Q.  Did you draft this Partnership Agreement?
20     A.  I did not.
21     Q.  Do you know who did?
22     A.  It looks like Khristopher Bond. He was
23  usually the guy who would sit with -- because of
24  Igor's language, Khristopher would have a lot more
25  patience, he would have a lot more time. I'm kind

---

22 (Pages 85 to 88)

086

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                                2/18/2016

---

93

1  he would understand, yes.
2      Q.  Do you recall what you said to him?
3      A.  We're just going to generate a few orders
4  every day to show him some consistency, and once we
5  do that for -- I don't know, I don't remember if it
6  was 10 or 20, how many days that was -- that once I
7  proved that fact to him, that we would -- he would
8  then move forward.
9      Q.  And it says here, the next line, "During
10  this test, BunZai will purchase at least 1,000
11  orders (CPA of $45 to $50 each) within the first 15
12  days, and a conversion from Free Trial to
13  Transitional stage (day 16 to day 30) of at least
14  75% of these orders."
15      I was wondering if you could -- do you know
16  what "CPA" stands for?
17      A.  Yes, I do.
18      Q.  What does it stand for?
19      A.  Cost per -- cost per action, actually.
20      Q.  And what is cost per action?
21      A.  What is cost per action?  Exactly what it
22  means, it's -- it's a cost for an action.  In
23  marketing terms it's an action, and in our language
24  it would be an acquisition, an acquisition of a
25  customer.

---

94

1      Q.  And are those payments made to external
2  affiliates?
3      A.  Yes, they are.
4      Q.  Did you explain that to Mr. Latsanovski?
5      A.  I don't recall.
6      Q.  Do you recall if you explained to
7  Mr. Latsanovski what a conversion from free trial to
8  transitional stage is?
9      A.  I believe I did.
10      Q.  I want to jump to 18-6.  At the bottom, is
11  that your signature there?
12      A.  It looks like it is, yes.
13      Q.  And on 18-7, is that your signature there?
14      A.  Yes.  Looks like it.
15      Q.  Do you recall signing this agreement?
16      A.  Just one second.  Let me read.
17      Q.  Sure.
18      A.  Okay.  Go ahead.
19      Q.  Do you recall this agreement?
20      A.  Vaguely, but I do.
21      Q.  Do you know if this was the final
22  memorialization of the agreement between you,
23  Igor -- I guess between you and Igor?
24      A.  This is in 2011, so the answer would be
25  absolutely not.

---

95

1      Q.  Do you know if any future agreements were
2  ever memorialized?
3      MR. UNGAR:  Objection as to the form of the
4  question.  Vague and ambiguous.
5      THE WITNESS:  It's verbal memorialization.
6  BY MR. TEPFER:
7      Q.  Well, first let's talk -- yeah, let's talk
8  about verbal first.
9      Was there subsequent, I guess, verbal
10  agreements to this document?
11      MR. UNGAR:  Objection --
12      THE WITNESS:  Many.
13      MR. UNGAR:  -- as to the form of the
14  question.  Vague and ambiguous.
15  BY MR. TEPFER:
16      Q.  Do you -- I'm sorry.  Go ahead.
17      A.  Many.
18      Q.  And do you know if there were subsequent
19  written, I guess, contractual agreements concerning
20  your --
21      A.  I -- in my mind, written stuff with Igor, it
22  changed so much that I'm not sure.  Based on my
23  looking at some of your documents or some of the
24  evidence, I remember there's one -- maybe one more.
25  I remember I saw something else in evidence.  So I'm

---

96

1  not really sure if it's this or not.  Maybe it was
2  under one page and just kind of copied different.
3      So in my understanding, to what I saw, there
4  was one more document, but as far as what our
5  understanding was together, it's not based on any of
6  this (indicating).
7      Q.  This part that I highlighted there at the
8  bottom of 18-6, it says Igor "1/3 of 100% of the
9  company".
10      To your knowledge, was there ever a point
11  where Igor owned one-third of BunZai Media Group?
12      A.  No, he did not.
13      Q.  Was it was there ever a discussion, I guess,
14  about Igor owning 1/3 of BunZai Media Group?
15      A.  He -- he -- no, he didn't have an interest
16  in owning.
17      Q.  Do you know why this was included in this
18  Partnership Agreement?
19      A.  Some --
20      MR. UNGAR:  Objection as to the form of the
21  question.  It's vague and ambiguous, and it's
22  argumentative.
23      THE WITNESS:  We wanted to have something on
24  paper so he can have some security, so he can have
25  something to -- to hold, something to -- to take

---

24 (Pages 93 to 96)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                                    2/18/2016

---

**97**

1   home.
2   BY MR. TEPFER:
3      Q.  Did you draft this Partnership Agreement?
4      A.  No.
5      Q.  Do you know who did?
6      A.  Khristopher did.
7      Q.  Did you consider Mr. Latsanovski to be a
8   partner of yours in BunZai Media Group, Inc.?
9      A.  No.
10         (Plaintiff's Exhibit 21 was
11         previously marked for identification
12         by the FTC and is attached hereto.)
13  BY MR. TEPFER:
14     Q.  I'm now handing the witness what's been
15  marked Exhibit 21.
16         And this is for Mr. Esensten.
17         Do you recall receiving this email from Igor
18  Latsanovski?
19     A.  No.
20     Q.  Have you ever read this before?
21     A.  Only after the FTC lawsuit.
22     Q.  Uh-huh.  Wait.  Could you repeat that?
23     A.  Only after the, what's provided in evidence.
24  I've never seen it before that.
25     Q.  Do you recall having a conversation with

