ROBERT L. ESENSTEN (SBN 65728)
resensten@esenstenlaw.com
RANDI R. GEFFNER (SBN 116574)
rgeffner@esenstenlaw.com
**ESENSTEN LAW**
12100 Wilshire Boulevard, Suite 1660
Los Angeles, California 90025
Telephone: (310) 273-3090
Facsimile: (310) 207-5969

Attorneys for Defendants DORON NOTTEA
and MOTTI NOTTEA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BUNZAI MEDIA GROUP, INC., *et al.*, <br><br> Defendants. | Case No.: 2:15-CV-04527-GW (PLAx) <br><br> *Assigned to the Honorable George Wu, Courtroom 10* <br><br> **DEFENDANT DORON NOTTEA'S OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** <br><br> **Date: May 23, 2016** <br> **Time: 8:30 a.m.** <br> **Courtroom: 10** |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   LEGAL STANDARD ........................................................................... 3

III.  THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT
      AGAINST DORON ............................................................................. 4

      A.   THE FTC FAILS TO SUBMIT ADMISSIBLE EVIDENCE TO SUPPORT
           ITS ALLEGATIONS. .................................................................... 6

           1.   That Doron Performed Bookkeeping Responsibilities Does
                Not Implicate Any Wrongdoing. ....................................... 6

           2.   Doron Did Not Assert Control Over Bank Accounts. ...... 7

           3.   Doron Did Not Manage Employees Beyond Those Engaged
                in Financial Matters Unrelated to the Alleged Unlawful
                Conduct. ............................................................................. 10

           4.   The FTC Fails to Produce Any Admissible Evidence That
                Doron Held Himself Out as an Owner. ........................... 11

           5.   Doron Did Not Determine Whether Any Corporate
                Defendants Should Cease Operations. ............................ 13

      B.   NONE OF THE FTC'S ALLEGATIONS AGAINST DORON IMPLICATE
           DORON'S PARTICIPATION IN, OR CONTROL OVER, ANY OF THE
           ALLEGED UNLAWFUL CONDUCT. ............................................. 14

      C.   THE FTC FAILS TO SATISFY ITS BURDEN OF ESTABLISHING THAT
           DORON HAD KNOWLEDGE OF THE UNLAWFUL CONDUCT. ...... 18

      D.   NO CONSTRUCTIVE KNOWLEDGE CAN BE INFERRED FROM
           DORON'S PARTICIPATION WITH SECURED COMMERCE. .......... 23

IV.   CONCLUSION ................................................................................. 26

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

<u>Addisu v. Fred Meyer, Inc.</u>,
   198 F.3d 1130 (9th Cir. 2000) ............................................................... 4

<u>Brodt v. Bache & Co.</u>,
   595 F.2d 459 (9th Cir. 1978) ......................................................... 24, 25

<u>C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.</u>,
   213 F.3d 474 (9th Cir. 2000) ................................................................. 4

<u>Carmen v. San Francisco Unified Sch. Dist.</u>,
   237 F.3d 1026 (9th Cir. 2001) ............................................................. 13

<u>Celotex Corp. v. Catrett</u>,
   477 U.S. 317 (1986) .............................................................................. 3

<u>Coan v. Bell Atl. Sys. Leasing Int'l, Inc.</u>,
   813 F. Supp. 929 (D. Conn. 1990) ...................................................... 25

<u>Copeland v. Hill</u>,
   680 F. Supp. 466 (D. Mass. 1988)....................................................... 25

<u>Cristobal v. Siegel</u>,
   26 F.3d 1488 (9th Cir. 1994) ................................................................. 9

<u>F.T.C. v. 1st Guar. Mortgage Corp.</u>,
   2011 WL 1233207 (S.D. Fla. Mar. 30, 2011),
   <u>aff'd sub nom.</u> <u>F.T.C. v. Lalonde</u>, 545 F. App'x 825 (11th Cir. 2013) .... 18

<u>F.T.C. v. Data Med. Capital, Inc.</u>,
   2010 WL 1049977 (C.D. Cal. Jan. 15, 2010)........................................ 8

<u>F.T.C. v. J.K. Publications, Inc.</u>,
   99 F. Supp. 2d 1176 (C.D. Cal. 2000) ................................................. 18

<u>F.T.C. v. Network Servs. Depot, Inc.</u>,
   617 F.3d 1127 (9th Cir. 2010) ............................................................. 24

<u>F.T.C. v. PayDay Fin. LLC</u>,
   989 F. Supp. 2d 799 (D.S.D. 2013) ..................................................... 24

<u>F.T.C. v. Publ'g Clearing House, Inc.</u>,
   104 F.3d 1168 (9th Cir. 1997) ..................................................... 5, 14, 18

<u>F.T.C. v. Ross</u>,
   2012 WL 2126533 (D. Md. June 11, 2012) .................................... 10, 19

<u>F.T.C. v. Swish Mktg.</u>,
   2010 WL 653486 (N.D. Cal. Feb. 22, 2010).................................... 14, 15

In re Cross Media Mktg. Corp. Sec. Litig.,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004) ........................................................... 20

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ............................................................................................ 4

Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.,
    553 F.2d 620 (9th Cir. 1977) ............................................................................. 3

Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,
    210 F.3d 1099 (9th Cir. 2000) ........................................................................... 4

Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.,
    752 F.3d 807 (9th Cir. 2014) ............................................................................. 4

S. Cal. Gas Co. v. City of Santa Ana,
    336 F.3d 885 (9th Cir. 2003) ............................................................................. 4

S.E.C. v. Eurobond Exch., Ltd.,
    13 F.3d 1334 (9th Cir. 1994) ........................................................................... 24

Soremekun v. Thrifty Payless, Inc.,
    509 F.3d 978 (9th Cir. 2007) ............................................................................. 4

United States v. Bldg. Inspector of Am., Inc.,
    894 F. Supp. 507 (D. Mass. 1995) ............................................................ 14, 15

Wichansky v. Zowine,
    2015 WL 8528396 (D. Ariz. Dec. 11, 2015) .................................................. 8

## Rules

Fed. R. Civ. P. 56 .......................................................................................................... 3

Fed. R. Evid. 901 ........................................................................................................ 21

## I.    INTRODUCTION

This action, filed by the Federal Trade Commission ("FTC") against a litany of corporate and individual defendants, concerns the selling of products over the Internet. The FTC bases this action on two specific types of allegedly unlawful conduct: (1) misleading statements about a free trial; and (2) unauthorized consumer credit card transactions.  Defendant Doron Nottea ("Doron") cannot be held individually liable for such conduct.

The FTC bases its case against Doron purely on a "guilt-by-association" theory, hoping to capitalize on the simple fact that Doron shares the same last name with his brother, the main individual defendant, Alon Nottea ("Alon").  Unfortunately for the FTC, the Federal Trade Commission Act ("FTCA") does not confer liability for having a certain last name or for associating with certain individuals.  Rather, liability under the FTCA requires overt action on the part of the individual defendant.

