1  ROBERT L. ESENSTEN (SBN 65728)
      resensten@esenstenlaw.com
2  RANDI R. GEFFNER (SBN 116574)
      rgeffner@esenstenlaw.com
3  **ESENSTEN LAW**
   12100 Wilshire Boulevard, Suite 1660
4  Los Angeles, California 90025
   Telephone: (310) 273-3090
5  Facsimile: (310) 207-5969

6  Attorneys for Defendants DORON NOTTEA and MOTTI NOTTEA

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

| 11  FEDERAL TRADE COMMISSION, | Case No.: 2:15-CV-04527-GW (PLAx) |
|---|---|
| 12         Plaintiff, | *Assigned to the Honorable George Wu, Courtroom 10* |
| 13     v. | |
| 14  BUNZAI MEDIA GROUP, INC., *et al.*, | **DECLARATION OF RANDI R. GEFFNER IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| 15         Defendants. | |

16

17

18       RANDI R. GEFFNER declares:

19       1.    I am an attorney admitted to practice in the State of California and am

20  Senior Associate Attorney at Esensten Law, attorneys of record for Defendant

21  Doron Nottea.  I make this declaration in support of the Opposition to the Federal

22  Trade Commission's Motion for Summary Judgment.  All facts contained herein are

23  within my personal knowledge, and if called upon to do so I could and would testify

24  competently hereto.

25  ///

26  ///

27  ///

28  ///

1     2.    Attached hereto as Exhibit "C" are true and correct copies of the

2  relevant excerpts of the cited deposition testimony of Doron Nottea taken on

3  January 20, 2016.

4        I declare under penalty of perjury under the laws of the State of California

5  that the foregoing is true and correct.

6        Executed on this 2nd day of May, 2016 at Los Angeles, California.

7

8  _____

9                                 Randi R. Geffner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "C"

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

**1**

```
 1              UNITED STATES DISTRICT COURT
 2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4    FEDERAL TRADE COMMISSION  )
                                )
 5          Plaintiff           )
                                )
 6    v.                        ) No. CV 15-4527-GW(PLAx)
                                )
 7    BUNZAI MEDIA GROUP, INC., )
      et al.,                   )
 8                              )
            Defendants.         )
 9    _____)
10
11
12
13             Wednesday, January 20, 2016
14
15             10877 Wilshire Boulevard
               Suite 700
16             Los Angeles, California
17
18
19
20          The above-entitled matter came on for
21    deposition, pursuant to Notice, at 10:04 a.m.
22
23
24
25
```

---

**2**

```
 1              UNITED STATES DISTRICT COURT
 2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4    FEDERAL TRADE COMMISSION  )
                                )
 5          Plaintiff           )
                                )
 6    v.                        ) No. CV 15-4527-GW(PLAx)
                                )
 7    BUNZAI MEDIA GROUP, INC., )
      et al.,                   )
 8                              )
            Defendants.         )
 9    _____)
10
11
12
13
14
15          DEPOSITION OF DORON NOTTEA, taken on
16    behalf of the Federal Trade Commission, at
17    10877 Wilshire Boulevard, Suite 700, Los Angeles,
18    California, commencing at 10:04 a.m., and concluding
19    at 6:15 p.m., on Wednesday, January 20, 2016,
20    pursuant to Notice, before CHRISTINA KIM-CAMPOS,
21    CSR No. 12598, a Certified Shorthand Reporter, in
22    and for the State of California.
23
24                      ***
25
```

---

**3**

```
 1    A P P E A R A N C E S
 2
    For the Federal      U.S. FEDERAL TRADE COMMISSION
 3  Trade Commission:    REID TEPFER, ESQ.
                         1999 Bryan Street
 4                       Suite 2150
                         Dallas, Texas  75201-6808
 5                       (214) 979-9383
                         rtepfer@ftc.gov
 6
 7                       U.S. FEDERAL TRADE COMMISSION
                         LUIS H. GALLEGOS, ESQ.
 8                       1999 Bryan Street
                         Suite 2150
 9                       Dallas, Texas 76201-6808
                         (214) 979-9383
10                       lgallegos@ftc.gov
11
    For the Witness:     ESENSTEN LAW
12                       ROBERT L. ESENSTEN, ESQ.
                         12100 Wilshire Boulevard
13                       Suite 1660
                         Los Angeles, California  90025
14                       (310) 273-3090
                         resensten@esenstenlaw.com
15
16  For the              CROSSWIND
    Defendants           ROBERT M. UNGAR, ESQ.
17  Alon Nottea and      2190 North Beverly Glen Blvd.
    Roi Reuveni:         Los Angeles, California  90077
18                       (818) 646-4750
                         rmu@crosswindlaw.com
19
20
    Also Present:        Alon Nottea
21
22
23
24
25
```

---

**4**

```
 1              I N D E X
 2
 3   WITNESS              EXAMINATION           PAGE
 4   Doron Nottea         By Mr. Tepfer           6
 5   Afternoon Session                          107
 6
 7   DEPOSITION EXHIBITS            INITIAL REFERENCE
 8   Nottea Deposition Exhibit No.  26          28
 9   Nottea Deposition Exhibit No.  46          39
10   Nottea Deposition Exhibit No.  49          55
11   Nottea Deposition Exhibit No.  43          70
12   Nottea Deposition Exhibit No.  29          83
13   Nottea Deposition Exhibit No.  45          89
14   Nottea Deposition Exhibit No.  41         108
15   Nottea Deposition Exhibit No.  44         114
16   Nottea Deposition Exhibit No.  21         115
17   Nottea Deposition Exhibit No.  30         118
18   Nottea Deposition Exhibit No.  47         121
19   Nottea Deposition Exhibit No.  37         123
20   Nottea Deposition Exhibit No.  35         129
21   Nottea Deposition Exhibit No.  32         132
22   Nottea Deposition Exhibit No.  51         134
23   Nottea Deposition Exhibit No.  53         136
24   Nottea Deposition Exhibit No.  54         144
25
```

1 (Pages 1 to 4)

FTC v. Bunzai Media Group, Inc., et al.                                          1/20/2016

---

13

1   what the case was about.
2       Q.  Okay.  And aside from your attorney, did you
3   speak with anyone about today's deposition?
4       A.  No.
5       Q.  Did you review any documents to prepare for
6   today?
7       A.  Yes.
8       Q.  What did you look at?
9       A.  I just have a conversation with my attorney.
10      Q.  But did you look at documents?
11      A.  We looked at some documents, yes.
12      Q.  Could you let me know what documents?
13      A.  Just documents we -- relating to the case.
14  We just went over some -- some notes that I made.
15      Q.  Okay.  I want to talk a little bit about
16  your personal background.
17          When were you born?
18      A.  1971.
19      Q.  And where were you born?
20      A.  Israel.
21      Q.  Is that where you were raised?
22          MR. ESENSTEN:  Objection; vague.
23          THE WITNESS:  I came here when I was 13.
24  BY MR. TEPFER:
25      Q.  Okay.  And have you lived in Los Angeles

---

14

1   ever since?
2       A.  Yes.
3       Q.  And what is your current address?
4       A.  18565 Doral Way, Tarzana, California 91356.
5       Q.  How long have you lived there?
6       A.  I year.
7       Q.  And are you married?
8       A.  Yes.
9       Q.  Who are you married to?
10      A.  Lori.
11      Q.  And are you currently employed?
12      A.  At the moment?  No.
13      Q.  What was your last job?
14      A.  My adult company.
15      Q.  Did you have any other jobs at the same
16  time?
17      A.  I did some bookkeeping for some of the --
18  some of the defendant corporations.
19      Q.  And did you attend college?
20      A.  No.
21      Q.  Do you have any other post high school
22  education?
23      A.  No.  I didn't finish high school.
24      Q.  And I want to talk about your work history
25  before the adult company.  You said that you did

---

15

1   some bookkeeping?
2       A.  No.  I said while --
3       Q.  Oh.
4       A.  -- in the last few years.  I was always in
5   adult, since after high school.
6       Q.  Okay.  And have you held any other
7   positions?
8       A.  Like what?
9       Q.  Any other employment, besides your adult
10  business?
11      A.  No.
12      Q.  And did you ever work for BunZai Media
13  Group?
14      A.  No.
15      Q.  Did you ever do bookkeeping for BunZai Media
16  Group?
17      A.  No.
18          MR. UNGAR:  Objection as to the form of the
19  question, it's vague and ambiguous.
20  BY MR. TEPFER:
21      Q.  And when you said that you did bookkeeping,
22  who did you do bookkeeping for?
23      A.  For --
24          MR. UNGAR:  Objection as to the form of the
25  question, it's vague and ambiguous.

---

16

1          THE WITNESS:  For a few of the entities that
2   I -- in the case.
3   BY MR. TEPFER:
4       Q.  A few of the entities in the Complaint?
5       A.  Yes.
6       Q.  I'd like to go over a few of those entities
7   and see if you did accounting, or rather,
8   bookkeeping for them.
9          Did you do bookkeeping for BunZai Media
10  Group?
11      A.  No.
12          MR. UNGAR:  Objection as to the form of the
13  question, it's vague and ambiguous.
14  BY MR. TEPFER:
15      Q.  When you say "bookkeeping," what are you
16  referring to?
17      A.  Just helping, overseeing accounts payable,
18  you know.  Bills come in.  I'm being told to pay
19  them.  I pay them.  That's -- that was my, the scope
20  of my actual job.
21      Q.  Who tells you to pay the bills?
22          MR. UNGAR:  Objection as to the form of the
23  question, it's vague and ambiguous, calls for
24  speculation.
25          THE WITNESS:  If my brother told me, if one

---

4 (Pages 13 to 16)

EXHIBIT "C" - PAGE 2

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

17

1  of the officers of the company told me.
2  BY MR. TEPFER:
3      Q.  And so did you do bookkeeping for Pinnacle
4  Logistics, Inc.?
5      A.  A little.
6      Q.  And did you ever have any training in
7  bookkeeping?
8      A.  No.
9      Q.  Did you ever do bookkeeping for DSA
10  Holdings, Inc.?
11      A.  DSA Holdings, Inc., yes.
12      Q.  Do you know what BunZai Media Group is?
13      A.  I know it's a corporation that my brother
14  has.
15      Q.  Do you know what the company sells?
16      MR. UNGAR:  Objection as to the form of the
17  question.
18      MR. ESENSTEN:  Objection.
19      MR. UNGAR:  It's vague and ambiguous.
20      MR. ESENSTEN:  And vague as to time.
21      Do you understand?  If you understand the
22  question, you can answer it.  If you don't, tell him
23  you do not understand the question.
24      THE WITNESS:  I understand they sell creams,
25  they sell skin care products.

---

18

1  BY MR. TEPFER:
2      Q.  Do you know the method by which BunZai Media
3  Group sells those creams?
4      A.  I think they sell them -- sell them on
5  Internet.
6      Q.  Have you ever viewed one of the -- any of
7  the websites that BunZai Media Group uses to sell
8  them?
9      A.  No.
10      MR. UNGAR:  Objection as to the form of the
11  question, it's vague and ambiguous, it calls for
12  speculation, lacks foundation.
13      MR. ESENSTEN:  And vague as to time.
14  BY MR. TEPFER:
15      Q.  Are you familiar with BunZai Media Group's
16  corporate structure?
17      A.  A little bit.
18      Q.  Are you familiar with any companies that
19  make payments to BunZai Media Group, as the
20  bookkeeper?
21      MR. UNGAR:  Objection as to the form of the
22  question --
23      THE WITNESS:  No.
24      MR. UNGAR:  -- calls for speculation.
25  ///

---

19

1  BY MR. TEPFER:
2      Q.  Did you ever analyze BunZai Media Group --
3  BunZai Media Group's sales method regarding its
4  profitability?
5      A.  No.
6      Q.  How are you compensated for doing this
7  bookkeeping for BunZai Media Group?
8      A.  I wasn't doing --
9      MR. UNGAR:  Objection; vague as to the form
10  of the question, it's vague.
11      THE WITNESS:  I don't know.  I wasn't doing
12  any bookkeeping for BunZai.
13  BY MR. TEPFER:
14      Q.  Sorry.  How were you compensated for
15  bookkeeping for Pinnacle Logistics?
16      MR. UNGAR:  Same objection.
17      THE WITNESS:  I didn't do accounting, I said
18  before.
19      MR. UNGAR:  Finish your answer.  You said
20  before --
21      THE WITNESS:  I didn't do any bookkeeping
22  for BunZai.
23  BY MR. TEPFER:
24      Q.  So which -- so you said you did bookkeeping
25  for Pinnacle Logistics?

---

20

1      A.  I said a little, a little bit, a little bit.
2  Just as a transition when somebody left, I just
3  looked at some stuff, but not really doing any
4  paperwork.  I mean not enough bookkeeping for me to
5  know stuff like that.
6      Q.  Do you know what period of time you did this
7  bookkeeping?
8      A.  I think from -- I think about April 2013.
9      Q.  Just for the month of April 2013?
10      A.  From April 2013 on.
11      Q.  So from April 2013 until the FTC filed its
12  lawsuit in June?
13      A.  I think so.  Yeah.
14      Q.  And you didn't receive any compensation for
15  that?
16      A.  From Pinnacle, no.
17      Q.  Did you receive any compensation from anyone
18  for that?
19      A.  I received some.
20      MR. UNGAR:  Objection as to the form of the
21  question, it's vague and ambiguous.
22      THE WITNESS:  I did receive some
23  compensation, yes.
24  BY MR. TEPFER:
25      Q.  Who did you receive compensation from?

