DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov; Tex. Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Ste 2150
 Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.*<br><br>**Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S REPLY TO DEFENDANTS ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK ARMOR, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   Introduction ................................................................................................3

II.  Legal Argument. ........................................................................................4

   A. Corporate Defendant SM's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability ................................4

   1. SM was a Member of the Common Enterprise .............................................4

   2.  SM's Role in the Common Enterprise was Central to the Scheme's Capital Structure and Finances. ...................................................6

   B. Corporate Defendant CBA's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability .............................7

   C. Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability. ..............................................12

   1. Defendant Argaman's Management and Participation in the Common Enterprise was Critical to the Scheme's Success. ...............................12

   2.  The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception. ..........................................15

III.   Conclusion .............................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564 (7th Cir. 1989) ..........................15

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ....................3, 13

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) .............4, 5

*FTC v. Ivy Capital, Inc., et al.*  2013 WL 1224613 (D. Nev. Mar. 26, 2013) .........7

*FTC v. JK Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Ca. 2000) ...........4, 11

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) .........5

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ................15

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) ...............11,15

*FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991) .............................15

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

**I.      Introduction**

In their Opposition, Defendants assert that "[a]t its core, this is a case about deceptive marketing and advertising." Dkt. 392, at 17. Defendants' view, however, only captures half of AuraVie's wrongs. This is also a case about using consumers' credit card information for unauthorized and unwanted charges to their accounts—rank theft that Defendants Argaman, Secured Merchants, LLC ("SM") and Chargeback Armor, Inc. ("CBA," and, together with Defendants Argaman and SM, "Defendants"), alongside Argaman's other company, Secured Commerce, LLC, were integral to perpetrating and perpetuating.

Defendants' contentions in their Opposition to Plaintiff's Motion for Summary Judgment, Dkt. 392, mirror their Motion for Summary Judgment, Dkt. 354, so in many respects this Reply will reflect Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Dkt. 394 ("Plaintiff's Opposition"). Instead of burdening the Court with responses to the same arguments discussed in previous filings, however, Plaintiff will address Defendants' legal and factual arguments by cross-referencing Plaintiff's Opposition when possible.

Defendants not only participated in AuraVie's scheme but were central to areas critical to the enterprise's success. As such, although Defendants argue that this Court should hold them without fault in AuraVie's massive swindle, it should

3

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  instead impose injunctive and monetary liability. *See FTC v. Commerce Planet,*

2  *Inc.*, 815 F.3d 593 (9th Cir. 2016). As in Plaintiff's Opposition, this Reply Brief

3  will first address SM and CBA to establish their respective roles in the scheme—

4  SM as a member of the common enterprise and CBA as a relief defendant—and

5  resulting liability; this Brief will then move to the role of Defendant Argaman,

6  whose wrongs included not only those of SM and CBA but also his own further

7  participation in the scheme.

8  **II.   Legal Argument.**
   **A.   *Corporate Defendant SM's Integral Role in the Scheme Demands***

9  ***Injunctive Relief and Joint and Several Monetary Liability***

10  To challenge SM's liability for the AuraVie's wrongs, Defendants forgo

11  substantive discussion of SM's actual role in the scheme, opting instead to recast

12  SM's relationship to its co-conspirators as not meeting the legal standards

13  associated with common enterprise liability. Dkt. 392, at 12-18. The facts of the

14  case, however, show that SM was a fully-integrated cog in the AuraVie machine.

15  As Plaintiff set forth in the case law discussion in Plaintiff's Opposition, Dkt. 395,

16  at 5-7, when Corporate Defendants act as a common enterprise, each may be held

17  jointly and severally liable for the unlawful acts and practices of the other. *FTC v.*

18  *Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) ; *FTC v. JK*

19  *Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Ca. 2000) .

20  **1.  *SM was a Member of the Common Enterprise.***

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1    Where, as here, corporate defendants act as a common enterprise, each may

2    be held jointly and severally liable for the unlawful acts and practices of the other.

