# APPENDIX A

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's response to Cited Fact and Supporting Evidence |
|---|---|
| 36a. Doron Nottea and Motti Nottea stated that Igor Latsanovski was an owner of BunZai, and CEO of Zen Mobile Media Group, Inc. Dkts. 244 ¶ 36; 245 ¶ 36. | 36a. The FTC's reference to Doron and Motti Nottea's statement that I was an 'owner' of Bunzai is erroneous [36a]. They specifically denied that I had any ownership interest in 'Response's to FTC's Request for Admission-Set One." A true copy of their response is attached hereto as Exh. 'H' and incorporated herein by reference. I never owned any part of Bunzai. I was the 'CEO' of Zen Mobile Media. Alon Nottea asked me to incorporate Zen Mobile. Mr. Nottea thereafter managed the business' day to day operations. Zen Mobile handled merchant account business [Attached hereto as Exhibit 'I' is a true copy of Mr. Nottea's February 18, 2016 deposition R.T. 219: Ins. 14-21; Nottea specifically testified that 'A. I made decisions on behalf of Zen. It was not Igor. It is not Igor's consent to make decisions there.'] |

36a. Moving Party's Response

1. Plaintiff contests the entirety of this Dispute.

That Doron and Motti Nottea denied Latsanovski's ownership in Bunzai: Defendants contend that Doron and Motti Nottea "specifically denied" that Latsanovski owned Bunzai, but both parties admitted Latsanovski's ownership of Bunzai in the dockets to which Plaintiff cites in Fact 36(a). Dkts. 244 ¶ 36; 245 ¶ 36.

| 36b. Partnership agreements show Igor Latsanovski was an owner of BunZaiEx. 18-2. | 36b. I fully explained that no partnership was ever created with Bunzai above. I have no knowledge concerning the source of Defendant Medina's belief that I was an 'owner' of Bunzai. I was never a Bunzai owner. |
|---|---|

# APPENDIX A

| | Defendant Medina testified in his February 23, 2016 deposition that he was hired to work at Bunzai by Kristopher Bond; that he was supervised by Kristopher Bond and Alon Nottea; and that he 'assum[ed] [Bunzai] is owned by Alon and Kristopher because…they hired me.' A true copy of Medina's February 23, 2016 Deposition R.T. 10 and 12 is attached hereto as Exhibit 'J' and incorporated herein by reference. The specific testimony is at R.T. 10: lns. 9-15; and R.T. 12; lns. 10-13.] Because Calenergy loaned Bunzai substantial funds I was interested in Bunzai's financial status to ensure Calenergy would be repaid; because Bunzai was typically late or delinquent in repaying the loan. |
|---|---|

36b. Moving Party's Response

1. Plaintiff contests the entirety of this Dispute:

That Latsanovski was a co-owner of Bunzai Media Group, Inc.:
   a. Defendant Latsanovski does not provide any further evidence that disputes Plaintiff's contention.
   b. BunZai Media Group, Inc.'s certified public accountant, David Davidian, circulated corporate structure charts on at least two occasions long after the March 2011 Partnership Agreement was executed—one in December 2011, Ex. 522, and the other in March 2012, Ex. 302—where the "Shareholder(s)" for BunZai Media Group, Inc. are listed as "Alon, Igor, Chris."
   c. In a payroll spreadsheet for September 2011, Defendant Latsanovski is listed as an "Executive" alongside Defendants Alon Nottea and Kristopher Bond. Ex. 451.
   d. Partnership agreements show Igor Latsanovski was an owner of BunZai Ex. 18-2.
   e. Defendant Latsanovski provided his business partners with his opinion on who should lead various departments of their company and, demonstrating keen knowledge of their activities, he evaluated the relative strengths and weaknesses of various employees. Ex. 21.

# APPENDIX A

f. Tax documentation in the form of an I-9 and a W-2 provide that Latsanovski was an employee of Bunzai Media Group, Inc. Exs. 402-8; 949.

g. Nastassia Yalley of BunZai testified that Defendant Latsanovski received and reviewed monthly accounting reports for BunZai. Ex. 556, at 34:2-4; 34:20-35:7.

h. Doron Nottea and Motti Nottea stated that Latsanovski was an owner of BunZai. Dkts. 244 ¶ 36; 245 ¶ 36.

i. Defendant Khristopher Bond testified that Alon Nottea and Latsanovski were his partners in the AuraVie companies. Dkt. 92, at 4 ¶ 7.

j. Defendant Alon Nottea included Defendant Latsanovski in an email from Nottea's BunZai email account where he asked a third party if the person "had a chance to think about our corporate structure discussion . . . When would be a good time for Igor and I to see you and make some final decisions?" Ex. 425.

That Paul Medina testified that Latsanovski was an owner of BunZai Media Group, Inc.:

a. Defendant does not appear to dispute Defendant Medina's testimony other than to note that Latsanovski did not know the source of the information, although it may have been Medina's immediate supervisor, Defendant Bond, who himself testified that Latsanovski was a co-owner of BunZai Media Group.

b. Defendant Latsanovski's further evidence regarding Defendant Medina's testimony does not rebut Medina's earlier assertions: his being personally supervised as a day-to-day matter by Defendants Nottea and Bond does not in any way preclude not only Latsanovski's ownership of BunZai but his substantial involvement in the business in areas outside of Defendant Medina's responsibilities.

| | |
|---|---|
| 36e. The website for Igor's personal company, Defendant CalEnergy, reflected that CalEnergy was the parent company of both Defendants Media Urge and Pinnacle. Dkt. 908. | 36e. Calenergy's website accurately referenced at the time that 'we are working under a strategic hierarchy which allows us to hire management companies that specialized in managing our clients.' That accurately describes Calenergy's business. The companies identified on the website were either contracted management companies or clients. There is no reference to Calenergy having an ownership in any |

# APPENDIX A

| | of the identified companies; it was not a 'parent' company. |
|---|---|

**36e. Moving Party's Response**

1. Plaintiff does not contest that there was "no reference to ownership in any of the identified companies" but qualifies this response by noting that Facts 36(e) and 36(e)(i) did not contend that CalEnergy "owned" either company but instead that CalEnergy was the "parent company" that "supervised and managed" Pinnacle and Media Urge.

| 36e(i). CalEnergy's internal organizational chart—which Latsanovski reviewed—confirms that Latsanovski supervised and managed Media Urge and Pinnacle. *See* Exs.561-3; 588-1, -9. | 36e(i). Calenergy's organization chart referenced by the FTC was a document that was never fully implemented [Exh. 561]. Calenergy never successfully commenced the operation identified on the charts. Calenergy did employ Camerino as an accountant; Reuveni referred Calenergy information concerning potential start-up company investment opportunities; and Nottea worked for Calenergy developing prospective contracts with international companies. They worked between three and six months for Calenergy in late 2013. Their general title was 'manager.' |
|---|---|

**36e(i). Moving Party's Response**

1. Plaintiff contests the entirety of this Dispute:

That CalEnergy's control of Pinnacle Logistics and Media Urge was never fully implemented:
   a. Disputes 36(e)(i) and 36(h) must be jointly addressed here because they contain representations by Latsanovski that conflict regarding
      i. The roles Defendants played in the scheme, and
      ii. The roles of CalEnergy's employees Roi Reuveni and Philip Camerino and two of the entities CalEnergy controlled—Defendants Pinnacle Logistics and Media Urge.
   b. In Dispute 36(h), Latsanovski acknowledges that his disclosures to US immigration services "accurately describe[] Calenergy and my [i.e. Latsanovski's] ownership of Calenergy."

# APPENDIX A

c. Comparing Latsanovski's representations in Dispute 36e to his disclosures to US immigration services, however, creates the following contradictions:

d. Latsanovski

    i. In Dispute 36(e), Latsanovski's role at CalEnergy was merely hiring third-party "contracted companies."

    ii. In his "Response to the USCIS Request for Evidence," Latsanovski writes under "Business Duties of Calenergy, Inc. Staff" that his role was "reviewing the activities and providing guidance to managed companies," Ex. 571-2, which included Pinnacle Logistics and Media Urge.

e. Reuveni

    i. In Dispute 36e(i), Reuveni merely "referred Calenergy information" concerning investment opportunities.

    ii. In Latsanovski's USCIS Response, Reuveni is recast as "supervis[ing] and coordinat[ing] activities of call-center (Pinnacle Logistics Inc.)." Ex. 571-5.

f. Camarino

    i. In 36e(i), CalEnergy hired "Camerino as an accountant."

    ii. In Latsanovski's USCIS Response he provided that Camerino "[m]anages and coordinates activities of Medi[a] Urge." Ex. 571-5.

g. CalEnergy in Dispute 36e:

    i. In Dispute 36e, Latsanovski characterized Pinnacle Logistics and Media Urge as "contracted management companies" that provide services for CalEnergy's "clients," such as AuraVie.

        a) Defendants then contend that the organizational chart showing CalEnergy as controlling Pinnacle and Media Urge is yet another of his fully executed agreements that was "never fully implemented."

        b) This Organizational Chart was accompanied by an executed Management Services Agreement allowing CalEnergy to "conduct[] relations on behalf of [Pinnacle] with accountants, attorneys, financial [m]anagers and other professionals." Ex. 561-6.

        c) Instead of reflecting the information on the organizational chart, Dispute 36(e) characterizes Pinnacle as a third-party contractor and Reuveni as merely "refer[ring] Calenergy information" relating to potential future investments.

        d) Media Urge is a contractor and Philip Camerino is only "employ[ed by Calenergy] as an accountant." *Id.*

    ii. Thus, as shown in the foregoing discussion, Latsanovski's USCIS

## APPENDIX A

| | |
|---|---|
| responses directly contradict this Dispute's characterization of CalEnergy. | |
| 36e(ii). Igor is listed as the "President" of Calenergy, Inc., who supervised (1) Defendant Reuveni, who himself managed Pinnacle, and (2) Philip Camerino, who himself managed "MediUrge," a misspelling of Defendant Media Urge. Ex. 561; 561-3; 588-9. | 36e(ii). Calenergy's organization chart referenced by the FTC was a document that was never fully implemented [Exh. 561]. Calenergy never successfully commenced the operation identified on the charts. Calenergy did employ Camerino as an accountant; Reuveni referred Calenergy information concerning potential start-up company investment opportunities; and Nottea worked for Calenergy developing prospective contracts with international companies. They worked between three and six months for Calenergy in late 2013. Their general title was 'manager.' |

36e(ii). Moving Party's Response

1. Plaintiff contests the entirety of this Dispute: See Response to Dispute 36e(i).

| | |
|---|---|
| 36f. Latsanovski previously swore under oath that BunZai was his employer. *See* Ex. 949. | 36f. I never swore under oath that Bunzai was my employer. Exh. 949 referenced by the FTC is a form I-9 Employment Eligibility Verification. Bunzai's HR employee Lear Arazy executed the document apparently believing I was an 'employee' of Bunzai in November 2011. I was never employed by Bunzai **and therefore did not sign the form.** The FTC's statement that I swore under oath is accordingly false. |

36f. Moving Party's Response

1. Plaintiff does not contest that the Form I-9 provided as Exhibit 949 was unexecuted.
    a. Plaintiff qualifies this response by asserting that the cited Exhibit, as

# APPENDIX A

qualified by a "*see*," was appropriate because

    i. Latsanovski concedes that Bunzai's human resources staff prepared and executed the document, swearing under penalty of perjury that Defendant Latsanovski was a Bunzai employee; and

    ii. Exhibit 949 reflects the available evidence but does not preclude whether a fully-executed version of the document exists.

b. This latter contention is further supported by both Latsanovski's Form W-2, discussed in Response to Dispute 36g immediately below, as well as the other evidence that he was an owner and employee of Bunzai discussed in Response to Dispute 36b.

| | |
|---|---|
| 36g. A BunZai Form W-2 listed Defendant Latsanovski as an employee. Ex.402-8. | 36g. This is a 2012 W-2 that Bunzai issued to me for $110.00. This is the sole and only W-2 I ever received from Bunzai. This W-2 was issued apparently to document $110 paid to me sometimes in 2012. I have no records of the payment and no knowledge as to why Bunzai gave me a W-2 rather than a 1099. |

**36g. Moving Party's Response**

1. Defendant Latsanovski does not appear to dispute the fact that a W-2 in his name was issued by Bunzai Media Group, Inc.

| | |
|---|---|
| 36h. In a letter to the United States Citizenship and Immigration Services describing his job responsibilities at CalEnergy, Latsanovski represented that he was involved in "reviewing the activities and providing guidance to managed companies." Ex. 571-2. | 36h. All information provided to the immigration service accurately described Calenergy and my ownership of Calenergy. This is a resume I prepared as part of my immigration application in 2014. It accurately reflects that I was fully employed by Calenergy in 2014 and that my 'work schedule does not have fixed hours and includes travel within the United States and abroad for negotiations and assessment of potential projects…" |

**36h. Moving Party's Response**

## APPENDIX A

| | |
|---|---|
| 1. Defendants do not appear to dispute Fact 36h. | |
| 36i. Latsanovski was personally involved in managing the enterprise on a day-to-day level. | 36i. I never was personally involved in managing Bunzai on a day to day level |
| 36i. Moving Party's Response<br><br>1. Plaintiff contests the entirety of this Dispute as presented in Dispute 36i's subparts, below, since Defendants contest Fact 36i by discussing individual Exhibits in the Fact's subparts: | |
| 36i(i). Latsanovski sent a revised profit and loss spreadsheet containing sales and chargeback information for the common enterprise. Ex. 503. | 36i(i). Paul Medina provided me with quarterly (sometimes monthly) financial reports concerning Bunzai's operations; I requested reports because I authorized Calenergy to loan money to Bunzai with no security. Exh. 507 is a form of detailed financial information that I was provided by Medina; I sent Exh. 507 back to Medina as confirming my acceptance of the format. |
| 36i(i). Moving Party's Response<br><br>1. No response is required because Latsanovski does not contest the fact that he was provided reports and that he edited the documents to reflect his preferences. | |
| 36i(ii). Latsanovski participated in discussions concerning international merchant accounts. See Ex. 319. | 36i(ii). In 2011, I introduced Alon Nottea to Oleg Trushla. Mr. Trushla was attempting to sell cosmetics in Europe. I understand that he was unsuccessful. I received copies of some correspondence between them, I assume because I introduced them. At no time did I participate directly in their communications. Exh. 319 referenced by the FTC is such a communication. |
| 36i(ii). Moving Party's Response | |

## APPENDIX A

1. Plaintiff contests the entirety of this Dispute:

<u>That Plaintiff mischaracterized Exhibit 319:</u> Latsanovski claims that Exhibit 319 is correspondence between Alon Nottea and an associate of Latsanovski's, but Exhibit 319 is instead correspondence between a Bunzai employee, Latsanovski, and a third party regarding a "fund movement for the offshore account." Ex. 319.

| | |
|---|---|
| 36i(iii). Latsanovski participated in meetings or conference calls with payment processors. *See* Ex. 329. | 36i(iii). Exhibit 329 referenced by the FTC contains no evidence of my participation in any meeting or conference call. |

36i(iii). Moving Party's Response

1. Plaintiff contests the entirety of this Dispute:

<u>That Plaintiff mischaracterized Exhibit 329:</u> Defendant Latsanovski claims that Exhibit 329 "contains no evidence of my participation in any meeting or conference call," when in fact an email in the Exhibit finds Alon Nottea writing to a representative of UMS Bank: "Please let me know when you, Igor and I can jump on a short call" relating to Bunzai's web of merchant accounts. Ex. 329-1.

| | |
|---|---|
| 36i(iv). Latsanovski was asked to proofread advertising to be used by Defendants overseas and assisted in coordinating the marketing campaign. Exs. 564; *see* Ex. 559. | 36i(iv). Exhibits 564 and 559 reference communications to me from David Migdal in 2014. Migdal was an associate of Alon Nottea. I referred Nottea/Migdal to 'Miki' in Barcelona; I do not recall Miki's last name. I met Miki when I lived in Barcelona. Miki sold a product through his Spanish magazines called 'Gold Mask.' Mr. Nottea expressed an interest in speaking to Miki. I wasn't involved in the conversations. Exhibits 564 and 559 are updates sent to me by Midgal concerning the Barcelona business. He apparently thought because I referred Miki that he should update me on the status of a few conversations. Also, at no time did I ever proofread Bunzai advertising; or have any involvement in |

APPENDIX A

| | the Bunzai website creation or operation. And exhibits 564 and 559 make no reference to advertising. |
|---|---|

**36i(iv). Moving Party's Response**

1. Plaintiff contests the entirety of this Dispute:

That Plaintiff mischaracterized Exhibits 564 and 559:
   a. Defendants' contentions do not reflect the contents of the emails cited.
   b. Latsanovski attempts to characterize Exhibits 564 and 559 as "updates" relating to Bunzai's meetings with a business associate of him.
   c. In fact, in the emails, Latsanovski is directly asked questions regarding basic aspects of producing, selling, and marketing Dellure in Spain, Ex. 559, as well as directly asking information such as who has phone numbers relating to the enterprise. Ex. 564.

| 36i(v). Latsanovski was apprised of low-level contractual disputes relating to the advertising. *See* Exs. 48. | 36i(v). I was not apprised of 'low level contractual disputes' concerning advertising. Exhibit 48 referenced by the FTC is an e-mail to Jose at an 'investment group'. I was copied on the email. I have no recollection of reading it. I don't know 'Jose' and never had any discussion with him. Exhibit 48 appears to concern direct sales by Bunzai. It has nothing to do with a contractual dispute. |
|---|---|

**36i(v). Moving Party's Response**

1. Plaintiff does not dispute that Exhibit 48 does not relate to a contractual dispute.
   a. Plaintiff qualifies this response by asserting it does reflect Latsanovski's involvement in low-level contracts such as establishing new merchant processing contracts.
   b. This day-to-day level of involvement with basic contracts is further reflected, for example, in his inclusion in discussions relating to a cease and desist letter for unauthorized use of a model's photo. Exs. 276; 277.

| 36i(vi). Latsanovski assisted Defendants | 36i(vi). I did not assist Defendants in |
|---|---|

### APPENDIX A

| | |
|---|---|
| in transferring funds overseas for safekeeping, including possibly to a Cyprus trust. *See* Exs. 55; 450; 470. | transferring funds overseas to Cypress. This is an FTC fabrication. Exhibit 55 references my referral of Alon Nottea to a banker. Mr. Nottea specifically testified at his February 23, 2016 deposition that he never transferred any funds to a Cypress trust or bank. [Attached hereto as Exh. K' is a true copy of pages 252 and 253 of the February 23, 2016 Deposition of Alon Nottea. His testimony denying transferring funds to Cypress is at R.T. 252 Ins. 22-25; 253: Ins. 1-20.] the FTC's assertion is false. |

36i(vi). Moving Party's Response

1. Plaintiff contests the entirety of this Dispute:

That Plaintiff mischaracterized Exhibit 55:
    a. Defendants' contention that Plaintiff's "fabrication" is in fact a mere "referral to a banker" does not reflect the facts.
    b. The Exhibit's email contains an attachment for an "E-commerce Merchant Application," with Latsanovski's message referring to the application as an available "acc[ount]" from his associate's "bank en[sic] Cyprus" and goes so far as to refer Nottea to a translator only because he was not confident in his own English. Ex. 55.

| | |
|---|---|
| 36i(vii). He provided Defendants with blank, pre-signed checks to allow Defendants to operate the company. Dkt. 120, at 9, 35, 36. | 36i(vii). From time to time I would leave pre-signed checks with Doron Nottea to pay my personal bills when I was travelling on business; and to pay Calenergy bills. |

36i(vii). Moving Party's Response

1. No response is required because Defendants acknowledge that Doron Nottea "pa[id] Calenergy's bills" with Latsanovski's pre-signed blank checks.

| | |
|---|---|
| 36i(viii) Among those Corporate Defendants, CalEnergy transferred funds to Latsanovski and a company he | I own Calenergy. Calenergy loaned funds at my direction to Bunzai and Bunzai affiliates as described above. |

## APPENDIX A

| | |
|---|---|
| owns. Dkt. 120, at 69. | |
| 36i(viii). Moving Party's Response<br><br>1. No response is required because Defendants acknowledge that CalEnergy transferred funds "at my direction to Bunzai and Bunzai affiliates." | |
| 36i(ix). Defendant Medina testified that Latsanovski was present at the common enterprise's place of business multiple days each month from 2010 until 2014. Ex. 946, at 28:17-29:3. | 36i(ix). The FTC intentionally miscites Medina's testimony. He never said I was present 'at the common enterprises place of business **multiple days each month**.' His true deposition testimony was:<br><br>'Q. How do you know Igor Latsanovski?<br><br>A. I would see him around the office a **few days** out of each month.' [Attached hereto as Exhibit 'L' is a true copy of Medina's February 23, 2016 R.T. 28: Ins. 17-18.] [Exh. 946] |
| 36i(ix). Moving Party's Response<br><br>1. No response is required because Defendants only contest Plaintiff's use of "multiple" in lieu of Medina's more colloquial "a few days." This is a semantic difference that does not create a genuine dispute of material fact. | |
| 36j. Latsanovski participated in or controlled companies in addition to Pinnacle, including ones that he had no ownership interest in. | 36j. At no time have I owned or controlled Pinnacle. Attached hereto as Exhibit 'M' is a true copy of the (1) Articles of Incorporation of Pinnacle Logistics, Inc. filed June 6, 2012 by Oz Mizrah; and (2) Statement of Information for Pinnacle filed September 10, 2012 with the California Secretary of State's office. Mizrah is identified as the CEO, Secretary and CFO of Pinnacle. Also, the FTC's Exhibit 553 is a portion of the deposition of Roi Reuveni. At R.T. 172: |

**APPENDIX A**

| | |
|---|---|
| | Ins. 19-25; 174: Ins. 1-4; Reuveni testified that he was the sole person involved in Pinnacle's day to day operations at R.T. 174: Ins. 1-4. He specifically testified that I had no involvement in the day to day operations of Pinnacle at 175: 11-17. |

36j. Moving Party's Response

1. Plaintiff contests the entirety of this Dispute:

That Latsanovski did not control Pinnacle:
   a. Latsanovski: Latsanovski stated in his "Response to the USCIS Request for Evidence" under "Business Duties of Calenergy, Inc. Staff" that his role as the principle of Calenergy was "reviewing the activities and providing guidance to managed companies," then specifically referenced Pinnacle as one such company. Ex. 571-2.
   b. Reuveni's Testimony does not challenge the Fact: Plaintiff does not dispute that Defendant Reuveni was the sole person involved in supervising day-to-day operations at Pinnacle. He ran those day-to-day operations, however, not as an officer of Pinnacle but instead as an employee of CalEnergy. Ex. 571-5.
   c. According to his USCIS statement, Latsanovski's role as the principal of Calenergy was to oversee Reuveni's management of Pinnacle. Plaintiff did not assert that Latsanovski managed Pinnacle on a day-to-day basis but instead that he had actual control of the company.
   d. Pinnacle's corporate filings do not challenge the Fact: Similarly, Latsanovski's providing the Articles of Incorporation and Statement of Information for Pinnacle, both of which provide that Oz Mizrahi operated Pinnacle, does not affect the contention that Latsanovski controlled the entity.
      a. Mizrahi's minimal role is further confirmed by the fact that despite extensive discovery and culling of email records relating to Pinnacle, Mizrahi is included in almost no substantive discussions about its operations.
      b. Moreover, Mizrahi's involvement in Pinnacle contradicts Reuveni's own testimony that he himself was the sole operator of Pinnacle.

| | |
|---|---|
| 36j(i). Latsanovski ordered Doron to issue a payment to an Israeli bank | 36j(i). Exhibit 64 confirms my request that $38,892 be wired to Leumi Le Bank |

# APPENDIX A

| account using funds from SBM Management, Inc., a company purportedly owned and operated by Stephan Bauer. Ex. 64. | in Israel from SBM to provide necessary cash for a small start-up business I was developing in Spain. A company in Israel provided required equipment. The $38,892 was a loan repayment by SBM to Calenergy that I elected to use for the new startup company. |
|---|---|

**36j(i). Moving Party's Response**

   1. Defendants do not appear to dispute this Fact, and Latsanovski's explanation of needing "cash for a small start-up" and having SBM make the transfer in lieu of a "repayment by SBM to Calenergy" at best shows the lack of corporate formalities that is a key component of proving a common enterprise.

| 36k. An email shows Igor making business decisions concerning operational aspects of companies within the common enterprise. These discussions include employee staffing decisions and how to manage the business's needs for areas such as "plants and Call-centers" while leaving higher level "intellectual labor" to Alon Nottea and himself. Ex. 21. | 36k. I discussed Exhibit 21, my August 14, 2013 e-mail above at p. 8; UF36(a). |
|---|---|

**36k. Moving Party's Response**

   1. Defendants do not appear to contest Fact 36(k), instead referring to their Dispute 36(q), addressing the use of the word "partner," which does not create a material fact of genuine dispute requiring trial.

   2. Plaintiff qualifies this response by asserting that the word "partner" is an appropriate description of the relationship seen in the email, which features Latsanovski

      a. Providing managerial-level employment decisions such as Reuveni serving "as head of the Product company";

      b. Having "us" (*i.e.*, Alon Nottea and Latsanovski himself) consider "new businesses" and referring to BunZai as "our entire company"; and

      c. Holding himself forward as a director and manager of the common enterprise: "Directors, the people who can not just perform, but also to

# APPENDIX A

| | |
|---|---|
| make decisions and in addition whom we trust and know their capabilities. . . .Who we have: You, Paul, Roy, Andre and David and me a little, that's all!" Ex. 21. | |
| 36l. Latsanovski discussed and reviewed sales with employees. | 36l. Undisputed |
| 36l(i). Former employee Yalley stated that Latsanovski would sit down next to her and review profit and loss statements for the enterprise. Exh. 556, at 34:2-4; 34:20-35:7. | 36l(i). I never discussed and reviewed with employees. As I stated, I would regularly request to see a Bunzai profit and loss statement to make sure the loan would be repaid. |

36l(i). Moving Party's Response

1.  Plaintiff contests the entirety of this Dispute:

That Latsanovski never discussed and reviewed financials with employees:
   a.  This assertion is further contradicted by Paul Medina's testimony that Latsanovski "would say, 'How are things going? How are sales going?', because I [i.e. Medina] managed Hitpath and all the sales would be coming in from affiliate networks." Ex. 946, at 30:4-30:13.
   b.  Latsanovski's day-to-day interactions with employees is similarly seen in an email from an employee at Media Urge, in which Latsanovski received information on, among other things, "[h]ow many new sales today," as well as "how many calls from which re-bills" and "how many & how many returns $ to customer" that elicited answers on a single-day basis. Ex. 549 ("Our Refund Report says $0 today").

| | |
|---|---|
| 36l(ii). Defendant Medina testified that he would have discussions concerning sales and affiliates with him. Ex. 946, at 30:4-30:13. | 36l(ii). I would from time to time ask Medina how the business is doing – because I was nervous about Bunzai repaying the loan. |

36l(ii). Moving Party's Response

1.  See Response to 36l(i)

| | |
|---|---|
| 36l(iii). Paul Medina testified that he overhead Igor Latsanovski discussing chargebacks with Defendant Paul Medina. Ex. 946, at 31:16-32:3 | 36l(iii). I would from time to time ask Medina how the business is doing – because I was nervous about Bunzai repaying the loan. |

# APPENDIX A

| 36l(iii). Moving Party's Response <br><br> 1. See Response to 36l(i) | |
|---|---|
| 36m. Latsanovski was included on emails with links to the companies' advertisements and emails discussing issues with chargebacks and compliance. | 36m. I never discussed Bunzai's advertising with anyone. I have no recollection of receiving Exhibits 562 and 565 |
| 36m. Moving Party's Response <br><br> 1. Defendants here deny involvement with Bunzai's advertising, but Fact 36m states only that he was included in "emails with links to the companies' advertisements" and in "emails discussing issues with chargebacks and compliance." This Uncontroverted Fact relates to his claims that he lacked knowledge regarding the roles of either high chargebacks rates or the AuraVie website's in the scheme. Dkt. 397 at 15. <br> 2. Exhibits 562 and 565 include Alon Nottea writing regarding merchant accounts that "show we are at a 20% chargeback ratio" which was "way too high," leaving Nottea to order load balancing by "get[ting] some transactions in there to lower the percentage." Exs. 562-1; 565-2. | |
| 36m(i). Latsanovski received an email concerning excess chargeback programs and the enterprise's excessive chargeback rates. Ex.562. | 36m(i). Undisputed |
| 36m(ii). Latsanovski received emails discussing high-risk merchant accounts. Exs. 235; 444; 445. | 36m(ii). The FTC's contention I received e-mails discussing high-risk merchant accounts is false. Exhibit 444 referenced by the FTC is an offer I received to invest in a company called 'National Merchant Center.' I didn't invest. Exhibit 445 has no relationship to Bunzai's operations. Exhibit 235 has no relationship to me, Calenergy or Bunzai. It is a 'draf'' agency agreement that I considered with a third party named Rick Lee. It was never formalized |
| 36m(ii). Moving Party's Response | |

## APPENDIX A

1. Plaintiff contests the entirety of this Dispute:

That Latsanovski never received emails discussing high-risk merchant accounts:

    a. See Response to Dispute 36m.

    b. Defendants contend Exhibit 444 is a mere offer to "invest in a company" but fail to note that this "investment" involved an acquisition of a marketing platform to "increase our low risk merchant volume" by "seeking out" agents that would recruit "new merchant accounts," presumably for use by Bunzai considering that Latsanovski emailed the "investment" opportunity to Defendants Alon Nottea and Bond. Ex. 444-5.

    c. Defendants contend that Exhibit 445 has "no relation to Bunzai's operations," but the Exhibit is an email with Bunzai email addresses that discusses a Bunzai merchant account that has "a negative balance due to refunds and incoming chargebacks." Ex. 445-1.

    d. Even more bizarrely, Latsanovski claims that Exhibit 235 has "no relationship to me, Calenergy or Bunzai," when Latsanovski himself is one of the parties to the agreement and the agreement provides that Latsanovski's counterparty will provide "Igor's designated company" with "80% low risk and 20% high-risk accounts." Ex. 235-1.

| | |
|---|---|
| 36m(iii). Latsanovski received an email discussing load balancing to maintain merchant accounts for the enterprise. Ex. 565. | 36m(iii). Exhibit 565 if essentially the same e-mail as Exhibit 562. I have no recollection of receiving these e-mails or ever reading them. |

36m(iii). Moving Party's Response

1. Defendants do not appear to dispute this Uncontroverted Fact. The documentary evidence shows that the email was delivered to Latsanovski's email address, and as seen in Plaintiff's Response to Dispute 36m(ii) above, Latsanovski was integrated into AuraVie's load balanced merchant account scheme.

| | |
|---|---|
| 36m(iv). Latsanovski received emails containing links to Defendants' deceptive risk-free trial websites. Ex. 28. | 36m(iv). Exhibit 28 is a communication between Alon Nottea and Alex Pitt concerning Pitt's interest in seeking investors for his business called 'Pay Pro.' Alon Nottea so testified at his February 18, 2016 deposition. A true copy of pages 134 and 135 are attached |

**APPENDIX A**

| | |
|---|---|
| | hereto as Exhibit 'N'. Mr. Nottea specifically testified that he never showed me the websites included in Exhibit 28; or any other similar websites. [See, R.T. 135: Ins. 10-15.] |

**36m(iv). Moving Party's Response**

1. Plaintiff does not dispute Defendants' description of Exhibit 28, but Defendants' Dispute does not affect the veracity of the corresponding Uncontroverted Fact. Exhibit 28 was cited as proof that "Latsanovski received emails containing links to Defendants' deceptive risk-free trial websites," which Defendants do not contest and is seen in the Exhibit's email with Nottea's hyperlinks. Ex. 28.

| | |
|---|---|
| 36n. Latsanovski requested information concerning the common enterprise's chargeback rates and merchant reserve. Ex. 549. | 36n. Exhibit 549 represents information given to me to consider in analyzing a United Kingdom investment. |

**36n. Moving Party's Response**

1. Plaintiff does not dispute that Exhibit 549 related to business in the United Kingdom.
2. Plaintiff qualifies this response by asserting that this "investment" was in fact his investment in AuraVie:
   a. Latsanovski emailed an employee at Media Urge regarding day-to-day sales, chargeback, and re-billing information. Ex. 549.
   b. In his responses, the employee references "Tyler" Reitenbach and "Avi" Argaman regarding the information in "ChargeBack Armor," as well as Defendant "Paul" Medina relating to "analyses" of the enterprise. *Id.*

| | |
|---|---|
| 36o. Latsanovski incorporated Zen Mobile Media, Inc., one of the shell companies used by Defendants to process consumer payments for Defendants' risk-free trials. Ex. 904-23. | 36o. Alon Nottea requested I incorporate Zen Mobile Media, Inc. I filed the necessary documents to incorporate. I didn't own any stock or other interest in Zen. And I have never managed or controlled Zen. [See p. 8-9; 36(a).] |

**36o. Moving Party's Response**

## APPENDIX A

1. Defendant does not appear to dispute the corresponding Uncontroverted Fact.
2. However, regarding Defendants' additional claims that Latsanovski "didn't own any stock or other interest in Zen" and "ha[s] never managed or controlled Zen," this claim is undermined by the Receiver's review of Zen's activities:
3. In her Report, the Receiver noted that Latsanovski:
   a. Was listed as "CEO, CFO, Director, and Secretary" in Zen's corporate filings. Dkt. 120, at 39-40;
   b. "[S]igned blank checks on Zen's account which were left in Doron Nottea's possession" and used for "round amounts such as $10,000"; *Id.*;
   c. Used Zen to pay "Latsanovski's American Express bills—a total of $164,757"; *Id.*; and
   d. Received "transfers directly from Zen" into CalEnergy's coffers. *Id.*

| | |
|---|---|
| 36p. Latsanovski provided loans to Corporate Defendants in the common enterprise for the AuraVie business. Ex. 552, at 22:14-21, 23:11-24:21, 27:5-13, 36:13-37:13, 52:5-53:8, 60:5-12, 69:21-70:2. | 36p. I fully discuss the loans made to Bunzai (and Bunzai affiliates) above. |

36p. Moving Party's Response

1. Plaintiff contests the entirety of this Dispute: See Response to Dispute 36b.

| | |
|---|---|
| 36q. Latsanovski sent an "opinion" email regarding the future of Pinnacle and the common enterprise. Ex. 21. | 36q. This is my August 13, 2013 e-mail to Alon Nottea expressing my 'opinion' and concerns. Before I sent the e-mail I had discussions with Alon Nottea, Bunzai's controlling principal, expressing my concern that the loan to Bunzai would not be repaid. As I stated in my January 28, 20166 deposition, '[t]the personal thing inside me was that I don't want to lose my money,' [Attached as Exhibit 'F' and incorporated herein by reference is a true copy of page 91 of Latsanovski's deposition. The quote is at 91: Ins. 5-7.] |

**APPENDIX A**

|  | As of July-August 2013 Calenergy was owed approximately $100,000 and Mr. Nottea was requesting I authorize Calenergy to loan further funds; in September 2013 Calenergy loaned $400,000 to SBM. Mr. Nottea had also informed me that he was considering closing down all operations because the business was no making enough money. My primary opinion that I expressed was that "I want us to think and concentrated (sic) our efforts on the opening of new businesses…and thus use outsourcing…[A]nd we are in a quite mode to create new products…' Also, in my e-mail I closed with the reference 'Sincerely your sincere partner Igor.' I understand the word 'partner' as referencing a close personal friend. I had no other understanding of the term at the time. My e-mail was originally written in Russian and translated by an automated translator. The Russian word I used that was translated into 'partner' is the word 'tovarish.' The word actually means referring to a person who thinks and feels like you. [Attached hereto as Exhibit 'G' is a true copy of a page from Yandex Translator showing multiple translated meanings; 'partner' is included." |
|---|---|
| 36q. Moving Party's Response | |

1. Plaintiff does not contest any of Defendants' Dispute insofar as Defendant does not appear to dispute any Uncontroverted Fact except Latsanovski's own use of the word "partner."
2. Plaintiff qualifies this response by asserting that the word "partner" appears, however, an appropriate description of the relationship seen in the email, which features Latsanovski:
   a. Providing managerial-level employment decisions such as Reuveni

# APPENDIX A

serving "as head of the Product company";

b. Having "us" (i.e., Alon Nottea and Latsanovski himself) consider "new businesses" and referring to BunZai as "our entire company"; and

c. Holding himself forward as a director and manager of the common enterprise: "Directors, the people who can not just perform, but also to make decisions and in addition whom we trust and know their capabilities. . . .Who we have: You, Paul, Roy, Andre and David and me a little, that's all!" Ex. 21.