Jeffrey S. Benice, Esq., State Bar No. 81583
LAW OFFICES OF JEFFREY S. BENICE
*A Professional Law Corporation*
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, California 92626
Telephone No.: (714) 641-3600
Facsimile No.: (714) 641-3601
Website: www.JeffreyBenice.com
E-Mail: JSB@JeffreyBenice.com

Attorneys for Defendants,
Igor Latsanovski and Calenergy, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP INC., et al.,<br><br>Defendants. | CASE NO. CV 15-04527 GW (PLAx)<br><br>DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56; SUPPLEMENTAL DECLARATIONS OF IGOR LATSANOVSKI AND JEFFREY S. BENICE IN SUPPORT THEREOF.<br><br>Date: May 23, 2016<br>Time: 8:30 A.M.<br>Courtroom: 10<br><br>[Assigned for All Purposes to the Honorable George H. Wu]<br><br>[First Amended Complaint Filed: October 9, 2015]<br><br>[Concurrently filed with Request for Judicial Notice and Reply Statement of Uncontroverted Facts and Conclusions of Law] |

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

1.

## DEFENDANTS LATSANOVSKI'S AND CALENERGY'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED; THE FTC FAILS TO RAISE GENUINE FACT ISSUES

The FTC's attempt to link Defendants Latsanovski and Calenergy to Defendant Bunzai's purported wrongful conduct is specious. For example, the FTC falsely asserts that Defendant Latsanovski *"previously swore under oath that the company [Bunzai] was his employer."* [FTC Opp. At 12: lns. 12-13.] Untrue. As explained, in Defendant Latsanovski's declaration in opposition to the FTC's summary judgment motion he never swore under oath to such a statement. [Request for Judicial Notice No. 1; April 30, 2016 Declaration of Latsanovski, ¶36(f).]

Moreover, the FTC admits that Latsanovski *"never interacted with consumers or directly sold the product to consumers to further the scheme, which is true."* [FTC Opp. At 4: lns. 15-16.] This admission alone compels that the Court to grant Defendants' motion for summary judgment. The two-pronged test to establish individual liability is unequivocally not established. No evidence exists that Defendants (1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, [were] recklessly indifferent to the truth or falsity of the misrepresentations, or [were] aware of a high probability of fraud and intentionally avoided learning the truth." See, FTC v. Network Services Depot, Inc., 617 F.3d 1127, 1138-39 (9th Cir. 2010.) The FTC utterly fails to present any evidence raising a genuine issue concerning this two pronged test to establish liability. Rather, the evidence is undisputed that:

- Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai. [Decl. of Latsanovksi, ¶2-4; Exh. "A" thereto; *July, 2015 Loan Summary*.][Decl. of Benice, ¶4; Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* at R.T. 84: lns. 15-25 (Bates 85); 85: 1-25 (Bates 86); 86: lns. 1-24 (Bates 86).]

- Defendants actually received $317,000 in investment return on the $500,000

1

investment and were repaid the $500,000. [Decl. of Latsanovksi, ¶¶2-4; Exh. "A" thereto; *July 1, 2015 Loan Summary.*][Decl. of Latsanovsky, ¶¶15-16.] [Decl. of Benice, ¶2: Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski*, R.T. 35: lns. 2-25 (Bates 21); 36: lns. 1-24 (Bates 22); 37 lns. 1-24 (Bates 23); 38: lns. 1-24 (Bates 24); 114: lns. 1-24 (Bate 41); 116: lns. 1-11 (Bates 42)][Decl. of Benice, ¶4: Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* R.T. 85: lns. 3-5 (Bates 86)("*Did Bunzai...pay back Igor...? A. I believe it did.*"]

- Defendants had no involvement in the day to day operations of defendant Bunzai.[Decl. of Benice, ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski* at R.T. 30: lns. 6-23 at Bates 20.][Decl. of Benice, ¶4; Exh. "C" thereto, *February 18, 2016 Deposition of Alon Nottea* at R.T. 109: lns. 22-24 (Bates 89); 110: lns. 1-25; 111: lns. 1-25: 112: lns. 1-12; 161: lns. 10-19 (Bates 92).][Decl. of Latsanovsky, ¶10; 12-18.]

- Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct. [Decl. of Benice, ¶2, Exh. "A" thereto, *January 28, 2016 Deposition of Latsanovski* at R.T. 269: lns 4-18 (Bates No. 069) ("*Alon can do it... He is running it. [Bunzai]*"[Decl. of Latsanovski, ¶17.]

- Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly. [Decl. of Latsanovksi, ¶¶10; 17-18.]

Defendants' summary judgment motion should be accordingly be granted.

2

**DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM**

## 2.

## NO EVIDENCE EXISTS THAT CALENERGY PLAYED AN
## "*INTEGRAL ROLE IN THE SCHEME*"

Rather than reference evidence to support its claim against Defendants -*because none exists*- the FTC uses unsupported negative characterizations of Defendants. For example, the FTC falsely asserts that "*Calenergy's central role in the scheme demands its designation as part of the common enterprise responsible for the AuraVie scam.*" [FTC Opp. At 5: lns. 16-17.] First, as the declaration of Alon Nottea filed in opposition to the FTC's summary judgment motion makes clear there was no "*AuraVie Scam.*" [Request for Judicial Notice No. 2; *May 2, 2016 Decl. of Nottea*, ¶¶3-5.]

Second, FTC's contention that Defendants Latsanovski and Calenergy are part of a common enterprise with Defendants Bunzai and Nottea is baseless. Defendant Latsanovski specifically addresses this contention in his declaration in opposition to the FTC's summary judgment motion. [Request for Judicial Notice No. 1; April 30, 2016 Decl. of Latsanovksi, ¶29(e).]

Third, Defendant Calenergy's proposed management agreements with Defendant Pinnacle and Media Urge are irrelevant to the key issue the FTC ignores: *that no evidence exists that Defendants Latsanovski and Calenergy had control over or any knowledge of Defendant Bunzai's purported wrongful conduct.* [*See*, Defendants Genuine Issues at Nos. 4-6 and evidence referenced therein.]

Fourth, the FTC's contention Defendant Calenergy functioned as a "*financial intermediary*" is absurd. Defendant Calenergy loaned $500,000 to Defendant Bunzai which, according to the FTC, operated a $75 million dollar operation over the years. Defendant Calenergy's $500,000 loan transaction was obviously not "*essential to allowing the AuraVie companies to maintain business.*" [FTC Opp. At 9: lns. 5-6.]

Finally, the FTC attempts to "*bootstrap*" liability on Defendants, which does not exist, by contending they are part of a common enterprise. However, even assuming *arguendo* a party is part of a "*common enterprise*," if no evidence exists to establish that party's participation in and knowledge of an unlawful scheme, the party can have no individual liability. *See*, FTC v. Network

3

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

1  *Services Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010). In other words, before an individual
2  can become liable (even if part of a common enterprise) an independent basis for liability must
3  exist. See, <u>FTC v. Grant Connect, LLC</u>, 827 F. Supp. 2d 1199, 1217 (U.S.D.C. Nevada
4  2011)("*...that defendants engaged in a common enterprise for the various offers in this case.*")

### 3.

### **DEFENDANT LATSANOVSKI HAS NO INDIVIDUAL LIABILITY**

The FTC fails to present any evidence that Defendant Latsanovski "*participated directly in the wrongful acts or practices or had authority to control the corporations [Defendant Bunzai]*" <u>FTC v. Publishing Clearing House, Inc.</u>, 104 F.3d 1168, 1170 (9th Cir. 1997) (citations omitted.); or that Defendant Latsanovski was as "*a corporate officer*" with authority to sign documents on behalf of the corporate defendant. As Defendant Alon Nottea stated in his declaration in opposition to the FTC's motion:

> "5.   *Bond and I had very limited resources when we started BMG. I was introduced to Igor Latsvanovski ("Igor") sometime in late 2010 as a person who may be willing to make a sorely needed modest investment in BMG. Many discussions were had about Igor becoming an owner and a shareholder of BMG, but in the end, Igor did not have experience in the online marketing business and decided instead to loan money to BMG. In consideration for the loan, Igor received a net profit participation and a modest fixed interest rate along with Bond and I personally guaranteeing repayment of the loan. Igor was not involved with the marketing of AuraVie or the operations of the business. Igor's concern was whether the finances of the business would allow repayment of his loan. In this regard, Bond and I tried to keep Igor informed of the finances of the business.*"

. . .

> ***"8.   Avi Argaman, Roi Reuveni, Igor Latsanovski, and Doron Nottea had no authority to control AuraVie operations, sales, marketing, or finances, nor knowledge of any alleged wrongdoing in connection with the marketing and sales of AuraVie products."*** [Request for Judicial Notice No. 2: *May 2, 2016 Decl. of Nottea*, ¶¶5 and 8.]

Thus, as a matter of law, Defendant Latsanovski may not be held liable for injunctive relief.

Moreover, as a matter of law, Defendant Latsanovski is not individually liable for restitution because no evidence exits that he (1) had actual knowledge of the wrongful acts or practices; (2) was recklessly indifferent as to whether or not the corporate acts were fraudulent; or (3) had an awareness of a high probability that the corporation was engaged in fraudulent practices along with an intentional avoidance of the truth. See, <u>FTC v. J.K. Publications, Inc.</u>, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000).

The FTC freely references <u>FTC v. J.K. Publications</u>, *supra*, but ignores a portion of the district court's analysis that directly supports Defendants Latsanovski's and Calenergy's motion for summary judgment. [See, FTC Opp. at 10-11.]

In <u>FTC v. J.K. Publications</u>, *supra*, the district court granted a defendant's summary judgment motion dismissing him from the FTC's action based upon facts analogous to the facts herein. The defendant -O'Bannon- was dismissed although he had:

- Served for a time period as an officer and director of the defendant corporations MJD, Discreet Bill and TAL;
- Signed and filed start up documents on behalf of the corporate defendants MJD, Discreet Bill and TAL;
- Signed fictitious business name statements as an officer concerning corporate defendants N-Bill, Online billing, Webted and Assist Online.
- Signed a merchant account agreement on behalf of defendant TAL; the district court noted that *"[t]he merchant account agreement enabled TAL to continue the fraudulent scheme..."* <u>Id</u>. at 1208.

Regardless of these facts, which mirror the FTC's contentions against Defendants Latsanovski and Calenergy, the district court granted defendant O'Bannon's motion for summary judgment:

> "The FTC contends that O'Bannon's role as an officer or director on paper, without more, sufficiently shows authority to control or, at the very least, sufficiently shows that O'Bannon's Motion should be denied. The Court disagrees. At this stage, to successfully oppose this motion, the FTC must have enough evidence 'on which a reasonable jury could reasonably find for [the FTC].' Anderson, 477 U.S. at 252. But the record submitted by the FTC is devoid of evidence that shows O'Bannon even knew any of the other defendants (or their agents) or communicated in any way with any other defendants (or their agents). Without some other evidence linking O'Bannon to the other defendants, the evidence simply shows that an unwise man signed certain documents from afar on behalf of companies unknown to him without knowledge about (1) who actually owned or operated those companies or (2) the business activities of those companies.
>
> The Court is very troubled by the nature of O'Bannon's activities, lending his name and signature to faceless and unknown corporations and signing documents without care for their content or legal effect. The record shows that O'Bannon did not merely act as an officer and director from strange companies for the limited purpose of signing incorporation documents. The Court is also skeptical about O'Bannon's claim that he received little or no benefit from Nevada Corp. in exchanges for his 'services.' However, the FTC did not prosecute O'Bannon independently for unlawful practices unrelated to the defendants' billing scheme. **In this case, there is simply**

> *insufficient evidence for a reasonable jury to find that O'Bannon actually had authority to control the defendant corporations. Accordingly, the Court concludes that O'Bannon is entitled to judgment as a matter of law on the FTC's claims against him."*

*Id.* at 1208 [Emphasis Added.]

Defendants Latsanovski's and Calenergy's limited involvement with the other defendants in solely a lender capacity compels the granting of their summary judgment motion.

### 4.
### DEFENDANT LATSANOVSKI WAS NEITHER AN OWNER NOR CONTROLLING OFFICER OF DEFENDANT BUNZAI OR ANY BUNZAI AFFILIATE

Defendant Latsanovski was never a partner in Defendant Bunzai. As Defendant Alon Nottea discussed in his declaration in opposition to the FTC's summary judgment motion:

> "4.     As an online marketing business with limited resources, BMG's merchant processor limited the daily amount of BMG's skin care orders that could be processed. The merchant processor advised in 2011 that BMG sell AuraVie through other retail merchant entities as a means of allowing more orders to be processed while reducing merchant processing costs. Following those suggestions, several retail merchant entities were formed with the help of friends and family. **Those retail entities, as well as subsequently formed retail merchant business entities, were at all times managed and operated by Bond and I.**
>
> 5.     Bond and I had very limited resources when we started BMG. I was introduced to Igor Latsvanovski ("Igor") sometime in late 2010 as a person who may be willing to make a sorely needed modest investment in BMG. Many discussions were had about Igor becoming an owner and a shareholder of BMG, but in the end, Igor

7

> *did not have experience in the online marketing business and decided instead to loan money to BMG.* **In consideration for the loan, Igor received a net profit participation and a modest fixed interest rate along with Bond and I personally guaranteeing repayment of the loan. Igor was not involved with the marketing of AuraVie or the operations of the business. Igor's concern was whether the finances of the business would allow repayment of his loan. In this regard, Bond and I tried to keep Igor informed of the finances of the business.**"

. . .

> "8.    *Avi Argaman, Roi Reuveni, Igor Latsanovski, and Doron Nottea had no authority to control AuraVie operations, sales, marketing, or finances, nor knowledge of any alleged wrongdoing in connection with the marketing and sales of AuraVie products.*"

[May 2, 2016 Decl. of Nottea, ¶¶4-5 and 8.][Emphasis added.]

And, whether he was a "*partner*" is irrelevant unless he had the ability to control defendant Bunzai. See, *Network Services Depot, supra at 1138-1139*. The evidence is undisputed that he had no control over defendant Bunzai or any affiliate. [See, Defs.' Uncontroverted Facts No. 6 and evidence referenced therein.]

The FTC points to American Express credit card payments made purportedly on Defendant Latsanovski's behalf as evidence of a business relationship apparently permitting imposition of liability on Defendant Latsanovksi. However, the American Express Card Payments involved a $1,450 business expense reimbursement to an employee named Phillip Camerino. At no time did Defendant Latsanovski receive any credit card reimbursement from Defendant Bunzai or any affiliate. [Supplemental Decl. of Latsanovski, ¶2; Exh. "A" thereto.] The fact $1,450 was paid to reimburse expenses of an employee is irrelevant to the issues of control and the imposition of individual liability for restitution.

For simplicity, each of the FTC's meritless contentions at pp. 15-19 of the opposition

8

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

concerning "*three critical areas*" of involvement ("*(1) structuring the enterprise; (2) overseeing the financial performance, advertising, and business operations of the enterprise; and (3) providing expertise relating to managing high-risk credit card processing accounts*") is discussed below:

- Defendant Latsanovski's August 13, 2013 "*opinion*" e-mail is discussed at p.8 ¶28 of his declaration in opposition to the FTC's summary judgment motion.

- The e-mail referenced by the FTC (Exh. 425) was copied to Defendant Latsanovski. He explains in his declaration in opposition to the FTC's summary judgment motion that he was sent such information from defendant Nottea and Bunzai from time to time as general information concerning his $500,000 loan. [*See*, ¶29 at 12: lns. 14-28; 13: lns. 1-22.]

- The FTC references its Undisputed Fact No. 36 at pp. 17-19 of its opposition. Defendants Latsanovski and Calenergy address each of the identified subparagraphs of paragraph 36 referenced in the FTC's opposition as set forth in Defendant Latsanovski's declaration in opposition to the FTC's summary judgment motion[1]:

    - "*36(q) This is my August 14, 2013 e-mail to Alon Nottea expressing my "opinion" and concerns. Before I sent the e-mail I had discussions with Alon Nottea, Bunzai's controlling principal, expressing my concern that the loan to Bunzai would not be repaid. As I stated in my January 28, 2016 deposition, "[t]he personal thing inside me was that I don't want to lose my money." [Attached as Exhibit "F" and incorporated herein by reference is a true copy of page 91 of Latsanovski's deposition. The quote is at 91: lns. 5-*

---

[1] The subparagraphs are referenced in the same sequence referenced by the FTC at pp. 17-18.

9

**DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM**

| | |
|---|---|
| 1 | *7.] As of July-August 2013 Calenergy was owed approximately* |
| 2 | *$100,000 and Mr. Nottea was requesting I authorize Calenergy to* |
| 3 | *loan further funds; in September 2013 Calenergy loaned $400,000* |
| 4 | *to SBM. Mr. Nottea had also informed me that he was considering* |
| 5 | *closing down all operations because the business was not making* |
| 6 | *enough money. My primary opinion that I expressed was that "I* |
| 7 | *want us to think and concentrated (sic) our efforts on the opening of* |
| 8 | *new businesses...and thus use outsourcing...[A]nd we are in a quite* |
| 9 | *mode to create new products..." Also, in my e-mail I closed with* |
| 10 | *the reference "Sincerely your sincere partner Igor." I understand* |
| 11 | *the word "partner" as referencing a close personal friend. I had* |
| 12 | *no other understanding of the term at the time. My e-mail was* |
| 13 | *originally written in Russian and translated by an automated* |
| 14 | *translator. The Russian word I used that was translated into* |
| 15 | *"partner" is the word "tovarish." The word actually means* |
| 16 | *referring to a person who thinks and feels like you. [Attached* |
| 17 | *hereto as Exhibit "G" is a true copy of a page from Yandex* |
| 18 | *Translator showing multiple translated meanings; "partner" is* |
| 19 | *included.* |
| 20 | •     *36(a) The FTC's reference to Doron and Motti Nottea's* |
| 21 | *statement that I was an "owner" of Bunzai is erroneous [36a].* |
| 22 | *They specifically denied that I had any ownership interest in* |
| 23 | *"Response's to FTC's Request for Admission-Set One." A true* |
| 24 | *copy of their responses is attached hereto as Exh. "H" and* |
| 25 | *incorporated herein by reference. I never owned any part of Bunzai.* |
| 26 | *I was the "CEO" of Zen Mobile Media. Alon Nottea asked me to* |
| 27 | *incorporate Zen Mobile. Mr. Nottea thereafter managed the* |
| 28 | *business' day to day operations. Zen Mobile handled merchant* |

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

account business. [Attached hereto as Exhibit "I" is a true copy of Mr. Nottea's February 18, 2016 Deposition R.T. 219: lns. 14-21; Nottea specifically testified that    "A. I made decision on behalf of Zen. It was not Igor.  It is not Igor's consent to make decisions there."]

- 36(i)    I never was personally involved in managing Bunzai on a day to day level.

  i.    Paul Medina provided me with quarterly (sometime monthly) financial reports concerning Bunzai's operations; I requested reports because I authorized Calenergy to loan money to Bunzai with no security. Exh. 507 is a form of detailed financial report that I was provided by Medina; I sent Exh. 507 back to Medina as confirming my acceptance of the format.

  ii.   In 2011, I introduced Alon Nottea to Oleg Trushla. Mr. Trushla was attempting to sell cosmetics in Europe.  I understand that he was unsuccessful.  I received copies of some correspondence between them, I assume because I introduced them. At no time did I participate directly in their communications. Exh. 319 referenced by the FTC is such a communication.

  iv.   Exhibits 564 and 559 reference communications to me from David Migdal in 2014.  Migdal was an associate of Alon Nottea.  I referred Nottea/Migdal to "Miki" in Barcelona; I do not recall Miki's last name. I met Miki when I lived in Barcelona. Miki sold a product through his Spanish magazines called "Gold Mask." Mr. Nottea expressed an interest in speaking to Miki.  I wasn't involved in the

11

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

conversations. Exhibits 564 and 559 are updates sent to me by Midgal concerning the Barcelona business. He apparently thought because I referred Miki that he should update me on the status of a few conversations. Also, at no time did I ever proofread Bunzai advertising; or have any involvement in the Bunzai website creation or operation. And Exhibits 564 and 559 make no reference to advertising.

ix. The FTC intentionally miscites Medina's testimony. He never said I was present "at the common enterprises place of business **multiple days each month**." His true deposition testimony was:

> "Q. How do you know Igor Latsanovski?
> A. I would see him around the office a *few days* out of each month." [Attached hereto as Exhibit "L" is a true copy of Medina's February 23, 2016 R.T. 28: lns. 17-18.][Exh. 946]

• 36(j)  At no time have I owned or controlled Pinnacle. Attached hereto as Exhibit "M" is a true copy of the (1) Articles of Incorporation of Pinnacle Logistics, Inc. filed June 6, 2012 by Oz Mizrah; and (2) Statement of Information for Pinnacle filed September 10, 2012 with the California Secretary of State's office. Mizrah is identified as the CEO, Secretary and CFO of Pinnacle. Also, the FTC's Exhibit 553 is a portion of the deposition of Roi Reuveni. At R.T. 173: lns. 19-25; 174: lns. 1-4; Reuveni testified that he was the sole person involved in Pinnacle's day to day operations at R.T. 174: lns. 1-4. He specifically testified that I had no involvement in the day to day operations of Pinnacle at 175: 11-17.

> i. *Exhibit 64 confirms my request that $38,892 be wired to Leumi Le Bank in Israel from SBM to provide necessary cash for a small start-up business I was developing in Spain. A company in Israel provided required equipment. The $38,892 was a loan repayment by SBM to Calenergy that I elected to use for the new startup company.*

- 36(l) i. *I never discussed and reviewed sales with employees. As I stated, I would regularly request to see a Bunzai profit and loss statement to ensure the loan would be repaid.*

    > ii and iii. *I would from time to time ask Medina how the business is doing – because I was nervous about Bunzai repaying the loan.*

- 36(m) *I never discussed Bunzai's advertising with anyone. I have no recollection of receiving Exhibits 562 and 565.*

    > ii. *The FTC's contention I received e-mails discussing high-risk merchant accounts is false. Exhibit 444 referenced by the FTC is an offer I received to invest in a company called "National Merchant Center." I didn't invest. Exhibit 445 has no relationship to Bunzai's operations. Exhibit 235 has no relationship to me, Calenergy or Bunzai. It is a "draft" agency agreement that I considered with a third party named Rick Lee. It was never formalized.*

    > iii. *Exhibit 565 is essentially the same e-mail as Exhibit 562. I have no recollection of receiving these e-mails or ever reading them.*

    > iv. *Exhibit 28 is a communication between Alon Nottea*

13
**DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM**

> and Alex Pitt concerning Pitt's interest in seeking investors for his business called "Pay Pro." Alon Nottea so testified at his February 18, 2016 deposition. A true copy of pages 134 and 135 are attached hereto as Exhibit "N". Mr. Nottea specifically testified that he never showed me the websites included in Exhibit 28; or any other similar websites. [See, R.T. 135: lns. 10-15.]
>
> • 36(o) Alon Nottea requested I incorporate Zen Mobile Media, Inc. I filed the necessary documents to incorporate. I didn't own any stock or other interest in Zen. And I have never managed or controlled Zen." [See p. 8-9; 36(a).][Request for Judicial Notice No. 1; *Decl. of Latsanovksi*, ¶¶28-19.]

The FTC's attempt to implicate Defendants Latsanovski and Calenergy in any wrongful conduct by Defendant Bunzai is meritless.

## 5.

## THE DECLARATIONS OF MARIYA ALEKSANDROVNA AND ILIA KLYKOV PROPERLY SET FORTH THEIR OWNERSHIP OF FROZEN ASSETS

Defendants will not repeat section 6 of their motion explaining that the FTC's freeze order is overbroad and affects innocent third parties. Further, the FTC's contention the supporting declarations of Mariya Aleksandrovna and Ilia Klykov cannot be referenced because they were not disclosed in Rule 26 disclosures is incorrect. Both persons were identified in two supplemental disclosures dated April 6, 2016 and April 20, 2016. [Supp. Decl. of Benice, ¶2; Exhs. "A" and "B" thereto.]

Moreover, Defendants had no obligation under Rule 26 to disclose these persons. Their identities and testimony is unrelated to the claims and defenses asserted between the parties. Rule 26 requires the name and (if known) the addresses and telephone numbers of individuals *"likely to*

14

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

*have discoverable information"* that the disclosing party may use to support its claims or defenses. *See, Fed. R. Civ. Proc., Rule 26 (a)(1)(e)(West 2016)*. The Mariya Aleksandrovna and Ilia Klykov declarations are presented solely to advise the Court of the FTC restraining orders overbreadth and negative effect on innocent third party assets.

### 6.

### DEFENDANT LATSANOVSKI DID NOT VIOLATE A COURT ORDER

The FTC contends that Defendant Latsanovski violated a court order concerning the release of funds subject to the asset freeze. [FTC Opp. at 27: lns. 10-17.] False. Defendant Latsanovski wired $900,000 to the escrow company to close the Rosewood escrow by June 30, 2015 pursuant to the Order at p.2, line 14. After the wire Defendant Latsanovski learned the escrow needed $707,000 not $900,000. The order at lines 13-14 was incorrect in designating the closing amounts due for Redwood and Rosewood. Defendant Latsanovski thereafter wired the correct sums that are correctly noted at lines 26-27; $707,000 for Rosewood and $900,000 for Redwood. Both escrows closed. The Order simply contained a typographical error. The FTC's representation to the Court that Latsanovski violated the Order is false. Defendant Latsanovski fully complied with the Order's terms. [Supp. Decl. of Latsanvoski, ¶3; Exh. "B" thereto.]

### 7.

### THE FTC'S CONTENTION THAT THE AURAVIE SKIN CARE SALES PROGRAM WAS A *"DECEPTIVE SCHEME"* IS BASELESS

The FTC contends that *"this case concerns a deceptive scheme that has defrauded consumers of more than $75 million."* [FTC Opp. at 4: lns. 2-4.] The FTC has yet to describe precisely what was *"fraudulent"* or *"deceptive"* about Defendant Bunzai's web-based sales program. Contrary to the FTC's unfounded assertions, there were in fact no *"hidden costs"* or deceptive *"return"* policies. And the negative option feature is a common sales procedure that is neither deceptive nor unlawful if fully disclosed; *the AuraVie website fully disclosed this element.* The website identified in the FTC's First Amended Complaint fully and clearly disclosed all elements to the consumer concerning the purchase of AurieVie skin care product. [*See, First Amended Complaint*, ¶56.]

15
**DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM**

A practice is deceptive under the Federal Trade Commission Act *"if it is likely to mislead consumers acting reasonably under the circumstances...in a way that is material."* Cyberspace.com LLC, 453 F.3d at 1199. *"A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."* Id. at 1200. Disclosures in fine print may not overcome an advertisement's deceptive net impressions. *Id.* at 1200-01(*holding fine print notices on reverse side of check did not overcome net impression that check was a refund or rebate when the fine print stated that cashing the check would result in a monthly fee for internet access*). A defendant violates the FTC Act if its advertisement *"induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."* Resort Car Rental Sys., Inc. v. F.T.C., 518 F.2d 962, 964 (9th Cir. 1975).

**The AuraVie website contained none of these improper practices:**

- AuraVie was a group of high quality skin care products marketed by Bunzai. It wasn't a *"scam"* involving nonexistent, defective or misrepresented products as suggested by the FTC. The consumers received precisely what was advertised.

- Bunzai successfully marketed the AuraVie skin care products for approximately 4 years. If there was any *"scam"* nature to Bunzai's marketing or the AuraVie products, Bunzai's operations would have been terminated earlier.

- Bunzai's *"risk free"* trial or *"trial order"* disclosures were truthfully represented on the AuraVie sales website. Bunzai's sales procedure was simple: a consumer could order the AuraVie skincare product for a 10 day *"risk free"* trial period and be subject only to a $4.95 shipping and handling charge. The *"risk free"* trial meant that if the customer notified Bunzai within the 10 day period of the desire to cancel, they had an additional 20 days to return the product. The consumer was not charged for the product. If the consumer elected to return the product within the total 30 day period the $4.95 was the only charge as fully disclosed. If the consumer elected to keep

product then a $97.88 fee was charged for the product. Again, this charge was fully disclosed. The Bunzai marketing program was a permissive and lawful continuity sales program; if the customer did not cancel the program he would continue to receive the product. This element of the program was fully disclosed as well.

- These straight forward terms were uniformly fully disclosed in the *"Terms and Conditions"* portion of the website

- The FTC admits in the complaint that Bunzai's websites disclose these terms in the *"Final Step"* of Bunzai's ordering page. [First Amended Compl., ¶56.] The *"Final Step"* page is where the consumer provided credit card and related information to order the product. This is the obvious and proper place to identify the *"Terms and Conditions."*

- Moreover, the *"Terms and Conditions"* are expressly identified on the *"Final Step"* page directly adjacent to the *"Get My Order"* section and directly below the *"Shipping & Payment"* section on the website. Further, a more detailed *"Terms and Conditions"* section can be accessed at the bottom of the *"Final Step"* page. [First Amended Compl., ¶56.][See, Request for Judicial Notice No. 2; *May 2, 2016 Decl. of Nottea* ¶¶2-23.] Under no circumstances could a customer be misled in anyway concerning the *"Terms and Conditions"* of the AurieVie *"risk free"* trial unless the consumer elected not to read the *"Terms and Conditions"*.

- Most importantly, the general terms and conditions were clear and understandable:

  *"We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for you 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you*

17

DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM

> *will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household."* [First Amended Complaint, ¶57.]

In short, the FTC's baseless assertions that the AuraVie website was deceptive and misleading are false; all of the terms and conditions were fully disclosed and easily understandable. Thus, the substantive basis of the FTC's Complaint is meritless; Defendant Bunzai did not engage in *"a deceptive scheme"* that *"defrauded"* consumers.

## 8.
## CONCLUSION

For the reasons stated, Defendants Igor Latsanovski and Calenergy, Inc.'s motion for summary judgment should be granted or alternatively partial summary judgment granted as requested. Further, the preliminary injunction and asset freeze should be dissolved and/or modified to limit its effect to $317,000 of Defendants' funds.

DATED: May 12, 2016                    Respectfully submitted,

_____
LAW OFFICES OF JEFFREY S. BENICE
Jeffrey S. Benice
Attorney for Defendants, Igor Latsanovski and Calenergy, Inc.

**DEFENDANTS LATSANOVSKI AND CALENERGY'S REPLY MEMORANDUM**

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 13, 2016, a true and correct copy of the foregoing document described as DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56; SUPPLEMENTAL DECLARATIONS OF IGOR LATSANOVSKI AND JEFFREY S. BENICE IN SUPPORT THEREOF was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

**Local Counsel For Receiver**
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA 90036
nameri@agmblaw.com

**Counsel For Alon Nottea and Roi Rueveni**
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com

**Federal Trade Commission**
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

**Counsel For Doron Nottea and Motti Nottea**
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA 90025
Telephone: (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

**Counsel For Chargeback Armor, Inc.**
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 13 day of May, in Costa Mesa, California 92626.

Javaise Escoto, Declarant