# REQUEST FOR JUDICIAL NOTICE NO. 1

1  JEFFREY S. BENICE, ESQ., State Bar No. 81583
   LAW OFFICES OF JEFFREY S. BENICE
2  *A Professional Law Corporation*
   3080 Bristol Street
3  Sixth Floor, Suite 630
   Costa Mesa, California 92626
4  Telephone No.: (714) 641-3600
   Facsimile No.: (714) 641-3601
5  Website: www.JeffreyBenice.com
   E-Mail: JSB@JeffreyBenice.com
6
7  Attorneys for Defendants,
   Igor Latsanovski and Calenergy, Inc.
8
9
10              **UNITED STATES DISTRICT COURT**
11      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
12
13  FEDERAL TRADE COMMISSION,          **CASE NO. CV 15-04527 GW (PLAx)**
14              Plaintiff,             **DECLARATION OF IGOR
                                       LATSANOVSKI IN SUPPORT OF**
15          v.                         **DEFENDANTS IGOR LATSANOVSKI
                                       AND CALENERGY, INC.'S OPPOSITION**
16  BUNZAI MEDIA GROUP INC., et al.,   **TO PLAINTIFF FEDERAL TRADE
                                       COMMISSION'S MOTION FOR**
17          Defendants.               **SUMMARY JUDGMENT**
18
                                       ───────────────────────────
19                                      **Date:        May 23, 2016**
                                        **Time:        8:30 A.M.**
20                                      **Courtroom:   10**
21
                                       ───────────────────────────
22                                     **[Assigned for All Purposes to the Honorable
                                       George H. Wu, Courtroom 10]**
23
                                       **[First Amended Complaint Filed: October
24                                     9, 2015]**
25
26
27
28
────────────────────────────────────────────────────────────
     **DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
                  MOTION FOR SUMMARY JUDGEMENT**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 3 of 82   Page ID
#:12620
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 2 of 16   Page ID
#:10410

## OPPOSING DECLARATION OF IGOR LATSANOVSKI

I, Igor Latsanovski, declare and state, as follows:

*A.*    *Introduction.*

1.      I am a defendant herein.  I have personal knowledge of the facts set forth herein.  I am the president and sole shareholder of Defendant Calenergy, Inc. ("*Calenergy*").  If called as a witness, I would and could testify thereto as follows.  I make this declaration in support of my and Defendant Calenergy, Inc.'s Opposition to Plaintiff Federal Trade Commission's Motion for Summary Judgment.

*B.*    *Summary Of CalEnergy Loans To Bunzai Media Group, Inc. and Affiliates.*

2.      Attached hereto as Exhibit "A" and incorporated herein by reference is a true and correct copy of the Summary prepared by David Davidian on or about July, 2015. [1]  The Summary reflects all loans made by CalEnergy to Defendant Bunzai Media Group, Inc. ("*Bunzai*") and Bunzai's successor SBM Management ("*SBM*") during the period 2010 through 2015.  To my knowledge, Bunzai ceased operations in September 2013. Prior to Bunzai's cessation of business, CalEnergy's loans were to my knowledge, made solely to Bunzai. After Bunzai ceased business operations in 2013, the loans were made to Bunzai affiliate as noted above, SBM.

3.      The total funds advanced as loans during the period 2010 to 2015 were up to $500,000.  Bunzai and Bunzai's affiliated companies repaid me the total sum of $500,000 in principal; and $317,522.13 in interest during that time period as reflected on the Summary.  The FTC's contention I loaned $1.9 million is incorrect.  That is the approximate aggregate of all principal loan advances; repayments; and further re-advances of the original $500,000 loan made in various installments.

*C.*    *Latsanovski's Use of Interpreter.*

4.      In 2010 I met Mr. Gleb Gregory Lipskiy through my family.  He immigrated from Ukraine to the United States in 1994 at six (6) years of age. He was born in 1988 in Ukraine.  He

---

[1] Exh. "A" to Mr. Latsanovski's July 15, 2015 Declaration.

1

1    graduated from high school in America in 2008.  He speaks fluent Russian and English.

2         5.      I had just immigrated to the United States from Spain in 2010 and spoke little

3    English; I had lived in Spain for approximately fifteen (15) years before coming to the United

4    States. Because I could not read English, or speak English well, I asked Mr. Lipskiy to assist me,

5    when I was involved in negotiations concerning investments in the United States that I was

6    contemplating.  He agreed to do so.

7         6.      In or about 2010 and 2011 Mr. Lipskiy assisted in my negotiations with persons

8    named Alon Nottea and Khristopher Bond in Los Angeles.  He assisted me in reading documents

9    and negotiating terms.  Mr. Nottea and Mr. Bond did not speak Russian and I did not speak

10   English well.  I began to partially speak English in 2011-2012 but continued to use a translator for

11   reading.

12   **D.**   **_June 10, 2015 Loan from Lawrence Rubin to Felix Katz and Sunset Holding Partners,_**

13   **_LLC._**

14        7.      On or about June, 2015, Lawrence Rubin was offered an investment opportunity in

15   a California liability company called "*Sunset Holding Partners, LLC*" ("*Sunset*").  I am a sixty

16   percent (60%) owner of an LLC interest in Sunset.    At my direction Sunset was involved in

17   investing in real estate investment opportunities in Southern California.  Generally, Sunset would

18   purchase the real estate assets; Sunset would then improve or develop the real estate assets; and

19   thereafter sell the real estate assets.  The sale proceeds would be first distributed to repay all debts,

20   operating costs and expenses.   Any net proceeds would thereafter be distributed to the LLC

21   Members.

22        8.      Mr. Rubin agreed to advance the sum of $1,000,000 to Sunset on or about June 10,

23   2015. I approved the transaction. The funds were used for the purchase and renovation of property

24   located at 430 W. Antonio Drive, Long Beach, California  90807 ("*the Property*").   Attached

25   hereto as Exhibit "B" and incorporated herein by reference is a true copy of the "*Promissory Note*

26   *Secured by Deed of Trust*" dated June 10, 2015 ("*the Note*") and accompanying Deed of Trust.

27   Pursuant to the Note's terms, the full principal of $1,000,000 and all unpaid interest is due for

28   payment on June 10, 2016.  The payment due on that date, pursuant to paragraph 2.2 of the Note

2

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

1    entitled "*Balloon Payment*" is $1,007,500.00.

2    **E.    *Effect of Federal Trade Commission Preliminary Injunction On Note's***

3    ***Repayment.***

4          9.    I understand that the Property's current fair market value is approximately

5    $700,000. Because Sunset's development plan for the Property has been stopped as a result of the

6    Federal Trade Commission injunction, the loan is grossly undersecured and will likely be

7    defaulted on in four (4) months when it is due. I accordingly request that the Federal Trade

8    Commission injunction be modified to enable the Property to be sold or to permit redevelopment

9    of the Property to enable Mr. Rubin to receive full repayment of the $1,007,500 in loan funds.

10   **F.    *Latsanovski Had No Control Over Defendant Bunzai.***

11         10.    I did not play any role in the operation of the internet skincare business Defendant

12   Bunzai. I never spoke to any customers; was not involved in the day to day operations of the

13   internet skincare business; had no involvement in the marketing or advertising of the skincare

14   products; never received or reviewed any reports regarding customer complaints; and had no

15   knowledge of the web based advertising used by Defendant Bunzai. Defendants Alon and Bond

16   actually operated and controlled Defendant Bunzai and made all operational decisions. Neither

17   Calenergy nor I received any money from consumers directly.

18   **G.    *Latsanovski's Relationship with Third Party Investors.***

19         11.    My role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC,

20   and Vastpay LLC was primarily to locate third party investors who would be willing to provide

21   investment funds to these businesses. None of these businesses received funds from Defendant

22   Bunzai. As a result of the asset freeze, these legitimate businesses have had their bank accounts

23   frozen even though (a) these businesses are completely unrelated to the alleged internet skincare

24   business; (b) were funded by other sources of income; and/or (c) were not run by Defendants

25   Calenergy.

26   ///

27   ///

28   ///

3

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

**H.    _Defendants Latsanovski's and Calenergy's History_.**

12.    I am a 52 year old immigrant.  I was born in Kazakhstan (USSR) in 1964 and lived with his family there until approximately 1990.  I graduated from college in approximately 1983. In 1992, I moved to Canada. In 1996, when I was 33 years old, I moved with my wife to Spain.  I lived in Barcelona, Spain from 1996 to 2010. While in Spain, I became involved in various real estate development projects.  In 2010, I moved from Spain to the United States. [my wife and family (2 children), moved to the United States in 2011.]  When I first arrived in the United States in 2010 he could speak a little English, but could not read nor write English.

13.    I represented a group of foreign investors in 2010 as their agent in the United States. My business plan involved placing the foreign investors investment funds in to suitable investments in the United States. I also made investments on my own behalf. In 2009, I created Defendant Calenergy and became its CEO.  I used Defendant Calenergy to fund investments with investor funds.

14.    Sometime in 2010, I was approached by Defendant Alon Nottea, to invest in an internet skincare project with Defendant Bunzai Media Group, Inc. ("_Bunzai_").  Defendant Nottea was Defendant Bunzai's president and CEO. From conversations with Defendant Nottea, I understood that Defendant Bunzai needed funds to hire additional employees and resources. I preliminarily agreed to invest funds in Bunzai:

15.    Defendant Nottea also introduced me to Defendant Khristopher Bond, who I was advised by Defendant Alon Nottea handled the day to day operations for the internet skincare business and also handled all aspects of the business, including marketing, advertising, product fulfillment and customer service.

16.    My sole involvement in Defendant Bunzai, and all entities related to it ("_Bunzai Group_"), was to provide loans through my company Defendant Calenergy. As Defendant Calenergy's CEO, I had no involvement in the operation of the Bunzai Group and had no authority to make any decisions regarding the operations of the Bunzai Group.

17.    I did not perform any functions in advertising, payment processing, billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai Group's operational

4

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC MOTION FOR SUMMARY JUDGEMENT**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 7 of 82   Page ID
#:12624
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 6 of 16   Page ID
#:10414

1   decisions.   Moreover, I had no interactions with customers, did not received any customer

2   complaints, nor any reports of customer complaints.

3       18.   At no point did I believe that any customers were being deceived or defrauded. By

4   all indications, Defendant Nottea was running a legitimate company operating in a legitimate

5   industry.

6   **I.   _Defendant Latsanovski's Loan Transactions with Defendant Bunzai._**

7       19.   In 2010 when I was introduced to defendants Nottea and Bunzai, an initial proposal

8   was made to me, in which I would invest _"$350k in exchange for 55% ownership of Bunzai Media_

9   _Group, Ownership Shares ... will be as follows:  55% Igor, 22.5% Alon[Nottea], 22.5 Khristopher_

10  _[Bond]"_.   The proposal was memorialized in a document entitled _"Bunzai Media Group   -_

11  _Partnership Agreement,"_ dated October 12, 2010. A true copy of the October 12, 2010 Agreement

12  is attached hereto as "Exhibit C".

13      A condition to the October 12, 2010 Agreement's validity was that:

14          _"upon signing this agreement, Igor shall invest $75k to run a_

15          _continuity test for 30 days.  During this test, Bunzai will purchase_

16          _at least 1,000 orders . . . within the first 15 days, and a conversion_

17          _from free trial to transitional stage . . . of at least 75% of those_

18          _orders.  If this goal is met and both parties agree to continue with_

19          _the partnership, then Igor will immediately invest the remaining_

20          _$275k to complete the financial agreements of this deal."_ [Exh.

21          "C" hereto; _October 12, 2010 Agreement at 1._]

22      20.   I advanced the $75,000 on October 12, 2010. However, the condition to the validity

23  of the October 12, 2010 Agreement did not occur. The continuity test was not satisfactorily

24  completed and the _"parties [did not] agree to continue with the partnership . . ."_

25      21.   Defendants Nottea and Bond, defendant Bunzai's officers, then proposed a _"Bunzai_

26  _Media Group Loan Agreement"_ dated December 16, 2010. A true copy of the Agreement is

27  attached hereto as Exhibit "D" and incorporated herein by referenced.  The December 16, 2010

28  Loan Agreement offered two alternatives to me concerning a loan of $175,000 I was to make to

5

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 8 of 82   Page ID
#:12625
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 7 of 16   Page ID
#:10415

1   defendant Bunzai; "*This Agreement . . . with respect . . . to the loan of $175k to existing company.*"

2   First, defendant Bunzai agreed to repay the $175,000 in three (3) payments on April 5, May 5, and

3   June 5, 2010 respectfully of $50,000, $50,000 and $100,000. "*Alternatively, "Igor's 175k will*

4   *become an investment that will represent a percentage of ownership in the company that will be*

5   *determined the first week of January, 2011.*"

6         22.     No subsequent agreement was negotiated in January, 2011. Rather, in March, 2011

7   Defendants Nottea and Bond offered me a new partnership proposal. This new agreement dated

8   March 23, 211, required me to immediately "*invest $500,000 into the company for administration,*

9   *manufacturing and marketing expenses. . . Investments shall be returned as follows:*

10             *Igor $300k*

11             *Alon and Khristopher (to go to French Partners) $200k*

12             *Igor $200k*

13             *Alon and Khristopher $300k*"

14   [A true copy of the March 23, 2011 Agreement is attached hereto as Exhibit "E" and incorporated

15   herein by reference.]

16         23.     Pursuant to the March 23, 2011 Partnership Agreement's terms, I and defendants

17   Nottea, and Bond would each own "*1/3 of 100% of the company.*" Further:

18           "*5. It is understood by all parties that this will be Alon Nottea and*

19           *Khristopher Bond's primary business and they shall devote to the*

20           *conduct of the business so much of their respective time as may*

21           *be reasonably necessary for the efficient operation of the business.*"

22         24.     I decided not to invest $500,000 in one lump sum into Defendant Bunzai in March,

23   2011. I was uncomfortable with the terms of repayment of the investment and decided that I would

24   remain a lender as set forth in December 16, 2010 Loan Agreement. Defendants Nottea and Bond

25   agreed that my status would be as a lender only.

26   **J.**    **_The FTC Asset Freeze._**

27         25.     The FTC has frozen the equity of my personal residence located at 3420 Cordova

28   Drive, Calabasas, CA 91302. The house is valued at $3.1 million. There is approximately $1.3

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 9 of 82   Page ID
#:12626
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 8 of 16   Page ID
#:10416

1    million of equity in the house.

2        26.     Further, third party investor funds of Lawrence Rubin and Mariya Aleksandrovna

3    totaling respectively $1,000,000 and $1,100,000 were also invested into Sunset and are also

4    improperly subject to the asset freeze.  And, $5.8 million of funds invested into Sunset by Ilia

5    Klykov were also improperly frozen.

6        27.     ComicsFix, Vastpay and Sunset were all funded by outside investors, not proceeds

7    from the internet skincare business. For example, the accounts of Sunset have been frozen even

8    though Sunset was formed in January 2015; Sunset is a real estate investment company, and the

9    vast majority of the funds frozen in June 2015 came from outside real estate investors, including

10   Mariya Aleksandrovna, and Ilia Klykov.

11   **K.**    ___The FTC's Contention about Latsanovski's Ownership of Bunzai is Baseless.___

12       28.     I was never "*a principal member and investor in the AuraVie common*

13   *enterprise...*" [FTC Motion at 15: lns. 4-5.] Rather, as explained above, I was solely an investor.  I

14   was never a "*partner*" in Bunzai and was never an employee.  The FTC's reference to "Dkt. 106 at

15   6" and UF #36(g) supposedly confirming that I was an "*employee*" and "*officer*" are misleading:[2]

16      •  UF 36(g):     This is a 2012 Form W-2 that Bunzai issued to me for $110.00.

17                       This is the sole and only W-2 I ever received from Bunzai.  This W-2 was issued

18                       apparently to document $110 paid to me sometime in 2012. I have no records of

19                       the payment and no knowledge as to why Bunzai gave me a W-2 rather than a

20                       1099.

21      •  UF 36 (h):    This is a resume I prepared as part of my immigration application in

22                       2014. It accurately reflects that I was fully employed by Calenergy in 2014 and

23                       that my "*work schedule does not have fixed hours and includes travel within the*

24                       *United States and abroad for negotiations and assessment of potential projects...*"

25

26   _____

27   [2] The noted sub-paragraphs specifically reference the FTC's Statement of Uncontroverted Facts and Conclusions of
     Law paragraphs.

28

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

1  • UF36(q):  This is my August 14, 2013 e-mail to Alon Nottea expressing my

2  "*opinion*" and concerns.  Before I sent the e-mail I had discussions with Alon

3  Nottea, Bunzai's controlling principal, expressing my concern that the loan to

4  Bunzai would not be repaid.  As I stated in my January 28, 2016 deposition,

5  "*[t]the personal thing inside me was that I don't want to lose my money.*"

6  [Attached as Exhibit "F" and incorporated herein by reference is a true copy of

7  page 91 of Latsanovski's deposition.  The quote is at 91: lns. 5-7.] As of July-

8  August 2013 Calenergy was owed approximately $100,000 and Mr. Nottea was

9  requesting I authorize Calenergy to loan further funds; in September 2013

10  Calenergy loaned $400,000 to SBM.  Mr. Nottea had also informed me that he was

11  considering closing down all operations because the business was not making

12  enough money.  My primary opinion that I expressed was that "*I want us to think*

13  *and concentrated (sic) our efforts on the opening of new businesses...and thus use*

14  *outsourcing...[A]nd we are in a quite mode to create new products...*" Also, in my

15  e-mail I closed with the reference "*Sincerely your sincere partner Igor.*" I

16  understand the word "*partner*" as referencing a close personal friend.  I had no

17  other understanding of the term at the time.  My e-mail was originally written in

18  Russian and translated by an automated translator.  The Russian word I used that

19  was translated into "*partner*" is the word "*tovarish.*"  The word actually means

20  referring to a person who thinks and feels like you. [Attached hereto as Exhibit

21  "G" is a true copy of a page from Yandex Translator showing multiple translated

22  meanings; "*partner*" is included.

23  **L.**  **_Latsanovski's Specific Response to Uncontroverted Fact No. 36._**

24  29.  I have reviewed the FTC's Uncontroverted Fact No. 36 and its subparts and

25  specifically respond as follows:

26  (a)  The FTC's reference to Doron and Motti Nottea's statement that I was an

27  "*owner*" of Bunzai is erroneous [36a].  They specifically denied that I had any

28  ownership interest in "*Response's to FTC's Request for Admission-Set One.*" A

8

Case 2:15-cv-04527-GW-PLA  Document 428-8  Filed 05/13/16  Page 11 of 82  Page ID
#:12628
Case 2:15-cv-04527-GW-PLA  Document 397-1  Filed 05/02/16  Page 10 of 16  Page ID
#:10418

1   true copy of their responses is attached hereto as Exh. "H" and incorporated herein

2   by reference. I never owned any part of Bunzai.  I was the "*CEO*" of Zen Mobile

3   Media.  Alon Nottea asked me to incorporate Zen Mobile.  Mr. Nottea thereafter

4   managed the business' day to day operations. Zen Mobile handled merchant

5   account business. [Attached hereto as Exhibit "I" is a true copy of Mr. Nottea's

6   February 18, 2016 Deposition R.T. 219: lns. 14-21; Nottea specifically testified that

7   "*A. I made decision on behalf of Zen. It was not Igor.  It is not Igor's consent to*

8   *make decisions there.*"]

9       (b)    I fully explained that no partnership was ever created with Bunzai above.

10      (c)    I have no knowledge concerning the source of Defendant Medina's belief

11  that I was an "*owner*" of Bunzai.  I was never a Bunzai owner.  Defendant

12  Medina testified in his February 23, 2016 deposition that he was hired to work at

13  Bunzai by Khristopher Bond; that he was supervised by Khristopher Bond and

14  Alon Nottea; and that he "*assum[ed][Bunzai] is owned by Alon and Khristopher*

15  *because ...they hired me.*" A true copy of Medina's February 23, 2016 Deposition

16  R.T. 10 and 12 is attached hereto as Exhibit "J" and incorporated herein by

17  reference.  The specific testimony is at R.T. 10: lns. 9-15; and R.T. 12: lns. 10-13.]

18  Because Calenergy loaned Bunzai substantial funds I was interested in Bunzai's

19  financial status to ensure Calenergy would be repaid; because Bunzai was typically

20  late or delinquent in repaying the loan.

21      (e)    Calenergy's website accurately referenced at the time that "*we are working*

22  *under a strategic hierarchy which allows us to hire management companies that*

23  *specialized in managing our clients.*" That accurately describes Calenergy's

24  business. The  companies identified on the website were either contracted

25  management companies or clients.  There is no reference to Calenergy having an

26  ownership in any of the identified companies; it was not a "*parent*" company.

27      i. and ii.    Calenergy's "*organization chart*" referenced by the FTC was

28  a document that was never fully implemented [Exh. 561]. Calenergy

9

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

1     never successfully commenced the operation identified on the charts.

2     Calenergy did employ Camerino as an accountant; Reuveni referred

3     Calenergy information concerning potential start-up company investment

4     opportunities; and Nottea worked for Calenergy developing prospective

5     contracts with international companies. They worked between three and six

6     months for Calenergy in late 2013. Their general job title was "*manager*."

7        (f)     I never swore under oath that Bunzai was my employer. Exh. 949

8 referenced by the FTC is a Form 1-9 Employment Eligibility Verification.

9 Bunzai's HR employee Lear Arazy executed the document apparently believing I

10 was an "*employee*" of Bunzai in November, 2011. I was never employed by

11 Bunzai *and therefore did not sign the form*. The FTC's statement that I swore

12 under oath is accordingly false.

13        (g)     See discussion above at ¶28, UF36(g).

14        (h)     All information provided to the immigration service accurately described

15 Calenergy and my ownership of Calenergy.

16        (i)     I never was personally involved in managing Bunzai on a day to day level.

17            i.     Paul Medina provided me with quarterly (sometime monthly)

18     financial reports concerning Bunzai's operations; I requested reports

19     because I authorized Calenergy to loan money to Bunzai with no security.

20     Exh. 507 is a form of detailed financial report that I was provided by

21     Medina; I sent Exh. 507 back to Medina as confirming my acceptance of

22     the format.

23            ii.     In 2011, I introduced Alon Nottea to Oleg Trushla. Mr. Trushla was

24     attempting to sell cosmetics in Europe. I understand that he was

25     unsuccessful. I received copies of some correspondence between them, I

26     assume because I introduced them. At no time did I participate directly in

27     their communications. Exh. 319 referenced by the FTC is such a

28     communication.

10

DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC<br/>MOTION FOR SUMMARY JUDGEMENT

iii.     Exhibit 329 referenced by the FTC contains no evidence of my participation in any meeting or conference call.

iv.     Exhibits 564 and 559 reference communications to me from David Migdal in 2014.  Migdal was an associate of Alon Nottea.  I referred Nottea/Migdal to "*Miki*" in Barcelona; I do not recall Miki's last name. I met Miki when I lived in Barcelona. Miki sold a product through his Spanish magazines called "*Gold Mask*." Mr. Nottea expressed an interest in speaking to Miki.  I wasn't involved in the conversations.  Exhibits 564 and 559 are updates sent to me by Midgal concerning the Barcelona business. He apparently thought because I referred Miki that he should update me on the status of a few conversations.  Also, at no time did I ever proofread Bunzai advertising; or have any involvement in the Bunzai website creation or operation. And Exhibits 564 and 559 make no reference to advertising.

v.     I was not apprised of "*low level contractual disputes*" concerning advertising.  Exhibit 48 referenced by the FTC is an e-mail to Jose at an "*investment group*". I was copied on the e-mail.  I have no recollection of reading it.  I don't' know "Jose" and never had any discussion with him.  Exhibit 48 appears to concern direct sales by Bunzai.  It has nothing to do with a contractual dispute.

vi.     I did not assist Defendants in transferring funds overseas to Cypress. *This in an FTC fabrication.*  Exhibit 55 references my referral of Alon Nottea to a banker. Mr. Nottea specifically testified at his February 23, 2016 deposition that he never transferred any funds to a Cypress trust or bank. [Attached hereto as Exh. "K" is a true copy of pages 252 and 253 of the February 23, 2016 Deposition of Alon Nottea. His testimony denying transferring funds to Cypress is at R.T. 252 lns. 22-25; 253: lns. 1-20.] The FTC's assertion is false.

11

DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 14 of 82   Page ID
#:12631
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 13 of 16   Page ID
#:10421

1          vii.     From time to time I would leave pre-signed checks with

2          Doron Nottea to pay my personal bills when I was travelling on

3          business; and to pay Calenergy bills.

4          viii.     I own Calenergy. Calenergy loaned funds at my direction to Bunzai

5          and Bunzai affiliates as described above.

6          ix.     The FTC intentionally miscites Medina's testimony.  He

7          never said I was present "*at the common enterprises place of*

8          *business multiple days each month*."  His true deposition testimony

9          was:

10          "*Q.  How do you know Igor Latsanovski?*

11          *A.  I would see him around the office a few days out of*

12          *each month*." [Attached hereto as Exhibit "L" is a true copy of

13          Medina's February 23, 2016 R.T. 28: lns. 17-18.][Exh. 946]

14      (j)     At no time have I owned or controlled Pinnacle.  Attached hereto as Exhibit

15 "M" is a true copy of  the (1) Articles of Incorporation of Pinnacle Logistics,

16 Inc. filed June 6, 2012 by Oz Mizrah; and (2) Statement of Information for

17 Pinnacle filed September 10,  2012 with the California Secretary of State's office.

18 Mizrah is identified as the CEO, Secretary and CFO of Pinnacle.  Also, the FTC's

19 Exhibit 553 is a portion of the deposition of Roi Reuveni.  At R.T. 173: lns. 19-25;

20 174: lns. 1-4; Reuveni testified that he was the sole person involved in Pinnacle's

21 day to day operations at R.T. 174: lns. 1-4. He specifically testified that I had no

22 involvement in the day to day operations of Pinnacle at 175: 11-17.

23          i.     Exhibit 64 confirms my request that $38,892 be wired to Leumi Le

24          Bank in Israel from SBM to provide necessary cash for a small start-

25          up business I was developing in Spain. A company in Israel provided

26          required equipment. The $38,892 was a loan repayment by  SBM to

27          Calenergy that I elected to use for the new startup company.

28      (k)     I discussed Exhibit 21, my August 14, 2013 e-mail above at p. 8; UF36(a).

12

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 15 of 82   Page ID
#:12632
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 14 of 16   Page ID
#:10422

1       (l)    i.    I never discussed and reviewed sales with employees.   As I stated,

2   I would regularly request to see a Bunzai profit and loss statement to ensure the

3   loan would be repaid.

4                  ii and iii.    I would from time to time ask Medina how the business is

5                  doing – because I was nervous about Bunzai repaying the loan.

6       (m)    I never discussed Bunzai's advertising with anyone.  I have no recollection

7   of receiving Exhibits 562 and 565.

8                  ii.    The FTC's contention I received e-mails discussing high-risk

9                  merchant accounts is false.  Exhibit 444 referenced by the FTC is an offer I

10                  received to invest in a company called "*National Merchant Center*."   I

11                  didn't invest. Exhibit 445 has no relationship to Bunzai's operations.

12                  Exhibit 235 has no relationship to me, Calenergy or Bunzai.

13                  It is a "*draft*" agency agreement that I considered with a third party named

14                  Rick Lee. It was never formalized.

15                  iii.    Exhibit 565 is essentially the same e-mail as Exhibit 562.  I have no

16                  recollection of receiving these e-mails or ever reading them.

17                  iv.    Exhibit 28 is a communication between Alon Nottea and Alex Pitt

18                  concerning Pitt's interest in seeking investors for his business called "*Pay*

19                  *Pro*." Alon Nottea so testified at his February 18, 2016 deposition.  A true

20                  copy of pages 134 and 135 are attached hereto as Exhibit "N". Mr. Nottea

21                  specifically testified that he never showed me the websites included in

22                  Exhibit 28; or any other similar websites.  [See, R.T. 135: lns. 10-15.]

23       (n)    Exhibit 549 represents information given to me to consider in analyzing a

24   United Kingdom investment.

25       (o)    Alon Nottea requested I incorporate Zen Mobile Media, Inc.  I filed the

26   necessary documents to incorporate.  I didn't own any stock or other interest in

27   Zen.  And I have never managed or controlled Zen. [See p. 8-9; 36(a).]

28       (p)    I fully discuss the loans made to Bunzai (and Bunzai affiliates) above.

13

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

1    (q)    I fully discuss my "*opinion*" e-mail above.

2   **J.    _Latsanovski Had Minimal Expertise in the Payment Processing Industry._**

3    30.    In 2013 I invested in a business wholly unrelated to Bunzai called "*Vastpay*." I

4   was the majority shareholder of Vastpay. Vastpay's business plan was to aggregate small

5   businesses into one main business and ultimately sell the combined businesses at profit. Vastpay's

6   CEO was Eugene Shanpansky. The business ceased operations in 2015. My financial investment

7   in Vastpay did not result in me developing detailed expertise in the payment processing business. I

8   do have some general information concerning payment processing that any investor would

9   acquire. Mr. Shanpansky was the person with specific merchant processing expertise.

10

11

12    I declare under penalty of perjury under the laws of the United States of America that the

13   foregoing is true and correct.

14    Executed this 30th day of April, 2016, at Costa Mesa, CA.

15

16    IGOR LATSANOVSKI

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 17 of 82   Page ID
#:12634
Case 2:15-cv-04527-GW-PLA   Document 397-1   Filed 05/02/16   Page 16 of 16   Page ID
#:10424

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 2, 2016, a true and correct copy of the foregoing document described as DECLARATION OF IGOR LATSANOVSKI IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT were served electronically via e-mail.  The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

*Local Counsel For Receiver*
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA  90036
nameri@agmblaw.com

*Counsel For Chargeback Armor, Inc.*
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA  90210
SP@BeverlyHillsLawCorp.com

*Federal Trade Commission*
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

*Counsel For Doron and Motti Nottea*
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA  90025
Telephone:  (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

*Counsel For Alon Nottea and Roi Rueveni*
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA  91403
rmu@crosswindlaw.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed the 2nd day of May, 2016, in Costa Mesa, California 92626.

_____
Javaise Escoto, Declarant

15

**DEFENDANTS LATSANOVSKI AND CALENERGY' DECLARATION IN OPPOSITION OF FTC
MOTION FOR SUMMARY JUDGEMENT**

# EXHIBIT

# "A"

# EXHIBIT

## "A"

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 20 of 82   Page ID #:12637
Case 2:15-cv-04527-GW-PLA   Document 397-2   Filed 05/02/16   Page 3 of 6   Page ID #:10427
Case 2:15-cv-04527-GW-PLA   Document 356-1   Filed 04/18/16   Page 2 of 5   Page ID #:8788
Case 2:15-cv-04527-GW-PLA   Document 90-2   Filed 07/15/15   Page 1 of 4   Page ID #:1570

# Exhibit A

152

Case 2:15-cv-04527-GW-PLA   Document 90-2   Filed 07/15/15   Page 2 of 4   Page ID #:1571

| Date | No. | Description | RECEIVED | PAID |
|---|---|---|---|---|
| **2010** | | | $ (327,883.00) | $ 175,000.00 |
| **2011** | | | | |
| **2012** | | | $ (229,117.00) | $ 172,883.00 |
| 1/25/13 | | | $ (13,500.00) | |
| 2/20/13 | | | $ (1,712.97) | |
| 2/27/13 | | | $ (10,000.00) | |
| 2/28/13 | | | $ (10,111.71) | |
| 2/21/13 | | | $ (10,000.00) | |
| 3/15/13 | | | $ (10,000.00) | |
| 3/15/13 | | | $ (10,000.00) | |
| 4/10/13 | | | $ (3,170.45) | |
| 4/12/13 | | | $ (10,000.00) | |
| 4/24/13 | | | $ (20,000.00) | |
| 5/9/13 | | | $ (1,313.36) | |
| 5/13/13 | | | $ (10,000.00) | |
| 5/15/13 | | | $ (8,924.65) | |
| 6/26/14 | 1055 | | | $ 200,000.00 |
| 7/3/13 | | | $ (20,352.00) | |
| 7/15/13 | | | $ (6,500.00) | |
| 7/9/13 | | | $ 10,912.34 | |
| 7/18/13 | | | $ (10,000.00) | |
| 7/25/13 | | | $ (10,000.00) | |
| 7/31/13 | | | $ (10,000.00) | |
| 8/1/13 | | | $ (7,500.00) | |
| 8/1/13 | | | $ (16,500.00) | |
| 8/14/13 | | | $ (10,000.00) | |
| 8/19/13 | | | $ (10,000.00) | |
| 8/29/13 | | | $ (10,000.00) | |
| 9/3/13 | | | $ (10,000.00) | |
| 9/27/13 | | | $ (9,000.00) | |
| 9/27/13 | 1032 | Cal to SBM | | $ 375,000.00 |
| 9/27/13 | 1033 | Cal to SBM | | $ 25,000.00 |
| 10/1/13 | | | $ (10,000.00) | |
| 10/2/13 | | | $ (12,000.00) | |

Exhibit A, Page 9

| Date | Type | Description | Amount | Amount |
|---|---|---|---|---|
| 10/2/13 | | | $(3,806.25) | |
| 10/10/13 | | | $(10,000.00) | |
| 10/22/13 | | | $(10,000.00) | |
| 10/29/13 | | | $(10,000.00) | |
| 11/7/13 | | | $(15,000.00) | |
| 11/8/13 | | | $(10,000.00) | |
| 11/21/13 | | | $(15,000.00) | |
| 11/29/13 | | | $(10,000.00) | |
| 11/7/13 | 1080 | Cal to SBM | | $200,000.00 |
| 11/7/13 | 1079 | Cal to SBM | | $50,000.00 |
| 11/1/13 | 1078 | Cal to SBM | | $125,000.00 |
| 12/1/13 | SBM | SBM | $(55,000.00) | |
| 12/6/13 | | | $(10,000.00) | |
| 1/1/14 | ZEN | December Interest | $(5,000.00) | |
| 1/21/14 | SBM | December Int PMT | $(7,500.00) | |
| 1/21/14 | | Payment To WF | $(7,500.00) | |
| 1/27-1/28/14 | | Payment To WF | $(20,000.00) | |
| 1/31/14 | | Jan Interest | $(150,000.00) | |
| 2/18/14 | | Jan Int | $(7,500.00) | |
| 1/27/14 | | | $(6,750.00) | |
| 2/21/14 | | Payment To WF | $(25,000.00) | |
| 2/21/14 | | Jan Int | $(25,000.00) | |
| 3/31/14 | | Feb Int | $(7,500.00) | |
| 4/8/14 | | Mar Int | $(5,500.00) | |
| 4/10/14 | | | $(5,500.00) | |
| 4/10/14 | | SBM | $(55,000.00) | |
| 4/10/14 | | SBM | $(15,000.00) | |
| 4/17/14 | ACH | SBM PMT | $(150,000.00) | |
| 4/17/14 | ACH | ZEN PMT | $(15,000.00) | |
| 4/17/14 | ACH | SBM PMT | $(50,000.00) | |
| 4/18/14 | | SBM | $(30,000.00) | |
| 4/15/14 | | SBM | $(55,000.00) | |
| 4/28/14 | | | $(10,000.00) | |
| 5/21/14 | | Apr Interest | $(2,940.00) | |

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 23 of 82   Page ID #:12640

Case 2:15-cv-04527-GW-PLA   Document 397-2   Filed 05/02/16   Page 6 of 6   Page ID #:10430

Case 2:15-cv-04527-GW-PLA   Document 356-1   Filed 04/18/16   Page 5 of 5   Page ID #:8791

Case 2:15-cv-04527-GW-PLA   Document 90-2   Filed 07/15/15   Page 4 of 4   Page ID #:1573

| Date | Description | | Debit | | Credit |
|---|---|---|---|---|---|
| 6/25/14 | May Interest | $ | (2,940.00) | | |
| 7/1/14 | Pricipal Payment | $ | (4,000.00) | | |
| 7/1/14 | June Interest | $ | (2,940.00) | | |
| 8/21/14 | July Interest | $ | (2,940.00) | | |
| 8/31/14 | August Interest | $ | (2,900.00) | | |
| 9/18/14 | Cal to SBM | | | $ | 50,000.00 |
| 9/19/14 | | | | $ | 50,000.00 |
| 9/19/14 | | | | $ | 20,000.00 |
| 9/23/14 | August Interest | | | $ | 130,000.00 |
| 9/23/14 | Sep Interest | $ | (2,250.00) | | |
| 9/30/14 | October Interest | $ | (2,250.00) | | |
| 10/17/14 | Nov Interest | $ | (2,250.00) | | |
| 10/20/14 | SBM Loan Ret | $ | (15,000.00) | | |
| 10/22/14 | SBM Loan Ret | $ | (20,000.00) | | |
| 10/31/14 | SBM Loan Ret | $ | (20,000.00) | | |
| 11/26/14 | 1081 | | | $ | 39,000.00 |
| 11/30/14 | AMD Loan Return | $ | (35,000.00) | | |
| 12/3/14 | Heritage Loan Ret | $ | (20,000.00) | | |
| 12/4/14 | Zen Loan Return Ret | $ | (10,000.00) | | |
| 12/4/14 | Insight Loan Return t | $ | (20,000.00) | | |
| 12/4/14 | DMA Loan Return | $ | (15,000.00) | | |
| 12/5/14 | Sep - Nov Interest | $ | (7,400.00) | | |
| 12/31/14 | Dec Interest | $ | (1,250.00) | | |
| 1/12/15 | Dec Interest | $ | (2,500.00) | | |
| 1/21/15 | Dec Interest | $ | (1,250.00) | | |
| 1/31/15 | Jan Interest | $ | (1,250.00) | | |
| 2/25/15 | Jan Interest | $ | (1,250.00) | | |
| 2/27/15 | Feb Int | $ | (1,250.00) | | |
| 3/4/15 | Feb Int | $ | (1,250.00) | | |
| 3/5/15 | Principal Payment | $ | (125,000.00) | | |
| 4/3/15 | Feb Int | $ | (1,250.00) | | |
| 4/3/15 | | $ | (35,000.00) | | |
| | | $ | (15,000.00) | | |
| | | **($1,929,629.05)** | | $ | **1,611,883.00** |
| | Difference | | | | **($317,746.05)** |

Exhibit A, Page 11

155

# EXHIBIT "B"

# EXHIBIT

## "B"

# EXHIBIT B

156

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 27 of 82   Page ID #:12644
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 4 of 21   Page ID #:10434
Case 2:15-cv-04527-GW-PLA   Document 330-4   Filed 04/18/16   Page 3 of 20   Page ID #:8794



## PROMISSORY NOTE SECURED BY DEED OF TRUST
*(Twelve Month Term / Interest-Only Payments / Balloon Payment / Interest Reserve / Prepayment Premium)*

$ 1,000,000                                          Date June 10, 2015

**Property Address:**   430 W San Antonio Dr Long Beach, CA 90807 ("Property")

FOR VALUE RECEIVED, the undersigned Felix Katz and Sunset Holding Partners LLC, a California Resident and LLC ("Borrower"), jointly and severally hereby promise to pay to Lawrence Rubin and Annaliese Kambour, a married couple as their community property ("Lender"), the principal sum of One Million Dollars ($1,000,000), together with interest on the unpaid principal balance of this Note, as follows:

1. **Interest.** Interest on the unpaid principal balance will accrue from the date the proceeds have been distributed to or on behalf of the Borrower (the "Date of Advance") at an annual rate equal to Nine Percent (9.0%). Interest shall be computed based on a 365-day year and the actual number of days elapsed.

2. **Payment of Principal and Interest.**
   2.1. **Payments.** Interest-only payments shall be due and payable in consecutive monthly installments of Seven Thousand Five Hundred Dollars ($7500.00) on the 10th day of each month beginning on July 10, 2015. In accordance with section 2.3 below, the payments due for the period from June 10, 2015 through August 10, 2015 will be paid from the Interest Reserve. Borrower shall tender the monthly interest-only payments to Lender effective with the third payment due on September 10, 2015. Such payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on June 10, 2016 (the "Maturity Date").
   Payments Due under the Note shall be made in U.S. currency Lender encourages payments to be made via Electronic Funds Transfer. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under this Note and the Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, a bank check, treasurer's check or cashiers check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
   2.2. **Balloon Payment.** The payment schedule contained in this loan requires that Borrower make a balloon payment of One Million Seven Thousand Five Hundred Dollars ($1,007,500.00) on the Maturity Date, which is comprised of the unpaid principal balance in the amount of $1,000,000.00 and the unpaid

Borrower's Initials

157

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 28 of 82   Page ID #:12645
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 5 of 21   Page ID #:10435
Case 2:15-cv-04527-GW-PLA   Document 356-2   Filed 04/18/16   Page 4 of 20   Page ID #:8795

interest only payment in the amount of $ 7,500.00 for the period from May 10, 2016 through June 10, 2016. This balloon payment is more than double the amount of the regular payments.

2.3.  **Interest Reserve.** Out of the Loan proceeds, Lender will hold in reserve an amount equal to four months advance interest ( Fifteen Thousand Dollars ($15,000.00)) as an interest reserve (the "Reserve"). Lender will use the Interest Reserve to pay the monthly interest-only payments due for the period from June 10, 2015 through August 10, 2015. Upon an Event of Default, Lender may use the Interest Reserve to protect its Deed of Trust, by: (i) making interest payments hereunder, (ii) making protective advances under the Deed of Trust, or (iii) paying down the principal amount owed on the loan, in Lender's sole and absolute discretion. Should Lender be required to utilize the Interest Reserve for anything other than the payment of interest payments herein, Borrower, shall be required to replenish funds in the Interest Reserve. The failure to replenish the Interest Reserve upon five (5) business days written notice by Lender to Borrower shall be an additional event of default under this Note.

2.4.  **Intentionally Left Blank**

2.5.  **Delivery of Payments.** Payments shall be made to Lender via electronic wire or ACH to Lender's Bank as directed by Lender. If Lender's bank returns any payment, Borrower shall be responsible for a returned funds charge of $50.00 plus any Late Charge as specified in Paragraph 3 below that may become due as a result of the returned funds.

2.6.  **Order of Application of Payments.** Each payment under this Note shall be credited in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest under any provision of this Note or the Deed of Trust, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

2.7.  **Extension.** Notwithstanding the foregoing to the contrary, if no Events of Default (as specified in paragraph 6 below) has occurred and is outstanding on the date of the notice or the Maturity Date, Borrower may, at the sole discretion of Lender to grant or deny, extend the Maturity Date hereof for an additional three (3) months up to a maximum of two (2) times, by delivering written notice to Lender no less than fifteen (15) days before the Maturity Date, together with an extension fee of one percent (1%), (the "Extension Fee") per extension, of the outstanding Principal and interest due under the Note at the time of notice. This Note requires a Balloon Payment and Lender has no obligation to refinance all or any part of the obligations owed at Maturity Date. Borrower agrees that Borrower assumes the risk of refinancing the obligation at maturity.

If Borrower fails to request an extension or fails to pay the Extension Fee in a timely manner, Borrower understands the Lender may, in its sole and absolute discretion extend the Maturity Date for one (1) month and if it does so, an Extension Fee of three percent (3%) of the outstanding Principal balance of the

_____ Borrower's Initials

Note will be added to the Principal balance of the Note and will accrue interest at the interest rate described above.

An extension of the Maturity Date shall not be deemed a waiver of any right of Lender pursuant to this Note or any other documents executed in connection with this Note.

3.  **Late Charge.**  Borrower acknowledges that the default in the payment of any sum due under this Note will result in losses and additional expenses to Lender in servicing the indebtedness evidenced by this Note, handling such delinquent payments, and meeting its other financial obligations.  Borrower further acknowledges that the extent of such loss and additional expenses is extremely difficult and impractical to ascertain.  Borrower acknowledges and agrees that, if any payments due under this Note is not received by Lender within ten days (10) days when due, a charge of ten-cents ($0.10) for each dollar ($1.00) that is not paid when due would be a reasonable estimate of expenses so incurred (the "Late Charge").  Without prejudicing or affecting any other rights or remedies of Lender, Borrower shall pay the Late Charge to Lender as liquidated damages to cover expenses incurred in handling such delinquent payment.  In the event that a Balloon Payment is delinquent more than ten (10) days after the date it is due, Borrower agrees to pay a late charge in an amount equal to the maximum late charge that could have been assessed with respect to the largest single monthly installment previously due, other than the Balloon Payment, multiplied by the sum of one plus the number of months occurring since the late payment charge began to accrue.

4.  **Default.**  On (a) Borrower's failure to pay any installment or other sum due under this Note, when due and payable (whether by extension, acceleration, or otherwise), (b) an Event of Default (as defined in the Deed of Trust), or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note, then, and in any such event, Lender may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the Maturity Date.  Borrower expressly waives notice of the exercise of this option.

5.  **Prepayment.**
    5.1.  **Prepayment Premium.**  Borrower may prepay this Note in whole or in part at anytime.  If Borrower prepays this Note in whole or in part before August 10, 2015, Borrower will pay a Prepayment Premium equal to the balance of the advanced interest which would be due and payable to Lender through August 10, 2015 ("Prepayment Premium").  After the Prepayment Premium period has elapsed, Borrower may prepay this Note in whole or in part at any time without paying a premium.  All pre-payments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.
    5.2.  **Ability to Pay Prepayment.**  Borrower shall have no right to prepay and Lender shall have no duty to accept full or partial prepayment of this Note without Borrower giving Lender thirty (30) days prior written notice of his, her or its intention to prepay this Note.  Said notice shall include the amount Borrower intends to repay.  Borrower shall pay Lender the principal due under this Note

 Borrower's Initials

159

Case 2:15-cv-04527-GW-PLA  Document 428-8  Filed 05/13/16  Page 30 of 82  Page ID #:13647
Case 2:15-cv-04527-GW-PLA  Document 397-3  Filed 05/02/16  Page 7 of 21  Page ID #:10437
Case 2:15-cv-04527-GW-PLA  Document 350-23  Filed 04/18/16  Page 6 of 20  Page ID #:8797

together with (a) any prepayment premium contemplated in paragraph 5.1 of this Note and (b) any accrued but yet unpaid interest and fees.

5.3. <u>Prepayment Waivers.</u>  BORROWER ACKNOWLEDGES AND AGREES THAT BORROWER HAS NO RIGHT TO PREPAY THIS PROMISSORY NOTE EXCEPT AS PROVIDED IN THIS PARAGRAPH 5. BORROWER FURTHER ACKNOWLEDGES AND AGREES THAT IF THE MATURITY DATE IS ACCELERATED BY LENDER PURSUANT TO PARAGRAPH 4 OR 8, AND BORROWER OR ANY THIRD PERSON (INCLUDING, WITHOUT LIMITATION, A JUNIOR LIEN LENDER OF THE PROPERTY) THEREAFTER SEEKS TO PAY OFF SUCH ACCELERATED INDEBTEDNESS OR PURCHASE THE PROPERTY AT A FORECLOSURE SALE (WHETHER JUDICIAL OR NONJUDICIAL), SUCH PAYOFF OR PURCHASE SHALL CONSTITUTE A PREPAYMENT HEREUNDER AND THE PREPAYMENT PREMIUM SET FORTH ABOVE SHALL BE DUE IN THE EVENT PREPAYMENT OCCURS. BY INITIALING BELOW, BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT BORROWER SHALL PAY THE PREPAYMENT PREMIUM, EVEN IN THE CASE WHERE LENDER HAS ACCELERATED THE MATURITY DATE PURSUANT TO PARAGRAPH 4 OR PARAGRAPH 8; THAT THE CALCULATION OF THE PREPAYMENT PREMIUM IS FAIR AND REASONABLE TO COMPENSATE LENDER FOR THE LOSS WHICH LENDER MAY INCUR AS A RESULT OF PREPAYMENT OF THIS PROMISSORY NOTE; THAT BORROWER WAVES ANY RIGHT BORROWER MAY HAVE OR CLAIM TO HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 OR ANY SUCCESSOR STATUTE; AND THAT LENDER HAS MADE THE LOAN EVIDENCED BY THIS PROMISSORY NOTE IN RELIANCE ON THE AGREEMENTS AND WAIVERS OF BORROWER IN THIS PARAGRAPH 5 AND LENDER WOULD NOT HAVE MADE THE LOAN WITHOUT SUCH AGREEMENTS AND WAIVERS.

BORROWER'S INITIALS: 

6. <u>Interest on Default.</u> If Borrower is in default under this Note, as that event is contemplated under Paragraph 4 of this Note, or default under any other clause of any document associated with this Note, then the entire unpaid principal balance shall automatically bear an annual interest rate (instead of the rate specified in Paragraph 1) equal to the lesser of (a) Sixteen and 25/100 percent (16.25%) or (b) the maximum interest rate allowed by law (the "Default Rate"). If the Maturity Date is accelerated pursuant to Paragraph 4, the unpaid principal shall accrue interest at the Default Rate only until the default is cured and the Deed of Trust is reinstated. Borrower acknowledges and agrees that it would be extremely difficult or impractical to fix the actual damages resulting from Borrower's failure to pay the principal, accrued interest and other sums due on the Maturity Date, and therefore, Borrower shall pay interest at the Default Rate not as a penalty, but for purposes of defraying the

Borrower's Initials

160

Case 2:15-cv-04527-GW-PLA Document 428-8 Filed 05/13/16 Page 31 of 82 Page ID #:12648
Case 2:15-cv-04527-GW-PLA Document 397-3 Filed 05/02/16 Page 8 of 21 Page ID #:10438
Case 2:15-cv-04527-GW-PLA Document 330-3 Filed 04/18/16 Page 7 of 20 Page ID #:8798

expenses incident to handling the past-due principle, accrued interest and other sums due under this Promissory Note. Interest at the Default Rate represents the reasonable estimate of the loss that may be sustained by Lender due to the failure of Borrower to pay the principal, accrued interest and other sums due on the Maturity Date. Interest at the Default Rate shall be payable by Borrower without prejudice to the rights of Lender to collect any other amounts to be paid under this Promissory Note (including, without limitation, late charges pursuant to Paragraph 3, above) or the Deed of Trust.

7. **Interest on Interest.** If any interest payment under this Note is not paid when due, the unpaid interest shall be added to the principle of this Note, shall become and be treated as principal, and shall thereafter bear like interest.

8. **Due-On-Sale.** If Borrower sells, conveys, assigns or otherwise transfers (a) all or any part of the Property, (b) any interest in the Property, or (c) all or substantially all of the beneficial interest of Borrower (which shall include, without limitation, a sale or other transfer of twenty-five percent (25%) or more of the shares of Borrower if Borrower is a corporation, and a sale or transfer of twenty-five percent (25%) or more of the general partner's interest in Borrower if Borrower is a partnership), whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of Lender (which maybe withheld in Lender's sole and absolute discretion), then Lender may elect, in its sole and absolute discretion, to accelerate the Maturity Date and declare the entire unpaid principal, accrued interest and any other sums due hereunder to be immediately due and payable.

9. **Attorney Fees.** Borrower agrees to pay the following costs, expenses, and attorney fees paid or incurred by Lender, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and attorneys fees paid or incurred in connection with the collection or enforcement of this Note, whether or not suit is filed; (b) reasonable costs, expenses, and attorneys fees paid or incurred in connection with representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Note; (c) reasonable costs, expenses, and attorney fees incurred to protect the lien of the Deed of Trust; and (d) costs of suit and such sum as the court may adjudge as attorney fees in any action to enforce payment of this Note or any part of it.

10. **Waiver.** Borrower, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Promissory Note, any acceptance of additional security of any kind and any release of any party liable under this Promissory Note. Any such renewals or extensions may be made without notice to Borrower.

11. **Notice.** Any notice required to be provided in this Note shall be given in writing and shall be sent (a) for personal delivery by delivery service that provides a record of the date of delivery, the individual to whom the delivery was made, and the address where delivery was made, (b) by first class certified United States mail, postage prepaid, return receipt requested; or (c) by a nationally recognized overnight courier service, marked for next day business delivery. All notices shall be addressed to the

 Borrower's Initials

161

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 32 of 82   Page ID
#:12649
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 9 of 21   Page ID
#:10439
Case 2:15-cv-04527-GW-PLA   Document 350-2   Filed 04/18/16   Page 8 of 20   Page ID
#:8799

party to whom such notice is to be given at the following addresses:

Lender:        Lawrence Rubin
               239 Greenway South
               Forest Hills, NY 11375

Borrower:      Felix Katz
               1879 Clarkia Street
               Simi Valley, CA 93065

Or to such other address as a party may designate by written notice to the other. All
notices shall be deemed effective on the earliest of (a) actual receipt; (b) rejection of
delivery; (c) if sent by certified mail, the third day on which regular United States
mail delivery service is provided after the day of mailing or, if sent by overnight
delivery service, on the next day on which such service makes next business day
deliveries after the day of sending.

12. **Secured by Deed of Trust**.  This Note is secured by, among other things, that certain
Deed of Trust (with a due-on transfer clause), Assignment of Leases and Rents,
Fixture Filing, and Security Agreement (the "Deed of Trust") of even date herewith
made by Borrower, as trustor, for the benefit of Lender, as beneficiary.  The Deed of
Trust contains the same address as the Property.  Borrower acknowledges that all of
the agreements, conditions, covenants. provisions and stipulations contained in the
Deed of Trust are to be kept and performed by Borrower and are hereby made a part
of this Note to the same extent and with the same force and effect as if they were fully
set forth herein, and Borrower covenants and agrees to keep and perform them, or
cause them to be kept and performed, strictly in accordance with their terms.  If any
Borrower is not also a trustor of the Deed of Trust, such Borrower makes all
covenants, representations, warranties and indemnities contained in the Deed of Trust
jointly and severally with the trustor of the Deed of Trust to and for the benefit of
Lender.

13. **Forbearance Not a Waiver**.  If Lender delays in exercising or fails to exercise any of
its rights under this Note, that delay or failure shall not constitute a waiver of any
Lender Rights for any breach, default, or failure of condition under this Note. No
waiver by Lender of any of its rights or any such breach, default, or failure of
condition shall be effective, unless the waiver is expressly stated in a writing signed
by Lender.

14. **Assignment**.  This Note inures to and binds the heirs, legal representatives,
successors and assigns of Borrower and Lender; provided, however, that Borrower
may not assign this Note or any proceeds of it, or assign or delegate any of its rights
or obligations, without Lender's prior written consent in each instance.  Lender in its
sole discretion may transfer this Note, and may sell or assign participations or other

_____ Borrower's Initials

162

interest in all or any part of this Note, all without notice to or the consent of Borrower.

15. **Governing Law.** This Note Shall be construed and enforceable according to the laws of the State of California for all purposes.

16. **Intentionally Left Blank**

17. **Usury.** All agreements between Borrower and Lender are expressly limited, so that in no event or contingency, whether because of the advancement of the proceeds of this Note, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agree to be paid to Lender for the use, forbearance, or retention of the money to be advanced under this Note exceed the highest lawful rate permissible under the applicable usury laws. If, under any circumstances, fulfillment of any provision of this Note, or the Deed of Trust securing this Note or any other agreement pertaining to this Note, after timely performance of such provision is due, shall involve exceeding the limit of validity prescribed by law that a court of competent jurisdiction deems applicable, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity. If, under any circumstances, Lender shall ever received as interest and the amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Note, such excess shall be refunded to Borrower. This provision shall control every other provision of all agreements between Borrower and Lender.

18. **Time is of the Essence.** Time is of the essence with respect to all obligations of Borrower under this Note.

19. **Cross-Default.** Any default under the terms of any loan agreement, promissory note, deed of trust, mortgage, lease, conditional sale contract or other agreement, document or instrument evidencing, governing or securing any indebtedness owing by Borrower or any Affiliate of Borrower to Lender or any Affiliate of Lender; shall, at Lender's option, constitute a default under this Note. The following definitions of shall apply to this Section:

"Affiliate" means, with respect to any Person, any other Person that is directly or indirectly Controlling, Controlled by or under common Control with, such Person.

"Control" and derivatives terms means the possession, directly or indirectly, and acting either alone or together with others, of the power or authority to direct or cause the direction of the management, material policies, material business decisions or the affairs of a Person, whether through the ownership of equity securities or interests, by contract or other means.

"Person" means any natural person, business, corporation, company, and or association, Limited Liability Company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

_Borrower's Initials_

163

BORROWER'S INITIALS: _____

20. WAIVER OF JURY TRIAL. LENDER AND BORROWER EACH HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED ON, ARISING FROM, OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED BY THIS NOTE, IN ANY ACTION, PROCEEDING, OR OTHER LITIGATION OF ANY TYPE BROUGHT BY EITHER PARTY AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. BORROWER AND LENDER AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM, OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE. THIS WAIVER SHALL APPLY TO ANY FUTURE AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS NOTE.

BORROWER'S INITIALS. _____

21. Representation on Use of Proceeds. Borrower represents and warrants to Lender that the proceeds of this Note will be used solely for _____.

22. Assignment. Holder May, at its sole option, assign this Promissory Note and/or designate any other person or entity as the holder hereof.

23. No Modifications or Amendments; No Waiver. Except as specified herein, this Promissory Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

24. Severability. Any provision of this Promissory Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal, shall in no way affect, impair or invalidate any other provision or term hereof, and such other provisions or terms shall remain in full force and effect.

25. Successors and Assigns. Whenever used herein, the terms "Lender" and "Borrower" shall be deemed to include their respective heirs, personal representatives, successors and assigns.

26. Responsibility of Persons Under this Note. If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note has the same obligations as the Borrower Any person who takes over these obligations, including the obligation of the

_____ Borrower's Initials

164

guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all parties together.

27. **Cooperation.** Borrower acknowledges that Lender and its successors and assigns may (a) sell, transfer, or assign the Deed of Trust, this Note and other Loan Documents to one or more investors as a whole loan, any rated or unrated public offering or private placement; (b) participate the Loan secured by the Deed of Trust to one or more investors in a rated or unrelated public offering or private placement; (c) deposit the Deed of Trust, this Note, and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement; or (d) otherwise sell the Loan or interest therein to investors in a rated or unrated public offering or private placement ("The transactions referred to in clauses (a)-(d) are here in after referred to as "Secondary Market Transactions.") Borrower shall, at Lender's expense, cooperate in good faith with Lender in effecting any such Secondary Market Transaction shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including, without limitation, a Rating Agency and/or an institutional purchaser, participant, or investor) including, without limitation, all structural or other changes to the Loan, modifications to any documents evidencing or securing the Loan, delivery of opinions of counsel acceptable to the Rating Agency or such other purchasers, participants or investors, and addressing such matters as the Rating Agency or such other purchasers, participants, or investors may require; provided, however, that Borrower shall not be required to modify any documents evidencing or securing the Loan that would modify (i) the interest rate payable under this Note, (ii) the stated maturity of this Note, (iii) the amortization of principal of this Note, or (iv) any other material terms or covenants of the Loan. Borrower shall provide such information and documents relating to Borrower, the Property, the Leases, and any lessees as Lender or the Rating Agency or such other purchasers, participants, or investors may reasonably request in connection with a Secondary Market Transaction. Lender shall have the right to provide to the Rating Agency or prospective purchasers, participants, or investors any information in its possession including, without limitation, financial statements relating to Borrower, the Property, and any lessee. Borrower acknowledges that certain information regarding the Loan and the parties thereto and the Property may be included in a private placement memorandum, prospectus, or other disclosure documents.

AGREED TO AND ACCEPTED:

Borrower:

By: _____

__.__.__ Borrower's Initials

165

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 36 of 82   Page ID
#:12653
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 13 of 21   Page ID
#:10443
Case 2:15-cv-04527-GW-PLA   Document 358-2   Filed 04/18/16   Page 12 of 20   Page ID
#:8803

Name: *Felix Katz*

Date: *June 10, 2015*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

DATE:

STATE OF CALIFORNIA COUNTY OF *Ventura*

On *June 10, 2015* before me, *C. Mabello* , a Notary Public,

personally

appeared *Felix Katz*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature

C. MABALLON
Commission # 1979341
Notary Public - California
Ventura County
My Comm. Expires Jun 6, 2015

Borrower's Initials

166

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 37 of 82   Page ID
#:12654
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 14 of 21   Page ID
#:10444
Case 2:15-cv-04527-GW-PLA   Document 350-2   Filed 04/18/16   Page 13 of 20   Page ID
#:8804

## BALLOON PAYMENT DISCLOSURE

THE NOTE YOU ARE SIGNING WITH RESPECT TO THE LOAN YOU ARE
OBTAINING REQUIRES THE ENTIRE AMOUNT OF OUTSTANDING
PRINCIPAL AND ACCRUED INTEREST TO BE PAYABLE IN FULL ON THE
"BALLOON PAYMENT DATE" INDICATED BELOW.

### NOTICE TO BORROWER:

IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT
WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN
AGAINST YOUR PROPERTY TO MAKE THE BALLOON PAYMENT. IN
THAT CASE, YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES,
AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN. IN
ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY
PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE
PROPERTY AND ALL OF YOUR EQUITY THROUGH FORECLOSURE.
KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS
OF THIS LOAN.

PLEASE BE SURE YOU FULLY UNDERSTAND THE ABOVE BEFORE
SIGNING THE NOTE AND OTHER RELATED LOAN DOCUMENTS.

BALLOON PAYMENT DATE:

BALLOON PAYMENT AMOUNT:

(Plus any unpaid late charges or other unpaid amounts due under the Note or Deed of
Trust)

I ACKNOWLEDGE RECEIPT OF THE ABOVE AND CERTIFY MY FULL
UNDERSTANDING OF ALL OF THE TERMS AND CONDITIONS OF THE
NOTE, INCLUDING THE BALLOON PAYMENT REQUIREMENT.

### AGREED AND ACCEPTED:

Borrower:

Name: _Felix Kratz_

Date: _June 10, 2015_

Borrower's Initials

### Notice of Insurance Requirements

**Hazard Insurance**

The following requirements are the minimal requirements established by Lender to protect its interests. It is important that you review your own insurance coverage with your insurance agent/broker to assure that the insurance coverage that you purchase will meet your own personal and financial needs. If you have any questions about these requirements, please contact Lender.

Lenders minimum requirements for hazard insurance coverage are as follows:

- Your hazard insurance coverage must be at minimal one -year fire and extended coverage policy (commonly known as Full Replacement Cost) in an amount equal to no less than 100% of the replacement value of the improvements new. This insurance must not limit or exclude windstorm, hurricane, or hail damage and other perils that are not normally excluded under an extended coverage endorsement.
- A memorandum of fire insurance and subscription agreement must be included with the policy.
- The dwelling deductible may not exceed the greater of one percent of the face value of the policy, or $1,000.00 (we recommend a deductible of $500.00)
- The property insurance policy must be written through a company acceptable to Lender in its sole discretion.
- Lender requires you to purchase flood insurance coverage, if the Property securing your Note is located in an area designated as a Special Flood Hazard Area that has federally mandated flood insurance purchase requirements. The flood insurance policy must be issued by the National Flood Insurance Program (NFIP).
- Lender requires you to purchase earthquake insurance if the Property securing your Note is located in the State of California.

A mortgage clause/Lender's Loss Payable Endorsement must be included with your insurance policy and must provide that the insurance company notifies the Lender at least 10 days prior to cancellation of insurance unless otherwise stated in this document.

The mortgagee clause should read as follows:
Lawrence Rubin, a married man, and/or its assigns as their interest may appear.

If you fail to maintain the above-mentioned insurance as required by Lender, Lender may obtain insurance to protect Lender's interest. This insurance is called "forced –placed insurance." Lender may obtain forced-placed insurance if (a) you allow insurance covering the property securing the Note to lapse; (b) the amount of the insurance is reduced below Lender's requirements; (c) the deductible is increased; or (d) the insurance company issuing the policy does not meet Lender's approval.

Borrower's Initials

168

Forced-placed Insurance coverage may not be comparable to your former coverage and may not adequately protect your interest. Forced-placed Insurance may cover only the improvements on Property securing your Note and will only be in the amount required by Lender to protect its interest in the Property. In addition to other differences, forced-placed Insurance may differ from insurance coverage that you will purchase on your own behalf in the following manner:

* The amount or type of coverage on the forced-placed Insurance policy may be less than your former policy;
* The amount or type of coverage may protect only Lender and the Lender's interest in the Property securing your Note;
* Forced-placed Insurance may not cover your interest or equity in the Property;
* The deductible may be higher;
* There will not be personal property/contents, personal liability, medical or special risk coverage.

FORCED-PLACED INSURANCE IS TYPICALLY MORE EXPENSIVE THAN THE INSURANCE THAT YOU OBTAINED THROUGH YOUR OWN AGENT, AND YOU ARE OBLIGATED UNDER THE TERMS OF THE NOTE TO PAY FOR FORCED-PLACED INSURANCE THAT LENDER PURCHASES.

If lender obtains forced-placed insurance, this insurance may be canceled when you obtain insurance that is acceptable to Lender. While the forced-placed Insurance may be canceled, you will be charged for premiums due for a time period for which you've failed to provide acceptable coverage, any cancellation fee assessed by the insurer, any policy issuance fee and any other costs that Lender incurs as a result of your failure to maintain adequate insurance. You may be entitled to a prorated refund of premiums paid, if the forced-placed Insurance policy is canceled.

Lender encourages you to contact your own insurance agent to advise them of our insurance requirements and to assure Lender that you maintain acceptable coverage throughout the life of the Note.

AGREED AND ACCEPTED:

Borrower:

Name: Felix Kate

Date: June 10, 2015

Borrower's Initials

169

Case 2:15-cv-04527-GW-PLA Document 428-8 Filed 05/13/16 Page 40 of 82 Page ID #:12657
Case 2:15-cv-04527-GW-PLA Document 397-3 Filed 05/02/16 Page 17 of 21 Page ID #:10447
Case 2:15-cv-04527-GW-PLA Document 356-2 Filed 04/18/16 Page 16 of 20 Page ID #:8807

This page is part of your document - **DO NOT DISCARD**



# 20150748034



Pages:
0003

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**06/23/15 AT 12:23PM**

| | |
|---|---|
| FEES: | 46.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 46.00 |



LEADSHEET



201506230720034

00010764256



006915558

SEQ:
01

DAR - Counter (Upfront Scan)

**THIS FORM IS NOT TO BE DUPLICATED**

170

RECORDING REQUESTED BY:
AND WHEN RECORDED MAIL TO:
SUNSET HOLDING PARTNERS, LLC
23679 CALABASAS RD # 531
CALABASAS CA 91302

APN# 7139-032-023

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST
### (This Deed of Trust contains a "DUE-ON-SALE" clause)

This DEED OF TRUST, made June 10, 2015, between

**SUNSET HOLDING PARTNERS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY** herein called TRUSTOR,

whose address is :  430 WEST SAN ANTONIO DR. LONG BEACH CA 90807
(Number and Street)        (City)        (State)        (Zip)

**STEWART TITLE COMPANY**, a California Corporation, herein called TRUSTEE, and

**LAWRENCE RUBIN AND ANNALIESE KAMBOUR, A MARRIED COUPLE AS THEIR COMMUNITY PROPERTY,** herein called BENEFICIARY,

Trustor irrevocably grants, transfers and assigns to Trustee in Trust, with Power of Sale, that property in the City of LONG BEACH, County of [LOS ANGELES], California, described as:

LOT 2 OF TRACT NO. 27966, IN THE CITY OF LONG BEACH, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 776, PAGE 53 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

COMMONLY KNOWN AS: 430 WEST SAN ANTONIO DR. LONG BEACH CA 90807

If the trustor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the beneficiary being first had and obtained, beneficiary shall have the right, at its option, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any note evidencing the same, immediately due and payable.

Together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits.

For the Purpose of Securing (1) Payment of the indebtedness evidence by one promissory note of even date herewith executed by Trustor in favor of Beneficiary or order in the principal sum of $1,000,000.00 for a term of One Year (2) Performance of each agreement of Trustor contained herein or incorporated by reference. (3) Payment of additional sums may hereafter be borrowed from Beneficiary by the then record owner of said property, when evidenced by another promissory note (or Notes) reciting it is so secured. of Trust.

171

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 42 of 82   Page ID #:12659
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 19 of 21   Page ID #:10449
Case 2:15-cv-04527-GW-PLA   Document 356-2   Filed 04/18/16   Page 18 of 20   Page ID #:8809

Escrow No.:

To protect the security of this Deed of Trust, Trustor agrees: By the execution and delivery of this Deed of Trust and the note secured hereby, that provisions (1) to (5), inclusive, of Section A and provisions (1) to (10), inclusive, of Section B of the fictitious deed of trust recorded in the book and at the page of Official Records in the office of the county recorder of the county where said property is located, noted below opposite the name of such county, vis.:

| COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alameda | 1288 | 556 | Kings | 858 | 713 | Placer | 1028 | 379 | Sierra | 38 | 187 |
| Alpine | 3 | 130-31 | Lake | 437 | 110 | Plumas | 166 | 1307 | Siskiyou | 506 | 762 |
| Amador | 133 | 438 | Lassen | 192 | 367 | Riverside | 3788 | 347 | Solano | 1287 | 621 |
| Butte | 1330 | 513 | Los Angeles | T-3878 | 874 | Sacramento | 71-10-26 | 615 | Sonoma | 2067 | 427 |
| Calaveras | 185 | 338 | Madera | 911 | 136 | San Benito | 300 | 405 | Stanislaus | 1970 | 56 |
| Colusa | 323 | 391 | Marin | 1849 | 122 | San Bernardino | 6213 | 768 | Sutter | 655 | 585 |
| Contra Costa | 4684 | 1 | Mariposa | 90 | 453 | San Francisco | A-404 | 596 | Tehama | 457 | 183 |
| Del Norte | 101 | 549 | Mendocino | 667 | 99 | San Joaquin | 2855 | 283 | Trinity | 108 | 595 |
| El Dorado | 704 | 635 | Merced | 1660 | 753 | San Luis Obispo | 1311 | 137 | Tulare | 2530 | 108 |
| Fresno | 5052 | 623 | Modoc | 191 | 93 | San Mateo | 4788 | 175 | Tuolumne | 177 | 160 |
| Glenn | 469 | 76 | Mono | 69 | 302 | Santa Barbara | 2045 | 881 | Ventura | 2607 | 237 |
| Humboldt | 801 | 83 | Monterey | 357 | 239 | | 6626 | 664 | Yolo | 769 | 16 |
| Imperial | 1189 | 701 | Napa | 704 | 742 | Santa Cruz | 1638 | 607 | Yuba | 398 | 693 |
| Inyo | 165 | 672 | Nevada | 363 | 94 | Shasta | 800 | 633 | | | |
| Kern | 3756 | 690 | Orange | 7182 | 18 | San Diego SERIES 5 Book 1964, Page 149774 | | | | | |

(which provisions, identical in all counties are printed on the reverse hereof) hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in the Deed of Trust.

The undersigned Trustor, requests that a copy of any notice of default and any notice of sale hereunder be mailed to him at this address hereinbefore set forth.

Dated: June 17, 2015

SUNSET HOLDING PARTNERS, LLC
BY: IT'S AUTHORIZED SIGNER  *Felix Katz*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF [VENTURA]                    }ss.

On June 17, 2015 before me Christine Martinez
a Notary Public, personally appeared
Felix Katz
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature

(This area for official notarial seal)

CHRISTINE MARTINEZ
Comm. # 2109358
NOTARY PUBLIC - CALIFORNIA
VENTURA COUNTY
My Comm. Exp. Apr. 26, 2018

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 43 of 82   Page ID #:12660
Case 2:15-cv-04527-GW-PLA   Document 397-3   Filed 05/02/16   Page 20 of 21   Page ID #:10456
Case 2:15-cv-04527-GW-PLA   Document 356-2   Filed 04/18/16   Page 19 of 20   Page ID #:8810

Fidelity National Title Company

RECORDING REQUESTED BY
Fidelity National Title

WHEN RECORDED MAIL DOCUMENT AND TAX
STATEMENT TO:
Sunset Holding Partners, LLC
23679 Calabasas Rd, #531
Calabasas, CA  91302

04/08/2015

*20150386142*

ASSESSOR'S PARCEL NO  7139-032-023
TITLE ORDER NO  93131
ESCROW NO  1016-JS

THIS SPACE FOR RECORDER'S USE ONLY

# GRANT DEED

(43)

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 753.50 County
XX   computed on the full value of the interest of property conveyed, or
     computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale
     OR transfer is EXEMPT from tax for the following reason

Signature of Declarant or Agent Determining Tax          Castlehead, Inc. Escrows
                                                         Firm Name

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Suyen D. Mosley, a Single
Woman

HEREBY GRANT(S) to Sunset Holding Partners, LLC , a California Limited Liability Company

All that real property situated in the City of Long Beach, County of Los Angeles, State of California, described as:
Legal Description Exhibit "A" attached hereto and made part hereof

Commonly Known As: 430 West San Antonio Drive, Long Beach, CA  90807

Dated, March 25, 2015

A notary public officer or other officer completing this certificate verifies only the
identity of the individual who signed the document to which this certificate is
attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On ___April 1, 2015___, before me,
___Dennis Deng___, a Notary Public
personally appeared ___Suyen D. Mosley___

who proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf
of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing paragraph is true and correct

WITNESS my hand and official seal

Signature _____

Mail Tax Statements to Same as Above

Suyen D. Mosley

DENNIS DENG
Commission # 1956658
Notary Public - California
Los Angeles County
My Comm. Expires Oct 15, 2015

(SEAL)

76

173

3

## EXHIBIT A
### LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LONG BEACH, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 2 OF TRACT NO. 27966, IN THE CITY OF LONG BEACH, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 776, PAGE 53 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 7139-032-023

174

# EXHIBIT

## "C"

# EXHIBIT

## "C"

## BUNZAI MEDIA GROUP – PARTNERSHIP AGREEMENT

This Partnership Agreement dated herein is by and between Alon Nottea ("Alon"), Khristopher Bond ("Khristopher") and Igor Latsanovski ("Igor") with respect to a Partnership in the existing company BunZai Media Group, Inc. ("Company").

Igor will invest $350K in exchange for 55% ownership of BunZai Media Group.
Ownership Shares in BunZai Media will be as follows:   55% Igor   22.5% Alon   22.5% Khristopher

If needed, Igor will provide additional investment to grow the company – these monies will be paid back by the company at fair market interest.

Alon & Khris will have total autonomy on how budget is spent, once approved by all shareholders every 6 months. Anything above and beyond the budget must first be approved by the shareholders.

Alon & Khristopher shall both be signers on all accounts up to $10K – for all checks over $10K then either Alon and/or Khris and Igor's representative will need to sign $10K

After 18 months, the board will meet to see progress of company, at that time if Alon & Khris have not met company goals, without prejudice, then board may elect to remove them from their positions, without affecting their ownership percentage in the company.

Alon (C.E.O) & Khristopher (C.O.O) shall each earn the following:
$5K month 1 & month 2
5% of net profits from Month 3 onward

Upon signing this agreement, Igor shall invest $75K to run a continuity test for 30 days. During this test, BunZai will purchase at least 1,000 orders (CPA of $45 to $50 each) within the first 15 days, and a conversion from Free Trial to Transitional stage (day 16 to day 30) of at least 75% of these orders. If this goal is met and both parties agree to continue with the partnership, then Igor will immediately invest the remaining $275K to complete the financial requirements of this deal. If Alon & Khristopher do not reasonably meet the goals outlined herein and Igor decides to not go forward with the deal, then Alon & Khristopher will have 90 days to repay the $75K.

If after the test period Alon & Christopher meet the goals herein and Igor decides to not go forward with the deal, then Igor will forfeit 50% of the $75K invested thus far and Alon & Khristopher will have 90 days to repay the remaining balance. If Alon and Christopher decide after the test to not continue with the deal, then they will have 90 days to repay the $75K invested by Igor.

After month 2 of operations, the partners will divide 5% of the net profits of the company on a monthly basis. The division of net profits will be revisited again every 6 months and the shareholders will agree to a division of net profits for the next 6 months.

FTC-AUR-S1-0000138

Ex. 19

175

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 48 of 82   Page ID #:12665
Case 2:15-cv-04527-GW-PLA   Document 397-4   Filed 05/02/16   Page 4 of 5   Page ID #:10455
Case 2:15-cv-04527-GW-PLA   Document 356-3   Filed 04/18/16   Page 3 of 4   Page ID #:8814

Case 2:15-cv-04527-GW-PLA   Document 93-1   Filed 07/16/15   Page 10 of 36   Page ID #:1730

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date. All signed copies of this Agreement shall be deemed originals.

_____          _____
Alon Nottea (Partner)                  Date
7900 Gloria Avenue, Van Nuys CA 91406

10-12-10

_____          _____
Khristopher Bond (Partner)             Date
7900 Gloria Avenue, Van Nuys CA 91406

10-12-10

_____          _____
Igor Latsanovski (Partner)             Date
            , Tarzana CA

10-12-10

FTC-AUR-S1-0000139

Ex. 19

176

FTC-AUR-S1-0000140

Case 2:15-cv-04527-GW-PLA   Document 93-1   Filed 07/16/15   Page 11 of 36   Page ID #:1731

Ex. 19

177

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 50 of 82   Page ID
#:12667
Case 2:15-cv-04527-GW-PLA   Document 397-5   Filed 05/02/16   Page 1 of 3   Page ID
#:10457

# EXHIBIT

# "D"

# EXHIBIT

# "D"

## BUNZAI MEDIA GROUP LOAN AGREEMENT

This Agreement dated herein is by and between BunZai Media Group ("Company") represented by its principals Alon Nottea ("Alon"), Khristopher Bond ("Khristopher") and Igor Latsanovski ("Igor") with respect to the loan of $175K to existing company.

It is understood that Igor has loaned the Company $175K
$75K received on 10-12-2010
$100K received on 12-06-2010

The Company will repay the loan baring interest of $25K to Igor as follows:

April 5th – $50,000
May 5th – $50,000
June 5th – $100,000

Or

Igor's $175K loan will become an investment that will represent a percentage of ownership in the Company that will determined the first week of January 2011.

Furthermore, this loan is guaranteed by the assets of the company as well as personally guaranteed by Alon & Khristopher and all their personal assets.

The terms herein are agreed to and accepted by all parties as of the date signed herein. All signed copies of this Agreement shall be deemed originals.


Alon Nottea (CEO)
7900 Gloria Avenue, Van Nuys CA 91406

Khristopher Bond (COO)
7900 Gloria Avenue, Van Nuys CA 91406


Igor Latsanovski (LOANER)
█████ Tarzana CA █████

10/12/2010
Date

FTC-AUR-S1-0000141

Ex. 19

# EXHIBIT

# "E"

# EXHIBIT

# "E"

### BUNZAI MEDIA GROUP – PARTNERSHIP AGREEMENT

Alon Nottea ("Alon"), Khristopher Bond ("Khristopher") & Igor Latsanovski ("Igor"), individually referred to as "Partner" "Party" and collectively "Parties" & "Partners"

#### Explanatory Statement

The parties hereto desire to enter into a partnership agreement for the existing company named Bunzai Media Group Inc., a company that manufactures, distributes & markets various products to the worldwide consumer via all mediums and medias.

NOW THEREFORE, in consideration of their mutual promises, covenants, and agreements, the parties hereto do hereby promise, covenant and agree as follows:

1. The name of the Company shall be "Bunzai Media Group Inc./BunZai Media World" and all worldwide subsidiaries and affiliates of the company and campaigns, domains, websites, intellectual properties and businesses including AuraVie Skincare.

2. The principal office and place of business of the Partnership (the "Office") shall be located at 7900 Gloria Avenue, Van Nuys, CA 91406. The Partnership shall have such other or additional offices as the Partners may choose, from time to time.

3. The business and purposes of the Partnership is to manufacture, distribute and market various products in all mediums and media to the worldwide consumer.

4. Igor shall invest $500,000 into the company for Administration, Manufacturing and Marketing expenses. It is understood that Alon & Khristopher has invested $500,000 into the company. Both parties will receive their investment returned from 30% of net profits beginning July 2011. Investment shall be returned as follows:

   Igor $300K
   Alon & Khristopher (to go to French Partners) $200K
   Igor $200K
   Alon & Khristopher $300K

   The partnership shares/ownership shall be as follows:

   Alon – 1/3 of 100% of the company
   Khristopher - 1/3 of 100% of the company
   Igor - 1/3 of 100% of the company

5. It is understood by all parties that this will be Alon Nottea & Khristopher Bond's primary business and they shall devote to the conduct of the business so much of their respective time as may be reasonably necessary for the efficient operation of the business.

BUNZAI MEDIA GROUP INC – PARTNERSHIP AGREEMENT

FTC-AUR-S1-0000142

Ex. 19

179

6.  It is understood by all parties that Alon & Khristopher shall receive a minimum salary of $15K per month each (starting January 1st, 2011) and Igor shall receive a minimum salary of $5K per month (starting April 1st, 2011). Executive salaries shall not exceed 5% of net proceeds during any given month, and bonuses of an additional 5% of net proceeds of any given year.

7.  This agreement shall commence from October 12th, 2010.

8.  Accounting shall be transparent to all parties. All parties shall have signatory rights on all bank accounts.

IN WITNESS WHEREOF, the parties hereunto agree to the terms and conditions set forth above.

Alon Nottea (Partner)

7900 Gloria Avenue, Van Nuys CA 91406

Khristopher Bond (Partner)

7900 Gloria Avenue, Van Nuys CA 91406

Igor Latsanovski (Partner)

_____, Terzana CA _____

03-23-11

Date

BUNZAI MEDIA GROUP INC – PARTNERSHIP AGREEMENT

FTC-AUR-S1-0000143

Ex. 19

180

## BUNZAI MEDIA GROUP – PARTNERSHIP AGREEMENT

Alon Nottea ("Alon"), Khristopher Bond ("Khristopher") & Igor Latsanovski ("Igor"), individually referred to as "Partner" "Party" and collectively "Parties" & "Partners"

### Explanatory Statement

The parties hereto desire to enter into a partnership agreement for the existing company named Bunzai Media Group Inc., a company that manufactures, distributes & markets various products to the worldwide consumer via all mediums and medias.

NOW THEREFORE, in consideration of their mutual promises, covenants, and agreements, the parties hereto do hereby promise, covenant and agree as follows:

1. The name of the Company shall be "Bunzai Media Group Inc./BunZai Media World" and all worldwide subsidiaries and affiliates of the company and campaigns, domains, websites, intellectual properties and businesses including AuraVie Skincare.

2. The principal office and place of business of the Partnership (the "Office") shall be located at 7900 Gloria Avenue, Van Nuys, CA 91406. The Partnership shall have such other or additional offices as the Partners may choose, from time to time.

3. The business and purposes of the Partnership is to manufacture, distribute and market various products in all mediums and media to the worldwide consumer.

4. Igor shall invest $500,000 into the company for Administration, Manufacturing and Marketing expenses. It is understood that Alon & Khristopher has invested $500,000 into the company. Both parties will receive their investment returned from 30% of net profits beginning July 2011. Investment shall be returned as follows:

   Igor $300K
   Alon & Khristopher (to go to French Partners) $200K
   Igor $200K
   Alon & Khristopher $300K

   The partnership shares/ownership shall be as follows:

   Alon – 1/3 of 100% of the company
   Khristopher - 1/3 of 100% of the company
   Igor - 1/3 of 100% of the company

5. It is understood by all parties that this will be Alon Nottea & Khristopher Bond's primary business and they shall devote to the conduct of the business so much of their respective time as may be reasonably necessary for the efficient operation of the business.

BUNZAI MEDIA GROUP INC – PARTNERSHIP AGREEMENT

FTC-AUR-S1-0000144

Ex. 19

181

6.   It is understood by all parties that Alon & Khristopher shall receive a minimum salary of $15K per month each (starting January 1st, 2011) and Igor shall receive a minimum salary of $5K per month (starting April 1st, 2011).  Executive salaries shall not exceed 5% of net proceeds during any given month, and bonuses of an additional 5% of net proceeds of any given year.

7.   This agreement shall commence from October 12th, 2010.

8.   Accounting shall be transparent to all parties.  All parties shall have signatory rights on all bank accounts.

IN WITNESS WHEREOF, the parties hereunto agree to the terms and conditions set forth above.

Alon Nottea (Partner)

7900 Gloria Avenue, Van Nuys CA 91406

Khristopher Bond (Partner)

7900 Gloria Avenue, Van Nuys CA 91406

Igor Latsanovski (Partner)

███████, Tarzana CA ███████

07-23-11

Date

BUNZAI MEDIA GROUP INC – PARTNERSHIP AGREEMENT

FTC-AUR-S1-0000145

Ex. 19

182

# EXHIBIT

# "F"

Larsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

89

1    they're going to share.
2        Q   Did you have any reason to think that Alon
3    might not see this e-mail?
4        A   Big ones.  Because typically Alon would send
5    my e-mails to trash in the same way, because he would
6    always say, "Your computer translation is something I
7    can't understand."
8        Q   And so your thought was that Doron would make
9    sure that Alon read this e-mail?
10       MR. BENICE:  If you don't know, you don't
11   know.
12       THE WITNESS:  I don't know, no.  It's just I
13   don't know.  That was an emotional letter.
14       It was in 2013.  In 2013 two women sued Alon,
15   he separated from Khristopher, and he had family
16   problems, and he was thinking about leaving to go to
17   Israel.
18       And I was trying to -- maximally trying to --
19   saying that we're together, and I was saying our
20   business.  Even though it's his business, I wanted to
21   make it emotional to make sure that he stayed so that
22   I can get my money.  If he left to Israel, I would
23   have lost my money, because I invest in people.
24   BY MR. TEPFER:
25       Q   And so is that -- so just to be clear, the

90

1    conversation that you had was a personal one-on-one
2    conversation with Alon?
3        A   What conversation are you talking about?
4        Q   In the first sentence you said "after our
5    conversation," and I -- I was just wondering who was
6    included in that conversation.
7        A   Well, probably -- I don't remember exactly.
8    It was a long time ago.  I just have this general
9    feeling that I remember having there.  I don't
10   remember why I used this one phrase or the other
11   phrase.
12       I wrote it first in Russian, and then I
13   translated it with the automated translator; and after
14   that automated translator, I, with my limited
15   knowledge of the language, tried to correct it.
16       So the thing that came out is some kind of --
17   but I was trying, for the most part, to make it more
18   emotional to use that kind of language.
19       Sometimes some of these phrases I translated
20   several times -- two or three times.  Sometimes it
21   translated from Russian into English.  You read it and
22   you don't understand it.  So then you translate it
23   back, and then you translate it back again, and then
24   you still don't understand it, and then you insert it
25   and put another thing in there.

91

1        In principal, I wanted to give Alon this
2    emotional attachment that those women who were suing
3    him, it's not the end of the world and that you
4    shouldn't be moving to Israel because of that.
5        But from my side personally, I'm telling the
6    truth.  The personal thing inside me was that I don't
7    want to lose my money.
8        Q   And when you say -- on the second line when
9    you refer to "our company," what company are you
10   referring to?
11       A   It was -- it's just a general term of phrase.
12   Just try to imagine if I said "your company," what
13   kind of emotional connection would there be?  I would
14   have pushed him away.
15       That's -- that's why I tried to use those
16   common words, so he can get a feeling that there's
17   some kind of potential with me in the future for
18   tomorrow; that I will be investing in some other
19   businesses.  My bottom line objective was that he
20   doesn't stay in Israel so I don't lose my investment.
21       Q   And on the third line when you referred to --
22   when you say "Pinicle," are you referring to Pinnacle
23   Logistics, Inc.?
24       A   Yes.
25       Q   And when you say "We want to keep Pinicle,"

92

1    is it your understanding that Alon decided -- would
2    have the final say in whether Pinnacle Logistics would
3    continue to operate?
4        A   You are grabbing two separate sentences, but
5    this is in general.
6        Imagine the situation.  Two women illegally
7    are blackmailing him because they want to get money
8    from him, and he has a lot of employees.
9        I was trying to be emotional.  I was trying
10   to say, "Do you want to have a lot of employees
11   because they can turn around the next day and sue you?
12   Do you want to have all those problems?" or, "You can
13   just outsource all this and have people working for
14   you and avoid all these problems."
15       I was giving him this as my personal opinion,
16   more like as a comrade.
17       MR. TEPFER:  As a what?
18       THE INTERPRETER:  Comrade.
19       MR. TEPFER:  Oh, a comrade.
20       Q   So my question, though, is that:  Was it --
21   was it your understanding that Alon Nottea made
22   business decisions for Pinnacle Logistics, Inc.?
23       A   When I was -- when I was writing this letter,
24   I didn't have any kind of understanding, because it
25   was all emotional.  You can't really compare it.

23 (Pages 89 to 92)

# EXHIBIT

## "G"



Case 2:15-cv-04527-GW-PLA   Document 397-9   Filed 05/02/16   Page 1 of 4   Page ID #:10470

# EXHIBIT

# "H"

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 64 of 82   Page ID
#:12681
Case 2:15-cv-04527-GW-PLA   Document 397-9   Filed 05/02/16   Page 2 of 4   Page ID
#:10471

Case 2:15-cv-04527-GW-PLA   Document 353-30   Filed 04/18/16   Page 90 of 417   Page ID
#:7869

1   compound.  Without waiving said objections, Responding Party responds as follows:

2   Deny.

3   **REQUEST FOR ADMISSION NO. 21:**

4        Admit that, since at least January 2010, Alon Nottea has controlled or had the

5   authority to control the business operations of BunZai Media Group, Inc.

6   **RESPONSE TO REQUEST FOR ADMISSION:**

7        Admit.

8   **REQUEST FOR ADMISSION NO. 22:**

9        Admit that Alon Nottea transacts or has transacted business in the Central

10   District of California.

11   **RESPONSE TO REQUEST FOR ADMISSION:**

12        Admit.

13   **REQUEST FOR ADMISSION NO. 23:**

14        Admit that Alon Nottea resides in the Central District of California.

15   **RESPONSE TO REQUEST FOR ADMISSION:**

16        Admit.

17   **REQUEST FOR ADMISSION NO. 24:**

18        Admit that Alon Nottea resides at ▮▮▮▮▮▮▮▮▮▮, Winnetka, California.

19   **RESPONSE TO REQUEST FOR ADMISSION:**

20        Responding Party objects to this Request on the grounds that it seeks private

21   information protected by the California Constitution and the United States

22   Constitution.

23   **REQUEST FOR ADMISSION NO. 25:**

24        Admit that Igor Latsanovski has been an officer of BunZai Media Group, Inc.

25   **RESPONSE TO REQUEST FOR ADMISSION:**

26        Deny.

27   ///

28   ///

DORON NOTTEA'S RESPONSES TO FTC'S REQUEST FOR ADMISSIONS- SET ONE
912-8                                                    **Exhibit 912**

**REQUEST FOR ADMISSION NO. 26:**

Admit that Igor Latsanovski was an owner of BunZai Media Group, Inc. since at least January 1, 2010.

**RESPONSE TO REQUEST FOR ADMISSION:**

Deny.

**REQUEST FOR ADMISSION NO. 27:**

Admit that, since at least January 2010, Igor Latsanovski has controlled or had the authority to control the business operations of BunZai Media Group, Inc.

**RESPONSE TO REQUEST FOR ADMISSION:**

Deny.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Igor Latsanovski had knowledge that consumers had alleged that unauthorized charges were being billed to consumers' credit cards by BunZai Media Group, Inc.

**RESPONSE TO REQUEST FOR ADMISSION:**

Responding Party objects on the grounds that the Request calls for Responding Party to speculate as to the state of mind and knowledge of Defendant Igor Latsanovski; Responding Party objects on the grounds that the Request is vague and ambiguous and compound. Without waiving said objections, Responding Party responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Igor Latsanovski had knowledge that consumers had alleged that unauthorized charges were being billed to consumers' debit cards BunZai Media Group, Inc.

**RESPONSE TO REQUEST FOR ADMISSION:**

Responding Party objects on the grounds that the Request calls for Responding Party to speculate as to the state of mind and knowledge of Defendant Igor Latsanovski; Responding Party objects on the grounds that the Request is vague and

9

**Exhibit 912**

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 66 of 82   Page ID
#:12683
Case 2:15-cv-04527-GW-PLA   Document 397-9   Filed 05/02/16   Page 4 of 4   Page ID
#:10473

Case 2:15-cv-04527-GW-PLA   Document 353-30   Filed 04/18/16   Page 158 of 417   Page ID
#:7937

1    **RESPONSE TO REQUEST FOR ADMISSION:**

2        Responding Party objects to this Request on the grounds that it seeks private

3    information protected by the California Constitution and the United States

4    Constitution.

5    **REQUEST FOR ADMISSION NO. 25:**

6        Admit that Igor Latsanovski has been an officer of BunZai Media Group, Inc.

7    **RESPONSE TO REQUEST FOR ADMISSION:**

8        Deny.

9    **REQUEST FOR ADMISSION NO. 26:**

10        Admit that Igor Latsanovski was an owner of BunZai Media Group, Inc. since

11    at least January 1, 2010.

12    **RESPONSE TO REQUEST FOR ADMISSION:**

13        Deny.

14    **REQUEST FOR ADMISSION NO. 27:**

15        Admit that, since at least January 2010, Igor Latsanovski has controlled or had

16    the authority to control the business operations of BunZai Media Group, Inc.

17    **RESPONSE TO REQUEST FOR ADMISSION:**

18        Deny.

19    **REQUEST FOR ADMISSION NO. 28:**

20        Admit that Igor Latsanovski had knowledge that consumers had alleged that

21    unauthorized charges were being billed to consumers' credit cards by BunZai Media

22    Group, Inc.

23    **RESPONSE TO REQUEST FOR ADMISSION:**

24        Responding Party objects on the grounds that the Request calls for Responding

25    Party to speculate as to the state of mind and knowledge of Defendant Igor

26    Latsanovski; Responding Party objects on the grounds that the Request is vague and

27    ambiguous and compound.  Without waiving said objections, Responding Party

28    responds as follows:  Upon reasonable inquiry, Responding Party lacks sufficient

MOTTI NOTTEA'S RESPONSES TO FTC'S REQUEST FOR ADMISSIONS– SET ONE

**913-9**                   **Exhibit 913**

# EXHIBIT

## "I"

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

---

217

1   question, and it's vague and ambiguous. The
2   information is equally accessible and available to
3   Plaintiff.
4         THE WITNESS: Not -- not exactly, no.
5   BY MR. TEPFER:
6      Q. Did --
7      A. Pinnacle, you said?
8      Q. Yes.
9      A. It's here (indicating). Before, you showed
10  me a document that the accountant gave. That's
11  dated here. In 6/6/2012. 2012.
12     Q. In Pinnacle Logistics, after BunZai was
13  dissolved, Pinnacle Logistics sold AuraVie products;
14  is that correct?
15     A. No.
16        MR. UNGAR: Objection as to the form of the
17  question. It's vague and ambiguous. It's asked and
18  answered now three times.
19  BY MR. TEPFER:
20     Q. So Pinnacle Logistics never sold AuraVie
21  products?
22     A. No.
23        MR. UNGAR: Objection as to the form of the
24  question. It's vague and ambiguous, asked and
25  answered four times.

218

1   BY MR. TEPFER:
2      Q. The reason I ask, on Document 110 -- oh,
3   perhaps I'm misunderstanding.
4         Pinnacle Logistics, I guess, handled
5   customer service for the sale of AuraVie products?
6      A. Yes, sir.
7      Q. Okay. That was my confusion.
8         And after BunZai was dissolved, the other
9   AuraVie companies continued to sell AuraVie
10  products; is that correct?
11        MR. UNGAR: Objection as to the form of the
12  question. It's vague and ambiguous, it assumes
13  facts not in evidence, misstates the prior testimony
14  of the witness.
15        THE WITNESS: Some of the companies that
16  we've said yes to a couple times today kept selling,
17  and some of them were gone.
18  BY MR. TEPFER:
19     Q. If we could -- it was Exhibit 65. If we
20  could jump back just a moment --
21     A. Found 66.
22     Q. Oh. I think it's --
23     A. Oh, it's the one I pulled out?
24     Q. Yes, yes.
25     A. Sorry. It's my fault.

219

1      Q. You reference some companies that had ceased
2   at that point in time to be selling AuraVie SkinCare
3   products. Are any of those entities described here?
4      A. Yeah, but I can't tell you which one
5   exactly.
6      Q. Do you know when -- at the time of the
7   filing of the FTC's lawsuit in June 2015, do you
8   know if Zen Mobile Media was still, I guess, selling
9   AuraVie products?
10     A. I don't believe they were. I don't believe
11  many of these companies were. I think all of them,
12  maybe besides one, that was just refilling happy
13  consumers orders from 18 months and 2 years ago
14  because we haven't acquired new consumers in over a
15  year.
16     Q. Did you discuss with Mr. Latsanovski his
17  company Zen Mobile Media, Inc.'s, decision to cease
18  selling AuraVie SkinCare products?
19     A. I made decision on behalf of Zen. It was
20  not Igor. It is not Igor's consent to make
21  decisions there.
22     Q. Did you make decisions on --
23     A. SBM Management made decision on behalf of
24  the retail merchants.
25     Q. And you mean the AuraVie companies we

220

1   discussed?
2      A. (Witness shakes head up and down.)
3      Q. Did -- I guess we can turn back.
4         At the time that the AuraVie companies --
5   after BunZai had dissolved and the AuraVie companies
6   were, had their customer service needs met by
7   Pinnacle, did you discuss this, I guess, the
8   Pinnacle standard operating procedure with anyone
9   there?
10        MR. UNGAR: Objection as to the form of the
11  question. It's vague and ambiguous.
12        THE WITNESS: We discussed many topics as
13  far as the expectation between SBM Management's
14  expectation. We had meeting with Stephan Bauer,
15  with Roi, with Pinnacle Logistics, as far as the
16  management of SBM to the retail merchants and what
17  SBM expected Pinnacle to do on behalf of the retail
18  merchants.
19  BY MR. TEPFER:
20     Q. Who was your point of contact at Pinnacle
21  Logistics for these discussions?
22     A. The majority of the time I spoke to Roi and
23  a few other people at Pinnacle, and Andree. They
24  were -- they were some of them, some of the people
25  in management.

---

55 (Pages 217 to 220)

# EXHIBIT

## "J"

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 70 of 82   Page ID
#:12687
Case 2:15-cv-04527-GW-PLA   Document 397-11   Filed 05/02/16   Page 2 of 2   Page ID
#:10477

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

---

**9**

1   Q. And anyone else?
2   A. No.
3   Q. And is Alon Nottea the one that hired you
4   for Focus Media Solutions?
5   A. Yes.
6   Q. And when did you begin your position at
7   Media Urge?
8   A. 2013. I don't recall the -- the dates.
9   Q. Okay. And who hired you at Media Urge?
10  A. Alon Nottea.
11  Q. And did you have a title while you were
12  there?
13  A. I was Director of Business Development, and
14  then I was moved to Vice President.
15  Q. Was that a promotion?
16  A. It was a promotion, yes.
17  Q. Do you recall when you got that promotion?
18  A. I don't recall.
19  Q. Were you working anywhere else, like at
20  another company, simultaneously with Media Urge?
21  A. I was working -- I started working for a
22  company called BunZai Media in 2010, I believe.
23  Q. Uh-huh.
24  A. And then -- and then Alon Nottea told me to
25  go work for Media Urge.

**10**

1   Q. And who hired you at BunZai Media?
2   A. Khristopher Bond.
3   Q. And at Focus Media Solutions did you have a
4   supervisor of any kind?
5   A. Alon Nottea.
6   Q. And did you have a supervisor while you were
7   at Media Urge?
8   A. Alon Nottea and Khristopher Bond.
9   Q. And I think you said that Alon hired you at
10  BunZai. Was he your supervisor there -- or rather,
11  you said Khristopher hired you?
12  A. Khristopher hired me at BunZai Media. Yes.
13  Q. And who were your supervisors at BunZai
14  Media?
15  A. Khristopher and Alon.
16  Q. And what sort of work did you do for BunZai
17  Media while you were there?
18  A. I started as a Customer Service Rep, taking
19  phone calls for Customer Service Reps. I
20  transitioned from Customer Service to learning about
21  a software called Lime Light. It's a -- it's a
22  customer relation management software. So I was
23  doing -- actually, I did some shipping -- actually,
24  I started as doing shipping at BunZai Media, and
25  then I moved from shipping to Customer Service, and

**11**

1   then from Customer Service to learning about this
2   new software.
3   Q. And did you have a direct supervisor in the
4   Shipping Department?
5   A. There was a Shipping Manager called -- by
6   the name of George. George. He was a Shipping
7   Manager. Mainly -- I was mainly working with him on
8   the shipping side.
9   Q. And what about in the Customer Service
10  Department? Do you have a direct supervisor there?
11  A. Khristopher. He was -- he managed our
12  Customer Service.
13  Q. And do you know what BunZai Media Group's
14  business was?
15  A. Yes. They were -- BunZai Media was selling
16  a skin care product.
17  Q. And I guess I just want to run through a
18  list of companies and see if you're familiar with
19  them.
20      Have you ever heard of a company called
21  Pinnacle Logistics, Inc.?
22  A. Yes.
23  Q. And how did you become familiar with that
24  company?
25  A. They -- they managed the -- they managed the

**12**

1   call center, so yeah.
2   Q. And so they -- you said they managed a call
3   center. Did -- how did you learn this?
4   A. Just overhearing. Overhearing the -- just
5   the colleagues talking about Pinnacle running
6   Customer Service.
7   Q. Do you happen to know who owned Pinnacle
8   Logistics, Inc.?
9   
10  Q. And do you know who owned BunZai Media
11  Group?
12  A. I assume its owned by Alon and Khristopher
13  because they -- because they hired me.
14  Q. And have you ever heard of the company DSA
15  Holdings, Inc.?
16  A. Yes.
17  Q. And where have you heard of that?
18  A. I don't recall. Just overhearing a company
19  called DSA Holdings.
20  Q. Do you recall who you heard speaking about a
21  company called DSA Holdings?
22  A. Alon.
23  Q. Do you have any idea what DSA Holdings'
24  business was?
25  A. No.

---

3 (Pages 9 to 12)

# EXHIBIT "K"

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                           2/18/2016

249

1   it.
2           (The previous question was read back
3       by the court reporter as follows:
4           "QUESTION:  Did the AuraVie
5       companies enter into any sort of
6       licensing agreement with a U.S.
7       manufacturer for the sale of AuraVie
8       products?")
9           THE WITNESS:  I believe there was some
10  agreement with the retail merchants.  There was an
11  agreement between them.  The retail merchants, with
12  the sale of AuraVie -- one more time.  I just want
13  to make sure I answer correctly.  One more time.
14          (The previous question was read back
15      by the court reporter as follows:
16          "QUESTION:  Did the AuraVie
17      companies enter into any sort of
18      licensing agreement with a U.S.
19      manufacturer for the sale of AuraVie
20      products?")
21          THE WITNESS:  No.
22  BY MR. TEPFER:
23      Q.  A moment ago you stated they did enter into
24  some sort of agreement; is that correct?
25      A.  Yes.

250

1       Q.  What was the nature of the agreement that
2   the AuraVie companies entered --
3       A.  I think it was a buyer/reseller agreement.
4   Like a buyer approval.  You're approved to buy and
5   resell the product, but it wasn't licensing
6   agreement.
7       Q.  Sure.
8           Did AuraVie ever contain an Israel secret
9   ingredient?
10      A.  They're all secret ingredient.  The whole
11  thing is.  Secret ingredient, no.
12      Q.  Did any of the products sold by the AuraVie
13  companies contain any sort of Israel secret
14  ingredient?
15      A.  No.  It's the combination of all the
16  ingredients that make it a secret.  It's not any one
17  ingredient.
18      Q.  Sure.
19      A.  It's the formula.  It just depends how you
20  look at it.
21      Q.  On 119-4, on the second line of the first
22  bullet point, there's reference to brands, formulas,
23  and trade secrets.  Do you know what brands,
24  formulas, or trade secrets that refers to?
25          MR. UNGAR:  Same objection.  Exhibit 119 is

251

1   a document protected by the attorney-client
2   privilege.  It's violation of the FRE 502,
3   confidentiality agreement, and it's a violation of
4   the California Professional Rules of Conduct, the
5   use of this document, knowing that it's a -- it's
6   protected by attorney-client privilege.
7           MR. TEPFER:  Are you instructing the witness
8   not to answer, Mr. Ungar?
9           MR. UNGAR:  It's not my deposition, Counsel.
10  I've said it 12 times already, so --
11          THE WITNESS:  Can you refer to the question
12  that you mentioned on which page?
13  BY MR. TEPFER:
14      Q.  Sure.
15          MR. UNGAR:  Are you telling the witness not
16  to answer the question?
17          MR. TEPFER:  No.  I'm just asking.
18          MR. UNGAR:  Then you don't need to keep
19  asking me if I'm advising or informing the witness
20  not to answer the question.  If I'm going to do so,
21  you'll know it.
22          MR. TEPFER:  I'm very sorry, Mr. Ungar.
23          MR. UNGAR:  Do you understand?
24          MR. TEPFER:  Yes, sir.
25          MR. UNGAR:  Thank you.

252

1   Why are you laughing?
2           MR. TEPFER:  I'm not laughing.
3           MR. UNGAR:  Why are you grinning?
4           MR. TEPFER:  I'm just trying to diffuse this
5   situation.
6           MR. UNGAR:  I don't --
7           MR. TEPFER:  Would you mind --
8           MR. UNGAR:  I don't know what you mean.
9           MR. TEPFER:  Counsel, I'd like to move on.
10  Would you mind reading the question.
11          (The previous question was read back
12      by the court reporter as follows:
13          "QUESTION:  On 119-4, on the
14      second line of the first
15      point, there's reference to brands,
16      formulas, and trade secrets.  Do you
17      know what brands, formulas, or trade
18      secrets that refers to?")
19          MR. UNGAR:  Same objection.
20          THE WITNESS:  No.
21  BY MR. TEPFER:
22      Q.  Are you aware if any proceeds from the sale
23  of AuraVie products by the AuraVie companies were
24  ever transferred to a trust in Cyprus?
25      A.  Never.

63 (Pages 249 to 252)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

190

Notea

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

253

1    Q.   And are you aware -- did you ever consider
2  the possibility of transferring funds from the sale
3  of AuraVie products to a trust in Cyprus?
4        MR. UNGAR:  Objection as to the form of the
5  question.  It's vague and ambiguous.
6        THE WITNESS:  No.
7  BY MR. TEPFER:
8    Q.   Did you ever consider transferring funds
9  from the sale of AuraVie products to any bank in
10  Cyprus?
11       MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.
13       THE WITNESS:  Like I said in the beginning,
14  I don't know, I don't recollect exactly.  There was
15  an attempt to understand banking in Cyprus.  I
16  contacted a bank.  I saw the numbers, the rates.
17  The importation was crap.  Moved on.  Never
18  happened.
19  BY MR. TEPFER:
20   Q.   So you explored the possibility of BunZai
21  marketing AuraVie in Cyprus?
22   A.   I explored the possibility of seeing how
23  business gets done in Cyprus.
24   Q.   And do you recall what type of business you
25  had considered conducting in Cyprus?

254

1        MR. UNGAR:  Objection as to the form of the
2  question.  It's vague and ambiguous.
3        THE WITNESS:  Online marketing.
4  BY MR. TEPFER:
5    Q.   And do you recall what product you
6  anticipated marketing online in Cyprus?
7    A.   There was no product.  It wasn't a product
8  development.  It wasn't about a product.  It was
9  about different concept.
10   Q.   Do you know if SBM Management contracted for
11  media buys for the AuraVie companies?
12       MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.
14       THE WITNESS:  I don't really understand what
15  you're saying.
16  BY MR. TEPFER:
17   Q.   Did -- I guess, did SBM Management make
18  payments to third parties for online advertising for
19  the AuraVie companies?
20       MR. UNGAR:  Objection as to the form of the
21  question.  It's vague and ambiguous.
22       THE WITNESS:  Yes.
23  BY MR. TEPFER:
24   Q.   Do you recall the third party entities that
25  SBM Management made payments to for the AuraVie

255

1  companies's online marketing?
2    A.   One by one?
3    Q.   Sorry.  And it -- there are -- I guess
4  you're saying many?
5    A.   It managed the RMCs.
6    Q.   Okay.
7    A.   Of course.
8    Q.   Did you ever discuss with the CEOs of the
9  AuraVie companies their potential exposure to claims
10  for false advertising?
11       MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.
13       THE WITNESS:  I explained to them the risks,
14  as I knew them, as I understand them.
15  BY MR. TEPFER:
16   Q.   And so you explained to the various CEOs of
17  the AuraVie companies the potential risks associated
18  with this marketing?
19       MR. UNGAR:  Objection as to the form of the
20  question.  It's vague and ambiguous, and it
21  misstates the testimony of the witness, and it's
22  argumentative.
23       THE WITNESS:  You have to repeat the
24  question for me, please.
25       (The previous question was read back

256

1  by the court reporter as follows:
2        "QUESTION:  And so you explained
3        to the various CEOs of the AuraVie
4        companies the potential risks
5        associated with this marketing?")
6        THE WITNESS:  Based on my understanding of
7  what the risks were, sure.
8  BY MR. TEPFER:
9    Q.   And what was your understanding of the risks
10  associated with this marketing?
11   A.   That they might, you know, there might be an
12  issue with a merchant account and they might get
13  themselves -- if -- if an issue occurred with a
14  merchant account that was out of its parameters,
15  that they might get themselves a problem
16  establishing another merchant account.
17   Q.   Did you discuss the possibility of an FTC
18  enforcement action with any of the CEOs of the
19  AuraVie companies?
20   A.   Not that I can recall.
21   Q.   What about the possibility of an Attorney
22  General enforcement action?
23   A.   Not that I can recall.
24   Q.   And so just to clarify, the risks that you
25  spoke with them about were regarding actions taken

64 (Pages 253 to 256)

191

# EXHIBIT

# "L"

28

1    related to any of the AuraVie companies?

2        A.    Yes.

3        Q.    Do you know the time period in which you

4    heard overheard this?

5        A.    2011, 2012, 2013.

6        Q.    And you had stated that you would speak to

7    Philip, I guess, about some of these accounting

8    issues as they arose?

9        A.    Correct.

10       Q.    What made you think that you should speak to

11   Philip?  Did --

12       A.    Alon Nottea told me to talk to Philip for

13   anything regarding any financials, accounting.

14       Q.    Okay.  We discussed Igor Latsanovski

15   earlier.

16       A.    Yes.

17       Q.    How do you know Igor Latsanovski?

18       A.    I would see him around the office a few days

19   out of each month.

20       Q.    And that's the 7900 Gloria?

21       A.    Yes.

22       Q.    Do you recall -- I'll strike that.

23             Do you -- was that for the entire duration

24   that you worked at 7900 Gloria?

25       A.    Yes.

946 - 11                    EXHIBIT 946

192

# EXHIBIT "M"

3477467

FILED
In the Office of the Secretary of State
of the State of California

JUN ~ 6 2012

## ARTICLES OF INCORPORATION

### OF

### PINNACLE LOGISTICS, INC.

The undersigned, desiring to form a corporation under the laws of the State of California, declares:

I

The name of the corporation is:

### PINNACLE LOGISTICS, INC.

II

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in this State of the corporation's initial agent for service of process is Oz Mizrahi, 7900 Gloria Avenue, Van Nuys, CA 91406.

IV

This corporation is authorized to issue only one class of shares, which shall be designated "common" shares. The total number of such shares authorized to be issued is 1,000,000 shares.

V

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California Law.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation this 6th day of June, 2012.

OZ MIZRAHI, INCORPORATOR

Case 2:15-cv-04527-GW-PLA   Document 428-8   Filed 05/13/16   Page 78 of 82   Page ID
#:12695
Case 2:15-cv-04527-GW-PLA   Document 397-14   Filed 05/02/16   Page 3 of 5   Page ID
#:10485

Case 2:15-cv-04527-GW-PLA   Document 353-24   Filed 04/18/16   Page 15 of 22   Page ID
#:7537



## State of California
## Secretary of State

| S |
|---|

**E-N56787**

**FILED**

In the office of the Secretary of
State of the State of California

**Sep - 10 2012**

This Space For Filing Use Only

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)

FEES (Filing and Disclosure): $25.00. If amendment, see Instructions.
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. CORPORATE NAME
C3477467
PINNACLE LOGISTICS, INC.

Due Date:

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>7900 GLORIA AVENUE   VAN NUYS  CA  91406 | | | |
| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>7900 GLORIA AVENUE   VAN NUYS  CA 91406 | | | |
| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/<br>O  S  MIZRAHI | 7900 GLORIA AVENUE   VAN NUYS, CA 91406 | | | |
| 6. SECRETARY<br>O  S  MIZRAHI | 7900 GLORIA AVENUE   VAN NUYS, CA 91406 | | | |
| 7. CHIEF FINANCIAL OFFICER/<br>O  S  MIZRAHI | 7900 GLORIA AVENUE   VAN NUYS CA 91406 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who Are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8. NAME<br>O S MIZRAHI | 7900 GLORIA AVENUE   VAN NUYS, CA 91406 | | | |
| 9. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |

11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.)

12. NAME OF AGENT FOR SERVICE OF PROCESS
O S MIZRAHI

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL<br>7900 GLORIA AVE   VAN NUYS, CA 91406 | | | |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
CUSOMER SERVICE

15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 09/10/2012 | O S MIZRAHI | CEO | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

SI-200 C (REV 10/2010)                                    APPROVED BY SECRETARY OF STATE

ATTACHMENT M
**904-6**

APP. 000560
**Exh. 904**

## State of California
### Secretary of State

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

**F031408**

**FILED**

In the office of the Secretary of State
of the State of California

**JUL-09 2014**

| S |

1. CORPORATE NAME
PINNACLE LOGISTICS, INC.

2. CALIFORNIA CORPORATE NUMBER    C3477467

*This Space for Filing Use Only*

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check this box and proceed to Item 17.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 6 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE  16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY  16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/  TAL KARASSO | 16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |
| 8. SECRETARY  TAL KARASSO | 16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |
| 9. CHIEF FINANCIAL OFFICER/  TAL KARASSO | 16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME  TAL KARASSO | 16830 VENTURA BLVD, SUITE #360, ENCINO, CA 91436 | CITY | STATE | ZIP CODE |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
CALIFORNIA CORPORATE AGENTS, INC.

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
MANAGEMENT

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 07/09/2014 | TAL KARASSO | SECRETARY | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013)    Page 1 of 1    APPROVED BY SECRETARY OF STATE

ATTACHMENT M
**904-7**

APP. 000561
**Exh. 904**

| | |
|---|---|
| **DISS STK** | |

**State of California**
**Secretary of State**

3477467

**Domestic Stock Corporation**
**Certificate of Dissolution**

There is no fee for filing a Certificate of Dissolution.

IMPORTANT – Read Instructions before completing this form.

D I268523

**FILED**
Secretary of State
State of California

DEC 16 2014

This Space For Filing Use Only

**Corporate Name**  (Enter the name of the domestic stock corporation exactly as it is of record with the California Secretary of State.)

1. Name of corporation
   PINNACLE LOGISTICS, INC

**Required Statements**  (The following statements are required by statute and should not be altered.)

2. A final franchise tax return, as described by California Revenue and Taxation Code section 23332, has been or will be filed with the California Franchise Tax Board, as required under the California Revenue and Taxation Code, Division 2, Part 10.2 (commencing with Section 18401). The corporation has been completely wound up and is dissolved.

**Debts & Liabilities**  (Check the applicable statement. Note: Only one box may be checked.)

3. ☐ The corporation's known debts and liabilities have been actually paid.

   ☐ The corporation's known debts and liabilities have been paid as far as its assets permitted.

   ☐ The corporation's known debts and liabilities have been adequately provided for by their assumption and the name and address of the assumer is _____

   ☐ The corporation's known debts and liabilities have been adequately provided for as far as its assets permitted.
   (Specify in an attachment to this certificate (incorporated herein by this reference) the provision made and the address of the corporation, person or governmental agency that has assumed or guaranteed the payment, or the name and address of the depositary with which deposit has been made or other information necessary to enable creditors or others to whom payment is to be made to appear and claim payment.)

   ☑ The corporation never incurred any known debts or liabilities.

**Assets**  (Check the applicable statement. Note: Only one box may be checked.)

4. ☑ The known assets have been distributed to the persons entitled thereto.

   ☐ The corporation never acquired any known assets.

**Election**  (Check the "YES" or "NO" box, as applicable. Note: If the "NO" box is checked, a Certificate of Election to Wind Up and Dissolve pursuant to Corporations Code section 1901 must be filed prior to or together with this Certificate of Dissolution.)

5. The election to dissolve was made by the vote of all the outstanding shares.   ☑ YES   ☐ NO

**Verification & Execution**  (If additional signature space is necessary, the dated signature(s) with verification(s) may be made on an attachment to this certificate. Any attachments to this certificate are incorporated herein by this reference.)

6. The undersigned constitute(s) the sole director or a majority of the directors now in office.  I declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of my own knowledge.

12/12/2014
Date

_____
Signature of Director

TAL KARASSO, DIRECTOR
Type or Print Name of Director

_____
Signature of Director

_____
Type or Print Name of Director

_____
Signature of Director

_____
Type or Print Name of Director

DISS STK (REV 01/2013)                    APPROVED BY SECRETARY OF STATE

ATTACHMENT M
**904-8**

APP. 000562
**Exh. 904**

196

# EXHIBIT

# "N"

FTC v. Bunzai Media Group, LLC, et al.                                        2/18/2016

---

**133**

```
 1        So how did you learn about --
 2     A.  From the call center.
 3     Q.  Did you -- was, I guess, affiliate traffic
 4  that resulted in more chargebacks another way that
 5  you would learn about affiliates that had misleading
 6  advertisements?
 7     A.  If -- if it's already gotten to a
 8  chargeback, it's kind of late by then because that
 9  affiliate might not even be working anymore.
10     Q.  Okay.
11     A.  It's directly from the call center.  If a
12  consumer was given something by a affiliate that was
13  misled, it kind of floats through the call center
14  very quickly.
15     Q.  And so if an affiliate -- sorry.
16        If a consumer calls the call center,
17  reporting these advertisements, would the call
18  center employees report this to you?
19        MR. UNGAR:  Objection as to the form of the
20  question.  It's an improper hypothetical, it calls
21  for speculation, lacks foundation.
22        THE WITNESS:  Not directly, no.
23  BY MR. TEPFER:
24     Q.  Who would they report it to?
25     A.  Their manager.
```

**134**

```
 1        MR. UNGAR:  Same objection.
 2  BY MR. TEPFER:
 3     Q.  And who is the manager?
 4     A.  It changed.  Maybe that particular call
 5  center manager would be Andree, and then Andree
 6  would walk it up the food chain and --
 7     Q.  If we could go to Exhibit 28.
 8        (Plaintiff's Exhibit 28 was
 9        previously marked for identification
10        by the FTC and is attached hereto.)
11  BY MR. TEPFER:
12     Q.  I'm now handing the witness what's been
13  marked as Exhibit 28.
14        Do you recall sending this email?
15     A.  Yes.
16     Q.  What is PayPro?
17     A.  It's a -- it was a business model that this
18  person owned -- Alex.
19     Q.  Did you -- did BunZai Media Group do any
20  business with PayPro?
21     A.  No.
22     Q.  Were you considering in investing in PayPro
23  at this time?
24     A.  No.
25     Q.  What is this email regarding?
```

**135**

```
 1     A.  This person reached out to Igor to see if
 2  Igor wanted to invest in his company.  Igor showed
 3  me his business model.  I looked, I had some
 4  questions, I didn't like it, and moved on.
 5     Q.  And why did you include, I guess, these
 6  websites, Miracle --
 7     A.  To show Alex what we do.  Basically, he sent
 8  me what he does, I showed him what we do, and it was
 9  kind of a -- that's it.
10     Q.  Did you ever show Mr. Latsanovski these
11  websites that you include in this email?
12     A.  Not directly, no.
13     Q.  Did you ever show him similar websites to
14  these?
15     A.  No.
16     Q.  Who's Gary Bhasin?
17     A.  Gary Bhasin is a person I know from a long
18  time ago who is good in accounting.  He knows how to
19  run reports.  He's a reporting guy.
20        (Plaintiff's Exhibit 29 was
21        previously marked for identification
22        by the FTC and is attached hereto.)
23  BY MR. TEPFER:
24     Q.  I'm handing the witness what's been marked
25  as Exhibit 29.
```

**136**

```
 1     A.  Thank you.
 2     Q.  Do you recall -- sorry.  Mine's a little
 3  messed up.
 4        Do you recall receiving this email from Gary
 5  Bhasin?
 6     A.  Yes.  I think I do.
 7     Q.  Did you request that he send you a
 8  management consulting proposal for AuraVie?
 9     A.  I did.
10     Q.  At this time was Media Urge marketing the
11  AuraVie product?
12     A.  This is 2013.  Yeah, I think so.
13     Q.  In Mr. Bhasin's email -- and that's
14  B-h-a-s-i-n.  He states, "As per my initial
15  conversation with Doron and Paul Medina" --
16     A.  Yeah.
17     Q.  -- "I understand that there is some serious
18  need of accurate projections, accounting
19  profitability model for your business."
20        What was your understanding of what business
21  Mr. Bhasin was referring to?
22     A.  Basically, after Nastassia left I had my
23  brother help me with some accounting.  He was busy
24  with his company.  He told me, "I don't have time
25  for this.  Find somebody who can do your stuff."
```

34 (Pages 133 to 136)