DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov; Tex. Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Ste 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. CV 15-4527-GW(PLAx) |
| **Plaintiff,** | **PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES** |
| **v.** | |
| **BUNZAI MEDIA GROUP, INC.,** *et al.* | |
| **Defendants.** | |

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| UNCONTROVERTED FACT | RESPONSE |
|---|---|
| 1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b; Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404; and Section 917(c), of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § l693o(c) to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' law violations. | 1. This is a conclusion. It is virtually impossible to respond to this and all other conclusions in the Statement of Uncontroverted Facts because this is not a material fact and is not in compliance with L.R. 56-1. This Statement of Genuine Disputes will respond to material facts contained in the moving party's Statement of Uncontroverted Facts in which there is a genuine dispute. |
| **1. Moving Party's Response:** LR 56-1 states: "A party filing a notice of motion for summary judgment or partial summary judgment shall lodge a proposed 'Statement of Uncontroverted Facts and Conclusions of Law.'" ||
| 2. Defendants collectively marketed skincare products over the Internet using deceptive offers with hidden costs, negative option features, and return policies. Specifically, Defendants offered "risk-free" trials of skincare products to consumers nationwide through pop-up advertisements and websites. Defendants required consumers who accepted the "risk-free" trials to provide their credit or debit card billing information, purportedly to pay nominal shipping and handling fees to receive the advertised products. However, 10 days after receiving consumers' billing information, Defendants charged consumers the full costs of the products included in the | 2. This is a series of conclusions. To the extent there are also material facts, it is virtually impossible to respond to because there is more than one material fact and is not in compliance with L.R. 56-1. |

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| | |
|---|---|
| "risk-free" trials, imposing charges of up to $97.88 onto consumers' credit or debit cards. Defendants refused to provide refunds for product returns unless consumers met onerous conditions that were not adequately disclosed. Additionally, after charging consumers, Defendants enrolled consumers in a negative option continuity plan, in which Defendants shipped additional products each month and charged consumers' credit or debit cards the full costs of the products, usually $97.88 per month. Defendants' scheme deceived consumers nationwide out of millions of dollars. | |

**2. Moving Party's Response:**

LR 56-1 includes no limitation as cited by Defendant.

| | |
|---|---|
| 9.c. BunZai was owned by Defendants Alon Nottea, Igor Latsanovski, and Khristopher Bond. Exs. 18-2; 302-2. | 9.c. Disputed. Bunzai was owned by Defendants Alon Nottea and Kristopher Bond. Declaration of Alon Nottea ("Alon Dec."), ¶5, 3:11-16. |

**9c. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Alon Nottea and Khristopher Bond were owners of BunZai Media Group, Inc.

Plaintiff disputes the contention that Igor Latsanovski was not an owner of Bunzai Media Group. Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut the evidence provided by Plaintiff.  Defendants' failed to provide any evidence to rebut evidence that shows Igor Latsanovski held a 55% ownership in BunZai Media Group. Ex. 18. Defendants also failed to provide any evidence to rebut evidence that lists Igor as being a shareholder of BunZai Media Group. Ex. 302. Defendant's also did not provide evidence to rebut Doron and Motti Nottea's statements that Igor Latsanovski " . . . was an owner of BunZai Media Group, Inc . . .." Dkts. 244¶ 36; 245 ¶ 36.

| | |
|---|---|
| 10. Defendant Pinnacle Logistics, Inc., ("Pinnacle") is or was a California corporation with its principal place of business at the same location as BunZai | 10. This is a series of material facts and conclusions that is virtually impossible to respond to because there is more than one material fact and is not in |

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| | | |
|---|---|---|
| 1 | at the Van Nuys Office. Exs. 904-5; 550 at 17:21-24 and 216:12-17. Pinnacle had a secondary address of 6925 Canby Avenue, Suite 105, Reseda, California 91335 ("the Reseda Office"). Dkts. 244 ¶ 10; 245 ¶ 10. At times material to the Complaint, Pinnacle, advertised, marketed, distributed, or sold the skincare products at issue in this case, or provided customer service for such products, to consumers throughout the United States. Dkts. 244 ¶ 10; 245 ¶ 10. Pinnacle transacted business in this district and throughout the United States. Dkts. 244 ¶ 10; 245 ¶ 10; 250 ¶ 10; 253 ¶ 10; 254 ¶ 10. | compliance with L.R. 56-1. To the extent it can be responded to, Disputed. Pinnacle did not advertise, market, or sell the skincare products. Declaration of Roi Reuveni ("Reuveni Dec."), ¶3, 2:15-17. |

**10. Moving Party's Response:**

    <u>Defendants Roi Reuveni and Alon Nottea did not dispute that</u>: (a) Pinnacle is or was a California corporation with its principal place of business at the same location as BunZai at the Van Nuys Office; (b) Pinnacle had a secondary address of 6925 Canby Avenue, Suite 105, Reseda, California 91335; (c) Pinnacle provided customer service for the skincare products at issue in this case; and (d) Pinnacle transacted business in this district and throughout the United States.

    Defendants Roi Reuveni and Alon Nottea did dispute that Pinnacle advertised, marketed, or sold the skincare products. Plaintiff disputes Defendants' contention to the extent that as part of a common enterprise, Pinnacle Logistics, Inc., did advertise, market, and sell skincare products.

| | | |
|---|---|---|
| | 10.a. Pinnacle took over the order fulfillment, customer service, and chargeback functions and managed merchant accounts for Defendants' skincare business after BunZai dissolved. See Exs. 194; 195; 222 | 10.a. Disputed. Pinnacle did not manage merchant accounts for Defendants' skincare business. Reuveni Dec., ¶3, 2:16-17. |

**10a. Moving Party's Response:**

    <u>Defendants Roi Reuveni and Alon Nottea did not dispute</u>: that Pinnacle took over the order fulfillment, customer service, and chargeback functions for Defendants' skincare business after BunZai dissolved.

    <u>Defendants Roi Reuveni and Alon Nottea do dispute</u>: that Pinnacle managed merchant accounts for Defendants' skincare business. Plaintiff disputes

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

this contention.

    a. Other than a self-serving conclusory declaration, Defendants failed to provide any evidence to rebut evidence that showed that Pinnacle Logistics received several payments from various corporations involved in the common enterprise and sent invoice to several corporations involved in the common enterprise. Ex. 222-8,-9,-10,-11.

    b. In addition, as testified by a former employee, Pinnacle Logistics, Inc., managed responding to chargeback disputes for various merchant accounts used corporations involved in the common enterprise. Ex. 554 at 86:17-87:7.

| | |
|---|---|
| 20. Defendant Adageo, LLC is or as a California limited liability company with Encino Mailbox A listed as its registered place of business. Ex. 904-46, -47. At times material to the Complaint, Adageo, LLC, existed to advertise, market, distribute, or sell the skincare products at issue in this case to consumers throughout the United States. See Ex. 54-15, see also Ex. 550, at 156:21-157:15. Adageo, LLC transacted business in this district. Dkts. 244 ¶ 20; 245 ¶ 20; 250 ¶ 20; 251 ¶ 20. | 20. Disputed. Adageo, LLC did not advertise, market, distribute or sell the skincare products at issue in this case. Alon Dec., ¶16, 7:1-6. |

**20. Moving Party's Response:**

    <u>Defendants Roi Reuveni and Alon Nottea did not dispute that</u>: (a) Adageo, LLC is or was a California limited liability company with Encino Mailbox A listed as its registered place of business; (b) Adageo, LLC transacted business in this district and throughout the United States.

    <u>Plaintiff disputes the contention that Adageo, LLC, did not advertise, market, distribute or sell the skincare products at issue in this case.</u>

    a. Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut the evidence provided by Plaintiff.

    b. Defendants' failed to provide any evidence to rebut evidence that shows a Secured Commerce bill to Adageo, LLC for "Design, Creation, & Optimization of Auravie Landing Page Campaign Setup . . ." Ex. 54-2.

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

c. Defendants also failed to provide any evidence to rebut Adageo's Operating Agreement that shows the company was formed to "market, sell, and distribute cosmetic and other consumer products (the "Company Business)." Ex. 54-15.  As shown on an invoice, Adageo, LLC, was billed for 500 "AuraVie online customer acquisition leads." Ex. 54-9

| | |
|---|---|
| 20.a. Adageo, LLC purchased AuraVie products from a distributor and had them shipped to Pinnacle. Ex. 54 p. 11. | 20.a. Disputed. Adageo, LLC did not purchase AuraVie products from a distributor and have them shipped to Pinnacle. Alon Dec., ¶16, 7:5-6. |

**20a. Moving Party's Response:**

Plaintiff disputes the contention that Adageo, LLC, did not purchase AuraVie products from a distributor and have them shipped to Pinnacle.

    a. Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut the evidence provided by Plaintiff.

    b. Defendants' failed to provide any evidence to rebut evidence that shows a Jacem Healthy Products, Inc., invoice to Adageo, LLC for various "AuraVie" products to be shipped to Pinnacle Logistics, Inc. Ex. 54-11.

| | |
|---|---|
| 32.t. Alon was aware that consumers were misled by his companies' deceptive advertising. | 32.t. Disputed. Alon learned that some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie products if they did not cancel during the trial period. Alon was not aware that advertising was deceptive. Alon Dec., ¶17, 7:7-11. |

**32t. Moving Party's Response:**

    Defendants Roi Reuveni and Alon Nottea state that Alon learned that some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie products if they did not cancel during the trial period.

    Plaintiff disputes the contention that Alon was not aware that the advertising was deceptive.  Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut the evidence provided by Plaintiff.

    BunZai's attorney, William Rothbard, provided Alon Nottea a point-by-

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

point breakdown of the many ways the AuraVie marketing campaign violated FTC law.  Ex. 589.  In the email to Alon, BunZai's attorney listed the myriad of ways Defendants' websites violated FTC law. UF #61(a). In fact, BunZai's attorney advised Alon not to use the term "risk-free trial" at all because of its deceptiveness. UF #61(a)(iv). There can be no doubt Alon was aware that he was violating the law with his deceptive advertising and inadequate disclosure. For example, his attorney told him in no uncertain terms that "[a]lmost certainly the FTC would say [your disclosure] therefore is not 'conspicuous.'" UF #61(a)(vi).

Additional evidence shows Alon's knowledge of Defendants' deceptive business practices.

   a.  Evidence also shows Alon being forwarded an email from the Better Business Bureau concerning the "Risk-Free Trial" disclosure and the BBB's request that "the disclosure be added to areas where the risk-free trial is mentioned on the website and in promotional materials for the purpose of clarity."  Ex. 592.

   b.  Roi forwarded to Alon and others AuraVie complaints from the website "ripoffreport.com." Ex. 93.

   c.  In a recorded meeting, Alon stated "One more note … We must try 500 orders with the terms and conditions on the invoice for customers.  It's complete illegal to not have it there, at least." Ex. 556 at 95:7-95:22.

   d.  During this same meeting, he stated "…if you send them the terms, it can act like…we told you that we're going to charge…we notified you…you have ten days.  Exactly. But when me and Paul tried it a year ago, it didn't work so good.  It hurt us…If it's done creatively, if it's done correctly and optimized…not just try, it didn't work. Let's see what Jeff is doing because it is working for him."  Ex. 556 at 101:15-103:4.

   e.  Alon went on to state, "So what is it for? To reduce chargebacks or to... stay compliant? Stay compliant and to tell the woman on the phone... it's another piece that we can actually use to fight chargebacks. It's going to help Sabina, it's going to help us be compliant, it's going to shut the fucking customer up, but it might hurt your numbers." Ex. 55, at 101:15-103:7.

   f.  Moreover, Alon Nottea frequently received updates and reports concerning chargebacks, chargeback monitoring, and other chargeback-related issues with payment processing entities.  *See*, *e.g.*, Exs. 29, 58, 385, 60, 62, 102, 122, 131, 132, 146, 151, 285, 319, 320, 324, 337, 351.

| | |
|---|---|
| 34. Defendant Doron Nottea is or has been a manager at BunZai and Pinnacle. Defendant Doron Nottea resides in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States. Dkt. 244 ¶ 34. | 34. Disputed. Doron Nottea was not a manager at Bunzai or Pinnacle. Alon Dec., ¶8, 4:14-17; ¶11, 5:1-6:3. |

**34. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Doron Nottea resides in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

Plaintiff disputes the contention that Doron Nottea did not manage BunZai and Pinnacle employees.

a. Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut Plaintiff's evidence showing Doron Nottea's management of these companies.

b. Defendants did not rebut evidence showing Leor Arazy, Pinnacle and BunZai's human resources manager, included Doron Nottea on an email sending out a salary report by department for Pinnacle. Ex. 38.

c. Defendants did not rebut evidence showing Leor Arazy sending Doron Nottea Pinnacle's loan policy and requesting that Doron let her know if he wanted any changes. Ex. 84.

d. Defendants did not rebut evidence showing Doron Nottea receiving payroll information for some of the Corporate Defendants. Exs. 345; 346; 353.

e. Defendants did not rebut evidence of Defendant Paul Medina testifying that he reported to Doron's employees or assistants for anything financially related for the various Corporate Defendants. Ex. 946 at 28:6-28:13; Ex. 946 at 27:8-27:21.

f. Defendants did not rebut evidence showing Paul Medina emailing Doron Nottea a list of current merchant accounts selling AuraVie. *See* Ex. 384

g. Defendants did not rebut evidence of Defendant Medina testifying that he provided Defendant Doron Nottea with commission calculations to payment the straw "owners" of the various Corporate Defendants, who were paid. Exs. 946 at 44:10-20; *see* Ex. 166.

| | |
|---|---|
| 34.d. Doron Nottea owned Corporate Defendants that participated in the common enterprise.<br>i. Andrew Stanley, a former employee | 34.d. Disputed. Other than a company called Secured Commerce LLC, Doron Nottea was not an owner of any entity defendant in this lawsuit. |

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

8

| | |
|---|---|
| of both BunZai and Pinnacle, testified that Doron Nottea held himself out as the owner of both BunZai and Pinnacle. Ex. 554, at 65:20-66:7; 86:17-87-7; see also Exs. 35; 43; 544. | Alon Dec., ¶8, 4:14-17; ¶11, 5:1-6:3. |

**34d. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea admitted that Doron was an owner of Secured Commerce, LLC.  Defendants Roi Reuveni and Alon Nottea did not dispute that a former employee of both BunZai and Pinnacle, testified that Doron Nottea held himself out as the owner of both BunZai and Pinnacle.

Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut Plaintiff's evidence showing Doron Nottea's ownership of common enterprise companies. Doron Nottea also held himself out as a member of Secured Merchants LLC. Ex. 176-2. Doron Nottea had officer positions at least two other Corporate Defendants. Doron Nottea held himself out in bank documents as secretary of Chargeback Armor, Inc. UF #43(c)(x). And BunZai Media Group's business plan identified Doron Nottea as CFO/Controller" of BunZai. Ex. 26, at 23. Because Defendants did not observe corporate formalities, the true ownership of many of the Corporate Defendants is often not formally memorialized. However, Doron's ownership of other Corporate Defendants is clear from his authority and control over these entities.

| | |
|---|---|
| 34.e. Doron Nottea managed employees of the common enterprise. | 34.e. Disputed. Doron Nottea did not manage employees of Bunzai or Pinnacle. Alon Dec., ¶8, 4:14-17; ¶11, 5:1-6:3. |

**34e. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did dispute that Doron Nottea managed employees of BunZai or Pinnacle.

Plaintiff disputes the contention that Doron Nottea did not manage BunZai and Pinnacle employees.  Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut Plaintiff's evidence showing Doron Nottea's management of these companies.  Defendants did not rebut evidence showing Leor Arazy, Pinnacle and BunZai's human resources manager, included Doron Nottea on an email sending out a salary report by department for Pinnacle. Ex. 38. Defendants did not rebut evidence showing Leor Arazy sending Doron Nottea Pinnacle's loan policy and requesting that he let her know if he wants any changes. Ex. 84. Defendants did not rebut evidence showing Doron Nottea receiving payroll information for some of the Corporate

Defendants. Exs. 345; 346; 353. Defendants did not rebut evidence of Defendant Paul Medina testifiying that he reported to Doron's employees or assistants for anything financially related for the various Corporate Defendants. Ex. 946 at 28:6-28:13; Ex. 946 at 27:8-27:21. Defendants did not rebut evidence showing Paul Medina emailing Doron Nottea a list of current merchant accounts selling AuraVie. *See* Ex. 384 Defendants did not rebut evidence of Defendant Medina testifying that he provided Defendant Doron Nottea with commission calculations to pay the straw "owners" of the various Corporate Defendants. Exs. 946 at 44:10-20; *see* Ex. 166.

| | |
|---|---|
| 36.a. Doron Nottea and Motti Nottea stated that Igor Latsanovski was an owner of BunZai, and CEO of Zen Mobile Media Group, Inc. Dkts. 244 ¶ 36; 245 ¶ 36. | 36.a. Disputed. Igor Latsanovski was not an owner of BunZai. Alon Dec., ¶5, 3:11-14; ¶8, 4:14-17. |

**36a. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Doron and Motti Nottea stated that Igor Latsanovski was an owner of BunZai, and CEO of Zen Mobile Media Group, Inc.

Plaintiff disputes the contention that Igor Latsanovski was not an owner of Bunzai Media Group.   Other than Alon Nottea's self-serving conclusory declaration, Defendants failed to provide any evidence to rebut the evidence provided by Plaintiff.  Defendants' failed to provide any evidence to rebut evidence which shows that Igor Latsanovski held a 55% ownership in BunZai Media Group. Exhibit 18.   Defendants' also failed to provide any evidence to rebut evidence that lists Igor as being a shareholder of BunZai Media Group. Exhibit 302.

| | |
|---|---|
| 37.b. Chargeback Armor, Inc. stated that Roi Reuveni was the COO of Chargeback Armor, Inc. Ex. 917-66 ¶ 237. | 37.b. Disputed. Roi Reuveni assumed the title of COO for less than three months in 2015 but did not have any management authority in Chargeback Armor, Inc. Reuveni Dec., ¶10, 4:16-17 |

**37b. Moving Party's Response:**

LR 56-1 does not contain the limitation Defendants contend.

Defendants Roi Reuveni and Alon Nottea admitted that Roi Reuveni assumed the title of COO for less than three months in 2015.

Plaintiff disputes the contention that Roi Reuveni did not have any management authority in Chargeback Armor, Inc.  Other than Roi's self-serving conclusory declaration, Defendants failed to provide any evidence to show that

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

Roi Reuveni did not have management authority in Chargeback Armor, Inc.  As shown in an email from Roi Reuveni to Chargeback Armor, Inc.'s CEO, Roi described his role as COO to include ensuring staff members received timely and appropriate training and development, establishing and monitoring staff performance and development goals, setting objectives, establishing priorities, conducting annual performance appraisals, administering salary adjustments, and maintaining continuous lines of communication with the CEO.  Dkt. 231-1 at 26-27.

| | |
|---|---|
| 37.g. Reuveni supervised BunZai and Pinnacle chargeback department employees.<br>See e.g. Exs. 129; 131; 132. | 37.g. Disputed. Bunzai hired Reuveni as its information technology manager. Ex. 263, Doc #353-15/28; 263-1; Ex. 93, Doc.#353-13/35; 93-1;<br>Reuveni did not supervise a BunZai chargeback department. Reuveni Dec., ¶2, 1:27-2:9; Ex. 554, Stanley Deposition, Doc#353-19/229; 554-17:4-8; Ex. 553, Doc#353-19/200; 553-18:12-18; Ex. 946, Doc#353-32/37; 946-23:6-14 |

**37g. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Roi Reuveni supervised Pinnacle chargeback department employees.

Plaintiff disputes the contention that Roi Reuveni did not supervise BunZai's chargeback department employees.

a. Other than Roi's self-serving, conclusory declaration and deposition excerpts that do not support Defendants' proposition, Defendants failed to provide any evidence to show that Roi Reuveni did not supervise BunZai's chargeback employees.

b. Paul Medina testified that " there was a Chargeback Department that Kristopher ran downstairs with a guy by the name Andrew.  The period when he handed that off to Roi, I can't recall." Ex. 946 at 48:6-14. However, Kristopher Bond left the company before Defendants started Pinnacle.  Dkt. 391-3, at 3¶ 7.

c. Defendants did not rebut evidence that shows:

   i. BunZai chargeback employee, Andrew Stanley, reported to Roi Reuveni his work hours and informed Roi that he would send him daily and weekly reports.  Ex. 129;

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| | |
|---|---|
| | ii.   Andrew Stanley sending Roi Reuveni a "Retrieval Request Report" that included chargeback information.  Ex. 131; and<br><br>iii.   A BunZai "Charge-back Dept." employee, Cristina Moreno, sending Alon Nottea and Roi Reuveni the "CB Smartsheet Process."  Ex. 132. |

| | |
|---|---|
| 37.g.ii. Reuveni assisted in reviewing or drafting AuraVie's template collection letter.<br>Exs. 312. | 37.g.ii. Reuveni did not draft AuraVie's template collection letter. Reuveni Dec., ¶5, 3:10-11. |

**37g(ii). Moving Party's Response:**

     Defendants Roi Reuveni and Alon Nottea did not dispute that Roi Reuveni assisted in reviewing AuraVie's template collection letter.

| | |
|---|---|
| 37.g.vi. Reuveni reviewed the companies' deceptive free trial websites.<br>Exs. 202 (Reuveni's email address in upper left hand corner of screenshot); 203 (Reuveni's email address in upper left hand corner of screenshot); 594. | 37.g.vi. Disputed. Reuveni was not involved in the marketing of AuraVie products. Reuveni Dec., ¶¶2, 3, 1:27-2:21; ¶5, 3:6-9; ¶¶8, 9, 3:25-4:10; ¶13, 5:1-7; Alon Dec., ¶7, 4:9-12; ¶15, 6:25-28. |

**37g(vi). Moving Party's Response:**

     Defendants Roi Reuveni and Alon Nottea did not dispute that Roi Reuveni reviewed the companies' deceptive free trial websites.

     Defendants Roi Reuveni and Alon Nottea did dispute that Roi Reuveni was involved in the marketing of AuraVie products. Plaintiff disputes this contention. Other than Roi and Alon's self-serving conclusory declarations, Defendants failed to rebut the evidence provided by Plaintiff.  Defendants failed to rebut evidence showing Roi Reuveni's email in screenshots of tryauravieskincare.com and tryauravie.com.  Exs. 202 and 203.  Additionally, as part of the common enterprise, Roi Reuveni was involved in the marketing of AuraVie products.

| | |
|---|---|
| 37.g.viii. Reuveni assisted in managing LimeLight, the customer management software used by the common enterprise.<br>Ex. 248. | 37.g.viii. Disputed. Reuveni did not manage the LimeLight software. Reuveni Dec., ¶7, 3:23-24. |

**37g(viii). Moving Party's Response:**

     Defendants Roi Reuveni and Alon Nottea did not dispute    that Limelight

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

was the customer management software used by the common enterprise.

      Plaintiff disputes the contention that Roi Reuveni did not assist in managing LimeLight software.  Other than Roi's self-serving conclusory declaration, Defendants failed to provide evidence provided by Plaintiff.  As shown by the evidence, Roi was tasked with pulling reports from Limelight.  Ex. 86-3 ¶ 20.

| | |
|---|---|
| 42.g. Counsel for BunZai designed the common enterprise structure. See Exs. 119; 278; see also Ex. 123 (waiver of privilege). | 42.g. Disputed. Attorney-client privileged confidential memorandums re Intellectual Property ("IP") licensing based upon consultations between counsel and his client, Alon Nottea. Privileged documents copied by Plaintiff from seized computer hard drives. See, Alon Dec., ¶6, 3:20-25. |

**42g. Moving Party's Response:**
Defendants' evidentiary objections are addressed in Plaintiff FTC's Response to Defendant Roi Reuveni, Alon Nottea, and Doron Nottea's Request for Evidentiary Rulings on Plaintiff's Evidence in Support of Summary Judgment, filed simultaneous with this document.

| | |
|---|---|
| 43. Defendants Alon Nottea, Motti Nottea, Doron Nottea, Oz Mizrahi, Igor Latsanovski, Roi Reuveni, Khristopher Bond, also known as Ray Ibbot, Alan Argaman, and Paul Medina collectively, "Individual Defendants") formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise. | 43. Disputed. Excepting Pinnacle Logistics, Inc., Roi Reuveni did not own, manage, have the authority to control, or participate in the acts or practices of the defendants. Roi Reuveni was not involved in the marketing of AuraVie products and had no management authority concerning the marketing of the AuraVie products. Roi Reuveni was not involved with or have management authority over the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of AuraVie products. Reuveni Dec., ¶13, 5:1-5; Alon Dec. ¶7, 4:9-12; ¶8, 4:14-17. |

**43. Moving Party's Response:**

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

13

Plaintiff disputes Defendants contention that Roi Reuveni did not own, manage, have the authority to control, or participate in the acts or practices of the defendants:

    a. Defendants Roi Reuveni and Alon Nottea admitted that Roi Reuveni owned, managed, had authority to control, or participate in the acts or practices of the defendants with regard to Pinnacle.

    b. Defendants Roi Reuveni and Alon Nottea did not dispute   that Defendants Alon Nottea, Motti Nottea, Doron Nottea, Oz Mizrahi, Igor Latsanovski, Khristopher Bond, also known as Ray Ibbot, Alan Argaman, and Paul Medina (collectively, "Individual Defendants") formulated, directed, controlled, had the authority to control, or participated in the acts and practices of other Corporate Defendants that constitute the common enterprise.

Plaintiff disputes the contention that Roi Reuveni was not involved with or did not have management authority over the processing or charging of customer credit cards, debit cards or bank accounts in connection with the sale of AuraVie products.

    a. Other than Roi and Alon's self-serving conclusory declaration, Defendants fail to provide any evidence to rebut the evidence provided by Plaintiff.

    b. Roi managed the chargeback department at BunZai as evidenced by chargeback employee, Andrew Stanley, reporting to Roi Reuveni his work hours and informed Roi that he would send daily and weekly reports.  Ex. 129.

    c. Andrew Stanley also sent Roi Reuveni a "Retrieval Request Report" email that included chargeback information.  Ex. 131.

    d. BunZai "Charge-back Dept." employee, Cristina Moreno, sent Alon Nottea and Roi Reuveni an email with the "CB Smartsheet Process." Ex. 132.

    e. Paul Medina deposition testimony states that "I remember there was a Chargeback Department that Kristopher ran downstairs with a guy by the name Andrew.  The period when he handed that off to Roi, I can't recall." Ex. 946, at 48:6-14.  However, Kristopher Bond left the enterprise before Defendants started Pinnacle.  Dkt. 391-3, at 3¶ 7.

Plaintiff contests Defendants' dispute that Reuveni was not involved in the marketing of AuraVie products and had no management authority concerning the marketing of the AuraVie products:

a. Evidence shows that Roi was involved in the marking of the AuraVie product as demonstrated by Roi Reuveni's email in screenshots of tryauravieskincare.com and tryauravie.com. Exs. 202 and 203.

b. Additionally, as part of the common enterprise, Roi Reuveni would have been involved in the marketing of AuraVie products.

| | |
|---|---|
| 43.a. Media Urge, Inc. and Focus Media Solutions, Inc. were controlled by the Individual Defendants. See Ex. 941 at 8:18-9:10; Ex. 941 at 9:19-9:25; Id. at 10:3-10:5; *see also* Dkt. #120 at 6 n.3, 17. | 43.a. Disputed. Roi Reuveni did not control Media Urge, Inc. or Focus Media Solutions, Inc. Reuveni Dec., ¶13, 5:1-5. |

**43a. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Media Urge, Inc. and Focus Media Solutions, Inc., were controlled by Alon Nottea and the other Individual Defendants except for Roi Reuveni.

Defendants Roi Reuveni and Alon Nottea did dispute that Roi Reuveni controlled Media Urge, Inc. or Focus Media Solutions, Inc.

| | |
|---|---|
| 45. Defendants advertised, marketed, distributed, and sold skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, since at least 2010. Exs. 909; 597-13,-16,-19, -22; see also Dkt. 120 at 1. Defendants offered free trials of their products under a variety of brand names including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively, "AuraVie"). Exs. 909-23, -24, -25, -144, -155; 335 (Dellure); 232-33 (Miracle Face Kit). | 45. Disputed. Roi Reuveni did not advertise, market, distribute, or sell "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, since at least 2010. Reuveni Dec., ¶¶2, 3, 1:27-2:21; ¶5, 3:6-9; ¶¶8, 9, 3:25-4:10; ¶13, 5:1-7. |

**45. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Alon Nottea and the other Defendants (except for Roi Reuveni) advertised, marketed, distributed, and sold skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

15

mymiraclekit.com, since at least 2010.  Defendants Roi Reuveni and Alon Nottea also did not dispute that Defendants offered free trials of their products under a variety of brand names including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively, "AuraVie").

Defendants Roi Reuveni and Alon Nottea did dispute that Roi Reuveni advertised, marketed, distributed, or sold "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, since at least 2010.

Plaintiff disputes Defendants' contention that Roi Reuveni did not advertise, market, or sell "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products online from multiple Internet websites, including auravie.com, auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, since at least 2010. Other than Roi's self-serving conclusory declaration, Defendants fail to provide any evidence to substantiate their contention.  Evidence also shows that Roi Reuveni was involved in the marking of the AuraVie and LéOR products.  Exs. 202, 203, and 594.  Additionally, as part of the common enterprise, Roi Reuveni would have been involved in the marketing of "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" products.

| | |
|---|---|
| 46. Defendants' website failed to disclose adequately and materially misrepresented the terms of their trial offers. Ex. 909-113, -115, -116, -126, -128, -140. | 46. Disputed. "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites disclosed and did not misrepresent trial offers and also offered products on a straight sale. Alon Dec. ¶14, 6:22-24; ¶18, 7:12-14; ¶19, 7:16-17; Ex. 909, Doc#353-29/1-22; Ex. 909, Doc#353-29/27-30 BBB advised that for internet usage, hyperlinking to a disclosure/explanation page might be acceptable, depending upon context. Ex. 597, Doc#353:20/38 |

**46. Moving Party's Response:**

Plaintiff contests Defendants' disputed that the "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites disclosed and did not misrepresent trial offers.

   a. Defendants failed to rebut evidence that Defendants advertised on third-party websites such as Facebook.com, Amazon.com, HomeDepot.com, and

offered a "risk-free" trial or "trial order" of Defendants' skincare products. Exs. 2 ¶ 2; 13 ¶ 2; 14 ¶ 2.

b. Defendants failed to rebut evidence that after consumers clicked on these advertisements, they were directed to Defendants' websites and lured into providing their credit or debit card information by representations that if consumers paid a nominal shipping and handling charge, typically $4.99 or less, they would receive a "risk-free" trial, "trial order," or "gift" of products. Exs. 2 ¶ 2; 4 ¶ 2; 13 ¶ 2; 14 ¶ 2; 15 ¶ 2; 909-113,-125; 909-113, -115, -128; *see also* 903-8.

c. Defendants' websites did not contain a disclosure concerning the initial charges for the product, continuity program, or return policies until the "final step" of their ordering page. Ex. 909-125.

d. Consumers have testified that they never saw such a disclosure, even when they specifically looked for one. Exs. 4 ¶ 8; 8 ¶ 3.

e. These websites were facially deceptive. *FTC v. Publrs. Bus. Servs.*, 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010) (citing *Cyberspace.Com*, 453 F.3d at 1200) ("To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates.").

f. Defendant Alon Nottea admitted that he learned that "some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie product if they did not cancel during the trial period." Dkt. 391-3, at 7 ¶ 17.

g. Nottea was advised by the Defendants' attorney that their disclosures were inadequate. *See* UF #61(a).

h. Even if the disclosure were prominently displayed, it failed to mention many material terms and conditions of Defendants' offer. Defendants' disclosure stated:

  i. We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.  Ex. 909-125

i. Defendants' disclosure paragraph, as set forth above, failed to disclose:

i.    That the 10-day trial period by which consumers must cancel began on the day that the product was ordered;

ii.   That, to avoid charges, the consumer must also return the product to Defendants by a certain time;

iii.  That consumers could not return the product for a refund after 10 days if it has been opened;

iv.   That consumers could not return the product for a refund after 30 days, even if it was not opened; and

v.    That a restocking fee, usually $15, may be charged when a product was returned. *Id.*

j.  Most of the material terms and conditions of Defendants' offer were found in a separate, multi-page terms and conditions webpage that was accessible by hyperlink. Ex. 909-116,-117,-118,-119,-120,-130,-131,-132,-133,-134,-145,-146,-147,-148,-149,-164,-165, -166,-167,-172. On many of Defendants' websites, this hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" Ex. 909-115,-128,-144,-163, *See also* 909-144, -163, -172.

| | |
|---|---|
| 50. When a user attempted to leave Defendants' websites, a text box appeared that offered to ship the trial offer at a lower shipping price. These pop-up advertisements contained false representations that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating. Ex. 909-116. In fact, AuraVie was not accredited by the BBB and it had an F rating. Ex. 907 ¶ 5. | 50. Disputed. AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating. Alon Dec. ¶13, 6:20-21. |

**50. Moving Party's Response:**

Defendants did not dispute:

a.  That when a user attempted to leave Defendants' websites, a text box appeared that offered to ship the trial offer at a lower shipping price. They also did not dispute that these pop-up advertisements contained representations that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating.

b.  That the pop-up advertisements contained false representations about AuraVie was accredited by the Better Business Bureau ("BBB") with an

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

"A-" rating.

Plaintiff contests Defendants' dispute that AuraVie was accredited by the BBB with an "A-" rating:

    a. Other than Alon's self-servicing, conclusory declaration, Defendants failed to provide any evidence to rebut Plaintiff's evidence.

    b. Defendants' failed to rebut evidence showing that the Better Business Bureau of Santa Clara Valley, Ltd., stated that since March 2014, AuraVie Skincare was unaccredited and had an F rating. Ex. 907-1 ¶ 5.

    c. Defendants also failed to rebut evidence of a March 2014 screen shot of a pop up advertisement on the auraviefreetrial.com website where Defendants advertised that they had an "A-" rating with the BBB. Ex. 909-116.

| | |
|---|---|
| 51. Defendants' marketing practices employed tactics including hidden costs, signing up consumers for negative option continuity plans without their consent, and undisclosed and onerous return policies. See, e.g., Exs. 2 ¶¶ 3-6; 5 ¶¶ 2-5; 6 ¶¶ 3-6; 7 ¶¶ 2-6; 8 ¶¶ 3-5; 9 ¶¶ 2-5; 11 ¶ 5; 13 ¶ 7; 14 ¶¶ 4-6; 909-117, - 118, -130, -131, -145, -146. In their advertisements and sales offers, Defendants failed to disclose adequately that they would charge consumers' credit or debit accounts for the trial product, typically as much as $97.88, after a 10-day period. Id. | 51. Disputed. "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites disclosed all costs, charges, return policies, and obtained customer consent to the continuity offer. Alon Dec. ¶14, 6:22-24; ¶18, 7:12-14; ¶19, 7:16-17; Ex. 909, Doc#353-29/27-30; Doc#353-2/84; Doc.#235/30 ["by clicking "get my order" I agree that I am over 18 years of age and to the terms and conditions"]; Doc.#7-4/16 [order page checkbox in FTC moving papers]. Roi Reuveni did not advertise, market, distribute, or sell "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products. Reuveni Dec., ¶¶2, 3, 1:27-2:21; ¶5, 3:6-9; ¶¶8, 9, 3:25-4:10; ¶13, 5:1-7. |

**51. Moving Party's Response:**

    Defendants Roi Reuveni and Alon Nottea disputed that "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites failed to disclose all costs, charges, return policies, and obtained customer consent to the continuity offer. Defendants cannot rebut the evidence from their own website that the terms concerning negative option continuity plans and return policies were not clearly and conspicuously disclosed. They also disputed that Roi Reuveni advertised,

marketed, distributed, or sold "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products but did not dispute that Alon Nottea did so.

Plaintiff disputes the contention that Defendants' "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites disclosed all costs, charges, return policies, and obtained customer consent to the continuity offer. Defendants failed to rebut evidence that Defendants advertised on third-party websites such as Facebook.com, Amazon.com, HomeDepot.com, and offered a "risk-free" trial or "trial order" of Defendants' skincare products. Exs. 2 ¶ 2; 13 ¶ 2; 14 ¶ 2. Defendants failed to rebut evidence that after consumers clicked on these advertisements, they were directed to Defendants' websites and lured into providing their credit or debit card information by representations that if consumers paid a nominal shipping and handling charge, typically $4.99 or less, they would receive a "risk-free" trial, "trial order," or "gift" of products. Exs. 2 ¶ 2; 4 ¶ 2; 13 ¶ 2; 14 ¶ 2; 15 ¶ 2; 909-113,-125; 909-113, -115, -128; *see also* 903-8. As evidenced by the copy of Defendants' website, Defendants' websites did not contain a disclosure concerning the initial charges for the product, continuity program, or return policies until the "final step" of their ordering page. Ex. 909-125. Defendants cannot rebut the evidence, from their own websites, that they did not clearly and conspicuously disclose their terms and conditions. Consumers have testified that they never saw such a disclosure, even when they specifically looked for one. Exs. 4 ¶ 8; 8 ¶ 3. Defendant Alon Nottea admitted that he learned that "some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie product if they did not cancel during the trial period." *See* Response to Dispute 32t; Dkt. 391-3, at 7 ¶ 17.

Nottea was advised by the Defendants' attorney that their disclosures were inadequate. *See* UF #32(t). But even if the disclosure were prominently displayed, it failed to mention many material terms and conditions of Defendants' offer. Defendants' disclosure stated:

We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household. Ex. 909-125

Defendants' disclosure paragraph, as set forth above, failed to disclose: (a) that the 10-day trial period by which consumers must cancel began on the day that the product was ordered; (b) that, to avoid charges, the consumer must also return the product to Defendants by a certain time; (c) that consumers could not return the product for a refund after 10 days if it has been opened; (d) that consumers could not return the product for a refund after 30 days, even if it was not opened; and (e) that a restocking fee, usually $15, may be charged when a product was returned. *Id*. Most of the material terms and conditions of Defendants' offer was found in a separate, multi-page terms and conditions webpage that was accessible by hyperlink. Ex. 909-116,-117,-118,-119,-120,-130,-131,-132,-133,-134,-145,-146,-147,-148,-149,-164,-165, -166,-167,-172. On many of Defendants' websites, this hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" Ex. 909-115,-128,-144,-163, *See also* 909-144, -163, -172.

| | |
|---|---|
| 52. Defendants also failed to disclose adequately that consumers who accepted the trial offer would be enrolled into a continuity program. Exs. 2 ¶ 6; 3 ¶ 14; 5 ¶ 4; 7 ¶ 6; see also 4 ¶ 6; 9 ¶ 5; 13 ¶ 7; 909-113, -115, -116, -126, -140, - 155.<br><br>Under the continuity program, Defendants sent consumers additional shipments of Defendants' skincare product each month and charged consumers' credit or debit cards the full cost of each product shipped until consumers affirmatively canceled their membership in the continuity program. Exs. 2 ¶ 6; 14; 5 ¶ 4; 7 ¶ 6; 909-117,-118, -130, -131, -145, -146; see also 3 ¶¶ 8; 4 ¶ 6; 9 ¶ 5; 13 ¶ 7. | 52. Disputed. "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites disclosed the continuity program terms and conditions. Alon Dec. ¶18, 7:12-14; Ex. 909, Doc#353-29/27-30.<br><br>Roi Reuveni did not advertise, market, distribute, or sell "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" skincare products. Reuveni Dec., ¶¶2, 3, 1:27-2:21; ¶5, 3:6-9; ¶¶8, 9, 3:25-4:10; ¶13, 5:1-7; Alon Dec. ¶15, 6:25-28. |

**52. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute   that under the continuity program, Defendants sent consumers additional shipments of Defendants' skincare product each month and charged consumers' credit or debit cards the full cost of each product shipped until consumers affirmatively canceled their membership in the continuity program.

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

Defendants Roi Reuveni and Alon Nottea claimed that Defendants disclosed that consumers who accepted the trial offer would be enrolled into a continuity program, but they did not claim that such disclosures were clear or conspicuous.

Plaintiff disputes Defendants' contention that they adequately disclosed that consumers who accepted the trial offer would be enrolled into a continuity program.  Other than Alon Nottea's self-serving conclusory declaration, Defendant failed to offer any evidence to support their contention.  Defendants cite to evidence showing their terms and conditions.  Ex. 909- 117, -118,-119,-120.  However, Defendants fail to mention that most of the material terms and conditions of Defendants' offer are found on a separate, multi-page terms and conditions webpage that was accessible only by hyperlink. Ex. 909-117,-118,-119,-120,-130,-131,-132,-133,-134,-145,-146,147,-148,-149,-164,-165, -166,-167,-172. On many of Defendants' websites, this hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" Ex. 909-115,-128.  Such disclosures, as a matter of law, have been held to violate Section 5 of the FTC Act because they are not clear and conspicuous.

| 55. Consumers have testified that, because they did not receive their "riskfree" trial until after 10 days have elapsed (or nearly elapsed), they could not return the product in time to avoid the $97.88 fee. Ex. 14 ¶ 4, 6; see also 10 ¶¶ 3-4. Consumers also testified that Defendants failed to disclose adequately that they often assessed a "restocking" fee of up to $15 for returning products. Ex. 4 ¶ 7; see also Exs. 2 ¶ 6; 901-49: 8; 909-118, -131, -146. Accordingly, consumers who accepted Defendants' trial offers were likely to incur unexpected charges. | 55. Disputed. Customer has 30 days to return the product. Doc#353-29/27-30 |
|---|---|

**55. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that consumers testified that, because they did not receive their "risk free" trial until after 10 days have elapsed (or nearly elapsed), they could not return the product in time to avoid the $97.88 fee.  They also did not dispute that consumers testified that Defendants

failed to disclose adequately that they often assessed a "restocking" fee of up to $15 for returning products.

Defendants terms and conditions which are buried in hyperlinks on Defendants' websites, state "[a]fter the 10 day trial expires, and if you have not cancelled your order within the 10-day trial period and return all product shipments, you agree that your card will be charged $97.88 for our advanced AuraVie SkinCare as part of this exclusive member auto-ship program." Ex. 909-117.  Defendants' terms and conditions also state "If You wish to cancel future deliveries of the Product and You are within the Risk Free Trial Period, then call AuraVie SkinCare Customer Care toll-free at 866-216-9336 within your 10-day trial period to cancel. We will issue you an RMA number and you then simply return the unused portion of the product within 30 days from the order date, and you will NEVER be billed, that is, unless you do not return the product within the time allotted." Ex. 909-117.  It further read that "For all unused trial orders that are past their 10 day trial period and have been billed under the terms herein, you may return the unopened package within 30 days from the order date and you will be refunded for that order. Used trial orders are not eligible for return once the trial period has expired." 909-118. Therefore, the only way a consumer could get a refund after the trial period would be if they had not opened the "risk free" trial and returned it within 30 days of the date they ordered. Ex. 240. While Defendants' claim their policy was to give refunds, this is not supported by the evidence. Defendants' own training materials make clear that refunds were a "last resort." Ex. 103. Defendants' advised their employees to "refund as little as you have to. ONLY refund in full if you ABSOLUTELY have to, resolving a dispute."

| | |
|---|---|
| 56. Defendants' websites did not contain a disclosure concerning the initial charges for the product, continuity program, or return policies until the "final step" of their ordering page. Ex. 909-125. Consumers have testified that they never saw such a disclosure, even when they specifically looked for one. Exs. 4 ¶ 8; 8 ¶ 3. | 56. Disputed. Prices, charges and terms were disclosed before the "final step" for straight sales. Ex. 909, Doc#353-29/1-22. In some instances, shipping and handling charges were disclosed before the order page ("final step"). Alon Dec. ¶14, 6:22-24; See, Doc.#235/30 [shipping & handling charge in red]. |

**56. Moving Party's Response:**

Defendants appear not to dispute that for their risk-free trial websites they did not provide the disclosure until the final order page.  Defendants only cite to Exhibit 909-91 through 909-112 (auravie.com website) for the proposition that they did disclose charges and terms before the final step for "straight sales."

Defendants failed to provide any evidence that shows their risk-free trial websites disclosed the initial charges for the product, continuity program, or return policies until the "final step" of their ordering page.  In addition, the purported disclosure failed to disclose: (a) that the 10-day trial period by which consumers must cancel began on the day that the product was ordered; (b) that, to avoid charges, the consumer must also return the product to Defendants by a certain time; (c) that consumers could not return the product for a refund after 10 days if it has been opened; (d) that consumers could not return the product for a refund after 30 days, even if it was not opened; and (e) that a restocking fee, usually $15, may be charged when a product was returned. Ex. 909-125.

| 56.b. For some websites, no disclosure was provided even in the final step. Ex. 902-1. | 56.b. Disputed. Order page contained terms and conditions. Doc#353-2/84. |
| --- | --- |

**56b. Moving Party's Response:**

    Defendants Roi Reuveni and Alon Nottea disputed that for some websites, no disclosure was provided even in the final step.

    Defendants failed to provide any evidence to rebut Plaintiff's evidence that in some cases no disclosure was provided in the final step.  Ex. 902-1.

| 58. Defendants' disclosure paragraph, failed to disclose: (a) that the 10-day trial period by which consumers must cancel began on the day that the product was ordered; (b) that, to avoid charges, the consumer must also return the product to Defendants by a certain time; (c) that consumers could not return the product for a refund after 10 days if it has been opened; (d) that consumers could not return the product for a refund after 30 days, even if it was not opened; and (e) that a restocking fee, usually $15, may be charged when a product was returned. Ex. 909-125. | 58. Disputed. Consumers were not billed a re-stocking fee in any amount if cancelled during the trial period. Consumer could return the opened (or unopened) product within 30 days if cancelled during the trial period. Doc#353-29/27-30 |
| --- | --- |

**58. Moving Party's Response:**

    Defendants Roi Reuveni and Alon Nottea did not dispute   that Defendants' disclosure paragraph failed to disclose: (a) that the 10-day trial period by which consumers must cancel began on the day that the product was ordered; (b) that, to avoid charges, the consumer must also return the product to Defendants by a

certain time; (c) that consumers could not return the product for a refund after 10 days if it has been opened; (d) that consumers could not return the product for a refund after 30 days, even if it was not opened; and (e) that a restocking fee, usually $15, may be charged when a product was returned.

Defendants Roi Reuveni and Alon Nottea disputed that consumers were not billed a re-stocking fee in any amount if they cancelled during the trial period and that consumers could return the opened (or unopened) product within 30 days if cancelled during the trial period.

Defendants' terms and conditions, contained in a small hyperlink buried on Defendants' websites, state that "For all unused trial orders that are past their 10 day trial period and have been billed under the terms herein, you may return the unopened package within 30 days from the order date and you will be refunded for that order." Ex. 909-118. Therefore, consumers could not return the product for a refund after 10 days if it had been opened—information not included in the disclosures provided to consumers at the "Final Steps" of their "order."

| | |
|---|---|
| 60. Defendants sent consumers who signed up for a trial offer a confirmation email that reinforced the impression that they would receive a free shipment of Defendants' skincare product. Exs. 8 ¶ 4; 8-5,-6; 14 ¶ 3; 15 ¶ 3; 15-5; *see also* 12 ¶¶ 2, 7; 14 ¶¶ 3, 8; 902-2. These emails showed no charges for the "risk-free" trial other than the nominal shipping and handling fees. Id. | 60. Disputed. The email confirmed that the order was being processed. Alon Dec. ¶20, 7:19-20. |

**60. Moving Party's Response:**

<u>Defendants Roi Reuveni and Alon Nottea did not dispute that Defendants sent consumers who signed up for a trial offer a confirmation email that reinforced the impression that they would receive a free shipment of Defendants' skincare product</u>. Exs. 8 ¶ 4; 8-5,-6; 14 ¶ 3; 15 ¶ 3; 15-5; *see also* 12 ¶¶ 2, 7; 14 ¶¶ 3, 8; 902-2.

    a. These emails showed no charges for the "risk-free" trial. Exs. 8 ¶ 4; 8-5,-6; 14 ¶ 3.

    b. During a recorded conversation, Alon Nottea noted this same type of practice with respect to invoices sent to customers. Ex. 556, at 95:7-95:22. In the conversation Alon Nottea stated, "One more note...We must try 500 orders with the terms and conditions on the invoice for

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| customers. It's completely illegal to not have that there, at least." *Id.* | |
|---|---|
| 62. Consumers testified that, after they learned that Defendants charged their credit card or debit card accounts and signed them up for a continuity plan, they often had significant difficulty receiving a refund and cancelling the continuity plan.<br>*See* Exs. 3 ¶¶ 5, 9; 4 ¶¶ 4-6; 6 ¶ 6; 8 ¶ 5; 11 ¶ 5; 14 ¶ 5-7. | 62. Disputed. An interactive automated voice response service was available to consumers 24 hours a day seven days a week by toll free telephone number for cancellation, consumers could email, or consumers could speak to a customer service representative. Alon Dec. ¶2, 2:3-11. Reuveni Dec. ¶7, 3:13-21. |

**62. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that onsumers testified that, after they learned that Defendants charged their credit card or debit card accounts and signed them up for a continuity plan, they often had significant difficulty receiving a refund and cancelling the continuity plan. *See* Exs. 3 ¶¶ 5, 9; 4 ¶¶ 4-6; 6 ¶ 6; 8 ¶ 5; 11 ¶ 5; 14 ¶ 5-7.

Defendants Roi Reuveni and Alon Nottea stated that an interactive automated voice response service was available to consumers 24 hours a day seven days a week by toll free telephone number for cancellation and claim number, consumers could email, or consumers could speak to a customer service representative. Plaintiff disputes the entirety of Defendants' contention.  Other Alon and Roi's self-serving conclusory declarations, Defendants failed to provide any evidence to substantiate their business practices claims.  As evidence provided by Plaintiff shows, consumers testified that, after they learned that Defendants charged their credit card or debit card accounts and signed them up for a continuity plan, they often had significant difficulty receiving a refund and cancelling the continuity plan.  *See* Exs. 3 ¶¶ 5, 9; 4 ¶¶ 4-6; 6 ¶ 6; 8 ¶ 5; 11 ¶ 5; 14 ¶ 5-7. While Defendants' claim their policy was to give refunds, this is not supported by the evidence. Defendants' own training materials make clear that refunds were a "last resort." Ex. 103. Defendants' advised their employees to "refund as little as you have to. ONLY refund in full if you ABSOLUTELY have to, resolving a dispute."

| 63. Many consumers reported difficulty contacting Defendants' customer service representatives, despite calling Defendants' toll-free number numerous times. Id. Even when consumers spoke with a representative, some consumers | 63. Disputed. An interactive automated voice response service was available to consumers 24 hours a day seven days a week by toll free telephone number for cancellation. It was not a practice to ship product after cancellation. It was |
|---|---|

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

26

| | |
|---|---|
| continued to receive shipments and unauthorized charges after cancelling the continuity plan. Ex. 8 ¶ 6. Still others reported receiving multiple charges from Defendants without receiving products. Ex. 10 ¶¶ 3-4. As a result, consumers continued to incur unwanted and unauthorized charges. Id. | not a practice to charge customers without shipping an ordered product. Alon Dec. ¶2, 2:3-11; ¶20, 7:18-20. |

**63. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute   that many consumers reported difficulty contacting Defendants' customer service representatives, despite calling Defendants' toll-free number numerous times. Id. Even when consumers spoke with a representative, some consumers continued to receive shipments and unauthorized charges after cancelling the continuity plan. Ex. 8 ¶ 6. Still others reported receiving multiple charges from Defendants without receiving products. Ex. 10 ¶¶ 3-4. As a result, consumers continued to incur unwanted and unauthorized charges. Id.

Defendants Roi Reuveni and Alon Nottea claimed that an interactive automated voice response service was available to consumers 24 hours a day seven days a week by toll free telephone number for cancellation. Defendants claim it was not a practice to ship product after cancellation. They claim it was not a practice to charge customers without shipping an ordered product.

Plaintiff disputes the entirety of Defendants' response.  Other than Alon's self-serving conclusory declaration, Defendants failed to provide any evidence to substantiate their business practices claims.  As the evidence provided by Plaintiff shows, many consumers reported difficulty contacting Defendants' customer service representatives, despite calling Defendants' toll-free number numerous times. *See* Exs. 3 ¶¶ 5, 9; 4 ¶¶ 4-6; 6 ¶ 6; 8 ¶ 5; 11 ¶ 5; 14 ¶ 5-7.  Others reported receiving multiple charges from Defendants without receiving products. Ex. 10 ¶¶ 3-4. While Defendants' claim their policy was to give refunds, this is not supported by the evidence. Defendants' own training materials make clear that refunds were a "last resort." Ex. 103. Defendants' advised their employees to "refund as little as you have to. ONLY refund in full if you ABSOLUTELY have to, resolving a dispute."

| | |
|---|---|
| 65. Defendants' continuity program resulted in many complaints and chargeback requests by consumers. See Exs 907; 554 at 26:2-7, 27:7-18, 28:2-5, | 65. Disputed. Chargebacks were approximately 2%. Ex 554, Stanley Deposition, Doc# 353-19/239; 554-27:23. |

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

| | |
|---|---|
| 28:17-23, 90:20-23.<br>A former employee testified that Defendants provided false documents to payment processing companies and exaggerated the measures they took to communicate the terms of their offer to consumers. Ex. 554 at 97:22-98:4, see Ex. 554 at 71:3-72:5, 72:8-72:22, 96:10-96:18, 96:23-97:4, 98:16-98:19; see 27:13-27:18. | False documents were not provided to payment processing companies. Alon Dec. ¶21, 7:21. |

**65. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that Defendants' continuity program resulted in many complaints and chargeback requests by consumers. *See* Exs 907; 554 at 26:2-7, 27:7-18, 28:2-5, 28:17-23, 90:20-23. They also did not dispute that a former employee testified that Defendants provided false documents to payment processing companies and exaggerated the measures they took to communicate the terms of their offer to consumers. Ex. 554, at 97:22-98:4, *see* Ex. 554, at 71:3-72:5, 72:8-72:22, 96:10-96:18, 96:23-97:4, 98:16-98:19; see 27:13-27:18.

Plaintiff contests Defendants' dispute that false documents were not provided to payment processing companies:

   a. Other than Alon's self-serving conclusory declaration, Defendants failed to provide any evidence to substantiate their claim.

   b. As the evidence shows a chargeback department employee of BunZai and Pinnacle, Andrew Stanley, testified that Defendants provided false documents to payment processing companies and exaggerated the measures they took to communicate the terms of their offer to consumers. Ex. 554 at 97:22-98:4, *see* Ex. 554 at 71:3-72:22, 96:10-96:18, 96:20-97:4, 98:16-98:19; *see also* Ex. 554 at 27:13-27:18.

Plaintiff contests Defendants' dispute that the Corporate Defendants' chargeback rate was "only" two percent:

   a. "Analysis of the entities' chargeback rates indicates the rates for RD's ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%." Dkt. #121-1, at 8.

| | |
|---|---|
| 65.b. Andrew Stanley also testified that | 65.b. Disputed. Sometimes particular |

| | |
|---|---|
| Defendants submitted falsified documents to oppose consumer chargeback requests. Ex. 554, at 71:3-72:22, 96:10-18, 96:20-97:4, 98:16-19; *see also* 97:22-98:4, 60:13-22. These falsified documents were altered or doctored to make it appear that Defendants' websites required consumers to click a box on the ordering screen indicating that they had read the terms and conditions of the sales offer in order to complete a purchase. Ex. 909-13 to -28. No such box existed on AuraVie's websites. See Ex. 554 at 71:12-72:5. Disclosures were made larger and more prominent in materials provided to dispute chargeback requests than appeared on the actual websites. See Exs. 600-21; 909-119,-147,-166; 15-16. | pages on the "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites, including the ordering screen, required the consumer to click a box that they had read the terms and conditions of the sales offer. See, for instance, Doc.#7-4/16 [order page checkbox in FTC moving papers] but, clicking the "get my order button" confirmed the consumer had read the terms and conditions. See, Doc.#235/30 [FTC FAC], "by clicking "get my order" I agree that I am over 18 years of age and to the terms and conditions". |

**65b. Moving Party's Response:**

Plaintiff contests Defendants' dispute that sometimes particular pages on the "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" websites, including the ordering screen, required the consumer to click a box that they had read the terms and conditions of the sales offer.

    a. Andrew Stanley stated that BunZai and Pinnacle would send falsified documents showing that a consumer had checked a box indicating that they had read the terms and conditions. Ex. 554 at 71:3-72:22, 96:10-18, 96:20-97:4, 98:16-19; *see also* 97:22-98:4, 60:13-22.

    b. Mr. Stanley testified that no such box existed. Ex. 554 at 71:12-72:5.

    c. Mr. Stanley's testimony is corroborated by a consumer declaration that included a screenshot of the website with a check box. Ex. 15-2 ¶ 6, 15-16. The consumer testified that she never saw this pop-up. Ex. 15-2 ¶ 6. Although the checked box appears on the "Final Step" of the screen shot provided by Defendants to contest the consumer's chargeback dispute, it does not appear on the screenshot referenced by Defendants in response to this uncontroverted fact. Compare Ex. 15-16 with Ex. 909-125 (cited in Plaintiff's Amended Complaint Dkt. 235 at 30).

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

d. In a recorded conversation, Alon Nottea noted "We're not getting a check box. When the consumer gets the product at home, the packing slip, it can be a little bit grayed out. It doesn't have to be huge. You can make the 'for Customer Service inquiries and questions, call 1-800' big, and below that, the terms." Ex. 556 at 96:11-97:6.

e. BunZai's attorney advised them that "[t]o satisfy the 'express informed consent' requirement, the Green Millionaire consent mandates a 'check box, signature, or other substantially similar method, that consumers must affirmatively select or sign to accept the negative option feature.' All key negative option disclosures (costs, trial period length, need to cancel to avoid charge), together with a statement that the consumer is agreeing to pay the costs, must be 'immediately adjacent' to the check box." Ex. 589-4.

f. The attorney went on to say "I know this is an issue for you." Ex. 589-4.

g. Defendants claim "[s]ometimes" particular pages on websites, including the ordering screen, required the consumer to click a box that they had read the terms and conditions of the sales offer. However, Defendants failed to provide any evidence to substantiate the claim that they "sometimes" required consumers to click a box that they had read the terms and conditions.

| | |
|---|---|
| 66. Consumers testified that Defendants often did not honor return policies, even when consumers satisfied them. See Ex. 11 ¶ 5; 901-26:19. For example, Defendants told consumers that they could obtain a refund on any product returned even when the product remained unopened and the 30-day period had not yet elapsed, contrary to Defendants' terms and conditions. Id. Some consumers reported being refused a refund by Defendants despite sending the product back within the permissible time period, with Defendants' customer service representative stating that Defendants could not confirm receipt of return shipment or that the shipment | 66. Disputed. These were the terms and conditions. Doc#353-29/27-30 |

| | |
|---|---|
| was not returned properly. Exs. 7 ¶ 6; 13 ¶ 7. | |

**66. Moving Party's Response:**

Defendants Roi Reuveni and Alon Nottea did not dispute that consumers testified that Defendants often did not honor return policies, even when consumers satisfied them. See Ex. 11 ¶ 5; 901-26:19. Defendants did not dispute that Defendants told consumers that they could obtain a refund on any product returned even when the product remained unopened and the 30-day period had not yet elapsed, contrary to Defendants' terms and conditions. Id. Defendants did not dispute that some consumers reported being refused a refund by Defendants despite sending the product back within the permissible time period, with Defendants' customer service representative stating that Defendants could not confirm receipt of return shipment or that the shipment was not returned properly. Exs. 7 ¶ 6; 13 ¶ 7. While Defendants' claim their policy was to give refunds, this is not supported by the evidence. Defendants' own training materials make clear that refunds were a "last resort." Ex. 103. Defendants' advised their employees to "refund as little as you have to. ONLY refund in full if you ABSOLUTELY have to, resolving a dispute."

| | |
|---|---|
| 100. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and EFTA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest. | 100. Disputed. Plaintiff's assertion of the amount paid by consumers for AuraVie products is grossly overstated. The amount of consumer injury cannot be greater than the amount paid by consumers. Plaintiff is double and triple counting amounts paid by consumers by including revenue of defendant entities (approximately $9.8M) who consumers never paid for AuraVie products, and does not credit 25% of the total sales that was previously returned to consumers. See, Doc#120/68 fn.139. See Doc.#232-1/4; Doc#121-2/3 [defendant entity merchant accounts] Alon Dec. ¶3, 2:26-27. |

**100. Moving Party's Response:**

According to Defendants' own business records and payment processing records, Defendants' charges, minus returns, chargebacks, and refunds, totaled $75,624,030 million. (Ex. 944). Importantly, the FTC need only reasonably

approximate the amount of consumer injury, which the FTC has done using Defendants' tax returns and business records. After the FTC has satisfied this obligation, the burden shifts to Defendants to show that the figures are inaccurate. *See Commerce Planet*, 815 F.3d at 593 (*quoting FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d. Cir 2011)) ("If the FTC makes the required threshold showing, the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains. Any risk of uncertainty at this second step "fall[s] on the wrongdoer whose illegal conduct created the uncertainty."'); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

Respectfully Submitted,

Dated: 5/13/16                    /s/ *Reid Tepfer*_____
                                 REID A. TEPFER
                                 LUIS H. GALLEGOS
                                 EMILY ROBINSON
                                 ZACHARY KELLER
                                 Attorneys for the Plaintiff
                                 Federal Trade Commission
                                 1999 Bryan Street, Suite 2150
                                 Dallas, Texas 75201
                                 (214) 979-9395 (Tepfer)
                                 (214) 979-9383 (Gallegos)
                                 (214) 953-3079 (facsimile)
                                 rtepfer@ftc.gov
                                 lgallegos@ftc.gov

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON NOTTEA'S STATEMENT OF GENUINE DISPUTES

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 13, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and
Roi Rueveni*

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
*Counsel for Doron Nottea and Motti
Nottea*

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630

Costa Mesa, CA 92626
Telephone: (714) 641-3600 Ext. 214
*Counsel for Igor Latsanovski and
CalEnergy, Inc.*

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
*Attorney for Paul Medina, Secured
Merchants, LLC,
and Chargeback Armor, Inc.*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

Kelly M. Crawford
Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
*Counsel to Receiver*

/S/ REID TEPFER
REID TEPFER

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON
NOTTEA'S STATEMENT OF GENUINE DISPUTES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39

PLAINTIFF'S RESPONSE TO DEFENDANTS ROI REUVENI AND ALON
NOTTEA'S STATEMENT OF GENUINE DISPUTES

2