DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov; Tex. Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Ste 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND McKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.,*<br><br>Defendants. | Case No. 2:15-CV-04527-GW (PLAx)<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................... 2

II.    PLAINTIFF'S ALLEGATIONS, ELEMENTS, AND KEY EVIDENCE... 3

A.     COUNT ONE: DECEPTIVE OMISSIONS ................................. 3

     1.  Defendants Failed To Disclose Adequately Material Terms Of Their Offer In Violation Of Section 5(A) Of The FTC Act, 15 U.S.C. § 45(A)3

     2.  Elements To Prove Count One ........................................................ 4

     3.  Key Evidence Supporting Count One ................................................ 5

B.     COUNT TWO:  DECEPTIVE REPRESENTATION .................................. 7

     1.  Defendants Falsely Represented That Consumers Could Try Their Product Risk Free In Violation Of Section 5(A) Of The FTC Act, 15 U.SC. Secction 45(A) .............................................................................. 7

     2.  Elements To Prove Count Two ........................................................ 8

     3.  Key Evidence Supporting Count Two ................................................ 9

C.     COUNT THREE: DECEPTIVE REPRESENTATION............................ 10

     1.  Defendants Have Falsely Represented That Defendants Were Accredited And Had A Rating Of "A-" With The Better Business Bureau In Violation Of Section 5(A) Of The FTC Act, 15 U.S.C. Section 45(A) ........................................................................ 10

     2.  Elements To Prove Count Three .................................................... 10

     3.  Key Evidence Supporting Count Three .......................................... 11

D.     COUNT FOUR: UNFAIRNESS ................................................ 12

     1.Defendants Unfairly Charged Consumers for their Risk Free Trial in Violation of Section 5 of the FTC Act, 15 U.S.C. Section 45(n) ......... 12

     2.  Elements to Prove Count Four ...................................................... 12

     3.  Key Evidence Supporting Count Four ............................................ 14

E.     COUNT FIVE: ROSCA .......................................................... 15

     1.  In Marketing Their "Risk-Free Trial" Offer, Defendants Failed To: (A)Clearly And Conspicuously Disclose All Material Terms Of The Negative Option Feature; (B) Obtain The Consumers' Express Informed Consent To The Negative Option Feature Before Charging; (C) Provide Simple Mechanisms For A Consumer To Stop Recurring Charges, In

Violation Of Section 4 Of The Restore Online Shoppoers Confidence Act ("ROSCA"), 15 U.S.C. Section 8403............................................ 15

2.  Elements To Prove Count Five ........................................ 16

3.  Key Evidence Supporting Count Five ............................. 17

F.    COUNT SIX: EFTA COUNT ...................................................... 18

1.  Defendants Debited Consumers Accounts Without Obtaining A Written Authorization Signed Or Authenticated By A Consumer And Without Providing A Copy Of A Written Authorization Signed Or Similarly Authenticated By The Consumer In Violation Of Section 907(A) Of The Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e(A), And Section 205.10(B) Of Regulation E, 12 C.F.R. § 205.10(B)................................................................................. 18

3.  Elements To Prove Count Six ......................................... 19

3.  Key Evidence Supporting Count Six ............................... 20

G.    COUNT SEVEN: RELIEF DEFENDANT...................................... 21

1. Relief Defendant, Chargeback Armor, Inc., received, directly or indirectly, funds and other assets from Defendants that are traceable to funds obtained from Defendants customers through the unlawful acts or practices……………………………………………………………21

2.  Elements to Prove Count Seven...................................... 22

3.  Key Evidence Supporting Count Seven........................... 23

III.    COMMON ENTERPRISE LIABILITY .................................... 24

A. Elements of Common Enterprise .................................... 24

B.    Key Evidence Supporting Common Enterprise ....................... 25

IV.    INDIVIDUAL LIABILITY .......................................................... 28

A. Elements to Prove Individual Liability .......................... 28

B. Evidence Supporting Individual Liability....................... 28

V.    CONSUMER INJURY AND RELIEF SOUGHT ...................... 38

VI.    DEFENDANTS' AFFIRMATIVE DEFENSES ........................ 39

VII.    ANTICIPATED EVIDENTIARY ISSUES ............................. 40

VIII.   ANTICIPATED ISSUES OF LAW ......................................... 40

IX.    BIFURCATION OF ISSUES ..................................................... 41

X.    NO JURY TRIAL....................................................................... 41

XI.    ATTORNEYS' FEES .................................................................................... 41

XII.   ABANDONMENT OF ISSUES ................................................................... 41

# TABLE OF AUTHORITIES

*CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037 (N.D. Ga. May 7, 2012) 23

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964)............................................. 25

*FTC v. Cyberspace.com, LLC.*, 453 F.3d 1196 (9th Cir. 2006) .............. 4, 8, 10, 11

*FTC v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048 (C.D. Cal. 2012)  5, 9, 10, 11, 13, 39

*FTC v. Crescent Publ'g Grp.*, 129 F. Supp. 2d 311 (S.D. N.Y 2001)................... 13

*FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010)........................

*FTC v. Figgie Int'l,* 994 F.2d 595 (9th Cir. 1993)…………………………..4, 8, 11

*FTC v. Fevre,*128 F.3d 530 (7th Cir. 1997)……………………………………..39

*FTC v. Grant Connect*, 827 F. Supp. 2d 1199 (D. Nev. 2011).............................. 24

*FTC v. Holiday Enterp*, No. 1:06-CV-2939-CAP, 2008 WL 953358 (N.D. Ga. Feb. 5, 2008) ...................................................................................................... 22

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010), *aff'd* 475 Fed. Appx. 106 (9th Cir. 2012)................................................................... 12, 14, 22

*FTC v. Ivy Capital, Inc., et al.*, No. 2:11–CV–283 JCM (GWF), 2013 WL 1224613 (D. Nev. Mar. 26, 2013)................................................................. 22, 23, 25

*FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ......... 12, 13, 14, 15, 24

*FTC v. MacGregor*, 360 Fed App'x 891 (9th Cir. 2009)..................................... 13

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ............

*FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114 (D. Nev. 1995) (O'Connor, J.)................................................................................................................ 6

*FTC v. Neovi*, 604 F.3d 1150 (9th Cir. 2010)...................................................... 14

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)..................... 25

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ....................................... 13

*FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043 (D. Nev. 1992) (George, C.J.)............................................................................................... 6

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997).................... 28

*FTC v. Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010)............. 4, 8

*FTC v. QT, Inc.*, 448 F. Supp 2d 908 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008) ........................................................................................................ 13

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000). ........ 22

*FTC v. Windward Mktg.*, No. CIV. A. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ..................................................................... 12, 14

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ........ 6

*FTC v.Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ....... 22, 23

*SEC v.Colello*, 139 F.3d 674 (9th Cir. 1998)................................................... 22, 23

## I.    INTRODUCTION

Defendants, acting as a common enterprise, operated multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, that promoted the availability of "risk-free trial" or "trial order" offers of skincare products to consumers nationwide since at least 2010. (Exs. 909; 597-13; 597-16; 597-19; 597-22. See also Dkt. 120 at 5). The websites offered trials of products with a variety of brand names, including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively "AuraVie products."). (Exs. 909-23; 909-24; 909-144; 909-155). Some websites also promoted AuraVie products as a "gift" or "giveaway," purportedly for completing an online survey. (Ex. 903-8).

Consumers interested in accepting the "risk-free trial" or "trial order" offers were required to provide credit card or debit card information, purportedly to pay nominal shipping and handling fees. (See, e.g., Ex. 909-125). Consumers who accepted the AuraVie "risk-free trial" or "trial order" offers were automatically enrolled into an "auto-ship" or negative option plan, in which additional products were shipped and billed to consumers' credit cards or debit cards each month. (Exs. 2 ¶ 6; 5 ¶ 4; 7 ¶ 6; 14 ¶ 3-4; 909-117, 909-118; 909-125; 909-130; 909-131; 909-145; 909-146. See also Exs. 3 ¶ 8; 4 ¶ 6; 9 ¶ 5; and 13 ¶ 7). In addition, unless

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

consumers returned their trial product within 10 days of signing up for the "risk-free trial" or "trial order," their credit cards or debit cards would be billed the full costs of the product, typically $97.88. (Ex. 909-125).

## II.   PLAINTIFF'S ALLEGATIONS, ELEMENTS, AND KEY EVIDENCE

### A. COUNT ONE: DECEPTIVE OMISSIONS

#### 1. Defendants Failed To Disclose Adequately Material Terms Of Their Offer In Violation Of Section 5(A) Of The FTC Act, 15 U.S.C. § 45(a)

In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of skincare products, including but not limited to AuraVie products, Defendants represented, directly or indirectly, expressly or by implication, that consumers who provide their credit or debit card billing information will be charged only a nominal shipping and handling fee to receive a trial shipment of Defendants' skincare products and, that their satisfaction is guaranteed.

In numerous instances, when Defendants made the above representation, Defendants have failed to disclose, or disclose adequately to consumers, material terms and conditions of their offer, including:

> a. That Defendants will use consumers' credit or debit card information to charge consumers the full costs of the trial

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

3

products, usually $97.88, upon the expiration of a limited trial period;

b. The dates on which the trial period begins and ends;

c. That Defendants will automatically enroll consumers in a negative option continuity plan with additional charges;

d. The cost of the continuity plan, and the frequency and duration of the recurring charges;

e. The means consumers must use to cancel the negative option program to avoid additional charges; and

f. Requirements of their refund policies.

## 2. Elements to Prove Count One

An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

a. A representation, omission, or practice that

b. Is likely to mislead consumers acting reasonably under the circumstances and

c. Is material to consumers.

"To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *FTC v. Publrs. Bus. Servs., 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010* ) (citing *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)). A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[1] *Cyberspace.com LLC*, 453 F.3d at 1201 (quoting *Cliffdale*

---

[1] The FTC need not prove actual reliance by each individual consumer. *FTC v. Figgie Int'l*, 994 F.2d 595, 605 (9th Cir. 1993). Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

4

*Assocs.*, 103 F.T.C. at 165). The failure to clearly and conspicuously disclose material terms of an offer is deceptive and violates Section 5. A false representation that a product is "free" or "risk free" is also material and violates Section 5. *See FTC v. Commerce Planet, Inc.,* 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012).

### 3.  Key Evidence Supporting Count One

After representing that they were offering a "risk-free trial" offer of skincare products, Defendants failed to disclose the material terms of that offer. Specifically, Defendants failed to disclose that:

- They would use consumers' credit or debit card information to charge for the full costs of the products after a limited time. (UF #45, #47-49, #59-62).[2]
- The trial period began and ended. (UF #56-58, UF #61(a)).
- Consumers who accepted a "risk-free trial" offer would be automatically enrolled in a negative option continuity plan with additional charges. (UF #56-58).
- The costs of the continuity plan and the frequency and duration of the recurring charges. (UF #51-61).

redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id.* at 605–06.

[2] In support of its motion for summary judgment, (Dkt. #353) the FTC filed a separate Statement of Uncontroverted Facts and Conclusions of Law ("UF") (Dkt. 353-2), which provides a comprehensive overview of the evidence in this case. Cites to "UF" throughout this Memorandum of Contentions of Law and Fact are in reference to the numbered paragraphs of this document.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1       – The means consumers could use to cancel the continuity plan. (UF #55-58). Finally, Defendants failed to disclose the limitations of their

2       refund policies.  (UF #62-67).

3       These failures to disclose were likely to mislead reasonable consumers.

4 Indeed, Defendants knew from consumer complaint and chargeback activity that

5 consumers were being misled and believed the website offers were advertising

6 free products. (*See*, *e.g.,* UF #32(s) and (u); UF #34(j); UF #39(f) and (g); UF

7 #65). Notably, the FTC is not required to show an intent to deceive, since

8 consumers can be equally harmed by both deliberate and negligent conduct. *FTC*

9 *v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC*

10 *v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995)

11 (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043,

12 at 69,156 (D. Nev. 1992) (George, C.J.). However, the evidence in this case shows

13 that Defendants intended to deceive consumers. (*See* UF #61(a), UF #32). They

14 buried the material terms of their sales offers in obscure hyperlinks, to trick

15 consumers into paying for Defendants' products. (*See* UF #49; UF #56, UF #59).

16 Defendants' failure to clearly and conspicuously disclose the material terms of

17 their offer was a deceptive omission that violated Section 5 of the FTC Act.

18       Consumers learned about the costs of the "risk free trial" offers only when

19 they saw charges—typically $97.88 each—on their credit or debit card statement.

20 PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

(UF #53). Likewise, consumers learned about Defendants' onerous return polices only when they realized they were being charged for products that they believed were free or received subsequent shipments of unordered product and tried to return the items. (UF #52-54). Consumers alleged, and Defendants' former employees and business records confirm, that Defendants generally refused to provide consumers with full refunds.[3] (UF #55, UF #62-67). In fact, even when consumers contacted their credit card companies and requested chargebacks for unauthorized charges, Defendants aggressively continued their deception. (UF #65). Defendants told consumers that chargebacks were illegal and would be reported to local or federal law enforcement authorities for civil or criminal enforcement proceedings. (UF #65(c)). Defendants also submitted doctored and falsified documents to banks, protesting chargebacks and asserting that consumers had knowingly agreed to the charges and the continuity plan. (UF #65).

**B. COUNT TWO:  DECEPTIVE REPRESENTATION**

   **1. Defendants Falsely Represented That Consumers Could Try Their Products "Risk Free" In Violation Of Section 5(a) of The FTC Act, 15 U.S.C. § 45(a)**

---

[3] For example, Defendants' scripts advised customer service agents to avoid refunds: "*Important* Avoid Returns as much as possible . . . Customers should initially be advised that the best we can do is cancel their membership and prevent any future charges or shipments." UF #63(a)(i).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Defendants have falsely represented, expressly or by implication, directly or indirectly, that consumers can try AuraVie or their other skincare products "risk-free."

## 2.  Elements to Prove Count Two

An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

    a.  A representation, omission, or practice that
    b.  Is likely to mislead consumers acting reasonably under the circumstances and
    c.  Is material to consumers.

"To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d at 1223 (citing *Cyberspace.Com*, 453 F.3d at 1200). A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[4] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. 110, 165

---

[4] The FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id.* at 605–06.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

(1984)). The failure to clearly and conspicuously disclose material terms of an offer is deceptive and violates Section 5. A false representation that a product is "free" or "risk free" is also material and violates Section 5. *See FTC v. Commerce Planet, Inc.,* 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012).

### 3. Key Evidence Supporting Count Two

Defendants' websites prominently touted that products were offered "Free" in large, colorful font, often in multiple places. This created a "net impression" that Defendants' product was free (except for the disclosed nominal shipping fee). That impression was likely to mislead reasonable consumers because it was false: Defendants actually intended to charge up to $97.88 for the products. (UF #51-53). Defendants' misrepresentations did in fact mislead consumers, leading to numerous complaints and chargebacks. (UF #64-UF #65; Dkt. #121-1, at 8.) Moreover, the Ninth Circuit has found that a false representation that a product is "free" or "risk free" is material and violates Section 5. In *FTC v. Commerce Planet, Inc.,* the Court held that "This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product. The notion that consumers will get a free kit makes it more likely that they will unwittingly provide their credit card information, thinking they are only paying

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

9

for shipping and handling, when in fact, they are obligating themselves to pay a subscription fee for the continuity program."[5] 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012).

## C. COUNT THREE: DECEPTIVE REPRESENTATION

### 1. Defendants falsely represented that Defendants were accredited by and had a rating of "A-" with the Better Business Bureau in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)

In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of skincare products, Defendants falsely represented that Defendants were accredited by and had a rating of "A-" with the Better Business Bureau.

### 2. Elements to Prove Count Three

An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

    a. A representation, omission, or practice that
    b. Is likely to mislead consumers acting reasonably under the circumstances and

---

[5] To be clear, the fact that some of Defendants' websites contained hidden disclosures of some, but often not all, of the charges a consumer would incur by accepting the "risk free" offer did not cure Defendants' deception. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."). [5] As Defendants knew, consumers did not see the disclosures that they buried in inconspicuous hyperlinks. (UF #56-61).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

c.  Is material to consumers.

"To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d at 1223 (citing *Cyberspace.Com*, 453 F.3d at 1200). A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[6] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165). The failure to clearly and conspicuously disclose material terms of an offer is deceptive and violates Section 5. A false representation that a product is "free" or "risk free" is also material and violates Section 5. *See FTC v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012).

### 3.  Key Evidence Supporting Count Three

Defendants claimed on their "risk-free trial" websites that they were accredited by the Better Business Bureau ("BBB") with an A- rating. (UF #49-

---

[6] The FTC need not prove actual reliance by each individual consumer.  *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.  *Id.* at 605–06.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

50). In fact, AuraVie was not accredited by the BBB and it had an F rating. (UF #50). Moreover, the BBB actually contacted Defendants concerning their deceptive practices. (UF #50(a)).

## D. COUNT FOUR: UNFAIRNESS

### 1. Defendants Unfairly Charged Consumers For Their "Risk Free Trial" In Violation Of Section 5 Of The FTC Act, 15 U.S.C. § 45(n)

In numerous instances, Defendants caused charges to be submitted for payment to the credit and debit cards of consumers without the express informed consent of consumers.

### 2. Elements to Prove Count Four

An act or practice is unfair and violates Section 5 of the FTC Act if:

      a. It is likely to cause substantial injury to consumers that is
      b. Not reasonably avoidable and
      c. Not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

Courts have regularly found unauthorized billing practices to be unfair. *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010) (unauthorized charges to telephone bills were unfair); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000) (unauthorized credit card charges); *FTC v. Windward Mktg., Ltd.*, No. 96-615F, 1997 WL 33642380, at *10, 13 (N.D. Ga. Sept. 30,

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    1997) (unauthorized bank debits). Taking consumers' money without

2    authorization is presumed to cause substantial injury. *See J.K. Publ'ns*, 99 F.

3    Supp. 2d at 1201 (finding substantial injury where "consumers were injured by a

4    practice for which they did not bargain"). The injury is substantial even if the

5    amount taken is relatively small. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th

6    Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995) ("[C]onsumer injury is substantial

7    when it is the aggregate of many small individual injuries."). Indeed, it is a well-

8    established principle in the federal courts that large numbers of consumer

9    complaints and high chargeback, return, and refund rates are convincing evidence

10   that a consumer did not agree to be charged. *See FTC v. MacGregor*, 360 Fed

11   App'x 891, 894 (9th Cir. 2009) (holding that high refund and return rates, along

12   with high volume of complaints, are probative of misrepresentations and other

13   abuses).[7] Consumers cannot reasonably avoid an unauthorized charge that they

14

---

15   [7] *See also FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) (high volume of consumer complaints and excessive chargeback rates

16   reaching 8 percent consistent with fraud); *Grant Connect*, 827 F. Supp. 2d at 1221 ("[H]igh number of cancellations, refunds and chargebacks suggest that in fact

17   consumers were deceived about what they were ordering."); *J.K. Publ'ns*, 99 F. Supp. 2d at 1203 (finding unauthorized charging where, among other things, more

18   than 50 percent of consumers contacting defendants claimed they had not ordered defendants' products and there were 7.3 percent chargebacks); *FTC v. QT, Inc.,*

19   448 F. Supp 2d 908, 936 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008) (refund rate of 25 percent indicates deception); *FTC v. Crescent Publ'g Grp.*, 129

20   PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

13

1  only discover after it occurs. *Inc21.com*, 745 F. Supp. 2d at 1004 ("[T]he burden

2  should not be placed on defrauded customers to avoid charges that were never

3  authorized to begin with.").

4      Finally, consumers do not benefit from being debited or charged for

5  products or services "they never agreed to purchase, didn't know were being

6  provided to them, and never wanted in the first place." *Inc21.com*, 745 F. Supp. 2d

7  at 1004-05; *see also  FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010)

8  (consumers are "injured by a practice for which they did not bargain"); *J.K.*

9  *Publ'ns*, 99 F. Supp. 2d at 1202.

### 3.  Key Evidence Supporting Count Four

11      Three uncontroverted facts irrefutably prove that Defendants charged

12  consumer credit cards and bank accounts without authorization. First, Defendants'

13  records and those of its processors show that it processed thousands of charges to

14  consumer credit card accounts. (Exs. 2-15, 944). Second, Defendants' victims

15  have testified that they did not authorize those charges, or even see a disclosure

17  F. Supp. 2d 311, 315, 322 (S.D. N.Y 2001) (lack of consumer authorization
18  evidenced by "strikingly high chargeback level that averaged approximately 10.51
   percent."); *Windward Mktg.,* 1997 WL 33642380, at *6, 12 (concluding from 40
   percent return rate that defendant knew debits were unauthorized).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

regarding such charges. (Exs. 2-15, 907). Thousands of these consumers complained directly to Defendants, to banks, the Better Business Bureau, or to law enforcement. Third, Defendants' chargeback rates rose as high as 35 percent.[8] These rates were consistent across Defendants' many merchant accounts. These appallingly high rates accord no explanation other than unauthorized charges.[9]

### E. COUNT FIVE: ROSCA

**1. In marketing their "risk-free trial," Defendants failed to: (a) clearly and conspicuously disclose all material terms of the negative option feature; (b) obtain the consumer's express informed consent to the negative option feature before charging; (c) provide simple mechanisms for a consumer to stop recurring charges, in violation of Section 4 of the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8403**

---

[8] *See* Dkt. #121-1, at 8 ("Analysis of the entities' chargeback rates indicates the rates for RD's ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%.").

[9] Defendants' high chargeback rates existed despite their use of dozens of shell companies, merchant accounts, and billing descriptors. These practices served no other purpose than to conceal the immense common enterprise and its beneficiaries from its victims, payment processors, banks, and law enforcement. *See J.K. Publ'ns*, 99 F. Supp. 2d at 1202-3 (finding that defendants' use of five different merchant accounts and four fictitious business names in one year was evidence of unauthorized billing).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

In numerous instances, in connection with the selling of skincare products on the Internet through a negative option feature, Defendants failed to:

    a.  clearly and conspicuously disclose all material terms of the negative option feature of the skincare products transaction before obtaining the consumer's billing information;

    b.  obtain the consumer's express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction; and/or

    c.  provide simple mechanisms for a consumer to stop recurring charges for skincare products to the consumer's credit card, debit card, bank account, or other financial account.

**2.  Elements to Prove Count Five**

Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless:

    a.  The seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information,

    b.  Obtains the consumer's express informed consent before making the charge, and

    c.  Provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403 (2006).[10]

---

[10] It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. *Id.*

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

The Telemarketing Sales Rule defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u) (2006). [11] Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

### 4.  Key Evidence Supporting Count Five

Defendants violated ROSCA in three ways. First, Defendants failed to disclose clearly all material terms of their negative option continuity plan. (UF #51-62). The terms, when provided at all, were buried in fine print hyperlinks on pages dominated by "risk free" and "trial" offers. (UF #56, UF #59). The unusually (and unconscionably) onerous return and chargeback policies were buried in an obscure, small "T&C" hyperlink filled with fine print and impenetrable jargon. (*Id.*).

---

[11] The TSR defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    Second, Defendants routinely charged consumers for continuity plans

2    without obtaining their express informed consent. Defendants solicited

3    consumers' credit card information purportedly for the purposes of paying  a

4    nominal shipping and handling fee. (UF #48, #50). Defendants then used that

5    billing information to charge consumers—without consumers' authorization or

6    knowledge—up to $97.88. (UF #51-62).

7    Third, Defendants failed to provide a simple mechanism for cancelling the

8    continuity plan. Chargeback demands and return requests were met by a level of

9    resistance from Defendants and their employees that was designed to obstruct any

10   refunds and to threaten and intimidate consumers who challenged Defendants'

11   unlawful practices. (UF #9-41). Their intimidation tactics included telling

12   consumers that chargeback requests were almost never successful to informing

13   consumers that chargeback requests would be treated by Defendants as fraudulent

14   and were subject to potential civil and criminal investigation and even

15   prosecution. (*Id.*)

16   **F.  COUNT SIX: EFTA COUNT**

17   **1.  Defendants debited consumers accounts without obtaining a
         written authorization signed or authenticated by a consumer and**

18   **without providing a copy of a written authorization signed or
         similarly authenticated by the consumer in violation of Section**

19   **907(a) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C.**

20   PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
     CONTENTIONS OF FACT AND LAW

**§ 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).**

In numerous instances, Defendants debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts.

In numerous instances, Defendants debited consumers' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account.

### 2.  Elements to Prove Count Six

A "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing[.]" and Section 907(a) of EFTA, 15 U.S.C. § 1693e(a). "[A] copy of such authorization shall be provided to the consumer when made."  Section 907(a) of EFTA, 15 U.S.C. § 1693e(a).

The Electronic Fund Transfer Act, and its implementing statute Regulation E, regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account. EFTA and Regulation

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1  E require that, before a merchant can make such recurring debits, it must obtain a

2  written authorization signed or similarly authenticated by the consumer.[12]

3     Section 903(9) of EFTA, 15 U.S.C. §1693a(9), provides that the term

4  "preauthorized electronic fund transfer" means "an electronic fund transfer

5  authorized in advance to recur at substantially regular intervals."  Section

6  205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that "[p]reauthorized

7  electronic fund transfers from a consumer's account may be authorized only by a

8  writing signed or similarly authenticated by the consumer.  The person that

9  obtains the authorization shall provide a copy to the consumer."  Section 205.10

10  of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12

11  C.F.R. §205.10(b), Supp. I, provides that "[t]he authorization process should

12  evidence the consumer's identity and assent to the authorization."  *Id*. ¶10(b), cmt

13  5.  The Official Staff Commentary further provides that "[a]n authorization is

14  valid if it is readily identifiable as such and the terms of the preauthorized transfer

15  are clear and readily understandable …"  *Id*. ¶ 10(b), cmt 6.

16        **3.  Key Evidence Supporting Count Six**

17

18  _____

[12] 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

19

20  PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
   CONTENTIONS OF FACT AND LAW

First, Defendants' terms and conditions regarding recurring monthly fees were not clear and readily understandable. In fact, this information was concealed in documents available only by hyperlink or in hard-to-read disclosures. Further, Defendants' websites were covered with claims that their offer was "risk free" and other directly contradictory statements.

Second, Defendants' websites or terms and conditions pages could not serve as the consumer's "copy" of the authorization, as required by 15 U.S.C. § 1693e(a), because it was not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional transfers. In short, consumers who purchased Defendants' products using their debit cards were not authorizing recurring debits from their bank accounts and never received a copy of any purported authorization for such debits.

## G. COUNT SEVEN: RELIEF DEFENDANT

**1. Relief Defendant Chargeback Armor, Inc. received, directly or indirectly, funds and other assets from Defendants that are traceable to funds obtained from Defendants' customers through the unlawful acts or practices.**

Relief Defendant, Chargeback Armor, Inc. received, directly or indirectly, funds and other assets from Defendants that are traceable to funds obtained from Defendants' customers through the unlawful acts or practices.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Relief Defendant is not a bona fide purchaser with legal and equitable title to Defendants' customers' funds or other assets, and Relief Defendant will be unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of Defendants' unlawful acts or practices.

### 2. Elements to Prove Count Seven

Disgorgement from a relief defendant is warranted where:
   a.  The relief defendant has received ill-gotten gains; and
   b.  The Relief Defendant does not have a legitimate claim to those gains.[13]

Once demonstrated, the appropriate remedy is an equitable monetary judgment equivalent to the amount of ill-gotten gains that the relief defendant received.[14]

---

[13] *See FTC v. Ivy Capital,Inc., et al.,* 2013 WL 1224613, * 18 (relief defendant who was responsible for keeping the books and for various operations or administrative tasks is liable for disgorgement); *FTC v.Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (relief defendant liable for the full amount off ill-gotten gains she received when she provided no service to the corporate defendants); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (summary judgment against a relief defendant who failed to show he had a legitimate claim to the ill-gotten gains he received); *FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1009 (N.D. Cal. 2010)*, aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten gains as he was "president" of a corporation "in name only" and provided no services to the corporation); *FTC v. Holiday Enterp*, 2008 WL 953358, * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant liable as "[s]he never performed any work for the [defendant] companies (except for occasional signing of checks) and would not have a legitimate claim to properties because of any work performed for the Holiday companies"); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

### 3. Key Evidence Supporting Count Seven

Relief Defendant has no legal or equitable title to the funds it received gratuitously from the Individual Defendants and other Corporate Defendants engaged in the scheme. "The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."[15] Here, disgorgement of the revenues Chargeback Armor generated in its furtherance of the scheme is the minimal equitable relief that should be levied by this Court. It is well-established that government agencies, in an effort to maximize the recovery of funds taken through fraud, may pursue individuals or companies even if they are no longer in possession of the ill-gotten assets.[16]

The evidence shows that the Relief Defendant received substantial transfers of funds traceable directly or indirectly to the unlawful conduct of AuraVie.

---

[14] *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1273.

[15] *FTC v. Ivy Capital, Inc., et al.*, No. 2:11–CV–283 JCM (GWF), 2013 WL 1224613, *18 (D. Nev. Mar. 26, 2013) (quoting *SEC v.Colello*, 139 F.3d 674, 676 (9th Cir. 1998)).

[16] *See, e.g., CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.").

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

(UF #41). Chargeback Armor, Inc. was a key component to the continuation of the scheme and received transfers in exchange for aiding the enterprise's ability to manage and abusively contest chargeback demands from consumers. (UF #41(d)). Because these payments were generated by deceiving consumers, Chargeback Armor does not have a legitimate claim to them and should be forced to disgorge those funds. Moreover, Chargeback Armor, Inc. was an asset of the Defendants, as made clear by the fact Defendants controlled the company. (UF #32(d); UF #41(c); UF #34(h)(xviii); UF #37(b)(i); UF #37(f), (k), and (l)); UF #39(f)-(g).

## III.   COMMON ENTERPRISE LIABILITY

### A. Elements of Common Enterprise

Where, as here, Corporate Defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

To determine whether a common enterprise exists, the Court considers factors such as:

- common control;
- the sharing of office space and officers;
- transacting business through a maze of interrelated companies;
- the commingling of corporate funds and failure to maintain separation of companies;

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

24

1        –   unified advertising; and

2        –   evidence that reveals that no real distinction exists between the
          corporate defendants.

3       *Id.* (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167,

4 1182 (N.D. Ga. 2008)); *see also Ivy Capital, Inc.*, 2013 WL 1224613 at *13

5 (common enterprise existed where there was common control, shared office space,

6 interrelated activity, and commingled funds).  When determining whether a

7 common enterprise exists, "the pattern and frame-work of the whole enterprise

8 must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746-47

9 (2d Cir. 1964) (affirming company was liable because it was part of a "maze of

10 interrelated companies"). The Ninth Circuit has also held that "entities constitute a

11 common enterprise when they exhibit either vertical or horizontal commonality –

12 qualities that may be demonstrated by a showing of strongly interdependent

13 economic interests or the pooling of assets and revenues."[17]

14 **B. Key Evidence Supporting Common Enterprise**

15       The evidence proves that Defendants participated in or controlled the

16 common enterprise with knowledge of its deceptive and unfair practices. (UF #9-

17 41). Defendants created a complex web of companies to deceive consumers,

18 banks, and law enforcement and to operate the scheme. (UF #42-43). The Court's

19 ---
[17] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

20      PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
                CONTENTIONS OF FACT AND LAW

Receiver identified as many as 27 corporate entities that Defendants used to carry out their scheme. (Ex. 121-3 at 4-5). Defendants collectively operated these corporations from the same physical location, with the same employees, and commingled funds generated from the sale of the same products. (UF #42).

**BunZai Media Group, Inc.** ("BunZai") was owned by Alon Nottea, Igor Latsanovski, and Khristopher Bond. (UF #9). Defendants initially operated their online skincare product business exclusively through BunZai. (UF #9). However, apparently to avoid detection and to protect their assets, Defendants dissolved BunZai around 2012 and replaced it with a convoluted corporate structure with numerous shell companies, each with different "owners" or "CEOs." (UF #9(e)). Defendants recruited friends, family, and acquaintances to permit their names to be used for shell corporations and merchant accounts. (UF #42(h)). These shell companies funneled the money primarily to two entities: **SBM Management, Inc.** and **CalEnergy, Inc.** (UF #42(d)). In turn, these companies passed funds on to the Individual Defendants or their personal shell companies. *Id*. There were many participants, but one common enterprise scheme.

After dissolving BunZai, Alon Nottea, Igor Latsanovski, and Khristopher Bond formed **Pinnacle Logistics, Inc.**, to take over order fulfillment and customer service functions for the enterprise. (UF #10). **Media Urge, Inc.,** and its

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

26

successor, **Focus Media Solutions, Inc.**, both owned by Alon Nottea, served as the marketing arm. (UF #19, 24). These companies, controlled and managed by the Individual Defendants (UF #43(a)), assisted in the created and placed online advertisements and websites for skincare and other products sold by "risk free trial" offers. They also coordinated with affiliate networks to deceptively market the company's "risk-free trials." (Dkt. #120, at 46.)

 **CalEnergy, Inc**., owned by Igor Latsanovski, held itself out as the parent company of the enterprise and managed both Pinnacle and Media Urge. It provided the common enterprise the funds needed to keep afloat. (UF #21, UF #36(e), UF #36(g)). **Secured Commerce LLC**, owned by Alan Argaman and Doron Nottea (UF #39(b)), created the webpages containing bogus "risk free trial" offers. (UF #39(d)(viii)). It also leased the suite where the Individual Defendants operated the common enterprise. (Dkt. #120, at 12). Among other things, **Secured Merchants LLC,** provided chargeback services to companies (UF #26(a), UF #26(b), UF #39(f)) that included the Corporate Defendants (UF #27(d)), a service it termed "Chargeback Armor." (UF #27(e)). This service was critical to retaining Defendants' payment processor accounts and maintaining the ability to accept credit card payments from consumers—upon which the entire deceptive enterprise hinged. Relief Defendant **Chargeback Armor, Inc.** likewise refuted consumer

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

27

chargebacks for unauthorized charges for Defendants' skincare products. (UF #41(d)(ii)). Chargeback Armor, Inc. was owned and operated by Defendants Alon Nottea, Doron Nottea, Roi Reuveni, and Alan Argaman, in addition to purported CEO Mike Costache. (UF #42(c)).  Other companies served as shells to operate merchant accounts, mailboxes, or performed other limited support functions for the common enterprise. (UF #11-17, UF #20, UF #22-23, UF #27-31; *see generally* Dkt. #120).

## IV.   INDIVIDUAL LIABILITY

### A. Elements to Prove Individual Liability

Individuals are liable for injury to consumers resulting from a company's deceptive acts or practices when they either: participated directly in or had authority to control the acts or practices and had some knowledge of the acts or practices.[18]

### B. Key Evidence Supporting Individual Liability

#### 1.  Individual liability of Alon Nottea

Defendant Alon Nottea oversaw or was involved in nearly every aspect of the day-to-day operation of the AuraVie common enterprise. (UF #32). His duties included soliciting investors (UF #32(j)); determining the business model and

---

[18] *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

28

company organization (UF #32(k)); managing employees (UF #32(*l*)); procuring new merchant accounts and "merchant account guarantors" or "CEOs" (UF #32(m)); managing complaint responses and threatened litigation (including Better Business Bureau and Attorney General) (UF #32(n)); reviewing accounting and bookkeeping (UF #32(o)).; overseeing and implementing advertising and marketing (UF #32(p)); addressing customer service issues (UF #32(q); registering websites (UF #32(r)); and monitoring chargeback demands. (UF #32(s)).

Because Alon oversaw virtually all aspects of the enterprise, he was fully knowledgeable of the companies' deceptive acts and practices. He knew consumers were misled by the deceptive "risk-free trial" offers. In fact, Alon was recorded strategizing how to continue the scheme, while maintaining a façade of compliance. In a recorded meeting with Roi Reuveni, Paul Medina, and others, Alon stated:

> [I]f you send them the terms, it can act like... we told you that we're going to charge... we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurted us... If it's done creatively, if it's done correctly and optimized... not just try, it didn't work.

(UF #32(u)(vi)).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Alon was well aware that reliance on hidden disclosures was unlawful. He suggested that, "[w]e must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least." (UF #32(u)(v)). Nonetheless, because he believed that clear disclosure of the terms and conditions of their "risk-free trial" offers would cause revenues to plummet, Alon failed to correct the business practices. Instead, he prepared for an inevitable FTC law enforcement action. He planned to defend the FTC lawsuit by creating a façade of compliance. His plan, dubious as it was, included placing and recording calls to dissatisfied customers, pretending to be a third party company and asking why the customers sought chargebacks. He believed that evidence of such calls would placate the FTC:

> "And the FTC comes to me, I'm telling them, listen, I'm calling back my chargebacks and see what I did wrong? Do you know how that looks?... we[']re going to call all of our chargebacks, and say we are a third party." [19]

Alon likely believed an FTC enforcement action was inevitable because BunZai Media Group's attorney had informed him that the AuraVie enterprise

---

[19] Alon elaborated on his plan again later in the recorded conversation, stating that he would retain a file of recorded calls to present to the FTC: "[B]ut I want to have a hundred call folder so that later on in two years when I have an FTC, here, here, here, I'm proactive. It's like—it's like a folder. Here you go. Here's everything. Your file recordings. Look at everything. Look at what we're doing to be proactive for our consumer." UF #32(u)(i).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

was violating FTC law.[20] The attorney noted a myriad of problems with Defendants' "risk-free trial" offers and websites, including that purported disclosures were "buried in the T&C's." (UF 61(a).) In an email—sent over two years before the FTC's enforcement action—BunZai's attorney suggested numerous changes to improve compliance with the law. *Id*. Most, if not all, of these suggestions were ignored.

### 2. Individual Liability of Doron Nottea

Doron Nottea, Alon's brother, was a principal member of the common enterprise. Specifically, for various Corporate Defendants, acting alone or in concert, Doron (1) held himself out as an owner (UF #34(d)); (2) managed employees of Corporate Defendants ( UF #34(e)); (3) controlled and managed Corporate Defendants' banking and merchant accounts (UF #34(f)); (4) performed bookkeeping and accounting duties (UF #34(g)); and (5) determined whether to continue or cease operations of various Corporate Defendants. (UF #34(h)). Thus, Doron unquestionably exercised control and participated in the common enterprise to a degree that directly implicates him in the scheme.

---

[20] *See* UF #61(a) BunZai attorney William Rothbard provided a point-by-point breakdown of the many ways the AuraVie marketing campaign violated FTC law).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1     Moreover, Doron's participation and control far exceeds the limited

2  bookkeeping activities he claims. His financial management (UF #34(d)-(j);

3  #43(b)(v),  his role supervising the employees (*See*, *e.g.,* UF #34(e)), and his

4  oversight of payment to straw account holders directly implicates him in the

5  scheme and demonstrates the knowledge he had of the enterprise's day-to-day

6  operations. Moreover, he was included on numerous emails discussing the

7  enterprise's business practices,[21] even to the degree of reviewing packaging for

8  skincare products. (UF #39(e)(i)).

9     Doron evinced intimate knowledge of the scam in a text message he sent to

10  his own email address. (UF #34(j) . In it, he complained that "our volume is

11  down" due to regulatory scrutiny.[22] He further discussed litigation the Defendants

12  were embroiled in with former employees, noting that former employees were

13  "threatening to file against all corporations and people involved," which posed a

14  "a very big exposure and risk to our entire entities." (UF #34(j)).

---

15  [21] For example, Alon includes Nottea on an email he forwards from UMS Bank, in which he discusses his plan for winding down the sales of AuraVie in part because
16  of FTC regulations. UF #34(i)(viii); UF #34(i)(viii).

17  [22] UF #34(j) ("Our volume is down to about 350 (100 from lifescript + 250 from un-compliant survey traffic per day ... ) And even that is a miracle since we can no
18  longer use advertorials for now ... As the lady (pam bondi) in the Florida Atty. Gen. is reviewing every single continuity skincare and diet advertisers in the
19  industry ... We are waiting for some more industry news to be released in order to make an executive decision on whether or not to run blogs again ...")

20     PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

32

1    Moreover, in the same correspondence, Doron acknowledged the "high-risk

2 nature of our business model" and the possibility that their assets may be frozen

3 by the FTC. (UF #34(j)). This text message leaves no doubt that Doron fully

4 understood the illegal and deceptive nature of the enterprise he was running.

5        **3.  Individual Liability of Igor Latsanovski**

6        Igor Latsanovski was a principal member and investor in the AuraVie

7 common enterprise. He was a partner in BunZai Media Group, Inc. (UF #36(a),

8 (b), and (c) the principle entity in the common enterprise. (Dkt. #120, at 38).

9 Although Latsanovski claimed that he was merely a "silent investor" in BunZai

10 Media Group, (Dkt. #106, at 6) he previously swore under oath that the company

11 was his employer (UF #36(g))[23] and that he held an officer's position in the

12 company. (Dkt. #106, at 6). In a letter to the United States Citizenship and

13 Immigration Services describing his job responsibilities at CalEnergy,

14 Latsanovski represented that he was actively involved in "reviewing the activities

15 and providing guidance to managed companies." (UF #36(h)).  Business

16 correspondence and emails confirm Defendant Latsanovski was personally

17 involved in managing the companies on a day-to-day level. (UF #36(q)). For

18

19 [23] *See also* UF #36(g) (BunZai Media Group, Inc. Form W-2 listing Defendant Latsanovski as an employee.).

20        PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

example, in an August 2013 email, Latsanovski described his plan for the future of the AuraVie companies and his own role within it. (UF #36(q)). Writing to his partners, co-Defendants Alon and Doron Nottea, Latsanovski outlined his thoughts concerning the leadership and growth of Pinnacle, which he described as "our company." (UF #36(q)). He provided his business partners with his opinion on who should lead various departments of their company and, demonstrating keen knowledge of their activities, he evaluated the relative strengths and weaknesses of various employees. (UF #36(q)).

Other emails show Latsanovski participated in and controlled companies in addition to Pinnacle Logistics, including ones in which he had no apparent ownership. (UF #36(i) and (n)). And emails confirm Latsanovski was a decision-making business partner, rather than an uninformed investor that only provided loans. (*See*, *e.g.,* UF #36(q)). In addition to managing the companies, Latsanovski also propped up the common enterprise by financing the Corporate Defendants despite his knowledge of Defendants' illegal business practices. (Dkt. 120, at 35-36). Latsanovski himself has acknowledged his funding of the enterprise was essential to the companies' continued operations. (Dkt. #106-2, at 30-31.) Defendant Latsanovski owned, managed, and directly participated in the business practices at issue in the scheme.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

34

Latsanovski knew or consciously avoided knowledge of his companies' illegal business practices. In emails, Latsanovski demonstrated a keen understanding of the company's business model, its issues with chargebacks, its related entities, and its employees. (UF #36(j) and (l)). He was consistently provided updates from the other Individual Defendants concerning the common enterprise and in fact specifically inquired into company chargeback rates in his email correspondence. (UF #36(l) and (m)). He was often at the Corporate Defendants' business premises (UF #36(i)(ix)), where he discussed chargebacks with Defendant Alon Nottea. (UF #36(l)(iii). Moreover, he reviewed the company's books with employees and demonstrated a comprehensive knowledge of the financial workings and performance of the enterprise. (Ex. 36(i)). Moreover, he edited and emailed a spreadsheet containing sales, revenue, and chargeback information and would periodically discuss and review sales data with employees. (Ex. 36(i)(i)).

Further, Latsanovski's claim that he was unaware of Defendants' attempts to deceive banks, consumers, and law enforcement is not credible. Latsanovski has expertise in the payment-processing industry, and owned at least one merchant service provider. (*See* Dkt. #90-1). In his emails, he also discussed and was

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  apprised of the companies' issues with compliance. UF #36(m).  The evidence

2  thus shows Latsanovski acted with full knowledge of the deception.

3  ### 4.  Individual Liability of Alan Argaman

4  Defendant Argaman provided the common enterprise with a variety of

5  essential services without which the common enterprise could not have continued

6  operations. (UF #39(d)). Aside from his individual involvement in other aspects of

7  the common enterprise,[24] Argaman provided many services through Secured

8  Merchants LLC, a company he owns and jointly operated with other Individual

9  Defendants. (UF #39).

10  Secured Merchants's executive summary shows its founders were in the

11  business of selling skincare products:

12  > Over the past two years, the founders of Secure
   > Merchants saw first-hand every type of failure trap that

13  > could have killed their skin care product company,
   > which today has monthly sales of $2.5 million or 25,000

14  > orders.
   > Thus the problems that our three initial services

15  > solve for any DRM [Direct Response Marketing]
   > company are the core infrastructure needed to deal with

16  > (1) the inevitable credit card chargebacks, (2) keeping

17  [24] *See*, *e.g.,* UF # 39(d)(xii) (Argaman forwarding shipping rates for AuraVie

18  product to Doron Nottea); UF # 39(d)(ix) (providing potential purchase
   opportunity for common enterprise to Doron Nottea); UF #39(k) (working with

19  Doron Nottea regarding payments made to the Indian call center providing
   customer services for the common enterprise).

20  PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
   CONTENTIONS OF FACT AND LAW

1  customers happy or allowing them an easy opt-out, and
2  (3) providing the most sophisticated customer record management system. (UF #26(c)).

3  Thus, either Defendant Argaman himself was involved in the skincare

4  business or the other founders—founders Argaman denies the existence of[25]—are

5  the members touting such a history with managing a chargeback-ridden skincare

6  business. In fact, through Secured Merchants LLC, Defendant Argaman received

7  at least $300,000 from the common enterprise. (Dkt. #120, at 25).

8  Defendant Argaman was included on numerous emails discussing the

9  companies' business that far exceed the limited scope of his claimed involvement,

10  including emails discussing or including the enterprise's unusually high

11  chargeback rates.[26] And despite his claims to the contrary, numerous factors

12  should have alerted Defendant Argaman to the high probability of fraud.

13  Defendant Argaman knew, or consciously avoided knowing, that

14  Defendants marketed their products using deceptive risk free trial offers. (UF

15  #39(h)).  Moreover, he knew, or should have known, that Defendants took

16  significant measures to disguise their common enterprise. (UF #39(i) and (j)).

17  Argaman knew Defendants required a platform for responding to the large number

18  _____

[25] UF #43(b)(vi).

19  [26] *See* UF #39(h), (i), (j), and (l).

20  PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

of chargebacks they received—in fact, he created such a platform for Defendants and assisted them in responding to such chargebacks without regard for whether the high number of chargebacks indicated fraud. (UF #39(f) and (g)). Lastly, Defendant Argaman knew, or should have known, that consumers had a valid basis for requesting the chargebacks he contested: Chargeback Armor claimed to investigate all chargebacks they contested. (UF #41(h)).

## V.    CONSUMER INJURY AND RELIEF SOUGHT

The FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, Section 5 of ROSCA, 15 US.C. § 8404, Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers, requests that the Court enter the relief contained in the proposed order lodged by the FTC at docket number 381-1.

The FTC has requested that the Court award equitable monetary relief in the amount of $75,624,030.[27] This figure is based on Defendants' own tax returns and Quickbook files.[28] The Ninth Circuit has held that "[b]ecause joint and several liability is permissible, restitution awards need not be limited to the funds each

---

[27] Dkt. #381-1, at 44.

[28] *See* Dkt. #232; *see also* Ex. 944. While Defendants claim the FTC failed to provide any evidence supporting this figure (Dkt. #391, at 12), Defendants' Statement of Genuine Disputes cites precisely where this evidence was previously filed in the record. Dkt. #391-1, at 17 (citing Dkt. #232-1).

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

38

defendant personally received from the wrongful conduct . . . . Defendants held jointly and severally liable for payment of restitution are liable for the unjust gains the defendants *collectively* received, even if that amount exceeds (as it usually will) what any one defendant pocketed from the unlawful scheme."[29]

The FTC need only reasonably approximate the amount of consumer injury, which the FTC has done using Defendants' tax returns and business records. After the FTC has satisfied this obligation, the burden shifts to Defendants to show that the figures are inaccurate.[30] Defendants have failed to show why the FTC's calculation is inaccurate. "Fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendants' burden to show inaccuracy."[31]

## VI.   DEFENDANTS' AFFIRMATIVE DEFENSES

The Court has struck all Defendants' affirmative defenses with the exception of those plead by Defendants Alan Argaman, Secured Merchants LLC,

---

[29] *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016).

[30] *See Commerce Planet*, 815 F.3d at 593 (*quoting FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d. Cir 2011)) ("If the FTC makes the required threshold showing, the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains. Any risk of uncertainty at this second step "fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'"); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

[31] *Id.*

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

and Chargeback Armor, Inc.,[32] as these Defendants filed their answers[33] subsequent to the FTC's Second Amended Motion to Strike Defendants' Jury Demand and Affirmative Defenses.[34] These Defendants have claimed the affirmative defenses of: (1) failure to allege sufficient facts; (2) any harm to consumers was due to acts of third parties; (3) consumer consent; (4) no proximate cause between claimed harm and actions of the Defendants; (5) Defendants conduct caused no harm;  (6) any harm to consumers was due to acts of third parties (this is duplicative of Defendants third affirmative defense); (7) consumers assumed any risk; and (8) Defendants allege that this case violates FED. R. CIV. P. 11. These Defendants failed to provide any responsive documents in discovery suggesting these affirmative defenses had any merit, however.

## VII.   ANTICIPATED EVIDENTIARY ISSUES

Defendants appear to contest all, or nearly all, evidence proffered by the FTC.[35] Defendants contend that the evidence is unauthenticated and is hearsay. The FTC has filed a brief in response to these contentions addressing the issue.[36]

## VIII.  ANTICIPATED ISSUES OF LAW

---

[32] Dkt. #317.
[33] Dkt. #299, 300, and 301.
[34] Dkt. #274.
[35] *See* Dkt. #391-4; Dkt. #391-1).
[36] Dkt. #431.

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Defendants do not appear to dispute the FTC's interpretation of the pertinent law and governing statutes.

## IX.   BIFURCATION OF ISSUES

The FTC does not request bifurcation of any claims or issues at trial.

## X.   NO JURY TRIAL

As the Court has previously ruled,[37] there is no right to a jury trial in this matter.

## XI.   ATTORNEYS' FEES

There is no claim for recoverable attorneys' fees.

## XII.   ABANDONMENT OF ISSUES

There are no claims or affirmative defenses that have been abandoned.

Respectfully submitted,

Dated: 5/19/16

_____/s/ Reid Tepfer_____
REID TEPFER
rtepfer@ftc.gov
Texas Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov
Oklahoma Bar No. 19098
EMILY ROBINSON

[37]

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

41

erobinson@ftc.gov
Texas Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (*pro hac vice* pending)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 979-9386 (Robinson)
(214) 979-9382 (Keller)
(214) 953-3079 (fax)

RAYMOND MCKOWN,
California Bar No. 150975
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
(310) 824-4343(voice)
(310) 824-4380 (fax)
rmcknown@ftc.gov

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 19, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and*
*Roi Rueveni*

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
*Counsel for Doron Nottea and Motti*
*Nottea*

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, CA 92626

Telephone: (714) 641-3600 Ext. 214
*Counsel for Igor Latsanovski and*
*CalEnergy, Inc*

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
*Attorney for Paul Medina, Secured*
*Merchants, LLC,*
*and Chargeback Armor, Inc.*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

Kelly M. Crawford
Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
*Counsel to Receiver*

PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

43

1

2          */S/ Reid Tepfer*
           Reid Tepfer

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF
     CONTENTS OF FACT AND LAW

1