**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. 2:15-CV-04527-GW (PLAx) |
| Plaintiff, | **[PROPOSED] FINAL PRETRIAL CONFERENCE ORDER** |
| v. | |
| **BUNZAI MEDIA GROUP, INC.,** *et al.,* | |
| Defendants. | |

Following pretrial proceedings, pursuant to FED. R. CIV. P. 16 and L.R. 16,

**IT IS ORDERED**:

1. **Parties for trial:**

   The parties for trial are:

   **Plaintiff:** FTC

   **Defendants:** Alon Nottea; Doron Nottea; Igor Latsanovski; Alan

   Argaman; Secured Merchants LLC; CalEnergy, Inc.

**Relief Defendant:** Chargeback Armor, Inc.

Each of these parties has been served and appeared.

## Settling Defendants:

Defendants Oz Mizrahi, Paul Medina, and Motti Nottea have settled with the FTC.[1]  The FTC and Defendant Roi Reuveni have reached a tentative settlement and have filed a joint motion to stay this action as to him only to permit the Commission to review and vote on the proposed settlement.[2]

## Defaulted Defendants:

The following Defendants have defaulted:

- – BunZai Media Group, Inc., d/b/a AuraVie and Miracle Face Kit
- – Pinnacle Logistics, Inc.
- – DSA Holdings, Inc.
- – Lifestyle Media Brands, Inc.
- – Agoa Holdings, Inc.
- – Zen Mobile Media, Inc.
- – Safehaven Ventures, Inc.
- – Heritage Alliance Group, Inc., also doing business as AuraVie Distribution
- – AMD Financial Network, Inc.
- – SBM Management, Inc.
- – Media Urge, Inc.
- – Adageo, LLC

[1] *See* Doc. No. 440 (Oz Mizrahi final order); Doc. No. 441 (Paul Medina final order); Doc. No. 439 (Motti Nottea).

[2] Doc. No. 420.

FINAL PRETRIAL ORDER

– KAI Media, Inc.

– Insight Media, Inc.

– Focus Media Solutions, Inc.

– Secured Commerce, LLC

– USM Products, Inc.

– Merchant Leverage Group, Inc.

– DMA Media Holding, Inc.

– Shalita Holdings, Inc.

– All Star Beauty Products, Inc.

– Individual Defendant Khristopher Bond.

**Pleadings which raise the issues:**

– The FTC's Amended Complaint (Doc. No. 235)

– First Amended Answer of Doron Nottea (Doc. No. 244)

– First Amended Answer of Igor Latsanovski (Doc. No. 253)

– First Amended Answer of CalEnergy, Inc. (Doc. No. 254)

– First Amended Answer of Alan Argaman (Doc. No. 299)

– First Amended Answer of Chargeback Armor, Inc. (Doc. No. 300)

– First Amended Answer of Secured Merchants LLC (Doc. No. 301)

– First Amended Answer of Alon Nottea (Doc. No. 251)

2.     Federal jurisdiction and venue are invoked upon the following grounds: The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 15 U.S.C. § 53(b).

FINAL PRETRIAL ORDER

**3.**     <u>**Trial Length:**</u>

–   **FTC's position:** The trial is estimated to take at least 20 to 25 trial days (unless the issues are narrowed through summary judgment and evidentiary rulings).

–   **Defendant Alon Nottea's position:** The trial is estimated to take 5 to 10 trial days.

4.     The trial is to be a non-jury trial. At least seven (7) days prior to the trial date the parties shall lodge and serve by e-mail, fax, or personal delivery the findings of fact and conclusions of law the party expects the Court to make upon proof at the time of trial as required by L.R. 52-1.

5.     Fact stipulations shall be submitted at least 5 days before the June 9, 2016 Final Pretrial Conference pursuant to the Court's Standing Order. (Doc. No. 25.)

<u>Defendant Alon Nottea's position:</u>

–   Defendant Alon Nottea reserves the right to file motions in limine and amend this final pretrial conference order when and if Plaintiff exchanges proposed joint stipulations of fact as per Local Rule 16-2.2, and meets and confers re the same. Fact stipulations referred to herein, include fact stipulations without prejudice to evidentiary objections.

– When and if Plaintiff exchanges proposed joint stipulations of fact as per Local Rule 16-2.2, Defendant Alon Nottea reserves the right to stipulate to facts without prejudice to evidentiary objections.

**6. Claims and Defenses**

**Plaintiff(s):**

**a. Plaintiff plans to pursue the following claims against the Defendants:**

**Claim 1:** Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by failing to disclose adequately material terms of their offer, including:

i.  That Defendants will use consumers' credit or debit card information to charge consumers the full costs of the trial products upon the expiration of a limited trial period;

ii.  The dates on which the trial period begins and ends;

iii. That Defendants will automatically enroll consumers in a negative option continuity plan;

iv. The cost of the continuity plan, and the frequency and duration of the recurring charges;

v.  The means consumers must use to cancel the negative option program to avoid additional charges; and

vi. Requirements of their refund policies.

**Claim 2:** Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by falsely representing that consumers could try Defendants' products "risk-free."

**Claim 3:** Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by falsely representing that they were accredited by, and had a rating of "A-" with, the Better Business Bureau.

FINAL PRETRIAL ORDER

**Claim 4:** Defendants violated Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n), by unfairly causing consumers' credit and debit cards to be charged without their express informed consent.

**Claim 5:** Defendants violated Section 4 of the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8403, by failing to:

 i.  clearly and conspicuously disclose all material terms of their negative option feature;

 ii.  obtain consumer's express informed consent to the negative option feature before charging consumers' accounts;

 iii. provide simple mechanisms for a consumer to stop these recurring charges.

**Claim 6:** Defendants violated Section 907(a) of the Electronic Funds Transfer Act, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), by:

 i.   debiting consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers and

 ii.  failing to provide a copy of this written authorization signed or similarly authenticated by the consumer.

**Claim 7:** Relief Defendant Chargeback Armor, Inc. received ill-gotten gains to which it does not have a legitimate claim.

**Additional Issue:** FTC contends Corporate Defendants acted as a common enterprise in carrying out their scheme.

 **b.  The Elements to Prove Plaintiff's Claims include:**

**Claim 1:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

 i.  A representation, omission, or practice that

FINAL PRETRIAL ORDER

Page  6

ii. Is likely to mislead consumers acting reasonably under the circumstances and

iii. Is material to consumers.[3]

**Claim 2:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

    i.  A representation, omission, or practice that

    ii. Is likely to mislead consumers acting reasonably under the circumstances and

    iii. Is material to consumers.[4]

**Claim 3:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

    i.  A representation, omission, or practice that

    ii. Is likely to mislead consumers acting reasonably under the circumstances and

    iii. Is material to consumers.[5]

**Claim 4:** An act or practice is unfair and violates Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n), if:

    i.  It is likely to cause substantial injury to consumers that

    ii. Is not reasonably avoidable by consumers and

    iii. Is not outweighed by countervailing benefits to consumers or competition.[6]

---

[3] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[4] *Id.*

[5] *Id.*

[6] *See, e.g., FTC v. Neovi, Inc.*, 604 F.3d 1150, 1152 (9th Cir. 2010).

FINAL PRETRIAL ORDER

**Claim 5:** Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless:

    i.  The seller clearly and conspicuously discloses all material terms of the transaction <u>before</u> obtaining the consumer's billing information,

    ii.  Obtains the consumer's express informed consent before making the charge, and

    iii. Provides a simple mechanism to stop recurring charges.[7]

**Claim 6:** The Electronic Funds Transfer Act Provides that:

    i.  A "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing[.]"[8]

    ii.  "[A] copy of such authorization shall be provided to the consumer when made."[9]

**Claim 7:** Disgorgement from a relief defendant is warranted where:

    i.  The relief defendant has received ill-gotten gains; and

    ii.  The Relief Defendant does not have a legitimate claim to those gains.[10]

### c. Key Evidence

---

[7] *See* 15 U.S.C. § 8403 (2006). It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. *Id.*

[8] Section 907(a) of EFTA, 15 U.S.C. § 1693e(a).

[9] *Id.*

[10] *See*, *e.g., FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010).

FINAL PRETRIAL ORDER

**Claim 1:** After representing that they were offering a "risk-free trial" offer of skincare products, Defendants failed to disclose material terms of that offer. Specifically, Defendants failed to disclose:

– They would use consumers' credit or debit card information to charge for the full costs of the products after a limited time. (UF #45, #47-49, #59-62). [11]
– The dates the trial period began and ended. (UF #56-58, UF #61(a)).
– That consumers who accepted a "risk-free trial" offer would be automatically enrolled in a negative option continuity plan with additional charges. (UF #56-58).
– The costs of the continuity plan and the frequency and duration of the recurring charges. (UF #51-61).
– The means consumers could use to cancel the continuity plan. (UF #55-58).
– The limitations of their refund policies.  (UF #62-67).

These failures to disclose were likely to mislead reasonable consumers. Indeed, Defendants knew from consumer complaint and chargeback activity that consumers were being misled and believed the website offers were advertising free products. (*See*, *e.g.,* UF #32(s) and (u); UF #34(j); UF #39(f) and (g); UF #65).[12] Defendants buried material terms of their sales offers in obscure

---

[11] In support of its motion for summary judgment, (Dkt. #353) the FTC filed a separate Statement of Uncontroverted Facts and Conclusions of Law ("UF") (Dkt. 353-2), which provides a comprehensive overview of the evidence in this case. Cites to "UF" throughout this section are in reference to the numbered paragraphs of that document.

[12] Notably, the FTC is not required to show an intent to deceive, since consumers can be equally harmed by both deliberate and negligent conduct. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D.

hyperlinks. (*See* UF #49; UF #56, UF #59). Defendants' failure to clearly and conspicuously disclose material terms of their offer was a deceptive omission that violated Section 5 of the FTC Act.

**Claim 2:** Defendants' websites prominently touted that products were offered "Free" or "Risk Free" in large, colorful font, often in multiple places. (*See*, *e.g.,* UF #59). This created a "net impression" that Defendants' product was free (except for the disclosed nominal shipping fee). That impression was likely to mislead reasonable consumers because it was false: Defendants actually intended to charge up to $97.88 for the products. (UF #51-53). Defendants' misrepresentations did in fact mislead consumers, leading to numerous complaints and chargebacks. (UF #64-UF #65; Dkt. #121-1, at 8.)[13]

**Claim 3:** Defendants claimed on their "risk-free trial" websites that they were accredited by the Better Business Bureau ("BBB") with an A- rating. (UF #49-50). This was likely to mislead reasonable consumers because AuraVie was not accredited by the BBB and it had an F rating. (UF #50). Moreover, the BBB actually contacted Defendants concerning their deceptive practices. (UF #50(a)).

---

Nev. 1992) (George, C.J.). However, the evidence in this case shows that Defendants intended to deceive consumers. (*See* UF #61(a), UF #32).

[13] "Information concerning cost [] is presumed material." *FTC v. BlueHippo Funding, LLC*, 08 Civ. 1819 (PAC), 2015 U.S. Dist. LEXIS 15112, *3 (S.D. NY 2015).

**Claim 4:** Defendants charged consumer credit cards and bank accounts without authorization. Defendants' records and those of its processors show that it processed thousands of charges to consumer credit card accounts. (*See* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27; *see generally* Doc. No. 120). Defendants' victims have testified that they never authorized those charges and that the charges had not been disclosed to them. (Doc. Nos. 353-3 through 353-11; Dkt. 353-27 at pp.10-27). Thousands of consumers complained directly to Defendants, to banks, the Better Business Bureau, or to law enforcement. (*See*, *e.g., id.*) Many consumers sought chargebacks and Defendants' chargeback rates rose as high as 35 percent.[14] These rates were consistent across Defendants' many merchant accounts.[15]

**Claim 5:** As evidenced by their website offers, Defendants failed to disclose clearly all material terms of their negative option continuity plan. (UF #51-62). The terms, when provided at all, were buried in fine print hyperlinks on pages dominated by "risk free" and "trial" offers. (UF #56, UF #59). The

---

[14] *See* Dkt. #121-1, at 8 ("Analysis of the entities' chargeback rates indicates the rates for RD's ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%.").

[15] Defendants' high chargeback rates existed despite their use of dozens of shell companies, merchant accounts, and billing descriptors. These practices served no other purpose than to conceal the immense common enterprise and its beneficiaries from its victims, payment processors, banks, and law enforcement.

FINAL PRETRIAL ORDER

unusually (and unconscionably) onerous return and chargeback policies were buried in an obscure, small "T&C" hyperlink filled with fine print and impenetrable jargon. (*Id.*).

Defendants solicited consumers' credit card information purportedly to pay a nominal shipping and handling fee. (UF #48, #50). Defendants then used that billing information to charge consumers—without consumers' authorization or knowledge—up to $97.88. (UF #51-62). Consumers filed complaints and sought chargebacks of charges, stating that they were not aware of, and never authorized, the charges. (*See*, *e.g.,* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27).

Defendants also failed to provide a simple mechanism for cancelling the continuity plan. Defendants threatened and intimidated consumers who challenged Defendants' practice of imposing unauthorized charges. (UF #9-41). They told consumers that chargeback requests were almost never successful and informed consumers that such requests would be treated  as fraud subject to potential civil and criminal investigation or prosecution. (*Id.*) Defendants website offers included no clear or conspicuous details on how to cancel membership in their negative option program. (*See*, *e.g.,* Ex. 909-113 through 909-124).

**Claim 6:** As evidenced by Defendants website offers, Defendants' terms and conditions regarding recurring monthly fees were not clear and readily

understandable. (*See*, *e.g.,* Ex. 909-113 through 909-124). In fact, this information was concealed in documents available only by hyperlink or in hard-to-read disclosures. (UF #56, UF #59.) Further, Defendants' websites were covered with claims that their offer was "risk free" and other directly contradictory statements. Consumers filed complaints and sought chargebacks of charges, stating that they were not aware of, and never authorized, the charges. (*See*, *e.g.,* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27).

Defendants did not receive authorization from consumers for these charges (*Id.*) and accordingly could not have provided a copy of this authorization to consumers. Defendants' websites or terms and conditions pages could not serve as the consumer's "copy" of the authorization, as required by 15 U.S.C. § 1693e(a), because it was not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional transfers.

**Claim 7:** The evidence shows that the Relief Defendant gratuitously received substantial transfers of funds traceable directly or indirectly to the unlawful conduct of AuraVie. (UF #41). The funds were provided without consideration and as "seed money" or a loan. (Exs. 916 ¶ 235; 917 ¶ 235; 280-1; Doc. No. 424-1, at 21-22) Chargeback Armor did not earn and had no entitlement to the funds. These payments were generated by deceiving consumers, and Chargeback Armor does not have a legitimate claim to them and should be forced

to disgorge those funds. Moreover, Chargeback Armor, Inc. was an asset of the Defendants, as made clear by the fact Defendants controlled the company. (UF #32(d); UF #41(c); UF #34(h)(xviii); UF #37(b)(i); UF #37(f), (k), and (l)); UF #39(f)-(g).)

## DEFENDANT DORON NOTTEA'S DEFENSES AND KEY EVIDENCE IN OPPOSITION.

**A.    Defenses and Denials:**

In his Answer to First Amended Complaint, Defendant Doron Nottea has denied, in whole or in part, the following substantive allegations (listed by Paragraph number): 1, 2, 3, 11 through 67, 70 through 81, 85, 87, 88, 93, 94, and 96 through 100.

**B.    Key Evidence Supporting the Defenses and Denials:**

(1)    Doron Nottea ("Doron") has never sold or marketed AuraVie products either directly or indirectly. The preparation of web pages, marketing plans, corporate formation and structures for the selling of AuraVie products were made by the owners of Bunzai Marketing ("Bunzai"). Doron was not involved in any such decisions as he did not have the responsibilities, rights or desire to make any such decisions.

(2)    Doron had only limited involvement with some, but not all, of the Corporate Defendants in this case, as a bookkeeper. He had no involvement at all with some of the Corporate Defendants.

(3)    Doron is a bookkeeper by profession which requires that he be provided with all types of financial information related to clients, including but not limited to income and expense information, commission and other

payout information, financial arrangements with other persons or entities, employee information, payroll information, insurance information, banking information, merchant account information, corporate structure information, and related matters.

(4)    The focus of Doron's work at all relevant times has been on running his adult content companies full time, as buyer, seller and controller, which he has done for more than twenty years.

(5)    Doron has never been an officer and/or director of Chargeback Armor, Inc., Secured Merchants, LLC, Bunzai Media Group, Inc., Pinnacle Logistics, Inc., DSA Holdings, Inc., Lifestyle Media Brands, Inc., Agoa Holdings, Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc., Heritage Alliance Group, Inc., AMD Financial Network, Inc., SBM Management, Inc., Media Urge, Inc., Adageo, LLC., Calenergy, Inc., Kai Media, Inc., Insight Media, Inc., Focus Media Solutions, Inc., USM Products, Inc., Merchant Leverage Group, Inc., DMA Media Holdings, Inc., Shalita Holdings, Inc., or All Star Beauty Products, Inc. (collectively "Corporate Defendants").

(6)    Doron has never performed any management duties for any of the Corporate Defendants.

(7)    Doron has never been a shareholder, member or partner in any of the Corporate Defendants.

(8)    There are no written documents that discuss or specify any management functions that Doron was allegedly to perform for any of the Corporate Defendants.

(9)    Doron has never received any compensation or money from any of the Corporate Defendants.

(10)    There are no written documents that evidence that Doron was a

FINAL PRETRIAL ORDER

partner in any of the Corporate Defendants.

(11)   Doron has never been a partner with Alon Nottea, Motti Nottea, Igor Latsanovski, Oz Mizrahi, Roi Reuveni, Kristopher Bond, Alan Argaman or Paul Medina with regard to any of the actions, activities or conduct related to the claims set forth by the FTC in this action.

(12)   The selling of AuraVie products, pricing programs, returns, refunds and contact with customers were conducted by the owners and employees of Bunzai.  Doron was not involved in any such decisions as he did not have the responsibilities, rights or desire to make any of these decisions.

(13)   Doron did not have any knowledge of the content of any of the web pages used to sell AuraVie products nor did he know what information should or should not be contained on web pages that advertise the selling of products.

(14)   Doron did not have any input in any pricing decisions for the products, or know of any return programs, refund policies or practices that address any customer complaints.  These activities were performed by the owners of the companies, and not Doron, as he performed bookkeeping services, not management services.  Doron also did not know if the practices about which the FTC complains are proper or not.

(15)   Bunzai prepared its web sites and landing pages for AuraVie in or about mid-2010.  Bunzai began selling AuraVie products in or about July 2010.  Doron first began to perform bookkeeping services in April 2013, more than three years after Bunzai was formed (January 1, 2010).

(16)   From the dates it is very clear that Doron did not have any involvement in the preparation of, content, decisions related to, or had any abilities to change or even object to the content of any web page, landing page, pricing program, free trial program, returns, charge backs or refunds

as any such activity began and was in operation for years before Doron performed any services.  In addition, he had no knowledge of any such activities.

(17)   Doron did not meet with any individuals to discuss management plans for the AuraVie business.

(18)   Doron has never held himself as an owner of any of the Corporate Defendants, with the exception of his shared ownership of Secured Commerce, LLC.  Doron is a 50% shareholder of Secured Commerce, LLC.  Secured Commerce, LLC, was engaged in the business of re-selling discounted postage and shipping.

(19)   Doron is not aware of what practices are proper or not in the charging of customers on a monthly basis.  Doron did not have any involvement in any decision as to how and when customers would be charged.

(20)   Doron did not have any involvement in any decision as to when and under what circumstances a customer could or could not return an item purchased or receive a refund.

**DEFENDANTS ALAN ARGAMAN, SECURED MERCHANTS, LLC, AND CHARGEBACK ARMOR INC.'S DEFENSES AND KEY EVIDENCE IN OPPOSITION.**

A.     **Defenses and Denials:**

In their Answer to the First Amended Complaint, Defendants Argaman, SM, and CBA have denied in whole or in part, the following substantive allegations (listed by Paragraph number): 1, 2, 3, 11 through 100.

B.     **Key Evidence Supporting the Defenses and Denials:**

(1)     Defendants have never sold or marketed AuraVie products either

directly or indirectly. The preparation of web pages, marketing plans, corporate formation and structures for the selling of AuraVie products were made by the owners of Bunzai Marketing ("Bunzai").  Defendants were not involved in any such decisions as they did not have the responsibilities, rights or desire to make any such decisions.  Argaman and SM were arms-length third party vendors providing legitimate technological services and CBA has never processed any chargebacks for AuraVie as it was not even formed until February 2015.

(2)     Argaman and SM's involvement was limited to providing the technology for chargebacks and the IVR services, but they did not actually control the operations of the chargebacks or the IVR.  No chargeback services or IVR services were provided.  Only the technology was provided. No toll-free numbers for shell companies were provided.  Argaman never received any monies from any of the other Defendants.  The only monies CBA received from the other Defendants was $250,000 from SM as a capital infusion, which came from three separate clients of SM, not from any of the other Defendants in this matter.

(3)     None of the other individual or corporate Defendants had ownership or control over SM or CBA, as Argaman and Mike Costache, respectively, were the sole owners and operators of those entities.

(4)     Argaman has never been an officer and/or director of Chargeback Armor, Inc., Bunzai Media Group, Inc., Pinnacle Logistics, Inc., DSA Holdings, Inc., Lifestyle Media Brands, Inc., Agoa Holdings, Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc., Heritage Alliance Group, Inc., AMD Financial Network, Inc., SBM Management, Inc., Media Urge, Inc., Adageo, LLC., Calenergy, Inc., Kai Media, Inc., Insight Media, Inc., Focus Media Solutions, Inc., USM Products, Inc., Merchant Leverage

Group, Inc., DMA Media Holdings, Inc., Shalita Holdings, Inc., or All Star Beauty Products, Inc. (collectively "Corporate Defendants").

(5)   Argaman has never performed any management duties for any of the Corporate Defendants.

(6)   Argaman has never been a shareholder, member or partner in any of the Corporate Defendants.

(7)   There are no written documents that discuss or specify any management functions that Argaman was allegedly to perform for any of the Corporate Defendants.

(8)   Argaman has never received any compensation or money from any of the Corporate Defendants.

(9)   There are no written documents that evidence that Argaman was a partner in any of the Corporate Defendants.

(10)   Argaman has never been a partner with Alon Nottea, Motti Nottea, Igor Latsanovski, Oz Mizrahi, Roi Reuveni, Kristopher Bond, Doron Nottea or Paul Medina with regard to any of the actions, activities or conduct related to the claims set forth by the FTC in this action.

(11)   The selling of AuraVie products, pricing programs, returns, refunds and contact with customers were conducted by the owners and employees of Bunzai.  Argaman, SM, and CBA were not involved in any such decisions as they did not have the responsibilities, rights or desire to make any of these decisions.  Argaman and SM were vendors, such as USPS or AT&T, and CBA was not formed until February 2015.

(12)   Argaman, SM, and CBA did not have any knowledge of the content of any of the web pages used to sell AuraVie products nor did he know what information should or should not be contained on web pages that advertise the selling of products.  The only website worked on by

Argaman/SM was a straight-sale website that contained no prohibited advertising or marketing.

(13)  Defendants did not have any input in any pricing decisions for the products, or know of any return programs, refund policies or practices that address any customer complaints.  These activities were performed by the owners of the companies, and not Defendants, as they performed technical services as vendors, not management or operational services.  Defendants also did not know nor should have known if the practices about which the FTC complains are proper or not.

(14)  The evidence provided by the FTC makes it is very clear that SM and Argaman were nothing more than vendors and technical providers and did not have any involvement in the preparation of, content, decisions related to, or had any abilities to change or even object to the content of any web page, landing page, pricing program, free trial program, returns, charge backs or refunds as any such activity was not within the purview of the duties and responsibilities of SM and Argaman as vendors. In addition, neither they, nor CBA had no knowledge of any such activities.

(15)  None of the Defendants met with any individuals to discuss management plans for the AuraVie business.

(16)  Defendants are not aware of what practices are proper or not in the charging of customers on a monthly basis.  Defendants did not have any involvement in any decision as to how and when customers would be charged.

(17)  Defendants did not have any involvement in any decision as to when and under what circumstances a customer could or could not return an item purchased or receive a refund.

(18)  There were no credit cards, merchant accounts, or bank accounts

used in the alleged AuraVie scheme that were in the names of any of the Defendants.

(19)   CBA has not received any ill-gotten gains or "tainted" monies from AuraVie, as it never received any monies from AuraVie and the $250,000 received from SM can be traced to three non-AuraVie clients of SM.

(20)   Defendants were not part of the Common Enterprise here, based on the foregoing.

## DEFENDANTS IGOR LATSANOVKSI AND CALENERGY INC.'S DEFENSES AND KEY EVIDENCE IN OPPOSITION

**A.      *Defenses and Denials.***

In their Answer to First Amended Complaint, Defendants Latsanovski and Calenergy have denied, in whole or in part, the following substantive allegations (listed by Paragraph number):  1, 2, 3, 9 through 67, 70 through 81, 85, 87, 88, 93, 94, 96 through 98, and 100.

**B.      *Key Evidence Supporting the Defenses and Denials.***

**a.      *Count One: Deceptive Omissions.***

1.      Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.      Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.      Defendants had no involvement in the day to day operations of defendant Bunzai

4.      Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.      Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

6.      The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

7.      Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.      Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well

Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

      **b.**    ***Count Two:  Deceptive Representation Re False "Risk Free" Trial Claim.***

1.    Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.    Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.    Defendants had no involvement in the day to day operations of defendant Bunzai

4.    Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.    Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

6.    The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

FINAL PRETRIAL ORDER

7.     Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.     Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

c.     *__Count Three: Deceptive Representation Re False Better Business Bureau Accreditation And Rating Claims.__*

1.     Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.     Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.     Defendants had no involvement in the day to day operations of defendant Bunzai

4.     Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.     Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any

customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions. Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

6.      The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

7.      Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.      Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

###   d.      *Count Four: Unfairness.*

FINAL PRETRIAL ORDER

1.    Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.    Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.    Defendants had no involvement in the day to day operations of defendant Bunzai

4.    Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.    Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

6.    The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

7.    Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen

FINAL PRETRIAL ORDER

even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.      Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

e.      ***Count Five: ROSCA.***

1.      Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.      Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.      Defendants had no involvement in the day to day operations of defendant Bunzai

4.      Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.      Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

FINAL PRETRIAL ORDER

6.      The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

7.      Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.      Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

### f.      *Count Six: EFTA Count.*

1.      Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.

2.      Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.

3.      Defendants had no involvement in the day to day operations of defendant Bunzai

4.     Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct

5.     Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business.  Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions.  Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

6.     The amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

7.     Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai.  As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though  (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

8.     Unrelated third party, Sunset Holding Partner, LLC ("Sunset") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved.  But its Well

Fargo account ($212,000) and real estate assets valued in excess of $5 million were frozen in September 2015, even though all of the funds frozen came from outside real estate investors.

      **g.**    ***Common Enterprise Liability.***

    1.    No evidence exists that Defendants acted in concert with defendant Bunzai to violate the FTC Act, Defendants are liable if at all to only disgorgement of the sums they directly received from defendant Bunzai during the period 2010-2015.  That sum is $317, See, *FTC v. Commerce Planet, Inc*., 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016).

    2.    No evidence exists the Defendants "*participated directly in*" or controlled the alleged unlawful acts and had actual knowledge of the misrepresentations or were recklessly indifferent to them. The evidence is undisputed that Defendants loaned Defendant Bunzai $500,000 during the period 2010 to 2015; that the full principal amount of $500,000 was repaid by Defendant Bunzai; and $317,000 in interest on the investment return on the $500,000 loan was repaid.

    3.    To the extent Defendants are liable at all it is solely for disgorgement of the $317,000 they received for Defendant Bunzai – nothing more.  Defendants accordingly seek partial summary judgment on this issue.  *See, e.g., FTC v. Burnlounge, Inc*., 584 Fed. Appx. 315, 317 (9th Cir. 2014) (Affirming district court's order that a defendant who raised capital necessary to create the defendant corporation; owned stock in the corporation; and held a position in the organization; "*likely ... had actual knowledge or was at least recklessly indifferent to the truth of the misrepresentations made to consumers*" disgorge "*all monies and other items of enrichment which he obtained from Burnlounge's operations*.") This Court has "*broad authority to fashion appropriate remedies for violations of*

*the Act. [and] it includes the 'authority to grant any ancillary relief necessary to accomplish complete justice.'" FTC v. Pantron Comp., 33 F.3d 1088, 1102 (9th Cir. 1994).  Such ancillary relief may include restitution or disgorgement. Id. at w.4.*

4.       Because of Defendants sole involvement in Defendant Bunzai's operations was as a lender of only $500,000, they should be subject solely to disgorgement of the $317,000 they received as a return on their $500,000 investment.

**h.       *Individual  Liability.***

1.       The Ninth Circuit has established a two-pronged test for determining when an individual may be held personally liable for corporate violation of the FTC Act.  *The test requires the FTC to prove that the individual: (1) participated directly in, or had the authority to control, the unlawful acts or practices at issue;* ***and*** *(2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth. See, FTC v. Network Services Depot, Inc., 617 F.3d 1127, 1138-39 (9th Cir. 2010).*

Defendants Latsanovski and Calenergy did not engage in conduct satisfying the two-pronged test.  Thus, as a matter of law they have no liability arising from the FTC's claims asserted in the FAC.

**i.       *Bunzai Website Did not Violate the FTC Act (or Any Other Law).***

The Bunzai website used to generate internet sales was compliant with the FTC Act and all other applicable law.  All terms of sale of AuraVie products were fully disclosed to the consumer.  The instructions to purchase products were clear; as was the risk free trial period.  No misleading terms were included on the website.

**C.       *Counterclaims and Affirmative Defenses.***

Defendants' evidence is as set forth above.

<u>Third Party Plaintiffs and Defendants:</u> Not applicable.

7.   **Plaintiff's position:** In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

    a.   Whether Defendants' Internet offers violated Section 5 of the FTC Act.

    b.   Whether Defendants' Internet offers violated the Restore Online Shopper's Confidence Act, 15 U.S.C. § 8403.

    c.   Whether Defendants' business practices violated the Electronic Funds Transfer Act, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

    d.   Whether the Corporate Defendants acted as a common enterprise.

    e.   Whether the Individual Defendants should be held individually liable.

    f.   Whether the Relief Defendant received ill-gotten gains to which it does not have a legitimate claim.

    g.   The amount of consumer redress or disgorgement Defendants are liable for.

**Defendant Alon Nottea's position:** (h) The scope of any permanent injunction. Defendant Alon Nottea reserves the right to amend this final pretrial conference order when and if Plaintiff exchanges proposed joint stipulations of fact as per Local Rule 16-2.2.

8.     All discovery is complete.

9.     The following trial parties made disclosures under FED. R. CIV. P. 26(a)(3): FTC; Alon Nottea; Igor Latsanovski; and CalEnergy, Inc. The following trial parties failed to serve Initial Disclosures on the parties: Defendants Alan Argaman; Secured Merchants; Doron Nottea; and Chargeback Armor, Inc.

The joint exhibit list of the parties will be filed under separate cover as required by the Court's Standing Order (Doc. No. 25) five days before the Final Pretrial Conference.

**Defendant Alon Nottea's position:** Defendant Alon Nottea reserves the right to file motions in limine and amend this final pretrial conference order when and if Plaintiff exchanges a proposed joint exhibit list and meets and confers re the same.

10.     **Plaintiff's position:** Witness lists of the parties have been exchanged. The joint witness list of the parties will be filed under separate cover as required by the Court's Standing Order (Doc. No. 25) five days before the Final Pretrial Conference.

1       <u>Defendant Alon Nottea's position:</u> Defendant Alon Nottea reserves the right

2   to file motions in limine and amend this final pretrial conference order when and

3   if Plaintiff exchanges a proposed joint witness list and meets and confers re the

4   same.

5       11.   **Plaintiff's motions:** The following law and motion matters and

6   motions in limine, and no others, are pending or contemplated by the FTC:

7         – Motion in limine to pre-admit declarations from the Better Business

8            Bureau, Florida Attorney General, consumers, the United States

9            Postal Service, and the Federal Trade Commission.

10        – Motion in limine to find that the Court's Receiver had authority to

11           waive any purported attorney-client privilege for the Receivership

12           Defendants.

13        – Motion in limine to preclude testimony of undisclosed witnesses and

14           undisclosed expert witness.

15        – Motion in limine to preclude irrelevant evidence of "satisfied

16           consumers."

17      **Defendant Doron Nottea's position:**

18      Defendant Doron Nottea may bring a motion in limine or pre-trial motion to

19  exclude all proffered evidence by the FTC that has not been authenticated or for

20  which an appropriate foundation has not been laid.

FINAL PRETRIAL ORDER

**Defendant Alon Nottea's motions:**

–   Motion in limine to preclude Plaintiff from calling Defendant Alon Nottea's trial counsel as a witness.

–   Motion in limine to preclude evidence of consumer monetary loss, consumer damage, and consumer compensatory relief.

**Defendant Alon Nottea's position:** Defendant Alon Nottea reserves the right to file motions in limine and amend this final pretrial conference order when and if Plaintiff exchanges a proposed joint witness list, joint exhibit list, joint stipulations of fact, and meets and confers re the same.

12.   Bifurcation of the following issues for trial is ordered: none.

13.   The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.


_____
GEORGE H. WU
U.S. DISTRICT JUDGE


Approved as to form and content:

____/s/ Reid Tepfer_____
Reid Tepfer
Attorney for the Federal Trade Commission


FINAL PRETRIAL ORDER

1

___/s/ Jeffrey Benice____

2  Jeffrey Benice
Attorney for Igor Latsanovski and

3  CalEnergy, Inc.

4  ____/s/ Robert Ungar
Robert Ungar

5  Attorney for Alon Nottea and
Roi Reuveni

6
___/s/ Robert Esensten

7  Robert Esensten
Attorney for Doron Nottea

8
___/s/ Sagar Parikh

9  Sagar Parikh
Attorney for Alan Argaman,

10  Secured Merchants LLC, and
Chargeback Armor, Inc.

11

12

13

14

15

16

17

18

19

20