```
 1  Jeffrey S. Benice, Esq., State Bar No. 81583
    LAW OFFICES OF JEFFREY S. BENICE
 2  *A Professional Law Corporation*
    3080 Bristol Street
 3  Sixth Floor, Suite 630
    Costa Mesa, California 92626
 4  Telephone No.: (714) 641-3600
    Facsimile No.: (714) 641-3601
 5  Website: www.JeffreyBenice.com
    E-Mail: JSB@JeffreyBenice.com
 6
    Attorneys for Defendants,
 7  Igor Latsanovski and Calenergy, Inc.
```

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| FEDERAL TRADE COMMISSION, | CASE NO. CV 15-04527 GW (PLAx) |
|---|---|
| Plaintiff, | DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S TRIAL BRIEF |
| v. | |
| BUNZAI MEDIA GROUP INC., et al., | Date: June 21, 2016 |
| | Time: 8:30 A.M. |
| Defendants. | Courtroom: 10 |

[Assigned for All Purposes to the Honorable George H. Wu]

[First Amended Complaint Filed: October 9, 2015]

---

DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF

| | TABLE OF CONTENTS | |
|---|---|---|
| 1. | SUMMARY OF DEFENDANTS LATSANOVSKI AND CALENERGY'S DEFENSE TO FEDERAL TRADE COMMISSION'S ("FTC") CLAIMS | 1 |
| | A. The FTC's Claims. | 1 |
| | B. Defendants Latsanovski and Calenergy Have No Liability Under The FTC Act. | 2 |
| | C. The FTC's Claims Against Defendants Latsanovski and Calenergy are Meritless; The FTC's Summary Judgment Motion Must be Denied. | 5 |
| 2. | PROCEDURAL HISTORY | 6 |
| 3. | DEFENDANTS NEITHER PARTICIPATED IN NOR HAD KNOWLEDGE OR RECKLESSLY DISREGARDED DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT | 6 |
| | A. Defendants Latsanovski's and Calenergy History. | 6 |
| | B. Defendant Latsanovski's Loan Transactions with Defendant Bunzai. | 7 |
| 4. | THE FTC'S CONTENTION THAT THE AURAVIE SKINCARE SALES PROGRAM WAS A "*DECEPTIVE SCHEME*" IS BASELESS | 10 |
| 5. | AS A MATTER OF LAW; DEFENDANTS CAN BE LIABLE, IF AT ALL, ONLY FOR EQUITABLE DIGORGEMENT; THE FTC'S CONTENTION DEFENDANTS ARE SUBJECT TO JOINT AND SEVERAL LIABILITY IS MERITLESS | 13 |
| 6. | CONCLUSION | 14 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

| | |
|---|---|
| *Delaware Watch Co. v. FTC*, 332 *F.2d* 745, 746 (2d Cir. 1694) | 2 |
| *Delaware Watch*, 332 *F.2d* 1143 | 2 |
| *FTC v. Burnlounge, Inc.*, 584 Fed. Appx. 315 (9th Cir. 2014) | 5 |
| *FTC v. Burnlounge, Inc.*, 584 Fed. Appx. 315, 317 (9th Cir. 2014) | 13 |
| *FTC v. Commerce Planet, Inc.*, 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016) | 13 |
| *FTC v. Network Services Depot, Inc.*, 617 *F.3d* 1127, 1138-39 (9th Cir. 2010); | 5, 9, 14 |
| *FTC v. Pantron Comp.*, 33 *F.3d* 1088, 1102 (9th Cir. 1994) | 13 |
| *FTC v. Publishing Clearing House, Inc.*, 104 *F.3d* 1168, 1170-71 (9th Cir. 1997) | 6 |
| *FTC v. Stefanchik*, 559 *F.3d* 924, 931 (9th Cir. 2009) | 3, 5, 9, |
| *Hately v. SEC*, 8 *F.3d* 653, 656 (9th Cir. 1993); | 5 |
| *Resort Car Rental Sys., Inc. v. F.T.C.*, 518, *F.2d* 962, 964 (9th Cir. 1975) | 10 |
| *SEC v. First Pacific Bancorp*, 142 *F. 3d* 1186, 1191-92 (9th Cir. 1998) | 5 |
| *Stefanchik*, 559 *F.3d* at 927, 930-32 | 5 |

1.

## SUMMARY OF DEFENDANTS LATSANOVSKI AND CALENERGY'S DEFENSE TO FEDERAL TRADE COMMISSION'S ("*FTC*")CLAIMS

**A.** *The FTC's Claims.*

The FTC's first amended complaint ("*FAC*") contains seven counts for (1) failure to disclose adequate material terms of offer; (2) false "*risk-free*" trial claim; (3) false Better Business Bureau Accreditations and rating claims; (4) unfairly charging consumers without authorization; §§(5) violation of ROSCA – Auto-Renewal Continuity Plan; (6) unauthorized debiting from consumer's accounts; and (7) a separate count against relief Defendant Chargeback Armor, Inc.

The FTC's primary factual contention is that defendants conceived and operated a skincare business called "*Aura Vie*"; and improperly sold the products through misleading web-based advertising. Defendants dispute that the AuraVie skincare business was advertised in a misleading fashion. [See discussion infra at § 5.]

Defendants Latsanovski and Calenergy are third party investors/lenders who loaned approximately $500,000 to defendant Bunzai. The FTC's allegations against Defendants Latsanovksi and Calenergy directly implicated them in the alleged scheme:

> "21. *Defendant Calenergy, Inc. is or was a California corporation with its principal place of business at 63420 Cordova Drive, Calabasas, CA 91302. At times material to this Complaint, CalEnergy, Inc. had advertised marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States. CalEnergy, Inc. transacts or has transacted business in this district and throughout the United States.*"
> [FAC ¶21]
>
> "36. *Defendant Igor Latsanovski is or was an owner of Bunzai Media Group, Inc. and CEO of Zen Mobile Media Group, Inc. At times material to this Complaint, he has formulated, directed, controlled, had the Authority to control, or participated in the acts*

1

> *or practices set forth in this Complaint. By and through the corporate defendants, he has harmed consumers nationwide with his unfair and deceptive practices. Defendant Igor Latsanovski resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States."* [FAC, ¶36.]

Contrary to the FTC's allegations, the evidence at trial will show that neither Defendant Latsanovski nor Calenergy held any ownership interest in Defendant Bunzai; nor had any involvement in defendant Bunzai's operations. Moreover, they did not participate directly or indirectly in any alleged wrongful conduct.

The FTC further alleges that Defendants Latsanovksi and CalEnergy engaged in a common enterprise. [FAC, ¶42.] The FTC uses the common enterprise doctrine to expand its reach beyond those who themselves deceptively market a product where the *"same individuals were transacting an integrated business through a maze of interrelated companies."* Delaware Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir. 1694). Courts rely on several factors to assess the existence of a common enterprise: whether companies (1) maintain officers and employees in common; (2) operate under common control; (3) share offices; (4) commingle funds; and (5) share advertising and marketing. No one factor is determinative, rather, the entirety of the factual circumstances dictates whether a common enterprise exists and whether a company should be found to be a part of it. Delaware Watch, 332 F.2d 1143.

The evidence a trial will demonstrate that, neither any individual factor nor the overall circumstances support finding Defendants Latsanovski and Calenergy to be a part of any common enterprise with the Bunzai defendants; Defendants Latsanovski and CalEnergy were solely third party lenders to Defendant Bunzai (and affiliate companies) during the period 2010 to 2015. No common enterprise existed between them.

**B.** <u>**Defendants Latsanovksi and Calenergy Have No Liability Under The FTC Act**</u>.

Defendant Latsanovski and his company Calenergy have been named as defendants by Plaintiff FTC because they allegedly *"participated in the scheme"*; and Latsanovski was *"an*

*employee of Bunzai, he was a party and majority shareholder.*" [*See, FTC's July 31, 2015 Reply to Defendants' Opposition to Preliminary Injunction* at 8: lns. 15-16; 9: lns. 1-2.] The evidence at trial will establish that the FTC's assertions concerning Defendants' participation in the alleged Aura Vie marketing "*scheme*" are materially misstated or grossly exaggerated for the sole purpose of imposing joint and several liability on Defendants. *See, FTC v. Stefanchik*, 559 *F.3d* 924, 930-931 (9th Cir. 2009); *only these defendants have significant assets to seize*. The remaining defendants are essentially judgment proof.

For example, the FTC contends *inter alia* that Defendants transferred at least $1.9 million from defendant Bunzai to Defendants. [*See, Receiver's July 16, 2015 Response to Defendants' Application for Partial Relief from Temporary Restraining Order* at 2: lns. 21-22.] In fact, the evidence will establish that Defendant Calenergy loaned defendant Bunzai the principal sum of $500,000 as a form of revolving credit line during the period 2010 to 2015. Defendant Bunzai repaid $500,000 in principal and $317,748.05 (herein "*$317,000*") in interest to Calenergy. [Decl. of Latsanovski, ¶¶2-5; Exh. "A" thereto; *July 1, 2015 Loan Summary.*] The evidence will establish that the $1.9 million number is the aggregate of all principal loan advances; repayments; and further re-advances of the original $500,000 in loans made in various installments. The FTC (and the Receiver) has continued to grossly overstate Defendants' loans to defendant Bunzai to improperly attempt to expand Defendants' role and relationship with Defendant Bunzai.

More importantly, Defendants' business relationship with defendant Bunzai has been mischaracterized and distorted by the FTC to ensnare Defendants in this litigation; and subject unrelated third party "*untainted*" assets owned by unrelated third party Sunset Holdings, LLC ("*Sunset*") and others to be subject to an asset freeze through this Court's September 9, 2015 preliminary injunction. In fact, the evidence at trial will establish:

- Defendants Latsanovski and Calenergy were solely investors who loaned $500,000 in principal to defendant Bunzai.
- Defendants actually received $317,000 in investment return on the $500,000 investment and were repaid the $500,000.
- Defendants had no involvement in the day to day operations of defendant Bunzai.

3
**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

- Defendants had no knowledge of or involvement in Defendant Bunzai's alleged wrongful activity and did not recklessly disregard such conduct.

- Defendant Latsanovski, Calenergy's CEO, did not play any role in the operation of the internet skincare business. Latsanovski never spoke to any customers; was not involved in the day to day operations of the internet skincare business; had no involvement in the marketing or advertising of the skincare products; never received or reviewed any reports regarding customer complaints; and had no knowledge of the web based advertising used by defendant Bunzai. Defendants Alon and Bond actually operated and controlled Defendant Bunzai and made all operational decisions. Neither Calenergy nor Defendant Latsanovski received any money from consumers directly.

- As noted above, the amount of Defendant Latsanovski's assets impacted by the TRO and asset freeze far exceeds the amount he made from his loan to Bunzai. In total, over $3.1 million of Latsanovski's assets have been impacted by the asset freeze. Latsanovski's $3.1 million home is subject to the freeze and his personal bank accounts (which contained approximately $50,000) have been frozen.

- Defendant Latsanovski's role in unrelated third parties Sunset Holdings Partners LLC, ComicFix LLC, and Vastpay LLC was solely to locate third party investors who would be willing to provide funds to these businesses. None of these businesses received funds from Defendant Bunzai. As a result of the asset freeze, these legitimate businesses have had their bank accounts frozen even though (a) these businesses are completely unrelated to the alleged internet skincare business, (b) were funded by unrelated sources of income; and/or (c) were not run by Defendants Calenergy or Latsanovski.

- Most importantly, unrelated third party, Sunset Holding Partner, LLC ("*Sunset*") is a real estate investment company that was formed in January 2015, well after the business entities involved in the skincare business were dissolved. But its Well Fargo account ($212,000) and real estate assets valued in excess of $5 million were

frozen in September 2015, even though all of the funds frozen came from a outside real estate investors.

C. **<u>The FTC's Claims Against Defendants Latsanovski and Calenergy Are Meritless.</u>**

The Ninth Circuit has established a two-pronged test for determining when an individual may be held personally liable for corporate violation of the FTC Act. *The test requires the FTC to prove that the individual: (1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; **and** (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth.* See, <u>FTC v. Network Services Depot, Inc.</u>, 617 F.3d 1127, 1138-39 (9th Cir. 2010); <u>FTC v. Stefanchik</u>, 559 F.3d 924, 931 (9th Cir. 2009). Satisfaction of the two-pronged test establishes the degree of collaboration between co-defendants necessary to justify joint and several liability in analogous factual contexts, such as actions brought by the Securities and Exchange Commission ("*SEC*") to obtain disgorgement in securities fraud cases. See, <u>SEC v. First Pacific Bancorp</u>, 142 F.3d 1186, 1191-92 (9th Cir. 1998); <u>Hately v. SEC</u>, 8 F.3d 653, 656 (9th Cir. 1993); <u>Network Services Depot</u>, 617 F.3d at 1138-39; <u>Stefanchik</u>, 559 F.3d at 927, 930-32; <u>FTC v. Publishing Clearing House, Inc.</u>, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

The evidence at trial will establish that Defendants Latsanovski and Calenergy did not engage in conduct satisfying the two-pronged test. Thus, the FTC's Action against them must be dismissed; **as a matter of law they have no liability arising from the FTC's claims asserted in the FAC.** The preliminary injunction and asset freeze must be dissolved as well.

Alternatively, Defendants liability if any must be limited to equitable disgorgement, not joint and several liability. Assuming *arguendo* that the Court determines that defendants Latsanovski and Calenergy's alleged status as *partners* with Bunzai creates an inference that they likely had actual knowledge or were recklessly indifferent to the truth of purported misrepresentations made to consumers, they are *subject only to disgorgement, not joint and several liability*. See, <u>FTC v. Burnlounge, Inc.</u>, 584 Fed. Appx. 315 (9th Cir. 2014) [*See*, F.R.A.P. Rule 32.1(a); *citation permitted of unpublished opinions.*] Defendants received $317,000 in

profit/interest return on the $500,000 investment made into Bunzai. *The amount they should be ordered to disgorge if any should not exceed $317,000.*

## 2.

## PROCEDURAL HISTORY

The FTC filed this Action on June 16, 2015 concurrently with an ex parte application to temporarily seal the entire file and docket; and an ex parte application for a restraining order. This Court granted the TRO and thereafter lifted the stay. A hearing on the FTC's preliminary injunction and asset freeze was set for August 6, 2015. On September 9, 2015 the Court entered its order granting a preliminary injunction and asset freeze as to Defendants Latsanovski and Calenergy. (As well as all other defendants).

## 3.

## DEFENDANTS NEITHER PARTICIPATED IN NOR HAD KNOWLEDGE OR RECKLESSLY DISREGARDED DEFENDANT BUNZAI'S ALLEGED WRONGFUL CONDUCT

A. *Defendants Latsanovski's and Calenergy's History.*

The evidence at a trial will establish the following:

Defendant Latsanovksi is a 52 year old immigrant. He was born in Kazakhstan (USSR) in 1964 and lived with his family there until approximately 1990. He graduated from college in approximately 1983. In 1992 Defendant Latsanovksi moved to Canada. In 1996, when he was 33 years old, he moved with his wife to Spain. Defendant Latsanovksi lived in Barcelona, Spain from 1996 to 2010. While in Spain he became involved in various real estate development projects. In 2010, he moved from Spain. [his wife and family (2 children), moved to the United States in 2011.] When he first arrived in the United States in 2010 he could speak a little English, but could not read nor write English. He used an interpreter to read English.

Defendant Latsanovski represented a group of foreign investors in 2010 as their agent in the United States. His business plan involved placing the foreign investors' investment funds in to suitable investments in the United States. He also made investments on his own behalf. In 2009 Defendant Latsanovski created Defendant Calenergy and became its CEO. Defendant Latsanovski

**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

used Defendant Calenergy to fund investments with investor funds.

Sometime in 2010, Latsanovski was approached by Defendant Alon Nottea, to invest in an internet skincare project with Defendant Bunzai Media Group, Inc. ("*Bunzai*"). Mr. Nottea was Defendant Bunzai's president and CEO. From conversations with Defendant Nottea, Defendant Latsanovski understood that Defendant Bunzai needed funds to hire additional employees and resources. Defendant Latsanovksi preliminarily agreed to invest funds in Defendant Nottea's company.

Defendant Nottea also introduced Defendant Latsanovski to Defendants Khristopher Bond who handled the day to day operations for the internet skincare business and also handled all aspects of the business, including marketing, advertising, product fulfillment and customer service.

Defendant Latsanovski's sole involvement in Defendant Bunzai, and all entities related to it ("*Bunzai Group*"), was to provide loans through his company Defendant Calenergy. As Defendant Calenergy's CEO, Defendant Latsanovski had no involvement in the operation of the Bunzai Group and had no authority to make any decisions regarding the operations of the Bunzai Group.

Defendant Latsanovksi did not perform any functions in advertising, payment processing, billing, product fulfillment, customer service, returns, or anything else regarding the Bunzai Group's operational decisions. Moreover, he had no interactions with customers, did not received any customer complaints, nor any reports of customer complaints.

At no point did Defendant Latsanovski believe that any customers were being deceived or defrauded. By all indications, Defendant Nottea was running a legitimate company operating in a legitimate industry.

### B. *Defendant Latsanovski's Loan Transactions with Defendant Bunzai.*

In 2010 when Defendant Latsanovski was introduced to defendants Nottea and Bunzai an initial proposal was made to Defendant Latsanovski, in which he would invest *"$350k in exchange for 55% ownership of Bunzai Media Group, Ownership Shares ... will be as follows: 55% Igor, 22.5% Alon[Nottea], 22.5 Khristopher [Bond]"*. The proposal was memorialized in a document entitled *"Bunzai Media Group - Partnership Agreement,"* dated October 12, 2010. *Bunzai Media Group Partnership Agreement dated October 12, 2010;* Trial Exh. "633".]

A condition to the October 12, 2010 Agreement's validity was that:

> *"upon signing this agreement, Igor shall invest $75k to run a continuity test for 30 days. During this test, Bunzai will purchase at least 1,000 orders . . . within the first 15 days, and a conversion from free trial to transitional stage . . . of at least 75% of those orders. If this goal is met and both parties agree to continue with the partnership, then Igor will immediately invest the remaining $275k to complete the financial agreements of this deal."*

Defendant Latsanovski advanced the $75,000 on October 12, 2010. However, the condition to the validity of the October 12, 2010 Agreement did not occur. The continuity test was not satisfactorily completed and the *"parties [did not] agree to continue with the partnership . . ."*

Defendants Nottea and Bond, defendant Bunzai's officers, then proposed a *"Bunzai Media Group Loan Agreement"* dated December 16, 2010. [*"Bunzai Media Group Loan Agreement dated December 16, 2010;* Trial Exh. "634".] The December 16, 2010 Loan Agreement offered two alternatives to Defendant Latsanovski concerning a loan of $175,000 he was to make to defendant Bunzai; *"This Agreement . . . with respect . . . to the loan of $175k to existing company."* First, defendant Bunzai agreed to repay the $175,000 in three (3) payments on April 5, May 5, and June 5, 2010 respectfully of $50,000, $50,000 and $100,000. *"Alternatively, "Igor's 175k will become an investment that will represent a percentage of ownership in the company that will be determined the first week of January, 2011."* [*Bunzai Media Group Loan Agreement* dated December 16, 2010; Trial Exh. "634".]

No subsequent agreement was negotiated between the parties in January, 2011. Rather, in March, 2011 Defendants Nottea and Bond offered Defendant Latsanovski a new partnership proposal. This new agreement required Defendant Latsanovski to immediately *"invest $500,000 into the company for administration, manufacturing and marketing expenses. . . Investments shall be returned as follows:*

> *Igor $300k*
>
> *Alon and Khristopher (to go to French Partners) $200k*

8

**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

> *Igor $200k*
>
> *Alon and Khristopher $300k"*

Pursuant to the March 23, 2011 Partnership Agreement's terms defendants Latsanovski, Nottea, and Bond would each own "*1/3 of 100% of the company.*" Further:

> "*5. It is understood by all parties that this will be Alon Nottea and Khristopher Bond's primary business and they shall devote to the conduct of the business so much of their respective time as may be reasonably necessary for the efficient operation of the business.*"
>
> ["*Bunzai Media Group – Partnership Agreement* dated March 23, 2011; Trial Exh. "635".]

Defendant Latsanovsky decided not to invest $500,000 in one lump sum into Defendant Bunzai in March, 2011. He was uncomfortable with the terms of repayment of the investment and decided that he would remain a lender as set forth in December 16, 2010 Loan Agreement Defendants Nottea and Bond agreed that Defendant Latsanovski's status would be as a lender only.

Because Defendants Latsanovski and Calenergy functioned solely as lenders to defendant Bunzai, as a matter of law they may not be held personally liable for Defendant Bunzai's corporate violation of the FTC Act. Accordingly, as a matter of law no evidence exists that they *(1) participated directly in, or had the authority to control, the unlawful acts or practices at issue;* **and** *(2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth.* See, FTC v. Network Services Depot, Inc., 617 *F.3d* 1127, 1138-39 (9th Cir. 2010); FTC v. Stefanchik, 559 *F.3d* 924, 931 (9th Cir. 2009). The FTC's Action against them must accordingly be dismissed.

///

///

///

## 4.

## THE FTC'S CONTENTION THAT THE AURAVIE SKIN CARE SALES PROGRAM WAS A *"DECEPTIVE SCHEME"* IS BASELESS

The FTC contends that *"this case concerns a deceptive scheme that has defrauded consumers of more than $75 million."* The FTC has yet to describe in pretrial proceedings precisely what was *"fraudulent"* or *"deceptive"* about Defendant Bunzai's web-based sales program. Contrary to the FTC's unfounded assertions, the trial evidence will show that there were in fact no *"hidden costs"* or deceptive *"return"* policies. And the negative option feature is a common sales procedure that is neither deceptive nor unlawful if fully disclosed; **the AuraVie website fully disclosed this element.** The website identified in the FTC's First Amended Complaint fully and clearly disclosed all elements to the consumer concerning the purchase of AurieVie skin care product. [*See, First Amended Complaint*, ¶56.]

A practice is deceptive under the Federal Trade Commission Act *"if it is likely to mislead consumers acting reasonably under the circumstances...in a way that is material."* Cyberspace.com LLC, 453 F.3d at 1199. *"A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."* Id. at 1200. Disclosures in fine print may not overcome an advertisement's deceptive net impressions. Id. at 1200-01(*holding fine print notices on reverse side of check did not overcome net impression that check was a refund or rebate when the fine print stated that cashing the check would result in a monthly fee for internet access*). A defendant violates the FTC Act if its advertisement *"induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."* Resort Car Rental Sys., Inc. v. F.T.C., 518 F.2d 962, 964 (9th Cir. 1975).

*As the evidence at trial will establish, the AuraVie website contained none of these improper practices:*

- AuraVie was a group of high quality skin care products marketed by Bunzai. It wasn't a *"scam"* involving nonexistent, defective or misrepresented products as suggested by the FTC. The consumers received precisely what was advertised.

- Bunzai successfully marketed the AuraVie skin care products for approximately 4 years. If there was any "*scam*" nature to Bunzai's marketing or the AuraVie products, Bunzai's operations would have been terminated earlier.

- Bunzai's "*risk free*" trial or "*trial order*" disclosures were truthfully represented on the AuraVie sales website. Bunzai's sales procedure was simple: a consumer could order the AuraVie skincare product for a 10 day "*risk free*" trial period and be subject only to a $4.95 shipping and handling charge. The "*risk free*" trial meant that if the customer notified Bunzai within the 10 day period of the desire to cancel, they had an additional 20 days to return the product. The consumer was not charged for the product. If the consumer elected to return the product within the total 30 day period the $4.95 was the only charge as fully disclosed. If the consumer elected to keep the product then a $97.88 fee was charged for the product. Again, this charge was fully disclosed. The Bunzai marketing program was a permissive and lawful continuity sales program; if the customer did not cancel the program he would continue to receive the product. This element of the program was fully disclosed as well.

- These straight forward terms were uniformly fully disclosed in the "*Terms and Conditions*" portion of the website

- The FTC admits in the complaint that Bunzai's websites disclose these terms in the "*Final Step*" of Bunzai's ordering page. [First Amended Compl., ¶56.]
The "*Final Step*" page is where the consumer provided credit card and related information to order the product. This is the obvious and proper place to identify the "*Terms and Conditions.*"

- Moreover, the "*Terms and Conditions*" are expressly identified on the "*Final Step*" page directly adjacent to the "*Get My Order*" section and

11
**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

       directly below the *"Shipping & Payment"* section on the website. Further, a more detailed *"Terms and Conditions"* section can be accessed at the bottom of the *"Final Step"* page. [First Amended Compl., ¶56.] Under no circumstances could a customer be misled in anyway concerning the *"Terms and Conditions"* of the AurieVie *"risk free"* trial unless the consumer elected not to read the *"Terms and Conditions"*.

- Most importantly, the general terms and conditions were clear and understandable:

  *"We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for you 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household."* [First Amended Complaint, ¶57.]

In short, the FTC's Action that the AuraVie website was deceptive and misleading is baseless; all of the terms and conditions were fully disclosed and easily understandable. Thus, the substantive basis of the FTC's Complaint is meritless; Defendant Bunzai did not engage in *"a deceptive scheme"* that *"defrauded"* consumers. The FTC's Action must be dismissed.

///

///

///

///

**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

## 5.

## AS A MATTER OF LAW, DEFENDANTS CAN BE LIABLE, IF AT ALL, ONLY FOR EQUITABLE DISGORGEMENT; THE FTC'S CONTENTION DEFENDANTS ARE SUBJECT TO JOINT AND SEVERAL LIABILITY IS MERITLESS

Because no evidence exists that Defendants acted in concert with defendant Bunzai to violate the FTC Act, Defendants are liable if at all to only disgorgement of the sums they directly received from defendant Bunzai during the period 2010-2015. That sum is $317,000 See, *FTC v. Commerce Planet, Inc.*, 2016 U.S. App. LEXIS 3992, 2016-1 Trade Reg. Rep. (CCH) P79,526 (9th Cir. Cal. Mar. 3, 2016).

Utterly no evidence exists and none will be presented at trial that the Defendants "*participated directly in*" or controlled the alleged unlawful acts and had actual knowledge of the misrepresentations or were recklessly indifferent to them. The evidence is undisputed that Defendants loaned Defendant Bunzai $500,000 during the period 2010 to 2015; that the full principal amount of $500,000 was repaid by Defendant Bunzai; and $317,000 in interest on the investment return on the $500,000 loan was repaid.

Accordingly, to the extent Defendants are liable at all it is solely for disgorgement of the $317,000 they received for Defendant Bunzai – nothing more. See, e.g., *FTC v. Burnlounge, Inc.*, 584 Fed. Appx. 315, 317 (9th Cir. 2014) (Affirming district court's order that a defendant who raised capital necessary to create the defendant corporation; owned stock in the corporation ; and held a position in the organization; "*likely ... had actual knowledge or was at least recklessly indifferent to the truth of the misrepresentations made to consumers*" disgorge "*all monies and other items of enrichment which he obtained from Burnlounge's operations.*") This Court has "*broad authority to fashion appropriate remedies for violations of the Act. [and] it includes the 'authority to grant any ancillary relief necessary to accomplish complete justice.'*" *FTC v. Pantron Comp.*, 33 *F.3d* 1088, 1102 (9th Cir. 1994). Such ancillary relief may include restitution or disgorgement. *Id*. at w.4.

Because of Defendants sole involvement in Defendant Bunzai's operations was as a lender

**DEFENDANTS LATSANOVSKI AND CALENERGY'S TRIAL BRIEF**

of only $500,000, they should be subject solely to disgorgement of the $317,000 they received as a return on their $500,000 investment. Assuming Defendants have any liability at all.

### 6.

### CONCLUSION

No evidence exists to establish that (1) Defendants' participated in or had authority to control Defendant Bunzai's alleged unlawful practices; and (2) that Defendants *"had actual knowledge of the misrepresentations involved..."* <u>FTC v. Network Services Depot, Inc.</u>, 617 *F.3d* 1127, 1138-1139 (9th Cir. 2010). Moreover, the FTC's contention that the AuraVie website was misleading or deceptive is baseless. The FTC's claims must accordingly be dismissed; judgment entered for Defendants Latsanovski and Calenergy; and the preliminary injunction and asset freeze dissolved.

DATED: June 1, 2016

Respectfully submitted,

_____
LAW OFFICES OF JEFFREY S. BENICE
Jeffrey S. Benice
Attorney for Defendants,
Igor Latsanovski and Calenergy, Inc.

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 2, 2016, a true and correct copy of the foregoing document described as DEFENDANTS IGOR LATSANOVSKI AND CALENERGY, INC.'S TRIAL BRIEF] was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court.

**Local Counsel For Receiver**
Tom Vidal
Michael Weiss
Nina Nahal Ameri
Abrams Garfinkle Margolis Bergson
5900 Wilshire Blvd., Suite 2250
Los Angeles, CA  90036
nameri@agmblaw.com

**Counsel For Alon Nottea and Roi Rueveni**
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd., Penthouse
Sherman Oaks, CA  91403
rmu@crosswindlaw.com

**Federal Trade Commission**
Reid Tepfer
Luis Gallegos
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
rtpefer@ftc.gov
lgallegos@ftc.gov

**Counsel For Doron Nottea and Motti Nottea**
Randi R. Geffner
Esensten Law
12100 Wilshire Blvd.
Suite 1660
Los Angeles, CA  90025
Telephone:  (310) 273-3090
RGEFFNER@ESENSTEINLAW.COM

**Counsel For Chargeback Armor, Inc.**
Sagar Parikh
Beverly Hills Law Corp.
433 N. Camden Drive, 6th Floor
Beverly Hills, CA  90210
SP@BeverlyHillsLawCorp.com

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 2nd day of June, in Costa Mesa, California 92626.

_____
Javaise Escoto, Declarant