DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
EMILY ROBINSON
erobinson@ftc.gov; Tex. Bar No. 24046737
ZACHARY A. KELLER
zkeller@ftc.gov
Texas Bar No. 24087838 (pro hac vice pending)
Federal Trade Commission
1999 Bryan Street, Ste 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9386 (Robinson); (214) 979-9382 (Keller)
(214) 953-3079 (fax)
RAYMOND MCKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)
Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BUNZAI MEDIA GROUP, INC., *et al.*,<br><br>Defendants. | Case No.  CV 15-4527-GW(PLAx)<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR ORDER STATING THAT CERTAIN MATERIAL FACTS HAVE BEEN ESTABLISHED** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff Federal Trade Commission hereby moves the Court for partial summary judgment relating to the matters discussed in this Motion.

This Motion is based upon this Motion, the incorporated memorandum in support, all other papers being filed in support of this Motion, evidence and other pleadings previously filed with the Court in this case, and such further argument and evidence as may be presented in writing or at any hearing held on this Motion.

# CONTENTS

I. Introduction ........................................................................................ 1

II. Procedural History ........................................................................... 1

III. The AuraVie Website Offers ......................................................... 3

IV. FTC Act Violations ......................................................................... 5

    a. Count 1: Deceptive Omissions ......................................... 6

    b. Count 2: Deceptive Representation of "Risk Free" ......................... 8

    c. Count 3: False Representation of BBB Accreditation and Rating .. 10

    d. Count 4: Consumers Were Unfairly Charged................................. 11

V. Count 5: The Restore Online Shoppers' Confidence Act (ROSCA) Violations ................................................................................................ 13

VI. Count 6: Electronic Fund Transfer Act and Regulation E Violations ... 14

VII. The AuraVie Scheme was Carried Out by a Common Enterprise .. 16

VIII. Alon Nottea's Knowledge, Participation, and Control Are Sufficient to Establish Individual Liability ................................................ 20

IX. The FTC Has Made a Reasonable Approximation of Consumer Harm ................................................................................................ 23

X. Conclusion..................................................................................... 25

## Cases

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ................................................................ 21

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) ........................................... 24

*FTC v. Bronson Partners, LLC,* 654 F.3d 359 (2d. Cir 2011) ................................................... 27

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) ............................. 14

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ................................................................. 9

*FTC v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048 (C.D. Cal. 2012) ......................... 13, 15, 27

*FTC v. Crescent Publ'g Grp.*, 129 F. Supp. 2d 311, 315 (S.D. N.Y 2001) ............................... 16

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ............................................... 9, 13

*FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ....................................... 14

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ...................................................................... 27, 28

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) .................................. 14

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) .................................................................... 9, 12, 14

*FTC v. Inc21.com*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) ................................................. 10, 16

*FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) .......................................... 10, 15, 16

*FTC v. MacGregor*, 360 Fed App'x 891 (9th Cir. 2009) ......................................................... 15

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ........................... 21

*FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) ................... 11

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) ................................................................ 16

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010) .......................... 24

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ....................................... 9, 12, 14, 15

*FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev. 1992) ........ 12

*FTC v. Porter & Deitsch*, 605 F.2d 294 (7th Cir. 1979) ......................................................... 14

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) ............................. 24

*FTC v. Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010) .................................... 9

*FTC v. QT, Inc.*, 448 F. Supp 2d 908 (N.D. Ill. 2006) ............................................................ 16

*FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991) ......................................................... 24

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ................................................................... 27

*FTC v. Windward Mktg.*, 1997 WL 33642380, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept. 30, 1997)
................................................................................................................................... 10, 16

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ........................... 11

*Removatron Intern. Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) .......................................... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

The FTC submits this Motion requesting the Court to rule that: (1) certain website offers violated the FTC Act; (2) certain website offers violated the Restore Online Shoppers' Confidence Act; (3) certain website offers violated the Electronic Funds Transfer Act; (4) these website offers, and resulting sales, were operated by a common enterprise; (5) Alon Nottea should be held individually liable for the law violations; and (6) the FTC has made a reasonable approximation of consumer injury. Making these findings now will significantly streamline the trial in this matter by eliminating the need to provide evidence and testimony concerning issues not genuinely in dispute.

### II. Procedural History

The FTC sued Alon and Doron Nottea, Igor Latsanovski, CalEnergy, Inc. and 18 other defendants on June 18, 2015, seeking temporary, preliminary, and permanent injunctions to stop deceptive sales of negative option continuity programs involving AuraVie and other skincare products over the Internet. (Dkt. #3). After reviewing the website offers and other evidence (Dkts. 6–9), the Court found the FTC was likely to prevail on the merits of its Complaint and issued an

*ex parte* temporary restraining order ("TRO").[1] The Court later entered preliminary injunctions against the Notteas (Dkts. 105, 108) by stipulation, and against Latsanovski and CalEnergy (Dkt. 200) after contested hearings.

In October 2015, the FTC amended its Complaint to add 11 Defendants, including Alan Argaman, Secured Merchants, LLC, and Chargeback Armor, Inc. (Dkt. 235). All but 7 of the 33 Defendants named in this action have defaulted or stipulated to final orders.[2] Only claims against Alon and Doron Nottea, Latsanovski, Argaman, CalEnergy, Secured Merchants, and Chargeback Armor remain. Except Alon Nottea,[3] all parties moved for summary judgment (Dkts. 352–354), which was denied. The Court found the case involves "a complex web of interlacing entities and individuals" but that questions remain concerning who participated in or controlled that complex web. (Tentative Ruling p. 2).

Plaintiff now asks the Court, pursuant to FED. R. CIV. P. 56(e), to enter partial summary judgment or enter an order holding that certain material facts are not genuinely in dispute and shall be treated as established for trial.

---

[1] The Court found good cause to believe Defendants violated the FTC Act, ROSCA, and EFTA. (Dkt. 1-2 ¶ 6).

[2] Twenty-one corporate defendants and one individual defendant have defaulted (Dkts. 157–159, 229–230, 417–418); 3 defendants stipulated to final orders (Dkts. 439–441 ); and the FTC is considering a fourth settlement. (*See* Dkt. 420).

[3] As discussed at Section VI, *infra*, Alon Nottea's participation in and control over the AuraVie scheme is undisputed, as is his knowledge of the law violations.

**III.  The AuraVie Website Offers**

The uncontroverted evidence shows that multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, promoted "risk-free trial" or "trial order" offers of AuraVie and other skincare products to consumers nationwide since at least 2010. (UF # 45, 48-49.) Excerpts from these websites are attached as an appendix to this motion, and the full websites were submitted as evidence. (Ex. 909.) These websites prominently offered a "trial" or "risk free trial" of skincare product upon payment of a nominal shipping and handling fee. (*See* App. 1;[4] UF #49-50.[5]) Some websites offered products as a "gift" or "giveaway," purportedly for completing an online survey. (Ex. 903-8.) The evidence shows that, in some instances, when consumers attempted to leave the websites, a text box appeared offering to ship the trial offer at an even lower shipping price. (*See* App. 2; UF #50.) The websites stated that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating. (*See* App. 2; UF #50.)

---

[4] "App." refers to the appendix filed with this Motion.

[5] In support of its motion for summary judgment (Dkt. #353), the FTC filed a separate Statement of Uncontroverted Facts and Conclusions of Law ("UF") (Dkt. 353-2), which provides a comprehensive overview of the evidence in this case. Cites to "UF" throughout this Memorandum of Contentions of Law and Fact are in reference to the numbered paragraphs of this document.

The AuraVie websites did not conspicuously disclose the costs of the products offered. The websites also did not conspicuously disclose that consumers who accepted the trial or risk free trial would be enrolled in a continuity plan. The websites did not conspicuously disclose the existence or terms of the continuity program or return policies. Some of the AuraVie websites included a small-print disclosure on the final page of their ordering process. (*See* App. 3; UF #56-57.) That disclosure was in significantly smaller print and was obscured by a variety of graphics and text. (*See* App. 3; UF #56-57.) The websites stated, in bold, red font at the top-center of the page that the trial shipment cost "$0.00." At the bottom of the page, nowhere near the cost, was a text box with small font that stated:

> We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.

Other terms and conditions of the offer were found in a separate, multi-page terms and conditions webpage that was accessible only by hyperlink. On many of the AuraVie websites, this hyperlink was found by scrolling to the bottom of the website and clicking on an inconspicuous "T&C." (*See* App. 4; UF #59.)

**IV.  FTC Act Violations**

The FTC has alleged that the AuraVie websites were deceptive and unfair under Section 5 of the FTC Act. Section 5(a) of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An act or practice is deceptive if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, and the representation, omission, or practice is material. *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). A representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (internal citations and quotation marks omitted).

To determine whether an advertisement is deceptive and likely to mislead a consumer, the Court looks to its overall net impression.  *FTC v. Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010) (citing *Cyberspace.com*, 453 F.3d 1196, 1200 (9th Cir. 2006)); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) (The meaning of an advertisement may be determined by an examination of the advertisement itself).  Thus, to determine whether a violation of Section 5 occurred in this action, the Court must determine the overall net impression made by the website offers.  *See FTC v. Gill*, 71 F. Supp. 2d 1030,

1  1043 (C.D. Cal. 1999).[6]

2       An act or practice is unfair and violates Section 5(a) of the FTC Act if it

3  causes, or is likely to cause, substantial injury to consumers that is not reasonably

4  avoidable and is not outweighed by countervailing benefits to consumers or

5  competition. 15 U.S.C. § 45(n). The FTC alleges it was unfair to charge

6  consumers' debit or credit card account without authorization when consumers

7  accepted the AuraVie risk free trial.

8       **a.  Count 1: Deceptive Omissions**

9       The evidence shows that the AuraVie scheme centered around deceptive

10  omissions. Specifically, after prominently touting the availability of a "risk-free

11  trial," the AuraVie websites failed to disclose adequately the material terms of that

12  offer.  The websites failed to disclose adequately that consumers' credit or debit

13  card would be charged not only the nominal shipping fees, but also the full costs

14  of the skincare products after a limited time. (UF #45, #47-49, #59-62). The

15  websites failed to disclose adequately the dates that the risk free trial period began

16  and ended. (UF #56-58, UF #61(a)). The websites failed to disclose adequately

17  ---

[6] The law is clear the FTC need not prove that the claim misled all consumers. The
FTC need only prove that the claim is likely to mislead some consumers. *Figgie*

18  *Int'l*, 994 F.2d 595, 605 (9th Cir. 1993). Requiring such proof would defeat the
intent of the FTC Act and would frustrate prosecutions of large consumer redress

19  actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has
proved that the defendant made material misrepresentations, that they were widely
disseminated, and that consumers purchased the defendant's product.  *Id.* at 605–

20  06.d 1030, 1043 (C.D. Cal. 1999), aff'd, 265 F.3d 944 (9th Cir. 2001).

that consumers who accepted a "risk-free trial" offer would be enrolled into a negative option continuity plan with additional charges. (UF #56-58). The websites failed to disclose adequately the costs of the continuity plan and the frequency and duration of the recurring charges. (UF #51-61). The websites also failed to disclose adequately how consumers could cancel the continuity plan. (UF #55-58). Finally, the websites failed to disclose adequately refund policies for the product.  (UF #62-67). These failures were likely to mislead reasonable consumers. Indeed, overwhelming consumer complaint and chargeback activity indicate consumers were misled and believed the website offers were advertising free products. (*See*, *e.g.,* UF #32(s) and (u); UF #34(j); UF #39(f) and (g); UF #65). Moreover, many consumers denied seeing such disclosures, even when they specifically looked for the information. (UF #51-52, 56.)

The FTC is not required to show an intent to deceive because consumers can be equally harmed by both deliberate and negligent conduct. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev. 1992) (George, C.J.).[7]

---

[7] However, in this case, the evidence shows that Defendants did intend to deceive consumers. *See* UF #61(a) (Several years before this lawsuit, BunZai attorney William Rothbard provided Alon Nottea a point-by-point breakdown of the many

The AuraVie websites buried key disclosures that were material to the sales offer in obscure hyperlinks, which prevented consumers from knowing the terms of the offer. (*See* UF #49; UF #56, UF #59). The  failure to clearly and conspicuously disclose material terms of the AuraVie offer was deceptive under Section 5 of the FTC Act, regardless of whether the failure was inadvertent or deliberate.

### b.  Count 2: Deceptive Representation of "Risk Free"

Defendants do not contest that the AuraVie websites represented to consumers that products were "Free" or "Risk Free." (UF #47-50). These representations were deceptive under Section 5 of the FTC Act because they were likely to mislead consumers acting reasonably and were material to consumers' purchasing decisions. *See FTC v. Gill*, 265 F.3d 950; *FTC v. Pantron I Corp.*, 33 F.3d 1095.  Representations need not be express to be deceptive; implied claims are covered under the statute as well. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993).

Again, the Court must determine whether AuraVie's Internet sales offers were deceptive by examining the overall net impression conveyed by the offers. Here, the websites prominently touted that products were "Free" using large,

---

ways the AuraVie marketing campaign violated FTC law; the AuraVie websites continued this scheme despite notice); UF #32(u) (Alon Nottea, the mastermind of the AuraVie scheme, was recorded strategizing how to continue the scheme, while maintaining a façade of compliance).

Motion for Partial Summary Judgment

colorful font, often in multiple places. This created a "net impression" that the products were free (except for the nominal shipping fee that was clearly disclosed). That impression was likely to mislead reasonable consumers because it was false: consumers were actually charged up to $97.88 for the products unless they complied with numerous onerous terms and conditions that were buried in hyperlinks. (UF #51-53). Courts have previously held that similar false representations that a product was "free" or "risk free" were material and violated Section 5. *See FTC v. Commerce Planet, Inc.,* 878 F.Supp.2d 1048, 1068 (C.D. Cal. 2012) ("This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product. The notion that consumers will get a free kit makes it more likely that they will unwittingly provide their credit card information, thinking they are only paying for shipping and handling, when in fact, they are obligating themselves to pay a subscription fee for the continuity program.")

Critically, the fact that a website contains hidden disclosures does not cure deception. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com,* 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains

truthful disclosures.").[8]

### c. Count 3: False Representation of BBB Accreditation and Rating

The AuraVie websites falsely represented that AuraVie was accredited by the Better Business Bureau ("BBB") with an "A-" rating. (UF #49-50). These representations were likely to mislead reasonable consumers because they were false; AuraVie had its accreditation revoked over a year before the filing of this suit and had an "F" rating with the BBB. (UF #50). Express product claims are presumed to be material and reliance upon such claims is presumptively reasonable. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000). Accordingly, the misrepresentation of BBB accreditation and rating was materially deceptive and violated Section 5 of the FTC.

---

[8] *See also FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010) ("[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an accurate impression") (*quoting Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine print disclosure at the bottom of the ad); *FTC v. Porter & Deitsch*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers made in contract for credit repair services were insufficient to counteract advertising claims about the service).

### d. Count 4: Consumers Were Unfairly Charged

Thousands of consumers complained to Defendants, to banks, the BBB, and to law enforcement that they did not authorize their credit or debit cards to be charged for AuraVie products. Consumers nationwide were injured by these unauthorized charges. Taking consumers' money without authorization is presumed to cause substantial injury. *See J.K. Publ'ns*, 99 F. Supp. 2d at 1201 (finding substantial injury where "consumers were injured by a practice for which they did not bargain").[9] It is a well-established principle in the federal courts that large numbers of consumer complaints and high chargeback, return, or refund rates are convincing evidence that a consumer did not agree to be charged. *See FTC v. MacGregor*, 360 Fed App'x 891, 894 (9th Cir. 2009) (holding that high refund and return rates, along with high volume of complaints, are probative of misrepresentations and other abuses).[10]

---

[9] The injury is substantial even if the amount taken is relatively small. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995) ("[C]onsumer injury is substantial when it is the aggregate of many small individual injuries.").

[10] *See also FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) (high volume of consumer complaints and excessive chargeback rates reaching 8 percent consistent with fraud); *Grant Connect*, 827 F. Supp. 2d at 1221 ("[H]igh number of cancellations, refunds and chargebacks suggest that in fact consumers were deceived about what they were ordering."); *J.K. Publ'ns*, 99 F. Supp. 2d at 1203 (finding unauthorized charging where, among other things, more than 50 percent of consumers contacting defendants claimed they had not ordered defendants' products and there were 7.3 percent chargebacks); *FTC v. QT, Inc.*,

In addition, consumers had no means of reasonably avoiding charges that
were not effectively disclosed to them. (UF #51-62). Consumers cannot
reasonably avoid an unauthorized charge that they only discover afterwards.
*Inc21.com*, 745 F. Supp. 2d at 1004 ("[T]he burden should not be placed on
defrauded customers to avoid charges that were never authorized to begin with.").

Finally, consumers do not benefit from being debited or charged for
products or services "they never agreed to purchase, didn't know were being
provided to them, and never wanted in the first place." *Inc21.com*, 745 F. Supp. 2d
at 1004-05; *see also Neovi*, 604 F.3d at 1157 (consumers are "injured by a practice
for which they did not bargain"); *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

Courts have regularly found unauthorized billing practices to be unfair.
*FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010) (unauthorized
charges to telephone bills were unfair); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176,
1203 (C.D. Cal. 2000) (unauthorized credit card charges); *FTC v. Windward
Mktg., Ltd.*, No. 96-615F, 1997 WL 33642380, at *10, 13 (N.D. Ga. Sept. 30,
1997) (unauthorized bank debits).

---

448 F. Supp 2d 908, 936 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008)
(refund rate of 25 percent indicates deception); *FTC v. Crescent Publ'g Grp*., 129
F. Supp. 2d 311, 315, 322 (S.D. N.Y 2001) (lack of consumer authorization
evidenced by "strikingly high chargeback level that averaged approximately 10.51
percent."); *Windward Mktg.,* 1997 WL 33642380, at *6, 12 (concluding from 40
percent return rate that defendant knew debits were unauthorized).

As their sole response to this contention in the FTC's Motion for Summary Judgment, Defendants claim that the AuraVie websites clearly discloses the charges. (Dkt. #391-1, at 11-12.)

**V. Count 5: The Restore Online Shoppers' Confidence Act (ROSCA) Violations**

Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless (1) the seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403.[11] AuraVie's continuity plans were a negative option feature, as defined by the TSR. 16 C.F.R. § 310.2(u). [12]

The undisputed evidence filed in this case shows that summary judgment is

---

[11] It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. *Id.*

[12] The TSR defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

appropriate for at least two ROSCA violations. First, the AuraVie websites failed to disclose clearly all material terms of the negative option continuity plan. (UF #51-62). The terms, when provided at all, were buried in fine print hyperlinks on pages dominated by "risk free" and "trial" offers. (UF #56, UF #59).

Second, the undisputed evidence shows that consumers who accepted the AuraVie websites' offers were routinely charged for continuity plans without their express informed consent. The AuraVie websites solicited consumers' credit card information purportedly for the purposes of paying a nominal shipping and handling fee. (UF #48, #50). That billing information was then used to charge consumers—without consumers' authorization or knowledge—up to $97.88 for the AuraVie products. (UF #51-62.) This practice was indefensible, and, in fact, none of the Defendants have denied that it was a violation to charge consumers without their consent. Instead, Defendants simply claimed that consumers' consent is demonstrated by their submitting payment information in response to the website offers. (*See* Dkt. #391-1, at 10-11.) Once again, this Court can determine from a review of the websites that the AuraVie offers violated the law.

## VI.  Count 6: Electronic Fund Transfer Act and Regulation E Violations

The Electronic Fund Transfer Act, and its implementing statute Regulation E, regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account. EFTA and Regulation E require

that, before a merchant can make such recurring debits, it must obtain a written

authorization signed or similarly authenticated by the consumer and provide a

copy of such authorization to the consumer.  Section 205.10 of the Federal

Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R.

§205.10(b), Supp. I, provides that "[t]he authorization process should evidence the

consumer's identity and assent to the authorization."  *Id.* ¶10(b), cmt 5. The

Official Staff Commentary further provides that "[a]n authorization is valid if it is

readily identifiable as such and the terms of the preauthorized transfer are clear

and readily understandable …" *Id.* ¶ 10(b), cmt 6.

The undisputed evidence demonstrates that the AuraVie websites did not

clearly disclose the terms and conditions regarding recurring monthly fees.[13] In

fact, this information was concealed in documents available only by hyperlink or

in hard-to-read and hard-to-read disclosures.[14] Further, the AuraVie websites were

littered with claims that their offer was "risk free" and other directly contradictory

statements.[15]

Only Defendant Alon Nottea arguably addressed the EFTA violations. He

claimed consumers authorized the payments because they clicked on a "Get My

Order" button that had a disclaimer above it stating

---

[13] UF #51, #52, and #53.

[14] UF #56, #57, and #59

[15] UF #48 and #49,

"By clicking 'Get my order' I agree that I am over 18 years of age and to the terms and conditions."[16] As confirmed by a review of the AuraVie website, the terms of the negative option feature were not clearly and conspicuously disclosed. Moreover, neither this page nor the terms and conditions pages could serve as the consumer's "copy" of the authorization as required by 15 U.S.C. § 1693e(a), because they were not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional charges.[17] In short, consumers who purchased AuraVie products using debit cards did not authorize recurring debits from their bank accounts and never received a copy of any purported authorization for such debits. These practices violated EFTA.

**VII. The AuraVie Scheme was Carried Out by a Common Enterprise**

This Court described the case as involving a "complex web of interlacing entities and individuals."[18] Plaintiff agrees. Therefore, Plaintiff urges the Court to find that the AuraVie website offers and negative option sales were committed by a common enterprise, while reserving the issue of the Defendants' membership in or control over the common enterprise for trial.

"To determine whether a common enterprise exists, the Court considers

---

[16] Dkt. #391-1 at 10 (Response to UF #51); Dkt. 235 at 30.

[17] Plaintiff's MSJ UF #56 and #59.

[18] *See* page 2 of this Court's "Tentative Rulings on Motions for Summary Judgment."

Motion for Partial Summary Judgment                                    Page | 16

factors such as: [1] common control; [2] the sharing of office space and officers; [3] transacting business through a maze of interrelated companies; [4] the commingling of corporate funds and failure to maintain separation of companies; [5] unified advertising; and [6] evidence that reveals that no real distinction exists between the corporate defendants." *Grant Connect*, 827 F. Supp. 2d, at 1216 (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)). When determining whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable because it was part of a "maze of interrelated companies").

    *(1) Common control*: The FTC's evidence has shown that the Corporate Defendants and shell companies operated as a single economic unit under common control using shared resources to effect their mutual goals of charging consumers without their authorization and evading detection. (UF #42).

    *(2) Common offices*: Many, if not all, of the Corporate Defendants operated out of a single nerve center that was leased by Secured Commerce LLC (co-owned by Doron Nottea and Alan Argaman). Several other factors show the intertwined nature of these companies: for example, Defendant Argaman, despite his purported non-involvement in the AuraVie scheme, established the telephone numbers for the various shell merchant account entities. (UF #39(d)(xi)).

*(3) Network of interrelated companies*: The diagram contained in the Receiver's Report and attached here as App. 5 demonstrates the vast, fully integrated web that the Corporate Defendants formed. Corporate Defendants are owned and operated by Defendants, their family members, or associates. The numerous shell merchant account entities served the common purpose of generating revenues through the AuraVie scheme while evading detection by payment processors. Then, once the many shell entities received revenue from AuraVie, certain Defendants served as intermediary entities transferring funds to a web of entities whose purposes ranged from maintaining operations to funneling funds to Individual Defendants.

*(4) Commingling of corporate funds*: The finances for almost all of the Corporate Defendants were derived from the sale of the same products. (UF #42.) The finances of these Corporate Defendants were handled by the same managers, employees, and third-party accounting firm. (UF #42(d)).

*(5) Unified advertising*: The AuraVie scheme had a unified advertising company in Media Urge, Inc. The common enterprise used the same Internet advertising for the same product, regardless of which shell company processed the charge or which upstream entity received the ill-gotten gains. (UF #19, #43(a)).

*(6) Pooled resources and staff*: The same principal actors, most of whom are Individual Defendants in this action, owned and operated the numerous

corporate entities associated with this scheme. (UF #43). Despite the extensive operations and many nominally different operating entities associated with the scheme, a relatively small group of individuals was responsible for day-to-day operations. (UF #43). No single employee relating to the financing or decision making of the various entities worked for only one entity or in only one field: all operated across companies and in various positions throughout the corporate web. (UF #32, #34, , #36(a), #37, #39, #40.)

(7) *No distinctions between entities*: Although each Corporate Defendant served its own purpose in the scheme, many served similar purposes or easily could have served a different one because the companies shared owners, managers, and financial expertise. Insofar as the small group of Individual Defendants owned and operated such a vast web of companies to execute the scheme, the companies' names and structure were essentially nominal: each entity could have served a different purpose without any needed change in ownership structure, hiring of employees, or recruiting of experts. (UF #41, #43(b), #43(c)).

Thus the AuraVie scheme involved a web of companies that should be held jointly and severally liable for the scheme's wrongdoing. The weight of the evidence is so compelling that none of the four Oppositions to Plaintiff's Motion for Summary Judgment bothered to brief the issue. Because AuraVie's structure meets all indicia of common enterprise that courts have recognized, this Court

Motion for Partial Summary Judgment

should find as a matter of law that a common enterprise existed, while leaving the issues of CalEnergy, Inc. and Secured Merchants LLC's membership and the Individual Defendants' control over the common enterprise for trial.

## VIII.  Alon Nottea's Knowledge, Participation, and Control Are Sufficient to Establish Individual Liability

Alon Nottea seemingly conceded liability in his opposition to the FTC's motion for summary judgment. (Dkt. 391 pp. 6-12). Instead of denying liability, Alon Nottea objected to the Court finding that his cousin, Roi Reuveni, exerted control over the common enterprise, participated in or controlled the unlawful acts and practices, or acted with knowledge of the law violations. (Dkt. 391 pp. 13-14). In fact, the evidence does conclusively establish Alon Nottea's

Individuals are subject to injunctive relief for a company's deceptive acts or practices when they either (1) participated directly in the acts or practices; or (2) had authority to control them. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). They are also liable for equitable monetary relief where they have some knowledge of the company's deceptive acts or practices. *J.K. Publications, Inc.,* 99 F. Supp. 2d 1176, 1204 (C.D. Ca. 2000). Individuals possess the requisite knowledge if they: (1) had actual knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive

conduct together with an intentional avoidance of the truth.[19] The "degree of participation in business affairs is probative of knowledge."[20] The FTC, however, is not required to prove that an individual actually intended to deceive to establish knowledge.[21]

*Participation and Control*: Nottea oversaw or was involved in nearly every aspect of the day-to-day operation of the AuraVie common enterprise. (UF #32). His duties included (1) soliciting investors (UF #32(j)); (2) determining the business model and company organization (UF #32(k)); (3) managing employees (UF #32(*l*)); (4) procuring new merchant accounts and "merchant account guarantors" or "CEOs" (UF #32(m)); (5) managing complaint responses and threatened litigation (including BBB and Attorneys General) (UF #32(n)); (6) reviewing accounting and bookkeeping (UF #32(o)).; (7) overseeing and implementing advertising and marketing (UF #32(p)); (8) addressing customer service issues (UF #32(q); (9) registering websites (UF #32(r)); and (10) monitoring chargeback demands. (UF #32(s)).

*Knowledge*: The evidence in this case demonstrates that Nottea oversaw

---

[19] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

[20] *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[21] *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

Motion for Partial Summary Judgment                                                  Page | 21

virtually all aspects of the enterprise and not only knew of but in fact *actively planned* AuraVie's abuses. To this end, Nottea was recorded discussing AuraVie's reliance upon deceiving consumers and lamenting how consumers would call to cancel the AuraVie continuity plan when consumers received an email with the terms after being enrolled into the plan:

> "if you send them the terms, it can act like... we told you that we're going to charge... we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurted us... If it's done creatively, if it's done correctly and optimized... not just try, it didn't work."(UF #32(u)(vi)).[22]

Moreover, Nottea was well aware that reliance on hidden disclosures was unlawful. Despite AuraVie's practice of not disclosing its offer's terms, he told his co-conspirators, "[w]e must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least." (UF #32(u)(v)). But instead of reforming AuraVie's marketing, he opted to prepare for FTC intervention by creating a façade of compliance. His plan included recording calls to dissatisfied customers where he would pretend to be a third party and ask why the customers sought chargebacks. He believed that evidence of such calls would placate the FTC:

---

[22] Alon Nottea even admits his knowledge that consumers were deceived in his declaration submitted in opposition to FTC's Motion for Summary Judgment. *See* Dkt. #391-3, at 7 ("I learned that some AuraVie customers who had not read the terms and conditions were unaware when placing their order that they would be charged for their AuraVie products if they did not cancel during the trial period.").

"And the FTC comes to me, I'm telling them, listen, I'm
calling back my chargebacks and see what I did wrong?
Do you know how that looks?... we[']re going to call all
of our chargebacks, and say we are a third party." [23]

Alon likely believed an FTC enforcement action was inevitable because BunZai Media Group's attorney provided a point-by-point memorandum explaining the many ways in which the AuraVie enterprise was violating FTC law. UF #61. The attorney noted the myriad problems with Defendants' "risk-free trial" offers and websites, including that AuraVie's disclosures were "buried in the T&C's." (UF 61(a)). In the email—sent over two years before the FTC's enforcement action—BunZai's attorney suggested numerous changes to improve compliance with the law. *Id*. Most, if not all, of these suggestions were ignored. Thus through the actions he took, the advice he received, and the words he spoke, Defendant Nottea demonstrated a thorough grasp of not only the abuses he wrought on unsuspecting consumers but also the illegality of his deception.

## IX.  The FTC Has Made a Reasonable Approximation of Consumer Harm

Plaintiff has put forward a reasonable approximation of consumer harm for

---

[23] Alon elaborated on his plan again later in the recorded conversation, stating that he would retain a file of recorded calls to present to the FTC: "[B]ut I want to have a hundred call folder so that later on in two years when I have an FTC, here, here, here, I'm proactive. It's like—it's like a folder. Here you go. Here's everything. Your file recordings. Look at everything. Look at what we're doing to be proactive for our consumer." UF #32(u)(i).

which Defendants should be held jointly and severally liable.[24]  Plaintiff's

approximation is based on Defendants' own corporate tax records and

QuickBooks files that showed total consumer harm as being at least

$75,624,030.[25] Once Plaintiff provides a reasonable approximation of monetary

relief, the burden shifts to Defendants to show that the figures are inaccurate.  *See*

*Commerce Planet,* 815 F.3d at 593 *(quoting FTC v. Bronson Partners, LLC,* 654

F.3d 359, 368 (2d. Cir 2011)) ("If the FTC makes the required threshold showing,

the burden then shifts to the defendant to show that the FTC's figures overstate the

amount of the defendant's unjust gains. Any risk of uncertainty at this second step

"fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'"); *FTC v.*

*Febre*, 128 F.3d 530, 535 (7th Cir. 1997). Pursuant to Rule 56(g), Plaintiff requests

that the Court make a finding that Plaintiff's $75,624,030 figure is a reasonable

approximation, and permit Defendants to come forward with their own evidence

---

[24] Where, as here, consumers suffer economic injury resulting from defendants' violations of the FTC Act, equity requires monetary relief in the full amount of consumers' losses. *Stefanchik*, 559 F.3d at 931 (affirming summary judgment holding defendants liable for the full amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

[25] Ex. 944.  This figure may not include all consumer harm.  It does not, for example, account for the NSF fees or other costs incurred by AuraVie's victims because of the unauthorized, and unexpected, charges.  Defendants claim that the FTC is "double and triple counting amounts paid by consumers" and overstates Defendants' revenue by "approximately $9.8M." But Defendants provide no evidence or explanation for where this figure came from.  "Fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendants' burden to show inaccuracy."  *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

for why the FTC's figure is inaccurate. Such a finding will streamline issues for trial.

**X. Conclusion**

  For the reasons stated above, the FTC respectfully requests that the Court grant partial summary judgment on the four issues addressed above.

            Respectfully submitted,

Dated: 6/6/16          _____*/s/ Reid Tepfer*_____
            REID TEPFER,
            Texas Bar No. 24079444
            LUIS GALLEGOS
            Oklahoma Bar No. 19098
            Federal Trade Commission
            1999 Bryan Street, Suite 2150
            Dallas, Texas 75206
            (214) 979-9395 (Tepfer)
            (214) 979-9383 (Gallegos)
             (214) 953-3079 (fax)
            rtepfer@ftc.gov; lgallegos@ftc.gov;
            erobinson@ftc.gov; zkeller@ftc.gov

            RAYMOND MCKOWN,
            California Bar No. 150975
            10877 Wilshire Boulevard, Suite 700
            Los Angeles, California 90024
            (310) 824-4343(voice)
            (310) 824-4380 (fax)
            rmcknown@ftc.gov

1

## **CERTIFICATE OF SERVICE**

2
The undersigned certifies that on June 6, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

3

4

5
Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
Counsel for Oz Mizrahi

6

7

8
Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
Counsel for Alon Nottea and
Roi Rueveni

9

10

11

12
Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
Counsel for Doron Nottea and
Motti Nottea

13

14

15

16
Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
Receiver

17

18

19

20
Sagar Parikh
Beverly Hills Law Corp. PC

Motion for Partial Summary Judgment                                          Page | 26

433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
Attorney for Secured Merchants LLC
and Chargeback Armor, Inc.

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630
Costa Mesa, CA 92626
jsb@jeffreybenice.com
Telephone: (714) 641-3600 Ext. 214

/S/ REID TEPFER
REID TEPFER