1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No.  CV 15-4527-GW(PLAx) |
| **Plaintiff,** | **[PROPOSED] ORDER GRANTING PLAINTIFF FEDERAL TRADE COMMISSION PARTIAL SUMMARY JUDGMENT** |
| **v.** | |
| **BUNZAI MEDIA GROUP, INC.,** *et al.* | |
| **Defendants.** | |

Plaintiff, Federal Trade Commission ("FTC" or "Commission"), filed its

First Amended Complaint for Permanent Injunction and Other Equitable Relief

("Complaint") in this action on October 9, 2015, seeking a permanent injunction

and other equitable relief against 32 Defendants and one Relief Defendant. (Dkt.

235). Plaintiff's Complaint alleges that Defendants, acting as a common

enterprise, violated Section 5 of the Federal Trade Commission Act ("FTC Act"),

15 U.S.C. § 45; Section 4 of the Restore Online Shoppers' Confidence Act

1   ("ROSCA"), 15 U.S.C. § 8404; and Section 917(c) of the Electronic Funds

2   Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c).

3       On April 18, 2016, Plaintiff filed its Notice of Motion and Motion for

4   Summary Judgment Against Defendants Alon Nottea, Doron Nottea, Igor

5   Latsanovski, Roi Reuveni, Alan Argaman, Secured Merchants, LLC, Calenergy,

6   Inc., and Relief Defendant Chargeback Armor, Inc. (Dkt. 353).[1] Plaintiff's motion

7   was supported by voluminous exhibits, including declarations, deposition

8   transcripts, and business records and communications of the Corporate

9   Defendants. (Dkts. 353-1 through 353-32). Simultaneously, Defendants Igor

10  Latsanovski and CalEnergy, LLC and Defendants Alan Argaman, Secured

11  Merchants, LLC, and Relief Defendant Chargeback Armor, Inc. also moved for

12  summary judgment and provided exhibits, including declarations, deposition

13  transcripts, and business records. (Dkts. 352, 356-61; and Dkts. 354-55 ).

14      Pursuant to FED. R. CIV. PRO. 56(g), the Court opts to consider entry of an

15  order stating any material fact that is not genuinely in dispute and treating the fact

16  as established in this case.

17      The Court, having read the parties' submissions and considered the claims

18  and defenses raised, finds that Plaintiff FTC has shown that there is no genuine

19  dispute of material fact regarding the following claims presented in its Complaint

20

---

[1] Due to a scrivener's error, Plaintiff's motion for summary judgment contained the incorrect title and, on April 19, 2016, Plaintiff filed a Notice of Errata. (Dkt. 364).

**[PROPOSED] ORDER GRANTING PLAINTIFF FEDERAL TRADE COMMISSION SUMMARY JUDGMENT**                                                      **PAGE 2**

and that it is entitled to summary judgment as a matter of law as to these claims:

1.      AuraVie's Internet Website Offers violated the FTC Act and

        A.      Failed to disclose adequately material terms of the offer;
        B.      Falsely offered "Risk-Free" Trials;
        C.      Falsely claimed Better Business Bureau accreditation and ratings; and
        D.      Unfairly charged consumers without authorization;

2.      AuraVie's Internet Website Offers violated the Restore Online Shoppers' Confidence Act:
        A.      Failed to clearly and conspicuously disclose ROSCA-Auto-Renewal Continuity Plan;

3.      AuraVie's Internet Website Offers violated the Electronic Funds Transfer Act and Regulation E:
        A.      Unauthorized debiting from consumers' accounts;

4.      AuraVie Internet Website Offers were operated by a Common Enterprise;

5.      Alon Nottea should be held individually liable; and

6.      The Federal Trade Commission presented a reasonable approximation of Consumer Injury.

      Therefore, the Court awards partial summary judgment in favor of Plaintiff FTC and against Defendants Alon Nottea, Doron Nottea, Igor Latsanovski, Alan Argaman, Secured Merchants LLC, Calenergy, Inc., and Relief Defendant Chargeback Armor, Inc. as discussed below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### JURISDICTION AND VENUE

      1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.

1   §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b.

2   2.   Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and

3   (b)(2), and 15 U.S.C. § 53(b).

**PLAINTIFF**

5   3.   The FTC is an independent agency of the United States Government

6   created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section

7   5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or

8   deceptive acts or practices in or affecting commerce. Additionally,

9   the FTC enforces ROSCA, 15 U.S.C. §§ 8401-05, which prohibits

10   certain methods of negative option marketing on the Internet, and

11   EFTA, 15 U.S.C. § 1693 *et seq.*, which regulates the rights,

12   liabilities, and responsibilities of participants in electronic fund

13   transfer systems.

14   4.   The FTC is authorized to initiate federal district court proceedings,

15   by its own attorneys, to enjoin violations of the FTC Act, ROSCA,

16   and EFTA, and to secure such equitable relief as may be appropriate

17   in each case, including rescission or reformation of contracts,

18   restitution, the refund of monies paid, and the disgorgement of ill-

19   gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b,

20   8404, and 1693o(c).

**MSJ DEFENDANTS**

5.   **Alon Nottea ("Alon")** resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (Dkt. 251 ¶ 32).

6.   **Doron Nottea ("Doron")** resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (Dkt. 244 ¶ 34).

7.   **Igor Latsanovski ("Latsanovski")** resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (Dkt. 253 ¶ 36).

8.   **Alan Argaman ("Argaman")** resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (*See* Dkt. 299 ¶ 39).

9.   **CalEnergy, Inc.** is a California corporation and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (Dkt. 244 ¶ 21; Dkt. 245 ¶ 21; Dkt. 253 ¶ 21; Dkt. 254 ¶ 21; Ex. 904-49).

10.  **Secured Merchants, LLC** is a California limited liability company and, in connection with the matters alleged in the Plaintiff's

Complaint, transacts or has transacted business in this district. (Dkt. 299 ¶ 26; Dkt. 301 ¶ 26; Dkt. 244 ¶ 26; Dkt. 245 ¶ 26).

11. **Relief Defendant Chargeback Armor, Inc.** is a California corporation and, in connection with the matters alleged in the Plaintiff's Complaint, transacts or has transacted business in this district. (Dkt. 300 ¶ 41; Dkt. 244 ¶ 41; Dkt. 245 ¶ 41).

### COMMERCE

12. At all times material to this Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44. Defendants' Internet skincare product business was marketed, and sold products, to consumers nationwide. (Ex. 910 ¶ 55; Ex. 911 ¶ 55).

### AURAVIE'S "RISK-FREE TRIAL" OR "TRIAL ORDER" OFFERS VIOLATED THE FTC ACT, ROSCA, AND EFTA

13. The uncontroverted evidence shows that multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com, promoted "risk-free trial" or "trial order" offers of skincare products to consumers nationwide since at least 2010. (Ex. 909 pp. 28-29, 113-116, 125-126, 128; Ex. 597 pp. 13, 16, 19, 22; *see also* Dkt. 244 ¶ 45; Dkt. 245 ¶ 45; Dkt. 250 ¶ 45; Dkt. 251 ¶ 45; Dkt.

120 p. 5). The websites offered trials of products with a variety of brand names, including "AuraVie," "Dellure," "LéOR Skincare," and "Miracle Face Kit" (collectively "AuraVie products."). (Ex. 909 pp. 23-24, 28-29, 113-116, 125-126, 128, 144, 155). Some websites promoted AuraVie products as a "gift" or "giveaway," purportedly for completing an online survey. (Ex. 903-8).

14.   Consumers interested in accepting the "risk-free trial" or "trial order" offers were required to provide credit card or debit card information, purportedly to pay nominal shipping and handling fees. (*See, e.g*., Ex. 909-125). Consumers who accepted the AuraVie "risk-free trial" or "trial order" offers were automatically enrolled into an "auto-ship" or negative option plan, in which additional products were shipped and billed to consumers' credit cards or debit cards each month. (Ex. 2 ¶ 6; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7; Ex. 14 ¶¶ 3-4, 6; Ex. 909 pp. 117-118, 125-126, 130-131, 145-146. *See also* Ex. 3 ¶¶ 8, 14; Ex. 4 ¶ 6). In addition, unless consumers returned their trial product within 10 days of signing up for the "risk-free trial" or "trial order," their credit cards or debit cards would be billed the full costs of the product, typically $97.88. (Ex. 909 pp. 117-118, 125, 130-131, 146).

*Analysis of the FTC Act Violations*

15. Plaintiff alleges that the AuraVie websites and sales offers were deceptive and unfair under Section 5 of the FTC Act. 15 U.S.C. § 45.

   a. An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes a representation, omission, or practice that is both likely to mislead consumers acting reasonably under the circumstances and material. *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

      i. "To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates." *Publrs. Bus. Servs., Inc.*, 821 F. Supp. 2d at 1223 (citing *Cyberspace.com*, 453 F.3d 1196, 1200 (9th Cir. 2006)).

      ii. A representation, omission, or practice is material if it is important to consumers and likely to affect their purchasing decisions. *FTC v. Cyberspace.com LLC*, 453 F.3d at 1201 (internal citations omitted). The failure to clearly and conspicuously disclose material terms of an offer is deceptive and violates Section 5. *See FTC v. Am. Standard*

*Credit Sys., Inc.*, 874 F. Supp. 1080, 1087-88 (C.D. Cal. 1994). A false representation that a product is free or risk free is also material. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012).

b.  An act or practice is unfair under Section 5 if it causes substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

16.  The uncontroverted evidence, gleaned from a facial review of the AuraView websites (Ex. 903-8; Ex. 909 pp. 113-116, 125, 127-128; *see* Ex. 909 pp. 155, 165), establishes that AuraVie's "risk-free trial" or "trial order" offers were materially misleading to consumers in several ways:

a.  The overall net impression of the offers was that AuraVie products were available to consumers without risk, further obligation, or cost—other than the disclosed nominal shipping and handling fees. (Ex. 903-8; Ex. 909 pp. 113, 115-116, 125, 127-128. *see* Ex. 589-3).

b.  The offers stated that customer satisfaction was "100% guaranteed." (Ex. 909-128). In fact, customers were regularly

1   dissatisfied with the trial offers because they resulted in

2   undisclosed and unauthorized charges. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7;

3   Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-

4   5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶

5   5-6; Ex. 15 ¶ 4).

6      c.  The offers stated that AuraVie was accredited by the Better

7          Business Bureau ("BBB") with an "A-" rating. (Ex. 909-116). In

8          fact, at least since March 2014, AuraVie did not have BBB

9          accreditation and its rating was an F. (Ex. 907 ¶ 5; Ex. 592).

10     d.  The offers failed to clearly and conspicuously disclose that

11         acceptance of the offers would result in consumers being charged

12         as much as $97.88 for the skincare products after a 10 days or

13         other limited time period. (Ex. 903-8; Ex. 909 pp. 113-116, 125-

14         128; *see* Ex. 589 pp. 3-5).

15     e.  The offers failed to clearly and conspicuously disclose that, to

16         avoid charges, consumers would have to return the product, at

17         their own cost and within a short time period. (Ex. 903-8; Ex. 909

18         pp. 113-116, 125-128; *see* Ex. 589 pp. 3-5).

19     f.  The offers failed to clearly and conspicuously disclose that

20         consumers would incur restocking or other charges if they

returned the product. (Ex. 903-8; Ex. 909 pp. 113-116, 125-128; *see* Ex. 589 pp. 3-5).

    g.  The offers failed to clearly and conspicuously disclose that acceptance of the offers would result in consumers being automatically enrolled into a negative option continuity program, receiving additional AuraVie skincare products each month, and incurring additional charges of up to $97.88 on their credit cards or debit cards each month. (Ex. 903-8; Ex. 909 pp. 113-116, 125-128; *see* Ex. 589 pp. 3-5).

    h.  The offers failed to clearly and conspicuously disclose how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (Ex. 903-8; Ex. 909 pp. 113-116, 125-128; *see* Ex. 589 pp. 3-5).

17.  The uncontroverted evidence also establishes that AuraVie's "risk-free trial" or "trial order" offers were unfair:

    a.  Consumers nationwide have testified, by declaration, that they were subject to injury in the form of unauthorized charges for product that was advertised as part of a "risk-free trial" or "trial order," as well as for additional unordered and unwanted products that were sent each month. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex.

5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

b. Consumers could not reasonably avoid such injury because the costs and negative option continuity features of the AuraVie offers were not clearly disclosed to consumers. (*E.g.,* Ex. 909 pp. 115, 117-120, 125).

c. Business practices that rely upon a lack of disclosure and unauthorized billing provide no countervailing benefits to consumers or competition.

d. Courts have regularly found unauthorized billing practices to be unfair. *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000); *FTC v. Windward Mktg., Ltd.*, No. 1:96-cv-615F, 1997 U.S. Dist. LEXIS 17,114, at *10, 13 (N.D. Ga. Sept. 30, 1997).

18. Defendants contend that the terms and conditions relating to the "risk-free trial" or "trial order" offers of AuraVie products were disclosed to consumers. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com*, 453 F.3d at 1200;

*see also FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010); *Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999).

19.  Even assuming *arguendo* that each of the AuraVie websites included such disclosures, the disclosures were unquestionably deficient. They were either accessible only by hyperlink (Ex. 909-124) or were inconspicuous:

> We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.  (Ex. 909-125).

a.  A facial review of the websites shows that disclosures were not placed in proximity to the "risk-free trial" or "trial order" offer and were not of sufficient size or clarity to be readily seen by consumers. (Ex. 909 pp. 113-116, 125-128). Thus, the disclosures

were not sufficiently clear and prominent so that the overall net impression of the offer was truthful.

   b.  The disclosures failed to state whether the 10-day trial offer began on the date that the product was ordered, or days later, when the product was delivered. (*E.g.,* Ex. 909-125).

   c.  The disclosures failed to state that consumers would incur restocking or other charges for returning the product. (*E.g.,* Ex. 909-125).

   d.  The disclosures failed to state that refunds would not be provided after 10 days if the product was opened or 30 days if the product was unopened. (*E.g.,* Ex. 909-125).

   e.  The disclosures failed to state that charges for additional products would automatically be imposed onto consumers' credit cards or debits cards. (*E.g.,* Ex. 909-125).

20.  Consumers who accepted AuraVie "risk-free trial" or "trial orders" were directed to an order confirmation page and often received an email confirming their order. The confirmation page stated that the product was being shipped at $0.00 and was also materially misleading (Ex. 902 pp. 1-3; Ex. 8 ¶ 4; Ex. 8 pp. 5-6; Ex. 14 ¶¶ 3, 8; Ex. 15 ¶ 3; Ex. 15-5.; *see* Ex. 12 ¶¶ 2, 7):

a. The overall net impression of the email was that AuraVie products were being sent to consumers "risk free" and without further cost or obligation, other than the disclosed nominal shipping and handling fee. (*Id.*).

b. The email failed to clearly and conspicuously disclose that the consumer would be charged as much as $97.88 for the skincare products after a 10 days or other limited time period. (*Id.*).

c. The email failed to clearly and conspicuously disclose that, to avoid charges, consumers would have to return the product, at their own cost and within a short time period. (*Id.*).

d. The email failed to clearly and conspicuously disclose that consumers would incur restocking or other charges if they returned the product. (*Id.*).

e. The email failed to clearly and conspicuously disclose that the consumer was automatically enrolled into a negative option plan, would receive additional AuraVie skincare products each month, and would incur additional charges of up to $97.88 on their credit cards or debit cards each month. (*Id.*).

f.  The email failed to clearly and conspicuously disclose how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (*Id.*).

21.  There is no genuine issue of material fact that AuraVie products were promoted, marketed, and sold using the above practices. Nor is there a genuine issue of material fact that such practices violated Section 5 of the FTC Act:

a.  The failure to disclose, or disclose adequately, material terms and conditions of a sales offer, including: that consumers' credit card or debit card information would be billed the costs of products upon the expiration of a limited trial period; the dates on which the trial period began and ended; that consumers would be enrolled into a negative option plan with additional charges to their credit cards or debit cards; the costs of the negative option plan, and the frequency and duration of the recurring charges; the means to cancel the negative option plan to avoid additional charges; and the requirements of refund policies were deceptive omissions that were likely to mislead consumers acting reasonably. There is no genuine issue of material fact that these practices violated Section 5 of the FTC Act, 15 U.S.C. § 45(a).

b. The representation that consumers could try AuraVie products "risk-free" was deceptive and likely to mislead consumers acting reasonably. This practice violated Section 5, 15 U.S.C. § 45(a).

c. The representation that AuraVie was accredited by and had a rating of "A-" with the BBB was false and likely to mislead consumers acting reasonably. This practice also violated Section 5, 15 U.S.C. § 45(a).

d. There is no genuine issue of material fact that the practice of causing charges to be submitted for payment to consumers' credit cards and debit cards without their express informed consent was unfair and violated Section 5, 15 U.S.C. § 45(n).

***Analysis of the ROSCA Violations***

22. Likewise, there is no genuine dispute that the above-described practices violated Section 4 of ROSCA, 15 U.S.C. § 8403:

a. A negative option feature is "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).

b. AuraVie treated consumers' silence or failure to take affirmative action as acceptance of the offer to send and charge consumers for additional AuraVie products. (*E.g.*, Ex. 909 pp. 115, 117-120, 125). Therefore, the AuraVie offers included a negative option feature.

c. ROSCA generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless the seller: (i) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (ii) obtains the consumer's express informed consent before making the charge; and (iii) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403.

d. As discussed above, the AuraVie websites and offers failed to clearly and conspicuously disclose all material terms of the transaction before obtaining consumers' billing information; and failed to obtain consumers' express informed consent before making charges. There is no genuine issue of material fact that these practices violated ROSCA, 15 U.S.C. § 8403.

*Analysis of the EFTA Violations*

23.    Finally, there is no genuine dispute that the above-described practices violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a).

24.    A "preauthorized electronic fund transfer" is any electronic fund transfer that is authorized in advance and scheduled to recur at substantially regular intervals. 12 C.F.R. § 205.10(b).

25.    AuraVie's negative option plan, which billed consumers at regularly monthly intervals, use electronic funds transfers that were purportedly pre-authorized.

26.    Under EFTA, a preauthorized electronic fund transfer may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693a(10); *see also* Section 205.10(b) of Regulation E ("preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer.")

27.    The uncontroverted evidence shows that consumers who accepted AuraVie's "risk-free trial" or "trial order" offers did not authorize, in writing, electronic fund transfers to be made from their accounts.

Further, because the consumers had not authorized the electronic fund transfers, consumers were not provided copies of any such authorization. (*See, e.g.*, Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4). Accordingly, there is no genuine issue of material fact that the practices violated EFTA. 15 U.S.C. § 1693e(a).

**DEFENDANT ALON NOTTEA IS LIABLE FOR FTC ACT, ROSCA, AND EFTA VIOLATIONS**

28.   Having determined that the uncontested facts prove that the AuraVie "risk-free trial" and "trial order" offers violated the FTC Act, ROSCA, and EFTA, the Court next examines whether Defendants are liable for the violations.

29.   An individual may be held liable for injunctive relief arising from deceptive or unfair acts or practices when they *either* participated directly in the acts or practices *or* had authority to control them. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

a.   Participation may include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publ'ns, Inc.*, 99 F.

Supp. 2d at 1206. Where an officer participates in "acts crucial to the success" of an enterprise, the officer has directly participated for the purposes of individual liability. *Id*.

b.  Authority to control may be inferred from "'active involvement in business affairs and the making of corporate policy.'" *J.K. Publ'ns*, 99 F. Supp. at 1203-04 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). An individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *J.K. Publ'ns., 99* F. Supp. at 1204.

i.  A "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority." *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 U.S. Dist. LEXIS 42369 at *42 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982 at *26 (D. Utah Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007); *FTC v.*

1    *Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S.

2    Dist. LEXIS 17,114 at *38-39 (N.D. Ga. Sept. 30, 1997).

3          ii.   "A heavy burden of exculpation rests on the chief executive

4                and primary shareholder of a closely held corporation

5                whose stock-in-trade is overreaching and deception."

6                *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C.

7                Cir. 1973).

8    30.   To obtain equitable monetary relief against an individual, the FTC

9          must show, in addition to one of the two factors above, that the

10         individual had some knowledge of the company's deceptive acts or

11         practices. *J.K. Publ'ns*, 99 F. Supp. 2d at 1204.

12         a.   Individuals possess the requisite knowledge if they: (i) had actual

13              knowledge of the misrepresentations; (ii) were recklessly

14              indifferent to the truth or falsity of the misrepresentations; or (iii)

15              had an awareness of a high probability of deceptive conduct

16              together with an intentional avoidance of the truth. *FTC v.*

17              *Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir.

18              2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy*

19              *Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

20

b. The "degree of participation in business affairs is probative of knowledge." *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

31. The FTC is not required to prove that an individual actually intended to deceive to establish knowledge. *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

32. Defendant Alon Nottea, although given ample opportunity to respond to the FTC's motion for summary judgment, failed to come forward with any evidence to rebut the FTC's evidence of his individual liability. The Court finds that there is no genuine issue of material fact that Defendant Alon Nottea participated in, controlled, or had the authority to control the unlawful acts and practices at issue in this case and that Defendant Alon Nottea is therefore liable for injunctive relief. The Court further finds that there is no genuine issue of material fact that Defendant Alon Nottea acted with the requisite knowledge to be held liable for equitable monetary relief and therefore a monetary judgment against Defendant Alon Nottea is proper.

a. **Alon Nottea** owned, operated, or controlled companies that collectively marketed and sold "AuraVie" and other skincare

products though negative option continuity plans, to consumers across the United States. Acting in concert with the other named Defendants, Alon controlled, had the authority to control, or participated in the activities of BunZai Media Group, Inc., Pinnacle Logistics, Inc., Media Urge, Inc., Adageo, LLC, and other "AuraVie" companies, including the activities alleged in Plaintiff's Complaint.

   i.  Alon, through his alias Jay Michael, was the registrant, technical contact, administrative contact, and billing contact for the websites (auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com) used to promote the AuraVie "risk-free trial" and "trial order" offers. (Ex. 910 ¶ 202; Ex. 597 pp. 14, 20; Ex. 598 pp. 5-10, 21). He paid for those websites with a business credit card in his name. (Ex. 598 pp. 34-35, 37-38, 40, 42-43, 45). Using his alias, Alon also registered at least 65 domain names related to sale of the AuraVie, LeOR, and Dellure skin care products. (*See* Dkt. 120 pp. 27, 43-44).The evidence that Alon participated in or controlled the deceptive and unfair website offers is irrefutable.

ii. Evidence that Alon acted with actual knowledge of the deceptiveness of the scheme is equally irrefutable. In an audio-recorded business meeting with co-defendants Roi Reuveni and Paul Medina, Alon acknowledge that it was "completely illegal" not to disclose the terms of conditions of the AuraVie sales offer on invoices. (Ex. 556-23). Instead of taking corrective action, however, he conspired for ways to show compliance without clearly disclosing the offers' terms and conditions –which he believed would decrease sales. (*See* Ex. 556-29). The options he considered included feigning concern by recording interviews with dissatisfied customers to present in a potential FTC suit, indiscreetly disclosing terms "a little bit grayed out" on packing slips, or trying a test run with terms disclosed to gauge impact. (*E.g.*, Ex. 556 pp. 19, 21, 24).

## COMMON ENTERPRISE

33. "When determining whether a common enterprise exists, courts look to a variety of factors, including: common control; the sharing of office space and officers; whether business is transacted through 'a maze of interrelated companies'; the commingling of corporate funds

and failure to maintain separation of companies; unified advertising; and evidence which 'reveals that no real distinction existed between the Corporate Defendants.'" *FTC v. Wolf*, No. 98-8119-civ-Ferguson, 1996 U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 30, 1996) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431 (7th Cir.), *cert. den.*, 377 U.S. 992 (1964); *Zale Corp. and Corrigan-Republic, Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *SEC v. Elliott*, 953 F.2d 1560, 1565 n.1 (11th Cir. 1992); *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) P 70,570 at 72,095 (S.D. Fla. 1994)).

34.   The FTC alleges that the evidence shows Defendants promoted the AuraVie websites and offers as a common enterprise with:

a.   <u>Common control</u>: the Individual Defendants exerted control over the common enterprise:

i.   Alon was CEO of Bunzai Media Group, a consultant for Media Urge, and owner of Adageo. (Dkt. 251 ¶ 32). He also had control over Pinnacle Logistics and Focus Media

Solutions. (Ex. 946-18 at 42:19-24; Ex. 914-48 ¶ 220; Ex. 915-48 ¶ 220).

ii. Doron oversaw accounts at Bunzai Media Group and Pinnacle Logistics. (*See* Ex. 554-37 at 86:17-87:7; Ex. 35; Ex. 544). He was an owner of Secured Commerce (Ex. 912-52 ¶ 214; Dkt. 120 at 8) and managed the AuraVie call center. (Ex. 579). He also exerted control over Secured Merchants (Ex. 59) and performed services for all or virtually all of the Corporate Defendants (Ex. 551-4 at 17:3-17:5 and 17:9-17:11; Ex. 551-13 at 60:14-60:18; Ex. 551-9 at 53:9-53:14; Ex. 551-10 at 56:21-56:23; Ex. 551-5 at 44:13-44:15; Ex. 551-6 at 49:3-49:7; Ex. 551-7 at 51:10-51:12; Ex. 551-8 at 52:12-52:14; Ex. 551-7 at 51:16-51:20; Ex. 551-11 at 58:7-58:11; Ex. 551-11 at 58:23-59:9; Ex. 551-14 at 61:2-61:4; Ex. 551-14 at 61:13-61:17; and Ex. 551-19 at 68:20-68:25).

iii. Latsanovaki was an owner of Bunzai Media Group and a CEO of Zen Mobile Media. (Dkt. 244 ¶ 36; Dkt. 245 ¶ 36; Ex. 18-2). He managed or helped manage Media Urge and Pinnacle Logistics (Ex. 561-3; Ex. 588-9; *see* Ex. 588-1),

and was able to direct that payments be made from SBM Management. (Ex. 64).

    iv.  Reuveni was an officer and manager of Pinnacle Logistics. (Exs 553-7 at 18-19; Ex. 911-16 ¶¶ 106-08). He was an officer and director of Agoa Holdings. (Ex. 911-37 ¶ 245; Dkt. 250 ¶ 37). He was also president of DMA Media Holdings (Ex. 911-37 ¶ 244), COO of Chargeback Armor (Ex. 917-66 ¶ 237), and a managing member and employee of Secured Merchants (Ex. 412-5; Ex. 553-5 at 16:19-20).

    v.  Argaman owned Secured Commerce (Dkt. 299 ¶ 39), Secured Merchants (Dkt. 299 ¶ 39), and was the Chief Technology Officer of Chargeback Armor. (Ex. 281-3).

35. The uncontroverted evidence shows that Defendants promoted the AuraVie websites and offers as a common enterprise with:

  a.  <u>Shared office space and officers</u>: In addition to the overlapping officers noted above, the common enterprise shared office space:

    i.  Bunzai Media Group, Pinnacle Logistics, DSA Holdings, Agoa Holdings, Zen Mobile Media, SafeHaven Ventures, Heritage Alliance Group, and AMD Financial Network all shared physical office space in Van Nuys, California. (Dkt.

244 ¶¶ 9, 11, 13-17; Dkt. 245 ¶¶ 9-11, 13-17; Dkt. 250 ¶¶ 9-10, 13; Dkt. 251 ¶¶ 9-10, 13).

   ii.  Bunzai Media Group and Agoa Holdings shared a mailbox. (Dkt. 244 ¶ 9; Dkt. 245 ¶ 9; Ex. 904-2; Ex. 904-47).

  iii.  Zen Mobile Media, SafeHaven Ventures, SBM Management, Adageo, Kai Media, and Insight Media shared a mailbox. (Ex. 904-24; Ex. 904-30; Ex. 904-40; Ex. 904-47; Ex. 904-53; Ex. 904-56).

b.  <u>A maze of interrelated companies</u>: Defendants recruited friends and family to serve as owners of shell companies, which were used to operate the common enterprise.  (*See* Exs. 262; 268-2; Ex. 474; *see* Ex. 318). CalEnergy claimed to be the "parent" corporation of two of the AuraVie companies: Pinnacle Logistics and Media Urge. (Ex. 908-3).

c.  <u>Commingling of funds</u>: Doron possessed credit cards, signature stamps, checks, and deposit slips for dozens of entities. (Dkt. 120 pp. 13, 70-71, 74; Ex. 536. *See also* Ex. 49; Ex. 437). CalEnergy, through Latsanovski, provided signed, blank checks to finance operations (Dkt. 120 at 13, 39-40), and paid Reuveni, who reportedly worked for other companies. (Ex. 911-37 ¶ 246).

Secured Merchants gave $250,000 to Chargeback Armor. (Ex. 916-57 ¶ 235; 917-65 ¶ 235; Dkt, 231-1 at 53). Revenues from AuraVie flowed to SBM Management and CalEnergy, then to Focus Media. (Dkt. 121-1 at 3).

36.   In the Ninth Circuit, cases hold that entities constitute "a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1143 (9th Cir. 2010).

   a.   Vertical commonality exists where an investor and promoter are involved in a common venture without requiring other investors' involvement. *Brodt v. Bache & Co*., 595 F.2d 459, 461 (9th Cir.1978) (noting that a farmer, a feedlot operator, and a bank may be involved in a "common enterprise" if the farmer and the bank both depended upon the success of the feedlot for the success of their investments).

   b.   Conversely, horizontal commonality is shown by the "pooling of interests, usually combined with a pro-rata sharing of profits." *Brodt v. Bache & Co*., 595 F.2d at 460. "[T]he critical factor in

the common enterprise test 'is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts.'" *Id.* at 461.

37.   A common enterprise may be proven by evidence that companies pooled resources, staff, and funds; that companies were owned and managed by the same group of individuals; and that companies all participated to some extent in a common venture to sell the same products. *Network Servs. Depot, Inc.*, 617 F.3d at 1143.

38.   It is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an "unholy" alliance. *See FTC v. Ameridebt, Inc.*, 343 F. Supp. 2d 451, 462 (D. Md. 2004); *see also FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Texas 2008).

39.   The Court finds that there is no issue of material fact that Defendants maintained an "unholy" alliance, that Defendants pooled resources, staff, and funds; that a common enterprise sold the same products, and that the AuraVie business practices were effectuated through, and there existed, a Common Enterprise. The Court reserves until trial a determination of whether Calenergy, Inc. and Secured Merchants, LLC were members of the Common Enterprise and

whether Doron Nottea, Igor Latsanovski, or Alan Argaman controlled the Common Enterprise.

**THE PROPER INJUNCTIVE EQUITABLE MONETARY RELIEF**

40.   Having found that the Individual Defendant Alon Nottea is liable for the FTC Act, ROSCA, and EFTA violations alleged, the Court next examines the proper forms of relief to be awarded.

41.   Section 13(b) of the FTC Act authorizes courts to issue a permanent injunction whenever a defendant violates the laws enforced by the Commission and is likely to continue to violate them.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009). To determine whether a defendant is likely to engage in similar violations in the future, courts look to two general factors:  (a) the deliberateness and seriousness of the present violation, and (b) the defendant's past record with respect to deceptive and unfair marketing practices. *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*, 2013 WL 1224613, at *16.  The court may also weigh the "adaptability or transferability of the unfair practice to other

1   products." *Id*.  This Court finds that a permanent injunction against

2   all defendants is proper and serves the public interest.

3   42.   Further, "[a] court may frame an injunction based on violation of the

4   FTC Act broadly enough to prevent the defendant from engaging in

5   similar illegal conduct in the future." *FTC v. Neovi, Inc*., No. 06-1952

6   JLS, 2010 WL 3789713, at *2 (S.D. Cal. Sept. 27, 2010) (citing *FTC*

7   *v. Colgate-Palmolive*, 380 U.S. 374, 395 (1965)). Numerous courts

8   have imposed bans enjoining future participation in a particular line

9   of business. *See, e.g., FTC v. Gill*, 265 F.3d 944, 957-58 (9th Cir.

10   2001) (ban on engaging in the credit repair business); *Ivy Capital*,

11   2013 WL 1224613, at *16 (ban on business coaching); *FTC v. John*

12   *Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1013 (C.D. Cal.

13   2012) (ban on telemarketing and producing or disseminating

14   infomercials); *Grant Connect*, 827 F. Supp. 2d at 1233 (ban on

15   marketing and selling grant products and business opportunities);

16   *FTC v. Dinamica Financiera*, No. 2:09-03554, 2010 WL 9488821, at

17   *12 (C.D. Cal. Aug. 19, 2010) (ban on loan modification and

18   foreclosure relief services); *FTC v. Neiswonger*, 494 F. Supp. 2d

19   1067, 1084 (E.D. Mo. 2007) (ban on marketing  business

20   opportunities); *FTC v. Bay Area Bus. Council, Inc.,* No. 02-5762

(N.D. Ill. Apr. 16, 2004) (ban on telemarketing and on sale of credit-related products), aff'd, 423 F.3d 627 (7th Cir. 2005); *FTC v. Credit Enhancement Servs.*, No. 02-2134 (E.D.N.Y. Mar. 31, 2004) (ban on marketing or selling credit-related goods or services); *FTC v. Consumer Alliance*, No. 02-2429 (N.D. Ill. Sept.29, 2003) (ban on telemarketing and sales of credit card protection and credit-related products). Such a ban, prohibiting Defendants from engaging in future negative options sales, is appropriate here.

43.     Where consumers suffer economic injury resulting from defendants' violations of the FTC Act, equity requires monetary relief in the full amount of consumers' losses (or ill-gotten gains). *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (affirming summary judgment holding defendants liable for the full amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

44.     To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate. *See Commerce Planet*, 878 F. Supp. 2d at 1089 (citing *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)). "Fuzzy figures due

1   to a defendant's uncertain bookkeeping cannot carry a defendants'

2   burden to show inaccuracy." *Id*.

3   45.   Where defendants act as a common enterprise, each may be held

4   jointly and severally liable for the unlawful acts and practices of the

5   other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F.

6   Supp. 2d at 1202.

7   46.   Here, the Court's Receiver determined that the amount of

8   Defendants' ill-gotten gains or consumer injury is $75,624,030.

9   47.   The Court therefore finds that there is no genuine issue of material

10   fact that:

11   a.   The FTC has presented a reasonable approximation of the amount

12   of consumer injury;

13   b.   A reasonable approximation of the amount of Defendants' ill-

14   gotten gains or consumer injury is $75,624,030.

15   **DISPOSITION**

16   For the foregoing reasons, the FTC's Motion for Partial Summary Judgment

17   is **GRANTED** as to:

18   1.   AuraVie's Internet Website offers violated the FTC Act by:
        a.   Failing to disclose adequately material terms of offer;

19   b.   Falsely offering a "Risk-Free" Trial;

20

    c.  Falsely stating its Better Business Bureau accreditation and rating;

    d.  Unfairly charging consumers without authorization;

2.  AuraVie's Internet Website offers violated the Restore Online Shoppers' Confidence Act by:

    a.  Failing to clearly and conspicuously disclose all material terms of the negative option feature of the skincare products transaction before obtaining the consumer's billing information; and

    b.  Failing to obtain the consumer's express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account or other financial account for the transaction;

3.  The AuraVie sales violated the Electronic Funds Transfer Act and Regulation E by:

    a.  Debiting consumers' accounts without authorization;

4.  AuraVie's Internet Website offers were operated by a Common Enterprise;

5.  Defendant Alon Nottea is individually liable;

6.  The Federal Trade Commission presented a reasonable approximation of Consumer Injury.

A separate final order as to injunctive and ancillary relief against Defendant Alon Nottea's shall be forthcoming.


**IT IS SO ORDERED this ___ day of _____, 2016.**


_____

**UNITED STATES DISTRICT JUDGE**