1

2  DAVID C. SHONKA
   Acting General Counsel

3  REID TEPFER
   rtepfer@ftc.gov; Tex. Bar No. 24079444
4  LUIS GALLEGOS
   lgallegos@ftc.gov; Okla. Bar No. 19098
5  ZACHARY A. KELLER
   zkeller@ftc.gov; Tex. Bar No. 24087838
6  DAMA J. BROWN
   Dbrown1@ftc.gov; Mi. Bar No. P54775

7  Federal Trade Commission
   1999 Bryan Street, Suite 2150
8  Dallas, Texas 75201
   (214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
9  (214) 979-9382 (Keller); (214) 979-9374 (Brown)
   (214) 953-3079 (fax)

10 RAYMOND MCKOWN
   rmckown@ftc.gov; Cal. Bar No. 150975
11 10877 Wilshire Boulevard, Ste 700
   Los Angeles, California 90024
12 (310) 824-4343(voice); (310) 824-4380 (fax)

13 Attorneys for Plaintiff Federal Trade Commission

   UNITED STATES DISTRICT COURT
14 CENTRAL DISTRICT OF CALIFORNIA
   WESTERN DIVISION

15

16 FEDERAL TRADE COMMISSION,          Case No.  CV 15-4527-GW(PLAx)

17                      Plaintiff,    PLAINTIFF FEDERAL TRADE
                                      COMMISSION'S PROPOSED
         v.                           FINDINGS OF FACT &
                                      CONCLUSIONS OF LAW
18 BUNZAI MEDIA GROUP, INC.,
   ET AL,
19                                    Trial: June 21, 2016
                      Defendants.     Time: 9:00 a.m.
20                                    Courtroom 10

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

Pursuant to Fed. R. Civ. P. 52(a), Plaintiff, Federal Trade Commission ("FTC" or "Commission"), submits the following Procedural History, Statement of the Case, Proposed Findings of Fact, and Conclusions of Law to aid the Court in examining the evidence and reaching a decision on the merits of the case.

## I.    INTRODUCTION

This action is scheduled for bench trial before the **Honorable Judge George H. Wu**, United States District Court Judge, Central District of California, on **June 21, 2016 at 9:00 a.m.** in Courtroom 10, located at 312 North Spring Street, Los Angeles, California 90012. The parties, FTC and Defendants Alon Nottea, Doron Nottea, Igor Latsanovski, Alan Argaman, CalEnergy, Inc., and Secured Merchants, LLC, and Relief Defendant Chargeback Armor, Inc., shall appear, with their counsel of record, on that date and time.

## II.    PROCEDURAL HISTORY OF THE CASE

Plaintiff FTC filed its initial Complaint in June 2015, seeking a permanent injunction and other equitable relief against 15 corporate and 7 individual defendants to stop their allegedly deceptive Internet sales.[1] (Dkt. 3). Plaintiff

---

[1] The initial complaint asserted claims against Bunzai Medial Group, Inc., Pinnacle Logistics Inc., DSA Holdings, Inc., Lifestyle Media Brands, Inc., Agoa Holdings, Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc., Heritage Alliance Group, Inc., AMD Financial Network, Inc., SBM Management, Inc., Media Urge, Inc., Adageo LLC, CalEnergy, Inc., Kai Media, Inc., Insight Media, Inc., Alon Nottea, Motti Nottea, Doron Nottea, Igor Latsanovski, Oz Mizrahi, Roi Reuveni, and

alleged that Defendants used materially false and misleading website offers to induce consumers to provide their credit or debit card information, purportedly to pay nominal shipping fees to receive a "risk-free trial" of skincare products. Plaintiff alleged that Defendants then imposed unauthorized charges onto consumers' credit and debit cards for the trial products and enrolled consumers into an "auto-ship" negative option plan[2] that was not clearly or conspicuously disclosed in the sales offers. (Dkt. 3 ¶¶ 34-50).

Plaintiff alleged that the Defendants operated as a common enterprise—a "maze of interrelated companies"—and that their practices violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45; Section 4 of the Restore Online Shoppers' Confidence Act of 2010 ("ROSCA"), 15 U.S.C. § 8404; and Section 917(c) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c). (Dkt. 3 ¶¶ 31-32, 57-85).

Simultaneous with its Complaint, Plaintiff sought an *ex parte* temporary restraining order to enjoin the alleged law violations, to appoint a Receiver to control the corporate entities, and to freeze Defendants' assets to preserve the

---

Kristopher Bond. (Dkt. 3).

[2] A negative option is an offer or agreement to sell or to provide goods or services under a provision that uses a customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement as acceptance of the offer. 16 CFR Sec. 310.2u.

availability of funds for future consumer redress. (Dkts. 4-5, 11). Plaintiff's motion
was supported by four volumes of exhibits, including copies of the challenged
websites, declarations from injured consumers, the Better Business Bureau, and
law enforcement personnel. (Dkts. 6-9).

After reviewing the evidence and receiving argument, this Court held that
there was good cause to believe that Defendants were violating the FTC Act,
ROSCA, and EFTA; good cause to believe that Plaintiff was likely to succeed on
the merits of the Complaint; good cause to believe that immediate, irreparable
harm would occur if a restraining order were not granted; and that a proper
balancing of the equities favored entry of an *ex parte* temporary restraining order,
with receivership and asset freeze provisions, against the named Defendants. (Dkt.
14 ¶¶ 4-10).

Subsequently, Stipulated Preliminary Injunctions were entered against Alon
Nottea, Roi Reuveni, Doron Nottea, and Motti Nottea, and following contested
hearings, against Igor Latsanovski and CalEnergy. (Dkts. 105, 107-108, and 147).
The Preliminary Injunctions continued the conduct prohibition, receivership, and
asset freeze provisions. (*Id.*).

Plaintiff filed its First Amended Complaint ("Complaint," Dkt. 235) in
October 2015, asserting the same causes of actions, but adding 7 additional
corporate and 2 individual defendants, and a cause of action against a relief

defendant.[3] Plaintiff served complaints upon the 33 defendants and the relief defendant. (Dkts. 71-77, 79-89, 109-112, 138, 266-268, 327, 371-376, 378-379, 406).

Only 11 defendants answered Plaintiff's Complaint: Alon Nottea, Motti Nottea, Doron Nottea, Igor Latsanovski and CalEnergy, Oz Mizrahi, Roi Reuveni, Alan Argaman and Secured Merchants, Paul Medina, and Relief Defendant Chargeback Armor. (Dkts. 64-65, 115-118, 171, 173, 176, 244-245, 259-251, 253-254, 299-301). The remaining 23 defendants failed to appear or defend, causing defaults to be entered by the Clerk (Dkts. 157-159, 229-230, 417-418), and a motion by Plaintiff to enter default judgments. (Dkt. 454).[4] Four defendants stipulated to entry of Permanent Injunctions with Monetary Judgments prior to trial: Motti Nottea (Dkt.439), Oz Mizrahi (Dkt. 440), Paul Medina (Dkt. 441), and Roi Reuveni (*see* Dkt. 442).

In April 2016, Plaintiff moved for summary judgment. (Dkt. 353). Plaintiff's motion was supported by voluminous exhibits, including declarations, deposition

---

[3] The additional defendants included Focus Media Solutions, Inc., Secured Commerce, LLC, Secured Merchants, LLC, USM Products, Inc., Merchant Leverage Group, Inc., DMA Media Holding, Inc., Shalita Holdings, Inc., All Star Beauty Products, Inc., Alan Argaman, and Paul Medina. Chargeback Armor, Inc. was named as a relief defendant, only. (Dkt. 253).

[4] Plaintiff initially moved for entry of a default judgement in October 2015. (Dkt. 232). For reasons stated on the record, that motion was denied without prejudice. (Dkt. 271).

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

transcripts, and business records and communications of the defendants. (Dkts. 353-1 through 353-32). Simultaneously, Defendants Igor Latsanovski and CalEnergy and Defendants Alan Argaman, Secured Merchants, and Relief Defendant Chargeback Armor also moved for summary judgment and provided exhibits, including declarations, deposition transcripts, and business records. (Dkts. 352, 356-61; and Dkts. 354-55). The Court found that Plaintiff's allegations involved a "complex web of interlacing entities and individuals" but that questions of fact remained concerning each appearing Defendants' participation in or control over the "web," and their knowledge of the law violations. (Dkt. 456 ¶ 3). Therefore, the Court denied summary judgment. (Dkt. 456).[5] The matter was set for bench trial on June 21, 2016.

## III.   STATEMENT OF THE CASE

### A.   VIOLATIONS OF THE FTC ACT, ROSCA, AND EFTA

In its Complaint, Plaintiff alleges that since at least 2010, Defendants, acting collectively and through a maze of interrelated companies and websites,

---

[5] On June 9, 2016, noting that Plaintiff's Motion for Summary Judgment also requested a narrowing of issues pursuant to Fed. R. Civ. P. 56(e), Plaintiff sought leave to move for partial summary judgment. The court granted leave but ordered the motion to be filed the same day. Plaintiff filed the motion and provided an Appendix of evidence and citations to Plaintiff's previously filed Statement of Uncontested Facts in support. (Dkts. 452, 453-1, 361). The court denied that motion without prejudice on the record, citing Plaintiff's failure to include pinpoint citations to the relevant portions of exhibits in its brief.

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

prominently advertised to consumers that AuraVie and other skincare products were available for a "trial order" or "risk-free trial," upon payment of a nominal shipping fee. (Dkt. 235 ¶¶ 45, 48-49). Plaintiff alleges that the websites were deceptive because they failed to clearly and conspicuously disclose material terms and conditions of the sales offers. (Dkt. 235 ¶¶ 51-59). Plaintiff claims that material terms were buried in inconspicuous text fields, in hyperlinks, or in some instances, were not disclosed at all. Specifically, Plaintiff claims that the websites failed to clearly and conspicuously disclose to consumers:

1.   that credit or debit card information provided by consumers to pay shipping fees associated with trial offers would also be used to pay for the full costs of the products, following a limited time period;

2.   when the trials period began and ended;

3.   that consumers who accepted the "trial order" or "risk-free trial" offers would be automatically enrolled into "auto-ship" or negative option plans in which additional skincare products would be shipped, and the consumers' credit or debit cards charged, every month unless consumers affirmatively canceled within a limited time period;

4.   material terms of the "auto-ship" or negative option plan —including the cost, frequency, and duration of recurring charges;

5.   the means to cancel the "auto-ship" or negative option plan; and

6.   the requirements of the sellers' return and refund

**PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

policies.

(Dkt. 235 ¶¶ 51-59).

According to Plaintiff, because the websites prominently used the terms "trial order" and "risk-free trial" and failed to disclose the above information, consumers were misled into believing they could obtain a trial sample of the skincare products upon payment of a nominal shipping fee, without further risk, cost, or obligation. (Dkt. 235 ¶¶ 70-74).

Plaintiff contends that the website offers were materially deceptive in two ways. First, Plaintiff contends that the websites represented, expressly or by implication, that consumers could try products "risk free." (Dkt. 235 ¶¶ 49, 56, 59-60, 73-75). Plaintiff contends that this representation was materially false because, in fact, consumers who accepted the trial offers were likely to incur additional costs, typically of $97.88, to pay for the products at the end of the trials or to pay other costs to cancel and return the products. (Dkt. 235 ¶¶ 53-55). Second, Plaintiff contends that, from at least March 2014 and until the Court's Receiver suspended Defendants' operations, some of the websites falsely claimed to be accredited by the Better Business Bureau with an A- rating. (Dkt. 235 ¶¶ 50, 76-77, *but see* Ex. 907 ¶ 5).

Plaintiff alleges that Defendants, again acting through a maze of interrelated companies, imposed charges onto consumers' credit and debit cards beyond the

advertised shipping fees, without consumers' express, informed consent. (Dkt. 235 ¶¶ 53, 62-67, 79-81, 87-88). Finally, Plaintiff alleges that Defendants and their maze of interrelated companies debited consumers' bank accounts on a recurring basis without first obtaining signed, written authorizations or other authentication and without providing copies of such authorizations to consumers. (Dkt. 235 ¶¶ 93-94).

The above practices, if true, violated Section 5 of the FTC Act, 15 U.S.C. § 45, which broadly prohibits unfair or deceptive acts or practices in or affecting commerce; violated Section 4 of the Restore Online Shoppers' Confidence Act of 2010 ("ROSCA"), 15 U.S.C. § 8404, which prohibits Internet sellers from charging consumers for goods sold in negative option plans unless all material terms are clearly and conspicuously disclosed before billing information is obtained; and violated Section 917(c) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), which allows preauthorized electronic fund transfers from a consumer's financial account only when authorized in writing or in a similarly authenticated manner, and only when a copy of the authentication is provided to the consumer.

Defendant Alon Nottea acknowledges that the AuraVie and other skincare products at issue were sold exclusively though websites controlled by BunZai Media Group and its successors and that negative option plans were used to market

the products. (*See*, *e.g*., Decl. of Alon Dkt. 391-3 ¶¶ 6). In fact, Defendants raise only limited defenses to the Plaintiff's claims. (*See*, *generally*, Joint Statement of the Case Dkt. 450-1). First, Defendants contend that the website offers were not deceptive because all material terms and conditions, including the details of the "auto-ship" negative option plan, were clearly and conspicuously disclosed. (Decl. of Alon Dkt. 391-3 ¶¶ 2, 18). Second, as to the false statement of BBB accreditation, Defendants contend that the information was true. (Decl. of Alon Dkt. 391-3 ¶ 13). Third, Defendants contend that charges imposed onto consumers' credit or debit cards were neither unfair nor in violation of any Act because the websites clearly disclosed the charges and because consumers agreed to the terms when accepting the trial offers. (Decl. of Alon Dkt. 391-3 ¶ 18). Finally, with the exception of Alon Nottea, Defendants contend that they did not participate in nor control the scheme or have sufficient knowledge of the law violations to be held liable. (*See*, *e.g*., Joint Statement of the Case, Dkt. 450-1 pp. 5-7).

### B.   RELIEF DEFENDANTS' RECEIPT OF ILL-GOTTEN GAINS

Plaintiff asserts a narrow and limited claim against the Relief Defendant. Plaintiff asserts that Chargeback Armor received $250,000 in funds that are traceable to the unlawful practices described above. Further, Plaintiff claims that Chargeback Armor is not a *bona fide* purchaser or holder with legal or equitable title to the funds and therefore should be required to pay the funds back. (Dkt. 235

**PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

¶¶ 97-99). Chargeback Armor acknowledges that it provided no goods or services for the funds, and states it received the money as an investment or loan from Secured Merchants. Chargeback Armor says that the funds were commingled with untainted funds from other sources and ultimately dissipated. (*See* Decl. of Costache Dkt. 392-2 ¶¶ 5-6, Decl. of Argaman Dkt. 392-1 ¶ 18).

## IV.   ISSUES BEFORE THE COURT

Based upon the pleadings and arguments in this matter, and the submitted joint reports and pretrial orders, the Court finds that the following issues are properly before it:

A.   Whether Defendants, directly or indirectly, violated Section 5 of the FTC Act by:

1.   Failing to disclose, or disclose adequately, material terms and conditions of Internet sales offers, including but not limited to:

a.   that consumers' credit or debit cards would be charged the full costs of "free trial" or "risk-free trial" products upon the expiration of a limited trial period;

b.   the dates on which any trial period began and ended;

c.   that consumers who accepted the trial offers would automatically be enrolled in an "auto-ship" or negative option plan in which additional products would be shipped and charges imposed onto consumers' credit or debit cards each month unless the consumer acted to affirmatively cancel the plan

within a limited time period;

    d.    the costs of the negative option and the frequency and duration of recurring charges;

    e.    the means consumers needed to use to cancel the negative option program and avoid additional charges; and

    f.    the requirements of the sellers' return or refund policies;

2.  Falsely representing, expressly or by implication, that consumers could try skincare products "risk-free";

3.  Falsely representing, expressly or by implication, that the website or seller was accredited by and had a rating of "A-" with the Better Business Bureau;

4.  Whether disclosures in the websites were sufficiently clear and conspicuous to ensure that theoverall net impression of the sales offer was not deceptive;

B.    Whether Defendants, directly or indirectly, violated Section 5 of the FTC Act by unfairly imposing charges onto consumers' credit or debit cards without consumers' express informed consent;

C.    Whether Defendants, directly or indirectly, violated ROSCA by selling products over the Internet through a negative option without:

    1.    Clearly and conspicuously disclosing all material terms of the negative option before obtaining consumers' credit or debit card information;

    2.    Obtaining consumers' express informed consent before charging consumers' credit or debit cards; or

        3.       Providing a simple mechanisms for consumers to stop recurring charges to their credit or debit cards;

D.      Whether Defendants, directly or indirectly, violated EFTA by debiting consumers' bank debit cards on a recurring basis without:

        1.       Obtaining a written authorization signed or similarly authenticated from consumers permitting preauthorized electronic fund transfers from their accounts; or

        2.       Providing a copy of the written authorization for preauthorized electronic fund transfers to consumers;

E.      Whether the Corporate Defendants operated as a "common enterprise";

F.      Whether the Individual Defendants:

        1.       Participated in *or* controlled the unlawful activities and are therefore liable for injunctive relief;

        2.       Acted with actual knowledge of the law violations, reckless indifference to the violations, or with an awareness of a high probability of fraud coupled with an intentional avoidance of knowledge, and therefore are additionally liable for equitable monetary relief;

G.      The appropriate injunctive and equitable monetary relief to award;

H.      Whether the Relief Defendant has a legal or equitable claim to retain money received gratuitously from one of the defendants that was derived from the deceptive scheme.

# V.   FINDINGS OF FACT

## A.   JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b. (Joint Stipulation Dkt. 450-2 ¶ 1).

2.   Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 15 U.S.C. § 53(b). (Joint Stipulation Dkt.450-2 ¶ 2).

## B.   COMMERCE

3.   Defendants operated, or provided services to support, online businesses that marketed and sold skincare products to consumers nationwide. (Ex. 910 ¶ 55; Ex. 911 ¶ 55). Accordingly, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## C.   PLAINTIFF

4.   The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.

5.   The FTC enforces Section 5 of the FTC Act, 15 U.S.C. § 45(a), which broadly prohibits unfair or deceptive acts or practices in or affecting commerce.

6.   The FTC enforces Section 4 of ROSCA, 15 U.S.C. § 8403, which prohibits

charging consumers for goods sold over the Internet through a negative option unless certain conditions are met.

7.   The FTC also enforces Section 907(a) of EFTA, 15 U.S.C. § 1693 *et seq.*, which establishes the rights, liabilities, and responsibilities of participants in electronic fund system and protects consumers' financial accounts from unauthorized electronic fund transfers.

8.   The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and EFTA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 8404, and 1693o(c).

### D.   TRIAL DEFENDANTS AND RELIEF DEFENDANT

#### 1.   Alon Nottea ("Alon")

9.   Alon Nottea resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (Dkt. 251 ¶ 32; Ex. 910 ¶¶ 22-23).

10.   According to Alon, he and Kristopher Bond founded BunZai Media Group to sell AuraVie and other skincare products online. (Decl. of Alon Dkt. 391-3 ¶ 2).

11.  Alon was an owner and CEO of BunZai Media Group following its incorporation in January 2010. (Ex. 910 ¶ 17; Ex. 904 pp. 1-2; Dkt. 117 ¶ 24).

12.  Alon was involved in the day-to-day operations of BunZai Media Group (Ex. 910 ¶ 18) and controlled or had the authority to control its business operations. (Ex. 910 ¶ 21).

13.  Alon participated in or controlled other Corporate Defendants as well: he was a member of Adageo and a consultant for Media Urge (Dkt. 117 ¶ 32); he helped solicit investors for Chargeback Armor (Ex. 910 ¶ 234) and provided it consulting services (Decl. of Alon Dkt. 391-3 ¶ 12); he also had authority to control all of the "retail merchant entities"—shell companies that were used to process credit and debit card payments for AuraVie and other skincare product sales. (Decl. of Alon Dkt. 391-3 ¶ 4; *see* Ex. 65).

14.  Alon used the email addresses: alon@chargebackarmor.com, alon@securedmerchants.com, and vigorect@gmail.com. (Ex. 910 ¶¶ 254-255; Ex. 911  ¶¶ 254-255; Ex. 916 ¶ 256; Ex. 918 ¶ 256).

15.  Alon, through his alias Jay Michael, was the registrant, technical contact, administrative contact, and billing contact for the websites (auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com) used to

promote the AuraVie "risk-free trial" and "trial order" offers. (Ex. 910 ¶ 202; Ex. 597 pp. 14, 20; Ex. 598 pp. 5-10, 21).

16.   Alon paid for the websites with a business credit card in his name. (Ex. 598 pp. 34-35, 37-38, 40, 42-43, 45).

17.   Using his alias, Alon also registered at least 65 domain names related to sale of the AuraVie, LeOR, and Dellure skin care products. (See Dkt. 120 pp. 27, 43-44).

18.   Alon registered dozens of website URLs that were used by BunZai Media Group and its affiliated businesses. (Ex. 597 pp. 6, 9, 11, 13; *see also* Ex. 65).

19.   Kristopher Bond left BunZai Media Group in 2013, and Alon and several friends then established three "service companies": Media Urge (for advertising), Pinnacle Logistics (for order fulfillment), and SBM Management (a financial intermediary between shell companies and operating entities) to facilitate the continued sale of AuraVie and other skincare products. (Decl. of Alon Dkt. 391-3 ¶ 7).

20.   Alon has not denied that he participated in or controlled the business practices giving rise to the Plaintiff's Complaint. (*See*, *generally*, Decl. of Alon Dkt. 391-1).

21.   Alon disputed that his companies committed law violations, but he cannot credibly deny knowledge of the deceptive acts.

22.   In April 2012, during an audio-recorded meeting with Co-Defendants Roi Reuvenie and Paul Medina, Alon discussed BunZai Media Group's compliance issues and strategized on how to respond to a future FTC action. (Ex. 86, Ex. 165).

23.   In the April 2012 meeting, Alon stated:

**…I want to have a hundred call people recording...but I want to have a hundred call folder so that later on in two years when I have an FTC, here, here, here, I'm proactive. It's like -- it's like a folder. Here you go. Here's everything. Your file recordings. Look at everything. Look at what we're doing to be proactive for our consumer. Okay. Number 1, it's really going to give us some answers, and Number 2, it's going to make us look amazing.**

* * *

**I can't survive in this un-compliant world. I can't sleep. I don't like it. It's not good.**

(*Id*.).

24.   During that meeting, Alon also acknowledged that the company was violating the law and considered including terms and conditions on invoices—as long as they were not too conspicuous:

**We must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least.**

* * *

**We're not getting a check box. When the consumer gets the product at home, the packing slip, it can be a little bit grayed out. It doesn't have to be huge. You can make the 'for Customer Service inquiries and questions, call 1-800' big, and below that, the terms.**

\* \* \*

**This calls for another 10 minute meeting for that, just make it, in the chargeback meeting let's talk about this particular details, how to do a test between 500 and 1,000 customers that get the terms. It's a complete different world when the woman -- when you can prove to the bank that the terms and conditions are on the invoice...no, the only thing...I know we crashed and burned when we tested it before, but somehow Rappoport is doing it and getting through with it."**

\* \* \*

**Rappoport is also sending an email when you're getting billed. Okay. He's sending this email. I know we can do it. Yeah. I'm just saying I don't see how he was surviving doing that.**

\* \* \*

**"...if you send them the terms, it can act like...we told you that we're going to charge...we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurt us...If it's done creatively, if it's done correctly and optimized...not just try, it didn't work. Let's see what Jeff is doing because it's working for him."**

(*Id*.)

25. More than a year later, in August 2013, Alon shared with other individuals an opinion from BunZai Media Group's lawyer, Bill Rothbard, that warned that the company's website offers were likely deceptive. (Ex. 589).

26. After reviewing getmyauravie.com, auravietrialkit.com, getauravieskin.com, and tryauravie.com websites, Attorney Rothbard warned that the efficacy claims contained in the websites required competent and reliable scientific proof. (Ex. 589 pp. 2-3).

27. With regard to the "risk-free trial" offer, Attorney Rothbard advised:

> **I would recommend that you not say "Risk-Free Trial"** since there is risk the consumer won't cancel and will be charged the purchase price, and the FTC certainly wouldn't view it as "riskfree."

(Ex. 589 p. 3, emphasis added).

28. Attorney Rothbard warned that disclosure of the negative option feature of the sales offer was inadequate:

> "Rockefeller" requires online negative option terms to be disclosed before you "obtain the consumer's billing information," i.e., credit card data. The FTC and a recent federal court decision in an FTC case in California also require that negative option terms appear "above the fold," requiring no scrolling. **Right now your negative option terms are well below and quite far to the left of the credit card fields and the submit button, and are below the fold** (at least on my screen), invisible without scrolling. **As such, they are out of compliance with the placement requirements of both Rockefeller and the FTC.**

(Ex. 589 p. 4, emphasis added).

29. Attorney Rothbard further cautioned:

> The 2012 Green Millionaire consent order is the FTC's latest and most detailed guidance on "clear and conspicuous" disclosure requirements for negative option. Your order page disclosure appears to contain and express reasonably clearly the material negative terms that need to be disclosed (i.e., amount and timing of charges, length of trial period, cancellation option and method). The question, under

Green Millionaire and current FTC negative option standards as
reflected in that order, is whether the disclosure is conspicuous
enough and whether the consumer is providing her "express informed
consent" to the negative option. As noted above, **the disclosure on
the order page is below the fold** (again, at least on my screen) **and
not in "close proximity" to the submit button. Almost certainly
the FTC would say it therefore is not "conspicuous."**

(Ex. 589 p. 4, emphasis added).

30.    Attorney Rothbard advised:

Right now nothing identifies the text of the disclosure as the
trial/continuity purchase terms. **To call sufficient attention to them,
I would recommend that you place something like,
"IMPORTANT: READ PURCHASE TERMS BEFORE
ORDERING," immediately above or at the beginning of the
negative option disclosure. I also would increase font size, bold the
numbers** (10, $4.95 s&h, $97.88), **and sharpen the color contrast of
the text with the page.** Finally, I would definitely include a hyperlink
to the full T&Cs in the disclosure and would make the reference to the
T&Cs more specific, by saying something like, "For additional
purchase, cancellation, return, refund and other details, and for our
privacy policy, see Terms & Conditions and Privacy Policy." **With
these changes, I think you would have a much more defensible
argument that your negative option disclosure is sufficiently
noticeable** ("unavoidable" in FTC speak) **to the "reasonable
consumer."**

(Ex. 589 p. 4, emphasis added).

31.    Recognizing that consumers who accepted the website trial offers were

likely not aware of the negative option terms, Attorney Rothbard advised:

To satisfy the "express informed consent" requirement, the Green
Millionaire consent mandates a "check box, signature, or other
substantially similar method, that consumers must affirmatively select
or sign to accept the negative option feature." **All key negative option
disclosures (costs, trial period length, need to cancel to avoid**

**charge), together with a statement that the consumer is agreeing to pay the costs, must be "immediately adjacent" to the check box.**

(Ex. 589 p. 4, emphasis added).

32.     Attorney Rothbard also advised BunZai Media Group that post-sale confirmation notices reciting the material negative option terms and refund procedures should be should be promptly emailed to consumers and included with the invoice for the trial order. (Ex. 589 p. 5).

33.     Attorney Rothbard also objected that (a) the website offers were not clear "whether the 10-day trial begins from order or delivery date" and (b) that the 15 percent restocking fee was **"buried in the T&Cs. That's a highly material term that should be disclosed much more prominently**, ideally on the order page." (Ex. 589 p. 5, emphasis added).

34.     Contemporaneously, the Better Business Bureau advised BunZai Media Group that clearer disclosures needed to be included in AuraVie's website offers:

First, with respect to the request concerning the "Risk-Free Trial" disclosure: **we've made the request that the disclosure be added to areas where the risk-free trial is mentioned on the website** and in promotional materials for the purpose of clarity. Additionally, **this may assist in helping to eliminate a potential source of complaints** for your business. BBB's Code of Advertising, concerning issues like this, reads as follows:

> "An advertisement as a whole may be misleading although every sentence separately considered is literally true.

> Misrepresentation may result not only from direct statements
> but by omitting or obscuring a material fact."

While placing the disclosure only at the point of check may meet what
you're required to do, it may not provide enough clarity for consumers
to have a complete understanding of the program and its structure.

(Ex. 592 pp. 2-3, emphasis added).

35.   Despite receiving clear guidance from Attorney Rothbard and the BBB in

August 2013, appropriate changes were not made to the AuraVie websites.

(Ex. 600 pp. 17-23 (myauravie.com, dated 01/14/2015); Ex. 994

(auraviefreetrial.com, dated 03/25/2014)).

### 2.   Doron Nottea ("Doron")

36.   Doron Nottea resides in this district and, in connection with the matters

alleged in the Plaintiff's Complaint, transacted business in this district. (Dkt.

244 ¶ 34; Ex. 911 ¶¶ 13-14; Ex. 912 ¶¶ 13-14).

37.   Doron and Alon are brothers. (Decl. of Alon Dkt. 391-3 ¶ 11).

38.   Doron was hired to handle and oversee bookkeeping for BunZai Media

Group and its affiliated companies. (Decl. of Alon Dkt. 391-3 ¶ 11; Decl. of

Doron Dkt. 398-2 ¶ 9).

39.   Doron was given, used, and had access to extensive financial information

concerning these companies, including information concerning income and

expenses, commissions and payments, financial arrangements, employee and

payroll information, tax and insurance issues, banking and financial

accounts, merchant accounts and chargebacks, and corporate structure. (Decl. of Alon  Dkt. 391-3 ¶ 11, Decl. of Doron Dkt. 398-2 ¶ 27, 31-36).

40.  Doron admitted to providing the financial-related services to companies that promoted the AuraVie "risk-free trial" and "trial order" offers, including Pinnacle Logistics, Inc. (Ex. 398-2 p. 3 ¶9); DMA Media Holdings, Inc. (Ex. 398-2 p. 3 ¶9); SBM Management, Inc. (Ex. 398-2 p. 4 ¶9); Kai Media, Inc. (Ex. 398-2 p. 3 ¶9); Lifestyle Media Brands, Inc. (Ex. 398-2 p. 3 ¶9); Agoa Holdings, Inc. (Ex. 398-2 p. 3 ¶9); Heritage Alliance Group, Inc. (Ex. 398-2 p. 3 ¶9); Safehaven Ventures, Inc. (Ex. 398-2 p. 3 ¶9); Insight Media, Inc. (Ex. 398-2 p. 3 ¶9); Secured Merchants, LLC (Ex. 398-2 p. 4 ¶9); Shalita Holdings, Inc. (Ex. 398-2 p. 4 ¶9); and Allstar Beauty Products, Inc. (Ex. 398-2 p. 3 ¶9).

41.  Email communications show that Doron was involved in management decisions concerning corporate structure (Ex. 299; Ex. 41; Ex. 505; Ex. 483), operations (Ex. 330; Ex. 271; Ex. 308; Ex. 333; Ex. 47; Ex. 60), sales (Ex. 21; Ex. 47; Ex. 51; Ex. 59; Ex. 337), marketing (Ex. 51), and human resources (Ex. 38; Ex. 84; Ex. 579).

42.  Doron exerted control over the financial affairs of BunZai Media Group and the affiliated companies: he maintained checks and credit cards for the companies, as well as deposit stamps for their financial accounts, and

devices to enable him to make electronic fund transfers. (Decl. of Doron Dkt. 398-2 ¶ 27; Decl. of Receiver Dkt. 92 ¶¶ 24-25).

43.     He also possessed credit cards and signed blank checks for many of the companies' banking accounts, including Zen Mobile Media. (Decl. of Doron Dkt. 398-2 ¶ 27).

44.     Doron was also a 50 percent owner of Secured Commerce. (Decl. of Alon Dkt. 391-3 ¶ 11; Decl. of Doron Dkt. 398-2 ¶ 6).

45.     Doron had signatory authority for financial accounts belonging to Secured Merchants and Chargeback Armor. (Decl. of Argaman Dkt. 392-1 ¶ 4).

46.     Doron used the email addresses Doron@doron.us, securedmerchantsllc@gmail.com, and xposedinc@gmail.com.  (Decl. of Argaman Dkt. 392-1 ¶ 26; Ex. 910 ¶ 257; Ex. 911 ¶ 257).

### 3.     Igor Latsanovski ("Latsanovski")

47.     Igor Latsanovski resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (Dkt. 253 ¶ 36; Ex. 910 ¶¶ 30-31; Ex. 911 ¶¶ 30-31).

48.     Latsanovski is and has been the owner and CEO of CalEnergy since 2009. (Decl. of Latsanovski Dkt. 90-1 ¶ 2; Dec. of Latsanovski Dkt. 397-1 ¶ 1).

49.   Latsanovski was approached to invest in BunZai Media Group in 2010, to provide financing to allow the company to hire employees and continue operations. (Decl. of Latsanovski Dkt 90-1 ¶ 4).

50.   Latsanovski agreed to provide such financing through his company CalEnergy. (Decl. of Latsanovski Dkt. 90-1 ¶¶ 5-6).

51.   Latsanovski executed a Partnership Agreement with Alon and Kristopher Bond in October 2010 that granted him a 55 percent ownership interest in BunZai Media Group, but denies that the Agreement was effectuated. (Decl. of Latsanovski Dkt. 397-1 ¶ 19).

52.   In December 2010, Latsanovski, Alon, and Bond entered into a Loan Agreement in which Latsanovski agreed to invest $175,000 in BunZai Media Group in exchange for repayment of $200,000 or an ownership interest in the company in an amount to be determined in January 2011. (Decl. of Latsanovski Dkt. 397-1 ¶ 21).

53.   Latsanovski and CalEnergy invested $175,000 in BunZai Media Group in 2010. (Decl. of Latsanovski Dkt. 90-1 ¶ 11).

54.   Latsanovski invested $1.6 million in BunZai and its affiliated companies by November 2014. (Decl. of Latsanovski Dkt. 90-1 ¶¶ 11, 6).

55.   Neither Latsanovski nor CalEnergy received security for the loans issued to BunZai Media Group or its affiliated companies. (Decl. of Latsanovski Dkt. 397-1 ¶ 29.i.)

56.   In March 2011, the parties executed a Partnership Agreement stating that Latsanovski, Alon, and Bond each owned a 33 percent interest in BunZai Media Group. (Decl. of Latsanovski Dkt. 371-1 ¶¶ 21-23; Dkt. 371-6; Ex. 19).

57.   Despite the execution of the document, and the fact that no rescission of it was made, Latsanovski maintains that he never acquired an ownership interest in the company and remained simply an investor. (Decl. of Latsanovski Dkt. 397-1 ¶ 23-24).

58.   Nonetheless, BunZai Media Group's accountant identified Latsanovksi as an owner of BunZai Media Group on its company reports. (Ex. 65).

59.   In November 2011, BunZai Media Group's HR Director completed an U.S. Employment Eligibility Verification Form that stated that Latsanovski was an employee of BunZai Media Group. (Ex. 949).

60.   Latsanovksi and CalEnergy received payments from BunZai Media Group and its associated companies. (Decl. of Latsanvoski Dkt. 397-1 ¶ 3).

61.   According to the Receiver in this matter, who examined BunZai Media Group's financial records, payments made from BunZai Media Group and

its affiliated companies to Latsanovski or CalEnergy did not appear to be repayment of a loan with principal and interest because the payments were large, round figures in the tens of thousands of dollars. (Decl. of Receiver Dkt. 92 ¶ 9).

62. In June 2015, Latsanovski and CalEnergy loaned Focus Media Solutions, Inc.— another of Defendants' companies—an additional $325,000 almost precisely the amount of "interest" that CalEnergy gained from its "loans" to the Bunzai companies.. (Decl. of Latsanovski Dkt. 90-1 ¶ 13).

63. Latsanovski received regular reports from BunZai Media Group concerning business operations. (Decl. of Latsanovski Dkt. 397-1 ¶ 29.i.).

64. Latsanovski also founded Zen Mobile Media, a shell company that operated retail merchant accounts to sell AuraVie skincare products. (Decl. of Latsanovski Dkt. 90-1 ¶¶ 15-17).

65. Latsanovski admitted that he founded Zen Mobile Media to help BunZai Media Group defeat limitations imposed by merchant processors. (Decl. of Latsanovski Dkt. 90-1 ¶ 15-16).

66. Latsanovski personally established the merchant account used by Zen Mobile Media to process charges for AuraVie products, and materially misrepresented Zen Mobile Media's business model in his application. (Ex. 600 p. 30).

67.  Although he disputes that he had authority to control the businesses, Latsanovski directed Doron to wire transfer nearly $40,000 from SBM Management. (Ex. 64).

68.  Latsanovski and CalEnergy received $1,929,629.05 from BunZai Media Group and its affiliated companies. (Decl. of Latsanovski Dkt. 90-1 ¶ 11; Decl. of Receiver - Dkt. 92 ¶ 22).

69.  Latsanovski and CalEnergy received funds directly from Zen Mobile Media, Heritage Alliance Group, DMA Media Holdings, and Insight Media (all of which were shell companies or "retail merchant entities" that processed credit and debit card payments from the sale of AuraVie and other skincare products), as well as from SBM Management. (Decl. of Receiver Dkt. 92 ¶ 23).

70.  Latsanovski oreviously attested that he was employed by Bunzai Media Group (Ex. 949; see also Ex. 402-8), and he represented to the U.S. Citizenship and Immigration Services that he guided "managed companies," including Pinnacle Logistics and reviewed "activities of the managed call center Pinnacle (including AuraVie, Dellure and Attitude . . .)" (Ex. 571 pp. 2-3).

71.  The companies' emails confirm Latsanovski's involvement in decisions concerning corporate structure (Ex. 904-23), operations (Ex. 571 pp. 2-3;

Ex. 319), sales (Ex. 503), marketing (Ex. 564; *see* Ex. 559; Ex. 48), and human resources (Ex. 561-3; Ex. 588-9).

72. Latsanovski referred to himself in an email as a "partner" in the businesses. (Ex. 21).

### 4. Alan Argaman ("Argaman")

73. Alan Argaman resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (*See* Dkt 299 ¶ 39).

74. Argaman was an owner of Secured Merchants and Secured Commerce. (Decl. of Argaman Dkt. 392-1 ¶¶ 1, 8; Dkt. 299 ¶ 39; Dkt. 244 ¶ 39; Dkt. 245 ¶ 39; *see also* Ex. 917-58 ¶ 208).

75. Secured Merchants, LLC provided technological solutions to help the AuraVie companies manage their negative option plans, including telephone, customer service, and chargeback refutation services. (*See* Dkt. 121-6 pp. 9-21; Dkt. 121-7 pp. 1-3; Ex. 47; Ex. 149; Ex. 432; *see also* Ex. 440; Ex. 441; Ex. 516).

76. Secured Commerce LLC designed, created, and helped manage the websites and landing pages used to promote the AuraVie "risk-free trial" and "trial order" offers. (Dkt. 299 ¶ 39; Ex. 46).

77.   He also used Secured Commerce to lease the main office suite where Defendants collectively operated the scheme. (Dkt. 120 at 12).

78.   Argaman helped plan and manage an "AuraVie Angels" promotional campaign. (Ex. 185; Ex. 494; Ex. 497).

79.   Argaman also developed the "chargeback armor" software technology used by the AuraVie Defendants to manage chargeback requests. (Decl. of Argaman Dkt. 392-1 ¶ 27).

80.   Argaman was identified as an officer of Chargeback Armor on the company's Executive Summary (Ex.155 p. 3).

81.   Argaman used the email address avicoglobal@gmail.com. (Ex. 910 ¶ 261; Ex. 911 ¶ 261).

82.   Although he claims to have developed the chargeback armor software, Argaman disavows involvement with the company (Chargeback Armor) established to market it. (Decl. of Argaman Dkt. 392-1 ¶¶ 21).

### 5.   CalEnergy, Inc.

83.   CalEnergy, Inc. is a California corporation and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (Dkt. 244 ¶ 21; Dkt. 245 ¶ 21; Dkt. 253 ¶ 21; Dkt. 254 ¶ 21; Ex. 904-49).

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

84.  According to its corporate filings, CalEnergy was incorporated in September 2009, Latsanovski was its CEO, CFO, and Secretary, and its business purpose was "business management and R&D." (Ex. 904 pp. 49-50).

85.  CalEnergy provided loans to BunZai Media Group and affiliated companies in excess of $1.9 million, to help fund their operations and keep them viable. (*See* Dkt. 90  ¶¶ 11, 6, 12)

### 6. Secured Merchants, LLC

86.  Secured Merchants, LLC is a California limited liability company and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (Dkt. 299 ¶ 26; Dkt. 301 ¶ 26; Dkt. 244 ¶ 26; Dkt. 245 ¶ 26).

87.  Secured Merchants was established in June 2013. (Decl. of Argaman Dkt. 392-1 ¶ 29).

88.  Secured Merchants provided technology solutions to BunZai Media Group and its affiliated companies, including website development, software development, e-commerce software, and related technology services.  (Decl. of Alon Dkt. 391-3 ¶ 12; Decl. of Argaman Dkt. 392-1 ¶ 2).

89.  Secured Merchants provided AuraVie and its affiliated companies software called "chargeback armor" to manage their high numbers of credit card

chargeback demands. (Decl. of Alon Dkt. 391-3 ¶ 12; *see* Decl. of Argaman
Dkt. 392-1 ¶ 5).

90.    Secured Merchants also assisted BunZai Media Group and its affiliated
companies with customer relations management software called "limelight,"
which Secured Merchants (through its principal, Argaman) used to
effectuate AuraVie's load balancing scheme. (Decl. of Alon Dkt. 391-3 ¶ 12;
Ex. 248).

91.    Secured Merchants was owned by Argaman (Decl. of Argaman - Dkt. 392-1
¶ 1), but Doron had signatory authority over its financial accounts. (Decl. of
Argaman Dkt. 392-1 ¶ 4).

### 7.    Chargeback Armor, Inc.

92.    Chargeback Armor, Inc. is a California corporation and, in connection with
the matters alleged in the Plaintiff's Complaint, transacted business in this
district. (Dkt. 300 ¶ 41; Dkt. 244 ¶ 41; Dkt. 245 ¶ 41).

93.    Chargeback Armor was incorporated in February 2015, though the company
claims to have processed 33,000 chargebacks in 2014 for "our fist [sic]
client, AuraVie." (Decl. of Costache Dkt. 392-2 ¶ 4; Ex. 155-2).

94.    Chargeback Armor was established as a marketing company to promote the
"chargeback armor" software (Decl. of Alon Dkt. 391-3 ¶ 12) developed by
Argaman. (Decl. of Argaman Dkt. 392-1 ¶ 27).

95.    Chargeback Armor marketed software and operated an automated merchant chargeback management and rebuttal system. (Decl. of Reuveni Dkt. 391-2 ¶ 10).

96.    Mike Costache claims to be the sole founder, shareholder, and officer of Chargeback Armor. (Decl. of Costache Dkt. 392-2 ¶ 1).

97.    However, according to Chargeback Armor's Executive Summary, Alon, Doron, Reuveni, and Argaman were each officers of the company. (Ex. 155-3).

98.    Costache contends that he falsely identified Alon, Doron, Reuveni, and Argman on the executive summary to deceive potential investors, who expected the company to have a board of directors.  (*See* Decl. of Costache Dkt. 392-2 ¶ 2).

99.    Doron was provided full signatory authority on financial accounts belonging to Chargeback Armor (Decl. of Costache Dkt. 392-2 ¶ 3).

100.   Doron, Argaman, and Secured Merchants were given authorization to receive and collect mail on behalf of Chargeback Armor. (Decl. of Costache Dkt. 392-2 ¶ 9).

101.   Alon was a consultant for marketing "chargeback armor" software. (Decl. of Alon Dkt. 391-3 ¶ 12).

102.   Chargeback Armor received $250,000 as an investment or loan from Secured Merchants. (Decl. of Costache Dkt. 392-2 ¶ 5).

103.   The $250,000 provided by Secured Merchants was intended to serve as operating expenses to help build the Chargeback Armor business and, after 4 months, was to be repaid or Secured Merchants was to receive equity in Chargeback Armor. (Decl. of Costache Dkt. 392-2 ¶ 6).

### E.   DEFAULTING DEFENDANTS

#### 1.   BunZai Media Group, Inc.

104.   BunZai Media Group, Inc., was a California corporation with its principal place of business at 7900 Gloria Avenue, Van Nuys, California 91406 ("the Van Nuys Office"). (Dkt. 117 ¶ 9).

105.   BunZai Media Group also used a mailbox with the address of 16161 Ventura Boulevard, #378, Encino, California 91436 ("Encino Mailbox A"). (Decl. of Doron Dkt. 398-2 p. 17; Ex. 904 p. 2).

106.   BunZai Media Group used fictitious names, including "AuraVie," "Miracle Fact Kit," "Dead Sea Products," and "Attitude Cosmetics." (Decl. of Doron Dkt. 398-2 pp. 17-18).

107.   BunZai Media Group advertised, marketed, distributed, or sold skincare products, or provided customer service for such products, to consumers

throughout the United States since at least 2009. (Decl. of Doron Dkt. 398-2 ¶ 23; *see* Ex. 911 ¶ 56).

108. BunZai Media Group offered for sale, sold, and distributed skincare products including "AuraVie," "Dellure,"and "Miracle Face Kit" products. (Ex. 910 ¶¶ 59-61; Ex. 911 ¶¶ 59-61).

109. Although BunZai Media Group explored the potential of selling its products through third party distribution channels, it determined that it would be impractical or unprofitable to do so, and it abandoned the idea. (Decl. of Alon Dkt. 391-3 ¶ 6).

110. The first product launched by BunZai Media Group was a Face Kit-Dead Sea Mud Mask and Serum, which launched in December 2009. (Decl. of Doron Dkt. 398-2 ¶ 23).

111.      BunZai was incorporated in January 2010 in the State of California. (Ex.

904 p. 1, Ex. 910 ¶ 54).

112. Bunzai Media Group began selling AuraVie products in or about July 2010. (Decl. of Doron Dkt. 398-2 ¶ 23).

113. BunZai Media Group filed notice of dissolution with the California Secretary of State on May 30, 2013. (Ex. 904 p. 4).

114.  Nonetheless, the company continued operating and BunZai Media Group began selling Dellure in 2014. (Decl. of Receiver Dkt. 92 ¶ 15).

115.  Because BunZai Media Group had inadequate financial resources, it sought financing from Latsanovski, who received profit sharing rights. (Decl. of Alon Dkt. 391-3 ¶ 5).

116.  BunZai Media Group marketed products online, including AuraVie brand skincare products, through both negative option continuity marketing and through a traditional online retail site. (Decl. of Alon Dkt. 391-3 ¶ 2).

117.  Bunzai Media Group created its website offers and landing pages for AuraVie in mid-2010. (Decl. of Doron Dkt. 398-2 ¶ 24).

118.  BunZai Media Group offered consumers a "risk-free trial" period to try AuraVie products. (Decl. of Alon Dkt. 391-3 ¶ 2).

119.  If a consumer decided not to purchase the products during the trial period, the consumer was required to call a toll-free phone number to cancel the purchase and to return the unused portion of the trial product. (Decl. of Alon Dkt. 391-3 ¶ 2).

120.  If a consumer did not opt out during the trial period, the consumer was charged the purchase price and enrolled into an "auto-ship" plan for a monthly supply of the products on a recurring basis. (Decl. of Alon Dkt. 391-3 ¶ 2).

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

121.   Alon, the CEO and an owner of BunZai Media Group, admitted that he
knew some AuraVie customers were unaware that they would be charged for
products if they did not cancel during the trial period. (Decl. of Alon Dkt.
391-3 ¶ 17).

122.   BunZai Media Group operated and marketed AuraVie products for at least 4
years, during which time 70 percent of customers did not continue the "auto-
ship" continuity program for an extended time. (Decl. of Alon Dkt. 391-3 ¶
3).

123.   During that same time period, $1 out of every $4 in revenue generated by
BunZai Media Group was returned to dissatisfied customers who demanded
refunds or chargebacks. (*See* Decl. of Alon Dkt. 391-3 ¶ 3).

124.   BunZai Media Group established merchant accounts with a merchant or
payment processor so that it could accept credit and debit card payments
from consumers. (*See* Decl. of Alon Dkt. 391-3 ¶ 4).

125.   To avoid restrictions and reduce penalties and costs imposed by the
merchant processor for excessive chargeback rates, BunZai Media Group
established numerous shell companies to serve as fictitious "retail merchant"
entities through which credit or debit card payments were accepted. (Decl. of
Alon Dkt. 391-3 ¶ 4).

126. The shell companies affiliated with BunZai Media Group were established by "straw" persons –primarily the friends and family members of Alon Nottea and Kristopher Bond. (Decl. of Alon Dkt. 391-3 ¶ 4; *see* Ex. 65).

127. The shell companies were nominally operated by "CEOs" each of whom was paid 1 percent of all sale revenues processed under his or her respective merchant accounts. (Ex. 910 ¶ 240).

128. According to Alon, he and Kristopher Bond managed and operated the "retail merchant entities." (Decl. of Alon Dkt. 391-3 ¶ 4).

129. Revenues for AuraVie sales were paid to BunZai Media until 2013 (Decl. of Alon Dkt. 391-3 ¶ 9), after which time they were paid to SBM Management. (Decl. of Alon Dkt. 391-3 ¶¶ 7, 9).

130. BunZai Media Group transacted business in this district and throughout the United States. (*See, generally*, above).

## 2.  Pinnacle Logistics, Inc.

131. Pinnacle Logistics, Inc. was a California corporation with its principal place of business at the same location as BunZai Media Group at the Van Nuys Office. (Dkt. 117 ¶ 10; Dkt. 397-14 p. 2; Ex. 904 p. 6; Ex. 910 ¶ 111). Pinnacle Logistics had a secondary address of 6914 Canby Avenue, Suite 107, Reseda, California 91335 ("the Reseda Office").

132.  Pinnacle Logistics was established in June 2012 and provided services such
as product order fulfillment, shipping and logistics support, customer
service, and call center services for AuraVie sales. (Decl. of Alon Dkt. 391-3
¶ 7; Decl. of Latsanovski Dkt. 397-1 ¶ 29.j.).

133.  Pinnacle Logistics operated a call center with customer service
representatives who handled inquiries, managed the AuraVie "auto-ship"
negative option plans, and responded to product inquiries, refund requests,
and return inquiries. (Decl. of Reuveni Dkt. 391-2 ¶ 3).

134.  Pinnacle Logistics also provided product fulfillment and logistics services
for sales of AuraVie products. (Decl. of Reuveni Dkt. 391-2 ¶ 3).

135.  Pinnacle Logistic's general manager, Reuveni, admitted that he knew
customers demanded refunds because they were not aware that they needed
to contact the company to affirmatively cancel the "free trial" or "risk-free
trial" orders to avoid charges. (*See* Decl. of Reuveni Dkt. 391-2 ¶ 14).

136.  Pinnacle Logistics filed a notice of dissolution with the California Secretary
of State in December 2014.

137.  Pinnacle Logistics transacted business in this district and throughout the
United States.

1

### 3.    DSA Holdings, Inc.

2

138.   DSA Holdings, Inc. was a California corporation with its principal place of

3

business at the same location as BunZai Media Group at the Van Nuys

4

Office, and a secondary address of 8335 Winnetka Avenue, #118, Winnetka,

5

California 91306. (Ex. 904 p. 9; Ex. 904 p. 12; Dkt. 244: Dkt. 245 p. 2 ¶ 11)

6

139.   DSA Holdings served as a "guarantor" of the merchant accounts that were

7

used to sell AuraVie and other skincare products. (Decl. of Receiver Dkt. 92

8

¶ 11).

9

140.   DSA filed a notice of dissolution with the California Secretary of State in

10

September 2012. (Ex. 904 p. 13).

11

141.   DSA Holdings transacted business in this district and throughout the United

12

States.

13

### 4.    Lifestyle Media Brands, Inc.

14

142.   Lifestyle Media Brands, Inc. was a California corporation with its principal

15

place of business at the Van Nuys Office and a secondary address of 8335

16

Winnetka Avenue, #112, Winnetka, California 91306. (Ex. 904 p. 15).

17

18

19

20

143. Lifestyle Media was incorporated in June 2011 by Rachel Nottea, who also served as the company's CEO, CFO, and Secretary. (Ex. 904 p. 15; Decl. of Receiver Dkt. 92 ¶ 11).

144. On its incorporation papers, Lifestyle Media Brands reported that it was a "fulfillment" company (Ex. 904 p. 15), but it processed payments for the negative-option skincare subscriptions and was owned in part by Rachel Nottea. (Decl. of Receiver Dkt. 92 ¶ 11).

145. Rachel Nottea filed notice of dissolution of the company with the California Secretary of State in December 2014. (Ex. 904 p. 17)

146. Lifestyle Media Brands transacted business in this district and throughout the United States.

### 5. Agoa Holdings, Inc.

147. Agoa Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (Ex. 904 p. 19).

148. Agoa Holdings was incorporated in June 2011 and Reuveni was its CEO, CFO, and Secretary. (Ex. 904 p. 19).

149. Although it reported to the Secretary of State that its business was "wholesaler" (Ex. 904 p. 19), Agoa Holdings was one of BunZai Media Group's online retail merchants. (Decl. of Reuveni Dkt. 391-2 ¶ 5; Decl. of Receiver Dkt. 92 ¶ 11).

150.    Agoa Holdings was purportedly dissolved in 2014 (Ex. 904 p. 22), but retained active merchant accounts and received more than $134,000 in income in 2015. (Decl. of Receiver Dkt. 92 ¶ 12).

151.    Agoa Holdings transacted business in this district and throughout the United States.

### 6.    Zen Mobile Media, Inc.

152.    Zen Mobile Media, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Zen Mobile Media used a commercial mail receiving agent mailbox, 16830 Ventura Boulevard, #360, Encino, California 91436 ("Encino Mailbox B"). (Ex. 904 p. 24).

153.    According to documents the company filed with the California Secretary of State, "Igor Lats" was the CEO, CFO, and Secretary of Zen Mobile Media and its business was "wholesaler" for one filing and "management" for another. (Ex. 904 pp. 24, 26).

154.    Zen Mobile Media processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

155.    Zen Mobile Media transacted business in this district and throughout the United States.

156. Zen Mobile Media purportedly dissolved in December 2014 (Ex. 904 p. 27), but retained active merchant accounts and received at least $81,929 in 2015. (Decl. of Receiver Dkt. 92 ¶ 13).

### 7.    Safehaven Ventures, Inc.

157. Safehaven Ventures, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Safehaven Ventures also used Encino Mailbox B. (Ex. 904 p. 30).

158. Safehaven Ventures was incorporated in November 2011 and, according to its corporate filings, its business was "sales" or "wholesaler." (Ex. 904 pp. 28-30).

159. Safehaven Ventures processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

160. Safehave Ventures purportedly dissolved in January 2014 (Ex. 904 p. 31), but maintained an active merchant account through which it processed charges for AuraVie skincare products (billed in the amount of $97.88) as late a June 2015. (Decl. of Receiver Dkt. 92 ¶ 17).

161. Safehaven Ventures transacted business in this district and throughout the United States.

### 8.   Heritage Alliance Group, Inc.

162.   Heritage Alliance Group, Inc. also doing business as AuraVie Distribution, was a California corporation with its principal place of business at the Van Nuys Office. Heritage also used the Encino address. (Ex. 904 p. 33).

163.   Heritage Alliance Group was incorporated in March 2012 and, according to its corporate filings, its business was "wholesales." (Ex. 904 pp. 32, 35).

164.   Heritage Alliance Group processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

165.   Heritage Alliance Group filed a notice of dissolution with the Secretary of State in December 2014. (Ex. 904 p. 35).

166.   Heritage Alliance Group transacted business in this district and throughout the United States.

### 9.   AMD Financial Network, Inc.

167.   AMD Financial Network, Inc. was a California corporation with its principal place of business at the Van Nuys Office.

168.   AMD Financial was incorporated in March 2012 and, according to its corporate filings, its business was "wholesaler." (Ex. 904 pp. 36-37).

169.   AMD Financial Network advertised, marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States.

170. AMD Financial Network processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

171. AMD Financial Network transacted business in this district and throughout the United States.

### 10. SBM Management, Inc.

172. SBM Management, Inc. was a California corporation with its principal place of business at 655 North Central Avenue, Suite 1700, Glendale, California 91203. SBM Management also used Encino Mailbox B. (Ex. 904 p. 40).

173. SBM Management was incorporated in June 2013 and, according to its corporate filings, its business was "management." (Ex. 904 pp. 39-40).

174. SBM Management was the management company that oversaw the AuraVie shell companies or "retail merchants" once the sale of AuraVie products migrated to Pinnacle Logistics. (Decl. of Alon Dkt. 391-3 ¶ 7, Decl. of Reuveni Dkt. 391-2 ¶ 7; Decl. of Latsanovski Dkt. 371-1 ¶ 2).

175. Revenue from AuraVie sales was paid to SBM Management beginning in 2013. (Decl. of Alon Dkt. 391-3 ¶¶ 7, 9).

176. SBM Management transacted business in this district and throughout the United States.

1

### 11.    Media Urge, Inc.

2

177.   Media Urge, Inc. was a California corporation with its principal place of

3

business at 18757 Burbank Boulevard, Suite 205, Tarzana, California 91436.

4

(Ex. 904 pp. 42-43).

5

178.   Media Urge was incorporated in June 2012 and, according to its corporate

6

filings, its business was "media." (Ex. 904 pp. 42-43).

7

179.   Media Urge advertised, marketed, or sold the skincare products at issue in

8

this case to consumers throughout the United States. (Decl. of Receiver Dkt.

9

92 ¶ 11; Ex. 910 ¶ 22; Ex. 912 ¶ 22).

10

180.   Media Urge hired former BunZai Media Group marketing employees and

11

provided marketing services to continue to promote AuraVie sales. (*See*

12

Decl. of Alon Dkt. 391-3 ¶ 7; Ex. 910 ¶ 81).

13

181.   Media Urge filed a notice of dissolution with the California Secretary of

14

State in December 2014. (Ex. 904 p. 45).

15

182.   Media Urge transacted business in this district and throughout the United

16

States.

17

### 12.    Adageo, LLC

18

183.   Adageo, LLC was a California limited liability corporation with Encino

19

Mailbox A listed as its registered place of business. Adageo, also used

20

Encino Mailbox B. (Ex. 904 pp. 46-47).

184. Adageo was incorporated in September 2012, Alon was its incorporator, CEO, CFO, and Secretary, and according to its corporate filings its business was "management services." (Ex. 904 pp. 46-47).

185. Adageo was Alon's "personal service company" that loaned out his consulting services to the BunZai Media Group-affiliated companies. (*See* Decl. of Alon Dkt. 391-3 ¶ 16).

186. Adageo transacted business in this district and throughout the United States.

### 13.   Kai Media, Inc.

187. Kai Media, Inc. was a California corporation with its principal place of business at the same location as BunZai Media Group, Inc. at the Van Nuys Office. Kai Media, Inc. also used Encino Mailbox B. (Ex. 904 pp. 52-53).

188. Kai Media was incorporated in July 2012 and according to its corporate filings, its business as "wholesale." (Ex. 904 pp. 52-53).

189. Kai Media processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

190. Kai Media transacted business in this district and throughout the United States.

### 14.    Insight Media, Inc.

191.  Insight Media, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Insight Media, Inc. also used Encino Mailbox B. (Ex. 904 pp. 55-56).

192.  Insight Media was incorporated in July 2012 and, according to its corporate filings, its business was "wholesale." (Ex. 904 pp. 55-56).

193.  Insight Media processed payments for the negative-option skincare subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

194.  Insight Media transacted business in this district and throughout the United States.

### 15.    Focus Media Solutions, Inc.

195.  Focus Media Solutions, Inc. was a California corporation with its principal place of business at 6850 Canby, Suite #103, Reseda, California 91335, which is in the same complex as the Reseda Office. Its secondary place of business is the Reseda Office.

196.  Focus Media Solutions created advertisements for AuraVie and other skincare products that were sold by negative option. (Ex. 910 ¶ 215).

197.  On June 16, 2015, Latsanovski provided Focus Media Solutions with $325,000—the approximate value of the "interest" that Latsanovski derived from his "loans" made to Bunzai entities. (Dkt. 120 p. 41).

198.  Focus Media Solutions transacted business in this district and throughout the
      United States.

### 16.   Secured Commerce, LLC

199.  Secured Commerce, LLC was a California limited liability company with its
      principal place of business at the Reseda Office.

200.  Secured Commerce was owned jointly by Doron and Argaman. (Dkt. 398-1
      ¶ 6).

201.  Secured Commerce was established by Doron and Argaman to provide a
      shared office arrangement for business ventures and to provide e-commerce,
      shipping and general IT services. (Decl. of Doron - Dkt.  398-2 ¶ 6).

202.  Secured Commerce prepared a "straight sale" website for AuraVie that did
      not include negative option offers. (Decl. of Argaman Dkt. 392-1 ¶ 9).

203.  Secured Commerce also prepared a risk-free trial website for Miracle Face
      Kit that did include the "Risk Free Trial" offer at issue in this case. (Ex.
      531).

204.  Secured Commerce billed Adageo for the creation of AuraVie landing
      pages, which contained the bogus "risk free trial" offers. (*See* Ex. 46).

205.  Argaman, on behalf of Secured Commerce, claims that Victor Azal, an "in
      house website designer for the AuraVie Defendants" designed all of the
      AuraVie trial offers but Argaman admits that he personally provided

technological advice to assist him with internet protocol procedures. (Decl. of Argaman - Dkt. 392-1 ¶ 23).

206.   Secured Commerce participated in efforts to advertise, market, distribute, or sell the skincare products at issue in this case to consumers throughout the United States.

207.   Secured Commerce also provided shipping services or support to BunZai Media Group and its affiliated companies. (Decl. of Alon N. - Dkt. 391-3 ¶ 11).

208.   Secured Commerce transacted business in this district and throughout the United States.

### 17.   USM Products, Inc.

209.   USM Products, Inc. was a California corporation with its principal place of business at the Reseda Office.

210.   USM Products made bulk purchases of products and containers for the skincare business. (Ex. 910 ¶ 194; Ex. 912 ¶ 194).

211.   USM Products transacted business in this district and throughout the United States. (Dkt. 244 ¶ 27; Dkt. 245 ¶ 27).

### 18.   Merchant Leverage Group, Inc.

212.   Merchant Leverage Group, Inc. was a California corporation with its principal place of business at the Reseda Office.

213. Merchant Leverage Group provided merchant processing services to the skincare business.

214. Merchant Leverage Group participated in efforts to advertise, market, distribute, or sell the skincare products at issue in this case to consumers throughout the United States.

215. Merchant Leverage Group transacted business in this district and throughout the United States. (Dkt. 244 ¶ 28; Dkt. 245 ¶ 28).

### 19.    DMA Media Holdings, Inc.

216. DMA Media Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business is or was the Reseda Office.

217. DMA Media Holdings was owned by Reuveni and Rachel Nottea. (Decl. of Receiver - Dkt. 92 ¶ 11).

218. DMA Media Holdings was one of BunZai Media Group's shell companies or "retail merchants" that processed payments for the negative-option skincare subscriptions. (Decl. of Receiver - Dkt. 92 ¶ 11; Decl. of Reuveni, Dkt. 391-2 ¶ 5).

219. DMA Media Holdings advertised, marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States.

220.   DMA Media Holdings transacted business in this district and throughout the United States. (Dkt. 244 ¶ 29; Dkt. 245 ¶ 29).

### 20.   Shalita Holdings, Inc.

221.   Shalita Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business was the Reseda Office.

222.   Shalita Holdings processed payments for the negative-option skincare subscriptions. (Decl. of Receiver - Dkt. 92 ¶ 11).

223.   Shalita was purportedly closed in 2014, but maintained an active merchant account and continued to process charges related to AuraVie skincare products as late as June 2015. (Decl. of Receiver - Dkt. 92 ¶ 17).

224.   Shalita Holdings transacted business in this district and throughout the United States.

### 21.   All Star Beauty Products, Inc.

225.   All Star Beauty Products, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business was the Reseda Office.

226.   All Star Beauty Products  processed payments for the negative-option skincare subscriptions. (Decl. of Receiver - Dkt. 92 ¶ 11).

227.   All Star Beauty Products advertised, marketed, distributed, or sold the

skincare products at issue in this case to consumers throughout the United

States.

228.   All Star Beauty Products transacted business in this district and throughout

the United States.

### 22.   Kristopher Bond ("Bond")

229.   Khristopher Bond, also known as Ray Ibbot, was an owner and officer of

BunZai Media Group. (Dkt. 117 ¶ 30; Ex. 910 ¶¶ 49-50; Ex. 911 ¶¶ 49-50).

230.   Bond formulated, directed, controlled, had the authority to control, or

participated in the acts or practices set forth in Plaintiff's Complaint. (Dkt.

391-3 ¶ 2).

231.   Bond was integrally involved in the day-to-day operations of BunZai Media

Group (Decl. of Latsanovski - Dkt. 90-1 ¶ 5, Ex. 910 ¶ 51; Ex. 911 ¶ 51)

and, among other things, trained customer-service representatives on

responding to consumer complaints.

232.   Bond left BunZai Media Group in 2013. (Decl. of Alon N. - Dkt. 391-3 ¶ 7).

233.   Bond resides in this district and, in connection with the matters alleged

herein, transacted business in this district and throughout the United States.

**F.   SETTLING DEFENDANTS**

**1.   Motti Nottea ("Motti")**

234.   Motti Nottea established the merchant account used by BunZai Media Group to process charges for AuraVie products. (Ex. 600 p. 9; Ex. 910 ¶ 228; Ex. 912 ¶ 38).

235.   Motti resided in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States. (Ex. 910 ¶¶ 37, 39-40; Ex. 911 ¶¶ 37, 39; Ex. 912 ¶¶ 37, 39).

**2.   Oz Mizrahi ("Mizrahi")**

236.   Oz Mizrahi was the founder and owner of Pinnacle Logistics, and served as its CEO, CFO and Secretary. (Decl. of Latsanovski Dkt. 397-1 ¶ 29.j.; Ex. 904 pp. 5-6; Ex. 910 ¶¶ 93-94; Ex. 911 ¶¶ 94-95).

237.   Mizrahi resided in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

**3.   Paul Medina ("Medina")**

238.   Paul Medina was the Executive President or Vice President of Media Urge. (Ex. 910 ¶ 140).

239.   Medina was also a manager of the call center at Defendant Pinnacle Logistics and was a manager of Focus Media Solutions. (Ex. 910 ¶ 142).

240.   Until recently, Paul Medina resided in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

### 4.   Roi Reuveni ("Reuveni")

241.   Roi Reuveni is the cousin of Alon. (Dkt. 319-2 ¶ 2).

242.   In 2011, Reuveni was hired as an employee of Bunzai Media Group (Decl. of Reuveni Dkt. 391-2 ¶ 2) and managed all aspects of its daily operations, including marketing, advertising, product fulfillment, and customer service. (Decl. of Latsanovski Dkt. 90-1 ¶ 5).

243.   Reuveni was an officer and general manager of Pinnacle Logistics and was responsible for managing its call center, fulfillment services, chargeback and customer services. (Decl. of Reuveni Dkt. 391-2 ¶ 3; Ex. 910 ¶¶106-108, 206-207).

244.   Reuveni was also an officer of Agoa Holdings. (Dkt. 117 ¶ 29; Decl. of Reuveni Dkt. 391-2 ¶ 3; Ex. 911 ¶ 245), and DMA Media Holdings. (Decl. of Reuveni Dkt. 391-2 ¶ 5, Ex. 910 ¶ 244; Ex, 911 ¶ 244).

245.   Reuveni also worked for Secured Merchants and was an officer of Chargeback Armor, where he helped develop software used by the BunZai Media Group affiliated companies. (*See* Decl. of Reuveni Dkt. 391-2 ¶¶ 9-10, Ex. 911 ¶ 237).

246. Reuveni also received income from CalEnergy, Inc. (Ex. 911 ¶ 246).

247. Reuveni used the email addresses roi@chargebackarmor.com and roi@securedmerchants.com . (Ex. 910 ¶¶ 259-260; Ex. 911 ¶¶ 259-260).

248. Reuveni resided in this district and transacted business in this district and throughout the United States. (Ex. 910 ¶¶ 46-47; Ex. 911 ¶¶ 46-47)

G.   **BUSINESS PRACTICES**

1.   **Websites Offers & Confirmation Emails**

249. Since at least 2010, AuraVie and other skincare products were sold online from multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com. (Ex. 597 pp. 13, 16, 22; Ex. 994; Ex. 995).

250. Products including AuraVie, Miracle Face Kit, Leor, and Dellure (collectively "AuraVie" products) were available exclusively through websites created, owned, or controlled by, the Defendants named in this action. (Decl. of Alon Dkt. 391-3 ¶ 6).

251. Most of the websites were registered by "Jay Michaels," an alias that Alon has admitted to using. (*See* Ex. 597 p. 14: Ex. 910 ¶ 202).

252. Consumers interested in accepting the trial offers were required to complete a short online order form and to provide their credit card or debit card

information, purportedly to pay nominal shipping and handling fees. (Ex. 994  pp. 1, 13).

253.   Consumers who completed the online order form and accepted the trial offers were automatically enrolled into an "auto-ship" or negative option plan, in which additional products were shipped to the consumer and billed to the consumer's credit or debit cards each month. (Ex. 994 p. 5; Ex. 995 p. 5; *see also* Ex. 2 ¶ 6; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7; Ex. 14 ¶¶ 3-4, 6; Ex. 3 ¶¶ 8, 14; Ex. 4 ¶ 6).

254.   Unless a consumer called and affirmatively canceled the trial offer within 10 days of the order date, the consumer's credit or debit card was billed the full cost of the product, typically $97.88. (Ex. 994 p.5; Ex. 995 p. 5; Decl. of Alon Dkt. 391-3 ¶ 2).

255.   Consumers who called within 10 days of accepting the trial offer were required to return the product, at their own cost, within 20 days or their credit or debit cards were billed the full costs of the product, typically $97.88. (*See* Decl. of Alon Dkt. 391-3 ¶ 2).

256.   Consumers who returned product were often charged a restocking charge of up to $15. (Ex. 4 ¶ 7; *see also* Ex. 2 ¶ 6; Ex. 994 p. 6).

257.   Consumers who did not call within 10 days of signing up for the trial offers were shipped additional products within 30 days and the full costs of such

products, typically $97.88, were charged to the credit or debit cards that consumers provided to pay for the offer's nominal shipping fees. (Decl. of Alon Dkt. 391-3 ¶ 2).

258.   After consumers completed the short online form to accept the trial offers, consumers were directed to an order confirmation page and often received an email confirming their order. The confirmation page stated, in clear red font, that the product cost was "$0.00." (Ex. 902 pp. 1-3; Ex. 8 ¶ 4; Ex. 8 pp. 5-6; Ex. 14 ¶¶ 3, 8; Ex. 15 ¶ 3; Ex. 15 at 5; *see* Ex. 12 ¶¶ 2, 7).

**--Claims Made--**

259.   The landing pages of the websites offered the products for a "trial order" or "risk-free trial." (Ex. 994 p.1 (AuraVie); Ex. 995 p. 1 (Miracle Face); Ex. 996 p. 1 (Miracle Face)).

260.   The landing and ordering pages of the websites used large font and colorful graphics or banners that proclaimed:

"TELL US WHERE TO SEND YOUR TRIAL ORDER"

"ACT NOW TO CLAIM YOUR **TRIAL PACKAGE!**"

"SEND ME MY TRIAL ORDER"

"**CLAIM YOUR RISK-FREE TRIAL NOW**"

(Ex. 994 pp. 1-2; *see also* Ex. 995 pp. 1-2; Ex. 600 pp. 17-18).

261.   Some websites promoted AuraVie products as a "gift" or "giveaway,"

1    purportedly for completing an online survey. (Ex. 903 p. 8).

2    262.   Some AuraVie websites represented that AuraVie was accredited by, and

3           had an A- rating with, the Better Business Bureau. (Ex. 994 p. 5).

4    263.   In fact, since at least March 2014, AuraVie has not had BBB accreditation

5           and its BBB rating was an F. (Ex. 907 ¶ 5; Ex. 592).

6    264.   Some websites stated that customer satisfaction was "100% guaranteed"

7           (Ex. 995 pp. 1, 3) or claimed that the product had won awards, including the

8           2010 Editor's Choice Award (Best Mask) (Ex. 995 p. 1), the 2011 Epic

9           Beauty Award. (Ex. 994 p. 1; Ex. 1007 p. 1; Ex. 600 p. 17), or the 2012

10          Women's Choice Award (Best Serum) (Ex. 994 p. 6).

11                              **--Disclosures--**

12   265.   The landing and ordering pages of the websites did not contain a clear and

13          conspicuous disclosure that acceptance of the trial order would result in

14          consumers being charged for the skincare products upon the expiration of a

15          limited trial period unless the consumer took affirmative action to avoid the

16          charges. (Ex. 2 ¶ 6; Ex.3 ¶ 14; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 994 p. 1, 13; Ex. 995

17          p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Exs. 4 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶

18          7).

19   266.   The landing and ordering pages of the websites did not contain a clear and

20          conspicuous disclosure of when the trial period began and ended. (Ex. 994 p.

1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Ex. 2 ¶¶ 7-10;

Ex. 5 ¶ 5; Ex. 9 ¶ 7; Ex. 12 ¶¶ 2-3; Ex. 13 ¶ 9; Ex. 14 ¶¶ 3-4, 8; Ex. 15 ¶ 3).

The fine-print reference to a 10-day trial did not make clear whether the 10

day trial began upon the date the product was ordered, or the date the

product was received. (Ex. 14 ¶¶ 4, 6; *see also* Ex. 10 ¶¶ 3-4).

267.   The landing and ordering pages of the websites did not contain a clear and

conspicuous disclosure that acceptance of the trial offer would result in

additional products being shipped to consumers and billed to the consumer's

credit or debit cards. (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p.

1, 18). Consumers have testified that they never saw such a disclosure, even

when they specifically looked for one. (Ex. 4 ¶ 8; Ex. 8 ¶ 3).

268.   The landing and ordering pages of the websites did not contain a clear and

conspicuous disclosure of the cost of the continuity plan or the frequency or

duration of the charges. (*Id*; *see also* Ex. 994 p. 5)

269.   The landing and ordering pages of the websites did not contain a clear and

conspicuous disclosure of how consumers could cancel their order or the

negative option plan and avoid additional charges. (*Id*.) For example, it is

not clear from a casual review of the website pages that, to avoid charges,

consumers were required to call the seller within a limited time and return

the product, also within a limited time, at their own cost or expense.  (Ex. 14

¶¶ 4, 6; *see also* Ex. 10 ¶¶ 3-4).

270.   The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure regarding steps to return unwanted products or to obtain a refund. (Ex. 994 p. 5).

271.   The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure that consumers would incur restocking or other charges if they returned the products. (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Ex. 2 ¶ 6; Ex. 901-49:8).

272.   While the landing pages of the websites contained no disclosures, the ordering pages included a fine-print disclosure, accessible only by scrolling toward the bottom of the page. The disclosure stated:

We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.

(Ex. 994 p. 13).

273.   As noted by BunZai Media Group's own lawyer, disclosures of the above terms were not placed in proximity to the "risk-free trial" or "trial order" offers and were not of sufficient size or clarity to be readily seen by

consumers. (Ex. 589).

274. In addition, the disclosure paragraph above failed to disclose:

    a. that the 10-day trial period begins on the day that the product was ordered;

    b. that, to avoid charges, the consumer must also return the product to Defendants before the end of the trial period;

    c. that to return a product, the consumer must first obtain a Return Merchandise Authorization ("RMA") code from Defendants;

    d. that consumers could not return the product for a refund after 10 days if it was opened;

    e. that consumers could not return the product for a refund after 30 days, even if it was not opened; and

    f. that a restocking fee, usually $15, may be charged when a product was returned.

    (*Id*.)

275. Most of the material terms and conditions of the trial offers were hidden in a separate, multi-page terms and conditions webpage accessible only by hyperlink.  On at least one website, the hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" (Ex. 994 p. 3).

Similarly, the post-sale confirmation emails sent to consumers who accepted the trial offers also failed to clearly and conspicuously disclose material terms including that:

a. the consumer would be charged as much as $97.88 for the skincare products after 10 days or other limited time period;

b. the dates on which the trial period began and ended;

c. that the consumer had been enrolled into a negative option plan,

d. that the consumer would receive additional products each month, and would incur additional charges of up to $97.88 on their credit or debit cards each month;

e. that, to avoid charges, the consumer would have to return the product, at his or her own cost, within a limited time period;

f. that the consumer would incur restocking or other charges for returning the product;

g. how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (Ex. 902).

## 2.    Consumer Complaints and Injury

276. Thousands of consumers filed complaints concerning Defendants' business activities. (*See*, *generally*, Ex. 907; Ex. 325).

277. The Better Business Bureau reported having at least 406 complaints on file as of June 2015 concerning billing, sales, or refund issues. (Ex. 907).

278. Consumer complaints concerning unauthorized charges were so prevalent for AuraVie products, that Defendants prepared a scripted "rebuttal" to guide AuraVie customer service representatives in responding. (Ex. 104).

279. The customer service scripts required AuraVie representatives to state:

> I see here that on (Date) you visited our website (Website Name) and placed and order for our AuraVie Risk Free Trial. When you placed this order did you take the opportunity to read over the Offer Terms and Condtions that were listed to the left of the credit card screen before submitting your order?

(Ex. 104 p. 3).

280. Representatives were also advised to tell consumers who complained about unauthorized charges that:

> . . . so you read that we shipped you a full 30 days supply of the AuraVie 3 in 1 skincare treatment and that you had a 10 day trial period with the products before being bill the discounted membership rate of $97.88 for all three products which we sell at malls and spas nationwide for over $200.

(Ex. 104 p. 3).

281. Alon, Reuveni, and Bond were also aware that consumers filed complaints online at www.ripoffreport.com, asserting that the AuraVie products were a "scam" or "ripoff." (Ex. 93).

282. Direct Outbound, a call center used by SBM Management to provide customer service for Dellure and AuraVie sales, provided regular reports itemizing consumer complaints received. (Ex. 325).

283. For the week of January 6, 2014, Direct Outbout reported that 127 customers called concerning Dellure product sales. (Ex. 325 pp. 2-5). Such customers complained about being "charged for the full price of the product," inquired "about the charges on dellure they are getting," and claimed they "had placed the trial but did not realize it was a recurring." (*Id.*)

284. For the week of January 6, 2014, Direct Outbout reported that 2,057 customers called concerning AuraVie product sales. (Ex. 325 pp. 6-52). Such customers called "to see why she was charged," "to cancel, declined save offers, threatened charge back," and to complain "that she sent the product back and never received the refund." (Id.)

285. The FTC offered declarations from 14 consumers, who shared similar experiences and were dissatisfied with the trial offers because they resulted in undisclosed and unauthorized charges. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

286. The consumer declarants attested that they were subject to injury in the form of unauthorized charges for product that was advertised as part of a "risk-

free trial" as well as for additional unordered and unwanted products that
were sent each month. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6
¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5;
Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

287.  According to Defendants' own income tax records and Quickbook records,
Defendants' revenue, minus returns, chargebacks, and refunds, totaled
$75,624,030. (Ex. 944 p.4).

### 3. Defendants' Chargeback and Merchant Account Issues

288.  BunZai Media Group established a merchant account with Cynergy Data,
LLC dba Priority Payment Systems and Signal Pay (hereinafter "Priority
Payment") in December 2010. (Ex. 600 p. 2),

289.  The merchant banks require merchant account holders to agree to "keep
fraud and chargebacks below thresholds." (*See* Ex. 600 p. 13).

290.  BunZai Media Group had difficulty keeping chargebacks within threshold
levels because many consumers complained about unauthorized charges.

291.  In June 2011, one of BunZai Media Group's merchant accounts (myauravie)
was fined $26,500 for having excessive chargebacks. (Ex. 102 p. 2-3)

292.  Alon and Bond recruited friends and family members to establish shell
companies with merchant accounts, to ensure access to credit card
processing services. (*See* Decl. of Alon Dkt. 391-3 ¶ 4).

293.   One of the shell companies, Zen Mobile Media, was established by Latsanovski for that same purpose. (Decl. of Latsanovski Dkt. 90-1 ¶ 15-16).

294.   Latsanovski also used Zen Mobile Media to pay his American Express bills, totaling $164,757. (Dkt. 120 p. 40).

295.   Zen Mobile Media established a merchant account with Priority Payment in November 2011 (Ex. 600 p. 2), and agreed to "keep fraud and chargebacks below thresholds." (Ex. 600 p. 34).

296.   On its merchant account application, signed by Latsanovski, Zen Mobile Media falsely represented that it promoted its products only through direct mail and telemarketing, and denied that any third parties provided sales, marketing, order fulfillment or similar services. (Ex. 600 p. 36).

297.   On its merchant account application, Latsanovski and Zen Mobile Media also falsely stated that customers placed orders only through the mail or by telephone. (Ex. 600 p. 36).

298.   As of December 2011, BunZai Media Group was using dozens of shell companies, merchant accounts, and billing descriptors to process credit and debit card payments for the sale of AuraVie and other skincare products. (Ex. 78 p. 2; *see* Ex. 65).

299.   BunZai Media Group and its affiliated companies regularly tracked consumer chargebacks, which were attributable to the "risk-free trial" offers

and "auto ship" negative option plans. (*See* Ex. 131 p. 4; Ex. 132; *see* Ex. 507).

300.   Chargebacks cost the AuraVie companies hundreds of thousands of dollars in fees and lost revenues. (*See. generally*, Ex. 507; Ex. 305; Ex. 307).

301.   For example, in March 2012, the AuraVie companies paid chargebacks of $219.99 (AuraVie), $12,259.46 (BunZai Media Group), $7,539.54 (Dead Sea), $29,432.34 (Agoa Holdings), $3,608.70 (DMA Media Holdings), 3,573.28 (Lifestyle Media Brands), $32,689.62 (Zen Mobile Marketing), $25,988.09 (Safehaven Ventures), for a total of $115,311.02 in chargebacks. (Ex. 305 p. 16). The companies also paid $92,325.65 in merchant account fees that month. (*Id.*). The companies' revenues for the month were $1,624,917.58.

302.   In May 2012, the AuraVie companies paid $133,102.12 in chargebacks and $85,839.79 in fees. The company had generated $1,765,394.61 in revenue that month—meaning their chargeback rate was 7.5 percent of sales. (Ex. 307 p. 17).

303.   Because chargebacks were an ongoing concern, Alon strategized with Medina and Roi in May 2012 about how to respond and determined that they should hire a third party company to call and survey consumers who

demanded chargebacks so that the company "would look extremely compliant and proactive." (Ex. 86).

304. To discourage chargeback requests, BunZai Media Group included a warning on the "Terms and Conditions" page of its website:

> CHARGEBACKS AND REVERSALS. We handle all chargebacks and reversals as potential cases of fraudulent use or our product offer and/or theft of product. In cases where we have provided a product and we have verified that a client has received a product and/or refused or returned product(s), whether or not they have used the product in any way, possible actions taken by the company may include filing a complaint with the Internet Crimes Bureau and/or local authorities in your state to investigate theft of product and possible mail fraud which is a Federal Crime. All cases of chargeback requests will be vigorously fought by the Company. BE AWARE that if you choose to claim your online transaction was fraudulent that all activity and IP address information is captured. This digital proof of whom and where the order was placed with be submitted to the proper authorities. This information may be used in a civil and criminal case against a customer if there is fraudulent use or theft of product(s).

(*See*, *e.g.* Ex. 600 p. 21; Ex. 994 p. 6; Ex. 995 pp. 6-7).

## VI.   CONCLUSIONS OF LAW

To determine the Issues Presented, *supra* at pp. 10-12, the first inquiry concerns whether the AuraVie and other websites at issue violated the FTC Act, ROSCA, or EFTA. The FTC contends that they do. The second inquiry examines whether each of the named Defendants were members of a common enterprise or

1   participated in, or controlled, the deceptive acts challenged by the FTC, which the

2   FTC also contends is true.

### A. THE AURAVIE WEBSITES WERE DECEPTIVE UNDER § 5 OF THE FTC ACT

1.   The Court may conclude the deceptiveness of a claim based upon its own analysis, without the testimony of an expert or consumer complainant. *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

2.   In *Cyberspace.com*, the court determined that a solicitation comprised of a check attached to an invoice-like form was deceptive, despite disclosures on the back of the check revealing that cashing the check constituted agreement to pay a monthly fee for Internet service. *Id*. The Ninth Circuit considered only the check and invoice to determine that, despite the disclosure, the documents created a deceptive impression that the check was a refund or rebate rather than an offer for services. *Id*.

3.   Likewise, in *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1076-77 (C.D. Cal. 2012), the court granted summary judgment against marketers who promised their products would help consumers earn large sums of money, but failed to adequately disclose their monthly cost. Although the court considered consumer declarations, a survey, and other materials to determine the falsity of the advertisements, it first determined the overall net impression based on the ads alone. *Id*. at 1066-67.

4.    In *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009), a business opportunity scheme, the court determined, based on the overall net impression of advertising and telemarketing materials, that the defendants falsely represented consumers could easily earn $10,000 per month.

5.    An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

- a representation, omission, or practice
- that is likely to mislead consumers acting reasonably
- and is material.

*See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

6.    A misrepresentation may be either express or implied. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("[N]othing in statute or case law . . . protects from liability those who merely imply their deceptive claims . . . .").

7.    Express product claims are presumed material and reliance upon such claims is presumptively reasonable. *Pantron I Corp.*, 33 F.3d at 1095-96; *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

8.    It is well-settled law that, to determine if a representation, omission, or practice is likely to mislead, the court considers the "overall net impression" made. *FTC v. Publishers Bus. Servs., Inc.,* 821 F. Supp. 2d at 1223 (citing

*Cyberspace.com*, 453 F.3d at 1200); *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).

9. A court is to consider all written and oral representations made by a seller to a consumer in assessing the net impression. *See Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1437 (9th Cir. 1986).

10. "[B]oth the advertisements and the disclosure documents must be construed together to evaluate the net impression of the representations to consumers. Consumers need not be actually deceived, the representations need only have the tendency or capacity to deceive." *FTC v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003).

11. Importantly, even a claim that includes a truthful statement can be deceptive if it has a capacity to mislead. "Even if [representations in advertisements] were true… these facts are immaterial because an advertisement could be misleading or deceptive by virtue of the net impression it creates even though it also contains truthful disclosures." *John Beck Amazing Profits*, 865 F. Supp. 2d at 1070 (citing *Cyberspace.com*, 453 F.3d at 1200).

12. "Although '[p]roof of actual deception is unnecessary to establish a violation of Section 5,' such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."

*Cyberspace.com*, 453 F.3d at 1201 (citation omitted) (quoting *Trans World
Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979)).

13.  Not all representations or omissions are deceptive; to violate Section 5, the
representation or omission must be material to consumers. *Gill*, 265 F.3d at
950.

14.  A representation, omission, or practice is material if it involves information
that is important to consumers and thus likely to affect their purchasing
decisions. *Cyberspace.com,*  453 F.3d at 1201 (internal citations omitted).

15.  Express claims are presumed to be material.

16.  Courts have also deemed as material:

   a.  the failure to clearly and conspicuously disclose terms which, if
   disclosed, would lead consumers not to pursue an offer. *See FTC v. Am.
   Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1087-88 (C.D. Cal. 1994);
   and

   b.  a false representation that a product is free or risk free, *see FTC v.
   Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012)
   ("This misrepresentation is undoubtedly material because the information
   about a free kit goes to the cost of the product, an important factor in a
   consumer's decision on whether or not to purchase a product.").

## 1.   The AuraVie Websites Failed to Adequately Disclose Material Terms and Conditions of their Sales Offers

17.   An advertisement that fails to disclose material information is deceptive. *See Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978) (holding deceptive an advertisement that stated a product was safe and effective because the ad omitted the fact that program included injections that had not been deemed safe or effective).

18.   "The failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts." Sterling Drug, Inc. v. FTC, 741 F.2d 1146, 1154 (9th Cir. 1984).

19.   The AuraVie website offers failed to clearly and conspicuously disclose material terms.

20.   Defendants failed to disclose clearly that their "risk free" trial offer converted into a $97.88 charge after just 10 days.

21.   Further, Defendants failed to disclose when the trial began and ended; that consumers were automatically enrolled into a negative option continuity plan with monthly charges; or how consumers could cancel membership in the program.

22.   Accordingly, the practices were deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45(a).

23.   In light of this evidence, the FTC has proven Count I of the Complaint by a preponderance of the evidence.

**2.   The AuraVie Websites Falsely Represented Their Offers to be "Risk Free"**

24.   The website offers were materially misleading because they contained misrepresentations: the overall net impression of the offers was that products were available to consumers without risk, further obligation, or cost—other than the disclosed nominal shipping and handling fees.

25.   Defendants used trickery to obtain consumers' credit card information: They prominently represented that products were available on a "risk free" basis and that consumers needed to pay only a nominal shipping fee.

26.   In fact, Defendants had buried material, contradictory terms concerning their "risk-free trial" offers inconspicuously at the bottom of the ordering page or in hyperlinks.

27.   Accordingly, the practices were deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45(a).

28.   In light of this evidence, the FTC has proven Count II of the Complaint by a preponderance of the evidence.

### 3.    The AuraVie Websites Falsely Represented their BBB Accreditation and Rating

29.    Until the filing of this lawsuit, Defendants represented on their website that AuraVie was accredited by the Better Business Bureau with an "A-" rating.

30.    These representations were false. AuraVie had its accreditation revoked in March 2014 and had an "F" rating with the BBB.

31.    Defendants' representations about their company's BBB rating and accreditation status were express claims, which are presumed to be material.

32.    Accordingly, the practices were deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45(a).

33.    In light of this evidence, the FTC has proven Count III of the Complaint by a preponderance of the evidence.

### 4.    Disclosures on the AuraVie Websites Were Not Clear or Conspicuous and Did Not Cure the Deceptive "Overall Net Impression"

34.    Importantly, numerous courts have held that an inconspicuous disclosure does not remedy the deceptiveness of a material omission. *FTC v. Cyberspace.com LLC*, No. C00-1806L, 2002 U.S. Dist. LEXIS 25564, *8-9 (W.D. Wash. July 10, 2002) (holding that a fine print disclosure was inadequate to escape liability), *aff'd* 453 F.3d 1196, 1200 (9th Cir. 2006) (collection case where deception was found because fine print disclosures were inadequate); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st

Cir. 2010) ("[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and leave an accurate impression") (quoting *Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); FTC v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine print disclosure at the bottom of the ad); *Porter & Deitsch v. FTC*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *Gill*, 71 F. Supp. 2d at 1044 (disclaimers made in contract for credit repair services were insufficient to counteract advertising claims about the service).

35.  To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.Com*, 453 F.3d at 1200; *see also Direct Mktg. Concepts,* 624 F.3d at  12; *Removatron*, 884 F.2d at 1497; *Gill*, 71 F. Supp. 2d at 1044.

36.  Deception is not cured by the mere inclusion of disclaimers in small print. *Cyberspace.com*, 453 F.3d at 1200.

### B.    AURAVIE'S BILLING PRACTICES WERE UNFAIR UNDER § 5 OF THE FTC ACT

37.    An act or practice is unfair if:

- it causes substantial injury to consumers

- that consumers cannot reasonably avoid, and

- that is not outweighed by countervailing benefits to consumers or competition.

15 U.S.C. § 45(n).

38.    "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'" *FTC v. Neovi*, 604 F.3d 1150, 1158 (9th  Cir. 2010) (citing *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C.Cir.1985) cert. denied, 106 S.Ct. 1185 (1986)).

39.    "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi, Inc.*, 604 F.3d at 1158.

40.    Business practices that rely upon a lack of disclosure and unauthorized billing provide no countervailing benefits to consumers or competition.

41.    Courts have regularly found unauthorized billing practices to be unfair. *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000); *FTC v. Windward*

*Mktg., Ltd.*, No. 1:96-cv-615F, 1997 U.S. Dist. LEXIS 17,114, at *10, 13 (N.D. Ga. Sept. 30, 1997).

42. "An unfair practice does not require knowledge of consumer harm and may merely 'facilitate, or contribute to, ill intentioned schemes if the injury was a predictable con sequence of those actions.'' FTC v. Wells, 385 Fed.Appx. 712 , 713 (9th Cir. 2010) (quoting Neovi, 604 F.3d at 1158 ).

43. In *Wells*, 385 Fed. Appx. at  713, the Court upheld a finding that the defendant engaged in unfair trade practices by "processing debit transactions to consumers' bank accounts, while knowing or consciously avoiding knowing that those debit transactions were unauthorized by consumers," based in part on high chargeback rates.

44. Accordingly, the practices were unfair under Section 5 of the FTC Act, 15 U.S.C. § 45(n).

45. In light of this evidence, the FTC has proven Count IV of the Complaint by a preponderance of the evidence.

## C. THE AURAVIE WEBSITES AND BILLING PRACTICES VIOLATED SECTION 4 OF ROSCA

46. ROSCA generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless the seller

- clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information

- obtains the consumer's express informed consent before making the charge, and

- provides a simple mechanism to stop recurring charges.

*See* 15 U.S.C. § 8403 (2006).

47. A negative option feature is "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u) (2006).

48. BunZai Media Group and its affiliated companies treated consumers' silence or failure to take affirmative action to cancel as acceptance of the offer to send and charge consumers for additional products. (Exs. 2 ¶ 6; 14; 5 ¶ 4; 7 ¶ 6; Ex. 994 pp. 5, 13; *see also* 3 ¶¶ 8; 4 ¶ 6; 9 ¶ 5; 13 ¶ 7). Therefore, the offers included a negative option feature.

    **1.    The AuraVie Websites Did Not Clearly and Conspicuously Disclose Negative Option Features**

49. Defendants fail to disclose clearly, if at all, material terms of their negative option plan. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure that:

    a.  acceptance of the trial order would result in consumers being charged for the skincare products upon the expiration of a limited

1  trial period unless the consumer took affirmative action to avoid

2  the charges (Ex. 2 ¶ 6; Ex.3 ¶ 14; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 994 p.

3  1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; see also Exs. 4

4  ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7);

5  b.  when the trial period began and ended (Ex. 994 p. 1, 13; Ex. 995

6  p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; see also Ex. 2 ¶¶ 7-10; Ex. 5 ¶

7  5; Ex. 9 ¶ 7; Ex. 12 ¶¶ 2-3; Ex. 13 ¶ 9; Ex. 14 ¶¶ 3-4, 8; Ex. 15 ¶

8  3);

9  c.  that acceptance of the trial offer would result in additional

10  products being shipped to consumers and billed to the consumer's

11  credit or debit cards (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1;

12  Ex. 997 p. 1, 18);

13  d.  the cost of the continuity plan or the frequency or duration of the

14  charges (*Id; see also* Ex. 994 p. 5);

15  e.  how consumers could cancel their order or the negative option

16  plan and avoid additional charges (*Id*.)

17  50.  Most of the material terms and conditions of the trial offers were hidden in

18  a separate, multi-page terms and conditions webpage accessible only by

19  hyperlink.  On at least one website, the hyperlink could only be found

20

by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" (Ex. 994 p. 3).

### 2. AuraVie Did Not Obtain Consumers' Express, Informed Consent Before Billing for Negative Option Plans

51. As described above, Defendants routinely charge consumers for negative option plans without obtaining their express informed consent.

### 3. AuraVie Did Not Provide Consumers With a Simple Mechanism to Stop the Negative Option Plan

52. Defendants fail to provide a simple mechanism for cancelling the negative option plan.

53. Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

54. Accordingly, the practices violated ROSCA, 15 U.S.C. § 8403.

55. In light of this evidence, the FTC has proven Count V of the Complaint by a preponderance of the evidence.

### D. AURAVIE'S BILLING PRACTICES VIOLATED SECTION 907(a) OF EFTA

56. EFTA and its implementing Regulation E regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account.

57. Under EFTA, a preauthorized electronic fund transfer

- may be authorized by the consumer only in writing, and

- a copy of such authorization shall be provided to the consumer when made.

15 U.S.C. § 1693a(10).

58.   A "preauthorized electronic fund transfer" is an electronic fund transfer that is authorized in advance and scheduled to recur at substantially regular intervals. 12 C.F.R. § 205.10(b).

59.   AuraVie's "auto-ship" or negative option plan billed consumers' debt cards at regularly monthly intervals, purportedly based upon pre-authorization by consumers. Thus, the "auto-ship" or negative option plan used preauthorized electronic fund transfers and was required to comply with EFTA.

60.   Under the law, before a merchant can make recurring debits from a consumer's bank account, the merchant must first obtain a written authorization signed or similarly authenticated by the consumer. 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

61.   Section 205.10(b) of Regulation E states that the person that obtains the authorization shall provide a copy to the consumer.

62.   For an authorization to be valid, the terms of the preauthorized transfer must be "clear and readily understandable" and the authorization "should evidence the consumer's identity and assent to the authorization." Federal

Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. Part 205, Supp I, ¶ 10(b), comments (5) & (6).

63. These protections ensure that consumers' consent to recurring debits will be knowing and informed.

64. A consumer's rights under EFTA cannot be waived. 15 U.S.C. § 1693*l* (2006).

65. Defendants' business practices failed to comply with EFTA for several reasons.

**1.    Consumers Accepting AuraVie "Risk-Free Trial" Offers Did Not Authorize Recurring Electronic Fund Transfers From their Accounts**

66. First, Defendants' terms and conditions regarding recurring monthly fees were not clear and readily understandable. In fact, this information was concealed in documents available only by hyperlink or in hard-to-read disclosures.

67. Further, Defendants' websites were covered with claims that their offer was "risk-free" and other directly contradictory statements.

68. Thus the evidence shows that consumers who accepted the "risk-free trial" offers did not authorize, in writing, electronic fund transfers to be made from their accounts.

1

2

    **2.**   **Consumers Accepting AuraVie "Risk-Free Trial" Offers Did Not Receive Copies of Any Authorization for Recurring Electronic Fund Transfers**

3

69. Second, Defendants' websites or terms and conditions pages could not serve

4

as the consumer's "copy" of the authorization, as required by 15 U.S.C. §

5

1693e(a), because they were not signed or similarly authenticated by the

6

consumer and did not evidence the consumer's identity and assent to

7

additional transfers.

8

70. Because consumers had never authorized the electronic fund transfers,

9

consumers were not provided copies of any such authorization. (*See, e.g.*,

10

Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶

11

4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14

12

¶¶ 5-6; Ex. 15 ¶ 4).

13

71. In short, consumers who used their debit cards to pay for shipping to receive

14

a "trial order" or "risk-free trial order" were not authorizing recurring debits

15

from their bank accounts and never received a copy of any purported

16

authorization for such debits.

17

72. Accordingly, the practices violated EFTA. 15 U.S.C. § 1693e(a).

18

73. In light of this evidence, the FTC has proven Count VI of the Complaint by

19

a preponderance of the evidence.

20

E.     **CORPORATE DEFENDANTS ACTED AS A "COMPLEX WEB OF INERLACING ENTITIES AND INDIVIDUALS" OR A COMMON ENTERPRISE**

74.    Plaintiff has alleged that Defendants acted collectively as a "common enterprise." (Dkt. 235 ¶¶ 42-43).

75.    "[I]n situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quotation omitted).

76.    "When determining whether a common enterprise exists, courts look to a variety of factors, including: common control; the sharing of office space and officers; whether business is transacted through 'a maze of interrelated companies'; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence which 'reveals that no real distinction existed between the Corporate Defendants.'" *FTC v. Wolf*, No. 948-8119-civ-Ferguson, 1996 U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 30, 1996) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431 (7th Cir.), *cert. den.*, 377 U.S. 992 (1964); *Zale Corp. and*

*Corrigan-Republic, Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973);

*Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *SEC v.*

*Elliott*, 953 F.2d 1560, 1565 n.1 (11th Cir. 1992); *FTC v. Jordan Ashley,*

*Inc.*, 1994-1 Trade Cas. (CCH) P 70,570 at 72,095 (S.D. Fla. 1994)).

77.   Common enterprise has been found where corporate defendants were

commonly controlled and shared the same business address and office space.

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D.

Cal. 2012).

78.   Common control can be established by showing that individuals held direct

or indirect ownership interests in the entities at issue, even if some interests

are shared with non-defendant individuals. *FTC v. Ivy Capital, Inc.*, No.

2:11-CV-283 JCM GWF, 2013 WL 1224613, at *13 (D. Nev. Mar. 26,

2013), *aff'd* in relevant part, 616 F. App'x 360 (9th Cir. 2015).

79.   Although Corporate Defendants object that they did not share the role of

creating the deceptive website offers at issue or processing sales, the law is

clear that, for purposes of a common enterprise, interrelated activity exists

where "the roles of each entity varied, but all had a distinct role to play as

part of the scam." *Ivy Capital, Inc.*, 2013 WL 1224613, at *14, *aff'd* in

relevant part, 616 F. App'x 360 (9th Cir. 2015).

80.   In the Ninth Circuit, entities constitute "a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

81.   Vertical commonality exists where an investor and promoter are involved in a common venture without requiring other investors' involvement. *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir.1978) (noting that a farmer, a feedlot operator, and a bank may be involved in a "common enterprise" if the farmer and the bank both depended upon the success of the feedlot for the success of their investments).

82.   Conversely, horizontal commonality is shown by the "pooling of interests, usually combined with a pro-rata sharing of profits." *Brodt v. Bache & Co.*, 595 F.2d at 460. "[T]he critical factor in the common enterprise test 'is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts.'" *Id.* at 461 (quoting *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974)).

83.   A common enterprise may be proven by evidence that companies pooled resources, staff, and funds; that companies were owned and managed by the same group of individuals; and that companies all participated to some

extent in a common venture to sell the same products. *Network Servs. Depot,*
*Inc.*, 617 F.3d at 1143.

84.   The evidence shows that Defendants promoted "risk-free" trial offers as a

common enterprise with:

    a.   <u>Common control</u>: Common control: The Corporate Defendants and

         shell companies operated as a single economic unit under common

         control and using shared resources to effect their mutual goals of

         charging consumers without their authorization and evading

         detection. (Decl. of Alon Dkt. 391-3 ¶ 4; Dkt. 121-1 at 3; Dkt. 120

         at 5; Ex. 65; Ex. 78 at 2; Ex. 82 p. 10; *see also* Decl. of

         Latsanovski 90-1 at 2-3 ¶5-6 and at 5 ¶16).

    b.   <u>Common offices</u>: Many, if not all, of the Corporate Defendants

         operated out of a single "nerve center" that was leased by Secured

         Commerce (co-owned by Doron Nottea and Alan Argaman). (Dkt.

         120 at 12-14). Many other factors show the intertwined nature of

         these companies: for example, Argaman, despite his claimed non-

         involvement in the AuraVie scheme, established the telephone

         numbers for the various shell merchant account entities. (Ex. 530;

         Ex. 529; *see also* Ex. 489; Ex. 516).

c. <u>Network of interrelated companies:</u> Defendants formed a vast, fully integrated web of Corporation. (Dkt. 121-1 at 3; *see also* Ex. 561 at 3). Corporate Defendants are owned and operated by Defendants, their family members, or associates. (Decl. of Alon Dkt. 391-3 ¶ 4; *see also* Decl. of Latsanovski 90-1 at 2-3 ¶5-6 and at 5 ¶16; Ex. 65; Ex. 78 at 2). The numerous shell merchant account entities served the common purpose of generating revenues through the AuraVie scheme while evading detection by payment processors. (Dkt. 120 at 5; Dkt 121-1 at 3). Then, once the many shell entities received revenue from AuraVie, certain Defendants served as intermediary entities transferring funds to a web of entities whose purposes ranged from maintaining operations to funneling funds to Individual Defendants. (Dkt. 121-3 at 4-5 Ex. 32; Ex. 170; 945; 988 at 9-10, 14, 16, 18, 20, 22).

d. <u>Commingling of corporate funds:</u> The finances for almost all of the Corporate Defendants were derived from the sale of the same products. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; see also Ex. 75). The finances of these Corporate Defendants were handled by the same managers and employees. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; Decl. of Doron Dkt. 398-2 at 3-4 ¶9; *see also* Ex. 78; Ex. 94).

e.   <u>Unified advertising:</u> The AuraVie scheme had a unified advertising company in Media Urge, Inc. (Decl. of Alon Dkt. 391-3 ¶ 7). The common enterprise used the same Internet advertising on various websites for the same product (*See*, *e.g.,* Ex. 600 at 17-26; Ex. 1007; Ex. 994) regardless of which shell company processed the charge or which upstream entity received the consumer's payment.

f.   <u>Pooled resources and staff:</u> The same principal actors, most of whom are Individual Defendants in this action, owned and operated the numerous corporate entities associated with this scheme. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; Ex. 75; Ex. 78 at 2). Despite the extensive operations and many nominally different operating entities associated with the scheme, a relatively small group of individuals was responsible for day-to-day operations. Defendants' employees operated across companies and in various positions throughout the corporate web. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7).

g.   <u>No distinctions between entities:</u> Although each Corporate Defendant served its own purpose in the scheme (Dkt. 121-3 at 4-5), many served similar purposes or easily could have served a different one because the companies shared owners, managers, and

financial expertise. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; *see also* Ex. 65). A small group of Individual Defendants owned and utilized this vast web of companies to execute the scheme. (Dkt. 120 at 30-31).

85. CalEnergy, Inc. financed BunZai Media Group, Inc., and managed Pinnacle Logistics, Inc., and Media Urge, Inc. (Ex. 571 pp. 2-3; *see also* Ex. 561-3; Ex. 588-1; Ex. 588-9). Latsanovski was the CEO of CalEnergy (Ex. 904-51) and used the company to provide financing for the AuraVie enterprise. CalEnergy claimed to be the parent company of both Pinnacle Logistics, Inc., and Media Urge, Inc.—both of which promoted the AuraVie "risk-free trial" and "trial order" offers. (Dkt. 908).  CalEnergy was part of the common enterprise.

86. Secured Merchants, LLC processed chargebacks for the AuraVie companies (*see* Ex. 917-45 ¶ 56; Ex. 348), often using the name Chargeback Armor. (Ex. 280; Ex. 412; Ex. 413). Secured Merchants was owned by Alan Argaman (Dkt. 299 ¶ 39; Dkt. 244 ¶ 39; Dkt. 245 ¶ 39; *see also* Ex. 917 ¶ 208) and Roi Reuveni claimed to be its managing member (Ex. 412-5). Both individuals participated in or controlled the unlawful activities described in Plaintiff's Complaint individually and through this entity. Although the company denies that it or its principals were ever involved in selling

AuraVie or other skincare products, its own executive summary states that the company's founders owned a skincare product business and created infrastructure to "to deal with [ ] inevitable credit card chargebacks." (Ex. 256). Secured Merchants also managed Defendants' automated customer service line. (Ex. 257-2). Secured Merchants was part of the common enterprise.

87.   Defendants pooled resources, staff, and funds; Corporate Defendants were owned and managed by the same group of individuals—the Individual Defendants—and all participated to some extent in a common venture to sell the same products.

## F.   BASED UPON THEIR PARTICIPATION OR CONTROL, AND THEIR KNOWLEDGE, THE INDIVIDUAL DEFENDANTS ARE EACH LIABLE FOR THE LAW VIOLATIONS

88.   Having determined that the evidence proves that the AuraVie "risk-free trial" and "trial order" offers violated the FTC Act, ROSCA, and EFTA, and that Defendants acted as a common enterprise, the court next examines whether the Individual Defendants are liable for the violations.

89.   The Court finds that Individual Defendants, Alon Nottea, Doron Nottea, Igor Latsanovski, and Alan Argaman, each participated in, controlled, or had the authority to control the unlawful acts and practices at issue in this case. Therefore, each is liable for Injunctive Relief.

90.   The Court further finds that each of the Individual Defendants acted with the requisite knowledge to be held liable for equitable monetary relief. Therefore, a monetary judgment against them is proper.

### 1.   The Individual Defendants Participated In *or* Controlled the Unlawful Activities and Are Liable for Injunctive Relief

91.   An individual may be held liable for injunctive relief arising from deceptive or unfair acts or practices when they *either*

- participated directly in the acts or practices *or*

- had authority to control them.

*FTC v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1170 (9th Cir. 1997).

*a.  Participation Alone is Sufficient to be Held Individually Liable*

92.   Defendants have focused their argument on their purported lack of control over the enterprise, but the law is well-established that participation in the unlawful acts alone is sufficient to be held individually liable for corporate violations of the FTC Act.

93.   Participation may include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publ'ns, Inc*., 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).

94.   An Individual Defendant's participation need not be directly in the violative conduct. "Where an officer participates in 'acts crucial to the success' of an

enterprise, the officer has directly participated for the purposes of individual liability." *FTC v. Ivy Capital*, Inc., No. 2:11-CV-283,  2013 WL 1224613, at *41 (D. Nev. 2013) (quoting *J.K. Publ'ns.*, 99 F.Supp.2d at 1206).

95.   Participation need not be limited solely to the creation of the deceptive websites. Courts have found participation where an individual participated in acts critical to an enterprise—such as participating in a billing scheme by using credit to obtain merchant bank accounts and signing agreements to purchase a credit card database.  *J.K. Publ'ns, Inc.*, 99 F. Supp. 2d at1206.

96.   Where an individual was copied on or sent emails regarding agendas for partnership or manager meetings; provided consultation services to the enterprise; recruited partners to the enterprise; introduced enterprise partners to others at trade shows; attended partnership meetings; and was present at the enterprise's office throughout its operation, direct participation was established. *Ivy Capital, Inc*., 2013 WL 1224613, at *15.

97.   Participation has been shown where an individual was involved in the company's scientific research, implemented the company's direction regarding advertising claims, participated in meetings to review advertising concepts and content, and reviewed, edited, and in some instances made decisions on advertising concepts and copy. *POM Wonderful LLC*, No. 9344, 2013 WL 268926, at *66 (Jan. 16, 2013).

98.   Hiring employees and reviewing, drafting, and approving  telemarketing scripts used to deceive consumers is clearly participation *See FTC v. Consumer Alliance, Inc*., No. 02C2429, 2003 WL 22287364, at *6 (N.D. Ill. Sept. 30, 2003); *see also FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1103 (9th Cir. 2014) (finding an individual defendant liable in part due to his participation in drafting misleading advertisements and organizing the schemes even though his involvement later ended); *FTC v. Sterling Precious Metals, LLC*, No. 12-80597-CIV-MARRA, 2013 U.S. Dist. LEXIS 20879(S.D. Fla. 2013) (concluding that allegations of being a broker who served as a signatory on financial documents would be sufficient to support individual liability ).

99.   However, having authority to formulate and implement policies and procedures is also participating, even against an individual who is only a "consultant" and not an owner. *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1055 (C.D. Cal. 2002).

*b.   Authority Control Does Not Require Proof of Control Over Specific Acts*

100.   The "authority to control" inquiry focuses on whether an individual "had authority to control the corporate entity's practices," and the Court need not find a "specific link from [the individual] to particular deceptive [acts]." *FTC v. Ross*, 743 F.3d 886, 893 (4th Cir. 2014); *FTC v. World Media*

*Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (stating that whether the individual was personally involved with the misrepresentations to consumers was irrelevant because he had the authority to control the corporation's deceptive practices).

101. An individual also does not need to exercise his authority to control the company's marketing practices to be held liable for its violations. *FTC v. Loewen*, No. C12-1207, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013).

102. Authority to control may be inferred from "'active involvement in business affairs and the making of corporate policy.'" *J.K. Publ'ns*, 99 F. Supp. at 1203-04 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).

103. "An individual's position as a corporate officer and/or authority to sign documents on behalf of the corporate defendant is sufficient to show the requisite control." *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1079 (C.D. Cal. 2012), *aff'd* in relevant part, 815 F.3d 593 (9th Cir. 2016); also *J.K. Publ'ns,* 99 F. Supp. at 1204.

104. In fact, a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority." *FTC v. Ivy Capital, Inc.*, No.

2:11-CV-283, 2013 U.S. Dist. LEXIS 42369 at *42 (D. Nev. Mar. 26, 2013)

(quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist.

LEXIS 104982 at *26 (D. Utah Sept. 16, 2011)). *See also FTC v. Transnet*

*Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007); *FTC v.*

*Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17,114

at *38-39 (N.D. Ga. Sept. 30, 1997).

105. Authority to control has been "abundantly establishe[d]" where an individual

served as a top executive with oversight of a company's operations and

authority to control the activities of its various department heads. *Commerce*

*Planet, Inc.*, 878 F. Supp. 2d at 1080.

106. "A heavy burden of exculpation rests on the chief executive and primary

shareholder of a closely held corporation whose stock-in-trade is

overreaching and deception." *Standard Educators, Inc. v. FTC*, 475 F.2d

401, 403 (D.C. Cir. 1973).

107. Evidence that an individual formulated policies, oversaw and directed

employees, signed corporate documents, controlled finances or the day-to-

day operations, or otherwise held themselves out as an authorized officer

indicates control over the corporation. *See, e.g., FTC v. USA Fin., LLC*, 415

F. App'x 970, 974-75 (11th Cir. 2011); *Direct Mktg. Concepts*, 624 F.3d at

13 n.10; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 637-38 (7th Cir.

2005) (rejecting the argument that a salaried employee cannot have control over and knowledge of corporate affairs); *World Media Brokers*, 415 F.3d at 765; *Publ'g Clearing House.*, 104 F.3d at 1170-71.

108. Notably, ultimate or sole control is not necessary to establish individual liability. *Griffin Sys., Inc*., 117 F.T.C. 515, 582-83 (1994) (finding no "authority indicating that sole control of a company is necessary to establish individual liability and concluding that an executive vice president who, among other responsibilities, "shared authority" with others to set prices for service contracts and hire employees was individually liable); *FTC v. World Media Brokers, Inc*., No. 02C6985, 2004 WL 432475, at *9 (N.D. Ill. Mar. 2, 2004) (finding liability because the individual managed the telemarketing operation and the daily financial and administrative affairs, and arranged for off-shore credit card processing, despite not having sole control over the business' affairs).

109. The preponderance of the evidence, as described in the Findings of Facts above, establishes that each Individual Defendant participated in, or controlled the common enterprises and the acts and practices giving rise to the Plaintiff's Complaint:

    a.   Alon Nottea owned, operated, and controlled the common enterprise

companies that marketed and sold the "AuraVie" and other skincare products though negative option continuity plans. Acting in concert with the other Defendants, Alon participated in, controlled, and had the authority to control, the activities of BunZai Media Group, Inc., Pinnacle Logistics, Inc., Media Urge, Inc., Adageo, LLC, and other "AuraVie" companies, including the activities alleged in Plaintiff's Complaint;

b.   Doron Nottea owned, operated, or controlled the common enterprise companies. Acting in concert with the other named Defendants, Doron participated in, controlled, or had the authority to control, the activities of BunZai Media Group, Inc., Pinnacle Logistics, Inc., Secured Commerce, LLC, and the other "AuraVie" companies, including the activities alleged in Plaintiff's Complaint.

c.   Igor Latsanovski owned, operated, or controlled companies that collectively marketed and sold "AuraVie" and other skincare products through negative option plans to consumers across the United States. Acting in concert with the other named Defendants, Latsanovski controlled, had the authority to control, or participated in the activities of BunZai Media Group, Inc., Pinnacle Logistics, Inc., CalEnergy,

Inc., Zen Mobile Media Group, Inc., and the other "AuraVie"

companies, including the activities alleged in Plaintiff's Complaint.

d.   Alan Argaman ("Argaman") owned, operated, or controlled

companies that collectively marketed and sold "AuraVie" and other

skincare products through negative option continuity plans to

consumers across the United States. Acting in concert with the other

named Defendants, Alan Argaman controlled, had the authority to

control, or participated in the activities of Secured Commerce, LLC,

Secured Merchants, LLC, and the other "AuraVie" companies,

including the activities alleged in Plaintiff's Complaint.

**2.   The Individual Defendants Acted With the Requisite Knowledge and Are Liable for Injunctive Relief**

*a.   No Showing of Actual Knowledge is Required*

110.   To obtain equitable monetary relief against an individual, the FTC must

show, in addition to participation *or* control, that the individual had some

knowledge of the company's deceptive acts or practices. *J.K. Publ'ns*, 99 F.

Supp. 2d at 1204.

111.   Individuals possess the requisite knowledge if they:

- had actual knowledge of the misrepresentations

- were recklessly indifferent to the truth or falsity of the misrepresentations

  or

- had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.

*FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc*., 875 F.2d 564, 574 (7th Cir. 1989).

112. The "degree of participation in business affairs is probative of knowledge." *Amy Travel Serv*., 875 F.2d at 574; FTC v. Sharp, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

113. An individual's "pervasive role and authority [at the company], which extended to almost every facet of the company's business and operations, also creates a strong inference that [he] had the requisite knowledge that [the] webpages were misleading. *Commerce Planet, Inc*., 878 F. Supp. 2d at 1082.

114. For example, evidence that an individual drafted the telemarketing scripts, hired personnel, controlled corporate finances, oversaw the daily sales operation, knew of consumer complaints and chargebacks, and served as principal shareholder and officer of the corporation can show actual knowledge of the illegal conduct. Id

115. "Nor is actual knowledge of the harm a requirement under the Act. Courts have long held that consumers are injured for purposes of the Act not solely

through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions." *Neovi,* 604 F.3d at 1156.

116. Significantly, proof of reckless indifference suffices. Reckless indifference exists where an individual knew the nature of the corporation's business, as well as the necessity and legal significance of actions such as signing documents or making representations on behalf of the corporation. J.*K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000); *see also Bay Area Bus. Council, Inc.*, 423 F.3d at 638 (finding reckless indifference where the individual was aware of consumer complaints and that banks were refusing to debit customers' accounts).

117. Reckless indifference to the truth or falsity of a misrepresentation has been established by factors such as the individual's review of misleading materials; receipt of reports regarding cancellations and refunds; discussion of the volume of consumer complaints; supervision of a marketing department; and pervasive role and authority within the entity. *Commerce Planet, Inc.*, 878 F. Supp. 2d at 1082.

118. Reckless indifference to the truth or falsity of misrepresentations can be established by awareness of "'red flags that would have led a reasonable

person to suspect something was amiss.'" *Ivy Capital, Inc.*, 616 F. App'x at 361(quoting *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010)). This includes awareness of consumer complaints; high costs; high chargeback rates; and the use of offshore accounts. Id.

119. Ignoring warning signs (such as disregarding customer complaints or failing to perform required actions or conduct any due diligence), engaging in suspicious financial practices, or making false statements, can demonstrate an awareness of a high probability of fraud and an intentional avoidance of such behavior. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010).

120. Awareness of a high probability of deceptive conduct has been found where an individual was included on emails discussing dishonest credit card chargeback practices; received documents discussing the entity's overall sales process; knew the entity had millions of dollars in sales but not if consumers recouped on their investment; and knew of consumer dissatisfaction and complaints to state attorneys general. Ivy Capital, Inc., 2013 WL 1224613, at *15-16.

121. In this action, high customer complaint and chargeback rates provided Defendants with notice of a high probability of fraud or unfairness. *See FTC v. Windward Mktg., Ltd.*, No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at

*11–*12 (N.D.Ga. Sept. 30,1997 (although defendant did not itself make any misrepresentations or initiate the fraudulent scheme, the court imposed liability under the FTC Act because it "facilitated and provided substantial assistance to [a] ...deceptive scheme").

122. Nonetheless, evidence was presented to demonstrate such intent in this case.

*b.   An Intent to Deceive is Not Required*

123. The FTC is not required to prove that an individual actually intended to deceive to establish knowledge. *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171; *World Media Brokers*, 415 F.3d at 764; *Amy Travel Serv.*, 875 F.2d at 574.

124.   However, in this case, the FTC does make such a showing:

    a. In an audio-recorded business meeting with Co-Defendants Roi Reuveni and Paul Medina, Alon acknowledge that it was "completely illegal" not to disclose the terms of conditions of the AuraVie sales offer on invoices. (Ex. 165).

    b. Instead of taking corrective action, however, he conspired for ways to show compliance without clearly disclosing the offers' terms and conditions –which he believed would decrease sales. (See Id.)

      c.  The options he considered included feigning concern by recording interviews with dissatisfied customers to present in a potential FTC suit, indiscreetly disclosing terms "a little bit grayed out" on packing slips, or trying a test run with terms disclosed to gauge impact. (E.g., Ex. Id.).

125.  The preponderance of the evidence, as described in the Findings of Facts above, establishes that each Individual Defendant participated in, or controlled the common enterprises with knowledge:

      a.  Evidence that Alon acted with actual knowledge of the deceptiveness of the scheme is irrefutable;

      b.  The evidence also establishes that Doron knew about the deceptive and unfair practices of the business enterprise. Indeed, in an email about "our business," Doron acknowledged receiving warnings about possible FTC asset freezes and the "high risk nature of our business model." (Ex. 330);

      c.  Latsanovski disavows his participation in or control over the AuraVie companies. His Latsanovski's knowledge of the deceptive and unfair practices is also irrefutable. He received links to AuraVie's  deceptive "risk-free trial" and "trial order" offers. (Ex. 28). He was aware that the AuraVie companies experienced

high rates of consumer chargebacks—a strong indicator of consumer fraud—and that the AuraVie companies responded by managing chargeback rates through "load balancing." (Ex. 444; Ex. 445; see Ex. 235).

    d.  Because he designed, created, and helped manage the websites and landing pages used to promote the AuraVie "risk-free trial" and "trial order" offers, Argaman unquestionably knew of the deceptiveness of the AuraVie enterprise. However, the fact that he played a key role in refuting consumer chargebacks for the Corporate Defendants, individually and through Secured Merchants LLC, makes clear that Argaman either knew that the companies were engaged in deception or he was recklessly indifferent. Argaman was aware that the companies operated through dozens of shell entities and that they engaged in "load balancing" merchant accounts. (See, e.g., Ex. 449). Despite these clear indications of fraud, Argaman continued to participate in the scheme.

126.  Therefore, considering evidence detailed above, this Court should hold each of the Individual Defendants, Alon Nottea, Doron Nottea, Igor Latsanovski, and Alan Argaman, fully liable for the damage caused by AuraVie.

**G.    PLAINTIFF IS ENTITLED TO AN ORDER AGAINST EACH OF THE DEFENDANT WITH APPROPRIATE INJUNCTIVE AND EQUITABLE MONETARY RELIEF**

127.  Having found that the Individual Defendants and Corporate Defendants are liable for the FTC Act, ROSCA, and EFTA violations alleged, the Court next examines the proper forms of relief to be awarded.

*a.  Entry of a Permanent Injunction is Appropriate*

128.  Section 13(b) of the FTC Act authorizes courts to issue a permanent injunction whenever a Defendant violates the laws enforced by the Commission and is likely to continue to violate them.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. Medlab*, *Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009).

129.  To determine whether a Defendant is likely to engage in similar violations in the future, courts look to two general factors:

- the deliberateness and seriousness of the present violation, and
- the Defendant's past record with respect to deceptive and unfair marketing practices.

*Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*, 2013 WL 1224613, at *16.

130.   The court may also weigh the "adaptability or transferability of the unfair practice to other products." *Id*.

131.   Here, the Court notes that the Defendants collectively operated a massive consumer fraud for more than 5 years, causing injury to consumers nationwide.

132.   Further, this Court finds, based upon (a) the interconnectedness of the Defendants' corporations, as well as their shared offices, control persons, and employees (*See*, *e.g.*, Ex. 11; Ex. 13; Ex. 15; Ex. 16; Ex. 65; Ex. 155 p. 2; Ex. 531; Ex. 904 pp. 24, 26, 46-47; Ex. 910 ¶ 240; Dkt. 90-1 ¶¶ 15-17; Dkt. 391-3 ¶¶ 3-4, 7, 11-12; Dkt. 392-1 ¶¶ 1-2, 4, 12, 8; Dkt. 392-1 ¶¶ 3-5, 9 ; Dkt. 398-2 ¶¶ 6, 9, 27, 31-36; Dkt. 371-1 ¶¶ 21-23) and (b) the excessive chargeback rates (Ex. 507; Ex. 305; Ex. 307;Dkt. 391-3 ¶ 3), high numbers of consumer complaints (Ex. 907; Ex. 325; Dkt. 391-2 ¶ 14; Dkt. 391-3 ¶ 3), warnings from their attorney (Ex. 589) and from the BBB (Ex. 592), that Defendants were well-aware of the deceptiveness of the scheme.

133.   As far back as April 2012, Defendant Alon Nottea knew, and communicated to his Co-Defendants, that the business practices associated with AuraVie's online sale of negative option plans were likely to result in an enforcement action by the FTC. (Ex. 165; Dkt. 391-3 ¶ 17) .

134.  This Court therefore finds that Defendants are likely to engage in similar

violations in the future if not enjoined.

135.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), also gives the FTC

authority to seek, and the district court authority to grant, "any ancillary

relief necessary to accomplish complete justice." *H. N. Singer*, 668 F.2d at

1111–13.

136.  This Court finds that a permanent injunction against all Defendants is proper

and serves the public interest.

*b. The Scope of Injunctive Relief*

137.  "A court may frame an injunction based on violation of the FTC Act broadly

enough to prevent the defendant from engaging in similar illegal conduct in

the future." *Neovi*, No. 06-1952 JLS, 2010 WL 3789713, at *2 (citing *FTC*

*v. Colgate-Palmolive*, 380 U.S. 374, 395 (1965)).

138.  Numerous courts have imposed bans enjoining future participation in a

particular line of business. *See, e.g., Gill*, 265 F.3d at 957-58 (ban on

engaging in the credit repair business); *Ivy Capital*, 2013 WL 1224613, at

*16 (ban on business coaching); *John Beck Amazing Profits, LLC*, 888 F.

Supp. 2d at 1013 (ban on telemarketing and producing or disseminating

infomercials); *Grant Connect*, 827 F. Supp. 2d at 1233 (ban on marketing

and selling grant products and business opportunities); *FTC v. Dinamica*

*Financiera*, No. 2:09-03554, 2010 WL 9488821, at *12 (C.D. Cal. Aug. 19,

2010) (ban on loan modification and foreclosure relief services); *FTC v.*

*Neiswonger*, 494 F. Supp. 2d 1067, 1084 (E.D. Mo. 2007) (ban on

marketing  business opportunities); *FTC v. Bay Area Bus. Council, Inc.,* No.

02-C5762, 2004 WL 769388  (N.D. Ill. Apr. 16, 2004) (ban on

telemarketing and on sale of credit-related products), aff'd, 423 F.3d 627

(7th Cir. 2005); *FTC v. Credit Enhancement Servs.*, No. 02-2134 (E.D.N.Y.

Mar. 31, 2004) (ban on marketing or selling credit-related goods or

services); *FTC v. Consumer Alliance*, No. 02-C-2429 2003 WL 22287364

(N.D. Ill. Sept.29, 2003) (ban on telemarketing and sales of credit card

protection and credit-related products).

139.  Such a ban, prohibiting Defendants from engaging in future negative options

sales, is appropriate here.

*c. The Scope of Monetary Relief*

140.  In addition, where consumers suffer economic injury resulting from

Defendants' violations of the FTC Act, equity requires monetary relief in the

full amount of consumers' losses (or ill-gotten gains). *Stefanchik*, 559 F.3d

at 931(affirming summary judgment holding Defendants liable for the full

amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

141.   The FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id*. Instead, a presumption of actual reliance arises once the FTC has proven that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id*. at 605–06.

142.   "Total consumer loss is an appropriate measure of restitution under the FTC Act, and a district court need not exclude costs incurred in carrying out unfair practices from the restitution order." *Wells*, 385 Fed.Appx. at 713 (citing *Gill*, 265 F.3d at 958 and *Neovi,* 604 F.3d at 1159-60.

143.   "The FTC may seek full restitution from any individual who caused consumer harm through unfair practices." *Wells*, 385 Fed. Appx. at 713 (citing *Pantron I Corp*., 33 F.3d at 1101-04).

144.   To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate. *See Commerce Planet*, 878 F. Supp. 2d at 1089 (citing *Direct Mktg. Concepts*, 624 F.3d at 15; *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)). "Fuzzy figures due to

a Defendant's uncertain bookkeeping cannot carry a Defendants' burden to show inaccuracy." *Id*. (quoting *Direct Mktg. Concepts*, 624 F.3d at 15).

145. Where Defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

146. This Circuit and others have long applied joint and several liability where multiple defendants' conduct violated the FTC Act, without regard to whether the amount of redress exceeds the proceeds received personally by any given one of the Defendants. *See*, *e.g., FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996).

147. Here, Plaintiff has shown that a reasonable approximation of the Defendants' ill-gotten gains or consumer injury is $75,624,030.

148. Defendants have not come forward with evidence to rebut Plaintiff's estimation.

149. The Court therefore finds that the Individual Defendants and Corporate Defendants shall be jointly and severally liable for that amount.

## H. EQUITY DICTATES THAT THE RELIEF DEFENDANT MUST REFUND MONIES TO WHICH IT HOLDS NO LEGAL OR EQUITABLE TITLE

150. Plaintiff has shown, by a preponderance of the evidence, that Relief Defendant, Chargeback Armor, received $250,000 in funds traceable to the

1  consumer fraud at issue in this case and that equity dictates that these funds

2  be refunded.

3  151.  Chargeback Armor gratuitously received $250,000 from Secured Merchants,

4  as a loan or seed money. (Ex. 916-57 ¶ 235; Ex. 917-65 ¶ 235; Dkt. 231-1 at

5  53).

6  152.  Secured Merchants was paid $300,000 from SBM Management, for

7  handling the AuraVie chargebacks. (Ex. 918-57 ¶ 236).

8  153.  SBM Management derived its revenues directly from the sale-by-negative-

9  option of AuraVie products. (Decl. of Alon Dkt. 391-3 ¶¶ 7, 9).

10  154.  Disgorgement of funds is proper where, as here, Chargeback Armor, can

11  claim no legal entitlement to retaining the money. *See, e.g., FTC v. Ivy*

12  *Capital, Inc*., 2013 WL 1224613, at * 18 (relief defendant who was

13  responsible for keeping the books and for various operations or

14  administrative tasks is liable for disgorgement); *FTC v. Transnet Wireless*

15  *Corp*., 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (Relief Defendant liable

16  for the full amount off ill-gotten gains received without providing any

17  service to the corporate Defendants). *See also SEC v. Colello*, 139 F.3d 674,

18  677 (9th Cir. 1998) (summary judgment against a relief defendant who

19  failed to show a legitimate claim to the ill-gotten gains received); *FTC v.*

20  *Inc21.com Corp*., 745 F. Supp. 2d 975, 999-1009 (N.D. Cal. 2010), aff'd,

475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten gains as he was "president" of a corporation "in name only" and provided no services to the corporation); *FTC v. Holiday Enter*, 2008 WL 953358, at * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant who never performed work for defendant companies would not have a legitimate claim); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000).

155.  It is well-established that government agencies, in an effort to maximize the recovery of funds taken through fraud, may pursue individuals or companies even if they are no longer in possession of the ill-gotten assets. *See, e.g., CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012).

156.  Notably, although named only as a Relief Defendant, Chargeback Armor was also heavily entwined in the deceptive AuraVie operation.

157.  Argaman incorporated Chargeback Armor in concert with other Individual Defendants and was the company's Chief Technology Officer. (Ex. 404; Ex. 281 p. 3).

158.  Reuveni, an active participant in the AuraVie scheme, was the Customer Service Manager (Ex. 281 p. 3) and Chief of Operations of Chargeback Armor, Inc. (*See* Ex. 917 ¶ 237).

159.  Alon Nottea was President of Chargeback Armor. (Ex. 281 p. 3).

160.  A Chargeback Armor services agreement, dated March 2, 2015, listed the company's board of directors as including Alon and Argaman. (Dkt. 231-1 at 36). Its lease agreement authorized Doron and Argaman to receive mail sent to Chargeback Armor. (Ex. 365 p. 13).

161.  Chargeback Armor provided critical chargebacks refutation services the AuraVie enterprise needed to continue its deceptive operations. (Dkt. 231-1 at 5; *see also* Ex. 280; Dkt. 231-1 at 8).

162.  According to a Secured Merchants employee and purported Chargeback Armor CEO, Secured Merchants was "the technology company that developed the Chargeback Armor product" and subsequently "transition[ed] all clients to be billed" by Chargeback Armor. (Dkt. 231-1 p. 8).

163.  The appropriate remedy against Chargeback Armor is an equitable monetary judgment equivalent to the amount of ill-gotten gains that the relief defendant received. *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1273. Thus, Relief Defendant Chargeback Armor is liable to disgorge the $250,000 it gratuitously received from Defendants.

**THEREFORE,** the Court **FINDS** that:

Defendants Alon Nottea, Doron Nottea, Igor Latsanovski, Alan Argaman, Secured Merchants LLC, CalEnergy, Inc., directly or indirectly, violated Section 5 of the FTC Act by:

A.  Failing to disclose, or disclose adequately, material

terms and conditions of Internet sales offers, including but not limited to:

1. that consumers' credit or debit cards would be charged the full costs of "free trial" or "risk-free trial" products upon the expiration of a limited trial period;

2. the dates on which any trial period began and ended;

3. that consumers who accepted the trial offers would automatically be enrolled in an "auto-ship" or negative option plan in which additional products would be shipped and charges imposed onto consumers' credit or debit cards each month unless the consumer acted to affirmatively cancel the plan within a limited time period;

4. the costs of the negative option and the frequency and duration of recurring charges;

5. the means consumers needed to use to cancel the negative option program and avoid additional charges; and

6. the requirements of the sellers' return or refund policies;

B. Falsely representing, expressly or by implication, that consumers could try skincare products "risk-free";

C. Falsely representing, expressly or by implication, that the website or seller was accredited by and had a rating of "A-" with the Better Business Bureau;

D. Defendants, directly or indirectly, violated Section 5 of the FTC Act by unfairly imposing charges onto consumers' credit or debit cards without consumers'

express informed consent;

E.  Defendants, directly or indirectly, violated ROSCA by selling products over the Internet through a negative option without:

    1.  Clearly and conspicuously disclosing all material terms of the negative option before obtaining consumers' credit or debit card information;

    2.  Obtaining consumers' express informed consent before charging consumers' credit or debit cards; or

    3.  Providing a simple mechanisms for consumers to stop recurring charges to their credit or debit cards;

F.  Defendants, directly or indirectly, violated EFTA by debiting consumers' bank debit cards on a recurring basis without:

    1.  Obtaining a written authorization signed or similarly authenticated from consumers permitting preauthorized electronic fund transfers from their accounts; or

    2.  Providing a copy of the written authorization for preauthorized electronic fund transfers to consumers;

G.  The Corporate Defendants operated as a "common enterprise";

H.  The Individual Defendants:

    1.  Participated in *or* controlled the unlawful activities and are therefore liable for injunctive relief; and

    2.  Acted with actual knowledge of the law violations, reckless indifference to the violations, or with an

awareness of a high probability of fraud coupled with an intentional avoidance of knowledge, and therefore are additionally liable for equitable monetary relief;

I.   A permanent injunctive and equitable monetary relief in the amount of $75,624,030, jointly and severally against Defendants, is appropriate.

The Court further **FINDS** Relief Defendant did not have a legal or equitable claim to retain money received gratuitously from one of the defendants that was derived from the deceptive scheme. The Court **HOLDS** that disgorgement of these ill-gotten funds is appropriate.

_____
HON. GEORGE H. WU
DISTRICT COURT JUDGE

Submitted by:

*/s/ Reid Tepfer*
Reid Tepfer
Attorney for Federal Trade Commission