1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   FEDERAL TRADE COMMISSION   )
            Plaintiff         )
5     v.                      ) No. CV 15-4527-GW(PLAx)

6                             )

7   BUNZAI MEDIA GROUP, INC., )
    et al.,                   )
8          Defendants.        )

9                             )

10

11

12

13                      Thursday, February 18, 2016

14

15                      10877 Wilshire Boulevard
                        Suite 700
16                      Los Angeles, California

17

18

19

20          The above-entitled matter came on for

21   deposition, pursuant to Notice, at 8:59 a.m.

22

23

24

25

```
 1                 UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   FEDERAL TRADE COMMISSION    )
                                 )
 5           Plaintiff           )
                                 )
 6      v.                       ) No. CV 15-4527-GW(PLAx)
                                 )
 7   BUNZAI MEDIA GROUP, INC.,   )
     et al.,                     )
 8                               )
             Defendants.         )
 9                               )

10

11

12

13

14

15              DEPOSITION OF ALON NOTTEA, taken on

16   behalf of the Federal Trade Commission, at

17   10877 Wilshire Boulevard, Suite 700, Los Angeles,

18   California, commencing at 8:59 a.m., and concluding

19   at 5:04 p.m., on Thursday, February 18, 2016,

20   pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21   CSR No. 12598, a Certified Shorthand Reporter, in

22   and for the State of California.

23

24                              ***

25
```

3

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    A P P E A R A N C E S
 2
      For the Federal        U.S. FEDERAL TRADE COMMISSION
 3    Trade Commission:      REID TEPFER, ESQ.
                             1999 Bryan Street
 4                           Suite 2150
                             Dallas, Texas  75201-6808
 5                           (214) 979-9383
                             rtepfer@ftc.gov
 6
 7                           U.S. FEDERAL TRADE COMMISSION
                             LUIS H. GALLEGOS, ESQ.
 8                           1999 Bryan Street
                             Suite 2150
 9                           Dallas, Texas 76201-6808
                             (214) 979-9383
10                           lgallegos@ftc.gov
11
12    For the Defendants     CROSSWIND
      Alon Nottea and        ROBERT M. UNGAR, ESQ.
13    Roi Reuveni:           2190 North Beverly Glen Blvd.
                             Los Angeles, California  90077
14                           (818) 646-4750
                             rmu@crosswindlaw.com
15
16    For the Defendants     LAW OFFICE OF JEFFREY S. BENICE
      Igor Latsanovski       JEFFREY S. BENICE, ESQ.
17    and CalEnergy, Inc.    (Via Telephone)
                             3080 Bristol Street
18                           Suite 630
                             Costa Mesa, California  92626
19                           JSB@JeffreyBenice.com
20
21
22
23
24
25
```

4

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1                           I   N   D   E   X

 2

 3    WITNESS                 EXAMINATION              PAGE

 4    Alon Nottea            By Mr. Tepfer             7

 5    Afternoon Session                              149

 6

 7    DEPOSITION EXHIBITS              INITIAL REFERENCE

 8    Nottea Deposition Exhibit No.  18              86

 9    Nottea Deposition Exhibit No.  21              97

10    Nottea Deposition Exhibit No.  23             115

11    Nottea Deposition Exhibit No.  26             127

12    Nottea Deposition Exhibit No.  28             134

13    Nottea Deposition Exhibit No.  29             135

14    Nottea Deposition Exhibit No.  32             144

15    Nottea Deposition Exhibit No.  33             147

16    Nottea Deposition Exhibit No.  36             149

17    Nottea Deposition Exhibit No.  38             151

18    Nottea Deposition Exhibit No.  42             154

19    Nottea Deposition Exhibit No.  46             156

20    Nottea Deposition Exhibit No.  48             159

21    Nottea Deposition Exhibit No.  58             164

22    Nottea Deposition Exhibit No.  62             166

23    Nottea Deposition Exhibit No.  65             173

24    Nottea Deposition Exhibit No.  66             174

25
```

5

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

| | | |
|---|---|---|
| 1 | DEPOSITION EXHIBITS | INITIAL REFERENCE |
| 2 | (Continued) | |
| 3 | Nottea Deposition Exhibit No.  67 | 178 |
| 4 | Nottea Deposition Exhibit No.  76 | 180 |
| 5 | Nottea Deposition Exhibit No.  77 | 181 |
| 6 | Nottea Deposition Exhibit No.  83 | 187 |
| 7 | Nottea Deposition Exhibit No.  86 | 189 |
| 8 | Nottea Deposition Exhibit No.  93 | 194 |
| 9 | Nottea Deposition Exhibit No.  94 | 197 |
| 10 | Nottea Deposition Exhibit No.  95 | 199 |
| 11 | Nottea Deposition Exhibit No. 102 | 201 |
| 12 | Nottea Deposition Exhibit No. 103 | 204 |
| 13 | Nottea Deposition Exhibit No. 104 | 208 |
| 14 | Nottea Deposition Exhibit No. 105 | 209 |
| 15 | Nottea Deposition Exhibit No. 106 | 211 |
| 16 | Nottea Deposition Exhibit No. 107 | 212 |
| 17 | Nottea Deposition Exhibit No. 108 | 213 |
| 18 | Nottea Deposition Exhibit No. 109 | 214 |
| 19 | Nottea Deposition Exhibit No. 110 | 216 |
| 20 | Nottea Deposition Exhibit No. 149 | 224 |
| 21 | Nottea Deposition Exhibit No. 118 | 227 |
| 22 | Nottea Deposition Exhibit No. 122 | 228 |
| 23 | Nottea Deposition Exhibit No. 120 | 230 |
| 24 | Nottea Deposition Exhibit No. 125 | 232 |
| 25 | | |

6

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1                          INDEX

 2                       (Continued)

 3

 4

 5
                   INFORMATION REQUESTED
 6
                          None.
 7

 8

 9

10          QUESTIONS INSTRUCTED NOT TO ANSWER

11                 Page 235    Line 16

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1                    LOS ANGELES, CALIFORNIA
 2                 THURSDAY, FEBRUARY 18, 2016
 3                        8:59 A.M.
 4
 5                    ALON NOTTEA,
 6          called as a witness by and on behalf of
 7          the Plaintiff, being first duly sworn,
 8          was examined and testified as follows:
 9
10                      EXAMINATION
11  BY MR. TEPFER:
12     Q.   Okay.  Good morning, Mr. Nottea.  My name is
13  Reid Tepfer, and this is Luis Gallegos.  We're both
14  attorneys with the Federal Trade Commission, and we
15  represent the FTC in FTC vs. BunZai Media Group,
16  Inc., in the Central District of California.
17          Would Counsel please identify himself for
18  the record.
19          MR. UNGAR:  Yes.  Robert Ungar, U-n-g-a-r,
20  appearing with Alon Nottea.  And I just wanted to
21  put on the record that Robert Esensten, who
22  represents Motti Nottea and Doron Nottea, will --
23  earlier indicated that he was going to appear today,
24  but he sent me an email last night indicating that
25  he was unable to participate today and asked that I
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1    ask the FTC's lawyers to provide an extra copy of
 2    exhibits for me to take to or send to Mr. Esensten.
 3            MR. TEPFER:  Sure, we can do that.
 4            MR. UNGAR:  Oh, in that regard as well, I
 5    would like copies of exhibits from previous
 6    depositions where I've appeared telephonically.
 7            MR. TEPFER:  We should be able to do that as
 8    well, if we can -- I'll take a look and see what
 9    we've used, and we'll get you those copies.
10    BY MR. TEPFER:
11      Q.   Okay.  Well, I just have a few, sort of,
12    preliminary questions.
13            First, you understand, Mr. Nottea, that you
14    are under the same oath today as if you were in the
15    courtroom?
16      A.   I do.
17      Q.   And I'll just assume that you understand the
18    questions I ask, unless you tell me you don't
19    understand them.  And feel free to ask me to
20    rephrase, if that's okay.
21      A.   Will do.
22      Q.   And sometimes your attorney may object, and
23    I just ask that you please answer the question,
24    unless he instructs you not to do so.
25      A.   Understood.
```

9

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.   Is there anything that would prevent you

2   from thinking clearly and testifying truthfully

3   today?

4      A.   No.

5      Q.   And if at any time you need to take a break

6   during the deposition, just let me know.

7      A.   Thank you.

8      Q.   And have you ever had your deposition taken

9   before?

10      A.   I have.

11      Q.   How many times?

12      A.   I believe twice.

13      Q.   What was the first time you had your

14   deposition taken?

15      A.   The first time, I was around nine years old,

16   and I had an accident, and I was deposed for an

17   injury I had.  And the second time was with the case

18   with Dawn Goddard and Nancy Yalley.

19      Q.   Okay.  I want to talk a little bit about

20   your background.  Where were you born?

21      A.   Born in Israel.

22      Q.   And when did you come to the United States?

23      A.   1984.

24      Q.   Have you lived in L.A. ever since?

25      A.   I have.

10

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       Q.    And are you currently employed?

2       A.    I'm not.

3       Q.    What was your last job?

4       A.    My last job is working for my company called

5    Adageo.

6       Q.    Were you working anywhere else at that time?

7       A.    No.

8       Q.    What is a Adageo's business?

9       A.    It's a personal service marketing company

10   that I use for my consulting services.

11      Q.    And you consult with third party companies;

12   is that --

13      A.    I do.

14      Q.    Could you identify any of those companies

15   that you consult with through Adageo, that you

16   remember?

17            MR. UNGAR:   Objection as to the form of the

18   question.  It's vague and ambiguous.

19            THE WITNESS:   Media Urge.

20   BY MR. TEPFER:

21      Q.    Are there any others?

22            MR. UNGAR:   Same objection.

23            THE WITNESS:   Can you be a little more

24   specific?

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1   BY MR. TEPFER:

 2      Q.   Did Adageo enter into a formal contract with

 3   Media Urge for your consulting services?

 4           MR. UNGAR:  Objection as to the form of the

 5   question.  It's vague and ambiguous.

 6           THE WITNESS:  I don't believe so.

 7   BY MR. TEPFER:

 8      Q.   Who owns Media Urge, if you know?

 9      A.   Media Urge.

10           MR. UNGAR:  Objection as to the form of the

11   question.  Vague and ambiguous temporally.

12           THE WITNESS:  I don't know what you mean by

13   "owns."

14   BY MR. TEPFER:

15      Q.   Could you -- would you mind explaining what

16   about the "owns" that you don't understand, and I'll

17   rephrase it accordingly.

18           MR. UNGAR:  Objection as to the form of the

19   question.  It's argumentative.

20           THE WITNESS:  No.

21   BY MR. TEPFER:

22      Q.   Do you have any ownership interest in Media

23   Urge?

24      A.   No.

25           MR. UNGAR:  Objection to the form of the
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1    question.  It's vague and ambiguous temporally.
 2    BY MR. TEPFER:
 3        Q.    Who did you speak with at Media Urge when
 4    you entered into this consulting contract through
 5    Adageo?
 6        A.    I'm trying to recall.  Media Urge.  I don't
 7    recall.
 8        Q.    And before -- did you have any other, I
 9    guess, employment before you worked at Adageo?
10        A.    I worked at BunZai Media Group.
11        Q.    Do you recall the time period that you
12    worked at Adageo?
13        A.    Approximately 2012 'til today.
14        Q.    And do you recall the time period that you
15    worked at BunZai Media Group?
16        A.    From approximately 2010 'til 2013.
17        Q.    And why did you leave BunZai Media Group?
18        A.    Bad company.  Didn't make money.
19        Q.    Were you the owner of BunZai Media Group?
20        A.    I was one of them, yes.
21        Q.    Who were the other owners of BunZai Media
22    Group?
23        A.    Myself and Khristopher Bond.
24        Q.    Were there any others?
25        A.    No.
```

13

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1      Q.    Did you have any investors in BunZai Media

2    Group?

3      A.    I did.

4      Q.    Could you identify them?

5      A.    I had an investor named Pierre Teboul, and

6    then I had an investor named Igor Latsanovski.

7      Q.    And is that all of the investors, as far as

8    you know?

9      A.    Yes.

10          MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.

12          THE WITNESS:  Yes.

13   BY MR. TEPFER:

14     Q.    What sort of consulting services did Adageo

15   provide?

16     A.    Marketing.

17     Q.    Would that -- would that be, like,

18   consulting about, like, advertisements, or something

19   different?

20          MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous.

22          THE WITNESS:  Can you be more specific?

23   BY MR. TEPFER:

24     Q.    Did Adageo provide consulting services

25   about, I guess, continuity programs?

14

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.    No.

2      Q.    And I want to talk a little bit about BunZai

3  Media Group.

4            What industry was BunZai Media Group in?

5      A.    It was an online skin care retailing

6  business.

7      Q.    Did it do anything aside from that?

8      A.    No.

9            MR. UNGAR:  Objection as to the form of the

10 question.  It's vague and ambiguous.

11 BY MR. TEPFER:

12     Q.    And how did it market its products?

13     A.    Through straight sales, through risk free

14 trials.  Those are the two main areas.

15     Q.    Do you know approximately what the breakdown

16 between straight sales and continuity was for those

17 sales?

18           MR. UNGAR:  Objection as to the form of the

19 question.  It's vague and ambiguous.

20           THE WITNESS:  I would say it's about 80/20,

21 80 percent continuity, 20 percent straight sale.

22           MR. UNGAR:  Counsel, may I inquire?  Are you

23 ill?

24           MR. TEPFER:  No.  This is -- not that it's

25 really relevant, but I think it's asthma --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

           1           MR. UNGAR:  Well, it is --
           2           MR. TEPFER:  -- so --
           3           MR. UNGAR:  -- because I don't want to be
           4    infected --
           5           MR. TEPFER:  I'm not --
           6           MR. UNGAR:  -- and I'm sure my client
           7    doesn't want to be infected.  So we would like a
           8    disclosure if, in fact, you have an upper
           9    respiratory infection.
          10           MR. TEPFER:  Sure, I would disclose that if
          11    I did.  I don't believe that I do.
          12           MR. UNGAR:  Thank you.
          13    BY MR. TEPFER:
          14       Q.   I want to talk about Pinnacle Logistics.
          15    Have you ever heard of Pinnacle Logistics, Inc.?
          16       A.   I have.
          17       Q.   Do you own Pinnacle Logistics, Inc.?
          18       A.   I do not.
          19       Q.   Have you ever owned Pinnacle Logistics,
          20    Inc.?
          21       A.   I have not.
          22       Q.   And do you have, I guess, a share of
          23    ownership in Pinnacle Logistics, Inc.?
          24           MR. UNGAR:  Objection as to the form of the
          25    question.  It's vague and ambiguous.

16

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1          THE WITNESS:  I don't.

2    BY MR. TEPFER:

3        Q.   Have you ever worked at Pinnacle Logistics,

4    Inc.?

5        A.   I have not.

6        Q.   Do you know who owns Pinnacle Logistics,

7    Inc.?

8          MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous temporally.

10          THE WITNESS:  We're back to the "owns."

11   BY MR. TEPFER:

12       Q.   Sure.

13          Do you know who's CEO of Pinnacle Logistics,

14   Inc.?

15          MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous temporally.

17          THE WITNESS:  Are we talking when?

18   BY MR. TEPFER:

19       Q.   Have you ever known anyone who was a CEO of

20   Pinnacle Logistics, Inc.?

21       A.   Yes.

22       Q.   Who is that?

23       A.   Oz Mizrahi.

24       Q.   Did BunZai Media Group ever do any business

25   with Pinnacle Logistics, Inc.?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        A.    I don't believe so.

2        Q.    I've got a few companies I just want to sort

3    of run through.

4              Could you tell me where BunZai Media Group,

5    Inc., was initially located at in 2010?

6        A.    7900 Gloria Avenue, Van Nuys, California

7    91406.

8        Q.    And did it ever move anywhere else, aside

9    from that location?

10       A.    BunZai also had a mailing address at

11   16161 Ventura Boulevard, Number 378, Encino, 91436,

12   and no, it did not have any other locations.

13       Q.    And those mailing locations, were those

14   buildings or -- sorry -- were those like a P.O. Box?

15             MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous, and it's

17   compound.

18             THE WITNESS:  16161 was a P.O. Box.  7900

19   was a warehouse.

20   BY MR. TEPFER:

21       Q.    Oh, okay.  Do you know where Pinnacle

22   Logistics, Inc., was located?

23       A.    At 7900 Gloria Avenue in Van Nuys,

24   California 91406.

25       Q.    Do you know what Pinnacle Logistics, Inc.'s,

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    industry of business was?

2       A.   Yes, I do.

3       Q.   What was that?

4       A.   Call center and fulfillment services.

5       Q.   Aside from Oz Mizrahi, do you know anyone

6    else who has been employed by Pinnacle Logistics,

7    Inc.?

8            MR. UNGAR:  Objection as to the form of the

9    question.  Vague and ambiguous temporally.

10           THE WITNESS:  Yes.

11   BY MR. TEPFER:

12      Q.   Would you mind naming a few of them?

13      A.   Just one by one --

14      Q.   Just --

15      A.   -- start naming names?

16      Q.   Well, I suppose anyone that you know at

17   Pinnacle Logistics, Inc., if you could tell me

18   anyone you know who's in a management position at

19   Pinnacle Logistics, Inc., if you know.

20      A.   Roi Reuveni.

21           MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous, calls for

23   speculation, lacks foundation.

24   BY MR. TEPFER:

25      Q.   How do you know that Roi Reuveni was the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    manager of Pinnacle Logistics, Inc.?

 2        A.    He is my cousin.

 3        Q.    What -- do you know what DSA Holdings, Inc.,

 4    is?

 5        A.    It's a company.

 6        Q.    Do you know who owns or do you know who the

 7    CEO of DSA Holdings, Inc., is?

 8              MR. UNGAR:  Objection as to the form of the

 9    question, vague and ambiguous --

10              THE WITNESS:  I don't recall.

11              MR. UNGAR:  -- temporally.

12    BY MR. TEPFER:

13        Q.    Has BunZai Media Group ever done any

14    business with DSA Holdings, Inc.?

15        A.    I believe they have.

16        Q.    Do you recall what sort of business that

17    was?

18        A.    No.

19        Q.    Do you know if DSA Holdings, Inc., ever

20    marketed AuraVie SkinCare products?

21        A.    I think they did.

22        Q.    Do you know where DSA Holdings, Inc., was

23    located when it was -- or at any point, have you

24    ever known where DSA Holdings, Inc., was located?

25        A.    I don't recall their particular address.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    Do you know if they were located at

2   7900 Gloria?

3      A.    At some point, DSA particularly may have,

4   but it's -- it was an older company that was paused

5   for a while and then it got started again.  So DSA,

6   I think there was some history prior to 2010.  I

7   think it's an older company from 2006 or '7.

8      Q.    Mm-hmm.

9      A.    So I'm not really sure as to exactly the

10   relationship with BunZai, but there may have been

11   some.

12      Q.    What about Lifestyle Media Brands.  Do you,

13   have you ever heard of that company?

14      A.    I have.

15      Q.    And what business is Lifestyle Media Brands,

16   Inc., in?

17      A.    It's an online retailer for skin care

18   products.

19      Q.    And is that product AuraVie?

20      A.    Yes, it is.

21      Q.    Did it sell any other products, aside from

22   AuraVie?

23      A.    It may have sold Miracle Face Kit as well.

24      Q.    Did BunZai, I guess, receive proceeds from

25   the sale of AuraVie skin products from Lifestyle

21

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    Media Brands, Inc.?

2         A.    I don't believe so.

3         Q.    Do you know who the CEO of Lifestyle Media

4    Brands, Inc., is?

5              MR. UNGAR:  Objection as to the form of the

6    question.  Vague and ambiguous temporally.

7              THE WITNESS:  I don't recall.

8    BY MR. TEPFER:

9         Q.    And have you ever known anyone to, or

10   rather, have you ever known anyone who was the CEO

11   of Lifestyle Media Brands, Inc.?

12        A.    I should.

13        Q.    Why do you believe that you should?

14        A.    Because I was the CEO of BunZai, and if

15   people were doing business with BunZai, I'm pretty

16   much aware of which companies were.

17        Q.    Do you know if Lifestyle Media Brands, Inc.,

18   had a physical location -- or office space, rather?

19        A.    I don't.

20        Q.    Do you know if Lifestyle Media Brands, Inc.,

21   was ever located at 7900 Gloria?

22        A.    I don't recall.

23        Q.    Sure, sure.

24              Have you ever heard of Safehaven Ventures,

25   Inc.?

22

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.    I have.

2      Q.    How did you hear about Safehaven Ventures,

3   Inc.?

4      A.    It was a company that became a retail, an

5   online retail merchant for AuraVie.

6      Q.    Do you know who the CEO, or have you ever

7   known anyone to be the CEO of Safehaven Ventures,

8   Inc.?

9      A.    I do.

10     Q.    Who's that?

11     A.    I don't recall particularly --

12     Q.    Sure.

13     A.    -- as far as each one, so I can't -- for

14   this particular one, I don't recall.

15     Q.    Okay.  Do you -- do you recall, do you know

16   anyone who's ever been employed by Safehaven

17   Ventures, Inc.?

18     A.    Not that I can recall.  I'm sure there has.

19   If you want to be more specific, I can answer you.

20   I don't recall exactly who it was.

21     Q.    Sure.

22           I don't think -- did I -- did I ask -- well,

23   I'll just ask.

24           Was Safehaven Ventures, Inc., ever at

25   7900 Gloria, ever located there?

23

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       A.   I don't think so.

2       Q.   Do you know a company by the name of Agoa

3   Holdings, Inc.?

4       A.   I do.

5       Q.   What -- if you know, what is that company's

6   business?

7            MR. UNGAR:  Objection as to the form of the

8   question.  Vague and ambiguous temporally.

9            THE WITNESS:  Online merchant for skin care

10  product.

11  BY MR. TEPFER:

12      Q.   Have you ever known Agoa Holdings to be

13  engaged in any other business, aside from online

14  skin care products?

15           THE WITNESS:  There may have been some other

16  business dealings they were in, but I don't recall

17  particularly which ones.  There was some other stuff

18  going on with Agoa.  I don't remember exactly what.

19  BY MR. TEPFER:

20      Q.   Do you recall who the CEO of that company

21  is?

22      A.   I believe that's Roi.

23      Q.   And do you recall where -- or do you recall

24  any addresses for Agoa Holdings, Inc.?

25      A.    You must know that I -- there's a lot of

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1    addresses in this thing, so if you want to ask me an
2    address, I can refer to it --
3        Q.    Sure.
4        A.    -- but I can't recollect addresses.
5        Q.    Yeah, it's tough to keep that straight, I'm
6    sure.  I think --
7              Did Agoa Holdings --
8              MR. UNGAR:  I'm going to interpose an
9    objection, Counsel.  We don't need in the record
10   your characterization, your remarks, your comments,
11   your thoughts.  The record doesn't care.  We don't
12   care.  Let's just move on with the deposition.  If
13   you have comments, keep them to yourself.
14             Proceed.
15             MR. TEPFER:  Okay.  What was the last
16   question?
17             (The previous question was read back
18             by the court reporter as follows:
19                "QUESTION:  And do you recall
20             where -- or do you recall any
21             addresses for Agoa Holdings, Inc.?")
22   BY MR. TEPFER:
23       Q.    So did Agoa Holdings, Inc., market AuraVie?
24       A.    Yes.
25       Q.    Okay.  What about Zen Mobile Media, Inc.?

25

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the

2     question.  It's vague and ambiguous.

3     BY MR. TEPFER:

4          Q.   Did Zen Mobile Media, Inc., market AuraVie?

5          A.   Yes.

6          Q.   Do you know who the owner of, or rather, the

7     CEO of Zen Mobile Media, Inc., was?

8          A.   Igor Latsanovski.

9          Q.   Do you know where Zen Mobile Media, Inc.,

10    was located?

11         A.   The actual address?

12         Q.   Uh-huh.

13         A.   Don't recall.

14         Q.   Was it located at 7900 Gloria?

15         A.   I don't believe so.

16         Q.   Did you request that Igor Latsanovski

17    incorporate this company?

18         A.   I don't recall.

19         Q.   The companies that we've discussed so far,

20    did you request that any of the CEOs incorporate

21    those companies?

22         MR. UNGAR:  Objection as to the form of the

23    question.  It's vague and ambiguous, calls for a

24    memory test.

25         THE WITNESS:  No.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            2/18/2016

```
 1    BY MR. TEPFER:
 2        Q.   Do you know what Heritage Alliance Group,
 3    Inc., is?
 4        A.   I do.
 5        Q.   What is that?
 6        A.   It's a retailer for online skin care.
 7        Q.   Is that AuraVie?
 8        A.   Yes.
 9        Q.   Do you know where, or rather, was Heritage
10    Alliance Group located at 7900 Gloria?
11        A.   No.
12        Q.   Do you know anyone who's ever been a CEO of
13    Heritage Alliance Group?
14        A.   Tal Topel.
15        Q.   Who's Tal Topel?  Is he -- or rather, was
16    Tal Topel ever an employee of BunZai Media Group?
17        A.   No.
18             MR. UNGAR:  Objection as to the form of the
19    question, it's vague and ambiguous, and it's
20    compound.
21             THE WITNESS:  He was not.
22    BY MR. TEPFER:
23        Q.   Was Roi Reuveni ever an employee of BunZai
24    Media Group, Inc.?
25        A.   I believe he was.
```

27

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1      Q.   Was Doron Nottea ever an employee of BunZai
 2   Media Group, Inc.?
 3      A.   No.
 4      Q.   Was Motti Nottea ever an employee of BunZai
 5   Media Group, Inc.?
 6      A.   He wasn't an employee, no, but I believe
 7   there was some -- for now, no.
 8      Q.   Sorry.  I didn't --
 9      A.   The answer is no.
10      Q.   Oh, okay.  Did he ever do any work for
11   BunZai Media Group, Inc.?
12      A.   No.
13      Q.   Did he ever sign documents on behalf of
14   BunZai Media Group, Inc.?
15      A.   Yes.
16      Q.   Do you recall what those documents were?
17      A.   Few merchant account applications.
18      Q.   Do you know who requested that he sign those
19   merchant account applications?
20      A.   I did.
21      Q.   Why did you ask Motti Nottea to sign
22   merchant account applications?
23      A.   I was going to do it under myself, and I
24   lost my credit a few years before that, and my
25   credit wasn't good enough to establish merchant
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                         2/18/2016

1   accounts under my name, so I reached out to my dad

2   for help.

3       Q.   Did you ever request that anyone else, to

4   your recollection, sign merchant account

5   applications for BunZai Media Group?

6           MR. UNGAR:  Objection as to the form of the

7   question, it's vague and ambiguous.

8           THE WITNESS:  No.

9   BY MR. TEPFER:

10      Q.   Did you ever request that anyone else ever

11  sign merchant account applications that were to be

12  used for the sale of AuraVie products?

13          MR. UNGAR:  Objection as to the form of the

14  question, it's vague and ambiguous.

15          THE WITNESS:  No.

16  BY MR. TEPFER:

17      Q.   Have you ever heard of AMD Financial

18  Network, Inc.?

19      A.   I have.

20      Q.   Where have you heard of that company?

21      A.   I believe it's another retailer for online

22  skin care products.  AuraVie is one of them.

23      Q.   And do you know where that company was

24  located?

25      A.   An actual address, no.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1      Q.   Do you know if that company had an actual
 2   address?
 3      A.   Every company has an actual address.
 4      Q.   Did you, to your recollection, ever visit
 5   AMD Financial Network, Inc., at its physical
 6   address?
 7           MR. UNGAR:  Objection as to the form of the
 8   question.  It's vague and ambiguous, and it borders
 9   the metaphysical.
10           MR. TEPFER:  Counsel, please limit your
11   objections to those permitted under the Federal
12   rules.
13           MR. UNGAR:  Oh, I think that is exactly
14   permitted under the Federal rules, Counsel.  Do you
15   have another question?
16           MR. TEPFER:  I believe there's a question
17   pending.
18           Can you --
19           MR. UNGAR:  What's the question?
20           THE WITNESS:  Can you repeat the question?
21           (The previous question was read back
22           by the court reporter as follows:
23               "QUESTION:  Did you, to your
24           recollection, ever visit AMD
25           Financial Network, Inc., at its
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1              physical address?")

2              THE WITNESS:  Not to my recollection.

3     BY MR. TEPFER:

4        Q.   Do you know if BunZai Media Group had a

5     contractual relationship with AMD Financial Network?

6        A.   Yes, it did.

7              MR. UNGAR:  Objection as to the form of the

8     question.  It's vague and ambiguous.

9              THE WITNESS:  Yes, it did.

10    BY MR. TEPFER:

11       Q.   What was that contractual relationship for?

12       A.   For the retailing of skin care products

13    online.

14       Q.   Did you negotiate that contract yourself

15    personally?

16       A.   No.

17       Q.   Do you know who did negotiate that contract?

18       A.   I believe Khristopher Bond did.

19       Q.   Who was typically tasked with negotiating

20    these contracts with additional companies for the

21    sale of AuraVie products?

22             MR. UNGAR:  Objection as to the form of the

23    question.  It's vague and ambiguous.

24             THE WITNESS:  You have to be more specific.

25             MR. UNGAR:  Calls for -- calls for

31

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                              2/18/2016

1    speculation --

2    BY MR. TEPFER:

3       Q.   Would --

4            MR. UNGAR:  -- and it assumes facts not in

5    evidence.

6    BY MR. TEPFER:

7       Q.   Who -- did you ever negotiate contracts with

8    any of these companies we've been discussing for the

9    sale of AuraVie products?

10           MR. UNGAR:  Objection as to the form of the

11   question.  Vague and ambiguous, calls for a memory

12   test.

13           THE WITNESS:  No.

14   BY MR. TEPFER:

15      Q.   What about Merchant Leverage Group, Inc.;

16   have you ever heard of that company?

17      A.   I did.

18      Q.   And what is that company's business?

19      A.   It was supposed to be a merchant sub ISO,

20   which never materialized.  So it's a company that

21   opened and nothing really happened with it.

22      Q.   Was -- did you help, I guess, incorporate

23   that company?

24      A.   I don't recall.

25      Q.   Do you know who was the CEO of Merchant

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Leverage Group?

2          MR. UNGAR:  Objection as to the form of the

3    question.  Vague and ambiguous temporally.

4          THE WITNESS:  I think it was my dad.

5    BY MR. TEPFER:

6      Q.   What about Shalita Holdings, Inc.; have you

7    ever heard of that company?

8      A.   I have.

9      Q.   And what is that company?

10     A.   An online retailer for AuraVie.

11     Q.   Do you know where that company -- or are you

12   aware of any physical addresses for Shalita

13   Holdings, Inc.?

14     A.   Off the top of my head, no.

15     Q.   Have you ever visited any physical address

16   for Shalita Holdings, Inc.?

17         MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, and it borders

19   on the metaphysical.

20         THE WITNESS:  Not to my recollection.

21   BY MR. TEPFER:

22     Q.   Do you know if Shalita Holdings, Inc., was

23   ever located at 7900 Gloria?

24     A.   I don't believe it was.

25     Q.   Have you ever heard of All Star Beauty

33

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Products, Inc.?

2          A.    I have.

3          Q.    And was that company also an online retailer

4      of AuraVie products?

5          A.    AuraVie and some other product as well.

6          Q.    What were those other products?

7          A.    I believe there was Pete Rose bat, a bat for

8      Pete Rose or some memorabilia or something like

9      that --

10         Q.    Okay.

11         A.    -- that it retailed.

12         Q.    Have you ever heard of Adageo, LLC?

13         A.    I have.

14         Q.    Sorry.

15              Was that the company we were discussing

16     earlier, that you did consulting through?

17         A.    Yes.

18         Q.    Okay.  Sorry.

19              Media Urge, Inc., you mentioned that

20     company.  Could you tell me what is that company's

21     business?

22         A.    It was kind of a marketing entity that tries

23     to develop new products or market strategies.

24         Q.    Do you know if that company ever marketed

25     AuraVie SkinCare products?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.   It's hard to answer your question.  You have
2   to be more specific.
3      Q.   Well, did that company, to your knowledge,
4   ever create advertisements for AuraVie SkinCare
5   products?
6      A.   Yes.
7      Q.   Did that company ever, I guess, interact
8   with affiliate networks who sold AuraVie SkinCare
9   products?
10          MR. UNGAR:  Objection as to the form of the
11   question.  It's vague and ambiguous.
12          THE WITNESS:  Yes.
13   BY MR. TEPFER:
14      Q.   Do you know if Nastassia Yalley was an
15   employee of Media Urge, Inc., at any point?
16          MR. UNGAR:  Objection as to the form of the
17   question.  It's vague and ambiguous.
18          THE WITNESS:  I think she was.  I think she
19   was.  I'm not sure exactly where she was, is
20   employed, if she was employed -- if it was a
21   company, but she was -- she was there for a while.
22   BY MR. TEPFER:
23      Q.   Sure.
24          Was she ever an employee at BunZai Media
25   Group, Inc.?

35

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

 1       A.   Yes, she was.

 2       Q.   Did you hire her?

 3       A.   No.

 4       Q.   Do you know who did?

 5       A.   Khristopher did.

 6       Q.   Do you recall what her -- when she was first

 7  hired, what her job title was?

 8       A.   She was kind of everything.  Affiliate

 9  manager, accounting.  She was kind of right hand.

10  It was -- she was the first employee.

11       Q.   Do you know who Alan Argaman is?

12       A.   I do.

13       Q.   How do you know Alan Argaman?

14       A.   Met him about 25 years ago.  We both sold

15  computer hardware.

16       Q.   Do you know what Secured Commerce, LLC, is?

17       A.   Sounds like a company.

18       Q.   Have you ever heard of it before?

19       A.   I have.

20       Q.   Where did you hear of it?

21       A.   It was through being close to -- to -- it's

22  a company that was doing some business with BunZai,

23  I think, selling some shipping or selling some

24  services.

25       Q.   Mm-hmm.  Do you know if your brother had an

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

36

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   ownership interest in Secured Commerce?

2       A.   I --

3            MR. UNGAR:  Objection as to the form of the

4   question.  It's vague and ambiguous.

5            THE WITNESS:  I'm not sure.

6   BY MR. TEPFER:

7       Q.   Do you know if Alan Argaman ever had an

8   ownership interest in Secured Commerce, LLC?

9       A.   I believe so.

10      Q.   Do you recall -- or rather, were you the

11  individual who, I guess, communicated with Secured

12  Commerce, LLC, about its business with BunZai Media

13  Group?

14      A.   No.

15      Q.   Do you know who that was?

16      A.   It was dealing with shipping.  May have been

17  somebody in the warehouse, or maybe Paul Medina.

18      Q.   Do you know if Secured Commerce, LLC, had

19  anything -- or had ever created AuraVie landing

20  pages?

21      A.   No.

22           MR. UNGAR:  Objection as to the form of the

23  question.  It's vague and ambiguous.

24  BY MR. TEPFER:

25      Q.   Did BunZai Media Group ever receive any sort

37

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1   of, I guess, landing page optimization from Secured

 2   Commerce, LLC?

 3           MR. UNGAR:  Objection as to the form of the

 4   question.  It's vague and ambiguous.

 5           THE WITNESS:  No.

 6   BY MR. TEPFER:

 7      Q.   Do you know what Secured Commerce -- rather,

 8   Secured Merchants, LLC, is?

 9      A.   It's an IT company, office company.  Alan's

10   company.

11      Q.   Do you -- more specifically, do you know

12   what sort of IT work Secured Merchants engages in?

13      A.   A variety.  IT work, servers, IT.  You know,

14   IT stuff.  If you want to be specific, I can answer.

15      Q.   Sure.

16           Well, I guess, to talk specifically about --

17   well, first I'll ask did BunZai Media Group ever

18   receive any sort of IT assistance from Secured

19   Merchants, LLC?

20      A.   BunZai Media, I'm not sure.

21      Q.   Has any company -- have you ever worked at a

22   company that received IT support from Secured

23   Merchants, LLC?

24      A.   I think they did some stuff for Adageo as

25   well, so I have to say yes.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.   What sort of IT support did Secured

2   Merchants, LLC, provide to Adageo?

3      A.   I think phone numbers.  I think -- I think

4   they're phone providers or requested a few numbers

5   for them for -- for our phone system.

6      Q.   What -- was that a phone system for

7   customers to call in at?

8      A.   Just -- just kind of phone system, like

9   interoffice system.

10     Q.   Okay.  Have you ever -- have you ever heard

11   of SBM Management, Inc.?

12     A.   I have.

13     Q.   Do you know who the owner of SBM Management,

14   Inc., is?

15     A.   Yes.

16     Q.   Who is that?

17     A.   Stephan Bauer.

18     Q.   Did BunZai Media Group ever do any business

19   with SBM Management, Inc.?

20     A.   I don't believe so.

21     Q.   Has BunZai Media Group, to your knowledge,

22   ever made any payments to SBM Management, Inc.?

23     A.   Not to my recollection.

24     Q.   Has Adageo ever done business with SBM

25   Management, Inc.?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       A.    No.

2       Q.    How did you become familiar with SBM

3    Management, Inc.?

4       A.    I don't understand your question.

5       Q.    Well, where did you first hear about SBM

6    Management, Inc.?

7       A.    From Stephan Bauer.

8       Q.    So you just heard about it from speaking

9    with Stephan Bauer about his job, I guess?

10           MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.  But more

12   importantly, it's argumentative.

13           (Interruption in the proceedings)

14           MR. TEPFER:  I guess if we could go off the

15   record real quick.

16           (Mr. Benice joins the proceedings.)

17           MR. TEPFER:  And, Jeffrey, if you would just

18   sort of announce yourself for the record.

19           MR. BENICE:  Jeff Benice on behalf of

20   Defendants CalEnergy, Igor Latsanovski.

21           MR. TEPFER:  Thank you.

22           Would you mind reading back the last

23   question.

24           (The previous question was read back

25           by the court reporter as follows:

40

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1              "QUESTION:  So you just heard
2          about it from speaking with Stephan
3          Bauer about his job, I guess?")
4    BY MR. TEPFER:
5        Q.   And if you could answer?
6        A.   Yes.
7        Q.   Have you ever heard of Focus Media
8    Solutions, Inc.?
9        A.   I have.
10       Q.   Is that a company that you own?
11       A.   No.
12       Q.   Do you know who owns that company?
13           MR. UNGAR:  Objection as to the form of the
14   question.  Vague and ambiguous temporally.
15           THE WITNESS:  I -- I'm not sure.
16   BY MR. TEPFER:
17       Q.   Have you ever had an ownership interest in a
18   company that did business with Focus Media
19   Solutions, Inc.?
20           MR. UNGAR:  Objection as to the form of the
21   question.  Vague and ambiguous.
22           THE WITNESS:  No.
23   BY MR. TEPFER:
24       Q.   Have you ever received any money from Focus
25   Media Solutions, Inc.?

41

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                          2/18/2016

1      A.    No.

2      Q.    Do you know what Focus Media Solutions,

3 Inc.'s, business is?

4      A.    They're an online media company, marketing

5 company.

6      Q.    How did you learn that Focus Media

7 Solutions, Inc., is a online marketing company?

8      A.    It was ran by Paul Medina, and I

9 communicated with Paul.

10      Q.    Do you know if Focus Media Solutions, Inc.,

11 marketed any products by -- or -- by negative

12 option?

13      A.    No.

14      Q.    And that's -- just for clarity, that's no,

15 you don't know, or no, they didn't?

16      A.    If you can be a little bit more specific

17 with your question, I can give you a direct answer.

18 So as far as them marketing, do they have products?

19 I don't understand your question as far as --

20      Q.    Okay.  I guess to rephrase it, do you know,

21 do you have any knowledge if Focus Media Solutions,

22 Inc., markets any of its or does any marketing of

23 products that are sold by negative option?

24      A.    No.

25      Q.    Have you ever heard of Insight Media, Inc.?

42

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        A.    I have.

2        Q.    What is that company's business?

3        A.    Online retailer for skin care.

4        Q.    And is that skin care product AuraVie?

5        A.    It is.

6        Q.    And did that company, I guess -- did that

7    company have any business with BunZai Media Group,

8    Inc.?

9        A.    We're talking about Insight?

10       Q.    Yes.

11       A.    I don't believe it did.

12       Q.    Just two more here.

13             Have you ever heard of Kai Media, Inc.?

14       A.    I have.

15       Q.    And what is that company?

16       A.    An online retailer for AuraVie.

17       Q.    Okay.  And do you know who the CEO of Kai

18   Media, Inc., is?

19       A.    I don't know.

20             MR. UNGAR:  Objection as to the form of the

21   question.  Vague and ambiguous temporally.

22             THE WITNESS:  I don't remember.

23   BY MR. TEPFER:

24       Q.    Do you know who came up with the product

25   name AuraVie?

43

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

```
 1      A.    Khristopher Bond.

 2      Q.    Was AuraVie a product, or rather, was

 3  AuraVie BunZai Media Group's product?

 4            MR. UNGAR:  Objection as to the form of the

 5  question.  It's vague and ambiguous.

 6            THE WITNESS:  I believe so.

 7  BY MR. TEPFER:

 8      Q.    Would BunZai Media Group, to your knowledge,

 9  enter into, I guess -- would BunZai Media Group, to

10  your knowledge, receive commission for the sale of

11  AuraVie by other companies?

12            MR. UNGAR:  Objection as to the form of the

13  question.  It's vague and ambiguous.

14            THE WITNESS:  No.

15  BY MR. TEPFER:

16      Q.    Have you ever heard of CalEnergy, Inc.?

17      A.    I have.

18      Q.    What is that company?

19      A.    It's Igor's company.

20      Q.    And that's Igor Latsanovski?

21      A.    It is.

22      Q.    And has BunZai Media Group ever done any

23  business with CalEnergy, Inc.?

24      A.    I believe so.

25      Q.    What is that business?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1      A.    Igor loans money to the company.

2      Q.    And he loans it through CalEnergy; is that

3   correct?

4      A.    Based on my recollection, yes.

5      Q.    Do you recall what the terms of that, I

6   guess, that deal was for the -- the terms of the

7   loan, rather?

8            MR. UNGAR:  Objection as to the form of the

9   question.  It's vague and ambiguous and compound.

10           THE WITNESS:  Particularly, no.  We had many

11   things change, so if you be specific, I can answer

12   you.

13   BY MR. TEPFER:

14      Q.    Sure.

15           Did you all ever memorialize, I guess, the

16   terms of those loans?

17           MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous.

19           THE WITNESS:  We did a few memorializations.

20   It changed over time.

21   BY MR. TEPFER:

22      Q.    Was there ever any point where Igor

23   Latsanovski was considered for a ownership interest

24   in BunZai Media Group, Inc.?

25           MR. UNGAR:  Objection as to the form of the

45

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    question.  It's vague and ambiguous.

2            THE WITNESS:  No.

3    BY MR. TEPFER:

4      Q.   So I guess when -- I want to talk a little

5    bit about that investment.

6            When you negotiated the terms of that

7    investment, did you give Igor Latsanovski a

8    description of BunZai Media Group, the company?

9            MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous.

11           THE WITNESS:  Yes.

12   BY MR. TEPFER:

13     Q.   Did you discuss with Igor Latsanovski the

14   product that his investment would be used for?

15           MR. UNGAR:  Objection as to the form of the

16   question.  Vague and ambiguous temporally.

17           THE WITNESS:  I told him we were going to

18   retail skin care products, so the answer is yes.

19   BY MR. TEPFER:

20     Q.   Did you discuss with him how those products

21   would be sold?

22     A.   I did, but Igor's understanding and

23   knowledge of details of business models and online

24   weren't really there, so it was -- it was a little

25   bit more generic as far as online sales, skin care,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

46

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    generating interest with women and selling a good

2    product.

3        Q.   Did you ever -- oh, sorry.

4        A.   It could have been men as well.  Doesn't

5    have to be women.

6        Q.   Okay.  Did you ever show him the websites

7    that BunZai created for the sale of AuraVie?

8             MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.

10            THE WITNESS:  He never had an interest, and

11   he wouldn't really know what that stood for, so --

12   BY MR. TEPFER:

13       Q.   Do you know if -- did Igor Latsanovski ever

14   make recommendations about how to improve BunZai

15   Media Group's marketing strategies?

16       A.   He wouldn't know how, so no.

17       Q.   Did he ever provide assistance to BunZai

18   Media Group in obtaining new merchant accounts?

19       A.   No.

20       Q.   Did BunZai Media Group market AuraVie

21   SkinCare products outside of the United States?

22            MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous.

24            THE WITNESS:  No.  There was a small attempt

25   that was unsuccessful, and that didn't materialize

47

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

 1    either.

 2    BY MR. TEPFER:

 3        Q.    Where did BunZai Media Group attempt to

 4    market those products?

 5             MR. UNGAR:  Objection as to the form of the

 6    question.  It's vague and ambiguous.

 7             THE WITNESS:  I'm -- it was a long, long

 8    time ago.  I'm not really sure.  A lot of people

 9    were talking about different types of processing or

10    different types of pricing.  I wanted to learn the

11    business a little more to get some more metrics in

12    the business.  I don't remember exactly which --

13    where it was or through which contact, but I tried a

14    couple of thousand dollars and the monies didn't

15    make sense, and I just dropped it.  It was like

16    three, four years ago, and it just -- nothing

17    materialized from it.

18    BY MR. TEPFER:

19        Q.    Okay.  Have you ever heard of a company

20    called SkinCare OU?

21        A.    I have a recollection of that name.

22        Q.    Do you know what that company's business

23    was?

24             MR. UNGAR:  Objection as to the form of the

25    question.  It's vague and ambiguous.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1            THE WITNESS:  I don't remember.
 2    BY MR. TEPFER:
 3       Q.   Do you know if BunZai Media Group has ever
 4    done any business with a company called SkinCare OU?
 5       A.   I think you're talking about the same little
 6    test that was done.  I think there was 3- to $5,000
 7    of a test of some processing.  Didn't make sense.
 8    Merchant fees didn't work out.  The lady that
 9    introduced, the fees were too high --
10       Q.   Mm-hmm.
11       A.   -- and it just -- it just went away.  There
12    was some lady named Kristina who set up a merchant
13    account.  There was a few monies that went through
14    this account.  The fees were too high.  It didn't
15    make sense for this business model.  I don't even
16    remember getting the fund.  I think -- I think it
17    was a loss before it started.  There was no -- the
18    fees were more than the money that was supposed to
19    come in, so it just -- nothing happened with it.
20       Q.   Do you know who Oleg Trushlya is?
21            MR. UNGAR:  Do you want to spell that for
22    the record --
23            MR. TEPFER:  Sure.  We spelled it yesterday.
24            MR. UNGAR:  -- because I don't -- I can't
25    even understand what the name is.
```

49

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1          MR. TEPFER:  It's O-l-e-g T-r-u-s-h-l-y-a, I

2     think.

3     BY MR. TEPFER:

4          Q.   Does that sound familiar?

5          A.   No.

6          Q.   So you've never heard of Oleg Trushlya?

7          A.   Not sure.

8          Q.   Sure.

9               Have you ever heard of software called

10    Chargeback Armor?

11         A.   I have.

12         Q.   Did BunZai Media Group ever utilize this

13    software?

14         MR. UNGAR:  Objection as to the form of the

15    question.  It's vague and ambiguous.

16         THE WITNESS:  No.

17    BY MR. TEPFER:

18         Q.   Do you know who created Chargeback Armor

19    software?

20         A.   Particularly, no.

21         Q.   How did you learn about Chargeback Armor

22    software?

23         A.   I learned about it from Alan Argaman.

24         Q.   Was Alan Argaman, to your knowledge, using

25    Chargeback Armor software in any of his businesses?

50

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's vague and ambiguous, calls for
3     speculation, lacks foundation.
4          THE WITNESS:  I have no idea.
5     BY MR. TEPFER:
6       Q.   What did Alan Argaman tell you about
7     Chargeback Armor software?
8       A.   I don't recall.
9       Q.   Did you ever solicit an investment from Igor
10    Latsanovski for the creation of a company called
11    Chargeback Armor, Inc.?
12      A.   I did.
13      Q.   Was that a company that you founded?
14      A.   No.
15      Q.   Why did you solicit an investment from Igor
16    Latsanovski for Chargeback Armor, Inc.?
17      A.   I believed in the business model and wanted
18    to get a piece of the action.
19      Q.   Do you know who owns Chargeback Armor, Inc.,
20    at this point?
21      A.   Michael Costache.
22          MR. UNGAR:  Objection as to the form of the
23    question.  Vague and ambiguous.
24          THE WITNESS:  I believe it's -- it's -- it's
25    owned -- I don't know exactly what you mean.  Like I

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            2/18/2016

```
 1    said, "owned" for me is a weird word -- Michael

 2    Costache.

 3    BY MR. TEPFER:

 4        Q.   Did you ever or have you ever at any point

 5    had an ownership interest in Chargeback Armor, Inc.?

 6        A.   No.

 7        Q.   Have you ever done any work on behalf of

 8    Chargeback Armor, Inc.?

 9             MR. UNGAR:  Objection as to the form of the

10    question.  Vague and ambiguous.

11             THE WITNESS:  I attempted to talk to Igor.

12    Does that work?

13    BY MR. TEPFER:

14        Q.   Sure.

15        A.   You know --

16        Q.   Aside from, you know, that investment

17    solicitation, have you ever done any other work for

18    Chargeback Armor, Inc.?

19        A.   For a while I really believed that this is

20    something I want to become part of, so yeah, there

21    was a month or two where I sent some emails and I

22    tried to make introductions and I tried to be a part

23    of it, but when Igor said no, I kind of lost my air.

24    The only way that I could be there was to bring

25    money, and when Igor told me no, it's kind of like
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    moving on.

2        Q.   And did you ever, I guess, invest any of

3    your -- your own personal money into Chargeback

4    Armor, Inc.?

5        A.   I did not.

6        Q.   Did any -- did you ever invest any other

7    company's money in which you have an ownership

8    interest in, into Chargeback Armor, Inc.?

9        A.   I did not.

10       Q.   To your knowledge, was Doron Nottea ever

11   employed by Chargeback Armor, Inc.?

12       A.   I don't believe so.

13       Q.   Do you know if Doron Nottea ever did any

14   work on behalf of Chargeback Armor, Inc.?

15       A.   I have no idea.

16       Q.   Did you ever have a Chargeback Armor, Inc.,

17   email address?

18       A.   I did.

19       Q.   Do you know if Doron Nottea did as well at

20   any point?

21       A.   Not --

22            MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous.

24            THE WITNESS:  Not to my recollection.

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1   BY MR. TEPFER:

2       Q.   Do you know if Roi Reuveni ever worked at

3   Chargeback Armor, Inc.?

4       A.   He may have consulted.  I don't know if he

5   worked there.  I don't know.

6       Q.   Do you know if Alan Argaman ever worked at

7   Chargeback Armor, Inc.?

8       A.   No idea.

9       Q.   Do you know if Secured Merchants ever

10  contested any chargebacks on behalf -- or any

11  consumer chargebacks on behalf of BunZai Media

12  Group, Inc.?

13          MR. UNGAR:  Objection as to the form of the

14  question.  Vague and ambiguous.

15          THE WITNESS:  No, they didn't.

16  BY MR. TEPFER:

17      Q.   Do you know if Pinnacle Logistics ever

18  contested any chargebacks on behalf of BunZai Media

19  Group, Inc.?

20          MR. UNGAR:  Objection as to the form of the

21  question.  Vague and ambiguous.

22          THE WITNESS:  If Pinnacle Logistics

23  contested on behalf of BunZai?

24  BY MR. TEPFER:

25      Q.   Mm-hmm.

54

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1      A.   No, they didn't.
 2      Q.   Do you know if Pinnacle Logistics, Inc.,
 3  ever contested any chargebacks, consumer
 4  chargebacks, from the purchase of AuraVie products?
 5           MR. UNGAR:  Objection as to the form of the
 6  question.  Vague and ambiguous.
 7           THE WITNESS:  I believe they did.
 8  BY MR. TEPFER:
 9      Q.   Why do you believe that?
10      A.   There was a Chargeback Department there.
11      Q.   So -- sorry.  I just wanted to clarify.  You
12  said Pinnacle Logistics was the Chargeback
13  Department there, and do you mean the Chargeback
14  Department at BunZai Media Group?
15           MR. UNGAR:  Objection as to the form of the
16  question.
17           THE WITNESS:  No.  I --
18           MR. UNGAR:  It's vague and ambiguous and it
19  misstates the prior testimony of the witness.
20           THE WITNESS:  Do you have a -- do you have a
21  question?  I'm not really sure what the question is.
22           MR. TEPFER:  Sure.
23           Could you read back the question.
24           MR. UNGAR:  Which one?
25           MR. TEPFER:  The last one.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

55

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1              (The previous question was read back
2              by the court reporter as follows:
3                  "QUESTION:  You said Pinnacle
4              Logistics was the Chargeback
5              Department there, and do you mean the
6              Chargeback Department at BunZai Media
7              Group?")
8              THE WITNESS:  Yes.  I think there's some
9    clarification.
10   BY MR. TEPFER:
11      Q.   Was Pinnacle Logistics, Inc., considered
12   the -- 0do you consider Pinnacle Logistics, Inc., to
13   be the Chargeback Department of BunZai Media Group,
14   Inc.?
15      A.   No.
16      Q.   Did Pin- -- to your knowledge, did Pinnacle
17   Logistics, Inc., sell AuraVie products?
18      A.   No.
19      Q.   Do you know why Pinnacle Logistics, Inc.,
20   would process chargebacks concerning AuraVie
21   products if they didn't sell those products?
22      A.   It's a service, just like a customer service
23   call center or fulfillment.  It's a service.
24      Q.   Did BunZai Media Group enter into a contract
25   with Pinnacle Logistics, Inc., for these services?

56

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2   question.  It's vague and ambiguous, and it's asked
3   and answered.
4          THE WITNESS:  No.
5   BY MR. TEPFER:
6     Q.   Do you know if they entered into a contract
7   with any other company that sold AuraVie products
8   for the -- processing these charges?
9          MR. UNGAR:  Objection as to the form of the
10  question.  Vague and ambiguous.
11         THE WITNESS:  I believe so.
12  BY MR. TEPFER:
13    Q.   Can you recall the names of any companies
14  specifically that Pinnacle Logistics provided these
15  services to?
16         MR. UNGAR:  Objection as to the form of the
17  question.  Vague and ambiguous.
18         THE WITNESS:  Some of the companies you
19  mentioned in the beginning of the deposition, one of
20  them being Kai Media or Agoa Holdings of such.
21  BY MR. TEPFER:
22    Q.   And I'll just -- I guess I'll, for clarity,
23  run down the list real quick.
24         Was DSA Holdings, Inc., one of those
25  companies, to your knowledge?

57

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

     1        A.    I'm not sure.

     2        Q.    Was Lifestyle Media Brands, Inc., one of

     3    those companies, to your knowledge?

     4        A.    Yes, sir.

     5        Q.    Was Agoa Holdings, Inc., one of those

     6    companies, to your knowledge?

     7        A.    Yes, it was.

     8        Q.    Was Zen Mobile Media one of those companies,

     9    to your knowledge?

    10        A.    Yes, it was.

    11        Q.    And what about Safehaven Ventures, Inc.?

    12        A.    Yes, it was.

    13        Q.    Heritage Alliance Group, Inc.?

    14        A.    Yes.

    15        Q.    AMD Financial Network, Inc.?

    16        A.    I believe so.

    17        Q.    SBM Management, Inc.?

    18        A.    No.

    19        Q.    Media Urge, Inc.?

    20        A.    No.

    21        Q.    Adageo, LLC?

    22        A.    No.

    23        Q.    CalEnergy, Inc.?

    24        A.    No.

    25        Q.    Kai Media, Inc.?

58

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
 1       A.   Yes.

 2       Q.   Insight Media, Inc.?

 3       A.   Yes.

 4       Q.   Focus Media Solutions?

 5       A.   No.

 6       Q.   USM Products, Inc.?

 7       A.   No.

 8       Q.   Merchant Leverage Group, Inc?

 9       A.   No.

10       Q.   DMA Media Holdings, Inc.?

11       A.   Maybe.

12       Q.   Shalita Holdings, Inc.?

13       A.   Yes.

14       Q.   And All Star Beauty Products, Inc.?

15       A.   Yes.

16       Q.   Okay.  At any point did BunZai Media Group

17  have in its name multiple merchant accounts that

18  were used to process the sales of AuraVie products?

19            MR. UNGAR:  Objection as to the form of the

20  question.  Vague and ambiguous.

21            THE WITNESS:  Be a little bit more specific.

22  BY MR. TEPFER:

23       Q.   Sure.

24            Did BunZai Media Group process sales for

25  AuraVie products through one merchant account or
```

59

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    through multiple, initially?

2            MR. UNGAR:  Objection as to the form of the

3    question.  Vague and ambiguous.

4            THE WITNESS:  Initially through one, and I

5    think we added a couple afterwards.

6    BY MR. TEPFER:

7       Q.   Do you know, I guess at the point that

8    BunZai Media Group had the most number of merchant

9    accounts in its name, do you recall about how many

10   that was?

11      A.   It's kind of weird to answer because there

12   may have been two that were then terminated and then

13   two more, so I don't know to answer you four or to

14   answer you two.  At a particular live time, two, to

15   my recollection.

16      Q.   Do you know if BunZai Media Group -- you

17   referred to the termination of merchant account.

18   Can you -- have you ever -- has BunZai Media Group

19   ever had a merchant account that was, I guess,

20   suspended by the merchant processor?

21           MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous, lacks

23   foundation --

24           THE WITNESS:  I don't recall.

25           MR. UNGAR:  -- calls for speculation.

60

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1             THE WITNESS:  I don't recall.

2      BY MR. TEPFER:

3          Q.    Do you recall if BunZai Media Group ever had

4      a merchant account terminated not by -- I guess not

5      by BunZai Media Group's decision?

6          A.    Terminated, no.  I remember held for a

7      while.  I don't remember terminated.

8          Q.    Do you remember which merchant processor, I

9      guess, held those funds?

10             MR. UNGAR:  Objection as to the form of the

11      question.  It's vague and ambiguous.

12             THE WITNESS:  I don't recall.

13      BY MR. TEPFER:

14          Q.    Do you recall why those funds were held?

15             MR. UNGAR:  Objection as to the form of the

16      question.  It's vague and ambiguous.

17             THE WITNESS:  No.

18      BY MR. TEPFER:

19          Q.    Do you recall about when that was?

20             MR. UNGAR:  Objection as to the form of the

21      question.  It's vague and ambiguous.

22             THE WITNESS:  Around 2011, maybe.

23      BY MR. TEPFER:

24          Q.    Could you explain why BunZai Media Group

25      established more than one merchant account?

61

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      A.    In order to grow.

2      Q.    And by that, do you mean that there is a

3  volume limit on a merchant account?

4      A.    Yes, sir.

5      Q.    Does that -- in your dealings with, I guess,

6  merchant processors, has the merchant processor ever

7  described to you the basis for determining their

8  volume limit?

9      A.    They have.

10      Q.    What do they -- and I guess are you

11  referring to a specific merchant processor that --

12      A.    No.  I was being more general.

13      Q.    Oh.  Well, in your understanding, what is

14  the basis for these merchant processors determining

15  their volume limits?

16          MR. UNGAR:  Objection as to the form of the

17  question.  Assumes facts not in evidence, it's vague

18  and ambiguous, calls for speculation, lacks

19  foundation.

20          THE WITNESS:  Previously --

21          MR. UNGAR:  Also, opinion as well.

22          THE WITNESS:  Previous history, time in

23  business, tax returns.  Normal stuff of how long

24  you've been in business in order to --

25  ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1   BY MR. TEPFER:
 2       Q.   Was it -- in your discussions with, I guess,
 3   merchant processors, did they ever describe, I
 4   guess, a company's chargeback ratio as being a
 5   consideration for the determination of a volume
 6   limit?
 7           MR. UNGAR:  Objection as to the form of the
 8   question.  It's vague and ambiguous.
 9           THE WITNESS:  Before setting up an account?
10   While you're in negotiations with them?  The answer
11   to your question is no.
12   BY MR. TEPFER:
13       Q.   In your -- I guess in your -- you know,
14   while running BunZai Media Group, in your
15   discussions with merchant processors, would you ever
16   discuss -- or would you ever discuss with them the
17   reserve amount for BunZai Media Group's merchant
18   accounts?
19       A.   Absolutely.
20           MR. UNGAR:  Objection as to the form of the
21   question.  It's vague and ambiguous.
22           THE WITNESS:  Yes.
23   BY MR. TEPFER:
24       Q.   Did they ever explain to you, I guess, the
25   reason why they set the reserve level where they do?
```

63

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1        A.    Yes.

2        Q.    Do you recall what the factors were that

3   they used to determine the reserve levels?

4        A.    Not particularly.

5        Q.    Do you know if chargeback ratios were one of

6   the considerations for the determination of reserve

7   levels?

8        A.    I believe they are.

9        Q.    Do you have any knowledge of what BunZai

10  Media Group's reserve level is compared to, I guess,

11  its industry at large?

12             MR. UNGAR:  Objection as to the form of the

13  question.  It's vague and ambiguous --

14             THE WITNESS:  I think --

15             MR. UNGAR:  -- calls for speculation, calls

16  for an expert opinion.  This is a lay witness.

17             Go ahead.

18             THE WITNESS:  I think you meant to say

19  "chargeback," not the word you used, so I think the

20  question is wrong.  I think the -- you used the

21  wrong word in your question, so the answer is no to

22  that one.

23             MR. UNGAR:  I'm going to interpose an

24  objection, Counsel.  You're going to have to hire

25  your own expert.  You can't use my client as your

64

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    expert.

2          MR. TEPFER:  Thank you.

3    BY MR. TEPFER:

4        Q.   Do you know who Philip Camareno is?

5        A.   I do.

6        Q.   Did he ever work for BunZai Media Group,

7    Inc.?

8        A.   He did.

9        Q.   Do you know if he ever worked for Doron

10   Nottea?

11       A.   He did.

12       Q.   Do you know in what capacity he worked for

13   Doron Nottea?

14       A.   First, I don't know if he worked for Doron.

15   He worked for maybe one of Doron's adult

16   companies --

17       Q.   Okay.

18       A.   -- but he was -- he was a bookkeeper.

19       Q.   Are you aware of Philip Camareno ever

20   representing that he was CEO of BunZai Media Group,

21   Inc.?

22       A.   Not to my recollection.

23       Q.   Are you aware of Motti Nottea ever

24   representing in any documents that he was CEO of

25   BunZai Media Group, Inc.?

65

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                   2/18/2016

1      A.    Not to my recollection.  I said before that

2    he filled out the merchant account.  I'm not sure

3    what position he wrote on his merchant account

4    initially.

5      Q.    The companies that we discussed earlier that

6    sell AuraVie products, can you recall if you

7    requested that any of your acquaintances open those

8    companies?

9          MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous.

11         THE WITNESS:  No.

12   BY MR. TEPFER:

13     Q.    Do you -- the companies that we discussed,

14   the companies that, I guess, are online retailers

15   for AuraVie -- I'll just call them AuraVie

16   companies -- are you aware of how -- I guess how

17   much the CEOs of those companies received in profit?

18         MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous, and it calls

20   for a memory test.

21         THE WITNESS:  Not exactly, no.

22   BY MR. TEPFER:

23     Q.    Do you know if the CEOs of the AuraVie

24   companies received 1 percent of processing through

25   merchant accounts in their names?

66

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's vague and ambiguous.
3          THE WITNESS:  Some of them did.
4     BY MR. TEPFER:
5     Q.    How do you know that?
6     A.    It's based on some of the relationships that
7     there were with these companies.
8     Q.    Did BunZai Media Group determine, I guess,
9     that 1 percent processing compensation amount?
10    A.    No.
11    Q.    Do you know who determined the 1 percent
12    processing payment amount?
13         MR. UNGAR:  Objection as to the form of the
14    question.
15         THE WITNESS:  No.
16         MR. UNGAR:  It's vague and ambiguous, it
17    assumes facts not in evidence.
18    BY MR. TEPFER:
19    Q.    Do you know, do you have any knowledge of
20    where, I guess, the rest of the AuraVie companies'
21    profit went?
22    A.    I do.
23         MR. UNGAR:  Objection as to the form of the
24    question.  It's vague and ambiguous, assumes facts
25    not in evidence.

67

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    BY MR. TEPFER:

2        Q.   Well, assuming -- I guess to talk about the

3    other 99 percent of what was processed through

4    merchant accounts in the name of the AuraVie

5    companies, do you know, do you have any knowledge of

6    what happened to that other 99 percent?

7            MR. UNGAR:  Objection as to the form of the

8    question.  It's vague and ambiguous.

9            THE WITNESS:  Daily operational business

10   expense.

11   BY MR. TEPFER:

12       Q.   And beyond the daily operational business

13   expense, I guess, to speak to the profits, do you

14   have any idea of what happened to the rest, the

15   remaining profits from the AuraVie companies?

16           MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous, it assumes

18   facts not in evidence.

19           THE WITNESS:  I do not.  I remember more

20   losses than profits.  I'm sorry.

21   BY MR. TEPFER:

22       Q.   And when you say that you remember more

23   losses than profits, are you speaking of the AuraVie

24   companies?

25           MR. UNGAR:  Objection as to the form of the

68

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    question.  It's vague and ambiguous as to the

2    meaning of "the AuraVie companies."

3            THE WITNESS:  Well, based on my

4    understanding of what you mentioned AuraVie

5    companies were two minutes ago, so that's what I'm

6    responding on behalf of.

7    BY MR. TEPFER:

8        Q.   Sure.  Yes.

9        A.   Was there a question?  I -- I'm sorry.  I

10   missed the question.

11           MR. TEPFER:  Would you read that back.

12           (The previous question was read back

13           by the court reporter as follows:

14               "QUESTION:  And when you say that

15           you remember more losses than

16           profits, are you speaking of the

17           AuraVie companies?")

18           THE WITNESS:  I am.

19   BY MR. TEPFER:

20       Q.   How did you become familiar with the AuraVie

21   companies', I guess, profit margin?

22           MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous, it assumes

24   facts not in evidence.

25           THE WITNESS:  I reviewed reports.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

69

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    BY MR. TEPFER:

2       Q.   So you would receive reports concerning the

3    profitability of the AuraVie companies?

4       A.   Sure.

5            MR. UNGAR:  Objection as to the form of the

6    question.  It's vague and ambiguous as to "AuraVie

7    companies."

8    BY MR. TEPFER:

9       Q.   And I guess -- and just to clarify, you

10   understand that AuraVie companies just refers to the

11   online retailers --

12           (Interruption in the proceedings)

13   BY MR. TEPFER:

14      Q.   I'm sorry.

15           -- online retailers of AuraVie SkinCare

16   products?

17           MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous as to "online

19   retailers of AuraVie products."

20           THE WITNESS:  I simply am talking about the

21   companies I said yes to a few minutes ago when you

22   asked me yes, no questions.

23   BY MR. TEPFER:

24      Q.   Right.  Right.  We'll agree that's the

25   definition.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          The reports that you said you received, can
2     you tell me as temporally, what period of time you
3     received these reports?
4          A.   As long as I was CEO.
5          Q.   Of BunZai Media Group, Inc.?
6          A.   Yes.
7          Q.   How often would you receive these reports?
8          A.   Biweekly or monthly.
9          Q.   Who would send these reports to you?
10         A.   Nastassia Yalley and Paul Medina.
11         Q.   Did anyone else ever draft these reports?
12         A.   No.
13         Q.   In addition to profits and losses, did these
14    reports contain any other information?
15         A.   No.
16         Q.   Did these reports ever contain information
17    concerning the AuraVie companies' chargeback ratios?
18              MR. UNGAR:  Objection as to the form of the
19    question.  It's vague and ambiguous temporally.
20              THE WITNESS:  Not necessarily.  And for me
21    those would fall into profits and losses, so --
22    BY MR. TEPFER:
23         Q.   Sure.
24              To your knowledge, did Doron have an office
25    located on Canby Avenue?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1      A.   Yes, he did.
 2           MR. TEPFER:  Actually, do you want to take a
 3  quick break?
 4           MR. GALLEGOS:  Sure.
 5           MR. TEPFER:  We've been going for an hour
 6  and 15.
 7           THE WITNESS:  No problem.
 8           (Recess)
 9           MR. TEPFER:  Back on the record.
10  BY MR. TEPFER:
11      Q.   Just to talk about, to run through the list
12  of companies that marketed online, marketed AuraVie
13  online by risk free trial, was BunZai Media Group,
14  Inc., one of those companies?
15      A.   Yes.
16      Q.   Was Pinnacle Logistics, Inc., one of those
17  companies?
18      A.   No.
19      Q.   Was DSA Holdings, Inc., one of those
20  companies?
21      A.   I believe so.  Not sure.
22      Q.   What about Lifestyle Media --
23      A.   Yes.
24      Q.   -- Brands?
25           Agoa Holdings?
```

72

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1        A.    Yes.

 2        Q.    Zen Mobile Media?

 3        A.    Yes.

 4        Q.    Safehaven Ventures?

 5        A.    Yes.

 6        Q.    Heritage Alliance Group?

 7        A.    Yes.

 8        Q.    AMD Financial Network?

 9        A.    Yes.

10        Q.    SBM Management?

11        A.    No.

12        Q.    Media Urge?

13        A.    No.

14        Q.    Adageo?

15        A.    No.

16        Q.    CalEnergy?

17        A.    No.

18        Q.    Kai Media?

19        A.    Yes.

20        Q.    Insight Media?

21        A.    Yes.

22        Q.    Focus Media --

23        A.    No.

24        Q.    -- Solutions?

25              Secured Commerce?
```

73

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1        A.    No.
 2        Q.    Secured Merchants?
 3        A.    No.
 4        Q.    USM Products?
 5        A.    No.
 6        Q.    Merchant Leverage Group?
 7        A.    No.
 8        Q.    DMA Holdings?
 9        A.    Maybe.
10        Q.    Shalita Holdings?
11        A.    No.
12        Q.    All Star Beauty Products?
13        A.    Yes.
14        Q.    And is it fair if I just refer to those
15   companies that you said yes to as AuraVie companies?
16        A.    Yes, as long as I get to clear up one thing.
17        Q.    Sure.
18        A.    Earlier I said I was reviewing reports for
19   BunZai Media Group, but a lot of these companies
20   didn't exist when BunZai Media Group existed, so
21   there's some time differences between what we're
22   speaking about.  The reports I reviewed were for
23   BunZai processing.
24        Q.    Sure.
25        A.    Earlier we mentioned the AuraVie group of
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1   companies, but some of those didn't exist in the

2   BunZai days.

3        Q.   So are you saying that you would, the

4   reports would only include, I guess, companies that

5   existed at the time that the report was made?

6        A.   It was -- it was for BunZai Media's

7   processing at that time.  Later on when some of

8   these companies were established and became

9   retailers and had stuff to review, it's a different

10  time period than the BunZai reviewing of reports.

11  That's all I'm saying.

12       Q.   So are you saying that the reports that you

13  reviewed only pertained to BunZai Media Group?

14       A.   At that particular time, yes.

15       Q.   And did you ever review reports that

16  included any of the other AuraVie companies?

17       A.   Later on I looked at some of those reports

18  as well --

19       Q.   Okay.

20       A.   -- but there was some time differences

21  between those two time periods.

22       Q.   Sorry.  I just misunderstood.

23            And you mentioned you were a CEO of BunZai

24  Media Group, Inc.  Could you describe what your

25  duties were as CEO of BunZai Media Group, Inc.?

75

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  Vague and ambiguous temporally.
3          THE WITNESS:  Overseeing the company, doing
4     what CEOs do.
5     BY MR. TEPFER:
6          Q.   Would -- oh, sorry.
7          A.   Yeah.
8          Q.   Were you -- would you, I guess, review the
9     company's advertising?
10         A.   Sometimes.
11         Q.   Would you review the company's sales
12    figures?
13         A.   Sure.
14         Q.   Would you review the company's, I guess,
15    refunds --
16         A.   Sure.
17         Q.   -- percentages?
18              And I believe you mentioned Roi Reuveni at
19    one point was an employee of BunZai; is that
20    correct?
21         A.   I think so.  There was right a time
22    before -- I think so.
23         Q.   Do you recall what period of time Roi
24    Reuveni was an employee of BunZai?
25         A.   I don't.  I don't.  He came in later.  I

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    don't recall the exact time.

2        Q.    Do you recall what Roi Reuveni's position

3    was at BunZai?

4        A.    He was an IT Manager.

5        Q.    Do you recall if Roi Reuveni ever worked in

6    the Customer Service Department at BunZai?

7        A.    He wasn't a Customer Service Rep, but he was

8    in the Customer Service Department and he helped

9    with IT stuff there and he helped the phone systems

10   there, yes.

11       Q.    And do you know if -- or did BunZai Media

12   Group have a Chargeback Department?

13       A.    I think so.  I don't know if it was

14   department, but yeah, there was a couple people

15   working on it.  Yeah.

16       Q.    Did Roi Reuveni, I guess, ever work on or

17   work in the Chargeback Department?

18       A.    Not that I recall.

19       Q.    Do you recall an employee named -- at BunZai

20   named Andrew Stanley?

21       A.    I remember Andrew Stanley.  I just don't

22   remember whether he was a BunZai employee or not,

23   but I remember Andrew Stanley, yes.

24       Q.    Can you recall anywhere that Andrew Stanley

25   worked at, to your knowledge?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.   I just don't know.  I think it was BunZai.

2   I think he was working with BunZai.

3      Q.   Do you know if he was ever an employee of a

4   company that you owned?

5           MR. UNGAR:  Objection as to the form of the

6   question.  It's vague and ambiguous.

7           THE WITNESS:  No.  There was some -- I just

8   don't know if he, if Andrew moved over to working

9   with Pinnacle or not.  I'm not really sure where --

10   where he was paid from.

11   BY MR. TEPFER:

12      Q.   Mm-hmm.  Did you review the company's, I

13   guess -- BunZai Media Group, Inc.'s, customer

14   service policies?

15           MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous, it assumes

17   facts not in evidence.

18           THE WITNESS:  Khristopher Bond was

19   responsible for hiring, managing, writing scripts,

20   dealing with the call center environment, working

21   with -- with the actual customer service reps.

22   Khristopher was -- you know, he used to come in, in

23   the morning, give these people a hug, sit with them,

24   you know, work with them on -- on how to improve

25   their business process and how to improve their

78

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    script.  It wasn't something that was -- English is

2    not my first language.  I can speak, obviously, but

3    it's -- Khristopher was much more of the guy who,

4    you know, sat in the Customer Service Department

5    and -- and performed and -- and, you know, filled

6    his duties.  I'm not so much into calls and customer

7    service and scripting and stuff like that.

8    BY MR. TEPFER:

9        Q.    To your knowledge, did BunZai Media Group

10   have a, sort of a standard operating procedure for

11   customer service?

12       A.    Probably.  I'm a big believer in SOPs.

13       Q.    Do you know -- and do you recall ever

14   reviewing the, I guess, the SOP for customer service

15   at BunZai Media Group?

16       A.    Most likely if it got through Khristopher's

17   eyes.  I'm not a big guy in reading.  I -- you know,

18   I don't read a lot of stuff too -- too deeply.  If

19   it looks good, it's there with manager, it got

20   approved from the department, it came to my desk,

21   looked good to me -- I don't -- I'm not a guy who

22   will read a hundred pages and look for the word.

23       Q.    Right.

24       A.    It's not my --

25       Q.    Do you recall if BunZai Media Group ever had

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                               2/18/2016

 1    a standard operating procedure for, I guess, Better

 2    Business Bureau complaints?

 3        A.    Probably.

 4        Q.    Do you recall reviewing that?

 5        A.    No.

 6        Q.    Do you think that it is likely that you

 7    reviewed that, if it exists?

 8              MR. UNGAR:  Objection as to the form of the

 9    question.  Vague and ambiguous.

10              THE WITNESS:  No.  I think it's likely

11    that's something Khristopher would review, and if he

12    would approve it, I would approve it.

13    BY MR. TEPFER:

14        Q.    When BunZai Media Group first opened, did

15    the company have department managers?

16        A.    No.

17        Q.    Did the company ever have department

18    managers?

19        A.    There was some managers.  I don't know

20    about, you know, department -- yeah, there was some

21    departments and some managers, yes.

22        Q.    Who were the managers over the, I guess,

23    generally speaking, over the entirety of BunZai's

24    existence?  Could you name some of those managers?

25        A.    I would say Andree Mansour was manager of

80

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

```
1    call center, Sandra Rubio was manager of
2    Resolutions.  That's about it.
3         Q.   There were only two managers that you're
4    aware of at BunZai Media Group, Inc.?
5         A.   Paul was kind of a manager.  Paul Medina was
6    kind of a manager.  It was a different department.
7    There wasn't really managers.  It was just kind of
8    get the work done kind of stuff, you know.
9         Q.   When you said Sandra was manager of
10   Resolutions --
11        A.   I guess I saw an email recently.  That's why
12   it came to my mind.
13        Q.   What is the, I guess, the Resolutions
14   Department?
15        A.   If there was any sort of complaint by a
16   customer, then I wanted to make sure that everything
17   would be handled professionally and there's no
18   damages to anybody and nobody feels like they got
19   the short end of the stick, so I had a person in
20   charge of making sure there was resolution to any
21   complaint.
22        Q.   Did Sandra report to you?
23        A.   No.
24        Q.   Who did she report to?
25        A.   To Khris.  Khristopher Bond.
```

81

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                      2/18/2016

1       Q.    Did you have a BunZai Media Group, Inc.,
2   email address?
3       A.    Yes.
4       Q.    Do you recall what it is?
5       A.    It was Alon at BunZai Media.
6       Q.    Do you recall if Doron, your brother, ever
7   had a BunZai Media address?
8       A.    I don't think so.
9       Q.    Do you know if Roi did?
10      A.    He may have.  He may have.
11      Q.    Do you happen to recall what it is?
12      A.    If it was, it's probably
13  roi@bunzaimediagroup.  Maybe Roi R.  But I don't
14  remember exactly.  I don't remember.  I don't
15  remember that email address.
16      Q.    Okay.
17      A.    I'm saying if he did, it would be Roi@.
18      Q.    What about -- did you use any other email
19  addresses to conduct business on behalf of BunZai
20  Media Group, Inc.?
21      A.    I had an email that I used called
22  vigorette@gmail.
23      Q.    Uh-huh.
24      A.    And -- and sometimes I would send to him
25  some emails from that email address as well.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1   Basically, my BunZai Media email was inside my

2   vigorette, so I can choose where I'm sending from.

3   So sometimes I didn't pay attention and an email

4   came out of vigorette instead of dropping the

5   drop-down and choosing BunZai Media.

6       Q.   Okay.  Did you ever conduct any other -- or

7   rather, did you ever use any other email addresses

8   to conduct BunZai business, that you recall?

9       A.   After BunZai I had Alon@MediaUrge.  I used

10  that email address.

11      Q.   In the Resolutions Department did Sandra, to

12  your knowledge, ever, I guess, draft reports about

13  her department concerning, I guess, complaints?

14      A.   I'm not sure.

15      Q.   Do you recall if you researched any reports

16  drafted by Sandra regarding complaints?

17      A.   Not to my recollection.  An actual report

18  about complaints, not to my recollection, but

19  there -- there may have been.  It was business and I

20  wanted reports on everything.  I'm a big reporting

21  guy.  Reports.  Somebody has to make a report.  They

22  have to work.

23      Q.   Would you typically review any reports

24  drafted by, I guess, the managers at BunZai Media

25  Group, Inc.?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.    I -- I -- we already answered that, and

2    that's the question you answered and I said yes to

3    that and yes.

4      Q.    Oh.

5      A.    Yes, I reviewed reports, but for me it was

6    more making sure there's an SOP.

7      Q.    Uh-huh.

8      A.    For me it was more making sure there's an

9    SOP and that somebody does a report and then sends

10   it to somebody below me.  It wasn't so much bring it

11   back to me.  Let's create a process that we're in

12   charge of, that I know the department is responsible

13   for that particular task, and then kind of maintain

14   it within their own chain of command.  I just wanted

15   to make sure that there is a report and an SOP.  And

16   if there is a complaint, make sure it gets solved.

17   If there's a happy customer, make sure we ask for a

18   referral.  I just like the stuff, you know, to work

19   and not, you know, fall between the cracks.

20     Q.    Okay.  Do you -- would you ever communicate

21   with Igor Latsanovski concerning BunZai Media Group,

22   through email?

23     A.    I'm sure there's a few emails, yeah.

24     Q.    Do you know what his email address is?

25     A.    Yeah.

84

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  Vague and ambiguous temporally.
3          THE WITNESS:  You mean Igor Latsanovski's
4     email address?
5     BY MR. TEPFER:
6          Q.   Do you know what Igor -- the email address
7     that you would send to him to communicate concerning
8     BunZai Media Group?
9          A.   I don't know the exact specifics of his
10    email, but I think it's Igor's gmail or something.
11    Igor --
12         Q.   Does igorlats@gmail.com sound correct to
13    you?
14         A.   Yeah.
15         Q.   Did you ever receive emails from Igor
16    concerning his company's investment in BunZai Media
17    Group?
18         A.   Not often.
19         Q.   But do you know if you -- you said "not" --
20         A.   Not to my recollection.
21         Q.   When did you initially receive -- or when
22    did BunZai Media Group initially receive its
23    investment from CalEnergy, Inc.?
24         A.   I don't know the -- the -- you know, if I
25    have to recall, it would have been somewhere in

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1    maybe end of 2010 or more towards the middle or end
 2    of 2010.  Somewhere around there.
 3        Q.   Did BunZai Media Group, Inc., ever pay back
 4    Igor Latsanovski's company?
 5        A.   I believe it did.
 6        Q.   Did BunZai Media Group, Inc., receive any
 7    subsequent investments from Igor Latsanovski's
 8    company?
 9            MR. UNGAR:  Objection as to the form of the
10    question.  It's vague and ambiguous.
11            THE WITNESS:  I don't know.  He kind of, you
12    know, gave me a line, and we tried to always pay
13    back this loan.
14    BY MR. TEPFER:
15        Q.   Was there ever any disputes between you and
16    Mr. Latsanovski concerning the repayments of any
17    loans?
18        A.   I wouldn't call it disputes, but there was
19    conversations.
20        Q.   What -- I guess, were those conversations
21    regarding the timeliness of BunZai Media Group's
22    repayment to CalEnergy?
23        A.   Sure.
24        Q.   Did BunZai Media Group ever have any
25    difficulties in repaying CalEnergy its loans?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        A.    Of course.

2        Q.    Would you say that that was a frequent

3    occurrence?

4        A.    Well, Igor is -- you know, he likes to know

5    where his money is.  So, you know, it's -- it's --

6    I'm not saying it's frequent, but, you know, when

7    you're commit to paying someone something back for

8    their money and it's not there, then you have to

9    have conversations about why not.

10       Q.    Okay.

11       A.    And Igor is not the guy who says he will

12   talk to you next month.  He wants to know why.

13       Q.    And did Igor frequently -- was there -- for

14   these loans, was there a standard, I guess, duration

15   for which these loans were to last from CalEnergy,

16   Inc.?

17            MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous.

19            THE WITNESS:  We always discuss some timing,

20   but it was clear that it was based on performance of

21   the business.

22            (Plaintiff's Exhibit 18 was

23            previously marked for identification

24            by the FTC and is attached hereto.)

25   ///

87

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                   2/18/2016

1    BY MR. TEPFER:

2        Q.   I'm now handing the witness what's been

3    marked as Exhibit 18.

4             And this is for Mr. Esensten.

5             Mr. Nottea, do you recall signing the

6    Partnership Agreements located in this document?

7        A.   There's a few here.  I'm not sure if it's

8    the same one or not.  There's a couple different

9    ones.

10       Q.   Sure.

11            Let's talk about first the signature on

12   18-3.  Do you recall signing that document?

13       A.   Is it okay just to turn up -- it's a little

14   cold -- just turning it up a little bit?

15       Q.   Yeah, yeah.  Sorry.

16       A.   Do I recall signing what's on 18-2 here

17   (indicating)?

18       Q.   3.

19       A.   18-3?

20       Q.   Uh-huh.

21       A.   Yes, I do.

22       Q.   And do you recall initialing 18-2?

23       A.   I do.

24       Q.   At the top of that highlighted portion,

25   which I highlighted --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1        A.    Okay.

2        Q.    -- it states, "Igor will invest 350K in

3    exchange for 55% ownership of BunZai Media Group."

4              Did, at any point, Igor Latsanovski have an

5    ownership interest in BunZai Media Group?

6        A.    No.

7        Q.    Do you recall why the terms of this

8    agreement did not come into fruition?

9        A.    This agreement was just something to have on

10   paper.  There was a test that we were doing at the

11   beginning because I obviously would not let anybody

12   have 55 percent of the company.  It was a test to

13   prove myself, to say show me what you can do, show

14   me you can bring in some orders, show me that you

15   can -- you are what you say, and then we'll

16   re-negotiate once we more forward.  So it was just

17   kind of a document to have in place so Igor could

18   feel secure about lending me some money.

19       Q.    Did you draft this Partnership Agreement?

20       A.    I did not.

21       Q.    Do you know who did?

22       A.    It looks like Khristopher Bond.  He was

23   usually the guy who would sit with -- because of

24   Igor's language, Khristopher would have a lot more

25   patience, he would have a lot more time.  I'm kind

89

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

 1   of a speak fast, move fast kind of guy, and

 2   Khristopher has patience to sit with Igor and write

 3   agreements and spend a day with him.  For me it's

 4   talk to me five minutes and get out of my face.

 5      Q.   At the bottom, that portion that I

 6   highlighted --

 7      A.   Okay.

 8      Q.   -- states "After month 2 of operations, the

 9   partners will divide 5% of the net profits of the

10   company on a monthly basis."

11         Do you know if that division of profits ever

12   occurred?

13      A.   Never, as far as what this says.

14      Q.   Uh-huh.  Was there ever a division of

15   profits between you and Mr. Bond and

16   Mr. Latsanovski?

17         MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, it assumes

19   facts not in evidence.

20         THE WITNESS:  You need to be more specific

21   with me.

22   BY MR. TEPFER:

23      Q.   Sure.

24         Well, I guess first I would ask, the loans

25   that CalEnergy provided to BunZai Media Group, did

90

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        2/18/2016

1    they have a consistent interest rate over the --
2    over the various loans that BunZai Media Group,
3    Inc., received?
4              MR. UNGAR:  Objection as to the form of the
5    question.  It's vague and ambiguous.
6              THE WITNESS:  Our general understanding was
7    that the minimum I would pay him would be 1 percent
8    a month for his money.  In general, the
9    understanding was if we're not doing well, if
10   there's not enough money to take out, if the company
11   doesn't do well or -- his money is basically a
12   1 percent per month loan.  If there's -- if we do
13   better than -- because we didn't know how to
14   classify it, then we -- we always try to find a way
15   to classify Igor, give him some -- some sort of
16   something to hold for his fear, for his investment.
17   But, you know, 1 percent a month interest was
18   basically the default if there was no money.  And
19   that happened a lot, where there was no money to
20   take out.  So it's 1 percent of his loan amount.
21   BY MR. TEPFER:
22      Q.   So the -- I guess the floor would be
23   1 percent interest on his loan; is that right?
24              MR. UNGAR:  Objection as to the form of the
25   question.  Vague and ambiguous.

91

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1              THE WITNESS:  Generally, yes.
 2    BY MR. TEPFER:
 3       Q.   And is it correct that if the business --
 4    you know, if BunZai Media Group is receiving profit,
 5    that, I guess -- that would increase the percentage
 6    that -- or increase the amount that Mr. Latsanovski
 7    would receive in return?
 8              MR. UNGAR:  Objection as to the form of the
 9    question.  It's vague and ambiguous, it's an
10    improper hypothetical, it calls for an opinion, it
11    calls for speculation, and it lacks foundation,
12    assumes facts not in evidence.
13              THE WITNESS:  No.
14    BY MR. TEPFER:
15       Q.   If the company was doing well, was there
16    ever a time where BunZai Media Group paid more than
17    the 1 percent interest monthly?
18       A.   I don't recall the particular -- the
19    particular times.  There wasn't some time that I
20    remember, but as far as exactly how, I think that
21    was kind of a good average to go by.  1 percent per
22    month.
23       Q.   Did Mr. Latsanovski ever receive any of
24    BunZai Media Group's profits from the sale of
25    AuraVie?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  Vague and ambiguous, assumes facts not in
3     evidence.
4          THE WITNESS:  No.
5     BY MR. TEPFER:
6        Q.   This other highlighted portion, sort of in
7     the middle on 18-2 --
8        A.   Okay.
9        Q.   -- it says, "Upon signing this agreement,
10    Igor shall invest $75K to run a continuity test for
11    30 days."
12       A.   Mm-hmm.
13       Q.   Do you know what this continuity test is
14    referring to?
15       A.   Yes.  Igor didn't believe that we can bring
16    in a consistent 20 sales a day or 30 sales a day,
17    and he wanted proof of that.
18       Q.   Did he explain why he didn't believe it
19    would be able to bring in that amount of sales?
20       A.   No.  He just -- he was -- he's not a -- he
21    doesn't believe you right off the bat.  He wants you
22    to show him.
23       Q.   Did you explain to him what this continuity
24    test would be?
25       A.   To the -- in the context of what I believed

Nottea
FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1   he would understand, yes.

2       Q.   Do you recall what you said to him?

3       A.   We're just going to generate a few orders

4   every day to show him some consistency, and once we

5   do that for -- I don't know, I don't remember if it

6   was 10 or 20, how many days that was -- that once I

7   proved that fact to him, that we would -- he would

8   then move forward.

9       Q.   And it says here, the next line, "During

10  this test, BunZai will purchase at least 1,000

11  orders (CPA of $45 to $50 each) within the first 15

12  days, and a conversion from Free Trial to

13  Transitional stage (day 16 to day 30) of at least

14  75% of these orders."

15      I was wondering if you could -- do you know

16  what "CPA" stands for?

17      A.   Yes, I do.

18      Q.   What does it stand for?

19      A.   Cost per -- cost per action, actually.

20      Q.   And what is cost per action?

21      A.   What is cost per action?  Exactly what it

22  means, it's -- it's a cost for an action.  In

23  marketing terms it's an action, and in our language

24  it would be an acquisition, an acquisition of a

25  customer.

94

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Q.   And are those payments made to external
2   affiliates?
3      A.   Yes, they are.
4      Q.   Did you explain that to Mr. Latsanovski?
5      A.   I don't recall.
6      Q.   Do you recall if you explained to
7   Mr. Latsanovski what a conversion from free trial to
8   transitional stage is?
9      A.   I believe I did.
10      Q.   I want to jump to 18-6.  At the bottom, is
11   that your signature there?
12      A.   It looks like it is, yes.
13      Q.   And on 18-7, is that your signature there?
14      A.   Yes.  Looks like it.
15      Q.   Do you recall signing this agreement?
16      A.   Just one second.  Let me read.
17      Q.   Sure.
18      A.   Okay.  Go ahead.
19      Q.   Do you recall this agreement?
20      A.   Vaguely, but I do.
21      Q.   Do you know if this was the final
22   memorialization of the agreement between you,
23   Igor -- I guess between you and Igor?
24      A.   This is in 2011, so the answer would be
25   absolutely not.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.   Do you know if any future agreements were

2  ever memorialized?

3           MR. UNGAR:  Objection as to the form of the

4  question.  Vague and ambiguous.

5           THE WITNESS:  It's verbal memorialization.

6  BY MR. TEPFER:

7      Q.   Well, first let's talk -- yeah, let's talk

8  about verbal first.

9           Was there subsequent, I guess, verbal

10  agreements to this document?

11          MR. UNGAR:  Objection --

12          THE WITNESS:  Many.

13          MR. UNGAR:  -- as to the form of the

14  question.  Vague and ambiguous.

15  BY MR. TEPFER:

16     Q.   Do you -- I'm sorry.  Go ahead.

17     A.   Many.

18     Q.   And do you know if there were subsequent

19  written, I guess, contractual agreements concerning

20  your --

21     A.   I -- in my mind, written stuff with Igor, it

22  changed so much that I'm not sure.  Based on my

23  looking at some of your documents or some of the

24  evidence, I remember there's one -- maybe one more.

25  I remember I saw something else in evidence.  So I'm

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    not really sure if it's this or not.  Maybe it was

2    under one page and just kind of copied different.

3         So in my understanding, to what I saw, there

4    was one more document, but as far as what our

5    understanding was together, it's not based on any of

6    this (indicating).

7    Q.   This part that I highlighted there at the

8    bottom of 18-6, it says Igor "1/3 of 100% of the

9    company".

10        To your knowledge, was there ever a point

11   where Igor owned one-third of BunZai Media Group?

12   A.   No, he did not.

13   Q.   Was it was there ever a discussion, I guess,

14   about Igor owning 1/3 of BunZai Media Group?

15   A.   He -- he -- no, he didn't have an interest

16   in owning.

17   Q.   Do you know why this was included in this

18   Partnership Agreement?

19   A.   Some --

20        MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous, and it's

22   argumentative.

23        THE WITNESS:  We wanted to have something on

24   paper so he can have some security, so he can have

25   something to -- to hold, something to -- to take

97

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    home.

2    BY MR. TEPFER:

3        Q.    Did you draft this Partnership Agreement?

4        A.    No.

5        Q.    Do you know who did?

6        A.    Khristopher did.

7        Q.    Did you consider Mr. Latsanovski to be a

8    partner of yours in BunZai Media Group, Inc.?

9        A.    No.

10             (Plaintiff's Exhibit 21 was

11             previously marked for identification

12             by the FTC and is attached hereto.)

13   BY MR. TEPFER:

14       Q.    I'm now handing the witness what's been

15   marked Exhibit 21.

16             And this is for Mr. Esensten.

17             Do you recall receiving this email from Igor

18   Latsanovski?

19       A.    No.

20       Q.    Have you ever read this before?

21       A.    Only after the FTC lawsuit.

22       Q.    Uh-huh.   Wait.   Could you repeat that?

23       A.    Only after the, what's provided in evidence.

24   I've never seen it before that.

25       Q.    Do you recall having a conversation with

98

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Mr. Latsanovski in, around this period of time?

2        A.   Yes.

3             MR. UNGAR:  Objection as to the form of the

4    question.  Vague and ambiguous.

5    BY MR. TEPFER:

6        Q.   Do you recall what that conversation was

7    concerning?

8        A.   In reference to the time period of this

9    document?  We're talking about the same kind of --

10       Q.   Yes, sir.

11       A.   No.

12       Q.   Do you have any idea why Mr. Latsanovski

13   included Doron on this email?

14            MR. UNGAR:  Objection as to the form of the

15   question.  It's vague and ambiguous, calls for

16   speculation, lacks foundation.

17            THE WITNESS:  I believe I was visiting

18   Israel at the time of this document, and there was

19   some issues going on, and Igor had some concerns

20   about the business, and I mentioned to him that I

21   want to get out of this business.  And he kind of

22   sent me his opinion on how he feels and -- and --

23   and kind of don't leave, don't stay in Israel, come

24   back to America, let's try something new.

25   ///

99

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    BY MR. TEPFER:

2        Q.   You said there were some issues going on.

3    What issues are you referring to?

4        A.   It was the beginning of Dawn Goddard and

5    Nancy Yalley's unlawful lawsuit that I ended up

6    being sued as an alter ego of someone that never

7    worked for me and I never hired.

8        Q.   And who's that person that you're referring

9    to that you never hired?

10       A.   Dawn Goddard and Nancy Yalley.

11       Q.   And they never worked for you?

12       A.   Never.

13       Q.   And you said that Mr. Latsanovski, I guess,

14   expressed some concerns.  What were those concerns

15   that he expressed?

16       A.   Same concerns.  Dawn Goddard came to the

17   office and threatened me and Igor for -- for -- for

18   suing us for something that had no relevance to us.

19   And it started to go downhill from there.  And, you

20   know, I told them, "Listen, I'm out of this" --

21   excuse my language -- "shit," and wanted to end the

22   company.  I went to Israel for a trip.  I told Igor

23   "I'm thinking about staying here with my wife and my

24   children."  He got a little nervous and sent me this

25   email -- which I never saw in Israel.  I only saw it

100

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

 1    later.

 2        Q.    Mm-hmm.

 3        A.    I only saw it years later.  I never -- when

 4    I went to Israel, I never even got a chance to read

 5    this email.

 6        Q.    And you said at that point you were

 7    considering ending your company.  What company are

 8    you referring to?

 9        A.    BunZai Media Group.

10        Q.    Was the -- sorry.

11              What period of time did BunZai Media Group,

12    I guess, cease to exist?

13        A.    Right around -- right around a little bit,

14    right around this time, what I believe is, like,

15    towards June, July, August of 2013, or right around

16    this time.

17        Q.    What was the reason for the decision to, I

18    guess, close BunZai Media Group, Inc.?

19        A.    Number one, profitability wasn't there.

20    Number two, there was -- too messy and too many -- I

21    just wasn't happy with the way it was managed, I

22    wasn't happy with my relationship with Khristopher.

23    It was kind of going south, and it was starting

24    to -- you know, have other interest in myself, and

25    it was time to -- time to finish.

101

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Q.    Before the decision to, I guess, cease

2    operations at BunZai Media Group, did you do, I

3    guess, internal assessments of the profitability of

4    BunZai Media Group?

5      A.    All the time.

6      Q.    Were there key factors that, I guess,

7    hindered BunZai Media Group's profitability?

8      A.    Of course.

9      Q.    What were some of the, I guess, factors that

10   were limiting BunZai Media Group's profitability, if

11   you remember?

12          MR. UNGAR:  Objection as to the form of the

13   question, vague and ambiguous temporally.

14   BY MR. TEPFER:

15     Q.    I suppose, and to speak -- like the

16   profitability concerns that caused you to --

17     A.    There was no money.  There was no profits.

18   There was -- money for -- for -- for marketing was

19   costing too much.  Internal overhead costs were

20   costing too much.  It's just at the end of the day

21   when you looked at the reports, it wasn't making

22   money.  It wasn't worth keeping alive.

23     Q.    On the third line Mr. Latsanovski states "we

24   want to keep Pinicle."

25          Did -- to your knowledge, did

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1     Mr. Latsanovski have a position at Pinnacle

2     Logistics, Inc.?

3              MR. UNGAR:  I'm going to object as to the

4     form of the question.  It's reading a portion of a

5     sentence, just a portion, and it's out of context.

6              Counsel, if you want to read a portion of a

7     sentence, you should read the entire sentence to the

8     witness, so that the witness has context.

9     BY MR. TEPFER:

10      Q.   Well -- and, Mr. Nottea, feel free to read

11    the rest of the sentence.  I'm just addressing the

12    end.

13             MR. UNGAR:  Well, I'm going to object.

14    That's vague and ambiguous, it misstates the

15    document.

16    BY MR. TEPFER:

17      Q.   To reiterate my question, do you -- to your

18    knowledge, did Mr. Latsanovski ever have a position

19    at Pinnacle Logistics, Inc.?

20      A.   No.

21      Q.   Did Mr. Latsanovski ever, to your knowledge,

22    make any management decisions concerning Pinnacle

23    Logistics, Inc.?

24      A.   Absolutely not.

25      Q.   Do you have any idea what -- why

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    Mr. Latsanovski was writing to you concerning

 2    Pinnacle Logistics, Inc.?

 3              MR. UNGAR:  Objection as to the form of the

 4    question.  Vague and ambiguous, calls for

 5    speculation, lacks foundation.

 6              THE WITNESS:  I don't understand your

 7    question.

 8    BY MR. TEPFER:

 9        Q.    Do you have -- do you have, I guess --

10              Well, could you read back the question real

11    quick.  Sorry.

12              (The previous question was read back

13              by the court reporter as follows:

14                "QUESTION:  Do you have any idea

15              what -- why Mr. Latsanovski was

16              writing to you concerning Pinnacle

17              Logistics, Inc.?")

18              THE WITNESS:  I think it was generally a

19    concern of costs.  The concern was financial.

20    BY MR. TEPFER:

21        Q.    So Mr. Latsanovski was concerned of the

22    financial costs, or rather, it's your understanding

23    that Mr. Latsanovski was concerned of the financial

24    costs of Pinnacle Logistics, Inc.?

25              MR. UNGAR:  Objection as to the form of the
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

 1    question.  Calls for speculation.

 2              THE WITNESS:  I need to have that read back.

 3    Sorry.

 4              (The previous question was read back

 5              by the court reporter as follows:

 6                "QUESTION:  So Mr. Latsanovski

 7              was concerned of the financial costs,

 8              or rather, it's your understanding

 9              that Mr. Latsanovski was concerned of

10              the financial costs of Pinnacle

11              Logistics, Inc.?")

12              THE WITNESS:  I don't think it was Pinnacle.

13    I think it was just business model.  I don't know if

14    it was Pinnacle specifically.

15    BY MR. TEPFER:

16      Q.   In -- I guess just to clarify, did you say

17    that you had similar discussions to this email

18    verbally with Mr. Latsanovski at around this time?

19              MR. UNGAR:  Objection as to the form of the

20    question.  It's vague and ambiguous.

21              THE WITNESS:  I had a call with Igor when I

22    was in Israel.  I called Igor and said, "Igor, I'm

23    thinking about staying in Israel and moving to

24    something different."  And this email came after

25    that.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1   BY MR. TEPFER:
 2       Q.   Did Mr. --
 3       A.   Go ahead.
 4       Q.   Did Mr. Latsanovski mention, to your
 5   knowledge, Pinnacle Logistics, Inc., in this phone
 6   call?
 7       A.   No.
 8            MR. TEPFER:  I think this just disconnected
 9   here.  If we could go off the record real quick.
10            THE WITNESS:  No problem.
11            (Recess)
12            MR. TEPFER:  Back on the record.
13            Would you mind reading back the last
14   question.
15            (The previous question was read back
16            by the court reporter as follows:
17               "QUESTION:  Did Mr. Latsanovski
18            mention, to your knowledge, Pinnacle
19            Logistics, Inc., in this phone
20            call?")
21   BY MR. TEPFER:
22       Q.   Have you ever heard of the company VastPay?
23       A.   Yes.
24       Q.   What is VastPay's business, if you know?
25       A.   They were a merchant aggregator, merchant
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

1    account aggregator, slash, provider.

2        Q.    Could you describe what a merchant account

3    aggregator is?

4        A.    Basically, what Igor wanted to do was to buy

5    a few merchant processing entities, smaller entities

6    that have retail businesses like hotels and retail

7    stores and -- and basically create a portfolio of

8    small companies in order to build a bigger merchant

9    processing entity.

10       Q.    Did you ever invest in VastPay?

11       A.    No, I did not.

12       Q.    Did you ever have a position at VastPay?

13       A.    No, I did not.

14       Q.    Do you know why he might have mentioned

15   VastPay in this email to you?

16       A.    Where specifically?  I --

17       Q.    Sorry.  It's -- I think it's the fifth line.

18       A.    Yes, I see it.  One second.

19             I think he was just mentioning to me like

20   some of his direction and where he's going and --

21   and, you know, there's no -- I -- I kind of forgot

22   the exact question.

23       Q.    Just sort of why -- do you --

24             Could you read it back.

25       A.    Why he mentioned VastPay to me in the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    document?  I don't know.

2        Q.    In the sentence above that, there's

3    reference to a product company.  Do you -- what is

4    your understanding of the product company to which

5    Mr. Latsanovski was referring?

6        A.    I have no idea.

7        Q.    What about -- he references hyphenated

8    security-merchant.  Do you have any idea what

9    Mr. Latsanovski is referring to there?

10       A.    No, I do not.

11       Q.    Later on in that same sentence he references

12   a product company in England.  Do you know of any

13   product company or do you know what product company

14   in England he may be referring to?

15       A.    I do not.  And it says Brazil.  You know, we

16   were talking to many people that said we want to do

17   this in Brazil, we want to do this in many

18   countries.  So no, I do not.

19       Q.    Did you ever consider a joint venture with

20   Mr. Latsanovski in England?

21       A.    Yes.

22       Q.    And what was that company going to be?

23       A.    Going to be an online marketing company.

24       Q.    Would it -- was it anticipated that the

25   company would market skin care products?

108

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        2/18/2016

1      A.    We didn't really discuss on what it would

2   market.   It was -- it was skin care online products

3   what whatever we -- whatever we decided we're going

4   to do post BunZai days.

5      Q.    On line 10, Mr. Latsanovski states, "Doron

6   has his department."  Did your brother Doron ever

7   have a department of any kind at BunZai Media Group,

8   Inc.?

9      A.    None whatsoever.

10     Q.    Did he ever have a department of any kind,

11  of any company that you were CEO of?

12     A.    No, no.

13     Q.    Do you have any idea what department

14  Mr. Latsanovski was referring to?

15     A.    I think he just meant to say, like, Doron

16  has his business, his adult business, his direction.

17     Q.    On line 12 I believe Mr. Latsanovski -- on

18  line 11 to 12 Mr. Latsanovski states "Paul likely

19  will be responsible for marketing the relationship

20  between Israel and America, to conduct reports and

21  everything else that he does now."

22          The -- do you know what marketing

23  relationship between Israel and America

24  Mr. Latsanovski is referring to there?

25     A.    No idea.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        Q.    Did BunZai Media Group, Inc., have any sort

2    of business relationship with any company located in

3    Israel?

4        A.    I believe there was one affiliate marketer,

5    there was one marketing company in Israel that did

6    some affiliate work.   Other than that, no.

7        Q.    That same line refers to David, and I was

8    wondering if you knew who David is.

9             MR. UNGAR:   Objection as to the form of the

10   question.   Vague and ambiguous, misstates the

11   document.

12   BY MR. TEPFER:

13       Q.    Do you see where it says "David" there?

14   Did --

15       A.    "David is good helper"?

16       Q.    Uh-huh.

17             Did you ever have an employee at this time

18   named David?

19       A.    I think we had a consultant.   I'm not sure

20   if it was an employee.   It was a guy named David.

21   There's a couple Davids.

22       Q.    Mm-hmm.   Later on Mr. Latsanovski states "I

23   would recommend Roy as head of the product company".

24             Was it -- is it your understanding that

25   Mr. Latsanovski is referring to BunZai Media Group?

110

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      A.   I have no idea.

2      Q.   At this time did you own any other company,

3  aside from BunZai Media Group?

4      A.   I don't know if -- if Adageo was there.  So

5  Adageo, yes.

6      Q.   Did Adageo market any products at that time?

7      A.   No.

8      Q.   Did Roi ever become the head of BunZai Media

9  Group?

10     A.   No.

11     Q.   Did Mr. Latsanovski, aside from his

12  statements in this email, did he ever make any

13  other, I guess, hiring recommendations to you for --

14  at BunZai Media Group?

15     A.   Never.

16     Q.   Later on Mr. Latsanovski states, "And I

17  would not want to so we are so constantly thinking

18  about how to download the work of our factory -

19  Pinicle."

20          Did Pinnacle Logistics manufacture the

21  AuraVie product?

22     A.   No, they did not.

23     Q.   Are you aware of anything that Pinnacle

24  manufactured?

25     A.   No.

111

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    Later in the document Mr. Latsanovski

2    states, "after all people is a problem, dividing the

3    information can give us testimony in court, or just

4    come up with these statements and show to us, and so

5    on."

6           Do you have any understanding of what

7    Mr. Latsanovski is referring to in that statement?

8           MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  The sentence

10   is gibberish.  It calls for speculation.  It lacks

11   foundation.  It seeks an expert opinion in language

12   and dialect.

13          MR. TEPFER:  Please, no speaking objections,

14   Counsel.

15          MR. UNGAR:  I'm sorry?

16          MR. TEPFER:  I said please, no speaking

17   objections, Counsel.

18          MR. UNGAR:  That was not a speaking

19   objection, Counsel.

20   BY MR. TEPFER:

21     Q.    If you could answer.

22     A.    I believe, to my knowledge, what Igor is

23   speaking about is the fact we were both offended

24   that two ladies sued us, that we have no idea why.

25     Q.    In your conversation with Mr. Latsanovski

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    when you were in Israel, did he express these same

2    concerns on the phone?

3            MR. UNGAR:  Objection as to the form of the

4    question.  It's vague and ambiguous.

5            THE WITNESS:  I don't recall.

6    BY MR. TEPFER:

7        Q.   At any time did Mr. Latsanovski express

8    concerns to you about testimony in court from

9    employees?

10           MR. UNGAR:  Objection as to the form of the

11   question.

12           THE WITNESS:  No.

13           MR. UNGAR:  It's vague and ambiguous.

14   BY MR. TEPFER:

15       Q.   I'm sorry.  You can --

16       A.   No.

17       Q.   Did BunZai Media Group have a call center?

18       A.   Yes.

19       Q.   Later on Mr. Latsanovski states, "And we are

20   in quiet mode to create new products".

21           Do you recall what new products you and Igor

22   were considering at this point in time?

23       A.   No.

24       Q.   Do you have any understanding of what

25   Mr. Latsanovski meant by "quiet mode"?

113

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      A.    No.

2      Q.    After that Mr. Latsanovski states, "then as

3    it is now in emergency mode are buying goods", and

4    he continues on.

5           I wanted to ask what do you, what was your

6    understanding of what Mr. Latsanovski meant by

7    "emergency mode"?

8      A.    I --

9           MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous, it misstates

11   the document, calls for speculation.

12          THE WITNESS:  I just saw it now for the

13   first time again.  I have no clue what emergency

14   mode -- I don't understand.  Seems like a very

15   emotional opinion -- opinionated letter that calls

16   itself "opinion" in the Subject line to me.

17   BY MR. TEPFER:

18     Q.    Do you have any idea of why Mr. Latsanovski

19   was emotional at this time?

20          MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous, calls for

22   speculation, seeks a medical opinion, psychological

23   opinion.  Witness is not qualified as an expert in

24   those areas.

25          THE WITNESS:  No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    BY MR. TEPFER:

2        Q.   At the end, Mr. Latsanovski states

3    "Sincerely Your sincere partner Igor."

4            Did Mr. Latsanovski typically refer to

5    himself as your partner?

6        A.   I believe Igor has a different understanding

7    of the word "partner" than you and I do.  So yeah,

8    it was common for us to introduce each other to

9    friends, to people, to acquaintances, as partners.

10       Q.   So --

11       A.   It was -- it was common way of introducing

12   each other.

13       Q.   So Mr. Latsanovski would commonly introduce

14   you as his partner?

15       A.   In -- in the context of a simple

16   conversation, yes, he introduced me as partner.  We

17   worked together.

18       Q.   Aside from BunZai Media Group, did you

19   invest with Mr. Latsanovski in any other companies?

20           MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous as to the term

22   "invest."

23           THE WITNESS:  No.

24   BY MR. TEPFER:

25       Q.   Do you know who Joyce Gaines is?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      A.   I do.

2      Q.   Who is she?

3      A.   She owns a company called UMS.  Merchant

4   Services something.  And she's the CEO of a merchant

5   processing company.

6      Q.   Is, I guess, is Dylan Gaines her husband?

7      A.   Dylan Gaines is her son.

8      Q.   Ah, okay.

9           (Plaintiff's Exhibit 23 was

10          previously marked for identification

11          by the FTC and is attached hereto.)

12   BY MR. TEPFER:

13     Q.   I'm now handing the witness what's been

14   marked as Exhibit 23.

15          Do you recall sending this email to

16   Mr. Latsanovski?

17     A.   I believe I do.  Yes, I do.  Just for the

18   record, this is a -- I'm forwarding an email to Igor

19   that I received from Joyce at UMS.

20     Q.   Okay.

21     A.   Okay.

22     Q.   And do you recall sending this, your initial

23   email, to Joyce at UMS?

24          MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1          THE WITNESS:  Yes.

2    BY MR. TEPFER:

3      Q.    So on page 23-3, the, I guess, second full

4    paragraph you state, "As discussed, 4 new RMCs

5    (Retail Merchant Corps) have signed up to become

6    retailers of the new Adagio, LeOR, and EllastiQ

7    product brands.  We agree to board these new MIDS

8    through UMS/EVO/Deutsche Bank."

9          What is Adageo?

10     A.    So Adageo was the name of Dellure before

11   Dellure, the gold mask that I thought was going to

12   be called Adageo and it wasn't.

13     Q.    What -- so I guess Adageo was a product that

14   you were considering marketing?

15     A.    Mm-hmm.

16     Q.    What company were you considering marketing

17   Adageo through?

18     A.    One of these retail merchant corps.

19     Q.    The four retail merchant corps discussed?

20     A.    That's correct.

21     Q.    Do you recall the names of those four retail

22   merchant corps?

23     A.    Not particularly.  They may be here.  Let's

24   look.

25          No, not exactly.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1      Q.   Do you -- could you tell me what LéOR is?

 2      A.   It's an additional skin care brand.

 3      Q.   And is EllastiQ also a skin care brand?

 4      A.   Never came to fruition.

 5      Q.   Were those products, I guess, Dellure and

 6   LéOR, marketed by negative option?

 7           MR. UNGAR:  Objection as to the form of the

 8   question.  Vague and ambiguous.

 9           THE WITNESS:  There was both of these

10   products.  Dellure was -- if it was, it was

11   10 percent of its sales because it wasn't -- it

12   wasn't built for that kind of a business model, but

13   I do believe there were some tests that we did, just

14   to kind of figure out lifetime value and to

15   understand more of a -- what that means, but I --

16           I forgot what I'm answering, forgot the

17   actual question.  You can repeat it for me if you

18   can.

19           (The previous question was read back

20           by the court reporter as follows:

21             "QUESTION:  Were those products,

22           I guess, Dellure and LéOR, marketed

23           by negative option?")

24           THE WITNESS:  Vaguely.

25   ///
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        2/18/2016

1    BY MR. TEPFER:

2       Q.   Okay.  At the end of that paragraph you

3    reference E-V-O.  Is that pronounced EVO?

4       A.   It's both.

5       Q.   Okay.

6       A.   It's E-V-O and EVO.

7       Q.   Do you know where EVO, the business is

8    located?

9       A.   If I remember, they're in the East Coast,

10   out of New York or Florida.

11      Q.   And I can't pronounce this very well.  Is

12   that --

13      A.   Deutsch Bank.

14      Q.   Deutsch Bank.  Where is Deutsch Bank

15   located?

16      A.   Deutsch Bank is a bank in Germany.  Deutsch

17   is a German word.  It's a bank in Germany, but

18   they're speaking about a bank in the U.S.

19      Q.   Okay.  And so none of these products were

20   ever marketed in Germany?

21      A.   No.

22      Q.   On 23-1 you state "the final answer is - A

23   BIG FAT NO!"  What are you referring to there?

24      A.   I -- I asked Joyce to release the reserves,

25   and she said she's going to hold them longer, and so

119

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    I told Igor and Paul "We're not getting our money

2    yet.  We're not getting money, so there's no money

3    in the company.  Don't dream."

4         Q.   Don't -- don't dream, you said?

5         A.   No, no, the answer was no.  We asked Joyce

6    to release some reserves.  She said no.  The answer

7    is a big fat no.

8         Q.   Did you ever discuss this in person with

9    Mr. Latsanovski, beyond this email?

10             MR. UNGAR:  Objection as to the form of the

11    question.  Vague and ambiguous.

12             THE WITNESS:  What do you mean by "this"?

13    BY MR. TEPFER:

14        Q.   Your request to UMS to release these funds.

15        A.   Yes.

16        Q.   Did you explain to him the reason why Joyce

17    denied your request to release these funds?

18             MR. UNGAR:  Objection as to the form of the

19    question.  Assumes facts not in evidence.

20             THE WITNESS:  Not in detail.

21    BY MR. TEPFER:

22        Q.   Do you recall what you said to

23    Mr. Latsanovski?

24        A.   No idea.

25        Q.   When you made this initial request to

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   Ms. Gaines, did you believe that she was going to

2   grant your request to release these funds?

3       A.   Absolutely.

4       Q.   And were you surprised when she denied it?

5       A.   Kind of.

6       Q.   Were you surprised by her explanation of why

7   she wasn't going to release the funds?

8       A.   Yes.

9       Q.   On point number 2 in Ms. Gaines's email to

10  you, she states "If for some reason the FTC would

11  close your accounts, you can add immediately another

12  $1 million plus of chargebacks because you will have

13  billed fees to clients and you will not be able to

14  ship products."

15           Before this mention of an FTC action, had

16  you ever considered the possibility of a FTC

17  enforcement action against your company?

18           MR. UNGAR:  Objection as to the form of the

19  question.  Vague and ambiguous.

20           THE WITNESS:  Yes.

21  BY MR. TEPFER:

22      Q.   Did you have concerns about the possibility

23  of an FTC enforcement action?

24      A.   Not particularly to my company.  Just from

25  what I've heard in the peers and people in the

121

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

1    industry and articles that I've read, then yes.

2        Q.   Later on in the email, in the paragraph

3    after Number 4 Ms. Gaines states, "I have to protect

4    UMS based on the nature and the risk of the business

5    in front of us, the current nature of the industry

6    and the regulatory scrutiny and the current

7    chargeback/return ratios.  One of your accounts is

8    already on the Excessive Chargeback Program."

9            Do you know which Excessive Chargeback

10   Program Mrs. Gaines is referring to?

11       A.   Not exactly.

12       Q.   Are you aware of any of your -- or rather,

13   of BunZai Media Group's accounts being on an

14   Excessive Chargeback Program?

15       A.   To begin with, I don't know if it was a

16   BunZai Media Group account, but as far as what we're

17   talking about, when a merchant account is no longer

18   being used, then there are no longer transactions to

19   that merchant account.  The only thing left for that

20   merchant account to occur is either a refund or some

21   customer who complained on it, which means if a

22   merchant account is not in use, there is no

23   transactions that are coming in on it.  So there was

24   an account that we stopped use, and it became

25   Excessive Chargeback Program because there were no

122

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1     new transactions.

2         Q.   Do you recall what account that is, that

3     you're referring to?

4         A.   No idea.

5         Q.   Do you believe it was a BunZai Media Group

6     account?

7         A.   No.

8         Q.   Do you believe it was one of the other

9     AuraVie companies?

10        A.   Potentially.

11        Q.   Was it a Media Urge company?

12        A.   No.

13        Q.   Or rather, was it Media Urge?

14        A.   No.

15        Q.   Do you recall any other emails from merchant

16    processors expressing their concern regarding any of

17    the AuraVie companies chargeback return ratios?

18        A.   Not off the top of my head.  I dealt with

19    many merchant processing.  Could be.

20        Q.   Subsequent to receiving this email, did you,

21    I guess, investigate or take investigative -- sorry.

22    Let me start over.

23            After receiving this email, did you

24    investigate the chargeback return ratio for any of

25    the AuraVie companies?

Nottea
FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        A.   Of course.

2        Q.   Do you recall what steps you took to look

3   into this?

4        A.   I took many steps.

5        Q.   Could you describe some of those?

6        A.   A deeper understanding of what's happening,

7   an understanding of -- you know, learning about

8   consumer disputes, understanding what the reason

9   codes are, what can we do to satisfy these

10  consumers?  Why are consumers complaining?  Why are

11  they not calling back the company to get a refund?

12  Somebody is calling the bank before they call me.

13  They're concerned.  Call me.  I'm happy to find

14  resolution.

15       Q.   As a result of this email, did you consider

16  making changes to the --

17       A.   All the time.  Excuse me.  Let you finish.

18       Q.   Sure.  And I was just going to say the

19  AuraVie risk free trial advertisements.

20            MR. UNGAR:  Objection as to the form of the

21  question.  It's vague and ambiguous.

22            THE WITNESS:  All days are moving, changing,

23  and optimizing, learning.  So yes, of course.

24  BY MR. TEPFER:

25       Q.   I guess to investigate these chargeback

Nottea

FTC v. Bunzai Media Group, Inc., et al.                      2/18/2016

1    return ratios, would you ever review the customer

2    complaints that were sent to the AuraVie companies?

3        A.   Can you be more specific?

4        Q.   Did you ever personally read any of the

5    complaints that were sent to --

6        A.   I did.

7        Q.   -- the AuraVie companies?

8        A.   I did.

9        Q.   Were there any, I suppose, common complaints

10   that you felt were reoccurring in these complaints?

11       A.   Not necessarily.

12       Q.   Did you ever read complaints where consumers

13   expressed complaints that they were unaware of the

14   $97.88 charge that was applied to their account, I

15   guess, after 10 days?

16            MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous, it assumes

18   facts not in evidence.

19            THE WITNESS:  No, not exactly.  No

20   particular document like that, that I recall.

21   BY MR. TEPFER:

22       Q.   Do you recall how often you would review

23   consumer complaints?

24       A.   Very rarely.

25       Q.   To go back to your statement about the four

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    new retail merchant corps that signed up to become

2    retailers, is that the same process by which the

3    AuraVie companies signed up to sell, I guess,

4    AuraVie by risk free trial?

5              MR. UNGAR:  Objection --

6              THE WITNESS:  I don't understand.

7              MR. UNGAR:  -- as to the form of the

8    question.  Vague and ambiguous.

9              THE WITNESS:  I don't understand what you're

10   saying.

11   BY MR. TEPFER:

12     Q.   Did, I guess -- are the -- were the AuraVie

13   companies, aside from BunZai Media Group, were those

14   also retail merchant corps?

15     A.   Yes.

16     Q.   And did they, I guess -- I guess, did they

17   also sign up to become retailers of AuraVie, in this

18   same fashion described here?

19             MR. UNGAR:  Objection as to the form of the

20   question.  Vague and ambiguous.  Nobody cares what

21   you guess about, Counsel.

22             THE WITNESS:  I don't understand.

23             MR. TEPFER:  Sorry.  Could you repeat the

24   question.

25             (The previous question was read back

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
1              by the court reporter as follows:
2                   "QUESTION:  And did they, I
3              guess -- I guess, did they also sign
4              up to become retailers of AuraVie, in
5              this same fashion described here?")
6              THE WITNESS:  I don't understand your
7    question.  What fashion?
8    BY MR. TEPFER:
9       Q.   So here you reference companies signing up
10   to become retailers, on 23-3.
11      A.   Okay.
12      Q.   Did companies have to sign up to become a
13   retailer of AuraVie?
14              MR. UNGAR:  Objection as to the form of the
15   question.  Vague and ambiguous.
16              THE WITNESS:  Companies.  I can't answer
17   your question.
18   BY MR. TEPFER:
19      Q.   Did any of the AuraVie companies enter into
20   a contract for the, I guess, sale of AuraVie?
21      A.   Yes.
22      Q.   Do you happen to have copies of those
23   contracts?
24      A.   No.
25      Q.   Do you know where those -- if those
```

127

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    contracts still exist?

2        A.    They may exist in a file.  Some are maybe

3    provided to Joyce Gaines or merchant processor --

4        Q.    Uh-huh.

5        A.    -- to show the relationship between these

6    entities.  So maybe.  I'm pretty sure that you can

7    get your hands on one of those.

8        Q.    Sure.

9              (Plaintiff's Exhibit 26 was

10             previously marked for identification

11             by the FTC and is attached hereto.)

12   BY MR. TEPFER:

13       Q.    I'm now handing the witness what's been

14   marked Exhibit 26.

15       A.    Thank you.

16       Q.    Have you ever reviewed this Business Plan?

17       A.    Vaguely.  I reviewed it.

18       Q.    Did the sections that are attributed to you

19   throughout the document, did you draft those?

20             MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous.

22             THE WITNESS:  I don't understand.

23             MR. UNGAR:  Are you asking him to look

24   through it and read the sections?

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   BY MR. TEPFER:

2       Q.   Did you understand?

3       A.   No.

4       Q.   So throughout the document it says Alon,

5   just in reference to, I guess, your memory.  Did you

6   draft the section that follows your name throughout

7   the document?

8            MR. UNGAR:  Do you want him to read the

9   sections?

10           MR. TEPFER:  Counsel, I'm just asking him if

11  he recalls drafting any of this document.

12           MR. UNGAR:  How would he know unless he goes

13  through the document and looks at the sections?

14           MR. TEPFER:  I'm just -- Counsel, I'm just

15  asking if he recalls drafting any part of this

16  document.

17           MR. UNGAR:  That's a completely different

18  question than what you just asked.

19           MR. TEPFER:  Then that's the question I'll

20  present.

21           THE WITNESS:  Khristopher wrote --

22  Khristopher Bond wrote this entire Business Plan.

23  BY MR. TEPFER:

24      Q.   All right.  So if you could turn, for

25  example, to the page ending in 561, is the Bates

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1   number --

2       A.   Okay.  Yes, sir.

3       Q.   Did you draft either of those two sections

4   that are attributed to you?

5            MR. UNGAR:  Objection as to the form of the

6   question.  It's vague and ambiguous.

7            THE WITNESS:  No.

8   BY MR. TEPFER:

9       Q.   Do you know if anyone, aside from

10  Khristopher Bond, assisted in drafting this

11  document?

12      A.   Khristopher asked some, asked me some

13  questions some industry terms --

14      Q.   Uh-huh.

15      A.   -- and I gave him some stuff, and we're

16  sitting in a very close office environment, and I

17  remember the times, it took a couple of months, he

18  took a couple of months while getting paid to work

19  on this document.  So some of the stuff that he has

20  here I may have told him, but he sat and wrote this

21  whole thing on his own.

22      Q.   And you said while Mr. Bond was getting

23  paid.  Were you paying Mr. Bond at that time?

24      A.   The -- you know, it wasn't me.  No, I wasn't

25  paying him.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       Q.    Do you recall if Mr. Bond consulted with

2    Nastassia Yalley concerning the drafting of this

3    document?

4       A.    I believe he did.

5       Q.    Do you recall if Mr. Bond consulted with

6    your brother Doron concerning the drafting of this

7    document?

8       A.    I don't think so.

9       Q.    Do you -- do you recall if he consulted with

10   Paul Medina concerning the drafting of this

11   document?

12      A.    I don't think so.

13      Q.    Did BunZai Media Group check its affiliates

14   or affiliate marketers for advertisements that you

15   believe were misleading?

16            MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous.

18            THE WITNESS:  Can you repeat that for me,

19   please.  I forgot the question.

20            (The previous question was read back

21            by the court reporter as follows:

22               "QUESTION:  Did BunZai Media

23            Group check its affiliates or

24            affiliate marketers for

25            advertisements that you believe were

131

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        2/18/2016

1          misleading?")

2              THE WITNESS:  Yes.

3     BY MR. TEPFER:

4        Q.    What sort of steps, or rather, did BunZai

5     Media Group have a standard operating procedure for

6     this sort of affiliate policing?

7        A.    It's something that was -- again, it was an

8     on moving target, always consistently changing.  By

9     default there were some parameters that we would

10    give to an affiliate network about the do's and

11    don't's.  Don't incentivize traffic.  Don't give

12    away free stuff.  Don't tell people if they fill

13    some form out.  So there was always some

14    instructions in the insertion orders, in the

15    agreement between the advertiser and the publisher

16    or the network about restrictions, about what not to

17    do.  So yes.

18       Q.    Who, if you know, at BunZai Media Group was

19    tasked with overseeing this affiliate policing?

20       A.    Well, myself, Nastassia, Paul.

21       Q.    Did, in your opinion, BunZai Media Group

22    have an issue with un-compliant affiliates?

23             MR. UNGAR:  Objection as to the form of the

24    question.  Calls for an opinion.

25             THE WITNESS:  There were affiliates that we

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1    stopped, that we terminated.  Yes.

2    BY MR. TEPFER:

3        Q.   On what grounds did you terminate your

4    relationship with these affiliates?  What sort of --

5    sorry.

6            To rephrase, can you describe the

7    advertisements of these affiliates that you found to

8    be -- you found would require you to terminate your

9    relationship with them?

10       A.   I don't recall the particulars right now, as

11   far as, you know, what they have, to give you an

12   example.  Can I recall what particular things we

13   terminated?

14       Q.   Well, perhaps a better question:

15           How would you learn about un-compliant

16   affiliates?

17           MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous regarding the

19   word "noncompliant" or "un-compliant."

20           THE WITNESS:  Again, I'm not speaking as to

21   the word un-compliant because I don't know what

22   noncompliant, un-compliant means.  I'm speaking of

23   problems, per se.

24   BY MR. TEPFER:

25       Q.   Right.  Sure.

133

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1          So how did you learn about --

2     A.    From the call center.

3     Q.    Did you -- was, I guess, affiliate traffic

4     that resulted in more chargebacks another way that

5     you would learn about affiliates that had misleading

6     advertisements?

7     A.    If -- if it's already gotten to a

8     chargeback, it's kind of late by then because that

9     affiliate might not even be working anymore.

10    Q.    Okay.

11    A.    It's directly from the call center.  If a

12    consumer was given something by a affiliate that was

13    misled, it kind of floats through the call center

14    very quickly.

15    Q.    And so if an affiliate -- sorry.

16          If a consumer calls the call center,

17    reporting these advertisements, would the call

18    center employees report this to you?

19          MR. UNGAR:  Objection as to the form of the

20    question.  It's an improper hypothetical, it calls

21    for speculation, lacks foundation.

22          THE WITNESS:  Not directly, no.

23    BY MR. TEPFER:

24    Q.    Who would they report it to?

25    A.    Their manager.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1            MR. UNGAR:  Same objection.
 2   BY MR. TEPFER:
 3       Q.   And who is the manager?
 4       A.   It changed.  Maybe that particular call
 5   center manager would be Andree, and then Andree
 6   would walk it up the food chain and --
 7       Q.   If we could go to Exhibit 28.
 8            (Plaintiff's Exhibit 28 was
 9            previously marked for identification
10            by the FTC and is attached hereto.)
11   BY MR. TEPFER:
12       Q.   I'm now handing the witness what's been
13   marked as Exhibit 28.
14            Do you recall sending this email?
15       A.   Yes.
16       Q.   What is PayPro?
17       A.   It's a -- it was a business model that this
18   person owned -- Alex.
19       Q.   Did you -- did BunZai Media Group do any
20   business with PayPro?
21       A.   No.
22       Q.   Were you considering in investing in PayPro
23   at this time?
24       A.   No.
25       Q.   What is this email regarding?
```

135

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      A.    This person reached out to Igor to see if
2  Igor wanted to invest in his company.  Igor showed
3  me his business model.  I looked, I had some
4  questions, I didn't like it, and moved on.
5      Q.    And why did you include, I guess, these
6  websites, Miracle --
7      A.    To show Alex what we do.  Basically, he sent
8  me what he does, I showed him what we do, and it was
9  kind of a -- that's it.
10      Q.    Did you ever show Mr. Latsanovski these
11  websites that you include in this email?
12      A.    Not directly, no.
13      Q.    Did you ever show him similar websites to
14  these?
15      A.    No.
16      Q.    Who's Gary Bhasin?
17      A.    Gary Bhasin is a person I know from a long
18  time ago who is good in accounting.  He knows how to
19  run reports.  He's a reporting guy.
20            (Plaintiff's Exhibit 29 was
21            previously marked for identification
22            by the FTC and is attached hereto.)
23  BY MR. TEPFER:
24      Q.    I'm handing the witness what's been marked
25  as Exhibit 29.

136

Nottea

FTC v. Bunzai Media Group, Inc., et al.                     2/18/2016

1      A.    Thank you.

2      Q.    Do you recall -- sorry.  Mine's a little

3   messed up.

4            Do you recall receiving this email from Gary

5   Bhasin?

6      A.    Yes.  I think I do.

7      Q.    Did you request that he send you a

8   management consulting proposal for AuraVie?

9      A.    I did.

10     Q.    At this time was Media Urge marketing the

11  AuraVie product?

12     A.    This is 2013.  Yeah, I think so.

13     Q.    In Mr. Bhasin's email -- and that's

14  B-h-a-s-i-n.  He states, "As per my initial

15  conversation with Doron and Paul Median" --

16     A.    Yeah.

17     Q.    -- "I understand that there is some serious

18  need of accurate projections, accounting

19  profitability model for your business."

20           What was your understanding of what business

21  Mr. Bhasin was referring to?

22     A.    Basically, after Nastassia left I had my

23  brother help me with some accounting.  He was busy

24  with his company.  He told me, "I don't have time

25  for this.  Find somebody who can do your stuff.

137
Nottea
FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Let's start with him and with Paul."  I said, "Okay.

2    Who's a good guy?"  And, oh, I said, "Gary, let me

3    send Gary an email.  Maybe Gary can help out, bill

4    some reporting and take over some of the stuff that

5    Nastassia didn't do anymore."  And I told Gary,

6    "Gary, listen, I know you're a good guy.  You're a

7    good reporting guy.  You're good in accounting.  You

8    know your stuff.  Send me a proposal.  I want you to

9    manage my -- my -- my finances, my books, my

10   reports."

11        That's it.

12   Q.   What period of time did your brother Doron

13   assist you with this accounting work?

14        MR. UNGAR:  Objection as to the form of the

15   question.  It's vague and ambiguous.

16        THE WITNESS:  Doron assisted in --

17   particularly in the times when Nastassia left, I got

18   a little nervous.  I said, "Please make sure

19   everybody gets paid, everybody gets their bills

20   paid," you know, 'cause she was there with me from

21   the beginning, so when Nastassia left, it was like a

22   serious person leaving the company.  And because I'm

23   not very, very good at finances, I kind of told him,

24   "Brother, please do me a favor.  Just kind of take a

25   look for me, make sure Nastassia is doing okay.

138

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Just, you know, a second pair of eyes on Nastassia's
2      accounting work.  When she's giving me a report,
3      make sure I'm not getting screwed."
4              That's it.
5      BY MR. TEPFER:
6         Q.   So before Nastassia left, Doron would
7      sometimes -- are you saying he would sometimes
8      review her accounting reports for --
9         A.   For me, on my behalf, because I'm not that
10     good with numbers.  So I said to my brother, "This
11     is -- does this look okay finance wise?"
12             I mean, I'm a marketing head, not a
13     financial head.
14        Q.   Mm-hmm.  When -- do you, if you recall, do
15     you -- when did Doron first assist you with
16     reviewing these accounting reports?
17             MR. UNGAR:  Objection as to the form of the
18     question.  It's vague and ambiguous.
19             THE WITNESS:  I don't know.  Somewhere
20     around 2012.
21     BY MR. TEPFER:
22        Q.   And did he assist you with the review of
23     these accounting reports until the filing of this
24     lawsuit in June 2015?
25        A.   No.

139

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1           MR. UNGAR:  Objection as to the form of the
2      question.  It's vague and ambiguous.
3           THE WITNESS:  Let's correct again for a
4      second.
5      BY MR. TEPFER:
6          Q.   Sure.
7          A.   Reports as internal business processes were
8      done by Paul.  After Nastassia left, Paul did
9      reports, Paul did profit analysis.  Doron did more
10     payroll, more if a bill came in.  But actual reports
11     on profitability levels, refunds, the business
12     model, Doron has no clue.  Paul ran the reports that
13     I looked at the business model.  Doron ran the
14     reports of payroll, vendors, normal business
15     operation, not within the scope of the business
16     model.  Those reports are run by Paul.
17         Q.   And I guess the reports that were created by
18     Nastassia, what did those reports include?
19         A.   Just income, income.
20          MR. UNGAR:  Objection as to the form of the
21     question.  It's vague and ambiguous.
22          THE WITNESS:  Income and expense.
23     BY MR. TEPFER:
24         Q.   And so you were, I guess, seeking to employ
25     Gary Bhasin to perform some of the same tasks that

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Nastassia had previously performed?

2        A.   As a subcontractor.  I just -- I knew he was

3    really good and I wanted somebody with a good pair

4    of eyes.

5        Q.   Did you ask Doron to meets with Gary Bhasin

6    to discuss his management consulting proposal?

7        A.   Doron and I knew Gary from way before this

8    business ever existed, so because I'm not so good at

9    finances I told Doron and Paul, "Please show the guy

10   what the combination between your existing reports

11   and your financial reports.  Give -- give -- give it

12   to the guy.  Show him."  Yes.

13          By the way, he never got hired in this.  It

14   never happened.

15       Q.   Sure.

16          Mr. Bhasin states --

17          MR. UNGAR:  Counsel, again, I'm going to

18   object.  We don't care about your comments, the

19   record doesn't care about your comments, the case

20   doesn't care about your comments.  You keep saying

21   "sure."  Nobody cares what you think about his

22   answer.

23          MR. TEPFER:  I --

24          MR. UNGAR:  So I would ask you to please

25   refrain from cluttering the record that way and

141

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    characterizing what my client has said.

2              MR. TEPFER:  Okay.  Well, I certainly

3    understand that you do not care.

4    BY MR. TEPFER:

5        Q.    In the --

6              MR. UNGAR:  Cut it out.

7              MR. TEPFER:  Cut what out?

8              MR. UNGAR:  Do you have another question?

9              MR. TEPFER:  I do, if --

10             MR. UNGAR:  Ask it or we're done.  Ask your

11   question, please.

12             MR. TEPFER:  I'm preparing to.  Just let me

13   read this document, please.

14   BY MR. TEPFER:

15       Q.    Under -- you state -- or rather, Gary states

16   the "End goal is to provide you with:"  And under

17   Number 7 it states "Chargeback Analysis."

18             Did you request that Mr. Bhasin provide you

19   the chargeback analysis?

20       A.    Not to my recollection.

21             MR. UNGAR:  Objection.  Objection.

22             THE WITNESS:  Sorry.

23             MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous, misstates the

25   document.  I don't even know where you're reading

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    from.

2    BY MR. TEPFER:

3        Q.    Sir, you can go ahead.

4        A.    Not to my recollection.

5        Q.    Do you know if your brother Doron discussed

6    chargeback analysis with Mr. Bhasin?

7        A.    I don't believe he did.

8        Q.    At this point in time did you believe that

9    your company required, I guess, chargeback analysis?

10       A.    I think every company requires that.  It's

11   normal part of doing business, chargeback analysis.

12             I don't know why we're sticking to that

13   point, but it's up to you.

14       Q.    And do you recall what, I guess, what the --

15   about the time that this email was sent, do you

16   recall what your company's chargeback percentage

17   ratio was?

18             MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous.

20             THE WITNESS:  I have no idea what the

21   chargeback was, what company you're talking about.

22   No.

23   BY MR. TEPFER:

24       Q.    Well, I suppose --

25             So do you know what company Gary Bhasin is

143

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   referring to in this email?

2          MR. UNGAR:  Objection as to the form of the

3   question.  Vague and ambiguous, calls for

4   speculation, lacks foundation.

5          THE WITNESS:  No.

6   BY MR. TEPFER:

7     Q.   And you said that you had requested this

8   management proposal or management consulting

9   proposal from Gary Bhasin.  Do you recall which

10  company that you wanted a management consulting

11  proposal for?

12         MR. UNGAR:  Objection as to the form of the

13  question.  Misstates the prior testimony of the

14  witness.

15         THE WITNESS:  That's not what I said before,

16  so --

17  BY MR. TEPFER:

18    Q.   Sorry.  You didn't request --

19    A.   It's not a business proposal.  It's not --

20  it's not a -- I don't see it as a proposal.  I see

21  it as a financial management position of creating

22  reports.

23    Q.   And do you recall what companies you wanted

24  reports created for?

25    A.   Most likely the AuraVie companies.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    So -- okay.

2      A.    The subject line says "Management Consulting

3   Proposal for AuraVie".

4      Q.    So it's your understanding this was just a

5   general proposal for the AuraVie companies?

6            MR. UNGAR:  Objection as to the form of the

7   question.  It's argumentative.

8            THE WITNESS:  Yes.

9            MR. TEPFER:  Okay.  If we can go to

10  Exhibit 32.

11           (Plaintiff's Exhibit 32 was

12           previously marked for identification

13           by the FTC and is attached hereto.)

14  BY MR. TEPFER:

15     Q.    I'm now handing the witness what's been

16  marked Exhibit 32.

17     A.    Ready when you are.

18     Q.    Sure.

19           Do you recall receiving this email?

20     A.    No.

21     Q.    Is the 1 percent -- is it your understanding

22  that the 1 percent that Mr. Medina refers to, the

23  1 percent processing that the CEOs of the AuraVie

24  companies received?

25           MR. UNGAR:  Objection as to the form of the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    question.  Vague and ambiguous, assumes facts not in

2    evidence.

3            THE WITNESS:  Do you want -- are we speaking

4    about this document, or are we generalizing from

5    this document?

6    BY MR. TEPFER:

7        Q.    Just, first, to talk about this document.

8        A.    Yes.

9        Q.    Did you -- you didn't have any ownership

10   percent -- or -- any ownership interest in Heritage

11   Alliance Group, did you?

12       A.    No.

13       Q.    And you didn't for, I guess -- is that AMD

14   Financial Network?

15       A.    I did not.

16       Q.    Do you have any idea why Paul Medina might

17   be reporting to you the income of those companies?

18       A.    Yes.

19       Q.    Why is that?

20       A.    They're -- they're selling AuraVie.

21       Q.    And did you receive a percentage of -- or

22   the profit from those companies?

23            MR. UNGAR:  Objection as to the form of the

24   question.  Vague and ambiguous, assumes facts not in

25   evidence.

146

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          THE WITNESS:  I don't understand your

2    question.

3    BY MR. TEPFER:

4      Q.   The amount of money that was processed

5    through the AuraVie companies, would you receive a

6    share of the profit from those sales?

7      A.   If it made money, yes.

8      Q.   Okay.  Do you have any idea why Paul Medina

9    might have included Doron on this email?

10     A.   No.

11     Q.   Was -- this is in, I guess, June of 2012.

12   Was Nastassia still employed at BunZai at that time?

13     A.   I --

14          MR. UNGAR:  Objection as to the form of the

15   question.  It's vague and ambiguous, it assumes

16   facts not in evidence.

17          THE WITNESS:  I don't recall exactly.

18   Nastassia left no -- she was still -- she still

19   would have been there by then.

20   BY MR. TEPFER:

21     Q.   Okay.

22     A.   She still should have been there.

23     Q.   If we could go to Exhibit 33.

24   ///

25   ///

147

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1              (Plaintiff's Exhibit 33 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4   BY MR. TEPFER:
 5      Q.   I'm now handing the witness what's been
 6   marked as Exhibit 33.
 7              Have you ever seen this document before?
 8      A.   I have.  I think I saw it as part of the
 9   evidence on this case.
10      Q.   Had you ever seen it before it was filed in
11   this case?
12      A.   No.
13      Q.   Did -- do you know who drafted this
14   document?
15      A.   I think Khristopher drafted this.
16      Q.   Do you know if BunZai Media Group ever
17   entered into the agreement that's written down here?
18      A.   I have no idea.  No.
19      Q.   That's no, they never entered into it?
20      A.   No.
21      Q.   And you never signed this document?
22      A.   This document is false and wrong.
23      Q.   And so --
24      A.   This document is false.
25      Q.   And when you say "false," you mean it, this
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1    was a contract that was never entered into?

2        A.    It was never entered into, it is written

3    wrong, and -- and I don't know about this contract.

4    It says -- it says stuff that's completely not true.

5    Company has given the right to BunZai, no.

6        Q.    Do you have any idea why Khristopher Bond

7    might have drafted this document?

8        A.    No.  May have been a request that he

9    understood wrong.  No idea.

10       Q.    And so BunZai Media Group did not have any

11   or did not purchase the right to the AuraVie product

12   name from any company?

13       A.    No.

14             MR. TEPFER:  Actually, I think now might be

15   a good time for lunch.  Do you want to meet back at

16   1:30?

17             We can go off the record.

18             (A discussion was held off the record.)

19

20             (Whereupon, at the hour of

21             12:14 p.m., a luncheon recess was

22             taken, the deposition to be resumed

23             at 1:31 p.m.)

24

25

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
     1                 LOS ANGELES, CALIFORNIA
     2              THURSDAY, FEBRUARY 18, 2016
     3                      1:31 P.M.
     4
     5                    ALON NOTTEA,
     6          having been previously duly sworn,
     7        was examined and testified as follows:
     8
     9         MR. TEPFER:  Back on the record.
    10         Could you read back the last question.
    11         (The previous question was read back
    12         by the court reporter as follows:
    13            "QUESTION:  And so BunZai Media
    14         Group did not have any or did not
    15         purchase the right to the AuraVie
    16         product name from any company?")
    17         THE WITNESS:  No.
    18         (Plaintiff's Exhibit 36 was
    19         previously marked for identification
    20         by the FTC and is attached hereto.)
    21
    22                    EXAMINATION
    23    BY MR. TEPFER:
    24      Q.   Okay.  I'm handing the witness what's been
    25    marked Exhibit 36.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1          Do you know anyone named Eugene Shampansky?

2     A.   I know him.

3     Q.   Do you have any business dealings with

4     Mr. Shampansky?

5     A.   I do not.

6     Q.   Do you know who uses -- in the cc area it

7     says Xposed, Inc.  Do you know who uses that email

8     address?

9     A.   My brother.

10    Q.   Do you know of a company called NexiPay?

11    A.   Yes.

12    Q.   Do you know -- or rather, why did you

13    request that Mr. Shampansky forward all corporate

14    VastPay NexiPay docs to you?

15    A.   Igor asked me.

16    Q.   Did you assist Mr. Latsanovski in

17    incorporating either of those companies?

18    A.   No, no.

19    Q.   Did Igor explain why he wanted you to get

20    the corporate documents for VastPay and NexiPay?

21    A.   Because Eugene was the one who held it from

22    him, and he likes to keep -- he liked to keep a

23    record in -- in our side as well.

24          So he just said ask Eugene for the corporate

25    documents or for some documents.  There may have

151

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

```
 1    been a bank account he wanted.  Just as a favor
 2    because he wasn't good in English -- provided it to
 3    him.
 4         Q.   Do you know what NexiPay's business is?
 5         A.   Same as VastPay.
 6         Q.   Same --
 7         A.   Same as VastPay.  Little bit different
 8    business models, but same merchant processing.
 9         Q.   Okay.  I'll jump to Exhibit 38.
10              (Plaintiff's Exhibit 38 was
11              previously marked for identification
12              by the FTC and is attached hereto.)
13    BY MR. TEPFER:
14         Q.   I'll hand the witness what's been marked as
15    Exhibit 38.
16         A.   Thank you.
17         Q.   Do you know who Leor Arazy is?
18         A.   Yes, I do.
19         Q.   And that's L-e-o-r A-r-a-z-y.
20              And who is Leor Arazy?
21         A.   She was responsible for Human Resources.
22         Q.   And was that at BunZai Media Group?
23         A.   This document in particular is from Pinnacle
24    Logistics.  I don't have a recollection that she was
25    there for BunZai.
```

152

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        2/18/2016

1      Q.    Would you typically receive salary reports
2   broken down by department from Leor Arazy?
3      A.    No.
4      Q.    Do you recall receiving this salary report,
5   in particular?
6      A.    No.
7      Q.    Do you have any idea why Ms. Arazy may have
8   sent you this salary report?
9      A.    It may have been for analyzing of expenses,
10  kind of some way to analyze expenses.  The subject
11  here is "Salary Breakdown for May", and then it says
12  attachment is May salaries, so it seems as though
13  she was the one that gave the departments that she
14  was managing, she gave those hours for payroll to
15  the payroll company.  So it's just -- it's just --
16  it seems like it's a document so everybody can get
17  in line and reconcile accounts.  That's what it
18  seems like to me.
19     Q.    Did you personally review this report?
20     A.    No.
21     Q.    And you said that this was so the companies
22  can reconcile accounting?  Is that what you said?  I
23  may have misheard you.
24     A.    Yeah.  That's what it seems like.
25     Q.    What do you mean by "reconcile accounting"?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

```
 1        A.    Just what it means, reconciliation of
 2   accounting.   Just to make sure that the reports that
 3   come out at the end are in line of what actual
 4   expense were.   Just kind of make sure that the
 5   numbers add up.
 6        Q.    And did you perform this sort of accounting
 7   for Pinnacle Logistics?
 8        A.    No.
 9        Q.    Do you know if Doron did?
10        A.    No.
11        Q.    And what about Nastassia?
12        A.    I think Pinnacle is right -- I don't know.
13        Q.    Did you ever communicate with Oz Mizrahi
14   concerning these, I guess, salary reports?
15        A.    No.
16        Q.    The second sentence of Ms. Arazy states,
17   "You will notice that this months salary is higher
18   than usual because June 1st payroll came out on"
19   March -- or rather, "on May 31st."
20              Were you typically apprised of, I guess, the
21   monthly salaries for Pinnacle Logistics?
22        A.    I don't know what the word "apprised" means.
23   I'm sorry.
24        Q.    That's okay.
25              Were you -- I guess, were you typically
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

154

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    advised about the monthly salary for Pinnacle

2    Logistics?

3        A.    I was advised of the entire expenses and

4    income as a whole in a report.  This is just a part

5    of what ended up in front of me.

6        Q.    Okay.  I'm going to go to Exhibit 42.

7              (Plaintiff's Exhibit 42 was

8              previously marked for identification

9              by the FTC and is attached hereto.)

10   BY MR. TEPFER:

11       Q.    I'm now handing the witness what's been

12   marked as Exhibit 42.

13             Do you recall sending this email to

14   Mr. Latsanovski?

15       A.    Yes.

16       Q.    Do you know what it's concerning?

17       A.    It's concerning the same doc -- document you

18   showed me earlier -- I forgot the exhibit number --

19   regarding a guy named Alex and his PayPro business.

20       Q.    Mm-hmm.

21       A.    These are questions I created on behalf of

22   what Igor should ask this guy if he wanted to

23   invest.

24       Q.    And was it your understanding, when you

25   emailed him these questions, that he would receive

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

     1    this?

     2         MR. UNGAR:  Objection as to the form of the

     3    question.  It's vague and ambiguous.

     4         THE WITNESS:  I have no idea what you just

     5    asked.

     6    BY MR. TEPFER:

     7    Q.    When you sent this email to Mr. Latsanovski,

     8    was it your impression that he would receive it and

     9    read it?

    10    A.    No.  It was my impression that he would

    11    forward it from his email to the guy.

    12    Q.    Okay.  When you said in this email, "Do you

    13    have the customers service personnel to support the

    14    questions that will arise from these merchant

    15    accounts?", what sort of questions did you

    16    anticipate?

    17    A.    So the business model there, if I remember

    18    correctly, was to open up websites for people.  And

    19    for people to have websites, they also need to get

    20    merchant accounts so they can sell something online.

    21    This is nothing to do with continuity, by the way.

    22    It's just regular business.

    23         So what I told him was "As soon as people

    24    get a merchant account to your company, they're

    25    going to call in, and how do I do use this, How do I

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    do that?  So you support these questions.  Can you
 2    support customer inquiries for regular people who
 3    don't know how to integrate and work with your
 4    technology?  So get ready.  If you want to open up
 5    200 sites a day, get ready for some phone calls."
 6        Q.   Sure.
 7             If we could go to Exhibit 46.
 8             (Plaintiff's Exhibit 46 was
 9             previously marked for identification
10             by the FTC and is attached hereto.)
11    BY MR. TEPFER:
12        Q.   I'm handing the witness what's been marked
13    Exhibit 46.
14             Do you recognize this invoice?
15        A.   No.
16        Q.   Did, to your knowledge, did Adageo, LLC,
17    ever receive 13,500 -- or rather, did Adageo ever
18    pay 13,500 to Secured Commerce for design, creation,
19    and optimization of AuraVie landing pages?
20        A.   No, I don't think so.  I don't believe so.
21        Q.   So it's -- did Adageo, LLC, ever provide
22    consulting to any of the AuraVie companies?
23             MR. UNGAR:  Objection as to the form of the
24    question.  It's vague and ambiguous.
25             THE WITNESS:  Yes.
```

157

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    BY MR. TEPFER:

2        Q.    What sort of consult --

3              Well, first, what companies did Adageo, LLC,

4    provide consulting services to?

5        A.    I -- I don't recall directly.

6        Q.    Sure.

7        A.    It may have been one of the company, but I

8    can't give you specifics.

9        Q.    What sort of consulting services?

10       A.    Management.

11       Q.    And when you say "management," is that,

12   like, how to manage a company?

13       A.    How to manage a company, how to manage a

14   campaign, how to, you know, be in business in online

15   arena.

16       Q.    And would -- was it you personally that was

17   providing these consulting services?

18       A.    If it was -- if it was a consulting services

19   to Adageo, maybe it was me personally.

20       Q.    Are there other employees at Adageo, LLC?

21       A.    No.

22       Q.    Did Secured Commerce ever provide Adageo any

23   services at all, to your knowledge?

24       A.    No.

25       Q.    And I don't believe I asked this:

158

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
 1          The 16161 Ventura Boulevard, Number 378,
 2     provided for Adageo, LLC, is that address correct?
 3          A.   I believe --
 4               MR. UNGAR:  Objection as to the form of the
 5     question.  It's vague and ambiguous.
 6               THE WITNESS:  Is the address correct for
 7     Adageo?
 8     BY MR. TEPFER:
 9          Q.   Yes.
10          A.   I think so.
11          Q.   So did -- is that a -- to your knowledge, is
12     that an office location?
13          A.   P.O. Box.
14          Q.   Where was Adageo, LLC, physically located?
15          A.   Right there.
16          Q.   At that -- at the P.O. Box or at --
17          A.   (Witness shakes head up and down.)
18          Q.   Did Adageo, LLC, ever conduct business at
19     7900 Gloria?
20          A.   No.
21          Q.   Did you ever do work on behalf of Adageo,
22     LLC, at home?
23          A.   I think -- like I said, it's a personal
24     service LLC, my consulting.  So my answer would be
25     yes.  I do it in the shower.  Every time I think, I
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    do work for Adageo.  It's like my thoughts.

2        Q.   Do you recall where Adageo, LLC, maintained,

3    like, physical records?

4        A.   Such as?

5        Q.   Any invoices it receives, for example.

6        A.   No.  It usually doesn't receive invoices.

7        Q.   Can you think of any companies that did

8    provide design, creation, or optimization of AuraVie

9    landing pages?

10       A.   BunZai Media Group.

11       Q.   And did BunZai handle all of that process

12   inhouse?

13       A.   Yes.

14            (Plaintiff's Exhibit 48 was

15            previously marked for identification

16            by the FTC and is attached hereto.)

17   BY MR. TEPFER:

18       Q.   I'm now handing the witness what's been

19   marked as Exhibit 48.

20       A.   Thank you.

21       Q.   Do you know anyone named Jose that works at

22   Gryphon Investment Group?

23       A.   No.

24       Q.   Do you recall sending this email?

25       A.   No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    Do you know anyone named Micky?

2            MR. UNGAR:  Objection as to the form of the

3      question --

4            THE WITNESS:  No.

5            MR. UNGAR:  -- it's vague and ambiguous, not

6      discovery relevant, not reasonably calculated to

7      lead to the discovery of admissible evidence, not

8      related to any of the issues that are the subject of

9      this lawsuit.

10           I presume you're not referring to Mickey

11     Mouse.

12           THE WITNESS:  No.

13     BY MR. TEPFER:

14     Q.    The first sentence of this email refers to a

15     Micky.  Do you have any idea who that might be?

16     A.    No.

17     Q.    Is this email a typical representation of

18     what you would send to potential investors for

19     BunZai Media Group?

20     A.    No.

21     Q.    Would you typically send investors or

22     potential investors from BunZai Media Group any sort

23     of introductory email?

24     A.    No.

25     Q.    How did you --

161

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1       A.    Investors?  No.
 2       Q.    In the second sentence you state that you
 3  called Jose on Friday regarding setting up a
 4  merchant processing relationship.
 5            Do you remember that phone call?
 6       A.    No recollection of it.  It's five years ago.
 7  I don't know who Jose is.  I may have called some
 8  guy.  You know, I did a lot of business in few
 9  years.  No.
10       Q.    Did Mr. Latsanovski ever, to your knowledge,
11  provide you any introductions to individuals at
12  merchant processing companies?
13       A.    I asked -- I asked him if he can introduce
14  me to a few people.  I remember during the course of
15  a few years together he may have introduced me to a
16  few people in the business.
17       Q.    And did Mr. Latsanovski have a lot of
18  connections in the merchant processing industry?
19       A.    No.
20            MR. UNGAR:  Objection to the form of the
21  question.  It's vague and ambiguous, it calls for
22  speculation, lacks foundation.
23  BY MR. TEPFER:
24       Q.    In -- later on you state "In every
25  department of our business, from Product
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

1    Development, Manufacturing, Design & Optimization,

2    Media Planning & Buying, Merchant Processing,

3    Understanding Online Compliance, Affiliate

4    Management & Fraud Prevention, to 'True, In-house'

5    Customer Service, Call Center Management & Product

6    Fulfillment."

7             Are those an accurate description of BunZai

8    Media Group's various departments?

9         A.   It's -- no.

10        Q.   Are there --

11        A.   It's not department.

12        Q.   Are there any of the, I guess, the

13   departments described there that were departments at

14   BunZai Media Group?

15        A.   No, no.  There was a Design Department.

16        Q.   Later on you state that "We understand

17   consumer/publisher fraud and are extremely proactive

18   with chargeback resolution."

19             What did you mean by the phrase "extremely

20   proactive with chargeback resolution"?

21        A.   Just what it means.

22        Q.   As in that -- how do you -- how do you mean

23   "proactive"?

24        A.   How do I mean "proactive"?

25        Q.   Well --

163

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

```
 1        A.    By -- by finding possible, the quickest way
 2   to minimize damages and finding resolution with the
 3   customer.
 4        Q.    And what is --
 5            So chargeback resolution, does that phrase
 6   include contesting chargebacks successfully?
 7            MR. UNGAR:  Objection as to the form of the
 8   question.  It's vague and ambiguous.
 9            THE WITNESS:  No.
10   BY MR. TEPFER:
11        Q.    Are you familiar with BunZai Media Group's
12   chargeback resolution processes?
13        A.    Not in detail.
14        Q.    Who at the company would be tasked with
15   chargeback resolution or managing that department?
16        A.    In the beginning Khristopher took a couple
17   of months to call a bunch of companies to get a
18   deeper understanding of what needs to happen in
19   order to comply and supply and respond back to
20   chargebacks.  And he called a few banks and called a
21   few merchant processors and did some research and
22   created a protocol.  So the Regional Department was
23   actually maintained and created by Khristopher, and
24   then I think he handed it down to a few of the
25   employees.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1        Q.    Did BunZai Media Group have a merchant
 2   account with National -- National Merchant at any
 3   point?
 4        A.    National Merchant?
 5        Q.    Yes.
 6        A.    National Merchant?  National Merchant, no,
 7   I'm not familiar with that name.
 8        Q.    Okay.  Do you know anyone by the name of
 9   Roman Balanko?
10        A.    Yes.
11        Q.    Who is he?
12        A.    He's a merchant processor.
13              (Plaintiff's Exhibit 58 was
14              previously marked for identification
15              by the FTC and is attached hereto.)
16   BY MR. TEPFER:
17        Q.    I'm now handing the witness what's been
18   marked Exhibit 58.
19              Do you recall receiving this email from
20   Mr. Latsanovski?
21        A.    No.
22        Q.    To your recollection, did you ever have any
23   conversations with Mr. Latsanovski regarding Visa
24   and MasterCard Excessive Chargeback Program?
25        A.    No.  This is an email that he forwarded me.
```

165

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.   Do you have any idea why Igor would send you
2   this email?
3      A.   He -- he received an email from Roman,
4   figured that it's relevant to me, and forwarded it
5   to me.  Other than that, I have no idea why.
6      Q.   Do you know anyone named Greg Augustine?
7      A.   Yes.
8      Q.   Who is he?
9      A.   I believe he's also a merchant processor.
10      Q.   And are you familiar with anything called a
11   Midflex chargeback intercept program?
12      A.   I think that's his -- intercept program, I
13   think that's kind of in line with him, Greg
14   Augustine.
15      Q.   And do you have any understanding of what a
16   chargeback --
17      A.   I never -- sorry.
18      Q.   -- chargeback intercept program is?
19      A.   I have an understanding of my understanding.
20   I don't know what his -- I never saw seen a demo.  I
21   don't know what he sold.  I don't know what the
22   product is.  I just know I saw it in a signature
23   line in the bottom of one of his emails.
24   ///
25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1              (Plaintiff's Exhibit 62 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4    BY MR. TEPFER:
 5       Q.   I'm now handing the witness what's been
 6    marked as Exhibit 62.
 7       A.   Thank you.
 8       Q.   Do you recall receiving this email from
 9    Mr. Latsanovski?
10       A.   This is not from Mr. Latsanovski.  No, I
11    don't.
12       Q.   My apologies.  Rather, from you to
13    Mr. Latsanovski.
14            Do you recall sending this email to
15    Mr. Latsanovski?
16       A.   No.  I don't recall this email, period.
17       Q.   Have you ever -- sorry, were you done?
18       A.   Go ahead.  Go ahead.
19       Q.   Have you ever discussed BunZai Media Group's
20    chargeback resolution protocol with Mr. Latsanovski?
21            MR. UNGAR:  Objection as to the form of the
22    question.  It's vague and ambiguous and assumes
23    facts not in evidence.
24            THE WITNESS:  No.
25    ///
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    BY MR. TEPFER:

2        Q.   Why would you have thought that

3    Mr. Latsanovski would be interested in Midflex's

4    chargeback intercept program?

5        A.   I think it's while -- during the same time

6    that I asked him for making an investment in

7    Chargeback Armor, and it may have been to show him

8    that, you know, look, people are doing it.  It's --

9    you know, maybe to kind of spark some insight from

10   my asking of money from him.

11       Q.   Did you ever consider contracting for a

12   chargeback intercept program for BunZai Media Group?

13       A.   I did.

14       Q.   And what exactly is your understanding of

15   what a chargeback intercept program is?

16       A.   I have no idea what intercept program is.  I

17   have chargeback -- third party chargeback rebuttal

18   service.  I have no idea what chargeback intercept

19   program is.

20       Q.   Why did you come to consider contracting for

21   a chargeback rebuttal service for BunZai Media

22   Group?

23       A.   Managing less people.  There was few people

24   in the department.  I met a woman named Sabina who

25   showed me that she can do it better and faster and

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    more accurately, and I can get rid of the two, three
2    people working on it.  I went for it.
3       Q.   So it was a way to lessen expenses relating
4    to employees?
5       A.   Not just expenses, but also, managing them,
6    dealing with them and -- you know.
7       Q.   Did Alan Argaman come to assist you with
8    these -- with a chargeback resolution program?
9       A.   Eventually -- Alan Argaman didn't assist me.
10   No.
11      Q.   Did Alan Argaman provide BunZai Media Group
12   services regarding an automated telephone service
13   for answering customer calls?
14      A.   No.
15      Q.   Did BunZai Media Group ever have an
16   automated service for responding to customer,
17   consumer calls?
18      A.   You're not saying it right, but yes, let's
19   continue.  We'll fix it.
20      Q.   Sure.
21           And just to clarify, am I, I guess, using
22   the wrong company name or --
23      A.   No.
24      Q.   Oh.  Did any of the other AuraVie companies,
25   to your knowledge, have an automated service for

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    responding to customer request?

2        A.   At some point all of our customer service

3    numbers were pointed to an automated system

4    before -- before they got routed to an agent, so the

5    consumer had an opportunity -- because sometimes

6    people would call in at 2:00 o'clock in the morning,

7    3:00 o'clock in the morning.  So we wanted to have a

8    way where they can find resolution instead of

9    hanging up and not finding a customer service agent

10   or somebody that can manage their problem.

11        So there was an automated system that

12   recognized the customer and enabled him to either

13   opt out of the system, cancel out of his continuity

14   program.  Even at 3:00 o'clock in the morning, there

15   was an automated system without an agent.  So it was

16   basically there to provide a mechanism for a

17   consumer who called in on off business hours or on

18   on business hours where there was an overflux of

19   numbers, to be able to deal with the company and not

20   get a busy signal and be on hold for a long time.

21        Q.   Was that automated service initially

22   provided to the AuraVie companies by a third party

23   company?

24        A.   It was provided by a company called

25   RevGuard.

170

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Q.   Do you know who owns the company RevGuard?

2      A.   No idea.

3      Q.   Do you know, do you recall who your contact

4    was at RevGuard?

5      A.   No.

6      Q.   Did you personally negotiate that contract

7    with RevGuard?

8      A.   I think I may have made the first call, and

9    then I handed it off to Paul or somebody.

10     Q.   You mentioned multiple phone numbers being

11   pointed to one number; is that correct --

12     A.   No.

13     Q.   -- earlier?

14     A.   I just mentioned multiple phone numbers.

15     Q.   Did each of the AuraVie companies have a

16   separate 800 number?

17     A.   Every company had their own -- every one

18   of -- are we talking about the AuraVie companies?

19     Q.   Yes.

20     A.   They each had their own phone number.

21     Q.   Did BunZai Media Group ever use a third

22   party chargeback rebuttal service?

23     A.   Yes.

24     Q.   And what service was that?

25     A.   Sabina -- they're called -- I forgot the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    name of her platform.  I forgot the name.  It was a

2    cool name she had.

3        Q.   Did BunZai ever use any other chargeback

4    rebuttal service?

5        A.   I don't think it was BunZai anymore.

6        Q.   What company was it?

7        A.   Some of the other entities.

8        Q.   Okay.  Did Alan Argaman ever provide any of

9    the AuraVie companies any chargeback rebuttal

10   service?

11       A.   You mean himself personally?

12       Q.   Himself personally or any other company that

13   he owns.

14            MR. UNGAR:  Objection as to the form of the

15   question.  It's compound.

16            THE WITNESS:  Just ask it again.

17   BY MR. TEPFER:

18       Q.   Sure.

19            Did Secured Merchants ever provide any of

20   the AuraVie companies chargeback rebuttal services?

21       A.   No.

22       Q.   Did Alan -- did any company Alan Argaman

23   worked for, to your knowledge, provide any of the

24   AuraVie companies chargeback rebuttal services?

25       A.   No.  We did some chargeback services with

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            2/18/2016

1    Chargeback Armor, and it was managed through Mike
2    Costache.
3        Q.   So Chargeback Armor provided some of the
4    AuraVie companies chargeback rebuttal --
5        A.   Yes, they did.
6        Q.   -- services?
7             For what period of time did Chargeback Armor
8    provide the AuraVie companies chargeback rebuttal
9    services?
10       A.   From the period of time where another third
11   party didn't work and -- and slowly on they started.
12   I don't know exactly when.  For me it was the same.
13   For me it was whoever, just somebody respond.  I
14   don't know exactly the dates and when it
15   transitioned from a different third party to that
16   third party.
17       Q.   So do you mean you don't know when that
18   service or that -- I guess, when it came to be
19   called Chargeback Armor, Inc.?
20       A.   No.  I just don't know when we left Sabina,
21   and then there was somebody else in between.  We
22   attempted a few third party for people to respond
23   from.
24       Q.   Okay.  Do you know if -- just to help narrow
25   down the timeframe a little bit, do you happen to

173

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      recall if Chargeback Armor provided these chargeback

2      rebuttal services prior to 2015?

3          A.   Yes.

4          Q.   Do you know if it was prior to 2014?

5          A.   Should have been right around there.   2014

6      seemed like a good year for them.

7               (Plaintiff's Exhibit 65 was

8               previously marked for identification

9               by the FTC and is attached hereto.)

10     BY MR. TEPFER:

11         Q.   I'm now handing the witness what's been

12     marked Exhibit 65.

13              Have you ever seen this spreadsheet before?

14         A.   No.

15         Q.   Do you know what Dynamic Media, Inc., is?

16         A.   Is it here?

17         Q.   Sorry.  It's down at Number 22.

18         A.   No.  It's either an adult company or tech

19     company.  I'm not really sure which one.

20         Q.   What about, have you ever heard of Intensive

21     Media, Inc.?

22         A.   No.

23         Q.   Have you ever heard of Impulse Media, Inc.?

24         A.   I think these are something to do with adult

25     companies.  Nothing to do with me.  No.

174

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           2/18/2016

1       Q.   And Ipoint Vision, LLC, have you ever heard
2    of that?

3       A.   I have.

4       Q.   What's that company?

5       A.   It's a LLC owned by Tal Karasso.

6       Q.   Do you know what Ipoint Vision, LLC's,
7    business was?

8       A.   No.  Just looking for business.  Tal was
9    looking for something to do.

10      Q.   Do you know who Sean Brennecke is?

11      A.   Sean Brennecke, yes.

12      Q.   Sorry.  And that's B-r-e-n-n-e-c-k-e.

13           Who is Sean Brennecke?

14      A.   He was the CEO and guaranty for merchant
15   account of All Star Beauty Products.

16           (Plaintiff's Exhibit 66 was

17           previously marked for identification

18           by the FTC and is attached hereto.)

19   BY MR. TEPFER:

20      Q.   I'm now handing the witness what's been
21   marked Exhibit 66.

22      A.   From Kristina Perez to Alon, Khristopher,
23   Nastassia.

24      Q.   Do you recall receiving this email?

25      A.   No.  This is a long time ago.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1        Q.    Right.  It's from 2010.

2              Do you recall what company you were

3    discussing with Kristina a merchant account for?

4        A.    Could have been for BunZai.  I'm not sure.

5    I have to read.

6        Q.    Sure.

7        A.    She's telling me I spoke to my underwriter,

8    am happy -- okay.  Oh, hold on a second.

9        Q.    Sure.

10       A.    I saw something on here.  Gina Stagnitto and

11   DT.

12             This is a referral.  This is not from me.

13   This is a referral to Gina Stagnitto, and DT is

14   Daryl Turico, two people that wanted me to introduce

15   them to somebody or introduce me to her.  This is

16   nothing to do with my business.

17       Q.    So this email is concerning a referral that

18   you were making for another company?

19       A.    This particular one, 'cause there's two

20   people that are attached to here and don't have

21   anything to do with my business.  So that particular

22   one, she's not talking --

23       Q.    On 66-2 --

24       A.    Yes.

25       Q.    -- you state that this is -- "Because we are

176

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    all stressed for time - this is an email I sent to

2    Affiliate Networks and new publishers" and proceed

3    to give a short 'About Us' regarding BunZai Media.

4          Do you recall why you were providing this

5    information to Ms. Perez?

6    A.   No.  So let's find out.  I just have to read

7    it.  I don't know.

8    Q.   Okay.

9    A.   Okay.  All yours.

10   Q.   Are you okay?

11   A.   Ready.  Yeah.  I just hit my -- never mind.

12   We're on oath, we're on record, and --

13   Q.   Sure, sure.

14   A.   -- I banged my leg on my kid's bed in the

15   morning.

16   Q.   Oh, okay.

17   A.   Was there a question?

18        (The previous question was read back

19        by the court reporter as follows:

20           "QUESTION:  Do you recall why you

21        were providing this information to

22        Ms. Perez?")

23        MR. TEPFER:  So was there an answer?

24        (The previous answer was read back by

25        the court reporter as follows:

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1              "ANSWER:  No.  So let's find out.
 2         I just have to read it.  I don't
 3         know.")
 4    BY MR. TEPFER:
 5         Q.   And after reviewing it, do you have any
 6    better idea why you provided this information?
 7         A.   It seems like for the establishment of a
 8    merchant account.  She needed some information about
 9    our company for -- for the establishment of a
10    merchant account.
11         Q.   At this point was BunZai Media Group
12    considering establishing merchant accounts overseas?
13         A.   I don't believe so.  One second.  I just
14    want to make sure because I'm not really -- the
15    terms and conditions page.  Testimonials are from
16    new customers.  Products meet manufacturer --
17              I just don't know.  I just don't want to --
18    I don't know.
19         Q.   I understand.
20         A.   So here you go.  I mean, if you -- if you
21    like me to answer on this paper, I really have to go
22    through it well because all of these -- these are
23    merchant accounts for non-continuity or
24    trial business, so --
25              MR. UNGAR:  Counsel, would you like him to
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

178

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    read the whole document?

2            THE WITNESS:  Do you want me to read it?  I

3    can read it.

4    BY MR. TEPFER:

5        Q.   Sure.  Feel free to look at it, if you feel

6    it will help refresh your recollection.

7        A.   Talks about TV guides and infomercial and,

8    you know.  So go ahead ask me.

9        Q.   I think those are the only questions I

10   have --

11       A.   Okay.

12       Q.   -- concerning that particular document.

13           (Plaintiff's Exhibit 67 was

14           previously marked for identification

15           by the FTC and is attached hereto.)

16   BY MR. TEPFER:

17       Q.   I'm now handing the witness what's been

18   marked Exhibit 67.

19           Have you ever reviewed this document before?

20       A.   I've never seen this before in my life.

21       Q.   Do you have any idea why Doron Nottea may

22   have possessed this document?

23       A.   Doron?

24       Q.   Uh-huh.

25       A.   Take advantage of the opportunity -- I don't

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    know.  Maybe in a document from some book or some

2    copy machine.  I have no idea why Doron would have

3    this document.

4         Q.   Do you know if your brother Doron ever

5    provided accounting services to Pinnacle Logistics?

6         A.   Accounting services, no.

7         Q.   Do you know if he ever provided any services

8    to Pinnacle Logistics?

9         A.   I don't believe so.  They -- they were --

10   they kind of took over the building that he left.

11   So I'm sure there was some communication,

12   transitioning of Internet services, stuff like that,

13   but Pinnacle took over where Doron's old business

14   was, where there was some -- there was some -- he

15   was the guy on the lease, so there must have been

16   some transfers of responsibilities from the

17   landlord.

18        Q.   And just for the sake of clarity, that

19   address, the building you're talking about, is that

20   the --

21        A.   7900 Gloria Avenue was originally Doron's

22   adult distribution warehouse, and I came to my

23   brother to rent some space from him.

24        Q.   Okay.  If we could go to Exhibit 76.

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
 1              (Plaintiff's Exhibit 76 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4     BY MR. TEPFER:
 5        Q.   I'm now handing the witness what's been
 6     marked Exhibit 76.
 7        A.   Yes.
 8        Q.   Have you ever seen this document before?
 9        A.   Never.
10        Q.   Have you ever seen chargeback reports
11     similar to this one?
12        A.   No.
13        Q.   Do you know if anyone at BunZai Media Group
14     ever created chargeback reports like this?
15              MR. UNGAR:  Objection as to the form of the
16     question.  It's vague and ambiguous.
17              THE WITNESS:  They obviously did.  This is
18     some people that used to be a part of the Customer
19     Service Department.
20     BY MR. TEPFER:
21        Q.   Do you --
22        A.   Go ahead.  Go ahead.
23        Q.   Are there any names listed in those columns
24     that you don't recognize to have been employees at
25     BunZai Media Group?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1        A.    I don't remember any guy named Shant.   I'm

2    starting at the bottom here.

3        Q.    Okay.

4        A.    I don't remember an Ingrid.   I don't

5    remember a Derek.   Shant, Chadne, I don't remember.

6    And Alan, I don't know who Alan is, but, you know --

7    that's it.   So Alan, Derek, Ingrid, and Shant, I

8    don't know those names.

9        Q.    And the rest?

10       A.    I recognize those names.

11       Q.    And do you recognize them as employees of

12   BunZai?

13       A.    Yes.   I recognize them as employees.   I'm

14   not really sure which entity.

15       Q.    I'm going to jump to Exhibit 77.

16             (Plaintiff's Exhibit 77 was

17             previously marked for identification

18             by the FTC and is attached hereto.)

19   BY MR. TEPFER:

20       Q.    And I'm now handing the witness what's been

21   marked as Exhibit 77.

22             Have you ever reviewed a BunZai Media Group,

23   Inc., Customer Service Training Manual?

24       A.    No.   Never seen this before in my life.

25       Q.    I believe the author of this document,

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   according to the metadata, was Nastassia Yalley.  Do

2   you recall if she was tasked with creating a BunZai

3   Media Group Customer Service Training Manual?

4            MR. UNGAR:  Objection as to the form of the

5   question.  Vague and ambiguous, and assumes facts

6   not in evidence.

7            THE WITNESS:  I don't recall.

8   BY MR. TEPFER:

9       Q.   To your knowledge, when a customer returned

10  the AuraVie risk free trial, would they typically be

11  assessed a 15 percent restocking fee?

12           MR. UNGAR:  Objection as to the form of the

13  question.  Vague and ambiguous.

14           THE WITNESS:  No.

15  BY MR. TEPFER:

16      Q.   To your knowledge, did BunZai ever assess

17  restocking fees for returned products?

18           MR. UNGAR:  Objection as to the form of the

19  question.  Vague and ambiguous.

20           THE WITNESS:  No, I don't recall.  I wasn't

21  in Customer Service, so I don't know a lot of

22  details.

23  BY MR. TEPFER:

24      Q.   On 77, if you turn to 77-22, there are

25  percentages for discounts.

183

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1        A.    Okay.

 2        Q.    At the top it says 97.88.  Is that the

 3   amount that BunZai Media Group would charge for the

 4   AuraVie shipments?

 5        A.    Yes, it is.

 6        Q.    Do you have any idea why the Customer

 7   Service Training Manual may have had these

 8   percentage discount charts in it?

 9             MR. UNGAR:  Objection as to the form of the

10   question.  Vague and ambiguous, calls for

11   speculation, lacks foundation --

12             THE WITNESS:  No.

13             MR. UNGAR:  -- assumes facts not in evidence

14   that there actually ever was such a training manual.

15             THE WITNESS:  Pretty detailed.

16   BY MR. TEPFER:

17        Q.    To your knowledge, would -- was it standard

18   operating procedure for customer service

19   representatives at BunZai to first offer a partial

20   refund when a customer asked for a refund?

21        A.    I -- I'm not really sure as far as what the

22   offer partial is, but if somebody offered something

23   partial, then -- if they wanted to keep the product,

24   not if they wanted to return the product.

25        Q.    Is it true that the portion of the AuraVie
```

184

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    product which was permitted -- sorry.  Let me

2    rephrase that.

3            Were consumers allowed to use the full

4    amount of the AuraVie product that they received for

5    the risk free trial?

6            MR. UNGAR:  Objection as to the form of the

7    question.  It's vague and ambiguous.

8            THE WITNESS:  Yes.

9    BY MR. TEPFER:

10    Q.   So if a customer were to return an empty --

11   or -- I guess, an empty tin of AuraVie skin cream

12   within the 10 day window, would they be entitled --

13   or would they still be assessed a 97.88 fee?

14           MR. UNGAR:  Objection as to the form of the

15   question.  It's vague and ambiguous, it's an

16   improper hypothetical.

17           THE WITNESS:  I'm not really sure.

18   BY MR. TEPFER:

19    Q.   If you'd turn please to 77-29.  I'll wait

20   for you --

21    A.   Go ahead.

22    Q.   -- to get there.

23           If you'd take a look at that, please let me

24   know, does this reflect BunZai Media Group's

25   customer service script that employees would be

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1     provided?

2         A.    So one, I've never seen this before, so I

3     don't know if it's relevant to this.  Two, it's

4     something that would be ever changed and optimized.

5     So no, I can't say that it is because I've never

6     seen this.  We can look into that call recording and

7     figure it out together.

8         Q.    Sorry.  What call recording?

9         A.    There's one call recording that you guys put

10    into evidence that you provided for me when your

11    investigator called.

12        Q.    Oh.

13        A.    We can listen to that and see what the

14    script was.  I don't remember the script being this.

15        Q.    On 77-30 through, I guess, 33, are various

16    Lime Light scenarios.

17              (Interruption in the proceedings)

18              MR. TEPFER:  Startled me.  If we could go

19    off the record real quick.

20              (A discussion was held off the record.)

21    BY MR. TEPFER:

22        Q.    All right.  As I was mentioning, there's --

23    between 77-30 and 77-33 are various Lime Light

24    scenarios.  If you would please review those and let

25    me know if this reflects BunZai Media Group -- to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

 1    your knowledge, reflects BunZai Media Group's
 2    typical operating procedure.
 3           MR. UNGAR:  Objection as to the form of the
 4    question.  It's vague and ambiguous, it assumes
 5    facts not in evidence.
 6           THE WITNESS:  I can't tell you exactly.  I
 7    wasn't in this department.  I can't tell you.  I
 8    don't know how old this document is.  I don't know
 9    what -- what year this manual is from.
10    BY MR. TEPFER:
11       Q.   Sure.
12       A.   I can't -- I can't say yes to that.
13       Q.   Okay.  Just a few more questions concerning
14    this.  If you would turn to 77-41, it's titled
15    "Important - New Customer Service Protocols" from
16    November 21st, 2011.
17           Have you ever reviewed this customer service
18    protocols listed here?
19       A.   Never seen this before, ever.
20       Q.   Are you aware if customer service
21    representatives would typically represent to
22    consumers that because they filed a chargeback, the
23    bank will hold the money for six months until they
24    make a determination that the money will be
25    redeposited into the winning party's account, and so

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1   forth, as represented in that second paragraph

2   there?

3           MR. UNGAR:  Objection as to the form of the

4   question.  It's vague and ambiguous, it assumes

5   facts not in evidence.

6   BY MR. TEPFER:

7       Q.   I guess I'll just ask.  In that second

8   paragraph it states, "Once we do win, it is our

9   protocol to send this information to the customer's

10  credit reporting agencies, which will in-turn poorly

11  affect your credit rating."

12          Are you aware if BunZai Media Group ever

13  sent to credit reporting agencies information

14  concerning customers' chargeback requests?

15      A.   Not that I'm aware of.

16      Q.   Are you aware if BunZai Media Group customer

17  service agents ever represented that they would do

18  so to consumers?

19      A.   I don't believe they did.  That wouldn't be

20  something I would allow.

21          (Plaintiff's Exhibit 83 was

22          previously marked for identification

23          by the FTC and is attached hereto.)

24  BY MR. TEPFER:

25      Q.   I'm now handing the witness what's been

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    marked Exhibit 83.

2          Do you recall receiving this email from

3    Kristina Perez?

4          A.   No.  I was cc'd here.  It was actually sent

5    to Nastassia, so I'm only a cc here.

6          Q.   Have you ever visited the website

7    AuraVieset.com?

8          A.   I can't recall.

9          Q.   Do you know if BunZai Media Group or any of

10   the AuraVie companies ever had a merchant account

11   with any company located in Tallin, Estonia?

12         A.   I don't believe so, no.

13         Q.   Do you know if BunZai Media Group ever had a

14   bank account at Rietumu Banka?

15         A.   No.

16         MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous.

18   BY MR. TEPFER:

19         Q.   Do you know if any of the other AuraVie

20   companies ever had a bank account at Rietumu Banka?

21         MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous.

23         THE WITNESS:  Number one, no.  Secondly, are

24   we referring to the same evidence now?  Are we

25   referring to the same document?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

 1    BY MR. TEPFER:

 2        Q.   Yes.  It's on page 83-3 --

 3        A.   Okay.

 4        Q.   -- it's spelled out there, if that is

 5    helpful, down in the, towards the bottom of the

 6    document.

 7        A.   No, I'm not aware of it.  I've never seen

 8    this before in my life.

 9             MR. UNGAR:  Counsel, this document, 83-3, is

10    in a foreign language.  You're honestly giving it to

11    this witness to read this?  It's in a foreign

12    language.

13    BY MR. TEPFER:

14        Q.   I'm going to go --

15             MR. UNGAR:  Do you have a translation?

16    BY MR. TEPFER:

17        Q.   I'm going to go to Exhibit 86.

18             (Plaintiff's Exhibit 86 was

19             previously marked for identification

20             by the FTC and is attached hereto.)

21             MR. UNGAR:  Counsel, do you have a

22    translation for 83-3?

23             MR. TEPFER:  No.

24             MR. UNGAR:  Well, then why are you asking

25    the witness to read a document that's in a foreign

190

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1     language?

2              MR. TEPFER:  It's a document that he

3     received, so I'm asking if he recalled it.

4              MR. UNGAR:  That's misstating the testimony.

5     It's not a document he received.  Where did he say

6     that?

7              MR. TEPFER:  He's cc'd on the email.

8              MR. UNGAR:  It's not a document he said he

9     received.  Do you have a translation of 83-3, so

10    that the gentleman sitting here answering your

11    questions can read it?  You've asked him to look at

12    it.

13             MR. TEPFER:  And --

14             MR. UNGAR:  You've directed him to the

15    document page.  It's in a foreign language.  It

16    says, "Pielikums Nr. 2 Ligumam par norekinu" -- do I

17    need to go on?

18             MR. TEPFER:  I think that's sufficient.

19             MR. UNGAR:  Can you please provide him with

20    a translation?

21             MR. TEPFER:  No.  We're going to move onto a

22    different document.

23             MR. UNGAR:  You will not provide him with a

24    translation; is that correct?

25             MR. TEPFER:  That's correct.  We're going

191

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1    to --

2            MR. UNGAR:  Please do not have my client

3    review documents that are in a foreign language,

4    unless they're Hebrew, without providing him with a

5    translation.

6    BY MR. TEPFER:

7        Q.   I'm now handing the witness what's been

8    marked Exhibit 86.

9            MR. UNGAR:  I've never heard of such

10   practice.

11   BY MR. TEPFER:

12       Q.   Do you recall receiving this email from

13   Nastassia Yalley?

14       A.   No.

15       Q.   Do you recall requesting that Roi Reuveni

16   and Paul Medina send you five ways to lessen

17   chargebacks for BunZai Media Group, Inc.?

18       A.   Sounds like me.

19       Q.   And have you ever -- if you would take a

20   look at 86-2 and 86-3.  Have you ever reviewed these

21   meeting notes before?

22       A.   No.

23       Q.   Under 1A it states, "Write an SOP for load

24   balancing".

25           Would you -- what is your understanding of

192

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      what load balancing is?

2           A.    Management of merchant accounts.

3           Q.    Did the AuraVie companies engage in load

4      balancing?

5                 MR. UNGAR:  Objection as to the form of the

6      question.  It's vague and ambiguous.

7                 THE WITNESS:  Yes.

8                 MR. TEPFER:  And actually, it's been an hour

9      here, so let's go ahead and take a ten minute break.

10                We're off the record.

11                (Recess)

12     BY MR. TEPFER:

13          Q.    On Number 5 under the notes from the meeting

14     it states, "Trashing the chargebacks that are not

15     entered into the system?  Alon wants to see them

16     first - ROI."

17                Do you know what the phrase -- what it means

18     to trash a chargeback?

19          A.    Honestly, I have no idea what that means.

20          Q.    Would you typically review chargebacks to

21     BunZai Media Group?

22          A.    No.

23          Q.    I believe you had stated that RevGuard was a

24     company that BunZai Media Group had a business

25     relationship with; correct?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1         A.    I believe so.

2         Q.    And what did -- what services did RevGuard

3    provide?

4         A.    IVR, telephony, automated services.

5         Q.    And that's the automated telephone services

6    we discussed?

7         A.    Yes.  Well, we discussed -- I think we're

8    talking about the same thing, so I'm saying yes, but

9    the one that people can cancel at 3:00 o'clock in

10   the morning and so on --

11        Q.    Right.

12        A.    -- and so forth.

13        Q.    Okay.

14        A.    Yes.

15        Q.    And Number 8 it says under "Daily/Weekly

16   reports" it refers to chargeback, "(same day you do

17   load balancing)".

18             Would -- to your knowledge, would Roi create

19   chargeback reports?

20        A.    No.  I think they would come from that

21   department.

22        Q.    And by that, you mean the chargeback

23   department?

24        A.    I mean the person managing chargebacks.

25        Q.    And to your knowledge, did anyone draft

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1   weekly load balancing reports at BunZai Media Group?
 2   A.   No.
 3   Q.   I want to go to Exhibit 93.
 4        (Plaintiff's Exhibit 93 was marked
 5        for identification by the FTC and is
 6        attached hereto.)
 7   BY MR. TEPFER:
 8   Q.   I'm now handing the witness what's been
 9   marked Exhibit Number 93.
10   A.   Thank you.
11   Q.   Have you ever visited the website
12   ripoffreport.com?
13   A.   Once, twice in my life, yes.
14   Q.   What's the first time you visited
15   ripoffreport.com?
16   A.   I heard something from a call center, and I
17   just wanted to see what it is, and I just went to
18   the site to check it out.
19   Q.   What had you heard from the call center?
20   A.   Somebody may have put a link in there or
21   somebody may have put a complaint -- something that
22   came from the call center -- and I wanted to go see
23   what Ripoff Report means, so I went to check it out.
24   Q.   And what was that, a complaint from AuraVie?
25   A.   I don't recall.  Seems like it would have
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1    been.

2         Q.   And what about the second time you visited

3    Ripoff Report; what did you view on the website that

4    time?

5         A.   I don't know.  Probably a link that I

6    clicked on.  I just remember the logo.  It was some

7    red logo.  But I don't recall.

8         Q.   Do you recall sending this link to --

9    appears Roi Reuveni?

10        A.   I sent this?

11             MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13   BY MR. TEPFER:

14        Q.   Down towards the bottom of the page.

15        A.   Yeah, I may have searched for AuraVie online

16   and this came up on Google, and I just sent it to

17   somebody in the company, see what they can do about

18   it.

19        Q.   Aside from Ripoff Report have you ever

20   reviewed complaints on any other website concerning

21   AuraVie products?

22        A.   Yeah.  I saw a few other complaints.

23        Q.   Do you remember what those websites were?

24        A.   BBB.

25        Q.   Can you think of any others?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

 1      A.   Ripoff.   BBB.   There was some other website
 2   called something Scam something, some other website
 3   that people -- consumer complaining website.   I
 4   don't remember the name.
 5      Q.   Were you aware in June of 2015 that AuraVie
 6   had an "F" rating with the Better Business Bureau?
 7      A.   I wasn't.
 8           MR. UNGAR:   Objection as to the form of the
 9   question.   It assumes facts not in evidence, and
10   it's vague and ambiguous.
11           THE WITNESS:   I -- there was some point when
12   there was a lot of conversation about BBB and the
13   BBB having internal issues and the BBB, and we were
14   paying the BBB money, and all of a sudden, the BBB,
15   there was an article about them being frauders and
16   they're splitting up and the BBB is going two
17   sections in L.A.   And BBB lost credibility with
18   themselves, so the BBB rating was no longer
19   something that I cared about.   Once the BBB kind of
20   fell through themselves, they became two different
21   BBB's in L.A., and one was blaming the other and
22   they both wanted money now, and so I just told them
23   fuck BBB.   Excuse my language.
24   BY MR. TEPFER:
25      Q.   Do you recall when you visited the BBB's

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

197

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    website, what AuraVie's Better Business Bureau
2    rating was?
3        A.   A-minus.
4        Q.   And do you recall when you went to that
5    website --
6        A.   When I went, it was the A-minus rating.  I
7    don't remember when the date was.  I remember a call
8    Khristopher had with the BBB, multiple calls with
9    the BBB.  They were extremely happy with our
10   performance.  We're getting back with every
11   consumer.  I think we did an outstanding job until
12   they lost their credibility, and then they
13   started -- and they wanted more money, more money,
14   more money without a reason, and I just said,
15   "Cancel them."
16       Q.   I'm going to go to Exhibit 94.
17            (Plaintiff's Exhibit 94 was
18            previously marked for identification
19            by the FTC and is attached hereto.)
20   BY MR. TEPFER:
21       Q.   I'm now handing the witness what's been
22   marked as Exhibit 94.
23       A.   Thank you.  I'm ready for you.
24       Q.   Okay.  Do you recall being cc'd on this
25   email from Nastassia?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1       A.    I do not.

2       Q.    Do you know what sticky processing is?

3             MR. UNGAR:  Objection as to the form of the

4     question.  It's vague and ambiguous.

5             THE WITNESS:  Sticky, no.

6    BY MR. TEPFER:

7       Q.    In the text from Mr. Medina it states, "Alon

8     confirmed we need 400k more in processing for Jan,

9     at the moment I cannot surpass 150k per merchant

10    account based on our chargeback trending for the

11    month."

12            Do you recall making that statement

13    concerning needing 400K more in processing to

14    Mr. Medina?

15      A.    I don't recall that, no.

16      Q.    Is it -- have you ever reviewed, I

17    suppose -- we were talking a little bit ago about

18    chargeback reports.  Did you ever review any

19    chargeback reports similar to what is contained in

20    this email while at BunZai Media Group?

21      A.    Chargeback reports similar to this, yeah.

22      Q.    Do you happen to know what these percentages

23    on the far right column pertain to?

24      A.    I'm trying to figure that out.  One second.

25            No, I do not.  It seems as though it's --

199

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    let me just see for a second.  30.  It seems as

2    though the breakdown of the processing.

3        Q.   So it's your thought that these percentages

4    indicate the -- I guess the percent volume of sales

5    of AuraVie that go to each particular merchant

6    account?

7        A.   These are -- these are the retailers, the

8    particular retailer and how much volume it is.  From

9    the total volume that there was in sales for that

10   month, how much did each retailer, by percentage,

11   bring in.

12            (Plaintiff's Exhibit 95 was

13            previously marked for identification

14            by the FTC and is attached hereto.)

15   BY MR. TEPFER:

16       Q.   Okay.  I'm now handing the witness what's

17   been marked Exhibit 95.

18       A.   From Nastassia, C2M Accounting.

19       Q.   Do you know what C2M Accounting is?

20       A.   C2M Accounting.  Convert 2 Media.  Convert 2

21   Media is an affiliate marketer.

22       Q.   In this email Nastassia states, "Also from

23   now on please send accounting related emails to

24   accounting@sbmmgmt.com."

25            Do you know who used the mail address

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    accounting@sbmmgmt.com?

2         A.    Yes.

3         Q.    Who is that?

4         A.    Philip.  Philip Camareno.

5         Q.    And was Philip Camareno an employee at

6    BunZai Media Group?

7         A.    Yes.

8         Q.    Do you know if he was an employee at SBM

9    Management at any point?

10        A.    Not really sure.

11        Q.    Do you know?

12        A.    May have been.

13        Q.    Do you know if Mr. Camareno was employed by

14   any of the other AuraVie companies?

15        A.    No because if he was working with SBM, SBM

16   was managing the other company, so he could have --

17   not directly, no.

18        Q.    And to clarify, did SBM Management assist in

19   managing the various AuraVie companies?

20        A.    It did.

21        Q.    What sort of services did SBM Management

22   provide?

23        A.    Marketing services, management services,

24   accounting services, media placement services.  The

25   works.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       Q.   Is that -- I can't remember if we talked
2    about that.  Is this Stephan Bauer's company?
3       A.   That's correct.
4       Q.   Do you know if Nastassia ever worked for SBM
5    Management?
6       A.   I don't think so.
7       Q.   Do you know anyone named Don Siclari?
8       A.   Now that you mention him, yeah.  I have a
9    bad recollection, but yeah.
10      Q.   Who is Don Siclari?
11           And, sorry, that's S-i-c-l-a-r-i.
12      A.   He's a guy I met long, long time ago in the
13   beginning of the business, who helped me set up
14   merchant accounts.
15      Q.   Do you recall which AuraVie companies he
16   assisted?
17      A.   It was right in the beginning, so it had to
18   have been BunZai.
19      Q.   Mm-hmm.
20           (Plaintiff's Exhibit 102 was marked
21           for identification by the FTC and is
22           attached hereto.)
23   BY MR. TEPFER:
24      Q.   I'm now handing the witness what's been
25   marked Exhibit 102.

Nottea
FTC v. Bunzai Media Group, Inc., et al.                                      2/18/2016

```
 1      A.   Thank you.

 2      Q.   Are you a little hot?

 3      A.   I'm perfect, thank you.  I'm fine.  It

 4   doesn't bother you; right?

 5      Q.   No, it --

 6      A.   Sorry.  I'm kind of casual.

 7      Q.   No, I don't mind.  It fluctuates in here.

 8           Do you know what Inchek is?  Is that a

 9   company you're familiar with?

10      A.   That was Don's company.

11      Q.   And do you recall receiving this email from

12   Mr. Siclari?

13      A.   Particularly, no, but it's -- yeah, it's --

14   it's real.  I just don't remember this email

15   particularly.

16      Q.   Don is D-o-n.

17           Do you recall having to pay this referenced

18   fine from Visa?

19      A.   No.

20      Q.   Do you believe that BunZai Media Group did

21   have to pay this fine?

22      A.   Merrick Bank.  Determination -- I don't

23   think we had to pay.  I mean, I don't think there

24   was an actual payment.  I just think it was reduced

25   from monies that they gave us or something.  I think
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   there was some accounting for that, but I don't
2   think -- I don't remember BunZai sending a check for
3   that amount.  Probably reduced from the fees that
4   they deposited in our account.
5       Q.   To your knowledge, were there ever any
6   occasions in which BunZai Media Group's chargeback
7   percentage resulted in a fine from Visa?
8            MR. UNGAR:  Objection as to the form of the
9   question.  Vague and ambiguous.
10           THE WITNESS:  No.
11  BY MR. TEPFER:
12      Q.   And aside from this particular occasion, do
13  you recall any other occasion in which one of the
14  AuraVie companies was placed into Visa's High Risk
15  Chargeback Monitoring Program?
16           MR. UNGAR:  Objection as to the form of the
17  question.  Vague and ambiguous, calls for
18  speculation, lacks foundation.
19           THE WITNESS:  I thought it was this.  If
20  there's something else, there may have been, but I
21  thought it was this.  Or maybe we got placed for a
22  couple weeks and we showed that we were doing it
23  right and we got placed off the list.  I don't
24  remember if it was this issue or separate issue.  I
25  don't recall exactly.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1              (Plaintiff's Exhibit 103 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4     BY MR. TEPFER:
 5         Q.   I'm now handing the witness what's been
 6     marked Exhibit 103.
 7              Do you know who Joel Garcia is?
 8              MR. UNGAR:  Counsel, I'd like to interpose
 9     an objection.  On Exhibit 102-2, the Acquirer BIN
10     number needs to be redacted.
11              MR. TEPFER:  Okay.  Can you please identify
12     where that is?
13              MR. UNGAR:  102-2, in the gray box, middle
14     of the page it says "Merchant Name", then Acquirer
15     BIN" and then there is numbers and letters, and it
16     looks like that is a particular banking number.
17              MR. TEPFER:  Okay.  Let's go off the record
18     real quick so we can address that.
19              (A discussion was held off the record.)
20     BY MR. TEPFER:
21         Q.   Now that we've addressed that issue, I
22     believe I had asked if you know who Joel Garcia is.
23         A.   I remember him.  It was an employee.  I
24     remember him.
25         Q.   At BunZai?
```

205

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1        A.    Yeah.  I don't know what he was doing, but I

2    had a liking to him.  He was a nice guy.  It was

3    like a guy -- I always helped him.  I let him borrow

4    50 bucks.  I liked him, so I remember him now.

5        Q.    Sure.

6              Did he work in the Customer Service

7    Department?

8        A.    I think so.

9        Q.    Have you ever reviewed this "Answering

10   Calls:  Hold Etiquette"?

11       A.    I've never seen this document in my life.

12       Q.    Do you know if it was standard operating

13   procedure for the Customer Service Department to

14   advise customers of BunZai's FTC compliance?

15       A.    Can you tell me where you're looking?

16       Q.    Yeah.  Just under "For Customer's

17   Threatening Dispute" and in that second sentence, in

18   that first bullet point, if you'd take a look at

19   that --

20       A.    Return Policy/Refunds?

21       Q.    Uh-huh.

22       A.    Ensure customers --

23       Q.    Oh, no.  Right above that.  Sorry.

24       A.    Remember to advise customer of the FTC

25   compliance and please see attached Dispute Protocol.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1       Q.    And so I'm just wondering if, do you know if

2    that was like the typical operating procedure, to

3    reference BunZai's --

4       A.    I don't believe it is.  I don't believe it

5    is at all.  But like I said, we sometimes had ideas

6    or -- I wasn't even in the building at this time.

7    This is a time that I moved to Media Urge.  So this

8    is the time that I'm not in the building, I'm not

9    involved in the management of this company.

10      Q.    Okay.

11      A.    But so many things were tried -- like take

12   50 customers and try this, and take 50 customers and

13   try that.  We always try to find the right

14   resolution.

15      Q.    And so this document --

16      A.    But not in any time that I was involved.

17      Q.    And not any time that you were involved in

18   the customer service portion of --

19      A.    Yeah.  In the building or know what's up or,

20   you know.

21      Q.    And -- sorry.  I can't -- I don't think that

22   I've asked this.

23            Where was Media Urge located?

24      A.    Media Urge also had an office in Reseda,

25   California.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

 1        Q.    Is that --

 2        A.    Next to the Canby --

 3        Q.    Is that near -- is that the same location

 4   where Focus Media Solutions came to be located?

 5        A.    Not exactly, but very close.  Same business

 6   complex, not same unit.

 7        Q.    Do you know if it was standard operating

 8   procedure for BunZai Customer Service to only offer

 9   partial refunds as the last resort?

10             MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.

12             THE WITNESS:  No, I don't know.

13   BY MR. TEPFER:

14        Q.    Do you know if BunZai Media Group Customer

15   Service Department required that consumers who are

16   returning products include RMA number?

17        A.    Yes.

18        Q.    Do you know what -- do you know if -- sorry.

19             If a customer were to return a product

20   without an RMA number, would they still be, was it a

21   typical operating procedure for them to still be

22   charged?

23             MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous and an improper

25   hypothetical.  Also, assumes facts not in evidence.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1          THE WITNESS:  Based on my knowledge, returns

2     were issued a refund.  It was a company policy to

3     tell customers on the phone if there was no RMA

4     number, there was no refund, to make sure that we

5     can associate, because sometimes a package comes

6     back and you can't associate it with an order, and

7     then you don't know who to refund.  So we made it as

8     an item, so for identification.

9     BY MR. TEPFER:

10         Q.   To streamline the process?

11         A.   To streamline the refund process.

12    Otherwise, the package comes in, it sits there for

13    two weeks.  Customer can't get a refund because we

14    can't identify who it belongs to --

15         Q.   Okay.

16         A.   -- or which shipment of that customer.

17              (Plaintiff's Exhibit 104 was

18              previously marked for identification

19              by the FTC and is attached hereto.)

20    BY MR. TEPFER:

21         Q.   Just real quickly, I'm handing the witness

22    what's been marked Exhibit 104.

23              Have you ever reviewed this Inbound Call

24    Script before?

25         A.   This is not during my time.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1       Q.   I'm unclear of the time period of this

2   document.  How are you able to determine the time

3   period of this document?

4       A.   Just because I'm -- I'm -- when I was there

5   and I kind of know what I was involved in, if it's a

6   heading or -- I'm a marketing guy, so I know fonts

7   I would have used.  I know things I would have let

8   go.  This is not my -- this is somebody -- seems

9   like this is Pinnacle.  This is not my work.  This

10  is not something I'm involved in.  I don't release

11  stuff like this.  This is more of an internal

12  Customer Service Department document, not something

13  that reaches me or management or anybody of that

14  nature.

15          (Plaintiff's Exhibit 105 was

16          previously marked for identification

17          by the FTC and is attached hereto.)

18  BY MR. TEPFER:

19      Q.   I'm now handing the witness what's been

20  marked Exhibit 105.

21          Do you recognize this document?

22      A.   Same kind of thing.  I don't recognize it.

23  Let me just see.  Never seen this before.

24      Q.   Is there anything in that document which

25  suggests to you which company it is associated with?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1     A.    If you can give me a minute, I'll have to
2     read word for word and let you know.
3     Q.    Okay.
4     A.    Ask rep what the nature of the call is.
5           This seems like it's a bank call.  Yeah,
6     this seems like it's a -- I don't want to say
7     protocol, but it's not labeled as protocol, but kind
8     of like what to do when you have a bank
9     representative with a customer on the phone.
10    Q.    And is that --
11    A.    That was common.
12    Q.    Is it your impression that this was for
13    BunZai or Pinnacle?
14          MR. UNGAR:  Objection as to the form of the
15    question.  It's vague and ambiguous, it's compound.
16          THE WITNESS:  I have no idea.
17    BY MR. TEPFER:
18    Q.    Are you familiar with a product called Nue
19    Science?  And that's spelled N-u-e and then just
20    Science.
21    A.    I was familiar with it.
22    Q.    What is that product?
23    A.    It's a skin care product.
24    Q.    Do you know who marketed that product?
25    A.    Same guy Nastassia mentioned yesterday.

211
Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Jeff Rappoport.

2          Q.    So none of the AuraVie companies ever

3      marketed Nue Skin?

4          A.    No.

5                I just want to make sure the document --

6          Q.    Sure.  I'm getting ready to hand it.

7                (Plaintiff's Exhibit 106 was

8                previously marked for identification

9                by the FTC and is attached hereto.)

10     BY MR. TEPFER:

11         Q.    This is Exhibit Number 106.

12         A.    Yeah.

13         Q.    Is that -- is that your -- do you -- sorry.

14     Is that your handwriting?

15         A.    No.

16         Q.    Do you recognize whose handwriting that is?

17         A.    Right here, "BBB Rating" (indicating)?

18         Q.    Yeah.

19         A.    I have no idea.  I know it's not mine, but I

20     don't know who 'cause it looks like two different

21     handwritings.  It looks like "I agree - send my

22     order" is different than the "BBB," but I don't

23     know.

24         Q.    Did you ever discuss business with Jeff

25     Rappoport?

212

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1          A.    I did.

2          Q.    Was he a friend of yours?

3          A.    He's an acquaintance.

4          Q.    And do you recall what the name of his

5     company is?

6          A.    I don't know.  Maybe -- maybe he has another

7     name, but the product was called Nue Science.

8               (Plaintiff's Exhibit 107 was

9               previously marked for identification

10              by the FTC and is attached hereto.)

11    BY MR. TEPFER:

12         Q.    Okay.  I'm now handing the witness what's

13    been previously marked as Exhibit 107.

14         A.    Thank you.

15         Q.    Is this your handwriting on --

16         A.    No, it's not.

17         Q.    Do you know whose handwriting that is?

18         A.    No clue.

19         Q.    Have you ever viewed this image before?

20         A.    Sure, I've seen this image.

21         Q.    Do you know who?

22         A.    This image I haven't seen before, but this

23    order page (indicating).

24         Q.    The layout you've seen before?

25         A.    Similar layout I've seen.  I don't know if

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    it's this exact one in this exact way, but similar

2    order pages, credit card pages, I've seen.

3        Q.    Would you typically make suggestions

4    regarding ways to improve the design of the AuraVie

5    website?

6        A.    Occasionally.

7        Q.    Was there any one manager at BunZai Media

8    Group that was tasked with the design of the AuraVie

9    websites?

10       A.    There was -- there was a designer.  There

11   wasn't a manager.  We had a couple designers that

12   changed over time.  There was a guy named Boaz and

13   there was a guy named Victor.  So, you know, there

14   wasn't a person or department in charge of, you

15   know -- they just designed.

16       Q.    Have you ever heard of a product called Bio

17   Geniste?  And that's G-e-n-i-s-t-e.

18       A.    Do you have a document?  I'm very good with

19   logos.

20       Q.    Yeah.

21       A.    And I'll know it.

22             (Plaintiff's Exhibit 108 was

23             previously marked for identification

24             by the FTC and is attached hereto.)

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    BY MR. TEPFER:
 2        Q.   I'm handing the witness an exhibit marked
 3    Exhibit 108.
 4             Do you recognize that logo?
 5        A.   Don't recognize the brand, the logo, the
 6    order page.  This is not anything to do with our
 7    company.
 8             (Plaintiff's Exhibit 109 was
 9             previously marked for identification
10             by the FTC and is attached hereto.)
11    BY MR. TEPFER:
12        Q.   Okay.  And I'm now handing the witness an
13    exhibit that's been marked Exhibit 109.
14             Have you ever reviewed this Standard
15    Operating Procedure?
16        A.   No.
17        Q.   This document was located in Suite 105 at
18    Canby.  Do you have any idea why this document would
19    be at that location?
20        A.   Some --
21             MR. UNGAR:  Objection as to the form of the
22    question.  It's vague and ambiguous, and it assumes
23    facts not in evidence.
24             THE WITNESS:  No, but it might have been
25    some leftover stuff.  We moved -- we moved Van Nuys
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

215

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    into a smaller unit in Reseda.  That unit got shut
2    down.  The back of Unit 105 was kind of like a
3    storage area where we dumped the leftover stuff.
4    And so a lot of scripting and paperwork and stuff
5    that left Van Nuys and eventually left the small
6    Reseda office made it to the back of Unit 105.  It
7    was like a little storage unit back there.
8    BY MR. TEPFER:
9        Q.   What was the -- you mentioned a in between
10   location and Reseda.  What was that address --
11       A.   It was --
12       Q.   -- if you recall?
13       A.   -- Unit 107.
14       Q.   Oh, so I guess the next door facility?
15       A.   No.  This was -- well, they're all kind of
16   next door.  They're all very next to each other.
17   But when we couldn't afford Van Nuys anymore,
18   Pinnacle went out of business, and we decided to
19   close the business, and the business got wound up,
20   and BunZai Media Group finished, there was still
21   some happy consumers in the system, people that were
22   happily receiving product for 18 months, 20 months,
23   and those were the people that were left over that
24   were still receiving products.  So we couldn't
25   afford a huge building and everything we had before,

216

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1     so there was a tiny little building, about 900
2     square feet, that sent the remaining people their
3     shipments.  That was that office.
4              (Plaintiff's Exhibit 110 was
5              previously marked for identification
6              by the FTC and is attached hereto.)
7     BY MR. TEPFER:
8        Q.   I'm now handing the witness what's been
9     marked Exhibit 110.
10             Have you ever reviewed this document before?
11       A.   No.
12       Q.   In March of 2013, were BunZai and Pinnacle
13    both located at 7900 Gloria at that time?
14       A.   Yes, sir.  I don't know if it's March.  I'm
15    saying there was a couple months -- I don't know
16    exactly the dates, but there was a couple of months
17    between BunZai's death and Pinnacle's life, living.
18       Q.   So there was a period of time when BunZai
19    and Pinnacle, I guess, coexisted?
20       A.   A very short time, until some formalities
21    were done with -- with shutting up of the
22    corporation -- shutting down the corporation.
23       Q.   And after -- do you recall about when
24    Pinnacle was formed?
25             MR. UNGAR:  Objection as to the form of the

217

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      question, and it's vague and ambiguous.  The

2      information is equally accessible and available to

3      Plaintiff.

4              THE WITNESS:  Not -- not exactly, no.

5      BY MR. TEPFER:

6          Q.   Did --

7          A.   Pinnacle, you said?

8          Q.   Yes.

9          A.   It's here (indicating).  Before, you showed

10     me a document that the accountant gave.  That's

11     dated here.  In 6/6/2012.  2012.

12         Q.   In Pinnacle Logistics, after BunZai was

13     dissolved, Pinnacle Logistics sold AuraVie products;

14     is that correct?

15         A.   No.

16             MR. UNGAR:  Objection as to the form of the

17     question.  It's vague and ambiguous.  It's asked and

18     answered now three times.

19     BY MR. TEPFER:

20         Q.   So Pinnacle Logistics never sold AuraVie

21     products?

22         A.   No.

23             MR. UNGAR:  Objection as to the form of the

24     question.  It's vague and ambiguous, asked and

25     answered four times.

218

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    BY MR. TEPFER:

2        Q.   The reason I ask, on Document 110 -- oh,

3    perhaps I'm misunderstanding.

4            Pinnacle Logistics, I guess, handled

5    customer service for the sale of AuraVie products?

6        A.   Yes, sir.

7        Q.   Okay.  That was my confusion.

8            And after BunZai was dissolved, the other

9    AuraVie companies continued to sell AuraVie

10   products; is that correct?

11           MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous, it assumes

13   facts not in evidence, misstates the prior testimony

14   of the witness.

15           THE WITNESS:  Some of the companies that

16   we've said yes to a couple times today kept selling,

17   and some of them were gone.

18   BY MR. TEPFER:

19       Q.   If we could -- it was Exhibit 65.  If we

20   could jump back just a moment --

21       A.   Found 66.

22       Q.   Oh.  I think it's --

23       A.   Oh, it's the one I pulled out?

24       Q.   Yes, yes.

25       A.   Sorry.  It's my fault.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    You reference some companies that had ceased

2    at that point in time to be selling AuraVie SkinCare

3    products.  Are any of those entities described here?

4      A.    Yeah, but I can't tell you which one

5    exactly.

6      Q.    Do you know when -- at the time of the

7    filing of the FTC's lawsuit in June 2015, do you

8    know if Zen Mobile Media was still, I guess, selling

9    AuraVie products?

10     A.    I don't believe they were.  I don't believe

11   many of these companies were.  I think all of them,

12   maybe besides one, that was just refilling happy

13   consumers orders from 18 months and 2 years ago

14   because we haven't acquired new consumers in over a

15   year.

16     Q.    Did you discuss with Mr. Latsanovski his

17   company Zen Mobile Media, Inc.'s, decision to cease

18   selling AuraVie SkinCare products?

19     A.    I made decision on behalf of Zen.  It was

20   not Igor.  It is not Igor's consent to make

21   decisions there.

22     Q.    Did you make decisions on --

23     A.    SBM Management made decision on behalf of

24   the retail merchants.

25     Q.    And you mean the AuraVie companies we

220

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    discussed?

2        A.    (Witness shakes head up and down.)

3        Q.    Did -- I guess we can turn back.

4              At the time that the AuraVie companies --

5    after BunZai had dissolved and the AuraVie companies

6    were, had their customer service needs met by

7    Pinnacle, did you discuss this, I guess, the

8    Pinnacle standard operating procedure with anyone

9    there?

10             MR. UNGAR:   Objection as to the form of the

11   question.   It's vague and ambiguous.

12             THE WITNESS:   We discussed many topics as

13   far as the expectation between SBM Management's

14   expectation.   We had meeting with Stephan Bauer,

15   with Roi, with Pinnacle Logistics, as far as the

16   management of SBM to the retail merchants and what

17   SBM expected Pinnacle to do on behalf of the retail

18   merchants.

19   BY MR. TEPFER:

20       Q.    Who was your point of contact at Pinnacle

21   Logistics for these discussions?

22       A.    The majority of the time I spoke to Roi and

23   a few other people at Pinnacle, and Andree.   They

24   were -- they were some of them, some of the people

25   in management.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Q.    Would you ever discuss these -- discuss this

2    with Oz Mizrahi?

3    A.    No.

4    Q.    Did you -- were you the individual that

5    negotiated the, I guess, contract for customer

6    service relations for the AuraVie companies with

7    Pinnacle Logistics?

8    A.    It was Stephan, myself, and Roi.

9    Q.    And it was you three negotiating between the

10   three of you or with someone from Pinnacle

11   Logistics?

12   A.    It --

13         MR. UNGAR:  Objection as to the form of the

14   question.  It's vague and ambiguous.

15         THE WITNESS:  We weren't negotiating.

16   Myself and Stephan sat down with Pinnacle Logistics,

17   with some of the management from them, Roi being one

18   of them, Andree, some other people from Pinnacle,

19   and expressed to them what our interest would be for

20   them to provide services.

21   BY MR. TEPFER:

22   Q.    Do you recall if Oz Mizrahi was present at

23   that meeting?

24   A.    He wasn't at that meeting, no.

25   Q.    Did he attend any other meetings that you

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

 1    were present at with Pinnacle Logistics?

 2         A.    Not necessarily.  I think we had a meeting

 3    in the beginning.  We met -- we met sometime in the

 4    beginning.  He expressed some interest in owning

 5    some fulfillment or some business, and there was an

 6    opportunity and we spoke about it.  He became the

 7    owner.  He created the company.  And we met about

 8    that a few times.  And that's it.

 9         Q.    Do you know -- did you recall how much -- or

10    rather, did AuraVie, did the AuraVie companies pay

11    fees to Pinnacle Logistics for their customer

12    services relations?

13         A.    Yes.

14         Q.    Do you recall how much -- was it a monthly

15    fee?

16         A.    I -- I'm not sure.  I don't recall exactly

17    how that was, but it was -- I'm sure it was a

18    monthly fee, it was a weekly fee, it was -- it was

19    many.  It was technology fees and call center fees

20    and fulfillment fees and shipping fees and a lot of

21    business overhead fees, you know.

22         Q.    I think earlier, did you -- did you -- when

23    we were talking about the decision to close BunZai,

24    it was because of profitability concerns; correct?

25              MR. UNGAR:  Objection as to the form of the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1   question.  It's vague and ambiguous, it's asked and

2   answered, it misstates the prior testimony of the

3   witness, it's argumentative.

4           THE WITNESS:  There was many reasons for

5   closing BunZai.  Primarily, there was no money, and

6   second primary was Khristopher Bond going crazy, and

7   many other reasons.

8   BY MR. TEPFER:

9       Q.   So the reasons you've mentioned are

10  profitability and issues with Khristopher Bond.  And

11  can you recall any other reasons?

12      A.   It wasn't making money.  That's the --

13  that's the main -- that's the main reason.  It

14  wasn't worthwhile staying in business.  It was

15  losing.  It was full gas in neutral.  It was like

16  being there working, not making money.  What's the

17  point?

18      Q.   And so is that why you came to outsource

19  customer service to Pinnacle Logistics?

20          MR. UNGAR:  Objection as to the form of the

21  question.  It's vague and ambiguous, misstates prior

22  testimony, assumes facts not in evidence.

23          THE WITNESS:  I'm not really sure.

24          MR. UNGAR:  It's also argumentative.

25          THE WITNESS:  I'm not really sure why.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    BY MR. TEPFER:

2         Q.   Once BunZai Media Group ceased operating,

3    were the AuraVie companies profitable?

4         A.   No.

5         Q.   Were they losing money or just not making

6    very much?

7         A.   For a while it was a little bit of both.  It

8    was losing and not making very much, and kind of for

9    a while, that's where they were.  They were not

10   making much and losing.

11             MR. TEPFER:  If we could take a quick break.

12   I'm missing an exhibit.  If we could go off the

13   record.

14             (Recess)

15             MR. TEPFER:  If we could go back on the

16   record.

17             (Plaintiff's Exhibit 149 was

18             previously marked for identification

19             by the FTC and is attached hereto.)

20   BY MR. TEPFER:

21        Q.   I'm now handing the witness what's been

22   marked Exhibit 149.

23             And do you know who uses the email address

24   avicoglobal@gmail.com?

25        A.   Alan Argaman.

225

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1        Q.   Is Avico Global a company?

2        A.   I have no idea.

3        Q.   Do you recall receiving this email in 2013?

4        A.   Never.

5        Q.   Do you know what ClickConnector.com is?

6        A.   No.

7        Q.   Mr. Argaman refers to the individuals as

8    "Team."  Were you on any, I guess, team with the

9    individuals in this -- that this email is sent to?

10       A.   No.

11       Q.   On 149-2, the second page, Mr. Argaman

12   states "Call Center in the initial stages - will

13   update ETA later."

14            Do you know what call center Mr. Argaman is

15   referring to?

16       A.   No.

17       Q.   Do you know what MediaCRM.com is?

18       A.   It's a domain name.

19       Q.   Is that -- is Media CRM a company?

20       A.   Not that I'm aware of.

21       Q.   Have you ever visited the website

22   MediaCRM.com?

23       A.   No.

24       Q.   Do you know what IVRSwitch.com is?

25       A.   No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1        Q.    Do you know what IVR Logix is?

2        A.    I heard the name.

3        Q.    Do you -- to your knowledge, has Pinnacle

4    Logistics utilized a program called IVR Logix?

5        A.    I believe they did.

6        Q.    Do you know if Alan Argaman was employed by

7    Pinnacle Logistics?

8        A.    No.

9        Q.    Do you know if Secured Merchants ever

10    provided any services to Pinnacle -- did I say

11    Secured Merchants?

12        A.    Yeah.

13        Q.    Do you know if Secured Merchants ever

14    provided any services to Pinnacle Logistics?

15        A.    Not off the top of my head, but seems

16    normal.

17        Q.    Do you know who Terry Ball is?

18        A.    Terry Gall?

19        Q.    Well, sorry.  I mis- --

20        A.    No, no.  It's a name from -- I think she's a

21    lady who worked on some SEO.

22        Q.    And you mentioned Victor Azal earlier.  Was

23    he an employee at Media Urge?

24        A.    I think so.

25        Q.    Was Nastassia an employee at Media Urge?

227

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1      A.   You asked me that before.  I don't know
 2   exactly if she was an employee of Media Urge, but
 3   she was with Media Urge for a while.  I just don't
 4   know --
 5      Q.   Sorry.
 6      A.   -- if she was an employee of Media Urge.
 7      Q.   Sorry to repeat that there.
 8           If we could go to Exhibit 118.
 9           (Plaintiff's Exhibit 118 was
10           previously marked for identification
11           by the FTC and is attached hereto.)
12   BY MR. TEPFER:
13      Q.   I'm handing the witness what's been marked
14   Exhibit 118.  This page was found in Suite 105 on
15   Canby.
16           Have you ever seen this page before?
17           MR. UNGAR:  Objection as to the form of the
18   question.  Assumes facts not in evidence.
19           THE WITNESS:  That's some of my writing
20   there, so -- I haven't seen the page, but that's my
21   handwriting.  Some of it is.
22   BY MR. TEPFER:
23      Q.   Did BunZai have any business relationship
24   with -- or those circles where it says "BunZai,"
25   "Doron," and then "Estonia" and then "China," do you
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    know what this graph was illustrating, or this chart

2    was illustrating?

3        A.    That's what I'm trying --

4            MR. UNGAR:   Object to the form of the

5    question.   It's vague and ambiguous.

6            THE WITNESS:   No.   There's -- I think this

7    way, so I have hundreds of documents with circles

8    like this, so --

9    BY MR. TEPFER:

10       Q.    Did BunZai ever have any business

11   relationship with a company in China?

12       A.    Yes.

13       Q.    What company is that?

14       A.    Max Daniel something.

15       Q.    Do you recall what products or services

16   BunZai received from that company in China?

17       A.    Plastic goods, parts, packaging material,

18   containers, plastic containers, caps, stuff for

19   cosmetics.

20           MR. TEPFER:   I think we can go to Document

21   122.

22           (Plaintiff's Exhibit 122 was

23           previously marked for identification

24           by the FTC and is attached hereto.)

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

```
 1    BY MR. TEPFER:
 2        Q.    I'm now handing the witness what's been
 3    marked Exhibit 122.
 4        A.    Thank you.
 5        Q.    Do you recall receiving this email from Sam
 6    Ibrahim?  And that's I-b-r-a-h-i-m.
 7        A.    Not exactly this email.  I don't remember
 8    this email exactly.
 9        Q.    Who is Sam Ibrahim?
10        A.    Sam Ibrahim --
11        Q.    I'm sorry.
12        A.    -- was a person who did risk management and
13    underwriting for Don Siclari from Inchek, and then
14    he -- and then he later -- he also, during the same
15    time that he was employed on the side by Don, he was
16    a risk manager and underwriter -- or underwriter for
17    Cigna Pay.  I can't see his email here, so I can't
18    remember which -- I think it was Cigna Pay.  Doesn't
19    have a signature.  Yeah.  So he was a risk
20    management underwriting guy.
21        Q.    Did he provide -- did he consult with BunZai
22    Media Group concerning risk management?
23        A.    He did.
24        Q.    And did you personally meet with
25    Mr. Ibrahim?
```

230

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

 1      A.    Ibrahim, yes.

 2      Q.    Do you recall what Paul Medina's position

 3   was at BunZai Media Group?

 4      A.    As you're saying that, I'm reading Director

 5   of Business Development, but, you know, he was many

 6   things.  He was many things.  He was -- he was Paul.

 7      Q.    Right.

 8      A.    He was kind of a, you know, kind of like

 9   Nastassia.  People that I delegated to.

10      Q.    I think if we could get 125 -- actually, if

11   we could do 120 first.

12            (Plaintiff's Exhibit 120 was

13            previously marked for identification

14            by the FTC and is attached hereto.)

15   BY MR. TEPFER:

16      Q.    I'm now handing the Defendant what's been

17   marked Exhibit 120.

18            Do you recall sending this email?

19      A.    Yes.

20      Q.    And Xposed, Inc.; is that your brother

21   Doron?

22      A.    Yes.

23      Q.    Did he -- other than -- did he purchase

24   these web domains for you?

25      A.    I believe so.  He was always, like, more

231

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           2/18/2016

1    responsible than me, so I had him kind of buy these

2    domains for me.  I'm the crazy one, and he's the one

3    more in the box, do what I tell him, kind of.

4         Q.    Right.

5               Did he ever purchase any other domains on

6    your behalf?

7         A.    Maybe.  I gave him access to the GoDaddy

8    account, and I used to say to him --

9               (Interruption in the proceedings)

10              MR. TEPFER:  Jeffrey, are you there?

11              MR. BENICE:  Yes, I am.

12              MR. TEPFER:  Sorry.  We just heard some

13   dialing.

14   BY MR. TEPFER:

15        Q.    Did you ever use the alias Jay Michaels?

16        A.    I did.

17        Q.    And what did you use the alias for?

18        A.    As the first name and last name of the

19   GoDaddy account, and there was a document that was

20   one time signed Jay Michaels.

21        Q.    Do you recall why you used an alias to

22   register with GoDaddy?

23        A.    No, the alias wasn't used to register.

24   Basically, what happened was when I logged into the

25   account, the first name was Acai and the last name

232

Nottea

FTC v. Bunzai Media Group, Inc., et al.                               2/18/2016

1    was Berry.  And I didn't like the first name being
2    Acai and the last name being Berry, so I put the
3    name Jay Michaels.  That's why.  It wasn't trying to
4    be a name for myself.  It was just changing the name
5    Acai Berry to a different version of a first and
6    last name that sounds like a person.  That's it.
7              MR. TEPFER:  If we could get Exhibit 125.
8              Also, I think this -- sorry, if we could get
9    Exhibit 119.
10             (Plaintiff's Exhibits 125 and 119
11             were previously marked for
12             identification by the FTC and are
13             attached hereto.)
14   BY MR. TEPFER:
15       Q.   I'm now handing the witness what's been
16   marked Exhibit 125 and Exhibit 119.
17       A.   This is an email from Charlene.  Are you
18   sure --
19       Q.   Right.
20       A.   -- this is for me?
21       Q.   That's just sort of to go with Exhibit 119.
22   If you could take a moment to review both of those
23   documents.
24       A.   Okay.  I'll start with 119.  This stuff
25   would be attorney-client privilege, so I'm not going

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

233

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    to discuss any of this without my attorney's
2    approval.  And whatever your question is regarding
3    125, go for it.
4        Q.   I guess, do you recall receiving this email
5    from Mr. Ungar in April of 2012?
6        A.   I need permission to answer that question
7    from my attorney.
8        Q.   Sure, we'll wait on that.
9        A.   This is attorney-client privilege stuff.
10            MR. UNGAR:  You can answer that question.
11            THE WITNESS:  Yes, I do.
12   BY MR. TEPFER:
13       Q.   Did you review the attached memorandum?
14       A.   I did.
15       Q.   On the 119-2, the first line --
16       A.   Yes.
17       Q.   -- it references Hong Kong Trading Company.
18       A.   Okay.
19       Q.   Do you know a company -- or do you know what
20   that refers to?
21            MR. UNGAR:  Now I'm going to object to any
22   further use or reference to this document, 119,
23   pages 1 through 5, on the grounds that it is a
24   privileged document, that it was previously agreed
25   upon that any documents from BunZai Media, from

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    Alon, email accounts between -- from Counsel or to

2    Counsel concerning himself individually were

3    privileged documents and would be subject to both a

4    502 stipulation, would retain their attorney-client

5    privileged status, and also, would be subject to a

6    subsequent confidentiality agreement.

7          MR. TEPFER:  And just for -- to clarify, are

8    you instructing the witness not to answer any

9    questions regarding pages 119 through -- 119-2

10   through 119-5 of this document?

11         MR. UNGAR:  It depends on the question.

12         MR. TEPFER:  And sorry, would you mind

13   reading back Mr. Ungar's statement regarding

14   privilege.

15         (The previous statement was read back

16         by the court reporter as follows:

17            "Now I'm going to object to any

18            further use or reference to this

19            document, 119, pages 1 through 5, on

20            the grounds that it is a privileged

21            document, that it was previously

22            agreed upon that any documents from

23            BunZai Media, from Alon, email

24            accounts between -- from Counsel or

25            to Counsel concerning himself

235

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           2/18/2016

1              individually were privileged

2              documents and would be subject to

3              both a 502 stipulation, would retain

4              their attorney-client privileged

5              status, and also, would be subject to

6              a subsequent confidentiality

7              agreement.")

8          MR. TEPFER:  That's fine.

9          So is it the case that you're going to

10    object to any reference to pages 119-2 through

11    119-5?

12         MR. UNGAR:  My statement speaks for itself.

13    If you have a question, ask it.  We'll take it from

14    there.

15    BY MR. TEPFER:

16    Q.   And are you going to follow your attorney's

17    advice on that issue?

18         MR. UNGAR:  I instruct you not to answer

19    that question because it's argumentative.

20    BY MR. TEPFER:

21    Q.   So just to talk, the first line on 119-2

22    refers to Hong Kong Trading Company.  Do you know

23    what company that refers to?

24         MR. UNGAR:  I'm objecting on the grounds

25    that reference to this document violate prior

236
Nottea

FTC v. Bunzai Media Group, Inc., et al.                                   2/18/2016

1    agreements concerning retention of the
2    attorney-client privilege confidentiality, but the
3    witness can answer the question.
4              THE WITNESS:  No, I do not.
5              MR. TEPFER:  And just for clarity, the
6    agreement that you're referring to, is that between
7    the FTC and any party, Mr. Ungar?
8              MR. UNGAR:  It's not my deposition, so you
9    can ask your next question if you have one.
10   BY MR. TEPFER:
11        Q.   Okay.  And, sorry, I didn't hear the answer.
12        A.   No.
13        Q.   Did BunZai Media Group ever do business with
14   a company located in Cyprus?
15        A.   Not to my recollection.  There was something
16   in 2010 or '11 with some -- there may be an email or
17   some application, but nothing ever happened in
18   Cyprus.
19        Q.   On the third line of 119-2 there's reference
20   to a Cyprus corporation.  Do you know what
21   corporation that refers to?
22        A.   No.
23             MR. UNGAR:  Same objection as before.  The
24   document 119, Exhibit Number 119, all of the pages,
25   1 through 5, are subject to a -- subject to prior

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1     agreements regarding retention of attorney-client
2     privilege under Federal Rule of Civil Procedure
3     502 -- I'm sorry, Federal Rule of Evidence 502 and a
4     confidentiality agreement.  It is subject to the
5     attorney-client privilege.  Each and every reference
6     made by counsel to this document, knowing that the
7     document is subject to attorney-client privilege, is
8     an ethical violation and will be dealt with
9     accordingly and in due course.
10          MR. TEPFER:  I think in light of Mr. Ungar's
11    objection, are you instructing the client not to
12    answer, Mr. Ungar?
13          MR. UNGAR:  Counsel, this is not my
14    deposition.
15          MR. TEPFER:  Well, I only ask because I'm
16    wondering if in light of the issues that you're
17    claiming attorney-client privilege, if we should
18    suspend this deposition --
19          MR. UNGAR:  Ask your question.
20          MR. TEPFER:  I'm wondering if we should
21    suspend this deposition so you may seek a protective
22    order.
23          MR. UNGAR:  Counsel, you can wonder whatever
24    you want to wonder.  I've told you what I intend to
25    do.  You're violating your ethical obligations.

238

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    You're violating the 502 agreement that you signed.

2    You're violating the confidentiality agreement

3    between the Receiver, the FTC, and my office.  You

4    know that this is an attorney-client privileged

5    document.  If you want to continue on asking

6    questions and utilizing this document, you do so at

7    your own peril.

8         MR. TEPFER:  Well, at this -- first I want

9    to direct you to the Receiver's email, in which she

10   is waiving the privilege for this document.  But at

11   this point I think it's appropriate, we're going

12   to -- I think we need to file a motion to compel on

13   this and get this sorted out with the court.  If I'm

14   not able to get these questions answered --

15        MR. UNGAR:  I never said that.  You said

16   that.

17        MR. TEPFER:  Indeed.  We need to get -- we

18   need to get answers to what's in this document, and

19   at this point it doesn't seem like we're going to be

20   able to do that.

21        MR. UNGAR:  You said that.  I didn't say

22   that.

23        MR. TEPFER:  I believe if -- you stated

24   earlier, when you said in your statement, speaks for

25   itself, that any and all references to --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1               MR. UNGAR:  Counsel, do you have more
2      questions to ask?
3               MR. TEPFER:  I do, but I'd like --
4               MR. UNGAR:  Ask your questions.
5               MR. TEPFER:  I'd like to get this sorted
6      out.
7               MR. UNGAR:  Ask your questions.
8               MR. TEPFER:  If I'm not able to --
9               MR. UNGAR:  Counsel, ask your questions.
10              MR. TEPFER:  My concern is that if we're not
11     able to get these answered by Mr. Nottea, Mr. Ungar,
12     it appears that you're a fact witness in this case,
13     and I don't want to have to seek a deposition of
14     you, but somebody needs to be able to answer
15     questions about this document, and there is no
16     privilege of this document, as Exhibit 125 makes
17     clear.
18              MR. UNGAR:  If you have a question, ask it.
19              MR. TEPFER:  No.  At this time we're going
20     to go ahead and suspend the motion -- I mean,
21     suspend the deposition.  Is that --
22              MR. GALLEGOS:  Yeah, I mean --
23              MR. TEPFER:  If we're not able to continue
24     with this, you have ethical concerns --
25              MR. UNGAR:  Counsel, that's a choice you're

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      making, that you're not able to continue with this.

2      I've asked you repeatedly go ask your next question.

3      You don't want to.  It's your choice.

4              MR. TEPFER:  Let's go ahead and take a ten

5      minute break.

6              We're off the record.

7              (Recess)

8              MR. TEPFER:  All right.  If we can go back

9      on the record.

10             With the understanding that you may object,

11     I just want to ask a few more questions.

12     BY MR. TEPFER:

13     Q.   On 119-2 there's reference to brand name

14     products, in parentheses, BNP.  Do you know what

15     brand name products that refers to?

16             MR. UNGAR:  I'm raising the same objection

17     as before to Document 119, pages 1 through 5.

18             THE WITNESS:  No idea.

19     BY MR. TEPFER:

20     Q.   Number 2 references exclusive right to

21     license U.S. manufacturers.  Do you know what those

22     U.S. manufacturers are, what the company name is?

23     A.   This is a hypothetical.  There is no direct

24     manufacturer.  This is the thought of an IP,

25     protection of IP, brand names.  This is -- nothing

241

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    here goes anywhere.  Keep asking me.  I don't know
2    how to answer your question, but --
3        Q.   And to talk about the diagram on 119-3, is
4    that the -- does this reflect -- does this diagram
5    reflect the AuraVie companies' corporate structure?
6        A.   Not at all.
7             MR. UNGAR:  Same objection as to the form of
8    the question.  This is a privileged document.
9    Counsel knows it's a privileged document.  It's
10   subject to 502 agreement, Federal Rule of Evidence
11   502 agreement, it's subject to a confidentiality
12   agreement.  This is communication between Counsel
13   and his client, Alon Nottea, in April of 2012.  It's
14   not disclosed how Counsel came into possession of
15   this document.  It is not disclosed what email
16   account specifically this document came from, if it
17   came from an email account.  And the circumstances
18   of how Counsel came into Exhibit 119 are suspicious.
19   And this appears to be the use of a document,
20   knowing that it is an attorney-client privileged
21   document.  It's seemingly unethical.
22             You can answer.
23   BY MR. TEPFER:
24       Q.   And just to clarify for the record, on
25   119-1, under "To" it states "BunZai Media".  So,

242

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Mr. Nottea, is it your understanding that this

2      refers to your BunZai Media email address?

3              MR. UNGAR:  Objection as to the form of the

4      question.  It's vague and ambiguous.

5              THE WITNESS:  To me it would mean it went to

6      Alon at BunZai Media.

7      BY MR. TEPFER:

8          Q.   Okay.

9          A.   And the answer to your question was no.

10         Q.   Sorry, what question?

11         A.   Does it constitute the setup of how business

12     was, something like that.  You can have her repeat

13     the question for you if you'd like.

14         Q.   You referenced BunZai Media purchasing from

15     a company in China --

16         A.   Mm-hmm.

17         Q.   -- various products, I guess, for the sale

18     of AuraVie; is that correct?

19         A.   That's correct.

20         Q.   What were those products again?

21         A.   Parts.  It was containers, caps of the

22     serums and the moisturizers.  Something called a

23     clip, which covers the creams so it doesn't get

24     infected with something.  So there's a container, a

25     clip, a cushion for the cap, packaging material, and

243

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1       printing material.

2          Q.   Is that -- on 119-3, that box that says

3       "China Plastic", is that in reference to the company

4       you're describing?

5              MR. UNGAR:  Same objection as before, that

6       this is a document -- 119, pages 1 through 5, are

7       subject to attorney-client privilege.

8              THE WITNESS:  No.

9              MR. TEPFER:  And just to be clear,

10      Mr. Ungar, you don't want to suspend -- to seek a

11      protective order?

12             MR. UNGAR:  Counsel, it's not my deposition.

13      If you've got another question, ask it.

14             MR. TEPFER:  Sure.

15      BY MR. TEPFER:

16         Q.   Did BunZai Media Group ever receive the

17      cream that it sold as AuraVie from Israel?

18         A.   It did.

19         Q.   Do you recall the name of the company in

20      Israel that BunZai Media Group received this cream

21      from?

22         A.   There's a couple names.  One of them was

23      called Bless You.  Another one was called

24      Dr. Bernstein Limited -- something of that.

25      Dr. Bernstein Fulfillment.  Dr. Bernstein Limited.

244

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      Q.    Did you ever refer to the AuraVie companies
2    as retail merchant corporations?
3      A.    We did here today.
4      Q.    And did you ever refer to the CEOs of those
5    retail merchant corporations as investors or
6    merchant account guarantors?
7           MR. UNGAR:   Objection as to the form of the
8    question.   It's vague and ambiguous, and it's
9    compound.
10          THE WITNESS:   No.
11   BY MR. TEPFER:
12     Q.    Did you consider the CEOs of those companies
13   to be investors?
14     A.    Did I consider them to be investors?   Yes.
15     Q.    Did they invest money into the AuraVie
16   companies?
17          MR. UNGAR:   Objection as to the form of the
18   question.   It's vague, it's ambiguous.
19          THE WITNESS:   Some of them put up a little
20   bit of money.   So it depends.   If you want to be
21   specific about each one, we can go into it.
22   BY MR. TEPFER:
23     Q.    Did the -- to your knowledge, did the retail
24   merchant corporations, the AuraVie companies, did
25   they pay a monthly management fee to SBM Management?

245
Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  Vague and ambiguous, assumes facts not in
3     evidence.
4          THE WITNESS:  I don't recall.
5     BY MR. TEPFER:
6          Q.  Do you know if Pinnacle Logistics ever
7     employed a marketing compliance officer to review
8     and approve marketing materials used by the AuraVie
9     companies?
10         A.   If Pinnacle used them, there's -- there's --
11    there's something regarding compliance manager that
12    was brought in.  I just don't remember what company
13    it falls under.  So I don't want to say yes, but
14    there is -- if you find the right place, I'll give
15    you a yes.  I just don't know if it's under Pinnacle
16    or --
17         Q.  Sure.
18             Could that -- do you know if BunZai ever
19    hired or, I guess, ever had an employee that was a
20    marketing compliance officer?
21             MR. UNGAR:  Objection as to the form of the
22    question.  It's vague and ambiguous.
23             THE WITNESS:  I don't remember exactly when,
24    which company it was under.
25    ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    BY MR. TEPFER:

2        Q.   Do you remember the name of the marketing

3    compliance officer?

4        A.   I do not.

5        Q.   Did you hire him or her?

6        A.   I don't remember.  I don't remember who

7    we're speaking about, but if there's an email or

8    something, let's review it.

9             Nastassia checked compliance.  Paul checked

10   compliance.  It was a common thing to check

11   compliance.  It was a very common thing.  So I can't

12   pinpoint your answer.

13       Q.   The -- I guess the retail merchant

14   corporation model, was that used to market any other

15   products, aside from AuraVie?

16            MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous, it assumes

18   facts not in evidence.

19            THE WITNESS:  We sold some Dellure through

20   some retail merchants and Miracle Face -- no,

21   Miracle Face Kit was only sold through BunZai, to my

22   belief.  Yeah.  No, Miracle Face Kit as well.  So

23   Dellure and Miracle Face Kit.

24   BY MR. TEPFER:

25       Q.   On 119-3 there's reference to a professional

247

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    manager.  I guess on 119-4 a CM is defined to be

2    professional manager.

3          What was your understanding of what company

4    that referred to?

5          MR. UNGAR:  Objection as to the form of the

6    question.  It's vague and ambiguous.  Again,

7    Exhibit 119, including all pages, 1 through 5, are

8    subject to the attorney-client privilege.  The

9    document Exhibit 119 is being used right now in

10   violation and in breach of 502 stipulation, Federal

11   Rule of Evidence stipulation, confidentiality

12   agreement, and is an ethical violation under the

13   California Rules of Professional Conduct.  Counsel

14   well knows this is an attorney-client privileged

15   document.  It's -- it's obvious.

16         THE WITNESS:  Can you repeat the question

17   for me?

18         (The previous question was read back

19         by the court reporter as follows:

20           "QUESTION:  On 119-3 there's

21         reference to a professional manager.

22         I guess on 119-4 a CM is defined to

23         be professional manager.  What was

24         your understanding of what company

25         that referred to?")

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1              THE WITNESS:  1, I have no idea.  2, can you
 2     tell me where you're looking?
 3     BY MR. TEPFER:
 4          Q.   Sure.  There's a CM in the box --
 5          A.   Okay.
 6          Q.   -- on 119-3, and then the fourth from the
 7     bottom --
 8          A.   Okay.
 9          Q.   -- bullet point refers, it says -- it states
10     "The RMC contracts with a professional manager
11     (CM)for corporate and operational management
12     services."
13          A.   And your --
14              MR. UNGAR:  Same objection.
15              THE WITNESS:  I don't know.
16     BY MR. TEPFER:
17          Q.   Did the AuraVie companies have a
18     professional manager for corporate and operational
19     management services?
20          A.   I guess that would be SBM Management.
21          Q.   Did the AuraVie companies enter into any
22     sort of licensing agreement with a U.S. manufacturer
23     for the sale of AuraVie products?
24          A.   I missed a word in there.
25              MR. TEPFER:  Sure.  Would you mind reading
```

249

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

```
 1    it.
 2              (The previous question was read back
 3              by the court reporter as follows:
 4                 "QUESTION:  Did the AuraVie
 5              companies enter into any sort of
 6              licensing agreement with a U.S.
 7              manufacturer for the sale of AuraVie
 8              products?")
 9              THE WITNESS:  I believe there was some
10    agreement with the retail merchants.  There was an
11    agreement between them.  The retail merchants, with
12    the sale of AuraVie -- one more time.  I just want
13    to make sure I answer correctly.  One more time.
14              (The previous question was read back
15              by the court reporter as follows:
16                 "QUESTION:  Did the AuraVie
17              companies enter into any sort of
18              licensing agreement with a U.S.
19              manufacturer for the sale of AuraVie
20              products?")
21              THE WITNESS:  No.
22    BY MR. TEPFER:
23       Q.    A moment ago you stated they did enter into
24    some sort of agreement; is that correct?
25       A.    Yes.
```

250

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.    What was the nature of the agreement that
2    the AuraVie companies entered --
3      A.    I think it was a buyer/reseller agreement.
4    Like a buyer approval.  You're approved to buy and
5    resell the product, but it wasn't licensing
6    agreement.
7      Q.    Sure.
8            Did AuraVie ever contain an Israel secret
9    ingredient?
10     A.    They're all secret ingredient.  The whole
11   thing is.  Secret ingredient, no.
12     Q.    Did any of the products sold by the AuraVie
13   companies contain any sort of Israel secret
14   ingredient?
15     A.    No.  It's the combination of all the
16   ingredients that make it a secret.  It's not any one
17   ingredient.
18     Q.    Sure.
19     A.    It's the formula.  It just depends how you
20   look at it.
21     Q.    On 119-4, on the second line of the first
22   bullet point, there's reference to brands, formulas,
23   and trade secrets.  Do you know what brands,
24   formulas, or trade secrets that refers to?
25           MR. UNGAR:  Same objection.  Exhibit 119 is

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

```
 1    a document protected by the attorney-client
 2    privilege.  It's violation of the FRE 502,
 3    confidentiality agreement, and it's a violation of
 4    the California Professional Rules of Conduct, the
 5    use of this document, knowing that it's a -- it's
 6    protected by attorney-client privilege.
 7            MR. TEPFER:  Are you instructing the witness
 8    not to answer, Mr. Ungar?
 9            MR. UNGAR:  It's not my deposition, Counsel.
10    I've said it 12 times already, so --
11            THE WITNESS:  Can you refer to the question
12    that you mentioned on which page?
13    BY MR. TEPFER:
14      Q.   Sure.
15            MR. UNGAR:  Are you telling the witness not
16    to answer the question?
17            MR. TEPFER:  No.  I'm just asking.
18            MR. UNGAR:  Then you don't need to keep
19    asking me if I'm advising or informing the witness
20    not to answer the question.  If I'm going to do so,
21    you'll know it.
22            MR. TEPFER:  I'm very sorry, Mr. Ungar.
23            MR. UNGAR:  Do you understand?
24            MR. TEPFER:  Yes, sir.
25            MR. UNGAR:  Thank you.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            2/18/2016

1          Why are you laughing?

2              MR. TEPFER:  I'm not laughing.

3              MR. UNGAR:  Why are you grinning?

4              MR. TEPFER:  I'm just trying to diffuse this

5     situation.

6              MR. UNGAR:  I don't --

7              MR. TEPFER:  Would you mind --

8              MR. UNGAR:  I don't know what you mean.

9              MR. TEPFER:  Counsel, I'd like to move on.

10             Would you mind reading the question.

11             (The previous question was read back

12             by the court reporter as follows:

13                "QUESTION:  On 119-4, on the

14             second line of the first bullet

15             point, there's reference to brands,

16             formulas, and trade secrets.  Do you

17             know what brands, formulas, or trade

18             secrets that refers to?")

19             MR. UNGAR:  Same objection.

20             THE WITNESS:  No.

21    BY MR. TEPFER:

22        Q.  Are you aware if any proceeds from the sale

23    of AuraVie products by the AuraVie companies were

24    ever transferred to a trust in Cyprus?

25        A.  Never.

253

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1      Q.   And are you aware -- did you ever consider
2   the possibility of transferring funds from the sale
3   of AuraVie products to a trust in Cyprus?
4           MR. UNGAR:  Objection as to the form of the
5   question.  It's vague and ambiguous.
6           THE WITNESS:  No.
7   BY MR. TEPFER:
8      Q.   Did you ever consider transferring funds
9   from the sale of AuraVie products to any bank in
10  Cyprus?
11          MR. UNGAR:  Objection as to the form of the
12  question.  It's vague and ambiguous.
13          THE WITNESS:  Like I said in the beginning,
14  I don't know, I don't recollect exactly.  There was
15  an attempt to understand banking in Cyprus.  I
16  contacted a bank.  I saw the numbers, the rates.
17  The importation was crap.  Moved on.  Never
18  happened.
19  BY MR. TEPFER:
20     Q.   So you explored the possibility of BunZai
21  marketing AuraVie in Cyprus?
22     A.   I explored the possibility of seeing how
23  business gets done in Cyprus.
24     Q.   And do you recall what type of business you
25  had considered conducting in Cyprus?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's vague and ambiguous.
3          THE WITNESS:  Online marketing.
4     BY MR. TEPFER:
5       Q.   And do you recall what product you
6     anticipated marketing online in Cyprus?
7       A.   There was no product.  It wasn't a product
8     development.  It wasn't about a product.  It was
9     about different concept.
10      Q.   Do you know if SBM Management contracted for
11     media buys for the AuraVie companies?
12          MR. UNGAR:  Objection as to the form of the
13     question.  It's vague and ambiguous.
14          THE WITNESS:  I don't really understand what
15     you're saying.
16     BY MR. TEPFER:
17      Q.   Did -- I guess, did SBM Management make
18     payments to third parties for online advertising for
19     the AuraVie companies?
20          MR. UNGAR:  Objection as to the form of the
21     question.  It's vague and ambiguous.
22          THE WITNESS:  Yes.
23     BY MR. TEPFER:
24      Q.   Do you recall the third party entities that
25     SBM Management made payments to for the AuraVie

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              2/18/2016

1    companies's online marketing?

2        A.   One by one?

3        Q.   Sorry.  And it -- there are -- I guess

4    you're saying many?

5        A.   It managed the RMCs.

6        Q.   Okay.

7        A.   Of course.

8        Q.   Did you ever discuss with the CEOs of the

9    AuraVie companies their potential exposure to claims

10   for false advertising?

11           MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13           THE WITNESS:  I explained to them the risks,

14   as I knew them, as I understand them.

15   BY MR. TEPFER:

16       Q.   And so you explained to the various CEOs of

17   the AuraVie companies the potential risks associated

18   with this marketing?

19           MR. UNGAR:  Objection as to the form of the

20   question.  It's vague and ambiguous, and it

21   misstates the testimony of the witness, and it's

22   argumentative.

23           THE WITNESS:  You have to repeat the

24   question for me, please.

25           (The previous question was read back

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          2/18/2016

1              by the court reporter as follows:
2                   "QUESTION:  And so you explained
3              to the various CEOs of the AuraVie
4              companies the potential risks
5              associated with this marketing?")
6              THE WITNESS:  Based on my understanding of
7    what the risks were, sure.
8    BY MR. TEPFER:
9         Q.   And what was your understanding of the risks
10   associated with this marketing?
11        A.   That they might, you know, there might be an
12   issue with a merchant account and they might get
13   themselves -- if -- if an issue occurred with a
14   merchant account that was out of its parameters,
15   that they might get themselves a problem
16   establishing another merchant account.
17        Q.   Did you discuss the possibility of an FTC
18   enforcement action with any of the CEOs of the
19   AuraVie companies?
20        A.   Not that I can recall.
21        Q.   What about the possibility of an Attorney
22   General enforcement action?
23        A.   Not that I can recall.
24        Q.   And so just to clarify, the risks that you
25   spoke with them about were regarding actions taken

257

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    by the processor?

2         MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous.

4         THE WITNESS:  It was respect to merchant

5    processing and what's going to happen with

6    association -- with association of Visa, MasterCard,

7    Discover if the banking merchant accounts were -- I

8    was always educated -- I was always being told by

9    the merchant processors, if you blah, blah, blah,

10   you're going to get blah, blah, blah, you're going

11   to get TMF'd.  It was -- the same thing I learned

12   from the processor was the same thing I passed on.

13   BY MR. TEPFER:

14        Q.   And the use of the term TMF, what does that

15   stand for?

16        A.   It stands for a few different things in the

17   industry of merchant processing.  One is called the

18   match file, and second is -- people have different

19   meanings as to what it is, but it basically means

20   your name is matched to people who have had merchant

21   accounts who have breached the parameters that are

22   in line with what they consider okay.  So TMF means

23   that you've had a merchant account reach what you

24   called before the high risk monitoring program.

25        Q.   And so you explained to the CEOs of the

258

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1    AuraVie companies that there was a risk that there

2    may be TMF'd?

3        A.   There was a risk.

4             MR. UNGAR:  Objection to the form of the

5    question.  It's vague and ambiguous.

6             THE WITNESS:  Along those lines.

7    BY MR. TEPFER:

8        Q.   Did you ever discuss the possibility of a

9    FTC enforcement action against the AuraVie companies

10   with your brother Doron?

11       A.   Specifically no, not that I can recall.

12       Q.   What about with your cousin Roi Reuveni?

13            MR. UNGAR:  Objection as to the form of the

14   question.  It's vague and ambiguous.

15            THE WITNESS:  I may have.

16   BY MR. TEPFER:

17       Q.   Was that a concern that you had while

18   man- --

19       A.   It's been my concern since -- since -- yes.

20       Q.   Did you ever discuss your concerns about a

21   possible FTC enforcement action with Alan Argaman?

22            MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous.

24            THE WITNESS:  It's irrelevant.  There was no

25   need to talk to him about that.  He wasn't part of

259

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1    the entity.  He wasn't part of the company.

2              MR. UNGAR:  It's 4:58, Counsel.  Do you have

3    more questions?

4              MR. TEPFER:  Yes.

5              MR. UNGAR:  Let's move on then.

6              MR. TEPFER:  Sure.

7    BY MR. TEPFER:

8        Q.    The U.S. manufacturer -- I guess, did BunZai

9    Media Group ever purchase AuraVie products from Hong

10   Kong?

11             MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13             Nobody cares what you guess, Counsel.

14             If you understand it, you can answer.

15             THE WITNESS:  It wasn't from Hong Kong.  It

16   was from China.

17   BY MR. TEPFER:

18       Q.    Did BunZai ever have any business with any

19   company in Hong Kong at all?

20             MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous.

22             THE WITNESS:  Not that I can recall.

23             MR. UNGAR:  Counsel, do you need a break?

24             MR. TEPFER:  No.  I'm fine.

25             MR. UNGAR:  Are we moving on?  It's 4:59.

260

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. TEPFER:  Yes, sir.

2     BY MR. TEPFER:

3          Q.   The accounting -- the email address

4     accounting@bunzai.com, are you familiar with who

5     used that email address?

6          A.   Nastassia and Philip.

7          Q.   Okay.  And did Philip also use

8     accounting@pinlogistics.com?

9          MR. UNGAR:  Objection as to the form of the

10    question.  It's vague and ambiguous, calls for

11    speculation, lacks foundation.

12         THE WITNESS:  I am not sure.  I think it may

13    have been accounting@pinlogistics.

14    BY MR. TEPFER:

15         Q.   Yeah.  Do you know who used that email

16    address?

17         A.   I think the accountings were -- addresses

18    were created on behalf of Philip because he helped

19    with some payments and stuff like that.  So

20    accounting@ --

21         Q.   So accounting@sbmmgmt.com is Philip as well?

22         A.   I think we mentioned that before.

23         Q.   Yes.

24         Okay.  Well, I think those are -- I'll go

25    ahead and pass the witness.

261

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1           MR. UNGAR:  I don't have any questions.

2           MR. TEPFER:  Mr. Benice, do you have any

3      questions?  Jeffrey, are you there?

4           You know, let's give it a minute, just in

5      case Mr. Benice has it on mute here.

6           Mr. Benice?

7           THE WITNESS:  I don't think he came back

8      since we got back from break.

9           MR. TEPFER:  Oh, he hasn't been?  Luis, do

10     you think we should take a minute to see if

11     Mr. Benice comes back and has any questions?

12          MR. GALLEGOS:  I think we'll give him 30

13     seconds, and that's it otherwise.

14          MR. TEPFER:  Sure.  Let's give him until --

15     it's 1:22 now.  We'll give him until 1:23.

16          Mr. Benice, are you there?

17          All right.  It's now 1:23.  For the record,

18     I'll just state there's no stipulation concerning

19     the transcript.

20          MR. UNGAR:  Counsel, you refuse to enter

21     into a stipulation?

22          MR. TEPFER:  Yes.  We're just going to do it

23     pursuant to the Central District local rules, so

24     yes.

25          MR. UNGAR:  Which local rule are you

262
Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1      referring to?

2              MR. TEPFER:  Do you have it handy?  We'll

3      just provide that for the record.

4              MR. GALLEGOS:  32-2, original transcript.

5      Oh, if you want to --

6              MR. TEPFER:  Sure.  That's Local Rule 32-2.

7      All right.

8              MR. GALLEGOS:  And I guess the court

9      reporter will offer to provide a transcript to the

10     witness if he wants to review.

11             MR. UNGAR:  We're prepared to enter into a

12     stipulation.  Let the record reflect that Counsel is

13     unwilling to do so.

14             And I'll take a look at Local Rule 32-2.  I

15     don't think 32-2 relieves the court reporter of her

16     responsibilities.

17             MR. TEPFER:  We don't mean that.

18             MR. UNGAR:  I don't think that 32-2 deals

19     with the signing of the deposition transcript.  I

20     don't believe that Rule 32.2 deals with what happens

21     with regard to the transcript if the witness is

22     unavailable to sign it.

23             MR. TEPFER:  All right.  That concludes

24     the --

25             MR. GALLEGOS:  Just clarify, though.

263

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

1              MR. TEPFER:  Sure.

2              MR. GALLEGOS:  In other words, the court

3    reporting service will provide the witness with the

4    ability to review the transcript.

5              MR. TEPFER:  Right.  Pursuant to the Federal

6    Rule.

7              MR. UNGAR:  32.2, I don't think, addresses

8    any of that.

9              MR. GALLEGOS:  That's where if you want to

10   stipulate as to that --

11             MR. TEPFER:  Yeah.

12             MR. GALLEGOS:  -- you can stipulate.

13             MR. UNGAR:  Hold on.

14             MR. GALLEGOS:  We're still on the record.

15             MR. UNGAR:  Okay.  Hold on.  Hold on.

16        You've refused to enter into a stipulation

17   through numerous depositions.

18             MR. TEPFER:  Correct.

19             MR. UNGAR:  If you're now proposing a

20   stipulation, state it on the record.

21             MR. TEPFER:  We're not.

22             MR. UNGAR:  Thank you.

23             MR. TEPFER:  We're doing what's required by

24   the Federal rules.

25             MR. UNGAR:  You've answered the question.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

264

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    2/18/2016

1          MR. TEPFER:  And if you could state for the

2     record the deposition is concluded, and we're good.

3          THE REPORTER:  The deposition is now

4     concluded.

5          (The deposition was concluded at 5:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

265

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    2/18/2016

```
 1                        --o0o--

 2      Please be advised I have read the foregoing

 3      deposition, and I state there are:

 4      (Check one)

 5                            NO CORRECTIONS

 6                            CORRECTIONS ATTACHED

 7

 8

 9                    ALON NOTTEA

10

11                    Date Signed

12

13

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

266

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                2/18/2016

1    STATE OF CALIFORNIA                )

2                                       )   ss.

3    COUNTY OF LOS ANGELES              )

4

5            I, ALON NOTTEA, having appeared for my

6    deposition on February 18, 2016, do this date

7    declare under penalty of perjury that I have read

8    the foregoing deposition, I have made any

9    corrections, additions or deletions that I was

10   desirous of making in order to render the within

11   transcript true and correct.

12           IN WITNESS WHEREOF, I have hereunto

13   subscribed my name this      day of            ,

14   2016.

15

16

17

18

19

20                        W   I   T   N   E   S   S

21

22

23

24

25

267

Nottea

FTC v. Bunzai Media Group, LLC, et al.                                    2/18/2016

```
 1                   REPORTER'S CERTIFICATE

 2

 3          I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify;

 6          That the foregoing proceedings were taken

 7   before me at the time and place herein set forth;

 8   that any witnesses in the foregoing proceedings,

 9   prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand, which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14          I further certify that I am neither

15   financially interested in the action, nor a relative

16   or employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated:  March 4th 2016

21

22

23          Christina Kim-Campos

24   CHRISTINA KIM-CAMPOS

25   CERTIFICATE NO. 12598
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555