1                UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION   )
                                )
5              Plaintiff        )
                                )
6       v.                      ) No. CV 15-4527-GW(PLAx)
                                )
7    BUNZAI MEDIA GROUP, INC.,  )
     et al.,                    )
8                               )
               Defendants.      )
9    _____)

10

11

12

13                        Wednesday, January 20, 2016

14

15                        10877 Wilshire Boulevard
                          Suite 700
16                        Los Angeles, California

17

18

19

20            The above-entitled matter came on for

21   deposition, pursuant to Notice, at 10:04 a.m.

22

23

24

25

2

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4  FEDERAL TRADE COMMISSION  )
                              )
 5          Plaintiff         )
                              )
 6    v.                      ) No. CV 15-4527-GW(PLAx)
                              )
 7  BUNZAI MEDIA GROUP, INC., )
    et al.,                   )
 8                            )
            Defendants.       )
 9  _____)

10

11

12

13

14

15           DEPOSITION OF DORON NOTTEA, taken on

16  behalf of the Federal Trade Commission, at

17  10877 Wilshire Boulevard, Suite 700, Los Angeles,

18  California, commencing at 10:04 a.m., and concluding

19  at 6:15 p.m., on Wednesday, January 20, 2016,

20  pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21  CSR No. 12598, a Certified Shorthand Reporter, in

22  and for the State of California.

23

24                              ***

25
```

3

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1   A P P E A R A N C E S
 2
     For the Federal    U.S. FEDERAL TRADE COMMISSION
 3   Trade Commission: REID TEPFER, ESQ.
                        1999 Bryan Street
 4                      Suite 2150
                        Dallas, Texas  75201-6808
 5                      (214) 979-9383
                        rtepfer@ftc.gov
 6
 7                      U.S. FEDERAL TRADE COMMISSION
                        LUIS H. GALLEGOS, ESQ.
 8                      1999 Bryan Street
                        Suite 2150
 9                      Dallas, Texas 76201-6808
                        (214) 979-9383
10                      lgallegos@ftc.gov
11
     For the Witness:   ESENSTEN LAW
12                      ROBERT L. ESENSTEN, ESQ.
                        12100 Wilshire Boulevard
13                      Suite 1660
                        Los Angeles, California  90025
14                      (310) 273-3090
                        resensten@esenstenlaw.com
15
16   For the            CROSSWIND
     Defendants         ROBERT M. UNGAR, ESQ.
17   Alon Nottea and    2190 North Beverly Glen Blvd.
     Roi Reuveni:       Los Angeles, California  90077
18                      (818) 646-4750
                        rmu@crosswindlaw.com
19
20
     Also Present:      Alon Nottea
21
22
23
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4

Nottea
FTC v. Bunzai Media Group, Inc., et al.                           1/20/2016

```
 1                      I   N   D   E   X

 2

 3   WITNESS                 EXAMINATION              PAGE

 4   Doron Nottea           By Mr. Tepfer              6

 5   Afternoon Session                               107

 6

 7   DEPOSITION EXHIBITS            INITIAL REFERENCE

 8   Nottea Deposition Exhibit No.  26              28

 9   Nottea Deposition Exhibit No.  46              39

10   Nottea Deposition Exhibit No.  49              55

11   Nottea Deposition Exhibit No.  43              70

12   Nottea Deposition Exhibit No.  29              83

13   Nottea Deposition Exhibit No.  45              89

14   Nottea Deposition Exhibit No.  41             108

15   Nottea Deposition Exhibit No.  44             114

16   Nottea Deposition Exhibit No.  21             115

17   Nottea Deposition Exhibit No.  30             118

18   Nottea Deposition Exhibit No.  47             121

19   Nottea Deposition Exhibit No.  37             123

20   Nottea Deposition Exhibit No.  35             129

21   Nottea Deposition Exhibit No.  32             132

22   Nottea Deposition Exhibit No.  51             134

23   Nottea Deposition Exhibit No.  53             136

24   Nottea Deposition Exhibit No.  54             144

25
```

5

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

```
 1    DEPOSITION EXHIBITS                INITIAL REFERENCE
 2        (Continued)
 3
 4    Nottea Deposition Exhibit No.  56                149
 5    Nottea Deposition Exhibit No.  58                152
 6    Nottea Deposition Exhibit No.  57                154
 7    Nottea Deposition Exhibit No.  60                175
 8    Nottea Deposition Exhibit No.  50                170
 9    Nottea Deposition Exhibit No.  59                176
10              `
11                    INFORMATION REQUESTED
12                         None.
13
14
15
16            QUESTIONS INSTRUCTED NOT TO ANSWER
17                         None.
18
19
20
21
22
23
24
25
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 20, 2016
 2                      10:04 A.M.
 3
 4                   DORON NOTTEA,
 5           called as a witness by and on behalf of
 6           the Plaintiff, being first duly sworn,
 7           was examined and testified as follows:
 8
 9           MR. ESENSTEN:  We're on the record now.
10    Mr. Nottea has appeared.  He does not feel well.
11    You can see he has some cold medicine in front of
12    him.  Had you not flown in from Dallas, I would have
13    canceled the deposition because of his medical
14    condition, but we're going to do our best, and if he
15    doesn't feel well enough or there's a -- he needs a
16    break or something, he's going to let you know.
17           MR. TEPFER:  Great.  Thanks.
18
19                   EXAMINATION
20    BY MR. TEPFER:
21      Q.   Hello, Mr. Nottea.  My name is Reid Tepfer.
22    I'm an attorney with the Federal Trade Commission,
23    and I'll be deposing you today.  As you know, we're
24    here in the matter of Federal Trade Commission vs.
25    BunZai Media Group, case number CV 15-4527-GW (PLA),
```

7

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                        1/20/2016

1    pending in the Central District of California.  With

2    me is Luis Gallegos.  He's also an attorney with the

3    FTC.

4          Can Counsel please identify themselves for

5    the record.

6          MR. ESENSTEN:  I'm Robert L. Esensten.  I

7    represent Mr. Nottea.

8          MR. UNGAR:  Robert M. Ungar, U-n-g-a-r.  I

9    represent the Defendants Alon Nottea, N-o-t-t-e-a,

10   first name A-l-o-n, and Roi Reuveni, first name

11   R-o-i, last name R-e-u-v-e-n-i, both of whom are

12   defendants.  Mr. Alon Nottea is also a

13   cross-defendant.

14         MR. TEPFER:  Thank you.

15   BY MR. TEPFER:

16      Q.   Mr. Nottea, have you ever been deposed

17   before?

18      A.   Yes.

19      Q.   All right.  Do you understand that you're

20   under oath, and that means your response has to be

21   completely truthful?

22      A.   Yes.

23      Q.   Do you understand that your testimony here

24   today has as much importance as if you were

25   testifying in front of a judge in court?

8

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      A.    Yes.

2      Q.    And because you're under oath, you cannot

3    say that you don't know or don't remember in

4    response to a question if, in fact, you do have some

5    knowledge or some memory of the information

6    requested.

7            MR. ESENSTEN:  That's not true.  He can say

8    if he doesn't know if he has no knowledge of some of

9    the answer, if he has a failure to recollect, he's

10   not so sure he knows or not.  That's not an accurate

11   statement.

12           MR. TEPFER:  We're just --

13           MR. UNGAR:  I'm going to object based on the

14   form of the question, it's vague and ambiguous, and

15   it's argumentative and it misstates the law.

16   BY MR. TEPFER:

17     Q.    Mr. Nottea, are you represented by an

18   attorney today?

19     A.    Yes.

20     Q.    And who is that?

21     A.    Robert Esensten.

22     Q.    All right.  Thank you.

23           MR. ESENSTEN:  I announced that I was

24   representing him.

25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1   BY MR. TEPFER:
 2       Q.   All right.  Let's go over some of the ground
 3   rules for this deposition, so we're all on the same
 4   page.
 5            The court reporter will be recording my
 6   questions and your answers.  You will have to speak
 7   up and answer orally, so that she can record your
 8   answers.  This means you can't nod or shake your
 9   head to answer a question.  Does that make sense to
10   you?
11       A.   Yes.
12       Q.   That also means that we can't speak at the
13   same time, or the court reporter won't be able to
14   accurately record what we say --
15            (Mr. Alon Nottea joins the proceedings.)
16   BY MR. TEPFER:
17       Q.   So even if you think you understand the
18   question before I finish asking, please wait until
19   I'm done before answering.
20       A.   Okay.
21            MR. ESENSTEN:  He's asking for you to say
22   "yes" or "no."
23            THE WITNESS:  Okay.
24            Yes.  Sorry.
25            MR. TEPFER:  And could you please state your
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

 1    name for the record.

 2              MR. ALON NOTTEA:  My name is Alon Nottea.

 3              MR. TEPFER:  Thank you.

 4    BY MR. TEPFER:

 5      Q.   Sometimes I might ask a question that you

 6    don't understand.  If you don't understand my

 7    question, let me know, and I'll rephrase it and try

 8    to ask a better question; okay?

 9      A.   Okay.

10      Q.   And sometimes you might give an answer and

11    then later remember something else, either

12    additional information or clarification on an issue.

13    If that happens, just tell me that you have

14    something to add to an earlier question or you want

15    to clarify something you said earlier --

16      A.   Okay.

17      Q.   -- okay?

18              And if you need a break at any time, just

19    let me know.  We'll finish whatever question you're

20    in the middle of answering --

21      A.   Okay.

22      Q.   -- and then try to take a break shortly

23    after that, if that works.

24      A.   Okay.

25      Q.   And you're allowed to talk to your attorney,

11

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    of course, but if you've just been asked a question

2    or are in the middle of answering a question, we ask

3    that you please finish answering before speaking to

4    your attorney, and don't speak to him when there's a

5    question pending.

6           Do you understand?

7    A.    Yes.

8    Q.    All right.  And at times your attorney or

9    one of -- or the other attorney in the room might

10   make an objection to a question I ask, which the

11   judge will want to rule on later.  I may rephrase

12   the question or I might just ask that you answer my

13   original question.  And you should still answer, as

14   long as your attorney doesn't instruct you not to.

15   Okay?

16   A.    Okay.

17   Q.    We -- you mentioned earlier that you were

18   taking some cold medicine; is that correct?

19   A.    (Witness shakes head up and down.)

20   Q.    So you're sick today?

21   A.    Yes.

22   Q.    Okay.  Will that affect your ability to

23   answer my questions fully, accurately, and to the

24   best of your ability?

25   A.    Hopefully not.

12

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1     Q.   Okay.  And you had mentioned that you had

2  been deposed before.  How many times have you been

3  deposed?

4     A.   Once, but years -- it was years ago.

5     Q.   Okay.  And what was that for?

6          MR. ESENSTEN:  You can tell him it was some

7  litigation --

8          THE WITNESS:  Some litigation.

9          MR. ESENSTEN:  -- that you were involved in.

10         THE WITNESS:  Years ago.  I mean, some

11 litigation long, long time ago.

12 BY MR. TEPFER:

13    Q.   And --

14    A.   Plenty of years back.

15    Q.   And were you -- were you a defendant in that

16 action?

17    A.   Defendant in that action.  Yes.

18    Q.   And do you remember why you were sued?

19    A.   I was a part of -- of -- of, like, a group,

20 but it wasn't me directly.

21    Q.   Okay.  Do you remember why the group was

22 sued?

23    A.   It was a sale of a business.  It happened

24 too long ago.  I don't remember the exact name.  But

25 it was sale of a business, and that's what -- that's

13

Nottea

FTC v. Bunzai Media Group, Inc., et al.                               1/20/2016

 1   what the case was about.

 2      Q.   Okay.  And aside from your attorney, did you

 3   speak with anyone about today's deposition?

 4      A.   No.

 5      Q.   Did you review any documents to prepare for

 6   today?

 7      A.   Yes.

 8      Q.   What did you look at?

 9      A.   I just have a conversation with my attorney.

10      Q.   But did you look at documents?

11      A.   We looked at some documents, yes.

12      Q.   Could you let me know what documents?

13      A.   Just documents we -- relating to the case.

14   We just went over some -- some notes that I made.

15      Q.   Okay.  I want to talk a little bit about

16   your personal background.

17           When were you born?

18      A.   1971.

19      Q.   And where were you born?

20      A.   Israel.

21      Q.   Is that where you were raised?

22           MR. ESENSTEN:  Objection; vague.

23           THE WITNESS:  I came here when I was 13.

24   BY MR. TEPFER:

25      Q.   Okay.  And have you lived in Los Angeles

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1   ever since?
 2      A.   Yes.
 3      Q.   And what is your current address?
 4      A.                      , Tarzana, California      .
 5      Q.   How long have you lived there?
 6      A.   11 years.
 7      Q.   And are you married?
 8      A.   Yes.
 9      Q.   Who are you married to?
10      A.   Lori.
11      Q.   And are you currently employed?
12      A.   At the moment?  No.
13      Q.   What was your last job?
14      A.   My adult company.
15      Q.   Did you have any other jobs at the same
16   time?
17      A.   I did some bookkeeping for some of the --
18   some of the defendant corporations.
19      Q.   And did you attend college?
20      A.   No.
21      Q.   Do you have any other post high school
22   education?
23      A.   No.  I didn't finish high school.
24      Q.   And I want to talk about your work history
25   before the adult company.  You said that you did
```

15

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

     1    some bookkeeping?

     2       A.    No.  I said while --

     3       Q.    Oh.

     4       A.    -- in the last few years.  I was always in

     5    adult, since after high school.

     6       Q.    Okay.  And have you held any other

     7    positions?

     8       A.    Like what?

     9       Q.    Any other employment, besides your adult

    10    business?

    11       A.    No.

    12       Q.    And did you ever work for BunZai Media

    13    Group?

    14       A.    No.

    15       Q.    Did you ever do bookkeeping for BunZai Media

    16    Group?

    17       A.    No.

    18            MR. UNGAR:  Objection as to the form of the

    19    question, it's vague and ambiguous.

    20    BY MR. TEPFER:

    21       Q.    And when you said that you did bookkeeping,

    22    who did you do bookkeeping for?

    23       A.    For --

    24            MR. UNGAR:  Objection as to the form of the

    25    question, it's vague and ambiguous.

16

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1          THE WITNESS:  For a few of the entities that
 2   I -- in the case.
 3   BY MR. TEPFER:
 4      Q.   A few of the entities in the Complaint?
 5      A.   Yes.
 6      Q.   I'd like to go over a few of those entities
 7   and see if you did accounting, or rather,
 8   bookkeeping for them.
 9          Did you do bookkeeping for BunZai Media
10   Group?
11      A.   No.
12          MR. UNGAR:  Objection as to the form of the
13   question, it's vague and ambiguous.
14   BY MR. TEPFER:
15      Q.   When you say "bookkeeping," what are you
16   referring to?
17      A.   Just helping, overseeing accounts payable,
18   you know.  Bills come in.  I'm being told to pay
19   them.  I pay them.  That's -- that was my, the scope
20   of my actual job.
21      Q.   Who tells you to pay the bills?
22          MR. UNGAR:  Objection as to the form of the
23   question, it's vague and ambiguous, calls for
24   speculation.
25          THE WITNESS:  If my brother told me, if one
```

17

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1    of the officers of the company told me.
 2    BY MR. TEPFER:
 3        Q.    And so did you do bookkeeping for Pinnacle
 4    Logistics, Inc.?
 5        A.    A little.
 6        Q.    And did you ever have any training in
 7    bookkeeping?
 8        A.    No.
 9        Q.    Did you ever do bookkeeping for DSA
10    Holdings, Inc.?
11        A.    DSA Holdings, Inc., yes.
12        Q.    Do you know what BunZai Media Group is?
13        A.    I know it's a corporation that my brother
14    has.
15        Q.    Do you know what the company sells?
16            MR. UNGAR:  Objection as to the form of the
17    question.
18            MR. ESENSTEN:  Objection.
19            MR. UNGAR:  It's vague and ambiguous.
20            MR. ESENSTEN:  And vague as to time.
21            Do you understand?  If you understand the
22    question, you can answer it.  If you don't, tell him
23    you do not understand the question.
24            THE WITNESS:  I understand they sell creams,
25    they sell skin care products.
```

18

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    BY MR. TEPFER:

2        Q.    Do you know the method by which BunZai Media

3    Group sells those creams?

4        A.    I think they sell them -- sell them on

5    Internet.

6        Q.    Have you ever viewed one of the -- any of

7    the websites that BunZai Media Group uses to sell

8    them?

9        A.    No.

10           MR. UNGAR:  Objection as to the form of the

11   question, it's vague and ambiguous, it calls for

12   speculation, lacks foundation.

13           MR. ESENSTEN:  And vague as to time.

14   BY MR. TEPFER:

15       Q.    Are you familiar with BunZai Media Group's

16   corporate structure?

17       A.    A little bit.

18       Q.    Are you familiar with any companies that

19   make payments to BunZai Media Group, as the

20   bookkeeper?

21           MR. UNGAR:  Objection as to the form of the

22   question --

23           THE WITNESS:  No.

24           MR. UNGAR:  -- calls for speculation.

25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    BY MR. TEPFER:

2        Q.   Did you ever analyze BunZai Media Group --

3    BunZai Media Group's sales method regarding its

4    profitability?

5        A.   No.

6        Q.   How are you compensated for doing this

7    bookkeeping for BunZai Media Group?

8        A.   I wasn't doing --

9             MR. UNGAR:  Objection; vague as to the form

10   of the question, it's vague.

11            THE WITNESS:  I don't know.  I wasn't doing

12   any bookkeeping for BunZai.

13   BY MR. TEPFER:

14       Q.   Sorry.  How were you compensated for

15   bookkeeping for Pinnacle Logistics?

16            MR. UNGAR:  Same objection.

17            THE WITNESS:  I didn't do accounting, I said

18   before.

19            MR. UNGAR:  Finish your answer.  You said

20   before --

21            THE WITNESS:  I didn't do any bookkeeping

22   for BunZai.

23   BY MR. TEPFER:

24       Q.   So which -- so you said you did bookkeeping

25   for Pinnacle Logistics?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1       A.   I said a little, a little bit, a little bit.

2   Just as a transition when somebody left, I just

3   looked at some stuff, but not really doing any

4   paperwork.  I mean not enough bookkeeping for me to

5   know stuff like that.

6       Q.   Do you know what period of time you did this

7   bookkeeping?

8       A.   I think from -- I think about April 2013.

9       Q.   Just for the month of April 2013?

10      A.   From April 2013 on.

11      Q.   So from April 2013 until the FTC filed its

12  lawsuit in June?

13      A.   I think so.  Yeah.

14      Q.   And you didn't receive any compensation for

15  that?

16      A.   From Pinnacle, no.

17      Q.   Did you receive any compensation from anyone

18  for that?

19      A.   I received some.

20           MR. UNGAR:  Objection as to the form of the

21  question, it's vague and ambiguous.

22           THE WITNESS:  I did receive some

23  compensation, yes.

24  BY MR. TEPFER:

25      Q.   Who did you receive compensation from?

21

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

         1      A.   From a few --

         2           MR. UNGAR:  Objection as to the form of the

         3      question, it's vague and ambiguous.

         4           THE WITNESS:  I received compensation from a

         5      few of the corporations, a few of the entities, for

         6      bookkeeping services.

         7      BY MR. TEPFER:

         8      Q.   Could you tell me which corporations?

         9      A.   Out of my head, I think one of them was

        10      probably, maybe DMA Holdings, maybe.

        11      Q.   And what is DMA Holdings?

        12      A.   Just one of the corporations, one of the

        13      entities that I did work for.

        14      Q.   Do you know who owns DMA Holdings?

        15      A.   Yes.

        16      Q.   Who is it?

        17      A.   Jason Menin.

        18      Q.   And did he hire you?

        19      A.   To do bookkeeping?

        20      Q.   Yes.

        21      A.   I guess so, yes.  I mean yes.

        22      Q.   And DMA Holdings paid you to do bookkeeping

        23      for Pinnacle?

        24      A.   For them, no.  DMA, no.

        25      Q.   Do you know of any other companies you did

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   bookkeeping services for?

2      A.   I did for few of them.

3           MR. UNGAR:  Objection as to the form of the

4   question, it's vague and ambiguous.

5           THE WITNESS:  I did for a few of the

6   entities.  I don't remember for each one

7   specifically, but I did.

8   BY MR. TEPFER:

9      Q.   Did you help incorporate or create any of

10  the corporations named as defendant in this lawsuit?

11          MR. UNGAR:  Objection as to the form of the

12  question, it's compound, it's vague and ambiguous as

13  well.

14          THE WITNESS:  I introduced --

15          MR. ESENSTEN:  That calls for a "yes" or

16  "no."

17          THE WITNESS:  No.

18          MR. ESENSTEN:  Did you do any incorporation?

19  BY MR. TEPFER:

20     Q.   Do you know who came up with the corporate

21  structure for BunZai Media Group and its related

22  companies?

23          MR. UNGAR:  Objection as to the form of the

24  question, it's vague and ambiguous.

25          THE WITNESS:  No.

23

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    BY MR. TEPFER:

2        Q.    Did you ever meet with David Davidian

3    regarding BunZai's corporate structure?

4        A.    No.

5        Q.    Do you know who David Davidian is?

6        A.    Of course.

7        Q.    Do you know what work he did for BunZai

8    Media Group?

9        A.    He was their CPA.

10       Q.    Do you know what a continuity program is?

11       A.    No.

12       Q.    Did you ever oversee any of the corporate

13   defendants' merchant accounts?

14       A.    The owner --

15             MR. ESENSTEN:   Objection; vague as to the

16   word "continuity."

17             I'm sorry.  Could you reread the question.

18   I misstated.

19             MR. UNGAR:   Did you ever oversee any of the

20   corporate defendant merchant accounts?

21             MR. ESENSTEN:   Could you read it.

22             (The previous question was read back

23             by the court reporter as follows:

24                 "QUESTION:   Did you ever oversee

25             any of the corporate defendants'

24

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           1/20/2016

1          merchant accounts?")

2          MR. ESENSTEN:  I'll withdraw that objection.

3    Vague as to the word "oversee."

4          Pretty astute as to the way I did it.

5          MR. UNGAR:  It's also vague as to "corporate

6    defendants."  It's also vague as to "merchant

7    accounts."  The whole thing is vague, but if he

8    understands, he can answer.

9          THE WITNESS:  The only thing I see is money

10   coming in into bank accounts.  I had no access or

11   anything to any merchant accounts.  I saw money

12   coming in, and that's all.

13   BY MR. TEPFER:

14      Q.  Do you know which payment processing

15   companies BunZai Media Group --

16      A.  No.

17      Q.  -- had?

18          Do you know why a company would need

19   multiple merchant contacts?

20          MR. ESENSTEN:  Objection; vague.

21          MR. UNGAR:  Objection as to the form of the

22   question, it's vague and ambiguous, it calls for

23   rank speculation.

24   BY MR. TEPFER:

25      Q.  Do you know who Nastassia Yalley is?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      A.   Yes.

2      Q.   Do you know what her position was at BunZai

3   Media Group?

4      A.   She managed all the books.

5      Q.   Did you work with her in any capacity?

6      A.   She went -- she left -- she transferred some

7   of the stuff that she used to do for accounts

8   payable to me.

9      Q.   And when she left, did you begin doing the

10  same work she was doing?

11     A.   I was --

12          MR. UNGAR:  Objection as to the form of the

13  question, calls for --

14          THE WITNESS:  Only thing --

15          MR. UNGAR:  -- speculation.

16          THE WITNESS:  -- I was doing is bookkeeping.

17  That's all.

18          MR. ESENSTEN:  Let's be sure that if

19  somebody else is talking, wait 'til --

20          THE WITNESS:  Oh, okay.

21          MR. ESENSTEN:  -- they finish talking --

22          THE WITNESS:  Okay.

23          MR. ESENSTEN:  -- so that we don't have

24  overlap and make the court reporter crazy.

25          THE WITNESS:  No problem.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. ESENSTEN:  Do you want to repeat the

2   question, so we make sure we have --

3   BY MR. TEPFER:

4      Q.   Do you know what work Nastassia Yalley was

5   doing for BunZai Media Group?

6          MR. UNGAR:  Objection as to the form of the

7   question, it's vague and ambiguous, lacks

8   foundation, calls for speculation.

9          THE WITNESS:  As far as what she gave me to

10  do was her bookkeeping authorities.  Paying invoices

11  that she got.  She told me those are the vendors,

12  pay them; payment comes in, pay them.

13  BY MR. TEPFER:

14     Q.   So did Nastassia Yalley direct you to make

15  those payments?

16         MR. UNGAR:  Objection as to the form of the

17  question, it's vague and ambiguous.

18         MR. ESENSTEN:  And vague as to time.

19         THE WITNESS:  She -- did she told me to pay

20  them?  She just showed me a list of vendors with

21  accounts payable and told me to make sure that they

22  get paid, once she leaves.

23  BY MR. TEPFER:

24     Q.   Do you know who Gary Bhasin is?

25     A.   Gary Bhasin.  I don't remember Gary's last

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

 1    name.

 2        Q.   It's spelled B-h-a-s-i-n.  I might be

 3    mispronouncing it.

 4        A.   I don't recall.  I don't remember the last

 5    name.  Can you give me a little bit more info, so I

 6    need to know?

 7            MR. ESENSTEN:  B-h- --  I'm sorry.  Can you

 8    spell it again?

 9            MR. TEPFER:  B-h-a-s-i-n.

10            THE WITNESS:  Yes, yes, yes.  I know who it

11    is.

12    BY MR. TEPFER:

13        Q.   Who is he?

14        A.   He is a guy that I think offered the

15    companies to take over, to do analyzing or to do

16    bookkeeping, if I'm right.  Yes.

17        Q.   Did you ever meet with him to discuss his, I

18    guess, proposal for those companies?

19            MR. UNGAR:  Objection as to the form of the

20    question.

21            THE WITNESS:  No.  I know he --

22            MR. UNGAR:  It's vague and ambiguous.

23            THE WITNESS:  Sorry.

24            I know he -- I think that he came in once,

25    but I myself didn't speak with him.

28
Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1   BY MR. TEPFER:

2       Q.    So you didn't personally speak with him?

3       A.    No.   I think he sent me email saying he

4   wants to help, but in person I didn't meet him.

5             (Plaintiff's Exhibit 26 was marked

6             for identification by the court

7             reporter and is attached hereto.)

8             MR. TEPFER:   Okay.   I'm handing the witness

9   what's been marked as Plaintiff's Exhibit 26.

10            MR. ESENSTEN:   Do you have a copy for us;

11  right?

12            MR. TEPFER:   Sure.

13            MR. UNGAR:   I'd like a copy, Counsel.

14            MR. TEPFER:   Well --

15            MR. UNGAR:   I'd like a copy, Counsel.

16            MR. TEPFER:   -- we have three.

17            MR. UNGAR:   I'm sorry?

18            MR. TEPFER:   Can you all --

19            MR. UNGAR:   You don't have a copy for me?

20            MR. GALLEGOS:   We weren't expecting you to

21  be here today, Robert.   You didn't notify us.

22            MR. UNGAR:   First of all, Counsel, can you

23  cite authority for me and the rules that says that

24  counsel for a party has to notify the notifying

25  party that they will be appearing at a deposition?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    What's the rule, citation?

2         MR. GALLEGOS:  Well, Mr. Esensten represents

3    Mr. Nottea.  We were expecting him to be here.  In

4    other words, as a matter of courteousness, it would

5    have been nice to know if you were coming, so we

6    would know whether to make copies.

7         MR. UNGAR:  So you have no authority for

8    what you've just stated; is that right?

9         MR. GALLEGOS:  Once again --

10        MR. ESENSTEN:  Maybe it would be easier, why

11   don't we just copy it right now.

12        MR. UNGAR:  I'd like a copy.

13        MR. ESENSTEN:  Why don't we just copy one

14   right now, and this will save some time.

15        MR. TEPFER:  Can we go off the record real

16   quick?

17        (A discussion was held off the record.)

18        (Mr. Gallegos leaves the room.)

19        (Recess)

20        MR. TEPFER:  Back on the record.

21   BY MR. TEPFER:

22   Q.   Mr. Nottea, do you recognize this document?

23   A.   No.

24   Q.   Have you ever spoken with anyone about

25   BunZai Media Group's business plan before?

30

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
1       A.    Never.

2       Q.    Do you know who Khristopher Bond is?

3       A.    Yes.

4       Q.    Who is he?

5       A.    He's Alon's ex-partner.

6       Q.    And he was his ex-partner in what business?

7       A.    In BunZai.

8             MR. ESENSTEN:  Can I ask a favor of you

9   guys?  There's some pictures of some women in this

10  thing.  Can you guys depose them, please?

11            MR. GALLEGOS:  I assume that's off the

12  record there, Bob?

13            MR. ESENSTEN:  No.  It's a reasonable

14  request.  I think that would be a fun deposition.

15  BY MR. TEPFER:

16      Q.    Do you know what period Khristopher Bond was

17  your brother Alon's business partner?

18      A.    I think probably in maybe 2010 to 2013.

19            MR. ESENSTEN:  Is that your best estimate?

20            THE WITNESS:  Best estimate.

21            MR. ESENSTEN:  Okay.  When you have best

22  estimates like that, just tell him "My best estimate

23  is".

24            THE WITNESS:  Okay.

25  ///
```

31

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    BY MR. TEPFER:

2        Q.   And do you know if your brother had any

3    other business partners in BunZai Media Group?

4        A.   Partners, no.  No.

5        Q.   Do you know if BunZai Media Group had any

6    other investors?

7        A.   Yes.

8        Q.   Who were they?

9        A.   From what I know, it's Igor Latsanovski.

10       Q.   And were there any other investors, aside

11   from Igor Latsanovski?

12       A.   Not that I know of.

13       Q.   If you would, please turn to page 22 of

14   Plaintiff's Exhibit 26.

15            MR. UNGAR:  Could you give the Bates number,

16   please?

17            MR. TEPFER:  Sure.  It ends in 576.

18            MR. UNGAR:  576.

19   BY MR. TEPFER:

20       Q.   Are you on that page?

21       A.   Yes.

22       Q.   Could you read there on the bottom, there's

23   a highlighted position beginning "Doron"?

24       A.   It says, "Doron (CFO/Controller):  For every

25   customer that successfully passes through the Day 15

32

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   transitional billing stage, the company will make a

2   gross profit of $40 per order, if they were to

3   cancel after this stage (Day 1:  9.95 plus 7.95

4   shipping and handling equals $17.90, plus day 15:

5   80 equals $97.90 minus 18 COG slash S and H, minus

6   40 CPA equals 39.90)."

7   BY MR. TEPFER:

8       Q.   Did you write --

9       A.   No.

10      Q.   -- this passage?

11           Did anyone ask your permission to write --

12           MR. ESENSTEN:  Wait.  He answered before you

13  finished the question.  Can we make sure we have the

14  question and the answer?

15  BY MR. TEPFER:

16      Q.   Did you write this passage?

17      A.   No.

18      Q.   Do you know who wrote this passage?

19      A.   No.

20      Q.   Did anyone ask your permission to write this

21  passage?

22      A.   No.

23      Q.   Were you ever CFO of BunZai Media Group?

24      A.   No.

25           MR. UNGAR:  Objection as to the form of the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

 1   question, it's vague and ambiguous.

 2   BY MR. TEPFER:

 3       Q.   Do you know what a transitional billing

 4   stage is?

 5       A.   No.

 6       Q.   Do you know what COG stands for?

 7       A.   No.

 8       Q.   Would you please turn to page 25.  That's

 9   Bates number ending in 579.  When you get to that

10   page, there's a highlighted portion that says

11   "Doron."  If you would please read that.

12       A.   "Customers that pass the Day 45 mark have

13   accrued a life time value of 93.78.  (This does not

14   factor in up sells)."

15       Q.   Did you write that statement?

16       A.   No.

17       Q.   And no one asked you to -- asked your

18   permission to write that?

19       A.   No.

20           MR. ESENSTEN:  That is a double negative.

21   Can you try that again so we have a clear answer?

22           Let's have the reporter read it.  We'll hear

23   what I have to say.

24           (The previous question was read back

25           by the court reporter as follows:

34

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1              "QUESTION:  And no one asked you
 2         to -- asked your permission to write
 3         that?")
 4              MR. ESENSTEN:  And the answer was no, so
 5    that's a double negative.  No one asked you.
 6    BY MR. TEPFER:
 7       Q.   Did anyone ask your permission to write
 8    that?
 9              MR. ESENSTEN:  There.
10              THE WITNESS:  No.
11    BY MR. TEPFER:
12       Q.   Okay.  Do you know what Secured Commerce is?
13       A.   Yes.
14       Q.   What is it?
15       A.   It's an LLC that I hold.
16       Q.   Are you the sole owner of that LLC?
17       A.   No.
18       Q.   Who do you own it with?
19       A.   With Alan Argaman.
20       Q.   What is the business of Secured Commerce,
21    LLC?
22       A.   When initially opened that LLC, we wanted to
23    form a discount rate of shipping so we can apply our
24    discount to people that want to use UPS, FedEx, DHL,
25    just to get a bulk rate shipping so customers can
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    save money on shipping.

2        Q.   And does Secured Commerce have any

3    employees?

4        A.   No.

5            MR. UNGAR:  Objection as to the form of the

6    question, it's vague and ambiguous temporally.

7    BY MR. TEPFER:

8        Q.   Has Secured Commerce had any employees,

9    aside from you and Alan Argaman?

10       A.   No.

11       Q.   And when did Secured Commerce, when was it

12   formed?

13       A.   I think sometime in end of 2012.

14       Q.   And as of the filing of the FTC's lawsuit,

15   did Secured Commerce still exist?

16           MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous.  It seeks

18   metaphysical information.

19           MR. ESENSTEN:  Can you give him the date?

20   Do you know the date it was filed?

21           MR. TEPFER:  I believe it's June 18th, 2015.

22   As of June 18.

23           THE WITNESS:  If it was June 18, if the

24   company was -- what did you say?

25   ///

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1   BY MR. TEPFER:

2       Q.   Did the -- sorry.  I'll rephrase.

3            Did the company, was the company operating

4   as of June 18th, 2015?

5       A.   Yes.  I mean, it didn't do business, but it

6   was all operating.  It was open.

7       Q.   What customers did Secured Commerce have?

8            MR. UNGAR:  Objection as to the form of the

9   question.  Vague and ambiguous temporally.

10           THE WITNESS:  It didn't really -- I mean,

11  the company didn't really pick up -- I mean, we got

12  our licenses, we got our discounts.  We just passed

13  the discounts along, but we never really did

14  anything with actual company.  I mean, it just sat

15  there.  It's an LLC.

16  BY MR. TEPFER:

17      Q.   Did the company ever have any customers?

18      A.   It had a few.  I mean, my adult company and

19  a few other adult company used the discount, UPS

20  account of the Secured Commerce as a -- as a third

21  party biller, and that's about it.  I mean, that's

22  really the only people that it was used for.

23      Q.   Did the company -- did Secured Commerce ever

24  have any customers that weren't companies owned by

25  you or your brother?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1          MR. UNGAR:  Objection as to the form of the
 2     question, it's vague and ambiguous, and it calls for
 3     speculation.
 4          THE WITNESS:  It did, yes.
 5     BY MR. TEPFER:
 6        Q.   What customers were those?
 7        A.   Adult companies.  Various companies that I
 8     used to work with.  They just -- I just gave them --
 9     what we did is we gave them our discount rate, so
10     when they ship they use us as a third party,
11     shipping on our account, and that's how they get our
12     discount.  That's how we would get paid.  If they
13     shipped, we got couple pennies.
14        Q.   Did Secured Commerce do anything aside from
15     shipping?
16        A.   Not at all.  Nothing.
17        Q.   Did it ever design web pages?
18        A.   Not at all.
19        Q.   Did it ever do any business with Adageo,
20     LLC?
21        A.   My brother's company?
22          MR. ESENSTEN:  I didn't hear the response.
23     Did you --
24          THE WITNESS:  My brother's company?  No,
25     but -- as far as I know, no.  No.
```

38

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    BY MR. TEPFER:

2        Q.    Do you know what Adageo, LLC, is?

3        A.    It's my brother's company, my brother's LLC.

4        Q.    Do you know what Adageo LLC's business is?

5        A.    No.  That's his personal company.

6        Q.    So you never discussed Adageo LLC's --

7        A.    Not at all.

8        Q.    -- business with -- sorry.

9        A.    Go ahead.

10       Q.    You never discussed Adageo, LLC's, business

11   with your brother?

12       A.    Not really, no.

13       Q.    And just to be clear, when you say your

14   brother, you mean Alon?

15       A.    Alon, yes.

16       Q.    And you don't have any other brothers?

17       A.    No.

18       Q.    Okay.  I'm now going to pass the witness

19   what's been marked Plaintiff's Exhibit 46.

20             MR. ESENSTEN:  Can I just ask a

21   clarification question?

22             MR. TEPFER:  Sure.

23             MR. ESENSTEN:  The exhibit numbers you're

24   using have been marked in other matters?  You're

25   skipping around, so --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1          MR. TEPFER:  Yeah.

 2          MR. ESENSTEN:  -- I'm trying to figure out

 3     why they're not in order.

 4          MR. TEPFER:  We've labeled them before.  I'm

 5     not necessarily doing them in the order that I've

 6     labeled them.

 7          MR. ESENSTEN:  So you've just pre-labeled

 8     them; they haven't been used in other proceedings;

 9     is that correct?

10          MR. TEPFER:  Some of them have been used in

11     this proceeding and some haven't been yet.

12          MR. ESENSTEN:  Okay.  We're going off the

13     record or --

14          MR. GALLEGOS:  We can go off the record.

15          (A discussion was held off the record.)

16          (Plaintiff's Exhibit 46 was marked

17          for identification by the court

18          reporter and is attached hereto.)

19     BY MR. TEPFER:

20     Q.   Mr. Nottea, do you recognize this document?

21     A.   Yes.  I've seen it before.

22     Q.   Where have you seen it?

23     A.   In the Complaint.

24     Q.   Before you saw it in the Complaint, had you

25     ever seen it aside from that?
```

40

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.   No.

 2      Q.   So you didn't create this document?

 3      A.   No.

 4           MR. ESENSTEN:  Can we do that without a

 5   double negative?

 6           Did you create this document?

 7           THE WITNESS:  No.

 8           MR. ESENSTEN:  Okay.

 9   BY MR. TEPFER:

10      Q.   Did you create this document?

11      A.   No.

12      Q.   Did Alan Argaman do bookkeeping for your

13   company Secured Commerce?

14           MR. UNGAR:  Objection as to the form of the

15   question, vague and ambiguous.

16           THE WITNESS:  No.

17   BY MR. TEPFER:

18      Q.   Did Alan Argaman ever draft invoices for

19   Secured Commerce?

20           MR. UNGAR:  Objection as to the form of the

21   question, it's vague and ambiguous, calls for

22   speculation, lacks foundation.

23           THE WITNESS:  No, not that I know of, no.

24   BY MR. TEPFER:

25      Q.   Did you typically draft invoices for Secured
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    Commerce?

2       A.   No.

3       Q.   Have you ever drafted invoices for Secured

4    Commerce?

5       A.   I might have, yes.

6       Q.   So you typically handled paying bills for

7    Secured Commerce?

8       A.   Me and other gentleman that worked for me.

9       Q.   Are you aware of Secured Commerce ever

10   designing web pages?

11      A.   Not possible, no.

12      Q.   Do you know what Lime Light is?

13      A.   Not exactly, no.

14      Q.   What is your understanding of what Lime

15   Light is?

16           MR. UNGAR:  Objection as to the form of the

17   question, it's vague and ambiguous, it's

18   unintelligible without any definition of the word or

19   words "Lime Light."

20           THE WITNESS:  I think it's a -- some sort of

21   a management online tool.  That's all I -- I know

22   about it.

23   BY MR. TEPFER:

24      Q.   So you only know that it's a tool used

25   for --

42

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

 1       A.    For --

 2       Q.    -- online?

 3       A.    For online.

 4             MR. UNGAR:  Objection as to the form of the

 5    question, misstates the witness's prior testimony,

 6    and it's argumentative.

 7    BY MR. TEPFER:

 8       Q.    Okay.  And to your knowledge, has Secured

 9    Commerce ever had business with any other defendant,

10    or rather, corporate defendant in this lawsuit?

11       A.    Never.

12             MR. ESENSTEN:  And vague as to the term "had

13    business."

14    BY MR. TEPFER:

15       Q.    I want to go back, if you don't mind, to

16    discussing the bookkeeping that you did for the

17    various corporate defendants.  I know that -- sorry.

18       A.    Go ahead.

19       Q.    You said that you never did -- you said that

20    you've never done bookkeeping for BunZai Media

21    Group, Inc.; correct?

22       A.    Right.

23       Q.    And sorry.  I'm having trouble recalling.

24    Did you say that you did bookkeeping for Pinnacle

25    Logistics, Inc.?

43

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1       A.    I said after Nastassia left.

2       Q.    Thanks.

3             And so did you ever do bookkeeping at the

4    same time as Nastassia at Pinnacle Logistics?

5             MR. UNGAR:  Objection as to the form of the

6    question, vague and ambiguous, calls for

7    speculation, lacks foundation.

8             THE WITNESS:  There was a transitional time

9    when she left, so I think for a month she just

10   showed me what she used to do, and I kind of took it

11   over.

12   BY MR. TEPFER:

13      Q.    And what did she train you on?

14            MR. UNGAR:  Objection as to the form of the

15   question, it's vague and ambiguous.

16            THE WITNESS:  She only trained me on how we,

17   who are the vendors that send invoices, if they're

18   on prepaid, the 5, the 15, the 30; method of

19   payment, ACH, check, wire.  And that's it.  I mean,

20   she -- she -- she showed me how she put them in --

21   in their accounting software and --

22   BY MR. TEPFER:

23      Q.    And you said -- sorry.

24      A.    Go ahead.  That's it.

25      Q.    And you said that you did bookkeeping for

44

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      DSA holdings, Inc.; is that correct?

2          A.   Yes.  Originally, yes.

3          Q.   And from what time period?

4          A.   From, I think, 2006, 2007, to probably 2009.

5          Q.   And do you know what DSA Holdings, what

6      their business was?

7          A.   They used to sell adult content.

8          Q.   Do you know if they had any other business?

9          A.   Besides selling adult, no.

10         Q.   Is that -- you don't know if they had any

11     other business?

12         A.   I don't have any other business.

13         Q.   Did you ever do bookkeeping for Lifestyle

14     Media Brands, Inc.?

15         A.   Yes.

16              MR. UNGAR:  Objection to the form of the

17     question, it's vague and ambiguous.

18              THE WITNESS:  Yes.

19     BY MR. TEPFER:

20         Q.   And from what time period?

21         A.   I mean, when I took over accounting was the

22     time I told you.  March, April 2013.

23         Q.   And so you took over accounting for all of

24     these companies at the same time?

25         A.   About the same --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

45

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. UNGAR:  Objection as to the form of the
2     question, it's vague and ambiguous.
3          THE WITNESS:  About the same time.  When she
4     left, whatever she used to do, she -- she gave it to
5     me, and I kind of looked through and I did what
6     had -- I took to be done.
7     BY MR. TEPFER:
8          Q.   And Nastassia was, to your knowledge, also
9     doing accounting for all of these companies?
10         A.   Yes.
11         Q.   Do you know who owned DSA Holdings, Inc.?
12         A.   DSA Holdings, Inc., Jason.
13         Q.   Is he the one that hired you?
14         A.   Yes.  Back in -- yes.
15         Q.   Did you ever receive paychecks from him?
16         A.   No.  It was in 2006, 2007 when the company
17    opened.  We used to -- it was an adult business.  We
18    just used to -- instead of paying, I used to get
19    product.
20         Q.   And so you were compensated --
21         A.   It wasn't a matter of compensation.  It was
22    more of a company that was trading product with us.
23    I did help them with bookkeeping, just because I
24    help a lot of people doing -- doing bookkeeping.  It
25    wasn't a matter of compensation.  Matter of -- our

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    mutual companies traded for that with each other.

2    It was like a friendly thing, not being paid for

3    work.  So they took, you know, an amount of DVD's,

4    give it to us.  We took same amount of DVD -- it

5    wasn't on contract basis.  I wasn't doing

6    bookkeeping as bookkeeping there.  He did his own.

7    I just help him a little bit because I knew more

8    than him about Quick -- about the QuickBooks

9    accounting, so I just showed him the ropes more.

10       Q.   So you taught bookkeeping to Jason?

11       A.   Kind of.  Whatever I knew.  You know, how to

12   put a bill in, how to make a due, pay bills.

13       Q.   And you were compensated?

14       A.   I wasn't compensated.  From DSA I was not

15   compensated, period.

16       Q.   Okay.  Did you ever do accounting for

17   Lifestyle Media Brands, Inc.?

18       A.   You asked me that.  Yes.

19       Q.   And what did that company do?

20       A.   It was a -- one of the -- one of the

21   corporations.

22       Q.   When you say "one of the corporations," what

23   do you mean?

24       A.   One of the corporations that I did work for.

25       Q.   And do you know what that company sold?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1        A.    I think it sold skin product as well.

2        Q.    And what period did you do accounting for

3    Lifestyle Media Brand?

4              MR. ESENSTEN:   Let me --

5              MR. UNGAR:   Objection to the form of the

6    question, it's vague and ambiguous.

7              MR. ESENSTEN:   You use the term accounting

8    and bookkeeping interchangeably.   Is that the intent

9    of the question, or do you intend -- are you using

10   accounting, versus, bookkeeping as two different

11   definitions?   'Cause it goes back and forth, and

12   I'm -- and it's unclear as to how you're using that

13   term.

14   BY MR. TEPFER:

15       Q.    Mr. Nottea, is -- I just want to make sure I

16   understand.   Is there a difference in your mind

17   between accounting and bookkeeping?

18       A.    Definitely.

19       Q.    Can you tell me what you understand the

20   difference to be?

21       A.    Bookkeeping is a matter of controlling who

22   gets paid, as well as pay bills.   Accounting is done

23   by the accountant.

24       Q.    Okay.

25       A.    Two different scenarios.   I mean, I was more

48

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    in charge of making sure people got paid on time.
2    That was my main thing.
3         Q.   And so beyond, I guess, payroll, did you do
4    any other tasks?
5         A.   Even payroll I haven't done.  Everything was
6    done through an accountant.
7         Q.   So you didn't do payroll.  You just signed
8    the checks?
9              MR. UNGAR:  Objection as to the form of the
10   question, it's vague and ambiguous.  It also
11   misstates the testimony.  It's also argumentative.
12             THE WITNESS:  Didn't sign checks.  When was
13   payroll -- when I was told to have payroll done, I
14   contact the CPA, told him that's how much needs to
15   be paid.  He made a paper.  He made the payroll
16   stubs.
17   BY MR. TEPFER:
18        Q.   And when you were told to have payroll done,
19   you say, who told you to have payroll done?
20        A.   Wherever -- from wherever company I was
21   told, that's where -- what was paid.  If I was told
22   from one, it was paid from one; if it was two, paid
23   from two; if it was three, paid from three.
24        Q.   So -- sorry.
25        A.   Go ahead.

49

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.   So by bookkeeping, you paid the vendors?
2      A.   Exactly.
3      Q.   Okay.  Did you ever do any bookkeeping for
4  Agoa Holdings, Inc.?
5           MR. UNGAR:  Objection to the form of the
6  question, it's vague and ambiguous.
7           THE WITNESS:  Yes.
8  BY MR. TEPFER:
9      Q.   Do you know -- could you tell me the time
10 period?
11     A.   Again, probably March, April 2013.
12     Q.   And do you know what Agoa Holdings, Inc.'s,
13 business was?
14     A.   Skin care as well.
15     Q.   Do you know what brand of skin care Agoa
16 Holdings sold?
17     A.   I think it's a product called AuraVie.
18     Q.   And do you know who the owner of Agoa
19 Holdings, Inc., was?
20     A.   Yes.
21     Q.   And who was it?
22     A.   Roi Reuveni.
23          MR. ESENSTEN:  Do you need spellings of some
24 of these names?
25          MR. TEPFER:  Oh, can you spell them as we

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

50

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

    1   go?

    2           MR. ESENSTEN:  Sure.

    3           MR. TEPFER:  And Agoa is A-g-o-a Holdings,

    4   Inc.

    5   BY MR. TEPFER:

    6     Q.   Did you ever do --

    7           MR. ESENSTEN:  Wait.  Do you want to spell

    8   Roi's name?

    9           MR. TEPFER:  I think it's R-o-i

   10   R-e-u-v-e-n-i.

   11           MR. ALON NOTTEA:  Correct.

   12           MR. ESENSTEN:  And you used Igor's name.  Do

   13   you know how to spell his last name?  It's --

   14           MR. TEPFER:  It's like a spelling bee.  I

   15   think it's L-a-t-s-a-n-o-v-s-k-i.

   16   BY MR. TEPFER:

   17     Q.   Mr. Nottea, did you ever do bookkeeping for

   18   Zen Mobile Media, Inc.?

   19     A.   Yes.

   20     Q.   And from what time period?

   21     A.   About the same.  April 2013 and on.

   22     Q.   And do you know what that company's business

   23   was?

   24     A.   Skin care as well.

   25     Q.   And do you know which brand of product it

51

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    sold?

2        A.    AuraVie.

3        Q.    Do you know how Zen Mobile Media sold

4    AuraVie?

5            MR. UNGAR:  Objection as to the form of the

6    question, vague and ambiguous.

7            THE WITNESS:  I know it was done -- from

8    what I know, it was done online.

9    BY MR. TEPFER:

10       Q.    And who hired you to do bookkeeping for Zen

11   Mobile Media, Inc.?

12       A.    Igor Latsanovski.

13       Q.    And so Igor was the owner of Zen Mobile

14   Media, Inc.?

15       A.    Yes.

16       Q.    And did you ever do bookkeeping for

17   Safehaven Ventures, Inc?

18           MR. UNGAR:  Objection as to the form of the

19   question, it's vague and ambiguous.

20           THE WITNESS:  Safehaven, yes.

21   BY MR. TEPFER:

22       Q.    What period of time did you do bookkeeping

23   for Safehaven Ventures, Inc.?

24       A.    Same time.  April 2013.

25       Q.    Do you know what Safehaven Ventures, Inc.'s,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                     1/20/2016

1    business was?

2        A.    Skin care.

3        Q.    And do you know which product it sold?

4        A.    AuraVie.

5              MR. GALLEGOS:  I had a hard time

6    understanding what year you're saying, if it's 2013

7    or 2015.

8              THE WITNESS:  2013.

9              MR. GALLEGOS:  '13.  Sorry.

10             THE WITNESS:  No problem.

11   BY MR. TEPFER:

12       Q.    And did you ever do bookkeeping for Heritage

13   Alliance Group, Inc.?

14       A.    Yes.

15       Q.    And who hired you to do bookkeeping for

16   Heritage Alliance Group?

17       A.    The guy's name is Tal Topel.  T-o-p-e-l.

18       Q.    And when did he hire you to do this?

19       A.    I don't exactly know the dates.  I mean, I

20   think that -- I think it might be also in the same

21   time that Nastassia -- I can't recall the exact

22   date.

23       Q.    And do you know what Heritage Alliance

24   Group's business was?

25       A.    Skin care as well.

53

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Q.    And do you know which brand of skin care it
2    sold?
3      A.    AuraVie.
4      Q.    Sorry.
5            To go back to Safehaven Ventures, do you
6    know what Safehaven Ventures' business was?
7      A.    Skin care.  AuraVie as well.
8      Q.    And thank you.
9            I'm going to ask about SBM Management, Inc.
10   Did you ever do management for SBM Management?
11     A.    Yes.
12           MR. UNGAR:  Objection as to the form of the
13   question, vague and ambiguous.
14           THE WITNESS:  Yes.
15   BY MR. TEPFER:
16     Q.    Do you know who owned SBM Management, Inc.?
17     A.    Yes.
18     Q.    Who was that?
19     A.    Stephan Bauer.
20     Q.    And is he the one that hired you?
21     A.    Yes.
22     Q.    And what period of time did you do
23   bookkeeping for them?
24     A.    I guess from the same time.  April 2013 to
25   present.

54

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Q.    And what was SBM Management's business, if
2  you know?
3      A.    It was a management company that paid bills
4  on behalf of the other corporations.
5      Q.    Do you recall any of the corporations that
6  SBM Management paid bills for?
7      A.    I believe Agoa, Agoa Holdings, Lifestyle,
8  the companies who I mentioned before, and Heritage,
9  and I think DMA, a few more.  I don't remember the
10  exact names, but some of the ones that you mentioned
11  before.
12      Q.    Did you ever do bookkeeping for Media Urge,
13  Inc.?
14      A.    No.
15      Q.    Did you ever do bookkeeping for Adageo, LLC?
16      A.    No.
17      Q.    Did you ever do bookkeeping for CalEnergy,
18  Inc.?
19      A.    No.
20      Q.    And on SBM Management, when you say that you
21  paid bills on their behalf, what do you mean by
22  that?
23      A.    They gave me bills, told me to pay it from
24  certain companies, and that's what I did.
25      Q.    Okay.  And when you say "they," are you

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            1/20/2016

```
 1   referring to?
 2       A.    Stephan.
 3       Q.    Okay.
 4            (Plaintiff's Exhibit 49 was marked
 5            for identification by the court
 6            reporter and is attached hereto.)
 7            MR. TEPFER:  I'm handing the witness what's
 8   been previously been marked as Plaintiff's
 9   Exhibit 49.
10            MR. UNGAR:  Thank you.
11   BY MR. TEPFER:
12       Q.    Do you recognize this document?
13       A.    Sure.
14       Q.    What do you recognize it from?
15       A.    I think it's checks that were in my office.
16       Q.    And they're checks from CalEnergy, Inc.;
17   correct?
18       A.    Right.
19       Q.    And do you recognize the signature on them?
20       A.    Yes.
21       Q.    Whose signature is that?
22       A.    Igor.
23       Q.    Did you put these checks in your office?
24       A.    No.  He did.
25       Q.    Do you know why he put these checks in your
```

56

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    office?

2        A.   Because a lot of the time he was traveling,

3    and he had bills to pay, so he -- he told me, for

4    instance, "I want to tell you to pay a bill, and

5    that's the certain date.  Take a check, send him a

6    check."

7            I just helped him with, you know, actually

8    filling out the check because he doesn't know

9    English, and mailing them.

10       Q.   And so you would pay bills, on occasion, for

11   CalEnergy Inc.?

12       A.   Yes.

13       Q.   But you did not do bookkeeping for them?

14       A.   No.

15           MR. ESENSTEN:  Again, we have a double

16   negative.

17           Did you do bookkeeping for them?

18           THE WITNESS:  No.

19           MR. ESENSTEN:   Okay.

20   BY MR. TEPFER:

21       Q.   Did you ever do bookkeeping for Kai Media,

22   Inc.?

23       A.   Yes.

24           MR. ESENSTEN:  Can you spell that for the

25   reporter, please.

57

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1            MR. TEPFER:  It's K-a-i.

2   BY MR. TEPFER:

3       Q.    Sorry.  I didn't hear your answer.

4       A.    Yes.

5       Q.    From what period?

6       A.    When I took over the bookkeeping was, I told

7   you, April 2013, so that's when.

8       Q.    And --

9       A.    And before -- I mean it was after, probably

10  after.

11      Q.    And who hired you to work for Kai Media?

12      A.    Nobody hired me to work for Kai.  I mean

13  SBM, when Stephan told me to pay bills on behalf of

14  Kai or any other company, I just paid their bills.

15  They didn't specifically hire me.

16      Q.    So no one specifically hired you to do that

17  for Kai Media?

18      A.    No.

19      Q.    You just did it as part of your position

20  at --

21      A.    Exactly.

22      Q.    -- SBM Management?

23      A.    It wasn't a position at SBM.  Stephan asked

24  me to pay certain bills because he was also out of

25  town.  I paid bills.  That was my function, just to,

58

Nottea

1    you know, when they get bills like those, whatever,

2    make sure they get paid, and get paid on time.

3        Q.   And do you know what Kai Media Inc.'s

4    business was?

5        A.   I believe it had the same.  Skin care.

6    AuraVie is what I think.

7        Q.   And did you ever do bookkeeping for Insight

8    Media, Inc.?

9            MR. UNGAR:  Objection to the form of the

10   question, it's vague and ambiguous.

11           THE WITNESS:  Yes.

12   BY MR. TEPFER:

13       Q.   And did you begin doing bookkeeping in April

14   2013 for them as well?

15       A.   If they were open then, probably yes.  I

16   don't know exactly when they started, but I did

17   bookkeeping for them.

18       Q.   And were you doing bookkeeping for all of

19   these companies as of June 2015?

20       A.   June 2015, no.

21       Q.   Do you know what Secured Merchants, LLC, is?

22       A.   Yes.

23       Q.   Did you ever do any work for Secured

24   Merchants, LLC?

25       A.   I did some -- I did some bookkeeping for

59

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    them, yes.

2       Q.    When did you start doing bookkeeping for

3    Secured Merchants, LLC?

4          MR. UNGAR:  Objection as to the form of the

5    question, vague and ambiguous.

6          THE WITNESS:  Secured Merchants is owned by

7    Alan Argaman, which is sitting in the same building.

8    So since he asked me to help him, I helped him.  I

9    think it's 2013.  We were sharing an office so --

10   BY MR. TEPFER:

11      Q.    Did you ever do -- sorry.

12          What was Secured Merchants, LLC's, business?

13      A.    I don't exactly know what they did.  They

14   did some technical -- how can I explain it?  I think

15   they did some, they had some technical service that

16   they were bidding for.  I don't exactly know.  I

17   mean, I never made invoices there, so I don't know

18   exactly -- what exactly they actually did, but I

19   know it was something to do with technology.

20          MR. UNGAR:  Move to strike everything after

21   "I don't know."

22          THE WITNESS:  I don't know.

23   BY MR. TEPFER:

24      Q.    I'm sorry.

25      A.    I think it had something to do with

60

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

    1    technology, but I don't know more.

    2        Q.    Okay.   Did you ever do any bookkeeping for

    3    Merchant Leverage Group, Inc.?

    4            MR. UNGAR:   Objection as to the form of the

    5    question, vague and ambiguous.

    6            THE WITNESS:   No.

    7    BY MR. TEPFER:

    8        Q.    Do you know who owned Merchant Leverage

    9    Group, Inc.?

   10        A.    No.

   11        Q.    Do you know what Merchant Leverage Group,

   12    Inc.'s, business was?

   13        A.    No.

   14        Q.    And did you ever do bookkeeping for DMA

   15    Media Holdings, Inc.?

   16            MR. UNGAR:   Objection as to the form of the

   17    question, vague and ambiguous.

   18            THE WITNESS:   Yes.

   19    BY MR. TEPFER:

   20        Q.    When did you start doing bookkeeping for DMA

   21    Media Holdings, Inc.?

   22        A.    Same time.   April 2013.

   23        Q.    And do you know what DMA Media Holdings,

   24    Inc.'s, business was as well?

   25        A.    They did the same skin care, same products.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

61
Nottea
FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

    1    AuraVie.
    2        Q.    And did you ever do bookkeeping for Shalita
    3    Holdings, Inc.?
    4        A.    Yes.
    5        Q.    What period of time did you do bookkeeping
    6    for Shalita Holdings, Inc.?
    7        A.    2000 -- I mean, I think 2014, 2015.
    8        Q.    Do you know what Shalita Holdings, Inc.'s,
    9    business was?
   10        A.    Yes.
   11        Q.    What was it?
   12        A.    It was skin care as well.
   13        Q.    And did you ever do bookkeeping for Allstar
   14    Beauty Products, Inc.?
   15            MR. UNGAR:  Objection as to the form of the
   16    question, it's vague and ambiguous.
   17            THE WITNESS:  Yes.
   18    BY MR. TEPFER:
   19        Q.    And when did you do bookkeeping for Allstar
   20    Beauty Products?
   21        A.    April 2013 until it stopped.
   22        Q.    And do you know what Allstar Beauty
   23    Products's business was?
   24        A.    Beauty products.  Skin care.  One of them, I
   25    think, was AuraVie.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

1       Q.    Okay.   And when these businesses hired you,

2   did you receive an employment offer from one

3   individual or from all of the owners of these

4   respective businesses?

5           MR. UNGAR:   Objection as to the form of the

6   question, it's compound, it calls for speculation --

7           THE WITNESS:   And --

8           MR. UNGAR:   -- it's also argumentative.

9           THE WITNESS:   I think every -- every

10  corporation came to me, and they told me listen, pay

11  for us to do for us accounting.   That's what I did

12  for every owner of every specific company.

13  BY MR. TEPFER:

14      Q.    And you mentioned that several of these

15  companies --

16          MR. ESENSTEN:   Before you ask the question,

17  I'd like to take a break.

18          MR. TEPFER:   Okay.

19          MR. ESENSTEN:   Let's go off the record.

20          MR. TEPFER:   Yeah, let's go off.

21          (Recess)

22          MR. ESENSTEN:   Let's go back on the record.

23          Mr. Nottea wants to make a clarification on

24  his testimony.   So would you do so?

25          THE WITNESS:   I just want to clarify on the

63

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   record that when we mean accounting, I only mean
2   bookkeeping.  I never did accounting.  I'm not an
3   accountant, never provided accounting services.
4   Only bookkeeping.  So let's make sure that we're
5   both on the same page.
6   BY MR. TEPFER:
7       Q.   Sure.
8            And during the break, did you speak with
9   your brother?
10      A.   Yes.
11      Q.   And what did you all speak about?
12           MR. ESENSTEN:  There is a joint defense
13  issue because we're defendants with joint purposes
14  and joint defenses.  He will generally tell you what
15  occurred because I was present, and thus it's
16  attorney-client privilege involved, and there was
17  times that he spoke just with me.  So you need to
18  refine your question --
19           (Mr. Alon Nottea leaves the room.)
20           MR. ESENSTEN:  -- if he spoke solely to
21  Mr. Nottea, Alon Nottea, without me present.
22  BY MR. TEPFER:
23      Q.   Did you speak with your brother without your
24  attorney present ever?
25      A.   Yes.

64
Nottea
FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1      Q.    What did you all speak about?

2      A.    This, how's he doing.  He asked me how am I

3    doing.  I asked him how is he doing.  That's it.

4      Q.    I think the last thing we were talking about

5    is Allstar Beauty Products.

6      A.    Yes.

7      Q.    You had mentioned that it sold AuraVie.  How

8    did you know it sold AuraVie?

9            (Mr. Alon Nottea enters the room.)

10           THE WITNESS:  I seen it.  I -- this -- I

11   seen it maybe on a bank statement.

12     Q.    Okay.  Can we get 43?

13           MR. GALLEGOS:  43, okay.

14           MR. ESENSTEN:  Are we going off the record?

15           MR. TEPFER:  Yeah, let's go off the record

16   real quick.

17           (Recess)

18           MR. ESENSTEN:  Let's go back on the record.

19           MR. TEPFER:  All right.  We're on the

20   record.  I just realized I'm going to run back over

21   some of the businesses we were discussing.

22   BY MR. TEPFER:

23     Q.    Do you know where BunZai Media Group, Inc.,

24   was located?

25     A.    7900 Gloria Avenue, Van Nuys.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1       Q.    And do you know the period that it was
2    located there?
3       A.    I think it was always there, from what I
4    remember.
5       Q.    Do you know beginning in when?
6       A.    2010 to 2013, I guess.
7       Q.    Until it closed?
8       A.    Yeah, probably.
9       Q.    Do you know when it closed?
10      A.    I believe sometime 2013.
11      Q.    And do you know where Pinnacle Logistics was
12   located?
13      A.    Same -- same place.
14      Q.    And do you know when Pinnacle Logistics,
15   Inc., began operating?
16      A.    No.   Maybe 2012, 2013.
17      Q.    Do you know where DSA Holdings, Inc., was
18   located?
19      A.    It was located in Winnetka, California, and
20   then it moved to same location, to -- to
21   7900 Gloria.
22      Q.    And so it was located at 7900 --
23      A.    Gloria.
24      Q.    -- Gloria while you were doing bookkeeping
25   for them?

66
Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1      A.   I wasn't doing bookkeeping for them.  I told
2   you that.
3      Q.   I'm sorry.  I'm sorry.
4      A.   I was helping Jason with bookkeeping.
5      Q.   Okay.
6           MR. UNGAR:  I'm going to object to the form
7   of the question because it apparently misstates the
8   prior testimony of the witness.  It's also
9   argumentative.
10  BY MR. TEPFER:
11     Q.   And do you know where Lifestyle Media
12  Brands, Inc., was located while you did bookkeeping
13  for them?
14          MR. UNGAR:  Objection as to the form of the
15  question, it's vague and ambiguous.
16          THE WITNESS:  I don't remember the address
17  of Lifestyle, but I think it was -- I mean, I don't
18  know the exact address, but I know that they were
19  probably shipping from the Gloria address as well.
20  BY MR. TEPFER:
21     Q.   So it did business from the 7900 Gloria,
22  also?
23     A.   Yes.
24     Q.   Do you know where Agoa Holdings, Inc., was
25  located during the period in which you did

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

67

Nottea

FTC v. Bunzai Media Group, Inc., et al.                               1/20/2016

1    bookkeeping for them?

2        A.   I think same location as well.

3        Q.   And do you know where Zen Mobile Media,

4    Inc., was located while you -- during the period in

5    which you did bookkeeping for them?

6        A.   In the same location.

7        Q.   And that's 7900 Gloria?

8        A.   Gloria, yes.

9        Q.   And do you know where Safehaven Ventures was

10   located during the period you did bookkeeping for

11   them?

12       A.   They have an office in downtown, Safehaven,

13   and -- the one I know is in downtown, in L.A.

14       Q.   In downtown L.A.?

15       A.   Yeah.

16       Q.   And do you know if it had any other

17   location, aside from a downtown L.A. office?

18       A.   No.

19       Q.   Do you know where Heritage Alliance Group

20   was located during the period in which you did

21   bookkeeping for them?

22       A.   I think also the location, also Gloria.

23       Q.   And what about AMD Financial Network, Inc.?

24   Do you know where that was located?

25       A.   I know they have an office in Chatsworth,

68

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           1/20/2016

1    and that's really the only address I know of them.

2        Q.   Okay.  What about Kai Media, Inc.?  Do you

3    know where Kai Media, Inc., was located during the

4    period in which you did bookkeeping?

5        A.   I -- same location.

6        Q.   And that's 7900 Gloria?

7        A.   Gloria, yes.

8        Q.   And what about Insight Media, Inc.?

9             MR. UNGAR:  Objection as to the form of the

10   question, it's vague and ambiguous.

11            THE WITNESS:  Insight had an office in

12   Woodland Hills or Calabasas.

13   BY MR. TEPFER:

14       Q.   And did it have any other locations, aside

15   from the Calabasas location?

16            MR. UNGAR:  Objection as to the form of the

17   question, it's vague and ambiguous.

18            THE WITNESS:  No.

19   BY MR. TEPFER:

20       Q.   And during the period that you did

21   accounting for USM Products, Inc., do you know where

22   that company was located?

23       A.   I never did accounting for USM Products.  I

24   think I might have done a little bit of bookkeeping

25   on this company.  The office was in Canoga Park.

69

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1      Q.    And do you know where Merchant Leverage

2   Group, Inc., was located?

3      A.    No.

4      Q.    Do you know -- I believe you said you did

5   accounting for DMA Media Holdings, Inc.; is that

6   correct?

7           MR. UNGAR:  Objection as to the form of the

8   question, it's argumentative, it's harassing,

9   misstates prior testimony of the witness.  It's

10  inflammatory, especially after what was clarified

11  earlier.

12  BY MR. TEPFER:

13     Q.    Sorry.  Do you know where DMA Holdings, or

14  rather, you said that you had done bookkeeping

15  for DMA Media Holdings, Inc.; is that correct?

16     A.    Yes.

17     Q.    And --

18     A.    They were in same location, in the Gloria.

19     Q.    And so DMA Media Holdings, Inc., did

20  business --

21     A.    On Gloria.

22     Q.    -- did business at 7900 Gloria?

23     A.    Yes.

24     Q.    And during the period that you did

25  accounting -- I mean bookkeeping for Shalita

70

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1       Holdings, Inc., where was that located?

2           A.    Shalita, Calabasas.

3           Q.    And did it have any other locations?

4           A.    No.

5           Q.    And during the period that you did

6       accounting -- I mean, that you did bookkeeping for

7       Allstar Beauty Products, Inc., do you know where

8       that company was located?

9           A.    In 7900 Gloria.

10          Q.    Let's see.  So I'd like you to take a look

11      at what's been marked Plaintiff's Exhibit 43.

12                MR. UNGAR:   What's the Bates number, please?

13                MR. TEPFER:   There is no Bates number.

14                (Plaintiff's Exhibit 43 was marked

15                for identification by the court

16                reporter and is attached hereto.)

17      BY MR. TEPFER:

18          Q.    Do you recognize this document?

19          A.    Wait a minute.  Yes, I've seen this before.

20          Q.    So you recall getting this email?

21          A.    Yes.

22          Q.    Could you read that first sentence in the

23      email?

24          A.    If you want.  Here (indicating)?

25          Q.    Yes, sir.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1      A.   It says, "SMB Consulting, Ltd.  If you want
 2   to continue to use a company that is smart and cost
 3   effective you have it.  If we are going to sell
 4   anything online and or at retail this is a
 5   management and card processor of our own."
 6            MR. ESENSTEN:  Is that all you want him to
 7   read?
 8            MR. TEPFER:  Yes.
 9            MR. UNGAR:  I'm going to object because it
10   misstates what the document says.
11   BY MR. TEPFER:
12      Q.   Were you using SMB for any business purpose?
13            MR. ESENSTEN:  Objection; vague as to time.
14            THE WITNESS:  No.  I don't even know them.
15   BY MR. TEPFER:
16      Q.   Have you ever done business with SMB?
17      A.   No.
18            MR. ESENSTEN:  Objection; vague.  And vague
19   as to time.  I'm sorry.  Withdraw the vague as to
20   time.  Vague.
21   BY MR. TEPFER:
22      Q.   Okay.  Could you read the sentence beginning
23   in "Specializing".
24            MR. ESENSTEN:  I'm sorry.
25   ///
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1    BY MR. TEPFER:

 2        Q.    I'm sorry.  Beginning with "Alon".

 3        A.    "Alon know and has done business with Adam

 4    Alisa who can make us our own card clearing

 5    companies especially in hard core online trial and

 6    office business."

 7              MR. UNGAR:  Objection; misstates what the

 8    document says.

 9    BY MR. TEPFER:

10        Q.    Do you know what hard core online trial and

11    offers biz is?

12        A.    For me, high profile is my business, adult,

13    not -- I don't know what means hard core online

14    trial.  No, I don't know.

15        Q.    Could you read the sentence beginning with

16    "You have the account".

17        A.    "You have the account and the biz, we just

18    need to transition to" a new -- "to the new whatever

19    biz as the old wind down.  Happy to help make it

20    happen."

21        Q.    That's fine.

22              What business did you believe Stephan Bauer

23    was referring to?

24              MR. UNGAR:  Objection as to the form of the

25    question, it's vague and ambiguous --
```

73

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

 1          THE WITNESS:  I don't know.

 2          MR. UNGAR:  -- calls for speculation, lacks

 3     foundation.

 4     BY MR. TEPFER:

 5        Q.   Sorry.  What was that?

 6        A.   I don't know.  It doesn't mention any

 7     business, any -- anything here.

 8        Q.   And when Mr. Bauer referred to you

 9     continuing to use a company that is smart and cost

10     effective, what did you believe he was referring to?

11          MR. ESENSTEN:  Objection.

12          MR. UNGAR:  Objection as to the form of the

13     question, it's vague and ambiguous, lacks

14     foundation, calls for speculation.

15          THE WITNESS:  Repeat the question.

16     BY MR. TEPFER:

17        Q.   When Mr. Bauer said that you could continue

18     to use a company that is smart and cost effective,

19     what -- what company did you believe he was

20     referring to?

21        A.   I have no idea.

22          MR. UNGAR:  Objection as to the form of the

23     question --

24          THE WITNESS:  I have no idea which --

25          MR. UNGAR:  -- calls for speculation, it's

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

74

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   vague and ambiguous, and it assumes facts not in

2   evidence.

3   BY MR. TEPFER:

4       Q.   Go ahead.

5            MR. ESENSTEN:  His response was "I have no

6   idea", but it was in the middle.  So is that your

7   response?

8            THE WITNESS:  I have no idea.

9   BY MR. TEPFER:

10      Q.   And when Mr. Bauer refers to a business

11  winding down, do you -- what was your understanding

12  of what business was winding down?

13      A.   I --

14           MR. UNGAR:  Objection as to the form of the

15  question, it's vague and ambiguous.

16           THE WITNESS:  I don't know.  It doesn't

17  mention even, so I have no idea.

18           MR. ESENSTEN:  Just to be clear --

19  BY MR. TEPFER:

20      Q.   Did you --

21           MR. ESENSTEN:  -- the document says "new

22  whatever business as the old wind down," so I think

23  you misstated the document.

24  BY MR. TEPFER:

25      Q.   And during this period were you assisting

75

Nottea

FTC v. Bunzai Media Group, Inc., et al.                               1/20/2016

1    any company in winding down business?

2        A.   No.

3        Q.   Were you aware of any company that was

4    winding down business?

5             MR. UNGAR:  Objection as to the form of the

6    question, it's vague and ambiguous and has

7    absolutely no discovery relevance whatsoever.  It is

8    not connected in any way to any of the issues in

9    this lawsuit, and the question is not reasonably

10   calculated to lead to the discovery of admissible

11   evidence.

12   BY MR. TEPFER:

13       Q.   You can go ahead.

14       A.   No.

15       Q.   Were you aware that your brother's company

16   was at this time period winding down sales of

17   AuraVie skin care products?

18            MR. ESENSTEN:  Objection; vague.

19            THE WITNESS:  No.

20   BY MR. TEPFER:

21       Q.   And up at the top, doron5000@gmail.com, is

22   that your email address?

23       A.   Yes.

24       Q.   Does anyone else use that email address?

25       A.   No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1              MR. UNGAR:  Objection; vague and ambiguous.
 2              THE WITNESS:  No.
 3              MR. UNGAR:  We don't know if your question
 4     includes servers, Internet service providers,
 5     intermediaries who receive packet transmissions.
 6     Vague and ambiguous.
 7     BY MR. TEPFER:
 8        Q.   Did you create that email address account?
 9        A.   Yes.
10        Q.   When did you create that email address
11     account?
12        A.   I have no idea.  I don't know.
13        Q.   Do you -- can you recall roughly a year in
14     which you created that email address account?
15        A.   Seven, eight years ago.
16        Q.   Is doron@doron.us an email address that you
17     use?
18        A.   Yes.
19        Q.   To your knowledge, does anyone else use that
20     email address?
21        A.   No.
22              MR. UNGAR:  Did you answer the question?
23              THE WITNESS:  I said no, I don't know.
24              MR. UNGAR:  Oh, I'm going to interpose an
25     objection.  It's vague and ambiguous because it
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    doesn't take into account intermediaries, Internet,

2    and service providers.

3           MR. ESENSTEN:  Are you okay?  Are we off the

4    record?

5           MR. TEPFER:  No, I'll just keep going.  Luis

6    is going to get a copy made.

7    BY MR. TEPFER:

8       Q.   Do you know who Paul Medina is?

9       A.   Yes.

10      Q.   Is he a business associate of your

11   brother's?

12      A.   Yes.

13      Q.   What company did he work with your brother

14   at?

15           MR. UNGAR:  Objection as to the form of the

16   question, it's vague and ambiguous and calls for

17   speculation.

18           THE WITNESS:  Repeat the question again.

19   BY MR. TEPFER:

20      Q.   What company did Paul Medina work with your

21   brother at?

22           MR. UNGAR:  Same objection.

23           THE WITNESS:  I think he worked in BunZai.

24   BY MR. TEPFER:

25      Q.   Do you know what his role at BunZai was?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      A.    I think they ran corporation.

2      Q.    Did you ever communicate with him regarding

3 BunZai Media Group's business?

4           MR. UNGAR:  Objection as to the form of the

5 question, it's vague and ambiguous.

6           MR. ESENSTEN:  Objection; overbroad, vague.

7           THE WITNESS:  No.

8 BY MR. TEPFER:

9      Q.    Would he assist you in any of your

10 bookkeeping responsibilities at any of the corporate

11 defendants?

12     A.    Yes.

13           MR. UNGAR:  Objection as to the form of the

14 question, it's vague and ambiguous.

15 BY MR. TEPFER:

16     Q.    How did he assist you?

17     A.    He as well, he gave me vendors to pay as

18 well.  People that he work with at -- that the

19 companies owed money to.  And I believe that he made

20 reports.  I mean, he was -- he knows accounting lot

21 more than I, so I think he made daily reports or

22 monthly reports, some sort of -- money coming in and

23 out.

24     Q.    Did you ever review these monthly reports?

25     A.    No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Q.   Did you ever receive these monthly reports?

2           (Mr. Gallegos leaves the room.)

3           THE WITNESS:   I might have seen some emails,

4      but they didn't really make any difference to me.   I

5      wasn't part of -- I wasn't doing decision making or

6      anything that needed me to look at them.

7      BY MR. TEPFER:

8      Q.   Did you request that he send you these

9      monthly reports?

10     A.   No.

11     Q.   Did you ever do any analysis --

12          (Mr. Gallegos enters the room.)

13     BY MR. TEPFER:

14     Q.   -- concerning monthly chargebacks for the

15     sale of AuraVie products?

16          MR. UNGAR:   Objection as to the form of the

17     question, vague and ambiguous.

18          THE WITNESS:   No.

19     BY MR. TEPFER:

20     Q.   And going back to Nastassia Yalley, did she

21     ever provide you with sales spreadsheets concerning

22     BunZai Media Group's sales?

23     A.   It's possible that I have been cc'd on the

24     chain of emails, but nothing that I ever asked her

25     to do for me.

80

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.   Did she ever send them, to your knowledge,
2   just to you?
3           MR. UNGAR:  Objection as to the form of the
4   question, vague and ambiguous.
5           THE WITNESS:  I don't know.
6   BY MR. TEPFER:
7      Q.   Did you ever request that she send them to
8   you?
9      A.   No.
10           MR. UNGAR:  Objection as to the form of the
11   question --
12           THE WITNESS:  Sorry.
13           MR. UNGAR:  -- vague and ambiguous.
14           THE WITNESS:  No.
15   BY MR. TEPFER:
16      Q.   Did you review these sales spreadsheets?
17      A.   No.
18           MR. UNGAR:  Objection as to the form of the
19   question, vague and ambiguous, assumes facts not in
20   evidence.
21           MR. TEPFER:  Do we have the --
22           MR. GALLEGOS:  She's getting them.
23           MR. TEPFER:  So we'll get back to that.
24           MR. GALLEGOS:  Is this one yours
25   (indicating)?

81
Nottea
FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
1            MR. TEPFER:  Yeah, yeah.  We've got two

2    here.

3    BY MR. TEPFER:

4        Q.   I want to talk a little bit more about Gary

5    Bhasin.  Am I pronouncing that right?

6        A.   I guess.

7        Q.   Did you ever have a conversation with Gary

8    Bhasin about his proposal for the sale of AuraVie

9    products?

10           MR. ESENSTEN:  Objection; asked and

11   answered.

12           THE WITNESS:  No, never.

13           MR. UNGAR:  This one (indicating)?

14           MR. TEPFER:  Yeah.

15           MR. UNGAR:  It was attached to your 26.

16           MR. TEPFER:  Oh, okay.

17           MR. UNGAR:  It was stapled to 26.

18           MR. TEPFER:  That's good.

19           MR. GALLEGOS:  Ah.

20           MR. TEPFER:  Does everyone have --

21           MR. ESENSTEN:  What exhibit are we?

22           MR. TEPFER:  29.

23           MR. UNGAR:  Okay.  I've got to have my lunch

24   now.  I've got to go.

25           MR. ALON NOTTEA:  I've got to walk Robert
```

82

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    out.

2              MR. ESENSTEN:  Let's go off the record.

3              MR. UNGAR:  No, I've got to stay on the

4    record.  So let's have the -- let's have the record

5    reflect that I'm personally serving counsel for the

6    FTC with Defendant Roi Reuveni and Defendant Alon

7    Nottea Responses to the FTC's discovery request, as

8    well as Defendants' discovery request, and I'm

9    handing that now to counsel for the FTC.

10             MR. TEPFER:  Thanks.

11             MR. UNGAR:  Do you acknowledge receipt,

12   Counsel?

13             MR. TEPFER:  Yes.

14             MR. UNGAR:  Did you say yes?  She has to get

15   it.

16             MR. TEPFER:  Yes.

17             MR. GALLEGOS:  As long as this is under the

18   Federal Rules of Civil Procedure, that's fine.

19   Otherwise, you need to follow Federal Rules.

20             MR. UNGAR:  Hand delivery is not following

21   the Federal Rules?  Give a citation.

22             MR. GALLEGOS:  I will let you look at the

23   Federal Rules.  All I said is as long as it follows

24   Federal Rules --

25             MR. UNGAR:  That's what I'm asking.  Do you

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    have a citation?

2              MR. GALLEGOS:  As long as --

3              MR. UNGAR:  I'm asking you.  I know your

4    instruction and --

5              MR. GALLEGOS:  Well --

6              MR. UNGAR:  -- I'm asking you if you have a

7    citation for the proposition that hand delivery is

8    not acceptable --

9              MR. GALLEGOS:  Can we go off the record?

10             MR. UNGAR:  -- under the Federal Rules of

11   Civil Procedure.

12             MR. ESENSTEN:  No.  We'll keep this on the

13   record.

14             MR. TEPFER:  No.  We're off the record.

15             (A discussion was held off the record.)

16             (Mr. Ungar and Alon Nottea leave the room.)

17             MR. TEPFER:  Can we go back on?  Thanks.

18             (Plaintiff's Exhibit 29 was marked

19             for identification by the court

20             reporter and is attached hereto.)

21   BY MR. TEPFER:

22     Q.   Do you recognize this document?  Sorry.

23          Do you recognize what's been marked as

24   Plaintiff's Exhibit 29?  I just want to be clear

25   what we're referring to.

84

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

1      A.    Yes.

2      Q.    So you recall receiving this email?

3      A.    Yes.

4      Q.    Could you read the sentence beginning "As

5   per my".  It's about midway at the, towards the

6   bottom of the page.

7      A.    "As per my initial conversations with Doron

8   and Paul Median, I understand that there is serious

9   need of accurate projections accounting and

10  profitability model for your business."

11     Q.    Did you ever have a conversation with Gary

12  Bhasin regarding the need for accurate projections

13  and accounting and profitability model for any

14  business?

15     A.    No.

16     Q.    Do you -- what -- do you have --

17           What was your understanding of what business

18  Gary was referring to?

19     A.    It says he was about -- continuing to do

20  business.  It doesn't say any name of business, so I

21  don't know.  I've seen this.  I never read it, but

22  I've seen this before.

23     Q.    And --

24     A.    And I've seen it only because I've seen it,

25  I think, in some documents.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1               MR. ESENSTEN:  Documents that they produced?

2               THE WITNESS:  You guys produced before.

3     BY MR. TEPFER:

4         Q.   So you never saw this email in October 2013?

5         A.   No.

6         Q.   On the back -- sorry, if you could read that

7     first line.

8         A.   "As I mentioned to Doron, I would have to

9     spend at least 2-3 days with your team to understand

10    business model in detail.  I would like to spend my

11    time as" --

12        Q.   That's fine.

13        A.   Okay.

14        Q.   Did Gary ever mention to you that he would

15    have to spend two to three days with Alon's team?

16              MR. ESENSTEN:  Are you referring to orally?

17              MR. TEPFER:  I guess either, yeah.

18    BY MR. TEPFER:

19        Q.   Did he ever mention to you in conversation

20    that Gary would need to spend two to three days with

21    Alon's team?

22        A.   Yes.

23        Q.   When did he mention that to you?

24        A.   In the phone.

25        Q.   So you had a phone conversation with Gary?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1       A.   I believe that it was a conversation between
2    Alon and him, and I was -- I didn't enter the
3    conversation.
4       Q.   So you spoke with Alon and Gary in, like, a
5    three-way call?
6       A.   Yeah.
7       Q.   And what was that conversation about?
8       A.   The only thing I was involved in is
9    something about giving him access to QuickBooks.
10      Q.   So you --
11      A.   I mean --
12      Q.   Sorry.  Go ahead.
13      A.   I mean, I never seen it before.  First time
14   reading it now.
15      Q.   And you were going --
16      A.   I was never --
17           MR. ESENSTEN:  You've answered the question.
18           THE WITNESS:  Go ahead.
19           (Interruption in the proceedings)
20   BY MR. TEPFER:
21      Q.   Do you know what QuickBooks Gary wanted to
22   access?
23      A.   I guess the QuickBooks that I was doing
24   bookkeeping for.
25      Q.   For all of those --

87

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

```
 1      A.   I don't know for which ones.  It didn't
 2   mention.  Access to QuickBooks.  That's okay.  I was
 3   off the conversation.
 4      Q.   And Alon was stating that he would ask you
 5   to provide access to QuickBooks?
 6      A.   Yes.
 7      Q.   And what was in those QuickBooks?
 8      A.   Accounting.  That's all.
 9      Q.   And --
10      A.   I mean accounts payable.
11      Q.   And so Gary just wanted to have access to, I
12   guess, the outgoing payments of Alon's companies?
13      A.   I don't --
14           MR. ESENSTEN:  Objection; speculation.
15           THE WITNESS:  I don't know.
16   BY MR. TEPFER:
17      Q.   And did you ever speak with any of the other
18   owners of the companies that you did bookkeeping
19   for, concerning Gary's request?
20      A.   No.
21      Q.   Did you ever provide Gary access to any
22   QuickBooks?
23      A.   No.  This thing's never happened.
24           MR. ESENSTEN:  Okay.  You've answered the
25   question.
```

88

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          THE WITNESS:  Yeah.  So that's why I don't
2     know.
3          MR. ESENSTEN:  You've answered the question.
4          THE WITNESS:  Sorry.
5          MR. ESENSTEN:  And let me just also state,
6     anything you say, anything Counsel says, whether it
7     relates to the weather or anything in this room, the
8     reporter takes down.
9          THE WITNESS:  Oh, okay.
10          MR. ESENSTEN:  So confine yourself to
11     answering just the questions, and it will expedite
12     matters.
13          THE WITNESS:  Okay.
14     BY MR. TEPFER:
15       Q.  And was Gary, during that conversation, did
16     he ask about any company that Alon owned, or did he
17     ask any questions concerning any companies Alon
18     owned?
19       A.  No.
20       Q.  Do you know why Alon contacted Gary?
21       A.  No.  I guess the letter.
22          MR. ESENSTEN:  Do you know?
23          THE WITNESS:  No.
24     BY MR. TEPFER:
25       Q.  Let's see.

89

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

```
 1            MR. GALLEGOS:  We have 45 now.

 2            MR. TEPFER:  Okay.  We've got the copy, but

 3    we --

 4            MR. GALLEGOS:  Now he's gone.

 5            MR. TEPFER:  Lost counsel.

 6            MR. GALLEGOS:  He's over there, imaginary.

 7            (Plaintiff's Exhibit 45 was marked

 8            for identification by the court

 9            reporter and is attached hereto.)

10    BY MR. TEPFER:

11       Q.   So I'm handing -- this one's mine here --

12    what's marked there at the bottom Exhibit 45.  If

13    you'll take a look at that.

14            Do you recall receiving this email from Paul

15    Medina?

16            MR. ESENSTEN:  And you're referring to

17    including the attachment?

18            MR. TEPFER:  Oh, I'm sorry.  The exhibit

19    contains Attachments A through C.

20    BY MR. TEPFER:

21       Q.   Page 1, do you recall seeing this email --

22       A.   No.

23       Q.   -- on Exhibit 45 page 1?

24       A.   (Witness shakes head from side to side.)

25            MR. ESENSTEN:  Just for clarity, I see
```

90

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    Exhibit C, but nothing behind.  Is there anything

2    intended to be behind it?

3            MR. TEPFER:  Exhibit C continues for several

4    pages.  For some reason, when it prints out it adds

5    an extra page.  I'm not sure.  That's Excel.

6            MR. ESENSTEN:  I don't -- hold on a second.

7    Let's see if I understand.

8            So Exhibit C starts at the top True Market

9    Partner Lime Light?

10           MR. TEPFER:  The first -- let's see.

11   Exhibit C begins right here at Fact Expenses, Total

12   Expenses.  I believe it's a two column spreadsheet,

13   anyway.

14           MR. ESENSTEN:  Could you just show me where

15   it is?  I don't see it.

16           MR. GALLEGOS:  It's here (indicating).

17           MR. ESENSTEN:  Oh, I see.

18           MR. TEPFER:  It's just a two-column

19   spreadsheet, and it's quite long.

20           MR. ESENSTEN:  And then it ends at --

21           MR. TEPFER:  And for some reason it printed

22   blank.

23           MR. ESENSTEN:  -- Total Operation Expenses,

24   the last part of the document?

25           MR. TEPFER:  Well, I mean the last one with

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                        1/20/2016

```
 1    any writing, yes.

 2              MR. ESENSTEN:  Okay.

 3    BY MR. TEPFER:

 4         Q.   So Exhibit 45, page 1, do you recall

 5    receiving that email from Paul --

 6         A.   No.

 7         Q.   -- Medina?

 8         A.   I never seen this.

 9         Q.   Where it says "Attachments: US Rebill Die

10    Down," do you have any understanding of what that's

11    referring to?

12         A.   No.

13         Q.   On the first page of Attachment A in the

14    spreadsheet, I want to draw your attention to the

15    9th box in the first column where it says "1% Owner

16    Commission."

17              Do you -- what's your understanding of what

18    that refers to?

19         A.   It refers to the percentage that the owner

20    gets.

21         Q.   The owner of what?

22         A.   I guess the corporations.  I don't know.  I

23    never seen it before.  I don't know.

24         Q.   So the owner of corporations that you did

25    bookkeeping for received 1 percent; is that correct?
```

92

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1       A.    Yeah.

2             MR. ESENSTEN:   Object.   I'll object as

3    overbroad, vague.

4    BY MR. TEPFER:

5       Q.    1 percent of what?

6       A.    I don't really know.   I mean, those

7    reports -- I mean, I don't know for what, and I used

8    to get reports saying pay 1 percent, 2, and to -- as

9    a individual and he was -- he was paid.

10      Q.    So it's your understanding that the owners

11   of the companies that you did bookkeeping for

12   received only 1 percent of, I assume, profit?

13            MR. ESENSTEN:   Objection; speculation --

14            THE WITNESS:   I --

15            MR. ESENSTEN:   -- lacks foundation.

16            THE WITNESS:   Sorry.   I don't know if it's

17   profit or not, 1 percent of something.   I never had

18   to calculate that, so I don't know.

19   BY MR. TEPFER:

20      Q.    And who determines -- in your understanding,

21   who determines the percentage that the owners get?

22            MR. ESENSTEN:   Who did or --

23            MR. TEPFER:   Yeah.

24            THE WITNESS:   Paul.   Paul.   Paul did.

25   ///

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1    BY MR. TEPFER:

 2        Q.   So Paul Medina determined the, I guess the

 3    percentage payout to owners of the companies you did

 4    bookkeeping for?

 5        A.   Yeah.  Paul send me few times text.

 6        Q.   You said that Paul a few times sent you

 7    spreadsheets like this?

 8        A.   Spreadsheet that just said 1 percent,

 9    like -- not a spreadsheet.  Like an email that said

10    1 percent to A, B, C, D, E, F, G.  We made checks

11    and we send them out.

12        Q.   And where did Paul work at when he sent you

13    these emails?

14        A.   I believe he used to work for BunZai, and I

15    know that he moved to another company and -- and --

16    Media Urge.

17        Q.   So while Paul was at BunZai, he was making

18    these payout decisions for the other companies that

19    you did bookkeeping for?

20        A.   Yeah, I guess.  I didn't do bookkeeping with

21    BunZai, but I know it continued after I took it

22    over.

23             (Mr. Alon Nottea enters the room.)

24    BY MR. TEPFER:

25        Q.   Okay.  If you could turn to, well, the
```

94

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1    fourth page of Attachment A --
 2            MR. ESENSTEN:  Wait.  Can we be sure we're
 3    on the same --
 4            MR. TEPFER:  Sure.
 5            MR. ESENSTEN:  Where does it start?
 6            MR. TEPFER:  The first column is "SBM
 7    Flexible."
 8            MR. ESENSTEN:  With the word "Legal" to the
 9    very left.
10            MR. TEPFER:  Yeah.
11            MR. ESENSTEN:  Okay.
12    BY MR. TEPFER:
13       Q.   Do you know what SBM Flexible refers to?
14       A.   Not at all.
15       Q.   Do you know what "AuraVie Monthly Cost Per
16    Chargeback" refers to?
17       A.   No.
18            MR. ESENSTEN:  Wait.  I'm sorry.  Okay.
19    You're down to about two thirds of the way down?
20            MR. TEPFER:  Mm-hmm.  Mm-hmm.
21            MR. ESENSTEN:  Yes?
22            MR. TEPFER:  Yes.  Sorry.  Got to do that
23    for the record.
24    BY MR. TEPFER:
25       Q.   And you've never seen this spreadsheet
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

 1   before?

 2      A.   Never.

 3      Q.   Do you know who -- I'm going to mispronounce

 4   this, but I'm going to try -- Feliberto Rivas is?

 5           MR. ESENSTEN:  Can you spell it?  I'm not

 6   sure where his name is.

 7           MR. TEPFER:  Sure.

 8           THE WITNESS:  This one (indicating).

 9           MR. ESENSTEN:  Oh, okay.  F-e-l-i-b-e-r-t-o,

10   last name R-i-v-a-s.

11           THE WITNESS:  I guess he was employee or

12   something.

13           MR. ESENSTEN:  Do you know?

14           THE WITNESS:  Do I know what?

15           MR. ESENSTEN:  Who he is.

16           THE WITNESS:  No.

17   BY MR. TEPFER:

18      Q.   Do you know who -- this is going to be a

19   tough one, too -- Geiner Samayoa is?

20           MR. ESENSTEN:   Last name S-a-m-a-y-o-a.

21   BY MR. TEPFER:

22      Q.   Do you know who Geiner Samayoa is?

23      A.   I've seen it before, yes.

24      Q.   Where have you seen it?

25      A.   He used to work for BunZai.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Q.   Do you know what he did for BunZai?

2      A.   I think he was working in the warehouse.

3      Q.   Do you know what he did?

4      A.   Shipping.

5      Q.   Do you know what Grafipack is?

6           MR. ESENSTEN:   G-r-a-f-i-p-a-c-k.

7           THE WITNESS:   Yes.

8  BY MR. TEPFER:

9      Q.   What is Grafipack?

10     A.   The Grafipack that I know if it's the same

11  company that they make there a printer.  They print

12  boxes --

13     Q.   They --

14     A.   -- flyers, boxes.  It's a printer.

15     Q.   Okay.

16     A.   I know because I use similar company doing

17  my adult stuff.  I'm not sure if it's the same

18  company, but it sounds the same.

19     Q.   Okay.  Do you know what Chargeback Armor is?

20     A.   I know the company, yes.

21     Q.   Did you ever do any work for Chargeback

22  Armor, Inc.?

23     A.   I wrote a few checks with them, yes.

24     Q.   Did you do anything beyond writing a few

25  checks for Chargeback Armor, Inc.?

97

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      A.    Not at all.

2      Q.    Who owns Chargeback Armor, Inc.?

3      A.    Michael Costache.

4            MR. ALON NOTTEA:  Is it okay with you if I

5      open the door a little bit?  It's really, really hot

6      in here.

7            MR. GALLEGOS:  Sure.

8            MR. ALON NOTTEA:  There's nobody here.

9      BY MR. TEPFER:

10     Q.    Are you aware if your brother Alon ever sold

11     AuraVie products?

12     A.    Yes, of course.

13     Q.    Through what company did he sell AuraVie

14     products?

15     A.    Through BunZai.  I mean, what do you mean?

16     Q.    Which company did -- which company or

17     companies did your brother use to sell AuraVie

18     products?

19     A.    I know he used BunZai, and I know he used a

20     few of the other companies as well, a couple of

21     them, the names you mentioned.  Allstar, Agoa, maybe

22     Heritage.

23     Q.    Did you -- to your knowledge, did your

24     brother ask the owners of the companies permission

25     to sell AuraVie product through their company?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1        A.   I don't know.
 2             MR. ESENSTEN:  Objection; vague, overbroad.
 3   BY MR. TEPFER:
 4        Q.   Do you know why your brother Alon stopped
 5   selling AuraVie products?
 6        A.   No.  It's a great product.  I use it.
 7             MR. ESENSTEN:  You've answered the question.
 8   BY MR. TEPFER:
 9        Q.   Did you ever have a conversation with your
10   brother about reasons why he was going to cease
11   selling AuraVie products?
12        A.   No.
13        Q.   Do you have any idea why your brother sold
14   AuraVie products through multiple companies?
15        A.   No.  I guess it's his choosing.  No.
16        Q.   Do you have any knowledge of your brother
17   running a call center of any kind, ever?
18             MR. ESENSTEN:  Objection; vague, overbroad.
19             THE WITNESS:  I've seen people on the phone
20   on Gloria.  I don't know if --
21   BY MR. TEPFER:
22        Q.   So at 7900 Gloria they ran a call center; is
23   that correct?
24        A.   I believe so.
25        Q.   Do you know what company ran that call
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

99

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

1    center?

2        A.    BunZai, I believe.

3        Q.    When did they run that company, to your

4    understanding -- I mean, run that call center,

5    rather?

6        A.    2011, 2010 to 2013, probably.

7        Q.    And they stopped -- the call center ceased

8    to exist in 2013; is that your understanding?

9        A.    I don't -- I was not there, so I don't know.

10       Q.    What is E-V-O, or EVO?

11       A.    I think it's a merchant processor, is all I

12   know.

13       Q.    And just to make sure, is it EVO or E-V-O,

14   do you know?

15       A.    I don't know.  I have no idea.

16       Q.    Did you ever assist in opening accounts at,

17   we'll say EVO?

18       A.    No.

19       Q.    Did you ever assist in responding to

20   inquiries from EVO for BunZai or any of the other

21   corporate defendants?

22       A.    No.

23             MR. ESENSTEN:  Objection; vague.

24             THE WITNESS:  Sorry.  No.

25             MR. TEPFER:  Do you know if we have

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1    Exhibit 39?
 2            MR. GALLEGOS:  I'll check.
 3            MR. ESENSTEN:  Are we done with 45?
 4            MR. TEPFER:  Yeah.  I think for now.
 5            MR. GALLEGOS:  I don't have a 39 in my
 6    stack, unless I'm missing it.
 7            MR. TEPFER:  Really?
 8            MR. GALLEGOS:  I'll get a copy later on for
 9    Bob.
10            MR. TEPFER:  Do we need one more?
11            MR. ESENSTEN:  I think it would be
12    appropriate, so that he can get a set of exhibits.
13            MR. GALLEGOS:  I'll get one during the
14    break, a copy.
15            MR. ESENSTEN:  Okay.
16            MR. TEPFER:  So you all only have one?
17            MR. ESENSTEN:  Did you give one to the
18    witness?  No.
19            MR. TEPFER:  I don't believe so.
20            MR. ESENSTEN:  If you didn't, let's get
21    another one copied.
22            MR. TEPFER:  Sure.
23            MR. ESENSTEN:  Do me a favor.  One side.
24            MR. TEPFER:  Yeah, well, in the future.  I
25    think that's good for right now.  We just have a few
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

 1    questions about it.

 2            MR. GALLEGOS:  I'll do it real quick.  If

 3    you want to go on to something else, I can get it

 4    real quick for you.

 5            MR. TEPFER:  Okay.

 6            (Mr. Gallegos leaves the room.)

 7    BY MR. TEPFER:

 8        Q.   So when you were doing bookkeeping for the

 9    Corporate Defendant -- and just for ease of

10    communication, that group of companies that you did

11    bookkeeping for that we've been discussing, do you

12    have any sort of name that you use to refer to those

13    companies?

14        A.   Yeah, companies.

15            MR. ESENSTEN:  You're asking for this

16    deposition, how to identify them --

17            MR. TEPFER:  No.

18            MR. ESENSTEN:  -- or something they used in

19    the past?

20            MR. TEPFER:  Well, just either way.

21    BY MR. TEPFER:

22        Q.   Did you refer to those companies by any one

23    term?

24        A.   No.

25        Q.   Can we refer -- is it acceptable to you to

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

1   refer to those as the BunZai companies or the,

2   rather, the AuraVie group of companies?

3       A.   Either one.

4            MR. ESENSTEN:  I think you better use a more

5   neutral term.

6   BY MR. TEPFER:

7       Q.   Well, so the companies that we've discussed

8   that you did bookkeeping for that sold AuraVie

9   products, only the companies that sold AuraVie

10  products that you've mentioned, can we refer to

11  those as the AuraVie companies?

12           MR. ESENSTEN:  Can I -- give me a second.

13  Let me think about that.

14           Could you repeat that, Ms. Reporter.

15           (The previous question was read back

16           by the court reporter as follows:

17              "QUESTION:  Well, so the

18           companies that we've discussed that

19           you did bookkeeping for that sold

20           AuraVie products, only the companies

21           that sold AuraVie products that

22           you've mentioned, can we refer to

23           those as the AuraVie companies?")

24           (Mr. Gallegos enters the room.)

25           MR. ESENSTEN:  One more time.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

103

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1              (The previous question was read back
 2         by the court reporter as follows:
 3              "QUESTION:  Well, so the
 4         companies that we've discussed that
 5         you did bookkeeping for that sold
 6         AuraVie products, only the companies
 7         that sold AuraVie products that
 8         you've mentioned, can we refer to
 9         those as the AuraVie companies?")
10         MR. ESENSTEN:  Sure.
11         MR. TEPFER:  Okay.  That -- I think that
12    will make things a little bit easier.
13         MR. ESENSTEN:  That's my job.
14    BY MR. TEPFER:
15    Q.   Let's see.
16         Are you aware of the AuraVie companies ever
17    selling their product overseas?
18    A.   No.
19    Q.   Let's see.
20         Have you ever heard the AuraVie group of
21    companies referred to as a high risk business?
22    A.   No.
23    Q.   Do you have any understanding of the AuraVie
24    companies' profit margin?
25    A.   Not at all.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.    When you were doing bookkeeping for the

2    AuraVie companies, did you treat them as separate

3    companies, or did you -- well, I'll just leave it at

4    that.

5          Did you treat them as separate entities?

6      A.    Yes.

7      Q.    Do you have any idea why an owner of the

8    AuraVie companies would receive only 1 percent of

9    processing or 1 percent share of income?

10         MR. ESENSTEN:  Objection; speculation,

11   assumes facts not in evidence.

12         THE WITNESS:  I have no idea.

13   BY MR. TEPFER:

14     Q.    Sorry?

15     A.    I have no idea.

16     Q.    Okay.  Do you have any understanding of what

17   the owners of the AuraVie companies did to receive

18   their 1 percent share?

19         MR. ESENSTEN:  Objection; vague, lack of

20   foundation --

21         THE WITNESS:  No.

22         MR. ESENSTEN:  -- assumes facts not in

23   evidence.

24   BY MR. TEPFER:

25     Q.    Would you typically meet with the owners of

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    the AuraVie companies?

2         MR. ESENSTEN:  Objection; vague.  Vague as

3    to time, vague as to the word "meet."

4    BY MR. TEPFER:

5      Q.  Let me rephrase.

6         Would you, during the period that you did

7    bookkeeping, would you periodically meet with the

8    owners of the AuraVie companies --

9         MR. ESENSTEN:  Vague.

10   BY MR. TEPFER:

11     Q.  -- in person?

12        MR. ESENSTEN:  Vague, speculation, lack of

13   foundation, overbroad.

14        THE WITNESS:  Once in a while, yes.

15   BY MR. TEPFER:

16     Q.  Would you meet with anyone else concerning

17   the management of the -- or rather, the bookkeeping

18   of the AuraVie companies?

19        MR. ESENSTEN:  Same objection.

20        THE WITNESS:  Stephan or Paul.

21        MR. TEPFER:  Well, I just went over by a

22   minute.  I think if now's a good time, we can --

23        MR. GALLEGOS:  It's up to you.

24        MR. TEPFER:  -- do lunch.

25        MR. ESENSTEN:  It's up to you.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

```
 1          MR. TEPFER:  Sure.

 2          MR. ESENSTEN:  Let's go off the record.

 3          MR. TEPFER:  Okay.

 4          (A discussion was held off the record.)

 5

 6          (Whereupon, at the hour of

 7          12:32 p.m., a luncheon recess was

 8          taken, the deposition to be resumed

 9          at 2:13 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 20, 2016
 2                         2:13 P.M.
 3
 4                    DORON NOTTEA,
 5          having been previously duly sworn,
 6          was examined and testified as follows:
 7
 8          MR. TEPFER:  Back on the record.
 9
10                         EXAMINATION
11    BY MR. TEPFER:
12       Q.   Mr. Nottea, I want to ask you about DSA
13    Holdings, Inc.  You had mentioned that's a company
14    you did bookkeeping at one point for; correct?
15       A.   I helped, yes.
16       Q.   You helped Jason do bookkeeping?
17       A.   Yes.
18       Q.   Did you ever communicate with David Davidian
19    about the incorporation of DMA Holdings, to your
20    recollection?
21          MR. ALON NOTTEA:  DMA or DSA?
22          THE WITNESS:  DSA.
23    BY MR. TEPFER:
24       Q.   Sorry.  DSA Holdings.
25       A.   I don't know.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      Q.   Do you recall if you ever edited DSA's
 2   Articles of Incorporation?
 3      A.   No.
 4      Q.   Do you recall ever requesting that the
 5   Articles of Incorporation for DSA Holdings be sent
 6   to you?
 7      A.   Possibly, yes.
 8           (Plaintiff's Exhibit 41 was marked
 9           for identification by the court
10           reporter and is attached hereto.)
11   BY MR. TEPFER:
12      Q.   Okay.  I want to hand Mr. Nottea Plaintiff's
13   Exhibit 41.  And Plaintiff's Exhibit 41 has
14   Attachment A to it.
15           MR. GALLEGOS:  I don't have -- I have --
16           MR. TEPFER:  Really?
17           MR. GALLEGOS:  I have 470.  Here we go.
18           There's three copies in here, or is it one
19   copy?
20           MR. ESENSTEN:  Here's 44 back.
21           MR. GALLEGOS:  Thanks.
22   BY MR. TEPFER:
23      Q.   Do you recall --
24           MR. ESENSTEN:  Yeah, looks like it's a
25   four-page document; is that correct?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. TEPFER:  Yes.  It's -- Exhibit 41 has

2    three pages, and then Attachment A is one page.

3    BY MR. TEPFER:

4      Q.   Do you recall receiving this email from

5    David Davidian?

6          MR. ESENSTEN:  Which email are we talking

7    about?

8          MR. TEPFER:  The first email up at the top

9    that says "Please see attached."

10         MR. ESENSTEN:  Are you asking if he received

11   it?  It doesn't show him on the email chain.

12   BY MR. TEPFER:

13     Q.   If you can answer.

14     A.   I've never seen this at all.

15     Q.   Do you use the email address X-p-o-s-e-d --

16     A.   I do, yes.

17     Q.   Sorry.  Let me just --

18     A.   Yes, yes.  I see it.

19     Q.   xposedinc@gmail.com, is that your --

20     A.   Yes.

21     Q.   -- email address?

22     A.   Yes.

23         MR. ALON NOTTEA:  Wait for him.  Let him

24   finish before you respond.

25         THE WITNESS:  Okay.  Sorry.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   BY MR. TEPFER:

2       Q.   Do you recall sending the email requesting a

3   word file containing these resolutions?

4       A.   I see I sent an email here, obviously.

5            MR. ESENSTEN:  The only question is do you

6   recall doing that.

7            THE WITNESS:  Yes.  I sent him an email, but

8   it doesn't say anything about resolutions here,

9   anything.

10  BY MR. TEPFER:

11      Q.   What were you requesting when you sent that

12  email?

13      A.   Send me a word file.  David, just send me a

14  word file.  I will fix.  I don't --

15           MR. ESENSTEN:  Do you remember that specific

16  request?

17           THE WITNESS:  I remember request.  I don't

18  know what I did.  It's six years ago.  I don't know.

19           MR. ESENSTEN:  Answer -- listen carefully to

20  his questions and just answer his questions.

21           THE WITNESS:  No.

22           MR. ESENSTEN:  Thank you.

23  BY MR. TEPFER:

24      Q.   So you don't recall -- so do you recall what

25  you were requesting when you wrote that email?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                        1/20/2016

1       A.   No.

2       Q.   Do you remember if you did, in fact, edit

3    the document in Attachment A titled "Resolutions

4    Adopted By Board of Directors of DSA Holdings,

5    Inc."?

6       A.   No.

7       Q.   Do you know if Motti Nottea is, in fact --

8    or at the time of the drafting of this document,

9    that Motti Nottea was, in fact, the Director of DSA

10   Holdings, Inc.?

11           MR. ESENSTEN:  You're asking for his

12   recollection now?  Okay.  You shook your head yes.

13   Does that mean yes?

14           MR. TEPFER:  Yes.

15           THE WITNESS:  Repeat the question again.

16   BY MR. TEPFER:

17      Q.   Do you know if Motti Nottea was at any time

18   Director of DSA Holdings, Inc.?

19      A.   No.  Not that I know, no.

20      Q.   Do you remember sending David Davidian the

21   address 8335 Winnetka?

22           MR. ESENSTEN:  Winnetka.

23           MR. TEPFER:  Oh, is that a common street?

24           MR. ESENSTEN:  Yes.

25           THE WITNESS:  Yes.  I mean, if I did, yes.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    It says so, I mean.

2           MR. ESENSTEN:  He still asked you if you

3    remember doing that.

4           THE WITNESS:  I'm trying to understand this

5    email.  I never wrote it, so I never got it.  I'm

6    just trying to read it at the same time.

7           MR. ALON NOTTEA:  Say whatever you feel.

8           THE WITNESS:  Repeat the question again.

9    BY MR. TEPFER:

10      Q.   Do you recall sending David Davidian the

11   address 8335 Winnetka?

12      A.   Yes.

13      Q.   Why did you send him that address?

14      A.   'Cause this is address on Winnetka for DSA

15   Holdings.

16      Q.   Do you know what he had intended to use that

17   address for?

18      A.   No.

19      Q.   Do you recall if you reviewed the rest of

20   the email chain when you received this email?

21      A.   No.

22      Q.   When your brother Alon says, "I used 2

23   different addresses on 2 different apps," do you

24   know what he's referring to?

25      A.   No.

113

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.   Do you know if he's referring to merchant

2   account applications?

3      A.   I have no idea, no.

4           MR. ALON NOTTEA:  Do you guys have the same

5   documents I do?  There's two here.  Is it four or

6   two?  I have two pieces of document.  Are you

7   looking at four?  Mine aren't front and --

8           MR. GALLEGOS:  Sorry.  They probably didn't

9   get the front page.

10           MR. ALON NOTTEA:  You don't have to get up.

11   You don't have to get up.

12           MR. ESENSTEN:  Do you want to just be clear

13   and copy these two, or do you want to wait?

14           MR. ALON NOTTEA:  You're fine.  Just

15   continue.

16           MR. ESENSTEN:  Are you done with the

17   exhibit?

18           MR. TEPFER:  Yeah, I'm done with that.

19           MR. ALON NOTTEA:  As far as I'm concerned,

20   it's fine.

21           MR. ESENSTEN:  We're all talking at the same

22   time.  Give the reporter a chance.

23           MR. ALON NOTTEA:  Sorry.

24           MR. ESENSTEN:  Does the FTC have some paper

25   clips?  We can use -- these are all sticking

114
Nottea
FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1    together.
 2              MR. GALLEGOS:  At a break.
 3              (Plaintiff's Exhibit 44 was marked
 4              for identification by the court
 5              reporter and is attached hereto.)
 6    BY MR. TEPFER:
 7       Q.   I'm handing Mr. Nottea what has been marked
 8    Plaintiff's Exhibit 44.
 9              Do you recall receiving this email?
10              MR. ESENSTEN:  Give me one second to look at
11    it, please.
12              The question is did he recall receiving the
13    email?
14              MR. TEPFER:  Mm-hmm.
15              MR. ESENSTEN:  Yes?  Did you say?
16              MR. TEPFER:  Yes.
17              THE WITNESS:  No.
18    BY MR. TEPFER:
19       Q.   You have no recollection of this email?
20       A.   (Witness shakes head from side to side.)
21       Q.   Do you know what Skincare EU is?
22       A.   No.
23       Q.   Have you ever heard of Skincare OU?
24       A.   No.
25       Q.   Do you know who Oleg Trushyla is?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          And that's spelled T-r-u-s-h-y-l-a, I

2    believe.

3        A.    I have no idea.

4        Q.    Do you know if BunZai Media Group, Inc., had

5    any fulfillment agreement for operations in the USA

6    with Skincare OUT?

7        A.    No, I don't know.

8              MR. TEPFER:  I'll run and get this document.

9              MR. GALLEGOS:  Off record?

10             MR. TEPFER:  Sure, off record.

11             (Recess)

12             MR. TEPFER:  Back on the record.

13             (Plaintiff's Exhibit 21 was marked

14             for identification by the court

15             reporter and is attached hereto.)

16    BY MR. TEPFER:

17       Q.    We're discussing Exhibit 21, Attachment A.

18             MR. ESENSTEN:  Give me a chance to look at

19    it, please.

20       Q.    Do you recall receiving this email?

21             MR. ESENSTEN:  Wait, wait.  Let me have a

22    chance to look at it.  It's pretty long.  Hold on.

23             Okay.

24    BY MR. TEPFER:

25       Q.    Mr. Nottea, do you recall receiving this

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    email?

2        A.   Yes.

3        Q.   Down midway through the page where your name

4    is mentioned, would you mind reading just that

5    sentence?

6            MR. ESENSTEN:  Where is -- you need to be

7    more specific than that?

8            MR. TEPFER:  Well, his name is just

9    mentioned one time.  So we're starting "Doron" --

10           THE WITNESS:  "Doron has his department."

11   BY MR. TEPFER:

12       Q.   Do you know what Igor is referring to?

13       A.   Bookkeeping.

14       Q.   So my understanding was that -- so did you,

15   in fact, do bookkeeping for Pinnacle?

16       A.   No.  I told you, a little bit.

17       Q.   A little bit?

18       A.   Yeah.

19       Q.   Okay.

20       A.   Go ahead.

21       Q.   And sorry.  Who owned Pinnacle Logistics?

22       A.   Oz Mizrahi.

23       Q.   And is he the one who hired you?

24       A.   He didn't hire me.  I told you, when

25   Nastassia kind of left the company, she gave me a

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1    list to help, and I know the guy, but he didn't hire
 2    me.
 3         Q.   Who did hire you for Pinnacle Logistics?
 4         A.   Nobody.  I mean, I barely did for them
 5    anything.  If I did, it was for a few months.  I
 6    didn't do -- I mean Pinnacle was open.  When I came
 7    along, Pinnacle was already there.
 8         Q.   I'm sorry.  When you said, "When I came on,
 9    Pinnacle was already there" --
10         A.   Pinnacle was already one corporation that
11    did bookkeeping.  They didn't hire me.  They never
12    paid me.
13         Q.   Who asked you to do bookkeeping for Pinnacle
14    Logistics?
15              MR. ESENSTEN:  Objection; asked and
16    answered.
17              THE WITNESS:  Alon and Oz.
18    BY MR. TEPFER:
19         Q.   Do you know if Alon had a position at
20    Pinnacle Logistics?
21         A.   No, I have no idea.
22         Q.   Do you know what VastPay is?
23         A.   I heard the name before, yes.
24         Q.   What is it?
25         A.   I have no -- I know it's one of the
```

118
Nottea
FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    companies that Igor has.  I don't know anything else

2    about it.

3        Q.   Do you know if Roi had a position at

4    Pinnacle Logistics?

5        A.   I don't know.  I'm not sure if he did or

6    not.  If he did, maybe Technical Department, but I

7    don't know.  With Pinnacle, I don't know.

8        Q.   Do you know what Paul's position was at

9    Pinnacle Logistics?

10           MR. ESENSTEN:  Paul.  Can you be more

11   specific?

12           MR. TEPFER:  Oh, Paul Medina's position was

13   at Pinnacle Logistics.

14           THE WITNESS:  I'm not sure what the position

15   was, but I know that he was running some operations

16   there.  His exact title, I don't know.

17           MR. TEPFER:  Do you have Exhibit 30?

18           MR. GALLEGOS:  30.

19           (Plaintiff's Exhibit 30 was marked

20           for identification by the court

21           reporter and is attached hereto.)

22   BY MR. TEPFER:

23       Q.   I'm now handing you, Mr. Nottea, what has

24   been marked Plaintiff's Exhibit 30.

25           Do you use or have you ever used the email

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    address doron@securedcommerce.com?

2        A.    Yes.

3        Q.    Has anyone else, to your knowledge, ever

4    used that email address?

5        A.    Possibly.  I mean, it's an open email.

6    Anybody is going to use that, but it's my email.

7            MR. ESENSTEN:  You've answered the question.

8            THE WITNESS:  Go ahead.

9    BY MR. TEPFER:

10       Q.    Are you aware of anyone else using the email

11   address doron@securedcommerce.com?

12       A.    I have no idea.

13       Q.    Do you recall receiving this email?

14       A.    Not really.  Obviously, it was sent to me.

15       Q.    Is the address Avico Global, is that Alan

16   Argaman's email address?

17       A.    Yes.

18       Q.    Did you review the -- or did you review any

19   resumes for Pinnacle Logistics call center?

20       A.    No.

21       Q.    Did you typically participate in hiring

22   decisions for Pinnacle Logistics --

23       A.    Never.

24       Q.    -- call center?

25            Have you ever participated in any hiring

Nottea

FTC v. Bunzai Media Group, Inc., et al.                     1/20/2016

1    decisions for any telemarketers, or rather, call

2    center employees for AuraVie products?

3        A.    Never.

4        Q.    Are you aware if the AuraVie companies ever

5    used a call center located in India?

6        A.    They might have.

7        Q.    Do you recall ever, in your work as a

8    bookkeeper, making payments to companies located in

9    India?

10       A.    Yes.

11       Q.    Do you recall what those companies were?

12             MR. ESENSTEN:  You mean the name?

13             MR. TEPFER:  Yes.

14             THE WITNESS:  I think one of them is called,

15   that I remember, Telstar Solutions, maybe.

16   BY MR. TEPFER:

17       Q.    Do you recall who asked you to make those

18   payments to Telstar?

19       A.    I -- if -- I think I'm -- Argaman did.  If I

20   remember correctly, yes.

21       Q.    Do you know if Alan Argaman ran any or ran a

22   call center for the AuraVie companies?

23       A.    I don't think he did, no.

24             MR. ESENSTEN:  Well, this person refers to

25   Superman, so I assume you could --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1            MR. TEPFER:  We'll be deposing him next.
 2            MR. ESENSTEN:  And he can get back to India
 3     pretty quick.
 4            MR. TEPFER:  Could we pull 47.
 5            (A discussion was held off the record.)
 6            (Plaintiff's Exhibit 47 was marked
 7            for identification by the court
 8            reporter and is attached hereto.)
 9     BY MR. TEPFER:
10        Q.   Now I'm handing you, Mr. Nottea, what has
11     been marked as Plaintiff's Exhibit 47.
12            Did you ever speak with Nastassia Yalley
13     concerning the 800 numbers for any of the AuraVie
14     companies?
15        A.   The number, obviously --
16            MR. ALON NOTTEA:  That's your answer.
17            MR. ESENSTEN:  If you've answered the
18     question, you've answered the question.
19     BY MR. TEPFER:
20        Q.   Did you typically make decisions about what
21     telephone numbers the AuraVie companies would use?
22        A.   I didn't involve -- no.  The answer is no.
23     That's not me.
24        Q.   Do you know why the AuraVie companies used
25     multiple 800 numbers?
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1      A.   No idea.

2      Q.   Do you have any idea what Alan Argaman -- or

3  do you have any idea what Alan Argaman is referring

4  to when he says "what 818 numbers you need to port

5  if any?"

6           MR. ESENSTEN:  This refers to Avi --

7           MR. TEPFER:  Mm-hmm.

8           MR. ESENSTEN:  -- okay?  And it's

9  speculation since that email was not -- he's not

10  even on the chain.

11          MR. TEPFER:  Sure.  If he can answer,

12  though.

13          THE WITNESS:  I have no idea.  818 numbers,

14  I don't know.

15          MR. ALON NOTTEA:  I'm not shy to say

16  something.

17          MR. ESENSTEN:  You can't; okay?  I'm sorry.

18          MR. ALON NOTTEA:  It's okay.  It's okay.  I

19  have to follow the rules.

20          MR. ESENSTEN:  You're here, but you're not.

21          MR. ALON NOTTEA:  Yeah, I know.  Okay.

22  BY MR. TEPFER:

23     Q.   And, Mr. Nottea, just to clarify, it's true

24  that Alan Argaman goes by Avi; is that correct?

25     A.   Yes.

123

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1       Q.    Okay.  Do you know any other Avi?

2       A.    I know a lot of Avi's.

3       Q.    Do you know any other Avi's that are

4   employed by any of the AuraVie companies?

5       A.    No.  It's like John.

6       Q.    Oh.

7       A.    Vast.

8       Q.    Okay.  That's helpful to know.

9             MR. ESENSTEN:  Or Bob.

10            THE WITNESS:  Yeah.  It's like --

11            MR. ESENSTEN:  Luis.

12            MR. GALLEGOS:  Yeah.

13            THE WITNESS:  Do you have one for me, too?

14   It's okay.  I'll look.

15            MR. ESENSTEN:  No, no.  You have to have a

16   set for him, for the court reporter.

17            (Plaintiff's Exhibit 37 was marked

18            for identification by the court

19            reporter and is attached hereto.)

20   BY MR. TEPFER:

21       Q.    Now I'm handing Mr. Nottea what's marked as

22   Plaintiff's Exhibit 37.

23            Do you recall receiving --

24            MR. ESENSTEN:  I'm sorry.  Are we using the

25   same exhibit?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1            MR. TEPFER:  Yeah.

2            MR. ESENSTEN:  I don't see his name on this

3    at all.

4    BY MR. TEPFER:

5       Q.   Are you aware if any of the AuraVie

6    companies had sales in the United Kingdom?

7       A.   No, I don't know.

8       Q.   Are you aware of any monthly fees associated

9    with merchant accounts in the sale of AuraVie

10   products?

11           MR. ESENSTEN:  Can I get that back, please.

12           (The previous question was read back

13           by the court reporter as follows:

14              "QUESTION:  Are you aware of any

15           monthly fees associated with merchant

16           accounts in the sale of AuraVie

17           products?")

18           THE WITNESS:  I never even heard -- okay.

19           MR. ESENSTEN:  He's not referring to the

20   exhibit right now.  Listen to his question.  He's

21   not referring to the exhibit.

22           THE WITNESS:  Oh.

23           MR. ESENSTEN:  He's asking you a general

24   question.

25           THE WITNESS:  Yes.

125

Nottea

FTC v. Bunzai Media Group, Inc., et al.                      1/20/2016

1    BY MR. TEPFER:

2        Q.    What fees are you aware of?

3        A.    The only thing I had access for is when I

4    look at the bank statement, I see -- I see money

5    coming in, I see fees taken out.  Can be discount

6    fees, can be some other fees, but --

7        Q.    And --

8        A.    -- that's all you see.

9        Q.    And so as part of your duties as bookkeeper,

10   did you make payments to various merchant processors

11   for the AuraVie companies?

12       A.    No.  They don't -- they take payments,

13   from -- from what I saw.

14       Q.    Okay.  And when you say you see money coming

15   out, what are you referring to?

16       A.    When you look at the bank statements you see

17   money coming in, money coming out, some transactions

18   where fees, discount fees, fees that the bank

19   account charges, like every merchant account.

20       Q.    And as part of your review, would you

21   typically see chargebacks?

22            MR. ESENSTEN:  Are you referring to a

23   merchant account bank statement?  Is that what

24   you're asking him about?

25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

126

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    BY MR. TEPFER:
2        Q.    If you can answer.
3              MR. ESENSTEN:  Well, then I object as
4    vague --
5              MR. TEPFER:  Sure.
6              MR. ESENSTEN:  -- unintelligible, and it's
7    an unfair question if you're not telling him what he
8    should refer to.
9              Can you answer the question the way he asked
10   it?
11             THE WITNESS:  I mean, listen, from what I
12   used to see, I tried --
13             MR. ALON NOTTEA:  No, no, no, no, no.
14             MR. ESENSTEN:  Time out.  Listen carefully
15   to the question.
16             Ms. Reporter, would you please read it.
17             And answer just his question.  Don't
18   editorialize.  Don't speculate what his question is.
19   Just, if you have an answer, give it to him.
20             (The previous question was read back
21             by the court reporter as follows:
22                 "QUESTION:  And as part of your
23             review, would you typically see
24             chargebacks?")
25             MR. ESENSTEN:  Vague, unintelligible,

127

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1   outside -- it's just in the context.

2           MR. TEPFER:  Right.  If he can answer it,

3   though.

4           MR. ESENSTEN:  Do you understand the

5   question to answer it?

6           THE WITNESS:  Yes.

7           MR. ESENSTEN:  Okay.  Then answer it,

8   please.

9           THE WITNESS:  Yes.  I saw, like you say,

10  like you saw, fees.  I saw chargebacks.

11  BY MR. TEPFER:

12      Q.   Just to be clear, you saw chargebacks when

13  you were reviewing --

14      A.   Bank statements.

15      Q.   Bank statements.

16           Okay.  Would you also review statements from

17  these merchant accounts?

18      A.   No.

19      Q.   And as part of your bookkeeping, would you

20  keep track of the chargebacks on these bank account

21  statements?

22      A.   No, no, no, no.

23      Q.   Do you know who did that?

24      A.   No --

25      Q.   Do you --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      A.    -- I don't.

2      Q.    Sorry.

3      A.    Go ahead.

4      Q.    Do you know what departments BunZai Media

5  Group had?

6            MR. ESENSTEN:  Objection; vague.

7            THE WITNESS:  No.  I said before I wasn't in

8  BunZai.  I have no idea.

9  BY MR. TEPFER:

10     Q.    Were you doing -- were you working as a

11 bookkeeper out of 7900 Gloria at the same time that

12 BunZai Media Group was located at that address?

13     A.    No.

14     Q.    Where were you doing your bookkeeping

15 services at the time that BunZai Media Group was

16 located at 7900 Gloria?

17     A.    At my office, 6925 Canby Avenue, Suite

18 Number 105.

19     Q.    Do you know the -- do you know the

20 different, I suppose, corporate departments that

21 Pinnacle Logistics had?

22     A.    (Witness shakes head from side to side.)

23           MR. ALON NOTTEA:  You have to answer.  You

24 can't go like this (indicating).

25           THE WITNESS:  No.  Sorry.  No.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1              (Plaintiff's Exhibit 35 was marked

2              for identification by the court

3              reporter and is attached hereto.)

4      BY MR. TEPFER:

5         Q.   Turn real quick to Exhibit 35.

6              MR. ALON NOTTEA:  Thank you.

7              MR. TEPFER:  I'm now handing what's been

8      marked Exhibit 35 to Mr. Nottea.

9              THE WITNESS:  Thank you.

10             MR. ESENSTEN:  Just so we're clear, there's

11     been a couple of exhibits that has some highlighting

12     on it.  Was the highlighting performed by your

13     office?

14             MR. TEPFER:  Yes.  Sorry.  I did the

15     highlighting on it.

16             MR. ESENSTEN:  Give me a second to read it,

17     please.

18             MR. ALON NOTTEA:  Okay.

19             MR. ESENSTEN:  Okay.

20     BY MR. TEPFER:

21        Q.   Do you know who Julia Reaves is?

22        A.   Yes.

23        Q.   Who is she?

24        A.   She's an adult content broker.  She sells

25     adult material to companies in Europe and all over

130

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    the world.

2        Q.    Have you ever done any business with Julia

3    Reaves?

4        A.    Of course.

5        Q.    What sort of business have you done with

6    Julia Reaves?

7        A.    She sells me content.

8        Q.    Have you ever done any business aside from,

9    I guess, your adult businesses?

10       A.    No.

11       Q.    Do you recall receiving this email?

12       A.    Yes.

13       Q.    Do you know what Julia was referring to when

14   she states -- when she refers to your distribution

15   channel?

16            MR. ESENSTEN:  Could you help me identify

17   where you are in the exhibit?

18            MR. TEPFER:  Sure.  It's the second

19   highlighting.

20            MR. ESENSTEN:  I see.  "Would you please

21   send me another three sample packages?"

22            MR. ALON NOTTEA:  No.  The one above that in

23   the first paragraph.

24            THE WITNESS:  If they want to sell

25   cosmetics?

131

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1          MR. ESENSTEN:  Oh, okay.

2     BY MR. TEPFER:

3          Q.    Yes.

4               When she refers to your distribution

5     channel, do you know what she's referring to?

6          A.    No.

7          Q.    Do you have a distribution channel?

8          A.    Right.  For cosmetics, no.

9          Q.    Do you know what she's requesting or do you

10    know what she's referring to when she says "sample

11    packages" in the third highlighting?

12         A.    I don't recall.

13         Q.    Do you know if you ever did send her any

14    sample packages?

15         A.    Of what?

16         Q.    Of anything.

17         A.    Of course.  I sent -- I was doing business

18    two, three times a month.  Of course.

19         Q.    Did you ever send her any sample packages of

20    AuraVie?

21         A.    Maybe I sent it to her as a present.

22    Possibly, yes.

23         Q.    Did you ever provide her any AuraVie

24    promotional material?

25         A.    No.

132

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. ALON NOTTEA:   Thank you.
2          (Plaintiff's Exhibit 32 was marked
3          for identification by the court
4          reporter and is attached hereto.)
5     BY MR. TEPFER:
6       Q.   I'm now handing Mr. Nottea what has been
7     marked as Plaintiff's Exhibit 32.
8          Do you recall receiving this email?
9       A.   I think so, yes.
10      Q.   What's it about?
11      A.   It's about paying someone 1 percent.  That's
12    what it says here.
13      Q.   Do you know -- 1 percent of what?
14      A.   I guess it's 1 percent of processing fees,
15    from what I see here.
16      Q.   Did Paul Medina typically report to you
17    about the 1 percent that was paid out to the owners
18    of the AuraVie companies?
19          MR. ESENSTEN:   Objection; vague.
20          THE WITNESS:   Paul just gave me
21    instructions, like I mentioned before.
22    BY MR. TEPFER:
23      Q.   Sure.
24      A.   Gave me a person, a name, an amount, send
25    money.

133

Nottea

FTC v. Bunzai Media Group, Inc., et al.                      1/20/2016

1      Q.   And just to clarify, when speaking

2   generally, we're talking about the period between

3   January 1st, 2010, until the filing of the FTC's

4   lawsuit in June of 2015, if that's okay.

5           MR. ESENSTEN:  His testimony was April 2013

6   to the present.

7           MR. TEPFER:  Pardon?

8           MR. ESENSTEN:  He's testified earlier today

9   that the period of time he worked was April 2013 to

10   the present.  So are you -- I'm unclear as to how

11   the dates changed.

12           MR. TEPFER:  Just if -- all I'm requesting

13   is when I'm asking questions, I'm generally

14   referring to that period.  And I just asked if

15   Mr. Nottea is referring to a lesser period of time,

16   you know, just to specify, perhaps.

17           MR. ESENSTEN:  Is that the question, or

18   don't you -- why don't you restate the question

19   again, so I can understand where you're going?

20   BY MR. TEPFER:

21      Q.   Do you know what was sold through these

22   merchant accounts referred to in this email?

23      A.   Don't know what -- I believe it's the

24   AuraVie.  I mean, that's obviously what they were

25   doing, so --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

134

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                1/20/2016

1      Q.   Did you ever request that any of the owners

2   of the AuraVie skin care companies here -- let me

3   start over.

4          Did you ever offer to any of the individuals

5   who are listed as owners of the AuraVie skin care

6   companies to pay them 1 percent of what is processed

7   on their merchant accounts, in exchange for allowing

8   their names to be used on those merchant accounts?

9      A.   No.

10      Q.   Are you aware if Alon ever made that

11   request?

12      A.   No.  Possibly.  I don't know.

13          (Plaintiff's Exhibit 51 was marked

14           for identification by the court

15           reporter and is attached hereto.)

16          MR. ALON NOTTEA:   Thank you.

17   BY MR. TEPFER:

18      Q.   I'm now handing Mr. Nottea what has been

19   marked as Plaintiff's Exhibit 51.

20      A.   Thank you.

21      Q.   Do you recall sending this email to your

22   brother Alon?

23      A.   Yes.

24      Q.   Why did you send it to him?

25      A.   From what I see here, I was probably in the

135

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    bathroom looking at the iPad, and I saw a site that
2    mentioned AuraVie, so I sent it to him.
3         Q.   Did you --
4         A.   I --
5         Q.   Go ahead.
6              MR. ESENSTEN:  He's answered the question.
7              THE WITNESS:  Yeah.
8              MR. ESENSTEN:  Next question, please.
9    BY MR. TEPFER:
10        Q.   Did you typically review online reviews --
11   or have you ever reviewed online reviews of AuraVie
12   products?
13        A.   Never.
14        Q.   Do you remember how you came across this
15   website?
16        A.   I'm telling you again.  I see it on my iPad,
17   and I only use it when I go to the bathroom.  I was
18   probably sitting, probably popped up, and that's
19   what I saw.
20             MR. ALON NOTTEA:  That's true.
21             THE WITNESS:  I mean, I send it, so probably
22   I saw it somewhere.  I never review anything.  You
23   know, sometimes when you see it, something pops up
24   on your screen.  I saw it.  I send to him.
25   ///

136

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1   BY MR. TEPFER:

2       Q.   So you think it came from a popup

3   advertisement?

4       A.   At 1:00 a.m. at night?  I'm sure.

5            MR. ESENSTEN:  This is hard to read the

6   number.  Can you tell me the number again?

7            MR. TEPFER:  Sorry.  It's 51.  I don't have

8   good handwriting.

9            MR. ESENSTEN:  Better than mine.

10           (Plaintiff's Exhibit 53 was marked

11           for identification by the court

12           reporter and is attached hereto.)

13           MR. TEPFER:  I'm now handing what's been

14   marked Exhibit 53, and --

15           MR. ESENSTEN:  Can you wait 'til I get my --

16           MR. TEPFER:  And on the back is

17   Attachment A.

18           MR. ALON NOTTEA:  Thank you.

19           MR. ESENSTEN:  That's what you want him to

20   look at, is Attachment A?

21           MR. TEPFER:  Both 53 and Attachment A.

22           MR. ESENSTEN:  Okay.  I'm a little lost.

23   You handed him Exhibit 53, which is a two sided

24   document.  You want him to look at both sides?  Is

25   that what you just said?

137

Nottea

FTC v. Bunzai Media Group, Inc., et al.                            1/20/2016

```
 1              MR. TEPFER:  Yes.

 2              MR. ESENSTEN:   Okay.

 3              THE WITNESS:   I don't know this one, but

 4     okay.

 5              MR. ESENSTEN:  He didn't ask you anything.

 6              MR. ALON NOTTEA:  Hold on.  Hold on.

 7     BY MR. TEPFER:

 8        Q.   Do you recall receiving this email?

 9        A.   No.

10        Q.   Have you ever seen Attachment A before?

11        A.   Never.

12        Q.   Does that illustration comport with your

13     understanding of how BunZai Media Group sold the

14     AuraVie product?

15              MR. ALON NOTTEA:  Robert, did you --

16              THE WITNESS:  I don't understand it.

17     BY MR. TEPFER:

18        Q.   In your work for Agoa, do you recall if

19     money for the sale of AuraVie products was

20     transferred to BunZai Media Group?

21        A.   No.  No.

22        Q.   Do you have any idea why David Davidian

23     would send you the attached illustration in

24     Attachment A --

25              MR. ESENSTEN:  Objection --
```

138

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    BY MR. TEPFER:

2        Q.    -- of Exhibit 53?

3             MR. ESENSTEN:  -- speculation, lack of

4    foundation.

5             THE WITNESS:  No.

6    BY MR. TEPFER:

7        Q.    Did you ever have any conversations with

8    David Davidian regarding the AuraVie companies'

9    corporate structure?

10       A.    Yes, I did.

11       Q.    What did those conversations consist of?

12            MR. ALON NOTTEA:  Come on.

13            THE WITNESS:  Give him access reports for

14   QuickBooks, did sales tax.  If needed, to do tax

15   returns.  That's the only thing.

16   BY MR. TEPFER:

17       Q.    So in addition to paying, I guess, you know,

18   the --

19            MR. ALON NOTTEA:  Payroll?

20   BY MR. TEPFER:

21       Q.    -- the debts of the AuraVie companies, you

22   also did the tax returns for the AuraVie companies?

23       A.    I gave him access to QuickBooks.  I sent him

24   copy of QuickBooks.  He then take the QuickBooks;

25   then he do the tax return.

139

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

 1      Q.   And in the QuickBooks, what sort of data was

 2   contained in those?

 3      A.   Accounts payables, and I mean every check

 4   that was written out.  And any money coming in,

 5   deposits, checks -- I mean, accounts -- accounts

 6   payable and when money comes in.  That's about it.

 7   I mean --

 8      Q.   Who maintained those QuickBooks?

 9      A.   I had an -- an assistant that did

10   everything.  There's Philip Camerino.

11      Q.   And did --

12      A.   He took down information, you know,

13   reconciled it, and I just, you know, after he did --

14   did all of the work, I kind of looked to make sure

15   things are actually done right and make sure that

16   the payables are being paid on time.

17      Q.   And did Philip Camerino work for you?

18      A.   He worked for me for a little while.  He

19   worked for Alon for a little while.  I mean, he

20   worked for a few people.  He didn't do solo for me.

21   He was just a guy that you could pay per hour, and

22   he just helped me like an assistant.

23      Q.   And did you ever review the QuickBooks, I

24   guess, maintained by Philip Camerino?

25      A.   Yes.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1      Q.   How often would you review Philip's work?

 2      A.   Once a week.

 3      Q.   Did you pay Philip Camerino?

 4           MR. ESENSTEN:  Objection; vague as to time.

 5   BY MR. TEPFER:

 6      Q.   I'll rephrase it.

 7           Did you pay Philip Camerino during the

 8   period that you did accounting for the Aura- -- or

 9   that you did bookkeeping for the AuraVie companies?

10           MR. ESENSTEN:  Objection; vague as to time.

11   As to the entire period or a portion of that period?

12           MR. TEPFER:  The whole time.

13           THE WITNESS:  I only paid him when he worked

14   for me.  When he worked for me, I paid him.  When he

15   worked for other people, other people.  He wasn't

16   only working for me.

17   BY MR. TEPFER:

18      Q.   And what period of time did Philip Camerino

19   work for you?

20      A.   I believe 2008, '9, to 2015.  He -- I mean,

21   back and forth, back and forth.

22           MR. ALON NOTTEA:  You mean on and off.

23           THE WITNESS:  On and off.

24   BY MR. TEPFER:

25      Q.   And you mentioned that those QuickBooks, in
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

141
Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    addition to keeping track of, I guess, outgoing
2    payments for the companies' debts, it also
3    maintained sales figures; is that accurate?
4        A.   It maintained deposits only.  Just connected
5    to a bank, pulled data from the bank.  That's all
6    you can do.  You can pull the data in.  Once it's
7    in, you see money in the bank.  You have accounts
8    payable.  You owe "X" amount of money.  Person that
9    pay bills, you know, makes the checks for you.  He
10   doesn't have to --
11        MR. ESENSTEN:  Okay.  You've answered the
12   question.
13   BY MR. TEPFER:
14        Q.   Did those QuickBooks also identify if, for
15   example, deposited money to one of the AuraVie
16   companies was later withdrawn due to a chargeback
17   from a consumer?
18        A.   Possibly, yes.
19        Q.   Are you not sure?
20        A.   I'm not sure.  I mean, he just pulled data
21   out of the bank.  So whatever the bank had in -- in
22   his line, that's what came into the actual bank.  It
23   usually showed more money coming in from a merchant
24   account, I guess, and then fee -- you know, in fees
25   and then payables.  I'm not sure specifically if it

                                                              142
                            Nottea
FTC v. Bunzai Media Group, Inc., et al.                1/20/2016

     1    had chargeback in that.
     2             MR. TEPFER:  Is now a good time for a break
     3    for you?
     4             MR. ESENSTEN:  Sure.
     5             THE WITNESS:  Sure.
     6             MR. TEPFER:  Okay.
     7             (Recess)
     8             (Mr. Ungar enters the room.)
     9             MR. TEPFER:  We can go back on the record.
    10    BY MR. TEPFER:
    11        Q.   Mr. Nottea, do you know what Dayo World is,
    12    or a company named Dayo World?
    13        A.   Dayo World, I know the company.
    14        Q.   Do you know what its business -- do you know
    15    what its business was in 2013?
    16        A.   No.
    17        Q.   Do you know, are you aware of a company
    18    called Jacem Healthy Products?  That's J-a-c-e-m.
    19        A.   Yes.
    20        Q.   What is Jacem Healthy Products?
    21        A.   I think they're manufacturers of fillers of
    22    skin care products.
    23        Q.   Do you know if the AuraVie companies ever
    24    purchased skin care lotions from Jacem Healthy
    25    Products?

                          For The Record, Inc.
               (301) 870-8025 - www.ftrinc.net - (800) 921-5555

143

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

        1        A.    I think so.

        2              MR. ESENSTEN:  Ms. Reporter, I didn't hear

        3     the answer.

        4              (The previous answer was read back by

        5              the court reporter as follows:

        6                   "ANSWER:  I think so.")

        7              THE WITNESS:  Yes.  Yes.  Sorry.

        8     BY MR. TEPFER:

        9        Q.    Do you know who Pierre Teboul is?  And

       10     that's T-e-b-o-u-l.

       11        A.    Yes.

       12        Q.    Who is he?

       13        A.    He is -- he sells content of adult in

       14     Europe, and I think that he also, I think that he

       15     invested some money with my brother.

       16        Q.    Do you know when he invested this money with

       17     your brother?

       18        A.    A little bit off, but I think 2013.

       19        Q.    Do you know what that investment was for?

       20        A.    No.

       21        Q.    Do you know if it was for any of the AuraVie

       22     companies?

       23        A.    No.

       24        Q.    Do you know how much money Mr. Teboul

       25     invested with your brother?

144

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1       A.    I think a hundred thousand.

2       Q.    How did you learn about this investment?

3       A.    From Pierre.

4             (Plaintiff's Exhibit 54 was marked

5             for identification by the court

6             reporter and is attached hereto.)

7             MR. ALON NOTTEA:  Thank you.

8             MR. ESENSTEN:  Are we again -- in order to

9    understand the exhibit, we're going to have to mark

10   this 54-1 through whatever.

11            MR. TEPFER:  Okay.

12            MR. ESENSTEN:  So I'll mark mine.  You

13   should mark the witness's, so that we are talking --

14   oh, it's two sides again.

15            MR. TEPFER:  Yes.

16            MR. GALLEGOS:  I saw that, too.

17            MR. ESENSTEN:  Let me just report to Diane

18   one second as to how we're doing, and I'll -- give

19   us a second.

20            MR. GALLEGOS:  Off record for a second.

21            MR. ESENSTEN:  No, we don't have to.  I

22   won't be talking to her.

23   BY MR. TEPFER:

24      Q.    If I could hand --

25            MR. ESENSTEN:  Why don't you, in the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

145

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1   meantime, mark the pages, and this way, while you're

2   doing that, I'll finish this up.

3        24 pages.

4   BY MR. TEPFER:

5     Q.   Okay.  Handing Exhibit 54 to Mr. Nottea.  On

6   the first page is an email.

7        Do you recall sending this email to your

8   brother?

9     A.   Yes.

10    Q.   Did you review the files attached to this

11  email?

12    A.   No.

13    Q.   Do you remember attaching these files?

14    A.   Yeah.

15    Q.   Why did you send these files to your

16  brother?

17    A.   I guess they were probably on one of the

18  computers in the office, and he asked me to send it

19  to him.

20    Q.   Did he explain why he wanted you to send

21  these files?

22    A.   No.  He just told me "Send me the files on

23  Pierre."  And that's what I send him.

24    Q.   54-2, if you take a look at 54-2, do you

25  recognize that invoice?

146

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      A.   No.   This is same as before.   No.

2           MR. ESENSTEN:   It's the same as the previous

3   version.

4           MR. TEPFER:   Right.   This version was

5   electronic, so I'm not sure he -- when he sent the

6   email.

7   BY MR. TEPFER:

8      Q.   On 54-3, do you recognize the signature on

9   that check?

10     A.   Yes.

11     Q.   Whose is it?

12     A.   My brother.

13     Q.   And that is a payment to your company; is

14  that correct?

15     A.   Yes.

16     Q.   Do you know what that payment was for?

17     A.   No.

18     Q.   Did you cash that check?

19          MR. ESENSTEN:   Is he the person that cashed

20  the check; is that your question?

21          MR. TEPFER:   Yes.

22          THE WITNESS:   No.

23  BY MR. TEPFER:

24     Q.   Do you know if Alan Argaman cashed that

25  check?

147

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.   Possible.

 2      Q.   Do you know if this was deposited in Secured

 3   Commerce's bank account?

 4      A.   I can't recall.  I guess so.  I don't know.

 5      Q.   Was there anyone, aside from you or

 6   Mr. Argaman, that handled Secured Commerce's bank

 7   accounts?

 8      A.   Of course.

 9      Q.   Who are these individuals?

10      A.   Philip.

11      Q.   And did Philip have signatory authority for

12   Secured Commerce's bank accounts?

13      A.   No.

14      Q.   Who had signatory authority for Secured

15   Commerce's bank accounts?

16      A.   Alan and me.

17      Q.   And for what period did you and Alan have

18   signatory authority?

19      A.   Since the beginning until now.

20           (Mr. Alon Nottea leaves the room.)

21   BY MR. TEPFER:

22      Q.   If you would take a look at -- I guess it's

23   54-9.  Just to make sure we're talking about the

24   same thing, it says Dayo World, Inc., at the top.

25           (Mr. Alon Nottea enters the room.)
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

148

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    BY MR. TEPFER:
2        Q.    Do you recognize this invoice?
3        A.    No.
4              MR. ESENSTEN:  54-9?  I have that 54-10.
5              MR. TEPFER:  That could be.  I was just
6    counting.  Mine aren't marked.
7              MR. ESENSTEN:  Mine shows 9.  9 shows 10.
8    If we're going to end up with 24, it has to be
9    correct.  At least we agree on that.
10             MR. TEPFER:  Well --
11             MR. ESENSTEN:  Here, look at mine and make
12   sure I didn't make a mistake.
13             MR. TEPFER:  Sure.  I think this one skips
14   4.  There's no page 4 in your version, for some
15   reason.
16             MR. ESENSTEN:  What?
17             MR. TEPFER:  Yeah, you skipped 4.
18             MR. ESENSTEN:  Oh, my number is off.  Okay.
19   BY MR. TEPFER:
20       Q.    On 54-9, the Dayo World, Inc., invoice, do
21   you recall reviewing this invoice?
22       A.    No.
23       Q.    Do you know if Adageo sold AuraVie products?
24       A.    No, I don't know.
25       Q.    Do you know who drafted this invoice?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

149

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.   No idea.  Never seen it before.

 2      Q.   On the next page, 54-10, do you recognize

 3   that signature?

 4      A.   Yes.

 5      Q.   And whose is it?

 6      A.   My brother.

 7      Q.   I'm sorry?

 8      A.   My brother Alon.

 9      Q.   Okay.

10           MR. ESENSTEN:  Are we done with 54?

11           MR. TEPFER:  Yeah, I think so.

12           MR. ESENSTEN:  Do you want some water or --

13           THE WITNESS:  No, I'm okay.

14           (Plaintiff's Exhibit 56 was marked

15           for identification by the court

16           reporter and is attached hereto.)

17   BY MR. TEPFER:

18      Q.   Now I'm handing Mr. Nottea what has been

19   marked Exhibit 56.

20           Do you recall receiving this email from

21   David Davidian?

22      A.   Yeah.

23      Q.   Did you meet with Mr. Davidian around

24   June 21st, 2011?

25      A.   I guess so, yes.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1       Q.   Do you remember that meeting?
 2       A.   I remember him coming to Gloria, the office,
 3   and he met with Khristopher.  I was not part of the
 4   meeting.
 5       Q.   So you didn't personally meet with him?
 6       A.   I greet him at the door.  I introduced him
 7   to Alon and Khristopher, and they took the meeting.
 8       Q.   And so you were at 7900 Gloria that day?
 9       A.   At that time, yes.  In that -- the time
10   period.
11       Q.   Do you recall what you were doing there?
12       A.   What am I doing there?  Used to be my
13   building before.  So my adult entertainment used to
14   be at that building before.
15       Q.   Okay.  So you also ran a business out of
16   7900 Gloria?
17       A.   How to -- my --
18            MR. ESENSTEN:  Objection as to "also."
19   Sounds argumentative.
20            Can you rephrase it.
21   BY MR. TEPFER:
22       Q.   In 2011 did you also run a business out of
23   7900 Gloria?
24       A.   Yes.
25       Q.   What business was that?
```

151

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      A.    My adult business.

2      Q.    Do you have more than one adult business?

3      A.    I have a few adult business.

4      Q.    Okay.  And so you were there that day, I

5  guess, managing your adult business?

6      A.    Yes.  I had an office there as well.  So

7  we're actually clear, used to be my office before.

8      Q.    Sure.

9            How often during the period that BunZai

10  Media operated at 7900 Gloria, how often would you

11  be at that address?

12           MR. ESENSTEN:  Objection; vague as to time,

13  overbroad, vague.

14           THE WITNESS:  Two, three hours a week,

15  maybe.  A few hours here and there.

16  BY MR. TEPFER:

17      Q.    Okay.  Did you discuss the BunZai -- or

18  rather, the AuraVie companies' corporate structure

19  with Mr. Davidian around June 21st, 2011?

20      A.    No.

21      Q.    Do you know if your brother did?

22      A.    According to this, yes.  Obviously, if he

23  was there, he met him.

24      Q.    Did you, around this time, discuss the

25  BunZai or the AuraVie's corporate structure?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

152

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

```
 1     A.    No.
 2           (Plaintiff's Exhibit 58 was marked
 3           for identification by the court
 4           reporter and is attached hereto.)
 5           MR. TEPFER:  58, real quick.  I'm sorry.
 6    This is 58 and Attachment A, and it isn't, you know,
 7    numbered so --
 8           MR. ESENSTEN:  Let's number the pages, just
 9    so we're --
10           MR. TEPFER:  Okay.
11           MR. ESENSTEN:  -- on the same wavelength.  I
12    have 12.
13           MR. TEPFER:  Same here.  I am now handing
14    what's marked Exhibit 58 to Mr. Nottea.
15    BY MR. TEPFER:
16      Q.   On the first page of Exhibit 58 is an email.
17    Do you recall sending this email?
18      A.   No, never seen this email before.  Never
19    seen this paper before.
20           Just for the record, I want to say
21    something.  I think that the reason you're seeing my
22    name here is because maybe when somebody scanned the
23    paper, they sent it from my email, because a bunch
24    of these things I never seen before.
25           MR. ESENSTEN:  Okay.
```

153

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

    1          THE WITNESS:  Yeah.

    2          MR. ESENSTEN:  He's going to ask the next

    3   question.

    4          THE WITNESS:  I can't even comment about

    5   that.

    6   BY MR. TEPFER:

    7     Q.   On the following page, or the following

    8   pages of Exhibit 58 is a Consumer Product Evaluation

    9   for The Institute for Skin Research.  Did you ever

   10   review this, I guess, study?

   11     A.   No.

   12     Q.   Did you ever do, ever review any studies

   13   concerning skin care products for the AuraVie

   14   companies?

   15     A.   Never.

   16     Q.   Would Nastassia in, I guess, 2012 or 2013

   17   provide you monthly reports concerning BunZai Media

   18   Group's sales and chargebacks, to your knowledge?

   19          MR. UNGAR:  Objection as to the form of the

   20   question.  It's asked and answered.  But aside from

   21   that, it's vague and ambiguous, assumes facts not in

   22   evidence, and misstates prior testimony of the

   23   witness.

   24          THE WITNESS:  I never asked to do report, so

   25   I don't know.  Again, it might be in the string of

154

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    an email.  I never asked, never do those reports.

2    It wasn't part of my duties, so no.

3              MR. TEPFER:  57.

4              MR. ESENSTEN:  Wait, wait, wait.  I have

5    25 -- 26 pages; is that correct?

6              MR. GALLEGOS:  I have 36.

7              MR. ESENSTEN:  36 pages.  I probably screwed

8    that up.

9              MR. TEPFER:  No problem.

10             MR. ESENSTEN:  Whoa.  Hold on.  I think I

11   really messed this up.  That's why it's always good

12   to pre-mark exhibits with the numbers.

13             Okay.  Thank you.  Go ahead.  Did you give a

14   copy to the witness?

15             MR. TEPFER:  Oh, sorry.

16             THE WITNESS:  It's okay.  I'll follow you.

17             (Plaintiff's Exhibit 57 was marked

18             for identification by the court

19             reporter and is attached hereto.)

20   BY MR. TEPFER:

21      Q.   Yeah, this is Exhibit 57.  On the first

22   page, do you recall receiving this email from

23   Nastassia?

24      A.   I guess so, yes.

25      Q.   Did she typically send you monthly email

155

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    breakdowns in this format?

2        A.    No.

3            MR. UNGAR:  Objection as to the form of the

4    question, it's vague and ambiguous.

5    BY MR. TEPFER:

6        Q.    Did you ever request that she send you these

7    documents?

8        A.    No.  I think the reason she did send it --

9            MR. ESENSTEN:  He didn't ask you that.

10           THE WITNESS:  This --

11           MR. ESENSTEN:  Did he ask you that question?

12           THE WITNESS:  No.

13           MR. ESENSTEN:  Okay.  Next question.

14   BY MR. TEPFER:

15       Q.    Where do you think she sent you these

16   documents?

17           MR. UNGAR:  Objection as to the form of the

18   question, it's vague and ambiguous, lacks

19   foundation, calls for speculation.

20           THE WITNESS:  I think because, from time to

21   time they used to use my American Express, so she

22   wanted -- she wanted to show me that it was paid.

23   BY MR. TEPFER:

24       Q.    Who --

25       A.    That's why I see my name here.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1       Q.   Who used your American Express?

2       A.   I guess my brother or BunZai.

3       Q.   Do you know during what period your brother

4    periodically used your American Express card for

5    BunZai?

6       A.   No.

7       Q.   Did you give him permission to do that?

8       A.   Of course.

9            MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous.

11   BY MR. TEPFER:

12      Q.   Do you know why he needed to use your

13   American Express card?

14           MR. ESENSTEN:  Object.

15           MR. UNGAR:  Objection as to the form of the

16   question, it's vague and ambiguous, calls for

17   speculation, lacks foundation.

18           MR. ESENSTEN:  Objection; speculation, lack

19   of foundation.

20           THE WITNESS:  I liked -- I like miles, so

21   every time they used to charge my credit card, I get

22   miles.  So that's the reason.

23   BY MR. TEPFER:

24      Q.   In the first column on the second page, it

25   refers to Dead Sea.  Do you know what Dead Sea is?

157

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1          MR. UNGAR:  Objection as to the form of the

2     question, vague and ambiguous.

3          MR. ESENSTEN:  Dead Sea, is that what you

4     said?

5          MR. TEPFER:  In the first column.  I think

6     it's two, three --

7          MR. ESENSTEN:  Yeah, I see.

8          THE WITNESS:  No.

9  BY MR. TEPFER:

10     Q.   Do you know what SignaPay is?

11     A.   Yes.  The -- a processor.

12     Q.   Do you know if the AuraVie companies ever

13     used SignaPay as a processor?

14     A.   I think so.

15     Q.   What period of time do you think the BunZai

16     companies used SignaPay as a processor?

17     A.   I don't know.

18          MR. UNGAR:  Objection as to the form of the

19     question, vague and ambiguous, seeks impermissible

20     opinion, improper hypothetical, lacks foundation,

21     calls for speculation.

22          THE WITNESS:  I don't know.

23  BY MR. TEPFER:

24     Q.   Did you use the information from this

25     spreadsheet to do your bookkeeping?

158

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.   No.
 2           MR. ESENSTEN:  And are you referring to what
 3      page of this document?
 4           MR. TEPFER:  Just generally any of these.
 5           THE WITNESS:  No.
 6  BY MR. TEPFER:
 7      Q.   Any spreadsheet?
 8      A.   No.  No.
 9      Q.   Would you typically review the charges on
10      your American Express during 2012?
11      A.   Of course.
12      Q.   Do you know what Adblade is?
13           MR. ESENSTEN:  Can you spell that for the
14      court reporter?
15           MR. TEPFER:  It's A-d-b-l-a-d-e.
16           MR. ESENSTEN:  And you're look on what page?
17           MR. TEPFER:  This is on page 26.
18           THE WITNESS:  From what I see here, it
19      says -- Adblade, sorry.  It says, I guess, internal
20      marketing.  That's what they do.
21  BY MR. TEPFER:
22      Q.   What is internal marketing?
23           MR. ESENSTEN:  If you know.
24           THE WITNESS:  I don't know.
25           Done with this (indicating)?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

159

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    BY MR. TEPFER:

2        Q.   Yeah, on that one.

3             I'm handing the witness --

4             MR. ESENSTEN:  This is Exhibit 21?  I'll

5    mark the numbers.

6             MR. TEPFER:  And this has already been

7    filed.  It has page numbers here at the bottom for

8    reference.  This was filed in -- a while ago.

9             MR. ESENSTEN:  You mean on the top?

10            MR. TEPFER:  Well, and also right -- right

11   there (indicating).

12            MR. ESENSTEN:  So then this is not proper.

13   You have to give him the entire exhibit.  You just

14   gave him page 1.  You can't start an exhibit in the

15   middle.

16            MR. TEPFER:  Is there --

17            MR. ESENSTEN:  This starts at page 2.

18            MR. TEPFER:  It should start at page 1.

19            MR. ESENSTEN:  Why don't you look at it?

20            MR. GALLEGOS:  It's missing 1.

21            MR. TEPFER:  Yeah, I think one page is

22   missing.

23            MR. GALLEGOS:  I found the other part of it.

24   I think that one's single sided.

25            MR. TEPFER:  Sorry.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1              MR. GALLEGOS:  That's okay.

 2              Sorry about that, Bob.

 3              MR. ESENSTEN:  No problem.  Give him a

 4      chance to look at it, please.  Do you want to give

 5      one to the witness, please.

 6              MR. TEPFER:  Do you -- oh, I'm holding

 7      yours.

 8              THE WITNESS:  Yeah.

 9              MR. ESENSTEN:  Okay.

10              (Plaintiff's Exhibit 21 was marked

11              for identification.)

12      BY MR. TEPFER:

13         Q.  Do you recall receiving this email from your

14      brother?

15         A.  Yes.

16         Q.  In the email it refers to a UMS reserve.  Do

17      you know what that is?

18              MR. ESENSTEN:  Where are you referring to?

19              MR. TEPFER:  The second sentence of the

20      email.

21              MR. ESENSTEN:  Of the first page?  You're

22      pointing to about 25 percent down.

23              MR. TEPFER:  Yeah.

24              MR. ESENSTEN:  Under "Please see attached",

25      addressed to Paul --
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1          MR. TEPFER:  Yeah.

2          MR. ESENSTEN:  -- is that what you're

3    referring to.

4          MR. TEPFER:  Uh-huh.

5          MR. ALON NOTTEA:  Can I make sure I'm

6    looking at the same thing you are?

7          MR. ESENSTEN:  You said "uh-huh."  Does that

8    mean yes?

9          MR. TEPFER:  Yes.

10          MR. ALON NOTTEA:  Where is it?  Is that

11    page 1?

12          THE WITNESS:  Yeah.

13          MR. ESENSTEN:  Hold on.

14          MR. GALLEGOS:  I'll find it.  We're still on

15    Exhibit 21; correct?

16          MR. TEPFER:  Yeah, 21.

17          MR. ALON NOTTEA:  If you have the first

18    page --

19          MR. TEPFER:  What's that?

20          MR. GALLEGOS:  Getting late in the day.

21          MR. TEPFER:  Don't worry about it.

22          MR. ALON NOTTEA:  Thank you.  Thank you.

23          MR. TEPFER:  All right.  Would you mind

24    reading the question.

25          (The previous question was read back

162

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

          1              by the court reporter as follows:

          2                  "QUESTION:  In the email it

          3              refers to a UMS reserve.  Do you know

          4              what that is?")

          5              THE WITNESS:  From what I know, a reserve is

          6    money that is in reserve, and that's specified here,

          7    some amounts of money they're going to get released.

          8              MR. ESENSTEN:  He just asked if you know

          9    what a UMS reserve is; yes or no.

         10              THE WITNESS:  Yes.

         11              MR. ESENSTEN:  Okay.  Next question, please.

         12    BY MR. TEPFER:

         13       Q.   And that's for a merchant account; is that

         14    correct?

         15       A.   I believe so, yes.

         16       Q.   And did you review these EVO processing

         17    reports when you received this email?

         18              MR. ESENSTEN:  What is these EVO processing

         19    reports you're referring to?

         20              MR. TEPFER:  Well --

         21              MR. ESENSTEN:  I -- I -- your question is

         22    vague.

         23              MR. TEPFER:  Well, let's just see.

         24              THE WITNESS:  No.

         25              MR. ESENSTEN:  I still don't -- I'm sorry.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    I'm entitled to know the question.  Where are you

2    referring to?

3            MR. TEPFER:  It says "EVO remaining

4    processing reports" but --

5            MR. ESENSTEN:  Thanks.

6            THE WITNESS:  I don't.

7            MR. ESENSTEN:  Wait for the question.

8    BY MR. TEPFER:

9        Q.   Do you know who Joyce Gaines is?

10       A.   No.

11       Q.   Do you know if the AuraVie companies did a

12   layered decrease in sales volume in 2013?

13           MR. UNGAR:  Objection as to the form of the

14   question --

15           MR. ESENSTEN:  Objection; vague.

16           MR. UNGAR:  -- vague and ambiguous.

17           THE WITNESS:  No.

18   BY MR. TEPFER:

19       Q.   Do you know if your brother had a position

20   at Media Urge in 2014?

21       A.   I think he did.

22       Q.   Did he have an ownership interest in that

23   company?

24       A.   No.

25           MR. UNGAR:  Objection as to form of the

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1      question, vague and ambiguous.

2              THE WITNESS:  No, not that I know of.  No.

3      BY MR. TEPFER:

4        Q.    What was his position at Media Urge?

5              MR. UNGAR:  Objection as to the form of the

6      question, vague and ambiguous, lacks foundation --

7              MR. ESENSTEN:  He just testified he doesn't

8      know.

9              MR. UNGAR:  -- assumes facts not in

10     evidence, and calls for speculation.

11             MR. ESENSTEN:  I heard his answer was he did

12     not have a position.

13             MR. TEPFER:  Oh, sorry I -- I misunderstood.

14             MR. GALLEGOS:  I think he said he didn't

15     have an ownership position, but he had a position --

16             MR. TEPFER:  Can we get it read back?

17             MR. GALLEGOS:  Yeah.

18             MR. UNGAR:  Probably two or three questions

19     back.

20             (The previous question and answer

21             were read back by the court reporter

22             as follows:

23                 "QUESTION:  Did he have an

24             ownership interest in that company?

25                 "ANSWER:  No.  No, not that I

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

```
 1          know of.  No.")
 2          MR. UNGAR:  And before that.
 3          (The previous question and answer
 4          were read back by the court reporter
 5          as follows:
 6              "QUESTION:  Do you know if your
 7          brother had a position at Media Urge
 8          in 2014?
 9              "ANSWER:  I think he did.")
10   BY MR. TEPFER:
11      Q.   Okay.  What was that position?
12      A.   I don't know.
13      Q.   What makes you think that your brother had a
14   position at Media Urge?
15      A.   What makes me think?  I don't know.  I've
16   seen business cards of his.  That -- that's how I
17   think.
18      Q.   Do you recall what title was on those
19   business cards of your brother's from Media Urge?
20      A.   Rainmaker.
21      Q.   Do you know why your brother went by the
22   title of Rainmaker at Media Urge?
23      A.   I don't know even know what Rainmaker means.
24      Q.   On the second page of Exhibit 21,
25   Attachment O, at around the middle of the page
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      there's a paragraph that begins "Due to new".  Would

2      you mind reading that sentence?

3          A.    "Due to new compliance regulations that are

4      coming out soon (FTC, VISA, MasterCard), and due to

5      the aggressive marketing nature of these external

6      affiliates/marketers which we have to monitor and

7      police daily.  We have decided to 'stop' new

8      AuraVie, Dellure, and Miracle face kit, new customer

9      acquisitions.  This means that we will quickly see

10     new transactions fading away and over the next few

11     months, we are just going to go thru the existing

12     subscriptions re-bills we have in our system."

13         Q.    Did you read this portion of the email when

14     you received it?

15         A.    No.

16         Q.    Do you know if --

17             MR. ESENSTEN:  When you're ready, I have a

18     concern about the exhibit.  So let me know when

19     you're ready.

20     BY MR. TEPFER:

21         Q.    Do you know, did you ever discuss with your

22     brother his concerns about FTC regulations?

23         A.    No.

24             MR. ESENSTEN:  While you're in between

25     questions, we have two Exhibit 21's.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1          MR. TEPFER:  We do?

2          MR. ESENSTEN:  We do.  One shows Exhibit

3    Attachment A, and the other one is Attachment O.

4    We're going to have a mess of a time with the

5    exhibits if you --

6          MR. TEPFER:  Which is the second exhibit,

7    Exhibit 21?

8          MR. ESENSTEN:  Exhibit 21 is the one you

9    marked.  It's an email of August 14th, 2013.

10          MR. TEPFER:  That's a different -- that's

11    Attachment A of Exhibit 21.

12          MR. ESENSTEN:  You're going to have a mess

13    of a time --

14          MR. TEPFER:  Right, but this is already --

15          MR. ESENSTEN:  -- figuring out the exhibits.

16          MR. TEPFER:  But I think we filed Exhibit 21

17    already, and Exhibit 21 is a declaration of, I

18    believe, our investigator testifying as to

19    certain -- the authenticity of certain exhibits.  So

20    that's -- you know, that's why we have it by

21    attachments.  I think it makes the most sense to,

22    you know, proceed with labeling them as attachments.

23    That's how we've been referring to them in other

24    documents, just for consistency.

25          MR. ESENSTEN:  The problem that you're going

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    to have is exhibits that have been marked at

2    depositions have to be the same exhibits that have

3    to be used at time of trial.  So you're going to

4    have two Exhibit 21's.  If you tell the court you

5    have Exhibit 21 Attachment A, and then Attachment O,

6    and then you're trying to use it at the time of

7    trial to have a witness identify an exhibit and the

8    various pages -- so, for instance, this document has

9    Exhibit 21, 1 through 5, this Exhibit 21 has page

10   1 -- the court's going to be real unhappy with

11   this --

12          MR. TEPFER:  Should we --

13          MR. ESENSTEN:  -- confusion.

14          MR. TEPFER:  Do you want to go off the

15   record and discuss it?

16          MR. GALLEGOS:  Let's go off the record.

17          (A discussion was held off the record.)

18          MR. ESENSTEN:  Let's go back on the record,

19   please.

20          Ms. Reporter, we're on the record, but

21   during the break I told counsel for the FTC that we

22   have two Exhibit 21's.  One is deemed Attachment A,

23   the other is Attachment O, and it's my belief that

24   that's going to be confusing.  There's a --

25   allegedly, a declaration that has various

169

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Exhibit 21's with various attachments, and the local

2      rules require you consecutively mark exhibits.  So I

3      think it's confusing.  I think it's going to be

4      confusing for the witness later on when he reviews

5      the transcript, and it will definitely be confusing

6      at the time of trial and for other depositions.

7      I've asked counsel to consider it.  They have

8      thought about it and apparently want to go forward

9      the way it presently is.

10             So I want it clear on the record that I

11     don't think it's the proper method and I think it's

12     confusing and that it will affect us adversely later

13     on.

14             MR. UNGAR:  I join in the objection and

15     further state that in my view, the Plaintiff's

16     counsel is acting in noncompliance with local rules

17     after notice.

18             MR. TEPFER:  All right.  Could you read back

19     the last question.

20             (The previous question and answer

21             were read back by the court reporter

22             as follows:

23                 "QUESTION:  Do you know, did you

24             ever discuss with your brother his

25             concerns about FTC regulations?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

170

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1              ANSWER:  No.")

2          MR. TEPFER:  Let's go to Exhibit 50.

3          MR. GALLEGOS:  Which one?

4          MR. TEPFER:  50.

5          (Plaintiff's Exhibit 50 was marked

6          for identification by the court

7          reporter and is attached hereto.)

8          MR. ESENSTEN:  This is, again, highlighted

9      by you?

10         MR. TEPFER:  Yes.

11         MR. ESENSTEN:  Are you ready?

12         THE WITNESS:  Ready.  Yeah.

13     BY MR. TEPFER:

14     Q.   Do you recall receiving this email from

15     Stephan Bauer?

16     A.   I think so, yes.

17     Q.   Do you know why he went to China?

18         MR. ESENSTEN:  Objection; speculation.

19         Withdraw that objection.

20         MR. UNGAR:  Objection; it assumes facts not

21     in evidence, vague and ambiguous.

22         THE WITNESS:  Why he went to China?

23     BY MR. TEPFER:

24     Q.   Yes.  Do you know why Stephan Bauer went to

25     China?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1     A.   I guess he was trying to help Alon.  I mean,
2  I've seen this email.  I never --
3          MR. ESENSTEN:  Do you know why he went to
4  China; yes or no?
5          THE WITNESS:  No.
6  BY MR. TEPFER:
7     Q.   And you said he was trying to help Alon --
8     A.   I'm reading it now.  That's why I know.
9          MR. ESENSTEN:  Listen to his question.
10          THE WITNESS:  Yeah.
11          MR. ESENSTEN:  Okay.  He hasn't finished.
12  BY MR. TEPFER:
13     Q.   Do you know what he was trying to help Alon
14  with?
15     A.   No.
16     Q.   Do you know if your brother had any plans
17  for mass marketing skin care?
18          MR. ESENSTEN:  Objection; vague --
19          THE WITNESS:  No.
20          MR. ESENSTEN:  -- vague as to time,
21  ambiguous.
22          MR. UNGAR:  Join.
23          THE WITNESS:  No.
24  BY MR. TEPFER:
25     Q.   Did you ever, in December 2013, discuss with

172

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    Stephan Bauer plans for the marketing of skin care
2    products abroad or overseas?
3        A.    No.
4        Q.    Do you know if the AuraVie companies
5    purchased their skin care products from China?
6        A.    I don't know, no.
7        Q.    During your bookkeeping for the AuraVie
8    companies, did you ever issue checks to companies
9    based in China?
10            MR. UNGAR:   Objection; vague and ambiguous,
11   assumes facts not in evidence, calls for
12   speculation.
13            THE WITNESS:   China, possible.   I don't
14   know.   I mean, I can't recall.   I made so many
15   payments that I have no idea.   No.
16   BY MR. TEPFER:
17       Q.    Do you know if the AuraVie companies had any
18   merchant accounts in Estonia?
19       A.    No.
20       Q.    During the time that you were bookkeeper, do
21   you know if the AuraVie companies had any merchant
22   accounts in Latvia?
23       A.    No.
24       Q.    During the time that you were bookkeeper, do
25   you know if the AuraVie companies had any merchant

173

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      accounts in Israel?

2         A.   No.

3         Q.   I guess from the time that you were

4      bookkeeper, do you know if the AuraVie companies

5      transferred any money to banks located in Estonia?

6              MR. UNGAR:  Objection as to the form of the

7      question, it's vague and ambiguous.

8              THE WITNESS:  No.

9      BY MR. TEPFER:

10        Q.   And to clarify, are you saying that you

11     don't know or that they did not make those

12     transfers?

13        A.   I don't know.

14             MR. TEPFER:  If it works, we can take a

15     break real quick.

16             MR. ESENSTEN:  Sure.

17             MR. GALLEGOS:  Five-minute break?

18             MR. ESENSTEN:  Yeah.

19             (Recess)

20             MR. TEPFER:  Since you all are from here,

21     perhaps I'll go with you all's understanding and

22     just do -- if we can clarify for the record, rather

23     than having 21-A as -- you know, doing it that way,

24     we could just have 21-A be Exhibit 21, and then I

25     believe it was 21-O we were discussing earlier; is

174
Nottea
FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1   that correct?

2             MR. ESENSTEN:  Mm-hmm.

3             MR. GALLEGOS:  That's correct.

4             MR. TEPFER:  We can make that Exhibit 60?

5             MR. ESENSTEN:  Okay.

6             MR. TEPFER:  And I have a few more --

7             MR. ESENSTEN:  So 21-O, we're going to

8   change -- we're on the record; right?  We're going

9   to change to Exhibit 60?

10            MR. GALLEGOS:  Correct.

11            MR. ESENSTEN:  Okay.  So we got -- I'm

12  sorry.  Give me one second.  60-1, 60-2, 60-3.

13            MR. TEPFER:  And I have a few --

14            MR. ESENSTEN:  Wait, wait, wait.  I have

15  60-1 through 5.  Is that what you have?

16            MR. TEPFER:  Oh, let's look at 21 real

17  quick.

18            MR. GALLEGOS:  The other option, Bob,

19  instead of making them 21-A, B, C, just making them

20  21-1, 2, 3, 4, whatever the corresponding letter.

21            MR. ESENSTEN:  We can do that.  We just have

22  to be sure we have a 21 dash something or other or a

23  new number.

24            MR. GALLEGOS:  Do you want to do that?

25            MR. ESENSTEN:  I --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. TEPFER:  The problem is we've been doing

2      21-1 to mean page 1, rather than, you know --

3          MR. ESENSTEN:  Right.

4          MR. TEPFER:  So I think it's better to do it

5      just as a separate exhibit.

6          MR. GALLEGOS:  All right.

7          MR. ESENSTEN:  Just so we're clear, I'm

8      handing you a business card with my phone number and

9      office number, so if the court, if there's some

10     issue about tomorrow, you have the phone numbers to

11     have them call.

12         MR. GALLEGOS:  Sure.

13         MR. ESENSTEN:  Thank you.

14         MR. UNGAR:  And the clerk Javier, he has my

15     phone number.

16         MR. ESENSTEN:  And one more thing, Reid,

17     just to be safe, I'll put my phone number.

18         MR. GALLEGOS:  We have limited time so --

19         MR. ESENSTEN:  Okay.  So we now have a card

20     with all my numbers on it.

21         MR. GALLEGOS:  Thank you, Bob.

22         (Plaintiff's Exhibit 21 was re-marked

23          for identification by the court

24          reporter as Exhibit 60 and is

25          attached hereto.)

176

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1    BY MR. TEPFER:

2        Q.   Do you know if your brother ever had any

3    ownership interest in Chargeback Armor, Inc.?

4        A.   He doesn't.

5        Q.   Has he at any point in the company's

6    existence had an ownership interest in Chargeback

7    Armor, Inc.?

8        A.   No.

9        Q.   Do you know if he ever --

10           Do you know if Alan Argaman ever had an

11   ownership interest in Chargeback Armor, Inc.?

12       A.   I'm not -- no, I don't think so.  No.

13       Q.   Do you know if Alan Argaman ever served as

14   Chief Technology Officer for Chargeback Armor, Inc.?

15       A.   No.

16           MR. ESENSTEN:  No or you don't know?

17           THE WITNESS:  I don't know.

18           (Plaintiff's Exhibit 59 was marked

19           for identification by the court

20           reporter and is attached hereto.)

21           MR. ALON NOTTEA:  Thank you.

22   BY MR. TEPFER:

23       Q.   Doron, do you remember receiving this email?

24       A.   Yes, I believe so.

25       Q.   Do you know the Lime Light account that

177
Nottea
FTC v. Bunzai Media Group, Inc., et al.                                1/20/2016

```
 1     Mr. Medina is referring to?
 2         A.    I don't know the account, no.
 3         Q.    Did you in 2013 manage the Lime Light
 4     accounts for the AuraVie companies?
 5               MR. ESENSTEN:  Objection; vague.
 6               THE WITNESS:  No.
 7     BY MR. TEPFER:
 8         Q.    Did you have an ownership interest in 2013
 9     in Secured Merchants?
10         A.    No.
11         Q.    Did you -- let's see.  Did you have any
12     position at Secured Merchants in 2013?
13         A.    No, never.
14         Q.    Do you know why Paul would run this request
15     by you?
16         A.    To get a --
17               MR. UNGAR:  Objection as to the form of the
18     question, it's vague and ambiguous.
19               THE WITNESS:  I believe just to get a credit
20     card and number.
21     BY MR. TEPFER:
22         Q.    And so did you do bookkeeping at this time
23     for Secured Merchants?
24         A.    I think so.
25         Q.    Did you have signatory authority over
```

178

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Chargeback Armor's bank accounts in June of 2015?

2          A.    Yes.

3          Q.    Who requested that you have signatory

4      authority over those accounts?

5          A.    The owner, Michael Costache.

6          Q.    Do you know anyone else that has worked at

7      Chargeback Armor, Inc., since its inception?

8              MR. ESENSTEN:  Objection; vague, overbroad.

9              MR. UNGAR:  Join.

10             THE WITNESS:  Roi.  Roi Reuveni.

11     BY MR. TEPFER:

12         Q.    Do you know who created the software, the

13     Chargeback Armor software used by Chargeback Armor,

14     Inc.?

15         A.    No.

16         Q.    Do you know what the business of Chargeback

17     Armor, Inc., is?

18         A.    No.

19         Q.    Do you know if your mother ever had a

20     merchant account in her name, through which

21     Chargeback -- through which AuraVie products were

22     sold or processed?

23         A.    Yes, she did.

24         Q.    Do you know who asked her to open a merchant

25     account in her name?

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1        A.    I guess my brother.
 2        Q.    Do you know why he asked your mother to open
 3   that account?
 4        A.    No.  His mother.  I don't know.
 5        Q.    Do you know if your father has a merchant
 6   account in his name, through which AuraVie products
 7   were sold or charged?
 8        A.    I know he had one, yes.
 9        Q.    Do you know if he had more than one?
10        A.    No, I don't know.  No.
11        Q.    Did your brother also request that your
12   father open that account?
13        A.    I guess so, yes.
14        Q.    Did you ever sign any documents on your
15   father's behalf for these payment processors or
16   merchant accounts?
17        A.    No.
18        Q.    Did you ever sign Stephan Bauer's name on
19   any bank documents relating to the AuraVie
20   companies?
21        A.    No.
22        Q.    Do you know which company your mother had a
23   merchant account with?
24        A.    I think Lifestyle something.  Lifestyle
25   Brands, maybe.  I'm not sure.
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1     Q.    Was she the owner of Lifestyle Media -- or

2  is it Lifestyle Media, I believe?

3     A.    I believe so.

4     Q.    Do you know when she created that company?

5     A.    No.

6     Q.    Did Alon ask her to create that company?

7           MR. UNGAR:  Objection; vague and ambiguous.

8  Objection as to the form of the question.  It's

9  vague and ambiguous, it calls for speculation, lacks

10  foundation.

11          THE WITNESS:  No.

12  BY MR. TEPFER:

13     Q.    No as in he --

14     A.    I don't know.

15     Q.    Okay.  During your time as bookkeeper, did

16  you ever pay for any of the websites used to market

17  AuraVie skin care products?

18     A.    No.

19     Q.    Did you ever authorize anyone to use a

20  credit card in your name to pay for websites used to

21  market AuraVie products?

22     A.    It's so vague.  I don't know.  I mean, they

23  use my credit card -- what is it for?

24     Q.    Did you ever use corporate credit cards in

25  the name or other corporate credit cards associated

181

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    with the AuraVie companies for personal purchases?

2           MR. UNGAR:  Objection as to the form of the

3    question, vague and ambiguous.

4           MR. ESENSTEN:  I join on that, those

5    objections.

6           THE WITNESS:  No.

7    BY MR. TEPFER:

8       Q.   Do you know why Alon never asked you to open

9    a merchant account in your name?

10          MR. ESENSTEN:  Objection --

11          MR. UNGAR:  Object.

12          MR. ESENSTEN:  -- speculation, lack of

13   foundation, assumes facts not in evidence.

14          MR. UNGAR:  Join.

15          MR. ESENSTEN:  If I didn't say vague, I

16   would like to.

17          MR. UNGAR:  Join.  And argumentative.

18          THE WITNESS:  The answer is no.

19   BY MR. TEPFER:

20      Q.   Do you know who Andrew Stanley is?

21      A.   Yes.

22      Q.   Where do you know him from?

23      A.   I've seen him at the building in Gloria, in

24   the old building that --

25      Q.   Do you know what he did at the Gloria

182

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    building?

2        A.    No.

3        Q.    Do you know if he worked for BunZai?

4        A.    I think so, yes.

5        Q.    Do you know if he worked for Pinnacle?

6        A.    Yes.  Probably, yes.

7        Q.    Do you know who his supervisor was?

8            MR. ESENSTEN:  Objection; vague.

9            THE WITNESS:  Supervisor, Khristopher Bond.

10   BY MR. TEPFER:

11       Q.    During the time that you served as

12   bookkeeper for the AuraVie companies, did you ever

13   give any assignments to -- work assignments to

14   Mr. Stanley?

15       A.    No.

16       Q.    As bookkeeper, did you ever write any refund

17   checks for customers of the AuraVie companies?

18       A.    I don't think so, no.  No.

19       Q.    Do you know if your brother ever used the

20   alias J. Michaels?

21       A.    No.

22       Q.    Is that you don't know?

23       A.    No, I don't know.

24       Q.    During your time as bookkeeper, did you ever

25   use any aliases yourself?

183

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

 1     A.   No.
 2     Q.   Do you know if your father personally signed
 3  the merchant account applications for -- that he had
 4  opened in his name for selling AuraVie products?
 5     A.   I don't know.
 6          MR. GALLEGOS:  Let's take a break.  Off
 7  record.
 8          (Recess)
 9          MR. TEPFER:  Back on the record.
10  BY MR. TEPFER:
11     Q.   We just have a few more topics here.  I want
12  to talk about your office on Canby --
13     A.   Okay.
14     Q.   -- in Suite 105.
15     A.   Okay.
16     Q.   Is that your office?
17     A.   Yes.
18     Q.   Do you share that office with anyone?
19     A.   Yes.
20     Q.   Who?
21          MR. ESENSTEN:  And what time period are we
22  at?
23  BY MR. TEPFER:
24     Q.   What time period did you rent that space in
25  Suite 105?

184

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.    I think September, October 2012 until now.

 2      Q.    Okay.  And since you began renting that

 3   space in 2012, who all have you shared that office

 4   with?

 5      A.    Until recently it was only me and Alan.  He

 6   had his office and I had mine.

 7      Q.    And so did you all have a, I guess, a divide

 8   in Suite 105 where all your separate offices were?

 9      A.    There's one, two, three offices there.  One

10   for him, one for me.  One was like a --

11            MR. ALON NOTTEA:  Common area.

12            THE WITNESS:  Common area.

13   BY MR. TEPFER:

14      Q.    Okay.  Could you describe where your office

15   in Suite 105 was located?

16      A.    Come in, mine was the second office straight

17   in.  Alan was the first, mine was the second.

18   Actually, I'm sorry.  No.  One -- mine was the third

19   office.  There's a third office.  Alan was one,

20   there was one more, hallway, and then mine.

21      Q.    And --

22      A.    Yeah.

23      Q.    Okay.  Do you know what business Alan

24   Argaman ran out of that office in Suite 105 during

25   the period that you all shared that suite?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1          MR. UNGAR:  Objection as to the form of the
2     question, assumes facts not in evidence.
3          THE WITNESS:  I believe he ran Secret
4     Mansions.
5     BY MR. TEPFER:
6       Q.    And did you all also run Secured Commerce
7     out of that suite?
8       A.    Yeah.
9       Q.    Were any other businesses operated out of
10    Suite 105 since you began renting that space?
11      A.    In, I think, March or April, Chargeback
12    Armor took two rooms there.
13      Q.    Sorry.  Could you repeat that?
14      A.    I think in March or April Chargeback Armor
15    took two -- two rooms, the common -- the -- the
16    common area and the second office next to Alan.
17      Q.    So that's April 2015?
18      A.    Yes.
19      Q.    And Chargeback Armor, Inc., was renting, I
20    guess --
21      A.    Exactly.
22      Q.    -- renting two rooms in Suite 105?
23      A.    Yes.
24      Q.    And what Chargeback Armor employees were
25    working out of Suite 105 during that period?

186

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      A.    Michael -- Michael Costache was there, and
2   Roi was also there.
3      Q.    And did Michael or Roi pay rent to you for
4   that space?
5            MR. ESENSTEN:  Objection; assumes facts not
6   in evidence, speculation, vague.
7            And are you asking personally?  That's what
8   your question seems to infer, versus, corporate.
9   So --
10  BY MR. TEPFER:
11     Q.    Sure.
12           Did Chargeback Armor pay rent to anyone for
13  that space in Suite 105, to your knowledge?
14     A.    I don't know.  I don't know.
15     Q.    Did you personally issue the checks to pay
16  for the space in Suite 105?
17     A.    Yes.
18     Q.    Do you know the company that was on the
19  lease for Suite 105 --
20     A.    Yeah.
21     Q.    -- from the --
22     A.    Secured Commerce.  Actually, they did pay
23  rent.  They did pay rent.  Chargeback Armor did pay
24  rent.
25     Q.    And who did Chargeback Armor pay rent to?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1      A.   That was directly.

 2      Q.   They had a lease through the landlord, you

 3  said?

 4      A.   No.  They just paid their share, their

 5  portion, whatever it was.  They paid directly to the

 6  to the people -- people who owned the center over

 7  there.

 8      Q.   Okay.  Is it correct that in June 2015 you

 9  had pre-signed blank checks for the AuraVie

10  companies in your office in Suite 105?

11          MR. UNGAR:  Objection as to the form of the

12  question, it's vague and ambiguous.

13          THE WITNESS:  Yes.

14  BY MR. TEPFER:

15      Q.   Did you request that the owners of those

16  companies sign those checks?

17      A.   Yes.

18          MR. UNGAR:  Objection as to the form of the

19  question, it's vague and ambiguous.

20  BY MR. TEPFER:

21      Q.   Why did you request that they sign those

22  checks?

23      A.   If they're not available to pay a bill, if

24  they cannot come to pay a bill and the bill is due,

25  so we can make a payment.
```

188

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.   Did you also have, I suppose in June 2015,

2    deposit stamps for the AuraVie companies in your

3    office in Suite 105?

4      A.   I believe so, yes.

5      Q.   Who gave those to you?

6      A.   I believe when they moved out of the

7    Van Nuys office, they -- they brought me a bunch of

8    stuff.  I don't know if it was in boxes, in drawers.

9    I mean, I -- I never had to use them so --

10     Q.   When who moved out of the Van Nuys office?

11     A.   When the AuraVie companies moved out of

12   there.

13     Q.   Do you know where they moved to?

14     A.   They had -- they had a unit in the complex.

15   6914 Canby, Unit 107.

16     Q.   And is it's your understanding that the

17   AuraVie companies operated out of Suite 107?

18     A.   Yes.

19     Q.   Do you know of any other companies that

20   operated out of Suite 107?

21     A.   No.

22     Q.   Do you know if Focus Media Solutions, Inc.,

23   sold AuraVie products?

24     A.   No.

25     Q.   Do you -- is it true that Focus Media

189

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1    Solutions, Inc., is the successor to Media Urge,
 2    Inc.?
 3              MR. UNGAR:  Objection as to the form of the
 4    question, vague and ambiguous.
 5              MR. ESENSTEN:  Calls --
 6              MR. UNGAR:  Calls for speculation.
 7              MR. ESENSTEN:  And legal conclusion.
 8              THE WITNESS:  I don't know.  No.
 9    BY MR. TEPFER:
10       Q.   What, in your understanding, is the
11    relationship between BunZai Media Group, Inc., and
12    Pinnacle Logistics, Inc.?
13              MR. ESENSTEN:  Speculation.
14              MR. UNGAR:  Objection.
15              MR. ESENSTEN:  If any.
16              MR. UNGAR:  Objection as to the form of the
17    question, assumes facts not in evidence, vague and
18    ambiguous, calls for speculation, lacks foundation,
19    also.
20              THE WITNESS:  Repeat the question again.
21              MR. TEPFER:  Could you read it back, please.
22              (The previous question was read back
23              by the court reporter as follows:
24                 "QUESTION:  What, in your
25              understanding, is the relationship
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                         1/20/2016

```
1            between BunZai Media Group, Inc., and
2            Pinnacle Logistics, Inc.?")
3            MR. UNGAR:  Same objection.
4            THE WITNESS:  I don't know.  I can't even
5    tell.  No, I don't know.
6    BY MR. TEPFER:
7      Q.   Are you aware of any relationship between
8    Media Urge, Inc., and Focus Media Solutions, Inc.?
9            MR. ESENSTEN:  Object --
10            MR. UNGAR:  Objection as to the form of the
11    question, it's vague and ambiguous, calls for
12    speculation, lacks foundation.
13            THE WITNESS:  No.
14    BY MR. TEPFER:
15      Q.   Do you know if Focus Media Solutions, Inc.,
16    used the same office space as Media Urge, Inc., at
17    any point?
18      A.   No.
19      Q.   Is that --
20      A.   No, they didn't.
21      Q.   Okay.  Do you know if Media Urge, Inc., ever
22    did any advertisements for or designed any
23    advertisements for AuraVie products?
24            MR. UNGAR:  Objection as to the form of the
25    question, vague and ambiguous, and compound.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

191

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1          THE WITNESS:  No.

2    BY MR. TEPFER:

3        Q.    Is that no, they didn't?

4        A.    No, I don't know.

5        Q.    Did you ever, as bookkeeper for Pinnacle

6    Logistics, make payments from a Pinnacle Logistics

7    account to a Media Urge, Inc., account, to your

8    recollection?

9        A.    No.

10       Q.    Is that no, you didn't, or --

11       A.    No, I didn't.

12       Q.    Do you know if BunZai Media Group, Inc.,

13   used affiliates for the marketing of AuraVie

14   products --

15          MR. UNGAR:  Object.

16   BY MR. TEPFER:

17       Q.    -- any point?

18          MR. UNGAR:  Objection as to the form of the

19   question, vague and ambiguous.

20          THE WITNESS:  I guess so.

21   BY MR. TEPFER:

22       Q.    Why do you -- why do you guess so?

23       A.    I guess they used some of it to market the

24   product.  They just called -- if it's called

25   affiliates, affiliates.

192

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1      Q.   And what is your understanding of what an
2  affiliate is?
3      A.   Someone who helps you.
4      Q.   Are you aware of any affiliate networks used
5  by BunZai Media Group, Inc., for the marketing of
6  AuraVie products?
7           MR. UNGAR:  Objection as to the form of the
8  question, vague and ambiguous.
9           MR. ESENSTEN:  And calls for legal
10 conclusion.
11          THE WITNESS:  No.
12 BY MR. TEPFER:
13     Q.   Did you have in your office in Suite 105 in
14 June 2015 any signature stamps?
15     A.   I think so.
16     Q.   Do you recall for what individuals you had
17 signature stamps for?
18     A.   I believe his name is David.  And last name
19 Yosfian, I think.
20     Q.   Who's David -- sorry, and could you spell
21 that last name?
22     A.   I think Y-o-s-f-i-a-n.
23     Q.   Who's David Yosfian?
24     A.   He's one of the officers, one of the owners
25 of Kai Media.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

```
 1       Q.    Did you have any other signature stamps, to
 2    your knowledge?
 3       A.    No.
 4       Q.    What did you use those signature stamps for?
 5       A.    I myself never used them.
 6       Q.    Did -- you never used any of -- any
 7    signature stamps?
 8       A.    Not -- no, not signature stamps.  No.
 9    Never.
10       Q.    Why did you have them?
11       A.    The owner of the company, they came to sign
12    checks and probably left it there.
13       Q.    Did you ever use the deposit stamps that you
14    had at your office?
15       A.    I might have.
16       Q.    Do you recall that your office contained a
17    book of credit cards?
18       A.    Yes.
19       Q.    Who gave you those credit cards?
20       A.    There were a lot of credit cards there.
21    There's my credit cards, my family credit cards.  I
22    mean there was some check cards of some of the
23    corporations.  My family members gave it to me when
24    they're away.  I have friends that I do bookkeeping
25    for, gave me the credit cards.  Owners of the
```

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    corporations has just debit cards there.

2        Q.   Do you typically request that the owners of

3    the AuraVie corporations give you these credit cards

4    in their names?

5            MR. ESENSTEN:  Objection; assumes facts not

6    in evidence, vague.

7            THE WITNESS:  No.

8            MR. UNGAR:  Join in the objection.  And

9    argumentative.

10           MR. ESENSTEN:  I'll join in that one.

11           THE WITNESS:  No, I don't request.

12   BY MR. TEPFER:

13       Q.   So the owners give you these credit cards

14   without your request?

15       A.   Yeah.

16       Q.   Do you have any idea why they do that?

17       A.   Yeah.  I use --

18           MR. UNGAR:  Objection as to the form of the

19   question, vague and ambiguous, lacks foundation,

20   calls for speculation.

21           MR. ESENSTEN:  I'll join.

22           THE WITNESS:  I used to make the deposits.

23   BY MR. TEPFER:

24       Q.   Uh-huh.

25       A.   So you don't have to stand in line, so you

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    can make the deposits.

2        Q.    Did you ever use any of those credit cards

3    in that book that weren't in your name for personal

4    expenditures not related to the AuraVie companies?

5        A.    No.

6        Q.    During the course of your employment as

7    bookkeeper, do you have a general idea of how much

8    money you received in compensation from the AuraVie

9    companies?

10       A.    Not on top of my head, no.

11       Q.    Do you believe that it was more than 50,000?

12       A.    Yes.

13       Q.    Do you believe it was more than a hundred

14   thousand?

15       A.    Yes.

16       Q.    Do you believe it was more than 300,000?

17       A.    No.

18       Q.    Is it more than 200,000?

19       A.    I don't know.

20       Q.    Do you recall how you received this

21   compensation from the AuraVie companies?

22       A.    They paid me through my corporation, and

23   every once in a while I -- I -- I mean, I used one

24   of -- a credit card to -- to pay bills, and that was

25   a part of it.

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1      Q.    When you say they paid you through your
2    corporation, which corporation do you mean?
3      A.    The company is called Critical Media.
4      Q.    Do you recall which companies made payments
5    to Critical Media to compensate you for this
6    bookkeeping?
7      A.    A few of them.  I don't remember exactly
8    which ones.  Not the specific one.
9      Q.    Do you recall which credit card you used to
10   pay bills as part of your compensation for
11   bookkeeping for the AuraVie companies?
12     A.    No.
13     Q.    Were those credit cards, to your knowledge,
14   in your own name or someone else's?
15     A.    In my own name.
16     Q.    Were those, to your knowledge, personal
17   credit cards or corporate credit cards?
18     A.    I don't really know.  I just can't -- I -- I
19   can't speculate.  I don't know.
20     Q.    Sure.
21           And those payments, were those for your own
22   personal expenses or for the expenses of one of your
23   companies, to your knowledge?
24     A.    It varied.  I mean, they're reimbursement
25   for stuff that was put on my credit cards.  I can't

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

197
Nottea
FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

 1     give you off the top of my mind exactly each one.

 2     Some stuff was reverse, and some stuff pay bills.

 3          Q.    And whenever you, I suppose, received this

 4     compensation from the credit cards, would you

 5     request authorization from, I suppose, the owner of

 6     the separate companies?

 7          A.    Of course.

 8          Q.    And which owner would this be?

 9          A.    Depending what company.

10          Q.    Okay.  Do you know who created the AuraVie

11     brand?

12          MR. UNGAR:  Objection as to the form of the

13     question, it's vague and ambiguous.

14          MR. ESENSTEN:  I join in that.

15          THE WITNESS:  No.

16     BY MR. TEPFER:

17          Q.    Do you know who came up with the name

18     AuraVie?

19          A.    No.

20          Q.    Do you know if these separate companies

21     which marketed AuraVie had any licensing agreement

22     with any other company for the marketing or sale of

23     AuraVie?

24          A.    I don't know.

25          Q.    Do you recall ever issuing checks in payment

198

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1    for the licensing of AuraVie, as bookkeeper?

2        A.   No.   There were so many bills, I have no --

3    I don't know specifically each one.

4             MR. GALLEGOS:   Just how would he document?

5             MR. TEPFER:   Hmm?

6             MR. GALLEGOS:   How would he document the

7    notice?   Would he send an email to the --

8             MR. TEPFER:   Oh, right, right.

9             MR. ESENSTEN:   You're down to --

10            MR. GALLEGOS:   Dos minutos.

11            MR. ESENSTEN:   Dos minutos.

12   BY MR. TEPFER:

13       Q.   When you received this compensation from the

14   AuraVie companies, how would you document it?

15       A.   An expense.

16       Q.   Would you document it in a QuickBook?

17       A.   I think so.

18       Q.   Would you document it in an email?

19       A.   Possibly.

20            MR. TEPFER:   I think that will conclude the

21   deposition.

22            MR. ESENSTEN:   You don't have any further

23   questions?

24            MR. TEPFER:   I don't have --

25            MR. ESENSTEN:   The deposition is now

199

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    concluded; correct?

2              MR. TEPFER:  Yes.

3              MR. ESENSTEN:  Do you have any questions,

4    Mr. Ungar?

5              MR. UNGAR:  I do not.

6              MR. ESENSTEN:  I propose that the original

7    of the transcript be sent to my office.  We will

8    collectively relieve the reporter of her obligations

9    to maintain it under the Federal Rules of Civil

10   Procedure, so that I can have the witness sign and

11   correct the deposition within 30 days of receipt.  I

12   will then inform all counsel that the deposition is

13   signed and corrected within that timeframe.  If the

14   deposition is not signed and corrected, a copy may

15   be used as though the original was signed and

16   corrected.  I'll maintain the original, have it

17   available for any hearing and inspection by counsel

18   upon proper notice.  If the original is lost,

19   stolen, destroyed or somehow unavailable, a copy may

20   be used as though the original was available.  And

21   I'll lodge it with the court at the time of trial,

22   if necessary.

23             MR. UNGAR:  So stipulated.

24             MR. GALLEGOS:  I'll have to check on that,

25   Bob -- make sure if you keep the original or if we

Nottea

1    keep the original.  I'll double check on that, but

2    if that's the case, we will be fine with that.

3              MR. ESENSTEN:  I'll keep the original

4    because you're going to get a copy of the transcript

5    anyway.

6              MR. GALLEGOS:  Yeah.

7              MR. ESENSTEN:  This way I'll keep it

8    pursuant to our stipulation, and I'll record, I'll

9    file, if necessary.  It's going to have to be signed

10   and corrected.

11             MR. TEPFER:  Sure, I know it has to be

12   reviewed and corrected.  Just, I suppose, you know,

13   if -- I'd like to review whatever the Federal Rules

14   provides for who retains it and, you know, if we

15   could just do whatever is typical procedure under

16   the Federal Rules, if it does specify any particular

17   procedure.

18             MR. ESENSTEN:  So why don't we do this:  The

19   original will be sent to me.  I'll sign -- I'll have

20   the signed and corrected version.  If you guys think

21   that you must maintain it so that you sleep well at

22   night, then we'll talk about it.

23             MR. TEPFER:  Okay.

24             MR. GALLEGOS:  Okay.

25             MR. ESENSTEN:  But right now our stipulation

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1    is what it is, and we can then go from there if you

2    feel that --

3              MR. GALLEGOS:   The other issue is,

4    obviously, payment of the court reporter's services.

5    Obviously, we're going to pay for the transcript,

6    but --

7              MR. ESENSTEN:   You sure are.

8              MR. GALLEGOS:   -- the question is whether or

9    not the defendants have to pay for a copy of the

10   transcript, and I don't know if that's the case or

11   not.

12             MR. ESENSTEN:   No.   On the record,

13   absolutely 100 percent not.   We do not pay for any

14   of the transcripts.   We get the original, and you

15   guys are paying for the original and a copy, and

16   that's what you guys get, is a copy.

17             MR. GALLEGOS:   We'll double check on that.

18             MR. ESENSTEN:   So the reporter will -- well,

19   I don't know --

20             Don't have any belief that we're going to

21   pay for the transcript because it's your deposition,

22   you guys ordered the reporter, and you guys get the

23   privilege of paying for it; okay?

24             MR. GALLEGOS:   Well, what I'm saying is --

25             MR. UNGAR:   So stipulated.

202

Nottea

FTC v. Bunzai Media Group, Inc., et al.                          1/20/2016

1          MR. GALLEGOS:  -- we won't agree, but in

2     other words, if that's the case, if that's what

3     Federal Rules basically specify, then we'll follow

4     Federal Rules, but we're not on the record going to

5     agree to do that until we verify that's the case.

6          MR. TEPFER:  Yeah.  The thing -- I think

7     it's best for us just to check and see what the

8     Federal Rules provide, rather than, you know,

9     without doing any research, binding the FTC on the

10    record to making unnecessary payments, if it does,

11    indeed, turn out to be the case.

12         MR. ESENSTEN:  You can't be serious.  How

13    many depositions have you done?  It's never been the

14    procedure.  Reid, I'm sorry.  I don't mean to be

15    rude --

16         MR. TEPFER:  Okay.

17         MR. ESENSTEN:  -- but you can't be serious

18    that you don't know the process of the reporter

19    sending out the transcript pursuant to stipulation

20    and who pays for the deposition.

21         MR. GALLEGOS:  Well, there's --

22         MR. TEPFER:  We'll go off the record.

23         MR. ESENSTEN:  No, no, no.  I don't want to

24    go off the record.  This is something that is

25    necessary for the stipulation.

203

Nottea

FTC v. Bunzai Media Group, Inc., et al.                           1/20/2016

1        MR. TEPFER:  Bob, I'm not sure why -- I
2   mean, if -- anything that we're, you know, supposed
3   to pay for, we're going to.  I just would like to
4   look it up before --
5        MR. GALLEGOS:  The witness -- and I've had
6   situations in which the witness does review the
7   transcript to make sure if there's any errata,
8   corrections they'd like to make.  In certain
9   circumstances the court reporter has the technology
10  to send the witness a electronic one, where they can
11  review it either at your computer or something, but
12  they can't print it out.  So there are situations in
13  which we have done that, Bob.  So I'm just saying,
14  in other words, if the Federal Rules specify that we
15  have to do what you're saying, we'll follow that,
16  but we're not right now on the record willing to say
17  that's going to be the case or agreeing with that
18  stipulation -- your statement there.
19       MR. UNGAR:  Is there any stipulation here to
20  waive code, or is there no stipulation here to waive
21  code?
22       MR. ESENSTEN:  I'm amazed that we're having
23  this discussion.  Come on, guys --
24       MR. GALLEGOS:  Well --
25       MR. ESENSTEN:  -- this is not your first

204

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1     dance.

2              MR. GALLEGOS:  No.

3              MR. ESENSTEN:  Why are we having this

4     discussion?  If the original is sent to me and I've

5     agreed that we'll have a discussion if you guys keep

6     the original or we do, the rest of it is -- is like

7     standard stuff.

8              MR. GALLEGOS:  Well, it goes back to the

9     payment of the court reporter there, Bob.  In other

10    words, what I'm saying is we will verify between

11    today and tomorrow that as far as if whether or not

12    what the process is that we have to follow.

13             MR. TEPFER:  And --

14             MR. GALLEGOS:  If we have to pay for that

15    copy as well as the original, we'll do that.  But if

16    that's not the case, then we'll talk with you and

17    tell you, you know, what our stance is.

18             MR. ESENSTEN:  Maybe I didn't make myself

19    clear.  You guys get a copy.  You get the original

20    and a copy -- you pay for the original and a copy.

21    You automatically get the copy.  It doesn't go to

22    me.  The original comes to me for the signing and

23    correction by the witness.  I then inform you when

24    it's signed and any corrections.  I maintain it,

25    have it available for the court.  You guys keep your

Nottea

FTC v. Bunzai Media Group, Inc., et al.                              1/20/2016

1    copy, and fine, I'm not asking you to pay for an
2    extra copy for me.  I think that's where we have a
3    disconnect.  I'm not asking you to do that --
4          MR. GALLEGOS:  Well --
5          MR. ESENSTEN:  -- because I'm sure the
6    reporter or her office will confirm that you guys
7    are paying for an original and a copy.  That's how
8    it's done every day of the week.
9          MR. GALLEGOS:  Yeah, we'll verify that with
10   the reporter.  Then if that's the case, we'll follow
11   that, Bob.
12         MR. ESENSTEN:  Okay.  So assuming that's the
13   case, that her and her office confirm that, my
14   stipulation is what you're going to agree to?
15         (Mr. Alon Nottea leaves the room.)
16         MR. GALLEGOS:  If that's the case and that's
17   what Federal Rules require, we'll follow that.
18         MR. TEPFER:  Yeah.  We don't mean to suggest
19   that we're not going to follow Federal Rules, or
20   something like that.  I just would like to look it
21   up before I do that.
22         (Mr. Alon Nottea enters the room.)
23         MR. ESENSTEN:  You've never had a
24   stipulation like this suggested to you?
25         MR. TEPFER:  No.  I don't --

Nottea

FTC v. Bunzai Media Group, Inc., et al.                    1/20/2016

1        MR. GALLEGOS:  Like I've said, I've had

2    situations in which we'll have situations where the

3    reporter will send it to the witness to review the

4    document and make sure if there's any corrections

5    that they'd like to make, but it's not where they

6    keep the actual original or if they keep the copy,

7    or anything like that.

8        MR. ESENSTEN:  So where does the original

9    go?

10       MR. TEPFER:  In those types of situations,

11   we'll keep the original.

12       MR. ESENSTEN:  And you're going to have one

13   not signed and not corrected --

14       MR. GALLEGOS:  No, they'll have the

15   opportunity to review the transcript and make any

16   corrections.

17       MR. ESENSTEN:  I'm sorry that we're having

18   this discussion.

19       MR. UNGAR:  Madam Court Reporter, I'm --

20       MR. ESENSTEN:  I really don't know what

21   we've agreed on, what we haven't agreed on, and you

22   guys are making it too difficult on me.  I'm sorry.

23   It's just like --

24       MR. UNGAR:  Madam Court Reporter, I'm not

25   ordering a copy.

207

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

1          MR. ESENSTEN:  Okay.  We're off the record.

2          (The deposition was concluded at 6:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

208

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1                    --o0o--

 2   Please be advised I have read the foregoing

 3   deposition, and I state there are:

 4   (Check one)

 5                         NO CORRECTIONS

 6                         CORRECTIONS ATTACHED

 7

 8

 9              DORON NOTTEA

10

11              Date Signed

12

13

14                    --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nottea

FTC v. Bunzai Media Group, Inc., et al.                                    1/20/2016

```
 1

 2

 3   STATE OF CALIFORNIA            )
                                   )   ss.
 4   COUNTY OF LOS ANGELES         )

 5

 6          I, DORON NOTTEA, having appeared for my

 7   deposition on January 20, 2016, do this date declare

 8   under penalty of perjury that I have read the

 9   foregoing deposition, I have made any corrections,

10   additions or deletions that I was desirous of making

11   in order to render the within transcript true and

12   correct.

13          IN WITNESS WHEREOF, I have hereunto

14   subscribed my name this_____day of_____,

15   2016.

16

17

18

19

20

21                  W    I    T    N    E    S    S

22

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1

2

3      I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6          That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:  __2/3/16_____

21

22

23  _____

24      CHRISTINA KIM-CAMPOS, CSR

25      CERTIFICATE NO. 12598