```
 1                    FEDERAL TRADE COMMISSION
 2                          I N D E X
 3
 4   WITNESS:                              EXAMINATION:
 5   IGOR LATSANOVSKI
 6        BY MR. TEPFER                                5
 7
 8
 9   EXHIBITS              DESCRIPTION          FOR ID
10   Number 16     AuraVie Web Site Printout        64
11   Number 17     Friday, April 15, 2011, E-mail   72
12   Number 18     Bunzai Media Group - Partnership 73
                   Agreement
13
     Number 19     Thursday, 1/12/2012, E-mail      81
14
     Number 20     Wednesday, 7/10/2013, E-mail     85
15
     Number 21     Wednesday, August 14, 2013, E-mail  88
16
     Number 23     Wednesday, April 17, 2013, E-mail  102
17
     Number 24     Friday, 2/24/2012, E-mail        107
18
     Number 25     Friday, 5/11/2012, E-mail Chain  108
19
     Number 27     Thursday, March 1, 2012, E-mail  110
20                 Chain
21   Number 28     Monday, January 23, 2012, E-mail 113
22   Number 30     Friday, February 17, 2012, E-mail 116
                   Chain
23
     Number 33     Exclusive U.S.A. Fulfillment &   117
24                 Call Center Agreement
25   Number 34     Friday, 10/7/2011, E-mail Chain  118
```

2

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                      1/28/2016

```
 1    EXHIBITS                    DESCRIPTION                FOR ID

 2    Number 36      Thursday, May 9, 2013, E-mail           119
                     Chain
 3
      Number 38      Friday, November 30, 2012, E-mail       121
 4
      Number 39      Wednesday, July 13, 2011, E-mail        123
 5
      Number 42      Thursday, January 12, 2012, E-mail      124
 6

 7

 8

 9    OTHER EXHIBITS REFERENCED                             PAGE

10    None

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                        1/28/2016

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4

 5   FEDERAL TRADE COMMISSION,      )Case No.
                                    )CV 15-4527-GW(PLAx)
 6            Plaintiff,            )
                                    )
 7        v.                        )
                                    )
 8   BUNZAI MEDIA GROUP, INC.,      )
     et al.                         )
 9                                  )
              Defendants.           )
10   _____)

11

12

13                        Thursday, January 28, 2016

14

15                        Federal Trade Commission

16                        10877 Wilshire Boulevard, Suite 700

17                        Los Angeles, California 90024

18

19

20            The above-entitled matter came on for

21   deposition, pursuant to notice, at 10:20 a.m.

22

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

```
 1    APPEARANCES:
 2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3            REID A. TEPFER
              Federal Trade Commission
 4            1999 Bryan Street, Suite 2150
              Dallas, Texas 75201
 5            (214) 979-9395
              rtepfer@ftc.gov
 6
 7    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 8            LUIS H. GALLEGOS
              Federal Trade Commission
 9            1999 Bryan Street, Suite 2150
              Dallas, Texas 75201
10            (214) 979-9383
              lgallegos@ftc.gov
11
12    ON BEHALF OF ALON NOTTEA AND ROI REUVENI:
13            ROBERT M. UNGAR
              (Telephonic Appearance)
14            CROSSWIND LAW
              14724 Ventura Boulevard, Penthouse
15            Sherman Oaks, California 91403
              (310) 405-1884
16            rmu@crosswindlaw.com
17
      ON BEHALF OF IGOR LATSANOVSKI AND CAL ENERGY, INC.:
18
              JEFFREY S. BENICE
19            LAW OFFICE OF JEFFREY S. BENICE
              3080 Bristol Street, Suite 630
20            Costa Mesa, California 92626
              (714) 641-3600
21            JSB@JeffreyBenice.com
22
23
24            Also present:
25            NATALIYA KHARIKOVA, Russian Interpreter
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

5

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1                    P R O C E E D I N G S
 2                    -   -   -   -   -
 3   Whereupon--
 4                    NATALIYA KHARIKOVA,
 5   was duly sworn to act as English/Russian interpreter.
 6                    IGOR LATSANOVSKI
 7   a witness, called for examination, having been first
 8   duly sworn, was examined and testified as follows:
 9                    EXAMINATION
10   BY MR. TEPFER:
11       Q    Thank you.  Mr. --
12            THE INTERPRETER:  Excuse me, Counsel.
13            May I introduce myself for the record?
14            MR. TEPFER:  Sure.
15            THE INTERPRETER:  Thank you.
16            Nataliya Kharikova, certified Russian
17   interpreter -- certified interpreter for the Russian
18   language, ID Number 301296, credentials both verified,
19   and I've just been sworn in by the court reporter.
20            MR. TEPFER:  And let's see, could counsel
21   identify himself for the record?
22            MR. BENICE:  Yes.  Jeffrey Benice on behalf
23   of Mr. Latsanovski.
24   BY MR. TEPFER:
25       Q    All right.  Mr. Latsanovski, my name is Reid
```

6

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

    1    Tepfer; with me is Luis Gallegos.  We're both
    2    attorneys for the Federal Trade Commission, and we
    3    represent the FTC in FTC versus BunZai Media Group in
    4    the Central District of California.
    5             First I wanted to ask you:  Do you understand
    6    that you are under the same oath today as if you were
    7    in a courtroom?
    8        A    Yes.
    9        Q    And I'll assume that you understand the
   10    questions that I ask you unless you tell me that you
   11    don't understand them.
   12             Does that sound fair?
   13        A    Yes.
   14        Q    Okay.  Sometimes your attorney may object.
   15    Afterwards I ask that you please answer the question
   16    unless he instructs you not to.
   17             Is that okay?
   18        A    Okay.
   19        Q    And is there anything that would prevent you
   20    from thinking clearly or testifying truthfully today?
   21        A    Just my tiredness, if it comes on.
   22        Q    Okay.  Let's see, if at any time you need to
   23    take a break during the deposition, please just let me
   24    know.
   25        A    Okay.  Thank you.

7

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1      Q    And aside from your previous deposition by
2  the receiver, have you ever had your deposition taken?
3      A    No.
4      Q    Okay.  So first, let's just --
5           MR. TEPFER:  And I almost forgot.
6           Mr. Ungar, can you please identify yourself
7  for the record?
8           MR. UNGAR:  Yeah.  Robert Ungar, U-n-g-a-r,
9  appearing on behalf of the defendants, Alon Nottea and
10  Roi Reuveni, R-e-u-v-e-n-i.
11  BY MR. TEPFER:
12      Q    All right.  So Mr. Latsanovski, let's begin
13  by discussing -- well, where were you born?
14      A     In the Soviet Union.
15      Q    Okay.  And that's now Kazakhstan; is that
16  correct?
17      A    Yes.
18      Q    Okay.  And from there, did you move to Spain?
19  Is that correct?
20      A    No.
21      Q    When -- when did you leave Kazakhstan or the
22  USSR?
23      A    Approximately in 1992.
24           MR. TEPFER:  I should also probably -- as you
25  know, you've already clarified this, but anything

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1    that -- we ask that any comments that Mr. Latsanovski
 2    makes, just for purposes of clarity of the record, if
 3    you could translate all side comments.
 4              THE INTERPRETER:  Yes, Counsel.
 5              MR. TEPFER:  Okay.  Thank you.
 6        Q    Okay.  So I'm sorry, when did you say that
 7    you left Kazakhstan?
 8        A    Approximately -- in 1992 approximately.  I
 9    don't remember exactly.
10        Q    And where did you move to?
11        A    Canada.
12        Q    Okay.  How long did you live in Canada?
13        A    Approximately five years.
14        Q    Is that where you first learned English?
15        A    Well, yes.  On the street I communicated with
16    people; that is, I didn't go specifically to any
17    colleges or anything like that.
18        Q    So you just picked it up naturally from
19    living in Canada?
20        A    Correct.
21        Q    And so you've -- I suppose you began learning
22    English in 1992; is that correct?
23        A    Maybe I had some classes in school.  I don't
24    remember now.  It was too long time ago.
25        Q    Okay.  And how good would you say your --
```

9

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1    your English literacy is?

2        A    Can I clarify?  I need to evaluate myself?

3    My qualifications?

4        Q    Sure.  Just in your everyday communicating

5    with people, do you struggle in speaking English to

6    people that you meet?

7        A    So on the phone I don't understand people,

8    for the most part.  That's why for the most part, for

9    the sake of communication, I try to meet people

10   personally to use my body language.

11       Q    So it's easier for you to communicate in

12   English when you're in person with the individual?

13       A    Yes, because I use two languages.  I'll say

14   it again, the body and the language.

15       Q    Sure.  And what about your literacy of the

16   English language?  Your ability to read English?

17       A    Absolutely I can only read English with a

18   translator.  I go online and I use Yandex or Google,

19   and I use that.

20       Q    And --

21       A    But if it's a PDF file, for me it's like

22   Greek, because it's only with a Word document I can

23   scan and copy and paste it.

24       Q    And without -- are you able to understand

25   English without using those tools?

10

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                      1/28/2016

1    A    Well, if the sentence consists of fewer than

2    five words approximately, yes; and they've got to be

3    simple.

4    Q    And so as, you know, a standard course of

5    practice, when you're, I guess, receiving business

6    e-mails, do you typically translate those using the

7    online tools you mentioned?

8    A    If I get something by e-mail, I send it

9    straight to trash because everybody knows that to

10   communicate with me you need to meet with me

11   personally.  I don't read mail.

12   Q    So you don't communicate by e-mail?

13   A    Just the very tiny things like that.  I

14   communicate, but very briefly.

15   Q    And that's -- you -- are you referring to

16   sending e-mails or receiving e-mails?

17   A    One more time.  I don't understand the

18   question.

19   Q    Do you send e-mails that you write?  Do you

20   ever communicate with other people using e-mail?

21   A    Very rarely, because for me to write an

22   e-mail, I need to perform double work.  I need to

23   write it in Russian and then translate it.

24   Q    And you mentioned earlier translating PDF

25   documents.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1           In situations where -- for example, if in one
2    of your businesses you were to receive a document that
3    isn't a Word document, do you have -- do you ever have
4    anyone assist you in translating those documents in
5    your standard course of business?
6        A    In the course of business sometime there was
7    help, but it was very rarely and only if I could find
8    somebody who was available at that point.
9        Q    And as for contracts, for example, are you
10   more cautious in the standard course of your business
11   dealings to have those documents translated, for
12   example, before signing them?
13       A    A contract for me is a secondary thing,
14   because it's more important that I trust the person,
15   because I understand the contract is just a piece of
16   paper; and if they decide not to follow through with
17   it, they're just not going to follow through with it.
18           That's why sometimes I don't have the
19   contract translated because I understand that if we
20   had an agreement with the person, then he's going to
21   do everything right.
22       Q    And so it's your position in your business
23   dealings that the contracts that you sign will
24   represent the agreements that you've communicated
25   verbally; is that correct?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

```
 1      A    Yes.  I believe that that's how it will be.
 2      Q    And I want to talk about specifically from
 3   the beginning of January 2010 to the present.
 4           Does the practice of -- the practices of
 5   understanding the English language that we've been
 6   talking about thus far, does -- do those practices
 7   apply to that time period?
 8      A    One second.  It's just too long.
 9           Can you break it down into parts?
10      Q    Sure.  Sorry.  That probably wasn't the most
11   artfully-phrased question.
12           The translation practices that we've been
13   talking about using the online tools and those sort of
14   things, have you been doing that from the period of
15   January 2010 until now?
16      A    Yes.
17      Q    Okay.  So you said that in, I guess it was,
18   1992 you moved to Canada.
19           When did you come to the United States?
20      A    So I came to America sometime in the end of
21   2010, but I had been coming before to prepare for my
22   move and to evaluate the visibility.
23      Q    And did you move to America for any
24   particular job?
25      A    No.  I came here because I was assessing --
```

13

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    to make it short, I came here for the American dream,

2    because I thought I would have more opportunities

3    here; because when I lived in Spain, I felt that I

4    wasn't a Spaniard.

5         Q    And when did you live in Spain?

6         A    Before I came here.

7         Q    Oh.  So you went from Canada to Spain for a

8    period?  I'm sorry.

9              What period did you live in Spain?

10        A    Approximately -- the last 15 years before I

11   came here approximately.

12        Q    So from around -- try to do the math.

13             Would that be from 1995 to 2010?

14        A    '96.

15        Q    Okay.  From '96 until 2010?

16        A    '96 approximately.  I don't remember.

17        Q    Okay.

18        A    Because I didn't live there permanently.

19        Q    And what brought you to Spain?

20        A    To Spain?  Because I was doing -- my family

21   decided to live there, and I had my children born

22   there, and I thought I would have more opportunities

23   there.

24        Q    Okay.  And then you moved to Los Angeles in

25   2010?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1       A     Permanently -- to live here permanently I
 2    came in 2011.
 3       Q     And did you know Alon Nottea before you moved
 4    to America in 2011?
 5       A     No.
 6       Q     How soon after you moved here did you meet
 7    Alon Nottea?
 8       A     I met him in the end of 2010.
 9       Q     Shortly after you moved here; is that
10    correct?
11       A     I started looking for businesses I can invest
12    into, because living in any country you need to have
13    income.
14       Q     Sure.  How did you meet Alon Nottea?
15       A     I was introduced to him by his father.
16       Q     Motti Nottea?
17       A     Yes.
18       Q     And how did you meet Motti Nottea?
19       A     I met him -- it was a long time ago, so I
20    don't remember exactly.  I think I met him in an
21    Israeli restaurant.  Some common acquaintances
22    introduced us.
23       Q     And so he was a -- just a friend of yours; is
24    that correct?
25       A     No.  But what are you calling a friend?  What
```

15

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/28/2016

1    do you understand are you using the word friend?  For
2    me a friend is somebody you've known for at least ten
3    years.
4        Q    Sure.  I was just wondering if he was -- if
5    Motti Nottea was someone that you did business with or
6    if he was just an acquaintance.
7        A    Was trying to do business.  More likely
8    something like that.  When you're trying to invest in
9    a business, you start communicating with a large
10   number of people, and you don't remember how you met
11   some of them.
12       Q    So you began communicating in this period
13   with Motti Nottea about potential business
14   opportunities?
15       A    Yes.
16       Q    Do you recall what those business
17   opportunities were that you discussed with Motti
18   Nottea?
19       A    It was a long time ago.  I don't remember.
20       Q    And why did he introduce you to his son?
21          MR. UNGAR:  Objection to the form of the
22   question.  Vague and ambiguous, calls for speculation,
23   lacks foundation.
24          THE WITNESS:  Okay.
25   BY MR. TEPFER:

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1      Q      You can answer.
 2             MR. BENICE:  Do you understand the question?
 3             THE WITNESS:  Right now I just got confused.
 4             Can you please repeat it?
 5  BY MR. TEPFER:
 6      Q      Sure.
 7      A      There's just too much information.
 8      Q      Sure.  Sure.  I was just wondering if Motti
 9  Nottea introduced you to Alon Nottea because of any
10  particular business opportunity.
11      A      He introduced me because he said that his son
12  is in business and maybe we will be able to find some
13  common ground.
14      Q      Sure.  I wanted to talk a bit about your
15  background in business.
16             Do you have any particular formal education
17  in business?
18      A      What do you mean by business education?
19      Q      Like, did you go to a college or university
20  to study business?
21      A      So I have a college education, and the
22  specialty is in construction.
23             Can you call this business or no?
24      Q      I don't know, but that's -- that's helpful to
25  know.
```

17

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          So your education was in, sort of,

2   construction?  The business side of construction or,

3   for example, architecture?

4        A    I studied how to operate construction

5   equipment at a construction site.

6        Q    Okay.  And do you have any other formal

7   education aside from that?

8        A    I studied it at a university.

9        Q    Is that -- are you referring to your

10  education in construction?

11       A    Um-hum.

12       Q    And was that in the former USSR where you

13  studied?

14       A    Yes.

15       Q    And after moving to Canada or the United

16  States, have you had any other formal education?

17       A    No.

18       Q    Okay.  Do you recall when Motti Nottea

19  introduced you to his son, what the business

20  opportunities were that you discussed with him?

21       A    He suggested that I invest money into his

22  existing beauty product sales business.

23       Q    Do you know what the name of the business

24  was?

25       A    BunZai.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1       Q     And who was -- do you remember who, I guess,

2    the partners were in BunZai Media Group at the time

3    that Motti introduced you to Alon?

4       A     Can you please repeat the question one more

5    time?

6             MR. TEPFER:  Would the court reporter please

7    repeat it.

8             (Record read.)

9             THE WITNESS:  What do you mean when you say

10   "partners," because this word for me has absolutely

11   different meanings.

12   BY MR. TEPFER:

13      Q     Sure.

14      A     This word does not exist in the Russian

15   language.

16      Q     And so you were saying that --

17      A     Are you trying to say shareholders?

18      Q     Well, I suppose I'm interested to know:  The

19   word "partner," what does it mean to you?

20      A     Partners are people who are friends with each

21   other.

22      Q     So a partner is just a friend?

23      A     Well, not exclusively, because it could be a

24   sexual partner.

25      Q     And what about a -- are you familiar with

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1   any, I suppose, business meaning or particular

2   business meaning for the word "partner"?

3            MR. UNGAR:  Objection as to the form of the

4   question.  Vague and ambiguous.

5            THE WITNESS:  In the Russian language in the

6   legal, this word does not exist.  This word has been

7   born from English after Perestroika.

8   BY MR. TEPFER:

9        Q    As far as the word is used in the English

10  language, are you familiar with any -- well, I suppose

11  I'll rephrase it.

12           Are you familiar with the word "partnership"

13  in the English language?

14       A    Yes.

15           MR. UNGAR:  Objection as to the form of the

16  question.  Vague and ambiguous.

17  BY MR. TEPFER:

18       Q    What is your understanding of what the word

19  "partnership" means as it's used in the English

20  language?

21       A    These are the people who hold the stock of a

22  company.

23       Q    So a partner, in your understanding as it's

24  used in the English language, would be a shareholder?

25       A    No.  No.  It's a friend or like a --

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  Vague and ambiguous, calls for a -- calls
3     for a conclusion.
4     BY MR. TEPFER:
5          Q    And just to make sure -- I may have been
6     misunderstanding -- the word "partnership," what is --
7     what is your, I guess, understanding of what the word
8     "partnership" is as opposed to "partner" in the
9     English language?
10         MR. UNGAR:  Objection as to the form of the
11    question.  It's vague and ambiguous, calls for
12    speculation, calls for a conclusion.
13         THE WITNESS:  And how am I supposed to react
14    to that?
15         MR. BENICE:  Just listen to his question.  If
16    you can answer it, answer it.  If you can't answer it,
17    tell him you don't understand.
18         THE WITNESS:  I don't understand.  (In
19    English)
20         THE INTERPRETER:  I don't understand.
21    BY MR. TEPFER:
22         Q    I suppose I'll try to rephrase it in an
23    easier way to understand.
24              I was just wondering if you -- if -- if you
25    understood the word "partnership" to have any

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                               1/28/2016

1  particularized meaning in -- I suppose in a business
2  context beyond friendship.
3             MR. UNGAR:  Objection as to the form of the
4  question.  It's vague and ambiguous.
5             THE WITNESS:  Can you clarify, please?
6  BY MR. TEPFER:
7       Q    Sure.  Well, I suppose -- could you explain
8  what part of the question you didn't understand and
9  I'll expound on it.
10       A    Can you -- can you just make your questions
11  shorter, because when they're long like this, the
12  first part starts and the second part ends and it's
13  all just --
14       Q    Sure.  Do you -- let me think for a second.
15             I suppose -- do you understand the word
16  "partnership" to have any meaning in the English
17  language beyond friendship?
18       A    Partnership or partner?
19       Q    Partnership.
20       A    For me personally, I would say that I deeply
21  don't understand the meaning of this word.  For me,
22  it's a legal word, and I don't understand the meaning
23  of it because I'm not a lawyer.
24       Q    Okay.  And to use a different word, who did
25  you understand to be the owner of -- or the owner or

22

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    owners of BunZai Media Group when Motti introduced you

2    to Alon?

3         A    As far as I understood, the owners were Alon

4    and Khristopher.

5         Q    And -- and just for clarity, that would be

6    Alon Nottea and Khristopher Bond?

7         A    Yes.

8         Q    And did Alon Nottea and Khristopher Bond

9    invite you to invest in the company at that point?

10             MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous.

12             THE WITNESS:  Clarify.

13   BY MR. TEPFER:

14        Q    Did Alon Nottea or Khristopher Bond ask for

15   you to invest money into BunZai Media Group when you

16   were introduced to them?

17        A    Yes.

18        Q    And did you --

19        A    I gave them a loan so that they could show --

20   that is, they asked me to give them a loan, and I did

21   it.  That's it.

22        Q    Did they offer you an ownership interest in

23   BunZai Media Group in exchange for the loan?

24             MR. UNGAR:  Objection as to the form of the

25   question.  Vague and ambiguous.

23

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                          1/28/2016

1              THE WITNESS:  And can you clarify what you

2     mean?

3     BY MR. TEPFER:

4         Q    As to the word "ownership"?

5         A    No.  In general, the question as it is.

6         Q    I'm sorry.  What -- what part of the

7     question?  I'm having to clarify -- what part of the

8     question would you like me to clarify?

9         A    What did they offer to me in exchange for

10    what?

11        Q    Sure.  In exchange for the initial loan that

12    you were discussing, did Alon or Khristopher offer an

13    ownership or shareholder interest in BunZai Media

14    Group?

15             MR. UNGAR:  Objection as to the form of the

16    question.  Vague and ambiguous and compound.

17             THE WITNESS:  I don't understand how I'm

18    supposed to respond to that.

19             MR. BENICE:  Listen to the question

20    carefully.

21             Do you understand what he's asking you?

22             THE WITNESS:  Yeah.  (In English)

23             MR. BENICE:  Well, then answer the question.

24             THE WITNESS:  So they told me -- and the

25    conditions between us changed all the time -- and for

24
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1   me, in exchange for my loan, first we talked of --
2   about interest, but they said that they couldn't give
3   me interest because they didn't know how the business
4   is going to be.
5           And second, they suggested that I get income
6   for my loan; that I get interest from the profits,
7   yes.  So not a fixed interest, but a percentage of the
8   profits.
9   BY MR. TEPFER:
10      Q    Okay.  And was that the final understanding
11  that you came to with the -- with Alon and
12  Khristopher?  That you would receive a percentage of
13  profits in exchange for your investment?
14          MR. UNGAR:  Objection as to the form of the
15  question.  It's vague and ambiguous.
16          THE WITNESS:  In exchange for my -- one
17  second.  One second.
18          So I gave them a loan, and for my loan they
19  would pay me interest, and the interest consisted of
20  one-third of the profits.  I didn't have any ownership
21  in the BunZai company.
22  BY MR. TEPFER:
23      Q    So what -- so you -- you received one -- I
24  guess the agreement you came to -- this -- was this
25  the final agreement between y'all?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      A      Yes.

2      Q      And I guess -- I suppose I should ask:  How

3   did you know that Alon and Khristopher were the owners

4   of BunZai Media Group?

5      A      I didn't know what is to know.  I haven't

6   checked any paperwork.

7      Q      Sure.

8      A      Because I invest money in people.

9      Q      But I suppose what I'm asking is:  Did -- did

10   they represent to you that they were owners of BunZai

11   Media Group?

12             MR. UNGAR:  Objection --

13             THE WITNESS:  Yes.

14             MR. UNGAR:  -- as to the form of the

15   question.  Vague and ambiguous.

16   BY MR. TEPFER:

17      Q      And this final agreement that we were

18   discussing in which you received one-third of the

19   profits, what period of time did that arrangement

20   cover?

21      A      Until the BunZai companies closed.

22      Q      And when did -- when was that agreement

23   started?

24      A      Because they changed the conditions between

25   us.  So for me, the most important thing was to get my

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1    investment back and to get some kind of profit.  If

2    we're talking about a specific date, I don't even

3    know.

4         Q    So that agreement where you -- I guess, where

5    you and Alon and Khris agreed that you would receive

6    one-third of the profits, when did -- I guess, when

7    did y'all come to that agreement?

8              MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.

10             THE WITNESS:  The conditions between us

11   changed so often, and I'll say it again.

12             They changed so often that for me, from the

13   very beginning of the loan -- from when I gave them

14   the loan, regardless of -- for what they were calling,

15   regardless of any intermediate agreements, for me, it

16   was the idea to get some profit from this loan.

17   BY MR. TEPFER:

18        Q    Okay.  And you said that the terms of the

19   various agreements that you had with Alon and

20   Khristopher changed frequently.

21             Was -- that one-third profit term, was that a

22   constant in the various agreements?

23             MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous, misstates his

25   prior testimony.  It's argumentative.

27

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          THE WITNESS:  I don't understand.  I don't

2     understand what you would call the essence of the

3     question.

4     BY MR. TEPFER:

5          Q     Okay.  Well, I suppose -- when did you make

6     the initial loan to BunZai Media Group?

7          A     In the year of 2010.

8          Q     Okay.  And did you make loans subsequent to

9     that?

10          A     We had agreement that I would open a credit

11     line up to half a million dollars; and constantly I

12     would give them the loan, and they would repay.  I

13     would give it, and they would repay it.

14          Q     And when you made that initial loan -- well,

15     I suppose -- when you first met Alon and Khristopher

16     to discuss BunZai Media Group and your potential loan,

17     did they make a sales pitch to you about the company?

18          A     I don't remember exactly.  It was so many

19     years ago.  So many things have happened during this

20     time, especially in the last six months.

21          Q     Sure.  Do you recall discussing what the

22     business was when -- or sorry, when you made that

23     initial loan, do you recall discussing with them what

24     the business was that you would be loaning money to?

25          A     Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1      Q    What did they explain to you that you would

2   be investing in?

3           MR. BENICE:  You mean what entity he would be

4   loaning the money to?

5   BY MR. TEPFER:

6      Q    Or the -- sorry.  To explain, did they -- did

7   Alon or Khristopher describe what -- what product it

8   was you would be investing in?

9      A    They showed the final product to me, and I

10  liked the way it looked.

11     Q    Did you review any of their advertisements at

12  that time?

13          MR. UNGAR:  Objection as to the form of the

14  question.  Vague and ambiguous, assumes facts not in

15  evidence.

16          THE WITNESS:  Discussed numbers with them

17  because I'm an investor.  For me, even I didn't try to

18  understand the word.  The Internet, for me, was

19  something from the clouds.

20  BY MR. TEPFER:

21     Q    Sorry.  The -- you were unfamiliar with the

22  Internet?

23     A    No.  I was familiar with the Internet; but

24  selling something on the Internet, that was something

25  that, for me --

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

```
 1       Q     It was a new thing?
 2       A     Absolutely.  I've never been involved with
 3   something like this in my life.
 4       Q     Okay.  And I should -- I should ask:  Do
 5   you -- after meeting Alon Nottea, aside from BunZai
 6   Media Group, did you invest in any other businesses of
 7   his?
 8       A     Other businesses in what field and with whom?
 9       Q     I'm just wondering if BunZai Media Group --
10   aside from BunZai Media Group, did you ever have any
11   other businesses that you -- or any other joint
12   enterprises with Alon Nottea?
13       A     You mean Alon specifically?
14       Q     Yes.
15       A     No.
16       Q     Did y'all ever discuss, from that period to
17   the present, any other business ideas other than
18   BunZai Media Group?
19       A     With whom?
20       Q     With Alon.
21       A     A lot.
22       Q     A lot?
23             Do you recall any of the other business
24   ventures you discussed with Alon?
25             MR. UNGAR:  Objection as to the form of the
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                      1/28/2016

```
1   question.  Vague and ambiguous.

2   BY MR. TEPFER:

3       Q    Sorry.  Did you -- could you answer the

4   question?

5       A    Sometimes the name of an idea and the name of

6   the company are two different things.

7       Q    Sure.  Well, I suppose we can sort of address

8   those individually.

9            Did you -- do you recall any other companies

10  by name that you discussed, you know, starting with

11  Alon Nottea?

12           MR. UNGAR:  Objection as to the form of the

13  question.  Vague and ambiguous.

14           THE WITNESS:  We discussed many different

15  areas.  The exact names, I do not remember.

16  BY MR. TEPFER:

17      Q    Could you tell me some of the areas that

18  you're referring to?

19      A    The whole segment of the economy.

20      Q    Could you provide some examples?

21      A    Better ask me specifically what you mean,

22  because --

23      Q    Sure.

24      A    -- if I start enumerating them --

25      Q    Did Alon Nottea ever ask you to invest in
```

31

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                        1/28/2016

1     Chargeback Armor, Inc., for example?

2               THE INTERPRETER:  Excuse me, Counsel.

3               Could you repeat it for the interpreter?

4               MR. TEPFER:  Sure.

5        Q    Did Alon Nottea ever ask you to invest in

6     Chargeback Armor, Inc., and that's -- Chargeback is

7     one word.

8        A    Specifically that name I do not remember, but

9     Alon had the -- those ideas about IT technology to

10    support -- well, IT technology, and it was in this

11    area; but that name I do not remember if it's word for

12    word.

13              MR. BENICE:  Can we take a two-minute

14    restroom break?

15              MR. TEPFER:  Sure.  We'll take a break real

16    quick.

17              (Recess.)

18              (Record read.)

19    BY MR. TEPFER:

20       Q    And you said those ideas about IT technology

21    in this area.

22              What area are you referring to?

23       A    In the area of chargeback.

24       Q    It sounded like you were not finished.

25       A    Yes.  He asked me to invest in the building

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    of this technology; but because I didn't understand --

2    because I don't understand this area at all, I

3    refused.

4        Q    So it was your understanding that Alon

5    Nottea -- and I was going to ask:  What's the --

6    what's the time period you're referring to here?

7        A    I don't remember when.  I don't remember

8    exactly.

9        Q    Do you know a year perhaps?

10       A    Maybe the year, but I don't remember exactly.

11       Q    Sure.  But it was after -- I guess after you

12   moved here in 2011?

13       A    Yes.

14       Q    And so it was your understanding that Alon

15   Nottea was, I guess, developing a program for -- in

16   the chargeback area?

17            MR. UNGAR:  Objection as to the form of the

18   question.  Vague and ambiguous, calls for speculation,

19   lacks foundation, misstates prior testimony.

20   BY MR. TEPFER:

21       Q    I should explain.  Every once in a while an

22   attorney may object, and I ask that you still answer

23   the question unless your attorney instructs you not

24   to.

25            MR. BENICE:  Do you understand the question?

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

```
 1              THE WITNESS:  For me, it's just very
 2      abstract.
 3              Can you please ask it again, just making
 4      sure?
 5              MR. TEPFER:  So could you read back the
 6      question?
 7              (Record read.)
 8              THE WITNESS:  He's not a programmer.
 9      BY MR. TEPFER:
10         Q    So what -- what was -- what was Alon
11      Nottea -- I guess you said he's not developing a
12      program.
13              What was he doing that you're referring to?
14              MR. UNGAR:  Objection as to the form of the
15      question.  Vague and ambiguous, calls for speculation.
16              THE WITNESS:  Unfortunately, since it was
17      Alon's idea, I didn't try to understand it deeply, so
18      I can't say what he was thinking, what he was
19      planning, or what happened eventually.
20      BY MR. TEPFER:
21         Q    But you -- I suppose you did have a
22      conversation with him about this technology?
23              MR. UNGAR:  Objection as to the form of the
24      question.  Vague and ambiguous.
25              THE WITNESS:  I didn't, yes, because it's an
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/28/2016

1   abstract question.  He just said, "There's this
2   business.  There's this area.  Do you want to invest?"
3            And I said, "I don't understand anything
4   about it.  I don't even want to talk about it."
5   BY MR. TEPFER:
6       Q    And do you know what a chargeback is?
7       A    Do you mean do I understand how this word is
8   translated?
9       Q    No.  My question is a little different.
10           Do you understand what a chargeback is as
11  that word is used in the English language?
12           MR. UNGAR:  Objection as to the form of the
13  question.  Vague and ambiguous.
14           THE WITNESS:  I understand chargeback as the
15  return of the money to the client.  That's how I
16  understand it.  If you're asking about any technical
17  issues, I don't have any idea.
18  BY MR. TEPFER:
19      Q    Sure.  How did you learn that that's what a
20  chargeback was -- or come to that understanding
21  rather?
22      A    This question is very abstract.  How -- how
23  can I know?  It's like asking me how did I find out
24  that two by two is four?  How can we talk about that?
25  How can I give you that point of time when I started

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    knowing this?

2        Q    Well, I suppose what I'm wondering is:  Did

3    you know what a chargeback was before 2010?

4        A    What do you mean by this word "chargeback"?

5    Do you mean the translation that it's the return of

6    funds?  How to translate that?

7        Q    No.  I suppose, you know, the -- what I'm

8    asking is:  Using the word chargeback as it's used --

9    as you understand it to be used in the English

10   language, when did you come to learn what that word

11   meant?

12            MR. UNGAR:  Motion to strike prior answers of

13   the deponent regarding the term "chargeback."

14            Objection as to the form of the question.

15   Vague and ambiguous.

16            MR. BENICE:  Do you understand his question?

17   He's just asking you -- if you can answer it -- when

18   you first learned your understanding of what a

19   chargeback is.

20            THE WITNESS:  If we go deep, I still don't

21   know exactly what it is.  I just know the translation.

22   BY MR. TEPFER:

23       Q    So --

24       A    Because everybody interprets this word in

25   their own way.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      Q     I guess your understanding -- what I'm
2  wondering is:  You said earlier, I believe, that a
3  chargeback is essentially getting your money returned,
4  and I'm wondering when did you come to that
5  understanding?  Was it after 2010?
6      A     Of course.  Most probably, yes, because how
7  can I -- sometimes you don't even remember what you
8  came to know yesterday.
9      Q     Do you know if you learned it from the
10  Internet?
11     A     I don't know.  I don't remember how I learned
12  this word.
13     Q     Okay.  And to go back a little bit to talk
14  about other business that you discussed with Alon,
15  aside from BunZai Media Group, did you ever provide
16  him loans for any other company?
17     A     Yes.
18     Q     What company?
19     A     Focus Media Group.
20     Q     Are there any other companies that you
21  provided Alon Nottea loans for?
22     A     I gave money to Alon as a loan; but what
23  legal entities he used to accept this money or to
24  accept this loan, I don't know, but I was giving the
25  loans directly to him under his personal guaranties.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1      Q      What are those personal guaranties you're

2      referring to?

3      A      Trust.

4      Q      Okay.  So it was your understanding that Alon

5      was -- was using the loans that you provided him to

6      sell skin products; correct?

7             MR. UNGAR:   Objection as to the form of the

8      question.  Vague and ambiguous, misstates prior

9      testimony.

10     BY MR. TEPFER:

11     Q      You can go ahead.

12     A      I provided Alon a loan for his business.  How

13     he used it, I don't know.

14     Q      So you didn't know that BunZai Media Group

15     was selling skin care products?

16     A      I did.

17     Q      So did you -- do you know if you made loans

18     to Alon Nottea that weren't for the -- or for

19     companies that were selling skin care products?

20     A      That is, if he used the money that I provided

21     to him as a loan in some other areas?  Do I understand

22     correctly?

23     Q      Yes.

24     A      I don't think so, but he could have used it

25     for a number of different goals.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      Q     Do you know if -- did you ever own a company

2     that sold AuraVie skin care products?

3            THE INTERPRETER:  Excuse me.  Can you repeat

4     the question?

5     BY MR. TEPFER:

6      Q     Were you ever the owner of a company that

7     sold AuraVie skin care products?

8            MR. TEPFER:  I should probably spell that.

9            THE INTERPRETER:  Yes.

10           MR. TEPFER:  It's A-u-r-a, V-i-e.

11           THE INTERPRETER:  Is this a brand?

12           MR. TEPFER:  Yeah.  Yeah.

13           THE WITNESS:  The owner or a company that was

14    registered in my name?

15    BY MR. TEPFER:

16     Q     Could you explain what your understanding is

17    of the difference between those two things?

18     A     Well, it was -- it was just nominal.  I was

19    just a nominal shareholder, but I didn't own this

20    company.  To own a company means to own it and to run

21    it.

22     Q     Okay.

23     A     I personally never owned a single company

24    selling skin care products in the meaning that I

25    attach to this.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1     Q     But you -- so you used the term "nominal
2  owner."
3           What's your understanding of what a nominal
4  owner is?
5     A     When a company is opened in your name by
6  another person who's running the company.
7     Q     Have you ever been a nominal owner of a
8  company that sold AuraVie skin care products?
9     A     Yes.
10    Q     What companies were those?
11    A     The company was called Zen Mobile.
12    Q     Zen Mobile Media, Inc.?
13          Are there any other companies?
14    A     No.
15    Q     Do you know if Alon Nottea since 2010 has
16  sold skin care products overseas?
17    A     I know that he tried.
18    Q     Do you know which company he used to do that?
19    A     I don't remember.  I don't know.  I don't
20  remember.
21    Q     Have you ever had any association with a
22  company that sold skin care products overseas?
23    A     What do you mean by "association"?
24    Q     Did you ever have an ownership interest in
25  any company that sold skin care products overseas?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

```
 1      A    No.

 2      Q    Were you ever a nominal owner of a company

 3   that sold skin care products overseas?

 4      A    No.

 5      Q    And to talk a bit more about BunZai Media

 6   Group, you said that you had given them -- or given

 7   Alon and Khristopher loans, but I wanted to talk --

 8   aside from that, have you ever been an employee of

 9   BunZai Media Group?

10      A    No.

11      Q    Have you ever, I suppose, represented that

12   you were an employee of BunZai Media Group?

13      A    Can you be more specific?  That's just too

14   abstract.

15      Q    Sure.

16      A    Who would I represent it to?  My wife or who?

17      Q    Well, for example, have you ever -- on a

18   government document, have you ever represented in a --

19   have you ever represented on a government form that

20   you were an employee of BunZai Media Group?

21      A    Maybe BunZai employees presented some

22   papers -- some government papers that I signed; but I

23   have never physically worked for BunZai, and I never

24   had any responsibilities in this company.

25      Q    I suppose were you -- I should -- were you
```

41

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1   referring to a specific instance where -- that you're

2   aware of that you signed papers that said you were an

3   employee?

4       A    No.  It's just I remember there's always so

5   much paperwork and all this paperwork in the company,

6   and maybe there was some documents that they gave me

7   to sign mistakenly or not mistakenly.

8            I gave them a loan, and I always wanted to --

9   for them to give me the interest and to get the

10  principal back.

11           They constantly tried in various ways to not

12  return the money to me, and they offered various ways

13  of how they're going to be repaid and always postponed

14  the repayment.

15           I was ready to agree for them to call this

16  money anything they wanted just so that I could get it

17  back.

18      Q    Do you -- you said that you were a nominal

19  owner of Zen Mobile Media, Inc.

20           Did you -- and you signed, I suppose,

21  paperwork for Zen Mobile Media, Inc.?

22      A    What paperwork do you mean?

23      Q    For example, did you ever sign applications

24  for merchant accounts for Zen Mobile Media, Inc.?

25      A    I don't remember.  If there are any

42

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    applications with my signature, then I did.  If there

2    aren't any, then I didn't.  I just don't remember.

3        Q    Do you recall who would ask you to sign

4    documents concerning Zen Mobile Media, Inc.?

5        A    Yes.

6        Q    Who was that?

7        A    Alon.

8        Q    Did anyone else ever request that you sign

9    documents concerning Zen Mobile Media, Inc.?

10           MR. UNGAR:  Objection as to the form of the

11   question.  Vague and ambiguous, calls for speculation.

12           THE WITNESS:  No.

13   BY MR. TEPFER:

14       Q    And was -- you stated that you were only the

15   nominal owner of Zen Mobile Media, Inc.

16           Who was -- in your understanding was the real

17   owner of Zen Mobile Media, Inc.?

18       A    I don't know.

19       Q    Why did you allow Zen Mobile Media, Inc. to

20   be opened in your name?

21           MR. UNGAR:  Objection as to the form of the

22   question.  Vague and ambiguous and argumentative.

23   BY MR. TEPFER:

24       Q    You can go ahead.

25           MR. BENICE:  If you understand the question.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

```
 1              THE WITNESS:  Can you please repeat it?
 2              (Record read.)
 3              THE WITNESS:  Alon asked me about it.
 4    BY MR. TEPFER:
 5       Q    So Alon Nottea asked you to open that
 6    company?
 7       A    Yes.
 8       Q    Did he state why he wanted you to open Zen
 9    Mobile Media, Inc.?
10       A    Well, I trusted him.  I trusted him with
11    money, so.  He said the company's growing, expanding,
12    so we need another company, and I okayed it.
13       Q    I'm going to maybe shift gears a little bit
14    to talk about other -- other companies that you own.
15              (Discussion off the record.)
16              MR. TEPFER:  Yeah.  Maybe now would be a good
17    time for a lunch break -- if we could go off the
18    record -- if that's good for everyone.
19              THE WITNESS:  Okay.
20              MR. GALLEGOS:  We're off the record.
21              (Noon recess.)
22              MR. TEPFER:  We're back on the record.
23       Q    So before the break we were talking a little
24    bit about some of the other companies that you -- I
25    wanted to see if we could talk about VastPay.
```

44

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1          Could you tell me what -- what VastPay's
2    business is?
3          A    Okay.  VastPay is a company that I opened
4    together with Eugene in order to buy -- to buy
5    wholesale small companies and to make it a big
6    company.
7          Q    And that's Eugene Shampansky?
8          A    Yes, Shampansky.
9          Q    Do you know how to spell that for the court
10   reporter?
11              MR. TEPFER:  I'll be able to get that to you.
12         Q    So you said that it's a company that you
13   started with Eugene to buy other companies?
14         A    Small ones.  It was Eugene's idea to buy
15   small ones and make a big one.
16         Q    So it's an investment firm?  Is that --
17         A    In the area of merchant business.
18         Q    So by "merchant business" do you mean
19   merchant processing?
20         A    That's -- that's just the name of the
21   company.  The idea was to buy companies with existing
22   clients because they don't cost as much; and then when
23   the companies are bigger, when it has a lot of
24   clients, the idea is it's going to cost more.
25         Q    And what does VastPay do for its clients?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

45

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      A      VastPay, it's like an aggregator.  It
2  collects other small companies to become big.  That
3  was the original idea.  In order to do that we had to
4  get, well, special documents.
5      Q      Did -- the smaller companies that you are
6  referring to that VastPay purchases, do they work in
7  one particular field?
8      A      As far as I understand -- Eugene knows more
9  about it, but as far as I understand, it's
10 restaurants, shops, everything.  Small companies that
11 have many clients.
12     Q      Do you know -- sorry.
13            When did -- when did you and Eugene open this
14 company?
15     A      I don't remember.  I need to look at the
16 documents, because for the longest time you and him
17 were negotiating the terms.
18            THE INTERPRETER:  Sorry.  Interpreter
19 correction.
20            I don't know, because for the longest time me
21 and him were negotiating the terms.
22 BY MR. TEPFER:
23     Q      Sure.  Sure.  You're an owner of VastPay; is
24 that correct?
25     A      Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1       Q     Are you the sole owner?

 2       A     Right now, yes; but before Eugene was one as

 3   well.

 4       Q     So Eugene sold you his share of VastPay?

 5       A     He just left it and quit.

 6       Q     So Eugene doesn't work there anymore?

 7       A     (No audible response.)

 8       Q     So do you handle the day-to-day operations of

 9   VastPay?

10             Sorry.  Could you --

11       A     No.

12             MR. TEPFER:  Could you repeat the question?

13   Sorry.

14             (Record read.)

15             THE WITNESS:  No.

16   BY MR. TEPFER:

17       Q     Who does?

18       A     Nobody.

19       Q     Does the company not exist anymore?

20       A     Legally it exists on paper, but physically we

21   killed it.

22       Q     Do you know if VastPay has ever advertised

23   itself as a merchant processor?

24             MR. UNGAR:  Objection as to the form of the

25   question.  Vague and ambiguous.
```

47

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          THE WITNESS:  Operational management was

2    under the responsibility of Eugene.  I don't know.

3    BY MR. TEPFER:

4          Q     Who came up with the idea for VastPay?

5          A     The idea itself?

6          Q     Yes.

7          A     Eugene.

8          Q     Did he, I guess, show you a business

9    proposal?

10         A     Of course.

11         Q     And what did he propose in the business

12   proposal?

13         A     He proposed to invest in the business

14   approximately -- well, a certain amount of money, and

15   for a certain period of time it could be sold for much

16   more.

17         Q     What about Nexipay?  Is that another company

18   of yours?

19         A     It's a company that was supposed to be like

20   VastPay.  Eugene was looking for a good name for a

21   business; and this was opened, but it actually never

22   operated.

23         MR. TEPFER:  Robert, would you mind muting?

24   We're getting some sort of background noise a little

25   bit.

48

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1              MR. UNGAR:  There is no background where I
 2    am.  It's quiet.
 3              MR. TEPFER:  I think it must be if you have
 4    us on speaker phone, we're getting feedback.
 5              It seems to have died down.
 6        Q     What about Guayas?  What is Guayas?
 7              MR. TEPFER:  And I think that's G-u-a-y-a-s.
 8        Q     Guayas Limited; is that right?
 9        A     It's a company.
10        Q     And do you own that company?
11        A     I'm a shareholder.
12        Q     Are you a shareholder with other people?
13        A     No, I'm the sole shareholder.
14        Q     When did you become sole shareholder of
15    Guayas?
16        A     A long time ago.  I need to check the papers.
17        Q     Was it before 2010?
18        A     Yes.
19        Q     Have you been sole shareholder since 2010?
20        A     Yes.
21        Q     And what is Guayas's business?
22        A     As far as I know, it's better to address this
23    question to the director, CU.
24        Q     Sorry.  So you're not familiar with the
25    business purpose of Guayas?
```

49

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          MR. UNGAR:  Objection.  Objection as to the
2     form of the question.  Vague and ambiguous and
3     argumentative.
4          THE WITNESS:  I know, but somebody who runs
5     the company's day-to-day activities is familiar more
6     and knows better.
7     BY MR. TEPFER:
8          Q    Okay.  Sure.
9          A    And I don't want to present my general ideas
10    as actual knowledge.
11         Q    Sure.  Well, what is your understanding of
12    what Guayas's business is with the understanding that
13    the -- the person who runs the day-to-day operations
14    may know better?
15         MR. UNGAR:  Objection as to the form of the
16    question.  Vague and ambiguous.
17         THE WITNESS:  In my view, it's a company that
18    invests money into different areas.
19    BY MR. TEPFER:
20         Q    Has Guayas ever invested money in BunZai
21    Media Group?
22         A    No.
23         Q    I'm going to talk a little bit -- to go back
24    to Zen Mobile Media.
25         So Zen Mobile Media was a company that you

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1    said that Alon had asked you to help open.

2           Did you understand that it sold AuraVie skin

3    care products?

4           MR. UNGAR:  Objection as to the form of the

5    question.  Vague and ambiguous, misstates the prior

6    testimony of the deponent.

7           THE WITNESS:  Do I understand the question

8    correctly if Alon asked me to open a company to sell

9    skin care products?

10   BY MR. TEPFER:

11      Q    No.  I guess my question was just that:  Did

12   you understand that Zen Mobile Media sold AuraVie skin

13   care products?

14      A    Alon asked me -- he said, "Igor, the company

15   is growing, and I need to open another company."  What

16   specifically it was going to be doing I didn't

17   investigate because I trusted him.

18      Q    And when you spoke with the receiver back in

19   August you discussed what you referred to as the

20   BunZai companies or the BunZai group of companies.

21          Do you recall discussing that with the

22   receiver?

23      A    Six months ago I don't remember.  Something

24   in general.

25      Q    Do you -- do you recall BunZai Media Group

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    being associated with other companies that also sold

2    AuraVie?

3         A    Yes.

4         Q    Do you recall the names of those companies?

5         A    No.

6         Q    If I were to read you the names of some of

7    those companies, do you think you would recall if they

8    were one of those companies?

9         A    Let's try it.

10        Q    Sure.  Do you know -- have you ever heard of

11   DSA Holdings, Inc.?

12        A    Maybe I did hear about it, but I'm not sure.

13        Q    What about Lifestyle Media Brands, Inc.?

14        A    Same thing.  Kind of sounds familiar, but I

15   don't remember exactly.

16        Q    And what --

17             MR. UNGAR:  Motion -- motion to strike as

18   nonresponsive.  Objection to this line of questioning.

19   It's vague and ambiguous because it doesn't

20   distinguish between the witness hearing of these names

21   by virtue of the fact that they're defendants in the

22   lawsuit versus him hearing of these names for some

23   other means or reasons.

24             MR. TEPFER:  Counsel, I'm going to ask that

25   you limit your objections to proper objections under

52

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    the federal rules rather than speaking objections.

2            MR. UNGAR:  Okay.  Then it's vague and

3    ambiguous.

4            MR. TEPFER:  Thank you.

5        Q    Are you familiar with SBM Management, Inc.?

6        A    Yes.

7            MR. UNGAR:  Objection as to the form of the

8    question.  Vague and ambiguous.

9    BY MR. TEPFER:

10       Q    What is SBM Management, Inc.?

11       A    It's a company.

12       Q    Do you know what the business of that company

13   is?

14       A    Well, I don't know.  It's one of the

15   companies that was in business.

16           MR. TEPFER:  Sorry.  Did you say it was one

17   of the companies that was a business?

18           THE INTERPRETER:  In business.

19           MR. TEPFER:  In business.

20       Q    In the BunZai group of companies business?

21   Is that what you meant?

22           MR. UNGAR:  Objection as to the form of the

23   question.  Vague and ambiguous.

24           THE WITNESS:  I don't know.  After the BunZai

25   company was closed, Alon asked me for a loan, and I

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

53

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

```
 1    provided a loan for this company.
 2    BY MR. TEPFER:
 3        Q    You provided a loan to SBM Management, Inc.?
 4        A    Yes.
 5        Q    And what -- do you recall what time period
 6    this was?
 7        A    Well, a couple years ago.  A year -- in the
 8    last two years.
 9        Q    Okay.  And so you said that Alon asked you to
10    provide the loan to SBM Management, but do you know if
11    Alon was the one that, I guess, controlled SBM
12    Management, Inc.?
13             MR. UNGAR:  Objection as to the form of the
14    question.  Vague and ambiguous.
15             THE WITNESS:  I don't know.
16    BY MR. TEPFER:
17        Q    And I think you had also mentioned that you
18    provided a loan to Focus Media Solutions, Inc.
19             Do you recall when you did that?
20        A    It was approximately in June of this last
21    year.
22        Q    Who asked you to provide that loan to Focus
23    Media Solutions, Inc.?
24        A    Alon.
25        Q    Did he say what the loan was for?
```

54

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

```
 1        A    Yes.

 2        Q    What did he say it was?

 3        A    It was for the company Focus Media.

 4        Q    Did he say what Focus Media was going to use

 5   the loan for?

 6        A    Yes.

 7        Q    What did he say?

 8        A    For a marketing campaign.

 9        Q    Did he say what he was going to market with

10   that loan?

11        A    Various types of advertising.

12        Q    Do you know -- are you familiar with the

13   company Pinnacle Logistics, Inc.?

14        A    That is when you say am I familiar, what does

15   that mean?

16        Q    Have you ever heard of that company?

17        A    Of course, yes.

18        Q    What is that company's business?

19        A    It provides call center services.

20        Q    And when did you become familiar with

21   Pinnacle Logistics, Inc.?

22        A    I don't know.  Also a couple years ago.

23        Q    And who, in your understanding, owns Pinnacle

24   Logistics, Inc., if you know?

25        A    I don't know.
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1     Q     Do you know anyone that works at Pinnacle
2   Logistics, Inc.?
3     A     Yes.
4     Q     Who do you know that works there?
5     A     Roi.
6     Q     To your knowledge, has Alon Nottea ever
7   worked at Pinnacle Logistics, Inc.?
8           MR. UNGAR:  Objection as to the form of the
9   question.  Vague and ambiguous.
10          THE WITNESS:  I have no idea.
11  BY MR. TEPFER:
12    Q     What -- you said that Roi worked there.
13          Do you know what Roi's job was at Pinnacle
14  Logistics, Inc.?
15    A     To work in the call center.  He was doing
16  something in the call center, but I don't know the
17  details.
18    Q     And that's Roi Reuveni, to be clear?
19    A     Yes.
20          MR. TEPFER:  And just to spell it, it's
21  R-o-i, R-e-u-v-e-n-i.
22    Q     And -- and you said it was a call center.
23          Do you know what it was a call center for?
24    A     Well, to support.  Like a customer support.
25  That's how I understand it.

56

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

 1       Q     Sure.  So like a customer services --
 2       A     Yes.
 3       Q     And do you know what product it provided
 4   customer service for?
 5       A     As far as I know, various.  As far as I know,
 6   various.
 7       Q     Do you know --
 8       A     But, again, this is something that I just
 9   suppose.
10       Q     And how did you come to learn this
11   information about Pinnacle Logistics, Inc.?
12             MR. UNGAR:  Objection as to the form of the
13   question.  Vague and ambiguous.
14             THE WITNESS:  Well, just simply I can't
15   remember exactly.  I just knew it.
16   BY MR. TEPFER:
17       Q     Do you know where Pinnacle Logistics, Inc.
18   was located?
19       A     I know where they were located for a period
20   of time.  Not for the whole time, but for a short
21   period of time I knew where they were.
22       Q     What period of time are you discussing?
23       A     I don't remember exactly.  I just remember
24   that they were there for some period of time.
25       Q     Like in the past few years?

57

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1     A     During the -- if we take the last five years,
2   I know that at some point -- some period of time
3   during those five years they were located there.
4     Q     And what -- what's the address that -- or
5   location that you're referring to?
6     A     In the Valley, but I don't remember the
7   address.  I remember physically where it is, but I
8   don't have it in my memory.
9     Q     Sure.  Do you know if it was Van Nuys?
10    A     Most probably, yes.
11    Q     Does 7900 Gloria Avenue sound correct to you?
12    A     Yes, it does.
13    Q     Do you know if AuraVie was one of the
14  products that the call center provided customer
15  service support for?
16          MR. UNGAR:  Objection as to the form of the
17  question.  Vague and ambiguous.
18          THE WITNESS:  Probably.
19  BY MR. TEPFER:
20    Q     And why do you believe that it is likely that
21  Pinnacle Logistics provided customer service support
22  for AuraVie products?
23    A     For many indications.
24    Q     Can you provide some of those indications?
25    A     Well, they were located in the same building,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

58
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1    yes.  Call center expenses; that is, the call center

2    services were paid to them.  Just in general, you

3    know.  I can't tell you specific dot by dot things,

4    but in general.

5         Q    And you said the same building -- the same

6    building -- Pinnacle Logistics was in the same

7    building as what?

8         A    Where Alon was.

9         Q    And you said that call center services were

10   paid to -- I think you said call center services were

11   paid to them.

12             Could you explain that?

13        A    That's not what I said.

14        Q    Oh, sorry.

15        A    You didn't interpret it correctly.

16             I said that Alon paid the call center for its

17   services.

18        Q    Okay.  Do you know other companies that were

19   located in that building?

20        A    I know that for a while in this business --

21   in this building another business was located, but I'm

22   not sure.

23        Q    Do you know what that business sold?

24             THE INTERPRETER:  Could you repeat this for

25   the interpreter, please?

59

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1           MR. TEPFER:  Sorry.

2      Q    Do you know what that other business sold?

3           THE INTERPRETER:  Are you saying sold,

4    Counsel?

5           MR. TEPFER:  Sold.  Uh-huh.  Sorry.

6           THE WITNESS:  To who?  Interpreted as

7    specifically who was it sold to, this business.

8    BY MR. TEPFER:

9      Q    Oh.  I'm just curious if you know what this

10   other -- the business purpose of -- this other

11   business located at that 7900 Gloria, if you knew what

12   that business purpose was.

13     A    I can only assume.

14          MR. BENICE:  Don't assume.  If you don't

15   know, tell him you don't know.

16          THE WITNESS:  I don't know.

17   BY MR. TEPFER:

18     Q    Did you ever hire anyone to do any work for

19   Zen Mobile Media, Inc.?

20     A    No.

21     Q    Doron Nottea testified that you had hired him

22   to do bookkeeping services for Zen Mobile, Inc.

23          Do you know why he would say that?

24          MR. UNGAR:  Objection as to the form of the

25   question.  Vague and ambiguous.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1           THE WITNESS:  I never managed Zen Mobile

2      company.  That's why even theoretically I couldn't

3      hire anybody for work.

4      BY MR. TEPFER:

5           Q    So if we were to go back to the BunZai group

6      of companies, is it -- is it your understanding that

7      Alon Nottea owned multiple companies that sold the

8      AuraVie product?

9           A    My understanding is that I gave the money as

10     an investment, and how he managed it wasn't my

11     business.  I didn't try to understand.  My goal was to

12     have my loan repaid with interest as soon as possible.

13          Q    My question was:  Do you know if Alon Nottea

14     owned multiple companies that sold AuraVie?

15          A    No.  I don't know.  I don't know.  I don't

16     know how he functioned.

17          Q    And do you know if he asked other individuals

18     to open companies to, I guess, grow the business as

19     you said?

20          MR. UNGAR:  Objection as to the form of the

21     question.  Vague and ambiguous, calls for speculation,

22     lacks foundation.

23          THE WITNESS:  I can guess, but I do not know

24     exactly.

25     BY MR. TEPFER:

61

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1     Q    Okay.
2          MR. BENICE:  Don't guess.  No guessing.
3          Can we take a one-minute break?
4          MR. TEPFER:  Sure.  Sure.  Off the record.
5          (Recess.)
6          MR. TEPFER:  We're back on the record.
7     Q    I want to ask:  Do you know who Alan Argaman
8     is?
9     A    As far as I understand, it's Avi; right?
10    Q    I believe he does go by Avi.
11         Do you know Avi Argaman?
12    A    Yes.  Yes.
13    Q    Do you know if -- do you know if he worked at
14    BunZai Media Group, Inc.?
15    A    I don't know exactly, but I doubt it.
16    Q    Do you know of any businesses that Avi owns?
17    A    I know that he has some kind of business, but
18    the name -- what kind of name the business has
19    exactly, I don't know.
20    Q    What sort of business do you understand him
21    to have?
22         MR. UNGAR:  Objection as to the form of the
23    question.  Vague and ambiguous.
24         THE WITNESS:  He's in IT.
25    BY MR. TEPFER:

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      Q      How did you meet Avi Argaman?

2      A      He was introduced to me by Alon.

3      Q      Was he -- sorry.  Did -- to your knowledge,

4    did Alon do business with Avi Argaman?

5      A      I don't know exactly personally, but I doubt

6    it.

7      Q      So your understanding is that Avi Argaman was

8    a personal friend of Alon Nottea?

9      A      Yes.  They have different characters.

10     Q      And by "different characters," you mean that

11   you don't think they would work well together, or

12   something like that?

13     A      Yes.  That's exactly what I meant.

14     Q      Okay.  What about Doron Nottea?  Do you know

15   Doron Nottea?

16     A      I do.  Very good decent person.

17     Q      Do you know what Doron Nottea's, I guess,

18   professional employment is?

19            MR. UNGAR:  Objection as to the form of the

20   question.  Vague and ambiguous.

21            THE WITNESS:  Only according to Alon.

22   BY MR. TEPFER:

23     Q      And what did Alon tell you that Doron's

24   employment was?

25     A      Alon said that Doron has his own business

63
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1     selling adult business.  You know what I'm talking
2     about.
3         Q    And do you know if Doron had any other, I
4     guess, professional business aside from those adult
5     companies you're talking about?
6              MR. UNGAR:  Objection as to the form of the
7     question.  It's vague and ambiguous.  It assumes facts
8     not in evidence.  It calls for speculation.  It lacks
9     foundation.
10             THE WITNESS:  I don't know.
11    BY MR. TEPFER:
12        Q    We were talking about -- at the beginning
13    about your use of e-mail in your, I guess,
14    professional businesses.
15             What -- what e-mail addresses do you use?
16        A    I use igor@cal_energy.co.
17        Q    Did you use any other e-mail addresses -- or
18    have you from 2010 to the present used any other
19    e-mail addresses?
20        A    Yes.  My personal one as well.
21        Q    And what's that one?
22        A    Igorlats- -- igorlats@gmail, and some other
23    ones.  I don't remember now.
24        Q    Okay.  Are you the only one that has access
25    to that e-mail address, to your knowledge?

64

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1        A    I hope so, but I'm not sure.

2        Q    And so you're not aware of anyone else ever

3   using your e-mail address?

4        A    No.

5        Q    Okay.  And I'm assuming that that Gmail

6   address we're talking about is password protected;

7   correct?

8        A    Well, as far as I understand, all e-mail

9   addresses are protected by password.  How safely, I

10  don't know.

11       Q    And have you ever provided that password to

12  anyone else?

13       A    Yes.

14       Q    Who have you provided it to?

15       A    Well, I don't remember everybody who knows my

16  password.  I use the same password for everything.  I

17  have memory problems.  That's why I use the same

18  password for everything.

19       Q    But in that Gmail account, though, you don't

20  have any reason to believe anyone else has ever used

21  it; correct?

22       A    No.

23            (Exhibit 16 marked.)

24            MR. TEPFER:  Okay.  Let's turn to -- I'm

25  going to hand the witness what has been marked

65

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

```
 1   Exhibit 16.
 2             MR. BENICE:  60?
 3             MR. TEPFER:  16.
 4        Q    Have you ever seen this Web site?
 5        A    What is have I seen?
 6        Q    Like, have you ever -- sorry.  Maybe we're --
 7        A    It's just too abstract.  I need to see.
 8        Q    Have you -- have you ever -- before the
 9   filing of this lawsuit, have you ever seen this
10   advertisement before?
11        A    I don't remember exactly.  Maybe briefly when
12   I was running around when I popped into the office and
13   saw it; but if you want to ask if anybody specifically
14   showed me this Web site and told me what's on it, then
15   no.
16        Q    And you said you might have seen it when you
17   popped into the office.
18             Are you referring to BunZai Media Group?
19        A    Yes, maybe.
20        Q    How often would you stop by the offices
21   there?
22        A    What do you mean by "often"?
23        Q    Would you go by once a month?
24        A    And for what purpose?
25        Q    Just for any purpose.
```

66

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          Would you go once a month?

2     A    Sometimes once a month.  Sometimes once every

3 six months.

4     Q    Would you ever go by once a week?

5     A    I don't remember.

6     Q    I guess on -- what -- for what purpose would

7 you -- would you go to the BunZai Media Group offices?

8     A    For the most part it was to discuss new

9 projects with Alon.

10    Q    Did y'all ever have meetings about BunZai

11 Media Group?

12    A    We had meetings to discuss financial results

13 of Alon's business.

14    Q    Who would typically attend these meetings?

15         MR. UNGAR:  Objection.  Vague and ambiguous.

16         THE WITNESS:  It varied from time to time,

17 but most frequently me and Alon.

18 BY MR. TEPFER:

19    Q    Would -- did Doron ever attend any of these

20 meetings?

21    A    I don't remember.  Maybe some.  I don't

22 remember exactly; but in my memory, I don't remember

23 any.

24    Q    What about Roi Reuveni?

25    A    Same.

67

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/28/2016

```
 1       Q     Do you know who was in charge of creating
 2    advertisements for -- or overseeing rather -- the
 3    advertising department at BunZai Media Group?
 4       A     My understanding or exactly?
 5       Q     Your understanding.
 6       A     As far as I understand, Khristopher was
 7    responsible for the advertising.
 8       Q     Did you know if the AuraVie products were
 9    sold by or were offered as a free trial?
10             MR. UNGAR:  Objection as to the form of the
11    question.  Vague and ambiguous.
12             THE WITNESS:  Yes.
13    BY MR. TEPFER:
14       Q     How did you know that?
15       A     Alon, with Khristopher, told me.
16       Q     So they explained that they would offer a
17    free trial, and then what was your understanding of
18    the terms of the free trial?
19       A     They said we have an amazing product, and I
20    know it myself because I brought it to Europe and
21    everybody liked it.  So every time when I would travel
22    to Europe I would get calls, "Please bring it.  Please
23    bring it."
24             MR. BENICE:  Just listen to his question.
25             THE WITNESS:  Okay.
```

68

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                          1/28/2016

1          MR. BENICE:  Do you want the question read

2     back?

3          THE WITNESS:  Please read it back.

4          (Record read.)

5          MR. BENICE:  If you know.

6          THE WITNESS:  They said that this product --

7     they're going to let people try it.  That's all I

8     knew.  For five years I saw good results.  People

9     liked it for the most part.  My wife -- my wife likes

10    it as well.

11    BY MR. TEPFER:

12        Q    Did you understand that if the product was

13    not returned within a particular time period that the

14    customer would then be charged a certain amount for

15    the skin cream?

16         MR. UNGAR:  Objection as to the form of the

17    question.  It's vague and ambiguous and assumes facts

18    not in evidence.

19         THE WITNESS:  Okay.  I know that Alon used

20    various ways to sell the product; but specific

21    details, techniques, I never really tried to

22    understand it deeply.  They changed drawings or did

23    some other things.

24    BY MR. TEPFER:

25        Q    They changed drawings?

69

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      A    Yes.  But I never tried to understand what
2   they were doing.  My goal was to have my investment
3   repaid as soon as possible with interest -- my
4   interest -- my percentage.
5      Q    As a businessman were you concerned about
6   getting your investment back if they were giving away
7   the product for free?
8           MR. BENICE:  I'll object as irrelevant, no
9   foundation.
10          You can answer if you understand the
11  question.
12          MR. UNGAR:  Objection as to the form of the
13  question.  It's vague and ambiguous.  It assumes facts
14  not in evidence, and it's argumentative.
15          THE WITNESS:  So maybe you ask this question
16  differently somehow.
17          MR. BENICE:  Do you understand his question?
18          THE WITNESS:  Can you then repeat it?
19  There's so many things that are --
20          (Record read.)
21          THE WITNESS:  As an investor I'm interested
22  in people.  I invest in people.  I gave -- if I trust
23  them intuitively, then I give a loan to people.
24          But how they run their business, I don't
25  know.  Asking these technical details, I have no idea.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1     I invest in the people, and I hope to get the
2     investment back.
3     BY MR. TEPFER:
4         Q    Do you know what selling products -- what it
5     means to sell a product by negative option?
6         A    Explain this to me.
7         Q    Well, I'm asking if you know what that means.
8         A    I can guess, but --
9              MR. BENICE:  No.  Don't guess.  He's asking
10    you a simple question.  If you know, tell him you
11    know.  If you don't know, tell him you don't know.
12             THE WITNESS:  I don't know.
13    BY MR. TEPFER:
14        Q    Do you know what a continuity plan is?
15        A    Yes.
16        Q    What is your understanding of what a
17    continuity plan is?
18        A    If I go to a gym they charge -- they charge
19    me every month.
20        Q    Were you aware that that was one of the
21    methods by which AuraVie was sold?
22             MR. UNGAR:  Objection as to the form of the
23    question.  Vague and ambiguous.
24             THE WITNESS:  Exactly or guesses?
25             MR. BENICE:  Don't guess about anything.

71

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1    He's asking you a question.  If you don't know, tell

2    him you don't know.

3              THE WITNESS:  I didn't try to understand in

4    detail how Alon was running the business.  I was

5    interested in the financial result.

6    BY MR. TEPFER:

7        Q    Did Alon ever mention that phrase "continuity

8    plan" to you?

9        A    I don't remember exactly.  Maybe he did;

10   maybe he didn't.  I just don't remember.

11       Q    Aside from yourself, do you know of any other

12   individuals who invested in BunZai Media Group, Inc.?

13       A    And what is "invested"?

14       Q    I suppose --

15       A    You mean provide a loan?

16       Q    Sure.

17       A    I don't know.

18       Q    Do you know if Alon invested or provided a

19   loan to BunZai Media Group?

20       A    Yes.

21       Q    Did Khristopher Bond?

22       A    I don't know exactly.

23       Q    Do you happen to know how much they invested

24   in BunZai Media Group?

25       A    As far as I remember, approximately half a

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    million dollars.

2        Q    Do you know who Nastassia Yalley is?

3             MR. TEPFER:  And that's N-a-s-t-a-s-s-i-a,

4    Y-a-l-l-e-y.

5             THE WITNESS:  As far as I understand, it is

6    one of the employees or assistant of Alon and

7    Khristopher, if we're talking about the same person.

8             (Exhibit 17 marked.)

9    BY MR. TEPFER:

10       Q    Okay.  So I'm handing you what's been marked

11   as Exhibit 17.

12            Do you recall if in April of 2011 you were on

13   the payroll of BunZai Media Group, Inc.?

14       A    No.

15       Q    Do you have any idea why Nastassia may have

16   referred to you as being on the normal payroll?

17       A    I can only guess.

18            MR. BENICE:  Don't guess.

19            THE WITNESS:  I don't know.

20   BY MR. TEPFER:

21       Q    Did you -- do you remember in April of 2011

22   if you received any paychecks from BunZai Media?

23       A    No.

24       Q    And none -- no paychecks in the -- I guess

25   around that time period?

73

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1      A     I don't remember a single check personally

2    with my name from the BunZai company.

3            (Exhibit 18 marked.)

4            MR. TEPFER:   I'm now handing the witness

5    what's been marked as Exhibit 18.

6      Q     This collection of documents, are you

7    familiar with these documents?

8      A     Yes.

9      Q     Is that your initials and signature -- well,

10   like, I suppose -- I'm sorry.  Go ahead.

11           On that first page with 18-2, is that your

12   initials down at the bottom?

13     A     Yes.

14     Q     And on 18-3, is that your signature?

15     A     Yes.

16     Q     And, I guess, on 18-4 on that check, is that

17   your signature?

18     A     Yes.

19     Q     And 18-5, is that also your signature?

20     A     Yes.

21     Q     And the last one just on 18-6, that's your

22   signature as well; correct?

23     A     Yes.

24     Q     Oh, did I forget one?

25           On 18-7, is that your signature?

74

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1       A    Yes.

2       Q    On the first -- I guess on 18-2 -- and these

3    are my own highlights here -- that first highlight, do

4    you -- the ownership shares, during -- was that ever

5    the ownership shares of BunZai Media Group or the

6    ownership distribution?

7            MR. UNGAR:  Objection as to the form of the

8    question.  Vague and ambiguous.

9            THE WITNESS:  Look at the next document,

10   18-5.  Everything is explained there, that it was a

11   loan.

12   BY MR. TEPFER:

13      Q    Sure.  But to -- my question is a little

14   different, though.

15           As far as these -- was there ever a period of

16   time where the ownership distribution was -- of BunZai

17   Media Group was 55 percent to you, 22.5 percent to

18   Alon, and 22.5 percent to Khristopher Bond?

19      A    We signed a great deal of documents.  This is

20   one of the ways or means for commerce between us.  We

21   only have three documents here, but we signed at least

22   five or six.

23           You now are simply trying to ask me about

24   intermediate negotiations, but I'm talking about our

25   final agreement that -- and the agreement is that I

75
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    give them a loan and that they pay it back and pay me
2    interest of -- of one-third of the profits.
3         Q    So was there ever a period of time where the
4    ownership distribution was what is stated here?
5         A    No.
6         Q    And so in October of 2010, the -- on the date
7    of this signature, is it your testimony that that
8    ownership distribution of BunZai Media Group was
9    different than what's stated up here?
10        A    Because during the same period of time there
11   were other documents signed.
12        Q    And so your testimony is that there are other
13   documents signed at the same time that conflict with
14   the ownership distribution in this document?
15             MR. UNGAR:  Objection as to the form of the
16   question.  It's vague and ambiguous, misstates prior
17   testimony of the witness.
18             THE WITNESS:  We signed and developed at the
19   same time and at different times various documents.
20   This is just a part of them.
21             The most important thing is that from day
22   one -- it was agreed that from day one it is a loan,
23   and I will have one-third of the income regardless of
24   what kind of documents we have signed in between.
25   BY MR. TEPFER:

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

```
 1      Q    And to go down to the second part that I
 2    highlighted on 18-2, where it says "Upon signing this
 3    agreement, Igor shall invest $75K to run a continuity
 4    test for 30 days," do you know what that statement is
 5    referring to?
 6      A    I'll say it again.  This is a document that
 7    never came into force because it's an intermediate
 8    document that was signed in between while we were
 9    negotiating on the terms.
10         The most important term was that from day one
11    from when I gave my first check, it's a loan and it's
12    payable back with interest on my investment as a
13    percentage, and that all the papers that we have
14    signed between ourselves were not and are not valid.
15         MR. TEPFER:  I guess I'll object as
16    nonresponsive.
17      Q    I guess what -- I'm just curious.
18         Is it your understanding that the -- this
19    continuity test never occurred?
20         MR. UNGAR:  Objection as to the form of the
21    question.  Vague and ambiguous.
22         MR. BENICE:  Do you understand his question?
23         Restate the question, please.
24         THE WITNESS:  Confusing all the time.
25         (Record read.)
```

77

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          MR. UNGAR:  Same objection.

2          THE WITNESS:  What exactly did not occur?

3     BY MR. TEPFER:

4     Q    So, I guess, first I had better clarify.

5          It says "Igor shall invest $75K to run a

6     continuity test."

7          Do you know what a continuity test is?

8     A    I'll explain one more time.  We signed a lot

9     of papers as a method of how to negotiate with each

10    other.  It's a pile of papers.

11         What do you want to ask me?  Like this paper

12    was valid for five minutes, and for the other one it

13    didn't.  I just don't understand what I need to say.

14         MR. BENICE:  Listen to the question.  Just

15    answer the question.

16         THE WITNESS:  Okay.  (In English)

17         MR. BENICE:  No editorial.

18         THE WITNESS:  Okay.  (In English)

19    BY MR. TEPFER:

20    Q    I just -- the aspect I'm curious about is

21    whether you -- whether you know what a continuity test

22    is.

23    A    Can you translate this for me?

24         THE INTERPRETER:  Would you like the

25    interpreter to translate the paragraph?

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          MR. TEPFER:  Sure.  Sure.

2          Would you mind translating?

3          THE WITNESS:  It doesn't say here that the

4    use was going to happen for 30 days, that the test was

5    going to run for 30 days, and within 30 days they will

6    have to show that they're selling the product.

7          MR. BENICE:  His question is:  Do you know

8    whether there was a continuity test?  That's his only

9    question.  Yes or no or you don't know.

10         THE WITNESS:  I don't remember.

11   BY MR. TEPFER:

12    Q    And do you know what a continuity test is?

13    A    The way I understand it here is that they had

14   30 days to -- to show me that they actually have

15   sufficient volume of sales.

16    Q    And, I guess, towards the end of that

17   highlighted section it says -- it refers to a

18   conversion from free trial to transitional stage.

19         Do you understand what that is referring to?

20    A    No.  I didn't even read this document when we

21   signed it, because I was giving money.  I was

22   investing money in people.

23    Q    I guess if you could turn to 18-6.  Those

24   highlights are mine.

25         Do you recall reviewing this document at any

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1    point?

2        A    Yes.

3        Q    So you read this or had this translated when

4    you signed it?

5        A    I don't remember, but I understand what it

6    talks about.

7        Q    And it says on the next page on 18-7 that it

8    was signed in March of 2011.

9             Do you know if you signed any other

10   partnership agreements for BunZai Media Group after

11   this date?

12       A    I don't remember, but most probably yes.

13   There was a bunch of papers all the time.

14       Q    Down at the bottom, the last highlight there

15   says "Igor - 1/3 of 100% of the company."

16            Was that your -- or this distribution

17   referenced here, was that your understanding of the

18   partnership shares or ownership in March of 2011?

19       A    No.  We agreed that I'm going to get

20   one-third of the profits, and I don't have any

21   ownership share in the company.

22            And Khristopher categorically objected to

23   those terms.

24       Q    Do you know if Alon or Khristopher also

25   received, I guess, a percentage of net profits?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1      A     As far as I can guess, yes.

2      Q     18-7, the last -- or rather that -- after

3   Number 6, the section I highlighted there, it states

4   "Igor shall receive a minimum salary of $5K per month

5   (starting April 1st, 2011)."

6            Did you ever receive a monthly salary of

7   $5,000 from BunZai Media Group?

8      A     This was a way -- because what they did was

9   they assigned 15,000 a month salary to each of them.

10           And I said, "Guys, there's a person who's

11  providing the loan.  With those kind of expenses,

12  I will never be able to get any kind of profit."  And

13  I said, "Give me at least some type of guaranteed

14  minimum."

15           And they -- "minimum interest on my money."

16           And they put down 5,000, but it's a technical

17  error that it's a salary.  I think in subsequent

18  documents this error was corrected.

19     Q     And this collection of documents that is

20  Exhibit 18 was found in a folder in Doron Nottea's

21  office.

22           Do you know why he would be in possession of

23  these contracts?

24     A     Because he helped his brother to store all

25  the paperwork because he was organized and Alon was

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1   disorganized.  That's why.

2       Q    Do you know of any other ways that Doron

3   Nottea assisted his brother in running BunZai Media

4   Group?

5       A    Do I know exactly or do I guess?

6       Q    Just to your knowledge.

7       A    He assisted.  He was like a bookkeeper for

8   him.

9       Q    And when you say "bookkeeper," what sort of

10  activities are you referring to?

11      A    Just helping with the papers -- organize the

12  papers so he doesn't lose them.

13      Q    Do you know if he helped keep track of sales

14  of these various entities?

15      A    I have no idea.

16           MR. TEPFER:  I guess we'll do 19.

17           (Exhibit 19 marked.)

18  BY MR. TEPFER:

19      Q    So I'm handing you what's been marked

20  Exhibit 19.

21           Do you know what affiliate marketing is?

22      A    My understanding is it's when somebody is

23  trying -- is helping you to sell.

24      Q    Do you know if BunZai Media Group did

25  affiliate marketing?

82

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1       A     I don't know.

2       Q     Do you know if any of Alon's other companies

3    engaged in affiliate marketing?

4       A     When you say "engaged in affiliate

5    marketing" -- one more time.  To whom or for whom?

6       Q     I guess what I mean is:  Do you know if any

7    of Alon's other companies used affiliate marketing to

8    sell skin care products?

9       A     Not to offend the interpreter, but I don't

10   even understand what you're saying.  One more time.

11          Can you ask them to specify the question and

12   make it a little more specific?

13      Q     Well, I guess I'll -- probably a better

14   question is:  Do you remember sending this attached

15   document that's -- oh.

16          Do you remember sending Alon this document in

17   Exhibit 19?

18      A     First time I've see it.

19      Q     So you're saying you didn't send this e-mail?

20      A     Well, if it's been sent from my e-mail

21   address, it means that I sent it, but I don't remember

22   it.

23      Q     But --

24      A     I don't even understand what it's about.

25   Some two percent here --

83

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1          MR. BENICE:  No.  No.  You don't need to make

2     editorial comments about it.

3     BY MR. TEPFER:

4          Q    So had you ever heard of affiliate marketing

5     before today?

6          A    Yes.

7          Q    Do you recall where you heard about affiliate

8     marketing?

9          A    No.

10         Q    Did you ever discuss affiliate marketing with

11    Alon Nottea?

12         A    No.

13         Q    Did you ever invest in selling, I guess, a

14    product called Gold Masks?  It's like a facial mask.

15         A    I know that Alon was selling --

16         MR. BENICE:  No.  Listen carefully to the

17    question.

18         Did you invest in that product?  You.

19         THE WITNESS:  No.

20    BY MR. TEPFER:

21         Q    But --

22         MR. BENICE:  Just answer yes or no.

23         THE WITNESS:  I provided a loan to Alon for

24    the business.

25         MR. TEPFER:  So did you say a loan?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1            THE INTERPRETER:  I provided a loan to

2     Alon --

3            MR. TEPFER:  Okay.

4            THE INTERPRETER:  -- for the business.

5     BY MR. TEPFER:

6        Q    And so was that another company that you

7     invested in, or was that through BunZai Media Group

8     that you had provided this -- the loan for Gold Masks?

9            MR. BENICE:  I'll object to the question as

10    lacking foundation.  He said he doesn't know.

11           MR. TEPFER:  Oh, sorry.

12           THE WITNESS:  I gave a loan to Alon.

13    BY MR. TEPFER:

14       Q    Oh.  Just generally a loan, but not

15    specifically for Gold Masks?

16       A    Correct.

17       Q    Are you aware if Alon sold Gold Masks at any

18    point?

19           MR. BENICE:  You mean as a business, or if he

20    sold facial products?

21           MR. TEPFER:  Sorry?

22           MR. BENICE:  My question is:  Do you mean

23    whether he sold the company as a business or whether

24    he sold facial masks?

25           MR. TEPFER:  Whether he ever sold, like, a

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

 1    product called Gold Masks that went on your face.

 2              THE WITNESS:  As far as I know, Alon sold

 3    such a product.

 4    BY MR. TEPFER:

 5        Q    Do you know through what company Alon sold

 6    this product?

 7        A    No.

 8              (Exhibit 20 marked.)

 9    BY MR. TEPFER:

10        Q    I guess we can go to -- I'm handing you

11    what's been marked as Exhibit 20.

12              Do you remember receiving this e-mail from

13    Alon in 2013?

14        A    I don't remember; but if I received it, it

15    means I received it.

16              MR. BENICE:  Listen carefully to the

17    question.  He's asking if you have a memory of having

18    received it.  If you don't remember, you tell him.

19              THE WITNESS:  I don't remember.  (In English)

20              THE INTERPRETER:  I don't remember.

21    BY MR. TEPFER:

22        Q    Do you typically review Alon's e-mails when

23    you get them?

24        A    Most often all e-mails that I get I send to

25    trash.

86

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      Q      So you send to trash even e-mails from, I
2    guess, business associates?
3      A      Because most often they are in the English
4    language, and I don't have a good command of it.  If
5    people want to say something to me, they call me.
6      Q      And do you -- do you know if your -- have you
7    ever communicated this practice of deleting your
8    e-mails to your business associates?
9      A      I don't remember exactly, but most likely
10   yes, they will know that it doesn't make any sense to
11   send me anything.  For the most part I remember
12   getting e-mails when there were excuses why Alon
13   didn't want to pay the investment back.  So all the
14   e-mails were his excuses of why he's not doing it.
15     Q      Have you ever heard of a product called
16   Dellure -- or a brand called Dellure?
17     A      Yes, I have.
18     Q      Where have you heard of that brand?
19     A      From Alon.
20     Q      Is it your understanding that one of Alon's
21   companies marketed this brand of product?
22     A      I think so, yes.
23     Q      On -- sorry.  Do you happen to know which --
24   through which company Alon sold Dellure products?
25     A      No.

87
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      Q     Do you know whose e-mail address is X -- it's
2   up at the top of Exhibit 20 -- xposedinc@gmail.com?
3      A     No.
4      Q     Do you have any idea why Alon included you on
5   this e-mail?
6      A     It's another one series of excuses of he
7   needing to pay for the product, and that's why he
8   can't give money to me.
9            MR. TEPFER:  And so -- okay.  Is now a good
10   time for a break for y'all?
11           MR. BENICE:  Sure.
12           MR. GALLEGOS:  Five minutes.
13           (Recess.)
14           MR. TEPFER:  Back on the record, please.
15      Q     The -- I guess I wanted to ask to go back to
16   Pinnacle Logistics.
17           I believe -- I believe you had stated that
18   you didn't know who owned Pinnacle Logistics, but you
19   did know that Roi Reuveni worked at the call center;
20   is that correct?
21      A     I stated that I didn't know who was the owner
22   of Pinnacle Logistics, according to the documents.
23      Q     Do you know -- when you say "according to the
24   documents," you mean who -- you don't know who is
25   listed, I guess, on any official paperwork?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1       A     Yes.

2       Q     Do you know who -- I guess, do you know who,

3    in fact, controlled Pinnacle Logistics?

4             MR. BENICE:  Listen carefully.  He's asking

5    you --

6             THE WITNESS:  My speculation?

7             MR. BENICE:  -- specific information.

8             If you don't know, tell him you don't.

9             THE WITNESS:  No.  Exactly 100 percent I

10   don't know.  I can only speculate.

11            MR. BENICE:  No speculation.

12            THE WITNESS:  Okay.

13            (Exhibit 21 marked.)

14            MR. TEPFER:  I guess if we can go to

15   Exhibit 21.  I'm handing the witness what's been

16   marked as Exhibit 21.

17      Q     Do you remember sending this e-mail in 2013?

18      A     Yes, of course.

19      Q     In the first sentence you say -- you refer to

20   a conversation that you had.  It appears -- the e-mail

21   is directed to Alon and Doron.

22            Was that who you had a conversation with?

23      A     This e-mail was sent exclusively to Alon.  I

24   even wrote "Hi Alon."  I inserted Doron here just in

25   case Alon doesn't get it.  I felt they're brothers, so

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    they're going to share.

2        Q    Did you have any reason to think that Alon

3    might not see this e-mail?

4        A    Big ones.  Because typically Alon would send

5    my e-mails to trash in the same way, because he would

6    always say, "Your computer translation is something I

7    can't understand."

8        Q    And so your thought was that Doron would make

9    sure that Alon read this e-mail?

10            MR. BENICE:  If you don't know, you don't

11   know.

12            THE WITNESS:  I don't know, no.  It's just I

13   don't know.  That was an emotional letter.

14            It was in 2013.  In 2013 two women sued Alon,

15   he separated from Khristopher, and he had family

16   problems, and he was thinking about leaving to go to

17   Israel.

18            And I was trying to -- maximally trying to --

19   saying that we're together, and I was saying our

20   business.  Even though it's his business, I wanted to

21   make it emotional to make sure that he stayed so that

22   I can get my money.  If he left to Israel, I would

23   have lost my money, because I invest in people.

24   BY MR. TEPFER:

25       Q    And so is that -- so just to be clear, the

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    conversation that you had was a personal one-on-one

2    conversation with Alon?

3        A    What conversation are you talking about?

4        Q    In the first sentence you said "after our

5    conversation," and I -- I was just wondering who was

6    included in that conversation.

7        A    Well, probably -- I don't remember exactly.

8    It was a long time ago.  I just have this general

9    feeling that I remember having there.  I don't

10   remember why I used this one phrase or the other

11   phrase.

12        I wrote it first in Russian, and then I

13   translated it with the automated translator; and after

14   that automated translator, I, with my limited

15   knowledge of the language, tried to correct it.

16        So the thing that came out is some kind of --

17   but I was trying, for the most part, to make it more

18   emotional to use that kind of language.

19        Sometimes some of these phrases I translated

20   several times -- two or three times.  Sometimes it

21   translated from Russian into English.  You read it and

22   you don't understand it.  So then you translate it

23   back, and then you translate it back again, and then

24   you still don't understand it, and then you insert it

25   and put another thing in there.

91

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1              In principal, I wanted to give Alon this

2    emotional attachment that those women who were suing

3    him, it's not the end of the world and that you

4    shouldn't be moving to Israel because of that.

5              But from my side personally, I'm telling the

6    truth.  The personal thing inside me was that I don't

7    want to lose my money.

8         Q    And when you say -- on the second line when

9    you refer to "our company," what company are you

10   referring to?

11        A    It was -- it's just a general term of phrase.

12   Just try to imagine if I said "your company," what

13   kind of emotional connection would there be?  I would

14   have pushed him away.

15             That's -- that's why I tried to use those

16   common words, so he can get a feeling that there's

17   some kind of potential with me in the future for

18   tomorrow; that I will be investing in some other

19   businesses.  My bottom line objective was that he

20   doesn't stay in Israel so I don't lose my investment.

21        Q    And on the third line when you referred to --

22   when you say "Pinicle," are you referring to Pinnacle

23   Logistics, Inc.?

24        A    Yes.

25        Q    And when you say "We want to keep Pinicle,"

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    is it your understanding that Alon decided -- would

2    have the final say in whether Pinnacle Logistics would

3    continue to operate?

4         A    You are grabbing two separate sentences, but

5    this is in general.

6              Imagine the situation.  Two women illegally

7    are blackmailing him because they want to get money

8    from him, and he has a lot of employees.

9              I was trying to be emotional.  I was trying

10   to say, "Do you want to have a lot of employees

11   because they can turn around the next day and sue you?

12   Do you want to have all those problems?" or, "You can

13   just outsource all this and have people working for

14   you and avoid all these problems."

15             I was giving him this as my personal opinion,

16   more like as a comrade.

17             MR. TEPFER:  As a what?

18             THE INTERPRETER:  Comrade.

19             MR. TEPFER:  Oh, a comrade.

20        Q    So my question, though, is that:  Was it --

21   was it your understanding that Alon Nottea made

22   business decisions for Pinnacle Logistics, Inc.?

23        A    When I was -- when I was writing this letter,

24   I didn't have any kind of understanding, because it

25   was all emotional.  You can't really compare it.

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          It's more like, for example, if you were
2     comparing a book -- a fiction book with some kind of
3     business document or a poem.  Imagine if we were
4     trying to take a poem right now and dissect it like
5     this word for word.
6          Q    Right.  But, you know, my -- what I want
7     to -- what I want to get at, though, is:  When you say
8     "We want to keep Pinicle," I was -- I want to, you
9     know, understand if it is your -- if it was at this
10    time your understanding that Alon Nottea would be able
11    to decide whether Pinnacle Logistics continued to
12    operate.
13         A    Absolutely not.  I was giving him an example.
14    No.  It was -- it was just an example of when a
15    company has a lot of people, that's when you get
16    problems.  This is -- this was happening with
17    Pinnacle.
18              People were specifically suing him, so this
19    was me trying to provide him with some emotional
20    support and say that it doesn't have to be the end of
21    the world when something like this is happening.
22              Who ran -- when I was writing this, it didn't
23    matter to me who ran Pinnacle and who didn't.
24         Q    Was it your understanding that your money was
25    being -- or your loans were being used to run or fund

94

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/28/2016

1      Pinnacle Logistics?

2          A     No.   I provided a loan to Alon.   He used this

3      money for business for payments and to pay the

4      Pinnacle Services as well, most likely.

5              They don't understand that there's people who

6      were suing Alon.   They didn't even work for Alon.

7      They worked for Khristopher, the way it was explained

8      to me.   That's why it turns out that here in America

9      companies might even be suing you.   Employees --

10             MR. BENICE:   Just answer the question.

11             THE WITNESS:   -- who are working for other

12     companies can sue you.

13             MR. BENICE:   Just answer the question.   No

14     editorial.

15     BY MR. TEPFER:

16         Q     Okay.   In the sentence below that you say

17     "Already we have Product company in the U.S."

18             What -- what is -- what product company are

19     you referring to?

20         A     I don't remember exactly what I meant by that

21     phrase.   I'll say it again.   You can't look at this

22     e-mail sentence by sentence like this.   We have this

23     expression that certain words cannot just be taken out

24     of a song.

25         Q     So you're not referring to any specific

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

1    company with that product company there?

2         A    I don't remember.  My goal wasn't to talk to

3    him about business.  This is not a business letter.

4    This was a letter to provide emotional support to a

5    person to support them psychologically.

6         Q    And when you say "Merchant-VastPay," does --

7    were you -- at this point did Alon have any interest

8    in VastPay?

9         A    No.  And I'll say it again.  I just brought

10   everything together.  Everything that I saw I heard

11   somewhere so that Alon can have something to hold on

12   to emotionally in our relationship.

13        Q    You say "The product company in England."

14             Was there ever plans for there to be a

15   product company in England?

16        A    Since we -- since he talked about and offered

17   the various areas to open something in Latin America,

18   in Europe, different fields, this was not about some

19   specific business.  This is a general letter.  It's

20   just words and doesn't have any content in it.

21             I don't know if you understand this because

22   you're clinging on to separate words.  It's an

23   emotional letter.  Even look what I wrote in the very

24   end there, my dear comrade -- or actually, that I'm

25   your dear comrade Igor.

96

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1       Q    So it says -- to jump to that, it says "Your
2   sincere partner Igor."
3            Is there a reason you chose the word partner?
4       A    That's how you translate the word comrade or
5   tovarisch.  If you take the word tovarisch and put it
6   in the online translator, it converts it into partner,
7   and I was trying to say comrade in Russian.
8       Q    In around the middle of the document you
9   say -- you refer to "People who can not just perform,
10  but also to make decisions and in addition whom we
11  trust and know their capabilities."  And afterwards
12  you refer to "You, Paul, Roy, Andre and David and me a
13  little, that's all!"
14           I wanted -- where you say "Paul," are you
15  referring to Paul Medina?
16      A    Yes.
17      Q    And Roi is Roi Reuveni?
18      A    Yes.
19      Q    And who's Andre?  What's his last name?
20      A    To be honest, I don't remember.  I'll say it
21  again.  It's like with the name of the companies.  I
22  wasn't writing about anybody specifically personally.
23  I didn't mean anybody.  In the same way with people's
24  names.  I just put it altogether to create this aura
25  of emotional support for Alon.

97

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      Q      So you were -- your testimony is that you
2    were listing people that, I guess, would --
3      A      Whose names I knew.
4      Q      Okay.  When you say "Doron has his
5    department," what department are you referring to?
6      A      I meant that he shouldn't get desperate in
7    his life.  He has a brother who is helping him as a
8    bookkeeper.
9      Q      So you're referring to Doron's bookkeeping
10   work?
11     A      I'm referring to the fact that he has a
12   brother who will always help him and support him.
13            Again, it's an emotional letter.  You can't
14   take a poem and dissect it like this into technical
15   elements.
16     Q      When you say "Paul likely will be responsible
17   for marketing the relationship between Israel and
18   America," what relationship are you talking about?
19     A      Again, same as with Doron.  I approximately
20   knew who of these people was responsible for what, and
21   I was writing about all of this in general.
22     Q      And did you have any understanding that there
23   was a -- I guess a business relationship between
24   Alon's companies in America and, I guess, any
25   companies in Israel?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

98

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/28/2016

```
 1      A    As far as -- as far as I know, Alon did not

 2    have any companies in Israel.  He was planning to move

 3    there to live.

 4      Q    And I can't remember if I asked this.

 5           Did you -- the David you referred to, what

 6    was -- what was his last name?

 7      A    I don't remember exactly.

 8      Q    You said that "David is a good helper, but he

 9    has no power to make decisions and you always have to

10    solve them for him, he's very good assistant, but

11    assistant."

12           Do you know what this David assisted Alon

13    with?

14      A    I am in my 50s already, and I'm able to talk

15    to somebody and form an opinion about them after I

16    talk to them a little bit.

17           So here I'm just stating my personal opinion,

18    and it's my personal subjective opinion about the

19    people surrounding Alon that he introduced me to

20    during a certain period of time.

21           How specifically David was assisting Alon, I

22    don't know.

23      Q    When you say that you would recommend Roi as

24    head of the product company, what were you basing that

25    recommendation on?
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

```
 1       A    Because Roi is like a -- but a sergeant in
 2   the Army.  I just tell that because there are some
 3   people who are creative, and there are other people
 4   who are like soldiers or sergeants.
 5            It was my opinion that this would be the best
 6   position for him; that if you were to go and you stay
 7   in America and this business would continue, that's
 8   something that he could do.
 9            That was just my evaluation of his
10   personality.
11       Q    And you thought Roi should be the head of the
12   product company and that -- what -- what product
13   company did you think Roi should be the head of?
14       A    Again, this is just a general letter.  It's
15   not about any specific business.  I was trying to
16   create an atmosphere, and I was trying to express
17   myself emotionally.  So that if Alon is going to have
18   some kind of activity or some kind of area, that means
19   that he has a team around him.
20       Q    When you say later on, "After all people is a
21   problem, dividing the information can give us
22   testimony in court, or just come up with these
23   statements and show to us and so on," what sort of
24   court testimony were you concerned about?
25       A    A specific situation that was happening at
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    the time where two women were illegally suing him when

2    they came up with all these allegations of sexual

3    harassment and all of these other things that I

4    couldn't theoretically imagine.

5         That is the specific example that I gave to

6    him.  So they said things that did not actually

7    happen, so they invented them.

8    Q    When you say "dividing the information," what

9    information were you referring to?

10   A    Where is this?

11   Q    It's in the same sentence.  People were

12   dividing information.

13   A    That's, again, just not the correct

14   translation.  It's not divide information.  It's that

15   they can invent information or that they can misstate

16   it on purpose in order to get the money in the end,

17   and that's what happened in the end.

18   Q    And when you -- a couple sentences down you

19   say "Let those who can not make Intelligent business,

20   own and operate plants and Call-centers, and we will

21   deal with intellectual labor."

22        Is the plants or call center you're referring

23   to Pinnacle Logistics?

24   A    I didn't refer to anything specific in this

25   letter.  I was writing in general so that he doesn't

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1    get upset that if he made some mistakes in running the

2    business, he -- there are other ways and it's not the

3    end of the world.

4              And all the example is they are just

5    associations that are examples that come together,

6    because if you're too abstract, the person is not

7    going to be able to understand you.  They're not going

8    to understand what you're trying to tell them

9    emotionally.

10             THE WITNESS:  Can we go to the restroom?  (In

11   English)

12             MR. TEPFER:  Sure.  Take a five-minute break.

13             (Recess.)

14             MR. TEPFER:  We can go back on the record.

15        Q    I guess if we could go to -- well, maybe not

16   yet.

17             Do you know what UMS Banking is?

18        A    Yes.

19        Q    What is it?

20        A    It's a business that's involved in merchant

21   business.

22        Q    Have you ever done any business with UMS

23   Banking?

24        A    Me personally, no.

25        Q    How did you become familiar with UMS Banking?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                          1/28/2016

```
 1      A      From Alon.

 2      Q      What did Alon tell you about UMS Banking?

 3      A      Big, good company.

 4      Q      And did he tell you that this was a company

 5   that was used for processing charges to consumers for

 6   the sale of AuraVie products?

 7      A      He said that he was working together with

 8   them.  What specific products, I don't know.

 9             (Exhibit 23 marked.)

10             MR. TEPFER:  I'm just handing the witness

11   what's been marked as Exhibit 23.

12      Q      So this e-mail is from Alon Nottea in 2013.

13             Do you remember receiving this?

14      A      No.  Well, but if it has my -- you know, if

15   I'm on here, it means I received it.

16      Q      And is it -- is it your opinion that you

17   likely reviewed this e-mail and don't remember?

18      A      Doubt it.  Because when Alon would send me

19   e-mails, it would, for the most part, be when I call

20   him and I ask him about the repayment of my investment

21   and the interest; and he would send me an e-mail back,

22   so maybe that would be one of them, I don't know, as

23   an excuse why he's not paying it back mostly -- most

24   probably, but I don't know.

25      Q      In the forwarded e-mail from Joyce Gaines at
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1     Number 3 it says "In the event of an FTC closure they

2     will freeze our reserves on your accounts

3     immediately."

4              Did Alon Nottea ever discuss with you before

5     June of 2015 the possibility of a -- or risk of an FTC

6     enforcement action?

7        A    No.

8        Q    Did he ever discuss with you Federal Trade

9     Commission laws and regulations?

10       A    The initial stage.  He gave me a letter from

11    an FTC attorney saying he was working correctly and

12    everything is well.  He showed me that letter.

13             MR. BENICE:  Listen carefully to his

14    question.  Read the question back.

15             (Record read.)

16             THE WITNESS:  No.

17    BY MR. TEPFER:

18       Q    In the second to the last paragraph, I think,

19    it states "I have to protect UMS based on the nature

20    and risk of the business in front of us."

21             Did you ever hear anyone characterize the

22    BunZai group of companies as a high risk business?

23             MR. BENICE:  You mean before the FTC action

24    was filed?

25             MR. TEPFER:  Right.  Before June 2015.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

 1          THE WITNESS:  And what is "high risk"?
 2    BY MR. TEPFER:
 3          Q    Well, just have you ever --
 4          A    What do you mean by "high risk"?
 5          Q    Well, have you ever heard anyone use the
 6    phrase "high risk" in reference to these companies
 7    prior to the FTC's enforcement action?
 8          A    I don't remember exactly.
 9          Q    It refers to the current chargeback return
10    ratios.
11               Were you ever apprised of the
12    chargeback/return ratios of Alon's businesses?
13          A    No.  I fortunately have not read this e-mail.
14          Q    Sure.  But outside of the context of this
15    e-mail, had you ever just been -- generally speaking,
16    been apprised at any point of the chargeback/return
17    ratios of the companies that you invested in with Alon
18    that sold AuraVie?
19          A    Can you clarify the question specifically?
20    Have I heard this phrase, or what does it mean?
21          Q    Like you stated before that you would discuss
22    numbers more with Alon rather than other topics, and I
23    was wondering if one of those topics that you did
24    discuss with Alon would be chargeback/return ratios
25    for the companies that you invested in or that sold

105

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    AuraVie.

2       A    I discussed profit numbers with Alon; and if

3    you are talking specifically about that ratio slash

4    whatever you call it, that particular thing we did not

5    discuss.

6       Q    Did -- did y'all ever discuss, I guess, ways

7    to improve the profitability of BunZai Media Group or

8    the other companies that sold AuraVie?

9       A    I did not have any influence on the running

10   of the business that Alon did.  The only thing I was

11   doing was asking him, "Please pay me back my

12   investment and the interest."

13      Q    Who's Oleg Trushlya?  And that's O-l-e-g,

14   T-r-u-s-h-l-a, I think; right?

15      A    The director of Guayas company in Estonia.

16           MR. TEPFER:  That's G-u-a-y-a-s.

17      Q    So how do you know Oleg Trushlya?

18      A    I don't remember now -- or I've known him for

19   a long time.

20      Q    Do you know of any other companies that Oleg

21   Trushlya, I guess, works for?

22      A    One he works for or owned?

23      Q    Owned is probably a better question.

24      A    Yes.

25      Q    Is Skincare OU one of those companies?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1    A    Yes.

2    Q    And what is Skincare OU?

3    A    A company.

4    Q    What does it sell?

5    A    It doesn't sell anything.  Oleg opened this

6  company in order to sell skin care products in Europe,

7  but he never started doing it, as far as I know.

8    Q    Do you know when he opened it?

9    A    Well, many years ago.  I don't remember

10  exactly.

11    Q    Do you know the brand name of the skin care

12  products that Skincare OU was intended to sell?

13    A    I don't remember exactly, because it was a

14  long time ago.

15    Q    Did you have any position in Skincare OU?

16    A    No.

17    Q    And at any point have you ever done any work

18  on behalf of Skincare OU -- or for Skincare OU rather?

19    A    Can you clarify the question?  Work for or --

20    Q    Like, have you ever done anything to assist

21  Skincare OU in its business?

22    A    What do you mean "assist"?  Can you describe

23  specifically the kind of action?

24    Q    Did you ever set up any merchant accounts for

25  Skincare OU?

107

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1          A     Me, no.

2          Q     Did you ever review Skincare OU sales figures

3   at any point?

4          A     No.

5          Q     What's Transact Pro?

6          A     I don't know.

7                (Exhibit 24 marked.)

8   BY MR. TEPFER:

9          Q     I'm now handing you what's been marked

10  Exhibit 24.

11               Do you recall sending this e-mail to Alon

12  in 2012?

13         A     I don't remember; but if I sent it, I sent

14  it.

15               MR. BENICE:  He's asking you a specific

16  question.

17               Do you remember if you sent it?

18               THE WITNESS:  No.

19  BY MR. TEPFER:

20         Q     Do you know of any -- any reason why you

21  would request that Alon Nottea print what's been

22  marked as Attachment A -- or, I guess, 24-2 at the

23  bottom?

24               And I wrote "Attachment A" there.

25         A     Are you asking me if I remember?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/28/2016

1     Q     Or can you think of any reason why you would

2  have requested that Alon print this document?

3     A     I couldn't be asking Alon to do anything.

4           And what does it all mean?  Can you translate

5  that?

6     Q     Do you know who Maksims Jaro- -- I'm going

7  to mispronounce this, I'm sure, but Jarosevskis is?

8           I can just spell it.  It's M-a-k-s-i-m-s,

9  J-a-r-o-s-e-v-s-k-i-s.

10    A     I don't have an idea.

11    Q     Who's Roman Balanko?

12    A     Roman Balanko is a guy who has -- he's an

13 acquaintance of mine.

14    Q     Did you ever do any business with Roman

15 Balanko?

16    A     No.  There were attempts, but nothing ever

17 came out of them.

18          MR. TEPFER:  And just to spell his name real

19 quick, it's B-a-l-a-n-k-o.

20          (Exhibit 25 marked.)

21 BY MR. TEPFER:

22    Q     Real quick, this is Exhibit 25.

23          In this e-mail from Eugene Shampansky to

24 you -- and this is Exhibit -- on Exhibit 25-1 to you

25 and Roman Balanko he says "Attached are the

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    projections we discussed yesterday."

2            Do you recall having any conversation with

3    Eugene Shampansky regarding any of the attached

4    documents, which are 25-2 through 25-8?

5        A    Yes.  It was a long time ago, so I don't

6    remember; but most probably it was just one of those,

7    you know, business projects.

8        Q    Do you -- was this regarding BunZai Media

9    Group, this business project?

10       A    No.  This was in relation to merchant

11   business.

12       Q    Is this a merchant business that you had

13   considered, I guess, entering into with Alon Nottea

14   and Khristopher Bond?

15       A    No.  I was never going to, but no.

16       Q    Do you know why you forwarded this e-mail to

17   Alon Nottea and Khristopher Bond?

18       A    Who forwarded it?  I did.

19       Q    Yes.  But do you know why, or do you --

20           MR. TEPFER:  Can you repeat the question?  I

21   can't even remember what it was.

22           (Record read.)

23           THE WITNESS:  Maybe simply because I wanted

24   to find out maybe -- it was a long time ago.  It was

25   in 2012.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

1   BY MR. TEPFER:

2      Q    So you don't recall specifically why you

3   would have forwarded that to Alon Nottea or

4   Khristopher?

5      A    Absolutely not.  Maybe it was a mistake.

6   Maybe not.  Maybe I wanted to know his opinion on the

7   subject.

8      Q    Do you know what AD Lifestyle Network is?

9      A    What is it?  You mean the name of the company

10  or the product?

11     Q    Have you ever heard of that company?

12     A    I'm not sure, but I think I do.

13          (Exhibit 27 marked.)

14  BY MR. TEPFER:

15     Q    I'm now handing you what's been marked as

16  Exhibit 27.

17          In this e-mail that was sent to you and Alon,

18  Paul Medina requested that you read below the

19  forwarded document.

20          Did you read that forwarded message?

21     A    No.  I'll say it again that for the most

22  part, the e-mails I get, I don't read them.

23          What is this e-mail about?

24     Q    Well, it refers to -- and this is from Andy

25  Meadows at SignaPay -- well, first I should ask:  Do

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    you know what SignaPay is?

2        A    I can give you my guess.  I think most

3    probably it's a company which is a processor for a

4    loan.

5             And I see the subject of this e-mail it says

6    "New accounts."  So most probably it's just another

7    excuse from Alon where he's saying, "The company is

8    growing.  They're new accounts, and that's why I'm not

9    paying the money back."

10            So I don't know the contents of this e-mail,

11   but I think that's what it is.

12       Q    And so your understanding of -- well, your

13   understanding of why you received this e-mail was more

14   of an excuse from Alon about why he's failed to repay

15   your loans?

16       A    Most often all the e-mails were about that.

17       Q    Do you know why Paul Medina would have sent

18   you this e-mail, though?

19       A    I don't know.  Maybe Alon asked him.

20       Q    Do you know what BunZai Media Group's profit

21   margin was?

22       A    It's a very abstract question, because I did

23   not control expenses; and for me, I was -- I was

24   looking for any way for them to repay me my loan and

25   the interest as soon as possible.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1              I knew that any of my attempts to actually
2      seriously check all those things was not going to
3      be -- that's why I just accepted everything they were
4      saying.  Just accepted it as it was.
5          Q    So you're saying that it wasn't worth trying
6      to discuss those issues with Alon because you didn't
7      think that he would be truthful with you about your
8      information?  Is that what you're stating?
9          A    No.  No.  I just knew that most probably he
10     didn't even know this information, so.
11         Q    And when you mentioned earlier that you would
12     sort of discuss numbers with Alon Nottea, was profit a
13     part of that discussion?
14         A    Yes.  But in the end I was just trying to get
15     a way for him to repay me at least some money, because
16     for the profits I understood that he didn't even know
17     about it all himself.
18         Q    And did you come to understand any reasons
19     why Alon's companies had a thin -- or, I guess, didn't
20     have much profit?
21         A    I could only guess.  Most probably because
22     his expenses were high.
23         Q    Do you know what his expenses were?
24         A    Well, the ones I know is advertising, call
25     center.  All those business expenses were high, but,

113

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1      again, it's all according to him.

2         Q    Do you -- did you have any idea of why he

3      needed a large call center to -- for the sale of these

4      products?

5         A    According to him, he says, "I want to provide

6      the best customer support for the buyers, and I want

7      the company to help with Pinnacle," the company that

8      was helping him.

9         Q    So your understanding was that Pinnacle was a

10     company that was assisting with the customer support

11     for the sale of AuraVie products?

12        A    I knew -- I know that Pinnacle was a call

13     center.  Whether it helped Alon or all the companies

14     as well, I don't know.

15        Q    Do you know who Alex Pitt is?

16        A    Yes.

17        Q    Who is he?

18        A    So it's a guy who owns a merchant business,

19     and he invited me to be his investor.

20        Q    Do you know is the company you're referring

21     to PayPro?

22        A    No.  I don't remember exactly, but it's

23     unlikely.

24             (Exhibit 28 marked.)

25     BY MR. TEPFER:

114

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      Q    I'm handing you now what's been marked
2    Exhibit 28.
3           Do you recall receiving this e-mail from Alon
4    in January of 2012?
5      A    I probably received it since it's here.
6      Q    But more specifically do you -- do you
7    remember actually reviewing it?
8      A    I remember the purpose of this meeting.  I
9    don't remember this particular e-mail, but I remember
10   why we met him.
11     Q    Why did you meet him?
12     A    He created a program on the Internet where it
13   could be like eBay where everybody could be a merchant
14   or businessman and open the -- open merchant accounts.
15          So he created a program that generated many
16   clients, and we met him and showed it for investment
17   purposes.
18     Q    Do you -- well, first I should ask:  It lists
19   miraclekitfreetrial.com.
20          Have you ever viewed that Web site?
21     A    No.
22     Q    What about auravietrialkit.com?
23     A    I don't go to any Web sites.  This letter --
24   these three e-mails here, here it's -- it's his
25   proposal.

115

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

1          I asked Alon to arrange this meeting, because

2     my English is not good, so that he could tell his

3     opinion about this program.

4          Q    Do you know why Alon included these three

5     AuraVie or Miracle Kit Web sites?

6          A    I don't know.

7               MR. GALLEGOS:  We should probably switch this

8     one out because it has a mark.

9               Since these are the originals, we ask that

10    you not mark them.

11              Do you want to keep this one, Jeffrey?

12    BY MR. TEPFER:

13         Q    Have you ever heard of a company called Pago

14    Technology?

15              MR. TEPFER:  And it's P-a-g-o Technology.

16              THE WITNESS:  I don't remember.

17    BY MR. TEPFER:

18         Q    Do you know who Kristina Perez is?

19         A    Yes.

20         Q    Who is she?

21         A    She has a merchant business as well.

22         Q    Did you have any business relationship with

23    Kristina Perez in 2012?

24         A    I did not have business relationship.

25         Q    If you look at -- sorry.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1          (Exhibit 30 marked.)

2     BY MR. TEPFER:

3          Q    This is Exhibit 30.  Looking at Exhibit 30,

4     on 30-2 there's a processing statement.

5               Do you know what this processing statement is

6     for?

7          A    This correspondence most probably was sent

8     for Alon.  Sometimes she would send e-mails to me if

9     she couldn't because -- yes.  Exactly.

10         Q    So was it -- is it your understanding that

11    this e-mail pertains to the sale of -- or of skin care

12    products?

13         A    This e-mail was most probably sent to Alon,

14    and he worked with skin care.

15         Q    And to your knowledge, did Alon at around

16    this time period market skin care products in Latvia?

17         A    I don't know.

18         Q    Did you have any business in Latvia at this

19    time?

20         A    No.

21         Q    Do you have any idea why Kristina Perez

22    included you on this e-mail regarding the processing

23    statement of Skin Care OY?

24         A    I can guess it's because I introduced Alon to

25    Oleg.  She knew that I introduced Alon to Oleg, and

117

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1     she wanted to send this to Alon, and she forwarded

2     them through me.

3          Q     Why did you introduce Alon to Oleg Trushlya?

4          A     Alon wanted to increase sales, and he wanted

5     to start selling in Europe.  He asked me since I'm

6     from Europe if I know anybody -- recommend somebody,

7     and I recommended Oleg to him.

8          Q     Are you aware of any, I guess, contract or

9     business -- rather business relationship between

10    Skincare OU and BunZai Media Group, Inc.?

11         A     I don't remember exactly, but I know that

12    Alon tried to arrange the technical logistical part

13    through Europe.  He tried, and he stopped because it

14    didn't -- because it never happened.

15               (Exhibit 33 marked.)

16               MR. TEPFER:  I'm now handing what's been

17    marked as Exhibit 33 to the witness.

18         Q     Have you ever seen this document before?

19         A     I don't remember.

20         Q     Do you know if Alon Nottea through BunZai

21    Media Group ever entered into an Exclusive U.S.A.

22    Fulfillment & Call Center Agreement with Skincare OU?

23         A     Who would do what for whom?

24               (Record read.)

25               THE WITNESS:  Do I understand it correctly

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

118

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1    that BunZai group gave Skincare an exclusive right or

2    the other way around?  I just don't understand the

3    question.

4    BY MR. TEPFER:

5        Q    Well, were you aware of any sort of

6    relationship like that between these two companies

7    either way?

8        A    Probably they signed some papers.  I don't

9    know.

10            MR. BENICE:  Just don't speculate.  Whatever

11   your information is.

12            THE WITNESS:  Okay.

13   BY MR. TEPFER:

14       Q    Do you know if -- do you know who came up

15   with the brand name AuraVie?

16       A    As far as I know, it was Khristopher with

17   Alon, because when I came to them in 2010, they

18   already had product and were selling them.

19       Q    Do you know if Nastassia Yalley ever had any

20   sort of -- or ever did any work for Skincare OU?

21       A    No.  She was Khristopher's and Alon's

22   assistant.

23            MR. TEPFER:  Just get Exhibit 34 real quick.

24            (Exhibit 34 marked.)

25   BY MR. TEPFER:

119

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1      Q    Do you recall receiving this e-mail from
2   Kristina Perez?
3      A    No.  I don't remember.  Probably I received
4   it since my name --
5           MR. BENICE:  Don't speculate.
6           THE WITNESS:  Okay.
7           MR. BENICE:  He's asking you do you remember
8   receiving it.
9           THE WITNESS:  No.  I don't remember.
10  BY MR. TEPFER:
11     Q    And, I guess, this is 34-3.
12          It appears that Nastassia Yalley states "In
13  order to keep our European merchant accounts, I have
14  to provide the real signed copies of the merchant
15  account paperwork."
16          Do you know if BunZai Media Group had any
17  European merchant accounts?
18     A    I don't know.
19          (Exhibit 36 marked.)
20          MR. TEPFER:  I'm handing what's been marked
21  as Exhibit 36 to the witness.
22     Q    In this e-mail from Alon to Eugene -- or
23  rather from Eugene to Alon -- sorry -- Eugene states
24  that he's handing -- or that he's sending the VastPay
25  documents, and that you have the Nexipay documents.

120

Latsanovski

1          Did Alon have any position at these

2     companies?

3          A     No.

4          Q     Do you know why Eugene might have sent these

5     documents to Alon?

6          A     I don't remember exactly, but I think most

7     probably because I was abroad and I asked Alon to get

8     the documents for me.  I don't know exactly why.

9     Maybe for safekeeping so that I just can have them.

10         Q     In the "To" row it says it's sent from Alon's

11    MediaUrge e-mail address.

12               Do you know what MediaUrge, Inc. is?

13         A     I know that it was one of the companies that

14    Alon had.

15         Q     So it was a -- you said one of the companies

16    Alon had.

17               Is that -- do you mean MediaUrge was a

18    company owned by Alon?

19         A     I don't know exactly.  It's just that I see

20    it here, and it sounds like it; but who really owned

21    it, I never checked the documents, so I don't know.

22         Q     And do you know what the business purpose of

23    MediaUrge was during this time?

24         A     I did not try to understand the business

25    purposes of all separate companies.  I was giving

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

```
1    money to Alon; and how he managed it, for me, it was
2    just to get the investment back and the interest.
3              (Exhibit 38 marked.)
4              MR. TEPFER:  I'm handing what's been marked
5    as Exhibit 38 to the witness.
6         Q    Do you know who Leor Arazy is, A-r-a-z-y?
7         A    I knew a Leor, and she worked; so if that's
8    the same person, then yes.
9         Q    What -- who is Leor Arazy?
10        A    It's a girl who worked, but I don't know
11   exactly what specifically she was responsible for and
12   where she worked.
13        Q    But she worked -- did she work for Alon?
14        A    I can't tell you exactly.  For Alon or
15   Khristopher or for somebody else.
16        Q    Do you know why she would send you a salary
17   breakdown for Pinnacle Logistics, Inc.?
18        A    I cannot be sure exactly, but you can see
19   that probably Alon asked her, again, to send this to
20   me to show those large expenses to use it as an excuse
21   to not pay the interest back.
22        Q    And --
23             MR. BENICE:  Can we take a bathroom break?
24             MR. TEPFER:  Oh, sure.  Off the record.
25             (Recess.)
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1           MR. TEPFER:  We can go back on the record.

2           So just to clarify with everybody, I was just

3     talking with Jeffrey, and we were thinking we would

4     end at 5:15 today and pick up tomorrow with the

5     understanding that we can ask about some of these

6     documents --

7           MR. BENICE:  Yes.

8           MR. TEPFER:  -- pertaining to Igor in

9     addition to CalEnergy.

10          MR. BENICE:  What's the number I'll call

11    into?

12          MR. TEPFER:  Oh, the call-in number?  Sure.

13    Let me get that real quick.

14          Are you going to call in?

15          MR. BENICE:  Well, my associate is going to

16    be here, but I'll call in.

17          MR. TEPFER:  Is that Sam that's going to be

18    here tomorrow?

19          MR. BENICE:  Yeah.

20          MR. TEPFER:  It's (310) 824-4311.

21          MR. BENICE:  All right.

22    BY MR. TEPFER:

23      Q    Aside from these -- this salary breakdown in

24    Exhibit 38, can you recall any other day-to-day

25    activities that you were updated about from Pinnacle

123

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/28/2016

 1    Logistics employees?

 2        A    No.  I was not, no.

 3        Q    Do you know of a bank by the name of Rietumu

 4    Banka?

 5             MR. TEPFER:  And that's R-i-e-t-u-m-u,

 6    B-a-n-k-a.

 7             THE WITNESS:  One more time.

 8             Can you repeat this?

 9    BY MR. TEPFER:

10        Q    Sure.  I believe it's pronounced Rietumu

11    Banka.

12             Are you familiar with a bank by that name?

13        A    This name sounds a little familiar, but I

14    don't remember exactly.

15        Q    To your knowledge, do you have a personal

16    account at that bank?

17        A    No.

18        Q    To your knowledge, do you have any -- do any

19    of the companies in which you have an ownership

20    interest have an account at that bank?

21        A    No.

22        Q    And do -- do you know if you have any sort of

23    merchant accounts through that bank?

24        A    No.

25             (Exhibit 39 marked.)

124

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1           MR. TEPFER:  I guess if we could turn to
2   Exhibit Number 39, which I'm handing to the witness
3   right now.
4       Q    Do you recall receiving this e-mail from
5   Kristina Perez?
6       A    I don't remember exactly.
7       Q    Did you ever assist Alon Nottea in opening an
8   account at this bank?
9       A    No.
10      Q    And do you have any idea why Kristina Perez
11  might have sent you this information for opening an
12  account?
13      A    Most probably she just copied the
14  information, the contact that happened between Alon
15  and Oleg, and she just copied this information to me.
16  Why they do it, I don't know.
17          (Exhibit 42 marked.)
18          MR. TEPFER:  I guess if we could turn to
19  Exhibit Number 42, which I'm now handing to the
20  witness.
21      Q    Do you recall receiving this e-mail in 2012
22  from Alon?
23      A    I don't remember, but I even understand what
24  this e-mail is about.  You see where at the top it
25  says "Subject:  Biz op"?  That's probably this Alex

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

1     Pitt.  It's Alon's opinion regarding his program.

2         Q     Regarding Alex Pitt's program?

3         A     Yes.

4         Q     Okay.  And could you remind me what program

5     of Alex Pitt you believe this to be referring to?

6         A     As far as I remember -- and I don't remember

7     exactly because it was a long time ago -- he had a

8     program where a person can open everything quickly.

9     You have a site in 15 minutes and a merchant

10    account -- do everything quickly -- and that's why he

11    called it business opportunity.

12        Q     And so this -- this is regarding like a

13    merchant processing company?  Is that the explanation?

14        A     No.  This is about a startup that Alex

15    proposed.

16        Q     Okay.  And that startup, would it do merchant

17    processing or -- is that correct?

18        A     No.  It would deal with opening.  The person

19    could open the business on the Internet in 15 minutes,

20    including this whole technology of taking or getting

21    the money.

22        Q     Okay.  So it's a -- it's a way for people to

23    open their own business through using this program?

24        A     Yes.  And the number of people was a lot.

25    According to his proposal plan, it was 2-, 300 people

126

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/28/2016

1    a day who could open.

2        Q    So the projection was that 200 or 300 people

3    a day --

4        A    I don't remember exactly, but --

5             MR. BENICE:  If you don't know, say you don't

6    know.

7             THE WITNESS:  -- it was a lot.  In short, a

8    lot.

9    BY MR. TEPFER:

10       Q    Do you know what a -- sorry.

11       A    Where is --

12       Q    We're talking about Exhibit 42.

13            Do you know what a CRM solution is?

14       A    It's a program that Alex was proposing.

15   That's what the e-mail is about.

16       Q    And do you know Alex's last name?

17       A    I don't remember.  Oh, it says here Pitt.

18       Q    Oh, okay.  And did you discuss these topics

19   with Alon Nottea?

20       A    Which ones particularly?

21       Q    Well, I suppose did you have further

22   conversations about this business opportunity with

23   Alon?

24       A    Alon was at this meeting, and Alex wanted too

25   much -- the terms that he described for me were too

127

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/28/2016

1    hard.  I did not like it, and I didn't want it.

2            So I said, "Would that be possible to have a

3    separate business?"

4            And he said no, it's either with him or you

5    don't even start it, and that was it.  That's how it

6    ended.

7            MR. BENICE:  Good time?

8            MR. TEPFER:  Yeah.  That's what I was just

9    thinking.

10           MR. GALLEGOS:  Off the record.

11           (End of proceedings 4:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

128

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/28/2016

```
 1              CERTIFICATE OF DEPONENT

 2

 3          I do hereby declare under penalty of

 4    perjury that I have read the foregoing transcript;

 5    that I have made any corrections as appear noted; that

 6    my testimony as contained herein, as corrected, is

 7    true and correct.

 8              EXECUTED this _____ day of _____,

 9    20___, at _____, _____.

10              (City)                    (State)

11

12

13              _____

                          IGOR LATSANOVSKI
14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3         I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6         That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14        I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: *February 17th, 2016*

21

22        KIMBERLY CATHEY

         CSR No. 10701

23

24

25

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   FEDERAL TRADE COMMISSION   )
                                )
 5          Plaintiff           )
                                )
 6      v.                      )  No. CV 15-4527-GW(PLAx)
                                )
 7   BUNZAI MEDIA GROUP, INC.,  )
     et al.,                    )
 8                              )
            Defendants.         )
 9   _____)

10

11

12

13                    Friday, January 29, 2016

14

15                    10877 Wilshire Boulevard
                      Suite 700
16                    Los Angeles, California

17

18

19

20          The above-entitled matter came on for

21   deposition, pursuant to Notice, at 10:15 a.m.

22

23

24

25
```

131

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1              UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   FEDERAL TRADE COMMISSION   )
                                )
 5           Plaintiff          )
                                )
 6     v.                       ) No. CV 15-4527-GW(PLAx)
                                )
 7   BUNZAI MEDIA GROUP, INC.,  )
     et al.,                    )
 8                              )
             Defendants.        )
 9   _____)
10
11
12
13
14
15           DEPOSITION OF IGOR LATSANOVSKI, taken on
16   behalf of the Federal Trade Commission, at
17   10877 Wilshire Boulevard, Suite 700, Los Angeles,
18   California, commencing at 10:15 a.m., and concluding
19   at 1:59 p.m., on Friday, January 29, 2016, pursuant
20   to Notice, before CHRISTINA KIM-CAMPOS,
21   CSR No. 12598, a Certified Shorthand Reporter, in
22   and for the State of California.
23
24                              ***
25
```

132

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                        1/29/2016

```
 1    A P P E A R A N C E S
 2
      For the Federal     U.S. FEDERAL TRADE COMMISSION
 3    Trade Commission:   REID TEPFER, ESQ.
                          1999 Bryan Street
 4                        Suite 2150
                          Dallas, Texas   75201-6808
 5                        (214) 979-9383
                          rtepfer@ftc.gov
 6
 7                        U.S. FEDERAL TRADE COMMISSION
                          LUIS H. GALLEGOS, ESQ.
 8                        1999 Bryan Street
                          Suite 2150
 9                        Dallas, Texas 76201-6808
                          (214) 979-9383
10                        lgallegos@ftc.gov
11
      For the Witness:    LAW OFFICE OF JEFFREY S. BENICE
12                        JEFFREY S. BENICE, ESQ.
                          (via telephone)
13                             - & -
                          SAM MARALAN, ESQ.
14                        3080 Bristol Street
                          Suite 630
15                        Costa Mesa, California  92626
                          (714) 641-3600
16                        JSB@JeffreyBenice.com
                          SamMaralan@JeffreyBenice.com
17
18    For the            CROSSWIND
      Defendants         ROBERT M. UNGAR, ESQ.
19    Alon Nottea and    (via Telephone)
      Roi Reuveni:       2190 North Beverly Glen Blvd.
20                        Los Angeles, California  90077
                          (818) 646-4750
21                        rmu@crosswindlaw.com
22
23    Also Present:       Nataliya Kharikova,
                          Russian interpreter
24
25
```

133

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1                      I   N   D   E   X

 2

 3    WITNESS                EXAMINATION              PAGE

 4    Igor Latsanovski      By Mr. Tepfer            134

 5    Afternoon Session                              195

 6

 7    DEPOSITION EXHIBITS            INITIAL REFERENCE

 8    Latsanovski Deposition Exhibit No.  48         135

 9    Latsanovski Deposition Exhibit No.  50         138

10    Latsanovski Deposition Exhibit No.  52         142

11    Latsanovski Deposition Exhibit No.  55         145

12    Latsanovski Deposition Exhibit No.  56         151

13    Latsanovski Deposition Exhibit No.  57         154

14    Latsanovski Deposition Exhibit No.  58         160

15    Latsanovski Deposition Exhibit No.  61         165

16    Latsanovski Deposition Exhibit No.  62         176

17    Latsanovski Deposition Exhibit No.  63         188

18    Latsanovski Deposition Exhibit No.  64         189

19    Latsanovski Deposition Exhibit No.  65         192

20

21                INFORMATION REQUESTED

22                      None.

23

24          QUESTIONS INSTRUCTED NOT TO ANSWER

25                      None.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1      LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 29, 2016
 2                  10:15 A.M.
 3
 4              NATALIYA KHARIKOVA,
 5          an interpreter, who was first duly sworn
 6          to translate from the English language
 7          into the Russian language, and from
 8          the Russian language into the English
 9          language, thereupon acted as interpreter
10          for the witness therein; and
11
12              IGOR LATZANOVSKI,
13          called as a witness by and on behalf of
14          the Plaintiff, being first duly sworn,
15          was examined and testified as follows:
16
17      THE INTERPRETER:  Nataliya Kharikova,
18  Certified Court Interpreter, I.D. number of 0301296.
19  Credential's been verified, and I've just been sworn
20  in by the court reporter.
21
22                  EXAMINATION
23  BY MR. TEPFER:
24      Q.  Okay.  So, Mr. Latsanovski, this is just a
25  continuation of what we were talking about
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

```
 1    yesterday, but before we get started I just wanted
 2    to clarify.  Do you understand that you're still
 3    under the same oath as if you were in court right
 4    now?
 5        A.   Yes.
 6        Q.   Okay.  I guess if we could turn to
 7    Exhibit 48, and this is an email that appears to be
 8    from Alon Nottea, and I'm now handing Exhibit 48 to
 9    the witness.
10             (Plaintiff's Exhibit 48 was marked
11             for identification by the court
12             reporter and is attached hereto.)
13    BY MR. TEPFER:
14        Q.   Do you recognize this email?
15        A.   No.
16        Q.   Do you know a Jose that works at Gryphon
17    Investment Group?
18        A.   No.
19        Q.   Have you ever heard of Gryphon Investment
20    Group?
21        A.   No.
22        Q.   The first sentence of the email, after the
23    greeting, says that -- it appears that Alon is
24    telling Jose, quote, "We were introduced through
25    Micky and Igor."
```

136

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1          Do you recall introducing in April of 2011
2     Alon to anyone named Jose?
3          A.   In 2011, I don't remember.
4          Q.   Do you recall introducing Alon to someone
5     named Jose at any point?
6          A.   I don't remember.
7          Q.   Do you know anybody or do you have a
8     business relationship with anybody named Micky?
9          A.   I know several people by that name.
10         Q.   Do you have any idea which Micky Alon may be
11    referring to in this email?
12         A.   I don't remember.  I can't associate with
13    anybody right now.
14         Q.   And I believe yesterday we were discussing
15    some of the materials that or the introduction that
16    you received from Alon and Khristopher at BunZai
17    Media Group.
18         Did you receive an email similar to one such
19    as this whenever you were considering investing in
20    BunZai Media Group?
21         A.   Can you clarify the question?  I don't
22    understand the question.
23         Q.   Sure.
24         When you were considering investing in
25    BunZai Media Group, did you receive a written sales

137

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

 1    pitch similar to the one in this email?

 2        A.    Not likely.  I don't remember exactly, but

 3    not likely.  We sat there in person personally and

 4    they were showing me the product and giving me all

 5    this.  That I remember for sure.

 6        Q.    And when you were discussing the product

 7    with them, did they show you any of the

 8    advertisements they considered using?

 9        A.    I don't remember.  It was five years ago.

10        Q.    And in this email there's a lot of websites

11    that are listed.  If you would, please review those

12    websites that are down towards the bottom and tell

13    me if you have ever visited any of those websites.

14        A.    Most likely, no, but I don't remember.  It

15    was long time ago.  It was 2011.

16        Q.    After 2011 do you believe you might have

17    visited any of these websites?

18        A.    On purpose, no.

19        Q.    And in the third paragraph it lists various

20    departments of BunZai Media Group's business,

21    including merchant processing, affiliate management,

22    customer service, et cetera.

23            Were you aware that BunZai Media Group had

24    these various departments?

25        A.    With BunZai Media Group I gave them a loan

138

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    for my company CalEnergy, and I didn't figure out in

2    detail how they operated, how they changed their

3    managers.  All of this was all the same to me.  The

4    only thing that was important to me was to get my

5    loan back.

6              (Plaintiff's Exhibit 50 was marked

7              for identification by the court

8              reporter and is attached hereto.)

9    BY MR. TEPFER:

10       Q.   Let's see.

11            And I'm now handing the witness what's been

12   marked as Exhibit 50.

13            Do you recall receiving this email from

14   Kristina Perez?

15       A.   I don't remember.

16       Q.   Do you know if there's a difference between

17   SkinCare OY and SkinCare OU?

18       A.   I don't know.

19       Q.   The email refers to MIDS.  Do you happen to

20   know what that is, the capital M-I-D-S?

21       A.   It's probably some kind of acronym.

22       Q.   But you don't know what it stands for?

23       A.   No.

24       Q.   On 50-5, it states that the funds are being

25   wired to an Estonian bank.  Are you aware of any

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    proceeds from Alon's companies being sent to

2    Estonia?

3        A.   I don't know.

4            MR. UNGAR:  Objection to the form of the

5    question.

6    BY MR. TEPFER:

7        Q.   I guess to rephrase, are you aware of any of

8    the proceedings from the sale of AuraVie products

9    being sent to a bank in Estonia at any time?

10           MR. UNGAR:  Objection as to the form of the

11   question, vague and ambiguous.

12   BY MR. TEPFER:

13       Q.   Have you ever heard of a company called EVO,

14   spelled E-V-O?

15       A.   It sounds like I heard it, but exactly I

16   don't know.  Exactly, I don't know.

17       Q.   Did you ever -- sorry.

18           Do you know Joyce Gaines?

19       A.   What is to know?

20       Q.   Have you ever met someone names Joyce Gaines

21   who works at UMS Banking?

22       A.   That is, have I ever attempted to work with

23   her?

24       Q.   Or just, have you, do you know someone named

25   Joyce Gaines?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                            1/29/2016

1        A.    Yes.

2        Q.    So how do you know Joyce Gaines?

3        A.    She has a merchant business.

4        Q.    And do you have any -- or rather, have you

5   had any business relationship with Joyce Gaines?

6        A.    When I opened the company VastPay, I wanted

7   to have a joint business with her.

8        Q.    What kind of joint business did you want to

9   have with Joyce Gaines?

10       A.    I wanted to be an investor in her business.

11       Q.    And what business of Joyce Gaines did you

12   want to be an investor in?

13       A.    We considered a joint new business.

14       Q.    And what would be the nature of the joint

15   new business that you would be -- or that you wanted

16   to do with Joyce Gaines?

17       A.    Just like I wanted to buy small companies

18   and to create one big company, but our business has

19   not gone past the negotiation stage.

20       Q.    And have you ever discussed merchant

21   accounts with Joyce Gaines?

22       A.    What accounts are we talking about?

23       Q.    Or any accounts at all?

24       A.    If we were discussing a possible joint

25   business, we used this word in our conversation.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1      Q.    So the joint business that you discussed

2   with her involved merchant processing?

3      A.    It was related to the purchase of small

4   companies who had those -- who had various clients.

5      Q.    And did Alon Nottea have any part in this

6   potential business that you discussed with Joyce

7   Gaines?

8           MR. UNGAR:  Objection as to the form of the

9   question, vague and ambiguous.

10          THE WITNESS:  I asked him to arrange a

11  meeting with her, face-to-face meeting.  He tried

12  several times, and in the end this meeting never

13  took place.

14  BY MR. TEPFER:

15     Q.    To your knowledge, did Joyce Gaines have

16  any -- or did Joyce Gaines have a business

17  relationship with Alon Nottea at any point?

18          MR. UNGAR:  Objection as to the form of the

19  question, vague and ambiguous, calls for

20  speculation, lacks foundation.

21          THE WITNESS:  I don't know.

22  BY MR. TEPFER:

23     Q.    How did you know that Alon Nottea knew Joyce

24  Gaines?

25     A.    Because he said he knew her.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1              (Plaintiff's Exhibit 52 was marked
 2              for identification by the court
 3              reporter and is attached hereto.)
 4    BY MR. TEPFER:
 5       Q.   I want to show you what's been marked as
 6    Exhibit 52, if you would take a look at that
 7    exhibit.  In Alon's forwarded email on
 8    December 2013, Alon requests that Joyce -- and the
 9    quote is "Please let me know when you, Igor and I
10    can jump on a short call.  I just want to make sure
11    we're on the same road."
12              Did you ever participate in a phone call
13    with Joyce and Alon?
14       A.   No.  But as far as I understand, this is one
15    of those attempts to have a meeting with her.
16       Q.   And so you never discussed skin care
17    merchant accounts with Joyce Gaines?
18       A.   No.
19       Q.   Yesterday we talked a little bit about, you
20    know, obviously, BunZai Media Group and Zen Mobile
21    Media, but I wanted to know have you ever been an
22    owner of any company, excluding those two companies,
23    that sold skin care products?
24       A.   No.
25       Q.   And you've never been a shareholder in any
```

143

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    other company that sold skin care products?

2        A.    No.

3        Q.    And have you ever been an informal owner in

4    any other company or had an informal interest in any

5    other company that sold skin care products?

6              MR. UNGAR:  Objection as to the form of the

7    question, vague and ambiguous.

8              THE WITNESS:  What companies specifically

9    are you asking about?

10   BY MR. TEPFER:

11       Q.    I'm just asking, speaking generally, if you,

12   you know, have ever, I guess, had financial interest

13   in a company that sold skin care products that

14   wasn't BunZai Media Group or Zen Mobile Media.

15       A.    No.

16             MR. UNGAR:  Objection.  Objection as to the

17   form of the question, vague and ambiguous.

18   BY MR. TEPFER:

19       Q.    And I was also wondering, do you, have you

20   ever done business in Cyprus?

21       A.    No.

22       Q.    And have you ever owned a company in Cyprus?

23       A.    No.

24       Q.    And you've never been a shareholder of a

25   company in Cyprus?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

```
 1      A.   No.
 2      Q.   Do you have any friends in Cyprus?
 3      A.   I have friends in a lot of different places.
 4  There are a lot of Russians living in Cyprus.
 5      Q.   So you do know people that live in Cyprus?
 6      A.   Yes.
 7      Q.   Do you know someone named Vladimir Kondakov?
 8  And that's spelled V-l-a-d-i-m-i-r K-o-n-d-a-k-o-v.
 9      A.   Personally?
10      Q.   Yes.
11      A.   No.
12      Q.   Have you ever heard of Vladimir Kondakov?
13      A.   I have heard many names, and I don't have
14  very good memory for names.  Sometimes I can shake
15  hands with a person; five minutes go by and I don't
16  remember the name.
17      Q.   So that name Vladimir Kondakov doesn't sound
18  familiar to you at all?
19      A.   No.
20      Q.   Have you ever heard of FBME Bank, Limited?
21      A.   Yes.
22      Q.   Where have you heard of that bank?
23      A.   Well, I don't remember.  It's some European
24  bank.
25      Q.   And have you ever had an account there
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

 1    personally?

 2        A.    No.

 3        Q.    Have any of your companies ever had an

 4    account there?

 5        A.    No.

 6              MR. UNGAR:  Objection as to the form of the

 7    question, vague and ambiguous.

 8    BY MR. TEPFER:

 9        Q.    And do you know the owner of FBME Bank

10    Limited?

11        A.    No.

12              MR. UNGAR:  Objection as to the form of the

13    question, vague and ambiguous, calls for

14    speculation, lacks foundation.

15              (Plaintiff's Exhibit 55 was marked

16              for identification by the court

17              reporter and is attached hereto.)

18    BY MR. TEPFER:

19        Q.    If you could turn to Exhibit 55, which I'm

20    going to hand over to the witness.

21              Do you remember sending this email in March

22    2011 to Alon?

23        A.    I recall.

24        Q.    Sorry.  I didn't hear it.

25        A.    I'm recalling.

146

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1      Q.   Oh, you do remember it?

2      A.   Yes.

3      Q.   What was the email about?

4      A.   Alon asked me if I had any acquaintances in

5   European banks when he wanted to run a test there,

6   and I knew one guy, a manager, and I called him and

7   sent this email, and I forwarded to Alon.  But

8   whether he contacted him or not, I don't know.  So

9   how the story developed, I don't know.

10     Q.   Is the contact that you knew in Estonia that

11  you're referring -- or sorry.  The contact that you

12  knew in Cyprus, was that Vladimir Kondakov?

13     A.   No.

14     Q.   Who was that contact?

15     A.   I don't remember now.  It was a long time

16  ago.

17     Q.   And you said that Alon wanted to run a test

18  over there?

19     A.   He wanted to run a test in Cyprus.  I don't

20  know the details.  He wanted to do it in Europe, but

21  where specifically, I don't know.

22     Q.   What sort of test did Alon want to run; do

23  you remember?

24          MR. UNGAR:  Objection, objection, objection,

25  objection as to the form of the question, vague and

147

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    ambiguous, calls for speculation.

2             THE WITNESS:  Better ask Alon.  He knows

3    about it.

4    BY MR. TEPFER:

5        Q.   Well, what did Alon tell you about this test

6    that he wanted to run?

7        A.   "I want to open the European market.  I want

8    to run a test."  That's all I know.

9        Q.   So it was for the sale of products in

10   Europe?

11       A.   I don't know technical details.

12            MR. UNGAR:  Objection as to the form of the

13   question, it's vague and ambiguous, and it calls for

14   speculation.

15   BY MR. TEPFER:

16       Q.   Sorry.  I didn't hear the answer.

17       A.   Alon said that he wanted to run a test.  How

18   he is going to do it technically, I don't know.  I

19   didn't get into details.

20       Q.   But when you say "a test," are you referring

21   to -- and to get -- you also said to get into the

22   European market.  Is that referring to selling

23   products in Europe?

24            MR. UNGAR:  Objection, objection, objection

25   as to the form of the question.  It is vague and

148

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1   ambiguous, it calls for speculation.

2           THE WITNESS:  For me it's just too general,

3   too abstract of a word.

4   BY MR. TEPFER:

5       Q.   Well, when you say "run a test," what do you

6   mean?

7       A.   I don't even know what it means.  I mean it

8   generally.  To run a test, to test the market, but

9   that's how I see it.

10      Q.   And so this was a test that, in your

11  understanding, required a merchant account?

12      A.   I don't know the details.  It's like, for

13  example, when you take an engine apart.  If you're a

14  mechanic, you know how this engine works; but if

15  you're just a driver, you don't.  So I don't know

16  all the details and I don't want to sit here and

17  appear smart now.

18      Q.   So you state in the email -- after you state

19  "This is one of my good friends who has bank in

20  Cyprus," you state, "he ask me for fill up this

21  application."

22           Did someone ask you to get a merchant

23  account application filled out for this bank in

24  Cyprus?

25      A.   I received this email, I forwarded it to

149

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1   Alon, and this was the end of my help to Alon with

2   this.

3                MR. TEPFER:  And sorry.  Could you read that

4   back.  I missed it.

5                (The previous answer was read back by

6                the court reporter as follows:

7                   "ANSWER:  I received this email,

8                I forwarded it to Alon, and this was

9                the end of my help to Alon with

10               this.")

11  BY MR. TEPFER:

12     Q.   Okay.  And after that you state, "Company

13  just from Europa will use our from Estonia."

14               What are you referring to in Estonia?

15     A.   I don't know.

16     Q.   You don't -- okay.

17     A.   This is March 2011.  How can I remember?

18     Q.   And when you say "my part about company and

19  director," do you remember what you meant by that?

20     A.   No.

21     Q.   And you refer to Rita.  Who is Rita?

22     A.   And where's Rita being referred to?

23     Q.   Sorry.  It's in, like -- I guess that's the

24  fourth sentence -- or fourth line.

25     A.   I don't remember exactly.  Maybe it's a

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

 1    person who was helping me with translation from time

 2    to time at that point.

 3             MR. TEPFER:  Is the -- and I'm not sure if

 4    you're able to do it -- is the translator able to

 5    translate these sentences right here (indicating)?

 6             THE INTERPRETER:  Interpreter translating

 7    the email.

 8             Igor, good day.  To provide a more correct

 9    answer to your question -- questions, please fill

10    out the attached form and send it at my address.

11    Regards.

12    BY MR. TEPFER:

13        Q.   Do you remember what the questions were that

14    you had for the person that wrote this email?

15             MR. UNGAR:  Objection as to the form of the

16    question, vague and ambiguous.

17             THE WITNESS:  No.

18    BY MR. TEPFER:

19        Q.   Have you ever heard of a company called

20    AuraVie Limited?

21        A.   I know of a name AuraVie as the name, is the

22    brand.

23        Q.   But did you ever own a company called

24    AuraVie Limited?

25        A.   No.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

151

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                      1/29/2016

1        Q.    Were you ever sole director of a company
2    called AuraVie Limited?
3            THE INTERPRETER:  Could you repeat this for
4    the interpreter, please?
5    BY MR. TEPFER:
6        Q.    Oh, sorry.  What did I say?
7            Were you ever sole director of a company
8    called AuraVie Limited?
9        A.    No.
10       Q.    Did you ever have power of attorney for a
11   company called AuraVie Limited?
12       A.    No.
13       Q.    Do you know who Vasiliki Argyrou is?  And I
14   should spell it.  It will probably be easier.  It is
15   V-a-s-i-l-i-k-i A-r-g-y-r-o-u.  Do you know anyone
16   by that name?
17       A.    No.
18           (Plaintiff's Exhibit 56 was marked
19           for identification by the court
20           reporter and is attached hereto.)
21   BY MR. TEPFER:
22       Q.    And I'm handing the witness what's been
23   marked as Exhibit 56.
24           Do you recognize this document?
25       A.    No.

152

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1       Q.    Under A, at about midway through the page it
2   says, "It has been proposed that a power of attorney
3   in the form of the draft attached hereto as
4   'Annex A' and hereinafter referred to as the 'Power
5   of Attorney' be given Mr. Igor Latsanovski having a
6   Canadian passport" -- that number's redacted --
7   "henceforth the Attorney to act in the name and on
8   behalf of the Company."
9           Did you ever act on behalf of the company
10  AuraVie Limited in any capacity?
11      A.    Maybe somebody to -- I, in this case, have
12  never owned this company, and it's the first time I
13  see this document.
14      Q.    Do you have any idea why Ms. Argyrou may
15  have listed you in this document?
16          MR. UNGAR:  Objection as to the form of the
17  question, vague and ambiguous, assumes facts not in
18  evidence.  Witness just said he's never seen it
19  before.
20          THE WITNESS:  I don't have an idea.
21  BY MR. TEPFER:
22      Q.    Do you know how Mrs. Argyrou might have
23  gotten your Canadian passport number?
24      A.    I don't know.
25          MR. UNGAR:  Ob- --

153

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                           1/29/2016

1    BY MR. TEPFER:

2        Q.    The third line of the email, it lists an

3    address in Larnaca, Cyprus.  Have you ever been to

4    that address?

5        A.    Never.

6        Q.    Were you the -- were you ever the, I

7    guess -- were you ever entitled to benefit from

8    property held by a trust in the interest of AuraVie

9    Limited, or were?

10           MR. UNGAR:  Objection.  Objection as to the

11   form of the question, it's vague and ambiguous,

12   assumes facts not in evidence.

13           THE WITNESS:  No.

14   BY MR. TEPFER:

15       Q.    So, to your knowledge, you never received

16   any benefit, or rather, any remuneration from

17   AuraVie Limited?

18       A.    Never.

19       Q.    Do you know someone named Eleni Papapavlou?

20   I can't pronounce this either.  It's E-l-e-n-i and

21   then P-a-p-a-p-a-v-l-o-u.  Do you know someone by

22   that name?

23       A.    No.

24       Q.    So you've never heard that name before?

25       A.    I can't associate it with anything.

154

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1      Q.   Have you ever heard of Cy World Alliance

2   Limited?  Spelled C-y-World, one word.

3      A.   No.

4           (Plaintiff's Exhibit 57 was marked

5           for identification by the court

6           reporter and is attached hereto.)

7   BY MR. TEPFER:

8      Q.   I'm now handing the witness what has been

9   marked as Exhibit 57.  Do you recognize this

10  document?

11     A.   First time I see it.

12     Q.   It states that an agreement was reached

13  between you and CyWorld Alliance and Ms. Vasiliki

14  Argyrou.  Did you ever enter into any sort of

15  agreement with that company and that individual?

16     A.   No.

17          MR. UNGAR:  Objection, objection.  Vague and

18  ambiguous, lacks discovery relevance.  Without an

19  offer of proof there is nothing to connect the

20  question to any of the issues in this lawsuit.

21  There is no offer of proof that any of these

22  questions in this last line of questioning is

23  reasonably calculated to lead to the discovery of

24  admissible evidence.

25          Counsel, are we still involved in the case

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

 1    right now of FTC vs. BunZai Media Group?

 2              MR. TEPFER:  Mr. Ungar, I'm requesting that

 3    you please concisely state your objections.

 4              MR. UNGAR:  And I -- and I'm asking -- I'm

 5    asking for an offer of proof right now with regard

 6    to discovery relevance, which is perfectly permitted

 7    in an objection.

 8              MR. TEPFER:  This case is called AuraVie,

 9    and the case is about the sale of AuraVie.

10              THE WITNESS:  So does that mean all

11    companies in the world that are called AuraVie are

12    going to be in this case --

13    BY MR. TEPFER:

14        Q.   Well --

15        A.   -- in the whole world?

16        Q.   Well, we're able to ask about the sale of

17    AuraVie.  So if you could answer the question.

18              If the court reporter would read it back.

19              (The previous question was read back

20              by the court reporter as follows:

21                "QUESTION:  It states that an

22              agreement was reached between you and

23              CyWorld Alliance and Ms. Vasiliki

24              Argyrou.  Did you ever enter into any

25              sort of agreement with that company

156

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1          and that individual?")

2          MR. BENICE:  This is Jeffrey Benice.  I

3   didn't hear that read back at all.

4          MR. TEPFER:  Sure.  I'll push you closer

5   over here.

6          (The previous question was read back

7          by the court reporter as follows:

8             "QUESTION:  It states that an

9          agreement was reached between you and

10         CyWorld Alliance and Ms. Vasiliki

11         Argyrou.  Did you ever enter into any

12         sort of agreement with that company

13         and that individual?")

14         MR. UNGAR:  I renew my objection, and I

15   further -- and I further state the objection to the

16   question that in the absence of an offer of proof,

17   it is oppressive, burdensome, and harassing.

18         THE WITNESS:  Do I have to answer or not?

19   Can I ask my attorney?

20   BY MR. TEPFER:

21      Q.   Sure, you can ask your attorney.

22         MR. BENICE:  If you understand the question,

23   you can answer the question, subject to the

24   objection.

25         THE WITNESS:  No.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1    BY MR. TEPFER:
 2        Q.    This document states after your name, it
 3    lists you as the beneficial owner, and further
 4    states that the beneficial owner is the ultimate
 5    owner of the company.
 6            Were you ever the beneficial owner of
 7    AuraVie Limited?
 8        A.    No.
 9            MR. UNGAR:  Objection, objection.  Vague and
10    ambiguous.  There is no offer of proof of any
11    discovery relevance to this question.  So for that
12    reason, the objection also is discovery relevance.
13            MR. BENICE:  Question?
14            MR. TEPFER:  Sorry.  What was that, Jeffrey?
15            MR. BENICE:  If you'll just re-ask, so I can
16    hear it clearly, the end of the question.  There's
17    interference in the line.
18            MR. TEPFER:  Sure.
19            Can you read back the question.
20            (The previous question was read back
21            by the court reporter as follows:
22              "QUESTION:  This document states
23              after your name, it lists you as the
24              beneficial owner, and further states
25              that the beneficial owner is the
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1          ultimate owner of the company.  Were
 2          you ever the beneficial owner of
 3          AuraVie Limited?")
 4  BY MR. TEPFER:
 5     Q.    And you have to answer audibly so that the
 6  court reporter and your attorney can hear.
 7     A.    No.
 8     Q.    At the bottom of page, I guess, 57-1,
 9  those -- are either of those initials or signatures
10  yours?
11     A.    No.  You know my signature.
12     Q.    And just to be certain, on the next page,
13  neither of those two initials or signatures are
14  yours either?
15     A.    No, absolutely not.
16     Q.    Okay.  Do you know what a -- or have you
17  ever heard the term "chargeback monitoring program"?
18     A.    I heard the word "chargeback," and probably
19  "monitoring" as well, or something related to it.
20     Q.    Are you aware that credit card companies
21  such as Visa or MasterCard have monitoring programs
22  for excessive chargebacks?
23     A.    I don't know what kind of departments they
24  have.  I'm sure they have a lot of them.
25     Q.    Right.
```

159

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1          But are you aware that they have a program

2     that companies can be entered into if it's

3     determined that they have excessive chargebacks?

4          A.   I -- I don't work for Visa or MasterCard.

5     How would I know what kind of departments they have?

6          Q.   Right.

7          But have you ever reviewed, I guess, Visa or

8     the terms of Visa or MasterCard's excessive

9     chargeback program?

10         A.   Me personally?  Never.  Why would I do that?

11         Q.   Have you ever discussed any credit card

12    company's excessive chargeback program with Alon

13    Nottea?

14         A.   No.  I sometimes, when I was involved in

15    opening a merchant business, VastPay, I was

16    receiving general information on merchant business,

17    and I was forwarding it to Alon in general,

18    sometimes.

19         Q.   So you just referred to VastPay as a

20    merchant business.  Do you consider VastPay to be a

21    merchant business?

22         MR. UNGAR:  Objection.  Objection as to the

23    form of the question, it's vague and ambiguous.

24         THE WITNESS:  I think that VastPay is a

25    business, a business that is an aggregator of small

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

 1    businesses.  Because what is meant by the word
 2    merchant, I'm still unable to understand deeply --
 3    BY MR. TEPFER:
 4        Q.   Sure.
 5        A.   -- but the technical meaning.
 6             (Plaintiff's Exhibit 58 was marked
 7             for identification by the court
 8             reporter and is attached hereto.)
 9        Q.   I'm now handing the witness what's been
10    marked as Exhibit 58.
11             Do you recall sending this email in January
12    2012?
13        A.   Just like I said, I received here an email
14    from National Merchant, and I forwarded it to Alon.
15        Q.   Do you, did you request that Roman Balanko
16    send you this email?
17        A.   No.  It -- very often things would arrive at
18    my email.  People that I communicated with, they
19    were trying to send me something.
20        Q.   Why did you think that this email should go
21    to Alon?
22        A.   Well, I don't know.  I work with Alon and I
23    forwarded it to him.  Maybe it's some additional
24    information that can help somebody with something.
25        Q.   Well, the reason I ask, you own multiple

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    businesses and have multiple business partners, and

2    this document doesn't refer specifically to Alon or

3    BunZai Media Group, but you forwarded it to Alon, so

4    I was wondering if there's anything specific in this

5    document that made you believe it would be relevant

6    for Alon.

7          MR. UNGAR:  Objection.  Objection as to the

8    form of the question, it's vague and ambiguous, it's

9    argumentative.

10         THE WITNESS:  I didn't only forward this

11   document.

12   BY MR. TEPFER:

13     Q.   Sure.

14         Did you forward this document to anyone

15   other than Alon Nottea, to your recollection?

16     A.   How can I have any recollection?  I haven't

17   even read it.  So many pages.  What it's about, I

18   don't even have a clue.

19         MR. BENICE:  You know or you don't know?

20         THE WITNESS:  What?

21         (In English) I don't know.

22         THE INTERPRETER:  I don't know.

23   BY MR. TEPFER:

24     Q.   Do you have any knowledge of BunZai Media

25   Group's merchant accounts being added to Visa or

162
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1    MasterCard's excessive chargeback program?

2        A.    No.

3        Q.    Do you know roughly what your yearly income

4    from Guayas Limited is?

5        A.    My personal?

6        Q.    Yes.

7        A.    No.

8        Q.    Do you think it's more than $500,000?

9              MR. UNGAR:  Objection as to the form of the

10   question, it's vague and ambiguous.

11             THE WITNESS:  I don't understand the

12   question.

13   BY MR. TEPFER:

14       Q.    Do you think that your yearly -- I guess

15   your average yearly income from Guayas Limited is

16   more than $500,000?

17       A.    No.

18       Q.    Do you believe that it's less than $500,000?

19       A.    I don't have any income from Guayas.

20       Q.    Does -- to your knowledge, does Guayas,

21   since its inception, has it made profit?

22             MR. UNGAR:  Objection as to the form of the

23   question, vague and ambiguous, particularly

24   temporally.

25             THE WITNESS:  As far as I know, yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

163

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1    BY MR. TEPFER:

 2        Q.   Have you ever received any income from

 3    Guayas?

 4        A.   No.

 5        Q.   Has Guayas ever paid out any of its profits

 6    to anyone?

 7             MR. UNGAR:  Objection as to the form of the

 8    question, it's vague and ambiguous, assumes facts

 9    not in evidence.

10             THE WITNESS:  Ask Guayas's director.  Why

11    are you asking me?

12    BY MR. TEPFER:

13        Q.   Have you ever represented to anyone that

14    you've received income from Guayas?

15        A.   Income from Guayas?

16        Q.   Yes.

17        A.   In what position?

18        Q.   Just, have you ever made the

19    representation --

20        A.   Salary?  Dividends?  Can you specify?  Or

21    potential to obtain?

22        Q.   So you're saying you want to differentiate

23    between salary and other, I guess, dividends, that

24    sort of thing?

25        A.   Well, it's not that I want to.  It's how it
```

164

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    is.

2        Q.    Sure.

3        A.    There are different things.

4        Q.    So have you ever received dividends from

5    Guayas?

6        A.    No.

7        Q.    Have you ever received salary from Guayas?

8        A.    No.

9        Q.    Have you ever been paid any money from

10   Guayas?

11       A.    As an income?

12       Q.    Just in general, have you ever received

13   money from the company Guayas?

14       A.    Me personally?

15           MR. UNGAR:   Objection to the form of the

16   question, vague and ambiguous.

17           THE WITNESS:   I don't understand the

18   question.

19   BY MR. TEPFER:

20       Q.    Can you tell me what part of the question

21   that you don't understand, so I can rephrase it?

22       A.    The last one.

23       Q.    Can you tell me what part of the last

24   question, so I can rephrase it?

25       A.    Just repeat the question.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

```
 1          MR. TEPFER:  Okay.  Can the court reporter
 2   read it back.
 3          (The previous question was read back
 4          by the court reporter as follows:
 5            "QUESTION:  Just in general, have
 6          you ever received money from the
 7          company Guayas?")
 8          THE WITNESS:  Me as who?  CalEnergy?
 9   BY MR. TEPFER:
10     Q.   You personally.
11     A.   Or me as Igor Latsanovski?
12     Q.   You as Igor Latsanovski.
13     A.   In the form of what?
14     Q.   Have you ever received any remuneration of
15   any kind, you personally, from Guayas?
16     A.   Remuneration I did not receive.
17          MR. UNGAR:  Objection.  Objection as to the
18   form of the question.  It's vague and ambiguous.
19          (Plaintiff's Exhibit 61 was marked
20          for identification by the court
21          reporter and is attached hereto.)
22   BY MR. TEPFER:
23     Q.   If I could hand over Exhibit 61 to the
24   witness.  Oh, I think we might need to -- Exhibit 55
25   got marked, and we might need -- this is the master
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1    exhibit.
 2        A.   (In English) But this is for attorney, no?
 3        Q.   I think that's the court reporter's, but
 4    that can be -- 'cause we have multiple copies, we
 5    can just switch them out.  It's no problem.
 6        A.   (In English) Sorry.
 7        Q.   Don't worry about it.  Yeah, just keep that
 8    one clean and you can have that one.
 9             Do you recognize this document called,
10    titled Uniform Residential Loan Application?
11        A.   Yes.
12        Q.   And that's your initials down at the bottom
13    of the page?
14        A.   Yes.
15        Q.   On 61-2 it states under Total for base
16    employee or, I guess, base employee income or EMPL
17    income, it states $587,694.83.  Did you give that
18    total, or did you input that total into this
19    document?
20        A.   I already explained this three times.  Just
21    call the bank already and explain this.  This
22    application is for residents, but I took out a loan
23    as a nonresident.  And the agent who was filling out
24    the form called the bank asking how do I fill out
25    the resident form as if for a nonresident.  And they
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

 1    said that we don't give out loans based on the
 2    income, but based on the down payments, so we don't
 3    care what kind of income you have.  So tell how much
 4    money you have approximately, divide this amount by
 5    12, and put this number in there.
 6           That's what they told the agent, and that's
 7    it.
 8      Q.    And so your thought was so the bank and the
 9    person who filled out this loan came to that total
10    amount?
11      A.    Just off the -- off our heads, because
12    that's what the bank said.
13      Q.    And so at that time you believe that you had
14    approximately 12 times this $587,694.83 figure in
15    Guayas?
16           MR. UNGAR:  Objection, objection, objection,
17    objection.  Lack of discovery relevancy.  In the
18    absence of an offer of proof there is no connection
19    between the question and any of the issues in this
20    lawsuit.  There is no basis to believe that there
21    is -- that there is any reasonable connection
22    between the question and -- and the likelihood of
23    discovery of any admissible evidence in this case.
24    In the absence of an offer of proof, this further
25    line of questioning is oppressive, burdensome, and

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1   harassing.
 2           MR. TEPFER:  Counsel, I want to renew my
 3   request that you please limit your speaking
 4   objections.
 5           And that's a good point.
 6   BY MR. TEPFER:
 7      Q.   I'm not sure, Mr. Latsanovski, did you
 8   answer the last question?  I didn't hear.
 9      A.   I didn't.  I didn't understand the question.
10   And do I have to answer or not because I'm thinking
11   the same way that Counsel is thinking, that there's
12   really no relevance to this matter at all.
13      Q.   Well, you can ask your attorney.
14      A.   Jeffrey?
15           MR. BENICE:  Yes, if you can answer the
16   question, answer the question.  I don't remember now
17   what the question was.
18           MR. TEPFER:  Could the court reporter read
19   it back.
20           (The previous question was read back
21           by the court reporter as follows:
22             "QUESTION:  And so at that time
23           you believe that you had
24           approximately 12 times this
25           $587,694.83 figure in Guayas?")
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1              THE WITNESS:  And what does Guayas have to
 2      do with it?
 3      BY MR. TEPFER:
 4          Q.    Objection; nonresponsive.
 5              Could you read back the question again.
 6              (The previous question was read back
 7              by the court reporter as follows:
 8                  "QUESTION:  And so at that time
 9              you believe that you had
10              approximately 12 times this
11              $587,694.83 figure in Guayas?")
12              MR. UNGAR:  And could the court reporter sit
13      a little closer to the phone 'cause I didn't quite
14      hear.
15              MR. TEPFER:  Sure.  We'll move the speaker a
16      little bit over.
17              THE WITNESS:  Can we have a break because
18      I'm tired already.
19              MR. TEPFER:  Sure.  After.
20              MR. UNGAR:  No, no, no, no, no.  I want to
21      hear the question back first.  No break until we
22      hear the question.  There's a question pending.
23      There's a question pending.
24              MR. TEPFER:  Right.  Mr. Ungar, we were
25      going to answer the question and then take a break.
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1          MR. UNGAR:  So let's hear the question.
 2    Let's hear the question from the court reporter,
 3    without the translation at the same time.  Just from
 4    the court reporter.
 5          (The previous question was read back
 6          by the court reporter as follows:
 7            "QUESTION:  And so at that time
 8          you believe that you had
 9          approximately 12 times this
10          $587,694.83 figure in Guayas?")
11          MR. UNGAR:  And I'm going to -- I'm going to
12    add to my objection that it is vague and ambiguous.
13          THE WITNESS:  I just don't understand this
14    question.  How is it that this application, loan
15    application to buy my home has something to do with
16    Guayas?  I can't answer a question that I don't
17    understand.
18    BY MR. TEPFER:
19       Q.   Well, just to -- by way of explanation, up
20    at the top of that same page you list under
21    Borrower, Guayas Limited, and provide its address in
22    Estonia and state that you're the owner of this
23    company, and then it says Base Income, and it lists
24    that figure that we've been discussing.  And in
25    discussing that figure, you said that the person who
```

171

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1      filled out the form spoke with the bank and told
2      them to divide by 12 to get that figure.  And so I
3      just wanted to confirm that it was your
4      understanding that at this time, that Guayas had
5      essentially 12 times $587,694.83.
6              MR. UNGAR:  Objection, objection; it's
7      vague, it's vague and ambiguous and it lacks
8      discovery relevance.
9              THE WITNESS:  To answer to you, I need to
10     answer correctly the contents of this application.
11     And since I haven't filled it out, I don't want to
12     mislead you or myself either.
13     BY MR. TEPFER:
14        Q.   Well, and I'd like to just ask not
15     specifically about this application, but about the
16     company Guayas, and I'm not sure how much --
17        A.   What -- what's your question about Guayas
18     then?  That don't have anything to do with this
19     application.  It's a different question.  Or is this
20     related to it?
21        Q.   I'm using the figure listed here, but my
22     question is just that at the time that this was
23     filled out in approximately -- it's hard to read
24     that month, but I think it's 2013, if it was your
25     understanding that if Guayas had 12 times the sum

172

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

 1    listed there.

 2            MR. UNGAR:  Objection, objection; vague and

 3    ambiguous, lacks discovery relevance.

 4            MR. TEPFER:  Oh, it's August.

 5            MR. BENICE:  That application and financial

 6    information in Guayas, he already said there's no

 7    connection.

 8    BY MR. TEPFER:

 9        Q.   Do you know anyone named Greg Augustine?

10        A.   No.  And I'll repeat one more time.  I just

11    want to say that my memory for names is really bad.

12        Q.   Sure.  And sorry.  Just one last thing.

13            On that -- on 61, on -- oh, I think we did

14    ask about the initials, but on the last page of that

15    61-4, I just want to confirm if that's your

16    signature there.

17        A.   Yes.

18        Q.   Or -- sorry, and I think a little bit ago

19    Igor had asked to take a break.  Do you still want

20    to take that break?

21        A.   (Witness shakes head up and down.)

22            MR. TEPFER:  Okay.  We can go off the

23    record.

24            (Recess)

25            MR. TEPFER:  Could the court reporter read

173

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    back the last question.

2                 (The previous question was read back

3                 by the court reporter as follows:

4                    "QUESTION:  On that -- on 61, on

5                 -- oh, I think we did ask about the

6                 initials, but on the last page of

7                 that 61-4, I just want to confirm if

8                 that's your signature there.")

9    BY MR. TEPFER:

10       Q.   Right.  Right.

11            Mr. Latsanovski, have you ever heard of

12   something called a chargeback intercept program?

13       A.   I don't remember.

14       Q.   Do you know of any reason why a company

15   would want to reduce its chargebacks?

16       A.   I don't understand what we're talking about.

17       Q.   Yesterday we had talked about chargebacks,

18   and I was -- my question is with your understanding

19   of what a chargeback is, do you know of any reason

20   why a company would want to lessen the number of

21   chargebacks it gets?

22       A.   Why would a company want to lessen the

23   number of them?

24       Q.   Uh-huh.  Yes.

25       A.   Well, just to -- why?  Probably every

174

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    company has its own reasons.  What company are we

2    talking about --

3         Q.   Well, my question was just --

4         A.   -- because it's just too general.

5         Q.   Right.

6              And just, generally speaking, do you think

7    there are any universal reasons why a company might

8    want to reduce the number of chargebacks it gets?

9         A.   Universal?  In general?

10        Q.   Yeah, just in general.

11        A.   How would I know what company, for what

12   reason, would want to reduce their number?

13             MR. UNGAR:  Okay, I'm going to object.  The

14   question, the answer -- the question is vague and

15   ambiguous, number one.  I'm moving to strike the

16   answer as nonresponsive to the question.  The

17   question -- the question, in its form, lacks any

18   discovery relevance.  Can we please move on?  And

19   it's argumentative.  Can we please move on?

20             MR. TEPFER:  Mr. Ungar, please just

21   concisely state your objections.  If --

22             MR. UNGAR:  I stated my objections

23   concisely, and I am requesting that we please move

24   on to a fruitful area.

25             MR. TEPFER:  Would we be able to stipulate

175

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    to a standing objection as to relevance?

2         MR. UNGAR:  Counsel, my objection is not a

3    relevancy objection.  My objection with regard to

4    discovery relevance is different.  You should know

5    that, and if you don't, then I suggest you review

6    the Federal Rules of Civil Procedure.

7         MR. TEPFER:  Please let the record reflect

8    that Counsel is raising his voice.

9          If you could read back --

10        MR. UNGAR:  That is an incorrect -- that is

11   an incorrect characterization, representation,

12   Counsel.  That is the way the speaker works where I

13   am, so do not improperly make your characterizations

14   to this record.

15        MR. TEPFER:  Well, I disagree, but could you

16   read back the question please, Court Reporter.

17         (The previous question was read back

18          by the court reporter as follows:

19            "QUESTION:  How would I know what

20           company, for what reason, would want

21           to reduce their number?")

22        MR. UNGAR:  Same objections.

23   BY MR. TEPFER:

24      Q.   And you can answer if you know.

25      A.   I don't know the answer.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1      Q.   Do you know of any reason why BunZai Media
 2  Group would want to reduce the number of chargebacks
 3  that it had?
 4      A.   I don't know.  Ask Alon.  He would know.  He
 5  ran the business.  How would I know?
 6      Q.   So that wasn't a topic of discussion ever
 7  between you two?
 8      A.   Absolutely not.
 9           (Plaintiff's Exhibit 62 was marked
10           for identification by the court
11           reporter and is attached hereto.)
12  BY MR. TEPFER:
13      Q.   I want to turn to what's been marked as
14  Exhibit 62.
15           Do you remember receiving this email from
16  Alon?
17      A.   Don't remember.
18      Q.   Do you have any reason to believe you did
19  not review this email when you received it?
20      A.   Most probably I didn't because it's not even
21  sent to me, and I see there's an address there, but
22  probably it's a mistake or maybe it's just another
23  excuse to explain to me why the money is not being
24  paid.  Here it says Alon and Paul.  What does it
25  have to do with me?
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1     Q.    Sorry.  If we could just switch out the
2    exhibits real quick because the mark --
3     A.    (In English) Sorry.
4          THE INTERPRETER:    Sorry.
5    BY MR. TEPFER:
6     Q.    And if you'd like some scratch paper, we can
7    give you some scratch paper, too.  So you just, in
8    your answer, you referenced a mistake.  Is it your
9    opinion that this was mistakenly sent to you?  Is
10   that what you meant?
11    A.    I don't know.  Ask whoever sent it.
12    Q.    Okay.  And do you know the company BP
13   Pacific?
14    A.    No.
15    Q.    Have you ever heard of the company IMP
16   Merchant Solutions?
17    A.    No.
18    Q.    And do you know the company Bridgepoint
19   Pacific Group?
20    A.    No.
21    Q.    On the second page, 62-2, Mr. Augustine
22   states that, he purports to have a big impact on the
23   preservation of thousands of merchant accounts who
24   are in danger of breaching the strict visa/MC
25   chargeback thresholds getting fined and/or losing

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    their merchant accounts.

2           At this point in 2012 were you aware of

3    anything that might have indicated to you that

4    BunZai Media Group was in danger of losing its

5    merchant account or a merchant account?

6           MR. UNGAR:  Objection.  Objection as to the

7    form of the question, vague and ambiguous, assumes

8    facts not in evidence, calls for speculation.

9           THE WITNESS:  I have not read this email and

10   I'm not aware of its contents.

11   BY MR. TEPFER:

12     Q.   Sure.  My question was just a little bit

13   different.  What I was asking is just at this -- at

14   the time that you received this email, were you

15   aware of any indicators that might have suggested to

16   you that BunZai Media Group was at risk of losing a

17   merchant account due to breaching the strict Visa,

18   slash, MasterCard chargeback thresholds?

19          MR. UNGAR:  Objection, objection, objection

20   as to the form of the question, vague and ambiguous,

21   calls for speculation, assumes facts not in

22   evidence, lacks foundation, misstates prior

23   testimony of the witness.

24   BY MR. TEPFER:

25     Q.   You can answer the question.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

 1        A.    I'm just lost already.

 2              MR. TEPFER:  And, Mr. Ungar, I'd like to

 3    correct my question to avoid some of those

 4    objections.  Would you mind explaining what

 5    testimony you believe I'm misstating?

 6              MR. UNGAR:  Yes.  Your question assumes

 7    prior testimony of this witness consistent with your

 8    question.  It's not accurate.

 9              MR. TEPFER:  Well, sorry.  I was just asking

10    for his knowledge.

11              MR. BENICE:  Can the reporter read back the

12    last question.

13              MR. TEPFER:  Sure.

14              You can go ahead.

15              (The previous question was read back

16              by the court reporter as follows:

17                "QUESTION:  My question was just

18                a little bit different.  What I was

19                asking is just at this -- at the time

20                that you received this email, were

21                you aware of any indicators that

22                might have suggested to you that

23                BunZai Media Group was at risk of

24                losing a merchant account due to

25                breaching the strict Visa, slash,

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

    1          MasterCard chargeback thresholds?")

    2          MR. UNGAR:  And, Counsel, to clarify my

    3    objection, because apparently you didn't understand

    4    it, the only testimony I heard of this witness

    5    regarding the email was that he never saw it before.

    6    Correct me if I'm wrong.

    7          MR. TEPFER:  My question wasn't about the

    8    email, Counsel.

    9          MR. UNGAR:  You asked him -- you asked him

   10    from the time he received it.

   11          MR. TEPFER:  No, I'm sorry.  My question was

   12    a little different.  I was just wondering if he's

   13    aware of --

   14          MR. UNGAR:  Sir, sir, sir, didn't you ask

   15    him, isn't your question -- didn't your question

   16    begin with concerning the time that he received the

   17    email?

   18          MR. TEPFER:  At about this time.  It's

   19    concerning the time period, not the email itself.

   20    But I'd like to move on, but thank you for your

   21    explanation.

   22          MR. UNGAR:  Wait, wait, wait, wait, wait one

   23    second.  Wait one second.  Didn't your question

   24    presuppose --

   25          MR. TEPFER:  Counsel --

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1              MR. UNGAR:  -- the time in which this
2      witness received the email?
3              MR. TEPFER:  Counsel, I understand your
4      objection.  I'd like to move on.
5              Could the court reporter --
6              MR. UNGAR:  Let's move on.  Let's move on to
7      something that's discovery relevant.
8              MR. TEPFER:  All right.  Counsel, would you
9      mind --
10             Sorry, would the court reporter mind reading
11     back the question.
12             (The previous question was read back
13             by the court reporter as follows:
14                "QUESTION:  My question was just
15             a little bit different.  What I was
16             asking is just at this -- at the time
17             that you received this email, were
18             you aware of any indicators that
19             might have suggested to you that
20             BunZai Media Group was at risk of
21             losing a merchant account due to
22             breaching the strict Visa, slash,
23             MasterCard chargeback thresholds?")
24     BY MR. TEPFER:
25         Q.   And you can answer if you know.

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1          MR. UNGAR:  Same, same objections.

2     Presupposes the man received the email.

3     BY MR. TEPFER:

4          Q.   You can -- you can go ahead.  I just ask,

5     you know, if you understand the questions, to answer

6     them, unless your attorney instructs you not to.

7          A.   No.  No.

8          Q.   Do you know if, to your knowledge, did Alon

9     Nottea ever refer to you as your partner -- or as

10    his partner?

11         A.   We're going back to the discussion of what a

12    partner means.

13         Q.   Well --

14         A.   For me a partner means comrade.

15         Q.   Right.

16         A.   In Russian there's no such a word.  That's

17    why I'm constantly confused.

18         Q.   Right.  My --

19         A.   There's a shareholder.  There is a CEO,

20    Director.  And what is a partner?

21         Q.   I guess I'll object as nonresponsive.  My

22    question just goes to do you know if Alon Nottea

23    ever used the word "partner", in English, to

24    describe you all's relationship?

25         MR. UNGAR:  Objection.  Objection as to the

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    form of the question.  Vague and ambiguous.

2              THE WITNESS:  Well, even for me it's

3    ambiguous.

4    BY MR. TEPFER:

5         Q.   Well --

6         A.   How -- how can I know what and who referred

7    to what and in what context?

8         Q.   Right.  I'm just asking to your own personal

9    knowledge, to your own personal knowledge did Alon

10   Nottea ever use the English word "partner" to refer

11   to you all's relationship?

12             MR. UNGAR:  Objection.  Objection as to form

13   of the question, vague and ambiguous.

14             THE WITNESS:  How can I answer this if I

15   don't understand the word "partner" in English,

16   since it does not exist in Russian?

17   BY MR. TEPFER:

18        Q.   Well, without necessarily concerning

19   yourself with the definition of the word "partner,"

20   my question is just have you ever heard Alon Nottea

21   use the English word "partner" in reference to you?

22        A.   In what context?

23        Q.   In any context.

24        A.   I don't know.

25        Q.   Yesterday we talked a little bit about SBM

184

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1   Management, Inc.  Did you ever perform any work of

2   any kind for SBM Management, Inc.?

3        A.   No.

4        Q.   Did you ever have any sort of ownership of

5   any kind of SBM Management, Inc.?

6        A.   No.

7        Q.   Were you ever able to direct that payments

8   be made from SBM Management, Inc., to other

9   accounts?

10       A.   Me personally?

11       Q.   Yes, you personally.

12       A.   No.

13       Q.   Have you ever directed that a payment from

14  one of SBM's accounts be sent to accounts outside of

15  the United States?

16       A.   No.  I once asked for the money to be

17  transferred for, for the payback for my investment

18  from my loan 'cause I've always tried to minimize

19  this amount to be transferred to one of the startups

20  in Israel.

21       Q.   What was the startup in Israel that you're

22  referring to?

23       A.   Well, I have there -- it's one thing to

24  manufacture equipment.  It's a technical thing.

25       Q.   Why did you have a preference that the

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1   payment be made from SBM Management, Inc.'s,

2   accounts?

3       A.   It's just because I provided loan from

4   CalEnergy to SBM, so just the numbers could match.

5   It's just very often that the money for the loan

6   were repaid from various companies, and to avoid

7   this spaghetti or garbage I asked for the money to

8   be transferred from this company, the company that

9   was provided the loan, that I provided the loan to,

10  from CalEnergy.

11       MR. TEPFER:  Would the court reporter mind

12  reading back that answer.  I got a little bit

13  confused.

14       MR. UNGAR:  What, wait, wait, wait, wait one

15  second.  Was he in the middle of an answer?

16       MR. TEPFER:  No.

17       MR. UNGAR:  I thought he got cut off.  I

18  didn't hear the end of his answer, and he was cut

19  off, it sounded like.

20  BY MR. TEPFER:

21       Q.   Were you finished, Mr. Latsanovski?

22       A.   I will repeat the answer.  May I?

23       Q.   It's not necessary.  I just -- there was

24  apparently some confusion about whether you had

25  finished your answer.  Had you finished your answer?

186

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                          1/29/2016

1      A.    I'm confused myself now.

2            MR. TEPFER:   Would the court reporter read

3      back the answer.

4            (The previous answer was read back by

5            the court reporter as follows:

6                "ANSWER:   It's just because I

7            provided loan from CalEnergy to SBM,

8            so just the numbers could match.

9            It's just very often that the money

10           for the loan were repaid from various

11           companies, and to avoid this

12           spaghetti or garbage I asked for the

13           money to be transferred from this

14           company, the company that was

15           provided the loan, that I provided

16           the loan to, from CalEnergy.")

17           THE WITNESS:   That's all clear; right?

18     BY MR. TEPFER:

19     Q.    Sure.

20           I had a few more questions about that.   Why

21     was it important that the loans match?

22     A.    I -- CalEnergy provided a loan to SBM.   And

23     if any money comes back, it needs to come back from

24     SBM.

25     Q.    And who asked that you make your loan

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    payment to SBM Management, Inc.?

2        A.   We had an agreement with Alon.

3        Q.   And when you say "we," who are you referring

4    to?

5        A.   Myself, CalEnergy, and the loan.

6        Q.   And this loan that we're talking about to

7    SBM Management, was it your understanding that this

8    was for Alon's sale of AuraVie?

9        A.   This was a loan for Alon's business, who was

10   engaged in selling various products.

11       Q.   And --

12            MR. UNGAR:  Move to strike the answer as --

13   as speculative and objection to the question.  It's

14   vague and ambiguous and it calls for speculation.

15   BY MR. TEPFER:

16       Q.   So do you know why you made this request to

17   Doron?

18            MR. UNGAR:  Objection as to the form of the

19   question, vague and ambiguous, calls for

20   speculation, lacks foundation.

21            THE WITNESS:  I don't remember why.

22   BY MR. TEPFER:

23       Q.   Is it your understanding that Doron had some

24   association with SBM Management, Inc.?

25       A.   On what association are we talking about?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1     Q.   Was it your understanding that Doron was
2  authorized to make payments from SBM Management,
3  Inc.?
4     A.   I don't know.  Unlikely.
5     Q.   Is there any reason you didn't send this
6  request to Alon Nottea if it was -- I'll just end
7  that question there.
8     A.   Maybe technically I just made a mistake, and
9  that's it.
10    Q.   So you believe that this email was
11 mistakenly sent to Doron?
12    A.   I don't -- I don't remember.  Maybe it
13 wasn't a mistake, but I don't remember now why I
14 sent it to Doron, and it was within the framework of
15 me being repaid my loan.
16         MR. UNGAR:  Move to strike everything after
17 "I don't remember."
18         (Plaintiff's Exhibit 63 was marked
19         for identification by the court
20         reporter and is attached hereto.)
21 BY MR. TEPFER:
22    Q.   I'm now handing the witness what's been
23 marked as Exhibit 63.  And the request that -- or
24 rather, do you recognize this email?
25    A.   How can I know it if it's not sent to my

*Latsanovski*

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1    name?
 2        Q.   I'm sorry.  I'm not sure I understood.
 3    Could you -- are you saying that you didn't send
 4    this email?
 5        A.   Well, where does it say that I sent it?
 6        Q.   Up at the top where it says "From", it says
 7    "Igor" and it says igorlats@gmail.com.
 8        A.   Which one are we talking about?
 9        Q.   Oh, is that the -- which one -- what are
10    you --
11        A.   (In English) 63.
12             THE INTERPRETER:   63.
13    BY MR. TEPFER:
14        Q.   Oh, I'm sorry.  I meant to give you 64.
15             So which one are you looking at there?
16    Exhibit 63?
17        A.   Yes.
18        Q.   I think we mistakenly skipped over one.
19             Yeah, I'm now handing the witness what's
20    been marked as Exhibit 64.
21             (Plaintiff's Exhibit 64 was marked
22             for identification by the court
23             reporter and is attached hereto.)
24    BY MR. TEPFER:
25        Q.   Do you recall that email?
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

 1       A.   Yes, I do.

 2       Q.   And you wrote this email?

 3       A.   Yes, I did.

 4       Q.   Do you know who Tomer Amsalem is?  And

 5   that's T-o-m-e-r A-m-s-a-l-e-m.

 6       A.   I'll just say again, my name memory is not

 7   very good.  If you show me a photograph, but like

 8   this I can't remember.

 9       Q.   Okay.  Sure.

10            Have you ever heard of Safehaven Ventures,

11   Inc.?

12       A.   This name does not ring many bells.

13       Q.   What about Merchant Leverage Group, Inc.?

14       A.   It's some company, and I don't know.  Maybe

15   I heard it, but I don't know what it was doing.

16       Q.   Do you know who owned Merchant Leverage

17   Group, Inc.?

18       A.   No.

19       Q.   Do you know who Stephan Bauer is?

20       A.   Stephan Bauer and -- what do you mean by

21   "know"?

22       Q.   Have you ever met someone named Stephan

23   Bauer?

24       A.   Yes.

25       Q.   Where did you meet Stephan Bauer?

191

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1          A.    At Alon's office.

2          Q.    Do you know what business Alon had with

3    Stephan Bauer?

4          A.    No.

5                MR. UNGAR:   Objection, objection as to the

6    form of the question, assumes facts not in evidence,

7    calls for speculation, lacks foundation.

8    BY MR. TEPFER:

9          Q.    And I think the answer was no; is that

10   correct?

11         A.    No.

12         Q.    Do you know what Trigen, LLC, is?

13   T-r-i-g-e-n.

14         A.    No.

15         Q.    Do you know what Adageo, LLC, is?  And

16   that's A-d-a-g-e-o.

17         A.    No.

18         Q.    Do you know what USM Products, Inc., is?

19         A.    I heard of such a company, but what they do

20   specifically, I don't know.

21         Q.    Where did you hear about that company?

22         A.    From Alon.

23         Q.    What did Alon tell you about that company?

24         A.    I -- I repeat again, I just heard of it, but

25   I don't know what -- how we used it, how did he

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                1/29/2016

1      corporate it with them.

2          Q.   When -- do you remember about when he

3      mentioned this company to you?

4          A.   No.

5          Q.   And you don't recall anything specifically

6      that he said concerning this company?

7          A.   I don't recall.

8          Q.   Do you know what Secured Commerce, LLC, is?

9          A.   No.  I'm tired already.

10             MR. TEPFER:  Yeah, I think we're -- well,

11     let me -- yeah, a few more minutes and we can break

12     for lunch.

13             Does that sound good?

14             THE WITNESS:  (In English) Yes.

15             THE INTERPRETER:  Yes.

16             (Plaintiff's Exhibit 65 was marked

17             for identification by the court

18             reporter and is attached hereto.)

19     BY MR. TEPFER:

20         Q.   Now I'm handing what's been marked as

21     Exhibit 65.  Have you ever seen this spreadsheet

22     before?

23             MR. UNGAR:  What's the exhibit number,

24     please?

25             MR. TEPFER:  65.

193

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                      1/29/2016

        1              MR. UNGAR:  Is the document marked
        2    Exhibit 55?
        3              MR. TEPFER:  It's 65.  And yes.
        4              MR. UNGAR:  It's a document marked
        5    Exhibit 65?
        6              MR. TEPFER:  Yes.
        7              MR. UNGAR:  Thank you.
        8              THE WITNESS:  No, I haven't seen it.
        9    BY MR. TEPFER:
       10       Q.   Have you ever -- in the second column from
       11    the left, under Entity Name, there is 26 company
       12    names listed.  Have you ever heard these company
       13    names referred to as BunZai companies?
       14              MR. UNGAR:  Objection as to the form of the
       15    question.  It's vague and ambiguous.
       16              THE WITNESS:  Oh, first of all, I can't
       17    really see very well 'cause with my eyesight, I'm
       18    not that young anymore.
       19    BY MR. TEPFER:
       20       Q.   Sure.
       21       A.   I didn't bring my eyeglasses.
       22       Q.   So you can't read this page?
       23       A.   Not clearly.
       24       Q.   Well, have you ever heard anyone state the
       25    phrase BunZai companies, plural?

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1          MR. BENICE:  Objection as to the form of the
 2   question, it's vague and ambiguous.
 3   BY MR. TEPFER:
 4       Q.   You can answer if you know.
 5       A.   I don't know.
 6       Q.   Have you ever personally used the phrase
 7   "BunZai companies"?
 8       A.   Maybe.
 9       Q.   What were you referring to when you used
10   that phrase?
11          MR. UNGAR:  Objection as to the form of the
12   question, assumes facts not in evidence, misstates
13   the prior testimony of the witness.
14          THE WITNESS:  At different times it was
15   different in my mind when I use that word.  And
16   sometimes it doesn't have anything to do with it.
17   That's why I don't want my personal, roughly
18   speaking, images present as facts.
19          MR. TEPFER:  I guess, well, maybe we could
20   break for lunch now and talk about it a little bit
21   more when we get back.  We can go off the record.
22          (Whereupon, at the hour of
23          12:31 p.m., a luncheon recess was
24          taken, the deposition to be resumed
25          at 1:48 p.m.)
```

195
Latsanovski
FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1      LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 29, 2016

2                          1:48 P.M.

3

4           (Mr. Maralan joins the proceedings.)

5

6                     IGOR LATSANOVSKY,

7             having been previously duly sworn,

8          was examined and testified as follows:

9

10          MR. TEPFER:  Back on the record, please.

11

12                     EXAMINATION

13   BY MR. TEPFER:

14       Q.   So I think before the break we were talking

15   a little bit about your understanding of the phrase

16   BunZai companies.  You had mentioned that -- I

17   believe you had said that that phrase BunZai

18   companies had meant different things to you at

19   different times; is that correct?

20       A.   Yes.

21       Q.   So by that do you mean that companies

22   included in BunZai companies has increased or

23   decreased over time?

24          MR. MARALAN:  Objection as to form.

25          THE WITNESS:  I don't understand the sense

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1   behind this question.

2   BY MR. TEPFER:

3       Q.   Well, I'm just trying --

4            MR. UNGAR:  Objection as to -- objection.

5   Objection as to the form of the question, it's vague

6   and ambiguous, calls for speculation, lacks

7   foundation.

8   BY MR. TEPFER:

9       Q.   How has the term BunZai companies, as you

10  use it, how has it changed over time?

11           MR. UNGAR:  Objection as to the form of the

12  question, vague and ambiguous, assumes facts not in

13  evidence.

14           THE WITNESS:  I mean, it's a

15  philosophical -- some kind of general question.  How

16  can I remember what I associated it with a month

17  ago, a year ago, two years ago?

18  BY MR. TEPFER:

19      Q.   Well, I suppose what I'm trying to

20  understand is why are you saying that that term had

21  different meanings for you over time?

22           MR. MARALAN:  Object as to form.

23           THE WITNESS:  I, for CalEnergy, provided a

24  loan to Alon Nottea.  He received this loan for

25  BunZai Media Group and I was getting paid from this

197

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    company, and that's all I know about what's

2    connected with this name.  No, I was getting the

3    money back from this company.

4    BY MR. TEPFER:

5       Q.   Okay.  Have you ever understood or have you

6    ever considered -- I'm trying to think how to ask

7    this.

8            Have you ever used the term BunZai companies

9    to refer to SBM Management?

10           MR. UNGAR:  Objection as to the form of the

11   question, vague and ambiguous.

12           THE WITNESS:  I'll repeat one more time.

13   When I was providing a loan to BunZai, I was dealing

14   with BunZai.  When my company was giving a loan to

15   SBM Company, I was doing that company through

16   company CalEnergy because these are two completely

17   different things.

18   BY MR. TEPFER:

19      Q.   Oh, I guess objection; nonresponsive.  I

20   just want to know if you've ever referred, used

21   BunZai companies to refer to SBM Management.

22           MR. MARALAN:  Objection; vague.

23           MR. UNGAR:  Same, same objection.

24           THE WITNESS:  To me the question was not

25   clear.  Each company has its own name; correct?  If

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                                  1/29/2016

```
 1    I give a loan to BunZai Company, CalEnergy gives a
 2    loan to BunZai company.  That company is CalEnergy
 3    BunZai.  And if CalEnergy provides a loan to SBM,
 4    that means it's a company CalEnergy SBM.
 5    BY MR. TEPFER:
 6        Q.   I guess my question is, that list of
 7    entities in Exhibit 65 in that second column, have
 8    you ever used the term BunZai companies to refer to
 9    any of the companies listed in that column not named
10    BunZai Media Group, Inc.?
11        A.   Do I understand it correctly that he wants
12    to ask if any of those companies have any kind of
13    relation to BunZai or if it worked with them?  When
14    I worked, CalEnergy gave loan to BunZai Company;
15    right?  I called it BunZai Group.  It's the same.  I
16    just didn't use the name of the company word for
17    word.
18        Q.   Do you know in sum total about how much
19    money you invested with BunZai Media Group, Inc.,
20    over the course of your time investing with Alon?
21             MR. MARALAN:  Objection; vague.
22             THE WITNESS:  A company CalEnergy opened a
23    credit line for company BunZai Media Group in the
24    amount of $500,000.
25    ///
```

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1   BY MR. TEPFER:
 2      Q.   Do you have any idea how much money or how
 3   much profit you received from that investment?
 4            MR. MARALAN:   Vague and ambiguous.
 5            THE WITNESS:   I asked an accountant to
 6   provide me with calculations, and based on his
 7   calculations, I received approximately $317,000.
 8   BY MR. TEPFER:
 9      Q.   Did you ever sign blank checks for Zen
10   Mobile Media, Inc.?
11            MR. MARALAN:   Objection; lacks foundation.
12            THE WITNESS:   Yes.
13   BY MR. TEPFER:
14      Q.   Who asked you to do that?
15            MR. MARALAN:   Same objection.
16            THE WITNESS:   Alon.
17            MR. UNGAR:   Objection as to form of the
18   question, vague and ambiguous, assumes facts not in
19   evidence.
20            MR. GALLEGOS:   Did he answer?
21            MR. TEPFER:   I think he said "Alon."
22   BY MR. TEPFER:
23      Q.   Oh, I think we're about ready to move on to
24   CalEnergy, but I just wanted to, before we get to
25   that, I should have asked at the beginning, did you,
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

200

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    after our discussions yesterday, did you review any
2    documents to prepare for today's deposition?
3        A.   No.
4            MR. TEPFER:  Yeah, just seeing if you could
5    state your name for the record.  I don't think we
6    ever --
7            MR. MARALAN:  Sam Maralan for Defendant
8    CalEnergy, Inc.
9            MR. TEPFER:  So I guess could we go off the
10   record real quick.
11           (A discussion was held off the record.)
12           MR. TEPFER:  I guess we can go back on the
13   record.  That's all the questions that I have for
14   Igor personally, and I'll pass the witness.
15           MR. MARALAN:  No questions.
16           (The deposition was concluded at 1:59 p.m.)
17
18
19
20
21
22
23
24
25

201
Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1                          --o0o--

2     Please be advised I have read the foregoing

3     deposition, and I state there are:

4     (Check one)

5                              NO CORRECTIONS

6                              CORRECTIONS ATTACHED

7

8

9                    IGOR LATSANOVSKI

10

11                   Date Signed

12

13

14                         --o0o--

15

16

17

18

19

20

21

22

23

24

25

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1              CERTIFICATE OF READER-INTERPRETER

 2

 3         I,                        , whose address is

 4                            a person who speaks the

 5    language of the witness, namely,

 6    do hereby certify that on the     day of          ,

 7    2016, I did translate the foregoing deposition from

 8    the English language to the Russian language,

 9    reading same to the witness in his native tongue, to

10    the best of my ability;

11         That all corrections and changes requested

12    by the witness were made and initialed by the

13    witness;

14         That upon completion of said reading, the

15    witness did confirm to me that he had understood the

16    reading.

17

18

19

20                   Reader-Interpreter

21

22

23                   Date

24

25
```

203

Latsanovski

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1    STATE OF CALIFORNIA          )
                                   )   ss.
 2    COUNTY OF LOS ANGELES        )

 3

 4         I, IGOR LATSANOVSKI, having appeared for my

 5    deposition on January 29, 2016, do this date declare

 6    under penalty of perjury that I have read the

 7    foregoing deposition, I have made any corrections,

 8    additions or deletions that I was desirous of making

 9    in order to render the within transcript true and

10    correct.

11         IN WITNESS WHEREOF, I have hereunto

12    subscribed my name this_____day of_____,

13    2016.

14

15

16

17

18         _____

19                   IGOR LATSANOVSKI

20

21

22

23

24

25
```

```
 1

 2

 3          I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby

 5    certify:

 6              That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14              I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17              IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20    Dated: February 17th, 2016

21

22

23    _____

24          CHRISTINA KIM-CAMPOS, CSR

25          CERTIFICATE NO. 12598
```