1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION   )
                                )
5              Plaintiff        )
                                )
6       v.                      ) No. CV 15-4527-GW(PLAx)
                                )
7    BUNZAI MEDIA GROUP, INC., )
     et al.,                    )
8                               )
               Defendants.      )
9    _____)

10

11

12

13

14                         Friday, January 29, 2016

15

16                         10877 Wilshire Boulevard
                           Suite 700
17                         Los Angeles, California

18

19

20

21

              The above-entitled matter came on for
22
     deposition, pursuant to Notice, at 2:00 p.m.
23

24

25

2

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                           1/29/2016

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION    )
                                 )
5            Plaintiff           )
                                 )
6       v.                       ) No. CV 15-4527-GW(PLAx)
                                 )
7    BUNZAI MEDIA GROUP, INC.,   )
     et al.,                     )
8                                )
             Defendants.         )
9    _____)

10

11

12

13           RULE 30(b)(6) DEPOSITION OF CALENERGY, INC.,

14    IGOR LATSANOVSKI, taken on behalf of the

15    Federal Trade Commission, at 10877 Wilshire

16    Boulevard, Suite 700, Los Angeles, California,

17    commencing at 2:00 p.m., and concluding at

18    3:58 p.m., on Friday, January 29, 2016, pursuant to

19    Notice, before CHRISTINA KIM-CAMPOS, CSR No. 12598,

20    a Certified Shorthand Reporter, in and for the State

21    of California.

22

23                              ***

24

25

3

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
1    A P P E A R A N C E S
2
     For the Federal    U.S. FEDERAL TRADE COMMISSION
3    Trade Commission:  REID TEPFER, ESQ.
                        1999 Bryan Street
4                       Suite 2150
                        Dallas, Texas  75201-6808
5                       (214) 979-9383
                        rtepfer@ftc.gov
6
7                       U.S. FEDERAL TRADE COMMISSION
                        LUIS H. GALLEGOS, ESQ.
8                       1999 Bryan Street
                        Suite 2150
9                       Dallas, Texas 76201-6808
                        (214) 979-9383
10                      lgallegos@ftc.gov
11
     For the Witness:   LAW OFFICE OF JEFFREY S. BENICE
12                      SAM MARALAN, ESQ.
                        3080 Bristol Street
13                      Suite 630
                        Costa Mesa, California  92626
14                      (714) 641-3600
                        SamMaralan@JeffreyBenice.com
15
16   For the           CROSSWIND
     Defendants         ROBERT M. UNGAR, ESQ.
17   Alon Nottea and    (via Telephone)
     Roi Reuveni:       2190 North Beverly Glen Blvd.
18                      Los Angeles, California  90077
                        (818) 646-4750
19                      rmu@crosswindlaw.com
20
21   Also Present:     Nataliya Kharikova,
                        Russian interpreter
22
23
24
25
```

4

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1                    I  N  D  E  X

 2

 3    WITNESS                EXAMINATION              PAGE

 4    Igor Latsanovski      By Mr. Tepfer              5

 5

 6

 7             DEPOSITION EXHIBITS

 8                  None.

 9

10

11         INFORMATION REQUESTED

12                  None.

13

14

15    QUESTIONS INSTRUCTED NOT TO ANSWER

16                  None.

17

18

19

20

21

22

23

24

25
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1    LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 29, 2016
 2                          2:00 P.M.
 3
 4                   NATALIYA KHARIKOVA,
 5           an interpreter, who was first duly sworn
 6           to translate from the English language
 7           into the Russian language, and from
 8           the Russian language into the English
 9           language, thereupon acted as interpreter
10           for the witness therein; and
11
12                   IGOR LATSANOVSKI,
13           called as a witness by and on behalf of
14           the Plaintiff, being first duly sworn,
15           was examined and testified as follows:
16
17                       EXAMINATION
18    BY MR. TEPFER:
19       Q.   Igor, now I want to turn, if we could, to
20    CalEnergy.  And, Mr. Latsanovski, you're appearing
21    today on behalf of CalEnergy; is that correct?
22       A.   Yes.
23       Q.   You're here in response to the FTC's Notice
24    of Deposition 30(b)(6), Notice of Deposition for
25    CalEnergy, Inc.; correct?
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1        A.    Yes, yes.

 2        Q.    What is your position at CalEnergy?

 3        A.    Director.

 4        Q.    And are you the sole owner of CalEnergy?

 5        A.    Yes.

 6        Q.    As of the FTC's filing of this lawsuit in

 7   June 2015, at that point in time how many employees

 8   did CalEnergy have?

 9        A.    As of what point in --

10        Q.    Oh, in June 2015 how many employees did

11   CalEnergy have?

12        A.    One.

13        Q.    And who was that employee?

14        A.    Igor Latsanovski.

15        Q.    Oh.  And where is, where does CalEnergy

16   physically conduct business at?

17        A.    California.

18        Q.    But more specifically, like does it have an

19   office location?

20        A.    As of now, no.  Just a P.O. box.

21        Q.    And so do you run CalEnergy out of your

22   home?

23        A.    At recent time, yes.

24        Q.    Has it ever had any other location than your

25   home?
```

7

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1       A.    Before?
 2       Q.    Yes, before.
 3       A.    Yes.
 4       Q.    Where did it used to be?
 5       A.    Various places.
 6       Q.    So --
 7       A.    I don't remember all of them.  Don't have it
 8  in memory.
 9       Q.    Did you incorporate CalEnergy?
10       A.    Yes.
11       Q.    When did you do that?
12       A.    In 2009, as far as I remember.
13       Q.    Aside from yourself, has CalEnergy ever had
14  any employees?
15       A.    Yes.
16       Q.    Who are those employees?
17       A.    Roi, Motti, and another guy.  What's it?  I
18  don't remember his name.
19       Q.    Mm-hmm.  And I should ask, going back to the
20  location of it, do you remember the last location
21  before CalEnergy was run out of your home, the
22  location before that?
23       A.    Yes.
24       Q.    What was that location?
25       A.    It's the same location where VastPay Company
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1    was.
 2        Q.    Do you know that address?
 3        A.    Well, I remember where it was physically,
 4    but the address --
 5        Q.    Sure.
 6        A.    -- my memory for names is --
 7        Q.    During what period of time was it there?
 8        A.    I don't remember, but during some period of
 9    time.
10        Q.    What city was it located in?
11        A.    Los Angeles.  The greater Los Angeles.
12        Q.    You mentioned Roi and Motti were former
13    employees.  What position did Roi Reuveni have at
14    CalEnergy?
15        A.    He provided me with startups and performed
16    analysis on them.  And he worked for me part-time,
17    not full-time.
18        Q.    So you said that he provided you with
19    startups.  What do you mean by that?
20        A.    He was looking for startups, finding them,
21    proposed them to me, analyzed them, did his
22    analytical, like a consultant, because at the time
23    CalEnergy was looking for new investment
24    opportunities, new fields.
25        Q.    So Roi would propose startups to invest in?
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1      A.   Did not propose, but looked for.

 2      Q.   He would try to find new startups, I guess?

 3      A.   (Witness shakes head up and down.)

 4      Q.   During what period of time did Roi Reuveni

 5 work for CalEnergy?

 6      A.   I don't remember.  Somewhere around half a

 7 year.  Maybe a little bit longer.

 8      Q.   And do you know what years you're referring

 9 to?

10      A.   Approximately 2013, plus or minus.

11      Q.   And I should ask, did you review any

12 documents to prepare for, I guess, the deposition of

13 CalEnergy?

14      A.   No.

15      Q.   Okay.  And you had said that Motti Nottea

16 was an employee or had been an employee of

17 CalEnergy.  When did Motti Nottea work at CalEnergy?

18      A.   Approximately during the same period of

19 time, like Roi.

20      Q.   And he did the same work for you that Roi

21 did, was that what you're saying?

22      A.   No.

23      Q.   Okay.  What sort of work did Motti Nottea

24 do?

25      A.   He -- we had an idea.  He had contacts and I
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                               1/29/2016

1     wanted to use them to open up a new area, new

2     specific area.

3          Q.   So Motti Nottea's function was to introduce

4     you to other business contacts; is that correct?

5          A.   Correct.

6          Q.   What sort of industries did Motti Nottea

7     introduce you to contacts in?

8          A.   He had contact in Spain.  We traveled to

9     Spain.  This is related to television, but in the

10    end nothing has worked out.

11         Q.   And Motti Nottea no longer works for

12    CalEnergy; right?

13         A.   No.

14         Q.   Did you decide to end that business

15    relationship with Motti Nottea?

16         A.   It just so happened by itself.  Joint

17    business didn't work out, so it didn't work out.

18         Q.   Was Motti Nottea a shareholder in CalEnergy?

19         A.   No.

20         Q.   What was the arrangement for or was there

21    any arrangement for Motti Nottea's salary at

22    CalEnergy?

23         A.   I don't remember now.  I need to check the

24    accounting documents.

25         Q.   For Roi do you remember what the payment

11

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1   arrangement was for him?

2       A.   He had -- he had a fixed salary.  How much

3   it was, I don't remember.  Again, I just need to

4   check the books.

5       Q.   Okay.  What areas did CalEnergy, or what

6   industry areas did CalEnergy invest in?

7       A.   Various.  Can you ask a more specific

8   question?

9       Q.   Well, can you recall any areas that

10  CalEnergy invested in?

11      A.   Well, oil and gas mining.  Tried to invest,

12  but this project turned out not to be successful.

13      Q.   What period of time did you -- or rather,

14  did CalEnergy invest in the oil and gas industry?

15      A.   The very beginning, when the company was

16  just open, 2010.

17      Q.   And do you recall when CalEnergy decided to

18  end its investments in this industry?

19      A.   It wasn't something that happened on just

20  one day.  It just slowly -- the investments stopped

21  because the gas prices dropped, and it wasn't

22  economically efficient anymore to continue with this

23  project.

24      Q.   Did CalEnergy ever invest in real estate?

25      A.   Can you be more specific?  You mean

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    CalEnergy itself?

2        Q.    Mm-hmm.

3        A.    CalEnergy itself did not invest.

4        Q.    Did CalEnergy ever invest in BunZai Media

5    Group?

6        A.    It opened a credit line in the amount of

7    $500,000.

8        Q.    Did that, I guess, the amount of credit that

9    CalEnergy gave to BunZai Media Group, did that

10   change over time, or was that a constant amount?

11           MR. UNGAR:   Okay, okay, okay.  Hold it,

12   everybody.  I'm -- I'm personally not able to hear

13   the question.  Counsel, your voice is trailing off

14   at the end of each of the last sentence questions.

15   As a result, I'm not able to hear it.  Number two,

16   interpreter is interpreting into the microphone as

17   you're asking the question, and so that's also not

18   allowing me to hear the entire question.

19           MR. TEPFER:   Okay, Robert.  Well, we can

20   move this speaker closer to me.  If you have trouble

21   hearing, just let me know.

22           MR. UNGAR:   Counsel, Counsel, I need you to

23   speak more clearly, directly into the microphone,

24   and to make it clear through the entire question.

25   And Madam Interpreter, I would appreciate it if you

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    could hold off on your interpretation until the

2    question has ended, so that we can hear it over the

3    microphone.

4              MR. TEPFER:  Well, let's give this a shot

5    first.

6              Can you read the question back.

7              (The previous question was read back

8              by the court reporter as follows:

9                  "QUESTION:  Did that, I guess,

10             the amount of credit that CalEnergy

11             gave to BunZai Media Group, did that

12             change over time, or was that a

13             constant amount?")

14             THE WITNESS:  Do I understand it correctly?

15   You are asking if the amount of credit exceeded the

16   $500,000?

17   BY MR. TEPFER:

18      Q.   Just if it was ever more or less than

19   500,000.

20      A.   Well, I need to check the accounting

21   documents.  The agreement between CalEnergy and

22   BunZai was that the line was going to be open for

23   500,000.  And sometimes the amount between them was

24   lower, sometimes it was higher, but I doubt it.

25      Q.   Did -- was this agreement about a line of

14

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    credit, was that ever memorialized in any document?

2        A.    No.

3        Q.    And so it was a verbal agreement?

4        A.    Yes.

5        Q.    And who did you reach this verbal agreement

6    with?

7        A.    With Alon.

8        Q.    Did CalEnergy have difficulty getting its

9    investment returned from BunZai Media Group?

10       A.    Now, what do you mean by "difficulties?"

11       Q.    Did CalEnergy ever request that BunZai Media

12   Group return its investment if BunZai Media Group

13   failed to do so?

14       A.    Yes.

15             MR. UNGAR:  The question is ambiguous.

16             MR. TEPFER:  Did you hear, Robert?  I think,

17   Robert, you might have cut out a little bit.  Could

18   you repeat that?  Are you there, Robert?

19             Okay.  Sorry.  I lost track.  Could you read

20   back the question.  I'm not sure if it got answered.

21             MR. MARALAN:  He answered it.

22             MR. TEPFER:  Could you read it back.

23             (The previous question was read back

24             by the court reporter as follows:

25                 "QUESTION:  Did CalEnergy ever

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1            request that BunZai Media Group

 2            return its investment if BunZai Media

 3            Group failed to do so?")

 4    BY MR. TEPFER:

 5        Q.   And --

 6        A.   Do we need to reconnect that or --

 7        Q.   It shows that he's on the line.

 8             On how many occasions did CalEnergy request

 9    that these, that its loan be repaid if BunZai Media

10    Group failed to do so?

11             MR. MARALAN:  Lacks foundation.

12             THE WITNESS:  I don't remember exactly.

13    BY MR. TEPFER:

14        Q.   What were the terms of the repayment of this

15    line of credit?

16             (Interruption in the proceedings)

17             MR. TEPFER:  Can we go off record a little

18    bit?

19             (A discussion was held off the record.)

20             MR. TEPFER:  We can go back on the record

21    then.  I think the question was -- well, could you

22    read the question back.

23             (The previous question was read back

24             by the court reporter as follows:

25                 "QUESTION:  What were the terms
```

16

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1            of the repayment of this line of
 2            credit?")
 3            THE WITNESS:  As soon as possible.
 4    BY MR. TEPFER:
 5       Q.   So --
 6            (Interruption in the proceedings)
 7            MR. TEPFER:  Let's go off record real quick.
 8            (A discussion was held off the record.)
 9            MR. TEPFER:  Back on the record.
10    BY MR. TEPFER:
11       Q.   So the terms were that BunZai Media Group
12    would repay your investment as soon as possible?
13       A.   Yes.
14       Q.   And you said that -- or am I correct you've
15    requested that -- or in the past you've requested
16    that these loans be repaid if BunZai Media Group
17    failed to do so?
18       A.   Sometimes they failed and sometimes they
19    didn't.  But in the end, in the very end, it
20    returned all the money.
21       Q.   Okay.  Would you typically -- how would you
22    typically make these requests for repayment?
23            MR. UNGAR:  Objection as to form of the
24    question, it's vague and ambiguous.
25            THE WITNESS:  I called Alon.
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

    1    BY MR. TEPFER:

    2        Q.    So you would -- would you typically do it

    3    verbally?

    4        A.    Yes.

    5        Q.    Did you ever do it in writing?

    6              MR. UNGAR:  Objection as to the form of the

    7    question, vague and ambiguous.

    8              THE WITNESS:  I don't remember.  Because my

    9    English is bad, I typically wouldn't write anything.

   10    BY MR. TEPFER:

   11        Q.    Did CalEnergy receive any or have any

   12    collateral from BunZai Media Group for these loans?

   13              MR. MARALAN:  Vague, ambiguous.

   14              THE WITNESS:  CalEnergy, no.

   15    BY MR. TEPFER:

   16        Q.    And when did CalEnergy first invest in

   17    BunZai Media Group or provide this loan?

   18              MR. UNGAR:  Objection.  Objection as to the

   19    form of the question, vague and ambiguous.

   20              THE WITNESS:  As far as I remember,

   21    approximately, in the end of 2010.

   22    BY MR. TEPFER:

   23        Q.    And when did it, I guess, end its line of

   24    credit with BunZai Media Group?

   25        A.    When this company was closed.  Approximately

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                            1/29/2016

```
 1      2013.
 2          Q.    Did CalEnergy ever invest in any other
 3      companies that sold skin care products?
 4          A.    CalEnergy gave a loan to Alon for SBM
 5      Management.  What kind of relationship did he have
 6      with them or if it sold skin care products, I don't
 7      know.
 8          Q.    So CalEnergy also invested in SBM
 9      Management, Inc.?
10          A.    CalEnergy gave a loan.
11          Q.    To SBM Management --
12          A.    Yes.
13          Q.    -- is that right?
14                Do you recall how much the loan to SBM
15      Management was?
16          A.    We had an agreement in the same way.  Up to
17      five -- up to half a million dollars of credit.
18          Q.    So SBM Management also had a line of credit
19      for half a million?
20          A.    Yes.
21          Q.    Did any other companies have a line of
22      credit with CalEnergy?
23          A.    What companies are we talking about?
24          Q.    Any companies.
25          A.    Yes.
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1      Q.   Could you name those companies?

2      A.   VastPay, Comics Fix.

3      Q.   Is that --

4      A.   That's it.

5      Q.   That's all the companies?

6      A.   Yes.

7      Q.   Did CalEnergy ever invest in NexiPay?

8      A.   No.

9      Q.   The money that CalEnergy invested, did it

10   get that money from private investors?

11          MR. UNGAR:  Objection as to the form of the

12   question, vague and ambiguous.

13          THE WITNESS:  What is private investors?

14   Can you specify?

15   BY MR. TEPFER:

16     Q.   Sure.

17          Did individuals give money to CalEnergy for

18   CalEnergy to invest in these other companies?

19     A.   CalEnergy would take out a loan and then

20   reinvest -- that is, provide a loan to other

21   companies to obtain additional income.

22     Q.   So CalEnergy would borrow money and then

23   invest that money in other companies; is that

24   correct?

25          MR. UNGAR:  Objection, objection, objection

20

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    as to the form of the question, as vague and

2    ambiguous.

3            THE WITNESS:  Depending on every area, would

4    be considered differently.  And at some points it

5    was an agent, at some points it borrowed money.

6            Can you be more specific?

7            MR. TEPFER:  Can you repeat the first part

8    of the question?

9            THE INTERPRETER:  At some point it was an

10   agent.

11   BY MR. TEPFER:

12     Q.   An agent.

13          To talk specifically about BunZai Media

14   Group, where did CalEnergy get the money that it

15   loaned to BunZai Media Group?

16          MR. UNGAR:  Objection.  Objection as to the

17   form of the question.  Lacks discovery relevance.

18          THE WITNESS:  CalEnergy borrowed money from

19   abroad.

20   BY MR. TEPFER:

21     Q.   Are you referring to a specific company

22   abroad?

23     A.   Yes.

24          MR. UNGAR:  Wait, wait, wait, wait, wait,

25   wait, wait.  I'm going to object.  Is the witness in

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1    the middle of an answer and then there was another

2    question, or what's going on?

3    BY MR. TEPFER:

4        Q.   Mr. Latsanovski, were you in the middle of

5    an answer?

6        A.   No.  I just got confused again.  Can you

7    repeat the question?

8            MR. TEPFER:  Sure.

9            Could the court reporter read it back.

10           (The previous question was read back

11           by the court reporter as follows:

12               "QUESTION:  Are you referring to

13           a specific company abroad?")

14   BY MR. TEPFER:

15       Q.   And what company was that?

16       A.   What company what?

17       Q.   You say that you were referring to a company

18   abroad, and I was just wondering what the name of

19   that company was.

20       A.   CalEnergy borrowed money from a company

21   Guayas, Estonia.

22       Q.   So the money that CalEnergy invested in

23   BunZai Media Group came from Guayas?

24       A.   Yes.

25       Q.   When did CalEnergy borrow that money from

22

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                        1/29/2016

1   Guayas?

2          MR. UNGAR:  Objection as to the form of the

3   question, lacks discovery relevance.

4          THE WITNESS:  (In English) How can I

5   reaction to everything?

6          THE INTERPRETER:  How can I reaction to

7   everything?

8   BY MR. TEPFER:

9   Q.   Are you able to answer the question?

10  A.   Yes.

11  Q.   Could I ask that you answer, unless your

12  attorney instructs you not to.

13  A.   Okay.  So what -- can you repeat the

14  question?

15         MR. TEPFER:  Sure.

16         Could the court reporter read the question

17  back.

18         (The previous question was read back

19         by the court reporter as follows:

20             "QUESTION:  When did CalEnergy

21         borrow that money from Guayas?")

22         MR. UNGAR:  Objection as to the form of the

23  question, lacks discovery relevance.

24         THE WITNESS:  (In English) Have to answer?

25         MR. MARALAN:  If you remember when the date

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

```
 1    was.
 2            THE WITNESS:  Before giving it to the
 3    company, that's when it borrowed it.
 4    BY MR. TEPFER:
 5        Q.   Could you give a specific year?
 6            MR. MARALAN:  If you remember.
 7            THE WITNESS:  Approximately 2010.
 8    BY MR. TEPFER:
 9        Q.   Did CalEnergy agree to repay Guayas on -- at
10    any particular time?
11        A.   Yes.
12        Q.   What was the date for, I guess, this
13    repayment to Guayas to become due?
14        A.   I don't remember exactly, but our contract
15    was for five or ten years.  For a long time.
16        Q.   Did Guayas understand that this money was
17    going to be invested in BunZai Media Group?
18            MR. MARALAN:  Objection; lack of foundation.
19            MR. UNGAR:  Objection as to the form of the
20    question, vague and ambiguous, calls for
21    speculation, lacks foundation.  It is not discovery
22    relevant, it has no connection to the issues in this
23    lawsuit, and it is not reasonably calculated to lead
24    to the discovery of admissible evidence.  It is
25    therefore harassing, burdensome, and oppressive, and
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

```
1     no offer of proof has been made.

2     BY MR. TEPFER:

3         Q.   Can you answer, if you know?

4              MR. MARALAN:  Can you repeat the question,

5     please?

6              THE WITNESS:  It's just procedurally, I

7     don't understand how it's all -- that's why.

8     BY MR. TEPFER:

9         Q.   Oh, you don't understand --

10             MR. MARALAN:  So these objections are just

11    technicalities to protect the record.  If you know

12    the answer, you have to answer, unless I

13    specifically tell you not to answer.  If you don't

14    know, just say you don't know.  If you don't

15    understand, just tell the attorney you don't

16    understand the question and he'll clarify the

17    question for you.

18             MR. TEPFER:  Right, right.

19             THE WITNESS:  Please repeat the question.

20             (The previous question was read back

21             by the court reporter as follows:

22                "QUESTION:  Did Guayas understand

23             that this money was going to be

24             invested in BunZai Media Group?")

25             THE WITNESS:  No.
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1    BY MR. TEPFER:

2        Q.   Was this, I guess, loan that CalEnergy

3    received from Guayas, was it memorialized in any

4    document?

5        A.   Yes.

6        Q.   Do you have a copy of that document?

7        A.   Well, I can find it.

8        Q.   Do you recall who signed the document on

9    behalf of CalEnergy?

10       A.   Yes.

11       Q.   Who is that?

12       A.   CEO.

13       Q.   And is that you?

14       A.   Yes.

15       Q.   And do you recall who signed that document

16   on behalf of Guayas?

17       A.   Yes.

18       Q.   And who is that?

19       A.   Director.

20       Q.   And who's the Director?

21       A.   Oleg Trushlya.

22       Q.   So to talk about -- sorry.

23            To talk about the terms of the loan that

24   CalEnergy received from Guayas, did -- was CalEnergy

25   required to pay interest on this loan?

26

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
1          MR. MARALAN:  Objection; relevance.
2          THE WITNESS:  Yes.
3    BY MR. TEPFER:
4      Q.   Do you remember how much the interest was?
5          MR. MARALAN:  Same objection.
6          THE WITNESS:  It's specified in the
7    contract.
8    BY MR. TEPFER:
9      Q.   But you don't, you don't recall the actual
10   amount of interest?
11     A.   Specifically, I don't.
12     Q.   Okay.  You stated that CalEnergy did not
13   invest in real estate, but did it own any companies
14   that did, or has it ever owned any companies that
15   did?
16     A.   Do you want to ask about Sunset?
17     Q.   Well, is Sunset a company that CalEnergy
18   owned?
19     A.   Owned or owns?
20     Q.   Has CalEnergy at any point ever owned Sunset
21   Holding Partners, LP, or LLP?
22     A.   So company Guayas asked CalEnergy to invest
23   money in real estate and have this company
24   registered in my name.  And that's what happened,
25   eventually.
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    Q.   So to make sure I understand, Guayas asked
2    CalEnergy to invest in real estate through a company
3    called Sunset Holding Partners?
4    A.   CalEnergy acted as an agent for Guayas to
5    purchase real estate, and in order to do that, a
6    company called Sunset was opened.  And I am a
7    60 percent owner in this company.
8    Q.   So you're a 60 percent owner, or you, Igor
9    Latsanovski, are 60 percent owner of Sunset Holding
10   Partners, LLC?
11   A.   Yes.  And in this company was the, the name
12   was the real estate purchased for Guayas.
13   Q.   Who owns the other 40 percent?
14   A.   Mike Peniche.
15   Q.   And did CalEnergy, Inc., ever have an
16   ownership share of Sunset Holding Partners?
17   A.   I don't know the legal wording for this, but
18   factually, we're talking factually here, from the
19   very first day I owned 60 percent of shares in
20   Sunset and Mike Peniche owned the other 40.  And --
21   but in between, while this company was there, we
22   signed various papers between ourselves.  But I'll
23   say it again.  Factually, it was 60/40.
24   Q.   Okay.  Did -- was there an agreement in
25   place that CalEnergy would receive some form of

28

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    compensation from Guayas for taking these actions on

2    its behalf?

3        A.    CalEnergy was an agent for Guayas, and it

4    passed on those obligations to Sunset.

5        Q.    Was it anticipated that CalEnergy would be

6    compensated for acting as an agent of Guayas in this

7    capacity?

8        A.    Of course.

9        Q.    Could you tell me what the terms of that

10   arrangement were?

11       A.    I don't remember.  It's in the agreement.  I

12   provided all these documents to you.  You should

13   have them all.

14       Q.    In CalEnergy --

15             Well, I guess -- do you all want to get

16   ready to take a break or --

17       A.    (In English) Yeah.

18             MR. TEPFER:  Okay.  Let's go off record real

19   quick.

20             (A discussion was held off the record.)

21             MR. TEPFER:  Could you read back the last

22   question.

23             (The previous question was read back

24             by the court reporter as follows:

25                 "QUESTION:  Could you tell me

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1          what the terms of that arrangement
 2          were?")
 3          MR. TEPFER:  And the answer.
 4          (The previous answer was read back by
 5          the court reporter as follows:
 6              "ANSWER:  I don't remember.  It's
 7          in the agreement.  I provided all
 8          these documents to you.  You should
 9          have them all.")
10  BY MR. TEPFER:
11     Q.   In CalEnergy's negotiations with Guayas for
12  CalEnergy to act on its behalf in this capacity,
13  were you the individual doing these negotiations as
14  Igor Latsanovski?
15          MR. UNGAR:  Objection.  Objection.
16  Objection as to the form of the question.  It's
17  vague and ambiguous, misstates prior testimony,
18  assumes facts not in evidence.  And I could not hear
19  the very tail end of the question because it was
20  late in coming, the interpreter started to
21  interpret, and it was just a bunch of blur.  So you
22  want to try it again, but the objection will remain
23  the same to the first part I could hear.
24          MR. TEPFER:  Would you like the court
25  reporter to read it back?
```

30

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
1              MR. UNGAR:  Or repeat it.  I don't care.
2    Either way.  I just couldn't hear the end of it, and
3    the part I did hear -- those are my objections.
4              MR. TEPFER:  Okay.  Can the court reporter
5    read it back.
6              (The previous question was read back
7              by the court reporter as follows:
8                 "QUESTION:  In CalEnergy's
9              negotiations with Guayas for
10             CalEnergy to act on its behalf in
11             this capacity, were you the
12             individual doing these negotiations
13             as Igor Latsanovski?")
14             THE WITNESS:  Can you just make this
15   question a little bit shorter?  It's just too long,
16   and it has me confused.
17   BY MR. TEPFER:
18      Q.   Sure.
19           Were you the one that negotiated this
20   agreement with Guayas?
21      A.   Yes.
22      Q.   And who's negotiating on Guayas's behalf?
23      A.   Oleg, Guayas's Director.
24      Q.   Oleg Trushlya?
25      A.   Yes.
```

31

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1        Q.    Did Oleg ever state why he wanted CalEnergy
2    to act as Guayas's agent?
3        A.    State where?
4        Q.    Did Oleg ever state during the course of
5    these negotiations why he wanted CalEnergy to act as
6    its agent?
7        A.    Yes.
8        Q.    What was the reason that Oleg gave?
9        A.    Because I was the manager of CalEnergy and
10   he had trust in me.
11       Q.    Did he state any reason why Guayas wasn't
12   directly invested in real estate?
13       A.    Of course.
14             MR. UNGAR:   Objection.   Objection as to the
15   form of the question.   It's vague and ambiguous,
16   calls for speculation, lacks foundation.
17   BY MR. TEPFER:
18       Q.    And what was that reason?
19       A.    Because he needed, he needed to open a
20   separate legal entity to do all this.   Somebody had
21   to find this real estate, and this is something that
22   as an agent, CalEnergy did.
23       Q.    So CalEnergy was, I suppose, in this
24   agreement, tasked with locating properties to invest
25   in?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1      A.   No.
 2      Q.   Sorry.  Maybe I misunderstood.  I thought
 3  that he had meant that when you said "agent," that
 4  CalEnergy was the entity that was going to, I guess,
 5  search for properties for Guayas.
 6           Who was the entity that was going to locate
 7  the properties for Guayas?
 8           MR. UNGAR:  Objection, objection, objection,
 9  objection, objection.  Objection as to the form of
10  the question, it's vague and ambiguous.
11           THE WITNESS:  Absolutely not.
12  BY MR. TEPFER:
13      Q.   Does CalEnergy own or has CalEnergy ever
14  owned any residential property?
15      A.   No.
16      Q.   Does CalEnergy own any other corporations?
17      A.   Yes.
18      Q.   What are those corporations?
19      A.   VastPay, and I think that's it.
20      Q.   Has CalEnergy ever owned any other
21  corporations, aside from VastPay?
22      A.   Legally on paper or in actual fact?
23      Q.   Well, I suppose first let's talk about --
24      A.   Factually, no.
25      Q.   And what about legally on paper?
```

Latsanovski 30(b)(6)
FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1       A.   I don't know.

2       Q.   Does CalEnergy have a website?

3       A.   It used to.  The one that closed for

4   nonpayment.

5       Q.   The website was closed down for nonpayment?

6       A.   Yes.

7       Q.   Do you know what the URL of that website

8   was?

9       A.   No idea.

10      Q.   Do you know what --

11      A.   But the first question is what is a URL?

12      Q.   Sorry, the -- do you know what the web

13  address, what you would type into the top browser

14  board to go to that website?  Sorry.

15          MR. UNGAR:  I'm going to object.  I'm going

16  to object.  I could not hear the question because as

17  the question was being asked, the translation was

18  going on, and they were blending together and it was

19  impossible to hear what was happening.  Now you want

20  to repeat your question?

21          MR. TEPFER:  Could the court reporter read

22  it back.

23          (The previous question was read back

24          by the court reporter as follows:

25              "QUESTION:  Do you know what the

34

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

    1            URL of that website was?")
    2    BY MR. TEPFER:
    3        Q.   Do you know approximately the time period
    4    that --
    5        A.   But then we corrected it because I didn't
    6    know what URL was, and that's why we changed it.  If
    7    it's website's name?
    8        Q.   Sure, yeah.
    9            What was the website's name?  That's
   10    probably an easier way to say it.
   11        A.   Cal-energy.co.  I think so.  I'm not a
   12    hundred percent sure.
   13        Q.   And is that the website that was shut down
   14    for nonpayment?
   15        A.   I think so, yes.
   16        Q.   Do you know the approximate time period that
   17    this website was available online?
   18        A.   I don't remember exactly.
   19        Q.   Do you remember when that website was first
   20    created?
   21        A.   No.
   22        Q.   And do you recall when it was, I guess, shut
   23    down for nonpayment?
   24        A.   I just remember the year.  It was last year.
   25        Q.   And did you personally review that website?

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1      A.   Honestly, I just asked the guy to create a
2   website for me.  I saw a couple of pages of this
3   website, but as to going deeply into the contents, I
4   didn't really do it.  It was all in English.
5      Q.   And who's the guy -- you said guy.  Who's
6   the guy that created the website?
7      A.   One who creates websites.
8      Q.   Do you remember his name?
9      A.   To be honest, I don't.  It was a long time
10  ago.
11     Q.   Was it Avi Argaman?
12     A.   No.
13     Q.   And was it any of the individuals named in
14  this lawsuit; do you know?
15     A.   No.
16     Q.   And who provided the content for the
17  creation of the website?
18          MR. MARALAN:  Objection; relevance.
19          THE WITNESS:  I don't remember now, but it
20  wasn't me, definitely.
21  BY MR. TEPFER:
22     Q.   Was it -- do you believe that it was any of
23  CalEnergy's employees, other employees?
24          MR. MARALAN:  Objection; relevance, asked
25  and answered.

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1            THE WITNESS:  I don't remember.
 2            MR. TEPFER:  Yeah, let's take a break real
 3     quick.  Off the record, please.
 4            (Recess)
 5            MR. TEPFER:  If we could go back on the
 6     record.
 7     BY MR. TEPFER:
 8        Q.   I'm handing the witness what's been marked
 9     as Exhibit 22.
10            Have you ever seen this website before?
11        A.   Yes.
12        Q.   When did you see it?
13        A.   I don't remember exactly, but saw it.
14        Q.   To draw your attention specifically to the
15     graphic at the bottom of 22-1, I guess, first I
16     should say, is this CalEnergy's website?
17        A.   Oh, probably.
18        Q.   Do you have any reason to think this isn't
19     CalEnergy's website?
20        A.    It's just that I don't know whether it was
21     taken off the website or from some, well, you know,
22     computer.  Maybe it's just some material prepared by
23     somebody.
24        Q.   I believe earlier you said that you had seen
25     this website before.  Does it look like how it
```

Latsanovski 30(b)(6)
FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    looked the last time you saw it?

2        A.   Approximately.  Approximately it does look

3    like it, but exactly I can't tell you.

4        Q.   Sure.

5            And to go back again to the graphic at the

6    bottom of 22-1, below CalEnergy are, I guess,

7    different graphics.  Did CalEnergy have a

8    relationship with all of the companies listed there?

9        A.   No.

10       Q.   Which companies listed there did CalEnergy

11   not have a business relationship with?

12       A.   Media Arch it didn't.  Pinnacle.  Lifestyle.

13       Q.   Are there any others?

14       A.   Are you talking about the top companies?

15       Q.   Oh, so --

16       A.   I just don't understand the question in

17   general.

18       Q.   Right.

19            Just in terms of all of the logos, did

20   CalEnergy have a relationship with -- or which of

21   the logos did CalEnergy not have any affiliation

22   with that brand or company?

23       A.   Well, it didn't have with any of them, other

24   than Vista Energy, VastPay.  Well, when the designer

25   was putting the website together, I said gather

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski 30(b)(6)
FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1   together everything that you have and put it

2   together so it makes -- it looks more respectable.

3   Why he put it together like this in this proportion,

4   all these diagrams, I don't know, and in that

5   sequence.  I wanted the website -- since CalEnergy

6   was an investment company, I wanted it to look

7   respectable.  Of course I couldn't just use any

8   company that I haven't even heard of, so I told him

9   of anything that I know, and I said bring it all

10  together in one pile and put it together.

11      Q.   So just to clarify, you advised, you know,

12  the website creator which companies to include in

13  this graphic; is that correct?

14      A.   No.  I told him gather all the information

15  that you consider necessary and put it together

16  because you're the designer and not me.  But the

17  important thing, that it needs to look respectable.

18      Q.   Did you provide the designer with

19  individuals to contact to discuss the creation of

20  the website?

21      A.   Don't remember now.  It was a long time ago.

22  I just remember the concept, what kind of task I

23  gave him.  Gather maximum information possible and

24  make it maximally respectable.

25      Q.   And did you communicate with this website

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1   designer by email?

2      A.   No.  Over the phone.  I never communicate by

3   email.

4      Q.   Okay.  So it's your understanding that the

5   website designer gathered this information from

6   individuals that were not CalEnergy employees?

7           MR. MARALAN:  Object; lacks foundation,

8   vague and ambiguous, relevance.

9           MR. UNGAR:  Join.  Join in the objection.

10          THE WITNESS:  Can you clarify the question,

11   please?

12   BY MR. TEPFER:

13      Q.   Sure.

14          I'm just trying to understand where the

15   individual who created the website might have gotten

16   this information, and I believe your testimony is

17   that the website creator did not get the names of

18   these companies from you; is that correct?

19          MR. MARALAN:  Same objections.

20          THE WITNESS:  I don't remember.  And I

21   didn't say that it wasn't me.  I said I don't

22   remember.

23   BY MR. TEPFER:

24      Q.   Oh, okay.

25      A.   Well, how can I say about something that I

40

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                     1/29/2016

1    don't remember?

2        Q.    Sure.

3            I believe we talked about a line of credit

4    that CalEnergy provided to Pinnacle Logistics and

5    Guayas.  I'm just wondering did CalEnergy ever

6    provide a line of credit to Pinnacle Logistics, Inc.

7    I'm sorry.  I may have misstated.

8            We talked about a line of credit to BunZai

9    Media Group and Guayas, but what I'm wondering is if

10   CalEnergy ever provided a line of credit to Pinnacle

11   Logistics, Inc.

12       A.    No.

13       Q.    Did CalEnergy ever provide a line of credit

14   to Focus Media Solutions, Inc.?

15       A.    To Focus Media?

16       Q.    Mm-hmm.

17       A.    Yes.

18       Q.    Who was your contact, or rather, were you

19   the one that negotiated the terms of this line of

20   credit with Focus Media?

21       A.    Alon.

22       Q.    So you negotiated that -- that, I guess,

23   that arrangement with Alon at Focus Media?

24       A.    Yes.

25       Q.    Did Alon ever provide any specifics about

41

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    what that line of credit was going to be used for at

2    Focus Media?

3         A.    For operational costs --

4         Q.    And --

5         A.    -- cash flow.  Specifically or in detail,

6    no.

7         Q.    Okay.  When did CalEnergy first provide this

8    line of credit to Focus Media?

9         A.    I don't remember exactly, but in 2015.

10        Q.    And at the time or in June of 2015, did

11   Focus Media still have a line of credit with

12   CalEnergy?

13        A.    I gave them one check for $325,000,

14   CalEnergy, on behalf of CalEnergy, to Focus Media

15   Group.

16        Q.    And it was your understanding that that was

17   part of a line of credit?

18        A.    Yes.

19             MR. UNGAR:  Objection as to the form of the

20   question, it's vague and ambiguous.

21   BY MR. TEPFER:

22        Q.    And when -- do you know specifically what

23   month in 2015 you gave that check to Focus Media?

24        A.    I don't remember.

25        Q.    And you had mentioned that the check was for

42

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1   operational expenses, I believe; is that correct?

2       A.   There was a loan for cash flow of the

3   company.

4       Q.   And at the time that -- or rather, yet at

5   the time that you made or wrote this check to Focus

6   Media, did you have an understanding of what kind of

7   business Focus Media engaged in?

8       A.   I knew it was going to be engaged in.

9       Q.   And what was that?

10      A.   Marketing.

11      Q.   And do you know what Focus Media would be

12  marketing?

13      A.   No.

14      Q.   Earlier you mentioned that you're the

15  Director of CalEnergy.  I was wondering if you've

16  been Director of or if you've had any other position

17  at CalEnergy.

18      A.   I don't understand the question.

19      Q.   Have you always, since the creation of

20  CalEnergy in 2009, been the company's Director?

21      A.   Yes.

22      Q.   I forgot to ask.  Regarding the loan that

23  CalEnergy provided to Focus Media, was the terms of

24  that agreement ever memorialized in a written

25  contract?

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
 1      A.   There was something on the paper, but I
 2   don't know if we signed it or not.  For the most
 3   part, it was a verbal agreement.
 4      Q.   What were your duties as Director of
 5   CalEnergy?
 6           MR. UNGAR:  Objection; vague as to form of
 7   the question, it's vague and ambiguous.
 8   BY MR. TEPFER:
 9      Q.   I guess I'll ask a different question.
10           Have your duties at CalEnergy been the same
11   since 2009?
12      A.   Of course not.  It changed all the time.
13   Like any business, it changes, it develops.
14      Q.   And did it change based on what sort of
15   investments CalEnergy was engaged in at the time?
16           MR. UNGAR:  Objection as to the form of the
17   question, vague and ambiguous.
18           THE WITNESS:  It's just such a general
19   question.  The market changes, stock market changes,
20   everything changes.  So how can you say what kind of
21   duties you would have for one point in time?  Today
22   you have one set of duties.  Tomorrow you have
23   different ones.
24   BY MR. TEPFER:
25      Q.   Did CalEnergy have a Board of Directors?
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1      A.   I was the Director.  I was making the
2   decisions.
3      Q.   And has that been the case since CalEnergy
4   was created?
5      A.   Yes.
6      Q.   When -- I guess when, as a general -- to
7   speak as a general practice, during the period of
8   time whenever you had Roi and Motti as employees,
9   would you all have regular meetings?
10     A.   No.
11     Q.   Did you all work in the same location?
12     A.   No.
13     Q.   Did -- it was a part-time job?
14     A.   Yes.
15     Q.   And during the period of, I guess, the time
16   that Roi or Motti were working at CalEnergy, I
17   guess, did they work remotely online?
18     A.   I don't understand.  What do you mean work
19   remotely?
20     Q.   Well, I'm just trying to understand where
21   your part-time employees, where they were working on
22   behalf of CalEnergy.
23          MR. UNGAR:  Objection, objection, objection.
24   Objection as to the form of the question, vague and
25   ambiguous, lacks any discovery relevance.  It is not

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1   related to any issue in the case.  It is not

 2   reasonably -- it is not reasonably calculated to

 3   lead to the discovery of admissible evidence.

 4          MR. TEPFER:  Counsel, I'd like to renew my

 5   request that you please state your objections as

 6   concisely as required by the Federal Rules.

 7          MR. UNGAR:  Cite me -- cite me a Federal

 8   Rule of Civil Procedure rule that says the objection

 9   I just stated is improper or inappropriate.

10          MR. TEPFER:  I'm going to move on.

11          Can you repeat the question.

12          MR. UNGAR:  That's what I thought.

13          (The previous question was read back

14          by the court reporter as follows:

15             "QUESTION:  Well, I'm just trying

16          to understand where your part-time

17          employees, where they were working on

18          behalf of CalEnergy.")

19          THE WITNESS:  But I don't remember.

20   BY MR. TEPFER:

21      Q.   You stated that you were the Director when

22   we were discussing the board.  Were there any other

23   members of CalEnergy's board at any time?

24      A.   No.

25      Q.   I suppose -- do you recall how CalEnergy
```

46

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

1    paid its website designer?

2           MR. MARALAN:  Objection; lacks foundation,

3    vague and ambiguous, relevance.

4           THE WITNESS:  Don't remember.

5    BY MR. TEPFER:

6      Q.   Did CalEnergy typically pay its -- or was

7    CalEnergy's standard practice to pay its, I guess,

8    employees by check?

9           MR. MARALAN:  Same objections.

10          THE WITNESS:  I don't remember the account.

11   You just need to check on the accounting.

12   BY MR. TEPFER:

13     Q.   Did CalEnergy have an accountant?

14     A.   One second.  Accountant or a CPA --

15     Q.   Well, first let's --

16     A.   -- if there's a difference, because I don't

17   really understand very much of that difference.

18     Q.   You know, I can't say that I really

19   understand that difference either.

20          Did -- at any time did CalEnergy have a CPA

21   or an accountant?

22     A.   Yes, 'cause you need to file your income

23   tax.

24     Q.   Did CalEnergy have the same accountant since

25   its inception in 2009?

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                          1/29/2016

```
 1      A.    Up until now?

 2      Q.    Yes.

 3      A.    No.

 4      Q.    Who -- if CalEnergy currently has an

 5   accountant, who is that?

 6      A.    David Davidian.

 7      Q.    How long has David Davidian been the

 8   accountant of CalEnergy?

 9      A.    Can't tell you exactly, but approximately

10   for the last two years.

11      Q.    Who was the accountant before that?

12      A.    Another accountant, and her name is Olga,

13   but her last name I don't remember.

14      Q.    Is CalEnergy still a, as far as you know, an

15   active corporation?

16            MR. UNGAR:  Objection to the form of the

17   question, it's vague and ambiguous.

18   BY MR. TEPFER:

19      Q.    I guess I'll rephrase.

20            Do you know if CalEnergy has been legally

21   dissolved?

22            MR. UNGAR:  Objection as to form.

23            THE WITNESS:  No.

24            MR. UNGAR:  Objection as to the form of the

25   question, it's vague and ambiguous, calls for a
```

Latsanovski 30(b)(6)
FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    legal conclusion, calls for legal opinion --
2            THE WITNESS:  I don't know.
3            MR. UNGAR:  -- lacks foundation, calls for
4    speculation.
5    BY MR. TEPFER:
6      Q.   But as of June of 2015, was CalEnergy still
7    conducting business?
8      A.   But can I ask you, like, this legal lawsuit,
9    is this a business?
10           MR. MARALAN:  Just answer his questions.  It
11   will make it easier for you if you just answer.
12           THE WITNESS:  I don't understand.
13           MR. MARALAN:  Just say you don't understand.
14           THE WITNESS:  (In English) I don't
15   understand it.  Sorry.
16           THE INTERPRETER:  I don't understand it.
17   Sorry.
18   BY MR. TEPFER:
19     Q.   As of June 2015, was CalEnergy, did
20   CalEnergy still have any employees?
21     A.   Yes.
22     Q.   Does CalEnergy have a --
23           Does CalEnergy have a, I suppose, a
24   Custodian of Records regarding its contracts for its
25   investments?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                1/29/2016

```
 1        A.    You mean a special place?

 2        Q.    Well, I suppose, sure, I'll go with that.

 3              Where does CalEnergy retain its records

 4     concerning its various investments?

 5        A.    There isn't.  There isn't just one specific

 6     place.

 7        Q.    Do you maintain some of these records at

 8     your home?

 9        A.    Before I did.  Now I don't.

10        Q.    When did you stop maintaining the records at

11     your home?

12        A.    Since last year.

13        Q.    Where did you move the records to?

14        A.    I had them all in the office.

15        Q.    And what office are you referring to?

16        A.    The office, the same premises where VastPay

17     was.  I -- I had my own separate office in there.

18        Q.    Did Doron Nottea ever do any bookkeeping

19     services for CalEnergy?

20              MR. UNGAR:  Objection as to the form of the

21     question, vague and ambiguous.

22              THE WITNESS:  There was no need.  Well, he

23     was helping me sometimes when I was traveling, just

24     to pay some urgent bills.

25     ///
```

50

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

1    BY MR. TEPFER:

2        Q.    During what time period did Doron Nottea

3    assist you in this way?

4        A.    I don't remember.  Periodically.

5        Q.    Do you recall about when Doron Nottea began

6    assisting you in this way?

7        A.    No.

8              MR. UNGAR:  Objection.  Objection as to the

9    form of the question, vague and ambiguous.  Also

10   very difficult to understand at the end of the

11   questions because you were both talking over each

12   other.

13   BY MR. TEPFER:

14       Q.    And as of June 2015 was Doron Nottea still

15   assisting you in this way?

16       A.    Could I ask him for help as of that point in

17   time?

18       Q.    Well, I suppose can you recall when was the

19   last time Doron Nottea provided this sort of

20   assistance you're describing?

21             MR. UNGAR:  Objection as to form of the

22   question, vague and ambiguous.

23             THE WITNESS:  I asked him to have my

24   personal checks and CalEnergy checks, just in case,

25   for some urgent situations, but when he actually

51

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                              1/29/2016

1     assisted me physically through the last time, I

2     cannot remember.

3     BY MR. TEPFER:

4          Q.    Did you -- or rather, did CalEnergy ever

5     compensate Doron Nottea for this service?

6                MR. UNGAR:  Objection.  Objection as to the

7     form of the question, assumes facts not in evidence,

8     misstates previous testimony of the witness.

9                THE WITNESS:  No.

10    BY MR. TEPFER:

11         Q.    This arrangement between Doron Nottea and

12    CalEnergy, did you request for this assistance from

13    Doron Nottea?

14               MR. MARALAN:  Relevance, vague and

15    ambiguous.

16               THE WITNESS:  Yes, personally.

17               MR. TEPFER:  I guess I'll pass the witness.

18               MR. MARALAN:  I've got nothing.

19               MR. TEPFER:  Robert, do you have any

20    questions?  I pass the witness.  Robert, are you

21    there?

22               MR. UNGAR:  I'm sorry.

23               MR. TEPFER:  Yeah.

24               MR. UNGAR:  What's the question?

25               MR. MARALAN:  No more questions.

52

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

1              MR. TEPFER:  I said I pass the witness.  If
2      you have any questions, I wanted to provide you that
3      opportunity.
4              MR. UNGAR:  I have no questions.
5              MR. GALLEGOS:  We're done.
6              MR. TEPFER:  Off the record, please.
7              (The deposition was concluded at 3:58 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

53

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
     1                          --o0o--
     2    Please be advised I have read the foregoing
     3    deposition, and I state there are:
     4    (Check one)
     5                              NO CORRECTIONS
     6                              CORRECTIONS ATTACHED
     7
     8
     9                      IGOR LATSANOVSKI
    10
    11                      Date Signed
    12
    13
    14                          --o0o--
    15
    16
    17
    18
    19
    20
    21
    22
    23
    24
    25
```

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                                    1/29/2016

```
1              CERTIFICATE OF READER-INTERPRETER

2

3         I,                        , whose address is

4                              a person who speaks the

5    language of the witness, namely,

6    do hereby certify that on the     day of         ,

7    2016, I did translate the foregoing deposition from

8    the English language to the Russian language,

9    reading same to the witness in his native tongue, to

10   the best of my ability;

11        That all corrections and changes requested

12   by the witness were made and initialed by the

13   witness;

14        That upon completion of said reading, the

15   witness did confirm to me that he had understood the

16   reading.

17

18

19

20                         Reader-Interpreter

21

22

23                         Date

24

25
```

1

2

3      I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6           That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14           I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _February 17th, 2016_

21

22

23  _____

24           CHRISTINA KIM-CAMPOS, CSR

25           CERTIFICATE NO. 12598

55

Latsanovski 30(b)(6)

FTC v. Bunzai Media Group, Inc., et al.                    1/29/2016

```
 1   STATE OF CALIFORNIA          )
                                  )   ss.
 2   COUNTY OF LOS ANGELES        )

 3

 4        I, IGOR LATSANOVSKI, having appeared for my

 5   deposition on January 29, 2016, do this date declare

 6   under penalty of perjury that I have read the

 7   foregoing deposition, I have made any corrections,

 8   additions or deletions that I was desirous of making

 9   in order to render the within transcript true and

10   correct.

11        IN WITNESS WHEREOF, I have hereunto

12   subscribed my name this_____day of_____,

13   2016.

14

15

16

17

18   _____

19                     IGOR LATSANOVSKI

20

21

22

23

24

25
```