```
 1                UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   FEDERAL TRADE COMMISSION  )

 5           Plaintiff         )

 6     v.                      ) No. CV 15-4527-GW(PLAx)

 7   BUNZAI MEDIA GROUP, INC., )

 8   et al.,                   )

 9           Defendants.       )

10

11

12

13

14                       Wednesday, February 24, 2016

15

16                    10877 Wilshire Boulevard

17                    Suite 700

18                    Los Angeles, California

19

20

21

22           The above-entitled matter came on for

23   deposition, pursuant to Notice, at 1:00 p.m.

24

25
```

2

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION  )

5           Plaintiff          )

6      v.                      ) No. CV 15-4527-GW(PLAx)

7    BUNZAI MEDIA GROUP, INC., )

8    et al.,                   )

9           Defendants.        )

10

11

12

13

14

15

16           DEPOSITION OF ALAN ARGAMAN, taken on

17   behalf of the Federal Trade Commission, at

18   10877 Wilshire Boulevard, Suite 700, Los Angeles,

19   California, commencing at 1:00 p.m., and concluding

20   at 4:45 p.m., on Wednesday, February 24, 2016,

21   pursuant to Notice, before CHRISTINA KIM-CAMPOS,

22   CSR No. 12598, a Certified Shorthand Reporter, in

23   and for the State of California.

24

25                              ***

3

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

```
 1    A P P E A R A N C E S

 2

 3    For the Federal      U.S. FEDERAL TRADE COMMISSION

 4    Trade Commission:    REID TEPFER, ESQ.

 5                         EMILY B. ROBINSON, ESQ.

 6                         1999 Bryan Street

 7                         Suite 2150

 8                         Dallas, Texas  75201-6808

 9                         (214) 979-9383

10                         rtepfer@ftc.gov

11                         erobinson@ftc.gov

12    For the Defendants   CROSSWIND

13    Alon Nottea and      ROBERT M. UNGAR, ESQ.

14    Roi Reuveni:         (Via Telephone)

15                         2190 North Beverly Glen Blvd.

16                         Los Angeles, California  90077

17                         (818) 646-4750

18                         rmu@crosswindlaw.com

19    For the Witness      BEVERLY HILLS LAW CORP., PC

20    Alan Argaman:        SAGAR PARIKH, ESQ.

21                         433 North Camden Drive

22                         6th Floor

23                         Beverly Hills, CA  90210

24                         (310) 887-1338

25                         SP@BeverlyHillsLawCorp.com
```

4

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                   2/24/2016

```
 1                        I   N   D   E   X

 2

 3    WITNESS                   EXAMINATION              PAGE

 4    Alan Argaman          By Ms. Robinson              6

 5

 6    DEPOSITION EXHIBITS              INITIAL REFERENCE

 7    Argaman Deposition Exhibit No. 175            20

 8    Argaman Deposition Exhibit No. 182            22

 9    Argaman Deposition Exhibit No. 176            27

10    Argaman Deposition Exhibit No. 178            32

11    Argaman Deposition Exhibit No. 185            37

12    Argaman Deposition Exhibit No.  66            44

13    Argaman Deposition Exhibit No. 152            59

14    Argaman Deposition Exhibit No. 184            63

15    Argaman Deposition Exhibit No. 149            87

16    Argaman Deposition Exhibit No. 191           111

17    Argaman Deposition Exhibit No. 190           114

18    Argaman Deposition Exhibit No. 187           124

19    Argaman Deposition Exhibit No. 188           128

20    Argaman Deposition Exhibit No. 189           128

21

22

23              INFORMATION REQUESTED

24

25                    None.
```

5

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
1                              INDEX
2                          (Continued)
3
4
5            QUESTIONS INSTRUCTED NOT TO ANSWER
6                            None.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1                    LOS ANGELES, CALIFORNIA
 2               WEDNESDAY, FEBRUARY 24, 2016
 3                         1:00 P.M.
 4
 5                    ALAN ARGAMAN,
 6          called as a witness by and on behalf of
 7          the Plaintiff, being first duly sworn,
 8          was examined and testified as follows:
 9
10                            EXAMINATION
11   BY MS. ROBINSON:
12      Q.   Okay.  My name is Emily Robinson.  I'm an
13   attorney with the FTC.
14      A.   Okay.
15      Q.   I'll be doing your deposition today.
16      A.   Mm-hmm.
17      Q.   Here, also, is Reid Tepfer --
18      A.   All right.
19      Q.   -- who also is an attorney with the FTC.
20      A.   Okay.
21           MS. ROBINSON:  Should we wait for -- it just
22   occurred to me he hasn't called.
23           MR. TEPFER:  No, no.  It's 1:00 right now,
24   so we can go ahead.
25           MS. ROBINSON:  All right.  Well, okay.
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
 1    Mr. Parikh, will you identify yourself for the
 2    record.  I guess it's just you.
 3           MR. PARIKH:  Sagar Parikh, Counsel for the
 4    Defendant Alan Argaman.
 5    BY MS. ROBINSON:
 6      Q.   Mr. Argaman, can you state and spell your
 7    full name for the record.
 8      A.   Sure.  Alan Argaman.  A-l-a-n A-r-g-a-m-a-n.
 9      Q.   Have you ever been deposed before?
10      A.   Not that I recall.
11      Q.   Do you understand that your testimony here
12    today is the same as if you were in court?  So
13    you're under oath.
14           (Interruption in the proceedings)
15           MS. ROBINSON:  Oh, there we go.
16           MR. TEPFER:  I guess we could go off the
17    record.
18           MS. ROBINSON:  Off the record for a sec.
19           (A discussion was held off the record.)
20           (Mr. Ungar joins the proceedings.)
21    BY MS. ROBINSON:
22      Q.   So you understand your testimony is the same
23    as if you're testifying in front of a judge?
24      A.   Now I understand.
25      Q.   I'm going to go over some brief ground
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
 1   rules.  I won't spend a lot of time on this.  But
 2   the court reporter, obviously, is recording all my
 3   questions and all your answers.  That just means
 4   it's important that you don't nod or shake your
 5   head.  Just give an oral answer like "yes" or "no,"
 6   and not "uh-huh" or "nuh-uh."
 7           Does that make sense?
 8   A.    Yes.
 9   Q.    Also, let's try our best not to speak at the
10   same time.  So I will try not to interrupt you while
11   you're speaking, and if you don't interrupt me --
12   even if you think you know what I'm asking, let me
13   go ahead and finish the question before you answer
14   it.
15   A.    Okay.
16   Q.    Does that make sense?
17   A.    Sure.
18   Q.    If you need a break at any time, just let me
19   know, and we'll finish the question we're on and try
20   to get to a break as quickly as possible.
21           Is that okay?
22   A.    Sure.
23   Q.    At times your attorney or one of the
24   attorneys, Mr. Ungar on the phone, may have an
25   objection to any question I ask.  I might rephrase
```

9

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1    my question or I may just ask you to answer my
2    original question.  And go ahead and answer the
3    question, as long as your attorney doesn't instruct
4    you not to answer.
5        A.   Okay.
6        Q.   Does that make sense?
7        A.   Sure.
8        Q.   Are you taking any medication or drugs of
9    any kind that would make it difficult for you to
10   understand or answer my questions today?
11       A.   No.
12       Q.   Anything you're taking that would affect
13   your memory?
14       A.   No.
15       Q.   Can you think of any other reason you
16   wouldn't be able to answer my questions fully,
17   accurately, to the best of your ability?
18       A.   No.
19       Q.   Okay.  All right.  Other than your attorney,
20   did you speak with anyone about today's deposition?
21       A.   No.
22       Q.   Okay.  Did you review any documents to
23   prepare for this deposition?
24       A.   No.
25       Q.   Have you ever been sued before personally?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

    1    Let's start with that.

    2        A.   I don't remember.

    3        Q.   Okay.  Have you ever worked for any other

    4    company that's been sued, that you remember?

    5        A.   I don't remember.

    6        Q.   Okay.  Have you ever been arrested?

    7        A.   I don't know how to answer this question.

    8        Q.   Do you -- what do you think I mean when I

    9    say "arrested"?

   10        A.   Like go to jail?

   11        Q.   Like arrested by the police.  So they would

   12    usually take you down to the station, yes, to a

   13    police station.

   14        A.   I was once when I was young, yeah.

   15        Q.   Okay.  Was it for anything involving a false

   16    statement?  Any crime involving a false statement?

   17        A.   No.

   18        Q.   Okay.  When and where were you born?

   19        A.   In Israel.  Do you want my birthday?

   20        Q.   Just year.

   21        A.   Oh.  1969.

   22        Q.   Okay.  And where do you currently reside?

   23        A.   Current address, do you want the full

   24    address?

   25        Q.   Just city and state is fine.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1       A.   Sherman Oaks, California.

2       Q.   How long have you lived there?

3       A.   Ten years.

4       Q.   Okay.  Have you ever used or gone by any

5  other names, besides the name you just stated and

6  spelled for me?

7       A.   I have a nickname of Avi.  It's my Hebrew

8  name.

9       Q.   Okay.  Any other names?

10       A.   Not that I can recall.

11       Q.   Okay.  If you think of anything later, feel

12  free to let me know.  And that's another thing I

13  should add.  If at any time during the deposition,

14  if you remember the answer to a question I

15  previously asked you, please feel free to tell me.

16       A.   Sure.

17       Q.   All right.  Let's talk about email addresses

18  that you've used.

19            Could you tell me email addresses that

20  you've used?  Do you remember email addresses you've

21  used?

22       A.   No.

23       Q.   What email addresses do you currently use?

24       A.   Can't -- if you want to be specific, maybe I

25  can -- I just don't remember them all.  So do you

12

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                         2/24/2016

1   want me to pick and choose what I remember or --
2      Q.   Tell me what you remember.  Yes.  We can
3   start with -- maybe it would be easier --
4      A.   Should I --
5      Q.   -- if we start with emails you currently
6   use, and then you can tell me the ones you remember
7   in the past.  And I understand you're telling me you
8   don't remember all of them.
9      A.   I mean me?  My business?  I'm not getting
10  the question.  Can you rephrase it --
11     Q.   Okay.
12     A.   -- in a way I can better explain?
13     Q.   Is your confusion about what an email
14  address is, or just what context I'm talking about?
15     A.   No, I know what an email address is.
16     Q.   Okay.  Yes.
17     A.   But what do you mean "use"?  Like use like
18  in -- I'm not getting the word "What do you use?"
19     Q.   Okay.  So what I mean when I say "use" is an
20  email that you would have the user name and
21  password, and you would sign on and check those
22  emails that come to that email address.
23     A.   Sure.  So it would be avicoglobal@gmail.
24     Q.   Okay.
25     A.   That would be my personal email.  And I

13

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

 1    can't really specify what -- what I have forwarded

 2    there or not, so I don't want to just throw emails.

 3        Q.    That's fine.

 4        A.    But the way you described it, for now that's

 5    what I have.

 6        Q.    Okay.  Is it all -- is it true that you may

 7    have other email addresses that are forwarded that

 8    G-mail address?

 9        A.    I don't know forwarded or not forwarded, but

10    I do have other emails.  I just -- you know, I don't

11    want to just --

12        Q.    Okay.

13        A.    -- throw names.

14        Q.    Okay.  Is there a reason why you don't want

15    to throw names?

16        A.    Well, I want to be correct.

17        Q.    Okay.

18        A.    So if I don't know and I'm not sure, I'm not

19    going to give you any information that I'm not sure

20    about.

21        Q.    All right.  Okay.  Did you attend college?

22        A.    No.

23        Q.    Are you affiliated with any professional

24    associations?

25            MR. PARIKH:  Object.  It's vague as to

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    "affiliate."

2    BY MS. ROBINSON:

3        Q.    Okay.  Are you a member of any professional

4    associations?

5        A.    Not that I recall.

6        Q.    Okay.  All right.  Let's talk about

7    employment.  What companies do you --

8              Well, where do you currently work?

9        A.    By myself.

10       Q.    Okay.  Do you have a company name that

11   you -- is it a company, or you work on your own?

12       A.    Can you rephrase the question so I can

13   understand?  I mean, where do you currently work?

14       Q.    Okay.

15       A.    What do you -- what do you mean by -- like

16   what do I do for a living or --

17       Q.    What do you do for a living?

18       A.    What do I do?

19       Q.    Yes.

20       A.    Okay.  I'm a third party Internet service

21   provider.

22       Q.    What name is on your paychecks?

23             MR. PARIKH:  I want to object that it

24   assumes facts not in evidence.

25   ///

15

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    BY MS. ROBINSON:

2        Q.    Okay.  Do you receive a paycheck?

3        A.    No.

4        Q.    Okay.  Do you receive payment for your

5    services, of any kind?

6        A.    Again, I mean, you're asking -- re- --

7    rephrase the question so I understand, 'cause when

8    you say "Do you receive", like, what do you mean do

9    I receive?  Like do I receive personally from

10   clients?  For myself?  For --

11       Q.    Do you receive personally any kind of

12   consideration for providing third party Internet

13   services?

14       A.    Personally?

15       Q.    Mm-hmm.

16       A.    No.

17       Q.    Okay.  Do you have a company that you own?

18       A.    Sure.

19       Q.    Okay.  What's the name of the company that

20   you own?

21       A.    Secured Merchants, LLC.

22       Q.    Do you own any other companies?

23       A.    Don't -- I can't -- the question is too, too

24   vague.  I don't know.  I can't answer it correctly.

25       Q.    Do you currently own any other companies?

16

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1          A.     There's a possibility, yes.

2          Q.     Okay.  Are there currently any active

3     corporations or LLCs or -- let's start with those

4     two; okay? that have you listed as an owner, member,

5     or officer with the California Secretary of State

6     Corporation Division?

7          A.     Sure.

8          Q.     Okay.

9          A.     So this question is better asked to my

10    accountant.

11         Q.     Okay.

12                MR. UNGAR:  Hello?

13                MS. ROBINSON:  Hello?

14                MR. UNGAR:  Hello?

15                MS. ROBINSON:  Did someone say something on

16    the phone?

17                MR. UNGAR:  Hello?

18                MR. TEPFER:  Robert, we can -- we can hear

19    you.  Did you -- can you hear us?

20                MR. PARIKH:  He just hung up.

21                MS. ROBINSON:  I think you're right.

22                MR. PARIKH:  The green light.

23                MS. ROBINSON:  Yeah.  Well, maybe they'll

24    call back.  Should we go off the record for just a

25    moment?

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                     2/24/2016

```
 1          (Recess)

 2          (A discussion was held off the record.)

 3          MS. ROBINSON:  Let's go back on the record.

 4          Okay.  Would you mind reading the last

 5   question, and I think you started answering.

 6              (The previous questions and answers

 7              were read back by the court reporter

 8              as follows:

 9                 "QUESTION:  Are there currently

10              any active corporations or LLCs or --

11              let's start with those two; okay?

12              that have you listed as an owner,

13              member, or officer with the

14              California Secretary of State

15              Corporation Division?

16                 "ANSWER:  Sure.

17                 "QUESTION:  Okay.

18                 "ANSWER:  So this question is

19              better asked to my accountant.")

20          THE WITNESS:  That would be -- can I can ask

21   my accountant?

22   BY MS. ROBINSON:

23      Q.  Do you have any personal knowledge of

24   any of --

25      A.  I mean, I can't give you an accurate answer
```

18

Argaman

FTC v. Bunzai Media Group, Inc., et al.                           2/24/2016

1    because I don't know the state of some companies --

2        Q.   Okay.

3        A.   -- such as the ones you have put in the

4    lawsuits.  I can maybe name it, but it wouldn't be a

5    correct answer to your question.  So I don't know

6    for sure, but if you want an answer, if you're

7    asking specific question that I don't know the

8    answer to -- so I don't know.  Ask my accountant.

9        Q.   Okay.

10       A.   That would be my best answer.

11       Q.   What are a few companies that you remember,

12   in which you are listed as the owner or member or

13   officer?

14            MR. PARIKH:   Currently active?

15   BY MS. ROBINSON:

16       Q.   Even if you're not sure of the status, let's

17   just list them anyway.

18       A.   I know one company is VBonita, Inc.

19       Q.   Okay.  Now what does VBonita, Inc., do?

20       A.   It's a business that never materialized.

21       Q.   What was it supposed to do?

22       A.   Sell products to department stores.  It's a

23   vision that I had but didn't -- didn't materialize.

24       Q.   And you're not sure whether or not it's

25   still an active corporation --

19

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1     A.    I'm not --

2     Q.    -- is that correct?

3     A.    I'm not sure.

4     Q.    Okay.

5     A.    Yeah.

6     Q.    All right.  Any other companies, besides

7   Secured Merchants, LLC, and VBonita, Inc.?

8     A.    Well, there was a Secured Commerce that I

9   was, for a limited time, involved with as well, but

10  I don't know the -- again, I don't know the status.

11  It's best if you talk to my accountant.

12    Q.    What does Secured Commerce do?

13    A.    It provided shipping discounts to companies.

14    Q.    All right.  Any other organizations, besides

15  VBonita, Inc., and Secured Commerce, LLC, and

16  Secured Merchants, LLC?

17    A.    There is a Commerce Pack.

18    Q.    And what did Commerce Pack do?

19    A.    It provides a shopping cart platform for

20  companies to use for straight sale business.

21  There's no risk free trial or negative options that

22  has ever ran on Commerce Pack.

23    Q.    And is Commerce Pack, to your knowledge,

24  still an active corporation?

25    A.    I believe so, yes.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1       Q.    So when you testified earlier that you are a

2    third party Internet service provider, which one of

3    these corporations or LLCs are you using to provide

4    those services, if any?

5       A.    Yeah, so I can -- I can use any one of them

6    if I choose to give services.  It depends what the

7    service is and where --

8       Q.    Okay.

9       A.    -- it best fits.

10      Q.    Okay.  I'm going to hand you this -- hold on

11   here -- an exhibit that's marked as 175.

12            (Plaintiff's Exhibit 175 was

13            previously marked for identification

14            by the FTC and is attached hereto.)

15   BY MS. ROBINSON:

16      Q.    I've got enough copies for everybody.

17            Feel free to take a look at that for a

18   minute, if you need to.  I'm just going to ask you,

19   does this look familiar to you?

20      A.    Okay.  So what would you like me to tell you

21   about this?  If it looks familiar?  What does

22   familiar mean?  What do you mean by --

23      Q.    Are you saying you don't understand the

24   question?

25      A.    Yes.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1     Q.   Okay.  Does the name LTU Communications mean
2  anything to you?
3     A.   Yes.
4     Q.   Okay.  So what is that?
5     A.   It's a domain name that I have.
6     Q.   Okay.  The domain LTU Communications, was it
7  also a business name that you used?
8     A.   I don't remember using it as a business
9  name --
10    Q.   Mm-hmm.
11    A.   -- but possibly.  It was not -- if it was,
12 it was definitely not something I pushed forward as
13 anything, so --
14    Q.   And is this -- is this a bank statement for
15 Alan Argaman dba LTU Communications?
16    A.   Looks like empty bank statement to me.
17    Q.   Okay.  And do you remember having a bank
18 account that was in the name of Alan Argaman dba LTU
19 Communications?
20    A.   Best to talk to my accountant.
21    Q.   So is that a yes or a no?
22         MR. PARIKH:  She's asking if you personally
23 remember.
24         THE WITNESS:  Honestly, not really.  No.
25 ///

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                   2/24/2016

1    BY MS. ROBINSON:

2        Q.    Is LTU Communications a domain name that you

3    still use?

4        A.    No.

5        Q.    Okay.  I'm also going to show you

6    Exhibit 182.

7              (Plaintiff's Exhibit 182 was

8              previously marked for identification

9              by the FTC and is attached hereto.)

10   BY MS. ROBINSON:

11       Q.    And this is titled an Addendum to a

12   Certificate of Authority for Wells Fargo Bank; is

13   that correct?

14       A.    Yes.

15       Q.    Okay.  And the business name listed on here

16   is VBonita, Inc., which you've already talked about;

17   right?

18       A.    Sure.

19       Q.    Okay.  One of the authorized signers here is

20   Doron Nottea; is that correct?

21       A.    Looks like it.

22       Q.    And what was his role in VBonita, Inc.?

23       A.    There was no role 'cause the business didn't

24   move forward, but he is -- I mean, you can ask him

25   what his role was.  There was no business,

23

Argaman

FTC v. Bunzai Media Group, Inc., et al.                               2/24/2016

1    basically, in VBonita.

2        Q.    But there was enough of a business for you

3    to open an account; is that correct?

4        A.    No.   There was no business.

5        Q.    Did you fill out these documents?

6        A.    I don't see my signature here, but I don't

7    know what you mean by "fill out."   I don't see any

8    handwriting or anything.

9        Q.    Did you type in --

10       A.    I'm not -- I don't use a typewriter.

11       Q.    -- the blanks?

12       A.    Never did.

13       Q.    Did you use a computer or other device to

14   fill in the blanks on this application?

15       A.    I don't see -- I don't see my -- this form

16   being filled out by me.   I don't -- I don't see --

17       Q.    Correct.   That's not -- it's a yes or no

18   question.

19            MR. PARIKH:   It's just a yes or no.

20            THE WITNESS:   Can you -- can you repeat your

21   question?

22   BY MS. ROBINSON:

23       Q.    Okay.   Did you fill out this application,

24   this Addendum to the Certificate of Authority for

25   this bank account?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      A.   I don't remember.  I don't think so, but --

2      Q.   Do you remember how long that you had a bank

3  account for VBonita, Inc.?

4      A.   No.

5      Q.   But your testimony was that it's no longer

6  active; is that correct?

7      A.   No, that wasn't my testimony.  It could be

8  active.  I told you to talk to my accountant, or you

9  guys need to look at your records because you put a

10 hold on my -- on this business, so I don't know.  I

11 mean, it's not active as a business.  It's not doing

12 business.  Is that what you asked?  But the company

13 itself could be active.  I'm not sure.

14     Q.   Is the bank account active, to your

15 knowledge?

16     A.   Again --

17          MR. PARIKH:  Active meaning open?

18          MS. ROBINSON:  Yes.

19 BY MS. ROBINSON:

20     Q.   Is the bank account open, to your knowledge?

21     A.   I think you would know the better answer.

22 You put a hold on it.

23     Q.   But my question to you was, to your

24 knowledge, is the bank account open?

25     A.   I don't know.  I don't have access to it

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                        2/24/2016

1   because this situation we're involved in, I'm

2   involved in, so --

3       Q.   To your knowledge, was the bank account open

4   at the time that assets were frozen by the FTC?

5       A.   Possibly.

6       Q.   Is possibly, a possible yes or --

7       A.   Well --

8       Q.   -- possible no?

9       A.   -- I mean, I don't know hundred percent if

10  it was or wasn't.

11      Q.   Mm-hmm.  All right.  Let's talk about

12  Secured Merchants and Secured Commerce.

13          First, could you tell me again what Secured

14  Merchants does, its business purpose and what

15  Secured Commerce does?

16          MR. PARIKH:  Are you asking currently?  At

17  any time in the past?

18  BY MS. ROBINSON:

19      Q.   As of June 2015.

20      A.   Can you ask one by one, so I don't get

21  confused?

22      Q.   Yes, yes.

23          So what is Secured Merchants?  What did

24  Secured Merchants do as of June 2015?

25      A.   Provides third party IT services.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      Q.    What did Secured Commerce do as of June

2    2015?

3      A.    To my knowledge, it wasn't active.

4      Q.    Okay.  Let's go back to Secured Merchants,

5    LLC.  Could you give me a more detailed explanation

6    of what Secured Merchants, LLC, does?

7            MR. PARIKH:  As of June 2015?

8            MS. ROBINSON:  As of June 2015.

9            THE WITNESS:  Secured Merchant, LLC, is a

10   vendor that provides IT services to clients.  If a

11   client has a request that is IT related that Secured

12   Merchants, LLC, can fulfill the requirements, then

13   we consider the job, and if we take the job, we

14   perform the job.

15   BY MS. ROBINSON:

16     Q.    Would you give me, just give me a couple

17   examples of types of services you provided?

18     A.    Merchants -- can you rephrase the question

19   because it's too broad.  I'm not getting -- I'm not

20   sure I understand how to answer it correctly.

21     Q.    Okay.  You've given me a broad explanation

22   of what Secured Merchants, LLC, does, and what I was

23   asking for is provide a couple -- two examples of

24   types of IT services that Secured Merchants has

25   provided for companies.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      A.   It could, for example -- if I think so, I
2   can give you a correct answer.  I just don't want to
3   say any --
4      Q.   Absolutely.
5      A.   So, for example, if you needed to connect
6   to, let's say, eBay, or if you want to connect to
7   Amazon or if you want to -- or if you're using, as a
8   client, certain CRM and you're having difficulties
9   understanding it, so you can possibly call in and
10   say -- and ask me questions, and maybe we can build
11   some kind of a software connector to -- to help your
12   business automation flow.
13           MS. ROBINSON:  Okay.  Would you mind
14   grabbing 176 --
15           MR. TEPFER:  Sure.
16           MS. ROBINSON:  -- for me?  I'm going to hand
17   you Exhibit 176.
18           (Plaintiff's Exhibit 176 was
19           previously marked for identification
20           by the FTC and is attached hereto.)
21   BY MS. ROBINSON:
22      Q.   Let me know when you've finished reading --
23      A.   No, I'm okay.
24      Q.   Okay.  If you look at page 2 here --
25      A.   Okay.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1      Q.    -- actually 176-2, it says "Certified Copy
2   of Limited Liability Company Resolutions Opening and
3   Maintaining Deposit Accounts and Services" for Bank
4   of America; is that correct?
5      A.    Yes.
6      Q.    Okay.  And it's for the company Secured
7   Merchants, LLC; is that correct?
8      A.    Correct.
9      Q.    Okay.  And it lists here Doron Nottea and
10  Alan Argaman as members; is that correct?
11     A.    That's what it lists here, yes.
12     Q.    Yes.  Okay.
13           The -- and then is that your signature on
14  the next page, 176-3?
15     A.    Yes, it is.  Yes.
16     Q.    Okay.  How would you describe your role with
17  Secured Merchants, LLC?
18     A.    My role?
19     Q.    Yeah.
20     A.    I am -- the only role in Secured Merchants,
21  LLC, as far as my -- I'm not getting what you're
22  asking exactly, but if I gave you a correct answer,
23  then you're good with it.
24     Q.    This document lists you as a member;
25  correct?

29

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1          Are you also the owner of the company?

2     A.   This I -- I can't go into legal term what is

3     the difference between member and owner, but I

4     believe LLC works with members.

5     Q.   Okay.

6     A.   So if I'm a member, then --

7     Q.   Are you a controlling member?

8     A.   I'm the only member.

9     Q.   Okay.  This here lists Doron Nottea as a

10    member.  Is that incorrect?

11    A.   This is incorrect.  So just to --

12    Q.   Is there a newer version of this document?

13    A.   Okay.  Can I finish what I was going to say?

14    Q.   Absolutely.

15    A.   Thank you very much.

16         Secured Merchant, LLC, is and always has

17    been a single member LLC, and in a single member LLC

18    you're not allowed to have more than one member,

19    according to my knowledge.  So this is obviously a

20    mistake by someone or somehow, or it kind of --

21    Q.   But is that your name, is that your

22    signature on page 176-3?

23    A.   It looks like it, but I'm not sure, but it

24    does look like it.

25    Q.   Okay.  Do you remember filling this document

30

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1   out?

2      A.   No.

3      Q.   Do you remember -- now if you look at

4   page 176-4, it's for the Business Signature Card.

5   It has both you and Doron Nottea and -- and your

6   signatures.  Do you remember filling this document

7   out?

8      A.   I don't remember.

9      Q.   Do you remember whether Doron Nottea was

10  ever a authorized signature on this account?

11     A.   There could be a chance that I -- since I

12  was out of town and Doron has -- there -- there

13  could be a chance of that.

14     Q.   There could be a chance that he was a

15  signatory on the account?

16     A.   Yes.  There --

17     Q.   Okay.

18     A.   -- could be.

19     Q.   But you don't remember; is that your

20  testimony?

21     A.   My testimony that there could be a chance,

22  you can --

23     Q.   Do you remember whether or not --

24     A.   I'm -- I'm --

25     Q.   It's a yes or no.  So it's just yes or no.

31

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1      A.    Yeah.

 2      Q.    Do you remember whether or not he was a

 3  signatory on the account at any point?

 4      A.    No.

 5      Q.    You don't remember; correct?  Is that what

 6  you're saying?

 7      A.    No, I don't.

 8      Q.    On page 176-1, the first page of the

 9  document, it has an email in the middle of the page

10  there.  It says -- email is

11  globalmediausa@gmail.com.  Is that an email

12  address -- was that your email address, one of your

13  email addresses?

14      A.    Possibly.

15      Q.    Do you remember whether this was one of your

16  email addresses?

17      A.    I've had so many emails in my, life I don't

18  know.

19      Q.    You don't remember?

20      A.    Don't remember.

21      Q.    All right.  I'm also going to hand you

22  Exhibit 178.

23      A.    Okay.

24  ///

25  ///
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1              (Plaintiff's Exhibit 178 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4    BY MS. ROBINSON:
 5       Q.   This document is titled "Professional
 6    Service Agreement"; is that correct?
 7       A.   Yes.
 8       Q.   I'll give you a chance to look at it if you
 9    like.
10       A.   No, no.  Go ahead.
11       Q.   Okay.  It looks like it's an agreement
12    between -- between Secured Merchants, LLC, and
13    Wealth Vision, Inc. --
14       A.   Sure.
15       Q.   -- to provide technology platforms to
16    client?
17       A.   Okay.
18       Q.   Do you remember having a Service Agreement
19    with Wealth Vision, Inc.?
20       A.   Yes.
21       Q.   Okay.  And is this kind of typical of the
22    types of services you would provide for clients?
23       A.   Yes.
24       Q.   Okay.  And I notice here this is not signed
25    by you if you look at page 3, but you do believe at
```

33

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    some point you did have a Professional Services
2    Agreement with this company; is that correct?
3        A.    Yes.
4        Q.    Even though this is not signed?
5        A.    Yes.
6        Q.    Okay.  I want to switch gears a little bit
7    and talk about your familiarity with the corporate
8    defendants.
9        A.    Sure.
10       Q.    I'm going to go through a list.
11       A.    Go for it.
12       Q.    Are you familiar with or have any knowledge
13   of BunZai Media Group, Inc.?
14            MR. PARIKH:  Again, I'm going to object as
15   vague and ambiguous, "familiar."
16   BY MS. ROBINSON:
17       Q.    Have you ever heard of the company BunZai
18   Media Group, Inc.?
19       A.    Yes.
20       Q.    When did you first hear about it?
21       A.    I don't recall.
22       Q.    Was it before or after this lawsuit was
23   filed?
24       A.    Probably before.
25       Q.    Do you remember if it was before or after

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

    1    this lawsuit was filed?

    2        A.    "Probably" has a meaning, but that's the

    3    best answer I can give you.

    4        Q.    Do you remember with any certainty at all?

    5        A.    If I was a hundred percent sure, I would

    6    tell you hundred percent.

    7        Q.    Okay.

    8        A.    But probably is -- there's a good chance

    9    that I did --

   10        Q.    Okay.

   11        A.    -- but --

   12        Q.    What about Pinnacle Logistics, Inc.?   Had

   13    you heard of Pinnacle Logistics --

   14        A.    Yes.

   15        Q.    -- before this lawsuit was filed?

   16              Yes?   Before the lawsuit was filed?

   17        A.    Well, you're asking me -- you're asked me if

   18    I heard of it, so I said yes.   If you have a second

   19    question --

   20        Q.    Okay.

   21        A.    -- you can go ahead.

   22        Q.    That was an example of me not being done

   23    with my question --

   24        A.    No, no --

   25        Q.    -- so let me --

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      A.    -- no, it's my apology.

2      Q.    No, no --

3      A.    But I mean, it was like two, three questions

4   at once.

5      Q.    Absolutely.

6      A.    Maybe I spoke too fast.

7      Q.    Absolutely.

8            Have you -- before this lawsuit was filed,

9   have you ever heard of Pinnacle Logistics, Inc.?

10     A.    I think so.

11     Q.    Who do you believe owns or operates Pinnacle

12  Logistics, Inc.?

13           MR. UNGAR:  Objection as to the form of the

14  question.  It's compound, it's vague and ambiguous,

15  calls for speculation, and it lacks foundation.

16  BY MS. ROBINSON:

17     Q.    You can answer.

18     A.    Can you repeat the question, please?

19     Q.    Yes.

20           Who do you believe owns or operates Pinnacle

21  Logistics, Inc.?

22           MR. UNGAR:  Same objection.

23           THE WITNESS:  I think you should ask

24  Pinnacle Logistics.

25  ///

36

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    BY MS. ROBINSON:

2        Q.   I asked you who you believe owns or

3    operates --

4            MR. PARIKH:  Just answer, if you know.

5            THE WITNESS:  I believe Pinnacle Logistics

6    should know.  I don't.

7    BY MS. ROBINSON:

8        Q.   But I'm not asking -- okay.  You know what?

9    Let's just pause for just a second.  I understand

10   what you're saying, and so I will start by asking do

11   you know who owns or operates --

12       A.   No.

13       Q.   -- Pinnacle Logistics, Inc.?

14       A.   Okay.  That was a good question.

15       Q.   Have you ever spoken to someone who claimed

16   to be representing Pinnacle Logistics, Inc.?

17       A.   The way you're phrasing the question, no.

18       Q.   Okay.  What about Media Urge, Inc.?  Have

19   you heard of Media Urge, Inc., prior to this lawsuit

20   being filed?

21       A.   Probably, yes.

22       Q.   Okay.  What does Media Urge, Inc., do?

23       A.   I don't know.

24       Q.   What was the context in which you heard

25   about Media Urge, Inc.?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

37

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1       A.   What is the what?
 2       Q.   How did you hear about Media Urge, Inc.,
 3   when you first heard about it?
 4       A.   I don't know how I heard about it.
 5       Q.   Okay.
 6       A.   If you're asking me if I heard about it, I
 7   heard about it.
 8       Q.   Okay.
 9       A.   How I heard about it, I don't know.
10       Q.   Okay.  Have you ever done any business with
11   Media Urge, Inc.?
12       A.   I'm sorry?
13       Q.   Have you ever done any business with Media
14   Urge, Inc.?
15       A.   There's a possibility, but I'm not sure.
16       Q.   Okay.  Let's look at 185.
17            (Plaintiff's Exhibit 185 was
18            previously marked for identification
19            by the FTC and is attached hereto.)
20   BY MS. ROBINSON:
21       Q.   Let me know when you've had a chance to look
22   at Document 185.
23       A.   Well, it's a pretty big document, so --
24       Q.   Mm-hmm.  That's why, just let me know.
25       A.   Okay.  Okay.
```

38

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1        Q.    Okay.

2        A.    I'm good.

3        Q.    This is a -- this is an email that's from

4    Avico Global; is that correct?

5        A.    It's an email from me.

6        Q.    From you?

7        A.    Yeah.

8        Q.    This is an email address you used, you said?

9        A.    Yeah.

10       Q.    So tell me what this email is about.

11       A.    This is email is about a proposed job that

12   never took place, never materialized, never got

13   paid, never implemented.

14       Q.    So what was the job?

15       A.    It's right here.  Let's read it together and

16   see.

17             They wanted to -- do you want me to go into

18   details and read it?  This is the job.  It's right

19   here.  It's written.  It's written here

20   (indicating).

21       Q.    I would like you to tell me a summary of

22   what the job was.

23       A.    I mean, I can read it.  This job was never

24   implemented, so I don't remember it.

25       Q.    Okay.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

```
1      A.   It was -- it was no -- it seemed like some

2    angel blog that they -- Main Wordpress Portal will

3    let angels.auravie -- I think they wanted to hire

4    some models to -- some celebrities to be angels, and

5    they wanted to create some kind of portal for them

6    to log into.  That's just my recollection.  Again,

7    this was never implemented.

8           So I gave you some description.  If it's --

9    if it's enough, fine.  If not, ask me more about it.

10   Please feel free.  Yeah.

11     Q.   So Alon here, with BunZai Media in the "To"

12   line --

13     A.   Alon at BunZai Media, yes.

14     Q.   -- is that Alon Nottea?

15     A.   I -- I -- I think so.

16     Q.   What makes you think that?

17     A.   Alon referenced in this email should

18   probably be him.

19     Q.   Okay.  Do you know any other Alons that work

20   somewhere called BunZai Media?

21     A.   No.

22     Q.   Do you remember - it seems like you have

23   some memory here of these negotiations, of this

24   project, even though it didn't come to pass.

25     A.   Well, I mean, I read it, and some -- some --
```

40

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    some things, you know.

2        Q.   And you remember it wasn't implemented?

3        A.   I'm sorry?

4        Q.   You remember that it wasn't implemented;

5    correct?

6        A.   Yes.

7        Q.   Okay.  Who made the decision?

8        A.   Well, at least not by me.

9        Q.   Okay.  Who made the decision that it would

10   not be implemented?

11       A.   I have no idea.

12       Q.   Okay.

13       A.   A lot of -- a lot of business quotes or --

14   so -- so all don't materialize or don't get

15   fulfilled.

16       Q.   Okay.

17       A.   So this -- this is definitely that.

18       Q.   Do you remember discussing this project with

19   Alon Nottea?

20       A.   I didn't discuss this project with Alon.

21   There was another person by the name of Kevin, if

22   you can see here.  So this -- this was not even done

23   by me; okay?  This was not -- there was a person on

24   top.  See on the second line?  His name is Kevin.

25       Q.   Mm-hmm.

41

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1      A.   See, "Last we spoke... Kevin should be
2    working on this"; right?  So it wasn't done by me.
3      Q.   Okay.  It does say "Last we spoke", which
4    would imply you spoke with Alon Nottea; right?
5      A.   Let me read it, so I can --
6      Q.   Okay.
7      A.   -- see what it means.
8      Q.   Sure.
9      A.   'Cause -- this actually could mean the last
10   I spoke with Kevin.  So "Last we spoke" could
11   interpret the last I spoke to Kevin.
12     Q.   What's Kevin's last name?
13     A.   So I'm not sure.  I don't know.
14     Q.   Do you remember speaking to a Kevin?
15     A.   Yes.
16     Q.   Did Kevin work with BunZai Media?
17     A.   I'm not sure.
18     Q.   Did you know at the time?
19     A.   I think he was a third party provider as
20   well --
21     Q.   Okay.
22     A.   -- actually.
23     Q.   What's SMS mean?  The last -- second line
24   says, "Last we spoke, SMS is on hold".
25     A.   It's better to ask Kevin that.  I don't

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

42

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

 1    know.

 2         Q.    Do you know what SMS means?

 3         A.    No.

 4         Q.    Okay.  Is -- if you use the term SMS, would

 5    you know what it meant?

 6              MR. PARIKH:  Are you talking about in this

 7    context?  Any context?

 8    BY MS. ROBINSON:

 9         Q.    In the context of software development, IT

10    support, does SMS have a meaning?

11         A.    I can -- I can give you my best answer, but

12    I -- I don't know for sure.  But I can tell you what

13    I think it is.

14         Q.    Okay.

15              MR. PARIKH:  You shouldn't guess, though.

16    BY MS. ROBINSON:

17         Q.    Yeah, I wouldn't guess.  It's just a yes or

18    no question.

19         A.    Well, you're asking --

20         Q.    Are you familiar with SMS in the context of

21    IT?  Sorry we spoke over each other there.

22         A.    You're asking me -- it looks -- since I'm

23    not sure, I'm going to say no.

24         Q.    Okay.  Do you know Alon Nottea?

25         A.    Yes.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1       Q.    Okay.  How do you know him?

2       A.    Can you rephrase that or ask in more

3    specific -- like how do you know him, like what do

4    you mean, how I do know him?

5       Q.    What part of the question is confusing?

6       A.    How do you know him?  What is how?  Like --

7       Q.    When did you first meet Alon Nottea?

8       A.    Okay.  That's better.  Maybe 20 years ago.

9       Q.    Okay.  How did you meet him?

10      A.    I believe we were in a similar type of

11   business.

12      Q.    Okay.

13      A.    Okay.

14      Q.    And have you ever provided IT services for

15   any company in which Alon Nottea was involved?

16      A.    Yes.

17      Q.    Okay.  When?

18      A.    You want me to pick a date or -- I mean,

19   when is -- when is --

20      Q.    Describe the services you provided.

21      A.    So the question is again?  Can you tell me

22   what the question is?

23      Q.    Describe the services you provided for Alon

24   Nottea.

25      A.    Him personally?

44

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      Q.    Describe the services you provided for Alon

2    Nottea's businesses.

3      A.    So let's say he had -- he was selling

4    security cameras and DVR, so I provided some

5    services for that.  He was in the business of

6    selling servers, computer servers, so I provided

7    some business in relation to that.  He also sold

8    skin care products, so I provided services for that

9    as well.

10          MS. ROBINSON:  Okay.  I'm going to hand you

11    Exhibit 66 here.

12          (Plaintiff's Exhibit 66 was

13          previously marked for identification

14          by the FTC and is attached hereto.)

15    BY MS. ROBINSON:

16      Q.    Were there any other times you provided him

17    services?

18      A.    Any other times?

19      Q.    Any other occasions?  You mentioned --

20      A.    I didn't mention occasions.  I mentioned

21    businesses that I provided.  I didn't -- time wise,

22    I didn't mention.

23      Q.    You mentioned serviced you provided to him.

24      A.    But now you're going into time, so that

25    confused me.  Are you looking at -- tell me what

45

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1     your current question is.

2          Q.   Okay.  You listed security cameras, you

3     provided services for --

4          A.   Yes.

5          Q.   -- relating to that.  You listed skin care

6     creams.  And you listed a third thing, which I'm not

7     immediately remembering.

8          A.   It's computer hardware.

9          Q.   Computer hardware, yes.

10              Other than those three services, have you

11    provided services for him or one of his businesses?

12         A.   No.

13         Q.   Okay.  This is Exhibit 66.

14         A.   Okay.

15         Q.   And this is an invoice from Secured Commerce

16    to Adageo, LLC --

17         A.   Sure.

18         Q.   -- is that correct?

19         A.   Sure.

20         Q.   Is Adageo owned by Alon Nottea?

21         A.   I don't know.

22         Q.   Is it operated by him?

23         A.   I don't know.

24         Q.   Secured Commerce, is it the Secured

25    Commerce, LLC, that you're referring to earlier?

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1        A.    Okay.

2        Q.    Is Secured Commerce at the top of this

3    invoice the company that you're referring?

4        A.    Does it say Secured Commerce here; is that

5    what you're asking me?

6        Q.    Is that the Secured Commerce, the company

7    you were talking about earlier?

8        A.    Yes, yes.

9        Q.    Okay.  And this invoice is for the design,

10   creation, optimization of the AuraVie landing page;

11   is that correct?

12       A.    That's what it says.  Yes.

13       Q.    Do you remember sending this invoice?

14       A.    I don't recall.  I don't remember.

15       Q.    Did -- did you -- were you paid by Adageo,

16   LLC, for designing, creating, and optimizing the

17   AuraVie landing page?

18            MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous.

20   BY MS. ROBINSON:

21       Q.    You can answer it.

22       A.    It looks like there is a check here.

23       Q.    Okay.  Do you remember being paid for those

24   services?

25       A.    I mean, if there's a check and it went to

47

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    the bank, then it was paid.

2        Q.   That wasn't my question.   My question was

3    just yes or no, do you remember being paid?

4            MR. PARIKH:   I'm going to object.   You're

5    asking him personally or Secured Commerce?

6            MS. ROBINSON:   I'm asking him personally.

7            THE WITNESS:   Personally?

8            MR. UNGAR:   I join.

9    BY MS. ROBINSON:

10       Q.   Do you remember if Secured Commerce was

11   paid --

12           MR. UNGAR:   Excuse me.

13   BY MS. ROBINSON:

14       Q.   -- for these services?

15           MR. UNGAR:   Excuse me.   Excuse me.   I join

16   in the last objection.

17   BY MS. ROBINSON:

18       Q.   You can answer the question.

19       A.   So again, please.   I mean, what are you

20   asking me?

21       Q.   Okay.   I'm sorry.   I'm saying do you

22   remember if Secured Commerce was paid for designing

23   the AuraVie landing page.

24           MR. PARIKH:   Well, you said him personally.

25   Now you said Secured Commerce.

Argaman
FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1        MS. ROBINSON:  I meant if he personally
2    remembered.  I thought you were asking me --
3        MR. PARIKH:  Oh.
4        MS. ROBINSON:  -- Secured Commerce.  I mean,
5    I didn't understand your question.
6        THE WITNESS:  I can't remember everything
7    and everybody that paid, but if this is -- if
8    there's a check, then -- and there's an invoice,
9    then let's assume it was paid.
10       MR. UNGAR:  Move to strike everything after
11   the phrase "I can't remember."
12   BY MS. ROBINSON:
13   Q.   Describe to me in more detail what services
14   that Secured Commerce provided to Adageo relating to
15   the designing the AuraVie landing pages.
16   A.   Okay.  So Secured Commerce has never --
17   well, let me not use the word "never."  Secured
18   Commerce did not provide services, you know.  I'm
19   not sure I understood your question, actually, so I
20   don't want -- I don't want to give you the wrong
21   answer.  So if you can please ask the question again
22   in a more specific way, I'll be glad to answer you.
23   Q.   Did Secured Commerce provide the services it
24   invoiced for here?
25   A.   No.  However, I might have provided some

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    services myself, and this amount might be a payment
2    for services that I have provided for AuraVie.com
3    website.
4         MR. UNGAR:  Move to strike everything after
5    the word "No."
6    BY MS. ROBINSON:
7         Q.    Did you provide services for AuraVie.com?
8         A.    I myself provided a website called
9    AuraVie.com that was a straight sale website.
10   AuraVie.com sold skin care products on a website
11   that had shopping carts, that had no risk free
12   trials, that had multiple SKUs and products of skin
13   care that customers came in and bought, such as they
14   would buy on Amazon or eBay or Shopify or
15   BigCommerce or Volusion or any other shopping cart
16   platform.  So I provided a website for AuraVie.com.
17   Again, the word "provide," I don't know what it
18   means, but yes.
19        Q.    And is it your testimony that the AuraVie
20   website landing page that you designed did not have
21   a negative option?
22        A.    Absolutely not.
23        Q.    Okay.  And so --
24        A.    The AuraVie.com website that I worked on did
25   not have negative options, did not have risk free

50

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                          2/24/2016

1    trial, did not have continuity ability of re-billing

2    customers.  My software or the platform or the

3    website AuraVie.com did not do risk free trial on

4    AuraVie.com.

5        Q.   Let's look at the second line in the

6    description.  It says, "Campaign Setup and

7    integration to Lime Light CRM and ClickConnector."

8    Can you tell me what that means?

9        A.   Lime Light CRM is a Lime Light CRM.  It's a

10   software that they use for -- for their business,

11   for their continuity business, I suppose.  I mean, I

12   don't know.  You can ask them, but yup.

13       Q.   What does CRM mean?

14       A.   Lime Light CRM, it's a customer relation

15   management system.

16       Q.   What's ClickConnector?

17       A.   ClickConnector, are we -- are we talking

18   about different document now or what?

19       Q.   It says, second line there --

20       A.   Oh --

21       Q.   -- says --

22       A.   -- so ClickConnector is an API connector.

23       Q.   What's API stand for?

24       A.   It's basically part of Lime Light.

25       Q.   Okay.  So describe that in a little more

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1    detail for me.

2        A.    What is the exact question?

3        Q.    What does Lime Light do?

4        A.    You're asking me what Lime Light, another

5    software, does?

6        Q.    Campaign integration to Lime Light, so I'm

7    asking you --

8        A.    So you go to Lime Light, you -- you -- you

9    have a menu.  You use -- I haven't used it myself,

10   so I don't really know, but I mean, if you want a

11   demo, you would have to go to Lime Light CRM and ask

12   them for a demo.

13       Q.    So is it your testimony that you don't know

14   what Lime Light does?

15       A.    I just told you before that I do know.  As a

16   whole, Lime Light is a CRM where negative option

17   companies go to, to perform their business --

18       Q.    Okay.

19       A.    -- and continuity.

20       Q.    So is it your testimony that you designed a

21   landing page that did not have con- --

22       A.    Did --

23       Q.    -- did not have the continuity plan or

24   the negative option --

25       A.    Absolutely.  First of all, I don't know

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

 1    you're going into detail design or not, but I
 2    operated for them, hosted a website called
 3    AuraVie.com that was not a negative website, that
 4    did not have risk free trial options, that was a
 5    legitimate -- not to say that others are not, but it
 6    was a straight sale, add to shopping cart, check
 7    out, and buy it.  The -- the price was not free.  In
 8    fact, it was maybe 100 or 200 or $300 per item.
 9    Clients purchased it from their website.  And I
10    operated it for them.
11       Q.   But then you also provided campaign setup
12    integration to Lime Light, which is for continuity
13    plans; is that correct?
14       A.   No.  Lime Light -- again, Lime Light is
15    software that does not belong to me, and they know
16    very well how to use Lime Light by them-self.
17       Q.   Okay.  So what were you billing for in this
18    line, "Campaign Setup and integration to Lime Light
19    CRM and ClickConnector"?
20       A.   Yeah.  I mean, this could be just added
21    con- -- I -- I -- I -- Secured Commerce did not work
22    with Lime Light.
23       Q.   Did you work with Lime Light?
24       A.   Yes.
25       Q.   Okay.  What did you do with Lime Light?

53

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1        A.    I worked with it.

 2        Q.    So when you say you worked with it, what do

 3   you mean "worked with it"?

 4        A.    I provided services for the other APIs.  So

 5   if they had an API and you had some questions about

 6   their API and their technical verbiage, you didn't

 7   understand, instead of calling Lime Light and

 8   waiting two days for support, you maybe could call

 9   me and I can better explain you what certain options

10   do or mean.

11        Q.    Okay.  Do you know Doron Nottea?

12        A.    Yes.

13        Q.    How -- when did you meet Doron Nottea?

14        A.    I don't know the date.

15        Q.    Was it before or after you met Alon?

16        A.    I cannot tell you that.

17        Q.    Was it around the same time that you met?

18        A.    Could be.  I'm not sure.

19        Q.    You're not sure because you don't remember;

20   is that correct?

21        A.    I don't remember, yes.

22        Q.    What were the circumstances surrounding your

23   meeting Doron Nottea?

24        A.    Meeting?

25        Q.    Yeah.
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1       A.   I'm not getting the question.
 2       Q.   Have you ever met Doron Nottea?
 3            MR. PARIKH:  Objection; asked and answered.
 4   BY MS. ROBINSON:
 5       Q.   When you met him, how did you meet him?
 6       A.   That's a very vague question.  Are you
 7   asking -- first, like I just told you, I don't know
 8   when I met him, so if I don't know when I met him,
 9   then how can I tell you?  I'm -- I'm not
10   understanding the question.  I mean, if you can just
11   be more specific.
12       Q.   When I asked you how you met Alon Nottea,
13   you said because you guys were in a similar
14   business.  And I'm just asking a similar -- the same
15   question --
16       A.   Okay.
17       Q.   -- about Doron.
18       A.   I'm not sure, but I can probably say that
19   during the times where I knew Alon, then his brother
20   was in the adult business, and he requested services
21   from me for his adult business.
22       Q.   Did you provide services for him?
23       A.   Yes, I did.
24       Q.   What kind of services did you provide?
25       A.   Also Internet related website services.
```

Argaman
FTC v. Bunzai Media Group, Inc., et al.                           2/24/2016

 1    Yeah.

 2         Q.   Do you -- do you know -- have you met Oz

 3    Mizrahi?

 4         A.   I've seen him.

 5         Q.   Have you ever spoken to him?

 6         A.   Yes, I believe I did.

 7         Q.   Have you ever provided any business services

 8    of any kind to Oz Mizrahi?

 9         A.   No.

10         Q.   What about Paul Medina; have you ever met

11    Paul Medina?

12         A.   Yes, I have.

13         Q.   How did you meet Paul Medina?

14         A.   He was working for -- for a company.  I

15    don't know what company he worked for.

16         Q.   Okay.

17         A.   But he was working for a company.  I guess

18    could possibly be BunZai, but I'm not sure.

19         Q.   Okay.  Was he working with Alon Nottea at

20    the time that you met him?

21         A.   Yes.

22         Q.   Okay.  Have you ever done any, provided any

23    business services to Paul Medina?

24         A.   Again, are you talking personally or to --

25    to the business that he worked for?

56

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1     Q.   To businesses that he worked for or owned or
2  operated.
3     A.   Yeah.  If Paul asked me for -- for services,
4  and then I most likely have, yes.
5     Q.   So was that a yes or no?  You have or you
6  haven't?
7     A.   Can you re -- can you ask the question
8  again?
9     Q.   Have you provided, have you worked in a
10 business relationship with Paul Medina?
11    A.   I don't understand the word "relationship."
12    Q.   Is it your testimony that you provided
13 business services to a company that Paul Medina
14 worked for?
15    A.   Yes.
16    Q.   What about Khristopher Bond; have you
17 provided -- do you know Khristopher Bond?
18    A.   I've seen him.
19    Q.   Have you ever spoken to him?
20    A.   Probably, yes.
21    Q.   Have you provided business services for a
22 company that he worked for, owned, or operated?
23    A.   I don't know what he owns or operates.
24    Q.   Have you provided business services?
25         MR. UNGAR:  I'm going to -- I'm going to

57

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    object.  The question is compound, it's vague and

2    ambiguous, it calls for speculation, and it lacks

3    foundation.

4    BY MS. ROBINSON:

5        Q.    You can answer the question.

6        A.    Can you ask the question again?

7        Q.    Have you provided business services to any

8    companies that Khristopher Bond worked for?

9        A.    I'm not --

10             MR. UNGAR:  Same objection.

11             THE WITNESS:  I'm not sure who he worked

12   for.

13   BY MS. ROBINSON:

14       Q.    So you don't know?

15       A.    Don't know what?

16       Q.    You don't know whether you provided business

17   services for a company that he worked for?

18       A.    I don't know who he worked for.

19             MR. UNGAR:  Objection.  Objection.

20   BY MS. ROBINSON:

21       Q.    So yes or no, do you know whether or not --

22             MR. UNGAR:  Objection.  Objection.

23   Objection as to the form of the question.  It's

24   vague and ambiguous, it calls for speculation, and

25   it lacks foundation, and it's argumentative.

58

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    BY MS. ROBINSON:

2        Q.   Do you know whether you provided business

3    services?

4        A.   I -- I don't know who he worked for;

5    therefore, I wouldn't know.

6        Q.   So you don't know; correct?

7        A.   If I -- well, I mean, no.  Of --

8        Q.   What about Igor Latsanovski?  Do you know

9    Igor Latsanovski?

10       A.   Yes.

11       Q.   How did you meet Igor Latsanovski?

12       A.   I've seen him.

13       Q.   Have you ever spoken to him?

14       A.   Yes.

15       Q.   Have you ever provided business services to

16   a company he worked for?

17       A.   I don't know.

18            MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous, it lacks

20   foundation, and it calls for speculation.

21            MR. PARIKH:  You can answer.

22   BY MS. ROBINSON:

23       Q.   You can answer.

24       A.   I don't know who he worked for.

25       Q.   Do you know what company or companies

59

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      operated AuraVie.com?

2              MR. PARIKH:  Object it's vague as to the

3      word "operate."

4              THE WITNESS:  Yeah.  I don't understand the

5      question.

6      BY MS. ROBINSON:

7         Q.   Did -- going back to Exhibit 66, did Adageo,

8      LLC, own the AuraVie.com landing page?

9         A.   I don't know.

10             (Plaintiff's Exhibit 152 was

11             previously marked for identification

12             by the FTC and is attached hereto.)

13     BY MS. ROBINSON:

14        Q.   All right.  I'm going to show you

15     Exhibit 152.

16        A.   Should we take maybe a little break?  Yes or

17     no?

18        Q.   Would you like a break?

19        A.   Can we?

20             MS. ROBINSON:  Sure.  Let's take a break.

21             We'll go off the record for ten minutes.

22             (Recess)

23             (Mr. Tepfer leaves the room.)

24             MS. ROBINSON:  Okay.  Let's go back on the

25     record.

60

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1              Mr. Ungar, are you there?

2              MR. UNGAR:  Present.

3   BY MS. ROBINSON:

4       Q.   Okay.  I'm going to hand you Exhibit 152.

5   And this is an email from Paul Medina to you and two

6   other people; is that correct?

7       A.   Yes.

8       Q.   All right.  Do you know who the Roi R is

9   that this email address refers to?

10      A.   Roi, yeah.

11      Q.   Uh-huh.

12      A.   Yes.

13      Q.   So who is Roi?

14      A.   I'm not understanding the question.  Who's

15  Roi?  What do you mean who's Roi?

16      Q.   Is that Roi Reuveni?

17      A.   Oh, you want his last name?

18      Q.   Is it Roi Reuveni?

19      A.   It says Roi R.

20      Q.   Do you believe that's Roi Reuveni?

21           (Mr. Tepfer enters the room.)

22           THE WITNESS:  Possibly, yeah.

23  BY MS. ROBINSON:

24      Q.   So this email that was from Paul Medina to

25  you and Roi and Alon, is -- it says, "Team, We need

61

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

 1     the following below."

 2              Why was -- why was this email sent to you?

 3              MR. PARIKH:  Objection; calls for

 4     speculation.

 5     BY MS. ROBINSON:

 6         Q.   Do you remember receiving this email?

 7         A.   No.

 8         Q.   Do you know what -- okay.  On Number 3 it

 9     says -- there's handwriting.  It says "CBA."  Do you

10     see that, next -- right below the Number 3, kind of

11     in the middle of the page?

12         A.   Okay.  So your question is?

13         Q.   Do you know what CBA -- do you see it?

14         A.   Yes.

15         Q.   Okay.  Do you know what CBA stands for?

16         A.   No.

17         Q.   Were you on a team or project with Paul

18     Medina, Roi, and Alon?

19              MR. UNGAR:  Objection as to the form of the

20     question.  And it's vague and ambiguous, it's

21     compound.

22              MR. PARIKH:  I'll join in that objection.

23              THE WITNESS:  Can you ask me again?

24              MS. ROBINSON:  Would you mind reading it

25     back.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
 1              (The previous question was read back
 2         by the court reporter as follows:
 3              "QUESTION:  Were you on a team or
 4         project with Paul Medina, Roi, and
 5         Alon?")
 6         THE WITNESS:  Not that I recall.
 7    BY MS. ROBINSON:
 8    Q.   Have you ever worked for any company,
 9    provided IT services -- actually, strike the entire
10    thing.
11         Have you ever provided IT services for any
12    company that sold skin care products by risk free
13    trial?
14    A.   Can you ask again, please?
15    Q.   Mm-hmm.  Have you ever provided IT services
16    for any company that provided skin care services by
17    risk free trial?
18         MR. PARIKH:  Objection.  The question is
19    vague and ambiguous.
20         THE WITNESS:  I mean, I provided IT services
21    to this company BunZai or whoever the company that
22    requested the services from me.  So I -- I don't
23    know exactly what and how they did things.
24    BY MS. ROBINSON:
25    Q.   Okay.  What services did you provide for
```

63

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    BunZai?

2       A.    I don't recall.

3             MR. UNGAR:  Ob- --

4    BY MS. ROBINSON:

5       Q.    What -- what IT services did you provide for

6    Pinnacle Logistics?

7             MR. UNGAR:  Objection as to the form of the

8    question.  It's vague and ambiguous.

9             THE WITNESS:  I don't recall.

10   BY MS. ROBINSON:

11      Q.    Did you provide IT services for Pinnacle

12   Logistics?

13      A.    Possibly.

14      Q.    When you say "possibly," is it because you

15   don't know or you don't remember?

16      A.    I don't recall.

17            MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, and it's

19   argumentative.

20            MS. ROBINSON:  All right.  I'm going to hand

21   you Exhibit 184.

22            (Plaintiff's Exhibit 184 was

23            previously marked for identification

24            by the FTC and is attached hereto.)

25   ///

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
 1    BY MS. ROBINSON:
 2        Q.   Go ahead and take a look at that, and just
 3    let me know when you're done.
 4        A.   Okay.
 5        Q.   Okay.  This is an email to you from Alon --
 6        A.   Yes.
 7        Q.   -- is that correct?
 8             And it's copied to Tal Karasso --
 9        A.   Mm-hmm.
10        Q.   -- and looks like Roi Reuveni.  Do you know
11    who Tal Karasso is?
12        A.   Yes.
13        Q.   And why was -- strike that.
14             How do you know him?
15        A.   Seen him.
16        Q.   Have you spoken to him?
17        A.   Yes.
18        Q.   Do you know who he worked for?
19        A.   No.
20        Q.   Did he work for you?
21        A.   No.
22        Q.   Okay.  Let's see.  It says -- first line
23    says give me your -- excuse me -- "Good meeting
24    regarding call center yesterday".  Do you remember
25    having a meeting about a call center?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

65

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      A.    No.

2      Q.    Do you remember ever having any talks or

3   meetings with Alon about a call center?

4            MR. UNGAR:  Objection as to the form of the

5   question.  It's vague and ambiguous.

6            THE WITNESS:  Don't recall.

7   BY MS. ROBINSON:

8      Q.    Did you ever provide any IT services to

9   Alon, relating to a call center?

10     A.    Possibly.

11     Q.    Do you remember whether you did?

12           MR. UNGAR:  Objection as to the form of the

13  question.  It's vague and ambiguous.

14           THE WITNESS:  Can you ask again what --

15  BY MS. ROBINSON:

16     Q.    You said -- you said "Possibly."  Do you

17  remember providing any IT services or any services

18  related to a call center --

19     A.    No.

20     Q.    -- to Alon?

21           MR. UNGAR:  Objection as to the form of the

22  question.  It's vague and ambiguous.

23  BY MS. ROBINSON:

24     Q.    The second and onto the third line says,

25  "Thank you for stepping up and getting directly

66

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    involved."

2            Do you know what Alon means by that?

3            MR. PARIKH:  Objection; calls for

4    speculation.

5    BY MS. ROBINSON:

6      Q.   And to clarify, my question is do you know

7    what he means by that?

8      A.   No.

9      Q.   Okay.  Did you ever at any point get

10   directly involved in an IT project for Alon?

11           MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13           THE WITNESS:  That's a vague question.  I'm

14   not getting it.

15   BY MS. ROBINSON:

16     Q.   Are you saying you don't understand the

17   question?

18     A.   The question, I don't understand it in the

19   current form that you're presenting it.  No.

20     Q.   Okay.

21     A.   So maybe you want to rephrase it.

22     Q.   Did you provide IT services to Alon?

23     A.   I told you that a few times today.

24     Q.   Yeah, I thought so.

25           So what services did you provide to him?

67

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1        A.    I don't recall.

2        Q.    You don't recall what services you provided

3    to him?

4        A.    At this time, sitting here, I don't recall.

5    I can't -- if you ask me specifically, I might

6    recall --

7        Q.    Okay.

8        A.    -- but right now I don't.

9        Q.    But you don't recall any services relating

10   to a call center; is that your testimony?

11             MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous, and it's

13   argumentative.

14             THE WITNESS:  I don't understand your

15   question.

16   BY MS. ROBINSON:

17       Q.    What part don't you understand?

18       A.    It's too broad.

19       Q.    Do you remember providing any call center

20   services or IT services for a call center for Alon

21   or one of Alon's companies?

22       A.    It depends what you define as IT service.

23       Q.    Did you provide --

24             MR. UNGAR:  Objection.

25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

68

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    BY MS. ROBINSON:

2        Q.    -- any kind of services?

3            MR. UNGAR:  Objection.  Objection as to the

4    form of the question.  It's vague and ambiguous.

5            THE WITNESS:  I don't understand the

6    question.

7    BY MS. ROBINSON:

8        Q.    Okay.  Did you provide any services of any

9    nature for a call center for Alon or for one of

10   Alon's companies?

11           MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.

13           THE WITNESS:  I don't recall.

14   BY MS. ROBINSON:

15       Q.    Did you -- strike that.

16           Have you worked for a company that provided

17   IT services for Media Urge, Inc.?

18           MR. UNGAR:  Objection as to the form of the

19   question.  It's vague and ambiguous.

20           THE WITNESS:  I don't understand the

21   question.

22   BY MS. ROBINSON:

23       Q.    Which part is confusing to you?

24       A.    You're asking me about Media Urge, and I'm

25   not sure if -- I don't know if I provided services

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    to Media Urge, Inc., or whatever the company's name
2    is in specific, so I can't really answer this
3    question in the form you're asking me.  I already
4    told you that I provided IT services, but you're
5    asking me specifically to a company that I cannot
6    say yes because I don't know.
7        Q.   Have you ever worked for a company that
8    provided IT services for CalEnergy, Inc.?
9        A.   No.
10       Q.   Have you ever worked for a company that
11   provided IT services for Adageo, LLC?
12       A.   Not to my recollection, no.
13       Q.   Okay.  If we look back at -- I showed you
14   Exhibit 60 -- Exhibit 54-ish -- it was an invoice.
15   There we go.  If we look back at Exhibit 66 --
16       A.   Sure.
17       Q.   -- it's an invoice from Secured Commerce to
18   Adageo, LLC.  Does that refresh your recollection?
19       A.   We talked about this invoice quite a bit,
20   and I told you what I think about this invoice, is I
21   don't recall exactly this invoice, but this amount,
22   if it was paid and collected, it was probably for
23   money owed for an AuraVie.com straight sale website
24   project that I've done.
25       Q.   Okay.  And who did you do that project for?

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1          MR. UNGAR:  Move to strike as not
2     responsive.
3     BY MS. ROBINSON:
4          Q.   Who did you do that project for?
5          A.   Can you -- can you ask me again?
6          Q.   Yeah.
7               The project that you described that this,
8     this invoice here --
9          A.   Yeah.
10         Q.   -- you described a project that was in this
11    invoice.
12         A.   Yeah.
13         Q.   Who did you provide that project for?
14         A.   From what I recall, SBM Management.
15         Q.   Okay.
16              MR. UNGAR:  Objection.  Objection as to the
17    form of the question.  It misstates the previous
18    testimony of the witness, it's vague and ambiguous,
19    it's badgering, and it's argumentative.
20    BY MS. ROBINSON:
21         Q.   Who did you speak to or with at SBM about
22    the project?
23         A.   SBM -- can you ask the question again --
24         Q.   Sure.
25         A.   -- 'cause I'm --

71

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1      Q.    Who did you speak to at SBM Management about
2    the projects that you described?
3      A.    What do you mean "speak to"?  Speak to about
4    life or business or what?
5      Q.    About the project that you just described.
6      A.    About the AuraVie.com?
7      Q.    Yes.
8      A.    AuraVie.com project?  I don't remember
9    exactly who was -- it was most likely some of or all
10   of the -- because I don't know exactly who, I'm
11   going to say I don't remember who I spoke to, but
12   this project, AuraVie.com straight sale, was
13   requested to by the client.
14     Q.    And your testimony is the client was SBM
15   Management?
16     A.    Oh, yes.
17     Q.    Right.
18           Do you -- do you know why Adageo paid you
19   for a project you performed for SBM Management?
20     A.    I have no idea.
21           MR. UNGAR:  Objection as to the form of the
22   question.  It's vague and ambiguous, misstates the
23   prior testimony of the witness, it's argumentative,
24   and it's badgering.
25   ///

72

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

 1    BY MS. ROBINSON:
 2        Q.   You just testified that you provided the
 3    AuraVie.com web page IT services for SBM Management;
 4    is that correct?
 5        A.   SBM Management wasn't my client.
 6        Q.   Yes.
 7             Did you ever provide any other IT services
 8    or business services to SBM Management?
 9        A.   Possibly.
10             MR. UNGAR:  Objection as to the form of the
11    question.  It's vague and ambiguous.
12    BY MS. ROBINSON:
13        Q.   Do you remember any other projects you
14    provided for SBM Management?
15        A.   No, I don't.  I already stated that I don't.
16    I told you that I don't recall the exact services I
17    gave, but -- but a website AuraVie.com was a service
18    that I did provide.
19        Q.   Have you ever worked for a company that
20    provided IT services to Focus Media Solutions?
21        A.   Yes.
22        Q.   What kind of services did you provide to
23    Focus Media Solutions?
24        A.   Hosting, consultation, insurance, leads,
25    related stuff.  Life insurance.  Yeah.

73

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      Q.   Did you ever provide any IT services for

2   Focus Media Solutions relating to skin care

3   products?

4      A.   No.

5      Q.   Did you ever work for a company that

6   provided IT services to Agoa Holdings, Inc.?

7      A.   No.

8      Q.   Did you ever work for a company that

9   provided IT services to Zen Mobile Media, Inc.?

10      A.   No.

11      Q.   Did you ever work for a company that

12   provided IT services to Safehaven Ventures, Inc.?

13      A.   I don't recall.

14      Q.   Did you ever work for a company that

15   provided IT services to Heritage Alliance Group,

16   Inc.?

17      A.   I don't recall.

18      Q.   Did you ever work for a company that

19   provided IT services to AMD Financial Network, Inc.?

20      A.   I don't recall.

21      Q.   Did you ever work for a company that

22   provided IT services to Kai Media, Inc.?

23      A.   I don't recall.

24      Q.   Did you ever work for a company that

25   provided IT services to Insight Media, Inc.?

74

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1         A.    Don't recall.

2         Q.    Did you ever work for a company that

3    provided IT services to DMA Holdings, Inc.?

4         A.    I don't recall.

5         Q.    Did you ever work for a company that

6    provided services, IT services, to DSA Holdings,

7    Inc.?

8         A.    I don't recall.

9         Q.    Did you ever work for a company that

10   provided services to Lifestyle Media Brands, Inc.?

11        A.    Don't recall.

12        Q.    Did you ever work for a company that

13   provided services, IT services, to USM Products,

14   Inc.?

15        A.    Don't recall.

16        Q.    Did you ever work for a company that

17   provided IT services to Merchant Leverage Group,

18   Inc.?

19        A.    Don't recall.

20        Q.    Did you ever work for a company that

21   provided IT services to Shalita Holdings, Inc.?

22        A.    Don't recall.

23        Q.    Did you ever work for a company that

24   provided services to All Star Beauty Products, Inc.?

25        A.    Don't recall.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1      Q.   Did you or Secured Merchants ever contest

2   consumer chargebacks for AuraVie products?

3           MR. PARIKH:  I'm going to object as to the

4   word "contest."

5           THE WITNESS:  Yeah.

6   BY MS. ROBINSON:

7      Q.   Did Secured Merchants ever provide any IT

8   services related to consumer chargebacks for AuraVie

9   products?

10     A.   Can you repeat that question a little

11  slower?

12          MS. ROBINSON:  Would you mind --

13          THE WITNESS:  A little slower?

14          MS. ROBINSON:  -- reading it slower than I

15  said it.

16          (The previous question was read back

17          by the court reporter as follows:

18             "QUESTION:  Did Secured Merchants

19          ever provide any IT services related

20          to consumer chargebacks for AuraVie

21          products?")

22          THE WITNESS:  Yes.

23  BY MS. ROBINSON:

24     Q.   What were those services?

25     A.   Those services allowed the customer to

76

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    review bank documents that came into their

2    repository, storage, or system.  It allowed them to

3    review the bank documents.  I assume some were

4    chargeback, but I'm not -- not only chargebacks.

5    Determine if there were any mistakes for customers,

6    determine if there were any fraud, determine what

7    the bank is asking for.  Basically, review the

8    documents that they received from the bank and

9    respond accordingly.  After reviewing, to -- in

10   order to ensure and to protect the customer's bank

11   interest and -- best interest, and to also -- and

12   also to fulfill their obligation with the banks that

13   send these documents, so I -- we provided a review

14   portal so they can transmit back via fax the

15   document to the bank.

16        Q.    Did -- when you say in that description,

17   when you say customer, you meant the customer, as in

18   the company that was selling the product and

19   receiving the chargeback, not the customer who

20   purchased?

21        A.    Well, I mean, it was kind of a lengthy

22   answer, so I'm not sure.

23        Q.    Okay.

24        A.    So let me make it a little shorter.

25              Basically, the client, which would be SBM

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    Management in this case, would be able to review

2    documents and respond only -- respond more correctly

3    and accurately, accurately; therefore, ensuring and

4    protecting the integrity of the response to -- back

5    to the banks, which makes it more accurate.

6         Q.   Did that program have a name?

7         A.   Yes.

8         Q.   The program that you --

9         A.   Yes.

10        Q.   What was it called?

11        A.   Secured Merchants.

12        Q.   It was called Secured Merchants program?

13        A.   Well, did the program have a name?  It was

14   the name of a service that I -- that I have in

15   Secured Merchants, and I described the service to

16   you, but --

17        Q.   Yes.

18             Did you provide that service to any other

19   companies, besides SBM Management, Inc.?

20        A.   Yes.  So this was an up and coming service,

21   and it was provided -- it was in its infancy.  So I

22   was developing it to make sure it's good, friendly

23   system, and I was able to have a few clients on it,

24   yeah.  I had -- to answer your question, yes, there

25   were more clients on the system and -- and more were

78

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    looking forward to sign up.

2         Q.    What is Chargeback Armor?

3         A.    It's similar to what I just described.

4         Q.    Okay.  Do you know who designed Chargeback

5    Armor?

6              MR. PARIKH:  Objection; vague.

7              THE WITNESS:  I don't understand the

8    question.

9    BY MS. ROBINSON:

10        Q.    Do you know who -- scratch that.

11             So you know what Chargeback Armor is;

12   correct?

13        A.    The way you're stating it --

14        Q.    Mm-hmm.

15        A.    -- I would have to say no.

16        Q.    Okay.

17        A.    Are you -- I mean, I'm not going to ask

18   questions for you, but the way you're stating it, I

19   have to say no.

20        Q.    Okay.  If we can look back at Exhibit 184.

21   Would you -- I've handed it to you.

22        A.    Okay.

23        Q.    It's going to say 184 at the bottom.  It was

24   an email from you to Alon.  It looks like this

25   (indicating).

79

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1        A.    Okay.  Go ahead.

2        Q.    Should be in your stack there.

3        A.    Go ahead.

4        Q.    Down at the bottom of it, the last full

5   paragraph, I guess, it says excited about sales call

6   and boarding of the first customer for Chargeback

7   Armor.  And then it says, "as you mentioned" -- and

8   again, this email is written to you.  So "as you

9   mentioned, we need to have a meeting in order to

10  discuss a few points with respect to the launch of

11  these companies."

12        Do you know what this email is about?

13       A.    You want to point me where -- where you --

14  okay.  Okay.  I will read it.

15       Q.    Okay.  Yeah, please.  Take your time.

16       A.    Okay.  Go ahead.

17       Q.    Okay.  So do you know what this paragraph is

18  talking about when it says "the boarding of the

19  first customer for Chargeback Armor"?

20        MR. PARIKH:  Object.  Calls for speculation.

21        THE WITNESS:  Well, it says that -- how can

22  I know what it says if I didn't write it?  So I

23  guess I would say no, I don't know what he meant by

24  that.

25  ///

Argaman
FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    BY MS. ROBINSON:

2        Q.   Okay.  Do you remember a time when -- strike

3    that.

4             What was your role with Chargeback Armor?

5        A.   I just told you before that Chargeback Armor

6    is -- is -- I don't know what -- what it is in the

7    format that you're presenting it.  You asked me if

8    Secured Merchants was working with or give IT

9    services in relation to chargeback.

10       Q.   Mm-hmm.

11       A.   But you didn't say Chargeback Armor.  You

12   said chargeback.

13       Q.   Okay.

14       A.   And that, I said, and I explained to you

15   what it does.  But you keep on saying Chargeback

16   Armor --

17       Q.   Then I think we can --

18       A.   -- and confusing --

19       Q.   We can stop and have the court reporter read

20   it back to us, if you would like, but --

21       A.   We could.  I mean --

22       Q.   I'm fairly certain you described it, and I

23   said, "So what is Chargeback Armor?", and you said

24   it's similar to what I just described.  Would you

25   want us to go back and read it?

81

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1          MR. PARIKH:  You did say that.

2          MR. UNGAR:  Well, hold on, everybody.  Hold

3    on, everybody.  I'm going to object as to the form

4    of the question.  It's vague and ambiguous.  It's

5    improper in form.

6    BY MS. ROBINSON:

7       Q.   Go ahead.

8       A.   You can -- you can -- I'm -- you can ask me

9    again what you like, and I'll do my best to answer.

10      Q.   Okay.  So do you know, do you know about a

11   software program called Chargeback Armor?

12      A.   Again, you're assuming that it's a software

13   program.  So the way you're asking the question, it

14   has an assumption within the question, so -- so I

15   have to say no because I don't think your assumption

16   is correct.

17      Q.   Okay.  So what is Chargeback Armor?

18      A.   But you asked me this question.  This is for

19   the fifth time you're asking me the same question.

20   Chargeback Armor is a name.  That -- that's what it

21   is.

22      Q.   What is it a name for?

23      A.   What is the name for --

24      Q.   Mm-hmm.

25      A.   -- you're asking me?

82

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1        Q.    Yes.

2        A.    It's a name that can be used for something.

3        Q.    Is it your testimony that you don't know

4    what Chargeback Armor is?

5              MR. UNGAR:   Objection as to the form of the

6    question.  It's vague and ambiguous, and it's

7    argumentative.

8              THE WITNESS:   The way you're -- the way -- I

9    have -- I think I have a clue of where you're going,

10   but the way you're asking me, I have to answer

11   correctly, so my answer is that I don't understand

12   your question, and if you rephrase it, maybe I can

13   answer you.

14   BY MS. ROBINSON:

15       Q.    Which part of the question is confusing?

16       A.    Chargeback Armor, we're talking about a

17   name.  So if you -- if you tell me where you want to

18   go with this name, then maybe I'll understand where

19   you're going.  I'm just not getting it.  It's a

20   name.

21       Q.    Have you ever worked on anything called

22   Chargeback Armor?

23       A.    Yes.

24       Q.    Okay.  So what did you do?

25       A.    Again, the way you're asking the question,

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    there's nothing I did, nothing that I did.  Are you

2    asking me -- I mean, I'm not going to put words in

3    your mouth, but again, the way you're asking me the

4    question, I didn't do anything.

5        Q.   You didn't do anything relating to anything

6    called Chargeback Armor; is that your testimony?

7        A.   Again, I'm going to say that the way you're

8    asking the question, I -- I have to answer it

9    correctly, so I would -- I'm just confused as to the

10   nature of your question.  So if you can please be

11   specific so I can answer correctly, it would really

12   help us.

13       Q.   Okay.  Okay.  So have you ever heard of a

14   program of any kind called Chargeback Armor?

15       A.   Again, you're using the word "program," so

16   you're making an assumption that it's a program,

17   but --

18       Q.   Are you aware of any program, product,

19   service --

20       A.   Service, yes.

21       Q.   Okay.  A service called Chargeback Armor,

22   you're aware of a service called Chargeback Armor;

23   is that correct?

24       A.   No, it's not correct.  I'm aware of -- of --

25   of a service that could be related to -- to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

84

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1    Chargeback, but again, your question is -- is a bit

2    confusing 'cause I'm not understanding the exact of

3    it, but --

4        Q.   Have you ever heard of anything called

5    Chargeback Armor?

6        A.   Yes.

7        Q.   Okay.  How would you describe it?

8        A.   I would describe Chargeback Armor as a -- as

9    a service being offered by Chargeback Armor, Inc.

10       Q.   Okay.  Is Chargeback Armor -- strike that.

11            Chargeback Armor, what is your

12   involvement -- strike that.

13            Have you provided any IT services to

14   Chargeback Armor, Inc.?

15       A.   Yes, of course.

16       Q.   What have you provided?

17       A.   Whatever they requested.

18       Q.   Okay.  So what services did you provide?

19       A.   Whatever they requested.

20       Q.   I'm going to strike as nonresponsive.

21            But what did they request?

22       A.   Boarding of clients.  Hey, we have a new

23   client we signed up, and we need to integrate to

24   their gateway.  Those -- those are the types --

25       Q.   Okay.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

```
 1      A.    -- of requests.
 2      Q.    Okay.  So -- and who at Chargeback Armor did
 3  you get those requests from?
 4      A.    Mike Costache.
 5      Q.    Can you spell the last name for me, please?
 6      A.    I can't spell.
 7      Q.    Okay.
 8      A.    I'm not a good speller.  Sorry.
 9      Q.    Okay.  So let's go back to Exhibit 184,
10  where it says -- that paragraph we were just talking
11  about --
12      A.    Yeah.
13      Q.    -- toward the bottom, boarding of the first
14  customer for Chargeback Armor.  Do you know if
15  that's talking about the first customer for
16  Chargeback Armor, Inc.?
17            MR. PARIKH:  Objection; calls for
18  speculation.
19            THE WITNESS:  I didn't write this document.
20  I don't know.
21  BY MS. ROBINSON:
22      Q.    But it is to you, so I just want to make
23  sure that you're thinking about that.
24            And were you involved at the time that
25  Chargeback Armor, Inc., got its first customer?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                               2/24/2016

```
 1      A.   If you look at the dates and the date
 2   Chargeback Armor, Inc., was informed, then you'll be
 3   able to understand that the dates conflict with each
 4   other.  So it cannot be that -- that I was involved
 5   because Chargeback Armor, Inc., I believe, started
 6   business on -- and I might be mistaken, but on
 7   February of 2015, if I'm not mistaken.
 8      Q.   Okay.
 9      A.   I think so.
10      Q.   Did Chargeback Armor, the service that you
11   described earlier, exist before Chargeback Armor,
12   Inc.?
13           MR. UNGAR:  Objection as to the form of the
14   question.  It's vague and ambiguous.
15           THE WITNESS:  Chargeback Armor, the server,
16   the service, as I mentioned to you before, is
17   your -- opened on February 2015, Chargeback Armor,
18   Secured Merchant -- sorry.  Chargeback Armor -- a
19   chargeback system, back response system, the way I
20   described before, without the Armor, was serviced a
21   bit by Secured Merchant, by my company.  So as I
22   mentioned, I did perform IT services for chargeback,
23   as we mentioned before, and I -- and I described to
24   you what Secured Merchant did as that.
25   ///
```

87

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    BY MS. ROBINSON:

2       Q.   Are you aware of anyone providing services

3    under the name Chargeback Armor before February

4    2015?

5       A.   It wasn't existing.  The company didn't

6    exist.

7       Q.   Okay.  I'm going to hand you this

8    Exhibit 149.

9            (Plaintiff's Exhibit 149 was

10           previously marked for identification

11           by the FTC and is attached hereto.)

12   BY MS. ROBINSON:

13      Q.   And I only have one copy.  I apologize.

14      A.   Okay.

15      Q.   You can share.

16           This is an email from you --

17      A.   Okay.

18      Q.   -- to Alon, Roi, Paul Medina, and Doron.

19      A.   Okay.

20      Q.   And down in the middle of it -- all right.

21   Well, first it says, "Hi Team.  Here's a short

22   update in regards to running projects."  Is that

23   correct, that's how it starts?

24      A.   Yes.

25      Q.   Okay.  And it mentions several -- towards

88

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1    the middle of the page it mentions
2    Chargebackarmor.com or ChargebackStars.com
3    Chargeback.pro.com.
4        A.    Sure.
5        Q.    And then there's a soft launch demo
6    scheduled for anytime after 7/13; is that correct?
7    Am I reading that correct?
8        A.    Sure.
9        Q.    Okay.  And this was sent -- it was sent by
10   you, it looks like July 1, 2013; is that correct?
11       A.    Yes.
12       Q.    Okay.  So was there -- so this mentions
13   chargebackarmor.com; is that correct?
14       A.    Yes, it does.
15       Q.    So were you aware of anyone providing
16   services under the name Chargeback Armor?
17       A.    Yeah.  So as this document states, these are
18   three names, chargebackarmor.com, ChargebackStars
19   or -- and it says or, or, or -- two ors and three
20   names.  And as I stated before, it's a name.
21   Chargeback Armor, Chargeback Star, Chargeback Pro
22   are just names.  Providing services of chargeback of
23   any kind was done by Secured Merchant, LLC.   I
24   mentioned that to you.
25       Q.    Are you aware of any way that the chargeback

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    services Secured Merchants provides to the AuraVie

2    products was different from those provided by

3    Chargeback Armor?

4         A.   It was completely different.

5         Q.   In what way?

6         A.   My services were my services, and Mike's

7    services were his services.

8         Q.   So how were they different?

9         A.   Each person does business a different way.

10   They perform businesses, give services in their own

11   required way.  I don't know.  I told you about my

12   services.  If you want to ask, you can ask Mike how

13   he provided his services.

14        Q.   So when you testified that they were

15   completely different, in what way were they

16   completely different?

17        A.   I meant completely different.  They were two

18   different businesses.  So two different businesses

19   to me is completely different.

20        Q.   So how were the services different?

21        A.   Ask Mike.  I told you my services.  I can't

22   tell you his services.

23        Q.   So it's your testimony that you don't know

24   what Chargeback Armor, Inc., did?

25        A.   That wasn't my testimony.  I didn't say

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    that.

2        Q.    Okay.  So what does Chargeback Armor do?

3        A.    I'm assuming they give IT services.  So that

4    would be my testimony.  I mean, that's their name,

5    Chargeback Armor; right?

6        Q.    Mm-hmm.

7        A.    So you would assume that they would do that.

8        Q.    And you had chargebackarmor.com, as a

9    website, soft launch for sometime after --

10       A.    Yeah.

11       Q.    -- July 13; is that correct?

12       A.    You're asking me the question and kind of

13   giving me the answer at the same time.  Are you

14   asking is that correct?  So that is incorrect, the

15   way you're stating it.

16       Q.    Okay.  So state it in a way that would be

17   correct.

18       A.    The correct way to say, that as a

19   businessperson, I -- I put -- I wrote that there

20   should be a soft launch scheduled on 7/1/13, beta

21   launch 8/1/13.  However, from my recollection, soft

22   one -- soft launch dates such as this one almost

23   don't occur in that time, at least this one didn't.

24   It always takes longer.

25       Q.    Mm-hmm.  So this -- so this Exhibit 149

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    here, it says that the soft launch was scheduled for

2    7/1/13.  You just read that.

3        A.   Yeah.

4        Q.   Beta launch 8/1/13, commercial launch

5    9/1/13.  Is that what it says?

6        A.   But it was never launched.

7        Q.   It was never launched, however.  But then --

8    and if you go back to Exhibit 184 --

9        A.   One.

10       Q.   -- down at the bottom, this is the email we

11   talked, looked at several times now --

12       A.   Yeah.

13       Q.   -- it says -- and this email is dated

14   9/2014 --

15       A.   Yeah.

16       Q.   -- and it says excited first customer for

17   Chargeback Armor.  Is that related to the commercial

18   launch in your email?

19            MR. UNGAR:  Objection as to the form of the

20   question.  It's vague and ambiguous.

21            MR. PARIKH:  Same objection.

22            THE WITNESS:  I don't know what this email

23   meant.  It doesn't look to be related to me, though.

24   BY MS. ROBINSON:

25       Q.   Okay.  It was -- it was addressed to you,

92

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

 1    though; correct?  Do you think --

 2        A.   I'm not sure it was -- can you ask your

 3    question again?

 4        Q.   Yeah.

 5             The email was addressed to you?

 6        A.   I see other people on -- on the -- on the

 7    email.

 8        Q.   On this -- on the copy to line; right, but

 9    the email was addressed to you?

10        A.   It's addressed to a few people.

11        Q.   Okay.  At the very top where it says the

12    salutations, it says "Avile."  Is that you?

13        A.   I'm one of the names it's addressed to, yes.

14        Q.   No, I'm talking about not the email

15    addresses, but just talking about --

16        A.   Yes.

17        Q.   -- the name.  Right above where it says

18    "Good meeting regarding call center yesterday,"

19    Avile, is that you?

20        A.   No.

21        Q.   Okay.  You don't ever go by Avile?

22        A.   This is not my name.

23        Q.   Okay.  So do you remember responding to this

24    email, saying I have no idea what you're talking

25    about?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1        A.    I respond to so many emails.

2        Q.    Okay.

3        A.    I wish that I could tell you that I do

4   remember --

5        Q.    Do you remember --

6        A.    -- but I have no idea.

7        Q.    If you got a big long email and you had no

8   idea what they were talking about --

9        A.    This is the first I see this.  I don't

10   remember this email at all.

11        Q.    Okay.  So did you ever, in the context of

12   providing IT services for Chargeback Armor, Inc.,

13   did you speak with anybody other than Mr. -- and I'm

14   going to butcher his name -- Casit?

15        A.    Costache.

16        Q.    Costache.  I'm sorry.

17              Did you speak with anybody other than

18   Mr. Costache at Chargeback Armor, Inc.?

19              MR. PARIKH:  At what point in time?

20   BY MS. ROBINSON:

21        Q.    In the context of when you're providing the

22   IT services to -- so strike -- let me start over

23   with the question.

24              In the con- -- while you're providing IT

25   services to Chargeback Armor, Inc., did you speak

94

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    with anyone other than Mr. Costache?

2        A.    Mike was my point to guy.   Yeah.

3        Q.    Point to.

4              When did you start providing services to

5    Chargeback Armor, Inc.?

6        A.    I don't know the date.

7        Q.    Was it -- strike that.

8              Did Mr. Costache have any conversations with

9    you, prior to starting Chargeback Armor, Inc., about

10   using your website chargebackarmor.com?

11       A.    Possibly, yes.

12       Q.    Did you sell it to him?

13       A.    No.

14       Q.    Okay.  Did he -- did he use Chargeback --

15   did Chargeback Armor, Inc., use the website

16   chargebackarmor.com?

17             MR. PARIKH:  Objection; calls for

18   speculation.

19             THE WITNESS:  Not sure.

20   BY MS. ROBINSON:

21       Q.    You're not sure if it did or not; is that

22   your, what you're saying?

23       A.    I'm not sure.

24       Q.    Okay.  Did you have any conversation with

25   Mr. Costache about Chargeback Armor, Inc., using

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

95

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    chargebackarmor.com?

2         A.    Probably.

3         Q.    What were those conversations about?

4         A.    I don't recall.

5         Q.    Did anyone pay you any money for the

6    Chargeback Armor system -- services?

7               Did anyone pay you any money for Chargeback

8    Armor services?

9         A.    I just want to think out loud here.

10        Q.    Okay.

11        A.    I mean, if Chargeback Armor was serviced via

12   Chargeback Armor, Inc., then how can people pay me

13   money?  They pay Chargeback Armor, Inc.

14        Q.    So Secured Merchants invested 250,000 in

15   Chargeback Armor, Inc.; is that correct?

16        A.    Yes, that's correct.

17        Q.    Did you receive any kind of business plan

18   prior to your investment?

19        A.    Yes.

20        Q.    Okay.  Do you still have a copy of that

21   business plan?

22        A.    It was a verbal business plan.

23        Q.    Did you -- what did you -- what did Secured

24   Merchants receive for the 250,000?

25        A.    Secured Merchant invested 250,000 in

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1    Chargeback Armor, Inc., as a startup company headed
2    by CEO Mike Costache --
3       Q.    Mm-hmm.
4       A.    -- who I talked to in great length, and he
5    convinced me that he can take the company to the
6    next level and bring clients and be -- and make it a
7    successful company.  It looked like a very good
8    business opportunity for Secured Merchant, and the
9    money was invested, and everything was going well
10   until the FTC came and ruined the plan, shall we
11   say.
12      Q.    Did Secured Merchants receive an ownership
13   in percentage for its investment, or did it receive
14   any kind of --
15      A.    Secured Merchant made a business deal that
16   was viable for them.  The main two points of the
17   deal was that at least half, if not more of that
18   same money that Secured Merchant gave, would come
19   back to Secured Merchant for its services that it
20   required.  So it was not like a lost investment
21   because half of that money would come back, at
22   least, and an unknown amount of ownership that was
23   supposed to be decided four months down the line,
24   after the inception of the company of Chargeback
25   Armor, Inc., was again interrupted by this lawsuit.

97
Argaman
FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1    So no ownership was able to be given to Secured
2    Merchant, but it -- on paper, for -- for me, as a
3    single member, Secured Merchant, LLC, operator and
4    owner, it looked like a very good opportunity for a
5    startup business, with great service to help and
6    protect the consumers and giving them proper
7    representation of IT, of services, in regards to
8    banking and chargebacks.
9        Q.   So the one half that would come back in
10   services, do you mean IT services or --
11       A.   I can't say exactly, but I'm -- half could
12   be the more, could be less, but obviously, a lot of
13   it did come back before, again, the situation
14   occurred here, so --
15       Q.   Was Secured Merchants the exclusive provider
16   of IT services and support --
17       A.   Yes.
18       Q.   -- for Chargeback Armor support?
19       A.   I believe so.  Yes.
20       Q.   And why did you decide to wait four months
21   down the line to determine ownership?
22       A.   Because Mike is a professional entrepreneur
23   with lot of experience in investment banking, and he
24   suggested that we wait four months down the line to
25   see what kind of investment opportunities are there

98

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      before any ownership gets assigned to me.

2           Q.    Who came up with the name Chargeback Armor?

3           A.    I don't know.

4           Q.    Did you create the website for Chargeback

5      Armor?

6           A.    I think -- I'm not sure.

7           Q.    Okay.  You mentioned before that Mike

8      convinced you that he could take the company to the

9      next level, which is why you invested in Chargeback

10     Armor, Inc.; is that right?

11          A.    Yes.

12          Q.    So was there a company that was already

13     existing, that he was going to take to the next

14     level?

15          A.    No.  The company was not in existence.

16          Q.    Did Mike Costache develop the method that

17     Chargeback Armor used to respond to chargebacks?

18          A.    You can ask him.

19          Q.    What did you think that Mike was going to

20     take to the next level?

21          A.    The business.

22          Q.    And was it a business that was already in

23     existence?

24          A.    Asked me this question five times already,

25     so --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1      Q.   Mm-hmm.

2      A.   I told you this business was not in

3  existence because it's open on February 2015.  If --

4  again, could be --

5      Q.   Was --

6      A.   -- a little off on the date, but that's --

7  that's, to my recollection, was the day that it

8  opened.  So how can there be business before

9  business opens?

10      Q.   Did you ever provide a business that you

11  called Chargeback Armor prior to the company

12  opening?

13      A.   Again, you asked me ten times already, and

14  if it's not ten times, it's definitely a few times.

15  I told you I provided services under Secured

16  Merchants.

17      Q.   Did you ever use the name Chargeback Armor

18  as you were providing those services?

19      A.   No.  That name is not used in -- in -- it's

20  just a name.  So what -- what do you mean "used that

21  name"?  I'm not getting you.  Again, we're going

22  back to the same subject we talked before.

23      Q.   Okay.  So --

24      A.   Secured Merchant, LLC, provided IT services

25  that were for -- again, we -- I gave you the

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

 1    explanation of what Secured Merchant did.  It was
 2    under the Secured Merchant, LLC, umbrella.  That's
 3    it.  It did not provide under some names.
 4        Q.   So I just want to be extremely clear --
 5        A.   Okay.
 6        Q.   -- because I'm not --
 7        A.   Okay.  You can ask me again.
 8        Q.   -- that you never used the name Chargeback
 9    Armor relating to --
10             MR. UNGAR:  Objection.
11    BY MS. ROBINSON:
12        Q.   -- services provided by Secured Merchants?
13             MR. UNGAR:  Objection as to the form of the
14    question.  It's vague and ambiguous, it's badgering,
15    it's badgering, and it's argumentative.
16             MR. PARIKH:  I'm also going to object that
17    it's been asked and answered.
18             THE WITNESS:  I answered you already.
19    BY MS. ROBINSON:
20        Q.   And what was your answer?
21        A.   What was my answer that I answered you
22    before?
23        Q.   Mm-hmm.
24        A.   Ask me the question again.  I'll try to
25    recall --

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                   2/24/2016

1       Q.    Okay.

2       A.    -- but I mean, I don't know exactly.

3       Q.    Okay.

4       A.    If I don't know your exact question, how can

5    I tell you what the exact answer was?

6       Q.    Did you ever use the name Chargeback Armor

7    in connection with chargeback services provided by

8    Secured Merchants?

9       A.    No.  Chargeback -- chargebacks in my

10   business, I use Secured Merchant, LLC.  I invoiced

11   clients under Secured Merchant, LLC.  Not any other

12   name.

13      Q.    Okay.

14            MR. PARIKH:  Can we take a break?

15            MS. ROBINSON:  Sure.

16            MR. PARIKH:  Five minutes?

17            MS. ROBINSON:  Let's do five minutes.

18            (Recess)

19   BY MS. ROBINSON:

20      Q.    Okay.  You described earlier the process

21   service you provided -- that Secured Merchants

22   provided relating to chargebacks --

23      A.    Sure.

24      Q.    -- for Alon --

25      A.    Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

102

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1      Q.    -- for SBM Management, Inc. --

2      A.    Right.

3      Q.    -- is that correct?

4      A.    Yes.

5      Q.    And as part of that service, did you review

6   any of the documents that you were sent, that came

7   from the banks or was sent back to the banks?

8      A.    No.

9      Q.    So how did you provide the service, without

10  reviewing the documents?

11     A.    It's -- you just don't open the document.  I

12  mean, it's their documents, not my documents.

13  Why -- why would I want to open their documents?

14     Q.    So earlier, I -- earlier you were

15  describing -- and I believe you used the word

16  "platform."  So was what service you provided was a

17  platform for other people to review documents?  I'm

18  just trying to make sure I understand.

19     A.    I -- platform is a technical name.

20     Q.    Okay.

21     A.    So whether we want to call it platform or

22  not platform, it's -- it's -- again, that's just a

23  name.  What I provided, again, was the ability for

24  them to receive documents and review them before

25  they respond, to make sure that customers' best

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1    interests is in line and banks get their response

2    according to their regulations, whatever they may

3    be.  That's it.

4       Q.   Okay.  Did you ever create any reports about

5    numbers of chargebacks or results of chargebacks for

6    SBM Management?

7       A.   No.

8       Q.   Okay.  So did you ever make any documents

9    that kept track of the numbers of --

10      A.   No.

11      Q.   -- chargebacks?

12           And you testified earlier that you don't

13   remember who you spoke to at SBM Management about

14   these services; is that correct?

15      A.   Are you asking me right now what I testified

16   earlier?  'Cause I don't -- I mean, you can ask me

17   the question again if -- but if it's --

18      Q.   Do you remember?

19      A.   -- the same question, then I ask you please

20   don't ask me the same question twice, if it's okay

21   to ask that.

22      Q.   I will ask do you remember who you spoke

23   with, with SBM Management, about providing these

24   chargeback services?

25      A.   Sure.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1          MR. PARIKH:  Objection; asked and answered.

2     BY MS. ROBINSON:

3          Q.   You can answer.

4          A.   I did answer already.

5          Q.   You can answer now.

6          A.   No, I answered.  I answered this question

7     earlier.

8          Q.   You can answer it now.  He's objected, but

9     you need to go ahead and answer.

10         MR. PARIKH:  I mean, you can check the

11    record.  I'm not going to have him answer the same

12    question again.

13         MS. ROBINSON:  Well, he did answer it

14    differently the second time.

15         THE WITNESS:  I did answer it differently

16    the second time?

17    BY MS. ROBINSON:

18         Q.   The first time you said you didn't remember

19    who you spoke to at SBM Management, which is what

20    I've just asked you; is that correct, that you don't

21    remember anything of --

22         A.   Well, right now you're telling me what I

23    answered.  So if you want to go for the record, then

24    you can see what my answer is.

25         MS. ROBINSON:  Okay.  Sure.  Can you search

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                        2/24/2016

```
 1    by word?  Can you do, like, a word search?  Look up
 2    SBM Management?  There was a question sometime back
 3    about if he remembers who he spoke to at SBM about
 4    chargebacks, about providing chargeback services.
 5              (The previous questions and answers
 6              were read back by the court reporter
 7              as follows:
 8                  "QUESTION:  Who did you speak to
 9              at SBM Management about the projects
10              that you described?
11                  "ANSWER:  What do you mean
12              "speak to"?  Speak to about life
13              or business or what?
14                  "QUESTION:  About the project
15              that you just described.
16                  "ANSWER:  About the AuraVie.com?
17                  "QUESTION:  Yes.
18                  "ANSWER:  AuraVie.com project?  I
19              don't remember exactly who was -- it
20              was most likely some of or all of
21              the -- because I don't know exactly
22              who, I'm going to say I don't
23              remember who I spoke to, but this
24              project, AuraVie.com straight sale,
25              was requested to by the client.")
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

 1   BY MS. ROBINSON:

 2      Q.   So has any of our conversation and the

 3   document you reviewed since you've answered that

 4   question refreshed your recollection --

 5      A.   Yeah.

 6      Q.   -- about who you spoke to at SBM Management

 7   about the chargebacks?

 8      A.   Yeah.  It not only refreshed, it also let me

 9   see that the questions that were asked before, it's

10   not exactly the same now.  Therefore, I -- I'm glad

11   we checked.  But as I stated, SBM Management was a

12   client, and whoever was involved with a task that

13   was related to my client, I did my best to assist

14   and provide services.

15      Q.   Do you remember -- strike that.

16           Do you know anyone who works at SBM

17   Management?

18           MR. PARIKH:  Objection; vague.

19           You're asking right now, at any time, or --

20   BY MS. ROBINSON:

21      Q.   At the time that you were providing

22   chargeback services to SBM Management, did you know

23   anyone who worked at SBM Management?

24      A.   I would have to assume that people worked

25   there.  I don't know for sure, though.  Knowing for

107

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    sure, I don't know, but I can assume.  I mean, I

2    don't check records to see who works where.

3         Q.   I'm going to object as nonresponsive.

4              And at the time you were providing

5    chargeback services to SBM Management, did you know

6    anybody who worked for SBM Management?

7         A.   I received requests from SBM Management from

8    Stephan and Alon.

9         Q.   Do you remember the approximate timeframe

10   when you started providing chargeback services to

11   SBM Management?

12        A.   No.

13        Q.   Okay.  Did you provide chargeback services

14   for any other companies that Alon worked for?

15        A.   Again, you're asking me who worked for

16   where, and I already told you before that I don't

17   know who worked for what company.  I can only

18   assume.

19        Q.   Did you ever have conversations with Alon

20   about chargeback services that weren't related to

21   SBM Management?

22        A.   Not that I recall.

23        Q.   Okay.  Did you ever provide any chargeback

24   services for Alon that were not related to skin care

25   products?

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

```
 1       A.    Not that I recall.
 2       Q.    Did Alon ever discuss with you a goal of
 3   reducing chargebacks?
 4       A.    No.
 5       Q.    Did Alon ever tell you why he wanted to hire
 6   you to provide services related to chargebacks?
 7       A.    Can you rephrase that?  I mean, "hire you"?
 8   He never hired me.
 9       Q.    Did Alon ever tell you why he wanted to
10   charge -- to hire Secured Merchants to help with
11   chargebacks?
12       A.    No.
13       Q.    Did Alon ever say anything to you about the
14   number or volume of chargebacks that he was
15   receiving related to skin care products?
16       A.    He might have, but I don't recall.
17       Q.    Did he ever say anything to you about -- did
18   Alon ever say anything to you while you were
19   providing chargeback services to SBM Management, did
20   he ever say anything to you about why there were so
21   many merchant accounts related to the company?
22       A.    No.
23       Q.    Did you or Secured Merchants ever provide
24   any services related to IVR Logix?
25       A.    I think the form of your question is
```

Argaman
FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    incorrect, but if you meant did we provide IVR
2    services, then yes.  But I don't know.  I don't want
3    to --
4        Q.   Okay.  Did you provide --
5        A.   -- tell you what --
6        Q.   -- IVR services?
7        A.   Yes.
8        Q.   Okay.  Did you provide IVR services to SBM
9    Management?
10       A.   Yes.
11       Q.   Did you provide IVR services to any other
12   company that Alon Nottea worked for?
13       A.   I don't know.
14       Q.   When you were providing IVR services to SBM
15   Management, did you discuss those services with
16   Alon?
17       A.   Probably.
18       Q.   And what are IVR services?  Could you please
19   describe those to me?
20       A.   IVR services, in a -- in an example would be
21   if you were to call AT&T and they would let you hear
22   an automated attendant, "Please press 1 for sales.
23   Please press 2 for customer service.  If you know
24   your order number, please press it now."  IVR and
25   telephony terms of the world, according to my best

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

 1  judgment or understanding, means a better customer

 2  interaction with the business, due to the fact that

 3  it can work 24/7, it can provide better customer

 4  satisfaction, it can provide customer with their

 5  customer information, to know if their order is

 6  active or cancelled.  It allows them to leave a

 7  voicemail.  It allows them to perform -- perform

 8  tasks, which, in the long-term or in the short term,

 9  means better customer service and satisfaction.

10      Q.   And do you remember the timeframe that you

11  or Secured Merchants provided IVR services to SBM

12  Management?

13      A.   All that information was submitted to you

14  right at the beginning when you asked for it.  It

15  was submitted to the Receiver and -- and to

16  Mr. Reid.  I don't recall the dates, but you should

17  have that information.

18      Q.   Okay.  I'm going to object as

19  nonresponsive --

20      A.   Okay.

21      Q.   -- but I do believe I now understand that

22  you don't remember when you provided IVR services.

23      A.   No.

24      Q.   What's IVR Logix?

25      A.   It's a name.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1     Q.   Is it -- what is it the name of?

2     A.   Could be anything you want it to be.

3     Q.   Have you ever used the name IVR Logix?

4     A.   Probably.

5     Q.   Okay.  When?

6     A.   In conversations with myself, thinking of

7   the names.

8     Q.   Okay.

9     A.   What name can --

10    Q.   Did you use the name IVR Logix in context of

11  services to SBM Management?

12    A.   I'm not sure.

13         MS. ROBINSON:  I'll show you here.  This is

14  Exhibit 191.

15         (Plaintiff's Exhibit 191 was

16         previously marked for identification

17         by the FTC and is attached hereto.)

18  BY MS. ROBINSON:

19    Q.   And if you'll look, this is an Excel

20  spreadsheet --

21    A.   Sure.

22    Q.   -- that was just printed out.  If you'll

23  look at the last page --

24    A.   Okay.

25    Q.   -- and it's small font, so I'm going to warn

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    you about that, but on the right side of the page it

2    says "Related People" and it says, "Author, Avi.

3    Last modified by Avi."

4           Do you remember preparing this Excel

5    spreadsheet?

6       A.   I don't remember preparing it, but --

7       Q.   Does it look like something you might have

8    prepared?

9       A.   Could be.

10      Q.   Did you prepare Excel spreadsheets that

11   listed toll free numbers for SBM Management?

12      A.   I just told you I don't remember if I

13   prepared it, as you're --

14      Q.   Is this the type of report that you

15   provided?

16      A.   This is -- this is a report from the IVR in

17   regards to the amount of calls that came in per toll

18   free number.

19      Q.   All right.  Was this a report that you, as

20   part of your services related to IVR for SBM

21   Management, is this the type of report that you

22   would have prepared?

23      A.   Possibly.  This isn't something I do on

24   regular basis --

25      Q.   Okay.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1       A.    -- but this -- this could be.

2       Q.    So what does IVR Logix refer to at the top

3   of the page?

4       A.    It's a name.

5       Q.    It's a name for what?

6       A.    It's a name for, I guess, IVR here.  I mean,

7   I --

8       Q.    Okay.

9       A.    It's a name for what?  I mean, the

10  question -- it's a name.  It's -- it's -- can you be

11  more specific on -- on what you mean?  Name for

12  what?  Like --

13      Q.    What part of that is confusing?

14      A.    What's confusing about that is when you

15  say -- when I tell you it's a name, then I -- and

16  you ask me what do I use this name for, I told you I

17  used it as a possible name for businesses or for

18  ventures or for referral domains or for anything

19  that I may use in the -- in the future.  I mean, you

20  can have many names and not necessarily use them as

21  businesses.

22      Q.    Okay.  So did you --

23      A.    So.

24      Q.    -- use the name IVR Logix in business?

25      A.    I used it for myself, but it wasn't

114

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                        2/24/2016

1   officially used because Secured Merchant, LLC, was

2   used and invoices were via Secured Merchant, LLC.

3        Q.    Right.

4             So I'm not asking if IVR Logix was a

5   separate legal entity.

6        A.    So what are you asking?

7        Q.    I'm asking if it was a name that you used

8   for a specific IVR servicing --

9        A.    It could be a nickname to -- to a particular

10  service.  Not -- call it a service or call it what

11  you want.  It could be a particular name reflecting

12  to -- to something.  So now if you can be more

13  specific, we can -- I mean, I'm just not

14  understanding what the exact question is.

15       Q.    Do you have any idea why SBM had so many

16  toll free phone numbers?

17             MR. PARIKH:  Objection; calls for

18  speculation.

19             THE WITNESS:  I don't think it's too many

20  phone numbers.

21  BY MS. ROBINSON:

22       Q.    I'll show you, also, Exhibit 190 here.

23             (Plaintiff's Exhibit 190 was

24             previously marked for identification

25             by the FTC and is attached hereto.)

115

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1   BY MS. ROBINSON:

2       Q.   And similar thing, if you look at the last

3   page --

4       A.   Okay.

5       Q.   -- same thing.  Author is Avi, last modified

6   by Avi.

7       A.   Okay.

8       Q.   And so the first page, 190-1, has a title of

9   "UK Hosting" and then there's a list of -- there's a

10  list of dotcom addresses.

11         How would you describe those?  Are those --

12  would you call that a landing page?  Would you call

13  that a website?  Would you call it a domain?  How

14  would you describe it?

15      A.   It's a URL.

16         MR. PARIKH:  Objection; vague and compound.

17  BY MS. ROBINSON:

18      Q.   How would you call it?

19      A.   URL.

20      Q.   URL.

21         So if you look at 190-4, it says "US

22  Hosting" and then has a whole list of URLs.

23      A.   Okay.

24      Q.   Do you remember preparing this document?

25      A.   No.

116

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                      2/24/2016

        1        Q.    Okay.  Did you provide services related to

        2    URLs in the UK for any company that Alon worked for?

        3        A.    I'm not -- I'm not understanding the

        4    question.  Could you please rephrase it --

        5        Q.    Okay.

        6        A.    -- or ask it again --

        7        Q.    Sure.

        8        A.    -- a little slower, so I can understand?

        9        Q.    Sure.

       10        Did you provide any services for any URL

       11    based in the UK for SBM Management or any company

       12    that Alon worked for?

       13        MR. UNGAR:  Objection as to the form of the

       14    question.  It's vague and ambiguous and compound.

       15        MR. PARIKH:  Same objection.

       16        THE WITNESS:  I can't recall any particular

       17    service at this time.

       18    BY MS. ROBINSON:

       19        Q.    Okay.  I'll break it up.

       20        A.    Sure.

       21        Q.    Did you provide any -- any service for any

       22    URL based in the UK for SBM Management?

       23        MR. PARIKH:  Objection; vague and ambiguous.

       24        THE WITNESS:  No.

       25    ///

117

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    BY MS. ROBINSON:

2        Q.    Okay.  If you look at page 4 there, did you

3    provide any services for the URLs listed on this

4    page?

5        A.    I provided services to the client, not to

6    the URL.

7        Q.    Okay.  Did you provide any services to SBM

8    Management relating to these URLs?

9        A.    Not that I recall any one of them in

10   particular.  Again, if it was in the scope of their

11   requirements, then maybe.

12       Q.    Okay.

13       A.    But not -- it's a -- it's a very broad

14   question.  I provided services to SBM Management.

15   You're showing me a hundred URLs here that they

16   supposedly had.

17       Q.    Mm-hmm.  Do you --

18       A.    What do you want me to really answer you?  I

19   mean --

20       Q.    Do you remember any of these URLs?

21       A.    Remember?

22       Q.    Mm-hmm.

23       A.    No.  Let me -- let me rephrase that

24   question.  Some might look familiar in one way or

25   another.  I mean, these are not some strange names

118

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1    'cause I know that they did business under these
2    names, but --
3        Q.   So you know -- you know that, and when you
4    say "they," who do you mean?
5        A.   SBM Management.
6        Q.   Okay.
7        A.   Yeah.
8        Q.   Do you know that SBM Management did business
9    selling a product called AuraVie?
10       A.   I believe so.
11       Q.   Okay.  Do you have any idea why SBM
12   Management had so many websites?
13            MR. PARIKH:  Objection; calls for
14   speculation.
15            MR. UNGAR:  Join.
16            THE WITNESS:  I don't have any idea why a
17   client had so many website.  I don't know if it's so
18   many.  That's what you're saying.
19   BY MS. ROBINSON:
20       Q.   Do you -- does it seem like a lot of
21   websites to you?
22       A.   Not necessarily.
23       Q.   During the time that you were providing
24   chargeback services to SBM, were you aware that they
25   were selling their skin care products by risk free

119

Argaman

FTC v. Bunzai Media Group, Inc., et al.                          2/24/2016

1   trial offer?

2          MR. PARIKH:  Objection; assumes facts not in

3   evidence.

4          THE WITNESS:  I can't answer your question

5   correctly.

6   BY MS. ROBINSON:

7     Q.   Okay.  Why not?

8     A.   I don't necessarily know what risk free

9   trial is.

10    Q.   Okay.  When you used the term before, what

11  did you mean?

12    A.   I -- I used it as an option that I don't

13  provide in my software the ability to do.  What

14  exactly it means in the scope of the business, I

15  don't know.

16    Q.   Okay.  Well, in the context that -- using

17  the definition that you meant when you said it, were

18  you aware that SBM Management was selling skin care

19  products by risk free trial?

20    A.    When I say that, I say that in scope of

21  technical terms.  In technical term, I don't know.

22  I mean, they were using Lime Light, so Lime Light

23  probably supports it.  I'm not sure if they went

24  that route or not.  I -- I didn't put my nose in

25  their business.

120

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    Q.   So during the time that you were providing
2    chargeback services to SBM Management, were you
3    aware what kind of product the company was selling?
4    A.   I assume it was skin care, but I'm not sure
5    if that was the only thing.
6    Q.   Okay.  And during the time that you were
7    providing chargeback services to SBM Management, did
8    you ever ask to see any of the websites they were
9    using to sell the product?
10   A.   They were public websites.  I don't have to
11   ask.  Anybody can see them.
12   Q.   Okay.
13   A.   So I never asked to see them --
14   Q.   Okay.
15   A.   -- if that's your question.
16   Q.   So during the time that you provided the
17   chargeback services to SBM Management, did you see
18   the websites that they were using to sell their
19   products?
20   A.   Which one?
21   Q.   The skin care products.
22   A.   They had many websites.  I saw AuraVie.com.
23   Q.   During the time that you were providing
24   chargeback services to SBM Management, did you see
25   any websites that the company was using?

121

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1      A.    Yes.   AuraVie.com.

2      Q.    Was AuraVie.com selling a product by risk

3   free trial offer?

4          MR. PARIKH:   Objection; calls for

5   speculation.

6   BY MS. ROBINSON:

7      Q.    The web -- the AuraVie.com that you said you

8   saw, was it selling the product by risk free trial

9   offer?

10     A.    I already answered this question a few

11  times, and AuraVie.com was a straight sale site that

12  didn't sell any trials, whether they're risk free,

13  not risk free.   I'm not really sure what's the

14  meaning between all those 'cause I don't --

15  AuraVie.com does not -- does not have the ability to

16  sell anything other than straight sale.

17     Q.    And did you see AuraVie.com as a public

18  website?

19     A.    Oh, yeah.   It was their main web -- AuraVie

20  is the brand, as far as I knew it to be.

21     Q.    Okay.

22     A.    And they were selling products on the

23  website for hundred or $150, whatever they sold.   I

24  don't -- again, it's not my business, so I don't

25  look at other businesses because I'm a professional

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1    and I'm here to give them services, not to diagnose

2    their products or their business.

3         Q.   You said Lime Light indicated to you they

4    were probably selling products by risk free trial?

5         A.   Lime Light indicated to me?

6         Q.   Yeah.

7         A.   I never said that.

8         MS. ROBINSON:  Would you mind going back and

9    reading what he just said about Lime Light.  The

10   last time Lime Light came up, read that part.

11        (The previous answer was read back by

12        the court reporter as follows:

13        "ANSWER:  When I say that, I say

14        that in scope of technical terms.  In

15        technical term, I don't know.  I

16        mean, they were using Lime Light, so

17        Lime Light probably supports it.  I'm

18        not sure if they went that route or

19        not.  I -- I didn't put my nose in

20        their business.")

21   BY MS. ROBINSON:

22        Q.   So --

23        A.   So what's the question, 'cause the --

24        Q.   Yeah.  So you said that they were using Lime

25   Light, which supports risk free trial offers?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

123

Argaman

FTC v. Bunzai Media Group, Inc., et al.                        2/24/2016

1        A.    That's not what I said.

2        Q.    Okay.

3        A.    In regards to this question, when you asked

4    me about a risk free trial.

5        Q.    Mm-hmm.

6        A.    I told you that I don't support it, and you

7    asked me what I think it is.  And I told you on

8    technical terms we don't -- we don't support

9    anything but straight sale.  I suppose that Lime

10   Light does offer other kinds of services, whether

11   they're trials or risk trials or non-risk trials

12   or -- they have abilities, the other CRM, to support

13   many, many different types of offers.  But that's --

14   I mean, I --

15       Q.    What is ClickConnector?

16             MR. PARIKH:  Objection; asked and answered.

17             THE WITNESS:  Yeah, I answered you already

18   what it is.  I'll answer again.  It's an API

19   connector.

20   BY MS. ROBINSON:

21       Q.    And it's your testimony earlier that

22   ClickConnector connected with Lime Light, connected

23   to Lime Light?

24       A.    Is that -- is that what you're saying that I

25   said?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
 1        Q.    I'm asking you if that's what you said.

 2        A.    Can you rephrase that?

 3        Q.    Yes.

 4              Did you testify before that Lime Light

 5    connected to ClickConnector -- no, that click

 6    ClickConnector connected to Lime Light?

 7        A.    To Lime Light's API.

 8        Q.    Okay.

 9        A.    ClickConnector worked with Lime Light's API,

10    yeah.

11        Q.    Okay.  Let me show you this.  187.

12        A.    Okay.

13              (Plaintiff's Exhibit 187 was

14              previously marked for identification

15              by the FTC and is attached hereto.)

16    BY MS. ROBINSON:

17        Q.    So does this look familiar to you?  This is

18    a screenshot.

19        A.    Yes.

20        Q.    What is this a screenshot of?

21        A.    This is a screenshot of Lime Light's

22    information.

23        Q.    Okay.  Is it -- the tabs up at the top says

24    ClickConnector, so how does ClickConnector relate to

25    Lime Light in this context?
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                            2/24/2016

1        A.    ClickConnector is a name.

2        Q.    Mm-hmm.

3        A.    And are you -- do you want to know the

4    functionality of ClickConnector?  I mean, I'm not

5    understanding the relationship.

6        Q.    Yeah.  I think that would be helpful.

7        A.    The functionality of ClickConnector, even

8    though I stated it before --

9        Q.    Yes.

10       A.    -- I believe it's the third time that I'm

11   saying it.

12       Q.    Pretend you're talking to someone who

13   majored in history in college.

14       A.    Okay.  So Lime Light is a soft -- is a CRM

15   software.

16       Q.    Okay.

17       A.    And Lime Light has lots of features, and

18   Lime Light enables their clients or their clients'

19   vendors or vendors or partners, whatever Lime

20   Light -- whatever Lime Light associates with, their

21   clientele, they enable them to -- they give them an

22   API platform.  An API platform that is basically

23   every function that they have is now available via

24   an API, so meaning that in order for ClickConnector

25   to work, it has to work with Lime Light.  If you

Argaman

FTC v. Bunzai Media Group, Inc., et al.                               2/24/2016

1    were to take Lime Light out, there would be no

2    connector 'cause there would be nothing to connect

3    it.  So, in essence, you can call it maybe an

4    overlay of Lime Light.

5            So, for example, if Lime Light had a name of

6    a customer, but it displayed it in a small font,

7    then via the API I can make ClickConnector take that

8    font and display it bigger; okay?  But the database

9    and the information is on Lime Light.  This is

10   just -- this is virtual overlay that all the back

11   end and the logic of it is actually Lime Light; it's

12   just a presentation.  It's like -- it's like you

13   take information and you can present it horizontal

14   or vertical or something, but the information is

15   Lime Light.  So, in essence, ClickConnector is

16   not -- is an overlay or connector.  Just like it is,

17   it connects.  It can connect to eBay, it can connect

18   to Amazon, and display the eBay information in a

19   different, maybe more -- more specific to the

20   client's needs.

21           So in short, ClickConnector without Lime

22   Light would not connect to anything.  Therefore, it

23   would be nothing.  And when it connects, it

24   basically gives you the information that Lime Light

25   displays.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                2/24/2016

1              Is that better?

2      Q.   I believe so.

3              So I'm going to ask a question --

4      A.   Sure.

5      Q.   -- and I'm not going to use the exact

6   terminology.

7      A.   Go for it.

8      Q.   So what we're looking at here in

9   Exhibit 187, is this the QuickConnector overlay that

10  you were talking about with the Lime Light

11  information, or is this --

12     A.   Yes.

13     Q.   -- the actual screenshot of Lime Light?

14     A.   Yes.

15     Q.   Okay.  Yes.

16     A.   Yes.  So this information comes from Lime

17  Light.

18     Q.   Okay.  But this is the ClickConnector view

19  overlay?

20     A.   I don't know at which time --

21     Q.   Okay.

22     A.   -- but I mean, seems like -- I mean, it's

23  really small --

24     Q.   It is all those things.

25     A.   -- and it's kind of dark and grayish, and at

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
1    my age I can't really see too well, but -- but --
2    but it does look a little bit -- I -- I think I need
3    to look for some glasses to -- to -- yeah.  So I can
4    see better, but it does -- it does look like a
5    ClickConnector type of a page.
6        Q.   And I'm going to hand you Exhibit 188 and
7    189 at the same time because I believe they are
8    similar to --
9        A.   Okay.  So what is your question here?
10       Q.   Okay.  I'm going to hand them both to you.
11       A.   Okay.
12            (Plaintiff's Exhibits 188 and 189
13            were previously marked for
14            identification by the FTC and are
15            attached hereto.)
16   BY MS. ROBINSON:
17       Q.   Are these both, 188 and 189, both also a
18   view --
19       A.   Yes.
20       Q.   -- in ClickConnector?
21       A.   Would you like me to explain to you?
22       Q.   Yes.
23       A.   Okay.  Good.
24            So this Exhibit 189 is, looks like a
25   sophisticated graphs and pie charts, and it looks
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1    really neat.  Unfortunately, none of it ever worked
2    and it's just dummy graphs that we're now looking.
3    And I used it as a placement to make it look good,
4    but they never -- they never worked.
5           So if you click on them, they don't work,
6    the numbers don't move.  It's static information
7    that doesn't move or work.  It's for look purposes
8    only.  In fact, it was taken from a template on the
9    Internet that -- that it was copied from.
10       Q.   Okay.
11       A.   Yeah.
12       Q.   That's Exhibit 189.
13       A.   Sure.
14       Q.   What about 187 and 188?
15       A.   So 188 is Lime Light information displayed
16   in a I-frame, so it's information that is from Lime
17   Light.
18       Q.   Okay.  So did you provide this
19   ClickConnector overlay to SBM Management?
20       A.   I believe so, yes.
21       Q.   And when I say "you," I mean Secured
22   Merchants, so --
23       A.   Sometimes I don't know what you mean, so --
24       Q.   Okay.  In that context --
25       A.   -- this time I meant --

130

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1      Q.   Yeah.

2           In that context I meant Secured Merchants.

3      A.   Okay.

4      Q.   So did you have access -- did Secured

5   Merchants have access to this information?

6      A.   This is my client's information, not my

7   information.

8      Q.   So did Secured Merchants have access to it?

9      A.   I don't know.  I never accessed it.

10     Q.   Did you provide any services related to --

11  strike that.

12          Did you provide any IT services related to

13  the Customer Service Department at the AuraVie

14  companies?

15          MR. PARIKH:   Objection; vague and ambiguous

16  as to "AuraVie companies."

17  BY MS. ROBINSON:

18     Q.   Did you --

19     A.   Yeah.  I mean, the whole question --

20     Q.   Did Secured Merchants provide any IT

21  services to the Customer Service Department for SBM

22  Management?

23     A.   I believe all the services we talked to

24  until now are somewhat related to Customer Service.

25  I mean, I don't know how they work or how they come

131

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    into Customer Service or what is Customer Service

2    and what isn't.  That's something you should ask

3    them.

4        Q.   Did you ever discuss SBM Management with

5    Doron Nottea?

6        A.   No.

7        Q.   Did you ever discuss any of the IT services

8    you were providing to SBM Management with Doron

9    Nottea?

10       A.   No.

11       Q.   Okay.  Did you ever -- did you ever discuss

12   any IT services that Secured Merchants was providing

13   to SBM Management with Doron Nottea?

14       A.   No.

15       Q.   Did you ever discuss AuraVie products with

16   Doron Nottea?

17       A.   No.

18       Q.   Do you know if Doron Nottea provided

19   accounting services to SBM Management?

20       A.   No.

21       Q.   Do you know if Doron Nottea provided

22   accounting services to any of the companies that

23   sold the AuraVie products?

24       A.   I'm not sure.

25           MS. ROBINSON:  If we could take a ten minute

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    break.  I'm hoping --

2              THE WITNESS:  Sure.

3              MS. ROBINSON:  -- I can wrap up soon.

4              MR. PARIKH:  Okay.

5              (Recess)

6              MS. ROBINSON:  Let's go back on the record.

7    BY MS. ROBINSON:

8        Q.    So was Secured Merchants' office located at

9    6925 Canby Avenue, Suite 105, in Reseda?

10             MR. PARIKH:  At what point in time are you

11   asking?

12             MS. ROBINSON:  2015.  Until June 2015.

13             THE WITNESS:  I'm not sure of dates, but I

14   did operate from there --

15   BY MS. ROBINSON:

16       Q.    Okay.

17       A.    -- from time to time.

18       Q.    Okay.  How many days a week were you in the

19   office?

20       A.    Not much.

21       Q.    You were there the day the Receiver showed

22   up with the FTC's lawsuit --

23       A.    Yes, I was.

24       Q.    -- is that correct?

25             So do you have an estimate of how many days

133
Argaman
FTC v. Bunzai Media Group, Inc., et al.                                        2/24/2016

 1    a week you were in the office?
 2             MR. PARIKH:  At what point in time?
 3    BY MS. ROBINSON:
 4        Q.   2015, up until when the Receiver showed up
 5    in June.
 6        A.   I was rarely there.  During those times, I
 7    was rarely there.
 8        Q.   What about in the calendar year 2014?  How
 9    often, how many days a week did you average in the
10    office?
11        A.   I would have to estimate 'cause, I mean,
12    it's a hard --
13        Q.   Okay.  Yes, just estimate.
14        A.   Yeah.  So during that time, almost,
15    probably, once or twice a month.
16        Q.   Did you have any other office suites where
17    you operated Secured Merchants during that same time
18    period, 2014 and 2015, up until when the Receiver --
19        A.   No.
20        Q.   Okay.  And I'm assuming even when you
21    weren't in the office, you were working; is that
22    correct?
23        A.   No.
24        Q.   Were you working on the days you weren't in
25    the office?

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

```
 1      A.   No.  That's incorrect.  No.
 2      Q.   Okay.  Did you ever work from home during
 3   2014, the beginning of 2015?
 4      A.   Rarely.  I mean, that was a year I was out
 5   of the country.  I -- I believe almost for a year,
 6   year and a half.  So maybe two years I was out of
 7   the country.
 8      Q.   Okay.  Were you out of the country in 2013?
 9      A.   I'm not sure of the dates --
10      Q.   Okay.
11      A.   -- but yeah.
12      Q.   And while you were out of the country, were
13   you doing any work related to Secured Merchants?
14      A.   Not -- not that I can recall.
15      Q.   When did you come back into the country?
16      A.   I'm not sure about dates.
17      Q.   Was it in 2014 or 2015?  Could you even
18   guess a year?
19      A.   Probably late 2014, early 2015.  I -- I
20   don't want to give you the wrong dates.
21      Q.   Okay.
22      A.   So I mean --
23      Q.   Mm-hmm.
24      A.   -- I'm -- if you have -- if you have maybe a
25   more specific question that is not date related, I
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                      2/24/2016

1    could tell you, but as far as dates, it's -- I don't

2    know.

3         Q.   During the days that you were in the office

4    from, let's say 2012 'til when the Receiver came;

5    okay?  During the times you were in the office --

6         A.   The receiver came 2000.

7         Q.   No.  I'm sorry.  From 2012 to June, I think

8    the Receiver --

9              MR. TEPFER:  What's that?

10             MS. ROBINSON:  When did the receiver show

11   up?

12             MR. TEPFER:  I think June 18.

13   BY MS. ROBINSON:

14        Q.   Okay.  From the beginning of 2012 'til

15   June 18th, 2015, when the Receiver and the FTC

16   showed up and took immediate access of the business

17   premises, during that time period -- strike that.

18        A.   Okay.

19        Q.   Okay.  From 2012 to 2014, did Secured

20   Merchants have its office at Suite 105 at 6925 Canby

21   Avenue in Reseda?

22             MR. PARIKH:  Objection; asked and answered.

23             THE WITNESS:  I don't think -- I don't think

24   so, and I don't think these are correct dates for

25   your question.  I don't believe Secured Merchant was

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

```
 1    there in 2012.  I don't even know if I was at that
 2    address.
 3    BY MS. ROBINSON:
 4        Q.    That's why I asked.
 5        A.    Yeah, but you're asking me -- I already
 6    answered you.  Date related questions, I don't
 7    recall --
 8        Q.    Okay.
 9        A.    -- at this time.  I didn't come prepared
10    for, you know, anything except talking to you.  So
11    for something like that, I would need to maybe look,
12    go to the leasing office, ask them --
13        Q.    Okay.
14        A.    -- when, you know, the lease was and stuff
15    like that.  So date related questions, I don't know.
16        Q.    Okay.  Do you know when Secured Commerce
17    started its lease at 6925 Canby Avenue, Suite 105?
18        A.    Yeah, I think when is also related to dates;
19    right?  I think -- I don't know dates at this
20    moment.
21        Q.    So your testimony right now, no matter what
22    I ask you in a date --
23        A.    I didn't say no matter what.
24        Q.    Well, you said any question that I ask you
25    about dates, you're not going to remember --
```

137

Argaman

FTC v. Bunzai Media Group, Inc., et al.                        2/24/2016

1        A.    No, I didn't say that.

2        Q.    -- is that what you said?

3        A.    You may ask me anything you want, but I said

4     the dates, currently at this date, for what you're

5     asking, I can't recall exact dates.  I mean, we're

6     talking about years.  You want me to go specific on

7     a date, it's very difficult.

8        Q.    Okay.  Why don't you give me a year.

9        A.    I told you I didn't come prepared.  At least

10    give me some exhibit, give me some documentation I

11    can look at and refresh my mind to say this looks

12    correct or not.  But if you're not doing that and if

13    you're just asking me dates from years ago, and I'm

14    telling you that I don't know, then that's my honest

15    answer 'cause anything else would be the wrong

16    answer.

17       Q.    Okay.  And what I am asking you, though, is

18    do you remember -- and you can give me a year,

19    whatever -- whatever specificity that you're

20    comfortable with -- do you remember when Secured

21    Commerce started its lease at 6925 Canby Avenue,

22    Suite 105, Reseda, California?

23       A.    No.

24       Q.    Do you remember not even to a year?

25       A.    No.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
1      Q.   Okay.  Do you know how many companies were

2    subleasing from Secured Commerce, LLC?

3      A.   I don't recall.

4      Q.   During the days that you worked in the

5    office, Doron Nottea's office was in that same

6    office as well; is that correct?

7      A.   I didn't hear that question.

8      Q.   Oh, I'm sorry.

9      A.   Yeah.

10      Q.   Did Doron Nottea also have an office in

11    Suite 105 at any point during the time you had a

12    lease there?

13      A.   I believe so.

14           MR. PARIKH:  Objection; calls for

15    speculation.

16    BY MS. ROBINSON:

17      Q.   And if he did have a office there, he would

18    have subleased from Commerce; is that correct?

19      A.   That's an assumption that you're making.  I

20    believe he had a room that he was coming and going

21    from.  I don't know --

22      Q.   Did he sublease --

23      A.   So that --

24      Q.   -- from Secured Commerce?

25      A.   I don't know.
```

139

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
1      Q.    Secured Commerce, LLC, is your company;
2   right?
3      A.    Secured Commerce, LLC, is not fully my
4   company.
5      Q.    Okay.  Who else has ownership of that
6   company?
7      A.    It's -- Doron has ownership of that.
8      Q.    Okay.
9      A.    Yeah.  And that --
10     Q.    So what percentage ownership do you and
11  Doron have?
12     A.    At this time?
13     Q.    Yes.
14           Has it changed since Secured Commerce, LLC,
15  was --
16     A.    Oh, I -- I don't know the proper term, but I
17  left as a member of Secured Commerce, LLC, because
18  the company was failing, and there was -- my
19  business vision was not implemented.  That company
20  did not benefit me in any way, so I detached myself
21  from that company --
22     Q.    Okay.
23     A.    -- as a member.
24     Q.    So when did you do that?
25     A.    Again, you're asking me when, and I don't
```

140

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    know the dates.

2        Q.   Okay.  Was it before you left the country?

3        A.   I'm not sure.

4        Q.   So at the time, June 18th, 2015, when the

5    Receiver came over --

6        A.   Mm-hmm.

7        Q.   -- and took access of the premises, at that

8    time were you still a member of Secured Commerce,

9    LLC?

10       A.   You would have to ask my accountant, but I

11   wasn't actively a member as far as my communication

12   with Doron.  I de- -- you know, I left the company.

13       Q.   Do you know -- strike that.

14            Who is your accountant?

15       A.   David Davidian.

16       Q.   How long has David Davidian been your

17   accountant?

18       A.   Long time.  I don't remember the dates

19   again.

20       Q.   Okay.  Who recommended David Davidian to

21   you?

22       A.   Nobody.

23       Q.   How did you know David Davidian?

24       A.   I don't remember.

25       Q.   Do you know how much SBM Management paid

Argaman

FTC v. Bunzai Media Group, Inc., et al.                              2/24/2016

1    Secured Merchants for its chargeback services?

2        A.   I don't recall.

3        Q.   Do you recall if it was over $300,000?

4        A.   How much?

5        Q.   $300,000?  Do you recall if it was over

6    $300,000?

7        A.   I don't recall.

8        Q.   Did you read the Receiver's report that was

9    filed in this case?

10       A.   Some of it.  Only what's related to me.

11       Q.   Okay.  Do you have -- is there anything in

12   the Receiver's report that you dispute or disagree

13   with?

14       A.   I didn't read it.  I read only my portion.

15       Q.   Okay.  The portion that you read that

16   related to you, was there any parts that you

17   disputed or disagreed with?

18       A.   So I don't remember everything I read, but

19   from my recollection she wrote that Secured Merchant

20   and Alan Argaman, maybe she said Alan or not, I'm

21   not sure, but it seemed like a viable technology

22   company that gave service to many clients.

23       Q.   Did you agree or disagree with that?

24       A.   With that assumption --

25       Q.   Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

1       A.    -- that I just stated?

2       Q.    Yes.

3       A.    I think that's what I do for a living.

4       Q.    Okay.

5       A.    I do that every day.

6       Q.    Did you read anything that you disagreed

7  with in the Receiver's report?

8       A.    I don't -- I don't re -- remember word for

9  word.  If you want to give me the segment about

10  myself, we can look into it.

11      Q.    During the time that you provided chargeback

12  services for SBM Management, did you ever run an

13  Internet search for AuraVie?

14      A.    What?

15      Q.    During the time that you provided chargeback

16  services for SBM Management, did you ever run an

17  Internet search for AuraVie?

18      A.    Like a -- I don't understand the question.

19  Internet search for AuraVie?  What --

20      Q.    Yeah.

21      A.    -- does that mean?

22      Q.    Have you ever used an Internet search

23  engine?

24      A.    Yes.

25      Q.    Okay.  Have you ever used an Internet search

143

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

 1    engine to search for AuraVie?

 2        A.    Why would I do that?

 3        Q.    Did you ever do it?

 4        A.    No.  Don't recall doing that.

 5        Q.    Okay.  Did you ever ask anyone related to

 6    SBM Management for information about their sales

 7    practices?

 8             MR. PARIKH:  Objection; vague and ambiguous

 9    as to "sales practices."

10             THE WITNESS:  No.

11    BY MS. ROBINSON:

12        Q.    Okay.  Did you ever ask anyone at SBM

13    Management for information on their AuraVie

14    marketing materials?

15        A.    No.

16        Q.    When you were at the Suite 105 office for

17    Secured Merchants, was Doron Nottea ever there as

18    well at the same time as you?

19        A.    I usually have my door closed, so I'm not

20    sure when he was there or not.

21        Q.    Was he there sometimes?

22        A.    I -- I would assume he was.

23        Q.    Did you ever talk about what he was working

24    on?

25        A.    Not specifically.

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

```
1       Q.   When you were at the Suite 105 office, how
2  often was Alon there?
3       A.   He wasn't there.
4       Q.   Ever?
5       A.   I don't like to use the word "ever," but
6  maybe he came to visit his brother or -- or -- it
7  was not his office, that's for sure.
8       Q.   Did he ever come for meetings?
9            MR. PARIKH:  Objection; calls for
10 speculation.
11           MR. UNGAR:  Join.
12           THE WITNESS:  I myself didn't see that.
13 BY MS. ROBINSON:
14      Q.   Okay.  Did he ever come to have a -- to the
15 office to have a meeting with you?
16      A.   I was hardly there.  I don't recall
17 meetings.
18      Q.   Okay.  So when you did talk with Alon about
19 services you provided to SBM Management, was it
20 usually over the phone or email?
21      A.   I'm not sure.
22           MS. ROBINSON:  I'll pass the witness.  That
23 means --
24           MR. PARIKH:  I don't have any questions.
25           MS. ROBINSON:  Mr. Parikh, do you have any
```

Argaman

FTC v. Bunzai Media Group, Inc., et al.                                    2/24/2016

1    questions?

2            MR. PARIKH:  No.

3            MS. ROBINSON:  Mr. Ungar, do you have any

4    questions?

5            MR. UNGAR:  I do not.

6            MS. ROBINSON:  Okay.  We passed, and

7    Mr. Parikh doesn't have any questions, so we are

8    going to go off the record now.

9            MR. TEPFER:  And the stipulation --

10           MS. ROBINSON:  Yeah.

11           MR. TEPFER:  -- that -- we're not offering

12   any stipulation, but we're just going to retain the

13   original copy of the deposition, pursuant to the

14   Federal and local rules.

15           And if the court reporter would, you know,

16   please say we're done.

17           THE REPORTER:  The deposition is concluded.

18           (The deposition was concluded at 4:45 p.m.)

19

20

21

22

23

24

25

146

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
1                        --oOo--
2    Please be advised I have read the foregoing
3    deposition, and I state there are:
4    (Check one)
5                              NO CORRECTIONS
6                              CORRECTIONS ATTACHED
7
8
9                    ALAN ARGAMAN
10
11                   Date Signed
12
13
14                       --oOo--
15
16
17
18
19
20
21
22
23
24
25
```

147

Argaman

FTC v. Bunzai Media Group, Inc., et al.                    2/24/2016

```
 1    STATE OF CALIFORNIA              )

 2                                     )   ss.

 3    COUNTY OF LOS ANGELES            )

 4

 5         I, ALAN ARGAMAN, having appeared for my

 6    deposition on February 24, 2016, do this date

 7    declare under penalty of perjury that I have read

 8    the foregoing deposition, I have made any

 9    corrections, additions or deletions that I was

10    desirous of making in order to render the within

11    transcript true and correct.

12         IN WITNESS WHEREOF, I have hereunto

13    subscribed my name this       day of              ,

14    2016.

15

16

17

18

19

20                        W   I   T   N   E   S   S

21

22

23

24

25
```

1

2

3        I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6            That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14           I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: ___8/10/16_____

21

22

23   _____

24       CHRISTINA KIM-CAMPOS, CSR

25       CERTIFICATE NO. 12598