1                 UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    FEDERAL TRADE COMMISSION   )

5            Plaintiff          )

6      v.                       ) No. CV 15-4527-GW(PLAx)

7    BUNZAI MEDIA GROUP, INC., )

8    et al.,                    )

9            Defendants.        )

10

11

12

13

14                          Tuesday, February 23, 2016

15

16                          10877 Wilshire Boulevard

17                          Suite 700

18                          Los Angeles, California

19

20

21

22

23            The above-entitled matter came on for

24    deposition, pursuant to Notice, at 9:02 a.m.

25

2

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4    FEDERAL TRADE COMMISSION   )

 5          Plaintiff           )

 6      v.                      ) No. CV 15-4527-GW(PLAx)

 7    BUNZAI MEDIA GROUP, INC., )

 8    et al.,                   )

 9          Defendants.         )

10

11

12

13

14

15              DEPOSITION OF PAUL MEDINA, taken on

16    behalf of the Federal Trade Commission, at

17    10877 Wilshire Boulevard, Suite 700, Los Angeles,

18    California, commencing at 9:02 a.m., and concluding

19    at 11:40 a.m., on Tuesday, February 23, 2016,

20    pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21    CSR No. 12598, a Certified Shorthand Reporter, in

22    and for the State of California.

23

24                              ***

25
```

3

Medina

FTC v. Bunzai Media Group, Inc., et al.                                   2/23/2016

```
 1    A P P E A R A N C E S
 2    For the Federal      U.S. FEDERAL TRADE COMMISSION
 3    Trade Commission:    REID TEPFER, ESQ.
 4                         EMILY B. ROBINSON, ESQ.
 5                         1999 Bryan Street
 6                         Suite 2150
 7                         Dallas, Texas   75201-6808
 8                         (214) 979-9383
 9                         rtepfer@ftc.gov
10                         erobinson@ftc.gov
11    For the Defendants   CROSSWIND
12    Alon Nottea and      ROBERT M. UNGAR, ESQ.
13    Roi Reuveni:         (Via Telephone)
14                         2190 North Beverly Glen Blvd.
15                         Los Angeles, California  90077
16                         (818) 646-4750
17                         rmu@crosswindlaw.com
18    For the Defendants   ESENSTEN LAW
19    Doron Nottea and     ROBERT ESENSTEN, ESQ.
20    Motti Nottea:        (Via Telephone)
21                         12100 Wilshire Boulevard
22                         Suite 1660
23                         Los Angeles, California  90025
24                         (310) 273-3090
25                         resensten@esenstenlaw.com
```

4

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1                          I   N   D   E   X

 2

 3    WITNESS                   EXAMINATION              PAGE

 4    Paul Medina          By Mr. Tepfer               6

 5

 6    DEPOSITION EXHIBITS              INITIAL REFERENCE

 7    Medina Deposition Exhibit No.  26              36

 8    Medina Deposition Exhibit No.  23              38

 9    Medina Deposition Exhibit No.  37              49

10    Medina Deposition Exhibit No.  38              51

11    Medina Deposition Exhibit No.  40              54

12    Medina Deposition Exhibit No.  45              57

13    Medina Deposition Exhibit No.  47              63

14    Medina Deposition Exhibit No.  52              65

15    Medina Deposition Exhibit No.  59              66

16    Medina Deposition Exhibit No.  65              72

17    Medina Deposition Exhibit No.  76              78

18    Medina Deposition Exhibit No.  81              79

19    Medina Deposition Exhibit No. 107              82

20    Medina Deposition Exhibit No. 138              83

21    Medina Deposition Exhibit No. 141              85

22    Medina Deposition Exhibit No. 146              87

23    Medina Deposition Exhibit No. 149              89

24    Medina Deposition Exhibit No. 152              92

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

5

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1   DEPOSITION EXHIBITS                    INITIAL REFERENCE

 2      (Continued)

 3   Medina Deposition Exhibit No. 153             96

 4   Medina Deposition Exhibit No. 166             98

 5   Medina Deposition Exhibit No. 168             99

 6   Medina Deposition Exhibit No. 169            100

 7   Medina Deposition Exhibit No. 171            102

 8   Medina Deposition Exhibit No. 172            103

 9   Medina Deposition Exhibit No. 173            104

10   Medina Deposition Exhibit No. 174            105

11

12

13

14              INFORMATION REQUESTED

15                    None.

16

17

18        QUESTIONS INSTRUCTED NOT TO ANSWER

19                    None.

20

21

22

23

24

25
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1                    LOS ANGELES, CALIFORNIA
 2                  TUESDAY, FEBRUARY 23, 2016
 3                        9:02 A.M.
 4
 5                    PAUL MEDINA,
 6          called as a witness by and on behalf of
 7          the Plaintiff, being first duly sworn,
 8          was examined and testified as follows:
 9
10                      EXAMINATION
11  BY MR. TEPFER:
12    Q.   All right.  Mr. Medina, my name is Reid
13  Tepfer, and with me is Emily Robinson.  We're both
14  attorneys with the Federal Trade Commission, and we
15  represent the FTC in FTC vs. BunZai Group, in the
16  Central District of California.
17          First of all, I'll ask do you understand
18  you're under the same oath today as if you were in
19  the courtroom?
20    A.   Yes.
21    Q.   And I'll assume that you understand the
22  questions that I ask you, unless you tell me that
23  you don't understand them.  Is that okay?
24    A.   Yes.
25    Q.   Sometimes an attorney may object.
```

7

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    Afterwards please answer the question, unless he
2    instructs you not to.
3        A.    Okay.
4             MR. TEPFER:  Okay.  And, Mr. Ungar, would
5    you mind representing yourself for the record.
6             MR. UNGAR:  Robert Ungar.
7    BY MR. TEPFER:
8        Q.    Okay.  And is there anything that would
9    prevent you from thinking clearly and testifying
10   truthfully today?
11       A.    No.
12       Q.    And if at any time you need a break, let me
13   know.
14       A.    Okay.
15       Q.    Have you ever had your deposition taken
16   before?
17       A.    No.
18       Q.    I want to talk a little bit about your
19   background.  As of June 2015, where were you
20   employed at?
21       A.    Focus Media Solutions.
22       Q.    And were you employed anywhere else at this
23   time?
24       A.    No.
25       Q.    And when did you begin your position at

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

8

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1    Focus Media Solutions?

2        A.    September 2014.

3        Q.    Did you have a job title?

4        A.    CEO at Focus Media Solutions.

5        Q.    And you said September 2014?

6        A.    Yes.

7        Q.    Were you employed anywhere else at that

8    time?

9        A.    For Media Urge.

10       Q.    So you worked at both companies at the same

11   time?

12       A.    Yes.

13       Q.    Okay.

14       A.    Well --

15       Q.    When did you --

16       A.    -- Media --

17       Q.    Oh, sorry.  Go ahead.

18       A.    Media Urge was -- we were going to open a

19   new company called Focus Media.  Well, I was hired

20   for Focus Media, so it was just a new, a new entity

21   that was started, that they wanted me to act as the

22   acting CEO.

23       Q.    And when you say they wanted you to be the

24   acting CEO, who are you referring to?

25       A.    Alon Nottea.

9

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1       Q.    And anyone else?

2       A.    No.

3       Q.    And is Alon Nottea the one that hired you

4    for Focus Media Solutions?

5       A.    Yes.

6       Q.    And when did you begin your position at

7    Media Urge?

8       A.    2013.  I don't recall the -- the dates.

9       Q.    Okay.  And who hired you at Media Urge?

10       A.    Alon Nottea.

11       Q.    And did you have a title while you were

12    there?

13       A.    I was Director of Business Development, and

14    then I was moved to Vice President.

15       Q.    Was that a promotion?

16       A.    It was a promotion, yes.

17       Q.    Do you recall when you got that promotion?

18       A.    I don't recall.

19       Q.    Were you working anywhere else, like at

20    another company, simultaneous with Media Urge?

21       A.    I was working -- I started working for a

22    company called BunZai Media in 2010, I believe.

23       Q.    Uh-huh.

24       A.    And then -- and then Alon Nottea told me to

25    go work for Media Urge.

10

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      Q.     And who hired you at BunZai Media?

2      A.     Khristopher Bond.

3      Q.     And at Focus Media Solutions did you have a

4    supervisor of any kind?

5      A.     Alon Nottea.

6      Q.     And did you have a supervisor while you were

7    at Media Urge?

8      A.     Alon Nottea and Khristopher Bond.

9      Q.     And I think you said that Alon hired you at

10   BunZai.  Was he your supervisor there -- or rather,

11   you said Khristopher hired you?

12     A.     Khristopher hired me at BunZai Media.  Yes.

13     Q.     And who were your supervisors at BunZai

14   Media?

15     A.     Khristopher and Alon.

16     Q.     And what sort of work did you do for Bunzai

17   Media while you were there?

18     A.     I started as a Customer Service Rep, taking

19   phone calls for Customer Service Reps.  I

20   transitioned from Customer Service to learning about

21   a software called Lime Light.  It's a -- it's a

22   customer relation management software.  So I was

23   doing -- actually, I did some shipping -- actually,

24   I started as doing shipping at BunZai Media, and

25   then I moved from shipping to Customer Service, and

11

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    then from Customer Service to learning about this

2    new software.

3        Q.    And did you have a direct supervisor in the

4    Shipping Department?

5        A.    There was a Shipping Manager called -- by

6    the name of George.  George.  He was a Shipping

7    Manager.  Mainly -- I was mainly working with him on

8    the shipping side.

9        Q.    And what about in the Customer Service

10   Department?  Do you have a direct supervisor there?

11       A.    Khristopher.  He was -- he managed our

12   Customer Service.

13       Q.    And do you know what BunZai Media Group's

14   business was?

15       A.    Yes.  They were -- BunZai Media was selling

16   a skin care product.

17       Q.    And I guess I just want to run through a

18   list of companies and see if you're familiar with

19   them.

20            Have you ever heard of a company called

21   Pinnacle Logistics, Inc.?

22       A.    Yes.

23       Q.    And how did you become familiar with that

24   company?

25       A.    They -- they managed the -- they managed the

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

 1    call center, so yeah.

 2        Q.   And so they -- you said they managed a call

 3    center.  Did -- how did you learn this?

 4        A.   Just overhearing.  Overhearing the -- just

 5    the colleagues talking about Pinnacle running

 6    Customer Service.

 7        Q.   Do you happen to know who owned Pinnacle

 8    Logistics, Inc.?

 9        A.   No.

10        Q.   And do you know who owned BunZai Media

11    Group?

12        A.   I assume its owend by Alon and Khristopher

13    because they -- because they hired me.

14        Q.   And have you ever heard of the company DSA

15    Holdings, Inc.?

16        A.   Yes.

17        Q.   And where have you heard of that?

18        A.   I don't recall.  Just overhearing a company

19    called DSA Holdings.

20        Q.   Do you recall who you heard speaking about a

21    company called DSA Holdings?

22        A.   Alon.

23        Q.   Do you have any idea what DSA Holdings'

24    business was?

25        A.   No.

13

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1              (Interruption in the proceedings)
 2              MR. TEPFER:  I think we have someone calling
 3     in here.  Do you have -- if we could go off the
 4     record real quick.
 5              (Mr. Esensten joins the proceedings.)
 6              MR. TEPFER:  Back on the record.
 7              Would you mind reading the last thing that
 8     we were talking about.
 9              (The previous question and answer
10              were read back by the court reporter
11              as follows:
12                  "QUESTION:  Do you have any idea
13              what DSA Holdings' business was?
14                  "ANSWER:  No.")
15     BY MR. TEPFER:
16       Q.   Have you ever heard of the company, a
17     company called Agoa Holdings, Inc.?
18       A.   Yes.
19       Q.   And where have you heard of that company?
20       A.   I managed Lime Light software.  So Lime
21     Light allows you to enter in campaign's product
22     SKUs, and it also tells you to enter in a merchant
23     account.  So whenever I had to enter in a merchant
24     account, I would get the information from Alon
25     Nottea.  He would send me the information to upload
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1      into the Lime Light software.  That's the only time

2      I've heard about Agoa Holdings.

3          Q.    So do you know if Agoa Holdings sold AuraVie

4      products?

5          A.    Yes.

6          Q.    Do you know if it sold it by risk free

7      trial?

8          A.    Yes.

9          Q.    And do you know who owned Agoa Holdings,

10     Inc.?

11         A.    I don't recall, no.

12         Q.    Do you know who managed the merchant account

13     in Agoa Holdings' name?

14         A.    Managed as in?

15         Q.    Do you -- I guess you mentioned that

16     Mr. Alon Nottea had directed you to --

17         A.    Enter in the account details into Lime

18     Light.

19         Q.    And just to talk about Lime Light real

20     quick, could you --

21              (Interruption in the proceedings)

22              MR. TEPFER:  If we could go off the record

23     real quick.

24              (Recess)

25              MR. TEPFER:  If we could go back on the

15

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    record.

2              And would you mind reading back the last

3    question.

4              (The previous partial question was

5              read back by the court reporter as

6              follows:

7                  "QUESTION:  And just to talk

8              about Lime Light real quick, could

9              you --")

10   BY MR. TEPFER:

11     Q.   Oh, would you mind explaining what the Lime

12   Light software is?

13     A.   Yes, it's a customer relation management

14   tool.  Lime Light manages campaigns, product SKUs,

15   merchant accounts, shipping I.D.'s, manages

16   customers.

17     Q.   Have you ever heard of the company Zen

18   Mobile Media, Inc.?

19     A.   Yes.

20     Q.   Where have you heard of that company?

21     A.   From Alon.

22     Q.   And what did Alon tell you about Zen Mobile

23   Media, Inc.?

24     A.   No information about the company.  Only to

25   upload the -- the information into Lime Light.

16

Medina

1      Q.    And was it your understanding that Zen

2    Mobile Media, Inc., sold AuraVie products?

3      A.    Yes.

4      Q.    By -- do you know if it sold it by risk free

5    trial?

6      A.    Yes.

7      Q.    Do you have any idea who owns Zen Mobile

8    Media, Inc.?

9      A.    No.

10     Q.    And what about the company Safehaven

11   Ventures, Inc.; have you ever heard of that?

12     A.    Yes.

13     Q.    Was that another company that you, I guess,

14   uploaded into Lime Light?

15     A.    That's correct.

16     Q.    Okay.

17     A.    Yes.

18     Q.    And have you ever heard of the company

19   Heritage Alliance Group, Inc.?

20     A.    No.

21     Q.    What about the company AMD Financial

22   Network, Inc.?

23     A.    Yes.

24     Q.    And what is that company?

25     A.    Same as -- uploaded into Lime Light.

17

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1      Q.   And who directed you to upload that into
2  Lime Light?
3      A.   Alon Nottea.
4      Q.   And what about SBM Management, Inc.; have
5  you ever heard of that?
6      A.   Yes.
7      Q.   Where did you hear of that company?
8      A.   From Alon Nottea.
9      Q.   Did that company also have a merchant
10  account?
11      A.   No.
12      Q.   What did Alon Nottea tell you about SBM
13  Management, Inc.?
14      A.   No details about SBM Management.
15      Q.   Do you have any idea what that company's
16  business purpose was?
17      A.   I -- no.
18      Q.   Do you recall the context that SBM
19  Management, Inc., was discussed in?
20      A.   I don't recall.
21      Q.   Do you recall the time period in which
22  Mr. Nottea mentioned the company?
23      A.   At -- when I was working at Media Urge, I
24  heard about this company.
25      Q.   And do you know if Media Urge had any sort

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    of business relationship with SBM Management?

2         A.    SBM paid some employees to Media Urge.

3    That's all I know --

4         Q.    Oh.  So --

5         A.    -- about SBM.

6         Q.    -- just to make sure I understand, SBM

7    Management paid some of Media Urge's employees's

8    salaries?

9         A.    Correct.  And myself as well.

10        Q.    So you received paychecks from SBM

11   Management?

12        A.    Yes.

13        Q.    Do you recall what time period it was that

14   you received these paychecks from SBM Management?

15        A.    I don't remember.  I'm going to say 2013.

16        Q.    Do you recall who signed those paychecks?

17        A.    I believe I remember seeing Stephan Bauer on

18   those paychecks.

19        Q.    Were all your paychecks, while you worked at

20   Media Urge, from SBM Management, Inc.?

21        A.    Yes.

22        Q.    Have you ever heard of the company Adageo,

23   LLC?

24        A.    No.

25        Q.    What about the company CalEnergy, Inc.?

19

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      A.    I remember that was a company mentioned from

2   Igor.

3      Q.    And that's Igor Latsanovski?

4      A.    Yes.

5      Q.    What did Mr. Latsanovski tell you about

6   CalEnergy, Inc.?

7      A.    Nothing.

8      Q.    Did he state that he was the owner of the

9   company?

10     A.    No.

11     Q.    Have you ever heard of the company Kai

12   Media, Inc.?

13     A.    Yes.

14     Q.    And where have you heard of that name?

15     A.    From Alon Nottea.

16     Q.    Was that another one of the companies that,

17   to your knowledge, sold AuraVie products by risk

18   free trial?

19     A.    Yes.

20     Q.    Have you ever -- have you ever heard of the

21   company Secured Commerce, LLC?

22     A.    No.

23     Q.    What about the company Secured Merchants,

24   LLC?

25     A.    Yes.

20

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1      Q.    Where have you heard of that company?

2      A.    From Alon as well.

3      Q.    Do you recall what Alon Nottea mentioned to

4   you about Secured Merchants?

5      A.    They managed technical development, software

6   development.  There was a period of time when Lime

7   Light needed to connect to the websites, so they

8   were outsourced to Secured Merchants.

9      Q.    And when you say "the websites," what

10  websites are you referring to?

11     A.    The websites that sold the products.

12     Q.    Do you recall the URL of any of those

13  websites?

14     A.    Yes.

15     Q.    Could you state the ones that you recall?

16     A.    Miracle Face Kit, myauravie.com.

17  Tryauravie.com.  Auraviefreetrial.com.

18     Q.    Have you ever heard of a company called USM

19  Products, Inc.?

20     A.    No.

21     Q.    Have you ever heard of a company called

22  Merchant Leverage Group, Inc.?

23     A.    No.

24     Q.    What about DMA Media Holdings, Inc.?

25     A.    Yes.

21

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      Q.   Where have you heard of that company?

2      A.   Same company.  To upload into Lime Light.

3      Q.   And so another company that sold AuraVie?

4      A.   Yes.

5      Q.   And have you ever heard of Shalita Holdings,

6    Inc.?

7      A.   Yes.

8      Q.   And where have you heard of that company?

9      A.   Same company.  To upload into Lime Light.

10     Q.   And have you ever heard of the company All

11   Star Beauty Products, Inc.?

12     A.   Yes.

13     Q.   And where have you heard of that company?

14     A.   Similar case.

15     Q.   Another one that sold AuraVie?

16     A.   Yes.

17     Q.   And just for, to make things simpler, if I

18   could refer to the companies that sold AuraVie by

19   risk free trial, just refer to them as the AuraVie

20   companies, does that sound okay?

21     A.   That sounds okay.

22     Q.   So all of the AuraVie companies that we've

23   just discussed --

24     A.   Correct.

25     Q.   -- were -- you stated that you uploaded

22

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1    those companies onto Lime Light?
 2        A.   Correct.
 3        Q.   And did Alon -- was Alon Nottea the one that
 4    directed you to upload the companies onto Lime
 5    Light?
 6        A.   Yes.
 7        Q.   Do you have any --
 8             So is Focus Media Solutions, Inc., was that
 9    an advertising company?
10        A.   Yes.  It was an online marketing company.
11        Q.   Did it do any marketing for AuraVie?
12        A.   No.
13        Q.   Did it market any other products by risk
14    free trial?
15        A.   Yes.
16        Q.   Do you recall the names of any of those
17    products?
18        A.   Yes.  Sorry.  One second.
19        Q.   Sure.  No problem.
20        A.   I'm trying to think of the companies.
21    Nuvoderm.  Essence of Argon.  LifeCell.  There's
22    about two to three more that I can't remember the
23    names.
24        Q.   Do you know if Dellure Collagen Face Mask
25    was another product?
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1       A.    Not for Focus Media Solutions.

2       Q.    Do you know of a company that marketed

3    Dellure Collagen Face Mask at any time?

4       A.    Media Urge.

5       Q.    Do you know what time period Dellure was

6    marketed by Media Urge?

7       A.    I would say mid-2013 to February of 2014.

8       Q.    Did Media Urge market AuraVie products at

9    any time?

10      A.    Yes.

11      Q.    And how did you learn this?

12      A.    How did I learn --

13      Q.    I suppose, was that in the course of your

14   job that you learned that Media Urge marketed

15   AuraVie?

16      A.    Yes.  I was responsible, also, for managing

17   another software called Hitpath, Hitpath tracking

18   software.

19      Q.    Mm-hmm.

20      A.    So one of my responsibilities was to send a

21   tracking link to affiliate networks.

22      Q.    Mm-hmm.

23      A.    This is how I got to learn the -- the

24   websites and how I got to learn about the products.

25   Hitpath is a tracking tool that allows you to track

24

Medina

FTC v. Bunzai Media Group, Inc., et al.                               2/23/2016

1    sales for affiliate networks.  So when a sale would
2    come in from, let's say, an affiliate network, it --
3    it would notify me, letting me know where the sale
4    came from.
5        Q.   Okay.  And is this Hitpath software, do you
6    happen to know who developed that software?
7        A.   Hitpath Company -- it's a company called
8    Hitpath.
9        Q.   Okay.  And are you familiar with a company
10   called Chargeback Armor, Inc.?
11       A.   I've heard of that company, yes.
12       Q.   Where have you heard of Chargeback Armor,
13   Inc.?
14       A.   From Alon.
15       Q.   Do you recall anything that Alon said to you
16   regarding the company?
17       A.   They were going to manage some chargeback.
18   They were going to manage chargebacks for his
19   products.
20       Q.   And so Chargeback Armor, Inc. -- so
21   Chargeback Armor, Inc., was going to be hired to
22   manage chargebacks for AuraVie?
23       A.   Correct.
24       Q.   Do you recall what time period Alon said
25   this to you?

25

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1       A.    2014, mid-2014.

2       Q.    Do you happen to know, do you have any

3    knowledge of who owns the company Chargeback Armor,

4    Inc.?

5       A.    I believe Alon owns it.  I believe he owns

6    it.

7       Q.    And have you ever heard of Motti Nottea?

8       A.    Yes.

9       Q.    Have you ever -- where have you heard of

10   Motti Nottea?

11      A.    I've seen him at the office.

12      Q.    And is that the BunZai Media Group office?

13      A.    Yes.

14      Q.    Do you know, is that the office at

15   7900 Gloria?

16      A.    Yes.

17      Q.    To discuss the other AuraVie companies that

18   we've mentioned earlier, do you happen to know where

19   any of those companies are located?

20      A.    No.

21      Q.    Do you know if they're located at

22   7900 Gloria?

23      A.    Yes.

24      Q.    So it was your understanding that the

25   principal place of business for all of AuraVie

26

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    companies was 7900 Gloria?

2        A.    Correct.

3        Q.    Was Motti Nottea a coworker of yours at

4    BunZai Media?

5        A.    No.

6        Q.    He would -- but you said he would come by

7    the office sometimes?

8        A.    He's -- he's Alon's father.

9        Q.    And would he do any, I guess, work for the

10   company when he would come by?

11       A.    No.

12       Q.    What about Doron Nottea; do you know him?

13       A.    Yes.

14       Q.    How do you know Doron Nottea?

15       A.    I would see him around as well --

16       Q.    And --

17       A.    -- at 7900 Gloria.

18       Q.    Did -- to your knowledge, did Doron Nottea

19   work at BunZai Media Group, Inc.?

20       A.    No.

21       Q.    Did he do any -- did he assist his brother

22   in running BunZai Media Group, Inc.?

23       A.    I'm not sure.  I -- I would ask questions to

24   his, to his employee Philip, so I would ask anytime

25   there was a payroll concerned with Media Urge or one

27

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    of the Media Urge employees or myself, I would ask

2    Philip.

3        Q.    Did Doron Nottea have some kind of role at

4    Media Urge?

5        A.    No.  I would -- I would -- I would mainly

6    work with Philip, so I'm assuming Philip would talk

7    to Doron.

8        Q.    And so it was your understanding that Philip

9    was an assistant to Doron?

10       A.    Yes.

11       Q.    Do you know if Nastassia Yalley was also an

12   assistant to Doron at any point?

13       A.    Yes.

14       Q.    How do you know that Nastassia was an

15   assistant to Doron?

16       A.    I would -- I would overhear Doron asking her

17   for some accounting task.

18       Q.    Do you recall what those accounting tasks

19   were related to?

20       A.    A lot of information about banking.  I never

21   got into details.  I -- I never asked about --

22       Q.    Do you --

23       A.    -- that.

24       Q.    Sorry.

25             Do you know if those accounting tasks

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    related to any of the AuraVie companies?

2         A.   Yes.

3         Q.   Do you know the time period in which you

4    heard overheard this?

5         A.   2011, 2012, 2013.

6         Q.   And you had stated that you would speak to

7    Philip, I guess, about some of these accounting

8    issues as they arose?

9         A.   Correct.

10        Q.   What made you think that you should speak to

11   Philip?  Did --

12        A.   Alon Nottea told me to talk to Philip for

13   anything regarding any financials, accounting.

14        Q.   Okay.  We discussed Igor Latsanovski

15   earlier.

16        A.   Yes.

17        Q.   How do you know Igor Latsanovski?

18        A.   I would see him around the office a few days

19   out of each month.

20        Q.   And that's the 7900 Gloria?

21        A.   Yes.

22        Q.   Do you recall -- I'll strike that.

23             Do you -- was that for the entire duration

24   that you worked at 7900 Gloria?

25        A.   Yes.

29

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1    Q.   And -- sorry, would you mind reminding me
2    that time period, the beginning, end point?
3    A.   I started in 2010, until 2014.
4    Q.   And when you went to work for Media Urge,
5    did you change locations?
6    A.   No.
7    Q.   So Media Urge was also located at
8    7900 Gloria?
9    A.   Yes.
10   Q.   Do you know if Igor Latsanovski was an owner
11   in BunZai Media Group, Inc.?
12   A.   I believe so, yes.
13   Q.   You said that Mr. Latsanovski would be there
14   a few days out of the month; is that correct?
15   A.   Correct.  Mm-hmm.
16   Q.   Do you know what he would do when he was at
17   7900 Gloria?
18   A.   He would go into a room with Alon and
19   Khristopher all the time, and they would close the
20   door.
21   Q.   And do you know if they would have meetings?
22   A.   Yes.
23   Q.   Do you happen to know what those meetings
24   were about?
25   A.   No.

30

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      Q.    Did you ever discuss the sale of AuraVie
2  with Mr. Latsanovski?
3      A.    No.
4      Q.    Did you ever have any business discussions
5  with Mr. Latsanovski?
6      A.    Because he knew that I ran Hitpath and Lime
7  Light and I -- I knew a lot about reporting, Excel,
8  he would come up to me and he would say, "How are
9  things going?  How are the sales going?", because I
10  managed Hitpath and all the sales would be coming in
11  from affiliate networks.  So he wanted to know that
12  they were -- that -- just wanted to interact with
13  me, seeing how things were -- were doing.
14      Q.    And just to make sure I understand your job
15  responsibilities a little better --
16      A.    Mm-hmm.
17      Q.    -- did you ever -- I know that -- BunZai
18  Media Group had a Chargeback Department; correct?
19      A.    Yes.
20      Q.    Did you have any part in the chargeback
21  department?
22      A.    No.
23      Q.    Do you know who that was?
24      A.    Khristopher.
25      Q.    Do you know if Roi Reuveni had any position

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1     at any point in the Chargeback Department at BunZai?

2         A.    Not at BunZai.  At Pinnacle.

3         Q.    Was -- do you know -- did Roi Reuveni work

4     at BunZai Media Group?

5         A.    No.

6         Q.    Do you recall when Mr. Reuveni began working

7     at Pinnacle Logistics?

8         A.    I don't recall, but I'm going to say late

9     2012, 2013 timeframe.

10        Q.    And what was his position at Pinnacle

11    Logistics?

12        A.    He managed all the IT, all the technical

13    side of the buildings -- printers, faxes -- any time

14    there was an IT related issue.  I saw him working

15    with Khristopher a lot.

16        Q.    And so did you -- so you never discussed

17    with Mr. Latsanovski the company's chargebacks --

18    rather, BunZai Media Group, Inc.'s, chargebacks?

19        A.    No.

20        Q.    Did you ever overhear him having discussions

21    concerning chargebacks with anyone else?

22        A.    Alon and Khristopher.

23        Q.    Do you recall the nature of those

24    conversations?

25        A.    He would ask about the Chargeback

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1    Department, how are things going in the Chargeback.

2    I would overhear him talking about that, but that

3    was -- that was about it.

4        Q.   Do you recall about how often

5    Mr. Latsanovski had these discussions concerning

6    chargebacks with Alon and Kris?

7        A.   They always had a private meeting, closed

8    doors 95 percent of the time.

9        Q.   Sure.

10            And do you know, have you ever heard of

11    anyone named Alan Argaman?

12        A.   Yes.

13        Q.   How do you know Alan Argaman?

14        A.   When there was a period of time that we

15    needed some tech -- some technical software

16    development, Alon Nottea referred me to Alan

17    Argaman.

18        Q.   Who sort of software development did

19    Mr. Argaman work on?

20        A.   He assisted in a software called

21    ClickConnector.

22        Q.   And what's ClickConnector?

23        A.   ClickConnector is a software that allows you

24    to API into Lime Light, and it makes it easier to --

25    to connect the software to Lime Light.

33

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1      Q.   And you'll have to forgive me.  I'm not very
 2  tech savvy.
 3      A.   Sure.
 4      Q.   What does API mean?
 5      A.   I don't know the exact meaning.
 6      Q.   Sure.
 7      A.   I just -- I use it a lot as a --
 8      Q.   That's no problem.
 9      A.   -- as a -- but in theory it's -- it's a
10  virtual -- not even a virtual -- it's a piece of
11  code that connects one software to another software.
12      Q.   So ClickConnector is a software that keeps
13  track of affiliate traffic; is that correct?
14      A.   No.  That's Hitpath.
15      Q.   Oh, sorry.  I'm mixing them up.
16      A.   Sure.  Yeah, there were three softwares.
17      Q.   Sure.
18      A.   Hitpath kept track of the sales and all the
19  traffic coming from affiliate networks, and that was
20  its only purpose, just to track sales and who, where
21  the sales are coming from.
22      Q.   Uh-huh.
23      A.   Lime Light is used for merchant accounts,
24  setting up campaigns, product SKUs, shipping SKUs.
25  And then ClickConnector is what connects the website
```

34

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1      to Lime Light.

2          Q.    Okay.   That makes sense.

3          A.    Yeah.

4              MR. TEPFER:   Sorry.   Would the court

5      reporter mind reading that back.

6              (The previous answer was read back by

7              the court reporter as follows:

8                 "ANSWER:   Hitpath kept track of

9              the sales and all the traffic coming

10             from affiliate networks, and that was

11             its only purpose, just to track sales

12             and who, where the sales are coming

13             from.   Lime Light is used for

14             merchant accounts, setting up

15             campaigns, product SKUs, shipping

16             SKUs.   And then ClickConnector is

17             what connects the website to Lime

18             Light.")

19     BY MR. TEPFER:

20         Q.    Okay.   And do you know -- so Alon Nottea

21     directed you to, I guess, speak with Mr. Argaman

22     concerning this?

23         A.    Yes.

24         Q.    Do you recall the time period that was?

25         A.    2000 -- early 2013.

35

Medina

1       Q.    And do you recall which company Mr. Argaman
2    was performing this task for?
3       A.    Secured Merchants.
4       Q.    And so that was the company he was working
5    for?
6       A.    Yes.
7       Q.    And was the company that he was -- I guess,
8    the client company, was that BunZai at that point?
9       A.    I -- I -- I wouldn't -- I don't know the
10   agreement they had.
11      Q.    Sure.
12      A.    I don't know what company they signed it
13   with.
14      Q.    This may be rehashing a bit what --
15      A.    No problem.
16      Q.    -- we already discussed.
17      A.    No problem.
18      Q.    So we were talking a little bit about Doron
19   Nottea, and you said that typically you would speak
20   with his assistant Philip?
21      A.    Philip, correct.
22      Q.    And sometimes with his other assistant
23   Nastassia?
24      A.    I would speak to Philip, but I would see
25   Nastassia working with Philip and Doron.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1        Q.    Okay.  Okay.  That makes sense.

2              And did you ever discuss with Doron Nottea

3    directly concerning the AuraVie companies?

4        A.    Yes.  Because Lime Light has a processing

5    report, he asked me one time to send him all the

6    processing for each company that Alon told me to

7    upload.

8        Q.    And was it your understanding that Doron

9    Nottea was in charge of the accounting for the

10   AuraVie companies?

11       A.    Yes.

12       Q.    If we could jump in to talking a little bit

13   about some documents --

14       A.    Okay.

15       Q.    -- I'm now handing the witness what's been

16   marked Exhibit 26.

17             (Plaintiff's Exhibit 26 was marked

18             previously for identification by the

19             FTC and is attached hereto.)

20   BY MR. TEPFER:

21       Q.    Have you ever seen this document before?

22       A.    No.

23       Q.    In -- if you could turn to -- if you could

24   turn to -- at the bottom it has a Bates number --

25       A.    Okay.

37

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1      Q.    00 and the page would be page 25, or ending
2   in Bates number 579.
3      A.    25?
4      Q.    Mm-hmm.
5      A.    Okay.
6      Q.    About halfway down the page it says "Paul".
7      A.    Okay.
8      Q.    If you'd mind reading that paragraph real
9   quick.
10      A.    "Since we've implemented a 5 day hold before
11   we ship all successful rebills, we've found that
12   most customers have enough time to see the charge on
13   their bank account, and call to question, cancel
14   and/or refund.  This procedure alone has saved us
15   thousands of dollars in product and shipping costs,
16   as well as customer service and warehouse manpower."
17      Q.    Did you write that paragraph?
18      A.    No.
19      Q.    Okay.  So you're unfamiliar with this
20   document entirely?
21      A.    Okay.  Oh, I'm sorry.  What's your question?
22      Q.    Just that you're unfamiliar with this
23   document?
24      A.    Entirely.  Correct.
25      Q.    Okay.

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

 1      A.   These are not my words.

 2      Q.   Okay.  I'm now handing the witness what's

 3  been marked Exhibit 23.

 4           (Plaintiff's Exhibit 23 was marked

 5           Previously for identification by the

 6           FTC and is attached hereto.)

 7  BY MR. TEPFER:

 8      Q.   And, Mr. Medina, if you want, we can give

 9  you copies to keep as well.  I'm not sure if you

10  want any of these exhibits.

11      A.   I'm okay.

12      Q.   Okay.  Well --

13      A.   Thanks.

14      Q.   -- some people do.

15           So this is a -- appears to be an email from

16  Alon Nottea.

17           Do you recall receiving this email?

18      A.   Yes.

19      Q.   Do you recall what the email was concerning?

20      A.   I don't recall.  I see --

21      Q.   And feel free to take your time to review

22  it.

23      A.   Okay.

24      Q.   Do you remember what the email was about?

25      A.   I would -- I would have to check with Alon

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1    what this is -- what this is regarding.
 2        Q.   Do you recall if you read it at the time
 3    that you received it?
 4        A.   Yes.
 5        Q.   Do you have any idea why in the "To" column
 6    it says "Igor"?
 7             Do you have any idea why Alon may have sent
 8    this email to Igor?
 9        A.   No.
10        Q.   Did you ever have any discussions with Alon
11    Nottea concerning the possibility of a FTC closure
12    of their UMS accounts?
13        A.   No.
14        Q.   Did Alon Nottea ever express to you any
15    concerns regarding the possibility of a FTC
16    enforcement action?
17        A.   No.
18        Q.   Did Mr. Nottea ever discuss with you FTC
19    rules or regulations?
20        A.   No because I handle Lime Light merchant
21    accounts.
22        Q.   Yes, sir.
23        A.   There was -- he always wanted to know --
24    Alon Nottea always wanted to know the processing for
25    each merchant account, for the reason of making sure
```

40

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    that each merchant account in Lime Light does not

2    surpass by a lot.  So he always liked to keep me in

3    the loop regarding processing because of -- because

4    I managed the -- the software.

5        Q.   And so Alon Nottea tried -- wanted to make

6    sure that one merchant account wasn't processed a

7    lot more than the other?

8        A.   That's right.

9        Q.   And do you know why that is?

10       A.   It has to do with the Visa/MasterCard

11   regulations, I believe.

12       Q.   Is that the chargeback regulations you're

13   referring to?

14       A.   Yes.

15       Q.   Did Mr. Nottea ever express concern about

16   the Visa/MasterCard chargeback regulations?

17       A.   Yes.  He always told me to make sure in Lime

18   Light the processing does not -- one does not spike

19   up too much.

20       Q.   Did he direct you to his process through

21   different entities, based on the chargeback

22   percentages for the company?

23       A.   Yes.

24       Q.   Was that standard practice?

25       A.   I never seeked legal advice for standard

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

41

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    practice.  I was just doing as I was told.

2        Q.   Yes, sir.

3             And that was as you were told from Mr. Alon

4    Nottea?

5        A.   Right.

6        Q.   And do you recall the time period in which

7    that was, I guess, the direction from Alon Nottea?

8        A.   I took over Lime Light in 2011.  So from the

9    beginning.

10       Q.   And to your knowledge, did Alon Nottea

11   direct other employees to do that same practice?

12       A.   No.  He only told me.

13       Q.   Were you the only person, I suppose, in

14   charge of Lime Light and --

15       A.   Yes.

16       Q.   -- that practice?

17       A.   That's right.  There was -- when -- when Roi

18   was in charge of doing the whole call center, he --

19   he had direct access to Lime Light as well, and

20   also, another colleague by the name of Andree

21   Mansour.

22       Q.   Do you know if Roi Reuveni would also --

23   sorry.

24            Is that practice called load balancing?

25       A.   Yes.

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1     Q.    Do you know if Roi Reuveni ever engaged in

2     load balancing for the AuraVie companies?

3     A.    No.

4     Q.    And is that no, you don't know, or no, he

5     did not?

6     A.    No, he did not.

7     Q.    We may have also discussed this, but I --

8     just for clarity, at Pinnacle Logistics, do you know

9     what Roi Reuveni's title was?

10    A.    I don't know his exact title, but I knew he

11    ran the Pinnacle department.

12    Q.    And when you say "the Pinnacle department,"

13    do you mean Pinnacle Logistics, the company?

14    A.    Pinnacle Logistics.

15    Q.    Did you think of Pinnacle as a department of

16    a bigger company?

17    A.    As a -- I saw it as a department of Alon's

18    process.

19    Q.    And so was it -- and when you say his

20    process, do you mean his sale of AuraVie products?

21    A.    That's right.

22    Q.    Did -- and was it your understanding that

23    Pinnacle was one of Alon Nottea's companies?

24    A.    Yes.

25    Q.    And what made you think that Pinnacle was

43

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1    one of Alon Nottea's companies?

2        A.    It was in the same building.

3        Q.    In that 7900 Gloria?

4        A.    Yes.

5        Q.    Are there any other reasons that made you

6    think that?

7        A.    No.  Because I saw Roi working with Alon.

8        Q.    And have you ever met anyone by the name of

9    Oz Mizrahi?

10       A.    No.

11       Q.    Do you know -- do you know if any of the

12   AuraVie companies ever had a merchant account or

13   ever had a merchant account that was in the Visa or

14   MasterCard Excessive Chargeback Program?

15       A.    Alon told me one time to remove a company

16   out of Lime Light, and I asked him why, and he said

17   because it went over the Visa/MasterCard chargeback

18   ratio.

19       Q.    And do you know which company that was?

20       A.    No.

21       Q.    Do you --

22       A.    I don't recall.  At the time I did remember.

23   Now I don't remember now.

24       Q.    Sure.

25             And do you recall what time period that was?

44

Medina

1      A.    That was early.  That was in the earlier
2  years.  2012.
3      Q.    Did Alon Nottea ever explain to you why so
4  many different companies were processing, I guess,
5  charges for the AuraVie risk free trial sales?
6      A.    I -- I never asked him.  I never --
7      Q.    Did you ever hear Mr. Nottea discuss it with
8  anyone else?
9      A.    No.
10     Q.    Are you aware if any -- to talk about the
11  AuraVie companies generally, the individuals that
12  are listed as CEO, owner on those companies, are you
13  aware if they received a 1 percent commission for
14  sales process through their merchant accounts?
15     A.    Yes.  I pulled a processing report from Lime
16  Light, and Doron Nottea told me to place a formula
17  saying at the end of the processing add 1 percent to
18  there, but I didn't ask him why.
19     Q.    Did --
20     A.    So I sent him that report.
21     Q.    And did Doron Nottea ever refer to this
22  1 percent amount as a commission?
23     A.    No, he didn't refer.  He just told me to
24  just do the report.
25     Q.    And do you recall the time period that Doron

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1     Nottea told you to do this report?

2         A.   2012.

3         Q.   And would you periodically provide these

4     reports to Doron Nottea?

5         A.   Yes.

6         Q.   And do you recall the duration in which you

7     provided these reports to Doron Nottea?

8         A.   Every three months.

9         Q.   And that began in 2012; correct?

10        A.   Correct.

11        Q.   Do you recall when it ended?

12        A.   2014.

13        Q.   And would you provide these reports directly

14    to Doron Nottea?

15        A.   Yes.

16        Q.   Do you recall if AuraVie, if Alon Nottea

17    ever had intentions of phasing out the sale of

18    AuraVie products?

19        A.   Yes.  I remember being in a meeting with him

20    saying that he wanted to stop the process.

21        Q.   Do you know who else was in that meeting?

22        A.   No, I don't recall.

23        Q.   Do you know if Roi Reuveni was in that

24    meeting?

25        A.   I don't remember.

46

Medina

FTC v. Bunzai Media Group, Inc., et al.                                      2/23/2016

1      Q.    What about Doron Nottea?

2      A.    It was -- it was just a verbal.  It was a

3   verbal.  It wasn't a formal --

4      Q.    Yes.

5      A.    -- meeting.

6      Q.    Did Mr. Nottea -- did Alon Nottea explain

7   why he was going to phase out AuraVie products?

8      A.    No.

9      Q.    Did Alon Nottea ever express concern about

10  the number of online complaints for AuraVie

11  products?

12     A.    Not to me.

13     Q.    Did Alon Nottea ever discuss with you the

14  amount of complaints that the call center received

15  at any point?

16     A.    Not with me, no.

17     Q.    Did you ever overhear him having that

18  discussion with anyone else?

19     A.    Yes.

20     Q.    Who did you hear Alon Nottea discuss the

21  complaints the call center received?

22     A.    Khristopher.

23     Q.    What -- do you recall what he said about

24  those complaints?

25     A.    They have to respond back.  They just have

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                                  2/23/2016

1    to respond back to those complaints.

2        Q.   Do you know if Alon Nottea had any role in

3    drafting the scripts that the call center used in

4    responding to these complaints?

5        A.   No.  I do know Khristopher did.

6        Q.   Do you know if Roi Reuveni ever had any role

7    in drafting the scripts that the call centers used?

8        A.   Yes.

9        Q.   How do you know that?

10       A.   Just discussing with him.  I would run into

11   him.  "Hi, how's the call center doing?  How you

12   doing?  How's the chargebacks doing?"

13            And then he would tell me, "Oh, I'm working

14   on this protocol, the -- the new report that" --

15   because Khristopher wrote the original one.

16       Q.   Mm-hmm.

17       A.   That's the one that I was using when I was a

18   Customer Service Rep.  So I was reading off a script

19   that Khristopher wrote.

20       Q.   Mm-hmm.

21       A.   But then I -- I do know that he handed it

22   over to Roi.

23       Q.   Oh, to Roi?

24       A.   Yes.

25       Q.   Okay.  And do you recall when he handed that

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

 1    over to Roi?

 2        A.   I'm going to say 2012.  '12, '13.

 3        Q.   And do you know -- sorry.  Go ahead.

 4        A.   Sorry.  It's just my dates are hard to

 5    remember.

 6        Q.   Do you recall the time period in which Roi

 7    Reuveni began managing the Chargeback Department of

 8    Pinnacle?

 9        A.   I remember there was a Chargeback Department

10    that Khristopher ran downstairs with a guy by the

11    name of Andrew.  The period when he handed that off

12    to Roi, I can't recall.

13        Q.   And that Andrew, is that Andrew Stanley?

14        A.   Yes.

15        Q.   Is it correct that you were CEO of AD

16    Lifestyle Network?

17        A.   Yes.

18        Q.   What is that company?

19        A.   It's my personal company that I use for any

20    extra work on the side.

21        Q.   Okay.  It's separate from the AuraVie

22    companies?

23        A.   Yes.

24        Q.   Are you aware if BunZai Media Group ever did

25    any processing in the United Kingdom?

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1      A.    No.

 2      Q.    Are you aware if BunZai Media Group ever

 3   sold, I guess, products by risk free trial overseas?

 4      A.    I overheard that they wanted to do a

 5   process, but I wasn't -- I wasn't involved.

 6            MR. TEPFER:  I'm now handing the witness

 7   what's been marked Exhibit 37.

 8            (Plaintiff's Exhibit 37 was

 9            previously marked for identification

10            by the FTC and is attached hereto.)

11   BY MR. TEPFER:

12      Q.    Do you recall sending this email to Roi,

13   Alon, Tyler R, and it says Global Media?

14      A.    Yes.

15      Q.    In the "Subject" it refers to a Eugene.  Is

16   that Eugene Shampansky?

17      A.    Yes.

18      Q.    Who is Eugene Shampansky?

19      A.    Merchant processor.

20      Q.    Do you know, do you recall what company

21   Eugene Shampansky is a merchant processor for?

22      A.    I'm going to say Global.  Global Media.

23      Q.    And is Global Media, is there an individual

24   associated with that email address in that "To" row?

25      A.    I don't recall.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1       Q.    In the "To" row it references a Tyler R.   Is

2    that Tyler Reitenbach?

3       A.    Yes.

4       Q.    Who's Tyler Reitenbach?

5       A.    He was an employee of Alon.

6       Q.    In the second paragraph you state, "Doron

7    100% of all fees get taken out prior to deposit so

8    there is no monthly fees that get taken out once a

9    month."

10          What fees are you referring to in that

11   statement?

12      A.    Merchant fees.

13      Q.    Was it your understanding that Doron, like,

14   was in charge of keeping track of merchant fees for

15   the AuraVie companies?

16      A.    Yes.

17      Q.    And do you recall what -- this is concerning

18   the sale of -- sorry.

19          Do you recall what this email is regarding?

20      A.    It would -- it would have been the CRM

21   processing reports for Leor.

22      Q.    And what is Leor?

23      A.    Leor was another skin care product of

24   Alon's.

25      Q.    And do you recall where Leor was marketed?

51

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1      A.   Leor, in the UK.  In the UK.

 2      Q.   Was it exclusively marketed in the UK?

 3      A.   Yes.

 4           MR. TEPFER:  I'm now handing the witness

 5  what's been marked Exhibit 38.

 6           (Plaintiff's Exhibit 38 was

 7           previously marked for identification

 8           by the FTC and is attached hereto.)

 9  BY MR. TEPFER:

10      Q.   Do you recall receiving this email from Leor

11  Arazy?

12      A.   Yes.

13      Q.   Do you recall who Leor Arazy is?

14      A.   She was the Human Resource girl.

15      Q.   And did she work in the Human Resources

16  Department at Pinnacle Logistics?

17      A.   I don't know which company she worked for.

18  I was just told that she was the Human Resources.

19      Q.   Did she handle the Human Resources for Media

20  Urge, to your knowledge?

21      A.   Yes.

22      Q.   What about BunZai Media Group?

23      A.   Yes.

24      Q.   What about Focus Media Solutions?

25      A.   No.
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      Q.   Do you recall the time period that BunZai
2   Media Group, I guess, closed its operations?
3      A.   I wouldn't know that.
4      Q.   Do you recall if employees from BunZai Media
5   Group, after that company closed, were hired by
6   Pinnacle?
7      A.   Yes.  Same happened to me.  I was working
8   for BunZai Media Group, and then I was hired by
9   Media Urge.
10     Q.   And so when BunZai Media Group closed its
11  operation, did many of these employees go to these
12  other companies you're referring to?
13     A.   Mm-hmm.  Yes.
14     Q.   And are those companies Pinnacle and Media
15  Urge?
16     A.   Yes.
17     Q.   Was it -- did anyone ever explain to you why
18  BunZai was closing and these other companies were
19  opening?
20     A.   I didn't ask those questions.
21     Q.   I'm sorry.  I can't recall if I asked this
22  earlier, but we were discussing the, I guess, a wind
23  down period for AuraVie.  Did Alon explain to you
24  why he was deciding to wind down AuraVie products?
25     A.   No.

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1        Q.    In this email, in the cc it references Doron
2    and Igorlats Igor.  Do you have any idea why Leor
3    Arazy included Doron on this email?
4        A.    I'm assuming for accounting.
5        Q.    And was it your understanding that Doron
6    kept track of, I suppose, the payroll for the
7    AuraVie companies?
8        A.    I'm not sure.  Since I worked with Philip
9    mainly, I wouldn't know what Doron had --
10       Q.    Do you have any --
11       A.    -- on file.
12       Q.    Sorry.
13             Do you have any idea why Leor might have
14   included Igor Latsanovski on this email?
15       A.    No.
16       Q.    Can you recall any other payroll emails that
17   Mr. Latsanovski was included on?
18       A.    No.  I have --
19             MR. UNGAR:  Objection as to the form of the
20   question.  Objection as to the form of the question.
21   It's vague and ambiguous, calls for speculation,
22   lacks foundation.
23   BY MR. TEPFER:
24       Q.    You can go ahead.
25       A.    After I -- after my task of working for Lime

54

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    Light and Hitpath, I -- I would go up to Alon and

2    ask him if there's something else that I can help

3    you with, just to show -- just to show -- just try

4    to be a good employee, try to go up to him and say,

5    "Do you have something else?"

6        So he would tell me his challenges.  So a

7    lot of times I would be cc'd on a lot of things that

8    weren't related to myself, but he liked to keep me

9    informed, just in case he ever wanted to give me a

10   task outside of my day-to-day work.

11   Q.   Sure.

12       MR. UNGAR:  Counsel, Counsel, I'm again

13   going to object to your comment about the witness's

14   testimony.  It is improper.  It is unethical.

15   You're cluttering the record, and nobody cares about

16   your characterization of the witness's testimony.

17   Please cut it out.

18       MR. TEPFER:  I'm now handing the witness

19   what's been marked Exhibit 40.

20       (Plaintiff's Exhibit 40 was

21       previously marked for identification

22       by the FTC and is attached hereto.)

23   BY MR. TEPFER:

24   Q.   Do you recall receiving this email?

25   A.   Yes.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

55

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1      Q.   Do you know of a company -- sorry.

2           Do you know if that's pronounced EVO or

3    E-V-O?

4      A.   EVO.

5      Q.   Do you know of a company called EVO?

6      A.   Yes.

7      Q.   What is EVO?

8      A.   A merchant processor.

9      Q.    In this email, Alon requests that you keep

10   track of the EVO reserve.  Is that something that

11   you typically kept track of?

12     A.    Yes.  In -- in Lime Light, what he asked me

13   to do was he would -- he would ask me to do a

14   processing report, and then he would ask me to

15   calculate a percentage of that processing in a -- in

16   an Excel.

17     Q.    And do you recall what that percentage was

18   for?

19     A.    No.  He just asked me to -- just to do the

20   report.

21     Q.    Did you provide this report to anyone else

22   during the period you were tasked with that?

23     A.    No.

24     Q.    Down towards the bottom of the first page,

25   Joyce Gaines refers to the "layered decrease in

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

56

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1    volume so they do not freak out on CB increases."

2         Does CB there, to your knowledge, refer to

3    chargeback?

4    A.   C -- CB refers to chargeback, yes.

5    Q.   Do you know of any layered decrease in

6    volume for the sale of AuraVie products around April

7    of 2014?

8    A.   Can you ask me the question again?

9    Q.   Yeah.  Sorry.

10        Are you aware if the AuraVie companies were

11   engaged in a layered decrease of sales of AuraVie

12   products in April of 2014?

13   A.   There was a -- there was a big decrease in

14   sales.

15   Q.   Do you recall why there was a big decrease

16   in sales at that time?

17        MR. UNGAR:  Objection as to the form of the

18   question.  And it's vague.  It's vague and

19   ambiguous.

20        THE WITNESS:  I don't recall.

21   BY MR. TEPFER:

22   Q.   Did you ever discuss this decrease in sales

23   with Alon Nottea at that time?

24   A.   No.

25        MR. TEPFER:  Well, looks like we've been

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    going for about an hour, so I guess if we could take

2    a ten minute break.

3              THE WITNESS:  Okay.

4              (Recess)

5              MR. TEPFER:  I'm now handing the witness

6    what's been marked as Exhibit 45.

7              (Plaintiff's Exhibit 45 was

8              previously marked for identification

9              by the FTC and is attached hereto.)

10   BY MR. TEPFER:

11       Q.   Do you recall sending this email in March

12   2014?

13       A.   Yes.

14       Q.   Do you recall what it was concerning?

15       A.   It has to be -- let's see -- revised

16   expenses, US Rebill Die Down.  Has to be a report

17   I've created, probably from the CRM.

18       Q.   And the CRM is the --

19       A.   Lime Light.

20       Q.   Okay.  The software that keeps track of

21   sales?

22       A.   Yes, that is correct.

23       Q.   And do you recall why you sent this to

24   Doron?

25       A.   I don't recall.  It must have been Alon

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    saying to cc him.

2        Q.    And was it your understanding that these

3    expenses pertain to all the AuraVie companies?

4        A.    Let's see.  Check that expense.  Yes.  Alon

5    told me to plug in the expense report, and I was

6    supposed to tell him the sales that were still in

7    the software, on how many are in the system

8    scheduled to get charged.

9        Q.    And were those -- those are the rebills, I

10   suppose?

11       A.    Those are the rebills, in my mind, yes.

12       Q.    And were those rebills from all AuraVie

13   companies?

14       A.    That's correct.

15       Q.    On the second page -- we should probably

16   number these pages.  On the second page there's

17   reference to a 1 percent owner commission.

18       A.    Okay.

19       Q.    Do you know what that is concerning?

20       A.    That would have to be for the merchant

21   accounts.

22       Q.    And are those the payments that were made to

23   the CEO owners of the various AuraVie companies?

24       A.    I wouldn't know that.

25       Q.    Do you know who gave you the projected

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1    expense figure to put in there?

2        A.    Alon.

3        Q.    And on the first row, under "Customer

4    Service", there's reference to "IVR Logix .70".

5              Do you know what that is?

6        A.    Yes.

7        Q.    And what is that?

8        A.    That is a company that has a software where

9    customers call in to the software, and the software

10   allows customers to cancel their product with

11   automated system.

12       Q.    Do you know who owns IVR Logix?

13       A.    No.  It's a -- it's a vendor.

14       Q.    Do you know if Alan Argaman has any

15   association with IVR Logix at any point?

16       A.    I don't know.

17       Q.    Did the AuraVie companies utilize the

18   software created by IVR Logix?

19       A.    Yes.

20       Q.    On the fourth page, about midway down the

21   page --

22       A.    Okay.

23       Q.    -- there's reference to a CFO.  Do you know

24   who was considered the CFO of the AuraVie companies?

25       A.    I don't recall.

60

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1      Q.   Do you know if that was Doron Nottea?

2           MR. UNGAR:   Objection as to the form of the

3    question.  Calls for speculation, lacks foundation.

4           THE WITNESS:   I don't recall.

5    BY MR. TEPFER:

6      Q.   A little bit further down it says "Matan

7    Reuveni" and then it says --

8      A.   Mm-hmm.

9      Q.   -- "Load Balancing".

10     A.   Mm-hmm.

11     Q.   Do you know anyone named Matan Reuveni?

12     A.   Yes.

13     Q.   And to spell that, it's M-a-t-a-n.

14          Who is Matan Reuveni?

15     A.   Roi Reuveni's brother.

16     Q.   And do you know if Matan Reuveni did any

17   load balancing for the AuraVie companies at any

18   point?

19     A.   Yes.

20     Q.   What time period did he do that?

21     A.   2012, 2013.

22     Q.   Do you know what company Matan Reuveni

23   worked for?

24     A.   No.

25     Q.   Do you know if Matan Reuveni had any

61

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

 1    supervisor?

 2        A.    Alon and Roi.

 3        Q.    And did he engage in load balancing for the

 4    sale of AuraVie products?

 5        A.    Yes.

 6        Q.    On the next page, at the top it says "SBM

 7    Flexible".  Do you know what that refers to?

 8        A.    SBM Flexible.  SBM Flexible.  No.  Alon must

 9    have told me to put in this.

10        Q.    And a little bit further down, I guess one,

11    two, on the fourth row, it says "Sandra Rubio

12    E-mails and BBB/ATTY".

13        A.    Okay.

14        Q.    Do you know what that refers to?

15        A.    No.  I do know she worked in some Resolution

16    Department they created.

17        Q.    Oh, so Sandra Rubio was an employee of the

18    AuraVie companies?

19        A.    Yes.

20        Q.    And a little bit further down it says "CB

21    Armour" and then "$4".

22        A.    Mm-hmm.

23        Q.    Do you know what that refers to?

24        A.    It was a third party company that charges a

25    fixed rate to answer chargebacks.

62

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1     Q.   And that's Chargeback Armor?

2     A.   That's correct.

3     Q.   And that was, I suppose -- is that $7,500

4   the amount that Chargeback Armor was to be paid for

5   processing --

6     A.   Yes.

7     Q.   -- AuraVie chargebacks?

8     A.   Correct.

9     Q.   Do you know what Grafipack/Hot Marketing,

10   Inc., is?

11     A.   No.

12     Q.   And the figures that you input here --

13     A.   Mm-hmm.

14     Q.   -- who provided you those?

15     A.   Nastassia.  Alon.  That's it.

16     Q.   All right.

17     A.   And then Philip as well.

18     Q.   All right.

19     A.   They like to use me a lot for Excel because

20   I was pretty good at Excel.

21     Q.   Sure.

22          I'm now handing the witness what's been

23   marked Exhibit 47.

24   ///

25   ///

63

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

 1          (Plaintiff's Exhibit 47 was

 2          previously marked for identification

 3          by the FTC and is attached hereto.)

 4   BY MR. TEPFER:

 5      Q.   This email states it's from Avico Global.

 6   Do you know who that is?

 7      A.   Yes.

 8      Q.   And who is that?

 9      A.   That's Alan Argaman.

10      Q.   Do you know what that email is concerning?

11      A.   Yes.  In Lime Light, when a customer gets

12   charged, I have to put in a phone number, which is

13   called a descriptor.  So in Lime Light it says enter

14   in, you know, when somebody gets charged for this

15   company, what would you like the customer to see on

16   their statement.  So I would get the phone numbers,

17   descriptors from -- I would get the descriptors from

18   the Alon and the phone numbers from Alan.

19      Q.   And down in the bottom half of the email,

20   the portion from Nastassia states, "I spoke with

21   Doron about this, and we're going to keep 10 numbers

22   open."

23          Do you know if Doron had any part in

24   managing the AuraVie companies' phone numbers?

25      A.   No.

64

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's vague and ambiguous.
3          THE WITNESS:  I wouldn't know why Nastassia
4     would ask Doron this.
5     BY MR. TEPFER:
6       Q.   And was it your understanding that the
7     various AuraVie companies all had different
8     telephone numbers?
9       A.   That is correct.
10      Q.   Do you have any idea why the companies had
11    different telephone numbers?
12      A.   No.
13      Q.   And did all of the AuraVie companies have
14    different billing descriptors, to your knowledge?
15      A.   Yes.
16      Q.   Do you know why the companies had different
17    billing descriptors?
18      A.   No.
19      Q.   Are you aware if any of the billing
20    descriptors ever mentioned AuraVie products by name?
21      A.   Yes.
22      Q.   Did they?
23      A.   Yes.  They showed AuraVie.
24      Q.   And did they ever mention any other -- or
25    any other names?

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1        A.   I --
2             MR. UNGAR:   Objection as to the form of the
3        question.   It's vague and ambiguous.
4        BY MR. TEPFER:
5        Q.   Oh, you can go ahead.
6        A.   I do remember, yes.
7        Q.   And do you recall any of those product
8        names?
9        A.   I don't recall.   I do know that they would
10       show a company name on there.
11            MR. TEPFER:   I'm now handing the witness
12       what's been marked Exhibit 52.
13            (Plaintiff's Exhibit 52 was
14            previously marked for identification
15            by the FTC and is attached hereto.)
16       BY MR. TEPFER:
17       Q.   Do you recall receiving this email?
18       A.   Yes.
19       Q.   In the cc'd area it states "Xposed, Inc."
20       Do you know whose email that was?
21       A.   No.
22       Q.   Do you have any idea if Doron ever used that
23       email?
24       A.   I don't know.
25       Q.   Do you have any idea why Alon Nottea

66

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    forwarded you this email?

2       A.   I'm sure it had to do with processing on the

3    software.  Processing of one of their mids.

4       Q.   In the forwarded portion, the email to

5    Joyce, Alon states, "Please let me know when you,

6    Igor and I can jump on a short call."

7            Are you aware if Mr. Latsanovski ever

8    participated in a phone call with Joyce and Alon?

9       A.   Not that I'm aware of.

10           MR. UNGAR:  Objection.  Objection as to the

11   form of the question.  It's vague and ambiguous, it

12   calls for speculation.  But he just confirmed he

13   doesn't know.

14   BY MR. TEPFER:

15      Q.   Are you aware if Igor ever participated in

16   any calls concerning the AuraVie merchant accounts?

17      A.   I don't know.

18           MR. UNGAR:  Objection as to the form of the

19   question.  Vague and ambiguous, calls for

20   speculation.

21           MR. TEPFER:  I'm now handing the witness

22   what's been marked Exhibit 59.

23           (Plaintiff's Exhibit 59 was

24           previously marked for identification

25           by the FTC and is attached hereto.)

67

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    BY MR. TEPFER:

2        Q.   Do you recall sending this email to Doron,

3    Avico Global, and Alon N?

4        A.   Yes.

5        Q.   Is Avico Global Alan Argaman?

6        A.   Yes.

7        Q.   Do you recall why you included Doron Nottea

8    on this email?

9        A.   Because of an expense.

10       Q.   And was it your understanding that any

11   expense, any emails regarding expenses related to

12   the AuraVie companies needed to include Doron

13   Nottea?

14       A.   Yes.

15       Q.   Why did you --

16            MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous.

18   BY MR. TEPFER:

19       Q.   Why did you include Alan Argaman on this

20   email?

21       A.   Because he was the person that I would --

22   any -- any technical related software that I needed,

23   he was the person to contact.  So this is a

24   second -- this is a test Lime Light account that we

25   used to connect ClickConnector.  So if there was any

68

Medina

FTC v. Bunzai Media Group, Inc., et al.                     2/23/2016

1    errors between Lime Light and ClickConnector, they

2    didn't want to do it on the main Lime Light account,

3    so they wanted to test it on the testing Lime Light

4    account.  So this -- this is the test Lime Light

5    account.

6        Q.   Did the management of the AuraVie companies

7    have regular meetings, to your knowledge?

8        A.   I'm sorry.  One more time?

9             MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous.

11            MR. TEPFER:  Sorry.  Would you mind

12   repeating it.

13            MR. UNGAR:  Objection as to the form of the

14   question.  It's vague and ambiguous.

15            (The previous question was read back

16            by the court reporter as follows:

17               "QUESTION:  Did the management of

18            the AuraVie companies have regular

19            meetings, to your knowledge?")

20            THE WITNESS:  Yes.

21   BY MR. TEPFER:

22       Q.   How often would they meet?

23            MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous.

25            THE WITNESS:  I don't recall.

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

```
 1   BY MR. TEPFER:
 2       Q.   Do you know who would typically be present
 3   at these meetings?
 4           MR. UNGAR:  Objection as to the form of the
 5   question.  It's vague and ambiguous.
 6           THE WITNESS:  I wasn't invited in the main
 7   big meeting, so I couldn't tell you.
 8   BY MR. TEPFER:
 9       Q.   Sure.
10           Do you know who would be invited to these?
11           MR. UNGAR:  I'm going to object.  I'm going
12   to object again, Counsel.  I keep admonishing you,
13   do not characterize, do not agree or disagree with
14   the witness's testimony.
15           MR. TEPFER:  I'm --
16           MR. UNGAR:  You're cluttering the record.
17   It's improper and it's unethical.
18           MR. TEPFER:  I'm sorry, Robert.  It's just a
19   vocal tic.  I'll try not to do that.  Thank you.
20           MR. UNGAR:  Please cut it out.
21           MR. TEPFER:  Yes, sir.
22   BY MR. TEPFER:
23       Q.   Do you know --
24           Would you mind repeating the question.
25   ///
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1              (The previous question was read back
 2         by the court reporter as follows:
 3              "QUESTION:  Do you know who would
 4         be invited to these?")
 5         THE WITNESS:  I don't recall.
 6    BY MR. TEPFER:
 7      Q.   Do you know if Doron Nottea was ever invited
 8    to these management meetings?
 9      A.   I don't recall.
10         MR. UNGAR:  Objection as to the form of the
11    question.  It's vague and ambiguous, it calls for
12    speculation, and it lacks foundation.
13    BY MR. TEPFER:
14      Q.   What about Alan Argaman?
15         MR. UNGAR:  Same objection.
16         THE WITNESS:  Only I would have a meeting
17    with him for software related.
18    BY MR. TEPFER:
19      Q.   Would he -- how often would Alan Argaman
20    meet with Alon --
21         Well, would Alon Nottea ever meet with Alan
22    Argaman, to your knowledge?
23      A.   Yes.
24      Q.   How often would Alan Argaman meet with Alon
25    Nottea?
```

71

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1         MR. UNGAR:  Objection as to the form of the
2    question.  It's vague and ambiguous, it calls for
3    speculation, and it lacks foundation.
4         THE WITNESS:  I -- I couldn't say.
5    BY MR. TEPFER:
6      Q.   Do you know -- do you know the time period
7    in which Alan Argaman would meet with Alon Nottea?
8      A.   The time period?  The --
9      Q.   Yeah.  I guess the time period of their
10   business relationship.
11        MR. UNGAR:  Objection as to the form of the
12   question.  It's vague and ambiguous, assumes facts
13   not in evidence, misstates the prior testimony of
14   the witness, calls for speculation, and it lacks
15   foundation.
16        THE WITNESS:  I wouldn't know their -- their
17   connection --
18   BY MR. TEPFER:
19     Q.   Sure.
20     A.   -- their time and how many times they met.
21     Q.   Do you -- in this email you reference a
22   website www.mucbo.com.
23     A.   Mm-hmm.
24     Q.   Do you know what that website is?
25     A.   That website is the testing website that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

 1    Lime Light provided for us to use, to log into the

 2    testing software.

 3         Q.   And then below that you state, "I can

 4    contact them and give them the new CC # if you

 5    provide me."

 6         A.   Correct.

 7         Q.   And are you referring to a credit card

 8    number?

 9         A.   That is correct.

10         Q.   And who did you believe would provide you

11    that credit card number?

12         A.   Alon.

13              MR. TEPFER:  I'm now handing the witness

14    what's been marked Exhibit 62.

15              (Plaintiff's Exhibit 62 was

16              previously marked for identification

17              by the FTC and is attached hereto.)

18    BY MR. TEPFER:

19         Q.   This is a email that appears to have been

20    forwarded from Alon to Igor, but below it, it

21    appears, there's an email address in the original

22    address paul@bunzaimedia.com.  Is that your email

23    address?

24         A.   Yes.

25         Q.   Do you recall receiving the message that was

73

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    forwarded?

2        A.    Yes.

3        Q.    Do you recall what this email is concerning?

4        A.    Yes.

5        Q.    What's it about?

6        A.    Let me just go ahead and read it, so I can

7    refresh my memory.

8        Q.    No problem.

9        A.    A new merchant processor offering Alon a new

10   merchant account.

11       Q.    Down towards the bottom fourth, maybe, of

12   the email there's reference to a MidFlex Chargeback

13   Intercept Program.  Do you know what that's

14   referring to?

15       A.    No.  I wouldn't get involved in the

16   chargeback process.

17       Q.    Did you ever hear Alon discuss a Midflex

18   Chargeback Intercept Program?

19       A.    No.

20       Q.    Are you aware if any of the AuraVie

21   companies were in the market for a chargeback

22   refutation service?

23       A.    Yes.

24       Q.    Do you know why?

25       A.    Yes.  To reduce chargebacks.

74

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1      Q.   Are you aware if any of the AuraVie
 2  companies -- sorry for the -- I'll rephrase.
 3           Did Alon Nottea ever discuss with you
 4  concerns about chargeback percentages for any of the
 5  AuraVie companies?
 6      A.   Yes.  He told me not to take a processing of
 7  a merchant account in a software too high.
 8      Q.   And do you recall how high that chargeback
 9  ratio was permitted to go, according to Alon's
10  instructions?
11      A.   Well --
12           MR. UNGAR:  Objection as to the form of the
13  question, and it's vague and ambiguous.
14           THE WITNESS:  Well, no because the software
15  didn't tell me how many chargebacks were coming in
16  the Chargeback Department.  He would just tell me to
17  keep them even.
18  BY MR. TEPFER:
19      Q.   And so it was your understanding that the
20  chargeback ratio was supposed to be consistent
21  across the --
22      A.   That is --
23      Q.   -- AuraVie companies?
24      A.   That is correct, yes.
25      Q.   Did you ever hear Alon Nottea discuss
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

75

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    chargeback issues with Doron Nottea?

2        A.   No.

3        Q.   Did you ever hear --

4            MR. UNGAR:  Objection as to the form of the

5    question.  It's vague and ambiguous.

6    BY MR. TEPFER:

7        Q.   In the cc section of the email that

8    Mr. Nottea forwarded, there's reference -- or in the

9    email address it refers to an IMP Merchant

10   Solutions.  Have you ever heard of that company?

11       A.   IMP Merchant Solutions.  IMP.  Where do you

12   see it?

13       Q.   Sorry.  It's -- so these --

14       A.   Oh.  I don't know the relationships Alon had

15   with these contacts.

16       Q.   Do you have any idea why Alon Nottea may

17   have forwarded this email to Igor Latsanovski?

18       A.   No.

19           MR. UNGAR:  Objection as to the form of the

20   question.  Vague and ambiguous, calls for

21   speculation.  Foundation.

22   BY MR. TEPFER:

23       Q.   On 62-2, the next page in the email that you

24   received --

25       A.   Mm-hmm.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

76

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

1      Q.   Greg Augustine states, "We are poised to

2  have a big impact on the preservation of thousands

3  of merchants who are in danger of breaching the

4  strict Visa/MC chargeback thresholds" --

5      A.   Mm-hmm.

6      Q.   -- "getting fined and/or losing their

7  merchant accounts."

8      A.   Mm-hmm.

9      Q.   Are you aware if any of the AuraVie

10 companies at this time were at risk of losing their

11 merchant accounts?

12     A.   No.

13     Q.   Are you aware if any of the merchant AuraVie

14 companies were at risk of getting fined by

15 Visa/MasterCard for chargebacks?

16     A.   No.

17          MR. UNGAR:   Objection.   Objection as to the

18 form of the question.   It's vague and ambiguous,

19 calls for speculation, lacks foundation.

20          MR. TEPFER:   I'm now handing the witness

21 what's been marked Exhibit 65.

22          (Plaintiff's Exhibit 65 was

23          previously marked for identification

24          by the FTC and is attached hereto.)

25 ///

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1    BY MR. TEPFER:
 2        Q.   Have you ever seen this spreadsheet titled
 3    "BunZai Companies"?  Have you ever seen this
 4    spreadsheet before?
 5        A.   No.
 6        Q.   Do you know what Dynamic Media, Inc., is?
 7        A.   I'm sorry.  I don't.
 8        Q.   Have you ever heard of Impulse Media Group,
 9    Inc.?
10        A.   Impulse, no.
11        Q.   What about Ipoint Vision, LLC?
12        A.   No.
13        Q.   Have you ever seen a spreadsheet
14    substantially similar to this one?
15        A.   Yes.
16        Q.   Where have you --
17        A.   Just with the company names and the merchant
18    account information, so that I can upload into Lime
19    Light.
20        Q.   Who provided you with that spreadsheet?
21        A.   Alon.
22        Q.   Do you know who maintained that spreadsheet?
23        A.   He did.
24             MR. TEPFER:  I'm now handing the witness
25    what's been marked Exhibit 76.
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

```
 1              (Plaintiff's Exhibit 76 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4     BY MR. TEPFER:
 5          Q.   Do you recognize this document?
 6          A.   No.
 7          Q.   Have you ever seen a document substantially
 8     similar to this one?
 9          A.   Oh, Alon showed me once.  He showed me -- I
10     came over to his office, and he showed me a similar
11     graph, saying "Oh, look what we're working on."
12     That's it.
13          Q.   Do you recall what time period that was?
14          A.   2013.
15          Q.   And was that also a graph concerning
16     chargebacks?
17          A.   That is correct, yes.
18          Q.   And do you recall if it was a graph
19     concerning chargebacks from the sale of AuraVie
20     products?
21          A.   Yes.
22          Q.   Do you know who created that graphic that
23     you viewed?
24          A.   No.
25          Q.   Was it keeping track of chargebacks by call
```

79

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    center employee; do you know?

2        A.   I don't.  I didn't know their process on --

3        Q.   Do you know what --

4        A.   -- chargebacks.

5        Q.   Sorry.

6             Do you know what software was used to create

7    that chart that you viewed?

8        A.   No.

9        Q.   Did Alon Nottea say anything else concerning

10   the chart, when he showed it to you?

11       A.   Just keep the processing in Lime Light even.

12       Q.   Are you aware if the Pinnacle call center

13   employees were evaluated based on the percentage of

14   refunds that they gave consumers that called in?

15       A.   I don't know their process.

16       Q.   Do you know if employees in Pinnacle

17   Logistics call back -- or, I'm sorry -- in Pinnacle

18   Logistics Chargeback Department were evaluated on

19   their win ratio in contesting chargebacks?

20       A.   I don't know their process.

21            MR. TEPFER:  I'm now handing the witness

22   what's been marked Exhibit 81.

23            (Plaintiff's Exhibit 81 was

24            previously marked for identification

25            by the FTC and is attached hereto.)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

80

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1     BY MR. TEPFER:

2         Q.    Do you recall receiving this email from XP

3     Media?

4         A.    Media Urge has applied for credit and has

5     given us your name as a reference.  From XP Media.

6              I -- I don't recall this email or who XP

7     Media is.

8         Q.    In the forwarded message, in the cc row --

9         A.    Mm-hmm.

10        Q.    -- there is an email address

11    accounting@sbmmgmt.com.

12        A.    Mm-hmm.

13        Q.    Do you know who used that email address?

14        A.    Philip.

15        Q.    Do you know who used the email address

16    accounting@bunzai.com?

17        A.    Nastassia, I believe.

18        Q.    And do you know if Doron Nottea ever

19    monitored either of those --

20        A.    I --

21        Q.    -- email addresses?

22              MR. UNGAR:  Objection as --

23              THE WITNESS:  -- don't know.

24              MR. UNGAR:  -- to the form of the question.

25    It's vague and ambiguous, it calls for speculation,

81

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    and it lacks foundation.
2              THE WITNESS:  Yeah, I don't know about that.
3    BY MR. TEPFER:
4         Q.   In parentheses next to "Media Urge" in the
5    forwarded message, it says "Media Urge" and then
6    "SMB Management, Inc."
7              Do you know why SMB Management, Inc., is
8    listed next to Media Urge like that?
9         A.   SMB Management, Inc.  SMB.  It's a
10   misspelling.
11        Q.   And that's a misspelling of SBM Management?
12        A.   Yes.
13        Q.   Do you know why SBM Management, Inc., would
14   have been referenced in that sentence next to Media
15   Urge?
16        A.   They managed any -- any -- anything related
17   with expense, they managed.
18        Q.   And that's expenses of Media Urge?
19        A.   Yes.
20        Q.   Do you know why -- do you recall Media Urge,
21   Inc., ever applying for credit at this time period?
22        A.   Yes.  Yes.
23        Q.   Why was Media Urge applying for credit?
24        A.   Let's see.  We would need the date of
25   account, payment terms, current balance.  I don't

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    recall what fluentco.com does.

2            MR. TEPFER:  I'm now handing the witness

3    what's been marked Exhibit 107.

4            THE WITNESS:  Mm-hmm.

5            (Plaintiff's Exhibit 107 was

6            previously marked for identification

7            by the FTC and is attached hereto.)

8    BY MR. TEPFER:

9       Q.   Do you have any idea whose handwriting that

10   is on this document?

11      A.   I'm sorry, I don't.

12      Q.   Do you recall who was tasked with your

13   viewing the AuraVie advertising while you were

14   employed at Media Urge?

15      A.   Khristopher.

16           MR. UNGAR:  Objection.  Objection as to the

17   form of the question.  It's vague and ambiguous.

18   BY MR. TEPFER:

19      Q.   Do you recall if Alon Nottea ever reviewed

20   the advertising while you were at Media Urge, for

21   the marketing of AuraVie products?

22      A.   Yes.

23      Q.   Would he sometimes make suggestions about

24   ways to change the advertising of AuraVie products?

25      A.   I'm assuming so, but I -- I didn't -- I

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1    wasn't involved in that process.
 2        Q.    Are you aware if any of the AuraVie
 3    companies did any business in Estonia?
 4        A.    No.
 5        Q.    What about Latvia?
 6        A.    No idea.
 7              MR. TEPFER:  I'm now handing the witness
 8    what's been marked Exhibit 138.
 9              (Plaintiff's Exhibit 138 was
10              previously marked for identification
11              by the FTC and is attached hereto.)
12    BY MR. TEPFER:
13        Q.    Do you recall receiving this email in May
14    2012 from Nastassia?
15        A.    Yes.
16        Q.    Have you ever been to the website
17    ripoffreport.com?
18        A.    Yes, I have.
19        Q.    Have you ever discussed the website with Roi
20    Reuveni?
21        A.    No.
22        Q.    What about Alon Nottea?
23        A.    No.
24        Q.    Do you know, have you ever discussed any
25    sort of online complaints concerning AuraVie
```

84

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1     products with Alon Nottea?

2        A.   No.

3        Q.   Aside from this email, have you ever had any

4     discussions with anyone at Media Urge concerning

5     online complaints for AuraVie products?

6        A.   No.  This is my own personal research on

7     seeing on the Internet what was happening with --

8     with these products.

9        Q.   So you would, I guess, perform some --

10    you're saying you performed some research to see --

11       A.   My own research, yes.

12       Q.   And did you discuss your findings after

13    looking online, with anyone at any of the AuraVie

14    companies?

15       A.   No.  I was going by the suggestions of what

16    Nastassia was finding.

17       Q.   And so Nastassia, I guess, told you about

18    complaints that were online for AuraVie products?

19       A.   Yes.

20       Q.   Did you ever hear Nastassia discuss those

21    online complaints about AuraVie products with anyone

22    else?

23       A.   Alon.

24       Q.   And what did she tell Alon Nottea?

25       A.   I wasn't in the meeting, but she told me

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    that "I just found these complaints," and she said,

2    "I'm going to go talk to him about it."

3         Q.   Do you recall the time period that this

4    occurred?

5         A.   May 22nd, 2012.

6              MR. TEPFER:   I'm now handing the witness

7    what's been marked Exhibit 141.

8              (Plaintiff's Exhibit 141 was

9              previously marked for identification

10             by the FTC and is attached hereto.)

11   BY MR. TEPFER:

12        Q.   Do you recall receiving this email from Alon

13   Nottea?

14        A.   Alon told me that he was working with a

15   company -- with a lady by the name of Sabina that --

16   to look into -- they were going to look into their

17   chargebacks.  But he was -- he was discussing this

18   more with Roi.  But like I mentioned before, he

19   would like to cc me on a lot of different things,

20   just to kind of keep me in the loop.  But that was

21   about it.

22        Q.   So Alon would primarily discuss these

23   chargeback resolutions with Roi Reuveni?

24        A.   That is correct.

25        Q.   And do you recall at this time in August of

86

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    2012 what Roi Reuveni's position was at BunZai

2    Media?

3        A.   At this time he was -- he was working -- he

4    was doing a lot of IT.  I remember that.  But I know

5    that that wasn't, that wasn't -- you know, when

6    there was time off, you know, after he was done with

7    IT, he would go up to Alon and say, "Alon, what are

8    your challenges?"  And then Alon would tell him his

9    challenges, and he would try to assist in any way he

10   could.

11       Q.   And Alon Nottea, in the last line of his

12   email, states "It looks like we might need a new URL

13   per mid."

14            Do you have any idea what Alon meant by

15   that?

16       A.   Yes.  He meant that we would need a new

17   landing page per merchant account.

18       Q.   And so was it your understanding that each

19   merchant account for each AuraVie company needed a

20   separate website?

21       A.   That is correct.

22            MR. TEPFER:  Let the record reflect I'm

23   handing the witness what's been marked Exhibit 146.

24   ///

25   ///

Medina

FTC v. Bunzai Media Group, Inc., et al.                                2/23/2016

```
 1              (Plaintiff's Exhibit 146 was

 2              previously marked for identification

 3              by the FTC and is attached hereto.)

 4    BY MR. TEPFER:

 5        Q.    Do you recall receiving this email from

 6    Sabina Keil?

 7        A.    Yes.

 8        Q.    And that's K-e-i-l?

 9        A.    Yes.

10        Q.    Are you familiar with a company called

11    XCaliber Solutions?

12        A.    Yes.

13        Q.    And that's X-C-a-l-i-b-e-r.

14        A.    That is correct.

15        Q.    What is XCaliber Solutions?

16        A.    They provide -- what Sabina does is I would

17    send her a report from Lime Light, and their --

18    their -- they claim that they can break down the

19    transactions based by chargebacks.  So my duty was

20    to send the -- all the -- all the information from

21    Lime Light, export it.  And she had some agreement

22    with Lime Light that they can create a report for

23    us.

24        Q.    And so these -- down here it appears to be

25    broken down by -- there's a number listed above each
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    section.  Do you know --

2         A.    Correct.

3         Q.    -- what those numbers refer to?

4         A.    Those -- let's see.  Those would be merchant

5    accounts.

6         Q.    And so those four numbers correspond with, I

7    guess, the merchant accounts?

8         A.    Oh, merchant account.  That is correct, yes.

9         Q.    Do you recall what period of time BunZai

10   Media Group used XCaliber Solutions' services?

11        A.    It was towards the end of 2012.

12        Q.    And how long did they use XCaliber

13   Solutions?

14        A.    About a year.

15        Q.    Did they use any other company after that,

16   to provide the same services?

17        A.    No.  I remember Alon saying that the data

18   wasn't -- wasn't accurate, it wasn't -- their

19   service wasn't as good as what they say it was.

20   I -- I remember seeing this report, and I -- I

21   didn't know what they meant by "Call Center,

22   Fulfillment, Descriptor."

23        Q.    Did they ever -- did anyone ever explain

24   what those various rows referred to?

25        A.    Merchant accounts, each one.

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1        Q.    And when it says "Call Center," what does
 2   that mean; do you know?
 3        A.    That was Roi's department.
 4        Q.    Sure.
 5              And where it says "Fraud," do you know what
 6   that's referring to?
 7        A.    Fraud -- I do remember the call center had
 8   some type of disposition when they were ending the
 9   call, they can put a disposition of the -- this
10   disposition of the call.  So I'm assuming that when
11   Roi sent his data, they had the disposition on there
12   related to fraud.
13              MR. UNGAR:  Move to strike as speculation,
14   all of the assumptions made in the answer.
15              MR. TEPFER:  I'm now handing the witness a
16   exhibit marked 149.
17              (Plaintiff's Exhibit 149 was
18              previously marked for identification
19              by the FTC and is attached hereto.)
20   BY MR. TEPFER:
21        Q.    Do you recall receiving this email from Alan
22   Argaman?
23        A.    Yes.
24        Q.    Do you know what this email is concerning?
25        A.    Yes.  Avi was my go to person for software
```

90

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    development with ClickConnector.  He provided me an
2    oDesk system that I can log in and place my requests
3    in there for Lime Light.  So I would get a response
4    from -- from that oDesk.  But it's letting me know,
5    keeping me updated with ClickConnector.
6         Q.   About halfway down 149-1, there's reference
7    to a chargebackarmor.com.
8         A.   Mm-hmm.
9         Q.   Do you know what Alan Argaman's role was in
10   the development of that website?
11        A.   Project Manager.
12        Q.   And so Alan Argaman was the Project Manager,
13   to your understanding, of Chargeback Armor?
14        A.   Of all these projects.
15        Q.   And in the beginning, Mr. Argaman states "Hi
16   Team."  Was there any sort of -- was it your
17   understanding that Doron, Alon, you, Roi were on a
18   team for the development of these projects?
19        A.   Right.  Each one would --
20             MR. UNGAR:  Objection.  Objection as to the
21   form of the question.  It's vague and ambiguous.
22             THE WITNESS:  I -- I can only tell you that
23   I was in charge of ClickConnector.
24   BY MR. TEPFER:
25        Q.   Okay.  Do you have -- do you know what

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1    Doron's role was in the development of any of these
 2    projects, if any?
 3        A.   No.
 4             MR. UNGAR:  Objection.  Objection as to the
 5    form of the question.  It's vague and ambiguous,
 6    calls for speculation, and it lacks foundation.
 7    BY MR. TEPFER:
 8        Q.   Underneath Chargeback Armor it states "Soft
 9    launch demo scheduled for anytime after 7-1-13".
10        A.   Mm-hmm.
11        Q.   What -- do you know if -- do you know what
12    that refers to?
13        A.   No.
14        Q.   Do you know what a soft launch is?
15        A.   Soft launch is -- for example, they finished
16    a software, and we're going to do a soft launch to
17    check if there's any bugs in the software.
18        Q.   Are you aware if the Chargeback Armor
19    software was soft launched around July of 2013?
20        A.   I couldn't recall.  I wasn't a part of that
21    process.
22        Q.   Do you know if it was anticipated that there
23    was going to be a soft launch of the Chargeback
24    Armor software in July of 2013?
25        A.   Yes.  Based on -- 'cause I was -- I read
```

92

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    through the whole email, so I was able to see, okay,

2    well, yeah, soft launch, software.

3         Q.    There's reference to an IVRLogix.com.

4         A.    Mm-hmm.

5         Q.    Do you have any knowledge of what Alan

6    Argaman's role was in the development of IVR Logix

7    software?

8         A.    Project Manager.

9         Q.    And IVR Logix, that was the call recording

10   automated system?

11        A.    That is correct.

12        Q.    Do you know what IVRSwitch.com is?

13        A.    No.

14        Q.    What about LinkMyChat.com?

15        A.    No.

16        Q.    On 149-2, there's reference to a call

17   center.  Do you know what that refers to?

18        A.    No.  Sorry.

19             MR. TEPFER:  I'm now handing the witness

20   what's been marked Exhibit 152.

21             (Plaintiff's Exhibit 152 was

22             previously marked for identification

23             by the FTC and is attached hereto.)

24   BY MR. TEPFER:

25        Q.    Do you recall sending this email?

93

Medina

FTC v. Bunzai Media Group, Inc., et al.                                   2/23/2016

1      A.   Yes.

2      Q.   Do you know -- do you know why you included

3    Alan Argaman in this email?

4      A.   He assisted in -- in -- him and -- him and

5    Roi assisted in providing me the numbers.

6      Q.   And those -- what numbers are you referring

7    to?

8      A.   Descriptor numbers for Lime Light.

9      Q.   And those are, what are those descriptor

10   numbers?

11     A.   When -- when I log into the software and I

12   upload a merchant account, one of the questions that

13   the software asks me is what is the phone number

14   that they want people to show when they get charged,

15   and the descriptor.  So I would have to put in a

16   phone number in that software.

17     Q.   And those were the descriptors that, to your

18   knowledge, appeared on consumers' credit card

19   statements after the sale of AuraVie?

20     A.   That's correct, yes.

21     Q.   Do you recall why you included Roi Reuveni

22   on this email?

23     A.   He assisted in the -- in this process, in

24   getting the phone numbers.

25     Q.   And what about Alon Nottea; do you recall

94

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      why you included him?

2          A.    He asked me to always cc him on anything

3      that I do.

4          Q.    Number 2 --

5          A.    Sure.

6          Q.    -- you reference new corporations.  Do you

7      know what -- what were you referring to by new

8      corporation Number 1?

9          A.    When I set up the profile in the -- in the

10     software, it would ask me the corporation name.  So

11     Alon told me not to -- to put whatever -- when he

12     would send me the sheet of the merchant accounts

13     that he would get, it would show the corporation

14     name -- for example, Agoa Holdings.  So I would have

15     to put in Agoa Holdings, and then -- and then a

16     phone number for -- for that company.  It was

17     something Alon would tell me that he wanted to do.

18         Q.    Sure.

19             MR. UNGAR:  Counsel, this is, I think, the

20     third or the fourth time I have asked you to stop

21     characterizing or commenting upon the witness's

22     testimony.  It is improper.  It is unethical.

23     BY MR. TEPFER:

24         Q.    What sort of new corporations were you

25     anticipating at this time?

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1      A.    I'm sorry.  I don't understand.

2      Q.    Did Alon Nottea state to you that he

3   anticipated new corporations to be created for the

4   sale of AuraVie products?

5      A.    I wouldn't ask him that.

6      Q.    In the email you state "We need the

7   following below."

8      A.    Correct.

9      Q.    Do you know why you needed those?

10     A.    Yes.  In order for me to include that into

11   the software.

12     Q.    Do you know why a corporation needed -- why

13   these corporations required six fax numbers each?

14     A.    Six fax numbers.  Six fax numbers for new

15   corp 1, six fax numbers for new corp 1.  Faxes.  It

16   must have been a request from Alon.  I wouldn't know

17   why he would need that.

18     Q.    And at Number 3 you state, "Roi like you

19   mentioned there may be a few fax numbers we can

20   reinstate from before."

21           What did you mean by that?

22     A.    I don't recall.  I don't recall why we

23   needed so many fax numbers.

24           MR. TEPFER:  I'm now handing the witness

25   what's been marked Exhibit 153.  Oops, there's two

96

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

          1      of those there.
          2                (Plaintiff's Exhibit 153 was
          3                previously marked for identification
          4                by the FTC and is attached hereto.)
          5      BY MR. TEPFER:
          6          Q.    Do you recall being cc'd on this email from
          7      Andree Mansour?
          8          A.    Yes.
          9          Q.    Do you know what it's concerning?
         10          A.    ClickConnector.  I would have Andree help me
         11      with some -- checking the -- the software sometimes
         12      because he had a good idea for checking any --
         13      anything that I -- I could be missing.  So he -- he
         14      assisted me in looking for any type of errors.
         15          Q.    And do you know why Andree sent this email
         16      to Alan Argaman?
         17          A.    Because he knew that he was my Project
         18      Manager.
         19          Q.    And so did you report to Alan Argaman
         20      concerning some projects?
         21          A.    Yes.
         22          Q.    And what projects are those?
         23          A.    For ClickConnector.
         24          Q.    And for -- and what time period was this?
         25          A.    This was 2013.

Medina
FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

```
 1        Q.   Do you recall any other projects that you
 2   reported to Mr. Argaman concerning?
 3        A.   Only at Focus Media Solutions.
 4        Q.   What did you report to Mr. Argaman
 5   concerning at Focus Media Solutions?
 6        A.   I needed some websites for lead generation,
 7   so he would help me with -- he would set up the
 8   server for me.
 9        Q.   And when you say you needed some websites,
10   what kinds of websites are you referring to?
11        A.   We -- at Focus Media Solutions we were doing
12   a lot of lead generation for auto insurance.  We
13   were building websites to -- -- you know, for leads
14   for life insurance, health insurance, auto, and
15   then -- so he would help me with setting up the
16   server and putting in, sometimes if I needed a
17   ticket system to -- for developers, to help me with
18   a task that I needed.  He was my go to person for
19   that.
20        Q.   Did Mr. Argaman ever provide assistance in
21   lead generation concerning AuraVie products?
22        A.   No.  At Focus Media Solutions we -- we did
23   not do anything for AuraVie --
24        Q.   Ah.
25        A.   -- or any of Alon's products.
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1          MR. TEPFER:  I'm now handing the witness

2     what's been marked Exhibit 166.

3               (Plaintiff's Exhibit 166 was

4               previously marked for identification

5               by the FTC and is attached hereto.)

6     BY MR. TEPFER:

7          Q.   Do you recall sending this email to Doron

8     Nottea in --

9          A.   Yes.

10         Q.   -- March of 2013?

11         A.   Yes.

12         Q.   Do you recall why you sent this email to

13    Doron Nottea?

14         A.   This was part of that every three months

15    report that he requested from processing.

16         Q.   And so to your knowledge, this concerned the

17    1 percent commission paid to the CEO owners of the

18    AuraVie companies?

19         A.   I -- I -- I can't confirm that's what he did

20    with the report, but I just provided the report to

21    him.  It was a report he requested me to do for him.

22              MR. TEPFER:  I'm now handing the witness a

23    document that's been marked Exhibit 167.

24    ///

25    ///

99

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1           (Plaintiff's Exhibit 167 was

2           previously marked for identification

3           by the FTC and is attached hereto.)

4   BY MR. TEPFER:

5       Q.   Do you recall receiving this email from

6   Nastassia Yalley?

7       A.   Yes.

8       Q.   Do you know what it's concerning?

9       A.   Yes.  It was the expenses that was going to

10  be paid to the affiliate networks.

11      Q.   Do you know if Nastassia Yalley regularly

12  created these reports at BunZai Media Group?

13      A.   Yes, regularly.

14      Q.   Do you know if she regularly provided these

15  reports to the same recipients?

16      A.   Yes.

17           MR. TEPFER:  I'm now handing the witness a

18  document that's been marked Exhibit 168.

19           (Plaintiff's Exhibit 168 was

20           previously marked for identification

21           by the FTC and is attached hereto.)

22  BY MR. TEPFER:

23      Q.   Do you recall sending this email to Doron

24  Nottea?

25      A.   Yes.

Medina

FTC v. Bunzai Media Group, Inc., et al.                          2/23/2016

1      Q.   Do you recall why you sent this email to
2   Doron Nottea?
3      A.   I don't know why he requested it, but he
4   wanted me to send him all the faxes from the
5   software that was uploaded into the system.  I don't
6   know why he wanted me to send him this.
7      Q.   But he requested that you send this to him?
8      A.   But he requested it, yes.
9           MR. TEPFER:  I'm now handing the witness
10   what's been marked Exhibit 169.
11           (Plaintiff's Exhibit 169 was
12           previously marked for identification
13           by the FTC and is attached hereto.)
14   BY MR. TEPFER:
15      Q.   Do you recall receiving this email?
16      A.   Yes.
17      Q.   And do you know what it's concerning?
18      A.   Yes.  This is a third party company that
19   requested that they can sell additional products to
20   Alon's customers.  So Alon included me, to help with
21   the implementation process.
22      Q.   And so this company wanted to use, I guess,
23   the --
24      A.   The data.  They wanted to use the data that
25   was already in the software, to -- to sell

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    additional non -- non Alon's products, additional

2    products from other companies.

3        Q.   In the first sentence of the email it

4    states, "It looks like I had already implemented the

5    more conservative approach listing everything as

6    risk free vs. a free supply."

7             Did -- are you aware -- sorry.

8             Do you recall --

9             MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous.

11   BY MR. TEPFER:

12       Q.   Do you recall Alon ever having a similar

13   discussion concerning the advertising of AuraVie

14   products?

15       A.   Yes.  He had a conversation with this

16   company about the AuraVie products.

17       Q.   And did he discuss the decision between

18   advertising as risk free vs. a free trial?

19       A.   I don't recall, but if it's -- if it's here,

20   must be.

21       Q.   But speaking specifically about the sale of

22   AuraVie products and their advertising, do you know

23   if Alon ever had a similar discussion about those

24   advertisements?

25       A.   Can you -- can you rephrase the question?

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1      Q.    Sure.  Sorry.
 2            Do you know, did you ever hear Alon Nottea
 3   discuss the AuraVie landing pages?
 4      A.    Correct.
 5      Q.    And did he ever discuss the decision to
 6   advertise the AuraVie trial as a risk free trial?
 7      A.    That is correct.
 8      Q.    And do you recall who he discussed that
 9   with?
10      A.    With the affiliate networks.
11            MR. TEPFER:  I'm now handing the witness
12   what's been marked Exhibit 171.
13            (Plaintiff's Exhibit 171 was
14            previously marked for identification
15            by the FTC and is attached hereto.)
16   BY MR. TEPFER:
17      Q.    Do you recall sending this email to Doron
18   Nottea in 2013?
19      A.    Let's see.  Yes.  Alon had me have an
20   updated report of the -- when -- when a merchant
21   account provides a merchant account, they have all
22   the -- all the company information on there and
23   everything.  So every time he -- since he handed it
24   to me to upload into Lime Light, he asked to keep
25   him updated of all that information.
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1      Q.    And did Doron request that you provide him

2   this information?

3      A.    I don't recall.  I don't recall why he would

4   ask me to send him this information, but any time

5   Doron asked me a task, I just did it.

6           MR. UNGAR:  Move to strike everything after

7   "I don't recall."

8           MR. TEPFER:  I'm now handing the witness

9   what's been marked Exhibit 172.

10          (Plaintiff's Exhibit 172 was

11          previously marked for identification

12          by the FTC and is attached hereto.)

13  BY MR. TEPFER:

14     Q.    Do you know who Sean Brennecke is?

15     A.    Sean Brennecke was -- I'm trying to remember

16  here.  I don't remember.

17     Q.    Do you recall forwarding the email in

18  Exhibit 172 to Doron Nottea?

19     A.    Yeah.  That's why any accounting was --

20  related, sent it to him.

21     Q.    And have you ever heard Doron Nottea

22  referred to as Chief Financial Officer?

23     A.    No.

24     Q.    Do you have any idea what Sean Brennecke is

25  asking about in his email to you?

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1      A.   I think it had something to do with

2  shipping.  There was a shipping issue.  Yeah.  I'm

3  sorry.  I don't recall.

4      Q.   That's not a problem.

5           I'm handing the witness what's been marked

6  Exhibit 173.

7           (Plaintiff's Exhibit 173 was

8           previously marked for identification

9           by the FTC and is attached hereto.)

10          MR. UNGAR:  Counsel, again, I'm going to ask

11  that you stop characterizing or commenting upon the

12  testimony of the witness.

13  BY MR. TEPFER:

14     Q.   Do you recall --

15          MR. UNGAR:  It is improper.  It is

16  unethical.

17  BY MR. TEPFER:

18     Q.   Do you recall receiving this email from

19  Eugene Shampansky?

20     A.   Yes.

21     Q.   Do you recall what it was regarding?

22     A.   Yes.  Alon asked me to reach out to Eugene

23  to check on the status of a reserve, reserve

24  release.

25     Q.   And was that a reserve of a merchant

105

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    account?

2        A.    Yes.

3        Q.    And was that merchant account one that was

4    used in the sale of AuraVie products, to your

5    knowledge?

6        A.    Yes.

7        Q.    Do you have any idea why Eugene Shampansky

8    included Doron on this email?

9        A.    No.

10            MR. UNGAR:   Objection as to the form of the

11    question.   It's vague and ambiguous, it calls for

12    speculation, it lacks foundation.

13            MR. TEPFER:   I'm handing the witness what's

14    been marked Exhibit 174.

15            (Plaintiff's Exhibit 174 was

16            previously marked for identification

17            by the FTC and is attached hereto.)

18    BY MR. TEPFER:

19        Q.    Do you recall being cc'd on this email?

20        A.    Yes.

21        Q.    Do you know what it's concerning?

22        A.    Yes.   Sean is a sales representative for

23    USPS.   Alon asked me to find a salesperson at USPS

24    that can save him money on shipping.

25        Q.    Do you know if xposedinc@gmail.com is an

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

1    email address related to Doron Nottea?

2        A.    I don't know.

3        Q.    Do you know why Alan Argaman might have

4    included Avi Argaman on this email?

5        A.    It would probably have to be with the tech

6    side because USPS offers a API.  So it would have

7    had to have been for the technical part.

8        Q.    And in the third paragraph it states "Let's

9    all get involved and find the best possible rate as

10   we would like to launch Canada the second week of

11   January."

12       A.    Mm-hmm.

13       Q.    Do you have any idea what that's in

14   reference to?

15       A.    Alon had some discussions of launching it in

16   Canada, but it never -- never happened.

17       Q.    And was that concerning the sale of AuraVie

18   products in Canada?

19       A.    Yes.

20             MR. TEPFER:  Do you mind if we take a ten

21   minute break?

22             THE WITNESS:  Of course.

23             MR. TEPFER:  We're going to take a ten

24   minute break until 11:34.

25             THE WITNESS:  Okay.

Medina

FTC v. Bunzai Media Group, Inc., et al.                              2/23/2016

1          MR. TEPFER:  Off the record, please.

2          (Recess)

3     BY MR. TEPFER:

4          Q.   We only have a few more questions, and I

5     think we should be able to end the FTC's portion of

6     the questioning very shortly.

7               So first I just want to ask, other than

8     ClickConnector software and Chargeback Armor, did

9     you work on any other project with Mr. Argaman

10    relating to the AuraVie products?

11         A.   The Chargeback Armor, I didn't -- I didn't

12    work with him on that.  I worked on ClickConnector

13    and only at Focus Media Solutions, when I needed a

14    website for lead generation.

15         Q.   Do you know who ran the company referred --

16    sorry.

17              We discussed earlier Global Media; do you

18    recall that?

19         A.   Global Media.  I don't know who ran that

20    company.

21         Q.   And to go back to Exhibit 65, that

22    spreadsheet there --

23         A.   Yes.

24         Q.   -- on the "Entity Name," do you recall who

25    ran the companies listed there that sold AuraVie

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

1    products?

2        A.    Yes.

3        Q.    And who --

4        A.    I can -- I can --

5        Q.    Sure.  Let's just --

6        A.    I can tell you.

7        Q.    Okay.

8        A.    Agoa Holdings, DMA Media Holdings, Lifestyle

9    Media Brands, Zen Mobile, Safehaven, Heritage, AMD,

10   All Star, Kai Media, Insight, Shalita.  And that's

11   it.

12       Q.    And that's, in your understanding, the

13   companies that sold AuraVie products by risk free

14   trial?

15       A.    These are the companies that I can

16   acknowledge that were on Lime Light process --

17       Q.    For --

18       A.    -- for processing.

19       Q.    And for processing AuraVie?

20       A.    AuraVie products, yes.

21       Q.    And do you know who managed those companies?

22       A.    Manage --

23             MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous.

25   ///

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1    BY MR. TEPFER:
 2        Q.   Well, I guess, go to the column of officers.
 3    Can you identify which officers you've spoken with
 4    concerning the sale of AuraVie products by risk free
 5    trial?
 6            MR. UNGAR:  Objection as to the form of the
 7    question.  It's vague and ambiguous.
 8            THE WITNESS:  I need a more specific
 9    question.
10    BY MR. TEPFER:
11        Q.   Have you met everyone listed under "Officer"
12    in that column?
13        A.   I have met Alon --
14            MR. UNGAR:  Objection as to the form of the
15    question.  It's vague and ambiguous.
16    BY MR. TEPFER:
17        Q.   You can go ahead.
18        A.   I can tell you who I've met.
19        Q.   Sure.  That would be great.
20        A.   I've met Alon.  I've met Motti.  I've met
21    Roi, Igor, Avi, Stephan Bauer, Tal Topel.  That's
22    it.  Igor, Khristopher.
23        Q.   Is that all that you've met in that column?
24        A.   Yeah.  Yeah.
25            Tal Karasso.  Oh, I met Tal Karasso, not Tal
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                         2/23/2016

1      Topel.

2          Q.   When did you meet Tal Karasso?

3          A.   I met him at Focus Media Solutions.  He

4      was -- he was -- he liked to come in and give a lot

5      of his ideas on what can help Focus Media grow as a

6      marketing agency.  That's the only time he would

7      come in.  He had some blogging experience.  We had a

8      blog called livingpress.com.  It was just a blog.

9      We tried to compete with Elite Daily.  It was a very

10     big website.  So he had some suggestions on how to

11     compete with Elite Daily.

12          MR. TEPFER:  Okay.  Those are the questions

13     that I had.  So Robert and Jeffrey, I'm going to

14     pass the witness.

15          MR. UNGAR:  No questions.

16          MR. TEPFER:  And, Mr. Benice, are you there?

17          Okay.  Do you think I should give him a

18     minute?

19          MS. ROBINSON:  I don't think so.  I mean,

20     it's 45 minutes.

21          MR. TEPFER:  Okay.  Well, then that should

22     be everything.  For the record, I'll just state that

23     we don't have any stipulation concerning the

24     possession of the transcript, but we're going to, of

25     course, abide by the Federal and local rules and

111
Medina
FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

  1    permit the witness to review and make corrections to

  2    the transcript, and that the FTC will be in

  3    possession of the original.

  4              If the court reporter could just say for the

  5    record that we're done.

  6              THE REPORTER:  We are concluded.

  7              MR. TEPFER:  Okay.  We're done.

  8              (The deposition was concluded at 11:40 a.m.)

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25

112

Medina

FTC v. Bunzai Media Group, Inc., et al.                    2/23/2016

```
 1                        --o0o--

 2    Please be advised I have read the foregoing

 3    deposition, and I state there are:

 4    (Check one)

 5                                NO CORRECTIONS

 6                                CORRECTIONS ATTACHED

 7

 8

 9                        PAUL MEDINA

10

11                        Date Signed

12

13

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

Medina

FTC v. Bunzai Media Group, Inc., et al.                                    2/23/2016

```
 1    STATE OF CALIFORNIA            )

 2                                   )   ss.

 3    COUNTY OF LOS ANGELES          )

 4

 5           I, PAUL MEDINA, having appeared for my

 6    deposition on February 23, 2016, do this date

 7    declare under penalty of perjury that I have read

 8    the foregoing deposition, I have made any

 9    corrections, additions or deletions that I was

10    desirous of making in order to render the within

11    transcript true and correct.

12           IN WITNESS WHEREOF, I have hereunto

13    subscribed my name this      day of              ,

14    2016.

15

16

17

18

19

20                        W   I   T   N   E   S   S

21

22

23

24

25
```

1

2

3       I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6        That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14       I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17       IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____3/10/16_____

21

22

23  _____

24      CHRISTINA KIM-CAMPOS, CSR

25      CERTIFICATE NO. 12598