```
 1                   UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3
    FEDERAL TRADE COMMISSION,       )
 4                                  )
                         Plaintiff, )
 5                                  )
            vs.                     )no. 2:15-CV-04527-
 6                                  )    GW (PLAx)
                                    )
 7  BUNZAI MEDIA GROUP, INC., A     )
    CALIFORNIA CORPORATION, ALSO    )
 8  DOING BUSINESS AS AURA VIE,     )
    MIRACLE FACE KIT, AND           )
 9  ATTITUDE COSMETICS;            )
                                    )
10  PINNACLE LOGISTICS, INC., A     )
    CALIFORNIA CORPORATION;         )
11                                  )
    DSA HOLDINGS, INC., A           )
12  CALIFORNIA CORPORATION;         )
                                    )
13  LIFESTYLE MEDIA BRANDS, INC.,   )
    A CALIFORNIA CORPORATION;       )
14                                  )
    AGOA HOLDINGS, INC., A          )
15  CALIFORNIA CORPORATION;         )
                                    )
16  ZEN MOBILE MEDIA, INC., A       )
    CALIFORNIA CORPORATION;         )
17                                  )
    SAFEHAVEN VENTURES, INC., A     )
18  CALIFORNIA CORPORATION;         )
                                    )
19  HERITAGE ALLIANCE GROUP, INC., )
    A CALIFORNIA CORPORATION, ALSO  )
20  DOING BUSINESS AS AURA VIE      )
    DISTRIBUTION;                   )
21                                  )
    AMD FINANCIAL NETWORK, INC.,    )
22  A CALIFORNIA CORPORATION;       )
                                    )
23  SBM MANAGEMENT, INC.,           )
    A CALIFORNIA CORPORATION;       )
24  _____)
25  ***CAPTION ON NEXT PAGE **
```

2

Stanley

FTC v. Bunzai Media Group, Inc., et al. 2/20/2016

```
1    ***CAPTION CONTINUED***
2    MEDIA URGE, INC., A CALIFORNIA )
     CORPORATION;                   )
3                                   )
     ADAGEO, LLC, A CALIFORNIA      )
4    LIMITED LIABILITY COMPANY      )
                                    )
5    CALENERGY, INC., A CALIFORNIA  )
     CORPORATION;                   )
6                                   )
     KAI MEDIA, INC., A CALIFORNIA  )
7    CORPORATION;                   )
                                    )
8    INSIGHT MEDIA, INC., A         )
     CALIFORNIA CORPORATION;        )
9                                   )
     FOCUS MEDIA SOLUTIONS, INC., A )
10   CALIFORNIA CORPORATION;        )
                                    )
11   SECURED COMMERCE, LLC, A       )
     CALIFORNIA LIMITED LIABILITY   )
12   COMPANY;                       )
                                    )
13   SECURED MERCHANTS, LLC, A      )
     CALIFORNIA LIMITED LIABILITY   )
14   COMPANY;                       )
                                    )
15   USM PRODUCTS, INC,  A          )
     CALIFORNIA CORPORATION;        )
16                                  )
     MERCHANT LEVERAGE GROUP,       )
17   INC., A CALIFORNIA CORPORATION;)
                                    )
18   DMA MEDIA HOLDINGS, INC., A    )
     CALIFORNIA CORPORATION;        )
19                                  )
     SHALITA HOLDINGS, INC., A      )
20   CALIFORNIA CORPORATION;        )
     ALL STAR BEAUTY PRODUCTS, INC.,)
21   A CALIFORNIA CORPORATION;      )
                                    )
22   ALON NOTTEA, INDIVIDUALLY AND  )
     AS AN OFFICER OR MANAGER OF    )
23   BUNZAI MEDIA GROUP, INC. AND   )
     PINNACLE LOGISTICS, INC.;      )
24   _____ )
25   ***CAPTION CONTINUED ON NEXT PAGE***
```

3

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                      2/20/2016

```
 1    ***CAPTION CONTINUED***
 2    DORON NOTTEA, INDIVIDUALLY AND )
      AS AN OFFICER OR MANAGER OF   )
 3    BUNZAI MEDIA GROUP, INC.  AND  )
      PINNACLE LOGISTICS, INC.;      )
 4                                   )
      IGOR LATSANOVSKI, INDIVIDUALLY )
 5    AND AS AN OFFICER OR MANAGER OF)
      BUNZAI MEDIA GROUP, INC,       )
 6    PINNACLE LOGISTICS, INC., AND  )
      ZEN MOBILE MEDIA, INC.;        )
 7                                   )
      OZ MIZRAHI, INDIVIDUALLY AND AS)
 8    AN OFFICER OR MANAGER OF BUNZAI)
      MEDIA GROUP, INC., AND PINNACLE)
 9    LOGISTICS, INC.;               )
                                     )
10    ROI REUVENI, INDIVIDUALLY AND  )
      AS AN OFFICER OR MANAGER OF    )
11    BUNZAI MEDIA GROUP, INC. AND   )
      PINNACLE LOGISTICS, INC.;      )
12                                   )
      AND                            )
13                                   )
      KHRISTOPHER BOND, ALSO KNOWN AS)
14    RAY IBBOT INDIVIDUALLY AND AS  )
      AN OFFICER OR MANAGER OF BUNZAI)
15    MEDIA GROUP, INC.;             )
                                     )
16    ALAN ARGAMAN, INDIVIDUALLY AND )
      AS AN OFFICER OR MANAGER OF    )
17    SECURED COMMERCE, LLC AND      )
      SECURED MERCHANTS, LLC         )
18                                   )
      PAUL MEDINA, INDIVIDUALLY AND  )
19    AS AN OFFICER OR MANAGER OF    )
      MEDIA URGE, INC., PINNACLE     )
20    LOGISTICS, INC., AND FOCUS     )
      MEDIA SOLUTIONS, INC., AND     )
21                                   )
              DEFENDANTS, AND        )
22                                   )
      CHARGEBACK ARMOR, INC.,        )
23    A CALIFORNIA CORPORATION;      )
                                     )
24            RELIEF DEFENDANT.      )
      _____)
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1                    DEPOSITION OF ANDREW STANLEY

 2                     SATURDAY, FEBRUARY 20, 2016

 3                       LOS ANGELES, CALIFORNIA

 4

 5

 6      Deposition of ANDREW STANLEY, taken on behalf of

 7      Plaintiff, at 8:24 A.M., Saturday, February 20, 2016,

 8      at 10877 Wilshire Boulevard, Suite 700, Los Angeles,

 9      California, before Jeanine Curcione, C.S.R. No. 10223,

10      RPR, pursuant to notice.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3         FEDERAL TRADE COMMISSION
          BY:  LUIS GALLEGOS, ESQ.
4         BY:  REID A. TEPFER, ESQ.
          1999 Bryan Street
5         Suite 2150
          Dallas, Texas 75201

6

7    FOR THE DEFENDANTS:

8         ROBERT M. UNGAR, ESQ.
          14724 Ventura Boulevard
9         Penthouse
          Sherman Oaks, California 91403-3513

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

Stanley
FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1                     I N D E X

 2   WITNESS                 EXAMINATION              PAGE

 3   ANDREW STANLEY          BY MR. GALLEGOS          7, 144

 4                           BY MR. UNGAR             96

 5

 6                     E X H I B I T S

 7   NO.                     DESCRIPTION              PAGE

 8   Exhibit 103    Document Bates Stamped            77

 9                  FTC-AUR-S1-0000001-2

10   Exhibit 104    Document Bates Stamped            80

11                  FTC-AUR-S1-0000003-8

12   Exhibit 128    Standard Operating Procedure      54

13                  Chargeback Protocol

14   Exhibit 129    E-mail from Andrew Stanley        55

15                  to Roi dated 12/15/11

16   Exhibit 131    E-mail from Andrew Stanley        58

17                  to Roi and others dated 1/25/12

18   Exhibit 134    Chargeback Rebuttal &             69

19                  Offer Terms

20   Exhibit 140    Document Entitled Call            73

21                  Center - Call Dispositions

22   Exhibit 143    Memo from Andree Mansour          36

23                  dated 8/27/12

24   Exhibit 148    Chargeback Rebuttal               75

25   Exhibit 163    Merchant Accounts                 83
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley
FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1                    LOS ANGELES, CALIFORNIA;

 2              SATURDAY, FEBRUARY 20, 2016, 8:24 A.M.

 3

 4                        ANDREW STANLEY,

 5                having been duly affirmed, was

 6                examined and testified as follows:

 7

 8                          EXAMINATION

 9    BY MR. GALLEGOS:

10           Q.  Good morning, Mr. Stanley.  My name is Lewis

11    Gallegos.  I'm the attorney with the Federal Trade

12    Commission and I will be deposing you today.  We're

13    here today in the matter of FTC versus BunZai Media

14    Group, Inc., et al., case number CV15-4527 pending in

15    the United States District Court for the Central

16    District of California.  With me is Mr. Reid Tepfer who

17    is also an attorney for the Federal Trade Commission.

18           MR. GALLEGOS:  Can counsel please identify

19    themselves for the record.

20           MR. TEPFER:  This is Reid Tepfer with the FTC.

21           MR. UNGAR:  Robert Ungar, U-n-g-a-r.

22    BY MR. GALLEGOS:

23           Q.  And Mr. Stanley, can you state and spell

24    your name for the record.

25           A.  Andrew Stanley, A-n-d-r-e-w, S-t-a-n-l-e-y.
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.  And do you understand that you're under oath
2      and that means your responses have to be completely
3      truthful?
4          A.  Yes.
5          Q.  Do you understand that your testimony here
6      today has as much importance as if you were testifying
7      in front of the judge in court?
8          A.  Yes.
9          Q.  If we can go over a couple of ground rules.
10     The court reporter will be recording my answers and
11     your answers.  You will have to speak up and answer
12     orally so she can record your answers.  This means you
13     can't nod your head or shake your head to give answers.
14     Does that make sense to you?
15         A.  Yes.
16         Q.  That also means we can't speak at the same
17     time or the court reporter won't be able to record
18     accurately what we say.  So if you think you understand
19     my question before I finish asking it, please wait
20     until I'm done before answering.
21         A.  Okay.
22         Q.  Sometimes I might ask a question that you
23     don't understand.  If you don't understand my question
24     let me know and I'll rephrase it and try to ask a
25     better question.  Okay?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

     1          A.  Okay.

     2          Q.  If you don't inform me that you don't

     3    understand a question, I will assume that you

     4    understood the question.  Is that fair?

     5          A.  That's fair.

     6          Q.  If you need a break at any time let me know

     7    and we'll finish whatever question we're in the middle

     8    of answering and then try to take a short break after

     9    that.

    10          A.  Okay.

    11          Q.  At times an attorney might make an objection

    12    to a question I ask.  I may rephrase the question or

    13    ask you to answer my original question and you should

    14    still answer.

    15          A.  Okay.

    16          Q.  Can you think of any reason that you

    17    wouldn't be able to answer my questions fully,

    18    accurately and to the best of your ability today?

    19          A.  No, I can't.

    20          Q.  Prior to today have you ever given testimony

    21    in any deposition?

    22          A.  I don't believe so.

    23          Q.  Have you ever given any testimony in any

    24    court-related matter?

    25          A.  No.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

10

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          Q.   Let's talk a little bit about your
2     background.   What year and where were you born?
3          A.   I was born in Westlake in 1990.
4          Q.   And without giving us the physical address,
5     what city and state do you currently reside in?
6          A.   Los Angeles.
7          Q.   And how long have you lived in Los Angeles?
8          A.   Pretty much for about 15 years now.
9          Q.   Does anybody reside with you at your current
10    address?
11         A.   Yeah.   I have a roommate.
12         Q.   And are you currently employed?
13         A.   Yes, I am.
14         Q.   As far as your -- tell us a little bit about
15    your educational background.
16         A.   I went to a charter school in the valley and
17    I did some community college.
18         Q.   And how far into community college did you
19    get?
20         A.   I got about 80 units complete so about
21    two-thirds of the way finished.
22         Q.   Which college is that?
23         A.   Pierce College in the San Fernando Valley.
24         Q.   Tell us about your employment history during
25    the past five years.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1              A.   For the past five years I ended up working
 2    for -- last year I worked for a solar company.  It was
 3    outside sales and setting up appointments.  And prior
 4    to that I worked for Pinnacle Logistics or BunZai Media
 5    for three years as a customer service agent and worked
 6    in the chargebacks department.
 7              Q.   And prior to -- you said Pinnacle Logistics
 8    and BunZai Media.  Are those the same company?
 9              A.   Pretty much, yes.
10              Q.   Do you recall when you started working?
11              A.   I started working at BunZai Media in 2011.
12              Q.   And until when did your employment at BunZai
13    Media end?
14              A.   In January -- around January 2014.
15              Q.   And when did you start working at Pinnacle
16    Logistics?
17              A.   They set up Pinnacle Logistics I believe in
18    2012.
19              Q.   And when did you stop working at Pinnacle
20    Logistics?
21              A.   In January 2014.
22              Q.   And when you said you worked in the customer
23    service and chargeback department, for which company
24    were you working?
25              A.   So originally I was hired by BunZai Media
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    and was working in their customer service department,

2    and then in -- I want to say like maybe a few months

3    into 2012 they said that they were -- BunZai Media was

4    going to be the marketing department and Pinnacle

5    Logistics was going to be like their customer service

6    department and handle the Pinnacle Logistics and handle

7    the shipping so now we were going to be paid under

8    Pinnacle Logistics.  Yeah, in 2012.

9         Q.  At BunZai Media did you work in the

10   chargeback department?

11        A.  No.  Actually, I take that back.  There were

12   some weeks where she would have some of the customer

13   service agents go to different departments like maybe

14   working in the shipping department or chargeback

15   departments.  There were a couple of weeks when I

16   worked in the chargeback department.

17        Q.  When you stated a second ago that BunZai

18   Media was going to be marketing and Pinnacle was going

19   to do -- what was that again?

20        A.  Handle the Pinnacle Logistics, like the

21   customer service.  Pinnacle Logistics would handle like

22   the customer service and the shipping department.

23        Q.  And who told you that?

24        A.  It was Alon or Roi.

25        Q.  And when you say Alon, who is Alon?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

```
 1          A.  Alon was the owner of BunZai Media.

 2          Q.  Is that Alon Nottea?

 3          A.  Yes.

 4          Q.  And you said it was either Alon or Roi?

 5          A.  Yes.

 6          Q.  Is that Roi Reuveni?

 7          A.  Yes.

 8          Q.  And you said that Alon was the owner of

 9     BunZai Media; is that correct?

10          A.  That's correct.

11          Q.  And how did you know that?

12          A.  I mean, he just told me he was the owner of

13     the business.

14          Q.  Did Alon have any other title -- or any

15     title?

16          MR. UNGAR:  I'm going to object.  I can't hear

17     because the witness has his hand in front of his mouth

18     and it's very soft and I simply can't hear, so if the

19     witness would please -- thank you, and speak up a

20     little bit so I can hear.

21          THE WITNESS:  I'll try.  Yeah, Alon told me he

22     was the -- yeah, the owner of BunZai.

23     BY MR. GALLEGOS:

24          Q.  Did Mr. Nottea -- to your knowledge did

25     Mr. Nottea tell you he had any title at BunZai Media?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

 1          MR. UNGAR:  Objection as to the form of the
 2   question.  Calls for speculation.  Lacks foundation.
 3   BY MR. GALLEGOS:
 4          Q.  You can go ahead and answer if you know?
 5          A.  Can you repeat the question?
 6          Q.  Sure.  Did Mr. Nottea inform you -- to your
 7   knowledge did Mr. Nottea have any title as far as
 8   position at BunZai Media Group?
 9          MR. UNGAR:  Objection as to the form of the
10   question.  It's vague and ambiguous.  Compound.  Calls
11   for speculation.  The second part calls for
12   speculation.
13          THE WITNESS:  He just simply told me that he
14   owned the business and nothing specific to the title.
15          MR. UNGAR:  Excuse me, I can't hear you.  Can
16   you speak up a little bit?
17          MR. GALLEGOS:  If you'd like you can move closer
18   to the witness, Robert.
19          MR. UNGAR:  I don't want the witness to feel
20   like I'm intimidating him.  This is where I choose to
21   sit.  I would like the witness though to speak up a
22   little bit if it's possible.
23          THE WITNESS:  I can try to speak and louder.  I
24   feel like I'm speaking as loud as I can.
25          MR. UNGAR:  Thank you.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                  2/20/2016

```
 1    BY MR. GALLEGOS:
 2         Q.  And I want you to feel comfortable so you
 3    speak the way you naturally speak.
 4              As far as Mr. Reuveni, was Mr. Reuveni a
 5    manager at BunZai Media?
 6         A.  Yes, he was.
 7         Q.  And what was he manager of?
 8         A.  He started off there as a manager of the
 9    customer service department -- and I just know that
10    because he was just managing us and telling us what to
11    do from day to day and helping us out with quality
12    assurance and what we should be saying during the
13    calls.
14              I also know that he was doing some of the IT
15    work there, because that's -- yeah, he was handling
16    some of the computer problems.  And then after a while
17    he became a manager of the entire customer service
18    department, chargeback department, quality assurance
19    department.  And I'm pretty sure other things as well.
20         Q.  That was at BunZai Media?
21         A.  That was at BunZai Media and Pinnacle
22    Logistics.
23         Q.  When you started at BunZai Media in 2011 who
24    hired you?
25         A.  Kris.
```

16

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1         Q.   And do you know what Kris's last name was?

2         A.   He just told us Kris Bond.  We weren't sure

3    if that was his real last name.

4         Q.   And when you started at BunZai Media in

5    2011, was Mr. Reuveni your first manager?

6         MR. UNGAR:  Objection to the form of the

7    question.  It's vague and ambiguous.

8         THE WITNESS:  Was he my first manager?  I know

9    he was working there at the time.  It was kind of Kris

10   that was managing us at the time.

11   BY MR. GALLEGOS:

12        Q.   And when do you recall when it was that

13   Mr. Reuveni started taking over the duties of the

14   customer service department?

15        A.   I recall it being maybe a few months into

16   the job.  A couple of months into the job.  He was just

17   more involved in day-to-day operations.

18        Q.   And when you say more involved in the

19   day-to-day operations, is that of the customer service

20   department?

21        A.   Yeah.  That's with customer service.

22        Q.   And what exactly do you mean by more

23   involved?

24        A.   He was -- there was someone they put in

25   charge directly of like talking to the agents.  His

17

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1   name is Andre and he would be talking to Andre a lot

2   about what should be happening in the customer service

3   department, what the agent should be saying to

4   customers and that scripts needed to be made because at

5   the time no one actually had a script they were

6   following, so he was saying that scripts need to be

7   made and that entire protocol for the customer service

8   needs to be made, that we have packets to reference and

9   everything.

10        MR. UNGAR:  Move to strike as nonresponsive.

11   BY MR. GALLEGOS:

12        Q.  And how did you know this -- how did you

13   know that he had these conversations with Andre?

14        A.  Well, part of it I heard it and part of it

15   was Andre telling me that him and Roi were kind of

16   arguing about how the customer service department

17   should be set up.

18        Q.  Aside from Roi Reuveni, did BunZai Media

19   have any other managers?

20        MR. UNGAR:  Objection to the form of the

21   question.  Vague and ambiguous.

22        THE WITNESS:  Yeah.  They had other managers

23   that worked.  They were in charge of the customer

24   service department.  From time to time they had

25   different managers, but it was -- the main manager was

Stanley

FTC v. Bunzai Media Group, Inc., et al.                           2/20/2016

```
 1     Andre, Sandra and then Roi.
 2     BY MR. GALLEGOS:
 3          Q.  And do you recall what Sandra's last name
 4     was?
 5          A.  I believe Sandra Steele.
 6          Q.  Do you know how that's spelled?
 7          A.  I think it was S-t-e-e-l-e.
 8          Q.  And Andre, do you know what his last name
 9     was?
10          A.  No, I can't recall off the top of my head.
11          Q.  And those were the managers of the customer
12     service department?
13          MR. UNGAR:  Objection.  Leading.
14          THE WITNESS:  Yes.
15     BY MR. GALLEGOS:
16          Q.  Did BunZai Media Group have any other
17     departments?
18          A.  At the time -- I mean, they had chargebacks
19     set up.  They had chargeback department, a shipping
20     department.  I know they had a marketing department
21     upstairs.  Or the graphic design department that was
22     coming up with all the graphics for the websites and
23     landing pages they had set up.
24          Q.  Do you know who managed those different
25     departments?
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1          A.   No.   I don't know specifically.   I just know
 2     that Roi was involved, Kris Bond was involved and Alon.
 3          MR. UNGAR:   Move to strike everything after the
 4     word "No."
 5     BY MR. GALLEGOS:
 6          Q.   And when you say that Roi and Alon and
 7     Kristopher Bond were involved, what do you mean by
 8     that?
 9          A.   They were -- Kristopher Bond was telling me
10     directly that he was in charge of bringing different
11     people in to take pictures of them after they used the
12     product.   And one of the things that he told me was
13     that he would have, you know, someone that he met like
14     try the product on for 14 days.
15               He would take a picture of them before they
16     took the product and take a picture of them after the
17     product and he would post them on the landing pages
18     they had set up and Roi worked directly with Victor who
19     did the graphic design for the website and Alon was the
20     owner of the company, so that's how I know that he was
21     involved with the marketing.
22          MR. UNGAR:   Move to strike as nonresponsive.
23     Lacks foundation and speculation.
24     BY MR. GALLEGOS:
25          Q.   And how did you know that Roi worked
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    directly with Victor?

2          A.   Because they were just working on the

3    landing pages.  When I was upstairs sometimes I would

4    be talking to Roi about the chargebacks later on, and

5    he would be talking to Victor about what he needs to do

6    for some of the landing pages.

7          MR. UNGAR:  Move to strike as nonresponsive.

8    BY MR. GALLEGOS:

9          Q.   And when you stated that you would talk to

10   Roi about the chargebacks, why would you talk to Roi

11   about chargebacks?

12         A.   Because Roi was in charge of the department.

13   He was telling us directly what to do when we were

14   handling chargebacks.  So sometimes we would talk about

15   how many chargebacks we sent off or which way he wanted

16   the department to head so we would be upstairs talking

17   to him about it.

18         Q.   And this was while you worked at BunZai

19   Media?

20         MR. UNGAR:  Objection.  Leading.

21         THE WITNESS:  No.  This was more at Pinnacle.

22   But it was -- we were in like the same building and

23   same office.

24   BY MR. GALLEGOS:

25         Q.   As far as specifically at BunZai Media

21

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1    Group, do you know who was involved with the chargeback

2    department?

3            A.   Just Roi.  That's all I know.

4            Q.   And how do you know that Roi was involved

5    with the chargeback department at BunZai Media group?

6            A.   Because when I was handling -- like I said,

7    when they had different people handling chargebacks for

8    a week helping out other departments, Roi was telling

9    me he was in charge of the chargeback department and

10   trying to figure out ways to win more chargebacks.

11           Q.   When you say "ways to win more chargebacks,"

12   what did you understand that to mean?

13           A.   I didn't really understand chargebacks too

14   much at the time.  I had just assumed that they weren't

15   winning as many chargebacks as they wanted to.

16           MR. UNGAR:  Move to strike after "I didn't

17   really understand chargebacks."  And the balance of the

18   answer calls for speculation and lacks foundation.

19   BY MR. GALLEGOS:

20           Q.   While working at BunZai Media Group in the

21   customer service department, were you ever provided any

22   scripts to -- when speaking with customers?

23           MR. UNGAR:  Objection.  Vague and ambiguous.

24           THE WITNESS:  Yes, we were.

25   ///

22

Stanley
FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    BY MR. GALLEGOS:

2         Q.  And just for clarification, Mr. Ungar makes

3    an objection, wait until he finishes so he can properly

4    make that on the record.

5         A.  Okay.

6         Q.  And what would those scripts be about?

7         MR. UNGAR:  Objection as to the form of the

8    question.  Vague and ambiguous.

9         THE WITNESS:  The scripts -- the scripts

10   detailed specifically what we needed to say to

11   customers when they called in.  There were different

12   responses on the scripts.  If a customer said one thing

13   specifically that they wanted to return an item or they

14   didn't like the products, there was a response written

15   out to say to the customer.

16   BY MR. GALLEGOS:

17        Q.  When you first started working at BunZai

18   Media Group, were you provided any kind of training?

19        A.  Yes, we were.

20        Q.  And who provided that training?

21        A.  Kristopher Bond.

22        Q.  And what did that training involve?

23        A.  He just talked to us about the product and

24   told us that it was a great product and that we just

25   need to be alert when talking to customers on the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                      2/20/2016

```
 1    phone.  I don't recall too, too much about what the
 2    training was.  I just remember him talking about the
 3    product and saying it was one of the best products on
 4    the market.
 5         Q.  Did Mr. Bond discuss anything about what to
 6    expect from calls received by customers?
 7         MR. UNGAR:  Objection as to the form of the
 8    question.  It's vague and ambiguous.
 9         THE WITNESS:  To be honest I don't really recall
10    specifically.  I just remember him talking a lot about
11    the product.
12    BY MR. GALLEGOS:
13         Q.  Did Mr. Bond talk during the training about
14    anything about refunds or any of that type of
15    information?
16         MR. UNGAR:  Objection.  Leading.  Lacks
17    foundation.  Calls for speculation.
18         THE WITNESS:  They did talk about refunds,
19    several times in training throughout working at BunZai
20    Media and Pinnacle Logistics.  That first meeting I
21    don't recall specifically what they said about refunds
22    in general.
23    BY MR. GALLEGOS:
24         Q.  As far as specifically BunZai, not
25    necessarily during training, but what was your
```

24

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    recollection of what they talked about with respect to

2    refunds?

3            A.   Basically what they would say is if a

4    customer called in and, you know, was demanding a

5    refund that our first response should be to take the

6    customer back to the landing page where they signed up

7    at and show the customers the terms and conditions they

8    agreed to when placing the order for the trial.  I

9    know -- and then at that point, you know, once we were

10   at the terms and conditions, try to send the customer

11   out a complimentary product.

12              And if they declined to that -- I mean, the

13   goal was to keep just reinstating the fact that they

14   weren't entitled to a refund and make the customer

15   understand that they weren't supposed to receive a

16   refund.  And basically the procedure was if they were

17   still demanding a refund to start off at a 15 percent

18   refund.  If they declined a 15 percent refund go to a

19   25 refund.

20              If they declined that you're supposed to put

21   the customer on hold and pretend you're talking to the

22   manager and then hop back on the phone and offer a

23   50 percent refund.  If they were still demanding and

24   screaming about receiving a refund, sometimes you could

25   talk to the manager about it or you could just place

25

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    the customer on hold again and pretend that you were

2    talking to a manager and then offer a 75 percent

3    refund.

4              And they said if a customer just kept

5    calling in and in again several times throughout the

6    day then to issue a full refund.

7         MR. UNGAR:  Move to strike the entirety of the

8    answer on the grounds it lacks competency, lacks

9    personal knowledge.  The witness has no recollection.

10   BY MR. GALLEGOS:

11        Q.  And was this the standard operating

12   procedure with respect to refunds at BunZai Media

13   Group?

14        A.  Yes, it was.

15        Q.  And to your recollection who told you of

16   this standard operating procedure?

17        MR. UNGAR:  Objection to the form of the

18   question.  Lacks foundation.  Vague and ambiguous.

19        THE WITNESS:  It was Andre.  Andre had asked

20   us -- Andre had told us when we first started

21   working -- first started working there how to handle

22   refunds.  And I am -- I recall that being the exact

23   procedure because I worked in the quality assurance

24   department for a while as well, so over and over

25   again -- and the chargebacks department, so we would

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    listen to calls.

2         So over and over again you would hear that exact

3    same procedure of customer service agents placing the

4    customer on hold, offering the initial 15 percent or

5    25 percent refund, the customer declining then placing

6    them on hold again and then offering the 50 percent

7    refund --

8         MR. UNGAR:  Move to strike as nonresponsive.

9         MR. GALLEGOS:  If you could please let the

10   witness finish his statement before --

11        MR. UNGAR:  I thought he was done.  He talks

12   very softly.  I thought he was finished.

13        I apologize if I stepped on the end of your

14   answer.

15        Move to strike as nonresponsive.

16   BY MR. GALLEGOS:

17        Q.  Was this the standard operating procedure of

18   refunds at Pinnacle Logistics to your knowledge?

19        A.  Yes, it was the same.

20        Q.  And to your recollection do you recall who

21   advised you of the standard operating procedure at

22   Pinnacle Logistics with respect to refunds?

23        A.  Roi was involved and Andre was involved in

24   the customer service and refunds handling procedures

25   and protocols.

27

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.   While working in the customer service

2     department at BunZai Media, what were the, to your

3     recollection -- what were the typical complaints

4     customers were calling about?

5          MR. UNGAR:  Objection to the form of the

6     question.  Vague and ambiguous.  Lacks foundation.

7          THE WITNESS:  Customers mainly complained

8     about -- number one they didn't know why they were

9     charged.  They were calling in asking why they were

10    charged.  And they would just demand a refund when they

11    called in.  A lot of customers were upset.  They

12    claimed they didn't see the terms and conditions on the

13    website and the websites that -- one of the things they

14    had us say is that they had to check a box to agree to

15    the terms and conditions but on those websites there

16    was no box to click to agree to the terms and

17    conditions of the trial when entering in the

18    credit card information.

19         Q.   How do you know that?

20         A.   Because I looked at the websites when I was

21    working as a customer service agent and in the

22    chargebacks department as well.

23         Q.   While working at Pinnacle Logistics did you

24    also work in the customer service department?

25         A.   Sometimes.  Sometimes the -- at that time I

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

28

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    remember they were processing a lot of orders, so
2    obviously there were more customers calling in trying
3    to find out why they were billed, so when they would
4    get really busy I would hop on the phone as a customer
5    service rep.
6         MR. UNGAR:  Move to strike everything as
7    nonresponsive after "Sometimes."
8    BY MR. GALLEGOS:
9         Q.  To your recollection do you recall if the
10   complaints that were received be -- strike that.  To
11   your knowledge what were the types of complaints that
12   Pinnacle Logistics was receiving from customers?
13        A.  At Pinnacle Logistics?
14        MR. UNGAR:  Objection as to the form of the
15   question.  It's vague and ambiguous.  Calls for
16   speculation.  Lacks foundation.
17        THE WITNESS:  At Pinnacle Logistics they were
18   the same complaints that we were receiving with BunZai,
19   that the customers didn't know why they were billed.
20   They said they didn't see the terms of the trial.  And
21   sometimes at both BunZai and Pinnacle Logistics,
22   sometimes customers would complain that the product
23   didn't work or it burned their face.
24   BY MR. GALLEGOS:
25        Q.  When -- do you recall what address BunZai

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

 1   Media was located at?

 2        A.   I can't remember the address off the top of

 3   my head.  It was on Gloria -- I know the main streets.

 4   It was on Woodley and Saticoy or off of Woodley and

 5   Saticoy Street.

 6        Q.   In what city?

 7        A.   In Van Nuys.

 8        Q.   And when you started working at Pinnacle

 9   Logistics where was Pinnacle Logistics located?

10        A.   It was in the same building as BunZai Media.

11        Q.   As far as the employees that started working

12   at Pinnacle Logistics, were they the same as the

13   employees that worked at BunZai Media Group?

14        A.   Yes.  Some employees had quit while working

15   at BunZai but the transition from BunZai Media to

16   Pinnacle Logistics, when they told us it was officially

17   Pinnacle Logistics that we were working for it was the

18   same employees that were working there that were

19   working at BunZai.

20        Q.   Did any of the management structure change?

21        MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous.  Calls for

23   speculation.  Lacks foundation.

24        THE WITNESS:  It was -- the day-to-day

25   operations were a little bit more structured.  They

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                   2/20/2016

1     were providing us with more scripts and different

2     scripts to use.  Roi was coming down a lot and

3     listening to customer service reps on the phone.  He

4     would walk around with headphones and they were just

5     listening more for quality assurance purposes.  So it

6     was a bit more structured than BunZai Media was.

7             MR. UNGAR:  Move to strike as nonresponsive.

8     BY MR. GALLEGOS:

9             Q.  What about Alon Nottea's involvement?

10            MR. UNGAR:  Objection as to the form of the

11    question.  It's vague and ambiguous.  Calls for

12    speculation.  Lacks foundation.

13            THE WITNESS:  Alon, which is still the owner of

14    the business, he would come in and talk to us sometimes

15    and tell us we were doing a great job.  And then he

16    would come and talk to me about chargebacks a couple of

17    times when I was at Pinnacle Logistics.

18    BY MR. GALLEGOS:

19            Q.  To your recollection was Doran Nottea ever

20    involved with BunZai Media Group?

21            MR. UNGAR:  Objection as to the form of the

22    question.  It's vague and ambiguous.  Lacks foundation.

23    Calls for speculation.

24            THE WITNESS:  I'm sorry.  Could you repeat the

25    question.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                           2/20/2016

```
 1              (Record read.)
 2          THE WITNESS:  Was Roi involved with BunZai?
 3  BY MR. GALLEGOS:
 4          Q.  I believe it was Doron Nottea.
 5          MR. UNGAR:  Objection as to the form of the
 6  question.  Vague and ambiguous.  Lacks foundation.
 7  Calls for speculation.
 8          THE WITNESS:  Yes, he was involved.
 9  BY MR. GALLEGOS:
10          Q.  And to your knowledge how was he involved?
11          A.  From what I was told he handled all the
12  finances and did some of the accounting.  That's just
13  from what I was told by Roi.
14          MR. UNGAR:  Move to strike as speculative and
15  lacking foundation.
16  BY MR. GALLEGOS:
17          Q.  Did you understand Alon to be the head of
18  Pinnacle Logistics?
19          A.  Yes.
20          MR. UNGAR:  Objection to the form of the
21  question.  It's vague and ambiguous.  It's leading.
22  It's putting words into the witness's mouth.
23          THE WITNESS:  Yes.  Alon was in charge of
24  Pinnacle.
25  ///
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                        2/20/2016

```
 1    BY MR. GALLEGOS:

 2         Q.   And why did you believe that?

 3         A.   Because while we were working at Pinnacle

 4    when I was working in the chargebacks department, Alon

 5    would come in and talk to us and, you know, ask us how

 6    many chargebacks we were winning or asking us what the

 7    protocol was now because Roi was more involved in that

 8    process, so Alon every once in a while if we were

 9    having a problem or if -- if we were having a problem

10    or something that we wanted to talk to him directly

11    about, he was the person that we talked to if we were

12    ever having problems, so we would talk to him directly

13    if we needed something handled, if we needed to go

14    above Roi to talk to him about something.

15    BY MR. GALLEGOS:

16         Q.   Did you ever hear Doron Nottea discussing

17    merchant accounts while working at BunZai Media?

18         MR. UNGAR:   Objection.   Vague and ambiguous.

19    It's leading.   It's putting words into the witness's

20    mouth.

21         THE WITNESS:   Yes.   There was a time I heard he

22    was upset because his -- when we were responding to the

23    chargebacks his name and some of his family members'

24    names were on the paperwork that we were sending to the

25    banks, and he was upset that his name was on it and
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    some of his family members' names were on it that we

2    were sending out to the banks.

3    BY MR. GALLEGOS:

4         Q.  How do you know about this?

5         A.  Because Roi told me and he had us switch the

6    names.

7         Q.  When you were working in the customer

8    service department at BunZai Media, what product were

9    you providing customer service for?

10        A.  For -- it was for My Miracle Face Kits and

11   for AuraVie.

12        Q.  Any other products?

13        A.  There were some -- some soap products that

14   were additions that we could up sell a customer with.

15   But I can't remember the names of the products.

16        Q.  And while working as a customer service

17   representative with Pinnacle Logistics, what products

18   did Pinnacle Logistics provide customer service for?

19        A.  It was for -- at that time they were kind of

20   cutting out My Miracle Face Kit.  They weren't selling

21   it as much but it was mainly for AuraVie.

22        Q.  While working in the customer service

23   department at BunZai Media, did you ever hear

24   management discuss BBB complaints?

25        MR. UNGAR:  Objection as to the form of the

34

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1   question.  It's vague and ambiguous.  Calls for

2   speculation.  Lacks foundation.

3          THE WITNESS:  I'm sorry.  Did you say did I hear

4   about BBB complaints while working with BunZai?

5   BY MR. GALLEGOS:

6          Q.  Yes.

7          A.  Yeah, we heard about the Better Business

8   Bureau complaints.  If a customer was -- if a customer

9   was stating to us over the phone that they were going

10  to complain to the Better Business Bureau that we

11  needed to handle -- that we just needed to handle it

12  with better care while talking to the customer over the

13  phone, that we really need to try to resolve the issue

14  over the phone.

15  BY MR. GALLEGOS:

16         Q.  Was it ever explained to you why you needed

17  to resolve that issue?

18         MR. UNGAR:  Objection as to the form of the

19  question.  It's vague and ambiguous.

20         THE WITNESS:  Just so that they didn't file a

21  complaint with the Better Business Bureau so that it

22  didn't lower their rating.

23  BY MR. GALLEGOS:

24         Q.  While working at BunZai Media group did you

25  ever hear management discuss anything about online

35

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    complaints relating to AuraVie products?

2         MR. UNGAR:  Objection as to the form of the

3    question.  Vague and ambiguous.  Lacks foundation.

4    Calls for speculation.

5         THE WITNESS:  Online complaints about AuraVie

6    products with the Better Business Bureau?

7         MR. UNGAR:  Move to strike the answer as

8    nonresponsive.

9    BY MR. GALLEGOS:

10        Q.  Or with any third party?

11        MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous.  Calls for

13   speculation.  Lacks foundation.

14        THE WITNESS:  Definitely we heard -- we heard

15   complaints about AuraVie.  We would -- number one Andre

16   told us there were complaints online about AuraVie.

17   And then some of the customer service agents in the

18   office would talk about when they looked up AuraVie and

19   would go to third party websites they would see a lot

20   of complaints.  This is a scam, is this legit.  Is this

21   legal.

22        So that would be something that customer service

23   agents would look up while they were on their computer

24   and see a lot of complaints from customers online.  So

25   it was talk among customers in the office.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1          MR. UNGAR:  Move to strike as nonresponsive and

2     narrative.

3     BY MR. GALLEGOS:

4          Q.  Were customer service representatives

5     instructed by management to do anything with those

6     complaints?

7          MR. UNGAR:  Objection to the form of the

8     question.  Vague and ambiguous.

9          THE WITNESS:  No.  Customer service reps weren't

10    supposed to do anything with those complaints.  They

11    weren't really told to do anything about it at all.

12    BY MR. GALLEGOS:

13         Q.  Would customer service agents forward those

14    complaints to anyone in BunZai Media?

15         A.  No one in the customer service department,

16    no.

17         MR. GALLEGOS:  Let the record reflect I'm

18    handing the witness what's been marked as Exhibit 143.

19         MR. UNGAR:  Counsel, I'm still waiting for my

20    copies in the depositions that I appeared

21    telephonically which you haven't provided me yet of the

22    exhibits.  I presume I'll be receiving those today.

23         MR. GALLEGOS:  We'll get them to you as soon as

24    we can, but that's not a topic for this deposition.

25              (Exhibit 143 was marked for identification

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          by the Reporter.)

2    BY MR. GALLEGOS:

3          Q.   If you can look at 143-2 through 143-3.

4          A.   Okay.

5          Q.   Do you recognize this document, Mr. Stanley?

6          A.   Yes, this looks like one of the scripts that

7    were handed out during Pinnacle Logistics, at Pinnacle

8    Logistics.

9          MR. UNGAR:   Move to strike everything after

10   "Yes."

11   BY MR. GALLEGOS:

12         Q.   And do you recall who provided this script?

13         A.   No, I do not.

14         Q.   Was this script provided to all customer

15   service representatives at Pinnacle Logistics?

16         MR. UNGAR:   Vague and ambiguous.  Calls for

17   speculation.

18         THE WITNESS:   This was one of the scripts that

19   were handed out.  There were probably -- I have to say

20   more than ten scripts that were handed out between

21   BunZai Media and Pinnacle Logistics.

22   BY MR. GALLEGOS:

23         Q.   To your knowledge did Mr. Roi Reuveni ever

24   provide you this script?

25         MR. UNGAR:   Objection as to the form of the

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    question.  It's vague and ambiguous.

2           THE WITNESS:  I don't recall specifically this

3    script, but he did hand us scripts, yes.

4           MR. UNGAR:  Move to strike as nonresponsive.

5    BY MR. GALLEGOS:

6           Q.  And down towards the middle of the page

7    there's a question that starts with "Customer called

8    stating."  Do you see that?

9           A.  Yes, I do.

10          Q.  The last sentence in that section reads,

11   "Customer is not willing to call with bank and is not

12   willing to drop dispute."  Do you see that?

13          A.  Yes, I do.

14          Q.  Do you know what that means?

15          A.  Basically what this means is that if a

16   customer says to a customer service rep over the phone

17   that they filed a dispute with their bank and if

18   they're not willing to call back in with a -- with

19   their bank, like if they had Chase Bank they were

20   supposed to call their bank, say that they wanted to

21   call the company that they filed a dispute with, with

22   the bank rep on the line and they would call, you know,

23   AuraVie or they would call Pinnacle Logistics and they

24   basically had to say over the phone that they were

25   willing to drop the dispute in order to receive maybe a

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    partial refund or 50 percent refund or full refund, but

2    they had to admit over the phone with the bank rep that

3    they were dropping the dispute.

4         Q.  And if the customer was unwilling to do that

5    what would happen?

6         A.  If the customer wasn't willing to do that

7    you're basically not supposed to issue the customer a

8    refund until they called in with their bank.  And I

9    would hear, you know -- I specifically listened to

10   calls with Andre where he would get upset with

11   customers and basically say things -- he would get

12   upset with customers when they weren't willing to drop

13   the dispute to call in with the bank.

14        MR. UNGAR:  Move to strike as nonresponsive.

15   BY MR. GALLEGOS:

16        Q.  Was that policy the same policy as to BunZai

17   Media?

18        MR. UNGAR:  Objection to the form of the

19   question.  Vague and ambiguous.

20        THE WITNESS:  Yes.  It was exactly the same.  If

21   the customer wasn't willing to call in with their bank

22   to say they wanted to drop the dispute over the phone

23   with the bank rep, the customer service rep wasn't

24   supposed to issue a refund.

25   ///

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    BY MR. GALLEGOS:

2         Q.  If you could look at the first page of this

3    document.  I know a while ago you said you couldn't

4    remember Andre.  The e-mail shows Andre Mansour.  Is

5    that the Andre you've been speaking of?

6         A.  Yes, it is.

7         Q.  While working in the customer service

8    department at BunZai Media, did anyone at BunZai Media

9    discuss with you anything about the Federal Trade

10   Commission?

11        A.  While I was working at BunZai Media?  Yes.

12        Q.  And who discussed that with you?

13        A.  It was Roi.

14        Q.  And to your recollection what did Roi tell

15   you about the Federal Trade Commission?

16        A.  That we followed all their rules and

17   regulations.

18        Q.  While working in the customer service

19   department -- well, while working at Pinnacle Logistics

20   did anyone ever talk to you about the Federal Trade

21   Commission?

22        A.  Yes.  And I handled paperwork -- I handled

23   paperwork stating that we followed -- in the chargeback

24   department that we followed all FTC rules and

25   regulations.

41

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1          Q.  And when you say "handled paperwork," what
2     do you mean by that?
3          A.  They had some letter stating that they
4     followed all the rules by the FTC.
5          Q.  While working in the customer service
6     department at BunZai Media, were you responsible for
7     handling any consumer complaints?
8          A.  Consumer complaints with the Better Business
9     Bureau?
10         MR. UNGAR:  Move to strike as nonresponsive.
11    BY MR. GALLEGOS:
12         Q.  While working in the customer service
13    department at BunZai Media were you responsible for
14    handling consumer complaints received from the Better
15    Business Bureau?
16         A.  No.
17         Q.  Do you know if anybody in the customer
18    service department was responsible for handling those
19    types of complaints?
20         MR. UNGAR:  Objection as to the form of the
21    question.  It's vague and ambiguous.
22         THE WITNESS:  I remember there was a time when
23    Sandra who was a manager there was handling Better
24    Business Bureau complaints, but I know they had
25    different people handling those complaints.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                            2/20/2016

1          MR. UNGAR:  Move to strike as nonresponsive and

2     speculative and it lacks foundation.

3     BY MR. GALLEGOS:

4          Q.  While working in the customer service

5     department at BunZai Media, were you responsible for

6     handling any complaints received from the attorney

7     general's office?

8          A.  No.

9          Q.  While working in the customer service

10    department at BunZai Media group, were you ever

11    instructed to treat consumers threatening BBB

12    complaints differently?

13         A.  Yes.

14         Q.  And what were you told?

15         MR. UNGAR:  Objection as to the form of the

16    question.  It's vague and ambiguous.

17         THE WITNESS:  We were just told that it was more

18    serious if a customer was stating they were going to

19    file a complaint with the Better Business Bureau, that

20    we can't be short with them and we really needed to

21    take our time and see if they were willing to be issued

22    a partial refund and accept that refund.

23    BY MR. GALLEGOS:

24         Q.  And were these customers treated differently

25    from other customers?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                           2/20/2016

1          MR. UNGAR:  Objection as to the form of the

2     question.  It's vague and ambiguous.

3          THE WITNESS:  Yes, they definitely were.

4     BY MR. GALLEGOS:

5          Q.  While working in the customer service

6     department of BunZai Media were you ever instructed to

7     treat customers threatening to file attorney general

8     complaints differently?

9          A.  Yes, we were.

10         Q.  And how were you instructed to do that?

11         A.  We were just told in the same way to take it

12    as serious as a Better Business Bureau complaint.  Or a

13    customer stating that they were going to file a

14    dispute, but -- yeah.

15         Q.  And to your recollection who told you that?

16         A.  Well, first it was Andre when I first

17    started there stating that, you know, if a customer

18    wants to file a dispute or if a customer says they want

19    to file a complaint with the BBB, Better Business

20    Bureau, that needs to be taken seriously, and you

21    really needed to try to resolve the issue over the

22    phone and see if the customer accepts a partial refund,

23    and if they're not accepting it -- and the reason I say

24    they were treated differently because when customers

25    called in, it was protocol after a while when customers

44

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    called in and demanded to speak with the supervisor,

2    you were supposed to say you were a team leader and

3    that you had complete control over issuing refunds for

4    any customer that called in.

5              And if a customer absolutely demanded to

6    speak to a supervisor you were supposed to say it's

7    going to be 24 hours to 48 hours to hear back from a

8    supervisor.  And for customers who stated that they

9    were filing a dispute or complaint with the Better

10   Business Bureau, you were allowed to place the customer

11   on hold and have that customer speak directly with a

12   supervisor or someone else, just to make the customer

13   feel calm and at ease, that they were speaking with a

14   supervisor so that they felt they were getting the

15   highest refund that they were entitled to or supposed

16   to get back.

17        MR. UNGAR:  Move to strike as nonresponsive and

18   it's a narrative.

19   BY MR. GALLEGOS:

20        Q.  And was this policy as far as with respect

21   to consumers that threatened AG or BBB complaints or

22   any complaints the same policy followed at Pinnacle

23   Logistics?

24        A.  It was.

25        MR. UNGAR:  Objection as to the form of the

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1    question.  It's vague and ambiguous.

2         THE WITNESS:  Yes, it was.

3    BY MR. GALLEGOS:

4         Q.  While working in the customer service

5    department of BunZai Media Group, were you evaluated

6    based on number of refunds and amount of refunds you

7    gave?

8         MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.

10        THE WITNESS:  Yes.  They had data that Kris

11   showed me at one point in time at BunZai Media that

12   showed how long customer service agents were on the

13   phone and how many refunds they issued per day.  The

14   goal was to spend the least amount of time on the phone

15   with the customer and issue the least -- the least

16   amount of refunds that you could.

17   BY MR. GALLEGOS:

18        Q.  And how do you know about that goal?

19        A.  Because Andre told us that this was the

20   goal.  Kris told us that this was the goal for a

21   customer service rep.

22        Q.  And was this the same policy that was

23   followed at Pinnacle Logistics?

24        MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                           2/20/2016

1          THE WITNESS:  Yes, it was.

2    BY MR. GALLEGOS:

3          Q.  And who told you about that policy at

4    Pinnacle Logistics?

5          A.  It was the -- just everyone kept doing the

6    same thing and Andre would say to customer service reps

7    every once in a while when we had meetings, you guys

8    are spending too much time on the phone.  The average

9    time you want to spend on the phone with the

10   customer -- the average time you want to spend on the

11   phone with the customer is five to seven minutes.  You

12   guys are spending too much time on the phone with the

13   customer and that's not good.

14         MR. UNGAR:  Move to strike as nonresponsive.

15         THE WITNESS:  He would get upset if he saw a

16   customer service rep on the phone with a customer for

17   20 minutes or 30 minutes.  He'd say that's way too long

18   to spend on the phone with a customer.

19         MR. UNGAR:  Move to strike as nonresponsive.

20   BY MR. GALLEGOS:

21         Q.  To your knowledge did Andre report to

22   anybody?

23         A.  Andre reported to Roi.

24         Q.  And to your knowledge do you know if Andre

25   reported this information about the amount of time

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    spent with customers to Roi?

2          A.   Do I know if he reported this issue to Roi?

3          Q.   Yes.

4          A.   No, I don't know.

5          Q.   While working in the chargeback department

6    at BunZai Media, were you the only employee working in

7    the chargebacks department for BunZai Media?

8          A.   No.

9          Q.   How many other employees did the chargeback

10   department have at BunZai Media?

11         A.   At BunZai?  There was someone else named

12   Gabby that was working there for a while.

13         Q.   And were chargeback employees at BunZai

14   Media provided any training?

15         A.   For BunZai?

16         Q.   Yes.

17         A.   They were provided training, but when it was

18   set up as BunZai they were provided training but it

19   wasn't -- there wasn't a lot of training.  You were

20   basically just told to enter in the chargebacks into an

21   Excel sheet.  There wasn't a lot of training.  We kind

22   of had to while at BunZai find out what chargebacks

23   were.  We were provided some training by Kris and some

24   training by Roi.

25         Q.   Do you recall what training Roi provided?

48

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          A.   Yeah.  Roi would come and talk to us
2     sometimes, talk to Gabby and I and basically say,
3     you know, the goal of this department is to win every
4     chargeback.  You wanted to win 100 percent of the
5     chargebacks that were filed.  At the time he didn't
6     know you couldn't win 100 percent of the chargebacks
7     and we didn't know that either but he was basically
8     telling the goal of this department was to win
9     100 percent of the chargebacks and we should definitely
10    research some information online about what every
11    chargeback code is, like if it's for fraud or if
12    it's -- the customer is saying that the merchandise
13    wasn't received, that we should do research on it so we
14    could get better at responding to the chargebacks.  But
15    there were some templates that were set up, some basic
16    templates to respond to chargebacks.
17         Q.   And to your knowledge do you know who
18    developed these templates?
19         A.   When I first started at BunZai I was not
20    told specifically who set up the templates.  I do
21    remember Gabby saying something about Kris having
22    something to do with it but I can't remember
23    specifically.
24         Q.   Did BunZai Media have any -- strike that.
25    Did -- were you told about any goals while working in

49

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1      the chargeback department at Pinnacle Logistics?

2              A.   About how many chargebacks we should be

3      winning?

4              MR. UNGAR:   Move to strike as nonresponsive.

5      BY MR. GALLEGOS:

6              Q.   Yes.

7              MR. UNGAR:   Objection as to the form of the

8      question.   It's vague and ambiguous.   Unintelligible.

9              THE WITNESS:   While at Pinnacle Logistics we

10     were still told that we need to win at least 90 to

11     100 percent of the chargebacks, and at that time it was

12     Alon and -- Alon and Roi who were basically telling us

13     that once we start winning 90 percent to 100 percent of

14     chargebacks they would actually set up a charge --

15     another chargeback business that handled chargebacks

16     for other companies that had a similar set up to

17     theirs.

18             MR. UNGAR:   Move to strike as nonresponsive.

19     BY MR. GALLEGOS:

20             Q.   To your knowledge did BunZai Media have

21     standard operating procedures for responding to

22     consumer chargeback requests?

23             A.   They didn't have procedures like an actual

24     protocol or anything like that.   They just had

25     templates set up and we were told what to do.

50

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1            MR. UNGAR:  Move to strike everything after

2    "They didn't have procedures."

3    BY MR. GALLEGOS:

4            Q.  While working in the chargebacks department

5    at Pinnacle Logistics, did they have standard operating

6    procedures for responding to consumer chargeback

7    requests?

8            A.  At Pinnacle Logistics?

9            Q.  Yes.

10           A.  Yes, they did.

11           Q.  And do you know who was responsible for

12   developing those standard operating procedures at

13   Pinnacle Logistics?

14           A.  Yes, Roi was.

15           Q.  While working in the chargeback department

16   at BunZai Media, were you ever evaluated based on the

17   number of quote "wins" that you had?

18           A.  No, we weren't evaluated by it.  We were

19   just simply asked how many chargebacks we were winning

20   and how many we were losing.  We were just asked for

21   reports.

22           MR. UNGAR:  Move to strike everything after the

23   word "No."

24   BY MR. GALLEGOS:

25           Q.  And who asked you to provide reports while

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1    working in the chargeback department at BunZai Media?

2           MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous.

4           THE WITNESS:  Roi, Alon, Kris always had

5    questions about how many chargebacks we were winning.

6    Roi was the one mostly asking us, you know, how many

7    chargebacks, but we got the same question from Roi,

8    Alon and Kris.

9           MR. UNGAR:  Move to strike as nonresponsive.

10   BY MR. GALLEGOS:

11          Q.  While working in the chargeback department

12   at Pinnacle Logistics, were you also asked to provide

13   reports relating to chargebacks?

14          A.  Yes.  We were asked by both Alon and Kris --

15   I mean Alon and Roi from time to time about how many

16   chargebacks we were winning.

17          Q.  And did you actually provide those reports?

18          A.  We would just basically show -- it was

19   mainly Roi and he would just come in the room and we

20   would basically show him -- because we had everything

21   entered into an Excel sheet and we would show him how

22   many chargebacks we were winning.  He had like a

23   certain way that he had it set up but I remember

24   sometimes e-mailing out a percentage if it was

25   51 percent or 63 percent.

52

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1          MR. UNGAR:  Move to strike as nonresponsive.
 2   BY MR. GALLEGOS:
 3          Q.  And was that the same process that you --
 4   while working at BunZai Media, did you provide reports
 5   to anybody relating to chargebacks?
 6          A.  Yeah.  Roi -- it was basically -- they
 7   weren't e-mailed reports.  Roi would just come in the
 8   room and take a look at the Excel sheet with us and
 9   take a look at how many chargebacks we were winning and
10   how many we were losing.
11          MR. UNGAR:  Move to strike as nonresponsive.
12   BY MR. GALLEGOS:
13          Q.  Did you ever provide those reports to Alon
14   Nottea?
15          MR. UNGAR:  Objection.  Vague and ambiguous.
16   Reference to "those reports."
17          THE WITNESS:  Yes, I did tell Alon when he would
18   ask about chargebacks, how the chargebacks were going,
19   like what percent we were at with the win/lose rate.
20   BY MR. GALLEGOS:
21          Q.  And how often would you provide those
22   reports to Roi Reuveni?
23          MR. UNGAR:  Objection as to the form of the
24   question.  It's vague and ambiguous and assumes facts
25   not in evidence.  It's leading.  It's putting words
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

53

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1     into the witness's mouth.  Calls for speculation.

2     Lacks foundation.

3          THE WITNESS:  At least once a month.

4     BY MR. GALLEGOS:

5          Q.  And was that at BunZai Media?

6          MR. UNGAR:  Objection as to the form of the

7     question.  It's vague and ambiguous.

8          THE WITNESS:  Yes.

9     BY MR. GALLEGOS:

10          Q.  Was it the same amount of time at Pinnacle

11     Logistics?

12          MR. UNGAR:  Same objection.

13          THE WITNESS:  Yes.

14     BY MR. GALLEGOS:

15          Q.  How often would you provide those chargeback

16     reports to Alon Nottea?

17          MR. UNGAR:  Objection as to the form of the

18     question.  It's vague and ambiguous with reference to

19     the phrase "those reports."

20          THE WITNESS:  At BunZai Media it was definitely

21     more frequent.  It was pretty much any time --

22     basically any time that you were telling Roi about

23     chargebacks he was telling Alon what was happening with

24     the chargeback department because they were together a

25     lot.  But at Pinnacle Logistics it was mainly Roi

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

```
 1   coming in to see us so with Alon it wasn't as
 2   frequently as it was with Roi.
 3          MR. UNGAR:  I have to take a break now and deal
 4   with my car.
 5          MR. GALLEGOS:  Yes.  Off the record.
 6             (Recess taken.)
 7          MR. GALLEGOS:  Handing the witness what's been
 8   marked as Exhibit 128.
 9             (Exhibit 128 was marked for identification
10             by the Reporter.)
11   BY MR. GALLEGOS:
12          Q.  If you can look it over.
13          A.  Okay.
14          Q.  Do you recognize this document, Mr. Stanley?
15          A.  Yes, I do.
16          Q.  How is it that you recognize it?
17          A.  This document was given to me by Roi when I
18   was working in the chargeback department.
19          Q.  And was that chargeback department for which
20   company?
21          A.  I know I had it while working at Pinnacle
22   Logistics.  I'm not sure if it was given to me while I
23   was working at BunZai.
24          Q.  And what -- to your knowledge why was this
25   document given to you?
```

55
Stanley
FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1           MR. UNGAR:  Objection to the form of the
2     question.  Calls for speculation.  Lacks foundation.
3           THE WITNESS:  This document was given to me just
4     to have a protocol for responding to chargebacks that
5     we were sending to the banks.
6           MR. GALLEGOS:  Handing the witness what's been
7     identified as Exhibit 129.
8               (Exhibit 129 was marked for identification
9           by the Reporter.)
10    BY MR. GALLEGOS:
11          Q.  If you could look it over.
12          A.  Okay.
13          Q.  Do you recognize this document, Mr. Stanley?
14          A.  Yes, I do.
15          Q.  And what is this document?
16          A.  This is an e-mail that I sent to Roi.  And
17    then cc'd Leor and Alon.
18          Q.  Leor is spelled L-e-o-r?
19          A.  Yes.
20          Q.  In the e-mail the first part -- or first
21    sentence of the e-mail reads, "Hey, Roi, I worked from
22    6:05 to 7:50 yesterday."  Do you see that?
23          A.  Yes.
24          Q.  Why did you have to report to Roi your
25    hours?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

```
 1          A.  Because I was working overtime.  Yeah, I was
 2    working overtime because a lot of the deadlines for
 3    responding to the chargebacks were coming up.  So I had
 4    worked from home inputting some of the chargebacks into
 5    the system.
 6          Q.  Was Roi your immediate supervisor?
 7          MR. UNGAR:  Objection as to the form of the
 8    question.  It's vague and ambiguous.
 9          THE WITNESS:  Yes, he was.
10    BY MR. GALLEGOS:
11          Q.  The e-mail also shows in the cc an Alon N.
12    Do you see that?
13          A.  Yes.
14          Q.  Do you know who Alon N. is?
15          A.  Yes.  It's Alon, the owner of the company.
16          Q.  Is that Alon Nottea?
17          A.  Yes.
18          Q.  And did you typically report your hours to
19    Alon Nottea?
20          MR. UNGAR:  Objection to the form of the
21    question.  Vague and ambiguous.
22          THE WITNESS:  When I was working overtime Roi
23    told me to make sure I cc Leor and Alon to let them
24    know I was working overtime.
25    ///
```

57

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                        2/20/2016

1    BY MR. GALLEGOS:

2         Q.   The second part of the e-mail states, "I'm

3    trying to input and fax the chargebacks as soon as

4    possible because the deadlines are coming up.  Once I

5    finish them up, I'll be able to start sending you daily

6    and weekly reports."  Do you see that?

7         A.   Yes, I do.

8         Q.   What daily and weekly reports are you

9    referring to in this e-mail?

10        A.   Well, Roi had said that he wanted reports on

11   chargebacks and that he was going to show me a way to

12   do these -- to set up these reports to send to him, but

13   he never ended up showing me how to set up the reports,

14   so sometimes I would literally send him e-mails or just

15   tell him in person the win/lose rate percentage of the

16   chargebacks, like if we were winning 51 percent or

17   63 percent of the chargebacks.

18        MR. UNGAR:  Sir, can you move your hand away

19   from your mouth so I can hear you?

20        THE WITNESS:  Yeah.

21        MR. UNGAR:  Thank you.  Could you please repeat

22   the question and the answer because I couldn't really

23   hear the answer.

24             (Record read.)

25        MR. GALLEGOS:  Let the record reflect that I'm

58

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                2/20/2016

1    handing the witness Exhibit 131.

2              (Exhibit 131 was marked for identification

3         by the Reporter.)

4    BY MR. GALLEGOS:

5         Q.   Look over this document.

6         A.   Okay.

7         Q.   Do you recognize this document, Mr. Stanley?

8         A.   Yes, I do.

9         Q.   And what is this document?

10        A.   This was an e-mail that I had sent to Roi

11   Alon, Christina and Gabby, just about the amount of

12   chargebacks that we had entered into the system.

13        Q.   And when you said Christina, are you

14   referring to the Christina Moreno that's on the to

15   line?

16        A.   Yes.

17        Q.   And what department did Christina work in?

18        A.   In 2012 when they switched over to Pinnacle

19   Logistics they had put Christina in charge of the

20   chargeback department to manage the chargeback

21   department.

22        Q.   And Gabby Galleano?

23        A.   Gabby worked in the chargeback department.

24   She was just a -- a coworker.  She just worked with me

25   in the chargeback department.

59

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          Q.   In the from section, is that your e-mail
2     that appears in the from section?
3          A.   Yes, it is.
4          Q.   And this is an e-mail dated January 25,
5     2012; is that correct?
6          A.   Yes.
7          Q.   At this point in time were you working for
8     BunZai or for Pinnacle?
9          A.   The line is a little blurry.  I can't
10    remember if they had switched over to Pinnacle.  I know
11    that it was in 2012 they switched over to Pinnacle but
12    we could have been still working for BunZai.
13         Q.   And the Alon N. that appears in the to
14    section, is that Alon Nottea?
15         A.   Yes, it is.
16         Q.   And why would you have sent this report to
17    these individuals?
18         A.   From what I recall Roi wanted updates on
19    some of the retrieval requests because he wanted to see
20    if -- if we refunded the retrieval request if it will
21    turn into a chargeback.  So I know he wanted some
22    information on it.
23         Q.   And what is a retrieval request?
24         A.   Retrieval request is a document when a
25    customer -- once he has an inquiry as to why they were

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    charged or why they were billed, the bank will
2    sometimes send out a retrieval request so they can find
3    out information about the customer, about why the
4    customer was billed and then send it to the customer
5    and tell the customer.
6        Q.  Is this before a customer has actually filed
7    a chargeback dispute?
8        A.  Yes.
9        Q.  And what was the typical procedure with
10   respect to responding to these retrieval requests?
11       MR. UNGAR:  Objection as to the form of the
12   question.  It's vague and ambiguous.
13       THE WITNESS:  The procedure was the exact same
14   as responding to a chargeback.  Just simply gathering
15   information from Limelight where all the customer
16   orders were held, sending out the tracking information
17   or a screen shot of the tracking confirmation from the
18   United States Postal Service and a screen shot of the
19   landing page where the customer placed the order.
20       And there is a letter that they had at the end
21   of the packet that stated they followed all FTC rules
22   and regulations from a lawyer.
23   BY MR. GALLEGOS:
24       Q.  If you look at 131-3 of that exhibit.  The
25   column identified "Merchant Account."

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1          A.   Okay.

 2          Q.   What does that column -- what information is

 3   contained in that column?

 4          A.   These were different merchant accounts that

 5   were set up that we handled for BunZai and for Pinnacle

 6   Logistics.

 7          Q.   And in there it has "DSA Holdings."  Do you

 8   recognize that name?

 9          A.   Yes, I do.

10          Q.   Was that a company?

11          A.   Yes, that was a company.

12          Q.   And did that company sell AuraVie products,

13   to your knowledge?

14          A.   From what I was told is that it was BunZai

15   and Pinnacle selling the products but they had

16   different merchant accounts set up because if they

17   received over -- if they received more than 2 percent

18   of chargebacks for their overall transactions, the

19   merchant account would get shut down, so they had

20   different merchant accounts set up just in case some of

21   the accounts, merchant accounts got shut down or they

22   would process transactions through different merchant

23   accounts.  They never had over 2 percent chargebacks.

24          MR. UNGAR:  Move to strike as nonresponsive.

25   ///
```

62

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1     BY MR. GALLEGOS:

2          Q.  And who told you this?

3          MR. UNGAR:  Objection to the form of the

4     question.  Vague and ambiguous as to the words "who"

5     and "this."

6          THE WITNESS:  Roi and Kris told me about the

7     merchant accounts and why it was set up this way.

8     BY MR. GALLEGOS:

9          Q.  Did Roi and Kris also tell you about the

10    2 percent chargeback, to avoid more than 2 percent

11    chargeback on an account?

12         MR. UNGAR:  Objection as to the form of the

13    question.  It's vague and ambiguous and it's leading

14    and it's putting words into the witness's mouth.

15         THE WITNESS:  It was Roi.

16    BY MR. GALLEGOS:

17         Q.  Looking at 131-4 in the "Product Name"

18    column, what information is contained in this column,

19    to your knowledge?

20         A.  This was basically when we were entering in

21    the chargeback, you know, for each chargeback we

22    received a chargeback document.  When we looked up the

23    chargeback in Limelight where all the orders were

24    processed, we would see if the customer ordered AuraVie

25    or if they had ordered My Miracle Face Kit, so this was

63

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    the kind of program that they were enrolled in, either

2    a three-month program -- this basically stated at what

3    point the customer was in their trial when they filed

4    the chargeback.

5              So as you can see, right next to it is the

6    "Shipment Status" and it says "MT."  So that was the

7    first charge that took place for $97.88.  It was after

8    the customer's trial had expired.  And then if you go

9    down Shipment Status where it says "Third Month," that

10   was the third month into the customer's -- third month

11   into the customer's recurring program that they were

12   enrolled in that they had filed a dispute or a

13   chargeback.

14   BY MR. GALLEGOS:

15        Q.  Do you know what MT stands for?

16        A.  No, I can't remember off the top of my head.

17        Q.  Going back to 131-3 and the merchant

18   account, did you understand those companies to have any

19   purpose aside from opening merchant accounts?

20        A.  Not to my knowledge, no.

21        Q.  And if you can go over to 131-6 and 7.  In

22   the "Chargeback Official Reason" column, what is

23   contained in that column?  What information is

24   contained?

25        A.  This was basically the chargeback code, so

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    for each chargeback that was filed with the bank, the

2    bank -- Visa card and MasterCard process it under

3    different codes, so Visa card and MasterCard have

4    different codes for each chargeback, for each dispute.

5    So this is where we would input that reason code for

6    credit not processed.  That's a Visa code 85.  So it's

7    just different codes for Visa card and MasterCard.

8         Q.  And if you look at 131-7, what is this

9    column where it says "V/M/D, Official Reason"?

10        A.  It's Visa card, MasterCard and Discover

11   reason codes.  I know we had two separate columns

12   because these were -- these were drop downs.  When we

13   were in Excel or in another sheet that we were using

14   there was a drop down selection where you could select

15   the reason code but sometimes it wasn't there so we

16   would input it on the previous -- on a chargeback

17   official reason.

18        Q.  And it appears there was a column "RR to

19   CB."  What was that column?  And this is on 131-7.

20        A.  These were retrieval requests that turned

21   into chargebacks.

22        Q.  And if you look at 131-8, the "Agent

23   Chargeback Reason" column, what does that column --

24   what information is contained in that category?

25        A.  This was just basic information about the --

Stanley

FTC v. Bunzai Media Group, Inc., et al.                      2/20/2016

1    just about the dispute, the way that maybe customer

2    service agents were handling it.  If it was like maybe

3    a customer service agent's fault, like if they didn't

4    go through all the terms and conditions, we would input

5    this in here.

6              If the customer agreed to settle the dispute

7    over the phone but still ended up filing a chargeback,

8    like if they had agreed to a refund but a chargeback

9    was still filed, we would input that reason.  It was

10   just basically just more information about maybe why

11   the dispute was filed.

12       Q.  Going back to 131-3 with respect to the

13   merchant accounts, who did you believe owned these

14   merchant accounts?

15       MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous.  It lacks

17   foundation.  It calls for speculation.

18       THE WITNESS:  Alon, Doron and Kris.

19   BY MR. GALLEGOS:

20       Q.  And why do you believe that?

21       A.  Because Kris was -- we were told that Kris

22   was one of the owners of the company.  We were told

23   that Alon was one of the owners of the company.  We

24   were told that Doron was one of the owners of the

25   company and we had saw Doron's names on one of these

66

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1    merchant accounts, not specifically one of these

2    merchant accounts, but a merchant account we were

3    handling and responding to chargebacks for.

4              And I mean, Alon was the owner of the

5    company and then we also ended up -- I recall seeing

6    Roi on a merchant account that I was handling

7    chargebacks for earlier on.

8    BY MR. GALLEGOS:

9        Q.  And who told you Doron was one of the owners

10   of the -- what company?

11             MR. UNGAR:  Objection as to the form of the

12   question.  It's vague and ambiguous with regard to the

13   phrase "the company."

14             THE WITNESS:  Roi ended up telling me because he

15   said that him and Alon were cousins or just related.

16   BY MR. GALLEGOS:

17       Q.  And do you recall the name --

18             MR. UNGAR:  I'm sorry.  I have to stop you a

19   second.  I couldn't hear the end of the answer.  Could

20   you give the question and the answer, please.

21             (Record read.)

22   BY MR. GALLEGOS:

23       Q.  Do you recall the name of that company?

24       A.  BunZai.  That Doron was one of the owners of

25   BunZai.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          Q.  Aside from Alon and Doron who else was an
2      owner of the company BunZai?
3          MR. UNGAR:  Objection to the form of the
4      question.  Lacks foundation.  Vague and ambiguous.
5      Lacks personal knowledge.
6      BY MR. GALLEGOS:
7          Q.  Do you know who the owners of BunZai Media
8      were?
9          MR. UNGAR:  Same objection.
10         THE WITNESS:  Just based off of what we were
11     told it was just Alon, Doron and Kristopher Bond.
12     BY MR. GALLEGOS:
13         Q.  Who told you that?
14         A.  Kris told me he was one of the owners of
15     BunZai Media, and then Alon told me he was an owner of
16     the company.  We would talk sometimes and he would say
17     things like when I started this company or when I
18     opened this company.
19     BY MR. GALLEGOS:
20         Q.  Who do you believe were the owners of
21     Pinnacle Logistics?
22         MR. UNGAR:  Same objection.
23         THE WITNESS:  Doron and Alon but I know that
24     they ended up getting in other investors or getting
25     other people to invest in the company.

68

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    BY MR. GALLEGOS:

2         Q.   And how do you know that?

3         MR. UNGAR:   Objection.  Vague and ambiguous.

4    BY MR. GALLEGOS:

5         Q.   Let me rephrase.  How do you know that Alon

6    and Doron were owners of Pinnacle Logistics?

7         A.   Because at the time Alon and I would still

8    talk and he would say when I started this company, when

9    I opened this company.  It was under the assumption

10   that it was still his.  That's exactly what he would

11   say to me.

12        Q.   And what about Doron?

13        MR. UNGAR:   Objection as to the form of the

14   question.  Vague and ambiguous.  Lacks foundation.

15   Calls for speculation.  Lacks personal knowledge.

16        THE WITNESS:   I never talked to Doron about -- I

17   never talked to Doron at all.  Maybe one time just

18   saying hello.  But he was still, you know, working in

19   the office and the same protocol, the same procedures

20   were set up.  We were still getting -- under management

21   by the exact same people so we assumed nothing changed.

22        And when they switched over to Pinnacle

23   Logistics that's one of the things they told us was

24   that nothing was changing.  That we're still under the

25   same management.  We just have two different

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    departments now.

2              MR. UNGAR:  Move to strike as nonresponsive.

3              MR. GALLEGOS:  Let the record reflect that I'm

4    handing the witness Exhibit 134.

5              (Exhibit 134 was marked for identification

6              by the Reporter.)

7    BY MR. GALLEGOS:

8         Q.  If you could look at the first two pages of

9    that document, Mr. Stanley.

10             Do you recognize this document?

11        A.  Yes, I do.

12        Q.  And when I say this document I'm talking

13   about 134-1 through 134-2.

14        A.  Yes.

15        Q.  What is this document?

16        A.  In 2012 Roi had set up this template for

17   responding to chargebacks, so this template was used to

18   respond to chargebacks for each merchant account.

19        Q.  And how do you know Roi set up this

20   template?

21        A.  Because he said, "I set this up."

22        Q.  And how was this template used?

23        A.  This template was used -- like I said, there

24   were over 25 to 30 merchant accounts, so for each

25   chargeback you would have to input the merchant ID, the

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    merchant name, the company, you know, company's phone

2    and fax, the case number of the chargeback and send it

3    off to the banks.

4            Q.  Do you know which -- if BunZai Media Group

5    used this template?

6            A.  BunZai didn't use this template.

7            Q.  This template was used by Pinnacle

8    Logistics?

9            MR. UNGAR:  Objection to the form of the

10   question.  Vague and ambiguous.  It's leading.  Puts

11   words into the witness's mouth.  Counsel might as well

12   be testifying.

13           THE WITNESS:  Yes.

14   BY MR. GALLEGOS:

15           Q.  Did BunZai Media Group have a similar

16   template to this?

17           A.  It was a similar template in terms of

18   inputting a different merchant ID.  Making sure that it

19   was the right merchant ID and case number.  The terms

20   and conditions of the trial were on the first page and

21   the cancellation policy.  It was just organized

22   differently.

23   BY MR. GALLEGOS:

24           Q.  And to your knowledge do you know who

25   developed the BunZai template?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          A.   No.   I wasn't told who developed the BunZai

2     template.

3          Q.   And in that box right underneath your

4     chargeback department, in the second sentence of that

5     first paragraph it states, "As you can see on the

6     attached screen shot of the order page, the terms were

7     clearly shown on the pages required by the FTC, and the

8     customer had to check the box stating they accepted the

9     terms of the offer before they were able to continue

10    checking out."  Do you see that?

11         A.   Yes.

12         Q.   To your knowledge were customers required to

13    check a box stating they had accepted the terms of the

14    offer?

15         A.   On every single landing page for My Miracle

16    Face Kit, for AuraVie, we had access to every landing

17    page, because there were different pages.  They had

18    different landing pages for AuraVie.  They would have

19    Try AuraVie or Try My Miracle Face kits, there were a

20    lot of different websites they had set up for these

21    trials.

22              And when it came to the customer entering in

23    their credit card information, I never saw a check box

24    that the customer had to check to place the trial for

25    the order.  On some of the landing pages on the initial

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

72

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    page where the customer would enter in their shipping

2    information there would be a check box sometimes.  But

3    in terms of them having to enter in their credit card

4    number and click a box to agree to the terms in order

5    to check out I never saw one.

6          MR. UNGAR:  Move to strike as nonresponsive.

7    BY MR. GALLEGOS:

8          Q.  So where it talks about "as you can see on

9    the attached screen shot," what screen shot would the

10   chargeback department provide?

11         A.  It was one that was Photoshopped or just

12   one -- or just a screen shot of the AuraVie landing

13   page with a check box on it.  But on all of the

14   websites where the customer placed their order, I never

15   saw a check box.

16         Q.  And do you know -- when you say that it was

17   Photoshopped, do you know who Photoshopped that screen

18   shot?

19         A.  Who sent us the screen shot of the landing

20   page where the customer entered in their credit card

21   information was Roi.  I'm not sure who put that

22   together, but Roi had sent us these screen shots.

23         Q.  And was that the same process for both

24   Pinnacle and BunZai Media Group?

25         MR. UNGAR:  Objection as to the form of the

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                        2/20/2016

 1    question.  It's vague and ambiguous.

 2              THE WITNESS:  Yes, it was.

 3              MR. GALLEGOS:  Handing the witness Exhibit 140.

 4              (Exhibit 140 was marked for identification

 5              by the Reporter.)

 6    BY MR. GALLEGOS:

 7         Q.  Just take a look at the pages if you can.

 8         A.  Okay.

 9         Q.  Do you recognize this document, Mr. Stanley?

10         A.  Yes, I do.

11         Q.  And what is this document?

12         A.  This document was given to customer service

13    reps.  It was just protocol that they were to follow

14    for different types of calls that they would get from

15    customers.  If a customer was calling to cancel within

16    their ten-day trial period, after their ten-day trial

17    period and different steps they could take.

18         Q.  And when you stated customer service reps,

19    for which company are you talking about?

20         A.  This was given out during Pinnacle

21    Logistics.

22         Q.  And do you know who provided this document?

23         A.  Specifically, no.

24         Q.  To your knowledge did BunZai Media Group

25    have a similar document?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                     2/20/2016

 1          A.  They had a similar protocol.  It wasn't as

 2     detailed.

 3          MR. UNGAR:  Move to strike as nonresponsive.

 4     BY MR. GALLEGOS:

 5          Q.  In number 10 of Exhibit 140, on 140-1, it

 6     has -- reads, "If the customer has passed the trial

 7     period and was billed the full amount and he is not

 8     eligible to return the product, however, the agent

 9     offers a partial refund to avoid dispute."  Do you see

10     that?

11          A.  Yes, I do.

12          Q.  To your knowledge was a customer's receiving

13     a partial refund contingent upon them not disputing?

14          MR. UNGAR:  Objection as to the form of the

15     question.  It's vague and ambiguous.  It's calling for

16     a legal opinion of a lay witness.

17          THE WITNESS:  I'm sorry.  Can you repeat the

18     question?

19     BY MR. GALLEGOS:

20          Q.  Let me see if I can ask a better question on

21     that.

22          Were customers offered a refund if they

23     agreed not to dispute the charges?

24          A.  Only if the customer had brought up filing a

25     dispute.  Otherwise, if the customer had brought up

75

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                2/20/2016

1    filing a dispute, the customer would have to call back

2    in with their bank and state that they weren't filing a

3    dispute, that they signed up for the trial and that

4    they agreed to the charges, but if the customer was

5    just really upset about the charges, sometimes customer

6    service reps, they would take the steps to offer them,

7    you know, 25 percent refund, a 50 percent refund then a

8    75 percent refund.

9         MR. UNGAR:  Move to strike as nonresponsive.

10        MR. GALLEGOS:  Let the record show I'm handing

11   the witness what's been shown as Exhibit 148.

12            (Exhibit 148 was marked for identification

13        by the Reporter.)

14   BY MR. GALLEGOS:

15        Q.  If you can just look at the first page of

16   that document.

17        A.  Okay.

18        Q.  Do you recognize this document on 148-1?

19        A.  Yes, I do.

20        Q.  And what is this document, Mr. Stanley?

21        A.  This was a document that we used during

22   BunZai to respond to chargebacks.

23        Q.  And how do you know that?

24        A.  Because at BunZai, I mean, we used this

25   exact document to respond to chargebacks.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

```
 1          Q.  And do you know who developed this document?
 2          MR. UNGAR:  Objection as to the form of the
 3     question.  It's vague and ambiguous.
 4          THE WITNESS:  I remember working on this
 5     document with Kris at times, but I'm not sure who
 6     created this original template.
 7     BY MR. GALLEGOS:
 8          Q.  Was this template used to respond to all
 9     chargeback requests -- or chargeback disputes for
10     BunZai?
11          MR. UNGAR:  Objection as to the form of the
12     question.  It's vague and ambiguous.  Assumes facts not
13     in evidence.
14     BY MR. GALLEGOS:
15          Q.  Let me rephrase.  Did you use this template
16     to respond to all chargeback disputes that you
17     responded on behalf of BunZai Media Group?
18          A.  Yes.
19          Q.  Was this template used by Pinnacle
20     Logistics, to your knowledge?
21          A.  No.
22          Q.  To your knowledge did Roi Reuveni ever see
23     this document?
24          MR. UNGAR:  Objection as to the form of the
25     question.  It's vague and ambiguous.  It calls for
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1    speculation.  It lacks foundation.  Seeks clairvoyance.

2           THE WITNESS:  Yes, he did.  And --

3    BY MR. GALLEGOS:

4           Q.  How do you know that?

5           A.  Because we would work on some of the

6    chargeback responses together, screen shotting --

7    taking screen shots of some of the landing pages and I

8    remember working on this document with him.

9           Q.  To your knowledge did Alon Nottea ever see

10   this document?

11          MR. UNGAR:  Same objection as to the form of the

12   question.  It's vague and ambiguous.  It calls for

13   speculation.  It lacks foundation.

14          THE WITNESS:  No, not this document.  I'm not

15   sure if he saw it.

16          MR. GALLEGOS:  Let the record show I'm handing

17   the witness what's been marked as Exhibit 103.

18          (Exhibit 103 was marked for identification

19          by the Reporter.)

20   BY MR. GALLEGOS:

21          Q.  If you can take look at that document,

22   Mr. Stanley.

23          A.  Okay.

24          Q.  Do you recognize this document?

25          A.  Yes, I do.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.   And what is this document?

2          A.   This was -- this was a protocol for customer

3     service agents on just handling the calls.  I mean,

4     this seems to be mainly in regards to customers filing

5     disputes and issuing refunds.  I guess resolving

6     customer complaints over the phone.

7          Q.   And do you know which company used this

8     document?

9          A.   I knew Pinnacle Logistics had one like this

10    and BunZai Media had one that was similar.

11         Q.   And on the back page on 103-2 it appears to

12    have some signatures on it.  Do you see that?

13         A.   Yes, I do.

14         Q.   To your knowledge were Pinnacle employees

15    required -- or employees in the Pinnacle customer

16    service department required to sign these types of

17    documents?

18         A.   Yes, they were.

19         Q.   And to your knowledge were BunZai employees

20    in the customer service department required to sign

21    these types of documents?

22         A.   At BunZai?  No, I don't remember customer

23    service agents signing and agreeing to the way they

24    were supposed to handle calls.

25         Q.   On 103-1, it -- in item number 3, on the

79

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

 1   first item number 3, do you see that?  Where it states,
 2   "As a last resort"?
 3          A.  Yes.
 4          Q.  It states, "Offer partial refunds but do not
 5   start high.  Refund as little as you have to."  Do you
 6   see that?
 7          A.  Yes.
 8          Q.  "Only refund in full if you absolutely have
 9   to, resolving a dispute."  Do you see that?
10          A.  Yeah, I do.
11          Q.  Was this a policy of Pinnacle Logistics?
12          A.  Yes, it was.  It was a policy for BunZai as
13   well.
14          Q.  And this was a policy that all customer
15   service representatives were informed of to your
16   knowledge?
17          A.  Yes.
18          Q.  That was for both Pinnacle and BunZai
19   employees?
20          A.  Yes.  I mean, it was stated over and over
21   again to refund customers as little as possible.
22          Q.  Around the middle page where it has, "or
23   customers threatening dispute," it has, "If a customer
24   threatens a dispute, please do not say," quote, "That's
25   fine, ma'am," end quote.  "Remember to advise customers

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                   2/20/2016

1    of FTC compliance and please see attached dispute code

2    protocol for appropriate rebuttal."  Do you see that?

3        A.  Yes.

4        Q.  What were customer service representatives

5    informed of as far as FTC compliance to discuss with

6    customers?

7        MR. UNGAR:  Objection to the form of the

8    question.  Calls for speculation.  Lacks foundation.

9        THE WITNESS:  They were just simply told to tell

10   the customers that the company was FTC compliant and in

11   some of the scripts to say that AuraVie -- I mean,

12   basically the customer service agents would say that

13   AuraVie was FTC compliant and followed all rules and

14   regulations.

15       MR. GALLEGOS:  I'm showing the witness what's

16   been marked as Exhibit 104.

17           (Exhibit 104 was marked for identification

18           by the Reporter.)

19   BY MR. GALLEGOS:

20       Q.  If you can take a look at that document.

21       A.  Okay.

22       Q.  Did you recognize this document,

23   Mr. Stanley?

24       A.  Yes, I do.

25       Q.  What is this document?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          A.   This was one of the main scripts that were

2     used at Pinnacle Logistics for customers who signed up

3     for AuraVie trials.

4          Q.   When you say "main scripts," what do you

5     mean by that?

6          A.   This was just the main script that customer

7     service agents used.  I specifically remember this

8     script was used for a while.

9          Q.   And when you say "for a while," what do you

10    mean?

11         A.   Just for a long period of time that I was

12    there.  I mean, I don't have a specific time period on

13    it because I know they had a lot of different scripts

14    that they kept updating.  They would change one word or

15    they would change one sentence or maybe change the

16    order that they would place these responses under.  But

17    I remember this being a script that was definitely --

18    the customer service agents used.  It's one that I

19    used.

20         Q.   Do you know who developed this script?

21         MR. UNGAR:  Objection to the form of the

22    question.  It's vague and ambiguous.

23         THE WITNESS:  No.

24    BY MR. GALLEGOS:

25         Q.   Do you recall who provided you this script?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          A.  Yes, I do.

2          Q.  And who would that be?

3          A.  It was Andre.

4          Q.  Who was this script provided to?

5          A.  This was provided to all customer service

6   reps, all of the customer service agents.

7          Q.  At what company?

8          A.  At Pinnacle Logistics.

9          Q.  Were customer service representatives

10  allowed to deviate from these scripts?

11         MR. UNGAR:  Objection as to the form of the

12  question.  It's vague and ambiguous.  Calls for

13  speculation.  Lacks foundation.

14         THE WITNESS:  No, they weren't allowed to --

15  they weren't allowed to improvise.  At this time when

16  the customer service reps were provided this script

17  they were told to stick to the script but that they

18  could use their own words if they needed to.

19  BY MR. GALLEGOS:

20         Q.  And when you say, "they were told to stick

21  to scripts," who told them that?

22         A.  Andre and Roi would tell customer service

23  reps they needed to stick to the script or any script

24  that was given to them.

25         MR. GALLEGOS:  Let the record reflect I'm

83

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    handing the witness what's been marked as Exhibit 163.

2               (Exhibit 163 was marked for identification

3         by the Reporter.)

4         MR. UNGAR:  Thank you.

5    BY MR. GALLEGOS:

6         Q.   Take a look at that.

7         A.   Okay.

8         Q.   Do you recognize this document, Mr. Stanley?

9         A.   Yes, I do.

10        Q.   And what is this document?

11        A.   These were all of the merchant accounts

12   under Pinnacle Logistics.

13        Q.   And how do you know that?

14        A.   Because we would receive chargebacks for

15   each and every one of these merchant accounts that I'm

16   looking at, and -- yeah, we would receive a response

17   chargeback for every single one of these merchant

18   accounts.

19        Q.   In the column that shows "CEO/Owner," do you

20   see that?

21        A.   Yes, I do.

22        Q.   Did you ever speak with any of the

23   individuals that are listed as CEO or owner for any of

24   these merchant accounts?

25        A.   Yes, I did.

84

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1        Q.  And which CEO or owners did you speak with

2   about this?

3        A.  I mean, mainly Roi.  We met Igor a few

4   times.  He would come into the office a lot.  And he

5   would just talk to us for a few minutes, and we met

6   Sean a few times as well.  But all of the other -- I'm

7   not sure if they came into the office, but -- oh, and

8   then Motti.

9        Q.  And just for purposes of the record, when

10  you're talking about Igor, are you talking about Igor

11  Latsanovski?

12       A.  Yes.

13       Q.  And when you mentioned Sean are you talking

14  about Sean Brennecke?

15       A.  Yes.

16       Q.  Sean is spelled S-e-a-n.  Brennecke is

17  spelled B-r-e-n-n-e-c-k-e?

18       A.  Yes.

19       Q.  And when you mentioned Motti, are you

20  talking about Motti Nottea?

21       A.  Yes.

22       Q.  Motti is spelled M-o-t-t-i.

23            Do you know if whether or not any of the CEO

24  or owners that are identified for each merchant account

25  received a 1 percent compensation for any sales made

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1     through their merchant accounts?

2          A.  I know that they were -- that they were

3     compensated, but I didn't know what percent -- what the

4     percentage was.

5          MR. UNGAR:  Move to strike as nonresponsive.

6     Lacks foundation.  Speculative.  Incompetent.

7     BY MR. GALLEGOS:

8          Q.  How do you know that they received some kind

9     of compensation?

10         A.  Because when I had first started there, like

11    I didn't understand why there were so many merchant

12    accounts until Kris explained it to me just very

13    briefly.  He was kind of a little open about these

14    things.

15         Q.  What did Kris tell you?

16         A.  Kris just told me they had different

17    merchant accounts set up in friends' names that they

18    knew and they would compensate them.  They would pay

19    them but he didn't tell me how much.  He only told me

20    this one time.

21         Q.  And when you say Kris --

22         A.  Kristopher Bond.

23         Q.  And you spell Kris, K-r-i-s-t-o-p-h-e-r?

24         A.  Yes.

25         Q.  To your knowledge who owned these merchant

86

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                     2/20/2016

1    accounts?

2         A.   Doron and Alon and I mean, we were under the

3    assumption that since Kris told us all the time that he

4    was a partner in the company and owned BunZai, we

5    assumed that he had owned these merchant accounts too.

6         Q.   Were these merchant accounts owned by Doron

7    and Alon or by their company?

8         MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  Calls for

10   speculation.  It's leading.  It's putting words into

11   the witness's mouth.  It's improper in a deposition.

12   It's also unethical.

13        THE WITNESS:  Did Doron and Alon own -- can you

14   rephrase it.

15        MR. UNGAR:  Move to strike as nonresponsive.

16   BY MR. GALLEGOS:

17        Q.   To your knowledge did BunZai Media Group own

18   these accounts?

19        A.   Yes.

20        Q.   And how do you know that?

21        A.   Because Alon -- when we first started

22   working on the chargebacks, we had saw Doron's name and

23   Doron's family's name on some of these merchant

24   accounts, and Roi basically told us when we started

25   working in the chargeback department that, you know,

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    they owned all these merchant accounts, that these were

2    the company's merchant accounts.

3            We worked for BunZai Media and Pinnacle

4    Logistics and we were responding to chargebacks filed

5    under these merchant accounts and every single order

6    were for things sold by BunZai and Pinnacle Logistics

7    which was AuraVie and My Miracle Face Kit.

8            MR. UNGAR:  Move to strike as nonresponsive.

9    BY MR. GALLEGOS:

10           Q.  How often did Igor Latsanovski come by the

11   BunZai office or Pinnacle office?

12           A.  In 2011 I didn't see him very much but in

13   2012 he came by a lot.

14           Q.  And when you say "came by a lot," what do

15   you mean?

16           A.  He was there at least -- for a while he was

17   coming every day and then there were sometimes where he

18   would come once a week or sometimes he would come once

19   a month, but I remember for a while, maybe for a month

20   or so he was coming every day, every other day we saw

21   him in the office a lot.

22           Q.  And what would he do when he was there, to

23   your knowledge?

24           MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.  Calls for

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                        2/20/2016

1   speculation.  Lacks foundation.

2          THE WITNESS:  Kris Bond, Kristopher Bond told us

3   he was an investor but that's all I was told by Kris.

4   He would come in and wave to us sometimes or say hello.

5          MR. UNGAR:  Move to strike as nonresponsive

6   other than "He would come in and wave at us."

7   BY MR. GALLEGOS:

8          Q.  Did he meet with anybody when he would

9   visit?

10         MR. UNGAR:  Objection as to the form of the

11  question.  It's vague and ambiguous.

12         THE WITNESS:  Yeah, he met with Kris, met with

13  Alon, he met with Roi.

14  BY MR. GALLEGOS:

15         Q.  Do you recall if he ever met with Doron?

16         MR. UNGAR:  Objection as to the form of the

17  question.  Calls for speculation.  Lacks foundation.

18         THE WITNESS:  I would see Doron and Igor

19  talking.  I have no idea -- but other than that I would

20  mainly see him with Kris, Alon and Roi.

21         MR. UNGAR:  Move to strike everything other than

22  "I have no idea."

23         MR. GALLEGOS:  Let's go ahead and take a

24  ten-minute break.

25              (Recess taken.)

89

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    BY MR. GALLEGOS:

2         Q.  Mr. Stanley, do you ever recall anybody

3    either at Pinnacle Logistics or BunZai Media discussing

4    with you about phasing out the AuraVie product?

5         A.  About phasing out the AuraVie, about not

6    selling it any longer?

7         Q.  Yes.

8         A.  I remember towards the end in 2013 Alon and

9    Roi were basically saying there were a lot of negative

10   reviews of AuraVie online and that they were bringing

11   in a different product.

12        Q.  Do you recall ever hearing about a merchant

13   account being closed?

14        A.  Yeah.  On the attachment that you gave me

15   163-1 -- I'm sorry -- 163-2, the merchant accounts that

16   are highlighted in red were closed out.  We were told

17   by Roi these accounts were closed out.

18        Q.  Do you know who closed out these accounts?

19        A.  No.

20        Q.  Going over to 163, it looks like there's

21   various accounts in different colors.  Do you know who

22   these colors symbolize?

23        A.  From what I was told they don't mean

24   anything.  They just highlighted in different colors

25   that we can see that they were just different merchant

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    accounts.  That these were, you know, separate merchant

2    accounts.  But red specifically meant that the account

3    was closed down.

4            Q.  Do you know why the accounts were closed?

5            A.  No.

6            Q.  To your knowledge were the accounts ever

7    closed by a bank?

8            MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  Calls for

10   speculation.  Lacks foundation.  Incompetent.  Witness

11   just testified he doesn't know.

12           THE WITNESS:  Yes.

13   BY MR. GALLEGOS:

14           Q.  And how do you know?

15           A.  Kris ended up telling us at one point in

16   time that if the chargebacks were over 2 percent, that

17   the banks would close them out and that they did have

18   an account that was closed out.  He didn't tell me how

19   many or specifically on Attachment A, 163-2,

20   specifically why these accounts were closed, but we

21   knew that accounts were closed by the bank because

22   there were too many chargebacks on that merchant

23   account.

24           MR. UNGAR:  Move to strike as nonresponsive.

25   ///

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    BY MR. GALLEGOS:

2        Q.  Have you ever heard of a company named

3    Chargeback Armor?

4        A.  Yes.

5        Q.  And how did you hear about that company?

6        A.  Someone that they put in charge of the

7    quality assurance department, Tyler, he had seen that

8    they were working on software that would gather all the

9    chargeback paperwork and scan it into their system and

10   it was all automated, so it would gather packets

11   together to send off to the banks.

12           And it was -- from what he told me it was

13   pretty much all automated.  It took too much work to

14   gather up all this information, and it was something

15   that Roi had told me that he was working on, Alon had

16   told me that they were working on, and that they wanted

17   to handle chargebacks for other companies that had a

18   similar set up to theirs that did recurring and trial

19   orders online.

20       Q.  And did BunZai Media Group ever use any

21   services relating to Chargeback Armor?

22       MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous.

24       THE WITNESS:  Not that I'm aware of, no.

25   ///

92

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

 1    BY MR. GALLEGOS:

 2        Q.  Did Pinnacle Logistics ever use any services

 3    provided by Chargeback Armor?

 4        MR. UNGAR:  Objection to the form of the

 5    question.  It's vague and ambiguous.

 6        THE WITNESS:  Yes, they did.

 7    BY MR. GALLEGOS:

 8        Q.  And what services did they use?

 9        A.  They used Chargeback Armor.

10        MR. UNGAR:  Move to strike as nonresponsive.

11    It's not known whether the witness is talking about a

12    company or software.

13    BY MR. GALLEGOS:

14        Q.  To your knowledge did Pinnacle Logistics use

15    any services from Chargeback Armor, Inc.?

16        MR. UNGAR:  Objection.  It's vague and

17    ambiguous, calls for speculation.  Lacks foundation.

18        THE WITNESS:  Yes, they did.

19    BY MR. GALLEGOS:

20        Q.  And how do you know that?

21        A.  Tyler, who was in charge of quality

22    assurance and Chargeback Armor, told me that they were

23    using Chargeback Armor, the company they had started

24    and Roi and Alon had started to respond to chargebacks

25    for Pinnacle Logistics and that they were working on --

93

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1    they were working on responding to chargebacks for

2    other companies.

3           Q.   To your knowledge did Pinnacle Logistics,

4    Inc. use the chargeback software?

5           MR. UNGAR:  Objection as to the form of the

6    question.  Vague and ambiguous with respect to the

7    software.

8           THE WITNESS:  Did Pinnacle Logistics -- did they

9    use the software in house?

10   BY MR. GALLEGOS:

11          Q.   Let me rephrase.

12          MR. UNGAR:  Move to strike as nonresponsive.

13   BY MR. GALLEGOS:

14          Q.   To your knowledge did Pinnacle Logistics use

15   the chargeback software developed by Chargeback Armor,

16   Inc.?

17          MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous.

19          THE WITNESS:  Well, Tyler worked at Pinnacle

20   Logistics and he said that him, Alon and Roi were

21   starting Chargeback Armor and that they used the

22   software to respond to chargebacks for Pinnacle

23   Logistics.

24   BY MR. GALLEGOS:

25          Q.   And do you recall what time period that was?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          A.  Yeah.  That was late 2013.

2          Q.  Have you ever heard of an Alan Argaman?

3          A.  Yes.  Sounds familiar.

4          Q.  And how have you heard of Alan Argaman?

5          A.  Well, he came into the office a couple of

6    times to work on the software with Tyler for Chargeback

7    Armor.  And yeah, I was told directly, you know, by Roi

8    and by Tyler that he was helping develop the software

9    for Chargeback Armor.

10         Q.  When you say that he was helping develop,

11   who are you talking about as he?

12         A.  Alan.

13         Q.  Have you ever heard of a company called

14   Secured Commerce?

15         A.  No, that doesn't sound familiar.

16         Q.  Have you ever heard of a company called

17   Secured Merchants?

18         A.  No.  That doesn't sound familiar.

19         Q.  To your knowledge did Alan Argaman assist in

20   any other way other than working on the software with

21   Tyler?

22         MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous and it assumes

24   facts not in evidence.

25         THE WITNESS:  Not that I know of, no.

95

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    BY MR. GALLEGOS:

2         Q.  Have you ever heard of a company called SBM

3    Management, Inc.?

4         A.  SBM?  The name sounds familiar.  I'm pretty

5    sure I've seen it somewhere.

6         Q.  What, if anything, do you know about that

7    company other than the name?

8         MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous.  It assumes facts

10   not in evidence.

11        THE WITNESS:  The name sounds familiar but I'm

12   not sure.

13   BY MR. GALLEGOS:

14        Q.  Have you ever heard of a company called

15   Media Urge?

16        A.  Yes.

17        Q.  And what do you know about that company?

18        A.  I can't remember exactly what they did, but

19   I recall Kristopher Bond talking about it, talking

20   about Media Urge, but I don't know exactly what they

21   did.

22        Q.  Have you ever heard of a company called

23   Focus Media Solutions?

24        A.  No, that doesn't sound familiar.

25        MR. GALLEGOS:  Pass the witness.

96

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1                          EXAMINATION

2    BY MR. UNGAR:

3          Q.  Sir, tell me everything you know about a

4    check box on the AuraVie website.

5          A.  Everything that I know about it?

6          Q.  Tell me everything you know about a check

7    box on the AuraVie website.

8          MR. GALLEGOS:  Objection.  Overbroad.  Asks for

9    a narrative.

10         THE WITNESS:  Everything that I know about the

11   check box on the AuraVie website is on some of the

12   landing pages there would be a check box where the

13   customer entered in their shipping and billing

14   information and their e-mail address, their telephone

15   number, but when they had to enter in their credit card

16   information on these landing pages for My Miracle Kit

17   and for the AuraVie trial pages, there weren't any

18   check boxes there.

19   BY MR. UNGAR:

20         Q.  Do you know anything else about check boxes

21   on the AuraVie website other than what you just

22   testified to?

23         A.  Other than responding to the chargebacks,

24   like I said there were screen shots that we received

25   that we submitted to the banks when we were responding

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1     to the chargebacks and all these screen shots of these

2     landing pages were basically telling the banks that the

3     customer had to check a box when they entered in their

4     credit card information.

5          MR. GALLEGOS:  I'll object on the basis it's

6     vague and ambiguous --

7          MR. UNGAR:  Counsel, he was just testifying.

8     It's totally inappropriate.  It's improper.

9          MR. GALLEGOS:  It appeared that he had finished.

10         MR. UNGAR:  And I admonish you not to do it

11    again, please.  You've chastised me about it.  Please

12    follow proper decorum.

13    BY MR. UNGAR:

14         Q.  Would you like to hear the question again,

15    sir?

16         A.  Sure.

17         Q.  What else do you know about the check box on

18    the AuraVie website other than what you've already

19    testified to?

20         MR. GALLEGOS:  Before he answers I'm going to

21    object that it's ambiguous, vague, overbroad.

22         THE WITNESS:  Like I said, besides there being

23    no check box on the landing page for the trial websites

24    for AuraVie and My Miracle Kit, we were given screen

25    shots that we submitted to the banks that stated that

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    the customer had to check a box when they entered in

2    the credit card information, but on the actual landing

3    pages where the customer signed up at they didn't have

4    to check a box.

5    BY MR. UNGAR:

6         Q.  Isn't it true you had personally seen

7    AuraVie websites with check boxes?

8         MR. GALLEGOS:  Objection.  Misstates the

9    witness's testimony.

10        THE WITNESS:  I have seen AuraVie websites with

11   check boxes when a customer enters in their shipping

12   information, their billing address, but there are two

13   pages.  There was the first page that the customer saw

14   where they had to enter in their shipping information

15   and when they continued on to the next page, they had

16   to enter in their credit information.  On that page

17   there was no box that the customer had to click in

18   order to agree to the terms and conditions of the

19   trial.

20   BY MR. UNGAR:

21        Q.  What else do you know about the check box on

22   the AuraVie website other than what you've already

23   testified to?

24        A.  I believe I've stated mostly what I know

25   about the check box on the AuraVie websites.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.  Describe the graphical user interface on the
2   Chargeback Armor software that was used at Pinnacle
3   Logistics, Incorporated, at the time that you were
4   employed.
5          A.  For Chargeback Armor?
6          Q.  I'll restate the question, sir.
7              Describe the graphical user interface on the
8   Chargeback Armor software that was used at Pinnacle
9   Logistics, Incorporated, at the time that you were
10  employed there.
11         MR. GALLEGOS:  Objection as to form.
12         THE WITNESS:  I never saw the Chargeback Armor
13  software.
14  BY MR. UNGAR:
15         Q.  Thank you.  Do you know an individual by the
16  name of Dawn Goddard, G-o-d-d-a-r-d?
17         A.  Yes, I do.
18         Q.  Isn't it true you and Dawn Goddard are
19  friends?
20         MR. GALLEGOS:  Objection.  Form.  Relevance.
21         THE WITNESS:  I mean, we know each other.  I
22  wouldn't say we're friends.
23  BY MR. UNGAR:
24         Q.  How long have you known each other?
25         MR. GALLEGOS:  Objection.  Relevance.  Form.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

100

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          THE WITNESS:  We met while working at Pinnacle
2     Logistics.
3     BY MR. UNGAR:
4          Q.  When's the last time you spoke to Dawn
5     Goddard either by telephone or in person?
6          A.  The last time I talked to Dawn was when I
7     was -- it was a few weeks ago when I was called in for
8     the deposition.
9          Q.  Did you tell Dawn Goddard in your
10    conversation with her a few weeks ago that you had been
11    called in for a deposition?
12         A.  Yeah, I did.
13         Q.  Did you call Dawn Goddard on the telephone
14    and tell her that you had been called in for a
15    deposition?
16         MR. GALLEGOS:  Objection.  Asked and answered.
17         THE WITNESS:  Yes.
18    BY MR. UNGAR:
19         Q.  What else did you say to Dawn Goddard in
20    that telephone conversation that you initiated with
21    her?
22         A.  I mean, just simply that I was being called
23    in for a deposition.
24         Q.  You didn't say anything else?  You picked up
25    the telephone, you dialed her number and you said to

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1    her, "I've been called in for a deposition," and that
 2    was the end of everything that you said to her; is that
 3    correct?
 4         MR. TEPFER:  Let the record reflect counsel is
 5    raising his voice.
 6         THE WITNESS:  No.  I mean there was more.  I
 7    said that I'm being called in for a deposition.  I know
 8    that the people that we used to work for are like
 9    slightly unethical.  I was worried about maybe some
10    kind of retaliation.  That was it.
11    BY MR. UNGAR:
12         Q.  Did you describe to Dawn Goddard what type
13    of retaliation you were concerned about?
14         A.  No.
15         Q.  Are you concerned about retaliation as you
16    sit here today?
17         A.  I mean, it definitely crosses my mind, yeah.
18         Q.  What kind of retaliation are you concerned
19    about?
20         A.  I don't know.  Just any form of retaliation.
21         Q.  And before the telephone conversation you
22    had with Dawn Goddard a few weeks ago, when was the
23    next time?  I'm going back in time now.  When was the
24    next time you spoke to Dawn Goddard?
25         A.  Maybe some time last year.  Like in the
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    middle of last year.

2         Q.  And why did you speak to Dawn Goddard that

3    time last year?

4         A.  Because I was contacted by the FTC.

5         Q.  Why did you call Dawn Goddard when you were

6    contacted by the FTC?

7         A.  Because I know that -- I mean, she knew a

8    lot about what was going on in terms of like the

9    merchant accounts and everything as much as I did.  So

10   when I was contacted by the FTC, I was -- she was just

11   someone I felt comfortable talking to about it.

12   Because she worked at the company and she knew as much

13   as I did or more than I did about things that went on

14   there since she worked closely with Kris and Alon.  So

15   yeah, it was basically telling her that I was contacted

16   by the FTC.

17        Q.  What did you tell Dawn Goddard in the second

18   telephone conversation working backwards about your

19   being contacted by the FTC?

20        A.  I just simply told -- I mean, I don't know

21   what other way to state it besides just telling her I

22   was contacted by the FTC.

23        Q.  That's the only thing you said to Dawn

24   Goddard in the second telephone conversation going

25   backwards is that Dawn, I've been contacted by the FTC,

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1      and you didn't say anything else to her; right?

2              MR. GALLEGOS:  Objection.  Argumentative.

3              THE WITNESS:  Well, yeah, besides the fact that

4      they had questions for me and -- yeah, that they had

5      questions for me and I guess I was just trying to

6      figure out -- yeah, that they had questions for me and

7      I guess I need to answer them.

8      BY MR. UNGAR:

9          Q.  This telephone call that you're now

10     describing, what year was that?

11         A.  It was in 2015.

12         Q.  Was it in or about June of 2015?

13         A.  I believe it was a little earlier.  Might

14     have been maybe April or March.

15         Q.  Do you know who the person was who contacted

16     you and represented to you that they were associated

17     with the Federal Trade Commission?

18         A.  Yes.

19         Q.  Who?

20         A.  Mr. Reid.

21         Q.  Who are you pointing to?

22         A.  I'm pointing at Mr. Reid.

23         Q.  When you say Mr. Reid, are you referring to

24     Reid Tepfer?

25         A.  Yes.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          Q.  So his first name is Reid.

2          A.  Okay.

3          Q.  Did you know him in 2015 as Mr. Reid?

4          MR. GALLEGOS:  Objection.  Argumentative.

5          THE WITNESS:  No.

6    BY MR. UNGAR:

7          Q.  And who did you know him as in 2015?

8          A.  As Reid.

9          Q.  And Reid contacted you to the best of your

10   recollection in March or April of 2015; is that

11   correct?

12         A.  Yes.

13         Q.  Prior to the contact that you had with Reid

14   in March, April of 2015, had you been contacted at any

15   time prior to that by anyone who represented to you

16   that they were associated with the Federal Trade

17   Commission?

18         MR. TEPFER:  Counsel, can you please lower your

19   voice.

20         MR. UNGAR:  There's nothing wrong with my voice,

21   Counsel.

22         MR. GALLEGOS:  I'm going to object to form.

23         MR. UNGAR:  Do not interrupt in the middle of

24   question and answer.  It's improper.

25         MR. GALLEGOS:  The witness has not yet started

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

 1    his answer.

 2              MR. UNGAR:  I'm waiting for an answer.  Stop

 3    interrupting.

 4              MR. GALLEGOS:  I'm making my objection, Counsel.

 5              MR. UNGAR:  And that's not an objection.  What

 6    your partner just said is not an objection.

 7              MR. GALLEGOS:  First of all, lower your voice.

 8    Let the record reflect that Mr. Ungar is raising his

 9    voice --

10              MR. UNGAR:  I'm not going to lower my voice.

11    Limit yourself to proper objections.

12              MR. GALLEGOS:  And I'll object as to form.

13    Compound.  Argumentative.

14    BY MR. UNGAR:

15         Q.  Do you remember the question?

16         A.  I do.  And no.

17         Q.  Tell me everything that Reid told you in the

18    conversation in March or April of 2015?

19              MR. GALLEGOS:  Objection.  Overbroad.  Form.

20              THE WITNESS:  Reid had asked me a little bit

21    about what my role was at Pinnacle Logistics and at

22    BunZai.  And wanted to know -- and basically told me

23    that they were getting a lot of complaints and saw that

24    BunZai Media was getting a lot of complaints and they

25    were looking into it and wanted to know if I could tell

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

```
 1    him a little bit about what I did and that lead to us

 2    talking more.

 3    BY MR. UNGAR:

 4         Q.  Can you remember anything else that Reid

 5    said to you in March or April of 2015?

 6         MR. GALLEGOS:  Objection --

 7    BY MR. UNGAR:

 8         Q.  Other than what you just testified to?

 9         MR. GALLEGOS:  Objection.  Form.  Asks for a

10    memory test.

11         THE WITNESS:  I can't remember anything else

12    that he said like specifically the entire conversation.

13    I don't understand the question.

14    BY MR. UNGAR:

15         Q.  Let me rephrase it.  The conversation that

16    you had with Reid in March or April of 2015, was that

17    in person or by telephone?

18         A.  That was over the telephone.

19         Q.  Who initiated that telephone call in March

20    or April of 2015?

21         A.  I received an e-mail from Reid asking if I

22    can contact him, so I called him on the telephone.

23         Q.  So prior to the telephone call that you had

24    with Reid in March or April, you received an e-mail

25    from somebody who purported to be a representative of
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    the Federal Trade Commission; correct?

2         A.  Yes.

3    BY MR. GALLEGOS:

4         Q.  Objection.  Leading, form.  Argumentative.

5    BY MR. UNGAR:

6         Q.  Prior to you receiving that e-mail from

7    someone who purported to be a representative of the

8    Federal Trade Commission have you ever been contacted

9    before that --

10        MR. GALLEGOS:  Same objection.

11   BY MR. UNGAR:

12        Q.  -- by anyone who purported to be a

13   representative of the Federal Trade Commission?

14        MR. GALLEGOS:  Same objection.

15        THE WITNESS:  No.

16   BY MR. UNGAR:

17        Q.  Do you have a recollection of the e-mail

18   that you received from Reid in 2015?

19        A.  I can't remember exactly but he was

20   basically asking me if I can contact him.

21        Q.  Did the e-mail say why Reid wanted you to

22   contact him?

23        A.  I can't remember.

24        Q.  Did you contact Reid in March, April of

25   2015?

108

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1          A.   Yes.

2          Q.   So you initiated the telephone call to Reid

3    in March or April of 2015.

4          A.   Yes.  After I received an e-mail in my

5    in-box from someone -- from an attorney at the Federal

6    Trade Commission.  I talked to my mom about it and she

7    said it sounds very urgent and I should call so I

8    called.

9          Q.   What e-mail address, if you recall, did Reid

10   send the e-mail asking you to contact him?

11         THE WITNESS:  Do I have to provide my e-mail

12   address?

13         MR. GALLEGOS:  I'll object that the witness

14   shouldn't have to state his e-mail on a court document.

15   If you know.

16         THE WITNESS:  I do have to provide my e-mail

17   address?  Okay.  The e-mail address was

18                              .

19   BY MR. UNGAR:

20         Q.   In your telephone conversation with Reid in

21   March, April of 2015, did you inquire how Reid had your

22   e-mail address?

23         A.   I did ask him how he received my e-mail

24   address, and he had said that he had gotten it from

25   someone else that he was working with for his

Stanley
FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    investigation, but he didn't tell me specifically who.

2         Q.  Was it your understanding that he was

3    referring to a former co-employee of yours?

4         MR. GALLEGOS:  Objection.  Misstates the

5    witness's testimony.  Vague.  Form.

6         THE WITNESS:  I honestly didn't know.  I mean, I

7    just didn't ask.

8    BY MR. UNGAR:

9         Q.  Tell me everything that you can recall

10   saying to Reid in the March, April 2015 telephone

11   conversation other than what you've already testified

12   to.

13        MR. GALLEGOS:  Objection.  Asks for a memory

14   test.  Form.

15        THE WITNESS:  To state everything that we talked

16   about in that one telephone call?

17   BY MR. UNGAR:

18        Q.  Yes, sir.

19        A.  He had asked me specifically what my role

20   was at Pinnacle Logistics and BunZai, and I ended up

21   telling him specifically just what my role was, that we

22   responded to chargebacks, that we sent responses to the

23   banks.  I told him that there are a lot of merchant

24   accounts that Pinnacle Logistics and BunZai handled so

25   we had to respond to every single merchant account that

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    they handled.

2              He had asked me what the procedures were for

3    issuing customer refunds and I told him that exact

4    protocol that I stated earlier, that the customers

5    would -- or that the customer service reps would

6    initially not offer refunds and if the customer was

7    upset offer a 15 percent refund then the 25 percent

8    refund, and then a 50 percent refund.

9              And I told him the procedures for the way

10   that -- if disputes were handled over the phone if the

11   customer was saying they wanted to file a dispute that

12   they had to call their bank.  I told Reid that

13   sometimes e-mails were sent out and sometimes customer

14   service reps over the phone would tell customers if

15   they filed a dispute, that they would be investigated

16   for fraud and these were some of the things that I

17   heard over the phone.

18        Q.  Is there anything else that you can recall

19   telling Reid Tepfer in the telephone conversation in

20   March, April of 2015 other than what you've already

21   testified to?

22        MR. GALLEGOS:  Same objection.

23        THE WITNESS:  In that first telephone call?  No,

24   that's all I can recall.

25   ///

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1   BY MR. UNGAR:

2        Q.  Tell me everything you can recall Reid

3   Tepfer saying to you in the March, April 2015 telephone

4   call.

5        MR. GALLEGOS:  Objection.  Form.  Asks for a

6   memory test.

7        THE WITNESS:  That he wanted to set up another

8   conversation with me and that there was someone else --

9   there was someone else that he was working with that he

10  wanted to bring in to hear what I had to say.  And that

11  was basically it, that he wanted to set up another call

12  with him.

13  BY MR. UNGAR:

14       Q.  In the March, April 2015 telephone call, did

15  Reid Tepfer ask you questions about your employment

16  with Pinnacle Logistics, Incorporated?

17       A.  Did he ask me if I was employed there?

18       MR. GALLEGOS:  Objection.  Form.

19  BY MR. UNGAR:

20       Q.  Do you understand the question?

21       A.  Can you repeat the question or rephrase it?

22       Q.  Sure.  In the March, April 2015 telephone

23  conversation that you had with Reid Tepfer, did Reid

24  Tepfer ask you questions about your employment with

25  Pinnacle Logistics, Incorporated?

112

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1              MR. GALLEGOS:  Same objection.

2              THE WITNESS:  Yes.  He asked me if I was

3        employed there and how long I was employed for.

4        BY MR. UNGAR:

5              Q.  At the time of the telephone conversation in

6        March, April 2015, were you employed by Pinnacle

7        Logistics, Incorporated?

8              A.  What time period?  I'm sorry.

9              Q.  In March, April 2015, the time of the

10       telephone conversation that you had with Reid Tepfer,

11       were you employed by Pinnacle Logistics, Incorporated?

12             A.  No, I was not.

13             Q.  When was your employment at Pinnacle

14       Logistics terminated?

15             MR. GALLEGOS:  Objection.  Misstates the

16       evidence.  Form.

17             THE WITNESS:  January, January 2014.

18       BY MR. UNGAR:

19             Q.  Isn't it true that Roi Reuveni,

20       R-e-u-v-e-n-i, terminated your employment as a Pinnacle

21       Logistics employee?

22             MR. GALLEGOS:  Objection.  Form.

23             THE WITNESS:  Yes.

24       BY MR. UNGAR:

25             Q.  Do you know the reasons why your employment

113

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    was terminated at Pinnacle Logistics, Incorporated?

2         MR. GALLEGOS:  Objection.  Form.  Asks for

3    speculation.

4         THE WITNESS:  Yeah.  From what I was told

5    basically what ended up happening in December of 2013

6    there were a lot of agents that were quitting, a lot of

7    customer service reps that didn't like the way that

8    management was treating the employees and I don't know.

9    A lot of customer service reps were really stressed out

10   so a lot of people were quitting and the office was

11   getting smaller, and so basically what management told

12   us was that they were just going to set up another call

13   center in South Carolina or North Carolina, so they

14   were letting all the customer service reps go, besides

15   a few of them.  That's what we were told.

16   BY MR. UNGAR:

17        Q.  Did you quit your employment at Pinnacle

18   Logistics, Inc. in January 2014?

19        MR. GALLEGOS:  Objection.  Asked and answered.

20        THE WITNESS:  Did I quit?  No.

21   BY MR. UNGAR:

22        Q.  Isn't it true you were fired in

23   January 2014?

24        A.  Yes.

25        MR. GALLEGOS:  Objection.  Argumentative.  Form.

114

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          THE WITNESS:  Yes.  We were told we were being

2     let go.

3     BY MR. UNGAR:

4          Q.  Isn't it true that Roi Reuveni fired you in

5     January 2014 from your employment at Pinnacle

6     Logistics, Inc.?

7          A.  Yeah, he did.

8          Q.  Isn't it true that you dislike Roi Reuveni,

9     for firing you in January of 2014?

10         MR. GALLEGOS:  Objection.  Form.  Harassing.

11         THE WITNESS:  No.

12    BY MR. UNGAR:

13         Q.  Do you consider yourself to be a friend of

14    Roi Reuveni?

15         MR. GALLEGOS:  Objection.  Harassing,

16    argumentative.  Form.

17         THE WITNESS:  There were times that we were

18    closer than we were towards the end of me working

19    there, but I mean, I would have never said that we were

20    friends.

21    BY MR. UNGAR:

22         Q.  Why weren't you close towards the end of

23    your employment at Pinnacle Logistics, Inc. with Roi

24    Reuveni?

25         MR. GALLEGOS:  Objection.  Form.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                         2/20/2016

```
 1          THE WITNESS:  He was upset about -- he was upset
 2     about a choice that I made when I was working there.
 3     So at that point in time he didn't -- we didn't really
 4     talk as much after I made that decision.
 5     BY MR. UNGAR:
 6          Q.  Was it your impression towards the end of
 7     your employment with Pinnacle Logistics, Inc. that Roi
 8     Reuveni didn't like you?
 9          MR. GALLEGOS:  Objection.  Form.  Argumentative.
10          THE WITNESS:  I wouldn't say that he didn't like
11     me.  I just know that he didn't trust me.
12     BY MR. UNGAR:
13          Q.  Was your relationship with Roi Reuveni
14     towards the end of your employment at Pinnacle
15     Logistics, Inc. a hostile relationship?
16          MR. GALLEGOS:  Objection.  Form.  Argumentative.
17     Harassing.
18          THE WITNESS:  No.  It was never completely
19     hostile with Roi.
20     BY MR. UNGAR:
21          Q.  Was it partially hostile?
22          MR. GALLEGOS:  Same objections.
23          THE WITNESS:  There were times we had
24     disagreements but it was never hostile.  He never
25     raised his voice at me.  He always for the most part
```

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1     talked to me calm.  I know he was upset at me sometimes

2     but it never felt hostile with Roi.

3     BY MR. UNGAR:

4          Q.  Did you disagree with the reasons that were

5     given to you by Roi Reuveni for why you were being

6     fired from your employment at Pinnacle Logistics, Inc.?

7          MR. GALLEGOS:  Objection.  Form.

8          THE WITNESS:  I felt that it was -- or part of

9     the reason was in regards to the decision that I had

10    made earlier on in my employment that he disagreed

11    with.  But at the same time I know that they wanted to

12    save more money and that they wanted -- and felt they

13    were paying the agents there too much money so towards

14    the end after Kristopher Bond left they got really

15    greedy.

16         All they cared about was completely cutting down

17    the cost.  We saw that same process with the way that

18    they refunded customers, so it's no different than they

19    would treat their employees that way.

20    BY MR. UNGAR:

21         Q.  Did you disagree with any of the reasons

22    that Roi Reuveni gave you for why you were being fired

23    from your employment with Pinnacle Logistics, Inc.?

24         MR. GALLEGOS:  Objection.  Form.  Compound.

25    Argumentative.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1              THE WITNESS:  Yes.

2    BY MR. UNGAR:

3              Q.  Did you file an unemployment insurance claim

4    at any time against Pinnacle Logistics, Inc.?

5              MR. GALLEGOS:  Objection.  Form.  Argumentative.

6    Harassing.

7              THE WITNESS:  Yes.

8    BY MR. UNGAR:

9              Q.  What is the current status of your

10   unemployment claim against Pinnacle Logistics, Inc.?

11             A.  I'm no longer collecting unemployment.

12             Q.  When did you stop collecting unemployment on

13   your claim against Pinnacle Logistics, Inc.?

14             A.  June 2014.

15             Q.  Why did you file a claim for unemployment

16   against Pinnacle Logistics, Inc.?

17             MR. GALLEGOS:  Objection.  Form.  Relevance.

18             THE WITNESS:  Because I needed time to find

19   another job.

20   BY MR. UNGAR:

21             Q.  What were the reasons you gave to the State

22   of California for filing an unemployment claim against

23   Pinnacle Logistics, Inc.?

24             A.  That I was fired.

25             Q.  Did you state under penalty of perjury to

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    the State of California who fired you?

2          A.   I honestly don't remember.

3          Q.   Did you fill out an unemployment

4    compensation form at the offices of the California

5    Employment Development Department?

6          MR. GALLEGOS:   Objection.   Relevance.   Form.

7          THE WITNESS:   Yes.

8    BY MR. UNGAR:

9          Q.   Do you have a copy of that form?

10         A.   No, I don't believe so.

11         Q.   To the best of your knowledge today was

12   everything that you stated under penalty of perjury

13   that your employment -- in your unemployment

14   compensation form that you submitted to the Employment

15   Development Department truthful and accurate?

16         MR. GALLEGOS:   Objection.   Form.   Compound.

17   Argumentative.   Overbroad.

18         THE WITNESS:   From what I remember, yes.

19   BY MR. UNGAR:

20         Q.   After your March or April 2015 telephone

21   conversation with Reid Tepfer, did you have any other

22   contact after March -- after the March, April 2015

23   telephone conversation with any other person who

24   purported to represent the Federal Trade Commission?

25         A.   No.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.  So you never had the follow-up telephone
2     conversation with Reid Tepfer that you testified
3     earlier to; is that right?
4          A.  Oh, no.  I thought you meant anyone else
5     other than Reid.  Yeah, I did talk with Reid after that
6     telephone call.
7          Q.  And after the March or April 2015 telephone
8     conversation, how many more telephone conversations did
9     you have with Reid Tepfer?
10         MR. GALLEGOS:  Objection.  Asks for -- form, and
11    asks for a memory test.
12         THE WITNESS:  Anywhere between five and six.  I
13    can't remember the exact number.
14    BY MR. UNGAR:
15         Q.  And does the five or six include the March,
16    April 2015 initial telephone conversation that you had
17    with Reid Tepfer?
18         A.  Yes.
19         Q.  So in total you're testifying that you had
20    five to six telephone conversations with Reid Tepfer;
21    is that accurate?
22         A.  I mean, I can't remember the exact number,
23    but yeah.  I would say it's either that or less.
24         Q.  What is your best estimate of the number of
25    telephone conversations that you had with Reid Tepfer

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    from March, April of 2015 until last night?

2          MR. GALLEGOS:  Objection.  Argumentative.

3    Harassing.  Asked and answered.

4          THE WITNESS:  Between -- like I would say,

5    between five and six, four and six.

6    BY MR. UNGAR:

7          Q.  Do you know why it was necessary for you to

8    have five to six telephone conversations with Reid

9    Tepfer between March and April of 2015 and last night?

10         MR. GALLEGOS:  Objection.  Form.  Calls for

11   speculation.  Argumentative.  Harassing.

12         THE WITNESS:  I guess I misunderstood some of

13   the questions.  I thought you were referring to overall

14   how many times I've talked to Reid on the phone.

15   Overall.  But since March 2015 -- yeah.  So it was

16   between four and six.  Yeah.

17   BY MR. UNGAR:

18         Q.  Do you know why you needed to have five to

19   six telephone conversations with Reid Tepfer between

20   March, April 2015 and last night?

21         MR. GALLEGOS:  Objection.  Form.  Calls for

22   speculation.  Argumentative.  Harassing.

23         THE WITNESS:  At the time did I know why?  No.

24   I already stated earlier that when I received the

25   e-mail, I was not sure at all what it was about.  So I

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1   had asked my mom about it and I mean, that's serious.

2   So I ended up calling Reid.

3   BY MR. UNGAR:

4         Q.  But you had five to six telephone

5   conversations with Reid Tepfer between March,

6   April 2015 and last night; is that right?

7         A.  Yeah.  It was either six or less, yeah.

8         Q.  The first of those five to six telephone

9   conversations occurred in March, April 2015; correct?

10        A.  Yes.

11        Q.  Okay.  When was the second telephone

12  conversation that you had with Reid Tepfer after the

13  initial March, April 2015 telephone conversation?

14        A.  It was either that week or the following

15  week.

16        Q.  And what happened to the best of your

17  recollection in the second telephone conversation?

18        MR. GALLEGOS:  Objection.  Form.  Asks for a

19  memory test.

20        THE WITNESS:  He had asked me for -- he had told

21  me that he had someone else that wanted to hear

22  basically what I did at Pinnacle Logistics and I just

23  described that process.

24  BY MR. UNGAR:

25        Q.  Did Reid Tepfer tell you who this other

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    person was?

2          A.  I believe it was another attorney but I

3    can't remember specifically.

4          Q.  Did he say the name?

5          MR. GALLEGOS:  Objection.  Asked and answered.

6          THE WITNESS:  Yeah, he did.

7    BY MR. UNGAR:

8          Q.  Do you recall the name?

9          A.  No, I do not.

10         Q.  Is it Mr. Luis Gallegos who is here -- who's

11   been questioning you in this deposition?

12         MR. GALLEGOS:  Objection.  Asked and answered.

13         THE WITNESS:  I believe so.  But I'm not

14   100 percent certain.  It's been a while since I looked

15   at the e-mails.

16   BY MR. UNGAR:

17         Q.  How many people were on the telephone call,

18   the second telephone call in March, April of 2015 that

19   you've testified to?

20         A.  It was two.

21         Q.  And who were those participants?

22         A.  It was Reid and I believe Luis.

23         Q.  So there was a total of three people on the

24   second telephone call that you had; is that correct?

25         A.  Yes.  A total of three.

123

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1          MR. GALLEGOS:  Objection.  Misstates the

2     witness's testimony.

3     BY MR. UNGAR:

4          Q.  And the second telephone conversation that

5     you had with the FTC representatives, I believe you

6     testified was a few weeks after the initial March,

7     April 2015 telephone call; is that correct?

8          A.  No.  I said it was that week or the

9     following week.

10         Q.  So we're still in the March, April 2015

11     time frame; is that correct?

12         A.  That's right.

13         Q.  Can you recall anything else that the two

14     FTC representatives said to you in the second March,

15     April 2015 telephone conversation?

16         MR. GALLEGOS:  Objection.  Form.  Asks for a

17     memory test.

18         THE WITNESS:  They were basically -- I mean,

19     like I already stated, just asking me what I did there,

20     what the refund policy was, how we handled disputes at

21     Pinnacle Logistics, not BunZai, they asked me about

22     some of the owners of the companies.

23     BY MR. UNGAR:

24         Q.  Do you recall anything that you said to the

25     two FTC representatives in the second March, April 2015

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    telephone conversation?

2           MR. GALLEGOS:  Objection.  Asks for a memory

3    test.  Vague.  Form.

4           THE WITNESS:  Yeah.  I basically stated what I

5    did there at Pinnacle Logistics.  Yeah, I just stated

6    what I did there in handling disputes, customer

7    service, the way that we responded to chargebacks.

8    BY MR. UNGAR:

9           Q.  Anything specific that you can recall as you

10   sit here today that you said to the two FTC

11   representatives in the second conversation?

12          MR. GALLEGOS:  Objection.  Form.  Asks for a

13   memory test.

14          THE WITNESS:  Specifically?  I mean, everything

15   that I already stated, just how we responded to

16   merchant accounts -- responded to chargebacks for each

17   merchant account and what the refund policy was at

18   Pinnacle Logistics and BunZai.

19   BY MR. UNGAR:

20          Q.  And then there was a third telephone

21   conversation that you had with an FTC representative;

22   is that right?

23          A.  Yes.

24          Q.  And who was that third contact with from the

25   FTC?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

125

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1          A.  It was with myself, Reid and Luis.

2          Q.  And when did that third contact occur?

3          A.  I would probably say that same week.

4          Q.  So we're still in the March, April 2015 time

5     period; is that correct?

6          A.  That's right.

7          Q.  And to the best of your recollection what

8     did the FTC representative say to you in the third

9     conversation?

10         MR. GALLEGOS:  Objection.  Asks for a memory

11    test.  Form.

12         THE WITNESS:  They had asked me, they had a list

13    of names and asked me if I knew these people.  Mainly

14    it was a lot of names that they listed.  A lot of those

15    names they listed I didn't know.  The only people that

16    I knew were just Igor, Roi, Alon and Kris, but they had

17    an entire list of names that they were asking.

18    BY MR. UNGAR:

19         Q.  And then there was a fourth telephone

20    conversation.

21         A.  Right.

22         Q.  And the fourth telephone conversation was

23    again with FTC representatives; isn't that correct?

24         A.  That's right.

25         Q.  And to the best of your recollection when

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

126

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1    was the fourth telephone conversation that you had with

2    FTC representatives?

3              MR. GALLEGOS:  Objection.  Calls for --

4              THE WITNESS:  I would say it was a couple of

5    weeks later.

6    BY MR. UNGAR:

7          Q.  Are we still in the March, April 2015

8    time frame?

9          A.  Yes, we are.

10         Q.  And who participated in the fourth telephone

11   conversation that you had with FTC representatives?

12         A.  It was Luis and Reid, but I have to take a

13   break really quick.  I have to move my car.

14             MR. GALLEGOS:  Off the record.

15             (Recess taken.)

16   BY MR. UNGAR:

17         Q.  Sir, did you just have a conversation during

18   the break with either of the FTC lawyers here?

19         A.  Nope.

20         Q.  Other than what you've testified to in this

21   room today, this morning, have you had any

22   conversations today with either of the FTC lawyers

23   here?

24             MR. GALLEGOS:  Objection.  Form.

25             THE WITNESS:  No.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                2/20/2016

```
 1   BY MR. UNGAR:
 2        Q.  How much money have you been paid to give
 3   your testimony here today?
 4        MR. GALLEGOS:  Objection.  Argumentative.  Form.
 5        THE WITNESS:  $40 but I haven't filled out the
 6   form.
 7   BY MR. UNGAR:
 8        Q.  Have you been paid any other monies for
 9   giving your testimony here today other than $40?
10        A.  No.
11        Q.  Did you sign a declaration under penalty of
12   perjury in connection with the pending lawsuit between
13   the Federal Trade Commission and BunZai Media Group?
14        A.  Yes.  They did have me sign.
15        Q.  When did you do that?
16        A.  I want to say in March or April of last
17   year.
18        Q.  When you say last year you're talking about
19   2015?
20        A.  2015, that's right.
21        Q.  And was that a document that you signed as a
22   result of the many telephone conversations that you had
23   with the FTC lawyers?
24        MR. GALLEGOS:  Objection.  Argumentative.  Form.
25        THE WITNESS:  Yes.
```

128

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

 1    BY MR. UNGAR:
 2         Q.   Did the FTC lawyers ask you in any of the
 3    five to six telephone conversations about Lichtenstein?
 4         A.   No.
 5         Q.   Do you know anybody who has money in
 6    Lichtenstein?
 7         A.   No, I don't.
 8         Q.   What is Lichtenstein?
 9         A.   I don't know.
10         Q.   Do you know how to spell Lichtenstein?
11         MR. GALLEGOS:   Objection.   Argumentative.
12    Harassing.
13         THE WITNESS:   No, I don't.
14    BY MR. UNGAR:
15         Q.   To the best of your knowledge as you sit
16    here today is everything in your declaration that you
17    submitted in connection with this pending litigation
18    between the FTC and BunZai Media Group truthful and
19    accurate?
20         MR. GALLEGOS:   Objection.   Form.   Compound.
21         THE WITNESS:   To the best of my knowledge, yes.
22    BY MR. UNGAR:
23         Q.   Since you signed your declaration in March
24    or April of 2015, have you come to learn that anything
25    that's contained in your declaration is inaccurate?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                        2/20/2016

1          MR. GALLEGOS:  Objection.  Form.  Misstates the
2     consumer's testimony.
3          THE WITNESS:  Not that I know of, no.
4          MR. GALLEGOS:  And also would like to add
5     assumes facts not in evidence.
6     BY MR. UNGAR:
7          Q.  There was a fifth telephone conversation
8     between yourself and the FTC lawyers in 2015; is that
9     correct?
10         A.  That's right.
11         Q.  Was the fifth telephone conversation before
12    you signed the declaration?
13         A.  I believe so, yes.  Because the fourth
14    conversation they were basically telling me that they
15    were sending me a declaration to sign, and I hadn't
16    signed it because I was busy working and I didn't have
17    time to fill it out and go through it and send it back
18    to them, so the fifth time they were following up and
19    asking me to send it in.
20         Q.  So is it your testimony that the declaration
21    had been sent to you and the fifth telephone
22    conversation was the FTC lawyers calling you up to
23    follow up to see if you had signed the declaration or
24    not?
25         A.  That's right.

130

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.   In any of the five telephone conversations

2     that you had with the FTC lawyers, were you asked

3     questions about people having money outside the United

4     States?

5          A.   Possibly.

6          Q.   Do you have a recollection of those

7     questions --

8          MR. GALLEGOS:   Objection --

9     BY MR. UNGAR:

10         Q.   -- being asked to you by the FTC lawyers in

11    any of the five telephone conversations?

12         MR. GALLEGOS:   Objection, asked and answered.

13         THE WITNESS:   Yeah, I believe I might have been

14    asked about it but I don't remember.   I just remember

15    talking about my role at the company, my role at

16    Pinnacle and BunZai.

17    BY MR. UNGAR:

18         Q.   Do you recall saying anything to the FTC

19    lawyers in any of the telephone conversations you've

20    had with them about Alon Nottea having money outside of

21    the United States?

22         A.   I don't think so.

23         Q.   Do you have any recollection of ever saying

24    to the FTC lawyers that you had knowledge of any

25    individual associated with BunZai Media Group having

131

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1    money outside the United States?

2              MR. GALLEGOS:  Objection.  Form.  Compound.

3              THE WITNESS:  To be honest, no, I don't believe

4    so.

5    BY MR. UNGAR:

6         Q.  Do you have any recollection in any of the

7    telephone conversations that you had with the FTC

8    lawyers who are here today telling them that

9    individuals associated with BunZai Media Group were

10   hiding money?

11             MR. GALLEGOS:  Objection.  Form.  Compound.

12             THE WITNESS:  No, I don't believe so.  I don't

13   remember talking about -- I just remember mainly

14   talking about the merchant accounts.

15   BY MR. UNGAR:

16        Q.  Do you have any recollection in any of the

17   telephone conversations you had with the FTC lawyers

18   telling them that any of the individuals associated

19   with Pinnacle Logistics, Incorporated, were hiding

20   money?

21             MR. GALLEGOS:  Same objections.

22             THE WITNESS:  No.  I don't believe so.

23   BY MR. UNGAR:

24        Q.  So to the best of your recollection the main

25   thing that you spoke to the FTC lawyers about in all of

132

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    the telephone conversations were the merchant accounts;

2    is that correct?

3              A.   That's right.

4              MR. GALLEGOS:   Objection.  Misstates --

5              THE WITNESS:   Merchant accounts, responding to

6    chargebacks and disputes and just the protocol for

7    refunding customers.

8              MR. GALLEGOS:   And I'll interpose an objection.

9    Form.  Argumentative.  Compound.

10   BY MR. UNGAR:

11             Q.   Was there a sixth telephone conversation

12   between yourself and the FTC lawyers that you can

13   recall?

14             A.   No.

15             Q.   Do you have a recollection of when that

16   fifth telephone conversation took place between

17   yourself and the FTC lawyers that was a follow up

18   regarding the signing of the declaration?

19             A.   Yeah.  I think it was in possibly early

20   April.

21             Q.   So is it fair to say that all of the

22   telephone conversations that you can recall having with

23   the FTC lawyers who are here today occurred either in

24   March of 2015 or April of 2015?

25             A.   That's right.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          MR. GALLEGOS:   Objection.   Asks for a memory

2    test.   Form.

3    BY MR. UNGAR:

4          Q.   Since April of 2015 until last night, have

5    you had any other contact with either of the FTC

6    lawyers here today?

7          A.   They had sent me an e-mail asking me when I

8    would be able to do the deposition that we're having

9    today.   And I just told them that I'm usually free on

10   the weekends because I work and he had also said that

11   he had sent in paperwork for a reimbursement fee for

12   the deposition, but like I said, I haven't filled that

13   out yet.

14         Q.   Was the e-mail sent to that same e-mail

15   address you testified to earlier?

16         A.   Yeah.

17         Q.   Did you respond to the e-mail regarding your

18   appearance here today by e-mail or by telephone?

19         A.   It was by telephone.

20         Q.   Who did you speak to?

21         A.   I spoke with Reid.

22         Q.   And when did that occur?

23         A.   Just a few weeks ago.

24         Q.   And to the best of your recollection as you

25   sit here today, tell me everything that Reid said to

134

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1   you in that telephone conversation that occurred a few
2   weeks ago.
3           MR. GALLEGOS:  Objection.  Form.  Asks for a
4   memory test.
5           THE WITNESS:  He just told me that we needed to
6   have a deposition and that -- he asked me, you know,
7   what day I would be able to come in for a deposition
8   and I told him and that was it.
9   BY MR. UNGAR:
10          Q.  Was that in 2016?
11          A.  Yes.
12          Q.  Was it in January or this month, February of
13  2016?
14          A.  To be honest, it was probably either or.
15  Either the beginning of February or end of January.
16          Q.  What's your best estimate as to the number
17  of weeks when that telephone conversation took place?
18  A week ago?  Two weeks ago?  Three weeks ago?
19          A.  I'd probably say two or three weeks ago.
20          Q.  But you're not sure.
21          A.  No.
22          Q.  Do you take any medications?
23          A.  No.
24          Q.  Do you use alcohol?
25          A.  Socially.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                           2/20/2016

1          Q.   Do you use any substances that affect your
2    memory?
3          A.   No.  I mean, no.
4          Q.   When you say I mean -- it appears as if you
5    were about to suggest that there is some substance that
6    you're aware of that might affect your memory?
7          MR. GALLEGOS:  Objection.  Argumentative.
8          THE WITNESS:  Yeah, sometimes I take Melatonin.
9    I've taken prescription drugs before in the past but
10   that was a long time ago.
11   BY MR. UNGAR:
12         Q.   Does the Melatonin affect your memory?
13         A.   I don't know.  So no.
14         Q.   When's the last time you took that
15   medication?
16         A.   Melatonin was a month ago.
17         Q.   But you don't know if it affects your memory
18   or not?
19         MR. GALLEGOS:  Objection.  Argumentative.  Asks
20   for an opinion.
21         THE WITNESS:  My memory is not affected at all,
22   but I don't know if taking Melatonin affects your
23   memory.
24   BY MR. UNGAR:
25         Q.   Do you wear eyeglasses?

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1          A.   Occasionally when I read.

2          Q.   Do you wear contacts?

3          A.   No.

4          Q.   Are you able to read a book without

5    eyeglasses?

6          A.   Yes.

7          Q.   Why do you use eyeglasses though?

8          A.   Sometimes it makes the words clearer.

9    Sometimes I get headaches if I don't wear glasses while

10   reading.

11         Q.   Are your eyeglasses prescribed by either an

12   optometrist or ophthalmologist?

13         A.   No.  They're just basically reading glasses.

14         Q.   So they're like magnifying glasses; right?

15         A.   That's right.

16         Q.   Have you consumed alcohol in the last 48

17   hours?

18         A.   No.

19         Q.   Have you taken any drugs in the last 48

20   hours?

21         A.   No.

22         Q.   Do you know a person by the name of Nancy

23   Yalley, Y-a-l-l-e-y?

24         A.   If it's the Nancy I'm thinking about she

25   worked with Kris at BunZai.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

137

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1          Q.  Have you spoken to Nancy Yalley at any time

2     in the past?

3          A.  Just at work.

4          Q.  When you were notified that you were going

5     to be a witness in this case, did you contact Nancy

6     Yalley just like you contacted Dawn Goddard?

7          MR. GALLEGOS:  Objection.  Assumes facts not in

8     evidence.  Form.

9          THE WITNESS:  No, I did not.

10    BY MR. UNGAR:

11         Q.  You contacted Dawn Goddard you testified

12    when you were contacted that you were going to be a

13    witness in this case; right?

14         A.  That's right.

15         Q.  And isn't it true that you discussed with

16    Dawn Goddard your testimony that you were going to give

17    in connection with being a witness in this case?

18         MR. GALLEGOS:  Objection.  Assumes facts not in

19    evidence.  Misstates the consumer's prior testimony.

20    Form.  Argumentative.  Harassing.

21         THE WITNESS:  I just said that I was

22    contacted -- I just told her that I was contacted by

23    the FTC.  I didn't give her any specifics on what was

24    going on.

25    ///

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

 1   BY MR. UNGAR:

 2        Q.  So is it your testimony as you sit here

 3   today that you had absolutely no discussion in your

 4   telephone conversation with Dawn Goddard about the

 5   testimony that you would give here today?

 6        MR. GALLEGOS:  Same objection.

 7        THE WITNESS:  You mean specifics or that I was a

 8   doing a deposition?

 9   BY MR. UNGAR:

10        Q.  Let me repeat the question, sir.  Is it your

11   testimony that other than telling Dawn Goddard that you

12   were going to be a witness in this case, that you had

13   no discussion with her about your testimony that you

14   were going to give?

15        MR. GALLEGOS:  Objection.  Form.  Argumentative.

16   Assumes facts not in evidence.  Misstates consumer's

17   prior testimony.

18        THE WITNESS:  That's correct.  I didn't give her

19   any specifics.  I just said I was doing a deposition.

20   BY MR. UNGAR:

21        Q.  And did you discuss with Dawn Goddard in the

22   telephone conversation any of the information that you

23   were going to give in the deposition?

24        A.  No, I didn't.

25        Q.  Did you discuss with Dawn Goddard in the

139

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                              2/20/2016

1     telephone conversation anything concerning BunZai Media

2     Group?

3              MR. GALLEGOS:  Objection.  Form.

4              THE WITNESS:  Discuss anything?  No, I didn't.

5     BY MR. UNGAR:

6         Q.  Did you discuss with Dawn Goddard in the

7     telephone conversation anything about Pinnacle

8     Logistics, Inc.?

9         A.  No.  I didn't.

10             MR. GALLEGOS:  Objection.  Form.

11    BY MR. UNGAR:

12        Q.  Did you discuss with Dawn Goddard in the

13    telephone conversation anything about Alon Nottea?

14        A.  No, I didn't.

15        Q.  Did you discuss with Dawn Goddard in the

16    telephone conversation anything having to do with Roi

17    Reuveni?

18        A.  No, I didn't.

19        Q.  Other than your saying to Dawn Goddard in

20    the telephone conversation, I'm going to give my

21    deposition, do you recall saying anything else to her

22    in that telephone conversation?

23             MR. GALLEGOS:  Objection.  Argumentative.

24    Harassing.  Form.

25             THE WITNESS:  I had told you earlier the only

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    thing that I was concerned about was retaliation.  That

2    was it.

3    BY MR. UNGAR:

4         Q.  And other than your concerns of retaliation

5    and letting Dawn Goddard know that you were going to

6    appear for your deposition, you had no other

7    conversation with Dawn Goddard in that telephone

8    conversation; is that your testimony?

9         A.  That's my testimony.

10        MR. GALLEGOS:  Objection.  Asked and answered.

11   BY MR. UNGAR:

12        Q.  And that telephone conversation that you had

13   with Dawn Goddard took place when?

14        A.  Like I said, earlier this week.

15        Q.  What day?

16        A.  Tuesday.

17        Q.  Today is Saturday; right?

18        A.  That's right.

19        Q.  So we're talking about just this past

20   Tuesday; correct?

21        A.  That's right.

22        Q.  And you testified that you had a telephone

23   conversation with Dawn Goddard before Tuesday when you

24   were first contacted by the FTC; is that correct?

25        A.  That's right.

141

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

1          Q.   And did you discuss with Dawn Goddard in
2     that telephone conversation when you were first
3     contacted by the FTC any of the information concerning
4     this lawsuit?
5          MR. GALLEGOS:   Objection.  Form.  Argumentative.
6          THE WITNESS:   No.
7     BY MR. UNGAR:
8          Q.   Since you've left your employment with
9     Pinnacle Logistics, Incorporated, have you ever had a
10    conversation with Dawn Goddard concerning BunZai Media
11    Group, Inc.?
12         MR. GALLEGOS:   Objection.  Form.
13         THE WITNESS:   Any conversation concerning
14    BunZai?  I mean, yeah, just in regards to being
15    contacted by the FTC.
16    BY MR. UNGAR:
17         Q.   But other than what you just testified to,
18    you've had no other conversations with Dawn Goddard
19    since you left your employment at Pinnacle Logistics,
20    Inc., concerning BunZai Media Group; is that correct?
21         A.   That's correct.
22         MR. GALLEGOS:   And I'll object on form.  Asks
23    for a memory test.
24    BY MR. UNGAR:
25         Q.   Since you left your employment at Pinnacle

Stanley

FTC v. Bunzai Media Group, Inc., et al.                          2/20/2016

1      Logistics, Inc., have you had any conversation with

2      Dawn Goddard about Alon Nottea?

3              MR. GALLEGOS:  Objection.  Form.  Asks for a

4      memory test.

5              THE WITNESS:  No.

6      BY MR. UNGAR:

7          Q.  Did you ever have knowledge that Dawn

8      Goddard had brought a lawsuit against Alon Nottea?

9          A.  Yes, I did.

10         Q.  When did you first learn that information?

11         A.  I learned it while I was working at

12     Pinnacle.

13         Q.  And did you ever have any discussions with

14     Dawn Goddard concerning her lawsuit against Alon

15     Nottea?

16             MR. GALLEGOS:  Objection.  Relevance, form.

17             THE WITNESS:  No, I did not.

18     BY MR. UNGAR:

19         Q.  Did you ever have any discussions at any

20     time with Dawn Goddard concerning her lawsuit against

21     Kristopher Bond?

22             MR. GALLEGOS:  Same objection.

23             THE WITNESS:  No, I did not.

24     BY MR. UNGAR:

25         Q.  Have you ever had any discussions in person

143

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                   2/20/2016

1    or by telephone with Dawn Goddard concerning Kristopher
2    Bond?
3            MR. GALLEGOS:  Objection.  Compound.  Form.
4            THE WITNESS:  Yeah, I've talked to her about
5    Kristopher before.
6    BY MR. UNGAR:
7        Q.  Since you've left your employment at
8    Pinnacle Logistics, Inc., have you had any conversation
9    with Dawn Goddard concerning Kristopher Bond?
10           MR. GALLEGOS:  Same objection.
11           THE WITNESS:  Yeah, we talked about Kristopher
12   before.
13   BY MR. UNGAR:
14       Q.  Since you've left your employment at
15   Pinnacle Logistics, Inc., when did you have a
16   conversation with Dawn Goddard concerning Kristopher
17   Bond?
18           MR. GALLEGOS:  Objection.  Asks for a memory
19   test.  Form.
20           THE WITNESS:  It was when I had told her about
21   like the FTC and everything like that.  She was just --
22   I don't know, she was just talking about -- she
23   basically said how hard it was working with them at
24   Pinnacle Logistics.
25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Stanley

FTC v. Bunzai Media Group, Inc., et al.                    2/20/2016

1    BY MR. UNGAR:

2         Q.  So was the telephone conversation -- and

3    that was a telephone conversation; is that correct?

4         A.  That's right.

5         Q.  Was that telephone conversation, did that

6    occur in the same time period as your telephone

7    conversations with the FTC lawyers who are here today?

8         MR. GALLEGOS:  Objection.  Form.  Compound.

9         THE WITNESS:  Yeah.

10   BY MR. UNGAR:

11        Q.  Subsequent to that March, April 2015

12   telephone conversation you had with Dawn Goddard about

13   Kristopher Bond, have there been any subsequent

14   conversations, in person or by telephone, that you've

15   had with Dawn Goddard concerning Kristopher Bond?

16        A.  No.

17        MR. UNGAR:  I have nothing further.

18

19                      EXAMINATION

20   BY MR. GALLEGOS:

21        Q.  Just a couple of questions, Mr. Stanley.  Do

22   you recall when was the last time you spoke to the

23   Federal Trade Commission before today?

24        A.  Before today?  Just a few weeks ago just in

25   regards to the deposition.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                              2/20/2016

1         Q.   And is the testimony you provided today
2    truthful and accurate to the best of your recollection?
3         A.   Yes.
4         Q.   And was the information that you provided to
5    the FTC during the conversations you mentioned to
6    Mr. Ungar truthful and accurate?
7         A.   Yes.
8         MR. GALLEGOS:   We're done.
9         Just for the record the witness will be -- for
10   the record the court reporting service will provide the
11   witness with a copy of the transcript if he desires to
12   review it to determine if there's any corrections to be
13   added with it consistent with the Federal Rules.   The
14   Federal Trade Commission, pursuant to the local rules
15   of the Central District of California will keep the
16   original transcript.
17        My understanding is For The Record will provide
18   the witness with an electronic copy that they can
19   review but not print or download unless they wanted to
20   purchase it.   Counsel for the defendants, Mr. Ungar,
21   will be provided the opportunity to purchase a
22   transcript from the court reporting service should his
23   clients desire.   Anything else, Robert?   Okay.
24        MR. UNGAR:   I would offer a stipulation but you
25   refused every stipulation that's been offered.

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1          MR. GALLEGOS:   The court reporter will close out

 2   the hearing.

 3                (Ending time 12:34 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

147

Stanley

FTC v. Bunzai Media Group, Inc., et al.                                    2/20/2016

```
 1   STATE OF CALIFORNIA          )

 2                                )

 3   COUNTY OF LOS ANGELES        )

 4

 5        I, ANDREW STANLEY, hereby certify under penalty

 6   of perjury under the laws of the State of California

 7   that the foregoing is true and correct.

 8        Executed this _____day of

 9   _____, 2016 at

10   _____, California.

11

12

13        _____

14        ANDREW STANLEY

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, JEANINE CURCIONE, C.S.R. NO. 10223, RPR, in

 4     and for the State of California, do hereby certify:

 5          That prior to being examined, the witness named

 6     in the foregoing deposition was by me duly sworn to

 7     testify the truth, the whole truth and nothing but the

 8     truth and that the witness reserved the right of

 9     signature;

10          That said deposition was taken down by me in

11     shorthand at the time and place therein named, and

12     thereafter reduced to typewriting under my direction,

13     and the same is a true, correct and complete transcript

14     of said proceedings.

15          I further certify that I am not interested in

16     the event of the action.

17          Witness my hand this 4th day of March, 2016.

18

19                    _____
                      Certified Shorthand
20                    Reporter for the
                      State of California
21

22

23

24

25
```