1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5    FEDERAL TRADE COMMISSION  )

6              Plaintiff       )

7       v.                     ) No. CV 15-4527-GW(PLAx)

8    BUNZAI MEDIA GROUP, INC., )

9    et al.,                   )

10             Defendants.      )

11

12

13

14                             Wednesday, February 17, 2016

15

16                             10877 Wilshire Boulevard

17                             Suite 700

18                             Los Angeles, California

19

20

21

22             The above-entitled matter came on for

23   deposition, pursuant to Notice, at 9:02 a.m.

24

25

2

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4

 5   FEDERAL TRADE COMMISSION   )

 6          Plaintiff           )

 7     v.                       ) No. CV 15-4527-GW(PLAx)

 8   BUNZAI MEDIA GROUP, INC., )

 9   et al.,                    )

10          Defendants.         )

11

12

13

14

15             DEPOSITION OF NASTASSIA YALLEY, taken on

16   behalf of the Federal Trade Commission, at

17   10877 Wilshire Boulevard, Suite 700, Los Angeles,

18   California, commencing at 9:02 a.m., and concluding

19   at 3:07 p.m., on Wednesday, February 17, 2016,

20   pursuant to Notice, before CHRISTINA KIM-CAMPOS,

21   CSR No. 12598, a Certified Shorthand Reporter, in

22   and for the State of California.

23

24                              ***

25
```

3

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

```
 1    A P P E A R A N C E S

 2

 3    For the Federal      U.S. FEDERAL TRADE COMMISSION

 4    Trade Commission:    REID TEPFER, ESQ.

 5                         1999 Bryan Street

 6                         Suite 2150

 7                         Dallas, Texas  75201-6808

 8                         (214) 979-9383

 9                         rtepfer@ftc.gov

10

11                         U.S. FEDERAL TRADE COMMISSION

12                         LUIS H. GALLEGOS, ESQ.

13                         1999 Bryan Street

14                         Suite 2150

15                         Dallas, Texas 76201-6808

16                         (214) 979-9383

17                         lgallegos@ftc.gov

18

19    For the Defendants   CROSSWIND

20    Alon Nottea and      ROBERT M. UNGAR, ESQ.

21    Roi Reuveni:         (Via Telephone)

22                         2190 North Beverly Glen Blvd.

23                         Los Angeles, California  90077

24                         (818) 646-4750

25                         rmu@crosswindlaw.com
```

4

Yalley

FTC v. Bunzai Media Group, Inc., et al.                               2/17/2016

```
 1    A P P E A R A N C E S (Cont'd.)

 2

 3    For the Defendants    LAW OFFICE OF JEFFREY S. BENICE

 4    Igor Latsanovski      JEFFREY S. BENICE, ESQ.

 5    and CalEnergy, Inc.   (Via Telephone)

 6                          3080 Bristol Street

 7                          Suite 630

 8                          Costa Mesa, California  92626

 9                          JSB@JeffreyBenice.com

10

11

12    Also Present:         Alon Nottea, Via Telephone

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
1                    I   N   D   E   X

2

3   WITNESS                 EXAMINATION              PAGE

4   Nastassia Yalley     By Mr. Tepfer              7

5   Afternoon Session                         140, 198

6                        By Mr. Ungar              177

7

8   DEPOSITION EXHIBITS              INITIAL REFERENCE

9   Yalley Deposition Exhibit No.  86            41

10   Yalley Deposition Exhibit No. 165            80

11   Yalley Deposition Exhibit No.  66           105

12   Yalley Deposition Exhibit No.  67           107

13   Yalley Deposition Exhibit No.  68           115

14   Yalley Deposition Exhibit No.  69           117

15   Yalley Deposition Exhibit No.  71           119

16   Yalley Deposition Exhibit No.  77           121

17   Yalley Deposition Exhibit No.  73           126

18   Yalley Deposition Exhibit No.  74           127

19   Yalley Deposition Exhibit No.  75           127

20   Yalley Deposition Exhibit No.  76           131

21   Yalley Deposition Exhibit No.  78           133

22   Yalley Deposition Exhibit No.  79           134

23   Yalley Deposition Exhibit No.  80           135

24   Yalley Deposition Exhibit No.  81           140

25   Yalley Deposition Exhibit No.  82           143
```

6

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    DEPOSITION EXHIBITS                    INITIAL REFERENCE

 2    (Continued)

 3    Yalley Deposition Exhibit No.  83              145

 4    Yalley Deposition Exhibit No.  84              147

 5    Yalley Deposition Exhibit No.  88              148

 6    Yalley Deposition Exhibit No.  91              150

 7    Yalley Deposition Exhibit No.  92              153

 8    Yalley Deposition Exhibit No.  93              159

 9    Yalley Deposition Exhibit No.  94              162

10    Yalley Deposition Exhibit No.  95              164

11    Yalley Deposition Exhibit No.  96              166

12    Yalley Deposition Exhibit No.  97              167

13    Yalley Deposition Exhibit No.  98              168

14

15

16                   INFORMATION REQUESTED

17

18                         None.

19

20

21        QUESTIONS INSTRUCTED NOT TO ANSWER

22                         None.

23

24

25
```

7

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1                  LOS ANGELES, CALIFORNIA
 2               WEDNESDAY, FEBRUARY 17, 2016
 3                       9:02 A.M.
 4
 5                  NASTASSIA YALLEY,
 6          called as a witness by and on behalf of
 7          the Plaintiff, being first duly sworn,
 8          was examined and testified as follows:
 9
10          MR. TEPFER:  And, Robert, just to check, are
11   you there?
12          MR. UNGAR:  Yeah.  Robert Ungar.
13
14                      EXAMINATION
15   BY MR. TEPFER:
16      Q.   Good morning, Ms. Yalley.  My name is Reid
17   Tepfer, and this is Luis Gallegos.  We're attorneys
18   with the Federal Trade Commission.  We represent the
19   FTC in FTC vs. BunZai Media Group, pending in the
20   Central District of California.
21      A.   Uh-huh.
22      Q.   First I should ask, do you understand that
23   you're under the same oath as if you were in the
24   courtroom?
25      A.   Yes.
```

8

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                  2/17/2016

1        Q.    Okay.  And I'm going to assume that you

2     understand all the questions that I ask you, unless

3     you tell me that you don't understand; is that okay?

4        A.    Okay.

5        Q.    And sometimes an attorney, we have one

6     attorney on the phone today, he may object.

7     Afterwards we ask that you answer the question.

8        A.    Okay.

9        Q.    So first, is there anything that would

10    prevent you from thinking clearly and testifying

11    truthfully today?

12       A.    No.

13       Q.    All right.  And if at any time you need to

14    take a break, just let me know.

15       A.    Okay.

16       Q.    Okay.  Have you ever had your deposition

17    taken?

18       A.    No.

19       Q.    Okay.  And have you spoken with -- since the

20    filing of this lawsuit in June of 2015, have you

21    spoken with any of the individual defendants in this

22    matter?

23       A.    Not regarding this, no.  I saw them at a

24    wedding --

25       Q.    Okay.

9

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1      A.    -- and we hugged and that was it.
 2      Q.    Sure.
 3      A.    Yeah.
 4      Q.    Who did you see?
 5      A.    Doron, Alon, and Roi.
 6      Q.    Okay.
 7      A.    Yeah.
 8      Q.    Well, I want to talk a little bit about your
 9  background.  Do you have any post-high school
10  education?
11      A.    Uh-huh.  Yes.
12      Q.    Where did you go to college?
13      A.    Loyola Marymount University, and then I went
14  to UCLA to get my certificate in accounting.
15      Q.    Okay.  What did you study at Loyola
16  Marymount?
17      A.    Marketing and business law.
18      Q.    And you said at UCLA you got a certificate
19  in accounting?
20      A.    Yes.
21      Q.    Okay.  And when did you graduate?
22      A.    LMU, 2006.
23      Q.    And what about UCLA?
24      A.    UCLA, I think I finished the program in
25  2010.  I have to think about that.
```

10

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1      Q.   Sure.

 2      A.   Yeah.

 3      Q.   What was your first job after graduating

 4   from UCLA?

 5      A.   Gorilla Nation Media.  Oh, wait.  Not

 6   graduating UCLA.  Sorry.  Go back.

 7      Q.   Sure, sure.

 8      A.   After LMU, you mean?

 9      Q.   Sure.  How about that?

10      A.   Yeah.

11      Q.   Okay.  You said --

12      A.   Gorilla Nation Media.  It was a marketing

13   company.

14      Q.   Okay.  And what about after that?

15      A.   Myspace.

16      Q.   And how long were you at Myspace?

17      A.   Almost a year.

18      Q.   What year did you leave Myspace?

19      A.   Oh, I think 2007.

20      Q.   Okay.  And where did you work after Myspace?

21      A.   A few different places, but I -- a place

22   called DEI Worldwide.  Yeah.  And then some other

23   places, but they didn't last long.

24      Q.   Mm-hmm.

25      A.   Yeah.  And then this job eventually.
```

11

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1      Q.    And by "this job," BunZai Media Group?

2      A.    Uh-huh.   Yeah.

3      Q.    And how long did you work at BunZai Media

4   Group?

5      A.    For four years, I believe.

6      Q.    And where did you work after BunZai Media

7   Group?

8      A.    Engage BDR.

9      Q.    And while you were working at BunZai Media

10   Group, were you also employed anywhere else?

11     A.    No.

12     Q.    And the -- so what were the years that you

13   were employed at BunZai Media Group?

14     A.    2009 to 2013.   Yeah.

15     Q.    And how did you come to be working for

16   BunZai Media Group?

17     A.    Craigslist.

18     Q.    Oh, it was a posting?

19     A.    Yeah.

20     Q.    And then --

21     A.    But technically, that wasn't the company.

22   They didn't become BunZai until, like, 2010, so --

23     Q.    Oh.   What was the company at the time?

24     A.    I forgot what it was called, but they were

25   working with someone else, so -- yeah.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      Q.    And what was your position at BunZai Media

2   Group?

3      A.    Hmm.  It kind of changed.  Do you want title

4   or job duties?

5      Q.    Well, first let's talk about job titles.

6   Did you have multiple job titles there?

7      A.    Yeah, they changed.  They didn't really hold

8   any merit, though.  I mean -- so, like, Operations

9   Manager, Marketing -- so Affiliate Manager.  So --

10     Q.    Okay.  Can you think of any other ones?

11     A.    I don't know.  Maybe Director of Operations

12  or something.

13     Q.    And you said that the company was initially

14  called something other than BunZai Media Group;

15  correct?

16     A.    Yeah.

17           MR. UNGAR:  Objection.  Objection as to the

18  form of the question.  It's vague and ambiguous,

19  misstates prior testimony of the witness, it's

20  argumentative.

21  BY MR. TEPFER:

22     Q.    Did the company ever change names from

23  BunZai Media Group to anything else while you were

24  there?

25     A.    Yes.

13

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1       Q.    What did it change its name to?

2       A.    Well, sorry.  I'm confused by that.  Like

3    they started a new company.  I don't think --

4       Q.    Okay.

5       A.    -- they changed the name.

6       Q.    What was the new company?

7             MR. UNGAR:  Move to strike.  Move to strike

8    as nonresponsive.

9    BY MR. TEPFER:

10      Q.    Okay.  What was the name of the new company

11   that they started?

12      A.    Media Urge.

13      Q.    And who started it?

14      A.    I don't know.  I think Alon.

15      Q.    So I just want to talk for a moment about

16   your -- people that may have been your coworkers.

17      A.    Do you want a cough drop?

18      Q.    Sure.  Thank you.

19      A.    Yeah.

20      Q.    Sorry I'm coughing.

21      A.    No, it's okay.

22      Q.    So who were your supervisors at BunZai Media

23   Group?

24      A.    Khristopher and Alon.

25      Q.    And is that Khristopher Bond?

14

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1       A.   Yes.

2       Q.   And Alon Nottea?

3       A.   Yes.

4       Q.   I want to see if other people also worked

5   with you.

6            Did Paul Medina ever work with you at BunZai

7   Media Group?

8       A.   Yes, he did.

9       Q.   What was his position there?

10      A.   Khristopher brought him in as an intern, at

11  first, and then he kind of moved into a different

12  role.  He did internal media buying, merchant

13  accounting, and then other things.  I wouldn't know.

14      Q.   Sure, sure.

15           What about --

16           MR. UNGAR:  Counsel, let the record reflect

17  that Alon Nottea is present.

18           MR. TEPFER:  Okay.  Thank you.

19           MR. UNGAR:  Okay.

20  BY MR. TEPFER:

21      Q.   What about Alan Argaman?

22      A.   I don't know.

23           MR. TEPFER:  Oh, sorry.  We have someone

24  calling in here.  If you can hold real quick,

25  Robert.

Yalley
FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              MR. GALLEGOS:  Do you want to go off the
 2    record?
 3              MR. TEPFER:  Yeah.  If we could go off the
 4    record real quick.
 5              (Jeffrey Benice joins the proceedings.)
 6              MR. TEPFER:  All right.  We can go back on
 7    the record.
 8              Would you mind reading what the last
 9    question was.
10              (The previous question and answer
11              were read back by the court reporter
12              as follows:
13                 "QUESTION:  What about Alan
14              Argaman?"
15                 "ANSWER:  I don't know.)
16    BY MR. TEPFER:
17       Q.   What about Roi Reuveni; was he a coworker of
18    yours at BunZai Media Group?
19       A.   Yes.
20       Q.   Do you recall what Roi Reuveni's position
21    was at BunZai Media Group?
22       A.   He was in charge of Customer Service.
23       Q.   Anything else?
24       A.   I can't remember.
25       Q.   Do you recall when he was hired for that
```

16

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    Customer Service position?

2        A.    No, I don't.

3        Q.    Was Roi Reuveni employed by BunZai Media

4    Group the entire time that you worked there?

5              MR. UNGAR:  Objection; vague and ambiguous,

6    calls for speculation, lacks foundation.

7    BY MR. TEPFER:

8        Q.    So you said no.  Does that mean that he --

9    was he hired after you?

10       A.    Yes.

11             MR. UNGAR:  Objection as to the form of the

12   question, vague and ambiguous.

13   BY MR. TEPFER:

14       Q.    And did he, was he still, to your knowledge,

15   employed at BunZai Media Group when you left the

16   company?

17       A.    Yes.

18       Q.    What about Doron Nottea; was he a coworker

19   of yours at BunZai Media Group?

20       A.    Not -- no, not technically.

21       Q.    When you say "not technically," what do you

22   mean?

23             MR. UNGAR:  Objection as to the form of the

24   question.  It's vague and ambiguous.

25             THE WITNESS:  Just don't answer?

17

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                2/17/2016

1   BY MR. TEPFER:

2        Q.   Yeah, you can go ahead.

3        A.   He wasn't an employee.

4        Q.   But did he do any work for BunZai Media

5   Group?

6             MR. UNGAR:  Objection as to the form of the

7   question, vague and ambiguous, calls for

8   speculation, lacks foundation.

9             THE WITNESS:  Yes.

10  BY MR. TEPFER:

11       Q.   I'm sorry.  Could you repeat the answer?

12       A.   Yes.

13       Q.   What sort of work did he do for BunZai Media

14  Group?

15       A.   Accounting.

16             MR. UNGAR:  Objection as to the form of the

17  question, calls for speculation, lacks foundation.

18  BY MR. TEPFER:

19       Q.   Can you repeat the answer?

20       A.   Accounting.

21       Q.   And when you say "accounting," what do you

22  mean?

23       A.   Consulting, I guess.

24       Q.   And what period of time did Doron do this

25  accounting work, consulting for BunZai Media Group?

18

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      A.    I guess the whole -- at least the whole time

2   I was there.

3      Q.    And when you say "consulting," what do you

4   mean by that?  What sort of things did Doron consult

5   about?

6      A.    I'm not sure.  I can't say.  I wasn't

7   involved in every conversation.

8      Q.    Were --

9          MR. UNGAR:  Move to strike.  Move to strike

10   all prior testimony with regard to Doron and

11   accounting and consulting on the grounds that the

12   witness lacks personal knowledge, it's all

13   speculation, and it lacks foundation.

14   BY MR. TEPFER:

15     Q.    And so just speaking about any conversations

16   that you may have been a part of, what sort of tasks

17   do you know Doron to have performed for BunZai Media

18   Group?

19     A.    I don't -- I can't say.

20     Q.    You can't recall any tasks that Doron did?

21     A.    I just said accounting.

22         MR. UNGAR:  Objection.  Objection as to the

23   form of the question, asked and answered.  Witness

24   just testified she can't say, doesn't know.  And

25   it's argumentative.

19

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    BY MR. TEPFER:

2        Q.   Can you repeat your answer?

3        A.   I -- I can't say.

4        Q.   So talking about accounting, does that

5    include -- as far as accounting, does that include

6    calculations of Bunzai Media Group's profits, for

7    example?

8             MR. UNGAR:  Objection as to the form of the

9    question, calls for speculation --

10            THE WITNESS:  Maybe.

11            MR. UNGAR:  -- lacks foundation.

12   BY MR. TEPFER:

13       Q.   Sorry.  Just to clarify, if you could wait

14   'til after the attorney completes his objection to

15   answer.

16       A.   Oh, okay.

17            Maybe.

18       Q.   What about Motti Nottea; was he ever a

19   coworker of yours at --

20       A.   No.

21       Q.   Okay.  And Alon Nottea?

22       A.   He was my boss.

23       Q.   Okay.  I want to talk a little bit about

24   BunZai Media Group's business.  Do you recall what

25   BunZai Media Group's chief source of revenue was

20

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1   during the time that you worked there?

2        A.   AuraVie SkinCare.

3        Q.   And do you recall how those products were

4   sold?

5        A.   Yes.  Online.

6        Q.   And do you recall that they were sold by

7   risk free trial?

8        A.   Yes.

9        Q.   I want to talk about a company called

10  Pinnacle Logistics, Inc.

11           Do you know that company?

12       A.   I've heard of it, yes.

13       Q.   Where did you hear about it?

14       A.   That was, like, the Customer Service

15  company.

16       Q.   And it was the Customer Service company for

17  what?

18       A.   For AuraVie.

19       Q.   Do you know where it was located?

20       A.   In the same building.

21       Q.   And do you know what DSA Holdings, Inc., is?

22       A.   A corporation.

23       Q.   Do you know what that corporation's business

24  is or was?

25       A.   No.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1      Q.    What about Zen Mobile Media, Inc.; do you

2    know what that company is?

3      A.    Yeah.  They're all corporations that were,

4    had merchant accounts.

5      Q.    So those companies I'm describing, they had

6    merchant accounts?  What do you mean by that?

7      A.    They were -- they had -- I don't know how

8    else to explain it.  They had -- I don't know.

9    They -- I don't -- I don't know how to explain it.

10    They had merchant accounts under them, so --

11      Q.    So --

12      A.    -- in order to process money.

13      Q.    So were these companies, DSA Holdings and

14    Zen Mobile Media, were those companies owned by

15    BunZai Media Group, Inc.?

16      A.    No, I don't think so.

17      Q.    Do you know who owned Zen Mobile Media,

18    Inc.?

19      A.    I forgot.

20      Q.    Do you know if Alon Nottea had any

21    association with Zen Mobile Media, Inc.?

22      A.    In what --

23           MR. UNGAR:  Objection as to the form of the

24    question.  It's vague and ambiguous.

25    ///

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    BY MR. TEPFER:

2        Q.   Do you know if Alon Nottea ever worked for

3    Zen Mobile Media, Inc.?

4        A.   I don't know.

5             MR. UNGAR:  Objection as to the form of the

6    question, it calls for speculation and lacks

7    foundation, it's vague and ambiguous.

8    BY MR. TEPFER:

9        Q.   You can go ahead.

10       A.   No, I don't know.  I don't.

11       Q.   And when you said that they, they had

12   merchant accounts under their name, what were these

13   merchant accounts used for?

14       A.   For processing money --

15            MR. UNGAR:  Objection.

16            THE WITNESS:  -- for sales.

17            MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, it lacks

19   foundation, and it calls for speculation.

20   BY MR. TEPFER:

21       Q.   You can go ahead.

22       A.   Processing money.

23       Q.   Processing money from the sale of products?

24       A.   Yes.

25       Q.   And sale of what products?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                            2/17/2016

 1      A.    AuraVie SkinCare.

 2      Q.    Did you ever do any work for Zen Mobile

 3   Media, Inc.?

 4      A.    No.

 5            MR. UNGAR:  Objection as to the form of the

 6   question.  It's vague and ambiguous.

 7   BY MR. TEPFER:

 8      Q.    How do you know that Zen Mobile Media, Inc.,

 9   had a merchant account that was used to process

10   AuraVie SkinCare product sales?

11      A.    I -- I just know.  I don't know.

12      Q.    Did you ever -- did someone tell you that?

13      A.    No.  We all applied for those merchant

14   accounts, so --

15      Q.    Who is -- when you say "we all," who are you

16   referring to?

17      A.    As a company.

18      Q.    So BunZai Media Group applied for those

19   merchant accounts?

20      A.    No, not BunZai Media Group.  No, not as

21   BunZai Media Group.  I guess I need to understand.

22   Do you -- like, you know, how this works, you apply

23   for a merchant account under a different

24   corporation, so --

25            MR. UNGAR:  Move -- move to strike as

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1    nonresponsive.

2    BY MR. TEPFER:

3        Q.    I'd like to understand what you mean by

4    that.  So you're telling me that -- you're referring

5    to the sale of, I guess, continuity products?

6        A.    Any products you would need a merchant

7    account for selling online.

8        Q.    So to sell online, you have to have a

9    merchant account?

10       A.    Yes.

11       Q.    And I guess in the sale of AuraVie products,

12   you all had multiple merchant accounts?

13       A.    Yes.

14       Q.    And to sell these -- sorry.  To get

15   additional merchant accounts, you need additional

16   corporations; correct?

17       A.    Yes.

18       Q.    And so there were -- so who -- who told you

19   that multiple merchant accounts were needed for the

20   sale of these products?

21       A.    I guess --

22            MR. UNGAR:  Objection.  Objection as to the

23   form of the question, misstates the prior testimony

24   of the witness, it's leading, it's argumentative,

25   lacks foundation, and calls for speculation.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    BY MR. TEPFER:

2        Q.    You can go ahead.

3        A.    My boss.

4        Q.    Your boss being?

5        A.    Alon, Khris.

6        Q.    What was the explanation that you were given

7    for why multiple merchant accounts were needed?

8        A.    To process more money.

9        Q.    So was there a limit on the amount that

10   could be processed?

11       A.    Yeah.  Most of them had a limit, like -- I

12   don't know.

13       Q.    And --

14       A.    Depending on your credit, they would give

15   you a certain amount, or something like that.

16       Q.    So these additional merchant accounts, do

17   you know -- well, I guess just to sort of clarify,

18   the companies that we're talking about, if we could

19   go to -- I think it's -- I think this probably might

20   be helpful.  Hmm.  Well, I guess I'll just -- if I

21   could go through a few company names, and if you can

22   let me know if the companies that you understood to

23   have been, I guess, used to get these merchant

24   accounts, if you could let me know if this is one of

25   those companies or not.

26

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1          First one is All Star Beauty Products, Inc.

2     Do you know if that had any merchant accounts used

3     for processing AuraVie SkinCare sales?

4          A.   Yes.

5               MR. UNGAR:   Objection as to the form of the

6     question.   It's vague and ambiguous, calls for

7     speculation, lacks foundation.

8     BY MR. TEPFER:

9          Q.   And how do you know that?

10         A.   We -- I -- I just work there.   I don't

11    remember.

12         Q.   So you learned this from your time

13    working --

14         A.   Yes.

15         Q.   -- at BunZai?

16              What about Shalita Holdings, Inc.?

17         A.   Yes.

18         Q.   What about DMA Media Holdings, Inc.?

19         A.   Yes.

20              MR. UNGAR:   Same objection.

21    BY MR. TEPFER:

22         Q.   What about Merchant Leverage Group, Inc.?

23              MR. UNGAR:   I'm going to interpose a

24    standing objection to all these questions about the

25    companies and whether or not they have a merchant

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1    account on the grounds that the witness lacks
 2    foundation and -- and it calls for speculation and
 3    the question is vague and ambiguous.
 4    BY MR. TEPFER:
 5        Q.   Okay.  And the -- sorry, I didn't hear your
 6    answer for Merchant Leverage Group.
 7        A.   I'm not -- I can't remember.
 8        Q.   Okay.  What about USM Products, Inc.?
 9        A.   Don't know what that is.
10        Q.   What about Kai Media, Inc.?
11        A.   Yes.
12        Q.   What about CalEnergy, Inc.?
13        A.   Not sure.
14        Q.   What about Adageo, LLC?
15        A.   Not sure.
16        Q.   Do you know, what about Media Urge, Inc.?
17        A.   I don't think so.  Not sure.
18        Q.   And what about SBM Management, Inc.?
19        A.   I think so.
20        Q.   What about AMD Financial Network, Inc.?
21        A.   Yes.
22        Q.   And Heritage Alliance Group, Inc.?
23        A.   Yes.
24        Q.   Safehaven Ventures, Inc.?
25        A.   Yes.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1       Q.    What about Agoa Holdings, Inc.?

2       A.    Yes.

3       Q.    And Lifestyle Media Brands, Inc.?

4       A.    Yes.

5       Q.    So those companies that we just discussed

6    that you said yes to, those companies were opened

7    for the purpose of processing these skin care

8    payments?  Do you know, are you aware of -- as to

9    any of those, do you know who owned any of those

10   companies?

11      A.    I can't remember exactly.

12      Q.    Do you know if they were all owned by one

13   person or multiple people?

14      A.    Different people.

15      Q.    So I mentioned CalEnergy, Inc., earlier.  Do

16   you know what that company was?

17      A.    Igor's.  One of his companies.

18      Q.    Do you know what that company did?

19      A.    No.

20      Q.    What about SBM Management, Inc.; do you know

21   what that company is?

22      A.    For a merchant account.

23      Q.    So it was your impression that that company

24   just exists for processing leads?

25            MR. UNGAR:  Objection.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1              THE WITNESS:  Yes.

2              MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous.

4              THE WITNESS:  Yes.

5    BY MR. TEPFER:

6        Q.    Did you ever work for SBM Management, Inc.?

7        A.    No.

8        Q.    Did you ever have a SBM Management, Inc.,

9    email address?

10       A.    No.

11       Q.    To talk about BunZai Media Group a little

12   bit more, did that company have various departments?

13       A.    Yeah, I guess so.

14       Q.    Do you recall what any of those departments

15   were?

16       A.    Like Customer Service, Chargebacks.

17       Q.    Do you know who the manager was of the

18   Chargebacks Department while you were there?

19       A.    No.

20             MR. UNGAR:  Objection as to the form of the

21   question, assumes facts not in evidence.

22             THE WITNESS:  I don't remember.

23             MR. UNGAR:  Counsel, could you -- do you

24   need a break, Counsel, because you keep coughing

25   into the microphone and it makes it very difficult

30

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    to hear.

2              MR. TEPFER:  No, I'm good, thank you.

3    BY MR. TEPFER:

4        Q.   Did you, while you were at BunZai Media

5    Group, did you help prepare any of the merchant

6    account applications for any of these other entities

7    that we just discussed?

8        A.   Yes.

9              MR. UNGAR:  Objection as to the form of the

10   question, vague and ambiguous.

11   BY MR. TEPFER:

12       Q.   Who directed you to fill out those

13   applications?

14       A.   My bosses.

15       Q.   And just to be more specific, could you name

16   which individuals?

17       A.   Alon and Khris.

18       Q.   Did Doron ever direct you to fill out any of

19   this?

20       A.   I don't remember.

21       Q.   Are you aware of any of the entities that

22   sold AuraVie products ever having any issues with

23   high chargebacks?

24             MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous, lacks

31

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    foundation, calls for speculation.

2            THE WITNESS:  Not particularly.

3    BY MR. TEPFER:

4        Q.   While you were at BunZai Media Group, did

5    any of your supervisors ever discuss ways to lower

6    chargeback percentages?

7            MR. UNGAR:  Objection as to the form of the

8    question.  It assumes facts not in evidence, it's

9    vague and ambiguous.

10           THE WITNESS:  I'm sure it was brought up.

11           MR. UNGAR:  Move to strike as nonresponsive.

12   BY MR. TEPFER:

13       Q.   But you don't -- do you recall any specific

14   conversations about that issue?

15       A.   No.

16           MR. UNGAR:  Objection as to the form of the

17   question, and it's vague and ambiguous.

18   BY MR. TEPFER:

19       Q.   What about consumer complaints?  Who was --

20   do you know who was tasked at BunZai Media Group

21   with, I guess, reviewing consumer complaints?

22           MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous temporally.

24           THE WITNESS:  Not exactly.

25   ///

Yalley
FTC v. Bunzai Media Group, Inc., et al.                                2/17/2016

1   BY MR. TEPFER:

2       Q.   Do you know if at any point while you were

3   at BunZai Media Group, if there was a protocol for

4   responding to, I guess, Attorney General complaints?

5       A.   Yes, there was.

6       Q.   Do you know who drafted that protocol?

7       A.   I think originally it was something that I

8   worked on with Khris --

9       Q.   Mm-hmm.

10      A.   -- when it was very small, and after that

11  I'm not sure who it went to.  It wasn't my

12  responsibility.

13      Q.   Sorry.  Could you repeat that?

14      A.   I don't -- I -- we came up with an original

15  protocol.  I'm not sure how it was used though.

16      Q.   I want to talk a little bit about Doron

17  Nottea.

18           Just to be clear, did you work for BunZai

19  Media Group before Doron Nottea?

20           MR. UNGAR:  Objection as to the form of the

21  question.  It's vague and ambiguous.

22           THE WITNESS:  I don't think he worked for

23  them.

24  BY MR. TEPFER:

25      Q.   Sorry.  Do you know if Doron Nottea worked

33

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    for Pinnacle Logistics, Inc.?

2        A.   No, I don't.

3            MR. UNGAR:   Objection.   Objection as to the

4    form of the question.   It's vague and ambiguous, it

5    lacks foundation, and it calls for speculation.

6    BY MR. TEPFER:

7        Q.   While you were at BunZai Media Group, did

8    you ever train Doron Nottea about how to pay the

9    company's invoices?

10       A.   No.

11       Q.   Sorry.   So you laughed there, and I just was

12   wondering how come you laughed.

13       A.   Just, no.

14           MR. UNGAR:   Objection as to the form of the

15   question.   It's vague and ambiguous.

16   BY MR. TEPFER:

17       Q.   Did he ever train you on anything about

18   BunZai Media Group?

19       A.   No.

20           MR. UNGAR:   Objection as to the form of the

21   question.   It's vague and ambiguous.

22   BY MR. TEPFER:

23       Q.   And did he -- did you ever prepare reports

24   concerning BunZai Media Group's expenses for Doron

25   Nottea?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1      A.   Yes.

 2      Q.   What sort of reports did you prepare?

 3      A.   Accounting reports, profit and loss reports,

 4  bank account statement reports, where money went.

 5      Q.   Do you know why Doron Nottea -- or why --

 6  sorry.

 7      A.   They weren't for him specifically, no.

 8      Q.   What --

 9      A.   For the company.

10      Q.   Sure.

11           So those were prepared for BunZai -- you

12  said prepared for the company, and the company is?

13      A.   Meaning, like, Alon and Khris, so they would

14  know what happened to --

15           MR. UNGAR:  Move -- objection as to the form

16  of the question.  It's vague and ambiguous, it

17  misstates the prior testimony.  Move to strike the

18  response as nonresponsive.

19  BY MR. TEPFER:

20      Q.   And who asked you to prepare those reports?

21      A.   Again, my bosses.  Just a part of the job.

22  Also, Igor too.

23      Q.   Igor Latsanovski?

24      A.   Yes.

25      Q.   Do you -- did you ever send those reports to
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                         2/17/2016

1     Igor Latsanovski?

2        A.    Yes.

3        Q.    Do you know if he reviewed those reports?

4        A.    Yes, he did.

5        Q.    How do you know that?

6        A.    Because he would sit down next to me and we

7     would go through them, every line item.

8        Q.    Oh, really?

9        A.    (Witness shakes head up and down.)

10       Q.    Was he, I guess -- did he pay -- well, I

11    guess, just to talk about Igor Latsanovski a bit

12    more since you brought him up, did he work at BunZai

13    Media Group?

14       A.    He didn't work there, no.

15            MR. UNGAR:  Objection as to the form of the

16    question.  It's vague and ambiguous.

17            Counsel, you've got to define when you say

18    the word "he," "him," "his," who are you referring

19    to?  You've gone from Doron Nottea -- now you're --

20    I don't know where you are.

21            MR. TEPFER:  Counsel, please --

22            MR. UNGAR:  Who are you referring to?

23            MR. TEPFER:  Counsel, please limit your

24    objections to --

25            MR. UNGAR:  My objection is it's vague and

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    ambiguous because nobody knows who "he" is.
 2    BY MR. TEPFER:
 3        Q.   So just to press onward --
 4        A.   Sorry.
 5             MR. TEPFER:  Can you -- can you read back
 6    the question.
 7             MR. UNGAR:  Same objection.
 8             (The previous question was read back
 9             by the court reporter as follows:
10             "QUESTION:  Was he, I guess --
11             did he pay -- well, I guess, just to
12             talk about Igor Latsanovski a bit
13             more since you brought him up, did he
14             work at BunZai Media Group?")
15             THE WITNESS:  No, he did not work there.
16    BY MR. TEPFER:
17        Q.   So -- but he would review, I guess, the
18    profit and loss of the company with you?
19        A.   Yes.
20             MR. UNGAR:  Objection as to the form of the
21    question.  It's vague and ambiguous, it calls for
22    speculation, lacks foundation.
23    BY MR. TEPFER:
24        Q.   Do you know of --
25             Sorry.  We're getting a little bit of echo
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                      2/17/2016

1   there.  Robert, do you have -- do you, by chance,

2   have it not muted?

3            MR. UNGAR:  I didn't understand what you

4   just said.

5            MR. TEPFER:  Sorry.  We're getting a little

6   bit of echo from the speaker.  I was wondering if

7   you might be able to have it on mute until you have

8   your objection, then un-mute it for the objection,

9   if that would be possible.  Or if it's Jeffrey, if

10  Jeffrey is still here.

11           MR. UNGAR:  It has nothing to do with my

12  microphone, Counsel.

13           MR. BENICE:  I'm on the line.  This is Jeff

14  Benice.  I'm on the line.

15           MR. TEPFER:  Okay.  Jeffrey, would you mind,

16  if it's okay, would you be able to mute it

17  temporarily, and then when you object, un-mute it,

18  just because I think we're getting a little bit of

19  echo.  I'm not sure if it's because we're on speaker

20  phone somewhere.

21           MR. BENICE:  Okay.  No problem.

22           MR. TEPFER:  Thank you, Jeffrey.

23           THE WITNESS:  Can I ask who Jeffrey is?

24  BY MR. TEPFER:

25      Q.   Sorry.  Jeffrey Benice is counsel for Igor

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    Latsanovski and CalEnergy Group.

2        A.   Okay.  And Robert?

3        Q.   And Robert Ungar is counsel for Alon Nottea

4    and Roi Reuveni.

5        A.   Okay.

6             MR. UNGAR:  Alon Nottea and Roi Reuveni.

7    BY MR. TEPFER:

8        Q.   So what was 00 do you know if Igor

9    Latsanovski, while you were at BunZai Media Group,

10   did he ever assist Alon Nottea in, I guess, running

11   BunZai Media Group?

12       A.   I wouldn't know.  If they had conversations,

13   they were private.

14            MR. UNGAR:  Move to strike as nonresponsive.

15   BY MR. TEPFER:

16       Q.   Can you think of any other work that you

17   performed for BunZai Media Group that Igor

18   Latsanovski, to your knowledge, reviewed?

19       A.   No.

20       Q.   How often would Igor Latsanovski review the

21   profit/loss statements that you prepared?

22       A.   At the end of each month.

23       Q.   And for, do you recall about what time

24   period he would do that?

25       A.   Up until the time I worked there.  From -- I

39

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1    guess from the time he invested to when I stopped

2    working there.

3         Q.   Do you know who prepared the or who created

4    AuraVie, the various, I guess, the free trial

5    template website for BunZai Media Group?

6              MR. UNGAR:  Objection as to the form of the

7    question.  It's vague and ambiguous.

8              THE WITNESS:  I believe it was Victor.

9    BY MR. TEPFER:

10        Q.   Is that Victor Azal?

11        A.   Yes.

12        Q.   Do you know when Victor Azal created the

13   BunZai, or rather, the AuraVie free trial website?

14        A.   I can't remember the exact date.

15        Q.   So you mentioned that AuraVie was sold by

16   BunZai Media Group while you were there, by, I

17   guess, risk free trial offer.  Do you -- can you

18   recall --

19             MR. UNGAR:  Object.

20   BY MR. TEPFER:

21        Q.   -- if any other products were sold by BunZai

22   Media Group, by risk free trial offer, while you

23   were there?

24             MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous, it misstates

Yalley
FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

```
 1    the witness's prior testimony, and it puts words
 2    into the witness's mouth that is inappropriate.
 3              THE WITNESS:  No.
 4    BY MR. TEPFER:
 5        Q.   Do you know what Dellure is, or have you
 6    ever heard of that?
 7        A.   No, I haven't.
 8        Q.   What about Miracle Face Kit?
 9        A.   Yes.
10        Q.   What is Miracle Face Kit?
11        A.   It was a Dead Sea mud mask and another
12    product I can't remember.
13        Q.   Do you know who sold Miracle Face Kit?
14        A.   That was under BunZai.
15        Q.   Did they sell -- did BunZai sell Miracle
16    Face Kit by, I guess, continuity plan?
17        A.   Yes.
18              MR. UNGAR:  Objection as to the form of the
19    question.  It's vague and ambiguous.
20              Counsel, do you need a break?  You keep
21    coughing into the microphone and it's very difficult
22    to hear.
23              MR. TEPFER:  Robert, I'll let you know if I
24    need a break.  Thank you.
25              MR. UNGAR:  If you could, maybe just take a
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    cough drop or something.  It's very difficult to
 2    hear through all the coughing.
 3              MR. TEPFER:  I want to go to Exhibit 86.
 4              (Plaintiff's Exhibit 86 was
 5              previously marked for identification
 6              by the FTC and is attached hereto.)
 7    BY MR. TEPFER:
 8       Q.   I've now handed the witness what's been
 9    marked as Exhibit 86.
10              First, on 86-1, this is a, it appears --
11              MR. UNGAR:  Would you please identify 86-1
12    for the record?
13              MR. TEPFER:  We're getting ready to discuss
14    it, Robert.
15    BY MR. TEPFER:
16       Q.   Your email address up at the top,
17    nastassia@bunzaimediagroup.com -- or
18    bunzaimedia.com, is that your email address?
19       A.   It was when I worked there.
20              MR. UNGAR:  I'm going to object.  Could you
21    please identify the document that you are looking at
22    marked 86-1?
23              MR. TEPFER:  It's an email from Nastassia to
24    Alon Nottea on this email, and Roi at BunZai.
25              MR. UNGAR:  What is the date?
```

                                                                      42
                                    Yalley
FTC v. Bunzai Media Group, Inc., et al.                        2/17/2016

    1   BY MR. TEPFER:

    2        Q.   Do you recall sending this email?

    3        A.   No.

    4             MR. UNGAR:   Counsel, what is the date on

    5   86-1, please?

    6             MR. TEPFER:   May 1st, 2012.

    7             MR. UNGAR:   Thank you.

    8   BY MR. TEPFER:

    9        Q.   You don't recall this email?

   10        A.   No, I don't.

   11        Q.   Do you have any reason to believe you didn't

   12   draft this email?

   13        A.   No.

   14             MR. UNGAR:   Ob- --

   15   BY MR. TEPFER:

   16        Q.   Do you -- on 86-2 and 3 are some notes that

   17   were attached to this email.  Do you recall drafting

   18   these notes?

   19        A.   No.  This was almost four years ago.

   20        Q.   Sure.

   21             Would you, while you were at BunZai Media

   22   Group, would you typically draft notes after

   23   meetings with your supervisors?

   24        A.   Sometimes, yes.

   25             MR. UNGAR:   Objection as to the form of the

43

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    question.  It's vague and ambiguous.

2    BY MR. TEPFER:

3        Q.    And attached to this email is an audio file.

4    Do you recall recording a meeting around, I guess, a

5    little bit before --

6        A.    No --

7        Q.    -- this was sent?

8        A.    -- I don't.  I don't recall this at all.

9        Q.    Okay.

10       A.    But obviously, that was me.

11            MR. UNGAR:  I'm sorry.  What was the answer?

12   There was coughing going on.  Could I please have

13   the answer to the question?

14            THE WITNESS:  I said "No."

15            MR. UNGAR:  I'd like to hear it from the

16   court reporter, please.  There was coughing going

17   on.  I couldn't hear.

18            (The previous answer was read back by

19            the court reporter as follows:

20                "ANSWER:  No, I don't.  I don't

21            recall this at all.  But obviously,

22            that was me.")

23            MR. UNGAR:  Thank you very much.

24            MR. TEPFER:  I'd like to go off the record

25   for 10 minutes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1            MR. UNGAR:  I think that's a good idea,
 2    Counsel.  Try to see if you can help yourself on the
 3    coughing situation.
 4            (Recess)
 5            MR. TEPFER:  If we could go back on the
 6    record.
 7            Could you read back the last question.
 8            (The previous question was read back
 9            by the court reporter as follows:
10            "QUESTION:  And attached to this
11            email is an audio file.  Do you
12            recall recording a meeting around, I
13            guess, a little bit before this was
14            sent?")
15            MR. TEPFER:  And what was the answer?
16            (The previous answer was read back by
17            the court reporter as follows:
18            "ANSWER:  No, I don't.  I don't
19            recall this at all.  But obviously,
20            that was me.")
21    BY MR. TEPFER:
22       Q.  I'd like to play for you some of this audio
23    recording, and I have a few follow-up questions
24    about it, just as far as who is speaking and that
25    sort of thing.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

 1      A.    Okay.

 2      Q.    Let's see.  Let's give this a shot.

 3            (The recording is played:

 4            "That's the main report that I want

 5            to see.  Okay.  Average hold time

 6            report now?  Before RevGuard?  And

 7            then in a couple weeks after

 8            RevGuard?")

 9   BY MR. TEPFER:

10      Q.    Do you know whose voice that was?

11      A.    Alon.

12            MR. TEPFER:  And sorry, just to clarify, if

13   the court reporter could try to -- could we go off

14   the record real quick?

15            (A discussion was held off the record.)

16            MR. TEPFER:  If we could go back on the

17   record.

18   BY MR. TEPFER:

19      Q.    Ms. Yalley, the person you just identified,

20   Alon Nottea is speaking there; correct?

21      A.    Yes.

22      Q.    I heard mentioned something --

23            MR. GALLEGOS:  Bless you.

24            THE WITNESS:  Thank you.

25            MR. UNGAR:  Wait, wait, wait, wait, wait,

46

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    wait, wait.  Did you play a recording?

2            MR. TEPFER:  Yes.

3            MR. UNGAR:  Well, we never heard a

4    recording.

5            THE WITNESS:  Oh, God.

6            MR. UNGAR:  When was it played?

7            MR. TEPFER:  Just before you disconnected.

8    We'll replay it.

9            MR. UNGAR:  We did not hear the recording.

10           MR. TEPFER:  Yes, well --

11           MR. UNGAR:  We want to hear it.  We demand

12   to hear the recording.

13           MR. TEPFER:  Yes, we're going to replay it.

14           (The recording is played:

15            "That's the main report that I want

16            to see.  Okay.  Average hold time

17            report now?  Before RevGuard?  And

18            then in a couple weeks after

19            RevGuard?  ...let's see what we did.

20            Otherwise, who knows?")

21   BY MR. TEPFER:

22      Q.   And you identified that to be Alon Nottea;

23   correct?

24      A.   Yes.

25           MR. UNGAR:  Objection.  Objection as to the

47

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    form of the question.  Calls for an opinion.
 2    BY MR. TEPFER:
 3        Q.   And he -- I just heard mentioned RevGuard.
 4    Can you tell me, do you know what RevGuard is?
 5        A.   RevGuard, RevGuard, RevGuard.  I think it's
 6    a chargeback management thing.
 7             MR. UNGAR:  Move to strike as nonresponsive.
 8             THE WITNESS:  I can't remember exactly.
 9    BY MR. TEPFER:
10        Q.   Do you know if BunZai Media Group had a,
11    while you were there, a chargeback management
12    program?
13        A.   I think so.
14        Q.   Do you know what the name of that chargeback
15    management program was?
16        A.   I think it would be RevGuard.
17        Q.   Were you ever trained in how to use
18    RevGuard?
19        A.   No.  I don't -- no.
20        Q.   Were you ever trained in how to use any
21    other chargeback software while you were there?
22        A.   No, I don't remember.
23        Q.   I'm going to go to four minutes into the
24    recording real quick.
25             (The recording is played:
```

48

Yalley

FTC v. Bunzai Media Group, Inc., et al.                               2/17/2016

1          "We have 50 people.  We have three
2          people on one line.  I want to know
3          how many of those because each one is
4          going to get a different free gift
5          from me.  This is the thing.  I'm
6          going to get a guy.  He's going to
7          sit.  He's going to get a very,
8          very -- I know in advance he's going
9          to have a very, very, very, very low
10         contact ratio.  He's going to talk to
11         700 people.  But I'm going to call
12         back my chargebacks.  I'm going to
13         talk to them.  I'm going to say we
14         are a third party company hired by
15         BunZai Media, or by the company who
16         sold you AuraVie, to figure out what
17         they did wrong.  What did they do
18         wrong?  Why did they charge them
19         back?  Did you call?  Did you try to
20         call?  Was the cancellation wrong?
21         Did they fuck you?  Did you feel
22         misled?  Did you feel like you're an
23         idiot?  Do you like that?  Yeah.
24         Yeah.  Very low contact ratio.  But
25         out of the thousand people you'll

49

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

    1              talk to, out of the 10,000 phone
    2              calls you make, you'll know if you
    3              document it and it's documented and
    4              you have reports back from them.  And
    5              the FTC comes to me, I'm telling
    6              them, listen, I'm calling back my
    7              chargebacks and see what I did wrong?
    8              Do you know how that looks?
    9              Number 1, I'm really... and Number 2,
   10              I'm being proactive... we're going to
   11              call all of our chargebacks, and say
   12              we are a third party."
   13   BY MR. TEPFER:
   14      Q.   Sorry.  Were you able to hear some of that?
   15   And we'll play it again, but first I just want to
   16   ask you a few questions about it.
   17           Ms. Yalley, do you know who that was
   18   speaking?
   19      A.   Yes.
   20      Q.   And who was that?
   21           MR. UNGAR:  Objection as to the form of the
   22   question, calls for speculation, calls for opinion.
   23   BY MR. TEPFER:
   24      Q.   And were you present at this meeting?
   25      A.   I guess so.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

```
 1      Q.   Did you recognize any other voices
 2   speaking --
 3      A.   I didn't --
 4      Q.   -- on the recording?
 5      A.   -- hear anyone else on that recording.
 6      Q.   Sure.
 7      A.   No.
 8      Q.   In that -- did you hear Mr. Nottea reference
 9   the FTC in that recording?
10      A.   Yes.
11      Q.   Can you recall any other times that
12   Mr. Nottea discussed the FTC in meetings that you
13   were present at while you worked at BunZai?
14      A.   I can't recall a specific time.
15      Q.   Can you recall any of your other coworkers
16   discussing with you the FTC while you were at
17   BunZai?
18      A.   Again, I can't.
19           MR. UNGAR:  Objection as to the form of the
20   question.  It's vague and ambiguous.
21           THE WITNESS:  Again, I can't recall a
22   specific time.
23   BY MR. TEPFER:
24      Q.   Sure.  And I'll play that back again, just
25   for the benefit of the court reporter, and I'm also
```

51

Yalley

```
 1    going to let it play a little bit past that.  I have
 2    some more questions after that.
 3         A.    Okay.
 4               (The recording is played:
 5                    "We have 2,000 and 1, 4, we have
 6               50 people.  We have three people on
 7               one line.  I want to know how many of
 8               those because each one is going to
 9               get a different free gift from me.
10               This is the thing.  I'm going to get
11               a guy.  He's going to sit.  He's
12               going to get a very, very -- I know
13               in advance he's going to have a very,
14               very, very, very low contact ratio.
15               He's going to talk to 700 people.
16               But I'm going to call back my
17               chargebacks.  I'm going to talk to
18               them.  I'm going to say we are a
19               third party company hired by BunZai
20               Media, or by the company who sold you
21               AuraVie, to figure out what they did
22               wrong.  What did they do wrong?  Why
23               did they charge them back?  Did you
24               call?  Did you try to call?  Was the
25               cancellation wrong?  Did they fuck
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
1              you?  Did you feel misled?  Did you
2              feel like you're an idiot?  Do you
3              like that?  Yeah.  Yeah.  Very low
4              contact ratio.  But out of the
5              thousand people you'll talk to, out
6              of the 10,000 phone calls you make,
7              you'll know if you document it and
8              it's documented and you have reports
9              back from them.  And the FTC comes to
10             me, I'm telling them, listen, I'm
11             calling back my chargebacks and see
12             what I did wrong?  Do you know how
13             that looks?  Number 1, I'm really...
14             and Number 2, I'm being proactive...
15             I mean...we're going to call all of
16             our chargebacks, and say we are a
17             third party...Google, Google docs,
18             you have four... like you have a
19             spreadsheet...you know what might be
20             easier is just setting up a quick
21             poll and maybe emailing it to some of
22             these people... also good.  Also
23             good.  Because it's easier than
24             calling someone.  If someone...it's
25             digital...yeah, yeah, yeah.  She's
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              talking about...emailing all those
 2              chargebacks.  Hey, you want to get a
 3              free moisturizer... yeah, or a five
 4              dollar gift card or something like
 5              that... I create the link...do you
 6              have to take the service...we pull
 7              the history for the last year and all
 8              their email addresses are right
 9              there, so it's, we can get ahold of
10              everyone right there...email and also
11              try a little bit of phone because I
12              want to have...I want to have a
13              hundred call people recording...but I
14              want to have a hundred call folder so
15              that later on in two years when I
16              have an FTC, here, here, here, I'm
17              proactive.  It's like -- it's like a
18              folder.  Here you go.  Here's
19              everything.  Your file recordings.
20              Look at everything.  Look at what
21              we're doing to be proactive for our
22              consumer.  Okay.  Number 1, it's
23              really going to give us some answers,
24              and Number 2, it's going to make us
25              look amazing.")
```

54

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    BY MR. TEPFER:

2        Q.    So is this Alon Nottea -- first of all, I

3    just want to check.  Did you hear the statement "I

4    want to have a hundred call folder, so that later on

5    in two years when I have an FTC, here, here, here,

6    I'm proactive.  Look at what we're doing to be

7    proactive for our consumer.  Okay.  Number 1, it's

8    really going to give us some answers, and Number 2,

9    it's going to make us look amazing"?  Did you hear

10   that statement?

11       A.    Yes.

12             MR. UNGAR:   Objection as to the form of the

13   question, vague and ambiguous, compound,

14   unintelligible.

15   BY MR. TEPFER:

16       Q.    Do you know who made that statement?

17       A.    Yes.

18       Q.    Who was it?

19       A.    Alon.

20       Q.    And did you recognize the individual who

21   stated that they were going to help build a form?

22       A.    I -- build a form?

23       Q.    Yeah.  And I can replay that, but did you

24   hear any other individuals speaking on that --

25       A.    Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1      Q.    -- call?  Did you recognize any of their

2    voices?

3      A.    Yes.

4      Q.    Who were they?

5      A.    Myself, Roi.

6            MR. UNGAR:  Objection.  Objection as to the

7    form of the question, calls for an opinion, calls

8    for speculation.

9            THE WITNESS:  Roi, Paul, and myself.

10   BY MR. TEPFER:

11     Q.    Did you hear the statement, "I want to have

12   a hundred call recordings to prove it in court

13   later"?

14     A.    I can't remember.

15     Q.    Do you -- do you recall if at any point Alon

16   Nottea expressed concern about the possibility of an

17   FTC enforcement action against his company?

18     A.    Not at a specific time, no.

19     Q.    Do you recall at any time?

20     A.    It would be --

21           MR. UNGAR:  Objection as to the form of the

22   question.  It's vague and ambiguous, and it's

23   argumentative.

24           THE WITNESS:  Maybe.  On the phone call, you

25   mean, or --

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1     BY MR. TEPFER:

2         Q.   Or just at any point in, while you worked at

3     BunZai Media Group?

4              MR. UNGAR:   Objection.   Objection.

5     Objection as to the form of the question.   It's

6     vague and ambiguous, and it's argumentative.

7     BY MR. TEPFER:

8         Q.   Sorry.   You can answer.

9         A.   I -- maybe.

10        Q.   But you don't recall specifically?

11        A.   No.

12             MR. UNGAR:   Objection as to the form of the

13    question.   It's vague and ambiguous, it's

14    argumentative, calls for speculation, lacks

15    foundation.

16    BY MR. TEPFER:

17        Q.   Do you know if BunZai Media Group ever

18    implemented the process described in which employees

19    at BunZai Media Group would call back consumers who

20    requested chargeback -- chargebacks from their

21    credit card company and stated that they're with a

22    third party company to, I guess, inquire about --

23             MR. UNGAR:   Objection.

24             MR. TEPFER:   Sorry.

25             MR. UNGAR:   Objection as to the form of the

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    question.  It's vague and ambiguous, and it's

2    unintelligible.

3              MR. TEPFER:  Robert, please let me complete

4    my question before your objection.

5    BY MR. TEPFER:

6       Q.   So to ask again, are you aware of whether

7    BunZai Media Group ever implemented this callback

8    procedure described in the recording?

9       A.   No.

10      Q.   Do you have any idea why Alon Nottea was

11   discussing this possible procedure?

12      A.   I don't remember.

13      Q.   Do you know if at this point in time BunZai

14   Media Group had any issues with chargebacks?

15      A.   I don't remember.

16      Q.   I'm going to -- would it be helpful to play

17   it again or do you think -- I'm going to play

18   another segment here.

19              (The recording is played:

20              "All I need is those two hours, from

21              6:00 to 8:00, I need a personal

22              assistant.  Okay.  Okay.  Let's stay

23              on point.  Let's stay on point.  Back

24              to the reports.  Daily chargeback

25              report, my friend.  Daily.  I have a

58

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              question on that.  Have the person,
 2              have the person log in, just...you
 3              don't want to... oh, no, no, no.  The
 4              same day we do load balancing, the
 5              same day we want to report
 6              chargebacks...No, no, it's fine.  We
 7              can pull the report from the Google
 8              or from all -- all the paperwork goes
 9              there.  We can...but how?  I'm
10              talking about chargeback level with
11              the current MIDs, which means we know
12              we have 20 MIDs.  Oh, oh, oh... we
13              know we're at 67 and 37 merchant
14              account chargebacks...no, no, no,
15              no... I have a question for that.  I
16              have a question for that.  Because
17              they took over the process.  Mm-hmm.
18              That's winning, losing.  No, no.
19              Fine, fine.  Okay, let me tell you
20              right now, I have to do two things.
21              Number 1, I want to...chargeback.
22              Mm-hmm.  Number 2, agents, they got
23              to know...how do you want that
24              report?  These guys... I'm already
25              doing that...now because they have
```

Yalley
FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1              it... because they have, there's a
2              process, I can, I can get it.  That
3              report, the report -- go ahead.  All
4              I got to do is share it with you.
5              Just be a name...Is there a way for
6              that report to get off your hands?"
7    BY MR. TEPFER:
8       Q.   Did you hear an individual referring to
9    daily chargeback reports?
10      A.   Yes.
11      Q.   Do you know who that was?
12      A.   Paul.
13           MR. UNGAR:  Move to strike as nonresponsive.
14   Lacks foundation, calls for speculation on the part
15   of the witness.
16           MR. TEPFER:  Sure.  Let's play it one more
17   time.  It was kind of a long clip.
18           MR. UNGAR:  Also -- also it's an
19   impermissible opinion of a lay witness.
20           (The recording is played:
21           "All I need is those two hours, from
22           6:00 to 8:00, I need a personal
23           assistant.  Okay.  Okay.  Let's stay
24           on point.  Let's stay on point.  Back
25           to the reports.  Daily chargeback

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1              report, my friend.  Daily.")

2              THE WITNESS:  Oh, okay.  That's Alon.

3      BY MR. TEPFER:

4          Q.   That was Alon that said "daily chargeback

5      reports"?

6          A.   Yes.

7          Q.   And did you hear the statement that the

8      chargeback reports were to be done, quote, the same

9      day we do load balancing, unquote?

10         A.   I am not sure if that's what he said.

11         Q.   Sure.  Let's replay it.

12              (The recording is played:

13              "Have the person log in, just...you

14              don't want to... oh, no, no, no.  The

15              same day we do load balancing, the

16              same day we want to report

17              chargebacks.")

18              THE WITNESS:  Oh, okay.  Yes.

19      BY MR. TEPFER:

20         Q.   So you did hear the statement, the same --

21      that chargeback reports were be to done the same day

22      as load balancing?

23         A.   Yes.

24         Q.   While you worked at BunZai Media Group, was

25      there recurring load balancing done on BunZai Media

61

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    Group's merchant accounts?

2        A.    Yes.

3            MR. UNGAR:   Objection as to the form of the

4    question.   It's vague and ambiguous.

5    BY MR. TEPFER:

6        Q.    And what is load balancing?

7        A.    Load balancing is just balancing each MIDs

8    to make sure that they're processing them the way

9    that you want them to process.

10       Q.    And you used the term "MID."   What is "MID"?

11       A.    Merchant account.   Merchant I.D.

12       Q.    And how does -- how did BunZai Media Group

13   determine how much would be processed through each

14   merchant account?

15       A.    I'm not sure.

16           MR. UNGAR:   Objection as to the form of the

17   question.   It's vague and ambiguous, it calls for

18   speculation, lacks foundation.

19   BY MR. TEPFER:

20       Q.    Do you know who would conduct this load

21   balancing at BunZai Media Group while you were

22   there?

23       A.    Paul.

24           MR. UNGAR:   Objection as to the form of the

25   question.   It's vague and ambiguous.

62

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                2/17/2016

1          THE WITNESS:  Paul Medina.

2    BY MR. TEPFER:

3       Q.   Do you know if anybody else ever did load

4    balancing of the merchant accounts while you were at

5    BunZai Media Group?

6          MR. UNGAR:  Objection as to the form of the

7    question.  It's vague and ambiguous.

8    BY MR. TEPFER:

9       Q.   You can answer.

10      A.   No, I know.  I'm just thinking.

11      Q.   Oh, sorry.

12      A.   I guess it depends.  Doing the actual

13   process or the reports?

14      Q.   Well, first --

15         MR. UNGAR:  Move to strike as nonresponsive.

16   BY MR. TEPFER:

17      Q.   Well, first let's talk about the actual

18   process.

19      A.   Mm-hmm.

20      Q.   Do you know who did the actual process at

21   BunZai Media Group, if anyone, other than Paul?

22         MR. UNGAR:  Objection as to the form of the

23   question.  It's vague and ambiguous.

24         THE WITNESS:  I guess me or him.

25   ///

63

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    BY MR. TEPFER:

2        Q.   So it would be you or Paul?

3        A.   Yeah.

4        Q.   How did you -- who directed you to do this

5    load balancing?

6        A.   I'm not sure.  Well, hold on.  Could I take

7    that back?  I'm so confused right now.

8        Q.   Sure.

9             MR. UNGAR:  Move to strike as nonresponsive.

10   BY MR. TEPFER:

11       Q.   What are you confused about?  I can restate

12   it.

13            MR. UNGAR:  Is the witness okay?

14   BY MR. TEPFER:

15       Q.   Are you okay, Ms. Yalley?

16       A.   Yes.

17            MR. UNGAR:  Is the witness under distress?

18            THE WITNESS:  No, no.

19   BY MR. TEPFER:

20       Q.   Are you -- well, and like I said at the

21   beginning, if you ever want to take a break, just

22   let me know.

23       A.   Okay.

24       Q.   But anyway, so what -- could you tell me

25   what part you're confused about, and we'll just redo

64

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    that part.

2         MR. UNGAR:  Objection.  Objection as to the

3    form of the question.  It's vague and ambiguous, and

4    it's an inappropriate question, and it's

5    argumentative.

6         THE WITNESS:  Just who did the load

7    balancing, I don't really remember.  I just know

8    it's -- yeah, it happened.  So --

9    BY MR. TEPFER:

10        Q.   Mm-hmm.

11        A.   And it's just about keeping your MIDs

12   afloat.

13        Q.   Do you know if chargeback percentages played

14   a role in determining the load balancing amounts for

15   each MID?

16        A.   Yes.

17        MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous.

19   BY MR. TEPFER:

20        Q.   Who told you that?

21        A.   I don't remember.

22        Q.   What about the actual chargeback reports?

23   Do you know who, I guess, drafted those while you

24   were at BunZai?

25        A.   No, I don't remember.

65

Yalley

1       Q.   Would you ever draft those?

2       A.   No.

3       Q.   Did you ever review them?

4       A.   No.

5       Q.   I think I'm going to play through it one

6    more time.  There's one statement I want to ask

7    about that I don't know that I heard.

8            (The recording is played:

9            "No, no, it's fine.  We can pull the

10           report from the Google or from all --

11           all the paperwork goes there.  We

12           can...but how?  I'm talking about

13           chargeback level with the current

14           MIDs, which means we know we have 20

15           MIDs.  Oh, oh, oh... we know we're at

16           67 and 37 merchant account

17           chargebacks.")

18   BY MR. TEPFER:

19       Q.   So do you know who just stated, "We know we

20   have 20 MIDs"?

21       A.   Alon.

22       Q.   And that MIDs is referring to merchant

23   accounts?

24       A.   Mm-hmm.

25       Q.   And -- and those 20 MIDs, do you know what

66

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

 1   transactions those merchant accounts were used to

 2   process?

 3       A.   No.

 4           MR. UNGAR:  Objection as to the form of the

 5   question.  It's vague and ambiguous, it calls for

 6   speculation, and it lacks foundation.

 7           THE WITNESS:  AuraVie.

 8   BY MR. TEPFER:

 9       Q.   Okay.

10           MR. UNGAR:  Move to strike as nonresponsive.

11   BY MR. TEPFER:

12       Q.   Okay.  I'm going to jump forward a little

13   bit in the clip to 8 minutes and 22 seconds or 21

14   seconds in.

15           (The recording is played:

16               "There's overlapping information

17           that...you, you know.  He's sick, you

18           can do load balancing.  Yeah.  He's

19           sick, you can do load balancing.

20           Roi, you must learn to know -- I

21           know, I know -- how to do load

22           balancing.")

23   BY MR. TEPFER:

24       Q.   Do you -- did you hear the statement, "Roi,

25   you must learn how to do load balancing"?

67

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1        A.   Yes.

2        Q.   Do you know who was speaking?

3        A.   Alon.

4        Q.   Okay.  Are you aware if Roi ever learned to

5   do load balancing?

6        A.   No.

7        Q.   And that's no, you're not aware if he did?

8        A.   No, I'm not aware.

9        Q.   (The recording is played:

10             "...I know, like, seriously, you

11             know, like one day in the next couple

12             weeks I'm going to test you.  I'm

13             going to say Paul can do it, you do

14             it.  We're going to really do it.

15             You really have to know how to do it.

16             It's not a joke.  You need to know

17             how to load balance.  Yeah.  Paul is

18             sick, getting married, have to fly.

19             You're sick, getting married, have to

20             fly...load balancing...yeah, I know

21             that.  Physically run the report,

22             look at the chargeback, look at

23             the...and decide what's going to

24             6 percent, what's going to be 17

25             percent...Must.  That cannot... all

68

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              of us...It's the core of our company.
 2              Roi, the reason I busted this out is
 3              because there's been about two and a
 4              half months.")
 5    BY MR. TEPFER:
 6       Q.   Did you hear the statement "That's the core
 7    of our company"?
 8       A.   Yes.
 9       Q.   Do you know who was speaking then?
10       A.   Alon.
11       Q.   Do you know what he was referring to?
12       A.   Load balancing.
13              MR. UNGAR:  Move to strike as nonresponsive.
14    BY MR. TEPFER:
15       Q.   I'm going to jump forward just a few seconds
16    here.
17              (The recording is played:
18              "Absolutely.  They're going to...the
19              report.  Have the report every Friday
20              or every two weeks.  There's no
21              ifs...Send them email... call a
22              meeting with Sabina, talk to her for
23              half an hour on the phone, tell her
24              what you want, where you're going,
25              what you want to get to.  Okay.  Jump
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1              in the process.  I told her my cousin
 2              Roi is going to come in, he's going
 3              be all over you with chargebacks when
 4              they want to find the details.")
 5   BY MR. TEPFER:
 6      Q.   Did you hear the statement "My cousin Roi is
 7   going to come in, be all over you with chargebacks
 8   when they want to find the details"?
 9      A.   Yes.
10      Q.   And who is that?
11           MR. UNGAR:  Objection as to the form of the
12   question.  It's vague and ambiguous.
13           THE WITNESS:  Alon.
14           MR. UNGAR:  And objection, objection as to
15   the second question.  It's also vague and ambiguous.
16   BY MR. TEPFER:
17      Q.   Who's Sabina?
18      A.   I don't remember.
19      Q.   All right.  I'm going to press play again
20   here.
21           (The recording is played:
22              "Sabina is not going to tell you
23              that the chargeback belongs to...I
24              know, I know, I know, but what...
25              No, I'm just saying if she
```

70

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              gives...order numbers...no, no,

 2              no...That's what we have Gabby and

 3              Andrew to do.  That's why they're

 4              staying in Chargeback Department

 5              because they're going to be accessing

 6              that Google")

 7    BY MR. TEPFER:

 8       Q.   Did you hear the statement "That's what we

 9    have Gabby and Andrew to do"?

10       A.   Yes.

11       Q.   Do you know who that was talking?

12       A.   Paul.

13       Q.   Do you know -- well, first, do you know who

14    Gabby is?

15       A.   Yes.

16       Q.   Who's she?

17       A.   She was someone that worked in the

18    Chargeback Department.

19       Q.   Do you know her full name?

20       A.   I forgot.  I don't know.

21       Q.   What about Andrew?

22       A.   Yes.

23       Q.   Who is he?

24       A.   Andrew Stanley.

25       Q.   Do you know where he worked?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      A.    In the Chargeback Department, also.

2      Q.    And when he says, when Paul states "That's

3  what we have Gabby and Andrew to do," do you know

4  what he's referring to?

5      A.    No, not exactly.

6            MR. UNGAR:  Objection as to the form of the

7  question.  It calls for speculation, it's vague and

8  ambiguous, and it lacks foundation.

9  BY MR. TEPFER:

10     Q.    Okay.  And I'm going to hit play again real

11  quick.

12           (The recording is played:

13           "Just for the sake of that?  Just for

14           the sake -- this actually calls for

15           an entire chargeback meeting.  So

16           this call...just make a note.

17           Chargeback meeting today, tomorrow,

18           whenever you guys want to have...The

19           whole meeting is about chargebacks.

20           I need it tomorrow."

21  BY MR. TEPFER:

22     Q.    Who is it that states "This calls for" --

23  oh, sorry.

24           Did you hear the statement "This calls for

25  an entire chargeback meeting"?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

72

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1        A.    Yes.

 2        Q.    And who is that speaking, if you know?

 3        A.    Alon.

 4        Q.    Do you know if that meeting ever happened?

 5        A.    No, I don't.

 6              (The recording is played:

 7                  "I don't know what they're doing.

 8              Tomorrow at 10:30 a.m. chargeback

 9              meeting.  For, like, HR and just

10              employees, like how often does this

11              need to be done?  We came up with the

12              idea of everyone, you start with us,

13              you have a 30-day probationary

14              period.  At the end of the 30 days,

15              we should meet with you, review

16              you...no, I know, I know.  So every

17              30 days.")

18        Q.    Is that you speaking there?

19        A.    Yes.

20        Q.    You stated, I think -- did you refer to, I

21   guess, a review process for BunZai employees there?

22        A.    Yes.

23        Q.    What is that -- what was the basis for that

24   review process -- or rather, what were you reviewing

25   the employees on?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                   2/17/2016

```
 1        A.   I don't -- I don't remember.
 2             MR. UNGAR:  Ob- --
 3   BY MR. TEPFER:
 4        Q.   Do you recall if BunZai had a formal review
 5   process for Customer Service representatives at any
 6   point while you were working for BunZai?
 7             MR. UNGAR:  Objection as to the form of the
 8   question, assumes facts not in evidence.
 9             THE WITNESS:  I think so.
10   BY MR. TEPFER:
11        Q.   Do you recall what the Customer Service
12   representatives were reviewed based on?
13        A.   No, I don't.  I don't remember.
14        Q.   I'm going to start it back up real quick.
15             (The recording is played.
16             "The report doesn't have to come to
17             me every week.  We want every
18             Friday...okay... Avi...and to the
19             point where we're doing this three,
20             four times, and that's it.  It's
21             being done.  I don't")
22        Q.   Did you hear someone named Avi?
23        A.   Yes.
24        Q.   Who is that speaking?
25        A.   Roi.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1           MR. UNGAR:  Objection as to the form of the
2      question.  It's vague and ambiguous, calls for
3      speculation, lacks foundation, and impermissible lay
4      opinion.
5      BY MR. TEPFER:
6         Q.  Do you know who that Avi is, that Roi is
7      referring to?
8         A.  Yes.
9           MR. UNGAR:  Same objection.
10     BY MR. TEPFER:
11        Q.  Who is that?
12        A.  I just know of him.
13        Q.  Do you know if it's Alan Argaman?
14        A.  I think so.
15          MR. UNGAR:  Move to strike as nonresponsive.
16     BY MR. TEPFER:
17        Q.  I'm going to start it back up.
18          (The recording is played:
19          "No, not to the level of that...but
20          I'm just saying this, six months
21          away.  What?  Automated.  Automated
22          this...this automated graphs,
23          reporting...going to India, coming
24          back, that'll be sent over API...four
25          to six months away.")

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1      Q.   Did you hear the statement about auto- --
 2   sorry -- automated graphs and reports?
 3      A.   Yes.
 4      Q.   And was that Alon speaking?
 5      A.   Yes.
 6      Q.   What -- do you know what he was speaking
 7   about?
 8      A.   Chargeback reports.
 9           MR. UNGAR:  Move to strike.  Move to strike
10   as nonresponsive.
11   BY MR. TEPFER:
12      Q.   Was -- to your knowledge, was BunZai Media
13   Group in the process of developing an automated
14   system for these chargeback reports?
15      A.   I'm not sure.
16      Q.   I want to start back up real quick.
17           (The recording is played:
18               "No, it's okay.  I want...you're
19           too busy?  You're too busy?  I
20           need...dedicated programmers...don't
21           do it...full time job...the only way
22           that Andree, you, me, Khristopher,
23           somebody can gauge a person after a
24           month is not by his feeling
25           because... you guys that are now
```

76

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              working on...you programmers...like
 2              that working on any of our stuff so
 3              that we can be done in a month or
 4              two...plus, once we actually do it
 5              manual for a month, then we're going
 6              to own it.  Then we're going to...
 7              talk to India...but it's always 60,
 8              70 percent.  You do this for two
 9              weeks.  You're eating India.  You're
10              eating it... just like you did
11              with...you dial the number to India
12              and you...it's done.  It's not there
13              for you here.  It's not the same way.
14              No, I know, but I got to start
15              because if I had the people, if I had
16              the people...Don't wait for
17              automation...  I'm not...Don't wait
18              for...I'm not...It's six months
19              away.")
20    BY MR. TEPFER:
21       Q.   Did you hear the statement "Don't wait for
22    Avi" and another individual, "it's six months away"?
23       A.   Yes.
24       Q.   Was that Alon?
25       A.   Yes.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      Q.    Do you know what he was referring to?

2      A.    No.

3            MR. UNGAR:  Objection as to the form of the

4    question.  It's vague and ambiguous, calls for

5    speculation, lacks foundation.

6    BY MR. TEPFER:

7      Q.    All right.  Just a few more seconds on this

8    clip here.

9            The recording is played:

10           "Yes.  I want it to be six months

11           away from today or from

12           yesterday...two months from now...the

13           closest way you're going to get to

14           having it happen fast is when you

15           manually doing it... it's going to

16           kill you.  You're going to hate it...

17           as long as you're not doing it

18           manually...the delay is good.  It

19           will happen.  If you're doing it

20           manually, you're going to be so

21           hating...right here, until we have...

22           that's why I want...for them to do it

23           manually or you think you can

24           automate it... automation eventually.

25           Automation is a goal for four to six

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1            months...yeah, yeah...now pay

2            India... every night going

3            there...here's the report, report,

4            report.  Give it to us...give it to

5            us in Excel sheet.  Let them send

6            you...finding...I don't care.  Solve

7            it, pay for it, delegate it, but do

8            it... think about that."

9    BY MR. TEPFER:

10      Q.   In that clip there's reference to India.  Do

11   you recall if BunZai Media Group, while you were

12   there, did any business with any companies located

13   in India?

14      A.   No, I don't remember.

15      Q.   Do you know if they had call center

16   employees in India?

17      A.   No, I don't remember.

18           MR. UNGAR:  Counsel, these audio recordings,

19   they're marked as what exhibit number?

20           MR. TEPFER:  We're not entering them as an

21   exhibit.

22           MR. UNGAR:  They were -- the audio

23   recordings are marked as what exhibit number?

24           MR. TEPFER:  The -- we're talking about, I

25   suppose, what's that -- it's -- the audio recording

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1    itself isn't entered as an exhibit, but we're
 2    talking about the audio attached to Exhibit 86,
 3    which is an email.
 4            MR. UNGAR:  I'm demanding, for purposes of
 5    the record, that each individual audio recording
 6    that has been played for the witness be marked and
 7    attached to the deposition as marked.
 8            MR. TEPFER:  Okay.  We can -- I mean, it's
 9    one audio, so we can, you know, burn that onto a
10    disk, if you like.
11            MR. UNGAR:  And that -- and that the wit- --
12    and that further reference to the audio recordings
13    be identified by marked exhibit numbers to the
14    deposition transcript.
15    BY MR. TEPFER:
16       Q.   Jump ahead a little bit here to 1355.
17            MR. UNGAR:  What exhibit number -- what
18    exhibit number is this?
19            MR. TEPFER:  Can we go off the record real
20    quick?
21            (A discussion was held off the record.)
22            MR. TEPFER:  All right.  We're going to go
23    back on the record.
24            Robert, we're going to make the audio
25    recording Exhibit Number 165.  So it's just one
```

80

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    recording, and it's all going to be Exhibit 165 on a

2    disk.

3            MR. UNGAR:  Each -- each portion of

4    Exhibit 165 that is separately and distinctly played

5    for the witness must be marked individually --

6            MR. TEPFER:  No, we're not going to do it

7    that way, Robert.

8            MR. UNGAR:  -- so that the record, so that

9    the record reflects what portion of Exhibit 155 the

10   witness is responding to --

11           MR. TEPFER:  Well, I'm giving the minute

12   marker, and it's referencing, like, the line of a

13   document, so we're just going to do it that way.

14           (Plaintiff's Exhibit 165 was marked

15           for identification by the FTC and is

16           attached hereto.)

17   BY MR. TEPFER:

18     Q.   I'm going to proceed and play the next clip,

19   if we could.

20           MR. UNGAR:  What is the -- what is the

21   reference numbers of the next clip?

22           MR. TEPFER:  We are starting at 1352.

23           (The recording is played:

24           "I want you...Who's the right person?

25           It's probably me.  From three of you,

81

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                      2/17/2016

 1              from Andree and Sandra, I want five

 2              reasons that you guys feel will drop

 3              chargebacks."

 4    BY MR. TEPFER:

 5       Q.   All right.  Who is it that states -- oh,

 6    sorry.

 7              Did you hear the statement "I want five

 8    reasons that you guys feel will drop chargebacks"?

 9       A.   Yes.

10       Q.   And who's that?

11       A.   Alon.

12       Q.   And in Exhibit 68 there's -- you reference

13    those five reasons on 68-1.

14       A.   I don't think I have that.

15       Q.   Oh, sorry.  Sorry.  86.  I mixed it around.

16              86-1, at the bottom, you state, "Roi and

17    Paul, send Alon your five chargeback reasons."

18       A.   Mm-hmm.

19       Q.   Do you know if -- did you ever receive those

20    five chargeback reasons from Roi and Paul?

21       A.   I don't remember.

22       Q.   Okay.

23       A.   I mean, it says "sent Alon," so I don't know

24    why I'd have them.

25       Q.   Sure, sure.

82

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          I'm going to play just the end of this clip
2     here.
3          The recording is played:
4          ("Send them to me.")
5          MR. UNGAR:  What is the starting reference
6     of the clip?
7          MR. TEPFER:  14 -- now I'm going to start at
8     1408.
9          (The recording is played:
10         "Five reasons, five reasons, five
11         reasons from you.  Ask the same from
12         Andree and Sandra...all the emails,
13         give them to me.  I'll forward
14         them...for me it all sounds good.
15         It's 25 good reasons from the top
16         five people.  It's 25 of the best
17         reasons that people could...top five
18         people.  Your five reasons, my five
19         reasons...no, on how, what you feel
20         will lower chargebacks... what...that
21         we can make to lower chargebacks.
22         The same thing, once you're done with
23         that email, add another five
24         reasons... the best five options that
25         you feel for referral.  Okay.  Mainly

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              from women, but I want the guys'
 2              input, too.  So five reasons how to
 3              lower")
 4    BY MR. TEPFER:
 5       Q.  Well, actually, I don't have any questions
 6    about that clip.
 7              Let's see.  I'm going to jump to 15 minutes
 8    and play a clip.
 9              (The recording is played:
10              "Can't really do that either 'cause
11              it stops at six.  Fine.  Okay...month
12              two, three, four, five, six.  Okay.
13              AuraVie.com is generating 10 grand a
14              month.  I think if she -- with that
15              money that we use.")
16    BY MR. TEPFER:
17       Q.  Did you hear the statement "AuraVie.com is
18    generating 10 grand a month"?
19       A.  Yes.
20       Q.  Who's that talking, if you know?
21       A.  Paul.
22       Q.  Are you familiar with how much BunZai Media
23    Group's respective AuraVie offer sites brought in,
24    in revenue?
25       A.  Familiar, yes.
```

84

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      Q.   How did AuraVie.com compare to the free

2   trial offers, in terms of revenue?

3      A.   It was --

4           MR. UNGAR:  Objection as to the form of the

5   question.  It's vague and ambiguous.

6           THE WITNESS:  It was smaller.

7   BY MR. TEPFER:

8      Q.   Do you know about how much smaller?

9      A.   No.

10     Q.   Do you know if BunZai Media Group made the

11  majority of its profits from its continuity plan

12  sales of AuraVie?

13     A.   Yes.

14          MR. UNGAR:  Objection as to the form of the

15  question.  It's vague and ambiguous.

16  BY MR. TEPFER:

17     Q.   How did you -- how did you learn that

18  information?

19     A.   The accounting reports.

20     Q.   I'm going to play just a little bit more.

21  We're starting at 1514.

22          (The recording is played:

23              "Full-time, that to, to be doing

24          all day long marketing for, for...

25          well, that we got stuck with...all I

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

85

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              wanted to do was just make the
 2              site... the layout better, add some
 3              more products, and that's it, and
 4              then we can market something we're
 5              proud of.  Okay.  Now it's turned
 6              onto this whole thing, and I just
 7              want to... because that, we just, I
 8              mean...so...make $12,000 a month not
 9              doing anything.  So if we got access,
10              we'd...we're only making 12 grand a
11              month because we're spending a
12              million dollars a month doing our
13              other marketing.  Yeah.  These are
14              just leftover residual of the fucking
15              pipe.  Yeah.  It's just coming in
16              because of the size we are.  Yeah...
17              It's actually, for the amount of, for
18              the amount of money we spend on
19              marketing, the size that we are out
20              there, it just shows you")
21     BY MR. TEPFER:
22        Q.   Are you familiar with how much -- or while
23     you worked at BunZai Media Group, were you typically
24     familiar with how much the company spent on
25     marketing for its various campaigns?
```

86

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1       A.    Yes.

2       Q.    How did the marketing of AuraVie.com compare

3   to the marketing of the continuity plan websites?

4       A.    There wasn't any marketing.

5             MR. UNGAR:  Objection as to the form of the

6   question.  It's vague and ambiguous.

7   BY MR. TEPFER:

8       Q.    You can go ahead.

9       A.    I don't remember there being any marketing

10  to AuraVie.com.

11      Q.    Do you know about how much was, on average,

12  spent monthly on the marketing of the continuity

13  plan websites?

14      A.    I don't remember exactly.

15            MR. UNGAR:  Objection as to the form of the

16  question.  It's vague and ambiguous, it calls for

17  speculation, lacks foundation.

18            THE WITNESS:  I don't remember exactly.

19  BY MR. TEPFER:

20      Q.    I'm going to start back up.  We're at 1556.

21            (The recording is played:

22            "Will be dead in the fucking water.

23            If we try to survive on regular

24            AuraVie.com... we're doing a two

25            million dollar... I mean, I don't

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

87

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1           think so.  It's not...what do you
2           mean?  No, I just... because no
3           marketing is being done on it.  No,
4           no, no, you know, banner
5           advertisements pointing to
6           AuraVie.com, email, anything like
7           that.  Let me tell you...let me tell
8           you one thing.  I just solidified a
9           very, very, very, very strong deal in
10          Israel.  2,000 products.  I chose the
11          best...scrub, shower scrubs.  Yeah.
12          Mango, pineapple, cinnamon, coffee.
13          Amazing things.  I'm in the process
14          of negotiating the deal.  I'm getting
15          one drum for each product...90
16          products AuraVie.  Then, yes... we
17          have something to do... Besides that.
18          If you have better imaging, better
19          styling...did you see what
20          Khristopher and Igor did with
21          Lunelle?")
22     BY MR. TEPFER:
23        Q.   Did you hear the statement, "Did you see
24     what Khristopher and Igor did with Lunelle?
25        A.   Yes.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
1      Q.    Is that Khristopher Bond?

2      A.    Yes.

3      Q.    Igor Latsanovski?

4      A.    Yes.

5      Q.    Is that Alon talking?

6      A.    Yes.

7      Q.    What's Lunelle?

8      A.    I don't remember.  One of Khristopher's

9   friends.

10     Q.    Oh, it's a person?

11     A.    Yes.

12     Q.    Do you know, what did you understand Alon to

13  be referring to?

14     A.    Honestly, I don't remember.

15     Q.    Do you know if Khristopher and --

16           (Interruption in the proceedings.)

17  BY MR. TEPFER:

18     Q.    Sorry.

19     A.    Someone needs to be put on mute.

20           MR. TEPFER:  Yeah.  Robert, do you have us

21  on speaker phone, or is that Jeffrey?  Jeffrey are

22  you there?

23           MR. BENICE:  I just took off mute.

24           MR. TEPFER:  Okay.  Jeffrey, are you hearing

25  a lot of feedback?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1            MR. BENICE:  Not really.

2            MR. TEPFER:  Robert, do you happen to have

3    us on mute?

4            MR. UNGAR:  I'm sorry?

5            MR. TEPFER:  Would you mind -- you know, I

6    just want to reiterate my request.  If you could

7    just mute it while -- until you're speaking, because

8    I think the speaker phone is really making a lot of

9    noise over here.  It's sort of a background noise.

10           MR. UNGAR:  I will -- I will put it on mute,

11   as you have requested, provided that when you ask a

12   question, there is a delay before the answer, so

13   that I may have time to interpose an objection.

14           MR. TEPFER:  Sure.

15           MR. UNGAR:  And I'll need time to restore

16   the communication.

17           MR. TEPFER:  Sure.  Let's --

18           Ms. Yalley, if you heard that, if you could

19   just, like, give it one second.  And then if Robert

20   has any comments --

21           THE WITNESS:  Okay.

22   BY MR. TEPFER:

23      Q.   Do you know if Khristopher and Igor had or

24   were invested in any other companies, aside from

25   BunZai Media Group?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's compound, it's vague and ambiguous,
3     it calls for speculation, and it lacks foundation.
4          THE WITNESS:  I don't know.
5     BY MR. TEPFER:
6        Q.   All right.  I'm going to start back up.
7     We're at 16 minutes and 49.
8          (The recording is played:
9          "Give me ideas.  Let's make it
10         better.  Let me prove to you because
11         we have it kind of on hold until we
12         figure out...yeah...what's going on.
13         If you have ideas of what you feel
14         should be there, share it with me.
15         I'll sit down with Victor.  I'm going
16         back into design because he's not
17         designing, and I don't want you
18         optimizing."
19     BY MR. TEPFER:
20        Q.   Did you hear the statement "I'm going back
21     into design"?
22        A.   Yes.
23        Q.   And was that Alon speaking?
24        A.   Yes.
25        Q.   And did you hear that individual referred to

Yalley

FTC v. Bunzai Media Group, Inc., et al.                     2/17/2016

1    someone named Victor?

2        A.    Yes.

3        Q.    And was that Victor Azal?

4        A.    Yes.

5        Q.    Do you know if at any point Alon Nottea

6    reviewed the AuraVie continuity websites, the design

7    of it?

8            MR. UNGAR:  Objection as to the form of the

9    question.  It's vague and ambiguous, it calls for

10   speculation, it lacks foundation.

11           THE WITNESS:  Yes.

12   BY MR. TEPFER:

13       Q.    Do you know, do you have any knowledge if

14   Paul Medina had any part in the design of the

15   AuraVie websites?

16       A.    I don't -- I wouldn't know.

17           MR. UNGAR:  Objection as to the form of the

18   question.  It's vague and ambiguous, it calls for

19   speculation, it lacks foundation.

20   BY MR. TEPFER:

21       Q.    And to go back to Alon, how do you know that

22   Alon --

23           Sorry, could you read back the question

24   about Alon and the answer.

25           (The previous question and answer

92

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                        2/17/2016

```
 1          were read back by the court reporter

 2          as follows:

 3              "QUESTION:  Do you know if at any

 4          point Alon Nottea reviewed the

 5          AuraVie continuity websites, the

 6          design of it?"

 7              "ANSWER:  Yes.")

 8          MR. TEPFER:  And could you read the question

 9    before that one.

10          (The previous question was read back

11          by the court reporter as follows:

12              "QUESTION:  And was that Victor

13          Azal?"

14              "ANSWER:  Yes.")

15    BY MR. TEPFER:

16      Q.   And you said, I think you said, I guess,

17    that Alon reviewed those websites; is that correct?

18      A.   Yes, I guess.

19      Q.   What makes you think that Alon reviewed

20    those websites?

21          MR. UNGAR:  Objection as to the form of the

22    question.  It's vague and ambiguous.

23          THE WITNESS:  It's an assumption.

24    BY MR. TEPFER:

25      Q.   Okay.  I'm going to -- I'm going to play
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1    just the rest of this portion here.  We're starting
 2    at 1705.
 3              (The recording is played:
 4              "Figuring it out...leave my design
 5              world.  Start optimizing... you know,
 6              I got started into that when...I
 7              loved it.  I love it.  I love -- I
 8              love you.  Everything you're going,
 9              you're going with passion.  I'm just
10              saying, Number 1, leave me the stuff
11              I'm good at and take the stuff you're
12              good at... workers.  Work for two,
13              three hours.  Send out your couple of
14              wires.  Report...report to managers.
15              How do we get better?  The only way
16              we can survive... being by yourself,
17              finding... I can't survive in this
18              un-compliant world.  I can't sleep.
19              I don't like it.  It's not good.  We
20              don't know who's pushing us.  We
21              don't know who's fucking us.")
22    BY MR. TEPFER:
23        Q.   Sorry.
24        A.   It's okay.
25        Q.   It's a little tough to hear.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

 1          Did you hear the statement "I can't survive
 2    in this un-compliant world"?
 3      A.   Yes.
 4      Q.   Do you know who was talking there?
 5      A.   Alon.
 6      Q.   And what did you understand Alon to be
 7    referring to there?
 8      A.   I'm not sure.
 9      Q.   I'm starting at 1752.  I just want to hear
10    the last bit of this real quick.
11          (The recording is played:
12          "Merchant accounts... we got to find
13          a better solution... we can't have
14          just one guy, one guy")
15    BY MR. TEPFER:
16      Q.   Never mind.  I'm actually going to start
17    again at 1759.
18          (The recording is played:
19          "Make a decision on cleaning
20          everything Up...We must try 500
21          orders with the terms and conditions
22          on the invoice.  It's completely
23          illegal to not have that there, at
24          least.")
25    ///

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1   BY MR. TEPFER:

2       Q.   And sorry.  This is a tough one, so I'm

3   going to -- there's a little bit of typing noise

4   there, so I'm going to replay it again.  We're

5   starting at 1741 -- or rather -- sorry -- starting

6   at 1808.

7           (The recording is played:

8           "One more note...We must try 500

9           orders with the terms and conditions

10          on the invoice for customers.  It's

11          completely illegal to not have that

12          there, at least.")

13  BY MR. TEPFER:

14      Q.   So did you hear that statement, "We must try

15  500 with the terms and conditions on the invoice for

16  the customers.  It's completely illegal to not have

17  it there, at least"?

18      A.   Yes.

19      Q.   And who was that speaking, if you know?

20      A.   Alon.

21      Q.   And do you know what he's referring to?

22      A.   The terms and conditions.

23      Q.   And he -- were those terms and conditions,

24  while you worked at BunZai, were those placed on the

25  invoice sent to the cus- -- included in the risk

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

96

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

 1    free trial sent to consumers?

 2        A.    Do you mean after this?

 3              MR. UNGAR:   Objection.   Objection as to the

 4    form of the question.   It's vague and ambiguous.

 5    BY MR. TEPFER:

 6        Q.    Sure.  Let's talk about before -- before

 7    this meeting.

 8        A.    Honestly, I don't remember.

 9        Q.    All right.  I'm starting the recording

10    again.  It's at 1822.

11              (The recording is played:

12                  "We're not getting a check box.

13              When the consumer gets the product at

14              home, the packing slip, it can be a

15              little bit grayed out.  It doesn't

16              have to be huge.  You can make the

17              'for Customer Service inquiries and

18              questions, call 1-800" big, and below

19              that, the terms.")

20    BY MR. TEPFER:

21        Q.    Did you hear the statement, "We're not

22    getting a check box.  When the consumer gets the

23    product at home, the packing slip, it can be a

24    little bit grayed out.  It doesn't have to be huge.

25    You can make the 'For Customer Service inquiries and

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    questions, call 1-800" big, and below that, the
 2    terms"?
 3            Did you hear that statement?
 4    A.    Yes.
 5    Q.    And do you know who is speaking?
 6    A.    Alon.
 7    Q.    All right.  Starting at 18 minutes and 34
 8    seconds.
 9            (The recording is played:
10            "The best way to see who's doing
11            that...order his product...yeah.
12            Yeah, yeah, yeah... order...yeah.
13            Don't use...even though it's going to
14            go through...yeah... use a credit
15            card...  I want to see our calls...is
16            that going to be easy to do, to print
17            out specific labels for the campaign?
18            No, no, no, no, no, no, no.  What I'm
19            saying is, what I'm saying is that
20            the problem is not with shipping
21            it... I can take 500 bucks
22            but...yeah...the question is how are
23            we gauging it... if we do a separate
24            complaint, later on, a month from
25            now, you're going to filter that
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              complaint.  You'll see 500.  You'll
 2              see how many people called...more
 3              people called...less people
 4              call...Exactly.  That's why I say
 5              separate complaint in limelight.  No,
 6              but I'm talking about when it goes
 7              into commerce pack...yeah, yeah,
 8              yeah...ship out...have to be
 9              separate")
10   BY MR. TEPFER:
11        Q.   I'm just going to pause it real quick.
12             Was that you that referenced Commerce Pack
13   in there?
14        A.   Yes.
15        Q.   What is Commerce Pack?
16        A.   It was the back end of AuraVie.com.
17        Q.   And when you say "the back end," what do you
18   mean?
19        A.   To how they manage orders.
20        Q.   It's like an order, like a --
21        A.   Management system, yeah.
22        Q.   Okay.  I'm just going to start it back up at
23   19 minutes and 46 seconds.
24             (The recording is played:
25             "This calls for another 10 minute
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1              meeting for that, just make it, in
 2              the chargeback meeting let's talk
 3              about this particular details, how to
 4              do a test between 500 and 1,000
 5              customers that get the terms.  It's a
 6              complete different world when the
 7              woman -- when you can prove to the
 8              bank that the terms and conditions
 9              are on the invoice...no, the only
10              thing...I know we crashed and burned
11              when we tested it before, but somehow
12              Rappoport is doing it and getting
13              through with it.")
14   BY MR. TEPFER:
15      Q.   So did you hear the statement, "This calls
16   for another 10 minute meeting for that.  Just make
17   it in the chargeback meeting.  Let's talk about this
18   particular details, how to do a test between 500 and
19   1,000 customers that get the terms"?
20           Did you hear that?
21      A.   Yes.
22      Q.   And was that Alon?
23      A.   Yes.
24      Q.   Did you hear this statement, "It's a
25   complete different world when the woman -- when you
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    can prove to the bank that the terms and conditions

2    are on the invoice"?

3        A.    Yes.

4        Q.    And was that also Alon?

5        A.    Yes.

6        Q.    And did you hear the statement, "I know we

7    crashed and burned when we tested it before, but

8    somehow, Rappoport is doing it and getting through

9    with it"?

10       A.    Yes.

11       Q.    And do you know who that was?

12       A.    Alon.

13       Q.    Who's Rappoport, if you know?

14       A.    Jeff Rappoport.

15       Q.    And is he -- does -- how do you know him?

16       A.    He's in this industry.

17       Q.    The continuity industry?

18       A.    He was then.

19       Q.    Do you know if BunZai Media Group ever ran

20   this test with 500 to 1,000 customers?

21       A.    No, I don't remember.

22       Q.    I'm starting again at 20 minutes and 8

23   seconds.

24            (The recording is played:

25            "Rappoport is also sending an email

101

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1          when you're getting billed.  Okay.

2          He's sending this email.  I know we

3          can do it.  Yeah.  I'm just saying I

4          don't see how he was surviving doing

5          that."

6   BY MR. TEPFER:

7      Q.   Did you hear the statement that "Rappoport

8   is also sending an email when you're getting billed"

9   and the statement "I know we can do it.  I'm just

10  saying I don't see how he was surviving doing that"?

11         THE WITNESS:  Yes.

12  BY MR. TEPFER:

13     Q.   And was that Alon?

14     A.   Yes.

15     Q.   All right.  I'm starting at 2017.

16         (The recording is played:

17         "...if you send them the terms, it

18         can act like...we told you that we're

19         going to charge...we notified you...

20         you have ten days.  Exactly.  But

21         when me and Paul tried it a year ago,

22         it didn't work so good.  It hurted

23         us...If it's done creatively, if it's

24         done correctly and optimized...not

25         just try, it didn't work.  Let's see

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              what Jeff is doing because it's
 2              working for him.  Order one product,
 3              we'll get it, we'll see how it is.
 4              Yeah, maybe we could put a link,
 5              also.  Is that what we do now?  To
 6              view the terms and conditions, visit
 7              blah, blah, blah, dotcom?  On the
 8              actual...on the invoice, can we do
 9              that?  Maybe that's how...I mean,
10              I'll order it...find out, but maybe
11              that's something that can kind of
12              just... how many people are going to
13              be like...okay.  So what is it for?
14              To reduce chargebacks or to... stay
15              compliant?  Stay compliant and to
16              tell the woman on the phone... it's
17              another piece that we can actually
18              use to fight chargebacks.  It's going
19              to help Sabina, it's going to help us
20              be compliant, it's going to shut the
21              fucking customer up, but it might
22              hurt your numbers.")
23  BY MR. TEPFER:
24     Q.  Okay.  So did you hear the statement, "It's
25  another piece that we can actually use to fight
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    chargebacks.  It's going to help Sabina, it's going

2    to help us be compliant, it's going to shut the

3    effing customer up, but it might hurt your numbers"?

4        A.    Yes.

5        Q.    Sorry.  I wanted to make that P.G.

6              And who is that speaking?

7        A.    Alon.

8              MR. TEPFER:  Okay.  Why don't we take a

9    ten-minute break.

10             MR. GALLEGOS:  Yeah.

11             MR. TEPFER:  Is that okay with everyone?

12             We're off the record.

13             (Recess)

14             MR. TEPFER:  If we can go back on the

15    record.

16   BY MR. TEPFER:

17       Q.    Well, I think we can -- I think we can move

18    on from the recording.

19             And, Ms. Yalley, I don't mean to pry, but I

20    noticed that you were -- you've received some text

21    messages -- and it doesn't matter who they're from.

22    I just was curious if any of them are from any of

23    the defendants in this action.

24       A.    No.

25       Q.    Okay.  I just had to ask.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                           2/17/2016

1        MR. UNGAR:  Would you like to identify the

2   text messages by individual exhibit number, please?

3        MR. TEPFER:  They're not exhibits.

4   BY MR. TEPFER:

5     Q.   The --

6        MR. UNGAR:  Identify by exhibit number,

7   please.

8        MR. TEPFER:  I really don't understand.

9        MR. UNGAR:  Would you please identify the

10  text messages by exhibit number?

11       MR. TEPFER:  We're going to move on.

12  BY MR. TEPFER:

13    Q.   If we could turn to, I guess, Exhibit

14  Number 26.

15       MR. UNGAR:  Counsel, I want to be clear

16  about something.  Were you asking the witness about

17  text messages on paper that you are handing her or a

18  message that she received during the break?

19       MR. TEPFER:  I wasn't asking her about any

20  paper document.  I asked her if she had received any

21  text messages from defendants today.  And the answer

22  was no.

23       MR. UNGAR:  Thank you.

24  ///

25  ///

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1           (Plaintiff's Exhibit 66 was

2           previously marked for identification

3           by the FTC and is attached hereto.)

4    BY MR. TEPFER:

5        Q.    Sorry.  I'm going to ask, just, about a few

6    emails now.  I'm handing the witness what's been

7    marked as Exhibit 66.

8           Do you -- it says this email was sent in

9    March of 2010, so it's been a while, but just wanted

10   to see if you recalled receiving this email.

11       A.    No.

12       Q.    Do you know who Kristina Perez is?

13       A.    Vaguely.

14       Q.    Who is she?

15       A.    I think she helped us get a merchant

16   account, but I'm not a hundred percent sure.

17       Q.    And when you say "us," who are you referring

18   to?

19       A.    BunZai Media.

20       Q.    Do you know, do you recall if it was a

21   domestic or overseas merchant account?

22       A.    I don't remember.

23       Q.    Do you know if BunZai Media Group had any

24   overseas merchant accounts?

25       A.    I don't remember.

106

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      Q.   Do you know if BunZai Media Group ever sold

2   AuraVie products overseas by continuity?

3      A.   I don't think so.

4           MR. UNGAR:  Objection as to the form of the

5   question, vague and ambiguous, calls for

6   speculation.

7           THE WITNESS:  Not while I was there.

8   BY MR. TEPFER:

9      Q.   Do you know if after you left, they sold

10  overseas by continuity plan?

11     A.   No, I don't.

12          MR. UNGAR:  Objection as to the form of the

13  question, vague and ambiguous, calls for

14  speculation, lacks foundation.

15  BY MR. TEPFER:

16     Q.   On 66-2, on the next page, the email from

17  Alon Nottea states "Because we are all stressed for

18  time - this is an email I send to Affiliate Networks

19  and new publishers."

20          Do you know if Alon Nottea handled the

21  business relationships with BunZai's affiliate

22  networks?

23     A.   I don't remember.

24     Q.   Had you ever referred this or had you ever

25  reviewed this, I guess, this email sent to affiliate

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    networks before?

2        A.    I don't remember.

3        Q.    Okay.  I guess we'll go to 67-1.

4              And I just want to say I had to meet the

5    4 dollar limit, so if anybody wants a water, there's

6    a spare one.

7        A.    Yours is a better brand.

8        Q.    You're welcome to it if you want.

9        A.    Oh, no.  It's okay.

10             (Plaintiff's Exhibit 67 was

11             previously marked for identification

12             by the FTC and is attached hereto.)

13   BY MR. TEPFER:

14       Q.    I'm handing the witness what's been marked

15   67-1 -- or 67, rather.

16             Have you ever reviewed this document before?

17       A.    No.

18       Q.    It's -- the metadata referred to you as

19   being the author of this document.  Do you know if

20   you drafted any of the language in here?

21       A.    I don't remember.

22       Q.    Do you know who Oz Mizrahi is?

23       A.    I know of him, yes.

24       Q.    What do you know about Oz Mizrahi?

25       A.    I remember he was a friend of Alon's.

Yalley
FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      Q.    Did you ever work with Oz Mizrahi?

2      A.    No.

3      Q.    I can't remember if you said that -- did you

4    work at Pinnacle Logistics ever?

5      A.    No.

6      Q.    Do you know who founded Pinnacle Logistics?

7      A.    No.

8      Q.    Do you know anybody that worked at Pinnacle

9    Logistics?

10     A.    Yes.

11     Q.    Who do you know who worked as Pinnacle

12   Logistics at any point?

13     A.    Andree, Sandra.

14     Q.    And that was Andree and Sandra?

15     A.    Yes.

16     Q.    Two different people?

17     A.    Yes.

18     Q.    Okay.  And do you know of anyone else?

19     A.    I think Leor was under there.

20     Q.    How do you know that these individuals you

21   just described worked at Pinnacle?

22     A.    They were part of HR and Customer Service.

23     Q.    Did BunZai Media Group have any sort of

24   business relationship with Pinnacle Logistics that

25   you're aware of?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1       A.    Pinnacle, they took care of the orders for

2    AuraVie.

3       Q.    And would you ever interact with those

4    employees at Pinnacle while you worked at BunZai

5    Media Group, while you worked there?

6       A.    Interact, yes.

7       Q.    'Cause they were -- I believe you stated --

8       A.    In the same building.

9       Q.    Right.

10           In that building, what -- do you recall the

11   location?

12      A.    Yes.

13      Q.    What was that?

14      A.    7900 Gloria Avenue.

15      Q.    We talked about some of the other companies

16   earlier that you said had merchant accounts for

17   AuraVie.  So Pinnacle did or handled the HR for

18   BunZai; is that right?

19      A.    No.

20           MR. UNGAR:  Objection as to the form of the

21   question.  It's vague and ambiguous, calls for

22   speculation, it's leading, and it lacks foundation.

23   BY MR. TEPFER:

24      Q.    You can answer.

25      A.    I wouldn't say so, no.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1     Q.   Who did -- you referred to Pinnacle

2   Logistics as, I guess, having an HR Department; is

3   that right?

4     A.   Person, yes.

5     Q.   Oh, HR person.

6          Do you know what -- did Pinnacle Logistics

7   handle HR for companies, aside from Pinnacle

8   Logistics?

9     A.   I wouldn't know.

10         MR. UNGAR:  Objection as to the form of the

11  question.  It's vague and ambiguous, calls for

12  speculation, lacks foundation.

13  BY MR. TEPFER:

14    Q.   I want to talk about, to jump back to what

15  we were talking about, about the various companies

16  that had merchant accounts for processing AuraVie.

17    A.   Mm-hmm.

18    Q.   I want to talk about the location of those

19  companies.

20         Those companies that you described, did they

21  have a physical location?

22    A.   The ones that I know of, no.

23    Q.   Where were they?  So you said they didn't

24  have a physical location?

25    A.   They had a mailbox.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      Q.    So just sort of a drop box?

2      A.    P.O. Box.

3            MR. UNGAR:  Objection.  Objection.

4    Objection as to the form of the question.  It's

5    vague and ambiguous, it misstates the testimony of

6    the witness, and it's argumentative.

7    BY MR. TEPFER:

8      Q.    Who would -- do you know who would go and

9    get the mail at these various drop -- or at these

10   various P.O. Boxes?

11     A.    Sometimes I would.  Sometimes Leor.  Who --

12   wherever they were, who was closest to.

13     Q.    When you went to pick up the mail, who would

14   you give it to, typically?

15     A.    It depends what the mail was.

16     Q.    So it would sometimes go to various

17   individuals?

18     A.    Yes.

19     Q.    Would you ever provide Alon Nottea mail that

20   was addressed to other individuals, that was

21   received at these drop boxes?

22     A.    I wouldn't remember.

23     Q.    And you said that they didn't have a --

24   these businesses didn't have a physical location,

25   necessarily.  Do you know where those companies we

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1     discussed were operated?

2            MR. UNGAR:  Objection as to the form of the

3     question.  It's vague and ambiguous, it misstates

4     the prior testimony of the witness, calls for

5     speculation, lacks foundation.

6            THE WITNESS:  No.

7     BY MR. TEPFER:

8        Q.   Who was -- so you mentioned -- just to be

9     clear, the employees that you mentioned at Pinnacle

10    Logistics were Leor, Andree, and one other person.

11    I forgot.

12       A.   Sandra.

13       Q.   And do you know if Roi Reuveni worked at

14    Pinnacle Logistics?

15       A.   I'm not sure --

16       Q.   Sure.

17       A.   -- if he was under that company.

18       Q.   Did you ever work for a company called Media

19    Urge, Inc.?

20       A.   Yes.

21       Q.   When did you work for Media Urge?

22       A.   I don't remember the exact dates.

23       Q.   Do you remember the years?

24       A.   2000 -- end of 2012, until when I left.

25       Q.   And when did you leave again?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                   2/17/2016

1       A.    2013.

2       Q.    And how come you left?

3       A.    I found another job.

4       Q.    Who hired you at Media Urge?

5       A.    I don't know how to answer that.

6       Q.    How do you mean?

7       A.    It was just another one of their companies,

8   so there was no hiring process.

9       Q.    And you said "another one of their

10  companies."  Who are you referring to?

11      A.    I don't know who -- I don't know who owned

12  it, but it was one of their companies that --

13  BunZai's companies or something.

14      Q.    Okay.  So it was, it was in that same group

15  of companies?

16      A.    Yes.

17            MR. UNGAR:  Objection as to the form of the

18  question.  It's vague and ambiguous, it's

19  argumentative.

20  BY MR. TEPFER:

21      Q.    Who was your supervisor at Media Urge?

22      A.    Alon.

23      Q.    Do you know anyone else who worked at Media

24  Urge?

25      A.    Yes.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

```
 1       Q.    Who's that?

 2       A.    Paul and Victor Azal.

 3       Q.    Did you all work on, I guess, the -- well, I

 4    guess I'll just ask.

 5             What did you do at Media Urge?

 6       A.    I did accounting, the records that I

 7    mentioned earlier, and worked with affiliates,

 8    basically just making sure that their stats lined up

 9    properly, they had the right number of sales, and

10    then, you know, getting their invoices, paying their

11    invoices, AR -- you know, AP, stuff like that.

12       Q.    Did Doron Nottea ever assist you in your

13    work while at Media Urge?

14       A.    In what regard?

15       Q.    In any regard.

16       A.    I think so.

17       Q.    How so?

18       A.    With accounting.

19       Q.    What sort of -- like how did he help you

20    with your accounting?

21       A.    Like where to pay people from.

22       Q.    Anything else?

23       A.    That was basically it.

24       Q.    Do you recall when -- did BunZai Media Group

25    ever cease operating while you were there?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1      A.   I don't know.

2           MR. UNGAR:  Objection as to the form of the

3      question.  It's vague and ambiguous.

4      BY MR. TEPFER:

5      Q.   Do you recall any of the vendors that you

6      would pay at Media Urge?

7      A.   Vendors?  Define "vendors."

8      Q.   Like -- well, I think you were talking about

9      sending invoices or something.

10     A.   Yes, to affiliate networks.

11     Q.   Oh, okay.  And do you know what those

12     affiliates were marketing?

13     A.   Were marketing?

14     Q.   Yes.

15     A.   Oh.  AuraVie.

16     Q.   Who informed you that you were going to be

17     switching over from BunZai to Media Urge?

18          MR. UNGAR:  Objection as to the form of the

19     question.  It's vague and ambiguous, and it assumes

20     facts not in evidence, and it's leading.

21          THE WITNESS:  I would say Alon.

22          (Plaintiff's Exhibit 68 was

23          previously marked for identification

24          by the FTC and is attached hereto.)

25     ///

116

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    BY MR. TEPFER:

2        Q.    Okay.  I'm handing the witness what's been

3    marked as Exhibit 68.

4              Do you remember sending this email?

5        A.    No.

6        Q.    It's probably not too memorable, but do you

7    know what Jacem Healthy Products is?

8        A.    Sorry.  I'm thinking.

9        Q.    That's okay.

10       A.    Manufacturer.

11       Q.    Okay.  Of --

12       A.    Of AuraVie SkinCare.

13       Q.    Okay.  And do you recall why you included

14   Doron on this email?

15       A.    'Cause he also helped with accounting.

16       Q.    Okay.

17             MR. UNGAR:  Move to strike as nonresponsive

18   and on the grounds of speculation.

19   BY MR. TEPFER:

20       Q.    Do you know who used the email address

21   accounting818@gmail.com?

22       A.    Yes.  Philip.

23       Q.    Who's Philip?

24       A.    He was Doron's assistant.

25       Q.    Oh, is that Philip Camerino?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1      A.   Yes.

 2      Q.   What did Philip Camerino assist Doron with?

 3      A.   I wouldn't know exactly.

 4           MR. UNGAR:  Objection.  Objection as to the

 5   form of the question.  It's vague and ambiguous, it

 6   calls for speculation, it lacks foundation.

 7   BY MR. TEPFER:

 8      Q.   What -- do you know who used the email

 9   address accounting@sbmmgmt.com?

10      A.   I don't remember.

11      Q.   Do you know who Matan Gal is?

12      A.   Yes.  I remember him.

13      Q.   What did he do?

14      A.   He worked at Media Urge, also.

15      Q.   Okay.  What sort of stuff did he do there?

16      A.   Internal media buying.

17           (Plaintiff's Exhibit 69 was

18           previously marked for identification

19           by the FTC and is attached hereto.)

20   BY MR. TEPFER:

21      Q.   I'm handing the witness what's been marked

22   Exhibit Number 69.

23           Do you remember sending this email?

24      A.   No, I don't remember sending it, but it

25   looks like when I left.
```

118

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      Q.   Oh, okay.  You were -- so this was sort
2   of -- this was an email you sent when you were
3   leaving the company?
4      A.   Yes.
5      Q.   And what were you -- what was the purpose of
6   sending this email?
7      A.   Philip was handing the -- like, I mean, when
8   you leave the company, you need to clean everything
9   up, so, you know --
10     Q.   So you were just sort of --
11     A.   Just sorting everything out.
12     Q.   Okay.  And so you were sort of passing on
13  these duties to Doron's assistant?
14     A.   Yes.
15     Q.   Did you ever consider yourself Doron's
16  assistant?
17     A.   Maybe.  Actually, no.
18     Q.   Did you ever do any accounting for SBM
19  Management, Inc.?
20     A.   Yes.  The same reports that I did for
21  everything else.
22     Q.   Mm-hmm.  So you said -- it says here that
23  you did an accounting report for Paul weekly.  Is
24  that like what's attached here in 62, 3 and 4?
25     A.   Yeah, I guess.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1     Q.    Or 69, 3 and 4?  Sorry.

2     A.    I guess so.  Yes.

3     Q.    At the middle of the page you say "For the

4     internal sales we only run Clickbooth."

5           What are internal sales?

6     A.    Where does it say that?

7     Q.    Sorry.  It's like right at the middle.

8     A.    Make sure --

9     Q.    In the middle, from the first blacked out

10    area.

11    A.    Internal sales -- that's internal media

12    buying.

13    Q.    What is internal media buying?

14    A.    That's sales that we get ourselves as a

15    company.  Sorry.

16    Q.    So Media Urge would do its own marketing --

17    A.    Yes.

18    Q.    -- of AuraVie?

19    A.    Yes.

20    Q.    I guess we could jump to Exhibit 71.

21          (Plaintiff's Exhibit 71 was

22          previously marked for identification

23          by the FTC and is attached hereto.)

24    BY MR. TEPFER:

25    Q.    So I'm handing the witness what's been

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1   marked as Exhibit 71.  It's a pretty extensive
 2   report that had you as the author.
 3          Do you recall drafting a report similar to
 4   this?
 5      A.   No.
 6          MR. UNGAR:  What is the -- what is the date
 7   on Exhibit 71?
 8          MR. TEPFER:  There's no date on the
 9   document.  Oh, I guess at the top it refers to
10   visits for all visitors from 1/1/12 to 2/29/12, but
11   that's not the date the document was created, if
12   that is of any help, though.
13   BY MR. TEPFER:
14      Q.   And I just was wondering if you could
15   explain to me what this document is.
16      A.   I don't know.
17      Q.   Yeah, I couldn't figure it out either.
18          Do you know if BunZai Media Group tracked
19   what -- tracked the search terms used to pull up its
20   websites?
21      A.   I don't remember.
22      Q.   Maybe -- do you want to break at, like,
23   12:30 for lunch?  Does that sound good?
24      A.   That's fine.  I don't -- we can keep going.
25      Q.   Yeah, we'll try not to drag it on, as much
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    as we can.

2              If we could skip ahead -- and I'll come back

3    to these -- to Exhibit 77.

4              (Plaintiff's Exhibit 77 was

5              previously marked for identification

6              by the FTC and is attached hereto.)

7    BY MR. TEPFER:

8        Q.   I'm now handing the witness what's been

9    marked Exhibit 77.

10             This Customer Service Training Manual had

11   you as the author of it.  Do you remember drafting

12   this document?

13       A.   I don't remember drafting it, no.

14       Q.   Have you ever reviewed it --

15       A.   Now I am.

16       Q.   -- before today?

17       A.   Probably.

18       Q.   So if you could turn to 77-19.  Under the

19   heading "10-Day Trial," number 2, numeral 5, it

20   states "Explain to the customer that they are only

21   entitled to a 10 day portion of the 30 day supply."

22             Does that -- I wanted to see.  Does that

23   mean that a customer is only entitled to use a third

24   of the, I guess, the product?

25       A.   I'm not -- I'm not exactly sure about --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          MR. UNGAR:  Objection.  Objection as to the

2     form of the question.  It's vague and ambiguous,

3     it's leading.

4          THE WITNESS:  I don't remember what that

5     was, what that means.

6     BY MR. TEPFER:

7       Q.   Do you remember if customers were allowed to

8     use the entire bottle of AuraVie that was sent to

9     them in the risk free trial?

10      A.   I don't remember.

11         MR. UNGAR:  Objection as to the form of the

12    question.  It's vague and ambiguous, calls for

13    speculation, lacks foundation.

14         THE WITNESS:  I don't remember.

15    BY MR. TEPFER:

16      Q.   Do you recall if customers who returned the

17    risk free trial were typically charged a restocking

18    fee?

19         MR. UNGAR:  Objection as to the form of the

20    question.  It's vague and ambiguous, it calls for

21    speculation, and it lacks foundation.

22         THE WITNESS:  I believe if they returned it

23    within the time, they weren't charged anything.

24    BY MR. TEPFER:

25      Q.   On the next page, 77-20, I'm just going to

123

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1     read this portion here.

2              "When speaking with an upset

3          customer and you decide to give them

4          a partial refund.  Agent:  If you

5          will hold on for a minute or so, I

6          will speak with my supervisor.  Put

7          the customer on hold (minimum of 2

8          minutes...longer if you feel the

9          customer needs to chill out more -

10         remember you are supposed to be

11         pleading their case to the

12         supervisor, and that takes time!)"

13         Do you know if this was the standard

14    operating procedure for the Customer Service at, for

15    AuraVie products?

16      A.   No.

17         MR. UNGAR:  Objection as to the form of the

18    question.  Calls for speculation, lacks foundation.

19         THE WITNESS:  No, I believe this was written

20    before we actually started getting any sales.

21         MR. UNGAR:  Move to strike everything after

22    "No."

23    BY MR. TEPFER:

24      Q.   Do you know if customers who were returning

25    products had to, I guess, paste the RMA number on

Yalley

FTC v. Bunzai Media Group, Inc., et al.                         2/17/2016

1    the outside of the box when returning it?

2        A.    I think so.

3        Q.    Do you know what the procedure was for

4    customers that returned the product without doing

5    that?

6        A.    I don't remember.

7        Q.    If you'd turn to 77-41 in there.  Do you

8    remember -- this document says "Important - New

9    Customer Service Protocols."

10            Do you remember reviewing these Customer

11   Service protocols?

12       A.    No, I don't remember this.

13       Q.    And you didn't draft this?

14       A.    I -- I don't remember.

15       Q.    Okay.

16       A.    I don't think so.

17       Q.    About midway through the page, or a little

18   less than that, it says that you have to explain --

19            "You must explain to the

20            customer, that:  Because they filed

21            (or 'if they file') a chargeback, the

22            bank will hold that money for up to 6

23            months until they make a

24            determination, then the money will be

25            re-deposited into the winning parties

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1          account.  We win over 95% of customer

2          chargebacks, especially if the

3          customer admits they did not read the

4          T&C's.  Once we do win, it is or

5          protocol to send this information to

6          the customer's credit reporting

7          agencies, which will in-turn poorly

8          affect your credit rating."

9          Do you know if BunZai Media Group ever

10   referred to consumers' credit reporting agencies

11   information such as described here?

12      A.   I don't remember.  I don't -- I wouldn't

13   know.  I wasn't really involved in Customer Service.

14      Q.   Do you know, do you have any knowledge of

15   BunZai Media Group's success ratio in challenging

16   chargeback -- customer chargebacks?

17      A.   No.

18      Q.   Do you -- oh, I guess I'll just -- hmm.  I

19   think we can go to 73.

20          MR. GALLEGOS:  I don't have it here.  Is it

21   back there?  I have 74.

22          MR. TEPFER:  Let's just go to 74.  There's

23   73 (indicating).

24          MR. GALLEGOS:  Do you want it?

25          MR. TEPFER:  Yeah, I guess so.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    BY MR. TEPFER:

2        Q.   I'm now handing the witness what's been

3    marked Exhibit 73.

4             (Plaintiff's Exhibit 73 was

5             previously marked for identification

6             by the FTC and is attached hereto.)

7    BY MR. TEPFER:

8        Q.   Have you ever reviewed this document before?

9        A.   I don't remember.  I don't remember.

10       Q.   Do you have any knowledge of BunZai Media

11   Group's standard protocol for sending consumers to

12   collections?

13       A.   No.

14       Q.   Oh, I'm sorry.  Did you finish your review?

15       A.   Oh, you know, I don't -- I don't remember

16   this.

17       Q.   Sorry.  I was just --

18       A.   It's okay.

19       Q.   Do you know who at BunZai Media Group was in

20   charge of the, I guess, the collections process

21   there?

22       A.   Khris.

23       Q.   And I guess we can go to 74 real quick.

24   ///

25   ///

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1              (Plaintiff's Exhibit 74 was
 2              previously marked for identification
 3              by the FTC and is attached hereto.)
 4      BY MR. TEPFER:
 5         Q.   I'm now handing the witness what's been
 6      marked Exhibit 74.
 7              So this document was titled Chargeback
 8      Letter 2011 and had you as the author.  Do you
 9      recall drafting documents similar to this one?
10         A.   No.  I don't remember what this is.
11         Q.   Do you have any knowledge of what percentage
12      of BunZai Media Group's income came from
13      collections?
14         A.   Looking at this, it seems very small --
15         Q.   Uh-huh.
16         A.   -- so I don't know.
17              (Plaintiff's Exhibit 75 was
18              previously marked for identification
19              by the FTC and is attached hereto.)
20      BY MR. TEPFER:
21         Q.   I'm now handing the witness what's been
22      marked Exhibit 75.
23              Do you recognize that document?
24         A.   Yeah.
25         Q.   What is it?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

128

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

 1      A.    It is a list.  Also, this is document 75-1.

 2      Q.    Right.

 3      A.    Sorry.  You said 74.

 4      Q.    Sorry.

 5      A.    It's okay.

 6            It's a list of their accounts, their

 7    merchant accounts --

 8      Q.    And who's --

 9      A.    -- AuraVie's merchant accounts.

10      Q.    Mm-hmm.  Do you know who updated this

11    spreadsheet?

12      A.    I think myself --

13      Q.    And --

14      A.    - with Paul's help.

15      Q.    Do you know, did Rachel Nottea ever sell

16    these -- sell AuraVie products by continuity plan?

17      A.    What do you mean?

18      Q.    Like, it's listed here as -- Rachel Nottea,

19    in this column it says CEO, Owner, next to DMA Media

20    Holdings, Inc.

21      A.    Mm-hmm.

22      Q.    Did -- you did some work for DMA Holdings,

23    Inc.; correct?

24      A.    No.  I just did the accounting.

25      Q.    Yeah.  You did accounting for DMA Holdings,

129

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    Inc.?

2        A.   Yes.

3        Q.   Did you ever discuss your accounting work

4    with Rachel Nottea?

5        A.   No.

6        Q.   And did you do accounting work for Lifestyle

7    Media Brands, Inc.?

8        A.   The same reports, yes.

9        Q.   And did you ever discuss those reports with

10   Lori Bekhor?

11       A.   No.

12       Q.   Do you know who Tomer Amsalem is?

13       A.   No.

14       Q.   And I should spell that.  It's T-o-m-e-r

15   A-m-s-a-l-e-m.

16            And did those same reports, accounting

17   reports that you drafted, do they also contain

18   information concerning Safehaven Ventures, Inc.?

19       A.   Mm-hmm.

20       Q.   And did you ever discuss that with Tomer

21   Amsalem?

22       A.   No.

23       Q.   Do you know who Tal Topel is?  It's T-a-l

24   T-o-p-e-l.

25       A.   If it's the guy I'm thinking of, I remember

Yalley
FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1    him, sort of, but no.  No.
 2         Q.    What about Annasofie Algarp?
 3         A.    No.
 4         Q.    Oh, yeah.  Sorry.  A-n-n-a-s-o-f-i-e.
 5    That's one word.  And then Algarp is A-l-g- -- I
 6    think -a-r-p.  It's kind of small type.
 7              I guess we could go to -- is there -- on 75,
 8    under those corporations --
 9         A.    Mm-hmm.
10         Q.    -- is -- first let me ask.  I forgot to ask
11    about this person.  Sean Brennecke, do you know who
12    Sean Brennecke is?
13         A.    No.
14         Q.    And so, obviously -- never mind.  And that's
15    S-e-a-n B-r-e-n-n-e-c-k-e.
16              And so out of these corporations listed
17    under this third column, are there any corporations
18    listed there that you didn't include in your reports
19    about, I guess, the sale of AuraVie products?
20         A.    I don't think so.
21         Q.    And do you know if any of these corporations
22    had a physical address?
23         A.    I don't think so.
24         Q.    And is this -- and we were discussing
25    earlier Igor Latsanovski -- is this the report that
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                           2/17/2016

```
 1    you stated you would show to Igor Latsanovski?

 2         A.    No.

 3         Q.    Different report?

 4         A.    Yeah.  This is honestly just a list.

 5         Q.    I guess we could jump to 76.

 6               (Plaintiff's Exhibit 76 was

 7               previously marked for identification

 8               by the FTC and is attached hereto.)

 9    BY MR. TEPFER:

10         Q.    So this one, I'm handing the witness what's

11    been marked Exhibit 76.

12               Do you recognize this document?

13               MR. UNGAR:  Objection; vague and ambiguous.

14               What is it that you're referring to,

15    Counsel?  Is it an exhibit?  What's the exhibit

16    number?

17               MR. TEPFER:  76.

18               THE WITNESS:  No.

19    BY MR. TEPFER:

20         Q.    Did you ever see -- while you were at BunZai

21    Media Group, did you ever see documents

22    substantially similar to this one?

23         A.    Yeah.  I believe -- I think we get them in

24    email, something.

25         Q.    Who -- sorry.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1              Who sends what's in these reports?

2       A.    Roi.

3       Q.    Do you happen to know if he drafted these

4    reports?

5       A.    No, not for sure.

6       Q.    I'm just looking up at this, up at this top

7    column here.

8       A.    Mm-hmm.

9       Q.    Those list of names, do you know who those

10   people are?

11      A.    Most of them.

12            MR. UNGAR:   Objection as to the form of the

13   question.   It's vague and ambiguous.

14            THE WITNESS:   Most of them I know of, yeah.

15   BY MR. TEPFER:

16      Q.    Did those individuals work in any particular

17   department at BunZai?

18      A.    Yes.   Customer Service.

19      Q.    And then in the next column, it says "Count

20   of CB Agent Responsible."

21      A.    Mm-hmm.

22      Q.    Do you know what that means?

23      A.    Count of chargebacks.

24      Q.    Does that mean the number of chargebacks

25   each of these agents is responsible for; do you

133

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1   know?

2           MR. UNGAR:  Objection as to the form of the

3   question.  It's vague and ambiguous, it's leading,

4   it calls for speculation, it lacks foundation.

5           THE WITNESS:  Not for sure.

6   BY MR. TEPFER:

7       Q.   Mm-hmm.  Do you know if BunZai typically

8   kept track of, I guess, the number of chargebacks

9   per Customer Service agent?

10      A.   Not for sure.  Not my department.

11      Q.   Sure.

12          I guess we could jump to 76.

13          MR. GALLEGOS:  I think we already gave her

14  76.

15          MR. TEPFER:  Yeah.  I meant 78.

16          (Plaintiff's Exhibit 78 was

17          previously marked for identification

18          by the FTC and is attached hereto.)

19  BY MR. TEPFER:

20      Q.   I'm now handing the witness what's been

21  marked Exhibit 78.

22          Do you remember sending this email?

23      A.   No, I don't.

24      Q.   That email address doron@bunzaimedia.com, is

25  that Doron Nottea?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

134

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      A.   Yes.

2      Q.   While you worked at BunZai Media Group, do

3   you recall how many merchant accounts were closed?

4      A.   Were closed?  No, I don't remember.

5      Q.   Do you ever recall merchant accounts being

6   closed while you were there?

7      A.   Not specifically.  I -- yeah.

8      Q.   Do you know if BunZai Media Group ever had a

9   merchant account closed by the payment processor?

10     A.   I don't remember.

11     Q.   I guess we can jump to 79.

12          (Plaintiff's Exhibit 79 was marked

13          for identification by the FTC and is

14          attached hereto.)

15   BY MR. TEPFER:

16     Q.   And this is a photocopy from something that

17   we found in Suite 105 on Canby.

18     A.   In Reseda?

19     Q.   Yeah.

20          MR. UNGAR:  What is the exhibit number?

21          MR. TEPFER:  This is Exhibit 79.

22   BY MR. TEPFER:

23     Q.   Do you recognize that handwriting?

24     A.   Yes.  It's mine.

25     Q.   And it says Igor salary is $7,500.  Is that

135

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    the amount that Igor would typically receive in

2    salary?

3         A.   I don't -- I can't remember at this point.

4         Q.   Do you recall if Igor received a monthly

5    salary?

6         A.   No, I don't remember.

7         Q.   I guess we could jump to 80.

8              (Plaintiff's Exhibit 80 was

9              previously marked for identification

10             by the FTC and is attached hereto.)

11   BY MR. TEPFER:

12        Q.   I'm now handing the witness what's been

13   marked Exhibit 80.

14             What, do you know what this affiliate, what

15   an Affiliate Traffic Protocol is?

16        A.   Yeah.

17        Q.   What is it?

18        A.   A protocol for handling affiliate traffic.

19        Q.   So is it like -- and you'll have to forgive

20   me.  All this stuff is sort of new to me.  But is

21   that like, I guess, a way for reviewing affiliates'

22   advertising?

23        A.   That and the number --

24             MR. UNGAR:  Objection to the form of the

25   question.  It's leading.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    BY MR. TEPFER:

2        Q.   You can go ahead.

3        A.   Okay.  Do you want an answer according to

4    this document?

5        Q.   No.  Just your knowledge.

6        A.   Yeah.  Reviewing where their traffic is

7    coming from, what type of traffic sources they're

8    using, how many sales they get, et cetera.

9        Q.   Do you know who at BunZai Media Group, while

10   you were there, was in charge of this sort of

11   affiliate traffic review?

12       A.   That would probably be me.

13       Q.   What sort of stuff would you check for in

14   your -- in, I guess, this affiliate traffic?

15       A.   Again, how many sales they got, if there's

16   any fraud with the sales, types of things that they

17   were using to promote the traffic.

18       Q.   So -- and who did you report to about this

19   stuff?

20       A.   Alon.

21       Q.   Anyone else?

22       A.   Well, report like -- I don't know.  I told

23   anyone, like Paul, Khris.  I mean, they were all

24   kind of part of that marketing.

25       Q.   Mm-hmm.  Did you draft this document; do you

137

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                      2/17/2016

1      know?

2          A.    Probably.

3          Q.    In -- on 80-3, the second one, at Number 2,

4      it states, "First and foremost the word 'Sample' can

5      never be associated with AuraVie anywhere!"

6              Why did you write that?

7          A.   I don't remember why at the time.

8          Q.   Can you think of any reason that AuraVie

9      can't be associated with the word "sample"?

10         A.    It wasn't a sample.

11         Q.   Are you aware if BunZai Media Group had an

12     issue with customers thinking that their risk free

13     trial was, in fact, a sample at any point?

14             MR. UNGAR:  Objection as to the form of the

15     question.  It's vague and ambiguous.

16             THE WITNESS:  I can't remember specifically.

17     BY MR. TEPFER:

18         Q.   And you referred to, sort of, reviewing

19     affiliate traffic for fraud.  What sort of fraud was

20     an issue for BunZai?

21         A.   What we considered fraud, if someone, if a

22     customer, if an affiliate gave us a lot of sales and

23     a lot of customers called and complained, they were

24     probably doing something wrong.  So that's what we

25     would consider fraud.  We wouldn't pay for those

138

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1   sales.  So --
 2       Q.    Uh-huh.
 3       A.    It wouldn't make any sense if a customer
 4   called immediately and canceled.
 5       Q.    So if it -- if it was --
 6       A.    Most likely, if they were using misleading
 7   tactics, like using the word "sample" --
 8       Q.    Mm-hmm.
 9       A.    -- or give it away or -- I see it says "give
10   it away if you like."  We didn't accept those
11   either.
12       Q.    Mm-hmm.
13       A.    Or if the customer called and said their
14   card was stolen or something like that, then we
15   would stop that affiliate.
16            MR. TEPFER:  Do you want to -- can we take a
17   break for lunch?
18            MR. GALLEGOS:  Yeah, sure.  We're 10, 15
19   minutes ahead.  So off the record?
20            MR. TEPFER:  Yeah.  We're going to go off
21   the record and break for lunch.
22            (A discussion was held off the record.)
23
24            (Whereupon, at the hour of
25            12:12 p.m., a luncheon recess was
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1                    taken, the deposition to be resumed

2                    at 1:30 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1                    LOS ANGELES, CALIFORNIA
 2                WEDNESDAY, FEBRUARY 17, 2016
 3                        1:30 P.M.
 4
 5                    NASTASSIA YALLEY,
 6          having been previously duly sworn,
 7        was examined and testified as follows:
 8
 9          MR. TEPFER:  Back on the record.
10          Could you remind me what was the last
11    exhibit, if you know?
12          THE REPORTER:  80.
13          MR. TEPFER:  If we could jump to the next.
14          THE WITNESS:  I have it.
15          (Plaintiff's Exhibit 81 was
16          previously marked for identification
17          by the FTC and is attached hereto.)
18          MR. TEPFER:  Oh, 81.  I'm sorry.  I'm now
19    handing the witness what's been marked as
20    Exhibit 81.
21
22                    EXAMINATION
23    BY MR. TEPFER:
24        Q.   Do you recall receiving this email?
25        A.   No.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1     Q.    Do you know what XP Media is?

2     A.    No, I don't.  XP Media.

3     Q.    Do you know who Mohit Singla is?  And that's

4  M-o-h-i-t S-i-n-g-l-a.

5     A.    No, I don't.

6     Q.    Do you know what Fluent is?

7     A.    I think it's an affiliate network.

8     Q.    Okay.  Do you know why Media Urge might have

9  been applying for credit at this time?

10     A.    It's not credit.  When you want someone, an

11  affiliate to run traffic for you, you have to give

12  them references.  So that's what it is.  It's a

13  credit reference so they know that you're going to

14  pay them.

15     Q.    Oh, okay.  And so -- and is this email

16  concerning Media Urge's relationship with, I guess,

17  BunZai Media Group?

18     A.    No, I don't think so.

19     Q.    Oh, okay.

20     A.    Yeah.

21     Q.    I misread it.

22     A.    Oh, okay.

23     Q.    And it says Media Urge, Inc., and then in

24  parentheses (SBM Management, Inc.)  Were those two

25  companies -- was SBM Management, Inc., like a dba of

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    Media Urge, Inc.?

2           MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous, it assumes

4    facts not in evidence, calls for speculation, lacks

5    foundation.

6           THE WITNESS:  Well, also, I'd like to know.

7    It says SMB Management.

8    BY MR. TEPFER:

9       Q.   Oh, sorry.

10      A.   It's okay.  I don't know what that is

11   though.

12          MR. UNGAR:  And the objection will also

13   include misstates the document --

14          THE WITNESS:  It's --

15          MR. UNGAR:  -- Exhibit 81.

16          THE WITNESS:  Okay.  Sorry.  Now I forgot

17   the question.

18          MR. TEPFER:  Could you read it back.

19          (The previous question was read back

20          by the court reporter as follows:

21             "QUESTION:  And it says Media

22          Urge, Inc., and then in parentheses

23          (SBM Management, Inc.)  Were those

24          two companies -- was SBM Management,

25          Inc., like a dba of Media Urge,

143
Yalley
FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          Inc.?")

2              THE WITNESS:  I'm not sure.

3              MR. UNGAR:  Same objections.

4    BY MR. TEPFER:

5        Q.   If we could jump to 82.

6              (Plaintiff's Exhibit 82 was

7              previously marked for identification

8              by the FTC and is attached hereto.)

9    BY MR. TEPFER:

10       Q.   I'm now handing the witness what's been

11   marked as Exhibit 82.

12             So we've been talking a bit about, you know,

13   reports that you would, I guess -- accounting

14   reports that you drafted while you were at BunZai

15   Media Group.

16       A.   Yes.

17       Q.   Is this the sort of report that you've been

18   referencing?

19       A.   Yeah.

20       Q.   And so this is the type of report that Igor

21   reviewed with you?

22       A.   Uh-huh.  Yes.

23             MR. UNGAR:  Ob- --

24   BY MR. TEPFER:

25       Q.   And it says "To" and has "Doron."  Would you

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

144

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    typically provide these to Doron?

2         A.   Yes.

3         Q.   And you say, "working on July now...yes I

4    know I'm behind."

5              Is that -- was that -- did Doron, I guess,

6    specify how frequently you were supposed to send

7    these to him?

8         A.   I believe I mentioned before it was at the

9    end of every month, at the end of the bank statement

10   close date.

11        Q.   Okay.

12        A.   So --

13        Q.   On 82, slash -- or 82-8 -- yeah, I guess,

14   8 --

15        A.   8?  Sorry.  You said 8?

16        Q.   Yeah, yeah.  It says "Doron Amex Account 2."

17             Do you know what that refers to?

18        A.   An American Express account.

19        Q.   Is that --

20        A.   A credit card.

21        Q.   And Doron's personal credit card?

22        A.   I'm not sure.

23             MR. UNGAR:  Objection to the form of the

24   question, lacks foundation, calls for speculation.

25             THE WITNESS:  I'm not sure if it's his

145

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    personal -- I just nicknamed it that way.

2    BY MR. TEPFER:

3        Q.    And 82-9 says "Alon Amex Account."

4        A.    Same answer.  I don't think it's his

5    personal.  I think I just called it that, what it

6    was internally.

7        Q.    And I guess these accounts were used to pay

8    for business expenditures; is that correct?

9        A.    Yes.

10       Q.    Do you -- if you know what is Serenade

11   Marketing International, Inc.?

12       A.    That's Khristopher's company --

13       Q.    And --

14       A.    -- or was.

15            (Plaintiff's Exhibit 83 was

16            previously marked for identification

17            by the FTC and is attached hereto.)

18   BY MR. TEPFER:

19       Q.    Okay.  I'm handing the witness what's been

20   marked Exhibit 83.  I think I've asked you this.

21            Do you know who -- this is an email from

22   Kristina Perez to you.  Do you know who Kristina

23   Perez is?

24       A.    I think I said I know of her, yes.

25       Q.    Sorry.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
1        A.    That's okay.  I just can't remember what I
2    said.
3        Q.    Do you recognize -- so attached to this
4    document were the documents in 82-2 through?
5              MR. GALLEGOS:   83.
6    BY MR. TEPFER:
7        Q.    Yeah, sorry.  82-2 through 83-10.
8        A.    Yeah.
9        Q.    Do you recognize those documents?
10       A.    No.
11       Q.    Do you recall sending this email -- or
12   rather, receiving this email?
13       A.    No, I don't.
14       Q.    Do you know who Oleg Trushlya is?  And
15   that's O-l-e-g T-r-u-s-h-l-y-a.
16       A.    No, I don't know who that is.
17       Q.    And this is, I guess, 83-4.  That first box,
18   it says SkinCare OU.  Have you ever heard of that
19   company?
20       A.    I -- it sounds familiar, yes, but I don't
21   know what it was.
22       Q.    And on 83-3, there's reference to Rietumu
23   Banka.  And that's R-i-e-t-u-m-u and then B-a-n-k-a.
24   Have you heard of that bank?
25       A.    Rietumu?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1       Q.    Yeah, Rietumu Banka.

2       A.    I can't -- I don't remember hearing this,

3    no.

4       Q.    Sure.

5       A.    I don't even know what language this is in.

6       Q.    Yeah, that's a good question.

7            Do you know if Alon ever, I guess, had an

8    ownership in a company that did business in Latvia?

9            MR. UNGAR:  Objection as to the form of the

10   question.  It's vague and ambiguous, calls for

11   speculation, lacks foundation.

12           THE WITNESS:  No, I don't know.

13   BY MR. TEPFER:

14      Q.    What about Estonia?

15           MR. UNGAR:  Objection as to the form of the

16   question.  It's vague and ambiguous, lacks

17   foundation, calls for speculation.

18           THE WITNESS:  No, I don't know if he did.

19           MR. TEPFER:  If we could go to 84.

20           (Plaintiff's Exhibit 84 was

21            previously marked for identification

22            by the FTC and is attached hereto.)

23   BY MR. TEPFER:

24      Q.    I'm now handing the witness what's been

25   marked as Exhibit 84.

148

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1              Do you recall receiving this email?

2       A.    No, I don't remember receiving it.  No.

3       Q.    And do you recall on 84-2, the Pinnacle

4    Logistics Advance Policy, do you recall ever

5    reviewing that policy?

6       A.    Yes.

7       Q.    Who asked you to or why did you review that

8    policy?

9       A.    They gave out -- sometimes employees

10   would -- like Customer Service employees would ask

11   for an advance or a loan, so -- and since I did the

12   accounting, sometimes I would have to write the

13   check, so --

14      Q.    Mm-hmm.

15      A.    -- I think Leor just wanted my input on it.

16      Q.    And so did you, I guess -- at this time were

17   you doing accounting for Pinnacle Logistics?

18      A.    Yeah.

19      Q.    And do you know, do you have any idea why

20   Leor might have sent this to Doron?

21      A.    Again, he helps with accounting.

22      Q.    I guess we could go to 88.

23            (Plaintiff's Exhibit 88 was

24            previously marked for identification

25            by the FTC and is attached hereto.)

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    BY MR. TEPFER:

2        Q.   I'm now handing the witness what's been

3    marked Exhibit 88.

4             Do you remember sending this email to Doron?

5        A.   No, I don't remember sending this.  No.

6        Q.   But --

7        A.   Sorry.  I'm reading it.

8        Q.   Oh, sure, sure.

9        A.   Yeah.  No, I don't remember.

10       Q.   Do you know what you're talking about in

11   this email?

12       A.   I think it's to be able to accept PayPal.

13   Yeah, it says PayPal payments from AuraVie.com.

14       Q.   Okay.  So this is just --

15       A.   To verify a PayPal account.

16       Q.   Okay.

17       A.   Like if you sign up, they put in, like,

18   7 cents or something in your account.  You just have

19   to report that to PayPal, so they know it's your

20   account.

21       Q.   Right.

22       A.   That's -- yeah.

23       Q.   Okay.  I'm going to jump to Exhibit 91.

24   ///

25   ///

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1            (Plaintiff's Exhibit 91 was
 2            previously marked for identification
 3            by the FTC and is attached hereto.)
 4    BY MR. TEPFER:
 5       Q.   I'm now handing the witness what's been
 6    marked Exhibit 91.
 7            Do you recall receiving this email from
 8    Kristina Perez?
 9       A.   No, I do not.
10       Q.   In the email she references having, you
11    know, contracts signed over the weekend and
12    returning them to her.  Do you know if you ever did
13    that?
14       A.   I'm not sure.  Well, wait.  Okay.  Yeah.
15    No, I don't think so.  I don't know.
16       Q.   In -- on 91-2, under the email from you, you
17    state "We chose those descriptors because we plan on
18    doing load balancing, and we needed names that could
19    apply to either product since they will all be used
20    for each website."
21            Would you mind explaining what you mean
22    there?
23            MR. UNGAR:  Objection as to the form of the
24    question.  It's vague and ambiguous, compound.
25    ///
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    BY MR. TEPFER:

2        Q.   Can you --

3        A.   Does it have the descriptors anywhere else

4    that I can reference to, like in this email?

5        Q.   Let's see.  I guess what I'm sort of curious

6    about, do you recall if these merchant accounts were

7    used to sell multiple or, I guess, various types of

8    products?

9             MR. UNGAR:  Objection as to the form of the

10   question.  Vague and ambiguous.

11            THE WITNESS:  Types, no.  They only sold

12   skin care.

13   BY MR. TEPFER:

14       Q.   Did they sell, I guess, different brands of

15   skin care products through merchant accounts,

16   typically?

17            MR. UNGAR:  Objection as to the form of the

18   question, vague and ambiguous.

19            THE WITNESS:  When I was there, we only sold

20   Miracle Face Kit and Aura Vie.

21   BY MR. TEPFER:

22       Q.   Uh-huh.  Did your supervisors ever explain

23   to you why the descriptors did not state AuraVie in

24   them?

25            MR. UNGAR:  Objection as to the form of the

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    question.  It's vague and ambiguous, assumes facts

2    not in evidence, calls for speculation, lacks

3    foundation.

4          THE WITNESS:  I'm going to assume so, 'cause

5    I explained it in the email.

6          MR. UNGAR:  Move to -- move to strike as

7    nonresponsive.

8          THE WITNESS:  It says, "We needed names that

9    could apply to either product", so I'm going to go

10   with that.

11   BY MR. TEPFER:

12        Q.   Is there any other reason you can think of

13   why?

14        A.   No.

15        Q.   Okay.  Under -- on this email on 91-4, that

16   first email from Kristina, it says under Number 2,

17   "For the eyes of the bank or Visa/MC network you

18   wish to keep Estonia corp and BunZai separately

19   which is fine, but for the processor we need to

20   connect the dots between BunZai package we sent

21   earlier for pre-approval and OY."

22        Do you know what -- or do you know what

23   Estonia corp Kristina is referring to?

24        MR. UNGAR:  Objection as to the form of the

25   question.  It's vague and ambiguous.

153

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1              THE WITNESS:  No, I don't.
 2     BY MR. TEPFER:
 3        Q.   Do you know what she meant by "OY" there in
 4     the second line?
 5        A.   No.
 6              MR. UNGAR:  Objection as to the form of the
 7     question.  It's vague and ambiguous, calls for
 8     speculation, lacks foundation.
 9              THE WITNESS:  No, I don't.
10     BY MR. TEPFER:
11        Q.   I guess we could go to, yeah, 92, although I
12     didn't properly number this.  So we're going to just
13     quickly do it with a pen.
14        A.   I have one.
15              (Plaintiff's Exhibit 92 was
16              previously marked for identification
17              by the FTC and is attached hereto.)
18     BY MR. TEPFER:
19        Q.   I'm just going to number it real quick.
20              All right.  I'm now handing the witness
21     what's been marked Exhibit 92.
22              Do you recall receiving this email from, I
23     guess, Lime Light CRM Support?
24        A.   No, I don't remember this.
25        Q.   What's Lime Light?
```

154

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      A.    Lime Light is a CRM, a Customer Relationship
2    Management software.
3      Q.    And did BunZai Media Group have, I guess --
4    did they, in this CRM software, segregate sales made
5    from California than from those of the rest of the
6    United States?
7      A.    I can't remember.  What do you mean
8    "segregate"?  Well, you know what?  I don't
9    remember.
10     Q.    Sure.
11          Like did they ever, I guess, use a separate
12   campaign or, I guess, process them in a separate
13   account?
14     A.    A separate --
15          MR. UNGAR:  Objection as to the form of the
16   question.  It's vague and ambiguous, compound.
17          THE WITNESS:  I don't believe so.
18   BY MR. TEPFER:
19     Q.    Do you know what Salt Souffle is?
20     A.    Yes.  It was one of the -- it was an upsell
21   product.  That's Canada.
22     Q.    Oh, is it really?
23     A.    (Witness shakes head up and down.)
24     Q.    Okay.  So that's my bad.  So CA is --
25     A.    CAD is Canada currency.  But when I was

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    there, we were not -- we weren't selling in Canada,

2    so I don't --

3        Q.   Thanks.

4        A.   Yeah.

5        Q.   Well, I totally missed that.  CAD.

6             So this was for -- so while you were there,

7    were your supervisors considering, I guess,

8    expanding into sales in Canada?

9        A.   I believe so.

10            MR. UNGAR:  Objection as to the form of the

11   question.  It's vague and ambiguous, assumes facts

12   not in evidence, calls for speculation, and lacks

13   foundation.

14   BY MR. TEPFER:

15       Q.   And what makes you think that your

16   supervisors were considering that?

17            MR. UNGAR:  Objection as to the form of the

18   question.  Lacks foundation, it's vague and

19   ambiguous.

20            THE WITNESS:  Do I answer?  Okay.

21   BY MR. TEPFER:

22       Q.   If you understand it.

23       A.   Yeah.  I -- I just remember seeing a

24   document files yesterday that said something about

25   Canada.

156

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1      Q.    Okay.

2      A.    So that's -- again, it's an assumption.

3      Q.    Sure.

4            MR. UNGAR:  Move to strike the response.

5   BY MR. TEPFER:

6      Q.    On -- so cc'd on that email is

7   avicoglobal@gmail.com.  Do you know who that is?

8      A.    Avi.

9      Q.    Do you know what his role was in regard to

10  this Lime Light CRM support while you were there?

11     A.    He had not --

12           MR. UNGAR:  Objection to the form of the

13  question.  It's assumes facts not in evidence.

14           THE WITNESS:  I don't think -- he'd have

15  nothing to do with Lime Light.  He owned Commerce

16  Pack, though.

17           MR. UNGAR:  Move to strike everything after

18  "had nothing to do with Lime Light" as nonresponsive

19  to the question.

20  BY MR. TEPFER:

21     Q.    So I guess Alan Argaman owned Commerce Pack;

22  is that correct?

23     A.    I think so.

24           MR. UNGAR:  Objection to the form of the

25  question.  It's vague and ambiguous, it's leading,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

157

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

 1    it assumes facts not in evidence, calls for

 2    speculation, lacks foundation.

 3    BY MR. TEPFER:

 4        Q.   And what was -- I know you've already told

 5    me this, but what was Commerce Pack again?

 6        A.   From what I remember, it processed -- we

 7    processed the AuraVie sales, AuraVie.com sales, just

 8    like a basic storefront.  And I think that's how

 9    they process the shipping labels.

10        Q.   And when you say, I guess, "process the

11    sales," was Commerce Pack like a merchant processor?

12        A.   No.  They just --

13             MR. UNGAR:  Objection as to the -- objection

14    as to the form of the question.  It's leading, it's

15    vague and ambiguous, calls for speculation, lacks

16    foundation.

17             THE WITNESS:  No, just a customer service

18    management system.

19    BY MR. TEPFER:

20        Q.   Okay.  What sorts of -- I guess, how -- how

21    was -- what sorts of things was the Commerce Pack

22    program used for?

23        A.   Again, from what I remember, receiving

24    customer information, shipping out the product.  You

25    could refund them from there, too.  So just like

158

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      Lime Light, pretty much.

2          Q.    Okay.   And Paul down here references "our

3      current gateways."

4               Do you know what a gateway is?

5          A.    Yes.

6          Q.    What is that?

7          A.    Let's see how I can explain.   Gateway is

8      used to process the merchant accounts.

9          Q.    How do you mean "process"?

10         A.    Like each merchant account or multiple

11     merchant accounts are attached to a gateway.   I

12     don't -- I -- it's hard for me to explain without,

13     like, visual.

14         Q.    Sure.   I guess, do you want to -- I mean, we

15     could --

16         A.    I can't draw it out.

17         Q.    Yeah, we could draw it out and make that an

18     exhibit.   Is that good?

19         A.    No, I can't.

20         Q.    Oh, you can't?

21         A.    Yeah.   I'm trying to explain.   I know what

22     it is, but I don't know how to.   So yeah, I'm just

23     trying to explain.

24         Q.    Okay.   So I guess I don't need to -- I just

25     don't understand that very well.

159

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1              Okay.  If we could go to Exhibit 93.

2              (Plaintiff's Exhibit 93 was

3              previously marked for identification

4              by the FTC and is attached hereto.)

5     BY MR. TEPFER:

6        Q.   I'm now handing the witness what's been

7    marked Exhibit 93.

8              Do you remember sending this email?

9        A.   No, I don't.

10       Q.   Have you ever visited the website

11   ripoffreport.com?

12       A.   Yes.

13       Q.   Do you know if at the meetings -- would you

14   sometimes attend, I guess, weekly meetings at BunZai

15   Media Group?

16       A.   No.

17       Q.   Did you ever discuss with Alon, I guess,

18   online complaints?

19       A.   Most likely.

20       Q.   Who is Justin McKinnon, if you know?

21       A.   He was hired as a -- what's it called when

22   you need to check up on people, like follow up?  The

23   word is on the tip of my tongue.

24       Q.   Like a --

25       A.   Quality assurance.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1        Q.   Do you know if anyone at BunZai Media Group
 2   would or was tasked with, I guess, reviewing?
 3        A.   I think that was him, but I can't be sure.
 4        Q.   And like reviewing online, you're talking
 5   about reviewing online, I guess, comments or reviews
 6   of AuraVie?
 7        A.   Yeah.
 8        Q.   Okay.  Do you know who Justin McKinnon would
 9   report to about?
10        A.   Khristopher.
11        Q.   Do you know why -- I guess, do you know why
12   Alon included Roi Reuveni in this email?
13             MR. UNGAR:  Objection as to the form of the
14   question.  It's vague and ambiguous, calls for
15   speculation, lacks foundation.
16             THE WITNESS:  He was working there at the
17   time.
18   BY MR. TEPFER:
19        Q.   Sure.
20        A.   I don't know.
21        Q.   And did you select in this the cc area -- or
22   rather, the people that you emailed it to, was that
23   because you did a Reply All?
24        A.   I --
25        Q.   Do you know?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

 1       A.   I don't remember, no.  It looks like Alon

 2   sent this to -- I don't know.

 3       Q.   Roi references Laura.  Do you know who Laura

 4   is.

 5       A.   Yes.  That's his wife --

 6       Q.   Okay.

 7       A.   -- or was.  I don't know if they're still

 8   married.

 9       Q.   Okay.  We can go to 94.

10       A.   Is it possible to take a quick bathroom

11   break?

12            MR. TEPFER:  Yes.

13            We're off the record.

14            (Recess)

15            MR. TEPFER:  We can go back on the record.

16            Can you read back what was last said.

17            (The previous questions and answers

18            were read back by the court reporter

19            as follows:

20               "QUESTION:  Roi references Laura.

21            Do you know who Laura is?

22               "ANSWER:  Yes.  That's his wife --

23               "QUESTION:  Okay.

24               "ANSWER:  -- or was.  I don't know

25            if they're still married.")

162

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1           MR. TEPFER:  Okay.  I guess we can go to

2     Exhibit 94.

3              (Plaintiff's Exhibit 94 was

4              previously marked for identification

5              by the FTC and is attached hereto.)

6     BY MR. TEPFER:

7        Q.   I'm now handing the witness what's been

8     marked as Exhibit 94.

9              Do you remember sending this email?

10       A.   Nope.  Don't remember it.

11       Q.   Do you know what -- in it you reference

12    sticky processing.  Do you know what that is?

13       A.   Sticky processing is when you keep the same

14    customer on the same MID.

15       Q.   Oh, okay.

16       A.   Sorry.

17       Q.   Do you know what the -- what is the benefit

18    to keeping the same customer on the same MID?

19       A.   I'm not sure exactly.

20       Q.   In the email from Paul, Paul says, "I cannot

21    surpass 150k per merchant account based on our

22    chargeback trending for the month."

23             Do you know if any of the merchant accounts

24    that BunZai Media Group used were limited as to

25    volume because of chargeback percentages?

163
Yalley
FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1          MR. UNGAR:  Objection as to the form of the
2     question.  It's vague and ambiguous, it's compound,
3     it calls for speculation, and lacks foundation.
4          THE WITNESS:  I'm not sure -- sorry, I'm not
5     sure what the question is.  If that's why we got
6     them at that?
7     BY MR. TEPFER:
8       Q.   Oh, no.  I was wondering if -- it
9     references -- Paul says he can't surpass 150k per
10    merchant account based on the chargeback trending
11    for the month.
12         What did you understand Paul to mean when he
13    said that?
14         MR. UNGAR:  Objection as to the form of the
15    question.  It's vague and ambiguous, it's
16    argumentative, it assumes facts not in evidence.
17         THE WITNESS:  That basically, what he says,
18    that we can't use up the whole merchant account, we
19    didn't get up to a hundred percent of its usage.
20    BY MR. TEPFER:
21      Q.   So does the amount of chargebacks determine
22    how much you can -- how much volume you can put on a
23    merchant account?
24      A.   I believe so, yeah.
25         MR. UNGAR:  Objection as to the form of the

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
1    question.  It's vague and ambiguous.  It calls
2    impermissibly for a lay opinion.  Calls for
3    speculation and lacks foundation.
4             THE WITNESS:  I believe so, yes.
5             MR. TEPFER:  I'm now handing the witness
6    what's been marked Exhibit 95.
7             (Plaintiff's Exhibit 95 was
8             previously marked for identification
9             by the FTC and is attached hereto.)
10   BY MR. TEPFER:
11        Q.   Do you remember sending this email?
12        A.   No, I don't remember sending it.
13        Q.   Do you -- it's to C2M Accounting.  Do you
14   know what that is?
15        A.   Yes.  Convert 2 Media.  They're an affiliate
16   network.
17        Q.   Okay.  You state "from now on please send
18   accounting related emails to
19   accounting@sbmmgmt.com."
20             Why did you inform C2M Accounting to send
21   accounting email to accounting@sbmmgmt.com?
22             MR. UNGAR:  Objection as to the form of the
23   question.  It's vague and ambiguous, it's compound,
24   it calls for speculation, it lacks foundation.
25             Witness isn't competent to testify as to
```

165

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

    1    matters she's not aware of.

    2            THE WITNESS:  So --

    3    BY MR. TEPFER:

    4        Q.   You can answer if you --

    5        A.   Well, no, I'm --

    6        Q.   Sorry.  What the question was?

    7        A.   No, no, no.  What he said, but no, I'm not

    8    sure.

    9        Q.   Did anyone tell you that accounting emails

   10    should be directed to accounting --

   11        A.   I'm --

   12        Q.   -- at --

   13        A.   -- sure someone did.  Yes.

   14        Q.   Do you know who answered that email?

   15            MR. UNGAR:  Move to strike as calling for

   16    speculation.  Not based upon personal knowledge.

   17    BY MR. TEPFER:

   18        Q.   Do you know who answered or who used that

   19    email address?

   20        A.   I don't remember.

   21        Q.   I know we discussed SBM Management a little

   22    bit earlier, but I was wondering, do you know who

   23    owns that company?

   24        A.   I think it was Stephan Bauer who's under it.

   25        Q.   And --

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1          MR. UNGAR:  Move to strike.  Move to strike
 2     the response as speculative, lacks personal
 3     knowledge.
 4     BY MR. TEPFER:
 5          Q.   Why do you think Stephan Bauer owned that
 6     company?
 7          A.   I think you guys have mentioned that to me
 8     before in a phone call or something like that, so --
 9          Q.   Do you know Stephan Bauer?
10          A.   I know of him, yes.
11          Q.   How do you know about him?
12          A.   Through his company, through working there.
13          Q.   Oh, so --
14          A.   BunZai.
15          Q.   Right.
16               So you would interact with Stephan Bauer?
17          A.   Not directly, no, but I'd see him in the
18     office.
19          Q.   Sure.
20               I guess if we could go to 96.
21               (Plaintiff's Exhibit 96 was
22               previously marked for identification
23               by the FTC and is attached hereto.)
24     BY MR. TEPFER:
25          Q.   I'm now handing the witness what's been
```

167

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                        2/17/2016

1    marked as Exhibit Number 96.

2              In that email do you -- or, I guess, do you

3    remember sending that email to Kristina Perez,

4    Enrique Perez, Alon Nottea, and Paul Medina?

5        A.    No, I don't.

6        Q.    What --

7        A.    I don't remember.

8        Q.    What's a soft descriptor?

9        A.    It's a descriptor that appears while your

10   bank is processing.

11       Q.    If we could go to Exhibit 97.

12             (Plaintiff's Exhibit 97 was

13             previously marked for identification

14             by the FTC and is attached hereto.)

15   BY MR. TEPFER:

16       Q.    I'm now handing the witness what's been

17   marked as Exhibit 97.

18             Do you recall, I guess, receiving this email

19   from Enrique Perez?

20       A.    No, I don't.

21       Q.    While you were -- or in any of your

22   accounting reports that you did while at BunZai, do

23   you recall ever including withdrawals from banks

24   located overseas?

25       A.    No, I don't.

168

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1               MR. UNGAR:  Objection as to the -- objection

2       as to the form of the question.  It's vague and

3       ambiguous, and it assumes facts not in evidence.

4       BY MR. TEPFER:

5          Q.   And do you recall ever, in these accounting

6       reports, including, I guess, deposits made overseas?

7               MR. UNGAR:  Objection as to the form of the

8       question.  It's vague and ambiguous, assumes facts

9       not in evidence.

10              THE WITNESS:  I don't remember.

11      BY MR. TEPFER:

12         Q.   Sure.

13         A.   It says there was one.

14         Q.   Do you know who Dylan Gaines is?

15         A.   Yes.  He works at UMS Banking.

16              (Plaintiff's Exhibit 98 was

17              previously marked for identification

18              by the FTC and is attached hereto.)

19      BY MR. TEPFER:

20         Q.   I'm handing the witness what's been marked

21      Exhibit 98.

22              So in the email you state "the CEO has

23      already signed off and looked at the package that

24      Alon provided."

25              What package are you referring to there?

169

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      A.    That's not from me.

2      Q.    Oh, it's not?

3      A.    No.  Dylan sent that.

4      Q.    Oh, sorry.

5      A.    That's okay.

6            MR. UNGAR:  I'm going to -- I'm going to

7      object, interpose an objection to the question in

8      that it misstates Exhibit 98 intentionally to

9      deceive the witness.

10           MR. TEPFER:  Well, I assure you, it was an

11     accident.

12     BY MR. TEPFER:

13     Q.    But do you know what, do you know what Dylan

14     was, what package Dylan was referring to?

15           MR. UNGAR:  Objection as to the form of the

16     question.  It's vague and ambiguous, it calls for

17     speculation, it lacks foundation.

18           THE WITNESS:  It looks like it's attached.

19           MR. UNGAR:  Move to strike as nonresponsive.

20     BY MR. TEPFER:

21     Q.    On 98-3 it says, "Please add additional

22     merchant accounts under the same terms and

23     conditions for my licensed resellers."

24           Do you know if BunZai Media Group had any

25     licensed resellers of their product AuraVie?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1        A.   I'm not --
 2             MR. UNGAR:  Objection as to the form of the
 3   question.  It's vague and ambiguous.
 4             THE WITNESS:  I'm not sure what that, that
 5   sentence means.
 6   BY MR. TEPFER:
 7        Q.   Sure.
 8             Have you ever heard your supervisors refer
 9   to licensed resellers?
10        A.   Not that I remember.
11             MR. UNGAR:  Objection as to the form of the
12   question.  It's vague and ambiguous, and assumes
13   facts not in evidence.
14   BY MR. TEPFER:
15        Q.   To refer back to this spreadsheet,
16   Exhibit 75, under "Corporation," have you ever heard
17   any of those corporations listed under "Corporation"
18   in 75, have you ever heard any of those referred to
19   as licensed resellers?
20             MR. UNGAR:  Objection as to the form of the
21   question.  It's vague and ambiguous.
22             THE WITNESS:  No.
23   BY MR. TEPFER:
24        Q.   The CEO/Owners under column -- yeah, under
25   that column, CEO/Owners, is it your understanding
```

171

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    that those individuals listed there would receive

2    1 percent of, I guess, processing through merchant

3    accounts in their name?

4         MR. UNGAR:  Objection as to the form of the

5    question.  It's vague and ambiguous, calls for

6    speculation, lacks foundation.

7         THE WITNESS:  If I remember.

8         MR. UNGAR:  Also assumes facts not in

9    evidence.

10        THE WITNESS:  If I remember correctly, yes.

11   BY MR. TEPFER:

12        Q.   So while you were working at BunZai Media

13   Group, those CEO/Owners received 1 percent of

14   whatever is processed through a merchant account in

15   their name?

16        MR. UNGAR:  Objection as to the form of the

17   question.  It's vague and ambiguous, calls for

18   speculation, assumes facts not in evidence, lacks

19   foundation.

20        THE WITNESS:  I think so.  I could be wrong.

21   BY MR. TEPFER:

22        Q.   On Exhibit 82, those -- I guess those

23   accounting reports attached, did anyone else at the

24   company, I guess, work on these sorts of accounting

25   reports?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          MR. UNGAR:  Objection as to the form of the

2    question.  It's vague and ambiguous, calls for

3    speculation, lacks foundation.

4          THE WITNESS:  No, not that I know.

5    BY MR. TEPFER:

6     Q.   Let me just see.  Do you -- I think we

7    talked a little bit about your relationship with

8    Doron Nottea when -- you know, your working

9    relationship with him earlier, but would you be

10   surprised to hear if Doron Nottea were to testify

11   that you instructed him which vendors to pay at

12   BunZai Media Group?

13    A.   No.

14    Q.   Did you train him as to --

15    A.   No.  I did not train him, no.

16    Q.   Oh, sorry.

17         And did he train you?

18    A.   I don't know what --

19         MR. UNGAR:  Objection as to the form of the

20   question.  It's vague and ambiguous.

21         THE WITNESS:  Define "train."

22   BY MR. TEPFER:

23    Q.   Like when you were leaving BunZai Media

24   Group, did you, I guess, assist him in training him

25   how to take care or manage your job responsibilities

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    when you left?

2        A.    (Witness shakes head from side to side.)

3              MR. UNGAR:  Objection as to the form of the

4    question.  It's vague and ambiguous, and assumes

5    facts not in evidence.

6    BY MR. TEPFER:

7        Q.    Do you know who Gary Bhasin is?  Have you

8    ever heard that name?

9        A.    Vaguely.  Sounds familiar.  I don't know.

10             MR. TEPFER:  I guess, do you want to take a

11   quick break?

12             MR. GALLEGOS:  Sure.

13             MR. TEPFER:  Yeah, we're going to take a ten

14   minute break.

15             Off the record.

16             (Recess)

17             MR. TEPFER:  If we could go back on the

18   record.

19   BY MR. TEPFER:

20       Q.    Just before the break you had sort of

21   clarified something we were talking about -- or just

22   after the break, rather.  So I just want to ask:

23             When we were talking about -- we were

24   talking about, I guess -- you know, you were

25   directing Doron concerning invoices --

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          MR. UNGAR:  I'm going to -- I'm going to

2     interpose an objection.  Was there a question and

3     answer going on after we went off the record and

4     during the break?

5          MR. TEPFER:  The witness just made a

6     statement, so I just wanted to ask her about it.

7          MR. UNGAR:  I want to know verbatim what the

8     statement was and have it now put on the record

9     before anything else is said.

10          MR. TEPFER:  Okay.  Well, if the --

11     BY MR. TEPFER:

12     Q.   Do you remember?

13          MR. UNGAR:  What is the statement verbatim?

14     BY MR. TEPFER:

15     Q.   Do you recall?

16     A.   Verbatim, no.

17     Q.   If you could just say the gist of what we

18     said right when we went off the record.

19     A.   That just to be clear, I never -- I would

20     tell Doron what affiliates to pay, but it's not like

21     I told him how to do his job.  I wasn't his

22     supervisor or anything.  That's what the question

23     made it seem like.

24     Q.   Okay.  So just to clarify, you didn't

25     supervise Doron, as regarding his job?

175

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      A.    No.

2      Q.    And you -- when you say you, I guess,

3    directed Doron to pay invoices, you mean that you

4    told Doron, I guess, what invoices were due?

5          MR. UNGAR:  Objection as to the form of the

6    question.  It's leading, it's vague and ambiguous.

7          And stop putting words in the witness's

8    mouth.

9          MR. TEPFER:  Counsel, please limit your

10   objections to those appropriate under the Federal

11   rules.

12         MR. UNGAR:  Stop putting words into the

13   witness's mouth.  That is the objection.

14         MR. TEPFER:  Okay.

15         MR. UNGAR:  Cut it out.

16         MR. TEPFER:  Counsel, please.

17   BY MR. TEPFER:

18     Q.    I guess I want to talk a bit about the

19   accounting work that Doron did.

20     A.    I wouldn't know.

21     Q.    And this will be -- I think this is the last

22   topic for us.

23     A.    Okay.

24     Q.    But just as far as your personal knowledge,

25   when you say that Doron did accounting for BunZai,

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1    what do you mean?

2            MR. UNGAR:  Objection as to the form of the

3    question.  It's vague and ambiguous, it calls for

4    speculation, it lacks foundation.

5            The witness has just said she has no

6    personal knowledge.  She just stated on the record I

7    wouldn't know.

8            MR. TEPFER:  Counsel, please do not continue

9    with speaking objections.  If you could just state

10   your objection.

11           MR. UNGAR:  Counsel, stop trying to put

12   words into the witness's mouth.  Cut it out.

13   BY MR. TEPFER:

14       Q.   All right.  If you can answer the question.

15       A.   I don't know.  I --

16       Q.   Do you want -- oh, yeah, yeah.

17           Do you know -- I guess, have you ever

18   received an email from accounting@bunzai.com?

19       A.   I don't remember.

20       Q.   Do you know if you -- do you know who uses

21   the email address accounting@bunzai.com?

22       A.   I don't know.  I don't remember.

23       Q.   What about accounting@pinlogistics.com?

24       A.   I don't know.

25           MR. UNGAR:  Objection as to the form of the

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley
FTC v. Bunzai Media Group, Inc., et al.                                  2/17/2016

```
 1    question.  It's vague and ambiguous.
 2             MR. TEPFER:  Well, I think we'll pass the
 3    witness.
 4             MR. UNGAR:  I just -- very briefly.
 5
 6                            EXAMINATION
 7    BY MR. UNGAR:
 8       Q.   I'm sorry to hear that you're not feeling
 9    well today.  Is it true that you're not feeling
10    well?
11       A.   Yes, it is.
12       Q.   You have the flu?
13       A.   Sorry.  Do I have the flu?
14       Q.   Yes.  Yes, ma'am.
15       A.   I think so.
16       Q.   Are you taking -- are you currently taking
17    any medication for the virus that you have?
18       A.   Sudafed.
19       Q.   Are you taking any medication in addition to
20    Sudafed?
21       A.   Yes.
22       Q.   What else are you taking with regard to the,
23    with regard to your upper respiratory infection?
24       A.   Oh, Mucinex.
25       Q.   Does the Sudafed make you drowsy?
```

178

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                        2/17/2016

```
 1        A.    No.
 2        Q.    Do any of the medications that you're taking
 3   today for your upper respiratory infection affect
 4   your ability to remember things?
 5        A.    No.  This case -- I haven't worked there for
 6   three years.  I don't remember a lot.  And these
 7   emails are from six years ago.
 8        Q.    Okay.  Understood.
 9        A.    Yeah.
10        Q.    Did you receive documents that commanded you
11   to appear for your deposition today?
12        A.    Yes.  I received two subpoenas.
13        Q.    Were they the same subpoenas?  Were they the
14   same document, or were they two different ones?
15        A.    They were two different ones.
16        Q.    Do you --
17        A.    The first --
18        Q.    I'm sorry.  Go ahead.  If you could describe
19   those two documents, that would be helpful.
20        A.    Well, I have one right here.  It says United
21   States District Court for the Central District of
22   California, Federal Trade Commission, Plaintiff, vs.
23   BunZai Media Group, et al., Subpoena to Testify at a
24   Deposition in a Civil Action.
25        Q.    And the second one?
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1        A.    That -- sorry.   That -- that -- they were
 2    the same thing.   The date was changed.   I was
 3    originally scheduled to appear on February 2nd.
 4        Q.    Have you received money for your appearance
 5    today?
 6        A.    There was a check stapled to the first
 7    subpoena.   I did not cash it.
 8        Q.    And what about the second subpoena?   Was
 9    there a check stapled to the second subpoena?
10        A.    No, there was not.
11        Q.    Do you recall how much the check was for
12    that was attached to the first subpoena?
13        A.    I think it was for $49.
14        Q.    I'm sorry.   Did you say the number 4, 9?
15    49?
16        A.    Yes, but I can't -- it's either 40 or 49.   I
17    have it at home.   I didn't bring that with me.
18        Q.    And do you recall who the check was made
19    payable to?
20              Was it made payable to yourself personally?
21        A.    Yes, it was.
22        Q.    Have you received money for your travel
23    related expenses for appearing today?
24        A.    No, I haven't, but I was told I could get a
25    reimbursement for mileage and parking.
```

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1          Q.    And how much is your mileage and your
2     parking?
3          A.    I'm not sure about mileage, but parking is
4     $20.
5          Q.    And have you asked for that reimbursement
6     for your parking?
7          A.    No, I have not.
8          Q.    Do you intend to do so?
9          A.    No.
10         Q.    And what about your miles?  How many miles
11    did you travel?
12         A.    About 6 and a half, maybe.
13         Q.    So 6 and a half coming to the building and
14    then another 6 and a half going back to your
15    residence; is that right?
16         A.    Uh-huh.  Yes.  So 13 total.
17         Q.    And do you intend to ask for reimbursement
18    for your mileage?
19         A.    No, I don't.
20         Q.    Is there a reason why you don't intend to
21    ask for reimbursement for your parking and your
22    mileage?
23         A.    I don't know.  I feel odd asking for it.  I
24    just -- I don't know.
25         Q.    Has it been awkward -- has Counsel there

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1      today offered to pay you for your travel related

2      expenses for appearing?

3          A.   As a reimbursement, yes.

4          Q.   Has anybody -- has anybody handed you a

5      check?

6          A.   No.

7          Q.   Before today, have you spoken in person or

8      by telephone with any person who you understood was

9      a representative of the Federal Trade Commission,

10     including any lawyers or investigators?

11         A.   Yes.

12         Q.   Who have you spoken with, to the best you

13     can recall?

14         A.   To Reid, to Luis, and then there's someone

15     by the name of David who called me last year in

16     June.

17         Q.   Reid.  Reid is the lawyer there today, who's

18     been asking you questions; is that right?

19         A.   Yes.

20         Q.   Reid Tepfer?

21         A.   Yes.

22         Q.   And Luis is Luis the lawyer who's also there

23     today?

24         A.   Yes.

25         Q.   Okay.  And who is David, if you know?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1       A.    I know he works at the FTC.  Can you guys

2    tell me?  I asked you before.

3       Q.    No.

4       A.    Oh.

5       Q.    I'm sorry.  You said you asked one of the

6    attorneys who David was?

7       A.    Yes, I did.

8       Q.    Which attorney did you ask that to?

9       A.    Reid, over a phone call.

10       Q.    What did he tell you about David?

11       A.    I don't remember.  That's why I'm asking

12    again.

13       Q.    Oh, okay.  And do you remember David's last

14    name?

15       A.    No, but it starts with a "D."  I have it

16    written down, and I have his phone number at home.

17       Q.    Oh, okay.  And did David represent to you or

18    did he say to you what capacity he represented the

19    Federal Trade Commission?

20       A.    No, I don't remember.  He told me a little

21    bit about the -- the case.  He made me aware of the

22    case online, and that was it.  Said he came to the

23    offices and stuff when they took everything, and

24    then he had some questions to ask me over the phone.

25       Q.    And you say that this conversation took

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

1      place, to the best of your recollection, in June of

2      2015; is that right?

3          A.   Uh-huh.  Yes.

4          Q.   And to the best of your recollection, tell

5      me everything that David said in that conversation.

6          A.   He basically asked me what I did there, what

7      my day-to-day activities were.  He read off a lot of

8      different names, asked if I knew who they were.  He

9      did ask about, like, some of the companies.  He

10     asked why certain things were set up certain ways in

11     the office.  Just things like that.  And that's

12     pretty much all I remember.

13         Q.   Approximately how long did the telephone

14     conversation last between you and David in June of

15     2015?

16         A.   There were probably two or three

17     conversations.  The first one probably lasted the

18     longest.  I don't know.  Maybe 30 minutes, probably.

19     I don't know.  30 minutes to an hour total for all

20     three of them -- or all two of them.

21         MR. UNGAR:  Were the conversations, the two

22     and three of them, did they both or all of them

23     occur on the same day.

24         A.   No, they did not.

25         Q.   Did they all occur in the same week?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1        A.    I think so.  Or the same month, at least.

2        Q.    All right.  And can you recall anything else

3    that David said to you, other than what you just

4    testified to?

5        A.    Yeah.  He asked why there -- there are blank

6    checks that had signatures on them.

7        Q.    Anything else?

8        A.    That's all I could remember.

9        Q.    Did David ask you any questions about Alon

10   Nottea?

11       A.    No, I don't believe so.

12       Q.    Did David ask you any questions about Doron

13   Nottea?

14       A.    The check question.  I think he found those

15   in Doron's office.

16       Q.    Did he ask you any questions about Roi

17   Reuveni?

18       A.    I can't -- I can't remember for sure.

19       Q.    Okay.  Did David, to the best of your

20   recollection, did David ask you any questions about

21   Igor?

22       A.    Again, I don't -- I don't think so.

23       Q.    Did David ask you any questions in either of

24   the two or three conversations about the type of

25   work you did for BunZai Media Group?

185

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1        A.   Yes, he did.

2        Q.   And to the best of your recollection, what

3    did you tell him?

4        A.   The same thing I said today.  That I did

5    affiliate marketing and some accounting.

6        Q.   Did you tell David that you paid a vendor in

7    connection with your work at BunZai Media Group?

8        A.   Probably, yeah.  Accounts receivable.

9        Q.   All right.  So -- and you said that you

10   spoke to Reid Tepfer; is that right?

11       A.   Uh-huh, yes.

12       Q.   And approximately how many times have you

13   spoken to Reid Tepfer?

14       A.   Two, two or three, besides today.

15       Q.   And -- okay.  And when did those

16   conversations take place?

17       A.   One happened last week.  And I believe

18   another one happened after I got the other subpoena

19   in -- well, hold on.  I need to back up because

20   there's different ways we spoke to each other.  On

21   the phone and by email.

22       Q.   Okay.  The first contact you had with Reid

23   Tepfer, was it by phone or by email?

24       A.   By phone.  He left me a voice message.

25       Q.   And when was that?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      A.    I believe in January.

2      Q.    January 2016; right?

3      A.    Uh-huh.  Yes.

4      Q.    And what happened in that conversation?

5      A.    Well, the first time he contacted me was

6   just a voicemail.  I missed the call.

7      Q.    Oh, I'm sorry.

8      A.    It's okay.

9      Q.    A voicemail.

10          And to the best of your recollection, what

11   did Reid Tepfer say in the voicemail?

12     A.    Probably just identifying himself and

13   telling me to give him a call back.

14     Q.    And did you do so?

15     A.    Yes, I did.

16     Q.    Approximately the same day?  Within the same

17   week?

18     A.    Probably within the same week, yes.

19     Q.    And were you able to reach Mr. Tepfer?

20     A.    Yes.

21     Q.    And what did Mr. Tepfer say to you?

22     A.    Actually, no, hold on.  I do remember that

23   day.  I called him back the same day.  No, I could

24   not reach him.  I didn't leave a voicemail then.

25     Q.    So when you finally did reach Mr. -- did

187

Yalley
FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

    1     Mr. Tepfer call you back after you left the
    2     voicemail, or did you have to call him back?
    3         A.   I don't remember.
    4         Q.   Okay.  And when you did reach Mr. Tepfer
    5     in -- we're still in January 2016; is that correct?
    6         A.   Yes.
    7         Q.   When you finally did reach Mr. Tepfer,
    8     what -- tell me everything that Mr. Tepfer said to
    9     you in that first telephone conversation you
   10     actually had with him.
   11         A.   I -- I just had a lot of questions now what
   12     this was regarding, what exactly they were looking
   13     for, why was I a witness in this.
   14         Q.   What did Mr. Tepfer say in that first
   15     telephone conversation that you had with him?
   16         A.   I don't even know.  I don't know.  I don't
   17     remember exactly.
   18         Q.   Do you remember anything -- do you remember
   19     anything about what he said to you in that first
   20     conversation?
   21         A.   No, I can't.  I can't remember.
   22         Q.   All right.  And after that first telephone
   23     conversation in January of 2016, what was your next
   24     contact with Reid Tepfer?
   25         A.   I believe through email.

Yalley
FTC v. Bunzai Media Group, Inc., et al.                              2/17/2016

1       Q.   And did Mr. Tepfer send you an email?
2       A.   He did send me one.  After he left a
3    voicemail, he sent me an email -- or maybe it was
4    vice versa.  I emailed back.  We talked about moving
5    the date up, possibly.  And that didn't happen,
6    obviously.
7       Q.   Before January of 2016, you had never spoken
8    to Reid Tepfer; right?
9       A.    I don't think so.  I could check my email
10   right now, but I don't know.
11      Q.   And before January of 2016 you had never
12   spoken to Mr. Luis; right?
13      A.    No.
14      Q.    The other lawyer.
15           And so there was a second telephone
16   conversation between you and Reid Tepfer; correct?
17      A.    Yes.
18      Q.    And when was that telephone conversation?
19      A.    I believe it was last week.
20      Q.    And do you remember anything that Reid
21   Tepfer said to you in that telephone conversation
22   last week?
23      A.    There is a couple of them.  The first one
24   was just about the second subpoena.  I had had a
25   list of documents that they wanted to bring with me,

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    and I had a lot of questions about that, exactly
2    what they were looking for, how I should give it to
3    them, et cetera.  I asked him what kind of questions
4    I should expect.  Luis was on the phone, too, and I
5    guess, yeah, he called me, basically, to see, just
6    to get some more questions out of the way, see what
7    other information that I knew, that I could provide.
8         Q.   All right.  And what did Reid say to you
9    with regard to the questions and information that
10   you could give?
11        A.   Similar to today.  Who was who, if I heard
12   of these companies.  They asked a question about
13   whose decision it was to do, like, load balancing --
14   something like that -- how to set up the companies.
15   Yeah.
16        Q.   So Mr. Tepfer was asking you questions in
17   the telephone conversation you had with him last
18   week?
19        A.   Yes.
20        Q.   And were you providing answers to Mr. Tepfer
21   to his questions?
22        A.   To the best of my ability, yes.
23        Q.   And your understanding was that Mr. Luis was
24   also on the telephone?
25        A.   Yes, he was.

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1       Q.   All right.  And was Mr. Luis also asking you
2    questions?
3       A.   Yes.
4       Q.   And were you providing him answers?
5       A.   Yes.
6       Q.   So did you understand that this was
7    preparation questions and answers for your
8    deposition today?
9       A.   Yes.  Well, wait.  Sorry.  Define
10   "preparation."  Like for them to ask me or --
11      Q.   What was your understanding?
12      A.   I thought it was just a telephone
13   conversation, so I --
14      Q.   Okay.
15      A.    'Cause I had questions, too.  I didn't
16   really know what to expect.
17      Q.   Okay.  So were you asking Reid, Mr. Tepfer,
18   so you could prepare for your deposition testimony?
19      A.   Yes.
20      Q.   And were they -- did you understand that
21   Mr. Tepfer was asking you questions so that he could
22   prepare for the deposition testimony?
23      A.   Yeah, I guess so.
24      Q.    And after that telephone conversation where
25   Mr. Tepfer and Luis are asking you questions and

191

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                   2/17/2016

1     you're answering them regarding today's deposition,
2     was there a subsequent telephone conversation -- in
3     other words, a third telephone conversation?
4          A.   Yes.   There was one more.
5          Q.   And what was the substance of that third
6     telephone conversation?
7          A.   I had one more question because I remember I
8     signed a nondisclosure agreement with BunZai Media,
9     and I didn't know if that would put a quash in this
10    or how he would proceed.   And he directed me to call
11    the Federal Receiver and ask them.   And she
12    subsequently provided a document -- I don't know
13    what to call it -- just saying -- I don't know --
14    saying that I'm not liable for the nondisclosure or
15    something.   I'm probably not using the right
16    language.
17         Q.   Who is the Federal Receiver that Mr. Tepfer
18    told you to contact?
19         A.   I forgot her name.
20         Q.   Does the name Koonte, K-o-o-n-t-e, does that
21    sound like --
22         A.   Yeah, I spoke to Kelly Crawford.   I think
23    that's her attorney.
24         Q.   And what did Mr. Crawford say to you in
25    that -- that was a telephone conversation; correct?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                          2/17/2016

 1      A.    Mm-hmm.  Yeah, it was a telephone, and then

 2  he sent me the document by email.  And I guess Reid

 3  was also cc'd on that email.

 4      Q.    When did you have that telephone

 5  conversation with Kelly Crawford?

 6      A.    This was on last Thursday.

 7      Q.    Did Kelly Crawford ask you any questions?

 8      A.    No, he didn't.

 9      Q.    Okay.  And what did Kelly Crawford say to

10  you about --

11      A.    Oh, sorry.  Yes, he did ask for a copy of

12  the NDA that I signed, to give to that lady.

13      Q.    And did you, did you provide Kelly Crawford

14  with a copy of the NDA?

15      A.    Yeah, I gave him a copy of the NDA.  It

16  wasn't a signed copy.  I told him he -- they would

17  have them in other files.

18      Q.    Okay.  And other than -- other than that one

19  conversation that you had with Kelly Crawford, have

20  you had any other conversations in person or by

21  telephone with anyone who has told you that they

22  represent the Federal Receiver?

23      A.    No, I haven't.

24      Q.    Now, you said that in your second telephone

25  conversation with Mr. Tepfer you discussed documents

193

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    that you were supposed to bring with you today.

2       A.   Yes.

3       Q.   Did you bring any documents with you today

4    to the deposition?

5       A.   Yes.

6       Q.   Can you please describe what the documents

7    are?

8       A.   In the -- they're on a USB drive.

9    Basically, things, again, that they probably already

10   have.  My accounting reports that I did while I was

11   at BunZai Media or Media Urge, and then I think the

12   Customer Service Manual, and then I had a holder

13   called, just, AuraVie, and I think that had just,

14   like, some of our banners and creatives and stuff

15   like that on it.

16      Q.   And these are documents which you had in

17   your possession at your home; is that correct?

18      A.   Uh-huh.  Yeah.

19      Q.   Did you need to go to any third party in

20   order to obtain any of the documents --

21      A.   No.

22      Q.   -- that are on the USB media?

23      A.   No, I didn't.

24      Q.   Okay.  What did you do with what you called

25   the USB?  What did you do with that this morning?

Yalley

FTC v. Bunzai Media Group, Inc., et al.                         2/17/2016

1      A.    I gave it to them.

2      Q.    Them -- them is who?

3      A.    Reid and Luis.

4      Q.    Oh.  Other than the three telephone

5    conversations you testified to with Mr. Tepfer, have

6    you had any additional telephone conversations with

7    Mr. Tepfer?

8      A.    No, not that I can remember.

9      Q.    All right.  And what about Luis; have you

10   had telephone conversations with Luis, without

11   Mr. Tepfer on the line, to the best of your

12   knowledge?

13     A.    No, I haven't.

14     Q.    All right.  Besides the telephone

15   conversations that you had with Mr. Tepfer and Luis

16   and David, whose last name starts with C, is there

17   anybody else who told you that they were a

18   representative of the Federal Trade Commission,

19   whether a lawyer or an investigator, who you have

20   spoken with by phone or in person?

21     A.    No.

22     Q.    You said that you received some emails from

23   Mr. Tepfer.  You just testified that there was one

24   email you didn't know if it was the day that you

25   tried to call him back in January or during the week

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    thereafter.

2           Were there additional emails that you

3    received from Mr. Tepfer?

4    A.   Yes.  We went back about -- back and forth

5    about rescheduling the date.

6    Q.   Okay.

7    A.   That was it.  And then he sent me one more

8    about the witness fee and reimbursement forms.

9    Q.   All right.  Any other emails that you

10   received from Luis?

11   A.   No.

12   Q.   Any emails that you received from David,

13   whose last name starts with "C"?

14   A.   No.

15   Q.   When you arrived this morning for your

16   deposition, did you have a conversation with

17   Mr. Tepfer?

18   A.   What do you mean?

19   Q.   Before you -- before Mr. Tepfer began asking

20   you questions on the record --

21   A.   Mm-hmm.

22   Q.   -- did he have a conversation with you?

23   A.   No.  We just introduced ourselves, and that

24   was it.

25   Q.   Did you have any conversation with Luis this

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

```
 1    morning?

 2    A.    No.

 3    Q.    During any of the break, after you've been

 4    off the record, did you have any conversation with

 5    Mr. Tepfer?

 6    A.    Yes.

 7    Q.    What were those conversations?

 8    A.    One of them was we talked about places to

 9    eat around here for lunch.

10    Q.    Okay.

11    A.    And then another one was just about the work

12    environment at this -- at the -- at BunZai.  That

13    was me, though.  I just said it was really stressful

14    and stuff, and I said how this deposition is just

15    really stressful and -- yeah.

16    Q.    And did Mr. Tepfer, while you were on break,

17    did he ask you any questions about the work

18    environment at BunZai?

19    A.    No, he did not.

20    Q.    Why did you volunteer that information about

21    the stressful work environment to Mr. Tepfer?

22    A.    I'm not sure.  Just 'cause I'm nervous

23    and -- yeah.

24    Q.    All right.  Besides the work environment at

25    BunZai, did you have any other off the record during
```

197

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1    the break discussions with Mr. Tepfer?

2         A.   No.  Just the one that I wanted to -- that

3    we went over about paying invoices.

4         Q.   Okay.  Anything else?

5         A.   No, that was it.

6         Q.   What about with Luis?  Any off the record

7    during the break conversations you had with Luis?

8         A.   I mentioned that I wanted to take a nap.

9         Q.   When did you mention that?

10        A.   Why or when?

11        Q.   No, I said "when."

12        A.   When?  I think on our last break.

13        Q.   Are you fatigued?

14        A.   Yes.

15        Q.   Have you been fatigued the whole -- during

16   the entirety of the deposition?

17        A.   I -- I guess so, yeah.  You asked if I was

18   drowsy.  I'm not drowsy.  I just don't -- I feel

19   like crap.  That's all.

20        Q.   Other than Mr. Tepfer, Luis, David with a

21   "D," have you been contacted in any manner by any

22   other person who you believe to be associated with

23   the Federal Trade Commission at any time?

24        A.   No.

25             MR. UNGAR:  I have no further questions at

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

1      this time.
2                MR. TEPFER:  Okay.  Jeffrey, are you there?
3                MR. BENICE:  Yes, I am, and I have no
4      questions.
5                MR. TEPFER:  Okay.
6
7                          FURTHER EXAMINATION
8      BY MR. TEPFER:
9          Q.   I just have one last question.  Mr. Ungar
10     was asking a lot about, you know, how you're feeling
11     today, and I just wanted to see, do you feel that
12     your illness has affected your ability to answer
13     truthfully today?
14         A.   No.  I answered everything truthfully.
15         Q.   And do you believe it's affected your
16     ability to recall any of this information?
17         A.   No.
18               MR. TEPFER:  Okay.  No further questions.
19     Okay.  I guess -- would you mind stating for the
20     record that the deposition is concluded.
21               MR. UNGAR:  Are there any stipulations being
22     offered?
23               MR. TEPFER:  No, there's not, Robert.
24               MR. UNGAR:  Is that on the record?
25               MR. TEPFER:  Sure, we can have it on the

199

Yalley

FTC v. Bunzai Media Group, Inc., et al.                    2/17/2016

1    record that there's no stipulation.  And I guess

2    we're going to conclude if that's -- if that's it.

3            MR. UNGAR:  As long as that's on the record,

4    my question and the response.  Is there a

5    stipulation?  And the response is no, there is no

6    stipulation.

7            MR. TEPFER:  Okay.  So we're off the record.

8            (The deposition was concluded at 3:07 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

200

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                    2/17/2016

```
 1                          --o0o--
 2      Please be advised I have read the foregoing
 3      deposition, and I state there are:
 4      (Check one)
 5                              NO CORRECTIONS
 6                              CORRECTIONS ATTACHED
 7
 8
 9                      NASTASSIA YALLEY
10
11                      Date Signed
12
13
14                          --o0o--
15
16
17
18
19
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Yalley

FTC v. Bunzai Media Group, Inc., et al.                                      2/17/2016

```
 1    STATE OF CALIFORNIA              )

 2                                     )   ss.

 3    COUNTY OF LOS ANGELES            )

 4

 5            I, NASTASSIA YALLEY, having appeared for my

 6    deposition on February 17, 2016, do this date

 7    declare under penalty of perjury that I have read

 8    the foregoing deposition, I have made any

 9    corrections, additions or deletions that I was

10    desirous of making in order to render the within

11    transcript true and correct.

12            IN WITNESS WHEREOF, I have hereunto

13    subscribed my name this      day of             ,

14    2016.

15

16

17

18

19

20                    W   I   T   N   E   S   S

21

22

23

24

25
```

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6               That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14              I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17              IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: _____3|2|16_____

21

22

23   _____

24        CHRISTINA KIM-CAMPOS, CSR

25        CERTIFICATE NO. 12598