CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 46

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386



**SECURED COMMERCE**
Integrated online partner

6925 Canby Ave. #105
Reseda, CA 91335-4360
Tel 747.222.3333 Fax 747.222.3350
accounting@securedcommerce.com

# Invoice

| Date | Number |
|------|--------|
| 4/8/2013 | 55003 |

**Bill To**

Adageo, LLC.
16161 Ventura Blvd # 378
Encino, CA 91436

| Description | Amount |
|-------------|--------|
| Design, Creation, & Optimization of Auravie Landing Page Campaign Setup and integration to Lime Light CRM and Click Connector | 13,500.00 |
| Thank you for your business. | **Total**    $13,500.00 |

EXHIBIT 46

FTC-AUR-S2-0003022

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF' S EXHIBIT  47

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**     Nastassia Yalley[nastassia@bunzaimedia.com]
**Cc:**     Alon Nottea[alon@bunzaimedia.com]; Paul Medina[paul@bunzaimedia.com]
**From:**   avico global
**Sent:**    Mon 1/24/2011 2:08:05 AM
**Subject:**   Re: Phone Numbers
**MAIL_RECEIVED:**    Mon 1/24/2011 2:08:05 AM

Hi Nastassia,

I need to know what 818 numbers you need to port if any ?

As far as the toll free 800 numbers we will forward them to the new lines for now ...

Thanks

Avi

On Mon, Jan 10, 2011 at 10:47 AM, Nastassia Yalley <nastassia@bunzaimedia.com> wrote:

I spoke with Doron about this, and we're going to keep 10 numbers open. 5 of them are currently in use, but the two most important ones to move are 866.216.9336 and 888.291.7385

10 numbers:
866.982.6218
866.982.8712
888.276.7261
888.320.0198
888.291.7385
888.324.9771
888.241.2619
866.216.9336
866.701.7706

-- -- -- -- -- -- -- -- -- --
**Nastassia Yalley**
Director of Operations
O: 818.785.6800
F: 818.647.0182



PLAINTIFF'S EXHIBIT
4 7
Nottea

CASE NO. _2:15-CV-04527-GW (PLAx)_

_Federal Trade Commission_

VS. _BunZai Media Group, Inc., et al._

PLAINTIFF'S EXHIBIT _59_

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**      Doron[doron@doron.us]; Avico Global[avicoglobal@gmail.com]; Alon N[alon@mediaurge.com]
**From:**    Paul Medina
**Sent:**    Mon 12/30/2013 7:48:45 PM
**Importance:**      Normal
**Subject:**   Moving 2nd LL account over to secured merchants
**MAIL_RECEIVED:**   Mon 12/30/2013 7:49:06 PM

Doron and Avi,

I need to move the 2nd limelight account expense over too secured merchants

https://www.mucbo.com/admin/login.php

I can contact them and give them the new CC # if you provide me.

Regards,

--
Paul B. Medina
Executive Vice President

Mobile:818-983-7202 | Office:855-717-5656
Direct: 818-200-1035 ext 7004 | Fax:818-647-0182
Skype:PMedina0331 | Email: Paul@MediaUrge.com
Website: http://www.MediaUrge.com/


Further, this message is intended only for the designated recipient.
It may contain confidential or proprietary information and may be
subject to the attorney-client privilege or other confidentiality
protections. If you are not a designated recipient, you may not
review, copy or distribute this message. If you have received this
message in error, please immediately notify the sender by reply e-mail
and delete this message. Thank you.



Exhibit 59

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 144

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

| | |
|---|---|
| **From:** | Emily Springmann <emily@revguard.net> |
| **Sent:** | Wednesday, September 05, 2012 7:10 PM |
| **To:** | Alon; amansour@pinlogistics.com; Paul Medina; Roi |
| **Cc:** | Jonathan Bishoff |
| **Subject:** | RevGuard Overview Reporting |
| **Attachments:** | Overview Report BunzaiMedia 090512.xls |

Current OCO Profitability Stats Snapshot:

OCO Profitability Increase for the Week

Projected Monthly

Projected Annual

$                        11,273.59

$                    48,852.20

$    586,226.45

OCO Save Sale Revenue

$                    4,656.06

OCO Refund Savings

$                    6,928.22

OCO Customer Service Profit

$                    4,356.00

OCO Cost (Current Price)

$                    (4,666.70)

**Exhibit 144**

OCO Profitability Increase for the Week

$                            11,273.59

Hi Everyone,

I've attached the overview report for your program last week.  We would like to have a quick call this week to discuss adding in an additional option, which Jonathan mentions in his comments below.  Please let me know what is a good time for you either Thursday or Friday afternoon and I will send out a conference bridge.

OCO Profitability Snapshot:  As of 9/4, OCO is currently increasing your profitability by $11,273.59 per week based on the calculation you see above.  This number is variable, and should continue to improve over time as we test and optimize your program, and is only based on the actions we have taken on customer calls thus far.

Comments from Jonathan:

·      The campaign order volume increased significantly from the previous week to 4,058 orders for the week.  The only issue with the campaign is an elevated amount of callers leaving the In-Trial group to transfer to a CSR.  I have had success using what I refer to as "CSR interrupts" to interrupt the caller prior to being connected to a CSR and offer them the ability to cancel, etc.  Are you available for a quick analytics call so I can share with you how it would be implemented, the caller experience, and the expected results / savings?  The work is entirely on our side, so no development needed on your end.

·      The top line metrics for the week are:

o   Total Calls: 3,076

o   OCO Recognition: 53%

o   Optimal Handling: 30%

o   Save Sale Conversion Rate: 18%

o   Clean Cancel Rate: 62%

·      Please let me know when you are available for the call.  Look forward to speaking with you.  Thanks.

Exhibit 144

Thanks!


Emily


Emily McEvoy

Account Manager

RevGuard


6260 Lookout Rd.  Boulder, CO 80301  w: 303-218-6630  c: 303-905-4988

**Exhibit 144**

| OCO Profitability Increase for the Week | Projected Monthly | Projected Annual |
|---|---|---|
| $ 11,273.59 | $ 48,852.20 | $ 586,226.45 |

| | | |
|---|---|---|
| OCO Save Sale Revenue | $ | 4,656.06 |
| OCO Refund Savings | $ | 6,928.22 |
| OCO Customer Service Profit | $ | 4,356.00 |
| OCO Cost (Current Price) | $ | (4,666.70) |
| OCO Profitability Increase for the Week | $ | 11,273.59 |

**Program Goal:** Generate IT Save Sale Conversion Rate in excess of 17%; Keep Chargeback risk activities low; Increase Profitability

**Program Methods:** Cross Referencing Chargeback Data with OCO activities to gauge CB effect; use multivariate testing to determine optimal price point.

**Program Measurement:** Chargebacks from OCO activities within program less than the program without OCO; compared by reviewing CB rate prior to OCO with CB rate of all OCO processed orders; Price deteremined by highest value relative to conversion rate, decline rate, CSR transfer costs, and abandons

**Exhibit 144**

| | AuraVie Skin Care | | | |
|---|---|---|---|---|
| 8/29 - 9/4 | | | | |
| | All Calls | Rate | Unique Customers | Rate |
| **OVERVIEW** | | | | |
| Total Calls | 3,076 | | | |
| OCO Recognized Calls | 2,221 | 72.20% | | |
| OCO Unrecognized Calls | 855 | | | |
| Bypassed OCO / Straight Sales | 31 | | 25 | |
| Calls Sent to Call Center | 1,624 | 52.80% | | |
| | | | | |
| OCO Directed | 2,311 | | | |
|    Optimal Handling (Save Sale & Clean Cancel) | 702 | 30.38% | 702 | 35.76% |
|    Transfer to CSR | 1,329 | 57.51% | 1,069 | 54.46% |
|    Hang Ups | 219 | 9.48% | 131 | 6.67% |
|    Other (Non-Optimal Cancels) | 61 | 2.64% | 61 | 3.11% |
| OCO Unidentified | | | | |
|    Transfer to CSR | 529 | 61.87% | | |
|    Hang Ups | 326 | 38.13% | | |
| **Totals** | **2,311** | | **1,963** | |
| **Repeat Callers** | 348 | 11.31% | | |
| | All Calls | Rate | Unique Customers | Rate |
| **OCO SUCCESS METRICS BY STATUS - RECOGNIZED CALLS** | | | | |
| **IN-TRIAL STATUS** | | | | |
| Early Cancel Save Sale - $38.29 | 160 | 18.43% | 160 | 22.19% |
| RMA Issued | 61 | 7.03% | 61 | 8.46% |
| Transfer to Rep | 567 | 65.32% | 455 | 63.11% |
| No Action/Hangup | 80 | 9.22% | 45 | 6.24% |
| **In-Trial Status Total** | **868** | | **721** | |
| | | | | |
| **POST-TRIAL STATUS** | | | | |
| Clean Cancel | 542 | 62.01% | 542 | 66.75% |
| Transfer to Rep | 315 | 36.04% | 260 | 32.02% |
| No Action/Hangup | 17 | 1.95% | 10 | 1.23% |
| **Post-trial Status Total** | **874** | | **812** | |
| | | | | |
| **ALREADY BEEN CANCELLED** | | | | |
| Transfer to Rep | 447 | 78.56% | 354 | 82.33% |
| No Action/Hangup | 122 | 21.44% | 76 | 17.67% |
| **Already Been Cancelled Total** | **569** | | **430** | |

Exhibit 144

| | 9/4/2012 | 8/28/2012 | 8/21/2012 | 8/14/2012 | 8/7/2012 | 7/31/2012 | 7/24/2012 |
|---|---|---|---|---|---|---|---|
| Total Calls | | | | | | | |
| OCO Recognized Calls | 72.20% | 70.85% | 71.35% | 75.16% | 75.35% | 73.69% | 74.16% |
| OCO Unrecognized Calls | | | | | | | |
| Bypassed OCO | | | | | | | |
| Calls Sent to Call Center | 52.80% | 53.57% | 48.66% | 50.66% | 46.28% | 50.68% | 50.57% |
| | | | | | | | |
| OCO Directed | | | | | | | |
| Optimal Handling (Clean Cancels and In-Trial Saves) | 30.38% | 31.75% | 35.82% | 34.20% | 32.41% | 33.26% | 32.12% |
| Transfer to CSR | 57.51% | 57.27% | 53.01% | 54.63% | 48.43% | 53.87% | 54.07% |
| Hang Ups | 9.48% | 9.49% | 9.47% | 9.14% | 15.47% | 9.41% | 9.63% |
| Other | 2.64% | 1.49% | 1.71% | 2.04% | 3.70% | 3.46% | 4.18% |
| OCO Unidentified | | | | | | | |
| Transfer to CSR | 61.87% | 61.86% | 59.25% | 62.28% | 61.49% | 63.37% | 60.80% |
| Hang Ups | 38.13% | 38.14% | 40.75% | 37.72% | 38.51% | 36.63% | 39.20% |
| Totals | | | | | | | |
| Repeat Callers | 11.31% | 9.80% | 10.86% | 10.00% | 10.68% | 9.83% | 10.04% |
| | | | | | | | |
| OCO SUCCESS METRICS BY STATUS - RECOGNIZED CALLS | | | | | | | |
| IN-TRIAL STATUS | | | | | | | |
| Early Cancel Save Sale | 18.43% | 16.35% | 21.27% | 20.79% | 25.41% | 22.95% | 21.84% |
| RMA Issued | 7.03% | 6.30% | 10.13% | 9.86% | 12.71% | 11.11% | 11.52% |
| Transfer to Rep | 65.32% | 65.59% | 57.97% | 59.32% | 45.65% | 56.70% | 56.73% |
| No Action/Hangup | 9.22% | 11.75% | 10.63% | 10.04% | 16.24% | 9.24% | 9.91% |
| In-Trial Status Total | | | | | | | |
| | | | | | | | |
| POST-TRIAL STATUS | | | | | | | |
| Clean Cancel | 62.01% | 61.42% | 61.97% | 60.48% | 61.79% | 64.56% | 64.11% |
| Transfer to Rep | 36.04% | 36.28% | 35.08% | 37.13% | 30.94% | 33.20% | 34.11% |
| No Action/Hangup | 1.95% | 2.30% | 2.95% | 2.40% | 7.27% | 2.24% | 1.78% |
| Post-trial Status Total | | | | | | | |

Exhibit 144

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ALREADY BEEN CANCELLED** | | | | | | | |
| Transfer to Rep | 78.56% | 81.71% | 80.27% | 80.32% | 74.35% | 80.18% | 79.37% |
| No Action/Hangup | 21.44% | 18.29% | 19.73% | 19.68% | 25.65% | 19.82% | 20.63% |
| **Already Been Cancelled Total** | | | | | | | |
| **OCO VALUE** | | | | | | | |
| OCO Save Sale Revenue | 41.30% | 21.56% | 15.73% | 19.36% | 28.71% | 31.71% | 38.34% |
| OCO Refund Savings | 61.46% | 67.59% | 61.27% | 58.29% | 48.56% | 50.61% | 51.09% |
| OCO Customer Service Profit | 38.64% | 36.83% | 31.40% | 29.63% | 28.46% | 29.97% | 32.03% |
| OCO Cost (Current Price) | -41.39% | -25.98% | -8.40% | -7.27% | -5.74% | -12.28% | -21.46% |
| **OCO Value Add:** | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

Exhibit 144

| 7/17/2012 | 7/10/2012 | 7/3/2012 | 6/26/2012 | 6/19/2012 | 6/12/2012 | 6/5/2012 |
|---|---|---|---|---|---|---|
| | | | | | | |
| 75.53% | 76.06% | 74.22% | 72.80% | 76.42% | 73.64% | 74.54% |
| | | | | | | |
| 50.82% | 53.99% | 51.00% | 51.53% | 49.58% | 46.56% | 46.42% |
| | | | | | | |
| 29.67% | 25.73% | 29.96% | 30.69% | 34.76% | 33.48% | 34.65% |
| 53.34% | 57.81% | 56.11% | 57.26% | 52.34% | 53.31% | 49.52% |
| 14.30% | 11.85% | 9.93% | 8.41% | 8.86% | 9.02% | 10.04% |
| 2.69% | 4.61% | 4.01% | 3.63% | 4.03% | 4.19% | 5.79% |
| | | | | | | |
| 61.69% | 65.42% | 58.53% | 60.00% | 64.95% | 53.19% | 55.09% |
| 38.31% | 34.58% | 41.47% | 40.00% | 35.05% | 46.81% | 44.91% |
| | | | | | | |
| 11.14% | 11.09% | 10.95% | 10.36% | 9.94% | 10.86% | 11.44% |
| | | | | | | |
| | | | | | | |
| 23.42% | 20.40% | 18.87% | 14.62% | 19.27% | 19.95% | 18.06% |
| 9.51% | 10.72% | 11.04% | 12.06% | 15.20% | 14.39% | 20.68% |
| 56.44% | 58.02% | 61.23% | 63.46% | 56.04% | 56.15% | 50.79% |
| 10.63% | 10.86% | 8.87% | 9.86% | 9.50% | 9.51% | 10.47% |
| | | | | | | |
| | | | | | | |
| 61.51% | 58.36% | 63.38% | 62.85% | 61.46% | 61.90% | 61.31% |
| 34.08% | 38.36% | 34.74% | 35.06% | 36.45% | 35.60% | 34.75% |
| 4.40% | 3.28% | 1.88% | 2.09% | 2.09% | 2.49% | 3.95% |
| | | | | | | |
| | | | | | | |

**Exhibit 144**

| | | | | | | |
|---|---|---|---|---|---|---|
| 71.85% | 77.73% | 77.89% | 83.71% | 78.86% | 80.39% | 78.09% |
| 28.15% | 22.27% | 22.11% | 16.29% | 21.14% | 19.61% | 21.91% |
| | | | | | | |
| | | | | | | |
| 30.75% | 45.93% | 38.66% | 31.76% | 29.04% | 30.81% | 30.00% |
| 55.68% | 44.22% | 58.86% | 62.42% | 54.56% | 48.45% | 76.91% |
| 31.66% | 32.51% | 37.08% | 37.52% | 28.68% | 29.40% | 32.29% |
| -18.08% | -22.66% | -34.59% | -31.71% | -12.29% | -8.66% | -39.20% |
| 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

**Exhibit 144**

| | Total | 9/4/2012 | 8/28/2012 | 8/21/2012 | 8/14/2012 | 8/7/2012 |
|---|---|---|---|---|---|---|
| **Total Orders** | **38,379** | **4,058** | **2,928** | **1,135** | **1,103** | **1,093** |
| | | | | | | |
| Total Calls | 51,142 | 3,076 | 3,427 | 3,169 | 3,490 | 3,866 |
| OCO Recognized Calls | 37,884 | 2,221 | 2,428 | 2,261 | 2,623 | 2,913 |
| OCO Unrecognized Calls | 13,258 | 855 | 999 | 908 | 867 | 953 |
| Bypassed OCO | 624 | 31 | 67 | 38 | 36 | 33 |
| Calls Sent to Call Center | 25,757 | 1,624 | 1,836 | 1,542 | 1,768 | 1,789 |
| | | | | | | |
| OCO Directed | 38,766 | 2,311 | 2,488 | 2,345 | 2,702 | 2,922 |
| Optimal Handling (Clean Cancels and In-Trial Saves) | 12,347 | 702 | 790 | 840 | 924 | 947 |
| Transfer to CSR | 21,050 | 1,329 | 1,425 | 1,243 | 1,476 | 1,415 |
| Hang Ups | 4,044 | 219 | 236 | 222 | 247 | 452 |
| Other | 1,325 | 61 | 37 | 40 | 55 | 108 |
| OCO Unidentified | | | | | | |
| Transfer to CSR | 8,070 | 529 | 618 | 538 | 540 | 586 |
| Hang Ups | 5,188 | 326 | 381 | 370 | 327 | 367 |
| **Totals** | **38,766** | **2,311** | **2,488** | **2,345** | **2,702** | **2,922** |
| **Repeat Callers** | **5,401** | **348** | **336** | **344** | **349** | **413** |
| | | | | | | |
| | | | | | | |
| **IN-TRIAL STATUS** | | | | | | |
| Early Cancel Save Sale | 2,378 | 160 | 96 | 84 | 116 | 216 |
| RMA Issued | 1,325 | 61 | 37 | 40 | 55 | 108 |
| Transfer to Rep | 6,774 | 567 | 385 | 229 | 331 | 388 |
| No Action/Hangup | 1,219 | 80 | 69 | 42 | 56 | 138 |
| **In-Trial Status Total** | **11,696** | **868** | **587** | **395** | **558** | **850** |
| | | | | | | |
| **POST-TRIAL STATUS** | | | | | | |
| Clean Cancel | 9,969 | 542 | 694 | 756 | 808 | 731 |
| Transfer to Rep | 5,640 | 315 | 410 | 428 | 496 | 366 |
| No Action/Hangup | 467 | 17 | 26 | 36 | 32 | 86 |

**Exhibit 144**

| Post-trial Status Total | 16,076 | 874 | 1,130 | 1,220 | 1,336 | 1,183 |
|---|---|---|---|---|---|---|
| | | | | | | |
| **ALREADY BEEN CANCELLED** | | | | | | |
| Transfer to Rep | 8,636 | 447 | 630 | 586 | 649 | 661 |
| No Action/Hangup | 2,358 | 122 | 141 | 144 | 159 | 228 |
| **Already Been Cancelled Total** | **10,994** | **569** | **771** | **730** | **808** | **889** |
| OCO VALUE | | | | | | |
| OCO Save Sale Revenue | $73,650 | $4,656 | $2,794 | $2,444 | $3,376 | $6,286 |
| OCO Refund Savings | $131,860 | $6,928 | $8,759 | $9,522 | $10,163 | $10,631 |
| OCO Customer Service Profit | $76,155 | $4,356 | $4,773 | $4,881 | $5,166 | $6,231 |
| OCO Cost (Current Price) | ($44,136) | ($4,667) | ($3,367) | ($1,305) | ($1,268) | ($1,257) |
| **OCO Value Add:** | **$237,529** | **$11,274** | **$12,959** | **$15,543** | **$17,437** | **$21,891** |

**Exhibit 144**

| 7/31/2012 | 7/24/2012 | 7/17/2012 | 7/10/2012 | 7/3/2012 | 6/26/2012 | 6/19/2012 | 6/12/2012 | 6/5/2012 |
|---|---|---|---|---|---|---|---|---|
| **2,166** | **3,838** | **3,408** | **3,446** | **4,529** | **4,085** | **1,990** | **1,588** | **3,012** |
| | | | | | | | | |
| 4,108 | 4,443 | 4,650 | 4,119 | 3,798 | 3,823 | 3,532 | 3,866 | 1,775 |
| 3,027 | 3,295 | 3,512 | 3,133 | 2,819 | 2,783 | 2,699 | 2,847 | 1,323 |
| 1,081 | 1,148 | 1,138 | 986 | 979 | 1,040 | 833 | 1,019 | 452 |
| 41 | 41 | 55 | 112 | 46 | 34 | 41 | 26 | 23 |
| 2,082 | 2,247 | 2,363 | 2,224 | 1,937 | 1,970 | 1,751 | 1,800 | 824 |
| | | | | | | | | |
| 3,091 | 3,418 | 3,455 | 3,148 | 2,921 | 2,864 | 2,776 | 2,960 | 1,365 |
| 1,028 | 1,098 | 1,025 | 810 | 875 | 879 | 965 | 991 | 473 |
| 1,665 | 1,848 | 1,843 | 1,820 | 1,639 | 1,640 | 1,453 | 1,578 | 676 |
| 291 | 329 | 494 | 373 | 290 | 241 | 246 | 267 | 137 |
| 107 | 143 | 93 | 145 | 117 | 104 | 112 | 124 | 79 |
| | | | | | | | | |
| 685 | 698 | 702 | 645 | 573 | 624 | 541 | 542 | 249 |
| 396 | 450 | 436 | 341 | 406 | 416 | 292 | 477 | 203 |
| **3,091** | **3,418** | **3,455** | **3,148** | 2,921 | 2,864 | **2,776** | 2,960 | **1,365** |
| **404** | **446** | **518** | **457** | 416 | 396 | 351 | 420 | **203** |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| 221 | 271 | 229 | 276 | 200 | 126 | 142 | 172 | 69 |
| 107 | 143 | 93 | 145 | 117 | 104 | 112 | 124 | 79 |
| 546 | 704 | 552 | 785 | 649 | 547 | 413 | 484 | 194 |
| 89 | 123 | 104 | 147 | 94 | 85 | 70 | 82 | 40 |
| **963** | **1,241** | **978** | **1,353** | 1,060 | 862 | 737 | 862 | **382** |
| | | | | | | | | |
| | | | | | | | | |
| 807 | 827 | 796 | 534 | 675 | 753 | 823 | 819 | 404 |
| 415 | 440 | 441 | 351 | 370 | 420 | 488 | 471 | 229 |
| 28 | 23 | 57 | 30 | 20 | 25 | 28 | 33 | 26 |

**Exhibit 144**

| | | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| **1,250** | **1,290** | **1,294** | **915** | 1,065 | 1,198 | 1,339 | 1,323 | **659** |
| | | | | | | | | |
| 704 | 704 | 850 | 684 | 620 | 673 | 552 | 623 | 253 |
| 174 | 183 | 333 | 196 | 176 | 131 | 148 | 152 | 71 |
| **878** | **887** | **1,183** | **880** | 796 | 804 | 700 | 775 | **324** |
| | | | | | | | | |
| $6,431 | $7,886 | $6,664 | $8,032 | $5,820 | $4,706 | $5,409 | $6,496 | $2,651 |
| $10,265 | $10,509 | $12,066 | $7,732 | $8,861 | $9,248 | $10,163 | $10,214 | $6,796 |
| $6,078 | $6,588 | $6,861 | $5,685 | $5,583 | $5,559 | $5,343 | $6,198 | $2,853 |
| ($2,491) | ($4,414) | ($3,919) | ($3,963) | ($5,208) | ($4,698) | ($2,289) | ($1,826) | ($3,464) |
| **$20,283** | **$20,570** | **$21,672** | **$17,486** | $15,056 | $14,815 | **$18,627** | **$21,082** | **$8,836** |

**Exhibit 144**

| OCO Value Metrics | | |
|---|---|---|
| Cost Per CSR Call | $ | 3.00 |
| Cost for all Calls no-OCO | $ | 9,228.00 |
| Cost for CSR Calls with OCO | $ | 4,872.00 |
| OCO CSR Savings | $ | 4,356.00 |
| | | |
| | | |
| OCO Cost per Order | $ | (1.15) |
| Orders | | 4058 |
| OCO Cost | $ | (4,666.70) |

| Save Sale Information | | |
|---|---|---|
| Saves Issued - $38.29 | | 160 |
| Billable Rate | | 76.00% |
| Saved First Bills | | 121.6 |
| Bills per Order | | 1 |
| Total Additional Bills | | 121.6 |
| Bill amount | $ | 38.29 |
| Additional Revenue | $ | 4,656.06 |

| Anticipated Effects of Clean Cancels - Current | |
|---|---|
| | Current |
| Refund eligible Identified callers | 1443 |
| Callers Clean Cancelled by System | 542 |
| CSR Transfers of eligible callers | 762 |
| Refund Rate of Eligible Callers at CSRs | 12.00% |
| Refunds Without OCO from this group | 173 |
| Refunds with OCO | 91 |
| | |
| Typical Refund Amount | $84.78 |
| Pre OCO Refund Expense | $14,680.50 |
| OCO Refund Expense | $7,752.28 |
| Savings | $6,928.22 |
| Percent of ID'd callers Refund Eligible | 64.97% |
| Refund Eligible Unidentified Callers | 555 |
| Refunds Issued on Unidentified Callers | 67 |
| Refund Cost Unidentified Callers | $5,651.43 |
| Total Pre OCO Refund Cost | $20,331.94 |
| Total OCO Refund Expense | $13,403.72 |
| Improvement | $6,928.22 |
| Refunds per Caller Non-OCO | 6.609862584 |
| Refunds per Caller OCO | 4.35751486 |
| Improvement | $2.25 |

| | AuraVie Skin Care | |
|---|---|---|
| 8/1 - 8/31 | | |
| | **All Calls** | **Rate** |
| **OVERVIEW** | | |
| Total Calls | 15,530 | |
| OCO Recognized Calls | 11,373 | 73.23% |
| OCO Unrecognized Calls | 4,157 | |
| Bypassed OCO / Straight Sales | 192 | |
| Calls Sent to Call Center | 7,741 | 49.85% |
| | | |
| OCO Directed | 11,645 | |
|   Optimal Handling (Save Sale & Clean Cancel) | 3,875 | 33.28% |
|   Transfer to CSR | 6,230 | 53.50% |
|   Hang Ups | 1,276 | 10.96% |
|   Other (Non-Optimal Cancels) | 264 | 2.27% |
| OCO Unidentified | | |
|   Transfer to CSR | 2,537 | 61.03% |
|   Hang Ups | 1,620 | 38.97% |
| **Totals** | **11,645** | |
| | | |
| | | |
| OCO SUCCESS METRICS BY STATUS - RECOGNIZED CALLS | | |
| **IN-TRIAL STATUS** | | |
| Early Cancel Save Sale | 583 | 20.96% |
| RMA Issued | 264 | 9.49% |
| Transfer to Rep | 1,595 | 57.35% |
| No Action/Hangup | 339 | 12.19% |
| **In-Trial Status Total** | **2,781** | |
| | | |
| **POST-TRIAL STATUS** | | |
| Clean Cancel | 3,292 | 61.30% |
| Transfer to Rep | 1,884 | 35.08% |
| No Action/Hangup | 194 | 3.61% |
| **Post-trial Status Total** | **5,370** | |
| | | |
| **ALREADY BEEN CANCELLED** | | |
| Transfer to Rep | 2,751 | 78.73% |
| No Action/Hangup | 743 | 21.27% |
| **Already Been Cancelled Total** | **3,494** | |

**Exhibit 144**

| Monthly OCO Value Impact | | |
|---|---|---|
| OCO Save Sale Revenue | $ | 17,858 |
| OCO Refund Savings | $ | 43,024 |
| OCO Customer Service Profit | $ | 27,262 |
| OCO Cost (Current Price) | $ | (9,044) |
| OCO Value Add (Monthly): | $ | 79,101 |

| OCO Cost | | |
|---|---|---|
| OCO Monthly Minimum | $ | (2,500.00) |
| OCO Cost per Order | $ | (1.15) |
| Orders | | 7,864 |
| OCO Cost | $ | (9,043.60) |

| Anticipated Effects of Save Sales | | |
|---|---|---|
| Save Sale - $38.29 | | 583 |
| Success Rate on Saves | | 80.00% |
| Total Revenue | $ | 17,858.46 |

| Anticipated Effects of Refund Savings | |
|---|---|
| | Current |
| Refund eligible Identified callers | 8864 |
| CSR Transfers of eligible callers | 4635 |
| Refund Rate of Eligible Callers at CSRs | 12.00% |
| Refunds Without OCO from this group | 1064 |
| Refunds with OCO | 556 |
| | |
| Typical Refund Amount | $84.78 |
| Pre OCO Refund Expense | $90,178.79 |
| OCO Refund Expense | $47,154.64 |
| Total Refund Savings: | $43,024.15 |

| Anticipated Effects of Customer Service Savings | | |
|---|---|---|
| Total Calls Available to CSR's | | 15,530 |
| Total Calls Sent to Call Center | | 7,741 |
| OCO Saved CSR Calls | | 7,789 |
| CSR Cost Per Call | $ | 3.50 |
| Total CSR Savings: | $ | 27,261.50 |

| | Aug-12 | | Jul-12 | | Jun-12 | |
|---|---|---|---|---|---|---|
| **Total Orders** | 7,864 | | 14,826 | | 11,671 | |
| | All Calls | Rate | All Calls | Rate | All Calls | Rate |
| **OVERVIEW** | | | | | | |
| Total Calls | 15,530 | | 19,010 | | 15,080 | |
| OCO Recognized Calls | 11,373 | 73.23% | 14,211 | 74.76% | 11,210 | 74.34% |
| OCO Unrecognized Calls | 4,157 | | 4,799 | | 3,870 | |
| Bypassed OCO / Straight Sales | 192 | | 267 | | 178 | |
| Calls Sent to Call Center | 7,741 | 49.85% | 9,795 | 51.53% | 7,403 | 49.09% |
| | | | | | | |
| OCO Directed | 11,645 | | 14,291 | | 11,170 | |
| Optimal Handling (Save Sale & Clean Cancel) | 3,875 | 33.28% | 4,298 | 30.07% | 3,356 | 30.04% |
| Transfer to CSR | 6,230 | 53.50% | 7,836 | 54.83% | 6,251 | 55.96% |
| Hang Ups | 1,276 | 10.96% | 1,610 | 11.27% | 1,045 | 9.36% |
| Other (Non-Optimal Cancels) | 264 | 2.27% | 547 | 3.83% | 518 | 4.64% |
| OCO Unidentified | | | | | | |
| Transfer to CSR | 2,537 | 61.03% | 3,006 | 62.64% | 2,249 | 58.11% |
| Hang Ups | 1,620 | 38.97% | 1,793 | 37.36% | 1,621 | 41.89% |
| **Totals** | 11,645 | | 14,291 | | 11,170 | |
| | | | | | | |
| | | | | | | |
| **OCO SUCCESS METRICS BY STATUS - RECOGNIZED CALLS** | | | | | | |
| **IN-TRIAL STATUS** | | | | | | |
| Early Cancel Save Sale | 583 | 20.96% | 1,103 | 21.84% | 596 | 17.44% |
| RMA Issued | 264 | 9.49% | 547 | 10.83% | 518 | 15.16% |
| Transfer to Rep | 1,595 | 57.35% | 2,888 | 57.19% | 1,980 | 57.95% |
| No Action/Hangup | 339 | 12.19% | 512 | 10.14% | 323 | 9.45% |
| **In-Trial Status Total** | 2,781 | | 5,050 | | 3,417 | |
| | | | | | | |
| **POST-TRIAL STATUS** | | | | | | |

**Exhibit 144**

| | | | | | | |
|---|---|---|---|---|---|---|
| Clean Cancel | 3,292 | 61.30% | 3,195 | 62.55% | 3,204 | 62.08% |
| Transfer to Rep | 1,884 | 35.08% | 1,768 | 34.61% | 1,832 | 35.50% |
| No Action/Hangup | 194 | 3.61% | 145 | 2.84% | 125 | 2.42% |
| **Post-trial Status Total** | **5,370** | | **5,108** | | **5,161** | |
| | | | | | | |
| **ALREADY BEEN CANCELLED** | | | | | | |
| Transfer to Rep | 2,751 | 78.73% | 3,180 | 76.94% | 2,439 | 80.34% |
| No Action/Hangup | 743 | 21.27% | 953 | 23.06% | 597 | 19.66% |
| **Already Been Cancelled Total** | **3,494** | | **4,133** | | **3,036** | |
| **OCO VALUE METRICS** | | | | | | |
| OCO Save Sale Revenue | $ 17,858 | | $ 33,787 | | $ 22,928 | |
| OCO Refund Savings | $ 43,024 | | $ 43,675 | | $ 39,942 | |
| OCO Customer Service Profit | $ 27,262 | | $ 32,253 | | $ 26,870 | |
| OCO Cost (Current Price) | $ (9,044) | | $ (17,050) | | $ (13,422) | |
| **OCO Value Add (Monthly):** | **$ 79,101** | | **$ 92,665** | | **$ 76,318** | |

Exhibit 144

|  | | Completed | | | |
|---|---|---|---|---|---|
| | Early Cancel Save Sale Price | $59.95 | $49.95 | $39.95 | Total |
| T | Percent of Split Test | 33% | 33% | 34% | |
| E | Total Offers Presented | 191 | 185 | 184 | 560 |
| S | Total Offers Accepted | 29 | 32 | 55 | 116 |
| T | Total Offers Accepted after RMA | 2 | 4 | 4 | 10 |
| D | Total RMA Requests | 39 | 35 | 30 | 104 |
| A | Total CSR Transfers at Offer | 37 | 26 | 26 | 89 |
| T | Total CSR Transfers at Offer Acceptance | 3 | 6 | 1 | 10 |
| A | Total CSR Transfers at RMA | 64 | 62 | 48 | 174 |
| | Total CSR Transfers at RMA Acceptance | 1 | 1 | 1 | 3 |

| | | $59.95 | $49.95 | $39.95 | Total |
|---|---|---|---|---|---|
| C | Conversion Rate | 16.23% | 19.46% | 32.07% | 20.71% |
| O | CSR Transfer Rate | 54.97% | 51.35% | 41.30% | 49.29% |
| N | RMA Rate | 20.42% | 18.92% | 16.30% | 18.57% |
| C | | | | | |
| L | Early Cancel Save Sale Revenue | $1,858.45 | $1,798.20 | $2,357.05 | $6,013.70 |
| U | Early Cancel Return Cost | -$68.25 | -$61.25 | -$52.50 | -$182.00 |
| S | CSR Expenses | -$315.00 | -$285.00 | -$228.00 | -$828.00 |
| I | | | | | |
| O | | | | | |
| N | Net Value by Save Sale | $1,475.20 | $1,451.95 | $2,076.55 | $5,003.70 |

| | | Cumulative | | | |
|---|---|---|---|---|---|
| | Early Cancel Save Sale Price | $59.95 | $49.95 | $39.95 | Total |
| T | Percent of Split Test | 33% | 33% | 34% | |
| E | Total Offers Presented | 641 | 688 | 622 | 1951 |
| S | Total Offers Accepted | 128 | 146 | 199 | 473 |
| T | Total Offers Accepted after RMA | 7 | 19 | 10 | 36 |
| D | Total RMA Requests | 144 | 151 | 124 | 419 |
| A | Total CSR Transfers at Offer | 111 | 105 | 82 | 298 |

Exhibit 144

| | | | | | |
|---|---|---|---|---|---|
| **T A** | Total CSR Transfers at Offer Acceptance | 11 | 14 | 7 | 32 |
| | Total CSR Transfers at RMA | 182 | 184 | 153 | 519 |
| | Total CSR Transfers at RMA Acceptance | 4 | 5 | 4 | 13 |
| | | | | | |
| | | **$59.95** | **$49.95** | **$39.95** | **Total** |
| **C O N C L U S I O N** | Conversion Rate | 21.06% | 23.98% | 33.60% | 24.24% |
| | CSR Transfer Rate | 48.05% | 44.77% | 39.55% | 44.18% |
| | RMA Rate | 22.46% | 21.95% | 19.94% | 21.48% |
| | | | | | |
| | Early Cancel Save Sale Revenue | $8,093.25 | $8,241.75 | $8,349.55 | $24,684.55 |
| | Early Cancel Return Cost | -$252.00 | -$264.25 | -$217.00 | -$733.25 |
| | CSR Expenses | -$924.00 | -$924.00 | -$738.00 | -$2,586.00 |
| | | | | | |
| | **Net Value by Save Sale** | **$6,917.25** | **$7,053.50** | **$7,394.55** | **$21,365.30** |

| | Comparison Table: Net Value Per Price Point | | | | |
|---|---|---|---|---|---|
| **V a l u e** | **Price Point** | **Save Sale Revenue** | **CSR Cost** | **RMA Cost** | **Net Value** |
| | $59.95 | $24,633.28 | $ 3,515.45 | $ 438.29 | **$20,679.53** |
| | $49.95 | $23,371.59 | $ 3,275.30 | $ 428.20 | **$19,668.09** |
| | $39.95 | $26,189.67 | $ 2,893.57 | $ 388.95 | **$22,907.16** |

**Exhibit 144**

CASE NO. <u>2:15-CV-04527-GW (PLAx)</u>

<u>Federal Trade Commission</u>

VS. <u>BunZai Media Group, Inc., et al.</u>

PLAINTIFF'S EXHIBIT <u>149</u>

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**Gallegos, Luis**

| | |
|---|---|
| **From:** | Avico Global <avicoglobal@gmail.com> |
| **Sent:** | Monday, July 01, 2013 12:01 PM |
| **To:** | Alon N; Roi | Pinnacle; Paul Medina; Doron . |
| **Subject:** | Projects updates |

Hi Team ..

Here is a short update in regards to running projects ...

ClickConnector.com

Live with next major release done by 7-2-13

StoreFrontAdmin
Soft launch demo Scheduled for anytime after 7-1-13 + (ready to test for inhouse usage)

Beta launch scheduled for 7-15-13
Commercial Launch 8-15-13

ChargeBackArmor.com or ChargebackStars.com or ChargebackPro.com

Soft launch demo Scheduled for anytime after 7-1-13 + (ready to test for inhouse usage) Beta Launch scheduled for 8-1-13

Commercial Launch 9-1-13

IVRLogix.com

Soft Launch 7-1-13 (waiting on voices.com recordings) + (ready to test for inhouse usage) Beta Launch scheduled for 8-1-13 Commercial Launch 9-1-13

IVRSwitch.com
Soft Launch 7-20-13 (ready to test for inhouse usage) Beta Launch scheduled for 8-15-13 Commercial Launch 9-15-13

LinkMyChat.com or ChatAPI.com
Soft Launch 7-25-13 (ready to test for inhouse usage) Beta Launch scheduled for 8-15-13 Commercial Launch 9-15-13

MediaCRM.com

In the initial stages - will update ETA later

**Exhibit 149**

Call Center
In the initial stages - will update ETA later

Exhibit 149

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 151

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

| | |
|---|---|
| **From:** | Tyler R <tyler@securedmerchants.com> |
| **Sent:** | Tuesday, February 17, 2015 5:44 PM |
| **To:** | Alon N; Mike Costache; Avico Global; Doron@doron.us; Roi R |
| **Subject:** | ChargeBack Armor Jan + Feb figures |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

As per Mike's request, below are the numbers of chargebacks we processed for each active client from Jan 1st, 2015 till today:

1. Auravie  (Jan 244 + Feb 190) x $6 = $2,604

2. PureVision Marketing  (Jan 38 + Feb 18) x $10 = $560

3. Creative Ventures (Jan 86 + Feb 17) x $10 = $1,030

4. Jersey Consolidated Feb 130 x $10 = $1,300 (free trial so we will not be billing for these chargebacks)

Total to be billed to 3 clients for Jan and Feb (so far) is $4,194

The following clients are onboarding @ $10/chargeback:

1. CHH Capital - approx 300/ month

2. 98 Interactive - approx 450/ month

3. Apex Ads Group - approx 1000/ month

Cheers,


Tyler Reitenbach


<http://i.imgur.com/0k3Qxnm.png?1>


IT Shaman - Secured Merchants LLC
Phone: (800) 976-7027     |   Email: Tyler@SecuredMerchants.com
<mailto:Tyler@SecuredMerchants.com>
Skype: Tyler.Reitenbach   |   Website: www.SecuredMerchants.com
<http://www.securedmerchants.com/>

Exhibit 151

This e-mail message may contain confidential, proprietary or legally privileged information. It should not be used by
anyone who is not the original intended recipient.  If you have erroneously received this message, please delete it
immediately and notify the sender.  The recipient acknowledges that Secured Merchants LLC. is unable to exercise
control or ensure or guarantee the integrity of/over the contents of the information contained in e-mail transmission
and further acknowledges that any views expressed in this message shall not be implied or assumed unless the sender
does so expressly with due authority of Secured Merchants LLC.  Before opening any attachments please check them for
viruses and defects.
<https://mail.google.com/mail/u/0/images/cleardot.gif>

**Exhibit 151**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 174

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**     Avi Argaman[avicoglobal@gmail.com]; Xposed Inc[xposedinc@gmail.com]
**Cc:**     Paul Medina[Paul@mediaurge.com]
**From:**   Alon | MediaUrge
**Sent:**   Mon 12/10/2012 6:02:52 PM
**Importance:**   Normal
**Subject:**   USPS Canada rates
**MAIL_RECEIVED:**   Mon 12/10/2012 6:03:37 PM

TEAM,

These are the rates that Paul received from Sean our contact at USPS, our goal is to beat this price by at least 15 to 20% while not affecting the days of delivery, we also have to see if we can potentially add a tracking number......

If we cannot find a carrier that will provide tracking numbers, we could live without the tracking number...

Let's all get involved and find the best possible rate as we would like to launch Canada the second week of January...

These are the rates Sean at USPS gave us for shipping at 1lb to Canada.

1st class international 5-7 days no tracking # $5.75
Priority International 3-5 days partial tracking #'s $23.25
Express mail International 2-3 days 100% tracking #'s $32.90


Regards,

--
Paul B. Medina
Executive Vice President

Mobile: 818-983-7202 | Office: 855-717-5656
Direct: 818-200-1035 ext 7004 | Fax: 818-647-0182
Skype:PMedina0331 | Email: Paul@MediaUrge.com
Website: http://www.MediaUrge.com/



Further, this message is intended only for the designated recipient. It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

**Exhibit 174**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF' S EXHIBIT 176

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

Printed 06/26/13 @ 11:48:20 AM



**Exhibit 176**



**Bank of America**

BANK OF AMERICA, N.A. (THE "BANK")

Act # ████████0977

**Certified Copy of Limited Liability Company Resolutions**
**Opening and Maintaining Deposit Accounts and Services**

Name of Limited Liability Company   SECURED MERCHANTS LLC

I, the undersigned, hereby certify to   BANK OF AMERICA, N.A.

, that I am the a/the   **Member**                                                                                          and the designated keeper
Title

of the records and minutes of   SECURED MERCHANTS LLC                                                                    ,

a ☒ limited liability Company ☐ professional limited liability company duly organized and existing under the laws of the State of **CA** ,
(the "Company"); that I have full authority to manage, represent, sign for and bind the Company, that the following is a true copy of resolutions duly adopted
by a majority of the members/managers of said Company at a meeting duly held on the **25** day of **October** , **2013** , at
which a quorum was present and acted throughout or adopted by the written consent of a majority of the members/managers; and that such resolutions are in full
force and effect and have not been amended or rescinded.

1.  **Resolved,** that   BANK OF AMERICA, N.A.                                                                               (the "Bank")
is hereby designated as a depository of the Company and that deposit accounts and/or time deposits (CDs) to be opened and maintained in the name of this Company
with the Bank in accordance with the terms of the Bank's Deposit Agreement and Disclosures and the applicable rules and regulations for such accounts; that any
one of the following members, managers, or employees of this Company:

| | |
|---|---|
| **Doron Nottea** | **Member** |
| Name | Title/Status |
| **Alan Argaman** | **Member** |
| Name | Title/Status |
| | |
| Name | Title/Status |
| | |
| Name | Title/Status |

is hereby authorized, on behalf of this Company and its name, to execute and sign any application, deposit agreement, signature card and any other documentation
required by Bank to open said accounts; to sign checks, drafts, notes, bills of exchange, acceptances, time deposits (CDs) or other orders for payment of money; to
endorse checks, drafts, notes, bills, time deposits (CDs) or other instruments owned or held by this company for deposit with Bank or for collection or discount by
Bank; to accept, drafts, acceptances, and other instruments payable at Bank; to place orders with Bank for the purchase and sale of foreign currencies on behalf of
this Company; to execute and deliver an electronic fund transfers agreement and to make transfers or withdrawals by electronic transfer on behalf of the Company;
to obtain an access device (including but not limited to a card, code, or other means of access to the Company's accounts) that may be used for the purpose of
initiating electronic fund transfers [Company agrees and acknowledges that neither the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) nor Regulation E (12
C.F.R. Part 205) are applicable to any such access device]; to establish and maintain a night deposit relationship; to execute and deliver a wire transfer agreement
and to request, or to appoint and delegate from time to time such persons who may request, wires of funds; to enter into any agreements with the Bank for the
provision by Bank of various Treasury Management services to this Company as such member, manager or employee may determine, in his or her sole discretion,
and to sign any and all documents and take all actions required by Bank relative to such Treasury Management services or the performance of the Company's
obligations there under, and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in
accordance with the terms of any such agreement shall have been received by Bank and that such termination shall not affect any action taken by the Bank prior to
such termination; to rent or lease a safe deposit box from Bank, to execute the rental agreement or lease, to enter the safe deposit box and to terminate the rental
agreement or lease; to take whatever other actions or enter into whatever other agreements relating to the accounts or investment of funds in such accounts with
Bank and to execute, amend, supplement and deliver to Bank such agreements on behalf of the Company upon such terms and conditions as such member, manager
or employee may deem appropriate and to appoint and delegate, from time to time, such person(s) who may be authorized to enter into such agreements and take any
other actions pursuant to such agreements in connection with said accounts that the member, manager or employee deems necessary; and to waive presentment,
demand, protest, and notice of protest or dishonor of any check, note, bill, draft, or other instrument made, drawn or endorsed by this Company; and

2.  **Further Resolved,** that the Bank be and is hereby authorized to honor, receive, certify, pay or exchange for money orders or other instruments all instruments
signed in accordance with the foregoing resolutions even though such payment may create an overdraft or even though such instruments may be drawn or endorsed to the
order of any member, manager or employee signing the same or tendered by such member, manager or employee or a third party for exchange or cashing, or in payment
of the individual obligation of such member, manager or employee, or for deposit to such member's, manager's or employee's personal account and Bank shall not be
required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolutions or the
application or disposition of such instrument or the proceeds thereof; and, further, that the Bank is authorized to honor any instructions regarding withdrawals, orders for
payment or transfer of funds whether oral, by telephone or electronic means if such withdrawal, orders or transfer are initiated by an above authorized member, manager
or employee; and

3.  **Further Resolved,** that the Bank be and is hereby requested, authorized and directed to honor and to treat as authorized, checks, drafts or other orders for
the payment of money drawn or purportedly drawn in this Company's name, including those payable to the individual order of any person whose name appears
thereon as signer thereof, when bearing or purporting to bear the facsimile signature of an member, manager or employee authorized in the foregoing resolutions and
the Bank shall be entitled to honor, to treat as authorized, and to charge this Company for such checks, drafts, or other orders regardless of by whom or by what
means the actual or purported facsimile signature thereon may have been affixed thereto, if such signature resembles the facsimile specimen duly certified to or filed
with the Bank by a member/manager of this Company or if such facsimile signature resembles any facsimile signature previously affixed to any check, draft, or
other order drawn in the Company's name, which check, draft, or other order was accepted and paid without timely objection by the Company, thereby ratifying the
use of such facsimile signature; and the Company hereby indemnifies and holds the Bank harmless against any and all loss, cost, damage or expense suffered or
incurred by the Bank arising out of or in any way related to the misuse or unlawful or unauthorized use by a person of such facsimile signature; and

00-14-9258M  06-1999                                                                                                    Page 1 of 2

NCA



Act # Redacted 0977

**4. Further Resolved,** that endorsements for deposit may be evidenced by the name of the Company being written or stamped on the check or other instrument deposited, without designation of the party making the endorsement, and the Bank is authorized to supply any endorsement on any instrument tendered for deposit or collection; and

**5. Further Resolved,** that a duly authorized member/manager of this Company shall certify to the Bank names and signatures of persons authorized to act on behalf of this Company under the foregoing resolutions and shall from time to time hereafter, as changes in the identity of said members, managers and employees are made, immediately report, furnish and certify such changes to the Bank and shall submit to the Bank a new account signature card reflecting such change(s) in order to make such changes effective and the Bank shall be fully protected in relying on such certifications and shall be indemnified and saved harmless from any claims, demands, expenses, losses, or damages resulting from, or growing out of, honoring the signature of any member, manager or employee so certified, or refusing to honor any signature not so certified; and

**6. Further Resolved,** that the foregoing resolutions shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as the Bank is concerned until three (3) business days after the Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by said Bank prior thereto; and

**7. Further Resolved,** that all transactions by any member, manager or employee of this Company on its behalf and in its name with the Bank prior to the delivery to the Bank of a certified copy of the foregoing resolutions are, in all respects, hereby ratified, confirmed, approved and adopted; and

**8. Further Resolved,** that any member/manager be and hereby is, authorized and directed to certify these resolutions to the Bank and that the provisions hereof are in conformity with the Articles of Organization and Operating Agreement of this Company.

**In Witness Whereof,** and intending to bind the Company, I have hereunto subscribed my name as a member/manager of this Company, this 25 day of October 2013 .

X _____
Member/Manager

| Bank Information | |
|---|---|
| Date | 10/25/2013 |
| Banking Center Name | TARZANA |
| Associate's Name | Shaghayegh Esmaeili |
| Associate's Phone Number | 818-712-6015 |

Page 2 of 2



# Bank of America

BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card with Substitute Form W-9**

Account Number ████ 0977                     Bank Number: 318

Account Type:  ☒ DDA   ☐ SAV   ☐ CD

Account Title:

SECURED MERCHANTS LLC

---

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☐ C Corporation   ☐ S Corporation

☐ Partnership   (Enter the type of partnership: General, LP, LLP or LLLP)

☒ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor)  C

☐ Other (Defined in W-9 instructions)

Social Security Number _____   (or)   Employer Identification Number  46-3059095

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, I/we acknowledge the receipt of these documents. **By signing below, I/we acknowledge and agree** that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

**Substitute Form W-9.** Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions).

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS instructions for Form W-9).

☐ **Exempt Payee (check if applicable)**

| The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. |

☐ **Nonresident Alien Status (if applicable)** If the beneficial owner of this account is a foreign person, check here, and complete and sign the applicable Form(s) W-8.

| Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|
| 1 DORON NOTTEA | MEMBER | X | 10/25/13 |
| 2 ALAN ARGAMAN | MEMBER | X | 10/25/13 |
| 3 | | | |
| 4 | | | |
| 5 | | | |

© 2012 Bank of America, N.A. All Rights Reserved

NCA
00-14-9297M 02-2013



Page 1 of 2

**176-4**

**Exhibit 176**

**Account Number:** 3250 1501 0977 _____

☐ **Signature Card Addendum on File**

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

_____     _____
Authorized Signer                                                 Title

---

**Review Information**

**Customer 1:**

Name  DORON NOTTEA

ID Type: US Driver License W/Photo        ID#: Redacted        ID Issuer: California        Iss. Date: 06/2013     Exp. Date: 07/2018

ID Type: Other        ID#: Redacted        ID Issuer: SS CARD        Iss. Date: N/A     Exp. Date: N/A

**Customer 2:**

Name  ALAN ARGAMAN

ID Type: US Driver License W/Photo        ID#: Redacted        ID Issuer: California        Iss. Date: 06/2012     Exp. Date: 04/2017

ID Type: Other        ID#: Redacted        ID Issuer: SS CARD        Iss. Date: N/A     Exp. Date: N/A

**Customer 3:**

Name _____

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

**Customer 4:**

Name _____

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

**Customer 5:**

Name _____

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

ID Type: ___        ID#: ___        ID Issuer: ___        Iss. Date: ___     Exp. Date: ___

---

**Bank Information**

| | |
|---|---|
| **Date** | 10/25/2013 |
| **Banking Center Name** | TARZANA |
| **Associate's Name** | Shaghayegh Esmaeili |
| **Associate's Phone Number** | 818-712-6015 |

NCA
00-14-9297M  02-2013

176-5                                                        **Exhibit 176**



**BANK OF AMERICA, N.A. (THE "BANK")**

Act# ~~Redacted~~ 0922

**Certified Copy of Limited Liability Company Resolutions**
**Opening and Maintaining Deposit Accounts and Services**

Name of Limited Liability Company   SECURED MERCHANTS LLC

I, the undersigned, hereby certify to   BANK OF AMERICA, N.A.

, that I am the a/the   Member   and the designated keeper

of the records and minutes of   SECURED MERCHANTS LLC   Title

☒ limited liability Company ☐ professional limited liability company duly organized and existing under the laws of the State of   CA

(the "Company"); that I have full authority to manage, represent, sign for and bind the Company; that the following is a true copy of resolutions duly adopted by a majority of the members/managers of said Company at a meeting duly held on the   25   day of   October   2013, at which a quorum was present and acted throughout or adopted by the written consent of a majority of the members/managers; and that such resolutions are in full force and effect and have not been amended or rescinded.

**1. Resolved,** that   BANK OF AMERICA, N.A.   (the "Bank") is hereby designated as a depository of the Company and that deposit accounts and/or time deposits (CDs) to be opened and maintained in the name of this Company with the Bank in accordance with the terms of the Bank's Deposit Agreement and Disclosures and the applicable rules and regulations for such accounts; that any one of the following members, managers, or employees of this Company:

| | |
|---|---|
| Doron Nottea | Member |
| Name | Title/Status |
| Alan Argaman | Member |
| Name | Title/Status |
| | |
| Name | Title/Status |
| | |
| Name | Title/Status |

is hereby authorized, on behalf of this Company and its name, to execute and sign any application, deposit agreement, signature card and any other documentation required by Bank to open said accounts; to sign checks, drafts, notes, bills of exchange, acceptances, time deposits (CDs) or other orders for payment of money; to endorse checks, drafts, notes, bills, time deposits (CDs) or other instruments owned or held by this company for deposit with Bank or for collection or discount by Bank; to accept, drafts, acceptances, and other instruments payable at Bank; to place orders with Bank for the purchase and sale of foreign currencies on behalf of this Company; to execute and deliver an electronic fund transfers agreement and to make transfers or withdrawals by electronic transfer on behalf of the Company; to obtain an access device (including but not limited to a card, code, or other means of access to the Company's accounts) that may be used for the purpose of initiating electronic fund transfers [Company agrees and acknowledges that neither the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) nor Regulation E (12 C.F.R. Part 205) apply to any such access device]; to establish and maintain a night deposit relationship; to execute and deliver a wire transfer agreement and to request, or to appoint and delegate from time to time such persons who may request, wires of funds; to enter into any agreements with the Bank for the provision by Bank of various Treasury Management services to this Company; that any such member, manager or employee may determine, in his or her sole discretion, and to sign any and all documents and take all actions required by Bank relative to such Treasury Management services or the performance of the Company's obligations there under, and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in accordance with the terms of any such agreement shall have been received by Bank and that such termination shall not affect any action taken by the Bank prior to such termination; to rent or lease a safe deposit box from Bank, to execute the rental agreement or lease, to enter the safe deposit box and to terminate the rental agreement or lease; to take whatever other actions or enter into whatever other agreements relating to the accounts or investment of funds in such accounts with Bank and to execute, amend, supplement and deliver to Bank such agreements on behalf of the Company upon such terms and conditions as such member, manager or employee may deem appropriate and to appoint and delegate, from time to time, such person(s) who may be authorized to enter into such agreements and take any other actions pursuant to such agreements in connection with said accounts that the member, manager or employee deems necessary; and to waive presentment, demand, protest, and notice of protest or dishonor of any check, note, bill, draft, or other instrument made, drawn or endorsed by this Company; and

**2. Further Resolved,** that the Bank be and is hereby authorized to honor, receive, certify, pay or exchange for money orders or other instruments all instruments signed in accordance with the foregoing resolutions even though such payment may create an overdraft or even though such instruments may be drawn or endorsed to the order of any member, manager or employee signing the same or tendered by such member, manager or employee or a third party for exchange or cashing, or in payment of the individual obligation of such member, manager or employee, or for deposit to such member's, manager's or employee's personal account and Bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolutions or the application or disposition of such instrument or the proceeds thereof; and, further, that the Bank is authorized to honor any instructions regarding withdrawals, orders for payment or transfer of funds whether oral, by telephone or electronic means if such withdrawal, orders or transfer are initiated by an above authorized member, manager or employee; and

**3. Further Resolved,** that the Bank be and is hereby requested, authorized and directed to honor and to treat as authorized, checks, drafts or other orders for the payment of money drawn or purportedly drawn in this Company's name, including those payable to the individual order of any person whose name appears thereon as signer thereof, when bearing or purporting to bear the facsimile signature of an member, manager or employee authorized in the foregoing resolutions and the Bank shall be entitled to honor, to treat as authorized, and to charge this Company for such checks, drafts, or other orders regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such signature resembles the facsimile specimen duly certified to or filed with the Bank by a member/manager of this Company or if such facsimile signature resembles any facsimile signature previously affixed to any check, draft, or other order drawn in the Company's name, which check, draft, or other order was accepted and paid without timely objection by the Company, thereby ratifying the use of such facsimile signature; and the Company hereby indemnifies and holds the Bank harmless against any and all loss, cost, damage or expense suffered or incurred by the Bank arising out of or in any way related to the misuse or unlawful or unauthorized use by a person of such facsimile signature; and

00-14-9258M  06-1999

NCA

Page 1 of 2



AC# Redacted 0922

**4. Further Resolved,** that endorsements for deposit may be evidenced by the name of the Company being written or stamped on the check or other instrument deposited, without designation of the party making the endorsement, and the Bank is authorized to supply any endorsement on any instrument tendered for deposit or collection; and

**5. Further Resolved,** that a duly authorized member/manager of this Company shall certify to the Bank names and signatures of persons authorized to act on behalf of this Company under the foregoing resolutions and shall from time to time hereafter, as changes in the identity of said members, managers and employees are made, immediately report, furnish and certify such changes to the Bank and shall submit to the Bank a new account signature card reflecting such change(s) in order to make such changes effective and the Bank shall be fully protected in relying on such certifications and shall be indemnified and saved harmless from any claims, demands, expenses, losses, or damages resulting from, or growing out of, honoring the signature of any member, manager or employee so certified, or refusing to honor any signature not so certified; and

**6. Further Resolved,** that the foregoing resolutions shall remain in full force and effect and the authority herein given to all of said persons shall remain irrevocable as far as the Bank is concerned until three (3) business days after the Bank is notified in writing of the revocation of such authority and that receipt of such notice shall not affect any action taken by said Bank prior thereto; and

**7. Further Resolved,** that all transactions by any member, manager or employee of this Company on its behalf and in its name with the Bank prior to the delivery to the Bank of a certified copy of the foregoing resolutions are, in all respects, hereby ratified, confirmed, approved and adopted; and

**8. Further Resolved,** that any member/manager be and hereby is, authorized and directed to certify these resolutions to the Bank and that the provisions hereof are in conformity with the Articles of Organization and Operating Agreement of this Company.

**In Witness Whereof,** and intending to bind the Company, I have hereunto subscribed my name as a member/manager of this Company, this

_____ day of _October, 2013_ .

X _____
Member/Manager

| Bank Information | |
|---|---|
| Date | 10/25/2013 |
| Banking Center Name | TARZANA |
| Associate's Name | Shaghayegh Esmaeili |
| Associate's Phone Number | 818-712-6015 |

Page 2 of 2



# Bank of America

BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card with Substitute Form W-9**

Account Number: ▮▮▮▮ 0922                                Bank Number: 318

Account Type:  ☒ DDA    ☐ SAV    ☐ CD

Account Title:

SECURED MERCHANTS LLC

_____

_____

_____

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☐ C Corporation   ☐ S Corporation

☐ Partnership   (Enter the type of partnership: General, LP, LLP or LLLP)

☒ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor)   C

☐ Other (Defined in W-9 instructions) _____

Social Security Number _____   (or)   Employer Identification Number ▮▮▮▮▮▮095

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, I/we acknowledge the receipt of these documents. By signing below, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

**Substitute Form W-9.** Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions).

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS instructions for Form W-9).

☐ Exempt Payee (check if applicable)

> The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

☐ Nonresident Alien Status (if applicable) If the beneficial owner of this account is a foreign person, check here, and complete and sign the applicable Form(s) W-8.

| Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|
| 1 DORON NOTTEA | MEMBER | x | 10/25/13 |
| 2 ALAN ARGAMAN | MEMBER | x | 10/25/13 |
| 3 | | | |
| 4 | | | |
| 5 | | | |

© 2012 Bank of America, N.A. All Rights Reserved

NCA
00-14-9297M  02-2013

Page 1 of 2



**176-8**

**Exhibit 176**

**Account Number:** Redacted 0922

☐ **Signature Card Addendum on File**

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

| Authorized Signer | Title |
|---|---|
| | |

**Review Information**

**Customer 1:**

Name DORON NOTTEA

| ID Type: US Driver License W/Photo | ID#: Redacted | ID Issuer: California | Iss. Date: 06/2013 | Exp. Date: 07/2018 |
|---|---|---|---|---|
| ID Type: Other | ID#: Redacted | ID Issuer: SS CARD | Iss. Date: N/A | Exp. Date: N/A |

**Customer 2:**

Name ALAN ARGAMAN

| ID Type: US Driver License W/Photo | ID#: Redacted | ID Issuer: California | Iss. Date: 06/2012 | Exp. Date: 04/2017 |
|---|---|---|---|---|
| ID Type: Other | ID#: Redacted | ID Issuer: SS CARD | Iss. Date: N/A | Exp. Date: N/A |

**Customer 3:**

Name

| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |
|---|---|---|---|---|
| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |

**Customer 4:**

Name

| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |
|---|---|---|---|---|
| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |

**Customer 5:**

Name

| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |
|---|---|---|---|---|
| ID Type: | ID#: | ID Issuer: | Iss. Date: | Exp. Date: |

**Bank Information**

| Date | 10/25/2013 |
|---|---|
| Banking Center Name | TARZANA |
| Associate's Name | Shaghayegh Esmaeili |
| Associate's Phone Number | 818-712-6015 |

NCA
00-14-9297M  02-2013

**176-9**

Page 2 of 2

**Exhibit 176**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 184

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**     Avi Argaman[avicoglobal@gmail.com]
**Cc:**     Tal Karasso[talkarasso@gmail.com]; Roi R[roireuveni@gmail.com]
**From:**  Alon | MediaUrge
**Sent:**   Sat 9/20/2014 5:20:06 PM
**Importance:**    Normal
**Subject:**  Moving forward...
**MAIL_RECEIVED:**  Sat 9/20/2014 5:20:29 PM
hatch.pdf

Avile,

Good meeting regarding call center yesterday, let's make sure to get our hands around everything we discussed in order to push forward correctly and be able to increase volume without having to worry too much... Thank you for stepping up and getting directly involved ... I'm sure that we will take this to the next level.

I had a good call with Kashlinski and his daughter with regards to understanding of the tech-support model, why we feel it is the best possible option for them at this time... They were very receptive and I believe that we have a real viable serious interest with them...
We need to meet in order to discuss how we'd like the final touch ups of this deal organized, and figure out if we are sure that we prefer to work with Alex and not Igor as at this point, I believe that we can get the same deal from both of them...  If you can, let's have a call with Roi in order to review the final details of the PNL so I can send it to them for their review questions...
I just want to make sure we don't send a document prior to our review, that's going to arise questions that a correct document will avoid...
Let's make sure that we have a clear description of our previous investment, in order to show that their current investment to simply going to match ours and is not going to be booked as a loan...

Also, Paully and Charlie are gearing up to start running somebody else's tech-support offer in order to learn insights as well as to optimize an internal campaign for us... I'm sure we're going to get some amazing insights over the next few business days... And I am confident that we will be able to generate a consistent influx of inbound calls...

On a completely separate note,

Attached, I'm sending you a 'private' investment deck that I was able to get my hands on... It encompasses most of what we want to build with respect to our social media advertising platform... [PS] #PRANA @SOCIAL

... But we want all the pic/video content from the platforms (Vine, Instagram, YouTube and others) managed through one centralized content distribution system called trublog... I will send more on the architecture of our intended CMS platform soon....

Can you share this with our TechTeam and get some feedback on what kind of information they need in order to 1. price out and 2. build this for ourselves... Is it time-consuming? Let's get an estimated time line of such a build out? We also have the option to white label two different platforms that manage influencers... And we need to figure out if developing our own technology is worth the wait?

I think using somebody else's technology is going to be easy in the beginning, but is going to hurt the exit strategy since there's always somebody else that owns the platform... And intellectual property is always a very big part of the exit...

On another front: Also very excited about Tyler's sales call and the boarding of the first customer for chargeback armor ☐ ☒ ☐ ☐ as you mentioned, we need to have a meeting in order to discuss a few points with respect to the launch of these companies... How we are billing the customers, through which entity are we signing the agreements under and so on.... Let's meet, decide and push!
If you can, we need to complete both P&L's of the two other sides of India in order to figure out our breakeven analysis and know how many customers we need there in order to start being profitable... Dylan mentioned he has two call center customers doing straight sale diet ... That want to leave John monarch ... Are we interested ?

Lets talk.....

**Exhibit 184**

--

Best Regards,

Alon Nottea
Rainmaker | MediaUrge
skype: **alonbaba**
email: alon@mediaurge.com



Confidentiality Notice: this message is intended only for the designated recipient. It may contain confidential or proprietary information and is subject to the attorney-client privilege and other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you have received this message in error, please immediately notify the sender by reply e-mail and delete this message. Thank you.

CASE NO. 2:15-CV-04527-GW (PLAx)

 Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 185

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

Redacted

| | |
|---|---|
| **From:** | Avico Global <avicoglobal@gmail.com> |
| **Sent:** | Thursday, July 26, 2012 1:58 AM |
| **To:** | Alon | Bunzai Media |
| **Subject:** | FINAL ANGEL SCOPE |
| **Attachments:** | PastedGraphic-2.png; BeautyRegimen-SkinDetox.pdf; BeautyBuzz - AuraVie FACE YOGA.pdf |

Alon - Check out below as final bullet point of what you will get on the Angel Project.
Last we spoke SMS is on hold and Kevin should be working on this only.

I will call you in the morning to confirm ... Avi


Auravie Angels - Final Development Schedule & Budget

Below are the first two of many additions and modifications to auravie.  We want to get the balling rolling on these aspects before we take on the other requests.

Auravie Angels Blog
Timeline 1.5 - 2 months
Setup Cost : $10,000

This is to create the groundwork for the Angels platform and create the platform for additional build-outs.
Additional Requests/Modifications may create fluctuation in scope/schedule/budget, or be held off for PHASE 2.


1. Auravie.com <http://auravie.com/>  Homepage will contain links to
- Beauty Buzz (static html page - see pdf below - face yoga)
- Beauty Regimen (static html page - see pdf below)
- 2 Angel Links
- See More (Shows main angel portal and angel links)


2. Main Wordpress Portal will be at angels.auravie.com <http://angels.auravie.com/>
- Slideshow
- Links to each angel
- Text
- Additional Pages (About, Signup to be an Angel, Contact, FAQ, Shop)


3. Each Wordpress Angel will have their own blog : angels.auravie.com/sandra <http://angels.auravie.com/sandra>
,angels.auravie.com/lunelle <http://angels.auravie.com/lunelle> , ...etc
- Angel Banner (Using photo from photoshoot)
- Links to other angels
- Blog content (videos, images, etc)
- Facebook, Twitter, Contact Options

*(Angels will each be given a Basecamp email address to email their content, so that the content can be moderated as Basecamp tasks by Auravie staff.)

STEPS:

* Create subdomains & url structure
* Design & creation of a main portal (angels.auravie.com <http://angels.auravie.com/> ) showing each angel (Wordpress)
* Design & creation of an individual blog site (ie - angels.auravie.com/sandra) for each angel (Wordpress)
* Customized images will be added
* Create multiple user logins and setups for each individual blog
* Additional wordpress modules wil be installed for social media integration and seo
* A protocol will be setup for content management via basecamp email addresses
* In-house tutorial for amarie, victor, nastassia, and khris
* Create signup form to become an auravie angel
* Edit links on auravie.com <http://auravie.com/> to include a link to the Auravie Angel site and additional content seen below.
* Slice below static content and integrate into commercepak
* Create the links shown in the above screenshot for auravie.com <http://auravie.com/> homepage
* Include additional link to angels main portal in auravie.com top nav



Exhibit 185

# AuraVie SkinCare
## 2-DAY SKIN DETOX REGIMEN



**OUR** skin reflects our diet and lifestyle choices: it's the mirror to internal health. In order to experience the maximum benefits of your **AuraVie SkinCare Treatments,** it is important to first **DETOX** your skin of harmful, aging toxins and pollutants. While **AuraVie SkinCare Treatments are scientifically formulated to care for your skin from the outside in,** it's just as essential to cleanse your skin from the inside out; by reducing internal impurities, you can have clearer, glowing skin. That's why we designed this easy-to-do, homemade, **ALL NATURAL 2-DAY SKIN DETOX REGIMEN** to promote and support your healthy skin by shedding these skin-aging impurities.

Our bodies are built to detoxify potential carcinogens or repair genetic damages at rates sufficient to neutralize the low doses of toxicity in our everyday environment. Anything that supports our body's elimination of waste can be said to help us to detox naturally. **The human body is designed to detox quite well, if given enough pure water and fiber.**

**BEWARE: FASTING and COLON CLEANSES are not required for detoxification or even recommended for a healthy lifestyle.**

 Exhibit 185

# AuraVie SkinCare
## 2-DAY SKIN DETOX REGIMEN

**STEP 1: FREE YOUR FACE.** Most women start wearing make-up on a daily basis in their early teens.  Rarely, do they give their face a chance to BREATHE.  Now add to that, the harmful toxins found in everything from our environment to our foods and it is no wonder our skin is suffering and we don't get the results we yearn for from our skincare treatments.  **Therefore, it is vital that during your 2-Day Skin Detox, that you DO NOT wear a stitch of make-up.**

Also, during your 2-Day Skin Detox, you will **ONLY wash your face with water, and a small amount of our gentle yet extremely effective AuraVie RENEW Purifying Cleansing Toner**.  DO NOT use any moisturizers or serums, or any other products on your face during these 2 days.  The point is to let your skin comeback to its natural balance, and prepare it for your **AuraVie Skin Rejuvenation Daily Regimen.** 

**92% of our customers,** who completed our 2-Day Skin Detox Regimen before beginning their **AuraVie SkinCare Treatments,** reported a dramatic improvement in their results.

**YOU deserve these results too!**

**HINT:**  Most of our customers found it easiest to do their 2-Day Skin Detox Regimen on the weekend!



**STEP 2: WATER** is the important detoxifying agent in your body. It helps clean us through our skin and kidneys, and it improves our sweating with exercise. Simply **increasing liquids** and **decreasing fats and proteins** in our diets **will shift the balance strongly toward improved detoxification, elimination, and less toxin buildup.**

During your **2-DAY SKIN DETOX REGIMEN** you will be required **each day**, to **drink 8 ounces** of clean, filtered **water**, **every 2 hours**, **starting within 30 minutes of waking**. *If you are lucky enough to get the recommended 8 hours of delicious sleep, then you will consume 8 glasses of water during your waking hours. If you sleep only 6 hours, then you will consume 10 glasses of water during your waking hours, and so forth, and so on.*

Drinking a glass of water every 2 hours you are awake, sounds easy, but many of us find this very challenging.

So, to insure your successful results, I'm including these helpful tips submitted by our faithful customers on *how to drink water?*

- Set your Alarm to remind you.

- Leave bottles of water in strategic places, such as next to your bed, computer, and television.

- You will drink more, if you keep your water cold.




**STEP 3** in our **AuraVie 2-DAY SKIN DETOX REGIMEN** is a **nutrient-rich diet** to boost your complexion's intrinsic beauty and revive your youthful appearance.  It is important to eliminate foods that that can trigger problems for your skin. **The worst offenders include:**

- **Hydrogenated Vegetable Oils (Trans Fats)**
- **Sugar**
- **Caffeine**
- **Alcohol**
- **Red Meat**
- **Excess Dairy**
- **Processed Foods**
- **Refined Carbohydrates**

Along with getting rid of the bad stuff listed above, you **must consume more vital nutrients so your digestive system can handle the heavy lifting and sifting of toxins.** Without plenty of antioxidants and other vitamins, your body can't break down these toxins, and they continue to work their poison.

In order to add the maximum nutrients back into your body, we suggest:

- Ramping Up Your Daily Dose Of **Fruits And Vegetables**

- Substituting **Whole Grains** For Refined Carbs

- Replacing Fatty Red Meat with **Omega-3-Rich Fish**

- Cooking with **Olive** or **Sesame Oil** Instead of Hydrogenated Vegetable Oil

- Consuming **Nuts** and **Seeds** and **Foods With High Levels Of Antioxidants** (Acai Berries, Red Wine Grapes, Blueberries, etc.)

- Eat foods rich in the "skin" nutrients **Vitamin A** and **Zinc**. Butter and cod liver oil contain ample amounts of vitamin A, while eggs and pumpkin seeds are packed with Zinc.

- And you should probably consider taking these "beauty" supplements: **Vitamin B Complex**, which **helps your body cope with the skin-taxing stress** of daily life; **Vitamin C**, which **aids in collagen building**; and **Vitamin E**, which rejuvenates. Both C and E are strong antioxidants that break

down toxins and help the skin rebound from sun damage and other assaults.



**STEP 4** in our **AuraVie 2-DAY SKIN DETOX REGIMEN** is **therapeutic sweating**, which promotes profuse perspiration to eliminate unhealthy toxins from your skin.  So whether you enjoy a sauna, working out, dancing, or fast walking, you need to pump up your heartbeat until you break a sweat. (Then 10 minutes more...please.)

After completing your **AuraVie 2-DAY SKIN DETOX REGIMEN** your skin is now ready to receive the maximum benefits of using your **AuraVie SkinCare Treatments.**

**When NOT To Detox:**

- During pregnancy
- If you suffer from major heart disease
- If you are over seventy-five or under twelve
- When you are on prescribed medication (check with your doctor)
- If you are under extreme pressure emotionally or physically (training for sports competition, or if you are recovering from the loss of a loved one

- If you are significantly underweight

- It is necessary to consult your local doctor or physician if you plan to embark on the detox journey to ensure you receive relevant advice and suggestions that are specific to your needs.

The most important reason for skin detoxification is a better quality of life. Your skin will feel and look better than it did when you allowed toxins to build up in it.

You will feel more energized to take on the challenges of life, and your skin will regain its natural balance in preparation for you to receive the maximum benefits of your AuraVie SkinCare Treatments.

Happy Healthy Day!



*Copyright © 2012 AuraVie Marketing CO.*
*All rights reserved. No part of this Article may be used or reproduced*
*without written permission of the publisher.*

# AuraVie SkinCare
## FACE YOGA

Along with a healthy diet, regular exercise, and using your **AuraVie SkinCare Treatments** as directed, incorporating **FACE YOGA** will **motivate muscles and keeping your skin in place**, returning your face to its smooth, youthful prime, without a scalpel in sight.

The main benefit of **FACE YOGA** is that it works on your mind as much as your muscles and all organs, putting right imbalances and helping your body work with peak efficiency. Practice it regularly to **improve the circulation of blood to all organs and detoxify the system.** FACE YOGA emphasizes postures that direct attention to the face, jawline and neck. **FACE YOGA** can stimulate oxygen flow to the muscles of the face, jawline and neck to help smooth and tighten the skin.

FACE YOGA are **8 EASY-TO-DO** EXERCISES that take just minutes!

## 5 LASTING BENEFITS of FACE YOGA:

**FOREHEAD:** Erase furrow lines and release your worries. This leads to a more relaxed Body, Mind & Soul.

**EYES:** Improve your vision; relax the muscles that allow you to move your eyes around. Dry eyes, blurry vision and headaches can be eased away

**CHEEKS, MOUTH & LIPS**: Smooth skin texture and decrease lines around MOUTH while firming and pumping lips.

**CHIN**: Get rid of the double chin and get a sharper jawline

**THROAT, NECK & SHOULDERS**: Lift, Firm, Tighten & Tone while preventing drooped posture and wrinkles on the neck



AuraVie
Aura of Youth

*Copyright © 2012 AuraVie Marketing CO.*
*All rights reserved. No part of this Article may be used or reproduced*
*without written permission of the publisher.*

## AuraVie SkinCare - FACE YOGA



### THE SPHINX SMILE
- **Decrease Smile Lines**
- **Smooth Cheeks**
- **Decrease Lines Around Mouth**

**DIRECTIONS:**

Smile by lifting the corners of your mouth up and across, but keep your eyes staring in neutral, as if you know a secret. Hold for 10 seconds.

Keep relaxed as you do this 5 times.

The idea is to eradicate those smiling creases and the habits that cause them.



### THE SATCHMO
- **Smooth Cheeks & Mouth Lines**
- **Plump Lips**
- **Lift & Tone Throat and Neck**

**DIRECTIONS**

This exercise mimics the facial position of a trumpet player. Begin by sitting or standing in good posture, with your head in neutral alignment.

Close your mouth and visualize zipping your lips shut. Puff up both cheeks with air.  Hold 5 seconds and then transfer air from cheek to cheek until you are out of breath.

Repeat this exercise 10 to 12 times.

**AuraVie SkinCare - FACE YOGA**



## SMILING FISH FACE
- **Firm & Tone Cheeks and Lips**
- **Lift & Tighten Throat and Neck**

**DIRECTIONS:**

It is important to maintain proper breathing and upright posture when executing this pose.

Relax your neck and sit upright with your shoulders square to your hips. Inhale and smile as big as you can. Holding the smile, exhale and pucker your lips together, while sucking your cheeks in.

Take caution not to bite your cheeks. Repeat the sequence 10 to 12 times.



## SURPRISE ME
- **Smooth Forehead Lines**
- **Lift Sagging Eyebrows**
- **Lower Eyelids Firmed**

**DIRECTIONS:**

Sit in a comfortable position. Inhale while widening your eyes as if you are surprised. Be careful not to wrinkle your brow.

Stare with a gentle, steady gaze at a single point in front of you. Hold for 5 seconds. Exhale and release the pose.

Repeat the exercise 5 times.

**AuraVie SkinCare - FACE YOGA**



## MARILYN
- **Plump & Firm Lips**
- **Smooth Out Furrow Lines**

### DIRECTIONS:
This facial yoga exercise is named after the famous Marilyn Monroe pout. It keeps your lips strong and full and your brow smooth and wrinkle-free.

Keep your brow smooth and blow kisses, extending your lips out as you kiss.

Repeat 4 times, and then press your first two fingers to your lips.

Relax and repeat 3 times.



## FREE YOUR TONGUE
- **Firm Jaw Line, Throat & Neck**
- **Improve Vision**
- **Decrease Headaches**
- **Get Rid of Double Chin**

### DIRECTIONS:
Sit up straight, tilt your head back, and keep your lips closed but relaxed.

Open your lips and stick out your tongue and try to touch your chin with the tip of your tongue. Keep your tongue out in this position for 10 seconds.

Repeat the exercise 5 Times

**AuraVie SkinCare - FACE YOGA**



## BABY BIRD

- **Firm & Tighten Jaw, Throat, Neck and shoulders**
- **Stimulate blood circulation**

**DIRECTIONS:**

This exercise helps firm your cheeks, chin and neck and helps prevent the formation of sagging jowls, as well as reducing existing jowls.

Tilt your head up, look at the ceiling and relax.

Swallow while you firmly press the tip of your tongue to the roof of your mouth.

Now swallow while tilting your head slightly to the right. Then tilt your head to the left and swallow.

Perform 4 repetitions

**AuraVie SkinCare - FACE YOGA**



## LION FACE

- **Total Face, Neck, Shoulders tightening & firming**
- **Stimulate overall blood circulation**

### DIRECTIONS:

This exercise is a basic jaw stretch that eases tension in the face. It tones the Platysma muscle that controls the front of the throat. This pose works the corners of the mouth down and prevents wrinkly throat skin.

**Step 1:** Inhale through nose, make fists and squeeze all your facial muscles as if you've bit into a lemon.

**Step 2:** exhale through and open up mouth wide, then stick out your tongue, and stretch tongue tip toward chin, roll your eyes up, and open your hands.

Repeat 4 times.

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 187

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386



Exhibit 187

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 255

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**OPERATING AGREEMENT**

**OF**

**SECURE MERCHANTS, LLC**

**TABLE OF CONTENTS**

*Page*

1. Definitions ............................................................................................................ 1
    1.1   "Act" ........................................................................................................ 1
    1.2   "Agreement" ............................................................................................ 1
    1.3   "Assignee" .............................................................................................. 1
    1.4   "Capital Account" ................................................................................... 1
    1.5   "Capital Contribution" ........................................................................... 1
    1.6   "Cash Available for Distribution" .......................................................... 1
    1.7   "Code" ..................................................................................................... 1
    1.8   "Company" .............................................................................................. 1
    1.9   "Company Property" ............................................................................... 2
    1.10  "Member's Interest" or "Company Interest" .......................................... 2
    1.11  "Manager(s)" ........................................................................................... 2
    1.12  "Member(s)" ............................................................................................ 2
    1.13  "Net Income" or "Net Loss" .................................................................. 2
    1.14  "Percentage Interest" ............................................................................. 2
    1.15  "Person" or "Persons" ............................................................................ 2
    1.16  "Substitute Member" .............................................................................. 2

2. Formation ............................................................................................................. 2
    2.1   Defects as to Formalities ....................................................................... 3
    2.2   No Partnership Intended for Nontax Purposes ...................................... 3
    2.3   Rights of Creditors and Third Parties .................................................... 3
    2.4   Title to Property ..................................................................................... 3
    2.5   Payments of Individual Obligations ...................................................... 3

3. Name ..................................................................................................................... 3

4. Office; Agent for Service of Process .................................................................... 3

5. Purposes of the Company ..................................................................................... 3

6. Term ...................................................................................................................... 3

7. Capital Contributions ........................................................................................... 4
    7.1   Capital Contributions ............................................................................. 4
    7.2   No Interest on Capital ............................................................................ 4
    7.3   No Withdrawal of Capital ...................................................................... 4
    7.4   Additional Capital .................................................................................. 4
    7.5   Capital Accounts .................................................................................... 4

i

Secure Merchants, LLC

8.   Loan To The Company.................................................................................................4

9.   Contribution and Assignment of Computer Software...................................................4

10.  Allocations...................................................................................................................4

11.  Company Expenses.......................................................................................................5

12.  Distributions of Cash Available for Distribution.........................................................6

13.  Powers, Rights and Obligations of Managers..............................................................6
     13.1   General Authority and Powers of Managers......................................................6
     13.2   Time Devoted to Company; Other Ventures; Competition.................................7
     13.3   Liability of Managers to Members and Company..............................................7
     13.4   Indemnification.................................................................................................7
     13.5   Fiduciary Responsibility...................................................................................7
     13.6   Conflicts of Interest..........................................................................................8
     13.7   Restrictions on Authority of Managers.............................................................8

14.  Status of Members........................................................................................................9
     14.1   Limitation of Liability.......................................................................................9
     14.2   Death or Incapacity of a Member......................................................................9
     14.3   Recourse of Members........................................................................................9
     14.4   No Right to Property.........................................................................................9

15.  Books and Records, Accounting, Reports and Statements and Tax Matters.................9
     15.1   Books and Records............................................................................................9
     15.2   Annual Accounting Period.................................................................................9
     15.3   Right to Examine Records................................................................................10
     15.4   Tax Matters Partner.........................................................................................10
     15.5   Tax Returns.....................................................................................................10
     15.6   Tax Elections...................................................................................................10

16.  Transfers of Company Interests; Withdrawal and Admission of Members.................10
     16.1   General Prohibition.........................................................................................10
     16.2   Withdrawal of Member....................................................................................10
     16.3   Permitted Transfers Without Refusal Rights...................................................11
     16.4   Other Transfers Subject to Refusal Rights......................................................11
     16.5   Purchase or Redemption Price........................................................................12
     16.6   Conditions Precedent to Any Transfer or Encumbrance..................................12
     16.7   Effect of Transfer............................................................................................12
     16.8   Substitute Members.........................................................................................13
     16.9   Assignment as Security Permitted...................................................................13

17.  Resignation and Admission of Manager.....................................................................13
     17.1   Resignation of Manager..................................................................................13
     17.2   Death or Incompetency of Manager................................................................13

ii

Ruby Sky Development, LLC

17.3    Removal of a Manager.................................................................13
17.4    Appointment of a New or Replacement Manager.................................. 14

18.    Dissolution, Winding Up and Termination.............................................14
18.1    Events Causing Dissolution........................................................ 14
18.3    Distributions.......................................................................15
18.4    Certificate of Cancellation; Report; Termination............................... 15

19.    Special and Limited Power of Attorney................................................ 15

20.    Amendments........................................................................... 16

21.    Miscellaneous........................................................................ 16
21.1    Notices............................................................................ 16
21.2    Entire Agreement.................................................................. 16
21.3    Captions; Pronouns................................................................ 17
21.4    Counterparts...................................................................... 17
21.5    Governing Law..................................................................... 17

Ruby Sky Development, LLC

iii

OPERATING AGREEMENT
OF
SECURED MERCHANTS, LLC

This Agreement (the "Agreement") is made and entered into as of the 1st day of June, 2013, by and between Secure Merchants, and Alon Nottea and Avi Argamon, as the Managers (the "Managers"), and _____, _____, and _____, (the "Members"). The parties desire to operate as a limited liability company under the laws of the state of California.

The parties hereto agree as follows:

1. <u>Definitions</u>.   The following terms used in the Agreement shall have the meanings specified below:

1.1 "Act" means the California Beverly-Killea Limited Liability Act (California Corporation Code §17000 *et seq.*), as amended from time to time.

1.2 "Agreement" means this Operating Agreement of  Secure Commerce, LLC as it may be amended from time to time.

1.3 "Assignee" means a person who has acquired a Member's Interest in whole or part and has not become a Substitute Member.

1.4 "Capital Account" means the account maintained for each Member in accordance with Section 7.8.

1.5 "Capital Contribution" means the money, property or services contributed pursuant to the terms of the Agreement.

1.6 "Cash Available for Distribution" means all cash receipts of the Company in excess of amounts reasonably required for payment of operating expenses, repayment of current liabilities, repayment of such amounts of Company indebtedness as the Managers shall determine necessary or advisable, and the establishment of and additions to such cash reserves as the Managers shall deem necessary or advisable, including, but not limited to reserves for capital expenditures, replacements, contingent or unforeseen liabilities or other obligations of the Company.

1.7 "Code" means the United States Internal Revenue Code of 1986, as amended.  References to specific Code Sections or Treasury Regulations shall be deemed to refer to such Code Sections or Treasury Regulations as they may be amended from time to time or to any successor Code Sections or Treasury Regulations if the Code Section or Treasury Regulation referred to is repealed.

1.8 "Company" means the  Secure Merchants, LLC, governed by the Agreement.

Secure Merchants, LLC

EXHIBIT 255

1.9 "Company Property" means all the real, personal and intellectual property owned by the Company.

1.10      "Member's Interest" or "Company Interest" means the ownership interest of a Member in the Company, including the right of such Member to any and all benefits to which such Member may be entitled as provided in the Agreement and in the Act, together with the obligations of such Member to comply with all the terms and provisions of the Agreement and the Act.

1.11      "Manager(s)" means those persons who are appointed in accordance with this Agreement to exercise the authority of Manager under this Agreement and the Act.  If at any time a Member who is a Manager, or is controlled by a Manager, ceases to be a Member for any reason, then that Member shall simultaneously cease to be a Manager. The initial Managers of the Company shall be Alon Nottea and Avi Argaman.

1.12      "Member(s)" means those persons or entities identified above as the Members and who have signed a counterpart of this Agreement and those persons who are hereafter admitted as members under Section 14.4 below.   Such persons or entities are sometimes referred to herein as "Member" and collectively as "Members".

1.13      "Net Income" or "Net Loss" means taxable income or loss (including items requiring separate computation under Section 702 of the Code) of the Company as determined using the method of accounting chosen by the Managers and used by the Company for federal income tax purposes, adjusted in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g), for any property with differing tax and book values, to take into account depreciation, depletion, amortization and gain or loss as computed for book purposes.

1.14      "Percentage Interest" means, with respect to the Members, the following:

| Member | Percentage Interest |
|---|---|
| _____ | 33 1/3% |
| _____ | 33 1/3% |
| _____ | 33 1/3% |

1.15      "Person" or "Persons" means any individual, partnership, corporation, limited liability company, joint venture, joint-stock company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government, governmental agency, political subdivision of any government or other entity.

1.16      "Substitute Member" means an Assignee who has been admitted to all of the rights of membership pursuant to Section 14.8 below.

Secure Merchants, LLC

-ii-

**EXHIBIT 255**

2.   <u>Formation</u>.  The Members hereby agree to form and to operate the Company under the terms and conditions set forth herein.  Except as otherwise provided herein, the rights and liabilities of the Members shall be governed by the Act.

2.1 <u>Defects as to Formalities</u>.   A failure to observe any formalities, procedures, or requirements of this Agreement, the articles of organization for the Company or the Act shall not be grounds for imposing personal liability on the Members or Managers for liabilities of the Company.

2.2 <u>No Partnership Intended for Nontax Purposes</u>.   The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership.  The Members do not intend to be partners one to another, or partners as to any third party.  The Members hereto agree and acknowledge that the Company is to be treated as a partnership for federal income tax purposes.

2.3 <u>Rights of Creditors and Third Parties</u>.   This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their successors and assigns.  The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person.  Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member.

2.4 <u>Title to Property</u>.  All Company Property shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in the Member's individual name or right, and each Member's Interest in the Company shall be personal property for all purposes.  Except as otherwise provided in this Agreement, the Company shall hold all Company Property in the name of the Company and not in the name or names of any Member or Members.

2.5 <u>Payments of Individual Obligations</u>.   The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member unless otherwise provided for herein.

3.   <u>Name</u>.  The name of the Company shall be SECURE MERCHANTS, LLC. The Managers may from time to time change the name of the Company, adopt such trade or fictitious names, and form wholly owned business units as they may determine to be appropriate.

4.   <u>Office; Agent for Service of Process</u>.  The principal office of the Company shall be at _____, California.  The Company may maintain such other offices at such other places as the Managers may determine to be appropriate.  The agent for service of process for the Company shall be _____, California _____.

5.   <u>Purposes of the Company</u>.  The purpose of the Company is engage in any lawful business under the laws of the state of California.

Secure Merchants, LLC

**EXHIBIT 255**

6.  <u>Term</u>.  The term of the Company commenced on the date of the filing of the Articles of Organization for the Company in the office of the California Secretary of State, and shall continue perpetually, unless sooner dissolved, wound up and terminated in accordance with the provisions of this Agreement and the Act.

7.  <u>Capital Contributions</u>.

7.1 <u>Capital Contributions</u>.

(a)  _____ shall contribute the sum of $1,000.00 as a capital contribution to the Company.

(b)  _____ shall contribute the sum of $1,000.00 as a capital contribution to the Company.

(c)  _____ shall contribute the sum of $1,000.00 as a capital contribution to the Company.

7.2 <u>No Interest on Capital</u>.  No Member shall be entitled to receive interest on such Member's Capital Contributions or such Member's Capital Account.

7.3 <u>No Withdrawal of Capital</u>.  Except as otherwise provided in this Agreement, no Member shall have the right to withdraw or demand a return of any or all of such Member's Capital Contribution.

7.4 <u>Additional Capital</u>.  Except as otherwise agreed upon with the unanimous written consent of the Members, no Member shall be obligated to make an additional Capital Contribution to the Company.

7.5 <u>Capital Accounts</u>.  The Company shall maintain a Capital Account for each Member in accordance with Treasury Regulations issued under Code Section 704.  Any Member who is a Member of more than one Class shall have a separate Capital Account for each Class.

8.  <u>Loan To The Company.</u>  _____ shall make a loan to the Company in the sum of $1,000,000.00 (the "Principal") which Principal shall be delivered and paid over to the Company concurrent with the signing of this Agreement. Company shall repay the Principal, without interest, to _____ from 66 2/3% of all Cash Available for Distribution until the Principal has been paid in full.

9.  <u>Contribution and Assignment of Computer Software</u>. Pursuant to a Contribution and Assignment Agreement of even date herewith (the "CAA"), _____ has contributed to the Company the computer software described in the CAA, and Company agrees to pay to _____ 33 2/3% of all Cash Available for Distribution until _____ has received from Cash Available for Distribution the sum of $500,000.00.

Secure Merchants, LLC

EXHIBIT 255

10. Allocations. The Company shall allocate Net Income and Net Loss to the Members in proportion to each Member's Percentage Interest; provided that, until such time as the amounts in Sections 8 and 9 above have been paid in full, Net Income and Net Loss shall be specially allocated 66 2/3% to _____ and 33 1/3% to _____.

11. Company Expenses.  The Company shall pay, and the Managers shall be reimbursed for, all costs and expenses of the Company, which may include, but are not limited to:

(a) All organizational expenses incurred in the formation of the Company;

(b) All costs of personnel employed by the Company;

(c) All costs reasonably related to the conduct of the Company's day-to-day business affairs, including, but without limitation, the cost of supplies, utilities, taxes, licenses, fees and services contracted from third parties;

(d) All costs of borrowed money, taxes and assessments on Company property, and other taxes applicable to the Company;

(e) Legal, audit, accounting, brokerage and other fees;

(f) Fees, costs, expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an interest in the Company or in connection with the business of the Company;

(g) Fees and expenses paid to contractors, investment bankers, brokers and services, leasing agents, consultants, managers, brokers, insurance brokers and other agents, including affiliates of the Managers;

(h) Expenses in connection with Company financing and refinancing, and operation, sale, distribution, publication and use of Company Property;

(i) The cost of insurance obtained in connection with the business of the Company;

(j) Expenses of revising, amending, converting, modifying or terminating the Company;

(k) Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members;

(l) Expenses in connection with preparing and mailing reports required to be furnished to Members for investment, tax reporting or other purposes that the Managers deem appropriate; and

Secure Merchants, LLC

**EXHIBIT 255**

(m) Costs incurred in connection with any litigation, including any examinations or audits by regulatory agencies.

12. Distributions of Cash Available for Distribution.  At such times and in such amounts as the Managers in their discretion determine appropriate, Cash Available for Distribution shall be distributed first as provided in Sections 8 and 9 above until those amounts have been paid in full, and then to the Members in proportion to their Percentage Interest.

13. Powers, Rights and Obligations of Managers.

13.1    General Authority and Powers of Managers.  Except as provided in Section 13.7, the Managers shall have the exclusive right and power to manage, operate and control the Company and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Company.  All decisions required to be made by the Managers or action to be taken by the Managers pursuant to this Section 13.1 shall require the approval and action of both Managers.  In the event that the Managers are unable to agree, then such approval and action shall require the written consent of a majority of the Members.  The authority of the Managers shall include, but shall not be limited to the following:

(a) To spend the capital and revenues of the Company;

(b) To manage, sell, develop, improve, distribute, operate, publish, market, advertise, finance, repair, organize, and dispose of the Company business and Company Property;

(c) To employ persons, firms and/or corporations for the Company's business and for the operation, use, development and exploitation of Company Property;

(d) To acquire, lease and sell personal and/or real property, hire and fire employees, and to do all other acts necessary, appropriate or helpful for the operation of the Company business;

(e) To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted the Managers under the laws of the state of California or other provisions of this Agreement;

(f)  To enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the Managers deem necessary or appropriate to operate the Company's business and to operate, exploit, and dispose of Company Property or to effectively and properly perform its duties or exercise its powers hereunder;

(g) To borrow money on a secured or unsecured basis from individuals, banks and other lending institutions to finance the Company business, to meet other Company obligations, provide Company working capital and for any other Company purpose, and to execute promissory notes, mortgages, deeds of trust and assignments of Company Property, and such other security instruments as a lender of funds may require, to secure repayment of such borrowings; provided, that no individual, bank or other lending institution to which the

Secure Merchants, LLC

Managers apply for a loan shall be required to inquire as to the purpose for which such loan is sought, and as between the Company and such individual, bank or other lending institution, it shall be conclusively presumed that the proceeds of such loan are to be, and will be, used for purposes authorized under the terms of this Agreement;

(h) To enter into such agreements and contracts and to give such receipts, releases and discharges, with respect to the business of the Company, as a Manager deems advisable or appropriate;

(i) To purchase, at the expense of the Company, such liability and other insurance as the Managers, in their discretion, deem advisable to protect the Company's assets and business; however, the Managers shall not be liable to the Company or the other Members for failure to purchase any insurance; and

(j) To sue and be sued, complain, defend, settle and/or compromise, with respect to any claim in favor of or against the Company, in the name and on behalf of the Company.

13.2    <u>Time Devoted to Company; Other Ventures; Competition</u>.    The Managers shall devote so much of their time to the business of the Company as in their judgment the conduct of the Company's business reasonably requires. The Managers and the other Members may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Company, and shall have no obligation to disclose business opportunities available to them, and neither the Company nor any of the other Members shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of their acquisition of interests in the Company. This Section is intended to modify any provisions or obligations of the Act to the contrary and each of the Members and the Company hereby waives and releases any claims they may have under the Act with respect to any such activities or ventures of the Managers or other Members.

13.3    <u>Liability of Managers to Members and Company</u>.    In carrying out its duties and exercising the powers hereunder, the Managers shall exercise reasonable skill, care and business judgment.  A Manager shall not be liable to the Company or the Members for any act or omission performed or omitted by it in good faith pursuant to the authority granted to it by this Agreement as a Manager or Tax Matters Partner (as defined in the Code) unless such act or omission constitutes gross negligence or willful misconduct by such Manager.

13.4    <u>Indemnification</u>.  The Company shall indemnify, defend, pay and hold harmless the Managers from any loss or damage, including attorneys' fees actually and reasonably incurred by it, by reason of any act or omission performed or omitted by it on behalf of the Company or in furtherance of the Company's business or interests, or as Tax Matters Partner; however, such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Company and not from the Members.  The foregoing indemnity shall extend only to acts or omissions performed or omitted by a Manager in good faith and in the belief that the acts or omissions were in the Company's interest or not opposed to the best interests of the Company.

Secure Merchants, LLC

13.5    Fiduciary Responsibility.    The Managers shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and all such funds and assets shall be used in accordance with the terms of this Agreement.

13.6    Conflicts of Interest.

(a)    Subject only to the specific provisions set forth in this Section 13.6, either or both Managers, or their affiliated companies, may contract with and are expected to contract with and transact business with the Company as long as any such transactions are on terms that are normal and competitive with terms which the Company could generally obtain from unaffiliated third persons of similar quality. Such contracts and agreements with the Managers, or their affiliated or controlled companies, shall require the unanimous consent of all the Members, including any agreement or contract for compensation to be paid to the Managers for rendering services to the Company.  Such contracts and agreements may be amended from time to time by the Managers by change order or otherwise as the Managers shall determine reasonable in the conduct of the Company's business without any approval of the Members. Specifically, the Managers, in their sole and arbitrary discretion, may contract with themselves individually, or their controlled or affiliated companies, for goods or services in connection with the Company business. The duty of the Managers to the Company and the Members with respect to the negotiation, execution, administration, amendment and termination of such contracts and agreements shall be to act in good faith and in a commercially reasonable manner as established by applicable usages of trade.  The foregoing provisions are specifically included herein for the benefit of the Company and with the understanding of the Members that from the time one or both Managers will be separately compensated for rendering services to the Company.

(b)    Subject to the terms of this Agreement, the fact that either or both Managers or any affiliate or controlled company of the Managers is directly or indirectly interested in or connected with any company, entity or individual with which or with whom the Company may have dealings, shall not preclude such dealings or make them void or voidable, or result in the Managers, or any affiliate or controlled company of the Managers, forfeiting the profit from such activities and services and neither the Company nor any of the Members shall have any rights in or to such dealings or any profits derived therefrom; provided, however, that such contracts, dealings and transactions shall be on terms that are normal and competitive with terms which the Company could generally obtain from unaffiliated third persons of similar quality.

(c)    In order to ensure that Members are informed of potential conflicts of interest situations, the Managers will send information to the Members at least five (5) business days in advance of any engagement, contract or agreement setting forth any potential conflict of interest, the material terms of the engagement, contract or agreement, the direct or indirect benefit to Manager(s), and a statement by the Managers that the material terms are commercially reasonable, normal and competitive with terms which the Company could generally obtain from unaffiliated third persons of similar quality.

Secure Merchants, LLC

13.7     Restrictions on Authority of Managers.  The following Company decisions shall require the unanimous written consent of all Managers and Members:

(i)  A change in the nature of the business of the Company;

(ii) The dissolution and winding up of the Company;

(iii)       The sale of all or substantially all of the assets of the        Company; or

(iv) Any decisions and matters referred to in this Agreement that require the unanimous consent of the Members.

14. Status of Members.

14.1     Limitation of Liability.  No Member shall have, solely by virtue of such Member's status as a Member in the Company, any personal liability whatever, whether to the Company, to any Members or to the creditors of the Company, for the debts or obligations of the Company or any of its losses beyond the amount committed by such Member to the capital of the Company, except as otherwise required by the Act.

14.2     Death or Incapacity of a Member.   The death, incompetence, withdrawal, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.  Upon the occurrence of such event, the rights of such Member to share in the Net Income and Net Loss of the Company, to receive distributions from the Company and to assign an interest in the Company pursuant to Section 16 below shall, on the happening of such an event, devolve upon such Member's executor, administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  However, in any such event, such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Company as a Member only in accordance with and pursuant to all of the terms and conditions of Section 16 hereof.

14.3     Recourse of Members.   Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and such Member's Capital Contribution thereto and share of Net Income and Net Loss thereof and shall have no recourse therefor, upon dissolution or otherwise, against any Manager or any other Member.

14.4     No Right to Property.   No Member, regardless of the nature of such Member's contributions to the capital of the Company, shall have any right to demand or receive any distribution from the Company in any form other than cash, upon dissolution or otherwise.

15. Books and Records, Accounting, Reports and Statements and Tax Matters.

15.1     Books and Records.   The Managers shall, at the expense of the

Secure Merchants, LLC

Company, keep and maintain, or cause to be kept and maintained, the books and records of the
Company on the same method of accounting as utilized for federal income tax purposes.

15.2    Annual Accounting Period.  All books and records of the Company
shall be kept on the basis of an annual accounting period ending December 31 of each year,
except for the final accounting period, which shall end on the date of termination of the
Company.    All references herein to the "fiscal year of the Company" are to the annual
accounting period described in the preceding sentence, whether the same shall consist of twelve
months or less.

15.3    Right to Examine Records.    Members shall be entitled, upon
written request directed to the Company, to review the records of the Company at all reasonable
times and at the location where such records are kept by the Company.

15.4    Tax Matters Partner.    Should there be any controversy with the
Internal Revenue Service or any other taxing authority involving the Company, the Managers
may expend such funds as they deem necessary and advisable in the interest of the Company to
resolve such controversy satisfactorily, including, without being limited thereto, attorneys' and
accounting fees.  Alon Nottea is hereby designated as the "Tax Matters Partner" as referred to in
Section 6231(a)(7)(A) of the Code, and is specially authorized to exercise all of the rights and
powers now or hereafter granted to the Tax Matters Partner under the Code.

15.5    Tax Returns.  The Managers shall, at Company expense, cause the
Company to prepare and file a United States Partnership Return of Income and all other tax
returns required to be filed by the Company for each fiscal year of the Company.

15.6    Tax Elections.  The Managers shall be permitted in their discretion
to determine whether the Company should make an election pursuant to Section 754 of the Code
to adjust the basis of the assets of the Company.  Each of the Members shall, upon request,
supply any information necessary to properly give effect to any such election.  In addition, the
Managers, in their sole discretion, shall be authorized to cause the Company to make and revoke
any other elections for federal income tax purposes as they deem appropriate, necessary, or
advisable.

16. Transfers of Company Interests; Withdrawal and Admission of Members

.

16.1    General Prohibition.  No Member may voluntarily or involuntarily,
directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge,
hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of
such Member's Interest in the Company, except as provided in this Section 16.  Any other
purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no
force or effect whatsoever

(a) Transfer Defined.  As used in this Agreement, the term "transfer" shall
include any sale, assignment, gift, pledge, or other disposition or encumbrance of all or a portion

of a Member's Interest in the Company, including a "deemed transfer" as defined in Section 16.1(b), whether voluntary or involuntary.

(b) <u>Deemed Transfers</u>.   An act of bankruptcy by a Member shall be deemed a "Deemed Transfer" and shall be subject to the restrictions of this Agreement.

16.2     <u>Withdrawal of Member</u>.   A Member shall have no power to withdraw voluntarily from the Company, except that a Member may withdraw upon written approval by the Managers and all the other Members, which approval shall include the terms for redemption by the Company of the Member's Interest of such Member.

16.3     <u>Permitted Transfers Without Refusal Rights</u>.   A Member may transfer all or a portion of its Percentage Interest without offering it to the Company or the other Members if such transfer is to his or her spouse, lineal descendant(s), or another Member.

16.4     <u>Other Transfers Subject to Refusal Rights</u>.

(a) <u>Proposed Sales</u>.  If a Member (the "transferor") desires to transfer all or any portion of its Percentage Interest to a third party other than an entity to which the transferor is expressly permitted to transfer its Percentage Interest pursuant to Section 16.3, the transferor shall first give written notice to the Company and to the other Members of its intention to do so ("Notice of Sale").  A pledge of a Percentage Interest consistent with the provisions of Section 16.3 is not a transfer subject to the refusal rights contained in this subsection (a).  The Notice of Sale must name the proposed transferee and specify the Percentage Interest to be transferred, the proposed price, and the proposed terms of payment.  Upon request, the transferor shall provide the Company and/or the other Members with documentation to verify that the prospective transferee's proposed price and terms constitute a bona fide offer.  Following delivery of the Notice of Sale and, if requested, documentation, first the Company and then the other Member(s) shall thereupon have the option, for a period of thirty (30) days and forty-five (45) days, respectively, from the date of delivery of the Notice of Sale, to purchase all, but no lesser portion, of said Percentage Interest at the price and on the other terms and conditions stated in the Notice of Sale.  If the Company does not exercise such option and more than one (1) other Member desires to purchase the Percentage Interest identified in the Notice of Sale within such forty-five (45) day period, the Percentage Interest being offered shall be apportioned among those Members willing to buy in proportion to the Percentage Interests owned by the buying Members immediately prior to the Notice of Sale.   To exercise such options, the other Member(s) shall notify the transferor of its or their intention, in writing, within the applicable option period.  The notice of intention shall be accompanied by the exercising party's cashier's check in the amount of the greater of five percent (5%) of the purchase price or $50,000, as non-refundable earnest money, provided, however, that in no event shall the earnest money exceed the purchase price.  If neither the Company nor any Member elects to purchase the Percentage Interest identified in the Notice of Sale, the transferor shall have the right, for a period of sixty (60) days after expiration of the option period, to transfer such Percentage Interest to the proposed transferee at the price and on the terms specified in the Notice of Sale.  Any Percentage Interest not so transferred by the transferor at the end of said 60-day period shall again become subject to the restrictions of this Agreement.

Secure Merchants, LLC

**EXHIBIT 255**

(b) <u>Deemed Transfers</u>.  Upon the occurrence of an event constituting a "Deemed Transfer" pursuant to Section 16.1(b), first the Company and then the other Member(s) shall have the same options to purchase the Percentage Interest which is subject to the deemed transfer as provided in subsection (a) above; <u>provided</u>, <u>however</u>, that in such event, the other Member(s) shall have the right to purchase all or any portion of the Percentage Interest of the transferor for cash at the price determined in accordance with the provisions of Section 16.5. Upon the occurrence of any such event, the Member whose Percentage Interest is affected shall give notice of such event to the Company and the other Member, and the option period referred to in subsection 16.3(a) shall run from the date of delivery of said notice.  If the Member in question fails to give such notice, then the option period shall commence upon the date on which the Company and the other Member(s) receive actual knowledge of the event constituting the deemed transfer.

16.5      <u>Purchase or Redemption Price</u>.  The purchase price to be paid for a Percentage Interest subject to this Agreement in the event of any deemed transfer pursuant to subsection 16.4(b) shall be equal to the agreed value of the Company multiplied by the Percentage Interest being transferred.  In the event of any deemed transfer, the Company shall engage an appraiser to determine the value of the Company.  The value determined by such appraiser shall be the agreed value of the Company, and the value of such Percentage Interest to be transferred shall reflect an appropriate discount, as determined by the appraiser, of holding a minority ownership interest in the Company.

16.6      <u>Conditions Precedent to Any Transfer or Encumbrance</u>.  Notwithstanding any contrary provision contained in this Agreement, no Member may transfer its Percentage Interest:

(a) Without first notifying the Company and each other Member, in writing, forty-five (45) days in advance of any proposed transfer;

(b) Unless and until the Company has received an opinion of counsel for the Company, prepared at the transferring Member's expense, stating that the proposed transfer will not cause the termination of the Company under this Agreement or the Act;

(c) Unless and until the Company has received an opinion of counsel satisfactory to such Member, prepared at the expense of the Member proposing the transfer, or the Company otherwise reasonably believes that the proposed transfer (A) may be effected without registration of the Percentage Interest under the Securities Act of 1933, as amended, and (B) will not violate any applicable state securities law (including investor suitability standards); and

(d) Unless and until the transferor has performed all obligations on its part to be performed under the terms of this Agreement.

16.7      <u>Effect of Transfer</u>.  If any purported transfer of a Member's Percentage Interest does not comply with the various requirements and restrictions contained in this Section 16, it will be void and of no force or effect.  If any such purported transfer complies with the various requirements and restrictions contained in this Section 16, then effective on the

Secure Merchants, LLC

date of the transfer, the transferor will cease to be a Member with respect to the transferred Percentage Interest and, whether or not the transferee is admitted to the Company as a Substitute Member pursuant to the provisions of this Agreement, the transferee will be entitled to receive all future distributions to which the transferor would otherwise be entitled.  In the case of a transfer of an interest, the transferee shall succeed to the Capital Account of the transferor, or, in the case of a partial transfer, a proportionate share thereof.  The Company will be entitled to treat the transferor as the record owner of the transferred Percentage Interest until the effective date, and no Manager or Member will incur liability for distributions made in good faith to the transferor prior to the effective date.  No such transfer will relieve the transferor of its existing obligations under this Agreement.

     16.8. <u>Substitute Members</u>. A transferee of a Member's Percentage Interest will not be admitted to the Company as a Substitute Member unless:

       (a) The transfer complies with all requirements of this Section 16;

       (b) The transferor gives the transferee the right to be substituted in its place; and

       (c) The transferee has agreed in writing to be bound by all of the terms and conditions of this Agreement, and has paid all expenses of the Company incurred in connection with the transfer.

    Upon admission to the Company as a substitute Member, a transferee shall succeed to all rights and obligations of its transferor under this Agreement.

     16.9. <u>Assignment as Security Permitted</u>. Notwithstanding any other provision of this Section 16, a Member may assign, as security for a loan or other indebtedness incurred by such Member, such Member's right to receive distributions from the Company, and the Managers, upon receipt of notification of any such assignment, shall acknowledge such assignment and shall agree to pay or distribute proceeds in accordance with instructions from such Member subject to such conditions, including indemnification, as the Managers may reasonably require; provided, however, that such lender shall acknowledge in writing to the Managers that such assignment of proceeds shall not entitle such lender to foreclose or otherwise acquire or sell the Company Interest and that the only right acquired by such lender shall be the right to receive distributions of cash and property, if any, made by the Company to the Members in accordance with this Agreement.

     17. <u>Resignation and Admission of Manager</u>.

     17.1. <u>Resignation of Manager</u>. A Manager shall be entitled to resign as a Manager 120 days after delivery of written notice to the Company and the Members of the Manager's intention to resign, or upon such earlier date as the Manager's resignation is accepted by the unanimous written consent of the Members. Resignation of a Manager, who is a Member, pursuant to this Section 17.1 shall not affect its interest, or the interest of Manager's affiliated or controlled company, as a Member.  Notwithstanding the foregoing, the transfer by a Manager, who is also a Member, of its, or its affiliated or controlled company's, Member's Interest in the

Company, shall constitute a resignation by such Member as a Manager, which resignation shall be effective as of the date of such transfer.

      17.2   <u>Death or Incompetency of Manager</u>.  A Manager shall cease to be a Manager upon the death, incompetence, bankruptcy or dissolution of such Manager, or any other event which terminates the continued membership of the Manager, or its affiliated or controlled company, as a Member of the Company.  Removal of a Manager who is a Member of the Company, or controls or is affiliated with a company that is a Member of the Company, shall not affect such Member's Interest in the Company.

      17.3   <u>Removal of a Manager</u>.  A Manager may not be removed as a Manager except for Cause and with the written consent of Members holding Two-Thirds of the Percentage Interests of the Company.  "Cause" means any of the following acts by a Manager: (a) conviction for a felony involving moral turpitude, or (b) dishonesty or engaging in conduct that is demonstrably injurious to the Company, or (c) violation by the Manager of any of the material terms of this Agreement, which violation is not remedied within thirty (30) days after written notice to such Manager.  Removal of a Manager who is a Member of the Company, or controls or is affiliated with a company that is a Member of the Company, pursuant to this Section 17.3, shall not affect such Manager's Interest as a Member of the Company.

      17.4   <u>Appointment of a New or Replacement Manager</u>.  A new or replacement Manager may be appointed and the terms of such appointment determined by the other or the remaining Manager(s) and with written consent of Members holding Two-Thirds of the Percentage Interests of the Company.

   18. <u>Dissolution, Winding Up and Termination</u>.

      18.1   <u>Events Causing Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of any of the following events:

      (a) Entry of a decree of administrative or judicial dissolution pursuant to the Act;

      (b) The sale or other disposition of all or substantially all of the assets of the Company;

      (c) The death, incompetence, withdrawal, expulsion, resignation, removal, bankruptcy or dissolution of a Manager, who is a Member, which is the last remaining Manager of the Company, unless (i) within 120 days of such occurrence, Members owning at least Two-Thirds of the Percentage Interests in the Company, consent to the appointment of a new Manager(s) in accordance with Section 17.4 for the purpose of continuing the Company business, in which case the business of the Company shall be carried on by the newly appointed Manager(s); or

      (d) The unanimous written approval of the Managers and Members.

Secure Merchants, LLC

18.2   <u>Winding Up</u>.   Upon dissolution of the Company for any reason, the Managers shall commence to wind up the affairs of the Company and to liquidate its assets.  In the event the Company has terminated because the Company lacks a Manager, then the remaining members shall unanimously appoint a new Manager solely for the purpose of winding up the affairs of the Company.  The Managers shall have the full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation.  Pending such sales, the Managers shall have the right to continue to operate or otherwise deal with the assets of the Company.  A reasonable time shall be allowed for the orderly winding up of the business of the Company and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Managers to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Company properties and general financial and economic conditions.  Any Member may be a purchaser of any properties of the Company upon liquidation of the Company's assets, including, without limitation, any liquidation conducted pursuant to a judicial dissolution or otherwise under judicial supervision; provided, however, that the purchase price and terms of sale are fair and reasonable to the Company.

18.3   <u>Distributions</u>.  Prior to making distributions in dissolution to the Members, the Managers shall first pay or make provision for all debts and liabilities of the Company, including payment of any Manager Loans, and other loans to Members and their affiliates, and all expenses of liquidation.  Subject to the right of the Managers to set up such cash reserves as they deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of liquidation and any other funds of the Company shall be distributed to the Members in proportion to their Percentage Interest.

18.4   <u>Certificate of Cancellation; Report; Termination</u>.   Upon the dissolution and commencement of winding up of the Company, the Managers shall execute and file articles of dissolution for the Company.  Within a reasonable time following the completion of the liquidation of the Company's assets, the Managers shall prepare and furnish to each Member, at the expense of the Company, a statement which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and the amount of each Member's distribution pursuant to Section 18.3 hereof.  Upon completion of the liquidation and distribution of all Company funds, the Company shall terminate and the Managers shall have the authority to execute and file all documents required to effectuate the termination of the Company.

19. <u>Special and Limited Power of Attorney</u>.

(a) The Managers with full power of substitution, shall at all times during the existence of the Company have a special and limited power of attorney as the authority to act in the name and on the behalf of each Member to make, execute, swear to, verify, acknowledge and file the following documents and any other documents deemed by the Managers to be necessary for the business of the Company:

(i) This Agreement, any separate articles of organization, fictitious business name statements, as well as any amendments to the foregoing which, under the laws of any state, are required to be filed or which the Managers deem it advisable to file;

Secure Merchants, LLC

(ii) Any other instrument or document which may be required to be filed by the Company under the laws of any state or by an governmental agency, or which the Managers deem it advisable to file; and

(iii)     Any instrument or document which may be required to effect the continuation of the Company, the admission of a Manager or Member, the transfer of an interest in the Company, the change in custodian or trustee of any IRA, trust or pension or profit sharing plan Member, or the dissolution and termination of the Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any increases or reductions in amount of contributions of Members.

(b) The special and limited power of attorney granted to the Managers hereby:

(i) Is a special and limited power of attorney coupled with an interest, is irrevocable, shall survive the dissolution or incompetency of the granting Member, and is limited to those matters herein set forth;

(ii) May be exercised by the Managers (or by any authorized officer of the Manager, if not a natural person) for each Member by referencing the list of Members on Appendix A and executing any instrument with single signatures acting as attorney-in-fact for all of them;

(iii)     Shall survive a transfer by a Member of such Member's Interest in the Company pursuant to Section 16 hereof for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary or appropriate to admit a transferee as a Member; and

(iv) Notwithstanding the foregoing, in the event that a Manager ceases to be a Manager in the Company, the power of attorney granted by this Section 19 to such Manager shall terminate immediately, but any such termination shall not affect the validity of any documents executed prior to such termination, or any other actions previously taken pursuant to this power of attorney or in reliance upon its validity, all of which shall continue to be valid and binding upon the Members in accordance with their terms.

20. Amendments.  Except as otherwise provided by law, this Agreement may be amended in any respect by approval of the Managers and the unanimous written consent of the Members; provided that, amendments may be made to this Agreement from time to time by the Managers without the consent or approval of the Members, (i) to cure any ambiguity or to correct any typographical errors in this Agreement or (ii) to correct or supplement any provision herein which may be inconsistent with any other provision herein.

21. Miscellaneous.

21.1     Notices.  Any notice, offer, consent or other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been sufficiently given or made when delivered personally to the party (or an officer of the

Secure Merchants, LLC

party) to whom the same is directed, or (except in the event of a mail strike) five days after being mailed by first class mail, postage prepaid, or by overnight delivery, if to the Company or to a Manager, to the office described in Section 4 hereof, or if to a Member, to such Member's last known address.  Any Member may change such Member's address for the purpose of this Section 21.1 by giving notice of such change to the Company, such change to become effective on the tenth day after such notice is given.

21.2    <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby cancelled.  This Agreement may not be modified or amended other than pursuant to Section 20 hereof.  Any amendment, change or modification of this Agreement shall be effective only if it is in writing and signed by all the Managers and Members.

21.3    <u>Captions; Pronouns</u>.  The paragraph and section titles or captions contained in this Agreement are inserted only as a matter of convenience of reference.  Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof.  All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

21.4    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of any executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of an executed original counterpart of this Agreement.

21.5    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the state of California.

*[Signature page follows]*

Secure Merchants, LLC

**EXHIBIT 255**

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first hereinabove written.

**MANAGERS:**

_____
Alon Nottea

_____
Avi Argamon

**MEMBERS:**

By: _____

By: _____

By: _____

Secure Merchants, LLC

-xviii-

**EXHIBIT 255**

CASE NO. 2:15-CV-04527-GW (PLAx)

 Federal Trade Commission

VS.  BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT  256

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

# *SECURE MERCHANTS*

**OUR SERVICES:** We are an enterprise cloud-based infrastructure provider to the Direct Response Marketing (DRM) industry. Our three initial services include:

**ChargeBack Armor:** Credit card chargeback processing, management & dispute services

**IVR Logix:** Interactive Voice Response (IVR) system that plugs into the client's CRM platform to optimize the Lifetime Value (LTV) of their customers by lowering the opt-out rates and saving DRMers the cost of running their customer service center

**Click-Connector:** Customer Relationship Management (CRM) on steroids allowing customization to an unprecedented level not currently addressed by anyone in the marketplace

**PROBLEMS WE SOLVE:** There are many great products and many great online marketers who are able to quickly ramp up sales based on the right media buying, but without the proper infrastructure to sustain their growth, the probability of failure is high.

Over the past two years, the founders of Secure Merchants saw first-hand every type of failure trap that could have killed their skin care product company, which today has monthly sales of $2.5 million or 25,000 orders.

Thus the problems that our three initial services solve for any DRM company are the core infrastructure needed to deal with (1) the inevitable credit card chargebacks, (2) keeping customers happy or allowing them an easy opt-out, and (3) providing the most sophisticated customer record management system.

**TARGET MARKETS:**

√ **Consumer Products:** Bella Brite, Kollagen Intensiv, IvoryWhite, ProCleanse, OrthWhite, youthEFX, XengthX1, PureCollagen, IdroTherapy, TestoForce, Mango Pure Cleanse, Prime Cleanse, Anana Stem Cellactiv, Lyten Skin, BioGeniste, BellaClear, The Ultimate Facial, Mobanu, SlimSplash, Givale Skin Peel, THINAction, 20MinuteBeauty, eyepothesis, BurnRX, Minoxigen, The Grant Approval Network, MaxCleanse, trimsport, Essence of Argan, PureClease360, RivitaSlim, HydraWhite, DermaJuvenate, Real, ColoCleansePro, PureMangoSlim, Lean DetoXCleanse, Financial Approval Network, InstanTrim, AfricanMango, NutraScience, PureBerryMax

√ **Resellers:** SuiteApp (NetSuite sister company), LimeLightCRM, OrangeCRM, TriangeCRM, UltraCard, ResponseCRM and OrderMotion

√ **CRM & ERP Implementers:** Sererra, DKM, Celigo

**BUSINESS MODEL:**

We intent to offer our CRM platform free of charge for the first six months as a loss leader in order to attract many DRMers to switch from their current CRM platform while starting to use our IVR and ChargeBack services.

We offer a tiered pricing model allowing our customers to start small and buy more services from us as their business scales based on the merit of their product offer, ability to increase their media buy and most importantly, their ability to increase credit card processing capacity.

*THIS IS NOT AN OFFER FOR SECURITIES AND SHOULD NOT BE CONSTRUED AS SUCH, THIS IS FOR INFORMATIONAL PURPOSES ONLY. WE RESERVE ALL RIGHTS TO MODIFY, CHANGE OR UNILATERRALY AMEND ANY OF THE ABOVE.*

# *SECURE MERCHANTS*

**PRICING MODEL:**

**ChargeBack Armor:**

**IVR Logix:**

**Click-Connector:**

**OMPETITION:**  The most well-known players for each of the three services we provide are:

- Revguard
- Limelight CRM, Orange CRM, TriangeCRM, UltraCard, ResponseCRM and OrderMotion
- ChargeBack.com, ChargeBack911, ChargeBackWin

**INVESTMENT OPPORTUNITY:**

We have secured a $1 million investment from an angel investor who had previously invested in the founders' previous startups. See Use of Proceeds for details.

**MANAGEMENT:**

- Alon Nottea
- Avi Argaman
- Paul Medina

**CONTACT:**

*THIS IS NOT AN OFFER FOR SECURITIES AND SHOULD NOT BE CONSTRUED AS SUCH, THIS IS FOR INFORMATIONAL PURPOSES ONLY. WE RESERVE ALL RIGHTS TO MODIFY, CHANGE OR UNILATERRALY AMEND ANY OF THE ABOVE.*

256 - 2                                                                                          **EXHIBIT 256**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 257

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

# SECURE MERCHANTS

1. **Marketing**
2. **Processing orders** (new, rebills, declines, reorders and personalized subscription cycles)
3. **Shipping** (daily shippable items report & shippable performance report)
4. **IVR** (reports in Roi's Excel)
5. **Call Center/CSR**
6. **RMA** (identified by the label with QR code printed on the original order box)
7. **Quality Assurance** (customize QA scripting forms for sales people, CSR reps, etc)
8. **ChargeBacks**
9. **Collections** (set up to mail collections notice after X declines after Y days in between declines)

We provide B2B management software for online marketers. Our services include CRM software, Gateway Processing (Onshore/Offshore), Chargeback Management, Call Center Management, Fraud Management (consumer/affiliate), Fulfillment Management (domestic/global), Advertising Optimization (online, print, radio, TV).

We equip online marketers with turn-key back-end office services to build a stable business through varied marketing channels. Flexible, compatible, intuitive—our software and business model allow you to take the reins and maximize the potential of your business.

**ChargeBack Armor:**

- We specialize in end-to-end processing of chargeback disputes.

- We are a leading innovator of solutions for fraud and risk management.

- We help you win back lost revenue by reversing chargebacks in your favor.

- We reduce the direct negative impact on your profit that chargebacks bring to your business.

- Our custom solutions provide you compliance, chargeback response and recovery, and we handle the entire chargeback dispute process on your behalf.

- Our proprietary technology follows all the rules, processes and requirements of all major merchant processors.

- We protect your merchant account by lowering risk, optimizing profit and reducing your internal cost of managing chargebacks.

1

- Consider us your "Chargeback Department" not your outsourced chargeback service provider.

- We providing real-time dashboard-based accuracy in results.

- **END-TO-END SOLUTION:** You only need one solution to run your entire fraud/risk operation.
- **SIMPLICITY AND EASE OF USE:** Fraud prevention does not have to be complex or complicated.
- **VALUE AND ACCURACY:** Single-source solution with fixed costs...avoid the expense / upkeep of using multiple, disparate tools.

*Optimizing Chargeback Management to Increase Profitability*

*Features Include:*

- Automated Dispute Resolution
- Chageback Prevention Tools
- High Recovery Rates
- Dispute Trend Analysis
- Global Chargeback Support

**IVR Logix:**

- We offer a vehicle to resolve consumer disputes before they become chargebacks

- An automated response service to assist you with resolving customer needs 24/7

- Expedited customer identification for customer reps to quickly locate and resolve accounts

- Leads to a lower staffing cost in the customer service center

- Customized reporting from customer service rep to manager to QA

- Reguard's 3 conditions: in-trial (0-14 days), post trial (15-180 days), already canceled (anytime)

2

**EXHIBIT 257**

- Our system will identity the tier level of the customer and offers an optimal resolution based on the parameters assigned by the Customer Service Manager

- Reduces call volume to a manageable level that your reps will need to actually respond to

- Will let you know how efficient the IVR system is responding to your customers' needs

- Accurate amount of money we're saving you and the revenue generated without the cost of an agent

Reporting:

- How much you are saving in save sale options
- How many customers are offered a discounted rate to keep the product
- Subscription Tracking, meaning what part of your program your customers are exiting in
- Helps you gauge where your customers need the most attention by categorizing to determine the customer service level required to resolve the particular need. This feature helps reduce chargebacks in the future by identifying which customers require the most attention and by assigning them to the most qualified reps
- How many customers are returning products through the IVR vs CSR
- Identify your peak CSR hours to optimize the staffing costs

**Click Connector:**

- One localized platform that segregates all aspects of a business yet gives every department head access to the modules required to operated on a daily basis
- Customizable
- Internal messenger and outbound emailing to end customers
- Workflow: assigning tasks, reminders, duties to co-workers with ticket tags for proper closer and future retrieval

3

**EXHIBIT 257**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT   280

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

# Standard Service Agreement

This Standard Service Agreement ("Agreement") is entered into by and between:

Secured Merchant LLC, a California Limited Liability Company ("SM"), and
_____ ("Client") a Limited Liability Company
as of this ___th day of_____, 2015.

Based upon the mutual covenants set forth in this Agreement, SM and Client agree to the following terms and conditions for use of the Software and the provision of a subscription service to be used by Client for the Services. The Software is made available to you and the Service is owned, operated, and provided to you by SM through the CHARGEBACKARMOR.COM Site.

By signing this Agreement, each party agrees to be bound by these Terms and Conditions, and Policies in effect from time to time. Each party's representatives, employees, or any person or entity acting on its behalf with respect to the provision of or use of the Service, shall be bound by, and shall abide by, these Terms and Conditions, and the Policies. Client further agrees that you are bound by these Terms and Conditions and the Policies whether you are acting on your own behalf or on behalf of a third party. If Client is using the Service on behalf of a business, that business accepts the Terms and Conditions and the Policies.

Client represents warrants and agrees that all information Client has provided or will provide to SM in connection with its use of the Service is and will be true, accurate, current and complete in all material respects, and will be maintained and updated to keep it true, accurate, current and complete in all material respects. If any information provided by Client is untrue, inaccurate, not current or incomplete in any material respect, SM has the right to terminate Client's account and refuse any and all current or future use of the Service.

DEFINITIONS: The following terms are defined for the purposes of this Agreement as follows:

"Account Charges" shall mean all fees, costs, and amounts ever kind and description that are charged or may be charged to Client's account pursuant to the Terms and Conditions and the Policies.
"Bandwidth" shall mean the amount of data transferred out from the SM CRM servers where Client's usage of SM CRM is hosted.
"CAN-SPAM Act" shall mean the federal CAN-SPAM Act of 2003, as amended from time to time.
"Client Data" shall mean (i) information input into the Software interface by Client, and (ii) user behavior on Client's web site captured by the Software on the Client's behalf, all of which shall be stored on SM CRM's servers.
"CRM" shall mean chargebackarmor.com Chargeback relationship management.
"Policies" shall mean all payment terms, policies, practices, rules, standards and guidelines provided to Client in writing.
"Service(s)" or "SM CRM Service(s)" shall mean the SM CRM, campaign management and reporting, including associated materials, and written documentation.
"Site" shall mean the web site located at www.chargebackarmor.com.
"SM Data" shall mean all data that is not Client Data.
"Software" shall mean the SM CRM software.
"Terms and Conditions" shall mean all of the terms and conditions set forth in this Agreement.
"You", "your", and "Client" refers to the entity subscribing to the Services hereunder.

1. USE LICENSE. Subject to the Terms and Conditions and the Policies, SM hereby grants Client a non-exclusive license to use the Software and the Service in accordance with the Terms and Conditions and Policies. Client agrees that it shall not at any time: (1) modify, translate, or create derivative works based on the Service or the Software, or permit other individuals to do so on its behalf; (2) rent, lease, transfer or otherwise transfer rights to the Service or the Software; (3) use a single account for multiple business entities; (4) provide third parties with access to Client account; and/or (5) reverse engineer or disassemble the Service or the Software. SM reserves the right to terminate this Agreement immediately, without liability, if Client violates any prohibition set forth in this Section 1.

2. FEES AND CHARGES. Fees shall be due and payable by Client to SM pursuant to Exhibit A attached hereto and incorporated by reference into this Agreement. Client agrees to pay SM all applicable charges to its account, in United States dollars, in accordance with the payment Policies in effect at the time those charges become due. Client's account will be debited with corresponding fees in accordance with the then-current rates. Client agrees to not charge back any of the related fees associated with this account, and any charge backs will result in Client paying associated charge back fees. Client authorizes SM to charge Client's credit card, charge card, or debit card for any and all Account Charges associated with Client's account hereunder. If payment cannot be charged to Client's credit/charge/debit card, for whatever reason, or if there is a charge-back for any reason, SM reserves the right to either suspend or terminate Client's account with SM and the associated Services until the payment is received. If Client provides SM with a credit card, charge card, or debit card that expires during the term of this Agreement, SM reserves the right to charge any renewal card issued to Client as a replacement without any additional Client consent. In the event of any failure by Client to make payment, or upon any Client charge-back, Client will be responsible for all reasonable expenses (including reasonable attorneys' fees)

**EXHIBIT 280**

incurred by SM in collecting such amounts plus interest at the rate of the lesser of one and one-half percent (1.5%) per month or the highest rate permissible under applicable law for the actual number of days elapsed. All paid fees, costs, charges and other amounts are NON-REFUNDABLE.

3. INTELLECTUAL PROPERTY. Client represents and warrants to SM that it owns or otherwise has the right to use Client Data as contemplated by this Agreement. Except as otherwise provided in this Agreement, SM shall acquire no right, title or interest in Client Data as a consequence of this Agreement. All final data produced as a result of the input by SM of Client Data into the Software in connection with the provision of the Services (the "IP Rights") shall be the sole and exclusive property of Client. Client shall be the sole owner of all the rights to such IP Rights in any form and in all fields of use known or hereafter existing. Client may transfer such IP Rights or use the IP Rights for any purpose without further payment to SM. Notwithstanding anything set forth herein, Client shall not, as a result of this Agreement, acquire any property or other right, claim or interest, including any patent right or copyright interest in any data, information or technology which is proprietary to or has been licensed to SM which is used to deliver the Services, the Software or other technology used to deliver the Services, any interim data created there from or any of the information, systems, processors, equipment, computer software, derivative works, service marks or trademarks of SM, whether created before, during or after the performance of this Agreement. Using the Services does not give Client ownership of any intellectual property rights in the Service. Client shall not reverse engineer, decompile, disassemble or otherwise attempt to determine the source code for computer programs or other trade secrets from the Software and/or Services.

4. LEGAL AND POLICY COMPLIANCE. To use the Service, Client must at all times comply with the following:

a. No activity in violation of applicable federal, State or local law, statute, rule or regulation.
b. No Software pirating or hacking.
c. No use of SM CRM URLs in emails.
d. No violations of the CAN-SPAM Act.
e. No pornographic, adult only, sexually oriented or related web sites / creative as reasonably determined by SM.
f. No racial, ethnic, political, hate-mongering or otherwise objectionable content.
g. You must follow any policies made available to you within the Service.
h. You can not misuse the Service. For example, don't interfere with the Service or try to access the Service using a method other than the interface and the instructions as provided.
i. You may use the Service only as permitted by law, including applicable export and re-export control laws and regulations.
j. You may not use any branding or logos used in the Service. You may not remove, obscure, or alter any legal notices displayed in or along with the Service.
k. SM may review content to determine whether it is illegal or violates the Terms and Conditions or the Policies, and SM has the right to remove or refuse to display content that SM reasonably believes to violate the Terms and Conditions, the Policies, or the law.
l. To the extent the Service is available on mobile devices, you may not use the Service in a way that distracts you and prevents you from obeying traffic or safety laws.

Client is solely responsible for compliance with all laws and Policies. SM may suspend or stop providing the Service to you if you do not comply with the Terms and Conditions or the Policies or if we are investigating suspected misconduct. SM reserves the right to terminate this Agreement immediately, without liability, if Client does not comply with the requirements of this Section 4.

5. REPRESENTATIONS AND WARRANTIES. SM represents and warrants that it has full power and authority to enter into this Agreement. Client represents and warrants (i) that it has sufficient authority to enter into the Agreement; (ii) that it will perform its rights, duties and obligations under the Agreement and at all times be in compliance with all applicable federal, state and local laws, rules and regulations; (iii) that it shall not be in violation of any obligation, contract or agreement by entering into this Agreement, by performing its obligations under the Agreement, or by authorizing and permitting SM to perform the Services hereunder; (iv) that it shall comply with all Terms and Conditions and the Policies; and (v) that all information provided by Client to SM is truthful, accurate, and complete, and is not misleading in any material respect.

6. INDEMNIFICATION. Client will hold harmless and indemnify SM and its affiliates, officers, agents, and employees from any claim, suit or action arising from or related to the use of the Service or violation of the Terms and Conditions and Policies, including any liability or expense arising from claims, losses, damages, suits, judgments, litigation costs and attorneys' fees. The provisions of this Section shall survive the termination of the Agreement.

7. TERM. The initial term of this Agreement shall be one month, and shall automatically renew on a month-to-month basis thereafter.

8. TERMINATION. Except as otherwise expressly provided in this Agreement, this Agreement may be terminated by either party at any time and for any reason (or no reason at all) by providing the other party with at least ten (10) days prior written notice; provided that, regardless which party terminated this Agreement, Client shall pay in full all Account Charges and any other amounts due through the date of termination, including the unexpired term. Notwithstanding anything to the contrary, SM

**EXHIBIT 280**

may immediately terminate your account at any time during the term of the Agreement, and discontinue your participation in the Service, if SM reasonably believes that your conduct may be harmful to its business. Reasons for such termination may include, but are not limited to, failure to make payment when due; violation of Terms and Conditions and the Policies; or conduct harmful to others who participate in the Service. Upon any termination of the Agreement, Client shall have thirty (30) days from the date of termination in which to request the return of any and all Client Data in a form reasonably requested by Client. In the event that Client does not request the Client Data within such period of time, SM may delete the Client Data from Client's account. Upon termination of this Agreement, Client will no longer be able to access its account. However, at the request of Client, 30 day access to recoup Client Data will be granted. Upon any termination of this Agreement, SM reserves the right to delete any and all information in Client's account, at SM's discretion at any time after the date that is thirty (30) days after the termination of the Agreement; provided that, if requested by Client, SM will return to Client any such information during such thirty (30) day period in a form reasonably requested by Client and at Client's expense.

9. MODIFICATIONS. This Agreement may be modified by the parties only through a written agreement signed by both parties; excepting that, SM may modify the Terms and Conditions and/or the Policies, and add additional terms or Policies that apply to the Service, for example, to reflect changes to the law or changes to the Service. You should look at the terms regularly. SM will post notice of modifications and additions to the Terms and Conditions and/or the Policies on the Site. Changes will not apply retroactively and will become effective no sooner than thirty (30) days after they are posted. However, changes addressing new functions for a Service or changes made for legal reasons will be effective immediately. If there is a conflict between the Terms and Conditions and any subsequently modified or additional terms, the subsequently modified or additional terms will control for that conflict. SM may add or remove functionalities or features, and may suspend or stop the Service, or a portion thereof, altogether. If you do not agree to the modified or additional terms or Policies, you should discontinue your use of the Service.

10. MARKETING. Client hereby grants to SM a non-exclusive license to use, reproduce, publicly and digitally display and perform, transmit and broadcast Client's name, logos, trademarks, trade names, service marks, URLs and slogans to advertise, market, promote and publicize the Service and the Software, including the inclusion of Client in SM's marketing materials and on SM's website.

11. SERVICE LEVEL AGREEMENT. SM will supply advanced technical support, at Client's expense, via phone and email as it pertains to the Service. In the event of unscheduled monthly downtime exceeding one hour twice during the term of this Agreement, SM will promptly credit Client five percent (5%) of the next monthly fee. If there is unscheduled monthly downtime exceeding one hour three times during the term of this Agreement, SM will promptly credit Client an additional five percent (5%) of the next monthly fee.

12. DATA.

a. Data Storage. The Software and Client Data will be hosted on SM servers. SM does not warrant that Client's use of the Service will be error-free. Client acknowledges and agrees that Client is solely responsible to determine whether the Service sufficiently meets Client's requirements. Except as may otherwise be expressly provided for in this Agreement, SM is not responsible for Client Data residing on SM servers.

b. Client Data. "Client Data" consists of the following: (i) information input into the SM CRM interface by Client, and (ii) user behavior on Client's web site captured by the SM CRM Service system on the Client's behalf. SM agrees that you will own all Client Data. SM shall not use the Client Data except directly in furtherance of the purposes of this Agreement. SM shall not disclose the Client Data to any third party unless directed by you, unless (a) such disclosure is made by SM in response to a court order, and provided that SM has given you reasonable notice of such court order, or (b) is in the aggregate in non-personally identifiable form. Upon Client's request, Client is entitled to, and SM will provide Client, at Client's expense, all Client Data, in a format reasonably determined by SM.

c. SM Data. Client Data does not include any information and/or campaign methodologies generated by SM, regardless of whether or not the information or campaign methodology was generated as a result of Client's use of the SM CRM system. Client agrees that SM owns all SM Data. Client shall have a nonexclusive license to use SM Data during the term of this Agreement only as necessary to use the Services.

d. Use of Client Data. Notwithstanding anything to the contrary, Client grants SM the limited right and worldwide license to use, host, store, reproduce, modify, create derivative works (such as those resulting from translations, adaptations or other changes we make so that your content works better with the Service), communicate, publish, publicly perform, publicly display and distribute such Client Data. The rights you grant in this license are for the limited purpose of operating, promoting, and improving the Service, and to develop new functionality and Software for the Service. This license continues even if you stop using the Service and following the termination of this Agreement.

**EXHIBIT 280**

13. DISCLAIMER OF WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THESE TERMS AND CONDITIONS, YOU EXPRESSLY AGREE THAT YOUR USE OF THE SITE AND/OR SERVICE IS AT YOUR OWN RISK. EXCEPT AS EXPRESSLY SET FORTH IN THESE TERMS AND CONDITIONS, THE SITE AND/OR SERVICES ARE AVAILABLE ON AN "AS IS" BASIS, WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ACCURACY, OR IMPLIED WARRANTIES ARISING FROM COURSE OF PERFORMANCE OR COURSE OF CONDUCT AND WE DISCLAIM ANY WARRANTY REGARDING THE AVAILABILITY, ACCURACY OR CONTENT OF THE SITE, SERVICES, AND/ OR INFORMATION, PRODUCTS OR SERVICES AVAILABLE THROUGH THE SITE AND/OR SERVICES, OR ANY ECONOMIC BENEFIT YOU MAY GAIN FROM USE OF THE SITE AND/OR SERVICES. SOME STATES DO NOT ALLOW EXCLUSION OF AN IMPLIED WARRANTY, SO THIS DISCLAIMER MAY NOT APPLY TO YOU. SM MAKES NO GUARANTEES, REPRESENTATIONS OR WARRANTIES AS TO THE MARKETING PERFORMANCE, OR LEVEL OF LEADS OR SIGN-UPS GENERATED THAT CLIENT CAN EXPECT BY ENTERING INTO THIS AGREEMENT AND SUBSCRIBING TO THE SERVICE.

14. APPLICABLE LAW. The validity, interpretation, construction, and performance of this Agreement shall be governed by and construed in accordance with the laws of the state of California, without giving effect to its principles of choice of law or conflicts of law thereunder. Any action or proceeding arising from, or seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against either of the parties only in the state courts of the state of California in and for the county of Los Angeles at Los Angeles, California, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on either party anywhere in the world. In the event it shall become necessary for either party to take action of any type whatsoever to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all attorneys' fees, costs, and expenses, including all out of pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediation, arbitration, litigation, and appeals.

15. LIMITATION ON LIABILITY. CLIENT ACKNOWLEDGES AND AGREES THAT SM SHALL NOT BE LIABLE HEREUNDER FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT OR REVENUE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE), EVEN IF SM HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. SM'S TOTAL CUMULATIVE LIABILITY HEREUNDER, REGARDLESS OF THE FORM OF ACTION, WILL NOT EXCEED AN AMOUNT EQUAL TO ALL AMOUNTS ACTUALLY RECEIVED BY SM FROM CLIENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE INCURRENCE OF ANY SUCH LIABILITY. THE ESSENTIAL PURPOSE OF THIS PROVISION IS TO LIMIT THE POTENTIAL LIABILITY OF SM ARISING OUT OF THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS SET FORTH IN THIS SECTION 15 ARE REASONABLE AND ARE INTEGRAL TO THE AMOUNT OF CONSIDERATION LEVIED IN CONNECTION WITH CLIENT'S USE OF THE SOFTWARE AND SERVICES PROVIDED BY SM HEREUNDER, AND THAT, WERE SM TO ASSUME ANY FURTHER LIABILITY OTHER THAN AS SET FORTH HEREIN, SUCH CONSIDERATION WOULD OF NECESSITY BE SET SUBSTANTIALLY HIGHER.

16. NO ASSIGNMENT OR RESALE. Neither party hereto may resell, assign, or transfer any of its rights under this Agreement. If either party attempts to resell, assign, or transfer its rights, the other party may immediately terminate the Agreement without liability to such other party. Notwithstanding the foregoing, either party may assign this Agreement in connection with a sale of all or substantially all of its assets or a stock sale, merger or other corporate reorganization resulting in a change of control of such party, in each case without the consent of the other party.

17. CONFIDENTIALITY. Each party hereto may have access to confidential, proprietary or trade secret information disclosed by the other party, including, without limitation, its ideas, trade secrets, procedures, methods, systems, and concepts, whether disclosed orally or in writing through any media ("Confidential Information"). SM's Confidential Information includes the SM CRM Services, the Software and information related thereto, and the underlying software, hardware, and other technology used by SM to provide the SM CRM Service and Software. Each party acknowledges that the Confidential Information of the other party contains valuable trade secrets and other proprietary information of such other party and remains the sole and exclusive property of such other party. Each party will restrict disclosure of Confidential Information of the other party to its officers, directors, employees, affiliates and agents with a need to know, will not disclose Confidential Information of the other party to any other party, in the case of Client, will not pass out login's to anyone for purposes of evaluating or examining the Software or the Services, and will otherwise protect Confidential Information of the other party as it protects its own proprietary information (but will in no case take less than reasonable measures). No information will be deemed "Confidential Information" of a party to the extent that the other party can show that it: (a) was in the public domain when communicated to such other party; (b) is communicated to such other party by another party free of any confidentiality obligation; or (c) was in such other party's possession free of any obligation of confidence when first communicated to such other party. Neither party will be in violation of this Section by making a disclosure in response to a valid order

**EXHIBIT 280**

by a court or other governmental body, provided that, if permitted by law, such party provides the other party prompt notice of such impending disclosure to permit such other party to seek confidential treatment thereof. Any provision herein to the contrary notwithstanding, SM's total cumulative liability under this Section 17, regardless of the form of action, will not exceed an amount equal to all amounts actually received by SM from Client during the twelve (12) month period immediately preceding any allegation by Client of disclosure of Confidential Information.

18. NON-COMPETE. Client agrees that during the term of the Agreement and for one year thereafter, Client will not develop, offer, sell or distribute a competing service to the SM Service. A competing service is defined as a service that seeks to acquire clients for the purpose of offering a CRM or campaign management software system. Notwithstanding anything to the contrary in this Section 18, Client shall be permitted to develop and utilize a service similar to the SM CRM Service solely for use by Client in connection with its own marketing activities. Client understands that violation of this clause is grounds for immediate termination of this Agreement by SM with no liability on the part of SM. Client understands and agrees that SM may seek equitable relief to stop the violation and competing activity as well as any other relief available under the law.

19. DUTY TO DISCLOSE CHANGE OF OWNERSHIP. If Client's ownership changes whereby any entity acquires a majority ownership or other controlling interest in Client during the term of this Agreement, then Client shall immediately disclose to SM the name of such entity.

20. HEADINGS AND REFERENCES. Headings of sections are for the convenience of reference only. Words indicated in quotes and/or capitalized signify an abbreviation or defined term for indicated words or terms, including those definitions contained in this Agreement.

21. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings between the parties with respect to such subject matter.

22. SURVIVAL. The terms set forth in Sections 2, 3, 5, 6, 8, 12, 13, 14, 15, 17, and 18 of this Agreement shall survive the termination or expiration of this Agreement.

23. NOTICES. All notices or other communications required or permitted to be given hereunder must be (as elected by the party giving such notice) (a) personally delivered at the address set forth on the signature page hereof, or (b) transmitted by postage prepaid mail to the address set forth on the signature page hereof. Except as otherwise specified herein, all notices and communications will be deemed to have been given on (x) the date of receipt if delivered personally, or (y) the date that is five (5) days after posting if transmitted by mail. A party may change its address for purposes of this Section by written notice to the other party in accordance with this Section.

24. RELATIONSHIP OF THE PARTIES. Nothing contained herein will be construed to create a partnership relationship between the parties or the relationship of employer and employee between the parties or between a party or any of such party's employees or agents and any of the other party's employees or agents. It is the express intent of the parties that no party is an employee of the other party for any purpose, but is an independent contractor for all purposes and in all situations. Each party and its directors, officers, employees and agents may not represent that they are employees of the other party, nor may they in any manner hold themselves out to be employees of the other party.

25. SEVERABILITY. If any provision of the Agreement is be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision will, to such extent as it is determined to be invalid or unenforceable, be reformed without further action by the parties to the extent necessary to make the provision valid and enforceable and no other provision will be affected or impaired thereby.

26. COUNTERPARTS. This Agreement may be executed in separate counterparts (each of which is an original and all of which will be deemed one and the same instrument) and will be fully effective as of the date executed copies are exchanged between the parties. Counterparts may be executed either in original or facsimiled form and the parties adopt any signatures received by a receiving device as original signatures of the parties.

Secured Merchant LLC
A California Limited Liability Company
Operating (chargebackarmor.com)

By: _____          By: _____
Name: Roi Reuveni                     Name: _____
Its: Managing Member                  Its: Managing Member

Address: 23679 Calabasas Rd. #531, Calabasas, CA, 91302          Address: _____

EXHIBIT A
Standard License Fees

1. SM CRM Standard License Fees. In consideration for payment of the fees due and compliance with the Agreement, SM shall provide you with access to the SM CRM Services, which include the features listed on the Site. Upon the parties' acceptance of this Agreement, the initial license and setup fees are due and are nonrefundable. Capitalized terms used in this Exhibit A, but not defined in this Exhibit A, are used herein as defined in the Agreement to which this Exhibit A is attached. The license and set-up fees are as follows:

| | |
|---|---|
| Setup Fee: | $ Waived |
| Service Fee (Due Monthly): | $10.00 Per Re-presentment |
| Custom Programming: | $95.00 Per Hour |

2. Custom Development (as required and agreed). Custom development is billed by SM to Client at $95.00/hour, plus travel and related expenses, if necessary, with a 4 hour minimum. If such custom development is identified by SM to be beneficial to all Clients of the SM CRM Service, then SM will not charge for completion of the custom development request.

3. Term/Billing Cycle:

| | |
|---|---|
| License: | Standard License |
| Initial Term: | 30 Day Free Trial, Paid Service Renews Monthly if Not Cancelled. |
| Term Start Date: | _____, 2015 |
| Next Renewal Term Date: | _____, 2015 |
| Due Date: | Payments are due by the 5th of the month for the previous term of service |

At the end of the initial term of this Agreement, the Agreement shall automatically renew on a month-to-month term.

4. Support. SM will provide incident-based help desk phone and email support for all technical issues/questions in connection with the Agreement that arise during the term of the Agreement. Administrative tasks to the software or general configuration of the SM CRM Services system in each case by SM on behalf of Client that are not tied directly to technical issues in connection with the Services will be billed to Client at $95.00/hour (1 hour minimum).

Client Signature: _____
Name: _____
Date: January ___th, 2014

  EXHIBIT 280

**Appendix B**

**Recurring Payment Authorization Form**

Schedule your payments to be automatically deducted from your bank account, or charged to your Visa, MasterCard, American Express or Discover Card. Just complete and sign this form to get started!

**Recurring Payments Will Make Your Life Easier:**

- It's convenient (saving you time and postage)
- Your payment is always on time (even if you're out of town), eliminating late charges
-

**Here's How Recurring Payments Work:**

You authorize regularly scheduled charges to your checking/savings account or credit card.  You will be charged each billing period for the total amount due for that period. A receipt will be emailed to you and the charge will appear on your bank or credit card statement.  You agree that no prior-notification will be provided unless the payments date changes, you will receive notice from us at least 10 days prior to the payment being collected.

**Please complete the information below:**

I _____ authorize Secured Merchants to charge/debit my account
indicated below on the 1st of each Month for payment of my Chargeback Services.  I understand that I will only receive advance notice of the charge if the payments date changes.

Billing Address _____        Phone# _____

City, State, Zip _____        Email _____

| **Checking/ Savings Account** | **Credit Card** |
|---|---|
| ☐ Checking    ☐ Savings | ☐ Visa          ☐ MasterCard |
| Name on Acct  _____ | ☐ Amex          ☐ Discover |
| Bank Name  _____ | Cardholder Name  _____ |
| Account Number  _____ | Account Number  _____ |
| Bank Routing #  _____ | Exp. Date  _____ |
| Bank City/State  _____ | CVV (3 digit number on back of card) _____ |

Routing Number   Account Number

SIGNATURE _____        DATE _____

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify Secured Merchants in writing of any changes in my account information or termination of this authorization at least 10 days prior to the next billing date. If the above noted payment dates fall on a weekend or holiday, I understand that the payments may be executed on the next business day. For ACH debits to my checking/savings account, I understand that because these are electronic transactions, these funds may be withdrawn from my account as soon as the above noted periodic transaction dates. In the case of an ACH Transaction being rejected for Non-Sufficient Funds (NSF) I understand that Secured Merchants may at its discretion attempt to process the charge again within 30 days, and agree to an additional $25.00 charge for each attempt returned NSF which will be initiated as a separate transaction from the authorized recurring payment. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I certify that I am an authorized user of this credit card/bank account and will not dispute the scheduled transactions with my bank or credit card Company; provided the transactions correspond to the terms indicated in this authorization form.

EXHIBIT 280

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 281

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386



**OUR SERVICE:**

ChargeBackArmor is a cloud-based enterprise chargeback[1] management platform. Our proprietary technology empowers merchants to make real-time data-driven decisions that help recover lost revenue and increase their bottom line as well as and ISOs[2] to offer our service as a white label solution to the merchants they process credit cards for.

**THE PROBLEM WE SOLVE:**

Processing chargebacks is time-consuming for merchants and requires an internal costly staff.

Most merchants are not setup to proactively handle the issue of chargebacks and become very frustrated with the loss of revenues and time associated with handling this very time consuming and expensive issue. Instead of incurring a big cost for hiring internal staff to process chargebacks, we are a preferred vendor to handle all chargeback issues and provide reporting in real-time.

**THE MARKET:**

Credit card chargebacks are a painful part of doing business. As the volume of non-cash payments, and specifically ACH[3] payments, continues to rise, the payments industry is challenged to reduce transaction returns as well as account take-over fraud.

Fueled by the increase in online payments, ACH volume grew to almost **22 billion transactions equating to $38.7 trillion** in value in 2013 and has continued to climb in 2014.

In 2014, **chargebacks amounted to $11 billion[4]** up from $8 billion in 2012.

**OUR TARGET MARKET:**

√ Independent Sales Organizations (ISOs)[5]
√ High-rick online marketers

**BUSINESS MODEL:**

We charge a flat $8 fee per processed chargeback for direct clients and $5 fee per chargeback for White Label clients who are ISOs and who will markup this cost to create an additional revenue for themselves.

---

[1] A chargeback, also known as a reversal, is when a buyer asks their credit card issuer to reverse a transaction after it has been completed. It is available only to users who make a payment funded by their credit card or debit card.
[2] An Independent Sales Organization (ISO) also known as Member Service Providers (MSP) is a third-party company that is contracted by a credit card member bank to procure new merchant relationships. ISOs also process online credit card processing transactions for small businesses in exchange for a fee or percentage of sales.
[3] Automated Clearing House (ACH) is an electronic network for financial transactions in the United States.
[4] 2014 Identity Fraud Report by Javelin Strategy & Research

1

**EXHIBIT 281**

**COMPETITION**:

1. ChargeBack911
2. ChargeBackWin
3. ChargeBackExperts
4. MarginProfitsInc

**COMPETITIVE ADVANTAGES**:

1. Seamless API integration with any CRM, gateway and shipping providers

2. Real-time reporting on every facet of the chargeback process (by geography, by MID[6], by threshold, by time frame, by reason code, etc.)

3. Customized alerts & notifications

4. Full case history for legal and compliance purposes

5. Eliminating the need for an internal chargeback department

6. Enjoying higher winning ratios and putting money back into our clients' pocket

**INVESTMENT OPPORTUNITY**:

Currently seeking $500,000 for staffing and marketing purposes and a small portion will be used to continue developing the platform according to the needs of major ISOs who require a private label solution.

**INVESMENT DEAL TERMS**:

1. **Equity**: 20% <u>or</u>
2. **Debt & Equity**: 12 months term @ 12% annual interest rate + 5% equity upfront <u>or</u>
3. **Convertible Debt**: 12 months term @ 12% annual interested rate + 5% equity upfront + 1% additional equity per month for which the debt is not paid back

**MILESTONES**:

1. $1,000,000 invested by founders to develop the platform (over 18 months)

2. 33,000 chargebacks were processed in 2014 for our fist client, AuraVie, an anti-aging skincare company

3. 10 paying clients as of February 2015

4. $250,000 cash infusion from investor by end of February 2015

5. 100 paying clients at end of 2015

---

[6] A merchant identification number (MID) is a unique number assigned to a merchant account to identify it throughout the course of processing activities.

**281 - 2**                                    **EXHIBIT 281**

6. $3 million in revenue by end of 2015

7. $17 million in revenue by end of 2016

**MANAGEMENT:**

We are technology-driven marketers who understand every intricate aspect of the online sales process. Our founders and our management are a unique and diverse group of industry professionals ranging in skills from risk management, IT, direct marketing, and customer contact center management.  Having used almost every major chargeback provider for our various clients and having a deep understanding of their shortcomings, we decided to build a state-of-the-art cloud-based chargeback platform to lower internal processing costs and win back losses to help increase out clients' bottom line.

Alon Nottea – President
Mike Costache – Chief Executive Officer
Avi Argaman – Chief Technology Officer
Roi Reuven – Customer Service Manager
Tyler Reitenbach – Sales Account Manager

**CONTACT:**  Mike Costache / mike@chargebackarmor.com / 310.753.9292

**DISCLAIMER:**

This is not an offer for securities and should not be construed as such, this is for informational purposes only. We reserve all rights to modify, change or unilaterally amend any of the above.

3

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS.   BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT  285

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

| | |
|---|---|
| **To:** | Netistics LLC[netisticsllc@gmail.com] |
| **Cc:** | Dylan Gaines[dylan.gaines@umsbanking.com] |
| **From:** | Bob Sarkisyan |
| **Sent:** | Fri 5/29/2015 2:38:45 PM |
| **Importance:** | Normal |
| **Subject:** | Re: Tech Support - CB Management; Reserves & Settlements |
| **MAIL_RECEIVED:** | Fri 5/29/2015 2:41:37 PM |

Hello Roi,

The information I was running off of was actually not an error but rather it was the chargeback ratio based off of chargeback volume rather than chargeback count. I have recalculated what we will keep in reserves and will determine if any reserve will be needed next month once we have figures for June.

SafeTech - Merchant #: ██████1522 - $8,000.00 total reserves - No reserve release
SupportMega - Merchant #: ██████1523 - $24,000.00 total reserves - Releasing $14,000.00
iSupportTeam - Merchant #: ██████1537 - $12,659.47 total reserves - Releasing $7,659.47

Let me know if you have any questions. Thank you.

On 5/29/2015 11:19 AM, Netistics LLC wrote:

> Morning Bob Sir, how are you.
> Just following up and apologies for the numerous emails. We simply have a few bills to pay and the unexpected reserve amounts taken have placed us in a tough position.
>
> Since we figured out that the reserves taken were on incorrect data assumptions, can we confirm what amounts we can have released please? We hope it can be the full amount.
>
> Kind Regards,
>
> Roi
>
> On Thu, May 28, 2015 at 2:13 PM, Netistics LLC <netisticsllc@gmail.com> wrote:
>
>> Dear Bob,
>> Thank you for taking some time to talk.
>>
>> Our numbers were so drastically off that I am glad we had a chance to talk together and confirm that the system was showing some erroneous figures.
>>
>> As it stands now
>> SafeTech
>> April - 8.5%
>> May - **3.7%**
>>
>> SupportMega
>> April - 9.1%
>> May - **4.9%**
>>
>> iSupportTeam
>> April - 1.12%
>> May - 15% - (by next week we will be below 5%)
>>
>> Seeing as how we are not at 7.4%, 9.7% and 29% for SafeTech, SuppMega and SuppTeam respectively but rather the numbers above, we are within your requested goal of below 5% on 2 accounts and we are in fact doing what we promised from the outset.

Please. If possible. Trust that these trends downward will continue and by the end of next week you can be very confident knowing that we will be below 5% on all 3, not just 2 accounts.

Furthermore, knowing that the past few days Reserve Actions were taken because the computer system was providing you with bad data, can we please reverse the Reserves Taken as we now know that they were taken under false assumptions.

I look forward to sending you our CB data next week when all of our accounts are where you expect them to be. We are so happy to be both complying with your request & meeting your CB % goals.

Kind Regards,

Roi

On Thu, May 28, 2015 at 12:17 PM, Bob Sarkisyan <bob.sarkisyan@umsbanking.com> wrote:

Hello David,

I have updated the reserve figures and corrected the chargeback numbers with what I have (in red) in the email thread below.

SafeTech - Merchant #: ████1522 - $8,000.00 total reserves - 2k per month for now but will increase as chargebacks increase
SupportMega - Merchant #████1523 - $24,000.00 total reserves - Initially $2k per month reserve but adjusted due to excessive chargebacks.
iSupportTeam - Merchant #: ████1537 - $12,659.47 total reserves - This reserve is based off of the processing, in this case 10% of processing.

At this time, no caps can be set on the reserves nor will any reserves be released due to the chargeback/refund figures. Once we can see a solid decrease in chargebacks and refunds that can be maintained monthly, then we can consider reserve cap/reduction/release. I understand that you do not have 100 chargebacks monthly but this is not the only number we are concerned with.  I would like to see the chargeback percentages under 5% month over month without fluctuating volume.

Also, I do want to mention that you are being given the opportunity to show improvement since the accounts are still open. Normally, accounts with these figures would have been terminated but since we have a long standing and positive relationship with Alon we have allowed processing to continue.

Please let me know if you have any other questions.

Thank you.


On 5/27/2015 12:29 PM, Netistics LLC wrote:

Dear Dylan & Bob,
I apologize. Our Reserve figures were off.
The number of reserves taken out of the account without notification is hard to follow.

SafeTech - Merchant #: ████1522 - $6,000.00
SupportMega - Merchant #: ████1523 - $20,000.00
iSupportTeam - Merchant #: ████1537 - $10,075.84

Kind Regards,

David
650.291.4071

On Wed, May 27, 2015 at 12:12 PM, Dylan Gaines <dylan.gaines@umsbanking.com> wrote:

Bob,

Please read David's e-mail below and let him know how you would like to proceed. They are being proactive on this and want to get this handled. Alon is working with them and has NEVER stiffed us before on any account. I know that we will not take losses on these accounts as long as Alon is behind them. Please let David know.

Thanks MAN!

Dylan


-------- Forwarded Message --------
**Subject:** Tech Support - CB Management; Reserves & Settlements
**Date:** Wed, 27 May 2015 12:05:38 -0700
**From:** Netistics LLC <netisticsllc@gmail.com>
**To:** Dylan Gaines <dylan.gaines@umsbanking.com>


Hi Dylan,

Hope your well.

We have been working on getting our CB rate and count lowered. Although as you see below, our count is rather low already. We have not even come close to breaching 100.

We are having rather good success on lowering our % although we are implementing the last step right now that will eliminate any future issues.
We also had some problems with Verify/Ethoca which are just now getting cleared up. No alerts were being triggered due to a system error on their part that was out of our control. Now that error is being addressed and we finally received our 1st alert today.
With all these items in place. Within 2 weeks, we can be at whatever reasonable figure Bob expects and needs.

As of now, our reserves are being taken out at a rate of $2k per month. With no limit.
Can we please create a limit & second, have Bob tell us what constraint he would like us to be under (both % and count) in order for this limit to stay in effect.

All we are asking for is the opportunity to show you that we can control our %'s & counts and if we succeed, that we no longer have to deal with a monthly reserve drain.

You can see that we are not ignoring this issue. We are trending down on two accounts and we will correct the 3rd account within 7 business days.

**SafeTech - CB % & Count**
Mar - 5.36% & 3    5.5% @ 2
Apr - 8.75% & 7    24.72% @ 7
May - 4.1% & 24    7.36% @ 22

Refunds from March through May : 11.09% to 10.8% to 4.5%

**SupportMega**

Mar - 0.7% & 1   0% @ 0
Apr - 10.8% & 39   11.37% @ 33
May - 7.79% & 24   9.716% @ 24

Refunds from March through May : .0812% to 6.95% to 7.93%

**iSupportTeam**
Apr - 0.86% & 4   1.12% @ 4
May - 14.67% & 11   **28.56% @ 12**

Refunds from March through May : 16.57% to 4.26% to 16.08%

**Reserve Totals To Date**
SafeTech - Merchant #:█████1522 - $6,000.00
SupportMega - Merchant #:█████1523 - $4,000.00
iSupportTeam - Merchant #:█████1537 - $12,075.84

Yesterday we unexpectedly had another $10k taken from our account. There was no notification of this which makes it difficult for us to forecast our financial resource needs.

Can we get some reserves released with the condition that we meet Bob's requested goals?

Finally. These settlements never came in on our behalf. It would be great to get these funds settled into our account.

5-20-15 A total of 6,635.79 has been settled for your account Netistics LLC - Support Mega
5-19-15 A total of 12,742.75 has been settled for your account Netistics LLC - Support Mega
5-18-15 A total of 4,870.80 has been settled for your account Netistics LLC - Support Mega
5-16-15 A total of 1,069.98 has been settled for your account Netistics LLC - Support Mega
5-15-15 A total of 10,404.71 has been settled for your account Netistics LLC - Support Mega
5-14-15 A total of 2,561.92 has been settled for your account Netistics LLC - Support Mega
5-12-15 A total of 1,501.99 has been settled for your account Netistics LLC - Support Mega.
5-06-15 A total of 399.99 has been settled for your account Netistics LLC - Support Mega.
4-24-15 A total of 249.99 has been settled for your account Netistics LLC - Support Mega.
4-22-15 A total of 401.98 has been settled for your account Netistics LLC - Support Mega.
Total: $40,831

*****************************************************************************************************
The information in this e-mail and in any attachments is CONFIDENTIAL and intended
for the sole use of the addressee(s) listed.
This e-mail may contain information that is confidential and exempt from disclosure
under applicable law.
You are hereby notified that any dissemination, distribution, duplication or
retaining of this transmission by someone other than the intended addressee or
addressee's designated agent is strictly prohibited.
If you have received this communication in error, please notify us by return (reply) e-mail immediately.
Thank you.
*****************************************************************************************************

--



**Bob Sarkisyan Risk Management**

Phone: [(818) 246-6767](tel:8182466767)
Fax: (818) 246-3631
[bob.sarkisyan@umsbanking.com](mailto:bob.sarkisyan@umsbanking.com)
[www.umsbanking.com](http://www.umsbanking.com)

---

*****************************************************************************************************************************
The information in this e-mail and in any attachments is CONFIDENTIAL and intended
for the sole use of the addressee(s) listed.
This e-mail may contain information that is confidential and exempt from disclosure
under applicable law.
You are hereby notified that any dissemination, distribution, duplication or
retaining of this transmission by someone other than the intended addressee or
addressee's designated agent is strictly prohibited.
If you have received this communication in error, please notify us by return (reply) e-mail immediately.
Thank you.
*****************************************************************************************************************************

--



**Bob Sarkisyan Risk Management**

Phone: (818) 246-6767
Fax: (818) 246-3631
[bob.sarkisyan@umsbanking.com](mailto:bob.sarkisyan@umsbanking.com)
[www.umsbanking.com](http://www.umsbanking.com)

*************************************************************************************************************

The information in this e-mail and in any attachments is CONFIDENTIAL and intended
for the sole use of the addressee(s) listed.

This e-mail may contain information that is confidential and exempt from disclosure
under applicable law.

You are hereby notified that any dissemination, distribution, duplication or
retaining of this transmission by someone other than the intended addressee or
addressee's designated agent is strictly prohibited.

If you have received this communication in error, please notify us by return (reply) e-mail immediately.

Thank you.

*************************************************************************************************************

**EXHIBIT 285**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 348

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**From:**          Secured Merchants, LLC. <donotreply@intuit.com>
**Sent:**          Friday, January 02, 2015 4:38 PM
**To:**            accounting@sbmmgmt.com
**Subject:**       Invoice from Secured Merchants
**Attachments:**   Invoice_11278_from_Secured_Merchants_LLC.pdf

**Follow Up Flag:**    Follow up
**Flag Status:**       Flagged


Secured Merchants, LLC.


Invoice   Due: 01/01/2015
11278   Amount:

$3,663.30



To: SBM Management Inc.

Here's your invoice!

We appreciate your prompt payment.

Thanks for your business!
Secured Merchants



View Invoice Now
<https://connect.intuit.com/portal/app/CommerceNetwork/?cta=viewinvoicen
ow&locale=en_US#view/e1a41503-838e-4d49-845f-24da04c9bfae>



Send message to your invoicer
<https://connect.intuit.com/portal/app/CommerceNetwork/?cta=sendmessage&
locale=en_US#view/e1a41503-838e-4d49-845f-24da04c9bfae>


<https://prod-qbo.intuitcdn.net/c27/v81.323/images/email_quickbooks_logo
.gif>
© Intuit, Inc. All rights reserved.   Privacy

**348 - 1**                                              **EXHIBIT 348**

<http://smallbusiness.intuit.com/small-business/privacy/index.jsp>  | Terms of Service <https://connect.intuit.com/portal/app/CommerceNetwork/#termsOfService>

2



Secured Merchants, LLC.
23679 Calabasas Rd. #531
Calabasas, CA  91302

(747)222-3333
securedmerchantsllc@gmail.com

# Invoice

| DATE | INVOICE NO. |
|------|-------------|
| 01/01/2015 | 11278 |
| TERMS | DUE DATE |
| Due on receipt | 01/01/2015 |

**BILL TO**

SBM Management Inc.
655 N. Central Ave. Suite 1700
Glendale, CA  91203

| QUANTITY | SERVICE | ACTIVITY | RATE | AMOUNT |
|----------|---------|----------|------|--------|
| 88 | CBA | CBA<br>• ChargeBack resolution automated services ($4 per record) (12-15-14 to 12-31-14) | 4.00 | 352.00 |
| 1159 | IVR | IVR<br>• IVR PBX solution per record charge of 0.70  (12-15-14 to 12-31-14) | 0.70 | 811.30 |
| 1 | CC | CC<br>• Click Connector | 2,500.00 | 2,500.00 |
| | | | TOTAL | $3,663.30 |

EXHIBIT 348

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 360

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

| | |
|---|---|
| **From:** | ImagisMedia Webgraphics <imagismediainc@gmail.com> |
| **Sent:** | Thursday, July 25, 2013 6:58 PM |
| **To:** | alon@mediaurge.com; Tal Karasso; Avi Argaman; Oren Ohayon; doron5000 @gmail.com |
| **Subject:** | NEW DESIGN LeELLE TUBES AND BOX |
| **Attachments:** | leElle-1.jpg; leElle-2.jpg; leElle-3.jpg |

Hi Guys take a look

Feedbacks welcome ;)

--

Thanks


--

Best Regards,
Ygal Edy

IMAGIS MEDIA INC.
www.imagismedia.com

T. (818) 528.5172
18653 Ventura Blvd. #268
Tarzana, CA 91356

 <http://www.imagismedia.com/logo.gif>

PRIVACY | CONFIDENTIALITY NOTICE:
This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.

**360 - 1**                                                          **EXHIBIT 360**







CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 361

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**       Doron .[doron@doron.us]
**From:**     Avico Global
**Sent:**     Wed 7/24/2013 11:44:18 AM
**Importance:**        Normal
**Subject:**  Fwd: LeElle New Presentation
**MAIL_RECEIVED:**    Wed 7/24/2013 11:44:32 AM
presentation-leelle new.pdf

fyi

---------- Forwarded message ----------
From: **Avico Global** <avicoglobal@gmail.com>
Date: Tue, Jul 23, 2013 at 11:07 PM
Subject: Fwd: LeElle New Presentation
To: Roi | Pinnacle <roi@pinlogistics.com>


fyi

---------- Forwarded message ----------
From: **ImagisMedia Webgraphics** <imagismediainc@gmail.com>
Date: Tue, Jul 23, 2013 at 10:55 PM
Subject: Fwd: LeElle New Presentation
To: Avi Argaman <avicoglobal@gmail.com>



--
**Thanks**

--

Best Regards,
Ygal Edy
IMAGIS MEDIA INC.
www.imagismedia.com

T. (818) 528.5172
18653 Ventura Blvd. #268
Tarzana, CA 91356



PRIVACY | CONFIDENTIALITY NOTICE:
This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF' S EXHIBIT 362

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**　　　Doron .[doron@doron.us]; Alon N[vigorect@gmail.com]
**From:**　　Avico Global
**Sent:**　　Tue 8/20/2013 3:49:45 PM
**Importance:**　　Normal
**Subject:**　oren / lelle
**MAIL_RECEIVED:**　Tue 8/20/2013 3:49:46 PM

Hi Doron,

As we all know working with Oren can lead to unnecessary headache,

Yesterday I spoke to Alon regarding Lelle and we agreed that Alon/Igor will own 100 percent of the new line and Alon/Igor will be able to use the line as they wish etc...

We Also agreed that I will be the one to tell Oren that we are no longer partners and that he can continue to do business with Alon and the Lelle product by purchasing the product from Alon.

Avi

**EXHIBIT 362**

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 367

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

**To:**      Doron .[doron@doron.us]
**From:**    Avico Global
**Sent:**     Wed 8/7/2013 3:38:16 PM
**Importance:**    Normal
**Subject:**  Fwd: [US > Auravie Skincare ] Shipping - Potential Cost Savings
**MAIL_RECEIVED:**   Wed 8/7/2013 3:38:17 PM

Fyi

---------- Forwarded message ----------
From: "Alon | H.Being" <vigorect@gmail.com>
Date: Aug 7, 2013 10:35 PM
Subject: Fwd: [US > Auravie Skincare ] Shipping - Potential Cost Savings
To: "Xposed Inc" <xposedinc@gmail.com>, "Avi Argaman" <avicoglobal@gmail.com>
Cc:


From: **David Migdal** <reply-9b63895a668402e7c7b1c1d693308f0f@asana.com>
Date: Wed, Aug 7, 2013 at 10:31 AM
Subject: [US > Auravie Skincare ] Shipping - Potential Cost Savings
To: Alon N <vigorect@gmail.com>


            **David Migdal added Alon N as a follower**10:27AM on August 7


      **David Migdal**
      **General:**
      **First Class Mail - Average is 3.1 days to arrive.**
      **Priority Mail - Average is 2.7 days to arrive.**

      **Priority Mail has a 15oz limitation.**
      **If a First Class mailer is above 13oz's, it automatically gets bumped to Priority Mail Status.**
      **Our goal - Under 13 oz.**
»
      **Once under 13oz.**
      **Out of the 8 zones the US postal service divides the country into. We could reach zones 1 through under 3 days. Pay $3.38 per order which includes Tracking.**
      **75% of customers would receive in 2 days.**
      **25% of customers would receive in 3 days.**

      **Further - Zones 5 & 6.**
      **For Zone 5 - 90% of customers would receive in 4 days.**


    9:58AM on August 7

            **David Migdal added the description**9:54AM on August 7

        **David Migdal added the name "Shipping - Potential Cost Savings"**9:54AM on August 7

        **David Migdal added to US > Auravie Skincare** 4:06PM on July 31


| Shipping - Potential Cost Savings |
| --- |
| Description |
| Evaluating if possible to go to First Class Mail for some customers, thereby paying only $3.38 per order as opposed to $5.50. |

**367 - 1**                  **EXHIBIT 367**

| Projects | US > Auravie Skincare |
|---|---|
| Followers | Alon N David Migdal Paul Medina Roi R |

**Reply to this email to comment,** view and edit **(as Alon N) in Asana, or** unfollow**.** You can also reply with "complete" to mark this task complete, or add a teammate to the "to" field to assign it to them.

CASE NO. 2:15-CV-04527-GW (PLAx)

Federal Trade Commission

VS. BunZai Media Group, Inc., et al.

PLAINTIFF'S EXHIBIT 368

DATE _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk

AO-386

| | |
|---|---|
| **From:** | Avico Global <avicoglobal@gmail.com> |
| **Sent:** | Wednesday, June 19, 2013 7:28 PM |
| **To:** | doron@securedcommerce.com |
| **Subject:** | Fwd: purchase order |
| **Attachments:** | OR-Purchase Order 7.docx; final presentation.pdf; OR-Purchase Order 10.docx; OR-Purchase Order.docx; OR-Purchase Order 4.docx; OR-Purchase Order 8.docx; OR-Purchase Order 9.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

PO from Oren


---------- Forwarded message ----------
From: Luzette Juliano <luzette@attitudeline.com>
Date: Tue, Jun 18, 2013 at 1:22 PM
Subject: purchase order
To: Avico Global <avicoglobal@gmail.com>
Cc: oren@attitudeline.com



Hi Avi,
How are you and good afternoon. Please see the attached purchase orders for Infini Skincare line.Please be informed
that i will be sending you 3 more purchase orders later or tomorrow morning. Just waiting for the
invoices: They
are as follows:

  Oded - collagen mask(no mud) and  hand renewal kit
  Shanghai Champion- cosmetic bag for nail kit
  China supplier   - wooden nail box for Hand Renewal
  China supplier   - magnet for the mask
  China supplier   - lip plummer bottle


Thank you. Avi, you can start the process. My clients are waiting since yesterday. I will look funny because they are
asking when they can buy the INFINI products.




Luzette Juliano
Business Development Manager
Beauty Beyond Time Enterprises
www.attitudeline.com
Telephone N0.18187178852

**EXHIBIT 368**

# PURCHASE ORDER

*From :  OR BEAUTY, 225 Flamingo St. Woodland Hills Ca,*
*91364 USA*

*To    :  Bio AntiAging ltd./Dr. M. Burstein Ltd.*
*Genin Oded*
*Hataasia St. North Industrial Zone*
*Askelon 78109 P.O.Box 1043 ISRAEL*

| PURCHASE ORDER | PAYMENT TERM | DELIVERY/SHIPPING |
|---|---|---|
| IB-101 | Bank T/T | By OCEAN |

| QTY | ITEM # | DESCRIPTION | JOB # | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 200 liters | IBBRC-01 | BREAST CONTOUR | 101 | $95.87/liter | 19,180.00 |
| 250 liters | IBCL- 02 | CELLU LIGHT | 101 | $9.14/liter | 2,285.00 |
| 300 liters | IBBDC-03 | BODY CONTOUR | 101 | $3.21/liter | 963.00 |
| 20 liters | IBT  - 04 | TULIP | 101 | $184.03/liter | 3,680.00 |
| 200 liters | IBSM- 05 | STRETCH MARK | 101 | $15.35/liter | 3,070.00 |
| 500 liters | IBSCRM-06 | SILKY CREAM MASK HAIR REMOVAL( three different kinds) | 101 | $14.00/liter | 7,000.00 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| | |
|---|---|
| SUBTOTAL | $36,178.00 |
| SALES TAX | 0.00 |
| TOTAL | $36,178.00 |

Note : The minimum order of Breast Contour is 200 liters.
Breakdown – Or Beauty = 100 liters
Alon        = 100 liters

# PURCHASE ORDER

From: OR BEAUTY, 225 Flamingo St. Woodland
      Hills Ca, 91364 USA

To   : Grafipack
      Contact Person- Martin Ceballos

| PURCHASE ORDER# | PAYMENT TERM | DELIVERY /SHIPPING |
|---|---|---|
| IB-104 | CHECK | OFFICE ADDRESS |

| QTY | ITEM # | DESCRIPTION | JOB | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 15,000 pcs. | IB-104A | 75ml Tube  box | 104 | 0.28/pc. | 4,200.00 |
| 10,000 pcs. | IB-104B | 100 ml. Jar box | 104 | 0.50/pc. | 2,800.00 |
| 5,000 pcs. | IB-104C | 100  ml. Jar box | 104 | 0.28/pc. | 1,400.00 |
| 2,500 pcs. | IB-104D | 6 ml. box for lip plumper | 104 | 0.18/pc. | 450.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | |
|---|---|
| SUBTOTAL | 8,850.00 |
| SALES TAX | 0.00 |
| TOTAL | 8,850.00 |

**EXHIBIT 368**

# PURCHASE ORDER

From: OR BEAUTY,225 Flamingo St. Woodland Hils
　　　 Ca, 91364 USA

To 　 : Rise Cosmetic Packaging Co., Ltd.

NO.68 XiTou Lu,LuDong Industrial Zone,Shangyu City,Zhejiang Prov.
312300,China
Tel:+86-575-8212-1689,8208-2698 Fax: +86-575-8202-6036
Email:sales2@risepack.com,rise@vip.sohu.com

| PURCHASE ORDER # | PAYMENT TERM | DELIVERY /SHIPPING |
|---|---|---|
| IB-107 | Bank Transfer | By Ocean |

| QTY | ITEM # | DESCRIPTION | JOB# | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 3,000 pcs. | IB- 107 A | Acrylic Ball RH-65 2-in-1 jar | 107 | $ 1.38/pc. | 4,140.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | SUBTOTAL | 4,140.00 |
| | | | | SALES TAX | 0.00 |
| | | | | TOTAL | 4,140.00 |

**EXHIBIT 368**

# PURCHASE ORDER

**From: OR BEAUTY,225 Flamingo St. Woodland Hils**
  **Ca, 91364 USA**

**To   : Beauty Channel Korea**

**36-1,Samjung-Dong,Ojing-Gu,Bucheon-City,**

**Kyunggi Province, Korea**

**TEL : 82 32-624-0985**

**FAX : 82 32-624-0976**

| PURCHASE ORDER # | PAYMENT TERM | DELIVERY /SHIPPING |
|---|---|---|
| IB-108 | Bank Transfer | By Ocean |

| QTY | ITEM # | DESCRIPTION | JOB# | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 1,000 pcs. | IB- 108 A | Eye Lash Grower | 108 | $ 3.90 | 3,900.00 |
| 1,000 pcs. | IB- 108 B | Eye Brow Enhancer | 108 | $ 3.90 | 3,900.00 |
|  |  | with box |  | $300.00 | 300.00 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| | SUBTOTAL | 8,100.00 |
|---|---|---|
| | SALES TAX | 0.00 |
| | TOTAL | 8,100.00 |

**EXHIBIT 368**

# PURCHASE ORDER

From: OR BEAUTY,225 Flamingo St. Woodland Hils
Ca, 91364 USA

To   : Xiamen Kangjlamei Cosmetic Packing Co.
Ltd.
6F, Water Building , No. 157 Lian Qian
West Road, Xiamen, China 361008
Contact Person -Linna

| PURCHASE ORDER # | PAYMENT TERM | DELIVERY /SHIPPING |
|---|---|---|
| IB-103 | Bank Transfer | By Ocean |

| QTY | ITEM # | DESCRIPTION | JOB# | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 15,000 pcs. | IB- 103 A | Plastic Glossy/Shinny look Flat Tube with flip top (75 ml/Stretch Mark/Silky Cream Mask Bikini & underarm/ Silky Cream Mask for face) | 103 | 0.25/pc. | 3,750.00 |
| 10,000  pcs. | IB-103 B | Plastic Glossy/Shinny look  Flat Tube with flip top (100 ml/Cellulight and Silky Cream Mask Body & Legs) | 103 | 0.25/pc. | 2,500.00 |
| 10,000 pcs. | IB-103 C | Plastic Glossy/Shinny look  Flat Tube with flip cap(( 50 ml./hand renewal) | 103 | 0.23/pc. | 2,300.00 |
| 10,000 pcs. | IB 103- D | Plastic Glossy/Shinny look Flat tube with flip cap(100ml /hand renewal) | 103 | 0.25/pc. | 2,500.00 |
| 10,000 pcs. | IB 103- E | Plastic Glossy/Shinny look Round Tube | 103 | 0.09/pc. | 900.00 |
|  |  | With screw cap( 4 ml./hand renewal) |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

|  | SUBTOTAL | 11,950.00 |
|---|---|---|
|  | SALES TAX | 0.00 |
|  | TOTAL | 11,950.00 |

# PURCHASE ORDER

From : OR BEAUTY,225 Flamingo St. Woodland Hills Ca
          91364 USA

To       : Ningbo Ningyi Import Export Ningbo China
              Room 423. No. 132 Renmin Road Ningbo
              China
              Contact Person- Julian Zhao

| PURCHASE ORDER | PAYMENT TERM | DELIVERY/SHIPPING |
|---|---|---|
| IIB-102 | Bank T/T | By Ocean |

| QTY | ITEM # | DESCRIPTION | JOB# | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 5,000 pcs. | IB- 102A | 30ml glass jar with cap | 102 | $0.58/pc. | 2,900.00 |
| 5,000 pcs. | Ib-102 B | 50ml glass jar with cap | 102 | $0.64/pc. | 3,200.00 |
| 5,000 pcs. | IB-102 C | 40ml.glass bottle with cap | 102 | $0.76/pc. | 3,800.00 |
| 5,000 pcs. | IB-102 D | 120ml. glass bottle with cap | 102 | $0.68/pc. | 3,400.00 |
| 5,000 pcs. | IB-102 E | 100ml. glass jar  with cap | 102 | $0.76/pc. | 3,800.00 |
| 5,000 pcs. | IB-102 F | Plastic Jar w/ Cap/Body Butter 200 ml. | 102 | $0.46/pc. | 2,300.00 |
| 10,000 pcs. | IB-102 G | Plastic Jar with Cap /Salt Scrubs 200 ml. | 102 | $0.46/pc. | 4,600.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | SUBTOTAL | 24,000.00 |
| | | | | SALES TAX | 0.00 |
| | | | | TOTAL | 24,000.00 |

**EXHIBIT 368**