DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
ZACHARY A. KELLER
zkeller@ftc.gov; Texas Bar No. 24087838
DAMA J. BROWN
Dbrown1@ftc.gov; Michigan Bar No. P54775
Federal Trade Commission
1999 Bryan Street, Ste 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9382 (Keller); (214) 979-9374 (Brown)
(214) 953-3079 (fax)
RAYMOND MCKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**BUNZAI MEDIA GROUP, INC.**, *et al.*<br><br>**Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S OPPOSITION TO RELIEF DEFENDANT CHARGEBACK ARMOR, INC.'S MOTION FOR SUMMARY JUDGMENT** |

PLAINTIFF'S OPPOSITION TO RELIEF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. Introduction ............................................................................................... 4

II. Procedural History. ................................................................................... 4

III. Factual Background. ................................................................................. 5

IV. Argument .................................................................................................. 7

A. CBA Received Ill-Gotten Gains from SM to Which It Has No Legitimate Claim………….. 7

B. As a Participant in the Common Enterprise, CBA Should Be Subject to Disgorgement…. 11

V. Conclusion .............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037 (N.D. Ga. May 7, 2012) ..9
*CFTC v. Walsh*, 618 F.3d 218 (2d Cir. 2010) ........................................................10
*FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d. 373 (D. Conn. 2009), aff'd, 654 F.3d 359 (2d Cir. 2011) ..........................................................................................9
*FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 U.S. Dist. LEXIS 90299 (C.D. Cal. July 12, 2016) ....................................................... 11, 12
*FTC v. Holiday Enterp.*, No. 1:06-CV-2939-CAP, 2008 WL 953358 (N.D. Ga. Feb. 5, 2008) ..........................................................................................................8
*FTC v. Inc21.com Corp.*, 745 F. Supp.2d 975 (N.D. Cal. 2010) *aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) ......................................................................................8
*FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013) ................................................................................................................................8, 9
*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010).........................9
*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000).............9
*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ...............9
*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998) ..........................................................8
*SEC v. Glauberman*, No. 90 Civ. 5205, 1992 WL 175270 (S.D.N.Y. Jul. 16, 1992) .................................................................................................................................9
*SEC v. Vassallo*, No. CIV-S-09-0665 LKK/DAD, 2012 U.S. Dist. LEXIS 71301 (E.D. Cal. May 21, 2012) .......................................................................................9

## I. Introduction

Relief Defendant Chargeback Armor, Inc. ("CBA") re-filed its Motion for Summary Judgment, including no new argument or evidence. Dkt. 541. Instead, CBA merely rehashes the same arguments that have failed to persuade this Court twice before. *See* Dkts. 264 (denying CBA's motion to unfreeze its assets); 456 (denying CBA's first Motion for Summary Judgment). The FTC respectfully requests this Court decline to reconsider its previous ruling. In the alternative, this Court should deny CBA's motion yet again.

This case concerns a deceptive scheme that defrauded consumers of more than $72 million; this Opposition seeks to ensure that CBA does not wrongfully receive a windfall at consumers' expense. The case against CBA is simple: CBA received $250,000 from Defendant Secured Merchants, LLC ("SM") to which it was not entitled and for which no consideration was granted. CBA has no legal or equitable claim to those funds, and those funds should be disgorged and applied toward the massive consumer injury that SM, CBA, and their cohorts caused.

## II. Procedural History

The FTC sued 32 defendants for operating this deceptive scheme and sued CBA as a relief defendant to recover $250,000 that it unjustly holds, to apply to consumer injury. CBA filed its initial motion for summary judgment with Defendants Alan Argaman and Secured Merchants, LLC on April 18, 2016. Dkt.

354. In denying this nearly identical motion, the Court noted "the parties argue over the *meaning* of evidence, not the *absence* of evidence." Dkt. 456, at 3. The Court further observed that the FTC's opposition made "clear that there is sufficient evidence to pose triable issues with respect to . . . whether Chargeback Armor, Inc. is properly considered a relief defendant." *Id.*

Following the denial of their summary judgment motion, CBA failed to file a motion for reconsideration. Then, after receiving approval from the Court to file a motion concerning limited, discrete issues, CBA instead filed another motion for summary judgment, Dkt. 541, including no new arguments, evidence, or explanation of why the Court should revisit its early ruling.

### III. Factual Background

The AuraVie defendants marketed skincare products over the Internet using deceptive offers with hidden costs, negative option continuity plans, and undisclosed, onerous return policies. Dkt. 353-2, at 76. Defendants falsely offered "risk free trials" or "gifts" of products to consumers nationwide using popup advertisements and website offers. *Id.* at 76-80. These offers were designed to trick consumers into purchasing products and incurring charges for products they did not want or order. *Id.* at 80-88.

The AuraVie defendants solicited consumers' credit card information by requiring consumers who accepted a purported "risk free trial" or "gift" to provide credit or debit card billing information, supposedly to pay nominal shipping and

handling fees to receive the advertised products. *Id.* at 88. However, 10 days after receiving consumers' billing information, the AuraVie defendants charged consumers the full costs of the products—imposing charges of up to $97.88 onto consumers' credit or debit cards. *Id.* Alongside the initial charge, the AuraVie defendants also enrolled consumers into a negative option continuity plan, in which Defendants shipped additional products each month and charged consumers' credit or debit cards the full costs of the products, usually $97.88 per month. *Id.*

When deceived consumers attempted to send unordered and unwanted purchases back for a refund, the AuraVie defendants generally refused to provide them with refunds. They relied upon onerous and unreasonable return policies in their Terms and Conditions, which were buried on a webpage accessible only by an obscure hyperlink at the bottom of the order page of the AuraVie defendants' websites. *Id.* at 90-94. In addition to requesting refunds, many consumers requested chargebacks[1] from their credit card providers in response to Defendants' unauthorized charges. *Id.* at 94-97. Like denying refunds, refuting consumer chargebacks was essential to the success of the scheme.[2] SM provided the

---

[1] A "chargeback" occurs when a consumer disputes a charge on his or her credit card statement as fraudulent or not authorized.

[2] Merchants that accept credit card payments contract with financial institutions called "acquiring banks" and use the services of payment processing companies. Acquiring banks have various rules that a merchant must follow to qualify for and retain access to a merchant account. Acquiring banks want to avoid losses associated with consumer reversals of credit card transactions (termed

AuraVie defendants this service, terming it "Chargeback Armor." Dkt. 231-1, at 41. SM ultimately spun off Chargeback Armor into the relief defendant in this case. In fact, CBA's purported CEO Mike Costache—formerly an employee of SM—wrote to an SM client that SM "established a new company, called Chargeback Armor, Inc., and we're transitioning all clients to be billed by this entity." *Id.* at 8. Indeed, CBA drafted prospectuses boasting of the "33,000 chargebacks" that "were processed in 2014 for our fist [sic] client, AuraVie." *Id.* at 5. It is this lack of distinction between the defendants, as well as their shared management, that led this Court to conclude that what "this case presents is a complex web of interlacing entities and individuals." Dkt. 354, at 3.

Indeed, shortly after CBA was formed, SM gave CBA the $250,000 at issue in this case, purportedly as a loan or equity purchase. See Dkt. 392-2, at 3, ¶5. However, the funds were never repaid, and no equity interest in CBA was ever transferred in kind. This action concerns the disposition of those funds.

IV. **Argument**

### A. *CBA Received Ill-Gotten Gains from SM to Which It Has No Legitimate Claim*

CBA received $250,000 from SM for no consideration and should be disgorged of these funds. Disgorgement of a relief defendant is warranted where the relief defendant (1) received ill-gotten gains and (2) does not have a legitimate

---

"chargebacks") and closely monitor the number of chargeback requests merchants receive.

claim to those gains.[3] The appropriate remedy against a relief defendant is an equitable monetary judgment equivalent to the amount of ill-gotten gains the relief defendant received. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1273.

Notably, government agencies, to maximize the recovery of funds taken through deception, may pursue individuals or companies even if they are no longer in possession of ill-gotten gains.[4] "The broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *FTC v. Ivy Capital, Inc.,* 2013 WL 1224613, *18 (quoting *SEC v. Colello*, 139 F.3d 676). While "ill-gotten gains

---

[3] *See FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613, * 18 (D. Nev. Mar. 26, 2013)(relief defendant who was responsible for keeping the books and for various operations or administrative tasks is liable for disgorgement); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) (relief defendant liable for the full amount off ill-gotten gains she received when she provided no service to the corporate defendants); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (summary judgment against a relief defendant who failed to show he had a legitimate claim to the ill-gotten gains he received); *FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1009 (N.D. Cal. 2010)*, aff'd* 475 Fed. Appx. 106 (9th Cir. 2012) (relief defendant liable for ill-gotten gains as he was "president" of a corporation "in name only" and provided no services to the corporation); *FTC v. Holiday Enterp.*, 2008 WL 953358, * 12 (N.D. Ga. Feb. 5, 2008) (relief defendant liable because "[s]he never performed any work for the [defendant] companies (except for occasional signing of checks) and would not have a legitimate claim to properties because of any work performed for the Holiday companies") ; *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020-22 (N.D. Ind. 2000) .

[4] *See*, *e.g., CFTC v. Gresham*, No. 3:09-cv-75, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.").

must be linked to the unlawful practices of the liable defendants," *FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009), *aff'd*, 654 F.3d 359 (2d Cir. 2011), direct tracing is unnecessary where, for example, there is a common enterprise or commingling of funds.[5] Moreover, a party lacks a legitimate claim to illegally obtained assets where he or she does not provide consideration for those funds. *SEC v. Vassallo*, No. CIV-S-09- 0665 LKK/DAD, 2012 U.S. Dist. LEXIS 71301, at *3 (E.D. Cal. May 21, 2012). Thus "the receipt of property as a gift, without the payment of any consideration, does not create a 'legitimate claim' sufficient to immunize the property from disgorgement." *CFTC v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010).

Here, CBA concedes that it received $250,000 from SM, a defendant in this case. Dkt. 541, at 3-4. CBA also does not contest that SM received over $300,000 from SBM Management, Inc., a defendant in this action that has a $72 million default judgment stemming from its role in the common enterprise.[6] CBA appears to admit that SM received no actual consideration for these funds:

According to CBA's purported CEO, SM and CBA executed a "Capital

---

[5] *See FTC v. Network Serv.'s Depot, Inc.*, 617 F.3d 1127, 1142 (9th Cir. 2010); *see also SEC v. Glauberman*, No. 90 Civ. 5205, 1992 WL 175270, at *2 (S.D.N.Y. Jul. 16, 1992)(rejecting the argument that disgorgement is not appropriate because "the challenged transfers cannot be traced dollar for dollar to profits from insider trading").

[6] Dkt. 532; *see also* Dkt. 120, at 25 ("Secured Merchants received more than $300K from SBM Management, Inc., which in turn received millions from entities owned, controlled or operated by the Defendants and which sell or market products via 'free trial' offers on line.").

Infusion Agreement," whereby CBA would grant SM equity in exchange for the $250,000. Dkt. 231-1, at 53-54. This exchange for equity never occurred, and the $250,000 at issue in this case is money that SM has simply given CBA, whether as a gift or otherwise. *See* 392-2, at 3 ¶6 (noting that "this granting of equity ownership interest to SM never came to fruition.").

CBA's sole argument for retaining the funds is that the money it received from SM is traceable to unrelated third-party sources. *See, e.g.*, Dkt. 392-2, at 3 ¶5. This claim fails for two reasons. First, the FTC need not show dollar-for-dollar tracing where, like in this case, a common enterprise or commingling of funds exists. *FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 U.S. Dist. LEXIS 90299, *21 (C.D. Cal. July 12, 2016)("Direct tracing is unnecessary where, for example, there is a common enterprise or commingling of funds."). Second, and equally compelling, CBA cites no evidence establishing these funds came from outside the common enterprise. CBA relies on executed third party contracts as proof that the source of the funds was from outside the common enterprise. However, these contracts merely show that third parties agreed to pay SM; they do not show that the money SM gave to CBA came from these third parties. In fact, even by CBA's own account, this money was commingled with other funds. *See* Dkt. 392-2, at 3 (claiming that third party funds were deposited into SM's account, which "had a bank balance of just $200.").

The fact is that SM was so financially dependent on the AuraVie scheme

that its continued existence—and all the revenue it could generate from that existence—were inextricably tied to deceiving consumers through AuraVie. SM could not help but commingle all its assets with AuraVie funds because those AuraVie funds were necessary for its survival. In her review of SM, the Receiver concluded that at least 40 percent of Defendant SM's revenue came from consumer funds and that SM lacked funds "for continued operations" without income from the common enterprise. Dkt. 120, at 82. Thus, given SM's dependence on revenue from AuraVie and SM's failure to provide contrary evidence, the Relief Defendant has failed to show that it has a legal or equitable claim to the funds at issue.

### B. As a Participant in the Common Enterprise, CBA Should Be Subject to Disgorgement

CBA's role in the common enterprise bolsters the argument that the funds it received from the SM should be disgorged. A recent FTC case in the Central District of California supports this conclusion. In *FTC v. Good Ebusiness, LLC*, No. 2:16-cv-01048-ODW-JPR, 2016 U.S. Dist. LEXIS 90299 (C.D. Cal. July 12, 2016), the Court disgorged a relief defendant of funds received from a common enterprise under similar facts. After first noting the illegally obtained funds were given with no consideration, the *Ebusiness* court held that disgorgement was appropriate "because there is evidence of a common enterprise." *Id.* at *21.

### 1. CBA Was Controlled by the Individual Defendants

PLAINTIFF'S OPPOSITION TO RELIEF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

As in *Good Ebusiness*, the facts show CBA's operational, managerial, and financial integration within the AuraVie enterprise. Although CBA now contends that it has no connection to the other AuraVie defendants or the scheme itself, it previously stated otherwise. CBA solicited further investors using documents that identified Defendants Alon Nottea, Alan Argaman, and Roi Reuveni as its board of directors. Dkt. 231-1, at 36.[7] A CBA executive summary lists Alon Nottea as President, Argaman as Chief Technology Officer, and Reuveni as Customer Service Manager alongside Costache as CEO and Tyler Reitenbach—an erstwhile SM employee, *see* Dkt. 396-3, at 13—as Sales Account Manager. Dkt. 231-1, at 6. When CBA was established, Alan Argaman informed CBA's accountants that "[w]e intend to issue shares to Alon and I and possibly one more investor." Ex. 404-2. CBA's office lease identified Doron Nottea, Alan Argaman, and Mike Costache as authorized to receive mail on behalf of CBA. Dkt. 231-1, at 21; *see also* Dkt. 120 at 22.

Written communications confirm that Roi Reuveni,[8] Alon Nottea,[9] and

---

[7] Mike Costache, the purported sole shareholder, director, and officer of CBA, claims in his sworn declaration that the investor solicitation was a sham "to obtain funding and thus had to list a full board and list of officers to attract investors." Dkt. 354-1, at ¶2. Thus, he at once concedes that other Individual Defendants were held out as officers and directors of CBA while at the same time claiming that they did so to deceive potential investors.

[8] *See* Dkt. 231-1, at 11 (Reuveni received an email regarding Chargeback Armor's hiring decision); *id.* at 14 (same); *id.* at 23 (same); *id.* at 15 (referring to the Chargeback Armor "team," which appears to include Roi Reuveni).

[9] Dkt. 231-1, at 9 (Mike Costache requested that Defendant Roi Reuveni create a Chargeback Armor email address for Defendant Alon Nottea and also referenced

Doron Nottea[10] each played a role in CBA's operations. For example, Reuveni's duties as COO were outlined in email exchanges by Reuveni and Costache. Dkt. 231-1, at 26-27. Costache executed bank documents identifying Doron Nottea as CBA's corporate secretary and giving him authority over CBA's financial accounts. Dkt. 231-1, at 46. Indeed, in an email to Chargeback Armor CEO Mike Costache, Alon Nottea indicated that he had a vote in Chargeback Armor's decisions and that Mike Costache's compensation was at least in part determined by him:

> "That being said, I hold you, personally responsible and accountable for making the right decisions on behalf of our company... These (right or wrong) decisions are in turn, directly attributable to your own incentive plan... If the right focus, dedication, passion, and fire in the eyes is there, you have my blessing and my vote...."

*See* Dkt. 231-1, at 26. Costache even acknowledged in writing that Alon Nottea and Alan Argaman were owners of Chargeback Armor—the only question was which shell corporation would offer the most tax advantages while disguising their ownership. *See* Dkt. 231-1, at 50 ("The only thin[g] I need you guys to decide upon is if you two will be shareholders (at least for now) th[r]ough Secured

---

Nottea receiving business cards and possibly receiving calls forwarded from the company's 800 number); *id.* at 11 (Alon received an email regarding Chargeback Armor's hiring decision); *id.* at 15 (referring to the Chargeback Armor "team," which appears to include Alon Nottea, Doron Nottea, Roi Reuveni, and Alan Argaman); *id.* at 39 (Alon Nottea assisted employees with Chargeback Armor's sale pitch).

[10] *See* Dkt. 231-1, at 10 (An email in which Mike Costache explains a business expense to Defendant Doron Nottea); *id.* at 34.

PLAINTIFF'S OPPOSITION TO RELIEF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Merchants. You can later decide through which entities you will individually own your shares in CBA [Chargeback Armor] if through SM [Secured Merchants] is not the most tax advantageous.").

The Receiver's review of CBA's assets corroborate the documentary evidence of CBA's relationship to the larger common enterprise. CBA's relationship to other Corporate and Individual Defendants ultimately led the Receiver to subject CBA's assets to a freeze because their ties to the AuraVie scheme "demonstrate the freeze on Chargeback Armor's assets was proper." Dkt. 120, at 24. The Receiver found that many of the participants in the AuraVie scam—including those named as Individual Defendants—helped operate and manage CBA, including Roi Reuveni (CBA's Chief Operating Officer and consultant); Dkt. 120, at 24; Alon Nottea (held out by Defendant Latsanovski as CBA's owner);[11] and Doron Nottea (listed as an account owner on CBA's bank account); Dkt. 120 at 23.

2. **CBA Participated in the Common Enterprise**

CBA claims it would have been impossible for it participate in the common enterprise because it was incorporated only after the AuraVie business "had been shuttered." Dkt. 541, at 3. CBA's own Executive Summary, however, boasted of the "33,000 chargebacks [that] were processed

---

[11] As noted by the Receiver, "Igor Latsanovski testified that Chargeback Armor 'was Alon[ Nottea]'s company.'" Dkt. 120, at 23 n.39. In addition, Paul Medina testified to believing that Alon Nottea owned CBA. Dkt. 476-7, AT 25:2-6.

in 2014 for our fist [sic] client, AuraVie, an anti-aging skincare company." Ex. 281-2. And Alon Nottea, the mastermind of the AuraVie scheme, confirmed that CBA participated in the enterprise:

> Q. So Chargeback Armor provided some of the AuraVie companies['] chargeback rebuttal—
> 5 A. Yes, they did.

Dkt. 353-19, at 138:3-16. Defendant Alon Nottea's testimony is bolstered by evidence showing that Defendant Argaman, along with Defendants Alon Nottea and Roi Reuveni, received statistics detailing chargeback numbers for various CBA clients that included AuraVie. Ex. 151.Thus given the lack of consideration for SM's transfer to CBA, the ill-gotten nature of the funds SM invested, and CBA's clear role in aiding the AuraVie scheme, equity demands that CBA be required to disgorge the ill-gotten gains it reaped from the AuraVie scheme. Therefore, the court should deny CBA's motion.

## V.     Conclusion

For the forgoing reasons, the FTC respectfully requests that the Court deny Relief Defendant CBA's Motion for Summary Judgment.

Respectfully submitted,

Dated: 9/30/16

/s/ REID TEPFER_____
REID A. TEPFER
LUIS H. GALLEGOS
ZACHARY A. KELLER
Attorneys for the Plaintiff

Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 979-9382 (Keller)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov
zkeller@ftc.gov

# CERTIFICATE OF SERVICE

The undersigned certifies that on September 30, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

| | |
|---|---|
| Erik S Syverson<br>Raines Feldman LLP<br>9720 Wilshire Boulevard Fifth Floor<br>Beverly Hills, CA 90212<br>esyverson@raineslaw.com<br>*Counsel for Oz Mizrahi* | Telephone: (714) 641-3600 Ext. 214<br>*Counsel for Igor Latsanovski and CalEnergy, Inc* |
| Robert M. Ungar<br>Crosswind Law<br>14724 Ventura Blvd Penthouse<br>Sherman Oaks, CA 91403<br>rmu@crosswindlaw.com<br>*Counsel for Alon Nottea and Roi Rueveni* | Sagar Parikh<br>Beverly Hills Law Corp. PC<br>433 N. Camden Drive, 6th Floor<br>Beverly Hills, CA 90210<br>SP@BeverlyHillsLawCorp.com<br>*Attorney for Paul Medina, Secured Merchants, LLC, and Chargeback Armor, Inc.* |
| Robert Esensten<br>Esensten Law<br>12100 Wilshire Blvd., Suite 1660<br>Los Angeles, CA 90025<br>resensten@esenstenlaw.com<br>*Counsel for Doron Nottea and Motti Nottea* | Charlene Cantrell Koonce<br>Receiver<br>Scheef & Stone<br>500 N. Akard, Suite 2700<br>Dallas, Texas 75201<br>charlene.koonce@solidcounsel.com<br>*Receiver* |
| Jeffrey Benice<br>Law Offices of Jeffrey S. Benice<br>A Professional Law Corporation<br>3080 Bristol Street<br>Sixth Floor, Suite 630<br>Costa Mesa, CA 92626 | Kelly M. Crawford<br>Scheef and Stone<br>500 N. Akard, Suite 2700<br>Dallas, Texas 75201<br>kelly.crawford@solidcounsel.com<br>*Counsel to Receiver* |

/S/ REID TEPFER
REID TEPFER