DAVID C. SHONKA
Acting General Counsel

DAMA J. BROWN
Dbrown1@ftc.gov
Regional Director

REID TEPFER
rtepfer@ftc.gov; Tex. Bar No. 24079444
LUIS GALLEGOS
lgallegos@ftc.gov; Okla. Bar No. 19098
ZACHARY A. KELLER
zkeller@ftc.gov; Texas Bar No. 24087838
DAMA J. BROWN
Dbrown1@ftc.gov; Michigan Bar No. P54775
Federal Trade Commission
1999 Bryan Street, Ste 2150
Dallas, Texas 75206
(214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
(214) 979-9382 (Keller); (214) 979-9374 (Brown)
(214) 953-3079 (fax)
RAYMOND MCKOWN
rmckown@ftc.gov; Cal. Bar No. 150975
10877 Wilshire Boulevard, Ste 700
Los Angeles, California 90024
(310) 824-4343(voice); (310) 824-4380 (fax)

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BUNZAI MEDIA GROUP, INC.,** *et al.*<br><br>**Defendants.** | **Case No. CV 15-4527-GW(PLAx)**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS ALAN ARGAMAN AND SECURED MERCHANTS, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT** |

# Table of Contents

I.   Introduction..…………………………………………….............2

II.  Procedural History………………………………………………3

III. Factual Background……………………………………………...4

    A.   Defendants' Business Practices……………………………...4

    B.   Defendants' Problems with Refunds and Chargebacks……….5

    C.   The Common Enterprise……………………………………...6

IV.  Legal Argument………………………………………………….7

    A.   Corporate Defendant SM's Integral Role in the Scheme Justifies Injunctive Relief and Joint and Several Monetary Liability………...7

        1.   SM's Role in the Common Enterprise……………………….8

        2.   SM's Role in the Common Enterprise was Central to the Scheme's Financial Success…………………………………13

    B.   Defendant Secured Commerce, LLC Participated in the Common Enterprise…………………………………………………...15

    C.   Individual Defendant Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability………16

        1.   Defendant Argaman's Participation in, or Control over, the Common Enterprise was Critical to the Scheme's Success…18

        2.   The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception………………………...20

V.   Conclusion…………………………………………………...21

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ...............................................9

*FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)................................10

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) ................. 19, 22

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ......................9

*FTC v. Ivy Capital, Inc.,* No. 11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013)9

*FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000)........18

*FTC v. JK Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Ca. 2000) .....................9

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)...........9

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010).........................9

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010) 19, 20, 22

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) .. 18, 19, 20

*FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).........................................19

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ...19

*FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008) .......10

*FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ....................................................................................19

*Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ................19

## I.      Introduction

Defendants Alan Argaman and Secured Merchants, LLC re-filed their Motion for Summary Judgment, including no new argument or evidence. *Compare* Doc. No. 354 *with* Doc. No. 542. Instead, Defendants frivolously rehash the same arguments that have previously failed to persuade this Court.[1] The FTC respectfully requests this Court decline to reconsider its previous ruling. In the alternative, this Court should deny Defendants' motion yet again.

This case concerns a deceptive scheme that defrauded consumers of more than $72 million. Defendant Alan Argaman was a principal and active member in the scheme. His companies, Defendants Secured Merchants, LLC ("SM") and Secured Commerce, LLC ("SC") played a similarly critical role in the common enterprise. (In fact, Argaman did not even attempt to defend Secured Commerce, and a $72 million default judgment was entered against it.) As such, both should be held jointly and severally liable.

In response to the FTC's charges to hold them liable for their roles in the deceptive scheme, Defendants portray their roles as a collection of half-measures, each aiding the enterprise but never quite crossing the line to illegality. For example, Defendant Argaman admits to designing the enterprise's website, but purportedly only for a "straight-sale" version limited to legitimate sales. He

---

[1] *See* Doc. 456 (denying Defendants' first Motion for Summary Judgment).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2

admits to SM's aiding AuraVie's chargeback abuses, but only as an oblivious arms-length contractor. He admits to allowing his co-conspirators to control SM's bank accounts, bookkeeping, and employee records, but only because these co-conspirators were his longtime friends. His friendship similarly motivated his sharing office space with his co-conspirators. Each of the roles they played in the scheme is qualified with a "yes, but…" that Defendants apparently hope will allow them to escape liability.

Unsurprisingly, the evidence tells a different, more plausible story. Instead of half-measures committed by arms-length, third-party participants who were merely friends of the other Individual Defendants, Argaman and his companies were central players in the common enterprise. Accordingly, this Court should instead again deny their motion for summary judgment.

## II.    Procedural History

Defendants filed their initial motion for summary judgment on April 18, 2016. Doc. No. 354. In denying this MSJ, the Court noted "the parties argue over the *meaning* of evidence, not the *absence* of evidence." The Court further observed that the FTC's opposition made "clear that there is sufficient evidence to pose triable issues with respect to Argaman's individual liability[.]"

Following the denial of their summary judgment motion, Defendants failed to file a motion for reconsideration. Then, after receiving approval from the Court

3

1   to file a motion concerning limited, discrete issues, Defendants instead re-filed

2   their MSJ, *See* Doc. No. 543, at 4, and Doc. No. 538, including no new arguments,

3   evidence, or explanation of why the Court should revisit its early ruling. In

4   response, the FTC filed a motion to quash Defendants' improperly filed MSJ and

5   this opposition. *See* Doc. No. 543, at 4. Because Defendants gave the Court the

6   false impression that they would not be merely re-filing their MSJ, Plaintiff was

7   denied the opportunity to re-file its MSJ. *See id.*

8   **III.    Factual Background**

9              ***A. Defendants' Business Practices***

10             Defendants marketed skincare products over the Internet using deceptive

11  offers with hidden costs, negative option continuity plans, and undisclosed,

12  onerous return policies. Doc. No. 353-2, at 76. Defendants falsely offered "risk

13  free trials" or "gifts" of products to consumers nationwide using popup

14  advertisements and website offers. *Id.* at 76-80. These offers were designed to

15  trick consumers into purchasing Defendants' product and unwittingly enrolling

16  into Defendants' negative option continuity plan, which automatically charged

17  consumers for additional products each month. *Id.* at 80-88.

18             Defendants solicited consumers' credit card information by requiring

19  consumers who accepted their purported "risk free trial" or "gift" to provide credit

20  or debit card billing information, supposedly to pay nominal shipping and

4

handling fees to receive the advertised products. *Id.* However, 10 days after

receiving consumers' billing information, Defendants charged consumers the full

costs of the products—imposing charges of up to $97.88 onto consumers' credit

or debit cards. *Id.*

Defendants also enrolled consumers into a negative option continuity plan,

in which Defendants shipped additional products each month and charged

consumers' credit or debit cards the full costs of the products, usually $97.88 per

month. *See* Doc. No. 353-2, at 81 ¶52.

### B. Defendants' Problems with Refunds and Chargebacks

When deceived consumers attempted to send unordered and unwanted

purchases back for a refund, Defendants generally refused to provide them with

refunds. Doc. No. 353-2, at 82. Many consumers requested chargebacks[2] from

their credit card providers in response to Defendants' unauthorized charges. *Id.* at

94. Just like denying refunds, refuting consumer chargebacks was essential to the

success of the scheme and the retention of profits.[3] Argaman and his company,

SM, provided Defendants this service, which it termed "Chargeback Armor." *See*

---

[2] A "chargeback" occurs when a consumer disputes a charge on his or her credit
card statement as fraudulent or not authorized.

[3] Merchants that accept credit card payments contract with financial institutions
called "acquiring banks" and use the services of payment processing companies.
Acquiring banks have various rules that a merchant must follow to qualify for and
retain access to a merchant account. Acquiring banks want to avoid losses
associated with consumer reversals of credit card transactions (*i.e.*, chargebacks)
and closely monitor the number of chargeback requests merchants receive.

5

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exh. 257. SM's Chargeback Armor service was designed to "help [] win back lost revenue by reversing chargebacks in your favor." *Id.*

### C. The Common Enterprise

As the Court previously observed, "this case presents is a complex web of interlacing entities and individuals." Doc. No. 354, at 3. The Court's Receiver identified as many as two dozen corporate entities that Defendants used to carry out their scheme. *See* Doc. No. 121-3, at 4-5. Defendants collectively operated these corporations from the same physical location, with the same employees, and using commingled funds generated from the sale of the same products. Defendants recruited friends and family to serve as figurehead owners of their various shell corporations, which Defendants used to open dozens of merchant accounts. *See* Doc. No. 353-2, at 71 ¶h. In return, these figurehead "CEOs" were paid the equivalent of one percent of sales through merchant accounts opened in their name. *See, e.g.*, Doc. 353-2, at 39 ¶34(h)(xii).

Defendants created this complex corporate web to disguise their ownership of the enterprise and manipulate their chargeback rate to deceive their merchant processors. This "complex web" allowed Defendants to engage in a practice called "load balancing," through which Defendants strategically placed consumer chargebacks across their many merchant accounts to artificially keep their

6

chargebacks at an acceptable level for their merchant processors. *See, e.g.*, Doc. No. 353-2, at 21 ¶32(m), and 25 ¶ 32(s)(ii).

## IV.   Legal Argument

### A.   *Corporate Defendant SM's Integral Role in the Scheme Justifies Injunctive Relief and Joint and Several Monetary Liability*

To determine whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming company was liable because it was part of a "maze of interrelated companies"). Courts "consider[] factors such as: [1] common control; [2] the sharing of office space and officers; [3] transacting business through a maze of interrelated companies; [4] the commingling of corporate funds and failure to maintain separation of companies; [5] unified advertising; and [6] evidence that reveals that no real distinction exists between the corporate defendants." *Grant Connect*, 827 F. Supp. 2d, at 1216 (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)); *see also FTC v. Ivy Capital, Inc.*, No. 11-283, 2013 WL 1224613 at *13 (D. Nev. Mar. 26, 2013). Where, as here, corporate defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) ; *FTC v. JK Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Ca. 2000) .

7

The Ninth Circuit has held that "entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010). Other courts have recognized that "[i]t is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an 'unholy' alliance." *FTC v. Websource Media, LLC*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)(citing *FTC v. Ameridebt*, 343 F. Supp. 2d. 451, 462 (D. Md. 2004)).

### *1. SM's Role in the Common Enterprise*

To challenge SM's liability, Defendants forgo discussing SM's actual conduct, opting instead to summarily assert that SM does not meet the common enterprise liability standard. *See generally* Doc. No. 542, at 9-16. Their argument fails to reflect the full facts of this case, which reveal that SM was an integral cog in the AuraVie machine. The evidence in this case demonstrates that the six elements of common enterprise liability are met:

(1) Interrelated Companies and (2) Common Control

Regarding (1) transacting business through a maze of interrelated companies, as well as (2) common control, Defendants claim "there is no

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

evidentiary support" for SM sharing employees with other Corporate Defendants, Doc. No. 542, at 11, and that SM was operated solely by Defendant Argaman.[4] Both documentary and testamentary evidence contradict this claim, however, and reveal SM was operated by various Individual Defendants and employees shared with other Corporate Defendants.

The involvement of other AuraVie individual defendants begins with Defendant Doron Nottea ("Doron"). Doron, among other things, handled the finances for virtually all Corporate Defendants involved in the common enterprise, including SM and CBA. Defendants' claim that Doron "never undertook any actions in furthering SM's business." Doc. No. 542, at 10. In fact, Doron controlled SM's bank account and held himself out as an owner of SM, listing his status as "Member" in bank documents. Ex. 176-2.[5] He also testified that he provided bookkeeping services to SM.[6] These services included authorizing payments for SM's payroll[7] from SM's accountant, who referred to SM's account as "your [*i.e.*, Doron's] account." *See* Doc. No. 396-3, at 10-11;

---

[4] *See* Doc. No. 542, at 7 ("SM is not controlled by, owned, or operated by any of the other defendants").

[5] He also created the email address securedmerchantsllc@gmail.com. Doc. No. 353-2, at 73 ¶43(b)(v).

[6] Doc. No. 353-2, at 40 ¶34(h)(xvi); *see* Doc. No. 353-19, at 153:2-9.

[7] Davidian's firm handled accounting for most of AuraVie's entities. *See* Doc. No. 353-2, at 20 ¶32(k)(iii); *id.* at 32 ¶34(d)(ix); *id.* at 41 ¶ 34(i)(ii), *id.* at 42 ¶(i)(iii); *id.* at 73 ¶43(b)(iv).

9

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   396-3, at 13. ) Doron also provided access to SM's employee records to SM's

2   accountant. Doc. No. 353-2, at 73 ¶43(b)(iv).

3   　　　Doron served these roles either because he had a role in building and

4   managing SM's business or perhaps, as Defendant Argaman would have it, as a

5   mere token of "friendship." *See* Doc. No. 542, at 10. But regardless of his

6   motives, Doron unquestionably had access to, and control of, SM's entire

7   financial and corporate structure and was critical to its operations. This

8   characterization also gels with Doron's own understanding of SM's relationship to

9   the other AuraVie companies: he provided the common enterprise's accountant a

10   list of "Bunzai Companies" that included SM. Doc. No. 353-2, at 73 ¶43(b)(iv).

11   　　　Other Co-Defendants were similarly involved in or controlled SM's

12   operations. Defendant Roi Reuveni worked for SM, Doc. No. 353-2, at 55

13   ¶37(i)—and even held himself out as an owner of SM when he signed a contract

14   on SM's behalf as SM's "Managing Member." Doc. No. 353-2, at 55 ¶37(i)(i);

15   Ex. 412-5. In addition, SM's Operating Agreement listed Defendant Alon Nottea

16   and Alan Argaman as the Managers. Doc. No. 353-2, at 72 ¶43(b)(ii); Ex. 255-22.

17   Finally, according to nonprivileged attorney invoices, Defendant Igor Latsanovski

18   attended and was involved in meetings with SM and its counsel. Doc. No. 353-2,

19   at 73 ¶43(b)(iii).

20   　　　SM also shared employees with other Corporate Defendants. Robert

10

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Stayner and Tyler Reitenbach were both employees of SM while employed by other Corporate Defendants—Stayner an employee of SBM Management, Inc. and Reitenbach an employee of Pinnacle Logistics, Inc. and later Chargeback Armor, Inc ("CBA"). Exs. Doc. No. 396-3, at 10-11; *id.* at 13; 370; 391; Doc. No. 396-3, at 25-28. Thus SM, far from being an arms-length contractor, was operationally and managerially integrated into AuraVie's operations.

(3) Commingling of Funds

Defendants deny commingling funds with the rest of the common enterprise. But here too their argument does not fully reflect the facts. Defendants admit to having financial relationships with its Co-Defendants: for example, they concede that SM received funds from SBM Management, Inc. Doc. No. 542, at 15.  SBM Management "received millions from entities owned, controlled or operated by Defendants and which sell or market products via 'free trial' offers on line." Doc. No. 120, at 25. In addition, Defendants concede that SM provided $250,000 to establish Defendant Chargeback Armor, Inc., an entity that, like SM, refuted chargebacks for Defendants, among others. Doc. No. 353-2, at 18 ¶26(b)(i).

Defendants contend that because SM sent an invoice to SBM, shifting money between these "BunZai compan[ies]" was an arms-length transaction. Doc. No. 542, at 15. But this logic fails to reflect SM's financial dependence on the

11

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

AuraVie scheme.[8] The complex corporate network that AuraVie built, depended on transfers between entities to sustain their operations. *See* Doc. No. 121-1, at 3. Moreover, just as SM shared officers and employees with other AuraVie Corporate Defendants in this case, those same AuraVie principals understood SM to be a "BunZai company." Doc. No. 353-2, at 73 ¶43(b)(iv).

(4) Marketing the Scheme

When (4) marketing the scheme, SM did not itself advertise for AuraVie. Instead, like all other AuraVie Defendants not responsible for that discrete area of the enterprise, it relied upon entities such as Media Urge, Inc. and Focus Media Solutions, Inc. to provide consumers the deceptive advertising that led to the entities' revenue streams. *See* Doc. No. 353-2 at 11 ¶19 and 13 ¶24. Nonetheless, however, Defendant Argaman spearheaded a marketing campaign for AuraVie called the "AuraVie Angels." Doc. No. 353-2, at 59 ¶39(d)(x).

(5) Distinction Between Entities and (6) Maintaining a Shared Office

Regarding (5) the distinction between entities, SM's sharing officers, certified professional accountant, funds, and employees with other AuraVie entities is supported by two additional facts. First, SM (6) shared an office with their co-conspirators, the same office where the entire AuraVie operation was managed. *See* Doc. No. 120, at 12-13. Doron noted that he and Argaman were

---

[8] The Receiver determined that without AuraVie it lacked funds "for continued operations," Doc. No. 120, at 82.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

"sitting in the same building . . . We were sharing an office[.]" Ex. Doc. 353-19, at 153:2-9.

In addition, SM and Relief Defendant Chargeback Armor, Inc.'s operations were virtually indistinguishable. SM created and developed Chargeback Armor: before Chargeback Armor, Inc. was formed, SM labeled its own chargeback refutation service as "chargeback armor." Exh. 257. Its "Standard Service Agreement" stated that SM's services were provided through chargebackarmor.com. Doc. No. 232-3, at 61 ¶39(f)(i)-(iii). Moreover, Mike Costache, an SM employee and the purported CBA CEO, referred to SM as "the technology company that developed the CBA product" and noted that SM was "transitioning all clients to be billed" by CBA. Doc. No. 231-1, at 8.

### 2. SM's Role in the Common Enterprise was Central to the Scheme's Financial Success

Secured Merchants's Executive Summary makes plain its close relationship with AuraVie:

> Over the past two years, the founders of Secure Merchants saw first-hand every type of failure trap that could have killed their skin care product company, which today has monthly sales of $2.5 million or 25,000 orders.

> Thus the problems that our three initial services solve for any DRM [Direct Response Marketing] company are the core infrastructure needed to deal with (1) the inevitable credit card chargebacks, (2) keeping customers happy or allowing them an easy opt-out, and

13

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

            (3) providing the most sophisticated customer record management system.

2

*See* Doc. No. 353-2, at 15¶26(c).

3

Despite this, Defendants' now claim that SM had only a "routine arms' length

4

business relationship[]" to the AuraVie scheme, Doc. No. 542, at 15. This claim

5

fails to reflect the evidence. Defendants contend that SM billed SBM

6

Management, Inc. for services "completely unrelated to the alleged sale of

7

skincare using deceptive marketing and advertising." Doc. No. 542, at 15.

8

       The invoices Defendants point to are for services that were critical to

9

perpetuating the AuraVie scheme, including (1) chargeback resolution through

10

their "ChargeBack Armor" service; Doc. No. 353-2, 60-62 ¶39(f); (2) automated

11

customer service systems; Doc. No. 353-2, at 15 ¶26(b)(i); and (3) managing

12

negative option continuity plans through a customer relationship management

13

software called LimeLight. Doc. No. 353-2, at 58 ¶39(d)(v).

14

       SM's services were critical to the AuraVie scheme because chargebacks are

15

a major concern for any business that relies on accepting credit card payments.

16

Defendants' chargeback rates were remarkably high and rose as high as 35

17

percent,[9] causing constant concern for Defendants. *See, e.g.*, Doc. No. 387-1, at 1-

18

---

19

[9] *See* Doc. No. 121-1, at 8 ("Analysis of the entities' chargeback rates indicates the rates for [the Receivership Defendants] ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%.").

20

14

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

4; Exs.144; 285; Doc. No. 396-3, at 12; *see also* Doc. No. 353-2, at 94-97 ¶65.

Defendant Argaman and the other *de facto* principals of SM were regularly apprised of AuraVie's chargeback rates. *See*, *e.g.*, Doc. No. 353-2, at 63 ¶39(g)(vii), and 66¶ (l). Yet despite the fact that high chargeback rates are a clear indicia of fraud, SM continued to, as stated in its Executive Summary, "handle the entire chargeback dispute process on your behalf," Doc. No. 353-2, at 62 ¶39(f)(v) and to have AuraVie "[c]onsider us your 'Chargeback Department,' not your outsourced chargeback service provider." Ex. 257-2.

In their Motion for Summary Judgment, Defendants claim "[m]ost of the work done by SM is done by technical personnel in India." Doc. No. 542, at 9. Indeed, Defendant Argaman, in his capacity at SM, appears to have coordinated Indian call centers for Defendants. Doc. No. 353-2, at 66 ¶39(k).  As the numerous consumer complaints make clear, Defendants' call centers were essential to preventing consumers from receiving refunds. Doc. No. 353-2, at 94 ¶65.

## B.	*Defendant Secured Commerce, LLC Participated in the Common Enterprise*

Secured Commerce, LLC, another company owed by Defendant Argaman, Doc. No. 120, at 8, was also a member of the common enterprise. SC was "Design[ed], Creat[ed], & Optimiz[ed] [the] Auravie landing page[.]" Doc. No.353-2, at 59. Secured Commerce also entered into contracts for Pinnacle

15

Logistics, Inc., the Corporate Defendant that managed fulfillment and customer service for the enterprise. *See* Doc. No. 120, at 66-67. SC also coordinated shipping for AuraVie products. *See* Exhs. 174; 370. Finally, SC leased the suite[10] that served as the "nerve center" for the common enterprise. *Id.* at 12-14. Argaman elected not to defend SC, however, and a $72.7 million default judgment was entered against it. *See* Doc. No. 532.

### C.     *Individual Defendant Argaman Meets the Legal Threshold for Injunctive Relief and Joint and Several Monetary Liability.*

Like SM and SC, Defendant Argaman's participation in, and control over, the scheme demands full injunctive and monetary liability. Individuals are subject to injunctive relief for a company's deceptive acts or practices when they either: (1) "participated directly in the acts or practices;" or (2) "had authority to control them." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). "Participation" can include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000). Moreover, where an officer participates in "acts crucial to the success" of an enterprise, the officer has directly participated for the purposes of individual liability. *Id.* In *J.K. Publications*, the court held liable a corporate officer who had obtained merchant accounts and purchased a database of consumers for the

---

[10] 353-2, at 60.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

corporate defendant. *Id.*

Individuals are also liable for injunctive relief if they had "authority to control" the corporation, which can be inferred from "'active involvement in business affairs and the making of corporate policy.'" *Id.* at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). An individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *Id.* at 1204. Indeed, a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority."[11]

To obtain equitable monetary relief against an individual, the FTC must show, in addition to one of the two factors above, that the individual had some knowledge of the company's deceptive acts or practices. *J.K. Publications,* 99 F. Supp. at 1204. Individuals possess the requisite knowledge if they: (1) had actual

---

[11] *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 WL 1224613, *14 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011)); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) ("An individual's status as a corporate officer gives rise to the presumption of ability to control a small, closely-held corporation."); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.").

17

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

knowledge of the misrepresentations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.[12] The "degree of participation in business affairs is probative of knowledge."[13] The FTC, however, is not required to prove that an individual actually intended to deceive to establish knowledge.[14] Here, Defendant Argaman meets the threshold of both control and participation, and the evidence demonstrates that he meets the knowledge required for joint and several monetary liability.

> **1.    *Defendant Argaman's Participation in, or Control over, the Common Enterprise was Critical to the Scheme's Success.***

Defendant Argaman participated in the common enterprise and owned two companies critical to the enterprise, SM and SC. Through SM, Argaman refuted consumer chargebacks. *See,e.g.*, 121-6, at 9-11; Exh. 257. He also established toll-free telephone numbers for the Corporate Defendants to further the false impression that the various shell corporations were distinct entities. Doc. No. 353-2, at 59 ¶39(d)(xi).

---

[12] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

[13] *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[14] *Network Servs. Depot*, 617 F.3d at 1139; *Publ'g Clearing House*, 104 F.3d at 1171.

18

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1      Argaman designed and created the Auravie landing page. Doc. No.353-2, at

2  59. One of the website pages Argaman designed included the following:



Ex. 531.

These screenshots, with a URL of http://localhost/mystore/order.php,

provide a landing site for Miracle Face Kit's "Serum Risk Free Trial," with all of

the "Satisfaction Guaranteed" and "Sub-Total $0.0000" traits of the very "risk

free" deception that Defendant Argaman denied having created. *Id.* He also

assisted Defendants in operating software to facilitate negative option continuity

plans. Doc. No. 353-2, at 58 ¶39(d)(v).

Other evidence proves Argaman's participation in the common enterprise.

Argaman considered marketing or selling other skincare products with Individual

Defendants, including Attitudeline/INFINI, Doc. No. 353-2, at 59 ¶39(d)(ix), and

LeElle. Doc. No. 353-2, at 60 ¶39(e). He also planned and managed the "AuraVie

Angels" promotional campaign. Doc. No. 353-2, at 59 ¶39(d)(x). Given

19

Defendant Argaman's extensive participation and control, there are genuine

disputes of material fact concerning Defendant Argaman's liabiity, and his motion

should be denied.

### 2.      The Evidence Confirms Defendant Argaman's Knowledge of the Common Enterprise's Deception.

Defendant Argaman's knowledge of his companies and co-conspirators'

deceptive conduct is clear. He was apprised of the enterprise's unusually high

chargeback rates,[15] its load-balancing practices,[16] and its many shell merchant

accounts. *See* Doc. No. 353-2, at 15-16 ¶26(d); 64 ¶39(h), 65 ¶ (i), 65 ¶ (j), and 66

¶ (l). Given his position in the chargeback industry, these factors should have, at a

minimum, alerted Argaman to the high probability of fraud. Moreover, Defendant

Argaman knew, or should have known, that consumers had a valid basis for their

---

[15] For example, Defendant Paul Medina provided Argaman, along with Defendants Alon and Doron Nottea and Roi Reuveni, with an overview of a merchant account's monthly performance in terms of the percentage of deposits that are consumed by chargeback and refund fees. In the review, three months for the account are listed above 22% of deposits being consumed by fees, with the three most recent months at a minimum of 39.97% in red lettering, bolded, and labeled "Extremely High." Doc. No. 356-16, at 14-15. In the email, Medina notes that the "last 4 months has been coming in at 40% avg which is 25% higher" than the ceiling for chargebacks before they are subject to penalties. *See id.*

[16] In one such email, Paul Medina writes Argaman, along with Defendants Khristopher Bond and Alon Nottea, that ""[o]ur CA customers are currently being load balanced between multiple merchant accounts and corporations" and that "Limelight is launching a new feature which load balances gateways and not just merchant accounts." Doc. No. 353-18, at 121. Medina then directly consults Argaman: "Avi, lets find a solution when customer selects 'CA[.]'" *Id.*

20

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

many chargeback demands, since SM claimed to handle the refutation of consumers' chargeback claims from start to finish.[17]

Given such a level of access to information alongside his broad responsibilities, Defendant Argaman meets either *Amy Travel*'s "degree of participation" standard or, at a bare minimum, the *Network Servs. Depo.* "high probability of deceptive conduct together with an intentional avoidance of the truth" standard, either of which establish monetary liability for his role in the AuraVie scheme.

## V.  Conclusion

For the forgoing reasons, Defendants have failed to show that there is no genuine dispute concerning material facts relating to Defendants liability for violations of the law. Accordingly, the FTC respectfully requests that the Court decline to revisit its earlier ruling or deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

Dated: 9/30/16                    /s/ REID TEPFER
                                 REID A. TEPFER
                                 LUIS H. GALLEGOS
                                 ZACHARY A. KELLER
                                 Attorneys for the Plaintiff
                                 Federal Trade Commission

_____
[17] *See* Exh. 257 ("We [*i.e.,* Secured Merchants] specialize in end-to-end processing of chargebacks . . . we handle the entire chargeback dispute on your behalf.").

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395 (Tepfer)
(214) 979-9383 (Gallegos)
(214) 979-9382 (Keller)
(214) 953-3079 (facsimile)
rtepfer@ftc.gov
lgallegos@ftc.gov

22

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 30, 2016, a true and correct copy of the foregoing document was electronically filed with the clerk of the U.S. District Court, Central District of California, using the electronic case filing system of the court. The attorneys listed below were served by pursuant to the ECF notice generated by the Court, or by email.

Erik S Syverson
Raines Feldman LLP
9720 Wilshire Boulevard Fifth Floor
Beverly Hills, CA 90212
esyverson@raineslaw.com
*Counsel for Oz Mizrahi*

Robert M. Ungar
Crosswind Law
14724 Ventura Blvd Penthouse
Sherman Oaks, CA 91403
rmu@crosswindlaw.com
*Counsel for Alon Nottea and
Roi Rueveni*

Robert Esensten
Esensten Law
12100 Wilshire Blvd., Suite 1660
Los Angeles, CA 90025
resensten@esenstenlaw.com
*Counsel for Doron Nottea and Motti
Nottea*

Jeffrey Benice
Law Offices of Jeffrey S. Benice
A Professional Law Corporation
3080 Bristol Street
Sixth Floor, Suite 630

Costa Mesa, CA 92626
Telephone: (714) 641-3600 Ext. 214
*Counsel for Igor Latsanovski and
CalEnergy, Inc*

Sagar Parikh
Beverly Hills Law Corp. PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
SP@BeverlyHillsLawCorp.com
*Attorney for Paul Medina, Secured
Merchants, LLC,
and Chargeback Armor, Inc.*

Charlene Cantrell Koonce
Receiver
Scheef & Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
charlene.koonce@solidcounsel.com
*Receiver*

Kelly M. Crawford
Scheef and Stone
500 N. Akard, Suite 2700
Dallas, Texas 75201
kelly.crawford@solidcounsel.com
*Counsel to Receiver*

/S/ REID TEPFER
REID TEPFER

23

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

2

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT