1

2   DAVID C. SHONKA
    Acting General Counsel
3   REID TEPFER
    rtepfer@ftc.gov; Tex. Bar No. 24079444
    LUIS GALLEGOS
4   lgallegos@ftc.gov; Okla. Bar No. 19098
    ZACHARY A. KELLER
5   zkeller@ftc.gov; Tex. Bar No. 24087838
    DAMA J. BROWN
6   Dbrown1@ftc.gov; Mi. Bar No. P54775

7   Federal Trade Commission
    1999 Bryan Street, Suite 2150
    Dallas, Texas 75201
8   (214) 979-9395 (Tepfer); (214) 979-9383 (Gallegos);
    (214) 979-9382 (Keller); (214) 979-9374 (Brown)
9   (214) 953-3079 (fax)

10  RAYMOND MCKOWN
    rmckown@ftc.gov; Cal. Bar No. 150975
    10877 Wilshire Boulevard, Ste 700
11  Los Angeles, California 90024
    (310) 824-4343(voice); (310) 824-4380 (fax)

12  Attorneys for Plaintiff Federal Trade Commission

13              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
14                    WESTERN DIVISION

15
    FEDERAL TRADE COMMISSION,          Case No.  CV 15-4527-GW(PLAx)
16
                                       **PLAINTIFF FEDERAL TRADE**
                              Plaintiff, **COMMISSION'S STATEMENT**
17                                     **OF ISSUES, PROPOSED**
              v.                       **FINDINGS OF FACT &**
                                       **CONCLUSIONS OF LAW**
18  BUNZAI MEDIA GROUP, INC.,
    *ET AL.,*
                                       **Trial: September 8, 2017**
                              Defendants. **Time: 9:00 a.m.**
19                                     **Location: Courtroom 9D, 350**
                                       **West 1st St., Los Angeles, CA**
20

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

# I.  STATEMENT OF ISSUES

Based upon the pleadings, arguments, and filings in this matter, the Court finds that the following issues are properly before it for adjudication:

**VIOLATIONS OF SECTION 5 OF THE FTC ACT**

**-DECEPTIVE OMISSIONS-**

A. Whether Defendants' risk free trial offers violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by:

  1. Failing to disclose, or disclose adequately, material terms and conditions of Internet sales offers to consumers, including but not limited to:

     a. that consumers' credit or debit cards would be charged the full costs of "free trial" or "risk-free trial" products upon the expiration of a limited trial period;

     b. the dates on which any trial period began and ended;

     c. that consumers who accepted a trial offer would automatically be enrolled in an "auto-ship" or negative option plan in which additional products would be shipped and charges imposed onto consumers' credit or debit cards each month unless the consumer acted to affirmatively cancel the plan within a limited time period;

     d. the costs to consumers of the negative option and the frequency and duration of recurring charges to consumers;

     e. the means consumers needed to use to cancel the negative option program and avoid additional charges; and

     f. the requirements of the sellers' return or refund policies;

### -Misrepresentations -

2. Falsely representing, expressly or by implication, that consumers could try skincare  products "risk-free";

3. Falsely representing, expressly or by implication, that the website or seller was accredited by and had a rating of "A-" with the Better Business Bureau;

4. Whether disclosures in the sales offers were sufficiently clear and conspicuous to ensure that the overall net impression of the offers were not deceptive;

### -Unfairness-

B. Whether Defendants, directly or indirectly, violated Section 5 of the FTC Act by imposing charges onto consumers' credit or debit cards without consumers' express informed consent;

### VIOLATIONS OF ROSCA

C. Whether Defendants, directly or indirectly, violated the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, by selling products over the Internet through a negative option without:

1. Clearly and conspicuously disclosing all material terms of the negative option *before* obtaining consumers' credit or debit card information;

2. Obtaining consumers' express informed consent *before* charging consumers' credit or debit cards; or

3. Providing a simple mechanisms for consumers to stop recurring charges to their credit or debit cards;

### VIOLATIONS OF EFTA

D. Whether Defendants, directly or indirectly, violated the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, by debiting consumers' bank debit cards on a recurring basis without:

1.  Obtaining a written authorization signed or similarly authenticated from consumers permitting preauthorized electronic fund transfers from their accounts; or

2.  Providing a copy of the written authorization for preauthorized electronic fund transfers to consumers;

### COMMON ENTERPRISE LIABILITY

E.  Whether the Corporate Defendants, including Secured Merchants, LLC, operated as a "common enterprise";

### INDIVIDUAL LIABILITY – INJUNCTIVE & MONETARY

F.  Whether Defendant Alan Argaman:

1.  Participated in *or* controlled the unlawful activities and is therefore liable for injunctive relief;

2.  Acted with actual knowledge of the law violations, reckless indifference to the violations, or with an awareness of a high probability of fraud coupled with an intentional avoidance of knowledge, and therefore is additionally liable for equitable monetary relief;

### INJUNCTIVE AND EQUITABLE MONETARY RELIEF

G.  The appropriate injunctive and equitable monetary relief to be awarded.

## II.   FINDINGS OF FACT

### A.   JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b. (Dkt. 450-2 ¶ 1).

2.  Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 15 U.S.C. § 53(b). (Dkt.450-2 ¶ 2).

**B.  COMMERCE**

3.  The named Defendants operated, or provided services to support, online businesses that marketed and sold skincare products, including but not limited to AuraVie, Dellure, Miracle Face Kit, and LeOr, to consumers throughout the US and internationally. (Ex. 910 ¶ 55; Ex. 911 ¶ 55). Accordingly, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**C.  PLAINTIFF**

4.  The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.

5.  The FTC enforces Section 5 of the FTC Act, 15 U.S.C. § 45(a), which broadly prohibits unfair or deceptive acts or practices in or affecting commerce.

6.  The FTC enforces Section 4 of ROSCA, 15 U.S.C. § 8403, which prohibits charging consumers for goods sold over the Internet through a negative option unless certain conditions are met.

7.     The FTC also enforces Section 907(a) of EFTA, 15 U.S.C. § 1693, *et seq*., which establishes the rights, liabilities, and responsibilities of participants in electronic fund system and protects consumers' financial accounts from unauthorized electronic fund transfers.

8.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and EFTA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 8404, and 1693o(c).

### D.     TRIAL DEFENDANTS

### -ALAN ARGAMAN ("ARGAMAN")-

9.     Alan Argaman resides in this district and, in connection with the matters alleged in the Plaintiff's Complaint, transacted business in this district. (*See* Dkt 299 ¶ 39).

10.     Argaman was an owner of Secured Merchants, LLC and Secured Commerce, LLC, both named as corporate defendants in this action. (Decl. of Argaman Dkt. 392-1 ¶¶ 1, 8; Dkt. 299 ¶ 39; Dkt. 244 ¶ 39; Dkt. 245 ¶ 39; Dkt. 235 at 20-21¶ 39; *see also* Ex. 917-58 ¶ 208).

11.     Argaman and Secured Merchants provided services to help the companies selling skincare products companies manage their businesses, including their negative option plans, telephones, customer service, and chargeback refutation services. (*See* Dkt. 121-6 pp. 9-21; Dkt. 121-7 pp. 1-3; Ex. 47; Ex. 149; Ex. 432; *see also* Ex. 440; Ex. 441; Ex. 516; Decl. of Argaman Dkt. 392-1 ¶ 5).

12.     Argaman and Secured Commerce designed, created, and helped manage the websites and landing pages used to promote the certain "risk-free trial" and "trial order" offers. (Dkt. 299 ¶ 39; Ex. 46; Ex. 249; Ex. 531; Ex. 965).

13.     Argaman and Secured Commerce also leased the main office suite where Defendants collectively operated their skincare product businesses and negative-option plans. (Dkt. 120 at 12).

14.     Argaman helped plan and manage an "AuraVie Angels" campaign to promote skincare products. (Ex. 185; Ex. 494; Ex. 497).

15.     Argaman developed the "chargeback armor" platform or technology used by the Defendants to respond to and defeat consumers' requests that credit card companies issue "chargebacks"—refunds for unauthorized or fraudulent charges—relating to their skincare products. (Decl. of Argaman Dkt. 392-1 ¶ 27; *see also* Ex. 256).

16.  Before designing the chargeback armor platform, Argaman was involved in negotiations with a third-party company concerning chargeback rebuttal services. (Ex. 1036 at p. 2-4).

17.  Argaman oversaw, managed, or assisted in managing Defendants' relationship with a third-party call center used for responding to complaints relating to the Skincare products risk-free trial offers. (Ex. 149 at p. 2; Ex. 184; Ex. 440; Ex. 996; Ex. 1032; Ex. 1047; Ex. 1065).

18.  Argaman received consumer complaints about the skincare  products risk-free trial offers. (Ex. 1035; Ex. 1068). Argaman and his employee, Tyler Reitenbach, received and had access to chargeback information concerning the skincare products. (Ex. 1064; Ex. 1068; Ex. 1039; Ex. 1062; Ex. 1037; Ex. 1041).

19.  Argaman used the email address avicoglobal@gmail.com. (Ex. 910 ¶ 261; Ex. 911 ¶ 261).

20.  Argaman, in conjunction with other Defendants, coordinated the launch of Defendants' sale of skincare products overseas and managed, or assisted in managing, the overseas operation. (Ex. 1070; Ex. 1068; Ex. 1061; Ex. 1044).

### -SECURED MERCHANTS, LLC-

21.  Secured Merchants, LLC is a California limited liability company and, in connection with the matters alleged in the Plaintiff's Complaint, transacted

business in this district. (Dkt. 299 ¶ 26; Dkt. 301 ¶ 26; Dkt. 244 ¶ 26; Dkt. 245 ¶ 26).

22. Secured Merchants was established in June 2013. (Decl. of Argaman Dkt. 392-1 ¶ 29).

23. Secured Merchants provided technology services to BunZai Media Group and its affiliated companies, including website and software development services. (Decl. of Alon Dkt. 391-3 ¶ 12; Decl. of Argaman Dkt. 392-1 ¶ 2).

24. Secured Merchants' employee Tyler Reitenbach managed and edited Defendants' risk-free trial websites. (Ex. 1038; Ex. 1054; Ex. 1057; Ex. 1031; Ex. 1042; Ex. 1043). He also weighed in on Defendants' refund policies (Ex. 1055) and was involved in strategizing how to reduce Defendants' chargebacks. (Ex. 1052).

25. Secured Merchants provided Defendants and their affiliated companies software called "chargeback armor" to manage their high numbers of credit card chargeback demands. (Decl. of Alon Dkt. 391-3 ¶ 12; *see* Decl. of Argaman Dkt. 392-1 ¶ 5; *see, e.g.*, Ex. 323; Ex. 348; Ex. 1062).

26. Secured Merchants also assisted BunZai Media Group and its affiliated companies with customer relations management software called "limelight," which Argaman and Secured Merchants used to keep chargeback percentages low and avoid having their credit card merchant accounts frozen or

suspended. (Decl. of Alon Dkt. 391-3 ¶ 12; Ex. 248, Dkt. 120 at 6).

Whenever one particular account was receiving too many chargebacks,

Defendants shifted sales to another merchant account with a lower

chargeback percentage. (Dkt. 120 at 6).

27.   Other Defendants were also significantly involved in Secured Merchants' its

operation:

a.   Defendant Doron Nottea had signatory authority over its financial

accounts. (Decl. of Argaman Dkt. 392-1 ¶ 4). He also provided

bookkeeping services for Secured Merchants (Decl. of Argaman Dkt.

392-1 ¶ 4), registered its email address (Ex. 357), and was identified

as a member of the company in bank documents. (Ex. 176 at p. 2).

b.   Secured Merchants' executive summary referred to its founders

having operated a $2.5 million skin care company. (Ex. 256).

c.   Defendant Roi Reuveni held himself out as a managing member of

Secured Merchants and signed a contract on its behalf. (Ex. 412 at p.

5).

d.   Defendant Alon Nottea used a Secured Merchants email address (Ex.

930 at p. 218) and was identified in the company's executive

summary as "Management," along with Defendant Paul Medina. (Ex.

256 at p. 2).

28.   Several Secured Merchants employees also worked for other Corporate Defendants. For example, Robert Stayner worked for both Secured Merchants (Ex. 287) and SBM Management, Inc. (Ex. 391). Likewise, Tyler Reitenbach, another Secured Merchants employee (Ex. 287), was a "Quality Assurance Manager" at Pinnacle Logistics, Inc. (Ex. 1066).

### E.   DEFAULTING DEFENDANTS

### -BUNZAI MEDIA GROUP, INC.-

29.   BunZai Media Group, Inc., was a California corporation with its principal place of business at 7900 Gloria Avenue, Van Nuys, California 91406 ("the Van Nuys Office"). (Dkt. 117 ¶ 9).

30.   BunZai Media Group used fictitious names, including "AuraVie," "Miracle Face Kit," "Dead Sea Products," and "Attitude Cosmetics." (Decl. of Doron Nottea, Dkt. 398-2 pp. 17-18).

31.   BunZai Media Group advertised, marketed, distributed, or sold skincare products, or provided customer service for such products, to consumers throughout the United States since at least 2009. (Decl. of Doron Nottea, Dkt. 398-2 ¶ 23; *see* Ex. 911 ¶ 56).

32.   BunZai Media Group offered for sale, sold, and distributed skincare products including "AuraVie," "Dellure,"and "Miracle Face Kit" products. (Ex. 910 ¶¶ 59-61; Ex. 911 ¶¶ 59-61).

33.   The first product launched by BunZai Media Group was a Face Kit-Dead Sea Mud Mask and Serum, which launched in December 2009. (Decl. of Doron Nottea, Dkt. 398-2 ¶ 23).

34.   BunZai Media Group was incorporated in January 2010 in the State of California. (Ex. 904 p. 1, Ex. 910 ¶ 54).

35.   Bunzai Media Group began selling AuraVie in or about July 2010. (Decl. of Doron Nottea, Dkt. 398-2 ¶ 23).

36.   BunZai Media Group filed notice of dissolution with the California Secretary of State on May 30, 2013. (Ex. 904 p. 4).

37.   Nonetheless, the company continued operating and BunZai Media Group began selling Dellure in 2014. (Decl. of Receiver Dkt. 92 ¶ 15).

38.   Because BunZai Media Group had inadequate financial resources, it sought financing from Defendant Igor Latsanovski. (Decl. of Alon Dkt. 391-3 ¶ 5).

39.   BunZai Media Group marketed the skincare products online, through both negative option continuity marketing and through a traditional online retail site. (Decl. of Alon Dkt. 391-3 ¶ 2).

40.   Bunzai Media Group began creating its website offers and landing pages for skincare products in mid-2010. (Decl. of Doron Nottea, Dkt. 398-2 ¶ 24).

41.   BunZai Media Group offered consumers a "risk-free trial" period to try its skincare products. (Decl. of Alon Dkt. 391-3 ¶ 2).

42.   Under the terms of its risk-free trial offers, if a consumer decided not to purchase the product during the trial period, the consumer was required to call a toll-free phone number to cancel the purchase and to return the unused portion of the trial product. (Decl. of Alon Dkt. 391-3 ¶ 2).

43.   If a consumer did not opt out during the trial period, the consumer was charged the full purchase price of the skincare product (typically $97.99) and was enrolled into an "auto-ship" plan for a monthly supply of the product on a recurring basis. (Decl. of Alon Dkt. 391-3 ¶ 2).

44.   Alon, the CEO and an owner of BunZai Media Group, knew that some customers were unaware that they would be charged for the risk free trial of skincare products if they did not cancel during the trial period. (Decl. of Alon Dkt. 391-3 ¶ 17).

45.   BunZai Media Group operated and marketed skincare products for at least four years (2010-2014), during which time 70 percent of its customers did not continue the "auto-ship" continuity program for an extended time. (Decl. of Alon Dkt. 391-3 ¶ 3).

46.   During that same time period, $1 out of every $4 in revenue generated by BunZai Media Group was returned to dissatisfied customers who demanded refunds or chargebacks. (*See* Decl. of Alon Dkt. 391-3 ¶ 3). The Receiver's accountants determined Defendants' chargeback rates ranged between 14

and 35 percent. (Dkt. 120 at 36 n.72). The industry standard cutoff for acceptable chargeback rates is 1 percent. (*Id.*).

47. BunZai Media Group established merchant accounts with payment processors so that it could accept credit and debit card payments from consumers. (*See* Decl. of Alon Dkt. 391-3 ¶ 4).

48. Payment processors typically limit the number of merchant accounts any one person or company can open. (Witness Narrative of Nastassia Yalley ¶ 26). Payment processors also limit the number of chargebacks, or consumer credit card disputes, any merchant account can accrue. (*Id.*). Defendants' merchant accounts often exceeded the permitted chargeback thresholds. (*See* Witness Narrative of Nastassia Yalley ¶ 43; Dkt. 120 at 36 n.72).

49. To avoid exceeding permitted thresholds and reduce penalties and costs imposed by the payment processor for excessive chargeback rates, BunZai Media Group established numerous shell companies accept consumers' credit or debit card payments. (Decl. of Alon Dkt. 391-3 ¶ 4).

50. The shell companies affiliated with BunZai Media Group were established by "strawpersons"—primarily the friends and family members of Alon Nottea and Kristopher Bond. (Decl. of Alon Dkt. 391-3 ¶ 4; *see* Ex. 65).

51.  The shell companies were nominally operated by "CEOs" who were paid 1 percent of all sale revenues processed through their respective merchant accounts. (Ex. 910 ¶ 240).

52.  Alon and Kristopher Bond managed and operated these "retail merchant entities." (Decl. of Alon Dkt. 391-3 ¶ 4).

53.  Revenues from the sale of skincare products were paid to BunZai Media Group until 2013 (Decl. of Alon Dkt. 391-3 ¶ 9), after which time the revenues were paid to SBM Management. (Decl. of Alon Dkt. 391-3 ¶¶ 7, 9).

### -PINNACLE LOGISTICS, INC.-

54.  Pinnacle Logistics, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (Dkt. 117 ¶ 10; Dkt. 397-14 p. 2; Ex. 904 p. 6; Ex. 910 ¶ 111). Pinnacle Logistics had a secondary address of 6914 Canby Avenue, Suite 107, Reseda, California 91335 ("the Reseda Office").

55.  Pinnacle Logistics was established in June 2012 and contributed to the Defendants' business operations by providing product order fulfillment, shipping and logistics support, customer service, and call center services for skincare product sales. (Decl. of Alon Dkt. 391-3 ¶ 7; Decl. of Latsanovski Dkt. 397-1 ¶ 29.j; Decl. of Reuveni Dkt. 391-2 ¶ 3).

56. Pinnacle Logistic's general manager, Roi Reuveni, knew customers demanded refunds because they were not aware that they needed to contact the company to affirmatively cancel the "free trial" or "risk-free trial" orders to avoid charges. (*See* Decl. of Reuveni Dkt. 391-2 ¶ 14).

57. Pinnacle Logistics filed a notice of dissolution with the California Secretary of State in December 2014.

### -DSA HOLDINGS, INC.-

58. DSA Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office and a secondary address of 8335 Winnetka Avenue, #118, Winnetka, California 91306. (Ex. 904 p. 9; Ex. 904 p. 12; Dkt. 244: Dkt. 245 p. 2 ¶ 11).

59. DSA Holdings served as a "guarantor" of the merchant accounts that were used to sell skincare products. (Decl. of Receiver Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

60. DSA filed a notice of dissolution with the California Secretary of State in September 2012. (Ex. 904 p. 13).

### -LIFESTYLE MEDIA BRANDS, INC.-

61. Lifestyle Media Brands, Inc. was a California corporation with its principal

place of business at the Van Nuys Office and a secondary address of 8335 Winnetka Avenue, #112, Winnetka, California 91306. (Ex. 904 p. 15).

62.   Lifestyle Media was incorporated in June 2011 by Rachel Nottea, the mother of Doron and Alon Nottea, who also served as the company's CEO, CFO, and Secretary. (Ex. 904 p. 15; Decl. of Receiver Dkt. 92 ¶ 11).

63.   On its incorporation papers, Lifestyle Media Brands reported that it was a "fulfillment" company (Ex. 904 p. 15), but it processed payments for the negative-option plans for skincare products and was owned in part by Rachel Nottea. (Decl. of Receiver Dkt. 92 ¶ 11).

64.   Rachel Nottea filed notice of dissolution of the company with the California Secretary of State in December 2014. (Ex. 904 p. 17)

### -AGOA HOLDINGS, INC.-

65.   Agoa Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (*See* Ex. 904 p. 19).

66.   Agoa Holdings was incorporated in June 2011 and Roi Reuveni was its CEO, CFO, and Secretary. (Ex. 904 p. 19). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

67.   Although it reported to the Secretary of State that its business was "wholesaler" (Ex. 904 p. 19), Agoa Holdings was one of BunZai Media

Group's online retail merchants. (Decl. of Reuveni Dkt. 391-2 ¶ 5; Decl. of Receiver Dkt. 92 ¶ 11).

68.   Agoa Holdings was purportedly dissolved in 2014 (Ex. 904 p. 22), but retained active merchant accounts and received more than $134,000 in income in 2015. (Decl. of Receiver Dkt. 92 ¶ 12).

## -SAFEHAVEN VENTURES, INC.-

69.   Safehaven Ventures, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (Ex. 904 p. 30).

70.   Safehaven Ventures was incorporated in November 2011 and, according to its corporate filings, its business was "sales" or "wholesaler." (Ex. 904 pp. 28-30).

71.   Safehaven Ventures processed payments for the negative-option plans of skincare products. (Decl. of Receiver Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

72.   Safehaven Ventures purportedly dissolved in January 2014 (Ex. 904 p. 31), but maintained an active merchant account through which it processed charges for skincare products as late as June 2015. (Decl. of Receiver Dkt. 92 ¶ 17).

## -HERITAGE ALLIANCE GROUP, INC.-

73. Heritage Alliance Group, Inc. also doing business as AuraVie Distribution, was a California corporation with its principal place of business at the Van Nuys Office. Heritage also used the Encino address. (Ex. 904 p. 33).

74. Heritage Alliance Group was incorporated in March 2012 and, according to its corporate filings, its business was "wholesales." (Ex. 904 pp. 32, 35).

75. Heritage Alliance Group processed payments for the negative-option plans of skincare products. (Decl. of Receiver Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

76. Heritage Alliance Group filed a notice of dissolution with the Secretary of State in December 2014. (Ex. 904 p. 35).

### -AMD FINANCIAL NETWORK, INC.-

77. AMD Financial Network, Inc. was a California corporation with its principal place of business at the Van Nuys Office.

78. AMD Financial was incorporated in March 2012 and, according to its corporate filings, its business was "wholesaler." (Ex. 904 pp. 36-37).

79. AMD Financial Network advertised, marketed, distributed, or sold the skincare products at issue in this case to consumers throughout the United States.

80.   AMD Financial Network processed payments for the negative-option plans of skincare products. (Decl. of Receiver Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

### -SBM MANAGEMENT, INC.-

81.   SBM Management, Inc. was a California corporation with its principal place of business at 655 North Central Avenue, Suite 1700, Glendale, California 91203. (Ex. 904 p. 40).

82.   SBM Management was incorporated in June 2013 and, according to its corporate filings, its business was in "management." (Ex. 904 pp. 39-40).

83.   SBM Management was the management company that oversaw Defendants' shell companies or "retail merchants" once the sale of the skincare products migrated to Pinnacle Logistics. (Decl. of Alon Dkt. 391-3 ¶ 7, Decl. of Reuveni Dkt. 391-2 ¶ 7; Decl. of Latsanovski Dkt. 371-1 ¶ 2).

Revenues from skincare products sales were paid to SBM Management beginning in 2013. (Decl. of Alon Dkt. 391-3 ¶¶ 7, 9). The company was managed and controlled by Defendants Doron and Alon Nottea. (Witness Narrative of Nastassia Yalley ¶¶ 36).

### -MEDIA URGE, INC.-

84.   Media Urge, Inc. was a California corporation with its principal place of business at 18757 Burbank Boulevard, Suite 205, Tarzana, California 91436. (Ex. 904 pp. 42-43).

85.   Media Urge was incorporated in June 2012 and, according to its corporate filings, its business was in "media." (Ex. 904 pp. 42-43).

86.   Media Urge advertised, marketed, or sold the skincare products at issue in this case to consumers throughout the United States. (Decl. of Receiver Dkt. 92 ¶ 11; Ex. 910 ¶ 22; Ex. 912 ¶ 22).

87.   Media Urge hired former BunZai Media Group employees and provided marketing services to continue to promote skincare product sales. (*See* Decl. of Alon Dkt. 391-3 ¶ 7; Ex. 910 ¶ 81).

88.   Media Urge filed a notice of dissolution with the California Secretary of State in December 2014. (Ex. 904 p. 45). The company was managed and controlled by Defendants Doron and Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

### -ADAGEO, LLC-

89.   Adageo, LLC was a California limited liability corporation incorporated in September 2012. Alon Nottea was its incorporator, CEO, CFO, and

Secretary, and according to its corporate filings its business was "management services." (Ex. 904 pp. 46-47).

90.   Adageo was Alon's "personal service company" that loaned out his consulting services to the BunZai Media Group-affiliated companies. (*See* Decl. of Alon Dkt. 391-3 ¶ 16).

-KAI MEDIA, INC.-

91.   Kai Media, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (Ex. 904 pp. 52-53).

92.   Kai Media was incorporated in July 2012 and according to its corporate filings, its business as "wholesale." (Ex. 904 pp. 52-53).

93.   Kai Media processed payments for the negative-option plans of skincare products. (Decl. of Receiver Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

-INSIGHT MEDIA, INC.-

94.   Insight Media, Inc. was a California corporation with its principal place of business at the Van Nuys Office. (Ex. 904 pp. 55-56).

95.   Insight Media was incorporated in July 2012 and, according to its corporate filings, its business was "wholesale." (Ex. 904 pp. 55-56).

96.    Insight Media processed payments for the negative-option plans of skincare products. (Decl. of Receiver Dkt. 92 ¶ 11).  The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

### -FOCUS MEDIA SOLUTIONS, INC.-

97.    Focus Media Solutions, Inc. was a California corporation with its principal place of business at 6850 Canby, Suite #103, Reseda, California 91335, which is in the same complex as the Reseda Office. Its secondary place of business is the Reseda Office.

98.    Focus Media Solutions created advertisements for skincare products that were sold by negative-option plans. (Ex. 910 ¶ 215).

99.    On June 16, 2015, Defendant Igor Latsanovski provided Focus Media Solutions with $325,000 to finance the company. (Dkt. 120 p. 41).

### -SECURED COMMERCE, LLC-

100.   Secured Commerce, LLC was a California limited liability company with its principal place of business at the Reseda Office.

101.   Secured Commerce was owned jointly by Defendants Doron Nottea and Alan Argaman. (Dkt. 398-1 ¶ 6).

102. Secured Commerce was established by Doron and Argaman to provide a shared office arrangement for business ventures and to provide e-commerce, shipping and general IT services. (Decl. of Doron Nottea, Dkt.  398-2 ¶ 6).

103. Secured Commerce prepared a "straight sale" website for AuraVie that did not include negative option offers. (Decl. of Argaman Dkt. 392-1 ¶ 9).

104. Secured Commerce also prepared a website for Miracle Face Kit that featured the "risk free trial" offers at issue in this case. (Ex. 531).

105. Secured Commerce billed Adageo for the creation of AuraVie landing pages that contained the bogus "risk free trial" offers. (*See* Ex. 46).

106. Argaman, on behalf of Secured Commerce, claimed that Victor Azal, an "in house website designer for the AuraVie Defendants" designed all of Defendants' skincare products risk-free trial offers websites. However, Argaman admitted that he personally provided technological advice to assist Azal with Internet protocol procedures. (Decl. of Argaman - Dkt. 392-1 ¶ 23). Azal testified that Argaman provided him with templates for creating the content for the risk-free trial websites. (Witness Narrative of Victor Azal at ¶ 9).

107. Secured Commerce participated in efforts to advertise, market, distribute, or sell the skincare products at issue in this case. (*See* Ex. 46).

108.   Secured Commerce also provided shipping services or support to BunZai Media Group and its affiliated companies. (Decl. of Alon N. - Dkt. 391-3 ¶ 11).

### -USM PRODUCTS, INC.-

109.   USM Products, Inc. was a California corporation with its principal place of business at the Reseda Office. Alon Nottea owned or controlled USM Products. (*See* Dkt. 120 at 19 n.34).

110.   USM Products made bulk purchases of products and containers for skincare products. (Ex. 910 ¶ 194; Ex. 912 ¶ 194).

### -MERCHANT LEVERAGE GROUP, INC.-

111.   Merchant Leverage Group, Inc. was a California corporation with its principal place of business at the Reseda Office.

112.   Merchant Leverage Group participated in efforts to advertise, market, distribute, or sell the skincare products at issue in this case. (Dkt. 120 at 81). Merchant Leverage Group was controlled by Defendant Alon Nottea. (*Id.*).

### -DMA MEDIA HOLDINGS, INC.-

113.   DMA Media Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business is or was the Reseda Office.

114.   DMA Media Holdings was owned by Defendant Roi Reuveni and Rachel Nottea. (Decl. of Receiver - Dkt. 92 ¶ 11).

115.   DMA Media Holdings was one of BunZai Media Group's shell companies or "retail merchants" that processed payments for the negative-option plans of skincare products. (Decl. of Receiver - Dkt. 92 ¶ 11; Decl. of Reuveni, Dkt. 391-2 ¶ 5).

116.   DMA Media Holdings advertised, marketed, distributed, or sold the skincare products at issue in this case.

### -SHALITA HOLDINGS, INC.-

117.   Shalita Holdings, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business was the Reseda Office.

118.   Shalita Holdings processed payments for the negative-option plans of skincare products. (Decl. of Receiver - Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

119.   Shalita was purportedly closed in 2014, but maintained an active merchant account and continued to process charges related to the sale of skincare products as late as June 2015. (Decl. of Receiver - Dkt. 92 ¶ 17).

**-ALL STAR BEAUTY PRODUCTS, INC.-**

120.   All Star Beauty Products, Inc. was a California corporation with its principal place of business at the Van Nuys Office. Its secondary place of business was the Reseda Office.

121.   All Star Beauty Products  processed payments for the negative-option plans of skincare products. (Decl. of Receiver - Dkt. 92 ¶ 11). The company was managed and controlled by Defendants Doron Nottea, Alon Nottea, and Paul Medina. (Witness Narrative of Nastassia Yalley ¶¶ 29 and 31).

122.   All Star Beauty Products advertised, marketed, distributed, or sold the skincare products at issue in this case.

**-KHRISTOPHER BOND ("BOND") -**

123.   Khristopher Bond, also known as Ray Ibbot, was an owner and officer of BunZai Media Group. (Dkt. 117 ¶ 30; Ex. 910 ¶¶ 49-50; Ex. 911 ¶¶ 49-50).

124.   Bond formulated, directed, controlled, had the authority to control, or participated in the acts or practices set forth in Plaintiff's Amended Complaint. (Dkt. 391-3 ¶ 2).

125.   Bond was integrally involved in the day-to-day operations of BunZai Media Group (Decl. of Latsanovski - Dkt. 90-1 ¶ 5, Ex. 910 ¶ 51; Ex. 911 ¶ 51) and, among other things, trained customer-service representatives on responding to consumer complaints.

126. Bond left BunZai Media Group in 2013. (Decl. of Alon N. - Dkt. 391-3 ¶ 7).

127. Bond resides in this district and, in connection with the matters alleged herein, transacted business in this district and throughout the United States. Bond has defaulted in this action (Dkt. 575), but no judgment has yet entered.

## F.    SETTLING DEFENDANTS

### -ALON NOTTEA ("ALON")-

128. Alon was an owner and CEO of BunZai Media Group following its incorporation in January 2010. (Ex. 910 ¶ 17; Ex. 904 pp. 1-2; Dkt. 117 ¶ 24).

129. Alon had authority to control all of the shell companies or "retail merchant entities" that were used to process credit and debit card payments for the skincare products sales. (Decl. of Alon Dkt. 391-3 ¶ 4; *see* Ex. 65).

130. Alon used the email address alon@securedmerchants.com and vigorect@gmail.com. (Ex. 910 ¶¶ 254-255; Ex. 911 ¶¶ 254-255; Ex. 916 ¶ 256; Ex. 918 ¶ 256).

131. Alon and several friends established three service companies to facilitate the sale of skincare products: Media Urge (for advertising), Pinnacle Logistics

(for order fulfillment), and SBM Management (a financial intermediary between shell companies and operating entities). (Decl. of Alon Dkt. 391-3 ¶ 7).

132. In April 2012, during an audio-recorded meeting with Defendants Roi Reuveni and Paul Medina, Alon discussed BunZai Media Group's compliance issues and strategized on how to respond to a future FTC action. (Ex. 86, Ex. 165).

133. In the April 2012 meeting, Alon stated:

> **…I want to have a hundred call people recording...but I want to have a hundred call folder so that later on in two years when I have an FTC, here, here, here, I'm proactive. It's like -- it's like a folder. Here you go. Here's everything. Your file recordings. Look at everything. Look at what we're doing to be proactive for our consumer. Okay. Number 1, it's really going to give us some answers, and Number 2, it's going to make us look amazing.**
>
> **\* \* \***
>
> **I can't survive in this un-compliant world. I can't sleep. I don't like it. It's not good.**  (*Id.*).

134. During that meeting, Alon also acknowledged that the company was violating the law and considered including terms and conditions on invoices—as long as they were not too conspicuous:

> **We must try 500 orders with the terms and conditions on the invoice for customers. It's completely illegal to not have that there, at least.**
>
> **\* \* \***
>
> **We're not getting a check box. When the consumer gets the product at home, the packing slip, it can be a little bit grayed out. It doesn't have to be huge. You can make the 'for Customer**

**Service inquiries and questions, call 1-800' big, and below that, the terms.**

* * *

**This calls for another 10 minute meeting for that, just make it, in the chargeback meeting let's talk about this particular details, how to do a test between 500 and 1,000 customers that get the terms. It's a complete different world when the woman -- when you can prove to the bank that the terms and conditions are on the invoice...no, the only thing...I know we crashed and burned when we tested it before, but somehow Rappoport is doing it and getting through with it."**

* * *

**Rappoport is also sending an email when you're getting billed. Okay. He's sending this email. I know we can do it. Yeah. I'm just saying I don't see how he was surviving doing that.**

* * *

**"...if you send them the terms, it can act like...we told you that we're going to charge...we notified you... you have ten days. Exactly. But when me and Paul tried it a year ago, it didn't work so good. It hurted us...If it's done creatively, if it's done correctly and optimized...not just try, it didn't work. Let's see what Jeff is doing because it's working for him."** (*Id.*)

### -DORON NOTTEA ("DORON")-

135.   Doron exerted control over the financial affairs of BunZai Media Group and the affiliated companies: he maintained checks and credit cards for the companies, as well as deposit stamps for their financial accounts, and devices to enable him to make electronic fund transfers. (Decl. of Doron Nottea, Dkt. 398-2 ¶ 27; Decl. of Receiver Dkt. 92 ¶¶ 24-25).

136.   Doron was also a 50 percent owner of Secured Commerce. (Decl. of Alon Dkt. 391-3 ¶ 11; Decl. of Doron Nottea, Dkt. 398-2 ¶ 6).

137. Doron had signatory authority for financial accounts belonging to Secured Merchants. (Decl. of Argaman Dkt. 392-1 ¶ 4).

138. Doron used the email addresses Doron@doron.us, securedmerchantsllc@gmail.com, and xposedinc@gmail.com.  (Decl. of Argaman Dkt. 392-1 ¶ 26; Ex. 910 ¶ 257; Ex. 911 ¶ 257).

### -IGOR LATSANOVSKI ("LATSANOVSKI")-

139. Latsanovski was the owner and CEO of CalEnergy beginning in 2009. (Decl. of Latsanovski Dkt. 90-1 ¶ 2; Dec. of Latsanovski Dkt. 397-1 ¶ 1).

140. Latsanovski was approached to invest in BunZai Media Group in 2010, to provide financing to allow the company to hire employees and continue operations. (Decl. of Latsanovski Dkt 90-1 ¶ 4).

141. Latsanovski invested $1.6 million in BunZai and its affiliated companies by November 2014. (Decl. of Latsanovski Dkt. 90-1 ¶¶ 11, 6).

142. In March 2011, the parties executed a Partnership Agreement stating that Latsanovski, Alon, and Bond each owned a 33 percent interest in BunZai Media Group. (Decl. of Latsanovski Dkt. 371-1 ¶¶ 21-23; Dkt. 371-6; Ex. 19).

143. Latsanovski also founded Zen Mobile Media, a shell company that operated retail merchant accounts to sell skincare products. (Decl. of Latsanovski Dkt. 90-1 ¶¶ 15-17).

144. Latsanovski founded Zen Mobile Media to help BunZai Media Group defeat limitations imposed by payment processors. (Decl. of Latsanovski Dkt. 90-1 ¶ 15-16).

145. Latsanovski personally established the merchant account used by Zen Mobile Media to process charges for skincare products, and he materially misrepresented Zen Mobile Media's business model in his application. (Ex. 600 p. 30).

146. Latsanovski and his company, CalEnergy, Inc., received funds directly from Zen Mobile Media, Heritage Alliance Group, DMA Media Holdings, and Insight Media (all of which were shell companies or "retail merchant entities" that processed credit and debit card payments from the sale of skincare products), as well as from SBM Management. (Decl. of Receiver Dkt. 92 ¶ 23).

147. Latsanovski previously attested that he was employed by BunZai Media Group (Ex. 949; see also Ex. 402-8), and he represented to the U.S. Citizenship and Immigration Services that he guided "managed companies," including Pinnacle Logistics and reviewed "activities of the managed call center Pinnacle (including AuraVie, Dellure and Attitude . . .)" (Ex. 571 pp. 2-3).

148.   Emails confirmed Latsanovski's involvement in decisions concerning corporate structure (Ex. 904-23), operations (Ex. 571 pp. 2-3; Ex. 319), sales (Ex. 503), marketing (Ex. 564; *see* Ex. 559; Ex. 48), and human resources (Ex. 561-3; Ex. 588-9).

### -MOTTI NOTTEA ("MOTTI")-

149.   Motti Nottea, the father of Doron and Alon Nottea, established the merchant account used by BunZai Media Group to process charges for skincare products. (Ex. 600 p. 9; Ex. 910 ¶ 228; Ex. 912 ¶ 38).

### -OZ MIZRAHI ("MIZRAHI")-

150.   Oz Mizrahi was the founder and owner of Pinnacle Logistics, and served as its CEO, CFO and Secretary. (Decl. of Latsanovski Dkt. 397-1 ¶ 29.j.; Ex. 904 pp. 5-6; Ex. 910 ¶¶ 93-94; Ex. 911 ¶¶ 94-95).

### -PAUL MEDINA ("MEDINA")-

151.   Paul Medina was the Executive President or Vice President of Media Urge. (Ex. 910 ¶ 140).

152.   Medina was also a Vice President at Media Urge, Inc. and was a manager of Focus Media Solutions. (Ex. 910 ¶¶ 140 and 142).

### -ROI REUVENI ("REUVENI")-

153.   In 2011, Reuveni was hired as an employee of Bunzai Media Group (Decl. of Reuveni Dkt. 391-2 ¶ 2) and he managed all aspects of its daily

operations, including marketing, advertising, product fulfillment, and customer service. (Decl. of Latsanovski Dkt. 90-1 ¶ 5).

154.  Reuveni was an officer and general manager of Pinnacle Logistics and was responsible for managing its call center, fulfillment services, chargeback and customer services. (Decl. of Reuveni Dkt. 391-2 ¶ 3; Ex. 910 ¶¶106-108, 206-207).

155. Reuveni was an officer of Agoa Holdings. (Dkt. 117 ¶ 29; Decl. of Reuveni Dkt. 391-2 ¶ 3; Ex. 911 ¶ 245), and DMA Media Holdings. (Decl. of Reuveni Dkt. 391-2 ¶ 5, Ex. 910 ¶ 244; Ex, 911 ¶ 244).

156. Reuveni also worked for Secured Merchants and was an officer of Chargeback Armor, where he helped develop software used by the BunZai Media Group affiliated companies. (*See* Decl. of Reuveni Dkt. 391-2 ¶¶ 9-10, Ex. 911 ¶ 237).

157. Reuveni also received income from CalEnergy, Inc. (Ex. 911 ¶ 246).

158. Reuveni used the email addresses roi@chargebackarmor.com and roi@securedmerchants.com. (Ex. 910 ¶¶ 259-260; Ex. 911 ¶¶ 259-260).

### -CALENERGY, INC.-

159.  CalEnergy, Inc. is a California corporation and, in connection with the matters alleged in the Plaintiff's Amended Complaint, transacted business in

1  this district. (Dkt. 244 ¶ 21; Dkt. 245 ¶ 21; Dkt. 253 ¶ 21; Dkt. 254 ¶ 21; Ex.

2  904-49).

3  160.  CalEnergy was incorporated in September 2009, Defendant Latsanovski was

4  its CEO, CFO, and Secretary, and its business purpose was "business

5  management and R&D." (Ex. 904 pp. 49-50).

6  161.  CalEnergy provided loans in excess of $1.9 million to BunZai Media Group

7  and affiliated companies to help fund their operations and keep them viable.

8  (*See* Dkt. 90  ¶¶ 11, 6, 12).

9  ### -ZEN MOBILE MEDIA, INC.-

10  162.  Zen Mobile Media, Inc. was a California corporation with its principal place

11  of business at the Van Nuys Office. Zen Mobile Media used a commercial

12  mail receiving agent mailbox, 16830 Ventura Boulevard, #360, Encino,

13  California 91436. (Ex. 904 p. 24).

14  163.  According to documents the company filed with the California Secretary of

15  State, "Igor Lats" was the CEO, CFO, and Secretary of Zen Mobile Media

16  and its business was described as "wholesaler" on one state filing and

17  "management" on another. (Ex. 904 pp. 24, 26).

18  164.  In fact, Zen Mobile Media was owned and operated by Defendant Igor

19  Latsanovski. Zen Mobile Media processed payments for the negative-option

20  skincare  subscriptions. (Decl. of Receiver Dkt. 92 ¶ 11).

165.  Zen Mobile Media purportedly dissolved in December 2014 (Ex. 904 p. 27) but retained active merchant accounts and received at least $81,929 in 2015. (Decl. of Receiver Dkt. 92 ¶ 13).

**G.   BUSINESS PRACTICES**

**-WEBSITES OFFERS & CONFIRMATION EMAILS-**

166.  Since at least 2010, skincare products were sold online from multiple Internet websites, including auraviefreetrial.com, auravietrialkit.com, and mymiraclekit.com. (Ex. 597 pp. 13, 16, 22; Ex. 994; Ex. 995).

167.  The skincare products, including AuraVie, Miracle Face Kit, LeOr, and Dellure, were available exclusively through websites created, owned, or controlled by, the Defendants named in this action. (Decl. of Alon Dkt. 391-3 ¶ 6).

168.  Most of the websites used to sell the skincare products at issue in this case were registered by "Jay Michaels," an alias that Alon admitted to using. (*See* Ex. 597 p. 14: Ex. 910 ¶ 202).

169.  The landing pages of the challenged websites offered the products for a "trial order" or "risk-free trial." (Ex. 994 p.1 (AuraVie); Ex. 995 p. 1 (Miracle Face); Ex. 996 p. 1 (Miracle Face)).

170.  The landing and ordering pages of the websites used large font and colorful graphics or banners that proclaimed:

"TELL US WHERE TO SEND YOUR TRIAL ORDER"

"ACT NOW TO CLAIM YOUR TRIAL PACKAGE!"

"SEND ME MY TRIAL ORDER"

"CLAIM YOUR RISK-FREE TRIAL NOW"

(Ex. 994 pp. 1-2; see also Ex. 995 pp. 1-2; Ex. 600 pp. 17-18).

171.   Some websites promoted Skincare  products as a "gift" or "giveaway," purportedly for completing an online survey. (Ex. 903 p. 8).

172.   Some Skincare  products websites represented that AuraVie was accredited by, and had an A- rating with, the Better Business Bureau. (Ex. 994 p. 5).

173.   In fact, since at least March 2014, AuraVie has not had BBB accreditation and its BBB rating was an F. (Ex. 907 ¶ 5; Ex. 592).

174.   Some websites stated that customer satisfaction was "100% guaranteed" (Ex. 995 pp. 1, 3) or claimed that the product had won awards, including the 2010 Editor's Choice Award (Best Mask) (Ex. 995 p. 1) and the 2011 Epic Beauty Award. (Ex. 994 p. 1; Ex. 1007 p. 1; Ex. 600 p. 17), or the 2012 Women's Choice Award (Best Serum) (Ex. 994 p. 6).

175.   Consumers interested in accepting the trial offers were required to complete a short online order form and to provide their credit card or debit card information, purportedly to pay nominal shipping and handling fees. (Ex. 994  pp. 1, 13).

176. Consumers who completed the short online order form and accepted the trial offers of skincare products were automatically enrolled into an "auto-ship" or negative option plan, in which additional skincare products were shipped to the consumer and billed to the consumer's credit or debit cards each month. (Ex. 994 p. 5; Ex. 995 p. 5; *see also* Ex. 2 ¶ 6; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7; Ex. 14 ¶¶ 3-4, 6; Ex. 3 ¶¶ 8, 14; Ex. 4 ¶ 6).

177. After consumers completed the short online order form to accept the risk free trial offers, consumers were directed to an order confirmation page and often received an email confirming their order. The confirmation page stated, in clear red font, that the product cost was "$0.00." (Ex. 902 pp. 1-3; Ex. 8 ¶ 4; Ex. 8 pp. 5-6; Ex. 14 ¶¶ 3, 8; Ex. 15 ¶ 3; Ex. 15 at 5; see Ex. 12 ¶¶ 2, 7).

178. Unless a consumer called and affirmatively canceled the trial offer within 10 days of the order date, the consumer's credit or debit card was billed the full cost of the product, typically $97.88. (Ex. 994 p.5; Ex. 995 p. 5; Decl. of Alon Dkt. 391-3 ¶ 2).

179. Consumers who called within 10 days of accepting the trial offer were required to return the product, at their own cost, within 20 days or their credit or debit cards were billed the full costs of the product, typically $97.88. (*See* Decl. of Alon Dkt. 391-3 ¶ 2).

180. Consumers who returned product were often charged a restocking charge of up to $15. (Ex. 4 ¶ 7; *see also* Ex. 2 ¶ 6; Ex. 994 p. 6).

181. Consumers who did not call within 10 days of signing up for the risk free trial offers were shipped additional skincare products within 30 days and the full costs of such products, typically $97.88, were charged to the credit or debit cards that consumers provided to pay for the offer's nominal shipping fees. (Decl. of Alon Dkt. 391-3 ¶ 2).

### -THE INADEQUACY OF DISCLOSURES-

182. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure that acceptance of the risk free trial offer would result in consumers being charged for the skincare products upon the expiration of a limited trial period unless the consumer took affirmative action to avoid the charges. (Ex. 2 ¶ 6; Ex.3 ¶ 14; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Exs. 4 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7).

183. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure of when the trial period began and ended. (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Ex. 2 ¶¶ 7-10; Ex. 5 ¶ 5; Ex. 9 ¶ 7; Ex. 12 ¶¶ 2-3; Ex. 13 ¶ 9; Ex. 14 ¶¶ 3-4, 8; Ex. 15 ¶ 3). The fine-print reference to a 10-day trial did not make clear whether the 10

day trial began upon the date the product was ordered, or the date the product was received. (Ex. 14 ¶¶ 4, 6; *see also* Ex. 10 ¶¶ 3-4).

184. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure that acceptance of the trial offer would result in additional products being shipped to consumers and billed to the consumer's credit or debit cards. (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18). Consumers have testified that they never saw such a disclosure, even when they specifically looked for one. (Ex. 4 ¶ 8; Ex. 8 ¶ 3).

185. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure of the cost of the continuity plan or the frequency or duration of the charges. (*Id*; *see also* Ex. 994 p. 5)

186. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure of how consumers could cancel their order or the negative option plan and avoid additional charges. (*Id*.) For example, it is not clear from a casual review of the website pages that, to avoid charges, consumers were required to call the seller within a limited time and return the product, also within a limited time, at their own cost or expense. (Ex. 14 ¶¶ 4, 6; *see also* Ex. 10 ¶¶ 3-4).

187. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure regarding steps to return unwanted products or to

obtain a refund. (Ex. 994 p. 5).

188.   The landing and ordering pages of the websites did not contain a clear and conspicuous disclosure that consumers would incur restocking or other charges if they returned the products. (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; *see also* Ex. 2 ¶ 6; Ex. 901-49:8).

189.   While the landing pages of the websites contained no disclosures, the ordering pages included a fine-print disclosure, accessible only by scrolling toward the bottom of the page. The disclosure stated:

> We take great pride in the quality of our products & are confident that you will achieve phenomenal results. By submitting your order, you agree to both the terms of this offer (click link below) & to pay $4.95 S&H for your 10 day trial. If you find this product is not for you, cancel within the 10 day trial period to avoid being billed. After your 10 day trial expires, you will be billed $97.88 for your trial product & enrolled in our monthly autoship program for the same discounted price. Cancel anytime by calling 866.216.9336. Returned shipments are at customer's expense. This trial is limited to 1 offer per household.

(Ex. 994 p. 13).

190.   BunZai Media Group's own lawyer found that the purported disclosures of the terms and conditions of the risk free trial offer were not adequate. (*See* Ex. 589).

191.   In particular, BunZai Media Group's lawyer noted that the purported disclosures failed to disclose:

    a.  that the 10-day trial period begins on the day that the product was ordered;

    b.  that, to avoid charges, the consumer must also return the product to Defendants before the end of the trial period;

    c.  that to return a product, the consumer must first obtain a Return Merchandise Authorization ("RMA") code from Defendants;

    d.  that consumers could not return the product for a refund after 10 days if it was opened;

    e.  that consumers could not return the product for a refund after 30 days, even if it was not opened; and

    f.  that a restocking fee, usually $15, may be charged when a product was returned.  (*Id.*)

192.  Material terms and conditions relating to the risk free trial offers were hidden in a separate, multi-page terms and conditions webpage accessible only by hyperlink. On at least one website, that hyperlink could only be found by scrolling to the bottom of the website and clicking on a hyperlink labeled "T&C" (Ex. 994 p. 3).

193.  Post-sale confirmation emails sent to consumers who accepted the risk free trial offers also failed to clearly and conspicuously disclose material terms, including that:

   a.  the consumer would be charged as much as $97.88 for the skincare products after 10 days or other limited time period;

   b.  the dates on which the trial period began and ended;

   c.  that the consumer had been enrolled into a negative option plan,

   d.  that the consumer would receive additional products each month, and would incur additional charges of up to $97.88 on their credit or debit cards each month;

   e.  that, to avoid charges, the consumer would have to return the product, at his or her own cost, within a limited time period;

   f.  that the consumer would incur restocking or other charges for returning the product;

   g.  how consumers could avoid incurring charges, cancel the negative option continuity program, or return unwanted products. (Ex. 902).

194.  In August 2013, Alon Nottea shared with other individuals an opinion from BunZai Media Group's attorney that the companies' website offers were likely deceptive and said that:

> **I would recommend that you not say "Risk-Free Trial"** since there is risk the consumer won't cancel and will be charged the purchase price, and the FTC certainly wouldn't view it as "risk free."

(Ex. 589 at p. 3, emphasis added).

195. Likewise, the attorney stated that the disclosure of the negative option feature of the risk free trial offers was also inadequate:

"Rockefeller" requires online negative option terms to be disclosed before you "obtain the consumer's billing information," i.e., credit card data. The FTC and a recent federal court decision in an FTC case in California also require that negative option terms appear "above the fold," requiring no scrolling. **Right now your negative option terms are well below and quite far to the left of the credit card fields and the submit button, and are below the fold** (at least on my screen), invisible without scrolling. **As such, they are out of compliance with the placement requirements of both Rockefeller and the FTC.**

(Ex. 589 at p. 4, emphasis added).

196. The attorney further cautioned:

The 2012 Green Millionaire consent order is the FTC's latest and most detailed guidance on "clear and conspicuous" disclosure requirements for negative option. Your order page disclosure appears to contain and express reasonably clearly the material negative terms that need to be disclosed (i.e., amount and timing of charges, length of trial period, cancellation option and method). The question, under Green Millionaire and current FTC negative option standards as reflected in that order, is whether the disclosure is conspicuous enough and whether the consumer is providing her "express informed consent" to the negative option. As noted above, **the disclosure on the order page is below the fold** (again, at least on my screen) **and not in "close proximity" to the submit button. Almost certainly the FTC would say it therefore is not "conspicuous."**
(Ex. 589 at p. 4, emphasis added).

197. Finally, he advised:

Right now nothing identifies the text of the disclosure as the trial/continuity purchase terms. **To call sufficient attention to them, I would recommend that you place something like, "IMPORTANT: READ PURCHASE TERMS BEFORE ORDERING," immediately above or at the beginning of the**

PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT
& CONCLUSIONS OF LAW

PAGE 43

**negative option disclosure. I also would increase font size, bold the numbers** (10, $4.95 s&h, $97.88), **and sharpen the color contrast of the text with the page.** Finally, I would definitely include a hyperlink to the full T&Cs in the disclosure and would make the reference to the T&Cs more specific, by saying something like, "For additional purchase, cancellation, return, refund and other details, and for our privacy policy, see Terms & Conditions and Privacy Policy." **With these changes, I think you would have a much more defensible argument that your negative option disclosure is sufficiently noticeable** ("unavoidable" in FTC speak) **to the "reasonable consumer."**

(Ex. 589 at p. 4, emphasis added).

198.   Recognizing that consumers who accepted the risk free trial offers were likely not aware of the negative option terms, BunZai Media Group's attorney advised:

To satisfy the "express informed consent" requirement, the Green Millionaire consent mandates a "check box, signature, or other substantially similar method, that consumers must affirmatively select or sign to accept the negative option feature." **All key negative option disclosures (costs, trial period length, need to cancel to avoid charge), together with a statement that the consumer is agreeing to pay the costs, must be "immediately adjacent" to the check box.**

(Ex. 589 at p. 4, emphasis added).

199.   He also stated that the companies' post-sale confirmation emails reciting the negative option terms and conditions should be should be promptly emailed to consumers and included with the invoice for the trial order. (Ex. 589 at p. 5).

200. He objected that (a) the website offers were not clear "whether the 10-day trial begins from order or delivery date" and (b) that the 15 percent restocking fee was **"buried in the T&Cs. That's a highly material term that should be disclosed much more prominently**, ideally on the order page." (Ex. 589 at p. 5, emphasis added).

201. Contemporaneously, the Better Business Bureau informed BunZai Media Group that clearer disclosures needed to be included in AuraVie's website offers:

First, with respect to the request concerning the "Risk-Free Trial" disclosure: **we've made the request that the disclosure be added to areas where the risk-free trial is mentioned on the website** and in promotional materials for the purpose of clarity. Additionally, **this may assist in helping to eliminate a potential source of complaints** for your business. BBB's Code of Advertising, concerning issues like this, reads as follows:

"An advertisement as a whole may be misleading although every sentence separately considered is literally true. Misrepresentation may result not only from direct statements but by omitting or obscuring a material fact."

While placing the disclosure only at the point of check may meet what you're required to do, it may not provide enough clarity for consumers to have a complete understanding of the program and its structure.

(Ex. 592 pp. 2-3, emphasis added).

202. Despite receiving clear guidance from their own attorney and the BBB in August 2013, appropriate changes were not made to the challenged websites.

(Ex. 600 pp. 17-23 (myauravie.com, dated 01/14/2015); Ex. 994 (auraviefreetrial.com, dated 03/25/2014)).

### -CONSUMER COMPLAINTS AND INJURY-

203. Thousands of consumers filed complaints concerning Defendants' business activities. (*See generally* Ex. 907; Ex. 325).

204. The Better Business Bureau reported having at least 406 complaints on file as of June 2015 concerning billing, sales, or refund issues. (Ex. 907).

205. Complaints concerning unauthorized charges for skincare products were so prevalent that Defendants prepared a scripted "rebuttal" to guide customer service representatives in responding to consumers. (Ex. 104).

206. The customer service scripts required customer service representatives to state:

I see here that on (Date) you visited our website (Website Name) and placed and order for our AuraVie Risk Free Trial. When you placed this order did you take the opportunity to read over the Offer Terms and Conditions that were listed to the left of the credit card screen before submitting your order?

(Ex. 104 p. 3).

207. Representatives were also advised to tell consumers who complained about unauthorized charges that:

. . . so you read that we shipped you a full 30 days supply of the AuraVie 3 in 1 skincare  treatment and that you had a 10 day trial period with the products before being bill the discounted membership

rate of $97.88 for all three products which we sell at malls and spas nationwide for over $200.

(Ex. 104 p. 3).

208. Defendants Alon, Reuveni, and Bond were aware that consumers filed complaints online at www.ripoffreport.com, asserting that AuraVie products were a "scam" or "ripoff." (Ex. 93).

209. Direct Outbound, a call center used by SBM Management to provide customer service for Dellure and AuraVie sales, provided regular reports itemizing consumer complaints received. (*See, e.g.*, Ex. 325; Ex. 1035).

210. For the week of January 6, 2014, Direct Outbound reported that 127 customers called concerning Dellure product sales. (Ex. 325 pp. 2-5). Such customers complained about being "charged for the full price of the product," inquired "about the charges on dellure they are getting," and claimed they "had placed the trial but did not realize it was a recurring." (*Id*.).

211. For the week of January 6, 2014, Direct Outbound reported that 2,057 customers called concerning AuraVie product sales. (Ex. 325 pp. 6-52). Such customers called "to see why she was charged," "to cancel, declined save offers, threatened charge back," and to complain "that she sent the product back and never received the refund." (*Id*.).

212.   The FTC submitted declarations from 14 consumers who shared similar experiences and were dissatisfied with the risk free trial offers because they resulted in undisclosed and unauthorized charges. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

213.   The consumer declarants attested that they were subject to injury in the form of unauthorized charges for skincare products that were advertised as part of a risk-free trial as well as for additional unordered and unwanted products that were sent each month. (Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

214.   According to Defendants' own income tax records and Quickbook records, Defendants' revenue, minus returns, chargebacks, and refunds, totaled $72,692,812. (Dkt. 482-1 at p.4).

### -DEFENDANTS' CHARGEBACK AND MERCHANT ACCOUNT ISSUES-

215.   BunZai Media Group established a merchant account with Cynergy Data, LLC dba Priority Payment Systems and Signal Pay (hereinafter "Priority Payment") in December 2010. (Ex. 600 p. 2),

216.   The merchant banks require merchant account holders to agree to "keep fraud and chargebacks below thresholds." (*See* Ex. 600 p. 13).

217.   BunZai Media Group had difficulty keeping chargebacks within threshold levels because many consumers complained about unauthorized charges. (*See* Witness Narrative of Nastassia Yalley ¶ 43; Dkt. 120 at 36 n.72). The chargeback threshold, per industry standard, is around one percent. (Dkt. 120 at 36 n.72).

218.   In June 2011, one of BunZai Media Group's merchant accounts (myauravie) was fined $26,500 for having excessive chargebacks. (Ex. 102 p. 2-3)

219.   Defendants Alon and Bond recruited friends and family members to establish shell companies with merchant accounts, to ensure access to credit card processing services. (*See* Decl. of Alon Dkt. 391-3 ¶ 4).

220.   One of the shell companies, Zen Mobile Media, was established by Latsanovski for that same purpose. (Decl. of Latsanovski Dkt. 90-1 ¶ 15-16).

221.   Zen Mobile Media established a merchant account with Priority Payment in November 2011 (Ex. 600 p. 2), and agreed to "keep fraud and chargebacks below thresholds." (Ex. 600 p. 34).

222.   As of December 2011, BunZai Media Group was using dozens of shell companies, merchant accounts, and billing descriptors to process credit and debit card payments for the sale of skincare products. (Ex. 78 p. 2; *see* Ex. 65).

223.  BunZai Media Group and its affiliated companies regularly tracked consumer chargebacks, which were attributable to the risk-free trial offers and "auto ship" negative option plans. (*See* Ex. 131 p. 4; Ex. 132; *see* Ex. 507).

224.  Chargebacks cost the Defendants' companies hundreds of thousands of dollars in fees and lost revenues. (*See. generally*, Ex. 507; Ex. 305; Ex. 307).

225.  For example, in March 2012, the Defendants' companies paid chargebacks of $219.99 (AuraVie), $12,259.46 (BunZai Media Group), $7,539.54 (Dead Sea), $29,432.34 (Agoa Holdings), $3,608.70 (DMA Media Holdings), 3,573.28 (Lifestyle Media Brands), $32,689.62 (Zen Mobile Marketing), $25,988.09 (Safehaven Ventures), for a total of $115,311.02 in chargebacks. (Ex. 305 p. 16). The companies also paid $92,325.65 in merchant account fees that month. (*Id*.). The companies' revenues for the month were $1,624,917.58.

226.  In May 2012, the AuraVie companies paid $133,102.12 in chargebacks and $85,839.79 in fees. The company had generated $1,765,394.61 in revenue that month—meaning their chargeback rate was 7.5 percent of sales—far exceeding the one percent industry standard. (Ex. 307 p. 17; *see* Dkt. 120 at 36 n.72).

227. Because chargebacks were an ongoing concern, Alon strategized with Defendants Paul Medina and Roi Reuveni in May 2012 about how to respond to payment processors and determined that they should hire a third party company to call and survey consumers who demanded chargebacks so that the company "would look extremely compliant and proactive." (Ex. 86).

228. To discourage chargeback requests, BunZai Media Group included a warning on the "Terms and Conditions" page of its website:

> CHARGEBACKS AND REVERSALS. We handle all chargebacks and reversals as potential cases of fraudulent use or our product offer and/or theft of product. In cases where we have provided a product and we have verified that a client has received a product and/or refused or returned product(s), whether or not they have used the product in any way, possible actions taken by the company may include filing a complaint with the Internet Crimes Bureau and/or local authorities in your state to investigate theft of product and possible mail fraud which is a Federal Crime. All cases of chargeback requests will be vigorously fought by the Company. BE AWARE that if you choose to claim your online transaction was fraudulent that all activity and IP address information is captured. This digital proof of whom and where the order was placed with be submitted to the proper authorities. This information may be used in a civil and criminal case against a customer if there is fraudulent use or theft of product(s).

(*See*, *e.g.* Ex. 600 p. 21; Ex. 994 p. 6; Ex. 995 pp. 6-7).

## III.    CONCLUSIONS OF LAW

1. To determine the Issues Presented, *supra* at pp. 1-3, the first inquiry concerns whether the risk-free trial offers at issue violated the FTC Act, ROSCA, or

EFTA. The FTC contends that they do. The second inquiry examines whether the Defendants were members of a common enterprise or participated in, or controlled, the deceptive acts challenged by the FTC, which the FTC also contends is true.

2.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the FTC authority to seek and this Court authority to grant a permanent injunction against violations of any provision of law enforced by the FTC and "any ancillary relief necessary to accomplish complete justice." *FTC v. H. N. Singer, Inc.* 668 F.2d 1107, 1111-13 (9th Cir. 1982)

3.  This Court finds that Defendants Argaman and Secured Merchants have violated §5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, § 907(a) of EFTA, 15 U.S.C. § 1693e(a), and §205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

## A. DEFENDANTS VIOLATED SECTION 5 OF THE FTC ACT

4.  Section 5(a) of the FTC Act empowers the FTC to prevent "deceptive acts or practices in or affecting commerce." 15 U.S.C. §45(a).

5.  An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasabonly under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Pantron I Corp.*, 33 F.3d

1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164-65 (1984)).

6.  A representation, omission, or practice is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).

7.  An act or practice is unfair if:

- it causes substantial injury to consumers
- that consumers cannot reasonably avoid, and
- that is not outweighed by countervailing benefits to consumers or competition.

15 U.S.C. § 45(n).

8.  The FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutiuons of large consumer redress actions. *Id.* Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misreprsentations, that they were widely disseminated, and that consumers purchased the defendant's product. *Id.* at 605-06.

9.  An act or practice is unfair, and also violates Section 5(a) of the FTC Act, if it causes, or is likely to cause, substantial injury to consumers that is not

1     reasonably avoidable and is not outweighed by countervailing benefits to

2     consumers or competition. 15 U.S.C. § 45(n).

3   10. Here, Defendants engaged in deceptive and unfair practices in violation of

4     Section 5(a) by: (a) failing to disclose clearly material terms of their offer; (b)

5     making false "risk-free trial" claims; (c) making false representations regarding

6     their Better Business Bureau rating and accreditation status; and (d) unfairly

7     charging consumers without authorization.

**- Deceptive Omissions –
Count I**

9   11. An advertisement that fails to disclose material information is deceptive under

10     Section 5. *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978);

11     *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984) ("The failure to

12     disclose material information may cause an advertisement to be deceptive, even

13     if it does not state false facts.").

14   12. Courts have agreed that an inconspicuous disclosure does not remedy the

15     deceptiveness of a material omission. *FTC v. Cyberspace.com*, No. C00-1806L,

16     2002 U.S. Dist. LEXIS 25565, *8-10 (W.D. Wash. July 10, 2002) (holding that

17     a fine print disclosure was inadequate to escape liability), *aff'd*, 453 F.3d 1196,

18     1200 (9th Cir. 2006); *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12

19     (1st Cir. 2010) ("Disclaimers or qualifications in any particular ad are not

20     adequate to avoid liability unless they are sufficiently prominent and

unambigious to change the apparent meaning of the claims and to leave an accurate impression[.]") (quoting *Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (holding that an advertisement's description of cigarette tar content was deceptive despite a fine-print disclosure at the bottom of the ad); *FTC v. Porter & Dietsch*, 605 F.2d 294, 301 (7th Cir. 1979) (upholding FTC and finding that disclosures "buried in small print" were inadequate to qualify weight loss claims in advertising); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers made in contract for credit repair services were insufficient to counteract advertising claims about the service).

13. To be effective, a disclosure must be sufficiently clear and prominent so that the "overall net impression" of the sales offer is truthful. *See Cyberspace.com*, 453 F.3d at 1200 (finding that deception is not cured by the mere inclusion of disclaimers in small print); *see also Direct Mktg. Concepts*, 624 F.3d at 12; *Removatron*, 884 F.2d at 1497; *Gill*, 71 F. supp. 2d at 1044.

14. Here, Defendants represented prominently that their skincare products were available through risk-free trial offers, upon payment of only a nominal shipping and handling fee.

15. Defendants effectively buried material, contradictory terms concerning their offer in hyperlinks and hidden text. These hidden disclosures failed to correct the overall net impression of the offers that skincare products were available upon payment of only a nominal shipping and handling fee.

16. Defendants failed to disclose clearly: (a) that their "risk free" trial offer of product converted into a $97.88 charge after just 10 days; (b) when the trial began and ended; that monthly charges; or how consumers could cancel their membership in the plan. (*See, e.g.*, Ex. 994; Ex. 1007; Ex. 995; Ex. 996; *see also* Ex. 589 at p. 4).

17. Information concerning costs, enrollment into a negative option continuity plan, and ways to terminate that plan were material to reasonable consumers when deciding whether to purchase, or their conduct regarding, Defendants' offers.

18. In light of this evidence, the FTC has proved Count I of the Amended Complaint by a preponderance of the evidence.

### -MISREPRESENTATIONS – Counts II and III

19. A misrepresentation under Section 5 of the FTC Act may be either express or implied. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("Nothing in statute or case law . . . protects from liability those were merely implying their deceptive claims[.]").

20. Express claims are presumed material and reliance upon such claims is presumptively reasonable. *Patron I Corp.*, 33 F.3d at 1095-96; *FTC v. Five-Star Autho Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

21. Here, Defendants prominently and expressly represented that they were offering "risk-free trials" of their skincare products. (*See, e.g.*, Ex. 994; Ex. 1007; Ex. 995; Ex. 996; *see also* 589 at p. 4).

22. In fact, Defendants' offers were not risk free: consumers were charged 10 days after acceptance of the offer and, to avoid such charges, were required to contact Defendants, return unused product at their own expense, and often pay restocking fees. (Witness Narrative of Nastassia Yalley at p. 6 ¶ 18).

23. The costs associated with accepting Defendants' purported risk-free trial offers were material to reasonable consumers.

24. In light of this evidence, the FTC has proved Count II of the Amended Complaint by a preponderance of the evidence.

25. In addition, Defendants represented on their website that they were accredited by the Better Business Bureau ("BBB") with an "A-" rating. (*See, e.g.*, Ex. 994 at p. 4 and 13).

26. Defendants continued making this representation for approximately one year after their BBB accreditation was revoked and an "F" rating was awarded. (*See* Witness Narrative of Steven McFarland).

27. This express representation was false, and this misrepresentation was material to consumers.

28. In light of this evidence, the FTC has proved Count III of the Amended Complaint by a preponderance of the evidence.

## - UNFAIRNESS –
## Count IV

29. Defendants' practice of charging consumers without their authorization was unfair.

30. "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'" *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (citing *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985) *cert. denied*, 106 S.Ct. 1185 (1986)).

31. "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi, Inc.*, 604 F.3d at 1158.

32. Business practices that rely upon a lack of disclosure and unauthorized billing provide no countervailing benefits to consumers or competition.

33. Courts have regularly found unauthorized billing practices to be unfair. *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010); *FTC v. J.K. Publ'ns*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000); *FTC v. Windward*

*Mktg., Ltd.*, No. 1:96-cv-615F, 1997 U.S. Dist. LEXIS 17114, at *9, *13, 40-42
(N.D. Ga. Sept. 30, 1997).

34. "An unfair practice does not require knowledge of consumer harm and may
merely 'facilitate, or contribute to, ill intentioned schemes if the injury was a
predictable consequence of those actions." *FTC v. Wells*, 385 Fed.Appx. 712,
713 (9th Cir. 2010) (quoting *Neovi*, 604 F.3d at 1158 ).

35. In *Wells*, 385 Fed. Appx. at  713, the Court upheld a finding that the defendant
engaged in unfair trade practices by "processing debit transactions to
consumers' bank accounts, while knowing or consciously avoiding knowing
that those debit transactions were unauthorized by consumers," based in part on
high chargeback rates.

36. Here, Defendants obtained consumers' credit card information purportedly to
pay nominal shipping fees and charged consumers for products without their
knowledge or consent. (*See, e.g.*, Witness Narrative of Nastassia Yalley at p. 6 ¶
18; Ex. 994; Ex. 1007; Ex. 995; Ex. 996).

37. The evidence showed that many consumers were unaware that by accepting
Defendants' "risk free trial" offer, they would be enrolled in a negative option
continuity plan. Therefore, they could not have reasonably avoided Defendants'
unauthorized charges. (*See, e.g.*, Ex. 994; Ex. 1007; Ex. 995; Ex. 996; *see also*
Ex. 589 at p. 4; Witness Narrative of Donna Gott).

38. Defendants' practices caused substantial injury to consumers that was not reasonably avoidable and that was not outweighed by countervailing benefits to consumers. Accordingly, the practices were unfair under Section 5 of the FTC Act, 15 U.S.C. § 45(n).

39. In light of this evidence, the FTC has proved Count IV of the Amended Complaint by a preponderance of the evidence.

## B.  VIOLATIONS OF ROSCA

### Count V

40. ROSCA generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless the seller

- clearly and conspicuously discloses all material terms of the  transaction before obtaining the consumer's billing information
- obtains the consumer's express informed consent before making the charge, and
-  provides a simple mechanism to stop recurring charges.

*See* 15 U.S.C. § 8403.

41. Defendants were subject to ROSCA but violated all three of these provisions.

42. A negative option feature is "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).

43. Defendants treated consumers' silence or failure to take affirmative action as acceptance of the offer to send and charge consumers for additional products.

(Exs. 2 ¶ 6; 14; 5 ¶ 4; 7 ¶ 6; Ex. 994 pp. 5, 13; *see also* 3 ¶¶ 8; 4 ¶ 6; 9 ¶ 5; 13 ¶ 7). Therefore, their risk-free trial offers included a negative option feature.

### The Skincare Products Websites Did Not Clearly and Conspicuously Disclose Negative Option Features

44. Defendants failed to disclose clearly, if at all, material terms of their negative option plan. The landing and ordering pages of the websites did not contain a clear and conspicuous disclosures that:

      a.  acceptance of the trial offer would result in consumers being charged for the skincare  products upon the expiration of a limited trial period unless the consumer took affirmative action to avoid the charges (Ex. 2 ¶ 6; Ex.3 ¶ 14; Ex. 5 ¶ 4; Ex. 7 ¶ 6; Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; see also Exs. 4 ¶ 6; Ex. 9 ¶ 5; Ex. 13 ¶ 7);

      b.  when the trial period began and ended (Ex. 994 p. 1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18; see also Ex. 2 ¶¶ 7-10; Ex. 5 ¶ 5; Ex. 9 ¶ 7; Ex. 12 ¶¶ 2-3; Ex. 13 ¶ 9; Ex. 14 ¶¶ 3-4, 8; Ex. 15 ¶ 3);

      c.  that acceptance of the trial offers would result in additional products being shipped to consumers and

billed to the consumer's credit or debit cards (Ex. 994 p.

1, 13; Ex. 995 p. 1; Ex. 996 p. 1; Ex. 997 p. 1, 18);

d.  the cost of the negative option continuity plan or the

frequency or duration of the charges (*Id; see also* Ex. 994

p. 5);

e.  how consumers could cancel their order or the negative

option plan and avoid additional charges (*Id*.)

45. Instead, most of the material terms and conditions of the trial offers were

hidden in  a separate, multi-page terms and conditions webpage accessible only

by hyperlink.  On at least one website, the hyperlink could only be found by

scrolling to the bottom of the website and clicking on a hyperlink labeled

"T&C" (Ex. 994 p. 3).

### Defendants Did Not Obtain Consumers' Express, Informed Consent before Billing for Negative Option Plans

46. Defendants routinely charged consumers for negative option plans without

obtaining their express informed consent. Consumers could not have consented

to the charge because many consumers were unaware that Defendants' "risk-

free trial" was in fact a negative option continuity plan because Defendants

failed to disclose this information. (*See, e.g.*, Ex. 994; Ex. 1007; Ex. 995; Ex.

996; *see also* 589 at p. 4; Witness Narrative of Donna Gott).

***Defendants Did Not Provide Consumers with a Simple Mechanism to Stop the Negative Option Plan***

47. Defendants failed to provide a simple mechanism for cancelling the negative option plan, as required under Section 4 of ROSCA.

48. Under Section 4 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

49. In light of this evidence, the FTC has proved Count V of the Amended Complaint by a preponderance of the evidence.

## C. DEFENDANTS' BILLING PRACTICES VIOLATED SECTION 907(a) OF EFTA Count VI

50. EFTA and its implementing Regulation E regulate the circumstances under which a merchant may make regularly recurring debits from a consumer's bank account.

51. Under EFTA, a preauthorized electronic fund transfer

- may be authorized by the consumer only in writing and
- a copy of such authorization shall be provided to the consumer when made.

12 C.F.R. § 205.10(b).

52. Defendants violated both EFTA provisions.

53. A "preauthorized electronic fund transfer" is an electronic fund transfer that is authorized in advance and scheduled to recur at substantially regular intervals. 15 U.S.C. § 1693a(10).

54. Defendants' "auto-ship" or negative option plan billed consumers' debt cards at regularly monthly intervals, purportedly based upon pre-authorization by consumers. Thus, the "auto-ship" or negative option plan used preauthorized electronic fund transfers and was required to comply with EFTA.

55. Under the law, before a merchant can make recurring debits from a consumer's bank account, the merchant must first obtain a written authorization signed or similarly authenticated by the consumer. 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).

56. Section 205.10(b) of Regulation E states that the person that obtains the authorization shall provide a copy to the consumer.

57. The terms of the preauthorized transfer must be "clear and readily understandable" and the authorization "should evidence the consumer's identity and assent to the authorization." Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. Part 205, Supp. I, ¶ 10(b), comments (5) & (6).

58. These protections ensure that consumers' consent to recurring debits will be knowing and informed.

59. A consumer's rights under EFTA cannot be waived. 15 U.S.C. § 1693*l*.

### *Consumers Who Accepted Defendants' "Risk-Free Trial" Offers Did Not Authorize Recurring Electronic Fund Transfers from Their Accounts*

60. Defendants' terms and conditions regarding recurring monthly fees were not clear and readily understandable. In fact, this information was concealed in fine-print documents available only by hyperlink or in hard-to-read disclosures.

61. Further, Defendants' websites were covered with claims that their offer was "risk-free" and other directly contradictory statements.

62. Consumers who accepted Defendants' risk-free trial offers did not authorize, in writing, electronic fund transfers to be made from their accounts.

63. In light of this evidence, the FTC has proved Count VI of the Amended Complaint by a preponderance of the evidence.

### Consumers Who Accepted Defendants' "Risk-Free Trial" Offers Did Not Receive Copies of Any Authorization for Recurring Electronic Fund Transfers

64. Defendants' websites or terms and conditions pages could not serve as the consumer's "copy" of the authorization, as required by 15 U.S.C. § 1693e(a), because they were not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional transfers.

65. Because consumers had never authorized the electronic fund transfers, consumers were not, and could not have been, provided copies of any such authorization. (*See, e.g.*, Ex. 2 ¶¶ 5-6; Ex. 3 ¶ 7; Ex. 4 ¶ 3; Ex. 5 ¶¶ 3-4; Ex. 6 ¶ 5; Ex. 7 ¶ 3; Ex. 8 ¶ 4; Ex. 9 ¶¶ 4-5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶ 3; Ex. 12 ¶ 5; Ex. 13 ¶¶ 6-7; Ex. 14 ¶¶ 5-6; Ex. 15 ¶ 4).

66. Accordingly, the practices violated EFTA. 15 U.S.C. § 1693e(a).

67. In light of this evidence, the FTC has proved Count VI of the Amended Complaint by a preponderance of the evidence.

### D. COMMON ENTERPRISE
***Corporate Defendants Acted as a "Complex Web of Interlacing Entities and Individuals" or a Common Enterprise***

68. Plaintiff alleged that Defendants acted collectively as a "common enterprise." (Dkt. 235 ¶¶ 42-43).

69. "[I]n situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quotation omitted).

70. "When determining whether a common enterprise exists, courts look to a variety of factors, including: common control; the sharing of office space and officers; whether business is transacted through 'a maze of interrelated companies'; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence which 'reveals that no real distinction existed between the Corporate Defendants.'" *FTC v. Wolf*, No. 948-8119-civ-Ferguson, 1996 U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 30, 1996) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175

(1st Cir. 1973); *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431

(7th Cir.), *cert. den.*, 377 U.S. 992 (1964); *Zale Corp. and Corrigan-Republic,*

*Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973); *Delaware Watch Co. v. FTC*,

332 F.2d 745, 746 (2d Cir. 1964); *SEC v. Elliott*, 953 F.2d 1560, 1565 n.1 (11th

Cir. 1992); *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) P 70,570 at

72,095 (S.D. Fla. 1994)).

71. Common enterprise has been found where corporate defendants were

commonly controlled and shared the same business address and office space.

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal.

2012).

72. Common control can be established by showing that individuals held direct or

indirect ownership interests in the entities at issue, even if some interests are

shared with non-defendant individuals. *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-

283 JCM GWF, 2013 WL 1224613, *13 (D. Nev. Mar. 26, 2013), *aff'd* in

relevant part, 616 F. App'x 360 (9th Cir. 2015).

73. The law is clear that, for purposes of a common enterprise, interrelated activity

exists where "the roles of each entity varied, but all had a distinct role to play as

part of the scam." *Ivy Capital, Inc.*, 2013 WL 1224613, at *14, *aff'd* in relevant

part, 616 F. App'x 360 (9th Cir. 2015).

74. In the Ninth Circuit, entities constitute "a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

75. Vertical commonality exists where an investor and promoter are involved in a common venture without requiring other investors' involvement. *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir.1978) (noting that a farmer, a feedlot operator, and a bank may be involved in a common enterprise if the farmer and the bank both depended upon the success of the feedlot for the success of their investments).

76. Conversely, horizontal commonality is shown by the "pooling of interests, usually combined with a pro-rata sharing of profits." *Brodt v. Bache & Co.*, 595 F.2d at 460. "[T]he critical factor in the common enterprise test 'is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts.'" *Id.* at 461 (quoting *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974)).

77. A common enterprise may be proved by evidence that companies pooled resources, staff, and funds; that companies were owned and managed by the same group of individuals; and that companies all participated to some extent in

a common venture to sell the same products. *Network Servs. Depot, Inc.*, 617 F.3d at 1143.

78. The evidence shows that Defendants promoted risk-free trial offers as a common enterprise with:

        a.  <u>Common control</u>: The Corporate Defendants and shell companies operated as a single economic unit under common control and used shared resources to effect their mutual goals of charging consumers without their authorization and evading detection. (Decl. of Alon Dkt. 391-3 ¶ 4; Dkt. 121-1 at 3; Dkt. 120 at 5; Ex. 65; Ex. 78 at 2; Ex. 82 p. 10; *see also* Decl. of Latsanovski 90-1 at 2-3 ¶5-6 and at 5 ¶16).

        b.  <u>Common offices</u>: Many, if not all, of the Corporate Defendants operated out of a single "nerve center" that was leased by Secured Commerce (co-owned by Doron Nottea and Alan Argaman). (Dkt. 120 at 12-14). Argaman, despite his claimed non-involvement in the negative-option scheme, established the telephone numbers for the various shell merchant account entities. (Ex. 530; Ex. 529; *see also* Ex. 489; Ex. 516).

        c.  <u>Network of interrelated companies</u>: Defendants formed a vast, fully integrated web of corporations. (Dkt. 121-1 at 3; *see also* Ex.

561 at 3). Corporate Defendants were owned and operated by the Individual Defendants, their family members, or associates. (Decl. of Alon Dkt. 391-3 ¶ 4; *see also* Decl. of Latsanovski 90-1 at 2-3 ¶5-6 and at 5 ¶16; Ex. 65; Ex. 78 at 2). The numerous shell entities and their merchant accounts served the common purpose of generating revenues through the negative-option scheme while evading detection by payment processors. (Dkt. 120 at 5; Dkt 121-1 at 3). Once the many shell entities received revenue from the sale of the skincare products, certain Defendants served as intermediary entities transferring funds to a web of entities whose purposes ranged from maintaining operations to funneling funds to Individual Defendants. (Dkt. 121-3 at 4-5 Ex. 32; Ex. 170; 945; 988 at 9-10, 14, 16, 18, 20, 22).

d. Commingling of corporate funds: The finances for almost all of the Corporate Defendants were derived from the sale of the same products. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; *see also* Ex. 75). The finances of these Corporate Defendants were handled by the same managers and employees. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; Decl. of Doron Nottea, Dkt. 398-2 at 3-4 ¶9; *see also* Ex. 78; Ex. 94).

e.  <u>Unified advertising:</u> Defendants' scheme had a unified advertising company in Media Urge, Inc. (Decl. of Alon Dkt. 391-3 ¶ 7). The common enterprise used the same Internet advertising on various websites for the same product (*See*, *e.g.,* Ex. 600 at 17-26; Ex. 1007; Ex. 994) regardless of which shell company processed the charge or which upstream entity received the consumer's payment.

f.  <u>Pooled resources and staff:</u> The same principal actors, most of whom were Individual Defendants in this action, owned and operated the numerous corporate entities associated with this scheme. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; Ex. 75; Ex. 78 at 2). Despite the extensive operations and many nominally different operating entities associated with the scheme, a relatively small group of individuals was responsible for day-to-day operations. Defendants' employees operated across companies and in various positions throughout the corporate web. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7).

g.  <u>Lack of distinctions between entities:</u> Although each Corporate Defendant served its own purpose in the scheme (Dkt. 121-3 at 4-5), many served similar purposes or easily could have served a different one because the companies shared owners, managers, and

financial expertise. (Decl. of Alon Dkt. 391-3 ¶¶ 4 and 7; *see also* Ex. 65). A small group of Individual Defendants owned and utilized this vast web of companies to execute the scheme. (Dkt. 120 at 30-31).

79. CalEnergy, Inc. financed BunZai Media Group, Inc., and managed Pinnacle Logistics, Inc., and Media Urge, Inc. (Ex. 571 pp. 2-3; *see also* Ex. 561-3; Ex. 588-1; Ex. 588-9). Latsanovski was the CEO of CalEnergy (Ex. 904-51) and used the company to provide financing for the AuraVie enterprise. CalEnergy claimed to be the parent company of both Pinnacle Logistics, Inc., and Media Urge, Inc.—both of which promoted the trial offers of skincare products. (Dkt. 908).  CalEnergy was part of the common enterprise.

80. Defendants pooled resources, staff, and funds; Corporate Defendants were owned and managed by the same group of individuals—the Individual Defendants—and all participated to some extent in a common venture to sell the same products.

### Defendant Secured Merchants Was a Member of Defendants' Common Enterprise Scheme

81. Secured Merchants processed chargebacks for the AuraVie companies (*see* Ex. 917-45 ¶ 56; Ex. 348), using a platform it developed for Defendants named Chargeback Armor. (Ex. 280; Ex. 412; Ex. 413).

82. Secured Merchants was owned and operated by the Individual Defendants. Secured Merchants was purportedly owned by Alan Argaman (Dkt. 299 ¶ 39; Dkt. 244 ¶ 39; Dkt. 245 ¶ 39; *see also* Ex. 917 ¶ 208). But Defendants Roi Reuveni and Doron Nottea both claimed to be managing members (Ex. 412-5; Ex. 176 at p. 2). Reuveni held himself out as a managing member of Secured Merchants and signed a contract on its behalf. (Ex. 412 at p. 5). Defendant Alon Nottea used a Secured Merchants email address (Ex. 930 at p. 218) and was identified in the company's executive summary as "Management," along with Defendant Paul Medina. (Ex. 256 at p. 2).  Defendant Doron Nottea handled Secured Merchants's finances and was listed as a member in Secured Merchants's bank documents. (Ex. 176 at p. 2; Dkt. 353-19 at 153:2-9).

83. Secured Merchants's own executive summary states that the company's founders owned a skincare  product business and created its products "to deal with [ ] inevitable credit card chargebacks." (Ex. 256).

84. Secured Merchants operated from the same office suite as the other Corporate Defendants. (Dkt. 120 at 24).

85. Secured Merchants received over $300,000 from Defendant SBM Management, Inc. (Dkt. 120 at 25).

86. Secured Merchants also managed Defendants' automated customer service line. (Ex. 257 at p. 2-3; Ex. 1015 at p. 3¶ 5; Ex. 149; Ex. 323; Ex. 348).

87. Secured Merchants was listed as one of the "Bunzai Companies" in Defendants' accountant's spreadsheet. (Witness Narrative of David Davidian at pp. 3 ¶ 8).

88. Accordingly, Secured Merchants was part of the common enterprise.

**E. Individual Liability – Injunctive and Monetary Relief**

89. Having determined that the evidence proves that the Defendants' risk-free trial offers violated the FTC Act, ROSCA, and EFTA, and that Defendants acted as a common enterprise, the court next examines whether Defendant Argaman is liable for the violations.

90. The Court finds that, acting in concert with others, Defendant Alan Argaman participated in, controlled, or had the authority to control the unlawful acts and practices at issue in this case. Therefore, Argaman is liable for Injunctive Relief.

91. The Court further finds that Defendant Argaman acted with the requisite knowledge to be held liable for equitable monetary relief. Therefore, a monetary judgment against him is proper.

> ***Defendant Argaman Participated In or Controlled the Unlawful Activities and Are Liable for Injunctive Relief***

92. An individual may be held liable for injunctive relief arising from deceptive or unfair acts or practices when they *either*

- participated directly in the acts or practices *or*

- had authority to control them.

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

### a. <u>Participation Alone is Sufficient to be Held Individually Liable</u>

93. Defendant Argaman has focused his argument on his purported lack of control over the enterprise, but the law is well-established that participation in the unlawful acts alone is sufficient to be held individually liable for corporate violations of the FTC Act.

94. Participation may include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g., FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).

95. An Individual Defendant's participation need not be directly in the violative conduct. "Where an officer participates in 'acts crucial to the success' of an enterprise, the officer has directly participated for the purposes of individual liability." *FTC v. Ivy Capital*, Inc., No. 2:11-CV-283,  2013 WL 1224613, at *41 (D. Nev. 2013) (quoting *J.K. Publ'ns.*, 99 F.Supp.2d at 1206).

96. Participation need not be limited solely to the creation of the deceptive websites. Courts have found participation where an individual participated in acts critical to an enterprise—such as participating in a billing scheme by using credit to obtain merchant bank accounts and signing agreements to purchase a credit card database.  *J.K. Publ'ns, Inc.*, 99 F. Supp. 2d at 1206.

97. Where an individual was copied on or sent emails regarding agendas for partnership or manager meetings; provided consultation services to the enterprise; recruited partners to the enterprise; introduced enterprise partners to others at trade shows; attended partnership meetings; and was present at the enterprise's office throughout its operation, direct participation was established. *Ivy Capital, Inc.*, 2013 WL 1224613, at *15.

98. Participation has been shown where an individual was involved in the company's scientific research, implemented the company's direction regarding advertising claims, participated in meetings to review advertising concepts and content, and reviewed, edited, and in some instances made decisions on advertising concepts and copy. *POM Wonderful LLC*, No. 9344, 2013 WL 268926, at *66 (Jan. 16, 2013).

99. Hiring employees and reviewing, drafting, and approving  telemarketing scripts used to deceive consumers is clearly participation *See FTC v. Consumer Alliance, Inc.*, No. 02C2429, 2003 WL 22287364, at *6 (N.D. Ill. Sept. 30, 2003); *see also FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1103 (9th Cir. 2014) (finding an individual defendant liable in part due to his participation in drafting misleading advertisements and organizing the schemes even though his involvement later ended); *FTC v. Sterling Precious Metals, LLC*, No. 12-80597-CIV-MARRA, 2013 U.S. Dist. LEXIS 20879 (S.D. Fla. 2013)

(concluding that allegations of being a broker who served as a signatory on financial documents would be sufficient to support individual liability ).

100.   However, having authority to formulate and implement policies and procedures is also participating, even against an individual who is only a "consultant" and not an owner. *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1055 (C.D. Cal. 2002).

b.   *Authority to Control Does Not Require Proof of Control Over Specific Acts*

101.   The "authority to control" inquiry focuses on whether an individual "had authority to control the corporate entity's practices," and the Court need not find a "specific link from [the individual] to particular deceptive [acts]." *FTC v. Ross*, 743 F.3d 886, 893 (4th Cir. 2014); *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (stating that whether the individual was personally involved with the misrepresentations to consumers was irrelevant because he had the authority to control the corporation's deceptive practices).

102.   An individual also does not need to exercise his authority to control the company's marketing practices to be held liable for its violations. *FTC v. Loewen*, No. C12-1207, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013).

103.   Authority to control may be inferred from "'active involvement in business affairs and the making of corporate policy.'" *J.K. Publ'ns*, 99 F. Supp. at 1203-

04 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).

104.   "An individual's position as a corporate officer and/or authority to sign documents on behalf of the corporate defendant is sufficient to show the requisite control." *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1079 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016); also *J.K. Publ'ns.*, 99 F. Supp. at 1204.

105.   In fact, a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority." *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283, 2013 U.S. Dist. LEXIS 42369, *42 (D. Nev. Mar. 26, 2013) (quoting *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982 at *26 (D. Utah Sept. 16, 2011)). *See also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17,114 at *38-39 (N.D. Ga. Sept. 30, 1997).

106.   Authority to control has been "abundantly establishe[d]" where an individual served as a top executive with oversight of a company's operations and authority to control the activities of its various department heads. *Commerce Planet, Inc.*, 878 F. Supp. 2d at 1080.

107.   "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973).

108.   Evidence that an individual formulated policies, oversaw and directed employees, signed corporate documents, controlled finances or the day-to-day operations, or otherwise held themselves out as an authorized officer indicates control over the corporation. *See, e.g., FTC v. USA Fin., LLC*, 415 F. App'x 970, 974-75 (11th Cir. 2011); *Direct Mktg. Concepts*, 624 F.3d at 13 n.10; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 637-38 (7th Cir. 2005) (rejecting the argument that a salaried employee cannot have control over and knowledge of corporate affairs); *World Media Brokers*, 415 F.3d at 765; *Publ'g Clearing House.*, 104 F.3d at 1170-71.

109.   Notably, ultimate or sole control is not necessary to establish individual liability. *Griffin Sys., Inc.*, 117 F.T.C. 515, 582-83 (1994) (finding no "authority indicating that sole control of a company is necessary to establish individual liability and concluding that an executive vice president who, among other responsibilities, "shared authority" with others to set prices for service contracts and hire employees was individually liable); *FTC v. World Media Brokers, Inc.*, No. 02C6985, 2004 WL 432475, at *9 (N.D. Ill. Mar. 2, 2004) (finding liability

because the individual managed the telemarketing operation and the daily financial and administrative affairs, and arranged for off-shore credit card processing, despite not having sole control over the business' affairs).

110.   The preponderance of the evidence, as described in the Findings of Facts above, establishes that Alan Argaman participated in, or controlled the common enterprises and the acts and practices giving rise to the Plaintiff's Amended Complaint. Alan Argaman ("Argaman") owned, operated, or controlled companies that collectively marketed and sold skincare  products through negative option continuity plans to consumers across the United States and internationally. Acting in concert with the other named Defendants, Alan Argaman controlled, had the authority to control, or participated in the activities of Secured Commerce, LLC, Secured Merchants, LLC, and the other "AuraVie" companies, including the activities alleged in Plaintiff's Amended Complaint.

### Defendant Argaman Acted With the Requisite Knowledge and Are Liable for Injunctive Relief

111.   To obtain equitable monetary relief against an individual, the FTC must show, in addition to participation *or* control, that the individual had some knowledge of the company's deceptive acts or practices. *J.K. Publ'ns*, 99 F. Supp. 2d at 1204.

112.   Individuals possess the requisite knowledge if they:

**PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

- had actual knowledge of the misrepresentations
- were recklessly indifferent to the truth or falsity of the misrepresentations or
- had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth.

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138-39 (9th Cir. 2010); *Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

113.   The "degree of participation in business affairs is probative of knowledge." *Amy Travel Serv.*, 875 F.2d at 574; FTC v. Sharp, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

114.   An individual's "pervasive role and authority [at the company], which extended to almost every facet of the company's business and operations, also creates a strong inference that [he] had the requisite knowledge that [the] webpages were misleading. *Commerce Planet, Inc*., 878 F. Supp. 2d at 1082.

115.   For example, evidence that an individual drafted the telemarketing scripts, hired personnel, controlled corporate finances, oversaw the daily sales operation, knew of consumer complaints and chargebacks, and served as principal shareholder and officer of the corporation can show actual knowledge of the illegal conduct. *Id.*

116.   "Nor is actual knowledge of the harm a requirement under the Act. Courts have long held that consumers are injured for purposes of the Act not solely

through the machinations of those with ill intentions, but also through the

actions of those whose practices facilitate, or contribute to, ill intentioned

schemes if the injury was a predictable consequence of those actions."

*Neovi,* 604 F.3d at 1156.

117.   Significantly, proof of reckless indifference suffices. Reckless indifference

exists where an individual knew the nature of the corporation's business, as

well as the necessity and legal significance of actions such as signing

documents or making representations on behalf of the corporation. J.*K. Publ'ns,*

*Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000); *see also Bay Area Bus.*

*Council, Inc.*, 423 F.3d at 638 (finding reckless indifference where the

individual was aware of consumer complaints and that banks were refusing to

debit customers' accounts).

118.   Reckless indifference to the truth or falsity of a misrepresentation has been

established by factors such as the individual's review of misleading materials;

receipt of reports regarding cancellations and refunds; discussion of the volume

of consumer complaints; supervision of a marketing department; and pervasive

role and authority within the entity. *Commerce Planet, Inc.*, 878 F. Supp. 2d at

1082.

119.   Reckless indifference to the truth or falsity of misrepresentations can be

established by awareness of "'red flags that would have led a reasonable person

to suspect something was amiss.'" *Ivy Capital, Inc*., 616 F. App'x at 361(quoting *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1141 (9th Cir. 2010)). This includes awareness of consumer complaints; high costs; high chargeback rates; and the use of offshore accounts. *Id.*

120.   Ignoring warning signs (such as disregarding customer complaints or failing to perform required actions or conduct any due diligence), engaging in suspicious financial practices, or making false statements, can demonstrate an awareness of a high probability of fraud and an intentional avoidance of such behavior. *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1141 (9th Cir. 2010).

121.   Awareness of a high probability of deceptive conduct has been found where an individual was included on emails discussing dishonest credit card chargeback practices; received documents discussing the entity's overall sales process; knew the entity had millions of dollars in sales but not if consumers recouped on their investment; and knew of consumer dissatisfaction and complaints to state attorneys general. Ivy Capital, Inc., 2013 WL 1224613, at *15-16.

122.   In this action, high customer complaint and chargeback rates provided Defendants with notice of a high probability of fraud or unfairness. *See FTC v. Windward Mktg., Ltd*., No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *11–

*12 (N.D. Ga. Sept. 30,1997 (although defendant did not itself make any

misrepresentations or initiate the fraudulent scheme, the

court imposed liability under the FTC Act because it "facilitated and provided

substantial assistance to [a] ...deceptive scheme").

123.   Nonetheless, evidence was presented to demonstrate such intent in this case.

124.   The FTC is not required to prove that an individual actually intended to

deceive to establish knowledge. *Network Servs. Depot*, 617 F.3d at 1139;

*Publ'g Clearing House*, 104 F.3d at 1171; *World Media Brokers*, 415 F.3d at

764; *Amy Travel Serv.*, 875 F.2d at 574.

125.   However, in this case, the FTC showed that many of the Individual

Defendants, with whom Defendant Argaman shared an office and interacted

with on a daily basis, were undoubtedly acting with the intent to deceive

consumers:

      a.   In an audio-recorded business meeting with Co-Defendants Roi

          Reuveni and Paul Medina, Alon acknowledged that it was

          "completely illegal" not to disclose the terms of conditions of the

          skincare products sales offer on invoices. (Ex. 165).

      b.   Instead of taking corrective action, however, he conspired for ways

          to show compliance without clearly disclosing the offers' terms

          and conditions –which he believed would decrease sales. (*See Id.*)

1          c.   The options he considered included feigning concern by recording

2             interviews with dissatisfied customers to present in a potential FTC

3             suit, indiscreetly disclosing terms "a little bit grayed out" on

4             packing slips, or trying a test run with terms disclosed to gauge

5             impact. (*E.g.,id.*).

6   126.   The preponderance of the evidence, as described in the Findings of Facts

7       above, establishes that Alan Argaman participated in, or controlled the common

8       enterprises with knowledge. Because he designed, created, and helped manage

9       websites and landing pages used to promote the Skincare  products risk-free

10      trial offers, Argaman unquestionably knew of the deceptiveness of the

11      enterprise. However, the fact that he played a key role in refuting consumer

12      chargebacks for the Corporate Defendants, individually and through Secured

13      Merchants LLC, and had access to data showing Defendants' high chargeback

14      rates makes clear that Argaman either knew that the companies were engaged in

15      deception or he was recklessly indifferent. Argaman received summaries of

16      consumer complaints relating to Defendants' risk-free trial offers. He Argaman

17      was aware that the companies operated through dozens of shell entities and that

18      they engaged in "load balancing" merchant accounts. (*See, e.g.*, Ex. 449).

19      Despite these clear indications of fraud, Argaman continued to participate in the

20      scheme.

127.   Therefore, considering evidence detailed above, this Court should hold Alan

Argaman, fully liable for the damage caused by Defendants.

### G.   INJUNCTIVE AND EQUITABLE RELIEF

128.   Having found that Defendants Argaman and Secured Merchants are liable

for the FTC Act, ROSCA, and EFTA violations alleged, the Court next

examines the proper forms of relief to be awarded.

*Entry of a Permanent Injunction is Appropriate*

129.   Section 13(b) of the FTC Act authorizes courts to issue a permanent

injunction whenever a Defendant violates the laws enforced by the Commission

and is likely to continue to violate them.  *FTC v. H.N. Singer, Inc.*, 668 F.2d

1107, 1111 (9th Cir. 1982); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th

Cir. 1996); *FTC v. Medlab*, *Inc.*, 615 F. Supp. 2d 1068, 1082 (N.D. Cal. 2009).

130.   To determine whether a Defendant is likely to engage in similar violations in

the future, courts look to two general factors:

* the deliberateness and seriousness of the present violation, and

* the Defendant's past record with respect to deceptive and unfair marketing

practices.

*Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *Ivy Capital*,

2013 WL 1224613, at *16.

131.   The court may also weigh the "adaptability or transferability of the unfair practice to other products." *Id*.

132.   Here, the Court notes that the Defendants collectively operated a massive consumer fraud for more than 5 years, causing injury to consumers nationwide.

133.   Further, this Court finds, based upon (a) the interconnectedness of the Defendants' corporations, as well as their shared offices, control persons, and employees (*See*, *e.g*., Ex. 11; Ex. 13; Ex. 15; Ex. 16; Ex. 65; Ex. 155 p. 2; Ex. 531; Ex. 904 pp. 24, 26, 46-47; Ex. 910 ¶ 240; Dkt. 90-1 ¶¶ 15-17;  Dkt. 391-3 ¶¶ 3-4, 7, 11-12; Dkt. 392-1 ¶¶ 1-2, 4, 12, 8; Dkt. 392-1 ¶¶ 3-5, 9 ; Dkt. 398-2 ¶¶ 6, 9, 27, 31-36; Dkt. 371-1 ¶¶ 21-23) and (b) the excessive chargeback rates (Ex. 507; Ex. 305; Ex. 307; Dkt. 391-3 ¶ 3), high numbers of consumer complaints (Ex. 907; Ex. 325; Dkt. 391-2 ¶ 14; Dkt. 391-3 ¶ 3), warnings from their attorney (Ex. 589) and from the BBB (Ex. 592), that Defendants were well-aware of the deceptiveness of the scheme.

134.   As far back as April 2012, Defendant Alon Nottea knew, and communicated to his Co-Defendants, that the business practices associated with Defendants' online sale of negative option plans were likely to result in an enforcement action by the FTC. (Ex. 165; Dkt. 391-3 ¶ 17).

135.   This Court therefore finds that Defendants are likely to engage in similar violations in the future if not enjoined.

136.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), also gives the FTC authority to seek, and the district court authority to grant, "any ancillary relief necessary to accomplish complete justice." *H. N. Singer*, 668 F.2d at 1111–13.

137.   This Court finds that a permanent injunction against all Defendants is proper and serves the public interest.

*The Scope of Injunctive Relief*

138.   "A court may frame an injunction based on violation of the FTC Act broadly enough to prevent the defendant from engaging in similar illegal conduct in the future." *Neovi*, No. 06-1952 JLS, 2010 WL 3789713, at *2 (citing *FTC v. Colgate-Palmolive*, 380 U.S. 374, 395 (1965)).

139.   Numerous courts have imposed bans enjoining future participation in a particular line of business. *See, e.g., Gill*, 265 F.3d at 957-58 (ban on engaging in the credit repair business); *Ivy Capital*, 2013 WL 1224613 at *16 (ban on business coaching); *John Beck Amazing Profits, LLC*, 888 F. Supp. 2d at 1013 (ban on telemarketing and producing or disseminating infomercials); *Grant Connect*, 827 F. Supp. 2d at 1233 (ban on marketing and selling grant products and business opportunities); *FTC v. Dinamica Financiera*, No. 2:09-03554, 2010 WL 9488821 at *12 (C.D. Cal. Aug. 19, 2010) (ban on loan modification and foreclosure relief services); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1084 (E.D. Mo. 2007) (ban on marketing business opportunities); *FTC v. Bay*

*Area Bus. Council, Inc.,* No. 02-C5762, 2004 WL 769388  (N.D. Ill. Apr. 16, 2004) (ban on telemarketing and on sale of credit-related products), *aff'd*, 423 F.3d 627 (7th Cir. 2005); *FTC v. Credit Enhancement Servs.*, No. 02-2134 (E.D.N.Y. Mar. 31, 2004) (ban on marketing or selling credit-related goods or services); *FTC v. Consumer Alliance*, No. 02-C-2429 2003 WL 22287364 (N.D. Ill. Sept.29, 2003) (ban on telemarketing and sales of credit card protection and credit-related products).

140.   Such a ban, prohibiting Defendants from engaging in future negative options sales, is appropriate here.

*The Scope of Monetary Relief*

141.   In addition, where consumers suffer economic injury resulting from Defendants' violations of the FTC Act, equity requires monetary relief in the full amount of consumers' losses (or ill-gotten gains). *Stefanchik*, 559 F.3d at 931(affirming summary judgment holding Defendants liable for the full amount of loss incurred by consumers); *Inc21.com*, 745 F. Supp. 2d at 1011.

142.   The FTC need not prove actual reliance by each individual consumer. *Figgie Int'l*, 994 F.2d at 605. Requiring such proof would defeat the intent of the FTC Act and would frustrate prosecutions of large consumer redress actions. *Id*. Instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were

widely disseminated, and that consumers purchased the defendant's product. *Id*. at 605–06.

143.   "Total consumer loss is an appropriate measure of restitution under the FTC Act, and a district court need not exclude costs incurred in carrying out unfair practices from the restitution order." *Wells*, 385 Fed.Appx. at 713 (citing *Gill*, 265 F.3d at 958 and *Neovi,* 604 F.3d at 1159-60.

144.   "The FTC may seek full restitution from any individual who caused consumer harm through unfair practices." *Wells*, 385 Fed. Appx. at 713 (citing *Pantron I Corp*., 33 F.3d at 1101-04).

145.   To determine the proper monetary relief, the FTC need only reasonably approximate the amount of consumer injury, at which point the burden shifts to Defendants to show that the figures are inaccurate. *See Commerce Planet*, 878 F. Supp. 2d at 1089 (citing *Direct Mktg. Concepts*, 624 F.3d at 15; *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)). "Fuzzy figures due to a Defendant's uncertain bookkeeping cannot carry a Defendants' burden to show inaccuracy." *Id*. (quoting *Direct Mktg. Concepts*, 624 F.3d at 15).

146.   Where Defendants act as a common enterprise, each may be held jointly and severally liable for the unlawful acts and practices of the other. *Grant Connect*, 827 F. Supp. 2d at 1216; *J.K. Publ'ns*, 99 F. Supp. 2d at 1202.

147.   This Circuit and others have long applied joint and several liability where multiple defendants' conduct violated the FTC Act, without regard to whether the amount of redress exceeds the proceeds received personally by any given one of the Defendants. *See*, *e.g., FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996).

148.   Here, Plaintiff has shown that a reasonable approximation of the Defendants' ill-gotten gains or consumer injury is $72,692,812. (Dkt. 482-1 at p.4).

149.   Defendants have not come forward with evidence to rebut Plaintiff's estimation.

150.   The Court therefore finds that Defendants Argaman and Secured Merchants shall be jointly and severally liable for that amount.

**THEREFORE,** the Court **FINDS** that:

Defendants Alan Argaman Secured Merchants LLC, directly or indirectly, violated Section 5 of the FTC Act by:

      A.    Failing to disclose, or disclose adequately, material terms and conditions of Internet sales offers, including but not limited to:

          1.    that consumers' credit or debit cards would be charged the full costs of "free trial" or "risk-free trial" products upon the expiration of a limited trial period;

          2.    the dates on which any trial period began and

ended;

3.     that consumers who accepted the trial offers would automatically be enrolled in an "auto-ship" or negative option plan in which additional products would be shipped and charges imposed onto consumers' credit or debit cards each month unless the consumer acted to affirmatively cancel the plan within a limited time period;

4.     the costs of the negative option and the frequency and duration of recurring charges;

5.     the means consumers needed to use to cancel the negative option program and avoid additional charges; and

6.     the requirements of the sellers' return or refund policies;

B.     Falsely representing, expressly or by implication, that consumers could try skincare products "risk-free";

C.     Falsely representing, expressly or by implication, that the website or seller was accredited by and had a rating of "A-" with the Better Business Bureau;

D.     Defendants, directly or indirectly, violated Section 5 of the FTC Act by unfairly imposing charges onto consumers' credit or debit cards without consumers' express informed consent;

E.     Defendants, directly or indirectly, violated ROSCA by selling products over the Internet through a negative option without:

1.    Clearly and conspicuously disclosing all material terms of the negative option before obtaining consumers' credit or debit card information;

**PLAINTIFF FTC'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

    2. Obtaining consumers' express informed consent before charging consumers' credit or debit cards; or

    3. Providing a simple mechanisms for consumers to stop recurring charges to their credit or debit cards;

F.    Defendants, directly or indirectly, violated EFTA by debiting consumers' bank debit cards on a recurring basis without:

    1. Obtaining a written authorization signed or similarly authenticated from consumers permitting preauthorized electronic fund transfers from their accounts; or

    2. Providing a copy of the written authorization for preauthorized electronic fund transfers to consumers;

G.    The Corporate Defendants, including Secured Merchants LLC, operated as a "common enterprise";

H.    Defendant Alan Argaman:

    1. Participated in *or* controlled the unlawful activities and is therefore liable for injunctive relief; and

    2. Acted with actual knowledge of the law violations, reckless indifference to the violations, or with an awareness of a high probability of fraud coupled with an intentional avoidance of knowledge, and therefore is additionally liable for equitable monetary relief;

I.    A permanent injunctive and equitable monetary relief in the amount of $$72,692,812, jointly and severally against Defendants Secured Merchants, LLC and Alan Argaman, is appropriate.

1

2

_____
HON. GEORGE H. WU
DISTRICT COURT JUDGE

3

Submitted by:

4

*/s/ Reid Tepfer*
Reid Tepfer
Attorney for Federal Trade Commission

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20