**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. 2:15-CV-04527-GW (PLAx) |
| Plaintiff, | **[PROPOSED] FINAL PRETRIAL CONFERENCE ORDER** |
| v. | |
| **BUNZAI MEDIA GROUP, INC.,** ***et al.,*** | |
| Defendants. | |

Following pretrial proceedings, pursuant to FED. R. CIV. P. 16 and L.R. 16,

**IT IS ORDERED**:

    1. **Parties for trial:**

       The parties for trial are:

       **Plaintiff:** FTC

       **Defendants:** Alan Argaman and  Secured Merchants, LLC ("SM")

Each of these parties has been served and appeared.

FINAL PRETRIAL ORDER

**Settled Defendants:**

Defendants Oz Mizrahi, Paul Medina, Motti Nottea, Roi Reuveni, Alon Nottea, Doron Nottea, Igor Latsanovski, Adageo, LLC, CalEnergy, Inc., and Zen Mobile Media, Inc., have settled with the FTC.[1]

**Defaulted Defendants:**

The following Defendants have had default judgments entered against them:[2]

- BunZai Media Group, Inc., d/b/a AuraVie and Miracle Face Kit
- Pinnacle Logistics, Inc.
- DSA Holdings, Inc.
- Lifestyle Media Brands, Inc.
- Agoa Holdings, Inc.
- Safehaven Ventures, Inc.
- Heritage Alliance Group, Inc., also doing business as AuraVie Distribution
- AMD Financial Network, Inc.
- SBM Management, Inc.
- Media Urge, Inc.
- KAI Media, Inc.
- Insight Media, Inc.
- Focus Media Solutions, Inc.
- Secured Commerce, LLC

---

[1] *See* Doc. No. 440 (Oz Mizrahi); Doc. No. 441 (Paul Medina); Doc. No. 439 (Motti Nottea); Doc. No. 508 (Roi Reuveni); Doc. No. 547 (Adageo, LLC, CalEnergy, Inc., Zen Mobile Media, Inc., Alon Nottea, Doron Nottea, and Igor Latsanovski).

[2] See Doc. No. 532 (Defaulting Corporate Defendants) and Doc. No. 634 (Kristopher Bond).

FINAL PRETRIAL ORDER

– USM Products, Inc.

– Merchant Leverage Group, Inc.

– DMA Media Holding, Inc.

– Shalita Holdings, Inc.

– All Star Beauty Products, Inc.

– Individual Defendant Khristopher Bond.

**The pleadings which raise the issues:**

– The FTC's Amended Complaint (Dkt. 235)

– First Amended Answer of Alan Argaman (Dkt. 299)

– First Amended Answer of Secured Merchants LLC (Dkt. 301)

2.      Federal jurisdiction and venue are invoked upon the following grounds: The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 45(a), 53(b), and 57b. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 15 U.S.C. § 53(b).

3.      **Trial Length:**

– **FTC's position:** The trial is estimated to take at least 5 to 7 trial days.

– **Defendant Alan Argaman's position:** The trial is estimated to take 5 to 7 trial days.

4.      The trial is to be a non-jury trial. Proposed findings of fact and conclusions of law were filed with the Court on May 26 and 27, 2017. Doc Nos. 599 and 600.

FINAL PRETRIAL ORDER

1       5.     **Plaintiff's Position:** Fact stipulations were due on June 13, 2017.

2  (Dkt. 578).  Plaintiff provided Defendants with proposed fact stipulations.

3  Defendants did not agree to any fact stipulations, nor did they offer any of their

4  own until the day this filing was due. Many of these fact stipulations pertain to

5  issues that are no longer before the Court, including issues pertaining to the

6  former Relief Defendant Chargeback Armor, Inc.

7       **Defendants' Position:** Defendants propose the following fact stipulations:

8       (1)     Defendants have never sold or marketed AuraVie products

9  either directly or indirectly. The preparation of web pages, marketing plans,

10  corporate formation and structures for the selling of AuraVie products were made

11  by the owners of Bunzai Marketing ("Bunzai").  Defendants were not involved in

12  any such decisions as they did not have the responsibilities, rights or desire to

13  make any such decisions.  Argaman and SM were arms-length third party vendors

14  providing legitimate technological services and CBA has never processed any

15  chargebacks for AuraVie as it was not even formed until February 2015.

16       (2)     Argaman and SM's involvement was limited to providing the

17  technology for chargebacks and the IVR services, but they did not actually control

18  the operations of the chargebacks or the IVR.  No chargeback services or IVR

19  services were provided.  Only the technology was provided.  No toll-free numbers

20  for shell companies were provided.  Argaman never received any monies from

any of the other Defendants.  The only monies CBA received from the other Defendants was $250,000 from SM as a capital infusion, which came from three separate clients of SM, not from any of the other Defendants in this matter.

(3)      None of the other individual or corporate Defendants had ownership or control over SM or CBA, as Argaman and Mike Costache, respectively, were the sole owners and operators of those entities.

(4)      Argaman has never been an officer and/or director of Chargeback Armor, Inc., Bunzai Media Group, Inc., Pinnacle Logistics, Inc., DSA Holdings, Inc., Lifestyle Media Brands, Inc., Agoa Holdings, Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc., Heritage Alliance Group, Inc., AMD Financial Network, Inc., SBM Management, Inc., Media Urge, Inc., Adageo, LLC., Calenergy, Inc., Kai Media, Inc., Insight Media, Inc., Focus Media Solutions, Inc., USM Products, Inc., Merchant Leverage Group, Inc., DMA Media Holdings, Inc., Shalita Holdings, Inc., or All Star Beauty Products, Inc. (collectively "Corporate Defendants").

(5)      Argaman has never performed any management duties for any of the Corporate Defendants.

(6)      Argaman has never been a shareholder, member or partner in any of the Corporate Defendants.

(7)      There are no written documents that discuss or specify any management functions that Argaman was allegedly to perform for any of the Corporate Defendants.

(8)      Argaman has never received any compensation or money from any of the Corporate Defendants.

(9)      There are no written documents that evidence that Argaman was a partner in any of the Corporate Defendants.

(10)      Argaman has never been a partner with Alon Nottea, Motti Nottea, Igor Latsanovski, Oz Mizrahi, Roi Reuveni, Kristopher Bond, Doron Nottea or Paul Medina with regard to any of the actions, activities or conduct related to the claims set forth by the FTC in this action.

(11)      The selling of AuraVie products, pricing programs, returns, refunds and contact with customers were conducted by the owners and employees of Bunzai.  Argaman, SM, and CBA were not involved in any such decisions as they did not have the responsibilities, rights or desire to make any of these decisions.  Argaman and SM were vendors, such as USPS or AT&T, and CBA was not formed until February 2015.

(12)      Argaman, SM, and CBA did not have any knowledge of the content of any of the web pages used to sell AuraVie products nor did he know what information should or should not be contained on web pages that advertise

the selling of products.  The only website worked on by Argaman/SM was a straight-sale website that contained no prohibited advertising or marketing.

(13)    Defendants did not have any input in any pricing decisions for the products, or know of any return programs, refund policies or practices that address any customer complaints.  These activities were performed by the owners of the companies, and not Defendants, as they performed technical services as vendors, not management or operational services.  Defendants also did not know nor should have known if the practices about which the FTC complains are proper or not.

(14)    The evidence provided by the FTC makes it is very clear that SM and Argaman were nothing more than vendors and technical providers and did not have any involvement in the preparation of, content, decisions related to, or had any abilities to change or even object to the content of any web page, landing page, pricing program, free trial program, returns, charge backs or refunds as any such activity was not within the purview of the duties and responsibilities of SM and Argaman as vendors. In addition, neither they, nor CBA had no knowledge of any such activities.

(15)    None of the Defendants met with any individuals to discuss management plans for the AuraVie business.

(16)     Defendants are not aware of what practices are proper or not in the charging of customers on a monthly basis.  Defendants did not have any involvement in any decision as to how and when customers would be charged.

(17)     Defendants did not have any involvement in any decision as to when and under what circumstances a customer could or could not return an item purchased or receive a refund.

(18)     There were no credit cards, merchant accounts, or bank accounts used in the alleged AuraVie scheme that were in the names of any of the Defendants.

(19)     CBA has not received any ill-gotten gains or "tainted" monies from AuraVie, as it never received any monies from AuraVie and the $250,000 received from SM can be traced to three non-AuraVie clients of SM.

(20)     Defendants were not part of the Common Enterprise here, based on the foregoing.

6. **Claims and Defenses**

   **Plaintiff(s):**

   a. **Plaintiff asserts the following claims against Defendants:**

**Claim 1:** Acting as a common enterprise, Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by failing to disclose adequately material terms of their offer, including:

i.   That Defendants used consumers' credit or debit card information to charge consumers the full costs of the trial products upon the expiration of a limited trial period;

ii.  The dates on which the trial period began and ended;

iii. That Defendants automatically enrolled consumers in a negative option continuity plan;

iv. The cost of the continuity plan, and the frequency and duration of the recurring charges;

v.  The means consumers must use to cancel the negative option program to avoid additional charges; and

vi. Requirements of their refund policies.

**Claim 2:** Acting as a common enterprise, Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by falsely representing that consumers could try Defendants' products "risk-free."

**Claim 3:** Acting as a common enterprise, Defendants violated Section 5 of the FTC Act, 15 U.S.C. §45(a), by falsely representing that they were accredited by, and had a rating of "A-" with, the Better Business Bureau.

**Claim 4:** Acting as a common enterprise, Defendants violated Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n), by unfairly causing consumers' credit and debit cards to be charged without their express informed consent.

**Claim 5:** Acting as a common enterprise, Defendants violated Section 4 of the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8403, by failing to:

i.  clearly and conspicuously disclose all material terms of their negative option feature;

ii.  obtain consumer's express informed consent to the negative option feature before charging consumers' accounts; and/or

iii. provide simple mechanisms for a consumer to stop these recurring charges.

FINAL PRETRIAL ORDER

**Claim 6:** Acting as a common enterprise, Defendants violated Section 907(a) of the Electronic Funds Transfer Act, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), by:

   i.  debiting consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers; and

   ii.  failing to provide a copy of this written authorization signed or similarly authenticated by the consumer.

**Additional Issue:** FTC contends that Corporate Defendants acted as a common enterprise in carrying out their scheme, that Defendant Secured Merchants was a part of this common enterprise, and that Defendant Argaman participated in or controlled the scheme, and had the requisite knowledge to be held individually liable for the law violations.

### b. The Elements to Prove Plaintiff's Claims include:

**Claim 1:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

   i.  A representation, omission, or practice that

   ii.  Is likely to mislead consumers acting reasonably under the circumstances and

   iii. Is material to consumers.[3]

**Claim 2:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

   i.  A representation, omission, or practice that

   ii.  Is likely to mislead consumers acting reasonably under the circumstances and

   iii. Is material to consumers.[4]

---

[3] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[4] *Id.*

**Claim 3:** An act or practice is deceptive under Section 5, 15 U.S.C. § 45(a), if it includes:

    i.  A representation, omission, or practice that

    ii.  Is likely to mislead consumers acting reasonably under the circumstances and

    iii. Is material to consumers.[5]

**Claim 4:** An act or practice is unfair and violates Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n), if:

    i.  It is likely to cause substantial injury to consumers that

    ii.  Is not reasonably avoidable by consumers and

    iii. Is not outweighed by countervailing benefits to consumers or competition.[6]

**Claim 5:** Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless:

    i.  The seller clearly and conspicuously discloses all material terms of the transaction <u>before</u> obtaining the consumer's billing information,

    ii.  Obtains the consumer's express informed consent before making the charge, and

    iii. Provides a simple mechanism to stop recurring charges.[7]

**Claim 6:** The Electronic Funds Transfer Act provides that:

---

[5] *Id.*

[6] *See*, *e.g.*, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1152 (9th Cir. 2010).

[7] *See* 15 U.S.C. § 8403. It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges. *Id.*

FINAL PRETRIAL ORDER

    i.   A "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing[.]"[8]

    ii.  "[A] copy of such authorization shall be provided to the consumer when made."[9]

**Common Enterprise:** To determine whether a common enterprise exists, courts consider a variety of factors including:

- common control;

- the sharing of office space and officers;

- transacting business through a maze of interrelated companies;

- the commingling of corporate funds and failure to maintain separation of companies;

- unified advertising; and

- evidence that reveals that no real distinction exists between the corporate defendants.[10]

"[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality-qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010).

**Individual Liability:**

Individuals are subject to injunctive relief for acts or practices in which they directly participate or have the authority to control.[11] Individuals are further liable for equitable monetary relief if they had knowledge of the deceptive practices.[12]

---

[8] Section 907(a) of EFTA, 15 U.S.C. § 1693e(a).

[9] *Id.*

[10] *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) (quoting *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)).

[11] *See FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001). "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy,

FINAL PRETRIAL ORDER

Page   12

The knowledge requirement may be satisfied by establishing actual knowledge, reckless indifference, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[13] A defendant is recklessly indifferent if he fails to investigate warning signs, such as consumer complaints, or fails to undertake "modest due diligence on behalf of their consumers." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1140-1141 (9th Cir. 2010). Moreover, a defendant is not relieved of personal liability because he believed the "repeated excuses and deceptions" of another or created a "Chinese wall" between the fraudulent part of the business and his own part of the operations. *Id.*[14]

### c. Key Evidence

**Claim 1:** After representing that they were offering a "risk-free trial" offer of skincare products, Defendants failed to disclose material terms of that offer. Specifically, Defendants failed to disclose adequately:

---

including assuming the duties of a corporate officer." *FTC v Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

[12] *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

[13] *Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel Serv.*, 875 F.2d at 574.

[14] Importantly, the FTC need not show that a defendant was an active participant to find him individually liable. "The relevant principle is that one may not enjoy the benefits of fraudulent activity and then insulate oneself from liability by contending that one did not participate directly in the fraudulent practices." *FTC v. Atlantex Associates*, No. 87-0045-CIV-NESBITT, 1987 WL 20384, at *12 (S.D. Fla. Nov. 25, 1987) *aff'd*, 872 F.2d 966 (11th Cir. 1989).

- They would use consumers' credit or debit card information to charge for the full costs of the products after a limited time (UF #45, #47-49, #59-62);[15]
- The dates the trial period began and ended (UF #56-58, UF #61(a));
- That consumers who accepted a "risk-free trial" offer would be automatically enrolled in a negative option continuity plan with additional charges (UF #56-58);
- The costs of the continuity plan and the frequency and duration of the recurring charges (UF #51-61);
- The means consumers could use to cancel the continuity plan. (UF #55-58); and
- The limitations of their refund policies.  (UF #62-67).

These failures to disclose were likely to mislead reasonable consumers. Indeed, Defendants knew from consumer complaint and chargeback activity that consumers were being misled and believed the website offers were advertising free products. (*See*, *e.g.*, UF #32(s) and (u); UF #34(j); UF #39(f) and (g); UF #65).[16] Defendants buried material terms of their sales offers in obscure hyperlinks. (*See* UF #49; UF #56, UF #59). Defendants' failure to clearly and conspicuously disclose material terms of their offer was a deceptive omission that violated Section 5 of the FTC Act.

---

[15] In support of its motion for summary judgment (Dkt. #353), the FTC filed a separate Statement of Uncontroverted Facts and Conclusions of Law ("UF") (Dkt. 353-2), which provides a comprehensive overview of the evidence in this case. Cites to "UF" throughout this section are in reference to the numbered paragraphs of that document.

[16] Notably, the FTC is not required to show an intent to deceive, since consumers can be equally harmed by both deliberate and negligent conduct. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, 1995-2 Trade Cas. (CCH) ¶71,114, at 75,346 (D. Nev. 1995) (O'Connor, J.); *FTC v. Pioneer Enters., Inc.*, 1992-2 Trade Cas. (CCH) ¶70,043, at 69,156 (D. Nev. 1992) (George, C.J.). However, the evidence in this case shows that Defendants intended to deceive consumers. (*See* UF #61(a), UF #32).

**Claim 2:** Defendants' websites prominently touted that products were offered "Free" or "Risk Free" in large, colorful font, often in multiple places. (*See, e.g.,* UF #59). This created an overall "net impression" that Defendants' products were free (except for the disclosed nominal shipping fee). The cost of products was material to consumers. That impression was likely to mislead reasonable consumers because it was false: Defendants actually intended to charge, and did charge, up to $97.88 for the products. (UF #51-53). Defendants' misrepresentations misled consumers who were acting reasonably, resulting in large numbers of complaints and chargebacks. (UF #64-UF #65; Dkt. #121-1, at 8.)[17]

**Claim 3:** Defendants claimed on their "risk-free trial" websites that they were accredited by the Better Business Bureau ("BBB") with an A- rating. (UF #49-50). This representation was material to consumers who ordered their products online. Defendants' claim was likely to mislead reasonable consumers because AuraVie was not accredited by the BBB and it had an F rating. (UF #50). In fact, the BBB contacted Defendants to halt their deceptive practices, but Defendants did not comply. (UF #50(a)).

---

[17] "Information concerning cost [] is presumed material." *FTC v. BlueHippo Funding, LLC*, 08 Civ. 1819 (PAC), 2015 U.S. Dist. LEXIS 15112, *3 (S.D. NY 2015).

FINAL PRETRIAL ORDER

**Claim 4:** Defendants charged consumers' credit cards and bank accounts without authorization. Defendants' records and those of its processors show that it processed thousands of charges to consumers' credit card accounts. (*See* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27; *see generally* Dkt. 120). Defendants' victims have testified that they never authorized those charges and that the charges had not been disclosed to them. (Doc. Nos. 353-3 through 353-11; Dkt. 353-27 at pp.10-27). Thousands of consumers complained directly to Defendants, to banks, the Better Business Bureau, or to law enforcement. (*See*, *e.g., id.*) Many consumers sought chargebacks and Defendants' chargeback rates rose as high as 35 percent.[18] These rates were consistent across Defendants' many merchant accounts.[19]

**Claim 5:** As evidenced by their website offers, Defendants failed to disclose clearly all material terms of their negative option continuity plan. (UF #51-62). The terms, when provided at all, were buried in fine print hyperlinks on pages dominated by "risk free" and "trial" offers. (UF #56, UF #59). The

---

[18] *See* Dkt. #121-1, at 8 ("Analysis of the entities' chargeback rates indicates the rates for RD's ranged between 14% and 35% for the various Defendant entities. The chargeback ratio appears significantly higher than the industry acceptable chargeback rates of 1%.").

[19] Defendants' high chargeback rates existed despite their use of dozens of shell companies, merchant accounts, and billing descriptors. These practices served no other purpose than to conceal the immense common enterprise and its beneficiaries from its victims, payment processors, banks, and law enforcement.

unusually (and unconscionably) onerous return and chargeback policies were buried in an obscure, small "T&C" hyperlink filled with fine print and impenetrable jargon. (*Id.*).

Defendants solicited consumers' credit card information purportedly to pay a nominal shipping and handling fee. (UF #48, #50). Defendants then used that billing information to charge consumers—without consumers' authorization or knowledge—up to $97.88. (UF #51-62). Consumers filed complaints and sought chargebacks of charges, stating that they were not aware of, and never authorized, the charges. (*See*, *e.g.,* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27).

Defendants also failed to provide a simple mechanism for cancelling the continuity plan. Defendants threatened and intimidated consumers who challenged Defendants' practice of imposing unauthorized charges. (UF #9-41). They told consumers that chargeback requests were almost never successful and informed consumers that such requests would be treated  as fraud subject to potential civil and criminal investigation or prosecution. (*Id.*) Defendants' website offers included no clear or conspicuous details on how to cancel membership in their negative option program. (*See*, *e.g.,* Ex. 909-113 through 909-124).

**Claim 6:** As evidenced by Defendants' website offers, Defendants' terms and conditions regarding recurring monthly fees were not clear and readily

understandable. (*See*, *e.g.,* Ex. 909-113 through 909-124). In fact, this information was concealed in documents available only by hyperlink or in hard-to-read disclosures. (UF #56, UF #59.) Further, Defendants' websites prominently claimed that their offer was "risk free" and other directly contradictory statements. Consumers filed complaints and sought chargebacks of charges, stating that they were not aware of, and never authorized, the charges. (*See*, *e.g.,* Doc. Nos. 353-3 through 353-11; 430-8; Dkt. 353-27 pp 10-27).

Defendants did not receive authorization from consumers for these charges (*Id.*) and accordingly could not have provided a copy of this authorization to consumers. Defendants' websites or terms and conditions pages could not serve as the consumer's "copy" of the authorization, as required by 15 U.S.C. § 1693e(a), because it was not signed or similarly authenticated by the consumer and did not evidence the consumer's identity and assent to additional transfers.

**Common Enterprise and SM's Membership in the Common Enterprise:**

SM shared employees with many other Corporate Defendants. Employees Tyler Reitenbach, Robert Stayner, and Roi Reuveni were all employed by at least one of the other Corporate Defendants. *See* testimony of Reitenbach and Stayner; witness narrative of Reuveni; *see also* Exhs. 287, 391. Defendant Doron Nottea provided SM bookkeeping services and was an

authorized signer on SM's accounts. *See, e.g.*, Exh. 289, 1021 at ¶4. Defendant Roi Reuveni signed a contract as a "managing member" of SM. *See* Exh. 415-5. And SM's prospectus asserted that SM's management team consisted of Defendants Alan Argaman, Alon Nottea, and Paul Medina, all of whom owned or were employed by other Corporate Defendants. *See* Dkt. 353-15 at 24.

SM was so intertwined with the other Corporate Defendants that several of its own employees had difficulty distinguishing between the companies. For example, witness Robert Stayner expressed confusion about the distinction between Defendant SBM Management, Inc. and SM, despite being employed by both companies. *See* Testimony of R. Stayner. SM's CPA, David Davidian, listed SM as a "BunZai Compan[y]," along with the other Corporate Defendants. *See* Witness Narrative of Davidian at ¶9.

SM operated from the same office suite as the other Corporate Defendants. *See* Doc. 120 at 24. Further, it was financially dependent on the common enterprise: around 40 percent of its income came from the scam. *See* Doc. 120 at 82.

SM was integrally involved in most aspects of the sale of AuraVie and LeOR, as discussed below.

**Defendants Secured Merchants and Argaman:**

FINAL PRETRIAL ORDER

Page   19

1
2
3
4
5

Defendant Argaman was sole owner of SM and co-owner of Defaulting Corporate Defendant, Secured Commerce LLC, with co-Defendant Doron Nottea. *See* Exh. 1021 at ¶¶1 and 5. The Court-appointed Receiver concluded that SM played an "undeniable role" in the unauthorized billing scheme at issue. Dkt. No. 120 at 82 n.181.

6
7
8
9
10
11
12
13
14
15

SM developed software called "Chargeback Armor" to fight consumer chargeback demands.[20] *See, e.g.*, Dkt. 121-6 at 9-21; Dkt. 353-14 at 89; Dkt. 353-15 at 25-27; *see also* Exhs. 1021 at ¶5; and 257; *see also* Witness Narrative of Yalley at ¶42. SM used this software to combat consumers' chargeback requests concerning AuraVie, Dellure, and LeOR. *See id.*; Testimony of Stayner and Reitenbach; Exhs. 1052; 1059; 1064; and 1055. Defendants SM and Argaman had access to data detailing Defendants voluminous chargeback demands. *See, e.g.*, Exh. 337 at 2, 549,1039, 1041, 1068, and 1037; Testimony of Reitenbach.  These high chargeback demands were an indicia of the deceptiveness of  the Common Enterprise's scheme.

16
17
18

Argaman and SM managed, or assisted Defendants with, Defendants' customer service software. *See, e.g.*, Dkt. 353-13 at 1; Dkt. 353-19 at 106; Exh. 449; *see also* Exh. 59 and 1070. Argaman also created an automated answering

19
20

[20] A chargeback is a forced reversal of a charge by a payment processor at the request of a consumer.

FINAL PRETRIAL ORDER

serviced called IVR Logix to respond to consumers' afterhours complaints and refund demands. *See* Exhs. 348 at 3, and 323; *see also* Dkt. 120 at 25; Dkt. 353-15 at 23; Exh. 149; 1050. Argaman oversaw Defendants' third-party call center in India. *See, e.g.*, Dkt. 353-14 at 101; testimony of Tyler Reitenbach; *see also* Exhs. 149, 344, 386, 440, 966, 184, 999, 1047, 1032; and 1065. He also planned sales promotions for AuraVie. Dkt. 353-14 at 103-04; Dkt. 353-19 at 48-50. Argaman identified skincare product suppliers and placed bulk orders for skincare products. Dkt. 353-17 at 1-26; Exh. 368.

Argaman and his employees maintained, edited, and updated Defendants' "risk-free" trial websites. Dkt. 353-18 at 103-06; Exhs. 356 at 20, 965,  531, 440 at 2-3, 1031, 1053, 1054, 1042, 1057, 1043, 1038, 1044; 1070; Witness Narrative of Azal at ¶9. Argaman's company, Secured Commerce, designed landing pages used to lure consumers into providing their credit or debit card information. *See* 356 at 20.

Argaman established toll free telephone numbers to be used by Defendants' dummy corporations and pointed these numbers to Defendants' call center. Dkt. 353-19 at 77; Exhs. 47 and 530; *see also* Exhs. 443 at 1, 152, and 516; Witness Narrative of Yalley at ¶41.

Argaman, through his companies, Secured Commerce and SM, fulfilled order shipments for the Corporate Defendants. *See, e.g.,* Dkt. 353-14 at 100; Dkt. 353-18 at 1, Exhs. 174, 367, 322, 372, 1032, 1056, 1063, 1072, and 1061.

Argaman was included under "project coordination" for the European sales of Dellure, another product sold by risk-free trial. *See* Exh. 469. Argaman's responsibilities for European sales of LeOR, another skincare product sold by risk-free trial, included: integrating the LeOR websites with Defendants' customer-relations software; "campaign set-up;" translating the LeOR webpages; hosting and domain purchases; automating LeOR's customer service hotline; contesting consumer chargebacks; shipping; creating or setting up the "check-out page" on LeOR websites; and "reporting." Exh. 1070 at 6.

SM's employee, Tyler Reitenbach, received information concerning AG complaints against Defendants. Exh. 1045 and 1033. Argaman received an invoice from a third-party call-center used by Defendants detailing hundreds of complaints concerning Defendants' business practices. Exh. 1035.

## DEFENDANTS ALAN ARGAMAN, SECURED MERCHANTS, LLC.'S DEFENSES AND KEY EVIDENCE IN OPPOSITION.

(1)     Defendants have never sold or marketed AuraVie products either directly or indirectly. The preparation of web pages, marketing plans, corporate formation and structures for the selling of AuraVie products were made by the owners of Bunzai Marketing ("Bunzai").  Defendants were not involved in any such decisions as they did not have the responsibilities, rights or desire to make any such decisions.  Argaman and SM were arms-length third party vendors providing legitimate technological services and CBA has never processed any chargebacks for AuraVie as it was not even

formed until February 2015.

(2)     Argaman and SM's involvement was limited to providing the technology for chargebacks and the IVR services, but they did not actually control the operations of the chargebacks or the IVR.  No chargeback services or IVR services were provided.  Only the technology was provided.  No toll-free numbers for shell companies were provided.  Argaman never received any monies from any of the other Defendants.  The only monies CBA received from the other Defendants was $250,000 from SM as a capital infusion, which came from three separate clients of SM, not from any of the other Defendants in this matter.

(3)     None of the other individual or corporate Defendants had ownership or control over SM or CBA, as Argaman and Mike Costache, respectively, were the sole owners and operators of those entities.

(4)     Argaman has never been an officer and/or director of Chargeback Armor, Inc., Bunzai Media Group, Inc., Pinnacle Logistics, Inc., DSA Holdings, Inc., Lifestyle Media Brands, Inc., Agoa Holdings, Inc., Zen Mobile Media, Inc., Safehaven Ventures, Inc., Heritage Alliance Group, Inc., AMD Financial Network, Inc., SBM Management, Inc., Media Urge, Inc., Adageo, LLC., Calenergy, Inc., Kai Media, Inc., Insight Media, Inc., Focus Media Solutions, Inc., USM Products, Inc., Merchant Leverage Group, Inc., DMA Media Holdings, Inc., Shalita Holdings, Inc., or All Star Beauty Products, Inc. (collectively "Corporate Defendants").

(5)     Argaman has never performed any management duties for any of the Corporate Defendants.

(6)     Argaman has never been a shareholder, member or partner in any of the Corporate Defendants.

(7)     There are no written documents that discuss or specify any

FINAL PRETRIAL ORDER

management functions that Argaman was allegedly to perform for any of the Corporate Defendants.

(8)      Argaman has never received any compensation or money from any of the Corporate Defendants.

(9)      There are no written documents that evidence that Argaman was a partner in any of the Corporate Defendants.

(10)      Argaman has never been a partner with Alon Nottea, Motti Nottea, Igor Latsanovski, Oz Mizrahi, Roi Reuveni, Kristopher Bond, Doron Nottea or Paul Medina with regard to any of the actions, activities or conduct related to the claims set forth by the FTC in this action.

(11)      The selling of AuraVie products, pricing programs, returns, refunds and contact with customers were conducted by the owners and employees of Bunzai.  Argaman, SM, and CBA were not involved in any such decisions as they did not have the responsibilities, rights or desire to make any of these decisions.  Argaman and SM were vendors, such as USPS or AT&T, and CBA was not formed until February 2015.

(12)      Argaman, SM, and CBA did not have any knowledge of the content of any of the web pages used to sell AuraVie products nor did he know what information should or should not be contained on web pages that advertise the selling of products.  The only website worked on by Argaman/SM was a straight-sale website that contained no prohibited advertising or marketing.

(13)      Defendants did not have any input in any pricing decisions for the products, or know of any return programs, refund policies or practices that address any customer complaints.  These activities were performed by the owners of the companies, and not Defendants, as they performed technical services as vendors, not management or operational services.  Defendants

also did not know nor should have known if the practices about which the FTC complains are proper or not.

(14)    The evidence provided by the FTC makes it is very clear that SM and Argaman were nothing more than vendors and technical providers and did not have any involvement in the preparation of, content, decisions related to, or had any abilities to change or even object to the content of any web page, landing page, pricing program, free trial program, returns, charge backs or refunds as any such activity was not within the purview of the duties and responsibilities of SM and Argaman as vendors. In addition, neither they, nor CBA had no knowledge of any such activities.

(15)    None of the Defendants met with any individuals to discuss management plans for the AuraVie business.

(16)    Defendants are not aware of what practices are proper or not in the charging of customers on a monthly basis.  Defendants did not have any involvement in any decision as to how and when customers would be charged.

(17)    Defendants did not have any involvement in any decision as to when and under what circumstances a customer could or could not return an item purchased or receive a refund.

(18)    There were no credit cards, merchant accounts, or bank accounts used in the alleged AuraVie scheme that were in the names of any of the Defendants.

(19)    CBA has not received any ill-gotten gains or "tainted" monies from AuraVie, as it never received any monies from AuraVie and the $250,000 received from SM can be traced to three non-AuraVie clients of SM.

(20)    Defendants were not part of the Common Enterprise here, based on the foregoing.

FINAL PRETRIAL ORDER

7.   **Plaintiff's position:** In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

    a.   Whether Defendants' Internet offers violated Section 5 of the FTC Act. Specifically, whether Defendants:

        i.   Failed to disclose adequately material terms of their offer, including: that Defendants would use consumers' credit or debit card information to charge consumers the full costs of the trial products upon the expiration of a limited trial period; the dates on which the trial period began and ended; that Defendants would automatically enroll consumers in a negative option continuity plan; the cost of the continuity plan, and the frequency and duration of the recurring charges; the means for consumers to cancel the negative option program to avoid additional charges; and requirements of their refund policy;

        ii.   Falsely represented that consumers could try Defendants products "risk free";

   iii. Falsely represented that they were accredited by, and had a

    rating of "A-" with, the Better Business Bureau;

   iv. Unfairly caused consumers' credit and debit cards to be

    charged without their express informed consent;

 b. Whether Defendants' Internet offers violated the Restore Online

  Shopper's Confidence Act, 15 U.S.C. § 8403, by failing to:

   i. Clearly and conspicuously disclose all material terms of

    their negative option feature;

   ii. Obtain consumers' express informed consent to the

    negative option feature before charging consumers'

    accounts; and/or

   iii. Provide simple mechanisms for consumers to stop these

    recurring charges;

 c. Whether Defendants' business practices violated the Electronic

  Funds Transfer Act, 15 U.S.C. § 1693e(a), and Section 205.10(b)

  of Regulation E, 12 C.F.R. § 205.10(b), by

   i. Debiting consumers' bank accounts on a recurring basis

    without obtaining written authorizations signed or similarly

    authenticated from consumers; and

FINAL PRETRIAL ORDER

ii.  Failing to provide a copy of these written authorization

signed or similarly authenticated by the consumer;

d.  Whether the Corporate Defendants acted as a common enterprise

and whether Secured Merchants was part of the common

enterprise;

e.  Whether Alan Argaman should be held individually liable because

he participated in and/or controlled a member of the common

enterprise and had knowledge of its practices; and

f.  The amount of consumer redress or disgorgement Defendants are

liable for.

8.  **Plaintiff's position:** Witness lists of the parties have been

exchanged. The joint witness list of the parties has been filed in accordance with

the Court's Scheduling Order.  *See* Doc. Nos. 578 and 605.

9.  **Plaintiff's motions:** The following law and motion matters and

motions *in limine*, and no others, are pending or contemplated by the FTC:

–  Motion *in limine* to permit Paul Medina's Testimony by Telephone.

(Dkt. 611)

– Motion to Preclude Defendants Alan Argaman and Secured Merchants, LLC's Undisclosed Exhibits, Witnesses, and Expert Witnesses. (Dkt. 602)[21]

**<u>Defendant Alan Argaman and SM's motions:</u>**

– Motion *in limine* to exclude Plaintiff FTC's evidence and exhibits. Dkt. 614

10.    Bifurcation of the following issues for trial is ordered: none.

11.    The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

_____
GEORGE H. WU
U.S. DISTRICT JUDGE

Approved as to form and content:

____*/s/ Reid Tepfer*_____
Reid Tepfer
Attorney for the Federal Trade Commission

_____

[21] On July 24, 2017, the Court held a hearing on Plaintiff's Motion to Preclude. Doc. No. 631. At the hearing, the Court continued Plaintiff's Motion until August 3, 2017. Id. The Court ordered the parties to meet and confer regarding any disagreements and to file a joint report by noon on August 1, 2017.

1

___/s/ Shai Oved___

2   Shai Oved
Attorney for Secured Merchants, LLC

3

___/s/ Alan Argaman_

4   Alan Argaman, *Pro Se*.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

FINAL PRETRIAL ORDER