---

**98**

1   Mr. Latsanovski in, around this period of time?
2      A.  Yes.
3         MR. UNGAR:  Objection as to the form of the
4   question.  Vague and ambiguous.
5   BY MR. TEPFER:
6      Q.  Do you recall what that conversation was
7   concerning?
8      A.  In reference to the time period of this
9   document?  We're talking about the same kind of --
10     Q.  Yes, sir.
11     A.  No.
12     Q.  Do you have any idea why Mr. Latsanovski
13  included Doron on this email?
14        MR. UNGAR:  Objection as to the form of the
15  question.  It's vague and ambiguous, calls for
16  speculation, lacks foundation.
17        THE WITNESS:  I believe I was visiting
18  Israel at the time of this document, and there was
19  some issues going on, and Igor had some concerns
20  about the business, and I mentioned to him that I
21  want to get out of this business.  And he kind of
22  sent me his opinion on how he feels and -- and --
23  and kind of don't leave, don't stay in Israel, come
24  back to America, let's try something new.
25     ///

---

**99**

1   BY MR. TEPFER:
2      Q.  You said there were some issues going on.
3   What issues are you referring to?
4      A.  It was the beginning of Dawn Goddard and
5   Nancy Yalley's unlawful lawsuit that I ended up
6   being sued as an alter ego of someone that never
7   worked for me and I never hired.
8      Q.  And who's that person that you're referring
9   to that you never hired?
10     A.  Dawn Goddard and Nancy Yalley.
11     Q.  And they never worked for you?
12     A.  Never.
13     Q.  And you said that Mr. Latsanovski, I guess,
14  expressed some concerns.  What were those concerns
15  that he expressed?
16     A.  Same concerns.  Dawn Goddard came to the
17  office and threatened me and Igor for -- for -- for
18  suing us for something that had no relevance to us.
19  And it started to go downhill from there.  And, you
20  know, I told them, "Listen, I'm out of this" --
21  excuse my language -- "shit," and wanted to end the
22  company.  I went to Israel for a trip.  I told Igor
23  "I'm thinking about staying here with my wife and my
24  children."  He got a little nervous and sent me this
25  email -- which I never saw in Israel.  I only saw it

---

**100**

1   later.
2      Q.  Mm-hmm.
3      A.  I only saw it years later.  I never -- when
4   I went to Israel, I never even got a chance to read
5   this email.
6      Q.  And you said at that point you were
7   considering ending your company.  What company are
8   you referring to?
9      A.  BunZai Media Group.
10     Q.  Was the -- sorry.
11        What period of time did BunZai Media Group,
12  I guess, cease to exist?
13     A.  Right around -- right around a little bit,
14  right around this time, what I believe is, like,
15  towards June, July, August of 2013, or right around
16  this time.
17     Q.  What was the reason for the decision to, I
18  guess, close BunZai Media Group, Inc.?
19     A.  Number one, profitability wasn't there.
20  Number two, there was -- too messy and too many -- I
21  just wasn't happy with the way it was managed, I
22  wasn't happy with my relationship with Khristopher.
23  It was kind of going south, and it was starting
24  to -- you know, have other interest in myself, and
25  it was time to -- time to finish.

---

25 (Pages 97 to 100)

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                                   2/18/2016

---

109

1    Q.  Did BunZai Media Group, Inc., have any sort
2  of business relationship with any company located in
3  Israel?
4    A.  I believe there was one affiliate marketer,
5  there was one marketing company in Israel that did
6  some affiliate work. Other than that, no.
7    Q.  That same line refers to David, and I was
8  wondering if you knew who David is.
9        MR. UNGAR:  Objection as to the form of the
10 question. Vague and ambiguous, misstates the
11 document.
12 BY MR. TEPFER:
13   Q.  Do you see where it says "David" there?
14 Did --
15   A.  "David is good helper"?
16   Q.  Uh-huh.
17       Did you ever have an employee at this time
18 named David?
19   A.  I think we had a consultant. I'm not sure
20 if it was an employee. It was a guy named David.
21 There's a couple Davids.
22   Q.  Mm-hmm. Later on Mr. Latsanovski states "I
23 would recommend Roy as head of the product company".
24       Was it -- is it your understanding that
25 Mr. Latsanovski is referring to BunZai Media Group?

---

110

1    A.  I have no idea.
2    Q.  At this time did you own any other company,
3  aside from BunZai Media Group?
4    A.  I don't know if -- if Adageo was there. So
5  Adageo, yes.
6    Q.  Did Adageo market any products at that time?
7    A.  No.
8    Q.  Did Roi ever become the head of BunZai Media
9  Group?
10   A.  No.
11   Q.  Did Mr. Latsanovski, aside from his
12 statements in this email, did he ever make any
13 other, I guess, hiring recommendations to you for --
14 at BunZai Media Group?
15   A.  Never.
16   Q.  Later on Mr. Latsanovski states, "And I
17 would not want to so we are so constantly thinking
18 about how to download the work of our factory -
19 Pinicle."
20       Did Pinnacle Logistics manufacture the
21 AuraVie product?
22   A.  No, they did not.
23   Q.  Are you aware of anything that Pinnacle
24 manufactured?
25   A.  No.

---

111

1    Q.  Later in the document Mr. Latsanovski
2  states, "after all people is a problem, dividing the
3  information can give us testimony in court, or just
4  come up with these statements and show to us, and so
5  on."
6        Do you have any understanding of what
7  Mr. Latsanovski is referring to in that statement?
8        MR. UNGAR:  Objection as to the form of the
9  question. It's vague and ambiguous. The sentence
10 is gibberish. It calls for speculation. It lacks
11 foundation. It seeks an expert opinion in language
12 and dialect.
13       MR. TEPFER:  Please, no speaking objections,
14 Counsel.
15       MR. UNGAR:  I'm sorry?
16       MR. TEPFER:  I said please, no speaking
17 objections, Counsel.
18       MR. UNGAR:  That was not a speaking
19 objection, Counsel.
20 BY MR. TEPFER:
21   Q.  If you could answer.
22   A.  I believe, to my knowledge, what Igor is
23 speaking about is the fact we were both offended
24 that two ladies sued us, that we have no idea why.
25   Q.  In your conversation with Mr. Latsanovski

---

112

1  when you were in Israel, did he express these same
2  concerns on the phone?
3        MR. UNGAR:  Objection as to the form of the
4  question. It's vague and ambiguous.
5        THE WITNESS:  I don't recall.
6  BY MR. TEPFER:
7    Q.  At any time did Mr. Latsanovski express
8  concerns to you about testimony in court from
9  employees?
10       MR. UNGAR:  Objection as to the form of the
11 question.
12       THE WITNESS:  No.
13       MR. UNGAR:  It's vague and ambiguous.
14 BY MR. TEPFER:
15   Q.  I'm sorry. You can --
16   A.  No.
17   Q.  Did BunZai Media Group have a call center?
18   A.  Yes.
19   Q.  Later on Mr. Latsanovski states, "And we are
20 in quiet mode to create new products".
21       Do you recall what new products you and Igor
22 were considering at this point in time?
23   A.  No.
24   Q.  Do you have any understanding of what
25 Mr. Latsanovski meant by "quiet mode"?

---

28 (Pages 109 to 112)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

089

Nottea

FTC v. Bunzai Media Group, LLC, et al.                    2/18/2016

---

121

1    industry and articles that I've read, then yes.
2    Q.  Later on in the email, in the paragraph
3    after Number 4 Ms. Gaines states, "I have to protect
4    UMS based on the nature and the risk of the business
5    in front of us, the current nature of the industry
6    and the regulatory scrutiny and the current
7    chargeback/return ratios.  One of your accounts is
8    already on the Excessive Chargeback Program."
9        Do you know which Excessive Chargeback
10   Program Mrs. Gaines is referring to?
11   A.  Not exactly.
12   Q.  Are you aware of any of your -- or rather,
13   of BunZai Media Group's accounts being on an
14   Excessive Chargeback Program?
15   A.  To begin with, I don't know if it was a
16   BunZai Media Group account, but as far as what we're
17   talking about, when a merchant account is no longer
18   being used, then there are no longer transactions to
19   that merchant account.  The only thing left for that
20   merchant account to occur is either a refund or some
21   customer who complained on it, which means if a
22   merchant account is not in use, there is no
23   transactions that are coming in on it.  So there was
24   an account that we stopped use, and it became
25   Excessive Chargeback Program because there were no

---

122

1    new transactions.
2    Q.  Do you recall what account that is, that
3    you're referring to?
4    A.  No idea.
5    Q.  Do you believe it was a BunZai Media Group
6    account?
7    A.  No.
8    Q.  Do you believe it was one of the other
9    AuraVie companies?
10   A.  Potentially.
11   Q.  Was it a Media Urge company?
12   A.  No.
13   Q.  Or rather, was it Media Urge?
14   A.  No.
15   Q.  Do you recall any other emails from merchant
16   processors expressing their concern regarding any of
17   the AuraVie companies chargeback return ratios?
18   A.  Not off the top of my head.  I dealt with
19   many merchant processing.  Could be.
20   Q.  Subsequent to receiving this email, did you,
21   I guess, investigate or take investigative -- sorry.
22   Let me start over.
23        After receiving this email, did you
24   investigate the chargeback return ratio for any of
25   the AuraVie companies?

---

123

1    A.  Of course.
2    Q.  Do you recall what steps you took to look
3    into this?
4    A.  I took many steps.
5    Q.  Could you describe some of those?
6    A.  A deeper understanding of what's happening,
7    an understanding of -- you know, learning about
8    consumer disputes, understanding what the reason
9    codes are, what can we do to satisfy these
10   consumers?  Why are consumers complaining?  Why are
11   they not calling back the company to get a refund?
12   Somebody is calling the bank before they call me.
13   They're concerned.  Call me.  I'm happy to find
14   resolution.
15   Q.  As a result of this email, did you consider
16   making changes to the --
17   A.  All the time.  Excuse me.  Let you finish.
18   Q.  Sure.  And I was just going to say the
19   AuraVie risk free trial advertisements.
20        MR. UNGAR:  Objection as to the form of the
21   question.  It's vague and ambiguous.
22        THE WITNESS:  All days are moving, changing,
23   and optimizing, learning.  So yes, of course.
24   BY MR. TEPFER:
25   Q.  I guess to investigate these chargeback

---

124

1    return ratios, would you ever review the customer
2    complaints that were sent to the AuraVie companies?
3    A.  Can you be more specific?
4    Q.  Did you ever personally read any of the
5    complaints that were sent to --
6    A.  I did.
7    Q.  -- the AuraVie companies?
8    A.  I did.
9    Q.  Were there any, I suppose, common complaints
10   that you felt were reoccurring in these complaints?
11   A.  Not necessarily.
12   Q.  Did you ever read complaints where consumers
13   expressed complaints that they were unaware of the
14   $97.88 charge that was applied to their account, I
15   guess, after 10 days?
16        MR. UNGAR:  Objection as to the form of the
17   question.  It's vague and ambiguous, it assumes
18   facts not in evidence.
19        THE WITNESS:  No, not exactly.  No
20   particular document like that, that I recall.
21   BY MR. TEPFER:
22   Q.  Do you recall how often you would review
23   consumer complaints?
24   A.  Very rarely.
25   Q.  To go back to your statement about the four

---

31 (Pages 121 to 124)

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

129

```
1    number --
2       A.  Okay.  Yes, sir.
3       Q.  Did you draft either of those two sections
4    that are attributed to you?
5       MR. UNGAR:  Objection as to the form of the
6    question.  It's vague and ambiguous.
7       THE WITNESS:  No.
8    BY MR. TEPFER:
9       Q.  Do you know if anyone, aside from
10   Khristopher Bond, assisted in drafting this
11   document?
12      A.  Khristopher asked some, asked me some
13   questions some industry terms --
14      Q.  Uh-huh.
15      A.  -- and I gave him some stuff, and we're
16   sitting in a very close office environment, and I
17   remember the times, it took a couple of months, he
18   took a couple of months while getting paid to work
19   on this document.  So some of the stuff that he has
20   here I may have told him, but he sat and wrote this
21   whole thing on his own.
22      Q.  And you said while Mr. Bond was getting
23   paid.  Were you paying Mr. Bond at that time?
24      A.  The -- you know, it wasn't me.  No, I wasn't
25   paying him.
```

130

```
1       Q.  Do you recall if Mr. Bond consulted with
2    Nastassia Yalley concerning the drafting of this
3    document?
4       A.  I believe he did.
5       Q.  Do you recall if Mr. Bond consulted with
6    your brother Doron concerning the drafting of this
7    document?
8       A.  I don't think so.
9       Q.  Do you -- do you recall if he consulted with
10   Paul Medina concerning the drafting of this
11   document?
12      A.  I don't think so.
13      Q.  Did BunZai Media Group check its affiliates
14   or affiliate marketers for advertisements that you
15   believe were misleading?
16      MR. UNGAR:  Objection as to the form of the
17   question.  It's vague and ambiguous.
18      THE WITNESS:  Can you repeat that for me,
19   please.  I forgot the question.
20      (The previous question was read back
21      by the court reporter as follows:
22      "QUESTION:  Did BunZai Media
23      Group check its affiliates or
24      affiliate marketers for
25      advertisements that you believe were
```

131

```
1    misleading?")
2       THE WITNESS:  Yes.
3    BY MR. TEPFER:
4       Q.  What sort of steps, or rather, did BunZai
5    Media Group have a standard operating procedure for
6    this sort of affiliate policing?
7       A.  It's something that was -- again, it was an
8    on moving target, always consistently changing.  By
9    default there were some parameters that we would
10   give to an affiliate network about the do's and
11   don't's.  Don't incentivize traffic.  Don't give
12   away free stuff.  Don't tell people if they fill
13   some form out.  So there was always some
14   instructions in the insertion orders, in the
15   agreement between the advertiser and the publisher
16   or the network about restrictions, about what not to
17   do.  So yes.
18      Q.  Who, if you know, at BunZai Media Group was
19   tasked with overseeing this affiliate policing?
20      A.  Well, myself, Nastassia, Paul.
21      Q.  Did, in your opinion, BunZai Media Group
22   have an issue with un-compliant affiliates?
23      MR. UNGAR:  Objection as to the form of the
24   question.  Calls for an opinion.
25      THE WITNESS:  There were affiliates that we
```

132

```
1    stopped, that we terminated.  Yes.
2    BY MR. TEPFER:
3       Q.  On what grounds did you terminate your
4    relationship with these affiliates?  What sort of --
5    sorry.
6       To rephrase, can you describe the
7    advertisements of these affiliates that you found to
8    be -- you found would require you to terminate your
9    relationship with them?
10      A.  I don't recall the particulars right now, as
11   far as, you know, what they have, to give you an
12   example.  Can I recall what particular things we
13   terminated?
14      Q.  Well, perhaps a better question:
15      How would you learn about un-compliant
16   affiliates?
17      MR. UNGAR:  Objection as to the form of the
18   question.  It's vague and ambiguous regarding the
19   word "noncompliant" or "un-compliant."
20      THE WITNESS:  Again, I'm not speaking as to
21   the word un-compliant because I don't know what
22   noncompliant, un-compliant means.  I'm speaking of
23   problems, per se.
24   BY MR. TEPFER:
25      Q.  Right.  Sure.
```

33 (Pages 129 to 132)

091

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

---

161

1      A. Investors? No.
2      Q. In the second sentence you state that you
3 called Jose on Friday regarding setting up a
4 merchant processing relationship.
5      Do you remember that phone call?
6      A. No recollection of it. It's five years ago.
7 I don't know who Jose is. I may have called some
8 guy. You know, I did a lot of business in few
9 years. No.
10      Q. Did Mr. Latsanovski ever, to your knowledge,
11 provide you any introductions to individuals at
12 merchant processing companies?
13      A. I asked -- I asked him if he can introduce
14 me to a few people. I remember during the course of
15 a few years together he may have introduced me to a
16 few people in the business.
17      Q. And did Mr. Latsanovski have a lot of
18 connections in the merchant processing industry?
19      A. No.
20      MR. UNGAR: Objection to the form of the
21 question. It's vague and ambiguous, it calls for
22 speculation, lacks foundation.
23 BY MR. TEPFER:
24      Q. In -- later on you state "In every
25 department of our business, from Product

---

162

1 Development, Manufacturing, Design & Optimization,
2 Media Planning & Buying, Merchant Processing,
3 Understanding Online Compliance, Affiliate
4 Management & Fraud Prevention, to 'True, In-house'
5 Customer Service, Call Center Management & Product
6 Fulfillment."
7      Are those an accurate description of BunZai
8 Media Group's various departments?
9      A. It's -- no.
10      Q. Are there --
11      A. It's not department.
12      Q. Are there any of the, I guess, the
13 departments described there that were departments at
14 BunZai Media Group?
15      A. No, no. There was a Design Department.
16      Q. Later on you state that "We understand
17 consumer/publisher fraud and are extremely proactive
18 with chargeback resolution."
19      What did you mean by the phrase "extremely
20 proactive with chargeback resolution"?
21      A. Just what it means.
22      Q. As in that -- how do you -- how do you mean
23 "proactive"?
24      A. How do I mean "proactive"?
25      Q. Well --

---

163

1      A. By -- by finding possible, the quickest way
2 to minimize damages and finding resolution with the
3 customer.
4      Q. And what is --
5      So chargeback resolution, does that phrase
6 include contesting chargebacks successfully?
7      MR. UNGAR: Objection as to the form of the
8 question. It's vague and ambiguous.
9      THE WITNESS: No.
10 BY MR. TEPFER:
11      Q. Are you familiar with BunZai Media Group's
12 chargeback resolution processes?
13      A. Not in detail.
14      Q. Who at the company would be tasked with
15 chargeback resolution or managing that department?
16      A. In the beginning Khristopher took a couple
17 of months to call a bunch of companies to get a
18 deeper understanding of what needs to happen in
19 order to comply and supply and respond back to
20 chargebacks. And he called a few banks and called a
21 few merchant processors and did some research and
22 created a protocol. So the Regional Department was
23 actually maintained and created by Khristopher, and
24 then I think he handed it down to a few of the
25 employees.

---

164

1      Q. Did BunZai Media Group have a merchant
2 account with National -- National Merchant at any
3 point?
4      A. National Merchant?
5      Q. Yes.
6      A. National Merchant? National Merchant, no,
7 I'm not familiar with that name.
8      Q. Okay. Do you know anyone by the name of
9 Roman Balanko?
10      A. Yes.
11      Q. Who is he?
12      A. He's a merchant processor.
13      (Plaintiff's Exhibit 58 was
14      previously marked for identification
15      by the FTC and is attached hereto.)
16 BY MR. TEPFER:
17      Q. I'm now handing the witness what's been
18 marked Exhibit 58.
19      Do you recall receiving this email from
20 Mr. Latsanovski?
21      A. No.
22      Q. To your recollection, did you ever have any
23 conversations with Mr. Latsanovski regarding Visa
24 and MasterCard Excessive Chargeback Program?
25      A. No. This is an email that he forwarded me.

---

41 (Pages 161 to 164)

092

# EXHIBIT

## "D"

# In the Matter of:

# FTC v. Bunzai Media Group, Inc., et al.

*January 20, 2016*
*Doron Nottea*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                          1/20/2016

---

**Page 1**

```
 1                  UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   FEDERAL TRADE COMMISSION  )
                               )
 5           Plaintiff         )
                               )
 6       v.                    )  No. CV 15-4527-GW(PLAx)
                               )
 7   BUNZAI MEDIA GROUP, INC., )
     et al.,                   )
 8                             )
             Defendants.       )
 9   _____)
10
11
12
13            Wednesday, January 20, 2016
14
15            10877 Wilshire Boulevard
              Suite 700
16            Los Angeles, California
17
18
19
20        The above-entitled matter came on for
21   deposition, pursuant to Notice, at 10:04 a.m.
22
23
24
25
```

**Page 2**

```
 1                  UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   FEDERAL TRADE COMMISSION  )
                               )
 5           Plaintiff         )
                               )
 6       v.                    )  No. CV 15-4527-GW(PLAx)
                               )
 7   BUNZAI MEDIA GROUP, INC., )
     et al.,                   )
 8                             )
             Defendants.       )
 9   _____)
10
11
12
13
14
15        DEPOSITION OF DORON NOTTEA, taken on
16   behalf of the Federal Trade Commission, at
17   10877 Wilshire Boulevard, Suite 700, Los Angeles,
18   California, commencing at 10:04 a.m., and concluding
19   at 6:15 p.m., on Wednesday, January 20, 2016,
20   pursuant to Notice, before CHRISTINA KIM-CAMPOS,
21   CSR No. 12598, a Certified Shorthand Reporter, in
22   and for the State of California.
23
24                    ***
25
```

**Page 3**

```
 1   A P P E A R A N C E S
 2
 3   For the Federal    U.S. FEDERAL TRADE COMMISSION
     Trade Commission:  REID TEPFER, ESQ.
 4                      1999 Bryan Street
                        Suite 2150
 5                      Dallas, Texas  75201-6808
                        (214) 979-9383
 6                      rtepfer@ftc.gov
 7                      U.S. FEDERAL TRADE COMMISSION
                        LUIS H. GALLEGOS, ESQ.
 8                      1999 Bryan Street
                        Suite 2150
 9                      Dallas, Texas  76201-6808
                        (214) 979-9383
10                      lgallegos@ftc.gov
11   For the Witness:   ESENSTEN LAW
                        ROBERT L. ESENSTEN, ESQ.
12                      12100 Wilshire Boulevard
                        Suite 1660
13                      Los Angeles, California  90025
                        (310) 273-3090
14                      resensten@esenstenlaw.com
15   For the            CROSSWIND
     Defendants         ROBERT M. UNGAR, ESQ.
16   Alon Nottea and    2130 North Beverly Glen Blvd.
17   Roi Reuveni:       Los Angeles, California  90077
                        (818) 646-4750
18                      rmu@crosswindlaw.com
19
20   Also Present:   Alon Nottea
21
22
23
24
25
```

**Page 4**

```
 1                       I N D E X
 2
 3   WITNESS              EXAMINATION           PAGE
 4   Doron Nottea        By Mr. Tepfer            6
 5   Afternoon Session                          107
 6
 7   DEPOSITION EXHIBITS               INITIAL REFERENCE
 8   Nottea Deposition Exhibit No.  26          28
 9   Nottea Deposition Exhibit No.  46          39
10   Nottea Deposition Exhibit No.  49          55
11   Nottea Deposition Exhibit No.  43          70
12   Nottea Deposition Exhibit No.  29          83
13   Nottea Deposition Exhibit No.  45          89
14   Nottea Deposition Exhibit No.  41         108
15   Nottea Deposition Exhibit No.  44         114
16   Nottea Deposition Exhibit No.  21         115
17   Nottea Deposition Exhibit No.  30         118
18   Nottea Deposition Exhibit No.  47         121
19   Nottea Deposition Exhibit No.  37         123
20   Nottea Deposition Exhibit No.  35         129
21   Nottea Deposition Exhibit No.  32         132
22   Nottea Deposition Exhibit No.  51         134
23   Nottea Deposition Exhibit No.  53         136
24   Nottea Deposition Exhibit No.  54         144
25
```

1 (Pages 1 to 4)

094

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                                1/20/2016

---

**29**

1   What's the rule, citation?
2         MR. GALLEGOS:  Well, Mr. Esensten represents
3   Mr. Nottea.  We were expecting him to be here.  In
4   other words, as a matter of courteousness, it would
5   have been nice to know if you were coming, so we
6   would know whether to make copies.
7         MR. UNGAR:  So you have no authority for
8   what you've just stated; is that right?
9         MR. GALLEGOS:  Once again --
10        MR. ESENSTEN:  Maybe it would be easier, why
11  don't we just copy it right now.
12        MR. UNGAR:  I'd like a copy.
13        MR. ESENSTEN:  Why don't we just copy one
14  right now, and this will save some time.
15        MR. TEPFER:  Can we go off the record real
16  quick?
17        (A discussion was held off the record.)
18        (Mr. Gallegos leaves the room.)
19        (Recess)
20        MR. TEPFER:  Back on the record.
21  BY MR. TEPFER:
22        Q.  Mr. Nottea, do you recognize this document?
23        A.  No.
24        Q.  Have you ever spoken with anyone about
25  BunZai Media Group's business plan before?

---

**30**

1         A.  Never.
2         Q.  Do you know who Khristopher Bond is?
3         A.  Yes.
4         Q.  Who is he?
5         A.  He's Alon's ex-partner.
6         Q.  And he was his ex-partner in what business?
7         A.  In BunZai.
8         MR. ESENSTEN:  Can I ask a favor of you
9   guys?  There's some pictures of some women in this
10  thing.  Can you guys depose them, please?
11        MR. GALLEGOS:  I assume that's off the
12  record there, Bob?
13        MR. ESENSTEN:  No.  It's a reasonable
14  request.  I think that would be a fun deposition.
15  BY MR. TEPFER:
16        Q.  Do you know what period Khristopher Bond was
17  your brother Alon's business partner?
18        A.  I think probably in maybe 2010 to 2013.
19        MR. ESENSTEN:  Is that your best estimate?
20        THE WITNESS:  Best estimate.
21        MR. ESENSTEN:  Okay.  When you have best
22  estimates like that, just tell him "My best estimate
23  is".
24        THE WITNESS:  Okay.
25  ///

---

**31**

2         Q.  And do you know if your brother had any
3   other business partners in BunZai Media Group?
4         A.  Partners, no.  No.
5         Q.  Do you know if BunZai Media Group had any
6   other investors?
7         A.  Yes.
8         Q.  Who were they?
9         A.  From what I know, it's Igor Latsanovski.
10        Q.  And were there any other investors, aside
11  from Igor Latsanovski?
12        A.  Not that I know of.
13        Q.  If you would, please turn to page 22 of
14  Plaintiff's Exhibit 26.
15        MR. UNGAR:  Could you give the Bates number,
16  please?
17        MR. TEPFER:  Sure.  It ends in 576.
18        MR. UNGAR:  576.
19  BY MR. TEPFER:
20        Q.  Are you on that page?
21        A.  Yes.
22        Q.  Could you read there on the bottom, there's
23  a highlighted position beginning "Doron"?
24        A.  It says, "Doron (CFO/Controller):  For every
25  customer that successfully passes through the Day 15

---

**32**

1   transitional billing stage, the company will make a
2   gross profit of $40 per order, if they were to
3   cancel after this stage (Day 1:  9.95 plus 7.95
4   shipping and handling equals $17.90, plus day 15:
5   80 equals $97.90 minus 18 COG slash S and H, minus
6   40 CPA equals 39.90)."
7   BY MR. TEPFER:
8         Q.  Did you write --
9         A.  No.
10        Q.  -- this passage?
11        Did anyone ask your permission to write --
12        MR. ESENSTEN:  Wait.  He answered before you
13  finished the question.  Can we make sure we have the
14  question and the answer?
15  BY MR. TEPFER:
16        Q.  Did you write this passage?
17        A.  No.
18        Q.  Do you know who wrote this passage?
19        A.  No.
20        Q.  Did anyone ask your permission to write this
21  passage?
22        A.  No.
23        Q.  Were you ever CFO of BunZai Media Group?
24        A.  No.
25        MR. UNGAR:  Objection as to the form of the

---

8 (Pages 29 to 32)

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                              1/20/2016

**49**

1     Q.  So by bookkeeping, you paid the vendors?
2     A.  Exactly.
3     Q.  Okay.  Did you ever do any bookkeeping for
4 Agoa Holdings, Inc.?
5        MR. UNGAR:  Objection to the form of the
6 question, it's vague and ambiguous.
7        THE WITNESS:  Yes.
8 BY MR. TEPFER:
9     Q.  Do you know -- could you tell me the time
10 period?
11     A.  Again, probably March, April 2013.
12     Q.  And do you know what Agoa Holdings, Inc.'s,
13 business was?
14     A.  Skin care as well.
15     Q.  Do you know what brand of skin care Agoa
16 Holdings sold?
17     A.  I think it's a product called AuraVie.
18     Q.  And do you know who the owner of Agoa
19 Holdings, Inc., was?
20     A.  Yes.
21     Q.  And who was it?
22     A.  Roi Reuveni.
23        MR. ESENSTEN:  Do you need spellings of some
24 of these names?
25        MR. TEPFER:  Oh, can you spell them as we

**50**

1 go?
2        MR. ESENSTEN:  Sure.
3        MR. TEPFER:  And Agoa is A-g-o-a Holdings,
4 Inc.
5 BY MR. TEPFER:
6     Q.  Did you ever do --
7        MR. ESENSTEN:  Wait.  Do you want to spell
8 Roi's name?
9        MR. TEPFER:  I think it's R-o-i
10 R-e-u-v-e-n-i.
11        MR. ALON NOTTEA:  Correct.
12        MR. ESENSTEN:  And you used Igor's name.  Do
13 you know how to spell his last name?  It's --
14        MR. TEPFER:  It's like a spelling bee.  I
15 think it's L-a-t-s-a-n-o-v-s-k-i.
16 BY MR. TEPFER:
17     Q.  Mr. Nottea, did you ever do bookkeeping for
18 Zen Mobile Media, Inc.?
19     A.  Yes.
20     Q.  And from what time period?
21     A.  About the same.  April 2013 and on.
22     Q.  And do you know what that company's business
23 was?
24     A.  Skin care as well.
25     Q.  And do you know which brand of product it

**51**

1 sold?
2     A.  AuraVie.
3     Q.  Do you know how Zen Mobile Media sold
4 AuraVie?
5        MR. UNGAR:  Objection as to the form of the
6 question, vague and ambiguous.
7        THE WITNESS:  I know it was done -- from
8 what I know, it was done online.
9 BY MR. TEPFER:
10     Q.  And who hired you to do bookkeeping for Zen
11 Mobile Media, Inc.?
12     A.  Igor Latsanovski.
13     Q.  And so Igor was the owner of Zen Mobile
14 Media, Inc.?
15     A.  Yes.
16     Q.  And did you ever do bookkeeping for
17 Safehaven Ventures, Inc?
18        MR. UNGAR:  Objection as to the form of the
19 question, it's vague and ambiguous.
20        THE WITNESS:  Safehaven, yes.
21 BY MR. TEPFER:
22     Q.  What period of time did you do bookkeeping
23 for Safehaven Ventures, Inc.?
24     A.  Same time.  April 2013.
25     Q.  Do you know what Safehaven Ventures, Inc.'s,

**52**

1 business was?
2     A.  Skin care.
3     Q.  And do you know which product it sold?
4     A.  AuraVie.
5        MR. GALLEGOS:  I had a hard time
6 understanding what your saying, if it's 2013
7 or 2015.
8        THE WITNESS:  2013.
9        MR. GALLEGOS:  '13.  Sorry.
10        THE WITNESS:  No problem.
11 BY MR. TEPFER:
12     Q.  And did you ever do bookkeeping for Heritage
13 Alliance Group, Inc.?
14     A.  Yes.
15     Q.  And who hired you to do bookkeeping for
16 Heritage Alliance Group?
17     A.  The guy's name is Tal Topel.  T-o-p-e-l.
18     Q.  And when did he hire you to do this?
19     A.  I don't exactly know the dates.  I mean, I
20 think that -- I think it might be also in the same
21 time that Nastassia -- I can't recall the exact
22 date.
23     Q.  And do you know what Heritage Alliance
24 Group's business was?
25     A.  Skin care as well.

13 (Pages 49 to 52)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

096

Case 2:15-cv-04527-GW-PLA   Document 397-21   Filed 05/02/16   Page 107 of 107   Page ID
#:10749
Case 2:15-cv-04527-GW-PLA   Document 355-4   Filed 04/18/16   Page 6 of 6   Page ID #:8777

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                              1/20/2016

|  | 53 |
|---|---|
| 1 | Q.  And do you know which brand of skin care it |
| 2 | sold? |
| 3 | A.  AuraVie. |
| 4 | Q.  Sorry. |
| 5 | To go back to Safehaven Ventures, do you |
| 6 | know what Safehaven Ventures' business was? |
| 7 | A.  Skin care.  AuraVie as well. |
| 8 | Q.  And thank you. |
| 9 | I'm going to ask about SBM Management, Inc. |
| 10 | Did you ever do management for SBM Management? |
| 11 | A.  Yes. |
| 12 | MR. UNGAR:  Objection as to the form of the |
| 13 | question, vague and ambiguous. |
| 14 | THE WITNESS:  Yes. |
| 15 | BY MR. TEPFER: |
| 16 | Q.  Do you know who owned SBM Management, Inc.? |
| 17 | A.  Yes. |
| 18 | Q.  Who was that? |
| 19 | A.  Stephan Bauer. |
| 20 | Q.  And is he the one that hired you? |
| 21 | A.  Yes. |
| 22 | Q.  And what period of time did you do |
| 23 | bookkeeping for them? |
| 24 | A.  I guess from the same time.  April 2013 to |
| 25 | present. |

|  | 54 |
|---|---|
| 1 | Q.  And what was SBM Management's business, if |
| 2 | you know? |
| 3 | A.  It was a management company that paid bills |
| 4 | on behalf of the other corporations. |
| 5 | Q.  Do you recall any of the corporations that |
| 6 | SBM Management paid bills for? |
| 7 | A.  I believe Agoa, Agoa Holdings, Lifestyle, |
| 8 | the companies who I mentioned before, and Heritage, |
| 9 | and I think DMA, a few more.  I don't remember the |
| 10 | exact names, but some of the ones that you mentioned |
| 11 | before. |
| 12 | Q.  Did you ever do bookkeeping for Media Urge, |
| 13 | Inc.? |
| 14 | A.  No. |
| 15 | Q.  Did you ever do bookkeeping for Adageo, LLC? |
| 16 | A.  No. |
| 17 | Q.  Did you ever do bookkeeping for CalEnergy, |
| 18 | Inc.? |
| 19 | A.  No. |
| 20 | Q.  And on SBM Management, when you say that you |
| 21 | paid bills on their behalf, what do you mean by |
| 22 | that? |
| 23 | A.  They gave me bills, told me to pay it from |
| 24 | certain companies, and that's what I did. |
| 25 | Q.  Okay.  And when you say "they," are you |

|  | 55 |
|---|---|
| 1 | referring to? |
| 2 | A.  Stephan. |
| 3 | Q.  Okay. |
| 4 | (Plaintiff's Exhibit 49 was marked |
| 5 | for identification by the court |
| 6 | reporter and is attached hereto.) |
| 7 | MR. TEPFER:  I'm handing the witness what's |
| 8 | been previously been marked as Plaintiff's |
| 9 | Exhibit 49. |
| 10 | MR. UNGAR:  Thank you. |
| 11 | BY MR. TEPFER: |
| 12 | Q.  Do you recognize this document? |
| 13 | A.  Sure. |
| 14 | Q.  What do you recognize it from? |
| 15 | A.  I think it's checks that were in my office. |
| 16 | Q.  And they're checks from CalEnergy, Inc.; |
| 17 | correct? |
| 18 | A.  Right. |
| 19 | Q.  And do you recognize the signature on them? |
| 20 | A.  Yes. |
| 21 | Q.  Whose signature is that? |
| 22 | A.  Igor. |
| 23 | Q.  Did you put these checks in your office? |
| 24 | A.  No.  He did. |
| 25 | Q.  Do you know why he put these checks in your |

|  | 56 |
|---|---|
| 1 | office? |
| 2 | A.  Because a lot of the time he was traveling, |
| 3 | and he had bills to pay, so he -- he told me, for |
| 4 | instance, "I want to tell you to pay a bill, and |
| 5 | that's the certain date.  Take a check, send him a |
| 6 | check." |
| 7 | I just helped him with, you know, actually |
| 8 | filling out the check because he doesn't know |
| 9 | English, and mailing them. |
| 10 | Q.  And so you would pay bills, on occasion, for |
| 11 | CalEnergy Inc.? |
| 12 | A.  Yes. |
| 13 | Q.  But you did not do bookkeeping for them? |
| 14 | A.  No. |
| 15 | MR. ESENSTEN:  Again, we have a double |
| 16 | negative. |
| 17 | Did you do bookkeeping for them? |
| 18 | THE WITNESS:  No. |
| 19 | MR. ESENSTEN:  Okay. |
| 20 | BY MR. TEPFER: |
| 21 | Q.  Did you ever do bookkeeping for Kai Media, |
| 22 | Inc.? |
| 23 | A.  Yes. |
| 24 | MR. ESENSTEN:  Can you spell that for the |
| 25 | reporter, please. |

14 (Pages 53 to 56)