In order to hold Doron individually liable for injunctive and restitutionary relief, the FTC must prove, among other things: (1) that Doron directly participated in or asserted direct control over the allegedly unlawful conduct; <u>and</u> (2) Doron had knowledge of the allegedly unlawful conduct.  In its Motion for Summary Judgment ("MSJ"), the FTC falls well short of its burden of proving both elements.

The evidence is overwhelming that Doron did not and could not manage, control, operate or direct the activities of any Defendant, Corporate or Individual. Instead, Doron's responsibilities were limited to bookkeeping for some, but not all, of the Corporate Defendants.  In an effort to greatly exaggerate Doron's role, the FTC is relegated to making untenable arguments unsupported by the evidence.  The FTC's arguments range from <u>omissions</u> (*e.g.* arguing that Doron "managed" employees, but omitting that the same testimony the FTC relies upon specifically states that Doron's management was limited only to financial matters), to the <u>absurd</u> (*e.g.* arguing that Doron being cc'd on an email informing him and others of a corporate decision someone else had already made amounts to retroactive direct participation in the

making of the decision), to outright <u>false statements</u> (*e.g.* arguing Doron participated in negotiations with payment processors, arguing Doron was responsible for wire transfers, arguing Doron determined whether to continue or cease operations).  The FTC's baseless arguments against Doron do not end there.  The MSJ is riddled with untenable arguments based upon either non-existent evidence or a disingenuous "interpretation" of the evidence.

    None of the FTC's allegations, much less admissible evidence, demonstrate that Doron directly participated in or asserted direct control over the allegedly unlawful activity.  The FTC's allegations with respect to Doron are limited to the following: (a) performing bookkeeping duties; (b) receiving bank account information as part of his bookkeeping responsibilities; (c) supervising employees on financial matters only; (d) holding himself out as an owner (even though it is undisputed that Doron was not an owner); and (e) being told by Alon of Alon's decision to cease operations after Alon made the decision.  There is:

- absolutely no evidence or allegation that Doron drafted or approved the alleged misrepresentations.
- absolutely no evidence or allegation that Doron asserted direct control over those that directly participated in making the alleged misrepresentations.
- absolutely no evidence or allegation that Doron directly participated in processing the consumer credit card transactions.
- absolutely no evidence or allegation that Doron asserted direct control over those that directly participated in processing the consumer credit card transactions.

    The undisputed evidence is that Doron did not engage in such conduct.  Doron's finance-based responsibilities, including billing and calculating revenues and expenses, all came after the allegedly unlawful activity was already committed, after the alleged misrepresentations were made and after the consumer credit cards were processed.

1        The FTC also fails to submit any evidence proving that Doron had actual

2  knowledge that statements on the website were misleading or that the consumer credit

3  cards being processed were not authorized.  Nor can such knowledge be inferred

4  because Doron asserted no control over those aspects of the company.  Unlike Alon,

5  Doron has never been an owner, shareholder, or officer of Bunzai Media Group

6  ("Bunzai") or any of the other Corporate Defendants, other than Secured Commerce,

7  LLC, a company that sold discounted postage and was not part of the alleged common

8  enterprise.  Doron has never signed a document on behalf of any Defendant,

9  Corporate or Individual.  Simply put, Doron's conduct and knowledge is wholly

10  unrelated to the unlawful conduct alleged in this action.

11        Without proof of Doron's participation in or control over the alleged unlawful

12  conduct and Doron's knowledge, he cannot be held liable.  Accordingly, the FTC is

13  not entitled to summary judgment against Doron.

14  **II.    LEGAL STANDARD**

15        Summary judgment may be granted only if movant shows that there is no

16  dispute as to any material fact and the movant is entitled to judgment as a matter of

17  law.  Fed. R. Civ. P. 56(a).  A "material issue," which will prelude the granting of

18  summary judgment, is an issue which may affect the outcome of the litigation and

19  requires a trial to resolve the parties' differing versions of the truth.  <u>Mutual Fund</u>

20  <u>Investors, Inc. v. Putnam Management Co., Inc.</u>, 553 F.2d 620, 624 (9th Cir. 1977).

21        The FTC, as the party seeking summary judgment, "always bears the initial

22  responsibility of informing the district court of the basis for its motion, and identifying

23  those portions of the pleadings, depositions, answers to interrogatories, and

24  admissions on file, together with the affidavits, if any, which it believes demonstrate

25  the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S.

26  317, 323 (1986).  As the FTC bears the burden of proof at trial in this case, the FTC

27  "must come forward with evidence which would entitle it to a directed verdict if the

28  evidence went uncontroverted at trial."  <u>C.A.R. Transp. Brokerage Co. v. Darden</u>

*Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  The FTC must demonstrate with affirmative evidence that no reasonable trier of fact could find other than for the FTC. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The FTC "must establish beyond controversy every essential element" of its claim.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

If the FTC fails to satisfy this heavy burden, Doron, as the nonmoving party, "has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  Only if the moving party carries its burden does the burden shift to nonmoving party.  In such a case, the nonmoving party may defeat summary judgment by establishing that a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

All doubts as to the existence of a material fact are resolved against the moving party and all inferences that may be drawn from the evidence are drawn in the light most favorable to the nonmoving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  In evaluating a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence, and all conflicting inferences must go to the jury, even if the inference is unlikely or unpersuasive. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014).

## III.   THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT AGAINST DORON

The FTC has not met the substantial burden required of it on summary judgment.  The FTC seeks summary judgment against the Corporate Defendants and Individual Defendants on seven Counts:

- Count I is based upon allegedly deceptive omissions by Defendants regarding a risk-free trial offer on a website.  (MSJ 23:6-24:4.)
- Count II alleges false representations about the trial offer that appeared on websites.  (Id. 25:1-27:2.)
- Count III alleges false representations about a Better Business Bureau rating. (Id. 27:3-14.)

- Count IV alleges consumer credit card charges were unauthorized.  (Id. 27:15-31:1.)
- Count V alleges that the negative option violated ROSCA for not making conspicuous disclosures and obtaining consent.  (Id. 31:2-33:3.)
- Count VI alleges that the recurring debit card transactions violated the EFTA.  (Id. 33:4-35:3.)
- Count VII alleges that the Relief Defendant possesses unlawful revenues "generated by deceiving consumers" and is asserted against the Relief Defendant only.  (Id. 34:4-37:5.)

Thus, the FTC's allegations against the Defendants can be broken down into two categories: (1) omissions and false representations on the website (Counts I, II, III, V); and (2) unlawful credit card charges (Counts IV, V, VI).  The FTC's MSJ seeks to hold Doron liable under these Counts as an Individual Defendant for the alleged actions of the Corporate Defendants.

In order to hold an individual defendant liable for injunctive relief for the actions of a corporate defendant, the FTC must prove: (1) that the corporate defendants violated the FTCA[1]; and (2) the individual defendant "participated directly" in the wrongful acts or had direct authority to control the wrongful acts. F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997).  To hold the individual defendant liable for restitution, the FTC, in addition to proving the above two elements, must also prove that the individual defendant had knowledge of the wrongful acts.  Id. at 1171.

Here, the FTC has failed to satisfy its burden on summary judgment in establishing that it is entitled to either injunctive or restitutionary relief from Doron. Doron's involvement in the company was limited to that of a bookkeeper and Doron did not participate in, or assert any control, over the alleged omissions and false

---

[1] The FTC's failure to prove through admissible evidence that the Corporate Defendants violated the FTCA has been addressed by other Defendants and need not be repeated here.  This Opposition will address the reasons that Doron cannot be held individually liable for any unlawful conduct by Corporate Defendants.

representations or the alleged unlawful credit card charges.  The FTC relies almost exclusively on inadmissible and/or non-probative evidence to support its allegations as to Doron's participation and knowledge.  Even if the evidence is admissible and supports the FTC's allegations (it is neither), the FTC's allegations of Doron's involvement are limited to financial duties and do not even suggest, much less prove, that Doron directly participated in, or asserted any control over, the allegedly unlawful activity of which the Corporate Defendants are accused.  The FTC's allegations concerning Doron's knowledge are likewise limited to knowledge of financials and do not implicate Doron had knowledge of the underlying and unrelated allegedly wrongful activity.

Having failed to submit evidence proving Doron's participation in, control over, or knowledge of the alleged omissions and false representations or the unlawful credit card charges, summary judgment cannot be granted in favor of the FTC as to Doron.

### A. THE FTC FAILS TO SUBMIT ADMISSIBLE EVIDENCE TO SUPPORT ITS ALLEGATIONS.

The FTC fails to satisfy its burden on summary judgment because it fails to produce admissible evidence supporting its allegations against Doron.  The FTC's MSJ alleges that Doron engaged in the following: (a) performing bookkeeping duties; (b) controlling and managing Corporate Defendants' banking and merchant accounts; (c) managing employees of Corporate Defendants; (d) holding himself out as an owner; and (e) determining whether to continue or cease operations of various Corporate Defendants.  (MSJ at 13:4-12.)  These allegations are not supported by admissible evidence.

#### 1. That Doron Performed Bookkeeping Responsibilities Does Not Implicate Any Wrongdoing.

Doron does not dispute that he provided bookkeeping services for some, but not all, of the Corporate Defendants.  (Geffner Decl. Ex. C (Doron Depo.) at 14:15-18.) The bookkeeping was done separately for each company.  (Id. 104:1-6.)

1   The mere fact that he was a bookkeeper, however, does not implicate him in

2   any wrongdoing.  All of Doron's alleged conduct as a bookkeeper consists of typical

3   bookkeeping conduct, including overseeing accounts receivable and accounts payable,

4   sending invoices, overseeing payroll, and obtaining corporate information.  (FTC's

5   Statement of Undisputed Facts ("SUF"), Dkt. #353-2, ¶34(h)); Doron Decl. ¶¶ 29-36;

6   Howard Decl. ¶¶ 4-8.)  Doron exerted no control.  He did not decide what bills to pay.

7   (Geffner Decl. Ex. C (Doron Depo.) at 16:21-17:1.)  Doron did not receive any

8   compensation for his bookkeeping responsibilities for Pinnacle.  (Id. 20:14-16.)

9   Therefore, Doron did not engage in any of the two categories of wrongdoing

10  alleged by the FTC in conducting his bookkeeping responsibilities.

## 2.  Doron Did Not Assert Control Over Bank Accounts.

12  For the proposition that Doron "controlled and managed Corporate Defendants'

13  banking and merchant accounts," the FTC's MSJ cites ¶34(f) of the FTC's SUF.

14  (MSJ at 13:6-7.)  Paragraph 34(f), however, does not support this claim.  Rather, it

15  states "Defendant Alon Nottea also kept Doron apprised of day-to-day higher level

16  issues concerning the enterprise."  (SUF ¶34(f).)  The "evidence" cited below this

17  statement does not relate to any conduct where Doron asserts control over a bank

18  account; instead, the cited evidence relates to shipping rates, taxes, audits, call centers,

19  confidentiality agreements with third parties, insurance, and a P.O. Box.  (Id.)

20  Receiving this type of information is within the typical duties of a bookkeeper and,

21  more importantly, does not implicate any of the alleged unlawful conduct.  (Howard

22  Decl. ¶¶ 4-8.)

23  Presumably, the FTC was referring to ¶34(g) claiming that Doron "managed or

24  controlled numerous accounts associated with the common enterprise" (SUF ¶34(g)),

25  but the evidence cited therein does not support the claim either.  The cited "evidence"

26  is limited to: (a) the assertion by the FTC that Doron was responsible for arranging

27  wire transfers; (b) inadmissible hearsay statements from the Receiver's Initial Report

28  that credit cards, deposit slips, copies of employee driver licenses, and checks were

1  allegedly found in an office that the Receiver claimed to be occupied by Doron; (c)

2  inadmissible hearsay testimony from a disgruntled former employee; (d) a guilty-by-

3  association argument concerning evidence indicating that Alon negotiated with

4  payment processors; and (e) emails allegedly implying that Doron possessed

5  spreadsheets and accounts.  (SUF ¶34(g).)

6      The only cited exhibit for the assertion that "Doron was responsible for

7  arranging wire transfers relating to the common enterprise" is Exhibit 497.  (SUF

8  ¶34(g)(iii).)  Exhibit 497 does not support the FTC's bold contention by any stretch of

9  the imagination.  Exhibit 497 is instead an email from Avico Global to Alon

10  containing a document entitled "Auravie Angels – Final Development Schedule &

11  Budget."  (Exhibit 497.)  Doron's name is not mentioned or referenced anywhere in

12  the email or its attachment.  (Id.)  Wire transfers are likewise never referenced.  (Id.)

13  Doron has no involvement with Avico Global and the FTC does not allege that he

14  does.  In fact, the FTC admits Avico Global is Alan Argaman, not Doron.  (SUF

15  ¶39(c).)

16      The statements from the Receiver's Initial Report that certain finance items,

17  such as deposit slips and checks (which are typically within a bookkeeper's

18  possession and duties (Howard Decl. ¶¶ 4-8), were supposedly found in Doron's

19  office, are offered for the truth of the matter and thus constitute inadmissible hearsay.

20  Wichansky v. Zowine, 2015 WL 8528396, at *10 (D. Ariz. Dec. 11, 2015) (receiver

21  report is inadmissible hearsay and precludes summary judgment); F.T.C. v. Data Med.

22  Capital, Inc., 2010 WL 1049977, at *28 (C.D. Cal. Jan. 15, 2010) (Stotler, J.)

23  ("Receiver's Report is hearsay insofar as the Court is asked to make factual findings

24  based on the various conclusions drawn by the Receiver…and [the] objections thereto

25  are sustained").

26      The FTC's reliance on a single nonresponsive statement during the deposition

27  of a disgruntled former employee, Andrew Stanley, that he purportedly saw "Doron's

28  name and Doron's family's name" on the merchant accounts is likewise hearsay and

offered for the truth that his name was on the accounts.  (SUF ¶34(g)(ix); Exhibit 554 at 86:16-87:7.)  Despite having the banking records, the FTC is unable to present any proof corroborating this statement.  This is because all of the evidence proves just the opposite: That Doron's name was not on the bank accounts.

And the FTC admits that it was Alon, not Doron, who was involved in negotiations with payment processors.  (SUF ¶34(g)(x).)  Doron was not even in charge of making payments to the payment processors.  (Geffner Decl. Ex. C (Doron Depo.) at 125:9-13.)  Although the FTC claims that Alon "apprised" Doron of those negotiations (SUF ¶34(g)(x)), the unauthenticated emails, for which the FTC provides absolutely no context whatsoever, simply do not support that bold assertion.  The Ninth Circuit "has consistently held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." Cristobal v. Siegel, 26 F.3d 1488, 1494 (9th Cir. 1994).  In any event, merely being kept "apprised" of negotiations does not rise to participation in such negotiations, much less any illegal activity whatsoever.  Therefore, there is no evidence Doron engaged in communications with payment processors, much less an allegation that any such communications were illegal.

For the proposition that Doron opened, managed, and controlled merchant accounts, the FTC cites various unauthenticated emails.  (SUF ¶34(g)(x).)  The FTC does not authenticate or explain any of these emails nor how they are relevant.  None of the emails even remotely addresses, much less proves, the FTC's proposition.  For example, Exhibit 88 is an email from Nastassia Yalley to Doron concerning activation of an American Express credit card.  (Exhibit 88.)  No context is provided.

If anything, the emails actually disprove the FTC's assertion that Doron opened, managed, and controlled merchant accounts.  Exhibit 467 is an email to Teny Minas that proves that Minas, not Doron, opened the bank accounts and that the bank accounts were in someone else's name, management, and/or control.  (Exhibit 467.) Exhibits 64 and 78 are emails to Doron with bank account information, including a list

of the merchant accounts.  (Exhibits 64, 78.)  If Doron opened, managed, and controlled merchant accounts, as the FTC contends, he would *not* have requested this information from another source within the organization.  On the contrary, he would have *been the source* for this information.  The same holds true for Exhibits 167 and 383, which are emails to Doron (among others) that include normal banking and account information needed for bookkeeping purposes.  Possessing such mundane bookkeeping information is certainly fully within Doron's responsibilities as a bookkeeper, and does not indicate or suggest any wrongful conduct.  (Howard Decl. ¶¶ 4-8.)  The same holds true for Doron's alleged possession of deposit slips, checks, and employee payroll information.  (Id.)

Further, the FTC does not produce any evidence that Doron used any of the banking information in an illegal manner.  In fact, the FTC does not have any evidence that Doron used any of this at all.  See F.T.C. v. Ross, 2012 WL 2126533, at *5 (D. Md. June 11, 2012) (the existence of inferences from evidence that individual defendant was merely an employee and did not control the illegal activity, "at the very least, create[s] genuine issues of material fact that cannot be decided on summary judgment").  Doron testified that he did not assert any control over merchant bank accounts; he merely saw when money came in and out.  (Doron Decl. ¶ 26; Geffner Decl. Ex. C (Doron Depo.) at 23:12-24:19, 125:2-19.)

Therefore, Doron's bookkeeping responsibilities regarding the bank accounts do not implicate him in any way in the allegedly unlawful activities.

### 3. Doron Did Not Manage Employees Beyond Those Engaged in Financial Matters Unrelated to the Alleged Unlawful Conduct.

In support of the proposition that Doron "managed employees" of the alleged common enterprise, the FTC relies upon the mere fact that Doron, a bookkeeper, was kept apprised of salary and payroll information.  (SUF ¶34(e).)  Specifically, the FTC cites the following: (i) Doron's one-time receipt of a salary report; (ii) Doron's receipt of payroll and merchant account information; (iii) a one-time communication with an

accountant regarding "new employee information;" and (iv) one or two "assistants" reported to Doron for financial matters.

It is to be expected that a bookkeeper would be kept apprised of salary, payroll, and bank account information.  This information is vital to a bookkeeper's ability to account for expenses and revenues.  (Howard Decl. ¶¶ 4-8; Geffner Decl. Ex. C (Doron Depo.) at 48:7-16 (testifying that he needed payroll information to inform accountant how much to pay employees).)  But being kept apprised of salary, payroll, and other financial information is a far cry from asserting that Doron "managed" employees.  The closest the FTC comes to addressing this is its contention that Doron had one or two bookkeeping "assistants" and one employee's testimony that he reported to Doron *for financial matters only*.  (SUF ¶34(e)(v), (vii).)  However, the FTC contradicts its own claims, claiming that Alon supervised these same employees. (SUF ¶32(l)(i-iii).)  And the FTC does not allege that any of the persons that reported to Doron directly participated in the wrongful conduct alleged by the FTC.  Therefore, the evidence, at best, demonstrates that Doron supervised one or two bookkeeping assistants only, and only for financial matters and nothing else.

### 4. The FTC Fails to Produce Any Admissible Evidence That Doron Held Himself Out as an Owner.

In support of the proposition that Doron held himself as an owner of Corporate Defendants, the FTC cites the following: (i) double-layered hearsay testimony from a disgruntled former employee; (ii) two unauthenticated and unsolicited emails from third parties to Doron that the FTC interprets to be offers to sell products on Nottea's distribution channel and marketing services; (iii) an unproduced email from Alon to Doron; (iv) an email to Doron concerning payroll reports; and (v) various emails from an accountant to Alon, cc'ing Doron.  (SUF ¶34(d).)

The FTC claims that a former disgruntled employee testified that Doron "held himself out as the owner of both BunZai and Pinnacle."  (SUF ¶34(d)(i).)  The FTC cites Exhibit 554, but the cited portions of the deposition transcript, pages 65-66, are

1   not produced.  And any assumptions that a former employee makes with respect to

2   ownership are clearly inadmissible.

3     The remainder of the "evidence" does not even support the notion that Doron

4   held himself as an owner or was an owner.  The FTC's interpretation of two

5   unauthenticated emails that "appear" to be unsolicited offers to sell products

6   completely unrelated to this litigation are inadmissible and do not support the notion

7   that Doron was an owner of the company or otherwise held himself out to be such.

8   (SUF ¶34(d)(ii-iii).)  There is no evidence Doron responded to the emails or otherwise

9   engaged in discussions, much less executive action, concerning the marketing of

10  products.  In fact, the email shows that Doron did *not* respond to the unsolicited offer,

11  ending the conversation as soon as it was started.  (Exhibits 35, 43.)  If this is

12  sufficient to confer ownership, every employee who receives unsolicited emails to sell

13  services to the employer would also be considered an owner of the company.

14    While the FTC claims that Doron "provided and received payroll reports for

15  Bunzai" (SUF ¶34(d)(v)), the cited exhibit (Exhibit 518) merely shows an email to

16  Doron attaching payroll reports; the evidence does not show that Doron ever

17  "provided" payroll reports.  (Exhibit 518.)  The FTC does not explain how a

18  bookkeeper's receipt of payroll information, information that a bookkeeper would

19  obviously need to know to calculate expenses, could possibly support the FTC's claim

20  Doron held himself out as an owner.  (Howard Decl. ¶¶ 4-8.)

21    The FTC's heavy reliance on four emails from an accountant to Alon on which

22  Doron was cc'd, is irrelevant for the same reasons.  (SUF ¶34(d)(vi-ix).)  Again, no

23  response from Doron is produced nor any other evidence establishing that Doron's

24  possession of corporate information establishes ownership of the corporations.  But

25  Doron never met with this accountant concerning incorporation.  (Geffner Decl. Ex. C

26  (Doron Depo.) at 23:2-9.)  Nor did he participate in helping incorporate or create any

27  of the Defendant Corporations.  (<u>Id.</u> 22:9-19, 108:1-3.)  Doron does not even know

28

1    who created the corporate structure for Bunzai or any other Corporate Defendant.  (Id.

2    22:20-25.)

3         Regardless, as with payroll, bookkeeping is another responsibility that would

4    clearly be within the purview of Doron's duties.  (Howard Decl. ¶¶ 4-8.)  Doron's

5    mere receipt of basic financial information does not mean that he was as an owner of

6    the company or that he held himself out as such; it simply means he was performing

7    his responsibilities as a bookkeeper.

8         As such, the FTC fails to submit any admissible evidence supporting the notion

9    that Doron held himself out as an owner of Bunzai.  The undisputed evidence is that

10   Doron was not an owner of Bunzai or any other Corporate Defendant, other than his

11   partial ownership interest in Secured Commerce, LLC, and the FTC does not contend,

12   much less produce evidence establishing, that he was.

13        **5.  Doron Did Not Determine Whether Any Corporate Defendants Should Cease Operations.**

14

15        For the proposition that Doron allegedly determined whether to continue or

16   cease operations, the FTC cites ¶34(h) of the SUF.  (MSJ at 13:9-10.)  Paragraph

17   34(h) refers to Doron's bookkeeping duties (SUF ¶34(h)), and it is entirely unclear to

18   which Paragraph or statement the FTC is referring.  This alone precludes granting

19   summary judgment.  See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026,

20   1029-30 (9th Cir. 2001) (on summary judgment, a district court may rely upon the

21   parties' citations and is "not required to comb the record").

22        The only portion of ¶34 dealing with continuing or ceasing operations is

23   ¶34(i)(vi).  That section states, however, that it was *Alon, not Doron*, who discussed

24   ceasing operations of AuraVie with a bank.  (SUF ¶34(i)(vi).)  Doron was simply one

25   of many employees omitted from the email chain, but included on the forwarded

26   email.  (Id.; Exhibit 60.)  Therefore, contrary to the FTC's contentions, Doron did not

27   decide whether to continue or cease operations.  (Geffner Decl. Ex. C (Doron Depo.)

28   at 22:9-19, 74:25-75:19.)

1   Accordingly, since the FTC has not submitted admissible evidence to prove

2   Doron's allegations, much less his involvement in the allegedly unlawful conduct, it is

3   not entitled to summary judgment.

4   **B.   NONE OF THE FTC'S ALLEGATIONS AGAINST DORON IMPLICATE
        DORON'S PARTICIPATION IN, OR CONTROL OVER, ANY OF THE
5       ALLEGED UNLAWFUL CONDUCT.**

6   Even if the FTC could prove its allegations against Doron, Doron's alleged

7   conduct is wholly unrelated to the Corporate Defendants' allegedly unlawful conduct.

8   An individual defendant is not subject to injunctive relief or otherwise liable unless he

9   *participated directly in the allegedly wrongful* or unlawful activity or *exerted direct*

10  *control over the allegedly wrongful* and unlawful activity.  Publ'g Clearing House,

11  104 F.3d at 1170-71.  **If the individual defendant's participation or control does**

12  **not extend to the allegedly wrongful activity, he is not liable for injunctive or**

13  **restitutionary relief.**  Id.; F.T.C. v. Swish Mktg., 2010 WL 653486, at *5 (N.D. Cal.

14  Feb. 22, 2010).

15  Here, even if the allegations against Doron are supported by admissible

16  evidence (which they are not), none of the allegations involve direct participation or

17  asserted control over allegedly deceptive representations and omissions on the website

18  or making unauthorized credit card transactions.  Nearly all of the FTC's allegations

19  with respect to Doron relate to responsibility over finances, including allegedly

20  managing employees with respect to finances, controlling and managing bank

21  accounts, and performing bookkeeping duties.  (MSJ at 13:35-10.)  This finance-based

22  conduct is limited to payroll, banking, taxes, and other expenses.  (SUF ¶¶34(e), (g),

23  (h).)  All of the FTC's claims regarding Doron's supposed involvement is conduct that

24  takes place *after* consumers are allegedly deceived into providing credit card numbers,

25  and after the credit card transactions are processed.

26  Doron's finance-based conduct does not amount to "direct participation" in

27  either of the two categories of allegedly wrongful activity.  Nor does it amount to

28  direct control over the persons that directly participated in either making the deceptive

1   representations and omissions on the website or processing unauthorized credit card

2   transactions.  Swish Mktg., 2010 WL 653486, at *5-6 (dismissing individual

3   defendant CEO where FTC was unable to tie relationship between the individual

4   defendant and the fraudulent scheme).

5        The FTC's "evidence" regarding Doron managing employees is limited to

6   finances, and specifically, one or two bookkeeping assistants.  (See SUF ¶34(e).)  It is

7   not alleged, much less proven, that those assistants directly participated in either

8   making the allegedly deceptive website representations or processing credit cards.  In

9   fact, the FTC claims that this conduct was done by Alon, and any contradicting

10  allegations that Doron engaged in the same conduct is without any factual or

11  evidentiary support.  (See SUF ¶¶ 32(a), (b), (g), (k)-(q).)

12       This is not the first time the FTC has sought to impose liability against a

13  bookkeeper simply because he shares the same name with the allegedly main

14  individual defendant.  In United States v. Building Inspector of America, Inc., 894 F.

15  Supp. 507 (D. Mass. 1995), the FTC filed an action under the FTCA against a

16  company, as well as various individual defendants, accusing them of making

17  misleading statements and omissions to perspective franchisees in a franchise offer.

18  Id. at 510.  The FTC moved for summary judgment against the individual defendants,

19  including the main wrongdoer, his wife, who was the company's treasurer, and the

20  director of sales and marketing.  Id.  Summary judgment was denied as to the wife and

21  the director of sales and marketing.

22       Like here, the FTC's case against the wife was "practically nonexistent."  Id.

23  There was "no evidence in the record that she was ever involved authorizing, drafting

24  or approving the content of the [franchise offer]."  Id.  The only evidence the FTC was

25  able to put forth against the wife was that she was the company's treasurer directly

26  responsible for handling bank accounts, paying bills, and occasionally spoke with

27  franchisees over the telephone.  Id.  "This, without more, is clearly insufficient to

28  make her vicariously liable for the [company's] wrongful activities."  Id.

1    The FTC's case against the director of sales and marketing also lacked the

2   specificity required to impose individual liability.  Although he participated in drafting

3   parts of the franchise offer, there was no evidence he was involved in drafting the

4   misleading statements or retained actual authority to determine the final content of the

5   franchise offer.  Id. at 520.  Nor was there evidence that he possessed the ability to

6   control the persons who actually made the misleading statements.  Id. The only

7   evidence that the FTC was able to produce concerning direct participation in the

8   unlawful conduct was a correspondence he drafted suggesting his involvement in the

9   scheme, but because the FTC failed to present any testimony explaining the

10   correspondence or elaborating on his role, the court found the evidence to be "sketchy

11   at best."  Id. at 520, n.14.

12    As with the FTC's failed summary judgment attempt in Building Inspector,

13   here, the FTC's case against Doron lacks the requisite connection with the allegedly

14   unlawful conduct to hold Doron individually liable.  Just as was the case with the

15   director of sales and marketing in Building Inspector, **the FTC has no evidence of**

16   **Doron's direct participation in making the false website representations or**

17   **processing the credit card charges and no evidence that Doron retained the**

18   **ability to control persons that directly participated in such conduct.**  In fact, there

19   is even less evidence against Doron than there was against the director of sales and

20   marketing in Building Inspector.  There, at least the FTC was able to rely upon a

21   correspondence in which the director engaged in conversation concerning the

22   allegedly unlawful conduct.  894 F. Supp. at 520, n.14.  Here, the emails the FTC

23   relies upon in its case against Doron do not have either quality: They do not involve

24   any alleged unlawful conduct, and, Doron, who was cc'd on a vast majority of the

25   emails, did not participate in any of the email conversations.  Consequently, the FTC's

26   evidence of Doron's participation in unlawful conduct is even worse than the "sketchy

27   at best" evidence that the FTC unsuccessfully relied on in Building Inspector.

28

1    The FTC's case against Doron is more closely akin to its "practically

2 nonexistent" case it had against the wife treasurer.  The FTC's finance-based

3 allegations against Doron are "clearly insufficient" and cannot serve as the basis for

4 imposing vicarious liability for the unrelated conduct of others.

5    The FTC has not put forth any evidence to prove that any of the alleged

6 unlawful actions were undertaken with Doron's involvement or control.  The FTC

7 fails to put forth any evidence that Doron directly participated in authorizing, drafting,

8 or approving the content of the webpages, specifically, the allegedly misleading

9 representations.  The FTC also fails to put forth any evidence that Doron directly

10 participated in receiving consumer credit card numbers or processing the credit cards.

11 Nor does the FTC put forth any evidence that Doron asserted control over the specific

12 persons that did directly participate in making the misleading statements or processing

13 the unauthorized transactions.  The FTC's failure to produce a scintilla of evidence

14 that Doron directly participated in making the deceptive website content or processing

15 unauthorized credit card transactions is fatal to its attempt to obtain summary

16 judgment (and its case) against Doron.

17    The undisputed facts prove that the allegedly unlawful activities are done

18 without Doron's involvement or control.  (Doron Decl. ¶¶ 7-9, 15-25; Alon Decl. ¶

19 11.)  He exerted absolutely no control over the marketing of the companies or the

20 content of the website.  (Doron Decl. ¶¶ 7-9, 13, 17, 23-25; Alon Decl. ¶ 11.)  He

21 exerted absolutely no control over obtaining consumer credit cards or processing

22 credit card charges.  (Doron Decl. ¶¶ 7-9, 13, 18-20; Alon Decl. ¶ 11.)

23    During Doron's deposition, he denied having drafting, authorizing, or

24 approving the alleged misrepresentations, denied having processed charged consumer

25 credit cards, denied having control over any aspect of Bunzai, denied having any

26 control over corporate policy, and denied having received various correspondences.

27 (Geffner Decl. Ex. C (Doron Depo.) at 23:10-11,125:9-13, 180:15-18, 182:16-18.)  He

28 exerted no control over the selling of the products; others made the decision to stop

1  selling the products.  (Id. 97:10-98:15.)  In fact, Doron began working at Bunzai in
2  April 2013, more than three yars after Bunzai was formed and after the websites were
3  created in 2010.  (Doron Decl. ¶¶ 22-23.)
4      This contradicting evidence is also fatal to the FTC's attempt to obtain
5  summary judgment.  See F.T.C. v. 1st Guar. Mortgage Corp., 2011 WL 1233207, at
6  *13 (S.D. Fla. Mar. 30, 2011), aff'd sub nom. F.T.C. v. Lalonde, 545 F. App'x 825
7  (11th Cir. 2013) (summary judgment denied where individual defendant's deposition
8  testimony denial of having participated or knowledge of the deceptive practices gave
9  rise to genuine issue of material fact concerning her direct participation in the alleged
10  misrepresentations).  Accordingly, since the FTC fails to, and cannot, prove that
11  Doron's involvement extended to the unlawful activity, the FTC is not entitled to
12  summary judgment against Doron.

13      **C.   THE FTC FAILS TO SATISFY ITS BURDEN OF ESTABLISHING THAT DORON HAD KNOWLEDGE OF THE UNLAWFUL CONDUCT.**

14      Even if Doron could be subject to injunctive relief (which he is not for the
15  reasons set forth hereinabove), he cannot be liable for restitutionary relief either
16  because the FTC's evidence on summary judgment does not support the notion that
17  Doron was aware of the unlawful conduct.  In order to hold an individual defendant
18  liable for restitution, the defendant must possess knowledge of the unlawful activity of
19  the corporate defendant.  Publ'g Clearing House, 104 F.3d at 1171.  To satisfy the
20  knowledge requirement, the FTC must prove that Doron had actual knowledge of the
21  wrongful acts or practices, was recklessly indifferent to whether or not the unlawful
22  activity was fraudulent, or had an awareness of a high probability of fraud along with
23  an intentional avoidance of the truth.  Id.; F.T.C. v. J.K. Publications, Inc., 99 F. Supp.
24  2d 1176, 1203-04 (C.D. Cal. 2000).  The FTC has not, and cannot, show either.
25      The FTC fails to cite any evidence supporting the notion that Doron had actual
26  or constructive knowledge that the representations on their website were false or
27  misleading or that the credit card transactions that others were processed were not
28

1   authorized by consumers.  The FTC submits no evidence that Doron possessed actual

2   knowledge that some of the representations were allegedly misleading, that the terms

3   of the free trial offer were allegedly illegal, or that unauthorized charges were

4   allegedly made against consumers' credit cards.  The FTC does not even submit

5   evidence that Doron possessed actual knowledge of the contents of the website, the

6   terms of the free trial offer, the marketing of the products, the distribution of the

7   products, the process for obtaining consumers' credit card numbers, or the process or

8   terms for processing credit cards.

9        The FTC's claim that Doron had such knowledge is limited to: (a) Doron's

10  financial management; (b) Doron's alleged supervision of certain employees; (c)

11  Doron's alleged oversight of payments; (d) that Doron was included on (but did not

12  participate in) a few emails discussing various unrelated and unspecified business

13  practices; and (e) an unauthenticated and inadmissible text message conversation that

14  the FTC alleges Doron had with himself.  (MSJ at 13:14-14:12.)

15       The FTC fails to explain how Doron's financial management, alleged

16  supervision of certain employees, or alleged oversight of payments proves that Doron

17  had knowledge of the allegedly unlawful activity.  All the FTC states is that these

18  activities "implicates [sic] [Doron] in the scheme and demonstrates [sic] the

19  knowledge he had of the enterprise's day-to-day operations."  (Id. 13:17-19.)  No

20  other argument or explanation is provided.  Importantly, the FTC does not allege that,

21  and fails to explain how, such activities "demonstrate" Doron's knowledge of the

22  existence of the website representations, the accuracy or deceptiveness of the website

23  representations, the existence of the negative option, the legality of the negative

24  option, or whether the consumers' credit card charges were authorized or not.

25  Without any such explanation or evidence as to how the FTC's allegations compel a

26  finding of knowledge of the specific unlawful conduct, the conclusory argument

27  cannot support summary judgment.  See Ross, 2012 WL 2126533, at *6 (although

28  evidence indicated that individual defendant "had some degree of control over certain

aspects of [the company's] affairs," none of the evidence proved that she had control over the content of representations).

The FTC's conjectural leap lacks factual support.  It is undisputed that Doron's "financial management" duties do not involve website marketing or content, the terms of the negative option, or the processing of consumer credit cards.  Those are all done and controlled by others.  (Alon Decl. ¶ 11.)  Similarly, Doron's alleged "supervision" of employees is limited to his bookkeeping assistant on unrelated financial matters.  (See *supra* § I.A.3.)  The FTC fails to provide any evidence that Doron supervised any employee that directly participated in any of the allegedly unlawful conduct.  Finally, no citation is provided for the FTC's claim concerning Doron's alleged "oversight of payment to straw account holders."  Therefore, Doron's performance of his "financial management" duties and his alleged supervision of bookkeeping employees for unrelated financial matters do not "demonstrate" knowledge of the specific unlawful conduct that the FTC alleges in this case (i.e. deceptive representations, illegal negative option, unauthorized credit card charges).  See In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 263 (S.D.N.Y. 2004) (FTC's claim against individual defendants not supported by any specific allegation of fact showing that individual defendants knew conduct was unlawful).

The FTC's reliance on its allegation that Doron was included on "numerous emails discussing the enterprise's business practices" is equally irrelevant.  The "numerous emails" to which the FTC refers number a grand total of three (3).  (SUF ¶¶34(i)(viii), 39(e)(i).)  Those three emails do not involve website content, the representations, or credit card charges, much less anything that could impart knowledge of the *illegality* of the representations or credit card charges.  The first is an email from David Midgal to Doron concerning a P.O. Box.  (Exhibit 331-1.)  The second is an email that the FTC alleges is to Doron, among others, concerning a product called LeElle, which is not the subject of this action.  (Exhibit 360.)  The third is a blank email forwarded to Doron that simply contains the words "fyi" (twice) and

1 "Thanks," without any attachments or context.  (Exhibit 361.)  Because none of these

2 "numerous emails" provides Doron with knowledge of the unlawful conduct alleged

3 in this action, this too cannot support summary judgment.

4       The last piece of "evidence" upon which the FTC relies to support Doron's

5 purported knowledge of the allegedly deceptive website representations and

6 unauthorized credit card transactions is an unauthenticated text message that the FTC

7 claims Doron sent to himself.  (MSJ at 14:3-12.)  The FTC does not attempt to

8 authenticate or explain how it came into possession of the text message.  That this is

9 what the FTC claims it to be—a text message from Doron to his own email address—

10 is belied by common sense as well as its content.  The very notion that someone

11 would send a text message to his or her own email address is farfetched.  Making it

12 even less likely that the person is talking to himself or herself is the fact that its

13 content imparts information, which a person would not need to impart on himself or

14 herself.  (Exhibit 330.)  Shedding any doubts that this is not a text message from and

15 to the same person is the fact the text message asks the person on the other end of the

16 conversation to "let your attorney speak to their attorney" or "I will [have] to [act]."

17 (Id.)  Clearly, this is not a text message that a person emails to himself.  Because the

18 FTC has not authenticated the document and it is not what the FTC claims it is, it is

19 inadmissible.  See Fed. R. Evid. 901(a) (evidence not properly authenticated and

20 inadmissible if it is not what the proponent claims it is).

21       Even if admissible (it cannot be), the purported text message that Doron

22 allegedly emailed to himself does not support the FTC's claim that the text message

23 "evinces" Doron's knowledge of the unlawful activity.  (MSJ at 14:3-4.)  The FTC

24 first contends that the message shows that Doron somehow knew of the allegedly

25 illegal conduct because the text message states that they were receiving "regulatory

26 scrutiny."  (Id. 14:4-5.)  The message says no such thing.  It actually states that the

27 "Florida Atty. Gen. is *reviewing every single* continuity skincare and diet advertisers

28 in the industry."  (Exhibit 330 (emphasis added).)  And the FTC fails to produce any

1  evidence of the nature of the investigation the Florida Attorney General was

2  undertaking, whether the investigation relates to the FTC's allegations in this

3  litigation, or whether it included the products at issue in this litigation.  At best, this

4  shows that the sender of the message knew that a general investigation of the market

5  was ongoing, not that the sender knew that the alleged conduct in this litigation was

6  illegal or that the specific products in this litigation were under investigation.

7        The FTC next contends that the text message shows that the sender was afraid

8  of a lawsuit of an unknown nature by former employees.  (MSJ at 14:5-8.)  The

9  gaping hole in the FTC's uncorroborated interpretation of the message is that the FTC

10  fails to explain what kind of lawsuit former employees could possibly bring against a

11  company based upon the consumer deception that stands as the basis for the FTC's

12  action.  An employee lawsuit, if one potentially existed, is irrelevant to this litigation.

13        Lastly, the FTC contends that the sender "acknowledged the 'high-risk nature

14  of our business model' and the possibility that their assets may be frozen by the FTC."

15  (MSJ at 14:9-11.)  Not so.  This is a hearsay statement where the sender was merely

16  saying that someone else expressed this concern.  (Exhibit 330.)  The message does

17  not discuss website representations nor credit card transactions.  More to the point, the

18  message does not discuss the accuracy of the website representations, the legality of

19  the negative option, or whether or not the credit card transactions are unauthorized.

20  (Id.)  And FTC is never mentioned in the message.  Because the unauthenticated

21  message is inadmissible and does not support that Doron knew the website

22  representations were allegedly misleading or that Doron knew that consumers did not

23  authorize credit card transactions, it cannot support summary judgment.

24        In addition to there being no evidence of Doron's actual knowledge, there is

25  also no basis for inferring Doron had knowledge of the allegedly misleading nature of

26  the representations or unauthorized credit card charges.  Unlike its case against the

27  other individual defendants, the FTC has not been able to put forth any affirmative

28  evidence that Doron was an owner, shareholder, or officer of any Corporate

22

1   Defendant.  Unlike the other individual defendants, Doron does not appear as an

2   owner, shareholder, or officer of any Corporate Defendant on any document.  (Doron

3   Decl. ¶¶ 10-11, 15.)  Unlike the other individual defendants, Doron never performed

4   any management duties for the Corporate Defendants.  (Id. ¶ 12.)  Doron did not

5   engage in profit-sharing.  Doron asserted no control over the marketing or consumer

6   credit card aspects of the business.  (Id. ¶¶ 7-9.)  Doron asserted no control over

7   distribution.  Any control that Doron exercised was over bookkeeping, which does not

8   prove or imply knowledge of marketing or processing credit cards. (Id. ¶¶ 7-9, 17-24.)

9          Doron testified that his responsibilities did not, and would not have, imparted

10  him with any knowledge of illegal activities.  Doron had no decision making

11  authority.  (Geffner Decl. Ex. C (Doron Depo.) at 79:11-18.)  Doron was not an

12  officer of any Bunzai or the other Corporate Defendants.  (Id. 32:23-24, 177:3-13.)

13  Doron did not receive a percentage of the profits like the owners did; he received a

14  salary.  (Id. 91:13-92:1, 195:6-19.)  He did not have regular meetings with the owners.

15  (Id. 105:6-14.)  He had no participation in creating the Bunzai business plan.  (Id.

16  29:24-25.)  He did not receive nor analyze the monthly reports that the other officers

17  received.  (Id. 79:11-18.)  He worked at Bunzai for only two to three hours per week.

18  (Id. 151:9-15.)  During his deposition, Doron did not know the relationship between

19  the Corporate Defendants, if any existed.  (Id. 188:25-190:20.)  He also never

20  discussed FTC regulations with Alon.  (Id. 166:21-23.)  Doron had no knowledge of

21  processing credit cards or whether customers were receiving refunds.  (Id. 23:10-11,

22  182:16-18.)  Because there is no basis to find that Doron had knowledge of the

23  allegedly unlawful conduct, the FTC has not satisfied its burden on summary

24  judgment against Doron, and he is not liable for restitution.

25          **D.  NO CONSTRUCTIVE KNOWLEDGE CAN BE INFERRED FROM DORON'S PARTICIPATION WITH SECURED COMMERCE.**

26          To the extent that the FTC attempts to impart constructive knowledge upon

27  Doron based upon his ownership of Secured Commerce (which does not appear to be

28

1   the case from a reading of the MSJ), the FTC's attempt in this regard fails.  In order to

2   hold Doron vicariously liable for the conduct of others based upon his participation

3   with Secured Commerce, <u>in addition to proving Doron's direct participation and</u>

4   <u>knowledge</u>, the FTC must also prove that Secured Commerce was a member of the

5   common enterprise.  On summary judgment, it is not enough for the FTC to prove that

6   a common enterprise exists; rather, it must prove "which Defendants and whether all

7   Defendants are part of a common enterprise."  <u>F.T.C. v. PayDay Fin. LLC</u>, 989 F.

8   Supp. 2d 799, 810 (D.S.D. 2013) (FTC's failure to make this showing precluded entry

9   of summary judgment).

10         To be a member of a common enterprise, there must be "vertical commonality"

11   to the other wrongdoing members of the common enterprise.  <u>S.E.C. v. Eurobond</u>

12   <u>Exch., Ltd.</u>, 13 F.3d 1334, 1339 (9th Cir. 1994).  "[T]he requisite element of vertical

13   commonality" requires that Secured Commerce's fortunes be "linked" with the

14   fortunes of the wrongdoing members of the common enterprise.  <u>Id.</u>; <u>Brodt v. Bache</u>

15   <u>& Co.</u>, 595 F.2d 459, 460 (9th Cir. 1978); <u>F.T.C. v. Network Servs. Depot, Inc.</u>, 617

16   F.3d 1127, 1142-43 (9th Cir. 2010).  There must be a "direct correlation" between the

17   success or failure of the defendant's actions with the success or failure of the

18   wrongdoers' conduct.  <u>Brodt</u>, 595 F.2d at 461.  If no "direct correlation" between the

19   success or failure of the defendant's actions with the success or failure of the

20   wrongdoers' conduct exists, no common enterprise between the corporate defendant

21   and the wrongdoers exists, thereby precluding the corporate defendant (and

22   individuals associated with the corporate defendant) from being held vicariously liable

23   for conduct in which the individual defendant did not directly participate.  <u>Id.</u>

24         Here, while the FTC attempts to prove that a common enterprise exists, it fails

25   to submit any evidence that Secured Commerce was a member of the common

26   enterprise or that vertical commonality exists between Secured Commerce and any

27   other Corporate Defendant.  The evidence proves that no vertical commonality exists.

28   The fortunes of Secured Commerce, which was formed in 2012, well after Bunzai,

1   were not linked to the fortunes of Bunzai.  (Geffner Decl. Ex. C (Doron Depo.) at

2   35:8-13.)  Secured Commerce's customers were not related to the Corporate

3   Defendants.  (Id. 36:17-37:13, 42:8-11.)  There is no evidence that the companies

4   shared revenues.  Quite the opposite, the two companies operated completely

5   independent from one another and had their own independent revenue streams.

6   (Doron Decl. ¶ 6.)  Case in point, Secured Commerce's eventual failure did not impact

7   Bunzai.  (Id.; Geffner Decl. Ex. C (Doron Depo.) at 36:2-22); see Copeland v. Hill,

8   680 F. Supp. 466, 468-69 (D. Mass. 1988) (success or failure of defendant's

9   contribution would not cause the wrongdoers to gain or lose anything); see also Brodt,

10  595 F.2d at 461 (no vertical commonality where "no direct correlation on either the

11  success or failure side" between the defendant's conduct and the unlawful conduct).

12         Courts faced with similar situations have held that no vertical commonality

13  exists between an accountant's or bookkeeper's responsibilities for one company and

14  the allegedly unlawful activity of another company.  In Coan v. Bell Atl. Sys. Leasing

15  Int'l, Inc., 813 F. Supp. 929 (D. Conn. 1990), the court held that an accountant's

16  efforts with respect to a company did not create any vertical commonality.  Id. at 938.

17  Although the wrongdoers could have benefitted from "substantial tax benefits" and

18  defendant's "management abilities," any such benefits were independent from the

19  profitability of the unlawful activity.  Id.  "There simply were not any 'revenue

20  sharing arrangements' here between [the defendant and the wrongdoers]."  Id.

21         In PayDay, the court denied summary judgment on the grounds that genuine

22  issues of material fact exist as to whether the company, "which did payroll and

23  accounting functions, could be considered part of a "common enterprise" in this case

24  where the conduct at issue is the marketing and offering of loans and collection

25  practices thereon."  989 F. Supp. 2d at 809.

26         Just as in Coan and PayDay, the FTC has failed to prove that vertical

27  commonality exists, here, warranting the denial of summary judgment.

28

## IV.    CONCLUSION

Based on the foregoing, the Court should deny the FTC's Motion for Summary Judgment as to Doron.

Dated:  May 2, 2016                              **ESENSTEN LAW**
                                                 ROBERT L. ESENSTEN
                                                 RANDI R. GEFFNER


                                                 By:   */s/ Robert L. Esensten*
                                                       Robert L. Esensten
                                                 Attorneys for Defendants DORON NOTTEA
                                                 and MOTTI NOTTEA

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2016, I electronically filed the foregoing document entitled **DEFENDANT DORON NOTTEA'S OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court by using the CM/ECF System.

*/s/ Robert L. Esensten*
Robert L. Esensten