---

5 (Pages 17 to 20)

EXHIBIT "C" - PAGE 3

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

21

1      A.  From a few --
2          MR. UNGAR:  Objection as to the form of the
3   question, it's vague and ambiguous.
4          THE WITNESS:  I received compensation from a
5   few of the corporations, a few of the entities, for
6   bookkeeping services.
7   BY MR. TEPFER:
8      Q.  Could you tell me which corporations?
9      A.  Out of my head, I think one of them was
10  probably, maybe DMA Holdings, maybe.
11     Q.  And what is DMA Holdings?
12     A.  Just one of the corporations, one of the
13  entities that I did work for.
14     Q.  Do you know who owns DMA Holdings?
15     A.  Yes.
16     Q.  Who is it?
17     A.  Jason Menin.
18     Q.  And did he hire you?
19     A.  To do bookkeeping?
20     Q.  Yes.
21     A.  I guess so, yes.  I mean yes.
22     Q.  And DMA Holdings paid you to do bookkeeping
23  for Pinnacle?
24     A.  For them, no.  DMA, no.
25     Q.  Do you know of any other companies you did

---

22

1   bookkeeping services for?
2      A.  I did for few of them.
3          MR. UNGAR:  Objection as to the form of the
4   question, it's vague and ambiguous.
5          THE WITNESS:  I did for a few of the
6   entities.  I don't remember for each one
7   specifically, but I did.
8   BY MR. TEPFER:
9      Q.  Did you help incorporate or create any of
10  the corporations named as defendant in this lawsuit?
11         MR. UNGAR:  Objection as to the form of the
12  question, it's compound, it's vague and ambiguous as
13  well.
14         THE WITNESS:  I introduced --
15         MR. ESENSTEN:  That calls for a "yes" or
16  "no."
17         THE WITNESS:  No.
18         MR. ESENSTEN:  Did you do any incorporation?
19  BY MR. TEPFER:
20     Q.  Do you know who came up with the corporate
21  structure for BunZai Media Group and its related
22  companies?
23         MR. UNGAR:  Objection as to the form of the
24  question, it's vague and ambiguous.
25         THE WITNESS:  No.

---

23

1   BY MR. TEPFER:
2      Q.  Did you ever meet with David Davidian
3   regarding BunZai's corporate structure?
4      A.  No.
5      Q.  Do you know who David Davidian is?
6      A.  Of course.
7      Q.  Do you know what work he did for BunZai
8   Media Group?
9      A.  He was their CPA.
10     Q.  Do you know what a continuity program is?
11     A.  No.
12     Q.  Did you ever oversee any of the corporate
13  defendants' merchant accounts?
14     A.  The owner --
15         MR. ESENSTEN:  Objection; vague as to the
16  word "continuity."
17         I'm sorry.  Could you reread the question.
18  I misstated.
19         MR. UNGAR:  Did you ever oversee any of the
20  corporate defendant merchant accounts?
21         MR. ESENSTEN:  Could you read it.
22         (The previous question was read back
23         by the court reporter as follows:
24           "QUESTION:  Did you ever oversee
25           any of the corporate defendants'

---

24

1           merchant accounts?")
2          MR. ESENSTEN:  I'll withdraw that objection.
3   Vague as to the word "oversee."
4          Pretty astute as to the way I did it.
5          MR. UNGAR:  It's also vague as to "corporate
6   defendants."  It's also vague as to "merchant
7   accounts."  The whole thing is vague, but if he
8   understands, he can answer.
9          THE WITNESS:  The only thing I see is money
10  coming in into bank accounts.  I had no access or
11  anything to any merchant accounts.  I saw money
12  coming in, and that's all.
13  BY MR. TEPFER:
14     Q.  Do you know which payment processing
15  companies BunZai Media Group --
16     A.  No.
17     Q.  -- had?
18         Do you know why a company would need
19  multiple merchant contacts?
20         MR. ESENSTEN:  Objection; vague.
21         MR. UNGAR:  Objection as to the form of the
22  question, it's vague and ambiguous, it calls for
23  rank speculation.
24  BY MR. TEPFER:
25     Q.  Do you know who Nastassia Yalley is?

---

6 (Pages 21 to 24)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          EXHIBIT "C" - PAGE 4

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

25

1    A. Yes.
2    Q. Do you know what her position was at BunZai
3  Media Group?
4    A. She managed all the books.
5    Q. Did you work with her in any capacity?
6    A. She went -- she left -- she transferred some
7  of the stuff that she used to do for accounts
8  payable to me.
9    Q. And when she left, did you begin doing the
10  same work she was doing?
11    A. I was --
12    MR. UNGAR: Objection as to the form of the
13  question, calls for --
14    THE WITNESS: Only thing --
15    MR. UNGAR: -- speculation.
16    THE WITNESS: -- I was doing is bookkeeping.
17  That's all.
18    MR. ESENSTEN: Let's be sure that if
19  somebody else is talking, wait 'til --
20    THE WITNESS: Oh, okay.
21    MR. ESENSTEN: -- they finish talking --
22    THE WITNESS: Okay.
23    MR. ESENSTEN: -- so that we don't have
24  overlap and make the court reporter crazy.
25    THE WITNESS: No problem.

---

26

1    MR. ESENSTEN: Do you want to repeat the
2  question, so we make sure we have --
3  BY MR. TEPFER:
4    Q. Do you know what work Nastassia Yalley was
5  doing for BunZai Media Group?
6    MR. UNGAR: Objection as to the form of the
7  question, it's vague and ambiguous, lacks
8  foundation, calls for speculation.
9    THE WITNESS: As far as what she gave me to
10  do was her bookkeeping authorities. Paying invoices
11  that she got. She told me those are the vendors,
12  pay them; payment comes in, pay them.
13  BY MR. TEPFER:
14    Q. So did Nastassia Yalley direct you to make
15  those payments?
16    MR. UNGAR: Objection as to the form of the
17  question, it's vague and ambiguous.
18    MR. ESENSTEN: And vague as to time.
19    THE WITNESS: She -- did she told me to pay
20  them? She just showed me a list of vendors with
21  accounts payable and told me to make sure that they
22  get paid, once she leaves.
23  BY MR. TEPFER:
24    Q. Do you know who Gary Bhasin is?
25    A. Gary Bhasin. I don't remember Gary's last

---

27

1  name.
2    Q. It's spelled B-h-a-s-i-n. I might be
3  mispronouncing it.
4    A. I don't recall. I don't remember the last
5  name. Can you give me a little bit more info, so I
6  need to know?
7    MR. ESENSTEN: B-h- -- I'm sorry. Can you
8  spell it again?
9    MR. TEPFER: B-h-a-s-i-n.
10    THE WITNESS: Yes, yes, yes. I know who it
11  is.
12  BY MR. TEPFER:
13    Q. Who is he?
14    A. He is a guy that I think offered the
15  companies to take over, to do analyzing or to do
16  bookkeeping, if I'm right. Yes.
17    Q. Did you ever meet with him to discuss his, I
18  guess, proposal for those companies?
19    MR. UNGAR: Objection as to the form of the
20  question.
21    THE WITNESS: No. I know he --
22    MR. UNGAR: It's vague and ambiguous.
23    THE WITNESS: Sorry.
24    I know he -- I think that he came in once,
25  but I myself didn't speak with him.

---

28

1  BY MR. TEPFER:
2    Q. So you didn't personally speak with him?
3    A. No. I think he sent me email saying he
4  wants to help, but in person I didn't meet him.
5    (Plaintiff's Exhibit 26 was marked
6    for identification by the court
7    reporter and is attached hereto.)
8    MR. TEPFER: Okay. I'm handing the witness
9  what's been marked as Plaintiff's Exhibit 26.
10    MR. ESENSTEN: Do you have a copy for us;
11  right?
12    MR. TEPFER: Sure.
13    MR. UNGAR: I'd like a copy, Counsel.
14    MR. TEPFER: Well --
15    MR. UNGAR: I'd like a copy, Counsel.
16    MR. TEPFER: -- we have three.
17    MR. UNGAR: I'm sorry?
18    MR. TEPFER: Can you all --
19    MR. UNGAR: You don't have a copy for me?
20    MR. GALLEGOS: We weren't expecting you to
21  be here today, Robert. You didn't notify us.
22    MR. UNGAR: First of all, Counsel, can you
23  cite authority for me and the rules that says that
24  counsel for a party has to notify the notifying
25  party that they will be appearing at a deposition?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          EXHIBIT "C" - PAGE 5

29

1   What's the rule, citation?
2       MR. GALLEGOS:  Well, Mr. Esensten represents
3   Mr. Nottea.  We were expecting him to be here.  In
4   other words, as a matter of courteousness, it would
5   have been nice to know if you were coming, so we
6   would know whether to make copies.
7       MR. UNGAR:  So you have no authority for
8   what you've just stated; is that right?
9       MR. GALLEGOS:  Once again --
10      MR. ESENSTEN:  Maybe it would be easier, why
11  don't we just copy it right now.
12      MR. UNGAR:  I'd like a copy.
13      MR. ESENSTEN:  Why don't we just copy one
14  right now, and this will save some time.
15      MR. TEPFER:  Can we go off the record real
16  quick?
17      (A discussion was held off the record.)
18      (Mr. Gallegos leaves the room.)
19      (Recess)
20      MR. TEPFER:  Back on the record.
21  BY MR. TEPFER:
22      Q.  Mr. Nottea, do you recognize this document?
23      A.  No.
24      Q.  Have you ever spoken with anyone about
25  BunZai Media Group's business plan before?

30

1       A.  Never.
2       Q.  Do you know who Khristopher Bond is?
3       A.  Yes.
4       Q.  Who is he?
5       A.  He's Alon's ex-partner.
6       Q.  And he was his ex-partner in what business?
7       A.  In BunZai.
8       MR. ESENSTEN:  Can I ask a favor of you
9   guys?  There's some pictures of some women in this
10  thing.  Can you guys depose them, please?
11      MR. GALLEGOS:  I assume that's off the
12  record there, Bob?
13      MR. ESENSTEN:  No.  It's a reasonable
14  request.  I think that would be a fun deposition.
15  BY MR. TEPFER:
16      Q.  Do you know what period Khristopher Bond was
17  your brother Alon's business partner?
18      A.  I think probably in maybe 2010 to 2013.
19      MR. ESENSTEN:  Is that your best estimate?
20      THE WITNESS:  Best estimate.
21      MR. ESENSTEN:  Okay.  When you have best
22  estimates like that, just tell him "My best estimate
23  is".
24      THE WITNESS:  Okay.
25  ///

31

1   BY MR. TEPFER:
2       Q.  And do you know if your brother had any
3   other business partners in BunZai Media Group?
4       A.  Partners, no.  No.
5       Q.  Do you know if BunZai Media Group had any
6   other investors?
7       A.  Yes.
8       Q.  Who were they?
9       A.  From what I know, it's Igor Latsanovski.
10      Q.  And were there any other investors, aside
11  from Igor Latsanovski?
12      A.  Not that I know of.
13      Q.  If you would, please turn to page 22 of
14  Plaintiff's Exhibit 26.
15      MR. UNGAR:  Could you give the Bates number,
16  please?
17      MR. TEPFER:  Sure.  It ends in 576.
18      MR. UNGAR:  576.
19  BY MR. TEPFER:
20      Q.  Are you on that page?
21      A.  Yes.
22      Q.  Could you read there on the bottom, there's
23  a highlighted position beginning "Doron"?
24      A.  It says, "Doron (CFO/Controller):  For every
25  customer that successfully passes through the Day 15

32

1   transitional billing stage, the company will make a
2   gross profit of $40 per order, if they were to
3   cancel after this stage (Day 1:  9.95 plus 7.95
4   shipping and handling equals $17.90, plus day 15:
5   80 equals $97.90 minus 18 COG slash S and H, minus
6   40 CPA equals 39.90)."
7   BY MR. TEPFER:
8       Q.  Did you write --
9       A.  No.
10      Q.  -- this passage?
11          Did anyone ask your permission to write --
12      MR. ESENSTEN:  Wait.  He answered before you
13  finished the question.  Can we make sure we have the
14  question and the answer?
15  BY MR. TEPFER:
16      Q.  Did you write this passage?
17      A.  No.
18      Q.  Do you know who wrote this passage?
19      A.  No.
20      Q.  Did anyone ask your permission to write this
21  passage?
22      A.  No.
23      Q.  Were you ever CFO of BunZai Media Group?
24      A.  No.
25      MR. UNGAR:  Objection as to the form of the

8 (Pages 29 to 32)

FTC v. Bunzai Media Group, Inc., et al.                                1/20/2016

---

33

1  question, it's vague and ambiguous.
2  BY MR. TEPFER:
3      **Q.  Do you know what a transitional billing**
4  **stage is?**
5      A.  No.
6      **Q.  Do you know what COG stands for?**
7      A.  No.
8      **Q.  Would you please turn to page 25.  That's**
9  **Bates number ending in 579.  When you get to that**
10  **page, there's a highlighted portion that says**
11  **"Doron."  If you would please read that.**
12      A.  "Customers that pass the Day 45 mark have
13  accrued a life time value of 93.78.  (This does not
14  factor in up sells)."
15      **Q.  Did you write that statement?**
16      A.  No.
17      **Q.  And no one asked you to -- asked your**
18  **permission to write that?**
19      A.  No.
20      MR. ESENSTEN:  That is a double negative.
21  Can you try that again so we have a clear answer?
22      Let's have the reporter read it.  We'll hear
23  what I have to say.
24      (The previous question was read back
25      by the court reporter as follows:

---

34

1      "QUESTION:  And no one asked you
2  to -- asked your permission to write
3  that?")
4      MR. ESENSTEN:  And the answer was no, so
5  that's a double negative.  No one asked you.
6  BY MR. TEPFER:
7      **Q.  Did anyone ask your permission to write**
8  **that?**
9      MR. ESENSTEN:  There.
10      THE WITNESS:  No.
11  BY MR. TEPFER:
12      **Q.  Okay.  Do you know what Secured Commerce is?**
13      A.  Yes.
14      **Q.  What is it?**
15      A.  It's an LLC that I hold.
16      **Q.  Are you the sole owner of that LLC?**
17      A.  No.
18      **Q.  Who do you own it with?**
19      A.  With Alan Argaman.
20      **Q.  What is the business of Secured Commerce,**
21  **LLC?**
22      A.  When initially opened that LLC, we wanted to
23  form a discount rate of shipping so we can apply our
24  discount to people that want to use UPS, FedEx, DHL,
25  just to get a bulk rate shipping so customers can

---

35

1  save money on shipping.
2      **Q.  And does Secured Commerce have any**
3  **employees?**
4      A.  No.
5      MR. UNGAR:  Objection as to the form of the
6  question, it's vague and ambiguous temporally.
7  BY MR. TEPFER:
8      **Q.  Has Secured Commerce had any employees,**
9  **aside from you and Alan Argaman?**
10      A.  No.
11      **Q.  And when did Secured Commerce, when was it**
12  **formed?**
13      A.  I think sometime in end of 2012.
14      **Q.  And as of the filing of the FTC's lawsuit,**
15  **did Secured Commerce still exist?**
16      MR. UNGAR:  Objection as to the form of the
17  question.  It's vague and ambiguous.  It seeks
18  metaphysical information.
19      MR. ESENSTEN:  Can you give him the date?
20  Do you know the date it was filed?
21      MR. TEPFER:  I believe it's June 18th, 2015.
22  As of June 18.
23      THE WITNESS:  If it was June 18, if the
24  company was -- what did you say?
25  ///

---

36

1  BY MR. TEPFER:
2      **Q.  Did the -- sorry.  I'll rephrase.**
3      **Did the company, was the company operating**
4  **as of June 18th, 2015?**
5      A.  Yes.  I mean, it didn't do business, but it
6  was all operating.  It was open.
7      **Q.  What customers did Secured Commerce have?**
8      MR. UNGAR:  Objection as to the form of the
9  question.  Vague and ambiguous temporally.
10      THE WITNESS:  It didn't really -- I mean,
11  the company didn't really pick up -- I mean, we got
12  our licenses, we got our discounts.  We just passed
13  the discounts along, but we never really did
14  anything with actual company.  I mean, it just sat
15  there.  It's an LLC.
16  BY MR. TEPFER:
17      **Q.  Did the company ever have any customers?**
18      A.  It had a few.  I mean, my adult company and
19  a few other adult company used the discount, UPS
20  account of the Secured Commerce as a -- as a third
21  party biller, and that's about it.  I mean, that's
22  really the only people that it was used for.
23      **Q.  Did the company -- did Secured Commerce ever**
24  **have any customers that weren't companies owned by**
25  **you or your brother?**

---

9 (Pages 33 to 36)

37

1    MR. UNGAR:  Objection as to the form of the
2  question, it's vague and ambiguous, and it calls for
3  speculation.
4    THE WITNESS:  It did, yes.
5  BY MR. TEPFER:
6    Q.  What customers were those?
7    A.  Adult companies.  Various companies that I
8  used to work with.  They just -- I just gave them --
9  what we did is we gave them our discount rate, so
10  when they ship they use us as a third party,
11  shipping on our account, and that's how they get our
12  discount.  That's how we would get paid.  If they
13  shipped, we got couple pennies.
14    Q.  Did Secured Commerce do anything aside from
15  shipping?
16    A.  Not at all.  Nothing.
17    Q.  Did it ever design web pages?
18    A.  Not at all.
19    Q.  Did it ever do any business with Adageo,
20  LLC?
21    A.  My brother's company?
22    MR. ESENSTEN:  I didn't hear the response.
23  Did you --
24    THE WITNESS:  My brother's company?  No,
25  but -- as far as I know, no.  No.

38

1  BY MR. TEPFER:
2    Q.  Do you know what Adageo, LLC, is?
3    A.  It's my brother's company, my brother's LLC.
4    Q.  Do you know what Adageo LLC's business is?
5    A.  No.  That's his personal company.
6    Q.  So you never discussed Adageo LLC's --
7    A.  Not at all.
8    Q.  -- business with -- sorry.
9    A.  Go ahead.
10    Q.  You never discussed Adageo, LLC's, business
11  with your brother?
12    A.  Not really, no.
13    Q.  And just to be clear, when you say your
14  brother, you mean Alon?
15    A.  Alon, yes.
16    Q.  And you don't have any other brothers?
17    A.  No.
18    Q.  Okay.  I'm now going to pass the witness
19  what's been marked Plaintiff's Exhibit 46.
20    MR. ESENSTEN:  Can I just ask a
21  clarification question?
22    MR. TEPFER:  Sure.
23    MR. ESENSTEN:  The exhibit numbers you're
24  using have been marked in other matters?  You're
25  skipping around, so --

39

1    MR. TEPFER:  Yeah.
2    MR. ESENSTEN:  -- I'm trying to figure out
3  why they're not in order.
4    MR. TEPFER:  We've labeled them before.  I'm
5  not necessarily doing them in the order that I've
6  labeled them.
7    MR. ESENSTEN:  So you've just pre-labeled
8  them; they haven't been used in other proceedings;
9  is that correct?
10    MR. TEPFER:  Some of them have been used in
11  this proceeding and some haven't been yet.
12    MR. ESENSTEN:  Okay.  We're going off the
13  record or --
14    MR. GALLEGOS:  We can go off the record.
15    (A discussion was held off the record.)
16    (Plaintiff's Exhibit 46 was marked
17    for identification by the court
18    reporter and is attached hereto.)
19  BY MR. TEPFER:
20    Q.  Mr. Nottea, do you recognize this document?
21    A.  Yes.  I've seen it before.
22    Q.  Where have you seen it?
23    A.  In the Complaint.
24    Q.  Before you saw it in the Complaint, had you
25  ever seen it aside from that?

40

1    A.  No.
2    Q.  So you didn't create this document?
3    A.  No.
4    MR. ESENSTEN:  Can we do that without a
5  double negative?
6    Did you create this document?
7    THE WITNESS:  No.
8    MR. ESENSTEN:  Okay.
9  BY MR. TEPFER:
10    Q.  Did you create this document?
11    A.  No.
12    Q.  Did Alan Argaman do bookkeeping for your
13  company Secured Commerce?
14    MR. UNGAR:  Objection as to the form of the
15  question, vague and ambiguous.
16    THE WITNESS:  No.
17  BY MR. TEPFER:
18    Q.  Did Alan Argaman ever draft invoices for
19  Secured Commerce?
20    MR. UNGAR:  Objection as to the form of the
21  question, it's vague and ambiguous, calls for
22  speculation, lacks foundation.
23    THE WITNESS:  No, not that I know of, no.
24  BY MR. TEPFER:
25    Q.  Did you typically draft invoices for Secured

10 (Pages 37 to 40)

EXHIBIT "C" - PAGE 8

FTC v. Bunzai Media Group, Inc., et al.                                              1/20/2016

---

41

1     Commerce?
2         A.  No.
3         Q.  Have you ever drafted invoices for Secured
4     Commerce?
5         A.  I might have, yes.
6         Q.  So you typically handled paying bills for
7     Secured Commerce?
8         A.  Me and other gentleman that worked for me.
9         Q.  Are you aware of Secured Commerce ever
10    designing web pages?
11        A.  Not possible, no.
12        Q.  Do you know what Lime Light is?
13        A.  Not exactly, no.
14        Q.  What is your understanding of what Lime
15    Light is?
16            MR. UNGAR:  Objection as to the form of the
17    question, it's vague and ambiguous, it's
18    unintelligible without any definition of the word or
19    words "Lime Light."
20            THE WITNESS:  I think it's -- some sort of
21    a management online tool.  That's all I -- I know
22    about it.
23    BY MR. TEPFER:
24        Q.  So you only know that it's a tool used
25    for --

---

42

1         A.  For --
2         Q.  -- online?
3         A.  For online.
4             MR. UNGAR:  Objection as to the form of the
5     question, misstates the witness's prior testimony,
6     and it's argumentative.
7     BY MR. TEPFER:
8         Q.  Okay.  And to your knowledge, has Secured
9     Commerce ever had business with any other defendant,
10    or rather, corporate defendant in this lawsuit?
11        A.  Never.
12            MR. ESENSTEN:  And vague as to the term "had
13    business."
14    BY MR. TEPFER:
15        Q.  I want to go back, if you don't mind, to
16    discussing the bookkeeping that you did for the
17    various corporate defendants.  I know that -- sorry.
18        A.  Go ahead.
19        Q.  You said that you never did -- you said that
20    you've never done bookkeeping for BunZai Media
21    Group, Inc.; correct?
22        A.  Right.
23        Q.  And sorry.  I'm having trouble recalling.
24    Did you say that you did bookkeeping for Pinnacle
25    Logistics, Inc.?

---

43

1         A.  I said after Nastassia left.
2         Q.  Thanks.
3             And so did you ever do bookkeeping at the
4     same time as Nastassia at Pinnacle Logistics?
5             MR. UNGAR:  Objection as to the form of the
6     question, vague and ambiguous, calls for
7     speculation, lacks foundation.
8             THE WITNESS:  There was a transitional time
9     when she left, so I think for a month she just
10    showed me what she used to do, and I kind of took it
11    over.
12    BY MR. TEPFER:
13        Q.  And what did she train you on?
14            MR. UNGAR:  Objection as to the form of the
15    question, it's vague and ambiguous.
16            THE WITNESS:  She only trained me on how we,
17    who are the vendors that send invoices, if they're
18    on prepaid, the 5, the 15, the 30; method of
19    payment, ACH, check, wire.  And that's it.  I mean,
20    she -- she -- she showed me how she put them in --
21    in their accounting software and --
22    BY MR. TEPFER:
23        Q.  And you said -- sorry.
24        A.  Go ahead.  That's it.
25        Q.  And you said that you did bookkeeping for

---

44

1     DSA holdings, Inc.; is that correct?
2         A.  Yes.  Originally, yes.
3         Q.  And from what time period?
4         A.  From, I think, 2006, 2007, to probably 2009.
5         Q.  And do you know what DSA Holdings, what
6     their business was?
7         A.  They used to sell adult content.
8         Q.  Do you know if they had any other business?
9         A.  Besides selling adult, no.
10        Q.  Is that -- you don't know if they had any
11    other business?
12        A.  I don't have any other business.
13        Q.  Did you ever do bookkeeping for Lifestyle
14    Media Brands, Inc.?
15        A.  Yes.
16            MR. UNGAR:  Objection to the form of the
17    question, it's vague and ambiguous.
18            THE WITNESS:  Yes.
19    BY MR. TEPFER:
20        Q.  And from what time period?
21        A.  I mean, when I took over accounting was the
22    time I told you.  March, April 2013.
23        Q.  And so you took over accounting for all of
24    these companies at the same time?
25        A.  About the same --

---

11 (Pages 41 to 44)

45

1    MR. UNGAR: Objection as to the form of the
2  question, it's vague and ambiguous.
3    THE WITNESS: About the same time. When she
4  left, whatever she used to do, she -- she gave it to
5  me, and I kind of looked through and I did what
6  had -- I took to be done.
7  BY MR. TEPFER:
8    Q.  And Nastassia was, to your knowledge, also
9  doing accounting for all of these companies?
10   A.  Yes.
11   Q.  Do you know who owned DSA Holdings, Inc.?
12   A.  DSA Holdings, Inc., Jason.
13   Q.  Is he the one that hired you?
14   A.  Yes.  Back in -- yes.
15   Q.  Did you ever receive paychecks from him?
16   A.  No.  It was in 2006, 2007 when the company
17 opened.  We used to -- it was an adult business.  We
18 just used to -- instead of paying, I used to get
19 product.
20   Q.  And so you were compensated --
21   A.  It wasn't a matter of compensation.  It was
22 more of a company that was trading product with us.
23 I did help them with bookkeeping, just because I
24 help a lot of people doing -- doing bookkeeping.  It
25 wasn't a matter of compensation.  Matter of -- our

46

1  mutual companies traded for that with each other.
2  It was like a friendly thing, not being paid for
3  work.  So they took, you know, an amount of DVD's,
4  give it to us.  We took same amount of DVD -- it
5  wasn't on contract basis.  I wasn't doing
6  bookkeeping as bookkeeping, but because I
7  just help him a little bit because I knew more
8  than him about Quick -- about the QuickBooks
9  accounting, so I just showed him the ropes more.
10   Q.  So you taught bookkeeping to Jason?
11   A.  Kind of.  Whatever I knew.  You know, how to
12 put a bill in, how to make a due, pay bills.
13   Q.  And you were compensated?
14   A.  I wasn't compensated.  From DSA I was not
15 compensated, period.
16   Q.  Okay.  Did you ever do accounting for
17 Lifestyle Media Brands, Inc.?
18   A.  You asked me that.  Yes.
19   Q.  And what did that company do?
20   A.  It was a -- one of the -- one of the
21 corporations.
22   Q.  When you say "one of the corporations," what
23 do you mean?
24   A.  One of the corporations that I did work for.
25   Q.  And do you know what that company sold?

47

1    A.  I think it sold skin product as well.
2    Q.  And what period did you do accounting for
3  Lifestyle Media Brand?
4    MR. ESENSTEN: Let me --
5    MR. UNGAR: Objection to the form of the
6  question, it's vague and ambiguous.
7    MR. ESENSTEN: You use the term accounting
8  and bookkeeping interchangeably.  Is that the intent
9  of the question, or do you intend -- are you using
10 accounting, versus bookkeeping as two different
11 definitions?  'Cause it goes back and forth, and
12 I'm -- and it's unclear as to how you're using that
13 term.
14 BY MR. TEPFER:
15   Q.  Mr. Nottea, is -- I just want to make sure I
16 understand.  Is there a difference in your mind
17 between accounting and bookkeeping?
18   A.  Definitely.
19   Q.  Can you tell me what you understand the
20 difference to be?
21   A.  Bookkeeping is a matter of controlling who
22 gets paid, as well as pay bills.  Accounting is done
23 by the accountant.
24   Q.  Okay.
25   A.  Two different scenarios.  I mean, I was more

48

1  in charge of making sure people got paid on time.
2  That was my main thing.
3    Q.  And so beyond, I guess, payroll, did you do
4  any other tasks?
5    A.  Even payroll I haven't done.  Everything was
6  done through an accountant.
7    Q.  So you didn't do payroll.  You just signed
8  the checks?
9    MR. UNGAR: Objection as to the form of the
10 question, it's vague and ambiguous.  It also
11 misstates the testimony.  It's also argumentative.
12   THE WITNESS: Didn't sign checks.  When was
13 payroll -- when I was told to have payroll done, I
14 contact the CPA, told him that's how much needs to
15 be paid.  He made a paper.  He made the payroll
16 stubs.
17 BY MR. TEPFER:
18   Q.  And when you were told to have payroll done,
19 you say, who told you to have payroll done?
20   A.  Wherever -- from wherever company I was
21 told, that's where -- what was paid.  If I was told
22 from one, it was paid from one; if it was two, paid
23 from two; if it was three, paid from three.
24   Q.  So -- sorry.
25   A.  Go ahead.

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

73

1    THE WITNESS: I don't know.
2    MR. UNGAR: -- calls for speculation, lacks
3    foundation.
4    BY MR. TEPFER:
5    **Q. Sorry. What was that?**
6    A. I don't know. It doesn't mention any
7    business, any -- anything here.
8    **Q. And when Mr. Bauer referred to you**
9    **continuing to use a company that is smart and cost**
10   **effective, what did you believe he was referring to?**
11   MR. ESENSTEN: Objection.
12   MR. UNGAR: Objection as to the form of the
13   question, it's vague and ambiguous, lacks
14   foundation, calls for speculation.
15   THE WITNESS: Repeat the question.
16   BY MR. TEPFER:
17   **Q. When Mr. Bauer said that you could continue**
18   **to use a company that is smart and cost effective,**
19   **what -- what company did you believe he was**
20   **referring to?**
21   A. I have no idea.
22   MR. UNGAR: Objection as to the form of the
23   question --
24   THE WITNESS: I have no idea which --
25   MR. UNGAR: -- calls for speculation, it's

---

74

1    vague and ambiguous, and it assumes facts not in
2    evidence.
3    BY MR. TEPFER:
4    **Q. Go ahead.**
5    MR. ESENSTEN: His response was "I have no
6    idea," but it was in the middle. So is that your
7    response?
8    THE WITNESS: I have no idea.
9    BY MR. TEPFER:
10   **Q. And when Mr. Bauer refers to a business**
11   **winding down, do you -- what was your understanding**
12   **of what business was winding down?**
13   A. I --
14   MR. UNGAR: Objection as to the form of the
15   question, it's vague and ambiguous.
16   THE WITNESS: I don't know. It doesn't
17   mention even, so I have no idea.
18   MR. ESENSTEN: Just to be clear --
19   BY MR. TEPFER:
20   **Q. Did you --**
21   MR. ESENSTEN: -- the document says "new
22   whatever business as the old wind down," so I think
23   you misstated the document.
24   BY MR. TEPFER:
25   **Q. And during this period were you assisting**

---

75

1    any company in winding down business?
2    A. No.
3    **Q. Were you aware of any company that was**
4    **winding down business?**
5    MR. UNGAR: Objection as to the form of the
6    question, it's vague and ambiguous and has
7    absolutely no discovery relevance whatsoever. It is
8    not connected in any way to any of the issues in
9    this lawsuit, and the question is not reasonably
10   calculated to lead to the discovery of admissible
11   evidence.
12   BY MR. TEPFER:
13   **Q. You can go ahead.**
14   A. No.
15   **Q. Were you aware that your brother's company**
16   **was at this time period winding down sales of**
17   **AuraVie skin care products?**
18   MR. ESENSTEN: Objection; vague.
19   THE WITNESS: No.
20   BY MR. TEPFER:
21   **Q. And up at the top, doron5000@gmail.com, is**
22   **that your email address?**
23   A. Yes.
24   **Q. Does anyone else use that email address?**
25   A. No.

---

76

1    MR. UNGAR: Objection; vague and ambiguous.
2    THE WITNESS: No.
3    MR. UNGAR: We don't know if your question
4    includes servers, Internet service providers,
5    intermediaries who receive packet transmissions.
6    Vague and ambiguous.
7    BY MR. TEPFER:
8    **Q. Did you create that email address account?**
9    A. Yes.
10   **Q. When did you create that email address**
11   **account?**
12   A. I have no idea. I don't know.
13   **Q. Do you -- can you recall roughly a year in**
14   **which you created that email address account?**
15   A. Seven, eight years ago.
16   **Q. Is doron@doron.us an email address that you**
17   **use?**
18   A. Yes.
19   **Q. To your knowledge, does anyone else use that**
20   **email address?**
21   A. No.
22   MR. UNGAR: Did you answer the question?
23   THE WITNESS: I said no, I don't know.
24   MR. UNGAR: Oh, I'm going to interpose an
25   objection. It's vague and ambiguous because it

---

19 (Pages 73 to 76)

FTC v. Bunzai Media Group, Inc., et al.                                                      1/20/2016

---

77

1   doesn't take into account intermediaries, Internet,
2   and service providers.
3        MR. ESENSTEN:  Are you okay?  Are we off the
4   record?
5        MR. TEPFER:  No, I'll just keep going.  Luis
6   is going to get a copy made.
7   BY MR. TEPFER:
8        Q.  Do you know who Paul Medina is?
9        A.  Yes.
10       Q.  Is he a business associate of your
11  brother's?
12       A.  Yes.
13       Q.  What company did he work with your brother
14  at?
15       MR. UNGAR:  Objection as to the form of the
16  question, it's vague and ambiguous and calls for
17  speculation.
18       THE WITNESS:  Repeat the question again.
19  BY MR. TEPFER:
20       Q.  What company did Paul Medina work with your
21  brother at?
22       MR. UNGAR:  Same objection.
23       THE WITNESS:  I think he worked in BunZai.
24  BY MR. TEPFER:
25       Q.  Do you know what his role at BunZai was?

---

78

1        A.  I think they ran corporation.
2        Q.  Did you ever communicate with him regarding
3   BunZai Media Group's business?
4        MR. UNGAR:  Objection as to the form of the
5   question, it's vague and ambiguous.
6        MR. ESENSTEN:  Objection; overbroad, vague.
7        THE WITNESS:  No.
8   BY MR. TEPFER:
9        Q.  Would he assist you in any of your
10  bookkeeping responsibilities at any of the corporate
11  defendants?
12       A.  Yes.
13       MR. UNGAR:  Objection as to the form of the
14  question, it's vague and ambiguous.
15  BY MR. TEPFER:
16       Q.  How did he assist you?
17       A.  He as well, he gave me vendors to pay as
18  well.  People that he work with at -- that the
19  companies owed money to.  And I believe that he made
20  reports.  I mean, he was -- he knows accounting lot
21  more than I, so I think he made daily reports or
22  monthly reports, some sort of -- money coming in and
23  out.
24       Q.  Did you ever review these monthly reports?
25       A.  No.

---

79

1        Q.  Did you ever receive these monthly reports?
2        (Mr. Gallegos leaves the room.)
3        THE WITNESS:  I might have seen some emails,
4   but they didn't really make any difference to me.  I
5   wasn't part of -- I wasn't doing decision making or
6   anything that needed me to look at them.
7   BY MR. TEPFER:
8        Q.  Did you request that he send you these
9   monthly reports?
10       A.  No.
11       Q.  Did you ever do any analysis --
12       (Mr. Gallegos enters the room.)
13  BY MR. TEPFER:
14       Q.  -- concerning monthly chargebacks for the
15  sale of AuraVie products?
16       MR. UNGAR:  Objection as to the form of the
17  question, vague and ambiguous.
18       THE WITNESS:  No.
19  BY MR. TEPFER:
20       Q.  And going back to Nastassia Yalley, did she
21  ever provide you with sales spreadsheets concerning
22  BunZai Media Group's sales?
23       A.  It's possible that I have been cc'd on the
24  chain of emails, but nothing that I ever asked her
25  to do for me.

---

80

1        Q.  Did she ever send them, to your knowledge,
2   just to you?
3        MR. UNGAR:  Objection as to the form of the
4   question, vague and ambiguous.
5        THE WITNESS:  I don't know.
6   BY MR. TEPFER:
7        Q.  Did you ever request that she send them to
8   you?
9        A.  No.
10       MR. UNGAR:  Objection as to the form of the
11  question --
12       THE WITNESS:  Sorry.
13       MR. UNGAR:  -- vague and ambiguous.
14       THE WITNESS:  No.
15  BY MR. TEPFER:
16       Q.  Did you review these sales spreadsheets?
17       A.  No.
18       MR. UNGAR:  Objection as to the form of the
19  question, vague and ambiguous, assumes facts not in
20  evidence.
21       MR. TEPFER:  Do we have the --
22       MR. GALLEGOS:  She's getting them.
23       MR. TEPFER:  So we'll get back to that.
24       MR. GALLEGOS:  Is this one yours
25  (indicating)?

---

20 (Pages 77 to 80)

EXHIBIT "C" - PAGE 12

FTC v. Bunzai Media Group, Inc., et al.                                        1/20/2016

---

89

1          MR. GALLEGOS:  We have 45 now.
2          MR. TEPFER:  Okay.  We've got the copy, but
3    we --
4          MR. GALLEGOS:  Now he's gone.
5          MR. TEPFER:  Lost counsel.
6          MR. GALLEGOS:  He's over there, imaginary.
7          (Plaintiff's Exhibit 45 was marked
8          for identification by the court
9          reporter and is attached hereto.)
10   BY MR. TEPFER:
11       Q.  So I'm handing -- this one's mine here --
12   what's marked there at the bottom Exhibit 45.  If
13   you'll take a look at that.
14       Do you recall receiving this email from Paul
15   Medina?
16       MR. ESENSTEN:  And you're referring to
17   including the attachment?
18       MR. TEPFER:  Oh, I'm sorry.  The exhibit
19   contains Attachments A through C.
20   BY MR. TEPFER:
21       Q.  Page 1, do you recall seeing this email --
22       A.  No.
23       Q.  -- on Exhibit 45 page 1?
24       A.  (Witness shakes head from side to side.)
25       MR. ESENSTEN:  Just for clarity, I see

---

90

1    Exhibit C, but nothing behind.  Is there anything
2    intended to be behind it?
3          MR. TEPFER:  Exhibit C continues for several
4    pages.  For some reason, when it prints out it adds
5    an extra page.  I'm not sure.  That's Excel.
6          MR. ESENSTEN:  I don't -- hold on a second.
7    Let's see if I understand.
8          So Exhibit C starts at the top True Market
9    Partner Lime Light?
10         MR. TEPFER:  The first -- let's see.
11   Exhibit C begins right here at Fact Expenses, Total
12   Expenses.  I believe it's a two column spreadsheet,
13   anyway.
14         MR. ESENSTEN:  Could you just show me where
15   it is?  I don't see it.
16         MR. GALLEGOS:  It's here (indicating).
17         MR. ESENSTEN:  Oh, I see.
18         MR. TEPFER:  It's just a two-column
19   spreadsheet, and it's quite long.
20         MR. ESENSTEN:  And then it ends at --
21         MR. TEPFER:  And for some reason it printed
22   blank.
23         MR. ESENSTEN:  -- Total Operation Expenses,
24   the last part of the document?
25         MR. TEPFER:  Well, I mean the last one with

---

91

1    any writing, yes.
2          MR. ESENSTEN:  Okay.
3    BY MR. TEPFER:
4        Q.  So Exhibit 45, page 1, do you recall
5    receiving that email from Paul --
6        A.  No.
7        Q.  -- Medina?
8        A.  I never seen this.
9        Q.  Where it says "Attachments: US Rebill Die
10   Down," do you have any understanding of what that's
11   referring to?
12       A.  No.
13       Q.  On the first page of Attachment A in the
14   spreadsheet, I want to draw your attention to the
15   9th box in the first column where it says "1% Owner
16   Commission."
17       Do you -- what's your understanding of what
18   that refers to?
19       A.  It refers to the percentage that the owner
20   gets.
21       Q.  The owner of what?
22       A.  I guess the corporations.  I don't know.  I
23   never seen it before.  I don't know.
24       Q.  So the owner of corporations that you did
25   bookkeeping for received 1 percent; is that correct?

---

92

1        A.  Yeah.
2          MR. ESENSTEN:  Object.  I'll object as
3    overbroad, vague.
4    BY MR. TEPFER:
5        Q.  1 percent of what?
6        A.  I don't really know.  I mean, those
7    reports -- I mean, I don't know for what, and I used
8    to get reports saying pay 1 percent, 2, and to -- as
9    a individual and he was -- he was paid.
10       Q.  So it's your understanding that the owners
11   of the companies that you did bookkeeping for
12   received only 1 percent of, I assume, profit?
13         MR. ESENSTEN:  Objection; speculation --
14         THE WITNESS:  I --
15         MR. ESENSTEN:  -- lacks foundation.
16         THE WITNESS:  Sorry.  I don't know if it's
17   profit or not, 1 percent of something.  I never had
18   to calculate that, so I don't know.
19   BY MR. TEPFER:
20       Q.  And who determines -- in your understanding,
21   who determines the percentage that the owners get?
22         MR. ESENSTEN:  Who did or --
23         MR. TEPFER:  Yeah.
24         THE WITNESS:  Paul.  Paul.  Paul did.
25   ///

---

23 (Pages 89 to 92)

93

1   BY MR. TEPFER:
2       Q.  So Paul Medina determined the, I guess the
3   percentage payout to owners of the companies you did
4   bookkeeping for?
5       A.  Yeah.  Paul send me few times text.
6       Q.  You said that Paul a few times sent you
7   spreadsheets like this?
8       A.  Spreadsheet that just said 1 percent,
9   like -- not a spreadsheet.  Like an email that said
10  1 percent to A, B, C, D, E, F, G.  We made checks
11  and we send them out.
12      Q.  And where did Paul work at when he sent you
13  these emails?
14      A.  I believe he used to work for BunZai, and I
15  know that he moved to another company and -- and --
16  Media Urge.
17      Q.  So while Paul was at BunZai, he was making
18  these payout decisions for the other companies that
19  you did bookkeeping for?
20      A.  Yeah, I guess.  I didn't do bookkeeping with
21  BunZai, but I know it continued after I took it
22  over.
23          (Mr. Alon Nottea enters the room.)
24  BY MR. TEPFER:
25      Q.  Okay.  If you could turn to, well, the

94

1   fourth page of Attachment A --
2          MR. ESENSTEN:  Wait.  Can we be sure we're
3   on the same --
4          MR. TEPFER:  Sure.
5          MR. ESENSTEN:  Where does it start?
6          MR. TEPFER:  The first column is "SBM
7   Flexible."
8          MR. ESENSTEN:  With the word "Legal" to the
9   very left.
10         MR. TEPFER:  Yeah.
11         MR. ESENSTEN:  Okay.
12  BY MR. TEPFER:
13      Q.  Do you know what SBM Flexible refers to?
14      A.  Not at all.
15      Q.  Do you know what "AuraVie Monthly Cost Per
16  Chargeback" refers to?
17      A.  No.
18         MR. ESENSTEN:  Wait.  I'm sorry.  Okay.
19  You're down to about two thirds of the way down?
20         MR. TEPFER:  Mm-hmm.  Mm-hmm.
21         MR. ESENSTEN:  Yes?
22         MR. TEPFER:  Yes.  Sorry.  Got to do that
23  for the record.
24  BY MR. TEPFER:
25      Q.  And you've never seen this spreadsheet

95

1   before?
2       A.  Never.
3       Q.  Do you know who -- I'm going to mispronounce
4   this, but I'm going to try -- Feliberto Rivas is?
5          MR. ESENSTEN:  Can you spell it?  I'm not
6   sure where his name is.
7          MR. TEPFER:  Sure.
8          THE WITNESS:  This one (indicating).
9          MR. ESENSTEN:  Oh, okay.  F-e-l-i-b-e-r-t-o,
10  last name R-i-v-a-s.
11         THE WITNESS:  I guess he was employee or
12  something.
13         MR. ESENSTEN:  Do you know?
14         THE WITNESS:  Do I know what?
15         MR. ESENSTEN:  Who he is.
16         THE WITNESS:  No.
17  BY MR. TEPFER:
18      Q.  Do you know who -- this is going to be a
19  tough one, too -- Geiner Samayoa is?
20         MR. ESENSTEN:  Last name S-a-m-a-y-o-a.
21  BY MR. TEPFER:
22      Q.  Do you know who Geiner Samayoa is?
23      A.  I've seen it before, yes.
24      Q.  Where have you seen it?
25      A.  He used to work for BunZai.

96

1       Q.  Do you know what he did for BunZai?
2       A.  I think he was working in the warehouse.
3       Q.  Do you know what he did?
4       A.  Shipping.
5       Q.  Do you know what Grafipack is?
6          MR. ESENSTEN:  G-r-a-f-i-p-a-c-k.
7          THE WITNESS:  Yes.
8   BY MR. TEPFER:
9       Q.  What is Grafipack?
10      A.  The Grafipack that I know if it's the same
11  company that they make there a printer.  They print
12  boxes --
13      Q.  They --
14      A.  -- flyers, boxes.  It's a printer.
15      Q.  Okay.
16      A.  I know because I use similar company doing
17  my adult stuff.  I'm not sure if it's the same
18  company, but it sounds the same.
19      Q.  Okay.  Do you know what Chargeback Armor is?
20      A.  I know the company, yes.
21      Q.  Did you ever do any work for Chargeback
22  Armor, Inc.?
23      A.  I wrote a few checks with them, yes.
24      Q.  Did you do anything beyond writing a few
25  checks for Chargeback Armor, Inc.?

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

97

1    A.  Not at all.
2    Q.  Who owns Chargeback Armor, Inc.?
3    A.  Michael Costache.
4        MR. ALON NOTTEA:  Is it okay with you if I
5    open the door a little bit?  It's really, really hot
6    in here.
7        MR. GALLEGOS:  Sure.
8        MR. ALON NOTTEA:  There's nobody here.
9    BY MR. TEPFER:
10   Q.  Are you aware if your brother Alon ever sold
11   AuraVie products?
12   A.  Yes, of course.
13   Q.  Through what company did he sell AuraVie
14   products?
15   A.  Through BunZai.  I mean, what do you mean?
16   Q.  Which company did -- which company or
17   companies did your brother use to sell AuraVie
18   products?
19   A.  I know he used BunZai, and I know he used a
20   few of the other companies as well, a couple of
21   them, the names you mentioned.  Allstar, Agoa, maybe
22   Heritage.
23   Q.  Did you -- to your knowledge, did your
24   brother ask the owners of the companies permission
25   to sell AuraVie product through their company?

---

98

1    A.  I don't know.
2        MR. ESENSTEN:  Objection; vague, overbroad.
3    BY MR. TEPFER:
4    Q.  Do you know why your brother Alon stopped
5    selling AuraVie products?
6    A.  No.  It's a great product.  I use it.
7        MR. ESENSTEN:  You've answered the question.
8    BY MR. TEPFER:
9    Q.  Did you ever have a conversation with your
10   brother about reasons why he was going to cease
11   selling AuraVie products?
12   A.  No.
13   Q.  Do you have any idea why your brother sold
14   AuraVie products through multiple companies?
15   A.  No.  I guess it's his choosing.  No.
16   Q.  Do you have any knowledge of your brother
17   running a call center of any kind, ever?
18       MR. ESENSTEN:  Objection; vague, overbroad.
19       THE WITNESS:  I've seen people on the phone
20   on Gloria.  I don't know if --
21   BY MR. TEPFER:
22   Q.  So at 7900 Gloria they ran a call center; is
23   that correct?
24   A.  I believe so.
25   Q.  Do you know what company ran that call

---

99

1    center?
2    A.  BunZai, I believe.
3    Q.  When did they run that company, to your
4    understanding -- I mean, run that call center,
5    rather?
6    A.  2011, 2010 to 2013, probably.
7    Q.  And they stopped -- the call center ceased
8    to exist in 2013; is that your understanding?
9    A.  I don't -- I was not there, so I don't know.
10   Q.  What is E-V-O, or EVO?
11   A.  I think it's a merchant processor, is all I
12   know.
13   Q.  And just to make sure, is it EVO or E-V-O,
14   do you know?
15   A.  I don't know.  I have no idea.
16   Q.  Did you ever assist in opening accounts at,
17   we'll say EVO?
18   A.  No.
19   Q.  Did you ever assist in responding to
20   inquiries from EVO for BunZai or any of the other
21   corporate defendants?
22   A.  No.
23       MR. ESENSTEN:  Objection; vague.
24       THE WITNESS:  Sorry.  No.
25       MR. TEPFER:  Do you know if we have

---

100

1    Exhibit 39?
2        MR. GALLEGOS:  I'll check.
3        MR. ESENSTEN:  Are we done with 45?
4        MR. TEPFER:  Yeah.  I think for now.
5        MR. GALLEGOS:  I don't have a 39 in my
6    stack, unless I'm missing it.
7        MR. TEPFER:  Really?
8        MR. GALLEGOS:  I'll get a copy later on for
9    Bob.
10       MR. TEPFER:  Do we need one more?
11       MR. ESENSTEN:  I think it would be
12   appropriate, so that he can get a set of exhibits.
13       MR. GALLEGOS:  I'll get one during the
14   break, a copy.
15       MR. ESENSTEN:  Okay.
16       MR. TEPFER:  So you all only have one?
17       MR. ESENSTEN:  Did you give one to the
18   witness?  No.
19       MR. TEPFER:  I don't believe so.
20       MR. ESENSTEN:  If you didn't, let's get
21   another one copied.
22       MR. TEPFER:  Sure.
23       MR. ESENSTEN:  Do me a favor.  One side.
24       MR. TEPFER:  Yeah, well, in the future.  I
25   think that's good for right now.  We just have a few

---

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

101

1    questions about it.
2         MR. GALLEGOS:  I'll do it real quick.  If
3    you want to go on to something else, I can get it
4    real quick for you.
5         MR. TEPFER:  Okay.
6         (Mr. Gallegos leaves the room.)
7    BY MR. TEPFER:
8         Q.  So when you were doing bookkeeping for the
9    Corporate Defendant -- and just for ease of
10   communication, that group of companies that you did
11   bookkeeping for that we've been discussing, do you
12   have any sort of name that you use to refer to those
13   companies?
14        A.  Yeah, companies.
15        MR. ESENSTEN:  You're asking for this
16   deposition, how to identify them --
17        MR. TEPFER:  No.
18        MR. ESENSTEN:  -- or something they used in
19   the past?
20        MR. TEPFER:  Well, just either way.
21   BY MR. TEPFER:
22        Q.  Did you refer to those companies by any one
23   term?
24        A.  No.
25        Q.  Can we refer -- is it acceptable to you to

---

102

1    refer to those as the BunZai companies or the,
2    rather, the AuraVie group of companies?
3         A.  Either one.
4         MR. ESENSTEN:  I think you better use a more
5    neutral term.
6    BY MR. TEPFER:
7         Q.  Well, so the companies that we've discussed
8    that you did bookkeeping for that sold AuraVie
9    products, only the companies that sold AuraVie
10   products that you've mentioned, can we refer to
11   those as the AuraVie companies?
12        MR. ESENSTEN:  Can I -- give me a second.
13   Let me think about that.
14        Could you repeat that, Ms. Reporter.
15        (The previous question was read back
16   by the court reporter as follows:
17        "QUESTION:  Well, so the
18   companies that we've discussed that
19   you did bookkeeping for that sold
20   AuraVie products, only the companies
21   that sold AuraVie products that
22   you've mentioned, can we refer to
23   those as the AuraVie companies?")
24        (Mr. Gallegos enters the room.)
25        MR. ESENSTEN:  One more time.

---

103

1         (The previous question was read back
2    by the court reporter as follows:
3         "QUESTION:  Well, so the
4    companies that we've discussed that
5    you did bookkeeping for that sold
6    AuraVie products, only the companies
7    that sold AuraVie products that
8    you've mentioned, can we refer to
9    those as the AuraVie companies?")
10        MR. ESENSTEN:  Sure.
11        MR. TEPFER:  Okay.  That -- I think that
12   will make things a little bit easier.
13        MR. ESENSTEN:  That's my job.
14   BY MR. TEPFER:
15        Q.  Let's see.
16        Are you aware of the AuraVie companies ever
17   selling their product overseas?
18        A.  No.
19        Q.  Let's see.
20        Have you ever heard the AuraVie group of
21   companies referred to as a high risk business?
22        A.  No.
23        Q.  Do you have any understanding of the AuraVie
24   companies' profit margin?
25        A.  Not at all.

---

104

1         Q.  When you were doing bookkeeping for the
2    AuraVie companies, did you treat them as separate
3    companies, or did you -- well, I'll just leave it at
4    that.
5         Did you treat them as separate entities?
6         A.  Yes.
7         Q.  Do you have any idea why an owner of the
8    AuraVie companies would receive only 1 percent of
9    processing or 1 percent share of income?
10        MR. ESENSTEN:  Objection; speculation,
11   assumes facts not in evidence.
12        THE WITNESS:  I have no idea.
13   BY MR. TEPFER:
14        Q.  Sorry?
15        A.  I have no idea.
16        Q.  Okay.  Do you have any understanding of what
17   the owners of the AuraVie companies did to receive
18   their 1 percent share?
19        MR. ESENSTEN:  Objection; vague, lack of
20   foundation --
21        THE WITNESS:  No.
22        MR. ESENSTEN:  -- assumes facts not in
23   evidence.
24   BY MR. TEPFER:
25        Q.  Would you typically meet with the owners of

---

26 (Pages 101 to 104)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555   EXHIBIT "C" - PAGE 16

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

105

1  the AuraVie companies?
2         MR. ESENSTEN:  Objection; vague.  Vague as
3  to time, vague as to the word "meet."
4  BY MR. TEPFER:
5      Q.  Let me rephrase.
6         Would you, during the period that you did
7  bookkeeping, would you periodically meet with the
8  owners of the AuraVie companies --
9         MR. ESENSTEN:  Vague.
10  BY MR. TEPFER:
11     Q.  -- in person?
12        MR. ESENSTEN:  Vague, speculation, lack of
13  foundation, overbroad.
14        THE WITNESS:  Once in a while, yes.
15  BY MR. TEPFER:
16     Q.  Would you meet with anyone else concerning
17  the management of the -- or rather, the bookkeeping
18  of the AuraVie companies?
19        MR. ESENSTEN:  Same objection.
20        THE WITNESS:  Stephan or Paul.
21        MR. TEPFER:  Well, I just went over by a
22  minute.  I think if now's a good time, we can --
23        MR. GALLEGOS:  It's up to you.
24        MR. TEPFER:  -- do lunch.
25        MR. ESENSTEN:  It's up to you.

---

106

1         MR. TEPFER:  Sure.
2         MR. ESENSTEN:  Let's go off the record.
3         MR. TEPFER:  Okay.
4         (A discussion was held off the record.)
5
6         (Whereupon, at the hour of
7         12:32 p.m., a luncheon recess was
8         taken, the deposition to be resumed
9         at 2:13 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

107

1  LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 20, 2016
2                2:13 P.M.
3
4              DORON NOTTEA,
5       having been previously duly sworn,
6       was examined and testified as follows:
7
8         MR. TEPFER:  Back on the record.
9
10            EXAMINATION
11  BY MR. TEPFER:
12     Q.  Mr. Nottea, I want to ask you about DSA
13  Holdings, Inc.  You had mentioned that's a company
14  you did bookkeeping at one point for; correct?
15     A.  I helped, yes.
16     Q.  You helped Jason do bookkeeping?
17     A.  Yes.
18     Q.  Did you ever communicate with David Davidian
19  about the incorporation of DMA Holdings, to your
20  recollection?
21        MR. ALON NOTTEA:  DMA or DSA?
22        THE WITNESS:  DSA.
23  BY MR. TEPFER:
24     Q.  Sorry.  DSA Holdings.
25     A.  I don't know.

---

108

1      Q.  Do you recall if you ever edited DSA's
2  Articles of Incorporation?
3      A.  No.
4      Q.  Do you recall ever requesting that the
5  Articles of Incorporation for DSA Holdings be sent
6  to you?
7      A.  Possibly, yes.
8         (Plaintiff's Exhibit 41 was marked
9         for identification by the court
10        reporter and is attached hereto.)
11  BY MR. TEPFER:
12     Q.  Okay.  I want to hand Mr. Nottea Plaintiff's
13  Exhibit 41.  And Plaintiff's Exhibit 41 has
14  Attachment A to it.
15        MR. GALLEGOS:  I don't have -- I have --
16        MR. TEPFER:  Really?
17        MR. GALLEGOS:  I have 470.  Here we go.
18        There's three copies in here, or is it one
19  copy?
20        MR. ESENSTEN:  Here's 44 back.
21        MR. GALLEGOS:  Thanks.
22  BY MR. TEPFER:
23     Q.  Do you recall --
24        MR. ESENSTEN:  Yeah, looks like it's a
25  four-page document; is that correct?

---

27 (Pages 105 to 108)

FTC v. Bunzai Media Group, Inc., et al.                                         1/20/2016

---

125

BY MR. TEPFER:
Q. What fees are you aware of?
A. The only thing I had access for is when I look at the bank statement, I see -- I see money coming in, I see fees taken out. Can be discount fees, can be some other fees, but --
Q. And --
A. -- that's all you see.
Q. And so as part of your duties as bookkeeper, did you make payments to various merchant processors for the AuraVie companies?
A. No. They don't -- they take payments, from -- from what I saw.
Q. Okay. And when you say you see money coming out, what are you referring to?
A. When you look at the bank statements you see money coming in, money coming out, some transactions where fees, discount fees, fees that the bank account charges, like every merchant account.
Q. And as part of your review, would you typically see chargebacks?
MR. ESENSTEN: Are you referring to a merchant account bank statement? Is that what you're asking him about?
///

---

126

BY MR. TEPFER:
Q. If you can answer.
MR. ESENSTEN: Well, then I object as vague --
MR. TEPFER: Sure.
MR. ESENSTEN: -- unintelligible, and it's an unfair question if you're not telling him what he should refer to.
Can you answer the question the way he asked it?
THE WITNESS: I mean, listen, from what I used to see, I tried --
MR. ALON NOTTEA: No, no, no, no, no.
MR. ESENSTEN: Time out. Listen carefully to the question.
Ms. Reporter, would you please read it.
And answer just his question. Don't editorialize. Don't speculate what his question is. Just, if you have an answer, give it to him.
(The previous question was read back by the court reporter as follows:
"QUESTION: And as part of your review, would you typically see chargebacks?")
MR. ESENSTEN: Vague, unintelligible,

---

127

outside -- it's just in the context.
MR. TEPFER: Right. If he can answer it, though.
MR. ESENSTEN: Do you understand the question to answer it?
THE WITNESS: Yes.
MR. ESENSTEN: Okay. Then answer it, please.
THE WITNESS: Yes. I saw, like you say, like you saw, fees. I saw chargebacks.
BY MR. TEPFER:
Q. Just to be clear, you saw chargebacks when you were reviewing --
A. Bank statements.
Q. Bank statements.
Okay. Would you also review statements from these merchant accounts?
A. No.
Q. And as part of your bookkeeping, would you keep track of the chargebacks on these bank account statements?
A. No, no, no, no.
Q. Do you know who did that?
A. No --
Q. Do you --

---

128

A. -- I don't.
Q. Sorry.
A. Go ahead.
Q. Do you know what departments BunZai Media Group had?
MR. ESENSTEN: Objection; vague.
THE WITNESS: No. I said before I wasn't in BunZai. I have no idea.
BY MR. TEPFER:
Q. Were you doing -- were you working as a bookkeeper out of 7900 Gloria at the same time that BunZai Media Group was located at that address?
A. No.
Q. Where were you doing your bookkeeping services at the time that BunZai Media Group was located at 7900 Gloria?
A. At my office, 6925 Canby Avenue, Suite Number 105.
Q. Do you know the -- do you know the different, I suppose, corporate departments that Pinnacle Logistics had?
A. (Witness shakes head from side to side.)
MR. ALON NOTTEA: You have to answer. You can't go like this (indicating).
THE WITNESS: No. Sorry. No.

---

32 (Pages 125 to 128)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT "C" - PAGE 18

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

149

1    A.  No idea.  Never seen it before.
2    Q.  On the next page, 54-10, do you recognize
3  that signature?
4    A.  Yes.
5    Q.  And whose is it?
6    A.  My brother.
7    Q.  I'm sorry?
8    A.  My brother Alon.
9    Q.  Okay.
10    MR. ESENSTEN:  Are we done with 54?
11    MR. TEPFER:  Yeah, I think so.
12    MR. ESENSTEN:  Do you want some water or --
13    THE WITNESS:  No, I'm okay.
14    (Plaintiff's Exhibit 56 was marked
15    for identification by the court
16    reporter and is attached hereto.)
17  BY MR. TEPFER:
18    Q.  Now I'm handing Mr. Nottea what has been
19  marked Exhibit 56.
20    Do you recall receiving this email from
21  David Davidian?
22    A.  Yeah.
23    Q.  Did you meet with Mr. Davidian around
24  June 21st, 2011?
25    A.  I guess so, yes.

150

1    Q.  Do you remember that meeting?
2    A.  I remember him coming to Gloria, the office,
3  and he met with Khristopher.  I was not part of the
4  meeting.
5    Q.  So you didn't personally meet with him?
6    A.  I greet him at the door.  I introduced him
7  to Alon and Khristopher, and they took the meeting.
8    Q.  And so you were at 7900 Gloria that day?
9    A.  At that time, yes.  In that -- the time
10  period.
11    Q.  Do you recall what you were doing there?
12    A.  What am I doing there?  Used to be my
13  building before.  So my adult entertainment used to
14  be at that building before.
15    Q.  Okay.  So you also ran a business out of
16  7900 Gloria?
17    A.  How to -- my --
18    MR. ESENSTEN:  Objection as to "also."
19  Sounds argumentative.
20    Can you rephrase it.
21  BY MR. TEPFER:
22    Q.  In 2011 did you also run a business out of
23  7900 Gloria?
24    A.  Yes.
25    Q.  What business was that?

151

1    A.  My adult business.
2    Q.  Do you have more than one adult business?
3    A.  I have a few adult business.
4    Q.  Okay.  And so you were there that day, I
5  guess, managing your adult business?
6    A.  Yes.  I had an office there as well.  So
7  we're actually clear, used to be my office before.
8    Q.  Sure.
9    How often during the period that BunZai
10  Media operated at 7900 Gloria, how often would you
11  be at that address?
12    MR. ESENSTEN:  Objection; vague as to time,
13  overbroad, vague.
14    THE WITNESS:  Two, three hours a week,
15  maybe.  A few hours here and there.
16  BY MR. TEPFER:
17    Q.  Okay.  Did you discuss the BunZai -- or
18  rather, the AuraVie companies' corporate structure
19  with Mr. Davidian around June 21st, 2011?
20    A.  No.
21    Q.  Do you know if your brother did?
22    A.  According to this, yes.  Obviously, if he
23  was there, he met him.
24    Q.  Did you, around this time, discuss the
25  BunZai or the AuraVie's corporate structure?

152

1    A.  No.
2    (Plaintiff's Exhibit 58 was marked
3    for identification by the court
4    reporter and is attached hereto.)
5    MR. TEPFER:  58, real quick.  I'm sorry.
6  This is 58 and Attachment A, and it isn't, you know,
7  numbered so --
8    MR. ESENSTEN:  Let's number the pages, just
9  so we're --
10    MR. TEPFER:  Okay.
11    MR. ESENSTEN:  -- on the same wavelength.  I
12  have 12.
13    MR. TEPFER:  Same here.  I am now handing
14  what's marked Exhibit 58 to Mr. Nottea.
15  BY MR. TEPFER:
16    Q.  On the first page of Exhibit 58 is an email.
17  Do you recall sending this email?
18    A.  No, never seen this email before.  Never
19  seen this paper before.
20    Just for the record, I want to say
21  something.  I think that the reason you're seeing my
22  name here is because maybe when somebody scanned the
23  paper, they sent it from my email, because a bunch
24  of these things I never seen before.
25    MR. ESENSTEN:  Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555    EXHIBIT "C" - PAGE 19

165

1   know of.  No.")
2   MR. UNGAR:  And before that.
3   (The previous question and answer
4   were read back by the court reporter
5   as follows:
6       "QUESTION:  Do you know if your
7   brother had a position at Media Urge
8   in 2014?
9       "ANSWER:  I think he did.")
10  BY MR. TEPFER:
11      Q.  Okay.  What was that position?
12      A.  I don't know.
13      Q.  What makes you think that your brother had a
14  position at Media Urge?
15      A.  What makes me think?  I don't know.  I've
16  seen business cards of his.  That -- that's how I
17  think.
18      Q.  Do you recall what title was on those
19  business cards of your brother's from Media Urge?
20      A.  Rainmaker.
21      Q.  Do you know why your brother went by the
22  title of Rainmaker at Media Urge?
23      A.  I don't know even know what Rainmaker means.
24      Q.  On the second page of Exhibit 21,
25  Attachment O, at around the middle of the page

166

1   there's a paragraph that begins "Due to new".  Would
2   you mind reading that sentence?
3       A.  "Due to new compliance regulations that are
4   coming out soon (FTC, VISA, MasterCard), and due to
5   the aggressive marketing nature of these external
6   affiliates/marketers which we have to monitor and
7   police daily.  We have decided to 'stop' new
8   AuraVie, Dellure, and Miracle face kit, new customer
9   acquisitions.  This means that we will quickly see
10  new transactions fading away and over the next few
11  months, we are just going to go thru the existing
12  subscriptions re-bills we have in our system."
13      Q.  Did you read this portion of the email when
14  you received it?
15      A.  No.
16      Q.  Do you know if --
17      MR. ESENSTEN:  When you're ready, I have a
18  concern about the exhibit.  So let me know when
19  you're ready.
20  BY MR. TEPFER:
21      Q.  Do you know, did you ever discuss with your
22  brother his concerns about FTC regulations?
23      A.  No.
24      MR. ESENSTEN:  While you're in between
25  questions, we have two Exhibit 21's.

167

1       MR. TEPFER:  We do?
2       MR. ESENSTEN:  We do.  One shows Exhibit
3   Attachment A, and the other one is Attachment O.
4   We're going to have a mess of a time with the
5   exhibits if you --
6       MR. TEPFER:  Which is the second exhibit,
7   Exhibit 21?
8       MR. ESENSTEN:  Exhibit 21 is the one you
9   marked.  It's an email of August 14th, 2013.
10      MR. TEPFER:  That's a different -- that's
11  Attachment A of Exhibit 21.
12      MR. ESENSTEN:  You're going to have a mess
13  of a time --
14      MR. TEPFER:  Right, but this is already --
15      MR. ESENSTEN:  -- figuring out the exhibits.
16      MR. TEPFER:  But I think we filed Exhibit 21
17  already, and Exhibit 21 is a declaration of, I
18  believe, our investigator testifying as to
19  certain -- the authenticity of certain exhibits.  So
20  that's -- you know, that's why we have it by
21  attachments.  I think it makes the most sense to,
22  you know, proceed with labeling them as attachments.
23  That's how we've been referring to them in other
24  documents, just for consistency.
25      MR. ESENSTEN:  The problem that you're going

168

1   to have is exhibits that have been marked at
2   depositions have to be the same exhibits that have
3   to be used at time of trial.  So you're going to
4   have two Exhibit 21's.  If you tell the court you
5   have Exhibit 21 Attachment A, and then Attachment O,
6   and then you're trying to use it at the time of
7   trial to have a witness identify an exhibit and the
8   various pages -- so, for instance, this document has
9   Exhibit 21, 1 through 5, this Exhibit 21 has page
10  1 -- the court's going to be real unhappy with
11  this --
12      MR. TEPFER:  Should we --
13      MR. ESENSTEN:  -- confusion.
14      MR. TEPFER:  Do you want to go off the
15  record and discuss it?
16      MR. GALLEGOS:  Let's go off the record.
17      (A discussion was held off the record.)
18      MR. ESENSTEN:  Let's go back on the record,
19  please.
20      Ms. Reporter, we're on the record, but
21  during the break I told counsel for the FTC that we
22  have two Exhibit 21's.  One is deemed Attachment A,
23  the other is Attachment O, and it's my belief that
24  that's going to be confusing.  There's a --
25  allegedly, a declaration that has various

FTC v. Bunzai Media Group, Inc., et al.                                  1/20/2016

---

177

1    Mr. Medina is referring to?
2        A.  I don't know the account, no.
3        Q.  Did you in 2013 manage the Lime Light
4    accounts for the AuraVie companies?
5            MR. ESENSTEN:  Objection; vague.
6            THE WITNESS:  No.
7    BY MR. TEPFER:
8        Q.  Did you have an ownership interest in 2013
9    in Secured Merchants?
10       A.  No.
11       Q.  Did you -- let's see.  Did you have any
12   position at Secured Merchants in 2013?
13       A.  No, never.
14       Q.  Do you know why Paul would run this request
15   by you?
16       A.  To get a --
17           MR. UNGAR:  Objection as to the form of the
18   question, it's vague and ambiguous.
19           THE WITNESS:  I believe just to get a credit
20   card and number.
21   BY MR. TEPFER:
22       Q.  And so did you do bookkeeping at this time
23   for Secured Merchants?
24       A.  I think so.
25       Q.  Did you have signatory authority over

---

178

1    Chargeback Armor's bank accounts in June of 2015?
2        A.  Yes.
3        Q.  Who requested that you have signatory
4    authority over those accounts?
5        A.  The owner, Michael Costache.
6        Q.  Do you know anyone else that has worked at
7    Chargeback Armor, Inc., since its inception?
8            MR. ESENSTEN:  Objection; vague, overbroad.
9            MR. UNGAR:  Join.
10           THE WITNESS:  Roi.  Roi Reuveni.
11   BY MR. TEPFER:
12       Q.  Do you know who created the software, the
13   Chargeback Armor software used by Chargeback Armor,
14   Inc.?
15       A.  No.
16       Q.  Do you know what the business of Chargeback
17   Armor, Inc., is?
18       A.  No.
19       Q.  Do you know if your mother ever had a
20   merchant account in her name, through which
21   Chargeback -- through which AuraVie products were
22   sold or processed?
23       A.  Yes, she did.
24       Q.  Do you know who asked her to open a merchant
25   account in her name?

---

179

1        A.  I guess my brother.
2        Q.  Do you know why he asked your mother to open
3    that account?
4        A.  No.  His mother.  I don't know.
5        Q.  Do you know if your father has a merchant
6    account in his name, through which AuraVie products
7    were sold or charged?
8        A.  I know he had one, yes.
9        Q.  Do you know if he had more than one?
10       A.  No, I don't know.  No.
11       Q.  Did your brother also request that your
12   father open that account?
13       A.  I guess so, yes.
14       Q.  Did you ever sign any documents on your
15   father's behalf for these payment processors or
16   merchant accounts?
17       A.  No.
18       Q.  Did you ever sign Stephan Bauer's name on
19   any bank documents relating to the AuraVie
20   companies?
21       A.  No.
22       Q.  Do you know which company your mother had a
23   merchant account with?
24       A.  I think Lifestyle something.  Lifestyle
25   Brands, maybe.  I'm not sure.

---

180

1        Q.  Was she the owner of Lifestyle Media -- or
2    is it Lifestyle Media, I believe?
3        A.  I believe so.
4        Q.  Do you know when she created that company?
5        A.  No.
6        Q.  Did Alon ask her to create that company?
7            MR. UNGAR:  Objection; vague and ambiguous.
8    Objection as to the form of the question.  It's
9    vague and ambiguous, it calls for speculation, lacks
10   foundation.
11           THE WITNESS:  No.
12   BY MR. TEPFER:
13       Q.  No as in he --
14       A.  I don't know.
15       Q.  Okay.  During your time as bookkeeper, did
16   you ever pay for any of the websites used to market
17   AuraVie skin care products?
18       A.  No.
19       Q.  Did you ever authorize anyone to use a
20   credit card in your name to pay for websites used to
21   market AuraVie products?
22       A.  It's so vague.  I don't know.  I mean, they
23   use my credit card -- what is it for?
24       Q.  Did you ever use corporate credit cards in
25   the name or other corporate credit cards associated

---

45 (Pages 177 to 180)

EXHIBIT "C" - PAGE 21

FTC v. Bunzai Media Group, Inc., et al.                                                    1/20/2016

---

181

1    with the AuraVie companies for personal purchases?
2        MR. UNGAR:  Objection as to the form of the
3    question, vague and ambiguous.
4        MR. ESENSTEN:  I join on that, those
5    objections.
6        THE WITNESS:  No.
7    BY MR. TEPFER:
8        Q.  Do you know why Alon never asked you to open
9    a merchant account in your name?
10       MR. ESENSTEN:  Objection --
11       MR. UNGAR:  Object.
12       MR. ESENSTEN:  -- speculation, lack of
13   foundation, assumes facts not in evidence.
14       MR. UNGAR:  Join.
15       MR. ESENSTEN:  If I didn't say vague, I
16   would like to.
17       MR. UNGAR:  Join.  And argumentative.
18       THE WITNESS:  The answer is no.
19   BY MR. TEPFER:
20       Q.  Do you know who Andrew Stanley is?
21       A.  Yes.
22       Q.  Where do you know him from?
23       A.  I've seen him at the building in Gloria, in
24   the old building that --
25       Q.  Do you know what he did at the Gloria

---

182

1    building?
2        A.  No.
3        Q.  Do you know if he worked for BunZai?
4        A.  I think so, yes.
5        Q.  Do you know if he worked for Pinnacle?
6        A.  Yes.  Probably, yes.
7        Q.  Do you know who his supervisor was?
8        MR. ESENSTEN:  Objection; vague.
9        THE WITNESS:  Supervisor, Khristopher Bond.
10   BY MR. TEPFER:
11       Q.  During the time that you served as
12   bookkeeper for the AuraVie companies, did you ever
13   give any assignments to -- work assignments to
14   Mr. Stanley?
15       A.  No.
16       Q.  As bookkeeper, did you ever write any refund
17   checks for customers of the AuraVie companies?
18       A.  I don't think so, no.  No.
19       Q.  Do you know if your brother ever used the
20   alias J. Michaels?
21       A.  No.
22       Q.  Is that you don't know?
23       A.  No, I don't know.
24       Q.  During your time as bookkeeper, did you ever
25   use any aliases yourself?

---

183

1        A.  No.
2        Q.  Do you know if your father personally signed
3    the merchant account applications for -- that he had
4    opened in his name for selling AuraVie products?
5        A.  I don't know.
6        MR. GALLEGOS:  Let's take a break.  Off
7    record.
8        (Recess)
9        MR. TEPFER:  Back on the record.
10   BY MR. TEPFER:
11       Q.  We just have a few more topics here.  I want
12   to talk about your office on Canby --
13       A.  Okay.
14       Q.  -- in Suite 105.
15       A.  Okay.
16       Q.  Is that your office?
17       A.  Yes.
18       Q.  Do you share that office with anyone?
19       A.  Yes.
20       Q.  Who?
21       MR. ESENSTEN:  And what time period are we
22   at?
23   BY MR. TEPFER:
24       Q.  What time period did you rent that space in
25   Suite 105?

---

184

1        A.  I think September, October 2012 until now.
2        Q.  Okay.  And since you began renting that
3    space in 2012, who all have you shared that office
4    with?
5        A.  Until recently it was only me and Alan.  He
6    had his office and I had mine.
7        Q.  And so did you all have a, I guess, a divide
8    in Suite 105 where all your separate offices were?
9        A.  There's one, two, three offices there.  One
10   for him, one for me.  One was like a --
11       MR. ALON NOTTEA:  Common area.
12       THE WITNESS:  Common area.
13   BY MR. TEPFER:
14       Q.  Okay.  Could you describe where your office
15   in Suite 105 was located?
16       A.  Come in, mine was the second office straight
17   in.  Alan was the first, mine was the second.
18   Actually, I'm sorry.  No.  One -- mine was the third
19   office.  There's a third office.  Alan was one,
20   there was one more, hallway, and then mine.
21       Q.  And --
22       A.  Yeah.
23       Q.  Okay.  Do you know what business Alan
24   Argaman ran out of that office in Suite 105 during
25   the period that you all shared that suite?

---

46 (Pages 181 to 184)

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

185

1          MR. UNGAR:  Objection as to the form of the
2    question, assumes facts not in evidence.
3          THE WITNESS:  I believe he ran Secret
4    Mansions.
5    BY MR. TEPFER:
6          Q.  And did you all also run Secured Commerce
7    out of that suite?
8          A.  Yeah.
9          Q.  Were any other businesses operated out of
10   Suite 105 since you began renting that space?
11         A.  In, I think, March or April, Chargeback
12   Armor took two rooms there.
13         Q.  Sorry.  Could you repeat that?
14         A.  I think in March or April Chargeback Armor
15   took two -- two rooms, the common -- the -- the
16   common area and the second office next to Alan.
17         Q.  So that's April 2015?
18         A.  Yes.
19         Q.  And Chargeback Armor, Inc., was renting, I
20   guess --
21         A.  Exactly.
22         Q.  -- renting two rooms in Suite 105?
23         A.  Yes.
24         Q.  And what Chargeback Armor employees were
25   working out of Suite 105 during that period?

186

1          A.  Michael -- Michael Costache was there, and
2    Roi was also there.
3          Q.  And did Michael or Roi pay rent to you for
4    that space?
5          MR. ESENSTEN:  Objection; assumes facts not
6    in evidence, speculation, vague.
7          And are you asking personally?  That's what
8    your question seems to infer, versus, corporate.
9    So --
10   BY MR. TEPFER:
11         Q.  Sure.
12         Did Chargeback Armor pay rent to anyone for
13   that space in Suite 105, to your knowledge?
14         A.  I don't know.  I don't know.
15         Q.  Did you personally issue the checks to pay
16   for the space in Suite 105?
17         A.  Yes.
18         Q.  Do you know the company that was on the
19   lease for Suite 105 --
20         A.  Yeah.
21         Q.  -- from the --
22         A.  Secured Commerce.  Actually, they did pay
23   rent.  They did pay rent.  Chargeback Armor did pay
24   rent.
25         Q.  And who did Chargeback Armor pay rent to?

187

1          A.  That was directly.
2          Q.  They had a lease through the landlord, you
3    said?
4          A.  No.  They just paid their share, their
5    portion, whatever it was.  They paid directly to the
6    to the people -- people who owned the center over
7    there.
8          Q.  Okay.  Is it correct that in June 2015 you
9    had pre-signed blank checks for the AuraVie
10   companies in your office in Suite 105?
11         MR. UNGAR:  Objection as to the form of the
12   question, it's vague and ambiguous.
13         THE WITNESS:  Yes.
14   BY MR. TEPFER:
15         Q.  Did you request that the owners of those
16   companies sign those checks?
17         A.  Yes.
18         MR. UNGAR:  Objection as to the form of the
19   question, it's vague and ambiguous.
20   BY MR. TEPFER:
21         Q.  Why did you request that they sign those
22   checks?
23         A.  If they're not available to pay a bill, if
24   they cannot come to pay a bill and the bill is due,
25   so we can make a payment.

188

1          Q.  Did you also have, I suppose in June 2015,
2    deposit stamps for the AuraVie companies in your
3    office in Suite 105?
4          A.  I believe so, yes.
5          Q.  Who gave those to you?
6          A.  I believe when they moved out of the
7    Van Nuys office, they -- they brought me a bunch of
8    stuff.  I don't know if it was in boxes, in drawers.
9    I mean, I -- I never had to use them so --
10         Q.  When who moved out of the Van Nuys office?
11         A.  When the AuraVie companies moved out of
12   there.
13         Q.  Do you know where they moved to?
14         A.  They had -- they had a unit in the complex.
15   6914 Canby, Unit 107.
16         Q.  And is it's your understanding that the
17   AuraVie companies operated out of Suite 107?
18         A.  Yes.
19         Q.  Do you know of any other companies that
20   operated out of Suite 107?
21         A.  No.
22         Q.  Do you know if Focus Media Solutions, Inc.,
23   sold AuraVie products?
24         A.  No.
25         Q.  Do you -- is it true that Focus Media

47 (Pages 185 to 188)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555   EXHIBIT "C" - PAGE 23

189

1   Solutions, Inc., is the successor to Media Urge,
2   Inc.?
3       MR. UNGAR:  Objection as to the form of the
4   question, vague and ambiguous.
5       MR. ESENSTEN:  Calls --
6       MR. UNGAR:  Calls for speculation.
7       MR. ESENSTEN:  And legal conclusion.
8       THE WITNESS:  I don't know.  No.
9   BY MR. TEPFER:
10      Q.  What, in your understanding, is the
11  relationship between BunZai Media Group, Inc., and
12  Pinnacle Logistics, Inc.?
13      MR. ESENSTEN:  Speculation.
14      MR. UNGAR:  Objection.
15      MR. ESENSTEN:  If any.
16      MR. UNGAR:  Objection as to the form of the
17  question, assumes facts not in evidence, vague and
18  ambiguous, calls for speculation, lacks foundation,
19  also.
20      THE WITNESS:  Repeat the question again.
21      MR. TEPFER:  Could you read it back, please.
22      (The previous question was read back
23      by the court reporter as follows:
24         "QUESTION:  What, in your
25      understanding, is the relationship

190

1      between BunZai Media Group, Inc., and
2      Pinnacle Logistics, Inc.?")
3       MR. UNGAR:  Same objection.
4       THE WITNESS:  I don't know.  I can't even
5   tell.  No, I don't know.
6   BY MR. TEPFER:
7       Q.  Are you aware of any relationship between
8   Media Urge, Inc., and Focus Media Solutions, Inc.?
9       MR. ESENSTEN:  Object --
10      MR. UNGAR:  Objection as to the form of the
11  question, it's vague and ambiguous, calls for
12  speculation, lacks foundation.
13      THE WITNESS:  No.
14  BY MR. TEPFER:
15      Q.  Do you know if Focus Media Solutions, Inc.,
16  used the same office space as Media Urge, Inc., at
17  any point?
18      A.  No.
19      Q.  Is that --
20      A.  No, they didn't.
21      Q.  Okay.  Do you know if Media Urge, Inc., ever
22  did any advertisements for or designed any
23  advertisements for AuraVie products?
24      MR. UNGAR:  Objection as to the form of the
25  question, vague and ambiguous, and compound.

191

1       THE WITNESS:  No.
2   BY MR. TEPFER:
3       Q.  Is that no, they didn't?
4       A.  No, I don't know.
5       Q.  Did you ever, as bookkeeper for Pinnacle
6   Logistics, make payments from a Pinnacle Logistics
7   account to a Media Urge, Inc., account, to your
8   recollection?
9       A.  No.
10      Q.  Is that no, you didn't, or --
11      A.  No, I didn't.
12      Q.  Do you know if BunZai Media Group, Inc.,
13  used affiliates for the marketing of AuraVie
14  products --
15      MR. UNGAR:  Object.
16  BY MR. TEPFER:
17      Q.  -- any point?
18      MR. UNGAR:  Objection as to the form of the
19  question, vague and ambiguous.
20      THE WITNESS:  I guess so.
21  BY MR. TEPFER:
22      Q.  Why do you -- why do you guess so?
23      A.  I guess they used some of it to market the
24  product.  They just called -- if it's called
25  affiliates, affiliates.

192

1       Q.  And what is your understanding of what an
2   affiliate is?
3       A.  Someone who helps you.
4       Q.  Are you aware of any affiliate networks used
5   by BunZai Media Group, Inc., for the marketing of
6   AuraVie products?
7       MR. UNGAR:  Objection as to the form of the
8   question, vague and ambiguous.
9       MR. ESENSTEN:  And calls for legal
10  conclusion.
11      THE WITNESS:  No.
12  BY MR. TEPFER:
13      Q.  Did you have in your office in Suite 105 in
14  June 2015 any signature stamps?
15      A.  I think so.
16      Q.  Do you recall for what individuals you had
17  signature stamps for?
18      A.  I believe his name is David.  And last name
19  Yosfian, I think.
20      Q.  Who's David -- sorry, and could you spell
21  that last name?
22      A.  I think Y-o-s-f-i-a-n.
23      Q.  Who's David Yosfian?
24      A.  He's one of the officers, one of the owners
25  of Kai Media.

48 (Pages 189 to 192)

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

---

193

1    Q.  Did you have any other signature stamps, to
2  your knowledge?
3    A.  No.
4    Q.  What did you use those signature stamps for?
5    A.  I myself never used them.
6    Q.  Did -- you never used any of -- any
7  signature stamps?
8    A.  Not -- no, not signature stamps.  No.
9  Never.
10    Q.  Why did you have them?
11    A.  The owner of the company, they came to sign
12  checks and probably left it there.
13    Q.  Did you ever use the deposit stamps that you
14  had at your office?
15    A.  I might have.
16    Q.  Do you recall that your office contained a
17  book of credit cards?
18    A.  Yes.
19    Q.  Who gave you those credit cards?
20    A.  There were a lot of credit cards there.
21  There's my credit cards, my family credit cards.  I
22  mean there was some check cards of some of the
23  corporations.  My family members gave it to me when
24  they're away.  I have friends that I do bookkeeping
25  for, gave me the credit cards.  Owners of the

---

194

1  corporations has just debit cards there.
2    Q.  Do you typically request that the owners of
3  the AuraVie corporations give you these credit cards
4  in their names?
5    MR. ESENSTEN:  Objection; assumes facts not
6  in evidence, vague.
7    THE WITNESS:  No.
8    MR. UNGAR:  Join in the objection.  And
9  argumentative.
10    MR. ESENSTEN:  I'll join in that one.
11    THE WITNESS:  No, I don't request.
12  BY MR. TEPFER:
13    Q.  So the owners give you these credit cards
14  without your request?
15    A.  Yeah.
16    Q.  Do you have any idea why they do that?
17    A.  Yeah.  I use --
18    MR. UNGAR:  Objection as to the form of the
19  question, vague and ambiguous, lacks foundation,
20  calls for speculation.
21    MR. ESENSTEN:  I'll join.
22    THE WITNESS:  I used to make the deposits.
23  BY MR. TEPFER:
24    Q.  Uh-huh.
25    A.  So you don't have to stand in line, so you

---

195

1  can make the deposits.
2    Q.  Did you ever use any of those credit cards
3  in that book that weren't in your name for personal
4  expenditures not related to the AuraVie companies?
5    A.  No.
6    Q.  During the course of your employment as
7  bookkeeper, do you have a general idea of how much
8  money you received in compensation from the AuraVie
9  companies?
10    A.  Not on top of my head, no.
11    Q.  Do you believe that it was more than 50,000?
12    A.  Yes.
13    Q.  Do you believe it was more than a hundred
14  thousand?
15    A.  Yes.
16    Q.  Do you believe it was more than 300,000?
17    A.  No.
18    Q.  Is it more than 200,000?
19    A.  I don't know.
20    Q.  Do you recall how you received this
21  compensation from the AuraVie companies?
22    A.  They paid me through my corporation, and
23  every once in a while I -- I -- I mean, I used one
24  of -- a credit card to -- to pay bills, and that was
25  a part of it.

---

196

1    Q.  When you say they paid you through your
2  corporation, which corporation do you mean?
3    A.  The company is called Critical Media.
4    Q.  Do you recall which companies made payments
5  to Critical Media to compensate you for this
6  bookkeeping?
7    A.  A few of them.  I don't remember exactly
8  which ones.  Not the specific one.
9    Q.  Do you recall which credit card you used to
10  pay bills as part of your compensation for
11  bookkeeping for the AuraVie companies?
12    A.  No.
13    Q.  Were those credit cards, to your knowledge,
14  in your own name or someone else's?
15    A.  In my own name.
16    Q.  Were those, to your knowledge, personal
17  credit cards or corporate credit cards?
18    A.  I don't really know.  I just can't -- I -- I
19  can't speculate.  I don't know.
20    Q.  Sure.
21    And those payments, were those for your own
22  personal expenses or for the expenses of one of your
23  companies, to your knowledge?
24    A.  It varied.  I mean, they're reimbursement
25  for stuff that was put on my credit cards.  I can't

---

49 (Pages 193 to 196)

FTC v. Bunzai Media Group, Inc., et al.                                                1/20/2016

209

1
2
3      STATE OF CALIFORNIA          )
                                    )  ss.
4      COUNTY OF LOS ANGELES        )
5
6          I, DORON NOTTEA, having appeared for my
7      deposition on January 20, 2016, do this date declare
8      under penalty of perjury that I have read the
9      foregoing deposition, I have made any corrections,
10     additions or deletions that I was desirous of making
11     in order to render the within transcript true and
12     correct.
13         IN WITNESS WHEREOF, I have hereunto
14     subscribed my name this_____day of_____,
15     2016.
16
17
18
19
20
21          W I T N E S S
22
23
24
25

210

1              REPORTER'S CERTIFICATE
2
3          I, the undersigned, a Certified Shorthand
4      Reporter of the State of California, do hereby
5      certify;
6          That the foregoing proceedings were taken
7      before me at the time and place herein set forth;
8      that any witnesses in the foregoing proceedings,
9      prior to testifying, were placed under oath; that a
10     verbatim record of the proceedings was made by me
11     using machine shorthand, which was thereafter
12     transcribed under my direction; further, that the
13     foregoing is an accurate transcription thereof.
14         I further certify that I am neither
15     financially interested in the action, nor a relative
16     or employee of any attorney of any of the parties.
17         IN WITNESS WHEREOF, I have this date
18     subscribed my name.
19
20     Dated:
21
22
23
24          CHRISTINA KIM-CAMPOS
25          CERTIFICATE NO. 12598

53 (Pages 209 to 210)

EXHIBIT "C" - PAGE 26

# CERTIFICATE OF SERVICE

I hereby certify that on **May 2, 2016**, I electronically filed the foregoing document entitled **DECLARATIONOF RANDI R. GEFFNER IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court by using the CM/ECF System.


*/s/ Robert L. Esensten*
Robert L. Esensten