3    *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) ; *FTC v.*

4    *JK Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Ca. 2000) . "To determine

5    whether a common enterprise exists, the Court considers factors such as: [1]

6    common control; [2] the sharing of office space and officers; [3] transacting

7    business through a maze of interrelated companies; [4] the commingling of

8    corporate funds and failure to maintain separation of companies; [5] unified

9    advertising; and [6] evidence that reveals that no real distinction exists between

10   the corporate defendants." *Grant Connect*, 827 F. Supp. 2d, at 1216 (quoting *FTC*

11   *v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)). As

12   detailed in Plaintiff's Opposition, Dkt. 395 at 7-13, Defendants meet all six of the

13   factors courts have looked to in determining whether a defendant belonged to a

14   common enterprise. SM's various Auravie-related owners (Defendants Alon and

15   Doron Nottea, Roi Reuveni, and Argaman himself), shared employees, shared

16   office, shared financial management and advisors, shared marketing activities, and

17   SM's integration into the web of AuraVie enterprises all demonstrate that a

18   common enterprise existed and that SM was a critical component of it. And while

19   these facts may contradict Argaman's self-serving and otherwise unsupported

20   claim that he is the sole owner and manager of SM, Dkt. 392 at 13, the facts gel

5

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

perfectly with SM's own Executive Summary that touts SM's "founder**s**" who "saw first-hand every type of failure trap that could have killed *their* skin care product company," Ex. 256-1 (emphasis added), as well as Doron Nottea's apparent understanding of SM's relationship to the other AuraVie companies: Nottea provided David Davidian, the CPA for substantially all AuraVie entities, a list of "Bunzai Companies" that included SM. Ex. 394.

### 2. SM's Role in the Common Enterprise was Central to the Scheme's Capital Structure and Finances

Despite Defendants' claim that SM's relationship to the scheme was that of an "arms' length technology vendor," providing services "completely unrelated to the alleged sale of skincare using deceptive marketing and advertising." Dkt. 354, at 8, 17-18, this picture fails to reflect the facts. As briefed in Plaintiff's Opposition, Dkt. 395, at 13-15, Defendants' "services" were critical to perpetuating AuraVie's scheme. These services included (1) chargeback resolution through their "ChargeBack Armor" service; UF #39(f);[1] (2) automated customer service systems through their "voice logix" system; UF #26(b)(i); and (3) managing consumer relations for their negative option continuity plans through LimeLight, a third party customer relationship management (CRM)

---

[1] For the purposes of this Reply Brief, citation references to "UF #[x]" refer to the Plaintiff's Statement of Uncontroverted Facts & Conclusions of Law In Support of Its Motion for Summary Judgment, Dkt. 353-2.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

software, which Argaman used to facilitate AuraVie's load balancing.[2] Their role in the common enterprise was thus to stave off the numerous consumers whose credit accounts were surreptitiously billed by AuraVie—a critical aspect for a scheme premised upon such a deception.

### B.   *Corporate Defendant CBA's Integral Role in the Scheme Demands Injunctive Relief and Joint and Several Monetary Liability*

CBA's role in the scheme and the AuraVie defendants' participation in CBA's planning and execution demand its designation as part of the common enterprise responsible for the AuraVie scam. Its receipt of funds from AuraVie further renders it an appropriate relief defendant. As Plaintiff set forth in Plaintiff's Opposition, Dkt. 395, at 15-17, case law has held that "[t]he broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *FTC v. Ivy Capital, Inc., et al.* 2013 WL 1224613, *18 (D. Nev. Mar. 26, 2013) (quoting *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)). Here, disgorgement of the revenues CBA generated in its furtherance of the scheme is the *minimal* equitable

---

[2] *See* Ex. 248 (Argaman writes to Defendant Medina: "help me out... lime light has a place in the subscription where you can switch processors/[merchant account identifiers]" and then follows up with Defendant Reuveni because he "need[ed] this asap as team is idle and waiting on this."); *see also* Ex. 547-2 (Medina providing instructions directly to Argaman regarding load balancing.).

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

relief that this Court should impose against a company that played such a critical role in perpetuating AuraVie's deceptive enterprise.

The case against CBA is simple and direct: CBA received substantial revenues traceable directly or indirectly to the unlawful conduct of AuraVie. UF #41. CBA was a key component to the continuation of the AuraVie scheme and received transfers in exchange for aiding the enterprise's ability to manage and abusively contest chargeback demands from consumers. UF #41(d). Despite Defendants' claim that CBA could not have done any work for the scheme because it was incorporated after the AuraVie business "had been shuttered," Dkt. 354, at 7, CBA's own Executive Summary boasted of the "33,000 chargebacks [that] were processed in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." UF #39(g)(iv); Ex. 281-2.

Defendants present three flawed arguments regarding why CBA should escape liability: (1) that SM is not a member of the common enterprise and therefore its funding should not include CBA in the AuraVie scheme; (2) that SM purports to prove that the funds used on CBA derive from outside its ill-gotten AuraVie revenues; and (3) that the AuraVie defendants had no role in CBA. *See* Dkt. 392, at 23-24. The reasons Defendants' three arguments fail are as straightforward as the case against CBA itself: First, as detailed in Section II.A.1.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*supra.*, SM was part of the AuraVie common enterprise, so CBA remains an

appropriate relief defendant. Second, SM's evidence regarding the source of funds

for its CBA seed capital, while certainly proving that SM had clients outside the

common enterprise, fails to demonstrate that they used those non-AuraVie funds,[3]

much less why their failed fund tracing argument is significant when SM—a

company whose revenue was 40% derived from AuraVie and who depended on

AuraVie for its survival[4]—was the source of CBA's funds. Because SM's

AuraVie revenues were generated by deceiving consumers, CBA did not have a

legitimate claim to them and should be forced to disgorge those funds.

Defendants' third argument, that Argaman and the other AuraVie

defendants had no role in CBA, simply ignores the substantial evidence to the

---

[3] Setting aside why SM would be so conscientious in isolating the funds it derived from AuraVie were it not aware of the scheme's abuses, Defendants do not provide any compelling evidence regarding their alleged use of their non-AuraVie funds.

As evidence, Defendants cite Exhibits 834-838, which are (1) three Services Contracts between SM and third parties (providing that SM had clients outside of AuraVie); (2) a Capital Infusion Agreement between SM and CBA (providing the funds); and (3) bank statements relating to a transfer to CBA. Even if tracing of funds were relevant, this evidence misses the critical component of Defendants' argument: providing evidence that such funds derived from those non-AuraVie contracts.

[4] Dkt. 120, at 82. In the Receiver's evaluation of SM's capital structure in her Report, she noted SM's dependence upon AuraVie funds and determined that "based in the lack of funds in the estate" as well as Defendants' failure to provide an opinion regarding SM's viability without AuraVie, the AuraVie defendants were "directed to dissolve" SM. Dkt. 120, at 82.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

contrary. Indeed, CBA's culpability for its role in the scheme is reinforced by the critical roles that several AuraVie defendants played in building and developing the company so it could aid the common enterprise. Defendants' contention that neither Defendant Argaman nor any "other Defendant had any formal role with CBA as a shareholder or director," Dkt. 392, at 24, lacks any credibility in light of the substantial evidence contradicting such a claim. Both Argaman and other individual AuraVie defendants controlled and oversaw CBA. First, Defendants Alon Nottea and Argaman are both listed along with Mike Costache as the board of directors for CBA. Dkt. 231-1, at 36. [5] Moreover, a CBA Executive Summary lists Argaman as the company's "Chief Technology Officer," [6] as well as listing Alon Nottea as President, Roi Reuveni as Customer Service Manager, and Tyler Reitenbach, an employee of SM and Pinnacle Logistics, as Sales Account Manager. Dkt. 231-1, at 6. In email discussions, Reuveni was designated to be

---

[5] Defendants fail to adequately challenge the evidence underlying this fact. In his declaration accompanying Defendants' Motion for Summary Judgment, Mike Costache, the purported sole shareholder, director and officer of CBA, presents the various officer and director duties of the individual AuraVie defendants as a sham "in order to obtain funding and thus had to list a full board and list of officers to attract investors." Dkt. 354-1, at ¶2.

Thus he at once concedes that other Auravie defendants were held out as officers and directors of the enterprise while at the same time admitting that they were held out as such as a way to fraudulently represent CBA to potential investors.

[6] Moreover, Argaman himself directed the incorporation of CBA, noting that "[t]he CEO and only representative for now will be Michael Costache . . . We intend to issue shares to Alon and I and possibly one or more investors." Ex. 404-3.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1   CBA's COO. See Dkt. 231-1, at 26-27. In fact, Defendant Medina testified that he

2   believed Defendant Alon Nottea owned CBA, UF #43(c)(ii), and a CBA lease

3   listed Doron Nottea and Argaman alongside Mike Costache as individuals to

4   whom mail may be sent at CBA. UF #39(g)(v). [7] Defendants have ignored and

5   failed to counter any of this compelling evidence with anything other than their

6   own general denials. *See* Dkt. 392 at 24.

7          Defendants contend that Plaintiff "implies" that "CBA somehow is a

8   successor to SM." Dkt. 392, at 24. In fact, Plaintiff does not "imply" anything:

9   CBA's own CEO, Mike Costache, in an email to a SM client, referred to Secured

10   Merchants as "the technology company that developed the Chargeback Armor

11   product" and noted that Secured Merchants was "transitioning all clients to be

12   billed" by Chargeback Armor. Dkt. # 231-1, at 8. And in fact, SM's principals—

13   Defendants Argaman, Alon Nottea, and Roi Reuveni—received statistics detailing

14   chargeback numbers for various CBA clients, including AuraVie. UF #39(g)(vii);

15

16   [7] And even when Defendants key on specific Exhibits to challenge these
     relationships, they fail: for example, Defendants challenge Exhibit 184 by noting
17   that the email in question is "unrelated" and "has no reference to CBA nor does it
     show that Nottea was somehow 'reporting' to Argaman," Dkt. 392, at 24, when in
18   fact the email itself reads: "Also very excited about Tyler[ Reitenbach]'s sales call
     and the boarding of the first customer for chargeback armor. as you mentioned,
19   we need to have a meeting in order to discuss a few points with respect to the
     launch of these companies… How we are billing the customers, through which
20   entity are we signing the agreements and so on." Ex. 184.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Ex. 151. Under such facts, CBA should be required to disgorge the ill-gotten gains it reaped from the scheme.

### C.   *Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability***.**

Like SM and CBA, Defendant Argaman's direct participation in the scheme demands full injunctive and monetary liability. As Plaintiff set forth in the case law discussion in Plaintiff's Opposition, Dkt. 395, at 19-21, individuals are subject to injunctive relief for a company's deceptive acts or practices when they either: (1) "participated directly in the acts or practices;" or (2) "had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997), as well as have had some knowledge of the company's deceptive acts or practices. *J.K. Publications, Inc.,* 99 F. Supp. 2d 1176, 1204 (C.D. Ca. 2000). Here, Argaman meets the threshold of both control and participation, and the weight of the evidence demonstrates that he meets the knowledge required for joint and several liability.

### 1.   *Defendant Argaman's Management and Participation in the Common Enterprise was Critical to the Scheme's Success.*

Defendants' self-serving contention that Argaman "was not an employee or officer of any of the AuraVie Defendants," Dkt. 392, at 13, simply does not stand up against the evidence in this case. Argaman's influence ran the gamut of the enterprise's operational areas. Alongside his key ownership and managerial roles

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

at SM and CBA, Defendant Argaman also (1) owned and controlled Secured Commerce, LLC, which designed the misleading "free trial" webpage so critical to the scheme's success; and (2) provided discrete services, apparently in his individual capacity, that further entrenched him in the scheme's inner workings.

Defendants' Motion dismissively describes a Secured Commerce, LLC that "did very limited business and was eventually shuttered," Dkt. 392, at 13, but that fiction fails to reflect the integral role, shown in Plaintiff's Opposition, Dkt. 395, at 22-24, that Secured Commerce, LLC played in executing the scheme.[8] The scope of Argaman's involvement went beyond his managerial and ownership roles in discrete entities and extended to direct involvement with the products themselves. As Plaintiff's Opposition showed, Dkt. 395, at 24, Defendant Argaman among other things (1) coordinated with other AuraVie defendants to sell Attitudeline/INFINI skincare products, a product that Defendants marketed or

---

[8] Moreover, Defendants claim that Secured Commerce "w[as] invoiced for a total of $13,500, which hardly provides a basis for holding Secured Commerce responsible for all of AuraVie's negative continuitiy sales." Dkt. 392, at 10.

Setting aside that Secured Commerce is not a party filing Defendants' Opposition, Defendants' contention simply does not reflect the law: under *Commerce Planet*, "Defendants held jointly and severally liable for payment of restitution are liable for the unjust gains the defendants collectively received, even if that amount exceeds (as it usually will) what any one defendant pocketed from the unlawful scheme. Indeed, we have previously upheld joint and several liability for payment of restitution even though the award exceeded the unjust gains any individual defendant personally received." *Commerce Planet*, 815 F.3d, at 12-13.

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

sold, or assisted others in marketing or selling, by negative option continuity; UF #39(d)(ix); (2) planned and managed the AuraVie Angels promotional campaign; UF #39(d)(x); [9] (3) established toll-free telephone numbers for various shell corporations and set up call forwarding for those numbers to aid the deception AuraVie used against credit card processors; UF #39(d)(xi);[10] and (4) coordinated

_____

[9] Defendant Argaman was also the chief architect of the AuraVie Angels marketing campaigns. UF #39(d)(x). Defendants contend that the evidence relating to AuraVie Angels, Exhibits 185, 494, and 497, are "bogus" claims and that the underlying evidence is mere "quotes for blog creation services." Dkt. 392, at 21.

In fact, Exhibits 185 and 497 reveal Argaman planning the AuraVie Angels promotion, including designing blogs along with (1) redesigning AuraVie's homepage to "contain links to" the blogs Argaman created; (2) designing a "Main Wordpress Portal" that feature a "Shop" link for AuraVie; and (3) coordinating the various "Wordpress Angel" blogs. Ex. 185-1. He then provides a stepwise program for how he will proceed.

Exhibit 494 finds a third party contractor involved in the design of the AuraVie Angels blogs asking Argaman and Alon Nottea to "review what I've done so far and to review the content" regarding his "work on Angels" when either of them was available for him to "swing by Bunzai," to which Argaman says he will provide the contractor with updates after consulting Nottea.

[10] Defendants contend that Exhibit 529 does not support the claim that Argaman created toll-free numbers for "shell companies." Dkt. 392, at 20. In fact, the email chain finds an employee of Bunzai needing phone numbers for AuraVie's shell merchant account companies asking Argaman for "5 completely random 800 numbers . . . completely off and different because we will be using them for different corporations." Ex. 529-2.

Defendant Alon Nottea then replies to the email by asking Argaman: "when you can I need those 5 numbers for more merchant accounts – toda[y]." Ex. 529-1. In his response, Argaman provides the numbers "already pointing to the server" and asks "[i]f you need more numbers let me know." *Id.*

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

shipping logistics for Pinnacle Logistics, Inc.—the AuraVie company responsible for order fulfillment. Exs. 174; 370.

### 2. *The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception.*

As fully briefed in Plaintiff's Opposition, Dkt. 395, at 25-26, Defendant Argaman's knowledge of the wrongs AuraVie committed is manifest in both his degree of participation in the scheme and in the higher-level discussions he was privy to in his email correspondence, including load balancing for AuraVie's web of high risk merchant accounts.[11] Given such a level of access to information

---

[11] *See* UF #26(d); 39(h), (i), (j), and (l). Here, Defendants challenge Exhibits 337 and 449 relating to load balancing, contending that these exhibits "do not contain any reference to these 'magic words', load balancing and high risk accounts."

In fact, Exhibit 449 not only includes those "magic words" but specifically consults Argaman regarding how to make AuraVie's load balancing more efficient: the email finds Paul Medina writing Argaman, along with Defendants Khristopher Bond and Alon Nottea, that ""[o]ur CA customers are currently being load balanced between multiple merchant accounts and corporations" and that "Limelight is launching a new feature which load balances gateways and not just merchant accounts." Medina then directly consults Argaman: "Avi, lets find a solution when customer selects 'CA'" to provide the correct gateway for their load balancing scheme.

Exhibit 337 contains the other "magic words" Defendants failed to note in their review: Paul Medina provided Argaman, along with Alon and Doron Nottea and Roi Reuveni, with an overview of a merchant account's monthly performance in terms of the percentage of deposits that are consumed by chargeback and refund fees. In the review, three months for the account are listed above 22% of deposits being consumed by fees, with the three most recent months at a minimum of 39.97% in red lettering, bolded, and labeled "Extremely High." Ex. 337-2. In the email, Medina notes that the "last 4 months has been coming in at 40% avg which

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1   alongside his broad responsibilities, Defendant Argaman meets either *Amy*

2   *Travel*'s "degree of participation" standard[12] or, at a bare minimum, the *Network*

3   *Servs. Depot* "high probability of deceptive conduct together with an intentional

4   avoidance of the truth" standard,[13] either of which establish knowledge of his role

5   in the AuraVie scheme.

6   **III.    Conclusion**

7           For the forgoing reasons, the FTC respectfully requests that the Court grant

8   summary judgment against Defendants on all counts and enter a Final Order for

9   Final Judgment and Order for Injunctive and Other Relief.

10                                                      Respectfully submitted,

11  Dated: 5/13/16                          /s/ ZACHARY A. KELLER_____
                                            ZACHARY A. KELLER
12                                          REID A. TEPFER
                                            LUIS H. GALLEGOS
13                                          Attorneys for the Plaintiff
                                            Federal Trade Commission
14  _____

15  is 25% higher" than the ceiling for chargebacks before they are subject to
    penalties.

16  [12] "[T]he degree of participation in business affairs is probative of knowledge."
    *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989); *see also FTC v.*
17  *Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

18  [13] "The FTC may establish knowledge by showing that the individual defendant
    had actual knowledge of material misrepresentations, [was] recklessly indifferent
    to the truth or falsity of a misrepresentation, or had an awareness of a high
19  probability of fraud along with an intentional avoidance of the truth." *FTC v.*
    *Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-1139 (9th Cir. 2010) (quoting
20  *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170 (9th Cir. 1997)).

16

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1

## CERTIFICATE OF SERVICE

2

The undersigned certifies that on May 13, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

3

4

5

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

6

7

8

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*
*Roi Rueveni*

9

10

11

12

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
*Counsel for Doron Nottea and Motti*
*Nottea*

13

14

15

16

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630

17

18

Costa Mesa, CA 92626
Telephone: (714) 641-3600 Ext. 214
*Counsel for Igor Latsanovski and*
*CalEnergy, Inc*

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
*Attorney for Paul Medina, Secured*
*Merchants, LLC,*
*and Chargeback Armor, Inc.*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

Kelly M. Crawford
Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
*Counsel to Receiver*

19

20

/S/ ZACHARY A. EKLLER
ZACHARY A KELLER

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT